Scott E. Ortiz  WSB 5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper  WY 82602
Phone:  307-265-0700
Fax:      307-266-2306
Email:  sortiz@wpdn.net

WILLIAMS & CONNOLLY  LLP
John K. Villa (*pro hac vice* admission pending)
Ryan Scarborough (*pro hac vice* admission pending)
Whitney D. Hermandorfer (*pro hac vice* admission pending)
Jamie Wolf (*pro hac vice* admission pending)
680 Maine Avenue SW
Washington  DC 20024
Phone:  202-434-5000
Email:  jvilla@wc.com
          rscarborough@wc.com
          whermandorfer@wc.com
          jwolfe@wc.com

*Attorneys for Plaintiff Custodia Bank*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC.,<br>2120 Carey Avenue, Suite 300<br>Cheyenne, WY 82001<br><br>     *Plaintiff*,<br><br>       v.<br><br>FEDERAL RESERVE BOARD OF<br>GOVERNORS,<br>Constitution Ave NW & 20th St NW<br>Washington, DC 20551 | Civil Case No.: _____ |

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

      *Defendants*.

## COMPLAINT

1.      Plaintiff Custodia Bank, Inc. ("Custodia") (f/k/a Avanti) brings this Complaint against Defendants the Federal Reserve Board of Governors ("Board") and the Federal Reserve Bank of Kansas City ("Kansas City Fed") and alleges as follows.

## <u>INTRODUCTION</u>

2.      This case involves Defendants' patently unlawful delay in processing an application critical to Custodia's business. Custodia is a Wyoming-headquartered and chartered bank led by experienced and respected members of the financial-services industry, specializing in payment services and digital asset custody. For more than 19 months, Defendants have refused to act upon Custodia's application for a master account with the Federal Reserve. Such an account would allow Custodia to directly access the Federal Reserve, rather than going through an intermediary bank. This wholly unlawful delaying conduct is aggravated by the standardless processes the Defendants have apparently adopted, which they have interpreted to allow agencies of the federal government to act in complete secrecy whenever and however they choose with no accountability or rules to govern their decision-making. This government-in-secrecy has the effect, if not the purpose, of precluding the judicial review required by the most elementary standards of due process of law. Continued delay, in these circumstances, prevents newcomers like Custodia from introducing innovation and competition in the financial services marketplace

and, not coincidentally, benefits the established financial institutions whose interests are represented on the Board of Directors of the Kansas City Fed.

3.      Granting Custodia an account to access the Federal Reserve, as the statute commands and for which it is legally eligible and has met all requirements, would allow Custodia to access directly the Federal Reserve, sharply reduce its costs, and bring new products and options to users of financial services.  Direct access to the Federal Reserve is vital to Custodia's ability to operate effectively and efficiently in pursuit of its core mission to offer a secure, compliant bridge between digital assets and the United States dollar payment system.  Custodia has devoted years of effort by a number of skilled professionals and substantial resources to preparing its business, including by undergoing intense review and satisfying stringent regulatory requirements imposed by its chartering state of Wyoming—a nationwide leader in developing charters tailored for banking in the digital asset industry.  These efforts, however, are stalemated by Defendants' unexplained and indefensible refusal to act upon Custodia's application—ultimately to the detriment of potential customers who are entitled to make the decision about which financial institutions to utilize.

4.      As a state-chartered bank whose charter expressly permits U.S. dollar deposit-taking and whose business plan includes U.S. dollar deposit-taking in the ordinary course of business, Custodia is plainly eligible for a master account under the express terms of the governing federal law.  *See* 12 U.S.C. § 226 *et seq*.  Indeed, a federal statute prohibits the Board from discriminating against such institutions when offering financial services.  *Id.* § 248a. Custodia has taken the additional step of applying for Reserve System membership and its attendant supervision and regulation by the Board and the Kansas City Fed, even though these steps are not legally

required to obtain a master account.  None of this appears to have any effect on the Defendants, who have failed to take meaningful steps on processing and deciding Custodia's application.

5.      Defendants have a nondiscretionary duty to process applications for master accounts.  The Kansas City Fed, for its part, received Custodia's business plan in May 2020, months before Custodia submitted its master account application.  Defendants have confirmed that Custodia's master account application, submitted in late October 2020, is complete.  In early 2021, a representative of the Kansas City Fed moreover informed Custodia there were "no showstoppers" with Custodia's application.

6.      Upon information and belief, the Kansas City Fed's consideration and impending approval of Custodia's application was derailed when, in spring 2021, the Board asserted control over the decision-making process.  The result is that Defendants have failed to meaningfully consider—let alone decide—Custodia's long-pending application.  Defendants' resulting 19-plus-month delay in processing Custodia's completed application has clearly violated the 1-year statutory deadline for doing so.  *See* 12 U.S.C. § 4807(a).  The delay also breaches the schedule contained on the master account paperwork itself, which provides that a master account decision ordinarily takes "5 – 7 business days."  Compl. Ex. 1 (Fed. Reserve Bank, Operating Circular 1, Appx. 1, Master Account Agreement).  Custodia's application was submitted nearly 600 business days ago with no action.  This litigation will bring into the sunshine not only this impermissible delay, but also the fact that the Defendants have a standardless process for deciding who can compete in the financial services market—a process that favors incumbents in violation of federal law.

7.      Custodia—through countless meetings, phone calls, and written communications—has exhausted all informal means of obtaining a decision on its application.  There is a black-box

bureaucratic process with no clear rules or standards for processing applications, no clear lines of accountability or responsibility between the Board and Kansas City Fed, and no clear end to Custodia's application saga in sight.

8.     This delay in processing Custodia's master account application is resulting in substantial, ongoing injury to Custodia.  The immediate injury is that the delay has forced Custodia to defer its solo entry into the financial services market in favor of a decidedly second-best and far more expensive alternative:  launching with a correspondent bank—which has a master account—while Custodia awaits a decision on its long-pending application.  This makeshift solution is much costlier and introduces counterparty credit risk and settlement risk that would have been avoided if Defendants had acted on Custodia's master account application in a reasonable time period.  It also eliminates much of the competitive benefit that Custodia would enjoy from using the charter that Wyoming granted it, thus benefiting existing and entrenched competitors and ignoring Wyoming's sovereignty as a state that has clear statutory authority to charter depository institutions.

9.     Custodia has exhausted all options short of litigation to end Defendants' unreasonable and unlawful inaction on Custodia's application.  Custodia respectfully requests that this Court require Defendants to promptly provide a decision on the application and articulate the reasons for the decision as well as the standards that the Defendants believe are applicable.  This is, after all, a federal government agency which must operate under articulable and defined rules to conform itself to due process of law.  After more than 19 months of delay, the governing statutes—as well as baseline administrative and constitutional principles barring unreasonable and unlawful agency inaction—entitle Custodia to at least this much.

## PARTIES

10.     Plaintiff Custodia is a Wyoming bank.  It was granted a Special Purpose Depository Institution bank charter by the Wyoming State Banking Board in October of 2020.  It has its primary place of business at 2120 Carey Avenue, Suite 300, Cheyenne, WY 82001.  Custodia is currently regulated by the Wyoming Division of Banking.  Custodia's founders include experienced executives, such as Caitlin Long (CEO), a 22-year Wall Street veteran who was a managing director and head of Morgan Stanley's pension solutions business until 2016 and was appointed by then-Governor Mead to serve on the Wyoming Blockchain Task Force in 2018-2019.

11.     Defendant Federal Reserve Board of Governors is the main governing body of the Federal Reserve System.  The Board is charged with overseeing the 12 regional Federal Reserve Banks.  It has its principal place of business at Constitution Ave N.W. & 20th St. N.W., Washington, DC 20551.  The Board is an agency of the United States, and comprises seven members, or "governors," who are nominated by the President and confirmed by the Senate.

