Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| CUSTODIA BANK, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:22-cv-00125-SWS |
| v. | ) ) | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM & FEDERAL RESERVE BANK OF KANSAS CITY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.    The Federal Reserve ................................................................................ 2

    B.    Master Accounts and the Board's Guidelines Regarding Access ........................... 4

    C.    Custodia's Novel Structure and Risks .................................................... 8

ARGUMENT ...................................................................................................................... 10

I.    Custodia Has No Entitlement to a Master Account Decision on Its Preferred
Timeline and Claims I (APA) and II (Mandamus Act) Fail As a Result ......................... 10

    A.    No Statutory Timeline Applies to Plaintiff's Master Account Request ............... 10

    B.    Plaintiff Fails to State a Claim for Unreasonable Delay ........................................ 11

II.    Account Decisions are Discretionary and Committed by Statute to Reserve Banks ........ 17

    A.    Plaintiff Has No Statutory Entitlement to a Reserve Bank Account .................... 17

    B.    Plaintiff's Reliance on Contrary Dicta is Misplaced and Any Statutory Ambiguity
Should Be Resolved in Favor of the Board's Reasonable Interpretation ............. 22

III.    Plaintiff's Allegations Fail to Establish Justiciability ...................................................... 26

    A.    Plaintiff's Constitutional Claims Are Non-Justiciable ......................................... 27

    B.    Plaintiff's Contingent Claims Are Non-Justiciable .............................................. 30

    C.    Plaintiff's Timeliness Claims Are Non-Justiciable ............................................... 31

IV.    Plaintiff Fails to Allege Any Constitutional Violation ...................................................... 32

    A.    Plaintiff Fails to State a Claim for Violation of Due Process ............................... 33

        1.    Plaintiff fails to state a due process claim because it lacks a protected
property interest .......................................................................................... 33

i

　　　2.　　Plaintiff fails to state a due process claim based on vagueness ............... 33

　　　3.　　Plaintiff fails to state a due process claim based on delay ....................... 34

　　　4.　　Plaintiff fails to state a due process claim based on bias ......................... 35

　B.　Plaintiff Fails to State a Claim for Improper Delegation of Legislative Power.... 37

　C.　Plaintiff Fails to State a Claim for Violation of the Appointments Clause .......... 39

CONCLUSION .................................................................................................................. 45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORTIES

Page

**Cases**

*Allen v. Wright,*
    468 U.S. 737 (1984).................................................................................. 27

*Arthrex, Inc. v. Smith & Nephew, Inc.,*
    941 F.3d 1320 (Fed. Cir. 2019),............................................................... 44

*Association of American Railroads  v. DOT,*
    821 F.3d 19 (D.C. Cir. 2016) ..................................................................... 37

*Association of American Railroads v. DOT,*
    896 F.3d 539 (D.C. Cir. 2018) ................................................................... 37

*Audubon of Kansas, Inc. v. DOI,*
    568 F. Supp. 3d 1167 (D. Kan. 2021) ....................................................... 12

*Barrios Garcia v. DHS,*
    25 F.4th 430 (6th Cir. 2022) ...................................................................... 16

*Beckles v. United States,*
    137 S. Ct. 886 (2017)................................................................................. 34

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................. 35

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Government,*
    533 F.3d 1183 (10th Cir. 2008) ................................................................. 17

*Billings Utility Co. v. Advisory Committee Board of Governors,*
    135 F.2d 108 (8th Cir. 1943) ..................................................................... 19

*Board of Governors of the Federal Reserve System v. First Lincolnwood,*
    439 U.S. 234 (1978).................................................................................. 25

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013).................................................................................. 28

*Coalition for Sustainable Resources, Inc. v. U.S. Forest Service,*
    259 F.3d 1244 (10th Cir. 2001) ........................................................... 27, 30

*Collins v. Yellen*,
 141 S. Ct. 1761 (2021) ............................................................. 43

*Costello v. Grundon*,
 651 F.3d 614 (7th Cir. 2011) ...................................................... 11

*CS–360, LLC v. SBA*,
 20 F. Supp. 3d 104 (D.D.C. 2013) ................................................. 14

*Dastagir v. Blinken*,
 557 F. Supp. 3d 160 (D.D.C. 2021) ............................................... 15

*Edmond v. United States*,
 520 U.S. 651 (1997) ................................................................. 44

*Edwards v. Valdez*,
 789 F.2d 1477 (10th Cir. 1986) .................................................... 24

*Farmers and Merchants Bank v. Federal Reserve Bank of Richmond*,
 262 U.S. 649 (1923) ............................................................. 17, 18

*Farrell-Cooper Mining Company v. DOI*,
 728 F.3d 1229 (10th Cir. 2013) .................................................... 29

*Fasano v. Federal Reserve Bank of N.Y.*,
 457 F.3d 274 (3d Cir. 2006) ......................................................... 2

*Federal Reserve Bank of St. Louis v. Metrocentre Improvement District*,
 492 F. Supp. 353 (E.D. Ark. 1980) .................................................. 3

*Financial Oversight & Management Board for P.R. v. Aurelius Inv., LLC*,
 140 S. Ct. 1649 (2020) .......................................................... 40, 41

*First Bank & Trust Company v. Board of Governors of the Federal Reserve System*,
 605 F. Supp. 555 (E.D. Ky. 1984) .............................................. 24, 25

*Fleming v. USDA*,
 987 F.3d 1093 (D.C. Cir. 2021) .................................................... 44

*Forest Grove School District v. T.A.*,
 557 U.S. 230 (2009) ................................................................. 20

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
 861 F.3d 1052 (10th Cir. 2017) ........................................ 22, 23, 24, 25

*Fox News Network, LLC v. Board of Governors of the Federal Reserve System,*
  601 F.3d 158 (2d Cir. 2010)................................................................................ 11

*Fraternal Order of Police v. Board of Governors of Federal Reserve System,*
  391 F. Supp. 2d 1 (D.D.C. 2005) ................................................................ 26, 44

*Free Enterprise Fund v. PCAOB,*
  561 U.S. 477 (2010)................................................................................... 42, 43

*Golan v. Holder,*
  565 U.S. 302 (2012).......................................................................................... 40

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.,*
  866 F.2d 38 (2d Cir. 1989)................................................................................ 24

*Heckler v. Chaney,*
  470 U.S. 821 (1985).......................................................................................... 13

*Henderson v. Shinseki,*
  562 U.S. 428 (2011).......................................................................................... 22

*Hi-Tech Bed Systems Corporation v. GSA,*
  No. 11-cv-293, 2012 WL 12871622 (D. Wyo. Mar. 8, 2012) ......................... 13

*Hyde Park Company v. Santa Fe City Council,*
  226 F.3d 1207 (10th Cir. 2000) .................................................................. 33, 34

*In re A Community Voice,*
  878 F.3d 779 (9th Cir. 2017) ...................................................................... 13, 15

*In re Cooper Tire & Rubber Co.,*
  568 F.3d 1180 (10th Cir. 2009) ........................................................................ 16

*In re Stewart,*
  175 F.3d 796 (10th Cir. 1999) .......................................................................... 34

*Intercollegiate Broadcasting System Inc. v. Copyright Royalty Board,*
  684 F.3d 1332 (D.C. Cir. 2012).................................................................. 44, 45

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta,*
  713 F.2d 1221 (6th Cir. 1983) ..................................................................... 21, 25

*Kane County Utah v. Salazar,*
  562 F.3d 1077 (10th Cir. 2009) ............................................................. 12, 28, 29

*Kingdomware Technologies, Inc. v. United States*,
    579 U.S. 162 (2016) ........................................................................................ 17

*Labojewski v. Gonzales*,
    407 F.3d 814 (7th Cir. 2005) ......................................................................... 14

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994) ........................................................................................ 14

*Laufer v. Looper*,
    22 F.4th 871 (10th Cir. 2022) ....................................................................... 26

*Lewis v. United States*,
    680 F.2d 1239 (9th Cir. 1982) ......................................................................... 4

*Loughrin v. United States*,
    573 U.S. 351 (2014) ........................................................................................ 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 31

*M'Culloch v. Maryland*,
    17 U.S. 316 (1819) ......................................................................................... 42

*Martin Marietta Materials, Inc. v. Kansas Department of Transportation*,
    810 F.3d 1161 (10th Cir. 2016) ..................................................................... 33

*Martin v. O'Rourke*,
    891 F.3d 1338 (Fed. Cir. 2018) ............................................................... 15, 34

*McKinley v. Board of Governors of the Federal Reserve System*,
    647 F.3d 331 (D.C. Cir. 2011) ................................................................... 2, 4

*Melcher v. FOMC*,
    644 F. Supp. 510 (D.D.C. 1986), *aff'd*, 836 F.2d 561 (D.C. Cir. 1987) ............................ 4

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
    571 U.S. 191 (2014) ........................................................................................ 10

*Merit Management Group, LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018) ..................................................................................... 21

*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................................................................. 37, 38

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ......................................................................... 38

*National Mining Association v. DOL*,
    292 F.3d 849 (D.C. Cir. 2002) ............................................................. 14

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ............................................................................... 45

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ........................................................................... 12, 13

*Phillips v. United States*,
    201 F. 259 (8th Cir. 1912) ................................................................... 36

*Qwest Communications International, Inc. v. FCC*,
    398 F.3d 1222 (10th Cir. 2005) ........................................................... 15

*Raichle v. Federal Reserve Bank of N.Y.*,
    34 F.2d 910 (2d Cir. 1929) .................................................................. 19

*Rios v. Ziglar*,
    398 F.3d 1201 (10th Cir. 2005) ........................................................... 12

*Robertson v. Colvin*,
    564 F. App'x 931 (10th Cir. 2014) ...................................................... 28

*Sanofi-Aventis U.S., LLC v. DHHS*,
    570 F. Supp. 3d 129 (D.N.J. 2021) ..................................................... 45

*Schutz v. Thorne*,
    415 F.3d 1128 (10th Cir. 2005) ...................................................... 31, 32

*Scott v. Federal Reserve Bank of Kansas City*,
    406 F.3d 532 (8th Cir. 2005) ................................................................. 3

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................ 15

*Smith v. Illinois Bell Telephone Co.*,
    270 U.S. 587 (1926) ............................................................................. 34

*Smith v. United States*,
    561 F.3d 1090 (10th Cir. 2009) ........................................................... 26

*Southern Utah Wilderness Alliance v. Palma,*
    707 F.3d 1143 (10th Cir. 2013) .............................................................. 29, 30

*Telecommunications Research & Action Center v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ......................................................................... 16

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project,*
    576 U.S. 519 (2015).......................................................................................... 20

*Thacker v. Tennessee Valley Authority,*
    139 S. Ct. 1435 (2019)..................................................................................... 40

*TNB USA, Inc. v. Federal Reserve Bank of N.Y.,*
    No. 1:18-cv-7978, 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020)................... 17

*Town of Castle Rock, Colo. v. Gonzales,*
    545 U.S. 748 (2005).......................................................................................... 33

*U.S. National Bank of N.Y. v. First National Bank of Little Rock,*
    79 F. 296 (8th Cir. 1897) ................................................................................ 36

*U.S. Shipping Board Emergency Fleet Corporation v. Western Union Telegraph Co.,*
    275 U.S. 415 (1928).......................................................................................... 3

*U.S. Women's Chamber of Commerce v. SBA,*
    No. 1:04-cv-01889, 2005 WL 3244182 (D.D.C. Nov. 30, 2005)............... 15, 16

*United States v. Arthrex, Inc.,*
    141 S. Ct. 1970 (2021)........................................................................... 43, 44, 45

*United States v. Brown,*
    348 F.3d 1200 (10th Cir. 2003) ...................................................................... 38

*United States v. Hartwell,*
    73 U.S. 385 (1867)............................................................................................ 43

*United States v. Roberts,*
    185 F.3d 1125 (10th Cir. 1999) ...................................................................... 38

*United States ex. rel. McLennan v. Wilbur,*
    283 U.S. 414 (1931)..................................................................................... 12, 16

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994)............................................................................................ 32

*Utah v. Babbitt,*
    137 F.3d 1193 (10th Cir. 1998) ................................................................... 27

*Utah v. DOI,*
    210 F.3d 1193 (10th Cir. 2000) ................................................................... 32

*Utah Association of Counties v. Bush,*
    455 F.3d 1094 (10th Cir. 2006) ................................................................... 27

*Vietnam Veterans of America v. Shinseki,*
    599 F.3d 654 (D.C. Cir. 2010) ............................................................ 34, 35

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ..................................................................................... 34

*Whitman v. American Trucking Associations, Inc.,*
    531 U.S. 457 (2001) ............................................................................... 22, 38

*Wyoming v. Zinke,*
    871 F.3d 1133 (10th Cir. 2017) ............................................................ 29, 30

**Constitutional Provisions**

U.S. Const. art. I, § 1 ...................................................................................... 37, 38

U.S. Const. art. III, § 2, cl. 1 .............................................................................. 27

U.S. Const. art. III, § 2, cl. 2 ........................................................................ 39, 42

**Statutes**

5 U.S.C. § 551 *et seq.*.................................................................................... 11, 12

5 U.S.C. § 701(a)(2) ............................................................................................ 13

5 U.S.C. § 706(1) ........................................................................... 12, 13, 15, 16

5 U.S.C. § 7513(a) ............................................................................................... 43

8 U.S.C. § 1184(p)(6) ......................................................................................... 16

12 U.S.C. § 2 ........................................................................................................ 43

