Billie L.M. Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson (*pro hac vice* admission pending)
Laura Harris (*pro hac vice* admission pending)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice* admission pending)
Joshua N. Mitchell (*pro hac vice* admission pending)
Christine M. Carletta (*pro hac vice* admission pending)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500

*Counsel for Defendant the Federal Reserve Bank of Kansas City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants.* | No. 1:22-cv-00125-SWS |

## DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................... 4

    A.  The Federal Reserve System Is Designed to Ensure Financial Stability ...................... 4

    B.  Reserve Banks Consider Risks When Evaluating Master Account Requests .............. 6

    C.  Cryptocurrencies Present Novel Risks ........................................................................ 8

    D.  Wyoming "Special Purpose Depository Institutions" Have Unique Features ............ 10

    E.  Custodia Seeks Both a Master Account and Federal Reserve Membership ............... 11

LEGAL STANDARD ........................................................................................... 12

ARGUMENT ......................................................................................................... 13

I.     Count I: Custodia's APA Claim Fails Because FRBKC Is Not an Agency nor Has Custodia Suffered an Unreasonable Delay ......................................................... 13

    A.  FRBKC is not an agency ........................................................................................... 13

    B.  Custodia has not suffered an unreasonable delay under the APA ............................. 17

II.    Counts III and V: Because FRBKC Has Discretion Over Master Account Requests, Custodia Does Not Have a Property Interest and Its Due Process Claims Fail. ............................................................................................ 20

    A.  FRBKC has discretion to determine whether to grant a master account (Counts III and V) ................................................................................................. 20

    B.  Because a master account is discretionary, Custodia does not have a cognizable property interest (Counts III and V) ...................................................... 29

    C.  Master account decisions do not implicate a delegation of legislative authority (Count III) ................................................................................................ 30

    D.  The master account decision is not being made by Custodia's "competitors" (Count V) .......................................................................................... 31

III.   Count VI: Custodia's Appointments Clause Claim Is Unripe and Meritless ................. 33

    A.  Custodia's Appointments Clause claim is unripe because FRBKC has not taken action on Custodia's request ........................................................................... 33

B. Custodia's Appointments Clause claim is meritless because a decision on a master account request is not an exercise of the "executive Power" of the United States and because FRBKC is in any event constituted in accordance with that Clause.................................................................................34

IV.  Counts II, IV, VII, and VIII: Custodia's Declaratory Judgment Act and Mandamus Act Claims Are Improper, Inadequately Pleaded, and Unripe......................35

A. The Declaratory Judgment Act does not provide an independent right of action (Counts IV and VIII).............................................................................35

B. The Mandamus Act does not apply to FRBKC nor has Custodia adequately pleaded any claim arising under it (Counts II and VII) ...............................36

C. Counts VII and VIII are not ripe...............................................................36

V.  All Counts: Custodia Lacks Standing and This Case Is Constitutionally and Prudentially Unripe.........................................................................................37

A. Custodia lacks standing.............................................................................37

    1. Custodia has not suffered an injury-in-fact....................................38

    2. Custodia has not demonstrated that its requested relief is likely to redress its claimed injury ...............................................................39

B. Custodia's claims are prudentially unripe.................................................40

CONCLUSION.....................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth,*
300 U.S. 227 (1937).................................................................................. 35

*Am. Bankers Ass'n v. United States,*
932 F.3d 1375 (Fed. Cir. 2019) ................................................................... 8

*Ash Creek Min. Co. v. Lujan,*
969 F.2d 868 (10th Cir. 1992) ............................................................ 37, 39

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).................................................................................. 12

*Assoc. of Am. R.Rs. v. U.S. Dep't of Transp.,*
821 F.3d 19 (D.C. Cir. 2016) ..................................................................... 31

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ......................................................... 38, 40

*Bagherian v. Pompeo,*
442 F. Supp. 3d 87 (D.D.C. 2020) ............................................................ 20

*Bd. of Regents of State Colls. v. Roth,*
408 U.S. 564 (1972)........................................................................... 20, 29

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).................................................................................. 12

*Biden v. Texas,*
142 S. Ct. 2528 (2022)............................................................................... 21

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta,*
955 F.3d 971 (Fed. Cir. 2020) ................................................................... 16

*Camuglia v. City of Albuquerque,*
448 F.3d 1214 (10th Cir. 2006) ................................................................ 20

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936).................................................................................. 31

*Coleman v. Darden,*
595 F.2d 533 (10th Cir. 1979) ................................................................... 29

*Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.,*
693 F.3d 1195 (10th Cir. 2012) ................................................................ 35

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ................................................................ 13, 14, 15

*Dubbs v. Head Start, Inc.*,
  336 F.3d 1194 (10th Cir. 2003) ........................................................................ 12

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
  438 U.S. 59 (1978) ................................................................................... 37, 39

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
  466 F. Supp. 3d 100 (D.D.C. 2020) ................................................................... 13

*Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*,
  262 U.S. 649 (1923) ....................................................................................... 21

*Fasano v. Fed. Rsrv. Bank of N.Y.*,
  457 F.3d 274 (3d Cir. 2006) ............................................................................... 5

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ....................................................................................... 13

*Fed. Rsrv. Bank of Boston v. Comm'r of Corps. & Tax'n*,
  499 F.2d 60 (1st Cir. 1974) .............................................................................. 24

*Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*,
  657 F.2d 183 (8th Cir. 1981), *aff'd*, 455 U.S. 995 (1982) ...................................... 16

*Firebaugh Canal Water Dist. v. United States*,
  712 F.3d 1296 (9th Cir. 2013) .......................................................................... 19

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) ............................................................................... 5, 15, 16

*Fletcher v. Peck*,
  10 U.S. (6 Cranch) 87 (1810) ............................................................................ 31

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*,
  583 F. Supp. 674 (N.D. Ga. 1984) ..................................................................... 16

*Flight Int'l, Inc. v. Fed. Rsrv. Bank of Chi.*,
  597 F. Supp. 462 (N.D. Ga. 1984) ..................................................................... 16

*Forest Guardians v. Babbitt*,
  174 F.3d 1178 (10th Cir. 1999) .................................................................... 18, 19

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
  861 F.3d 1052 (10th Cir. 2017) .................................................................. *passim*

*Gliana v. Blinken*,
— F. Supp. 3d — , 2022 WL 910338 (D.D.C. Mar. 29, 2022) ............................................. 20

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*,
866 F.2d 38 (2d Cir. 1989) ................................................................................................... 8

*In re Hoag Ranches*,
846 F.2d 1225 (9th Cir. 1988) ........................................................................................... 15

*Irwin Mem'l Blood Bank of S.F. Med. Soc'y v. Am. Nat'l Red Cross*,
640 F.2d 1051 (9th Cir. 1981) ........................................................................................... 15

*Jefferson Cnty. v. Acker*,
137 F.3d 1314 (11th Cir. 1998),
*rev'd on other grounds*, 527 U.S. 423 (1999) ..................................................................... 17

*Katsiavelos v. Fed. Rsrv. Bank of Chi.*,
859 F. Supp. 1183 (N.D. Ill. 1994) .................................................................................... 16

*Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*,
558 F. Supp. 165 (D. Md. 1982) ................................................................................... 16, 17

*Lewis v. United States*,
680 F.2d 1239 (9th Cir. 1982) ................................................................................... 5, 14, 15

*Lombardo v. Handler*,
397 F. Supp. 792 (D.D.C. 1975),
*aff'd*, 546 F.2d 1043 (D.C. Cir. 1976) ................................................................................ 14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................................... 37, 39

*McGregor v. Gibson*,
248 F.3d 946 (10th Cir. 2001) .............................................................................................. 4

*McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*,
647 F.3d 331 (D.C. Cir. 2011) ........................................................................................... 15

*McKinney v. Caldera*,
141 F. Supp. 2d 25 (D.D.C. 2001) ..................................................................................... 14

*Melcher v. Fed. Open Market Comm.*,
644 F. Supp. 510 (D.D.C. 1986) .......................................................................................... 5

*Mun. Ass'n of S.C. v. USAA Gen. Indem. Co.*,
709 F.3d 276 (4th Cir. 2013) ............................................................................................. 17

*N. Mill Street, LLC v. City of Aspen*,
   6 F.4th 1216 (10th Cir. 2021) ................................................ 45

*New York v. Atl. States Marine Fisheries Comm'n*,
   609 F.3d 524 (2d Cir. 2010) ................................................ 13

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................ 36

*OK's Cascade Co. v. United States*,
   97 Fed. Cl. 635 (2011),
   *aff'd*, 467 F. App'x 888 (Fed. Cir. 2012) ................................................ 44

*Olim v. Wakinekona*,
   461 U.S. 238 (1983) ................................................ 29

*Rios v. Ziglar*,
   398 F.3d 1201 (10th Cir. 2005) ................................................ 36

*Robbins v. U.S. Bureau of Land Mgmt.*,
   438 F.3d 1074 (10th Cir. 2006) ................................................ 29

*Salgado-Toribio v. Holder*,
   713 F.3d 1267 (10th Cir. 2013) ................................................ 30

*Scott v. Fed. Rsrv. Bank of Kansas City*,
   406 F.3d 532 (8th Cir. 2005) ................................................ 6, 14, 16

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   140 S. Ct. 2183 (2020) ................................................ 33

*Sinochem Int'l Co. v. Malaysia Int'l. Shipping Corp.*,
   549 U.S. 422 (2007) ................................................ 45

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................ 37

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
   906 F. Supp. 2d 202 (S.D.N.Y. 2012),
   *aff'd*, 742 F.3d 37 (2d Cir. 2014) ................................................ 5

*Sunshine Anthracite Coal Co. v. Adkins*,
   310 U.S. 381 (1940) ................................................ 31

*Teigen v. Renfrow*,
   511 F.3d 1072 (10th Cir. 2007) ................................................ 21

*Telecomms. Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ................................................................. 18, 19

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
   576 U.S. 519 (2015) ................................................................................. 21

*Texas v. United States*,
   523 U.S. 296 (1998) ........................................................................... 36, 43

*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*,
   No. 1:18-CV-7978 (ALC),
   2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ............................... *passim*

*Twitter, Inc. v. Paxton*,
   26 F.4th 1119 (9th Cir. 2022) ............................................................... 45

*United States ex rel. Holbrook v. Brink's Co.*,
   336 F. Supp. 3d 860 (S.D. Ohio 2018) .................................................. 14

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021) ........................................................................... 33

*United States v. Brown*,
   381 U.S. 437 (1965) ............................................................................... 31

*United States v. Sup. Ct. of N.M.*,
   839 F.3d 888 (10th Cir. 2016) ............................................................... 40

*United States v. Wells Fargo & Co.*,
   943 F.3d 588 (2d Cir. 2019) .................................................................. 16

*Utah Animal Rts. Coal. v. Salt Lake City Corp.*,
   371 F.3d 1248 (10th Cir. 2004) ............................................................. 39

*Utah Housing Corp. v. Country Pines, Ltd.*,
   541 F. Supp. 3d 1288 (D. Utah 2021) ................................................... 35

*Van Woudenberg ex rel. Foor v. Gibson*,
   211 F.3d 560 (10th Cir. 2000) ................................................................. 4

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ................................................................... 22, 24, 28

*Wyoming v. U.S. Dep't of the Interior*,
   493 F. Supp. 3d 1046 (D. Wyo. 2020) .................................................. 43

*Wyoming v. Zinke*,
   871 F.3d 1133 (10th Cir. 2017) ............................................................. 40

**Constitutional Provisions**

U.S. Const. art. II, § 1 ................................................................................................ 34

U.S. Const. art. II, § 2 ................................................................................................ 34

**Statutes**

5 U.S.C. § 551(1) ...................................................................................................... 13

5 U.S.C. § 701(b)(1) .................................................................................................. 13

12 U.S.C. § 221 ........................................................................................................... 4

12 U.S.C. § 248(f) ............................................................................................... 32, 35

12 U.S.C. § 248(k) ............................................................................................... 6, 14

12 U.S.C. § 248a(a) .................................................................................................. 22

12 U.S.C. § 248a(b) ............................................................................................. 6, 22

12 U.S.C. § 248a(c)(2) ...................................................................... 8, 22, 23, 27, 29

12 U.S.C. § 248a(d) .................................................................................................. 22

