Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE, PC
PO Box 10700
Casper, WY 82602
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris (*pro hac vice* admission pending)
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Phone:   202-434-5000
Fax:      202-434-5029
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
whermadorfer@wc.com
jwolfe@wc.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC.,<br>2120 Carey Avenue, Suite 300<br>Cheyenne, WY 82001<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL RESERVE BOARD OF<br>GOVERNORS,<br>Constitution Ave NW & 20th St NW<br>Washington, DC 20551<br><br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br>1 Memorial Drive<br>Kansas City, MO 64108,<br><br>*Defendants*. | Civil Case No.: 1:22-CV-00125-SWS |

**OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    A.      The Federal Reserve System ........................................................................... 3

    B.      The Federal Reserve's Master Account Application Process .................. 4

    C.      Custodia Bank's Wyoming Charter and Master Account Application ................... 6

STANDARD OF REVIEW ...................................................................................................... 8

ARGUMENT ........................................................................................................................... 8

I.      This Case Is Justiciable ................................................................................................. 8

II.     Custodia Stated Actionable Claims Based on Defendants' Unlawful Delay in
Adjudicating Its Master Account Application (Counts I-IV) ......................................... 15

    A.      The Board's Failure to Adjudicate Custodia's Master Account within One
Year Violates 12 U.S.C. § 4807, and Thus the APA .............................................. 15

    B.      Even If the Kansas City Fed Exclusively Makes Master Account
Decisions, Custodia Has Adequately Pled That the Lengthy Delay
Violates the APA ..................................................................................................... 23

    C.      Defendants' Delay Is Also Actionable Under the Mandamus Act (Claim
II) .............................................................................................................................. 32

    D.      Custodia Adequately Pled a Declaratory Judgment Act Claim (Count IV) .......... 33

III.    Vesting Final Decision-Making Authority in the Kansas City Fed Would Violate
Numerous Constitutional Commands (Claims III, V, and VI) ...................................... 33

    A.      Reading Section 342 to Grant Reserve Banks Total Discretion Over
Master Accounts Would Flout Nondelegation Principles and Due Process
(Claim III) ................................................................................................................. 34

    B.      The Appointments Clause Prohibits the Kansas City Fed from Exercising
Final, Binding Decision-Making Authority (Claim VI) ........................................ 37

    C.      Allowing Reserve Bank Directors to Participate in Decision-Making
Would Separately Violate Due Process and the Separation of Powers
(Claim V) .................................................................................................................. 42

IV.    Custodia Adequately Pled Alternative Claims for Relief in the Event Defendants
Deny Custodia's Application (Claims VII and VIII) ...................................................... 43

CONCLUSION ....................................................................................................................... 45

# TABLE OF AUTHORITIES

Page

Cases:

*Am. Anti-Vivisection Soc. v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020) ................10

*Armstrong v. Exec. Off. of the President*, 90 F.3d 553 (D.C. Cir.1996).................................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................................................8, 19

*Ass'n of Am. R.R.s v Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016)............................42, 43

*Audubon of Kan., Inc. v. U.S. Dep't of the Interior*,
   568 F. Supp. 3d 1167 (D. Kan. 2021).................................................................................8

*Barrios Garcia v. U.S. Dep't of Homeland Sec.*,
   25 F.4th 430 (6th Cir. 2022)  .......................................................................13, 29, 30, 31

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972)........................................36

*Beckles v. United States*, 137 S. Ct. 886 (2017) .........................................................34

*Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*,
   353 F. Supp. 3d 1070 (D. Colo. 2018)...........................................................................33

*Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036 (10th Cir. 2014).........................10

*Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701 (5th Cir. 2017)..........................42

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971 (Fed. Cir. 2020)................28

*BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532 (2021) ...................................19

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................................37

*Bustos v. Mayorkas*, 2021 WL 3931173 (D.N.M. Sept. 2, 2021)........................................30

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).........................................................42

*Copelin-Brown v. N.M. State Pers. Off.*, 399 F.3d 1248 (10th Cir. 2005).........................11

*Cox v. Kijakazi*, 2022 WL 178953 (D.D.C. Jan. 19, 2022) .............................................31

*Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295 (D.D.C. 2014)........................29

*Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ...........................................34, 42

*Dong v. Smithsonian Inst.*, 125 F.3d 877 (D.C. Cir. 1997)......................................26, 27

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568 (1988).........................................................................................21

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100 (D.D.C.
   2020) .......................................................................................................26

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018).................................................21, 45

*Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*,
   262 U.S. 649 (1923).......................................................................................18

*Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*,
   657 F.2d 183 (8th Cir. 1981) ..........................................................................28

*Flaherty v. Ross*, 373 F. Supp. 3d 97 (D.D.C. 2019)...............................................28

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*,
   583 F. Supp. 674 (N.D. Ga. 1984)....................................................................28

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ................................16, 29, 30

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
   861 F.3d 1052 (10th Cir. 2017) ........................................................4, 17, 18, 44

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)............................11

Page

Cases—continued:

*Getty Oil Co. v. Clark*, 614 F. Supp. 904 (D. Wyo. 1985) ...........................................9

*Ghadami v. U.S. Dep't of Homeland Sec.*, 2020 WL 1308376 (D.D.C. Mar. 19, 2020).........29

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)...............44

*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*,
    482 F.2d 710 (D.C. Cir. 1973)..............................................................26, 28

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ...............................................34

*In re Hoag Ranches*, 846 F.2d 1225 (9th Cir. 1988) ..........................................28

*In re Pub. Emps. for Env't Resp.*, 957 F.3d 267 (D.C. Cir. 2020)..............................10

*Indep. Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ...................................33

*INS v. Chadha*, 462 U.S. 919 (1983) ............................................................36

*Intercoll. Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012).........41

*Jarkesy v. SEC*, 34 F. 4th 446 (5th Cir. 2022) ...............................................34, 35, 36

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ............................................21, 34, 44

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983).....28, 44

*Johnson v. Rogers*, 917 F.2d 1283 (10th Cir. 1990).............................................32

*Kane Cnty. Utah v. Salazar*, 562 F.3d 1077 (10th Cir. 2009) ..................................12

*Katsiavelos v. Fed. Rsrv. Bank of Chi.*, 859 F. Supp. 1183 (N.D. Ill. 1994)........................28

*L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014) .............................................24

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)..............................................31

*Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982)...............28

*Lewis v. United States*, 680 F.2d 1239 (9th Cir. 1982).........................................28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .....................13

*Lombardo v. Handler*, 397 F. Supp. 792 (D.D.C. 1975) .......................................27

*Lucia v. SEC*, 138 S. Ct. 2044 (2018).........................................................37

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...............................................8

*Mann v. Fifth Third Bank*, 2011 WL 1575537 (S.D. Ohio Apr. 25, 2011) .................16, 25, 26

*Mashpee Wampanoag Tribe Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003).........30

*McKinley v. Bd. of Govs. of Fed. Rsrv. Sys.*, 647 F.3d 331 (D.C. Cir. 2011)........................28

*Mistretta v. United States*, 488 U.S. 361 (1989) ..............................................34

*Motaghedi v. Pompeo*, 2020 WL 207155 (E.D. Cal. Jan. 14, 2020) ...............................30

*Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017).............................................21

*New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524 (2d Cir. 2010) ...........26, 27

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ........................................16

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) ...................................43

*Prier v. Steed*, 456 F.3d 1209 (10th Cir. 2006)................................................33

*Rector v. City & Cnty. of Denver*, 348 F.3d 935 (10th Cir. 2003)................................11

*Rice v. Vill. of Johnstown*, 30 F.4th 584 (6th Cir. 2022)........................................10

*Robertson v. Colvin*, 564 F. App'x 931 (10th Cir. 2014) .......................................12

*Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532 (8th Cir. 2005) ...........................28

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ...........................................11, 35

*Shands v. Tull*, 602 F.2d 1156 (3d Cir. 1979).................................................31

*Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587 (1926)................................................31

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)..........................................26, 28

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..................................................11

Page

Cases—continued:

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ............................................................13
*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................................13
*Taft v. Agric. Bank of China Ltd.*, 2016 WL 2766661 (S.D.N.Y. May 12, 2016)............16, 25
*Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)....................................29
*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*,
    2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ........................................................ *passim*
*Trump v. New York*, 141 S. Ct. 530 (2020)..............................................................................12
*U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415 (1928)..........34
*United States v. Arthrex*, 141 S. Ct. 1970 (2021) ........................................................37, 40, 41
*United States v. Cabral*, 926 F.3d 687 (10th Cir. 2019) ..........................................................12
*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019) ...........................................28
*Utah Ass'n of Counties v. Bush*, 455 F.3d 1094 (10th Cir. 2006) ...........................................12
*Wild Watershed v. Hurlocker*, 961 F.3d 1119 (10th Cir. 2020)...............................................21
*Wyoming v. U.S. Dep't of Interior*, 493 F. Supp. 3d 1046 (D. Wyo. 2020) ...........................15

Constitution, Statutes, and Rules:

U.S. Const. art. II, § 2, cl. 2 ................................................................................................ *passim*

5 U.S.C.
    § 551 .................................................................................................................................26
    § 706 ...........................................................................................................................25, 29

12 U.S.C.
    § 241 .................................................................................................................................38
    § 248.................................................................................................................3, 17, 20, 27
    § 248a........................................................................................................................20, 44, 45
    § 289 ...................................................................................................................................3
    § 302......................................................................................................................3, 38, 43
    § 307 ...................................................................................................................................3
    § 341.........................................................................................................................3, 41, 42, 43
    § 342............................................................................................................................ *passim*
    § 347 .................................................................................................................................21
    § 347d ...............................................................................................................................21
    § 348a ...............................................................................................................................21
    § 357 .................................................................................................................................20
    § 358 .................................................................................................................................21
    § 531 ...................................................................................................................................3
    § 1813.......................................................................................................................4, 16, 24
    § 1818 ...............................................................................................................................25
    § 1831j ..............................................................................................................................25
    § 4801 ...............................................................................................................................24
    § 4807............................................................................................................................ *passim*
    § 5465 ...............................................................................................................................18

Page

Constitution, Statutes, and Rules—continued:

28 U.S.C.
  § 451..................................................................................................................32
  § 1361................................................................................................................32
  § 2201................................................................................................................33

Wyo. Stat.
  § 13-12-101 *et seq.*............................................................................................6
  § 13-12-103.........................................................................................................6
  § 13-12-105.........................................................................................................6
  § 13-12-116.......................................................................................................10
  § 13-12-119.........................................................................................................6

12 C.F.R. § 265.20.................................................................................................27

Fed. R. Civ. P. 12(b)(6)...........................................................................................8

Other Authorities:

*Appointment and Removal of Federal Reserve Bank Members of the Federal Open*
  *Market Committee*, 43 Op. O.L.C. __ (Oct. 23, 2019) .............................. *passim*
Bd. of Govs. of Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service*
  *Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu ...............44
Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services*
  *Requests*, 87 Fed. Reg. 51,099 (Aug. 15, 2022) ....................................... *passim*
Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is That*
  *Legal?* Brookings (Nov. 14, 2018) https://tinyurl.com/4pxju8jd .........................4
Walter Dellinger & H. Jefferson Powell, *The Constitutionality of the Bank Bill: The*
  *Attorney General's First Constitutional Law Opinions*, 44 Duke L. J. 110 (1994) ..........39
Fed. Rsrv. Banks, Operating Circular 1 (Aug. 16, 2021) .........................................4
Fed. Rsrv. Bank of Phila., *The First Bank of the United States: A Chapter in the*
  *History of Central Banking* (Mar. 2021), https://tinyurl.com/4xb99ys8 ...........................39
H.R. Rep. No. 95-1590 (1978).................................................................................45
Liese Klein, *TNB Seeks to Become State's Newest Bank in Face of Fed Delays*,
  NewHavenBiz (Apr. 4, 2022) https://tinyurl.com/3x7ydccu.............................................15
Jennifer L. Mascott, *Who Are 'Officers of the United States'?*,
  70 Stan. L. Rev. 443 (2018)...................................................................................40
*Officers of the United States Within the Meaning of the Appointments Clause*,
  31 Op. O.L.C. 73 (2007) .................................................................................27, 37, 38
*Providing for Consideration of H.R. 7, Monetary Control Act of 1979*,
  125 Cong. 6314 (1979) .........................................................................................45

## INTRODUCTION

No one is above the law, especially not the government.  And the need for judicial review is at its apex when, as here, the government refuses to make decisions under the deadline Congress set, then claims to be completely unaccountable to anyone.  Wyoming-based Custodia Bank applied for a master account with a regional Federal Reserve Bank that would give Custodia access to key Federal Reserve services on the same terms provided to other depository institutions.  The federal agency that ultimately decides whether to grant master account applications—the Board of Governors of the Federal Reserve System—has now sat on that application for nearly two years without explanation.  Custodia simply asks for a decision, so that it can enjoy the same benefits as other depository institutions or address the agency's concerns should it reject or condition the application.  Yet the Board insists there is nothing this Court can do to stop its stonewalling, and refuses to give a timeline for resolution.

