LISA MARIE JERDE SPILLMAN (WY State Bar No. 7-5450)
  lisa@jerdespillmanlaw.net
JERDE SPILLMAN LAW LLC
7527 Jessica Drive
Cheyenne, WY 82009
Telephone (307) 314-8091

DAVID M. GOSSETT (DC Bar No. 468390; *pro hac admission pending*)
  davidgossett@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 973-4200

STEPHEN T. GANNON (VA State Bar No. 17649; *pro hac admission pending*)
  stevegannon@dwt.com
LISA WEINGARTEN RICHARDS (VA State Bar No. 96671; *pro hac admission pending*)
  lisarichards@dwt.com
DAVIS WRIGHT TREMAINE LLP
4870 Sadler Road, Suite 301
Glen Allen, VA 23060
Telephone: (804) 762-5320

*Attorneys for [Proposed] Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants*. | No. 1:22-cv-00125-SWS |

**[PROPOSED] BRIEF OF SENATOR CHRISTOPHER ROTHFUSS
AND REPRESENTATIVE JARED OLSEN AS *AMICI CURIAE*
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A.      Wyoming Efforts in Connection with Blockchain Initiatives................................. 3

    B.      The SPDI Legislation..................................................................................... 5

ARGUMENT ........................................................................................................... 7

Defendants Are Unreasonably Delaying Granting Custodia's Application For A Master
    Account. .......................................................................................................... 7

    A.      Defendants Have Not Identified Any Regulatory Risks Directly Related
            To SPDIs Generally Or To Custodia Specifically. .................................................. 8

    B.      The SPDI Statute, As Implemented By The Division of Banking,
            Adequately Protects Against Any Regulatory Risk............................................ 10

            1.      Credit and Stability Risks (Including Capital Levels, Liquidity and
                  Resilience)........................................................................................... 12

            2.      Operational and Information-Security Risks ........................................... 16

            3.      Bank Secrecy Act, Anti-Money Laundering, Anti-Terrorism, and
                  Sanctions Risks .................................................................................... 19

            4.      Quality of Oversight and Review ........................................................... 21

    C.      Defendants' Delay In Processing Custodia's Application Is Unreasonable. ........ 22

CONCLUSION..................................................................................................... 25

## INTRODUCTION

For more than 100 years, the system of concurrent federal and state banking regulation has been one of the pillars of financial regulation and innovation in the United States. "Each component of the dual banking system makes different, positive contributions to the overall strength of the US banking system, and efforts to dilute the unique characteristics of one component of the system undermines the collective strength that comes from the diverse contributions of the two systems. Commentators and state bank supervisors rightly assert, for example, that a separate system of state banks 'allows the states to serve as laboratories for innovation and change, not only in bank powers and structures, but also in the area of consumer protection.'"[1] This dual framework has led to advances in both innovation and regulation. To quote former Federal Reserve Board Chair Alan Greenspan: "The state charter is a key to the robustness of our banking structure. The dual banking system has fostered a steady stream of banking innovations that have benefited consumers and bank shareholders alike.… The dual banking system not only fosters and preserves innovation but also constitutes our main protection against overly zealous and rigid federal regulation and supervision."[2]

The State of Wyoming has long been an innovative leader in financial services—creating the first limited liability structure in the United States in 1977, for example. Over the past 6 years, the State has actively endeavored to modernize its financial system and to encourage the development of regulated cutting-edge financial institutions, especially institutions in the cryptocurrency space. In particular, the state legislative, regulatory and economic development

---

[1] OCC White Paper, *National Banks and the Dual Banking System*, at 10 (Sept. 2003).

[2] Remarks by Federal Reserve Board Chairman Alan Greenspan, CSBS Conference, San Diego, California, May 3, 1997; *see also* Remarks by Thomas Curry, Comptroller of the Currency, to CSBS Conference, Chicago, Illinois, May 2014, at 2 ("The states have innovated as well, serving as laboratories where new products and new ways of doing business are developed and tested.").

communities have worked long and hard to build a framework for an innovative but carefully regulated form of financial institution to serve new and expanding market needs—Special Purpose Depository Institutions (SPDIs). A number of other states have adopted the same or a similar framework. Unfortunately, defendants appear determined to reject the principles of the dual banking system and the innovations flowing from it. Their efforts, if successful, will chill innovation in banking at the state level.

The Wyoming SPDI efforts have been led by the Select Committee on Blockchain, Financial Technology and Digital Innovation Technology of the Wyoming Legislature, which is statutorily tasked with "(i) Develop[ing] knowledge and expertise among its members regarding issues pertaining to blockchain, financial technology and digital innovation technology"; and "(ii) Develop[ing] and introduc[ing] legislation as necessary to promote blockchain, financial technology and digital innovation in Wyoming."[3] The Select Committee is a bipartisan committee comprised of 4 members of the Wyoming Senate, 4 members of the Wyoming House, and 3 members of the public (appointed by the Governor). It is currently co-chaired by a Democrat (Sen. Chris Rothfuss) and a Republican (Rep. Jared Olsen), who jointly are submitting this *amicus* brief.[4]

We do not purport to be expert on the questions of federal jurisdiction or the Administrative Procedure Act that underlie much of the defendants' motions to dismiss. But we believe that our knowledge about the statutory framework of the SPDI program, about the system of regulation and examination of SPDIs that the Wyoming Legislature and Wyoming Division of Banking have crafted over the last several years, and about the extensive interactions between both defendants,

---

[3] Wyo. Stat. § 28-11-701(b). The Select Committee is the successor to the Wyoming Blockchain Task Force; references to the Select Committee generally include the predecessor Task Force.

[4] *See* Wyo. Stat. § 28-11-701(a), (c); https://www.wyoleg.gov/Committees/2022/S19. No counsel for a party authored this brief in whole or in part, and no one besides for the *amici* and their counsel made a monetary contribution intended to fund its preparation or submission.

the Select Committee, and the Wyoming Division of Banking about the SPDI program over the past four years, will assist this Court in understanding the context of this litigation. Given that background, we believe that the defendants' continued delay in granting Custodia the Master Account it seeks unconscionably interferes with Wyoming's efforts to modernize its banking system and enhance its economic development, and that this Court should deny the defendants' motion to dismiss and mandate final action on Custodia's application by a date certain.

