# *IN THE MATTER OF THE APPLICATION FOR CHARTER TO OPERATE STATE FINANCIAL INSTITUT*

## *BANK BOARD HEARING*

*10/06/2020*

———————————————————————————

## *Meadors Court Reporting*
*4025 Automation Way Unit D-2*
*Fort Collins, Colorado 80525*
*970-482-1506*

*Meadors Court Reporting*

HEARING BEFORE THE STATE BANKING BOARD
STATE OF WYOMING
DEPARTMENT OF AUDIT
DIVISION OF BANKING

Held on Tuesday, October 6, 2020
8:30 a.m. - 3:26 p.m.
(Executive session proceedings in separate transcript.)


at

Herschler Auditorium
State Capitol Building
Cheyenne, Wyoming

In the matter of:

Application for Bank Charter
Avanti Financial Group, Inc.


Board Members Present:
      Peter Lawton, Board Chair, Jackson
      Joshua Sorensen, Director, Rock Springs
      Copper France, Director, Rawlins
      Greg Dixson, Director, Casper
      Brittanie Sharp, Director, Douglas
      Bob Grady, Director, Jackson (by videoconference)
      Rod Jenson, Director, Afton
      Fred Rife, Ex Officio Member, Cheyenne

Staff Present:
      J.C. Demers, Hearing Examiner
      Sean Towles, Assistant Attorney General
            Attorney for the Board
      Devin Kenney, Assistant Attorney General
            Division of Banking
      Albert Forkner, Commissioner, Division of Banking
      Marie Castleberry, Secretary for State Banking
            Board

*Meadors Court Reporting*

1                    TABLE OF CONTENTS

2    WITNESSES:

3    CAITLIN LONG
          Examination by Mr. Dyekman       8
4         Questions by the Board          41

5    BRITNEY REDDY
          Examination by Mr. Dyekman      79
6    `    Questions by the Board          95

7    CHARLES THOMPSON
          Examination by Mr. Dyekman     102
8         Questions by the Board         118

9    BRYAN BISHOP
          Examination by Mr. Dyekman     126
10        Questions by the Board         144

11   ZEV SHIMKO
          Examination by Mr. Dyekman     150
12        Questions by the Board         164

13   JOHN PETTWAY
          Examination by Mr. Dyekman     169
14        Questions by the Board         174

15   PHILIP TREICK
          Examination by Mr. Dyekman     176
16

17   KATIE COX
          Examination by Mr. Dyekman     186
          Questions by the Board         196
18

19   NEIL SCHLOSS
          Examination by Mr. Dyekman     198

20   ROBERT CULLINAN
          Examination by Mr. Dyekman     207
21

22   ALBERT FORKNER
          Examination by Mr. Kenney      209
          Questions by the Board         213
23

24   CLOSING STATEMENT                   218

25

1    CHAIRMAN LAWTON:  Good morning.  I'm going to call the
     meeting to order.

2              My name is Peter Lawton.  I'm the Chairman of

3    the Board.  I'd like to welcome everybody today.

4              We have some formalities I'm going to get

5    through here quickly, and we'll start with the

6    application.

7              The Wyoming State Banking Board is convening

8    here today to hear from applicants for Avanti Bank,

9    Inc., d/b/a Avanti Bank and Trust, regarding the

10   special purpose of depository institution bank charter

11   application.

12             Marie Castleberry will call the roll of the

13   Banking Board members.

14             MS. CASTLEBERRY:  Chairman Peter Lawton.

15             CHAIRMAN LAWTON:  Present.

16             MS. CASTLEBERRY:  Joshua Sorensen.

17             MR. SORENSEN:  Present.

18             MS. CASTLEBERRY:  Copper France.

19             MR. FRANCE:  Present.

20             MS. CASTLEBERRY:  Greg Dixson.

21             MR. DIXSON:  Present.

22             MS. CASTLEBERRY:  Brittanie Sharp.

23             MS. SHARP:  Present.

24             MS. CASTLEBERRY:  Robert Grady.

25             (No response.)

*Meadors Court Reporting*

1          MS. CASTLEBERRY:  Rod Jenson.

2          MR. JENSON:  Present.

3          MS. CASTLEBERRY:  And Fred Rife.

4          MR. RIFE:  Present.

5          CHAIRMAN LAWTON:  Thank you.  I want to

6   remind the Board that with all charter applications,

7   the information provided to you contains a significant

8   amount of confidential information.  Any specific

9   questions relating to confidential information, the

10  Board will need to resolve itself into executive

11  session.

12          Per Wyoming Statute 15-12-115, the Board

13  shall render decisions on the charter application based

14  solely on seven criteria.  The Board will reconvene at

15  a later date to rule on charter applications.

16          This meeting is being streamed live.  So you

17  want to make sure that the microphones are close to you

18  and on.  We do have a court reporter here, so please

19  make sure to speak clearly and not too fast so that he

20  can follow along.

21          Unless there are any other questions from the

22  Board members at this time, I will turn the meeting

23  over to the Hearing Examiner from the Office of

24  Administrative Hearings.

25          MR. DEMERS:  Good morning.  I'm J.C. Demers

*Meadors Court Reporting*

1    from the Office of Administrative Hearings.  I will be

2    conducting the hearing this morning.

3              The parties have prepared a joint prehearing

4    stipulation, which I will be using as a guide during

5    the presentation of the case.

6              And currently, the applicant has submitted

7    Exhibits 1 through 4, and the parties have stipulated

8    that those will be admitted into evidence, so they're

9    hereby admitted.

10             The State, the Wyoming Division of Banking,

11   has offered Exhibit A, and the parties have also

12   stipulated that that will be accepted into evidence,

13   and it is hereby accepted.

14             The -- I guess, Mr. Dyekman, I would start

15   with you and ask you to please identify yourself, as

16   well as Mr. Thompson.

17             MR DYEKMAN:  Thank you, Mr. Demers.

18             I'm Greg Dyekman of Long Reimer Winegar here

19   in Cheyenne.  I am local counsel for Avanti, and I'm

20   joined at counsel table by Chuck Thompson, who is the

21   chief legal officer for Avanti.

22             I'll be asking most of the questions today,

23   and Mr. Thompson will be testifying later.

24             CHAIRMAN LAWTON:  Will Mr. Thompson be

25   presenting in this case?

1          THE WITNESS:  Only his own testimony.  He may

2     pop up if there's a confidentiality request.

3          MR. DEMERS:  And we've agreed in the

4     prehearing that that would be fine.  Mr. Thompson is

5     appearing in association with you this morning?

6          MR. DYEKMAN:  He is.

7          MR. DEMERS:  And acting as necessary.

8          MR. DYEKMAN:  That's correct.  Thank you.

9          MR. DEMERS:  Mr. Kenney, are you appearing

10    for the Division by yourself?

11         MR. KENNEY:  Yes.  Devin Kenney, hearing --

12    from the Attorney General's Office.

13         MR. DEMERS:  And then, I guess, if we could,

14    starting with Mr. Rife, we'll just go down the table

15    for introductions.

16         MR. RIFE:  Good morning.  I'm Fred Rife.  I'm

17    Director of the Wyoming Department of Audit.

18         MR. DIXSON:  Good morning.  Greg Dixson with

19    Hilltop National Bank of Casper, Wyoming, Board member.

20         MR. JENSON:  Good morning.  Rod Jenson.  I'm

21    a new Board member.  I'm with Bank of Star Valley in

22    Afton, Wyoming.  The new Board member.

23         MR. FRANCE:  Copper France, President, Bank

24    of Commerce in Rawlins, and Board member.

25         CHAIRMAN:  Pete Lawton, Chairman, Bank of

1    Jackson Hole.  And Board member.

2              MS. SHARP:  Brittanie Sharp, bank -- Converse

3    County Banking in Douglas, Board member.

4              THE WITNESS:  Josh Sorensen.  I'm a Board

5    member and non-banker.

6              MR. TOWLES:  Sean Towles from the Attorney

7    General's Office.  I'm advisory counsel for the Board.

8              MR. DEMERS:  And Mr. Dyekman, my

9    understanding from speaking to your earlier is, you're

10   going to waive your opening statement and generally

11   present Avanti's position through the testimony of

12   Ms. Long; is that correct?

13             MR. DYEKMAN:  That's correct.

14             CHAIRMAN LAWTON:  And Mr. Kenney, did you

15   desire to make an opening statement?

16             MR. KENNEY:  No, I do not.  Thank you.

17             MR. DEMERS:  Thank you.

18             With that, please proceed.

19             MR. DYEKMAN:  Thank you very much.  I'd call

20   my first witness, Caitlin Long.

21             Please state your full name and your position

22   with Avanti.

23             MS. LONG:  Caitlin Long.  Shall I swear in?

24             MR. DEMERS:  That's my bad.  Thanks.

25                       CAITLIN LONG,

*Meadors Court Reporting*

1    Having been first duly sworn, testified as follows:

2              MS. LONG:  Good morning, Mr. Chairman and

3    members of the Board.  I'll start with a brief opening

4    statement and then move on to our testimony, although

5    the opening statement is formally part of my testimony.

6              We're here to do something awesome for

7    Wyoming today, which is to consider another applicant

8    for a special purpose depository institution, or SPDI

9    bank.

10             Avanti is a word that means "forward" or

11   "ahead" in multiple languages.  It stems from a Latin

12   root, abante, a-b-a-n-t-e, and Wyoming is ahead as a

13   state.

14             We are building a niche in the financial

15   industry here.  So far, we're building for what South

16   Dakota and Utah have.  We saw Australia loan companies.

17   South Dakota has the credit card bank.  And Wyoming

18   will hopefully be home to the digital assets industry

19   niche within the broader scope of financial services.

20             Wyoming has a proud history of leading,

21   obviously for having invented the limited liability

22   company in 1977 and also being the first state to grant

23   women the right to vote 150 years ago.

24             Its whole initiative has always been about

25   attracting jobs outside capital and revenue to the

*Meadors Court Reporting*

1    state of Wyoming, as well as elevating the prestige of

2    the University of Wyoming, and it's happening.  Kraken

3    is obviously the most visible example of it, but I know

4    of some other big things that are happening outside of

5    the banking industry, some of which will never be

6    announced.

7          One thing we can point to is Secretary of

8    State Ed Buchanan's testimony at the Blockchain Select

9    Committee last week, that the number of new business

10   entities registered in Wyoming is up 75 percent here

11   today.  There's been a huge spike.

12         And there's also been a spike in the

13   University of Wyoming's event.  We just completed the

14   first part of Hackathon, and attendance was up 11 times

15   over last year.  4400 -- nearly 4400 attendees

16   participated in the third part of the Hackathon as well

17   as -- the Hackathon competition is a software

18   competition, as well as attended the conference.

19         And this was the first time that the law

20   school put on a conference about Wyoming blockchain

21   laws.  4400 participants attended, all of whom have

22   come from 97 countries.

23         We're really proud of what's happened at the

24   university and how much they have embraced what we're

25   doing in this technology area.  That event has helped

*Meadors Court Reporting*

1   raise, in its first three years, well over a million

2   dollars for the university.

3          And I co-founded and remain chairman of that

4   event, and I'm really proud of what the university has

5   done to run with it, which is, they have now founded a

6   blockchain program at the university, one of only 12

7   universities in the United States to do that, joining

8   MIT, Stanford, Cornell, Yale, and seven other

9   prestigious universities.  So --

10          MR. GRADY:  Ms. Long?

11          THE WITNESS:  Yes.

12          MR. GRADY:  Mr. Chairman, I'm sorry to

13   interrupt Ms. Long.  I just wanted the record to show,

14   it's Bob Grady.  I was holding on the Google lead line

15   that was sent as our link for this, so I was waiting

16   since 8:25.  And I just wanted the record to show that

17   I've joined the meeting and been virtually present here

18   since 8:30.  So thank you, and I look forward to the

19   presentation by Avanti and Ms. Long.

20          MR. DEMERS:  Thank you, and Ms. Long, I'd ask

21   if you could just slow down a little bit.  I'm watching

22   the court reporter --

23          THE WITNESS:  Okay.  So --

24          MR. DEMERS:  Thank you.

25          I'll watch that.  Thank you.  Yes, thank you,

*Meadors Court Reporting*

1    Mr. Chairman.

2              We have joined MIT, Stanford, Cornell, Yale,

3    and seven other prestigious universities.

4              So the seed is planted by the blockchain

5    efforts here in Wyoming, which began in 2018 and are

6    growing into tangible results, thanks to the dozens of

7    people involved, especially the Wyoming legislators,

8    Governor Mead, and Governor Gordon, who realized the

9    upside potential for all of this far exceeded the

10   downside risk.

11             Kraken, of course, kicked off the banking

12   aspect of this initiative in a very big way, thanks in

13   no small part to all of you.  I'm very proud of

14   Kraken's success and helped recruit them to Wyoming

15   over the last couple of years.

16             Let's set the stage.  Avanti is very

17   different than Kraken.  Kraken is a consumer-focused

18   company and a digital asset exchange, primarily,

19   whereas Avanti is primarily an institutional-focused

20   company, and we will provide -- be providing services

21   around those assets, but we will not be an exchange.

22             Both Kraken and Avanti share some important

23   characteristics, though.  We are both committed to

24   blockchain technology and doing right by the state of

25   Wyoming, who gave us this opportunity.

1      So we look forward to presenting our

2   testimony, and thank you.

3                     EXAMINATION

4   BY MR. DYEKMAN:

5      Q    Could you please describe the Avanti work

6   integration.

7      A    Yes.  Avanti is a depository institution that

8   also provides trust services around digital assets and

9   offers Avit, for proprietary new payment products.

10      To be clear, all digital assets that Avanti

11   handles will be through the trust function of the bank,

12   not on the depository balance sheet.  Our target

13   customers are institutions and consumers with a very

14   high minimum balance.

15      We will offer four product lines.  On-line

16   banking, trust digital assets, the Avit products, and

17   prime services for digital assets.

18      At this juncture, it's important to pause and

19   note that the Avit product is a proprietary product.

20   Nothing like it exists in the market currently.  And a

21   patent is pending for it.

22      We've spent a lot of legal fees on that

23   product, and we respectfully request that the -- that

24   any question you have pertaining to how it works will

25   be deferred to me in executive session, as details

*Meadors Court Reporting*

1   about Avit are confidential trade secrets.  Thank you.

2            Avanti's team consists of 13 full-time

3   employees.  Team members.  Plus six advisers, of which

4   two of the advisors are working for us part-time.  Four

5   of the team already work in Cheyenne, and two are in

6   the process of moving here.  We project to have

7   approximately 25 employees within the next 18 months of

8   which approximately 10 will be based here in Cheyenne,

9   including three of our five executives.

10           Avanti's revenue model is fee-based, because,

11  of course, as you know we are a nonlending charter.

12  Avanti will be almost entirely an online bank.  We will

13  have an office in Cheyenne, in order to meet that

14  requirement, as my colleague, Britney Reddy, will

15  describe to you in her statement.

16           Our executive team consists of five

17  executives who are highly experienced in regulating

18  financial services, and all are A players, in my

19  opinion.  All -- I have worked with all of them

20  previously except for Britney, who I got to know here

21  in the Cheyenne community.  Most of you know her, and

22  you don't need me to tell you she's a star.

23           Bryan Bishop is Avanti's chief technology

24  officer, and you will hear from all of the executives

25  here today.  Bryan is also a fellow director on the

*Meadors Court Reporting*

1    Board of Directors.

2            We jointly worked together to provide a

3    comment letter on best practices for digital asset

4    custody through the Securities and Exchange Commission

5    in 2018, and that's how I got to know Bryan.

6            He has the distinction of not only being a

7    contributor to bitcoin open source code, but he also

8    received the original email from Satoshi Yakamoto, the

9    bitcoin's creator, in 2009.

10           Bryan was previously the lead blockchain

11   engineer at LedgerX, which is the first bitcoin

12   derivative exchange that was licensed by the

13   Commodities Futures Trading Commission, or CFTC.

14           Britney Reddy is our chief financial officer

15   and chief banking officer.  She has held every senior

16   position in Wyoming community banks during her nearly

17   20-year career in banking in Wyoming.  She has also

18   negotiated and implemented core banking software

19   systems multiple times in her career.

20           As Avanti's most experienced executive in

21   traditional banking, she works very closely with all of

22   the other executives and has been instrumental in

23   melding a technology-forward company to banking

24   regulations and practical realities.  And she has come

25   up to speed very quickly on digital assets.

**Meadors Court Reporting**

1          Zev Shimko is our chief operating officer.

2     Zev and I worked together at Morgan Stanley while he

3     was beginning his career, and he was literally a star

4     fellow.  That's the name of Morgan Stanley's programs

5     for its top-rated junior employees across all of the

6     company.

7          We covered corporate treasurers together at

8     Morgan Stanley.  And a few years ago, we both left Wall

9     Street for startup individual asset industry.  But we

10    stayed in touch.

11         Zev is an expert on the market structure of

12    digital assets, especially trading dynamics, and he

13    will walk you through Avanti's proposed products as

14    well as the product-to-market fit.

15         And lastly, Chuck Thompson to my left, our

16    chief compliance officer and chief legal officer.

17    Chuck is also an alumnus of LedgerX, where he worked

18    with Bryan, as well as an alumnus at Morgan Stanley,

19    where we did not cross paths but worked with a number

20    of the same people at different times.

21         Chuck and I first met at a conference for

22    asset-backed securities in 2017, and we immediately

23    found common ground on the legal issues facing the

24    digital asset industry.

25         At LedgerX, Chuck built the Bank Secrecy Act

1    and anti-money-laundering compliance program, and I

2    knew that that experience, as well as his deep

3    securities experience at Morgan Stanley, as well as

4    many years with two of New York's top law firms, would

5    be invaluable to Avanti.

6              Next we turn to our capital raise.  We're a

7    de novo applicant, and our strategy was initially to

8    raise the statutorily required minimum before we clear

9    regulatory hurdles and to wait to do the big capital

10   raise required in order to be open for business until

11   after clearing as many of those hurdles as possible.

12             We note that many de novo banks have recently

13   been funded in the United States.  The reason de novo

14   banks are doing it this way and sequencing their

15   capital raising in such a careful manner is to reduce

16   the risk to investors that if the de novo applicant

17   does not receive its charter.

18             If Avanti does not obtain our charter, we

19   will be unable to operate and will not open.  So the

20   roadmap is to raise the statutory minimum plus some

21   working capital up-front, which we already did, and

22   then execute the bigger capital raise after the

23   regulatory risks have been significantly reduced.

24             And we have worked extensively with the

25   Wyoming Division of Banking on this capital plan.  And

1    Brittany and Zev will be discussing that with you

2    during their testimony.

3            Avanti's mission is to build a compliance

4    bridge between the legacy and the decentralized digital

5    financial world and to expand access to the open

6    financial system based on direct ownership of assets in

7    a way that is more stable, secure, and private than the

8    legacy system.

9            Our motto is "Both security and compliance

10   first."  We are committed to rigorous compliance and

11   security in everything we do, and our employees are

12   trained on this mission from the moment they start

13   working here and again during their reviews.

14           Lastly, let me close this session by thanking

15   the two Wyoming banks who helped Avanti get started.

16   We are not mentioning their names in today's hearing

17   testimony.  They know who they are.

18           Avanti faced trouble getting a bank account

19   and getting off the ground, which is very common in the

20   digital asset industry.  And I want to especially

21   thanked the banks who helped us because we attracted

22   outside capital from outside of Wyoming and wanted to

23   keep it inside Wyoming instead of sending it right back

24   out to one of the out-of-state banks that service this

25   industry.  And thanks to the local folks, we were able

1    to do that.

2         Q    Could you please explain to the Board your

3    qualifications and background.

4         A    Yes.   Thank you.

5              I bleed brown and gold.   I was born and

6    raised here in Wyoming, in Laramie.   My father was a

7    U-Dub professor for 40 years in electrical engineering,

8    and my mother was a schoolteacher, first in Lander and

9    Riverton, and then later in rural Rock River,

10   population 252.

11             I am a product of Wyoming's public schools.

12   Graduated from Laramie High School in 1987, from the

13   University of Wyoming in 1990, and then received a law

14   degree and master of public policy from Harvard in

15   1994.

16             By then, I owed more in student loans than my

17   parents' house in Laramie was worth, and I wanted my

18   parents out from under that obligation as fast as

19   possible, so I took a job on Wall Street.   Although I

20   never practiced law, I am a member of the New York Bar

21   and remain so today.

22             I ended up staying on Wall Street for 22

23   years, from 1994 to 2016, and was most recently head of

24   Morgan Stanley's pension solutions group and corporate

25   strategies group in New York.

1    Here's the chronology.  I cut my teeth in the

2    financial institutions group at Salomon Brothers,

3    working on bank mergers for a few years, and then

4    switched to equity research and joined Credit Suisse in

5    1997.

6    By 1999, I was the lead equity research

7    analyst for the initial public offerings of insurance

8    companies, MetLife and Manulife of Canada.  MetLife at

9    the time was the largest initial public offering ever

10   done in the United States.  And I also worked on a wave

11   of many similar complex insurance company conversions,

12   from mutual ownership by their members to publicly

13   traded ownership by shareholders.  During that time, I

14   was promoted early to managing director, which is the

15   equivalent of partner.

16   In 2002, the then-chief executive officer at

17   Credit Suisse Group, John Mack, asked me to move to

18   Zurich to help restructure Credit Suisse's troubled

19   insurance subsidiary in Europe.  The insurance

20   subsidiary's balance sheet needed to be massively

21   de-risked, its interest rate mismatch closed, and the

22   business ready for sale.

23   After spending nearly a year in Zurich,

24   working as a direct report to both John Mack and the

25   co-chief executive officers at Credit Suisse, Ossi

*Meadors Court Reporting*

1   Grubel, I returned to New York and, between 2003 and

2   2016, started or co-started three new businesses inside

3   the big banks, two at Credit Suisse and one at Morgan

4   Stanley.  These businesses were life insurance premium

5   financed, variable annuity reinsurance, and pension

6   solutions.

7           And here is some important context about my

8   experience with these three startups.  Each of these

9   businesses was established after completing a long and

10  intricate new business approval process inside the

11  bank, obtaining sign-offs from several departments,

12  including the legal compliance regulatory controllers,

13  financial controllers, corporate treasury, internal

14  audit, technology, operations, and reputation risks

15  departments.  I think that's all of them.

16          Each of these businesses also created value

17  where others hadn't seen it yet.  At bottom, they were

18  all very simple ideas, but seeing the opportunity

19  required a detailed understanding of the intercession

20  of applicable legal, regulatory, and accounting rules.

21  That's a theme that we're repeating here at Avanti.

22          Each of those businesses was a startup that

23  operated within the big banks' infrastructure, but was

24  stand-alone profitable after cost allocations.  The

25  revenue model for the latter two was purely fee based,

*Meadors Court Reporting*

1    and the other generated higher returns on the bank's

2    operating capital.

3              Again, in context, during those years, I had

4    primary responsibility for three regulated financial

5    institutions that were wholly owned subsidiaries of the

6    bank, including two from Bermuda reinsurance companies

7    while at Credit Suisse, and a Texas-domiciled life

8    insurance company while at Morgan Stanley.

9              Representative clients of these three startup

10   businesses included MetLife, General Motors, Verizon,

11   Bristol Myers Squibb, Motorola, J.C. Penney, Timken,

12   and other large companies.

13             So to sum up, I have not run a bank

14   previously, but I have run regulated financial

15   institutions.  I've been responsible for filings,

16   regulatory filings, including audited financial

17   statements, and interacted heavily with regulators.

18             And I anticipate the Texas Department of

19   Insurance's triennial regulatory exam process will be

20   similar in breadth and depth to what Avanti will face

21   with our supervisor here at the Wyoming Division of

22   Banking.

23             Next, let me turn to blockchain, Wyoming, and

24   the path to forming Avanti.  In 2012, I came across

25   bitcoin while I was at Morgan Stanley.  Like almost

*Meadors Court Reporting*

1       everyone who comes across bitcoin at first, I did not

2       think it would succeed.

3               By 2013, I took time to really learn about it

4       and started attending bitcoin meet-ups and conferences

5       after work and on weekends and after hours and then

6       started buying it personally.

7               In May 2014, Morgan Stanley was hosting the

8       corporate treasurers of the largest companies in the

9       United States, the Fortune 20 companies or so.  And the

10      treasurer of one large company who was co-hosting

11      selected bitcoin from a list of topics about -- about

12      which she thought her colleagues would be interested in

13      hearing a presentation.

14              So I drafted that presentation about bitcoin

15      with Morgan Stanley's logo on it.  In May of 2014, it

16      went all the way up to the head of compliance for

17      approval, and they approved it for release in this

18      small private setting in May of 2014.

19              The interest level and engagement from those

20      corporate treasurers was very high.  And many of them

21      face real challenges moving money around the world,

22      especially in countries without well-developed banking

23      systems, and some of them correctly thought that

24      bitcoin could become a useful solution for them.

25              Some of them followed it up.  And in a few

*Meadors Court Reporting*

1    cases, we have continued to talk about bitcoin from

2    that meeting in 2014 until today.  This experience is

3    relevant for Avanti, where we are targeting the

4    corporate treasury market as one of our target markets

5    for Avanti's payment solutions.

6              Back to the chronology, though.  By late

7    2014, Morgan Stanley's chief technology officer called

8    me to talk about bitcoin and blockchain, which was by

9    then garnering significant attention in Wall Street's

10   technology circles.

11             Net-net.  In addition to my big job in

12   pensions, I ended up as one of the five people on

13   Morgan Stanley's blockchain working group, along with

14   its CTO, technology officer -- or chief technology

15   officer, as well as its head of operations and two

16   senior executives from trading.  We vetted the myriad

17   startups that were contacting Morgan Stanley, almost on

18   a daily basis by then.

19             I'm grateful to the CTO because he was such a

20   skeptic about this whole technology.  And in fact, that

21   pushed me to dig deeper, and the deeper I dug, the more

22   I realized this is going to be a solution to the very

23   real problems my corporate clients were experiencing

24   with the settlement systems with both mainstream

25   payments and securities.  Those are the very problems

*Meadors Court Reporting*

1    Avanti is trying to solve, and I'll share more about

2    them shortly.

3           By 2016, I was all in on blockchain, leaving

4    Morgan Stanley and joining Symbiont, an enterprise

5    blockchain startup in New York as president and chairma

6    of its Board.

7           That year in 2016, I connected with the

8    innovations team at asset management giant Vanguard,

9    which took an important step with Symbiont toward

10   implementation of blockchain technology in securities

11   markets by completing a pilot project in 2017 that I

12   co-spearheaded.  That pilot went live last year, and

13   Vanguard is now using Symbiont's blockchain technology

14   in production in a mission-critical application.

15          I left Symbiont in 2018 and remain very proud

16   of the team's success.  But as that Vanguard pilot

17   project was proceeding in 2017, something else

18   important was happening.  Bitcoin's price was soaring,

19   and a lot of the mainstream world was beginning to take

20   notice that perhaps there was something special

21   happening here.

22          For example, Fidelity's chief executive

23   officer, Abigail Johnson, that year, announced that

24   Fidelity had already been experiencing with bitcoin for

25   a few years by then.  And those bitcoins I started

*Meadors Court Reporting*

1    buying in 2013 had become pretty valuable.

2            So I called the UW Foundation and started the

3    process of establishing another endowment at UW by

4    donating appreciated bitcoins to fund scholarships for

5    female engineers, in my father's memory.  I'd seen how

6    hard it was at Symbiont to hire -- to find female

7    engineers to hire and noticed that they often commanded

8    premium salaries in the market.

9            But the UW Foundation ran into a problem.  As

10   a Wyoming corporation, none of the digital asset

11   companies could do business with it due to Wyoming's

12   money transmission law, which requires the service

13   providers to hold a dollar-to-dollar reserve in

14   addition to the value of the bitcoins they were

15   transferring, thereby forcing them to do business at a

16   loss, and so they had all pulled out of Wyoming.

17           Therefore, the UW Foundation was not able to

18   find anyone to liquidate the bitcoin I wanted to donate

19   back to dollars.  I could not believe that Wyoming was

20   only one of only three states in the United States that

21   had that problem with similar laws and in which the

22   digital asset companies could not operate.

23           So I volunteered to help fix the problem.  A

24   college buddy introduced me to Representative Tyler

25   Lindholm, who had tried to fix it during the previous

*Meadors Court Reporting*

1   legislative session, and that was the germ of the

2   Wyoming Blockchain Coalition, which was a crowd-sourced

3   all-volunteer effort.

4           Representative Lindholm asked me to spend

5   that legislative session in Cheyenne helping make the

6   case to legislators, which I did, and then he kept

7   pushing me for more and more ideas.  He wanted to help

8   Wyoming's economic development, and he understood the

9   real economic development potential for Wyoming by

10  attracting a niche financial services industry here,

11  just as South Dakota has done with credit cards in the

12  early 1980s, and now there are 16,000 jobs in the

13  credit card industry in South Dakota.

14          I understood all this too.  And I've always

15  called Wyoming home.  I maintained very close ties

16  here, even while I was living in New York for 25 years,

17  including serving two terms on the UW's Foundation

18  board, as well as spending two decades, along with Greg

19  Dyekman, on the Arts and Sciences Board of Visitors at

20  UW.

21      Q    Could you please tell the Board about some

22  formative experiences that revealed the problems that

23  Avanti is now trying to solve.

24      A    Yes.  Thank you.

25          The pension business at Morgan Stanley was

1    predicated on a seemingly simple idea:  Transferring

2    ownership of financial assets and liabilities from one

3    party to another on the same day.  But oh, boy, was

4    that far from simple.

