Chris Land, General Counsel (Wyo. Bar #7-6006)
Office of Senator Cynthia M. Lummis
United States Senate
124 Russell Senate Office Building
Washington, DC 20510

Phone: (202) 224-3424
E-Mail: chris_land@lummis.senate.gov

*Counsel for Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC.,<br>2120 Carey Avenue, Suite 300<br>Cheyenne, WY 82001<br><br>     *Plaintiff*,<br><br>     v.<br><br>BOARD OF GOVERNORS OF THE<br>FEDERAL RESERVE SYSTEM,<br>Constitution Avenue NW & 20th St NW<br>Washington, DC 20551<br><br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br>1 Memorial Drive<br>Kansas City, MO 64108<br><br>     *Defendants*. | Civil Case No.: 1:22-CV-00125-SWS |

---

**PROPOSED BRIEF OF *AMICI CURIAE***

**MEMBERS OF THE**

**UNITED STATES SENATE BANKING COMMITTEE AND**

**UNITED STATES HOUSE OF REPRESENTATIVES FINANCIAL SERVICES COMMITTEE**

**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

---

[Proposed *Amici* Brief]

## TABLE OF CONTENTS

STATEMENT OF INTEREST………..…………………………………………....…3

RULE 29(A)(4)(E) STATEMENT.....………………………………………………..4

SUMMARY OF ARGUMENT……………………………………………………...5

ARGUMENT……………….......………………………………………..………6

    1. The Context of this Lawsuit…………………………...……………6

    2. Interpretive Matters…………………………………………………6

        A. *Congress Meant What It Said Regarding Master Accounts*…………….…………………………….…………….6

        B. *The Federal Reserve Has Reversed Its Consistent Historical Position on Master Account Access*.....……………….…………13

        C. *The One-Year Statutory Deadline for Application Processing*…..18

    3. The Wyoming Special Purpose Depository Institution in Context……....20

    4. Conclusion……………………………..………………………..23

CERTIFICATE OF SERVICE...……………….…..……………………………….24

[Proposed *Amici* Brief]

## STATEMENT OF INTEREST

*Amici*, set forth below, are members of the United States Senate Committee on Banking, Housing and Urban Affairs ("Senate Banking Committee") and the United States House of Representatives Committee on Financial Services ("House Financial Services Committee"). The Members have a distinct constitutional interest in the faithful execution of the laws enacted by Congress and the exercise of Congressional oversight prerogatives. Additionally, the Members have a strong legislative interest in emerging issues in financial services, including digital assets and other payment innovations, which will necessitate legislation in the coming years.

*Amici* understand this case to be of vital importance to the future of the United States' financial system, because it will set a number of precedents relating to access to the payment system, digital asset regulation and the future ability of states to charter depository institutions under our dual banking system.

<u>*Amici*</u>

**Members of the Senate Banking Committee**

Senator Cynthia M. Lummis

Senator Kevin Cramer

Senator Steve Daines

**Members of the House Financial Services Committee**

Representative Warren E. Davidson

Representative Ted Budd

Representative Trey Hollingsworth

Representative William Timmons

**[Proposed *Amici* Brief]**

## RULE 29(A)(4)(E) STATEMENT

The author of this brief certifies that no outside counsel, neither in whole nor in part, authored this brief. Further, the author of this brief did not receive funding from any party for preparation of the brief.

## SUMMARY OF ARGUMENT

The position advanced by the Board of Governors of the Federal Reserve System ("Board") and the Federal Reserve Bank of Kansas City ("Reserve Bank") in their respective Motions to Dismiss, if taken to its logical conclusion, would establish a standardless, unaccountable process for depository institutions to gain access to our Nation's payment system through Reserve Bank accounts and services ("master account"), one of the defining features of a depository institution. This is not a result that will benefit the safety and soundness of our Nation's financial markets, the future of banking in this country, or the rule of law. *Amici* also have deep concern about the potential harmful effect of Defendants' arguments on state regulation of banking, and the dual banking system under which our country has operated for centuries.

Section 1 of this brief provides brief introductory remarks on the context of this lawsuit. Section 2(A) analyzes legislative history surrounding the Depository Institutions Deregulation and Monetary Control Act of 1980, and outlines Congress' intent that master accounts be available to all entities which meet the definition of a "depository institution," without discretion inhering in the Reserve Bank. Section 2(B) highlights that the Federal Reserve Board has reversed its historical position on master account access, while Section 2(C) underscores the importance of judicial interpretation of 12 U.S.C. § 4807, a provision which establishes a one-year timeline for the completion of applications to all Federal banking agencies, including the Reserve Bank. Finally, Section 3 outlines a number of non-traditional financial institutions which have master accounts, compares them to the Wyoming special purpose depository institution, and describes the core policy need for this depository institution charter.

[Proposed *Amici* Brief]

# ARGUMENT

## 1.  The Context of This Lawsuit

Defendants may not ever act on Plaintiff's master account application unless compelled to by this Court. An unsuccessful plaintiff[1] once awaited a master account decision for two years before filing suit, and five years later continues to await a decision by the Federal Reserve Bank of New York on its master account application. Additionally, the Board interestingly only adopted its long-awaited guidelines for master account access literally the day before its motion to dismiss was due in this lawsuit. This is not a coincidence.

Tellingly, one Governor of the Federal Reserve Board, at the time those guidelines were adopted in August 2022, went so far as to issue a public statement stating that "[t]here is a risk that this publication could set the expectation that reviews will now be completed on an accelerated timeline,"[2] evidencing that Defendants have no actual timeline for completion of Plaintiff's master account application—and crucially providing evidence that the Board, and not the Reserve Bank, is actually in charge of the master account process for Plaintiff.

