Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| CUSTODIA BANK, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-00125-SWS |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM & FEDERAL RESERVE BANK OF KANSAS CITY, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................................................................ii

ARGUMENT ................................................................................................................ 2

I.     Congress Vested Reserve Banks with Deposit-Taking Authority and Imposed No
       Fixed Deadline on Requests for Deposit Accounts ........................................... 2

       A.     Reserve Banks Are Distinct Entities With Congressionally Defined Authority .... 2

       B.     Congress Conferred Discretion to Accept Deposits, and Therefore Whether
              to Open Master Accounts, to Reserve Banks in 12 U.S.C. § 342 ......................... 3

       C.     No Required Board Action Has Been Improperly Delayed .................................. 6

II.    Plaintiff Has Failed to Establish Justiciability ................................................. 11

III.   Plaintiff Fails to Allege Any Constitutional Violation ...................................... 17

       A.     Plaintiff Fails to State a Due Process Claim ........................................ 17

       B.     Plaintiff Fails to State a Claim for Improper Delegation of Legislative
              Power ................................................................................................. 20

       C.     Plaintiff Fails to State a Claim for Violation of the Appointments Clause .......... 22

CONCLUSION ........................................................................................................... 25

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page

## Cases

*Aetna Life Insurance Co. v. Haworth*,
  300 U.S. 227 (1937)..................................................................... 25

*Artis v. D.C.*,
  138 S. Ct. 594 (2018)................................................................... 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................... 6, 18, 19, 20

*Association of American Railroads v. DOT*,
  896 F.3d 539 (D.C. Cir. 2018) ..................................................... 20

*Barnhart v. Walton*,
  535 U.S. 212 (2002)....................................................................... 9

*Beckles v. United States*,
  137 S. Ct. 886 (2017)................................................................... 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................. 20, 25

*Bischoff v. Glickman*,
  54 F. Supp. 2d 1226 (D. Wyo. 1999).............................................. 7

*Bischoff v. Myers*,
  216 F.3d 1086 (10th Cir. 2000) ..................................................... 8

*Board of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)..................................................................... 17

*Brzezinski v. DHS*,
  No. 21-cv-376, 2021 WL 4191958 (D.D.C. Sept. 15, 2021)........... 10

*Carter v. Genesis Alkali, LLC*,
  No. 20-cv-216, 2021 WL 7209884 (D. Wyo. June 2, 2021) ........... 16

*Collins v. Daniels*,
  916 F.3d 1302 (10th Cir. 2019) ................................................... 13

*Department of Transportation v. Association of American Railroads*,
  575 U.S. 43 (2015)....................................................................... 21

*Detroit International Bridge Co. v. Government of Canada*,
  883 F.3d 895 (D.C. Cir. 2018) ..................................................................... 21

*Dong v. Smithsonian Institution*,
  125 F.3d 877 (D.C. Cir. 1997) ....................................................................... 8

*Farmers and Merchants Bank v. Federal Reserve Bank of Richmond*,
  262 U.S. 649 (1923) ....................................................................................... 3

*Farrell-Cooper Mining Co. v. DOI*,
  728 F.3d 1229 (10th Cir. 2013) ................................................................... 14

*Financial Oversight & Management Board for P.R. v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020) ................................................................................. 23

*Free Enterprise Fund v. PCAOB*,
  561 U.S. 477 (2010) ..................................................................................... 13

*Ghadami v. DHS*,
  No. 19-cv-397, 2020 WL 1308376 (D.D.C. Mar. 19, 2020) ......................... 10

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.*,
  866 F.2d 38 (2d Cir. 1989) ............................................................................ 5

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ....................................................................................... 7

*Hillsborough County v. Automated Medical Laboratories., Inc.*,
  471 U.S. 707 (1985) ....................................................................................... 9

*Hyde Park Company v. Santa Fe City Council*,
  226 F.3d 1207 (10th Cir. 2000) ................................................................... 18

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*,
  684 F.3d 1332 (D.C. Cir. 2012) ......................................................... 7, 24, 25

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ........................................................................ 18

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*,
  713 F.2d 1221 (6th Cir. 1983) ....................................................................... 5

*Kane County, Utah v. United States*,
  950 F.3d 1323 (10th Cir. 2020) ................................................................... 15

*Kokajko v. FERC*,
   837 F.2d 524 (1st Cir. 1988)..................................................................... 11

*Lambert v. Saul*,
   980 F.3d 1266 (9th Cir. 2020) .................................................................... 9

*Lane v. Lane*,
   646 F. App'x 646 (10th Cir. 2016) ............................................................ 16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................................... 16

*Laufer v. Looper*,
   22 F.4th 871 (10th Cir. 2022) .................................................................... 15

*Lewis v. United States*,
   680 F.2d 1239 (9th Cir. 1982) ..................................................................... 4

*Mann v. Fifth Third Bank*,
   2011 WL 1575537 (S.D. Ohio Apr. 25, 2011)............................................ 9

*Martin Marietta Materials, Inc. v. Kansas Department of Transportation*,
   810 F.3d 1161 (10th Cir. 2016) ................................................................ 17

*Morrison v. Olson*,
   487 U.S. 654 (1988).................................................................................... 25

*National Federation of Federal Employees v. United States*,
   905 F.2d 400 (D.C. Cir. 1990)................................................................... 21

*Nielsen v. Preap*,
   139 S. Ct. 954 (2019)................................................................................. 17

*O'Gilvie v. United States*,
   519 U.S. 79 (1996)....................................................................................... 5

*Rector v. City & County of Denver*,
   348 F.3d 935 (10th Cir. 2003) .................................................................. 12

*Sarlak v. Pompeo*,
   No. 20-cv-35, 2020 WL 3082018 (D.D.C. June 10, 2020)........................ 10

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020)............................................................................... 13

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ........................................................... 9, 10

*Smith v. U.S. Court of Appeals for the Tenth Circuit*,
    484 F.3d 1281 (10th Cir. 2007) ............................................................. 12

*Taft v. Agricultural Bank of China Ltd.*,
    2016 WL 2766661 (S.D.N.Y. May 12, 2016) ........................................... 8, 9

*TNB USA, Inc. v. Federal Reserve Bank of N.Y.*,
    No. 1:18-cv-7978, 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ..................... 6, 10, 14

*Telecommunications Research & Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................... 10, 11

*United States v. Arthrex, Inc.*,
    141 S. Ct. 1970 (2021) ...................................................................... 24

*United States v. Hilario*,
    218 F.3d 19 (1st Cir. 2000) ................................................................. 25

*United States v. Morgan*,
    44 F. App'x 881 (10th Cir. 2002) ........................................................ 25

*Utah v. Babbitt*,
    137 F.3d 1193 (10th Cir. 1998) ........................................................... 16

*Utah Association of Counties v. Bush*,
    455 F.3d 1094 (10th Cir. 2006) ........................................................... 15

*Webster v. Doe*,
    486 U.S. 592 (1988) .......................................................................... 6

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ......................................................................... 21

*WildEarth Guardians v. National Park Service*,
    703 F.3d 1178 (10th Cir. 2013) ............................................................. 9

*Wyoming v. Zinke*,
    871 F.3d 1133 (10th Cir. 2017) ........................................................... 14

