1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

CUSTODIA BANK, INC.,                    Case No. 22-CV-125

       Plaintiff,

                                  Casper, Wyoming
      vs.                                 October 28, 2022
                                    1:07 p.m.
FEDERAL RESERVE BOARD OF
GOVERNORS and FEDERAL RESERVE
BANK OF KANSAS CITY,

       Defendants.

---

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
HELD VIA ZOOM VIDEOCONFERENCE

BEFORE THE HONORABLE SCOTT W. SKAVDAHL
UNITED STATES DISTRICT JUDGE

---

APPEARANCES (via Zoom):

For the Plaintiff:          SCOTT ORTIZ
                            William, Porter, Day & Neville
                            159 North Wolcott
                            Suite 400
                            Casper, Wyoming 82601

                            RYAN T. SCARBOROUGH
                            JAMIE WOLFE
                            Williams & Connolly
                            680 Maine Avenue SW
                            Washington, D.C. 20024


For the Defendant           JOSHUA P. CHADWICK
Board of Governors:         Board of Governors of the Federal
                            Reserve System
                            20th Street and Constitution Ave. NW
                            Washington, D.C. 20551

2

APPEARANCES:   (Cont.)


For the Defendant          ANDREW Z. MICHAELSON
Reserve Bank of            King & Spaulding LLP
Kansas City:               1185 Avenue of the Americas
                           New York, NY 10036

                           JEFFREY S. BUCHOLTZ
                           King & Spaulding LLP
                           1700 Pennsylvania Ave. NW
                           Washington, D.C. 20006

                           BILLIE L.M. ADDLEMAN
                           Hirst Applegate LLP
                           1720 Carey Avenue
                           Suite 400
                           Cheyenne, WY 82003


Court Reporter:            MEGAN E. STRAWN, RPR, CRR
                           111 South Wolcott Street, Room 217
                           Casper, WY 82601
                           (307) 232-2626


*Proceedings recorded by stenography; transcript produced by
computer-aided transcription.*

I N D E X

MOTIONS TO DISMISS                                    PAGE

Mr. Bucholtz                                        9, 57
Mr. Chadwick                                       25, 61
Mr. Ortiz                                              34

1        (Proceedings commenced at 1:07 p.m., October 28, 2022.)

2            THE COURT:  Court is in session in the matter of

3    Custodia Bank, Inc., versus the Federal Reserve Board of

4    Governors and the Federal Reserve Bank of Kansas City.  I note

5    the presence of counsel for the parties via Zoom, and let me

6    verify that you're there, and you can hear me and I can hear

7    you.

8            Let me -- first, Mr. Scarborough, on behalf of

9    Plaintiff, are you present?

10           MR. SCARBOROUGH:  Yes, Your Honor.  I'm present here

11   with Mr. Ortiz; and my colleague, Jamie Wolfe, is also here

12   but not on camera.

13           THE COURT:  All right.  And I do recognize Mr. Ortiz.

14           And Mr. Chadwick on behalf of the Federal Reserve

15   Board of Governors, are you there?

16           MR. CHADWICK:  Yes, Your Honor.  Good afternoon.

17           THE COURT:  Good afternoon.  And I would also

18   recognize Mr. Michaelson on behalf of the Federal Reserve Bank

19   of Kansas City.

20           MR. MICHAELSON:  Hello, Your Honor.  This is Andrew

21   Michaelson on behalf of the Federal Reserve Bank of Kansas

22   City.  I'm off camera.  I'm joined by my colleague Jeff

23   Bucholtz, who is on camera.

24           MR. BUCHOLTZ:  Good afternoon, Your Honor.

25           THE COURT:  Good afternoon.  I note the presence of

1    Mr. Bucholtz, and I note the familiarity of Mr. Addleman.

2            MR. ADDLEMAN:  Yes, Your Honor.

3            THE COURT:  All right.  And I could hear everybody.

4            Let me note that this matter is before the Court on

5    Defendants' Motions to Dismiss.  The motions arise out of

6    Custodia Bank's application for access to the Federal Reserve

7    Bank of Kansas City's master account.  That application was

8    filed on October 29 of 2020.  And in addition to the

9    application for master account, Custodia Bank initiated the

10   process to become a member bank of the Federal Reserve in

11   2021.

12           I think that application was filed on -- October 29,

13   actually, of 2020 was the original application for the access

14   to the master account.  And on August 5 of 2021, Custodia

15   applied to be a member bank of the Federal Reserve System.

16           On March 2 of 2022, it's alleged in the pleadings

17   that Custodia was told by the Kansas City Federal Reserve Bank

18   that the application process had not started -- or the

19   processing of their application had not started.

20           On March 3, 2022, they submitted a letter to the

21   Kansas City Board urging their consideration and providing

22   information.  There was a meeting on March 24 of 2022 with

23   Ms. George, and that ended the information in terms of

24   communications back and forth.

25           Custodia Bank filed their Complaint in this matter

22-CV-125                                                                                          6

1    alleging eight causes of action.  Those causes of action --

2    the first cause of action is one for unreasonable delay of

3    agency action against both the Federal Reserve Board and the

4    Federal Reserve Bank of Kansas City.

5           There is a mandamus action, also, Count 2, against

6    all Defendants based upon 28 U.S.C. § 1361.

7           There is a -- Claim 3 is a separation of powers and

8    due-process violation as alleged against all Defendants.

9           Count 4 is a Declaratory Judgment Act claim as an

10   alternative to Counts 1 and 2 against all Defendants.

11          Count 5 is a claim for violation of the due-process

12   clause against all Defendants.

13          Count 6 is an alternative claim to Counts 1 and 2 for

14   violation of the Appointments Clause against all Defendants.

15          Count 7 is an alternative claim as to Claims 1 and 2

16   for mandamus pursuant to Title 28 § 1361 against all

17   Defendants.

18          And Count 8 is an alternative claim to Counts 1 and 2

19   for relief under the Declaratory Judgment Act § 2201 against

20   all Defendants.

21          As noted, both Defendants have filed Motions to

22   Dismiss based upon various theories.  One of those theories

23   and one of the primary issues that the Court would see -- and

24   I'm doing this so that you have a better idea of the focus of

25   your arguments that I want to see and hopefully save you some

1    time to go through unnecessary background.

2           But the arguments are that Custodia has no

3    entitlement to a master account, nor does it have any

4    entitlement to a decision on its preferred timeline.

5           There is an issue as to § 4807 and its potential

6    application of the one-year period of time.

7           In addition, the Board of Governors argues there's

8    been no unreasonable delay, although exceeding the gestation

9    period of an elephant.

10          The second argument is, is account determinations are

11   discretionarily committed to the Reserve Banks.  The Federal

12   Reserve Board has nothing to do with it.

13          Count 3 -- or argument -- the third argument is

14   there's an absence of justiciability as to the claims brought

15   by Custodia and a failure to allege constitutional violation

16   given the absence of any property interest in a master

17   account.

18          The arguments, as raised by the Federal Reserve as to

19   Count 1, the APA claims, the Federal Reserve Bank of Kansas

20   City takes the position that it's not an agency.  And even if

21   it were an agency, there's been no unreasonable delay.

22          As to Counts 3 and 5, the Federal Reserve Bank of

23   Kansas City has discretion over master-account requests; and

24   thus, given that discretion, there is no cognizable property

25   interest or entitlement to a master account.

1           There also are arguments regarding the appointment

2    clause and unripeness and meritless claims as to those issues.

3           Counts 2, 4, 7, and 8 as to the declaratory judgment

4    and mandamus, it is alleged that it -- Custodia is asserting

5    claims that are improper and inadequately pled and unripe.

6           And then as to all counts, there's a claim as to

7    prudential unripeness and that Custodia has not been denied,

8    so there's no injury in fact.  And the requested relief is not

9    likely to redress the claimed injury, and its prudentially

10   unripe, sounding similar to an argument out of the *TNB* case.

11          So those are the issues and the claims.  My -- one of

12   my first, I guess, focuses on this, and I think kind of a

13   foundational issue aside from who is an agency and who is not,

14   is whether or not there's any discretion to grant or deny a

15   master account, taking the line of reasoning as Judge

16   Bacharach had noted in his concurrence decision of the three

17   decision in the *Fourth Corner* case.

18          And that involves a dissection and determination as

19   to the application of Title 12 § 342 and Title 12 § 248a and

20   its language there and the consistency or inconsis- -- or the

21   conflict or non-conflict of those issues.

22          So those are the things that interest me.  And you

23   are free to also add to the information that you believe will

24   help this Court determine the merits of the Motions to

25   Dismiss.

1          With that, though, I would then turn to the Movants,

2    and you have been allocated, I believe, 30 minutes of time.

3    You should be able to see that clock.

4          So I would -- and I think that time was allocated

5    given the overlap of the issues and claims raised between the

6    Defendants jointly, the Federal Reserve Board of Governors and

7    the Federal Reserve Bank of Kansas City.

8          Mr. Chadwick, what is your preference in terms of the

9    argument and who goes first and how much time you wish to

10   reserve?

11         MR. CHADWICK:  Thank you, Your Honor.  I think

12   Mr. Bucholtz on behalf of the Reserve Bank is intending to

13   begin.  I think that if we could reserve five minutes combined

14   for the Defendants, that would be appreciated.

15         THE COURT:  All right.  Well, you'll be able to see

16   that clock, and we'll leave it at 30 minutes.  But when you

17   get down to five minutes, obviously, that will be a sign, and

18   then you'll be eating into any rebuttal time.

19         So, Mr. Bucholtz, I would recognize you for oral

20   argument.

