# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

---

CUSTODIA BANK, INC.,

     Plaintiff,

    v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

     Defendants.

Case No. 22-CV-125-SWS

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' 12(b)(6) MOTIONS TO DISMISS

---

This matter comes before the Court on Defendants' motions to dismiss (ECF 48, 50).  Plaintiff filed a consolidated opposition to both motions (ECF 58), and Defendants replied (ECF 96, 97).  Plaintiff supplemented its opposition (ECF 98), and Defendant Board of Governors responded to the supplement (ECF 99).  The Court has also reviewed and considered the amici briefs from the State of Wyoming (ECF 88), State Senator Rothfuss and State Representative Olsen (ECF 89), and Members of the U.S. Senate Banking Committee and U.S. House of Representatives Financial Services Committee (ECF 92), all of which oppose Defendants' motions to dismiss.  The Court heard arguments from counsel on October 28, 2022.  (ECF 100.)  Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court determines the motions to dismiss must be granted in part and denied in part.

## BACKGROUND

Plaintiff Custodia Bank is a Wyoming depository institution that is unlike a traditional bank because it is "designed to provide custody services for digital assets such as Bitcoin via their trust departments" and "provide a bridge connecting digital asset companies to the U.S. payments system," which would allow, for example, a Custodia customer to use a cryptocurrency like Bitcoin "to make a direct transfer, a purchase, or an investment, rather than having to first convert the" cryptocurrency into U.S. Dollars. (Compl. (ECF 1) ¶ 29.)  Custodia is state-chartered as a Special Purpose Depository Institution (SPDI), a unique-to-Wyoming financial institution intended to facilitate cryptocurrency banking that is prohibited from making loans.  (Compl. ¶ 28.)  It is also chartered to allow the traditional banking service of U.S. Dollar deposit-taking.  (*Id.* ¶ 4.)  As a state-chartered institution, it is subject to Wyoming's banking regulatory system and is not required to be insured by the Federal Deposit Insurance Corporation (FDIC).  (*Id.* ¶¶ 2, 18, 23, 26.)  In August 2021, Custodia also applied to Defendant Federal Reserve Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system).  (*Id.* ¶¶ 4, 24.)

On October 29, 2020, Custodia applied to Defendant Federal Reserve Bank of Kansas City (FRBKC) to obtain a Federal Reserve "master account," which is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).

"Without such access, a depository institution is nothing more than a vault."  *Id.* at 1053

(Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.).  A master account also enables its holder to access various

services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including

wire transfer services, automated clearinghouse services, settlement services, securities

safekeeping, and Federal Reserve float services.  Except for certain unique circumstances,

any financial institution can have only one master account with its Federal Reserve Bank.

Custodia asserts, "Direct access to the Federal Reserve is vital to Custodia's ability

to operate effectively and efficiently in pursuit of its core mission to offer a secure,

compliant bridge between digital assets and the United States dollar payment system."

(Compl. ¶ 3.)  Custodia currently accesses the Federal Reserve through an intermediary

("correspondent") bank that has a master account, but this arrangement "is much costlier

and introduces counterparty credit risk and settlement risk that would" be avoided with its

own master account.  (*Id.* ¶ 8.)  A master account "would allow Custodia to access directly

the Federal Reserve, sharply reduce its costs, and bring new products and options to users

of financial services."  (*Id.* ¶ 3.)

Now two years later, FRBKC has yet to grant or deny Custodia's application for a

master account.    Custodia alleges, "Upon information and belief, the [FRBKC's]

consideration and impending approval of Custodia's application was derailed when, in spring 2021, the [Defendant Federal Reserve Board of Governors] asserted control over the decision-making process." (Compl. ¶ 6.)  Custodia sues for an order compelling Defendants to "promptly decide" the application. (*Id.* ¶ 81.)  Alternatively, Custodia also says that if FRBKC denies the application, the Court should "issue a writ of mandamus" ordering Defendants to grant the application. (*Id.* ¶ 130.)  Defendants have moved to dismiss Custodia's complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6), asserting Custodia has failed to state any claim on which the Court can grant relief.

## STANDARD FOR 12(b)(6) MOTION TO DISMISS

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In the context of a 12(b)(6) motion to dismiss, this plausibility standard requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true. *Hall v.*

*Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

The Court starts with Custodia's primary causes of action before moving to its alternative claims.

### 1.  Claim I - Violation of Administrative Procedure Act (APA) for Unreasonable Delay of Agency Action

In its first claim for relief, Custodia contends the Administrative Procedures Act (APA) allows it to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and Defendants have unlawfully withheld or unreasonably delayed the decision on Custodia's application for a master account.  (Compl. ¶¶ 61-81.)  Defendant FRBKC argues it is not an "agency" for purposes of the APA, but even if it was, Custodia has not suffered an "unreasonable delay" under the APA.  (ECF 51 pp. 25-32.[1])  Defendant Federal Reserve Board of Governors argues that while it is an "agency" for APA purposes, it is not the entity that decides Custodia's application and Custodia has not suffered an unreasonable delay under the APA.  (ECF 49 pp. 32-41.)

#### 1.1  Whether FRBKC is an Agency Subject to the APA

The APA defines an agency, with certain exceptions not applicable here, as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1); 5 U.S.C. 701(b)(1).  Simply put, the law is

---

[1]  Pinpoint citations to documents in the court record are to the page number assigned by the CM/ECF system at the top of each page rather than the page number assigned by counsel at the bottom of the pages.

currently unsettled on whether a Federal Reserve Bank is an "agency" for APA purposes.

Neither the Tenth Circuit nor the U.S. Supreme Court have decided the question, and other

federal district courts are divided on the matter.  For example:

- *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 154 F. Supp. 3d 1185, 1187 (D. Colo. 2016) ("Despite its name, the Bank is not a federal agency. Rather, it is a private corporation created by an Act of Congress and run by its own board of directors."), *reversed and remanded with instructions on other grounds*, 861 F.3d 1052 (10th Cir. 2017).

