Scott E. Ortiz, W.S.B. # 6-4254
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:     (307) 265-0700
Facsimile:     (307) 266-2306
Email:          sortiz@wpdn.net

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-CV-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

**FIRST AMENDED COMPLAINT**

1.     Plaintiff Custodia Bank, Inc. ("Custodia") (f/k/a Avanti) brings this First Amended Complaint against Defendants the Federal Reserve Board of Governors ("Board") and the Federal Reserve Bank of Kansas City ("Kansas City Fed") and alleges as follows.

**<u>INTRODUCTION</u>**

2.     This case involves Defendants' patently unlawful denial of an application critical to Custodia's business—a master account—to which it is unequivocally entitled as an eligible depository institution. Without such an account Custodia cannot directly access the Federal Reserve and cannot offer the same custodial services for crypto-assets that incumbent banks like

BNY Mellon presently provide.  Without a master account, if Custodia is able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty to an intermediary bank.

3.      Custodia is a Wyoming-headquartered and chartered bank led by experienced and respected members of the financial-services industry, specializing in payment services and crypto-asset custody.  For 27 months, Defendants refused to act upon Custodia's application for a master account with the Federal Reserve.  Confronted with discovery requests to the Kansas City Fed and a looming deadline for the Board to produce an administrative record that would have revealed the Board's control over the Kansas City's Fed's decision-making process, Defendants tried to moot the litigation.  On January 27, 2023, in a coordinated maneuver orchestrated by the Board in consultation with the White House and leaked to reporters by Board officials the day before it occurred, the Kansas City Fed reported the denial of Custodia's master account application immediately after the Board denied Custodia's membership application.

4.      Throughout the initial stages of this litigation, the Kansas City Fed and the Board have maintained that the Kansas City Fed had complete discretion to grant or deny Custodia's master account application.  However, Defendants' actions throughout the application process, culminating in the denial of Custodia's master account application, have made clear what Custodia has long known to be true—it is the Board that is pulling the strings.  The Kansas City Fed can exercise no discretion over Custodia's master account application without the approval or, at the very least, the nonobjection of the Board.

5.      Defendants, however, had no discretion to deny Custodia's master account application.  Pursuant to 12 U.S.C. § 248a(c)(2), "[a]ll Federal Reserve bank services ... ***shall*** be available to nonmember depository institutions" (emphasis added).  As a state-chartered bank whose charter expressly permits U.S. dollar deposit-taking and whose business plan includes U.S.

dollar deposit-taking in the ordinary course of business, Custodia is plainly eligible for a master account under the express terms of the governing federal law.  *See* 12 U.S.C. § 226 et seq.  Indeed, it is undisputed that Custodia is an eligible "nonmember depository institution[]," a fact that the Kansas City Fed has acknowledged in its correspondence with Custodia.  It is further undisputed that Custodia must have a master account to access "Federal Reserve bank services."  Because 12 U.S.C. § 248a requires that Custodia be able to access all "Federal Reserve bank services," Defendants had a non-discretionary duty to grant Custodia's master account application and not to discriminate against Custodia in its ability to access all bank services using that account.  Any other outcome eviscerates the dual-banking system that has served our nation since its founding.

6.     Despite this clear statutory mandate, on January 27, 2023, the Kansas City Fed communicated to Custodia that its master account application was denied.  As such, Custodia, an eligible nonmember depository institution, cannot access Federal Reserve Bank Services.  Rather than operating as an independent institution as contemplated in its business plans, Custodia must partner with a correspondent bank if it is to provide any banking services.  This arrangement not only dramatically increases Custodia's costs but it also hinders Custodia's ability to provide the same custodial services for crypto-assets that incumbent banks like BNY Mellon presently offer.  Custodia has devoted years of effort by a number of skilled professionals and substantial resources to preparing its business, including by undergoing intense review and satisfying stringent regulatory requirements imposed by its chartering state of Wyoming.  Such efforts are for naught if Custodia is unable to access and use the master account to which it is statutorily entitled.

7.     The denial of Custodia's master account application results in substantial, ongoing injury to Custodia.  The immediate injury is that Custodia is forced to defer its solo entry into the financial services market in favor of a decidedly second-best and far more expensive alternative:

launching with a correspondent bank that has a master account.  This makeshift solution is much costlier, makes Custodia dependent on the whims of a third-party bank, and introduces counterparty credit risk and settlement risk that would have been avoided if Defendants had granted Custodia's master account application.  It also eliminates much of the competitive benefit that Custodia would enjoy from using the charter that Wyoming granted it, thus benefiting existing and entrenched competitors and ignoring Wyoming's sovereignty as a state that has clear statutory authority to charter depository institutions.

8.      Wyoming is a nationwide leader in developing charters tailored for banking in the crypto-asset industry.  In developing the Special Purpose Depository Institution ("SPDI") charter under which Custodia operates, Wyoming worked hand-in-glove with the Kansas City Fed in order to ensure that all SPDI-chartered banks would be eligible to access the Federal Reserve through master accounts.   Despite these efforts, Defendants' treatment of Custodia's application throughout the process, including the rationale for the ultimate denial, makes clear that Defendants have no intention of allowing any SPDI-chartered bank to access the Federal Reserve system.  Ultimately Defendants' refusal to recognize the SPDI charter works not only to the detriment of Custodia but also to the detriment of Wyoming and its autonomy under a centuries-old, dual-banking system to make the decision about which financial institutions to charter.  Defendants' refusal also contravenes federal statutory requirements prohibiting the Board from discriminating against such nonmember, state-chartered institutions.  12 U.S.C. § 248a.

9.      Defendants have a nondiscretionary duty to grant Custodia's application for a master account.  The Kansas City Fed, for its part, received Custodia's business plan in May 2020, months before Custodia submitted its master account application in October 2020.  In early 2021,

a representative of the Kansas City Fed moreover informed Custodia there were "no showstoppers" with Custodia's application.

10.     Upon information and belief, the Kansas City Fed's consideration and impending approval of Custodia's application was derailed when, in spring 2021, the Board asserted control over the decision-making process.  The Board then began a concentrated and coordinated effort to prevent Custodia and other de novo banks with any ties to crypto-assets from accessing the Federal Reserve through master accounts.

