Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| v. | ) | |
| | ) | |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.    Defendants Have Determined That Custodia's Monoline, Cryptocurrency-Focused Business Model Presents Substantial Risks ........................................................... 2

        1.    Custodia seeks Reserve Bank access to provide cryptocurrency services amid significant upheaval .......................................................... 2

        2.    The Board's Order denying Custodia's application for Federal Reserve System membership identifies the clear and substantial risks presented by Custodia's business model .......................................................... 6

    B.    Recent Board Guidance and Amendments to the Federal Reserve Act Confirm That the Federal Reserve Retains Authority to Deny Access to Reserve Bank Master Accounts and Services ................................................................. 9

    C.    Custodia's Amended Complaint Contends That the Board Has a Non-Discretionary Duty to Require and Enforce Plenary Access to Reserve Bank Accounts and Services Regardless of Risk ........................................................... 10

ARGUMENT .................................................................................................................. 11

I.    The Federal Reserve Act Does Not Require the Board to Mandate That Custodia Receive a Reserve Bank Master Account and Services ................................................................. 12

    A.    The Plain Text of Section 248a Does Not Grant Custodia a Right to a Master Account and Services ................................................................................ 13

    B.    Custodia's Construction of Section 248a Would Lead to Absurd Results and Ascribes to Congress an Unlikely Intent ........................................................... 18

    C.    Custodia's Construction of Section 248a Is Inconsistent with Recent Board Guidance and Amendments to the Federal Reserve Act .......................................... 21

II.    Because Custodia Lacks a Right to a Master Account, Its Complaint Must be Dismissed ................................................................................................. 24

CONCLUSION ................................................................................................................ 25

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page

**Cases**

*7-Eleven, Inc. v. National Union Insurance Co. of Pittsburgh, Pa.*,
  33 F. App'x 703 (5th Cir. 2002) ..................................................... 15

*Andresen v. Maryland*,
  427 U.S. 463 (1976)........................................................................ 15

*Board of County Commissioners v. EEOC*,
  405 F.3d 840 (10th Cir. 2005) ....................................................... 24

*Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.*,
  439 U.S. 234 (1978)........................................................................ 22

*Bob Jones University v. United States*,
  461 U.S. 574 (1983)........................................................................ 24

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979)........................................................................ 24

*Duncan v. Walker*,
  533 U.S. 167 (2001)........................................................................ 24

*First Bank & Trust Co. v. Board of Governors of the Federal Reserve System*,
  605 F. Supp. 555 (E.D. Ky. 1984) .................................................. 12

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
  861 F.3d 1052 (10th Cir. 2017) ...................................................... 20

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.*,
  866 F.2d 38 (2d Cir. 1989).............................................................. 13

*Hamric v. Wilderness Expeditions, Inc.*,
  6 F.4th 1108 (10th Cir. 2021) ......................................................... 17

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
  471 U.S. 707 (1985)........................................................................ 22

*In re Cooper Tire & Rubber Co.*,
  568 F.3d 1180 (10th Cir. 2009) ...................................................... 25

*In re McDaniel*,
  973 F.3d 1083 (10th Cir. 2020) ................................................. 15, 16

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*,
   713 F.2d 1227 (6th Cir. 1983) .................................................................. 13, 16

*Kidd v. Equitable Life Assurance Society of U.S.*,
   32 F.3d 516 (11th Cir. 1994) ................................................................... 15

*King v. Burwell*,
   576 U.S. 473 (2015) ................................................................................. 19, 20

*Lambert v. Saul*,
   980 F.3d 1266 (9th Cir. 2020) ................................................................. 22

*Loughrin v. United States*,
   573 U.S. 351 (2014) ................................................................................. 18

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   571 U.S. 191 (2014) ................................................................................. 25

*Merit Management Group, LP v. FTI Consulting, Inc.*,
   138 S. Ct. 883 (2018) .............................................................................. 16

*Navajo Nation v. Dalley*,
   896 F.3d 1196 (10th Cir. 2018) ............................................................... 15

*Nelson v. United States*,
   40 F.4th 1105 (10th Cir. 2022) ............................................................... 18

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ................................................................................... 24

*Prime Care of Northeast Kansas, LLC v. Humana Insurance Co.*,
   447 F.3d 1284 (10th Cir. 2006) ............................................................... 24

*Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*,
   390 F.3d 684 (10th Cir. 2004) ................................................................. 21

*Smith v. United States*,
   508 U.S. 223 (1993) ................................................................................. 15

*Sullivan v. University of Kansas Hospital Authority*,
   844 F. App'x 43 (10th Cir. 2021) ............................................................ 25

*Texas Office of Public Utility Counsel v. FCC*,
   183 F.3d 393 (5th Cir. 1999) ................................................................... 16

*Utah Power & Light Co. v. ICC,*
    747 F.2d 721 (D.C. Cir. 1984) ........................................................................ 16

*W. Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ................................................................................... 21

*Whitman v. American Trucking Associations, Inc.,*
    531 U.S. 457 (2001) ...................................................................................... 21

*WildEarth Guardians v. NPS,*
    703 F.3d 1178 (10th Cir. 2013) ..................................................................... 22

*Williams v. Taylor,*
    529 U.S. 362 (2000) ...................................................................................... 24

**Statutes**

5 U.S.C. § 706(2) ........................................................................................ 11, 24

12 U.S.C. § 225a ............................................................................................... 19

12 U.S.C. § 248(j) ............................................................................................. 12

12 U.S.C. § 248a ........................................ 11, 12, 13, 15, 16, 18, 19, 21, 22, 23, 24, 25

12 U.S.C. § 248a(a) ..................................................................................... 12, 13

12 U.S.C. § 248a(b) ..................................................................................... 17, 23

12 U.S.C. § 248a(c) ......................................................................... 12, 14, 15, 16, 25

12 U.S.C. § 248a(c)(1), (3)-(4) ......................................................................... 15

12 U.S.C. § 248a(c)(2) ......................................... 11, 14, 15, 16, 17, 18, 25

12 U.S.C. § 248a(c)(3) ....................................................................................... 16

12 U.S.C. § 248c ............................................................................................... 10

12 U.S.C. § 248c(a)(3) ....................................................................................... 23

12 U.S.C. § 248c(b)(1) ....................................................................................... 23

12 U.S.C. § 248c(b)(1)(A) ................................................................................. 10

12 U.S.C. § 248c(b)(1)(B) ................................................................................. 10

12 U.S.C. § 248c(b)(1)(C) .................................................................. 23

12 U.S.C. § 461(b)(1)(A)(i) ............................................................... 20

12 U.S.C. § 1813(a)(2) ...................................................................... 20

12 U.S.C. § 1815(a) ........................................................................... 20

12 U.S.C. § 1831p-1 .......................................................................... 19

28 U.S.C. § 1361 ............................................................................... 25

28 U.S.C. § 2201 ............................................................................... 25

28 U.S.C. § 2412(b) ........................................................................... 18

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq*.................... 12, 19, 22, 24

