FRB Order No. 2023-02
January 27, 2023

FEDERAL RESERVE SYSTEM

Custodia Bank, Inc.
Cheyenne, Wyoming

Order Denying Application for Membership

Custodia Bank, Inc., Cheyenne, Wyoming ("Custodia"), a de novo, state-chartered special purpose depository institution ("SPDI"), has requested the Board's approval under section 9 of the Federal Reserve Act (the "Act") to become a member of the Federal Reserve System.[1]  Custodia intends to focus its business model almost entirely on the crypto-asset[2] sector, and has described itself as seeking to become "a compliant bridge" between the U.S. dollar payment system and the crypto-asset ecosystem.[3]  Custodia proposes to provide a limited offering of core banking products and services and to develop various crypto-asset products and services, including crypto-asset custody,

---

[1]  12 U.S.C. § 321 et seq.

[2]  Throughout this Order, the term "crypto-assets" refers to digital assets issued using distributed ledger technology and cryptographic techniques (e.g., bitcoin and ether), but does not include such assets to the extent they are more appropriately categorized within a recognized, traditional asset class (e.g., securities with an effective registration statement filed under the Securities Act of 1933 that are issued, stored, or transferred through the system of a regulated clearing agency and in compliance with all applicable federal and state securities laws).  Custodia's materials submitted in connection with its application generally use the term "digital asset" instead of "crypto-asset."

[3]  Confidential Exhibit A to the Application by Custodia Bank to the Board of Governors of the Federal Reserve System for Membership in the Federal Reserve System—FR 2083 (August 5, 2021) ("Initial Business Plan"), at 2.

**Attachment A**

a crypto-asset token it refers to as an "electronic negotiable instrument," and crypto-asset prime services.  Custodia is not seeking deposit insurance from the Federal Deposit Insurance Corporation ("FDIC").

On August 5, 2021, Custodia submitted initial materials to apply for membership in the Federal Reserve System.[4]  In evaluating membership applications, the Board considers the general character of the management of the applying bank ("managerial factor"), the applying bank's financial condition ("financial factor"), whether the corporate powers to be exercised are consistent with the purposes of the Act ("corporate powers factor"), and the convenience and needs of the community ("convenience and needs factor").[5]  Based on its review of the record of Custodia's membership application,[6] the Board has fundamental concerns with Custodia's proposal, including its novel and unprecedented features, and has determined that approval of the membership

---

[4]  Application by Custodia Bank to the Board of Governors of the Federal Reserve System for Membership in the Federal Reserve System—FR 2083 (August 5, 2021) ("Initial Application").  In October 2020, Custodia made an initial, separate submission to the Federal Reserve Bank of Kansas City ("Reserve Bank") requesting a master account.  This order only relates to the Board's consideration of the membership application.  The master account request is under separate consideration by the Reserve Bank.

[5]  12 U.S.C. § 322; 12 CFR 208.3(b)(1)–(4).  As part of the financial factor, the Board considers the financial history and condition, capital adequacy, and future earnings prospects of the applicant.  12 U.S.C. § 329; 12 CFR 208.3(b)(1)–(2).

[6]  As of October 21, 2022, Custodia asserted that the "application record should now be considered complete."  Letter from Derek Bush to Jeffrey Imgarten dated October 21, 2022 ("Third AI Response"), at 2.

application would be inconsistent with the financial, managerial, and corporate powers factors.[7]

   ***Managerial Factor.***   The Board does not believe that approval of the application would be consistent with the managerial factor.  Banks admitted for membership in the Federal Reserve System must have risk management systems and controls commensurate with the nature, scope, and risks of the activities in their proposed business plans.  In general, the Board has heightened concerns about banks with business plans focused on a narrow sector of the economy.[8]  Those concerns are further elevated with respect to Custodia because it is an uninsured depository institution seeking to focus almost

---

[7] See 12 CFR 208.3(a)(2).  When reviewing applications for membership, the Board's long-standing view has been that adverse considerations with respect to any individual statutory factor may be sufficient grounds to support denial.  This approach is consistent with the Board's review of applications under statutory factors in other contexts.  See, e.g., Florida National Banks of Florida, Inc., 62 Federal Reserve Bulletin 696, 698 (1976) (denying the application by a company to retain voting shares in a bank acquired without proper prior approval of the Board on the grounds of adverse managerial considerations alone); Emerson First National Company, 67 Federal Reserve Bulletin 344, 345–46 (1981) (denying based on financial factors—including future prospects—alone); see also Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 244–48 (1978) (holding that the Board may "disapprove formation of a bank holding company solely on grounds of financial or managerial unsoundness" under the Bank Holding Company Act and noting "the similarity between these factors [under the Bank Holding Company Act] and those specified in other banking statutes as the basis for admitting state banks to membership in the Federal Reserve System").

[8] See, e.g., Green Dot Corporation, 98 Federal Reserve Bulletin 29, 32 (2011) ("A business plan that focuses on a narrow business activity and depends on a limited number of key business partners carries significantly greater risks than a business plan that employs broad diversification of activities and counterparties.  The Board expects banking organizations with a narrow focus to address these increased risks with financial resources, managerial systems, and expertise commensurate with that additional level of risk.") (internal citations omitted).

exclusively on offering products and services related to the crypto-asset sector, which presents heightened illicit finance[9] and safety and soundness risks.[10]

Pre-membership examination findings are particularly insightful in relation to a de novo charter because there is a lack of a management track record to review.  The findings of Federal Reserve staff's pre-membership examination suggested significant deficiencies in Custodia's ability to manage the risks of its day-one activities, which consist of limited basic banking services.  Specifically, the findings indicated Custodia's risk management and controls for its core banking activities were insufficient, particularly with respect to overall risk management; compliance with the Bank Secrecy Act ("BSA") and U.S. sanctions; information technology ("IT"); internal audit; financial projections; and liquidity risk management practices.

Despite these deficiencies, Custodia has proposed to expand its operations soon after approval for membership to focus almost exclusively on novel crypto-asset-related activities and to accept only uninsured deposits—an unprecedented business model that presents heightened risks involving activities that no state member bank previously has been approved to conduct.  As of the time of the pre-membership examination, Custodia had not yet developed a sufficient risk-management framework for its proposed crypto-asset-related activities, nor had it addressed the highly correlated risks associated with its undiversified business model.  Indeed, some products that are estimated to be significant

---

[9]  See infra part II.A.1.

[10]  See infra part II.C.2.

sources of revenue were still in the "conceptualization phase," and policies, procedures, and processes related to planned crypto-asset-related activities remained in the early stages of development, especially in the area of compliance. As such, at this time, Custodia has been unable to demonstrate that it could conduct an undiversified business focused on crypto-asset-related activities in a safe and sound manner and in compliance with BSA and Office of Foreign Assets Control ("OFAC") requirements.

In addition, the depth of relevant banking experience and bank-specific risk management experience among Custodia's board of directors and management team is limited, and the information available is not sufficiently persuasive in demonstrating that the proposed management team could conduct the proposed activities in a safe and sound manner. The number and degree of shortcomings identified in the pre-membership examination suggest that management's experience is not commensurate with the firm's intended risk profile.

The proposal also presents potential concerns with respect to Custodia's ability to be resolved safely and effectively upon failure. Uncertainty regarding such an outcome could contribute to instability and run risk at a time of stress for Custodia. Accordingly, considerations relating to the managerial factor are so adverse as to present sufficient grounds on their own for warranting denial of the application.

***Financial Factor.*** The Board does not believe that approval of the application would be consistent with the financial factor. The Board generally disfavors business plans that "result in a concentration of assets, liabilities, product offerings, customers,

revenues, geography, or business activity without effective mitigants."[11]  Without a materially diversified business franchise, Custodia's revenue and funding model relies almost solely upon the existence of an active and vibrant market for crypto-assets. However, crypto-asset markets have exhibited significant volatility.[12]  The Financial Stability Oversight Council ("FSOC") has observed that the value of most crypto-assets is driven in large part by speculation and sentiment, and is not anchored to a clear economic use case.[13]  Recent events, including the bankruptcies of crypto-asset intermediaries Celsius, Voyager, BlockFi, and FTX, have highlighted that the global and largely unregulated or noncompliant crypto-asset sector lacks stability and that dislocations in the sector can result in stress at financial institutions focused on serving the crypto-asset sector.

Given that Custodia only recently started operations, there is very limited financial history to assess.  While Custodia appears to have sufficient capital and resources to sustain initial operations, Custodia's pro forma financial statements assume that it would be permitted to engage in several novel crypto-asset-related activities; indeed, Custodia's medium and long term viability would be dependent on engaging in such activities.

---

[11]  SR Letter 14-2/CA Letter 14-1:  Enhancing Transparency in the Federal Reserve's Applications Process (February 24, 2014) ("SR Letter 14-2").

[12]  Financial Stability Oversight Council, Report on Digital Asset Financial Stability Risks and Regulation, at 9 (October 3, 2022) ("FSOC Report"), ("[Global crypto-asset] market capitalization exhibited substantial volatility, rising, for example, from about $200 billion in April 2020, to the November 2021 peak [of nearly $3 trillion], and later falling as of July 2022 to a trough of about $900 billion.").

[13]  FSOC Report, at 23–28.

However, in the event Custodia's application were to be approved, the Board would prohibit Custodia from engaging in a number of those activities because Custodia has not demonstrated that it can conduct the activities in a safe and sound manner and, in some cases, also because the activities would be impermissible for a national bank. Without the ability to conduct these crypto-asset-related activities, the financial condition, including the future earnings prospects of the institution, is uncertain. Accordingly, considerations relating to the financial factor are so adverse as to present sufficient grounds on their own for warranting denial of the application.

*Corporate Powers Factor.* The Board does not believe that approval of the application would be consistent with the corporate powers factor. Custodia's proposed business model would focus almost exclusively on the crypto-asset sector and would aim to create further connections between traditional financial intermediaries and the crypto-asset ecosystem by engaging in crypto-asset-related activities that are novel and unprecedented for state member banks. Given the speculative and volatile nature of the crypto-asset ecosystem, the Board does not believe that this business model is consistent with the purposes of the Federal Reserve Act. Further, if the Board were to approve Custodia's membership application, it would prohibit Custodia from engaging in a number of the novel and unprecedented activities it proposes to conduct—at least until such time as the activities conducted as principal are permissible for national banks and

Custodia can demonstrate that it can conduct the activities in a safe, sound, and compliant manner.[14]

Additionally, the admission of an uninsured deposit-taking institution to Federal Reserve membership is unprecedented since the creation of federal deposit insurance in 1933 and requires careful consideration of the heightened micro- and macro-prudential risks of wholly uninsured deposit-taking.[15]  The absence of deposit insurance coverage at Custodia could increase the firm's risk of runs and contagion.  This is especially concerning because the global crypto-asset industry, on which Custodia has focused its business model, is highly susceptible to runs, as recent events have demonstrated.[16]

Even if granted membership, Custodia, as an uninsured depository institution, would not be subject to a host of requirements tied to insured depository institution status.[17]  Further, the resolution of an uninsured deposit-taking institution would be required to be conducted outside the FDIC's proven and effective receivership process

---

[14]  See infra part II.C.

[15]  From 1934 until 1991, federal deposit insurance was granted as a condition of membership in the Federal Reserve System to all member banks in the business of accepting deposits other than trust funds.  See Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162, 172.  Since the passage of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), the Federal Reserve has not admitted to membership a bank proposing to accept deposits from the general public that has not been approved by the FDIC for deposit insurance.  Pub. L. No. 102-242, 105 Stat. 2236 (1991).

[16]  See FSOC Report, at 46–53.

[17]  Moreover, any future parent company of Custodia likely would not be subject to prudential supervision or regulation as a holding company because Custodia would be uninsured and is not allowed to engage in lending and, therefore, would not be a "bank" under the Bank Holding Company Act ("BHC Act").  12 U.S.C. § 1841 et seq.

and instead would occur under a newly enacted and entirely untested Wyoming state law resolution regime.  Future applicants may present business models and control frameworks to overcome the concerns presented by an uninsured deposit-taking bank, but the Board does not believe that Custodia has overcome these concerns or provided sufficient justification to break from long-standing precedent.  Accordingly, considerations relating to the corporate powers factor are so adverse as to present sufficient grounds on their own for warranting denial of the application.

*Convenience and Needs Factor.*  In addition to the statutory factors, under the Board's Regulation H, the Board considers the convenience and needs of the community to be served.  The Board has considered Custodia's purported benefits to its community. Custodia has not demonstrated that it could operate in a safe and sound manner as proposed, which also indicates Custodia will not be able to meet the convenience and needs of its community.  Instead, the current record indicates Custodia could in fact pose significant risk to its community.  It is also unclear whether Custodia would be able to comply with any applicable consumer protection requirements given the inherent features of its intended business model.

*     *     *

In summary, the Board believes that approving Custodia's application as submitted would be inconsistent with the factors that the Board is required to consider. There are significant deficiencies in Custodia's risk management and controls framework in relation to Custodia's limited basic banking activities.  Even if Custodia were able to successfully remediate all issues identified with respect to its ability to safely and soundly

conduct its limited day-one activities, conducting only this limited set of activities would not enable it to constitute a viable bank in the medium or long term.  Moreover, the future earnings prospects of the business model that Custodia has proposed—that is, an uninsured, undiversified, crypto-asset-focused business model featuring a number of novel and untested activities posing heightened risks—is inconsistent with approval.  In light of concerns set forth herein, the Board has determined that considerations relating to the managerial, financial, and corporate powers factors are so adverse as to each independently warrant denial of application.  The membership application is therefore denied without prejudice to future applications by Custodia.

## I.  Background

Custodia (formerly called "Avanti") is a de novo SPDI chartered by the state of Wyoming.  Custodia intends to focus on the crypto-asset sector and has described itself as seeking to become a "compliant bridge" between the U.S. dollar payment system and the crypto-asset ecosystem.[18]  Wyoming state law enables the chartering of SPDIs, a new type of financial institution that the state of Wyoming designed specifically to be able to meet the financial services needs of crypto-asset-related businesses.[19]  Under the

---

[18]  Initial Business Plan, at 2.

[19]  Wyoming specifically designed the Wyoming Special Purpose Depository Institutions Act ("SPDI Act"), and other crypto-asset-related legislation and regulations, to foster the establishment of a new type of financial institution to serve crypto-asset customers and encourage blockchain innovation.  See H.B. 0074, 65th Legislature, General Session (Wyo. 2019), at 1–2; see also Wyoming Division of Banking, Special Purpose Depository Institutions (accessed January 23, 2023), https://wyomingbanking division.wyo.gov/banks-and-trust-companies/special-purpose-depository-institutions; Carolyn Duren, Wyoming Aims to Become "Silicon Prairie" with 1st Cryptocurrency

Wyoming SPDI Act, Custodia may engage in a nonlending banking business, provide payment services for depositors, and, with the approval of the state banking commissioner, engage in any other activity that is usual or incidental to the business of banking.[20]

Wyoming law prohibits SPDIs from making loans and requires SPDIs to maintain unencumbered assets valued at 100 percent of its depository liabilities or more; Wyoming law allows SPDIs to meet the unencumbered-asset requirement by holding deposits at a Federal Reserve Bank or federally insured financial institution, U.S. Treasury securities, state and municipal bonds, and agency securities.[21]  Custodia proposes to maintain, during the first three years of its operations, reserves equal to at least 108 percent of customer deposits in a Reserve Bank master account, if one is granted, subject to the agreement of the Wyoming Division of Banking; after that period, Custodia proposes to invest the funds associated with customer deposits in Federal Reserve Bank deposits,

---

Bank, S&P Global (September 23, 2020), https://spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/wyoming-aims-to-become-silicon-prairie-with-1st-cryptocurrency-bank-60423622.

[20]  See Wyo. Stat. §§ 13-12-101 through 13-12-126.

[21]  Wyo. Stat. § 13-12-103(c); Wyo. Stat. § 13-12-105.  Permitted assets include deposits held at a Federal Reserve Bank or correspondent bank, obligations of the U.S. Treasury or other federal agencies, obligations of U.S. states and municipalities that are investment grade, securities issued by federal or state agencies or government-sponsored enterprises that are investment grade, and any other investments deemed to be "substantially similar" and "permissible under safe and sound banking practices" by the Wyoming Banking Commissioner (which, according to Custodia's Investment Policy, could include reverse repurchase agreements fully collateralized by U.S. Treasuries).  Wyo. Admin. Code 21-2-20 § 9(a).  The investments must be level 1 High-Quality Liquid Assets as defined under 12 CFR 249.20, unless approved by the Commissioner.  Wyo. Admin. Code. 21-2-20 § 9(b).

deposits at federally insured depository institutions, Treasury securities with maturities of three months or less, or reverse repurchase agreements on Treasury securities.[22] Wyoming law does not require SPDIs to obtain federal deposit insurance, and Custodia is not seeking to obtain federal deposit insurance.[23]

Because Custodia will not have federal deposit insurance,[24] there are significant gaps in the applicable federal legal and prudential framework.  As an uninsured institution, a range of requirements tied to insured depository institution status would not apply.  For example, Custodia would not be subject to the Change in Bank Control Act[25] or the Community Reinvestment Act.[26]  In addition, as a nonbank for purposes of the BHC Act, any entity that controls, or is under common control with, Custodia would be outside the scope of the BHC Act's activities restrictions and consolidated prudential supervision and regulation.[27]

---

[22]  Letter from Derek Bush to Jeffrey Imgarten dated July 22, 2022 ("First AI Response"), at 15–17; Custodia Bank, Inc., Investment Policy (July 19, 2022) (part of Confidential Exhibit D to the First AI Response) ("Investment Policy"), at 3–5.

