Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE, PC
PO Box 10700
Casper, WY 82602
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Phone:   202-434-5000
Fax:       202-434-5029
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
whermadorfer@wc.com
jwolfe@wc.com

*Attorneys for Plaintiff*

IN  THE  UNITED  STATES  DISTRICT  COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC.,<br>2120 Carey Avenue, Suite 300<br>Cheyenne, WY 82001<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL RESERVE BOARD OF<br>GOVERNORS,<br>Constitution Ave NW & 20th St NW<br>Washington, DC 20551<br><br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br>1 Memorial Drive<br>Kansas City, MO 64108,<br><br>*Defendants*. | Civil Case No.: 1:22-CV-00125-SWS |

**OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1
BACKGROUND ............................................................................................................2
I.      Federalism Promotes Innovation in Banking.................................................2
II.     The Federal Reserve System is Headed by the Board. ...................................3
III.    The Federal Reserve's Adjudication Process for Master Account Applications
        Has Changed. ...................................................................................................4
IV.     Custodia Bank Used Its Wyoming Charter to Apply for a Master Account. ......6
        A.      Custodia applied for a master account, but Defendants sat on their hands...........6
        B.      The Board denied Custodia's membership application. ...................................9
        C.      Defendants denied Custodia's master account application..............................10
STANDARD OF REVIEW ............................................................................................11
ARGUMENT ...............................................................................................................11
I.      The Court Previously Rejected Defendants' Arguments for Dismissal. ...........11
II.     Section 248a Entitles Custodia to a Master Account.......................................14
        A.      Defendants misread the statutory framework. .......................................14
        B.      Section 248c does not affect Defendants' treatment of master account
                applications. ...................................................................................21
                1.      Defendants can reject master account applications from financial
                        institutions that are otherwise ineligible. ..................................21
                2.      Section 248c was designed to promote transparency, not to alter
                        the master account process.....................................................25
                3.      Section 248c makes clear that the Board controls the master
                        account application process. ...................................................28
III.    Defendants' Policy Arguments and Smears Against Custodia Should Not Alter
        the Court's Statutory Analysis. .....................................................................28
IV.     The Kansas City Fed Is a Proper Defendant....................................................30
V.      Custodia's Declaratory Judgment Claims Are Valid.......................................33
CONCLUSION............................................................................................................34

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013) ...................................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..........................................................................11

*Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 568 F. Supp. 3d 1167 (D. Kan. 2021) ..............11

*Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*,
  353 F. Supp. 3d 1070 (D. Colo. 2018)................................................................33

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018)...........................................................17

*Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*,
  262 U.S. 649 (1923)........................................................................................18

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
  861 F.3d 1052 (10th Cir. 2017) ........................................................... *passim*

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)....................16

*Heydon's Case* (1584) 76 Eng. Rep. 637; 3 Co. Rep. 7 a (Exch.).................................25

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
  58 F. Supp. 3d 1191 (D.N.M. 2014) .................................................................33

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ..............................................................14

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983)...............16

*Ketcham v. U.S. Nat'l Park Serv.*,
  No. 16-CV-00017-SWS, 2016 WL 4268346 (D. Wyo. Mar. 29, 2016)....................33

*Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167 (10th Cir. 1997) ..............................32

*Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018) .............................29

*Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017).....................................................17

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ..................................................12

*Prier v. Steed*, 456 F.3d 1209 (10th Cir. 2006)..............................................................34

*Prime Care of Ne. Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284 (10th Cir. 2006) ..................27

*Robbins v. Chronister*, 402 F.3d 1047 (10th Cir. 2005) .................................................27

*Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988) ..................................................33

*Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005).................................30

*W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*,
  1 F.3d 1052 (10th Cir. 1993) ..........................................................................32

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ........................................27

*Wild Watershed v. Hurlocker*, 961 F.3d 1119 (10th Cir. 2020)......................................17

## STATUTES, REGULATIONS, AND RULES

12 U.S.C.
  § 25b.........................................................................................................19
  §§ 38–43...................................................................................................2
  § 222.........................................................................................................4
  §§ 226–228...............................................................................................2
  § 248.................................................................................................3, 8, 10
  § 248a.............................................................................................. *passim*
  § 248c...........................................................................................6, 21, 23, 28

Page

**Statutes, Regulations, and Rules—continued:**

12 U.S.C.
  § 342 ..............................................................................................8, 12, 13, 18
  § 461 ..............................................................................................23
  § 1813 ............................................................................................23
  § 1831d ..........................................................................................3, 4, 19
28 U.S.C. § 1361 ..............................................................................30
Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* ......................33, 34
Federal Reserve Act, 63 Cong. ch. 6, 38 Stat. 251 (1913)
  (codified at 12 U.S.C. § 226 *et seq.*) ........................................... *passim*
James M. Inhofe National Defense Authorization Act for Fiscal Year 2023,
  Pub. L. No. 117-263, § 5708, 136 Stat. 2395 (Dec. 23, 2022)
  (to be codified at 12 U.S.C. § 248c) ..............................................5
Monetary Control Act, Pub. L. No. 96-221, 94 Stat. 132 (1980) ............15
National Bank Act, ch. 343, 18 Stat. 123 (1874) ................................2
Wy. Admin. R., Banking Div. Ch. 20, § 3 ........................................20
Wyo Stat.
  § 13-12-103 ...................................................................................6
  § 13-12-105 ...................................................................................6
  § 13-12-119 ...................................................................................6
Bd. of Governors of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services*
  *Requests,* 87 Fed. Reg. 51,099 (Aug. 15, 2022) ............................7
  51,106 .........................................................................................8
  51,110 .........................................................................................8
Fed. R. Civ. P. 12(b)(6) ....................................................................11

## OTHER AUTHORITIES

168 Cong. Rec. S688–703 (Feb. 15, 2022) (Statement of Sen. Toomey) .....5
*Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*,
  43 Op. O.L.C. __ (Oct. 23, 2019) ..............................................3, 31
Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision*
  *of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) ................15
Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments*
  *System*, https://tinyurl.com/4wfhfnkn (last updated Aug. 11, 2020) ........................15
Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the*
  *Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb....................15
Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service*
  *Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu .....................15
Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967 (2021) ..........................25, 26
Kyle Campbell, *Toomey: Fed "Wildly Mischaracterized"Master Account Law for Own*
  *Gain*, Am. Banker (Apr. 3, 2023), https://tinyurl.com/2p8vs9nc......................26, 27
Peter Conti-Brown, *The Fed Wants To Veto State Banking Authorities. But Is That*
  *Legal?* Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd ..............................4, 14, 19

iv

Page

**Other Authorities—continued:**

Fed. Rsrv., *Fed. Rsrv. Banks Operating Circular 1: Account Relationships*
(Aug. 16, 2021) ................................................................................................4, 23

Thomas Franck, *State Bank Regulator Disputes KC Fed's Claim About Fintech Firm
Linked to Biden Nominee Raskin* (Feb. 15, 2022), https://tinyurl.com/3kj73xhf ...................24

Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*,
Iowa L. Rev. (forthcoming 2023),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405139...................................... *passim*

Julie A. Hill, *Opening a Federal Reserve Account*, 40 Yale J. Regul. (forthcoming 2023),
https://ssrn.com/abstract=4048081 ..................................................................................4, 5, 19

John F. Manning, *What Divides Textualists From Purposovists?*,
106 Colum. L. Rev. 70 (2006) ...............................................................................................25

Press Release, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual
Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on
Master Accounts* (Dec. 8, 2022), https://tinyurl.com/57d74r28 ............................5, 24, 25, 26

Statement from Fed. Rsrv. Bank of Kan. City, https://tinyurl.com/4schdpbw ............................24

Wy. Div. of Banking, SPDI Exam. Manuals (Jan. 2021) ...........................................................20

## INTRODUCTION

As Yogi Berra once memorably observed, "It's like déjà vu all over again."  Last fall, the Court entertained briefing and oral argument on Defendants the Federal Reserve Board of Governors' (the "Board") and the Federal Reserve Bank of Kansas City's (the "Kansas City Fed") motions to dismiss Plaintiff Custodia Bank Inc.'s original complaint.  That complaint alleged that Defendants had unduly delayed granting Custodia a master account, and the central question facing the Court in resolving the motions to dismiss was whether 12 U.S.C. § 248a entitled Custodia to a master account.  The Court granted in part and denied in part Defendants' motions, holding that it was plausible that § 248a entitled Custodia to a master account and that further factual development was warranted before the Court would undertake a complete analysis of the statute.  (Order, ECF 102 at 16–17.)  On the eve of having to produce discovery that would reveal the extent of the Board's control over the master account process, Defendants denied Custodia's master account application and moved to dismiss this case as moot without producing a single document in discovery.  Defendants' maneuver prompted Custodia to amend its Complaint to challenge Defendants' denial as unlawful.  (Amended Complaint ("AC"), ECF 121.)

