Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the*
*Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BOARD OF GOVERNORS OF )<br>THE FEDERAL RESERVE SYSTEM & )<br>FEDERAL RESERVE BANK )<br>OF KANSAS CITY, )<br>)<br>)<br>Defendants. )<br>) | Case No. 1:22-cv-00125-SWS |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.      Custodia Concedes the Federal Reserve May Restrict Master Account Access and "Adjudicate" Master Account Requests ........................................................ 2

II.     The Existence of Dual Chartering Authorities Does Not Mean Custodia Is Entitled to a Federal Reserve Master Account .................................................. 5

III.    Congress Has Not Directed the Federal Reserve to Rubber Stamp Master Account Requests Regardless of Risk ........................................................... 8

        A.     Section 248a Does Not Eliminate Discretion ....................................... 8

        B.     The Court Should Defer to the Board's Interpretation in the Guidelines ............ 14

        C.     Section 248c's Text and Legislative History Affirm the Longstanding Understanding that the Federal Reserve May Reject Account Requests ............. 15

IV.     Custodia is Not Entitled to Mandamus or Other Relief .................................... 21

CONCLUSION ..................................................................................................... 22

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

*Ausmus v. Perdue*,
  908 F.3d 1248 (10th Cir. 2018) .................................................. 21

*Barber v. Thomas*,
  560 U.S. 474 (2010) ................................................................... 21

*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996) ....................................................................... 7

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004) .................................................................. 16

*Board of Governors of the Federal Reserve System v. First Lincolnwood, Corp.*,
  439 U.S. 234 (1978) .................................................................. 14

*Bob Jones University v. United States*,
  461 U.S. 574 (1983) .................................................................. 20

*Cantero v. Bank of America, N.A.*,
  49 F.4th 121 (2d Cir. 2022) ......................................................... 7

*Chevron v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) .................................................................. 14

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) .................................................................. 21

*EagleMed LLC v. Cox*,
  868 F.3d 893 (10th Cir. 2017) .................................................. 16

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
  861 F.3d 1052 (10th Cir. 2017) ........................................... 9, 13

*Kansas Natural Resource Coalition v. DOI*,
  971 F.3d 1222 (10th Cir. 2020) ................................................ 21

*Kerr v. United States District Court*,
  426 U.S. 394 (1976) .................................................................. 21

*Marquez-Ramos v. Reno*,
  69 F.3d 477 (10th Cir. 1995) .................................................... 22

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
    571 U.S. 191 (2014)........................................................................................ 22

*Neustar, Inc. v. FCC*,
    857 F.3d 886 (D.C. Cir. 2017) ...................................................................... 15

*Oceana, Inc. v. Pritzker*,
    24 F. Supp. 3d 49 (D.D.C. 2014) .................................................................. 14

*Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.*
    390 F.3d 684 (10th Cir. 2004)........................................................................ 7

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance, Co.*,
    559 U.S. 393 (2010)...................................................................................... 16

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)...................................................................................... 17

*United States v. Polk*,
    61 F.4th 1277 (10th Cir. 2023) ..................................................................... 18

*Western Shoshone Business Council ex rel. Western Shoshone Tribe of the Duck Valley
Reservation v. Babbitt*,
    1 F.3d 1052 (10th Cir. 1993) ........................................................................ 21

*Wild Watershed v. Hurlocker*,
    961 F.3d 1119 (10th Cir. 2020) .................................................................... 15

**Statutes**

5 U.S.C. § 706(2) ................................................................................................. 14

12 U.S.C. § 248a .......................................................................................... 4, 5, 8

12 U.S.C. § 248a(c)(2) ............................................................................... 8, 13, 15

12 U.S.C. § 248c ......................................................................... 2, 3, 15, 16, 17, 19, 21

12 U.S.C. § 248c(b)(1)(B) ...................................................................... 15, 16, 17, 18

12 U.S.C. § 248c(b)(1)(C) ............................................................................... 17

12 U.S.C. § 461(c)(1)(A)-(B) .............................................................................. 8

28 U.S.C. § 1361 ................................................................................................ 21

28 U.S.C. § 2201 .................................................................................................. 22

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023,
    Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022)
    (codified at 12 U.S.C. § 248c) .............................................................. 15, 18, 19

Monetary Control Act of 1980, Pub. L. No. 96-221,
    § 107, 94 Stat. 132, 140 ........................................ 8, 9, 11, 13, 14, 15

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
    87 Fed. Reg. 51,099 (Aug. 19, 2022) (Guidelines)................................... 5, 6, 15
    87 Fed. Reg. 68,691 (Nov. 16, 2022)................................................................. 18

**Other Authorities**

Chester Morrill, Secretary, Board of Governors of the Federal Reserve System,
    Letter X-9187 (Apr. 26, 1935) https://fraser.stlouisfed.org/archival-
    collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-
    nonmember-bank-clearing-accounts-505912 ........................................... 12, 16

Dan Awrey, *Unbundling Banking, Money, and Payments*,
    110 Geo. L.J. 715 (2022) ................................................................................. 11

Federal Reserve Banks Operating Circular 1, Account Relationships
    (Aug. 16, 2021) https://www.frbservices.org/binaries/content/assets/crsocms/resources/
    rules-regulations/081621-operating-circular-1.pdf........................................ 3, 4

Federal Reserve Banks Operating Circular 5, Electronic Access
    (June 30, 2021) https://www.frbservices.org/binaries/content/assets/crsocms/resources/
    rules-regulations/063021-operating-circular-5.pdf .......................................... 4