12.     Defendant Federal Reserve Bank of Kansas City is one of 12 regional Federal Reserve Banks that, along with the Board, make up the United States Federal Reserve System. The Kansas City Fed serves at least portions of seven states, including the entirety of Wyoming. In this role, it operates pursuant to statutory and regulatory authority delegated to it by the Board. The Kansas City Fed has its principal place of business at 1 Memorial Drive, Kansas City, MO 64108.  The Kansas City Fed is separately incorporated as a non-profit governmental corporation with the capacity to sue and be sued in its own name.  The Kansas City Fed is headed by a nine-member board of directors comprising three representatives of commercial member banks, three representatives of the public, and three representatives appointed by the Board.  The Kansas City Fed supervises and regulates bank holding companies and Federal Reserve System member banks in its district, acts on applications within its authority, and enforces compliance with federal

banking laws against relevant banking institutions in its district.  The Kansas City Fed is an agency of the United States for purposes of the legal causes of action Custodia asserts.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."  Additionally, 28 U.S.C. § 1331 gives this Court jurisdiction over all civil actions "arising under the Constitution, laws or treaties of the United States."  And 28 U.S.C. § 2201(a) provides jurisdiction because Custodia is an "interested party" for whom the Court "may declare the rights" in this "actual controversy."

14.     Venue is proper in this District under 28 U.S.C. §1391(b)(1) because both the Board and the Kansas City Fed reside in this District for purposes of 28 U.S.C. §1391(c)(2).  The Board and the Kansas City Fed are entities with the capacity to be sued.  They are subject to this Court's personal jurisdiction because they have purposefully availed themselves of the privileges of conducting business in this District, the claims herein arose in this District, many material witnesses are located in this District, and Defendants are subject to this Court's jurisdiction under Wyo. Stat. Ann. § 5-1-17, Wyoming's Long-Arm Statute.  Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this matter occurred in this District.  In addition, venue is proper under 28 U.S.C. § 1391(e) because Custodia resides in this district and a substantial part of the events or omissions giving rise to its claims occurred here.

15.     An actual controversy exists between the parties concerning the legality of Defendants' process for and delay in processing Custodia's master account application.  That

controversy is justiciable:  Custodia already is suffering injury on account of Defendants' unlawful withholding of action on Custodia's application.

16.    A declaratory judgment will end the uncertainty and controversy between the parties.  It is presumed that if the Court were to declare the legal obligations incumbent upon the Defendants, they would conform their conduct to the Court's order, and injunctive relief would not be necessary.

17.    Under Federal Rule of Civil Procedure 57, this Court may order a speedy hearing on Custodia's request for a declaratory judgment in this matter and Custodia seeks such a hearing as continued delay is the very injury of which Custodia complains.  Allowing the Defendants to draw this case out for years simply extends the injury that the Defendants are knowingly and unlawfully inflicting on Custodia.  Justice delayed here is clearly justice denied.

## FACTUAL ALLEGATIONS

18.    On October 29, 2020, Custodia, an eligible state-chartered bank, applied for a Federal Reserve master account.  As required by Federal Reserve System regulations, Custodia submitted its application to the Federal Reserve Bank responsible for its district, the Kansas City Fed.  Despite regular meetings and thousands of pages of responses to various inquiries, more than 19 months have passed without a decision on Custodia's master account application, and no assurance has been provided that a decision is forthcoming at all, let alone in the near future.

### A.    History of Dual-Chartering and State-Level Banking Regulation

19.    The United States operates a dual banking system, which allows banks to be chartered by either the state or federal government.  At the founding of the United States, almost all banks were state chartered.

20.    It was not until the 1863 passage of the National Bank Act that nationally chartered banks started to proliferate.  12 U.S.C. § 38 *et seq*.

21.     In 1913, Congress established the federal banking system as we know it today with the passage of the Federal Reserve Act.  12 U.S.C. § 226 *et seq.*

22.     The dual-chartering system's division of regulatory responsibility among state and federal authorities is a hallmark of federalism.  It allows financial institutions to choose among various options to reflect their intended business plans, factoring in geographic concerns and operational concerns such as business models, accessibility of regulators, regulatory philosophies, and costs.  The availability of state charters allows for innovation in the financial services marketplace, permitting states to develop new ideas and competitors subject, of course, to applicable review by federal authorities.  The continued existence of state bank charters allows states to be responsive to the financial needs of their citizens and to innovate and support financial institutions that meet the needs of their citizens as well as the needs of the state as a whole.

23.     Under the current dual-chartering system, banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority.  National banks are chartered and primarily regulated by the OCC, while state banks are chartered and principally overseen by the state's banking regulatory agency.

24.     Once an institution is chartered, the next question is whether it will be a member of the Federal Reserve System.  Nationally chartered banks must become members of the Federal Reserve System. 12 U.S.C. § 222.  Within the Federal Reserve System, the Federal Reserve Board regulates, *inter alia*, bank holding companies.

25.     State-chartered banks may choose to become members of the Federal Reserve System, but, unlike nationally chartered banks, do not have to do so.  While applying to become a member of the Federal Reserve System brings additional scrutiny upon a state-chartered bank, it carries some additional prestige, and those state banks that join the Federal Reserve System are

known as "state member banks." Those that do not are known as nonmember banks. As a member of the Federal Reserve System, state member banks are regulated by both the Federal Reserve and the relevant state banking agency, whereas state-chartered nonmember banks are regulated by the state banking agency and may also be regulated by the Federal Deposit Insurance Corporation ("FDIC").

26.     National banks are generally required to apply for and obtain FDIC insurance. Most states require their state-chartered banking institutions engaged in taking deposits to be FDIC-insured. Not every state-chartered bank, though, is required to be insured by the FDIC. Uninsured state bank charters exist in several states and U.S. territories, such as Wyoming, Connecticut, and Puerto Rico. Likewise, some states, such as Massachusetts, Illinois, and Colorado, permit depository trust charters, which are eligible for Federal Reserve master accounts and are also uninsured.

27.     Federal law mandates that state-chartered deposit-taking institutions like Custodia must be allowed access to the Federal Reserve System through master accounts—regardless of whether such institutions elect to become Federal Reserve member banks, and regardless of whether they are FDIC-insured. The Federal Reserve System cannot discriminate against state-chartered depository banks in the provision of Federal Reserve bank services. *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

**B.     The Development of SPDI Banks in Wyoming**

28.     In 2019, Wyoming legislated a new type of state bank charter, the Special Purpose Depository Institution ("SPDI"). Wyo. Stat. § 13-12-101, *et seq*. This legislation passed the Wyoming legislature with a veto-proof, bi-partisan majority. SPDI banks are regulated by the Wyoming Division of Banking. Unlike traditional banks, SPDIs are generally prohibited from making loans with customer deposits of fiat currency, and further must continually back all

customer deposits with 100% cash on hand or high-quality liquid assets.  Like traditional banks, SPDIs must hold capital on top of the assets that back customer deposits.

29.     SPDI banks do not lend money; instead, they specialize in taking deposits, facilitating payments for customers, and other incidental services.  SPDI banks were designed to provide a bridge connecting digital asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars).  SPDI banks were also designed to provide custody services for digital assets such as Bitcoin via their trust departments, analogous to the custody services provided by the trust departments of custody banks for the trillions in securities held by retirement plans and mutual funds.  SPDI banks allow, for example, a customer to use his or her Bitcoin held in the trust department of an SPDI bank to make a direct transfer, a purchase, or an investment, rather than having to first convert that Bitcoin into U.S. dollars.

30.     Having a master account means that SPDI banks do not have to use an intermediary bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions.  Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services.

31.     The sponsors of Wyoming's SPDI regime recognized that access to master accounts would be crucial for the functioning of SPDI banks.  The SPDI charter accordingly was developed to satisfy all requirements of the Federal Reserve Act.  Wyoming legislators coordinated with the federal government, holding more than 100 meetings with the Board and the Kansas City Fed.[1]

---

[1] In a *Wall Street Journal* Op-Ed, U.S. Senator Cynthia Lummis provided background information on the steps that Wyoming took in passing its SPDI bank charter legislation.  Despite mutual efforts in passing this legislation, the Federal Reserve has to this point refused to grant SPDI banks access to the Federal Reserve System.  Cynthia Lummis, "The Fed Battles Wyoming on Cryptocurrency," *The Wall Street Journal* (Nov. 30, 2021), https://tinyurl.com/5xkcjpj5.