12 U.S.C. §§ 241-52 ............................................................................................ 21

12 U.S.C. § 241 ..................................................................................................... 2

12 U.S.C. § 248(a)(1) ................................................................................................ 2

12 U.S.C. § 248a ...................................................................................... 20, 24, 33

12 U.S.C. § 248a(a) .............................................................................................. 22

12 U.S.C. § 248a(b) .............................................................................................. 20

12 U.S.C. § 248a(c) ................................................................................. 20, 21, 22

12 U.S.C. § 248a(c)(2) .......................................................... 21, 22, 23, 24, 25

12 U.S.C. § 248a(d) .............................................................................................. 44

12 U.S.C. § 248(f) ..................................................................................... 2, 36, 43

12 U.S.C. § 248(h) .................................................................................................. 2

12 U.S.C. § 248(i) ...................................................................................... 2, 44

12 U.S.C. § 248(j) ......................................................................... 2, 5, 36, 44

12 U.S.C. § 248(k) ................................................................... 2, 3, 11, 44

12 U.S.C. § 263(c) ............................................................................................... 39

12 U.S.C. § 302 .......................................................................................... 35, 36

12 U.S.C. § 305 ...................................................................................................... 2

12 U.S.C. § 307 .................................................................................................... 44

12 U.S.C. §§ 341-61 .................................................................................. 3, 11, 21

12 U.S.C. § 341 ..................................................................................... 3, 35, 36, 42

12 U.S.C. § 341(5) .................................................................................................. 2

12 U.S.C. § 342 ......................................................... 4, 5, 10, 11, 17, 18, 20, 21, 22, 33, 38

12 U.S.C. § 343 ...................................................................................................... 5

12 U.S.C. § 347 ...................................................................................................... 5

12 U.S.C. § 347b(a) ............................................................................................ 11

12 U.S.C. § 347c-d ........................................................................................ 5

12 U.S.C. § 348 ........................................................................................... 19

12 U.S.C. § 355(1) ......................................................................................... 5

12 U.S.C. §§ 391-95 ...................................................................................... 3

12 U.S.C. § 391 .......................................................................................... 17

12 U.S.C. § 411 .......................................................................................... 40

12 U.S.C. § 485 ............................................................................................. 2

12 U.S.C. § 601 .......................................................................................... 10

12 U.S.C. § 1813(z) ..................................................................................... 11

12 U.S.C. § 4801 ......................................................................................... 11

12 U.S.C. § 4807 ..................................................................................... 10, 11

12 U.S.C. § 5322(a)(1) ................................................................................. 39

12 U.S.C. § 5465 ........................................................................................... 5

18 U.S.C. § 208(a) ...................................................................................... 35

28 U.S.C. § 1361 ......................................................................................... 12

Act of Feb. 25, 1791, Pub. L. No. 1-10, §§ 1, 4, 7(I), 7(XV), 10, 11, 12,
    1 Stat. 191, 192-93, 95-96 .............................................................. 40, 41, 42

Act of Apr. 10, 1816, Pub. L. No. 14-1, §§ 1, 8, 15,
    3 Stat. 266-70, 269, 274 ............................................................................ 42

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq.* ..................................... 2, 45
    Pub. L. No. 63-43, 38 Stat. 251 ............................................................. 38, 39
    Pub. L. No. 63-43, §§ 3, 4, 10, 38 Stat. 251, 253-57, 260-61 ......................... 45
    Act of June 21, 1917, Pub. L. No. 65-25, §§ 2-3, 40 Stat. 232 ....................... 45
    Act of Sept. 26, 1918, Pub. L. No. 65-218, § 1, 40 Stat. 967-68 .................... 45
    Act of June 3, 1922, Pub. L. No. 67-230, 42 Stat. 620-21 ............................ 45
    Act of June 26, 1930, Pub. L. No. 71-434, 46 Stat. 814, 815-16 .................... 45
    Act of July 1, 1966, Pub. L. No. 89-485, § 13(e), 80 Stat. 236, 243 ............... 45
    Act of Nov. 16, 1977, Pub. L. No. 95-188, §§ 202, 204, 91 Stat. 1387-88 ....... 45

Banking Act of 1933, Pub. L. No. 73-66, §§ 3(b), 6(a)-(b), 48 Stat. 162,
    163-64, 166-67 .......................................................................................... 45
Banking Act of 1935, Pub. L. No. 74-305, §§ 201, 203(b)-(c), 49 Stat. 684, 703-05 ...... 45
Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
    §§ 1107, 1108(a)(1), 124 Stat. 1376, 2126 .............................................. 45
Terrorism Risk Insurance Program Reauthorization Act of 2015, Pub L. No. 114-1,
    § 109, 129 Stat. 3, 9 .............................................................................. 45

Monetary Control Act of 1980, Pub. L. No. 96-221,
    94 Stat. 132 (Oct. 1, 1980) .................................................................... 20

Special Purpose Depository Institution Act, Pub. L. No. 74 (2019),
    Wyo. Stat. § 13-12-101 (amended 2020) ................................................. 8
    Wyo. Stat. § 13-12-115 ......................................................................... 31
    Wyo. Stat. § 13-12-116 ......................................................................... 31

**Legislative Materials**

126 Cong. Rec. 6250 (1980)
    (Conf. Rep.) ............................................................................... 23, 24

H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913) ...................................... 3, 4, 20

**Regulatory Materials**

Avanti Financial Group, Inc., Comment Letter on Proposed Guidelines for Evaluating
    Account and Services Requests, Board of Governors of the Federal Reserve System
    (July 12, 2021) https://www.federalreserve.gov/SECRS/2021/July/20210721/OP-
    1747/OP-1747_071221_138730_420086027347_1.pdf ................................... 14

Guidelines for Evaluating Account and Services Requests (Proposed),
    86 Fed. Reg. 25,865 (May 11, 2021) .......................................................... 6, 14

Guidelines for Evaluating Account and Service Requests (Supplemental Notice),
    87 Fed. Reg. 12,957 (Mar. 8, 2022) ........................................................ 6, 7, 14

Guidelines for Evaluating Account and Service Requests (Final),
    (Aug. 15, 2022) https://www.federalreserve.gov/newsevents/pressreleases
    /files/other20220815a1.pdf ...................................................... 7, 8, 14, 26, 39

**Rules**

Fed. R. Civ. P. 8(a)(1) ........................................................................................ 27

## Other Authorities

Alexander Hamilton, Secretary of Treasury, Report to House of Representatives,
    *Report on a National Bank* (Dec. 14, 1790), *in* Legislative and Documentary History
    of the Bank of the United States, 29 (Clark & Hall eds., 1832),
    https://fraser.stlouisfed.org/title/legislative-documentary-history-bank-
    united-states-3632 ..................................................................................................... 41

*Appointment & Removal of Federal Reserve Bank Members of the FOMC*,
    2019 WL 11594453, (Op. O.L.C. Oct. 23, 2019) ............................................................ 43

Board of Governors of the Federal Reserve System,
    *DIRECTORS – Appointment of Reserve Bank Presidents and First Vice President*,
    (Feb. 9, 2017) https://www.federalreserve.gov/aboutthefed/directors/PDF/
    appointment-of-reserve-bank-presidents-first-vice-presidents.pdf........................... 36, 37

Edmund Randolph, Attorney General of the United States, *Opinion to President
    Washington* (Feb. 12, 1791), *in L*egislative and Documentary History of the Bank
    of the United States, 86 (Clark & Hall eds., 1832), https://fraser.stlouisfed.org/title/
    legislative-documentary-history-bank-united-states-3632 ............................................... 42

Federal Reserve Bank Operating Circular 1, Account Relationships
    (August 16, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/
    resources/rules-regulations/081621-operating-circular-1.pdf ..................................... 5, 18

Federal Reserve Bank Operating Circular 5, Electronic Access
    (June 30, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/
    resources/rules-regulations/063021-operating-circular-5.pdf........................................... 26

Federal Reserve Bank Operating Circular 6, Funds Transfers Through the Fedwire®
    Funds Service (March 8, 2021), https://www.frbservices.org/binaries/content/
    assets/crsocms/resources/rules-regulations/030821-operating-circular-6.pdf ................. 26

Federal Reserve Board, Reserve Maintenance Manual,
    https://www.federalreserve.gov/monetarypolicy/reserve-maintenance-
    manual-account-structure.htm (last updated Nov. 20, 2019)............................................. 4

The Federal Reserve System, *The Fed Explained*, (11th ed. August 2021),
    https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf#page=8 ........ 2, 3

Financial Stability Board, *Assessment of Risks to Financial Stability from Crypto-assets*
    (Feb. 16, 2022) https://www.fsb.org/wp-content/uploads/P160222.pdf............................ 9

Janet Yellen, Chair, *The Federal Reserve's Monetary Policy Toolkit: Past, Present,
    and Future* (Aug. 26, 2016), https://www.federalreserve.gov/newsevents/
    speech/yellen20160826a.htm................................................................................... 5, 6

*On the Grant of Charter of 1816* (Mar. 6, 1816), *in* Legislative and Documentary
   History of the Bank of the United States, 666 (Clark & Hall eds., 1832),
   https://fraser.stlouisfed.org/title/legislative-documentary-history-bank-
   united-states-3632 ............................................................................................... 42

President's Working Group on Financial Markets, Federal Deposit Insurance Corporation,
   and Office of the Comptroller of Currency, *Report on Stablecoins* (Nov. 2021)
   https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf ................ 9

Stephen K. Halpert, *The Separation of Banking and Commerce Reconsidered*,
   13 J. Corp. L. 481 (1988) .................................................................................. 41

# INTRODUCTION

This case involves a single entity's demand to dictate the timing and substance of decisions in the complex and rapidly developing areas of novel bank charters and cryptocurrency.  Although lack of care and diligence in such decisions would hinder sound development in this sphere and pose substantial risks to the U.S. financial system—and the request at issue in this action remains in active process—plaintiff elevates its short-term interests above all else to claim an entitlement to its preferred outcome on its preferred timeline. Plaintiff's demands are non-justiciable, unsupported by the law, and must be rejected.

Plaintiff, Custodia Bank, Inc., alleges an "unlawful delay in processing an application critical to Custodia's business" of cryptocurrency banking.  Compl. ¶¶ 2, 29.  It contends that, "[f]or more than 19 months, [d]efendants have refused to act upon Custodia's application for a master account with the Federal Reserve," *id.*, and that "the statute commands" that it be granted access to a master account.  *Id.* ¶ 3.  But as shown below, no statute "commands" the Board of Governors of the Federal Reserve System ("Board") to direct the Federal Reserve Bank of Kansas City ("FRBKC") to open a master account for plaintiff (or for any other particular entity), or for FRBKC to do so, much less on the specific timetable demanded by plaintiff.

Notably, the Board, a federal agency, does not exercise deposit-taking functions and would not be an appropriate defendant even if plaintiff had any cognizable claims (and it does not).  Rather, the relevant provision of the Federal Reserve Act gives the twelve regional Federal Reserve Banks, including FRBKC, discretion in accepting deposits, the essential activity of a master account, and therefore discretion over whether to issue—or, in appropriate circumstances, revoke—such accounts.  This is consistent with the role of Reserve Banks, which by design perform many functions traditionally associated with banking, such as deposit taking and directly

lending to institutions, and reflects Congress's careful construction of the Federal Reserve System. Although the Board publishes guidance and exercises general supervisory authority over Reserve Banks, it has not been tasked with deciding individual master account requests. Rather, Congress chose to vest that authority directly in the Reserve Banks and imposed no fixed timeline by which such decisions must be made. Where, as here, such decisions are precedent-setting and involve complex and novel institutions and financial instruments that may present systemic financial risks, Reserve Banks appropriately treat them with the care and diligence that prudence dictates and the law permits. The Court should dismiss this action as a result.

## BACKGROUND

### A.       The Federal Reserve

The Federal Reserve System, the nation's central bank, was established in 1913 by the Federal Reserve Act, 12 U.S.C. § 221 *et seq.* ("FRA"). It consists of the Board, the Federal Open Market Committee ("FOMC"), and twelve Federal Reserve Banks that serve financial institutions in their respective districts. *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 277 (3d Cir. 2006). The Board is a federal agency whose members are appointed by the President and confirmed by the Senate. 12 U.S.C. § 241. Beyond exercising rulemaking authority, which may not be delegated, 12 U.S.C. §§ 248(i), (k), and carrying out other functions mandated by Congress, the Board exercises general supervisory authority over Reserve Banks. *See generally* 12 U.S.C. §§ 248(a)(1), (f), (h)-(j); 305; 341(5); 485; *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 333 (D.C. Cir. 2011) (describing Board and Reserve Banks).

By contrast, the twelve regional Reserve Banks serve as the System's "operating arms," carrying out a variety of functions subject to the general supervisory authority of the Board. *See The Federal Reserve System, The Fed Explained* 8, 10-11 (11th ed. Aug. 2021) (the "*Fed*

2

*Explained*").[1]  Reserve Banks perform certain functions vested in them by statute, 12 U.S.C.

§§ 341-61, 391-95, and other functions by Board delegation.  12 U.S.C. § 248(k).  Most notably

for present purposes, Reserve Banks are expressly authorized by statute (rather than Board

delegation) to provide various services in their capacity as "bankers' banks."  *Fed. Reserve Bank*

*of St. Louis v. Metrocentre Improvement Dist.*, 492 F. Supp. 353, 355 (E.D. Ark. 1980) (quoting

H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913) ("1913 House Report")); *see generally* 12

U.S.C. §§ 341-61.  They operate a wire transfer system, clear checks for depository institutions,

distribute currency and coin, extend mainly short-term credit to depository institutions, and serve

as depositories for banks within their districts, among other functions.  *Fed Explained* at 10-11.