12 U.S.C. § 303 ........................................................................................................ 32

12 U.S.C. § 321 .................................................................................................... 8, 12

12 U.S.C. § 324 ........................................................................................................ 43

12 U.S.C. § 341 ..................................................................................... 6, 32, 34, 35

12 U.S.C. § 342 .................................................................................................. *passim*

12 U.S.C. § 1813(z) .................................................................................................. 17

12 U.S.C. § 4801(1) .................................................................................................. 17

12 U.S.C. § 4807 ...................................................................................................... 17

12 U.S.C. §§ 241-252 ............................................................................................... 22

12 U.S.C. §§ 341-364 .......................................................................................... 6, 22

28 U.S.C. § 1361 ...................................................................................................... 36

Monetary Control Act of 1980 ("MCA"),
    Pub. L. No. 96-221 ........................................................................................... 7, 24

Wyo. Stat. § 12-12-116 (2019) ........................................................................ 11, 41

Wyo. Stat. § 13-12-103 ................................................................................... 10, 18

Wyo. Stat. § 13-12-105(b)(ii) ................................................................................ 44

Wyo. HB0074 § 1(a)(i) .......................................................................................... 10

## Regulations & Rules

12 C.F.R. § 201.1 ....................................................................................................... 7

12 C.F.R. § 265.11 ..................................................................................................... 6

Proposed Guidelines for Evaluating Account and Services Requests,
    86 Fed. Reg. 25,865 (May 11, 2021) ............................................................ 42

Proposed Guidelines for Evaluating Account and Services Requests,
    87 Fed. Reg. 12,957 (Mar. 8, 2022) ............................................................. 42

Board of Governors of the Federal Reserve System,
    *Guidelines for Evaluating Account and Service Requests*,
    Docket No. OP-1747, https://bit.ly/3C59BiP ........................................... 7, 42

Fed. R. Civ. P. 12(b)(1) ........................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 12

Wyo. Rules & Regs. 021.0002.20 § 2(a) ............................................................... 41

## Other Authorities

Andrew P. Scott, Cong. Rsrch. Serv.,
    No. R47014, An Analysis of Bank Charters and
    Selected Policy Issues (Jan. 21, 2022), https://bit.ly/3Qh5Qei ................... 8, 11, 12

Appointment and Removal of Federal Reserve Bank Members of the Federal Open
    Market Committee, 43 Op. Att'y Gen. __, Slip op. (Oct. 23, 2019) ........................ 35

Avanti Fin. Grp., Inc.,
    Comment Letter on Proposed Guidelines for Evaluating Accounts
    and Services Requests (July 12, 2021), https://bit.ly/3JIAf2N .......................... 11, 18

Bd. of Governors, Fed. Rsrv. Sys.,
    Money and Payments: The U.S. Dollar in the Age of
    Digital Transformation (Jan. 2022), https://bit.ly/3SFQ4uY ............................... 9

David Yaffe-Bellany, Erin Griffith, and Ephrat Livni,
*Cryptocurrencies Melt Down in a 'Perfect Storm' of Fear and Panic*,
N.Y. Times, (May 12, 2022), https://nyti.ms/3SIUYHV ....................................................... 10

Exec. Order No. 14,067
(Mar. 9, 2022), https://bit.ly/3IYJ4VI.................................................................................. 10

Fed. Rsrv. Sys., The Fed Explained: What the Central Bank Does,
35 Fed. Rsrv. Sys. 1 (11th ed. 2021)................................................................................ 4, 5, 6

Federal Reserve Policy on Payment System Risk,
FederalReserve.gov (Mar. 19, 2021), https://bit.ly/3zVvBd1 .................................................... 7

*Monetary Policy, Credit and Liquidity Programs and the Balance Sheet*,
FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva................................................ 7

Nate DiCamillo,
*Unpacking the Avit, Avanti Bank's New Digital Asset Being Built With
Blockstream*, CoinDesk.com (Sept. 14, 2021), https://bit.ly/3dujLPP .............................. 11, 26

Office of the Comptroller of the Currency,
*Bank Secrecy Act (BSA)*, https://bit.ly/3zzwND5 ..................................................... 26

President's Working Group on Fin. Mkts.,
the Fed. Deposit Ins. Corp., and the Office of the Comptroller of the Currency,
Report on Stablecoins (Nov. 1, 2021), https://bit.ly/3PQdJXv ...................................... 9, 10, 25

Press Release, State of N.Y.,
*DFS Superintendent Harris Announces $30 Million Penalty on
Robinhood Crypto for Significant Anti-Money Laundering, Cybersecurity, &
Consumer Protection Violations* (Aug. 2, 2022), https://on.ny.gov/3vX1CAy ...................... 26

Press Release, U.S. Dep't of Justice,
*CEO of Titanium Blockchain Pleads Guilty in $21 Million
Cryptocurrency Fraud Scheme* (July 25, 2022), https://bit.ly/3dmrX4F .................................. 9

Press Release, U.S. Dep't of Justice,
*Justice Department Announces Enforcement Action Charging Six Individuals with
Cryptocurrency Fraud Offenses in Cases Involving Over $100 Million in Intended
Losses*, (June 30, 2022), https://bit.ly/3SB8z3L .......................................................... 9

Press Release, U.S. Dep't of Treasury,
*U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*
(Aug. 8, 2022), https://bit.ly/3bQcoS8 .................................................................. 9, 26

*Reserve Maintenance Manual*,
FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl.................................................. 6

SEC, Div. of Examinations,
   The Division of Examinations' Continued Focus on Digital Asset Securities
   (Feb. 26, 2021), https://bit.ly/3Afdr7M ........................................................ 9

SEC Staff Accounting Bulletin No. 121,
   17 C.F.R. Part 211 (Apr. 11, 2022)................................................... 25, 26

State of Wyoming, Div. of Banking,
    General Overview of the Special Purpose Depository Institution
    Chartering Process, https://bit.ly/3dvljcf .......................................... 11, 41

*The Discount Window and Discount Rate*,
   FederalReserve.gov (July 12, 2022), https://bit.ly/3z504Fl..................................... 25

U.S. House Comm. on Fin. Servs.,
   Monetary Policy and the State of the Economy (June 23, 2022),
   https://bit.ly/3QoglMQ ............................................................... 10

U.S. Treasury, Fin. Crimes Enforcement Network,
   No. FIN-2019-A003, Advisory on Illicit Activity Involving
   Convertible Virtual Currency (May 9, 2019), https://bit.ly/3bFYJgE...................... 26

U.S. Treasury, Office of Foreign Assets Control,
   Sanctions Compliance Guidance for the Virtual Currency Industry
   (Sept. 21, 2021), https://bit.ly/3JMMbjP ............................................. 26

*When a Bank Fails—Facts for Depositors, Creditors, and Borrowers*,
   FDIC.gov (last visited July 22, 2022), https://bit.ly/3zcXo8x................................. 11

Zeke Faux and Muyao Shen,
   *A $60 Billion Crypto Collapse Reveals a New Kind of Bank Run*,
   Bloomberg (May 19, 2022), https://bloom.bg/3SRjsie............................................ 10

## INTRODUCTION

Plaintiff Custodia, a digital asset startup focused on serving as a bridge between the U.S. payment system and cryptocurrencies, has requested a "master account" with the Federal Reserve Bank of Kansas City ("FRBKC"). A master account would provide Custodia direct access to FRBKC financial services that Custodia would otherwise be required to access through an arrangement with a commercial bank, and it would result in Custodia's deposits sitting on the Federal Reserve balance sheet as liabilities of the nation's central bank. A master account for a novel entity focused on digital assets presents unique risks to FRBKC and the broader Federal Reserve System, and Custodia's request remains under careful consideration while FRBKC assesses these risks. This case is about whether Custodia can force FRBKC to rush a decision on Custodia's request before FRBKC has finished assessing the implications and risks related to granting Custodia direct access to the U.S. payment system and the Federal Reserve's balance sheet.

Custodia's request raises novel and unique questions because it is among the first entities with a Wyoming "Special Purpose Depository Institution" ("SPDI") charter to request a master account. By legislative design, an SPDI is not a traditional bank; Wyoming law prohibits Custodia from engaging in the traditional bank activity of lending and excuses it from insurance requirements that protect depositors. Thus, Custodia is seeking to become the first cryptocurrency-focused business—without Federal Deposit Insurance Corporation ("FDIC") insurance or any federal supervisor—to obtain direct access to FRBKC financial services.

This is not the first time a nontraditional business has tried to force access to Reserve Bank master accounts. Federal courts confronted similar claims in two recent lawsuits—*Fourth Corner*

and *TNB*—and both times the courts denied the plaintiffs relief.[1] This Court should follow suit and dismiss Custodia's Complaint. Were the Court to grant Custodia's demand, it would mark the first time that a Reserve Bank has been compelled to decide a master account request before it had adequately analyzed and mitigated the associated risks.

As a threshold matter, Custodia lacks standing and its suit is not ripe. In *TNB*, the plaintiff contended that the lack of a decision on its master account request after eighteen months constituted an actionable "constructive denial." The court disagreed and dismissed the complaint, concluding that the plaintiff lacked standing because FRBNY was still considering the request. Custodia, which is similarly situated, contorts its Complaint to try to avoid a similar fate. Instead of directly asking this Court to order FRBKC to grant its request for a master account (as TNB did), Custodia asks this Court to order FRBKC to *decide* the request. This is just obfuscation, as shown by Counts VII and VIII, which ask the Court to overrule FRBKC if its decision is to deny the request. And regardless, even in this contorted form, Custodia still lacks standing on the Complaint's own terms because the recast relief that Custodia seeks in Counts I through VI—that FRBKC make a decision—may not redress the injury it alleges (incurring bank fees, which Custodia would continue to incur if the decision is a denial). Meanwhile, Counts VII and VIII are contingent on future events and premature on their face.

Apart from these constitutional standing and ripeness deficiencies, Custodia's case at the very least is prudentially unripe. FRBKC continues to work on Custodia's request while both the executive and legislative branches of the federal government analyze regulation of the

---

[1] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (two members of panel affirming dismissal of suit); *TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-CV-7978 (ALC), 2020 WL 1445806, at *6 (S.D.N.Y. Mar. 25, 2020) (holding that plaintiff lacked standing to challenge the Federal Reserve Bank of New York's ("FRBNY") continued deliberation on its master account request).

cryptocurrency industry in general and its potential access to master accounts in particular. For example, the Federal Reserve Board of Governors has finalized guidelines to assist the Reserve Banks in evaluating master account requests like this one. *See* Compl. ¶ 49 (referencing the Board's proposed guidelines). Instead of prematurely addressing Custodia's barrage of constitutional and statutory claims, this Court should allow these deliberative processes to play out.

While Custodia's entire Complaint fails due to a lack of standing and ripeness, its individual counts also fail to state a valid claim:

- Count I, asserted under the Administrative Procedure Act, fails because FRBKC is not an executive agency and even if it were, there has been no unreasonable delay.

- Counts III and V, asserted under the Due Process Clause, fail because due process claims require a plaintiff to show deprivation of a cognizable property interest and Custodia has no property interest in a master account. To the contrary, Congress unambiguously granted Reserve Banks discretion over whether to accept deposits from eligible depository institutions.

- Count VI, asserted under the Appointments Clause, fails because FRBKC's decision whether to grant a master account is not an exercise of the "executive Power" of the United States and because the individual tasked with that decision, FRBKC's president, is in any event an "inferior Officer" appropriately appointed and removable by the executive.

- Counts II, IV, VII, and VIII are claims for declaratory and mandamus relief that fail because (among other reasons) the Declaratory Judgment Act does not provide a private right of action and the Mandamus Act does not apply to FRBKC.

This memorandum addresses Custodia's claims and explains why each lacks merit. Ultimately, however, analysis of the myriad legal issues raised by Custodia's claims reinforces that this lawsuit is not ripe, either constitutionally or prudentially, so this memorandum closes by explaining why the Court should decline to decide this suit until FRBKC completes its review of Custodia's request. Custodia's master account request raises serious and novel issues and requires time for appropriate consideration. Rather than allowing Custodia to substitute its judgment for that of FRBKC, the Court should allow FRBKC to complete its review consistent with its mandate to ensure the safety and soundness of the nation's financial system.