This Court should refuse the government's pretzel-twisted logic that the government can act as a law unto itself freed from statutory obligations or judicial review.  Congress gave "Federal banking agenc[ies]," including the Board, a one-year deadline to "take final action on any application." 12 U.S.C. § 4807.  Even absent a statutory deadline, the Administrative Procedure Act (APA) requires agencies to act within a reasonable time.  And the APA, Mandamus Act, and Declaratory Judgment Act all empower this Court to require the Board to finally make a decision.

Defendants try to duck their obligations.  They claim that Custodia lacks standing to challenge the delay in adjudicating its application.  But Custodia is suffering ongoing harm from the lack of an up-or-down decision.  Custodia has had to address that uncertainty by shouldering costlier, short-term arrangements instead of having access to its own master account (with an up decision) or forging a more affordable, long-term relationship with a bank that does have a master account (with a down decision).  Courts have routinely found standing in analogous circumstances.

1

Defendants also deem the dispute unripe, claiming that even with a master account, Custodia would need other business licenses (namely, a Certificate of Authority) to start operating. But Custodia just obtained that license, which in all events is inextricably linked with Custodia's ability to access a master account. Defendants further ask the Court to dismiss the case so the Board and its Federal Reserve Banks can firm up policies around digital assets before resolving Custodia's application on an unspecified timeline. But granting Defendants a blank check to delay decision-making would allow Defendants to dodge judicial review indefinitely.

As to the merits, Defendants' primary contention is that Federal Reserve Banks—not the Board—exercise unreviewable, unrestricted control over master account decisions. Because Reserve Banks (in Defendants' telling) are not federal agencies subject to the APA, no deadlines and no fixed criteria purportedly apply to whether parties can obtain master accounts. If adopted, that implausible above-the-law position would unleash thorny constitutional problems that this Court should avoid by adopting the most straightforward reading of the statutory language: under the Federal Reserve Act, the Board retains final decision-making authority over master account applications. Defendants' position also contradicts factual allegations in Custodia's complaint regarding the Board's intervention in Custodia's application process, which must be credited at this stage. As such, the Board is plainly subject to a one-year deadline in resolving applications, and is a federal agency that must operate within the APA's limits.

This Court is all that stands between Defendants and total unaccountability for deciding master account applications however and whenever they wish. The clearest path to a quick, clean, and commonsense result is to deny the motions to dismiss and move toward ordering Defendants to act on Custodia's application. The alternative is to plunge this Court into complex constitutional arguments that call into question the Board's nebulous relationship with Reserve Banks.

## BACKGROUND

### A.  The Federal Reserve System

The Federal Reserve System controls and executes the nation's monetary policy and serves as America's central bank.  The Federal Reserve's Board of Governors, a federal agency, sits atop this system.  *See* Bd. of Govs. Mem. in Support of Mot. to Dismiss (Bd. Br.) 1-2, ECF No. 49.

The Board exercises "general supervision" over twelve regional Reserve Banks, including the Kansas City Fed.  12 U.S.C. § 248(j).  As the Board puts it, "[t]he Board's general supervisory powers are extremely broad."  Bd. Br. 44 n.40.  "The Board oversees the operations of the regional Reserve Banks, including by setting policies for Reserve Banks' lending of money to private banks and provision of other financial services."  *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. __, at *3 (Oct. 23, 2019) (*Federal Reserve Bank Members*); Bd. Br. 2.  Congress also empowered the Board to "make all rules and regulations necessary to enable [the] board effectively to perform" its statutory duties, including supervising Reserve Banks.  12 U.S.C. § 248(i).  The Board can delegate many functions to Reserve Banks, but retains ultimate authority to review delegated functions.  *Id.* § 248(k).  The Board approves and can terminate Reserve Bank presidents and vice presidents, and appoints a third of Reserve Bank directors.  *Id.* §§ 248(f), 302, 307, 341.  And the Board can "suspend … operations of any Federal reserve bank" and "liquidate or reorganize such bank."  *Id.* § 248(h).

"The twelve regional Federal Reserve Banks execute the Federal Reserve System's policies."  *Federal Reserve Bank Members,* 43 Op. O.L.C. __, at *3.  As "operating arms" of the Reserve System, Reserve Banks act as "fiscal agents of the United States empowered by delegation from the Board … to supervise financial institutions and activities."  *Id.* at *8 n.3.  In carrying out these statutory mandates, Reserve Banks serve the United States' interests.  Their profits revert to the U.S. Treasury, *id.* § 289(a)(3)(B), and they are exempt from paying most taxes, *id.* § 531.

**B.    The Federal Reserve's Master Account Application Process**

1. Master accounts are accounts that banks hold with a Reserve Bank—in effect, "bank account[s] for banks." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).   Master accounts permit access to a bevy of "indispensable" financial services the Federal Reserve provides. *Id.* at 1064 (Bacharach, J.).  Only by holding a master account may banks directly utilize the Federal Reserve's electronic system for executing debit and credit entries between institutions, clearing checks, transferring securities, and cashing savings bonds. Fed. Rsrv. Banks, Operating Circular 1 at §§ 2.3, 4.1-.3 (Aug. 16, 2021).   Put simply, a bank shut out from the Federal Reserve's payment system "can't really function as a financial institution."  Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities.  But Is that Legal?* Brookings (Nov. 14, 2018) https://tinyurl.com/4pxju8jd.

Banks lacking their own master accounts may access key Federal Reserve services only by partnering with third parties that have a master account.  Operating Circular 1, § 2.7, *supra.*  The additional layer of transactions introduces delays and costs, and creates the prospect that the counterparty might default on the amounts owed or fail to deliver on contractual terms. *See* Compl. ¶ 8.  Intermediary banks also charge fees for their service as intermediaries.  Thus, master account access is by far the more preferable and less-costly course for banks whose primary business is payments, regardless of whether the banks are federally or state chartered.

2.  Congress required that "[e]ach Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency." 12 U.S.C. § 4807(a).  The definition of "Federal banking agency" expressly includes the Board. *Id.* § 1813(z).  But the application process for master accounts is opaque.

To apply, banks fill out a one-page application and a Master Account Agreement, which states at the bottom in fine print: "Processing may take 5-7 business days." Compl., Ex. 1, ECF No. 1-2. Ordinarily, master account applications are granted within a few days. Compl. ¶¶ 35, 77, 99. But Defendants have made inconsistent representations about who makes the ultimate decision, and under what criteria. *Id.* ¶¶ 50-60.

In a remarkable coincidence, the Board issued final Guidelines for evaluating master account applications the day before Defendants filed motions to dismiss in this case. Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51,099 (Aug. 15, 2022). Those Guidelines exemplify Defendants' inconsistent positions as to who makes master account decisions, and under what criteria. Compl. ¶¶ 50-60. On the one hand, the Guidelines point to the Board's ultimate control. The Board prescribed a tiered framework for evaluating risks of different institutions accessing master accounts, and stated that state-chartered, non-member institutions without FDIC insurance—namely, banks like Custodia—"will generally receive the strictest level of review." 87 Fed. Reg. at 51,110. The Board promulgated these "guidelines under its general supervision authority over the operations of the Reserve Banks," and identifies "principles to be used by Federal Reserve Banks … in evaluating requests for master accounts." *Id.* at 51,106. The Board "expect[s] that Reserve Banks [will] engage in consultation with … the Board" to apply the Guidelines, and will work "in consultation with the Board, to expeditiously develop an implementation plan." *Id.* at 51,102.

On the other hand, the Guidelines claim, as Defendants do here, that "decisions regarding individual access requests remain at the discretion of the individual Reserve Banks." *Id.* at 51,106; Bd. Br. 5; Fed. Rsrv. Bank of Kan. City's Mem. in Support of Mot. to Dismiss (KCF Br.) 12, ECF

No. 51.  The Guidelines do not say if the Board retains veto authority over master account decisions, or whether the Board will reverse determinations that defy these Guidelines.

### C.      Custodia Bank's Wyoming Charter and Master Account Application

1.  In 2019, after extensively consulting with Defendants, Wyoming created a new type of state bank charter, the Special Purpose Depository Institution (SPDI).  Compl. ¶ 28; Wyo. Stat. § 13-12-101 *et seq*.  SPDIs provide a bridge connecting digital asset companies to the U.S. payments system.  Wyoming's Division of Banking heavily regulates SPDIs.  Wyo. Stat. § 13-12-119.  For example, SPDI banks must hold reserves backing 100% of U.S. dollars that clients deposit in bank accounts.  Accordingly, if a client seeks to withdraw funds, the bank will have the assets on hand to cover the withdrawal.  Compl. ¶ 28; Wyo. Stat. §§ 13-12-103, 13-12-105.

In January 2020, Caitlin Long, a 22-year Wall Street veteran, formed Custodia.  That fall, Wyoming's State Banking Board granted Custodia an SPDI charter.  Compl. ¶ 10.  Custodia will not hold customers' digital assets in any of its accounts, so Custodia will not be exposed to digital asset price volatility; its customers will retain all digital asset risks.  *Id*. ¶ 42.  Custodia will simply maintain customers' digital assets in its trust department, like a safety deposit box for digital assets. *Id*.  Custodia will also facilitate exchanges of digital assets for dollars, acting as agent, like banks facilitate exchanges of euros for dollars.  Custodia needs a master account to handle the U.S. dollar portion so that Custodia can use the Federal Reserve payment system's electronic fund transfer services.  At no point would customers' digital assets touch Custodia's master account.  *Id*.