Defendants excuse their inaction by reciting a series of abstract concerns, not connected either to the SPDI structure generally or to Custodia's application specifically. As we explain below, this lack of concreteness arises directly from defendants' refusal to analyze the carefully and thoughtfully constructed SPDI legislative and regulatory architecture as well as the resulting internal controls at Custodia (built on that foundation), which either eliminate or fully mitigate each of the theoretical risks about which defendants speculate.

## BACKGROUND

### A.    Wyoming Efforts in Connection with Blockchain Initiatives.

Wyoming's efforts to modernize its banking system and enhance its economic development through blockchain innovation began in 2017, and accelerated in early 2018 with the formation of the Wyoming Blockchain Task Force.[5] The Task Force began holding a series of six public hearings in March 2018, which were held throughout Wyoming and in which input was received from numerous witnesses. The Task Force was succeeded in 2020 by the Select Committee, which held seven public meetings that year and has continued to hold more hearings since then. As the hearing agendas, meeting materials and transcripts reveal,[6] Wyoming also

---

[5] *See* Minutes of the May 2018 Blockchain Task Force hearing, at https://www.wyoleg.gov/ Committees/2018/S3.

[6] Information about each meeting is available at the following links: https://www.wyoleg.gov/

secured extensive information regarding blockchain and digital asset initiatives both in the United

States and around the world.[7]

As part of this initiative, the Wyoming Legislature in 2018 and 2019 developed a

comprehensive series of 12 other laws besides the SPDI Act, designed to support the evolution of

blockchain in Wyoming and to complement its SPDI efforts.[8] And while not directly related to

SPDIs, Wyoming also established a Chancery Court with jurisdiction over commercial, business,

---

Committees/2018/S3, https://www.wyoleg.gov/Committees/2019/S3, https://www.wyoleg.gov/ Committees/2020/S19, https://www.wyoleg.gov/Committees/2021/S19, and https://www.wyoleg. gov/Committees/2022/S19. Minutes of each meeting are available by clicking on the Minutes tab. Agendas, Meeting Materials, and Audio/Video Recordings are available at their respective tabs under the Details column.

[7] While the defendants attempt to portray blockchain and cryptocurrencies as something new and threatening, scores of major financial institutions in the United States and throughout the world have adopted aspects of blockchain and cryptocurrencies into their business models. To mention just a few, JPMorgan Chase, Bank of America, Citibank, Bank of New York Mellon, and State Street Bank all have major digital asset projects underway. Moreover, contrary to defendants' expressed concern about the operational risk related to the secure custody of digital assets, fully-qualified and secured crypto custodians have multiplied significantly in recent years, including Coinbase, NYDIG, Anchorage Digital, Bakkt, and Fidelity Digital Assets.

[8] These laws address issues of Money Transmission/Virtual Currency Exemption (HB0019) (codified at Wyo. Stat. § 40-22-102(a)(xxii), and § 40-22-104(a)(vi)); Open Blockchain Tokens Exemption (HB0070) (codified at Wyo. Stat. § 17-4-206, and Wyo. Stat. § 17-4-102(a)(iv)(F), § 17-4-102(a)(xvii), (xxviii)(D), (E) and by creating new subparagraph (F), § 40-22-104(a)(iv), (v) and by creating new paragraph (vi), and § 40-22-126 by creating new subsection (b)); Electronic Corporate Records (HB0101) (codified at Wyo. Stat. §§ 17-16-140, 17-16-141, 17-16-142, 17-16-626, 17-16-720, 17-16-724, 17-16-730, and 17-16-1601); Limited Liability Companies Amendments (HB0126) (codified at Wyo. Stat. § 17-29-211); Property Taxation Digital Currencies (SF0111) (codified at Wyo. Stat. § 39-11-105); Financial Technology Sandbox Act (HB0057) (codified at Wyo. Stat. § 13-5-304 and Wyo. Stat. §§ 40-28-101 through 40-28-109); Wyoming Utility Token—Property Amendments (HB0062) (codified by creating Wyo. Stat. § 34-29-101, amending Wyo. Stat. § 17-4-102(a)(xvii), adding § 40-12-105(a); and repealing Wyo. Stat. §§ 17-4-102(a)(iv)(F) and (xxviii)(F), Wyo. Stat. § 17-4-206, Wyo. Stat. § 40-22-104(a)(vii), and Wyo. Stat. § 40-22-126(b); Commercial [blockchain-based] Filing System (HB0070) (codified by amending Wyo. Stat. § 40-22-102(a) and § 40-22-104(a); Special Electric Utility Agreements (HB0113) (codified at Wyo. Stat. § 37-3-116); Corporate Stock Certificate Tokens (HB0185) (codified by creating Wyo. Stat. § 17-4-614, amending §§ 17-16-140, 17-16-625); Banking Technology and Stock Revisions (SF0028) (codified by amending Wyo. Stat. §§ 13-2-302, 13-2-306, 13-2-307(a), and 14 13-4-203(a) and (b)); and the Digital Assets Law (SF0125) (codified at Wyo. Stat. §§ 34-29-101 through 34-29-105 and 34.1-1-210).

trust and similar issues, a natural venue for the resolution of commercial disputes such as those involving blockchain issues.[9] None of this was rushed; these initiatives were undertaken on the basis of a thorough factual record.

For Wyoming, these carefully considered blockchain initiatives are not only an opportunity to spur innovation, but also to provide an economic development opportunity similar to that created by South Dakota's friendly legislative structure for trusts and credit card banks, which has resulted in the employment of approximately 16,000 people in that state.[10] Among other things, Wyoming's blockchain initiatives have led to the creation of new programs at the University of Wyoming and have spurred a high level of interest from blockchain enterprises around the world.

Wyoming engaged extensively with federal agencies and others, as can be seen from the meeting materials of the Select Committee public hearings, which indicates in the "Update on Fintech Activities" (May 22, 2020 Meeting, Agenda Item 2-01) dozens of outreach efforts to government agencies, elected officials and universities, including the Board of Governors and the Kansas City Reserve Bank.