5            Those pension transactions involved the

6    same-day settlement of the transfer of ownership of

7    billions in cash and securities from pension plans to

8    life insurance companies in exchange for an annuity.

9            We had a massive problem to solve.  All of

10   the assets absolutely had to transfer on the same day.

11   If even $1 of the transfer failed, then the entire

12   multi-billion dollar transaction would have been deemed

13   illegal.  It would have violated either the regulations

14   governing the pension plan or the regulations governing

15   the insurance company or both.

16           But here's the problem.  As you know,

17   securities settle three days after the trade date --

18   three days back then, two days now -- and treasury

19   private equity can take weeks or even months in order

20   to settle.  Remember, absolutely everything had to

21   settle on the same day.

22           And even cash, it turns out, might fail to

23   settle on the same day, given all the approval

24   procedures required in order to send a multi-billion

25   Fed wire between two nonbank counter-parties.

1          To figure all this out, I had to dig very

2    deeply into the plumbing of the financial system.  And

3    what I saw caused me to dedicate my career to finding a

4    better way, a better, faster, and less risky way, to

5    settle the transfer of ownership of financial assets.

6          Successfully achieving the same-day transfers

7    requires a small army of people, literally about 200

8    people, required months of dry-run practices for this

9    to orchestrate it all in perfect sequence, required

10   writing a procedures manual with screen shots of

11   exactly which market metric you rely on and precisely

12   what time of the day, with detailed contingency plans

13   if something went wrong.  And in one case, we even had

14   to involve the Federal Reserve Bank of New York to

15   ensure that a multi-billion dollar Fed wire between two

16   nonbanks went through without a glitch.

17          One formative experience during that time

18   pertained to the seeming esoteric but really important

19   and very real question:  What is cash?  Is a bank

20   deposit really the same thing as cash?

21          When my client agreed to make a multi-billion

22   cash payment, what does that really mean?  Was the

23   client supposed to deliver semi trucks filled with $100

24   bills -- we actually asked that question -- or make a

25   commercial bank transfer by Fed wire?  But is a

*Meadors Court Reporting*

1    commercial bank transfer really a cash transfer?

2          Who shoulders the counter-party risk if

3    something goes wrong?  In other words, what would

4    happen if one of the two commercial banks failed after

5    the Fed wire transfers were initiated from the payor

6    but before the wire was received by the payee?

7          We were talking about billions of dollars of

8    cash.  I've actually seen a previous -- I've seen a

9    different client's previous large payment get lost

10   temporarily when it was supposed to go through three

11   central banks in one day and didn't end up in a payee's

12   bank account.  It took days to find the lost payment,

13   and the corporate treasurers and their bankers lost a

14   lot of sleep.

15         But thankfully for these pension

16   transactions, a template for how to do all of this

17   politically was set by that first company who executed

18   it in November of 2012, and that template has been

19   repeatedly used by others since then.

20         In that first transaction, my client's

21   pension fund successfully transferred $29 billion of

22   assets, literally thousands of dollars of different

23   assets, to the insurance company on the same day and

24   with settlement finality.

25         Again, that took two years to figure out how

**Meadors Court Reporting**

1    to do something that should have been very simple,

2    allowing two willing counter-parties to transfer

3    financial assets on the timeline they both needed to

4    use which, for different regulatory reasons in their

5    case, was the same day.

6         These experiences left me wanting to find a

7    better way.  And to connect the dots, all this was

8    happening right as I was worrying about blockchain

9    technology, which helped me go down that rabbit hole.

10   And it was becoming mainstream at that very moment that

11   I was experiencing all those painful problems with the

12   tradition financial system.

13        It turns out that blockchain is indeed a very

14   real solution.  It offers the adult version of the way

15   kids trade baseball cards.  They both hold on to both

16   baseball cards, and they both let go at the same time.

17   The kids had it right.  It's the adults who made it

18   complicated by adding all these delays and not settling

19   at the same time.

20        And it turns out that we have the technology

21   now to enable customers to design their transactions

22   for what they need, to settle them as fast or as slow

23   as they want, and programmed to reflect whatever

24   preconditions they choose to agree to.

25        There's a reason why the digital asset

*Meadors Court Reporting*

1    industry is on the forefront of innovation in this

2    area.  Because necessity is the mother of invention.

3    As Zev will explain shortly, settlement risk is granted

4    when a digital asset is exchanged for a dollar.

5            When a service provider delivers the digital

6    asset to the customer and receives dollars in exchange,

7    usually via the automated clearinghouse or ACH payment,

8    the service provider is taking a huge risk.

9            The customer, as you know, can claw back that

10   ACH payment, but the service provider cannot claw back

11   the digital asset.  Once they deliver the digital

12   asset, it's gone.  It cannot be retrieved.  It has

13   settlement finality, usually in minutes.  But the ACH

14   payment doesn't settle usually for days and may not

15   have settled with finality for 60 days or potentially

16   even longer.

17           This fundamental mismatch in both the

18   settlement timing and the settlement finality create

19   Avanti's business opportunity, which is what our

20   payment solution solves.  As one of Avanti's probable

21   first customers in the digital asset industry told us,

22   We need your product yesterday.

23           But Avanti's ambitions go well beyond

24   servicing only the digital asset industry.  As you'll

25   hear from the recently retired treasurer of Ford Motor

**Meadors Court Reporting**

1    Company, as well as the recently retired head of Ford's

2    treasury IT team later today -- IT, information

3    technology -- this product should be commercializable

4    into mainstream payments as well.  It provides a

5    missing piece in a puzzle of solving payments in the

6    corporate treasury market.

7            I wanted to share all of this background with

8    you because it hopefully gives you some important

9    understanding of the problems that Avanti is trying to

10   solve.  There is a lot of capital tied up in unsettled

11   financial transactions at any given moment which could

12   be freed up and redeployed to better uses if customers

13   could settle transactions simultaneously at exactly

14   just the moment that they choose to schedule.

15           For example, in 2014, at Morgan Stanley, I

16   worked on a project with a mid-sized computer

17   manufacturer of hardware that has a global supply

18   chain, and we quantified that if that company could

19   move cash between its own subsidiaries around the world

20   on the same day -- this is its own money -- that would

21   free up $200 million in cash trapped on its balance

22   sheet to cover those unsettled payments.  And this was

23   just one of our smaller clients.

24           So there is a profitable business to be built

25   by helping customers fix these settlement problems

*Meadors Court Reporting*

1    because the customers have huge efficiency gains from

2    doing that.

3          Avanti's business plan is designed around

4    unlocking those efficiency gains for customers and the

5    users of our platform.  All of our products are

6    designed to solve real problems, and they're all

7    critical pieces of that platform, from online banking,

8    to Avit, to custody for digital assets, and to the

9    prime service around digital assets for creating

10   liquidity around them.  Thank you.

11        Q    Does Avanti have a board of directors?

12        A    Yes.  We have already constituted a

13   five-member Board and have been meeting on a monthly

14   basis since June.  All directors have already received

15   training about the responsibilities of being a bank

16   director and have been following the formalities,

17   despite the fact that, of course, Avanti is not yet a

18   bank.  So that transition is -- will be smoother if

19   Avanti is granted a charter.

20        Q    Could you describe the Board's composition

21   and its committees?

22        A    Yes.  The Board consists of five directors.

23   Two are insiders.  Bryan Bishop, our chief technology

24   officer, and me.  And there are three independent

25   directors.  Dick McGinity, John Pettway, and Philip

1    Treick.

2            Dick could not attend today, but you will

3    hear from John and Philip later and since Dick cannot

4    attend, I'd like to get his background on the record.

5            Most of you know him.  He is President

6    Emeritus of the University of a Wyoming, a long-time

7    venture capitalist at his own firm in Boston.  He has

8    previously served as a director of a bank.  And prior

9    to that, was a professor at Harvard Business School.

10   His specialty is business ethics.

11           Our Board meets monthly, and we communicate

12   via email or conference call approximately once a week.

13           Avanti's entire executive team participates

14   in each board meeting to enhance the flow of

15   information between management and the board.

16           The board is very engaged.  The directors ask

17   many probing questions, and they have also been

18   actively involved in strategic discussions, as Avanti

19   has received multiple incoming strategic inquiries

20   already from both nonbanks and banks.

21           We share that information with directors --

22   with the directors shortly after we get those calls.

23   I'm the chairman of the board, and in that

24   responsibility, I set the agenda as well as host the

25   Board meeting.

*Meadors Court Reporting*

1          However, the independent directors meet

2     always in executive session at every board meeting

3     without Bryan or me present or without the Avanti

4     executives present, as the last agenda item of every

5     board meeting.

6          We designate a corporate secretary and take

7     formal minutes at each meeting and then formally adopt

8     those minutes as part of our regular process.  Chuck

9     Thompson is the appointed secretary of the board, and

10    Britney Reddy and Greg Dyekman here, our outside

11    counsel, are also assistant secretaries of the

12    corporation.

13         Two of the directors I mentioned earlier have

14    prior experience as directors of banks, Dick McGinity

15    and John Pettway, both of whom also have extensive

16    venture capital experience and have served on many

17    corporate boards.  John Pettway is also a certified

18    public accountant, so in addition to his prior bank

19    director experience, he is well-qualified to chair the

20    audit committee of the board.

21         The board has five standing committees, and

22    all five members of the Board are currently members of

23    each committee.  And I'm sure you're familiar with many

24    of these committees:  The executive committee, the

25    audit committee, the digital asset committee, the

*Meadors Court Reporting*

 1   information technology committee, and the Bank Secrecy

 2   Act/Anti-money-laundering committee.

 3          So in summary, we have experienced people

 4   working in and around Avanti's board.  The board is

 5   already functioning largely as if it were the board of

 6   the bank.  And between the prior experience of Britney,

 7   Greg, Dick, and John, I believe the Board is ready to

 8   make a formal transition to being a board of a bank.

 9      Q    Will Avanti be competing with Wyoming banks?

10      A    No.  It's very unlikely we will compete with

11   local banks for three reasons.

12          First, Avanti will be focusing on digital

13   assets.

14          Second, Avanti will be serving primarily

15   large institutional customers for digital assets such

16   as hedge funds, pension funds, endowments, family

17   offices, and the treasurers of large corporations.

18          And third, the consumers that we do plan to

19   serve will be required to have very high minimum

20   balances.

21          These three characteristics have no overlap

22   with most of Wyoming's banks, and where there may be

23   overlap in the customer base, i.e., serving

24   institutions or high net worth individuals, the

25   existing Wyoming banks generally do not serve that

1    customer base for digital assets.

2          We are open to creating a partnership with

3    Wyoming banks, as we expect they will have digital

4    assets needs in the future, and we will likely need to

5    utilize some services from them, as we are not a

6    full-service bank ourselves.

7          Q    As a fee-only bank, how do you intend to make

8    money?

9          A    The key drivers of our business are four:

10   asset growth on our platform; transaction volume on our

11   program; managing our fee schedule; and keeping our

12   expenses low.

13         You have already seen from crafting these

14   applications how profitable fee-only digital asset

15   based business can be.  Although Kraken is in a

16   different business line, margin opportunities in the

17   industry are significant.  And Britney and Jeff will

18   shed more light on this question in their

19   presentations.

20         Q    What are the biggest risks to achieving your

21   financial projections?

22         A    The biggest risk that Avanti faces to

23   achieving our financial projections are two:  First of

24   all, not achieving our asset growth target; and second,

25   margin compression, either from reduction in revenues

*Meadors Court Reporting*

1    or expenses being too high.

2            As you will see from our financial

3    projections, though, our base pay is achievable based

4    on the direct precedence in our marketplace.  And we

5    think it's actually conservative.  And we can walk you

6    through our reasonableness check during executive

7    session if you're interested in that.

8        Q    Has Avanti hired outside counsel?

9        A    Yes.  Although we're not naming vendors

10   today, you have the names of the law firms in the

11   stipulation.  Obviously, you know Greg Dyekman.  He is

12   our local counsel.

13           And we have engaged both a top New York law

14   firm, with significant expertise in banking and

15   regulatory and commercial law, as our product and

16   Federal regulatory counsel, as well as the top boutique

17   law firm in digital assets, also based in New York.

18           Although not listed in the stipulation, we

19   should add that we engaged one of the top law firms in

20   the United States for our patent application for Avit,

21   and this law firm also happens to have significant

22   expertise in digital assets.

23       Q    Did outside counsel review the legal

24   structure of your Avit product?

25       A    Yes.  There is an extensive write-up of the

*Meadors Court Reporting*

1   legal structure of Avit in Avanti's business plan,

2   which you have in front of you.  It was prepared in

3   consultation with our product counsel, which again, is

4   a top New York law firm with significant expertise in

5   banking and commercial law.

6          Again, as this is proprietary and

7   confidential information, we would ask to discuss this

8   in further detail during the executive session, if you

9   would like to pursue that further.

10      Q    Do you intend to comply with all applicable

11   Bank Secrecy Act, anti-money laundering, and related

12   laws, rules, and regulations?

13      A    Yes.  You will hear of that.  Avanti already

14   has three very experienced compliance people on our

15   team.  And I will refer back to our motto, Security and

16   compliance first.

17          MR. DYEKMAN:  Thank you, Ms. Long.

18          I tender the witness for questioning.

19          MR. DEMERS:  Mr. Chairman, it's my

20   understanding that the Division is going to rely on

21   presentation of its case in chief for their

22   cross-examining of the witnesses; is that correct?

23          CHAIRMAN LAWTON:  Yes, sir.

24          MR. DEMERS:  Thank you.

25          I'd just like to take a moment.  There have

1    been numerous references to an executive session.

2            At times, the State Banking Board, in

3    fulfilling its obligations to the public in reviewing

4    this application, may be requiring information that may

5    be protected as either a trade secret or proprietary

6    information, or it could relate to issues of security

7    that in public would cause problems in terms of

8    securing the financial institution.  Additionally, some

9    information may be protected by law.

10           And in the event that it desires to inquire

11   into those type of matters, we may be asking to hold a

12   nonpublic session, or what's commonly referred to as an

13   executive session.

14           And Mr. Chairman, Mr. Dyekman, at the

15   prehearing, he indicated that it would be his

16   preference to address all the executive session or

17   nonpublic type questions at one time as opposed to

18   doing them piecemeal and end up being -- you know, just

19   for efficiency and conducting the proceeding on your

20   behalf.  Your input on that.

21           CHAIRMAN LAWTON:  Yes.  My preference would

22   be doing the presentation all at once.

23           MR. DEMERS:  Very good.  Thank you.

24           And in terms questioning, I would ask to

25   start with the Chairman and proceed to Mr. Rife, and

*Meadors Court Reporting*

1    finish then with a break.  Thank you.

2            Mr. Chairman?

3            EXAMINATION BY THE BOARD

4            CHAIRMAN LAWTON:  I just have -- I appreciate

5    the presentation.  It was a lot of information and

6    helped me understand it.

7            But I'm just curious.  I don't know about the

8    competition you're talking about.  I thought I heard

9    you were working with trusts also?  Did I hear that, or

10   did I misunderstand that?

11           MS. LONG:  No, Mr. Chairman.  However, we are

12   interested and open to the potential to work with trust

13   companies.  And a few trust companies have reached out

14   to us where we would potentially provide digital asset

15   custody services to their customers, for example, as a

16   trust rating.

17           CHAIRMAN LAWTON:  You also talk about audits.

18   And you're mostly fee-based.  And I'm trying to

19   understand how the audit reporting would work.

20           MS. LONG:  Sure.  To be clear, Mr. Chairman,

21   the deposits are US dollar deposits.  They are not

22   digital asset deposits.  I think everyone on this

23   committee is aware of the difference between the trust

24   deposits and the deposits function of a bank.  It would

25   be important to get that on the record.

*Meadors Court Reporting*

1          We will not be obtaining those deposits,

2     because we will not be generating much interest income,

3     if any, from the asset side of our business.  As a

4     result of being a special-purpose charter, we are

5     required to conduct only in high-quality liquid assets,

6     which don't generate such yield.

7          So from a deposit perspective, really, what

8     we're interested in is working with our existing

9     customers who will also be working with digital assets

10    and and/or our payments product.

11         So that is a necessary building block to the

12    business.  It is critical that we be a deposit-taking

13    institution, but it is not a big part of our business.

14    And from a competition perspective, the traditional

15    banks should easily be able to beat us, in that we're

16    not paying interest on deposits.

17         CHAIRMAN LAWTON:  Thank you.

18         MR. RIFE:  Good morning, Ms. Long.  Thank you

19    for the testimony.  It was eloquent and established a

20    good foundation, so appreciate that, along with the

21    comprehensive application.

22         Maybe to dovetail on the Chairman's question

23    just a little bit.  You mentioned in your presentation

24    that the bulk of your work is going to be in your trust

25    powers.  And so would you just walk us through where

*Meadors Court Reporting*

1    that comes from, this 13-12?

2             MS. LONG:   Yes.   13-12 is the statute that

3    provides -- that creates the special purpose depository

4    institution charter.   I don't have a precise statutory

5    reference.   Perhaps when Mr. Thompson testifies in a

6    moment, he can provide that precise statutory

7    reference.

8             But what -- what the statute does is enables

9    the bank charter to take deposits of dollars but to

10   handle digital assets through its trust powers.   This

11   is generally very different from a new type of bank

12   charter that has been granted in Switzerland, where in

13   Switzerland, the bank can actually take deposits of

14   digital assets.

15            Now, in Switzerland -- of course, they're

16   used to dealing with foreign currencies all the time,

17   so essentially, the regulator in Switzerland, FINMA,

18   will look at digital assets as just another type of

19   currency.

20            But to be clear, the statute in Wyoming only

21   allows a special-purpose depository institution to take

22   digital asset through the trust powers not on the bank

23   balance sheets as deposits.

24            As a result, it probably is helpful for you

25   to think of what the balance sheet of the big custom

*Meadors Court Reporting*

1    banks in the security industry look like.  So, say,

2    Bank of New York, for example, has relative small

3    deposit basis on balance sheets, but the trust assets

4    in which they provide custom services, their assets

5    under administration, are many, many, many multiples of

6    the deposits on their balance sheet and I would not be

7    surprised if Avanti looks very similar.

8           MR. RIFE:  Thank you.  Maybe in just broad

9    terms, because you've already talked about it, and I

10   think others will after you as well.

11          You know, historically, banking in Wyoming

12   has been traditional community banks, and we know the

13   lane that banks in Wyoming operate in.  The creation of

14   this fee charter is already pushing the envelope and

15   going in a different direction -- alongside, but

16   different -- and I'm not -- I'm not suggesting that's

17   good or bad.

18          But your application states that you've

19   complied with all of that.  But by that nature of what

20   you're doing, you're also testing and pushing many

21   other boundaries that you described in your testimony

22   today.  And again, I appreciate that testimony.

23          Could you just talk for us -- to us a little

24   bit about the comfort level we should have of this bank

25   operating outside of this traditional path we've seen

**Meadors Court Reporting**

1    so that we can anticipate that you will be successful

2    in your efforts.

3            MS. LONG:  Yes, thank you, Mr. Rife, and

4    members of the committee.

5            It is a very different bank.  I know you know

6    that, because it's not lending and therefore, its

7    profits come from a very different part of the

8    business.  It's a fee-based bank.

9            As a result, the risk is really quite

10   different.  The normal risks of a traditional bank

11   include credit risk and interest rate risk, as all of

12   you know very well.  And because Avanti and the

13   special-purpose depository institutions are not

14   permitted to make loans, they cannot earn yields by

15   taking credit and interest rate risks.

16           And as a result, the operating risk is really

17   the largest risk for the special purpose depository

18   institution.  Britney Reddy will go into this in much

19   greater detail in a moment, but that's probably a good

20   introduction to now different it is.

21           We have different operating risks, for sure.

22   We have some of the same ones that all of you do, the

23   core banking system risk, the compliance risk, the

24   procedures relating to the release of customer cash.

25           But interestingly, the way I think about

*Meadors Court Reporting*

1    the -- the company with digital assets is really not

2    that different from the way a traditional bank would

3    think about vault cash.

4         That is an asset that could walk out the

5    bank, outside the bank, if someone actually does get

6    access to it.  So the physical security around the

7    storage of that is of utmost importance.  And for a few

8    hundred years, banks have -- the banks have built their

9    whole security around vault cash.

10        It's not foolproof, but digital assets are

11   predominantly stored offline, and so the physical

12   security of the storage of those is really not that

13   different than the physical security of the vault cash.

14        The additional operating risk comes in when

15   the digital assets are online.  That's when that -- the

16   operating risk that -- that's the purpose that a

17   depository institution has, is greater than the

18   operating risk of a traditional bank.  And both Britney

19   and Zev will talk about our strategies for mitigating

20   that risk and also for insuring it.

21        MR. RIFE:  Thank you.  One more follow-up, if

22   I may, and related.  That's helpful.

23        On the other side of the equation is your

24   relationship with the regulator.  In this case, the

25   Division of Banking doesn't have either the co-equal

*Meadors Court Reporting*

1    partner, like a Federal Reserve or an FDIC.

2           You talk a little bit about your relationship

3    with the regulators and how you see this going forward,

4    because again, that's -- that's not the traditional

5    path that the Division of Banking has been on.  And so

6    how are you all going to work together to make this

7    successful in the long term?

8           MS. LONG:  Yes, thank you, Mr. Rife.  This is

9    a good question.  I have been working very closely with

10   the Wyoming Division of Banking, since the germ of a

11   special purpose depository institution idea, which I

12   remember talking about with Commissioner Forkner in

13   July of 2018 at a blockchain task force meeting in

14   Jackson Hole.

15          And there's been so much work done to get to

16   this point, including developing the expertise on the

17   Wyoming Banking -- or the Banking Board as well as

18   introducing them to the service providers who can help

19   them not only learn about digital assets but, more

20   importantly, create a supervisory manual and

21   supervisory program to supervise digital asset

22   providers.

23          What is interesting about this is, it was

24   coming.  It absolutely was going to be picked up by a

25   bank regulator somewhere first.  And that's the --

1    that's the opportunity that Wyoming had in being first.

2             As you probably are aware, the national bank

3    regulator in July released the first of a series of

4    interpretive letters allowing national banks,

5    essentially, to copy the Wyoming special purpose

6    depository institution's powers in this area.

7             It's not that easy, though, for a bank

8    regulator to get -- to allow banks to get into new

9    businesses like that because, of course, new rules have

10   to be promulgated, and a supervisory manual has to be

11   prepared.  That all took more than two years, in

12   Wyoming's case.

13            I think from an outsider's view, this looked

14   like it might have come out of left field if you

15   weren't paying attention in Wyoming, as we all were,

16   but -- but in fact, actually, this has been underway

17   for more than two years.

18            And I do also note that for helping to

19   promulgate the rules, that you'll hear a little bit

20   about the rules today.  Those were put together by an

21   advisory group that included a significant number of

22   digital assets industry persons, okay, and outside --

23   outside attorneys and consumer advocates.

24            It was fun to watch the consumer advocates

25   working with the group to try to insert with the

*Meadors Court Reporting*

1    industry which wanted certain things, and the consumer

2    advocate was wanting others, pushing back, to get to a

3    place.  There were some very heated discussions about,

4    What is the obligation of a digital asset service

5    provider when there's something called a fork in a

6    network?

7         A fork in the network is probably easiest

8    thought about as a soft dividend.  You get a new share

9    of stock that is attributable to the ownership of your

10   original share of stock.  That's the easiest way to

11   think about it.  There's value to that.  Whose value is

12   that?

13        And Wyoming in their rule was very clear.

14   That value belongs to the customer.  That value does

15   not belong to the service provider.  And in fact, one

16   of the issues in the digital asset industry is that the

17   service providers have held on to that value because

18   they didn't promise that they would give it to the

19   consumers.  It's a consumer issue.

20        So that's an example of the type of

21   discussion that we had, and it was very robust.  It was

22   a many-months long process just to draft those rules

23   before the rules were adopted.

24        And then, Commissioner Forkner will obviously

25   share the work that's been done on the supervisory

**_Meadors Court Reporting_**

1    manual.  As an applicant who then has the breadth of

2    the timing of that manual, and we've been told we will

3    shortly be receiving the bank's secrecy act and

4    anti-money laundering portions of that, so we can fully

5    make our program consistent with what is expected of us

6    in that process.

7              And I would wrap up that comment by saying,

8    we are at least two years ahead in Wyoming of the

9    national bank regulators.  They've got a lot of press

10   by putting those interpretive letters out.

11             And in fact, actually, we have received

12   inquiries from national banks who want to work with us

13   as a sub-custodian.  They are coming in this industry,

14   and the Wyoming banks, because they are banks, are the

15   preferred partners to work with the megabanks in those

16   industries, because we're ready.

17             Thank you.

18             MR. DIXSON:  Thank you for your testimony,

19   Ms. Long.  I don't have any questions but certainly

20   appreciate you helping to educate and continue to

21   educate all those parties involved.  So very

22   well-assembled and articulate testimony.  Thank you.

23             MS. LONG:  Thank you.

24             MR. JENSON:  Thank you so much, and I love

25   your business plan.  It was informative and, may I say

*Meadors Court Reporting*

1    on my behalf, educational.

2         My question revolves around your prime

3    services strategically after, probably, the first three

4    years.  You specifically on page 6, and then also on

5    page 11, list prime lending consumers of digital assets

6    as trustee.

7         My question is:  Is this a refi or

8    decentralized finance program?  What -- would you

9    expand on lending assets as a trustee or matching

10   assets and how that process will work and what Avanti

11   will receive in the whole program.

12        MS. LONG:  Yes, thank you.  I'm glad you

13   asked that question, because we are a nonlending

14   charter, and you mentioned the word "lending," and

15   that's an obvious case where it needs a clarification.

16        To be clear, Avanti cannot lend, and the

17   lending of customer deposits is absolutely prohibited

18   by statute.  So how does lending even come up in a

19   business plan for a charter like that?

20        It pertains only to the trust fund system.

21   And the best analogy is how the State Citizens Bank of

22   New York of the securities world works.  They have

23   custody of assets, the securities, for their clients,

24   but sometimes their clients direct them to go out and

25   earn income on those securities by lending them.

1          In those cases, they probably lend on a

2     principal basis.  I don't know for sure.  But of

3     course, Avanti would not be able to do that.  We are

4     only able to work as an agent in providing those

5     services to our customers.  And for those of you who

6     are sensitive to the legal structure, that would be as

7     a directed trustee only.

8          So we cannot go out and lend customers assets

9     unless the customer specifically directs us as trustees

10    to do so.  Again, it would not be Avanti's own capital,

11    and -- actually, I think all three of the next

12    executives you'll hear from will be talking about this

13    to clarify.

14         Lending, first of all, is not a product that

15    we intend to introduce right away.  It's something more

16    down the roadmap.  But we do estimate, given what's

17    happened in this industry, that we will have to offer

18    that service.

19         And so just to wrap up, we would be a

20    platform where lenders and borrowers can meet.  The

21    lenders, of course, would be -- would be -- yes, the

22    lenders would be those who post collateral through

23    their trust deposits of digital assets on our -- on our

24    books, and then the borrowers would be those that want

25    to come in and borrow the bitcoin for their own use,

*Meadors Court Reporting*

1   just as a security lending program would work where you

2   have an outside borrower come in, wanting to borrow the

3   customer's security and pay them a yield for that.

4          I should mention, there are traditional banks

5   that are lending against digital assets as collateral

6   as a profitable business.  And one of the inquiries we

7   hear is by a bank that wants to be the lender of record

8   for our platform, to the event that we actually do have

9   customers for lending out there, digital assets on

10  deposit in our trust department.

11         MR. JENSON:  Thank you for that answer, and

12  may I follow up.

13         MS. LONG:  Yes.

14         MR. JENSON:  So basically, Avanti's role is

15  not in credit underwriting in any way.  It's just the

16  vehicle of assets; is that correct?

17         MS. LONG:  That's a great summary, better

18  summary than mine.  Thank you.

19         MR. FRANCE:  Ms. Long, thank you for your

20  testimony.

21         And to some degree, I just -- a comment to,

22  that lending is -- I think traditional banks also

23  facilitate that vehicle, only it's a little bit -- it

24  is a little bit different.

25         And so I do believe there is some -- and I

**Meadors Court Reporting**

1    look forward to further testimony for clarification on

2    that, because to me, that line right there is very --

3    we're toeing that line, and it's very concerning to me

4    that this -- with respect to this SPDI charter that we

5    don't cross that line or don't approach that line based

6    on this, the nature of this.

7          On another note, you talk about your target

8    audience being high net worth individuals, including

9    customers with, you know -- left in a very large amount

10   of deposits.  Traditional banks under the FDIC are

11   subject to the guidelines which certainly apply to

12   lending but are also subject to TSTD and consumer

13   protection laws that -- you know, that really strongly

14   guard against red-lining and those types of practices.

15         Can you talk a bit and help us understand

16   maybe how your institution looks at this, uses it, and

17   maybe even some consideration, either regulatory-wise

18   or reputational-wise, that could come as a result of

19   targeting only high net worth?

20         And I understand your prime target is

21   institutional and is a little different than consumers,

22   but you also have -- you've indicated that you will be

23   also targeting consumers.

24         So if you could just talk to that and help us

25   understand how you and your company views this type of

*Meadors Court Reporting*

1   facts.

2            MS. LONG:  Yes.  Thank you for the question.

3            Yes, we had a big conversation in the

4   beginning with Britney Reddy about whether we even want

5   to serve consumers at all.  Our primary customer base

6   really is institutions.