Consequently, this Court should deny the Motions to Dismiss of the Board and Reserve Bank and consider the important constitutional, statutory, administrative questions raised by this controversy in full.

## 2.  Interpretive Matters

### A.  *Congress Meant What It Said Regarding Federal Reserve Accounts and Services*

Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980 ("Monetary Control Act") to create a level playing field for depository institutions that are

---

[1] *See* TNB USA, Inc. v. FRB of N.Y., 2020 U.S. Dist. LEXIS 62676 (S.D.N.Y. Mar. 25, 2020).
[2] *Statement on Guidelines to Evaluate Requests for Accounts and Services at Federal Reserve Banks by Governor Michelle W. Bowman*, Bd. of Governors of the Fed. Rsrv. Sys., August 15, 2022, *available at* https://www.federalreserve.gov/newsevents/pressreleases/bowman-statement-20220815.htm.

[Proposed *Amici* Brief]

members of the Federal Reserve System, including national banks and state member banks, with state non-member banks and federal and state credit unions to better address a period of heightened inflation.[3] Paul Volcker, Chairman of the Board at the time, noted that Titles I and II of the legislation "will undoubtedly take their place among the most important pieces of financial legislation enacted in this century."[4]

As the Monetary Control Act evidences, Congress was clear and unambiguous in requiring master accounts be provided to all depository institutions.[5] The primary reason for this was to enable depository institutions to comply with the new requirement of the Monetary Control Act to maintain a portion of the institution's capital at that institution's Administrative Reserve Bank[6] and to later[7] receive interest on excess reserves, both of which, as the Board acknowledges, are "essential"[8] to the appropriate conduct of monetary policy, which is primary mission tasked to the Board and the Reserve Bank by Congress.[9]

Notwithstanding the unambiguous text of § 248a, strong support for Plaintiff's argument can be found in numerous instances within the Monetary Control Act's legislative history. "Depository institution" is defined in the Monetary Control Act as "(i) any insured bank as defined in section 3 of the Federal Deposit Insurance Act or any bank which is eligible to make application

---

[3] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (last visited 6 September 2022). *See also* 126 Cong. Rec. 7070 (March 28, 1980) (statement of Sen. Proxmire).

[4] *Id.* Twelve U.S.C. § 248a, the provision mandating that Federal Reserve Banks provide accounts and services to all depository institutions on a level playing field was enacted as part of this legislation.

[5] 12 U.S.C. § 248a(c)(2) ("*All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions* and such services shall be priced at the same fee schedule applicable to member banks…") (emphasis added).

[6] The term "Administrative Reserve Bank" refers to the Federal Reserve Bank designated by Congress to cover a particular geographic area. *See* FEDERAL RESERVE BANKS, OPERATING CIRCULAR 1, at 1, *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

[7] Interest on excess reserves were authorized by Congress in the Financial Services Regulatory Relief Act of 2006, Pub. L. 109-256, 120 Stat. 1966, § 201.

[8] Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *5–6, ECF No. 49.

[9] 12 U.S.C. § 225a.

[Proposed *Amici* Brief]

to become an insured bank under section 5 of such Act."[10] A bank "is eligible to make application to become an insured bank" if it is duly chartered under federal or state law and is engaged in the business of receiving deposits, other than trust funds…"[11] The Board and Reserve Bank do not contend that Plaintiff fails to meets the legal definition of a "depository institution" under the Monetary Control Act and all other applicable federal laws.

In the final conference committee report on the Monetary Control Act, the conferees made the following explanatory statements on the scope, context and meaning of the legislation:

- "The conference reported bill provides certain Federal Reserve requirements for <u>all depository institutions</u>. It does not, however, require any institution to be a member of the Federal Reserve."[12]

- "These reserve requirements would apply to <u>all depository institutions</u>. Depository institutions are authorized to use balances maintained in Federal Reserve banks to satisfy liquidity requirements under the Federal Home Loan Bank Act and the Nation[al] Credit Union Act."[13]

- "<u>Any depository institution</u> holding transaction accounts would have access under the same terms and conditions as member banks to the Federal Reserve discount window upon enactment of the bill."[14]

---

[10] Depository Institutions Deregulation and Monetary Control Act, Pub. L. 96-221, 94 Stat. 132 (1980) § 103 (codified at 12 U.S.C. § 461(b)(1)(A)) (Monetary Control Act).

[11] *See* 12 U.S.C. § 1813 (Federal Deposit Insurance Act); Federal Deposit Insurance Corporation General Counsel Op. 88-67 (Oct. 27, 1988).

[12] H. Rept. 96-842, *Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report,* 96th Cong., 2d Sess., at *69 (March 21, 1980) (emphasis added).

[13] *Id.* at 70.

[14] *Id.* at 71.

[Proposed *Amici* Brief]

- "The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and* <u>open access to these services to all depository institutions</u> on the same terms and conditions as member banks."[15]

Additionally, in debate on the Senate floor on the conference committee report, Congress' intent for the act to apply to all depository institutions was evidenced clearly:

- "The <u>mandatory aspects of this bill</u> are directly opposite to the voluntary solution of Federal Reserve membership which were voted and agreed to by the Senate Banking Committee…"[16]

- "<u>This bill mandates banks to place reserves in the national bank</u>."[17]

- "One way to resolve this problem [allowing better control of monetary policy by the Federal Reserve] is to provide <u>mandatory reserves for all depository institutions</u>, including credit unions, savings and loan associations, commercial banks and mutual savings banks."[18]

- "Consequently, we will now have a system whereby <u>every depository institution in the country will be subject to keeping reserves at the Fed</u>."[19]

---

[15] *Id.* (emphasis added).