*Ysleta Del Sur Pueblo v. Texas*,
    142 S. Ct. 1929 (2022) ....................................................................... 8

v

**Statutes**

5 U.S.C. § 701(a)(2) ............................................................................................ 6

6 U.S.C. § 211 .................................................................................................... 2

12 U.S.C. §§ 241-52 ........................................................................................... 2

12 U.S.C. § 248 ............................................................................................ 2, 10

12 U.S.C. § 248(a)(1) ......................................................................................... 4

12 U.S.C. § 248(f) .......................................................................................... 2, 6

12 U.S.C. § 248(j) ............................................................................................ 25

12 U.S.C. § 248(k) ............................................................................................. 3

12 U.S.C. § 248a ............................................................................................... 5

12 U.S.C. § 248a(d) ......................................................................................... 25

12 U.S.C. § 307 ............................................................................................... 25

12 U.S.C. §§ 341-61 ..................................................................................... 2, 4

12 U.S.C. § 341(fifth) ...................................................................................... 20

12 U.S.C. § 341(seventh) ................................................................................. 20

12 U.S.C. § 342 ........................................................................................ 3, 4, 5

12 U.S.C. § 343 ................................................................................................. 4

12 U.S.C. § 347 ................................................................................................. 4

12 U.S.C. § 391 ............................................................................................. 4, 5

12 U.S.C. § 1813(q) ........................................................................................... 8

12 U.S.C. § 1813(z) ........................................................................................... 8

12 U.S.C. § 1818(t)(5)(A) .................................................................................. 8

12 U.S.C. § 4801 ............................................................................................... 8

12 U.S.C. § 4807 ................................................................................................ 8

12 U.S.C. § 5465(a) ........................................................................................... 5

28 U.S.C. § 509 ................................................................................................ 2

28 U.S.C. § 531 ................................................................................................ 2

31 U.S.C. § 5328(a) (repealed 2021) ................................................................. 9

Wyo. Stat. § 13-12-116(a) ................................................................................ 16

Act of Feb. 25, 1791, Pub. L. No. 1-10, §§ 10, 12,
    1 Stat. 191, 196 ....................................................................................... 22, 23

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
    § 806, 124 Stat. 1376, 1811-14 (2010) ........................................................ 5

Monetary Control Act of 1980, Pub. L. No. 96-221,
    94 Stat. 132 (Mar. 31, 1980) ...................................................................... 5

**Legislative Materials**

H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913) ......................................... 4

**Regulatory Materials**

Guidelines for Evaluating Account and Service Requests,
    87 Fed. Reg. 51,099 (Aug. 19, 2022) .......................................................... 25

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................... 10, 18, 19, 20

**Other Authorities**

*Appointment & Removal of Federal Reserve Bank Members of the FOMC,*
    2019 WL 11594453 (Op. O.L.C. Oct. 23, 2019) ....................................... 22, 23

The Federal Reserve Act ("FRA") makes clear that Congress assigned deposit-taking functions to Reserve Banks rather than to the Board and imposed no fixed deadline for decisions regarding the acceptance or rejection of deposits.  Faced with this inescapable conclusion, Plaintiff argues in its Opposition that the Court must credit its contrary legal conclusions as well-plead allegations that would allow this action to proceed despite its facial legal infirmity.  This is not the law and should be rejected by the Court.

Plaintiff's principal argument, that a one-year statutory deadline applies, is entirely unsupportable and incorrect.  No amount of artful pleading can avoid this conclusion.  And, particularly given the novel complexities of Plaintiff's business model, recent regulatory activity by the Board in this area, and the extensive efforts and ongoing attention being paid by FRBKC to Plaintiff's request (and to its Federal Reserve membership application by the Board), the passage of time in this case is far from unreasonable as a matter of law and provides no basis for the Court to accept Plaintiff's invitation to intervene and direct Plaintiff's preferred outcomes. Rather, FRBKC should be permitted to complete its due diligence, assess the potential systemic financial and other risks presented by Plaintiff's novel business model and plans (including the marketing of a proprietary "programmable U.S. dollar called Avit"), and reach an informed decision under legal authority granted directly to it by Congress subject to Board oversight.

Because the relief Plaintiff seeks is limited to its claim of impermissible delay, *see* Compl. at 42 ("Request for Relief"), dismissal is appropriate without need for the Court to proceed beyond the issue of timing and into Plaintiff's various other statutory and constitutional claims even if those claims could satisfy justiciability requirements (and, as shown below and in the Board's initial brief, they cannot, and would in any event fail on the merits).

1

**ARGUMENT**

I.   **Congress Vested Reserve Banks with Deposit-Taking Authority and Imposed No Fixed Deadline on Requests for Deposit Accounts**

A.   **Reserve Banks Are Distinct Entities With Congressionally Defined Authority**

Notwithstanding Plaintiff's repeated assertions that Reserve Banks are indistinguishable from the Board, the FRA makes each Reserve Bank a separate "body corporate" with distinct governance and powers.  12 U.S.C. §§ 341-61.  These unique entities are thus unlike the FBI or Border Patrol (*see* Opp. at 24), which, by statute, are components of the Department of Justice and Department of Homeland Security, respectively.  *See* 28 U.S.C. §§ 509, 531 (FBI); 6 U.S.C. § 211 (Border Patrol).  And Reserve Banks are far different from regional offices of the Federal Deposit Insurance Corporation ("FDIC") or Office of the Comptroller of the Currency ("OCC"), despite one unsupported and conclusory suggestion to the contrary.  *See* Br. of *Amici Curiae* Members of the U.S. Senate Banking Comm. and U.S. House of Reps. Financial Servs. Comm. ("U.S. Members Br."), ECF No. 90-1, at 18.[1]  Instead, Congress quite purposefully drafted the FRA to grant some powers to the Board and some powers directly to the separately incorporated Reserve Banks.  *Compare* FRA subchapter II, 12 U.S.C. §§ 241-52 ("Board of Governors of the Federal Reserve System"), *id.* § 248 ("Enumerated Powers" of the Board) *with* FRA subchapter IX, 12 U.S.C. §§ 341-61 ("Powers and Duties of Federal Reserve Banks").

Plaintiff's conflation of distinct functions notwithstanding, when Reserve Banks exercise powers granted to them by Congress, the Board exercises only supervisory authority.  It cannot make decisions statutorily vested in Reserve Banks, though it may exercise influence through its oversight authority and other means, including its removal powers, *see* 12 U.S.C. § 248(f).  On

---

[1] This brief was submitted by three out of twenty-four members of the Senate Banking Committee and four out of fifty-four members of the House Financial Services Committee.

the other hand, when the Board delegates its own statutory powers to Reserve Banks pursuant to

12 U.S.C. § 248(k), it *can* directly control their activity and outcomes with respect to the

delegated matter.  It is as a result of this delegated authority that Reserve Banks may "process"

many "bank applications on behalf of the Board."  U.S. Members Br. at 18.  The decision at

issue here concerns a distinct Reserve Bank function, not a delegated power.