21         MR. BUCHOLTZ:  Thank you very much, Your Honor.  May

22   it please the Court.  I'm Jeffrey Bucholtz for the Reserve

23   Bank.

24         I would like to address the issues, Your Honor, that

25   you just alluded to that you said were particularly on your

1   mind.  I'll start, if it's all right with Your Honor,

2   with justiciability, why we believe that Custodia lacks

3   standing and this case is not ripe.  And then after that, I'll

4   turn to why the Reserve Bank is not an agency within the

5   meaning of the APA and then turn to, third, why Congress gave

6   or how Congress gave Reserve Banks discretion to decide

7   whether to open a master account for any given institution.

8          And then I will defer to Mr. Chadwick on the other

9   issues that Your Honor mentioned and anything else that he

10  would want to add.

11         THE COURT:  All right.

12         MR. BUCHOLTZ:  First, standing.  The most

13  straightforward reason why we believe this case should be --

14         THE COURT:  Hold on -- hold on one minute,

15  Mr. Bucholtz.  I'm going to give you an extra minute.  My

16  court reporter needs to get her headphones on.

17     (Pause in the proceedings.)

18         THE COURT:  Okay.  Let's go ahead.  Go ahead,

19  Mr. Bucholtz.

20         MR. BUCHOLTZ:  Thank you, Your Honor.

21         The most straightforward reason why we believe this

22  case should be dismissed is that Custodia does not have

23  standing.  The relief that they seek would not redress the

24  injury that they claim.  The injury they plead and the only

25  injury they plead is that they're incurring fees to work with

 1   a partner bank that they wouldn't incur if they had their own

 2   master account.  The only relief Custodia seeks --

 3            THE COURT:  And isn't that -- isn't that a

 4   distinction from the *TNB* case?  *TNB* didn't have prudential

 5   ripeness because they never even engaged in any exchanges or

 6   banking functions because they never got access to the main

 7   account.  They were never able to do so.

 8            But here, Custodia has alleged, anyway, that they

 9   have engaged in banking and that they have incurred those

10   excess fees having to go through someone.  And they've claimed

11   that the delay, which Judge Carter found was lacking in their

12   complaint, is the cause and claim.

13            Is there a distinction in that?

14            MR. BUCHOLTZ:  Yes, Your Honor.  The way Custodia has

15   framed its injury and its claim is a little different from the

16   way *TNB* did, exactly as Your Honor just said.  I think that's

17   because Judge Carter found that TNB's claim was essentially

18   challenging a denial that hadn't occurred yet, and so the case

19   wasn't ripe.

20            So maybe to try to solve that problem, Custodia has

21   said they're incurring injury now with the delay.

22            My point is there's a redressability problem, because

23   the injury they're claiming from the delay is incurring fees

24   to work with a partner bank; but the relief they're seeking is

25   not the Court to grant them a master account, which would

1    redress that injury.  The relief they're seeking is simply to

2    order a decision by the Reserve Bank on whether to grant them

3    a master account up or down, yes or no.

4             And if that decision were no, then they would be in

5    the same position they're in.  They still wouldn't have a

6    master account.  They would still have to incur fees to work

7    with a partner bank.  So there's a redressability problem.

8             And the Supreme Court's decision in *Lujan* as well as

9    many other cases that we've cited in our papers make clear

10   that for Article III purposes, redressability has to be

11   likely, not just speculative.  At this point --

12            THE COURT:  If I take -- if I take Judge Bacharach's

13   position, then wouldn't that eliminate the absence of

14   redressability?

15            MR. BUCHOLTZ:  Well, Your Honor, I'm happy to turn to

16   why I think you should not adopt Judge Bacharach's position.

17   But I think, even more fundamentally, the Plaintiff is the

18   master of their complaint.  They've alleged the injury they've

19   alleged, and the only relief they're seeking -- the only

20   relief they're seeking at this stage is to order a decision.

21            And, you know, again, under Article III, relief has

22   to be likely to redress the injury.  And if the decision were

23   ordered without the Court ordering a particular decision -- in

24   other words, if the Court were to order only the relief that

25   Custodia is asking for at this stage -- then I think the Court

1    would have to speculate about whether the Reserve Bank's

2    decision would be up or down.  And that's why we think there's

3    a redressability problem.

4          But there's also -- beyond redressability and

5    standing, there's, we think, a ripeness problem and why the

6    Court should hold off at this stage on deciding the many

7    issues -- the many significant issues that Custodia is trying

8    to raise.  The fundamental point on ripeness is that this --

9    the Reserve Bank is continuing to actively review this

10   request.  This is an ongoing process.  We're doing so with an

11   open mind and in the spirit of engagement.

12         Our papers discuss some of the significant issues

13   that Custodia's request poses.  I'll mention just a few.  In

14   their own words, they seek to be the, quote, first of its kind

15   digital asset bank, unquote; to be a bridge between crypto and

16   dollars; and to issue the Avit, which is a sort of stablecoin

17   of their own creation.

18         So this is clearly not a routine or simple account

19   request.

20         THE COURT:  But let me ask you -- when you mention

21   that, that this creates a risk, what degree of assessment or

22   evaluation was done with the Bank of Mellon in New York with

23   regards to allowing them to engage in the type of exchange?

24         MR. BUCHOLTZ:  So, Your Honor, that wasn't my client.

25   That wasn't the Reserve Bank of Kansas City, and so I'm not

1   really sure that I'm able to answer that question factually.

2           What I can say is the Board of Governors -- and I

3   would defer to Mr. Chadwick to elaborate on this, but the

4   Board of Governors filed a response to Custodia's supplemental

5   notice about that last week and pointed out some significant

6   differences between Custodia and the Bank of New York Mellon.

7           You know, to maybe pick the biggest one, the Bank of

8   New York Mellon is a member bank.  So it's supervised.  And

9   so -- and they have FDIC insurance.  So they're subject to an

10  entire regime of federal supervision and regulation that

11  Custodia is not subject to.

12          And that regime, which is already in place, which

13  already, presumably -- again, I can't speak to the facts

14  involving BNY Mellon, but presumably has resulted in some

15  assurance that BNY Mellon has the appropriate procedures and

16  controls in place for anti-money laundering, for Bank Secrecy

17  Act, for foreign-asset controls, for audit, for everything

18  else that would be important to have in place before one

19  embarked on engaging in a new activity that involved inherent

20  risks like anything involving crypto.

21          THE COURT:  And what has your client done with

22  regards to -- have they not received sufficient information?

23  Based upon the Complaint, there's various information that's

24  been provided and responses to your client's concerns.

25          At this point in time -- and I'm probably getting

1   ahead of myself, but you're talking about ripeness.  What else

2   do you need?  You've had two years.

3          MR. BUCHOLTZ:  So it's -- Your Honor, it's very much

4   an ongoing process.  As recently as last week or maybe even

5   this week, there has been information exchanged between the

6   parties.  Details of that are not in the record here, but

7   since Your Honor asked, that's the truth.

8          And our position is that it doesn't do anyone any

9   good for the Reserve Bank to act prematurely before it's

10  ready, before it believes it has the information it needs.

11         If it were forced to make a decision before it had

12  the information it needed to evaluate any given request, then,

13  you know, presumably, if it had to act before it was ready, it

14  would have to deny it -- sort of a without-prejudice denial --

15  while it was still reviewing it.  That doesn't do anyone any

16  good.  It doesn't do the requestor any good.  It's an

17  arbitrary snapshot in time if one looked at only the

18  information available at a point in time.

19         It's far better, in our view, to engage

20  constructively with the requestor, to engage in an interactive

21  process, get information that we think we need, which is, as I

22  said, going on, really, right now.  And that process is

23  ongoing.

24         So it's really not -- you know, the Complaint was

25  filed almost five months ago, but things have continued to

1  happen since then.  And of course, the details of that aren't

2  in the record, but it's very much an ongoing process that's

3  really not a black box.  And it really does continue to be

4  pending with -- as I said before, my client has no

5  predetermined view about what the results should be.  My

6  client has questions and concerns and has been asking

7  questions and getting information and going back and forth

8  with Custodia.

9          My client's view is it should continue to engage in

10 that ongoing review rather than have time called at some

11 arbitrary point in time before it's gotten the information

12 that it believes it needs.

13         And in terms of ripeness, Your Honor, of course, if

14 the process is allowed to play out and the end of the -- the

15 decision at the end of the process is to grant an account,

16 then there's no dispute.  And all of the very interesting,

17 very important legal issues raised in the Complaint and in the

18 briefing papers here become sort of law school exam as opposed

19 to sort of a case or controversy.  The Court doesn't have to

20 decide any of them.

21         But even if, at the end of that process, the Reserve

22 Bank denies the account request, the Reserve Bank would do so

23 with reasons.  It would give reasons for the denial.  That

24 would inform any judicial review that occurred at that point.

25         THE COURT:  How many denials -- how many denials of

1   master account has your client, I mean, made?

2          MR. BUCHOLTZ:  I'm not sure that I know the specific

3   answer to that question offhand, Your Honor, over the decades.

4   I'm not sure that I know the answer to that.  What I would say

5   is until recently --

6          THE COURT:  *Fourth Corner*?  The *Fourth Corner* --

7          MR. BUCHOLTZ:  I'm sorry, Your Honor.  I didn't

8   hear -- well, right.  That's one example.  And there's been

9   some references in the papers in this case to a Reserve trust

10  matter in which an account was granted and then withdrawn.

11  There may be others over the decades.  I'm really not sure,

12  Your Honor.  The Reserve Bank has been providing accounts or

13  receiving account requests for many, many decades, so I don't

14  know that I can give you a specific number.