- *Lee Const. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 179 (D. Md. 1982) ("All in all, while the issue is a close one, it would seem that a consideration of each and every one of the relevant factors tips the balance in favor of holding that the Bank is an 'agency' for purposes of judicial review under the APA.  For the most part, that conclusion comports with the decisions of other Courts which have held that Federal Reserve Banks are agencies or instrumentalities of the United States for other purposes.")

- *Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chicago*, 583 F. Supp. 674, 678 (N.D. Ga.) ("There can be no doubt that the Federal Reserve Bank of Chicago is an 'authority' of the government of the United States. As a member bank of the Federal Reserve System, it performs important governmental functions and exercises powers entrusted to it by the United States government. [Collecting cases.] Because the Bank is an authority of the United States government and is not listed among the exclusions of section 551, the Court determines that the Bank is an agency subject to review of its action under the Administrative Procedure Act.  How the Bank can contend otherwise in good faith escapes the Court."), *vacated sub nom. Flight Int'l, Inc. v. Fed. Rsrv. Bank of Chicago*, 597 F. Supp. 462 (N.D. Ga. 1984) (expressly stating the prior opinion carries no precedential value).

There is no controlling precedent and precious little persuasive authority on the question

in the Tenth Circuit.  Moreover, the "law on the simple question of what is an agency is

quite complex."  *McKinney v. Caldera*, 141 F. Supp. 2d 25, 31 (D.D.C. 2001).

But in *Lee Const. Co.*, the District of Maryland persuasively concluded that to

determine whether the Federal Reserve Banks were APA agencies, it would be necessary

for a court "to review the organizational structure of Federal Reserve Banks and their

function within the Federal Reserve System in order to determine whether or not such Banks possess sufficient indicia of 'agency' status to be considered agencies for purposes of the APA." *Lee Const. Co.*, 558 F. Supp. at 176; *see New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) ("courts have emphasized 'the need to examine the structure, function, and mandate' of the entity in question in determining whether it falls within the definition set out in the APA") (quoting *McKinney*, 141 F. Supp. 2d at 33). This Court agrees those factors, and others, weigh on the decision of whether FRBKC is an "agency" for APA purposes. However, that level of information and detail is not part of the record at this stage of the proceedings. At this point, the Court is confident in stating FRBKC exercises, at the least, quasi-agency functions that may render it subject to the APA, but a definitive decision on the matter must wait for further factual development addressing the various factors the Court will have to examine to determine whether FRBKC is a federal agency for APA purposes. For now, the Court has little trouble concluding that, accepting the allegations of the complaint as true and construing them in the light most favorable to the non-moving party, Custodia has stated a plausible claim that FRBKC is subject to the APA.

### 1.2    Whether the Board of Governors is a Proper Defendant

The Board of Governors contends the decision on Custodia's master account application rests with FRBKC. Custodia asserts, "Upon information and belief, [FRBKC's] consideration and impending approval of Custodia's application was derailed when, in spring 2021, the Board [of Governors] asserted control over the decision-making process." (Compl. ¶ 6.) While this allegation is made "upon information and belief," the

plausibility standard of 12(b)(6) "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted).  Here, several factors combine to make it reasonable to infer the Board of Governors has involved itself in some manner to interfere with or delay Custodia's application:

(1)     More than a year and a half has passed since "Tara Humston, [FRBKC's] head of Supervision and Risk Management, informed Custodia that there were 'no showstoppers' with its master account application." (Compl. ¶ 36.)

(2)     FRBKC confirmed in a January 2022 letter "that Custodia meets the legal eligibility requirements for receiving a master account."  (*Id.*; *see also* Compl. ¶ 43.)

(3)     In a March 2022 meeting (i.e., after FRBKC asserted there were "no showstoppers" and confirmed Custodia was legally eligible for a master account), FRBKC then "informed Custodia that it had not started processing Custodia's master account application." (Compl. ¶ 40.)

*See also* 12 U.S.C. § 248 (setting forth the broad authority of the Board of Governors to oversee and supervise the Federal Reserve Banks).

Custodia has plausibly alleged the Board of Governors has participated in or interfered with the consideration and decision of Custodia's master account application.

### 1.3   Whether Custodia has Stated a Plausible Claim of Unreasonably Delayed Agency Action

Knowing that the Board of Governors is an agency subject to the APA and accepting for purposes of this Order that FRBKC is likewise, the next question is whether Custodia has stated a plausible claim of unreasonable delay under the APA against the Defendants. This inquiry breaks down into multiple sub-inquiries.

### 1.3.1   A one-year statutory deadline does not apply to deciding Custodia's master account application, but such decision can still be "unreasonably delayed" under the APA.

Custodia contends a one-year statutory deadline from 12 U.S.C. § 4807(a) applies to its master account application, which the Defendants have exceeded.  (Compl. ¶¶ 6, 46, 74, 87, 107.)  Defendants argue § 4807 does not apply, and therefore Custodia cannot state a claim for unreasonable delay under the APA.

Section 4807 provides:

(a)   In general: Each Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency.

(b)   Waiver by applicant authorized: Any person submitting an application to a Federal banking agency may waive the applicability of subsection (a) with respect to such application at any time.

12 U.S.C. § 4807.  Section 4801(1) says the term "Federal banking agencies" has the definition given to it by 12 U.S.C. § 1813.  And § 1813 says "Federal banking agency" means "the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation."  12 U.S.C. § 1813(z).  It does not include a Federal Reserve Bank as a "Federal banking agency."