11.     Notably, the Board's alleged concerns about the threat that crypto-assets pose to financial systems does not stretch to banks that already possess master accounts.  Incumbent banks, such as BNY Mellon, are already providing custodial services for crypto-assets with the consent of the Federal Reserve.  The Board's permission for established institutions, such as BNY Mellon, a Global Systematically Important Bank (12 C.F.R. § 217.402), to engage with crypto-assets belies Defendants' assertion that it is too risky for Custodia, a state-chartered Special Purpose Depository Institution, to do the same thing.  The Board's anti-competitive and hypocritical position benefits entrenched interests at the expense of Custodia, Wyoming, and Special Purpose Depository Institutions more generally.

12.     While the facts of this case may appear complex, the core issue is simple: Defendants are statutorily required to grant Custodia's master account application and failed to do so.  The governing statutes require the Court to enforce Defendants' non-discretionary duty to grant Custodia's master account application.

13.     Custodia has exhausted all options short of litigation to obtain the master account to which it is legally entitled.  Rather than submitting to full federal regulation and supervision as it intended to do, Custodia is now having to litigate against its would-be regulators to enforce the

governing statutes which entitle Custodia to the access and use of a master account.  Such a result benefits no one, least of all Custodia which would far rather use its knowledge and experience to provide safe and secure custodial services for crypto-assets.

## PARTIES

14.     Plaintiff Custodia is a Wyoming bank.  It was granted a Special Purpose Depository Institution bank charter by the Wyoming State Banking Board on October 28, 2020.  It has its primary place of business at 2120 Carey Avenue, Suite 300, Cheyenne, WY 82001.  Custodia is currently regulated by the Wyoming Division of Banking.   Custodia's founders include experienced executives, such as Caitlin Long (CEO), a 22-year Wall Street veteran who was a managing director and head of Morgan Stanley's pension solutions business until 2016 and was appointed by then-Governor Mead to serve on the Wyoming Blockchain Task Force in 2018-2019.

15.     Defendant Federal Reserve Board of Governors is the main governing body of the Federal Reserve System.  The Board is charged with overseeing the 12 regional Federal Reserve Banks.   It has its principal place of business at Constitution Ave N.W. & 20th St. N.W., Washington, DC 20551.  The Board is an agency of the United States, and comprises seven members, or "governors," who are nominated by the President and confirmed by the Senate.

16.     Defendant Federal Reserve Bank of Kansas City is one of 12 regional Federal Reserve Banks that, along with the Board, make up the United States Federal Reserve System. The Kansas City Fed serves at least portions of seven states, including the entirety of Wyoming. In this role, it operates pursuant to statutory and regulatory authority delegated to it by the Board. The Kansas City Fed has its principal place of business at 1 Memorial Drive, Kansas City, MO 64108.  The Kansas City Fed supervises and regulates bank holding companies and Federal Reserve System member banks in its district, acts on applications within its authority, and enforces compliance with federal banking laws against relevant banking institutions in its district.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."  Additionally, 28 U.S.C. § 1331 gives this Court jurisdiction over all civil actions "arising under the Constitution, laws or treaties of the United States."

18.     Venue is proper in this District under 28 U.S.C. §1391(b)(1) because both the Board and the Kansas City Fed reside in this District for purposes of 28 U.S.C. §1391(c)(2).  The Board and the Kansas City Fed are entities with the capacity to be sued.  They are subject to this Court's personal jurisdiction because they have purposefully availed themselves of the privileges of conducting business in this District, the claims herein arose in this District, many material witnesses are located in this District, and Defendants are subject to this Court's jurisdiction under Wyo. Stat. Ann. § 5-1-17, Wyoming's Long-Arm Statute.  Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this matter occurred in this District.  In addition, venue is proper under 28 U.S.C. § 1391(e) because Custodia resides in this district and a substantial part of the events or omissions giving rise to its claims occurred here.

19.     An actual controversy exists between the parties concerning the legality of Defendants' denial of Custodia's master account application.  That controversy is justiciable: Custodia already is suffering injury on account of Defendants' denial of Custodia's master account application.

20.     Custodia requests expedited discovery and a speedy hearing on its claims in this matter as continued delay will only further the injuries of which Custodia complains.  Custodia waited 27 months for a decision on its master account application.  On June 7, 2022, Custodia

brought claims against Defendants for unreasonable delay in adjudicating its master account. After over 6 months of litigation, and on the eve of having to produce discovery that would have revealed the extent of the Board's control over the Kansas City Fed's decision-making process, Defendants denied Custodia's membership and master account applications, thereby crystalizing the ultimate question:  whether Defendants have discretion to deny a master account for an eligible depository institution.  Allowing the Defendants to draw this case out longer simply extends the injury that the Defendants are knowingly and unlawfully inflicting on Custodia—depriving Custodia of the use of a master account.

## FACTUAL ALLEGATIONS

21.     On October 29, 2020, Custodia, an eligible state-chartered bank, submitted an application for a Federal Reserve master account.  As required by Federal Reserve System regulations, Custodia submitted its application to the Federal Reserve Bank responsible for its district, the Kansas City Fed.  Processing a master account application ordinarily takes "5 – 7 days," as stated on the application form at the time.  Over two years later, on January 27, 2023, Defendants denied Custodia's application in a decision orchestrated by the Board.  The denial of Custodia's master account application is contrary to law as Defendants had no discretion to deny the application.

### A.     History of Dual-Chartering and State-Level Banking Regulation

22.     The United States operates a dual-banking system, which allows banks to be chartered by either the state or federal government.  At the founding of the United States, almost all banks were state chartered.

23.     It was not until the 1863 passage of the National Bank Act that nationally chartered banks started to proliferate.  12 U.S.C. § 38 *et seq.*

24.     In 1913, Congress established the federal banking system as we know it today with the passage of the Federal Reserve Act.  12 U.S.C. § 226 *et seq*.

25.     The dual-chartering system's division of regulatory responsibility among state and federal authorities is a hallmark of federalism.  It allows financial institutions to choose among various options to reflect their intended business plans, factoring in geographic concerns and operational concerns such as business models, accessibility of regulators, regulatory philosophies, and costs.  The availability of state charters allows for innovation in the financial services marketplace, permitting states to develop new ideas and competitors subject, of course, to applicable review by federal authorities.  The continued existence of state bank charters allows states to be responsive to the financial needs of their citizens and to innovate and support financial institutions that meet the needs of their citizens as well as the needs of the state as a whole.