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023,
    Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022)
    (to be codified at 12 U.S.C. § 248c) ........................................ 10, 21, 23

Monetary Control Act of 1980, Pub. L. No. 96-221,
    § 107, 94 Stat. 132, 140 ................................................. 12, 13, 16, 19, 20

**Regulations**

12 C.F.R. Part 261.............................................................................. 6

12 C.F.R. § 303.14(a)......................................................................... 20

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
    86 Fed. Reg. 25,865 (May 11, 2021) (Proposed)........................ 21, 22
    87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice) ........... 21
    87 Fed. Reg. 51,099 (Aug. 19, 2022) (Final)........................... 9, 19, 22
    87 Fed. Reg. 68,691 (Nov. 16, 2022) (Proposed Amendments).......... 10

**News Articles**

Bob Van Voris, et al., *Sam Bankman-Fried Prosecutors Allege Plot to Shape Crypto Policy*,
    L.A. Times, Feb. 23, 2023 ....................................................... 3

Candice Choi, *Crypto Crisis: A Timeline of Key Events*,
    Wall St. J., last updated Mar. 24, 2023 ...................................... 3

David Benoit et al., *Signature Bank is Shut by Regulators After SVB Collapse*,
Wall St. J., Mar. 12, 2023 ................................................................................. 4

Ephrat Livni, *Amid Crypto Downturn, Two Big Names Cut Deal*,
N.Y. Times, Sept. 9, 2022 ................................................................................. 3

Manya Saini et al., *Silvergate Capital Shares Sink as Crypto-Related Deposits
Plunge by $8 Billion*, Colorado Springs Gazette, Jan. 5, 2023 ........................... 3

Mike Freeman, *San Diego's Silvergate Bank to Close Because of Crypto Losses*,
San Diego Union Tribune, Mar. 8, 2023 ........................................................... 3

**Other Authorities**

Board of Governors of the Federal Reserve System, Federal Deposit Insurance
Corporation, Office of the Comptroller of the Currency, Joint Statement on Crypto-
Asset Risks to Banking Organizations (Jan. 3, 2023), https://www.federalreserve.gov/
newsevents/pressreleases/files/bcreg20230103a1.pdf ....................................... 5

Federal Reserve Bank Operating Circular 1, Account Relationships
(Jan. 2, 1998), web.archive.org/web/20000116011948/http://www.frbservices.org/
Industry/pdf/Oc1.pdf ................................................................................. 17, 22

Federal Reserve Bank Operating Circular 1, Account Relationships
(Aug. 16, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/
resources/rules-regulations/081621-operating-circular-1.pdf ........................... 17, 22, 23

Federal Reserve Board, Press Release dated Nov. 3, 2022 (2023 fee schedule),
https://www.federalreserve.gov/newsevents/pressreleases/other20221103a.htm ............ 14

Federal Reserve Board, Press Release dated Jan. 27, 2023 (Policy Statement),
https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm.............. 5

Federal Reserve Board, Press Release dated Mar. 24, 2023 (Order),
https://www.federalreserve.gov/newsevents/pressreleases/
orders20230324a.htm ........................................................................... 6, 7, 8, 9

Federal Reserve Board, Supervision and Regulation Letter 22-6 Regarding
Engagement in Crypto-Asset- Related Activities by Federal Reserve-Supervised
Banking Organizations (Aug. 16, 2022) (EFC No. 98-02)................................... 4

Financial Stability Oversight Council, Report on Digital Asset Financial Stability
Risks and Regulation (Oct. 3, 2022), https://home.treasury.gov/news/press-
releases/jy0986................................................................................. 4

Financial Stability Oversight Council, Report Fact Sheet (Oct. 3, 2022),
    https://home.treasury.gov/system/files/261/Fact-Sheet-Report-on-Digital-Asset-
    Financial-Stability-Risks-and-Regulation.pdf ................................................................. 5

Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation,
    Board of Governors of the Federal Reserve System, Office of Thrift Supervision,
    Interagency Supervisory Guidance on Counterparty Credit Risk Management,
    (June 29, 2011), http://www.federalreserve.gov/newsevents/pressreleases/
    files/bcreg20110705a1.pdf........................................................................................ 19

Office of the Comptroller of the Currency, OCC Interpretive Letter No. 1179 (Nov. 18, 2021),
    https://www.occ.gov/topics/charters-and-licensing/interpretations
    -and-actions/2021/int1179.pdf ................................................................................... 4

William Strunk, Jr. & E.B. White,
    The Elements of Style 7-8 (3d ed. 1979) .................................................................... 15

## INTRODUCTION

Displeased with the substantive result of the master account decision that was the genesis of this lawsuit, Custodia now claims in its Amended Complaint that the Federal Reserve Act *guarantees* it a different outcome. Custodia's fundamental contention is that no entity within the Federal Reserve System may exercise any discretion in adjudicating master account requests, but must simply act in a ministerial capacity to rubber stamp approval without giving a moment's notice to the risks presented. But it is more than just that. Custodia not only claims that the Federal Reserve must give no *thought* to the risks that Custodia or other institutions present before granting an account, but asserts that the Board of Governors of the Federal Reserve System has an affirmative obligation to exercise its supervisory authority over the Federal Reserve Bank of Kansas City to *force* it to provide a Reserve Bank master account and services to Custodia (and to all other comers regardless of risk). Custodia makes this claim even though the Board separately and unanimously determined, in a detailed, 86-page decision on Custodia's Federal Reserve membership application, that Custodia's planned operations are inconsistent with safe and sound banking practices, contrary to the purposes of the Federal Reserve Act, and pose substantial risks to the Federal Reserve and to the U.S. financial system. In the course of making its claims, Custodia conspicuously makes no effort to challenge the substantive *reasons* for the denial of its account request. This is telling, and should give the Court substantial pause before adopting a proposed reading of the Federal Reserve Act that does not flow from ordinary principles of statutory construction, contradicts the express interpretation of the federal agency Congress has charged with its administration, and may have grave, far-reaching consequences.

Notably, Custodia makes its claim of absolute entitlement even as the cryptocurrency industry on which it pins its entire business model suffers extreme volatility and loss, and the depository institutions with the closest ties to these activities have collapsed into liquidation or

federal receivership. And it makes these claims within months of Congress having amended the Federal Reserve Act—with full knowledge of the Board's Account Access Guidelines—to define "Reserve Bank master accounts and services" for the first time without altering in any way the discretion in this area that has long been understood to reside within the Federal Reserve System (and making clear that access denials are to be expected).