[23]  All Wyoming state-chartered banks, except SPDIs, must obtain FDIC insurance. Wyo. Stat. § 13-2-103(a).

[24]  Even though it is a depository institution, Custodia contends that it is functionally similar to a nondepository national trust company and has asserted that some national trust companies do not have FDIC insurance.  Initial Business Plan, at 114.  There are currently no uninsured member banks that accept deposits from the general public.

[25]  12 U.S.C. § 1817(j).

[26]  12 U.S.C. § 2901 et seq.

[27]  See supra note 17.

Custodia was granted an SPDI charter from the state of Wyoming in October 2020.[28]  On August 5, 2021, Custodia submitted initial materials to apply for membership in the Federal Reserve System pursuant to section 9(1) of the Act.[29] Custodia received a certificate of authority to operate from the state of Wyoming on September 12, 2022.[30]  Custodia commenced operations on October 11, 2022.  Custodia intends to begin accepting deposits in early 2023.

Custodia proposes to operate as a "digital bank ███████████████" and plans to operate in all 50 states within its first ████████ of operation.[31]  Custodia has based its growth assessments on the judgment that "███████████████████████ ███████████████████" and that there would not be "████████████████ █████████████████████."[32]  Custodia proposes to offer its services to non-U.S. customers after ██████████ of operation.[33]



### A.  *Custodia's Proposed Business Model*

Custodia's membership application indicates that it would follow a novel business model—a digital banking platform offered globally, with no branches—focused on fee revenue by serving the crypto-asset industry across four core business lines:  Payments–

---

[28]  Initial Business Plan, at 2; <u>see also</u> Public Exhibit D to the Initial Application.

[29]  12 U.S.C. § 321; Initial Application.  There is a 1-year time limit on agency consideration of a completed application.  12 U.S.C. § 4807.

[30]  Third AI Response, at 13.

[31]  Initial Business Plan, at 39.

[32]  Initial Business Plan, at 92.

[33]  First AI Response, at 3, 44.

Core Banking; Custody; Payments–Avit; and Prime Services.[34]  Custodia intends to offer these services primarily to businesses conducting crypto-asset-related activities,[35] but would later offer such services to high-net-worth individuals that maintain large minimum balances.[36]

### 1. *Payments–Core Banking*

Custodia plans to offer deposit accounts for businesses and eventually high-net-worth individuals[37] and, in connection, would provide such customers access to ACH and wire transactions, ███████████, and online banking services.[38]  Custodia plans to target core banking business from crypto-asset-related customers that it believes are currently underserved in this area,[39] and for the core banking business line to be available

---

[34]  Initial Business Plan, at 6.  Custodia would also develop an application programming interface ("API") for its services, allowing third parties to develop custom software integrations ██████████████████████████.  See Initial Business Plan, at 8, 15–17; see also Confidential Exhibit B to the Initial Application, at 6, 10.  Custodia would offer API services to "███████████████████████."  Letter from Derek Bush to Jeffrey Imgarten dated August 19, 2022 ("Second AI Response"), at 32.

[35]  Custodia anticipates that its customers would include ████████████████████
████████████████████████████████████████████████████████████████
████████████."  Initial Application, at 7.

[36]  Initial Business Plan, at 10; First AI Response, at 3; Second AI Response, at 3–4; Third AI Response, at 13–14.

[37]  While Wyo. Stat. § 13-12-104(a)(i) prohibits SPDIs from taking deposits from natural persons, Custodia indicates that the Wyoming Division of Banking has interpreted Wyo. Stat. § 13-12-104(d) to allow for natural persons to be depositors as an activity that is incidental to the business of banking.  Third AI Response, at 13–14.

[38]  Initial Business Plan, at 8–9; First AI Response, at 2, 7–8.

[39]  Initial Application, at 7–8; see also Initial Business Plan, at 53–60.

when ███████████████ .[40]  The core banking business line also would be

integral to Custodia's proposed future business lines, particularly custody[41] and Avit.[42]

     *2.  Custody*

     Custodia plans to custody crypto-assets under ████ different arrangements: ████



███████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████████████

██████████████ .[43]

---

[40]  Initial Business Plan, at 7; First AI Response, at 2, 7–8.  While Custodia represents its core banking services are an important feature of the proposed crypto-asset-related business, a material aspect of Custodia's value-add proposition and potential for revenue generation is the subsequent addition of crypto-asset-related operations in conjunction with traditional banking products and services.  From provided revenue projections, ████████████████████████████████████████████████████ First AI Response, at 4.

[41]  See, e.g., Initial Business Plan, at 60 ("███████████████████████████ ███████████████████████████████ ███████████████████████████████ ██████████████████████ ).

[42]  ███████████████████████████████ ████████████████████████  See Initial Business Plan, at 13–15.

[43]  Initial Business Plan, at 10–11; Second AI Response, at 21–23.

Custodia would send and receive crypto-assets on behalf of customers under each of these custodial arrangements.[44]  Custodia would also conduct private key management, wherein it would act as a signatory on one of the keys in a multi-party, multi-signature arrangement, ███████████████████████████████████████████.[45]  Finally, Custodia would ████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████.[46]

Custodia asserts that it must hold a small amount of bitcoin and ether as principal in order to pay transaction fees on behalf of customers in order to offer custody services.[47]  Custodia argues that prudent risk management requires it to distribute large custody transfers and balances across multiple addresses to mitigate cyber theft risk and that it must pay transaction fees associated with these transfers using crypto-assets from its own account because the transfers are conducted at Custodia's direction, rather than at

---

[44]  Initial Business Plan, at 10–11.  Custodia would also ███████████████████ ███████████ Id., at 11.

[45]  Initial Business Plan, at 11; Second AI Response, at 22.

[46]  Initial Business Plan, at 10–11; Second AI Response, at 22–23.

[47]  First AI Response, at 18, 39 n.97; Second AI Response, at 24–25 ("Custodia must pay on-chain transaction fees both in respect of customer transactions and in relation to the risk management of these customer transactions.").  Custodia indicates that it expects to hold ███████████████ worth of crypto-assets as principal at any one time.  Under Custodia's proposed Investment Policy, however, it would be authorized to hold up to ██ ███████████████████ in crypto-assets.  First AI Response, at 18; Investment Policy, at 4–5.

the direction of the customer.[48]  ==Custodia has also asserted that Wyoming law requires it to hold certain crypto-assets as principal in order to custody crypto-assets because crypto-asset custodians must have on hand sums required for the execution of transactions.==[49]

Custodia plans for a limited version of its custody business line—providing custody services only for bitcoin—to be available by █████████████████.[50]  Custodia plans to launch custody services for ether around █████████████.[51]

---

[48]  Second AI Response, at 24–25.  When asked about alternatives, Custodia acknowledged that it is possible to conduct customer-directed transactions without paying transaction fees from crypto-assets in its own account in four ways but insisted that the options were not feasible.  First, Custodia could ████████████████████████ ████████████████████████████████████.  However, Custodia argues that this model would burden its proposed business model by increasing the risk a transaction fails, as this approach would ███████████████████████████████████████████ ██████████████████████████████████████████████████████.  Id. ███████████ Second, Custodia could ██████████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████ Third AI Response, at 19–21.  Custodia states it " ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ thus defeating the purpose of ████████████ in the first place."  Id., at 21.  Third, Custodia could ████████████████████████████████████████████████████; however, Custodia states ████████████████ "would not be feasible due to ██████████."  Id., at 20.  Fourth, Custodia could "██████████████████████████████████;" however, Custodia states that the approach would "increase operational risk" and "result in a poor customer experience."  Id., at 21.

[49]  First AI Response, at 12 n.31 ("████████████████████████████ ██████████████████████████████████████████."), 18 n.50, 39 n.97 (" ██████████████████████████████████████████████ ████████████████████" citing Wyo. Admin. Code 21-2-19 § 8(a)); Investment Policy, at 4–5.

[50]  First AI Response, at 2.

[51]  Id., at 3.

### 3. *Payments–Avit*

Custodia plans to issue, redeem, and transfer Avits—dollar-denominated tokens that Custodia describes as programmable "electronic negotiable instrument[s]"[52] and as deposits for purposes of federal banking law.[53]  Avits are designed to facilitate delivery-versus-payment transactions between counterparties transacting in crypto-assets by increasing the velocity of crypto-asset transactions and removing counterparty credit risk in U.S. dollar/crypto-asset transactions resulting from settlement timing mismatch.[54] While Custodia does not refer to Avits as "stablecoins," the tokens would likely function similar to "stablecoins" like Tether and USDC.[55]

---

[52]  Initial Business Plan, at 9 ("Avit has no direct analogue to an existing payment product.  Avits are not legal tender, securities, or commodities."), 98–102, 117–118; First AI Response, at 8 ("Avit is an electronic negotiable instrument, representing a claim on bank assets; it is a bank obligation issued as the electronic equivalent of a promissory note, which can be endorsed to a new transferee and can be redeemed by the most recent transferee."), 14; Third AI Response, at 24–28, 31–32.

[53]  First AI Response, at 9 ("For banking law purposes, an Avit is a deposit, representing a digital equivalent of a cashier's check."), 32 (stating that Avit would be "100% backed by risk-free assets, which will be held in Custodia's Federal Reserve Master Account, pending approval"); Initial Business Plan, at 31 ("[A]n Avit is likely to be treated as a bank deposit by the [Internal Revenue Service]").

[54]  Initial Business Plan, at 9–10, 27–28.

[55]  Custodia has stated that Avits are not stablecoins, but "a new payment technology." Initial Business Plan, at 9.  Custodia states that the "Avit could satisfy some of the demand for stablecoins" and that users would "primarily include ███████████ ██████████████████████ ."  Initial Business Plan, at 108.  Custodia's growth and fee assumptions for Avits are based on ████████████████████████████████ ████████████████████████████████████████████  Custodia Bank, Inc., Support for Digital Asset Assumptions (September 30, 2022) (Confidential Exhibit I to Letter from Caitlin Long to Ross Crouch dated December 20, 2022).

Custodia would issue Avits on Ethereum, a public blockchain,[56] and Liquid, a sidechain of the Bitcoin blockchain,[57] and would back each Avit with one dollar in funds held in a master account at the Federal Reserve, if such account is granted.[58]  Custodia states that under this structure an Avit would be a U.S. dollar-denominated "electronic transferable record" under the Uniform Electronic Transactions Act, providing its holder with rights similar to those of holders of a cashier's check or a promissory note.[59]  Ownership of and transactions with Avits would not be limited to customers of Custodia. Persons unknown to Custodia would be able to purchase Avits on the secondary market

---

[56]  A defining feature of a public blockchain is that it is "open to the public, and anyone can participate as a node in the decision-making process."  Imran Bashir, <u>Mastering Blockchain</u> 26 (3d ed. 2020); <u>see also</u> Ethereum.org, <u>Intro to Ethereum</u> (accessed January 23, 2023), https://ethereum.org/en/developers/docs/intro-to-ethereum/.

[57]  A sidechain is a blockchain with its own consensus mechanism and set of nodes that is connected to another blockchain through a two-way bridge.  Loïc Lesavre et al., Blockchain Networks:  Token Design and Management Overview, at 73, National Institute of Standards and Technology Internal Report No. NIST IR 8301 (February 2021).  Liquid relies on the Bitcoin blockchain in that Liquid's native asset, L-BTC, is issued to a participant that sends a corresponding amount of bitcoin to a wallet controlled by the Liquid network.  Blockstream, <u>How Does Liquid Bitcoin (L-BTC) Work?</u> (accessed January 23, 2023), https://help.blockstream.com/hc/en-us/articles/900001408623-How-does-Liquid-Bitcoin-L-BTC-work-.  Liquid's consensus mechanism and governance differs from that of the underlying Bitcoin blockchain, allowing transactions on the sidechain to settle more quickly; <u>see also</u> Second AI Response, at 8–9.

[58]  First AI Response, at 29–34.  Custodia states that the Wyoming Division of Banking requires Avits to be " ███████████████████████████████████████████ ██████████████████████████████████████████ " First AI Response, at 32 n.86. 

[59]  <u>See, e.g.</u>, Initial Business Plan, at 117–19; First AI Response, at 8–9.

and use them to conduct transactions.[60]  Custodia has also indicated that noncustomers

would be able to redeem Avits after a screening process without being required to

become customers of Custodia.[61]  Both customers and noncustomers of Custodia would

be able to hold Avits in custody arrangements or unhosted wallets; deposit Avits with

crypto-asset lenders, brokers, or exchanges; trade Avits for other crypto-assets on

secondary exchanges; invest or stake Avits in decentralized finance protocols; and use

Avits as part of smart contracts.[62]

Custodia has represented that it is in the process of finalizing its terms and

conditions relating to Avits and that these terms will not be available until ███████████

█████████████████████████████████████████████████.[63]  As of

October 2022, Custodia estimated that it planned ███████████ to launch Avits within

"███████," ██████████████████.[64]

---

[60]  First AI Response, at 14 ("Custodia will issue Avits only to customers of Custodia.
However, because Avits will be issued on a public blockchain, customers of Custodia
would be free to transfer Avits to non-customers of Custodia.  As a result, non-customers
of Avits could come to hold Avits."); see also Second AI Response, at 38–40; First AI
Response, 26–29 (indicating Custodia would only conduct risk-based due diligence of
non-customers transacting in Avits under specific circumstances).

[61]  See, e.g., First AI Response, at 44–45; Second AI Response, at 5; Third AI Response,
at 39.

[62]  First AI Response, at 24–29.

[63]  Third AI Response, at 22–23. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████.  See Confidential Exhibit B to the First AI Response.

[64]  Third AI Response, at 22.

4. *Prime Services*

Custodia states that its prime services business line would provide customers with an on- and off-ramp to the crypto-asset ecosystem.[65]  The main components of this business would entail allowing customers to buy and sell qualifying crypto-assets through Custodia's platform.[66]  Under this offering, a Custodia customer with an adequate deposit balance could use the Custodia platform to request a bid for purchases and sales of qualifying crypto-assets, and Custodia's platform would request bids from "██████ ████████████."[67]  The best bid would be provided to Custodia's customer for acceptance, and Custodia's platform ███████████████ would enable coordinated settlement of both legs of the transaction.[68]

Separately, Custodia would offer a platform that enables customers to borrow and lend crypto-assets held in trust accounts at Custodia for a fee.[69]  For the lending business, Custodia would ████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████

---

[65]  Initial Business Plan, at 11–12; First AI Response, at 11; Second AI Response, at 15.

[66]  Initial Business Plan, at 11–12, 15–18, 69.

[67]  Initial Business Plan, at 15–18.

[68]  Id.; see also id., at 34 ("████████████████████████████ █████████████████████████████████████████████ ██████.").

[69]  Id., at 11–12; First AI Response, at 13, 35; Second AI Response, at 2–3, 15–16, 19–20.  Custodia is prohibited from lending out crypto-assets held on behalf of customers.  See Wyo. Stat. § 34-29-104(k) (prohibiting rehypothecation of crypto-assets).



[70] Custodia would also offer [redacted]

[redacted].[71]

Custodia plans to initially offer prime services as soon as [redacted] [redacted].[72] It has represented that prime services would initially be offered [redacted] [redacted].[73]

### 5. _Activities Considered in Combination_

While there is no agreed-upon taxonomy of crypto-asset-related functions or activities, the services that Custodia would provide to customers serve a similar function as many of the services offered by so-called crypto-asset exchanges. Crypto-asset exchanges allow customers to purchase and sell crypto-assets in exchange for national currency or other crypto-assets; facilitate lending of crypto-assets;[74] and offer custody

---

[70] Second AI Response, at 2–3, 19, 24; Third AI Response, at 16.

[71] See, e.g., Initial Business Plan, at 11–12, 18–20; First AI Response, at 11; Second AI Response, at 15.

[72] First AI Response, at 2–3. Custodia would be required to receive prior written approval from the Wyoming Commissioner of Banking before commencing prime services and must inform the Commissioner that it meets the enhanced crypto-asset custody requirements under Wyo. Stat. § 13-12-103(b)(vii). [redacted] [redacted]. Id., at 6–7.

[73] First AI Response, at 35–36.

[74] See, e.g., Order Instituting Proceedings Pursuant to Section 6(c) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, In re iFinex Inc., BFXNA Inc., and BXFW Inc., Commodity Futures Trading Commission Docket No. 22-05, at 3 (October 15, 2021) ("During the Relevant Period, the substantial majority of

services with respect to crypto-assets.[75]  Many crypto-asset exchanges also issue

stablecoins or are closely connected to entities that issue stablecoins.[76]

Indeed, crypto-asset exchanges rely significantly on those services for revenue,[77]

as Custodia also would.[78]  While Custodia represents that its business model differs from

---

margin trading was financed through Bi[t]finex's peer-to-peer ('P2P') funding program. Through P2P, Bitfinex customers who held fiat or cryptocurrency in their Bitfinex account would 'lend' those funds to other Bitfinex customers.").

[75]  Peter Mell and Dylan Yaga, Understanding Stablecoin Technology and Related Security Considerations, at 40, National Institute of Standards and Technology Internal Report No. NIST IR 8408 (October 2022) (initial public draft); see also Coinbase Global, Inc. ("Coinbase"), Form 10-Q (May 10, 2022).