The central question in the Amended Complaint remains the same: Whether Custodia is entitled to a master account under § 248a.  In their motions, Defendants retread much of the same ground that the Court already has considered and rejected as a basis for dismissal, and their one new argument, concerning an irrelevant change to the Federal Reserve Act, does not move the needle.  Discovery is still necessary to resolve this dispute.  And the stakes could not be higher, as Defendants' position—that politically disfavored but eligible state-chartered depository institutions can be unilaterally blocked from accessing the banking system by the Board (or its agents, the Reserve Banks)—spells the demise of the dual-banking system that has prevailed for more than two centuries.  The fight over this statutory question turns on states' rights: did Congress

grant the Board (or its agents, the Reserve Banks) a veto over State bank chartering decisions without explicitly saying so in statute?  Accordingly, the Court should respond as it did before, by denying Defendants' motions to dismiss and allowing the parties to proceed to long overdue discovery so that the Court can have the full context when it decides this important question.

## BACKGROUND

### I.   Federalism Promotes Innovation in Banking.

The United States operates a dual banking system that allows banks to be chartered by either the state or federal government.  At the Founding, almost all banks were state chartered. (AC ¶ 22.)  It was not until the passage of the National Bank Act in 1863 that nationally chartered banks started to proliferate.  (*Id*. at ¶ 23;) *see also* 12 U.S.C. §§ 38–43.  In 1913, Congress established the federal banking system as we know it today with the passage of the Federal Reserve Act.  (AC ¶ 24;) *see also* 12 U.S.C. §§ 226–228.

The dual-chartering system's division of regulatory responsibility among state and federal authorities is federalism at its best.  Banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority.  (AC ¶ 26.)  National banks are primarily regulated by the OCC, while state banks are principally overseen by state regulators.  (*Id*.)  The availability of state charters allows financial institutions to survey various options to select the state that best suits their intended business plans, factoring in geographic and operational concerns such as business models, accessibility of regulators, regulatory philosophies, and costs.  State banking divisions compete and innovate in order to meet the financial needs of their citizens as well as the needs of the state as a whole.  (*Id*. at ¶ 25.)

While the dual-banking system divides the chartering and regulatory responsibilities between the Federal and state governments, it does not create two separate systems for bank

services.  The Federal Reserve must provide access to the U.S. dollar payment system to eligible depository institutions on a nondiscriminatory basis.  *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).  Just because a bank has a state charter does not mean that it uses a state system to clear checks, transfer electronic funds, and provide other banking services.  Instead, state-chartered banks have the right to use the Federal Reserve System for such banking services if they qualify as eligible depository institutions.  The dual-banking system has never segregated national and state-level banking services, or given the Federal Reserve a veto over state-chartered depository institutions' ability to access banking services.

## II.   The Federal Reserve System is Headed by the Board.

The Federal Reserve System controls and executes the nation's monetary policy, operates the U.S. dollar payment system, and serves as America's central bank.  The Federal Reserve's Board of Governors sits atop this system.  The Board exercises "general supervision" over twelve regional Reserve Banks, including the Kansas City Fed.  12 U.S.C. § 248(j).  "The Board oversees the operations of the regional Reserve Banks, including by setting policies for Reserve Banks' lending of money to private banks and provision of other financial services."  *Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __, at *3 (Oct. 23, 2019) (*Fed. Rsrv. Bank Members*).  Congress also empowered the Board to "make all rules and regulations necessary to enable [the] board effectively to perform" its statutory duties, including supervising Reserve Banks.  12 U.S.C. § 248(i).  The Board can delegate many functions to Reserve Banks, but retains ultimate authority to review delegated functions.  *Id.* § 248(k).

"The twelve regional Federal Reserve Banks execute the Federal Reserve System's policies."  *Fed. Rsrv. Bank Members*, 43 Op. O.L.C. __, at *3.  As operating arms of the Reserve System, Reserve Banks act as "fiscal agents of the United States empowered by delegation from the Board … to supervise financial institutions and activities."  *Id.* at *8 n.3.

3

Once a bank is chartered, the next question is whether it will be a member of the Federal Reserve System.  Nationally chartered banks must become members of the Federal Reserve System.  12 U.S.C. § 222.  State-chartered banks may choose to become members of the Federal Reserve System, but they are not required to do so.  (AC ¶ 27.)  The Federal Reserve System cannot discriminate against state-chartered depository banks in the provision of Federal Reserve bank services.  *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

**III.   The Federal Reserve's Adjudication Process for Master Account Applications Has Changed.**

Master accounts are accounts that banks hold with a Reserve Bank—in effect, "bank account[s] for banks."  *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Op. of Moritz, J.).  Master accounts permit access to a bevy of "indispensable" financial services the Federal Reserve provides.  *Id.* at 1064 (Op. of Bacharach, J.).  Withholding access to master accounts effectively nullifies a state charter because it is only by holding a master account that banks may directly utilize the Federal Reserve's electronic system for executing debit and credit entries between institutions, clearing checks, transferring securities, and cashing savings bonds.  Fed. Rsrv. Banks, Operating Circular 1 at §§ 2.3, 4.1–.3 (Aug. 16, 2021).  Put simply, a bank shut out from the Federal Reserve's payment system "can't really function as a financial institution."  Peter Conti-Brown, *The Fed Wants To Veto State Banking Authorities.  But Is That Legal?* Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd.

The application process for master accounts is opaque.  For many years "th[e] process for opening an account was quick" and "Reserve Banks conducted little of their own investigation when considering new account applications."  Julie A. Hill, *Opening a Federal Reserve Account*, 40 Yale J. Regul. (forthcoming 2023) (available at SSRN: https://ssrn.com/abstract=4048081), draft at 109.  "Instead, the Reserve Banks relied on the fact that the depository institution had been

4

vetted by some other federal or state bank supervisor," *id.*, and "Reserve Banks provided account and payment services to all legally eligible banks," Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023) (available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405139), draft at 46. At some point, the Federal Reserve changed the way master account applications are considered without announcing how, why, or when that change occurred. Today, depository institutions applying for master accounts face a "process more like applying for a bank charter" than "opening a bank account." Hill, *Opening a Federal Reserve Account*, 40 Yale J. Regul. at ____ (forthcoming 2023), draft at 103. The upshot is that the Federal Reserve has surreptitiously expanded its regulatory remit both by raising the threshold for obtaining an account and by controlling the use of accounts, all without statutory authorization to do so. *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 1–6.

In December 2022, Congress amended the Federal Reserve Act. *See* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022) (to be codified at 12 U.S.C. § 248c). United States Senate Banking Committee Ranking Member Pat Toomey (R-Pa.) had grown frustrated with the Board's lack of transparency regarding the master account application process. Press Release, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts* (Dec. 8, 2022), https://tinyurl.com/57d74r28.[1] Senator Toomey responded by sponsoring an amendment to the

---

[1] *See also* 168 Cong. Rec. S688–703 (Feb. 15, 2022) (Statement of Sen. Toomey) ("[T]his is the kind of stonewalling we are dealing with. Can't get answers to basic simple questions: Who did you talk to? When did you talk to them? What was the nature of the conversation? And from the Fed: What was the review process? What led you to change your conclusion? Do you have a memo from the general counsel laying out the case?").