Federal Reserve Operating Circulars,
    https://www.frbservices.org/resources/rules-regulations/operating-circulars.html ............ 2

Federal Reserve Board, Reserve Requirements
    https://www.federalreserve.gov/monetarypolicy/reservereq.htm
    (last updated Jan. 4, 2022) ................................................................................. 8

Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems*
    (2022 draft) ("2022 Hill draft") (Exhibit A)...................................... 10, 11, 15

Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*
    (Mar. 30, 2023 draft) ("2023 Hill draft")...................................... 10, 11, 12, 15

Michael S. Barr, Howell E. Jackson, & Margaret E. Tahyar,
　　*Financial Regulation: Law and Policy* (3d ed. 2021) ........................................................ 6

Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?*
　　(Nov. 14, 2018) https://www.brookings.edu/research/the-fed-wants-to-veto-state-
　　banking-authorities-but-is-that-legal/ ............................................................................... 9

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill
　　Includes Toomey Provision to Require Federal Reserve Transparency on Master
　　Accounts*, Dec. 8, 2022 ("Banking Committee Statement") https://www.banking.
　　senate.gov/newsroom/minority/annual-defense-bill-includes-toomey-provision-to-
　　require-federal-reserve-transparency-on-master-accounts ........................................ 19, 20

## INTRODUCTION

"Does the Federal Reserve retain discretion to deny a master account to a depository institution?" Everyone agrees that is the sole question at issue in this case. Custodia helpfully answers the question in the affirmative in its opposition, advancing a non-exhaustive list of various reasons why the Federal Reserve ___can___ deny a master account to a depository institution. Opp. at 21-25. Custodia contends that an account may be denied for "at least" these reasons, positing a capacious and malleable conception of "eligibility" that, while serving its own interests, is in no way grounded in any statute and offers no principled standard that would allow account denials to occur in these circumstances but not others. Recall that, for reasons left unsaid, Custodia has elected not to challenge its account denial as arbitrary or capricious in its reasoning, and has instead staked its claims entirely on demonstrating that each and every depository institution has a discretionless entitlement to a master account and services as a matter of law. Custodia has now exposed the unsustainability of this position, strategically conceding that accounts may be denied in a variety of circumstances but conveniently excluding its own. Custodia must live with these strategic choices, which underscore the existence of Federal Reserve discretion and render the Amended Complaint unsustainable.

Custodia seeks to escape dismissal by arguing that the circumstances of its Amended Complaint are the same as they were during the briefing on its original Complaint, and that fact development is still needed to assess the relevant involvement of the Board versus the Reserve Bank. But the circumstances have changed dramatically in recent months. Beyond the well-supported and carefully explained denials of its master account request and its application for Federal Reserve System membership, as well as Congress's amendment of the Federal Reserve Act in the very area at issue, Custodia's Amended Complaint no longer claims that the Reserve

Bank is an APA agency or that it is responsible for the decision to deny Custodia's account request. And the Board has conceded that, for Rule 12 purposes, Custodia's narrowed allegations concerning Board control[1] may be accepted as true. What further proceedings could accomplish in these circumstances is difficult to understand. Notwithstanding Custodia's resort to various policy and obfuscatory "states' rights" arguments, *see* Opp. at 1, what remains is a pure question of law that fails to support Custodia's claimed relief. The Board respectfully requests that the Amended Complaint be dismissed as a result.

## ARGUMENT

### I.     Custodia Concedes the Federal Reserve May Restrict Master Account Access and "Adjudicate" Master Account Requests

Custodia concedes that "[d]efendants can and do reject master account applications from ineligible financial institutions" for a wide variety of reasons after an "adjudication" process. Opp. at 23, 25; *see also id*. at 21 (citing Am. Compl.). Custodia attempts to cabin these concessions by arguing that, "[w]hile § 248c recognizes that there may be rejections due to ineligibility, it does not *sub silentio* expand the reasons that Defendants can reject a master account application beyond ineligibility." Opp. at 22. Custodia then goes on to list various non-statutory bases on which an applicant would be "ineligible" for a master account and services as set forth in Federal Reserve Operating Circulars ("OCs"),[2] Opp. at 21-25, even though this conception of "eligibility" is a creature of Custodia's own creation that involves strategically drawing lines around those access requirements it disfavors. Custodia thereby concedes that it

---

[1] To be precise, Custodia alleges "control by the Board *and even the White House* (which must be taken as true)," Opp. at 13 (emphasis added), but accepting such allegations does not alter the analysis or result.

[2] *Available at* https://www.frbservices.org/resources/rules-regulations/operating-circulars.html.

does not in fact have the unqualified statutory right to a master account that it elsewhere claims, *see* Opp. at 14-18, 24, an acknowledgement that is fatal to its Amended Complaint.

In Custodia's telling, Congress's new "[s]ection 248c itself recognizes this distinction by speaking generally to '*access request[s]*' rather than specifically to completed master account applications" when contemplating "rejections." Opp. at 23 (quoting 12 U.S.C. § 248c) (emphasis in original). Custodia further describes its conception that an applicant must supply complete information in order to be "eligible" for a master account, stating that, "[w]hile the master account agreement is only one page . . . , Federal Reserve Banks Operating Circular 1 ["OC-1"] sets out extensive requirements for a completed application." *Id.* (citing OC-1).[3] As examples, Custodia notes that, "among other requirements, the institution must agree to be subject to the regulations and policies of the Federal Reserve (Circ. 1 at 1.0); the institution cannot have an existing account with the Federal Reserve (Circ. 1 at 2.3); the institution must have a business address within the district where the Federal Reserve bank is located (Circ. 1 at 2.5); the institution's board must pass specific resolutions authorizing individuals to conduct business on behalf of the institution (Circ. 1 at 2.6); U.S. branches of foreign banks must execute additional agreements and provide additional information (Circ. 1 at 2.6); and more." Opp. at 23. As Custodia concedes, "[t]he failure to fulfill any of these or other application requirements would result in a financial institution not being eligible for a master account, and *Defendants would have good cause to reject the application*." *Id.* (emphasis added).