The resulting SPDI charter offers the prospect of safe, efficient, and protected access to the Federal Reserve banking system for the digital-asset industry.

32.     Under the Federal Reserve Act, Federal Reserve banking services must be accessible to "nonmember deposit institutions . . . [and] be priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2).  To be eligible for a master account, an applicant must be either a member bank or a depository institution, defined as either: (1) a bank insured by the FDIC, or (2) a bank eligible to be insured by the FDIC.  *Id.* §461(b)(1)(A)(i).

33.     Custodia currently meets the latter category because, as a state-chartered bank authorized and expected to take deposits, it is eligible to be insured by the FDIC.  The Kansas City Fed recognizes the eligibility of SPDI banks for master accounts and has specifically confirmed that Custodia is an eligible depository institution.

## C.     Custodia's Application and Defendants' Delay

34.     Custodia provided its business plan to the Kansas City Fed in May 2020.  On October 29, 2020, Custodia filed its application to open and maintain a master account with the Kansas City Fed.

35.     Along with its application, Custodia was required by the Federal Reserve to submit a one-page Master Account Agreement.  The standard form agreement, available from the Federal Reserve, stated that "[p]rocessing may take 5 – 7 business days.  Please contact the Federal Reserve Bank to confirm the date that the master account will be established."  Compl. Ex. 1.

36.     At the time the application was filed, Custodia's application was complete.  Neither the Kansas City Fed nor the Board has informed Custodia of the need for additional information necessary to complete the application.  In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that there were "no showstoppers" with its master account application.  Yet, upon information and belief, the Kansas City Fed's

impending approval of Custodia's application was stalled when, a few months later in spring 2021, the Board asserted its control over the decision-making process. This is so even though the Kansas City Fed has confirmed, including via a January 2022 letter, that Custodia meets the legal eligibility requirements for receiving a master account.

37.     While waiting to have its application considered, Custodia has been in regular contact with both the Kansas City Fed and the Board through letters, calls, emails, and remote and in-person meetings. Custodia has repeatedly offered to provide additional information about its business plan specifically, and SPDI-chartered banks more generally, to spur consideration of its application.

38.     The Board exercises ultimate control over the decision to grant or deny a master account, and has exercised that power to assert control over the decision-making process for Custodia's application in particular.

39.     In a further attempt to demonstrate its commitment to safety and soundness, Custodia applied to become a member bank of the Federal Reserve system on August 5, 2021. As a member bank, Custodia would be regulated and examined directly by the Federal Reserve Board in addition to the Wyoming Division of Banking. It is not necessary to be a member bank in order to receive a master account, and the Federal Reserve cannot discriminate against nonmember banks in granting access to Federal Reserve Bank services. 12 U.S.C. § 248a(c)(2). Custodia, however, took this additional step to demonstrate to the Kansas City Fed and the Board its willingness to submit to full federal supervision and accountability.

40.     In a March 2, 2022 meeting, nearly 17 months after the submission of Custodia's master account application, the Kansas City Fed informed Custodia that it had not started processing Custodia's master account application.

41.     After learning that the Kansas City Fed had not started processing its master account application, Custodia sent a letter to Esther George, the President and Chief Executive Officer of the Kansas City Fed.  In that March 3, 2022 letter, Custodia described the steps that it had taken to obtain approval and urged Ms. George to consider Custodia's application.

42.     Ms. George agreed to meet in person with Custodia on March 24, 2022.  Prior to that meeting, Custodia again wrote Ms. George a letter offering specific commitments Custodia would implement if granted a master account, including holding $1.08 in cash in its master account for every $1.00 of customer U.S. dollar deposits in its first three years of operation, providing monthly financial statements, and agreeing to certain restrictions.  These commitments are not necessary for the grant of a master account, but Custodia offered them in an effort to encourage the Defendants to adjudicate Custodia's master account application.  This is because Custodia's business model is safe and sound.  Custodia plans to hold all customer deposits of U.S. dollars in cash in a Federal Reserve master account and it plans to hold no digital assets for its own account. This means that Custodia will not be exposed to the volatility of digital asset prices because it will hold all digital assets in bailment on behalf of a customer in its trust department.  In other words, granting Custodia a master account would not expose the Federal Reserve System to any digital asset risk, as Custodia would only handle U.S. dollars in its master account and Custodia's trust customers would retain all digital asset risks.

43.     After the meeting, Tara Humston, the head of Supervision and Risk Management at the Kansas City Fed, sent a letter re-confirming that "Custodia is legally eligible for a master account."  Unfortunately, the Kansas City Fed still refused to provide any sort of timeline for a decision on Custodia's master account application.

14

44.    The Kansas City Fed's refusal or inability to provide any sort of timeline reflects the fact that the Board has asserted control over the decision-making process governing Custodia's master account application.

### D.    Defendants' Unlawful Application-Review Process

#### 1.    Defendants' Withholding of an Overdue Application Decision

45.    Despite the fact that Custodia's application was complete over 19 months ago, and Defendants have a nondiscretionary duty to decide master account applications in a timely fashion, neither the Board nor the Kansas City Fed has rendered an application decision.   Indeed, Defendants' representatives have declined to provide Custodia with any timeline as to when it might expect a decision.   Nor have they identified any additional steps that Custodia could take to hasten the process.   Most importantly, they have not explained what rules they believe control their decision-making or whether, as now appears likely, they feel that they can decide whenever and however they choose.

46.    Defendants' extensive delay is unlawful on its face, as a federal statute requires all federal banking agencies, including the Board, to process all completed applications within one year.   *See* 12 U.S.C. § 4807.   Time limits are, of course, essential because interminable delay allows for Kafkaesque situations where applicants have no answers and no opportunity to be heard. Statutory mandate aside, Defendants' delay unreasonably extends a ministerial process that is routinely completed within one week to one which has now taken more than 80 weeks with no end in sight.

47.    While Custodia waits in this holding pattern for an indefinite period of time, it continues to be unable to operate as designed, incurring unnecessary costs and monetary losses and losing ground to incumbent banks.   The promise of a SPDI charter remains unfulfilled, while the substantial investment Custodia made in reliance on that charter remains unrecouped.

## 2.   Defendants' Standardless, Black-Box Review

48.   Defendants' method for reviewing master account applications largely remains a black box, with the only clear feature being bureaucratic processes amounting to the proverbial shell game.  In various meetings and communications, the Kansas City Fed and the Board have alternately cited each other as the reason Custodia's application has yet to be processed.  Amidst Defendants' finger pointing, it remains a mystery how the Board and individual Federal Reserve Banks—including the Kansas City Fed here—allocate the decision-making authority for reviewing and granting master account applications.

49.   The Kansas City Fed, for its part, has pinned its delay on the Board.  It has cited, in particular, the Board's consideration of proposed guidelines that would, somewhat ironically, establish a "tiered-review framework to provide _additional clarity_ on the level of due diligence and scrutiny to be applied to requests for Reserve Bank accounts and services."  _See_ Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021) (emphasis added).  Most recently, in early March 2022, the Board issued supplemental proposed guidelines for notice and comment.  _See_ Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022).  This supplemental draft guidance included a new footnote stating that "[d]ecisions on access to accounts and services are made by the Reserve Bank in whose District the requestor is located."  _Id._ at n.4.  That footnote is at odds with the Board's exercise of control over the decision-making process for Custodia's master account application.