Each Reserve Bank is a separate corporation with its own board of directors that appoints

officers to run the Bank's day-to-day operations.  *See* 12 U.S.C. § 341 (Reserve Banks are "a

body corporate").[2]  Reserve Banks can make contracts, adopt bylaws, and sue and be sued.  *Id.*

§ 341 (enumerating powers of Federal Reserve Banks).  The courts have repeatedly made clear

that Reserve Banks are instrumentalities[3] separate from federal agencies, including the Board.

*See, e.g.*, *U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26

(1928) ("Instrumentalities like . . . the federal reserve banks, in which there are private interests,

are not departments of the Government.  They are private corporations in which the Government

has an interest."); *Scott v. Fed. Reserve Bank of Kan. City*, 406 F.3d 532, 535 (8th Cir. 2005) ("it

is possible to be a fiscal agent or instrumentality of the government without being a federal

---

[1] https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf#page=8.

[2] Reserve Bank presidents and first vice-presidents are appointed subject to Board approval. 12 U.S.C. § 341(fifth).

[3] *See* Compl. ¶ 112 ("[t]he Kansas City Fed is a federal instrumentalit[y] that acts as a fiscal agent[] of the United States" (quotations omitted)).

3

agency"); *see also Melcher v. FOMC*, 644 F. Supp. 510, 521 (D.D.C. 1986), *aff'd*, 836 F.2d 561

(D.C. Cir. 1987) ("Ever since the birth of this nation, the regulation of the nation's monetary

systems has been governed by a subtle and conscious balance of public and private elements.").

     While exercising "significant supervisory authority over Reserve Banks," *McKinley*,

647 F.3d at 333, the Board does not direct their day-to-day operations.  *See Lewis v. United

States*, 680 F.2d 1239, 1241 (9th Cir. 1982) ("[i]t is evident from the legislative history of the

Federal Reserve Act that Congress did not intend to give the federal government direction over

the daily operation of the Reserve Banks") (citing 1913 House Report at 18-19).  Indeed, the

legislative history of the FRA provides that while the Board "shall retain sufficient power over

the reserve banks to enable it to exercise direct authority when necessary," the Board "shall in no

way attempt to carry on . . . the routine operations and banking which require detailed knowledge

of local and individual credit and which determine the funds of the community in any given

instance."  1913 House Report at 18-19.

## B.    Master Accounts and the Board's Guidelines Regarding Access

     A master account is a deposit account maintained by a depository institution at its

regional Reserve Bank.  It "is both a record of financial transactions that reflects the financial

rights and obligations of an account holder and of the Reserve Bank with respect to each other,

and the place where opening and closing balances are determined."[4]  As deposit accounts, master

accounts are governed by FRA § 13, 12 U.S.C. § 342, which provides that "[a]ny Federal reserve

bank may receive from any of its member banks, or other depository institutions . . . deposits of

current funds in lawful money . . . ."  *Id.*

     The Board, a federal agency and not a bank, has neither the ability nor statutory authority

---

[4] Reserve Maintenance Manual, https://www.federalreserve.gov/monetarypolicy/reserve-maintenance-manual-account-structure.htm (last updated Nov. 20, 2019).

to receive deposits or carry out activities such as check clearing, wire transfers, automated clearing house ("ACH") services, currency and coin services, and other services appurtenant to the business of banking that Congress has vested in the Reserve Banks.  *See, e.g.*, 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1).  In supervising and overseeing the activities of the Reserve Banks, *see generally id.* § 248(j), the Board may issue guidance with regard to opening master accounts and providing services, but the Board itself has no ability to open a master account and with one limited exception[5] does not grant or deny a particular financial institution's request to open any account.  Rather, Congress has vested that authority in the Reserve Banks.

Operating Circulars, issued by Reserve Banks and subject to approval by the Board, and other guidance make clear that a master account creates a contractual relationship between a requesting depository institution and the Reserve Bank to which the Board is not a party.  For example, Operating Circular 1 ("OC-1")[6] "set[s] forth the terms under which a Financial Institution may open, maintain and terminate" a master account with a Reserve Bank, *id.* at 1, and does not list the Board as a party to the account relationship or state that Board approval is necessary.  Access to master accounts is a matter of substantial concern to the Board and entire Federal Reserve System, however, as they provide a gateway to the Federal Reserve's balance sheet—which is used to promote financial stability and conduct monetary policy—as well as its payment systems.  *See generally* Janet L. Yellen, *The Federal Reserve's Monetary Policy Toolkit: Past, Present, and Future* (Aug. 26, 2016) (explaining how ability "to pay interest on banks' reserve balances" held in Reserve Bank accounts is "essential" to the "expanded toolkit"

---

[5] The only instance where the Board can make account access determinations concerns opening a master account for Designated Financial Market Utilities.  *See* 12 U.S.C. § 5465.

[6] Operating Circular 1, Account Relationships (Aug. 16, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

of monetary policy and can "allow the Federal Reserve to control short-term interest rates").[7]

Consistent with its general supervisory function, and in light of the rapidly changing landscape of novel charters, digital assets, and increased efforts to obtain access to the Federal Reserve balance sheet and payment systems, in May 2021 the Board requested comments on proposed Account Access Guidelines for use by Reserve Banks in evaluating requests for master accounts and access to Reserve Bank services.  Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,866 (May 11, 2021) ("Proposed Guidelines").  Apart from furthering policy goals of "ensuring the safety and soundness of the banking system," "effectively implementing monetary policy," "promoting financial stability," "protecting consumers," and "promoting a safe, efficient, inclusive, and innovative payment system," the Proposed Guidelines sought to "ensure that Reserve Banks evaluate a transparent and consistent set of factors when reviewing requests for accounts and services."  *Id.*  To this end, the Board requested comment on six principles for use by Reserve Banks in evaluating requests against the backdrop of a rapidly evolving payments landscape.  *Id.* at 25,866-70.  It noted that review of access requests by federally insured institutions (which are also federally regulated and supervised) would usually be "fairly straightforward," but requests from other institutions might "require more extensive due diligence."  *Id.* at 25,866.  Importantly, the Proposed Guidelines would not disturb the Reserve Banks' "discretionary authority to grant or deny requests."  *Id.*

On March 8, 2022, the Board issued a supplemental notice and request for comment updating the Proposed Guidelines.  Guidelines for Evaluating Account and Service Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022) ("Supplemental Notice").  The Supplemental Notice requested comment on a proposal to incorporate a three-tiered review framework into the previously

---

[7] https://www.federalreserve.gov/newsevents/speech/yellen20160826a.htm.

proposed six principles in order "to provide additional clarity on the level of due diligence and scrutiny to be applied to requests for Reserve Bank accounts and services."  *Id*. at 12,957.  Under the proposed three-tiered review framework: 1) federally insured institutions would be subject to a more streamlined review because they "are already subject to a standard, strict, and comprehensive set of federal banking regulations"; 2) eligible institutions that are not federally insured, but subjected to federal prudential supervision, would receive an "intermediate" level of review; and 3) eligible institutions that are neither federally insured nor subject to federal prudential supervision would be subject to the strictest level of review.  *Id.* at 12,962.[8]

On August 15, 2022, the Board issued its final Guidelines for Evaluating Account and Service Requests ("Account Access Guidelines" or "Guidelines").[9]  Section 1 of the Guidelines adopted the six principles for use by Reserve Banks in evaluating requests for master accounts and access to Reserve Bank services.  *Id*. at 30, 34-46.  In Section 2, the three-tiered framework, the Board made changes in response to comments to provide "more comparable treatment between non-federally insured institutions chartered under state and federal law."  *Id.* at 8.  The Board revised Tier 2 to include a narrower set of uninsured national banks and "emphasize[d] that the review of institutions' requests will be completed on a case-by-case, risk-focused basis within each of the three tiers."  *Id*.  The Board also recognized that "Reserve Banks may take comparatively longer to review access requests by institutions that engage in novel activities for which authorities are still developing appropriate supervisory and regulatory frameworks."  *Id*.

The Guidelines highlighted the range of comments received on the proposal.  While some commenters recommended "provid[ing] an easier path for institutions, particularly those with

_____

[8] FRBKC has indicated an intention to consider any guidelines issued by the Board when evaluating plaintiff's request for a master account.  *See* Compl. ¶ 49.

[9] https://www.federalreserve.gov/newsevents/pressreleases/files/other20220815a1.pdf.

novel charters, to successfully gain access to accounts and services," *id*. at 10, others argued that institutions with novel charters should face greater scrutiny.  These commenters noted "that institutions with novel charters are not subject to the same strict and costly regulations or to the same rigorous reviews as apply to traditional institutions."  *Id*. at 11.  In issuing the Guidelines, the Board carefully considered all comments and sought to balance "responsible innovation and prudent risk management," *id.*, while providing Reserve Banks "a consistent, comprehensive, and transparent framework . . . to analyze access requests on a case-by-case . . . basis reflecting the institution's full risk profile."  *Id.* at 12.  As stated in the Proposed Guidelines and reiterated in the final Guidelines, "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated."  *Id.*

### C.   Custodia's Novel Structure and Risks

In 2019 Wyoming created a new type of state charter called a Special Purpose Depository Institution ("SPDI").  According to plaintiff, SPDIs are "designed to provide a bridge connecting digital asset companies to the U.S. payment systems" and "to provide custody services for digital assets such as Bitcoin."  Compl. ¶¶ 28-29; Wyo. Stat. § 13-12-101, *et seq*.  Wyoming amended the SPDI Act in 2020, and the state's Division of Banking promulgated regulations in 2020 and adopted amendments to the regulations in 2021.[10]  SPDIs are generally prohibited from making loans with customer deposits of fiat currency and are not required to obtain insurance from the Federal Deposit Insurance Corporation ("FDIC").  *Id.*

Plaintiff received an SPDI charter in October 2020.  Compl. ¶ 10.  It seeks to "provide real-time settlement finality for U.S. dollar payments in digital asset transactions" (*e.g.*, those

---

[10] *See* https://wyomingbankingdivision.wyo.gov/banks-and-trust-companies/special-purpose-depository-institutions (last visited Aug. 16, 2022).

involving Bitcoin and similar cryptocurrencies) and plans to offer other services "including a tokenized, programmable U.S. dollar called Avit" (a "stablecoin"[11] variation).[12]  Plaintiff acknowledges that it is a novel banking institution, Compl. ¶ 114, and the careful assessment of potential risks from the interaction of novel cryptocurrency activities and the financial system is the subject of substantial government efforts.  *See, e.g.*, President's Working Group on Financial Markets, Federal Deposit Insurance Corporation, and Office of the Comptroller of Currency, *Report on Stablecoins* (Nov. 2021) (addressing risks to financial stability of certain digital assets including through destabilizing runs and disruptions in payment systems);[13] Financial Stability Board, *Assessment of Risks to Financial Stability from Crypto-assets* (Feb. 16, 2022).[14]

Plaintiff filed a request for a master account with FRBKC on October 29, 2020, and later initiated the separate process to become a member bank of the Federal Reserve System in 2021. Compl. ¶¶ 34, 39.  Based on their respective statutory responsibilities, FRBKC is responsible for determining plaintiff's account request and the Board is responsible for deciding its membership application.  Both have dedicated extensive time and resources to the consideration of these requests through interactive processes in which supplemental information has and is being sought from plaintiff.  *See id.* ¶ 37 (noting regular contact through letters, calls, emails, and meetings).  These are no simple tasks, as the risks presented are real, complex, and substantial.

---

[11] "Stablecoins are digital assets that are designed to maintain a stable value relative to a national currency or other reference assets."  President's Working Group on Financial Markets, FDIC, and Office of the Comptroller of the Currency, *Report on Stablecoins*, at 1 (Nov. 2021), https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf.

[12] *See* https://custodiabank.com/; https://custodiabank.com/about/ (last visited Aug. 16, 2022) (describing Avit as a "digital dollar" that will "settle with the same mechanics of a cryptocurrency but leverage established commercial laws in a structure that addresses the accounting, tax and legal problems of existing stablecoins").

[13] https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf

[14] https://www.fsb.org/wp-content/uploads/P160222.pdf

**ARGUMENT**

I.   **Custodia Has No Entitlement to a Master Account Decision on Its Preferred Timeline and Claims I (APA) and II (Mandamus Act) Fail As a Result**

Because there is no statutory obligation for FRBKC to render a decision on plaintiff's request for a master account within a specified timeframe or for the Board to order FRBKC to do so, no Board action has been unlawfully withheld or unreasonably delayed.[15]

A.   **No Statutory Timeline Applies to Plaintiff's Master Account Request**

Plaintiff erroneously contends that a one-year statutory deadline applies to its master account request to FRBKC.  *See* Compl. ¶¶ 6, 46, 74, 87, 107 (citing 12 U.S.C. § 4807).  But Section 4807's text makes clear that it only applies to applications made to the Board, the FDIC, or the Comptroller of the Currency.  It thus does not encompass Custodia's submission at issue, which was necessarily made to FRBKC rather than the Board.

Section 4807 states:

(a) In general: Each *Federal banking agency* shall take final action on any application *to the agency* before the end of the 1-year period beginning on the date on which a completed application is *received by the agency*.

(b) Waiver by applicant authorized: Any person *submitting* an application *to a Federal banking agency* may waive the applicability of subsection (a) with respect to such application at any time.