## BACKGROUND

### A.    The Federal Reserve System Is Designed to Ensure Financial Stability

The Federal Reserve System, the nation's central bank, was established by the Federal Reserve Act of 1913 ("FRA"), 12 U.S.C. § 221 *et seq*. During the first 125 years of the Republic, the United States' financial system suffered recurrent fiscal emergencies including bank panics, bank failures, and scarce credit. In 1913, Congress passed the FRA, creating the Federal Reserve System to promote "the stability of the financial system and … to minimize and contain systemic risks through active monitoring." Fed. Rsrv. Sys., The Fed Explained: What the Central Bank Does, 35 Fed. Rsrv. Sys. 1, 1 (11th ed. 2021) [hereinafter "The Fed Explained"].[2] Among other things, the Federal Reserve serves the public interest by promoting a stable financial system and by setting and implementing monetary policy. *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F.

---

[2]  Any factual materials discussed in this Background section are matters of public record appropriate for judicial notice. *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of … facts which are a matter of public record."), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) (en banc). Of course, legal materials are proper for the Court's consideration even without a request for judicial notice.

Supp. 2d 202, 232 (S.D.N.Y. 2012) (FRA entrusts Federal Reserve with maintaining stability of financial system), *aff'd*, 742 F.3d 37 (2d Cir. 2014). The Federal Reserve also works to promote a sound and well-functioning financial intermediation system—the process through which banks both act as the middleman between two parties in a financial transaction and take in funds from depositors and lend them out to borrowers.

The System consists of the Board of Governors of the Federal Reserve System (the "Board of Governors"); the Federal Open Market Committee (the "FOMC"); and twelve regional Reserve Banks, including FRBKC. This decentralized system reflects Congress's desire to balance government oversight with insulation from undue political pressure. *See Fasano v. Fed. Rsrv. Bank of N.Y.*, 457 F.3d 274, 277 (3d Cir. 2006); *Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982). Congress thoroughly considered this structure; indeed, "[f]ew issues in the history of this nation have been as thoroughly considered and debated as central banking and the regulation of the money supply." *Melcher v. Fed. Open Market Comm.*, 644 F. Supp. 510, 524 (D.D.C. 1986).

By deliberate congressional design, Reserve Banks serve governmental interests, but stand apart from the government. They are federal instrumentalities—corporations chartered pursuant to federal law (the FRA) to perform federal functions, namely the central bank's operational responsibilities. *See Starr*, 742 F.3d at 40; *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 624-25 (1983) (government's corporate instrumentalities have distinctive ownership structure and features that "permit [them] to manage their operations on an enterprise basis while granting them a greater degree of flexibility"). Consistent with their federal instrumentality status, Reserve Banks do not receive federal appropriations (but instead finance their operations through a combination of service fees and accumulated interest on securities they possess), *see* The Fed Explained at 4; they lack the authority

to promulgate regulations having the force of law, *see Scott v. Fed. Rsrv. Bank of Kansas City*, 406 F.3d 532, 536 (8th Cir. 2005); 12 U.S.C. § 248 (k); and they may enter into contracts and sue and be sued in their own names, 12 U.S.C. § 341 (Third), (Fourth).

Throughout the FRA, Congress authorized the Reserve Banks to carry out certain banking functions. *See, e.g.*, 12 U.S.C. §§ 341-361. In effect, Reserve Banks operate as bankers' banks to much of the banking industry. They carry out many payment, clearing, and settlement functions (many of which echo those that commercial banks provide to end-user customers), including distributing currency and coin to depository institutions, clearing checks, operating the FedWire and automated clearinghouse (ACH) systems, and serving as a bank for the U.S. Treasury. *See* 12 U.S.C. § 248a(b) (enumerating the services provided by Reserve Banks); The Fed Explained at 48.

While the FRA authorizes the Reserve Banks to perform certain functions, in some instances the Reserve Banks perform functions delegated to them by the Board of Governors. *See, e.g.*, 12 U.S.C. § 248(k) (allowing the Board to delegate certain functions to "administrative law judges, members or employees of the Board, or Federal Reserve banks"). For example, the Board of Governors has delegated to the Reserve Banks certain of the tasks associated with supervising and examining state member banks (state-chartered banks that have chosen to become members of the Federal Reserve System). *See* 12 C.F.R. § 265.11. Granting a master account, however, is not a delegated function. *See* 12 U.S.C. § 342.

## B.    Reserve Banks Consider Risks When Evaluating Master Account Requests

A master account allows a depository institution to make deposits into and withdrawals from an account held at and administered by a Reserve Bank without using an intermediary. *Reserve Maintenance Manual*, FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl. A master account centralizes the account relationship between a depository institution and a Reserve

Bank. *Id.* Banks located in a geographic area that encompasses Wyoming direct requests for a master account to FRBKC. FRBKC's decision whether to grant a master account involves consideration of both the Reserve Bank's own risk related to the account holder (*e.g.*, credit risk, Bank Secrecy Act/anti-money-laundering compliance) and evaluation of broader policy concerns and systemic risks. Board of Governors of the Federal Reserve System, *Guidelines for Evaluating Account and Service Requests*, Docket No. OP-1747 ("Guidelines") at 8, https://bit.ly/3C59BiP.[3]

When a Reserve Bank provides certain services to master account holders, it may end up extending credit to them, even where the Reserve Bank takes steps to limit any extension of intraday or overnight credit to the institution. For example, check payment activity and incoming ACH items can result in check or ACH debits causing a master account to go negative. *See* 12 C.F.R. § 201.1, *et seq.* (establishing rules under which a Reserve Bank may extend credit to depository institutions and others); Federal Reserve Policy on Payment System Risk, FederalReserve.gov (Mar. 19, 2021), https://bit.ly/3zVvBd1 (outlining the methods used to provide intraday credit to ensure the smooth functioning of payment and settlement systems, while controlling credit risk to the Reserve Banks associated with such intraday credit). Furthermore, a Reserve Bank account holder's deposits—as recorded in a master account—sit on the Federal Reserve's balance sheet as liabilities, which has implications for the Federal Reserve's ability to effectuate monetary policy (through, for example, setting the interest rates paid on reserves held in master accounts) and promote U.S. financial stability. *See Monetary Policy, Credit and Liquidity Programs and the Balance Sheet*, FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva.

Before Congress passed the Monetary Control Act of 1980 ("MCA"), Pub. L. No. 96-221,

---

[3] The Guidelines have not yet been published in the Federal Register. Page numbers in this Memorandum's citations to the Guidelines refer to PDF document pages.

Reserve Bank accounts and direct access to Reserve Bank services were generally reserved only for Federal Reserve "member" banks and the U.S. government. Member banks are subject to supervision by the Board of Governors. They are required to subscribe to stock in their regional Reserve Bank and maintain certain reserve amounts. *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1379 (Fed. Cir. 2019). Because being a member bank comes with those responsibilities, the Reserve Banks offered payment services to members free of charge. *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989).

In 1980, through the MCA, Congress amended the FRA to enable nonmember depository institutions to obtain direct access to Reserve Bank services. 12 U.S.C. § 342 (adding "other depository institutions" to the list of entities from which Reserve Banks "may" receive deposits). The MCA then required the Board of Governors to set a uniform, nondiscriminatory pricing schedule for services Reserve Banks offer, provided that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks." 12 U.S.C. § 248a(c)(2). Since the MCA's enactment, nonmember master account holders typically have been engaged in the traditional business of banking—taking deposits and lending—under traditional banking charters, subject to FDIC insurance requirements and federal supervision. *See* Andrew P. Scott, Cong. Rsch. Serv., No. R47014, An Analysis of Bank Charters and Selected Policy Issues at 7 (Jan. 21, 2022), https://bit.ly/3Qh5Qei [hereinafter "CRS Bank Charter Report"]; *see also* 12 U.S.C. § 321 (describing member banks).

## C.   Cryptocurrencies Present Novel Risks

Cryptocurrencies are digital assets, certain of which have the potential to streamline access to banking services, improve cross-border payment systems, and lower transaction costs. *See, e.g.*, Bd. of Governors, Fed. Rsrv. Sys., Money and Payments: The U.S. Dollar in the Age of Digital

Transformation at 14-16 (Jan. 2022), https://bit.ly/3SFQ4uY. The cryptocurrency industry remains in its infancy, however, and the assets themselves face a number of significant questions and are subject to an uncertain regulatory landscape.

One set of questions is operational in nature, such as how digital assets can be safely custodied. *See, e.g.*, SEC, Div. of Examinations, The Division of Examinations' Continued Focus on Digital Asset Securities (Feb. 26, 2021), https://bit.ly/3Afdr7M (discussing "the risks and practices related to the custody of digital assets"). A second set of questions relates to the pseudonymous nature of the markets: cryptocurrency transactions occur between "wallets" whose owners are anonymized, which means cryptocurrencies can be more easily used to move proceeds of criminal conduct. *See, e.g.*, President's Working Group on Fin. Mkts., the Fed. Deposit Ins. Corp., and the Office of the Comptroller of the Currency, Report on Stablecoins at 19-21 (Nov. 1, 2021), https://bit.ly/3PQdJXv [hereinafter "Report on Stablecoins"]; Press Release, U.S. Dep't of Treasury, *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash* (Aug. 8, 2022), https://bit.ly/3bQcoS8; Ltr. from Sen. Maggie Hassan to Attorney Gen. Merrick Garland (Sept. 26, 2021), https://bit.ly/3bKjSWN (writing that the "anonymity provided by cryptocurrency has helped facilitate its use by criminals in a myriad of ways"). A third set of questions relates to manipulation and fraud, which can proliferate in markets where regulatory oversight is weak or uncertain. *See, e.g.*, Press Release, U.S. Dep't of Justice, *CEO of Titanium Blockchain Pleads Guilty in $21 Million Cryptocurrency Fraud Scheme* (July 25, 2022), https://bit.ly/3dmrX4F; Press Release, U.S. Dep't of Justice, *Justice Department Announces Enforcement Action Charging Six Individuals with Cryptocurrency Fraud Offenses in Cases Involving Over $100 Million in Intended Losses*, (June 30, 2022), https://bit.ly/3SB8z3L. And a fourth set of questions concerns the volatility of the assets and how such volatility can contribute to runs on, and collapses of, entire

asset classes. *See, e.g.*, David Yaffe-Bellany, Erin Griffith, and Ephrat Livni, *Cryptocurrencies Melt Down in a 'Perfect Storm' of Fear and Panic*, N.Y. Times, (May 12, 2022), https://nyti.ms/3SIUYHV. Indeed, even "stablecoins," a type of cryptocurrency theoretically pegged to the value of a second asset (including national currencies like the U.S. dollar), have suffered runs and collapses. *See* Zeke Faux and Muyao Shen, *A $60 Billion Crypto Collapse Reveals a New Kind of Bank Run*, Bloomberg (May 19, 2022), https://bloom.bg/3SRjsie.

Cryptocurrency's risks and potential benefits have garnered attention from the White House, Congress, and federal financial agencies. *See, e.g.*, Exec. Order No. 14,067 (Mar. 9, 2022), https://bit.ly/3IYJ4VI; Report on Stablecoins at 1. Public officials have called for further review and regulation of responsible development of digital assets and their potential integration into the financial system. *See* U.S. House Comm. on Fin. Servs., Monetary Policy and the State of the Economy (June 23, 2022), https://bit.ly/3QoglMQ. For all the promise that blockchain technology and digital assets may bring to payments and banking (among other domains), many significant questions and concerns remain.

### D.    Wyoming "Special Purpose Depository Institutions" Have Unique Features

As part of its effort to encourage cryptocurrency businesses to form in Wyoming, Wyoming promulgated the SPDI charter in 2018 to assist "blockchain innovators" in accessing "secure and reliable banking services." Wyo. HB0074 § 1(a)(i). SPDIs may provide cryptocurrency custody services, accept deposits, and provide payment services. *See* Wyo. Stat. § 13-12-103. SPDIs may not make loans; they attempt to derive profit from fee-based businesses (such as cryptocurrency custody). *See* Wyo. Stat. § 13-12-103(c).