2.  In October 2020, Custodia filed its master account application with the Kansas City Fed.  Compl. ¶ 34.  Custodia submitted some 900 pages of additional information, including Custodia's business plan, bylaws, policies, insurance agreements, and Wyoming Banking Approval Order.  Months passed.  In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that the application presented "no

showstoppers." *Id.* ¶ 36. And in January 2022, the Kansas City Fed confirmed that Custodia meets the legal eligibility requirements for receiving a master account. *Id.*

Nevertheless, nearly two years on, Custodia's application remains pending. *Id.* ¶ 45. Custodia has endeavored to expedite the process, regularly contacting Defendants and setting up numerous meetings. *Id.* ¶ 37. Custodia has repeatedly offered to provide more information, yet Defendants did virtually nothing on the application. *Id.* In August 2021, after nearly a year of Defendants' inaction, Custodia applied to become a member bank of the Federal Reserve System to show its willingness to submit to full federal supervision and accountability. *Id.* ¶ 39.

In March 2022, nearly 17 months after Custodia's master account request, the Kansas City Fed disclosed it had not begun processing the master account application. *Id.* ¶ 40. Custodia then met with Esther George, the Kansas City Fed's President, and offered myriad commitments if granted a master account. *Id.* ¶¶ 41-42. Custodia offered to hold $1.08 in cash in its master account for every $1.00 of customer dollar deposits in its first three years of operation, to provide monthly financial statements, and to follow other restrictions well beyond those of conventional banks. *Id.* ¶ 42. Custodia offered these commitments to further show that Custodia posed minimal risk to customers and the market and no risk to the Federal Reserve System. *Id.* Thereafter, Ms. Humston again confirmed: "Custodia is legally eligible for a master account." *Id.* ¶ 43.

Yet, Defendants still refused to provide any timeline for a decision. *Id.* Nor have Defendants explained their decision-making process. *Id.* ¶ 54. Instead, the Kansas City Fed has taken its direction from the Board, which intervened in Spring 2021 to halt the processing of Custodia's application. *Id.* ¶¶ 58-59; *see TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, 2020 WL 1445806, at *3 (S.D.N.Y. Mar. 25, 2020) (detailing Board intercession in similar case).

## STANDARD OF REVIEW

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim is plausible if it is accompanied by sufficient factual content to allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" and "the Court accepts as true all well-pleaded allegations." *Audubon of Kan., Inc. v. U.S. Dep't of the Interior*, 568 F. Supp. 3d 1167, 1174 (D. Kan. 2021) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I.     This Case Is Justiciable

Contrary to Defendants' assertions, this case is justiciable.  As to standing, Custodia is suffering ongoing injuries from delayed adjudication of its application.  And Custodia would suffer yet further injuries if (as Defendants claim) Reserve Banks are the only deciders of master account applications.  The constitutional problems with that argument are, first and foremost, reasons to reject Defendants' interpretation.  But, were Defendants' position correct, Custodia would suffer distinct here-and-now injuries from being subjected to unaccountable and unlawful decision-makers.  This case is also ripe.  Just like countless other cases challenging agency delay, Custodia's injuries from delay are already transpiring and await no further developments.  Defendants' ripeness objections would let the government indefinitely delay judicial review.

1. **Standing**.  Custodia has adequately alleged standing by identifying injuries-in-fact "fairly traceable to" Defendants' unreasonable delay in adjudicating Custodia's master account application, which would "likely ... be redressed" by an up-or-down decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 566 (1992).  To start, Custodia alleges that Defendants' unreasonable delay in processing Custodia's application for a master account inflicts monetary

8

harm, a classic injury in fact. By delaying that decision, Defendants left Custodia with no choice but to temporarily affiliate with a third-party bank that has a master account—a "makeshift," "much costlier" arrangement. Compl. ¶ 8. The third-party bank is charging Custodia to process its transactions in the short term, and Custodia is expending millions of dollars to retool its operating system and processes to be compatible with the third party's system. Using a third party bank introduces counterparty credit and settlement risks and competitive downsides that Custodia would avoid with its own master account. *Id.*

That second-best option harms Custodia regardless of how Defendants resolve Custodia's application. If Defendants grant the application, their delay will have inflicted unnecessary costs on Custodia. And if Defendants deny the application, Custodia will still have incurred unnecessary costs because Custodia cannot negotiate a long-term agreement with a third-party bank unless Custodia knows the fate of its application. Custodia must instead rely on a "makeshift" arrangement which compensates the third-party bank for the risk that its relationship with Custodia could be very short-term because Custodia would stop using it to clear payments as soon as Custodia obtains a master account. *See id.* Either way, Defendants' delay imposes distinct injuries from costly uncertainty that Custodia cannot mitigate until Defendants render a decision, *contra* Bd. Br. 31-32; KCF Br. 38-40. Such "business-related economic uncertainty" creates standing to raise administrative challenges. *Getty Oil Co. v. Clark*, 614 F. Supp. 904, 915 (D. Wyo. 1985).

Courts have found standing based on allegations that delayed agency action forced plaintiffs to expend resources or inflicted other harms. In another challenge to the Board's delayed processing of master account applications, the district court suggested that delay-related injuries would confer standing; the plaintiff there simply failed to plead that theory. *TNB*, 2020 WL 1445806, at *7. And the D.C. Circuit held that an animal rights group had standing to challenge

USDA's delay in issuing regulations because the group had to "fill the void by developing the guidance" themselves, draining their resources. *Am. Anti-Vivisection Soc. v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (internal quotation marks omitted). Likewise, the D.C. Circuit held that agencies' failure to issue rules governing commercial flights over national parks inflicted a cognizable injury on the plaintiffs, who alleged that their "enjoyment of the woods" was "marred by the intrusive noise of overflights." *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 272 (D.C. Cir. 2020); *accord Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014) (similar basis for standing). In these cases, agency action still might not avert the harm: USDA's rules might have been insufficiently clear to obviate the need for animal rights groups' guidance, and regulation of commercial flights might not have stopped overflights where plaintiffs hiked. But standing existed because agency inaction *guaranteed* those harms.

Defendants argue that Custodia cannot allege injury because Custodia lacks a Wyoming Certificate of Authority, and could not start operating even if it had a master account. Bd. Br. 31-32; KCF Br. 41 & n.9. The Wyoming Division of Banking approved Custodia's Certificate of Authority on September 12, 2022. Had Defendants acted sooner on Custodia's master account, Custodia could have received this certificate months earlier. Certificates of Authority expire within 6 months for banks that have not yet started operating. *See* Wyo. Stat. § 13-12-116(b). Under Wyoming banking rules, Custodia could not receive that certificate until *after* it received a master account or established a relationship with a third-party bank. Other courts have thus found standing where plaintiffs must navigate distinct application processes for permission to act, but the processes are "intertwined." *Rice v. Vill. of Johnstown*, 30 F.4th 584, 593 (6th Cir. 2022).

Defendants question Custodia's standing to bring due process, nondelegation, and Appointments Clause challenges (Counts III, V-VI). Bd. Br. 27-30; KCF Br. 33, 37-40. To start,

those are constitutional avoidance arguments that impugn Defendants' statutory interpretation that the Kansas City Fed is the sole decision-maker on master accounts. *Infra* p. 21. Even were the Kansas City Fed the lone decision-maker, the ensuing constitutional violations inflict discrete harms on Custodia. Being subjected to unconstitutional procedures and unaccountable decision-makers who exercise improper authority inflicts injury regardless of how the final decision turns out. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020). Standing flows from the prospect of "sustain[ing] injury from an executive act that allegedly exceeds the [agency's] authority." *Id.* (internal quotation marks omitted). Thus, challengers had standing to bring a pre-enforcement challenge to the Public Company Accounting Oversight Board to avoid the injury of being subjected to decisions by unaccountable decision-makers; they did not have to await Board action. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010).

Similarly, for due process challenges, plaintiffs "may suffer injur[ies] in fact from defective procedures," regardless of any additional harm that an adverse decision might inflict. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 943 (10th Cir. 2003); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016). To assess standing based on due process violations, courts "assum[e] the truth and validity of all of a plaintiff's factual allegations and legal theories," including asserted property interests, and focus on whether more process could benefit the plaintiff. *Copelin-Brown v. N.M. State Pers. Off.*, 399 F.3d 1248, 1253-54 (10th Cir. 2005) (internal quotation marks omitted); *accord Rector*, 348 F.3d at 943 ("Parties may suffer injury in fact from defective procedures even if, at the end of the day, they would not have prevailed on the merits."). Custodia suffers distinct harm from unconstitutional processes apart from any denial of its application. Declaring those

11

processes unconstitutional would remedy Custodia's harms by reverting decision-making authority to the Board, which must resolve Custodia's application, *contra* Bd. Br. 28 n. 27-28.[1]

Finally, Defendants object that Custodia lacks standing to challenge Defendants' failure to grant Custodia master account access (*i.e.*, standing as to Counts VII and VIII, which seek relief in the alternative). Bd. Br 30-31; KCF Br. 38-40 & n.8. Defendants' objections assume away the merits. If Custodia is correct that the statutory scheme compels Defendants to grant Custodia's application, then Defendants' failure to do so inflicts ongoing harm that this Court can redress by requiring Defendants to grant the application in the event Defendants deny it.

2. **Article III Ripeness.** For similar reasons, Custodia has alleged a ripe dispute because Custodia's claims are "not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam) (internal quotation marks omitted); *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019). As noted, Custodia's injuries are not contingent upon an adverse final decision, *contra* Bd. Br. 29-30. Defendants' delay is currently forcing Custodia to contract with a third-party bank on an expensive, short-term basis, and Custodia's constitutional claims implicate here-and-now injuries.

3. **Prudential Ripeness.** Finally, Defendants invoke prudential ripeness, claiming that "[t]he complex and far-reaching issues Custodia's Complaint presents are far from fit for a judicial decision" and could be deferred with "little if any hardship" until Defendants resolve both

---

[1] The Board's authorities (at 28) are irrelevant; none involved analogous here-and-now injuries from being subjected to unconstitutional decision-makers or processes. *Kane County Utah v. Salazar*, 562 F.3d 1077, 1090 (10th Cir. 2009), challenged agency action that had not yet occurred. *Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014), found no standing because plaintiff's alleged reputational harm from a Social Security adjudicatory finding was too abstract. And there was no standing in *Utah Association of Counties v. Bush*, 455 F.3d 1094 (10th Cir. 2006), because the plaintiff sued in 1997 but his complained of injury occurred only in 1998. *Id.* at 1101.

Custodia's master account application and its separate application for Federal Reserve membership. KCF Br. 40-41; *see* Bd. Br. 29-30 (invoking prudential ripeness decisions).

Recent Supreme Court decisions question the validity of the prudential ripeness doctrine. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). And Defendants' plea to punt this case is ironic. Ordinarily, "complex and far-reaching issues," KCF Br. 40, present a classic case for denying motions to dismiss, not reasons to duck federal courts' "virtually unflagging obligation" to decide controversies where jurisdiction exists, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (internal quotation marks omitted). The Board's objection (at 29) that "plaintiff's claims rest on factual speculation about who will make a final decision" is not a ripeness problem; it is a byproduct of Defendants' opaque process, and the remedy is discovery, not dismissal. *See Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 453 (6th Cir. 2022) (rejecting similar argument and deeming discovery "critical to understanding" opaque USCIS processes). Defendants also miss the mark by claiming that the lack of a final decision proves the dispute is unripe. Bd. Br. 29-30; KCF Br. 39-40. Custodia's central objection is that Defendants are refusing to adjudicate Custodia's application on any timeline. Dismissing this case as unripe because Defendants have not rendered a final decision would add insult to injury, and would render the APA's guarantee of judicial review of delayed agency actions a dead letter.