### B. The SPDI Legislation

As a result of the hearings and findings of the Task Force, in late 2018, the Wyoming Legislature began drafting a bill establishing the concept of a Special Purpose Depository Institution (SPDI). The SPDI program was publicly supported both by Wyoming's then-Governor, Matt Mead, and by its current Governor, Mark Gordon.

There were broad opportunities for both public and private input into the SPDI initiative.[11] Importantly for present purposes, drafts of the bill were sent directly to the Kansas City Fed and

---

[9] Wyo. Stat. §§ 5-13-103, 5-13-106, and 5-13-107.

[10] *See* Hearing Tr. at 26.

[11] *See* note 6, *supra.*

the Board of Governors for their comment and input. As Custodia notes in its Complaint, Wyoming officials held *more than 100 meetings with the Board and the Kansas City Fed* over the SPDI program before the legislation was finalized, including both engagement at public hearings and private meetings just with the federal regulators.[12]

These discussions led to meaningful changes to the SPDI bill. The initial draft of the bill, for example, included a provision authorizing the Wyoming Attorney General to file a civil action against the Board and the Kansas City Fed in the event an SPDI was denied authorization to access services made available under 12 U.S.C. § 248a (the section providing for master accounts).[13] That provision was removed at the behest of the Kansas City Fed, which we are told called it "unnecessary."

Wyoming formally adopted House Bill 74 in early 2019, creating the Special Purpose Depository Institutions Act,[14] and authorizing the Division of Banking to issue SPDI charters.[15] At the same time, Wyoming also created its Digital Asset Law.[16] Wyoming has since amended the SPDI Act in 2020, and amended its digital asset law in 2021.

The Wyoming Division of Banking has created an extensive system to regulate SPDIs, crafted to modernize the Wyoming financial system while carefully preserving the safety and soundness of the banking system. The Division of Banking first promulgated SPDI and digital

---

[12] *See* Compl. ¶ 31.

[13] *See* Working Draft 0.7 at 23, https://wyoleg.gov/InterimCommittee/2018/S3-2018102919LSO-0055.pdf ("If a [SPDI] is denied authorization to access any services required to be made available under 12 U.S.C. § 248a, the attorney general shall, on behalf of the state of Wyoming and the institution, commence a civil action to enforce the requirements of 12 U.S.C. § 248a relating to the institution and to maintain the authority of the state of Wyoming to charter, supervise and ensure the continued operation of institutions in this state.").

[14] Wyo. Stat. § 13-12-101 *et seq*.

[15] Wyo. Stat. § 13-12-111.

[16] Wyo. Stat. § 34-29-101 *et seq.*; *see* https://wyoleg.gov/2019/Introduced/SF0125.pdf .

asset regulations in 2020,[17] and adopted amendments to those regulations in 2021.[18] It also adopted an extensive, 772-page, examination manual for SPDIs.[19] Under these, the Division of Banking must investigate any SPDI charter application, give public notice of that application, hold a public hearing on that application, and allow third parties (including for example representatives of the Kansas City Fed or the Board of Governors) to appear and cross examine the applicant.[20]

The net result, as evidenced in the hearing on Custodia's charter application, is that Wyoming's policies and programs with respect to SPDIs are exceptionally thorough, incorporate industry best practices, and ensure compliance with all applicable federal and state regulations.[21]

## ARGUMENT

**Defendants Are Unreasonably Delaying Granting Custodia's Application For A Master Account.**

The grant of access to a Master Account at an Administrative Reserve Bank (ARB)[22] such as the Kansas City Fed turns entirely on factual issues. That is, the institution seeking access must be legally qualified as well as responsible, safe and sound, and compliant with all material federal and state laws and regulations. Defendants' continued delay—without any explanation— suggests that Defendants question whether an SPDI generally, or Custodia specifically, can be any of those

---

[17] HB0074 (SPDI bill) and SF0125 (digital asset regulations) signed into law February 26, 2019. https://legiscan.com/WY/bill/HB0074/2019; https://legiscan.com/WY/bill/SF0125/2019.

[18] https://wyoleg.gov/Legislation/2021/SF0148; 2021 Wyoming Laws Ch. 91 (HB0043).

[19] Version 1.0, January 2021.

[20] Notably, neither defendant availed itself of that right with respect to Custodia's SPDI application.

[21] *See, e.g.*, *In re Application for Charter to Operate State Financial Institution*, Hearing Transcript on Custodia Charter Application (hereinafter "Hearing Tr.") at 17 and 110-111. We have lodged a copy of the hearing transcript as an exhibit to this *amicus* brief.

[22] An Administrative Reserve Bank "means the Reserve Bank in the Federal Reserve District in which the Financial Institution is located." *See Federal Reserve Banks, Operating Circular 1, Account Relationships, effective August 16, 2021*, at 2, https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

things. Following recently issued guidance[23] and the statement of Federal Reserve Board Governor Bowman, Wyoming has every reason to believe that defendants will continue delaying a decision on Custodia's application:

> [T]hese guidelines are only the first step in providing a transparent process. More work remains to be completed before a process is established to fully implement the guidelines. There is a risk that this publication could set the expectation that reviews will now be completed on an accelerated timeline.[24]

In this Court, defendants apparently recognize that they must at least acknowledge the existence of some *actual* risks to justify their inaction. That is not an easy task for the defendants, however, as they ignore completely the Wyoming legislative and regulatory structure set forth above. When one looks at the SPDI statute and the publicly available material about Custodia's application for a Master Account, it is evident that the regulatory scheme here fully addresses the potential risks that SPDIs could theoretically pose.

### A.    Defendants Have Not Identified Any Regulatory Risks Directly Related To SPDIs Generally Or To Custodia Specifically.

Although the vast majority of both defendants' briefs are devoted to their effort to avoid having this Court address the unreasonable nature of their delay in processing Custodia's application for a master account, at times, both defendants suggest that the delay is reasonable because SPDIs are "novel" and might, the defendants argue, pose some risk to the Federal Reserve System.[25] This argument is simply false.

The Board of Governors refers to risks only in the broadest terms, stating that in this case the risks are "real, complex and substantial" (Board Br. at 9); that there are "complex issues

---

[23] Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51099 (Aug. 19, 2022).

[24] Press Release, Federal Reserve Board, Statement on Guidelines to Evaluate Requests for Accounts and Services at Federal Reserve Banks by Governor Michelle W. Bowman (Aug. 15, 2022).