7            And we elected to go ahead, knowing full well

8   that the regulations that you're alluding to come into

9   play, especially with the FTC, the Consumer Financial

10  Protection Bureau regulations come into play, when --

11  the moment we start servicing an individual customer as

12  opposed to an institutional customer.

13           But what we learned is that a number of the

14  family offices who are actively trading digital assets

15  and who are -- or who are literally just holding

16  digital assets as long-term assets, some of them really

17  actually do prefer to operate as individuals.

18           So by not serving consumers, we wouldn't be

19  able to service those who do act as individuals as

20  opposed to through a trust or through a limited

21  liability company or other business entity structures.

22           So we elected to go forward.  Our way of

23  handling the compliance is to limit the -- the value to

24  very high minimum balances.  We are not tasked to

25  handle a more mass-market consumer.

*Meadors Court Reporting*

1          And our initial plan is to focus on

2     institutions only.  But the moment we open it up for

3     consumers, we understand that the red-lining and those

4     regulations that we have to comply with, we have to

5     comply with them equally and on a nondiscriminatory

6     basis.

7          So the way we're handling it is literally to

8     set the minimum balances at a very high level so that

9     we will have to service all customers who do meet our

10    requirements and are able to meet that minimum high

11    balance requirement.

12         MR. FRANCE:  In follow-up, doesn't that

13    indicate a high minimum balance essentially draws a red

14    line?

15         MS. LONG:  Yes, in a way, it does.  I

16    understand your point that by only servicing high net

17    worth individuals, by definition, we are excluding

18    those that don't have or don't want to put a high

19    minimum balance with our bank.

20         But that's the way we've set up.  We really

21    are not set up to handle consumers, and that is why

22    we're different than Kraken, and we have actually

23    talked to them about, to the extent that we have

24    consumers that do actually want to engage with us, that

25    we will end up probably sending them over to Kraken,

1    because they have the compliance staff and the

2    operational staff, including customer service, for

3    professionals who can serve those customers.

4            You mentioned something about FDIC earlier,

5    and I didn't bring that in, but I think it's

6    appropriate to bring it in now.

7            Because we're dealing with businesses and

8    high net worth individuals, we're -- we're dealing with

9    net balances that are going to be far in excess of the

10   FDIC insurance limit.  Britney's going to talk about

11   this.

12           But the statute in Wyoming enables us to get

13   FDIC insurance on an optional basis.  We're not sure

14   the FDIC would allow us to become an insured bank

15   because digital assets are involved -- the digital

16   assets.

17           But at the end of the day, if it turns out

18   that our customers do want that for some reason, we're

19   not averse to becoming FDIC insured.  And again,

20   Britney will -- will share some of that.  We recognize,

21   at that point, that that would bring even more

22   regulations that we would then have to comply, and so

23   we would have to staff up if we were to do that.

24           But it is not -- to be clear, it's not in our

25   business plan right now, and only if our customers

*Meadors Court Reporting*

1    demand it that that becomes relevant.  I'm used to

2    working with corporate clients who spend a lot of time

3    understanding the counter-party risks at their bank,

4    because the deposits that they have are deposits that

5    far exceed the FDIC insurance limit.

6              MR. FRANCE:  Thank you.  One more question.

7    Somewhat -- a little bit different.

8              I guess in reading the little bit that I read

9    here, you talked about ACH -- you talked about ACH for

10   the future, identifying the problems for faster

11   payments due to the costs.

12             Traditional banks are subject to, as we

13   talked about, through FDIC laws that present them from

14   drawing bad actors.  In the event of fraud or bad

15   actors that do not -- or merchants that don't act in

16   good faith, how does what you're doing protect the

17   customer, the consumer -- does not matter what their

18   deposit base is -- how does it protect the consumer?

19             And I guess what I'm getting at is, if you

20   speed up the process and, as you suggest, remove the

21   ability to claw back the ACH, if you will.  Oftentimes,

22   it's what helps you determine when fraud has taken

23   place.  If you eliminate that mechanism of time, how do

24   you protect the consumer, or how do you propose to

25   protect the consumer?

**Meadors Court Reporting**

1          MS. LONG:  Sure.  I don't think consumers, as

2     we think of consumers will be actively engaging in what

3     we're doing.  We are -- we're working with

4     sophisticated customers who have their own armies of

5     attorneys and internal processes and controls before

6     they're able to release a payment.

7          And it's also worth noting that this isn't --

8     what we're doing is not in lieu of.  It's in addition

9     to the existing payment system.  So the challenge of

10    ACH, especially in the digital asset world, as you

11    agree to, is the fact that those payments can be

12    challenged and clawed back.

13         But in a corporate world, that is -- that is

14    not something that they're used to dealing with.  The

15    corporate -- they are interested in a faster payment

16    process that gives them settlement finality because

17    they know who their counter-party is, and there really

18    isn't going to be fraud in a very large corporate

19    payment.

20         That's all -- both sides, both banks

21    involved, will, of course, have to go through the

22    customer and the whole path of foreign assets and

23    control, analysis of the customer.  They will know the

24    identity of the customers; and therefore, there really

25    isn't the fraud problem that there is in the consumer

 1    world.

 2              And as a result, when a customer wants to

 3    settle the transactions quickly -- which if you think

 4    about it -- and you'll hear from the Ford team today of

 5    some examples of mission-critical payments.  These are

 6    high-value payments that go into a black hole, and very

 7    hard to trace them, until they come out the other side.

 8    If they don't come out the other side, that's where you

 9    see everybody's got problems.

10              That -- those types of payments, given the

11    mission-critical nature of them, are payments that are

12    very -- very appropriate for a fast payment settlement

13    system that has settlement finality, whereas a smaller

14    payment, paying for this bottle of water, it has a

15    consumer involved, probably would not be.

16              So this is not in lieu of ACH.  This is --

17    this is in addition to where customers can elect to

18    have a payment that goes through faster and with

19    settlement finality, because the delays in settlement

20    finality are what create the problems, and the digital

21    asset world is very, very attuned to all of this.

22              For those who are experienced in foreign

23    exchange, you'll recognize this.  It's something called

24    air shot [phonetic] risk.  The foreign exchange market

25    used to work on sort of a gentlemen's agreement that

*Meadors Court Reporting*

1    they were going to settle, you know, for example, for

2    the next day.

3              And that is exactly how the digital asset

4    world works, that trades happen, and then you agree to

5    settle within 24 hours right now.  But think about the

6    settlement risk of settling something that the -- where

7    the underlying settles in minutes and the dollar

8    payment might not come for 24 hours.

9              That's a -- that's a problem.  And so there's

10   absolutely fraud and -- and challenges on the consumer

11   side that the ACH system is designed to solve, but that

12   system doesn't fit very well with what I just

13   described, which is that both counter-parties want to

14   settle quickly and be done with it and not have capital

15   tied up in unsettled transactions.

16             MR. FRANCE:  So you're suggesting that,

17   basically, there's a known partnership prior to a

18   transaction, is essentially what you're saying.

19             I mean, I think that's just the part that I'm

20   struggling with here, mostly because, in our world,

21   generally, we're speaking in nonfraudulent

22   transactions.  There's also that known partnership.

23   However, we see corporate account takeover.  We see ACH

24   fraud.  I mean, most recently, ACH fraud comes from

25   the -- unemployment fraud, through the ACH system.

1            So, you know, I think in the digital world,

2      and maybe you can tell me, but one of the largest risks

3      that we have is fraud.  And so everybody on our side of

4      the bank, on your side of the bank, has great

5      intentions; but in the event that fraud happens to rear

6      its ugly head in our organization, and you have now a

7      fraudulent actor and another partner on the other end

8      making a billion-dollar transaction or multibillion

9      dollar transaction versus a $50 transaction.

10           This is typically -- that's where, you know,

11     I understand that you're telling me that, you know,

12     we've got two people, but we always seem to have two

13     people, you know.  We don't believe that we have red

14     flags nationally that kind of prevent that transaction

15     from happening.  So if you could maybe help me

16     understand, how do you prevent that fraud?

17           MS. LONG:  Yes.  The most important aspect in

18     prevention of fraud is understanding the optics, the

19     identity, of who's actually putting in that

20     instruction.

21           And Bryan is going to spend a lot of time

22     talking about how we authenticate customers and verify

23     that the instructions that they're giving us is

24     actually legitimate and actually did come from them.

25     So that is how we know.

**Meadors Court Reporting**

1          This is a -- this is a problem, you're

2     absolutely right, in payments.  I literally, all of us,

3     lost the wire transfer for selling my house when I

4     moved to Wyoming, because there was a fraudulent actor

5     who was in control of my law firm's email server, and I

6     thought the emails were coming from my lawyer.  They

7     were coming from his email address but not from him,

8     and in fact, I got to know the FBI offices here in

9     Cheyenne pretty well as a result of all that.

10          So I'm very familiar with that experience,

11     having almost lost that wire transfer.  And a big

12     problem was that the authentication of the -- of my law

13     firm wasn't legitimate.

14          And so the levels of security that we're

15     going to be going through are, I think, going to help

16     gain -- give you comfort that the instructions that we

17     will have from customers when instructing us to move a

18     digital asset on their behalf -- and even the US

19     dollars.

20          Our authentication is going to be much more

21     difficult, precisely because of the fact that we are a

22     digital asset bank.  Which is another reason why -- why

23     I think we probably wouldn't deal with that as a

24     competitor, even in a high net worth individual market

25     for US dollars.

*Meadors Court Reporting*

1        We talked earlier about not being able to pay

2   interest.  We're also going to make the customers jump

3   through hoops to authenticate that they are who they

4   really are in order to accept their -- their

5   instructions for moving any type of asset, especially

6   assets involved in US dollars, because it's all going

7   through the same portal with the same authentication.

8        MR. FRANCE:  So last question.  So as you ask

9   them to jump through hoops, that is not

10  counter-productive to the ease of the process -- I

11  mean, it seems somewhat contrasting.

12       MS. LONG:  That's a very good question.

13  There is absolutely a tension between ease of doing

14  business and security.  And we are hopefully going to

15  get that right in the way that we've designed that.

16       And Bryan can go into some detail about that.

17  You may want to take some of that into executive

18  session because it does get us into the IPR

19  professional and security design.

20       But you're absolutely right.  In digital

21  assets, there is no lender of last resort.  So if it --

22  if that bitcoin is lost, it's gone.  And therefore, the

23  level of proof that you have to have customers jump

24  through, by definition, are higher.

25       There is -- there is no ability to borrow on

*Meadors Court Reporting*

1    discount as we know, because they only lend your

2    dollars, and so that lender last-resort function is not

3    there.  It is -- it is, in that regard, a very

4    different market and it's a very different system that

5    is likely to be -- if the code's with the existing

6    ones.

7            The questions you're asking are all very good

8    questions related to the real-time ACH payment.  As you

9    know, there's an initiative in real-time ACH payments.

10   And then, now, we haven't talked about that.

11           Avanti -- and there's a market for a central

12   bank digital currencies, as I'm sure you're aware as

13   well.  China has already got its pilot program pretty

14   far extended out into the Chinese economy for its own

15   central digital currency.

16           And of course, one of the benefits of digital

17   currencies is that the transactions can be traced, so

18   you always can tell where the money went.  You just

19   don't necessarily go get it as a result of that because

20   it goes into what's called a public -- a public wallet,

21   a public fee address.  And -- but mostly by working

22   with law enforcement, that -- that it's pretty devious

23   to figure out where those coins went.

24           One example, and Chuck will be talking about

25   it, is the Twitter hacker.  The Twitter hacker in July

*Meadors Court Reporting*

1    was -- the digital asset industry knew within minutes

2    who that Twitter hacker was because it turned out that

3    the hacker had used a digital asset exchange, and all

4    of the digital asset exchanges happen to comply with

5    FINRA's requirements.  They -- they do the

6    anti-money-laundering, all of that analysis on the

7    customers, and they knew within minutes who that

8    Twitter hacker was.

9              So it's a different -- it's such a different

10   group of problems, and a different level of product.

11   The old products -- literally, if you think about it,

12   think about the vault cash.  A hundred years ago,

13   frauds were different than they are today.  So fraud a

14   hundred years from now, it's going to be very different

15   than they are today as well.  It's a -- it's a

16   different level of fraud.

17             But we can, at least, trace where those

18   assets go, and once you know where those assets went,

19   as -- as the FBI has proven in a couple of the things

20   that they've done.  They actually can dig up the IP

21   address, and once you can figure out the IP -- the

22   Internet protocol.  Once you can figure out the IP

23   address, ultimately, you're very likely to be able to

24   connect it to one person.

25             MR. FRANCE:  Thanks.

*Meadors Court Reporting*

1          CHAIRMAN LAWTON:  I know we had a question --

2     I know we had a question from Bob.  We can see him, but

3     he can't talk, correct?

4          SPEAKER:  Yes.  Correct.

5          CHAIRMAN LAWTON:  Okay.  Short one.

6          Thank you for your excellent, innovative

7     testimony.  I know we will discuss Avit in executive

8     session, but you mentioned on behalf of parties payment

9     transactions in other states that do not have Wyoming's

10    legal infrastructure.

11         Can you elaborate on the problems that have

12    arisen from other banks attempting to complete payments

13    and audited transactions in states without Wyoming's

14    laws which, you referenced addressed a legal statute --

15    or legal digital asset transactions.

16         Have there been problems beyond the ones you

17    referenced about having to settle with multiple parties

18    at once?

19         Also, can you address the shortcomings of

20    stablecoin, which I understand is coming to be

21    produced, a proxy for transactions using the fiat byte,

22    tracking method.  Thank you.

23         MS. LONG:  Yes.  Those are good questions.

24         CHAIRMAN LAWTON:  If you want to look at --

25         MS. LONG:  Oh, no, no, that's fine.  Those

**Meadors Court Reporting**

1    are some good questions in there.

2              One thing to highlight is that Wyoming did

3    jump out ahead of other states on clarifying the

4    commercial loss treatment of digital assets, and that

5    is what Mr. Grady's question is alluding to.

6              So what does it mean that other states

7    haven't done that yet?  It's a huge advantage for

8    Wyoming.  Frankly, it's the most important thing that

9    Wyoming did in the blockchain initiative is really just

10   categorized digital assets and matched them to the

11   existing commercial loss categories.

12             And -- and what I'm alluding to here is, are

13   digital assets securities?  Are they money?  Are they

14   commodities?  Are they something entirely different?

15   These are questions that have not been answered

16   anywhere else in the United States except for Wyoming.

17             Now, most intermediary -- all intermediaries

18   can do something called a Uniform Commercial Code

19   Article 8 and consider a financial asset to be a

20   financial asset under the definition of Article 8.

21             And indeed, that is -- when two

22   intermediaries are transacting with each other, that is

23   very clear that the law applies.  And so, any type of

24   financial asset, including a digital asset, could fall

25   into that category.  The challenge becomes when an

*Meadors Court Reporting*

1    individual who is not an intermediary is involved, and

2    that is where every other state's law is unclear, and

3    that is where Wyoming's laws are clear.

4          Now, you may be thinking that's not that big

5    of a deal, except 75 to 80 percent of digital assets

6    are owned by individuals.  These are bearer

7    instruments, and the individuals own them outright

8    themselves instead of having them deposited in as a

9    intermediary.

10         So there is a legal gray area for

11    institutions operating outside of Wyoming precisely

12    because there's an individual involved in a

13    transaction.  It is not 100 percent clear that the

14    legal status of that transaction is enforceable, and

15    it's not a hundred percent clear what a judge would do

16    in the event of litigation involving a transaction

17    where an individual was involved in digital assets.

18         So, I think where Mr. Grady's question is

19    going is, what does that mean for the digital asset

20    industry?

21         Right now, it is operating in a legal gray

22    area.  This is part of the reason why Wyoming has added

23    so much value, and the biggest request of it that the

24    digital asset industry has is just clarifying things.

25    We can operate in a clear legal regime as long as the

*Meadors Court Reporting*

1    legal regime is properly defined.

2              And Wyoming, to be clear, did not change its

3    Uniform Commercial Code.  It just created an appendix

4    to match digital assets to the existing categories.  So

5    now we know exactly what type of road map in the event

6    of a disputes.  Luckily, there haven't been that many

7    disputes, but to the extent that digital assets values

8    go up, you're going to see more of them.

9              Most people in the digital asset industry,

10   myself included, have just taken our losses and moved

11   on.  But to the extent that more value is involved, to

12   the extent that we see the failure of a company like a

13   Mt. Gox, there will be a lot more litigation in the

14   future.  And it's part of the maturation of the

15   industrial to -- to enable us to get to that point.

16             But the Krakens of the world, the coin bases

17   of the world, they're all taking some legal risks in

18   assuming that there will be individuals -- individual

19   digital assets in a state that does not have Wyoming's

20   laws.

21             Last comment.  I am working with the Uniform

22   Law Commission.  I've been appointed an observer on

23   their program.  You may be aware, they are actually

24   looking at rewriting the Uniform Commercial Code to

25   allow for electronic transactions as a general rule.

1            It's not just digital assets.  It's also all

2    kinds of electronic transactions, including what you

3    have to deal with on a daily basis.  There's a reason

4    why you need a photograph of the check that's being

5    deposited, and it's because the check actually has to

6    be in writing.

7            And those laws are very antiquated.  They've

8    figured out a way to comply with them by allowing a

9    paper copy -- no, a photo of the check to count as if

10   it were in writing, but the -- the commercial laws in

11   the United States are pretty antiquated.  They were --

12   the Uniform Commercial Code was written in the 1950s

13   when everything was in paper form.

14           And as you're aware, anything that's in

15   intangible form, if you're trying to lend against that

16   and perfect a security interest in it, it goes into a

17   catch-all bucket that's not easily served, if there's a

18   lien on that asset.

19           What's unique about digital assets is that

20   the data is itself unique.  It cannot be replicated.

21   And once the data is unique, then it become a

22   collectible, because it can't be replicated just like a

23   piece of fine art.  It's a collectible, and it's

24   scarce, and that scarcity is what gives it value.

25           So now we actually have the technology to be

*Meadors Court Reporting*

1    able to make it clear that data itself can be owned.

2    And when data can be owned, it can be controlled, and

3    when it can be controlled, then you can lend against it

4    and know exactly that you have an enforceable lien

5    against that asset.

6           That's what's been missing in this whole

7    question of electronic instruments in all of the

8    financial services world.  So we have the ability now,

9    thanks to blockchain technology, to make data unique,

10   and that's going to enable a lot of things, including

11   the traditional banking industry over the next decade

12   or so, to finally move to a totally virtual paperless

13   world, including mortgages and checks and all the --

14   all the paper that you're used to dealing with.

15          But my last comment.  The Uniform Law

16   Commission is expecting to release its model act in the

17   summer of 2022 -- 2022.  So Wyoming is literally four

18   years ahead of the rest of the United States, and it's

19   been fun to watch.

20          In the beginning, there were critics because

21   you don't like it when states jump out ahead.  Wyoming

22   has a long history of jumping out ahead, as you know,

23   and so they -- they were initially critical of what

24   Wyoming did.

25          But what's been fun for us from Wyoming to

1   participate in their process is to realize how much

2   they're moving exactly in the direction Wyoming moved.

3   And so I think when you see a uniform law, it won't be

4   difficult for Wyoming to conform what we've already

5   done to the uniform standard.  But what we got in

6   exchange was the jump out ahead, and so it was

7   definitely the right thing to do.

8          Mr. Grady also asked about stablecoins.  I'll

9   give a short answer to that.

10          Stablecoins are -- are not what Avit is, in

11   part because Avit is not using any of these unique

12   Wyoming laws.  The Avit is a -- is -- the Avit relies

13   exclusively on existing laws, so there is no potential

14   conflict of law pertaining to Avit versus other states'

15   laws, because we figured out how to structure it so

16   that it fits right up the middle of the fairway with

17   existing laws.

18          Stablecoins are a perfect example of

19   something that has no legal clarity.  Avit is not a

20   single purpose.  To be clear, it uses the same

21   technology.  It just has a very different legal

22   structure and therefore a different treatment under

23   accounting and so the whole -- I can't get the

24   accounting or legal guys here, but we've been told,

25   very, very different and much more favorable legal and

*Meadors Court Reporting*

1    accounting and tax structure than stablecoins.

2             And my last comment on that.  If you look at

3    the stablecoins USDC, which is the institutional dollar

4    stablecoins, on its website is a very big disclaimer

5    that says that they are not sure that any transaction

6    involving a USDC is legally enforceable anywhere in the

7    world.

8             And so we are trying to solve that problem

9    with our product, because Avit is -- is using existing

10   laws.  Stablecoins fall in between those buckets where

11   you don't really know what they are, legally.

12            CHAIRMAN LAWTON:  Mr. Grady does have a

13   follow-up question.  What about stablecoins?  Is that

14   the term that that -- is that transaction enforceable?

15   Is it just being stopped in its tracks by fiat rights?

16            MS. LONG:  Yes.  I think I just answered that

17   question.  I think so.  And this is part of the reason

18   why traditional institutions can't touch stablecoins.

19   Because they don't know if they're legally enforceable.

20            A good attorney reading -- well, first, I

21   called out USDC for having that disclaimer on its

22   website, but to be honest, I don't mean to call them

23   out, because I think they just had a better attorney

24   who was more careful about learning about the risks.

25   Every single existing stablecoin, including, by the

**Meadors Court Reporting**

1    way, when Facebook issues Libra, is going to fall in

2    that gray area, and no one is really going to know if

3    it's legally enforceable, because the laws don't exist

4    in the United States to create something that is

5    legally enforceable, unless it's issued by a bank using

6    the structure that Avit is proceeding with.

7         MS. SHARP:  Ms. Long, thank you for your

8    testimony.  I don't have any questions at this time.

9         MS. LONG:  Thank you.

10        MR. SORENSEN:  I don't have any questions

11   either.

12        MS. LONG:  Thank you.

13        CHAIRMAN LAWTON:  Can we do a follow-up

14   question?

15        MR. DEMERS:  Yes.

16        MR. JENSON:  I apologize.  I'm the new guy.

17        On the matter of stablecoins, maybe it's not

18   a question, but maybe something more for executive

19   session.

20        But in generating dollars, for example,

21   doesn't the stablecoin issued by Gemini New York Trust

22   put dollars back in Main Street Bank, a Federally

23   insured normal bank?

24        MS. LONG:  Yes.

25        MR. JENSON:  Can you compare Avit to Gemini

1    dollars so I can better understand Avit's advantage, or

2    is that an unfair question?

3          MS. LONG:  No, it's not an unfair question.

4    It doesn't get to the proprietary nature.  So at a high

5    level, I can work through it in the public world, and

6    then we can, of course, follow up if there are

7    additional questions, yes.

8          So Avit is -- Avit has a really important

9    advantage that is critical to figuring out how to make

10   all these things work, which is, that you have to have

11   a software and a payment system under the same legal

12   entity if you're going to have the settlement

13   transact -- settle at the same time as the digital

14   asset.

15         The problem with having the issuer of the

16   stablecoins having the dollars deposited at a different

17   legal entity is that now you have created a sequential

18   settlement.  You can't get it done at the same time.

19         This is one of the big advantages of having a

20   digital asset custody business inside of a bank.  And

21   it is the reason why stablecoins, frankly, should all

22   be issued by banks, if they're really going to go

23   mainstream, because you can't maximize the value of a

24   software if the US dollar leg of the transaction has to

25   settle in sequence in a different legal entity.  You

*Meadors Court Reporting*

1    can't settle them at the same time.

2              One of the issues that the United States has

3    had in this -- in the development of this market is

4    that banks can't custody digital assets due to the

5    Federal restrictions, and digital asset companies can't

6    sell payments at the Federal Reserve because they're

7    not banks.

8              So you're in this circular situation where

9    you're required to have the digital asset and the US

10   dollar in two different legal entities, and as a

11   result, you can't offer what Avanti is offering.

12   That's the secret sauce.

13             Frankly, I think this is also -- it's not

14   just the digital asset point, although I know your

15   question was a stablecoin point.  There's a reason why

16   the Syntech companies, the financial technology

17   companies, like Square, like Vero, like Seko, are

18   getting bank charters, because they realize that you

19   cannot have a software company that maximizes the value

20   of their payment software if it can't also settle US

21   dollar payment that's proposed.

22             And so this is ultimately why I think the

23   financial technology companies that built very

24   significant front-end payment software are not skating

25   towards where the puck is going to be and where it is

1    today, which is, that they need to narrow that software

2    with the ability to settle the payment at the US -- at

3    the Federal reserve.

4                    MR. JENSON:  Thank you.

5                    MR. DEMERS:  Any further questions from the

6    Board?

7                    Mr. Dyekman, in light of the Board's

8    questions, do you have any additional inquiries of this

9    witness?

10                   MR. DYEKMAN:  No, I do not.

11                   MR. DEMERS:  Thank you, ma'am, for your

12   testimony.

13                   Mr. Chairman, I suggest we take a recess at

14   this time?

15                   CHAIRMAN LAWTON:  We'll be in recess.

16                   (Recess from 10:13 a.m. to 10:23 a.m.)

17                   CHAIRMAN LAWTON:  We're back in session.

18                   MR. DEMERS:  Thank you.  And I would note

19   that Mr. Grady has been present via a remote

20   communications method.  And to the extent that there

21   may have been any interference, he will be provided

22   with a complete transcript of the proceedings here

23   today.

24                   Mr. Chairman, I'd just ask you to please note

25   for the record that there's been a quorum present

*Meadors Court Reporting*

1    throughout this morning?

2            CHAIRMAN LAWTON:  For the record, there's

3    been a quorum present.

4            MR. DEMERS:  Thank you.

5            Mr. Dyekman, your next witness?

6            MR. DYEKMAN:  Thank you very much.  I would

7    call Britney Reddy.

8            MR. DEMERS:  Ma'am, would you please raise

9    your right hand.

10                         BRITNEY REDDY,

11   Having been first duly sworn, testified as follows:

12                         EXAMINATION

13   BY MR. DYEKMAN:

14       Q    Please state your name and what your position

15   is at Avanti.

16       A    My name is Britney Reddy, and I'm the chief

17   financial officer and the chief banking officer at

18   Avanti.

19       Q    What are your responsibilities with Avanti?

20       A    My primary responsibilities are financial and

21   bank operations management, including management and

22   implementation of the bank core.  I work closely with

23   Avanti's chief legal officer and chief compliance

24   officer, Chuck Thompson, on compliance and risk

25   management.

1          The chief banking officer title is probably

2     one that you guys are not familiar with, so let me

3     explain a little bit to ensure that questions are

4     directed appropriately.

5          Our chief operating officer, Zev Shimko, has

6     a digital asset background.  My responsibilities will

7     include the oversight of capital liquidity, financial

8     management and reporting, bank operations, oversight of

9     customer on-boarding and customer service in connection

10    with Chuck Thompson, physical -- physical security,

11    implementation and oversight of internal controls,

12    internal audit, and risk management.

13         Compare those with the responsibilities of

14    chief operating officers Zev Shimko, which he will

15    describe in more detail later, but will generally

16    include business development, customer acquisition,

17    product oversight, liquidity partner management,

18    insurance, and capital raising and investor relations.

19    Q    Could you please describe your professional

20    background for the Board.

21    A    Yes.  Thank you.

22         I'm a Wyoming native.  I attended the

23    University of Wyoming for both my undergraduate degree

24    in art and finance as well as a master's in science.

25         During my time at the University, I spent a

**Meadors Court Reporting**

1    considerable amount of time with Professor Sherrill

2    Shaffer, as many of you may know.  Professor Shaffer

3    taught me about regulatory structure and policy issues

4    that the banks and financial institutions face from

5    their operational time as a bank.

6            Professor Shaffer and I published my thesis,

7    "The Effects of the Federal Reserve's Primary Credit

8    Program," in the International Journal of Applied

9    Economics.  It was instrumental in my career.

10           I have worked in the Wyoming bank industry

11   for a majority of my career.  I began my career at

12   Hilltop National Bank, and then I moved to First

13   Interstate Bank, in the operations and mortgage lending

14   division, before I moved to First National Bank of

15   Wyoming as an officer.

16           In this role, I was responsible for reporting

17   the bank's financials, preparing the audit information,

18   supervising operations, and assisting in human

19   resources.  I worked closely with the bank information

20   technology team and learned about the core in banking,

21   in how to manage them and how to set them up directly.

22           I later moved to Cheyenne State Bank, where

23   I've spent the majority of my career thus far.  I

24   managed all aspects of the bank, including regulatory

25   management, shareholder management, corporate

*Meadors Court Reporting*

1    governance, budget, information technology, compliance,

2    PSA, reserves for loan loss, in addition to managing

3    both the loan and operational departments.

4         I have assist -- I have assisted in the

5    development of four core platforms.  I have managed two

6    core conversions independently, both of which included

7    a full network and a full website conversion in

8    addition to the core.  I have --

9    Q    How did -- how did you get involved with

10   Avanti?

11   A    When Wyoming adopted its SPDI legislation,

12   community banks, including the one I was managing, were

13   receiving multiple calls from people in the digital

14   asset industry looking to purchase a Wyoming bank.

15   This was my first early exposure to digital assets and

16   where I began my research on those who had the money to

17   invest in Wyoming banks.

18        Having spent the majority of my career in the

19   traditional bank world, I was ready for a chance to try

20   something else.  I left my position as CO of the bank

21   and began working towards my appraisal license.  I was

22   contacted by a community bank and asked to assist in

23   developing their internal control program and assist

24   with regulatory oversight and financial management.