[16] 126 Cong. Rec. 7063 (Mar. 28, 1980) (emphasis added)

[17] *Id.* Sen. Armstrong's remark that the bill requires banks to hold reserves at the national bank refers to the requirement contained in 12 U.S.C. § 461(b)(2) that all banks maintain a portion of their capital on deposit at the Federal Reserve based on the size of their customer deposits.

[18] *Id.* at 7071 (statement of Sen. Tower) (emphasis added). It is notable that the 96th Congress and Sen. Proxmire included a variety of charter types in his statement and in the definition of "depository institution," emphasizing that the bill should have broad application to all bank-like entities.

[19] *Id*. at 7072.

[Proposed *Amici* Brief]

Despite Defendants' claims to the contrary,[20] it is clear that Members of Congress, in both the House and Senate, understood the Monetary Control Act to apply to "every depository institution in the country," without exception, which is wholly inconsistent with the Defendants' position that the Reserve Banks retain discretion.[21]

The Board, in its memorandum, attempts to advance the argument that the Federal Reserve Act and Monetary Control Act merely authorizes, but does not require, the Reserve Bank to provide a master account.[22] Mooveover, the Board states the following about 12 U.S.C. § 248a, the provision that requires the Reserve Banks to provide master accounts to all depository institutions: "Nothing in that section requires that any particular institution receive a master account, or that each and every institution is entitled to access Federal Reserve services. Rather, it requires only that nonmember institutions that do obtain Federal Reserve services pay the same amount for those services as member banks."[23]

The conference committee report on 12 U.S.C. § 248a states that "[t]he House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and* open access to these services to all depository institutions on the same terms and conditions as member banks."[24] There are two components to this statement: (1) "a provision for the Federal Reserve to price services"; *and* (2) "open access to these services to all depository institutions." Conference committee reports—generally bicameral and bipartisan—can be

---

[20] Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *25, ECF No. 49. ("[T]here is no indication that Congress intended the MCA as a *mandatory* right of access to Reserve Bank services to all nonmember banks…").

[21] *See supra* note 19.

[22] *See, e.g.,* Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *20, ECF No. 49.

[23] *Id.* at 20.

[24] H. Rept. 96-842, *Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report,* 96th Cong., 2d Sess., at *71 (March 21, 1980) (emphasis added).

[Proposed *Amici* Brief]

"authoritative" in statutory interpretation.[25] Why would Congress have included this provision in the conference committee report if it had not intended the statutory language in §248a to have an effect, especially when that section clearly states "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions *and* such services shall be priced at the same fee schedule applicable to member banks…" This statutory phrase has two parts as well, and its argument that § 248a only sets out a "pricing principle[]," misses the point that the word "<u>and</u>" separates the disjunctive phrases "All Federal Reserve bank services covered by the fee schedule <u>shall</u> be available to nonmember depository institutions…" and the phrase "such services shall be priced at the same fee schedule…" They are separate statutory functions, both of which should be given effect. Reading out half of this sentence, in favor of only effectuating the pricing principle, would violate the rule against surplusage.[26]

Furthermore, the other provisions of legislative history cited above make it clear that the provisions of the Monetary Control Act were intended by Congress to apply to "every depository institution in the country," without exception. This was meant to enable the Federal Reserve to have increased control over monetary policy by requiring <u>all</u> depository institutions to hold a specified amount of capital at their Reserve Bank based on their deposits.[27]

---

[25] Diallo v. Gonzales, 447 F.3d 1274, 1282 (10th Cir. 2006); George A. Costello, *Average Voting Members and Other "Benign" Fictions: The Relative Reliability of Committee Reports, Floor Debates and Other Sources of Legislative History*, 1990 DUKE L.J. 39, 47 ("Frequently the action of the conference committee is the critical stage in shaping legislation. It is here that bills subject to a conference take on their final form, and differences in House and Senate versions of the bills are reconciled. <u>If the conference committee explains its action clearly, then courts will not hesitate to rely on that explanation</u>.") (emphasis added).

[26] *See, e.g.*, TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

[27] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (last visited Sept. 6, 2022).

The Board relies upon 12 U.S.C. § 342 to ground the argument that the Reserve Banks have discretion in the issuance of master accounts. As Judge Bacharach noted in *Fourth Corner Credit Union*:

> Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection. S*ee* Farmers & Merchants Bank v. Federal Reserve Bank, 262 U.S. 649, 662 (1923) ("But neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection. The act merely confers authority to do so."). But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions. As a result, § 342 does not affect Fourth Corner's entitlement to a master account.[28]

As discussed above, § 248a clearly establishes a duty for the Reserve Banks to provide a master account to a depository institution, utilizing the word "shall" and being comprised of two separate phrases—one of which deals with the pricing of Federal Reserve services on the same terms as member banks, and the other phrase containing the directive that "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions…" When Congress created § 248a through the Monetary Control Act, it also amended § 342, adding the words "or other depository institution" and other miscellaneous amendments.[29]

Judge Bacharach's approach in harmonizing § 248a and § 342 reflects the intent of Congress and the longstanding maxim of reading statutes together as a consistent whole that gives effect to each portion.[30] The Board's preferred reading essentially reads out the words "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions" and the word "and" contained in § 248a(c)(2). Judge Bacharach's interpretation,

---

[28] Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City, 861 F.3d 1052, 1074 (10th Cir. 2017) (opinion of Bacharach, J.).
[29] Monetary Control Act, § 105(a).
[30] *See, e.g.,* Lindh v. Murphy, 521 U.S. 320, 336 (1997); United States v. Morton, 467 U.S. 822, 828 (1984); WILLIAM ESKRIDGE, ET AL, CASES AND MATERIALS ON LEGISLATION AND REGULATION (5th ed. 2014) ("Avoid interpreting a provision in a way that is inconsistent with the overall structure of the statute or with another provision or with a subsequent amendment to the statute or with another statute enacted by a Congress relying on a particular interpretation.").