### B.   Congress Conferred Discretion to Accept Deposits, and Therefore Whether to Open Master Accounts, to Reserve Banks in 12 U.S.C. § 342

As the Board has shown, master accounts are deposit accounts and as such are governed

by 12 U.S.C. § 342, which gives Reserve Banks, including FRBKC, discretion to receive or not

receive deposits, and therefore discretion over whether or not to open a master account for any

particular entity.  Bd. Mem. at 4, 17-20.  As the Board explained, the relevant statutory language

of § 342 includes the permissive "may," which has long been interpreted by courts, including the

U.S. Supreme Court, to denote a discretionary power.  *Id*. at 17-20.[2]

Plaintiff's argument that the Board "sits atop the Federal Reserve System," "exercises

veto power over everything Reserve Banks do," and therefore controls the decision whether to

grant individual master accounts, Opp. at 17; *see also id.* at 2 ("the Board retains final decision-

making authority over master account applications"), ignores Congress's express vesting in

Reserve Banks—not the Board—the discretionary authority to receive deposits, among

---

[2] Plaintiff claims that Defendants incorrectly rely on *Farmers and Merchants Bank v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923), handed down shortly after enactment of the FRA in 1913, in which the Court interpreted § 342's "may receive" language as permissive.  *See, e.g.*, Bd. Mem. at 18-19.  Plaintiff claims that *Farmers* merely "reinforces that § 342 confers some discretion over what types of monetary instruments Reserve Banks may accept," but not the "antecedent question" of whether to open master accounts.  Opp. at 18.  But *Farmers* cannot be read so narrowly, and the language of § 342 is far broader than plaintiff suggests, with the permissive "may" modifying both the verb "receive"—giving Reserve Banks discretion over whether or not to receive deposits, and therefore discretion over whether to open a master account—as well as discretion over the types of deposits to receive, including "current funds in lawful money," "checks," or "other items."  12 U.S.C. § 342.

numerous other statutory grants of authority directly to Reserve Banks.  *E.g.*, 12 U.S.C. § 342; *id.* § 343 (Reserve Banks "may discount" certain notes); § 347 (Reserve Banks "may make advances for [limited] periods . . . to its member banks").  Indeed, the entirety of subchapter IX of the FRA, 12 U.S.C. §§ 341-61, is devoted to the "Powers and Duties of Federal Reserve Banks."  While exercising significant supervisory authority over the Reserve Banks (as well as regulating commercial banks[3]), the Board does not direct their day-to-day operations.  *See* 1913 House Report at 18-19; *see also Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) ("It is evident from the legislative history of the Federal Reserve Act that Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks.").[4]

Plaintiff's further argument that § 342 cannot properly be interpreted to give Reserve Banks discretion over whether or not to accept deposits—and therefore discretion whether to open a master account—because this "would lead to the implausible conclusion that Reserve Banks could unilaterally deny master accounts *to the United States*," Opp. at 17, is incorrect.  A different provision of the FRA requires Reserve Banks to accept deposits of public moneys and gives the *Secretary of the Treasury* discretion to determine when to make such deposits.  12 U.S.C. § 391 (public funds "may, upon the direction of the Secretary of the Treasury, be deposited in Federal reserve banks, which banks, when required by the Secretary of the Treasury, shall act as fiscal agents of the United States; and the revenues of the Government or any part thereof may be deposited in such banks").  As a result, "a single, unaccountable Reserve Bank"

---

[3] *See, e.g.*, 12 U.S.C. § 248(a)(1) (granting Board power to "examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and to require such statements and reports as it may deem necessary").

[4] That a Reserve Bank might choose to wait to issue a master account decision until the Board issues rules or guidelines relevant to the decision does not convert the decision into one that was made or vested in the Board.  *Contra* Opp. at 14, 23.

could not, as Plaintiff implausibly argues, "unilaterally defeat federal monetary policy and create economic chaos." Opp. at 18.  Moreover, if § 342 in fact *required* Reserve Banks to accept deposits, as Plaintiff incorrectly contends, there would have been no reason for Congress to make specific provision in § 391.[5,6]

Plaintiff's citations to *Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989), and *Jet Courier Servs.*, *Inc. v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983), for the proposition that the Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (Mar. 31, 1980) ("MCA"), "made 'check clearing services . . . available to all banks,'" Opp. at 44, is also unpersuasive.  Master accounts are deposit accounts, not "services," Bd. Mem. at 20, but even if it were otherwise, these cases simply observed that the MCA added 12 U.S.C. § 248a ("Pricing of services") so that member and nonmember banks alike would pay a uniform fee for Reserve Bank services, not so that each and every bank, regardless of risks to the system and other factors, was guaranteed access to services.  *Greater Buffalo*, 866 F.2d at 46; *Jet Courier*, 713 F.2d at 1227 ("What is clear [from the MCA] is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made

---

[5] Plaintiff's claim that Congress "used different language [in 12 U.S.C. § 5465(a)] to grant the Board control over . . . master accounts" for designated financial market utilities, Opp. at 18, seeks to use inapposite legislation enacted nearly 97 years after the FRA, *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 § 806, 124 Stat. 1376, 1811-14 (2010), to impermissibly construe an earlier Congress's enactment. *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute").  In any event, the section supports the interpretation that § 342 gives Reserve Banks discretion over the master account decision for other depository institutions.

[6] Plaintiff also cites a laundry list of various statutes expressly providing for Board approval of specifically-enumerated Reserve Bank matters, and argues that "[i]t defies credulity that Congress carved out an exception to the rule that the buck stops with the Board just for determinations about who gets master accounts." Opp. at 20-21.  But this list of *specific matters* requiring Board approval actually indicates the lack of any general "rule" vesting all decisionmaking authority on all matters with the Board.  If the Board had such power, these specific grants of authority would be unnecessary.

available to nonmember depository institutions at the same fees charged member banks, and that 'over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services.'"); *see also* Bd. Mem. at 21.

### C.   No Required Board Action Has Been Improperly Delayed

Despite Plaintiff's contention that it has alleged facts supporting "an inference that the Board exercises final decision-making authority" over master accounts, Opp. at 23, its self-serving allegations cannot circumvent the language of the statute.[7]  Indeed, Plaintiff cannot bootstrap its way into an interpretation inconsistent with the statutory text by demanding that the legal inferences it wants drawn from its factual allegations be entitled to deference—they are not. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  As discussed above, and in the Board's initial brief (at 1-2, 4-5, 11, 17), the Board does not decide individual master account requests as a matter of law under the FRA.  If unhappy with such a decision, or pattern of decisions, the Board may of course consider use of its broad removal authority over Reserve Bank officials.  *See* 12 U.S.C. § 248(f).  Choosing whether to exercise this authority is a classic example of a matter that is committed to agency discretion, and not a matter subject to APA unreasonable delay jurisprudence.  *See* 5 U.S.C. § 701(a)(2) (APA does not provide for review of matters committed to agency discretion); *cf. Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (judicial review of NSA Director's terminations not permitted under the APA because discharge decisions were "committed to agency discretion by law").

---

[7] Plaintiff's citation to the *TNB* litigation is unavailing, *see* Opp. at 22, as that decision merely cited allegations related to the Board's involvement with TNB's master account request and did not make any findings of fact or law regarding the Board's authority or lack thereof.  *See TNB USA Inc. v. Fed. Reserve Bank of N.Y.*, No. 1:18-cv-7978, 2020 WL 1445806, at *3 (S.D.N.Y. Mar. 25, 2020).

Plaintiff conflates the Board's discretionary supervisory authority that may *influence* how Reserve Banks decide master account requests with responsibility for *directing* the decision.  But supervisory authority is legally distinct from decisionmaking authority, Plaintiff's creative pleading efforts notwithstanding.  *See, e.g.*, *Intercoll. Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012) (Librarian of Congress could use removal power to "supervise" officials who made "final" decisions not "directly reversible" by the Librarian).  Plaintiff takes issue with the Board's approval of Operating Circulars, Opp. at 22-23, but this activity is consistent with the Board's general supervisory role, which can encompass guidance about the process by which Reserve Banks make master account decisions without converting the Board into the decisionmaking authority.  Plaintiff also distorts the Board's role by wrongly claiming that the Board's expectation that Reserve Banks "engage in consultation" with it and each other is tantamount to the Board seizing control of master account decisions.  *See* Opp. at 23.  Once again, this consultative role is consistent with both the Board's general supervisory powers and the fact that it has not been tasked with master account decisions as a matter of law.  *Cf. Intercoll. Broad. Sys., Inc.* 684 F.3d at 1339-41 (consultation procedure was aspect of supervision of officials who made "final" decisions not "directly reversible" by superiors).