15         What I would say is it's really only very recently

16  that states -- first of all, it's very recent that crypto

17  exists, of course.  And so all of the issues that are

18  specifically related to the crypto-related businesses that

19  Custodia wants to engage in are, by definition, very recent.

20         And even beyond that, it's a recent phenomenon that

21  states are granting charters that don't require federal

22  deposit insurance that are special depository charters with

23  different activities, different limits, different rules that

24  raise new issues that the Reserve Banks need to consider that

25  weren't raised before because charters like that didn't exist

1    before.

2            So again, the Reserve Bank has an open mind on this.

3    We're continuing to ask questions, continuing to get

4    information, continuing to review the request.  And our

5    position is it would make much more sense to let that process

6    play out.  It might end up with a result that Custodia likes.

7    Even if it doesn't, it would end up with a decision with

8    reasons for a denial that the Court then could review in a

9    much more concrete context than exists right now.

10           Maybe I can turn, if it's all right with Your Honor,

11   to why the Reserve Bank, in our view, is not an agency under

12   the APA.

13           THE COURT:  All right.

14           MR. BUCHOLTZ:  The APA defines "agency" as an

15   authority of the government of the United States.  When

16   Congress created the Federal Reserve System a hundred years

17   ago, it took great care to design the Board in one way and the

18   Reserve Banks in another way.  It made the Reserve Banks

19   corporations.  It made them owned by their member banks.  They

20   created them in a way that they stood apart from the

21   sovereign.  Their employees are not employees of the

22   government.

23           Courts in lots of contexts over the decades have

24   recognized this unique status and held that the Reserve Banks

25   are not Government agencies for purposes of, for example, the

1    Federal Tort Claims Act, the rule that you get extra time to

2    appeal if a government agency is a party, and various other

3    contexts that we've addressed in our briefs.

4           And what I want to make sure I address on this is two

5    points.  The first is, in the interest of time, the two cases

6    that Custodia relies on, district court cases from the 1980s

7    that found that the Reserve Banks were APA agencies, seem to

8    conflate the concept of a federal instrumentality and an APA

9    agency.

10          And the Ninth Circuit in *Hoag Ranch* and the Eighth

11   Circuit in *Scott*, cases that we've cited in our papers, make

12   clear that that's an erroneous conflation, that Congress can

13   create entities, Congress can charter corporations without

14   thereby necessarily making them government agencies for

15   purposes of the APA.

16          And that's the case here.  So we agree that the

17   Reserve Banks are instrumentalities of the government, but

18   that doesn't make them agencies.  And the D.C. Circuit in

19   *Dong* (phonetic), a case about the Smithsonian that both

20   parties discuss in the briefs that we think sets out the right

21   approach, makes the point that an entity can be entwined with

22   the government, even deeply, without thereby necessarily being

23   an authority of the government.  And we think that's the case

24   here.

25          The Reserve Banks don't have the classic markers of

1   agency authority, like rulemaking.  In fact, Congress left no

2   doubt about that by specifically prohibiting the Board of

3   Governors from delegating the Board's rulemaking authority to

4   the Reserve Banks.

5          And when the Reserve Banks -- the second point I just

6   want to make is the activity that we're concerned about here,

7   the Reserve Bank decision on whether to grant the master

8   account, is exercising authority directly granted to Reserve

9   Banks by Congress.  It's not exercising authority delegated by

10   the Board of Governors.

11          THE COURT:  Where -- where is that authority granted?

12   What --

13          MR. BUCHOLTZ:  It's in 12 U.S.C. § 342, Your Honor.

14   12 U.S.C. § 342 says -- that's in a subchapter of Title 12

15   that's specifically addressed to the Reserve Banks.  There's a

16   different subchapter specifically addressed to the Board of

17   Governors.  Congress set out different powers and duties and

18   structure and provisions related to Reserve Banks in one place

19   and then, separately, Board of Governors in a different place.

20   § 342 is addressed specifically to the Reserve Banks, and it

21   says they may receive deposits.  The Supreme Court --

22          THE COURT:  What is the distinction, if any -- is

23   there a difference between deposits and the 24 -- § 248a and

24   the list of services identified there?

25          MR. BUCHOLTZ:  I think the distinction, Your Honor,

1   is that 342, the provision addressed to the Reserve Banks,

2   gives the Reserve Banks discretion about whether to accept

3   deposits.

4           And then in § 248a, Congress gave to the Board --

5   that's a provision addressed to the Board, not to the Reserve

6   Banks -- certain criteria that the Board needs to use in

7   setting prices for services to be offered by the Reserve

8   Banks.

9           So nothing in § 248a says who those services need to

10  be offered to.  Nothing in § 248a overrides the grant of

11  discretion that the Supreme Court recognized as early as 1923

12  in *Farmers Merchants* to grant the discretion that Congress

13  gave directly to the Reserve Banks in § 342.  All § 248a says

14  is prices have to be set by the Board according to certain

15  criteria.

16          And the provision that Custodia relies on here --

17          THE COURT:  But it says, "All Federal Reserve Bank

18  services covered by the fee schedule shall be available to

19  non-member depository institutions," and then it goes on.

20          MR. BUCHOLTZ:  Yes, Your Honor.  Yes.  And since

21  certainly 1980, the Monetary Control Act made Reserve Bank

22  services available to non-member banks.  That's true.

23          THE COURT:  Let me -- let me ask you this question:

24  If you don't have a master account, can you obtain the

25  services identified under § 248a(b)?

1          MR. BUCHOLTZ:  Well, through a partner bank, you

2   might be able to obtain them.  Maybe it's a -- I'm not sure as

3   to all of them.  Maybe as to some of them through a partner

4   bank.

5          I take Your Honor's question, but the point I'm

6   trying to make is, Congress specifically gave discretion in

7   § 342 that the Supreme Court recognized 99 years ago.  And

8   nothing in § 248a, which the amendment to allow non-member

9   banks access to services came later -- nothing there changed

10  the discretionary nature of § 342.

11         And what § 248a says is when the Board is supposed to

12  set a price schedule to price the services to be made

13  available by the Reserve Banks.  It doesn't say the Board --

14  that the Reserve Banks have to make those services available

15  to any and every -- any and every bank that requests an

16  account regardless of the risks that the Reserve Bank thinks

17  any requestor might pose.

18         And it would be a very, very big deal for Congress to

19  say that any requestor who is technically eligible is

20  automatically entitled to a Reserve Bank master account.  That

21  would, first of all, be contrary to the way the Supreme Court

22  understood § 342 a hundred years ago.  So it would be a big

23  deal for Congress to override that.

24         And it would be a big deal in terms of policy because

25  what it would mean is even if the Reserve Bank thought a bank

1   requesting an account had completely inadequate anti-money

2   laundering controls, for example, so that it would be

3   dangerous to give that bank an account, or foreign-asset-

4   restriction controls, it would really be a problem to give

5   that bank access to the Federal Reserve's own balance sheet.

6           Custodia's position is, Congress in § 248a said, It

7   doesn't matter.  It's too bad.  You have no choice.  You have

8   to give that bank an account even if you think they pose

9   serious risk to the payment system and to the Federal

10  Reserve's own balance sheet.  That would be a very anomalous

11  result.

12          THE COURT:  Did Judge -- would you agree that Judge

13  Bacharach also made that same conclusion?

14          MR. BUCHOLTZ:  I think Judge Bacharach got it wrong,

15  Your Honor.  I think Judge Bacharach didn't address the 1923

16  Supreme Court decision that I've mentioned, which is an

17  important thing you have to look at in considering the

18  statutes.

19          And Judge Bacharach mistook § 248a and its

20  relationship to § 342 because of who the different provisions

21  are addressed to and the way they relate to each other.

22          I want to make sure that Mr. Chadwick has the time

23  that he needs, but I --

24          THE COURT:  So you don't talk so fast, I will give

25  you five more minutes, and I'll give the other side five more

1    minutes.  So you'll be working with 35 minutes.

2              MR. BUCHOLTZ:  Thank you, Your Honor.  Then let me

3    make one more point about this issue, because it's a really

4    important one.

5              In 2010, Congress enacted 12 U.S.C. § 5465.  That

6    provision doesn't apply here because it's about designated

7    financial market utilities.  In that provision, Custodia

8    relies on it to say, there, Congress gave the Board of

9    Governors, as opposed to the Reserve Banks, authority to

10   decide whether to open an account.

11             But when you read that provision Your Honor, it's

12   really significant because there, in § 5465(a), Congress gave,

13   as to this category of entities called "designated financial

14   market utilities," as distinct from all of the other

15   depository institutions that are covered by § 342 -- Congress

16   gave the Board of Governors in § 5465(a) authority to

17   authorize the Reserve Banks, in turn, to do various things,

18   including providing deposit accounts -- "deposit accounts" is

19   the term Congress used in § 5465(a) -- consistent -- pursuant

20   to § 342.

21             So Congress itself understood in § 5465 what the

22   Reserve Banks do under § 342 as providing deposit accounts.

23   And in § 5465, Congress said, as to this narrow category of

24   designated financial market utilities, the Reserve Banks can't

25   do that themselves.  The Board of Governors has to authorize

1    it.

2            As to everyone else, under § 342, Congress had

3    already directly given the Reserve Banks authority to provide

4    accounts or not.  Again, the Supreme Court said, in 1923,

5    "may" means "may."  And the Supreme Court has, of course,

6    reiterated that who knows how many times since then.

7            So § 342 is discretionary.  Congress itself, in

8    § 5465, recognized that Congress had given the Reserve Banks,

9    in § 342, authority to grant deposit accounts, and nothing in

10   § 248a overrides that.

11           Your Honor, before I use more of Mr. Chadwick's time,

12   I should probably turn the microphone over to him unless Your

13   Honor has other questions for the Reserve Bank.

14           THE COURT:  I'll reserve them.

15           MR. BUCHOLTZ:  Thank you very much, Your Honor.

16       (Discussion off the record.)