Here, it is undisputed that Custodia submitted its application to FRBKC, not to one of the "Federal banking agencies" identified in 12 U.S.C. § 1813(z).  Accordingly, Custodia's application for a master account submitted to FRBKC is not bound by the one-year limitation of § 4807(a).  Custodia's arguments that Federal Reserve Banks must be inherently included as "Federal banking agencies" is unpersuasive and would require the Court to read words into § 4801 or § 1813(z) that do not exist, which the Court may not do.  Chapter 48 of Title 12 was codified as part of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325, 108 Stat. 2160 ("Riegle Act"), and when it was passed, Congress certainly knew what Federal Reserve Banks were and could have included them in the definition of "Federal banking agencies" as part of § 4801 if it wanted to.  Indeed, it referenced "Federal reserve bank" several times in other parts of the Riegle Act.  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009).  Custodia's assertion that deciding its master account application is subject to the one-year limitation of § 4807(a) is legally unsustainable and fails to state a claim on which relief can be granted.

Nonetheless, again presuming the application of the APA to this issue for now, the decision may be subject to a "reasonable time" deadline; the expiration of a concrete statutory deadline is not necessary for agency action to be unreasonably delayed.  "[I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that

agencies conclude matters presented to them 'within a reasonable time,' *see* 5 U.S.C. § 555(b)—a court must compel only action that is delayed unreasonably." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).   Section 555(b) provides, "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b); *see also Telecomm. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("section 706(1) coupled with section 555(b) does indicate a congressional view that agencies should act within reasonable time frames").   Under this "within a reasonable time" standard, it rests in the Court's "discretion to decide whether agency delay is unreasonable." *Forest Guardians*, 174 F.3d at 1190.

Custodia has stated a plausible claim of unreasonable delay that survives dismissal. Specifically, the "Master Account Agreement" completed by Custodia and submitted to FRBKC notes that "[p]rocessing may take 5-7 business days.   Please contact the Federal Reserve Bank to confirm the date that the master account will be established."   (ECF 1-2.) This suggests that a standard financial institution can expect a decision on their master account application in a matter of days, whereas Custodia's application has been pending for two years.   Further, Custodia alleges in its complaint, "In early 2021, a representative of [FRBKC] moreover informed Custodia there were 'no showstoppers' with Custodia's application" (Compl. ¶¶ 5, 36), thus suggesting the application had been considered and was on track to be granted.   Custodia also alleges FRBKC confirmed in a January 2021 letter that Custodia was legally eligible for a master account.   (*Id.* ¶¶ 36, 43.)   After all that, FRBKC then informed Custodia in March 2022 that it had not even started processing the

master account application (which may or may not have occurred due to the Board of Governors' involvement).  (*Id.* ¶ 40.)  Considered together, the Court has little difficulty concluding Custodia has asserted a plausible cause of action for unreasonable delay against both Defendants.

### 1.3.2   <u>Only legally-required action can be compelled under the law, and Custodia has stated a plausible claim to compel legally-required action.</u>

"[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  The Defendants argue that issuing a master account is discretionary and, therefore, cannot be compelled.  This issue, too, is unsettled in the law and, at least at this juncture, the Court concludes Custodia has stated a legally valid claim to relief.

The Defendants contend FRBKC has complete discretion to issue or deny a master account pursuant to 12 U.S.C. § 342, which says in part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, … deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.].

Section 342 is located in Subchapter IX of Chapter 3 of Title 12 of the U.S.C.  Subchapter IX is titled, "Powers and Duties of Federal Reserve Banks."  To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits.  *Farmers' & Merchants'*

*Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923). "The act merely confers authority to do so." *Id.*

The Defendants contend the discretion to receive or reject deposits necessarily carries with the discretion to grant or deny master accounts. (ECF 51 p. 33; ECF 49 pp. 32-35.) This argument presents as logical and may yet carry the day, but at least one judge of the Tenth Circuit has disagreed in a published opinion.

In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), Judge Bacharach determined 12 U.S.C. § 248a requires Federal Reserve Banks to issue master accounts to eligible depository institutions that apply. That section (part of the Depository Institutions Deregulation and Monetary Control Act of 1980), says in part:

> **(a)     Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
> Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
> …
> **(c)     Criteria applicable.**
> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
> > …
> > (2)     All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(a), (c)(2).  Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account.  *See Fourth Corner*, 861 F.3d at 1071 (Bacharach, J.) ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  To purchase these services, a master account is required.  Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts.").  In distinguishing § 342 from § 248a, Judge Bacharach opined:

> Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection…. But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions.  As a result, § 342 does not affect Fourth Corner's entitlement to a master account.

*Fourth Corner*, 861 F.3d at 1074.  That is, he agreed § 342 affords to a Federal Reserve Bank the discretion to take or refuse deposits, but concluded such discretion was separate and apart from the issuance of master accounts.  *See id.* at 1073-74 ("But this discretion does not encompass the issuance of master accounts."); *see also* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with Federal Reserve Banks and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

The Defendants spill much ink explaining why Judge Bacharach's opinion in *Fourth Corner* cannot win the day in this case.  (ECF 49 pp. 37-41; ECF 51 pp. 33-36.)  They

point out *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053. All true. Nonetheless, it's worth noting that the other two judges did not reach the merits of the § 248a versus § 342 statutory interpretation question (because they found dismissal warranted), so we don't currently know if they would have seen it the same as Judge Bacharach or not.

The Defendants also note that Section 248a is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. Thus, Judge Bacharach appears convinced that Congress effectively mandated Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions that apply in a Subchapter that sets forth the duties of a completely different entity (the Board of Governors). The Court agrees it appears a strange place for Congress to stick such a requirement that would seemingly govern the Federal Reserve Banks. Of course, the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little. "[U]nder the general rules of statutory interpretation, the title to a statutory provision is not part of the law itself, although it can be used to interpret an ambiguous statute." *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 n.4 (10th Cir. 1998) (quoting *Johnston v. Commissioner of Internal Revenue*, 114 F.3d 145, 150 (10th Cir. 1997), and giving "little

weight" to the title of the Americans With Disabilities Act); *see Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 529 (1947) ("For interpretative purposes, [statutory headings and titles] are of use only when they shed light on some ambiguous word or phrase.  They are but tools available for the resolution of a doubt.  But they cannot undo or limit that which the text makes plain.").  Thus, the title of Subchapter II and the location of § 248a within the statutory code likely offer relatively little toward refuting Judge Bacharach's opinion.