26.     Under the current dual-chartering system, banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority.  National banks are chartered and primarily regulated by the OCC, while state banks are chartered and principally overseen by the state's banking regulatory agency.

27.     Once an institution is chartered, the next question is whether it will be a member of the Federal Reserve System.  Nationally chartered banks must become members of the Federal Reserve System. 12 U.S.C. § 222.  Within the Federal Reserve System, the Federal Reserve Board regulates, *inter alia*, bank holding companies.  State-chartered banks may choose to become members of the Federal Reserve System, but, unlike nationally chartered banks, do not have to do so.  Those state banks that join the Federal Reserve System are known as "state member banks." Those that do not are known as "nonmember banks."  As a member of the Federal Reserve System, state member banks are regulated by both the Federal Reserve and the relevant state banking

agency, whereas state-chartered nonmember banks are regulated by the state banking agency and may also be regulated by the Federal Deposit Insurance Corporation ("FDIC").

28.     National banks are generally required to submit an application for and obtain FDIC insurance.  Most states require their state-chartered banking institutions engaged in taking deposits to be FDIC-insured.  Not every state-chartered bank, though, is required to be insured by the FDIC.  Uninsured state bank charters exist in several states and U.S. territories, such as Wyoming, Connecticut, and Puerto Rico.  Likewise, some states, such as Massachusetts, Illinois, and Colorado, permit depository trust charters, which are eligible for Federal Reserve master accounts and are also uninsured.

### B.     The Monetary Control Act of 1980

29.     In 1980, Congress enacted the Depository Institutions Deregulation and Monetary Control Act ("MCA") which mandates that nonmember state-chartered deposit-taking institutions, like Custodia, be allowed to access Federal Reserve System bank services through master accounts—regardless of whether such institutions elect to become Federal Reserve member banks, and regardless of whether they are FDIC-insured.  Under the statute, the Federal Reserve cannot discriminate against state-chartered depository banks in the provision of Federal Reserve bank services.  *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

30.     In keeping with the long history of dual-chartering, the MCA leveled the playing field as between member banks and state non-member banks.  In furtherance of that mission, the MCA mandated that "[a]ll Federal Reserve bank services covered by the fee schedule ***shall be available to nonmember depository institutions*** and such services shall be priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2) (emphasis added).  The services subject to the fee schedule which must be available to nonmember depository institutions include

"check clearing and collection services," "currency and coin services," "wire transfer services," and many other services which all require a master account.

31.     Legislative history makes clear that, at the time the MCA was passed, Congress intended that the MCA require the Federal Reserve to grant master accounts to all eligible nonmember institutions. The final conference committee report acknowledges that the MCA "includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks."[1] Such services can be accessed only with a master account.

32.     Debate on the House floor over the bill similarly recognized that the MCA required the Board "to publish a proposed schedule of fees for services which are now provided at no cost to members but which, under the new plan, *will be provided to all depository institutions* for a fee, regardless of membership."[2] Again, such services are available to nonmember depository institutions only through a master account.

33.     At the time the MCA passed, the Federal Reserve likewise recognized the historic import of the statute with the Chairman of the Board noting that Titles I and II of the MCA "will undoubtably take their place among the *most important pieces of financial legislation enacted in this century*."[3] The Board subsequently acknowledged that the relevant statutory language "expanded the Federal Reserve's role by *requiring the Federal Reserve to provide its services to*

---

[1] H. Rept. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report, 96th Cong., 2d Sess., at *71 (March 21, 1980) (emphasis added).

[2] 125 Cong. Rec. 6314 (July 20, 1979) (emphasis added).

[3] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (emphasis added).

*all depository institutions on an equitable basis*."[4]  And, the Board's own website continues to advise that "Federal Reserve payment services *are available to all depository institutions*."[5] Indeed, Custodia is not aware of any eligible depository institution for which Defendants have denied a master account application.

34.     The only Judge to have directly addressed the issue of whether the MCA mandates that all eligible depository institutions be granted master accounts concluded that it did.  In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017), Tenth Circuit Judge Robert Bacharach explained that state-chartered depository institutions like Custodia are statutorily entitled to master accounts because they "*shall*" be able to access banking services. 861 F.3d at 1067-74.  Other courts have likewise observed that the MCA made "check clearing services … available to all banks."[6]

35.     Congress, the Federal Reserve itself, and the courts have all recognized that the MCA expanded Federal Reserve bank services to all depository institutions, and those services can be accessed only through a master account.  Any contrary position now taken by Defendants

---

[4] *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Reserve Sys. (1984), https://tinyurl.com/2enw3reu (emphasis added).

[5] *Policies: The Federal Reserve in the Payments System*, Bd. of Governors of the Fed. Rsrv. Sys., available at http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (emphasis added); Fed. Rsrv. Bd., *Policies: Principles for the Pricing of the Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb ("Services covered by the fee schedule *are available to all depository institutions*." (emphasis added)); Fed. Rsrv. Bd., *Federal Reserve's Key Policies for the Provision of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) (noting that the Monetary Control Act gives *"all depository institutions access to the Federal Reserve's payment services"* (emphasis added)).

[6] *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *See also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983) (explaining that under the MCA, "check clearing formerly provided to member banks only *will be made available to all banks*, regardless of whether or not they are members" (emphasis added)).

contravenes statutory mandates and decades of prior interpretations and positions taken by the Board.

### C.    The Development of SPDI Banks in Wyoming

36.    In 2019, Wyoming legislated a new type of state bank charter, the Special Purpose Depository Institution ("SPDI").  Wyo. Stat. § 13-12-101, *et seq*.  This legislation passed the Wyoming legislature with a veto-proof, bi-partisan majority.  SPDI banks are regulated by the Wyoming Division of Banking.  Unlike traditional banks, SPDIs are generally prohibited from making loans with customer deposits of fiat currency, and further must continually back all customer deposits with 100% cash on hand or high-quality liquid assets.  Like traditional banks, SPDIs must hold capital on top of the assets that back customer deposits.