Against this backdrop, Custodia has substantially narrowed its Amended Complaint to focus squarely on the responsibilities of the Board and not on the Reserve Bank. Indeed, given that Congress has now defined "Reserve Bank master accounts and services" in the Federal Reserve Act and that the Board indisputably does not itself perform these functions, Custodia's core assertion is that "it is incumbent upon the Board to exercise its *supervisory authority* so as to ensure" that Custodia receives access. Am. Compl. ¶ 81 (emphasis added); *see also id.* (alleging Reserve Bank is merely "responsible for communicating the decision"). This focus on the Board's role invites the Court to accept Custodia's allegations about Board control for purposes of this motion, address the threshold statutory interpretation question at issue with the benefit of the recent Federal Reserve Act amendment, and dismiss without the need for further proceedings that are unlikely to illuminate the question of whether the Board is obligated to exercise its supervisory authority in the particular way that Custodia wishes. The Board respectfully requests that the Court do so and dismiss the complaint.

## BACKGROUND

**A.      Defendants Have Determined That Custodia's Monoline, Cryptocurrency-Focused Business Model Presents Substantial Risks**

### 1.      Custodia seeks Reserve Bank access to provide cryptocurrency services amid significant upheaval.

Custodia is pursuing a Reserve Bank master account so that it may "directly access the

Federal Reserve" to offer services for crypto-assets. Am Compl. ¶ 2. As a Special Purpose

Depository Institution ("SPDI"), Custodia would "provide a bridge connecting crypto-asset

companies to the U.S. payments system," *id.* ¶ 37, and has sought to issue a "stablecoin"

variation called Avit, *see* ECF No. 49 at 9.

 While Custodia's request for a Reserve Bank master account was pending, the

cryptocurrency sector entered what the industry has referred to as a "crypto winter," which

"wiped out roughly $2 trillion in market value" by Fall 2022 and resulted in an industry market

capitalization more than two-thirds below its high at the end of 2021. Ephrat Livni, *Amid Crypto*

*Downturn, Two Big Names Cut Deal*, N.Y. Times, Sept. 9, 2022; Candice Choi, *Crypto Crisis: A*

*Timeline of Key Events*, Wall St. J., last updated Mar. 24, 2023. As was widely reported, "the

spectacular collapse of FTX" in November, which was "one of the biggest crypto exchanges in

the world," led to the prosecution of its founder and CEO for misappropriating "billions of

dollars of customer deposits." Bob Van Voris, et al., *Sam Bankman-Fried Prosecutors Allege*

*Plot to Shape Crypto Policy*, L.A. Times, Feb. 23, 2023.

 In the wake of these developments, Silvergate Bank—which focused its business on

digital assets—suffered a run on crypto-related deposits and was reportedly forced to sell debt

securities earlier than planned to cover these withdrawals. Mike Freeman, *San Diego's Silvergate*

*Bank to Close Because of Crypto Losses*, San Diego Union Tribune, Mar. 8, 2023. Silvergate's

losses, which totaled in the billions of dollars, ultimately led to the bank's decision in early

March 2023 to liquidate. *Id.*; *see also* Manya Saini et al., *Silvergate Capital Shares Sink as*

*Crypto-Related Deposits Plunge by $8 Billion*, Colorado Springs Gazette, Jan. 5, 2023. Days

after Silvergate's announcement, regulators closed New York-based Signature Bank on

March 12, 2023, which press reports noted was "reeling from a bet on crypto banking that

foundered after the sector imploded," resulting in a "failure [that] is the third-largest in U.S. history." David Benoit et al., *Signature Bank is Shut by Regulators After SVB Collapse*, Wall St. J., Mar. 12, 2023.

Amid this upheaval and other developments in the crypto-asset sector, banking agencies including the Board, the OCC, and the FDIC issued guidance and policy statements addressing digital asset risks. On August 16, 2022, the Board issued guidance to its supervised entities warning of the "heightened and novel risks posed by crypto-assets," including "risks related to safety and soundness, consumer protection, and financial stability."[1] SR Letter at 2, 1. As a result of these heightened risks, the SR Letter cautioned Board-supervised banks that they should "have in place adequate systems, risk management, and controls to conduct [crypto-asset] activities in a safe and sound manner and consistent with applicable laws."[2] *Id.* at 4.

On October 3, 2022, the Financial Stability Oversight Council,[3] released its Report on Digital Asset Financial Stability Risks and Regulation ("FSOC Report").[4] Among other things, the Report concluded that "[c]rypto-asset activities could pose risks to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall

[1] *See* Board Supervision and Regulation Letter 22-6 Regarding Engagement in Crypto-Asset-Related Activities by Federal Reserve-Supervised Banking Organizations ("SR Letter") (Aug. 16, 2022) (ECF No. 98-02).
[2] The OCC had previously provided guidance in this area indicating that certain crypto custody activities are permissible for national banks, provided that the bank can first demonstrate to supervisors that it can conduct the activities in a safe and sound manner. *See* OCC Interpretive Letter No. 1179 (Nov. 18, 2021), *available at* https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2021/int1179.pdf.
[3] The Council, established by Congress in 2010 and chaired by the Secretary of the Treasury, "is charged . . . with identifying risks to the financial stability of the United States; promoting market discipline; and responding to emerging threats to the stability of the U.S. financial system." *See* https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/fsoc.
[4] *Available at* https://home.treasury.gov/news/press-releases/jy0986.

scale were to grow without adherence to . . . appropriate regulation." [5] The FSOC Report cautioned that "[c]rypto asset prices appear to be primarily driven by speculation rather than grounded in current fundamental economic use cases," and that many crypto-asset entities have "risky business profiles and opaque capital and liquidity positions." *Id*.

On January 3, 2023, the Board, OCC, and FDIC issued a Joint Statement on Crypto-Asset Risks to Banking Organizations (the "Joint Statement")[6] observing that "events of the past year . . . highlight a number of key risks associated with crypto-assets," including risks of "fraud and scams," "[l]egal uncertainties," "[i]naccurate or misleading representations and disclosures by crypto-assets companies," "[s]ignificant volatility," "[s]usceptibility of stablecoins to run risk," and "[c]ontagion risk." *Id*. at 1. The Joint Statement emphasized the importance that "risks related to the crypto-asset sector that cannot be mitigated and controlled do not migrate to the banking system." *Id*. at 1. "Given the significant risks highlighted by recent failures of several large crypto-asset companies," the agencies concluded that "issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network . . . is highly likely to be inconsistent with safe and sound banking practices" and further concluded that there are "significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities."[7] *Id*. at 2.