[76]  See, e.g., Binance, Understanding BUSD and Binance-Peg BUSD (November 15, 2022) (BUSD and Binance), https://www.binance.com/en/blog/ecosystem/understanding-busd-and-binancepeg-busd-5526464425033159282; Concord Acquisition Corp Form 8-K, Exhibit 99.6, at 11 (July 7, 2021) (USDC and Coinbase); Press Release, New York Department of Financial Services, DFS Continues to Foster Responsible Growth in New York's Fintech Industry with New Virtual Currency Product Approvals (September 10, 2018), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1809101 (GUSD and Gemini); Settlement Agreement, In re Investigation by Letitia James, Attorney General of the State of New York, of iFinex, Inc., et al. (February 17, 2021) (Tether and Bitfinex).

[77]  At least one crypto-asset exchange relies on fees for crypto-asset-related services, particularly services that allow customers to buy and sell crypto-assets, for substantially all of its revenue.  See, e.g., Coinbase, Form 10-Q, at 20–21 (May 10, 2022) (stating that nearly 90 percent of total revenue is from "transaction fees earned from customers that are primarily individuals" as well as institutional customers through the company's "crypto-asset matching service when customers buy, sell, or convert crypto-assets on the platform"); Coinbase, Form 10-Q, at 24–25 (November 3, 2022) (stating transaction fees from that "matching service" account for over 60 percent of total revenue).

[78]  First AI Response, at 4 (estimating that fees from prime services and custody business lines, which are likely directly attributable to crypto-asset-related activity, would account for ████████████████████████).

those of crypto-asset exchanges,[79] Custodia proposes to offer some of the same services that are central to the operations of crypto-asset exchanges, albeit to a more limited customer base.[80]

### B. Review of Custodia's Application

Federal Reserve staff has had regular meetings with Custodia and has sent detailed requests for additional information, to which Custodia has provided responses. In addition, Reserve Bank examiners conducted a pre-membership examination of Custodia, which concluded in October 2022. The examination focused only on Custodia's core banking products because the technology and risk management infrastructures to support, facilitate, and execute the crypto-asset-related businesses (that is, custody, Avit, and prime services) were in the early stages of development.

---

[79] Initial Business Plan, at 69 ("[Custodia] is not an exchange ██████████████████████ ████████████████████████████████████████████████ "); id., at 15, 33. Some crypto-asset exchanges offer services and products that Custodia does not currently propose to conduct, such as offering direct financing for margin lending, conducting proprietary trading, or acting as a counterparty to transactions, among other activities. Such activities, however, do not appear to account for a substantial share of revenue for at least one crypto-asset exchange. See, e.g., Coinbase, Form 10-Q, at 20–23 (May 10, 2022); Coinbase, Form 10-Q, at 24–27 (November 3, 2022).

[80] Many so-called crypto-asset exchanges primarily serve retail customers and also provide services, including custody and prime services, to institutional clients. See, e.g., Coinbase, Form 10-Q, at 24–25 (November 3, 2022); Gemini, Fund Managers and ETF Issuers (accessed January 23, 2023), https://www.gemini.com/institutions/fund-managers; Kraken, Institutions (accessed January 23, 2023), https://www.kraken.com/institutions. Custodia would serve institutional customers and high-net-worth individuals. See supra note 36; see also Initial Business Plan, at 71.

With respect to core banking products and services, the examiners identified a number of significant risk management gaps, including in relation to the anti-money-laundering ("AML") requirements of the BSA and requirements relating to OFAC sanctions; IT; internal audit; financial projections; and liquidity risk management practices.[81]  As a result, at the time of the examination, Custodia's risk management practices included numerous deviations from safe and sound banking practices typically expected or required of a state member bank under Federal Reserve supervision.

Custodia has represented that remediation efforts are underway to address these deficiencies, and potential follow-up examination work would be necessary to assess the organization's plans or work to address the gaps.[82]  However, the cited deficiencies in Custodia's risk management related to its offerings of core banking products and services negatively reflect on Custodia's ultimate capacity to offer novel crypto-asset-related products in a safe and sound manner, especially given the heightened risks associated with those products.  More importantly, given that many of Custodia's underlying policies, procedures, systems, and risk controls for the key proposed crypto-asset-related activities still remain under development[83]—despite Custodia's having had time to

---

[81]  See Letter from Jeffrey Imgarten to Board of Directors of Custodia Bank, Inc., dated October 21, 2022, at 2–6.

[82]  See infra note 112.

[83]  See generally First AI Response, Second AI Response, and Third AI Response.  On the afternoon of October 21, 2022, the Reserve Bank sent a letter to Custodia setting out the results of the pre-membership examination and describing significant risk management gaps, including deficiencies in BSA/AML/OFAC programs, IT, and internal audit.  See supra note 81.  Such outstanding items had been previously communicated to

address these issues since application materials were initially submitted and despite the

importance of the crypto-asset-related activities to Custodia's business model—it is not

currently possible to conclude that the envisioned risk management program, if finalized,

would sufficiently address concerns about Custodia's ability to operate the crypto-asset-

related activities in a safe and sound manner, and in compliance with applicable

regulations and requirements.

## II. Analysis of Statutory Factors

In acting on an application for membership in the Federal Reserve System, the

Board considers (A) the general character of the bank's management; (B) the financial

condition of the bank; (C) whether or not the bank's corporate powers are consistent with

the purposes of the Act; and (D) the convenience and needs of the community to be

served by the bank.[84]  In addition, all state member banks are required to establish and

maintain programs for compliance with the BSA.[85]

### A.  Managerial Considerations

In reviewing the managerial factor, the Board has considered Custodia's ability to

monitor and control financial, operational, compliance, and legal risks, including

---

Custodia's management orally.  Several hours after confirming receipt of the letter,
Custodia submitted its Third AI Response in which it informed the Federal Reserve that,
in its estimation, the "application record should now be considered complete" despite the
outstanding items raised by the pre-membership examination.  Third AI Response, at 2.

[84]  12 U.S.C. § 322; see also 12 CFR 208.3(b)(1)–(4).  As part of considering the
financial condition of the bank, the Board considers the financial history and condition,
capital adequacy and future earnings prospects of the applicant.  12 U.S.C. § 329; 12
CFR 208.3(b)(1)–(2).

[85]  12 CFR 208.62; 208.63.

BSA/OFAC compliance risk.[86]  The Board has also considered the experience of Custodia's proposed management and the adequacy of its risk management systems and operations, and the applicable resolution framework.

1.   *BSA and OFAC Compliance*

AML and OFAC compliance programs are reviewed in part because they reflect on the soundness of management and the safety and soundness of the institution. Identified weaknesses in AML and OFAC compliance programs can raise concerns about whether a company's managerial resources are consistent with approval of the application.[87]  In this case, examiners identified compliance program deficiencies with respect to Custodia's limited core banking activities.  More importantly, given the absence of developed policies, procedures, and controls for crypto-asset-related activities at this stage, the examiner findings suggest that Custodia is unlikely to be able to effectively comply with the BSA and OFAC requirements applicable to the proposed, more complex, higher-risk crypto-asset-related activities that are central to its business model.

***Legal Framework.***  In the United States, money laundering and terrorist financing ("ML/TF") concerns are primarily addressed through the legal requirements of the BSA

---

[86]  <u>See</u> SR Letter 16-11, Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets Less than $100 Billion (February 17, 2021).

[87]  <u>See, e.g.</u>, <u>M&T Bank Corporation</u>, FRB Order No. 2015-27, at 11 (September 30, 2015); <u>see also</u> SR Letter 14-2.

and the economic and trade sanctions administered by OFAC.[88]  The BSA requires

financial institutions to establish, implement, and maintain an effective and reasonably

designed AML program.[89]  BSA regulations require banks and certain other financial

institutions to perform due diligence to understand the nature and purpose of the

customer relationship; perform ongoing monitoring to identify and report suspicious

activity; and verify the identity of a new customer.[90]

---

[88]  While financial regulators, including the Board, review financial institutions for compliance with these requirements through regulation, supervision, and enforcement, the principal administrators of the BSA and U.S. economic sanctions are the Financial Crimes Enforcement Network ("FinCEN") and OFAC, respectively.

[89]  The AML compliance program must provide for the following requirements:  (i) a system of internal controls to assure ongoing compliance; (ii) independent testing for compliance to be conducted by bank personnel or by an outside party; (iii) designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance (BSA compliance officer); (iv) ongoing training for appropriate personnel; and (v) appropriate risk-based procedures for conducting ongoing customer due diligence.  See 31 CFR parts 1020 through 1030.

[90]  Banking organizations must establish and maintain procedures reasonably designed to assure and monitor compliance with BSA regulatory requirements, which should be commensurate with the institution's size, complexity, and business activities.  See, e.g., 12 CFR 208.63, 211.5(m), 211.24(j) (Federal Reserve); 31 CFR 1020.210 (FinCEN); Federal Financial Institutions Examination Council, Bank Secrecy Act/Anti-Money Laundering Examinational Manual, at 21–22 (April 2020).  Underlying BSA regulatory requirements include, among other things, (i) obtaining information identifying and verifying a new customer opening an account (31 CFR 1020.220); (ii) conducting ongoing risk-based customer due diligence (31 CFR 1020.210(a)(2)(v)); (iii) identifying and verifying the identity of beneficial owners of legal entity customers (31 CFR 1010.230); (iv) conducting ongoing monitoring to identify and report suspicious transactions (12 CFR 208.62, 211.5(k), 211.24(f) (Federal Reserve), 31 CFR 1020.320 (FinCEN)); (v) obtaining and retaining records for certain payment orders (commonly referred to as "Funds Transfers Recordkeeping") (31 CFR 1020.410(a), 31 CFR 1010.410(e)); and (vi) transmitting, among other things, the names of the originator and beneficiary on certain transactions (commonly referred to as the "Travel Rule") (31 CFR 1010.410(f)).

OFAC requires all U.S. persons to comply with U.S. economic and trade sanctions.  Moreover, to prevent prohibited transactions from flowing through the institutions and ensure their compliance with OFAC sanctions, most financial institutions and all banks, with OFAC's and regulators' encouragement, develop and implement a sanctions compliance program.

Banks structure their compliance programs to be risk-based and to identify and report potential ML/TF and other illicit financial activity.  Banks assess their individual exposure to the risk of money laundering, terrorism finance, and financial crime based on the composition of their customer base, geographies served, and financial products and services offered.  Banks must properly manage customer relationships and effectively mitigate risks by implementing controls commensurate with those risks.  Federal banking agency examiners evaluate the adequacy of a bank's AML compliance program relative to its risk profile to assess whether a bank has developed and implemented effective processes to identify, measure, monitor, and control risks.

***Heightened Risks Related to Crypto-Assets.***  Crypto-assets pose significant ML/TF risks due to the lack of transparency, ease and speed of transfer, and general irrevocability of transactions—all of which make crypto-assets attractive for use in money laundering.[91]  The ability to conduct instantaneous transactions electronically—

---

[91] See Department of the Treasury, National Money Laundering Risk Assessment and National Terrorist Financing Risk Assessment, at 40–45 (February 2022) ("2022 National Risk Assessment"); Department of the Treasury, National Strategy for Combating Terrorist and Other Illicit Financing (May 13, 2022); Department of Justice, The Role of Law Enforcement in Detecting, Investigating, and Prosecuting Criminal Activity Related

especially in a programmable manner that allows rapid, repeatable transactions—makes it possible to facilitate numerous small transactions through multiple accounts in order to move large sums.  Such small transactions are very difficult for financial institutions' transaction monitoring systems to identify as suspicious activity.

The ability to identify users and monitor transactions is central to mitigating ML/TF risks, but crypto-assets often afford their holders significant anonymity.  Users may transact through unregulated or less regulated money services businesses in a country lacking a robust AML/Combating Financing of Terror ("CFT") regime, and financial transparency may be further decreased by crypto-assets held by users in "unhosted wallets."[92]  Trading in crypto-assets is often conducted pseudonymously either on a peer-to-peer basis[93] or through facilitation by lightly regulated or unregulated intermediaries.[94]  Crypto-asset trading can occur globally, and there are few to no limits

---

to Digital Assets (September 6, 2022); and FinCEN, Advisory on Illicit Activity Involving Convertible Virtual Currency, FIN-2019-A003 (May 9, 2019).

[92]  "An unhosted wallet is not hosted by a third-party financial system.  It can be very difficult or impossible to determine who is accessing or in control of the use of cryptocurrencies in an unhosted wallet.  Unhosted wallets allow for anonymity and concealment of illicit financial activity."  Department of the Treasury, Requirements for Certain Transactions Involving Certain Convertible Currency or Digital Assets Frequently Asked Questions (FAQs) (December 18, 2020).  See Requirements for Certain Transactions Involving Convertible Virtual Currency or Digital Assets, 85 Federal Register 83840, 83843–44 (proposed December 23, 2020) ("FinCEN Proposed Requirements").

[93]  See, e.g., Press Release, FinCEN Penalizes Peer-to-Peer Virtual Currency Exchanger for Violations of Anti-Money Laundering Laws (April 18, 2019), https://www.fincen.gov/news/news-releases/fincen-penalizes-peer-peer-virtual-currency-exchanger-violations-anti-money.

[94]  See, e.g., 2022 National Risk Assessment, at 42–45.

on cross-border transactions.  While a financial institution can require customer

identification information in connection with a customer onboarding process (e.g., with

respect to custody customers), it can be very difficult for a financial institution that is an

issuer of crypto-assets to identify holders of such assets in circulation, unless holders of

the asset are limited to identified customers only.[95]

    A financial institution's ability to limit the misuse of crypto-assets for ML/TF

depends in large part on the internal controls in place at points where crypto-assets

interact with the traditional financial system, such as when a crypto-asset is obtained by a

user in exchange for national currency.[96]  Stablecoins, however, may reduce the need for

crypto-asset holders to interact with regulated institutions.[97]  ==Because a stablecoin's value

is derived from the value of a currency, a group of currencies, or a commodity, there is

generally no reason to hold stablecoins for investment, as they merely represent the value==

---

[95] See, e.g., Press Release, FinCEN Advises Increased Vigilance for Potential Russian Sanctions Evasion Attempts (March 2022), https://fincen.gov/sites/default/files/2022-03/FinCEN%20Alert%20Russian%20Sanctions%20Evasion%20FINAL%20508.pdf; 2022 National Risk Assessment, at 41–42;  FinCEN, Advisory on Illicit Activity Involving Convertible Virtual Currency, FIN-2019-A003 (May 9, 2019).

[96] Even with these controls in place, misuse of crypto-assets for money laundering frequently occurs.  FinCEN and OFAC enforcement actions are commonly taken due to failure to implement adequate controls as required by regulations.  Agencies—including FinCEN, OFAC, and the Department of Justice—have taken numerous public enforcement actions against entities or individuals dealing in crypto-assets.  See, e.g., 2022 National Risk Assessment, at 41–45.

[97] See President's Working Group on Financial Markets et al., Report on Stablecoins, at 19–21 (November 2021) ("PWG Stablecoin Report").  As noted in the PWG Stablecoin Report, "[c]riminals often use the most common and liquid forms of value for ML and TF, and mass-adopted stablecoins or other digital assets may be attractive to illicit actors, which could heighten ML/TF risks."  Id.

of another already available store of value.[98]  The holder of a stablecoin may instead be

seeking a medium of exchange that could offer faster settlement, access to crypto-asset

markets, cross-border capabilities, and anonymity relative to other payment forms.[99]  The

holder of a widely used stablecoin may have no need to redeem it for national currency at

the issuer, but instead could sell it on the secondary markets in exchange for other crypto-

assets or national currency.  Indeed, stablecoins can circulate continuously, quickly,

pseudonymously, and indefinitely.  While the financial institution that issued the

stablecoin might have information on the transaction flows on the applicable blockchain,

it would likely not know the identity of the transactors other than the initial purchaser and

the ultimate redeemer.[100]  Without information about the transactors, it is extremely

---

[98]  Stablecoins, by design, do not appreciate in value and typically do not pay interest to holders.  Stablecoin holders forgo appreciation and interest and incur additional counterparty risk in order to access crypto-asset markets.  Holders may, however, lend stablecoins back to crypto-asset intermediaries or protocols (including, in some cases, the stablecoin issuer) to earn interest.  See Will Rising Interest Rates Damage Stablecoins, PYMNTS (July 25, 2022), https://pymnts.com/cryptocurrency/2022/will-rising-interest-rates-damage-stablecoins/.

[99]  PWG Stablecoin Report, at 7–11.

[100]  While there are private companies that investigate transactions on crypto-asset blockchains solely based on public information, such as from the blockchain or social media, without customer identification information, the services are highly imperfect. Law enforcement and specialist blockchain analytics firms, like Chainalysis, can learn information about a wallet and its holder, including whether the wallet may be associated with illicit activity or other wallets identified as suspicious or sanctioned; however, it can be difficult, relying on blockchain analysis alone, to establish the real-world identity of the person with ownership or control of a wallet with available information at the time of the transaction.  Even following an investigation, such information can be difficult to establish, particularly if blockchain obfuscation techniques are used.  See, e.g., C. Alden Pelker, Christopher B. Brown, Richard M. Tucker, Using Blockchain Analysis from Investigation to Trial, 69 Department of Justice Journal of Federal Law and Practice 59, 62–63 (2021).

difficult for financial institutions to comply with AML/CFT requirements to identify
suspicious activity and sanctioned parties, especially within mandated reporting
periods.[101]

The pseudonymity of crypto-asset transactions may also lead to financial
institutions unknowingly but directly engaging in what may result in illicit financial
activity.  Crypto-asset transactions on some blockchains, including Ethereum, rely on
distributed networks of anonymous persons for validation.[102]  Validators perform this
service in exchange for earning crypto-assets, which may take the form of an award for
validations (for bitcoin "miners") or a tip from transactors as payment for the validation
("transaction processing fees").[103]  These transaction processing fees on some
blockchains, including Ethereum, go to unknown validators, which may include illicit
actors or sanctioned entities.[104]  To the extent a financial institution pays such transaction

---

[101]   See, e.g., 31 CFR 1020.320(b)(3); 12 CFR 208.62(d).