Federal Reserve Act, which is codified at 12 U.S.C. § 248c.  Under § 248c, the Board is required to "create and maintain a public, online, and searchable database" including "every entity that currently has access to a reserve bank master account and services," as well as "every entity that submits an access request for a reserve bank master account and services" and whether that request was "approved, rejected, pending, or withdrawn."  12 U.S.C. § 248c(b).

## IV.   Custodia Bank Used Its Wyoming Charter to Apply for a Master Account.

In January 2020, Caitlin Long, a 22-year Wall Street veteran, formed Custodia.  That fall, Wyoming's State Banking Board voted 7-0 to grant Custodia an Special Purpose Depository Institution ("SPDI") charter.  (AC ¶ 14.)  Wyoming SPDIs are regulated by the Wyoming Division of Banking.  Wyo. Stat. § 13-12-119.  Like traditional banks, SPDIs must hold capital on top of the assets that back customer deposits.  Unlike traditional banks, SPDIs are generally prohibited from making loans with customer deposits of fiat currency and must back all customer deposits with 100% cash on hand or high-quality liquid assets.  Id. §§ 13-12-103, 13-12-105.  SPDIs do not lend money; instead, they specialize in taking deposits of U.S. dollars, facilitating payments for customers, and other incidental services such as custody of digital assets or securities.  As a SPDI bank, Custodia will not hold customers' digital assets in any of its accounts, so Custodia will not be exposed to digital asset price volatility; its customers will retain all digital asset risks.  (Id. ¶ 38.)  Custodia will simply maintain customers' digital assets in its trust department, like a safety deposit box for digital assets.  (Id. ¶ 50.)  Custodia needs a master account to use the Federal Reserve payment system's electronic fund transfer services for U.S. dollars.  At no point would customers' digital assets touch Custodia's master account.  (Id.)

### A.   Custodia applied for a master account, but Defendants sat on their hands.

In October 2020, Custodia filed its master account application with the Kansas City Fed.  (AC ¶ 9.)  Custodia submitted some 900 pages of additional information, including Custodia's

business plan, bylaws, policies, insurance agreements, and Wyoming Banking Approval Order. Months passed.  In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that the application presented "no showstoppers."  (*Id*. ¶44.) And in January 2022, the Kansas City Fed confirmed that Custodia meets the legal eligibility requirements for receiving a master account.  (*Id*.)

Nevertheless, Custodia's application remained pending for over two years.  Custodia tried to expedite the process, regularly contacting Defendants and setting up numerous meetings.  (*Id*. ¶ 45.)  Custodia repeatedly offered to provide more information, yet Defendants did virtually nothing on the application.  (*Id.*)  In August 2021, after nearly a year of Defendants' inaction, Custodia applied to become a member bank of the Federal Reserve System to show its willingness to submit to full Federal supervision and accountability.  (*Id*. ¶ 47.)

After waiting for nearly two years for Defendants to act, Custodia filed suit in June 2022. (ECF 1.)  What followed were a series of calculated actions by the Federal Reserve timed to precede litigation deadlines.  The day before Defendants' motions to dismiss were due on August 16, 2022 (*see* ECF 48, 50), the Board issued final guidelines for evaluating master account applications.  Bd. of Governors of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099 (Aug. 15, 2022).  The Board promulgated  these "guidelines under its general supervision authority over the operations of the Reserve Banks," and identified "principles to be used by Federal Reserve Banks ... in evaluating requests for master accounts." *Id*. at 51,106.  The Board's guidelines prescribed a tiered framework for evaluating risks of different institutions accessing master accounts, and explained that state chartered, non-member institutions without FDIC insurance—namely, banks like Custodia—"will generally receive the

strictest level of review."  87 Fed. Reg. at 51,110.  Defendants then relied on these newly minted guidelines in their motions to dismiss.  (*See* ECF 49 at 7, 8, 14, 26, 39; ECF 51 at 7, 42.)

Custodia responded to Defendants' motions to dismiss on September 13, 2022.  (ECF 58.) Custodia's opposition was supported by amici the State of Wyoming (ECF 88), State Senator Rothfuss and State Representative Olsen (ECF 89), and Members of the U.S. Senate Banking Committee and U.S. House of Representatives Financial Services Committee (ECF 92).  After the motions to dismiss were fully briefed, the Court heard oral argument on October 28, 2022, and on November 11, 2022, the Court issued its Order granting in part and denying in part Defendants' motions to dismiss.  (Order, ECF 102.)

Most relevant to the pending motions, the Court held that:

- "Custodia ha[d] plausibly alleged that the Board of Governors has participated in or interfered with the consideration and decision of Custodia's master account application."  (Order at 8.)

- "Judge Bacharach's opinion [in *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), which held that eligible institutions are entitled to master accounts under the Federal Reserve Act,] may plausibly be the law on this matter in this case."  (Order at 16.)

- "[B]ecause the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of [12 U.S.C.] § 342 versus [12 U.S.C.] § 248, the Court" decided it would "not undertake a complete analysis . . . without further development of those facts."  (Order at 17.)

- "Custodia's request for mandamus relief should not be dismissed" because "applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have failed to discharge a duty owed to plaintiffs which Congress has directed them to perform."  (Order at 18 (internal quotation marks omitted).)

- Because "Custodia ha[d] asserted plausible claims of unreasonable delay under the APA and the Mandamus Act, its action for a declaration that a master account application must be decided within a reasonable period of time is valid."  (Order at 23.)

**B.      The Board denied Custodia's membership application.**

Following the Court's order, and in keeping with Custodia's claim for undue delay, Custodia served the Kansas City Fed with Requests for Information, Requests for Admissions, and Requests for Production as well as served third-party discovery requests. Because the claims against the Board fell under the APA, the Board was required to produce an administrative record on February 9, 2023. (ECF 106; ECF 112.)

Less than a week after the pretrial scheduling conference, and with the due date for its administrative record impending, "the Board staff held an impromptu meeting with Custodia." (AC ¶ 63.) "Custodia was not informed of the purpose of the meeting." (*Id.*) "During the meeting, the Board staff told Custodia that they would recommend that the Board vote to deny Custodia's application for membership in the Federal Reserve." (*Id.*) Although banks are generally "given at least one opportunity to address perceived shortcomings in a [membership] application" and are generally given "a week or longer to consider whether to withdraw a [membership] application once the staff conveys their intention to recommend denial," Custodia was given "48 hours to decide whether it would withdraw its [membership] application or face the likely denial." (*Id.* ¶¶ 63–64.) Custodia asked for a one-week extension to consider its options. That request was denied. (*Id.*)

Custodia responded to the Board staff on January 26, 2023, amid press leaks that the Board's vote to deny its membership application would be a foregone conclusion if it chose not to withdraw. (*Id.* ¶ 66.) Custodia did not withdraw its membership application, but it did offer to submit an amended application. (*Id.*) Custodia's response also detailed numerous irregularities in the Board's consideration of Custodia's application, which included the Board conducting a full examination before Custodia was even operational (in violation of the Board's own guidance), refusing to review Custodia's updated documentation and information, expanding the scope of

Custodia's examination midway through to include activities and products that would not be operational at launch, subjecting Custodia to a higher standard of review applicable to large banks without notifying Custodia in advance, and refusing to review the remediation plan submitted by Custodia that the Board itself, in writing, had requested from Custodia.  (*Id.*)

Less than 24 hours later, on January 27, 2023 the Board voted to deny Custodia's membership application.[2]  (*Id.* ¶ 67.)

**C.      Defendants denied Custodia's master account application.**

At approximately the same time as the Board made public its decision on Custodia's membership application, both the Board and the White House released coordinated statements on the risks of crypto-assets.  (*Id.*¶ 68.)  Within a few hours, the Kansas City Fed denied Custodia's master account application.  (*Id.* ¶ 69.)  "The language in the Kansas City Fed's denial echoed the Board's denial of Custodia's membership application and the White House's statement on crypto-assets."  (*Id.*)  By the end of the day, Defendants filed a motion to dismiss this case as moot.  (ECF 116.)