Custodia's acknowledgement that the Federal Reserve may impose requirements on applicants for a master account, and that an applicant's failure to meet any one of those terms

---

[3] *Available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

renders a depository institution "ineligible" for a master account, is entirely inconsistent with its claim that the Federal Reserve lacks discretion to substantively evaluate account requests. As Custodia concedes, Opp. at 23, OC-1 contains many such requirements, and, indeed, there are still more "requirements" that Custodia has not addressed. By way of example, OC-1 provides that the applicant "agrees to be bound by all the provisions, as amended from time to time, of this Circular and of all other Federal Reserve Bank operating circulars[4] that cover services that it obtains from any Reserve Bank," that "[e]ach Master Account Agreement is subject to approval by the Financial Institution's Administrative Reserve Bank," OC-1 ¶ 2.6, and that "[a] Reserve Bank may terminate a Master Account Agreement . . . or any Other Account Agreement at any time by notice to the Account Holder." *Id*. ¶ 2.10. Custodia provides no principled basis or standard for distinguishing among these requirements, rather apparently limiting itself to those it finds acceptable, Opp. at 23, but it is plain from Custodia's concession that the Federal Reserve retains discretion to limit or terminate master account access to applicants that present an excessive risk profile or otherwise fail to meet Federal Reserve requirements.

---

[4] Other Operating Circulars make clear that Reserve Banks may deny or terminate access to services if requirements are not met, contradicting Custodia's claim that it has an unqualified right to "services" under § 248a. For example, Operating Circular 5 ("OC-5"), governing electronic access to services, provides that Reserve Banks "immediately may terminate" a depository institution's electronic connection "if the Reserve Bank, in its sole discretion, determines that continued use of the Electronic Connection poses a risk to the Reserve Bank or others, or the Reserve Bank believes that the Institution or its Service Provider is in violation of this Circular." *Id.* ¶ 7.1. OC-5 further provides that depository institutions accessing Reserve Bank services via electronic connection must take "commercially reasonable security measures . . . necessary to prevent fraud, unauthorized access, or other unauthorized use" and maintain computer equipment and software that "comply with Reserve Bank requirements" as a requirement of electronic access. *Id.* ¶¶ 1.4, 2.0; *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/063021-operating-circular-5.pdf.

Indeed, the Board itself outlined requirements for master account eligibility in its Guidelines for Evaluating Account and Services Requests,[5] which provide that any Reserve Bank granting an "access request" for a master account or services, Opp. at 23, "may impose (at the time of account opening, granting access to service, or any time thereafter) obligations relating to, or conditions or limitations on, use of the account or services as necessary to limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy or to address other considerations." 87 Fed. Reg. at 51,106-07. The Guidelines make clear that "[p]rovision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank," *id*. at 51,107, and that "[t]he account-holding Reserve Bank may, at its discretion . . . place additional risk management controls on the account and services . . . as it may deem necessary to mitigate risks . . . [or] further restrict the institution's use of accounts and services or may close the account." *Id*.

Failure to meet any one of these requirements, by Custodia's own admission, permits "rejection" of the master account application. Opp. at 22. For this reason alone, Custodia's claim to an unqualified right to a master account under Section 248a must be rejected.

## II.     The Existence of Dual Chartering Authorities Does Not Mean Custodia Is Entitled to a Federal Reserve Master Account

Recognizing that there is discretion in the master account decision-making process does nothing to call into question the existing dual banking system as Custodia suggests. Despite Custodia's unsupportable claim that the Board's interpretation "spells the demise of the dual-banking system," Opp. at 1, the system is alive and well, including in the state of Wyoming. *See,*

---

[5] 87 Fed. Reg. 51,099 (Aug. 19, 2022) ("Guidelines").

*e.g.*, https://www.kansascityfed.org/banking/membership-state-member-banks/tenth-district-federal-reserve-state-member-banks/ (listing 164 state member banks alone in the district supervised by FRBKC, including eighteen in Wyoming, in addition to state non-member banks).[6] The Federal Reserve's exercise of master account discretion in no way infringes on Wyoming's ability to charter banks within the state, nor does it infringe on Wyoming's ability to autonomously regulate its depository institutions. After all, Custodia is, in fact, "a Wyoming-headquartered and chartered bank." Am. Compl. ¶ 3. Custodia also has access to Federal Reserve services through partnership with an existing accountholder. *See id.* ¶ 6. There is no disruption to the dual banking system; Custodia's chief complaint is instead that "launching with a correspondent bank that has a master account" is "more expensive." *Id.* ¶ 7. While direct access to a master account may increase profitability over other means, such access is not necessary to operate by Custodia's own admission and any such increased profitability involves transferring various risks to the Reserve Bank. *See* 87 Fed. Reg. at 51,107 (noting "credit, operational, settlement, cyber [and] other risks to the Reserve Bank"). Because a master account is not required for Custodia to operate as a state-chartered bank, Custodia's claims of an assault on the dual banking system ring hollow.