50.   Perhaps most importantly for purposes of due process of law and judicial review, these proposed guidelines, while purporting to provide "additional clarity," do not even suggest that the Federal Reserve Board will explain the criteria, processes, and procedures that would be used to evaluate applicants at each tier of the review framework, nor do they purport to change any statutory eligibility requirements for granting a master account (which would, in any event, be

beyond the authority of agency action). *See Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) (Under the APA, "[t]o refuse to define the criteria [the agency] is applying is equivalent to simply saying no without explanation.").

51.     The proposed guidelines and Federal Register notices also do not explain or provide the present standards the Board and Reserve Banks apply for assessing and adjudicating master account applications.  Nor, to Custodia's knowledge, are any such standards otherwise available, if they even exist.  Rather, the publicly available materials provide that the governing statute required Defendants to grant master accounts to all eligible entities as a matter of course.  *See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1068 (Bacharach, J.) (10th Cir. 2017) (discussing 12 U.S.C. § 248a(c)(2)).[2]  And depository entities chartered by one of the several states, in this instance Wyoming, are eligible.

52.     The Board has not finalized any guidelines, nor is there any guarantee it will do so (whether in the guidelines' present form or otherwise), and even if the Board does so, it appears not to intend to explain what criteria it will adopt to govern agency action.  If anything, the Board's track record indicates that any adoption will require a substantial amount of time:  a review of the most recent 20 proposed rules by the Board, stretching back to 2018, shows that there is, on

---

[2] *See also, e.g.*, Bd. of Governors of the Fed. Rsrv. Sys. (Fed. Rsrv. Bd.), *Policies: The Federal Reserve in the Payments System* (2001), https://tinyurl.com/3ed2xu8a ("Federal Reserve payment services are available to all depository institutions . . . ."); Fed. Rsrv. Bd., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2p83hmfv ("The Monetary Control Act of 1980 . . . has expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis . . . ."); Fed. Rsrv. Bd., *Policies: Principles for the Pricing of the Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb ("Services covered by the fee schedule are available to all depository institutions."); Fed. Rsrv. Bd., *Federal Reserve's Key Policies for the Provision of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) (noting that the Monetary Control Act gives "all depository institutions access to the Federal Reserve's payment services").

average, a nine-month delay between the close of the notice-and-comment period and the effective date of the final rule.  Three proposed rules have never, or at least not yet, been adopted.  So the current rulemaking process, which has already taken more than a year and has already been supplemented once, could take years, after which the Board could seek notice and comment on yet another proposed iteration.  Of course, central to this process is the Board's apparent intention not to explain even in the new guidelines, if they are ever adopted, what substantive criteria it believes it is entitled to apply.  Judicial review of agency action becomes much more difficult where, as here, the federal agency appears to believe that it is not required to explain the applicable standards.

53.     Any future Board pronouncement would be irrelevant to Custodia's application in all events.  Basic Administrative Procedure Act ("APA") and fair-notice requirements that are essential to due process of law would prohibit Defendants from retroactively applying any forthcoming rule to Custodia's long-ago filed application.

54.     On the other side of the coin, the Board and Kansas City Fed have jointly represented to Custodia that it will be the Kansas City Fed that communicates, if not makes, the decision on Custodia's master account application.   Yet in response to a recent letter from undersigned counsel for Custodia, the Defendants have taken the position that the Kansas City Fed is not a federal agency.  Defendants' position calls into question the permissibility of allowing the Kansas City Fed to exercise final decision-making authority—whether under a delegation of authority from the Federal Reserve Board or otherwise.  If this case proceeds, and if the Defendants maintain this position, the basic structure of the Defendants' decision-making processes will become the focus of this case and significant constitutional questions will be presented.

55.     The broader statutory and regulatory regime only compounds the confusion over the master account approval process.  Banks like Custodia must submit their master account

applications to individual Reserve Banks in the first instance, rather than to the Board.  And Custodia understands that the Kansas City Fed ultimately will communicate a decision on Custodia's master account application.  To support the Reserve Banks' role, the Board has elsewhere relied on 12 U.S.C. § 342 as granting the Reserve Banks statutory authority to make discretionary decisions on whether to open master accounts.  *See, e.g.*, Br. of Fed. Rsrv. Bd. of Governors as Amicus Curiae 14-15, *Fourth Corner Credit Union*, 861 F.3d 1052 (July 12, 2016). This provision, however, does not mention master accounts.  Rather, it specifies, as relevant here, that Reserve Banks "may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items."  12 U.S.C. § 342.

56.    Congress did not list the power to grant master accounts among the enumerated powers of Reserve Banks.  12 U.S.C. § 341.  Nor has the Board formally delegated to the Banks the power to decide master account applications. 12 C.F.R. § 265.11.

57.    Representations regarding Reserve Banks' master account application authority stand in apparent conflict with other provisions indicating that the Board maintains power over master accounts.  Of note, Congress expressly gave the Board the responsibility to "authorize a Federal Reserve Bank to open an account and provide services" for designated financial market utilities.  12 U.S.C. § 5465.[3]  Congress likewise empowered the Board with implicit authority over master account applications for nonmember depository institutions, like Custodia, by directing the Board to ensure that "[a]ll Federal Reserve bank services covered by the fee schedule shall be

---

[3] While Custodia is not a designated financial market utility, this Congressional grant of authority to the Board over master accounts implies that, absent a contrary grant of authority which does not appear to exist, the Board would also have authority over master accounts for nonmember depository institutions like Custodia.

available to nonmember depository institutions."  12 U.S.C. § 248a(c)(2).  In order for these bank services to be available to nonmember depository institutions, those institutions necessarily must have a master account.

58.     Even if the Board's power to grant master account applications was informally delegated to or vested in the Reserve Banks *sub silentio*, which would be a truly astonishing act without any discernable statutory support, the Board retains the power "[t]o exercise general supervision over" the Reserve Banks, 12 U.S.C. § 248(j), and to "act in its own name . . . in enforcing any provision of" the Federal Reserve Act, *id.* § 248(p).  The Board's oversight authority extends to decisions made by the Federal Reserve Banks on master account applications.  As a practical matter, the Board controls the decision because the Kansas City Fed has consulted with and defers to direction from the Board about Custodia's master account application, and in this case the Board has exercised control over the decision-making process for Custodia's master account application.  At a minimum, then, Reserve Banks' adjudication of master accounts would fall under the control and direction of the Board.

59.     The Board has also used its authority to affect the master account application review process through the proposed guidelines for considering master account applications, discussed above.  *See supra* ¶¶ 48-52.  That the Board proposed guidelines to standardize the Federal Reserve Banks' processes pursuant to Board specifications is alone *prima facie* evidence that the Board believes it has control.  The Reserve Banks have previously deferred to the Board with respect to individual master account applications, too.  By way of example, the New York Federal Reserve Bank consulted with the Board on a master account application for another applicant, ultimately delaying action so that the Board could weigh its "concerns" over that applicant's business model.  *See* Mot. to Dismiss 7, 14, *TNB USA, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-cv-7978 (ALC)

(S.D.N.Y. Mar. 8, 2019), ECF No. 21.  Thus, to the extent the Board disclaims authority to dictate master account decisions here, that position would break with past practice and is inconsistent with its actions over Custodia's master account application—namely, it assertion of control over the decision-making process related to Custodia's master account application in spring 2021.

60.     In short, the only thing clear about Defendants' master account review regime is that there are no clear rules, roles, or responsibilities.  What has resulted is an unaccountable Kafkaesque process that has and continues to inflict grave, irreparable harm on Custodia.  Due process of law and the fundamentals of judicial review of agency action require prompt decisions and clearly articulated reasons so that this Court can weigh whether the Defendants are conducting themselves in a lawful manner.

### CLAIM FOR RELIEF I
### Violation of APA, 5 U.S.C. § 706(1)
### Claim for Unreasonable Delay of Agency Action Against All Defendants

61.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

62.     Under Section 706 of the APA, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."

63.     Both the Board and the Kansas City Fed are agencies for purposes of the APA, which defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1).  This APA definition of agency has been interpreted to include "any administrative unit with substantial independent

authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971).