12 U.S.C. § 4807 (emphases added).[16]  The provision repeatedly makes clear that it only concerns applications to a "Federal banking agency"—by its own terms it sets limits on final

---

[15] Plaintiff's Claim IV, which seeks a declaration that defendants "must decide Custodia's master account application within a reasonable period of time," Compl. ¶ 109, is not an independent cause of action and fails for the various reasons stated herein.  *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) ("[T]he . . . Declaratory Judgment Act [is] only procedural, leaving substantive rights unchanged." (citations omitted)).

[16] Section 4807 applies to a range of matters under the Board's authority that, in contrast to section 342, require application *with the Board*.  *See, e.g.*, 12 U.S.C. § 601 (national banks "may file application *with the Board* . . . for permission to" engage in certain international banking activities (emphasis added)).

action by a *Federal banking agency* on applications *to the agency* that are *received by the agency*, unless the person *submitting* the application *to a Federal banking agency* waives this requirement.  12 U.S.C. § 4801 states that "'Federal banking agencies' [has] the same meaning[] as in section 1813 of this title," and section 1813, in turn, does not refer to Reserve Banks, stating instead that "'Federal banking agency' means the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the [FDIC]."  12 U.S.C. § 1813(z).  There is no provision for submitting master account requests to the Board, as the FRA places this within the powers of *Reserve Banks*, and plaintiff in fact alleges that "Custodia submitted its application to the Federal Reserve Bank responsible for its district, the Kansas City Fed."  Compl. ¶ 18.

Submission to FRBKC of a request for a master account is not made "to the" Board.  "The Board and the Federal Reserve Banks are 'two expressly independent statutory entities.'"  *Costello v. Grundon*, 651 F.3d 614, 632 (7th Cir. 2011) (citation omitted).  Although the Board may delegate certain of its own functions to Reserve Banks, 12 U.S.C. § 248(k), it has not done so here.  *See* Compl. ¶ 66 ("no such delegation exists").  Nor could it, as the power to open master accounts is not a Board function; instead, it is provided for by 12 U.S.C. § 342, which appears in subchapter IX of the FRA, 12 U.S.C. §§ 341-61, entitled "Powers of the Federal Reserve Banks."  *Cf. Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 161 (2d Cir. 2010) ("The power to make loans is explicitly granted by statute only to the Federal Reserve Banks themselves.  12 U.S.C. § 347b(a). . . . [T]he Federal Reserve Banks did not issue each loan on 'behalf of the Board,' or under the 'delegated authority' of the Board.").  Because section 4807 only applies to applications to the Board, it is not implicated by plaintiff's master account request, which was not and could not have been made to the Board.

## B.    Plaintiff Fails to State a Claim for Unreasonable Delay

Plaintiff's claims for unreasonable delay under the Administrative Procedure Act, 5

U.S.C. § 551 *et seq.* ("APA"), and Mandamus Act, 28 U.S.C. § 1361, must be dismissed for failure to state a claim.  *See* Compl. ¶¶ 61-81 (Count I); *id.* ¶¶ 82-91 (Count II).[17]  The APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1)), and the Mandamus Act permits courts to "compel . . . the United States or any agency thereof to perform a duty owed to the plaintiff."  Plaintiff claims the Board has "unlawfully withheld or unreasonably delayed" action on its master account request, *id.* ¶ 80 (quoting 5 U.S.C. § 706(1)), and that it is entitled to a writ of mandamus compelling such action, *id.* ¶ 91.  But it fails to meet threshold APA and mandamus standards and those claims must be dismissed.

   "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take*."  *Kane Cnty. Utah v. Salazar*, 562 F.3d 1077, 1086 (10th Cir. 2009) (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) ("*SUWA*")).  Likewise, a writ of mandamus is available "only where the duty to be performed is ministerial and the obligation to act peremptory and clearly defined."  *United States ex. rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *see also Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005).  As the Court held in *SUWA,* "the only agency action that can be compelled . . . is action that is legally required [such as] the failure to promulgate a [mandatory] rule or take some decision by a statutory deadline."  542 U.S. at 63.  "[C]hallenges to discretionary matters cannot be compelled."  *Audubon of Kansas, Inc. v. DOI*, 568 F. Supp. 3d 1167, 1181 (D. Kan. 2021) (quoting *SUWA*, 542 U.S. at 64-65).

   As discussed elsewhere herein, *see infra* Part II, Congress did not task the Board with final decisionmaking authority in this matter.  As a result, the Board has no statutory duty to act on plaintiff's request *to FRBKC* for a master account, nor is there any obligation for the Board to

---

[17] There is no question that the Board, a federal agency, is generally subject to the APA.

impose a specific timeline on Reserve Banks statutorily vested with responsibility for such decisions.  In the absence of any statute or regulation requiring discrete action by the Board by a specified deadline in relation to plaintiff's request for a master account, plaintiff cannot state a claim for unreasonable delay under the APA or for mandamus.  *See SUWA*, 542 U.S. at 63 n.1 ("Of course § 706(1) also authorizes courts to 'compel agency action . . . unreasonably delayed'—but a delay cannot be unreasonable with respect to action that is not required."); *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("an agency cannot unreasonably delay that which it is not required to do"); *Hi-Tech Bed Sys. Corp. v. GSA*, No. 11-cv-293, 2012 WL 12871622, at *7 (D. Wyo. Mar. 8, 2012) ("Having failed to cite a discrete, mandatory duty, [plaintiff] has similarly failed to identify any agency action unlawfully withheld or unreasonably delayed." (quotation omitted)) (dismissing complaint for mandamus and APA relief).

Although plaintiff contends that "it is incumbent upon the Board to exercise its supervisory authority" over the Reserve Bank to ensure master account decisions are "fair and timely," Compl. ¶ 72, the Board has no mandatory duty to enforce a particular timeline against Reserve Banks considering master account requests, and whether to enforce such requirements against a supervised entity is a matter committed to agency discretion by law.  *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821 (1985); *Hi-Tech Bed Sys.*, 2012 WL 12871622, at *5-7 (failure to identify "the violation of any mandatory duty" or "any statute, regulation, or policy that requires" agency to enforce a particular standard fails to overcome the "presumption of unreviewability" of such matters and the "Court lacks jurisdiction to hear [such] claims").[18]

---

[18] As articulated in the Guidelines: "Reserve Banks face challenges in balancing the desire by requestors for a specific timeline with Reserve Banks' need to perform thorough reviews of requestors with novel, complex, or high-risk business plans, along with requestors that are subject to novel regulatory regimes.  Setting a specific timeline could result in an increased

And, even if any requirement for the Board to facilitate master account decisionmaking by Reserve Banks existed, the Board has done so by using notice and comment proceedings to issue Guidelines related to account access, which plaintiff has supported in its submitted comments.[19]  The Board published the original notice on May 11, 2021, and a supplemental notice on March 8, 2022, 86 Fed. Reg. 25,865; 87 Fed. Reg. 12,957, on both occasions seeking public comment.[20]  Given the complex issues presented by novel charters, the time taken to date to address these issues is far from unreasonable.  *See* 86 Fed. Reg. at 25,866-67 (explaining that requests for master accounts from novel charter types occurred, until recently, on an exceptional

---

number of premature or unnecessary denials of access requests in cases where the specified timeline does not allow the Reserve Banks sufficient time to understand the intricacies of the requesting institutions' risk profiles.  Accordingly, the Board has not adopted a timeline expectation . . . ."  Guidelines at 15.

[19] *See* https://www.federalreserve.gov/SECRS/2021/July/20210721/OP-1747/OP-1747_071221 _138730_420086027347_1.pdf, at 1 n.1, 4 (plaintiff's statement, submitted under its former name Avanti, "support[ing] the principles of clarity and predictability" in the Board's Proposed Guidelines and "embrac[ing] the level of supervision and oversight the Federal Reserve should choose to apply to state-chartered, non-FDIC insured" institutions like plaintiff).

[20] Any assertion by plaintiff that the Account Access Guidelines cannot apply to its request, *see* Compl. ¶¶ 53, 79, is incorrect.  "In the administrative context, a rule is retroactive if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *Nat'l Mining Ass'n v. DOL*, 292 F.3d 849, 859 (D.C. Cir. 2002) (quotations omitted).  Because the Guidelines clarify the factors that Reserve Banks should consider when evaluating requests for account access—without compelling a particular outcome—the rule is not "impermissibly retroactive."  *See id.* at 860; Guidelines at 31 ("decisions regarding individual access requests remain at the discretion of the individual Reserve Banks").  Moreover, since retroactivity concerns apply only to "completed" acts, *Landgraf v. USI Film Products*, 511 U.S. 244, 269-70 (1994), any such concern is misplaced here because plaintiff's efforts to obtain account access are not yet complete and the mere act of seeking account access does not create a vested right in securing access.  *See* Guidelines at 31 ("[I]t is important to make clear that legal eligibility does not bestow a right to obtain an account and services.")); *Labojewski v. Gonzales*, 407 F.3d 814, 822 (7th Cir. 2005) (finding that filing a visa application, which was a prerequisite for applying for adjustment of status, "is not the sort of 'completed transaction' that gives rise to vested rights or settled expectations for purposes of the presumption against retroactivity"); *CS-360, LLC v. SBA*, 20 F. Supp. 3d 104, 110-11 (D.D.C. 2013) (applying recently promulgated procedural rule after holding that plaintiff's application was "plainly not closed" because the agency could, *inter alia*, engage in additional factfinding).

basis, and determinations of such requests have "potential to set a precedent that could affect the Federal Reserve's ability to achieve its policy goals now or in the future").

Indeed, depending on the matter before an agency, courts "have noted that delays between three to five years are often not unreasonable." *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 165 (D.D.C. 2021) (dismissing unreasonable delay claim related to the adjudication of a visa application that had been filed five years prior and pending in administrative processing for 29 months at the time petitioner brought suit); *see also In re A Cmty. Voice*, 878 F.3d at 787 (distinguishing an unreasonable eight-year delay from Ninth Circuit precedents "where the delay has been only months or a few years"). Particularly where the decision at issue involves complex issues and policy questions—such as the important issues of risk to the U.S. financial system, financial stability, and implementation of monetary policy at issue here—the law is clear that agency deliberations that may reasonably span a period of years do not amount to unreasonable delay. *See, e.g.*, *Martin v. O'Rourke*, 891 F.3d 1338, 1345-46 (Fed. Cir. 2018) ("[i]t is reasonable that more complex and substantive agency actions take longer"); *Sierra Club v. Thomas*, 828 F.2d 783, 799 (D.C. Cir. 1987) (finding that the passage of almost three years, with "little more than one year since the close of the public comment period," could "hardly be considered unreasonable" "[g]iven the complexity of the issues facing EPA and the highly controversial nature of the proposal"), *abrogated in part on other grounds by statute*; *cf. Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1238-39 (10th Cir. 2005) (rejecting petitioners' request under 5 U.S.C. § 706(1) for agency implementation of a statutorily compliant pricing scheme on any "arbitrary deadline" given FCC's "complex" task).

Additionally, where—as here—the interests involved are "purely economic in nature, delay impacting these interests is . . . entitled to greater indulgence." *U.S. Women's Chamber of*

*Com. v. SBA*, No. 1:04-cv-01889, 2005 WL 3244182, at *17 (D.D.C. Nov. 30, 2005); *cf.*

*Telecommc'ns Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("delays that might

be reasonable in the sphere of economic regulation are less tolerable when human health and

welfare are at stake").

      And, given the discretion in master account issuance discussed below, FRBKC is

similarly not bound by timing restrictions imposed by the APA or Mandamus Act even if it were

covered by the statutes (an issue the Court need not reach given that the passage of time on

plaintiff's master account request does not violate their requirements). *See Barrios Garcia v.

DHS*, 25 F.4th 430, 450-51, 455 (6th Cir. 2022) (holding that "federal courts cannot invoke

5 U.S.C. § 706(1) to force USCIS to speed up an unduly delayed prewaitlist work-authorization

adjudication, which is a nonmandatory agency action under 8 U.S.C. § 1184(p)(6)" because the

statute's "use of 'may' . . . render[ed] discretionary the decision to issue work authorizations");

*McLennan*, 283 U.S. at 420 (for a writ of mandamus, "[t]he law must not only authorize the

demanded action, but require it; [and] the duty to act must be clear and undisputable").  Given

that plaintiff's master account request remains under active consideration by FRBKC, the

Board's issuance of guidance in this area has proceeded appropriately, and no mandatory

deadline applies, plaintiff cannot state a claim based on its disagreement over the passage of

time.  As a result, mandamus—a "drastic remedy" that "is to be invoked only in extraordinary

circumstances," *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186 (10th Cir. 2009)

(quotation omitted)—is not appropriate here.  And because the relief plaintiff seeks in this action

is limited to remedying its allegations of undue delay, *see* Compl. at 42 ("Request for Relief"),

the Court need proceed no further to dispose of the action.

II.    **Account Decisions are Discretionary and Committed by Statute to Reserve Banks**

   A.    **Plaintiff Has No Statutory Entitlement to a Reserve Bank Account**

Contrary to plaintiff's allegations, the FRA does not require that FRBKC grant its request for a master account.[21]  A master account is a deposit account maintained at a Reserve Bank.  As such, master accounts are governed by FRA § 13, 12 U.S.C. § 342, which expressly gives Reserve Banks discretion over whether to open such accounts.  The relevant language of the statute includes the permissive "may," providing that "[a]ny Federal reserve bank *may* receive [deposits] from any of its member banks, or other depository institutions . . . ." *Id.*

Courts have long held that such language denotes a discretionary power.  *See, e.g.,* *Farmers and Merchants Bank v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923) (section 342's provision that a Reserve Bank "may receive" deposits from a member bank of checks for collection "imposes upon reserve banks [no] obligation to receive checks for collection.  The act merely confers authority to do so.").[22]  Indeed, Congress's use of the word "may" in a statute is ordinarily construed as "permissive, rather than mandatory." *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) ("The word 'may,'

---

[21] As noted above, the Court need not reach the entitlement question because, even if there were any general right to a master account—and there is not—there would be no such entitlement on plaintiff's demanded timeline.  *See TNB USA, Inc. v. Fed. Reserve Bank of N.Y.*, No. 1:18-cv-7978, 2020 WL 1445806, at *8 (S.D.N.Y. Mar. 25, 2020) ("[Plaintiff] argues that it is entitled by statute to a master account, but even assuming that is correct," it has not identified "a right for the [Reserve Bank] to provide that account within a certain time period.  [Plaintiff] does not object, after all, to the fact that there is an application process for the accounts, and implicit in the acceptance of that process is the understanding that a decision will not be immediate.").