SPDIs have unique features that distinguish them from banks and that weaken or remove protections that exist for standard bank customers. *See* Compl. ¶¶ 28-29. For example, SPDIs are exempt from Wyoming's requirement that its banks obtain FDIC insurance. *See* Wyo. Stat. § 13-

2-103(a). FDIC insurance "protects depositors if a bank fails … and helps prevent bank runs by providing consumers with the confidence that their money will be available during periods of economic or financial stress." CRS Bank Charter Report at 7. FDIC insurance also provides a well-established process for the orderly resolution of a failed bank that protects the bank's customers by preserving depositors' access to their money and their ability to make and receive payments during the transfer of the customer relationship to another bank. *See When a Bank Fails—Facts for Depositors, Creditors, and Borrowers*, FDIC.gov (last visited July 22, 2022), https://bit.ly/3zcXo8x.

Wyoming law prohibits an SPDI from "commenc[ing] business" until it has not only received an SPDI charter from the State but also a "certificate of authority to operate from the [Banking] commissioner." Wyo. Stat. § 13-12-116 (2019); *see* State of Wyoming, Div. of Banking, General Overview of the Special Purpose Depository Institution Chartering Process, https://bit.ly/3dvljcf.

### E.     Custodia Seeks Both a Master Account and Federal Reserve Membership

Custodia (formerly known as Avanti) is an SPDI that plans to offer customers a variety of digital-asset-related services including custody of cryptocurrencies. To facilitate its business, it intends to issue the "Avit," a stablecoin-like payment product of its own creation recorded on a blockchain. Nate DiCamillo*, Unpacking the Avit, Avanti Bank's New Digital Asset Being Built With Blockstream*, CoinDesk.com (Sept. 14, 2021), https://bit.ly/3dujLPP; *see also* Avanti Fin. Grp., Inc., Comment Letter on Proposed Guidelines for Evaluating Accounts and Services Requests (July 12, 2021), https://bit.ly/3JIAf2N.

On October 29, 2020, Custodia submitted a request for a master account to FRBKC. Compl. ¶ 18. Since that time, FRBKC has engaged extensively with Custodia regarding its request. *See* Compl. ¶¶ 37, 42-43, & 54. Custodia alleges that it intends to begin operating without a master

account, instead working with what it characterizes as a "correspondent" bank (through a traditional bank-customer relationship) that has its own master account. Compl. ¶ 8. Custodia does not allege that it has received the "certificate of authority" required by Wyoming law to "commence business." *See supra* at 11.

After requesting a master account, Custodia also filed an application with the Board of Governors seeking membership in the Federal Reserve System. Compl. ¶ 4; *see* 12 U.S.C. § 321 (Board of Governors reviews membership applications). Membership is separate from a request to a Reserve Bank for a master account. If Custodia is granted membership to the Federal Reserve System, it will then be subject to federal banking supervision and regulation. *See* CRS Bank Charter Report at 2-3 (explaining that nonmember banks are usually subject to FDIC oversight and member banks are subject to Federal Reserve oversight).

But Custodia has not waited for a decision on either its request for a master account or its membership application. Instead, Custodia filed this action to cut short FRBKC's evaluation of its master account request.

## LEGAL STANDARD

The Court's function on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is "to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (cleaned up). To overcome a Rule 12(b)(6) motion to dismiss, a complaint's well-pleaded factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Though the Court construes well-pleaded factual allegations in the light most favorable to the plaintiff, it does not accept legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

The Court must dismiss any claim over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

## ARGUMENT

### I.   Count I: Custodia's APA Claim Fails Because FRBKC Is Not an Agency nor Has Custodia Suffered an Unreasonable Delay

Count I of Custodia's Complaint fails for two reasons. First, the APA is inapplicable to FRBKC because it is not an agency. Second, regardless of whether FRBKC is an agency, Custodia has not suffered an "unreasonable delay."

### A.   FRBKC is not an agency

*1. The Reserve Banks are not "agencies" under the APA.* The APA defines "agency" as an "authority of the Government of the United States." 5 U.S.C. § 701(b)(1); *see also* 5 U.S.C. § 551(1) (same); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 525 n.6 (2009). When assessing whether an entity is an agency within the meaning of the APA, courts "examine the structure, function, and mandate of the entity in question." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010). Courts have cautioned that "[t]he wording of section 701(b)(1) indicates that we should not give the definition of 'agency' a more expansive reading" than what is present in the text. *Id.* at 532.

To qualify as an agency, an entity must "exercise substantial independent authority" or, put differently, be the "center of gravity in the exercise of administrative power." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997) (holding that the Smithsonian is not an agency). If an entity "does not make binding rules of general application or determine rights and duties through adjudication" and "issues no orders and performs no regulatory functions," it is not an agency. *Id.* at 882; *see also Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 110 (D.D.C. 2020) (finding that National Security Commission on AI was not an agency under the

APA); *McKinney v. Caldera*, 141 F. Supp. 2d 25, 34 (D.D.C. 2001) (finding that Judge Advocate General's Office was not an agency under the APA).

The Reserve Banks are not the center of gravity of the exercise of administrative power and do not make binding rules of general application or determine rights and duties through adjudication. *See Dong*, 125 F.3d at 881-82. The Reserve Banks cannot promulgate regulations with the force of law. *See Scott*, 406 F.3d at 536; 12 U.S.C. § 248(k). Indeed, the Federal Reserve's rulemaking authority is vested in the Board of Governors and may not be delegated. 12 U.S.C. § 248(k). Moreover, Reserve Bank employees are not federal government employees. *Scott*, 406 F.3d at 536. They do not participate in the Civil Service Retirement System, are not subject to federal travel regulations, and are not covered by the Federal Employees' Compensation Act. *United States ex rel. Holbrook v. Brink's Co.*, 336 F. Supp. 3d 860, 868-69 (S.D. Ohio 2018) (citing *Lewis*, 680 F.2d at 1241); *cf. Dong*, 125 F.3d at 883 (even though Smithsonian employees are covered by Federal Employees' Compensation Act, Smithsonian is not an agency).

Nor do the banking services performed by Reserve Banks, including decisions regarding master accounts, amount to such "substantial" and "independent" powers that they transform the Reserve Banks into agencies under the APA. *See Dong*, 125 F.3d at 881. The ability to make decisions on matters such as a master account request is not sufficient to qualify an entity as an agency. *See Lombardo v. Handler*, 397 F. Supp. 792, 794 (D.D.C. 1975) (National Academy of Sciences is not an "agency" under the APA even though it has authority to veto Environmental Protection Agency's suspension of vehicle-emission standards), *aff'd*, 546 F.2d 1043 (D.C. Cir. 1976). As the D.C. Circuit explained in *Dong*, "that an organization makes decisions does not always mean that it is a government agency." 125 F.3d at 881. For example, the Smithsonian museum at issue in *Dong* had a police force, received federal funds and grants, and made decisions

on how to distribute funds to research grantees, but the court reasoned that these did not make it an agency because private research universities also receive federal funds and private museums also have security personnel. *Id*. at 882. Similarly, services that may be provided upon grant of a master account—accepting deposits, offering banking services, permitting account holders to request credit—are akin to services provided by private-sector banks and are not governmental in nature. Moreover, the Board of Governors' general oversight of the Reserve Banks means that they lack the executive "independence" required to qualify as APA agencies. *See id*. at 881; *see supra* at 5-6 (describing relationship between Reserve Banks and Board of Governors).

Finally, the Reserve Banks' status as federal instrumentalities, *see* Compl. ¶ 112, does not make them agencies within the meaning of the APA. *See Bancec*, 462 U.S. at 626-27 (stating that U.S. law should "respect the separate juridical identities of different agencies or instrumentalities"); *In re Hoag Ranches*, 846 F.2d 1225, 1227 (9th Cir. 1988) (referencing Reserve Banks while stating that "[m]any financial institutions are federally chartered and regulated and are considered federal instrumentalities, without attaining the status of government agencies"); *Lewis*, 680 F.2d at 1243 (Reserve Banks are not federal agencies under the Federal Tort Claims Act)[4]; *cf. McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (treating Reserve Banks as not being agencies under FOIA definition, which includes any entity that qualifies as an agency under APA definition); *Irwin Mem'l Blood Bank of S.F. Med. Soc'y v. Am. Nat'l Red Cross*, 640 F.2d 1051, 1052 (9th Cir. 1981) (finding that the Red Cross was not an agency under FOIA).

---

[4] The Ninth Circuit's holding in *Lewis* that Reserve Banks are not agencies under the Federal Tort Claims Act is especially telling, as that statute uses a broader definition of agency than the APA. *See Dong*, 125 F.3d at 878-80 (explaining that definition of agency under FOIA and FTCA is broader than APA definition).

*2. Reserve Banks have not been considered agencies under a variety of statutes.* In addition to the precedent just described concerning the APA's definition of "agency," many courts have held, for many purposes and under numerous statutory schemes, that the Reserve Banks are not agencies of the federal government. *See, e.g.*, *Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 976 (Fed. Cir. 2020) (Reserve Banks are distinct from the government and thus "persons" for the review provisions of the America Invents Act); *United States v. Wells Fargo & Co.*, 943 F.3d 588, 597 (2d Cir. 2019) (Reserve Banks are not federal agencies under the False Claims Act); *Scott*, 406 F.3d at 538 (Reserve Banks are not federal agencies for purposes of Federal Rule of Appellate Procedure 4 or Title 28 of the U.S. Code); *Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183, 186 (8th Cir. 1981) (Reserve Banks are instrumentalities for purposes of special assessments imposed by state and local governments), *aff'd*, 455 U.S. 995 (1982); *Katsiavelos v. Fed. Rsrv. Bank of Chicago*, 859 F. Supp. 1183, 1185 (N.D. Ill. 1994) (Reserve Banks are not federal agencies under the Rehabilitation Act).

*3. Custodia's claims to the contrary are without merit.* Custodia relies on two cases to assert that FRBKC is an agency under the APA: *Flight International Group, Inc. v. Federal Reserve Bank of Chicago*, 583 F. Supp. 674 (N.D. Ga. 1984), and *Lee Construction Co. v. Federal Reserve Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982). In *Flight International Group*, the Northern District of Georgia incorrectly reasoned that being an instrumentality of the government is the same as being an agency, 583 F. Supp at 678 (citing cases)—a position the Supreme Court had rejected the prior year in *Bancec*, 462 U.S. at 624. *Flight International Group*, moreover, was vacated and "shall have no precedential effect." *Flight Int'l, Inc. v. Fed. Rsrv. Bank of Chi.*, 597 F. Supp. 462 (N.D. Ga. 1984) (Mem.).

*Lee* fares no better. The *Lee* court wrote that the Reserve Banks "are seemingly not

designated as agencies for any purpose," 558 F. Supp. at 179, before incorrectly relying on cases finding the Reserve Banks to be *instrumentalities* as support for an illogical leap that they must therefore be *agencies*, *see id.* at 179 n.20. The faulty reasoning displayed in both cases is underscored by their subsequent treatment. In the years since *Flight International Group* and *Lee* were decided, the Fourth and Eleventh Circuits have described the Reserve Banks not as agencies but as federal instrumentalities. *See, e.g.*, *Mun. Ass'n of S.C. v. USAA Gen. Indem. Co.*, 709 F.3d 276, 284 (4th Cir. 2013); *Jefferson Cnty. v. Acker*, 137 F.3d 1314, 1321-22 (11th Cir. 1998), *rev'd on other grounds*, 527 U.S. 423 (1999).

For all these reasons, FRBKC is not an "agency" under the APA.

### B.    Custodia has not suffered an unreasonable delay under the APA

Regardless of whether FRBKC is considered an agency, Custodia's APA claim should be dismissed. Custodia's allegation that it has suffered an "unreasonable delay" is without merit. At the heart of Custodia's claim is its assertion that 12 U.S.C. § 4807 sets a one-year period for FRBKC to act on its request for a master account. *See* Compl. ¶¶ 6, 46, 74, 87, & 107. But 12 U.S.C. § 4807 does not apply to FRBKC. That statute provides that "[e]ach Federal banking agency" shall take action on "applications" within 12 months from the date on which a completed application is received. 12 U.S.C. § 4807. "Federal banking agency" is a defined term encompassing three specific agencies: the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, and the FDIC. 12 U.S.C. §§ 1813(z) & 4801(1). The Reserve Banks are not listed and are therefore not Federal banking agencies within the meaning of § 4807. Congress has promulgated no timetable for FRBKC's decision whether to "receive … deposits" from an institution. *See* 12 U.S.C. § 342.