Meanwhile, Defendants' confidence that Custodia will not suffer harm from Defendants' undisclosed timetable is hard to credit given that the clock has been running for nearly two years with no end in sight. The Kansas City Fed (at 44) blithely portrays contracting with a third-party bank as "no mere makeshift solution." But, as the Complaint alleges, that option is costlier and far less desirable than master account access. Compl. ¶ 8. The Kansas City Fed's citationless

claim (at 44) that Custodia had "abundant notice" that its application "would take time to review" is absurd. The application form portrays 5-7 days as the standard timeframe; federal law prescribes a one-year deadline, 12 U.S.C. § 4807; and the Kansas City Fed told Custodia that it was legally eligible for an account and there were "no showstoppers." Compl. ¶ 36.

Accepting Defendants' prudential ripeness arguments would let the government sidestep judicial review of virtually any decision. The Kansas City Fed (at 42) asks for dismissal so it can "carefully consider how to exercise its discretion" in light of "ongoing work … by the Federal Reserve System, federal banking agencies, and Congress." If the standard is that no plaintiffs can sue before federal agencies wrap up considering how to address digital assets, challenges to agency delays would never be ripe. And kicking this suit until the Board resolves Custodia's Reserve System membership application would let Defendants continue unlawfully delaying Custodia's master account application by dragging their feet on another application. *Cf.* KCF Br. 43-44.

The Kansas City Fed's pleas for delay in light of the Board's recent Guidelines (at 41-43) are especially eyebrow-raising. It seems no accident that the Board finalized those Guidelines the day before Defendants' motions to dismiss were due. The Kansas City Fed claims to enjoy unfettered discretion to decide master account applications and apparently need not follow the guidelines. Yet the Kansas City Fed (but, tellingly, not the Board) claims that the need to account for those Guidelines justifies an unspecified amount of additional time, even though the final Guidelines substantially resemble the Board's May 2021 proposal, purport to track existing practice, and could not apply retroactively to Custodia if they actually changed substantive criteria for applications in any way. 87 Fed. Reg. at 51,099 & n.3; *supra* p. 5. Were the Court to accept this argument, agencies could always delay decisions, issue nonbinding guidance on the eve of litigation junctures, and buy more time.

14

This case differs from instances where courts delay adjudicating challenges to federal rules because the agency issues subsequent rules that modify the challenged rule, alongside plans to completely revise the rule. *See Wyoming v. U.S. Dep't of Interior*, 493 F. Supp. 3d 1046, 1054 (D. Wyo. 2020). There, agencies have actually taken binding, ensuing actions that affect the merits of the challenged rule—unlike the nonbinding guidance here. And those cases prompt stays of the litigation, not dismissal. *See id.* at 1054-57. Allowing an agency to bypass claims of unlawfully delayed agency action just by issuing nonbinding guidance and calling it new grounds for delay would give the government an unprecedented blank check for evading judicial review.

This Court is the only remaining safeguard against Defendants' delay tactics. If the Court takes Defendants at their word, Defendants may do nothing for years. That is what happened after a district court dismissed TNB's complaint alleging a constructive denial of its master account application after 18 months' delay. *TNB*, 2020 WL 1445806, at *10. Nearly five years after TNB applied for a master account, it is still waiting. Liese Klein, *TNB Seeks to Become State's Newest Bank in Face of Fed Delays*, NewHavenBiz (Apr. 4, 2022) https://tinyurl.com/3x7ydccu.

## II. Custodia Stated Actionable Claims Based on Defendants' Unlawful Delay in Adjudicating Its Master Account Application (Counts I-IV)

As Custodia's complaint alleged, the Board, not Reserve Banks, possesses the ultimate power to decide master account applications. All ordinary indicia of statutory meaning confirm that reading, and Custodia has pled myriad supporting facts. Defendants instead contend that Congress gave the Board control of everything except the kind of master account applications at issue here. That position is untenable, and still would not excuse Defendants' delay.

### A. The Board's Failure to Adjudicate Custodia's Master Account within One Year Violates 12 U.S.C. § 4807, and Thus the APA

1. Because the Board ultimately controls master account decisions, this case presents a blatant APA violation. Defendants concede that 12 U.S.C. § 4807 prescribes a mandatory, one-

15

year deadline for adjudicating applications: "Each Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency." Bd. Br. 10; KCF Br. 17. The statute identifies the Board as a "Federal banking agency." 12 U.S.C. § 1813(z). And "applications" would plainly include master account applications. Thus, if the Board controls master account adjudications, as Custodia alleges, the Board plainly violated § 4807's one-year deadline.

Defendants respond that, because Custodia submitted its application to the Kansas City Fed, not "to the agency" (the Board), § 4807 does not apply. Bd. Br. 10-11. That is a distinction without a difference: The Board is the head of the Federal Reserve System, of which Reserve Banks are constituent parts. Defendants' position produces absurd results. The point of § 4807 is that, when federal banking agencies are vested with authority to decide applications, they must act swiftly. Congress did not include a glaring loophole whereby the Board could make the one-year deadline magically disappear by routing applications to subsidiary officers or agents. *See Taft v. Agric. Bank of China Ltd.*, 2016 WL 2766661, at *12-13 (S.D.N.Y. May 12, 2016) (rejecting same argument under statute requiring reporting to a "Federal supervisory agency"); *Mann v. Fifth Third Bank*, 2011 WL 1575537, at *3 (S.D. Ohio Apr. 25, 2011) (same).

Nor is there any doubt that if the Board blew § 4807's one-year deadline, the Board violated the APA and should be compelled to resolve Custodia's application. The Board concedes it is a "federal agency" for APA purposes. Bd. Br. 1, 2. Textbook administrative law prescribes that violating a statutorily mandated deadline qualifies as "unlawfully with[holding]" agency action under the APA, 5 U.S.C. § 706(1). Faced with a mandatory deadline for agency action, the Tenth Circuit requires courts to compel agency action. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1189-91 (10th Cir. 1999); *accord Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

2.  Defendants deny that the Board exercises final decision-making authority over master account applications.  Instead, they contend, the Kansas City Fed exercises sole, unreviewable discretion over such applications as a distinct entity that is not subject to § 4807, the APA, or other constraints.  Bd. Br. 2, 12, 17-21; KCF Br. 17-18.  That argument is legally and factually untenable.

a.  Start with the law.  Because the Board sits atop the Federal Reserve System, exercises supervisory authority over Reserve Banks, and controls what powers are delegated to Reserve Banks, the overwhelming inference should be that the Board exercises veto power over everything Reserve Banks do.  *See* 12 U.S.C. § 248(j); *supra* p. 3.  Defendants counter that 12 U.S.C. § 342 gives Reserve Banks exclusive, unilateral authority to decide master account applications free from Board control.  Bd. Br. 17; KCF Br. 21.  That argument is fatally flawed.

*First*, § 342 does not address master account access.  Section 342 states that Reserve Banks "may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items."  Section 342 thus presupposes that various entities *already* have master accounts, which are prerequisites to receive deposits.  Section 342 merely describes "types of monetary instruments that Federal Reserve Banks may receive for deposit or collection" from entities possessing master accounts.  *Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.).  Section 342 does not prescribe conditions for obtaining master accounts.

Other textual clues confirm as much.  Section 342 puts the United States on par with "member banks" and "other depository institutions" as actors equally capable of depositing funds with Reserve Banks.  Reading that language to vest Reserve Banks with plenary control over who gets a master account would lead to the implausible conclusion that Reserve Banks could unilaterally deny master accounts *to the United States*—not just member banks or other depository

17

institutions—for any reason.  The United States needs master accounts to manage the money supply.  But, under Defendants' reading, a single, unaccountable Reserve Bank could unilaterally defeat federal monetary policy and create economic chaos.

Further, Congress elsewhere used different language to grant the Board control over certain master accounts.  In 12 U.S.C. § 5465(a), Congress empowered the Board to "authorize a Federal Reserve Bank to *establish and maintain an account*" and "*provide … services*" for designated financial market utilities.  (Emphasis added).  The Board concedes that language gives the Board control over master accounts involving designated utilities.  Bd. Br. 5 n.5.  Section 5465 shows that when Congress wanted to describe authorization to open master accounts, it used language like "establish an account" or "provide services."  By contrast, § 342 addresses the downstream question of what monetary instruments various actors can deposit once they have master accounts.

Defendants incorrectly rely on *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923), as evidence that 12 U.S.C. § 342 gives Reserve Banks discretion to deny master accounts.  Bd. Br. 17-19; KCF Br. 21.  *Farmers* reinforces that § 342 confers some discretion over what types of monetary instruments Reserve Banks may accept—not over the antecedent question of whether to grant master accounts in the first place.  *Farmers* held that "neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation *to receive checks for collection*.  The act merely confers authority to do so." 262 U.S. at 655, 662 (emphasis added).  That Reserve Banks need not accept every method of deposit is irrelevant to whether they have discretion to deny master account applications.  *See Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.) (rejecting Defendants' interpretation).

Finally, the Kansas City Fed argues that Wyoming's SPDI charter shows the desirability of giving Reserve Banks "discretion" over master accounts.  KCF Br. 24-27.  The Kansas City Fed

claims that "Custodia's focus on providing cryptocurrency-adjacent services to customers presents increased risk of failure," which risk is "magnified by fraud and manipulation of cryptocurrencies"; asserts "unique compliance challenges"; and warns that letting Custodia "place deposits on the federal Reserve Balance sheet" might impact "monetary policy and preserving U.S. financial stability." *Id.*

But "even the most formidable policy arguments cannot overcome a clear statutory directive." *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1542 (2021) (internal quotation marks omitted). And the Kansas City Fed's policy arguments misstate well-pled facts about Custodia's business model, which this Court must credit. *Iqbal*, 556 U.S. at 678. SPDI banks take U.S. dollar deposits, facilitate payments, and conduct incidental services; they do not lend money. Compl. ¶ 29. SPDI banks cannot make loans with customer deposits in fiat currency (*e.g.*, U.S. dollars) and must back all deposits with 100% cash on hand or similar liquid assets. *Id.* ¶ 28. If Custodia receives a master account, the Federal Reserve System will not be exposed to any digital asset risks. Custodia will hold all customer deposits of U.S. dollars in cash in its Federal Reserve master account, while digital assets will be held in bailment on behalf of customers in its trust department. *Id.* ¶ 42. The Federal Reserve System will remain walled off from the digital assets of Custodia's customers, just like when a bank holds shares of Apple stock for a trust customer. From the Federal Reserve's vantage, assets in Custodia's master account would be the same as those in master accounts of any traditional bank, except Custodia's master account would be far better funded. The Kansas City Fed also ignores Custodia's offer of further precautions, such as holding $1.08 in cash in its master account for every $1.00 of customer U.S. dollar deposits, providing monthly financial statements, and agreeing to certain restrictions. *Id.* ¶ 42.

*Second*, even if § 342 empowered Reserve Banks to adjudicate master account applications, the Board would still retain final decision-making authority.  Congress granted the Board the power "[t]o exercise general supervision over" the Reserve Banks, 12 U.S.C. § 248(j), *i.e.*, ultimate veto authority over all decisions Reserve Banks might make.  The Board itself portrays that authority as "extremely broad."  Bd. Br. 44 n.4.