[25] *See, e.g.*, KC Fed Br. at 1; Board Br. at 1, 8.

presented by novel charters" (*id.* at 14); and that there are "complex issues and policy questions" related to financial stability and implementation of monetary policy (*id.* at 15). While such broad hypothetical questions abound in the Board's telling, any specific criticisms of SPDIs generally, or of Custodia in particular, are entirely absent. Nor is there any recognition of the myriad ways in which Wyoming addressed these questions already, as did Custodia in its application.

The Kansas City Fed's efforts to demonstrate some basis for the delay fares only slightly better. Although the Kansas City Fed makes no effort to explain why there are any actual risks from SPDIs generally or from Custodia in particular, it does at least mention certain risks by name:

- Credit and stability risks (KC Fed Br. at 7, 19);
- Operational risk—that is, can digital assets be safely custodied (*id.* at 9);
- The pseudonymous nature of the digital asset markets (*id.* at 26);
- Risk of manipulation and fraud (*id.*);
- Volatility of digital assets (*id.*);
- Lack of FDIC insurance and an FDIC resolution process (*id.* at 11).

At least the Kansas City Fed has put its stake in the ground. But it is a factual question whether any of these risks are either (a) real, or (b) material enough to justify a failure to act on a master account application. If these risks are neither real nor material then there is not now, and never has been, reason for delay.[26] While that is subject to proof, we will demonstrate below why it is not surprising defendants have not mentioned the particulars of the Wyoming statutory and regulatory framework, nor the internal controls developed by Custodia. It is because each of these risks either does not exist under the SPDI structure or because the risk was fully contemplated and fully mitigated by Wyoming's efforts.[27]

---

[26] It is not enough under the APA for the Kansas City Fed to have "questions" about these risks, with nothing more. If it were, no agency ever could be called to account.

[27] Although we generally believe, based on our understanding of the record developed before the Division of Banking, that Custodia poses no risks to the Federal Reserve System and thus should be granted its request for a master account, we do not purport to have independently investigated

The Wyoming SPDI legislative and regulatory framework was designed to be prudent and compliant with the highest standards for risk management and risk avoidance. As the public record establishes, experts were consulted throughout the process and the result was a legislative and regulatory design that is comprehensive and resilient. This framework deals with the assessment, measurement, mitigation, monitoring, and reporting on *actual* risks that could arise from the activities of an SPDI—rather than theoretical bogeymen. Furthermore, as mandated by the Division of Banking's regulations, Custodia's application necessarily laid out a robust internal controls environment for its business model—and the lengthy public hearing on Custodia's charter application provides ample information about the substantial quantity and high quality of Custodia's internal controls and related processes.[28]

In short, once one compares the concocted fears expressed by defendants to the actual risks and how they have been mitigated, one can only conclude that there are no materials risks attendant to this SPDI application, or, as put well by the Kansas City Fed, there are "no showstoppers"— exactly the result intended by the Select Committee in its creation of the SPDI legislation itself.

**B.   The SPDI Statute, As Implemented By The Division of Banking, Adequately Protects Against Any Regulatory Risk.**

Defendants' excuses for their lack of action appear to be disconnected from any actual analysis of the details of the SPDI statutory and regulatory architecture, and based more on a grab bag of headlines from the popular press[29] or speculation about what might happen if they are not allowed an indefinite, and unbounded, amount of time to consider and re-consider the issues.[30]

---

Custodia's qualifications—and thus limit our argument to the need for the defendants to *rule on* Custodia's application.

[28] *See* note 22, *supra*.

[29] *See* KC Fed Br. at 10.

[30] *See id.* at 8-9. The Board also appears to rely on a comment to its Proposed Guidelines, which

Hence, defendants' refusal to act on Custodia's application amounts to an improper interference with Wyoming's legislative and regulatory processes, and will if successful, significantly erode the dual banking system as it exists in the United States.

Let us turn then to the actual Wyoming regulations governing SPDIs like Custodia, to show how those regulations and supervisory system will protect against risk. The Wyoming framework consist of four levels of analysis and oversight, which combine to ensure a safe, stable, and fully compliant financial institution. They are: (i) the statute itself; (ii) the rules and regulations promulgated by the Division of Banking; (iii) the extensive examination manuals; and (iv) the internal controls at each SPDI, which are the product of the first three. Only by assessing that framework and how it applies to eliminate, mitigate, monitor and manage risk can one properly analyze whether the risks raised by defendants are applicable or material.[31]

Unfortunately, despite having had years to do so, defendants simply have failed to undertake this type of analysis. Or, if they have done so, they have refused to share it. That is unfair not only to Custodia, but also to the Select Committee, the Wyoming Legislature, the Division of Banking, and the people of Wyoming—all of whom have invested far too much time and effort in this initiative simply to be told "We'll get back to you. Someday."

---

states that institutions with novel charters "are not subject to the same strict and costly regulations or to the same rigorous reviews as apply to traditional institutions." Board Br. at 8 (quoting unnamed commenters). But as we discuss below, the Wyoming statutory and regulatory architecture is just as, if not more rigorous, than that applied to traditional institutions.

[31] In addition, the SPDI framework also requires continual reporting, testing, auditing, and reassessing of risks. *See* SPDI Rules and Regulations § 7(j) (Commissioner shall conduct transaction testing on a regular basis), https://drive.google.com/file/d/1EVLJjkvgV3--gWnie72fJwn_9VwVaJLC/view; Digital Asset Custody Rules, § 7(e) (Operational risk management procedures must be revisited on a recurring basis to ensure all reasonably foreseeable scenarios have been considered), https://drive.google.com/file/d/1UPNxoRfQ4Fa9HiaM5jV9C65M4gSSFgph/view.

1.      **Credit and Stability Risks (Including Capital Levels, Liquidity and Resilience)**

Defendants have expressed the concern that the extension of credit to Custodia through a master account will expose the Kansas City Fed to credit risk. *See* KC Fed. Br. at 8-9. This ignores several things.