25        This ultimately led me to my bank consulting

*Meadors Court Reporting*

1   company.  Once I started a bank consulting company, I

2   was contacted by many potential SPDI applicants.  I

3   began speaking with Albert and Amanda of the Wyoming

4   Banking Division so I could learn more about the

5   legislation and why there was a high demand for the

6   charter.

7           I saw an opportunity to be involved and

8   assist with safe and sound compliance for the banking

9   activities.  This was important to me, not only for our

10  banking community but also because of Wyoming's

11  significant investment in banks.

12          I was contacted by multiple potential

13  applicants.  I ultimately decided to contract with

14  Avanti.  After working with their team as a consultant

15  for a short period of time, it became evident to me

16  that their management team had the expertise in the

17  aspects of digital assets, financial management, and a

18  commitment to compliance that I required.  That

19  ultimately led me to join the Avanti team.

20      Q   I interrupted you, I think, before you -- you

21  had something else wanted to say about your

22  background?

23      A   Oh, no, that's okay.  I was just going to

24  mention that I had -- I was a certified technology

25  officer, certified compliance officer, certified

*Meadors Court Reporting*

1    commercial lender, and was working toward certification

2    as an anti-money-laundering specialist.  Thank you.

3        Q     That's important.  Thank you.

4              So let's talk about financial and risk

5    management.  Do you think the bank will be sufficiently

6    well-capitalized in light of its business plan?

7        A     Yes.  Sufficient capital for a special

8    depository institution, as many of you know, is not

9    calculated on a traditional risk-based approach like

10   we're used to.  This is due to the inability for the

11   banks to do loans and also because of the high liquid

12   assets -- high liquidity investment restriction that's

13   placed on the banks.

14             However, as a comfort mechanism, I personally

15   have done risk-based capital calculations on our

16   projected financials, and they would result in us being

17   very well-capitalized for a traditional bank, in the

18   event they were held to the same standards.

19             In addition, similar -- similar to a

20   traditional bank, Avanti will have a capital

21   contingency funding plan.  If capital fell below an

22   acceptable level, which would be the ongoing bank

23   commitment, we would consider several measures,

24   including -- including capital contingent funding,

25   raising additional capital via a digital funding realm,

1    or investigating potential mergers and acquisition

2    opportunities.  The capital contingency plan will be

3    reviewed and, of course, approved by the board of

4    directors annually.

5        Q    What are the biggest risks for Avanti?

6        A    Avanti's motto is "Security and compliance

7    first," and we take that seriously for good reason.

8    Avanti does not have a credit or interest rate risk

9    like traditional banking has.  We have different risks,

10   mainly operational and technological.  Our greatest

11   risks will be operations, technology, and compliance.

12       Q    Could you describe the operational risks,

13   please.

14       A    Operational risks.  Operational risks in

15   banking is a risk of loss from inadequate, failed

16   systems, internal controls, policies, and procedures.

17   Due to the nature of Avanti's business plan, the

18   operational risk is high.  However, it can be

19   mitigated.

20           Our team, which includes our directors and

21   advisers, have extensive experience in internal

22   controls, procedures, and creating reliable systems.

23   Risk assessments have already begun at our institution

24   and will continue as operation is built out.

25           Our employees will be fully trained prior to

*Meadors Court Reporting*

1    beginning work, and we will also require continuous

2    training and monitoring to ensure policies and

3    procedures are being adhered to.  All systems and

4    accounts will be monitored and tested on an internal

5    schedule to ensure that no system is producing error.

6         Q     What are the technology risks?

7         A     Technology risk, as for any bank or

8    technology company, is high and requires constant

9    monitoring, training, and proper controls.  This will

10   ensure that Avanti's systems are protected

11   appropriately from a cyber event.

12             Bryan Bishop, our chief technology officer,

13   will go into more detail on our information technology

14   risk mitigation.  However, our plan encompasses

15   rigorous testing, dual control, audit, and education.

16        Q     Could you please discuss compliance risks.

17        A     Compliance risks.  We'll be operating in a

18   space where regulations and customer -- customer

19   expectations are changing radically.  In some cases,

20   like the travel rule, the application of the legal

21   requirements for the digital asset space are not clear.

22             The digital asset space creates a compliance

23   risk which heightens the already high compliance risks

24   that a traditional bank copes -- that a traditional

25   bank faces.

*Meadors Court Reporting*

1          Chuck Thompson, our chief compliance officer,

2     will have some more detail.  However, our team has the

3     knowledge and experience in both digital asset and

4     traditional banking.  We work -- we work closely

5     together and track evolving legal developments and best

6     practices, and we are well-positioned to manage the

7     compliance risks.

8          Compliance risks will be mitigated through

9     internal controls, clear accountability, separation of

10    duties, training, and audit.

11        Q    Will Avanti be engaging an external auditor?

12        A    Avanti will be engaging an external auditor.

13    The auditor, at a minimum, will provide an annual audit

14    in accounting, finance, compliance, Bank Secrecy Act,

15    or BSA, information technology or IT.

16        Other audits, and the frequency of audits,

17    can be adjusted by the Board's audit committee.

18        Q    So how does Avanti differ from a traditional

19    bank?

20        A    In lots of ways, Avanti differs from a

21    traditional bank.  All of them, you would know as the

22    ones that I've gone through so far.

23        Our employee mix.  Our employee mix is going

24    to be significantly different.  A traditional bank has

25    a significant investment in customer-facing personnel,

*Meadors Court Reporting*

1    however personal bankers run their operations.

2              Avanti intends to be largely remote and --

3    and customer support will primarily be its technology.

4    A majority of Avanti's employees will be technology

5    focused, and they will have platforms that will support

6    their customers.  Our employees will be largely remote

7    and will have limited customer contact.

8              With that said, we will have our headquarters

9    in Cheyenne, and that office will be used for meeting

10   by appointment and will not be open to walk-in

11   customers like a traditional bank.

12             Internal controls will be different.

13   Mitigating risk through internal controls is something

14   that is on the mind of all bankers.  Many of the

15   internal controls and subsequent audits in a

16   traditional community bank revolve around checking to

17   ensure the appropriate dual control procedures are in

18   place and are being followed by the employees.

19             Avanti will have the same mitigation.

20   However, many of the dual controls will involve a

21   technology component, involving the customer and then

22   subsequently check by an employee.  There will be a

23   higher focus on technology in dual control and

24   segregation of duties and roles than a traditional

25   bank.

1        Avanti's customers will now have access to

2    funds connecting in as many ways as are available to

3    customers of a traditional bank.  Avanti intends to

4    allow its customers to transact wire transfers

5    initially and then will move to the automated

6    clearinghouse, or ACH, transactions within the first

7    year.

8        Avanti will have cashier's checks for limited

9    use.  However, it is not intending on allowing

10   customers to have checks, cash, or debit card

11   transactions on any of their accounts.

12       Avanti will not provide FDIC insurance

13   coverage for its customers.  Instead, we will be a

14   fully reserved institution.  I will note that we may

15   consider adding FDIC insurance in the future, as

16   Wyoming statutes does make it optional for

17   special-purpose depository institutions.

18       Due to the fee-based nature of Avanti, we

19   will not be offering interest income on any customer

20   deposits.  Overall, Avanti will not have the credit

21   risk that more traditional banks have, but arguably

22   will have greater operational and business risks, due

23   to the nature of its business and the rapidly changing

24   space that it's in.

25       Q    So how will you manage your balance sheet and

1    liquidity risks?

2         A    For operational risk reasons, we plan to take

3    a conservative approach to our balance sheet.

4    Initially, until customer behavior is known, we intend

5    to keep a majority of our funds at the Federal Reserve

6    of Kansas City.

7              This simple balance sheet reduces the

8    complexity of liquidity management and diminishes the

9    risk of Avanti's Fed master account becoming overdrawn.

10   We will manage liquidity via a GAAP analysis, and we

11   will monitor customer behavior to determine what we are

12   able to invest and what we need to keep on hand at the

13   Fed master account.

14             We will only invest in highly liquid assets

15   which are detailed in the statute.  Also, due to

16   transactional risk with this type of transaction, which

17   was brought up earlier, and we will -- we'll begin

18   operating on automated clearinghouse, or ACH.  We will

19   establish a traditional risk reserve, which will ensure

20   no checking accounts or overdrafts could cause a

21   temporary loan to resolve or have happen.

22        Q    In your view, what are the key drivers of

23   Avanti's financial success?

24        A    As a state-chartered bank that is prohibited

25   by Wyoming law from making loans with customers' fiat

**Meadors Court Reporting**

1    deposits, our business plan and revenue model are

2    primarily fee-based.

3         Our financial success requires that we grow

4    assets under custody and grow assets on deposit, and

5    growth in volume dollars, both digital assets and in US

6    dollars.

7         We need the ability to adapt quickly, because

8    we are in an environment that has a quickly changing

9    market.  We will have to maintain our margins and fee

10   schedules management.  We also need to manage our

11   expenses.

12   Q    Do you think the bank has a reasonable

13   prospect of being sustainable and to be operated in a

14   safe and sound manner?

15   A    Yes.  Our projections show that Avanti can be

16   profitable by year two, and our business model promotes

17   a safe and sound financial institution.

18        As I said, we will have to manage

19   operational, technology, and the compliance risks.  We

20   will mitigate these risks with internal controls,

21   testing, and audits.

22        Risks that will require further -- further

23   mitigation, such as cybersecurity, we will ensure with

24   the appropriate insurance.  Zev Shimko, our chief

25   operating officer, will discuss more detail with you

1    later.

2         We have experienced personnel that will

3    oversee risk management needs in these areas.

4         Q    We did discuss this previously, but the

5    business plan references a lending product.  For the

6    record, how is it possible for a nonlending special

7    purpose depository institution to say that it will

8    engage in any of lending?

9         A    The Wyoming statutes 34-29-104,

10   subsection (k), allows the Wyoming SPDI banks to engage

11   in digital asset lending, but only as the trust

12   customers direct Avanti to lend customers' digital

13   assets on the customers' behalf.  We do not intend for

14   this to be a launch product for Avanti.

15        Q    How do you plan to staff the bank operations

16   department?

17        A    I believe I -- I anticipate needing bank

18   operations professionals in addition to the compliance

19   department.  These individuals will begin working at

20   Avanti prior to opening.

21        I will seek professionals with technology,

22   risk management, or bank operations experience.  These

23   individuals will begin in a variety of bank operational

24   or financial duties and all of -- as all personnel with

25   Avanti, will need a strong understanding of technology.

*Meadors Court Reporting*

1        Q      Do you intend to operate an office in

2    Cheyenne?

3        A      Yes.  We intend to office -- operate an

4    office in Cheyenne.  However, this office will look

5    very different from a traditional bank.  The office is

6    merely a location that will support staff and a

7    potential of holding customer meetings.

8               We intend to have five to fifteen employees

9    at this location.  Three of them, we expect to be an

10   executive of Avanti's, as two are required by Wyoming.

11       Q      Do you plan to store any customer cash

12   on-site?

13       A      No.

14       Q      Do you plan to store any digital assets

15   on-site?

16       A      No.

17       Q      What type of security do you intend to have

18   for the facility?

19       A      We will have security features similar to

20   that of a traditional bank, including alarms and

21   cameras.

22       Q      How do you plan to manage third-party

23   vendors?

24       A      Yes.  Our vendor management policy has been

25   included in the documents.  It sets out how we manage

1   key risks presented by third-party vendors, including

2   strategic, reputational, operational, credit,

3   information technology, and compliance risk.

4           All vendors are classified either as --

5   either as critical, significant, or low-risk, depending

6   on factors such as:  whether they are involved in

7   essential functions of Avanti; whether their failure or

8   nonperformance could cause Avanti significant risk;

9   what impact they have on our customers; and how

10  difficult it would be to replace the vendors.

11          Following the vendor management risk

12  assessment, we will -- we will conduct comprehensive

13  due diligence, which will focus on the vendors'

14  financial condition, market history, relevant

15  experience, knowledge of the applicable laws and

16  regulations, reputation, and the scope of -- and

17  effectiveness of its operations and controls.

18      Q    What's the current status of Avanti's core

19  banking vendor selection process?

20      A    We have been evaluating potential core

21  vendors since March of 2020.  Our team has selected two

22  final candidates, and we are working toward the final

23  solution.

24      Q    Do you intend to apply for FDIC insurance?

25      A    We do not intend to apply for FDIC insurance.

*Meadors Court Reporting*

1    We opt -- we may opt to in the future.

2         Q    Do you intend to apply for Fed membership?

3         A    We have conveyed to the Federal Reserve Bank

4    of Kansas City, we intend to apply for Fed membership

5    in the future.  Our timing for Fed membership will be

6    determined by our discussion with the Federal Reserve.

7              MR. DYEKMAN:  Thank you very much.  Ms. Reddy

8    is available for cross-examination.

9              MR. DEMERS:  Mr. Chairman?

10                  EXAMINATION BY THE BOARD

11             CHAIRMAN LAWTON:  Sorry.  Thank you for the

12   presentation.

13             I guess my question is, why -- how critical

14   it is that the FDIC is not present?

15             MS. REDDY:  We don't -- we don't feel that

16   our customers will benefit from FDIC insurance

17   coverage.  The full reserve, essentially, the customers

18   have the same -- the same coverage with Avanti instead

19   of the FDIC.  So we do not believe that the FDIC

20   insurance coverage will be required.

21             However, the Fed membership.  We elect that

22   as one of the partnerships, the Federal Reserve Bank of

23   Kansas City, although it's not necessarily critical to

24   our operations.  However, we do have another step of

25   general management and compliance and creating a

1    partnership as well.

2          CHAIRMAN LAWTON:  A little different topic.

3    It's a pretty significant job that you have.  So I

4    assume a lot of outsource for different systems which

5    you're putting in place, audit --

6          MS. REDDY:  Yes.  We will be outsourcing

7    audits.

8          CHAIRMAN LAWTON:  Will that continue going

9    forward?

10          MS. REDDY:  Yes.  We will have an external

11    auditor.

12          CHAIRMAN LAWTON:  Okay.  Not just in audit

13    but from other areas, I assume.

14          MS. REDDY:  Correct.

15          CHAIRMAN LAWTON:  Okay.  Thank you.

16          MR. DEMERS:  Mr. Rife?

17          MR. RIFE:  No questions.

18          MR. DIXSON:  Thank you for your testimony.  I

19    have one question.  Maybe just one.

20          Can you talk about just the mechanics of the

21    lending that you were referring to earlier and maybe

22    cite an example?

23          MS. REDDY:  I will be citing an example to

24    our chief operations officer, Zev Shimko.  He's more

25    familiar with -- in the marketplace, where that is

*Meadors Court Reporting*

1    available.

2          But essentially, you know, we will be acting

3    on our customers' behalf.  So if our customer opts to

4    want to lend its digital currency to another

5    individual, we're going to provide them the mechanism

6    to conduct that transaction.  But we are never going to

7    be the lender of record.

8          MR. DIXSON:  Just to follow up.  So that can

9    be a loan to an individual or -- or an institution of

10   that -- of your customers' choice, correct?

11         MS. REDDY:  Correct.

12         MR. DIXSON:  Okay.  Thank you.

13         MR. JENSON:  Thank you, Britney.

14         The first question is:  One risk the business

15   plan noted on page 92 is the business's sensitivity

16   analysis, specifically to the sensitivity of bitcoin

17   volatility.  If there's anything I know about bitcoin,

18   it's been proven over the last two years to be highly

19   volatile.

20         Would you expand on the impacts of bitcoin

21   volatility in both an up market and a down market on

22   financial revenues, or projected financial revenues, of

23   Avanti, please?

24         MS. REDDY:  Yes.  I'll expand on that at a

25   high level, and Zev Shimko is more familiar with the

**Meadors Court Reporting**

1    volatility of bitcoin and how that's going to interact

2    with our customer behavior, and he helps perform that

3    sensitivity of market risk, so we can defer any further

4    questions to him.

5         Obviously, as our customers are -- you know,

6    our deposit platform is going to be directly tied to

7    the bitcoin, and our income will be associated with

8    that.  We have created a bear -- a base of a bear case

9    and a bull case, and in all scenarios, we have the

10   financial capacity to -- to manage that volatility.

11        So further questions for that, though, would

12   be better suited for Zev Shimko.

13        MR. JENSON:  All right.  Thank you.  And one

14   more question.  I'm sorry.  I'm buried in the details.

15        MS. REDDY:  No --

16        MR. JENSON:  But Avanti is not a typical bank

17   with a normal net interest margin, which we are

18   rate-sensitive, obviously.

19        MS. REDDY:  Right.

20        MR. JENSON:  It's more fee-sensitive.  And

21   yet a large part of the business plan revenue is based

22   upon fees, and some assumptions, such as transactions

23   for five in-and-out transactions per account per year.

24        My question is:  Being a new bank, where did

25   those assumptions come from?  Are they reasonable?  And

**Meadors Court Reporting**

1    is there any supporting information to support the

2    transaction volume from which the fees would be

3    derived?

4              MS. REDDY:  Yeah, those -- those assumptions

5    came from other market participants, obviously not

6    banks, but other people that are dealing in the digital

7    asset space.  We also looked at some financial

8    institutions that assist in managing digital assets.

9    So there was extensive market research that was

10   completed.

11             And that was completed by Zev Shimko, so he

12   would also be better.  Any of the digital assets -- so

13   I've focused mostly on the traditional basing and

14   making sure that we meet with the traditional banking

15   requirements; however, ensuring that we meet the market

16   demands for digital assets and the correlation and how

17   that's going to work with the financial side, that's

18   better suited for Zev Shimko.

19             MR. JENSON:  If I may, considering that

20   you're the traditional banker and this business is not

21   going to derive a lot of income, and yet you're

22   responsible for the financial reporting and everything,

23   how are you going make that work where somebody over

24   here is kind of a profit center, and you're running the

25   banking center, and -- I mean, the reporting and that?

1    Please address that a little bit.

2         MS. REDDY:  So the reporting is going to set

3    up to more of a traditional banks.  Zev's not

4    necessarily going to be responsible for the reporting

5    of the financials or the management of the financials

6    or how things stay adhered to GAAP or regulatory

7    management.  However, he is responsible for

8    establishing products and customers and looking at

9    market conditions to see the demand for those, which is

10   based upon our production.

11        MR. FRANCE:  Thank you for your testimony.  I

12   just have one question.

13        You talked a little bit about customers not

14   having access traditionally to their funds in the

15   manner that a traditional bank would typically have.

16        Can you address kind of funds availability,

17   reg CC?  How do you manage that if they don't have

18   necessarily those types of traditional access to those

19   funds?

20        MS. REDDY:  Yes.  That's something that we've

21   talked quite a bit about, reg CC and funds ability,

22   especially when we turn on that consumer light switch.

23        So that's a big cashier's check, right?  So

24   we -- we added the cashier's check to those components

25   so that the customer does not necessarily need to have

1    another financial mechanism to transfer the money to

2    gain access to it.  So that would be where we would

3    utilize the funds availability.

4              CHAIRMAN LAWTON:  Britt.

5              MS. SHARP:  So I'm trying to wrap my head

6    around a little bit.  You talk a lot about the fee

7    structure, but then you also talk about the customer

8    base.

9              If competition enters into the market, how do

10   you differentiate yourself, because that fee structure

11   or that expense management is such a vital piece to the

12   operations of the business?  If competition comes in,

13   what happens?

14             MS. REDDY:  Well, that's an issue with every

15   bank, right?  So competition always comes in, and we

16   will adhere to trying to ensure that we have the

17   appropriate legal structure, the appropriate security

18   in place, and then the appropriate customer service so

19   that our customers would -- they would respond to.

20             MR. SORENSEN:  No questions.

21             MR. DEMERS:  Any further questions from the

22   Board?

23             Mr. Dyekman, any more questions for this

24   witness?

25             MR. DYEKMAN:  Nothing further.

*Meadors Court Reporting*

1          MR. DEMERS:  Could you please call your next

2    witness.

3          Thank you, ma'am.

4          MS. REDDY:  Thank you.

5          MR. DYEKMAN:  I'll ask Charles Thompson to

6    switch seats.

7                    CHARLES THOMPSON,

8    having been first duly sworn, testified as follows:

9                       EXAMINATION

10   BY MR. DYEKMAN:

11       Q    Please state your name and your position with

12   Avanti.

13       A    Hi.  My name is Charles Thompson.  So most

14   people call me Chuck, at least to my face.  I am the

15   chief compliance officer and the chief legal officer of

16   Avanti.  I also serve as secretary to the board of

17   directors.

18          My responsibilities include legal and

19   financial risk identification, analysis, and

20   mitigation, the creation and maintenance of robust

21   compliance policies and procedures, the management of

22   legal matters, and ensuring that Avanti's strict

23   adherence to applicable laws and regulations, and

24   overseeing statutory filings, such as licensing forms,

25   et cetera.  As Britney previously noted, we work

*Meadors Court Reporting*

1    closely together on compliance and risk management

2    matters.

3        Q    Could you please describe your professional

4    background.

5        A    Sure.  I have a relatively broad-ranging

6    background in law, technology, and finance.  I spent

7    about two decades of my career at law firms.  I was a

8    transactional lawyer at one of the world's preeminent

9    law firms during much of that time.

10        I practiced in a couple of areas, including

11    corporate finance and structured finance, practice

12    areas that require a fundamental understanding of a

13    wide variety of legal specialties, including banking,

14    tax, pension regulations called employment retirement

15    income securities act, or ERISA, security laws, and

16    other regimes.

17        I am a member of the bars in Illinois and New

18    York, I have been admitted before the US Supreme Court.

19    I'm also in the process of obtaining admission to the

20    Wyoming bar.

21        I believe that this broad background is a

22    helpful foundation for a role as a chief legal officer

23    of a regulated institution.

24        I've also held positions at several large

25    financial institutions, both in in-house legal roles as

*Meadors Court Reporting*

1    an associate general counsel at each of Morgan Stanley

2    and Assured Guaranty corporation and business role,

3    particularly in new product development at Bank of

4    America.

5         And that role in particular is interesting,

6    in that basically what we did was take existing

7    products, as new rules and regulations were rolled out,

8    to modify them in order to make them compliant with

9    those new laws and regulations.  So, you know, just a

10   lot of work going on here in this area in Wyoming.

11        In all of these roles, I have worked

12   extensively for highly regulated financial

13   institutions.  I've dealt with a large number of

14   Federal and state regulators, and a common denominator

15   in all of them has been focusing on identifying and

16   mitigating risks.

17        I spent much of my career in areas where

18   regulations were evolving, for example, in Oxley,

19   Dodd-Frank, Volcker, et cetera, in helping some of the

20   world's leading financial institutions develop

21   compliance business strategies for these evolving

22   regulatory regimes.

23        On the technical side, I've always been a bit

24   of a geek.  I'll share an anecdote here, which I think

25   is applicable for the year 2020.

1       At the law firm that I spent most of my

2  career at, I spent a lot of time doing work in the

3  Investment Company Act area.  So I would provide

4  presentations and training for large numbers of people.

5       During one of these live presentations, going

6  through slides, and my mentor, unbeknownst to me, had

7  included an extra slide.  So I put the slide, and

8  there's a picture of a geek.

9       And I sort of stopped, because I had no idea

10  what was going on, and he jumped in and he said, You

11  know, nobody knows it, but the original definition of a

12  geek is a circus guy who would bite the heads off of

13  bats.

14       The point being, in that circumstance, that,

15  you know, we wanted people to come to us early on with

16  problems they identified or transactions that they were

17  working on so that we could, you know, help them solve

18  their problems, or we would bite their head off.

19       Fortunately, I'm not that kind of a geek to

20  bite the heads off of bats, but I did start following

21  bitcoin in 2011, and I generally became interested in

22  digital assets in the following years.

23       In 2016, I decided to leave private practice

24  to establish a consulting firm focused on the

25  intersection of enterprise blockchain, financial

1   services, and regulation.

2          In that capacity, I worked with a number of

3   different entities, ranging from startups to at least

4   one Fortune 100 company. I helped these clients

5   establish policies and procedures to address regulatory

6   requirements, including BSA programs and other policies

7   and procedures applicable to regulated financial

8   institutions.

9          My interest in this emerging technology

10  eventually led to my serving as the chief compliance

11  officer of LedgerX, a bitcoin futures options and swaps

12  exchange, technically a swaps execution facility and a

13  derivatives clearing organization, headquartered in New

14  York City and regulated by the US Commodities Futures

15  Trading Commission, or the CFTC.

16          In my role as chief compliance officer at

17  LedgerX, I developed legal and regulatory compliance

18  programs for the first platform approved in the United

19  States for trading and clearing swaps and options on

20  cryptocurrencies, including the development of a

21  comprehensive BSA and AML compliance programs.

22          Both the development and the implementation

23  of that program and the underlying BSA/AML requirements

24  was done in a novel context, similar to the SPDI

25  context here in Wyoming.

1          At LedgerX, I also worked closely with the

2     engineering team to develop and implement a proprietary

3     real-time surveillance system for the trading engine

4     that LedgerX had developed.  And this is similar to the

5     working relationship that we had here at Avanti, where

6     Britney, I, and others worked very closely with the

7     engineering team to ensure that what is being built

8     from a technical perspective fits within the regulatory

9     framework within which we operate.

10          And of course, I worked, you know, very

11    closely on a daily basis with our primary regulator at

12    the CFTC.

13     Q    When and why did you join Avanti?

14     A    I joined Avanti earlier this year.  There are

15    many reasons that I joined.

16          I believe strongly that the current system of

17    banking can be improved significantly due through

18    compliant integration of digital assets.  There are a

19    number of great companies focusing on digital assets --

20    maybe some bad ones too -- but there are at least an

21    equal number that have been developed from the ground

22    up by technical individuals with incredible

23    technological skills, but with little or no

24    understanding of the enormous amount of legal and

25    compliance requirements necessary to protect the system

*Meadors Court Reporting*

1    that they have and are creating.

2              Regulators around the world have, in my

3    opinion, have been rightfully circumspect in their

4    adoption of this new technology.  Wyoming has spent an

5    enormous amount of time to develop legal and regulatory

6    infrastructure necessary to enable the first truly

7    regulated digital asset platforms, and Avanti has the

8    right group of talented people at all levels to make

9    Wyoming proud.

10             I think that in the long term, what is

11   happening here in Wyoming will ultimately create

12   opportunities where they don't exist today and in ways

13   that we cannot yet even fathom.  And being in

14   partnership of that watershed moment is very compelling

15   to me.

16             You know, finally, I've known -- as Caitlin

17   mentioned earlier, I've known her for several years.

18   I've also known Bryan for several years.  I happened to

19   be in New York at the end of last year, and through a

20   mutual connection, you know, he suggested, Reach out to

21   Caitlin.  She's doing something.  So I did.

22             That resulted in me flying out here to

23   Cheyenne and meeting with Caitlin.  At that point, I

24   also met Britney, and you know, everything just fell

25   into place really quickly for me once I had, you know,

*Meadors Court Reporting*

1   a full understanding of what she was trying to do.  And

2   then -- and you know, knowing Bryan and Britney, and I

3   just knew that the team that Avanti was building would

4   be destined for success.

5        I'm a firm believer that management is the

6   best predictor of success as a startup, and I think

7   having these pieces in place made my decision to join

8   Avanti very simple.

9        Q    Could you provide an overview of what's

10  planned for Avanti's compliance function.

11       A    Yes.  As the chief compliance officer, I

12  will, of course, be ultimately responsible for all

13  compliance-related aspects of the business.

14       However, in achieving this goal, I will work

15  closely with and draw on the extensive operational risk

16  management experience of our chief banking officer,

17  Ms. Reddy, as well as our BSA officer.

18       Our BSA officer is Erin Young, who will be

19  based in Cheyenne.  While she is scheduled to testify

20  later today, in the interests of time, we may not call

21  her.  So I will provide you with some of her background

22  here.

23       Erin has over six years of BSA/AML

24  traditional experience in traditional banking.  She is

25  a certified community bank compliance officer and a

1    certified bank internal auditor, via the independent

2    community bankers association, and a certified risk

3    management specialist via the American Bankers

4    Association.  She is also close to obtaining her

5    anti-money laundering specialist certification through

6    ACAM, the association of anti-money laundering

7    specialists.

8         She's most recently served in the BSA/AML

9    position at a community bank in Cheyenne.  She has

10    extensive experience with traditional BSA policies,

11    procedures, and software.

12         Ultimately, I think, the compliance apparatus

13    at Avanti will be driven by the volume of transactions

14    and the number of customers, and we will add additional

15    people as and when necessary.

16    Q    Could you provide a general overview of

17    Avanti's compliance programs and policies?

18    A    At Avanti, we have developed a suite of

19    compliance policies and programs meant to ensure our

20    stated focus on security and compliance first.  These

21    are meant to meet the strictest standards that our

22    institutional investors are familiar with and expect in

23    their dealings with banks.

24         This means that our compliance programs will

25    support compliance with all applicable Federal and

*Meadors Court Reporting*

1    State regulations, and we will voluntarily incorporate

2    certain financial regulatory frameworks as industry

3    best practices pertaining to customer disclosures,

4    regulatory reporting, and information and security

5    standards, to name a few.

6          Additional systems specific to the needs of

7    the digital asset industry will include blockchain

8    analysis and monitoring tools.  I know that you guys

9    all received electronic copies of what's in the binder

10   in front of you, but I want to just highlight some of

11   the programs and policies we maintain.

12         First, the AML program, which is focused on

13   making sure we have sufficient information about our

14   customers and their activity on our platform.