[Proposed *Amici* Brief]

similar to the *in pari materia* canon of statutory construction,[31] harmonizes both § 248a and § 342 and gives effect to each in a manner that acknowledges the Congressional intent surrounding the Monetary Control Act. Finally, the term 'may' contained in § 342 is susceptible of being interpreted to mean 'shall' if the context requires it.[32]

### B. The Federal Reserve Has Reversed Its Consistent Historical Position on Master Account Access

The Federal Reserve has historically stated that master accounts were available to all depository institutions. Today, the Federal Reserve's website states that "[i]n summary, the role of the Federal Reserve in providing payment services is to promote the integrity and efficiency of the payments mechanism and to ensure the provision of payment services to all depository institutions on an equitable basis, and to do so in an atmosphere of competitive fairness."[33] The Board's website also evidences that it understood the Monetary Control Act to require that Reserve Banks provide master accounts to all depository institutions.[34] Additionally, the Federal Reserve's Account Structure Guide states that "A Financial Institution may maintain a Master Account with its ARB [Administrative Reserve Bank] if it is eligible as defined in OC 1 [Operating Circular 1] and applicable law."[35] The current litigating position of the Board and Reserve Banks are not

---

[31] Wachovia Bank, Nat'l Ass'n v. Schmidt, 546 U.S. 303, 316 (2006) (quoting Erlenbaugh v. United States, 409 U.S. 239, 243 (1972) ("[S]tatutes addressing the same subject matter generally should be read 'as if they were one law.'").
[32] Lo Shippers Action Committee v. Interstate Commerce Com., 857 F.2d 802, 806 (D.C. Cir. 1988) ("While we recognize that the context of a particular usage may at times require the construction of "may" as mandatory or "shall" as permissive…").
[33] *Policies: The Federal Reserve in the Payments System,* Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last visited Sept. 8, 2022) ("Federal Reserve payment services are available to all depository institutions . . . .").
[34] *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_standards.htm ("The Monetary Control Act of 1980 . . . has expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis . . . .").
[35] FED. RSRV. SYS., FEDERAL RESERVE ACCOUNT STRUCTURE, TRANSACTION SETTLEMENT AND REPORTING GUIDE 12 (2017), *available at* https://app.frbservices.org/assets/resources/rules-regulations/operating-circular-1-accnt-structure.pdf.

[Proposed *Amici* Brief]

consistent with past statements and undercuts their stated commitment to provide payment services "in an atmosphere of competitive fairness."[36] The *Fourth Corner Credit Union* opinion from the Tenth Circuit discusses other statements made by the Board and the Reserve Banks on master account access in greater detail.[37]

Moreover, the Board and the Reserve Bank are not empowered to determine what is—and what is not—a "depository institution" under the existing statutory scheme. The Reserve Bank—shockingly—does not attempt to hide an attempt to arrogate this power to itself,[38] diminishing the fact that Congress, through a number of laws,[39] has set out clearly what is a depository institution/bank[40] and what is not. A master account, and corresponding access to the payment system, is one of the hallmark features of a bank that are not accessible to other financial institutions, including investment companies, broker/dealers and lenders. It is not conceivable that the Board or the Reserve Bank should have the authority to essentially determine what depository institutions are "real depository institutions" and which are not, when Congress has set down in explicit detail the requirements for a federal or state-chartered entity to qualify as a "depository institution," consistent with the spirit of our dual banking system. As an essential feature of the dual banking system, Congress intended for states to be permitted to charter depository institutions

---

[36] *Policies: The Federal Reserve in the Payments System,* Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last visited Sept. 8, 2022) ("Federal Reserve payment services are available to all depository institutions . . . .").

[37] Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City, 861 F.3d 1052, 1072 (10th Cir. 2017) (opinion of Bacharach, J.).

[38] *See* Def. Fed. Rsrv. Bank of Kansas City Mem. in Support of Mot. to Dismiss, at *24, ECF No. 51.

[39] *See, e.g.,* 12 U.S.C. § 461(b)(1)(A) (definition of "depository institution"); 12 U.S.C. § 1813(a) (definition of "bank" and "state bank"); 12 U.S.C. § 1841(c) (definition of "bank" for bank holding company supervision); 15 U.S.C. § 80b-2(a)(2) (definition of "bank" for Investment Company Act purposes); 15 U.S.C. § 80a-2(a)(5) (definition of "bank" for Investment Advisers Act purposes); 26 U.S.C. § 581 (definition of "bank" for tax purposes).

[40] A "depository institution" is a chartered financial institution that receives demand deposits, e.g., receiving customer currency for safekeeping/lending purposes and recording those customer funds as a liability on its balance sheet. A "depository institution" can be a bank, special purpose depository institution, credit union, federal thrift association or similar entities. A "bank" is generally a depository institution that is a for-profit entity which makes loans, but has the other characteristics of a "depository institution." This is in comparison to a credit union, which is a not-for-profit depository institution.