Because the authority to open master accounts is committed to Reserve Banks by statute, and the Board's powers to influence such decisions are also discretionary, any alleged act taken by the Board that may influence Reserve Bank action (or a decision not to act) as part of its supervisory authority is wholly discretionary and not subject to judicial review under the APA.  *Heckler v. Chaney*, 470 U.S. 821, 837 (1985); *see also, e.g.*, *Bischoff v. Glickman*, 54 F. Supp. 2d 1226, 1230 (D. Wyo. 1999) (dismissing APA claims because "issuance or non-issuance" of the requested action was "wholly within the discretion" of the agency), *aff'd on standing grounds*

*sub nom.*, *Bischoff v. Myers*, 216 F.3d 1086 (10th Cir. 2000).

Moreover, master account decisions are not subject to 12 U.S.C. § 4807, which applies a one-year deadline only to applications for decisions assigned to a federal banking agency such as the Board, *not* to decisions that Congress vested in Reserve Banks. Plaintiff's contrary claim is simply wrong. Opp. at 16. Section 4807 is expressly limited to applications made to "federal banking agenc[ies]," as defined in 12 U.S.C. § 1813(z), which is limited to the Board, OCC, and FDIC, and therefore does not encompass master account requests to Reserve Banks. Bd. Mem. at 10-11.[8] Plaintiff's § 4807 argument rests largely on its legally erroneous assertion that "the Board controls master account adjudications," Opp. at 16, which is incorrect. Plaintiff's citation to the definition in another federal banking statute, Opp. at 24-25, does not change this analysis, as § 4807 expressly incorporates the definition of "federal banking agency" in § 1813(z).[9] *See* 12 U.S.C. § 4801. Plaintiff's citation to *Taft v. Agricultural Bank of China Ltd.,* 2016 WL

---

[8] Plaintiff's assertion that excluding Reserve Banks from the scope of "Federal banking agency" for purposes of section 4807 would create a "glaring loophole whereby the Board could make the one-year deadline magically disappear by routing applications to subsidiary officers or agents," Opp. at 16, is plainly wrong. It was *Congress* and not the Board that assigned the power to engage in banking functions such as opening accounts to Reserve Banks in the original FRA, *see supra* at 2-5; the Board is not arguing here that when it delegates its own powers to Reserve Banks—a matter not at issue since this case does not involve a delegated function—section 4807 does not apply.

[9] Plaintiff's reliance on 12 U.S.C. § 1818(t)(5)(A), which concerns submission of investigative requests by a "regional office of an appropriate Federal banking agency (including a Federal Reserve bank)," does not help its position. The term "appropriate Federal banking agency" is separately defined at 12 U.S.C. § 1813(q) with no cross-reference to the definition of "Federal banking agency" in section 1813(z), so section 1818(t)(5)'s treatment of "appropriate Federal banking agency" is not in any way linked to section 1813(z)'s definition. In any event, Congress would have had no reason to add the phrase "(including a Federal Reserve bank)" to § 1818(t)(5)(A) if Reserve Banks were already included in the baseline definition of "Federal banking agency." *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("we must normally seek to construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant" (quotation omitted)); *cf. Dong v. Smithsonian Inst.*, 125 F.3d 877, 878-79 (D.C. Cir. 1997).

2766661, at *12-13 (S.D.N.Y. May 12, 2016), in which the court construed the undefined term "federal supervisory agency" in the Bank Secrecy Act, 31 U.S.C. § 5328(a) (repealed 2021), is similarly inapposite because it concerned a different statute and the *delegation* of the Board's examination duties to a Reserve Bank, which is an entirely different circumstance from that presented here.[10]

Although this analysis should conclude the Court's review of Plaintiff's APA claim, Plaintiff's related undue delay arguments also fail. Plaintiff paints an inaccurate picture of delay by claiming "22 months of inaction," Opp. at 29, but in doing so wholly ignores the Board's efforts to issue its Proposed Guidelines for Evaluating Account and Services Requests, review comments, publish a supplemental notice, and ultimately issue final Guidelines,[11] as well as Plaintiff's intervening action to begin its separate application with the Board to become a member bank some 10 months *after* filing its master account request with FRBKC. *See* Bd. Mem. at 6-7, 9; Opp. at 6-7; *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) (crediting the activity engaged in by the agency during the years that passed after initially proposing a rule). Such activity distinguishes this case from undue delay cases where an agency lay fallow without reason.

---

[10] *Mann v. Fifth Third Bank*, 2011 WL 1575537 (S.D. Ohio Apr. 25, 2011), also involved examination duties. *Id.* at *3.

[11] Plaintiff argues (Opp. at 21) that the Board is not entitled to deference for the positions articulated in the Guidelines even though the Board is charged with interpreting the FRA, the question of Reserve Bank discretion was squarely addressed in multiple rounds of notice and comment, and the Guidelines were adopted by a unanimous Board vote. This is not so. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1188 (10th Cir. 2013) (in deciding whether to give deference, courts must consider "the agency's expertise, the importance of the question to the agency's administration of the statute, . . . the degree of consideration the agency has given the question," and "the presence or absence of notice-and-comment") (citing *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)); *see also Lambert v. Saul*, 980 F.3d 1266, 1275 (9th Cir. 2020) (granting deference to interpretation in the *preamble* to a rule that followed notice and comment) (citing *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)).

Plaintiff next refers to the factors set forth in *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (cited in Bd. Mem. at 16), which it first urges the Court to apply, Opp. at 29, before suggesting that the factors should not be considered at the motion to dismiss stage, *id.* at 30. Many courts have rejected the latter argument, finding that "it is appropriate for the Court to apply the factors at this stage." *E.g.*, *Ghadami v. DHS*, No. 19-cv-397, 2020 WL 1308376, at *7 n.6 (D.D.C. Mar. 19, 2020). "In applying these factors, the Court is not determining whether there has been an unreasonable delay; rather, it is determining whether plaintiffs' complaint has alleged facts sufficient to state a plausible claim for unreasonable administrative delay." *Id.* Plaintiff's Complaint—spanning forty-two pages—alleges facts that allow the Court to be able to evaluate the APA claim at this time. Indeed, countless courts have applied the *TRAC* factors and dismissed the case. *E.g.*, *Sierra Club*, 828 F.2d at 799; *Brzezinski v. DHS*, No. 21-cv-376, 2021 WL 4191958, at *6 (D.D.C. Sept. 15, 2021) (dismissing undue delay claim under 12(b)(6) after analyzing the six *TRAC* factors where seventeen months had elapsed since the date of the last government action).

Moreover, the weight of the *TRAC* factors tilts in the Board's favor. With respect to the first two factors regarding a "rule of reason" or timetable for decision, there is no congressionally imposed timeline for a master account decision, and Congress has given the Board wide discretion with respect to the agency's supervision of Reserve Banks. *See* 12 U.S.C. § 248; *cf. Brzezinski*, 2021 WL 4191958, at *5.[12] Furthermore, by issuing the Guidelines, the Board *did*

---

[12] "Absent a congressionally supplied yardstick, courts typically turn to case law as a guide." *Sarlak v. Pompeo*, No. 20-cv-35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020). The limited case law on this point is in the Board's favor, as the *TNB* court suggested that while an 18-month wait could be "concerning," it was not problematic in the way that a many-year delay would be. *TNB*, 2020 WL 1445806, at *7. Similarly, Plaintiff's master account request here is nowhere approaching the timeline subject to potential judicial action posited by the court in that case.

take action within a reasonable time that will influence Reserve Banks.[13]  Just because the Board did not dictate a specific timeline for Reserve Banks to render a decision, or take some other discretionary act that Plaintiff may desire, does not mean that the Board has not acted in accordance with a "rule of reason."