17           MR. CHADWICK:  Thank you, Your Honor.  Joshua

18   Chadwick for the Federal Reserve Board.

19           So to start, I would certainly agree with all that

20   Mr. Bucholtz has had to say on behalf of the Reserve Bank,

21   Your Honor.

22           As for the Board, I think we've been very clear in

23   our briefs that the Board would not be a proper defendant in

24   this case even if there were cognizable claims against the

25   Reserve Bank.  And of course, we don't believe that there are.

1          In order to bring the Board into this case, Plaintiff

2     has gone to some extraordinary lengths to obfuscate what is a

3     very basic fact, and that is that responsibility for master-

4     account decisions rests with the Reserve Banks as a matter of

5     law.  Plaintiffs --

6          THE COURT:  And what is that law is that you rely on?

7     § 342?

8          MR. CHADWICK:  Correct, Your Honor, which comes under

9     a subsection entitled "The Powers of the Reserve Banks."

10         So even putting aside the question of discretion,

11    it's beyond dispute that these are -- master accounts are

12    deposit accounts; that they are opened and maintained by

13    Reserve Banks; they're held by Reserve Banks; and in

14    appropriate circumstances, they may be closed by Reserve Bank

15    ares.

16         None of this is accomplished by the Board, which has

17    no ability to take deposits --

18         THE COURT:  But if the Board issues rules and

19    regulations concerning the restrictions -- Tier 1, Tier 2,

20    Tier 3 -- of banks that controls and impacts the decisions,

21    are they not acting as an agency influencing and/or having

22    control over, by virtue of their regulation, the issuance of

23    or the non-issuance of a main account or a master account?

24         MR. CHADWICK:  Not at all, Your Honor.  Those

25    guidelines are guidance that the Board provides consistent

1   with its oversight role.  Of course, the Board regulates a

2   large number of commercial banks in this country.  The Board

3   also provides guidance for those entities, and that guidance

4   could cover account-opening principles and similar matters.

5   This is a heavily regulated industry.  The Board oversees

6   Reserve Banks; the Board also oversees commercial banks.

7           But the Reserve Banks play a special role.  That's by

8   careful design of Congress in the Federal Reserve Act.  They

9   play a bankers' bank role.  And Custodia attempts to plead

10  around that fact by suggesting that the Reserve Bank is

11  influenced by the Board's views.

12          Whatever views --

13          THE COURT:  Haven't they alleged that?  Do I have to

14  accept the allegation in the Complaint that the Federal

15  Reserve Board had responded to the Federal Reserve Bank of

16  Kansas City directing or delaying the issuance of or

17  determination as to the master account?

18          MR. CHADWICK:  Your Honor, that -- those -- they're

19  attempting to plead around the law by alleging speculative

20  facts.  But it doesn't matter that the Board has some

21  influence or has conversations with the Reserve Banks.

22  Obviously, the Board has issued guidelines that are meant to

23  inform the exercise of Reserve Banks' discretion.

24          THE COURT:  Didn't you also --

25          MR. CHADWICK:  But the Reserve Bank has --

1        THE COURT:  Didn't your client also, in *TNB*, issue

2   some regulations in the middle of that litigation?

3        MR. CHADWICK:  Yes.  Well, Your Honor, the Board

4   issued an Advance Notice of Proposed Rulemaking regarding

5   pass-through investment entities, which is what *TNB* is.  It's

6   a business model that's different from Custodia's but that the

7   Board identified as having potential significant monetary

8   policy concerns and would negatively impact the ability,

9   potentially, of the Board and the FOMC to implement monetary

10  policy.

11       So that -- the Board did issue an ANPR on that.

12  That's correct, Your Honor.

13       THE COURT:  All right.  Go ahead.

14       MR. CHADWICK:  But again, that's a decision for the

15  New York Reserve Bank.

16       THE COURT:  But aren't they bound by your rules and

17  regulations?

18       MR. CHADWICK:  They're bound by Board rules and

19  regulations, yes, Your Honor, just as -- as commercial banks

20  that the Board regulates are bound by the Board's rules and

21  regulations.  But no one would say that the opening of an

22  account by a commercial bank was a decision that was

23  controlled or made by the Board.  Those banks have agency

24  there just as the Reserve Bank here has agency as to whether

25  or not it will open a master account or not.

1          THE COURT:  Agency -- or -- I'm sorry.  What are you

2    saying?

3          MR. CHADWICK:  They have their -- they have their

4    ability to decide one way or the other.  It's not the Board's

5    choice.

6          THE COURT:  So here's my -- here's my quandary in

7    this from a legal perspective:  The Federal Reserve Bank of

8    Kansas City is not an agency, and the Federal Reserve Board of

9    Governors ain't calling the shots.  So nobody -- it's kind of

10   like mercury.  I'm trying to put my thumb on it, and it just

11   squirts.

12         So who -- where does the buck stop?

13         MR. CHADWICK:  Well, Your Honor, Congress granted the

14   Reserve Banks broad discretion in this area.  The acceptance

15   of deposits, the provision of services, these are functions

16   that the Reserve Bank takes on and was assigned under the

17   Federal Reserve Act.  But these are similar functions.

18         There's no dispute here that Custodia can proceed

19   without a master account at the Reserve Bank.  There's no

20   dispute that the various price services that the Board sets

21   out prices for are available either through a correspondent

22   bank or available otherwise.

23         The reason that the Board publishes the prices on

24   those, Your Honor, is because there's private sector

25   competition for all of those services.  So the function that's

1   being performed by the Reserve Bank is not a sovereign

2   function here.  It's a unique function within the Federal

3   Reserve System, but --

4           THE COURT:  But could you perform that function -- or

5   can that function be performed without the authorization of a

6   sovereign?

7           In other words, you have been granted, pursuant to

8   the statutory enactments, authority to regulate and/or

9   control.  Isn't that a sovereign function, and isn't that an

10  agency?

11          MR. CHADWICK:  No, Your Honor.  Those -- the function

12  of taking deposits or of -- or of securities custody or any of

13  the other things that are listed in the price services are

14  functions that are not sovereign in nature at all, Your Honor.

15  They are performed by other institutions -- by many other

16  institutions.

17          So the -- so I would disagree with that.  And those

18  banks are subject to national or state charters.  So to engage

19  in the business of banking, you do need some level of

20  government authorization.  You need a charter, but -- so

21  Congress chartered the Reserve Banks.  They were created by

22  function of the Federal Reserve Act.  But national banks are a

23  creature of statute, as well, Your Honor.  It's not a --

24          THE COURT:  And let me ask you this --

25          MR. CHADWICK:  -- distinctly sovereign function.

1        THE COURT:  -- is there a difference between deposits

2   of current funds and covered services?

3        MR. CHADWICK:  The deposits?  So a master account is

4   a deposit account, Your Honor, just as if you were to go to

5   your local bank and make a deposit.  It's where deposits are

6   received and then held by the bank.

7        The services are different things.  They're

8   securities custody services.  They are cash-and-coin custody

9   services.  They are check-clearing.  But again, all those

10  things are not uniquely sovereign.  They're done by the

11  clearinghouse.  They're done by local private clearinghouses.

12  They're done by other banking institutions.  So these are not

13  unique government or sovereign functions.

14       THE COURT:  Are they distinct, though?  Are deposit-

15  of-current-funds services distinct from the covered services

16  as identified under § 248a?

17       MR. CHADWICK:  They are distinct, Your Honor, yes.

18       THE COURT:  All right.  Thank you.

19       MR. CHADWICK:  So if I might turn for a moment, Your

20  Honor, to -- and this again gets to the separateness of

21  Reserve Banks.  The separateness of the Reserve Banks from the

22  Board can't seriously be questioned.  They are no mere

23  regional offices of the Board, as one of the filings in this

24  case has suggested, but rather, they're separately

25  incorporated entities.  They're established by Congress with

1    unique governance structure and specifically enumerated

2    powers.

3            Accordingly, a Reserve Bank is not a, quote, federal

4    banking agency under 12 U.S.C. § 4807, which is expressly

5    limited to the Board, the Office of Comptroller of Currency,

6    and the Federal Deposit Insurance Corporation, those three.

7    No more.

8            Congress easily could have included the Reserve Banks

9    in that statute had it to chosen to do so.  It did not.  And

10   there's zero statutory basis for the assertion Custodia makes

11   that § 4807 covers the Reserve Banks.  There's no question it

12   applies to the Board but, by its plain terms, has no

13   application to the Reserve Banks.

14           And for all the reasons already discussed, the Board

15   certainly agrees that the Reserve Bank is not an APA agency,

16   but it's also not subject to the Mandamus Act, which the Tenth

17   Circuit has said is a -- provides a drastic remedy to be used

18   only in extraordinary circumstances.

19           Of course, the Board is subject to the Administrative

20   Procedure and Mandamus Acts, but the exercise of its

21   supervisory functions of Reserve Banks -- and here, Custodia

22   suggests that the Board is required to take some action with

23   respect to the Reserve Bank to get the preferred results that

24   they would like in the preferred timeline that they would

25   like.  But that is a quintessential matter committed to agency

1   discretion, Your Honor.  That's *Heckler v. Chaney*.  That's

2   this Court's decision in *Hi-Tech Bed Systems*.  It's well

3   established.

4          In any event, if the APA or Mandamus Act standards

5   applied, there are many cases suggesting that, particularly in

6   the sphere of economic matters like we're dealing with here,

7   particularly where the matters are complex -- and here, they

8   are exceedingly complex, Your Honor -- that periods of time,

9   you know, similar to what's passed here -- in fact, much

10  longer -- are completely understandable.