To cut short what could become an unnecessarily long recap of the Defendants' objections to Judge Bacharach's opinion in *Fourth Corner*, the Court concludes Custodia has stated a plausible claim to compel legally-required action for two reasons.  First, Judge Bacharach's opinion may plausibly be the law on this matter in this case.  *See* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

Second, and more immediately significant, a full statutory interpretation of the matter is better left for another day.  In this particular case, the facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application.  For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC

failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested). Thus, because the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of § 342 versus § 248, the Court will not undertake a complete analysis at this stage of the proceedings without further development of those facts.

The Defendants' requests to dismiss Custodia's "Claim for Relief I - Violation of APA, 5 U.S.C. § 706(a) Claim for Unreasonable Delay of Agency Action Against All Defendants" will be denied.

## 2.    <u>Claim II - Compel Action under the Mandamus Act</u>

Custodia's second cause of action seeks a writ of mandamus compelling action from the Defendants under 28 U.S.C. § 1361, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

"Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005). In a mandamus action, the Court should

> measure the allegations in the complaint against the statutory and constitutional framework to determine whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators.... In other words, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated.

*Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981) (quoting *Davis Associates, Inc. v. Sec., Dep't of Housing and Urban Development*, 498 F.2d 385, 389 & n.5 (1st Cir. 1974)).

Under Judge Bacharach's view in *Fourth Corner*, Custodia has stated a claim of both unreasonable delay of a decision on its master account application and legal entitlement to a master account. Therefore, the Court finds Custodia's request for mandamus relief should not be dismissed. In short, "there may well exist statutory or regulatory standards delimiting the scope or manner in which" the Defendants may exercise their discretion (if any) over Custodia's master account application, and assuming the truth of Custodia's allegations, those standards may have been ignored or violated in this case. That is, applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have "failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." *Carpet, Linoleum & Resilient Tile Layers, etc. v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981).

Custodia's claim for mandamus relief plausibly functions in a complementary fashion to § 706(1) of the APA, which allows the Court to compel agency action that is unlawfully withheld or unreasonably delayed. Additionally, Custodia's claim for mandamus relief plausibly functions as an alternative claim to its APA claim as it relates to FRBKC, if the Court ultimately determines FRBKC is not an agency for APA purposes (as FRBKC currently asserts).

After having found Custodia stated a plausible claim for relief under the APA against both Defendants, it finds Custodia's claim for mandamus relief is also plausible and should not be dismissed.

**3.      Claim III (in part) - Violation of Due Process Based on Entitlement to Master Account and Unreasonable Delay**

As part of its third claim, Custodia contends it has been denied due process because it has a legal entitlement to and property interest in a master account.  The Defendants disagree and argue Custodia cannot prevail on a due process claim as a matter of law because it lacks a property interest in a master account.  (ECF 51 pp. 41-42; ECF 49 p. 48.)

"[T]o prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007) (quoting *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000)).  "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'" *Id.* at 1078-79 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  The Court determined above that if Judge Bacharach's opinion in *Fourth Corner* is a correct interpretation of the law, then Custodia appears entitled to a master account under 12 U.S.C. § 248a.

Therefore, at this early stage of the proceedings, Custodia has plausibly alleged a legitimate claim of entitlement to a master account sufficient to support a due process claim.  Similarly, because Custodia has plausibly alleged an unreasonable-delay claim

under the APA, it has stated a sufficient due process claim.  (*See* Compl. ¶ 100; ECF 49 pp. 4-50.)

4.      **Claim III (in part) - Violation of Separation of Powers (Nondelegable Doctrine)**

Also within its third cause of action, Custodia contends that if Defendants' claim is true that the Federal Reserve Banks have unbounded and unreviewable discretion under 12 U.S.C. § 342 to issue or deny master accounts, then Congress violated the nondelegation doctrine (separation of powers) by delegating its legislative power to the Federal Reserve Banks with no guidance ("intelligent principles").  Article I of the U.S. Constitution begins, "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art I, § 1.  "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  That is, the people's representatives in Congress must make the law rather than delegate that power to the executive or judicial branches.  The U.S. Supreme Court has long "recognized, however, that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  In particular, Congress "may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123 (citing *Mistretta*, 488 U.S. at 372).  "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (quoting *Mistretta*, 488 U.S. at 372).

Because the nondelegation doctrine bars Congress from delegating "powers which are strictly and exclusively legislative," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825), to the other Branches, it's not uncommon for a court facing a delegation challenge to first ask "whether the statute has delegated legislative power to the agency." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001). "Whether the statute delegates legislative power is a question for the courts[.]" *Id.* at 473. The Defendants argue a decision on a master account application is not the exercise of legislative authority. (ECF 51 pp. 42-43; ECF 49 pp. 52-54.)

Black's Law Dictionary defines "legislative power" as "[t]he power to make laws and to alter them." *Legislative Power*, <u>Black's Law Dictionary</u> (11th ed. 2019); *see Gundy*, 139 S. Ct. 2116, 2133 (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'") (footnotes omitted). Similarly, "legislation" is "[t]he process of making or enacting a positive law in written form." *Legislation*, <u>Black's Law Dictionary</u> (11th ed. 2019); *see Loving v. United States*, 517 U.S. 748, 758 (1996) ("the lawmaking function belongs to Congress").