37.    SPDI banks do not lend money; instead, they specialize in taking deposits, facilitating payments for customers, and other incidental services.  SPDI banks were designed to provide a bridge connecting crypto-asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars).  SPDI banks were also designed to provide custody services for crypto-assets via their trust departments, analogous to the custody services provided by the trust departments of custody banks for the trillions in securities held by retirement plans and mutual funds.  SPDI banks allow, for example, a customer to use his or her Bitcoin held in the trust department of an SPDI bank to make a direct transfer, a purchase, or an investment, rather than having to first convert that Bitcoin into U.S. dollars.

38.    Having a master account means that SPDI banks do not have to use an intermediary bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions.  Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services that can be programmed using software.  It does not mean that SPDI banks hold crypto-assets within their

master accounts.  Custodia would hold no crypto-assets on its balance sheet or within its master account.

39.     The sponsors of Wyoming's SPDI regime recognized that access to Federal Reserve banking services through master accounts would be crucial for the functioning of SPDI banks.  The SPDI charter accordingly was developed to satisfy all requirements of the Federal Reserve Act for depository institutions.  Under the Federal Reserve Act, Federal Reserve banking services must be accessible to "nonmember deposit institutions . . . [and] be priced at the same fee schedule applicable to member banks."  So, to be eligible for a master account, an applicant must be either a member bank or a depository institution, defined as either: (1) a bank insured by the FDIC, or (2) a bank eligible to be insured by the FDIC.  12 U.S.C. §461(b)(1)(A)(i).

40.     SPDI-chartered banks meet the latter category because, as a state-chartered bank authorized and expected to take deposits, they are eligible to be insured by the FDIC.  The Kansas City Fed recognizes the eligibility of SPDI banks for master accounts and has specifically confirmed that Custodia is an eligible depository institution.  And, because all eligible depository institutions "shall" be permitted to access the Federal Reserve bank services, SPDI-chartered banks are entitled to master accounts.  12 U.S.C. § 248a(c)(2).

41.     The SPDI charter's compliance with Federal Reserve regulations was no accident. In developing the SPDI charter, Wyoming legislators coordinated with the federal government, holding more than 100 meetings with the Board and the Kansas City Fed and taking their views into account in crafting and revising proposed legislation.[7]  The resulting SPDI charter offers the

---

[7] In a *Wall Street Journal* Op-Ed, U.S. Senator Cynthia Lummis provided background information on the steps that Wyoming took in passing its SPDI bank charter legislation.  Despite mutual efforts in passing this legislation, the Federal Reserve has to this point refused to grant SPDI banks access to the Federal Reserve System.  Cynthia Lummis, "The Fed Battles Wyoming on Cryptocurrency," *The Wall Street Journal* (Nov. 30, 2021), https://tinyurl.com/5xkcjpj5.

prospect of safe, efficient, and protected access to the Federal Reserve banking system for the crypto-asset industry.  As such, Wyoming, and by extension Custodia, reasonably believed that their charter would be honored by the Federal Reserve.

42.    Nevertheless, in an abundance of caution, Wyoming initially included in the SPDI charter legislation a provision which would have expressly allowed the Wyoming Attorney General to sue the Federal Reserve if SPDI-chartered banks were denied master accounts.  This provision was removed from the legislation after representatives of the Kansas City Fed assured Wyoming that the SPDI charter complied with Federal Reserve regulations making such a provision unnecessary.

### D.    Custodia's Application and Board Intervention

43.    On October 29, 2020, Custodia filed its application to open and maintain a master account with the Kansas City Fed.  Along with its application, Custodia was required by the Federal Reserve to submit a one-page Master Account Agreement.  The standard form agreement, available from the Federal Reserve, stated that "[p]rocessing may take 5 – 7 business days.  Please contact the Federal Reserve Bank to confirm the date that the master account will be established."  Compl. Ex. 1.

44.    At the time the application was filed, Custodia's application was complete.  Neither the Kansas City Fed nor the Board has informed Custodia of the need for additional information necessary to complete the application.  In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that there were "no showstoppers" with its master account application.  Yet, upon information and belief, the Kansas City Fed's impending approval of Custodia's application was stalled when, a few months later in spring 2021, the Board asserted its control over the decision-making process.  This is so even though the Kansas

15

City Fed confirmed, including via a January 2022 letter, that Custodia met the legal eligibility requirements for receiving a master account.

45.     While waiting to have its application considered, Custodia was in regular contact with both the Kansas City Fed and the Board through letters, calls, emails, and remote and in-person meetings.  Custodia repeatedly offered to provide additional information about its business plan specifically, and SPDI-chartered banks more generally, to spur consideration of its application.

46.     The Board exercises ultimate control over the decision to grant or deny a master account, and exercised that power to assert control over the decision-making process for Custodia's application in particular.

47.     In a further attempt to demonstrate its commitment to safety and soundness, Custodia submitted an application to become a member bank of the Federal Reserve system on August 5, 2021.  As a member bank, Custodia would be regulated and examined directly by the Federal Reserve Board in addition to the Wyoming Division of Banking.  It is not necessary to be a member bank in order to receive a master account, and the Federal Reserve cannot discriminate against nonmember banks in granting access to Federal Reserve Bank services.  12 U.S.C. § 248a(c)(2).  Custodia, however, took this additional step to demonstrate to the Kansas City Fed and the Board its willingness to submit to full federal supervision and accountability.

48.     In a March 2, 2022 meeting, nearly 17 months after the submission of Custodia's master account application, the Kansas City Fed informed Custodia that it had not started processing Custodia's master account application.

49.     After learning that the Kansas City Fed had not started processing its master account application, Custodia sent a letter to Esther George, the President and Chief Executive

Officer of the Kansas City Fed.  In that March 3, 2022 letter, Custodia described the steps that it had taken to obtain approval and urged Ms. George to consider Custodia's application.

50.     Ms. George agreed to meet in person with Custodia on March 24, 2022.  Prior to that meeting, Custodia again wrote Ms. George a letter offering specific commitments Custodia would implement if granted a master account, including holding $1.08 in cash in its master account for every $1.00 of customer U.S. dollar deposits in its first three years of operation, providing monthly financial statements, and agreeing to certain restrictions.  These commitments are not necessary for the grant of a master account, but Custodia offered them in an effort to encourage the Defendants to adjudicate Custodia's master account application.  This is because Custodia's business model is safe and sound.  Custodia plans to hold all customer deposits of U.S. dollars in cash in a Federal Reserve master account and it plans to hold no crypto-assets for its own account. This means that Custodia will not be exposed to the volatility of crypto-asset prices because it will hold all crypto-assets in bailment on behalf of a customer in its trust department.  In other words, granting Custodia a master account would not expose the Federal Reserve System to any crypto-asset risk, as Custodia would only handle U.S. dollars in its master account and Custodia's trust customers would retain all crypto-asset risks.