---

[5] *See* FSOC Report Fact Sheet (Oct. 3, 2022) at 1, *available at* https://home.treasury.gov/system/ files/261/Fact-Sheet-Report-on-Digital-Asset-Financial-Stability-Risks-and-Regulation.pdf.
[6] *Available at* https://www.federalreserve.gov/newsevents/pressreleases/files/ bcreg20230103a1.pdf.
[7] On January 27, 2023, the Board issued a policy statement designed to promote a level playing field for federally supervised banks, regardless of deposit insurance status. *Available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm. The statement noted that "the Board has not identified any authority permitting national banks to hold most crypto-assets, including bitcoin and ether, as principal in any amount," nor "any federal statute or rule expressly permitting state banks to hold crypto-assets as principal," and, as a result, the Board "would presumptively prohibit SMBs from engaging in such activity." *Id*. at 8.

2.      **The Board's Order denying Custodia's application for Federal Reserve System membership identifies the clear and substantial risks presented by Custodia's business model.**

On January 27, 2023, the Board issued its final order denying Custodia's application to become a Board-supervised state member bank, without prejudice to future applications.[8] In denying the application, the Board determined that, in light of the risks presented by Custodia's business model, which focused "almost entirely on the crypto-asset sector," Order at 1, among numerous other risks, approval was not consistent with the managerial, financial, and corporate powers factors the Board was required to consider by statute. *Id.* at 86. These risks were magnified by the fact that Custodia does not have FDIC deposit insurance. *Id.* at 2. Indeed, while "[i]nconsistency with any one of these [three] factors is sufficient to [deny] . . . Custodia's application," the Board ultimately determined that each of the three factors, standing alone, warranted denial. *Id.* at 86; *see also id.* at 3 n.7.

On the first, managerial factor, which considers whether the applicant has "risk management systems and controls commensurate with the nature, scope, and risks of the activities in their proposed business plans," *id.* at 3, the Board noted "heightened concerns about banks with business plans focused on a narrow sector of the economy." *Id.* at 3. Here, not only is Custodia "an uninsured depository institution seeking to focus almost exclusively on offering products and services related to the crypto-asset sector," which present heightened "illicit finance" and "safety and soundness risks," but the Board's pre-membership examination identified "significant deficiencies in Custodia's ability to manage the[se] risks," particularly

---

[8] The Board permitted Custodia a period of time to request confidential treatment for information in the Order pursuant to Board's disclosure regulations at 12 C.F.R. Part 261. The Board released the final version of the Order on March 24, 2023. *Available at* https://www.federalreserve.gov/ newsevents/pressreleases/orders20230324a.htm (confidential information redacted).

with respect to "overall risk management," Bank Secrecy Act and U.S. sanctions compliance, information technology, internal audit, financial projections, and liquidity risk management. *Id.* at 3-4. Despite these deficiencies, Custodia "proposed to expand its operations soon after approval for membership to focus almost exclusively on novel crypto-asset-related activities and to accept only uninsured deposits," which the Board observed is "an unprecedented business model that presents heightened risks involving activities that no state member bank previously has been approved to conduct." *Id.* at 4.

In addition to its lack of appropriate risk management structures and its novel and risky business model, the Board expressed "concerns with respect to Custodia's ability to be resolved safely and effectively upon failure," which "could contribute to instability and run risk." *Id.* at 5. Indeed, the Board concluded that, "[e]ven if Custodia were able to successfully remediate all issues identified with respect to its ability to safely and soundly conduct its limited day-one activities, conducting only this limited set of activities would not enable it to constitute a viable bank in the medium or long term." *Id.* at 9-10. Accordingly, the Board found that "considerations relating to the managerial factor are so adverse as to present sufficient grounds on their own for warranting denial of the application." *Id.* at 5; *see also id.* at 10, 49.

Similarly, the Board concluded with respect to the financial and corporate powers factors that the relevant considerations were so adverse as to warrant denial. *Id.* at 7, 9, 10, 57, 82. With regard to the financial factor, the Board observed that the crypto-asset markets in which Custodia proposed to concentrate its operations "have exhibited significant volatility," and noted "that the value of most crypto-assets is driven in large part by speculation and sentiment, and is not anchored to a clear economic use case." *Id.* at 6 (citing FSOC Report at 23-28). The Board found that "[r]ecent events, including the bankruptcies of crypto-asset intermediaries Celsius, Voyager,

BlockFi, and FTX, have highlighted that the global and largely unregulated or noncompliant crypto-asset sector lacks stability," *id*. at 6, and determined that, even if the Board approved Custodia's application, it would have to "prohibit Custodia from engaging in a number of those activities" because Custodia did not demonstrate that it "could conduct [them] in a safe and sound manner." *Id*. at 7.

      With regard to the corporate powers factor, the Board found that, in addition to focusing "almost exclusively on the crypto-asset sector," Custodia's proposed business model "would aim to create further connections between traditional financial intermediaries and the crypto-asset ecosystem by engaging in crypto-asset-related activities that are novel and unprecedented for state member banks." *Id*. at 7. The Board found that Custodia's business model was "unlike that of any other state member bank," and included "holding bitcoin and ether as principal; issuing instruments like Avits; facilitating the borrowing and lending of crypto-assets; or directly engaging with customers to facilitate the buying and selling of crypto-assets." *Id*. at 58. "Given the speculative and volatile nature of the crypto-asset ecosystem," the Board concluded that this business model is inconsistent "with the purposes of the Federal Reserve Act." *Id*. at 7.

      The Board further determined that "admission of an uninsured deposit-taking institution to Federal Reserve membership" would be "unprecedented since the creation of federal deposit insurance in 1933," and that "[t]he absence of deposit insurance coverage at Custodia could increase the firm's risk of runs and contagion." *Id*. at 8. As such, the Board observed that resolution of an institution such as Custodia would have to be "conducted outside of the FDIC's proven and effective receivership process." *Id*. at 8.

      Finally, the Board concluded that, because Custodia had "not demonstrated that it could operate in a safe and sound manner," but rather posed "significant risks to its customers in the

event of its potential failure," among other risks, *id*. at 85, 84, the convenience and needs of the community did not militate in favor of approval. FRBKC separately informed Custodia by letter on January 27 that it had denied its master account request and explained the basis for the decision, *see* ECF No. 116 at 1, identifying many similar concerns.