[102]   For example, on Ethereum, one of the two blockchains Custodia proposes to use (see
Third AI Response, at 16–17), no screening or diligence is done to determine if validators
are sanctioned persons.  Stereum, ETH Solo Staking Guide (accessed January 23, 2023),
https://stereum.net/eth-solo-staking-step-by-step-guide/.  Additionally, validators are
pseudonymous and randomly selected, and transactors cannot select particular validators
that have been identified or screened for sanctions risks.  Ethereum.org, Proof-of-Stake
(POS) (accessed January 23, 2023), https://ethereum.org/en/developers/docs/consensus-
mechanisms/pos/.

[103]   On Ethereum, validators are paid "priority fees," which are theoretically voluntary,
but it is unlikely a validator would validate a transaction if it were not paid to do so.
Ethereum.org, Gas and Fees (accessed January 23, 2023),
https://ethereum.org/en/developers/docs/gas/.

[104]   See supra notes 102–103.

processing fees, it is risking making payments that support illicit finance or terrorist activity or to a prohibited jurisdiction or entity.

*Custodia's Plans for BSA and OFAC Compliance.*  Custodia is in the process of developing policies, procedures, and controls to manage ML/TF and OFAC sanctions evasion risks for crypto-asset-related activities, including with respect to customer due diligence, transaction monitoring, and sanctions screening, but as of the pre-membership examination, the systems had not yet been sufficiently developed to allow for review. Custodia has indicated that its AML and OFAC compliance programs would ultimately be designed to meet the requirements in the Wyoming SPDI BSA/AML and OFAC examination manual.[105]  Among other things, these prospective compliance programs would include a board of directors compliance committee to report and escalate risks to the board; customer identification onboarding involving due diligence on purpose and source of wealth; use of vendors to assist with automated customer screening and transaction monitoring;[106] compliance staffing and resources including a Chief

---

[105]  Second AI Response, at 40; Third AI Response, at 36.  The program would include (i) the development and maintenance of comprehensive written policies and procedures that are tailored to its business model; (ii) designation of a compliance officer who has significant commercial bank BSA/AML compliance experience; (iii) ongoing training and education; (iv) independent review and testing; and (v) customer due diligence.  First AI Response, at 43–44; Second AI Response, at 33–34.

[106]  Second AI Response, at 33–34, 39–41.  For screening transactions for sanctions compliance, Custodia has indicated that it will (i) incorporate geolocation tools and IP blocking controls; (ii) implement screening of wallet addresses against those specifically listed by OFAC sanctions; (iii) implement screening of other IP or wallet addresses acquired in the course of the transaction; and (iv) employ blockchain analytics tools to identify and mitigate sanctions risks.  Id.  Custodia contends that with the help of vendors it will be able, through the use of open-source and proprietary data, to (i) develop a

Compliance Officer and a BSA/AML-specific analyst; an independent review of the

compliance program; and reports and metrics to inform senior management regarding

customer onboarding and transaction monitoring.[107]

In addition, Custodia proposes a phased roll-out of services and would initially

limit its offerings to certain customers and certain activities; for example, it does not

intend to accept non-U.S. businesses and natural persons to be customers at the outset, in

order to allow for build-out of a program commensurate with associated risks.[108]

Furthermore, Custodia seeks to rely on blockchain analytics firms[109] and other vendors to

mitigate any gaps in traditional AML/OFAC controls resulting from the characteristics of

---

sanctions risk profile of counterparties, (ii) employ a list of high-risk or "blacklisted" wallet addresses, (iii) trace the transaction history of particular crypto-assets, and (iv) screen wallet addresses against both OFAC's list of sanctioned addresses and a proprietary list of addresses associated with sanctioned persons or sanctioned jurisdictions built through the use of blockchain analytics.  Id., at 33–34.

[107]  Id., at 34–35.

[108]  Second AI Response, at 37.  While Custodia would not issue Avits directly to non-U.S. customers or natural persons initially, such persons could purchase and hold Avits on the secondary market during this phased roll-out period.  Given this feature, the proposed timeline for a phased roll-out, and the importance of these activities for Custodia's business model, in reviewing the application, the Board considered the entire proposal including later stages of the roll-out.  Indeed, Custodia proposes to begin offering some of its other services to non-U.S. persons within ███████ .  See First AI Response, at 44.

[109]  FinCEN, in discussing the capabilities of blockchain analytics firms, stated "[w]hile [blockchain analysis] techniques can be used to combat illicit finance, they are not a panacea.  Blockchain analysis can be rendered less effective by a number of factors, including the scale of a blockchain network, the extent of peer-to-peer activity (i.e., transactions between unhosted wallets), the use of anonymizing technologies to obscure transaction information, and a lack of information concerning the identity of transferors and recipients in particular transactions."  See FinCEN Proposed Requirements, at 83844.

crypto-assets.[110]  Custodia has asserted that it will have the ability to freeze and seize Avits in response to law enforcement requests and when an Avit is held by a "blacklisted" wallet.[111]

*Analysis of Custodia's Existing Compliance Programs.*  As of the time of the pre-membership examination, Custodia had not demonstrated that it could satisfactorily manage the significant ML/TF risks presented by its proposed business plan.  The pre-membership examination was limited to Custodia's proposed core banking activities and did not include review of the more challenging proposed crypto-asset-related operations, which were not ready to be reviewed.  Nevertheless, examiners identified significant gaps that indicated the bank has not yet established adequate AML and OFAC compliance

---

[110]  Second AI Response, at 40.  Custodia would ████████████ implement automated sanctions blacklisting on Ethereum.  Third AI Response, at 3, 35–36, 53–55.  Custodia asserts that on Liquid, it "will have the ability to screen Avit transactions on Liquid against its consolidated blacklist."  Third AI Response, at 55.  Custodia represented that it would "monitor one 'hop' in either direction before or after a digital asset hits or leaves Custodia."  First AI Response, at 46.  However, Custodia stated that "[w]hile Custodia will have the ability to monitor transactions across the blockchain(s), it will do so on a risk-based basis to ensure that customers of Custodia are not engaging in money laundering or other suspicious activity either downstream or upstream of the transaction(s) directly involving Custodia."  Id.  With respect to Liquid, Custodia states that it "is working ████████████████████ to set up [surveillance] capabilities, allowing it to meet all of its [BSA/OFAC] requirements," including the identification of individuals sanctioned by OFAC.  Second AI Response, at 10.

[111]  First AI Response, at 25; Third AI Response, at 52–55.  Custodia states it would develop and maintain a blacklist of wallets it "has deemed to be suspicious, whether through ████████████████████████████████████████████████████████ ████████████████████████████████████████ ."  Third AI Response, at 53.  According to Custodia, ████████████████████████ Avits on both blockchains would allow for freezing and seizing of the token.  Id., at 52–55.

programs even for its core banking activities.  As of the examination, Custodia had not yet developed or implemented a comprehensive AML/OFAC risk assessment that provided sufficient detail to guide the development of adequate, risk-based AML and OFAC compliance programs.[112]  This deficiency led or contributed to numerous additional compliance-related inadequacies noted by the examiners.  For example, examiners found that Custodia's policies and procedures were insufficient, oversight and implementation of key IT systems were lacking, and training resources were deficient and not tailored to Custodia's risk profile.

Examiners further determined that the transaction monitoring systems for high-risk customers are insufficient to support timely identification and reporting of suspicious transactions and that the transaction monitoring processes are not risk-based or aligned with Custodia's planned operations and risk profile.  Finally, examiners found that Custodia's policies, procedures, and processes did not allow for timely identification and reporting of suspicious activity.  Setting aside consideration of Custodia's crypto-asset-related activities, discussed below, the Board has previously made clear that proposals

---

[112] See generally Letter from Jeffrey Imgarten to Board of Directors of Custodia Bank, Inc., dated October 21, 2022.  Subsequent to the examination, Custodia provided an updated ML/TF and sanctions risk assessment.  In addition, Custodia has indicated that it is actively working to address the other issues identified in connection with the examination and has provided a remediation plan.  While these efforts have not yet been evaluated by the Reserve Bank examiners, and Custodia believes that the issues can be remediated by ███████, given the fundamental problems identified during the examination and the narrow focus of the exam, the anticipated timeline for potential remediation and verification of Custodia's AML/OFAC compliance program is uncertain.  This is particularly the case in light of the lack of development of systems, controls, policies and procedures with respect to Custodia's proposed crypto-asset-related activities generally.

from financial institutions with less than satisfactory AML and OFAC compliance programs face substantial barriers to approval, in part because resolving such concerns can take a significant amount of time.[113]

    ***Analysis of Compliance with Respect to Crypto-Asset-Related Activities.***  The examiner findings on Custodia's compliance deficiencies with respect to its core banking activities suggest that Custodia is unlikely to be able to effectively comply with the BSA/OFAC requirements for its proposed, more complex, higher-risk crypto-asset-related activities.  Custodia has acknowledged that it "faces the risk that its products may be used for money laundering activity or activity that violates U.S. sanctions" particularly in light of the fact that users would have the "ability . . . to make or accept transactions to or from non-Custodia wallets, which would not have undergone an onboarding process with Custodia."[114]  Further, Custodia has acknowledged that "due to the nature of pseudonymous blockchains in which Custodia will enable customers to transact, the

---

[113]  See supra note 87.

[114]  Second AI Response, at 37.  ███████████████████████████████
████████████.  First AI Response, at 3.  For instance, Kraken and Bittrex were fined for OFAC violations.  See Department of the Treasury, OFAC Settles with Virtual Currency Exchange Kraken for $362,158.70 Related to Apparent Violations of the Iranian Transactions and Sanctions Regulations (November 28, 2022); Department of the Treasury, OFAC Settles with Bittrex, Inc. for $24,280,829.20 Related to Apparent Violations of Multiple Sanctions Programs (October 11, 2022).  In addition, in April 2022, the Office of the Comptroller of the Currency ("OCC") entered into a consent order with Anchorage Digital Bank, NA, after determining that Anchorage failed to adopt and implement a compliance program that adequately covers the required BSA requirements. See In the Matter of Anchorage Digital Bank, National Association, OCC Consent Order 2022-010 (April 21, 2022).

name of a non-customer involved in a transaction may not always be available."[115]
Custodia indicates that noncustomers will be able to hold Avits and redeem Avits without
undergoing due diligence required for customer onboarding.[116]

Additionally, Custodia has indicated that it does not believe that certain
BSA/OFAC requirements would apply to certain elements of its proposed activities.  For
example, Custodia stated it "has no BSA requirements for transfers of Avits between
non-customers."[117]  More specifically, Custodia contends that it would not be required to
file Suspicious Activity Reports ("SARs") involving transactions between noncustomer
holders of Avits.[118]  In addition, Custodia does not believe it should be obligated to

---

[115] Second AI Response, at 38.  Identifying noncustomer holders of Avits would require
significant investigation (unless the wallet holder has previously and publicly been
identified), an expensive proposition not certain to actually identify the holder.  See
FinCEN Proposed Requirements, at 83844.  Custodia has indicated it would only conduct
risk-based due diligence of non-customers transacting in Avits under specific
circumstances.  Second AI Response, at 38–40; First AI Response, 26–29.

[116] First AI Response, at 44–45.  Custodia asserts that it is not required to conduct
ongoing due diligence of noncustomers holding Avits, although it proposes to engage
voluntarily in some monitoring of suspicious activities.  Third AI Response, at 33–39.
Custodia asserts that noncustomers will be subject to heightened compliance
requirements if they seek to redeem Avits, although it is unclear what those requirements
would be beyond ██████████████████████████████
████████████████████████  First AI Response, at 26–27; 44–45.

[117] Third AI Response, at 38.  Nevertheless, Custodia represents it would voluntarily
monitor transfers of Avits between noncustomers through ████████████████
██████████████.  Id.  In many cases, it is unlikely Custodia will know or be able
to determine the identity of the transactors, a vital element of transaction monitoring for
suspicious activity.  See FinCEN Proposed Requirements, at 83844 (noting that
Blockchain analysis can be rendered less effective by a number of factors).

[118] Third AI Response, at 42.  Custodia has also indicated that it does not believe Avits
should be treated as a negotiable instrument for BSA purposes, including for reporting of
transportation of currency/monetary instruments and recordkeeping with respect to

conduct ongoing due diligence of noncustomers holding Avits.[119]  Finally, as discussed

above, Custodia asserts that payments of transaction processing fees to unknown persons

likewise fall outside BSA and OFAC regulatory requirements.[120]  While these are issues

that neither FinCEN nor OFAC has specifically addressed and though Custodia has

offered to voluntarily monitor noncustomer transactions and file SARs, such issues

highlight the inherent risks and challenges associated with crypto-assets that need to be

mitigated to ensure this activity can be conducted in a safe and sound manner.

> 2.  _Proposed Management_

In evaluating Custodia's management, the Board has considered the competence,

experience, and integrity of the officers, directors, and principal shareholders of Custodia.

Insufficient banking experience is a commonly identified problem in membership

applications.  Proposed directors and managers should have experience commensurate

---

transfer of funds, currency, and monetary instruments.  Id., at 31–33.  Nevertheless,
Custodia believes recordkeeping rules would apply, even if an Avit is not a negotiable
instrument, because it would still be a transfer of funds or credit.  Id., at 32–33.

[119]  Id., at 33.

[120]  Custodia states it "is not aware of any way for it (or another submitter of transactions
on the Ethereum blockchain) to prevent payment of a [transaction processing fee] in
[e]ther to a sanctioned person acting as a validator pursuant to the Ethereum protocol,"
but argues such transactions are nevertheless permissible under certain OFAC guidance.
Id., at 17.  Specifically, Custodia referenced OFAC guidance stating that sales of goods to
Iran would only be prohibited in instances where the seller had explicit knowledge or
reason to know the seller's goods are intended for Iran.  Id. (citing Office of Foreign
Assets Control, Guidance on Transshipments to Iran, Ref. 020722-IR-01 (July 22, 2002)).
With respect to Liquid, Custodia represents that transaction processing fees are paid to a
wallet controlled by Blockstream, an entity that contributes to the management of Liquid,
which holds the fees in part to pay for the operation of Liquid, including to pay
transaction fees on the Bitcoin blockchain.  Id., at 44.

with the duties required for the position sought, taking into consideration the size and complexity of the organization.  The Board has discouraged proposals that involve individuals with limited relevant banking or business experience for key management or decision-making positions.[121]

In the course of the pre-membership examination, Custodia provided detailed information on the proposed management and leadership team.  While Custodia's board is active and meets biweekly, the overall effectiveness of board and senior management remains difficult to determine, as Custodia has yet to truly commence operations and the Board is not sufficiently assured that Custodia's proposed management team could conduct its proposed activities in a safe and sound manner based on the information currently available.  The depth of banking experience and bank-specific risk management experience among the board of directors and management team is limited, and Custodia's board, executives, and staff come from a variety of backgrounds that are largely outside of traditional commercial banking, which is the context in which the pre-membership examination was conducted based on Custodia's proposed day-one activities.[122]

---

[121]  SR Letter 14-2 notes that a common managerial issue that has made approval by the Federal Reserve of applications problematic is insufficient banking experience. Specifically, the letter indicates that individuals with extensive large bank or investment banking experience may not necessarily have the appropriate experience to manage community or regional banks.

[122]  See, e.g., Custodia Bank, Inc., Custodia Team's Experience in Traditional Banking (July 20, 2022) (Attachment to Email Correspondence from Caitlin Long to Ross Crouch et al. dated August 3, 2022).

Further, there has been significant turnover within management as the organization has worked through product, systems, and risk management development.[123] While Custodia has made recent staffing additions and proposed staffing increases,[124] it is unclear if these changes will address and remediate the identified gaps in the risk management practices.

     *3.*   *Risk-Management Systems and Operations*

Custodia's pre-membership examination raised significant questions about management's ability to conduct Custodia's intended business in a safe and sound manner.[125] Such an examination is particularly insightful in relation to a de novo charter



[123] Compare Initial Business Plan, at 76, with Custodia Bank, Inc., Organizational Chart (July 14, 2022) (Attachment to Email Correspondence from Caitlin Long to Ross Crouch et al. dated August 3, 2022).

[124] Since the pre-membership examination, Custodia has hired a Senior Vice President of Risk with supervisory and traditional banking senior risk management experience, and a dedicated BSA Officer. Custodia also recently posted three risk management positions to further expand traditional banking experience, which remained open as of December 20, 2022. Letter from Caitlin Long to Ross Crouch dated December 20, 2022.

[125] The Board, FDIC, and OCC have issued joint guidelines identifying safe and sound banking practices that would typically be expected or required of an operating state member bank. 12 CFR 208.3(d)(1); part 208, Appendix D-1. The guidelines indicate that banks should have an internal audit system, internal controls, and information systems that are appropriate to the size of the institution and the nature and scope of its activities to provide for an organizational structure that establishes clear lines of authority and responsibility for monitoring adherence to established policies, effective risk management, timely and accurate financial, operational, and regulatory reports, adequate procedures to safeguard and manage assets, and compliance with applicable laws and regulations. 12 CFR part 208, Appendix D-1.

because there is a lack of management track record to review.  The pre-membership
examination focused only on core banking activities, because at the time of the
examination, Custodia had not yet developed its policies and procedures for crypto-asset-
related activities to the point where they were ready for review.  Examiners found a wide
range of risk management systems and supporting policies and procedures to be
insufficient for a traditional commercial bank.  Areas lacking in formal and properly
documented practices include IT and internal audit and controls, as well as
BSA/AML/OFAC compliance (as discussed above).  The Board finds the deficiencies
identified in Custodia's pre-membership examination to be significant.