Rather than dismissing the case as moot, the Court allowed Custodia to file its First Amended Complaint on February 28, 2023.  (AC, ECF 121.)  That Amended Complaint includes three claims that present the same central issue as was presented to the Court last fall: Whether Federal bank regulators have discretion to deny a master account to a state-chartered bank that indisputably qualifies as an eligible depository institution.  Custodia respectfully submits that they cannot, given the unequivocal language of 12 U.S.C. § 248(a) and Judge Bacharach's opinion in

---

[2] Custodia is not challenging the Board's denial of Custodia's membership application.  And the Board's rationale for denying Custodia's application for membership in the Federal Reserve System is irrelevant to whether Custodia, as an eligible, state-chartered depository institution, is entitled to a master account under 12 U.S.C. § 248a.

*Fourth Corner*.   Recognizing this similarity, Defendants' motions to dismiss largely rehash arguments from their first motions to dismiss regarding the proper interpretation of § 248a. (*Compare* ECF 49 at 17–26, *with* ECF 127 at 11–25; *Compare* ECF 51 at 20–29, *with* ECF 124 at 6–11.)  The Court has already determined that Custodia is at least plausibly entitled to a master account and, in any event, that discovery will assist the court in interpreting the statute.  (Order at 16–17.)  Nothing has occurred that should affect the Court's analysis.  Defendants' motions should be denied, and Custodia should be permitted to proceed to discovery.

## STANDARD OF REVIEW

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "A claim is plausible if it is accompanied by sufficient factual content to allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" and "the Court accepts as true all well-pleaded allegations." *Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 568 F. Supp. 3d 1167, 1174 (D. Kan. 2021) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I.   The Court Previously Rejected Defendants' Arguments for Dismissal.

Defendants contend that Custodia's Amended Complaint should be dismissed because 12 U.S.C. § 248a does not entitle Custodia to a master account.  (KC Br. 8–11, Bd. Br. 11–25.)  The Court has already considered these same arguments from Defendants and concluded that they do not justify dismissal of Custodia's claims and that discovery is required before the Court can fully analyze the statutory landscape for master accounts.  (Order at 16–17.)  Such discovery has not yet occurred, and there is no reason for the Court to revisit its prior decision at this time.  Defendants' motions to dismiss should be denied.

As the Court previously recognized, in order to state a claim for undue delay under the APA, Custodia had to assert credibly that Defendants "failed to take a discrete agency action that [they are] required to take," namely granting Custodia's master account.  (Order at 12 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases omitted))).  After considering the statutory framework for master accounts, the Court concluded that "Judge Bacharach's opinion [in *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017), which held that eligible institutions are entitled to master accounts under the Federal Reserve Act,] may plausibly be the law on this matter in this case" and thus "Custodia ha[d] stated a legally valid claim for relief."  (Order at 12, 16.)  As the Court explained, dismissal was inappropriate because a full statutory interpretation required additional factual development.  (Order at 16) ("[T]he facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a)").  "For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested)." (Order at 16–17.)

Now that Defendants have denied Custodia's application for a master account, whether Defendants have discretion to deny that application is even more squarely before the Court.  The resolution of this issue depends, in part, on whether the master account application process is controlled by § 248a or by § 342.  (Order at 12–17.)  As before, Custodia has made well-pleaded allegations that "the Board of Governors in fact inserted itself into FRKC's consideration of Custodia's application" and the ultimate denial of that application.  (AC ¶¶ 4, 10, 44, 46, 52, 69.)

12

In direct contradiction of Custodia's well-pleaded allegations evincing control by the Board and even the White House (which must be taken as true), throughout its Motion to Dismiss, the Kansas City Fed argues that it exercised its own discretion to reject Custodia's master account application by way of § 342.  (KC Br. 6 n.3, 9–10, 13.)  As the Court previously concluded, discovery is required to make clear whether the Kansas City Fed exercised discretion to deny Custodia's master account application or whether the Board stepped in to control the process, as Custodia has plausibly alleged, thereby rendering moot the question whether Congress afforded any such discretion.  (Order at 16–17.)

Though the Board "invites the Court to accept Custodia's allegations about Board control for purposes of this motion" to dismiss, (Bd. Br. at 2), the Board introduces extra-record facts and concomitant factual disputes that are not appropriate to resolve at the motion to dismiss stage.  For example, Custodia alleges that in order for the bank services covered by § 248a's fee schedule "to be available to nonmember depository institutions, as they must be, those institutions must have a master account."  (AC ¶ 73.)  The Board contradicts Custodia's well-pleaded allegation and claims that "Reserve Banks have contracted with banks that lack master accounts" to provide the bank services covered by the fee schedule (Bd. Br. at 17), without acknowledging that Operating Circular 1, as cited by the Board (Bd. Br. at n. 12), requires such banks to be able to have master accounts as a prerequisite to establishing their relationships with a Reserve Bank in the first place.  As the Court previously recognized and should recognize now, a motion to dismiss is simply not the appropriate posture for resolving these and other factual disputes that are crucial to determining the legal question of whether or not Defendants had discretion to deny Custodia's master account application.

II.    **Section 248a Entitles Custodia to a Master Account.**

Even if the Court were to reconsider Defendants' arguments on the merits (it should not),

Defendants' statutory analysis is incorrect.  Section 248a prescribes that "[a]ll Federal Reserve

Bank services covered by the fee schedule ***shall be available to nonmember depository***

***institutions***."  12 U.S.C. § 248a(c)(2) (emphasis added).  "Shall" denotes a mandatory duty.

*Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).  The Board develops the fee schedule for

Reserve Bank services which include "currency and coin services; checking clearing and

collection services; wire transfer services; automated clearinghouse services; settlement services;"

and more.  12 U.S.C. § 248a(a–b).  Such services are available to nonmember banks only through

a master account.  *Fourth Corner*, 861 F.3d at 1068–69 (Op. Bacharach, J.).  As Judge Bacharach

concluded in *Fourth Corner*, eligible state-chartered depository institutions like Custodia are

statutorily entitled to master accounts because they "***shall***" be able to access banking services.  12

U.S.C. § 248a(c)(2) (emphasis added); *see* 861 F.3d at 1067–74.  Legal commentators agree.  *See*

Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023); Conti-Brown,

*The Fed Wants to Veto State Banking Authorities.  But Is that Legal?* (Nov. 14, 2018).  One

forthcoming law review article carefully analyzed "the statutory text, the legislative purpose

underpinning the statute, and past Federal Reserve Practices," and categorically "conclude[d] that

***the law requires that the Federal Reserve provide accounts*** and payment services ***to all member***

***banks and depository institutions***."  *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L.

Rev. (forthcoming 2023), draft at 5–6 (emphasis added).

A.    **Defendants misread the statutory framework.**

The Board advances three arguments as to why § 248a does not require that Custodia be

able to access Reserve Bank services through a master account.  These arguments largely retread

14

the same ground previously considered by the Court in denying Defendants' first motions to dismiss.  None warrant a different outcome.

First, the Board contends that § 248a concerns only "fee-setting for services" and does not address which entities are entitled to those services.  (Bd. Br. 13.)  The Board ignores that a statute can do more than one thing.  As Judge Bacharach explained, "[t]he statutory language does two things:  It ensures universal access to certain bank services and provides uniform pricing for them."  *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.).  That was the consensus understanding at the time the Monetary Control Act was passed: "[M]any articles summarizing the Monetary Control Act concluded that the Act required the Federal Reserve to make its payment services available to 'all depository institutions.'"  *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 36.  The Board itself previously recognized that this statutory language "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services ***to all depository institutions on an equitable basis***."  Bd. of Governors of Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984) (emphasis added).[3]

---

[3] *See also* Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu (acknowledging that the statute "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis"); Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, https://tinyurl.com/4wfhfnkn (last updated Aug. 11, 2020) (evidencing the Board's own website continues to advise that "Federal Reserve payment services are available to all depository institutions"); Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb ("[S]ervices covered by the fee schedule [are] available to all depository institutions."); Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) (noting that the Monetary Control Act gives "all depository institutions access to the Federal Reserve's payment services").