---

[6] Custodia's argument that the Board "has recently abandoned long-standing principles of federalism that have guided our country's dual-banking system for centuries," Opp. at 20, is equally unavailing. Custodia's characterization of the dual banking system and the National Banking Acts ignores the history of those statutes, the passage of which permitted new or existing banks "to operate under either federal or state jurisdiction according to their choice of charter" and created the dual banking system. Michael S. Barr, Howell E. Jackson, & Margaret E. Tahyar, *Financial Regulation: Law and Policy*, 42 (3d ed. 2021); *id.* at 43 ("Key proponents of the National Banking Acts . . . expected the Acts to induce state banks to convert to national banks. In reality, however, few did.). Despite the many benefits of disparate chartering authorities, nothing about the history of the dual banking system or the National Banking Acts suggests that there is an inviolate right to Reserve Bank master accounts and services.

Moreover, Custodia's vague assertion that "[t]he dual-chartering system's division of regulatory responsibility among state and federal authorities is federalism at its best," Opp. at 2, does nothing to support its counterintuitive argument that states and territories have control over which entities may access a federal payment system. The dual banking system has been described as simply a system where "both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters. Banks may seek a charter from either the state or federal government, and both state and national banks are able to compete—under the constraints of their respective regimes—for consumer business." *Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 125-26 (2d Cir. 2022) (quotations omitted). Nothing about this suggests that there is state regulatory control over federal financial actors whereby states and territories can solely dictate which banks may have direct access to the Federal Reserve's balance sheet, a matter of vital national importance. Indeed, there is abundant precedent demonstrating that when state and federal interests conflict with respect to banking, federal law governs. *See, e.g.*, *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 28 (1996) (holding that a federal law granting national banks the authority to sell insurance impliedly preempted a state law that prohibited banks from engaging in this activity); *cf. Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence Congress "plainly intended" it). There is simply no inviolate right under the principles of the dual-banking system that states can charter any type of entity they wish and then have those institutions automatically be granted a Federal Reserve master account without any consideration whatsoever by the Federal Reserve.

III.    **Congress Has Not Directed the Federal Reserve to Rubber Stamp Master Account Requests Regardless of Risk**

    A.    **Section 248a Does Not Eliminate Discretion**

Custodia has little response to the indisputable fact that Congress expressly denoted Section 248a(c)(2) to be one item in a list of pricing principles, in a section devoted exclusively to the Board's responsibilities regarding "*Pricing* of services," Board Br. at 13-16, instead reiterating its view that the provision acts as an entirely discretionless mandate. Custodia largely rests this conclusion on various sources recognizing that the Monetary Control Act ("MCA") served to "open access" to depository institutions previously barred from access under the Federal Reserve Act. Opp. at 15 and n.3. But these facts are not in dispute. Indeed, opening Federal Reserve accounts and services to nonmember banks—which had operated without them throughout history until 1980—was a key component of the MCA's objective of restoring Federal Reserve control over the money supply. *See* Board Br. at 12-13.[7] Notably, none of the legislative history, cases, or other various statements on which Custodia relies in any way suggest that this general opening of access to depository institutions, or the setting of a uniform fee structure for services, deprived the Federal Reserve of the ability to assess each potential accountholder for undue risk to the payment system, to the individual Reserve Bank, or to the implementation of national monetary policy before granting it access to its balance sheet. That there is no evidence of intent to hamper the Fed's financial stability or monetary policy

---

[7] Although the MCA standardized reserve requirements for both member and nonmember banks, those reserves need not be held in a Federal Reserve account. Rather, the MCA permits banks to maintain reserves in the form of vault cash or in another institution's account at a Federal Reserve Bank. *See* 12 U.S.C. § 461(c)(1)(A), (B); *see also, e.g., https://www.federalreserve.gov/monetarypolicy/reservereq.htm* ("The Board's Regulation D (Reserve Requirements of Depository Institutions) provides that reserve requirements must be satisfied by holding vault cash and, if vault cash is insufficient, by maintaining a . . . balance directly with a Reserve Bank or with another institution in a pass-through relationship.") (last updated Jan. 4, 2022).

responsibilities should not be surprising, as the statute expressly contemplates the Board's ability

to set "terms," and increased control was the very purpose of the MCA, "An Act . . . To *facilitate*

the implementation of monetary policy," 94 Stat. 132 (emphasis added). Any reading that would

cede control of the Fed's ability to effectively implement such policy to any individual institution

or state or territorial chartering entity cannot be reconciled with Congress's stated purpose.

Although Custodia turns to two commentators to support its position, Opp. at 14, these do

little to aid its cause. The first of these is an online article suggesting that Reserve Banks are

obligated to open accounts *even for entities with the avowed intention of violating federal law*, a

position that is the logical conclusion of Custodia's argument but was appropriately rejected by

the Colorado district court and each of the three members of the Tenth Circuit to consider the

question. *See* Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that*

*Legal?* (Nov. 14, 2018)[8] (the statute "isn't at all clear that the [Federal Reserve] had the authority

to reject Fourth Corner's application," despite the illegality under federal law of its marijuana-

focused business model). Although Custodia's brief parts ways with this extreme view for good

reason, *see* Opp. at 22-23 (suggesting Reserve Bank vetting and account denial of state-chartered

credit union "appropriate if the credit union intended to use Federal Reserve banking services for

illegal ends," and citing each of the separate *Fourth Corner* opinions), this only underscores its

engagement in an *ad hoc* line-drawing exercise that may serve its own purposes but lacks any

principle tethered to the statute for the Federal Reserve or the Court to apply. *See* Section I,