64.    There is no dispute that the Board is an agency of the United States government for purposes of the APA.  On its public website, the Board states that "[t]he Administrative Procedure Act sets out the requirements for federal agencies, *including the Federal Reserve Board*, to follow when issuing proposed and final regulations."[4]  The Board has substantial independent authority in the fulfillment of its specific duties, which include supervising and regulating financial institutions, fostering payment systems, and engaging in the rulemaking necessary to carry out its responsibility to set the monetary policy of the United States.  In fulfilling its duties, the Board acts with the imprimatur of the United States government.

65.    The Kansas City Fed is similarly an agency for purposes of the APA.  *See, e.g.*, *Lee Const. Co., Inc. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 179 (D. Md. 1982) (the Reserve Bank of Richmond was an agency for APA purposes); *Flight Intern. Group, Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F. Supp. 674, 680 (N.D. Ga. 1984) (same, for the Reserve Bank of Chicago). The Kansas City Fed, along with its 11 fellow Reserve Banks, operates as a governmental instrumentality pursuant to the Federal Reserve Act.  In this capacity, the Kansas City Fed wields significant powers delegated by statute and regulation to contribute to the operations of the United States monetary system, to provide supervision and oversight to financial institutions, to promote a safe and sound payment system through lending to depository institutions and providing key financial services, and to facilitate economic development and financial understanding.[5]  It acts as

---

[4] Fed. Rsrv. Bd., *What Specific Steps Does the Board Take to Issue a Regulation?* (June 29, 2018), https://tinyurl.com/3ffs8xuk (emphasis added).
[5] These functions are publicly listed on the Kansas City Fed's website.  *See* Kansas City Fed, *What We Do* (Jan. 8, 2021), https://tinyurl.com/ycksd7t4.

a "fiscal agent for the United States" and with interests indistinguishable from the monetary interests of the United States government, including the Board.[6]

66.    As an agency, the Kansas City Fed is "subject to review" by the Board.  5 U.S.C. § 551(1).[7]  For example, the Board is permitted to review the accounts and records of Federal Reserve Banks, 12 U.S.C. § 248(a); to remove Bank officers, 12 U.S.C. § 248(f); to suspend operations of the Bank if it violates its promulgating statute, 12 U.S.C. § 248(h); and to approve compensation paid to directors of the Bank, 12 U.S.C. § 307.  In addition to the Kansas City Fed's own statutory responsibilities, the Board is also permitted "[t]o delegate, by published order or rule and subject to the [Administrative Procedure Act], any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks."  12 U.S.C. § 248(k).  Such delegated responsibilities include but are not limited to deciding certain applications, requests, or petitions.  *See* 12 C.F.R. § 265.11.  This express delegation includes the authority to decide applications for Federal Reserve membership, *id.* § 265.11(e)(1); no such delegation exists, however, with respect to master account applications, *see supra* ¶ 56.  The Board thus has delegated substantial, independent decision-making authority to the Federal Reserve Banks to assist with formulating monetary policy for the United States.

67.    Like all Reserve Banks, the Kansas City Fed operates on a not-for-profit basis.  It receives its funds from the national banks within its district that are required to become members of the Federal Reserve System, from state-chartered banks that may choose to become members of the System, and in certain cases from private individuals or entities.  *See* 12 U.S.C. § 283.  To

---

[6] Henry Whitaker, Deputy Assistant Attorney General, Office of Legal Counsel, *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee* 8 n.3 (Oct. 23, 2019), https://tinyurl.com/52bzbery.

[7] *See also* Rules of Organization of the Federal Reserve System, 26 Fed. Reg. 12638 (as revised effective Nov. 2, 1976).

the extent that the Kansas City Fed receives net earnings greater than those needed to pay its dividends and supply its surplus fund, it pays those additional earnings to the United States Treasury.  12 U.S.C. §§ 289, 414.

68.     Despite all this, upon being asked by Custodia to state their position on the Kansas City Fed's agency status, Defendants have informed Custodia of their position that the Kansas City Fed is not an agency for purposes of the APA.  Defendants declined to offer any justification or legal support for this view.

69.     Adopting Defendants' position—particularly in view of the Kansas City's Fed purported final decision-making authority over master account applications—would raise a number of constitutional concerns.  For one, if the Kansas City Fed were considered a private entity, it would be constitutionally impermissible for the Kansas City Fed—whose Board of Directors is made up of a majority of non-presidentially or non-Board-appointed, private-sector officials—to wield substantial executive authority and issue final decisions over the adjudication of master account applications on behalf of the U.S. government.  Insofar as the Kansas City Fed is exercising governmental powers to determine which institutions are able to access the United States Federal Reserve System, the Kansas City Fed must be treated as a government agency whose decisions, like the decisions of other adjudicatory bodies under the APA, are subject to higher-level agency review—here, by the Board.  *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) (concluding that Amtrak is a government agency because "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form").[8]

---

[8] Recognizing the potential constitutional issues with permitting private entities to exercise substantial regulatory authority and make final decisions on behalf of the United States government, the Office of Legal Counsel ("OLC") has previously declined to address whether or

70.     Subjecting the Kansas City Fed to Board and APA review is also necessary to stave off significant due process problems.  The Due Process Clause of the U.S. Constitution prohibits schemes that permit an "economically self-interested entity [to] exercise regulatory authority over its rivals."  *Assoc. of Am. R.R.s v. U.S. Dept. of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016).  Rather, any such regulation must come through an "official or an official body" of the government, which are considered to be "presumptively disinterested."  *Id.* (citation omitted).  The Kansas City Fed comprises representatives of banks with economic interests potentially in conflict with those entities, like Custodia, seeking master accounts.  Allowing these potentially "self-interested entit[ies]" to exercise final decision-making authority outside the strictures of APA and Board review would plainly present due process problems.  *Id.*

71.     For all of the reasons listed above, the Kansas City Fed is an "authority of the United States," and thus an agency for purposes of the APA.  5 U.S.C. § 551(1).  To the extent that the Kansas City Fed is subject to review in the conduct of some of its responsibilities, it is subject to the review of the Board, another United States agency.  *See id.*

72.     As United States government agencies, the Board and the Kansas City Fed have a non-discretionary duty to adjudicate completed applications for master accounts.  While the Kansas City Fed may be responsible for communicating a decision, both agencies work in concert to consider and process applications and decisions are subject to the Board's supervision.  At a minimum, it is incumbent upon the Board to exercise its supervisory authority so as to ensure fair and timely adjudication of all master account applications.

---

not Reserve Bank presidents are "officers of the United States" or "the constitutional status of the Reserve Banks more broadly."  Whitaker, *supra* n.6, at 8 n.3.  As OLC explained, "Reserve Banks exhibit some features of private enterprises, but they are fiscal agents of the United States empowered by delegation from the Board of Governors—an establishment of the federal government—to supervise financial institutions and activities."  *Id.*

73.     Custodia completed its master account application on October 29, 2020. Defendants have acknowledged that Custodia is eligible to maintain a master account and that there are "no showstoppers" with its master account application.  To date, however, neither the Board nor the Kansas City Fed have processed Custodia's application or provided any indication of how much longer the application will remain pending.

74.     Defendants' action in withholding a decision on Custodia's master account application for more than 19 months is patently unlawful.  The Kansas City Fed and the Board have a duty to adjudicate applications.  And, Congress directed that they do so within one year. Under 12 U.S.C. § 4807, "[e]ach Federal banking agency *shall* take final action on *any application* to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency." (Emphasis added).  The definitional provision of the statute defines "appropriate Federal banking agency" as the "Board of Governors of the Federal Reserve, in the case of … any state member bank."  12 U.S.C. § 1813(q)(3)(A).  It also more generally defines "Federal banking agency" to mean "the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the [FDIC]."  12 U.S.C. § 1813(z).