[22] A different provision of the FRA, by contrast, *requires* Reserve Banks to accept deposits of moneys from the general fund of the U.S. Treasury: such funds "may, *upon the direction of the Secretary of the Treasury*, be deposited in Federal reserve banks, which banks, when required by the Secretary of the Treasury, *shall* act as fiscal agents of the United States . . . ."  12 U.S.C. § 391 (emphases added).

when used in a statute, usually implies some degree of discretion." (quotation omitted)).  Here, the use of "may" in section 342 makes clear Congress's intent that Reserve Banks have authority to accept deposits or open deposit accounts but are not required to do so.

Consistent with this understanding, the Board and Reserve Banks have long viewed such deposit-taking authority as discretionary.  OC-1, which sets the terms and conditions applicable to master accounts, expressly provides that "[e]ach Master Account Agreement" executed by a financial institution "is subject to approval by the Financial Institution's Administrative Reserve Bank," OC-1 at ¶ 2.6, and that "[a] Reserve Bank may terminate a Master Account Agreement . . . or any Other Account Agreement at any time."  *Id.* at ¶ 2.10.[23]  Indeed, OC-1 ¶ 2.11 refers to the first paragraph of FRA § 13, 12 U.S.C. § 342, underscoring the longstanding interpretation of section 342 as governing account relationships such as creation of a master account.

This reading is consistent with judicial interpretations of section 342.  Addressing section 342 shortly after passage of the FRA in 1913, the Supreme Court in *Farmers and Merchants* rejected an argument similar to plaintiff's that "the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank."  262 U.S. at 662.  Interpreting section 342's language that, "solely for the purposes of collection," a Reserve Bank "may receive from any nonmember bank . . . deposits of checks . . . payable upon presentation," the Court held that "neither § 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection."  *Id*.  The Court noted that Congress had from time to time enlarged the "the class of cases" to which the Reserve Banks' authority under section 342 applied, *id.*, "[b]ut in each amendment, as in § 13, the words

---

[23] https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/ 081621-operating-circular-1.pdf.

used were 'may receive'—words of authorization merely." *Id.* (quoting FRA).

The Court further observed that the FRA "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the Board and the Reserve Banks 'shall' do and what they 'may' do." *Id.* at 663 (quoting FRA). The Court listed some twenty-one provisions of the original FRA where both "may" and "shall" were used, and another seven where only "shall" was used, to illustrate the precision Congress took in distinguishing actions the Board and Reserve Banks were allowed to take from those they were required to take. *Id.* at 663 n.6; *see also Billings Utility Co. v. Advisory Comm. Bd. of Governors*, 135 F.2d 108, 111 (8th Cir. 1943) (listing provisions of the FRA in which Congress distinguished what a Reserve Bank "may" do from what it "must" do, and holding that the "may" provisions "seem so clearly to be permissive as to make any other construction of them by interpretation or construction judicial legislation"); *Raichle v. Fed. Reserve Bank of N.Y.*, 34 F.2d 910, 914 (2d Cir. 1929) (interpreting the phrase "any Federal Reserve Bank *may* . . . discount notes, drafts, and bills of exchange," in FRA § 13A, 12 U.S.C. § 348 (emphasis added), and holding that "it is important to note that [the Federal Reserve Bank] is not under any compulsion to rediscount eligible paper, for the words of the act in respect to rediscounting are wholly permissive").

The unambiguous text of Section 13, as interpreted by the Supreme Court and courts of appeals shortly after passage of the FRA, thus makes clear that Reserve Banks are *authorized* to accept deposits—and therefore open deposit accounts—but are not *required* to do so. Because opening a master account is intrinsically a deposit-taking activity, plaintiff's claims that FRBKC is required to open a master account for it must be rejected based on the statute's language.

While the text of the FRA alone should end any inquiry into whether the FRA gives the FRBKC discretion to deny master account requests, legislative history lends additional support

19

to the conclusion that it does.  The House Report on the FRA made clear that the permissive "may receive" language in Section 13 "authorized" Federal Reserve Banks "to receive current deposits from their [member banks]."  1913 House Report at 48 (1913).  The legislative history nowhere suggests the receipt of deposits is in any way mandatory.  Notably, when Congress later amended Section 13 as part of the Monetary Control Act of 1980 ("MCA"), Pub. L. No. 96-221, 94 Stat. 132, 139, to permit Reserve Banks to receive deposits from "other depository institutions," in addition to member banks, it did *not* alter the permissive "may receive" language.  Congress can therefore be presumed to have "accepted and ratified" the Supreme Court's reading of "may receive" in Section 13 as discretionary.  *Texas Dep't of Housing and Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 536 (2015); *see also Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009) ("When Congress amended [the Act] without altering the text [at issue], it implicitly adopted [the Court's] construction of the statute.").

Plaintiff's contrary claim that it has an unambiguous right to open a master account at FRBKC under the provisions of FRA § 11A, 12 U.S.C. § 248a(c), lacks merit.  *See* Compl. ¶¶ 27, 57.  Section 11A is directed at the Board, not the Reserve Banks, and merely requires the Board to adopt "pricing principles" for certain services offered by Reserve Banks to depository institutions and publish a schedule of fees for priced services.  *See* 12 U.S.C. § 248a ("the Board shall publish for public comment a set of pricing principles . . . and a . . . schedule of fees . . . for Federal Reserve Bank services").  The language plaintiff relies on in section 248a(c) is merely described as a principle on which "[t]he schedule of fees prescribed pursuant to this section shall be based."  It contains no command to open a master account and, indeed, makes no reference to master accounts, which are deposit accounts subject to section 342 and not "services" covered by section 248a.  *See* 12 U.S.C. § 248a(b) (listing services to be covered by fee schedule).  Nothing

20

in that section requires that any particular institution receive a master account, or that each and every institution is entitled to access Reserve Bank services. Rather, it requires only that nonmember institutions that do obtain Reserve Bank services pay the same amount for those services as member banks. *See* 12 U.S.C. § 248a(c)(2) ("The schedule of fees . . . shall be based on the following principles: . . . All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks."); *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983) (holding that the MCA provided that nonmember banks could receive Reserve Bank services "at the same fees charged member banks"). Its title, "Pricing of Services," further indicates that it concerns *principles for setting prices* rather than availability of services. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section headings "supply cues as to what Congress intended" (quotation omitted)).

Indeed, section 248a(c)(2) expressly provides that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks," 12 U.S.C. § 248a(c)(2), again making clear that section 248a(c) is directed at the Board, not Reserve Banks. And by empowering the Board to impose other conditions on access to Reserve Bank services, provided that the same terms are applicable to member and nonmember banks alike, this language necessarily means that there is no absolute right to obtain master accounts or access services, as plaintiff incorrectly claims.

Moreover, section 248a(c) appears in subchapter II of the FRA, 12 U.S.C. §§ 241-52, titled "Board of Governors of the Federal Reserve System," which generally sets out powers and duties of the Board, and requires the Board, not Reserve Banks, to publish a fee schedule. By contrast, FRA § 13, 12 U.S.C. § 342, appears in subchapter IX, 12 U.S.C. §§ 341-61, titled

"Powers and Duties of Federal Reserve Banks." *Cf., e.g.*, *Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) (placement of time limit in subchapter titled "Procedure" and not subchapter titled "Organization and Jurisdiction," indicates that Congress regarded it as nonjurisdictional).  It makes no sense—as plaintiff alleges—that Congress meant section 248a(c), enacted in 1980 as part of a section titled "Pricing of Services," which sets out a "pricing principle[]" used to establish a "Schedule of fees," 12 U.S.C. § 248a(a), (c), to overturn the discretion permitted the Reserve Banks since 1913 to accept deposits by requiring them to open master accounts for all comers regardless of risk or other considerations.  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

**B.      Plaintiff's Reliance on Contrary Dicta is Misplaced and Any Statutory Ambiguity Should Be Resolved in Favor of the Board's Reasonable Interpretation**

The split decision in *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), does not compel a different result, as plaintiff suggests. Compl. ¶¶ 133, 142.  In that case, the Tenth Circuit vacated a district court order dismissing with prejudice a Colorado-chartered credit union's complaint seeking a master account, and remanded with instructions to dismiss without prejudice.  861 F.3d at 1053.  Writing for himself, one panel member argued that section 342 "does not affect [a depository's institution's] entitlement to a master account" because it "does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2)." *Fourth Corner*, 861 F.3d at 1074 (opinion of Judge Bacharach).  Notably, however, this conclusion was reached in an entirely different context—one that did not implicate the complex issues presented by the novel charter and business model at issue here—and its statutory construction cannot withstand scrutiny.  It is also contrary to the Board's published interpretation of the relevant FRA provisions in the

subsequent Account Access Guidelines, and should not be adopted by the Court as a result.

As an initial matter, as discussed above, the pricing principle on which the opinion relies provides that Reserve Bank services "shall be available to nonmember depository institutions" and "shall be priced at the same fee schedule applicable to member banks," but does not provide that all services necessarily must be available to *all* nonmember banks.  12 U.S.C. § 248a(c)(2).  Congress's exclusion of the second "all" is significant, as it signals Congress's intent that services covered by the fee schedule be available to member and nonmember banks alike—as they generally are—but not that each and every nonmember bank, *even those that may present a variety of unmitigated risks*, are entitled to all services.  While Judge Bacharach's opinion noted that the use of "all" before the "nonmember depository institutions" was not grammatically necessary to indicate that all such banks were intended to receive access to the services on the schedule, 861 F.3d at 1070, it overlooked the fact that Congress chose to use "all" elsewhere in the *same sentence* to express universal applicability but omitted it in this context.  But "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning."  *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted).

Moreover, the opinion incorrectly concluded that section 248a(c)(2)'s legislative history indicates that "Congress hoped to . . . establish open access to Federal Reserve services."  861 F.3d at 1072.  In support, it cites a single sentence from a conference report stating that a House amendment includes a provision to "open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks."  *Id.* at 1072-73 (citing 126 Cong. Rec. 6250 (1980)).  The full excerpt of the report, however, like the statute, states:

> *Pricing of Federal Reserve Services*. The House amendment includes a provision
> for the Federal Reserve to price services provided by the Federal Reserve Banks

and open access to these services to all depository institutions on the same terms
and conditions as member banks.

126 Cong. Rec. 6250 (1980).  This history provides no more support for plaintiff's
position than the statute; it again labels section 248a as being about "pricing" rather than
access to a deposit account, and while it mentions "open[ing] access to all depository
institutions," it does so in the same breath with "on the same terms and conditions" as
member banks, rather than including a standalone reference to a mandatory grant of
access.  And it expresses no intent to overrule the prior statutory authority giving Reserve
Banks discretion in the matter.  "The proper function of legislative history is to solve, and
not create, ambiguity," *Edwards v. Valdez*, 789 F.2d 1477, 1482 n.6 (10th Cir. 1986), and
the cited history does not aid plaintiff here.

Indeed, contrary to Judge Bacharach's conclusion, the legislative history shows that
Congress enacted the MCA, including section 248a(c)(2), out of concern over the Federal
Reserve's growing lack of control over the money supply, and its ramifications for the national
economy, not in order to "entitle[] every nonmember depository institution to Federal Reserve
services."  861 F.3d  at 1073.  Prior to enactment of the MCA, Reserve Banks provided services,
such as check collection and wire transfers, free of charge to member banks in order to
compensate them "for the costs associated with having to maintain non-interest bearing reserves
with the Federal Reserve," which nonmember banks were not required to do.  *See Greater
Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989).  During the
1970s, the Federal Reserve experienced a decline in membership due to "the growing loss of
profits occasioned by [the] Federal Reserve's relatively high percentage of required reserves."
*First Bank & Trust Co. v. Bd. of Governors of the Fed. Reserve Sys.*, 605 F. Supp. 555, 558 (E.D.
Ky. 1984).  This decline in membership "did not escape Congress' attention . . . [which] in 1979,

24

[introduced] at least five bills . . . aimed at correcting the Federal Reserve's growing lack of control over the money supply." *Id.* Congress's efforts "to curb the rising tide of bank flight from the [Federal] Reserve System" resulted in enactment of the MCA in 1980. *Id*. at 565.

The MCA was enacted largely to restore Federal Reserve control over the money supply and monetary policy—of which master account discretion plays an important role—by requiring nonmember as well as member banks to maintain reserves (balances) at Federal Reserve Banks (*i.e.*, on the Federal Reserve balance sheet). In exchange, the MCA provided that nonmember banks would be able to receive Federal Reserve Bank services "at the same fees charged member banks." *Jet Courier Servs.*, 713 F.2d at 1227. While Judge Bacharach cited portions of the legislative history indicating that Congress supported "wide access to Federal Reserve services for nonmember banks," 861 F.3d at 1072 (quoting House report), there is no indication that Congress intended the MCA as a *mandatory* right of access to Reserve Bank services to *all* nonmember banks regardless of circumstances or risks to the central bank or financial system that access to the Federal Reserve balance sheet and payment systems may present.