Where no statute sets a mandatory deadline for action, a delay is not unreasonable as a matter of law so long as the agency has a reasonable explanation for it. *See Forest Guardians v.*

*Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). For a delay to warrant a court to order agency action within a specific time frame, the delay must be "egregious." *Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984). Even if FRBKC were an agency under the APA, Custodia's Complaint itself makes clear that FRBKC has not taken an unreasonable amount of time to consider Custodia's request, given the extraordinary nature of that request. The Court need not look beyond three core facts about Custodia's request to understand why the time spent considering of the request has been reasonable and certainly not "egregious": (1) an SPDI is permitted by statute to provide cryptocurrency services to customers, but it is forbidden from lending and excused from insurance requirements, *see* Wyo. Stat. § 13-12-103(a), (c); (2) Custodia would be the first SPDI to obtain a master account, *see* Compl. ¶ 31 n.1; and (3) Custodia has not pleaded that it intends to seek or has sought FDIC insurance, and it is presently not subject to supervision by any federal regulator. Almost all state-chartered deposit-taking banks are required to have FDIC insurance, which comes with an accompanying set of applicable laws and federal supervision that together provide enhanced oversight and standards for capital, liquidity, and other prudential requirements.

Custodia has itself acknowledged that "the digital asset industry's interactions with traditional U.S. dollar intermediaries pose unique risks and regulatory challenges to U.S. payment system regulators, some of which have not yet manifested." Avanti Fin. Grp., Inc., Comment Letter on Proposed Guidelines for Evaluating Accounts, *supra*. FRBKC, both on its own and as part of the larger Federal Reserve System, has a responsibility to maintain the stability of the U.S. financial system and act in the public interest. *See id.* at 4 ("Avanti supports the Federal Reserve's paramount goal of ensuring the safety and soundness of the U.S. payment system."). Introducing links between the Federal Reserve's balance sheet and cryptocurrencies, including stablecoins and

other similar instruments, poses credit and stability risks both to the individual Reserve Bank and to the Federal Reserve System as a whole. For example, given that direct access to certain FRBKC services necessarily involves credit risk to FRBKC from account holders, *see supra* at 7, what measures must FRBKC take to protect itself and Custodia's customers against the risk of Custodia failing? Given that the Federal Reserve's balance sheet will reflect Custodia's deposits as liabilities, how large should FRBKC anticipate those balances will be, how will they scale if other similar SPDIs are granted master accounts, and what impact might they have on monetary policy and financial stability? Given the pseudonymous nature of cryptocurrency transactions, how will Custodia's compliance with Bank Secrecy Act and Anti-Money Laundering laws be monitored? How does Custodia's reliance on the cryptocurrency industry to generate revenue complicate or compound these questions? What about the absence of FDIC insurance or any federal regulator or supervisor? And how does Custodia's business model, which is entirely digital and has international reach, impact its ability to scale quickly, and how would rapid growth affect these other questions?

Resolving these and other serious, complex questions requires time and careful consideration. Moreover, Custodia's master account request involves economic considerations, where courts are more tolerant of longer periods of deliberation. *See Forest Guardians*, 174 F.3d at 1191 n.18 (citing *TRAC*, 750 F.2d at 80, for the proposition that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"). This further supports the reasonableness of FRBKC's consideration of the request, and indeed courts have approved significantly longer timetables even for routine issues. *Firebaugh Canal Water Dist. v. United States*, 712 F.3d 1296, 1303 (9th Cir. 2013) (holding that Department of Interior's approximately six-year delay in implementing drainage plan was "understandable"

given "the scope and cost of the project"); *Gliana v. Blinken*, — F. Supp. 3d —, 2022 WL 910338, at *6 (D.D.C. Mar. 29, 2022) (granting motion to dismiss claim that 15-month wait in processing K-1 visa application was an unreasonable delay); *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 96 (D.D.C. 2020) (granting motion to dismiss claim that 25-month delay in processing waiver eligibility claim for foreign national was unreasonable). In light of courts' routine acceptance of multiyear deliberations, Custodia's complaint that it has suffered an unreasonable delay is meritless.

## II. Counts III and V: Because FRBKC Has Discretion Over Master Account Requests, Custodia Does Not Have a Property Interest and Its Due Process Claims Fail.

Counts III and V, alleging due process violations, should also be dismissed. Assuming that the Due Process Clause applies to FRBKC as a non-agency instrumentality, FRBKC has discretion to grant or deny a master account. Consequently, Custodia does not have a property interest cognizable under the Due Process Clause.

### A. FRBKC has discretion to determine whether to grant a master account (Counts III and V)

Custodia's due process claims fail because Custodia does not have a property interest in a master account. To survive a motion to dismiss a due process claim, a plaintiff must show that it possesses "a protected property interest to which due process protection was applicable" and was not "afforded an appropriate level of process" when being deprived of that property interest. *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006). A property interest requires "more than an abstract need or desire" or a "unilateral expectation" that one will receive a benefit. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Instead, Custodia must "have a legitimate claim of entitlement to it." *Id.* "Such an interest … is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." *Teigen v. Renfrow*, 511 F.3d 1072, 1079 (10th Cir. 2007).

*1. The FRA explicitly gives Reserve Banks discretion regarding whether to accept deposits.* No statute entitles Custodia to a "master account." Rather, the FRA unambiguously grants FRBKC discretion to decide whether to accept deposits from a depository institution. Section 342 provides that a Reserve Bank "*may* receive from any of its member banks, or other depository institutions, ... deposits...." 12 U.S.C. § 342 (emphasis added). "'May' does not just suggest discretion, it *clearly* connotes it." *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (cleaned up). Reserve Banks' discretion to *receive* a deposit plainly includes the discretion to *decline to receive* a deposit—or all deposits—from an institution. The Supreme Court held as much in the Reserve Banks' early days, concluding that § 342 does not "impose[] upon reserve banks any obligation to receive" deposits; it merely "confers authority to do so." *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923). This plain statutory text makes clear that while Federal Reserve Banks have the authority to accept deposits—and therefore to open deposit accounts, such as master accounts—the FRA does not require them to do so.

*2. Congress confirmed that discretion when it passed the MCA.* Had Congress disagreed with the Supreme Court's interpretation in *Farmers*, it could have revoked the Reserve Banks' discretion when it revised § 342. Instead, through the MCA, Congress amended § 342 to expand Reserve Banks' discretion, allowing them to decide whether to receive deposits from "other depository institutions"—*i.e.*, nonmember entities. Congress could easily have changed "may" to "shall," but it chose to leave Reserve Bank discretion intact. When Congress amends a statute without changing language previously interpreted by courts, that "is convincing support for the conclusion that Congress accepted and ratified" the courts' interpretation of that language. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 536 (2015).

*3. Section 248a Does Not Create an Entitlement to a Master Account.* Passing over

§ 342's unambiguous grant of discretion to create deposit accounts, Custodia hangs its hat on 12 U.S.C. § 248a. But § 248a does not apply here; it discusses powers and actions of the *Board of Governors*, not the Reserve Banks. The section is contained in a subchapter titled "Board of Governors of the Federal Reserve System." *See* 12 U.S.C. §§ 241-252; *compare* 12 U.S.C. §§ 341-364 (subchapter titled "Powers and Duties of Federal Reserve Banks"). It directs *the Board* to take certain actions. *See* § 248a(a) ("the Board shall publish for public comment a set of pricing principles"); *id.* ("the Board shall … put into effect a schedule of fees for such services"); *id.* § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve banks"). It would be anomalous for Congress to hide a requirement—and a revolutionary one at that—that Reserve Banks must grant direct access to the U.S. payment system to all nonmember depository institutions, irrespective of risk presented, in a provision that isn't even addressed to the Reserve Banks. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (courts should interpret statutes with a recognition that Congress does not "hide elephants in mouseholes").

Even if § 248a placed requirements on FRBKC, it does not create an obligation to provide Custodia or any other institution a master account. Section 248a instructs the Board to "put into effect a schedule of fees," 12 U.S.C. § 248a(a), for certain payment services and requires those services to be made available on a nondiscriminatory pricing basis to nonmember banks, so long as the nonmembers meet criteria that the Board has set for members, including maintaining minimum "balances sufficient for clearing purposes," *see* 12 U.S.C. § 248a(c). This section says nothing about whether a depository institution is entitled to a master account in the first instance— nor would one expect it to; that subject is addressed in § 342. Custodia alleges it is entitled to a master account because (1) the services listed in § 248a(b) are purportedly conditioned on having a master account and (2) as a nonmember depository institution, it is entitled to an account under

the principle that covered services are "available to" such institutions. *See* Compl. ¶ 106. But the fact that a master account may be a prerequisite to obtaining some Federal Reserve Bank services does not mean that every depository institution is automatically entitled to one.

To the contrary, discretion is baked into § 248a. While § 248a(c)(2) calls for services to be priced the same for nonmember and member banks, it authorizes the Board to make the availability of services contingent on "any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks." 12 U.S.C. § 248a(c)(2). Even the provision on which Custodia pins its argument, in other words, reinforces the basic truth that the exercise of discretion is necessary to further the mission of the Federal Reserve System.

All told, when read together, § 248a and § 342 stand for the propositions that (i) Federal Reserve Banks have discretion to accept (or reject) deposits—and thus master account requests— from a given depository institution and (ii) if a Reserve Bank elects to accept deposits from a nonmember depository institution, then that institution can seek access to any enumerated service that requires a master account at the same price paid by member banks. These statutes do not stand for the proposition that any nonmember depository institution has a statutory right to such services, or to a master account, irrespective of the risk its business presents to the Reserve Bank or the Federal Reserve System more broadly. If that is what Congress intended, it would have amended § 342 to change "may" to "shall." Far from negating the discretion provided in § 342, the mandatory language of § 248a highlights the importance of that discretion.

Custodia's position—that every eligible depository institution holding any state charter is automatically entitled to a master account—would turn Congress's carefully crafted structures on their head. Custodia is seeking a right to transact business directly with FRBKC: to make deposits

into and withdrawals from an account held on the books of and administered by FRBKC without using an intermediary. Reading the FRA to entitle every depository institution to a master account without Reserve Bank review would put each individual state in control of access to the national payment system, Federal Reserve financial services, and the Federal Reserve balance sheet. A state could create new charters with whatever standards and business powers it chose, subject to whatever review or ongoing oversight that state might choose to provide, and the Reserve Banks could then be obligated to provide master accounts and services directly to any depository institution that the state saw fit to charter.

Through the FRA, Congress charged the Board of Governors, the FOMC, and the Reserve Banks with ensuring the safety and reliability of the entire nation's payment system and operating "in furtherance of the *national* fiscal policy." *See Fed. Rsrv. Bank of Boston v. Comm'r of Corps. & Tax'n*, 499 F.2d 60, 62 (1st Cir. 1974) (emphasis added). Given that the FRA and MCA were intended to strengthen federal oversight of the banking system and control over the implementation of monetary policy, Custodia's proffered construction cannot be correct. Nothing in the text, structure, or history of the FRA suggests that Congress intended to substitute the judgment of an individual state for that of the Federal Reserve System to ensure a safe, reliable, and smooth-functioning U.S. payment system. *Whitman*, 531 U.S. at 468.

*4. SPDIs highlight why discretion was built into the FRA.* While FRBKC has long encouraged state innovations in banking and maintained positive relationships with state banking authorities, the SPDI charter highlights precisely why careful review and discretion are necessary before a novel entity may access directly the national payment system and the Federal Reserve balance sheet. Granting an SPDI—or another digital asset business lacking insurance and federal oversight—a master account could present risk to FRBKC and the Federal Reserve System in a

24

number of ways:

*First,* a master account would result in FRBKC potentially extending credit to Custodia through, for example, checks or ACH transfers taking Custodia's master account balance negative (creating a daylight overdraft) or through short-term borrowing from the discount window. *See supra* Background, Section B.[5] As explained in Background Sections C and D, Custodia's focus on providing cryptocurrency-adjacent services to customers presents increased risk of failure, and the absence of FDIC insurance presents risk to FRBKC and Custodia's customers that FRBKC would have to evaluate and manage in the event of insolvency/resolution. If volatility in the cryptocurrency market or the collapse of a particular cryptocurrency were to affect multiple depository institutions with master accounts (or even one large, interconnected depository institution), the risk to FRBKC, the public, and U.S. financial stability could be significant. *See* Report on Stablecoins at 11-12.