Congress confirmed the Board's ultimate control of Reserve Bank decisions throughout the Federal Reserve Act.  Take § 342 itself.  Right after the language Defendants invoke, § 342 authorizes "nonmember bank[s]" to make certain "deposits," but only "[p]rovided, [s]uch nonmember bank[s] … maintain[] with the Federal Reserve bank … balance[s] in such amount[s] as *the Board* determines."  (Emphasis added).  Section 342 also prescribes that "the Board of Governors" can regulate whatever "reasonable charges" that "member or nonmember bank[s]" make."  Translation:  the Board, not Reserve Banks, sets key conditions for deposits and charges.

Section 248a(c)(2) offers further support.  That provision prescribes that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions."  The Board develops the fee schedule for Reserve Bank services.  12 U.S.C. § 248a(a).  Those fees cover Reserve Banks' check clearing, collection, and wire transfer services—services that nonmember banks can access only if they have master accounts.  *Id.* § 248a(b).  Here again, Congress confirmed that the Board ultimately controls a key facet of master account access, *i.e.*, the terms on which account holders can use Reserve Bank services.

Other provisions where Congress delegated duties to Reserve Banks reinforce that Reserve Banks' decisions are subject to Board control.  Reserve Banks can set discount rates they will charge account holders, "subject to review and determination of the Board."  *Id.* § 357.  Reserve Banks can make advances to member banks on their promissory notes, but only at rates "subject

20

to the review and determination of the Board." *Id.* § 347. And Reserve Banks can receive deposits from and make advances to foreign banks, but only "[s]ubject to such restrictions, limitations, and regulations as may be imposed by the Board." *Id.* § 347d; *see id.* §§ 348a, 358 (similar Board oversight over foreign accounts and bank relationships). Even when Congress specified functions for Reserve Banks to perform, Congress made clear that the Board supervises those functions.

It defies credulity that Congress carved out an exception to the rule that the buck stops with the Board just for determinations about who gets master accounts. It is even less plausible that Congress did so in § 342 without mentioning master accounts, or even applications for or access to accounts. The constitutional problems that would arise if Reserve Banks exercised sole discretion over master account applications are further reason to reject Defendants' interpretation. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (given two possible interpretations, courts should pick the one that avoids constitutional doubts).

The Board's invocation of *Chevron* deference for its Guidelines (at 25-26) does not tilt the scales. The Supreme Court applies *Chevron* as a last resort, only if all other tools—including constitutional avoidance—do not resolve ambiguity. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018); *accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-75 (1988). Plus, courts do not owe *Chevron* deference to interpretations in non-binding guidance or operating circulars, least of all when those interpretations do not parse § 342 or invoke *Chevron*. *See Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1128 n.9 (10th Cir. 2020); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017).

b. Custodia's factual allegations—which, at this stage, the Court must accept as true— bear out the Board's ultimate control over master account decisions. Initially, the Kansas City Fed informed Custodia that its application presented "no showstoppers." Compl. ¶ 36. Then the

21

application sat for months after the Board "asserted its control over the decision-making process." *Id.* The Kansas City Fed itself has "pinned its delay on the Board." *Id.* ¶ 49. In practice, "the Board controls the decision because the Kansas City Fed has consulted with and defers to direction from the Board about Custodia's master account application, and in this case the Board has exercised control over the decision-making process." *Id.* ¶ 58.

Litigation over banking institution TNB's master account application underscores the plausibility of Custodia's allegations. *Id.* ¶ 59. There, the Reserve Bank (the New York Fed) conveyed its intent to approve TNB's application. *TNB*, 2020 WL 1445806, at *3. Then, the New York Fed "informed TNB that after hearing from the Board, the [New York Fed] did not think that TNB should expect approval any time in the near future" because "[t]he Board's staff was unwilling to decide on TNB's Master Account." *Id.* (internal quotation marks omitted). Later, the New York Fed indicated that "it was pessimistic *that the Board would allow* the [New York Fed] to issue a Master Account to TNB." *Id.* (emphasis added) (internal quotation marks omitted). And the New York Fed's brief stated that "it would be anomalous for the New York Fed *not* to consider" the "views" of the Board, since the Board "sets policy" and Reserve Banks "implement it." Reply 10, *TNB*, No. 1:18-cv-7978 (S.D.N.Y. Apr. 12, 2019), ECF No. 28.

Defendants' own statements underscore the improbability that the Board lacks control over master account decisions. The Board's brief states that Reserve Banks "carry[] out a variety of functions subject to the general supervisory authority of the Board," that Congress intended for the Board to "retain sufficient power over the reserve banks to enable it to exercise direct authority when necessary," and that "[a]ccess to master accounts is a matter of substantial concern to the Board and entire Federal Reserve System." Bd. Br. 2, 4-5. The Board also concedes that "Operating Circulars," including circulars detailing how to open and close master accounts, are

"issued by Reserve Banks and subject to approval by the Board." Bd. Br. 5. Given these points, the Board's claims that Reserve Banks somehow retain unreviewable discretion are implausible.

Or take the Board's final Guidance on master account access, which the Board issued under its supervisory authority over Reserve Banks and apparently believes Reserve Banks must follow. 87 Fed. Reg. at 51,099. The Guidelines evince the Board's belief that it could have imposed deadlines on master account adjudications. *Id.* at 51,102. The Board "expect[s] that Reserve Banks [will] engage in consultation with the other Reserve Banks and the Board" to consistently apply the Guidelines, and will work "in consultation with the Board, to expeditiously develop an implementation plan." *Id.* And the Board emphasizes the need for uniformity lest individual Reserve Bank decisions "set a precedent that could affect the Federal Reserve's ability to achieve its policy goals now or in the future." *Id.* at 51,106.

Defendants cannot have it both ways. The Board cannot assert authority in Guidelines issued on August 15, 2022 to extensively supervise and participate in master account decisions, yet claim in briefs on August 16 that Reserve Banks have total discretion over master account decisions. Bd. Br. 2, 12, 17-21; KCF Br. 17-18. All signs point to the Board—the head of the Federal Reserve System—retaining ultimate authority over master accounts. At a minimum, the factual allegations support an inference that the Board exercises final decision-making authority— an inference the Court must draw in Custodia's favor at this stage. Custodia has plausibly pled that the Board has defied the one-year statutory deadline and unlawfully withheld agency action under the APA, and dismissal would be inappropriate.

**B.   Even If the Kansas City Fed Exclusively Makes Master Account Decisions, Custodia Has Adequately Pled That the Lengthy Delay Violates the APA**

Even were Defendants correct that Reserve Banks alone make final decisions as to master accounts, Custodia is still entitled to an order compelling the Kansas City Fed to adjudicate

Custodia's application forthwith.  Like the Board, the Kansas City Fed is a "Federal banking agency" subject to 12 U.S.C. § 4807's mandatory one-year deadline for processing applications. Even were § 4807 somehow inapplicable to the Kansas City Fed, the lengthy delay in adjudicating Custodia's master account application would violate the APA's prohibition on unreasonably delayed agency action.  Defendants cannot indefinitely stonewall Custodia's application by shifting all blame to the Kansas City Fed and portraying that entity as a law unto itself.

1. ***Reserve Banks Are Federal Banking Agencies.***  The Kansas City Fed is a "Federal banking agency" under 12 U.S.C. § 4807, and must follow its one-year deadline. *Contra* Bd. Br. 10-11; KCF Br. 17-18.  Under the relevant provision, a "Federal banking agency" means "the Comptroller of the Currency," the FDIC, or "the Board of Governors of the Federal Reserve System." 12 U.S.C. § 1813(z); *id.* § 4801(1) (incorporating § 1813(z) definition).  When Congress refers to heads of agencies, that designation presumptively includes subordinate officers and subsidiaries.  *See L.D.G. v. Holder*, 744 F.3d 1022, 1026 (7th Cir. 2014) ("Statutory references to the 'Attorney General' include" constituent "component[s] of the Department of Justice").

Defendants are thus incorrect that by imposing a deadline on the "Board," Congress meant to exempt Reserve Banks from any time constraints. Bd. Br. 10; KCF Br. 17.  Under that logic, the FBI or individual U.S. Attorney's Offices could evade statutes directing the "Attorney General" to obtain warrants before conducting electronic surveillance, or the Border Patrol could disclaim any need to follow limits on the "Secretary of Homeland Security's" authority to perform immigration enforcement functions.  No court has endorsed such nonsensical positions.

Related statutes confirm that references to "the Board" include Reserve banks.  Take the Federal Deposit Insurance Act, where Congress used a materially identical definition of an "appropriate Federal banking agency" to refer to the Board.  12 U.S.C. § 4801(1) (adopting

§ 1813(q) definition).  Congress nonetheless specified that "[a] regional office of an appropriate Federal banking agency (including a Federal Reserve bank)" should perform certain functions, *id.* § 1818(t)(5)(A).  In other words, "Federal Reserve bank[s]" are part of "Federal banking agencies."

Courts, too, have held that statutes referring to the Board encompass Reserve Banks. Another district court deemed a Reserve Bank a "Federal banking agency" under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which includes the Board in its definition of "Federal banking agency." *See* 12 U.S.C. § 1831j(e); *Mann*, 2011 WL 1575537, at *3.  Reports to "local Federal Reserve bank examiners" thus satisfied FIRREA's statutory command to submit reports to "Federal banking agenc[ies]." *Mann*, 2011 WL 1575537, at *3. Likewise, a district court held that a Reserve Bank constituted a "federal supervisory agency" for purposes of the Bank Secrecy Act, which does not define that term.  The court refused to conclude that statutes defining a "federal supervisory agency" to include the Board, but not Reserve Banks, would apply only to the "seven Governors of the Federal Reserve Board," not "those acting under their authority and on their behalf." *Taft*, 2016 WL 2766661, at *12-13.  Defendants cite no contrary authorities.  Thus, even if the Kansas City Fed is the sole decision-maker on Custodia's application, it defied the statutory one-year deadline.

2. ***Reserve Banks Are APA Agencies That Must Act Within a Reasonable Time.***  Even were § 4807's one-year deadline inapplicable, the Kansas City Fed would qualify as an "agency" that must comply with the APA, including the APA's prohibitions on unlawfully withholding and unreasonably delaying agency action.  5 U.S.C. § 706(1).  And Custodia has adequately alleged that the 22-month delay in processing Custodia's application is manifestly unreasonable.

a. **Agency Status.**  Defendants deny that the Kansas City Fed is an "agency" for APA purposes.  Bd. Br. 12-13; KCF Br. 13-17.  The consequences of that position would be astonishing.

An entity that exercises many binding regulatory powers—including, in Defendants' telling, final authority over decisions affecting the U.S. financial system—would operate free of accountability.

Defendants' interpretation of the APA is incorrect and unprecedented.  As relevant here, the APA defines an "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1).  Courts look to "the structure, function, and mandate of the entity." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) (internal quotation marks omitted).  Particularly key is whether the entity exercises "substantial independent authority" to "take final and binding action affecting the rights and obligations of individuals." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997) (cleaned up); *accord Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 109-11 (D.D.C. 2020).

Thus, the Office of Science and Technology is an agency under the APA, despite being housed within the Executive Office of the President and performing many advisory functions, because that Office also performs the nonadvisory "function of evaluating federal programs." *Soucie*, 448 F.2d at 1075.  Likewise, the D.C. Circuit deemed "Regional Boards" agencies, even though they were housed within the Renegotiation Board, a defunct federal agency tasked with renegotiating federal contracts when contractor profits appeared excessive. *Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 714-15 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975).  Regional Boards were APA agencies because they were "empowered to make final decisions not even reviewable by the [Renegotiation] Board." *Id.* at 715.