First, as defendants know, intraday credit is extended by a Reserve Bank through the provision to a master account holder of "daylight overdrafts" and are controlled by a "net debit cap" allowed to each institution. Custodia has informed the Kansas City Fed (and has stated publicly) that it will have a *zero* net debit cap, meaning it will receive *no* credit from the Kansas City Fed. Defendants obscure this critical fact in their motions to dismiss, insinuating that Custodia poses credit risk to the Reserve Bank despite knowing full well that the Reserve Bank will never lend to Custodia. Second, with respect to SPDIs in general, Defendants ignore that the SPDI legislation requires the establishment of a risk reserve and that under Section 2.3 of the Custody and Fiduciary Services Examination Manual. SPDIs "are required to minimize credit risks to the greatest extent possible." Third, it overlooks the fact that Custodia has offered to maintain reserve levels of 108% of its deposits for the next three years.[32] Thus, when one moves beyond the expression of abstract concerns to concrete issues, it becomes apparent that credit risks from Custodia's master account application are either non-existent or immaterial.

Notably, and importantly for assessing safety and soundness concerns, under the SPDI legislation institutional investors doing business with Wyoming SPDIs differ from typical creditors of securities custodians. Because all publicly traded securities are owned indirectly, investors generally qualify as creditors of the custodians of their securities. Investors using an

---

[32] *See* Custodia Br. at 7.

SPDI will still *directly* own their digital assets, which will be under custody as a bailment. This means they retain direct ownership, merely giving up control while their digital assets are in custody at an SPDI. Because of the absence of counterparty risk, this will make a qualified custodian in Wyoming provably solvent—thus making credit concerns for SPDIs even less likely.

The Kansas City Fed also broadly argues that granting Custodia's application would "introduce links between the Federal Reserve balance sheet and cryptocurrencies," which it speculates might pose credit and stability risks both to itself and to the entire Federal Reserve System. *See* KC Fed Br. at 19. Putting aside the minimal threat that an SPDI startup might pose to the balance sheet of a Federal Reserve Bank or the Federal Reserve System as a whole, the Kansas City Fed completely elides the fact that any cryptocurrencies held by Custodia will be held in trust, and will not appear on Custodia's depository balance sheet at all, thus necessarily insulating the Fed entirely from those risks.

The Kansas City Fed also expressed a concern with respect to the volatility of digital assets and how such volatility can contribute to "runs" on different asset classes. *Id.* at 9-10. That concern has nothing to do with either SPDIs or Custodia. Defendants seem to overlook the fact that under Wyoming law the digital assets are not owned by an SPDI at any time. They are held in a bailment for the benefit of the customers, who retain full ownership while granting control to the SPDI. As noted above, the digital assets are neither held on the SPDI's balance sheet nor will they touch the balance sheet of the Kansas City Fed. Further, the statutory requirement that SPDI reserves be held in either cash, government backed securities, or Level 1 High Quality Liquid Assets (HQLAs) will dampen any "run risk," if one exists at all.

Moreover, there are additional significant steps provided in the Wyoming legislative and regulatory framework to provide further credit and stability protection. Three major considerations

for any new bank are its levels of capital and liquidity, as well as its ability to be resolved in the event of an adverse long-term outcome. These features, more than any others, protect the bank's customers and the banking system from any failures. The Wyoming statutory and regulatory framework provides ample protection across all three dimensions.

*Capital Levels.* The SPDI Act mandates robust amounts of capital, including fully paid in capital of not less than $5 million and a surplus fund of not less than three years of estimated operating expenses, as well as a capital contingency funding plan. *See* Wyo. Stat. § 13-12-106. Those capital levels are reviewed for adequacy by the Wyoming Division of Banking, and given the fact that trust banks are not engaged in lending activities are comparable to or in excess of those required of the 53 national trust banks. Moreover, Custodia worked extensively with the Wyoming Division of Banking on its capital plan.[33] In addition, during the public hearing on its charter application, Custodia's Chief Operating Officer, Britney Reddy, demonstrated that if Custodia were a "regular" bank, its capital levels would make it "well capitalized." (But Custodia is not a "regular" bank because it does not lend and does not take interest rate risk. Custodia is "well capitalized" like a "regular" bank, despite taking few of the risks typical of a "regular" bank.)

*Liquidity*: Per the statutory design, Custodia must hold reserves equal to 100% of its deposits. Of course, the quality of reserves is important, and the SPDI Act ensures that all SPDIs hold high-level reserves. Unlike prime money market funds, SPDIs must hold its reserves in government backed assets (such as Treasuries of various maturities and mortgage-backed securities) with the remainder in Level 1 HQLAs. This exceeds the quality of reserves held by many large commercial banks.[34] Liquidity is also protected because Custodia's customer base will

---

[33] Hearing Tr. at 16.

[34] For example, in 2019, the $200-plus-billion-dollar-asset Key Bank held approximately 40% of its reserves in Level 2 HQLAs. *See* KeyCorp U.S. Liquidity Coverage Ratio Disclosure at 5 (Sept.

be composed of institutions (pension funds, hedge funds, endowments, family offices, etc.) and very-high-net-worth individuals, and thus its exposure to consumer risk is minimal.[35]

While that is substantial, it is not all. The Wyoming Division of Banking requires in its Regulations that an SPDI "maintain a comprehensive policy on investments, liquidity risk, interest rate risk and other related issues that is reviewed during each examination," and specifies that the Commissioner of Banking "may use real time supervisory technology that permits monitoring of the investments and liquidity position of the institution."[36]

*Resilience:*[37] SPDIs are not only required to develop a recovery resolution plan but are required to secure a bond or pledge assets to pay for the cost of resolution borne by Wyoming in the case of a failure. An SPDI recovery and resolution plan must also be submitted to the Wyoming Banking Commissioner, and "shall generally encompass" the requirements of a national bank recovery plan and be a "targeted resolution plan" specified by the joint FRB/FDIC rule: *See* 12 C.F.R. § 243.6. The plan also requires the SPDI to identify at least two businesses that could acquire it, or any of its components, in the event of financial distress.[38] It is puzzling why defendants overlooked those statutory and regulatory provisions.

---

30, 2019).