15         Second, the privacy policy and information

16   security policy, each of which is designed to ensure

17   that Avanti protects customer data, that Avanti has

18   procedures to prevent or minimize any potential data

19   breaches, and that Avanti provides customers with

20   choices about collection of non-AML-related

21   information.

22         Third, the risk management policies, which

23   includes guidelines approved by our board of directors,

24   designed to help the bank identify, mitigate, and

25   manage various risks, including insurance coverage.

1      Fourth, the vendor management policy, which

2 covers due diligence and ongoing monitoring of our

3 vendors.

4      Fifth, internal controls policy, which is

5 meant to ensure our controls are effective and

6 comprehensive, independently reviewed, and updated,

7 based on risks that we face.

8      Sixth, the conflicts of interests and code of

9 ethics policy and an insiders activity policy, designed

10 to prevent both the existence and appearance of the

11 existence of any breach of fiduciary responsibility or

12 customer trust or any conflict of interest.

13      And lastly, the unfair, deceptive, or abusive

14 acts or practices policy, commonly known as UDAP, which

15 is meant to ensure that all of customer financial

16 products or services are fair and reasonable.

17      Q    Could you provide an overview of the key

18 components of the anti-money-laundering compliance

19 program that Avanti will maintain.

20      A    Yes.  Our anti-money-laundering program will

21 likely be familiar to many of you from your own banking

22 experience.  But of course, we will be incorporating a

23 component for digital assets as well.

24      The program elements include the

25 anti-money-laundering policy, which has been provided

*Meadors Court Reporting*

1    to the Board for this hearing; procedures and controls

2    to implement the anti-money-laundering policy,

3    including a customer identification program and a

4    know-your-customer process; transaction monitoring;

5    suspicious activity report filing; and sanctions

6    screenings.

7            The program includes a designated BSA

8    officer, Erin Young, who I just introduced.  We will

9    have foundational and ongoing training for the BSA

10   rules and regulations.  We'll have independent audit

11   and testing.  And we will have board reporting on the

12   AML program, including to a BSA/AML Board committee.

13       Q    Could you give a little more substance to the

14   description of the customer identification program and

15   know-your-customer process, please.

16       A    Yes.  So prior to being allowed to access my

17   portion of the Avanti ecosystem, a potential customer

18   will be required to satisfy our compliance screening.

19            Customers will be required to provide basic

20   customer identification program identifying

21   information.  We will screen against the Office of

22   Foreign Assets Controls, or the US Department of the

23   Treasury, or OFAC, and other government lists, and

24   we'll use traditional screening and risk management

25   software vendor to help us achieve this.

1        We will assign a risk rating to each

2   potential customer, and depending on that rating, the

3   customer will either be able to open the account

4   online, or that account will be flagged for further due

5   diligence.

6        If we cannot establish the required

7   information, or if a potential customer is flagged by

8   our sanctions screening, we will not open an account

9   for that customer.  Only parties who are Avanti

10  customers may redeem or be issued Avit or otherwise our

11  fiat on- and off-ramp services.

12       Q   You mentioned the Office of Foreign Asset

13  Control.  Could you describe how you'll comply with US

14  sanctions requirements.

15       A   OFAC screening will be done at account

16  opening, when completing a wire or ACH transfer, and

17  anytime a customer redeems an Avit.  A scan of Avanti's

18  entire customer database will also be done anytime an

19  OFAC list is updated.

20       Any attempted transaction that we identify

21  with someone on an OFAC list or residing in an

22  OFAC-prohibited area or as -- or a transaction that

23  involves a blockchain address that has been highlighted

24  by OFAC will be blocked.

25       Q   Will you file suspicious activity reports?

1        A     Yes.  The BSA officer will file suspicious

2   activity reports when any number of predefined

3   thresholds are crossed.

4        Q     What about cursory transaction report filing?

5        A     Well, as Avanti -- our business plan, at this

6   point, we don't intend to be handling any cash

7   transactions.  So we will be exempt from that

8   requirement.  But if, in the future, Avanti decides to

9   transact in cash, then of course, Avanti will fill all

10  requirements of completing and submitting currency

11  transaction reports.

12       Q     Could you describe any third-party services

13  Avanti will utilize for AML or OFAC compliance?

14       A     Sure.  We intend to engage various

15  third-party vendors to assist in BSA, AML, and fraud

16  monitoring.  One of those vendors will assist us on the

17  traditional core banking side, and one or more of those

18  vendors will assist us in the digital asset custody

19  side.

20             Caitlin earlier, in her testimony, mentioned

21  the Twitter hack, so I won't cover that in detail

22  again.  But I do want to just highlight how impressive

23  the digital asset analytics are, for those of you who

24  haven't the opportunity to -- to see them or, you know,

25  utilize them in action.

*Meadors Court Reporting*

1          They -- the amount of data and the rapidity

2     with which they obtain the data and the ability to, you

3     know, follow assets both backwards in time and, you

4     know, as something happens after, at least, our -- you

5     know, Avanti's platform is truly impressive, and I

6     think it's -- it's something that is not necessarily,

7     you know, capable of being done in the cash world,

8     right, because cash leaves, it's gone.  You can't --

9     you don't have any way of tracing, like we do a digital

10    asset.

11         I would also mention that the travel rule

12    that FinCEN is implementing in -- which is required for

13    compliance in June of 2021, will require that we

14    provide certain data to various counter-parties with

15    whom we transact, and we'll also be receiving that --

16    that data from other counter-parties that are on the

17    inbound side.

18         So the amount of data that we will be getting

19    on the digital asset analytics side is very impressive.

20    And I would say that, you know, we're -- we're in talks

21    with very well-respected computers in those spaces.

22    I'm happy to go further into detail on all of that in

23    executive session, if you would like.

24    Q     What is your top anti-money-laundering and

25    OFAC risks, and how will you mitigate those risks?

*Meadors Court Reporting*

1    A    Our business model insulates us from many of

2    the risks that are sometimes associated with digital

3    assets.  Avanti is not an exchange and will not operate

4    a trading desk.  We are a fee-based service provider

5    for digital assets, not a trading counter-party that

6    runs a proprietary trading business.

7          While many digital assets have underlying

8    systems based on anonymity and psuedonymity, every

9    customer that we interact with will go through our

10   rigorous onboarding process.  We will know who they

11   are.

12         Also, our target customers are institutional

13   which carry lower AML risks, and many of them have

14   their own rigorous and regulated AML programs in place.

15         There are certainly challenges based across

16   the industry in identifying digital asset

17   counter-parties of customers when those counter-parties

18   are, you know, quote, off platform.  In other words,

19   when they -- when they've left your -- your wall

20   garden, particularly in those cases of counter-parties

21   operating through unhosted wallets, meaning that

22   they're -- they're not operating through a regulated or

23   institutional service provider.

24         As I was previously mentioning, we will

25   employ state of the art tools from digital asset

*Meadors Court Reporting*

1    analytics providers that have been developed by market

2    participants aimed at identifying and preventing

3    transactions with prohibited parties and any other

4    transactions -- I'm sorry, any other illicit

5    activities.

6         And we intend to work closely with our

7    regulator as we build out our risk-based rule sets for

8    identifying transactions that require further scrutiny.

9         In addition, we have already begun developing

10   relationships with local law enforcement in Cheyenne,

11   including the local FBI field office, and we stand

12   ready to assist law enforcement as and when required.

13        I can assure you that under my watch, Avanti

14   will have in place, both in name and in function, a

15   robust BSA program.  Our goal is to strictly comply

16   with each and every Federal and State rule and

17   regulation applicable to us.

18        MR. DYEKMAN:  I have no further questions for

19   Mr. Thompson.

20        MR. DEMERS:  Mr. Chairman?

21              EXAMINATION BY THE BOARD

22        CHAIRMAN LAWTON:  Thank you.

23        Just a quick question, and it's probably in

24   here or you covered it.  Non-US institutions or

25   consumers?

*Meadors Court Reporting*

1            MR. THOMPSON:  At launch, we intend to be

2    US-only.  So if there were a foreign institution that

3    wanted to, you know, have a account at Avanti, we would

4    require that they set up a US-based entity that we

5    could then do screening.

6            CHAIRMAN LAWTON:  Okay.  Thank you.

7            MR. RIFE:  Thank you, Mr. Thompson.

8            Could you elaborate a little bit on my

9    question earlier about the trust powers and where they

10   derive from for this particular type of institution?

11           MR. THOMPSON:  Sure.  The -- so I think I

12   understand your question.  Do you mean the -- so 13-12

13   is an enabling regulation that -- pursuant to which

14   Chapters 19 and 20 of the audit board's rules were

15   promulgated.

16           Chapter 5, I believe, or paragraph 5 of

17   Chapter 19, has in the -- the provisions that we are

18   intending to utilize as our, quote, trust powers.

19           And I think, you know, the word "trust" might

20   be a little bit of a misnomer here.  The term in

21   Chapter 19 is bailment, which is, you know, one of

22   those words that nobody understands, right, has a very

23   technical legal meaning.

24           But what it does do is to allow us to -- you

25   know, because you can think of it as co-check write.

*Meadors Court Reporting*

1    We'll take possession of a digital asset but not

2    ownership of that digital asset.  So we're effectively

3    acting as a trust -- I'm sorry, as a trustee, by

4    holding that asset in bailment.

5            So I believe that that's what, you know, what

6    we're referring to when we're referring to our trust

7    powers.

8            MR. RIFE:  Thank you.

9            MR. DIXSON:   I have no questions for

10   Mr. Thompson.  Thank you for your testimony.

11           MR. THOMPSON:  Thank you.

12           MR. JENSON:  Mr. Thompson, thank you.  I've

13   got to congratulate you guys.  I noticed on

14   September 15th, FinCEN issued a new final rule that

15   reaches out and touches the state -- not Federally

16   insured -- institutions.  So you have definitely

17   brought the interest at the national level.  I

18   congratulate you.

19           With that said, and this is probably due to

20   my lack of intelligence or understanding, I understand

21   your on-boarding of a customer and BSA requirements,

22   and that's easy.

23           My questioning in the bitcoin world or the

24   Avit world is, what about the customers or the -- your

25   customer's payee?  In other words, Joe is going to pay

1      Y.

2              I don't understand the AML issue about Y,

3      because Y could be anywhere around the world.  The

4      customer -- customer doesn't slow the process down,

5      that if you have to take a day or -- to verify Y, or it

6      being Y, an individual.  Can you explain to me the

7      payee verification under BSA.

8              MR. THOMPSON:  Sure.  At a high level, the

9      analytics software that I was alluding to earlier

10     essentially does that for us.  It's -- it takes a

11     risk-based approach, right, based on the number of --

12     of rules that we put into it.  And again, we'll be

13     working with regulators to develop those rules and

14     determine, you know, what is and what's not acceptable.

15             But, you know, you can think of it from a

16     risk-based approach, again, from zero to 10 -- I'm just

17     making this up, but, you know, you might say that if --

18     if Y is in a known tariff state, then the risk there is

19     a 10, and so, you know, that session can't proceed.

20             But there's a whole bunch of, you know,

21     different scenarios that fall between that, you know,

22     very clear example and one that might be a little bit

23     in more of a gray area.  For example, somebody that's

24     in the -- a withdrawal to a personal wallet, right,

25     that has no data on watching, because it's never been

1    utilized before.

2           So again, I think we're -- we've intending to

3    utilize these digital asset analytics programs along

4    with those rules -- risk-based rule sets to kind of

5    determine whether or not we think that any given

6    transaction on the outgoing side of things is -- is

7    okay, you know, at minute zero or if it requires

8    further scrutiny based on, you know, the -- like we

9    said, the -- the set of rules, or if it's just an

10   automatic no.

11          And you know, a lot of that will be derived

12   also from our -- knowing our customer and knowing what

13   their, you know, history has been, just like your

14   credit card, right?  When you go in and use your credit

15   card, your credit company develops a database of

16   patterns of your credit card use.  And if there's

17   something that's outside of that, that norm, they might

18   put a fraud flag on your credit card and not allow that

19   transaction to go through.

20          So you know, all of these things are going to

21   be part of how we answer that -- that problem.

22          MR. JENSON:  Thank you.  And then just a

23   question.

24          On your risk matrix assessment on page 22 of

25   the business plan, I guess I was somewhat surprised to

*Meadors Court Reporting*

1    see you rate OFAC/BSA as a moderate risk.

2              In light of the recent Bitmex charges for

3    civil and criminal activity against the executives, do

4    you believe that the BSA risk is still moderate?  Or do

5    you stand by that?

6         MR. THOMPSON:  Well, let me just look at this

7    page quick so I make sure I know exactly what you're

8    talking about.  You said page 22?

9         MR JENSON:  Page 22.  It's under Regulatory

10   Compliance, about in the middle of the table.

11        MR. THOMPSON:  Yes.  So I think the -- this

12   table is really derived from the fiat side of things,

13   to be honest.  And as we're building out the rule sets

14   on our digital analytics system, the BSA and OFAC is

15   definitely going to be not moderate risk factors.

16   They're going to be, you know, closer to the 10 than

17   the 5.

18             And you know, with respect to Bitmex, you

19   know, I have no personal knowledge of what happened

20   there, so I can't really comment on that.  But I will

21   say that the -- the analytics provided that we are

22   likely utilizing did have them as a moderate risk

23   counter-party.

24             And within, you know, hours of the

25   allegations coming out, they were moved to a high-risk

*Meadors Court Reporting*

1    counter-party.  And what that means to us is, again, as

2    you look at the whole mix of rules that are going into

3    determining whether any transaction can proceed without

4    enhanced due diligence, you know, that -- that high

5    risk is going to probably kick in a higher due

6    diligence, enhanced due diligence, and meaning that the

7    transaction doesn't automatically proceed.

8             MR. FRANCE:  I want to make sure I didn't get

9    lost there.

10            So with respect to OFAC and blockchain,

11   because there is a level of anonymity in the

12   blockchain, if I understand correctly, how do you

13   validate OFAC through blockchain?

14            MR. THOMPSON:  Well, I think Bryan will be

15   able to speak quite -- quite well to this question.

16            But it's not so much that you validate

17   through -- through analytics.  It's that OFAC sometimes

18   puts in their risk blockchain addresses that have been

19   identified as associated with people on the OFAC list.

20            So if you then have transactions that are --

21   you know, have touched that address or otherwise, you

22   know, interacted with it, then that would raise your --

23   your, you know, overall risk level for the transaction.

24            MR. FRANCE:  Okay.  I don't have any other

25   questions at this time.

*Meadors Court Reporting*

1           MS. SHARP:  I have no questions.

2           MR. SORENSEN:  No questions.

3           MR. DEMERS:  Any further questions from the

4      Board?

5           MR. DIXSON:  I have one additional.  Thank

6      you.

7           My question is related to BSA diligence and

8      OFAC.  Speaking of lending -- lending the digital

9      currency.

10          What kind of -- what kind of diligence is

11     done to the party receiving the loans, that digital

12     currency loan, in making sure that it does comply with

13     OFAC?

14          MR. THOMPSON:  Well, anything that's going to

15     touch the Avanti platform is going to go through our --

16     our OFAC screening and the BSA screening that I was

17     alluding to earlier.

18          So you know, we're not going to allow that

19     platform where we're, you know, basically just doing --

20     acting as a directed trustee.  We're certainly not

21     going to allow that platform to become something where

22     people can then interact and transact with, you know,

23     people, for example, on the sanctions book.  So yes, we

24     will be doing full vetting as if they were customers.

25          MR. DIXSON:  Thank you.

**Meadors Court Reporting**

```
1                MR. DEMERS:  Mr. Dyekman, any further

2   questions for this witness?

3                MR. DYEKMAN:  No.  Thank you.

4                MR. DEMERS:  Thank you, Mr. Thompson.

5                Mr. Dyekman, do you want to call your next

6   witness, please?

7                MR. DYEKMAN:  Yes.  I'd call Bryan Bishop.

8                (Witness sworn.)

9                MR. DEMERS:  And Mr. Dyekman, the chairman

10  suggested that we may break for lunch after this

11  witness.  Do you have any idea as to which of the 15

12  listed witnesses you intend to call at this time, or do

13  you intend to parse the list at all?

14               MR. DYEKMAN:  Yes.  We will shorten the list.

15  We do still have some witnesses after this witness, but

16  they will not be as long.  So after this witness is

17  probably a good time to have lunch.

18               MR. DEMERS:  Thank you.

19                      BRYAN BISHOP,

20  Having been first duly sworn, testified as follows:

21                      EXAMINATION

22  BY MR. DYEKMAN:

23       Q    Please state your full name and your position

24  at Avanti.

25       A    My name is Bryan Bishop.  I am co-founder,
```

1    chief technology officer, and a director at Avanti.  My

2    role is mainly around software development, information

3    security, information technology, and other aspects

4    which I'll go into in a moment.

5        Q    Could you tell the Board about your

6    background, please?

7        A    Of course.  My background is in software

8    engineering and computer programming.  I've been doing

9    that in some form or capacity for about two decades

10   now.

11           I've touched all sorts of aspects of

12   software, including desktop software, web development,

13   mobile applications, competitive intelligence for

14   advertisements, and also some software work related to

15   biotech or bioinformatics.  Much of this was through

16   consulting and contracting.

17           Through those roles, I've also touched on

18   security on both sides of the table, both on conducting

19   security reviews where I thoroughly analyzed my

20   client's code and looked for security problems and how

21   they handle digital assets, for example.  But then

22   also, on the other side of the table, when I've worked

23   for companies that have paid for penetration tests and

24   other security technologies, and then receiving their

25   reports, processing it, and ameliorating any problems

1    that they identified.

2          Outside of software, I have a patent pending

3    on a method of storing data on DNA molecules for

4    high-density data storage.  I have a modest number of

5    academic publications, such as in the Journal of

6    Nucleic Acids Research, which is a molecular biology

7    publication.

8          My work has been featured in a number of

9    media outlets, such as CoinDesk, which is a digital

10   asset specific publication, but also the New York

11   Times, Wall Street Journal, MIT Technology Review,

12   various podcasts, and forthcoming documentaries.

13         I'll be zigzagging through my background just

14   a little bit.

15         So from 2014 to 2018, for four years, I was

16   working for a company called LedgerX, which was

17   previously introduced today.  They were the first

18   Federally regulated swap execution facility and

19   derivatives clearing organization, which means they

20   listed and cleared fully collateralized digital assets

21   swaps and options.  This was under the supervision of

22   Commodities Futures Trading Commission, or CFTC.

23         I was hired into LedgerX because of my

24   expertise in bitcoin and also software development.

25   One of my most interesting roles there, of course, was

1    in developing their custodial system for digital

2    assets.

3              During my time there, and to my knowledge

4    after, there was no theft or loss of digital assets

5    from the platform that I built.  But obviously, I no

6    longer have any involvement since leaving in 2018.

7              I was interested in the mission of LedgerX

8    because, at the time, I was actually reading about

9    clearinghouses, and I was saying, This needs to exist

10   for bitcoin, but also because, you know, at the time,

11   bitcoin -- people involved in bitcoin didn't really

12   talk about regulation or didn't think it was

13   appropriate.

14             And I disagreed with that.  I thought that

15   there must be a way to introduce bitcoin into the

16   mature, regulated financial industry.  And so LedgerX

17   presented me an opportunity to be involved in a -- in a

18   venture that was focused on that.  In some sense, I see

19   a bank that focuses on digital assets as an extension

20   of that mission, and so it was -- it was a welcome

21   opportunity for me to switch from consulting to working

22   for Avanti when that opportunity presented itself.

23             After LedgerX, I returned to consulting, as I

24   just mentioned.  For a time, I worked for a company

25   called Blockstream, which is a bitcoin-focused startup

1    that has raised $101 million in venture capital and for

2    which many of the preeminent bitcoin developers have

3    worked for.  I was originally asked in 2014 to be a

4    co-founder of their company, and I declined, instead,

5    to continue at LedgerX.

6            While there in 2018 and 2019, I was working

7    on a piece of software for over-the-counter swaps of

8    assets.  I also worked for a number of other clients

9    during this consulting period, such as a Hollywood

10   entertainment startup as their part-time CTO.

11           I performed code review and security review

12   for digital asset custodian.  I served as an advisor to

13   a digital asset hedge fund.  I advised a cryptocurrency

14   project, that is, a project that had its own

15   cryptocurrency.  Served as an expert witness in

16   blockchain-related matters, and many others.

17           My point is, I build software.  That's my

18   focus.

19           I also wanted to mention a little bit about

20   my background with bitcoin.  As you might know, bitcoin

21   is not a company.  It is a volunteer effort of

22   open-source software.

23           In January 10th, 2019, I was fortunate enough

24   to receive one of the original emails from Satoshi

25   Nakamoto, the pseudonym of the creator of bitcoin.  At

*Meadors Court Reporting*

1    the time, I read this email, and it was a time of

2    stress in my life, and I objected to it, and my

3    objection was, well, you know, this software only runs

4    on Microsoft Windows, and I had to ask myself, is

5    Microsoft really the future of money.

6         What I failed to overlook was that bitcoin

7    would actually resolve this problem, and now it runs on

8    all sorts of numerous platforms.  I couldn't even begin

9    to list the whole list.  So I was rather dismissive,

10   and it wasn't until 2013 that I became more involved in

11   bitcoin in particular and started to involved in

12   bitcoin software development.

13        I've been fortunate to work with other

14   bitcoin developers on the bitcoin core project, which

15   is the software that runs the bitcoin system, the

16   network, the blockchain consensus rules.

17        I do have a small amount of source code that

18   I've contributed to that project.  But also,

19   participated in code review, giving them feedback about

20   proposed changes to the network, and I've traveled the

21   word to meet with them at their request.  Had many

22   conferences and technical presentations and private

23   meetings that were private due to capacity.  They

24   didn't want, you know, a public record.

25        I had a skill in producing transcripts.  And

1    this is also why, recently, the University of Wyoming's

2    Heritage Center has reached out to for help with

3    archiving the history of bitcoin development.  An

4    article about my transcription efforts has actually

5    appeared on nasdaq.com.

6            So specifically, I believe my background in

7    all of these roles in software development will aid me

8    as CTO of the bank, specifically.  I previously worked

9    in a regulated financial institution.  I have expertise

10   in digital assets.  I have a software development

11   background.  And I've also built a secure custody

12   platform in my past.

13       Q    Could you describe your role and

14   responsibilities as chief technology officer.

15       A    Yes.  So my role as CTO is to oversee and be

16   responsible for the development of certain software

17   that is not available off the shelf from, for example,

18   core vendors.  They do not sell digital assets

19   software.

20           I'm also responsible for information security

21   programs and leading an engineering team, managing and

22   developing certain testing activities internal to, and

23   I'm also helping to facilitate external reviews,

24   external security review, and other related audit

25   functions.

*Meadors Court Reporting*

1           More specifically, I also have extreme

2     responsibilities relating to reporting to the Board,

3     based off of certain regular assessments and

4     information technology on an annual basis -- on at

5     least an annual basis.

6           As CTO, my philosophy is very hands-on.  I

7     get involved in the ongoing development activity.  I

8     work closely with the team under me.  We have a focus

9     on documentation, testing.  We have testing

10    environments that I can go into, in working through the

11    strengths of my staff.

12         Q    Is there an information technology budget for

13    Avit -- or for Avanti, rather?

14         A    There is for both.  Yes.

15         So I have been involved in the development of

16    the financial projections.  I signed off on them, with

17    respect to my responsibility and the goals of the

18    company as I understand them.  I believe the IT budget

19    is adequate for achieving the company's plan, and it

20    also includes budget for the requisite penetration

21    tests and external security reviews.

22         Q    So from a technological standpoint, will the

23    products and services that are listed in the business

24    plan be available and ready to go when the company

25    starts up and opens its doors?

*Meadors Court Reporting*

1      A     Right.  So there are many products listed in

2      our business plan, and we are not actually planning to

3      require that all of them are ready to go ln day one of

4      opening our doors for business.  So we do have a plan

5      in place to stagger the release of these products as

6      they're available and as they've been tested and fully

7      developed.

8      Q     How have the projects been prioritized?

9      A     The projects have been prioritized based off

10     of the -- based on a process where certain -- certain

11     aspects of the business are just absolutely required.

12     For example, the core absolutely must be in place and

13     operational for this to open.

14           And then in addition to that, in order to

15     provide the Avit product, there must be digital assets

16     custody.  So there's a bit of, you know, a dependency

17     tree of certain requirements leading into others, and

18     that's how we're able to determine which products need

19     to be launched first.

20     Q     Could you describe for the Board the

21     engineering team that you lead.

22     A     Yes.  So I do lead an engineering team.  We

23     focus on software development and the technical

24     operations of running Avanti.

25           I have dedicated resources for back-end

*Meadors Court Reporting*

1    development.  One example of that, would be, for

2    example, core integration, but also for front-end

3    development, for example, user interface, what the

4    users actually eventually see and use on a daily basis.

5    And then, of course, of note also is, we do have a

6    system administrator who is previously from Wyoming

7    community banks and has that background.  These are all

8    full-time resources.

9            But in addition to that, we do have an

10   advisor, Bob McElrath, who serves as an adviser and

11   part-time consultant.  Bob has a background as a Ph.D.

12   in theoretical particle physics.  Took a number of

13   post-docs.  Left academia to get into finance.  He

14   worked as a software engineer at Bloomberg.  And then

15   also, he was lead blockchain architect for Fidelity

16   Digital Assets, and he helped design their custodial

17   system.

18       Q    Could you describe the information security

19   policy of Avanti.

20       A    The information security policy outlines the

21   required elements of an information security program.

22   Those elements are as follows.

23            There's issues of training, hardware,

24   software, logging and monitoring, reporting, external

25   review, incident response, vendor management.  Let me

**Meadors Court Reporting**

1    start at training, and I'll describe each of these as

2    briefly as I can.

3         You know, we've talked a lot about internal

4    controls, and I'm a big fan of more technical automated

5    internal controls.  But even the most advanced

6    automated internal controls can be overcome by human

7    error and, in some cases, even phishing tax.

8         So one of the important elements at Avanti as

9    an information security is regular training of

10   employees, both from a cybersecurity awareness

11   training, but with regards to each employee's core

12   function.

13        At a hardware level, the information security

14   program focuses on access control.  Often, it might

15   sound simple, but it's often effective at the software

16   layer.  Another interesting aspect is encryption and

17   protection of data, customer information both in

18   transit and also at rest, which is a way of protecting

19   data.

20        We have extensive logging and monitoring of

21   our software systems.  And in addition, we have certain

22   data retention requirements around those logs.  This

23   retention requirements also extend to our ancillary

24   application databases beyond the core, such as for

25   digital asset data.

1    And so that's -- we have regular backups of

2  that data, and also -- that's on a daily basis, of

3  course, and then also something called active/active.

4  It's the availability of database, if there's more than

5  one database running, and one goes offline, the other

6  is available.

7    Another element of the information security

8  program is reporting and external review.  There is

9  reporting requirements, both internally, of course, up

10  the ladder but also to the Board.  And then external

11  review is a very important element on a number of

12  different layers.  You know, we've heard about audit

13  functions, but then there's also elements such as

14  penetration testing and then also security review of

15  some of the more critical systems.  And also review

16  internal controls, of course.

17    Now on to the fun part.  Incident response is

18  quite interesting.  At Avanti, our incident response

19  program, of course, intersects with information

20  security policy.  We do have a separate incident

21  response policy and program in place.

22    What's interesting about incident response in

23  this case is that issues of availability of our

24  services are responded in a manner similar to incidents

25  of security, such as breaches.  So we take both sorts

1    of issues very seriously.

2              We have -- in the incident response policy,

3    we have what we call playbooks, so in the event that

4    the incident response policy is called to action or the

5    incident response team is triggered there is easy

6    reference materials available.  So if your hair's on

7    fire, you know, you'll have something to refer to

8    and -- and reference.

9              Finally, I mentioned vendor management.

10   Britney Reddy is running our vendor management program.

11   It obviously intersects with information security and

12   information technology.  I am aware of that and

13   involved in that.  I'm aware that it just plays an

14   important role in retaining a safe and sound bank.

15        Q    So how do you identify risks and how you will

16   mitigate them?

17        A    So we identify risks with a risk assessment

18   process, which is on a regular recurring basis.  We

19   mitigate risks through internal controls, procedures.

20   And other mitigation with the help of our team, which

21   has considerable expertise to help facilitate

22   developing the appropriate mitigations.  We start with

23   high-risk, high-harm items, and we prioritize those,

24   and we work our way down to low-risk, low-harm items.

25        Q    Do you believe that the risks of this bank

1    differ from those faced by traditional banks?

2        A    Yes, I do.  There are a few differences in

3    terms of risks that we have to address.  Namely,

4    digital assets is a unique risk that most banks do not

5    have to address, other than, apparently, denying

6    accounts.  But that's because, I mean, of course, it

7    wasn't the go-ahead from regulators that banking

8    digital asset customers was okay.  The risks around

9    digital assets are numerous.  However, they can all be

10   addressed, and they are, in fact, being addressed.

11       Q    So in your opinion, are there systems at

12   Avanti that are similar to those of traditional banks?

13       A    Yes.  So while there may be different risks,

14   there are portions of the systems at Avanti that are

15   similar to traditional banks.  Of most importance to

16   me, I suppose, would be the mentioned -- the core

17   system, which is what other banks use, and so will we.

18       Q    Are you responsible for the policies

19   associated with the storage of digital assets?