[Proposed *Amici* Brief]

under that state's laws, and as long as the institution comported with the definition of depository institution/bank under Federal law, Congress did not intend for the Board or Reserve Bank to substitute the prudent judgment of a state for its own. This is a dangerous precedent.

During debate on the Monetary Control Act in 1980, Congress dismissed the possibility that the Board, the Reserve Banks or the Federal Government might assume the power of determining which state-chartered banks are in fact banks under Federal law. Senator Proxmire, Chairman of the Senate Banking Committee in 1980, noted the following:

> Nevertheless, the fact is that the Federal Government does not replace the State chartering of banks. The Federal Government does not replace the Federal insurance for State banks. The Federal Government does not replace examination and supervision of State banks by the State examiners and the State instructors under State control. The States retain authority to define the power of State-chartered banks.[41]

Today, ironically, debate around the Monetary Control Act has come full circle as the Board and the Reserve Banks, through this litigation, and the related Account Access Guidelines[42] are essentially arguing that they have the legal authority to determine what is a bank and what is not by arrogating a discretionary power to grant access to the payment system—one of the hallmark features of a depository institution. A depository institution that does not have a master account "can't really function as a financial institution,"[43] and if the Federal Reserve has the ability to determine which depository institutions can and cannot receive a master account, the Fed would essentially be the ultimate decision-maker for what is and is not a bank in this country, upsetting our long-standing dual banking system.[44]  These are not results Congress intended, nor had it been the previous position of the Board and Reserve Banks.

---

[41] 126 Cong. Rec. 7070 (Mar. 28, 1980).
[42] Guidelines for Evaluating Account and Service Requests, 87 Fed. Reg. 51099, 51100 (Aug. 19, 2022).
[43] *See* Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is that Legal? Brookings Institution* (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.
[44] Julie L. Stackhouse, *Why America's Dual Banking System Matters,* Fed. Rsrv. Bank of St. Louis, Sept. 18, 2017, https://www.stlouisfed.org/on-the-economy/2017/september/americas-dual-banking-system-matters.

[Proposed *Amici* Brief]

Kansas City Fed President Esther L. George herself has noted the crucial role the dual banking system—and yes, charter innovation—plays in our national system of financial regulation:

> The dual banking system has provided and continues to offer significant benefits to our financial system and the economy. <u>One of the primary benefits of dual banking is that the multiple options for state and federal charters have led to considerable innovation and improvement in banking services</u>. We have seen these benefits from the beginning.[45]

Ten years before the start of this matter, these words underscore how our banking system should function and the importance of responsible innovation in our financial system. The matter pending before this Court is yet another milestone in the "considerable innovation and improvement in banking services" which emerges from state banking regulation that President George referenced. Defendants claim that entitling every depository institution "to a master account without Reserve Bank review would put each individual state in control of access to the national payment system, Federal Reserve financial services, and the Federal Reserve balance sheet."[46] Accepting this premise would be irreconcilable with our longstanding dual banking system. Wyoming has gone above and beyond to ensure the special purpose depository institution charter can operate safely, as evidenced by the rules and policies outlined in section 3 of this brief.

Congress understood the importance of protecting and preserving this system when it passed the Monetary Control Act,[47] and as described, has set down very clear definitions of what is a "depository institution," "bank" in statute. Despite some original concerns by some that the Monetary Control Act would destroy our dual banking system,[48] the four decades since the bill's

---

[45] President Esther L. George, *Perspectives on 150 Years of Dual Banking*, Conference of State Bank Supervisors State-Federal Supervisory Forum, May 22, 2012 (emphasis added).

[46] Def. Fed. Rsrv. Bank of Kansas City Mem. in Support of Mot. to Dismiss, at *24, ECF No. 51.

[47] 126 Cong. Rec. 7070. (Mar. 28, 1980) (statement of Sen. Proxmire) ("Mr. President, this is not a destruction of the dual banking system. If it were, you would not get the tremendous over-whelming approval of the bill by the institutions themselves. The dual banking system is retained.").

[48] *Id.* at 7072. (Sen. Tower, "In my opinion, this will further erode the dual banking system and increase the possibility of creating a single bank regulatory agency, at the Federal level, for all financial institutions."

passage have proven that these fears were unfounded because the dual banking system remains alive and well even today, as was Congress' intention. Should the defendants' argument be accepted, however, it would serve as a paradigm shift that would subvert the states' role within our financial system. Congress never permitted this and any such change to our banking system today would require federal legislation that would grant this authority to Defendants.

Though largely dicta, every court to examine this matter has concluded that the Federal Reserve does not have discretion in the issuance of master accounts and that all depository institutions have access. The Board and Reserve Bank fail to cite this in their memoranda, but in the *Fourth Corner Credit Union* case, Judge Jackson in the District of Colorado found that absent the illegality of marijuana under Federal law, Fourth Corner Credit Union would be entitled to a master account as a matter of law and that the Reserve Bank did not have discretion over master account issuance.[49] Judge Jackson based his conclusion on clear statements contained in the *Jet Courier Services* (Sixth Circuit) and *Total Aviation Services* (E.D.N.Y.) cases in the 1980s litigated shortly after the enactment of the Monetary Control Act.[50]

### C. The One-Year Statutory Deadline for Application Processing

The provisions of 12 U.S.C. § 4807 state that "[e]ach Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency." Congress defined "Federal

---

[49] *See* Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City, 154 F. Supp. 3d 1185, 1189 (D. Colo. 2016) (noting "I agree with the plaintiff that the italicized language is not limited to pricing. Cases referencing § 248a appear to agree. However, it is at least implicit that this statute does not mandate the opening of a master account that will facilitate activities that violate federal law."). *See, e.g.,* Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta, 713 F.2d 1221, 1222 (6th Cir. 1983) ("services such as check clearing formerly provided to member banks only will be made available to all banks, regardless of whether or not they are members"); Total Aviation Services, Inc. v. United Jersey Bank, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1987) (fees generated by Federal Reserve Bank of Kansas City's check-processing activities in New York did not create personal jurisdiction because they did no more than compensate for a statutorily mandated act under 12 U.S.C. § 248a).