The third factor regarding the type of harm alleged—which Plaintiff conveniently failed to address—clearly weighs in the Board's favor because a lengthier delay can be reasonable when the issue presented involves economic matters and does not implicate human health and welfare.  *See* Bd. Mem. at 15-16; *Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988).  Fourth, "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  The Board explained at length why Plaintiff's business model poses novel, precedent-setting risks that require careful consideration by FRBKC.  Bd. Mem. at 9, 14.  A Court-imposed deadline could cause a rushed analysis that jeopardizes the Federal Reserve's ability to achieve its policy goals or result in a premature decision.  While the fifth factor is designed to lean in a petitioner's favor, the nature of the interests prejudiced by delay of a master account decision are purely pecuniary and, as discussed below at 15-17, Plaintiff failed to adequately allege a present injury given its independent inability to operate at the time it filed its Complaint.  Finally, as to the sixth factor, it should be noted that there has been no allegation of impropriety or bad faith by the Board.

## II.   Plaintiff Has Failed to Establish Justiciability

The Board made a facial attack on justiciability and nothing in Plaintiff's Opposition suggests that its allegations satisfy its threshold burden.  With respect to the constitutional claims

---

[13] Plaintiff blithely states, with no analysis, that retroactive application of any change of substantive criteria contained in the Guidelines would be unlawful.  *See* Opp. at 31.  Plaintiff's brief contains no response to the Board's prior argument that applying the Guidelines to Plaintiff's master account request has no impermissible retroactive effect.  Bd. Mem. at 14 n.20.

relating to who might make a final decision (Claims V-VI), and contingent claims seeking relief in the event of an adverse decision (Claim VII-VIII), the Board showed that Plaintiff failed to establish a present injury that supports standing as to such claims, and, alternatively, that the claims were unripe because a decision could be favorable to Plaintiff.  Bd. Mem. at 27-31.  As to Plaintiff's remaining claims relating to timeliness, the Board explained that the Complaint failed to allege that Plaintiff held a Certificate of Authority that allowed it to actually operate as of the time it sued, and therefore had not established the injuries it alleged.  *Id.* at 31-32.

The cases Plaintiff cites do not hold otherwise.  With respect to its due process claim concerning purported bias by officials it speculates might participate in making a final decision on its request (Claim V), *Rector v. City & County of Denver*, 348 F.3d 935 (10th Cir. 2003), in fact supports the Board's position.  *Rector* held that, because a plaintiff "was neither assessed, nor did she pay, the late fee, she has no standing to challenge claims addressing the procedures under which the late fee may be contested" and thus dismissed her due process claim.  *Id.* at 946.  Similarly here, absent an adverse final decision, Plaintiff lacks standing to challenge the purported bias of the potential decisionmakers who allegedly might make such a decision.

Plaintiff's lack of any concrete injury is further reflected in its inability to allege that the final decision—which has not been made—will actually be made by purportedly biased officials, instead resorting to hypotheticals and conjecture.  *See* Compl. ¶ 115 (asserting a violation "*to the extent*" allegedly biased decisionmakers participate in making the final decision).  A plaintiff cannot litigate a hypothetical due process violation that may not materialize based on such speculative assertions about events that may never occur.  *See Smith v. U.S. Ct. of Appeals, for the Tenth Cir.*, 484 F.3d 1281, 1285-86 (10th Cir. 2007) (plaintiff lacked standing to file a federal court challenge on due process grounds to a state court's issuance of unpublished

opinions when no opinion had been issued in his pending state court appeal at the time he sued).

The cases cited by Plaintiff to claim standing as to its Appointments Clause claim (Claim VI) are distinguishable because in those cases the challenged governmental act *had already occurred* and *already impacted* the party invoking the Court's jurisdiction, and thus there was no question as to injury.  In fact, *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), reaffirmed that a plaintiff raising a separation of powers challenge must show that it "sustains injury from an executive act that allegedly exceeds the official's authority" to have standing.  *Id.* at 2196 (cleaned up); *see also Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (cases raising separation of powers issues merit stricter, not laxer standing analysis).

Thus, in *Seila Law*, the petitioner challenged a civil investigative demand that *it had been issued* "to provide documents it would prefer to withhold, a concrete injury."  *Id.* at 2196.  The injury element of standing was thus not at issue; rather, the Court held that the petitioner did not need to show that the demand would not have been issued but for the asserted constitutional violation, *id.*, a matter that appears to concern causation.  Similarly, in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the respondent had already initiated a formal investigation, *id.* at 487, and its very power to do so was at issue.  *Id.* at 504-05 (noting that "the power to start, stop, or alter individual . . . investigations" was at issue and was one of the ways by which the respondent "interven[ed] in the affairs of regulated firms").  As in *Seila Law*, the Court simply held that the plaintiffs did not need to show that the investigation *that had already been opened* would not have commenced absent the constitutional violation at issue, again addressing causation rather than injury.  *Id.* at 512 n.12.  It did not hold that had no action yet been taken, the plaintiffs would have had standing.  Here, by contrast, Count VI specifically challenges the authority of certain officials to make a *final decision* that has not yet been made; it has not yet

impacted (and may never detrimentally impact) Plaintiff.  Until such a final decision has been

made, and unless such a decision is adverse to Plaintiff, it has suffered no concrete injury in

connection with these alleged claims, which must therefore be dismissed on standing grounds.

Moreover, the cases cited by Plaintiff do not address the ripeness of its constitutional

claims, which relate to the outcome of a process that has not concluded; under controlling

precedent, such claims must be dismissed on ripeness grounds when a pending administrative

proceeding may result in a decision favorable to the plaintiff.  *Wyoming v. Zinke*, 871 F.3d 1133,

1142 (10th Cir. 2017) (noting "waste of judicial resources" that would result absent dismissal);

*Farrell-Cooper Mining Co. v. DOI*, 728 F.3d 1229, 1238 (10th Cir. 2013) (dismissing on

ripeness grounds where pending administrative proceedings could result in a favorable decision

to the plaintiff).  Here, a final decision may be favorable to Plaintiff, meaning it will have

sustained no injury from involvement of any particular officials in making such a decision.[14]

With respect to Plaintiff's assertions about Counts VII and VIII, which are expressly

phrased in conditional terms relating to a potential denial of a master account, the fact that a

decision has not been made renders them unripe even if, as Plaintiff contends, it has an absolute

right to such an account.  *See generally TNB*, 2020 WL 1445806, at *8  (dismissing similar

claims on ripeness grounds when a final decision had not been made).  Moreover, as explained

below, even if, as Plaintiff contends, the law requires the grant of an account, these claims are

---

[14] The bulk of the briefs from the State of Wyoming and the Wyoming members focus on the substance of the master account decision, *i.e.*, the view that Wyoming SPDIs should quickly be granted a master account because they do not pose a serious risk to the national payment system or the Federal Reserve.  But that issue is unripe and beyond the scope of what should presently be considered by the Court.  Indeed, the Wyoming members acknowledged that they "do not purport to be expert on the questions of federal jurisdiction or the Administrative Procedure Act that underlie much of the defendants' motions to dismiss."  Br. of *Amici Curiae* Wyo. Senator Rothfuss and Rep. Olsen, ECF No. 89, at 2.

not justiciable for the same reason as Plaintiff's timeliness claims (Claims I-IV).