11         And the complexity of the Reserve Bank decision here

12  is underscored by many potential and serious risks.  And the

13  Board's respective potential impacts on financial stability,

14  on the ability to implement monetary policy are chief among

15  these as are concerns about the use of Federal Reserve payment

16  systems to facilitate --

17         THE COURT:  Let me ask you -- and I'm going to add a

18  minute of time.  Let me ask you this question:  How were those

19  concerns adequately addressed for purposes of the New York

20  Bank of Mellon or Bank of Mellon New York?

21         MR. CHADWICK:  Well, to start, Your Honor, I think

22  it's important to understand that whether the Reserve Bank of

23  Kansas City or the Board, we're dealing -- recognizing the

24  facts on the ground, not as the facts are limitedly pled in

25  the Complaint, it's clear here that Custodia's business model

1    is much broader, involves issuance of a stablecoin, involves a

2    suite of services that are entirely different than what, from

3    public materials, we know BNY Mellon's limited custody service

4    to be.

5            Moreover, BNY Mellon is a heavily federally regulated

6    bank.  It's federally insured.  It has --

7            THE COURT:  It's too big to fail?

8            MR. CHADWICK:  It's not too big to fail, Your Honor,

9    but it does have well-established anti-money-laundering, Bank

10   Secrecy Act departments.  It has close supervision on all

11   those areas, and Custodia does not yet.

12           So these questions as to the Board on the membership

13   side and the Reserve Bank on the master-account side, they're

14   complicated questions.  They have to be given due care, and

15   that's in the public interest, Your Honor.  It's not just one

16   institution.  It's the national economy, it's the national

17   monetary policy that has to be considered, Your Honor.

18           And I think we're at five minutes, Your Honor, so I

19   will stop there and reserve that unless there's further

20   questions.

21           THE COURT:  All right.  Thank you.

22           I would recognize Respondent.  Mr. Ortiz?

23           MR. ORTIZ:  Thank you, Your Honor.  Scott Ortiz on

24   behalf of the Plaintiff Custodia.  May it please the Court and

25   counsel.

1        Your Honor, I think I'd like to address really one of

2    the core issues you raised early on, and that is whether you

3    can square the application of § 248a and the way the

4    Defendants want us to basically ignore -- take out a full

5    sentence of that provision and buy into their argument that

6    § 342 controls with, again, the further logical extension,

7    then, that the Kansas City Fed would have unlimited discretion

8    and basically no reviewability as a non-agency, making

9    decisions the Defendants have argued are paramount to the

10   safety of the country's monetary system.

11       And I would suggest, Your Honor, that you simply

12   cannot square all those arguments.  There are only two

13   jurists -- well, first off, I'd like to talk a little bit

14   about the history of the Monetary Control Act.  And, Your

15   Honor, it was a big deal.  It was reported on and written

16   about by the leading authorities in the banking industry

17   because it really solidified the two-tier bank system and made

18   it clear by congressional intent on specific congressional

19   wording that those state-chartered banks that met that

20   qualification as a depository institution were to be provided

21   the same services.

22       You asked a question a minute ago, Your Honor, that

23   is spot-on.  It seems to be uncontested in this case that a

24   master account is a bank account for a bank.  Nothing more,

25   nothing less.  A deposit is a transaction, Your Honor.  It's a

1    service.  A deposit and a master account are sufficiently --

2    they're not even close.  You cannot make a deposit, you cannot

3    get check-clearing services, you can't get ACH services until

4    you get the master account.  That's why it was such a sweeping

5    pronouncement.

6           And I think it's important to point out to the Court

7    both the Federal Reserve Board of Governors and the Kansas

8    City Fed embraced that from 1980 forward.  That's exactly what

9    § 248 meant.  And these state-chartered organizations that had

10   gone through the qualifying procedures were entitled, shall be

11   entitled to those services.

12          And if you look at the historical context of that,

13   really, until you get into a litigation setting is the only

14   time you hear this argument --

15      (Zoom experiencing technical difficulties.)

16          THE COURT:  Hold on a minute if you're out there.

17          Mr. Ortiz, you've frozen, so we're holding.

18          All right.  Sorry.  Go ahead.  You're back.

19          MR. ORTIZ:  I apologize.  I was -- I think I was

20   talking about how § 248a has been embraced historically since

21   1980 by both the Board and the member banks, including the

22   Kansas City Fed.  That is spelled out in great detail in one

23   or more of the amicus briefs to this Court.

24          And I would submit to the Court, Your Honor, the

25   Defendants can't have it both ways.  They cannot -- they

1   cannot recognize that every leading authority in the country

2   is saying § 248a means you get master accounts if you've

3   qualified through a state charter and you can qualify as a

4   depository institution and never say, "No, that's not true.

5   We still hold all the discretion on § 342, and § 248a has no

6   application to that."  That simply is an absurd conclusion.

7             Your Honor --

8             THE COURT:  But, Mr. Ortiz, can you square with me

9   this:  Can you have or engage in deposits of current funds

10  without a master account?

11            MR. ORTIZ:  Not directly, no, Your Honor.  And if you

12  want to change Custodia's business model and you want to pay

13  exorbitant fees and reroute your entire structure, you could

14  go through a third-party bank and pay a high fee for each

15  transaction, which defeats the entire purpose of your model --

16            THE COURT:  I understand the model, but what I am

17  trying to square is, is if § 342 gives discretion as to "may

18  receive from other member banks or depository institutions

19  deposits of current funds," if that function requires a master

20  account, then doesn't that function grant discretion in

21  whether to allow or not allow the granting of a master

22  account?

23            MR. ORTIZ:  No, Your Honor, because the deposit

24  language -- if you look at § 342 in context, it lists an

25  entire list of different things that can be considered

1   deposits that may be taken by the Reserve Banks.  It has

2   nothing to do with access to an account and services.

3          And that's why the language of § 248a is at such odds

4   with that provision.  And that's why, if you really look, Your

5   Honor, there are only two jurists in the country that have

6   taken a true, full analysis of this.  Your counterpart, Judge

7   Jackson in Colorado, a well-respected, conservative jurist,

8   reached the same conclusion that § 248a meant what it said

9   when he looked at the *Fourth Corner* bank case.

10         Then as you've already alluded to, Judge Bacharach,

11  when he looked at that, his in-depth analysis looking at the

12  positions taken by the agencies over time, the positions taken

13  by Defendants, the only way to square the language with § 342,

14  § 248, and even § 351 is to look at the way he's gauged it.

15         And, Your Honor, this is -- this is what's really

16  discouraging from our perspective:  I want you to keep in mind

17  that this legislation that began in 2018 by the Wyoming

18  Legislature was crafted with the help, really hand in glove,

19  over 100 meetings, with the Kansas City Fed.

20         The Kansas City Fed knew at the time that legislation

21  was beginning it was going to be an avenue where you would be

22  dealing with blockchain and digital currency.  They knew that

23  from the word "go."  And they also knew that the State of

24  Wyoming specifically was interpreting that § 248a meant this

25  speedy-type depository institution could get a master account

1    and could have services.

2           And the Wyoming Legislature even had it in their bill

3    that if you try to deny us those services, the Attorney

4    General in the State of Wyoming was going to sue you directly.

5           The Kansas City Fed at that time did not say, "Wait a

6    minute.  § 248a doesn't control master accounts.  It has

7    nothing to do with it.  This is all § 342, and we don't care

8    whether you get a charter or not.  You're still subject to our

9    sole, unlimited discretion."

10          But what they told the Wyoming Legislature was, "You

11   don't need that provision about the Attorney General.  It's

12   not going to be necessary."

13          THE COURT:  Tell me how the Kansas City Bank is an

14   agency subject to APA or other -- and how, if it is, the

15   function its performing is not discretionary and one that this

16   Court doesn't have the power to direct.

17          MR. ORTIZ:  Well, Your Honor, I think it's

18   uncontested in this case.  It's an important governmental

19   instrumentality at a minimum that controls some of the most

20   important monetary policy in the country.  Because if you take

21   their view of things, they and they alone can decide whether

22   the two-tiered banking system really can remain intact.  And

23   they take the position that they and only they can make a

24   final determination as to whether a state-chartered bank is

25   even allowed to compete and be part of the access to services

1    that the whole Monetary Control Act was about.

2          So if you look at -- you talk about what's the --

3    what's the significance, what's the importance of the decision

4    they're making.  It's critical, according to their own briefs.

5    It's critical.  It goes to the safety of our monetary system.

6    And then you go to their next logical extension, they're

7    saying nobody else makes that decision but us, solely us.

8          And, Your Honor, I realize there are only two

9    decisions that have looked at a Reserve Bank in the context of

10   the APA, but they both reached that conclusion.  And I would

11   specifically point to the *Lee* decision.  *Lee* really went

12   through a nice analysis, taking into consideration some of the

13   arguments made by Defendants today that, you bet, there are

14   characteristics of the Kansas City Fed in a Reserve Bank that

15   are more private in nature:  the nature of their employees,

16   the nature of some of the other things they do.

17         But when you look at the significance, the critical

18   significance of the decision-making and the fact they're

19   saying they have unlimited discretion to make the final

20   decision, Your Honor, how could that not be an agency subject

21   to some level of review?  Because if not, then truly, Your

22   Honor, it becomes a black box with no key where we have no

23   idea what the rules of engagement are --

24         THE COURT:  So what is your -- what is your

25   position -- I understand your position on *Lee*, but how do you

1    distinguish or what is your thought with regards to *Scott v.*

2    *Federal Reserve Bank of Kansas City* in the Eighth Circuit?

3                MR. ORTIZ:  Yeah.  And I understand they're looking

4    at things like the Federal Tort Claims Act and other issues,

5    and I agree they had a differing view on that, Your Honor.  I

6    acknowledge that.  And they pointed out some of the

7    characteristics.