The Court starts where Custodia's Claim III starts—presuming the Defendants' interpretation of § 342 is correct for purposes of this discussion. Even with such a presumption, the boundless discretion to grant or deny a master account application is not "legislative power." Decisions on master account applications do not involve lawmaking

or rulemaking or enacting generally applicable regulations. Under Defendants' interpretation of § 342, Congress has passed a law instructing Federal Reserve Banks they may grant or deny master applications as they see fit, and granting or denying master applications, even with unbridled discretion, is not legislative action. It simply does not result in the passage of a generally applicable pronouncement governing future actions. *See United States v. Hutchinson*, 573 F.3d 1011, 1032 n.4 (10th Cir. 2009) ("Additionally, he claims that 21 U.S.C. § 851(a), the statute that allows the prosecutor to establish a prior conviction by information, violates the constitutional doctrine prohibiting the delegation of legislative power because it does not prescribe an 'intelligible principle' for the executive to follow in deciding whether to seek a sentencing enhancement on this basis. But allowing prosecutors discretion to seek (or not seek) sentencing enhancements involves no delegation of *legislative* power: such a decision is an exercise of the prerogative power committed to the *executive* department, and is no different than the discretion possessed by prosecutors to bring (or not bring) criminal charges in the first instance.") (internal citations omitted). Therefore, Congress cannot be said to have trespassed upon the nondelegation doctrine by enacting § 342 because the decision on a master account application is not a legislative function.

Custodia has not set forth a plausible separation-of-powers claim based on violation of the nondelegation doctrine, and this claim must be dismissed under Rule 12(b)(6).

### 5.   **Claim IV - Declaratory Judgment Based on Unreasonable Delay**

In its fourth claim for relief, Custodia seeks a judgment declaring the Board of Governors "and/or" FRBKC "must decide Custodia's master account application within a

reasonable period of time." (Compl. ¶ 109.) FRBKC accurately argues the Declaratory Judgment Act provides a remedy for valid federal causes of action and does not offer a separate cause of action. (ECF 51 p. 47); *see Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (unpublished) ("the Declaratory Judgment Act does not provide an independent federal cause of action") (citing *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671–74 (1950)). "To maintain an action for a declaratory judgment, then, [Custodia] must assert a valid federal cause of action—one that exists independent of any request for declaratory relief." *Nero*, 2002 WL 14423872, at *2. As the Court determined above Custodia has asserted plausible claims of unreasonable delay under the APA and the Mandamus Act, its action for a declaration that a master account application must be decided within a reasonable period of time is valid.

Therefore, while Custodia's claim for declaratory judgment is not properly understood as a stand-alone cause of action (and cannot truly be an "alternative" to Claims I and II, despite Custodia's pleading), it is a viable request for relief that will not be dismissed at this time.

**6.    Claim V - Violation of Due Process Based on Decision-Making by Interested Parties (Bias)**

Next, Custodia asserts that FRBKC's Board of Directors is comprised of officials from other banks who "are or may be competitors with all other banks requesting master accounts." (Compl. ¶ 114.) Custodia says:

> To the extent that [FRBKC's] Board of directors finally adjudicates the rights of would-be competitors like Custodia, the current master application review regime works "an intolerable and unconstitutional interference with personal

liberty and private property" by vesting "self-interested" actors with "regulatory authority over [their] rivals."

(Compl. ¶ 115 (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), and *Assoc. of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016)).

The Defendants assert the decision on a master account application is made by the president of FRBKC, not its Board of Directors. (ECF 49 p. 50; ECF 51 p. 44.) Custodia's factual allegations agree. Custodia alleges that after learning in March 2022 that FRBKC had allegedly not started processing Custodia's master account application (despite it being almost a year-and-a-half old at that point), Custodia sent a letter to FRBKC's president, Esther George, in which it "urged Ms. George to consider Custodia's application." (Compl. ¶¶ 40-41.) Custodia has not alleged Ms. George is biased against it or is an official from a competing bank. Statutory law precludes six of the nine FRBKC directors from being officers, directors, or employees of any bank. *See* 12 U.S.C. § 303. These six directors are the Class B and Class C directors. *See id.* More importantly, these six Class B and Class C directors select FRBKC's president (having selected Ms. George as relevant here), with the approval of the Board of Governors. 12 U.S.C. § 341. Thus, six non-officers, non-directors, and non-employees of any bank chose Ms. George to be FRBKC's president, and it is Ms. George (who is not alleged to be biased or Custodia's competitor) who the complaint's well-pled allegations plausibly suggest is to make the decision on Custodia's master account application.

Moreover, even if FRBKC's Board of Directors was making the decision on Custodia's master account application, two-thirds of the directors (the Class B directors

and the Class C directors) are not potential competitors of Custodia (because they are not officers, directors, or employees of a bank).

Custodia has not stated a plausible claim of violation of due process based on bias or regulation by a competitor.  This cause of action is not tethered to the relevant factual allegations or the statutory law.  Accordingly, it will be dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

7.      **Claim VI - Violation of the Appointments Clause**

In its sixth cause of action, which it identifies as an alternative claim to Claims I and II, Custodia asserts "the Federal Reserve System's process for deciding master account applications violates the United States Constitution's Appointments Clause."  (Compl. ¶ 118.)

> Under the Constitution, "[t]he executive Power" is vested in the President, who has the responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; § 3.  The Appointments Clause provides that he may be assisted in carrying out that responsibility by officers nominated by him and confirmed by the Senate ["principal officers"], as well as by other officers not appointed in that manner but whose work, we have held, must be directed and supervised by an officer who has been ["inferior officers"].  § 2, cl. 2.

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021) (first alteration in original).

The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2 cl. 2.  The Appointments Clause thus "lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018).

Essentially, Custodia alleges that a decision on its master account application constitutes the exercise of executive power, which must be done by the U.S. President, or a principal officer appointed by the President upon the advice and confirmation of the Senate.

> Under this framework, only principal officers—people with presidential appointments and Senate confirmation—can render final decisions about master accounts.  Adjudicating master account applications unquestionably involves exercising "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, because such adjudications "bind[] the government or third parties for the benefit of the public."  *Officers of the U.S.*, 31 Op. O.L.C. at 77.