51.     After the meeting, Tara Humston, the head of Supervision and Risk Management at the Kansas City Fed, sent a letter re-confirming that "Custodia is legally eligible for a master account."  Unfortunately, the Kansas City Fed refused to provide any sort of timeline for a decision on Custodia's master account application.  The Kansas City Fed's refusal or inability to provide any sort of timeline reflected the fact that the Board had already asserted control over the decision-making process governing Custodia's master account application.

**E.      Coordination of Efforts to Deny Custodia's Master Account Application**

52.      By trying to moot Custodia's original Complaint on the eve of discovery, Defendants are trying to hide the actual process for reviewing master account applications in a black box.   In various meetings and communications, the Kansas City Fed and the Board alternately cited each other as the reason that the adjudication of Custodia's application was delayed.   However, throughout the lengthy evaluation of Custodia's master account application and eventual denial, it has become increasingly clear that the Board masterminded the entire process.

**1.      The Board's Guidelines for Evaluating Account and Services Requests**

53.      The Kansas City Fed expressly cited the Board's development of guidelines for evaluating master account applications as a reason for not being able to decide Custodia's master account application in a timely manner.   Beginning in May 11, 2021, almost 7 months after Custodia filed its application for a master account, the Board issued proposed guidelines for evaluating master account applications to establish a "tiered-review framework to provide additional clarity on the level of due diligence and scrutiny to be applied to requests for Reserve Bank accounts and services."   *See* Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021).   More recently, in early March 2022, the Board issued supplemental proposed guidelines for notice and comment.   *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022).

54.      However, it was not until August 15, 2022, one day before Defendants were ordered to file motions to dismiss in this litigation, that the Board issued its final Guidelines.   Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51,099 (Aug. 15, 2022).   The eyebrow-raising timing of the Board's finalization of its Guidelines is

evidence that the Board had taken control over the consideration of Custodia's master account application and was seeding the ground for its eventual, unlawful denial.

55.     The Guidelines themselves further point to the Board's ultimate control over the master account process more generally.  The Board prescribed a tiered framework for evaluating risks of different institutions accessing master accounts, and stated that state-chartered, non-member institutions without FDIC insurance[8]—namely, banks like Custodia—"will generally receive the strictest level of review."  87 Fed. Reg. at 51,110.  The Board promulgated these "guidelines under its general supervision authority over the operations of the Reserve Banks," and identified "principles to be used by Federal Reserve Banks … in evaluating requests for master accounts."  *Id*. at 51,106.  The Board "expect[s] that Reserve Banks [will] engage in consultation with … the Board" to apply the Guidelines, and will work "in consultation with the Board, to expeditiously develop an implementation plan."  *Id*. at 51,102.

56.     While purporting to leave the ultimate decision on master accounts with the Federal Reserve Banks, the Guidelines make clear that the Board both manages and supervises the master account application adjudication process.  Custodia is not aware of a Federal Reserve bank ever issuing a decision on a master account application contrary to the Board's "consultation."

### 2.     Joint Statement on Crypto-Asset Risks to Banking Organizations

57.     On January 3, 2023, the Board in conjunction with the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency published a joint statement on the

---

[8] Custodia submitted an application for FDIC insurance in November 2021 in a good-faith attempt to break the logjam, but learned it was not available for de novo banks that engage in crypto-asset activities.  *See* Custodia, *Avanti Statement on its Application to Become an FDIC-Insured Bank* (Nov. 5, 2021), https://custodiabank.com/press/avanti-statement-on-its-application-to-become-an-fdic-insured-bank/.

risks of crypto-assets in the United States banking system.[9]  The statement acknowledged that the banking agencies are "carefully reviewing ***any proposals*** from banking organizations to engage in activities that involve crypto-assets."[10]

58.     As with the Guidelines, this statement was released by the Board and not the Federal Reserve Banks.  The statement shows that the Board has taken an active role in "reviewing any proposals" from banks intending to engage with crypto-assets.  Such applications undoubtably included Custodia's application for a master account.  The statement goes on to say that "the agencies continue to take a careful and cautious approach related to current or proposed crypto-asset-related activities."[11]  The Board thus emphasized its own care and caution in evaluating any proposals relating to crypto-assets.  Notably absent from the statement is mention of the Federal Reserve banks, let alone an acknowledgment that the Board's review would supposedly play second fiddle to the Federal Reserve banks' independent evaluation of those proposals—the fiction that Defendants have authored throughout this litigation.

59.     In the statement, the Board resorts to fear-mongering, claiming that "issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound

---

[9] Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, *Joint Statement on Crypto-Asset Risks to Banking Organizations* (Jan. 3, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230103a1.pdf.

[10] *Id.* (emphasis added)

[11] *Id.*

banking practices."[12]  Such statements reek of hypocrisy given that the Board and other Federal Reserve banks already permit federally-regulated banks like BNY Mellon to transfer crypto-assets.

60.     For example, on October 11, 2022, while Custodia's membership and master account applications were still pending, BNY Mellon—the oldest bank in the nation—announced that it was providing its customers with custodial services for crypto-assets.[13]  All that was required for BNY Mellon to initiate such activities was for the bank simply to "notify its lead supervisory point of contact at the Federal Reserve."[14]  On information and belief, neither the Board nor the Reserve Banks have prohibited or restricted BNY Mellon's crypto-asset services.  If such services are truly harmful to the United States banking systems, the participation of an institution as important and entrenched as BNY Mellon—a Global Systematically Important Bank—would presumably pose a larger threat than a Wyoming-based de novo banking institution like Custodia.

61.     Instead of truly viewing crypto-assets as an existential threat to the Federal Reserve, it appears that Defendants are attempting to restrict activities involving crypto-assets to federally-regulated banks at the expense of state-chartered institutions, like Custodia.  Such discrimination against state-chartered institutions demeans the state banking regulators, like Wyoming's Division of Banking, which are fully prepared to regulate such institutions and ensure compliance with all banking laws.  Such discrimination against state-chartered institutions is prohibited by statute.  *See* 12 U.S.C. § 248a.