> **B.    Recent Board Guidance and Amendments to the Federal Reserve Act Confirm That the Federal Reserve Retains Authority to Deny Access to Reserve Bank Master Accounts and Services**

On August 19, 2022, following two rounds of notice and comment, the Board's "Guidelines for Evaluating Account and Services Requests" became effective. 87 Fed. Reg. 51,099 ("Guidelines"). The Guidelines set forth six principles for use in access decisions and create a three-tiered review framework that "is meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." *Id.* at 51,109. The Guidelines note that "[a]lthough institutions in a higher tier will on average face greater due diligence and scrutiny than institutions in a lower tier, a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers . . . on a case-by-case, risk-focused basis[.]" *Id.* The three tiers are: "Tier 1: Eligible institutions that are federally insured"; "Tier 2: Eligible institutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency"; and "Tier 3: Eligible institutions that are not federally insured and are not considered in Tier 2." *Id.* at 51,109-10. The Board emphasized that "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." *Id.* at 51,102.

In November 2022, the Board made a separate proposal to provide additional information regarding the provision of master accounts and services at Federal Reserve Banks. Specifically,

the Board proposed to require that Reserve Banks "publish a periodic list of depository institutions with access to Reserve Bank accounts and/or financial services." 87 Fed. Reg. 68,691, 68,691 (Nov. 16, 2022). On December 23, 2022, before the Board finalized its proposal, Congress passed and the President signed into law the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("2023 NDAA"), which included among its provisions an amendment to the Federal Reserve Act. Pub. L. No. 117-263 § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022) (to be codified at 12 U.S.C. § 248c). Specifically, the 2023 NDAA requires that the Board create and "maintain a public, online, and searchable database" of "every entity that currently has access to a reserve bank master account and services," with the date that access was granted. 12 U.S.C. § 248c(b)(1)(A). In addition, the statute requires the Board to create "a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section (or that has submitted an access request that is pending on the date of enactment of this section), including whether, and the dates on which, a request— (i) was submitted; and (ii) was approved, *rejected*, pending, or withdrawn." *Id.* § 248c(b)(1)(B) (emphasis added).

C.   **Custodia's Amended Complaint Contends That the Board Has a Non-Discretionary Duty to Require and Enforce Plenary Access to Reserve Bank Accounts and Services Regardless of Risk**

In February 2023, Custodia filed its Amended Complaint challenging the January 27, 2023 decision denying its request for a master account.[9] Am. Compl. ¶ 21. The Amended Complaint rests on two premises. First, Custodia alleges that the Board orchestrated the denial of its master account request. Specifically, Custodia alleges that "[t]he Board exercises ultimate

---

[9] For the limited purposes of this motion, the Board accepts as true Custodia's factual contention that the Board "assert[ed] control over" the Custodia master account decision, *see* Am. Compl. ¶ 46, despite defendants' ongoing disagreement with that allegation.

control over the decision to grant or deny a master account, and exercised that power to assert control over the decision-making process for Custodia's application in particular." *Id.* ¶ 46. Second, Custodia contends that it is entitled to a master account by statute, citing 12 U.S.C. § 248a(c)(2), and claims that the Board must "exercise its supervisory authority" to ensure this result. Am. Compl. ¶¶ 73, 81.

Custodia brings three claims: (1) a claim against only the Board, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), asserting that the Board violated 12 U.S.C. § 248a(c)(2) by "depriving Custodia of access to Federal Reserve bank services," Am. Compl. ¶ 83; (2) a mandamus claim requesting a Court order "compelling the Board and/or Kansas City Fed to rescind the denial of Custodia's master account application and instead to grant the application," *id.* ¶ 94; and (3) a claim under the Declaratory Judgment Act seeking a declaration that, pursuant to 12 U.S.C. § 248a(c)(2), "Custodia has a right, as an eligible, deposit-taking bank, to have a master account." Am. Compl. ¶ 100. Notably, Custodia did not attach FRBKC's decision denying its master account request to its Complaint, much less take issue with any of the well-reasoned bases upon which FRBKC denied the request.

## ARGUMENT

The Amended Complaint fails to state a claim because the Board was under no legal obligation to direct that Custodia be granted a master account. As Custodia asserts, and the Board agrees, the "core issue" presented is whether "Defendants are statutorily required to grant Custodia's master account." Am. Compl. ¶ 12. They are not. Custodia's reliance on section 11A of the Federal Reserve Act, 12 U.S.C. § 248a, is misplaced. That section, as its title suggests, concerns the "Pricing of Services," and nowhere requires the action that Custodia demands. The Board has not acted "contrary to law" in violation of the APA as a result, and Custodia is not

11

entitled to relief under that statute or otherwise.

I.      **The Federal Reserve Act Does Not Require the Board to Mandate That Custodia Receive a Reserve Bank Master Account and Services**

The Federal Reserve Act, 12 U.S.C. § 221 *et seq*. ("FRA"), authorizes the Board "[t]o exercise general supervision" over Reserve Banks, 12 U.S.C. § 248(j), without specifically indicating how this general power should be exercised. In certain limited instances, the Act does require the Board to take specific actions relating to Reserve Banks, but mandating the grant of a master account is not among them. As a result, Custodia relies on Section 11A of the FRA, 12 U.S.C. § 248a, which is entitled "Pricing of services" and deals with a different subject. This section provides that that Board "shall publish . . . a set of pricing principles . . . and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions," 12 U.S.C. § 248a(a), and further provides that:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles: . . . (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(c).

Section 248a was added to the FRA through the Monetary Control Act of 1980 ("MCA"),[10] which was designed to restore Federal Reserve control over the money supply and "to curb the rising tide of bank flight from the [Federal] Reserve System." *First Bank and Trust Co. v. Bd. of Governors of the Fed. Reserve Sys.*, 605 F. Supp. 555, 565 (E.D. Ky. 1984). Prior to the MCA, Reserve Banks were authorized to accept deposits only from member banks, and they

---

[10] 12 U.S.C. § 248a, section 11A of the Federal Reserve Act, was added by section 107 of the MCA, Pub. L. No. 96-221, 94 Stat. 132, 140.

provided related services to member banks free of charge to "promote . . . membership" in the Federal Reserve System. *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989). The MCA sought to restore Federal Reserve control over the money supply by requiring nonmember as well as member banks to maintain reserves. To facilitate this goal, it authorized Federal Reserve Banks to open deposit accounts for nonmember banks and provided that nonmember banks would be able to receive Federal Reserve Bank services "at the same fees charged member banks." *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983).

The only imperative of Section 248a is that the Board publish a fee schedule for these services, which were formerly free to member banks, and that the fee schedule "shall be based" on principles relating to availability of services, and the Board has done so. Although the MCA expanded the ability and discretion to make Reserve Bank services "available" to nonmember banks, Section 248a does not guarantee such services to each and every bank, regardless of risk, as Custodia argues.