Examiners noted significant gaps relative to Custodia's development and
formalization of comprehensive IT-related policies, procedures, and standards; overall IT
risk management framework; vendor management; and business continuity planning.[126]
Further, examiners noted that Custodia had outsourced the internal audit program to the
same firm conducting the annual external audit of its financial statements, indicating a
lack of independence between the audit functions.  In addition, Custodia's internal audit
policy did not address its oversight of the outsourced internal audit provider, ensure

---

[126]  See generally Letter from Jeffrey Imgarten to Board of Directors of Custodia Bank,
Inc., dated October 21, 2022.  Subsequent to the pre-membership examination, Custodia
submitted updated business continuity planning documents and a cybersecurity risk
assessment.  While these efforts have not yet been evaluated by the Reserve Bank
examiners, as noted above, given the fundamental issues and narrow focus of the
examination, an anticipated timeline for potential remediation and verification of the
remediation is uncertain.  See supra note 112.

conformance with industry standards, describe the risk assessment methodology, or define reporting standards and expectations.

Custodia also had not developed sufficient liquidity risk management policies and procedures and lacked a contingency funding plan, liquidity risk management metrics, and comprehensive liquidity policy guidance. While Custodia's anticipated liquidity risk would be low during its first three years of operation, long-run liquidity risk would modestly increase as additional investment options become available.[127] Though Custodia's overall liquidity risk would remain low, a sufficient liquidity risk management policy commensurate with its appropriate level of risk, including a contingency funding plan, has not yet been developed.

Examiners also noted that policies and procedures related to planned crypto-asset-related activities were in the early stages of development, and formalized risk assessments for planned products and services were outdated at the time of review or had not yet been completed. In light of this, examiners were unable to determine whether Custodia's overall policies and procedures were sufficiently tailored to Custodia's unique business model and planned activities. Consequently, examiners concluded that there was insufficient information available at the time of the examination to fully evaluate

---

[127] Custodia has acknowledged the volatility of deposits from crypto-asset-related customers and proposes to mitigate associated risks by holding highly liquid reserves. Initially, Custodia would hold reserves equal to at least 108 percent of customer deposits in a Federal Reserve Bank master account, if one is granted. First AI Response, at 15–17. However, after three years of operation, Custodia proposes to invest at least some of the funds pertaining to customer deposits in Treasury securities with maturities of three months or less and/or in reverse repurchase agreements on Treasury securities. Id.; Investment Policy, at 1–3.

whether Custodia's risk management systems and controls were adequate to enable it to engage in the proposed crypto-asset-related activities in a safe and sound manner, or to assess comprehensively the overall administration of these activities relative to the factors the Board considers under the Federal Reserve Act and Regulation H.

Since the pre-membership examination, Custodia has provided a remediation plan and related materials.  Review of the plan and Custodia's proposed timing for full remediation suggests that an additional examination would be required at a later date.[128] However, the number and degree of shortcomings identified in the pre-membership examination suggest that management's experience is not commensurate with the firm's intended risk profile.  A management team that struggled to set up an effective risk management system for its core banking activities may not be well positioned to oversee a number of highly risky activities in which no state member bank has engaged to date. In addition, as noted in the recent Joint Statement on Crypto-Asset Risks to Banking Organizations, based on the Board's current understanding and experience to date, issuing or holding as principal crypto-assets that are issued, stored, or transferred on an

---

[128]  Letter from Caitlin Long to Ross Crouch dated December 20, 2022.  While several milestone dates are described in the proposed remediation plan, Custodia would not conclude its remediation efforts on outstanding risk management concerns until at least ███████.  Custodia acknowledges that continued effort is necessary to fully remediate the majority of the gaps identified in the pre-membership examination.  At a minimum, a targeted examination would be required to assess the adequacy of management's remediation efforts given the breadth of detailed issues identified during the pre-membership examination.

open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices.[129]

## 4. *Resolution*

The Board has also considered evidence regarding whether Custodia could be safely and effectively resolved upon failure.[130]  Under Wyoming Division of Banking regulations, Custodia is required to submit a recovery and resolution plan to the state banking commissioner within six months of commencing operations.[131]  While Custodia has not yet developed or submitted a resolution plan, it has indicated preliminarily that it would likely rely upon a sale of assets and liabilities to ███████████████████ ███████████████████████.[132]  Alternatively, Custodia would recommend selling its custody business to ███████████████████████, and its deposit business (which may include Avits) to ███████████████████████ ███████████████████.[133]  However, the very reason these ███████████████████ █████████████████ are identified as potential acquirers (their existing business with the

---

[129]  Board of Governors of the Federal Reserve System et al., Joint Statement on Crypto-Asset Risks to Banking Organizations, at 2 (January 3, 2023) ("Joint Statement").

[130]  Custodia represents that receivership would be "relatively straightforward, as its business does not include complex assets or liabilities to resolve."  Second AI Response, at 31.  Custodia asserts that its resolution plan and Wyoming's SPDI receivership rules and crypto-asset custody laws are designed to keep crypto-assets under custody outside an SPDI's estate, which would ensure that customers "would not need to endure a lengthy bankruptcy process before they obtain their property in the event of an SPDI receivership."  Id., at 31–32.

[131]  Wyo. Admin. Code 21-2-20 § 4.

[132]  First AI Response, at 40.

[133]  Id., at 40–41.

crypto-asset sector) makes it likely that such proposed acquirers would be experiencing stress at the same time and for the same reasons as Custodia.  Indeed, certain banks providing deposit and payment services to the crypto-asset industry have faced significant stress in connection with similar stress in the crypto-asset sector.[134]

Concerns about Custodia's preliminary approach to resolution planning are further heightened in view of the untested nature of Wyoming's SPDI receivership regime. Custodia represents that under Wyoming law, the state banking commissioner would act as the receiver and resolution official in the event of insolvency.[135]  Resolving complex depository institutions is a highly complicated task, and the receivership of such institutions is typically the responsibility of the FDIC.[136]  In 1991, when Congress passed FDICIA and made it possible for a deposit-taking state member bank to be outside the

---

[134]  See, e.g., Silvergate Capital Corporation, Form 8-K, Exhibit 99.1 (January 5, 2023) (explaining that a "crisis of confidence" in the crypto-asset ecosystem caused an $8.1 billion decline in deposits from crypto-asset customers in the fourth quarter of 2022, leading Silvergate Capital Corporation ("Silvergate") to increase wholesale funding and incur $718 million in losses on sales of debt securities to meet liquidity needs); see also Signature Bank ("Signature"), Form 8-K, Exhibit 99.2 (January 17, 2022) (noting that crypto-asset-related deposits declined $7.35 billion in the fourth quarter of 2022 and $12.39 billion for the twelve months ended December 31, 2022, due to a "[p]lanned [r]eduction in [crypto-asset-related deposits] and a [c]hallenging [c]ryptocurrency [e]nvironment").

[135]  First AI Response, at 39–41; Second AI Response, at 31–32; see also Initial Business Plan, at 4; Wyo. Stat. § 13-12-126; Wyo. Admin. Code 21-2-20 §§ 4 and 6.

[136]  See 12 U.S.C. § 1821(c).  In recognition of the unique complexities of resolving deposit-taking organizations, depository institutions generally are not considered eligible to become "debtors" for purposes of proceeding under the federal Bankruptcy Code.  See 11 U.S.C. § 109(b), (d).  While nondepository trust companies may be resolved outside of FDIC receivership, trust assets are generally not part of the failed institution's bankruptcy estate, making such resolutions significantly different than those for depository institutions.

reach of FDIC receivership, state member banks often conducted their business entirely in one state and were typically prevented from branching across state lines.[137]  Moreover, without internet banking, bank branches were more limited in their ability to attract deposits from far outside their locality.  However, Custodia's growth assumptions are based on the judgment that "



" such that there would not be "

." [138]  In addition, Custodia has stated that it "will accept and welcome international customers so long as they pass necessary due diligence requirements"[139] as early as ▮▮▮▮▮ after commencing operation. [140]

In addition to the foregoing concerns, Custodia acknowledges that several of its products and services involve novel applications or interpretations of property or

---

[137]  See S. Rep. No. 103-240, at 4–12 (1994) (describing the history of geographic constraints on banking); H.R. Rep. No. 103-448, at 19–21 (1994) (same).  Interstate branch banking by state member banks was restricted by the McFadden Act until this prohibition was repealed by the Riegle-Neal Interstate Banking and Branching Efficiency of 1994.  See McFadden Act § 9, ch. 191, 44 Stat. 1224 (1927); Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, 108 Stat. 2338, 2339.  While interstate banking was permissible under the McFadden Act for multibank holding companies with state approval, most states did not permit interstate multibank holding companies until the late 1980s.  Allen N. Berger et al., The Transformation of the U.S. Banking Industry:  What a Long, Strange Trip It's Been, 2 Brookings Papers on Economic Activity 55, 188–89 (1995).  Most states also imposed restrictions on intrastate branching, with several banning it entirely.  Id.

[138]  First AI Response, at 92.

[139]  Initial Business Plan, at 39.

[140]  First AI Response, at 44.

commercial law.[141]  One novel product, Avits, could be held by individuals all over the globe with whom Custodia has no customer relationship—and each holder would have a claim to a liability on Custodia's balance sheet.[142]  Thus, the untested resolution process could have nationwide or cross-border implications.  Based on the foregoing, Custodia has not provided sufficient evidence that it could be resolved in a safe or efficient manner.  Uncertainty regarding such an outcome could contribute to instability and run risk at a time of stress for Custodia.

*      *      *

Based on the foregoing review and all the facts of record, the Board has determined that the considerations relating to the managerial factor are so adverse as to be sufficient grounds on their own for warranting denial of Custodia's application.

### B.  Financial Considerations

In considering whether Custodia's proposal is consistent with the financial factor, the Board has reviewed Custodia's business plan and financial projections to assess the bank's financial history and condition, future earnings prospects, capital adequacy, and other financial indicators.[143]  As a general matter, proposals have been viewed

---

[141]  See, e.g., Initial Business Plan, at 10–11, 52, 68, 116–19; Second AI Response, at 21–23, 31–32; Third AI Response, at 22–32.

[142]  Further, Custodia has represented that it would not have policies and procedures to resolve disputes regarding the ownership of individual Avits (such as to resolve disputes between claimants to the same issued Avit) and has suggested that such disputes would need to be resolved by courts.  Third AI Response, at 28.

[143]  12 U.S.C. §§ 322, 329; 12 CFR 208.3(b)(1) and (2).

unfavorably if an applicant is (i) not in sound financial condition or (ii) has uncertain future earnings prospects.[144]

### 1. *Financial History and Condition*

Given that Custodia only recently started operations, there is very limited financial history to assess.  Although Custodia received its charter in 2020, it did not receive a certificate to operate from the state until September 12, 2022.  Custodia started operations in October, but it has not yet offered services to customers.  As of October 2022, Custodia has raised total capital of $52.0 million, although approximately half of that sum has been spent on formation expenses.  The most recently provided pro forma financial statements project total equity capital of $28.8 million and total assets of $65.1 million (assuming a 2022 opening).  Assets on the pro forma statements are almost entirely balances due from banks, and liabilities are predominantly customer deposits.  Projected initial pro forma capital ratios would be 190.5 percent for common equity tier 1 capital, tier 1 capital, and total capital.  The leverage capital ratio would be 66.4 percent.  Custodia has indicated that it would comply with the capital requirements for state member banks under Regulation Q.[145]

While Custodia appears to have sufficient capital and resources to sustain initial operations, Custodia's pro forma financial statements assume that it would be permitted

---

[144]  SR Letter 14-2, at 4, 6; 12 CFR 208.3(b)(2).

[145]  First AI Response, at 37.  See also 12 CFR part 217.  Banks applying for membership must have capital stock and surplus adequate in relation to the character and condition of assets, liabilities, and corporate responsibilities.  12 U.S.C. § 329.

to engage in several novel crypto-asset-related activities.  Indeed, Custodia's medium and long term viability would be dependent on engaging in such activities and, as discussed in part II.C below, the Board would prohibit Custodia from engaging in such activities, if it were to approve Custodia's membership application.[146]  There is thus a possibility that additional capital would be needed to sustain operations after start-up if aggressive earnings projections are not met.

Based on the lack of operating history and the reliance on future activities that the Board would prohibit at this time if the membership application were approved, as well as all the facts of record, the Board cannot reach a conclusion regarding whether Custodia's financial history and present financial condition is consistent with the financial factor.

   2.   *Future Earnings Prospects*

In assessing Custodia's future earnings prospects, the Board has considered, among other things, the proposed business plan in conjunction with the organization's current condition, economic environment, and other relevant factors.  Based on the pre-membership examination and the overall record, the Board believes that Custodia's business model is subject to substantial uncertainty and may ultimately not be viable.

Custodia's financial projections show . Management projects net income of ███████████ . ████████ , total capital is projected to ████████████████

---

[146]  <u>See infra</u> part II.C.

███████████████████████████, and total assets are estimated to ████████

████████.  Based upon the entirety of the application and the Board's considerations as

set out in this Order, the assumptions underlying these projections do not appear to be

realistic—particularly given the activities limitations Custodia would be subject to if it

were admitted to membership.[147]

Custodia's business model focuses solely on servicing the crypto-asset industry

and depends heavily on fee revenue from the crypto-asset-related activities it will

conduct.[148]  To the extent the activities may be conducted permissibly, demand for those

services (and, by extension, Custodia's ability to generate fee revenue) will ultimately

turn on the overall health of, and level of activity in, crypto-asset markets.[149]  The

institutional clients and individual customers that Custodia is targeting will only need the

---

[147]  Custodia provided additional support for crypto-asset-related assumptions underlying its financial projections in a proposed plan to remediate examiners' findings from the pre-membership examination.  Confidential Exhibit I to the Letter from Caitlin Long to Ross Crouch dated December 20, 2022.  However, the analysis provided is not specific to Custodia's business model, contains a number of arbitrary and/or unsupported assumptions, and fails to acknowledge recent volatility in the crypto-asset market.

[148]  From provided revenue projections, estimated income from Avit issuance, custody, and prime services—business lines likely directly attributable to crypto-asset-related activity—would account for ███████████████████████████████████.  First AI Response, at 4.

[149]  Reserve Bank examiners noted that the fee-based income model could result in volatile earnings streams and is highly dependent on market acceptance of Custodia's products, services, and proposed fee structure, as well as the market price of bitcoin and ether.  For example, the third quarter 2022 earnings of Coinbase, a crypto-asset custodian and exchange, show its total net revenue was half that of the year prior, driven by a 66 percent decline in transaction revenue.  See Coinbase, Form 10-Q (November 3, 2022); Coinbase, Form 10-Q (November 10, 2021).  Reserve Bank examiners also noted that, while Custodia projects rapid revenue growth, operating expenses are projected to remain relatively stable and that assumptions driving this scenario are not sufficiently supported.

bank's services if crypto-assets are perceived as an attractive investment. Moreover, given the importance of fee income from planned crypto-asset-related activities to Custodia's overall business plan and the concentration and interconnectedness of the crypto-asset industry, potential run-related risks with respect to assets under custody could impact the viability of Custodia via a significant and sudden reduction in fee-based revenue. For that reason, Custodia's fortunes are tied directly to those of the crypto-asset markets.

The Board generally disfavors business plans that "result in a concentration of assets, liabilities, product offerings, customers, revenues, geography, or business activity without effective mitigants."[150] A business plan that focuses on a narrow business activity and depends on a limited number of key business partners carries significantly greater risks than a business plan that employs broad diversification of activities and counterparties. In the past, the Board has indicated that it expects banking organizations with a narrow focus to address these increased risks with financial resources, managerial systems, and expertise commensurate with that additional level of risk.[151]

In that context, Custodia's concentration in crypto-assets is particularly troubling.[152] Crypto-asset markets have proven very volatile.[153] For example, bitcoin

---

[150] SR Letter 14-2, at 6.

[151] See Green Dot Corporation, supra note 8.

[152] See Joint Statement, at 2 (noting significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposures to the crypto-asset sector).

[153] See supra note 12.

and ether, the largest crypto-assets by market capitalization, have fallen in value by just under 45 percent from the date on which Custodia submitted its application.[154] Furthermore, the turmoil in crypto-asset markets, starting in spring 2022, highlights the significant interconnectedness between crypto-asset firms and the substantial risks of contagion in this industry.[155]

The May 2022 collapse of algorithmic stablecoin TerraUSD, the third largest stablecoin at the time, reportedly imposed substantial losses on investors, such as Three Arrows Capital.[156] Following the collapse of TerraUSD, crypto-asset market participants—most notably Voyager and Celsius—reportedly experienced liquidity issues from withdrawals or margin calls, as well as losses from depressed crypto-asset prices and exposure to Three Arrows Capital and each other.[157] The Securities and Exchange Commission and the Commodity Futures Trading Commission have alleged that

---

[154] According to data from coinmarketcap.com, bitcoin fell approximately 44.2 percent from an intraday high of $41,341.93 on August 5, 2021, to an intraday high of $23,056.73 on January 22, 2023. Ether fell approximately 41.7 percent from an intraday high of $2,840.43 on August 5, 2021, to an intraday high of $1,658.02 on January 22, 2023. These crypto-assets experienced significant volatility over this period, trading between highs of $68,789.63 and $4,891.71 and lows of $15,599.05 and $896.11 for bitcoin and ether, respectively.