The Board attempts to support this argument by implanting words into the introductory language of § 248a(c). That language provides that "[t]he schedule of fees prescribed pursuant to this section shall be based on the following principles . . . ." According to the Board, this introductory language designates everything that follows as merely "a fee-setting principle." (Bd. Br. at 14–15.) Contrary to the Board's argument, the phrase "fee-setting" does not appear in the provision. Instead, the introductory language makes clear that what follows are "principles" for the schedule of fees. And, one of the "principles" for the schedule of fees is that "[a]ll Federal Reserve bank services" covered by the schedule of fees "*shall* be available to nonmember depository institutions" like Custodia. 12 U.S.C. § 248a(c)(2) (emphasis added). Other courts have likewise recognized that this section made Federal Reserve bank "services ... *available to all banks*." *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989) (emphasis added); *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983).[4]

Second, the Board argues that, because "master account" is not listed as a service covered by the fee schedule, § 248a cannot entitle Custodia to a master account. (Bd. Br. at 16–17.) But, the Board ignores the catchall provision that requires Federal Reserve Banks to provide nonmember depository institutions with access to "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer

---

[4] The Board also contends that § 248a(c)(2)'s "use of '[a]ll' in relation to the services to which it applies but not the depository institutions that may access these services . . . indicates that at most it implicates the provision of '*all* Reserve bank services' to nonmember institutions as a class, but not necessarily to all nonmember banks in that class." (Bd. Br. 17.) In *Fourth Corner*, Judge Bacharach rejected this argument and explained that the use of "all" preceding "nonmember depository institutions" was unnecessary because "without a restrictive modifier, the phrase 'nonmember depository institutions' is an inclusive term that includes all nonmember depository institutions." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1069–70 (10th Cir. 2017) (Op. of Bacharach, J.) (citations omitted).

of funds" which would include master accounts.  12 U.S.C. § 248a(b)(8).  And, even if master accounts were not considered a covered "new service," § 248a still requires the issuance of master accounts because "all services offered by the Federal Reserve System are conditioned on the issuance of master accounts."  *Fourth Corner*, 861 F.3d at 1068–69 (Op. of Bacharach, J.).

Finally, the Board argues that because it may impose conditions on access to Reserve Bank services, Custodia does not have a right to access services covered by the fee schedule.  (Bd. Br. at 18.)  This is a strawman argument.  It is true that so long as the Board complies with the APA, the Federal Reserve Act, and other relevant sources of law, it can place reasonable restrictions on a depository institution's use of a master account.  That does not change the fact that the Federal Reserve Act requires the Board to provide nonmember depository institutions, like Custodia, access to Reserve Bank services equal to member banks.  12 U.S.C. § 248a(c)(2).  And, in order to have such equal access, Custodia requires a master account.

The Board's invocation of deference for its interpretation of § 248a and its Guidelines (Bd. Br. at 22) does not tilt the scales.  The Supreme Court applies *Chevron* as a last resort, only if the language of a statue is ambiguous and only if all other tools do not resolve ambiguity.  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).  Section 248a is an "**unambiguous** command to make services in the fee schedule available to nonmember depository institutions," *Fourth Corner*, 861 F.3d at 1069 (Op. of Bacharach, J.) (emphasis added), so *Chevron* deference is inappropriate.  Plus, courts do not owe *Chevron* deference to interpretations in non-binding guidance or litigation briefs, least of all when those interpretations contradict prior agency positions and do not parse statutory language or invoke *Chevron*.  *See Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1128 n.9 (10th Cir. 2020); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017).  "[T]he Federal Reserve's position should carry no weight because it ignores more than a century of its own

interpretations and was not adopted through formal rulemaking." Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 47.

Rather than deal directly with § 248a, the Kansas City Fed instead argues that master accounts "are governed by § 342, which addresses powers Congress granted to the Reserve Banks." (KC Br. at 9.)  Under § 342, "[a]ny Federal Reserve bank may receive from any of its member banks, or other depository institutions, . . . deposits of current funds in lawful money, national-bank notes, Federal reserve notices, [etc.]."  Judge Bacharach considered § 342 and concluded that it does not grant Reserve Banks discretion over whether to grant master accounts because "[§] 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection.  But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1074 (Op. Bacharach, J.) (internal citation omitted).  Notably, § 342 does not mention master accounts, and no court has ever concluded that § 342 gives Reserve Banks discretion over master account applications.  Rather, § 342 has consistently been interpreted as relating to Reserve Bank's discretion over the types of monetary instruments to accept.  *See Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 655, 662 (1923) (explaining that "neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation ***to receive checks for collection***" (emphasis added); Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 27, 29.

Beyond the express statutory language, the principles of the dual-banking system itself counsel against Defendants' statutory interpretation.  The Kansas City Fed contends that "[t]he federal half of our 'dual' banking system would be meaningless if the Board of Governors, a

federal agency, were required as an automatic, ministerial matter to give direct access to the Federal Reserve's balance sheet to any entity that obtained any charter that any state saw fit to issue." (KC Br. at 10.) The Board argues that it would be "absurd" for it to grant every eligible institution a master account. (Bd. Br. at 18.) Defendants' arguments upend our nation's dual banking system by essentially giving Federal regulators a veto over state-chartered institutions.

The dual-banking system did not create a primary, national financial system run by the Federal Reserve and fifty subordinate state banking systems. The dual-banking system predates the Federal Reserve, and is not concerned with the creation of two separate Federal banking and state banking systems, but rather divides the chartering and regulatory responsibility of financial institutions among state and Federal authorities. "The availability of state charters allows for innovation in the financial services marketplace, permitting states to develop new ideas and competitors subject, of course, to applicable review by federal authorities." (AC ¶ 25.) Just as states cannot discriminate against Federally chartered banks, *see, e.g.*, 12 U.S.C. § 25b(b)(1)(A) (preempting state consumer laws that "have a discriminatory effect on national banks"), the Federal Reserve cannot discriminate against state-chartered banks, *see* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

Both in practice and in this litigation, Defendants have tried to use their authority over master accounts to expand their regulatory authority over banking as a whole. *See* Hill, *Opening a Federal Reserve Account*, 40 Y. J. Reg. at ____, draft at 103–04; Hill, *Federal Reserve Discretion in Payment*, Iowa L. Rev (forthcoming 2023), draft at 6 ("caution[ing] the Federal Reserve to avoid tarnishing its legitimacy by exceeding its congressionally granted power."). An application for a master account should be just that—an application for a bank account. It is not a second chartering process. Peter Conti-Brown, *The Fed Wants to Veto State Banking*

*Authorities.  But Is that Legal?* Brookings (Nov. 14, 2018).  And despite Defendants' protestations, it need not be.  To be entitled to a master account, a depository institution must be eligible for a master account.  To be eligible for a master account, a depository institution must have a charter, either from the OCC or from a state division of banking.  That chartering authority, as well as a host of other authorities, will then regulate the depository institution once it is in business.  State chartering and regulatory requirements are substantial.  For example, in order to apply for a SPDI charter, a bank must submit a "detailed business plan" including "[a]ll proposed activities of the special purpose depository institution," "[a] business risk assessment," "[a] comprehensive estimate of operating expenses for the first three (3) years of operation," "[a] complete proposal for compliance," and more.  Wy. Admin. R., Banking Div. Ch. 20, § 3.  SPDI banks are also subject to increased examination by the Wyoming Division of Banking, including but not limited to "quarterly call reports" and, at least every 12 months for the first three years and at least every 18 months thereafter, a "full-scope examination" covering "traditional bank examination areas and other matters relating to digital asset capital markets activities as warranted based on the SPDI's risk profile."  Wy. Div. of Banking, SPDI Exam. Manuals (Jan. 2021) 8–9.