*supra*. Indeed, Custodia has gone out of its way to distinguish itself from other entities that have

requested but not obtained master accounts, suggesting the Fed retains discretion to vet and

---

[8] *Available at* https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-
authorities-but-is-that-legal/.

potentially deny accounts to institutions in *those* circumstances, but not here. *See id.*; ECF No. 100-01, Oct. 28, 2022 Hearing Transcript at 52:6-22, 48:5-16 (distinguishing Fourth Corner Federal Credit Union because "there was some pretty good argument that maybe they were not in compliance with federal law," and a Connecticut-chartered narrow bank because it "sprung this pass-through investment entity on the Federal Reserve Bank really with no notice and no thought on the front end and no participation with them, whether that was an entity that the Reserve Bank was going to agree to"). This "Rules for thee, not for me" approach cannot withstand scrutiny and is fundamentally inconsistent with the argument that the Federal Reserve retains no discretion.

The second commentary, a March 30, 2023 draft paper dated two days after the Defendants filed their motions to dismiss but before Custodia's opposition was due, fares no better. On the question of illegality, for example, the draft makes the conclusory assertion that "Reserve Banks need not launder money," but then supports this conclusion with a circular citation to the federal criminal statutes prohibiting money laundering. *See* Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments* (Mar. 30, 2023 draft) ("2023 Hill draft"), at 55 and n.345.[9] This just begs the question: How are Reserve Banks to know

---

[9] A draft article posted by Professor Hill last year reached different conclusions, stating, *inter alia*, that:

- "the text of the Monetary Control Act *is far from a conclusive mandate to provide service to every depository institution*";
- "the Federal Reserve *has discretion to deny some institutions accounts and services*";
- "[t]he Federal Reserve Banks' authority to receive deposits under the Federal Reserve Act *has long been viewed as discretionary*";
- "[i]f the Federal Reserve has the authority to set nondiscretionary terms, then *surely it also has authority to deny access to banks that did not meet those terms*";
- "[t]he legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, *rather than treat each individual bank exactly the same regardless of risk*";

whether an institution may engage in illicit activity without the ability to undertake such an assessment? And if an institution *intends* to launder money, or engage in some other illicit activity, how could it possibly have been Congress's intent that the Reserve Bank must nonetheless mindlessly open an account for and begin providing services to that institution before *then* setting out to find some other way to try to prevent its payment rails from being used to such ends? These are not academic questions, but real concerns that Reserve Banks face on an ongoing basis.[10] Once again, however, no principled standard is forthcoming.

---

- "[d]enying [the Federal Reserve] the authority to set terms and conditions that would, for example, limit risk and improve function, could *frustrate the purpose of the Monetary Control Act*";
- "*[t]he Federal Reserve's discretion to establish terms and conditions for account access is <u>reinforced</u> by* the Monetary Control Act's amendments"; and
- the statutory "history suggests that *the Federal Reserve retained discretion to set terms and conditions for access* and pricing for its payment services so long as those terms did not discriminate based on membership status. *<u>It does not compel the conclusion that Congress intended to outsource all risk evaluation to other state or federal banking regulators</u>*."

*See* Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (2022 draft), attached as Exh. A hereto, at 34-38 ("2022 Hill draft") (emphases added). Professor Hill further noted that "both the Board and the Reserve Banks have emphasized their discretion to limit access" across many years, concluding that "*[a] complete catalog of these instances would be too voluminous for this [86-page] article*." *Id.* at 39 (emphasis added); *see also*, *e.g.*, Dan Awrey, *Unbundling Banking, Money, and Payments*, 110 Geo. L.J. 715, 746 (2022) (observing that, "even within th[e] relatively narrow universe of eligible institutions, the Fed has considerable discretion to impose further access restrictions," and that in some circumstances "there is good reason for the Fed to exercise caution").

[10] As Professor Hill observed last year, "since the passage of the Monetary Control Act, the Federal Reserve Board and Reserve Banks have evaluated risks associated with providing account and payment services to individual banks. When individual banks present abnormally high risk, the Federal Reserve Banks have repeatedly stated that they have the authority to withhold services [to] those banks. Indeed, *operating major nation-wide payment systems without imposing risk-related terms and conditions <u>would be foolhardy</u>. Having risk-related terms and conditions without ability to enforce the terms by limiting services <u>would be useless</u>.*" 2022 Hill draft, at 41 (emphases added).

Moreover, the draft article concedes the long history from 1935 and before of Reserve Banks exercising discretion over accounts for entities not subject to the Fed's direct supervision,[11] noting but dismissing in a wholly unconvincing way that both the Board and Reserve Banks had affirmatively recognized that account-opening discretion was both afforded by Congress and fundamental to such account relationships. *See id.* at 49 and n.307; Chester Morrill, Secretary, Bd. of Governors of the Fed. Reserve Sys., Letter X-9187 (Apr. 26, 1935) ("1935 Morrill Letter")[12] (surveying each Reserve Bank chair "with respect to the circumstances and conditions under which clearing accounts of nonmember banks should be accepted under the authority of Section 13 of the Federal Reserve Act, "*including under what circumstances they should be "accept[ed] or refus[ed]*," and concluding that "it is the Board's view that requests for the establishment of clearing accounts by non-member banks *should be passed upon by your directors in the light of all the circumstances surrounding each application*" (emphases added)). The remainder of the draft is largely devoted to the unexceptional point that Reserve Banks historically had little reason to exercise account discretion over member banks, which were previously required to hold reserves at a Federal Reserve Bank and were already subject to extensive vetting and direct supervision by the Federal Reserve Board prior to 1980, and attempting to dismiss the significance of the Fed's articulated discretion in its Operating Circulars and elsewhere (previously referred to as "too voluminous" to catalog, *see* n.9). All of these efforts are aimed at supporting the policy conclusions that discretion should not rest within

---

[11] Under Section 13 of the Federal Reserve Act, non-member banks could obtain limited clearing accounts before the MCA opened regular deposit accounts to them.