75.     By its terms, then, the one-year statutory deadline applies to the Board.  The Board cannot avoid this congressionally mandated deadline by delegating authority to the Kansas City Fed to process master account applications.  As two components of the Federal Reserve System, the Board and the Kansas City Fed have a duty to promptly act on Custodia's application, and under no circumstances may they take longer than one year.  Defendants' failure to heed the "specific, non-discretionary time" for processing applications set by statute renders their inaction unlawfully withheld under the APA. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir.

1999).  Under Tenth Circuit precedent, this Court therefore "must compel the action unlawfully withheld."  *Id.* at 1190.

76.     Even apart from the one-year statutory deadline, a decision on Custodia's master account application has been unlawfully delayed.  Pursuant to 5 U.S.C. § 555(b), "[w]ithin a reasonable time, each agency shall proceed to conclude a matter presented to it."  The statute further directs courts to "compel agency action . . . unreasonably delayed."  *Id.* § 706(1).  The Board and the Kansas City Fed have failed to decide Custodia's master account application within a reasonable time.

77.     The Board's form, one-page Master Account Agreement, completed by Custodia, indicated that account "[p]rocessing may take 5 – 7 business days."  Compl. Ex. 1.  Even if the Kansas City Fed and the Board are not bound by that timeline, the statement indicates that the decision on master account applications is routine and does not require a substantial amount of time—certainly not 19 months and counting.

78.     Custodia has repeatedly asked both agencies if there is anything that Custodia can do to speed up the process.  Both agencies have agreed that Custodia is eligible for a master account.  Neither agency has requested any additional information necessary to decide Custodia's application.  Nor has either agency indicated a potential timeline for decision.

79.     When asked about the timing for a decision, each agency has suggested that the other is responsible and counseled patience.  The Board, for example, has identified the Kansas City Fed as holding the final decision-making authority over the completed application even though it has asserted control over the decision-making process for Custodia's master account application.  The Kansas City Fed, on the other hand, is only the vehicle for communicating an eventual decision and has attributed the delay to the fact that the Board eventually intends to issue

further guidance.  But these guidelines have not been finally promulgated, have already been supplemented and re-opened for a new public comment period once, and may not ever be adopted. Further, because Custodia's application is already pending—and was submitted before the proposed guidelines came about—the Board could not lawfully apply any forthcoming rule to Custodia retroactively.  *See* 5 U.S.C. § 551(4); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-59 (2012).  At best, Defendants' delay is unreasonable in light of their stated justifications and prior prompt processing of master account applications.  At worst, it reflects a concerted effort to change and obfuscate the rules of the master account application process to Custodia's detriment.

80.      In light of these facts, and the other facts alleged herein, the Board and the Kansas City Fed's "agency action" in adjudicating Custodia's master account application is "unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

81.      Custodia is therefore entitled under the APA to an order compelling the Board and/or the Kansas City Fed to promptly decide Custodia's application for a master account.

**CLAIM FOR RELIEF II**
**Relief Under the Mandamus Act, 28 U.S.C. § 1361**
**Claim for Mandamus Against All Defendants**

82.      Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

83.      Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  In this action, Custodia is requesting that the Court issue a writ of mandamus to the Board and Kansas City Fed directing that they promptly decide Custodia's pending application for a master account.

84.     This Court has jurisdiction over Custodia's action under the Mandamus Act.

85.     Based on facts already alleged, *supra* ¶¶ 62-71, both the Board and Kansas City Fed are United States agencies subject to the mandamus power of this Court.

86.     Mandamus is appropriate here because Custodia has a clear and certain claim to have its master account application decided in a timely fashion.  Pursuant to statute, Federal Reserve banking services "*shall* be available" on an equal and non-discriminatory basis to eligible depository institutions.  12 U.S.C. § 248a(c)(2) (emphasis added).  Such services are only available through a master account.  The Kansas City Fed has confirmed that Custodia is eligible for a master account.  Yet despite its valid Wyoming charter and conceded eligibility, Custodia has not received the standard application processing.  Instead, its application has been left to languish.

87.     The Board and the Kansas City Fed were statutorily required to "take final action" on Custodia's master account application within one year—a deadline already in the distant past.  12 U.S.C. § 4807.

88.     Custodia asks the Court to enforce Custodia's statutory right to have its application considered and decided in a timely manner.  Defendants acknowledge that accessing Federal Reserve services requires an institution like Custodia to maintain a master account.  Regardless of any argument that the Kansas City Fed or the Board may make as to whether the *granting* of master account applications is discretionary, Custodia is entitled, at a minimum, to have its master account application *adjudicated*.  *Cf. In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418-19 (D.C. Cir. 2004) (agency cannot thwart court review "by withholding a reviewable decision").

89.     Mandamus is necessary in this case because there are no other adequate remedies available.  Custodia completed its master account application on October 29, 2020.  Since that time, Custodia has been in regular communication with the Board and the Kansas City Fed in an

attempt to get its application processed.  Despite its best efforts, as well as the efforts of Custodia's stakeholders, the Board and the Kansas City Fed have not processed Custodia's application.

90.     Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to competitors that already have a master account.

91.     Custodia is therefore entitled under the Mandamus Act to an order compelling the Board and/or the Kansas City Fed to decide Custodia's application for a master account.

**CLAIM FOR RELIEF III**
**Violation of U.S. Const. Art. I, §1 & amend. V**
**Claim for Violation of Separation of Powers and Due Process Clause**
**Against All Defendants**

92.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

93.     Custodia asserts this claim under Article I, §1 and the Due Process Clause of the Constitution, which prohibit the government from transgressing the vesting of legislative authority in Congress and from depriving a person of property without the "due process of law."  U.S. Const. amend. V.

94.     The Board and the Kansas City Fed are governmental entities subject to separation of powers and due process requirements when determining applicants' ability to obtain a master account.   As a depository institution entitled to the services available to all depository institutions on a nondiscriminatory basis pursuant to 12 U.S.C. § 248a, Custodia has a property interest in a master account.  *Cf. Goldberg v. Kelly*, 397 U.S. 254, 262 & n.8 (1970).  This Court's equity jurisdiction empowers it to enforce and provide remedies for Defendants' violations of the Constitution.

95.     Baseline separation of powers and due process principles prohibit agencies from employing decision-making processes devoid of intelligible principles, public scrutiny, or discernable standards.  *See Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (government entities cannot, consistent with the Due Process Clause, deprive property under a law "so standardless that it invites arbitrary enforcement" (citation omitted)); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (requiring government to "follow a fair process of decision making when it acts to deprive a person of his possessions"); *Jarkesy v. SEC*, 2022 WL 1563613, at *9-11 (5th Cir. May 18, 2022) (Congress may not grant "open-ended" authority and "absolute discretion" to agencies).

96.     The Board and the Kansas City Fed have run afoul of these constitutional guarantees.  They have alternatively blamed each other for their extensive delay in processing Custodia's master account application.  It remains unclear from the regulations and from Custodia's communications with the Board and the Kansas City Fed who the ultimate decision-maker is, and what role each government entity plays in the decision-making process.  Custodia's efforts to obtain clarity have been met with obfuscation.  The black-box process is devoid of any meaningful public scrutiny.

97.     It is similarly unclear what considerations and standards are used to decide when or whether to grant a master account application.  The Federal Reserve Banks are not required to publish (on their websites or otherwise) applications by institutions seeking master account access or decisional records indicating which institutions had their master account access granted or revoked, when this occurred, or the reason why access was granted or revoked.  The Board and the Kansas City Fed have not provided guidance as to why some banks get their master accounts immediately while others are forced to wait indeterminate periods of time.  The lack of transparency exacerbates the Kafkaesque nature of the master account review process—a problem

that will be perpetuated if the Board's recently proposed guidelines are adopted, because they do not set or explain criteria, processes, or procedures for reviewing and evaluating master account applications. If anything, they only raise the question of what processes and standards, if any, the Board and the Kansas City Fed have been using and are continuing to use for processing and evaluating master account applications.

98.     For many of the same reasons discussed above, *see supra* ¶¶ 61-91, Defendants have violated Custodia's due process rights by subjecting Custodia to an indefinite administrative delay in the processing of its master account application.