Finally, the Board's interpretation of the statute is no mere "litigating position," 861 F.3d at 1071, but a view it has long taken, culminating in the issuance of the Guidelines. To the extent section 248a(c)(2) is ambiguous, the Board's interpretation as the agency primarily responsible for implementing the FRA is entitled to deference so long as it is reasonable. *See Bd. of Gov. of the Fed. Reserve Sys. v. First Lincolnwood*, 439 U.S. 234, 251 (1978) ("courts should defer to an agency's construction of its own statutory mandate, particularly when that construction accords with well-established congressional goals") (citations omitted)). Thus, the clear position articulated in the Board's Guidelines—issued after notice and comment—that decisions to grant a master account or make services available to any particular depository

institution are within the discretion of Reserve Banks,[24] is entitled to deference.  *See, e.g.,*

*Fraternal Ord. of Police v. Bd. of Governors of Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 5-6

(D.D.C. 2005) (granting deference to Board's construction of FRA provisions relating to Reserve

Banks).

### III.    Plaintiff's Allegations Fail to Establish Justiciability

Plaintiff bears the burden of establishing this Court's jurisdiction, but its complaint fails

to sufficiently allege a present injury, thus depriving this Court of jurisdiction on both standing

and ripeness grounds.[25]  Claims V through VIII, which relate to the final decision that will be

made on plaintiff's request, are not justiciable given that a final decision may be favorable to

plaintiff.  And plaintiff's failure to allege legal authorization to do business, *see* Part III.C., *infra*,

---

[24] *See, e.g.*, Guidelines at 2 (Guidelines are "to be used *by Reserve Banks in evaluating requests* for accounts and services" (emphasis added)); *id.* at 31 ("decisions regarding individual access requests remain at the discretion of the individual Reserve Banks"); *id.* at 46 ("a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers").  Consistent with this reading, the guidance issued through Operating Circulars has long made clear that Reserve Banks may deny or terminate services for a variety of reasons.  For example, Reserve Banks "immediately may terminate" a depository institution's electronic connection "if the Reserve Bank, in its sole discretion, determines that continued use of the Electronic Connection poses a risk to the Reserve Bank or others."  Operating Circular 5, Electronic Access ¶ 7.1 (June 30, 2021), https://www.frbservices.org/binaries/content/assets/ crsocms/resources/rules-regulations/063021-operating-circular-5.pdf.  Similarly, a "Reserve Bank may terminate or restrict Fedwire Funds Service access . . . at any time without notice if the Reserve Bank has reason to believe that" use "does not comply with any Reserve Bank agreement . . . [or] otherwise poses a risk to a Reserve Bank."  Operating Circular 6, Funds Transfers Through the Fedwire Funds Service, ¶ 9.1, https://www.frbservices.org/ content/assets/crsocms/resources/rules-regulations/030821-operating-circular-6.pdf.

[25] The Board is making only a facial attack on justiciability in this motion, pointing out that the allegations in plaintiff's complaint are insufficient to establish justiciability (rather than contesting the facts alleged by plaintiff in support of jurisdiction).  *See Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022) ("A facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction.  A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction.").  "A facial attack on the complaint's allegations regarding subject matter jurisdiction questions the complaint's sufficiency [which] is a question of law."  *Smith v. United States*, 561 F.3d 1090, 1097-98 (10th Cir. 2009) (citations omitted).

renders even its claims purporting to seek redress for alleged delay (Claims I-IV) premature.[26]

### A.       Plaintiff's Constitutional Claims Are Non-Justiciable

Plaintiff's constitutional attacks on purported flaws in the manner that a *final decision* might be made on its request, which focus on claims of potential participation by allegedly biased officials whom plaintiff contends were not properly appointed (*see* Claims V-VI), are untethered to present injury and should be dismissed on standing and ripeness grounds.

This Court is constitutionally limited to resolving "Cases" or "Controversies," U.S. Const. art. III § 2 cl. 1, and both standing and ripeness implicate this requirement. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Because plaintiff challenges alleged acts or omissions of the Board, an Executive Branch agency, as well as the constitutionality of an Act of Congress, "the necessity of a case or controversy is of particular import" to protect "against unrestrained exercise of the power of judicial review over the conduct of the executive or congressional branches . . . ." *Utah v. Babbitt*, 137 F.3d 1193, 1202 (10th Cir. 1998). Plaintiff bears the burden of establishing standing and ripeness, *id.*; *Coal. for Sustainable Res. v. U.S. Forest Serv.*, 259 F.3d 1244, 1249 (10th Cir. 2001); Fed. R. Civ. P. 8(a)(1), but fails to do so.

To establish standing, a plaintiff must demonstrate "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone." *Id.* at 754 (1984). Injury is assessed as of the time suit is brought, *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1099, 1101 (10th Cir. 2006), and "threatened injury must be certainly impending"—"allegations of possible future injury are not sufficient."

---

[26] To the extent Claim III includes a claim for delay, *see* Compl. ¶¶ 98-99, it is not justiciable for the same reason as the statutory timeliness claims. And to the extent it concerns the standards under which a final decision will be made, it is not justiciable for the same reason as plaintiff's other constitutional claims.

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). Causation requires injury to be "fairly traceable" to the challenged conduct without resort to speculation. *Id.* at 411.

But plaintiff makes no allegations showing how matters such as the particular official(s) it contends will make a future final decision on its request cause it present injury.[27]  Assuming for the sake of argument that plaintiff's account request could be decided by allegedly biased officials who were not properly appointed, *id.* ¶¶ 14, 123, it has not alleged any facts indicating how a final decision to be made *in the future* has caused present injury. It thus fails to make the critical showing of standing *at the time it filed suit*, and if it ultimately receives a favorable decision from FRBKC, these purported infirmities will have caused it no injury. *See Kane Cnty. Utah*, 562 F.3d at 1090 (no standing where "the District's Application remains pending before the BLM. . . .  In other words, it is entirely possible that the BLM will grant the District's Application, in which event the District will have suffered no injury."); *see also Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014) (no standing to seek judicial review of favorable agency decision); *Utah Ass'n of Cntys.*, 455 F.3d at 1100-01 (no standing at time of filing where statute and proclamation challenged on constitutional grounds did not cause immediate injury).[28]

---

[27] Nor does plaintiff demonstrate at more than a speculative level that these purported defects relating to the manner in which a final decision might be reached would cause it imminent harm in the form of a "certainly impending" adverse decision. For example, plaintiff complains about the purported lack of "discernable standards" and "intelligible principles" for review of its request, Compl. ¶ 95, but since *clearer* standards and principles would not necessarily be favorable to plaintiff, it is unclear how a *lack* of such criteria hurts its chances of ultimately securing an account. And plaintiff's entire bias claim rests on speculative assertions about who might (or might not) participate, *e.g.*, Compl. ¶ 115 (contending that plaintiff's due process rights would be violated "*[t]o the extent* that the Kansas City Fed's Board of Directors finally adjudicates" its request (emphasis added)), as does its Appointments Clause claim.

[28] Plaintiff also fails to demonstrate redressability, which requires showing that "it must be likely, not merely speculative, that a favorable judgment will redress the plaintiff's injury." *Utah Ass'n of Cntys.*, 455 F.3d at 1099-100. It would be beyond speculative to assume that a grant of relief in this case, *i.e.*, an order that a decision be made within 30 days, *see* Compl. at 42, would redress any injury arising from the alleged constitutional violations.

For similar reasons, plaintiff fails to establish the ripeness of its constitutional claims.  *Cf.* *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1157 (10th Cir. 2013) ("The doctrines of standing and ripeness substantially overlap in many cases." (citation omitted)).  Ripeness doctrine "prevents courts 'from entangling themselves in abstract disagreements over administrative policies,' while also 'protect[ing] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Id.* at 1158 (citations omitted).  Ripeness depends on "the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'"  *Id.* (citation omitted).  Plaintiff cannot carry its burden as to either factor.

First, plaintiff's allegations fail to demonstrate fitness, which depends on such factors as "whether the issue is a purely legal one, whether the agency decision in dispute was final, . . . whether further factual development would significantly advance [the court's] ability to deal with the legal issues presented," and whether adjudication would be a "wasteful use of limited judicial resources."  *Wyoming v. Zinke*, 871 F.3d 1133, 1141-42 (10th Cir. 2017) (cleaned up).  Here, there is no final decision; adjudicating the propriety of how such a decision might be made is thus a "wasteful use of limited judicial resources," *id.*, because the very process plaintiff attacks may lead to a favorable decision, leaving it uninjured.  *Cf. Kane Cnty*, 562 F.3d at 1090 ("[I]t is entirely possible that the BLM will grant the District's Application, in which event the District will have suffered no injury."); *see also Farrell-Cooper Mining Co. v. DOI*, 728 F.3d 1229, 1238 (10th Cir. 2013) ("Farrell–Cooper is currently seeking review of the disputed OSMRE actions before the Department of the Interior.  If that review vacates the contested OSMRE actions, Farrell–Cooper would receive the relief it seeks.").  And given that some of plaintiff's claims rest on factual speculation about who will make a final decision, the complaint

is not "purely legal" for ripeness purposes because "not *all* the issues are purely legal." *Coal. for Sustainable Res.*, 259 F.3d at 1250 (emphasis added) (issue not fit for review although a ruling for one side would be dispositive since a contrary ruling would not dispose of related issues dependent on subsequent events).  Plaintiff thus fails to meet the fitness test.

Nor can plaintiff demonstrate relevant hardship from withholding judicial review of its claims about the way in which a *final* decision will be made.  First, plaintiff has not shown that purported constitutional infirmities in *how* a final decision may be made presently impact it. Second, relevant hardships for ripeness purposes must be "direct and immediate," *Zinke*, 871 F.3d at 1143.  Thus, when the consequences of withholding immediate review are attenuated, courts have found claims unripe.  *E.g.*, *Palma*, 707 F.3d at 1160 (no hardship where intervening events must occur before a challenged action directly impacts the plaintiff).  Here, the claims concerning the way in which a final decision might be made seek relief relating to *how* that decision will be made, rather than its outcome.  Even favorable relief would not guarantee the grant of an account to plaintiff, and thus withholding such relief does not directly impact plaintiff.  Accordingly, its constitutional claims relating to a final decision are not ripe.

## B.    Plaintiff's Contingent Claims Are Non-Justiciable

Claims VII and VIII all but concede non-justiciability, as they acknowledge that they are implicated "only in the event that Defendants deny Custodia's application for a master account." Compl. ¶¶ 130, 139.  For the reasons discussed above, particularly the fact that no adverse decision has been made and that a final decision could be favorable to plaintiff, these Claims must be dismissed for lack of standing and ripeness.  These claims would in any event fail on the merits.  Claim VII, which seeks mandamus to compel the grant of an account, fails because the decision to grant an account is discretionary.  *See* Part II.B., *supra*.  Since plaintiff has no right to an account, Claim VIII, which seeks relief under the Declaratory Judgment Act, also fails, as the

Act provides no additional grounds for relief.  *See* n.15, *supra*.

### C.   Plaintiff's Timeliness Claims Are Non-Justiciable

Plaintiff's remaining claims are also non-justiciable because its conclusory allegations do not establish that it has suffered an injury from any purported delay that immediate action by defendants would redress.  They are thus insufficient to establish its standing to seek prospective relief for alleged delay and the ripeness of its claims for adjudication.

Importantly, plaintiff does not allege that it has commenced business, or even that it legally *can* commence business as a depository institution, such that it suffers any injury from a present lack of a master account.  It alleges that "[i]t was granted a Special Purpose Depository Institution bank charter by the Wyoming State Banking Board in October of 2020."  *Id.* ¶ 8.  It further alleges that it must launch its business by partnering with a bank that has a master account, which it contends is a "costlier" and less desirable alternative.  Compl. ¶ 8.  But plaintiff has failed to allege that it is legally authorized to commence business.

The SPDI statute under which plaintiff alleges it was chartered states that the charter granted by the State Banking Board is, on its own, insufficient to allow an SPDI to commence business.  Rather, "[i]f an application is approved and a charter granted by the board under W.S. 13-12-115, the special purpose depository institution shall not commence business before receiving a certificate of authority to operate from the commissioner."  Wyo. Stat. § 13-12-116.  Plaintiff has not alleged that it has received or will receive such a certificate from the Commissioner despite conceding that no master account is required.  Compl. ¶ 8.

Without such allegations, plaintiff has not carried its burden of establishing standing or ripeness over its claims related to delay.  *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be" do not establish justiciability); *Schutz v. Thorne*, 415

F.3d 1128, 1133 (10th Cir. 2005) ("Whether a plaintiff has standing to sue turns on the precise allegations of the parties seeking relief." (cleaned up)).  Courts have routinely dismissed claims on standing or ripeness grounds where the effects of a defendant's actions would only be felt once a necessary license or permit were issued, or other action taken by a different governmental entity.  Thus, in *Schutz*, a plaintiff's assertions that he had applied for a hunting license—but not "that he actually drew" a license—were insufficient to give him standing to challenge a requirement that he retain a guide when hunting.  415 F.3d at 1135; *id.* n.2.  Similarly, a challenge to the Department of Interior's approval of a lease to a firm intending to store nuclear waste was deemed unripe because the firm still needed to obtain a license from the Nuclear Regulatory Commission.  *Utah v. DOI*, 210 F.3d 1193, 1197-98 (10th Cir. 2000).  Given plaintiff's failure to allege that it had been granted an operating certificate at the time it sued, plaintiff has failed to establish the justiciability of its timeliness claims.