*Second,* these risks are magnified by fraud and manipulation of cryptocurrencies and other digital assets, and those assets' current volatility. *See supra* Background, Section C. Enacting a regulatory framework for the cryptocurrency industry may help mitigate these risks. But in the meantime, the magnitude of these dynamics, their potential impact on Custodia, and the risk that impact poses to FRBKC and the Federal Reserve System require further assessment.

*Third*, depository institutions' custody or issuance of cryptocurrency presents unique compliance challenges. *See* SEC Staff Accounting Bulletin No. 121, 17 C.F.R. Part 211 (Apr. 11, 2022). Bank Secrecy Act rules require that financial institutions work with the government to

---

[5] The discount window is a Reserve Bank function providing an extension of credit to a depository institution to help alleviate liquidity strains at the institution and in the banking system. It is a safety-valve measure designed to relieve pressures in reserve markets. *See The Discount Window and Discount Rate*, FederalReserve.gov (July 12, 2022), https://bit.ly/3z504Fl.

detect financial crimes, while anti-money-laundering rules seek to directly combat money laundering.[6] But a key feature of cryptocurrencies is that, although the transactions are publicly recorded on the blockchain, the identities of the individuals or entities transacting generally are not. This has made cryptocurrencies a desirable method to move proceeds of criminal conduct, and the extent to which cryptocurrency depositories know the true identities of their customers—or, even if so, would know when a customer transfers ownership of a digital asset to an unknown third party—requires careful consideration.[7]

*Fourth*, the Federal Reserve balance sheet will reflect Custodia's deposits as liabilities. FRBKC has substantial experience with how master accounts held by traditional banks typically affect the balance sheet. But the extent to which Custodia or other SPDIs may place deposits on the balance sheet, and the impact that this may have on the Federal Reserve System's goals of effectuating monetary policy and preserving U.S. financial stability, is a subject of ongoing

---

[6] *See, e.g.*, Office of the Comptroller of the Currency, *Bank Secrecy Act (BSA)*, https://bit.ly/3zzwND5.

[7] The New York Department of Financial Services recently announced its first penalty against a cryptocurrency platform, imposing a $30 million fine against Robinhood Crypto, LLC for significant failures in its consumer protection and anti-money laundering obligations, plus cybersecurity lapses. *See* Press Release, State of N.Y., *DFS Superintendent Harris Announces $30 Million Penalty on Robinhood Crypto for Significant Anti-Money Laundering, Cybersecurity, & Consumer Protection Violations* (Aug. 2, 2022), https://on.ny.gov/3vX1CAy. Numerous federal agencies have issued guidance regarding anti-money laundering and know-your-customer requirements as they relate to cryptocurrency. *See, e.g.*, U.S. Treasury, Fin. Crimes Enforcement Network, No. FIN-2019-A003, Advisory on Illicit Activity Involving Convertible Virtual Currency (May 9, 2019), https://bit.ly/3bFYJgE; U.S. Treasury, Office of Foreign Assets Control, Sanctions Compliance Guidance for the Virtual Currency Industry (Sept. 21, 2021), https://bit.ly/3JMMbjP; *see also* Press Release, U.S. Dep't of Treasury, *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash*, *supra*. These latest sanctions against Tornado Cash are particularly relevant since Tornado Cash operates on the Ethereum blockchain, the same blockchain Custodia plans to launch with. *See* Nate DiCamillo, *Unpacking the Avit*, *supra*.

analysis.

These risks and open questions underscore why it is so important for FRBKC to carefully evaluate requests for master accounts by cryptocurrency-focused businesses, particularly those that lack FDIC insurance or any federal supervision. If FRBKC lacked discretion over whether to grant Custodia's request, any number of SPDIs could automatically obtain direct access to FRBKC financial services and place deposits on the Federal Reserve balance sheet, irrespective of the risks to the Federal Reserve and to the stability of the U.S. payment system.

### 5. Custodia's reliance on Judge Bacharach's Fourth Corner opinion is unpersuasive.

These considerations also help explain why Custodia's reliance on Judge Bacharach's separate opinion in *Fourth Corner Credit Union* is misguided. *See Fourth Corner*, 861 F.3d at 1068; Compl. ¶¶ 51, 133, 142. In *Fourth Corner¸* a divided panel affirmed dismissal of Fourth Corner's complaint against FRBKC with each judge writing separately. Judge Moritz believed that Fourth Corner's case was legally meritless because the bank sought to provide banking services to the marijuana industry, an illegal activity under the Controlled Substances Act. *Id.* at 1058. Judge Matheson believed that Fourth Corner's case was not ripe because its business model was evolving and it was uncertain how FRBKC might respond to an updated master account request. *Id.* at 1060-61. In reaching those conclusions, both judges necessarily rejected the notion that every state-chartered depository institution is automatically entitled to a master account and instead presumed that FRBKC had discretion to consider Fourth Corner's request. Similarly, in *TNB*, the court likewise presumed that FRBNY had discretion over issuance of master accounts when it granted FRBNY's motion to dismiss on standing and ripeness grounds. *See TNB*, 2020 WL 1445806, at *4.

Judge Bacharach, in contrast, argued that § 248a(c)(2) creates a nondiscretionary right to a

master account. *Fourth Corner*, 861 F.3d at 1068. But Judge Bacharach erred by concluding that § 248a(c)(2)'s provisions directed to the Board of Governors regarding nondiscriminatory pricing of Federal Reserve services negated § 342's direct grant of discretion to Reserve Banks to decide whether to accept deposits. His view that "§ 342 does not address which institutions can access Federal Reserve services," *id*. at 1073-74, misses the point of the discretion conferred by § 342: that provision does not specify which institutions are entitled to master accounts precisely because it instead gives the Reserve Banks discretion to decide from which institutions they wish to accept deposits.

Judge Bacharach's opinion also fails to account for the monumental shift in regulation of the nation's financial system that his reading could create. Each state could have the authority to dictate the operations of the Federal Reserve and potentially frustrate national monetary policy by chartering novel and risky institutions to which FRBKC and other Reserve Banks could then be forced to grant accounts. As a result, the Federal Reserve could be forced to assume the risks those businesses pose to the payment system, monetary policy, financial stability, and the Federal Reserve balance sheet without the ability to control or mitigate those risks on the front end. But Congress created the Federal Reserve System to *improve* the stability and efficiency of payment systems and charged the System with responsibility to *maintain* this stability and efficiency. Holding that Reserve Banks have no discretion to deny master accounts would not only contradict the text of § 342, it would also undermine the FRA by removing a vital tool for the Reserve Banks to guard against money laundering, protect the broader payment system from financial contagion, contain cybersecurity breaches, and address a myriad of other risks. The Court should not conclude that Congress so drastically altered and endangered the U.S. payment and settlements systems absent a truly unambiguous command. Congress "does not alter the fundamental details of a

regulatory scheme in vague terms or ancillary provisions." *Whitman*, 531 U.S. at 468. Even putting § 342 aside, § 248a(c)(2) cannot bear the weight Custodia (and Judge Bacharach) seek to put on it.

### B. Because a master account is discretionary, Custodia does not have a cognizable property interest (Counts III and V)

Because it is not entitled to a master account, Custodia cannot plead a valid due process claim. A property interest requires "a legitimate claim of entitlement." *Roth*, 408 U.S. at 577; *see also Coleman v. Darden*, 595 F.2d 533, 538 (10th Cir. 1979) (applying same standard in the Fifth Amendment context). The interest must be more than an "abstract need or desire" or a "unilateral expectation of" a benefit. *Roth*, 408 U.S. at 577.

As a threshold matter, to avoid the fate of the plaintiff in *TNB*, Custodia recasts the relief that it seeks, requesting not that it be granted a master account but rather that FRBKC be forced to make a decision on its request. This is a request for *process*, but a demand for process cannot be the basis for a property interest. *See Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006) ("It is well established that an entitlement to nothing but procedure cannot be the basis for a property interest." (cleaned up)). For that reason alone, Custodia's due process claims fail. *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.").

Moreover, even taking Custodia's due process claims—contrary to how Custodia has pleaded them—as claims of a property interest in a master account, *see* Compl. ¶ 94, those claims still fail because Custodia has no right to a master account. As explained above, FRBKC has discretion regarding whether to grant a master account. 12 U.S.C. § 342. There is no property interest in a discretionary benefit. *Salgado-Toribio v. Holder*, 713 F.3d 1267, 1271 (10th Cir.

2013). Because Custodia has no entitlement to a master account, it has no protected property interest at stake and its due process claims in Counts III and V should be dismissed.

Custodia's allegation that FRBKC's decision-making process is "standardless," Compl. ¶ 2, does nothing to solve the fundamental problem with Custodia's due process claims, namely, that it cannot have a cognizable property interest in a master account given FRBKC's discretion regarding whether to grant one. Custodia's allegation also fails on its own terms, as Congress made its purposes in the FRA and the MCA clear via the provisions it enacted. *See supra* Background, Section A (describing Congress's directives to the Federal Reserve System to safeguard the nation's payment system).

### C.   Master account decisions do not implicate a delegation of legislative authority (Count III)

If the Court concludes that Custodia lacks a property interest in a master account, Count III must be dismissed and the Court need not consider the adequacy of the process involved in a master account request. In any event, Custodia's attacks on that process are also meritless.

Embedded in Count III, which Custodia styles a "Separation of Powers" claim, is the contention that FRBKC's review of Custodia's master account request constitutes an improper delegation of the United States' legislative power. Compl. ¶¶ 95, 101 (tying Count III to "Article I"). This contention conflicts with Custodia's suggestion that FRBKC's review of Custodia's master account request constitutes an improper use of the United States' *executive* power. *See* Compl. ¶¶ 117-127. But like that claim, this contention too is meritless.

A master account is a Reserve Bank account in the name of a depository institution, enabling the institution to make deposits and withdrawals with the Reserve Bank and to perform directly its customers' transactions with customers of other depository institutions. The grant or denial of an individual master account request does not impose any obligations on any other

30

requestor. Consequently, deciding whether to grant or deny the request is not "regulation"—that is, it is not the exercise of legislative authority through making rules of general application that govern the rights or behaviors of *groups* of entities and individuals. *E.g.*, *United States v. Brown*, 381 U.S. 437, 446 (1965) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.") (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810)). Nor would such a grant or denial bind FRBKC to grant or deny any future request from a different SPDI—or even from Custodia itself. As a result, that decision is in no way legislative. *Compare, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (emphasizing that "*regulating* [the] production" of coal "is necessarily a governmental function"), *with Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) (concluding that "[s]ince *law-making* is not entrusted to the industry, this statutory scheme is unquestionably valid") (emphases added); *cf. Assoc. of Am. R.Rs. v. U.S. Dep't of Transp.*, 821 F.3d 19, 32 (D.C. Cir. 2016) (holding that Amtrak had improperly been given "power to regulate its competitors" by promulgating "metrics and standards" for the use of railroad tracks with which those competitors could be obligated to comply). Accordingly, Count III does not state a claim for violation of the separation of powers because granting a master account is not a legislative function.

### D.     The master account decision is not being made by Custodia's "competitors" (Count V)

Custodia's second due process claim, Count V, also fails for an additional reason. In Count V, Custodia alleges that Federal Reserve member banks "have particular and heightened competitive incentives to ensure that novel banking institutions like Custodia cannot access master accounts so that stockholding 'traditional' banks can retain a monopoly on access to the Federal Reserve System." Compl. ¶ 114. Because those member banks elect some members of FRBKC's

board of directors, Custodia contends that its competitors are improperly engaged in "regulation" of Custodia. *Id.*; *see also id.* at ¶ 115 (citing *Carter & Assoc. of Am. R.Rs.*). In addition to the defects discussed in the preceding sections, Count V fails because Custodia does not and cannot plausibly allege that Custodia's competitors control FRBKC's master account decision.