By contrast, entities formed by interstate compacts are not APA agencies; they exercise powers delegated by States, not the federal government. *Atl. States Marine*, 609 F.3d at 532-33. Nor are the National Security Council and Smithsonian agencies; they function in an advisory or

grantmaking capacity and exercise no binding regulatory power. *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 558 (D.C. Cir.1996) (National Security Council); *Dong*, 125 F.3d at 881-83 (Smithsonian). Similarly, the National Academy of Sciences' functions are advisory, and while federal law requires the Environmental Protection Agency to evaluate some Academy findings, "[t]he E.P.A. has clearly felt free to make its own decisions irrespective of the Academy's advice." *Lombardo v. Handler*, 397 F. Supp. 792, 795 (D.D.C. 1975).

Under these cases, Reserve Banks qualify as APA agencies because they wield significant, independent federal regulatory powers. Congress tasked Reserve Banks with implementing federal monetary policy and empowered the Board to "delegate ... *subject to the [APA]*, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks." 12 U.S.C. § 248(k). The Board, in turn, has delegated to Reserve Banks the power to adjudicate Federal Reserve membership applications and other requests and petitions. *See* 12 C.F.R. § 265.20. Unlike the advisory or non-binding powers exercised by the Smithsonian, National Security Council, and other non-agencies, these are all quintessential federal regulatory powers that bind third parties. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007). It is irrelevant that Reserve Banks do not engage in rulemaking or formal adjudication, KCF Br. 14; Reserve Banks conclusively resolve various applications, thereby exercising binding federal power. *See Dong*, 125 F.3d at 882 (looking beyond rulemaking and adjudicatory functions).

Defendants' contention that Reserve Banks possess final authority over master account applications further seals their status as APA agencies. The Board even suggests that *all* functions Congress specifically conferred on Reserve Banks belong to Reserve Banks alone. Bd. Br. 11. That sort of final decision-making power prompted the D.C. Circuit to classify the Office of

Science and Technology and Regional Boards as APA agencies, even though both were part of other organizations (the Executive Office of the President and the Renegotiation Board) and exercised some advisory or non-binding functions. *Soucie*, 448 F.2d at 1075; *Grumman*, 482 F.2d at 714-15; *Flaherty v. Ross*, 373 F. Supp. 97, 104-06 (D.D.C. 2019) (discussing holdings).

Every court to consider the question has deemed Reserve Banks agencies for APA purposes; no case holds otherwise. *See Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F. Supp. 674 (N.D. Ga. 1984), *vacated on other grounds*, 597 F. Supp. 462 (N.D. Ga. 1984); *Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982); *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1228 and n.1 (6th Cir. 1983). The Kansas City Fed (at 17) accuses these courts of "faulty reasoning." But these decisions applied the right APA test, deeming Reserve Banks to be agencies because they exercise independent authority over specific functions. *Lee*, 558 F. Supp. at 178; *Flight Int'l*, 583 F. Supp. at 678-79. And these decisions did not even consider Reserve Banks' purported final decision-making authority over master accounts. By contrast, the Kansas City Fed (at 15-16) invokes cases rejecting Reserve Banks' status as "agencies" under definitions that differ from the APA and did not involve assertions of Reserve Banks' putative final decision-making authority.[2]

---

[2] *See Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 976 (Fed. Cir. 2020) (Reserve Banks are "distinct from the government" under America Invents Act, not other statutes); *United States v. Wells Fargo & Co.*, 943 F.3d 588, 597-98 (2d Cir. 2019) (False Claims Act); *Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532, 534 (8th Cir. 2005) (28 U.S.C. § 451 definition); *Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183, 186 (8th Cir. 1981) (not addressing Reserve Banks' agency status), *aff'd*, 455 U.S. 955 (1982); *Katsiavelos v. Fed. Rsrv. Bank of Chi.*, 859 F. Supp. 1183, 1185 (N.D. Ill. 1994) ("Plaintiff does not contend that the FRBC is an executive agency as that term is used in Title VII."); *In re Hoag Ranches*, 846 F.2d 1225, 1227 (9th Cir. 1988) (Fed. R. App. P. 4(a)(1)); *Lewis v. United States*, 680 F.2d 1239, 1240 (9th Cir. 1982) ("critical factor" for Federal Tort Claims Act "is the existence of federal government control over the detailed physical performance and day to day operation of that entity" (internal quotation marks omitted)); *McKinley v. Bd. of Govs. of Fed. Rsrv. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (not

b. **Unreasonable Delay**.  Even were § 4807's one-year deadline somehow inapplicable, the APA also instructs courts to compel "unreasonably delayed" agency action. 5 U.S.C. § 706(1); *see Barrios Garcia*, 25 F.4th at 454.  Custodia has plausibly alleged that Defendants' 22 months of inaction fit the bill.  The Tenth Circuit employs a six-factor test from the D.C. Circuit (the so-called *TRAC* factors) to determine the reasonableness of agency delay.  *Forest Guardians*, 174 F.3d at 1189-91 (discussing *Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)). Under those factors, Custodia "alleged facts sufficient to state a plausible claim for unreasonable administrative delay." *See Ghadami v. DHS*, 2020 WL 1308376, at *7 n.6 (D.D.C. Mar. 19, 2020).

The first two factors are most important, and ask whether there is "any rhyme or reason" for the government's delay and whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute." *Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) (cleaned up).  Custodia's allegations—which must be taken as true at this stage—show that Defendants have never identified missing information or other specific issues with Custodia's application; the Kansas City Fed instead found "no showstoppers."  The only apparent reason for delay is that the Board expressed broad concerns with institutions subject to "novel" state charters, and wants to freeze their applications regardless of how those specific institutions operate.  Compl. ¶¶ 4, 49, 79.

Meanwhile, Congress has indicated that speed is of the essence for banking-related applications.  Even were 12 U.S.C. § 4807's one-year deadline inapplicable to master account applications, that provision still evidences Congress' expectation that agencies would process banking applications swiftly.  Master account applications likewise represent that decisions usually

---

addressing Reserve Banks' agency status because "[t]he Board concedes that the Federal Reserve Banks ... are not federal agencies" and did not invoke FOIA protections).

take 5-7 days. *Id.* ¶¶ 6, 35, 77. As for other factors, expediting review of Custodia's delayed application would hardly derail Defendants' other priorities, especially since Defendants have never identified further information needed. And harms to Custodia from delay are ongoing and include unnecessary seven-figure costs and injecting uncertainty into Custodia's business model and its ability to retain investors, employees and interest from prospective customers. *Id.* ¶ 8.

At the very least, the reasonableness of Defendants' delay is a fact-laden inquiry that demands discovery, not dismissal. "Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances." *Mashpee Wampanoag Tribe Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Courts thus consider "[a] claim of unreasonable delay" something that "should not typically be resolved at" the motion to dismiss "stage." *Barrios Garcia*, 25 F.4th at 451 (internal quotation marks omitted); *accord Bustos v. Mayorkas*, 2021 WL 3931173 *8 (D.N.M. Sept. 2, 2021).

Defendants' rejoinders are meritless. The Board (at 12-13, 16) remarkably asserts that no timeline applies and that the Board has no duty to expedite decisions. But agencies do not possess unbridled powers of delay. "The absence of any standard upon which to frame a timing requirement is not unusual in APA unreasonable delay cases," which is why the *TRAC* factors supply the "framework" for deciding when agencies have dragged their feet too long. *Motaghedi v. Pompeo*, 2020 WL 207155, at *7 (E.D. Cal. Jan. 14, 2020). When Congress requires the agency to perform some duty, courts hold the agency to a reasonable timetable even if the agency retains discretion over the outcome. *See Forest Guardians*, 174 F.3d at 1190.

Defendants assert the reasonableness of their 22-months-and-counting delay, yet tellingly never mention the governing *TRAC* factors. Bd. Br. 14-15; KCF Br. 17-20. Given the circumstance-specific nature of those factors, Defendants' examples of courts excusing years-long

agency delays ring hollow.  Just because courts have blessed some lengthier delays is no reason to deem all shorter delays presumptively fine.  Likewise, the Board's just-finalized Guidelines for master account applications do not justify further delay.  Defendants do not say if the Board can reverse Reserve Bank decisions that violate these Guidelines, and portray them as kicking off further guidance to implement them.  Bd. Br. 4-8; KCF Br. 42-43.  Insofar as the Guidelines change substantive criteria, they cannot possibly justify delay, because applying new criteria retroactively would be unlawful.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994); *Cox v. Kijakazi*, 2022 WL 178953, at \*8 (D.D.C. Jan. 19, 2022).  At bottom, Defendants refuse to say why they have long delayed resolving Custodia's application.  If nothing else, the Court should allow discovery into what the holdup is—and why Defendants' explanations keep shifting.  Otherwise, "taken to its logical conclusion, the Government's argument would eliminate federal judicial review of any agency action and wipe the APA off the books." *Barrios Garcia*, 25 F.4th at 455.

c. **Due Process**.  For similar reasons, Defendants' unreasonable delay in adjudicating Custodia's master account application violates bedrock due process principles.  Compl. ¶¶ 92-101 (Count III).  "[A] delay in rendering a decision about property"—here, a master account—"could, at some point, constitute a denial of due process." *Shands v. Tull*, 602 F.2d 1156, 1159 (3d Cir. 1979); *see also Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 591 (1926).

The Board contends that Defendants' expressed "intention of going further" with Custodia's application obviates any due process problem.  Bd. Br. 34 (quoting *Smith*, 270 U.S. at 591).  But agencies cannot wave away due process violations with empty words, and the Board's Guidelines and communications with Custodia commit to no timeframe.  87 Fed. Reg. at 51,102.  Indeed, the Kansas City Fed invokes the Guidelines to justify indefinite delay.  KCF Br. 42-43.

**C.      Defendants' Delay Is Also Actionable Under the Mandamus Act (Claim II)**

Even were APA relief unavailable, Custodia would be entitled to compel Defendants to act on its application under the Mandamus Act, 28 U.S.C. § 1361, which authorizes district courts "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The Mandamus Act clearly covers Defendants. Under that Act, an "agency" includes "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest." 28 U.S.C. § 451. The Board plainly qualifies. *See* Bd. Br. 1. And Reserve Banks would likewise qualify as an "authority" or other entity "of the United States" given that they exercise various delegated sovereign functions. *Cf. Federal Reserve Bank Members*, 43 Op. O.L.C. __, at *8 & n.3 (identifying some of those functions as sovereign).

Regardless, the Mandamus Act also applies to "officer[s] … of the United States." According to Defendants, the Kansas City Fed's President makes final decisions on master account applications, and is undisputedly an inferior officer of the United States. Bd. Br. 35-36; KCF Br. 34-35. So, even were the Kansas City Fed not an "agency," Defendants' purported final decision-maker is subject to the Mandamus Act as an "officer," and this Court should compel her to act.

Custodia satisfies the criteria for mandamus relief based on Defendants' lengthy delay in adjudicating its application. Those criteria are: (1) "a clear right to the relief sought," (2) "a plainly defined and peremptory duty on the part of [the] respondent to do the action in question," and (3) "no other adequate remedy available." *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990).