[35] It also is worth noting that the SPDI fee-based revenue structure creates a predictable flow of income that historically has been quite stable throughout economic cycles, *see* Hearing Tr. at 13, and historically has produced a relatively stable profit margin contributing to the maintenance of strong capital ratios, which increases resiliency in the event of financial market uncertainty. *See* The Clearing House, White Paper, *The Custody Services of Banks* at 20 (July 2016). https://www.theclearinghouse.org/-/media/tch/documents/research/articles/2016/07/20160728_tch_white_paper_the_custody_services_of_banks.pdf

[36] *See* SPDI Rules and Regulations § 9(e)-(f), https://drive.google.com/file/d/1EVLJjkvgV3--gWnie72fJwn_9VwVaJLC/view.

[37] This also addresses Kansas City's expressed concern regarding lack of FDIC insurance and an FDIC resolution plan. *See* KC Fed Br. at 11.

[38] 021.0002.20 Wyo. Code R. § 7.

Resilience also is underpinned by strong corporate governance capable of overseeing and monitoring all relevant risks. As Custodia demonstrated to the Division of Banking, it employs a corporate governance framework intended to avoid any need for recovery. The Custodia Board has five standing committees—an Executive Committee, an Audit Committee, a Digital Asset Committee, an Information Technology Committee, and a Bank Secrecy Act/Anti-Money Laundering Committee—all led by deeply experienced financial services executives.[39] And, the SPDI regulatory framework requires annual, full-scope, on-site examinations, *see* SPDI Rules and Regulations § 12(c), as well as consultation with and approval by the Commissioner before engaging in any new substantial activity or line of business. *See id.* § 13(b).

## 2.      Operational and Information-Security Risks

As noted above (at page 9), the Kansas City Fed expresses concern as to whether digital assets can be safely custodied. Digital assets have, of course, been safely custodied by numerous institutions for years; and the SPDI structure was designed to meet SEC and CFTC custodial standards. *See id.* Beyond that, the SPDI Rules and Regulations indicate that assets held in custody by an SPDI may not be a source for payment of unrelated claims of creditors or other claimants. *See* SPDI Rules and Regulations § 6, https://drive.google.com/file/d/1EVLJjkvgV3--gWnie72fJwn_9VwVaJLC/view. Moreover, Wyoming also published a set of Digital Asset Custody Rules, 021.0002.20 WYO. CODE R. §§ 1-13, which, among other things, require that an SPDI have in place policies, procedures, internal controls and management information systems regarding custodial services. It further requires that operational risk management procedures regarding custody shall be revisited on a recurring basis "to ensure all reasonably foreseeable scenarios have been considered," and contains detailed sections regarding Technology Controls

---

[39] *See* Hearing Tr. at 35-36.

and Custody Safekeeping (§ 9), Transaction Handling [antifraud] (§ 10), and Custody Operations (§ 11). The Division of Banking also published an entire examination manual on the topic of SPDI Custody and Fiduciary Obligations. In short, risks related to custody are addressed—they have been covered comprehensively and mitigated by the Wyoming legislative and regulatory framework.

The Kansas City Fed also poses a related question with respect to the pseudonymous nature of digital asset markets. *See* KC Fed. Br. at 9. But again the Kansas City Fed inappropriately generalizes from risks that may exist in *other* areas of the digital asset spectrum, but that do not exist with respect to SPDIs. When an SPDI holds a digital asset in trust for a customer, it is not servicing an anonymous or pseudonymous entity. Not only are SPDIs required to comply with all federal laws regarding customer identification and beneficial ownership, *see* Wyo. Stat. § 13-12-107, but no SPDI depositor may maintain an account with an SPDI unless it meets certain criteria including "sufficient evidence available ... to enable compliance with ... customer identification and beneficial owner requirements, as determined by the institution." *See* Wyo. Stat. § 13-12-014. The regulations go further and require (i) that the Board of Directors establish key risk indicators (KRIs) for customer identification; (ii) annual independent testing with respect to, among other things, customer identification; (iii) a digital asset analytics provider to assist with customer identification; and (iv) the conducting of a source of funds review for each customer using a risk-focused approach. *See* SPDI Rules and Regulations § 7(c), (d), (f), (g).[40] And, in the case of transfers to a non-custodial address held by an institutional customer, "each institution shall

---

[40] The examination manuals further require that, before providing custodial services for any digital asset, an SPDI must provide a detailed analysis of that asset including any associated risks. *See* Custody and Fiduciary Services Manual, § 13, "Digital Asset Due Diligence and Permissibility," https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.

appropriately screen for ownership of the counterparty address, with auditable processes in place to recreate the methods through which the bank conducted screening, and appropriate escalation processes in the event that the bank identifies a change in ownership of the wallet address." *Id*. § 7(h)(i). More generally, the Rules require SPDIs to "maintain policies and conduct appropriate market surveillance to prevent, detect and combat manipulative or illegal trading practices in traditional and digital asset markets." *Id*. § 13(c). Finally, to ensure compliance with these requirements, the Regulations require the Commissioner to "conduct transaction testing of the digital asset transactions of the special purpose depository institution on a regular basis." *Id.* §7(j). Thus, pseudonymous risk is not plausibly an issue under the SPDI framework.

Of course, operational risk is a broader concept than simply custody and customer identity. It is a key consideration for any financial institution significantly dependent upon technology. These risks are dealt with in great detail in the four-level process we have been discussing. For example, in the SPDI Custody and Fiduciary Examination Manual, operational risk is defined and information is provided about policies and procedures as well as various other factors which must be considered to minimize the risk.[41] Moreover, in the SPDI Payment System Risk Examination Manual, Wyoming regulators explain various procedural methods that should be taken to control operational risks and what controls should be implemented.[42] Consistent with that guidance, Custodia's executives acknowledged the existence of operational risk and crafted internal controls to manage them, including continuous training, dual controls, segregation of duties, and monitoring and testing to ensure policies and procedures are being adhered to.[43]

---

[41] *See* Custody and Fiduciary Examination Manual at 9-10, 19-20. https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view

[42] *See* Payment and System Risk Examination Manual at 71-82. https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view

[43] *See* Hearing Tr. at 45-46, 85-86, 161.