20       A    Ultimately, the board is responsible for

21   board-approved policies.  However, I am responsible for

22   building a system, internal testing, and maintaining

23   them in production.  I'll note that other staff will be

24   responsible in daily operation in an internal control

25   sense for the movement of digital assets.  That will

*Meadors Court Reporting*

1    not be my role.

2         Q    So how is it, technologically, that an

3    intangible can be the subject of custody?

4         A    Right.  So we were talking about a lot about

5    digital asset custody.  What is that?  What is a

6    digital asset?  How does -- how does that work?  I'll

7    try to give a brief answer.

8              So when people talk about the custody of a

9    digital asset, what they're really talking about is the

10   safe and secure storage of a secret pieces of

11   information that endows with the ability to authorize

12   digital asset transactions.  So custody in this sense

13   is the protection of that secret.  In a sense, this can

14   be thought of as a very long password, for example.

15             So the security around custody is entirely

16   around the security of the secret, the management --

17   access control management, and other procedures or

18   mitigations to prevent unauthorized access of these

19   secrets.

20        Q    How are you going to protect digital assets

21   at Avanti?

22        A    Well, for details, specifics -- that get into

23   more specific detail, that is a subject that I would

24   ask to reserve for executive session, because it's a

25   matter of security.  However, I will say a few

1    high-level details.

2            One of them is that we do not store digital

3    assets in our office in Cheyenne, Wyoming.  We have

4    policies and elaborate procedures that are specifically

5    designed for the secure storage of digital assets.  We

6    have requirements, and we intend to engage in annual

7    penetration tests, ongoing risk assessments, external

8    audits, and other reviews.

9            In addition to that, with respect to

10   protecting digital assets, I intend to closely monitor

11   assets under management, and as they grow, that

12   warrants paying closer attention to the mechanisms of

13   protecting digital assets and whether -- whether

14   they're sufficient or need to be further developed over

15   time.

16   Q    So you're also a director of the company.

17   How would your describe your role and contribution as a

18   director?

19   A    Yes.  So as a director, I'm following the

20   office of the comptroller of the currencies director

21   handbook as a guide.  I prefer to seek out dissenting

22   opinion, review it, but then make specific decisions.

23   As a board member, I think that my contribution to this

24   five-member board at the moment is my extensive

25   background in technology and software development, my,

1      more specifically, background in digital assets, and my

2      in-depth technical understanding of software product

3      development in digital assets in general.

4           Q    Are you part of any board committee?

5           A    Currently, every board member sits on every

6      committee.  As we grow, we will segregate into

7      committees where we provide the most strength

8      individually, of course.

9           Q    How do you plan to ensure the integrations

10     that you build with the core banking system will

11     actually work?

12          A    So internally on my team, we adhered to

13     modern software development practices which has a

14     strong emphasis on testing.

15          When you can think of -- when you think of

16     software inside a company, at least well-run companies,

17     there should be multiple environments where that

18     software is used and tested and deployed.  For example,

19     development environments, staging environments,

20     sometimes even customer test environments, where

21     customers can get access to an environment where

22     mistakes are harmless.  And then, of course, a

23     production environment, which is the ultimate

24     environment, you know, very strongly locked down.

25          In addition, I've been working very closely

1   with Britney Reddy, our chief banking officer, to

2   ensure that the interplay between Avanti's custom

3   system and its core will go well.

4           Also, these integrations will also be tested

5   by an independent party not associated with building

6   it.

7       Q    How will you mitigate cybersecurity risk and

8   ensure that the systems are safe?

9       A    Well, the information security program is

10  designed to ensure that we have an appropriate

11  cybersecurity posture.  But in addition to that, I

12  believe security is a team sport, and so I do rely on

13  my team, with our expertise and experience in

14  security-related matters.  And then also, I feel it is

15  very important, and I can attest so does the rest of

16  management, that developing a culture of security is

17  extremely important to us.

18      Q    Finally, how are you going to mitigate risks

19  of internal theft?

20      A    Well, risk mitigation regarding internal

21  theft has a number of layers.  One layer is internal

22  controls, and as mentioned, we have an internal control

23  policy, regular review, and assessment of that.  We

24  have also the regular security assessments.

25          But then also, with regard to digital asset

1  transactions, multiple employees are required to be

2  involved to actually effect a movement of digital

3  assets.  In addition, regarding software development,

4  changes to software are reviewed by multiple

5  individuals in a process commonly referred to as code

6  review.

7          MR. DYEKMAN:  Thank you, Mr. Bishop.  That's

8  all the questions I have for you.

9          MR. DEMERS:  Mr. Chairman?

10         CHAIRMAN LAWTON:  Thank you.  I don't have

11  any questions at this time.

12         MR. RIFE:  Thank you.  No questions.

13         MR. DIXSON:  Thanks, no questions.

14         MR. JENSON:  Unfortunately, I do, so hold up

15  lunch.

16              EXAMINATION BY THE BOARD

17         MR. JENSON:  So inside any organization,

18  there's conflicting interests.  In other words, you're

19  bringing out Avanti.  You're actually creating a lot of

20  software that underlies Avanti and Avit, and there will

21  be different interests on how soon you bring this

22  technology to the market.  I'm sure you'll have some

23  CEOs saying, It's time.  You may have an IT guy saying,

24  I'm still in development.  I'm not in production.

25              Explain to us how a product comes to market,

*Meadors Court Reporting*

1    what is the deed level at which -- who has the final

2    say if it's time or it may not be time.  I can see a

3    conflict between you and some other people.

4              MR. BISHOP:  Well, first, I'll address

5    conflicts in general, especially with respect to

6    internal controls.  That's primarily mitigated by

7    segregation of duty, and it's very important to have

8    personnel that are, you know, not in the same role,

9    different areas, to provide input to that.

10             With respect to, when is it ready or it's

11   time to go, I have a few parts to answer to that.

12             One is that I believe that my role on the

13   board will protect the organization to ensure that we

14   do not launch something that is just not ready to be

15   launched.

16             In addition to that, I believe that we have a

17   strong culture of security, and everyone on the

18   executive team is aware of the importance of security

19   and to -- you know, throughout my -- my time here, I've

20   never once questioned whether someone will pressure me

21   to do something that I feel uncomfortable with.

22             MR. JENSON:  Thank you.  And that's more of

23   an unfortunate question, but you've got an impressive

24   resume and done some very impressive stuff.

25             What happens from a risk perspective, when

**Meadors Court Reporting**

1   you have to look at, if something happens to you and

2   you're unable to do your job in the short term?  Please

3   discuss that?

4         MR. BISHOP:  Well, so that's keyman risk.  So

5   a few parts to this answer.

6         I -- I take very extensive notes.  I'm a very

7   prolific note-taker.  You know, I do close to

8   word-for-word transcripts as much as I can when I'm

9   doing meeting notes, and that's just based off of, you

10  know, looking at the economics of the meeting when you

11  have 10 people in the meeting and you multiply by how

12  much money you're spending.  You know, these are

13  valuable meetings.

14        Anyway, extensive notes, extensive

15  documentation.  I -- I also believe that on my team, if

16  necessary, that there is someone who can be a successor

17  to -- to my role, should that become necessary.

18        MR. FRANCE:  Mr. Bishop, you've talked a lot

19  about software development, and as is noted, your

20  resume is very impressive.

21        With respect to the information security,

22  which naturally is extremely important, do you have any

23  certifications in actual information security?  It may

24  have been included in documentation.

25        MR. BISHOP:  No, I do not.  On that front, I

*Meadors Court Reporting*

1    am also looking to rely on other individuals on my team

2    and in the organization.  Britney Reddy.  And then

3    also, the system administrator resource that I

4    mentioned from previous Wyoming community banks.  But I

5    personally do not have security certifications, no.

6              MR. FRANCE:  With respect to an external

7    reviews, what is the frequency plan for external

8    reviews?

9              MR. BISHOP:  So at minimum, it is annual.  I

10   believe that some of them are, in our policies, set to

11   quarterly.

12             MR. FRANCE:  And then, I guess, lastly, as

13   the CTO, I know me, as a CF -- or CEO of my bank, one

14   of the things that keeps me up at night is information

15   security breach.

16             What keeps you up at night for this company

17   as you move forward if this charter is granted?

18             MR. BISHOP:  Well, the number one item on my

19   mind is a very specific element of information

20   security.  That's not to say I ignore other elements,

21   but risk of digital asset breach and theft is of

22   paramount importance to me.  That is -- that is the

23   item that I ponder on the most.

24             MR. FRANCE:  Should that happen, how do you

25   mitigation that risk or how do you mitigate that risk

1    ahead of time?

2           MR. BISHOP:  Sure.  So I'll start with, let's

3    say, should something happen.

4           Should something happen, there are all kinds

5    of things that could happen that are bad.  Our incident

6    response program is designed to activate in that

7    eventuality and immediately look into what has been

8    breached, to what level.

9           Often, it's common to look at the ultimate

10   catastrophe, such as a loss of all digital assets.  But

11   before you even get there, there's often other breaches

12   that lead up to that, and those important to monitor

13   and respond to just as swiftly.

14          With regards to mitigation on -- before

15   something bad happens, that -- that is a function of

16   the information security program, regular risk

17   assessments, the mitigations that come from -- come

18   from that risk assessment, implementing those.  I also

19   believe in code review by multiple personnel, and then,

20   of course, also the external review.

21          MR. FRANCE:  And then lastly, if you could

22   talk just of the frequency of employee training.

23   Certainly, I think most of us recognize that oftentimes

24   is the single greatest risk that we have.  So frequency

25   of training.  Could you address that?

1          MR. BISHOP:  I can.  However, I would prefer

2     to save that for executive session, details about

3     training frequency around cybersecurity, for example,

4     is not something for public comment.

5          MR. FRANCE:  Thank you.

6          MS. SHARP:  No questions.  Thank you.

7          MR. SORENSEN:  No questions.  Thanks.

8          MR. DEMERS:  Any further questions from the

9     Board?

10          Mr. Dyekman, any further questions?

11          MR. DYEKMAN:  No, thank you.

12          MR. DEMERS:  Okay.  Given Mr. Bishop's

13    testimony, I think I'd be derelict if I didn't ask, are

14    we going to be able to do anything to secure the room

15    during our lunch recess?  Thank you.

16          And Mr. Chairman, what time did you want to

17    get back together.

18          CHAIRMAN LAWTON:  It's 12:00 o'clock now.  So

19    let's shoot for 1:00 o'clock, please.

20          (Recess from 11:57 a.m. to 12:59 p.m.)

21          MR. DEMERS:  Thank you.  Mr. Dyekman, can you

22    call your next witness, please?

23          SPECTATOR:  I think it's still loading.

24          MR. DYEKMAN:  Yes.  That's all right.  I'll

25    speak up.

*Meadors Court Reporting*

1        There we go.  Thank you.  I have seated Zev

2    Shimko.

3                    ZEV SHIMKO,

4    having been first duly sworn, testified as follows:

5                    EXAMINATION

6    BY MR. DYEKMAN:

7        Q    Please state your name and your position with

8    Avanti.

9        A    My name is Zev Shimko, and I am co-founder

10    and chief operating officer of Avanti.

11        Q    And what are your responsibilities at

12    Avanti?

13        A    I am responsible for business development,

14    customer acquisition, product oversight, management of

15    liquidity providers on Avanti's platform, insurance,

16    capital raising, and investor relations matters.

17            As you heard, Britney Reddy mentioned

18    earlier, my operational focus is primarily on the

19    digital asset side of our business.  I am responsible

20    for building out the business process and flows for

21    each of our planned digital asset products and

22    services.

23            Business development also falls in my -- in

24    my domain, and I'd be leading conversations with

25    potential partners and customers.

*Meadors Court Reporting*

1    On the partner side, these conversations have

2    primarily been with institutional liquidity providers,

3    which will provide liquidity for digital assets on our

4    platform.

5    On the customer side.  This profile varies

6    widely from digital asset funds to traditional

7    corporations.  We have been fortunate to have received

8    meaningful inbound inquiries from prospective customers

9    for each of our products.

10    I am also responsible for putting our

11    insurance strategy in place, with input from others on

12    my team, for the traditional components of the policy.

13    We will comply with Wyoming's requirements with

14    respects to commercial insurance and will have

15    insurance on both the traditional aspects of our

16    business -- for example, directors and officers -- as

17    well as policies specific to digital assets, including

18    cybersecurity and theft.  We are engaged with a

19    well-known insurance broker and expect to have these

20    policies in place prior to opening.

21    Internally, I also cover the human resources

22    function within Avanti, which includes employee

23    onboarding, background checks, and benefits management.

24    The remainder of my time is spent on

25    investor-related matters, including capital raising and

*Meadors Court Reporting*

1    investor relations.  Avanti has closed two rounds of

2    funding to date, as well as a convertible note, and we

3    plan to soon close a third, bringing in the remaining

4    capital, as laid out in our business plan.  Our current

5    investors include well-respected funds and institutions

6    with deep knowledge in both financial services and

7    blockchain technologies.

8         Q    What's your personal background, and how were

9    you introduced to Avanti?

10        A    I started my career in the global capital

11   markets division of Morgan Stanley where I initially

12   met our CEO, Caitlin Long.  The group where we both

13   worked helped large corporations raise billions of

14   dollars through investment-grade bond sales.

15             As an example for the type of transactions,

16   our small group was responsible for -- I'll highlight

17   AbbVie, Inc.'s $16.7 billion investment-grade bond

18   offering to fund its acquisition of Pharmacyclics.

19   Morgan Stanley was primarily responsible for the

20   offering, known as "lead left book runner," and I was

21   the lead analyst on the transaction.  I was part of a

22   handful of analysts selected as star fellows, which

23   provided me the opportunity to spend some time in the

24   equity capital market side of the business.

25             Following three years in the analyst program

*Meadors Court Reporting*

1    at Morgan Stanley, I moved out to San Francisco and

2    ended up leading the capital markets efforts for a

3    financial technology lender.  Specifically, I helped

4    build out the securitization program for a company

5    called Upstart, which ensured ongoing institutional

6    funding for the company.  It was at this company where

7    I first started to develop meaningful relationships

8    with institutional investors.

9            I held a similar role at another marketplace

10   lending company called Prosper, which is considered to

11   be America's first peer-to-peer online lending

12   marketplace.

13           Around the same time, I was continuing to

14   learn more about virtual currencies and broader

15   blockchain technology.  I was spending many nights and

16   weekends digging deeper into this new technology and

17   made a decision that I needed to be in a

18   blockchain-cenetric organization.

19           My experience in capital markets and lending

20   led me to a company called SALT Lending, based in

21   Denver, which was the first company to provide dollar

22   loans against digital assets.  I was fascinated by

23   digital asset collateral and understood why it was an

24   ideal collateral form.  With the right technology, it

25   was quick to value and easy to liquidate.

*Meadors Court Reporting*

1           I ended up running corporate development for

2    SALT Lending and was promoted to become an officer of

3    the company.  As a lender in the US, SALT was required

4    to obtain certain state-by-state licenses, as we did

5    not rely on a bank lending partner.

6           We also provided lending services in other

7    countries, including Australia, where I spent a

8    meaningful amount of my time working with law firms,

9    potential customers, and investors.  I represented the

10   company at international events and also here in the US

11   with regulators.

12          I then made a decision to move back to

13   San Francisco to start my family and joined an

14   enterprise blockchain company, Figure Technologies.

15   Over $1 billion of home equity line of credits had been

16   originated, serviced, or sold on Figure blockchain

17   protocol provenance, and I was responsible for business

18   development of this platform.

19          Since leaving Morgan Stanley, I connected

20   with our CEO, Caitlin Long, at various conferences over

21   the years.  I was at Figure Technologies when Caitlin

22   had reached out to me and asked if I would be

23   interested in joining the Avanti team.

24          After a few conversations with Caitlin and

25   conducting independent research, I believed, and still

1    do, that Avanti is an important bridge between the

2    traditional and digital financial services industries

3    and critical infrastructure for blockchain-focused

4    companies.

5         Avanti sells many of the legal and regulatory

6    concerns that have frequently come up with

7    institutional investors in my past.  Additionally,

8    direct access to the Federal Reserve payments network

9    would allow Avanti to provide new products and avoid

10   many of the common risks in the digital asset industry,

11   such as settlement risks, as we have the ability to

12   settle both the dollar and digital asset legs of a

13   transaction.  I'll explain this risk in a few minutes.

14        I decided to join Avanti not only because of

15   its mission but also because of the team Caitlin had

16   assembled.  It is important to have deep experience

17   from both the traditional and blockchain industries,

18   and I have been impressed by the work of my colleagues.

19        My background in regulated companies, capital

20   markets, financial technology startups, and enterprise

21   blockchain has provided a well-rounded skill set for my

22   role at Avanti.  I'm excited to be a part of the Avanti

23   team and thankful to be working with such a talented

24   group of individuals.

25        Q    Could you please discuss Avanti's product

1    offerings and explain the settlement risk mitigation

2    that you mentioned earlier.

3        A    Sure.  Many of my past experiences involve

4    building and offering products that customers want or

5    need.  Each of Avanti's products provide necessary

6    functionality, increased efficiency, core enhanced

7    protection to our customers.

8            Let me describe the different business

9    lines -- business lines which consist of online

10   banking, Avit, digital asset custody, and prime

11   services.

12           Online banking.  We will offer digital

13   banking services through our online portal in a

14   seamless and efficient manner.  These services include

15   demand deposit accounts, ACH, or automated

16   clearinghouse, payments, and wire transfers.

17           Avit.  Our digital dollar product, Avit,

18   provides the stability of the US dollar with a

19   settlement efficiency and finality of a digital asset

20   and has applications in areas such as digital asset

21   trading and corporate treasury management.

22           Digital asset custody.  We will be offering

23   custody services as a qualified custodian, which

24   includes the state storage of digital assets and

25   deposit and withdrawal capabilities.

*Meadors Court Reporting*

1          Prime services.  This will include additional

2     digital asset services, including the purchase and sale

3     of digital assets and other escrow-related services.

4     It is through this business line that we were able to

5     reduce or eliminate much of the settlement risk that

6     currently exists within digital asset transactions.

7          As an example, many of the over-the-counter

8     transactions, which are estimated to be in the billions

9     on a daily basis, typically settle within a 24-hour

10    period post-trade confirmation.  During this window,

11    one party will settle the US dollar regulated

12    transaction and the other would settle the digital

13    asset leg.

14         In practice, it is common for the larger

15    company to settle second, but this creates a large

16    amount of counter-party risk for the first party.  If

17    two parties to the transaction were both customers of

18    Avanti, we could, for example, immediately and

19    bilaterally settle the transaction, eliminating the

20    counter-party risk.  We are able to do it efficiently,

21    as Avanti has the ability to settle both the US dollars

22    and the digital assets, unlike current participants in

23    the market.

24         Another aspect of risk mitigation comes into

25    play with our insurance strategy.  As mentioned

1      earlier, we are engaged with an insurance broker and

2      currently working through appropriate policies which

3      will include digital asset coverage.  Insurance is a

4      key risk mitigation tool and provides additional

5      comfort and protection to our customers.

6          Q    What are your current thoughts about customer

7      acquisition for Avanti?

8          A    As I am responsible for customer acquisition,

9      it is important that any potential customer understands

10     Avanti's structure and regulatory framework.  For

11     example, we will ensure that customers understand that

12     we have a full reserve structure and that Avanti does

13     not offer FDIC insurance.

14          Once customers have decided they'd like to

15     engage with Avanti, they will go through a robust

16     on-boarding process that will be overseen by our chief

17     compliance officer and BSA officer.

18          We believe Avanti's status as a bank serving

19     institutions in digital assets will attract customers

20     without requiring much outbound marketing, which is

21     consistent with our experience so far.  Avanti has been

22     the subject of numerous incoming inquiries, based on

23     press coverage, including pieces written by Forbes and

24     CoinDesk.

25          CoinDesk is generally regarded as one of the

*Meadors Court Reporting*

1      primary news sources for the digital asset space.  And

2      Avanti was recently highlighted in CoinDesk's selection

3      of business highlights of 2020.

4              Additionally, Avanti's executive team has a

5      robust network within the traditional and digital asset

6      target customer bases.  We plan to be actively engaged

7      with institutional investors and attend corporate

8      treasury conferences to drive user acquisition.

9              We do not anticipate a large marketing spend

10     but have projected modest levels of marketing-related

11     expenses in our financial projections, which will

12     include conference attendance and sponsorships, website

13     advertising, and marketing collateral.

14             Business development will be headed by myself

15     and Avanti's chief executive officer and will also be

16     crucial in obtaining large customer accounts.

17     Q    Do you believe you have enough resources in

18     place to execute your acquisition plan?

19     A    To add to my previous remarks, I also have a

20     director of business development on my team to assist

21     in driving customer acquisition and related business

22     development efforts.  He has been involved in the

23     digital asset industry for the last few years and was

24     most recently director of research and business

25     development at a digital asset fund prior to joining

1    the Avanti team.

2              To provide a bit more information, our first

3    wave of customers will largely come through current

4    relationships that the Avanti team has, whether from

5    former companies or through personal networks.

6              Our second wave of customers will likely come

7    to us through current customer referrals or simply from

8    seeing Avanti in the news.  As mentioned, we've had

9    numerous unpaid media stories written about Avanti

10   which has led to large amount of inbound inquiry for

11   digital asset services.

12             Finally, our third wave of customers will

13   come to us through more traditional business

14   developments and acquisition techniques, such as sales

15   processes, conferences, and other general marketing

16   efforts.

17        Q    Do you believe Avanti will be able to meet

18   its capital plan?

19        A    Yes.  We have successfully closed two rounds

20   of funding plus a convertible note.  Our last round of

21   funding was significantly oversubscribed, and investors

22   were cut back on their desired allocations.  We've had

23   significant inbound interest for our Series A capital

24   raise, which we have not kicked off, but we are

25   confident we will be able to complete the round.

1          For confidentiality reasons, if you would

2     like further information, we can provide it in the

3     executive session.

4          Q    How do you split your responsibilities with

5     Britney Reddy?

6          A    Britney has relevant experience in

7     traditional banking, and I have relevant experience in

8     financial technology and digital assets.  Britney will

9     ensure we are in a safe and sound manner and that our

10    operational procedures and internal controls meet or

11    exceed our statutory requirements, while I will develop

12    the products and manage our business development

13    efforts.

14         As an example, I may come up with a new

15    digital asset related product or service and will work

16    with Britney to understand how this fits within a

17    traditional banking regulatory structure and core

18    banking software.

19         Q    Speaking of Britney, she deferred a few

20    questions to you, so I'm going to remind you of those

21    and ask for your responses.

22         The first question was asked about the

23    mechanics of lending that we have discussed earlier for

24    Avanti.  So how would you describe that, those

25    mechanics?

*Meadors Court Reporting*

1    A    So to reiterate earlier remarks, I would just

2    confirm that we are not lending without the direct

3    approval of our customers.  And those customer assets

4    would not be lent out unless they had approved the

5    borrowers on our platform as well.  Both sides to the

6    transaction would be customers of Avanti, and as

7    mentioned previously, we would not be the lender of

8    record.  We just facilitate the lending with the

9    technology we have in place.

10    Q    And is there a fee related to that?

11    A    There will be a fee related to that.  I would

12    just note that this is not a launch product for us.  So

13    we have not finalized all the mechanics of how the

14    lending program will be built, but we are doing so in

15    the next few months and expect to launch this product

16    within the first three years of operation.

17    Q    The second question that was deferred to you

18    was the question of bitcoin volatility and its possible

19    effect on revenue.  What are your thoughts about that?

20    A    Great.  I'll first add that because of my

21    deep experience in digital assets, I aided Britney in

22    the original assumptions for the digital asset related

23    products and services and the specific assumptions that

24    went into the business plan and projections.

25         You'll notice that bitcoin volatility on a

*Meadors Court Reporting*

1   net basis did not have much impact to our net income,

2   and that's because there's an offsetting nature between

3   the fees and assets under custody and the fees in prime

4   services.

5          For example, when volatility increases, we

6   expect lower assets under custody due to increased

7   withdrawals.  However, prime services activity will

8   accelerate.  And the opposite is true as well.  When

9   volatility decreases, we will expect increased assets

10  under custody fee and lower fees tied to prime

11  services.

12      Q    And the last question, I think, had to do

13  with the factual rationales for certain things in your

14  projections.

15      A    So I won't go into specific numbers regarding

16  the multiples that you see in the financial

17  projections.  We had done extensive modular research

18  and then applied a significant haircut to the data that

19  we saw due to the fact that we are not yet an operating

20  business, and we obviously do not yet have customers.

21          On the specific multiples points, there are

22  some companies that we have spoken with that actually

23  see that multiple on a daily basis.  We are projecting

24  that multiple on an annual basis, so we actually think

25  that that number might be conservative, but again,

1   because we are not yet live, we do not yet have

2   customers, we do not yet know our specific customer

3   behavior.

4          We decided to add large haircuts to the data

5   points we saw in the market.  I'll also note that those

6   multiples will obviously change on a normal basis as we

7   start to understand customer behavior and see volume

8   flow of the platform.  We'll be making changes and

9   adjustments to the multiples.

10     Q    Anything else you wanted to mention?

11     A    No, I think that was it.  Thank you.

12          MR. DYEKMAN:  Okay.  Thank you.

13          That's all I have.

14                 EXAMINATION BY THE BOARD

15          MR. DYEKMAN:  Mr. Chairman?

16          CHAIRMAN LAWTON:  Thank you.  No questions.

17          MR. RIFE:  Thank you for your testimony.

18          Regarding the lending aspect of it, thanks

19   for that.  That helps clarify things in my mind.

20          But I'm just trying to piece together,

21   though, the marketing aspect of that.  So are you out,

22   leading that charge to match these customers together

23   to do that transaction that creates, basically, the

24   loan?  How does that work?

25          MR. SHIMKO:  So we have not got into the

*Meadors Court Reporting*

1    marketing component of that program, to be perfectly

2    honest.  I would expect that the activity comes from

3    closed customers of Avanti and from customers that do

4    know each other and do business with each other at the

5    start.

6              As the program goes, we may see additional

7    volumes, and our customers interested in working with

8    more participants on the platform.  But we have not

9    built out a marketing strategy for the lending program

10   that was mentioned.

11             MR. RIFE:  Thank you.  You mentioned in the

12   application that, you know, one of the things that

13   Avanti will do will be to apply for a master account at

14   the Fed, and I don't want to get into those details.

15             I'm just curious if you have created a

16   redundant path of some other alternative mechanism

17   should you need to do something in that arena.

18             MR. SHIMKO:  Is that a specific question to

19   lending?

20             MR. RIFE:  No.  I'm sorry.  Step back from

21   lending.

22             That master account, you're depending on

23   that.  As far as a redundant feature in case, for

24   whatever reason, that's not available to you or you

25   want another option, have you considered what that

*Meadors Court Reporting*

1    might look like?

2                SPEAKER:  Respectfully, I'd like for Zev to

3    answer the high levels, but if there's --

4                MR. RIFE:  Yeah.  Perfect.  Yeah.  Yeah, I

5    don't -- I don't require details right now.

6                MR. SHIMKO:  Yeah, I would just reiterate

7    Britney's comments that we do intend to seek Fed

8    membership, but we do not think that it will be crucial

9    for Avanti's success.

10               MR. RIFE:  Thank you.  Appreciate that.  And

11   I guess I'm not talking about Fed membership.  I'm

12   talking about the master account at the Fed.  So we can

13   save that for executive session.

14               MR. DIXSON:  No questions.

15               MR. RIFE:  No more questions.

16               MR. JENSON:  Just one question.

17               So the primary -- the only crypto you're

18   going to service at time zero is bitcoin.  How soon do

19   you think you'll move into some of the other

20   cryptocurrencies, and how important is it to expand

21   that?

22               Okay.  At time zero, you are only servicing

23   bitcoin.  How long do you think before you have to move

24   into other cryptocurrencies, and how important is

25   having multiple cryptocurrencies in your platform to

1    the business plan?

2          MR. SHIMKO:  As -- as you're probably aware,

3    a majority of the institutional interests in digital

4    assets revolves around bitcoin, which is our initial

5    plan to provide product and services around bitcoin.

6          We may expand to other top-tier digital

7    assets by market cap, and so I would expect us to

8    provide services for a few additional assets over the

9    next three to five years.  I don't anticipate going as

10   far down the list of market cap assets and provide a

11   full breadth of services.  We are really targeting the

12   institutional markets, and right now, that is really

13   around bitcoin, and second would be Ethereum.

14         MR. FRANCE:  No questions.

15         MS. SHARP:  No questions.

16         MR. SORENSEN:  I just want to understand your

17   customer base a little better.  Is there lots of

18   customers out there?  Is it a very refined group of

19   institutions?

20         MR. SHIMKO:  The short answer is, it's rather

21   broad, but I would break it up into customers that

22   currently are involved in digital assets and customers

23   that are looking for exposure to digital assets.

24         In the first group, you have digital asset

25   companies.  You have digital asset funds.  And perhaps

1    other types of funds.  And in the second group, you

2    have some of the larger institutions that deal in

3    conventions, such as pension funds, endowments, large

4    PE funds, that have been looking for a bank-like before

5    getting exposure to digital assets.

6          MR. SORENSEN:  So will you be helping some of

7    these entities that aren't currently in it to get

8    involved, do education, and such?  Is that part of the

9    marketing?

10          MR. SHIMKO:  That is part of the marketing,

11    yes.  You know, again, we have had numerous articles

12    written about Avanti and our products and have received

13    a meaningful amount of interest from large institutions

14    that are not yet involved in digital assets.