[50] Judge Jackson's opinion was later vacated and remanded by the Tenth Circuit for dismissal without prejudice. *See* Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City, 861 F.3d 1052 (10th Cir. 2017).

[Proposed *Amici* Brief]

banking agency" as "the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation,"[51] which includes the regional offices/branches of these entities.

One prominent law firm recently underscored the importance of judicial interpretation of this provision, noting that § 4807 has not been previously interpreted by any court.[52] The Board states that § 4807 is inapplicable because it refers to the Board itself, and not the Reserve Bank, noting that the definition of "Federal banking agency" excludes the Reserve Bank.[53] However, this argument is tantamount to saying that the regional offices of the Office of the Comptroller of the Currency (OCC) and Federal Deposit Insurance Corporation (FDIC) are excluded from the scope of this provision as well, which is clearly not the case, nor is it what Congress intended. The Board is statutorily mandated to supervise the Reserve Bank,[54] and the Reserve Bank processes the vast majority of bank applications on behalf of the Board.[55] Congress intended for § 4807 to be interpreted broadly, and excluding master account issuance from the scope of this provision does not make sense given the breadth and intent of the provision, especially in light of the normal 5–7 day processing time (and the fact that Plaintiff's bank charter application was provided to the Reserve Bank six months before its official application to give the Bank sufficient time).[56]

---

[51] 12 U.S.C. § 4801(1) (citing 12 U.S.C. § 1813(z)).

[52] *Crypto Bank Sues Federal Reserve Over Delay in Master Account Application*, Davis Polk, https://www.davispolk.com/insights/client-update/crypto-bank-sues-federal-reserve-over-delay-master-account-application (last visited Sept. 9, 2022).

[53] Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *10, ECF No. 49.

[54] See 12 U.S.C. § 248(a), (k); 12 U.S.C. § 1844. *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. __, at *5 (Oct. 23, 2019) ("The twelve regional Federal Reserve Banks execute the Federal Reserve System's policies.").

[55] *H.2.--Actions of the Board, Its Staff, and the Federal Reserve Banks; Applications and Reports Received*, Fed. Rsrv. Sys., *available at* https://www.federalreserve.gov/releases/h2/current/h2.pdf (last visited Sept. 9, 2022).

[56] *Master Account Agreement*, Fed. Rsrv. Financial Services, https://app.frbservices.org/assets/forms/accounting/master-account-agreement-oc1-app1-rv.pdf (last visited Sept. 9, 2022).

[Proposed *Amici* Brief]

The Reserve Bank, as the direct arm of the Board,[57] exercises significant supervisory authority over banks, including master account applications, changes in control, holding company applications, and regular examinations of the condition of the bank, many of which are functions delegated by the Board to the Reserve Bank by rule, order or customary practice.[58] It would frustrate the purposes of § 4807 in ensuring prompt action from the banking regulators if the Reserve Bank were found not to be subject to this statutory deadline.[59] Additionally, Plaintiff has alleged that the Board assumed control of its master account decision process in 2021, which would unambiguously subject to the Board to the one-year deadline.[60]

Furthermore, it is important that this Court examine the meaning of the word "completed" in § 4807. The Senate Banking Committee and House Financial Services Committee are aware that the Board, the Reserve Bank and the other Federal banking agencies routinely delay consideration of applications by stating that these applications are not "complete," frequently asking unnecessary questions in an attempt to gain more time to consider an application, even though an application form and all related materials were provided to the agency at the outset. A prominent law firm has also noted this agency practice.[61] Even though Plaintiff's master account

---

[57] See *supra* note 53.

[58] FED. RSRV. BANK OF KANSAS CITY, MEMBERSHIP IN THE FEDERAL RESERVE, *available at* https://www.kansascityfed.org/Banking/documents/7949/membership_brochure_2021_interactive.pdf; FED. RSRV. BANK OF KANSAS CITY, HOW WILL I BE SUPERVISED?, *available at* https://www.kansascityfed.org/banking/membership-state-member-banks/how-will-i-be-supervised/.

[59] *See* H. Rept. 103-652, *Conference Report: Community Development Banking Act*, 103rd Cong., 2d Sess., at *183 (Aug. 2, 1994) ("This section requires each Federal banking agency to complete action on an application to that agency within one year of receipt of the completed application.").

[60] Compl., at ¶¶ 38, 58.

[61] *Crypto Bank Sues Federal Reserve Over Delay in Master Account Application*, Davis Polk, https://www.davispolk.com/insights/client-update/crypto-bank-sues-federal-reserve-over-delay-master-account-application (last visited Sept. 9, 2022) ("It has also long been unclear, to the frustration of many banks and their lawyers, what makes an application 'completed' for purposes of the statute. It is widely known among the banking sector that applications can be delayed by additional questions so that the Board staff can take the position that the application is not 'completed.' This view has not ever been challenged in court.").