Plaintiff has also failed to establish standing to assert its timeliness claims (or any other claim), as it concedes that it has "just" obtained a Certificate of Authority allowing it to operate, Opp. at 2,[15] *i.e.*, that it was not operating three months earlier when it filed suit. Its Complaint made no allegations establishing that, as of the time it sued, it had qualified and applied for such a certificate allowing it to operate, or that whatever costs and risks it would incur due to using a partnering arrangement were actual or certainly impending at the time, when it was not actually operating or capable of operating under such an arrangement.[16] It thus has not established standing, which is assessed as of the time suit is filed. *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1099, 1101 (10th Cir. 2006) (harm accruing after suit was filed did not establish standing); *see also Kane Cnty., Utah v. United States*, 950 F.3d 1323, 1333 (10th Cir. 2020) (future injury must be "certainly impending" to constitute injury in fact (citation omitted)). Its citations to cases where delay or uncertainty caused an injury-in-fact, Opp. 9-10, are thus inapposite.

Plaintiff belatedly tries to assert new facts in its brief, claiming that at some unspecified time it incurred costs to retool systems due to a partnering arrangement, Opp. at 8-9, and asserting for the first time that because it had to have either a master account or a relationship with a third-party bank to obtain the certificate, the Defendants' actions delayed issuance of the certificate. Opp. at 10. The Board made only a facial attack on justiciability, however, Bd. Mem. at 26 n.25, and assertions not in the Complaint are therefore irrelevant to establishing standing. *Laufer v. Looper*, 22 F.4th 871, 875-76 (10th Cir. 2022) (disregarding declaration with

---

[15] The State's amicus brief further clarifies that the certificate was issued the day before Plaintiff's Opposition was filed, more than three months after it filed suit. Br. of *Amicus Curiae* State of Wyo., ECF No. 88 ("Wyo. Br."), at 6.

[16] In fact, Plaintiff has never alleged *when* it expects to start operating.

15

additional facts in support of standing submitted in opposition to motion to dismiss that raised only a facial attack to standing); *cf. Carter v. Genesis Alkali, LLC*, No. 20-cv-216, 2021 WL 7209884, at *3 (D. Wyo. June 2, 2021) ("Plaintiffs are not permitted to 'effectively amend their Complaint by alleging new facts in their response to a motion to dismiss.'" (citation omitted)).

These assertions are in any event insufficient to establish Plaintiff's standing as of the time it sued.  The claim about costs, like the claims of injury in the Complaint, fails to identify when such costs were incurred or became "certainly impending" relative to when the Complaint was filed.  The sudden and conclusory assertion that Defendants are responsible for allegedly delaying the grant of a certificate to Plaintiff is not based on any factual allegations supporting an inference that, by the time it brought suit, Plaintiff met all requirements for immediate issuance except for lack of a master account or partnering arrangement,[17] and is in fact inconsistent with Plaintiff's own factual assertions.  Plaintiff asserted that it had already negotiated a partnering arrangement as of the time it sued, Compl. ¶ 8, yet only "*just*" received a certificate, Opp. at 2. The State must issue the certificate within 30 days of receiving a complete application, Wyo. Stat. § 13-12-116(a), meaning Plaintiff would have previously received this certificate if the only holdup was lack of a master account or alternative arrangement as it now contends.

These assertions thus fail to demonstrate Plaintiff's standing as of the time it sued.  *See Utah v. Babbitt*, 137 F.3d 1193, 1207 n.20 (10th Cir. 1998) ("conclusory allegations" irrelevant to standing analysis (citations omitted)); *cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("'some day' intentions without . . . any specification of when the some day will be" do not establish justiciability); *Lane v. Lane*, 646 F. App'x 646, 649 (10th Cir. 2016) (bare assertion that

---

[17] As indicated in the State's brief, multiple requirements must be met to qualify for a certificate. Wyo. Br. at 5-6.

claim against debtor's bankruptcy estate deprived him of property, without factual allegations showing his entitlement to estate assets, failed to establish standing to contest the claim).

## III.    Plaintiff Fails to Allege Any Constitutional Violation

### A.    Plaintiff Fails to State a Due Process Claim

The Board has explained that Plaintiff failed to state a due process claim because it lacked a concrete property interest that implicated due process protections, and also because its allegations failed to show constitutionally impermissible delay, vagueness, or bias in the master account process.  Bd. Mem. at 33-37.  Plaintiff's Opposition fails to demonstrate otherwise.

First, discretion over master account requests precludes a due process claim because it establishes Plaintiff's lack of a property right implicating due process.  *Martin Marietta Materials, Inc. v. Kansas DOT*, 810 F.3d 1161, 1171, 1178 (10th Cir. 2016).  Plaintiff, quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972), responds in conclusory fashion that it "has 'a legitimate claim of entitlement . . .' which is all that is required to establish a property interest."  Opp. at 36.[18]  But *Roth* explained that, to be "legitimate," such a claim must be legally valid rather than reflect a plaintiff's "unilateral expectation."  408 U.S. 577.  Thus,

---

[18] Plaintiff relies on the canon of constitutional avoidance to argue that the Court should adopt its interpretation of the FRA, Opp. at 2, yet later relies on its favored construction of the statute to assert that it has a "legitimate claim of entitlement" to an account that implicates due process rights, Opp. at 36.  (Elsewhere it raises other statutory arguments in asserting a constitutional violation, *see, e.g., infra* at 20.)  Interpreting the FRA as plaintiff suggests here (or to make the grant of a master account mandatory or the Board responsible for deciding master account requests) is inconsistent with the statutory text, structure, and even section and chapter headings, and thus not a basis for applying the avoidance canon.  *See Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) (refusing to apply the canon where the statute's text "cuts clearly against" the proponent of avoidance, observing that the "constitutional concerns are offered as just another pillar in an argument for their preferred reading of the [statute]").  Moreover, the canon is only invoked to avoid "serious" constitutional problems.  When judicial precedents "undermine" a plaintiff's constitutional claims, the canon is not implicated.  *Artis v. D.C.*, 138 S. Ct. 594, 606 (2018).  Because Plaintiff's constitutional claims rest on conclusory assertions or inapplicable precedents, the avoidance doctrine provides no reason to adopt Plaintiff's strained construction of the FRA.

17

where no statute secured a right to the asserted entitlement, no due process rights attached.  *Id.*[19]

Moreover, Plaintiff fails to establish that the master account process violates due process. Citing *Beckles v. United States*, 137 S. Ct. 886, 892 (2017), it argues that "due process prohibits depriving private parties of property under a law 'so standardless that it invites arbitrary enforcement.'"  Opp. at 34.  But it fails to address the Board's point that, under *Beckles*, a purported lack of standards for *FRBKC's* actions does not burden *Plaintiff*'s due process rights. 137 S. Ct. at 895 (rejecting criminal defendant's vagueness challenge to sentencing guidelines for courts because they regulated courts rather than the general public); Bd. Mem. at 34.  Instead, Plaintiff dissembles, claiming to raise a "separate species of constitutional violation" from the vagueness challenge at issue in *Beckles*, but cites no authorities.  Opp. at 35-37.[20]  The only authority it *does* cite, *Beckles*, describes the "arbitrary enforcement" challenge Plaintiff raises as a vagueness challenge and not a distinct cause of action.  137 S. Ct. at 894.  *Beckles* thus controls and precludes Plaintiff's claim.[21]

Plaintiff also fails to state a due process claim for bias in a future final decision that will be made on its request.[22]  As the Board explained, Plaintiff made no factual allegations showing

---

[19] Plaintiff argues that in assessing its *standing* to raise this challenge, its legal conclusions are taken as true.  Opp. at 36.  This argument is irrelevant to the *merits* of its claim, as the Court need not accept Plaintiff's legal conclusions in adjudicating a 12(b)(6) motion.  *Iqbal*, 556 U.S. at 678.