8                But when you look at the *Scott* decision, it certainly

9    didn't have the ramifications that this case does.  And if you

10   don't -- if you don't consider the Kansas City Fed an agency

11   and you don't say that they are subject to some type of

12   review, then you really are letting individual Reserve Banks

13   kind of destroy the two-tiered banking system and basically

14   abolish the ability of state-chartered banks to have access on

15   equal footing to those services.

16               THE COURT:  But, I mean, when they passed that Act,

17   Mr. Ortiz, did they anticipate that they would be dealing or

18   having banks dealing in cryptocurrency?  I mean --

19               MR. ORTIZ:  Absolutely.  Well, let me -- not -- no

20   one could have foreseen digital currency in 1980, but the

21   cornerstone of the two-tiered system is the fact that state-

22   chartered banks bring new innovation to the marketplace.  They

23   are bringing new innovations, new systems, new efficiencies.

24               THE COURT:  Or new risks.

25               MR. ORTIZ:  Well, Your Honor, I'd love to talk about

1    that, because that, if you look at what is uncontradicted in

2    the record -- and what the Defendants have not even really

3    touched upon are the immense precautions put in place by the

4    Wyoming Division of Banking.  And the fact that right out of

5    the get-go, they put in place 772-page manuals and brought in

6    third-party contractors to make sure that Custodia could meet

7    all the BSA requirements, all the AML requirements, that they

8    would have best industry practices on the same level of a

9    member bank of the Federal Reserve.

10          And, Your Honor, I would submit that's why my clients

11   were so willing to simply say, "Fine.  We're willing to be

12   subject to federal scrutiny," because they knew the exacting

13   scrutiny they had already been put through.  Because the State

14   of Wyoming had such a vested interest to not get this wrong,

15   Your Honor, they needed this to be something that was safe.

16          And when you boil it down, the Defendants are now

17   trying to make arguments about what, ultimately, five years

18   down the road, my client would hope to accomplish with things

19   like Avit, that somehow that's something different than what

20   New York Bank Mellon is doing.

21          And, Your Honor, at this stage, my clients and the

22   business plan they've proposed is simply to do what Bank of

23   New York Mellon is doing.  My clients are not in the risk

24   business.  My clients are in the business of taking risk out

25   of transactions.  And my client's business model is not for

1    individual Bitcoin speculators that want to have somewhere for

2    their Bitcoin.  My client's business model is for blue-chip

3    industry and companies that want to be able to have direct,

4    efficient, and timely transactions done in real time.

5           THE COURT:  And, Mr. Ortiz, isn't there also -- isn't

6    there, though -- beyond just the simplification as to what

7    they seek to do and the absence of risk that they're averted

8    to, there's more to it in terms of security, in terms of fraud

9    or exchanges that are unregulated or unseen and unaccounted

10   for, such as money-laundering and those types of things.

11          MR. CHADWICK:  That can't happen under their model,

12   Your Honor, and here's why:  You cannot be an anonymous

13   account holder with Custodia.  And if you want to transact

14   with Custodia, have a transaction that they facilitate, you

15   have to go through an account and have your own account, and

16   they have met you --

17          THE COURT:  Is that -- but, I mean, I can see -- one

18   of the things that I've seen is, is you have to have your own

19   account.  So the LLC that was formed under Wyoming's

20   wonderful law to the bottom under LLC law, no one knows who

21   the LLC partners are.  We have them exchanging money, but no

22   one knows -- and four of them live in Switzerland, and three

23   live in the Caymans.

24          MR. CHADWICK:  Well, Your Honor, and that -- that

25   goes to the beefiness, so to speak, of the regulatory

1    procedures that were put in place on the front end and the

2    fact that Custodia has to meet the same standards that member

3    banks do to ferret out exactly who the customers are.  And

4    that really becomes -- you know, you can't -- you have to know

5    your customer.  You have to know who the members of your LLC

6    are.  You have to know how they're making their money.

7            But that's only part of it, because the real crux of

8    why this is safe is the safety deposit box of digital assets

9    that my client is going to be holding for its customers is

10   never touching the Fed.  And my client is meeting even

11   heightened capitalization requirements above and beyond what

12   is required so that any risk of digital currency, Bitcoin or

13   otherwise, remains with the customer.

14           And the liquidity, the capitalization standards that

15   my client's met assure the Fed that they're not going to be in

16   a position where they're going into a negative balance because

17   somehow they have loaned Custodia money on a transaction.

18           THE COURT:  I get the -- let me pull you back to the

19   issues as to agency action and conduct and the relief that

20   you're seeking and the legally entitled basis for it.

21           You argue there's a one-year deadline under § 4807.

22   Isn't that statute limited to federal banking agency, which

23   clearly does not include at least the Federal Reserve Bank of

24   Kansas City?

25           MR. ORTIZ:  Your Honor, there's -- there's a couple

1    of answers to that question.  First and foremost, if the -- if

2    the Board of Governors could delegate something to the Kansas

3    City Fed or another member bank and delay for five years, ten

4    years -- two and a half years, like this case -- and never

5    have a deadline, that would make absolutely no sense because

6    it would thwart the intent of Congress.

7              What's interesting, if you look at the definitions

8    and you start with § 1813(z), but you look at the entirety of

9    § 1813, they define and give a definition for virtually every

10   type of bank in the United States:  depository, lending, and

11   otherwise.

12             Ironically, "Federal Reserve Bank" is nowhere listed

13   in any of the definitions in § 1813.  It's not defined.  It's

14   not listed.  Your Honor, I think that's because they are

15   putting the Federal Reserve Bank in that category of the

16   federal agency.

17             It gets to the argument we've made to Your Honor.

18   It's like you can't say that the Department of Justice does

19   not include a regional office or does not include something

20   from Border Patrol or something else.  Because given the way

21   the arguments raised in this case, the Federal Reserve Banks

22   come into that forefront almost more than anyone else when

23   you're talking about some of these delays and applications.

24             And how could it be congressional intent that we

25   would simply carve out the Federal Reserve Banks and see any

1    application you dealt with, you had an unlimited time frame.

2              THE COURT:  But Congress certainly knows how and what

3    a Federal Reserve Bank is.  And isn't it inferred that if they

4    didn't include it in the definition that they intentionally

5    did not do so?

6              MR. ORTIZ:  Your Honor, I disagree for a couple of

7    reasons.  It's clear that there are times in the statutory

8    scheme that "Federal Reserve Bank" is separately referenced,

9    separately defined.  But within the confines of § 1813, it's

10   not referenced at all.

11             And if you look at -- and the deadlines, something as

12   important as monetary policy and applications to have access

13   to the Federal Reserve and the money -- the money that that

14   controls, why would Congress carve out an exception and say

15   the banks that can control who gets access have an unlimited

16   timeline?  They wouldn't, Your Honor.

17             I cannot define for you why there are some anomalies

18   on what's defined in some of the statutory scheme and what's

19   not, but I know one thing:  The far better argument is that

20   § 4807 applies because the Kansas City Fed, with what it does

21   in the context of its unlimited decision-making on critical

22   decisions, has to be an agency, has to somehow have review.

23             And I think in the context of that, they have to be

24   considered part of the Federal Reserve Board of Governors.

25             THE COURT:  By implication of their function?

1          MR. ORTIZ:  Absolutely.  I think that's the most

2     important element of it, Your Honor, is everyone agrees in

3     this case this is a critical decision dealing with which

4     state-chartered banks have access to the Fed.

5          And that seems to be the -- and the fact that if you

6     take their argument, they're saying that there's no review of

7     that decision.  There's no timeline.  There's no written

8     guideline as to how you get in the game.  There's nothing.

9          You're just simply left in this purgatory, like my

10    clients have been, where they're suffering losses on a daily

11    basis.  And they're being -- basically, their biggest fear was

12    exactly what's happening -- and you're well aware of now --

13    that the big seven banks, all the traditional banks would

14    realize they do want to be in digital currency.

15         Because, Your Honor, when my clients got into this,

16    when the State of Wyoming took on this legislative effort,

17    they knew that a lot of banks had no interest in digital

18    currency.  Many banks to this day do not see it as the future.

19         Custodia saw it much differently, and that's why they

20    tried to basically be on the forefront of this.  They tried to

21    make sure they got all the scrutiny.  They went through all

22    the processes so if they got this opportunity, they would be

23    doing it correctly and safely.

24         And I think that's -- that's why this is such a

25    tragedy, Your Honor, that, you know, Bank of New York Mellon

1   is doing the same thing and was basically green-lighted in

2   what looks like less than a two-month period to do what

3   Custodia has been trying to do, you know, for two years plus

4   at this point in time.

5          THE COURT:  Let me ask you, how do you distinguish

6   your situation from *TNB*?

7          MR. ORTIZ:  Sure.  There's a number of -- a number of

8   things.  First and foremost, it's clear that *TNB* basically

9   sprung this pass-through investment entity on the Federal

10  Reserve Bank really with no notice and no thought on the front

11  end and no participation with them, whether that was an entity

12  that the Reserve Bank was going to agree to or that there

13  would be problems with the Board of Governors regardless of

14  their state charter from Connecticut.

15         So clearly, they did not get involved in the type of

16  relationship on the front end that my clients did.

17         I think most importantly -- and, you know, Judge

18  Carter even kind of pointed this out.  He said, I realize

19  you're suffering losses.  I realize that, you know, this is

20  causing you injury.  But, you know, you have not pled for

21  me -- you didn't even plead it -- that delay is the problem.

22         We have pled that in spades, Your Honor, and we've

23  articulated to you in spades.  And contrary to what the

24  Defendants state, that we are somehow trying to plead away

25  legal conclusions, it's just the opposite of that.