(ECF 58 p. 43.)  As neither the president of FRBKC nor its board of directors are appointed by the U.S. President with Senate confirmation, Custodia asserts the Appointments Clause precludes them from deciding master account applications.  As noted above, the factual allegations in Custodia's complaint support that the master account application is decided by the president of FRBKC as opposed to FRBKC's board of directors.

Similar to the nondelegation doctrine discussed earlier, the first question to address for this claim is whether a decision on a master account application constitutes the exercise of "executive power."  FRBKC contends it is not, arguing the decision is "an essentially commercial decision," and "Custodia can point to no court that has held that a Reserve Bank's grant or denial of a master account—a bank account—somehow implicates [] 'executive Power.'" (ECF 51 p. 46.)  The Supreme Court has described executive power

as the authority to administer and enforce laws "or appoint the agents charged with the duty of such enforcement." *Buckely v. Valeo*, 424 U.S. 1, 139 (1976) (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928)), *superseded by statute on other grounds as recognized in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Relatedly, the Supreme Court has said the executive power of the government is "the general administrative control of those executing the laws, including the power of appointment and removal of executive officers." *Myers v. United States*, 272 U.S. 52, 164 (1926); *see also* U.S. Const. art. II, § 3 (assigning the U.S. President the responsibility to "take Care that the Laws be faithfully executed").

As applied here, the Court finds Custodia has plausibly alleged that FRBKC's president is exercising executive power when deciding a master account application. Whether deciding the application under § 342 (as the Defendants claim) or under § 248a (as Custodia claims), the complaint sufficiently asserts the decision constitutes the execution and enforcement of the Federal Reserve Act (and other laws and federal regulations with the force of law) when granting or denying a master account. *See Arthrex*, 141 S. Ct. at 1979 ("Today, thousands of officers wield executive power on behalf of the President in the name of the United States."); *but see United States v. Wells Fargo & Co.*, 943 F.3d 588, 597–98 (2d Cir. 2019) ("Although, in the intervening decades, Congress has transferred functional ownership and control of the [Federal Reserve Banks] to the Treasury and to the Board … Congress has carefully retained the formal separation of the [Federal Reserve Banks] from the executive branch.") (internal citations and footnotes omitted). The Court does not here decide as a matter of law whether decisions on master

account applications are executive functions, but it finds Custodia has plausibly alleged such.

Next, the Court considers whether a plausible violation of the Appointments Clause has been alleged concerning the master account decision by the FRBKC president. That largely depends on whether the FRBKC president is a principal officer (requiring appointment by the U.S. President with confirmation by the Senate), an inferior officer (who, by appropriate law, may be appointed directly by the President, courts, or department heads), or a nonofficer (a government employee not subject to the Appointments Clause). "The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley,* the line between officer and nonofficer." *Edmond v. United States*, 520 U.S. 651, 662 (1997); *see Buckley*, 424 U.S. at 126 ("any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article"). Under the circumstances of this case, Custodia has plausibly alleged FRBKC's president (who also serves as its CEO) exercises significant authority pursuant to the laws of the United States. *See, e.g.*, 12 U.S.C. § 341 (Federal Reserve Bank president shall also be the chief executive officer of the Federal Reserve Bank); *Job Description: President and CEO*, Fed. Rsrv. Bank of Kansas City (May 2022) ("The President and CEO of the Federal Reserve Bank of Kansas City is responsible for the overall performance of the Bank and represents the Tenth District economy in national policy discussions…. The

President's responsibilities fall into three broad areas: a policymaker and policy advisor; the CEO of the organization; and a contributor to Federal Reserve System leadership.")[2]. Indeed, that FRBKC's president holds final decision-making authority over the master account application demonstrates her exercise of significant authority. *See Bandimere v. Sec. & Exch. Comm'n*, 844 F.3d 1168, 1183-84 (10th Cir. 2016) ("final decision-making power is relevant in determining whether a public servant exercises significant authority"); (ECF 51 p. 46 (FRBKC noting the decision on a master account application is "one with significant implications")). It's fair to say Federal Reserve Bank presidents "perform more than ministerial tasks." *Freytag v. Comm'r*, 501 U.S. 868, 881 (1991). Accordingly, the FRBKC president is plausibly a principal officer or an inferior officer subject to the Appointments Clause.

The Board of Governors says that to the extent the master account application decision is an executive function, FRBKC's president is an inferior officer appointed in conformity with the Appointments Clause. (ECF 49 pp. 57-59; ECF 96 p. 30.) "Our cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond*, 520 U.S. at 661. Custodia's argument that only a principal officer may exercise final decision-making authority (and, correspondingly, that the exercise of final decision-making authority establishes someone as a principal officer) is misplaced. *See Bandimere*, 844 F.3d at 1183-84 (stating final

---

[2]   Available at: https://www.kansascityfed.org/about-us/presidential-search/.   The Court takes judicial notice of this document prepared by Defendant FRBKC. *See S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1192 (D.N.M. 2013) (court has discretion to take judicial notice of adjudicative facts, which are simply the facts of a particular case, at any stage of the proceeding, including a motion to dismiss without conversion to summary judgment).

decision-making authority weighs on whether a public servant is an officer versus a nonofficer and describing how inferior officers can have final decision-making power). Therefore, that FRBKC's president has final say over Custodia's master account application does not singularly determine whether she is or must be a principal officer as opposed to an inferior officer for purposes of the Appointments Clause.

> We held in *Edmond v. United States*, 520 U.S. 651, 662–663, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997), that "[w]hether one is an 'inferior' officer depends on whether he has a superior," and that "'inferior officers' are officers whose work is directed and supervised at some level" by other officers appointed by the President with the Senate's consent.

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010).