---

[12] *Id.*

[13] BNY Mellon, *BNY Mellon Launches New Digital Asset Custody Platform* (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html.

[14] Federal Reserve Board of Governors, *Engagement in Crypto-Asset-Related Activities by Fed. Rsrv.-Supervised Banking Orgs* (Aug. 16, 2022), https://www.federalreserve.gov/supervisionreg/srletters/SR2206.htm.

### 3.     Denial of Custodia's Master Account Application

62.     The Kanas City Fed communicated to Custodia that its master account application was denied on January 27, 2023.  The timing and circumstances of the denial reinforce that the denial was part of a larger effort coordinated by the Board (in conjunction with the White House) in response to its decision that de novo banks should not be permitted to engage with crypto-assets.

63.     On January 23, 2023, the Board staff held an impromptu meeting with Custodia. Custodia was not informed of the purpose of the meeting.  During the meeting, the Board staff told Custodia that they would recommend that the Board vote to deny Custodia's application for membership in the Federal Reserve.  The Board staff gave Custodia 48 hours to decide whether it would withdraw its application or face the likely denial, and denied a request for a one-week extension.

64.     Banks are ordinarily given at least one opportunity to address perceived shortcomings in an application; moreover, banks typically get a week or longer to consider whether to withdraw an application once the staff conveys their intention to recommend denial.  Custodia received neither.  Staff refused to consider additional, material information that previously had been invited by Board representatives, and offered only an additional 24 hours because, unbeknownst to Custodia at the time, the Board was orchestrating denial of Custodia's membership and master account applications behind the scenes and, prior to January 23, 2023, had already arranged to have individual Governors of the Federal Reserve Board vote to deny Custodia's applications.  Anything more than 72 hours for Custodia to decide whether to rescind its membership application would have jeopardized the plan that the Board had orchestrated with the Kansas City Fed and the White House.

65.     Custodia's Board of Directors was jammed into making a decision on January 26, 2023 whether to withdraw its membership application by the short 72-hour turnaround time and

by the Board's press leaks about Custodia, which caused rampant rumors that the outcome of Custodia's applications was already a foregone conclusion.

66.     On January 26, 2023, Custodia responded to the Board staff by letter and made clear that it would not withdraw its membership application but offered to submit an amended application if necessary for the Board to finally review the updated application information it had already submitted to the Board, some of which had been pending for more than six months. Custodia's letter detailed several unreasonable aspects concerning the Federal Reserve's consideration of its membership application.  Such irregularities included conducting a full examination before Custodia was even operational (in violation of the Federal Reserve's own guidance), refusing to review Custodia's updated documentation and information, expanding the scope of Custodia's examination midway through to include activities and products that would not be operational at launch, providing only one opportunity for Custodia to pass its examination while other applicants are afforded at least two, subjecting Custodia to a higher standard of review applicable to large banks without notifying Custodia in advance, and refusing to review the remediation plan submitted by Custodia that the Board itself had requested from Custodia.

67.     Less than 24 hours after Custodia sent its letter refusing to withdraw its membership application but offering to resubmit an amended version, the Board voted to deny Custodia's membership application.  The Board's decision was accompanied by an unusually lengthy order—making clear that the Board had finalized its decision long before Custodia's letter refusing to withdraw its application.

68.     At approximately the same time as the Board made public its decision on Custodia's membership application, the White House released a statement on the risks of crypto-assets.[15]  The White House statement noted that "agencies are using their authorities to ramp up enforcement where appropriate and issue new guidance when needed."[16]  It is no coincidence that the Board made public its denial of Custodia's membership application at approximately the same time that the White House released a statement on crypto-assets.  The Board had already decided that de novo banks would not be permitted to engage with crypto assets within the Federal Reserve System, and other offices and agencies were doing their part to support the Board's decision.

69.     The *coup de gracé* came just a few hours later, when the Kansas City Fed communicated to Custodia that its master account application was denied.  The denial of Custodia's master account application was done at the direction of the Board.  The language in the Kansas City Fed's denial echoed the Board's denial of Custodia's membership application and the White House's statement on crypto-assets.[17]

70.     The decision on Custodia's master account application occurred just two weeks before this Court had ordered the Board to produce the administrative record on its consideration of Custodia's master account application, and while Custodia's discovery requests to the Kansas City Fed were outstanding.  The timing of the denial in relation to these deadlines suggests it was

---

[15] The White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023),https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/.

[16] *Id*.

[17] The Kansas City Fed acted within hours of the Board's denial, ignoring the fact that Custodia has the right to request reconsideration of the Board's action within 15 days, in accordance with 12 CFR § 262.3(k), and exercised that right on February 13, 2023, submitting a revised business plan that addresses issues raised in the denial.  Again, the decisions were foregone conclusions.

designed to defer any visibility into, or judicial review of, the Board's outsized role in adjudicating Custodia's master account application.

### F.    Statutory Basis for Denial of Master Account Applications

71.    Defendants have relied on 12 U.S.C. § 342 to argue that Reserve Banks have the statutory authority to make discretionary decisions on whether to open master accounts.  This provision, however, does not mention master accounts.  Rather, it specifies, as relevant here, that Reserve Banks "may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items."  12 U.S.C. § 342. That Reserve Banks have discretion regarding the form of deposit is irrelevant to whether Defendants have discretion to deny master account applications.  *See Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923) (noting that the statute does not "impose[] upon reserve banks any obligation to *receive checks for collection*" (emphasis added)).  The statute, moreover, presupposes that various entities already have master accounts, which are prerequisites to receive deposits.

72.    In addition to 12 U.S.C. § 342 being inapplicable on its face, the circumstances surrounding Custodia's master account application and denial make clear that the Kansas City Fed did not have discretion to deny Custodia's master account application because, in practice, the decision was not the Kansas City Fed's to make.  Nearly three months after Custodia filed its master account application, Kansas City Fed's head of Supervision and Risk Management informed Custodia that its application had "no showstoppers."  Custodia's master account application was soon thereafter derailed when the Board took control over the application.  The Board has taken the position that de novo banks should not be permitted to engage with crypto-assets—discrediting Wyoming's efforts in creating the SPDI charter.  After the Board decided that

Custodia and banks like it should be excluded from the Federal Reserve system, the fate of Custodia's master account application was sealed regardless of which entity was ultimately charged with communicating the decision.