### A. The Plain Text of Section 248a Does Not Give Custodia a Right to a Master Account and Services

Section 248a's text does not give Custodia a right to a master account. It only mandates the establishment of a *fee schedule* for specified services. Moreover, the section is specific about what services it covers but does not refer to master accounts or provide that services must be offered to all institutions. And it expressly anticipates that the Board will limit access to services by setting "terms." The section cannot bear the meaning Custodia ascribes to it.

First, the enacting Congress labeled Section 248a as governing "Pricing of Services," MCA § 107, 94 Stat. 141, and its mandates to the Board concern fee-setting for services. Section 248a(a) requires that the Board publish proposed "pricing principles in accordance with this

13

section," and to subsequently "put into effect a schedule of fees for such services which is based on those principles." And Section 248a(c), entitled "[c]riteria applicable," further clarifies that "[t]he schedule of fees prescribed pursuant to this section shall be based on the following principles:" followed by a four-item list. Custodia's construction of the section rests on an isolated reading of one sentence that is structurally part of this list, whose components are expressly designated as *principles for setting fees* for services—not for determining whether any individual institution is entitled to services, much less to a master account, which is not a "priced service" covered by the fee schedule.[11]

Specifically, Custodia relies on an excerpt of one principle on this list stating that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks . . . ." 12 U.S.C. § 248a(c)(2); *see* Am. Compl. ¶ 83. Custodia claims that this phrase independently functions as a mandate requiring access to Reserve Bank services (and, implicitly, master accounts) by every depository institution. But the statute itself expressly states that this sentence serves a different purpose: it is one of four "principles" on which "[t]he schedule of fees prescribed pursuant to this section shall be based," 12 U.S.C. § 248a(c), and this reading is further confirmed when the list is read as a whole, as well as by Section 248a's title.

Custodia's construction of Section 248a(c) is inconsistent with basic rules of grammar and punctuation as well as principles of statutory interpretation because it ignores Section 248a(c)'s introductory language, which expressly designates everything that follows, including subsection (c)(2), as a fee-setting principle. When a list begins with introductory language

---

[11] The Board publishes its fee schedule annually in the Federal Register. *See, e.g.*, https://www.federalreserve.gov/newsevents/pressreleases/other20221103a.htm (2023 fee schedule).

followed by a colon, the colon indicates that the preceding text limits the nature of what follows, which lacks independent force. *See e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 481 (1976) ("[item in] a series that follows [a colon] is limited by what precedes that colon"); *7-Eleven, Inc. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 33 F. App'x 703 (5th Cir. 2002) ("[A colon preceding a list] tells [readers] that everything following the colon will deal exclusively with [what precedes it]."); *Kidd v. Equitable Life Assur. Soc. of U.S.*, 32 F.3d 516, 519 (11th Cir. 1994) ("A colon tells the reader that what follows is closely related to the preceding clause." (quoting William Strunk, Jr. & E.B. White, The Elements of Style 7-8 (3d ed. 1979))).

Custodia's attempt to read Section 248a(c)(2) without regard to the introductory language in Section 248a(c) indicating that what follows are principles for fee-setting rather than independent mandates also violates basic principles of statutory construction. *See Smith v. United States*, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute.); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (courts should seek to give effect to every part of a statute). Custodia's argument ignores Congress's express directive as to how Section 248a(c)(2) should be read; Congress designated it as one of four "principles" on which a "schedule of fees . . . shall be based." 12 U.S.C. § 248a(c).

The purpose of Section 248a as setting specific requirements for fees, rather than for mandatory provision of services, is also reflected by the nature of the other items listed in Section 248a(c) as well as the Section's title. The other three listed items relate solely to pricing, requiring explicit pricing, tying fees to actual costs and interest, and basing interest charges on market rates. 12 U.S.C. § 248a(c)(1), (3)-(4). The fact that every other item on this list relates solely to pricing indicates that Section 248a(c)(2) was only intended to relate to pricing of services rather than mandating access to master accounts. *See In re McDaniel*, 973 F.3d 1083,

1098 (10th Cir. 2020) (construing one phrase in a list based on its "common quality" with other list items in accordance with the canon of *noscitur a sociis*). Moreover, the enacting Congress specifically indicated in the title of both the relevant section of the MCA and its codification that the purpose of Section 248a is to govern "Pricing of Services," MCA § 107, 94 Stat. 141, further undermining Custodia's argument that the section governs *access* to such services. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section headings "supply cues as to what Congress intended" (citation omitted)); *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 441 n.89 (5th Cir. 1999) ("[T]he section heading enacted by Congress in conjunction with statutory text is considered to come up with the statute's clear and total meaning." (cleaned up)); *Utah Power & Light Co. v. ICC*, 747 F.2d 721, 727 (D.C. Cir. 1984) ("[T]he topical heading . . . indicates the intent of the legislature, because the heading was part of the Act as enacted . . . ."). Indeed, courts construing Section 248a(c) shortly after passage of the MCA found that this provision concerned explicit and equitable pricing of services and not a mandate that such services—much less master accounts—be made available to each and every entity. *See, e.g.*, *Jet Courier Servs.*, 713 F.2d at 1227 ("What is clear [from the MCA] is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made available to nonmember depository institutions at the same fees charged member banks, and that 'over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services.'" (quoting Section 248a(c)(3)).

Second, even if Section 248a(c)(2) were on its own read as some type of independent mandate, it would not grant every depository institution a right to a master account because— even assuming for purposes of this motion that a master account is a service, which it is not—the statute specifically designates only *other* services to which it applies (as spelled out in Section

16

248a(b)) and because its plain language does not require a universal right to access those services. The scope of Section 248a(c)(2) is limited to "Federal Reserve bank services covered by the fee schedule," and Section 248a(b) specifically lists which services are "covered by the schedule of fees" without listing master accounts. This omission indicates that even if Section 248a(c)(2) somehow mandated provision of certain services to all depository institutions, which it does not, the mandate would nevertheless only extend to services enumerated in the list, and the list does not include master accounts—which are not "priced services." *See Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1124 (10th Cir. 2021) (Under "the cannon of *expressio unius est exclusio alterius* . . . the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." (cleaned up)). In this regard, it should be noted that, for decades, Reserve Banks have contracted with banks that lack master accounts to provide services identified in Section 248a(b).[12]

Moreover, even if Section 248a(c)(2) could be read as an independent mandate implicating master accounts, its use of "[a]ll" in relation to the services to which it applies but not the depository institutions that may access these services ("[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions") indicates that at most it implicates the provision of "*all* Reserve bank services" to nonmember institutions as a class, but not necessarily to all nonmember banks in that class. Congress's omission of a second "all" is significant, as it signals Congress's intent that services covered by

---

[12] *See*, *e.g.*, 2021 Operating Circular 1 ("OC-1") at ¶ 2.7, *available at* www.frbservices.org/ binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf; 1998 OC-1 at ¶ 3.1, *available at* web.archive.org/web/20000116011948/http://www.frbservices. org/Industry/pdf/Oc1.pdf ("[Y]ou and a correspondent can provide us with a completed Transaction Settlement Authorization (Appendix 5), instructing us to settle some or all of your transactions in the correspondent's master account.").

the fee schedule be made available to member and nonmember banks alike—as they generally are—but not that each and every nonmember bank, *even those that may present a variety of unmitigated risks*, are entitled to all services. "[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the [adjoining] provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted); *cf. Nelson v. United States*, 40 F.4th 1105, 1115 (10th Cir. 2022) ("The rule against surplusage . . . counsel[s] us to construe 'any statute,' in § 2412(b), in a different and broader manner than the provision's initial, unadorned reference to "statute" in order to give meaning to the term 'any.'").