[155] See, e.g., FSOC Report, at 48–54.

[156] Id., at 38–40, 48–54; Chapter 15 Petition for Recognition of a Foreign Proceeding, In re Three Arrows Capital, Ltd. (Bankr. S.D.N.Y. July 1, 2022) (No. 22-10920).

[157] FSOC Report, at 38–40; Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors in Support of Chapter 11 Petitions and First Day Motion, In re Voyager Digital Holdings, et al. (Bankr. S.D.N.Y. July 6, 2022) (No. 22-10943); Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions, In re Celsius Network LLC, et al., (Bankr. S.D.N.Y. July 14, 2022) (No. 22-10964-MG).

Alameda Research, a hedge fund affiliated with FTX through common ownership, also experienced margin calls, prompting FTX to increase its support of Alameda Research, including by providing FTX customers' funds for the repayment of its loans.[158]  These actions helped to precipitate FTX and approximately 100 affiliates, including Alameda Research, filing for Chapter 11 bankruptcy protection in November 2022.[159]  Such events appear to have undermined confidence in the crypto-asset ecosystem.[160]

Recent experience has demonstrated that banks serving the crypto-asset sector by providing traditional deposit and payment services have been affected by the stress in the sector, even without engaging in the range of activities that Custodia proposes to

---

[158]  See Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties Under the Commodity Exchange Act and Commission Regulations, at 20–23, Commodity Futures Trading Commission v. Samuel Bankman-Fried, et al. (S.D.N.Y. December 13, 2022) (No. 1:22-cv-10503); Complaint, at 21, Securities and Exchange Commission v. Samuel Bankman-Fried (December 13, 2022) (No. 22-cv-10501).  FTX, in June 2022, provided a revolving line of credit to BlockFi, which also filed for Chapter 11 bankruptcy protection shortly after FTX did so.  Declaration of Mark A. Renzi in Support of Chapter 11 Petitions and First-Day Motions, In re BlockFi Inc., et al. (Bankr. D.N.J. November 28, 2022) (No. 22-19361-MBK).

[159]  See supra notes 157–158.

[160]  Suvashree Ghosh and Joanna Ossinger, Crypto's Post-FTX Crisis is Laid Bare as Trading Volumes Plummet by 50%, Bloomberg (December 16, 2022), https://www.bloomberg.com/news/articles/2022-12-16/crypto-s-post-ftx-crisis-is-laid-bare-as-trading-volumes-plummet-by-50.

conduct.[161]  Thus, Custodia's dependence on the crypto-asset market performance casts

substantial doubt on its future earnings prospects.[162]

Further, as set out in the Corporate Powers section below, if the Board were to

approve the membership application, it would prohibit Custodia from engaging in several

of the crypto-asset-related activities core to Custodia's business model.[163]  Without

interest income generated from lending products offered by traditional banks, the limited

array of core banking products Custodia proposes would not likely generate sufficient

standalone cash flow to sustain operations.  Deposit offerings do not typically provide

income, and ACH and wire transactions and issuance of cashier's checks are typically

ancillary services accompanying a wider suite of products and services, including

commercial lending.  If Custodia is unable to engage in most or even some of these

crypto-asset-related activities, it would effectively prevent the bank from moving forward

---

[161]  See supra note 134 (describing difficulties faced by Silvergate following a "crisis of confidence" in the crypto-asset ecosystem, and crypto-asset deposit outflows at Signature in part related to "a [c]hallenging [c]ryptocurrency [e]nvironment").  ██████████ ██████████████████████████████████████████████  Initial Business Plan, at 54. ████████████████████████████████████████████████████████ ██████████████████████████████████████████  Initial Business Plan, at 92.

[162]  The experience of Coinbase is instructive in this regard.  Coinbase is a crypto-asset platform that offers a variety of crypto-asset-related services.  Coinbase's business model is analogous to Custodia's insofar as it relies substantially on fee revenue from crypto-asset-related services.  See Coinbase Global, Inc., Form 10-Q (November 3, 2022).  Coinbase experienced substantial revenue declines in 2022.  Coinbase notes this point explicitly in its recent quarterly SEC filing: "A decline in the market price of [b]itcoin, [e]ther[] and other crypto-assets has had and could in the future have an adverse effect on our earnings, the carrying value of our crypto-assets, and our future cash flows.  This may also affect our liquidity and our ability to meet its ongoing obligations."  Id., at 71.

[163]  See infra part II.C.

with essential elements of its business plan, increasing the likelihood that the bank would not be viable.

*     *     *

Based on the foregoing review and all the facts of record, the Board has determined that the considerations relating to the financial factor are so adverse as to be sufficient grounds on their own for warranting denial of Custodia's application.

## C.  *Corporate Powers Considerations*

When reviewing applications for membership, the Board is required to consider "whether or not the corporate powers to be exercised [by the applicant] are consistent with the purposes of [the Federal Reserve] Act."[164]  Among the purposes of the Federal Reserve Act is the establishment of a stable banking system and bank supervisory framework in order to contribute to the stability of the United States economy.[165]  In its most recent cases, the Board has primarily considered whether the applicant's activities would be permissible under sections 9(13) and 9(20) of the Act,[166] which generally restrict any activities and investments of state member banks that would be impermissible

---

[164]  12 U.S.C. § 322; see also 12 CFR 208.3(b)(4).

[165]  See, e.g., Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (December 23, 1913) ("An Act . . . to establish a more effective supervision of banking in the United States, and for other purposes."); S. Rep. No. 133, 63d Cong. 1st Sess., at 7 (1913) ("The chief purpose of the [Federal Reserve Act] is to give stability to the commerce and industry of the United States, prevent financial panics or financial stringencies; making available effective commercial credit for individuals engaged in manufacturing, in commerce, in finance, and in business to the extent of their just deserts; put an end to the pyramiding of the bank reserves of the country and the use of such reserves for gambling purposes on the stock exchange.").

[166]  12 U.S.C. §§ 330 and 335.

for a national bank, and whether the applicant's activities would pose safety and soundness risks to the applicant.[167]  This section discusses those matters, as well as considerations related to the admission of an uninsured deposit-taking bank.

     1.   *Evaluation of Corporate Powers to be Exercised in Combination*

Custodia has proposed to engage in a crypto-asset-focused business that is unlike that of any other state member bank.  Some of Custodia's proposed activities, including providing traditional deposit and payments services to companies involved in the crypto-asset sector and, to a limited degree, offering safekeeping services with respect to crypto-assets, are currently conducted by other state member banks.  However, the Board is not aware of any state member bank holding bitcoin and ether as principal; issuing instruments like Avits; facilitating the borrowing and lending of crypto-assets; or directly engaging with customers to facilitate the buying and selling of crypto-assets—whether adjacent to a custody business; as a broker, dealer, exchange; or otherwise.  Indeed, Custodia's core banking business is projected to be a relatively small portion of its overall business.[168]

---

[167]  See, e.g., Warehouse Trust Company LLC, 96 Federal Reserve Bulletin B13 (2010); ICE US Trust LLC, 95 Federal Reserve Bulletin B73 (2009).  This is consistent with the Board's practice since 1915, when the Board announced it would consider whether an applicant bank's "charter provisions are consistent with the proper conduct of the business of banking and with membership in the Federal reserve bank."  1 Federal Reserve Bulletin 147 (July 1, 1915).

[168]  See supra part I.A.

Custodia's fundamental focus is to support investment in and trading of crypto-assets by institutional and high-net-worth investors.[169]  Crypto-assets are, however, largely speculative instruments, the value of which is driven in large part by sentiment and future expectations.[170]  Further, the crypto-asset sector appears to experience a high incidence of fraud and theft,[171] and heightened ML/TF risks as discussed above.[172]  To date, the volatility of the crypto-asset ecosystem[173] has not led to financial stability issues in other sectors—largely because interconnections between the crypto-asset sector and the traditional financial sector have been relatively limited.  But Custodia is attempting to make it easier for institutional investors to use the crypto-asset ecosystem,[174] which would increase such connections.

There are many examples of lawmakers and policy-makers taking steps to separate banks from speculative activities due to safety and soundness concerns.  Congress has

---

[169]  Initial Business Plan, at 2.

[170]  FSOC Report, at 25–28.

[171]  See, e.g., Consumer Financial Protection Bureau, Complaint Bulletin: An Analysis of Consumer Complaints related to Crypto-Assets (November 2022); Securities and Exchange Commission, Order Disapproving a Proposed Rule Change, as Modified by Amendment No. 1, to List and Trade Shares of Grayscale Bitcoin Trust under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) (June 29, 2022); Federal Trade Commission, Consumer Protection Data Spotlight:  Reports Show Scammers Cashing in on Crypto Craze (June 2022).

[172]  See supra part II.A.1 for discussion of ML/TF risks of crypto-assets.

[173]  Total crypto-asset market capitalization has fluctuated significantly, from a high of over $3 trillion in November 2021 to lows under $850 million in November and December 2022.  CoinGecko, Global Cryptocurrency Market Cap Charts (accessed January 23, 2023), https://www.coingecko.com/en/global-charts.

[174]  Initial Business Plan, at 2.

prohibited banks from taking part in a wide range of securities activities under the Banking Act of 1933 (commonly referred to as the "Glass-Steagall Act").[175]  Congress again sought to prohibit banks and bank affiliates from engaging in speculation in 2010 by limiting proprietary trading under the Volcker Rule.[176]  Further, Congress has prohibited banks from dealing in lottery tickets or promoting lotteries,[177] which was motivated by a desire to preserve "the inescapable responsibility of a bank to always be both a symbol and example of stability and security in the community."[178]

Based on the foregoing, the Board does not believe that Custodia's proposed business would be in furtherance of a stable banking system and bank supervisory framework, and approval of the application would therefore be inconsistent with the purposes of the Federal Reserve Act.

## 2. *Permissibility of Activities and Safety and Soundness Risks*

In assessing whether to grant membership, the Board considers whether an applicant's proposed activities and investments are permissible under sections 9(13) and 9(20) of the Act, and whether the proposed activities pose safety and soundness risks.  As discussed in detail below, Custodia has not established that several of its proposed

---

[175]  12 U.S.C. §§ 24, 378(a)(1).

[176]  12 U.S.C. § 1851.

[177]  Pub. L. No. 90-203, 81 Stat. 608 (1967) (codified at 12 U.S.C. §§ 25a, 339, 1829a). Congress reinforced this prohibition with a criminal statute, that enables the fining or imprisonment of anyone that "knowingly" violates the prohibitions on banking participation in lotteries.  18 U.S.C. § 1306.

[178]  S. Rep. No. 90-727, at 3 (1967).  The Senate Committee Report for the bill indicated that it is "entirely proper to protect the sound image of banking by prohibiting banks from the open sale of the lottery tickets to the public."  Id., at 4.

activities are permissible for national banks or that its proposed activities can be conducted in a safe and sound manner.  If the Board were to approve Custodia's application for membership, it would exercise its discretion under section 9(13) of the Act to limit Custodia to conducting as principal only those activities permissible for national banks.  Further, with respect to novel and unprecedented activities, the Board would condition admission under section 9(1) of the Act[179] on Custodia conducting only those activities for which it has demonstrated appropriate systems to monitor and control the risks of such activities.  Because Custodia's business model relies on its ability to conduct these activities, these limitations under section 9(13) of the Act and conditions under section 9(1) of the Act would adversely impact Custodia's viability in the medium and long term, as discussed in part II.B.2 above.

*Section 9(13) of the Act.*  Under section 9(13) of the Act, the Board "may limit the activities" of a state member bank and its subsidiaries to those activities that are permissible for a national bank in a manner consistent with section 24 of the Federal Deposit Insurance Act (FDIA).[180]  Section 24 of the FDIA generally prohibits insured

---

[179]  Section 9(1) of the Act authorizes the Board to approve membership applications "subject to the provisions of [the Act] and to such conditions as [the Board] may prescribe pursuant thereto."  12 U.S.C § 321.

[180]  12 U.S.C. § 330 (as amended by FDICIA § 303(b), Pub. L. No. 102-242, 105 Stat. 2236, 2353 (1991)).

state banks from engaging as principal in any activity that is not permissible for national banks,[181] unless specifically authorized by federal statute or the FDIC.[182]

The Board generally believes that the same bank activity, presenting the same risks, should be subject to the same regulatory framework, regardless of which agency supervises the bank.[183] This principle of equal treatment helps to level the competitive playing field among banks with different charters and different federal supervisors and to mitigate the risks of regulatory arbitrage. In alignment with this principle, and as made clear in a policy statement approved by the Board today, the Board generally presumes[184]

---

[181]  The National Bank Act enumerates certain powers that national banks may exercise and authorizes national banks to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24(Seventh). The OCC has the authority to interpret provisions of the National Bank Act and is charged with the "discretion to authorize activities beyond those specifically enumerated," within reasonable bounds. NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 258 n.2 (1995). Section 7.1000 of the OCC's regulations identifies the criteria that the OCC uses to determine whether an activity is authorized as part of, or incidental to, the business of banking under 12 U.S.C. § 24(Seventh). 12 CFR 7.1000. If a national bank has not been authorized by federal law, including the National Bank Act, to engage in an activity, then national banks are not permitted to engage in such activity.

[182]  12 U.S.C. § 1831a(a); 12 CFR part 362.

[183]  See, e.g., Nomination of Jerome H. Powell, of Maryland, to be Chairman of the Board of Governors of the Federal Reserve System:  Hearing Before the Committee on Banking, Housing, and Urban Affairs, 117th Cong. 81 (2022) (responses to written questions of Chairman Brown) ("It is vital that the United States maintain a strong financial regulatory system that adheres to the principle of same activity, same risks, same regulation for all financial activity, including novel asset classes such as cryptoassets.").

[184]  This presumption may be rebutted if there is a clear and compelling rationale for the Board to allow the proposed deviation in regulatory treatment among federally supervised banks, and the state member bank has robust plans for managing the risks of the proposed activity in accordance with principles of safe and sound banking. See Board of Governors of the Federal Reserve System, Policy Statement on Section 9(13) of

that it will exercise its discretion under section 9(13) of the Act to limit state member banks and their subsidiaries to engaging as principal in only those activities that are permissible for national banks—in each case, subject to the terms, conditions, and limitations placed on national banks with respect to the activity—unless those activities are permissible for state banks by federal statute or under part 362 of the FDIC's regulations.

**_Safety and Soundness Risks._**  Legal permissibility is a necessary, but not sufficient, condition to establish that a state member bank may engage in a particular activity.  A state member bank must at all times conduct its business and exercise its powers with due regard to safety and soundness.[185]  For instance, a state member bank should design and implement internal controls and information systems that are appropriate to the nature, scope, and risks of its activities.[186]  Further, a state member bank must comply with conditions of membership prescribed by the Board under section 9(1) of the Act,[187] and applicable laws and regulations, including those related to consumer compliance and anti-money laundering.  With respect to any novel and unprecedented activities, such as those associated with crypto-assets, it is particularly important for a state member bank to have in place appropriate systems to monitor and

---

the Federal Reserve Act, at 5–6 (January 26, 2023) ("Policy Statement") (to be codified at 12 CFR 208.112(d)).

[185]  12 CFR 208.3(d)(1).

[186]  12 CFR 208, appendix D-1.

[187]  12 U.S.C §§ 321; 1818(b), (e)(1)(A)(i)(III), (i)(2)(A)(iii); 12 CFR 208.3(d)(3).

control risks, including liquidity, credit, market, operational (including cybersecurity and use of third parties), and compliance risks (including compliance with BSA and OFAC requirements to reduce the risk of illicit financial activity).

    a.  <u>Crypto-Asset Custody:  Holding Bitcoin and Ether as Principal</u>

Custodia has proposed to provide custody services for crypto-assets, which it contends is permissible for national banks under OCC Interpretive Letter 1170.[188] However, Custodia asserts that, as part of this activity, it must hold a small amount of bitcoin and ether in a principal capacity in order to pay customers' transaction fees and comply with Wyoming law.[189]  Custodia also stated that it "has evaluated alternative approaches to holding digital assets [as principal] for transaction fees and has not identified an alternative approach that would allow it to serve customers efficiently and without creating unnecessary risk."[190]

***National Bank Permissibility.***  The Board has not identified any authority to support the position that national banks are permitted to hold bitcoin, ether, or most other crypto-assets as principal in any amount or for any purpose.[191]  To support the

---

[188]  First AI Response, at 10 ("In an interpretive letter issued in 2020, the OCC confirmed that a national bank 'may provide [ ] cryptocurrency custody services on behalf of customers, including by holding the unique cryptographic keys associated with cryptocurrency.'") (citing OCC Interpretive Letter No. 1170 (2020)).

[189]  <u>See supra</u> notes 47–49.

[190]  Second AI Response, at 24.