Section 248a presumes the existence of an eligible institution's charter and all the attendant regulators.  To prohibit state-chartered banks from accessing the Federal Reserve System denigrates state banking agencies and contravenes the dual-banking system, a hallmark of federalism.  Defendants are arguing, in essence, that state banking authorities cannot be trusted to do their job and properly regulate the banks whom they charter.  (Bd. Br. at 18–21.)  It is a shame the Board, without Congressional authorization and without announcing why, when or how, has recently abandoned long-standing principles of federalism that have guided our country's dual-banking system for centuries.

**B.      Section 248c does not affect Defendants' treatment of master account applications.**

The only intervening statutory change between this Court's previous partial denial of Defendants' motions to dismiss and the current round of briefing is the passage of 12 U.S.C. § 248c.  This statute instructs the Board to create a "Master account and services database" to keep track of the Reserve Banks' responses to master account applications.  While this provision makes clear that decisions on master accounts are within the purview of the Board (as Custodia has alleged was the case with its master account application), it does not otherwise alter the statutory landscape and should not alter the Court's analysis.

Under § 248c, "the Board shall create and maintain a public, online, and searchable database that contains" a list of all entities that have master accounts or have requested access to master accounts, including whether the request "was approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1).  Importantly, § 248c was not an amendment to § 248a and does nothing to alter the Congressional command that "all Federal Reserve bank services covered by the fee schedule *shall* be available to nonmember depository institutions."   12 U.S.C. § 248a(c)(2) (emphasis added).   The Board is still mandated to provide banking services to nonmember depository institutions, like Custodia, so § 248c is irrelevant to the Court's analysis of whether or not Defendants were required to grant Custodia's master account application.

**1.      Defendants can reject master account applications from financial institutions that are otherwise ineligible.**

Despite the fact that § 248c does not amend § 248a, the Board contends that § 248c's recognition that master account applications can be "rejected" refutes Custodia and Judge Bacharach's interpretation of § 248a.  (Bd. Br. at 23.)  This is a red herring.  Defendants, of course, can reject master account access requests from *ineligible* financial institutions.  Custodia has never suggested otherwise.  (AC ¶¶ 2, 5, 21, 31, 33, 34, 40, 81, 82, 90, 99, 100 (arguing that Custodia is

entitled to a master account as an "eligible" depository institution).)  While § 248c recognizes that there may be rejections due to ineligibility, it does not *sub silentio* expand the reasons that Defendants can reject a master account application beyond ineligibility.

There are at least three ways that a financial institution can be ineligible for a master account, giving Defendants justification to reject that institution's master account application. First, the institution could engage or intend to engage in activities illegal under Federal law. Second, the institution could fail to submit a completed application.  Third, the institution could have a charter that does not comply with the Federal Reserve Act's requirements.  Importantly, none of these concerns apply to Custodia.

First, an institution would not be eligible for Federal Reserve banking services if it intended to use those services to violate Federal law.  In *Fourth Corner*, a credit union sought a master account in order to provide banking services to the cannabis industry, an industry made legal under state law but which remained illegal under Federal law.  While each Judge wrote separately, all addressed the concern that the credit union would be using the Federal Reserve to promote activities illegal under Federal law.  *See* 861 F.3d at 1057–58 (Op. of Moritz, J.) (refusing to decide if the credit union was "entitled" to a master account because "[t]he district court correctly declined to facilitate this illegality"); *id*. at 1058 (Op. of Matheson, J.) (finding the dispute unripe because the credit union's changed business plan to engage only in legal activities was "divorced from the factual backdrop that gave rise to the original dispute").  Even Judge Bacharach, who ultimately concluded that the Federal Reserve was mandated to provide a master account to the credit union, rested his analysis on the recognition that the credit union had "promised to obey the law" and that the credit union "would obey the ruling that serving marijuana-related businesses is illegal." *Fourth Corner*, 861 F.3d at 1064–65, 1066 (Op. of Bacharach, J.).  A different result would have

been appropriate if the credit union intended to use Federal Reserve banking services for illegal ends.

Second, an application would be ineligible and Defendants could reject it if the application were incomplete or otherwise missing information necessary for adjudication.  Section 248c itself recognizes this distinction by speaking generally to "***access request[s]***" rather than specifically to completed master account ***applications***.  12 U.S.C. § 248c.  While the master account agreement is only one page, (AC Ex. 1), Federal Reserve Banks Operating Circular 1 sets out extensive requirements for a completed application.  Fed. Rsrv., *Fed. Rsrv. Banks Operating Circular 1: Account Relationships* ("Circ. 1") (Aug. 16, 2021).  For example, among other requirements, the institution must agree to be subject to the regulations and policies of the Federal Reserve (Circ. 1 at 1.0); the institution cannot have an existing account with the Federal Reserve (Circ. 1 at 2.3); the institution must have a business address within the district where the Federal Reserve bank is located (Circ. 1 at 2.5); the institution's board must pass specific resolutions authorizing individuals to conduct business on behalf of the institution (Circ. 1 at 2.6); U.S. branches of foreign banks must execute additional agreements and provide additional information (Circ. 1 at 2.6); and more.  The failure to fulfill any of these or other application requirements would result in a financial institution not being eligible for a master account, and Defendants would have good cause to reject the application.

Third, a nonmember financial institution would be ineligible for a master account if did not fit the definition of a "depository institution" under the Federal Reserve Act.  12 U.S.C. §461(b)(l)(A).  Whether a nonmember bank constitutes a "depository institution" eligible for a master account depends, in part, on the bank's state charter.  12 U.S.C. § 1813(a)(2) (defining "State bank" in reference to the bank incorporation "laws of any State").  In drafting the SDPI

legislation, "Wyoming worked hand-in-glove with the Kansas City Fed in order to ensure that all SPDI-chartered banks would be eligible to access the Federal Reserve through master accounts." (AC ¶ 8.)  However, some states offer charters that are not designed to comply with the Federal Reserve Act and to provide banks access to Federal Reserve services.

As an example, the Court need look no further than Reserve Trust Company.  The Kansas City Fed rejected Reserve Trust's master account application in 2017 because Reserve Trust was ineligible as it "did not meet the definition of a depository institution."  Statement from Fed. Rsrv. Bank of Kan. City ("KC Fed Statement") (Feb. 7, 2022), https://tinyurl.com/4schdpbw.  Shortly after that denial, and after an ex-Treasury Department official on the board of Reserve Trust personally contacted the Kansas City Fed's President, the denial was rescinded and Reserve Trust was granted a master account.  *Annual Defense Bill*, https://tinyurl.com/57d74r28.  Following Congressional inquiry, the Kansas City Fed issued a statement explaining that the master account was granted because Reserve Trust "changed its business model and the Colorado Division of Banking reinterpreted the state's law in a manner that meant [Reserve Trust] met the definition of a depository institution."  KC Fed Statement, https://tinyurl.com/4schdpbw.  Several days later, in a statement to the press, the Colorado Division of Banking disputed the Kansas City Fed's characterization and made clear that their analysis of the state banking laws had not changed from the time that the Kansas City Fed found Reserve Trust ineligible for a master account.  Thomas Franck, *State Bank Regulator Disputes KC Fed's Claim About Fintech Firm Linked to Biden Nominee Raskin* (Feb. 15, 2022), https://tinyurl.com/3kj73xhf.  Within the next several months, and in recognition of the state's authority over its own bank charter regulations, the Kansas City Fed revoked Reserve Trust's master account.  *Annual Defense Bill*, https://tinyurl.com/57d74r28. Under its state charter, Reserve Trust was not a depository institution and was not eligible for a

master account, so its application was properly rejected initially and its master account was properly rescinded later.

Defendants can and do reject master account applications from ineligible financial institutions.  The fact that Defendants can reject applications from ineligible institutions says nothing about whether applications from eligible nonmember depository institutions, like Custodia, can be rejected.  That question is answered in § 248a—Reserve bank services **shall** be available to eligible nonmember depository institutions through a master account.

### 2.      Section 248c was designed to promote transparency, not to alter the master account application process.

Reserve Trust does more than just provide an example of Defendants rejecting a master account application for ineligibility; the Reserve Trust saga also inspired the passage of § 248c in December 2022 (notably without changing § 248a).  *Annual Defense Bill*, https://tinyurl.com/57d74r28.  That is important context for understanding the scope of § 248c.