[12] *Available at* https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-nonmember-bank-clearing-accounts-505912.

the Federal Reserve, and that novel state charters can promote innovation. But the undoubted

benefits of innovation are necessarily tempered by an assessment of illegality or undue risk that

any particular institution may present to national monetary policy, the Federal Reserve's

payment system, or other important federal interests, and evaluation of these concerns is not

something that the Federal Reserve can cede to others given the responsibilities that Congress

has assigned to it. There is no indication that Congress expected or desired such an unlikely and

extraordinary outcome when it sought to enhance control over monetary policy by expanding the

availability of Reserve Bank accounts and services to non-members while at the same time

directing the Board to establish uniform pricing for these services for both members and non-

members alike.

Although both the draft article and Custodia's brief rely heavily on Judge Bacharach's

separate opinion in *Fourth Corner*, that analysis was notably not joined by the other members of

the panel and suffers from the same overreading of both Section 248a(c)(2) and generalized

statements about Congress's "opening of access." It also fails to identify an administrable

standard grounded in the statute by which the Federal Reserve (or a reviewing court) may assess

whether a particular institution's activities are unduly detrimental to important federal interests.

This reading would render both the Federal Reserve and the federal courts powerless to prevent

any entity from accessing an account and services (and the Fed's balance sheet), regardless of the

risks presented or potential illegality, so long as it was authorized to operate by a single state or

territory, a result assuredly not contemplated by Congress when it sought to restore the Federal

Reserve's control over the money supply in the MCA. In any event, Judge Bacharach's view was

developed in a far more limited context and without the benefit of the Board's published

Guidelines, the recent amendment to the Federal Reserve Act, or a full consideration of the Fed's longstanding assertion and exercise of discretion in practice.

The MCA has fulfilled and continues to fulfill Congress's intention of expanding access to Reserve Bank accounts and services to non-member institutions. And the Board has fulfilled its obligations under the MCA by publishing a pricing schedule that takes into account this expanded access alongside other stated criteria. It is not possible to conclude in these circumstances that the Board has acted "not in accordance with law" in violation of the APA and that its action should be "set aside" pursuant to 5 U.S.C. § 706(2) as Custodia claims.

### B. The Court Should Defer to the Board's Interpretation in the Guidelines

Custodia's argument that *Chevron* deference is not appropriate for the Guidelines (Opp. at 17) misses the mark: the Board never contended that the Guidelines carry the full force of law that mandatory *Chevron* deference typically requires. The Guidelines are nonetheless the Board's official position as the agency with expertise and authority as to the Federal Reserve Act. Even if not mandatory, such guidance "deserve[s] considerable deference" when the agency uses a "highly formal process" to adopt the guidance, including "notice[s] in the Federal Register," "accept[ing] public comments," engaging in lengthy "deliberation," and then "publish[ing] a proposed [set of guidelines] for further comment." *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 70 (D.D.C. 2014); *accord Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood, Corp.* 439 U.S. 234, 251 (1978) (deferring to statutory interpretation in pre-*Chevron* Board order). Thus, to the extent there is any ambiguity or uncertainty as to whether the Federal Reserve has the ability to deny requests for master accounts, it should be resolved in favor of the Board's reasonable interpretation. Here, such interpretation came from a unanimous Board, which affirmed in the Guidelines that Reserve Banks "retain the discretion to deny a request for access

14

to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102.[13]

Although Custodia contends that the Federal Reserve Act is unambiguous that discretion is not allowed, Section 248a(c)(2) does not establish that point. And while Custodia points to the 2023 Hill draft and its assertion that the Board has contradicted its prior positions and therefore should not be afforded deference,[14] the only evidence that the article is able to muster for this proposition is a selection of generalized statements in which the Federal Reserve indicated that certain banking services are "available," and the article eventually concedes that Operating Circular 1, first published in 1998, made clear that master "accounts were subject to" both "approval and termination." 2023 Hill draft at 50-51; *see also* n.9 *supra* (identifying "voluminous" history of Federal Reserve assertion of discretion). Custodia's arguments are insufficient to overcome the Board's reasonable interpretation in its published Guidelines.

### C.    Section 248c's Text and Legislative History Affirm the Longstanding Understanding that the Federal Reserve May Reject Account Requests

As the Board indicated in its opening brief, the 2023 NDAA created Section 248c within the Federal Reserve Act, which establishes that requests for a "reserve bank master account and services" may be "rejected." 12 U.S.C. § 248c(b)(1)(B). In its opening brief, the Board noted that

---

[13] Custodia urges the Court not to defer to "interpretations in non-binding guidance," but the cases it cites concerned guidance that had not gone through the notice-and-comment process and are otherwise distinguishable from the circumstances presented here. *See* Opp. at 17 (citing *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1128 n.9 (10th Cir. 2020); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017)).