99.     Custodia submitted its application for a master account on October 29, 2020. Such applications are typically granted as a matter of course within 5 to 7 business days. Compl. Ex. 1. The Kansas City Fed has confirmed that Custodia is eligible for a master account. However, despite the passage of over 19 months, Custodia's application remains pending. Neither the Board nor the Kansas City Fed will provide a deadline by which a decision will be made.

100.    The Board and the Kansas City Fed's "long-continued and unreasonable delay" in processing and deciding Custodia's application for a master account "effectively take[s]" Custodia's property without the fair process the Due Process Clause requires. *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587 (1926).

101.    Custodia is therefore entitled under Article I and the Due Process Clause to an order compelling the Board and/or the Kansas City Fed to decide Custodia's application for a master account consistent with constitutionally required discernable standards.

**CLAIM FOR RELIEF IV IN THE ALTERNATIVE**
**Relief under the Declaratory Judgment Act, 28 U.S.C. § 2201**
**Claim for Declaratory Judgment Against All Defendants**

102.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

103.    As an alternative to Custodia's above-pleaded claims for relief I and II, Custodia seeks a declaratory judgment under 28 U.S.C. § 2201(a).  This statute provides that, "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

104.    This case presents an actual controversy.  Custodia maintains that it is entitled to a timely decision on its master account application.  The Board is statutorily charged with making banking services available to nonmember depository institutions like Custodia.  These banking services require a master account, for which Custodia has applied with the Kansas City Fed.  The Kansas City Fed and the Board have thus far refused to issue a decision, and have offered no reasonable or sufficiently definite timeline for reaching a decision.  For reasons set out above, they do not have the discretion to simply ignore or delay consideration of completed and eligible applications.

105.    The controversy arises in this Court's jurisdiction.  Custodia resides in Wyoming. And the Kansas City Fed and the Board both reside in Wyoming for purposes of this action because they have availed themselves of the opportunity to conduct business in Wyoming.  Additionally, many of the events giving rise to this claim have occurred in Wyoming, including the issuance of Custodia's charter and the preparation of the master account application.

106.   Custodia has a right to have its master account application decided.  The Federal Reserve System is required to publish pricing principles and "to put into effect a schedule of fees for such services which is based on those principles."  12 U.S.C. § 248a(a).  The fee schedule promulgated by the Federal Reserve includes essential services for a depository institution like Custodia, all of which require a master account.  12 U.S.C. § 248a(b).  Under 12 U.S.C. § 248a(c)(2), "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available* to nonmember depository institutions" such as Custodia. (Emphasis added).

107.   The Board and the Kansas City Fed have a nondiscretionary statutory obligation to decide the master account applications that are submitted to them.  By statute, they must do so within one year of receiving a completed application. 12 U.S.C. § 4807.  The Board and the Kansas City Fed have disregarded this statutory deadline in the course of delaying a decision on Custodia's application for more than 19 months.

108.   Through this Complaint, Custodia has filed an appropriate pleading to have its rights declared.  The Court can resolve this controversy by declaring that Custodia has a right to have its master account application decided promptly.

109.   Custodia is therefore entitled under the Declaratory Judgment Act to a declaration from this Court that the Board and/or the Kansas City Fed must decide Custodia's master account application within a reasonable period of time.

### CLAIM FOR RELIEF V IN THE ALTERNATIVE
### Violation of U.S. Const. amend. V
### Claim for Violation of Due Process Clause Against All Defendants

110.   Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

111.    As an alternative to Custodia's above-pleaded claims for relief I and II, and in the event that the Court determines that the Kansas City Fed is not an "agency" subject to APA review and the Board's ultimate decision-making authority, Custodia asserts this claim under the Due Process Clause of the Constitution.  U.S. Const. amend. V.

112.    The Kansas City Fed is a "federal instrumentalit[y]" that acts as a "fiscal agent[] of the United States" as part of the Federal Reserve System.  Mot. to Dismiss 3, *TNB USA, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-cv-7978 (ALC) (S.D.N.Y. Mar. 8, 2019), ECF No. 21; Whitaker, *supra* n.6, at 8 n.3.  It is thus "part of the Government for purposes of" complying with the Constitution, *Lebron*, 513 U.S. at 399, and is subject to the Due Process Clause's requirements when determining applicants' ability to obtain a master account.  As a depository institution entitled to the services available to all depository institutions on a nondiscriminatory basis pursuant to 12 U.S.C. § 248a, Custodia has a property interest in a master account.  *Cf. Goldberg*, 397 U.S. at 262 & n.8.  This Court's equity jurisdiction empowers it to enforce and provide remedies for Defendants' violations of the Constitution.

113.    Under the Fifth Amendment, governmental entities must exercise "due process of law."  U.S. Const. amend. V.  The Due Process Clause requires "fairness" in the execution of the law.  *Assoc. of Am. R.R.s*, 821 F.3d at 27.  And, fairness necessitates that "an economically self-interested entity may [not] exercise regulatory authority over its rivals."  *Id.*

114.    Here, the Board of Directors of the Kansas City Fed in part comprises members "who shall be chosen and representative of the stockholding banks."  12 U.S.C. § 302. Stockholding banks are or may be competitors with all other banks requesting master accounts. Stockholding banks have particular and heightened competitive incentives to ensure that novel

banking institutions like Custodia cannot access master accounts so that stockholding "traditional" banks can retain a monopoly on access to the Federal Reserve System.

115.    To allow regulation by "private persons whose interests may be or often are adverse to the interests of others in the same business" is anathema to the presumption that the government acts in a fair, neutral, and disinterested fashion.  *See Carter v. Carter Coal Co*., 298 U.S. 238, 311 (1936).  To the extent that the Kansas City Fed's Board of Directors finally adjudicates the rights of would-be competitors like Custodia, the current master application review regime works "an intolerable and unconstitutional interference with personal liberty and private property" by vesting "self-interested" actors with "regulatory authority over [their] rivals."  *Id*.; *Assoc. of Am. R.R.s*, 821 F.3d at 27.

116.    If the Kansas City Fed is not an agency subject to APA review and the Board's ultimate decision-making authority, Custodia is entitled, under the Due Process Clause, to an order that the Kansas City Fed's processing and adjudication of Custodia's application—as well as any Board delegation of final decision-making authority—is unconstitutional and appropriate equitable relief to ensure Custodia receives a lawful administrative process.

### CLAIM FOR RELIEF VI IN THE ALTERNATIVE
### Violation of U.S. Const. Art. II, § 2, cl. 2
### Claim for Violation of Appointments Clause Against All Defendants

117.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

118.    As an alternative to Custodia's above-pleaded claims for relief I and II, and in the event that the Court finds that the Kansas City Fed has final decision-making authority over

Custodia's master account application, the Federal Reserve System's process for deciding master account applications violates the United States Constitution's Appointments Clause.

119.    "The executive Power" of the United States is vested in the President.  U.S. Const. Art. II, § 1, cl. 1.  Pursuant to the Appointments Clause, the President may be assisted in carrying out that responsibility by "Officers of the United States."  Art. II, § 2, cl. 2.  The Appointments Clause permits the vesting of the appointment of "inferior Officers" in the "President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*

120.    Under the Appointments Clause, only noninferior officers of the United States, otherwise known as "principal Officers," shall "exercis[e]" such "significant authority pursuant to the laws of the United States" in assisting the President in his executive powers.  *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).  Unlike inferior Officers, principal Officers must be nominated by the President and confirmed by the Senate.  Art. II, § 2, cl. 2.

121.    The Board of Directors for the Kansas City Fed, and other regional Federal Reserve Banks, are not principal Officers because they are not appointed by the President and confirmed by the Senate.

122.    Like all regional Federal Reserve Banks, the Board of Directors for the Kansas City Fed is authorized and regulated by statute.  The Kansas City Fed's Board of Directors comprises three Class A members, "who shall be chosen and representative of the stockholding banks," three Class B members, "who shall represent the public," and three Class C members "who shall be designated by the Board of Governors of the Federal Reserve System."    12 U.S.C. § 302.  No members are appointed by the President, and no members are approved by the Senate.