## IV.   Plaintiff Fails to Allege Any Constitutional Violation

Even assuming *arguendo* that plaintiff's constitutional claims were justiciable, they fail on the merits.  The due process claims fail because plaintiff lacks a property interest that implicates due process, and because its allegations fail to demonstrate that it has been deprived of due process due to claimed vagueness, delay, or bias.  Its legislative delegation claim fails because Congress has provided intelligible principles for defendants to follow in this matter.  And its Appointments Clause claim fails because opening a bank account is not a matter that implicates the Clause and, even if it did, the decision can be and is made by FRBKC's president, whose appointment conforms with the Clause.[29]

---

[29] Because "a statute is to be construed where fairly possible so as to avoid substantial constitutional questions," *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994), the Court should construe the FRA in a manner that eliminates such constitutional questions.

### A.      Plaintiff Fails to State a Claim for Violation of Due Process

#### 1.      Plaintiff fails to state a due process claim because it lacks a protected property interest

Plaintiff's various due process claims (Count III and (alternative) Count V) fail because it

lacks a property interest in a master account, which is a prerequisite to the attachment of due

process rights. *Martin Marietta Materials, Inc. v. Kansas DOT*, 810 F.3d 1161, 1171 (10th Cir.

2016). Plaintiff contends that it has a property interest in an account by virtue of 12 U.S.C.

§ 248a. *See* Compl. ¶ 94. But as explained in Part II, *supra*, section 248a does not mandate the

grant of a master account, which 12 U.S.C. § 342 places at a Reserve Bank's discretion, and

plaintiff therefore lacks an interest subject to due process protections. For due process purposes,

"a benefit is not a protected entitlement if government officials may grant or deny it in their

discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Absent legal

provisions mandating "'a particular outcome' . . . no property interest exists" that implicates due

process protections. *Martin Marietta*, 810 F.3d at 1178 (citations omitted). Thus, plaintiff's lack

of entitlement to a master account precludes it from asserting any due process claim.

#### 2.      Plaintiff fails to state a due process claim based on vagueness

Plaintiff contends that its due process rights have been violated by an allegedly

standardless process, *e.g.*, Compl. ¶ 97, and asks the Court to require defendants to review its

request for an account in accordance with "discernable standards." *Id.* ¶ 101. Plaintiff's

assertions in this regard prove too much and are insufficient to state a claim.

As explained above, to show it has a property interest implicating due process, plaintiff

must demonstrate a lack of discretion to deny it an account. But the purported lack of standards

claimed by plaintiff, if true, results in *unconstrained* discretion and thus underscores the lack of

an interest to which due process rights attach, barring plaintiff's claim. *See, e.g.*, *Hyde Park Co.*

*v. Santa Fe City Council*, 226 F.3d 1207, 1212-13 (10th Cir. 2000) ("Because the ordinances as written contain *no standards* governing the City Council's . . . exercise of discretion, [appellant] has no protectible property interest on which to base its due process claims." (emphasis added)).

Plaintiff also fails to state a claim in this regard because it does not allege that any statute or regulation is compelling or prohibiting its conduct.  Due process limits on vagueness serve to prevent rules that "regulate persons or entities" from being so vague as to allow "arbitrary *enforcement*."  *Beckles v. United States*, 137 S. Ct. 886, 892, 894 (2017) (citation omitted). [30]  A purported lack of standards for *Reserve Bank* action therefore does not implicate plaintiff's due process rights.  *See id*. at 895 (rejecting criminal defendant's challenge to advisory guidelines meant to guide courts in exercising sentencing discretion because the guidelines did not "regulate the public" and thus did not implicate due process vagueness concerns).

### 3.    Plaintiff fails to state a due process claim based on delay

Plaintiff, citing *Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587 (1926), claims that the timeframe for processing its request violates its due process rights.  Compl. ¶ 100.  In *Smith*, the Court found that a public body reviewing an application "for a period of two years remained practically dormant, and nothing in the circumstances suggests that it had any intention of going further with the matter."  270 U.S. at 591.  In contrast, the System has most certainly indicated an "intention of going further with the matter," as shown by the process leading to issuance of the Guidelines and ongoing engagement with plaintiff.  *Smith* is thus readily distinguishable.  Moreover, action that does not constitute an unreasonable delay under the APA does not violate due process.  *O'Rourke*, 891 F.3d at 1349; *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654,

---

[30] Moreover, far less clarity is required outside the criminal or First Amendment context, *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (citation omitted), and in the area of "economic regulation."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

660 (D.C. Cir. 2010).  For the same reasons that plaintiff fails to state an APA claim for delay, *supra* at Part I.B., it has not suffered a delay that violates due process.

### 4. Plaintiff fails to state a due process claim based on bias

Plaintiff wrongly implies that the FRA improperly gives FRBKC "Class A" directors "who shall be chosen and representative of [member] banks" (with which it claims to compete) decisionmaking power over master accounts.  Compl. ¶ 114 (quoting 12 U.S.C. § 302).

As a preliminary matter, plaintiff has not identified any FRBKC member bank that directly competes in the cryptocurrency services market plaintiff hopes to enter, despite the Rules' requirement that a plaintiff provide sufficient "factual matter," and not merely recite "labels and conclusions," in order to survive a motion to dismiss.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  Plaintiff also carefully avoids alleging that FRBKC directors will *actually be* the decisionmakers on its request, *e.g.*, Compl. ¶ 115 ("*To the extent that* the Kansas City Fed's Board of Directors finally adjudicates the rights of would-be competitors like Custodia" (emphasis added)), and its allegations recognize that the official exercising decisionmaking power in this matter is in fact FRBKC's *president.  See* Compl. ¶¶ 41-42.[31]  The FRA provides that Reserve Bank powers can be exercised by the "board of directors, *or duly authorized officers or agents*."  12 U.S.C. § 341(seventh) (emphasis added).  The president, whom plaintiff does not allege is biased,[32] is certainly a duly authorized "officer or agent," and more.  The FRA makes her "the chief executive officer of the bank [to whom] all other executive

---

[31] These conditional allegations further show why the constitutional claims are not ripe.  Even if Reserve Bank directors were the decisionmakers—which plaintiff does not allege—it requires speculation to predict *which* directors would make a decision, since, *inter alia*, they are subject to various limits on participating in matters involving conflicts of interest.  *E.g.*, 18 U.S.C. § 208(a).

[32] In fact, the Class A directors whom plaintiff accuses of bias are barred from participating in the appointment of FRBKC's president.  *See* 12 U.S.C. § 341(fifth).

officers and all employees of the bank shall be directly responsible," 12 U.S.C. § 341(fifth), which at the time of the statute's enactment was understood to encompass authority to control the conduct of a bank's business, including matters relating to deposits. *See, e.g.*, *Phillips v. United States*, 201 F. 259, 265 (8th Cir. 1912) ("The defendant . . . was the chief executive officer of the bank, and as such actually had control and direction of its affairs while it was a going concern."); *U.S. Nat'l Bank of N.Y. v. First Nat'l Bank of Little Rock*, 79 F. 296, 299 (8th Cir. 1897) (bank's president, as chief executive officer, may "indorse notes and bills, draw drafts and checks, certify checks, *or issue certificates of deposit*" (emphasis added)). This is unsurprising; as plaintiff alleges, it has been FRBKC's "President and Chief Executive Officer"—and not its directors—with whom it has met with respect to its master account request and whom it has "urged . . . to consider Custodia's application." Compl. ¶¶ 41-42.

Moreover, plaintiff's claim fails because even if the directors it focuses on were relevant decisionmakers, which they are not, they constitute a minority of the Reserve Bank's board, holding only three directorships, with the other six required to "represent the public" or the *non-banking* interests of "agriculture, commerce, industry, services, labor, and consumers." 12 U.S.C. § 302. They are also subject to supervision, suspension, and removal by the Board, *id.* § 248(f), (j), which plaintiff does not allege is a competitor. The Board has construed its powers as allowing it to order directors' recusal from matters that may present conflicts of interest, even where their participation is expressly authorized by statute, *see, e.g.*, Board of Governors of the Federal Reserve System, *DIRECTORS – Appointment of Reserve Bank Presidents and First Vice President* (Feb. 9, 2017)[33] (barring certain Class B directors from participating in the selection of

---

[33] https://www.federalreserve.gov/aboutthefed/directors/PDF/appointment-of-reserve-bank-presidents-first-vice-presidents.pdf.

Reserve Bank presidents due to potential conflicts of interest).

Plaintiff's reliance on *Ass'n of American Railroads v. DOT*, 821 F.3d 19 (D.C. Cir. 2016), Compl. ¶ 113, is therefore misplaced.  In that case, the court held that giving Amtrak the ability to impose its decisions on competing railroads violated due process.  821 F.3d at 31.  But it subsequently held that striking a portion of the offending statute in a manner that left Amtrak unable to unilaterally impose its will without concurrence of a disinterested party, the Federal Railroad Administration, cured any constitutional defect.  *Ass'n of Am. R.R.s v. DOT*, 896 F.3d 539, 546, 548 (D.C. Cir. 2018).  In so doing, it explained that the stricken provision had left the Railroad Administration unable to "temper or prevent Amtrak from adopting measures that promoted its own self-interest at the expense of its freight railroad competitors."  *Id.* at 545.  But by severing this provision, Amtrak could not act without the Administration's concurrence, and such "joint action" requiring assent of a disinterested party was permissible.  *Id.* (citations omitted).  Since the Reserve Bank directors alleged to be biased are a minority, even if they were to participate in the decision they would be outnumbered by disinterested directors and thus cannot impose their will unilaterally; moreover, any threat of bias is further "temper[ed]" because *all* directors are subject to supervision by *another* disinterested party—the Board— which can order their recusal if it perceives an actual or potential conflict of interest.

### B.    Plaintiff Fails to State a Claim for Improper Delegation of Legislative Power

Plaintiff's contention that Congress has improperly delegated its legislative authority by failing to set "intelligible principles," Compl. ¶¶ 93, 95 (citing U.S. Const. art. I § 1), is wrong. Except for two rulings issued in 1935, the Supreme Court has consistently "upheld . . . without deviation, Congress' ability to delegate power under broad standards."  *See Mistretta v. United*

*States*, 488 U.S. 361, 373 (1989).[34]  Such standards can be phrased in extremely general terms.

*See Whitman*, 531 U.S. at 474 ("[W]e have found an 'intelligible principle' in various statutes

authorizing regulation in the 'public interest.'").  Nor must the standards appear in the specific

provision at issue.  For example, a guiding principle can be inferred from legislative history,

*United States v. Roberts*, 185 F.3d 1125, 1137 (10th Cir. 1999), or an implied requirement to

"fit" action under the provision to objectives and requirements of the overall statutory scheme of

which it is a part.  *See United States v. Brown*, 348 F.3d 1200, 1217 (10th Cir. 2003) ("implicit in

the delegation of authority was that the regulations would 'fit' within the rest of the tax laws").

The authority to accept deposits in 12 U.S.C. § 342, which is the basis for Reserve

Banks' authority to open accounts, is clearly subject to sufficient intelligible principles to pass

master under this standard.  To begin with, the provision itself identifies the types of institutions

from which deposits can be accepted and the manner in which funds may be deposited.  *Id.*

Congressional intent and the overall statutory scheme provide additional guiding principles.  For

example, the FRA stated that the enacting Congress intended, among other goals, "to furnish an

elastic currency [and] establish a more effective supervision of banking in the United States."  38

Stat. 251.  It was subsequently amended to identify a monetary policy of "accommodating

commerce and business and with regard to their bearing upon the general credit situation of the

---

[34] An alleged violation of Article I § 1 results from *Congress* improperly giving the Executive *too much interpretive power* by enacting a vague statute lacking an "intelligible principle," and thus on the two occasions when the Supreme Court found such a delegation unconstitutional, it struck the offending statute.  *See Mistretta*, 488 U.S. at 373.  But plaintiff oddly asserts that the purported violation here is a *failure to exercise* interpretive authority by *the defendants* whom it wants compelled to process its request under "constitutionally required discernable standards."  Compl. ¶¶ 96-97, 101.  It does not challenge Reserve Banks's authority to accept deposits.  It thus is unclear how the Court could grant any relief on this claim, further undermining Plaintiff's standing.  *See Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018) (courts "cannot rewrite a statute"); *cf.* Compl. ¶¶ 53, 79 (claiming that no new standards could be applied to plaintiff's request).

country." 12 U.S.C. § 263(c).  Other provisions of the banking laws implicate additional policy

goals as significant as ensuring the financial stability of the economy as a whole.  *E.g.*, 12 U.S.C.

§ 5322(a)(1).  The Board's Guidelines with respect to master account requests, in fact, reflect an

effort to "fit" the exercise of Reserve Bank discretion to some of these broader goals.  *See, e.g.*,

Guidelines at 2 (noting, *inter alia*, that the Guidelines are meant to facilitate policy goals related

to "effectively implementing monetary policy [and] promoting financial stability").  The

authority to open master accounts is thus not an improper delegation of legislative power.

### C.  Plaintiff Fails to State a Claim for Violation of the Appointments Clause

Plaintiff contends that the FRA, which allows the decision on whether to grant it an

account to be made by an FRBKC official not subject to Presidential appointment and Senate

confirmation, violates the Appointments Clause, U.S. Const. art. II, § 2, cl. 2.  Compl. ¶ 126.