*First*, the statutorily mandated structure of FRBKC's board belies the notion that the board is acting in the competitive interest of FRBKC's member banks. FRBKC's board consists of nine directors, six of whom (Class B and Class C directors)—a supermajority—are elected to "represent the public." 12 U.S.C. § 302. Those directors are to be chosen "with due … consideration to the interests of agriculture, commerce, industry, services, labor, and consumers." *Id.* None of the Class B or Class C directors may be an "officer, director, or employee of any bank," and the Class C directors are prohibited even from owning stock in a bank or affiliate. 12 U.S.C. § 303. Further, to the extent any Class B or Class C director *ceases* to represent the public interest, the Board of Governors may remove that individual. 12 U.S.C. § 248(f). Thus, even if FRBKC's board of directors were somehow engaged in "regulation" of Custodia, that board does not represent Custodia's competitors; it represents the public. The concerns raised in *Carter* and *American Railroads*, therefore, have no application to this case.

And *second*, even Custodia essentially concedes that the master account decision will be made not by FRBKC's board of directors but by its president. *See* Compl. ¶ 41 (stating that Custodia "sent a letter to Esther George, the President and Chief Executive Officer of the Kansas City Fed," and that it "urged Ms. George to consider Custodia's application"). The Reserve Banks' presidents are, by statute, selected by the Class B and Class C directors—those chosen to represent the public—with the approval of the Board of Governors. 12 U.S.C. § 341 (Fifth). Custodia's professed concern about regulation by its competitors therefore has no application to its master

account request.

## III.    Count VI: Custodia's Appointments Clause Claim Is Unripe and Meritless

In Count VI, Custodia contends that FRBKC's structure offends the Appointments Clause because FRBKC's board of directors is not appointed by the President or a presidential appointee. But Custodia has not identified any action taken by FRBKC's board of directors, so this claim is unripe. In any event, a decision on a master account request is not an exercise of the "executive Power" of the United States, so the Appointments Clause is not applicable. And even if it were applicable, the appointment of FRBKC's president satisfies that Clause.

### A.    Custodia's Appointments Clause claim is unripe because FRBKC has not taken action on Custodia's request

The crux of Custodia's Complaint is that FRBKC has *not* taken action on its request for a master account. As a result, no justiciable controversy exists concerning whether an action that might be taken in the future would be taken by a constitutionally appointed individual. Custodia has not identified a case in which a court has held that a plaintiff may challenge the constitutionality of an appointment before the appointee has done anything. In *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), the case Custodia relies on, Arthrex did not challenge the constitutionality of the appointment process for the Patent Trial and Appeal Board in the abstract; it made that argument as part of its challenge to a final decision by that Board invalidating its patent. *See id*. at 1978. Similarly, in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), for example, the plaintiff law firm challenged a civil investigative demand issued by a board that the law firm contended was unconstitutional because its director was removable only for cause and not at the pleasure of the President. *See id*. at 2194, 2197.

Custodia asks the Court to take the extraordinary step of assessing the constitutionality of FRBKC's structure even though Custodia cannot identify any harm caused by FRBKC's

purportedly unconstitutional structure. *See* Compl. ¶ 116 (alleging that FRBKC's "processing and adjudication of Custodia's application … is unconstitutional," even though FRBKC is still reviewing the request). The Court should decline Custodia's invitation to prematurely reach the merits of whether a decision that *has not been made* is in the hands of a constitutionally appointed body.

> **B.      Custodia's Appointments Clause claim is meritless because a decision on a master account request is not an exercise of the "executive Power" of the United States and because FRBKC is in any event constituted in accordance with that Clause**

Custodia's Appointments Clause claim is meritless as well as unripe. According to Custodia, because a supermajority of FRBKC's board of directors is elected by the member banks and not appointed by the President, the board of directors cannot constitutionally act on a request for a master account. *Id.* ¶¶ 120-27. But the Appointments Clause applies only to the exercise of the "executive Power" of the United States. U.S. Const. art. II, §§ 1 & 2; Compl. ¶ 119. And when considering a master account request, FRBKC is not exercising the "executive Power" of the United States. Custodia can point to no court that has held that a Reserve Bank's grant or denial of a master account—a *bank account*—somehow implicates that "executive Power." Instead, FRBKC is making an essentially commercial decision, albeit one with significant implications. When FRBKC takes an action on a master account request, it is exercising business judgment concerning the risks posed to its own balance sheet by doing business with a particular entity. Neither the time required to assess particularly complex risks and make that decision nor any broader implications from the decision transform it into an exercise of the "executive Power."

In any event, FRBKC's structure complies with the Appointments Clause. In its zeal to conjure constitutional issues, Custodia focuses on FRBKC's board of directors. But the FRA expressly vests the powers of the Reserve Bank in any "duly authorized officer," 12 U.S.C. § 341

(Seventh), and authorizes the Reserve Bank's president to act as its Chief Executive Officer, *id.* § 341 (Fifth). That is why Custodia's Complaint demonstrates that Custodia has addressed its request to FRBKC's president. *See* Complaint ¶¶ 41-42. FRBKC's president is a constitutionally appointed inferior officer because she was appointed with approval of the Board of Governors, *see id.*, and may be removed by the Board of Governors, 12 U.S.C. § 248(f). *See* Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee, 43 Op. Att'y Gen. __, Slip op. at 2 (Oct. 23, 2019). Thus, even if a master account decision were an exercise of the United States' "executive Power," it is in the hands of an "inferior Officer" appointed consistently with the Appointments Clause.

## IV. Counts II, IV, VII, and VIII: Custodia's Declaratory Judgment Act and Mandamus Act Claims Are Improper, Inadequately Pleaded, and Unripe.

Counts II, IV, VII, and VIII all suffer from procedural flaws requiring dismissal. First, Counts IV and VIII fail because the Declaratory Judgment Act does not create a cause of action; it merely provides a remedy. Second, Counts II and VII fail because the Mandamus Act does not apply to FRBKC. Third, Counts VII and VIII are based on a contingent future event—the denial of Custodia's pending master account request—and are thus unripe.

### A. The Declaratory Judgment Act does not provide an independent right of action (Counts IV and VIII)

Counts IV and VIII fail as a matter of law because the Declaratory Judgment Act, 28 U.S.C. § 2201, does not create a right of action. *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012). A declaratory judgment is a remedy, not a cause of action. *Utah Housing Corp. v. Country Pines, Ltd.*, 541 F. Supp. 3d 1288, 1295 n.1 (D. Utah 2021) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Because the Declaratory Judgment Act does not confer an independent cause of action, Counts IV and VIII must be dismissed.

**B.**     **The Mandamus Act does not apply to FRBKC nor has Custodia adequately pleaded any claim arising under it (Counts II and VII)**

Counts II and VII also fail. The Mandamus Act, 28 U.S.C. § 1361, grants district courts the authority to issue a writ of mandamus compelling an "agency" of the United States to "perform a duty owed to the plaintiff." First, FRBKC is not an "agency" of the United States for reasons discussed above. *See supra* Section I.A. Section 1361 thus does not apply to FRBKC. Second, Custodia cannot demonstrate that FRBKC owes it a duty; FRBKC has discretion to decide whether to grant a master account. *See supra* Section II.A; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004) ("The only agency action that can be compelled … is action legally required" such as "the failure to promulgate a rule or take some decision by a statutory deadline.") (cleaned up). Third, relief under the Mandamus Act is limited to situations in which the plaintiff "has a clear right to relief" and the defendant's "duty to perform the act in question is plainly defined and peremptory." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005). The complexities of this case make Custodia's "right to relief" far from "clear" and any duty by FRBKC far from ministerial. *See id.* at 1206-07.

**C.**     **Counts VII and VIII are not ripe**

On the face of the Complaint, Custodia concedes that Counts VII and VIII are not ripe. The Complaint states that these claims are "only in the event that Defendants deny Custodia's application for a master account." Compl. ¶¶ 130, 139. Because that has not happened, *see* Compl. ¶¶ 42, 101, these causes of action "rest upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). Accordingly, Counts VII and VIII are "not ripe for adjudication," *id.*, and should be dismissed.

V.    **All Counts: Custodia Lacks Standing and This Case Is Constitutionally and Prudentially Unripe.**

For the reasons set forth above, each count in Custodia's Complaint fails to state a valid claim. But even more fundamentally, the complexity and significance of the questions discussed in the preceding sections highlight why this Court should not decide the merits of Custodia's claims at this premature juncture. First, Custodia lacks standing because FRBKC is still considering its request and because the relief Custodia seeks—for FRBKC to decide its request—would not redress any claimed injury if the decision were a denial. Second, for the same basic reasons, Custodia's claims are not constitutionally ripe. Third, Custodia's suit is not prudentially ripe: The Court should decline to wade into the issues Custodia seeks to litigate because those issues could be mooted—and at least will be clarified—by future action. The Court should therefore dismiss this action without prejudice and without deciding the legal issues raised on the merits by Custodia's various claims.

A.    **Custodia lacks standing**

To establish standing, Custodia must have suffered an injury in fact, meaning "an invasion of a legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury-in-fact must be both (1) particularized ("affect the plaintiff in a personal and individual way") and (2) concrete ("real, and not abstract"). *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (cleaned up). Custodia must also demonstrate a substantial likelihood that the relief requested will redress the injury claimed. *Ash Creek Min. Co. v. Lujan*, 969 F.2d 868, 875 (10th Cir. 1992) (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978)); *see also Spokeo*, 578 U.S. at 338. And just as a plaintiff must demonstrate that it has standing to sue, it must show that its claims are "ripe" so as to constitute a present case or controversy. The

constitutional requirements for ripeness are coterminous with those for standing. *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012).

Custodia does not have standing (and thus its claims are not constitutionally ripe) no matter how it frames its alleged injury. In *TNB*, the plaintiff alleged that FRBNY's period of deliberation on its master account request injured it on the theory that it constituted a "constructive denial" of that request. The court disagreed and dismissed the case on standing grounds. 2020 WL 1445806, at *7. To avoid the same fate, Custodia attempts to allege that FRBKC's ongoing consideration of its request has itself caused injury, on the theory that the pendency of Custodia's master account request is forcing Custodia to begin operations with a banking partner. Compl. ¶ 8. This effort to circumvent *TNB* fails. Custodia has not alleged an injury-in-fact, nor has it demonstrated a substantial likelihood that the relief it seeks will redress its claimed injury.

### 1. Custodia has not suffered an injury-in-fact

While Custodia purports to claim unreasonable delay, *see* Compl. ¶¶ 34-44, its real complaint is that it has not been *granted* a master account, *see* Compl. ¶¶ 8, 130, 139. Its actual grievance appears to concern what it thinks is a constructive denial of a master account, just like the plaintiff in *TNB*.

Custodia may have pivoted away from alleging a constructive denial to avoid the outcome of *TNB*. In *TNB*, the Southern District of New York confronted a challenge from a non-traditional financial institution to FRBNY's review of its master account request. 2020 WL 1445806. There, the plaintiff alleged a constructive denial after FRBNY had been reviewing its application for more than 18 months. *See id.* at *5. The court refused to treat FRBNY's ongoing review as a constructive denial and held that TNB lacked standing: "[B]ecause the denial has not occurred, TNB has no qualifying imminent injury and thus this case must be dismissed on standing grounds." *Id.* at *7.

Custodia's only alleged injury, incurring costs to prepare to launch with a banking partner,

is alleged to be caused by the lack of a master account; that is a quintessential constructive denial claim. But FRBKC has not denied Custodia a master account, constructively or otherwise. FRBKC is evaluating Custodia's request and may ultimately grant it. Custodia cannot manufacture an injury out of its own impatience and its decision to incur costs to prepare to begin operating without the benefit of a master account. This Court should follow *TNB*'s lead and find this claimed injury too conjectural to provide standing. *Id.; see Lujan*, 504 U.S. at 560.

Moreover, even taking Custodia at its word that it has suffered injury from "delay" alone, *see* Compl. ¶ 47, that would still not amount to a legally cognizable injury. To constitute an invasion of a legally protected interest, "delay alone" must be a "concrete injury," which courts have generally recognized only in the case of entitlements—not discretionary benefits. *See Utah Animal Rts. Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1256 (10th Cir. 2004) ("If UARC is correct on the merits, it was *entitled* to receive an answer to its permit application long before November[] 2001.") (emphasis added). Because, as explained elsewhere, FRBKC's decision as to whether and when to grant a master account is discretionary, delay in that decision-making process is insufficient to establish injury-in-fact.