As for the first two factors, Defendants have violated their statutory obligation to decide master account applications within a year under 12 U.S.C. § 4807, or at minimum violated due process principles through their unreasonable delay. *Supra* p. 32. Defendants' evergreen response, that they have discretion to deny applications, misses the boat. Bd. Br. 17-22; KCF Br. 36.

Custodia's primary mandamus claim (Claim II) seeks to compel Defendants to render a decision, not to exercise that discretion in a particular way, and Defendants have no discretion to let Custodia's application languish forever. *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 n.6 (9th Cir. 1997); Compl. ¶ 88. Finally, to the extent the APA is inapplicable, Custodia has no other adequate remedy available to compel Defendants to act. In that case, it is mandamus or nothing, and this Court should not allow Defendants to take years to act with no decision in sight.

### D. Custodia Adequately Pled a Declaratory Judgment Act Claim (Count IV)

Alternatively, Custodia is entitled to a declaratory judgment "that the Board and/or the Kansas City Fed must decide Custodia's master account application within a reasonable period of time." Compl. ¶ 109. The Declaratory Judgment Act authorizes federal courts, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Here, the actual controversy involves Custodia's entitlement to a timely decision on its master account application, and the harm caused by Defendants' refusal to act. Compl. ¶¶ 102-109.

The Kansas City Fed (at 35) asserts that "[a] declaratory judgment is a remedy, not a cause of action." But requests for declaratory judgments are commonly pled as claims whereby the requested remedy is that "the court . . . declare the rights or other legal relations of any interested party." *Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*, 353 F. Supp. 3d 1070, 1088 (D. Colo. 2018). Because there is "some independent basis of jurisdiction," declaratory relief is appropriate. *See Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006).

### III. Vesting Final Decision-Making Authority in the Kansas City Fed Would Violate Numerous Constitutional Commands (Claims III, V, and VI)

Defendants' interpretation that § 342 of the Federal Reserve Act endows Reserve Banks with exclusive, wholly discretionary authority over master account applications would create

severe constitutional problems.  Defendants concede that the Kansas City Fed is at least a federal instrumentality, *i.e.*, a "corporation[] in which the government has an interest." *U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26 (1928);  Bd. Br. 3; KCF Br. 5. Federal instrumentalities must comply with constitutional constraints. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 52-55 (2015).  Vesting Reserve Banks with sole discretion over master accounts would blatantly violate nondelegation principles, due process, and the Appointments Clause.  The Court should reject Defendants' position to avoid these substantial constitutional problems. *Jennings*, 138 S. Ct. at 842.  Alternatively, were Defendants' position correct, Custodia is entitled to redress the ensuing constitutional violations with relief reverting decision-making authority to the Board, which must swiftly resolve Custodia's application.

A.     **Reading Section 342 to Grant Reserve Banks Total Discretion Over Master Accounts Would Flout Nondelegation Principles and Due Process (Claim III)**

1. In Defendants' telling, § 342 grants Reserve Banks total, unreviewable discretion over master account applications—including the discretion to never decide those applications—just by providing that Reserve Banks "may receive … deposits of current funds" and other types of monetary instruments. Bd. Br. 16-18; KCF Br. 21-24.  That sweeping overreading of § 342 would walk Defendants straight into violations of bedrock nondelegation and due process principles.

Boundless, standardless discretion over regulatory decisions is unconstitutional. "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Jarkesy v. SEC*, 34 F. 4th 446, 461 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)); *see Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  Relatedly, due process prohibits depriving private parties of property under a law "so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (internal quotation marks omitted).

Yet, under Defendants' view, Congress in § 342 imposed no constraints whatsoever on how Reserve Banks resolve master account applications.  Reserve Banks could grant or deny access to the Federal Reserve System at will (including to the United States itself), with no oversight from anyone else, for any reason or by flipping a coin.  And they could take decades to render decisions, or even sit on applications forever.  *See* Bd. Br. 16-18; KCF Br. 21-24.  Congress' failure to provide any standard cabining Reserve Banks' discretion would amount to a blank check for Reserve Banks to write their own rules, a clear nondelegation violation.  Likewise, that view of § 342 impermissibly invites utterly arbitrary enforcement.  The Fifth Circuit recently held unconstitutional a statutory provision delegating to the Securities and Exchange Commission total discretion over whether to initiate enforcement actions in federal court or before the agency.  *Jarkesy*, 34 F.4th at 465-66.  The far broader delegation here is not a close call.

The proof of the problems with Defendants' interpretation is in the pudding.  Defendants have employed an opaque decision-making process and give contradictory accounts of how the application process works.  Compl. ¶ 97.  Defendants' litigation positions conflict with Defendants' representations elsewhere as to *who* decides master accounts.  Defendants simultaneously claim that Reserve Banks have total discretion, yet the Board just issued Guidelines purporting to prescribe a framework for master account application decisions.  *Supra* p. 5.

2.  Defendants contend that a government entity's boundless discretion over a decision insulates it from any due process challenge, because no regulated party could ever expect a sufficient chance of a favorable outcome to confer a property interest.  Bd. Br. 33; KCF Br. 20-21.  That argument does not apply to separation of powers or nondelegation violations, where private parties are independently harmed by being subjected to the exercise of powers that a governmental entity does not lawfully possess.  *Seila Law*, 140 S. Ct. at 2196.  As to due process violations,

private parties have standing, and the violation is complete, when the government subjects parties to unconstitutionally arbitrary procedures just for the chance of receiving some property benefit (here, master accounts). *Supra* pp. 11-12. Custodia also has "a legitimate claim of entitlement to" its master account, which is all that is required to establish a property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

The Kansas City Fed (at 30-31) denies that nondelegation principles are implicated, proclaiming that individual adjudications do not involve legislative power because they do not "govern the rights or behaviors of *groups* of entities and individuals," KCF Br. 31. But, under Defendants' view of § 342, nothing stops Reserve Banks from categorically granting or denying all applications. The Kansas City Fed also misapprehends the nondelegation doctrine. Congress impermissibly delegates legislative power by granting some other entity the power to decide what the substance of the law should be—in other words, by granting unfettered discretion over a decision that has "the purpose and effect of altering the legal rights, duties and relations of persons ... outside the legislative branch." *Jarkesy*, 34 F.4th at 461 (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). By contrast, when Congress delegates statutory duties to agencies but cabins their discretion, agencies exercise the *executive* power to enforce the law. *Id.* at 461-62. Similarly, nondelegation challenges do not depend on whether an entity exercises uncabined discretion through rulemaking or adjudication. *Jarkesy* illustrates the point: The Fifth Circuit found an invalid delegation even though the SEC determines case-by-case, not via rulemaking, whether to initiate a given enforcement proceeding before the agency or in federal court. *Id.* at 462-63.

Finally, the Board (at 33) misconceives of Custodia's claim as a vagueness challenge. But the problem here is not that Custodia cannot tell what conduct to engage in or eschew. The problem is that Defendants apparently adjudicate applications for master accounts—applications

that implicate public rights—with no discernible, fixed criteria and no safeguards against arbitrariness. That is a separate species of constitutional violation.

**B.  The Appointments Clause Prohibits the Kansas City Fed from Exercising Final, Binding Decision-Making Authority (Claim VI)**

1.  The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, imposes baseline rules of democratic accountability.  Anyone who performs important sovereign functions—*i.e.*, "exercise[s] significant authority pursuant to the laws of the United States'"—is an "[o]fficer of the United States" whose appointment must comply with the Clause. *United States v. Arthrex*, 141 S. Ct. 1970, 1980 (2021) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)).  Anyone who exercises *final* decision-making authority involving sovereign powers must be appointed as a "principal officer," through presidential appointment and Senate confirmation. *Arthrex*, 141 S. Ct. at 1984.  And anyone making *any* decisions involving important sovereign functions—even initial ones—must be appointed as an "inferior officer," *i.e.*, appointed by the President, the courts, or agency heads. *Lucia v. SEC*, 138 S. Ct. 2044, 2053-54 (2018).  The point of this process is simple: The "legitimacy" of various actors exercising executive power on the President's behalf depends on a "clear and effective chain of command" that alerts the public to *who* wields executive power and creates responsibility for bad decisions. *Arthrex*, 141 S. Ct. at 1979 (internal quotation marks omitted).  So important is this accountability that decisions by improperly appointed officers are void. *Lucia*, 138 S. Ct. at 2055.

Under this framework, only principal officers—people with presidential appointments and Senate confirmation—can render final decisions about master accounts.  Adjudicating master account applications unquestionably involves exercising "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, because such adjudications "bind[] the government or third parties for the benefit of the public." *Officers of the U.S.*, 31 Op. O.L.C. at 77.  Master

account access is not simply a private business decision; the decision implicates federal sanctions policy, implementation of "Board orders," and the stability of the federal payment system. 87 Fed. Reg. at 51,107-09. In the Board's words, controlling master account access is essential to address "risks to the Reserve Banks, to the payment system, to the financial system, and to the effective implementation of monetary policy." *Id.* at 51,100. Analogous functions—like "authority on behalf of the government to receive and oversee the public's funds" and exercising "legal authority over the contracts and supplies … of the nation"—involve significant sovereign authority. *Officers of the U.S.*, 31 Op. O.L.C. at 89-90 (internal quotation marks omitted).

Given the ramifications of master account access, Congress sensibly vested ultimate authority for those decisions in the Board. *Supra* pp. 16-24. And if the Board retains final decision-making power, there is no Appointments Clause problem: all members of the Board are presidentially appointed and Senate-confirmed. 12 U.S.C. § 241. But the Board would have plainly violated its statutory, one-year deadline for deciding applications.

By contrast, the system Defendants posit, where Reserve Banks purportedly possess unreviewable, final discretion over master account access, violates the Appointments Clause and upends accountability. All agree that Reserve Bank presidents, vice presidents, and directors are not appointed as principal officers. Compl. ¶ 121; Bd. Br. 42-45; KCF Br. 34-35; 12 U.S.C. § 302 (appointment process). Indeed, a majority of Reserve Banks' boards of directors are private parties appointed by other private parties. *Infra* p. 43. Under Defendants' view, the President, Treasury Secretary, the Board, and anyone else charged with setting federal monetary policy would be at the mercy of decision-makers within twelve Reserve Banks, any of whom could hold monetary policy, economic sanctions policy, and a host of other federal objectives hostage by granting

master account access to bad actors, denying access across the board to important stabilizing institutions, or simply by refusing to adjudicate any applications at all, much less within a year.

2. Defendants insist that decisions on master accounts involve only routine commercial decisions, not the exercise of sovereign power, and thus do not require *any* governmental actor to make master account decisions. Bd. Br. 39-42; KCF Br. 34-35. Defendants ignore the operative test: whether decisions as to master account access involve "exercise[s] of significant authority pursuant to the laws of the United States." And Defendants' own representations obliterate their litigation position that master account decisions do not involve sovereign power. Take the Board's recent Guidelines. There, the Board casts master account determinations as playing a critical role in executing all sorts of quintessentially sovereign functions, like controlling the money supply, implementing sanctions programs, and integrating the federal payment system. *Supra* pp. 38-39.