IT and information-security risk is another significant aspect of operational risk. In the case of the SPDI structure, the Legislature insisted on insurance covering information technology infrastructure and activities. Wyo. Stat. § 13-12-119. The regulations also require that an SPDI appoint a Chief Technology/Information Security Officer. *See* 021.0002.20 WYO. CODE R. § 7.[44] The Information Security Examination Manual provides a detailed explanation of all aspects of a proper information security program for SPDIs, including proper IT governance, proper IT security responsibility and accountability, proper culture as well as significant background information on information securities examinations.[45] Custodia's internal controls, as revealed at the charter application hearing, indicate that it has followed all those requirements and more, such as training, hardware, software, logging and monitoring, reporting, external review, incident response, vendor management, dual controls, encryption, and auditing, all of which lead to a culture of security. *See* Hearing Tr. at 17, 86, 111, 135-144. Of course, this also protects against cybersecurity risks. The Custodia cybersecurity controls include annual penetration tests, ongoing risk assessments, external audits as well as the acquisition of blockchain surveillance, analysis, and monitoring tools. *See id.* at 110, 141.

> ### 3.   Bank Secrecy Act, Anti-Money Laundering, Anti-Terrorism, and Sanctions Risks

Any financial institution must ensure that it is fully compliant with the extensive requirements addressing the Bank Secrecy Act, anti-money laundering, countering the financing of terrorism, and sanctions risks. These are critical not only to a well-functioning financial system free from antagonistic disruption, but as a component of our national security policy. The Kansas

---

[44] Custodia did so. *See* Hearing Tr. at 120.

[45] *See* Information Security Examination Manual at 1-127. https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.

19

City Fed briefly mentions this risk (at 19). Again, Wyoming's four layers of protection address these issues more than adequately.

The SPDI statute requires compliance with all federal laws, including those relating to anti money laundering, customer identification and beneficial ownership. Wyo. Stat. § 13-12-107. Any customer who wishes to do business with an SPDI must provide sufficient evidence to enable compliance with anti-money laundering, customer identification and beneficial ownership requirements. Wyo. Stat. § 13-12-104.

Section 7 of the Division of Banking's SPDI regulations specifically addresses anti-money laundering, customer identification and sanctions compliance, including a requirement that the SPDI's BSA/AML/Sanction compliance program must be approved initially by the Board of Directors, reviewed on an annual basis by the Board, and include annual written risk assessments. The regulations also require a written annual training program for directors, officers and other key personnel. 021.0002.20 Wyo. Code R. § 7. Wyoming has also promulgated a 252-page SPDI Bank Secrecy Act/Anti Money Laundering/Office of Foreign Assets Control Examination Manual.

Custodia's charter application also addresses internal controls with respect to these risks, *see* Hearing Tr. at 109-115, and Custodia's CCO testified that "anything that is going to touch the … platform is going to go through our OFAC screening and the BSA screening …." *Id.* at 125. The Commissioner of the Wyoming Division of Banking, Albert Forkner, also testified that the Division undertook an investigation of Custodia's information and cybersecurity program, as well as its BSA, AML, KYC and Sanctions compliance programs, and found that they were adequate. *See id.* at 212-214. There can thus be no real question that Custodia is committed to rigorous compliance and security and that its compliance policies and programs are meant to meet the

strictest standards in support of compliance with all applicable federal and state regulations as well as incorporating industry best practices. *See id.* at 17, 110.

### 4.    Quality of Oversight and Review

It is thus evident that the Wyoming statutory and regulatory processes in connection with SPDIs are extensive and adequately address any risks such institutions might cause. But it is also true that organizations must be supervised by regulatory bodies that are qualified to do so, and must be managed responsibly.

The Wyoming Division of Banking has a well-earned reputation as a conservative and diligent regulator. Its requirements for: real time reviews of transactions; the employment of digital asset analytic tools; involvement of the Board of Directors; auditable processes; pre-authorization and pre-transaction customer screening; and the development of KRIs, KPIs and annual reviews, are as aggressive as one will find anywhere. The public record also indicates that the Division of Banking is in the process of hiring additional staff to assist in the management of and oversight of SPDIs, and that it has developed a detailed 722-page examination manual that covers literally every risk attendant to the SPDI structure. It is exactly what one would expect from a highly responsible and committed state partner in the American dual banking system.

The public record also indicates that Custodia's senior management is exceedingly well qualified. It is led by a 22-year Wall Street veteran, who is also a Harvard Law School graduate.[46] Outside directors include the president emeritus at the University of Wyoming, a venture capitalist, a prior bank director, and a professor at Harvard Business School.[47] Another advisor has a Ph.D. in theoretical particle physics, worked as a software engineer at Bloomberg, and was the lead

---

[46] *See* Hearing Tr. at 18-25.
[47] *See id.* at 34.

blockchain architect for Fidelity Digital Assets in helping to design their custodial system.[48] The COO worked for Morgan Stanley, SALT Lending and Figure Technologies.[49] The BSA/AML officer has over six years of BSA/AML experience at a traditional bank, and has been a certified compliance officer, a certified bank internal auditor, and a certified risk management specialist.[50] Another advisor was the corporate treasurer for Ford.[51] Yet another advisor is a former commissioned federal bank examiner for the Federal Reserve who served in that position for 30 years and had responsibility for payment-system proposals made to the Federal Reserve Board.[52]

## C. Defendants' Delay In Processing Custodia's Application Is Unreasonable.

Regulators do not act in a vacuum, nor can they fulfill their obligations and responsibilities abstractly or by way of speculation regarding theories and assumptions. Wyoming has repeatedly provided the defendants ample evidence of the efficacy of the SPDI legislative framework and regulatory architecture in the process of developing that system—and they have never identified any specific problems with the SPDI framework or how it has been implemented. Defendants claim to need more time—but do not identify how much. And it seems evident that the defendants plan to take substantially more time to process Custodia's application, which should have been granted in a matter of days. They are long on words, but short on action.

Indeed, although the Board has now published Guidelines in connection with the granting of master accounts,[53] those Guidelines only provide broad classifications, which the Board says Reserve Banks should use in evaluating applications for master accounts. But the Board has not

---

[48] *See id.* at 135.

[49] *See id.* at 150-154.

[50] *See id.* at 109-110.

[51] *See id.* at 199-201.

[52] *See id.* at 187-188.