15          MR. SORENSEN:  So you guys are thinking

16    there's a lot of -- lot of customers out there?

17          MR. SHIMKO:  We do, yes.

18          MR. SORENSEN:   Okay.

19          MR. DEMERS:  Any further questions from the

20    Board?

21          Mr. Dyekman, anything further of this

22    witness?

23          MR. DYEKMAN:  Nothing further.

24          MR. DEMERS:  Thank you, sir.

25          THE WITNESS:  Thank you.

1          MR. DEMERS:  Did you want to call your next

2     witness, please.

3          MR. DYEKMAN:  John Pettway, please.

4                    JOHN PETTWAY,

5     having been first duly sworn, testified as follows:

6                    EXAMINATION

7     BY MR. DYEKMAN:

8          Q    Please state your name and your role at

9     Avanti.

10         A    John Pettway.  I'm an independent director.

11         Q    Could you describe your role in Avanti with

12    some more detail.

13         A    Sure.  My role as an independent director is

14    to understand and implement the business plan of the

15    company.  I will also assist in establishing and

16    enforcing policies and procedures to mitigate risks

17    associated with the financial institution.

18         Q    Could you describe your background to the

19    Board, please.

20         A    Sure.  I started as a certified public

21    accountant foe Ernst & Young, working in DC in the

22    audit program, where I got exposure to a number of

23    industries, including banking.

24              After a few years, I went to law school.

25    Ended up working for a small business practice firm in

*Meadors Court Reporting*

1    Alexandria, Virginia.  My work involved advising small

2    business -- businesses anywhere from structure to tax

3    compliance to evaluating business plans.

4           Several years later, I joined a -- set up a

5    real estate company in Salt Lake City, Utah, where we

6    purchased commercial real estate office buildings and

7    residential office -- residential communities.

8           Several years later, I moved to High Plains

9    Investments, which is headquartered in Park City, Utah.

10   High Plains had a bigger portfolio, and over the years,

11   I was probably involved in roughly 30 venture capital

12   transactions in a wide variety of industries.

13          Over those years, I would estimate that I was

14   on the board of somewhere between 15 and 20 different

15   companies, including two publicly traded companies,

16   Overstock.com and El Dorado Bank shares.  For the past

17   5 or 10 years, I've also independently provided

18   services to small businesses, typically evaluating

19   business plans or investment opportunities or helping

20   advise on structure and such.

21       Q    Well, so how did you get involved with

22   Avanti?

23       A    I represented the seed investor in Avanti.

24   And since January I've been working with Caitlin,

25   helping her work towards organizing the initial capital

*Meadors Court Reporting*

1    structure of Avanti.  I also invested personally in the

2    angel round.

3         Q    So what are your views on how the board is

4    currently functioning?

5         A    I think the Board is functioning very well.

6    We've met multiple times.  We've had two formal

7    meetings in person.  Updated weekly.  The board is very

8    engaged and supportive of management.  I think we're

9    ready to become a bank board.

10        Q    Do you know what your role will be as the

11   audit committee chair?

12        A    We haven't actually formally divided into

13   committees.  It's anticipated with my accounting

14   experience that I would assume the chair of the audit

15   committee.  That said, all members of the directors --

16   or all members -- all directors are going to

17   participate in all the committees at that stage.

18             My primary role as audit director will be to

19   provide oversight, internal control, and audit policy.

20   I'll be involved in engaging auditors with regard to a

21   minimum of information technology, the bank secrecy

22   act, compliance, and accounting.

23             I know that Zev and Britney has already been

24   in conversations with several auditing firms, and

25   they've shared those discussions with me, and I fully

1    expect to be actively involved in the final selection

2    process.

3         Q    As a CPA, how does your background assist

4    Avanti?

5         A    I've got a great appreciation for the

6    importance of internal controls and audit.  As a

7    director, I'll do my best to ensure the policies and

8    procedures are implemented, enforced.  All the

9    directors are aware of their importance of the

10   alignment between the policies and procedures to

11   internal control and audit, all in order to ensure a

12   safe and sound financial institution.

13        Q    As a member of the board, do you feel like

14   the board's getting sufficient access to information to

15   do its job?

16        A    I do.  I think the Board is well-informed,

17   has access to all the information we need to make an --

18   informed decisions.  When additional information is

19   requested, it's promptly provided, in a timely

20   manner.

21        Q    Given your prior experience as a director at

22   a bank, do you believe Avanti's board and executives

23   are capable of building and governing a bank that will

24   operate in a safe and sound manner?

25        A    I do.  I believe the management team, along

1   with the board of directors, is more than capable and

2   committed to operate a financial institution that's

3   financially sound and -- safe and sound.

4       Q    Have you seen anything yet with Avanti that

5   would create a red flag for you as the chairman of the

6   audit committee?

7       A    No, I have not.  Risks are being evaluated,

8   you know, continuously with executive management and

9   board, and appropriate risk mitigation strategies are

10  being developed and implemented.

11      Q    You've had some contact with Britney Reddy

12  now.  Do you think that she's capable of establishing a

13  strong internal audit program?

14      A    Absolutely.  Britney has established multiple

15  internal control programs.  Between her previous

16  banking experience and my background in public

17  accounting, I have no doubt that there will be an

18  extensive internal control and audit program.

19      Q    Do you believe that Avanti ought to be the

20  recipient of a bank charter in Wyoming?

21      A    I do.  Avanti's board and executive

22  management are knowledgeable, capable, and committed to

23  ensuring that the bank operates in a safe and sound

24  manner, with appropriate controls.  In my opinion, I've

25  seen or heard nothing that would make me think

*Meadors Court Reporting*

1    otherwise.

2              MR. DYEKMAN:  Thank you.

3                   EXAMINATION BY THE BOARD

4              CHAIRMAN LAWTON:  Thank you.  I just have a

5    quick question.  I think it's -- in my life, it's been

6    a little unusual for a CEO to sit on the audit

7    committee.  I know it's in the beginning stages of

8    it --

9              MR. PETTWAY:  I'm sorry.  For the --

10             CHAIRMAN LAWTON:  To separate the CEO from

11   the audit committee.  So as I understand, Caitlin's

12   going to be the CEO, correct?  But will also be on the

13   audit committee.

14             MR. PETTWAY:  All members of the board, it's

15   planned --

16             CHAIRMAN LAWTON:  Right --

17             MR. PETTWAY:  -- initially --

18             CHAIRMAN LAWTON:  -- I understood that, and I

19   understand it's initially that that's going to happen,

20   but is that something you may change down the road,

21   where the CEO is not going to be on the audit

22   committee?

23             MR. PETTWAY:  It could be.  I'll also note

24   that the board meets in executive session after every

25   meeting.  If there was an issue, you know --

1          CHAIRMAN LAWTON:  That's right.

2          MR. PETTWAY:  -- we want to discuss among --

3          CHAIRMAN LAWTON:  Okay.

4          MR. PETTWAY:  -- just --

5          CHAIRMAN LAWTON:  So that's how you're kind

6    of trying to balance it, is that you have a separate

7    board member.

8          MR. PETTWAY:  Yes.  And again, this is just

9    the initial structure.

10         CHAIRMAN LAWTON:  I understand.

11         MR. PETTWAY:  Everybody wants to be involved.

12   Everybody wants to make sure, you know, our collective

13   backgrounds are there to support that -- the bank.

14         CHAIRMAN LAWTON:  Right.  And I could be

15   wrong, and this is maybe a question for Albert, but I

16   think might be a regulatory issue, having a CEO on

17   a. . . and you guys may have looked at that.

18         MR. PETTWAY:  I'll defer to executive

19   management on that.

20         CHAIRMAN LAWTON:  Okay.  Thank you.

21         MR. RIFE:  No questions.

22         MR. DIXSON:  No questions.

23         MR. JENSON:  No questions.

24         MR. FRANCE:  No questions.

25         MS. SHARP:  No questions, thank you.

1           MR. SORENSEN:  No questions.

2           MR. DEMERS:  Thank you, sir.

3           Mr. Dyekman, are you ready to call your next

4  witness?

5           MR. DYEKMAN:  I am.  Thank you.

6           I call Philip Treick.

7                     PHILIP TREICK,

8  having been first duly sworn, testified as follows:

9                     EXAMINATION

10  BY MR. DYEKMAN:

11      Q     Please state your name and your role at

12  Avanti.

13      A     Philip Treick.  Independent director.

14      Q     And what's your role as independent director?

15      A     My role as an independent director is to

16  assist in corporate governance and the implementation

17  of the business plan.  This includes the duty to

18  enforce policies and procedures and ensuring they're

19  executed to design and assist in directing the bank

20  towards agreed-upon goals and capital structure.

21      Q     Could you give the Board your background,

22  please.

23      A     I was born and raised in Wyoming.  Spent most

24  of my life in Rawlins.  Graduated from high school

25  there.

1          But I began my career in -- at Raymond James

2     Financial in Clearwater, Florida, in 1987.  I was hired

3     in the public finance department as an analyst and

4     focused on municipal bonds underwritings and debt

5     studies for clients which included Florida counties and

6     cities.

7          Q    You might want to slow down just a little

8     bit.

9          A    Oh, okay.  After -- after nearly two years, I

10    relocated to San Francisco and joined Transamerica

11    Corporation.  I started off, actually, in IT, but

12    within a short period of time, ended up managing the

13    equity trading desk for the corporation.

14         Did that for a few years, then graduated to

15    securities analyst.  Followed a number of different

16    industries, from financial services, technology, media

17    entertainment, industrials.  So led a small group, so

18    it was more of a -- a generalist program.  So it was

19    actually a really good experience.

20         In 1994, I was appointed a portfolio manager

21    and began my portfolio management career managing

22    mutual funds, separate accounts, managed part of the

23    pension obligations of Transamerica Corporation.

24         In 1999, Transamerica was sold to Aegon

25    Corporation.  I left at that point and went into

1    business with a fellow by the name of Robert Day, who

2    was the founder of Trust Company of the West, an

3    LA-based corporation.

4              I worked with him for approximately four

5    years, managing mostly his private family office money.

6    Additionally, some hedge products.  And ultimately, the

7    Cypress Fund, which was a hedge fund that he had

8    established in the '60s.

9              In 2003, I moved my family back to Jackson

10   and lived there for six years.  The first two years

11   were on noncompetes, though.  Actually just enjoyed the

12   adult Disneyland of Jackson.

13             But in 2005, I started an investment

14   management firm that was specializing in tangible

15   assets.  So did that for four more years before moving

16   back to the Bay area.

17             Launched a sister product to that fund with

18   the Stephens Investment Management Company back in

19   San Francisco, and that was a fund that was focused on,

20   again, tangible assets but income streams attached to

21   them.  So kind of an income-focused product.

22             And in 2016, I came back to Wyoming.  I was

23   with my son, who was visiting the engineering

24   department, looking to do a Ph.D. program.  And when I

25   was there, I was called to come over to the College of

*Meadors Court Reporting*

1    Business.  So went over there, and they asked me if I

2    would come back in and instruct a class at the student

3    portfolio management program there, which I ended up

4    doing.

5         So after moving back to Laramie -- I thought

6    it would be for a semester, but I've been there ever

7    since, and they'll probably -- probably bury me there.

8    The company I'd started, we merged with Tocqueville

9    Asset Management out in New York.

10        And in 2019, I was approached by the

11   University of Wyoming Foundation to become their chief

12   investment officer and start an internal investment

13   management team inside the Foundation, which I did, and

14   at that point, left the partnership that I had formed

15   and my interest to my partners.  So that's basically

16   the short/long story of me.

17        Q    So how did you first meet Caitlin Long?

18        A    So Caitlin and I met in the late '90s.

19   Transamerica Corporation used to sponsor a senior golf

20   tournament at the Silverado Country Club in Napa

21   County.  And my license plates on my vehicle said

22   GO WYO.  And apparently, she had walked by my car and

23   saw that, and so she was asking around, Who's -- who's

24   from Wyoming?  Because we didn't really know -- I

25   didn't realize Caitlin was from Wyoming.

**Meadors Court Reporting**

1          I knew that she was an analyst.  I followed

2     the insurance industry, although not life insurance.

3     Property and casualty.  But then we quickly found out

4     that we were, you know, comrades.

5          And so that's where we met and we've

6     continued a great relationship over the years.  We

7     stayed in touch.  We'd -- we'd almost always talked

8     twice, three times a month, since I met her.  And so

9     it's been a very fruitful relationship and a lot of fun

10    for me.  And she was one of my original investors in

11    all -- all the funds that I've done.  She was always

12    there.  So. . .

13    Q     So could you describe the University of

14    Wyoming's investment in Avanti.

15    A     So the foundation's interest, and as chief

16    investment officer, you know, it was born out of

17    necessity only because when you look out into the

18    future, I mean, it's probably pretty clear to most

19    people in this room, if not all, that digital assets

20    are becoming a larger and larger part of the investment

21    spectrum.

22         And so from our point -- from our standpoint,

23    the necessity is really from the standpoint of custody

24    in the beginning.  So we have donors that have given us

25    bitcoin, Caitlin being one of them.  And we've had

*Meadors Court Reporting*

1   other donors give us other digital assets.

2          So trying to figure out a qualified custody

3   solution was really paramount in the beginning, because

4   it's over time, I think, that by virtue of the size and

5   the growth and the innovation, these digital assets,

6   especially bitcoins, will become an asset class that

7   most long-term allocators of capital will need to have

8   in their portfolio.

9          And one reason for that is that they're

10  constantly searching for a diversified portfolio for

11  those assets that are not correlated in traditional

12  manners to the underlying assets you've already

13  invested in.  And so it's -- I think it's just a

14  natural occurrence.

15         So I approached -- I approached my investment

16  committee, the board that governs, you know, how we

17  invest our assets.  And I said, Look, I was speaking

18  with Caitlin.  And they know Caitlin.  She was on the

19  board a few years back.  And she's looking to start one

20  of these SPDI banks.  And the -- the promise here is

21  that we can be part of the qualified custody solution.

22  We can also help the state.  And we can help ourselves.

23         And so I wanted to find out if they would be

24  amenable to making an investment, if it were -- if we

25  could do that, and I first had to approach Caitlin,

1    obviously.  And the chairman of the board, Frank

2    Mendocino, agreed with me, that we should -- we should

3    explore it.

4              So I called Caitlin, and I said, Would you

5    accept the potential of an investment from the

6    University of Wyoming Foundation, to which she agreed.

7    So I then invited her to our spring board meeting,

8    which was held in Houston in February, and had her

9    present the idea.

10             So when she agreed to do that, we began our

11   due diligence.  My internal team and I and -- started,

12   you know, calling people, including Commissioner

13   Forkner and others, to try to figure out, okay, so what

14   does this mean?  What's a SPDI bank?  What's it going

15   to mean for our needs?

16             And what we determined was that it's kind of

17   as an institutional investor, would fit our needs, that

18   other entities could not really do at that point in

19   time.

20             So Caitlin came out.  She presented.  It took

21   about three hours, and then -- that was questions and

22   answers, and then she left the room, and we debated

23   another hour.  And it was -- it was a good investment

24   discussion, but there were differing opinions, but in

25   the end, everyone agreed that it would an interesting

**Meadors Court Reporting**

1    and potentially great investment for the university,

2    provided we could come to terms.

3            And what we wanted to do was lead the angel

4    round.  And so I approached Caitlin, and I said, We

5    would like to invest if we can agree to terms, and we'd

6    like to lead the route.  And ultimately, we did do so.

7            Chairman Mendocino required that we hire

8    legal counsel, which we did, John Leonard, who

9    represented us in the negotiations.  And -- and so we

10   were, hopefully, instrumental in helping them make that

11   angel round.  And for that, I was appointed as a board

12   member.

13        Q    Why did you agree to be on the board of

14   Avanti?

15        A    You know, in my -- in my career, I've been

16   exposed to a lot of really, really interesting people.

17   I was very early on in the investment process with

18   Amazon.  I was early on in the investment process with

19   Steve Jobs at Pixar.  Early on with the investment

20   process -- I mean, Microsoft became public in 1983, but

21   I was -- still early in the '80s at Microsoft and being

22   exposed to Bill Gates.

23            And Caitlin is one of those people.  Every

24   time I speak with her, when I'm around her for any

25   period of time, I learn something.  So for me, it was a

*Meadors Court Reporting*

1   conscious decision, that, yeah, I wanted to learn more.

2   And so that -- that drove it.  But in addition, the

3   university was leading that.  The angel round.  We

4   wanted board representation, and it was natural that it

5   would be me.

6       Q    So how is the board of Avanti functioning, in

7   your eyes?

8       A    It is -- so we meet frequently.  We have

9   relevant discussions.  And as you guys know, the

10  world's changing.  Just since they started this

11  process, there's been all kinds of change.  And there's

12  all kinds of uncertainty as it relates to new

13  competitors, new forms of competition, new types of

14  competition.  And so there's lots of stuff to talk

15  about.

16           And what I have found is that a

17  well-functioning board is generally one that shares

18  information transparently and quickly and doesn't try

19  to hide behind denial of risk.  And so I don't see that

20  in -- in my judgment, dealing with the internal board

21  members and the executive management team.

22      Q    Given your prior experience in investment,

23  how do you feel about the prospects of success for this

24  team and building a successful banking business?

25      A    I think the most important thing a new

*Meadors Court Reporting*

1    business can do is be very judicious with their

2    capital.  And the allocation of capital is the single

3    biggest, I think, component of success.

4              And so in the case of this company, they've

5    been great stewards of the capital that they've raised

6    in their seed and their angel rounds so far.  And when

7    I see that, that makes me feel a lot better, because I

8    know that they'll have a longer runway.  Because when

9    things change, sometimes things take longer, and

10   there's a lot of change.

11             And so -- so I think that their -- I think

12   their prospects are actually quite good because they're

13   pragmatic.  And again, they're good -- so as far as I

14   have seen, they're very good allocators of capital.

15        Q    In your opinion, should Avanti be granted a

16   bank charter in this state?

17        A    Yes.  I think -- I think Avanti is going to

18   both advance the state of banking, and I think that

19   they're -- that the financial products that they're

20   developing and -- and marketing, I think, will be --

21   will benefit their clients.  And again, it'll benefit

22   the state.

23             And to the extent that it draws more of that

24   type of activity, I think it's going to benefit the

25   state in a myriad of ways, not only the people that

1  will drive the capital but will draw on the jobs it

2  will create.  So I think that -- that, yes, they should

3  because hopefully, they're successful.

4              MR. DYEKMAN:  Thank you.

5              CHAIRMAN LAWTON:  No questions.  Thank you.

6              MR. RIFE:  No questions.

7              MR. DIXSON:  No questions here.  Thanks.

8              MR. JENSON:  No questions.

9              MR. FRANCE:  None for me.

10             MS. SHARP:  No questions.  Thank you.

11             MR. SORENSEN:  No questions.

12             MR. DEMERS:  Thank you, sir.

13             Mr. Dyekman?

14             MR. DYEKMAN:  Thank you very much.

15             The next witness is Katie Cox.

16                        KATIE COX,

17  having been first duly sworn, testified as follows:

18                        EXAMINATION

19  BY MR. DYEKMAN:

20       Q    Please state your name and your relationship

21  with Avanti.

22       A    I'm Katie Cox, and I'm adviser to Avanti.

23       Q    Could you give the Board a bit of your

24  background, please.

25       A    Sure.  I spent 30 years with the Federal

*Meadors Court Reporting*

1  Reserve system as a Federal regulator, a bank

2  regulator.  I recently retired in February as an

3  official in the mergers and acquisitions section.

4       The first 10 years of my career at the

5  Federal Reserve, I spent as a commissioned Federal bank

6  examiner.  I examined or participated in examinations

7  of numerous types of banking industries that are

8  regulated by the Federal Reserve.  That included bank

9  holding companies as large as CMC in Pittsburgh, Bank

10 of America in Charlotte, as well as community banks in

11 the Federal Reserve.

12      I also went to non-banking entities, but bank

13 holding companies and examining those and foreign

14 agencies operating in the US, as well as US operations

15 oversees.  So I think I might be one of the few people

16 that's gone to almost every type of legal entity that

17 the Federal Reserve system encompasses.  I've worked

18 for four Federal Reserve banks, including the Kansas

19 City Reserve Bank, which, of course, encompasses

20 Wyoming.

21      And then after spending 10 years on the road,

22 I went to Washington, D.C., and spent the last 20 years

23 working for the -- for the Governors of the Federal

24 Reserve System in the mergers and acquisitions section.

25      I was one of the key Federal reserve

*Meadors Court Reporting*

1    officials responsible for a payment system related to

2    proposals, and that's what this is.  And I'll give you

3    an example of one of the proposals I've worked on that

4    I think you can relate to that has a lot of

5    similarities and issues or, you know, that -- the same

6    things that Avanti is dealing with.

7           And maybe you all are familiar with Green

8    Dot, the prepaid debit card.  You can buy them in

9    Walmart, CVS, 7-Eleven and Green Dot is probably the

10   largest prepaid debit card in America.  And they were

11   sort of tired of dealing with two third-party banks

12   that were holding their customers' deposits for their

13   debit cards.  And Green Dot wanted to buy some

14   commercial bank.

15          And so they came to us, and I ended up being

16   the -- the lead person on knowing the deal for my

17   division.  And this is a very novel proposal, a prepaid

18   debit card company that's not really that regulated,

19   and it wants to buy a bank, a regular commercial bank,

20   and they wanted to buy one in Utah.

21          And it's novel.  It's also a fee-based

22   business, not lending -- not a lending business.

23   Not -- not dependent on interest rates.  It's a

24   fee-based generated revenue business.  But also, it's

25   similar to Avanti in that its risks are operational

*Meadors Court Reporting*

1    risks and technology risks. They're not interest rate

2    risks or credit risks.

3            So this was a very novel proposal for the

4    Federal Reserve. I got to be the lucky winner to

5    present it to the Board of Governors for a vote. It

6    was controversial. All the governors but one, despite

7    what I thought was a wonderful presentation on my part,

8    voted on the deal. And one of them very much

9    vociferously disagreed with approving the deal, and she

10   dissented and wrote a very long dissent on her public

11   website.

12           So this is -- this is a similar type of

13   proposal where, you know, with some similar risks. And

14   so, just to let you know, I have that type of a

15   background, working on those types of proposals.

16           I've worked on numerous de novo bank

17   proposals. Also state membership proposals, where, you

18   know, banks want to join the Federal Reserve. I've

19   presented numerous policy recommendations and novel

20   banking proposals for the Federal Reserve Governors

21   during my tenure at the board. That includes

22   presenting to all the chairs or chair -- or Governors

23   who were going to become a chair, Greenspan, Bernanke,

24   Yellen, and Powell.

25           And for a career Federal employee in

*Meadors Court Reporting*

1   Washington, D.C., that's kind of the epitome of terror,

2   you know, very -- very scary of an experience to do

3   those types of presentations.  But anyway, I have a lot

4   of experience in that area, you know, working on novel

5   proposals or proposals that have policy twists to them.

6           I'm also the primary contributor for several

7   pieces of bank regulatory guidance during my tour with

8   the Board in Washington.

9       Q    So how did you -- or how do you view your

10  role as an adviser to Avanti, then?

11      A    Well, I believe my primary role is to provide

12  advice to Avanti on its regulatory strategy for its

13  proposals with the Federal Reserve.  Also, provide

14  advice on its Avit product and raise questions with a

15  focus on identifying and mitigating potential risks to

16  traditional payment systems.

17          And then I provide advice on strategic

18  inquiries that Avanti has already received, both from

19  banks and nonbanks, and those from entities from within

20  and outside of the United States.

21          I provide capital -- or advice regarding the

22  capitalization of Avanti from the perspective of a bank

23  regulator.  And that -- that includes advice that

24  Avanti should not agree to grant preferences, typically

25  requested by venture capital investors, such as

1    liquidation preferences, ride-along rights.

2         I'll just be honest with you.  The Federal

3    Reserve likes a capital structure that is as

4    straightforward as possible.  And so with looking

5    through it with that lens, you know, it's a lot easier

6    if you're dealing with a proposal to the Federal

7    Reserve, that you have a proposal that has a simplified

8    capital structure, as much as you can.

9         So I've provided advice on drafting of

10   Avanti's critical policies affecting bank operations

11   and also with regard to corporate governance.  I also

12   intend to provide advice and guidance as the internal

13   controls and audit program is formalized.

14        I also want to make it clear that due to

15   Federal ethics restrictions, I am not permitted to be

16   in communications with the Federal Reserve for 12

17   months following my departure, until it meets up on

18   March 1st of this year -- of 2021.  Avanti has not

19   asked me to contact anyone at the Federal Reserve, and

20   nor have I done so, regarding this proposal.

21        Q    How did you get connected with Avanti in the

22   first place?

23        A    Well, in April this year, Caitlin Long and

24   Britney Reddy contacted me, discussed the opportunity

25   of being an adviser with Avanti.  And Caitlin had

*Meadors Court Reporting*

1    become aware through a network of colleagues who work

2    in bank mergers and acquisitions that I had recently

3    retired, and I was interested in serving on bank boards

4    or as a bank adviser.

5            So when they contacted me, we had a nice

6    conversation.  I said, Well, let me look at your

7    business plan, your proposed management team, and your

8    capitalization.  So they gave me access to those

9    documents so I could go through those.

10           And while I was at the Board in Washington of

11   working in mergers and acquisitions for 20 years, I

12   really -- I reviewed hundreds of bank proposals.  And

13   you wouldn't believe some of the ones that get sent

14   that, you know, you're like, What are these people

15   thinking?

16           And -- but many of them were novel or

17   fee-based, and I could go through these proposals

18   pretty quickly and determine whether it's a proposal

19   that the Federal Reserve would deem feasible and would

20   approve.

21           So I went through their proposal, and I

22   looked at the proposed management and their business

23   team, and capitalization, and I was really impressed.

24   And I thought -- well, you know, I looked at it and I

25   thought, you know, this is something, in my -- in my

*Meadors Court Reporting*

1    opinion, I think are both feasible and approvable.  And

2    it's also a fascinating new business and novel and, I

3    think, challenging.  So I agreed to become an adviser

4    to Avanti.

5        Q    So now that you've had a chance to work with

6    the management team and -- and had interactions with

7    them many times, do you think that they are capable of

8    building a successful SPDI bank?

9        A    Yes, I do.  I think this is the team to

10   provide a product solution to the US's cumbersome

11   payment settlement system.  While this is a private

12   solution, it's also regulated -- it would be regulated

13   by the State of Wyoming.

14            And I've had -- you know, and I looked at the

15   proposed management team for this, for Avanti, and one

16   of the things, always as a regulator, was I researched

17   their track record.  You know, so what, you're from a

18   regulated entity.  What's your track record with that

19   entity?

20            Do you have funds?  Do you have public

21   enforcement action?  These are red flags you need to

22   look for.  And so I did that.  And that was part of my

23   due diligence, and I didn't see any of these red flags.

24            And also, you know, when I was at the Federal

25   Reserve because we did see these red flags.  They're

*Meadors Court Reporting*

1    speed bumps for your deal.  It creates issues.  You

2    have to explain, you know, why there's enforcement

3    action when you were in charge of this entity or why

4    they were fined.  And so you don't -- you know, we

5    don't have any of that with this proposal.

6          This team has also been highly proactive and

7    interactive.  They're serious about identifying and

8    mitigating the risks that this proposal presents.

9    They're not pretending that this proposal doesn't

10   present risks, and they're taking these risks head-on

11   and figuring out ways to mitigate the risks.  And I

12   think they have the skill sets to identify the risks

13   and -- and mitigate these risks.

14         There's something also unusual about this

15   group, is that they're already having regular board

16   meetings.  In my experience, that is very unusual for a

17   bank that's in formation or even of a seeding that's in

18   formation that doesn't even have a charter yet, but

19   they're already having formal bank minutes and --

20   excuse me, board meetings, taking minutes, executive

21   committee meetings.  That's unusual.

22         And so they're putting in a strong corporate

23   governance framework right off the bat, and that's

24   great.  So again, I think this management team is

25   capable of building and operating a safe and sound

1  SPDI.

2      Q    Given your experience with the Federal

3  Reserve, do you have any thoughts about Avanti's

4  getting a master account?

5      A    Well, yes, I do.  First of all, I've had

6  firsthand in-person meetings with many of the current

7  Governors at the Board.  And I believe that -- I

8  believe that the Federal Reserve -- it's only my

9  personal opinion, but the Federal Reserve system

10  welcomes private solutions to the US payment system's

11  inefficiencies.

12          So you've got private solutions but it's also

13  going to be a SPDI that's going to be a regulated

14  entity, and I commend Wyoming for putting together a

15  legal and regulatory framework for overseeing this type

16  of SPDI.

17          And so I think once the Federal Reserve --

18  and they -- I know they -- you know, I believe they're,

19  you know, closely working -- or it's my understanding

20  that they're closely working with Wyoming and getting

21  an understanding of all the work that's been put in.

22          And so having that type of private solution

23  that goes along with being also a regulated

24  institution, I think that really enhances the chances

25  that the Federal Reserve would support having Avanti

*Meadors Court Reporting*

1    get a master account with -- with them.

2                MR. DYEKMAN:   Thank you very much.

3                MS. COX:   Sure.

4                MR. DEMERS:   Are there any questions from the

5    Board?

6                    EXAMINATION BY THE BOARD

7                MR. RIFE:   Thank you, Ms. Cox.   I appreciate

8    your testimony.

9                If you maybe just say what the -- the top one

10   or two impediments are for this institution realizing

11   its success, how would you classify them.