[Proposed *Amici* Brief]

application has been fully complete for 23 months, this Court should consider the meaning of the word "completed" in § 4807 so as to give future applicants more certainty.

### 3.  The Wyoming Special Purpose Depository Institution in Context

The Wyoming special purpose depository institution charter is subject to rigorous prudential regulation and supervision, including strong capital standards,[62] holding company supervision,[63] activities restrictions, including a requirement to maintain 100% of its deposits as highly-liquid assets,[64] ownership restrictions,[65] recovery/receivership procedures,[66] and Bank Secrecy Act/sanctions compliance,[67] among many other topics.[68] The Wyoming Division of Banking, in partnership with Promontory Financial Group,[69] developed a comprehensive 772-page examination manual to supervise the special purpose depository institution charter.[70] The Senate Banking Committee and House Financial Services Committee are aware that Wyoming special purpose depository institutions are generally required to maintain in the neighborhood of $25 million in capital, five times greater than the $5 million statutory floor,[71] to fully account for

---

[62] *Special Purpose Depository Institutions: Updated Capital Guidance (July 7, 2021)*, Wyo. Div. Banking, *available at* https://drive.google.com/file/d/11RdmmL_ayo7cfgsMVACaCNtHtBgDbfVy/view; Rules of the Wyo. Div. Banking, Chapter 20, Special Purpose Depository Institutions, § 2 (Capital and Surplus/Operating Expenses), available at https://drive.google.com/file/d/1EVLJjkvgV3--gWnie72fJwn_9VwVaJLC/view/ [hereinafter Rules].

[63] Rules, § 5 (Supervision of Controlling Interests; Affiliate Relationships).

[64] *See, e.g.,* Wyo. Stat. §§ 13-12-103(e); 13-12-104; Rules, § 13 (Operations and Activities). Most depository institutions generally only maintain 8-12% of their deposits at any one time because of lending activities.

[65] Rules, § 5 (Supervision of Controlling Interests; Affiliate Relationships).

[66] Rules, § 4 (Recovery and Resolution Planning).

[67] Wyo. Stat. § 13-12-107; Rules, § 7 (Anti-Money Laudering, Customer Identification and Sanctions Compliance); Wyoming SPDI BSA/AML/OFAC Examination Manual, Wyo. Div. Banking, https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.

[68] *See generally* Rules.

[69] Promontory is regarded by the Federal banking agencies for its attention to detail and focus on risk management, even being referred to as banking's "shadow regulator." *See* Jeff Horowitz and Maria Aspan, *How Promontory Financial Became Banking's Shadow Regulator*, AM. BANKER, Mar. 13, 2013, https://www.americanbanker.com/news/how-promontory-financial-became-bankings-shadow-regulator.

[70] Wyoming SPDI BSA/AML Examination Manual, Wyo. Div. Banking, https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.

[71] Wyo. Stat. § 13-12-110.

operational risk and receivership costs.[72] Wyoming also requires special purpose depository institutions to comply with all Federal capital standards that are applicable to all other banks in this country.[73] These standards exceed the prudential supervisory standards of all other non-traditional charters including industrial loan companies, trust companies, credit card banks, international financial entities and uninsured depository institutions.

The Board and Reserve Bank want to have it both ways. They are focused on Plaintiff, but have given master accounts to many other charter types, including non-depository institutions, with substantially less regulation, without adequate explanation. Master account data is not public, and is closely held by the Federal Reserve, even from the Senate Banking Committee and House Financial Services Committee,[74] but at least 40 non-traditional entities have or have had master accounts, including international financial entities,[75] non-depository state- and federally chartered trust companies,[76] dozens of credit unions without share (deposit) insurance, a credit card processing company and at least one non-depository investment bank.

---

[72] *Special Purpose Depository Institutions: Updated Capital Guidance (July 7, 2021)*, Wyo. Div. Banking, *available at* https://drive.google.com/file/d/11RdmmL_ayo7cfgsMVACaCNtHtBgDbfVy/view.

[73] Wyo. Stat. 13-12-107. *See* 12 U.S.C. § 461(b)(2).

[74] *See, e.g.*, Letter from Sen. Pat Toomey, Sen. Tim Scott, Sen. Thom Tillis and Sen. Cynthia M. Lummis to President Esther George, June 28, 2022, *available at* https://www.banking.senate.gov/imo/media/doc/toomey_scott_tillis_lummis_letter_to_kc_fed_on_master_accounts.pdf; Letter from President Esther George to Sen. Pat Toomey, June 16, 2022, *available at* https://www.kansascityfed.org/AboutUs/documents/8854/06-16-22_Toomey_Letter_from_Esther_George.pdf; Letter from Sen. Pat Toomey to President Esther George, June 8, 2022, *available at* https://www.banking.senate.gov/imo/media/doc/toomey_letter_to_george_on_master_account_revocation.pdf.

[75] *See International Financial Entities in Puerto Rico*, DLA Piper Client Alert, Jan. 18, 2017, *available at* https://www.dlapiper.com/en/us/insights/publications/2017/01/international-financial-entities-in-puerto-rico/ (noting that IFEs are permitted to be chartered with IFEs permitted to be chartered with $5 million in capital, and only $250,000 in capital at opening); Office of the Puerto Rico Commissioner of Financial Institutions, https://ocif.pr.gov/Pages/default.aspx (last visited Sept. 9, 2022). *See generally FV Bank*, https://www.fvbank.us/ (last visited Sept. 9, 2022).