[20] The only other case Plaintiff cites in this discussion, *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), expressly declined to rule on any due process issues.  *Id.* at 466 n.21.

[21] Plaintiff also fails to address the point that, to the extent it asserts a lack of standards, it *lacks* a legally protected property right implicating due process protections.  *See Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1212-13 (10th Cir. 2000) ("[Where ordinances] contain *no standards* governing the . . . exercise of discretion, [appellant] has no protectible property interest on which to base its due process claims." (emphasis added)); Bd. Mem. at 33-34.

[22] Plaintiff does not appear to contest the Board's assertion that if it fails to state an APA claim for undue delay, it necessarily fails to state such a claim on due process grounds, *see* Bd. Mem.

that biased actors will actually participate in making a final decision, and, in any event, adequate safeguards exist to check any potential bias.  Bd. Mem. at 35-37.  Plaintiff has no response.

With respect to the adequacy of its allegations, Plaintiff makes a conclusory assertion that it "plausibly alleged that such directors would participate in Reserve Bank decisions."  Opp. at 42.  But the only allegation about director participation was conjectural, conditional, and conclusory, claiming bias "*[t]o the extent that* the Kansas City Fed's Board of Directors finally adjudicates the rights of would-be competitors like Custodia."  Compl. ¶ 115 (emphasis added).  Plaintiff also alleged no facts showing that, should this conjecture came to pass, the particular directors it accuses of bias (the minority elected to represent the interests of member banks, *see* Compl. ¶ 114), would participate.  *Cf.* Bd. Mem. at 35 n.31 (noting recusal requirements in cases of conflict of interest).  Plaintiff also made no allegations identifying any FRBKC member bank that competes with it in the cryptocurrency space; in fact, it merely speculated that member banks "are *or may be* competitors."  Compl. ¶ 114 (emphasis added).

Plaintiff's conjectural and conclusory assertions—that it will be harmed "to the extent" directors elected by unidentified banks that "may be" competitors would participate in a future decision—are insufficient.  Even more direct allegations about actions alleged to have *actually occurred* have been deemed too conclusory to survive a Rule 12(b)(6) motion.  *Iqbal*, 556 U.S. at 680-81 ("bare assertions" that Attorney General was the "principal architect" of a policy that knowingly subjected the plaintiff to confinement for discriminatory reasons were "conclusory and not entitled to be assumed true"); *see also id.* at 678 ("'naked assertion[s]' devoid of 'further factual enhancement'" fail to state a claim (citation omitted)).  And conjectural allegations about

---

at 34-35 (citing cases).  Thus, the reasons stated above (at 9-11) provide an additional basis for finding that plaintiff fails to state a due process claim based on any purported delay.

what *might* happen fail to meet the plausibility requirement necessary to survive a Rule 12(b)(6) motion.  *Id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

In contrast, the only factual content in the Complaint alleging actual involvement by an identified decisionmaker referred to FRBKC's *President*, whom Plaintiff does not accuse of bias, and whom Plaintiff allegedly met and "urged to consider Custodia's application."  *Id.* ¶¶ 41-42. Plaintiff contends, without elaboration, that there is "no support in 12 U.S.C. § 341(7)" for FRBKC's President to be the decisionmaker, Opp. at 43, but wholly fails to address the point that 12 U.S.C. § 341(fifth) expressly authorizes her to act as chief executive officer, which was understood at the time of the section's enactment to grant control over all of a bank's operations. *See* Bd. Mem. at 35-36 (citing cases).  And Plaintiff's claim that determining the President's role "would at least require discovery," Opp. at 43, is foreclosed by the standard and purpose of Rule 12(b)(6), which requires adequate pleading to subject defendant to *any* discovery.  *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-60 (2007).

Moreover, Plaintiff would still fail to state a claim even if its speculative assertions came to pass; no due process violation would result because the allegedly biased directors would be a minority and would be subject to various means of Board supervision.  *See* Bd. Mem. at 35-37 (discussing *Ass'n of Am. R.Rs. v. DOT*, 896 F.3d 539 (D.C. Cir. 2018)).  Plaintiff's only response is a conclusory assertion that "not just a Majority . . . must properly exercise . . . power," for which it cites no due process jurisprudence.  Opp. at 43.

### B.      Plaintiff Fails to State a Claim for Improper Delegation of Legislative Power

The Opposition fails to show that Plaintiff has a claim for improper delegation of legislative power.  It did not address controlling Tenth Circuit cases holding that the history and

provisions of an overall statutory scheme (such as the FRA) can provide sufficient "intelligible principles" to guide agency action.  *See* Bd. Mem. at 38-39.  Instead, Plaintiff argues that the Board's assertion that master account decisions are discretionary, as is the Board's decision on how to exercise its supervisory powers, *see supra* at 3-8, necessarily proves an improper delegation.[23]  Opp. at 35-36.  But given the minimal requirements for providing an "intelligible principle," *e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) ("[W]e have found an 'intelligible principle' in various statutes authorizing regulation in the 'public interest.'"), Congress can permissibly delegate sufficient discretion to preclude judicial review and thus commit a matter to agency discretion.  *See, e.g., Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 405 (D.C. Cir. 1990) (law contained sufficient intelligible principles to be permissible delegation, but these criteria were too general to allow judicial review of agency action); *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 902-03 (D.C. Cir. 2018) (same).

Plaintiff separately asserts that allowing Federal Reserve Banks to determine requests for master accounts violates limits on delegation of "regulatory power" to private parties.  Opp. at 43.  Assuming, *arguendo*, that a Reserve Bank's decision on whom it will transact with is a form of "regulatory power,"  the Board exercises significant influence over Reserve Banks, *e.g.*, Bd. Mem. at 36, 43-44, 44 n.40, and there is no separation of powers violation in allowing a federal instrumentality, *cf.* Compl. ¶ 112 (alleging that FRBKC is a "federal instrumentality"), that is not an "autonomous private enterprise" to exercise such power.  *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 53, 55 (2015) (holding that extensive government influence over Amtrak

---

[23] Plaintiff also fails to address the point that it cannot obtain relief based on this argument, *see* Bd. Mem. at 38 n.34.  Specifically, courts can void, but not rewrite statutes, and it is thus unclear how voiding the statute that allows for master accounts on nondelegation grounds would bring any relief to Plaintiff, which seeks such an account.  *Id.* (citing authorities).  Plaintiff therefore lacks standing to assert this claim due to lack of redressability.

renders it a non-private actor for separation of powers purposes notwithstanding its statutory classification as a private entity and partial ownership of its common stock by private parties), *cited by Appointment & Removal of Fed. Reserve Bank Members of the FOMC*, 2019 WL 11594453, at *5 n.3 (Op. O.L.C. Oct. 23, 2019) (citing authorities indicating that Reserve Banks are "not an autonomous private enterprise"); *see also* Bd. Mem. at 42-45.  Plaintiff thus fails to show that it has stated a claim for improper delegation of regulatory power.