1          When we talk about how we're suffering delay, it

2     becomes this interwoven process where we knew we had timelines

3     with the Division of Banking in Wyoming on our Certificate of

4     Authority.  We had every reason to believe early on from the

5     Kansas City Fed that they liked our application.  There were

6     no showstoppers.  You certainly look entitled to receive your

7     master account.

8          And then, bam, it sits with no action for more than a

9     year.  And they are specifically told that that's because the

10    Board of Governors has intervened, and they now are stopping

11    the application process.

12         So, I mean, that's the one part of our case that is

13    very similar to *The Narrow Bank*, Judge.  This looks to be a

14    little bit of a modus operandi by the Federal Board of

15    Governors in that if something comes in under a § 248a request

16    that they don't like, this is a delay tactic that they use

17    just like the guidelines they proposed in this case, the

18    guidelines that gave Custodia no guidance whatsoever.

19         Yet we're being told directly by representatives of

20    the Kansas City Fed that they're waiting because of these

21    guidelines, or they're waiting because there's something the

22    Board of Governors does not approve of.  Your Honor --

23         THE COURT:  Well, you're a Tier 3, right?

24         MR. ORTIZ:  Yeah.  And so what does that mean, Your

25    Honor?  That provides zero guidance for us other than it's

1   just a new label that came out.  And what does that mean in

2   regard to the different preferential treatment the Bank of

3   New York Mellon got as a Tier 1?  We have no idea.

4         You know, this is the other -- this is the other

5   thing that you cannot escape the reality of, Judge:  They did

6   not act on our application, the Kansas City Fed, until we

7   filed this lawsuit.  And long before we filed, we were

8   specifically trying to gather information of why is this not

9   moving through.  And we were told it was the Board of

10  Governors.

11        When we went to the Board of Governors, we got the

12  party-line response that, Oh, no.  That's a decision made by

13  the Kansas City Fed.  You've got to talk to them.

14        Well, Your Honor, it's clear the Kansas City Fed will

15  not make a decision unless it is green-lighted by the Board of

16  Governors.  And that puts us, again, in this -- this landscape

17  of delay where we are bleeding money.  It's an existential

18  threat to my clients at this point in time.

19        And, you know, this is the other problem, Your Honor:

20  You heard the Defendants say, Well, this is so novel, and this

21  is so complex, and, jeez, we need time to look at it.

22        Well, they've had our business plan since May of

23  2020.  The federal banking industry, the Federal Reserve

24  System, has multiple separate agencies that do nothing but

25  track trends in the crypto business.  They knew exactly what

1    we were trying to do.  They've had two years to look at the

2    application.  They've had two and a half years to look at this

3    business plan and scrutinize it.

4             And what they don't point out to you, Your Honor, is

5    any concrete, tangible risk that Custodia's plan poses.  They

6    throw out something with Avit saying they don't understand it.

7    Your Honor, they're not even -- they don't even have authority

8    from the Wyoming Department of Banking right now for the Avit

9    issue.  That's a Year Three or a Year Five concept.  All they

10   want right now is to do what their competitors are already

11   being allowed to do:  have a master account.

12            And all -- and you know what, as you've seen the way

13   we pled it, Your Honor, we're not even asking you to go where

14   I think you could go as a matter of law and say § 248a means

15   what it says it does, but at least for someone to make a

16   decision or Custodia may very well end up like The Narrow

17   Bank, sitting there now five years after their application and

18   no decision made.

19            Your Honor, that's -- that's just a destruction of

20   the two-tiered system.  It's a slap in the face to Wyoming

21   and the Special Purpose Depository Institutions.  There's

22   simply no way around that, Your Honor.

23            So that's -- that's why I think we're -- and that's a

24   long answer.  I understand, Your Honor.  But that's why I see

25   us dramatically different than *The Narrow Bank*, and I think

1  we've specifically pled why we are suffering damages now --

2  concrete damages because of the difference of having to try to

3  go to a short-term, make-shift intermediary that basically

4  defeats our ability to truly keep -- compete with the New

5  York -- Bank of New York Mellons of the world, Your Honor.

6          THE COURT:  And is it your position, though, that

7  they cannot deny you access or granting of that account?

8          MR. ORTIZ:  That is absolutely our position, Your

9  Honor.

10         THE COURT:  And how is that?

11         MR. ORTIZ:  We qualified as -- through our state

12  charter, we qualified under the definition of a depository

13  institution, and we are in compliance with all federal and

14  state law.  Obviously, *Fourth Corner* did not meet that

15  criteria because -- because there was some pretty good

16  argument that maybe they were not in compliance with federal

17  law.

18         And there's nothing tangible saying we're not in

19  compliance with federal law on bank-secrecy standards or on

20  anti-money-laundering standards or anything else.  We are.

21  And that's everything we have gone through, through the State

22  of Wyoming and all this scrutiny we've already received.

23         So I think you absolutely have that within your

24  right.  But if the Court doesn't want to go that far, Your

25  Honor, we're simply willing to say hold them to a timeline.

1    Have § 4807 apply to them and give us a decision.  It's

2    clearly an unreasonable delay when you consider all the

3    factors in this case and you consider what's at stake.

4            And, Your Honor, here's what I think is an easy

5    solution to the Court:  There are so many factual arguments

6    being made now where the Defendants are trying to ask you to

7    not take as true our well-pled factual allegations and trying

8    to argue, Well, there are additional problems, or there are

9    additional risks, or, you know, who really made the decision?

10           Your Honor, you could put this on a truncated,

11   streamlined discovery schedule and -- I would submit to you

12   four depositions and some written discovery -- and we could --

13   if the Court had additional time or wanted a more fully

14   developed record, that could be easily done in this case.

15           Your Honor, we gave the Defendants already the

16   courtesy of sending our 30(b)(6) topics to them of the things

17   right out of the gate we wanted to know.  And if the Federal

18   Board of Governors somehow is correct and they're arguing

19   they're not a proper party to this case, they would have an

20   obligation and an opportunity at the summary judgment stage to

21   bring evidence to you to support that.

22           But right now, if you take our well-pled allegations

23   and what -- you know, ironically, allegations pled based

24   mostly on what the Defendants employees were telling us, then

25   this case clearly has to proceed, Your Honor.

1              THE COURT:  All right.

2              MR. ORTIZ:  Any other points you'd like me to raise,

3    Your Honor?  Would you like me to -- I've got about four

4    minutes left, but I don't need to drone on unless you have

5    other specific questions I could answer for you.

6              THE COURT:  Well, I guess, tell me if I'm wrong in

7    this, but I see there's two fundamental questions that are

8    somewhat a threshold issues in this:  one is, is who is or

9    isn't subject to the APA, and you've addressed that; and

10   whether or not the Federal Reserve Bank of Kansas City is.

11   And my research, my law clerk's research has revealed that

12   there is a conflict in that.  That is not a uniformly answered

13   answer.

14             The second component that I see is, is what amount of

15   discretion or lack of discretion exists?  I don't -- § 4807,

16   I'm not -- I'm not buying what you're putting down.  But what

17   I see to be at least a fundamental question and threshold in

18   terms of your viability or plausible claim is, is the Federal

19   Board of Kansas City subject to the APA and/or a writ of

20   mandamus?

21             And then the second question is, is, if so, what --

22   and part of that is, I think, consumed by what level of

23   discretion do they have in granting or denying a -- because

24   that ties into, I believe, the issue as to the standing and

25   the injury.

1        But tell me this:  If they deny you, does that -- at

2   this point, they can grant or deny.  I understand your

3   position is, is that they cannot deny.  But assuming they can,

4   how does that not affect your standing ability?

5        MR. ORTIZ:  Because we've suffered real tangible

6   injury right now solely based on the delay, Your Honor.  And

7   even if it's a denial, it at least gives my clients a chance

8   to make a decision.  For instance, here's a simple explanation

9   for it:  If you want to partner short-term -- on a short-term

10  basis with an intermediary bank, they may charge you 7 cents

11  on the dollar for every transaction they process.

12        But if you agreed to partner with them for three

13  years or more and guarantee them a certain volume, maybe that

14  number comes down to something where you might be able to

15  compete with other people that have a direct master account.

16  It's unlikely.

17        But sitting right now where they are, my clients --

18  my clients can't make a decision.  We are -- we are in that

19  position much like in the *Rice* case where if we can't get a

20  decision as to where we stand, and if there's no reasonable

21  timeline and there's no -- no expectation there will be a

22  timeline given, then we're being denied due process, and

23  that's a constitutional deprivation.

24        And I really don't care how you couch it, Judge, but

25  you can't have -- and we still don't know, is it truly the

1    president of the Kansas City Fed making this decision?  Is it

2    truly the Board of Governors?  Is it the Kansas City Fed

3    itself?  But the delay itself is causing us tangible injury in

4    real time not having an answer.

5           And I think you -- you hit it right on the head,

6    Judge.  Given the fact we worked with them on the front end

7    going clear back to 2018, and you comment about how much time

8    they now claim they need to make a decision, that's

9    unreasonable.

10          And we haven't talked about the *TRAC* factors, but I

11   think if you applied the *TRAC* factors to this situation, they

12   strongly weigh in our favor.  And I realize we're not talking

13   about human harm or injury, but you're probably talking about

14   the existence and the viability of our business going forward,

15   and you may be talking about the existence and viability of

16   the speedy banks in Wyoming and whether they can survive.

17          So that's why, from our perspective, Your Honor,

18   simply getting any decision from them at least starts limiting

19   some of the harm we're suffering in real time.

20          THE COURT:  Thank you.

21          MR. ORTIZ:  Your Honor, if there's no other

22   questions, I would just thank the Court for your time today.

23          THE COURT:  Thank you.

24          I would turn back to -- I thought they had a

25   little -- they had 4 minutes and 53 seconds.