The Board of Governors, which is appointed by the U.S. President and confirmed by the Senate, argues that it supervises FRBKC's president and was required to approve her appointment, thus making her an inferior officer. The law accords with this contention. Federal Reserve Bank presidents are appointed by the Federal Reserve Bank's board of directors, and their appointment requires the approval of the Board of Governors. 12 U.S.C. § 341 (*Fifth*) ("The president shall be the chief executive officer of the bank and shall be appointed by the Class B and Class C directors of the bank, with the approval of the Board of Governors of the Federal Reserve System, for a term of 5 years[.]"). The Board of Governors supervises the Federal Reserve Banks, including their presidents, and has the authority to suspend or remove a Federal Reserve Bank president. *See, e.g.*, 12 U.S.C. § 248(a), (f), (j); 12 U.S.C. § 248b; *but see Scott v. Fed. Rsrv. Bank of Kansas City*, 406 F.3d 532, 535 (8th Cir. 2005) (FRBKC "is a private, independent entity independently run by its own board of directors. It is not run by the Federal Reserve Board of Governors

or any other part of the executive branch."). Thus, FRBKC's president's "work is directed and supervised at some level" by other officers appointed by the President and confirmed by the Senate. Accordingly, assuming for purposes of this Order that she is an "officer" of the Executive Branch, she is an inferior officer.

Finally, assuming the FRBKC president is an inferior officer, her appointment by the FRBKC's board of directors with approval by the Board of Governors accords with the Appointments Clause. Giving Custodia's cause of action every reasonable inference, the Court assumes for purposes of this Order that the Federal Reserve System is a "department" because it is a "free-standing, self-contained entity in the Executive Branch." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511 (2010). The Court further assumes that the Board of Governors is the "head" of the Federal Reserve System.[3] *See Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 16 (D.D.C. 2001) ("The Board administers the Federal Reserve System"), *aff'd sub nom. Trans Union LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002)); *Free Enter. Fund*, 561 U.S. at 512-13 (a multimember body may be the head of a department for purposes of the Appointments Clause). With that foundation of inferences in Custodia's favor, appointment of FRBKC's president by the board of directors with approval of the Board of Governors satisfies the Appointments Clause. *See Free Enter. Fund*, 561 U.S. at 512 n.13 ("We have previously found that the department head's approval [as opposed to direct appointment by the department head] satisfies the Appointments Clause[.]") (collecting cases). Therefore, Custodia has failed

---

[3] Determining the Federal Reserve System is not a "department" and the Board of Governors is not its "head" would arguably render the Appointments Clause inapplicable, thus eliminating this cause of action.

to state a plausible claim for relief based on the Appointments Clause, and Claim VI will be dismissed.

## 8.    Claims I through VI are justiciable but Claims VII and VIII are not.

The Court will next discuss the Defendants' arguments that Custodia's lawsuit is not justiciable, at least not currently.  (*See* ECF 49 pp. 41-47; ECF 51 pp. 49-57.)  This analysis will build off the prior examinations of Claims I through VI (which are justiciable) and then address Claims VII and VII (which are not justiciable).

In this case, justiciability refers to Custodia's legal standing to bring its lawsuit and whether its causes of action are ripe for adjudication.  *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) (explaining justiciability is "a concept of uncertain meaning and scope" and concerns a variety of subjects).  "[J]usticiability implicates the court's jurisdiction." *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004).

> A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may take one of two forms.  A facial attack looks only to the factual allegations of the complaint in challenging the court's jurisdiction. A factual attack goes beyond the factual allegations of the complaint and presents evidence in the form of affidavits or otherwise to challenge the court's jurisdiction.

*Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) (citing *Stuart v. Colorado Interstate Gas Co.,* 271 F.3d 1221, 1225 (10th Cir. 2001)). The Defendants here present a facial challenge to justiciability based on the allegations of the complaint.  Therefore, the Court applies "the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action." *Id.*

### 8.1   Custodia has standing to assert Claims I through VI.

The Court's authority to adjudicate live cases and controversies "includes the requirement that litigants have standing." *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (quoting *California v. Texas*, —— U.S. ——, 141 S. Ct. 2104, 2113 (2021)).

> To have standing, a plaintiff must establish three things: (1) he suffered an "injury in fact"—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely the injury will be "redressed by a favorable decision."

*Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61(1992) (internal quotation marks and citations omitted)).  "The party invoking federal jurisdiction has the burden of establishing the elements of standing." *Southwest Envtl. Ctr. v. Sessions*, 355 F. Supp. 3d 1121, 1128 (D.N.M. 2018).

Custodia's complaint satisfies the elements for standing to sue as to Claims I through VI (all considered above).  First, it alleges Custodia's continued need to use the master account of an intermediary ("correspondent") bank to access the Federal Reserve System while waiting for the last two years for a decision on its own master account application "is much costlier and introduces counterparty credit risk and settlement risk that would" be avoided with its own master account.  (Compl. ¶ 8.)  The complaint asserts that Custodia's own master account "would allow Custodia to access directly the Federal Reserve, sharply reduce its costs, and bring new products and options to users of financial services."  (*Id.* ¶ 3.)  These allegations of increased costs due to the delay of its own master account adequately assert a concrete, particularized, actual, and currently ongoing injury-

in-fact to Custodia. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 983 (2017) (citing *McGowan v. Maryland,* 366 U.S. 420, 430–431 (1961)).

Second, the complaint sufficiently alleges Custodia's injury is fairly traceable to the challenged delay. Specifically, as the Court already determined Custodia has stated a plausible claim for unreasonable delay under the APA and if Judge Bacharach's statutory interpretation in *Fourth Corner* applies here and entitles Custodia to a master account, Custodia's increased costs from having to use an intermediary bank during the unreasonable delay would be fairly traceable to one or both Defendants' actions causing the unreasonable delay.

Third, Custodia has adequately asserted its injury of increased costs would be redressed by a court decision in its favor. That is, if the Court ruled in Custodia's favor on Claim I (APA), Claim II (Mandamus) or Claim III (Due Process entitlement) and compelled FRBKC to issue a master account as the remedy, Custodia would then be saved the additional costs it is currently incurring. Accordingly, Custodia has carried its burden of establishing the elements of standing at this stage of the proceedings.