73.     Defendants' representations that 12 U.S.C. § 342 gives Reserve Banks discretionary authority over master accounts stands in conflict not only with the factual reality but also with the MCA.   Congress empowered the Board with authority over master account applications for nonmember depository institutions, like Custodia, by directing the Board to ensure that "[a]ll Federal Reserve bank services covered by the fee schedule ***shall be available to nonmember depository institutions***." 12 U.S.C. § 248a(c)(2) (emphasis added).  In order for these bank services to be available to nonmember depository institutions, as they must be, those institutions must have a master account.

74.     The Board used its statutory authority over master accounts unlawfully to coordinate the denial of Custodia's master account application.  And, this is not the first time the Board has asserted its control over Reserve Banks to commandeer a master account application. By way of example, the New York Federal Reserve Bank consulted with the Board on a master account application for another applicant, ultimately delaying action so that the Board could weigh its "concerns" over that applicant's business model.  *See* Mot. to Dismiss 7, 14, *TNB USA, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-cv-7978 (ALC) (S.D.N.Y. Mar. 8, 2019), ECF No. 21.  Thus, to the extent the Board disclaims authority to dictate master account decisions here, that position would break with past practice and is inconsistent with its actions over Custodia's master account application—namely, its assertion of control over the decision-making process related to Custodia's master account application in spring 2021.

75.     In short, the Board coordinated the denial of Custodia's master account application. Such coordination makes clear that the decision on Custodia's master account never truly rested with the Kansas City Fed and there was never any meaningful discretion to be exercised.

76.     The Board's coordination of the denial of Custodia's master account application was unlawful because the MCA provides that "[a]ll Federal reserve bank services ... **shall** be available to nonmember depository institutions."  12 U.S.C. § 248a(c)(2) (emphasis added). Without a master account, Custodia, a nonmember depository institution, cannot access Federal Reserve Services.  Such deprivation prevents Custodia from operating as designed and prevents Wyoming from realizing the promise of the SPDI charter.

### CLAIM FOR RELIEF I
### Violation of APA, 5 U.S.C. § 706(2)
### Claim for Unlawful Denial of Master Account Application Against the Board

77.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

78.     Under Section 706 of the APA, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

79.     The Board is an agency for purposes of the APA, which defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1).  This APA definition of agency has been interpreted to

include "any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971).

80.     There is no dispute that the Board is an agency of the United States government for purposes of the APA.  On its public website, the Board states that "[t]he Administrative Procedure Act sets out the requirements for federal agencies, ***including the Federal Reserve Board***, to follow when issuing proposed and final regulations."[18]  The Board has substantial independent authority in the fulfillment of its specific duties, which include supervising and regulating financial institutions, fostering payment systems, and engaging in the rulemaking necessary to carry out its responsibility to set the monetary policy of the United States.  In fulfilling its duties, the Board acts with the imprimatur of the United States government.

81.     As a United States government agency, the Board has a non-discretionary duty, under the MCA, to make available to nonmember depository institutions Federal Reserve bank services through master accounts.  12 U.S.C. § 248a(c)(2).  While the Kansas City Fed may be responsible for communicating the decision on Custodia's master account, both agencies work in concert to consider and process applications and decisions are subject to the Board's supervision. At a minimum, it is incumbent upon the Board to exercise its supervisory authority so as to ensure that all master account applications are fairly adjudicated and that eligible nonmember depository institutions can access Federal Reserve services.

82.     Custodia completed its master account application on October 29, 2020. Defendants acknowledged that Custodia is eligible to maintain a master account and that there were "no showstoppers" with its master account application.  Despite recognizing that Custodia

---

[18] Fed. Rsrv. Bd., *What Specific Steps Does the Board Take to Issue a Regulation?* (June 29, 2018), https://tinyurl.com/3ffs8xuk (emphasis added).

properly filed its master account and that it is an eligible nonmember depository institution, the Board orchestrated the denial of Custodia's master account application.

83.     The Board's action orchestrating the denial of Custodia's master account application is patently unlawful.  Under 12 U.S.C. § 248a(c)(2), "all Federal Reserve bank services ... *shall* be available to nonmember depository institutions" (emphasis added).  Such services are available to nonmember depository institutions like Custodia only through a master account.  As such, the Board acted unlawfully by orchestrating the denial of Custodia's master account application and depriving Custodia of access to Federal Reserve bank services.

84.     In light of these facts, and the other facts alleged herein, the Board's "agency action" in denying Custodia's master account application is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

85.     Custodia is therefore entitled under the APA to an order compelling the Board to rescind the denial of Custodia's master account application and to grant Custodia's master account application.

**CLAIM FOR RELIEF II**
**Relief Under the Mandamus Act, 28 U.S.C. § 1361**
**Claim for Mandamus Against All Defendants**

86.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

87.     Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  In this action, Custodia is requesting that the Court issue a writ of mandamus to the Board and the Kansas City Fed directing that they

promptly rescind the denial of Custodia's master account application and instead grant the application so that Custodia can access Federal Reserve bank services.

88.     This Court has jurisdiction over Custodia's action under the Mandamus Act.

89.     Based on facts already alleged, *supra* ¶¶ 79-80, the Board is a United States agency subject to the mandamus power of this Court.  And, regardless of the Kansas City Fed's agency status, the Kansas City Fed's President is an "officer[] ... of the United States" and is thus also subject to the Court's mandamus power.

90.     Mandamus is appropriate here because Custodia has a clear and certain claim to have its master account application granted.  Pursuant to statute, Federal Reserve banking services "***shall*** be available" on an equal and non-discriminatory basis to eligible depository institutions. 12 U.S.C. § 248a(c)(2) (emphasis added).[19]   Defendants acknowledge that accessing Federal Reserve services requires an institution like Custodia to maintain a master account.  The Kansas City Fed has confirmed that Custodia is eligible for a master account.  Yet despite its valid Wyoming charter and conceded eligibility, Custodia's master account application was denied.  The Board and the Kansas City Fed were statutorily required to grant Custodia's master account application.

91.     Custodia asks the Court to enforce Custodia's statutory right to have its master account application granted and for an order directing Defendants not to discriminate against Custodia's ability to use that account.