Lastly, Section 248a(c)(2) itself recognizes that the Board has no duty to grant access to Reserve Bank services to any individual institution. It expressly provides that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks," 12 U.S.C. § 248a(c)(2). By acknowledging that the Board may impose conditions on access to Reserve Bank services, this language necessarily means that there is no absolute right to obtain covered services—much less master accounts—as Custodia incorrectly claims.

### B.   Custodia's Construction of Section 248a Would Lead to Absurd Results and Ascribes to Congress an Unlikely Intent

Custodia's argument that Section 248a requires Reserve Banks, without exception, to provide services to nonmember banks must be rejected for another reason—it would lead to an absurd circumstance in which Reserve Banks must do business with any bank regardless of its risk profile or the implication to various federal statutory mandates. It would also abdicate control to states and territories to determine which entities Reserve Banks, which are federal instrumentalities, must do business with, and could expose the Federal Reserve balance sheet to

forces that would hinder the implementation of national monetary policy. Such extraordinary intent cannot be ascribed to a provision that Congress itself described as one item in a list of pricing principles.

Construing Section 248a as granting an unconditional right of access to Reserve Bank services and master accounts would undermine various provisions of the FRA and other banking laws as well as other federal statutory schemes, in derogation of basic principles of statutory construction. *See King v. Burwell*, 576 U.S. 473, 492 (2015) (statutes should be construed in light of "the remainder of the statutory scheme [to favor readings with] a substantive effect that is compatible with the rest of the law" (cleaned up)). It would force Reserve Banks to take counterparty risks that banks are generally required to limit in order to operate safely. *Compare*, *e.g.*, Guidelines, 87 FR at 51107 ("Provision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank."), *with* 12 U.S.C. § 1831p-1 (providing for federal banking supervisors to prescribe safety and soundness standards for their regulated institutions); Interagency Supervisory Guidance on Counterparty Credit Risk Management (June 29, 2011).[13] It thus could potentially jeopardize the public fisc in the event an institution the Reserve Bank would consider unsafe to deal with were to default with a balance owed on outstanding transactions. Moreover, by depriving the Federal Reserve System of control over its own balance sheet, it would undermine the Fed's ability to carry out its statutory mandate to regulate the money supply to promote maximum employment and price stability, 12 U.S.C. § 225a, which is an unlikely objective to ascribe to the MCA, the stated purpose of which was "[t]o *facilitate* the implementation of monetary policy," 94 Stat. 132

---

[13] *Available at* www.federalreserve.gov/newsevents/pressreleases/files/bcreg20110705a1.pdf (requiring regulated banks to manage many of the same risks).

(emphasis added), not hinder it. *Cf. King*, 576 U.S. at 493 ("We cannot interpret federal statutes to negate their own stated purposes." (citation omitted)). It would also force Reserve Banks to conduct transactions that might undermine various statutory mandates ranging from Bank Secrecy Act provisions meant to prevent money laundering to various foreign sanctions regimes and even federal drug laws. *Cf. Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1055 (10th Cir. 2017) (Moritz J., concurring) (noting that granting a master account to a bank catering to marijuana businesses would "facilitate illegal activity" in violation of the Controlled Substances Act).

Custodia's interpretation would also largely abdicate federal control over access to the Fed's balance sheet and the entities that Reserve Banks—which are federal instrumentalities that, *inter alia*, facilitate implementation of federal monetary policy and are a source of funding to the public fisc—must do business with. "Depository institutions" have been defined as institutions chartered by any U.S. State, territory, or possession that are "engaged in the business of receiving deposits other than trust funds," 12 U.S.C. §§ 461(b)(1)(A)(i), 1813(a)(2), 1815(a), a definition which in some contexts has been read broadly. *E.g.*, 12 C.F.R. § 303.14(a) ("maintain[ing] one or more non-trust deposit accounts in the minimum aggregate amount of $500,000"). Therefore, under Custodia's construction, any state (or U.S. territory or possession) might vest any business, regardless of how risky or illegal its activities or overall profile are, with an unqualified right to do business with Reserve Banks and access the Federal Reserve's balance sheet as long as it accepts one or more deposits.

This cannot be correct, especially in light of the intricate regulatory regime that applies to member banks and other depository institutions that, unlike Custodia, are subject to federal prudential regulation. "Congress . . . does not alter the fundamental details of a regulatory

scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In the federal agency context, Congress is deemed not to subtly grant broad authority to agencies "to make a 'radical or fundamental change' to a statutory scheme," or otherwise exercise "[e]xtraordinary regulatory authority" through "modest words, vague terms, or subtle devices." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). It would be equally bizarre to impute an intent by Congress to grant such powers to nearly five dozen states and territories, in derogation of multiple federal statutory regimes, based on text that it expressly labeled a pricing principle. *Cf. Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence Congress "plainly intended" it).

### C.   Custodia's Construction of Section 248a Is Inconsistent with Recent Board Guidance and Amendments to the Federal Reserve Act

Not only is Custodia's interpretation of 12 U.S.C. § 248a at odds with its text, Congressional intent, and other statutory provisions, but it is also inconsistent with the Board's recently issued Guidelines and with the recently enacted 2023 NDAA.

The Board's Guidelines, issued after notice-and-comment, make clear that decisions regarding whether to grant a master account or make services available to any particular depository institution are discretionary. These Guidelines were the result of a 15-month process, beginning before Custodia filed its original complaint. Specifically, the Board published a Federal Register notice on May 11, 2021, and a supplemental notice on March 8, 2022, and on both occasions sought public comment. 86 Fed. Reg. 25,865 (May 11, 2021); 87 Fed. Reg. 12,957 (Mar. 8, 2022). The original notice stated that the proposed guidelines sought to "ensure that Reserve Banks evaluate a transparent and consistent set of factors when reviewing requests for accounts and services," but that they would not disturb the "discretionary authority to grant or

Case 1:22-cv-00125-SWS   Document 127   Filed 03/28/23   Page 30 of 35

deny requests." 86 Fed. Reg. at 25,866. And when the final Guidelines were issued, after consideration of further public comments and a unanimous Board vote, the Board expressly recognized that Reserve Banks "retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102. Accordingly, the Board explicitly declined to adopt a reading of the FRA that would have mandated that master account requests be granted in every instance.