[191]  To date, the OCC has not made a determination addressing the permissibility of a national bank holding crypto-assets as principal, other than "stablecoins" to facilitate payments subject to the conditions of OCC Interpretive Letter 1179.  OCC Interpretive Letter No. 1174 (January 4, 2021) ("Interpretive Letter 1174"); OCC Interpretive Letter

permissibility of such holdings, Custodia cites other instances where the OCC has

specifically permitted banks to conduct activities that were otherwise impermissible in

limited circumstances.[192]   Custodia views these precedents as evidence of a universal

authority to conduct a small amount of impermissible activities if the permitted activity

would otherwise be "infeasible, burdensome or less advantageous" without the

---

No. 1179 (November 18, 2021) ("Interpretive Letter 1179").  The OCC has required a
national bank to divest crypto-assets held as principal that it acquired through a merger
with a state bank.  Specifically, the OCC conditioned its recent approval of the merger
between Flagstar Bank, FSB and New York Community Bank into Flagstar Bank,
National Association on the divestiture of holdings of "Hash," a crypto-asset, after a
conformance period, as well as a commitment not to increase holdings of any crypto-
related asset or token "unless and until the OCC determines that . . . Hash or other crypto-
related holdings are permissible for a national bank."  OCC Conditional Approval Letter
No. 1299, at 9 (October 27, 2022).

[192]   Exhibit G to the Third AI Response.  Custodia's cited examples include a conditional
approval permitting a national bank's operating subsidiary to "hold for limited periods of
time limited interest in certain private investment funds for which it serves as investment
manager," OCC Conditional Approval No. 578 (February 27, 2003); a conditional
approval permitting a national bank's operating subsidiary to own a general partnership
interest in a partnership if such interest enables it to act as investment manager for a fund
that, in practice, requires the manager to take an equity interest, id.; an interpretive letter
indicating that a national bank may become an inadvertent principal in a riskless principal
transaction because of the failure of the transaction, OCC Interpretive Letter No. 371
(June 13, 1986); ownership of shares in an insurance company that provided life
insurance to a national bank's directors and officers following the insurance company's
conversion from mutual to stock form, OCC Interpretive Letter No. 901 (June 29, 2000);
and ownership of limited partnership interests in connection with holding and reselling
transferrable state tax credits and natural gas leasing, OCC Corporate Decision No. 2006-
06 (July 12, 2006) and OCC Corporate Decision No. 98-18 (March 23, 1998).

impermissible activity.[193]  But the Board believes these precedents recognize limited authority to conduct carefully defined activities.[194]

Because the Board has not identified authority to support Custodia's contention that national banks are permitted to hold bitcoin and ether as principal incidental to permissible activities, and state banks have not been expressly permitted to do so by federal statute or part 362 of the FDIC's regulations, the Board would presumptively prohibit state member banks from holding such assets as principal.[195]

**Safety and Soundness.**  The Board's presumptive application of section 9(13) is bolstered in this instance by the Board's significant safety and soundness concerns with respect to the activity.[196]  The FSOC has observed that, in the absence of a fundamental economic use case, the value of most crypto-assets is driven largely by sentiment and future expectations, and not by cash flows from providing goods or services outside the crypto-asset ecosystem.[197]  This prevents firms that hold crypto-assets from engaging in

---

[193]  Exhibit G to the Third AI Response.

[194]  Further, Custodia cites instances when the Board found that certain activities are permissible in limited circumstances in connection with a permissible activity under the BHC Act.  Id.  In addition to not being legally relevant to bank-level permissibility, decisions made by the Board in such contexts do not implicate the competitive parity considerations applicable with respect to bank activities supervised by various regulators.

[195]  See Policy Statement, at 8.

[196]  As noted in the recent Joint Statement, based on the agencies' current understanding and experience to date, the agencies believe that holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices. Joint Statement, at 2.

[197]  FSOC Report, at 27; see also id., 23–28.

prudent risk management based on the underlying value of most crypto-assets, their anticipated discounted cash flows, or the historic behavior of the relevant markets. Moreover, the crypto-asset sector—which is globally dispersed—is largely unregulated or non-compliant with regulation from a market-conduct perspective, and issuers are often not subject to or not compliant with disclosure and accounting requirements. This opacity may make it difficult or impossible to assess market and counterparty exposure risks. Further, engagement in crypto-asset transactions can present significant illicit finance risks, in part due to the pseudonymity of transactors and validators.[198] Finally, crypto-assets may involve significant cybersecurity risks—especially in comparison to traditional asset classes.

If the Board were to approve Custodia's application, based on the foregoing and all the facts of record, it would exercise its discretion under section 9(13) of the Act, and impose a condition under section 9(1) of the Act, to prohibit Custodia from holding bitcoin and ether as principal. The inability to conduct such activity may adversely affect Custodia's future earnings prospects as a state member bank.

b.  Issuance of Avits

Custodia describes an Avit—a proposed token that would be issued on two blockchains[199]—as a "transferable record" for purposes of the Uniform Electronic Transfers Act; a negotiable instrument for purposes of Article 3 of the Uniform

---

[198]  See supra part II.A.1.

[199]  See supra part I.A.3 for additional details regarding Custodia's plans to issue and redeem Avits.

Commercial Code; an electronic promissory note;[200] and a deposit representing the digital

equivalent of a cashier's check for purposes of banking and securities law.[201]  Avits, as

described above, would be circulating tokens that could be transferred indefinitely to an

unlimited number of successive holders before redemption—if they are ever redeemed.[202]

---

[200]  Custodia likens an Avit to a "promissory note" for purposes of commercial law, but has declined to conduct an analysis of whether an Avit would be a "note" under the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "federal securities laws"), including Reves v. Ernst & Young, 494 U.S. 56, 66–67 (1990) ("Reves"), which sets out a four-part framework to determine if a "note" is a security.  Second AI Response at 17.  Custodia has asserted that "[f]rom a securities law perspective," Avits are "bank deposit[s]" and more appropriately evaluated exclusively under Marine Bank v. Weaver, 455 U.S. 551 (1982) (finding that certificates of deposit issued by an insured depository institution were not securities).  Second AI Response, at 17.

The Board does not take a position on how to evaluate the legitimacy of Custodia's interpretations regarding the federal securities laws.  The Board notes, however, that, with certain exceptions, under section 21(a)(1) of the Glass-Steagall Act, an entity engaged in the business of issuing securities may not also be in the business of receiving deposits.  12 U.S.C. § 378(a)(1).  In interpreting this provision in Investment Co. Institute v. Camp, the Supreme Court indicated that there is nothing in the provision to suggest "a narrow reading" of the term "securities."  401 U.S. 617, 635 (1971).  The Board has not reached a conclusion on this issue, but does not believe that a finding regarding whether Avits would be securities under the Glass-Steagall Act is necessary in light of the multiple, independent bases for denial of Custodia's application established herein.

[201]  First AI Response, at 8–9.

[202]  Further, the Avit is designed to be used by customers in a range of use cases.  See Second AI Response, at 14 ("A key benefit of Custodia issuing Avits on permissionless blockchains is that Custodia's customers will be able to build applications using Avit to solve their particular business problems without requiring permission from Custodia to do so, as would be the case with permissioned systems.  This means Custodia's customers can take advantage of the widespread and interoperable infrastructure built around permissionless systems to speed the development of their own software, improve the functionality and reduce the cost.").

The cash deposited by the initial holder of Avits would be held in a master account at the Reserve Bank, if such account is granted.[203]

***National Bank Permissibility***.  The permissibility of the issuance of "stablecoins" for national banks is subject to OCC Interpretive Letters 1174 and 1179,[204] including the conditions set out therein.[205]  The Board believes that Avits should be viewed as "stablecoins" for purposes of assessing permissibility.

OCC Interpretive Letters 1174 and 1179 specifically permit a national bank to issue "stablecoins" to facilitate payments, provided that the bank can demonstrate, to the satisfaction of its supervisory office, that it has controls in place to conduct the activity in a safe and sound manner.[206]  In determining whether such controls are adequate,

---

[203]  See supra note 58.

[204]  Interpretive Letter 1174, at 9; Interpretive Letter 1179.

[205]  Custodia argues that, aside from Interpretive Letters 1174 and 1179, issuing and redeeming Avits would be permissible for a national bank under the application of the OCC's Transparency Doctrine (12 CFR 7.5002(a)) to cashier's checks.  While it is true that both cashier's checks and Avits would represent deposits and could be held by unknown persons, the instruments have different functions.  Cashier's checks are designed to remove counterparty risk from a discrete payment transaction made in a specific denomination.  While a single cashier's check can theoretically be transferred more than once before it is returned to the bank, the logistics of physical transfer and issuance in a particular amount prevent the formation of a significant secondary market for cashier's checks and prevent their use in a widespread way in secondary markets as a settlement asset.  In contrast, Avits are designed to be actively traded on global, virtual secondary markets, including through centralized and decentralized exchanges, on an indefinite basis.  The ease of transacting in the instrument on a peer-to-peer basis or through exchanges—and, more significantly, the exit liquidity provided by the secondary markets—fundamentally distinguish Avits from cashier's checks.

[206]  The OCC also notes that "stablecoins" may be securities, depending on their structure, and that a bank's issuance of a "stablecoin" must comply with all securities laws and regulations, if applicable.  Interpretive Letter 1174, at 6.

Interpretive Letter 1179 states that supervisors will evaluate whether there are "adequate systems in place to identify, measure, monitor, and control the risks of [a bank's] activities, including the ability to do so on an ongoing basis."[207]

Custodia has not been able to demonstrate that it can implement Avits in a safe and sound manner because, at the time of the pre-membership examination, it had not yet developed its risk management and control framework for the product. The Board does not believe it would be permissible for Custodia to issue Avits at this time under the terms and conditions established by the OCC, and such issuance is not specifically permitted under federal statute or part 362 of the FDIC's regulations. Therefore, the Board would presumptively prohibit Custodia from issuing instruments like Avits until such time as Custodia is able to demonstrate that it has controls in place to conduct the activity in a safe and sound manner.

***Safety and Soundness.*** The Board's presumptive application of section 9(13) of the Act is bolstered in this instance because the Board has broader concerns about proposals to issue a token that represents a dollar deposit and circulates indefinitely on an open, decentralized, or similar network where (i) persons unknown to the issuing bank can hold the asset; and (ii) neither the bank nor its contracted vendors have control over the governance and policies of the network, including, for example, consensus

---

[207] Interpretive Letter 1179, at 4.

mechanisms for processing transactions.[208]  The Board's preliminary concerns with Avits include the following:

*Illicit Finance Risks.*  OCC Interpretive Letter 1174 states that stablecoin arrangements "should have the capability to obtain and verify the identity of all transacting parties, including for those using unhosted wallets."[209]  Custodia's proposal for issuing and redeeming Avits does not meet this expectation.  The first party that receives Avits from Custodia and the party that attempts to redeem Avits with Custodia would be known to the bank.  But any other person or entity, anywhere in the world, would be able to acquire or transfer Avits in the secondary markets without being known to Custodia, so long as the wallet to which the transfer is made has not been blacklisted due to sanctions concerns.[210]  Further, due to the use of Ethereum, both Custodia and holders of Avits will pay transaction processing fees to unknown transaction validators.[211]

*Operational Risks.*  Through the use of blockchains not controlled by the bank or its contracted vendors, operational activities—like processing transactions made in

---

[208]  Cf. Joint Statement, at 2 ("Based on the agencies' current understanding and experience to date, the agencies believe that issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices.").

[209]  Interpretive Letter 1174, at 4 (quoting President's Working Group on Financial Markets, Statement on Key Regulatory and Supervisory Issues Relevant to Certain Stablecoins, at 3 (December 23, 2020)).

[210]  See supra notes 110, 111.

[211]  See supra notes 102, 103; see also Third AI Response, at 17.

Avits—and the governance of such activities would be outsourced to unknown third

parties.[212]  Custodia would have little ability to hold validators or governance bodies

accountable for activity that may adversely affect the bank or its customers.[213]

*Cybersecurity Risks.*  Blockchain networks that are not controlled by a bank or its

contracted vendors present significant cybersecurity vulnerabilities.  For example, threat

actors could maliciously access private keys that provide access to Avits held by known

or unknown persons.  Additionally, threat actors could potentially compromise the smart

contract used to issue Avits and the underlying infrastructure of the blockchain,

particularly a network relying on a smaller number of validators.[214]

*Risks Related to Runs.*  On both Ethereum and Liquid, the public is able to see

tokens moving from one wallet to another, including as they are issued and redeemed.[215]

---

[212]  Ethereum relies upon pseudonymous nodes to validate transactions, as opposed to contracted third-party service providers.  See supra note 102.

[213]  With respect to Ethereum, Custodia would have no contractual or other relationship with Ethereum stakers involved in governance of the blockchain.  With respect to Liquid, Custodia states that ███████████████████████████████████████████.  Third AI Response, at 45–46; see also Second AI Response, at 8–9.  Governance of Liquid is managed by the Liquid Federation, a group of more than sixty crypto-asset companies.  Second AI Response, at 9.  Custodia states that Liquid "████████████████████████████████████████████."  Third AI Response, at 44; see also id., at 61–62.  The Liquid Federation selects a small number of its members to operate validator nodes and manages oversight of the Liquid network.  Id.

[214]  Id., at 59–60, 62–67; Second AI Response, at 10; see also Mell and Yaga, supra note 75, at 27–29.

[215]  See, e.g., Blockstream, Liquid Explorer (accessed January 23, 2023), https://blockstream.info/liquid/; Etherscan, Ethereum (ETH) Blockchain Explorer (accessed January 23, 2023) https://etherscan.io/.  On Liquid, the type of token and amount are not visible to the public; however, senders, receivers, and the number of

Therefore, the public would know when Avits are being redeemed in high or higher-than-usual quantities.[216]  This redemption transaction visibility could potentially increase the likelihood of a run on Custodia's Avits, other deposit liabilities, or custodied assets (which could affect its fee revenue).  While Custodia has said it will manage liquidity risks by keeping all the dollars backing Avits in a master account at the Federal Reserve, if such account is granted, runs on any bank or financial intermediary have been documented to lead to panic and contagion that spreads to other banks and financial intermediaries.[217]

     *Consumer Risks*.  Avits would function much like other dollar-denominated tokens issued on public blockchains—they could be traded on largely unregulated or

---

transactions are visible.  Blockstream, <u>How Does Liquid Keep My Transaction Data Confidential?</u> (accessed January 23, 2023), <u>https://help.blockstream.com/hc/en-us/articles/900001390743-How-does-Liquid-keep-my-transaction-data-confidential-</u>.

[216] <u>See</u> Krisztian Sandor, <u>Tether Sees New Wave of Redemptions as Fear of Market Contagion Spreads</u>, CoinDesk (June 15, 2022), <u>https://coindesk.com/markets/2022/06/15/tether-sees-new-wave-of-redemptions-as-fear-of-market-contagion-spreads/</u>; <u>see also</u> Krisztian Sandor, <u>Crypto Exchange Gemini Suffers $485M Rush of Outflows Amid Contagion Fears</u>, CoinDesk (November 16, 2022), <u>https://coindesk.com/markets/2022/11/16/crypto-exchange-gemini-suffers-485m-rush-of-outflows-amid-contagion-fears/</u>.

[217] <u>See, e.g.</u>, Charles W. Calomiris et al., <u>Interbank Connections, Contagion, and Bank Distress in the Great Depression</u> 51 Journal of Financial Intermediation 1 (July 2022); Erik Heitfield et al., <u>Contagion During the Initial Banking Panic of the Great Depression</u> NBER Working Paper Series (2017); Daron Acemoglu et al., <u>Systemic Risk and Stability in Financial Networks</u> 105 Am. Econ. Rev. 564 (2015); Hal S. Scott, <u>Connectedness and Contagion</u> 5–12 (2016); Gary Gorton and Andrew Metrick, <u>Getting Up to Speed on the Financial Crisis: A One-Weekend-Reader's Guide</u>, 50 Journal of Economic Literature 128 (2012); Ted Temzelides, <u>Are Bank Runs Contagious?</u> Federal Reserve Bank of Philadelphia Business Review (November/December 1997).  The PWG Stablecoin Report noted the potential for a "run" to occur on a stablecoin, as well as the potential implications of such a run for the broader financial system.  <u>See</u> PWG Stablecoin Report, at 12.

noncompliant exchanges; lent on crypto-lending platforms; and invested in decentralized finance protocols.[218]  Each of these poses risks to Avit holders,[219] as demonstrated by the bankruptcies of FTX,[220] Voyager,[221] Celsius,[222] Blockfi,[223] and the collapse of the Terra/Luna protocol.[224]  Avit holders engaging with these intermediaries and protocols may not be in a position to understand the risks they are taking, given that such intermediaries often do not comply with, or are not subject to, disclosure rules, conflicts-of-interest standards, or prudential regulations.

**Other Corporate Powers Considerations.**  In addition to these sufficient reasons, the Board is concerned that the proposed activity could potentially undermine a number of important public policies and mandates incorporated into the Federal Reserve Act and other laws that the Board administers and implements.[225]  For example, Congress charged

---

[218]  First AI Response, at 24–29.

[219]  While Custodia would not issue Avits directly to natural persons initially, such persons could purchase and hold Avits on the secondary market, and Avits would eventually be issued to high-net-worth individuals.

[220]  See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, In re FTX Trading Ltd., et al. (Bankr. D. Del. November 17, 2022) (No. 22-11068-JTD); Angus Berwick, Exclusive: At Least $1 Billion of Client Deposits Missing at Failed Crypto Firm FTX, Reuters (November 13, 2022), https://www.reuters.com/markets/currencies/exclusive-least-1-billion-client-funds-missing-failed-crypto-firm-ftx-sources-2022-11-12.

[221]  See Declaration of Stephen Ehrlich, supra note 157.

[222]  See Declaration of Alex Mashinsky, supra note 157.

[223]  See Declaration of Mark A. Renzi, supra note 158.

[224]  See FSOC Report, at 48–54.