The Mischief Rule is a longstanding canon of statutory construction that directs courts to consider the problem the legislature was trying to solve and the specific remedy the legislature chose.  *See* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967, 977 (2021) (citing *Heydon's Case* (1584) 76 Eng. Rep. 637; 3 Co. Rep. 7 a. (Exch.) for the "canonical" statement of the rule).  Although this rule is sometimes conflated with purposivism, "textualists recognize that the relevant context for a statutory text includes the mischiefs the authors were addressing."  John F. Manning, *What Divides Textualists From Purposovists?*, 106 Colum. L. Rev. 70, 84–85 (2006).  It is common for Courts to begin their analysis by noting the mischief and how Congress attempted to solve it.  *See, e.g.*, *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013).  That is because considering the mischief the legislature sought to solve helps a court determine a statute's scope,

avoid absurd results, and smoke out "subtle inventions and evasions for continuance of the mischief." Bray, *The Mischief Rule*, 109 Geo. L. J. at 1005 (citations omitted).

Defendants' reversals on Reserve Trust's master account application, and subsequent refusal to respond to Congressional inquiries, led to an increased awareness of the need for transparency and accountability in the master account process. Section 248c was Congress's response to the Board's lack of transparency and was designed to "provide the American people with the information about master account applications that they deserve, but which the Fed has refused to provide." *Annual Defense Bill*, https://tinyurl.com/57d74r28. When asked about Defendants' interpretation of § 248c in their motion to dismiss briefing, the amendment's sponsor Senator Toomey stated that Defendants "wildly mischaracterized" the legislation as newly granting them discretion to reject master account applications. Kyle Campbell, *Toomey: Fed "Wildly Mischaracterized" Master Account Law for Own Gain*, Am. Banker (Apr. 3, 2023), https://tinyurl.com/2p8vs9nc. Senator Toomey went on to explain that "[i]t's ridiculous to suggest that including these categories of outcomes is somehow an acknowledgement or consent or validation of the Fed's rejection of master accounts ... It's simply acknowledging that it happens. It is not in any way endorsing it, or suggesting that it's legitimate. And the Fed lawyers know this very well." *Id*. The drafting and subsequent misrepresentation of § 248c is unfortunately another example of the Board's chicanery. "[Board] staffers consulted on the legislation and insisted on the inclusion of language that was used in their dismissal argument [in this litigation]," but never disclosed to Congress the Board's secret intention to adopt an expansive interpretation of that language for the purposes of this litigation. *Id*. That the Board withheld this information from Congress is striking given that "[t]he same lawyers who were part of that conversation with [the Senate] are now a part of this lawsuit." *Id*. As one Senate staffer put it, "That looks pretty dirty."

*Id.* It appears that Defendants are so concerned about the results of this litigation that they are willing to rely on a single word they wanted added to a statute—"rejected"—despite knowing full well that the statute does not have the meaning that they attempt to give it.

If possible, Defendants' position that § 248c allows them to reject master account applications only looks worse in light of the existing statutory landscape. As the Board explained, "it is a well-settled principle that 'Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts.'" (Bd. Br. at 24 (quoting *Prime Care of Ne. Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284, 1287 (10th Cir. 2006) (citation omitted)).) The only judge to directly address the issue of whether or not the Federal Reserve has discretion to deny master account applications conclusively found that it did not. *Fourth Corner*, 861 F.3d at 1067–73 (Op. of Bacharach, J.). If Congress wanted to make clear that Defendants have discretion to deny master account applications, it is unreasonable to think that it would do so obliquely through a statute requiring the transparent disclosure of an online master account database. After all, it is also a well-settled principle that "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

The idea that a disclosure statute that was born out of need to check the Board's opacity actually expanded the Board's authority is nonsensical. "[W]here applying the plain language would produce an absurd and unjust result which Congress could not have intended, we need not apply the language in such a fashion." *Robbins v. Chronister*, 402 F.3d 1047, 1050 (10th Cir. 2005) (internal quotation marks and citation omitted)). Defendants' argument that § 248c grants them newly increased discretion over master accounts belies the purpose of the statutory addition,

as well as textual readings that accord with Judge Bacharach's interpretation of Section 248a. This argument does not countenance a different outcome on Defendants' motions.

3.   **Section 248c makes clear that the Board controls the master account application process.**

While § 248c does nothing to support Defendants' argument that they have discretion to deny master account applications, it does reinforce what § 248a and *Fourth Corner* already made pellucidly clear—the Board controls the master account application process. Section 248c contains the Federal Reserve Act's only explicit reference to master accounts. (KC Br. at 5; Bd. Br. at 2.) It requires the Board to document and publicize its actions with master accounts. It is the Board, not the Reserve Banks, that is charged with maintaining a database of master account applications. 12 U.S.C. § 248c(b)(1). If, as Defendants claim, the Reserve Banks were ultimately responsible for master account applications, Congress would have made the development and maintenance of the master account database a responsibility of the Reserve Banks. Instead, such responsibility over master accounts lies where it belongs, with the Board.

Ultimately, the Court should refuse to dismiss Custodia's claims for the same reasons it previously refused to dismiss Custodia's claims. Defendants present no new arguments, including the passage of § 248c, which would change the analysis.

III.   **Defendants' Policy Arguments and Smears Against Custodia Should Not Alter the Court's Statutory Analysis.**

As it did in its first motion to dismiss, the Board devotes pages of its brief warning about the dangers of crypto-assets and denigrating Custodia's business. (Bd. Br. at 2–11.) The "Background" section of the Board's brief devotes only a single sentence to the denial of Custodia's master account application, choosing instead to relay news stories outside the scope of the complaint about events, which occurred after the denial of Custodia's master account application, at other banks whose risky business models fomented the very bank runs that

28

Custodia's non-lending, 108% reserve business model was designed to avoid.  (Bd. Br. at 3.)  This is improper:  Courts do "not consider materials outside of the pleadings when resolving a motion to dismiss, other than those referenced in the Complaint and central to Plaintiff's claim, or court documents of which the Court may take judicial notice."  *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1301 (D.N.M. 2018).  Not only would it not be proper to take judicial notice of these news stories, Defendants did not even deign to ask the Court.  Instead, they merely relay this legally and factually irrelevant information, ostensibly in the hopes of poisoning the Court's view of Custodia.

The Board's random sampling of current affairs, such as the run on Silvergate Bank in March (Bd. Br. at 3), has nothing to do with the denial of Custodia's master account application in January or the proper interpretation of 12 U.S.C. § 248a.  The question presented is a narrow issue of statutory interpretation, informed by discovery; it is not a policy question about crypto-assets or bank regulation in general, or even Custodia's business model.  Those political questions are best left to Congress, and Congress has spoken by guaranteeing all eligible depository institutions access to covered services through a master account.  12 U.S.C. §248a.  The Court ought not countenance Defendants' guilt-by-association scaremongering, especially when the State of Wyoming and its Division of Banking are watching over the eligible depository institutions they have chartered.  In fact, Custodia was approved for initial launch by both the Wyoming Division of Banking and an independent compliance consultant in the fall of 2022.  The only authority to have examined Custodia and not clear it on the first attempt is the Federal Reserve, the party Custodia had already sued.

Similarly, as unjustified as it was, Custodia is not challenging the Board's denial of Custodia's membership application.  Yet the Board devotes pages of its brief to summarizing the

document and plucking out its most incendiary quotes, ignoring that it contained numerous procedural irregularities, factual inaccuracies that the Board refused to correct, and general bias against digital assets. (Bd. Br. at 6–9.)  The Board's scorched-earth litigation campaign and attempts to sully Custodia and its management team are unbecoming for a governmental agency tasked with serving the American people, not merely winning a lawsuit.  Even if one assumes that the Board's order denying Custodia's membership application was prepared in good faith and not as fodder for litigation (which almost certainly is not the case, given that it is 14 times longer than the longest ever denial order and was released as part of an orchestrated maneuver involving the White House and the Kansas City Fed) (AC ¶¶ 68–70,) the Board's rationale for denying Custodia's application for membership in the Federal Reserve System is irrelevant to whether Custodia is entitled to a master account under 12 U.S.C. § 248a.  These are completely separate applications with different standards governed by different bodies of law.  Nothing in the Board's order denying Custodia's membership application elucidates the proper construction of § 248a.