[14] *But see* 2022 Hill draft, at 41 (because "the Federal Reserve has the authority to interpret the Monetary Control Act," and "the statute is unclear, courts would likely afford some deference to the Federal Reserve's interpretation that it can impose risk-related terms and conditions on its accounts and payment services"); *see also id.* at 28 (Federal Reserve "believes it has discretion to restrict or deny access to depository institutions that present undue risk. I conclude the Federal Reserve's interpretation of the statute is reasonable."); *id. at* 29 n.199 (citing authority).

this was not a new pronouncement by Congress, but instead affirmed that "discretion in this area [] has long been understood to reside within the Federal Reserve System" such that "access denials are to be expected." Board Br. at 2; *accord* 1935 Morrill Letter, *supra*. Attempting to argue that Section 248c does not mean what it says on its face, Custodia first tries to rewrite the statute, then tries to rewrite its history. Neither is an acceptable method for construing the unambiguous text of Section 248c.

### 1.   Custodia is not permitted to rewrite Section 248c to indicate that "rejections" are only permitted for the reasons picked by Custodia

Custodia argues that the language in Section 248c providing for "reject[ions]" of master account requests is meant to apply only when requests are made by "***ineligible*** financial institutions." Opp. at 21 (emphasis in original). But the word "ineligible" does not appear anywhere in the provision, and this is a transparent attempt to rewrite the statute to suit Custodia's litigation objectives.

It is axiomatic that a court "cannot rewrite an unambiguous statute." *EagleMed LLC v. Cox*, 868 F.3d 893, 904 (10th Cir. 2017) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins., Co.*, 559 U.S. 393, 403 (2010)) (alterations omitted). This prohibition follows from "[t]he preeminent canon of statutory interpretation," which "requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (quotation omitted). Here, the unambiguous language of the statute contemplates that requests for master accounts and services by depository institutions may be "rejected." 12 U.S.C. § 248c(b)(1)(B). Custodia puts forth no reading of the statute that does not require inserting new terms or otherwise rewriting its language.

Custodia's attempt to rewrite Section 248c is not only impermissible because that provision is unambiguous, but such rewriting would make Section 248c internally contradictory. *See*, *e.g.*, *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (noting that an interpretation of a statute cannot be "inconsistent with both the text and context of the statute"). The statute indicates that the Board's forthcoming database must specify whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union" (12 U.S.C. § 248c(b)(1)(C))—all of which are indisputably entities eligible to have a master account. And for each such requesting entity, "reject[ion]" is a possibility. 12 U.S.C. § 248c(b)(1)(B). Thus, the statute explicitly contemplates rejections of master account requests from all three types of eligible depository institutions. Custodia's argument that the statute allows for rejections only with respect to "ineligible financial institutions" simply finds no support in the language of the statute.

Finally, while Custodia explains at length its views as to the appropriate circumstances in which master account requests can be rejected (Opp. at 22-25), this explanation is utterly devoid of any connection to the language of Section 248c. Custodia's suggestion that rejections are only allowed for three specific reasons is supposition, not statutory interpretation. The statute does not contain any description of acceptable reasons for a rejection of a master account request, much less the three reasons described by Custodia. Rather, the statute simply makes clear that rejection of an application is an anticipated outcome for any depository institution.

Accordingly, the language of Section 248c is remarkably straightforward: it contemplates rejections of master account requests from any of three categories of depository institutions. There is no basis for rewriting the statute to suit Custodia's ends.

### 2.     The legislative history anticipates that master account requests from certain depository institutions may be rejected

Resort to legislative history and statutory purpose ordinarily is not necessary when a statute is unambiguous, as is the case here. *United States v. Polk*, 61 F.4th 1277, 1281 n.6 (10th Cir. 2023). However, even if consulting these extra-textual sources were appropriate, in this case, they are in accord with the statute's plain text. Contrary to the suggestions of Custodia and a former Senator who filed an amicus brief in support of neither party (ECF No. 146-01) ("Amicus Br."), the existing legislative history and statutory purpose establish that Congress believed the Federal Reserve should not automatically be granting master account requests from depository institutions, but instead should be evaluating (and potentially denying) such requests fairly and consistently.

As recounted in its opening brief (at 9-10), after promulgating the Guidelines, the Board made a proposal in November 2022 to require that Federal Reserve Banks publish "two lists: (1) a list of federally-insured depository institutions with access to accounts and services, and (2) a list of non-federally-insured depository institutions with access to accounts and services." 87 Fed. Reg. 68,691, 68,691 (Nov. 16, 2022). The Board did not propose including any entities rejected or denied for a master account on the lists. However, before the Board finalized its proposal, Congress passed and the President signed into law the 2023 NDAA, which requires the Board to create "a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section . . . including whether, and the dates on which, a request— (i) was submitted; and (ii) was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B) (emphasis added). Thus, the "rejected" language was a creation of Congress, marking a departure from the Board's original proposal.

18

Lest there be any doubt about the origins of the "rejected" language, that doubt is put to rest by the U.S. Senate Committee on Banking, Housing, and Urban Affairs minority statement preceding the enactment of the 2023 NDAA. That statement made clear that the "rejected" language had not appeared in the Board's proposal and therefore Congress had made a conscious decision to deviate from the Board's proposal:

> [Section 248c's] inclusion in the NDAA is the result of extensive Banking Committee oversight of the Fed's approach to master account applications. In response to that oversight, the Federal Reserve announced on November 4, 2022 that it was seeking public comment on a proposal to periodically publish a list of institutions that have access to master accounts. *However, the Federal Reserve did not propose disclosing information about institutions whose requests for access to master accounts are pending or have been rejected.*[15]

The quote included in the statement underscored this point, noting the desire to publish "not only which institutions have been granted master accounts, *but also which ones have been denied access.*" *Id.* (emphasis added).[16]

Indeed, as the amicus brief acknowledges, members of Congress were keenly aware that there was an ongoing dispute as to whether the Federal Reserve has discretionary authority to reject master account requests from depository institutions. Amicus Br. at 10. Yet rather than adopting the "no discretion" view anywhere in the statute or in the legislative history, Congress

---

[15] *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts*, Dec. 8, 2022, *available at* https://www.banking.senate.gov/newsroom/minority/annual-defense-bill-includes-toomey-provision-to-require-federal-reserve-transparency-on-master-accounts ("Banking Committee Statement") (emphasis added).