123.    Because the Kansas City Fed's Board of Directors is not composed of principal Officers, the Kansas City Fed is not constitutionally permitted to exercise "final decision making

authority" on behalf of the United States—including rendering the decision regarding which institutions can access the United States Federal Reserve System via a master account. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1984 (2021). Such determinations involve the adjudication of public rights which must be decided by principal Officers. *Id*.

124.    Only three out of the nine members of the Board of Directors for the Kansas City Fed could even be considered inferior Officers of the United States because they are "designated by the Board of Governors of the Federal Reserve System." 12 U.S.C. § 302. The remaining six members of the Board of Directors of the Kansas City Fed are not even inferior Officers of the United States and can exercise no "significant" regulatory or decision-making authority "pursuant to the laws of the United States." *Buckley*, 424 U.S. at 125-26 (quoting *United States v. Germaine*, 99 U.S. 508, 509-10 (1879)).

125.    Instead, determinations on master accounts must be subject to the review and authority of a principal Officer. To allow members of the Kansas City Fed Board of Directors to exercise "unreviewable authority" in adjudicating public rights dilutes political accountability and, under the Appointments Clause, is "incompatible with their" status as either private-sector actors or inferior officers. *Arthrex*, 141 S. Ct. at 1983.

126.    Accordingly, because the members of the Kansas City Fed's Board of Directors are not appointed by the President or confirmed by the Senate, the Kansas City Fed cannot render a final decision on behalf of the United States government for any master account application, including Custodia's application. To the extent Defendants' current master account application review regime permits the Kansas City Fed to exercise final decision-making authority, it violates the Appointments Clause.

127.     Custodia is therefore entitled under the Appointments Clause to an order finding the Federal Reserve System's vesting of final master account determinations in the Reserve Banks to be unconstitutional and appropriate equitable relief to ensure Custodia receives a lawful administrative process.

**CLAIM FOR RELIEF VII IN THE ALTERNATIVE**
**Relief Under the Mandamus Act, 28 U.S.C. § 1361**
**Claim for Mandamus Against All Defendants**

128.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

129.     Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

130.     As an alternative to Custodia's above-pleaded claims for relief I and II, and only in the event that Defendants deny Custodia's application for a master account, Custodia requests that the Court issue a writ of mandamus to the Board and Kansas City Fed directing them to grant Custodia's application for a master account.

131.     This Court has jurisdiction over Custodia's action under the Mandamus Act.

132.     Based on facts already alleged, *supra* ¶¶ 62-71, both the Board and Kansas City Fed are United States agencies subject to the mandamus power of this Court.

133.     Mandamus is appropriate here because Custodia, as a state-chartered, deposit-taking bank, has a clear and certain claim to have its master account application granted.  Pursuant to statute, Federal Reserve banking services "*shall* be available" on an equal and non-discriminatory basis to all eligible depository institutions.  12 U.S.C. § 248a(c)(2) (emphasis added); *see also Fourth Corner Credit Union*, 861 F.3d at 1068 (Bacharach, J.) (opining that the

term "shall" "indicates a congressional command," as 1) the language was unambiguous, 2) prior agency interpretations were consistent with this understanding, and 3) legislative history supported this conclusion). Such services are only available through a master account. Custodia is an eligible depository institution. Yet despite its valid Wyoming charter and conceded eligibility, Custodia has been denied a master account.

134.    Custodia asks the Court to enforce Custodia's statutory right, as an eligible, deposit-taking bank, to have a master account.

135.    Mandamus is necessary in this case because there are no other adequate remedies available if Defendants deny Custodia's master account application.

136.    Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to competitors that already have a master account.

137.    Custodia is therefore entitled under the Mandamus Act to an order compelling the Board and/or the Kansas City Fed to comply with its statutory obligation to provide Custodia with a master account.

### CLAIM FOR RELIEF VIII IN THE ALTERNATIVE
### Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201
### Claim for Declaratory Judgment Against All Defendants

138.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

139.    As an alternative to Custodia's above-pleaded claims for relief I and II, and only in the event that Defendants deny Custodia's application for a master account, Custodia seeks a declaratory judgment under 28 U.S.C. § 2201(a). This statute provides that, "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

140.    This case presents an actual controversy.  Custodia maintains that, as a state-chartered, deposit-taking bank, it is entitled to have its master account application granted. Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to competitors that already have a master account.

141.    The controversy arises in this Court's jurisdiction.  Custodia resides in Wyoming. And the Kansas City Fed and the Board both reside in Wyoming for purposes of this action because they have availed themselves of the opportunity to conduct business in Wyoming.  Additionally, many of the events giving rise to this claim have occurred in Wyoming, including the issuance of Custodia's charter and the preparation of the master account application.

142.    The Board and the Kansas City Fed have a statutory obligation to provide Custodia with a master account.  Pursuant to statute, Federal Reserve banking services "*shall* be available" on an equal and non-discriminatory basis to all eligible depository institutions.  12 U.S.C. § 248a(c)(2) (emphasis added); *see also Fourth Corner Credit Union*, 861 F.3d at 1068 (Bacharach, J.) (opining that the term "shall" "indicates a congressional command," as 1) the language was unambiguous, 2) prior agency interpretations were consistent with this understanding, and 3) legislative history supported this conclusion).  Such services are only available through a master account.  Custodia is an eligible depository institution.  Yet despite its valid Wyoming charter and conceded eligibility, Custodia has been denied a master account.

143.   Through this Complaint, Custodia has filed an appropriate pleading to have its rights declared.  The Court can resolve this controversy by declaring that Custodia has a right, as an eligible, deposit-taking bank, to have a master account.

144.   Custodia is therefore entitled under the Declaratory Judgment Act to a declaration from this Court that the Board and/or the Kansas City Fed has a statutory obligation to provide Custodia with a master account.

## **REQUEST FOR RELIEF**

WHEREFORE, Custodia respectfully requests the Court to:

a.   Order a speedy hearing on this action, thereby advancing this action on the Court's calendar as permitted by Federal Rule of Civil Procedure 57;

b.   Declare unlawful the Defendants' continuing delay in processing Custodia's application for a master account;

c.   Order the Kansas City Fed and the Board to process and decide Custodia's application for a master account within 30 days of the Court's Order, or such other time as the Court deems reasonable;

d.   Grant Plaintiff costs, fees, and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

e.   Grant any other and further relief that the Court deems just and proper.

DATED: June 7, 2022                    Respectfully submitted,

　/s/　  SCOTT E. ORTIZ　　　　　　　
WILLIAMS, PORTER, DAY & NEVILLE, PC
Scott E. Ortiz   WSB 5-2550
159 N. Wolcott Street
Suite 400
Casper, WY 82601
sortiz@wpdn.net

WILLIAMS & CONNOLLY LLP

John K. Villa (*pro hac vice* admission pending)
Ryan Scarborough (*pro hac vice* admission pending)
Whitney D. Hermandorfer (*pro hac vice* admission pending)
Jamie Wolfe (*pro hac vice* admission pending)
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
jvilla@wc.com
rscarborough@wc.com
whermandorfer@wc.com
jwolfe@wc.com

*Attorneys for Plaintiff Custodia Bank, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I caused **Custodia Bank, Inc.'s Complaint** to be

served on the following via email:

Mark E. Van Der Weide
General Counsel, Board of Governors of the Federal Reserve System
mark.vanderweide@frb.gov
(202) 452-2263
20th Street and Constitution Avenue NW
Washington, DC 20551

Craig Zahnd
General Counsel, Federal Reserve Bank of Kansas City
craig.zahnd@kc.frb.org
(816) 881-2533
1 Memorial Drive
Kansas City, MO 64108


DATED:  June 7, 2022                    By: /s/   SCOTT E. ORTIZ
                                            SCOTT E. ORTIZ