But plaintiff is wrong—the master account decision does not implicate the Clause in light of

historical practice indicating that similar decisions may be made by officials not appointed under

the Clause.  And even if the Clause were implicated, FRBKC's president is authorized by law to

make the decision on whether to grant a master account, *see* Part IV.A.4., *supra*, and her ability

to make this decision does not render her a "principal officer" who must be nominated by the

President and confirmed by the Senate.  The Board's removal powers vis-à-vis the FRBKC

president (on their own or in combination with its supervisory powers over FRBKC) mean that,

at most, she is an inferior officer, and the manner in which she was elevated to her role as

president of FBRKC complies with the Clause's requirements as to the appointments of such

officers.

As an initial matter, a Reserve Bank's decision on whether to open a master account does

not implicate the Clause at all, as shown by practice under the First Congress.  Indeed, not all

exercises of statutorily authorized actions by government-affiliated entities necessarily implicate the type of power that only officers subject to the Clause may wield, much less the requirement of presidential nomination and Senate confirmation required for "principal" officers. *See, e.g.*, *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1654-55 (2020) (offices with purely local responsibilities in D.C. and U.S. territories not subject to the Clause). The First Congress' establishment of the First Bank of the United States indicates that a decision on whether to open an account at a government-affiliated bank is not the type of sovereign power implicating the Clause.[35]  Such practice by "men who were contemporary with [the Constitution], many of whom were members of the convention which framed it, is of itself entitled to very great weight."  *Golan v. Holder*, 565 U.S. 302, 321 (2012); *see also Aurelius*, 140 S. Ct. at 1659 (citing legislation by the First Congress in construing scope of the Clause).

Specifically, the First Congress passed an "Act to incorporate the subscribers to the Bank of the United States," Act of Feb. 25, 1791, Pub. L. No. 1-10, 1 Stat. 191, which created an entity whose notes were accepted as payment to the government, and which was granted the exclusive right to bank under such "full faith of the United States." *Id.* §§ 10, 12, 1 Stat. at 196.  In this respect its notes were not unlike Federal Reserve notes, which are "receivable . . . for all taxes, customs, and other public dues." 12 U.S.C. § 411.  The bank was expected to serve a number of public goals.  Act of Feb. 25, 1791, 1 Stat at 191 (noting Congressional expectation that the bank would facilitate the "successful conducting of the national finances" and "give facility to the obtaining of loans, for the use of the government, in sudden emergencies").  Like Reserve Banks,

---

[35] *Cf. Thacker v. Tennessee Valley Auth.*, 139 S. Ct. 1435, 1442 (2019) ("[T]he discretionary acts of hybrid entities like the TVA may be not governmental but commercial in nature.")

it was authorized to accept deposits.  *Id.* § 7(XV), 1 Stat. at 195.[36]

The Act provided for appointment of the bank's leadership without utilizing the procedures of the Appointments Clause.  Its directors were elected by shareholders, *id.* § 4, 1 Stat. 192-93, rather than being subject to Senate confirmation or appointment by the President or Head of Department, and the directors in turn selected the bank's president; *see also id.* §§ 7(I), 11, 1 Stat. 193, 196 (limiting the government's ownership share and thereby precluding it from electing a majority of the directors).  The decision not to conform to the Appointments Clause was intentional; Treasury Secretary Alexander Hamilton explained to Congress that "[t]o attach full confidence to an institution of this nature, it appears to be an essential ingredient in its structure, that it shall be under a *private*, not a *public* direction . . . ."[37]  *Report on a National Bank* (Dec. 14, 1790), *in* Legislative and Documentary History of the Bank of the United States 29 (Clark & Hall eds., 1832).[38]

The First Congress' decision not to make the 1791 Act comport with the Appointments Clause indicates that the banking functions it authorized—although meant to serve public purposes—do not implicate the Clause.  *Cf. Aurelius*, 140 S. Ct. at 1659 (legislation by the First Congress for filling territorial offices using procedures not provided under the Appointments Clause indicates that the Clause does not apply to such offices).  Contemporaneous criticism focused on whether Congress could or should charter a bank, and not on any purported failure

---

[36] The only limit on such deposit-taking was that branch offices had to accept such deposits "upon the same terms, and in the same manner, as at the Bank."  *Id.*

[37] It is hardly surprising that the Founders did not view the bank as exercising the type of governmental power implicating the Clause; its charter was modeled on that of the national bank with which they were most familiar—the Bank of England—which was privately owned despite performing quasi-public functions.  Stephen K. Halpert, *The Separation of Banking and Commerce Reconsidered*, 13 J. Corp. L. 481, 491 (1988).

[38] https://fraser.stlouisfed.org/title/legislative-documentary-history-bank-united-states-3632.

comply with the Clause.  *See, e.g.*, Edmund Randolph, Attorney General of the United States, *Opinion to President Washington* (Feb. 12, 1791), *in* Legislative and Documentary History 86 ("It must be acknowledged, that, if any part of the bill does either encounter the constitution, or is not warranted by it, the clause of incorporation is the only one.").  When the Supreme Court subsequently addressed the constitutionality of a second bank chartered in 1816, it cited to the First Congress' enactment of the 1791 Act as evidence that the statute was constitutional, *M'Culloch v. Maryland*, 17 U.S. 316, 402 (1819), although the second bank was given more resources and more public responsibilities.[39]  The First Congress' manner of providing for selection of leaders of a bank created for public purposes and authorized by statute to accept deposits thus substantially refutes Plaintiff's assertion that FRBKC's decision to open a master account for purposes of accepting deposits implicates the Appointments Clause.

Moreover, even if the Appointments Clause were implicated by a decision on a master account, the authority to make the decision lies with FRBKC's President, whose appointment comports with the Clause.  Her appointment required approval of the Board of Governors.  *See* 12 U.S.C. § 341(fifth).  Such approval by the Board, which heads a federal agency, meets the Clause's requirement that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper . . . in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2; *Free Enter.*

---

[39] For example, the second bank's capitalization was 250% greater than the first bank's, *compare* Act of Feb. 25, 1791 § 1, 1 Stat. 191 *with* Act of Apr. 10, 1816, Pub. L. No. 14-1, § 1, 3 Stat. 266, and it was expressly required to provide "necessary facilities for transferring the public funds from place to place, within the United States . . . and for distributing the same in payment of the public creditors."  Act of Apr. 10, 1816 § 15, 3 Stat. 269, 274.  The 1816 Act required presidential nomination and Senate confirmation for five directors, but gave private shareholders the power to elect the remaining twenty directors, with the directors electing a bank president, *id.* § 8, 3 Stat. 269-70, thus continuing to vest overall control of the bank in officials not installed in accordance with the Appointments Clause.  The House had rejected a provision that would have required the bank's president to be one of the directors chosen by the government.  *See On the Grant of Charter of 1816* (Mar. 6, 1816), *in* Legislative and Documentary History 666-67.

*Fund v. PCAOB*, 561 U.S. 477, 512-13 (2010) (a multimember body heading an independent

agency is a "Head of Department" for Appointments Clause purposes); *id.* at 512 n.13 (Head of

Department approval of selection by another official satisfies the Clause (citing *United States v.*

*Hartwell*, 73 U.S. 385, 393-94 (1867) and other cases)).

 Plaintiff's reliance on *United States v. Arthrex*, *Inc.*, 141 S. Ct. 1970 (2021), to argue that

an FRBKC official responsible for the final decision on its request for a master account is a

"principal officer," Compl. ¶ 123, is misplaced.  The statute at issue in *Arthrex* allowed for final

decisions made by officials whom a department head could not "meaningfully control . . .

because she can fire them only 'for such cause as will promote the efficiency of the service.'"

141 S. Ct. at 1972 (quoting 5 U.S.C. § 7513(a)).  But the Board may remove FRBKC's president

or other officials without such restrictions and thereby "meaningfully control" their actions.

Specifically, the Board may "suspend or remove any officer or director of any Federal reserve

bank, the cause of such removal to be forthwith communicated in writing by the Board of

Governors of the Federal Reserve System to the removed officer or director and to said bank."

12 U.S.C. § 248(f).  It thus is not restricted to removal only "for such cause as will promote the

efficiency of service," as in *Arthrex*.  The Executive Branch construes section 248(f) as allowing

the Board to remove FRBKC officials at will, *Appointment & Removal of Fed. Reserve Bank*

*Members of the FOMC*, 2019 WL 11594453, at *7 (Op. O.L.C. Oct. 23, 2019), consistent with

judicial construction of similar language in 12 U.S.C. § 2 allowing the President to remove the

Comptroller of the Currency "upon reasons to be communicated by him to the Senate."  *Collins*

*v. Yellen*, 141 S. Ct. 1761, 1785 n.19 (2021) (Comptroller "removable at will by the President").

 The ability to remove FRBKC's president, together with the Board's supervisory

authority over Reserve Banks, 12 U.S.C. § 248(j),[40] is sufficient to render her an inferior officer rather than a principal officer. *Arthrex* expressly characterized its holding as applying to the *combination* of "significant authority" assigned to the officials at issue with legal provisions "insulating their decisions from review *and their offices from removal*." 141 S. Ct. at 1985 (citation omitted) (emphasis added). In fact, the *Arthrex* Court reaffirmed its prior holdings that it has not "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Id.* at 1985 (quoting *Edmond v. United States*, 520 U.S. 651, 661 (1997)); *see also id.* at 1987 (declining to determine whether "at-will removal by the Secretary would cure the constitutional problem" because striking a different provision "better reflect[ed] the structure of supervision within the [agency] and the nature of [the official's] duties"). Importantly, *Arthrex* noted that "the threat of removal from federal service entirely" can allow for "meaningful" control. *Id.* at 1972; *see also Edmond*, 520 U.S. at 664 ("The power to remove officers . . . is a powerful tool for control." (citations omitted)).

Thus, *Arthrex* did not call into question the validity of the lower court's reasoning that sufficiently broad removal powers can render officials who make unreviewable final decisions inferior officers, *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1337-38 (Fed. Cir. 2019), as well as other rulings reaching the same conclusion. *See, e.g.*, *Fleming v. USDA*, 987 F.3d 1093, 1103 (D.C. Cir. 2021) (rejecting a categorical argument that "an inferior officer's decisions must be subject to review by a principal officer" where at-will removal and other provisions allow for meaningful control); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341 (D.C. Cir. 2012) (ability of agency head to provide some guidance,

---

[40] The Board's general supervisory powers are extremely broad. *See Fraternal Ord. of Police*, 391 F. Supp. 2d at 5-6. The Board also controls Reserve Bank operating budgets and salaries, 12 U.S.C. §§ 248a(d), 307, and has exclusive rulemaking authority under the FRA. *Id.* § 248(i), (k).

combined with at-will removal, was sufficient to make official whose decision was unreviewable an inferior officer); *see also Sanofi-Aventis U.S., LLC v. DHHS*, 570 F. Supp. 3d 129, 180-81 (D.N.J. 2021) (citing at-will removal power as grounds for distinguishing *Arthrex*). Here, as in *Intercollegiate Broadcasting System*, the Board has construed its supervisory authority over Reserve Banks as allowing it to provide guidance to Reserve Bank officials in various ways, and has in fact issued guidance concerning the grant of master accounts. Combined with its removal power over FRBKC's president, this level of supervision means that she is not a principal officer even if the Appointments Clause were to apply to the decision and even though she exercises final decisionmaking authority in this matter.[41]

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the case be dismissed.

---

[41] Historical practice further undermines plaintiff's assertion that the decision at issue must be made by a principal officer. *See NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("long settled and established practice . . . of at least twenty years duration on the part of the executive department, acquiesced in by the legislative department is entitled to great regard in determining the true construction of a constitutional provision" concerning the separation of powers (cleaned up)). Besides the 40 years that the Banks of the United States operated under leadership primarily elected by private shareholders, the 1913 FRA provided for Senate confirmation of the Board's Governors but not of any Reserve Bank officials. FRA §§ 3, 4, 10, 38 Stat. 253-57, 260-1. The FRA has never provided otherwise despite numerous amendments over more than a century, including ten subsequent statutes specifically addressing the provisions governing selection or appointment of Board and Reserve Bank officials that were enacted between 1917 and 2015. *See* Act of June 21, 1917, Pub. L. No. 65-25, §§ 2-3, 40 Stat. 232; Act of Sept. 26, 1918, Pub. L. No. 65-218, § 1, 40 Stat. 967-68; Act of June 3, 1922, Pub. L. No. 67-230, 42 Stat. 620-21; Act of June 26, 1930, Pub. L. No 71-435, 46 Stat. 814, 815-16; Banking Act of 1933, Pub. L. No. 73-66, §§ 3(b), 6(a)-(b), 48 Stat. 162, 163-64, 166-67; Banking Act of 1935, Pub. L. No. 74-305, §§ 201, 203(b)-(c), 49 Stat. 684, 703-05; Act of July 1, 1966, Pub. L. No. 89-485, § 13(e), 80 Stat. 236, 243; Act of Nov. 16, 1977, Pub. L. No. 95-188, §§ 202, 204, 91 Stat. 1387-88; Dodd-Frank Wall Street Reform and Consumer Protection Act §§ 1107, 1108(a)(1), 124 Stat. 1376, 2126; Terrorism Risk Insurance Program Reauthorization Act of 2015, Pub. L. No. 114-1, § 109, 129 Stat. 3, 9. Thus, for the majority of the time that the Republic has existed, Congress and the Executive Branch have acquiesced in a regime under which government-affiliated banks serving public goals could render decisions about opening deposit accounts, without requiring that these banks be under the control of Senate-confirmed leadership.

Dated: August 16, 2022

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2022, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.


By:    /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors
of the Federal Reserve System*