### 2.    Custodia has not demonstrated that its requested relief is likely to redress its claimed injury

Custodia also lacks standing for a second reason: it cannot demonstrate that its alleged injury is likely to be redressed by the relief it seeks. *Ash Creek*, 969 F.2d at 875 ("To satisfy the 'redressability' prong of the standing test, the plaintiff must demonstrate that a '"substantial likelihood" [exists] that the relief requested will redress the injury claimed.'" (quoting *Duke Power*, 438 U.S. at 75 n.20)). Custodia claims that it is injured because, without a master account, it will be forced to access FRBKC services indirectly, through the use of a banking partner that charges fees. *See, e.g.*, Compl. ¶ 8. The relief that Custodia seeks, however, is only that this Court

order FRBKC to make a *decision* on its request. *See id*. ¶¶ 81, 91, 101, 109 (each requesting an order that defendants "decide" the master account request); *id*. ¶¶ 116, 127 (each requesting an order directing "a lawful administrative process"); *id*. at 42 ("Request for Relief" requesting an order that defendants "process and decide" the request).[8]

If the Court were to grant Custodia's requested relief and FRBKC were to deny the request, then Custodia's alleged injury would not be redressed. Custodia has failed to demonstrate that its request would likely be granted in that scenario. Indeed, Custodia's Complaint runs away from the challenges presented by its request, making barely any mention of its digital asset business or proposed "stablecoin" and leaving it entirely speculative whether a decision on its request, if one were compelled in the near future, would be favorable to it.

### B.   Custodia's claims are prudentially unripe

For the reasons just explained, Custodia's claims fail to satisfy Article III's requirements for standing or ripeness. Ripeness also has a prudential dimension, and Custodia's claims at the very least are unripe as a prudential matter. "Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *Awad*, 670 F.3d at 1124. At bottom, ripeness doctrines "address[] a timing question: when in time is it appropriate for a court to take up the asserted claim"? *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 903 (10th Cir. 2016). Prudential ripeness is a two-pronged inquiry into (i) "the fitness of the issues for judicial decision," and (ii) "the hardship to the parties of withholding court consideration." *Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017). The complex and far-reaching issues Custodia's Complaint presents are far from fit for a judicial

---

[8] Counts VII and VIII assert that Custodia is entitled to a master account, but those counts are plainly unripe on their face, as they are pleaded "only in the event that Defendants deny Custodia's application for a master account," which has not happened. *Id*. ¶¶ 130, 139; *see* Section V.C, *supra*.

decision, and little if any hardship would result from waiting until Custodia's request for a master account and its application for Federal Reserve membership have been resolved.

*First*, Custodia has not alleged that it is authorized to even begin operations in Wyoming, regardless of whether it receives a master account. For example, while Custodia has alleged that it has a Wyoming charter, *see, e.g.*, Compl. ¶ 10, a charter is not all Custodia needs before it may launch its business. Wyoming does not permit an institution to "commence business before receiving a certificate of authority to operate from the commissioner." Wyo. Stat. § 12-12-116 (2019); *see* State of Wyoming, Div. Of Banking, General Overview of the Special Purpose Depository Institution, *supra*. Custodia has not alleged that it has received a certificate of authority. And that certificate is no mere *pro forma* requirement. Wyoming requires that an SPDI "have initial capital, subscribed for as fully paid stock, which is commensurate with the risk profile and proposed activities of the institution, as determined by the Commissioner," and that capital must "be subscribed and fully paid in at the time the institution applies for a certificate of authority." *See* Wyo. Rules & Regs. 021.0002.20 § 2(a), *available at* https://bit.ly/3zTb4px. Wyoming law also requires SPDIs "to have a paid-up surplus fund of not less than three (3) years of operating expenses prior to applying for a certificate of authority under W.S. 13-12-116." *Id.* at § 2(c). Custodia has not alleged that it has satisfied these requirements. If Custodia is not otherwise ready to commence operations regardless of the status of its master account request, there is no reason for the Court to entertain Custodia's suit at this time.[9]

*Second,* while FRBKC has ultimate discretion regarding whether to accept deposits from

---

[9] Custodia's failure to allege that it has obtained the necessary certificate under Wyoming law to begin operations also confirms that this action fails to satisfy Article III's redressability requirement to confer standing. Ordering FRBKC to decide Custodia's master account request would not enable Custodia to operate: even if FRBKC were to grant that request, Custodia still could not lawfully begin operations without satisfying Wyoming law's separate requirements.

Custodia, it must carefully consider how to exercise its discretion in the context of ongoing work related to digital assets by the Federal Reserve System, federal banking agencies, and Congress. As Custodia acknowledges in its Complaint, the Board of Governors has been actively working on guidelines for Reserve Banks to use in assessing risk and evaluating requests for access to master accounts. *See* Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021); Proposed Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022); Compl. ¶¶ 49-52. The Board of Governors has now finalized those guidelines.

The Board of Governors' Guidelines relate to access requests that Reserve Banks may receive from novel institutions like Custodia, with the goal of helping to ensure that "the Reserve Banks apply a consistent set of guidelines when reviewing such access requests to promote consistency across Reserve Banks and to facilitate equitable treatment across institutions." Guidelines at 31. The Guidelines outline six risk-based principles that the Reserve Banks can consider when evaluating such requests: (1) legal eligibility, (2) risk to the Reserve Bank, (3) risk to the overall payment system, (4) risk to the stability of the U.S. financial system, (5) risk of facilitating illicit activity, and (6) risk of adverse effects on the ability to implement monetary policy. Guidelines at 34-45.

The Guidelines also provide a tiered framework that prescribes the scrutiny of review based on the level of oversight to which the requesting institution is subject. Guidelines at 46-49. Account requests from institutions with more oversight (those that are federally insured and subject to a comprehensive set of federal banking regulations) receive less scrutiny from the Reserve Banks. Guidelines at 46. Requests from institutions like Custodia that fall into "Tier 3"—based in part on the absence of either federal insurance or prudential supervision by a federal banking agency—

receive the strictest level of review. *Id.* Because these new Guidelines have just been finalized and can now be taken into consideration by FRBKC in connection with Custodia's request, the Court should dismiss Custodia's Complaint as prudentially unripe. *See Wyoming v. U.S. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1055 (D. Wyo. 2020) (Skavdahl, J.) (noting that rulemaking process that was ongoing at earlier stage of the case raised prudential ripeness concerns); *see also* Guidelines at 8-9 (noting that "[to] promote consistency, the Reserve Banks are working together, in consultation with the Board, to expeditiously develop an implementation plan for the final Guidelines" and that "Reserve Banks may take comparatively longer to review access requests by institutions that engage in novel activities for which authorities are still developing appropriate supervisory and regulatory frameworks").

*Third*, Custodia has applied for membership in the Federal Reserve System, and that application is under active evaluation. Compl. ¶ 4. As Custodia notes, *see id.*, state-chartered banks that become members of the System are subject to supervision and regulation by federal authorities. *See* 12 U.S.C. § 324. As a result, membership could significantly impact FRBKC's analysis of the risks of granting Custodia a master account.

The implementation of the new Guidelines and the potential for action on Custodia's membership application present "contingent future events" that may alter the circumstances of this case and thus show that these issues are not yet fit for judicial determination. *See Texas*, 523 U.S. at 300; *see also Fourth Corner*, 861 F.3d at 1060 (op. of Matheson, J.) (declaratory action seeking to compel opening of master account was unripe: "We cannot know what the facts would be, making this case premature.").

Nor can Custodia point to any hardship that could outweigh these substantial fitness concerns. Custodia may complain of the need to partner with a bank to access federal payment

systems. *See* Compl. ¶ 8. But having to open an account at a traditional bank to access the payment system is no mere "makeshift solution." *See id*. It is, indeed, one of the options that Wyoming's statute expressly contemplates for SPDIs. *See* Wyo. Stat. § 13-12-105(b)(ii) (requiring an SPDI to "maintain unencumbered liquid assets valued at not less than one hundred percent (100%) of its depository liabilities" and defining liquid assets as, in part, "United States currency held for the special purpose depository institution *by a federal reserve bank or a federally insured financial institution*" (emphasis added)). Custodia had abundant notice that its novel and high-risk cryptocurrency-focused business would take time to review. *See Fourth Corner*, 861 F.3d at 1060 (op. of Matheson, J.); *TNB USA*, 2020 WL 1445806, at *5. Even assuming Custodia has made financial expenditures it might have avoided if it had already been granted a master account, those expenditures do not constitute the sort of hardship that should weigh in favor of deciding the issues raised by Custodia's claims now, before future events either moot those claims or provide a more concrete context in which to evaluate them. Custodia incurred any costs as a calculated business decision made with knowledge of the uncertainty that exists in this emerging economic space. *See OK's Cascade Co. v. United States*, 97 Fed. Cl. 635, 640-41, 650 (2011) (dismissing case on ground that company did not suffer any injury from Forest Service's termination for convenience because company's expenditures to upgrade equipment in anticipation of receiving government award were "made …. at its own risk, with no guarantee of repayment or reimbursement from the Government"), *aff'd,* 467 F. App'x 888 (Fed. Cir. 2012).

In similar circumstances, both the *TNB* court and Judge Matheson in *Fourth Corner* found that the plaintiffs' claims were not prudentially ripe. *Fourth Corner*, 861 F.3d at 1063 (op. of Matheson, J.) (plaintiff's claim was prudentially unripe despite its inability to "conduct legal business" where the "scope of the hardship [was] far from clear" and the "potential hardship does

not overcome the fitness concerns outlined…"); *TNB*, 2020 WL 1445806, at *9 ("Although the reasoning behind a potential denial may not prove relevant to adjudicating whether the FRA entitles banks like TNB to a master account, it could, and regardless, it is information a federal court should and can have before reaching a decision on the merits."); *but see Fourth Corner*, 861 F.3d at 1080 (op. of Bacharach, J.) (disagreeing with Judge Matheson on prudential ripeness). Simply put, it takes time for a Reserve Bank to reach a decision on the risks posed by a novel and untested business model and charter type that, by design, is largely outside the perimeter of federal regulation. With actions pending that will bear significantly on FRBKC's decision, including implementation of the Guidelines and a decision on Custodia's application for membership, Custodia's claims are not ripe for adjudication.[10]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

---

[10] Because prudential ripeness is a threshold non-merits ground for dismissal, the Court is free to dismiss this action as prudentially unripe regardless of whether Custodia satisfies Article III's standing and ripeness requirements and, therefore, without needing to reach those constitutional justiciability questions. *See N. Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1235 (10th Cir. 2021) (dismissing plaintiff's complaint as prudentially unripe even though plaintiff established Article III standing); *see also Sinochem Int'l Co. v. Malaysia Int'l. Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits."); *Twitter, Inc. v. Paxton*, 26 F.4th 1119, 1124 (9th Cir. 2022) (dismissing case on prudential ripeness grounds without deciding constitutional ripeness or personal jurisdiction).

Dated 16 August 2022.

Respectfully submitted,
/s Billie LM Addleman
Billie LM Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson (*pro hac vice* admission pending)
Laura Harris (*pro hac vice* admission pending)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice* admission pending)
Joshua N. Mitchell (*pro hac vice* admission pending)
Christine M. Carletta (*pro hac vice* admission pending)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
jmitchell@kslaw.com
ccarletta@kslaw.com

*Counsel for Defendant the*
*Federal Reserve Bank of Kansas City*

## CERTIFICATE OF SERVICE

I certify the foregoing **Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss** was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure on 16 August 2022, and that copies were served as follows:

John K. Villa
Ryan Thomas Scarborough
Whitney D Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY
680 Maine Avenue SW
Washington, DC 20024
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Scott E Ortiz
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P O Box 10700
Casper, WY 82602
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Angela Tarasi
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
*Attorneys for Defendant Federal Reserve Bank of Kansas City*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Joshua P. Chadwick, Senior Special Counsel
Yvonne F. Mizusawa, Senior Counsel
Yonatan Gelblum, Senior Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C.  20551
*Attorneys for Defendant Federal Reserve Board of Governors*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

/s Shannon M. Ward
OF HIRST APPLEGATE, LLP
Attorneys for Defendant