The Board (at 39-42) invokes historical practice, noting that the Founding-era First Bank of the United States was viewed as a private entity whose heads were not appointed consistent with the Appointments Clause. Characterizing the First Bank as a private entity is questionable under modern-day Appointments Clause precedents. *See* Walter Dellinger & H. Jefferson Powell, *The Constitutionality of the Bank Bill: The Attorney General's First Constitutional Law Opinions*, 44 Duke L. J. 110, 131-32 (1994). Regardless, the analogy is inapt because today's Federal Reserve System exercises far more governmental power. "Unlike modern central banks, the Bank of the United States did not officially set monetary policy. Nor did it regulate, hold the reserves of, or act as a lender of last resort for other banks." Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* 8 (Mar. 2021), https://tinyurl.com/4xb99ys8. The Federal Reserve System also exercises rulemaking and adjudicatory functions that Defendants elsewhere concede are hallmarks of sovereign authority.

Bd. Br. 2; KCF Br. 14.   Indeed, under the Board's position that Founding-era practice should

govern, the Appointments Clause would plainly apply to Reserve Banks' officers and directors,

since the Founding-era understanding was that "officers of the United States" included "anyone

with ongoing responsibility for a federal statutory duty." Jennifer L. Mascott, *Who Are 'Officers*

*of the United States'?*, 70 Stan. L. Rev. 443, 546 (2018).

      3.  Defendants alternatively contend that the President of the Kansas City Fed alone makes

decisions on master accounts.  Defendants thus see no Appointments Clause problem, reasoning

that even inferior officers (like Reserve Bank Presidents) can make "unreviewable final decisions"

so long as those officers can be fired at will and face other meaningful forms of supervision and

control.  Bd. Br. 42-45; KCF Br. 34–35.  Problems abound with Defendants' reasoning.

      To start, for Reserve Bank Presidents to validly make *final* decisions on master account

applications, they must be appointed as principal officers, *i.e.*, nominated by the President and

Senate-confirmed.  *Arthrex* held that "unreviewable executive power exercised by [administrative

patent judges] is incompatible with their status as inferior officers."  141 S. Ct. at 1983.  The

Supreme Court found it dispositive that administrative judges could "render a final decision on

behalf of the United States without any such review by their nominal superior or any other principal

officer in the Executive Branch." *Id.* at 1981 (internal quotation marks omitted). *Arthrex* reiterated

that "adequate supervision entails review of decisions issued by inferior officers." *Id.* at 1983.

      Significantly, *Arthrex* rejected the sufficiency of many other means for the Director of the

Patent and Trademark Office—a principal officer—to supervise and control these administrative

judges.  The Director's powers to pick which administrative judges hear cases, mandate rehearing

before a more favorable panel, deprive decisions of precedential effect, and withdraw all future

judicial assignments from judges without cause were no substitute for direct authority to review

administrative judges' decisions. *Id.* at 1981-83. By definition, then, the lesser control that Defendants portray the Board as exercising over Reserve Banks is plainly inadequate.

Defendants' own authorities illustrate that the Board's power to fire Reserve Bank Presidents is, itself, insufficient. Bd. Br. 44-45 (citing, *inter alia*, *Intercoll. Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341 (D.C. Cir. 2012)). Other "meaningful control" is necessary. Bd. Br. 44. But by Defendants' own account, no such control exists. Defendants pay lip service to the Board's supervisory authority, yet at the same time suggest the Board is powerless to control Reserve Banks' master account decisions in any way. Bd. Br. 4-8; KCF Br. 42-43.

Further, no authority remotely suggests that Reserve Bank Presidents are the sole decision-makers over master account applications. Defendants invoke 12 U.S.C. § 341(7), but that provision undermines their position: Reserve Bank powers can be "exercise[d] by [the] board of directors, or duly authorized officers or agents." In other words, officers *besides* Reserve Bank Presidents make decisions, *contra* Bd. Br. 32, 42; KCF Br. 34-35. Defendants note that Custodia has spoken with the Kansas City Fed's President. Bd. Br. 35; KCF Br. 32. But Custodia has also spoken with other Board and Kansas City Fed officials in a vain attempt to discern who is taking charge. Given the factual uncertainty, Defendants cannot prevail at the motion to dismiss stage.

Finally, the Appointments Clause violation would remain if Reserve Bank boards of directors made final decisions with Reserve Bank presidents. "When federal sovereign authority is delegated to a body, all voting members of that body share in the authority; the officer status of some members does not turn on the presence of others who may outvote them." *Federal Reserve Bank Members*, 43 Op. O.L.C. __, at *8. If Kansas City Fed directors participate in the decision, their appointments must comport with the Appointments Clause—but do not. Compl. ¶ 123.

**C.    Allowing Reserve Bank Directors to Participate in Decision-Making Would Separately Violate Due Process and the Separation of Powers (Claim V)**

The constitutional problems would multiply to the extent Reserve Bank directors—who are private parties—participate in Reserve Banks' purportedly unreviewable, discretionary decisions on master account applications. Custodia has plausibly alleged that such directors would participate in Reserve Bank decisions in the event Defendants' interpretation were correct and Reserve Banks made these decisions themselves. *Id.* ¶¶ 114-116. The Constitution prohibits Congress from vesting private parties with sweeping, discretionary authority. Defendants' contrary argument—that only Reserve Bank Presidents make decisions—is unsupported.

1. "There is not even a fig leaf of constitutional justification" for "handing off regulatory power to a private entity," which is "'legislative delegation in its most obnoxious form.'" *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)); *see also Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 708 (5th Cir. 2017) (private parties violate both due process and separation of powers by adjudicating other private parties' property rights). Handing off regulatory power to "private persons whose interests may be [or] often are adverse to the interests of others in the same business" exacerbates the constitutional offense. *Carter Coal*, 298 U.S. at 311; *see Ass'n of Am. R.R.s v. Dep't of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016).

Defendants' interpretation would thus produce a textbook nondelegation violation. Reserve Bank boards of directors include wholly private parties. Compl. ¶ 12. Under 12 U.S.C. § 341(7), Reserve Bank powers are exercised first and foremost by "[the] board of directors"; others must be "duly authorized" to act. Deciding master accounts also plainly involves regulatory power, and also determines other parties' property rights. *Supra* p. 32. "Congress may employ

private entities for ministerial or advisory roles, but it may not give these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004).

On top of that, some directors "shall be chosen by and be representative of the stockholding banks," 12 U.S.C. § 302, which Custodia has plausibly alleged are often competitors with other banks that request master accounts. The competitive incentives are heightened when a novel banking institution, like Custodia, applies for a master account, thereby threatening the monopoly that traditional banks have on Federal Reserve services. Compl. ¶ 114. These other banks' representatives cannot properly adjudicate Custodia's master account application.

2. Defendants' responses are unpersuasive. As discussed, Defendants' assertion that the Kansas City Fed's President alone makes master account decisions finds no support in 12 U.S.C. § 341(7), would raise constitutional problems, and would at least require discovery. *Supra* pp. 34-42. Defendants also argue that any self-interested parties among Reserve Bank directors would not be a majority and would be subject to Board-ordered recusal for conflicts of interest. Bd. Br. 36-37; KCF Br. 32. But anyone who participates in sovereign decision-making—not just a majority—must properly exercise that power. *See Federal Reserve Bank Members*, 43 Op. O.L.C. __, at *8. Alternative means of control cannot cure an improper delegation of regulatory power. Nor, at this stage, could the Court say whether disinterested Reserve Bank decision-makers (whoever they are) could "overrule" interested directors. *See Ass'n of Am. R.R.s*, 821 F.3d at 35.

## IV. Custodia Adequately Pled Alternative Claims for Relief in the Event Defendants Deny Custodia's Application (Claims VII and VIII)

If Defendants did deny Custodia's application, Custodia has adequately pled an entitlement to compel Defendants to grant the application. Compl. ¶¶ 128-144.

1. Custodia satisfies requirements for declaratory and mandamus relief because it is statutorily entitled to a master account. Congress has directed that "[a]ll Federal Reserve bank

services covered by the fee schedule" that the Board sets "shall be available to nonmember depository institutions." 12 U.S.C. § 248a(c)(2). "Shall" denotes a mandatory duty. *Jennings*, 138 S. Ct. at 844. "Covered" services include "currency and coin services; checking clearing and collection services; wire transfer services; automated clearinghouse services; settlement services," etc. 12 U.S.C § 248a(b). Putting those clauses together, Congress required that "nonmember depository institutions" like Custodia must be able to access the various "covered services." Critically, no one can access those services absent a master account. As Judge Bacharach concluded in *Fourth Corner*, state-chartered institutions like Custodia are statutorily entitled to master accounts because they "shall" be able to access banking services. 861 F.3d at 1067-73.[3]

Other courts likewise observe that the statute made "check clearing services … available to all banks." *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *see Jet Courier Servs.*, 713 F.2d at 1222-23. And the Board itself has said the relevant statutory language "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis." Bd. of Govs. of Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu.

2. Defendants counter that 12 U.S.C. § 342 governs applications for master accounts and confers plenary discretion on Reserve Banks. Bd. Br. 17-22; KCF Br. 21. As discussed, *supra* pp. 17-20, that provision has nothing to do with master account access, and covers what financial instruments Reserve Banks may receive from entities that *already* have master accounts.

---

[3] In *Fourth Corner*, the Tenth Circuit issued a per curiam decision remanding the case to the district court so that Fourth Corner's amended complaint could be dismissed without prejudice and Fourth Corner could "proceed with its claims," then each judge issued a separate opinion. 861 F.3d at 1053. Only Judge Bacharach's opinion engaged with § 248a.

Defendants object that § 248a(c)(2) does not mention master accounts and merely governs "principles for setting prices." Bd. Br. 21-22; *see* KCF Br. 22-23. Those objections equally indict the Board's interpretation of § 342, which also does not mention master accounts. And Defendants misread § 248a(c)(2), which mandates that "*services covered by* the fee schedule" must be "available" to "nonmember depository institutions" on equal footing. Defendants' position—that § 248a requires only parity of fees—reads out this services-to-all-depository-institutions language. Section 248a's mandate can be satisfied only if nonmember depository institutions can access master accounts; no master account, no access to services.

While the Board (at 19-20, 23-25) tries to muddy the waters with legislative history, "legislative history is not the law." *Epic*, 138 S. Ct. at 1631. Regardless, the legislative history supports Custodia. *E.g.*, H.R. Rep. No. 95-1590, at 20 (1978) (explaining that the Monetary Control Act "opens access to Fed services to nonmember banks"); *Providing for Consideration of H.R. 7, Monetary Control Act of 1979*, 125 Cong. 6314 (1979) (statement of Rep. Murphy) (Federal Reserve services "will be provided to all depository institutions").

Finally, the Kansas City Fed objects that if every depository institution is statutorily entitled to a master account, "each individual state" would be "in control of access to the national payment system." KCF Br. 24; *see id.* 28-29. But that is a feature, not a bug, of the dual-tiered banking system the United States has adopted from the beginning. Under that system, States and the federal government enjoy dual responsibilities for chartering banks, ensuring their soundness, and cooperating to police the monetary supply. Compl. ¶ 22.

## CONCLUSION

This Court should deny Defendants' motions to dismiss, ECF Nos. 48 and 50.

Dated: September 13, 2022.

Custodia Bank, Inc., Plaintiff,

45

/s/ Scott E. Ortiz
Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602

John K. Villa
Ryan T. Scarborough
Sarah M. Harris (*pro hac vice* admission pending)
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify, on the 13th day of September, 2022, a true and correct copy of the foregoing was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Angela Tarasi
Christine Carletta
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
King & Spaulding LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
atarasi@kslaw.com
ccarletta@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L. M. Addleman
Hirst Applegate LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com


                                        /s/ Scott E. Ortiz