[53] *See* note 24, *supra*.

provided any guidance about how those principles should be implemented—and Federal Reserve Board Governor Michelle Bowman commented that the Guidelines "are only the first step."[54]

Thus, the Guidelines have little or no meaning in connection with SPDI applications for master account access, other than to offer another reason for delay. They are apparently only a "first step," with an undefined number of steps to follow. Regardless of how filibustered and Byzantine the ultimate process will be, it is plain that it will not be completed at any time within the foreseeable future, and the suggestions by defendants that they are working diligently to process Custodia's application[55] ring hollow. And it is not only one SPDI that is being stonewalled. It is the Legislature of Wyoming, acting well within its powers as a responsible member of the dual banking system.

This is not an academic exercise involving a theoretical set of issues. This is a matter involving one state's carefully designed regulatory scheme, and one bank validly chartered under that state's law. Defendants must evaluate an SPDI application in connection with Wyoming's legislative and regulatory structure, which is intended to, and does, minimize risk. If other applicants appear holding valid SPDI charters, those applications, too can be decided on a case-by-case basis.

Nor is a master account review a new or significant strain on the Federal Reserve System. It is extraordinarily unlikely that future applications would overwhelm the Kansas City Fed, since only four SPDI charters have been issued. And as we have demonstrated, the SPDI program is in any event designed to eliminate any significant risk to the Federal Reserve System, so processing such applications *should* be ministerial. Finally, the fear expressed by Federal Reserve Chair

---

[54] *See* page 8, *supra*.
[55] *See* Board Br. at 9, 13, 15; KC Fed Br. at 17-19.

Powell that a decision (up or down) in this matter will be "precedential" and will lead to "hundreds" of other similar demands for master accounts,[56] seems to ascribe incompetence to Wyoming's state banking regulators whom, one must assume, the Fed Chair believes will act as mere "rubber stamps"—ignoring their duty to judge each charter application on its merits, after a rigorous and independent review.

The larger point is that it is the defendants' complete failure and refusal to engage in any way with the actual risks involved in the operation of an SPDI, as well as the extensive system of legislative and regulatory mitigation measures put in place to handle those risks, that is causing this delay. It cannot be reasonable for the defendants to refuse to engage at all with the statutory and regulatory framework crafted by Wyoming, as well as with Custodia's extensive internal controls processes that have been blessed by the Wyoming Division of Banking. If there is any question about the sufficiency of those provisions, or about Custodia's ability to meet those high standards, defendants have not revealed it. Rather, defendants appear to rely on what they claim *may* be (they are not sure) *theoretical* difficulties in managing national monetary policy should an SPDI master account application be granted.[57] But they merely state the proposition without articulating *why* that should pose a difficulty. It does not. It is true that deposits held by an SPDI will be recorded on the balance sheet of the Kansas City Federal Reserve Bank. At the end of 2021, however, that balance sheet held over $57 billion in deposits.[58] It is difficult even to imagine how SPDI assets would make the management of those vast sums more difficult by even an iota. Indeed, it is worth noting that deposits on the balance sheet of the Federal Reserve System increased by

---

[56] *See* Testimony of Jerome Powell at Senate Confirmation Hearing (January 10, 2022).

[57] *See* page 9, *supra.*

[58] *See* https://www.kansascityfed.org/AboutUs/documents/8672/Kansas-City-Fed-Financial-Statements-2021.pdf

34% during the COVID pandemic,[59] and yet the Reserve System did not buckle—and monetary policy was managed throughout in a proper (if debatable) manner.

Defendants should not be allowed to escape a rigorous review of their actions through conclusory statements and failures to engage with the facts on the ground. The text of the Administrative Procedure Act itself requires that unreasonable delay be determined on the basis of the "whole record."[60] Defendants have been involved for over four years with the process of Wyoming's development and refinement of the SPDI architecture, and have purportedly been assessing one straightforward master account application for nearly two years. They are intimately familiar with the details of the risks, and how those risks are mitigated under the statute and the rules. They also are familiar with Custodia's adherence to those standards. They have no explanation for their failure to act other than that the issues are, according to them, "complex." But these are no ordinary parties. They are the world's experts on monetary issues, and they have had four years to study and analyze those issues related to master account access. Vague protests of "complexity" should be a thing of the past. This Court should accordingly order defendants to process Custodia's application for a master account within 30 days, or set a prompt trial date so this matter may be adjudged on the facts and the "full record," as required by the APA.

## CONCLUSION

The Court should deny Defendants' Motions to Dismiss.

---

[59] FEDS Notes, Castro, Cavallo and Zarutskie, *Understanding Bank Deposit Growth During the COVID-19 Pandemic* (June 3, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/understanding-bank-deposit-growth-during-the-covid-19-pandemic-20220603.html.
[60] 5 U.S.C. § 706.

Respectfully Submitted,

/s   Lisa Marie Jerde Spillman
LISA MARIE JERDE SPILLMAN (WY State Bar No. 7-5450)
      lisa@jerdespillmanlaw.net
JERDE SPILLMAN LAW LLC
7527 Jessica Drive
Cheyenne, WY 82009
Telephone (307) 314-8091

DAVID M. GOSSETT (DC Bar No. 468390;
      *pro hac admission pending*)
      davidgossett@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 973-4200

STEPHEN T. GANNON (VA State Bar No. 17649;
      *pro hac admission pending*)
      stevegannon@dwt.com
LISA WEINGARTEN RICHARDS (VA State Bar No. 96671;
      *pro hac admission pending*)
      lisarichards@dwt.com
DAVIS WRIGHT TREMAINE LLP
4870 Sadler Road, Suite 301
Glen Allen, VA 23060
Telephone: (804) 762-5320

*Attorneys for [Proposed] Amici Curiae*

September 20, 2022

## CERTIFICATE OF SERVICE

I hereby certify, on the 20th day of September, 2022, a true and correct copy of the foregoing was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, NW
Washington, DC 20551

Angela Tarasi
Christine Carletta
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
King & Spaulding LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202

Billie L. M. Addleman
Hirst Applegate LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083

Scott E. Ortiz
Williams Porter Day Neville, PC
PO Box 10700
Casper WY 82602 So

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe
Williams & Connolly LLP
680 Maine Ave SW
Washington, DC 20024

/s/ Lisa Jerde Spillman