12               MS. COX:   Well, I guess there's -- it's a

13   couple -- there's several things they want to do.   I

14   think, you know, getting the master account would be a

15   tremendous boost for this company.   And I don't want to

16   say it's -- it's going to be a -- I don't know -- I

17   don't want to say difficult, but it'll probably be a

18   little bit longer road with the Federal Reserve to get

19   the Federal Reserve comfortable with granting a master

20   account.

21               This will have to more than likely be

22   considered in -- in Washington and be presented to at

23   least a subset of the Governors there for them to

24   consider.

25               And so from my perspective, that's what I

*Meadors Court Reporting*

1   think is going to be a challenge, but I don't think

2   it's an insurmountable challenge.

3           MR. DIXSON:  One quick question, Ms. Cox.

4   Thanks for your testimony.

5           My question is:  Will you -- do you see your

6   role continuing beyond the organizational phase into --

7   assuming a charter is granted?

8           MS. COX:  I would be glad to serve in any

9   capacity of, you know, particularly as a Board member,

10  if they so wish me to do so.  I'd be -- I would be glad

11  to do that.

12          MR. JENSON:  No questions.

13          MR. FRANCE:  No questions.

14          MS. SHARP:  No questions.

15          MR. SORENSEN:  No questions.

16          MR. DEMERS:  Thank you.

17          Mr. Dyekman, do you have any additional

18  questions for this witness?

19          MR. DYEKMAN:  No, I don't.  Thank you.

20          MR. DEMERS:  Thank you, Ms. Cox.

21          Do you have any additional witnesses?

22          MR. DYEKMAN:  For now, we'll -- we'll call

23  that our last witness.

24          MR. DEMERS:  I understand.  You're not --

25  you're not resting.  I understand.

*Meadors Court Reporting*

1            MR. DYEKMAN:  Yes.

2            MR. DEMERS:  Thank you.

3            MR. DYEKMAN:  Thank you.

4            MR. DEMERS:  At this time, the Division's

5     asked for a ten-minute recess before they commence

6     their case.

7            We'll be in recess.  Thank you.

8            (Recess from 2:02 p.m. to 2:14 p.m.)

9            MR. DEMERS:  You're going to call both of

10    them as a witness?

11           MR. DYEKMAN:  Yes.  Neil Schloss is who I was

12    going to ask a couple questions of first.

13           (Messrs. Schloss and Cullinan sworn.)

14           MR. DYEKMAN:  All right.  Very good.  Thank

15    you, gentlemen, for being here.

16                      NEIL SCHLOSS,

17    having been first duly sworn, testified as follows:

18                      EXAMINATION

19    BY MR. DYEKMAN:

20       Q    Neil, could you give your name and your role

21    with Avanti, please.

22       A    Yes.  Neil M. Schloss, adviser to Avanti.

23       Q    Could you please give the Board a description

24    of your background.

25       A    Yeah, my pleasure.  It's great to be here.  I

1    wish I could be there in person, because I've never

2    been to Wyoming, and look forward to the chance to --

3    to come visit.

4            I spent my entire career at Ford.  I spent 36

5    years at Ford, predominantly all in finance or treasury

6    roles.  Last two jobs I had, beginning in 2007, was

7    corporate treasurer, and then my last two years before

8    I retired, I was CFO of Ford Mobility.

9            As part of that career and as part of my

10   treasury background, which I spent about 25 years of

11   the 36, on a number of different roles, including

12   banking, cash management, trading, pension and

13   liability management, and risk management and strategy,

14   working my way up to the point where I got my dream job

15   in 2007 when I became corporate treasurer.

16           I managed a team of about 300 folks globally.

17   It was a dream job, but in 2007, for those of you who

18   remember, it was the beginning of the financial crisis.

19   It was the beginning of the auto crisis.  And I think

20   that the time of 2007 to 2009 was -- will go down for

21   me, anyway, as both a career highlight but also a

22   career lowlight, dealing with many of the things that

23   the auto industry was dealing with on top of what was

24   going on with the financial markets.

25           I think importantly, as treasurer -- I did it

1    for about 10 years -- I had a full responsibility for

2    all of the functionalities within treasury, and that

3    includes what Bob will talk about in a second with

4    regards to the treasury IT world.

5         As treasurer, I was also engaged in much of

6    the leadership, so part of the leadership team around

7    the table, and it helped save Ford from what its two

8    competitors in Detroit went through, filing for

9    bankruptcy.

10        Importantly, I think, for this Board is as

11   part of the role of treasurer, I also served on the

12   Board and audit committee of Ford Motor Credit Company,

13   which was or is about a $150 billion financial services

14   company, meant to finance dealers and our retail

15   customers.

16        The last two years as treasurer, I was also

17   chair of the audit committee.  Also as treasurer, I was

18   a frequent participant on the Ford Board and a

19   permanent management participant in the Ford Motor

20   Company audit committee and finance committee.

21        (Sound distortion)  And I understand

22   financial matters.  I have a really good understanding

23   of business strategy.

24        Toward the end of my career at Ford, I was

25   asked to join the CEO of Mobility to help start a

*Meadors Court Reporting*

1    mobility business, and this was really a start of -- a

2    startup inside of Ford to help build what the future of

3    auto 2.0 would be and really start building

4    mobility-based businesses beyond the traditional, you

5    know, design, manufacture, and sale and financing of

6    cars and trucks around the world.

7              I did that job for about two and a half

8    years, leading the -- the start of a finance

9    organization, building its own financial reporting, its

10   own internal controls, its own governance.  We also

11   bought four companies and started several internally as

12   well.

13             I retired from Ford at the end of 2018, and

14   since then, I've joined three different private company

15   boards, the largest being the US holding company or the

16   intermediate holding company for BNP Paribas, and so

17   I'm frequently involved in -- in learning about the

18   banking business from the other side.  I dealt with

19   the -- with the capital markets and strategy side

20   frequently as treasurer.  Now I'm getting a look at the

21   other side as it relates to -- to banking.

22             In addition to BNP, I'm on two startup

23   boards, both Israeli based.  One is a cybersecurity

24   company, and another is a venture capital fund.

25             With the BNP role, I'm getting indoctrinated

*Meadors Court Reporting*

1    in -- I think the way I would describe is drinking from

2    a fire hose on what bank regulatory environment is for

3    a US bank.

4           I think it's -- it's part of a learning

5    experience for me, for sure, but I never really

6    appreciated what was going on behind the scenes at

7    banks from a standpoint of the regulatory environment,

8    and with BNP, the internal holding company or

9    intermediate holding company, obviously came about as a

10   part of Dodd Frank.

11          The amount of time and effort that the Board

12   spends working with the management team to make sure

13   that the government controls are in process, are in

14   place and continue to be managed.

15          In addition to the board role, I'm also on

16   the IHC audit committee and both the IHC and US risk

17   committees.  So that's been it.  It's an eye-opening

18   experience, it's a learning experience, and I look

19   forward to continuing in that role.

20          And lastly, since retirement, I've created my

21   own advisory firm, basically a single proprietor, LLC,

22   to do -- to do advisory work, very similar to what I'm

23   doing with Avanti.

24          And with that, I (sound distortion)

25      Q    So how did you get connected with Avanti?

*Meadors Court Reporting*

1          A     I think it goes back a few years, anyway.  I

2     think I've known Caitlin now for almost a decade.  We

3     met originally when she was part of the Morgan Stanley

4     pension advisory group.  We were going through some

5     pretty significant delistings as part of the Ford

6     defined benefit pension plans which, like most plans in

7     the early part of the last decade were -- were

8     underfunded, heavily exposed to -- to equity returns,

9     and the liabilities were heavily exposed to discount

10    rates.

11             So we had the Morgan Stanley team come in.  I

12    had never met Caitlin before that and was extremely

13    impressed.  And I would say this even if she wasn't in

14    the room, but she was one of the smartest bankers I

15    think I've ever dealt with in my 25 years in treasury.

16             Subsequent to that, we reconnected at a peer

17    group -- I think she mentioned this earlier as part of

18    her testimony -- back in 2014.  She came to present to

19    the Cap Cap, which is a top 20 cap-based companies in

20    my peer group as treasurer.  She came and presented a

21    presentation on blockchain and bitcoin.

22             And I think for me, that was my first, sort

23    of, indoctrination to the subject, and it was really a

24    wow moment from the standpoint of what blockchain and

25    bitcoin could actually do to improve many of the

1    inefficiencies that existed within my treasury world.

2              I was so excited about that, I asked her if

3    she would come back and come present to my team.  And

4    so we had a session of what we called Lunch and Learn,

5    which the majority of my US team was present, to hear

6    again the subject, and for them, the first time hearing

7    it as well.

8              And from that, many of the discussions

9    continued along the line on many -- or several

10   financial transactions, ABS sort of being sort of the

11   most important one for us, given the asset-based

12   financing and the huge amount of inefficiencies that

13   exist in any kind of title-related transactions.

14             And so from there, we stayed in contact and

15   looking forward to -- and continue to find out what

16   each of us was doing, and connected earlier this year.

17   She told me about Avanti and told me about the things

18   she was doing with regards to corporate treasurers, and

19   asked me to join the ride.

20        Q    And what things --

21             MR. DEMERS:  Mr. Dyekman, you might want to

22   kill your mic between questions.

23             MR. DYEKMAN:  Okay.

24        Q    (By Mr. Dyekman)  What things caused you to

25   decide to become a member of the advisory board?

1      A    I think, by and large, it's what the company

2    is trying to do.  I think they've got a unique -- a

3    potentially unique strategy to really address some of

4    the inefficiencies in the payment world.  And from a

5    corporate treasurer perspective, the amount of

6    inefficiencies that exist between one party paying

7    another could take several days.

8           It's -- as a treasurer, when you send large

9    amounts of money out, you want to get large amounts of

10   money back or at least acknowledgment of receipt, if

11   it's a payment due.  And many -- as many of you know,

12   the number of parties that touch that transaction in

13   the process is -- and everybody's takes a little bit of

14   a fee, especially if you're going across borders.

15          And so I think what Avanti is trying to do,

16   and what interested me, is trying to find those --

17   those solutions, and working with a company and my old

18   peers from a standpoint of treasurers around the US, to

19   hopefully try to expand the strategy and try to break

20   into this, which is a process that's presently -- the

21   majority controlled by the -- the major banks.

22      Q    What do you think the barriers are to fixing

23   the problems in the corporate payment system?

24      A    I think it really relates to what I just said

25   from the standpoint that the large banks are the ones

1   that are facilitating these payments for corporations

2   today.  They're built into the -- the ecosystems that,

3   you know, treasury systems and payment systems are in.

4          And so it's really going to be getting one or

5   two clients that have some clout to try this out and

6   prove it out, and prove that the -- both the cost

7   reduction that comes with it and the risk reduction

8   that comes with it, as it relates to just overnight

9   exposures, can be proven out and make it efficient.

10          And then jointly, with the individual

11   clients, start showing the stair steps, so you start,

12   you know, sort of building as you go.  Get a couple of

13   them on board, and then I think it'll go off from

14   there.

15      Q    So is that how you think Avanti can compete

16   with the large bank providers?

17      A    Yeah, I'm not sure if "compete" is the right

18   word.  I think there's plenty of -- there's plenty of

19   business to go around.  There are going to be a number

20   of parties that -- that participate in this that are

21   efficient in this or can be efficient in this.

22          But it really is going to be getting a couple

23   of pretty good-sized clients that can put -- and put

24   some, you know, effort into selling it to others.

25   Selling it is not the same way, but pushing it toward

*Meadors Court Reporting*

1    others.  It's getting it integrated into some of the

2    treasury management systems and ecosystems, and Bob can

3    talk more effectively on that.

4            It's -- it's really going to be a step.  It's

5    going to be getting one, two, and then three and four,

6    and working your way through, and they'll get the

7    attention of the bigger guys, and I think they all want

8    to control it.  And they will try to control it, but

9    they're going to have trouble when you start getting

10   the efficiencies that I think this could bring.

11           MR. DYEKMAN:  Thank you very much.  You

12   mentioned Bob.

13                   ROBERT CULLINAN,

14   having been first duly sworn, testified as follows:

15                     EXAMINATION

16   BY MR. DYEKMAN:

17      Q    So Bob, could you please state your name and

18   your relationship with Avanti.

19           MR. SCHLOSS:  You're on mute.

20      A    There we go.  That's better.

21           Good afternoon.  My name is Robert Cullinan.

22   My relationship with Avanti is an adviser.

23      Q    (By Mr. Dyekman)  And could you please

24   describe your professional background.

25      A    Certainly.  I have about 49 years of

1   experience in information technology business, both in

2   the auto loan bail business and the captive finance

3   business.

4          I've had executive leadership roles as a

5   director of global treasury, finance and accounting

6   systems, and management information systems.  I've had

7   senior-level international positions located in the

8   United Kingdom, where I was responsible for

9   applications development and captive finance

10  organization.  I had a team in Germany and as well in

11  Spain.  I've taken short-term assignments in Brazil, in

12  India, Sweden, and in the United Kingdom as well.

13         Also in my career, I've had a strategic role

14  in automotive world-wide systems planning, where I did

15  work by developing systems strategy for emerging

16  markets and then packaged organizations which. . .

17         (Audio failure.)

18         SPEAKER:  Oh, no.

19  Q    (By Mr. Dyekman)  Can you still hear me, Bob?

20  We've lost your audio.

21         MR. DYEKMAN:  Well, I'll make what we call a

22  proffer of evidence, then, in court.

23         What he was going to talk about is the

24  interface between an IT product like this and industry

25  and the big opportunities that he sees in the

*Meadors Court Reporting*

1    industrial sector as far as this payment system and how

2    he's going to assist in trying to get people in similar

3    positions to his own to take a look at the Avanti

4    products.

5            MR. DEMERS:  Is the Board satisfied with

6    that?

7            Thank you.

8            MR. DYEKMAN:  Don't ask me any questions.

9            CHAIRMAN LAWTON:  And I apologize.

10           MR. DYEKMAN:  That's all right.

11           With that, we will rest.

12           MR. DEMERS:  Subject to something you may

13   want to present in the event that there's an executive

14   session later?

15           MR. DYEKMAN:  Absolutely.

16           MR. DEMERS:  Thank you.

17           MR. DYEKMAN:  Yes.  Thank you.

18           MR. DEMERS:  Mr. Kenney, are you ready to

19   proceed?

20           MR. KENNEY:  Yes.

21           MR. DEMERS:  Thank you.

22                   ALBERT FORKNER,

23   having been first duly sworn, testified as follows:

24   /

25                   EXAMINATION

*Meadors Court Reporting*

1    BY MR. KENNEY:

2        Q    Will you please state your name and position

3    for the record.

4        A    Albert Forkner.  Banking Commissioner for the

5    Wyoming Division of Banking.

6        Q    And would you please describe your role, in

7    particular with regards to this matter.

8        A    Well, as the Commissioner, I lead the

9    Division of Banking, which is charged with the

10   chartering and supervision of financial institutions

11   that are subject to Wyoming law.

12            And regarding this specific proceeding,

13   Mr. Chairman and members of the Board, you were

14   provided a copy of our report of investigation, which

15   is labeled Exhibit A.  That report summarizes our

16   investigation and subsequent findings and

17   recommendations.

18            Our purpose here today is to provide a

19   summary -- a few summary comments and then answer any

20   questions you have regarding the charter investigation

21   conducted by my office.

22            Wyoming Statute 13-12-114 states in part that

23   the Commissioner shall make a careful investigation and

24   examination of the following factors:  the character,

25   reputation, financial standing, and ability of the

1    incorporators, which in this case are the proposed

2    directors.  The character, financial responsibility,

3    banking or other financial experience, and business

4    qualifications of those proposed as officers and

5    directors.  And the application for a charter,

6    including the adequacy and plausibility of the business

7    plan of the special purpose depository institution and

8    whether the institution has offered a complete proposal

9    for compliance with the provisions of the chapter, that

10   being Chapter 12 of Title 13.

11        The investigation process for Avanti

12   Financial started informally early this year.  This

13   included discussions with Ms. Long about her vision for

14   Avanti and a high-level overview of the proposed

15   business activity.

16        In previous charter hearings, I've noted that

17   the most important factor for a financial institution

18   is its management team.  This includes day-to-day

19   operating management and the board of directors.

20        My early discussions with Ms. Long stressed

21   the importance of building a strong management team

22   with requisite experience needed for the activities the

23   SPDI would be engaging in.  In assessing compliance

24   with statutory factors 1 and 2, previously mentioned,

25   we verified, and as you have seen and heard today, that

*Meadors Court Reporting*

1    Avanti has built a strong management team, including a

2    slate of independent expert advisers.

3            Another important factor is maintaining the

4    proper capital position.  Bank capital performs very

5    important functions.  It absorbs losses, promotes

6    public confidence, helps restrict excessive growth, and

7    provides protection to depositors.

8            The amount of capital that is being proposed

9    appears to be sufficient for the overall risk profile

10   that Avanti will have during the three-year de novo

11   period.

12           As you're aware, digital assets pose unique

13   challenges and risks regarding BSA, AML, KYC, and OFAC

14   sanctions compliance.  We investigated Avanti's

15   compliance posture and risk management policies

16   regarding BSA/AML compliance.

17           Additionally, the proposed Avit product

18   requires Avanti to have a robust BSA/AML program as a

19   network administrator, and we are ensuring that

20   compliance is addressed appropriately there as well.

21           It probably goes without saying, but a sound

22   IT cybersecurity, information security infrastructure

23   is vital and expected in all areas of financial

24   services.  Digital asset custody elevates those

25   expectations even more.

**Meadors Court Reporting**

1          Private key management on behalf of a third

2     party requires the highest level of security and

3     controls.  And Avanti's proposed Avit requires

4     additional controls around the issuance and burning of

5     tokens.  So we have had a number of discussions about

6     that.

7          As our report of investigation indicates,

8     I've determined that Avanti Financial Group has

9     adequately and complied with the statutory factors that

10    my office is charged with investigating.

11         So with that, Mr. Chairman, I'll stand for

12    any questions from the Board.

13              EXAMINATION BY THE BOARD

14         CHAIRMAN LAWTON:  Not from me.

15         MR. RIFE:  No questions.

16         MR. FRANCE:  Mr. Forkner, I guess my question

17    to you has been, you've heard the testimony from some

18    of these other folks today regarding the potential

19    lending function.

20         Do you have a level of comfort through your

21    office that that would be in compliance with the

22    legislative direction that was provided?

23         MR. FORKNER:  Yeah, absolutely.  So again,

24    this is the context you think about securities lending.

25    In essence, it's that activity, other than it's a

*Meadors Court Reporting*

1    digital asset.  So that would be the closest one.

2            So you know, as I've listened today, yeah,

3    the term "lending" -- and yes, there is an asset being

4    lent out for -- for a purpose, and in the securities

5    lending world, it's different than the traditional --

6    whether it's consumer or commercial lending that is

7    done by traditional bank activities.

8            So in this case, the -- a client of Avanti

9    directs them to effectuate some sort of transaction on

10   their behalf as, in essence, a directed trustee.  So

11   that is a non-balance sheet lending activity, and

12   therefore, is -- there is no fiat deposits being lent

13   against, and so therefore, there is not a -- that loan

14   is not an asset of Avanti.

15           And so it is in compliance with the statute.

16   And in fact, that's an activity that is authorized as

17   additional activities that fee sharers can engage in.

18           MR. FRANCE:  On another note, I posed the

19   question earlier today regarding CFPB potential

20   red-lining when you're kind of identifying a high net

21   worth audience.

22           Do you see or anticipate any scrutiny that

23   that might come forth due to the potential target

24   audience that this company has identified.

25           MR. FORKNER:  You know what, we're still

1    looking into that.  I don't think it's applicable in

2    the sense of the -- the activities are allowed for --

3    for consumers under deposit, as the law is written, is

4    solely as it relates to custodial activities.

5           So if you remember when the law was first on

6    the books, it was corporate-focused only, commercial

7    client, and that was -- was structured to be.

8           So if you're a company in business, it didn't

9    matter what type, you could have an account with Avanti

10   and all the services that were allowed under the law.

11          Then last year -- or this last session

12   earlier this year, the amendment was to allow for

13   consumer activities, but if any of you followed that

14   legislative process, you know that I did want it to

15   just be open door to an alternative, non-FDIC insured

16   bank.  I mean, that just was never the whole intention

17   of this institution.

18          So we worked to make sure that what the

19   demand was, was those individuals who wanted to work

20   with an exchange that may be under an SPDI charter, an

21   affiliate maybe did, and as heard from the Kraken

22   hearing a few months ago, that was sort of the target.

23          So those activities are still limited to, in

24   essence, on and off ramp to custodial activities.

25   Individuals cannot, the way the law is written, have

1    full banking services.

2            So that being said, because it's limited, and

3    we'll continue to research it, I don't think that would

4    be subject to potential red-lining.  But obviously, as

5    a regulator, and we're -- consumer compliance is an

6    issue that, you know, banks have to follow.  We would

7    make sure, if it does -- in whatever fashion it does

8    apply, then we would -- the bank is expected to comply

9    with any and all applicable state and Federal

10    regulations.

11            MR. KENNEY:  I have no further questions.

12            MR. DEMERS:  Mr. Dyekman, did you wish to

13    make inquiry of Mr. Forkner?  Thank you.

14            MR. DYEKMAN:  No, thank you.

15            MR. DEMERS:  Then that concludes the

16    Division's case?

17            MR. KENNEY:  Yes, that does conclude the

18    Division's case.

19            MR. DEMERS:  Thank you.

20            CHAIRMAN LAWTON:  So now we will go into

21    executive session.

22            MR. DEMERS:  You probably want a motion.

23            CHAIRMAN LAWTON:  Oh, we need a motion for

24    that?

25            I'll entertain a motion to go into executive

1    session.

2           MR. FRANCE:  Mr. Chairman, I'll move that we

3    go into executive session.

4           MR. JENSON:  I'll second.

5           CHAIRMAN LAWTON:  All in favor, signify by

6    saying aye.

7           (Ayes expressed.)

8           CHAIRMAN LAWTON:  Opposed?

9           MR. DETERS:  I -- go ahead.  Sorry.  I

10   apologize.

11          CHAIRMAN LAWTON:  That's all right.  I'm

12   done.

13          MR. DEMERS:  I just want to state at this

14   point in time, the executive session is being convened

15   according to the Department of Bank Division's Rules,

16   Chapter 9, Section 3(c), being allowed for

17   confidentiality of nonpublic information.  And at this

18   point in time, the Board has determined that they want

19   to consider such information.

20          So in terms of preparing for the executive

21   session, Mr. Dyekman, I'd ask your assistance, please,

22   in identifying those individuals who Avanti is okay

23   with having present during the nonpublic session.

24          MR. DYEKMAN:  The executive team.  If we

25   could just have the people that were on the original

1    stipulated witness list.  That would be it.

2            MR. DEMERS:  So we'll stand in recess and,

3    after five minutes, give everybody time to clear the

4    room and have those who need to be here.  Thank you.

5            (Recess at 2:41 p.m.)

6            (Executive session transcribed separately.)

7            (Open proceedings resumed at 3:18 p.m.)

8            MR. DEMERS:  Thank you.  At this time, we'll

9    go back on the record.

10           At this point in the proceedings, we would

11   give indication for members of the public to make oral

12   comment.  If you would care to do so.

13           There being no indication that anybody

14   decides to make oral comment, Mr. Dyekman, do you

15   desire to present the closing statement?

16           MR. DYEKMAN:  I do.  Thank you.  And I'll

17   keep this short.

18           Mr. Chairman and members of the Board, I

19   appreciate your attention throughout this long hearing.

20   But I hope you found the witnesses today and their

21   testimony to be both interesting and informational.

22           The Chairman mentioned at the beginning of

23   the hearing the seven criteria that you have to decide

24   have been met in order to grant a charter, and I would

25   take a moment to say why I think they've all been met,

1    aside from the fact that the Banking Division has

2    already expressed its opinions that all seven have been

3    met.

4          The first one is that the character,

5    reputation, financial standing, and ability of the

6    incorporators -- which in this case is the management

7    team -- is sufficient to afford reasonable promise of

8    successful operation.

9          As you've seen today, Avanti has a team of

10   highly capable people with significant relevant

11   experience, and they have the requisite financial

12   standing to make this work.  They're all recognized

13   leaders of proven work histories of accomplishments,

14   and they're good people.

15         Question number 2 is pretty much the same,

16   except it asks about officers and directors.  And it's

17   been noted here that the fact that there are even

18   directors yet is unusual and a positive thing, and

19   that's definitely true with this team.

20         So not only do the executives meet the

21   requirements of character and financial responsibility

22   and experience, but so do the directors.  All the

23   directors have had governance experience.  The

24   independent directors are who I'm referring to.  And

25   they've had that at a high level in the relevant

*Meadors Court Reporting*

1    industry.

2           You would be hard-pressed to find a better

3    initial board of independent directors than they have

4    here.  And they're already part of the team.  That's

5    important, too, because they've added a lot to the

6    process.

7           The third criteria is the plausibility and

8    adequacy of the business plan.  And you've seen the

9    detail that these people have gone through to create

10   their business plan, to document it, and to explain it

11   to you.  You've seen their fiscally conservative

12   approach that's been referred to more than once.  And

13   you know that they have -- that there's strong

14   experience and that they've identified the potential

15   problems and are already hard at work to solve those

16   problems.

17          The fact that they gave their projections on

18   a conservative basis and that they projected both -- or

19   all three, bull, bear, and the middle scenario shows

20   that they're really considering all the possibilities,

21   and I think that's impressive and important and

22   definitely demonstrates that they have a plausible

23   plan.

24          You also know this -- or just discussed their

25   financial projections and their capital raising.  It

*Meadors Court Reporting*

1    sounds to me like people are beating down the door to

2    be part of this entity, and I think they will not have

3    that much difficulty raising the capital they need to

4    take on.

5            Compliance with the capital and service

6    requirements.  You heard the Commissioner's testimony

7    about that.  He sees the capital as adequate.  The

8    thing that's important is that this group is ready to

9    raise the capital, and it will be in place before they

10   open the doors, and you should be comforted by that.

11           Number 5 is the special purpose depository

12   institutions being turned down for no other purpose

13   than legitimate objectives, authorized by law.  The

14   discussion we just had about the trust powers was an

15   important one.  It shows definitely in favor of Avanti

16   and its product and its model, and their very laudable

17   objective, to meet proven needs in the industry and in

18   the payment system, so consistent with the legislative

19   enactment to encourage this sort of innovative

20   financial services firm.

21           The name of the proposed special depository

22   institution, it doesn't resemble anybody else's name.

23   That's clearly true, but just to make sure of that, we

24   protected the trade name for Avanti Bank and Trust when

25   we incorporated earlier this year with the Secretary of

*Meadors Court Reporting*

1    State.  So under the special statute, going with that,

2    assuming the charter is granted, that name can be

3    properly filed and used by this group or the

4    organization.

5           And finally, whether the applicant has

6    complied with all the applicable provisions of state

7    law.  I don't think there's been any testimony here

8    that we -- any question about that.  And if there's

9    been anything that was even -- where a question could

10   be raised, it was clear that Avanti is committed to

11   compliance with all laws, State, Federal, et cetera,

12   that become applicable to them.

13          So with all that in mind, we respectfully

14   request that this Board grant the charter application

15   for Avanti Financial Group as a special purpose

16   depository institution in Wyoming.

17          Thank you.

18          MR. DEMERS:  Mr. Chairman, I'll turn it back

19   over to you.

20          CHAIRMAN LAWTON:  I would concur, what an

21   incredibly informative, professional, and obviously a

22   very bright bunch of individuals.  And thank you for

23   the little bit of effort that you put into this

24   process.

25          Next, just to remind you that once a

*Meadors Court Reporting*

1    transcript of this meeting is completed, it will be

2    sent to the Board and applicant.  Then the Board will

3    schedule a meeting to vote on the application.

4            And anybody have any other comments or

5    questions?

6            Again, thank you, and I will entertain a

7    motion to adjourn.

8            MR. RIFE:  So moved.

9            MR. DIXSON:  Second.

10           CHAIRMAN LAWTON:  All those in favor, signify

11   by saying aye.

12           (Ayes expressed.)

13           Opposed?

14           (Hearing adjourned at 3:26 p.m.)

15                   *          *          *

16

17

18

19

20

21

22

23

24

25

1                    REPORTER CERTIFICATE

2          I, JASON T. MEADORS, Registered Professional
Reporter and Certified Realtime Reporter, Certified
3   Realtime Captioner, and Notary Public, appointed to
take the hearing before the State Banking Board, State
4   of Wyoming, Department of Audit, Division of Banking,
certify that the proceedings were taken by me at
5   Herschler Auditorium, State Capitol Building, Cheyenne,
Wyoming, on October 6, 2020.

6
          I certify that the foregoing proceedings were
7   reduced to typewritten form by computer-aided
transcription consisting of 224 pages herein; that the
8   foregoing is an accurate transcript of the proceedings,
based upon my ability to hear and understand same.

9
          I certify that I am not related to, employed
10  by, of counsel to any party or attorney herein, nor
interested in the outcome of this matter.

11
          Attested to by me this 20th of October, 2020.

12

13

14
                       _____
15                     Jason T. Meadors, RPR, CRR, CRC
                       Meadors Court Reporting
16                     800.482.1506
                       800.482.1230 fax
17                     meadors@meadorsreporting.com

18                     My commission expires January 26,
                       2021
19

20  Re:  State Bank Board hearing re Avanti Financial Group
    Reporter:  JM
21  Proofer:  SLM

22

23

24

25