[76] *See* Colo. Rev. Stat. § 11-109-101 *et seq.*; Code of Colo. Regs. § 3 CCR 701-6, Trust Companies, *available at* https://www.sos.state.co.us/CCR/GenerateRulePdf.do?ruleVersionId=10115; Operating Agreement, Anchorage Digital Bank and the Office of the Comptroller of the Currency, art. II(1)(B), *available at* https://www.occ.gov/news-issuances/news-releases/2021/nr-occ-2021-6b.pdf. Colorado trust companies are required to maintain between $750,000 and $5 million in capital. Code of Colo. Regulations § 3 CCR 701-6, Trust Companies, at * 19, *available at* https://www.sos.state.co.us/CCR/GenerateRulePdf.do?ruleVersionId=10115.

[Proposed *Amici* Brief]

Many of these institutions discussed above would fall within Tier 3 of the Board's Account Access Guidelines, which would subject them to the highest level of scrutiny for access.[77] Additionally, the supervision imposed by Wyoming law on the special purpose depository institution is much more stringent than most, if not all, of these institutions. If the risks relating to master account access are really so great, as the Board and Reserve Bank claims in its memorandum, especially relating to digital assets,[78] why does the Federal Reserve today permit many institutions with lower capital and supervisory standards to obtain master accounts? The fact that many of these institutions are operating today without impairing the banking and payments system is a testament to the fact that non-traditional institutions add value to our nation's banking system and operate in a safe and sound manner.

The reason many of these institutions have master accounts is because direct access to the payment system is one of the hallmark features of a depository institution, it permits payments to be sent more cheaply than using a correspondent bank, and because it is safer. Settlement in central bank money,[79] which a master account permits, is widely accepted by banking regulators[80] across the world to be a transaction form that reduces risk in the financial system, as it reduces the amount of shadow liabilities in the banking/payments system and liquidity/credit risk.[81] Settlement in

---

[77] *Guidelines for Evaluating Account and Service Request*s, 87 Fed. Reg. 51099, 51110 (Aug. 19, 2022).

[78] Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *8–9, ECF No. 49; Def. Fed. Rsrv. Bank of Kansas City Mem. in Support of Mot. to Dismiss, at *8–9, ECF No. 51.

[79] "Central bank money" refers to a liability of the central bank, whereas "commercial bank money" is a liability of a depository institution, which may or may not be backed by central bank money or deposit/share insurance.

[80] *See, e.g.*, Gov. Lael Brainard, *Private Money and Central Bank Money as Payments Go Digital: An Update on CBDCs*, Bd. of Governors of the Fed. Rsrv. Sys., May 24, 2021, *available at* https://www.federalreserve.gov/ newsevents/speech/brainard20210524a.htm ("Central bank money is important for payment systems because it represents a safe settlement asset, allowing users to exchange central bank liabilities without concern about liquidity and credit risk.").

[81] Bank for Int'l Settlements and Int'l Org. of Securities Comm'ns, Principles for Financial Market Infrastructures 67 (2012), *available at* https://www.bis.org/cpmi/publ/d101a.pdf ("Central banks have the lowest credit risk and are the source of liquidity with regard to their currency of issue. Indeed, one of the fundamental purposes of central banks is to provide a safe and liquid settlement asset."); Eur. Central Bank, Use of Central Bank Money in Securities Transactions (2004), *available at* https://www.ecb.europa.eu/ pub/pdf/other/useofcbmoneyforssten.pdf.

[Proposed *Amici* Brief]

central bank money is particularly important in the realm of digital assets, which settle in seconds or minutes, compared to their hours or days.

Finally, contrary to the Reserve Bank's implications,[82] it is also important to note that granting Plaintiff a master account poses no meaningful credit risk to the Reserve Bank. Plaintiff could be granted a "zero-cap" master account, which functions like a debit card in that, once the balance in an account hits zero, the Reserve Bank would not provide credit, and hence the account could not be overdrawn.[83] Out of an abundance of caution, Wyoming regulations grant the Reserve Bank a senior lien[84] on a closed special purpose depository institution's assets, in the unlikely event the institution owed the Reserve Bank any balance after it ceased operations.

## 4.   Conclusion

For the reasons discussed above, this Court should deny Defendants' motions to dismiss, ECF Nos. 48 and 50, as to all counts and consider the deeply important questions raised by this controversy to the future of the United States' financial system.

Submitted respectfully this [XX] day of September, 2022,

/s/ Chris Land

Chris Land, General Counsel (Wyo. Bar #7-6006)
Office of Senator Cynthia M. Lummis
United States Senate
124 Russell Senate Office Building
Washington, DC 20510

Phone: (202) 224-3424
E-Mail: chris_land@lummis.senate.gov

*Counsel for Amici Curiae*

---

[82] Def. Fed. Rsrv. Bank of Kansas City Mem. in Support of Mot. to Dismiss, at *7, ECF No. 51.
[83] FEDERAL RSRV. SYS., ACCOUNT MANAGEMENT GUIDE 72 (2020), *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/account-management-guide.pdf.
[84] Rules, § 6(j)(ii).

[Proposed *Amici* Brief]

# CERTIFICATE OF SERVICE

I hereby certify, on the [XX] day of September, 2022, a true and correct copy of this brief

was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Angela Tarasi
Christine Carletta
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
KING & SPAULDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
atarasi@kslaw.com
ccarletta@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L.M. Addleman
HIRST APPLEGATE LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com

Scott E. Ortiz
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602
(307) 265-0700
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe
Ian M. Swenson
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5173
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
whermandorfer@wc.com
jwolfe@wc.com
iswenson@wc.com

/s/ Chris Land