### C.       Plaintiff Fails to State a Claim for Violation of the Appointments Clause

Plaintiff contends that having FRBKC make final decisions (subject, of course, to its ability to revisit them) on master accounts renders its leadership principal officers who must be nominated by the President and confirmed by the Senate.  As the Board noted, historical precedent indicates that opening a bank account is not the type of sovereign act implicating the Appointments Clause given that the First Congress gave such authority to the First Bank of the United States without making its leaders subject to the Clause.  Bd. Mem. at 39-42.  And to the extent a master account decision implicates the Clause, it can be made by FRBKC's President, who is appointed as an inferior officer under the Clause and does not act as a principal officer regardless of any final decisionmaking power she has.  Bd. Mem. at 42-45.

Plaintiff argues that a decision on a master account request implicates the Clause because it has policy implications.  Opp. at 37-38.  But the First Bank of the United States was charged with advancing various national interests.  Act of Feb. 25, 1791, Pub. L. No. 1-10, 1 Stat. at 191 (Congressional expectation that the Bank would facilitate the "successful conducting of the national finances" and "give facility to the obtaining of loans, for the use of the government, in sudden emergencies").  And its business decisions had clear policy implications given that, for example, it was uniquely allowed to issue notes that the government had to accept as payment,

*id.* §§ 10, 12, 1 Stat. at 196, thus allowing it to create a *de facto* national currency and impact the government's finances.  Yet the First Congress saw no need to have the Bank's management appointed in conformity with the Clause.  Historical practice thus indicates that the Framers did not view banking functions provided for by statute as implicating the Clause regardless of any associated policy implications.  *Cf., e.g.*, *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659 (2020) (holding, based on legislation from the First Congress, that officials with statutory responsibilities related to U.S. territories are not subject to the Clause).[24]

Plaintiff tries to distinguish the Founders' treatment of the First Bank of the United States by arguing that the Federal Reserve exercises other sovereign powers such as officially setting monetary policy.  Opp. at 39.  But the Court need not decide whether one or more of these *other* responsibilities, such as Reserve Bank presidents' participation on the Federal Open Market Committee ("FOMC") that helps set monetary policy, makes them subject them to the Clause. *Cf. Appointment & Removal of Fed. Reserve Bank Members of the FOMC*, 2019 WL 11594453, at *1-2 (FOMC service requires that Reserve Bank presidents be appointed as inferior officers). That is because *Plaintiff* claims that a decision on *a master account* directly implicates the Clause, and that the ability to render a final decision *on this issue* makes the decisionmaker a principal officer under the Clause.  As explained above, historical practice indicates the Framers did not think that this particular type of decision implicated the Clause, and the fact that *other responsibilities* may make Reserve Bank presidents officers under the Clause is thus irrelevant to whether a master account decision implicates the Clause's provisions for principal officers.[25]

---

[24] Plaintiff has also not addressed historical practice spanning most of the Republic's history indicating that the decision at issue need not be made by principal officers.  Bd. Mem. at 45 n.41.

[25] Plaintiff's argument, taken to its logical end, would require that even mundane agency actions, such as deciding how much parking to locate at agency facilities, must be performed by officers appointed under the Clause because *other* agency responsibilities implicate the Clause.

Moreover, even if the Clause were implicated by a master account decision, Plaintiff has not disputed the Board's assertions that FRBKC's President is appointed under the Clause as an inferior Officer and that the Board can remove her at will.  Bd. Mem. at 42-43.  This removal power, combined with the Board's other statutory powers to supervise FRBKC and influence its actions, renders FRBKC's President an inferior officer despite her ability to make a final decision on master accounts.  *Id.* at 42-43.  Plaintiff's arguments to the contrary are unavailing.

As the Board noted, at-will removal power has been consistently found sufficient, in combination with other means of influence, to render an officer "inferior" regardless of any final decisionmaking authority she holds.  Bd. Mem. at 44-45 (citing cases).[26]  Plaintiff tries to distinguish the cited authorities by arguing that the Board lacks sufficient influence over FRBKC, asserting that the Board construes the FRA as leaving it "powerless to control Reserve Bank's master account decisions in any way."  Opp. at 41.  Plaintiff does not explain this conclusory assertion.  To the extent its complaint is that the Board does not act as a type of appellate tribunal, *cf. id.* at 6 (complaining that Guidelines do not indicate if Board will "veto" or "reverse" Reserve Bank decisions), or that Reserve Banks exercise "discretion" in making decisions, *cf.* Opp. at 18, the cited cases make clear that neither circumstance precludes a finding of inferior officer status given other means of exerting influence.  *E.g.*, *Intercoll. Broad. Sys.*, 684 F.3d at 1339-41 (officials who exercised "vast discretion" in making decisions not "directly

---

[26] Plaintiff implies that *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), categorically held that any officer who makes final decisions is a principal officer regardless of removability.  Opp. at 40-41.  But *Arthrex* applied to the *combined effect* of legal provisions "insulating [officers'] decisions from review and their offices from removal."  141 S. Ct. at 1985-86 (citation omitted).  It reaffirmed prior holdings that there is no "exclusive criterion for distinguishing between principal and inferior officers . . . ," *id.* at 1985, thus undercutting Plaintiff's assertion that final decisionmaking authority is such a criterion.  And it expressly declined to reach the question of whether "at-will removal . . . would cure the constitutional problem."  *Id.* at 1987.

reversible" by a superior were inferior officers when subjected to at-will removal and guidance through voluntary consultations); *see also Morrison v. Olson*, 487 U.S. 654, 655 (1988).[27]

Reserve Bank presidents thus are not principal officers, and their appointment as inferior officers comports with the Appointments Clause to the extent it applies.  Plaintiff makes desperate resort to conjecture and speculation, claiming that FRBKC's directors, some of whom are elected by private banks, *might* participate in the decision, and that "[g]iven the factual uncertainty, Defendants cannot prevail at the motion to dismiss stage."  Opp. at 41.  This argument proves too much: any "factual uncertainty" only shows why this claim is nonjusticiable.  *See supra* at 12-13; *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (courts must not issue opinions "advising what the law would be upon a hypothetical state of facts"); *United States v. Morgan*, 44 F. App'x 881, 885, *id.* n.2 (10th Cir. 2002) (noting "serious ripeness questions" when litigant sought ruling on "a wholly uncertain set of possible facts and scenarios").  And as explained above, such conjecture also fails to meet *Twombly*'s standards for stating a claim.

## CONCLUSION

For these reasons, and for the reasons stated in its opening brief, the Board respectfully requests that the case be dismissed.

---

[27] Beyond the Board's general supervisory powers and exclusive legal interpretive authority, *see* 12 U.S.C. § 248(j); 87 Fed. Reg. 51,099 at 51,103 n.11, the Board has various other means of exerting control over Reserve Banks.  For example, the Board controls their budgets and salaries. 12 U.S.C. §§ 248a(d), 307.  Such influence is a hallmark of supervision that renders an official an inferior rather than a principal officer.  *See Intercoll. Broad. Sys.*, 684 F.3d at 1339, 1341 (ability to provide guidance through even voluntary consultations together with at-will removal power sufficient to make a final decisionmaker an inferior officer); *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000) (citing Attorney General's authority to set U.S. Attorney salaries and authorize their office expenses as aspects of supervision that render them inferior officers).

Dated: October 4, 2022

Respectfully submitted,


 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 4, 2022, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.

By:   /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors*
*of the Federal Reserve System*