1           All right.  One minute.  I'm going to take five

2     minutes, and we'll come back, and I'll hear the rebuttal.

3           (A recess was taken from 2:27 p.m. to 2:32 p.m.)

4           THE COURT:  I note the presence of the parties -- I

5     should say the presence of counsel.  I would hear rebuttal.  I

6     think we have 4 minutes, 53 seconds.

7           Before you begin, let me ask, particularly

8     Mr. Bucholtz, here's the question for you:  When your client

9     issues a master account to a depository institution, is your

10    client then able to exercise discretion over the deposits made

11    by the depository institution?

12          And if you could answer that, and I'll hear anything

13    else you have to say in your rebuttal time.  I'll give him one

14    more minute in there, 5:53.

15          MR. BUCHOLTZ:  Thank you, Your Honor.

16          Yes.  The answer to your question is yes.  § 353 --

17    § 342 -- excuse me, I misspoke -- § 342 gives Reserve Banks

18    discretion about whether to open accounts in the first place,

19    because what you do with a master account is you put deposits

20    in it.  And the place that you put deposits, which is what

21    § 342 says we have discretion to accept or not, is a master

22    account.  A master account is just an administrative term that

23    Reserve Banks use for the thing you put deposits in.

24          THE COURT:  Let me -- I may have missed it a little

25    bit.  If I have a master account, do you still -- or does your

1   client still retain discretion over what deposits it receives

2   from -- can it still reject deposits even though I have a

3   master account?

4           MR. BUCHOLTZ:  Yes.  Yes, Your Honor.  I'm sorry.

5   That's the question I was trying to answer.  I just didn't get

6   to it quickly enough.

7           Yes.  § 342 gives both kinds of discretion:  whether

8   to open an account to accept deposits in the first place and

9   what deposits to accept.

10          What I want to try to do, Your Honor, in the little

11  bit of time that I have here is address the two issues that

12  you said at the end were the fundamental ones, the one that

13  you just asked about.

14          I think, Your Honor, it's really important to look at

15  what Congress did and what Congress didn't do in the Monetary

16  Control Act when it enacted § 248a and it amended § 342.  It

17  amended § 342 to add "other depository institutions" where it

18  had previously said, "member banks," but it kept "may" as

19  "may."  We already know the Supreme Court had construed, many

20  years earlier, "may" to mean "may."

21          Congress legislated against that backdrop.  It did

22  not change "may."  It did not do anything in § 248a to address

23  in any specific way the discretion that it previously had

24  given Reserve Banks about whether to accept deposits from any

25  given requestor.  It left that intact.

1          And what it did is say, as a class, generally,

2    non-member banks are eligible for the same services that shall

3    be priced the same way, which was the innovation of the

4    Monetary Control Act.

5          But nowhere in § 248a does Congress speak to the

6    Reserve Banks at all.  Nowhere does Congress say to the

7    Reserve Banks, "We're withdrawing the discretion that we gave

8    you previously in § 342."

9          Congress legislated against that backdrop.  § 248a is

10   about the Board set -- how the Board sets a price list for

11   services.  The premise of those services is they're available

12   to whoever has a master account, but § 248a doesn't say you

13   have to give a master account to everyone who asks.  The

14   Supreme Court had previously said that Reserve Banks have

15   discretion about whether to accept deposits from any given

16   requestor or not.  So that's the backdrop against which

17   Congress legislated.

18         I also want to just make clear the practical

19   importance of this, right?  So we heard a lot from my friend

20   on the other side, Mr. Ortiz, about the dual banking system,

21   right?  I want to be clear about this:  My client respects and

22   values the dual banking system.  We have nothing to say

23   otherwise.

24         But the dual banking system is dual, right?  And on

25   their view of the world, it's not really dual.  On their view

1   of the world, Congress said that the Reserve Banks have to

2   open an account, have to accept deposits that go on the

3   Reserve Bank's own balance sheet and create credit risk to the

4   Reserve Banks from any institution that any state chooses to

5   charter under any standards, any procedures, any level of

6   diligence, any level of supervision, et cetera.

7        So even if the Reserve Bank thinks that a particular

8   depository institution with a state charter has a dangerously

9   inadequate anti-money-laundering policy or a dangerously

10  inadequate set of controls on its business model creating

11  credit risk to the Reserve Bank, it's too bad.  Too bad.  The

12  Reserve Bank has no choice.

13       That's not a dual banking system.  That's Congress

14  turning over entirely control of the monetary system, the

15  payment system to the states.  There's no reason to think

16  Congress would do that.  That would be a really, really

17  anomalous thing for Congress to do, and there's no indication

18  that anyone in Congress thought it was doing anything remotely

19  like that.

20       I want to address very briefly a couple of other

21  points, and I'll let Mr. Chadwick do so, as well, if that's

22  all right with Your Honor.

23       THE COURT:  You may.

24       MR. BUCHOLTZ:  It is true that there were meetings

25  between my client and people in Wyoming involved in creating

1    this legislation.  It is not true that my client ever said

2    that any particular SPDI would be entitled to or would get a

3    master account.  I don't believe Mr. Ortiz said that, but I

4    wanted to be clear about that.  That would not be true.

5          And it also is true that my client has had a position

6    for a long time -- always has been consistent and always has

7    been clear -- that § 342 gives it discretion.  And the other

8    side -- Mr. Ortiz the pointed to places where various actors

9    within the Federal Reserve System have used very general

10   language to the effect that non-member banks, under the

11   Monetary Control Act, have access to the services.

12         Well, that's true but, that's very different from

13   saying that every single -- literally every single entity

14   chartered by any state under any standards is automatically

15   entitled to a master account regardless of the risks that the

16   Reserve Bank thinks that creates.  We've never said that, and

17   respectfully, I think that's just not a plausible position.

18         I'll let Mr. Chadwick pick up from there unless Your

19   Honor has questions specifically for me.  Thank you very much

20   for your indulgence with the time.

21         THE COURT:  Thank you.  Mr. Chadwick?

22         MR. CHADWICK:  Thank you, Your Honor.  Mr. Bucholtz

23   stole some of my points, but one of them I wanted to

24   underscore was the Monetary Control Act and the significance

25   of that, Your Honor.

1          The Monetary Control Act was designed to give greater

2    control over monetary policy, not less.  And the point that

3    Mr. Bucholtz makes about the modification of § 342 is of great

4    significance.  Congress left the discretionary "may," which

5    has been in the original Federal Reserve Act since 1930 --

6    1913 when it made that modification.  And when it told the

7    Board to set up pricing principles for the various services,

8    it instructed the Board to recognize that there would be --

9    that access to those services would be available to both

10   member banks and non-member banks.  And prior to that, the

11   deposit accounts had only been available to member banks, Your

12   Honor.

13          And the last point I'll say, Your Honor, is the

14   amount of resources that's been expended or continue to be

15   expended both by the Reserve Bank and by the Board.  There's a

16   lot of very conscientious, very smart people thinking very

17   hard about these issue.  This is not something that's sitting

18   idle.  There is just an extended, on-site examination on the

19   premises of Custodia.  So this is no idle action, Your Honor.

20   It is under active process.

21          And I appreciate your time.  Thank you.

22          THE COURT:  All right.  Thank you, Mr. Chadwick.

23          Well, a couple things.  First, I'm not going to rule

24   from the bench on this.  I've reviewed most, but I got a

25   couple more thousand pages of materials that have been

 1   submitted.  It's not a thousand.  I think there's only 343

 2   pages of briefing.

 3          But here's what I want to tell both sides:  I think

 4   the tree is going to be trimmed, but the tree is not going to

 5   be cut down, and this matter will survive in some form.  But I

 6   don't -- and I understand there's a lot of very competent and

 7   extremely bright and far more learned and skilled finance,

 8   banking, and regulatory individuals in the world that are

 9   looking at this, but I just don't see why we are looking at a

10   length of time that's equal to the gestation of an elephant to

11   figure this out with all those bright people.

12          So I -- nor do I believe, though -- and I understand

13   my role.  My role is to interpret the law and determine what

14   Congress did or didn't allow or authorize.  And it will -- my

15   decision will be rendered forthwith as quickly as possible,

16   and you can then go forward on those issues and your motion

17   practice as you deem appropriate.  But we will get this turned

18   around certainly quicker than the application decision

19   process.

20          All right.  With that, is there anything else we can

21   address, Mr. Ortiz?

22          MR. ORTIZ:  No, Your Honor.  Thank you for your time

23   today.  We appreciate it.

24          THE COURT:  Mr. Chadwick?

25          MR. CHADWICK:  No, Your Honor.  Thank you very much.

1          THE COURT:  Mr. Bucholtz?

2          MR. BUCHOLTZ:  Thank you, Your Honor.  Nothing

3    further for me.

4          THE COURT:  All right.  Thank you all.  Have a great

5    day -- rest of your day and a good weekend.

6          We'll stand in recess.

7       (Proceedings concluded at 2:42 p.m., October 28, 2022.)

8                   *      *      *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-CV-125                                                                65

1                          C E R T I F I C A T E

2

3          I, MEGAN E. STRAWN, Federal Official Court Reporter

4    for the United States District Court for the District of

5    Wyoming, a Registered Professional Reporter and Certified

6    Realtime Reporter, do hereby certify that I reported by

7    machine shorthand the proceedings contained herein on the

8    aforementioned subject on the date herein set forth, and that

9    the foregoing 64 pages constitute a full, true, and correct

10   transcript.

11          Dated this 3rd day of November 2022.

12

13

14

15                  _____/s/ Megan E. Strawn_____

16                        MEGAN E. STRAWN
                    Registered Professional Reporter
17                    Certified Realtime Reporter

18

19

20

21

22

23

24

25

Megan E. Strawn, RPR, CRR                              (307) 232-2626