FRBKC relies on the unpublished case of *TNB USA Inc. v. Fed. Rsrv. Bank of New York*, No. 1:18-CV-7978 (ALC), 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020), in support of its argument against Custodia's legal standing. (ECF 51 pp. 50-57.) Similar to this case, the plaintiff's master account application in *TNB* was still pending at the time suit was filed. *TNB*, 2020 WL 1445806, at *6. Dissimilar to this case, the plaintiff there argued the

Federal Reserve Bank had constructively denied the application by reason of the delay.  *Id.*

Significantly, the district court in *TNB* said:

> As discussed above, I do not think that the FRBNY has constructively or formally decided on TNB's application.  Accepting this premise, the current injuries TNB is enduring are those emanating from the FRBNY's *delay* in deciding on the application.  But the FRBNY's delay is not TNB's cause of action.  TNB is suing the FRBNY specifically over its *refusal* to provide TNB an account….
>
> Because the alleged injury is the FRBNY's denial, not delay, the current delay-induced injuries TNB cites are not the relevant injuries for the standing analysis.  Further, because the denial has not occurred, TNB has no qualifying imminent injury and thus this case must be dismissed on standing grounds.

*Id.* at *7.  *TNB* is materially different from this case.  Here, Custodia has specifically alleged a claim for the delay in deciding its application.  Further, as set forth above, Custodia has asserted delay-induced injuries sufficient for constitutional standing.  The Court finds the decision in *TNB* carries little applicability to this case.

Custodia has carried its burden of establishing the elements of Article III standing concerning Claims I through VI, and dismissal of those causes of action on standing grounds is not warranted.

### 8.2   Claims I through VI are constitutionally and prudentially ripe for adjudication.

The Defendants' arguments that this lawsuit is constitutionally unripe largely echo their arguments as to standing.  (*See* ECF 49 pp. 44-45; ECF 51 pp. 49-52.)  FRBKC further argues Custodia's claims are prudentially unripe.  (ECF 51 pp. 52-57.)

The ripeness doctrine originates "both from Article III limitations on judicial power and prudential reasons for refusing to exercise jurisdiction."  *N. Mill St., LLC v. City of*

*Aspen*, 6 F.4th 1216, 1224 (10th Cir. 2021) (quoting *Utah Republican Party v. Cox*, 892 F.3d 1066, 1092 (10th Cir. 2018)).  "The purpose of the ripeness doctrine is to prevent the premature adjudication of abstract claims."  *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (quoting *Tex. Brine Co. v. Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018)).  "Article III and prudential ripeness are both "concerned with whether a case has been brought prematurely, but they protect against prematureness in different ways and for different reasons."  *N. Mill St.*, 6 F.4th at 1224-25 (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003)).  "A claim is not constitutionally ripe for adjudication pursuant to Article III "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1065 (10th Cir. 2012) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Even where a claim is ripe under Article III's requirement of a live case or controversy, the Court may decline to consider the issue under the prudential ripeness doctrine.  This doctrine requires the Court to balance "the fitness of the issue for judicial review" against "the hardship to the parties from withholding review."  *Texas Brine Co., LLC & Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018)

Claims I through VI are ripe for consideration.  Based on Custodia's plausible claim of injury due to unreasonable delay, combined with the over two-year period since Custodia applied for a master account, Custodia's first six causes of action are grounded in events that have already transpired along with injuries that have occurred and continue to occur.  Claims I through VI do not concern contingent future events.  Moreover, their

current fitness for judicial review is weighty (see discussions above) and the hardship to Custodia from withholding review would be severe.  Consequently, the Court concludes Claims I through VI are both constitutionally and prudentially ripe for adjudication at the current time.

### 8.3    Custodia lacks standing to pursue Claims VII and VIII, and these causes of action are not ripe for adjudication.

The result is different concerning Claims VII and VIII.  In these causes of action, Custodia seeks mandamus relief (Claim VII) and declaratory judgment (Claim VIII) "only in the event that Defendants deny Custodia's application for a master account."  (Compl. ¶¶ 130, 139.)  Custodia does not allege such a denial has occurred, even constructively. Thus, Custodia has not suffered an injury of having its master account application denied, and these claims expressly rest upon a future event that may never come to pass. Consequently, Custodia lacks standing to sue the Defendants on Claims VII and VIII, and these claims are not constitutionally ripe for adjudication.  Claims VII and VIII must be dismissed as non-justiciable.

## CONCLUSION AND ORDER

In Claim I, Custodia alleges a plausible claim of unreasonable delay under the APA. In part of Claim III, Custodia alleges a plausible violation of due process based on an alleged property interest in and legal entitlement to a master account.  Claims II and IV complement these causes of action in seeking mandamus and declaratory judgment. Consequently, these claims survive dismissal.

In the remainder of Claim III, Custodia does not allege a plausible separation-of-powers violation based on the nondelegable doctrine, which will be dismissed.  Likewise, Claim V fails to state a plausible violation of due process based on bias and Claim VI fails to state a plausible violation of the Appointments Clause, both of which will be dismissed. Finally, Claims VII and VIII will be dismissed because Custodia does not have standing to pursue them and they are not ripe for adjudication.

**IT IS THEREFORE ORDERED** that Defendants' motions to dismiss (ECF 48, 50) are **GRANTED IN PART AND DENIED IN PART** for the reasons discussed herein. Claims I, II, IV, and part of Claim III (alleging a due process violation) state plausible causes of action for relief.  Claims V, VI, VII, VIII, and the remainder of Claim III (alleging a nondelegable doctrine violation) do not state plausible claims on which relief can be granted and are hereby dismissed.

**DATED**: November 11th, 2022.

Scott W. Skavdahl
United States District Court Judge