---

[19] *See also Fourth Corner Credit Union*, 861 F.3d at 1067-74 (Bacharach, J.) (opining that the term "shall" "indicates a congressional command," as (1) the language was unambiguous, (2) prior agency interpretations were consistent with this understanding, and (3) legislative history supported this conclusion).

92.     Mandamus is necessary in this case because there are no other adequate remedies available.  Custodia's master account was denied on January 27, 2023, and Custodia has no other method by which it can access Federal Reserve services.

93.     Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to competitors that already have a master account.  Ultimately, without a master account, Custodia will be unable to operate as designed and may have to cease all banking operations.

94.     Custodia is therefore entitled under the Mandamus Act to an order compelling the Board and/or the Kansas City Fed to rescind the denial of Custodia's master account application and instead to grant the application.

**CLAIM FOR RELIEF III**
**Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201**
**Claim for Declaratory Judgment Against All Defendants**

95.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

96.     Custodia seeks a declaratory judgment under 28 U.S.C. § 2201(a).  This statute provides that, "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

97.      This case presents an actual controversy.  Custodia maintains that, as a state-chartered, deposit-taking bank, it is entitled to access Federal Reserve bank services through a master account.  Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to

competitors that already have a master account.  Ultimately, without a master account, Custodia will be unable to operate as designed and may have to cease all banking operations.

98.     The controversy arises in this Court's jurisdiction.  Custodia resides in Wyoming. And the Kansas City Fed and the Board both reside in Wyoming for purposes of this action because they have availed themselves of the opportunity to conduct business in Wyoming.  Additionally, many of the events giving rise to this claim have occurred in Wyoming, including the issuance of Custodia's charter and the preparation of the master account application.

99.     The Board and the Kansas City Fed have a statutory obligation to provide Custodia with access to Federal Reserve bank services through a master account.  Pursuant to statute, Federal Reserve banking services "***shall*** be available" on an equal and non-discriminatory basis to all eligible depository institutions.  12 U.S.C. § 248a(c)(2) (emphasis added).[20]  Such services are available only through a master account.  Custodia is an eligible depository institution.  Yet despite its valid Wyoming charter and conceded eligibility, Custodia has been denied access to Federal Reserve banking services through a master account.  Defendants must rescind the denial of Custodia's master account application, grant Custodia's master account application, and permit Custodia to use its master account to access Federal Reserve bank services in a non-discriminatory manner.

100.     Through this Amended Complaint, Custodia has filed an appropriate pleading to have its rights declared.  The Court can resolve this controversy by declaring that Custodia has a right, as an eligible, deposit-taking bank, to have a master account and to use that master account to access Reserve Bank services in a non-discriminatory manner.

---

[20] *See supra* fn. 19.

101.    Custodia is therefore entitled under the Declaratory Judgment Act to a declaration from this Court that the Board and/or the Kansas City Fed has a statutory obligation to provide Custodia with a master account and to permit Custodia to use that master account to access Reserve Bank services in a non-discriminatory manner.

## REQUEST FOR RELIEF

WHEREFORE, Custodia respectfully requests the Court to:

a.    Order a speedy hearing on this action, thereby advancing this action on the Court's calendar;

b.    Order the Kansas City Fed and/or the Board promptly to rescind the denial of Custodia's master account application and instead to grant Custodia's master account application;

c.    Declare unlawful the Defendants' denial of Custodia's master account and any discriminatory treatment in Custodia's access to Federal Reserve bank services;

d.    Grant Plaintiff all monetary damages permissible under law;

e.    Grant Plaintiff costs, fees, and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.    Grant any other and further relief that the Court deems just and proper.

DATED: February 17, 2023                    Respectfully submitted,

/s/ Scott E. Ortiz
Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe

WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 17th day of February, 2023:

Mark Van Der Weide
Richard M. Ashton
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

_/s/ Scott E. Ortiz
Scott E. Ortiz

# <u>Exhibit 1</u>

Avanti Financial Group, Inc -

**FEDERAL RESERVE**

**FINANCIAL SERVICES**

FRBservices.org

## Federal Reserve Bank
## Operating Circular 1, Appendix 1
## Master Account Agreement

Servicing FRB Office: _____

Effective Date: _____

## Section 1 – Master Account Agreement

The Institution named below agrees to the provisions of Operating Circular 1, Account Relationships, of the Federal Reserve Bank named above, and to the provisions of all operating circulars of each Federal Reserve Bank from which the Institution obtains services, as the circulars may be amended from time to time.  The transactions and fees for services obtained will be settled in the Master Account unless the Institution requests otherwise by submitting a Transaction and Service Fee Settlement Authorization (Operating Circular 1, Appendix 2) and/or a Letter of Agreement for Obtaining Advances Through a Correspondent (Operating Circular 10).

**All Fields Are Required**

| | | | |
|---|---|---|---|
| Routing (ABA) Number | TBD | | |
| Financial Institution Name | Avanti Financial Group, Inc | | |
| Street Address | 2120 Carey Street, 3rd Floor | | |
| City | Cheyenne | | |
| State & Zip Code | *State* Wyoming | | *Zip Code* 82001 |
| Official Signature* | *Britney Reddy (signature)* | | |
| Name | *First* Britney | *Middle Initial* D | *Last* Reddy |
| Title | Chief Financial Officer and Chief Banking Officer | | |
| Date | 10/29/2020 | | |
| Anticipated Account Opening Date | January 2021 | | |

## Section 2 – Questions Regarding the Account Should be Directed to:

| | | | |
|---|---|---|---|
| Name | *First* Britney | *Middle Initial* D | *Last* Reddy |
| Title | Chief Financial Officer and Chief Banking Officer | | |
| Telephone Number | *Phone* ███ ███████ | | *Extension* |
| E-mail | ████████████████ | | |

## Section 3 – Questions Regarding the Account Should be Directed to Alternate:

| | | | |
|---|---|---|---|
| Name | *First* Charles | *Middle Initial* D | *Last* Thompson |
| Title | Chief Legal Officer and Chief Compliance Officer | | |
| Telephone Number | *Phone* ███ ██████ | | *Extension* |
| E-mail | ███████████████ | | |

* Official signature must be a signer designated on your institution's Official Authorization List.
Processing may take 5-7 business days. Please contact the Federal Reserve Bank to confirm the date that the master account will be established.