The Board's interpretation of the FRA, including Section 248a, should be afforded deference as the "agency's construction of its own statutory mandate." *Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 251 (1978). Deference is also warranted because the Guidelines were issued following notice and comment, with the Board providing "formal responses to public comments" and using "formalized procedures" associated with rulemaking. *See Lambert v. Saul*, 980 F.3d 1266, 1275 (9th Cir. 2020) (citing *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714-15 (1985)); *WildEarth Guardians v. NPS*, 703 F.3d 1178, 1188 (10th Cir. 2013) (considering "the agency's expertise, the importance of the question to the agency's administration of the statute, . . . the degree of consideration the agency has given the question," and "the presence or absence of notice-and-comment").[14]

---

[14] Notably, even though the Board's Guidelines are recent, they reinforce the Board's longstanding practice. Dating back at least to 1998, when uniform Operating Circulars applicable across all Reserve Banks were first issued, all versions of Operating Circular 1, which sets the terms and conditions applicable to master accounts, make clear that Reserve Bank approval was required to open a master account, and that the account could be terminated at any time. For example, the 1998 OC-1 states that "[a]ll master accounts are subject to Reserve Bank approval," and notes that "[w]e may close your master account . . . at any time but will endeavor to give you at least five business days' prior notice." 1998 OC-1 at ¶¶ 2.3, 2.8. Similarly, the most recent OC-1, issued in August 2021, provides that "[e]ach Master Account Agreement" executed by a financial institution "is subject to approval by the Financial Institution's Administrative Reserve

Moreover, to the extent any doubt remains as to the ability to deny requests for master accounts, that doubt was resolved by the 2023 NDAA. Specifically, that statute requires that the Board "create and maintain a public, online, and searchable database" that includes "a list of every entity that submits an access request for a reserve bank master account and services . . . including whether . . . a request . . . was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1) (emphasis added). The term "reserve bank master account and services" is defined as "an account in which a Federal reserve bank – (A) receives deposits for an entity . . . ; or (B) provides any service under section 248a(b)[.]" 12 U.S.C. § 248c(a)(3). Section 248a(b) contains the list of services that Custodia contends must be provided on a mandatory basis to all depository institutions. The statute further indicates that each entry on the list must specify whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union." 12 U.S.C. § 248c(b)(1)(C). Thus, by its plain terms, the law specifically contemplates that requests for master accounts and services (including those services set forth in Section 248a) from "a depository institution that is not an insured depository institution"—*a category that includes Custodia* (Am. Comp. ¶¶ 40, 55)—may be "rejected."

If it were the case that Reserve Banks were required to provide a "reserve bank master account and services" on a mandatory basis to every depository institution, then there would be no need for the Board to publish a list of the depository institutions "rejected" for such services. The only way that the 2023 NDAA can be read to give effect to all of its provisions is that there

---

Bank," and that "[a] Reserve Bank may terminate a Master Account Agreement . . . at any time." 2021 OC-1 at ¶¶ 2.6, 2.10. This longstanding practice supports the application of deference. *Accord First Lincolnwood Corp.*, 439 U.S. at 248 ("an agency's long-standing construction of its statutory mandate is entitled to great respect").

may be rejections of requests for "reserve bank master account and services" from depository institutions. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (quotation omitted)); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is, however, a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (quotation omitted)).

Indeed, it is a well-settled principle that "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Prime Care of Ne. Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284, 1287 (10th Cir. 2006); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 696-98 (1979); *Bd. of Cnty. Comm'rs v. EEOC*, 405 F.3d 840, 845 (10th Cir. 2005); *Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (holding that "Congress' awareness of [agency rulings] when enacting other and related legislation make[s] out an unusually strong case of legislative acquiescence in and ratification by implication"). Given that the Board publicly issued its Guidelines in August 2022 indicating that the FRA does not limit discretion to deny master account requests, it is notable that Congress acted just months later confirming the Board's position.

## II.    Because Custodia Lacks a Right to a Master Account, Its Complaint Must be Dismissed

Claim I alleges that the Board violated the APA because the denial of Custodia's master account request was "patently unlawful" and therefore "not in accordance with law." Am. Compl. ¶¶ 83-84 (quoting 5 U.S.C. § 706(2)). As discussed above, there is no legal requirement dictating that Custodia receive a master account, or that the Board direct that it receive one, and Custodia fails to state an APA claim as a result. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("[T]he only agency action that can be compelled under the APA is action legally *required*." (emphasis in original)).

24

Similarly, Claim II against the Board must be dismissed because Custodia cannot show that it has "a clear and certain claim to have its master account application granted" by the Board under Section 248a(c)(2), as it claims, Am. Compl. ¶ 90, which is a prerequisite to relief under the Mandamus Act, 28 U.S.C. § 1361. Mandamus "is a drastic remedy, and is to be invoked only in extraordinary circumstances." *In re Cooper Tire & Rubber Co.,* 568 F.3d 1180, 1186 (10th Cir. 2009) (quotation omitted). A plaintiff must establish: "(1) that [it] has a clear right to relief, (2) that the [defendant's] duty to perform the act in question is plainly defined and peremptory, and (3) that [it] has no other adequate remedy." *Sullivan v. Univ. of Kan. Hosp. Auth.*, 844 F. App'x 43, 51 (10th Cir. 2021) (quotation omitted). Here, there is no statute that "commands" the Board to direct the opening of a master account notwithstanding Custodia's contention that it has a "clear and certain claim to have its master account application granted" under 12 U.S.C. § 248a(c). Am. Compl. ¶ 90. To the contrary, the Board has fulfilled its responsibilities under Section 248a by publishing the required pricing principles and schedule of fees with the understanding that accounts and services are generally available to both member and nonmember banks. As discussed above, nothing more is required of the Board, and it cannot be compelled to exercise discretionary power over Reserve Banks to compel an outcome that it does not support.

Finally, Custodia's Claim III, for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, is not an independently viable cause of action because that Act does not create substantive rights. *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) ("Declaratory Judgment Act is "only procedural," and "leav[es] substantive rights unchanged").

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the case be dismissed.

Dated: March 28, 2023

Respectfully submitted,


 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2023, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.


By:   /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors*
*of the Federal Reserve System*