[225]  For the reasons explained herein, concerns related to Custodia's planned issuance of Avits with reliance on deposits at the Federal Reserve directly calls into question

the Federal Reserve with managing monetary policy "so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates,"[226] and has assigned the Federal Reserve various tools and responsibilities with respect to maintaining financial stability.[227]  Custodia's plan to offer Avits and back them with deposits at the Federal Reserve raises several concerns in this regard that would require further consideration if Custodia were to be granted a master account by the Reserve Bank.[228]

The design of Avits could have implications for the Federal Reserve's balance sheet because the funds backing outstanding Avits would be held in a master account (if granted),[229] which is essentially a deposit account with a Federal Reserve Bank.  These funds would be assets on Custodia's balance sheet and liabilities on the Federal Reserve's balance sheet.  Thus, Avit growth could generate particularly pronounced demand for

---

"whether . . . the corporate powers to be exercised [by Custodia] are consistent with the purposes of [the Federal Reserve] Act."  12 U.S.C. § 322.

[226]  12 U.S.C. § 225a.

[227]  See, e.g., 12 U.S.C. §§ 343, 347, 347c, 5321(b)(B)(1), 5322(a)(1); see also supra note 165.

[228]  As noted above at note 4, the decision to grant a master account with respect to a given institution rests with the regional Federal Reserve Bank pursuant to the discretionary deposit-taking authority vested in Federal Reserve Banks by Congress in section 13 of the Act, 12 U.S.C. § 342.  The Board's Guidelines for Evaluating Account and Services Requests, which provide guidance in this area, affirmed the Board's long-standing interpretation of the Act as granting such discretion to Reserve Banks.  See Guidelines for Evaluating Account and Services Requests, 87 Federal Register 51099 (August 19, 2022).

[229]  See supra note 58.

Federal Reserve liabilities.  Moreover, this demand could be volatile given Custodia's business model is tied to the highly volatile crypto-asset industry.[230]

The combination of Federal Reserve membership and the perceived backing of Avits by holdings of deposits in a master account at a Federal Reserve Bank could be viewed by external parties as a form of implicit backing for Avits by the Federal Reserve.[231]  This could enable such a product to scale quickly and globally; it could plausibly become a tool for persons around the world to access the stability of the U.S. dollar instantly and anonymously.[232]  Even if Custodia alone, at least initially, would not have a significant demand for Federal Reserve liabilities, approving Custodia's issuance of instruments like Avits may set a precedent of allowing similar products at other banks

---

[230]  The Federal Reserve generally accommodates changes in the level or volatility of demand for its liabilities through changes in the amount of assets (generally U.S. Treasury securities) that it holds.  As a result, large enough changes in the demand for Federal Reserve liabilities generated by significant Avit growth could complicate the Federal Reserve's ability to manage the size of its balance sheet and overall conditions in the federal funds market.

[231]  Initial Business Plan, at 31 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓  [A]s a regulated, audited, 100% reserve bank that plans to deposit its cash directly at the Federal Reserve, [Custodia] expects to be a novel solution in this space and the only one of its kind with regulator-enforced proof of solvency."); Initial Business Plan, at 115 ("As a fully regulated, audited, 100% reserve bank that (at least initially) intends to deposit its cash directly at the Federal Reserve, [Custodia] expects that it would likely be the only U.S. dollar issuer of a digital asset in the form of a negotiable instrument that can prove its solvency. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓.").

[232]  The risk that Custodia may undergo pronounced rapid growth may be mitigated by the imposition of regulatory capital requirements in that such growth would cause breaches in minimum capital ratios unless accompanied by concomitant capital raises.

and result in a new, meaningful, and volatile source of demand for Federal Reserve liabilities.

If the Board were to approve Custodia's application, based on the foregoing and all the facts of record, it would exercise its discretion under section 9(13) of the Act, and impose a condition under section 9(1) of the Act, to prohibit Custodia from issuing Avits at least until such time as the Board's significant concerns regarding safety and soundness have been addressed.  The inability to conduct such activity may adversely affect Custodia's future earnings prospects as a state member bank.

   c.   Prime Services

As part of its Prime Services business, Custodia proposes to offer a platform that enables customers to lend crypto-assets held in trust accounts at Custodia for a fee.[233]  In addition, Custodia would offer a "fiat on/off ramp" for crypto-assets.[234]  Under this service, customers would be able to buy and sell qualifying crypto-assets (███████ ███) by using their deposit balances (for purchases of qualifying crypto-assets) or custodied crypto-assets (for sales of crypto-assets).  Customers would request a bid for their purchase or sale through Custodia's online portal, and Custodia's platform would request bids from "█████████████████."[235]

---

[233]  Initial Business Plan, at 12–15, 69; First AI Response, at 13, 35; Second AI Response, at 2–3, 15–16, 18–19.

[234]  Initial Business Plan, at 40.

[235]  Id., at 40–43.

Based on the descriptions provided by Custodia to date, the Board has not determined whether certain of these activities would be conducted as principal;[236] therefore, the Board is not able to evaluate whether it would be appropriate to consider national bank permissibility and limiting such activity under section 9(13) of the Act. However, the Board has concerns regarding the risks posed by these activities, including operational, compliance, and illicit finance risks. The Board would want to comprehensively review the effectiveness of planned systems for such novel and unprecedented activities. At the time of the Reserve Bank's examination, Custodia had not yet designed its policies, procedures, or controls for these activities. Among other things, the Board would like to better understand Custodia's process for determining that a crypto-asset eligible for these services is not a security.[237] The Board would also want to review disclosures and customer-facing materials, in light of the risks of holding crypto-assets, as discussed above.[238]

---

[236] In the context of section 24 of the FDIA, the FDIC has previously stated that agency relationships "must be examined on an unbundled basis"— just because an activity is referred to as an "agency" or involves some elements of agency does not mean that the entire activity is conducted "as agent." FDIC Interpretive Letter FDIC-97-7, at 1 (October 20, 1997) (1997 WL 1050940).

[237] See, e.g., Memorandum and Order, Securities and Exchange Commission v. LBRY, Inc. (D.N.H. November 7, 2022) (No. 21-cv-260-PB). If Custodia were to act as a broker for sales of an unregistered security, it could be liable for the purchaser's losses. See 12 U.S.C. § 77*l* (establishing liability for offering or selling an unregistered security); Pinter v. Dahl, 486 U.S. 622, 647 (1988) (holding that this liability extends to a person or entity that successfully solicits the purchase of an unregistered security, motivated at least in part by the desire to serve its own financial interests or those of the security's owner). In addition, it would be subject to specific legal requirements regarding securities brokerage.

[238] See supra notes 170–173.

Given that these activities are novel and unprecedented for state member banks, if the Board were to approve Custodia's application, based on the foregoing and all the facts of record, it would impose a condition under section 9(1) of the Act to prohibit Custodia from engaging in these activities, pending further review and assessment of the permissibility considerations and the adequacy of the control environment.  The inability to conduct such activity may adversely affect Custodia's future earnings prospects as a state member bank.

3.  *Considerations Related to Admission of an Uninsured Deposit-Taking Bank*

The Board has considered whether admission to membership of an uninsured bank that generally accepts deposits is consistent with the purposes of the Act.  One of the principal goals of the Act is to promote the effective operation of the U.S. economy.  A key tool in achieving this goal is protecting the stability of the banking system, and since the 1930s, federal deposit insurance has been central to achieving that stability.  Prior to the establishment of deposit insurance, U.S. banks were highly susceptible to runs, and bank failures in the early 1930s had a devastating impact on the U.S. economy.  In the Banking Act of 1933,[239] Congress added section 12B to the Act, later separately enacted as the FDIA, which provides for the establishment of the FDIC and federal deposit insurance.  Importantly, the Banking Act of 1933 provided that federal deposit insurance would be extended to every member bank as of July 1, 1934, and to every bank that

---

[239]  Pub. L. No. 73-66, 48 Stat. 162, 168.

became a member of the Federal Reserve System after that date.[240]  Beginning in 1950, every member bank in the business of receiving deposits other than trust funds became an insured bank at the time it became a member of the Federal Reserve System.[241]

Admission of an uninsured member bank that accepts deposits other than trust funds would be unprecedented in modern times and could present risks to the stability of the Federal Reserve System by omitting a critical tool in preventing bank runs.[242] Although Custodia contends that certain aspects of its business plan reduce the bank's susceptibility to runs, Custodia may be subject to runs and could cause contagion to affect other institutions in the event of a run.[243]  The global crypto-asset industry, on which Custodia has focused its business model, is highly susceptible to runs, as recent events have demonstrated.[244]  These risks are heightened with respect to Avits,

---

[240]  48 Stat., at 169–70, 172–76.

[241]  Act of September 21, 1950, sec. 2, § 4, ch. 967, 64 Stat. 873, 875.  In 1991, this provision was amended such that membership in the Federal Reserve System did not automatically confer insured status.  See FDICIA § 115, Pub. L. No. 102-242, 105 Stat. 2236, 2249 (1991).  However, the legislative history of this provision indicates that the change was intended to require all banks seeking insurance to obtain the approval of both the FDIC and appropriate Federal banking agency, matching the statutory process for federal savings associations.  See 138 Congressional Record 3093, 3115 (1992).

[242]  While there are currently 49 uninsured member banks that are nondepository trust companies (including one uninsured state member bank), there are no uninsured member banks that accept deposits other than trust funds.

[243]  For example, in 2008 and 2020, money market mutual funds, which could be compared to uninsured deposit-taking entities, experienced significant stress due to outflows, which resulted in contagion.  See, e.g., President's Working Group on Financial Markets, Overview of Recent Events and Potential Reform Options for Money Market Funds (December 2020).

[244]  FSOC Report, at 46–53.

redemptions of which would be visible on the blockchain.  These financial stability risks are worsened by Custodia's managerial deficiencies, as revealed by the recent pre-membership examination.

Further, the Board would need to create bespoke regulatory and supervisory frameworks for Custodia, to ensure it is subject to supervision and regulations that are appropriate for an uninsured institution engaged in significant deposit-taking activities.[245] Finally, as discussed above, lack of deposit insurance coverage by the FDIC means that any resolution of Custodia would take place outside the FDIC's receivership regime.[246]

The Board acknowledges that, notwithstanding the lack of precedent, Congress has designed a legislative framework that makes it possible for an uninsured depository institution to become a state member bank.  Future applicants may present business models and control frameworks to overcome the concerns presented by uninsured deposit-taking banks.  But in light of the heightened risks of Custodia's business model and currently insufficient control framework, the Board does not believe that Custodia has overcome these concerns or provided sufficient justification to break from long-standing precedent.

*     *     *

---

[245]  See, e.g., supra notes 24–27; part II.C.2.

[246]  See supra part II.A.4.

Based on the foregoing review and all the facts of record, the Board has determined that the considerations relating to the corporate powers factor are so adverse as to be sufficient grounds on their own for warranting denial of Custodia's application.

### D.  *Convenience and Needs Considerations*

The Board has also considered the convenience and needs of the community to be served.[247]  In considering the convenience and needs factor for membership applications by de novo banks, the Board has traditionally considered Community Reinvestment Act ("CRA") plans for the community to be served, business plans as they relate to consumer compliance, and results from pre-membership examinations conducted by the Federal Reserve Banks.[248]

Given its unique charter, Custodia would not be subject to the CRA,[249] and therefore, there was no CRA plan for Reserve Bank examiners and the Board to consider. The Board has therefore reviewed Custodia's plans for serving the convenience and

---

[247]  12 CFR 208.3(b)(3).

[248]  The pre-membership examination focused on Custodia's core banking activities. Based on the proposed business plan, Custodia would initially only serve business entities.  In addition, the Wyoming statute chartering Custodia as an SPDI prohibits the bank from originating loans.  Wyo. Stat. § 13-12-103(c).  Accordingly, Reserve Bank examiners did not conduct a consumer compliance pre-membership exam.

[249]  Custodia would be exempt from the CRA because banks that do not grant credit to the public in the ordinary course of business are classified as special purpose banks to which the CRA requirements do not apply under 12 CFR 228.11(c)(3).  The Wyoming statute chartering Custodia as a special purpose depository institution prohibits the bank from originating loans.  Wyo. Stat. § 13-12-103(c).  In addition, the CRA only applies to "regulated financial institutions," which are in turn defined as "insured depository institutions," as defined in 12 U.S.C. § 1813.  Custodia is not seeking deposit insurance with the FDIC.

needs of the community it has identified.  Custodia defines the community it will serve as the crypto-asset market comprised of "███████████████████████████████ ████████████████████████████████████████████ █████████," as well as ████████████.[250]  Custodia states that it will serve as "a market 'utility' for the regulatory-compliant portion of the crypto-asset community."[251] Custodia believes that it will meet the convenience and needs of this community by serving as a supervised bank that provides customers access to both national currency and crypto-asset products.  Custodia also represents that its entry into the market would give the crypto-asset industry more banking options.

The Board most recently approved two membership applications from two uninsured (nondepository) state chartered institutions:  Warehouse Trust in 2010 and ICE Trust in 2009.[252]  In these cases, the applicants were viable institutions, which provided valuable services as market utilities and reduced risks within their communities, consistent with the convenience and needs factor.[253]  In contrast, and as described above,

---

[250]  Initial Application, at 7; see also Initial Business Plan, at 39.

[251]  Initial Application, at 7.

[252]  Warehouse Trust Company LLC, 96 Federal Reserve Bulletin B13 (2010); ICE US Trust LLC, 95 Federal Reserve Bulletin B73 (2009).

[253]  The Board found that Warehouse Trust, as the primary trade repository for credit default swap ("CDS") contracts, met the convenience and needs factor as an essential component of the market infrastructure for CDS transactions and found benefit in bringing Warehouse Trust into the Federal Reserve System and subjecting it to oversight. In addition, the Board found benefit in granting membership to Warehouse Trust because membership would promote greater transparency by making CDS data publicly available. Warehouse Trust Company LLC, 96 Federal Reserve Bulletin B13, B14 (2010).  The Board found that ICE Trust met the convenience and needs factor as a central

the Board has substantial doubts regarding Custodia's ability to operate in a safe and sound manner as proposed, which in turn indicates Custodia will not be able to meet the convenience and needs of its community.[254]  Instead, the current record indicates Custodia could pose significant risk to its community.

Custodia is not seeking deposit insurance with the FDIC, and admission of an uninsured member bank that accepts deposits (other than trust deposits) would be unprecedented since the establishment of federal deposit insurance.[255]  To the extent that Custodia would be able to expand the deposit capacity available to the crypto-asset market and attract depositors, Custodia has not proposed a sustainable business plan that would address the significant risk to its customers in the event of its potential failure.[256]  The risk to Custodia's depositors is highlighted by the managerial weaknesses, discussed above, revealed in the pre-membership examination.[257]  Accordingly, in contrast to the membership applications submitted by Warehouse Trust and ICE Trust, Custodia has

---

counterparty for CDS transactions that significantly reduced systemic risks associated with counterparty credit exposures in CDS transactions, and thereby enhanced the stability of the overall financial system.  The Board also found that bringing ICE Trust into the Federal Reserve System would promote greater market transparency by making market data more publicly available.  ICE US Trust LLC, 95 Federal Reserve Bulletin B73, B76 (2009).  The Board also found that the financial factor with respect to both entities was consistent with approval.  Id., at B75; Warehouse Trust Company LLC, 96 Federal Reserve Bulletin B13, B14 (2010).

[254]  See supra parts II.A, II.B.

[255]  See supra part II.C.3.

[256]  See supra parts II.A.4 and II.B.

[257]  See supra part II.A.

presented a business plan that is unlikely to provide sustainable services to its community and that exposes potential customers to significant risk.

The Board has also considered the consumer laws and regulations that may apply to Custodia's general business model, including its Avits.  Custodia has generally challenged the application of federal consumer laws and regulations, taking the position that they do not currently apply to its proposed businesses (including Avits); therefore, Custodia has not implemented any specific controls to comply with such laws and regulations.[258]  The Board has concluded that, at a minimum, the prohibition on unfair or deceptive acts or practices in section 5 of the Federal Trade Commission Act would apply to Custodia.

In summary, the Board has considered Custodia's purported benefits to its community.  Custodia has not demonstrated that it could operate in a safe and sound manner, which is a necessary precondition to being able to meet the convenience and needs of its community.  Instead, the current record indicates Custodia could in fact pose significant risk to its community.  It is also unclear whether Custodia would be able to comply with any applicable consumer protection requirements given the inherent features of its intended business model.

---

[258]  See First AI Response, at 35 ("Custodia does not intend to offer services to natural persons for at least ██████████████████████████████████.
Consequently, it has not done further analysis on potential implications under the Electronic Funds Transfer Act, Regulation E or any other relevant laws applicable to consumers."); Third AI Response at 11–12, 29–31.

## III.   **Conclusion**

Based on the foregoing and all the facts of record, the Board has determined that approval of Custodia's application for membership in the Federal Reserve System would be inconsistent with the managerial, financial, and corporate powers factors that the Board is required to consider under the Act.[259]  Inconsistency with any one of these factors is sufficient to warrant denial of Custodia's application,[260] and other factors the Board is required to consider under the Act do not lend sufficient weight to warrant approval of Custodia's application.

It is therefore the judgment of the Board that Custodia's membership application should be, and hereby is, denied without prejudice to future applications by Custodia.

By order of the Board of Governors,[261] effective January 27, 2023.

*Ann E. Misback (signed)*
Ann E. Misback
Secretary of the Board

---

[259]  12 U.S.C. § 322.

[260]  See supra note 7.

[261]  Voting for this action: Chair Powell, Vice Chair Brainard, Vice Chair for Supervision Barr, Governors Bowman, Waller, Cook and Jefferson.