## IV.    The Kansas City Fed Is a Proper Defendant.

Custodia's second cause of action seeks a writ of mandamus compelling action from the Defendants under 28 U.S.C. § 1361.  "Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties."  *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005).  Under 12 U.S.C. § 248a, Custodia is entitled to a master account, and Defendants have a nondiscretionary duty to provide Custodia a master account.  *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.) (concluding that "§ 248a(c)(2) unambiguously entitles [eligible institutions] to a master account").  The Court has already concluded that Custodia's mandamus claim is plausible and that it "functions in a complementary fashion" to Custodia's APA claim.  (*See* Order at 18.)  The Court should so conclude again.

30

As previously explained, § 248a provides that "[a]ll Federal Reserve Bank services covered by the fee schedule ***shall be available to nonmember depository institutions***." 12 U.S.C. § 248a(c)(2) (emphasis added).  Notably, § 248a is written in the passive voice:  Section 248a doesn't specify ***who*** should make service available to eligible depository institutions; but it does guarantee that such services ***shall*** be available to eligible depository institutions.

This guarantee applies to the Kansas City Fed just as it does to the Board.  The Reserve Banks, acting as "fiscal agents" of the Reserve System, "execute the Federal Reserve System's policies." *Fed. Rsrv. Bank Members,* 43 Op. O.L.C. __, at *3, *8 n.3.  Thus, it was the Kansas City Fed who received Custodia's master account application and the Kansas City Fed who communicated with Custodia regarding its master account application, including the ultimate denial.  (AC ¶¶ 6, 9, 10, 21, 43–45, 48–49, 51, 69.)  It is also the Kansas City Fed who will be the primary point of contact for all of the services listed in § 248a—for example, "check clearing" and "coin services."  12 U.S.C.§ 248a(b)(1)–(8).  It would be nonsensical for § 248a to require the listed services "be available" but not require the institution that provides those services to make them available.

The Kansas City Fed argues that Custodia's mandamus claim should be dismissed as duplicative of its APA claim.  (KC Br. 12.)  That is not correct.  Custodia's mandamus claim is an alternative to its APA claim and complements its APA claim.  Even if the Court concludes that the Board is not responsible for the decision on Custodia's master account, the Court should still conclude that § 248a and *Fourth Corner* give Custodia and other eligible depository institutions a right to a master account.  In that case, mandamus would lie against the Kansas City Fed for wrongfully denying Custodia's master account application.  (Order at 18–19.)

The Kansas City Fed argues that because APA relief is available against the Board, Custodia's mandamus claim against the Kansas City Fed should be dismissed. (KC Br. at 11–12.)  While it is true that the availability of "a remedy under the APA" can preclude a claim for mandamus, (KC Br. at 11–12), that is the case only where "review by other means is possible," *W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993).  Here, APA review of the Kansas City Fed's actions is not possible because Custodia has not asserted an APA claim against the Kansas City Fed.  Custodia has brought only a mandamus claim against the Kansas City Fed.  That was to streamline the case and avoid unnecessary litigation over whether the Kansas City Fed qualifies as an "agency" for purposes of the APA.  (Order at 5–7.)  Courts dismiss mandamus claims that duplicate APA claims because the relief requested is "essentially" the same.  *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997).  But without an APA claim against the Kansas City Fed, there is no relief to duplicate, and dismissal of the mandamus claim would leave Custodia without a path to relief from the Kansas City Fed.

For these same reasons, the Kansas City Fed is not merely a "relief defendant."  (KC Br. at 13.)  Custodia alleged myriad facts against the Kansas City Fed exclusively (AC ¶¶ 6, 9, 21, 40, 42–43, 48–51), and against the Kansas City Fed working in tandem with the Board (*Id*. at ¶¶ 3–4, 10, 20, 44–45, 53, 64, 69, 75, 81.)  Given its role acting on master account access requests, and the strategic ambiguity that permeates the agency status of Reserve Banks, the Kansas City Fed is a proper defendant.  The Court has confronted the substance of these arguments before.  Throughout this case, "the Kansas City Fed and the Board have alternately cited each other as the" party responsible for deciding Custodia's master account application.  (*Id*. at ¶ 52.)  The Court has recognized that fact discovery will clear up this confusion and simplify the key statutory

interpretation question.  (Order at 16–17.)  The Kansas City Fed should not be excused from this

case, if it ever is, until after the parties have taken discovery and the Court has had an opportunity

to make the factual findings necessary to properly interpret the statute.[5]

## V.    Custodia's Declaratory Judgment Claims Are Valid.

In the Amended Complaint, Custodia requests relief under the Declaratory Judgment Act

in the form of "a declaration from this Court that the Board and/or the Kansas City Fed has a

statutory obligation to provide Custodia with a master account and to permit Custodia to use that

master account to access Reserve Bank services in a non-discriminatory manner."  (AC ¶¶ 95–

101.)  Defendants argue that this claim should be dismissed because a claim under the Declaratory

Judgment Act "is not an independently viable cause of action."  (Bd. Br. 25; *see also* KC Br. 14–

15.)  But requests for declaratory judgments are commonly pleaded as claims whereby the

requested remedy is that "the court . . . declare the rights or other legal relations of any interested

party."  *Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*, 353 F. Supp. 3d 1070, 1088

(D. Colo. 2018).  This Court previously rejected Defendants' same argument explaining that as

---

[5] In a footnote, the Kansas City Fed claims that if it remains in this case, it should not be subject
to discovery and "the action should proceed on an administrative record under the APA." (KC Br.
14 n.7.)  The Kansas City Fed's attempts to evade discovery, first by denying the master account
application after Custodia had already served it with discovery requests, and now by trying to
invoke APA protections, signal real concern about what discovery will reveal.  Custodia has stated
a mandamus claim against the Kansas City Fed, which maintains that it is not a government agency
for purposes of the APA (ECF 51 at 13–17.)  There is no justification for proceeding on an
administrative record when the defendant is not an agency, and this Court has already recognized
that discovery is available against the Kansas City Fed (Order at 16; ECF 112 at 4.)  The cases the
Kansas City Fed cites are inapposite.  *See Ketcham v. U.S. Nat'l Park Serv.*, No. 16-CV-00017-
SWS, 2016 WL 4268346, at *2 (D. Wyo. Mar. 29, 2016) (Skavdahl, J.) (insisting on APA review
where the defendant was an agency); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58
F. Supp. 3d 1191, 1239 (D.N.M. 2014) (same); *Sierra Club v. Hodel*, 848 F.2d 1068, 1077 (10th
Cir. 1988) (per curiam) (proceeding on the administrative record where the plaintiff did not attempt
to take discovery of the non-agency defendant that "substantively [was a] third-party
defendant[]"), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956
F.2d 970 (10th Cir. 1992).

long as Custodia can state "valid federal causes of action," its claim for Declaratory Judgment is a "viable request for relief that [should] not be dismissed at this time."  (Order at 22–23); *see also Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) (allowing declaratory relief where there is "some independent basis of jurisdiction").  Custodia has stated a valid APA claim against the Board and a valid mandamus claim against the Board and the Kansas City Fed.  Accordingly, its request under the Declaratory Judgment Act is a viable claim for relief and should not be dismissed.

## CONCLUSION

This Court should deny Defendants' motions to dismiss, ECF Nos. 124 and 126.

Dated: April 11, 2023.

Custodia Bank, Inc., Plaintiff,

/s/ Scott E. Ortiz
Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify, on the 11th day of April, 2023, a true and correct copy of the foregoing was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Angela Tarasi
Christine Carletta
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
King & Spaulding LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
atarasi@kslaw.com
ccarletta@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L. M. Addleman
Hirst Applegate LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com

/s/ Scott E. Ortiz

35