[16] Custodia accuses the Board of "chicanery" with respect to the drafting of Section 248c, stating that it was Board lawyers who added the word "rejected." Opp. at 26-27. Although this diversion is entirely irrelevant to the task at hand, the Banking Committee Statement makes clear that language was added by Congress because the Board's own proposal did not include that concept. And the amicus brief indicates that the drafting suggestion made by Board attorneys was adding the phrase "reserve bank" before the definition of "master account," which merely affirms an unassailable fact that has long been the public position of both the Board and the Reserve Bank; the term "rejected" is never attributed to the Board. Amicus Br. at 9-10.

adopted a position that is directly at odds with that view and consistent with the Board's recently published Guidelines. *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) ("Congress' awareness of [agency rulings] when enacting other and related legislation make[s] out an unusually strong case of legislative acquiescence in and ratification by implication"). Although the Banking Committee Statement suggested that FRBKC may have improperly exercised discretion with respect to a master account granted to a state-designated depository institution, and therefore provided a mechanism to monitor Federal Reserve account decisions going forward, it notably spoke in discretionary terms. *See* Banking Committee Statement (citing to state regulator "press statement" in which it publicly confirmed entity's "status as a depository institution"); *id.* (stating expectation that Federal Reserve act in a "fair" and "consistent" manner in its account access decisions, terms denoting bounds on the exercise of discretionary authority rather than ministerial function); *see also* Amicus Br. at 7, 14 (same).

If it were the case that the granting of a master account to depository institutions is purely ministerial under the Federal Reserve Act, then Congress could have readily clarified that expectation while it was legislating in an adjacent provision of the statute dealing with a directly related issue in the immediate wake of the Board's publication of its Guidelines' affirming discretion. But instead, Congress confirmed its understanding that the Federal Reserve in fact exercises discretion (consistent with the Board's interpretation of the Federal Reserve Act in its Guidelines), and recognized that, in the exercise of this discretion, a "rejected" application is a possible outcome for depository institutions—just as "approved," "pending," and "withdrawn" applications are possible outcomes. And while the amicus brief now states that the provision was meant to be completely neutral on the question of whether the Federal Reserve can exercise discretion regarding master accounts (Amicus Br. at 10), such post-enactment statements have

little utility when all pre-enactment evidence shows that Congress wanted to monitor the Federal Reserve's exercise of discretion and suggested no intention to constrain that discretion. *See, e.g.*, *Ausmus v. Perdue*, 908 F.3d 1248, 1257 n.3 (10th Cir. 2018) ("post-enactment statements by [] members of Congress . . . do not bear on the meaning of the law") (citing *Barber v. Thomas*, 560 U.S. 474, 486 (2010)); *Kansas Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1237 (10th Cir. 2020) (post-enactment statements constitute "an extremely hazardous basis for inferring the meaning of a congressional enactment") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980)).

Although ultimately unnecessary to the Court's decision, at bottom both Section 248c and its legislative history serve to affirm the longstanding understanding that the Federal Reserve retains discretion to reject master account requests from depository institutions.

## IV.    Custodia is Not Entitled to Mandamus or Other Relief

Custodia's Claim II for relief under the Mandamus Act, 28 U.S.C. § 1361, is not, as Custodia argues, "an alternative to its APA claim," and does not "complement[] its APA claim." *See* Opp. at 31. Custodia's mandamus claim asks the Court to order that "its master account application [be] granted," Am. Compl. ¶ 91, which is duplicative of the relief sought in its APA claim for "an order compelling the Board to rescind the denial of Custodia's master account application and to grant Custodia's master account application," *id.* ¶ 85. Where review is possible under the APA, mandamus is not available. *E.g.*, *W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Reserve v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993) (citing *Kerr v. United States District Court*, 426 U.S. 394 (1976)). Moreover, even if Custodia could properly request mandamus relief, such a "drastic remedy," *id.*, would not be warranted here because as discussed above Custodia is not entitled to a master account under the law. Decisions

that are discretionary in nature cannot be subject to mandamus relief. *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995).

Additionally, Custodia's final claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, should be dismissed because it is not an independently viable cause of action. *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014). The Court should dismiss Claim III for the same reasons it previously rejected Custodia's "stand-alone cause of action" for declaratory judgment. *See* Order (ECF No. 102) at 23 (permitting only declaratory judgment as a *request for relief*—and not as an independent claim—to remain in light of the decision not to dismiss the APA or Mandamus Act claims).

## CONCLUSION

For the foregoing reasons, and the reasons stated in its opening brief, the Board respectfully requests that the case be dismissed.


Dated: May 2, 2023

Respectfully submitted,


 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the Federal Reserve System*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2023, I electronically filed the foregoing using the court's

CM/ECF system, which will send notification of such filing to all parties of record.

By:    /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors*
*of the Federal Reserve System*