# EXHIBIT A

# Bank Access to Federal Reserve Accounts and Payment Systems[†]

JULIE ANDERSEN HILL[*]

*Should the Federal Reserve process payments for a Colorado credit union established to serve the cannabis industry? Should the Federal Reserve provide an account for a Connecticut trust that plans to keep all its depositors' money in that Federal Reserve account? Should the Federal Reserve provide payment services for an uninsured, government-owned bank in American Samoa? What about Wyoming cryptocurrency custody banks? Should they have access to Federal Reserve accounts and payment systems? Although the Federal Reserve has recently considered account and payment services applications from these novel banks, its process for evaluating the applications is not transparent.*

*This Article examines how the Federal Reserve decides which banks get access to its accounts and payment systems. It explores the sometimes-ambiguous statutory authority governing the Federal Reserve's provision of accounts and payments and chronicles the Federal Reserve's longtime policies limiting access for risky banks. Because the statutes, regulations, and Federal Reserve policies are largely silent about the process banks encounter when seeking accounts and payment services, the Article analyzes recent novel account applications. These applications reveal confusion. Most district Federal Reserve Banks do not explain how banks should apply for an account or what information they should provide. It is not clear who decides which banks are legally eligible to receive accounts. While the Federal Reserve Banks all evaluate risk associated with account and payments requests, the Reserve Banks may not have the same risk tolerances. There are no processes to encourage consistent decisionmaking across the twelve Federal Reserve Banks. Getting a decision takes years. These applications show that the Federal Reserve needs a transparent framework for evaluating access requests. Unfortunately, the Federal Reserve's recently proposed guidelines, which consist primarily of a risk identification framework, do not go far enough.*

---

† © 2022 Julie Andersen Hill. DRAFT ARTICLE.

* Alton C. and Cecile Cunningham Craig Professor of Law, University of Alabama. I am grateful to the staff of the University of Alabama Bounds Law Library, especially Seth Brostoff and Penny Gibson, for their help in tracking down elusive sources.

Electronic copy available at: https://ssrn.com/abstract=4048081

Electronic copy available at: https://ssrn.com/abstract=4048081

# Bank Access to Federal Reserve Accounts and Payment Systems

INTRODUCTION .......................................................................... 1
I.   HISTORY OF FED ACCOUNTS AND PAYMENTS ................................... 7
     A.  MEMBER ACCOUNTS AND PAYMENT SERVICES ......................... 9
     B.  NONMEMBER ACCOUNTS..................................................... 13
     C.  MONETARY CONTROL ACT OF 1980......................................... 20
     D.  MASTER ACCOUNTS........................................................... 25
II.  FEDERAL RESERVE AUTHORITY .................................................... 27
     A.  LEGAL ELIGIBILITY ........................................................... 28
     B.  FEDERAL RESERVE DISCRETION.............................................. 33
III. PROPOSED GUIDELINES ........................................................... 42
IV.  NOVEL BANKS ...................................................................... 44
     A.  CANNABIS BANK............................................................... 45
     B.  PUBLIC BANK.................................................................. 51
     C.  NARROW BANK................................................................. 60
     D.  CRYPTOCURRENCY CUSTODY BANKS ...................................... 67
V.   LESSONS FROM NOVEL BANKS .................................................. 75
     A.  APPLICATION PROCESS ...................................................... 75
     B.  LEGAL ELIGIBILITY ........................................................... 78
     C.  THE BOARD'S ROLE............................................................ 80
     D.  CONSISTENCY ................................................................. 82
CONCLUSION ............................................................................ 85

## INTRODUCTION

A common conspiracy theory says that everyone has a secret bank account at the Federal Reserve. Supposedly, the government set up these accounts but is now hording consumers' money. According to the hoax, consumers can pay bills with these secret accounts by writing a combination of bank routing numbers and Social Security numbers on checks or entering the same information on electronic bill pay web sites.[1] Of course, there are no secret consumer bank accounts at the Federal Reserve, and

---

[1] Ann Carns, *Will Uncle Sam Pay Your Bills? Don't Fall for It*, N.Y. TIMES, Aug. 26, 2017, at B3.

Electronic copy available at: https://ssrn.com/abstract=4048081

attempting to pay bills this way could be a crime.[2] Nevertheless, this hoax is so widespread that district Federal Reserve Banks advise: "The Federal Reserve provides banking services only for banks. Individuals do not have accounts at the Federal Reserve."[3]

Although individuals currently do not have access to Federal Reserve accounts, it is less clear how the Federal Reserve decides which "banks" gets access to Federal Reserve accounts.

The question of access to a Federal Reserve account is important because a Federal Reserve account comes with two benefits. First, an account gives a bank access to payment systems operated by the Federal Reserve. Without an account, a bank, business, or individual must find a bank with a Federal Reserve account that is willing to process its payments, usually for an additional fee. Having direct access to the Federal Reserve avoids an intermediary and the associated fees. Second, an account provides an extremely safe place to deposit money and earn interest. While there are many private places to invest money, none provide the same level of security.

From the passage of the Monetary Control Act of 1980[4] until recently, it was often presupposed that all depository institutions were entitled to a Federal Reserve account. During this period, regional Federal Reserve Banks opened accounts for federally insured banks with little independent investigation.[5] However, as banks have evolved, banks without federal deposit insurance are increasingly seeking access to Federal Reserve accounts and payment services.[6] In response, the Federal Reserve is

---

[2] Bd. of Governors of the Federal Reserve System, Does the Federal Reserve Maintain Accounts for Individuals? Can Individuals Use Such Accounts to Pay Bills and Get Money?, https://www.federalreserve.gov/faqs/does-the-federal-reserve-maintain-accounts-for-individuals-can-individuals-use-such-accounts-to-pay-bills-and-get-money.htm (last updated Apr. 15, 2021).

[3] *See, e.g.,* Press Release, Fed. Reserve Bank of Atlanta, Consumer Scan Alert: Do Not Use Federal Reserve Routing Accounting Number to Pay Bills (July 12, 2017), https://www.frbatlanta.org/news/pressreleases/atlantafed/2017/0712-consumer-scan-alert-fr-routing-numbers.aspx); Scams Involving the Federal Reserve Name, Fed. Reserve Bank of NY (Jan. 20201) https://www.newyorkfed.org/banking/frscams.html.

[4] Pub. L. No. 96-221, 94 Stat. 132.

[5] *See* Telephone Interview with Thomas Hoenig, former President, Fed. Rsrv. Bank of Kansas City (Mar. 11, 2020) (explaining that prior to the recent novel bank applications, there was little controversy over Reserve Bank accounts and applications were routinely granted); Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is That Legal?*, Brookings (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/ (describing the process of getting a Federal Reserve account as "[]formerly[] routine").

[6] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,866 (May 11, 2021).

Electronic copy available at: https://ssrn.com/abstract=4048081

taking measures to control who can open accounts. The Federal Reserve Bank of Kansas City (Kansas City Fed) denied an account for Fourth Corner Credit Union, a new credit union that planned to process payments for marijuana businesses in Colorado.[7] The Federal Reserve Bank of New York (New York Fed) has spent more than four years considering an account application for TNB, a narrow bank that would deposit all of its customers' money in a Federal Reserve account.[8] And the Kansas City Fed has been reviewing applications from two Wyoming cryptocurrency custody banks (Kraken and Avanti) for more than two years.[9] Indeed, the Federal Reserve Board is so concerned about account and payment services requests that in May 2021 it issued proposed guidelines for evaluating them.[10]

Yet Federal Reserve accounts and payment systems have received little scholarly attention. Most legal scholars who have written about Federal Reserve accounts focus on expanding account access beyond banks. Building on Mehrsa Baradaran's work on public banking, John Crawford, Lev Menand, Morgan Ricks, and Saule Omarova believe that all individuals should have access to Federal Reserve accounts.[11] Colleen Baker examines expansion of accounts and payment services to clearinghouses.[12] Others, including Dan Awrey, George Selgin, and David Zaring, argue

---

[7] Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 861 F.3d 1052 (10th Cir. 2017). The Kansas City Fed later agreed to provide Fourth Corner Credit Union an account if did not serve businesses that are illegal under federal law. *See infra* notes 346-350.

[8] *See* TNB USA Inc. v. Fed. Reserve Bank of N.Y., No. 18-cv-7978 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) (dismissing the applicant's suit against the New York Fed on ripeness grounds even though the New York Fed had been investigating the application since 2017).

[9] Cynthia Lummis, Opinion, *The Fed Battles Wyoming on Cryptocurrency*, WALL ST. J., Dec. 1, 2021, at A15.

[10] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021).

[11] MEHRSA BARADARAN, HOW THE OTHER HALF BANKS 211 (2015) (concluding that "postal banking represents the most promising path toward effectuating a . . . public option" in banking); Mehrsa Baradaran, *Jim Crow Credit*, 9 UC IRVINE L. REV. 887, 948 (2019) (exploring the possibility of a public bank owned by a state or municipality to solve the problem of disparate access to credit); John Crawford, Lev Menand & Morgan Ricks, *FedAccounts: Digital Dollars*, 89 GEO. WASH. L. REV. 113 (2021); Saule T. Omarova, *The People's Ledger: How to Democratize Money and Finance the Economy*, 74 VAND. L. REV. 1301 (2021).

[12] Colleen Baker, *The Federal Reserve as Last Resort*, 46 U. MICH. J. L. REFORM 69, 109-11, 120-24 (2012); *see also* Anna L. Paulson & Kirstin E. Wells, *Enhancing Financial Stability: The Case of Financial Market Utilities*, CHI. FED. LETTER NO. 279, Oct. 2010.

Electronic copy available at: https://ssrn.com/abstract=4048081

that at least some fintech companies should get access to Federal Reserve accounts and payment systems.[13]

Missing from the discussion, however, is description of how the Federal Reserve evaluates bank access to its accounts and payment services. Providing that description is not straightforward. The district Federal Reserve Banks responsible for opening accounts and operating the payment systems are secretive. They have few publicly available policies governing access to accounts. The Federal Reserve Banks claim they are not subject to the Freedom of Information Act.[14] When faced with information requests, they withhold most information related to their accounts or payment services.[15] They do not generally provide public information explaining their decisions on account applications or service requests.[16]

---

[13] *See, e.g.*, Dan Awrey, *Unbundling Banking, Money, and Payments*, ___ GEO. L.J. ___ (forthcoming); George Selgin, Opinion, *Keeping Fintech's Promise: A Modest Proposal*, THE HILL (May 10, 2021, 11:00 A.M.), https://thehill.com/opinion/finance/552614-keeping-fintechs-promise-a-modest-proposal; Comment from George Selgin, Director, Center for Monetary and Financial Alternatives, Cato Institute on Proposed Guidelines for Evaluating Account and Services Requests, Docket No. OP-1747 (May 24, 2021), https://www.federalreserve.gov/SECRS/2021/May/20210526/OP-1747/OP-1747_052421_138130_358853386158_1.pdf; Comment from David Zaring, Professor, Department of Legal Studies and Business Ethics, The Wharton School, on Proposed Guidelines for Evaluating Account and Services Requests, Docket No. OP-1747 https://www.federalreserve.gov/SECRS/2021/July/20210721/OP-1747/OP-1747_071221_138732_418138947088_1.pdf; Brian Knight, Opinion, *Fed Should Open the Payments System to Fintechs*, AM. BANKER (Jan. 24, 2019, 10:00 A.M.), https://www.americanbanker.com/opinion/fed-should-open-the-payments-system-to-fintechs. *But see* Comment from Erik Gerding, Americans for Financial Reform Education Fund, on Proposed Guidelines for Evaluating Account and Services Requests, Docket No. OP-1747 (July 12, 2021), https://www.federalreserve.gov/SECRS/2021/July/20210714/OP-1747/OP-1747_071221_138238_358666957091_1.pdf (arguing that access to master accounts should be limited to traditional banks with federal deposit insurance).

[14] *See, e.g.*, Fed. Reserve Bank of N.Y., Freedom of Information Requests (last visited July 19, 2021), https://www.newyorkfed.org/aboutthefed/freedom-of-information-requests (stating that although the "[t]he Federal Reserve Bank of New York is not an agency as defined by the Freedom of Information Act (FOIA) and is therefore not subject to the provisions of FOIA," it nevertheless "is committed to complying with the spirit of FOIA"). Others believe that the regional Federal Reserve Banks are within the scope of FOIA. *See, e.g.*, Karla Karlson, Comment, *Check and Balances: Using the Freedom of Information Act to Evaluate the Federal Reserve Banks*, 60 AM. U. L. REV. 213 (2010).

[15] 5 U.S.C. § 552(b)(4), (8) (exempting "commercial or financial information" and information related to the condition of banks that were prepared for use by the "agency responsible for the regulation or supervision" of the institution); *see generally* Benjamin W. Cramer & Martin E. Halstuk, *Crash and Learn: The Inability of the Transparency Laws to Penetrate American Monetary Policy*, 25 WM. & MARY BILL RTS. J. 195 (2016) (describing legal attempts to gather information from the Federal Reserve Board and Reserve Banks using the Freedom of Information Act).

[16] *Cf.* E-mail from Erik Z Revai, General Counsel, Fed. Reserve Bank of S.F. to Author (July 24, 2019) (declining to provide information on account restrictions for a novel bank); Letter from Pat Toomey, Senator, to Esther L. George (Feb. 1, 2021) (explaining that when Senator Toomey requested information about meeting held between the Kansas City Fed staff and an applicant for an account,

Electronic copy available at: https://ssrn.com/abstract=4048081

Using interviews, court filings, information requests, historical documents, press reports, and other sources, this Article provides a more complete picture of the process novel banks encounter when seeking access to Federal Reserve accounts and payment services.

Part I reviews historical access to Federal Reserve accounts and payments. It shows that the Federal Reserve Banks have long exercised discretionary authority when opening accounts and providing payment services. It also highlights the divergent practices of district Federal Reserve Banks.

Part II examines the Federal Reserve's statutory authority over its accounts and payment systems. The Federal Reserve's authority comes in two parts. First, the Federal Reserve is only authorized to open accounts and provide payment systems for those banks that meet the definition of "depository institution."[17] Part II.A explains that because Congress and the Federal Reserve have defined "depository institutions" to include banks that are eligible to apply for federal deposit or share insurance,[18] the federal bank insurers, rather than the Federal Reserve, may have the authority to decide which banks are legally eligible for Federal Reserve services. Second, the Federal Reserve is instructed to provide payment services to nonmember banks on the same terms and conditions that it provides those service to member banks.[19] This raises questions about whether the Federal Reserve can deny banks access to accounts and payment services. While some believe that the Federal Reserve has no authority to limit access,[20] I conclude that the Federal Reserve's long claim of authority to limit access based on risk is a reasonable interpretation of its statutory authority.[21]

Part III describes the Federal Reserve's proposed guidelines for evaluating account services requests.[22] It consists largely of a framework describing risks (including credit, liquidity, operational, settlement, and

---

the Bank staff told the Senator "that they believed the records and information requested may contain confidential supervisory information").

[17] 12 U.S.C. §§ 248a, 342.

[18] *Id*. § 461(b)(1)(A).

[19] *Id*. § 248a(c)(2).

[20] *See e.g.* Conti-Brown, *supra* note 5.

[21] *See infra* Part II.B.

[22] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021).

Electronic copy available at: https://ssrn.com/abstract=4048081

cyber risks) that applicants might pose to the Reserve Bank, the payment system, the financial system, or the economy.[23]

Because the statutory authority and even the Federal Reserve's proposed guidelines provide little information about the processes the Federal Reserve uses when evaluating account requests, Part IV investigates recent account applications from novel banks. It explores the experiences of Fourth Corner Credit Union (a marijuana credit union in Colorado that was denied an account), Territorial Bank of American Samoa (a public bank that received an account), TNB (a narrow bank in Connecticut with a pending application), and Avanti and Kraken (cryptocurrency custody banks in Wyoming with pending applications). In each instance, the relevant Federal Reserve Bank considered the risk presented by the application. Among those risks are the risk that the applicant will violate anti-money laundering, sanctions law, or other banking laws; the risk that the applicant will compromise the payment systems or the broader financial system; and the risk that the applicant's business model will interfere with the Federal Reserve's ability to implement monetary policy.[24] Unsurprisingly, these are the same types of risk identified in the Federal Reserve Board's proposed guidelines for evaluating account and services requests.[25]

Nevertheless, the novel account applications illustrate that the Federal Reserve has not been forthcoming about its process for evaluating such applications. Part V summarizes the structural failings of the Federal Reserve's account and payment request process. For example, it is not readily apparent how applicant banks should request an account or what materials they must provide.[26] Once the Federal Reserve receives an application, it is not clear who decides if the bank is legally eligible for the account.[27] Eligible banks also undergo a risk assessment, but there are no bright-line rules or processes that would facilitate consistent decisions across the twelve Federal Reserve Bank districts.[28] In some instances, the Federal Reserve Board seems actively involved in risk assessments, but

---

[23] *Id*. at 25,867-69.

[24] *See infra* Part IV.

[25] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,866-89 (May 11, 2021).

[26] *See infra* Part V.A.

[27] *See infra* Part V.B.

[28] *See infra* Part V.D.

Electronic copy available at: https://ssrn.com/abstract=4048081

the Board is not transparent about its role or authority.[29] Novel banks requesting Federal Reserve accounts often wait years for a decision. None of the decisions are public.

Part V explains that Federal Reserve System would benefit from "a structured, transparent, and detailed framework for evaluating access requests."[30] Unfortunately, the Federal Reserve Board's proposed guidelines, which consist primarily of a set of risks that Reserve Banks should evaluate,[31] do not go far enough. The Federal Reserve should adopt procedures that detail how applicants can request accounts and services, what materials they must provide, and when they can expect the Federal Reserve to act on the request. The Federal Reserve should be clear about who is determining legal eligibility for the accounts and who is conducting the risk assessments. If the Federal Reserve Board's assessment will be dispositive, the applicant bank should be allowed to make its case to the Board rather than rely on a district Reserve Bank as an intermediary. Determinations about which types of banks are legally eligible for Federal Reserve accounts, should be communicated to the public. This would encourage consistent decisionmaking and prevent banks of the same type from needlessly traveling the same unfruitful path. Finally, the Federal Reserve Board should consider procedures that would encourage consistency across the Federal Reserve Bank districts. Helpful procedures might include a centralized committee staffed with people from Federal Reserve Banks and Board to review all access requests, procedures requiring that Reserve Banks share their access decisions with each other, or an internal appeals process for denied access requests.

## I.   History of Fed Accounts and Payments

The Federal Reserve System (Federal Reserve) was created by Congress in 1913.[32] Today it contains three distinct parts. Heading the System is the Board of Governors of the Federal Reserve System (the "Federal Reserve Board" or the "Board") — an independent government agency with seven members who are appointed by the President and confirmed by the Senate.[33] The Board "is the governing body of the Federal Reserve

---

[29] *See infra* Part V.C.

[30] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021).

[31] *See infra* Part III.

[32] Federal Reserve Act of 1913, Pub. L. No. 63-43, 38 Stat. 251.

[33] 12 U.S.C. § 241; 44 U.S.C. § 3502(5) (providing a list of independent regulatory agencies). Until 1935, the Board of Governors of the Federal Reserve System was known simply as the Federal

Electronic copy available at: https://ssrn.com/abstract=4048081

System."[34] Next, a collection of twelve Federal Reserve Banks geograph-ically dispersed throughout the country acts as the "operating arms" of the System.[35] "The Federal Reserve Banks are private corporations whose stock is owned by the member commercial banks within their districts."[36] Third, the Federal Open Markets Committee sets monetary policy by, among other things, establishing target interest rates.[37]

Although the Federal Reserve is most well-known for its role in mon-etary policy, it has been a hub of payment systems from its inception.[38] Today the Federal Reserve Banks provide three payment systems: (1) a centralize check collections system, (2) the Automated Clearinghouse (ACH) network for processing batched electronic small-dollar payments, and (3) the Fedwire system for larger electronic payments.[39] The Federal Reserve Banks facilitate these payment services by providing accounts for depository institutions and using those accounts to settle payments be-tween banks.[40] The Federal Reserve Board oversees the Reserve Banks' provision of payment systems by developing regulations and exercising supervisory authority over the Reserve Banks.[41] This Part describes the Federal Reserve's historical provision of accounts and payment services.

---

Reserve Board. CARL H. MOORE, THE FEDERAL RESERVE SYSTEM: A HISTORY OF THE FIRST 75 YEARS 88 (1990).

[34] FED. RSRV. SYS., THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 7 (11th ed. 2021).

[35] *Id*. at 8.

[36] Committee for Monetary Reform v. Bd. of Governors of the Fed. Rsrv. Sys, 766 F.2d 538, 539-40 (D.C. Cir. 1985).

[37] FED. RSRV. SYS., *supra* note 34, at 12.

[38] *See* FED. RSRV. SYS., *supra* note 34, at 87.

[39] ANNUAL REPORT OF THE BD. OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM 55-62 (2020); BD. OF GOVERNORS OF THE FED. RESERVE, POLICIES: THE FEDERAL RESERVE IN THE PAYMENTS SYSTEM (3rd ed. 2001), https://www.federalreserve.gov/paymentsystems/pfs_frpay-sys.htm.

[40] FED. RSRV. SYS., *supra* note 34, at 86-87.

[41] 12 U.S.C. § 248(a) (j) (granting the Board authority '[t]o examine at its discretion the accounts, books, and affairs of each Federal reserve bank" and "[t]o exercise general supervision over . . . Federal reserve banks"); Fasano v. Fed. Rsrv. Bank of N.Y., 457 F.3d 274, 278 (3d Cir. 2006) (stating that the Board "loosely oversees the Federal Reserve Banks' operations"); ANNUAL REPORT OF THE BD. OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM 71 (2020) ("The Board's reviews of the Reserve Banks include a wide range of oversight activities, conducted primarily by its division of Reserve Bank Operations and Payment Systems."); FED. RSRV. SYS., *supra* note 34, at 86 ("In general, the Board is responsible for developing regulations and supervisory policies for elements of the payment system that fall within the Federal Reserve's jurisdiction.").

Electronic copy available at: https://ssrn.com/abstract=4048081

#### A.   *Member Accounts and Payment Services*

Originally, the Federal Reserve System provided financial services to the U.S. government and "member banks."[42] Under the Federal Reserve Act of 1913, nationally chartered banks must become "members" of the Federal Reserve by purchasing stock in the Federal Reserve Bank in their district.[43] State-chartered banks are also eligible to become members by purchasing stock, however, doing so requires them to "submit to the examination and regulations prescribed . . . by the Federal Reserve Board."[44]

Section 13 of the Federal Reserve Act authorized Federal Reserve Banks to receive deposits from "any of its member banks."[45] Accepting deposits allowed the Reserve Banks to function as bankers' banks—banks that provide services to commercial bank that are like the services commercial banks provide their customers.[46] It gave banks a new, safe place to keep reserves.[47] Accepting deposits was also crucial to the new Federal Reserve Banks' task of improving the payments system. The following subsections describe the development of the Federal Reserve's primary payment systems and the role of Federal Reserve Bank accounts in those systems.

#### 1.   Checks

Concern about the stability and efficiency of the check clearing process had partly fueled demand for a central bank.[48] Before creation of the Federal Reserve, check collection was a sometimes-time-consuming process. If a bank received a check drawn on a bank that it did not regularly do business with, it might have to send that check through several other

---

[42] Federal Reserve Act of 1913, Pub. L. No. 63-43 § 13, 38 Stat. 251, 263.

[43] *Id*. § 2, 38 Stat. at 251-52.

[44] *Id.* § 9, 38 Stat. at 259.

[45] *Id.* § 13, 38 Stat. at 263.

[46] M.K. LEWIS & K.T. DAVIS, DOMESTIC & INTERNATIONAL BANKING 139-40 (1987); Sharon A. Sweeney & Jane Ann Schmoker, *Federal Reserve Banks and the Payment System: Regulation J, Regulation CC, Operating Circulars, and Other Deposit Account Issues*, 51 CONSUMER FIN. L.Q. REP. 204, (1997).

[47] Before 1913 Act, banks would keep reserves in money center banks. MOORE, *supra* note 33, at 37; DONALD R. WELLS, THE FEDERAL RESERVE SYSTEM: A HISTORY 19 (2004).

[48]      Paul M. Connolly & Robert W. Eisenmenger, *The Role of the Federal Reserve in the Payments System*, 131, at 134, *in* THE EVOLUTION OF MONETARY POLICY AND THE FEDERAL RESERVE SYSTEM OVER THE PAST THIRTY YEARS: A CONFERENCE IN HONOR OF FRANK E. MORRIS (Fed. Reserve Bank of Boston, 2000).

Electronic copy available at: https://ssrn.com/abstract=4048081

banks to collect it.[49] In times of financial turmoil, banks sometimes feared that some checks were worthless and would refuse to even attempt to collect them.[50] Member bank deposits at the Federal Reserve Bank facilitated check processing because rather than having to collect cash or notes for checks, the Federal Reserve Banks could settle between banks by adjusting the balance of their accounts.[51] "The Congress may also have wished to encourage national banks to support the passage of the Federal Reserve Act. Their support was more likely if national banks received a valuable service such as check collection."[52] To encourage banks to use the check clearing services, the Federal Reserve provided the service to members for free.[53] "[B]y the mid-1920s, the value of checks collected by Reserve Banks had reached roughly 50 percent of the value cleared through clearing houses."[54]

As technology improved, so did the Federal Reserve's check processing systems. Among other things, the Federal Reserve adopted the use of magnetic ink on checks to facilitate automated check sorting and developed methods for electronic processing of checks.[55]

### 2.   Wire Transfers

Over time, the Federal Reserve added other payments services facilitated by Federal Reserve Bank accounts. First came wire transfers. Initially, the Federal Reserve Banks processed wire transfers through "Western Union and Postal Telegraph facilities."[56] These wires were not rapid

---

[49]   *See* MOORE, *supra* note 33, at 5; Connolly & Eisenmenger, *supra* note 48, at 132.

[50]   Alice M. Rivlin, *Statements to Congress*, 83 FED. RESERVE BULLETIN 878, 879 (1997) ("During the financial panic of 1907, payments were largely suspended throughout the country because many banks and clearinghouses refused to clear checks drawn on certain banks."); *see also* O.M. W. Sprague, *The Federal Reserve Act of 1913*, 28 QUARTERLY J. OF ECON. 213, 215 (1914) (noting that "the lack of" an organized system for collecting checks had "been of the most serious defects in [the U.S.] banking system").

[51]   Sprague, *supra* note 50, at 214.

[52]   Connolly & Eisenmenger, *supra* note 48, at 132.

[53]   James N. Duprey & Clarence W. Nelson, *A Visible Hand: The Fed's Involvement in the Check Payments System*, FED. RESERVE BANK OF MINNEAPOLIS Q. REV., Spring 1986, at 27; FED. RSRV. SYS., *supra* note 34, at 87; Connolly & Eisenmenger, *supra* note 48, at 134.

[54]   Stuart E. Weiner, *The Federal Reserve's Role in Retail Payments: Adapting to a New Environment*, 93 ECON. REV., no. 4, 2008, at 51.

[55]   FED. RSRV. SYS., *supra* note 34, at 90-92.

[56]   *Federal Reserve Operation in Payment Mechanisms: A Summary*, 62 FED. RSRV. BULL. 481, 486 (1976), https://fraser.stlouisfed.org/title/62/item/20419/toc/287392?start_page=26.

Electronic copy available at: https://ssrn.com/abstract=4048081

or secure enough for all payments, so in June 1918, the Federal Reserve System "installed a private Morse code system," known as Fedwire [57] This private system used leased telegraph wires to connect the Reserve Banks to the Board and each other.[58] Because the leased wire system had limited capacity, the Federal Reserve System also processed some payments using commercial telegraph lines that were already in operation. [59] "[T]ransfers of funds over the leased wires [were] accepted from and paid to member banks only."[60] While these wires were free for member banks, initially "[t]ransfers for the benefit or use of an individual, firm, corporation, or nonmember bank" were not allowed.[61] Later member banks were allowed to send wires through the leased system on behalf of others, but these wires were priced "based on the commercial wire rate."[62] In contrast member banks could send wires over commercial lines in any amount and could send wires on behalf of "any bank, individual, firm or corporation."[63] Wire transfers were settled through banks' Federal Reserve Bank accounts.

Today Fedwire operates using IP protocols.[64] Federal Reserve member banks pay for wires based on their cost.

### 3.   ACH Payments

In 1987, Federal Reserve Banks began processing automated clearinghouse (ACH) payments.[65] ACH payments were developed by consortiums of banks and the Federal Reserve as an alternative to paper checks, particularly for large batches of recurring payments.[66] ACH payments, for

---

[57] *Id.*

[58] WALTER E. SPAHR, THE CLEARING AND COLLECTION OF CHECKS, 291-329 (1926).

[59] Bd. of Governors of the Fed. Reserve Sys., The Fedwire Funds Service: Assessment of Compliance with the Core Principles for Systemically Important Payment Systems 7-8 (July 2014), https://www.federalreserve.gov/paymentsystems/files/fedfunds_coreprinciples.pdf.

[60] Letter S-93 from Chester Morrill, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys., to the Presidents of All Federal Reserve Banks 1 (May 2, 1938), https://fraser.stlouisfed.org/archival/4957/item/507072?start_page=3 [hereinafter Letter from Chester Morrill (May 2, 1938)].

[61] *Id.*

[62] *Id.* at 3; Letter S-164 from Chester Morrill, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys., to All Federal Reserve Bank Presidents (June 12, 1939), https://fraser.stlouisfed.org/archival/4957/item/507367. The amount of the charge was "based on the commercial wire rate." *Id.*

[63] *Id.*

[64] *Id*. at 8.

[65] FED. RSRV. SYS., *supra* note 34, at 87, 90.

[66] *Id*. at 93; Connolly & Eisenmenger, *supra* note 48, at 137.

Electronic copy available at: https://ssrn.com/abstract=4048081

example, allow an employer to make regular transfers of payroll money from its account to the accounts of its employees.[67] "As an ACH operator, the Reserve Banks receive files of payments from originating institutions, edit and sort the payments, deliver the payments to receiving institutions and settle the payments by crediting and debiting the institutions' accounts."[68] Initially, ACH transactions were processed using magnetic tapes.[69] The use of magnetic tapes "required physical transport of tapes between the participants in the ACH system."[70] The Federal Reserve's system for transporting checks could also be used to transport the tapes, making the Federal Reserve Banks an attractive choice to serve as an ACH operator.[71] Thus, as banks organized themselves into regional automated clearinghouse associations, they nearly always asked the Federal Reserve to operate their ACH systems.[72] The Federal Reserve's role at the center of ACH payments was further cemented because it operated a telecommunications network that linked the regional clearinghouses.[73] Consequently, the Federal Reserve bore at least some of the cost of providing ACH payments.[74] Nevertheless, it was the regional clearinghouses, comprised of commercial banks, that controlled access and pricing to ACH payments. They "permitted all commercial banks (including banks that were not

---

[67] FED. RSRV. SYS., *supra* note 34, at 93.

[68] *Id*. at 93.

[69] Connolly & Eisenmenger, *supra* note 48, 137-38.

[70] FED. RSRV. SYS., *supra* note 34, at 94, 129.

[71] *Id*.; Connolly & Eisenmenger, *supra* note 48, 137-38.

[72] Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, ECON. REV., July/Aug. 1985, at 23, 25, (noting that "[t]he first privately operated ACH was not formed until December 1975, when the New York ACH (NYACH) began operations"); DONALD I. BAKER & ROLAND E. BRANDEL, THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS 3.06 (2011) ("[R]egional ACH associations entered into individual agreements with . . . Reserve Banks for ACH processing pursuant to the operating rules of those associations. The arrangements also encompassed delivery and settlement services.")

[73] Kuprianov, *supra* note 72, at 25.

[74] *See Federal Reserve System Budget: Hearing Before the S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 39 (1977) (written statement of Philip E. Coldwell, Member, Bd. of Governors, Fed. Rsrv. Sys.) ("The Federal Reserve performs only 1 of the 4 major functions necessary to process ACH payments. The other functions are performed by the corporation originating the payment, its depositing financial institution and the receiving financial institution. Federal Reserve expenses for ACH processing represent a small percentage of the total costs of making these types of payments. The financial and business community absorb over 90% of the cost."); Stanley M. Gorinson, *Overview: Essential Facilities and Regulation*, 58 ANTITRUST L.J. 871, 873 (1989) (stating that "[m]ost of the real operating costs of . . . . ACHs" was born by the Federal Reserve).

Electronic copy available at: https://ssrn.com/abstract=4048081

members of the Federal Reserve System) access," but excluded other financial institutions like thrifts.[75] The regional clearinghouse networks allowed their member banks to process ACH payments "at no explicit charge."[76]

Much has changed since the early years of ACH payments. Payments are now processed electronically.[77] Rather than many regional clearinghouses, we have two ACH systems—one operated by the Federal Reserve Banks and one operated by the Clearinghouse Payment Company L.L.C.[78] The Monetary Control Act of 1980 changed access to and pricing for the Federal Reserve's ACH system.[79] But the Federal Reserve Banks remain a major part of the ACH payment network.

### B.   Nonmember Accounts

Although the Federal Reserve Banks initially only opened accounts for its member banks, Congress expanded access in 1917.[80] When the Federal Reserve was created, Congress hoped that member banks use of its check clearing system would stabilize the banking system in times of financial turmoil, but not enough banks were using the system.[81] The Federal Reserve thought the situation would improve if more banks cleared items through the Federal Reserve Banks.[82] Accordingly, it asked Congress to expand the Federal Reserve Banks' authority to hold deposits.[83] Under the 1917 amendments, non-member banks and trust companies became eligible to open Federal Reserve accounts "solely for the purposes of exchange or collection."[84] In addition to allowing check clearing, these

---

[75] Kuprianov, *supra* note 72, at 26; *see also* Robert E. Lee, *Dialing for Dollars: Communications Regulation and Electronic Fund Transfer Systems*, 27 FED. COMM. B.J. 7, 19 (1974)

[76] *Id*. at 25.

[77] FED. RSRV. SYS., *supra* note 34, at 93.

[78] U.S. GOV'T ACCOUNTABILITY OFF., GAO-16-614, PAYMENT SERVICES: FEDERAL RESERVE'S COMPETITION WITH OTHER PROVIDERS BENEFITS CUSTOMERS, BUT ADDITIONAL REVIEWS COULD INCREASE ASSURANCE OF COST ACCURACY 9 (2016).

[79] Monetary Control Act of 1980, Pub. L. No 96-221 § 105, 94 Stat. 132, 139-41; *see infra* Part I.C. (discussing the passage of the Act).

[80] Act of June 21, 1917, Pub. L. No. 65-25, § 4, 40 Stat. 232, 235.

[81] Duprey & Nelson, *supra* note 53, at 26.

[82] THIRD ANNUAL REPORT OF THE FEDERAL RESERVE BOARD COVERING OPERATION FOR THE YEAR 1916, at 28 (1917).

[83] *Id*. at 12.

[84] Act of June 21, 1917, Pub. L. No. 65-25, § 4, 40 Stat. 232, 235.

Electronic copy available at: https://ssrn.com/abstract=4048081

accounts also allowed nonmember banks to send and receive wire transfers through the Federal Reserve's leased commercial telegraph wires.[85] The Federal Reserve required non-member banks to hold a balance in their clearing accounts sufficient to offset collection items in transit.[86] It explained that the "balances which nonmember banks participating in the clearing plan [would] be required to keep with Federal Reserve Banks [would] be sufficiently large to protect member banks and justify Federal Reserve Banks in undertaking the service."[87]

The Federal Reserve intended the 1917 amendments to "encourage[]" nonmember banks "to deposit their reserves with the Federal Reserve Banks."[88] Initially, "several large nonmember institutions opened" clearing accounts, but most of those banks soon became member banks.[89] Many "[n]on-member banks found it more convenient to use the Federal Reserve Collection system through their member bank correspondents."[90]

As correspondent banks began to fail during the Great Depression, Federal Reserve Bank accounts became more attractive.[91] However there was confusion about which non-member banks were entitled to open accounts. In 1934, the Chicago Fed wrote to the Federal Reserve Board asking about the "circumstances and conditions under which clearing accounts of nonmember banks should be accepted."[92] In particular, the Chicago Fed was concerned about opening an account for a nonmember bank

---

[85] Letter from Chester Morrill (May 2, 1938, *supra* note 60, at 1. Nonmember clearing banks could only send commercial wires in multiples of $100. *Id*. Both member and nonmember clearing banks paid the cost of telegrams sent transferring money over commercial wires. *Id*. at 4.

[86] Act of June 21, 1917, Pub. L. No. 65-25, § 4, 40 Stat. 232, 235.

[87] THIRD ANNUAL REPORT OF THE FEDERAL RESERVE BOARD COVERING OPERATION FOR THE YEAR 1916, 28 (1917).

[88] *Review of the Month*, 3 FED. RESERVE BULL. 497, 501 (1917).

[89] *See* FOURTH ANNUAL REPORT OF THE FEDERAL RESERVE BOARD COVERING OPERATIONS FOR THE YEAR 1917, 13 (1918) (stating that "the balances now carried by nonmember banks are relatively small amounting on December 31, [1917] to $16,480,000"); Howard H Preston, *The Federal Reserve Banks' System of Par Collection*, 28 J. POL. ECON. 565, 569 (1920) (stating that "the number of clearing accounts has never been large.").

[90] SPAHR, *supra* note 58, at 198 (1926); *see also* Duprey & Nelson, *supra* note 53, at 27.

[91] Stephen Quinn & William Roberds, *The Evolution of the Check as a Means of Payment: A Historical Survey*, 93 No. 4 ECON. REV. 1, 19 (2008).

[92] Letter B-1044 from Chester Morrill, Sec'y, Fed. Reserve Bd. to all Chairmen of the Fed. Reserve Banks except the Chairman for the Federal Reserve Bank of Chic. (Dec. 20, 1934), https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-data-requested-federal-reserve-banks-regarding-clearing-accounts-nonmember-banks-505805.

Electronic copy available at: https://ssrn.com/abstract=4048081

that was ineligible for Federal Reserve membership. The nonmember bank wanted "clearing privileges at the Federal Reserve Bank for the purpose of avoiding exchange and collection charges now made by its city correspondent."[93]   Prior to this request, the Chicago Fed had been stingy in granting clearing accounts, believing that "member banks should have certain privileges that the nonmember banks are not entitled to."[94] To respond to the inquiry, the Federal Reserve Board surveyed the district Reserve Banks. Their responses revealed a range of practices.

Some of the Reserve Banks welcomed clearing accounts for nonmember banks. The San Francisco Fed allowed a nonmember bank to maintain a clearing account "provided the account [was] not operated at a loss to the Federal Reserve Bank."[95] It explained that this practice generated "good will" and that more than a third of nonmember banks within the San Francisco district had clearing accounts.[96] The St. Louis Fed also opened many accounts.[97] It required the nonmember banks "to keep a collected funds balance . . . equal to approximately 50% of what they would be required to carry . . . were they member banks."[98] The Federal Reserve Board noted that "many of the nonmember clearing accounts . . . maintained with the Federal reserve banks [were] not being currently used solely for purposes of exchange or collection as required by section 13 of the Federal Reserve Act."[99]

Other Federal Reserve Banks were more cautious about accepting nonmember clearing accounts. The Minneapolis Fed allowed accounts for nonmembers provided they "carr[ied] a collected funds balance in the account equivalent to the amount in process of collection."[100] However, the

---

[93] *Id.*

[94] Letter X-9187 from Chester Morrill, Secr'y, Fed. Reserve Bd., to E.M. Stevens, Chairman, Fed. Reserve Bank of Chi., encl. 6 (Apr. 26, 1935), https://fraser.stlouisfed.org/ar-chival/4957/item/505912 [hereinafter Letter from Chester Morrill (Apr. 26, 1935)] (stating that the Chicago Fed held only one clearing account).

[95] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94.

[96] *Id.* encl. 5-6 (showing that the San Francisco Fed held 128 clearing accounts).

[97] *Id.* at encl. 6 (showing that the St. Louis Fed held 95 clearing accounts).

[98] *Id.* at encl 5.

[99] Minutes of Meeting of the Federal Reserve Board 14 (Apr. 29, 1935).

[100] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at encl. 3. Similarly, the Atlanta Fed explained that "[p]ractically the only requirements for opening non-member clearing accounts are that the non-member bank will remit at par for cash letters containing checks drawn on it and will maintain a balance on our books equal at all times to the amount of items outstanding for collection for its account." *Id.* at encl. 2.

Electronic copy available at: https://ssrn.com/abstract=4048081

Minneapolis Fed denied requests of banks seeking to "deposit idle funds."[101] The Cleveland Fed interviewed applicants seeking to open clearing accounts and required that the bank provide financial statements.[102]

Finally, some Federal Reserve Banks closed, discouraged, or refused nonmember clearing accounts. The Philadelphia Fed explained that it had opened several nonmember clearing accounts, but later closed them because the nonmember banks "constantly were attempting to draw against uncollected items."[103] Two of the banks whose accounts were closed were "still largely indebted to the Federal Reserve bank."[104] The New York Fed discouraged clearing accounts because "in actual practice we find it rather difficult to confine these accounts to" clearing.[105] The Richmond Fed had no clearing accounts.[106] It explained that it was not convinced it could legally require nonmember banks to hold a balance sufficient to offset the risk of providing the clearing.[107] The Richmond Fed pointed out that nonmember banks could get many of the same benefits of a clearing account indirectly through a correspondent bank.[108] The Kansas City Fed also did not have any clearing accounts.[109] When nonmember banks inquired about clearing, the Kansas City Fed explained that a clearing account did "not entitle a nonmember bank to the other facilities of the Federal reserve bank such as telegraphic transfers of funds, shipments of currency at the expense of the Federal reserve bank, safekeeping of securities, et cetera."[110]

---

[101] *Id.* at encl. 3-4 (explaining that the banks seeking these accounts thought it "would be convenient to pay for subscriptions to Treasury Department offerings by authorizing us to chair their accounts or to use the accounts in handling purchases and sales of direct obligation or the Government through our Securities Department"). The Dallas Fed explained "that where a nonmember bank plainly manifests that its only desire is to concentrate some of its fund with us it has been our general policy to disapprove its application." *Id.* at 5. However, "immediately following the banking holiday of 1933" the Dallas Fed "relaxed this rule somewhat." *Id.*

[102] *Id.* at encl. 1. The Cleveland Fed may have conducted this investigation because it anticipated that the banks requesting clearing accounts would soon apply for Federal Reserve membership. *Id.*

[103] *Id.* at encl. 1.

[104] *Id.*

[105] *Id.* At that time, "the Federal Reserve Bank of New York was maintaining clearing accounts for three private financial institutions." Minutes of Meeting of the Fed. Rsrv. Bd. 14 (Apr. 29, 1935).

[106] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at encl. 6.

[107] *Id.* at encl. 2.

[108] *Id.*

[109] *Id.* at encl. 6.

[110] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at encl. 4.

Electronic copy available at: https://ssrn.com/abstract=4048081

In response to the Chicago Fed's inquiry, the Board recommended a permissive approach because it thought the issue of accounts for nonmember banks would soon be moot. Congress had just created a new federal deposit insurance program. Under the Banking Act of 1933, state banks that sought federal deposit insurance were required to become members of the Federal Reserve System.[111] Accordingly, the Board explained that Reserve Banks should take "a liberal attitude . . . toward [nonmember] applications provided, of course the bank agree[d] to comply with the applicable provisions of the Federal Reserve Act and the rules and regulations issued thereunder."[112] The Board also decided that "in view of the fact that all insured banks must be member of the Federal Reserve System . . . [, it] did not wish to require the Federal reserve banks to discontinue any of the nonmember clearing accounts even though they were not at present being actively used solely for exchange or collection purposes."[113]

However, the requirement that federally insured banks join the Federal Reserve System was never implemented. Only a few months after the Board replied to Chicago Fed, Congress removed the mandatory Fed membership provision from the law for small state banks.[114] In 1939, Congress eliminated the membership requirement completely.[115] Thus, the Board's reasoning supporting liberal opening of clearing account disappeared. The Board's only other guidance to the Federal Reserve Banks was "that requests for the establishment of clearing accounts by nonmember banks should be passed upon by [Reserve Bank] directors in light of all the circumstances surrounding each application."[116] By the 1940's there were fewer non-member banks with clearing accounts, but they were still unevenly dispersed among the Federal Reserve Banks.[117] This pattern continued through the 1960s.[118]

---

[111] Banking Act of 1933, Pub. L. No. 73-66, § 8, 48 Stat. 162, 170 (giving insured banks until July 1, 1936 to become Fed members); Act of June 16, 1934, Pub. L. No. 73-362, § 8, 48 Stat. 969, 970 (extending the deadline for insured banks to be members to July 1, 1937).

[112] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at 2.

[113] Minutes of Meeting of the Federal Reserve Board 14 (Apr. 29, 1935).

[114] Banking Act of 1935, Pub. L. No. 74-305, §101, 49 Stat. 684, 703.

[115] Act of June 20, 1939, Pub. L. No. 76-135, § 2, 53 Stat. 842.

[116] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at 2.

[117] Bd. of Governors of the Fed. Rsrv. Sys., G.4 State Member Banks of the Federal Reserve (1944), https://fraser.stlouisfed.org/title/1063#40923.

[118] *See infra*, Table 1: Number of Nonmember Clearing Accounts Carried by Federal Reserve Banks.

Electronic copy available at: https://ssrn.com/abstract=4048081

In 1964 the Federal Reserve Board again provided the Reserve Banks guidance on which banks could open clearing accounts. The Board received an inquiry about whether branches of foreign banks and private banks were "nonmember banks" eligible to open "clearing accounts" at Reserve Banks.[119] In response, the Board noted that these entities engaged in banking activities like those typically performed by commercial banks.[120] In addition, both types of entities were subject to state supervision.[121] Accordingly, the Board concluded that foreign bank branches and private banks were "banks" eligible for clearing accounts.[122] Nevertheless, the Board reiterated that opening of such accounts was within the "discretion" of the regional Reserve Banks.[123]

From the end of the Great Depression through 1980, the popularity of checks expanded increasing the demand for check processing services. Notwithstanding the increased demand, the number of clearing accounts at Federal Reserve Banks declined.[124] Most small nonmember banks probably concluded it was more convenient to settle their clearing through correspondent accounts.[125] In 1972 the Fed opened remote check processing centers (RCPCs) throughout the country.[126] Nonmember banks and thrifts in a check processing region could send checks drawn on other banks in the region directly to the RCPC for clearing as long as they settled for those items through the reserve account of a correspondent bank.[127] In

---

[119] *Domestic Branches of Foreign Banks and Private Banks as "Banks,"* 50 FED. RSRV. BULL. 168-69 (1964).

[120] *Id.* at 168-69.

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *See infra* Table 1: Number of Nonmember Clearing Accounts Carried by Federal Reserve Banks.

[125] *See* Hal S. Scott, *The Risk Fixers*, 91 HARV. L. REV. 737, 751 (1978) (explaining that the Federal Reserve clearing privilege "was still of limited value to nonmember who were in deficit position on nonmember clearing—i.e., those banks which were drawn on more than they collected items drawn on others").

[126] Fed. Rsrv. Bank of New York, Board of Governors' Policy Statement on Payments Mechanism, Circular No. 6749 (June 18, 1972),  https://fraser.stlouisfed.org/title/466/item/14499;  FED. RSRV. SYS., *supra* note 34, at 125.

[127] *Oversight on the Federal Reserve System's Budget for Calendar Year 1977, Hearing Before the S. Comm. On Banking, Hous., & Urban Affairs*, 95th Cong. 38 (1977) (letter from Philip E. Coldwell, Member Bd. of Governors of the Fed. Rsrv. Sys. to William Proxmire, Senator); Bruce J. Summers, *Correspondent Services, Federal Reserve Services, and Bank Cash Management Policy*, ECON. REV., Nov./ Dec. 1978, at 29, 33 ("[N]onmembers are granted Regional Check Processing

Electronic copy available at: https://ssrn.com/abstract=4048081

other words, nonmember banks no longer needed to maintain a Federal Reserve clearing account to clear checks directly through the Federal Reserve.[128] Inflation made holding funds in a non-interest-bearing Federal Reserve account less attractive when compared with interest-bearing correspondent accounts.[129] Indeed, even small member banks that were required to hold a Federal Reserve Bank account often chose to settle checks through their correspondent bank.[130] By the end of the 1970s, nonmember clearing accounts had mostly disappeared.[131]

---

Center (RCPC) area clearing privileges on the same terms as are member banks, except that they must settle through a member correspondent's reserve account."); BAKER & BRANDEL, *supra* note 72, at § 23:01 (noting that RCPC clearing privileges extended to thrifts).

[128] Russell Dale Morris, An Analysis of Certain Aspects of the Federal Reserve System Payments Mechanism Program 9 (1973) (Ph.D. dissertation, The Ohio State University), http://rave.ohi-olink.edu/etdc/view?acc_num=osu1264525813.

[129] *Cf.* GEORGE J. BENSTON, FEDERAL RESERVE MEMBERSHIP: CONSEQUENCES, COSTS, BENEFITS AND ALTERNATIVES 28-57 (1978) (explaining that accelerating inflation led to declining membership in the Federal Reserve System and lower account balances in Federal Reserve accounts).

[130] R. Alton Gilbert, *Utilization of Federal Reserve Bank Services by Member Banks: Implications for the Costs and Benefits of Membership*, REVIEW (FED. RSRV. BANK OF ST. LOUIS), Aug. 1977, at 2, 11.

[131] *See Monetary Control and the Membership Problem: Hearings on H.R. 13476, H.R. 13477, H.R. 12706, and H.R. 14072 Before the H. Comm. on Banking, Fin. & Urban Affairs*, 95th Cong. 119, 127 (1978) (Bd. of Governors of the Fed. Rsrv. Sys. Preliminary Proposal) ("At present, Federal Reserve Banks maintain virtually no accounts for nonmember depository institutions.").

Electronic copy available at: https://ssrn.com/abstract=4048081

| Table 1: Number of Nonmember Clearing Accounts Carried by Federal Reserve Banks[132] | | | | | |
|---|---|---|---|---|---|
| **Federal Reserve District** | **Year** | | | | |
| | **1934** | **1944** | **1954** | **1964** | **1974** |
| District 1 – Boston | 1 | 2 | 2 | 0 | 0 |
| District 2 – New York | 15 | 37 | 37 | 25 | 2 |
| District 3 – Philadelphia | 3 | 5 | 4 | 0 | 0 |
| District 4 – Cleveland | 3 | 2 | 3 | 0 | 0 |
| District 5 – Richmond | 0 | 0 | 0 | 0 | 0 |
| District 6 – Atlanta | 15 | 7 | 2 | 2 | 2 |
| District 7 – Chicago | 1 | 2 | 1 | 0 | 0 |
| District 8 – St. Louis | 95 | 35 | 37 | 0 | 0 |
| District 9 – Minneapolis | 30 | 2 | 1 | 1 | 1 |
| District 10 – Kansas City | 0 | 0 | 0 | 0 | 0 |
| District 11 – Dallas | 10 | 5 | 3 | 1 | 0 |
| District 12 – San Francisco | 128 | 110 | 83 | 104 | 1 |
| **Total** | 301 | 207 | 173 | 133 | 6 |

### C.  Monetary Control Act of 1980

As Parts I.A and I.B explain, the Federal Reserve sometimes provided accounts and payment services to nonmember banks. This was not without controversy. For example, beginning in 1917, nonmember banks could open clearing accounts that allowed them to settle checks and wire

---

[132] Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at encl 6; Bd. of Governors of the Fed. Rsrv. Sys., G.4 State Member Banks of the Federal Reserve (1944), https://fraser.stlouisfed.org/title/1063#40923; Bd. of Governors of the Fed. Rsrv. Sys., G.4 State Member Banks of the Federal Reserve System 18-20 (1954), https://fraser.stlouisfed.org/title/1063#40911; Bd. of Governors of the Fed. Rsrv. Sys, G.4 State Member Banks of the Federal Reserve System 17-18 (1964), https://fraser.stlouisfed.org/title/1063#40933; Bd. of Governors of the Fed. Rsrv. Sys., G.4 State Member Banks of the Federal Reserve System (1974), https://fraser.stlouisfed.org/title/1063#40901.

Electronic copy available at: https://ssrn.com/abstract=4048081

transfers cleared through Federal Reserve Systems.[133] This led to questions about which banks could open clearing accounts.[134] With the creation of the regional check processing centers, banks without a Federal Reserve account could send checks from their region for clearing if they settled through a correspondent bank's Federal Reserve account.[135] Accessing Federal Reserve payments through a correspondent bank often meant that correspondent charged for these services.[136] This led to complaints about the Federal Reserve's "free" pricing for member banks with accounts.[137] Of course, membership in the Federal Reserve System was not free---members had to maintain reserve balances at the Federal Reserve Banks.[138]

Questions about access to Federal Reserve payment systems and the cost of the payments came to a head with the advent of ACH networks.[139] Although the Federal Reserve Banks handled ACH clearing and settlement for most regional clearinghouses, the clearinghouse themselves were organizations of commercial banks.[140] Thrift institutions wanted membership in the clearinghouses and access to process ACH payments, but commercial banks were not welcoming.[141] Eventually, the bank-controlled clearinghouses relented and allowed thrifts to process ACH transactions if they acted through a correspondent bank that was a member of the clearinghouse.[142] Still thrifts believed this "discriminatory access policy put

---

[133] Act of June 21, 1917, Pub. L. No. 65-25, § 4, 40 Stat. 232, 235.

[134] *See infra* notes 92-123 and accompanying text.

[135] Summers, *supra* note 127, at 33.

[136] Kuprianov, *supra* note 72, at 24.

[137] *See* BAKER & BRANDEL, *supra* note 72, at § 23.2 (stating that the pricing system "encouraged bank customers to write more checks by allowing them and their banks to avoid paying the full cost of clearance").

[138] Connolly & Eisenmenger, *supra* note 48, at 141 (describing the Federal Reserve Banks as using "country club" pricing because "[i]n return for a stiff annual fee, based on size—the reserve requirement burden—each correspondent bank received an array of financial services free of charge, and could charges its respondent banks for access to these free services").

[139] Fredric H. Karr, *Automated Clearinghouses: The Case for Barring Thrift Institutions*, 95 BANKING L.J. 823, 828 (1978).

[140] Kuprianov, *supra* note 72, at 24.

[141] *Id.* "Bankers viewed the thrift industry's attempts to gain direct access to ACH services as an attempt to circumvent the legal restrictions that prohibited thrifts from offering demand deposits." *Id.* at 26. Banks also believed that thrifts were not entitled to the same access because they had not helped develop the ACH processing networks. *Id.*

[142] Kuprianov, *supra* note 72, at 26; Lee, *supra* note 75.

Electronic copy available at: https://ssrn.com/abstract=4048081

them at a competitive disadvantage."[143] The thrifts' complaints caught the attention of the Department of Justice's Antitrust Division. It brought lawsuits against the California Automated Clearinghouse Association and the Rocky Mountain Automated Clearinghouse Association alleging that they were acting as illegal monopolies.[144] Among other things, the Department of Justice believed that "the Federal Reserve's almost total subsidy of the ACH operations made independent competitive alternatives economically unfeasible."[145] Both of the suits were dismissed after the clearinghouses agreed to allow the thrifts access.[146]

The controversy over ACH access and pricing, put pressure on the Federal Reserve to rethink access and pricing for check clearing and wire transfer services.[147] At the same time, however, the Federal Reserve was facing a membership crisis precipitated by rising interest rates.[148] The Federal Reserve required member banks to maintain relatively large reserves, but it did not pay interest on those reserves. In contrast, nonmember banks and thrifts had lower reserve requirements.[149] When the high interest rates of the 1970s hit, "the cost to banks of maintaining required reserves rose and banks began to withdraw from the System."[150] The Federal Reserve worried that with fewer members it would have less influence on the

---

[143] Kuprianov, *supra* note 72, at 26; *see also* Karr, *supra* note 139.

[144] United States v. California Automated Clearing House Ass'n, No. 77-1634-LTZ (C.D. Cal. Dismissed Oct. 28, 1977); United States v. Rocky Mountain Automated Clearing House Ass'n, Civ. No. 77-A-391 (D. Colo. 1977) (dismissed Nov. 17, 1977).

[145] BAKER & BRANDEL, *surpa* note 72,  at § 22.5..

[146] Gorinson, *supra* note 74, at 874.

[147] Kuprianov, *supra* note 72, at 30.

[148] *See Federal Reserve Requirements, Hearings on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm on Banking, Housing, & Urban Affairs*, 96 Cong. 5 (1980) (statement of Paul A. Volcker, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.) (noting the Federal Reserve had "lost 69 banks with some $7 Billion in deposit in the last 4 months"); Marvin Goodfriend & Monica Hargraves, *A Historical Assessment of the Rationales and Functions of Reserve Requirements*, ECON. REV., Mar.-Apr. 1983, at 3, 16 n.67 (noting that "[t]he Federal Reserve Board published legislative recommendations for dealing with the membership problem in each of its 1970s Annual Reports").

[149] *Monetary Control and the Membership Problem: Hearings on H.R. 13476, H.R. 13477, H.R. 12706, and H.R. 14072 Before the H. Comm. on Banking, Finance & Urban Affairs*, 95th Cong. 80 (1978) (testimony of G. William Miller, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.); Richard H. Timberlake, Jr., *Legislative Construction of the Monetary Control Act of 1980*, 75 AM. ECON. REV. 97, 98 (1985).

[150] Kuprianov, *supra* note 72, at 28.

Electronic copy available at: https://ssrn.com/abstract=4048081

money supply.[151] It also worried that if it charged member banks for payment services, even more banks would choose to forgo Federal Reserve membership.[152] Instead it recommended universal reserve requirements.[153] Unsurprisingly, nonmember banks and thrifts were not enthusiastic about the possibility of higher reserve requirements.[154]

Congress began holding hearings to consider the Federal Reserve's membership problems, reserve requirements, and payment systems access and pricing.[155] The resulting piece of legislation — The Monetary Control Act of 1980[156] — was largely a compromise.[157] The Act addressed the Federal Reserve's membership problems by requiring that all "depository institutions" hold comparable reserves.[158] The reserves can be held "in the Federal Reserve bank of which [the depository institution] is a member or at which it maintains an account" or in a correspondent bank with a Federal Reserve account.[159] With this uniform reserve requirement, "[m]ember

---

[151] *Federal Reserve Requirements Act of 1978: Hearings on S.3304 Before S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 14 (1978) (written statement of G. William Miller, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.).

[152] *Monetary Control and the Membership Problem: Hearings on H.R. 13476, H.R. 13477, H.R. 12706, and H.R. 14072 Before the H. Comm. on Banking, Finance & Urban Affairs*, 95th Cong. 87 (1978) (testimony of G. William Miller, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.).

[153] 65th ANNUAL REPORT OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM 317 (1978); Timberlake, *supra* note 149, at 99.

[154] Goodfriend & Hargraves, *supra* note 148, 17.

[155] *Monetary Control and the Membership Problem: Hearings on H.R. 13476, H.R. 13477, H.R. 12706, and H.R. 14072 Before the H. Comm. on Banking, Finance & Urban Affairs*, 95th Cong. (1978); *Federal Reserve Requirements Act of 1978: Hearings on S.3304 Before S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. (1978); *Monetary Control: Hearing on H.R. 7 Before H. Comm. on Banking, Fin. & Urban Affairs*, 96th Cong. (1979); *Monetary Policy Improvement Act of 1979: Hearings on S.85 and S.353 Before the S. Comm. on Banking, Housing, & Urban Development*, 96th Cong. (1979); *Federal Reserve Requirements, Hearings on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm on Banking, Housing, & Urban Affairs*, 96 Cong. (1980).

[156] Pub. L. No. 96-221, 94 Stat. 132 (1980).

[157] Goodfriend & Hargraves, *supra* note 148, at 17; Ben Weberman, *If It Looks Like a Bank and Acts Like a Bank . . .*, FORBES, Sept. 29, 1980, at 33.

[158] Monetary Control Act of 1980, Pub. L. No. 96-221 § 103, 94 Stat. 132, 133-34 (codified at 12 U.S.C. § 461(b)(2)). The reserve requirements were phased in over an eight-year period. *Id.* § 103, 94 Stat. at 138.

[159] Monetary Control Act of 1980, Pub. L. No. 96-221 § 104, 94 Stat. 132, 139 (codified at 12 U.S.C. § 461(c)(1)).

Electronic copy available at: https://ssrn.com/abstract=4048081

banks can no longer avoid the cost of holding sterile reserves by simply withdrawing from membership in the Federal Reserve System."[160]

Thrifts and nonmember banks got something they were seeking too: access to Federal Reserve payment services at the same price as member banks.[161] The Act requires the Board to establish pricing principles and fee schedules for its payment services, including check clearing and collection, wire transfers, ACH payments, coin and currency services, and new payment services the Federal Reserve system offers.[162] The Act provides a set of "principles" for the Board to follow in setting the fees. Relevant here:

> All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.[163]

One thrift representative called it a "new ballgame."[164]

Finally, the Monetary Control Act allowed Federal Reserve Banks to receive deposits from "other depository institutions."[165] It also broaden the scope of institutions eligible to maintain Federal Reserve accounts "solely for the purposes of exchange or collection" to include "other depository institutions" provided that the account holder "maintains with the Federal Reserve bank of its district a balance in such amount as the Board determines taking into account items in transit, services provided by the Federal Reserve bank, and other factors as the Board may deem appropriate."[166]

---

[160] Elijah Brewer III, *The Depository Institutions Deregulation and Monetary Control Act of 1980*, 4 No. 15 Econ. Persps. 3, 17 (1980).

[161] Kuprianov, *supra* note 72, at 33.

[162] Monetary Control Act of 1980, Pub. L. No. 96-221 § 107, 94 Stat. 132, 140-41 (codified at 12 U.S.C. § 248(a)).

[163] *Id.* at (codified at 12 U.S.C. § 248a(c)(2)).

[164] John H. Shain, *Monetary Control Act of 1980 Challenges Banking Industry*, Am. Banker, Apr. 15, 1980, at 10 (quoting a thrift representative).

[165] Pub. L. No. 96-221 § 105, 94 Stat. 132, 139 (codified at 12 U.S.C. § 342). Previously deposits were limited to "member banks." *See supra* notes 45-47 and accompanying text.

[166] Pub. L. No. 96-221 § 105, 94 Stat. at 140 (codified at 12 U.S.C. § 342).

Electronic copy available at: https://ssrn.com/abstract=4048081

Who are these "depository institutions" that must hold reserves, may open accounts at Federal Reserve banks, and may purchase Federal Reserve payments services at the same price as member banks? According to the statute they are federally insured banks, mutual savings banks, saving banks, savings associations, and credit unions, as well as any of those entities that are eligible to make application to become federally insured.[167] As Part II will discuss, the Monetary Control Act left some questions about the Federal Reserve's authority to grant and deny access to its accounts and payment services. Nevertheless, the Monetary Control Act provided more access to the Federal Reserve's accounts and payment systems than ever before.

### D.  Master Accounts

Following the passage of the Monetary Control Act, the Federal Reserve Banks began encouraging nonmember banks and thrifts to use their payment services.[168] Soon the Reserve Banks were opening accounts for newly eligible financial institutions. The Federal Reserve Banks started using the term "master accounts" in 1998.[169] Before that time, some banks held more than one Federal Reserve account and some banks had accounts at more than one Federal Reserve Bank.[170] The Federal Reserve Banks consolidated these accounts "into a single (master) account" to better accommodate newly authorized interstate bank branching.[171] With the new "master account" system, the Federal Reserve no longer separated "reserve accounts" and "clearing accounts."[172] A "master account" is "the record of financial transactions that reflects the financial rights and obligations of an accountholder and the Reserve Bank with respect to each

---

[167] 12 U.S.C. § 461.

[168] *Cf.* James Rubenstein, *Fed. Regions Go on Road to Brief New Constituents*, AM. BANKER, Sept. 18, 1980, at 3 (reporting that the Minneapolis Fed sent nonmember banks and credit unions an invitation to informational meetings stating that "[w]hile services will not become available until next year, it is not too early to learn about what the Federal Reserve has to offer").

[169] Press Release, Fed. Rsrv. Bank of St. Louis (May 2, 1996), https://fraser.stlouisfed.org/files/docs/publications/frbsl_news/frbsl-news-release-19960502.pdf.

[170] *Id.*

[171] Fed. Rsrv. Bd, Interstate Branching: New Account Structure, https://www.federalreserve.gov/generalinfo/isb/qanda.htm (last updated Sept. 27, 2002).

[172] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4048081

other, and where opening, intraday, and closing balances are determined."[173] Banks were then allowed flexibility to organize subaccounts within the master account.[174]

At the same time the Federal Reserve Banks began using master accounts, they adopted uniform operating circulars to "make it easier for depository institutions to conduct business with multiple Reserve Banks."[175] Operating Circular 1 covers "Account Relationships."[176] It "establish[es] the terms for opening, maintaining, and terminating master accounts."[177] Under Operating Circular 1, every master account was "subject to Federal Reserve policies, such as those on payments system risk, reserve balances, and clearing balances."[178]

To open an account, a bank must "execute a Master Account Agreement."[179] This agreement is a one-page document where the bank "agrees to all the provisions" of Operating Circular 1.[180] A bank's account must be

---

[173] Fed. Rsrv. Bd., Operating Circular No. 1 (Jan. 2, 1998), https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/federal-reserve-standardized-operating-circulars-546823 [hereinafter Operating Circular 1 (1998)].

[174] *Id.*

[175] Letter from Helen E. Holcomb, First Vice Pres. & CEO, Fed. Rsrv. Bank of Dallas to the CEO of each financial institution in the Eleventh Federal Reserve District (Nov. 12, 1997), https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/federal-reserve-standardized-operating-circulars-546823.

[176] Operating Circular 1 (1998), *supra* note 173; Fed. Rsrv. Bd., Operating Circular No. 1 (Aug. 16, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf [hereinafter Operating Circular 1 (2021)].

[177] Operating Circular 1. (1998), *supra* note 63, at §1.1; *see also* Operating Circular 1 (2021), *supra* note 176, at § 1.1 ("This operating circular and its appendices ('Circular') set forth the terms under which a Financial Institution may open, maintain, and terminate a Master Account with its Administrative Reserve Bank (ARB).").

[178] Operating Circular 1. (1998), *supra* note 63, § 1.1; *see also* Operating Circular 1 (2021), *supra* note 176, at § 1.0 ("A Master Account is subject to other applicable Federal Reserve regulations and policies relating to accounts maintained at Reserve Banks, such as Regulation D . . . and the Federal Reserve Policy Statement on Payments System Risk, as they may be revised from time to time.").

[179] Operating Circular 1 1998, *supra* note 63, at § 2.3; *see also* Operating Circular 1 (2021), *supra* note 176, at § 2.6 (stating that additionally the bank "must pass resolutions (in a form prescribed by the Reserve Banks) that authorize certain individuals to conduct business on behalf of the" bank).

[180] Operating Circular 1 (1998), *supra* note 63, at Apx. 1; *see also* Fed. Rsrv. Bank Operating Circular No. 1, Apx 1 (2021), https://www.frbservices.org/binaries/content/assets/crsocms/forms/accounting/master-account-agreement-oc1-app1-rv.pdf

Electronic copy available at: https://ssrn.com/abstract=4048081

held at the Federal Reserve Bank in the district where the bank is head-quartered.[181] For example, a bank headquartered in New York would request an account from the New York Fed and a bank in Wyoming would request of account from the Kansas City Fed.

Typically, this process for opening an account was quick—for a time the Federal Reserve Banks' materials suggested it could be accomplished in less than a week.[182] The Reserve Banks conducted little of their own investigation when considering new account applications.[183] Instead, the Reserve Banks relied on the fact that in nearly all cases the depository institution had been vetted by some other federal bank supervisor.[184] Applications were rarely, if ever, denied.[185] Today, Operating Circular 1 is substantially similar to its predecessors.[186] Yet recent account applications from novel financial institutions have drawn scrutiny. Before examining some of those novel applications, Part II discusses the extent of the Federal Reserve Banks' authority to grant and deny access to accounts and payment services.

## II.  FEDERAL RESERVE AUTHORITY

Under the Monetary Control Act, the Federal Reserve's authority comes in two parts, both of which are somewhat ambiguous. First, the Federal Reserve is authorized to open accounts and provide payment services only to those banks that meet the definition of "depository institution."[187] For federally insured banks, meeting the eligibility criteria is straightforward.[188] But uninsured banks and credit unions qualify only if

---

[181] Operating Circular 1. (1998), *supra* note 63, § 2.1; *see also* Operating Circular 1 (2021), *supra* note 176, at § 2.5.

[182] Operating Circular 1, Apx. 1 (2003) (providing a form master account agreement that noted: "[p]rocessing may take 5-7 business days").

[183] *See* Telephone Interview with Thomas Hoenig, *supra* note 5; Conti-Brown, *supra* note 5.

[184] *Cf.* Policy on Payments System Risk, 71 Fed. Reg. 36,800, 36,806 (2006) (explaining that in adopting risk policies it was not "intend[ing] to exert or create new supervisory or regulatory authority over any particular class of institutions or arrangements where the Board does not currently have such authority").

[185] *See* Reporter's Transcript Oral Argument 37-39, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633) (explaining that in the previous ten years the Kansas City Fed had not denied any application for an account).

[186] *See generally* Operating Circular 1 (2021), *supra* note 176.

[187] 12 U.S.C. §§ 248a, 342.

[188] *Id.* § 461(b)(1)(A) (defining "depository institution" to include insured banks and credit unions).

Electronic copy available at: https://ssrn.com/abstract=4048081

they are eligible to apply for federal insurance.[189] This raises questions about whether the Federal Reserve or the federal insurers (the FDIC and NCUA) get to decide which banks qualify for Federal Reserve accounts and payment services. Second, the Federal Reserve is instructed to provide payment services to nonmember banks on the same term and conditions that it provides those services to member banks.[190] Some believe this requires the Federal Reserve to provide accounts and payment services to all eligible depository institutions, regardless of the risk presented by the institution. The Federal Reserve, however, believes it has discretion to restrict or deny access to depository institutions that present undue risk. I conclude the Federal Reserve's interpretation of the statute is reasonable. This Part addresses the murky nature of the Federal Reserve's authority in greater detail.

### A.   *Legal Eligibility*

The Federal Reserve Banks are authorized to provide account and payment services to banks, or more precisely "depository institutions."[191] The relevant statute defines "depository institution" to include federally insured banks and credit unions.[192] Consequently, federally insured banks and credit unions are clearly eligible for Federal Reserve accounts and payment services. In contrast, the legal eligibility of uninsured banks and credit unions is murky. The Monetary Control Act extends eligibility to some institutions without federal insurance because it defines "depository institution" to include institutions "eligible to make application" for federal deposit or share insurance.[193] But which banks and credit unions are eligible to apply for federal deposit and share insurance? Who decides this question?

For banks without federal insurance, the question of legally eligibility arises when they attempt to complete the required account agreement. The first "required" field is for a routing number issued by the American Bankers Association (ABA).[194] A routing number is used to "identify the bank

---

[189] *Id.*

[190] *Id.* § 248a(c)(2)

[191] *Id.* §§ 248a, 342

[192] *Id.* § 461(b)(1)(A).

[193] *Id.*

[194] Federal Reserve Bank Operating Circular 1, Apx. 1 (Aug.16, 2021), https://www.frb-services.org/binaries/content/assets/crsocms/forms/accounting/master-account-agreement-oc1-app1-rv.pdf [https://perma.cc/2DC9-5BDA].

Electronic copy available at: https://ssrn.com/abstract=4048081

which is responsible to either pay or give credit or is entitled to receive payment or credit for a check or electronic transaction."[195] Under ABA policy, "[t]o be eligible for a regular routing Number, a bank must be eligible to maintain an account at a Federal Reserve Bank."[196] When the ABA is uncertain whether a bank requesting a routing number is a "depository institution" under the Monetary Control Act, it asks for clarification from the Federal Reserve Bank in the district of the applicant institution.[197]

The ABA's practice of asking the Federal Reserve for its opinion on whether novel banks are "depository institutions" illustrates the Federal Reserve's perceived authority. The Reserve Banks are the statutorily authorized to accept deposits.[198] And because the Federal Reserve Board is tasked with interpreting the Monetary Control Act, the Board would ordinarily have authority to interpret the meaning of "depository institution."[199] Indeed, the Board has promulgated regulations defining the term (although they largely mirror the statute).[200]

However, both the statute and the Board's regulations define "depository institutions" by referencing other statutes. In particular, the Act defines "depository institution" to include "any bank which is eligible to make application to become an insured bank under section 5 of [the Federal Deposit Insurance] Act" and "any credit union which is eligible to make application to become an insured credit union pursuant to [12 U.S.C. § 1781].[201] The FDIC administers Federal Deposit Insurance Act, and the NCUA administers federal credit union share insurance.[202]

---

[195] Am. Bankers Assoc., Routing Number Policy & Procedures (Sept. 2020), https://www.aba.com/-/media/documents/books/routingnumberpolicy.pdf?rev=66ad5741171a4a08b52431644c181859.

[196] *Id.*

[197] *Id.* at V.C.

[198] 12 U.S.C. § 342.

[199] *See* Securities Indus. Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys., 468 U.S. 207, 217 (1984) (stating where "the Board has primary responsibility for implementing" an act, courts "accord substantial deference to the Board's interpretation of the Act"); Monetary Control Act of 1980, Pub. L. No. 96-221 § 105, 94 Stat. 132, 139 (noting that the Board is tasked with promulgating pricing principles and fee schedules for accounts).

[200] 12 C.F.R. § 204.2(m)(1).

[201] 12 U.S.C. § 461.

[202] *See* 12 U.S.C. § 1820(g) (authorizing the FDIC to promulgate rules and "define terms" in the Federal Deposit Insurance Act); Meriden Trust & Safe Deposit Co. v. FDIC, 62 F.3d 449, 452-53 (2d Cir. 1995) (giving deference to the FDIC's interpretation of the Federal Deposit Insurance Act); 12 U.S.C. § 1789(a)(11) (authorizing the NCUA Board to "prescribe such rules and regulations as it may deem necessary or appropriate to carry out the provisions" of the law establishing federal credit union

Shortly after the passage of the Monetary Control Act, the FDIC issued a statement "regarding the eligibility of financial institutions to make application to the [FDIC] to become an insured bank."[203] The FDIC identified two requirements. First, "a bank must be engaged in the business of receiving deposits other than trust funds."[204] Second, the financial institution must be a "bank."[205] The FDIC explained that "[i]n determining a financial institution's status as a bank, the FDIC will look to the characterization of the institution by the laws under which the institution is created."[206] To be considered a "bank," state law must "expressly confer[]" the institution the power to receive deposits.[207] The FDIC emphasized that "the question of eligibility to make application to become an insured bank is a threshold question."[208] Once the FDIC, receives an application for insurance from a "depository institution," it then considers a variety of other factors and applicants that pose "unacceptable risks to [the] Federal deposit insurance fund will be denied" insurance.[209]

In 1988, an FDIC General Counsel Opinion considered whether a change in a Colorado statute would make trust companies chartered there eligible to apply for deposit insurance.[210] Under the Federal Deposit Insurance Act (as amended), those eligible to apply for deposit insurance include any state-chartered "bank, banking association, trust company, savings bank, . . . or other banking institution which is engaged in the business

---

NCUA's interpretation of credit unions statutes under the Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984) standard).

[203] Statement Regarding Eligibility to Make Application to Become an Insured Bank Under Section 5 of the Federal Deposit Insurance Act, 45 Fed. Reg. 77,517 (Nov. 24, 1980). The FDIC's statement was prompted by confusion over which financial institutions were "depository institutions" and thus required to maintain reserves under the Monetary Control Act. *Id.* The Act uses the same definition of "depository institution" for provision on required reserves, Federal Reserve accounts, and payment access. 12 U.S.C. §461.

[204] Statement Regarding Eligibility to Make Application to Become an Insured Bank Under Section 5 of the Federal Deposit Insurance Act, 45 Fed. Reg. 77,517 (Nov. 24, 1980).

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] *Id.* (citing 12 U.S.C. § 1816).

[210] Interpretive Letter, FDIC-88-67 (Oct. 17, 1988).

Electronic copy available at: https://ssrn.com/abstract=4048081

of receiving deposits, other than trust funds."[211] Thus, the legal question was whether under state law, Colorado trusts were eligible to receive deposits other than trust funds.[212] The FDIC concluded that because the Colorado statute authorized trusts to received time and savings deposits, those trusts would be eligible to apply for deposit insurance.[213] Of course, eligibility was just a threshold question; the FDIC retained authority to deny the insurance application if it decided the trust was too risky or did not meet other statutory qualifications.[214]

If the FDIC's view of which banks are eligibility to apply for deposit insurance is controlling, then the question is whether state law authorizes the bank to accept non-trust deposits. States have latitude to adopt new charter types. If state law unambiguously allows the new charter to accept non-trust deposits then institutions with that charter will be eligible to apply for deposit insurance and will be eligible for Federal Reserve accounts and payment services.

There are at least three instances where the Federal Reserve appears to have relied on the federal insurer or state law when determining whether an institution is eligible for an account. In 1981, a Federal Reserve Staff Opinion explained that because the NCUA determined Nebraska's "cooperative credit associations" were not eligible to apply for share insurance, the associations were not "depository institutions" under 12 U.S.C. § 461.[215] In 2017, when Fourth Corner Credit Union requested an account from the Kansas City Fed, the Reserve Bank asked the NCUA whether Fourth Corner was eligible to apply for federal share insurance.[216] More recently, the Kansas City Fed explained why it granted an account to Reserve Trust Company, a Colorado fintech. It said that "the Colorado Division of Banking reinterpreted the state's law in a manner that meant [Reserve Trust] met the definition of a depository institution."[217]

---

[211] 12 U.S.C. §1815(a) (allowing "any State nonmember bank" to apply for deposit insurance); *id*. § 1813(b) (defining "state nonmember bank" to mean "any State bank which is not a member of the Federal Reserve System); *id*. § 1813(p) (defining state bank as quoted in the text).

[212] Interpretive Letter, FDIC-88-67 (Oct. 17, 1988).

[213] *Id*. (explaining that to be eligible, the trust must also actually accept such deposits).

[214] *Id*.

[215] Fed. Rsrv. Bd. Staff Op. of Feb. 10, 1981, *available at* 2006 WL 3848482.

[216] *See infra* note 308.

[217] Statement from the Federal Reserve Bank of Kansas City (Feb. 7, 2022), https://www.kansascityfed.org/documents/8617/Statement_02_07_2022.pdf [https://perma.cc/EXE6-T2VG]. This statement is somewhat curious because relies on the Colorado Division of Banking's "re-interpretation" of state law. *Id*. The FDIC would require that state law expressly confer that authority. *See supra*

Electronic copy available at: https://ssrn.com/abstract=4048081

The Federal Reserve, however, has hinted that it might prefer not to follow the FDIC's guidance interpreting which depository institutions are eligible to apply for deposit insurance. The Board recently announced it was "considering whether it may in the future be useful to clarify the interpretation of legal eligibility under the Federal Reserve Act for a Federal Reserve account and services."[218] And it has delayed authorizing the ABA to issue routing numbers to institutions chartered under state laws that appear to authorize some form of deposit taking.[219]

The Federal Reserve and federal insurers (FDIC and NCUA) many have different incentives motivating their interpretations of which institutions are eligible to apply for Federal insurance. The insurers have little incentive to narrowly construe the types of depository institutions that may apply for insurance, because they have robust authority to deny deposit or share insurance applications on substantive ground.[220] In contrast, the Federal Reserve's authority to deny access to accounts and payment services may be more limited.[221]

Were a court to review a Federal Reserve Bank's decision about whether a bank qualifies as a depository institution, it is unclear whose interpretation would prevail. The FDIC's statement on eligibility was not

---

note 207. It is not clear that an administrative interpretation not expressed in statute or regulation would be sufficient for the FDIC. To better understand the nature of the Colorado law, I submitted a records request to the Colorado Division of Banking. I received the following reply:

> We consider the statement that the Division 'reinterpreted' state law as a misrepresentation of our practice. The Division regularly receives requests from state-chartered entities to provide clarifications to existing laws based on facts and information we receive from the entity. The analysis of the law is consistent, while what can change outcomes to our analysis are the facts provided by the entity. We are precluded from providing legal counsel to the entity. Further, the Division does not, nor has the authority to, change modify or reinterpret any law without engaging in the rulemaking process.

Letter from Kenneth Boldt, State Bank Comm'r, Colo., to the author (Feb. 15, 2022). Reserve Trust says that its approval "turned entirely on Colorado banking law, which was amended in 1989 with the advice and consent of the" FDIC. Dennis M. Gingold, Opinion, *Fed Nominee Sarah Raskin Did Nothing Wrong*, WALL ST. J., Feb. 16, 2022, at A16 (noting that the author is the "co-founder and former chairman of the Reserve Trust Co.")

[218] Policy on Payments System Risk, 71 Fed. Reg. 36,800, 36,806 (2006).

[219] *See infra* notes and accompanying text.

[220] *See* 12 U.S.C. § 1816; 12 U.S.C. § 1781(c).

[221] The Federal Reserve's power to deny account and payment services to "depository institutions" is discussed in Part II.B *infra*.

Electronic copy available at: https://ssrn.com/abstract=4048081

promulgated through notice and comment rulemaking.[222] As a result, courts might find its interpretation persuasive, but not controlling.[223] Perhaps a court would also believe the Federal Reserve's position is persuasive. However, allowing the Federal Reserve's approach to diverge significantly from that of the federal insurers might lead to odd results. For example, suppose the Federal Reserve decided that an uninsured bank was ineligible to apply for FDIC insurance, and consequently ineligible for a Federal Reserve account. Later, the same bank applies for FDIC insurance, the FDIC decides the bank is eligible to apply, and the FDIC grants the bank insurance. At that point, despite the Federal Reserve's prior decision, the bank would be eligible for a Reserve Bank account and payment services as a federally insured bank.[224]

### B.   *Federal Reserve Discretion*

For banks that are legally eligible for Federal Reserve accounts, the next question is whether (and if so, on what grounds) Federal Reserve Banks can nevertheless deny access to accounts and payment services. Some believe that the Federal Reserve banks must open an account and provide payment services for every "depository institution" that applies.[225] They argue that the Federal Reserve Banks have no business collecting any information from applicants beyond that necessary to physically open an account and process payments.[226] Conversely, the Federal Reserve Board and Federal Reserve Banks believe they have discretion to deny some eligible banks access based on the risk the bank presents.[227] This

---

[222] Statement Regarding Eligibility to Make Application to Become an Insured Bank Under Section 5 of the Federal Deposit Insurance Act, 45 Fed. Reg. 77,517 (Nov. 24, 1980).

[223] *See* Wells Fargo Bank, N.A. v. FDIC, 310 F.3d 202 (D.C. Cir. 2002) (holding that an FDIC interpretive opinion was "guidance to the extent that its position is persuasive" under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). *But see* Barnhart v. Walton, 535 U.S. 212, 222 (2002) (stating that "the fact that [an] Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, see 5 U.S.C. § 533, does not automatically deprive that interpretation of the judicial deference otherwise its due" under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)).

[224] 12 U.S.C. § 461.

[225] Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 861 F.3d 1052, 1067-74 (10th Cir. 2017) (per curiam) (Bacharach, J.); Conti-Brown, *supra* note 5; Opposition to Defendant's Motion to Dismiss at 14-19, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., Case No. 1:18-CV-7978, 2002 WL 1445806 (S.D.N.Y. 2020).

[226] Reply Brief of Appellant at 1-14, Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 861 F.3d 1052 (10th Cir. 2017).

[227] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,867 (2021) ("The Board believes it is important to make clear that legal eligibility does not bestow

Electronic copy available at: https://ssrn.com/abstract=4048081

section argues that the Federal Reserve has discretion to deny some institutions accounts and services, but that this exercise of discretion is bounded by the Monetary Control Act's non-discrimination principle as well as by the long-recognized authority of the Federal Reserve Banks to limit risk when providing account and payment services.

### 1.   Statutory Text

The Federal Reserve's authority here comes from two provisions of law. First, the Federal Reserve Act's long-standing provision stating that Federal Reserve Bank "may receive . . . deposits."[228] The Monetary Control Act of 1980 broadened the list of banks eligible to make deposits, but otherwise left this provision unchanged.[229] Second the Monetary Control Act's provision that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks."[230]

The Federal Reserve Banks' authority to receive deposits under the Federal Reserve Act has long been viewed as discretionary. Particularly with respect to clearing accounts, the Federal Reserve Board emphasized that opening accounts was within the discretion of the Reserve Banks.[231] Moreover, at least some Reserve Banks used this discretion to deny access to banks seeking clearing accounts.[232]

The United States Supreme Court agreed that the Federal Reserve Act granted Reserve Banks discretion. In 1923, the Supreme Court considered whether the Federal Reserve Act's statement that Reserve Banks "may receive" required those banks to receive checks for collection.[233] The Court

---

a right to obtain an account and services."); Fed. Rsrv. Bank of S.F., Federal Reserve Accounts and Services, https://www.frbsf.org/banking/about/what-we-do/accounts-services/ [https://perma.cc/NS5D-BBWV] (last visited Feb. 6, 2022) ("Approval of an application for an account or services is at the [San Francisco Fed's] discretion.").

[228] 12 U.S.C. § 342.

[229] Pub. L. No. 96-221 § 105, 94 Stat. 132, 139 (codified at 12 U.S.C. § 342).

[230] 12 U.S.C. § 248.

[231] *See* Letter from Chester Morrill (Apr. 26, 1935), *supra* note 94, at 2.

[232] *See supra* notes 100-110 and accompanying text.

[233] Farmers & Merchants' Bank of Monroe. v. Fed. Rsrv. Bank of Richmond, 262 U.S. 649, 662 (1923).

Electronic copy available at: https://ssrn.com/abstract=4048081

concluded the use of "may" "confer[ed] authority," not an obligation.[234] The Court explained:

> It is true that in statutes the word "may" is sometimes construed as "shall." But that is where the context, or the subject-matter compels such construction . . . . Here it does not. This statute appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the board and the Reserve Banks "shall" do and what they "may" do.[235]

The Court further explained that even if the statute could somehow be read as a requirement, it could not be read as a requirement that the Federal Reserve Banks perform a service when the cost of that service would be prohibitively high.[236]

Those believing the Federal Reserve lacks discretion to limit account and payment services, look past the account provision of the Federal Reserve Act, and instead focus on the Monetary Control Act's provision that "Federal Reserve bank services covered by the fee schedule shall be available."[237] They believe that the word "shall" "indicates a congressional command"[238] and "appears to eliminate the Fed's discretion entirely."[239]

But the text of the Monetary Control Act is far from a conclusive mandate to provide service to every depository institution. First, accounts themselves are not listed as a "covered service" for which the Federal Reserve Board must establish a fee schedule.[240] Second, the pricing provision contains an important limitation. It states that services "shall be available to nonmember depository institutions and such services shall be priced at

---

[234] *Id.*

[235] *Id.* at 662-63.

[236] *Id.* at 663.

[237] 12 U.S.C. § 248a.

[238] Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 861 F.3d 1052, at 1068 (10th Cir. 1997) (Bachrach, J.).

[239] Conti-Brown, *supra* note 5.

[240] Covered services includes "currency and coin services," "check clearing and collection services," "wire transfer services," "automated clearing house services," "settlement services," "securities safekeeping services," "Federal Reserve float," and "any new services which the Federal Reserve System offers." 12 U.S.C. § 248a(b). Federal Reserve accounts are not a "new service" because they had been used for decades prior to the passage of the Monetary Control Act. *See supra* Parts I.A-B discussing the historic provision of Federal Reserve accounts.

the same fee schedule applicable to member banks, *except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks*."[241] This could reasonably be interpreted to mean that the Federal Reserve is allowed to establish terms for its payment services beyond price, so long as it treats member and nonmember banks equitably in setting those terms.[242] If the Federal Reserve has the authority to set nondiscriminatory terms, then surely it also authority to deny access to banks that did not meet those terms.

## 2.   Legislative History

To bolster the argument that the Monetary Control Act requires Federal Reserve accounts and payment services for all depository banks, proponents of the "no discretion" argument turn to the Act's legislative history.[243] They claim that Congress intended the bank chartering authorities to provide the check on bank riskiness. As Professor Peter Conti-Brown writes, the Act "took the central bank out of the business of second guessing the chartering authority's original assessments about whether a financial institution can open its doors."[244]

Admittedly, the legislative history is littered with references to "open access" and "universal access."[245] This combined with the obvious intent

---

[241] 12 U.S.C. § 248a(c)(2) (emphasis added).

[242] As Anatoli Kuprianov, then an economist at the Richmond Fed, explained:

[L]egal provisions such as this one, which require the adoption of nondiscriminatory access and pricing policies, do not necessarily require that all purchasers be charged the same price in all conditions. Price discrimination arises when price differentials charged to different purchasers are unrelated to underlying differences in the cost of supply. Thus, the Federal Reserve can charge institutions that are more costly to service . . . a higher price than it charges other institutions without violating the requirements of the Monetary Control Act.

Kuprianov, *supra* note 72, at 33 n.37. Likewise, the Federal Reserve can impose different terms and conditions on institutions that present different risk or costs to the payment system.

[243] *See, e.g.*, Fourth Corner Credit Union, 861 F.3d 1052, 1072-73 (10th Cir. 2017) (Bachrach, J.); Reply Brief of Appellant at 6, Fourth Corner Credit Union, 861 F.3d 1052 (10th Cir. 2017).

[244] Conti-Brown, *supra* note 5.

[245] *See, e.g.*, 96 CONG. REC. 6894 (1980) (statement of Senator William Proxmire) ("In the future, access to services will be open to all depository institutions willing to pay the established fees on the same basis as members . . . . Those pricing principles must provide for access to those services that are priced to all nonmember depository institutions."); *Federal Reserve Requirements Act of 1978: Hearings on S.3304 Before S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 2 (1978) (statement of Senator William Proxmire) ("Federal Reserve Services are now basically available only to members. Open access to all depository institutions willing to pay should be sought."); *id.* at 195

Electronic copy available at: https://ssrn.com/abstract=4048081

to extend payment services to thrift institutions,[246] suggests that there is some limit on the Federal Reserve's discretion. It seems clear, for example that the Federal Reserve could not exercise its discretion to deny accounts and payment services to all nonmember banks.

The legislative history, however, repeatedly states that "open access" meant that the Federal Reserve was supposed to provide accounts and services to nonmember banks "on the same terms and conditions as member banks."[247] The legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, rather than treat each individual bank exactly the same regardless of risk.[248] Before the Act, member banks received payment services for "free" because of their higher reserve requirement.[249] After the Act, all types of depository institutions were subject to reserve requirements.[250] Thus, the Federal Reserve was instructed to "explicitly price its services on a fee basis without differentiating between member and nonmember banks."[251] This history suggests that Federal Reserve retained discretion to set terms and conditions for access and pricing for its payment services so long as those terms did not discriminate based on membership status. It

---

(statement of Robert Carswell, Deputy Sec'y, Dep't of the Treas.) ("The administration is, in principle, in favor of open access to Federal Reserve services for all nonmembers at nondiscriminatory prices.").

[246] *See supra* Part I.C.

[247] *See, e.g., Federal Reserve Requirements Act of 1978: Hearings on S.3304 Before S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong 64 (1978) (testimony of G. William Miller, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.) (stating that with "universal reserves, it would be desirable to look at universal access on the same terms and conditions as members"); H.R. CONF. REP. No 96-842, *as reprinted in* 1980 U.S.C.C.A.N. 298, 301 (stating that the legislation provides "open access to [Federal Reserve payment] services to all depository institutions on the same terms and conditions as member banks"); 126 CONG. REG. 21,280 (1980) ("Legislative Achievements document prepared by Democratic policy committee staff) (stating that the Monetary Control Act "gives open access to price services provided by the Federal Reserve Banks to all depository institutions on the same terms and conditions as member banks").

[248] *See e.g.,* 96 Cong. Rec. 6894 (1980) (statement of Senator William Proxmire) ("On equality, the legislation removes many competitive inequalities between different types of financial institutions. It seeks to create a level playing field so that all institutions may compete on the same terms.").

[249] *See supra* note 137-138 and accompanying text.

[250] *See supra* notes 158-160 and accompanying text.

[251] *Federal Reserve Services: Hearings before the S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 204 (1977) (written testimony of Leif H. Olsen, Senior Vice Pres. & Economist, Citibank); *see also* Peter Conti-Brown & David A. Wishnick, *Private Markets, Public Options, and the Payment System*, 37 YALE J. REG. 380, 410 (2020) ("The MCA left the Fed in its role as an active participate in the payment system, but set forth a goal of creating an equal playing field for member and nonmember depository institutions.").

Electronic copy available at: https://ssrn.com/abstract=4048081

does not compel the conclusion that Congress intended to outsource all risk evaluation to other state or federal banking regulators.

The Federal Reserve's discretion to establish terms and conditions for account access is reinforced by the Monetary Control Act's amendments to 12 U.S.C. § 342. Although the Federal Reserve has long read the "may receive" deposits as discretionary[252] and the Supreme Court had stated that the term was discretionary,[253] Congress chose not to replace the word "may" with shall.[254] This suggests that Congress agreed the statute was permissive.[255]

Finally, the statutory text and legislative history suggest that Congress intended the Federal Reserve to provide efficient and well-functioning payment services for the banking industry.[256] Denying it the authority to set terms and conditions that would, for example, limit risk and improve function, could frustrate the purpose of the Monetary Control Act.

### 3.  Federal Reserve's Historic Approach

Those who believe that the Federal Reserve lacks discretion to limit access and payment claim that the Federal Reserve had before 2017 "uniformly interpreted the [Monetary Control Act] to extend Federal Reserve service to all 'depository institutions.'"[257] This is incorrect (although perhaps understandably so given the Federal Reserve's tightlipped approach to the process for approving account and service requests). The Federal

---

[252] *See supra* notes 100-110 and accompanying text.

[253] Farmers & Merchants' Bank of Monroe. v. Fed. Rsrv. Bank of Richmond, 262 U.S. 649, 662-63 (1923).

[254] Pub. L. No. 96-221 § 105, 94 Stat. 132, 139 (codified at 12 U.S.C. § 342).

[255] *Cf.* Barnhart v. Walton, 535 U.S. 212, 220 (2002) (holding that where Congress "amended or reenacted" statutory provisions without significant changed, it was reasonable to conclude that "Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible").

[256] *See* 12 U.S.C. § 248a(c)(3) (stating that in establishing pricing principles, the Federal Reserve should "give due regard to . . . the provision of an adequate level of such services nationwide"); *Federal Reserve Services: Hearings before the S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 198 (1977) (statement of Leif H. Olsen, Senior Vice Pres. & Economist, Citibank) (explaining that one of the purposes of pricing Federal Reserve payment services was "to promote an efficient payments mechanism").

[257] Fourth Corner Credit Union, 861 F.3d 1052, 1070 (10th Cir. 2017) (Bachrach, J.); *see also* Opposition to Defendant's Motion to Dismiss, at 16 TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., Case No. 1:18-CV-7978, 2002 WL 1445806 (S.D.N.Y. 2020) (claiming that the argument that "all depository institutions" are entitled to Federal Reserve accounts mirrors "the Board's and [New York Feds] own consistent understanding for almost forty years" (emphasis omitted)).

Electronic copy available at: https://ssrn.com/abstract=4048081

Reserve Board and Reserve Banks have sometimes summarized the Monetary Control Act as extending payment services to "all depository institutions."[258] But in implementing its account and payment services policies, both the Board and the Reserve Banks have emphasized their discretion to limit access. A complete catalog of these instances would be too voluminous for this article, but here are some examples.

In 1985, the Federal Reserve adopted policies on daylight overdrafts that limited some depository institutions' ability to send payments via Fedwire.[259] Fedwire works by transmitting payment messages throughout the day and then settling net positions in Federal Reserve accounts at the end of the day.[260] A bank whose sent payments exceed its account balance incurs a "daylight overdraft."[261] The Federal Reserve was concerned about the risk that a bank might be unable to settle its overdraft at the end of the day.[262] Moreover, "[a] failure of one participant to settle could seriously jeopardize the financial position of its net creditors on the network, with serious repercussions spreading from those participants to their creditors. Thus, an unexpected settlement failure could result in serious disruptions of money and financial markets."[263] To limit the risk of daylight overdrafts, the Federal Reserve Banks began real-time monitoring of funds transfers from institutions they viewed as risky.[264] Each Reserve Bank had the power "to reject funds transferred" when those transfers "expose[d] the Reserve Bank to excessive risk."[265] In "extreme" cases, especially

---

[258] *See, e.g.*, Policies: Principles for the Pricing of Federal Reserve Bank Services, Bd. of Governors of the Fed. Rsrv. Sys. (1980), https://www.federalreserve.gov/paymentsystems/pfs_principles.htm ("Services covered by the fee schedule are available to all depository institutions."); Fed. Rsrv. Bd., The Federal Reserve in the Payment System (1990), https://web.archive.org/web/20100722115918/http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm ("Federal Reserve payment services are available to all depository institutions, including smaller institutions in remote locations that other providers might choose not to serve. . . . Since implementation of the [Monetary Control A]ct, the Reserve Banks have provided access to Federal Reserve services to nonmember banks, mutual savings banks, savings and loan associations, and credit unions.").

[259] Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems, 50 Fed. Reg. 21,120 (1985)

[260] *Id.* at 21,121.

[261] David L. Mengle, *Daylight Overdrafts and Payments System Risks*, Econ. Rev., May/June 1985, 14, at 17-18.

[262] Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems, 50 Fed. Reg. at 21,121.

[263] *Id.*

[264] *Id.* at 21,123-24.

[265] *Id.* at 21,124.

Electronic copy available at: https://ssrn.com/abstract=4048081

risky financial institutions would be precluded from using the Fedwire system altogether.[266] The Federal Reserve's management of daylight overdrafts has evolved, but its policies still allow Reserve Banks to reject transactions based on risk or remove risky institution from the Fedwire system.[267]

In 1998, the Federal Reserve Banks' first uniform circulars governing master accounts stated that accounts were "subject to Federal Reserve policies, such as those on payments system risk, reserve balances, and clearing balances, as they may be revised from time to time."[268] They also contained policies designed to limit services to risky banks. For example, "[a] sending bank that ha[d] been identified as presenting a high risk of disruption to the payments system agree[d] to take steps to permit its ACH credit items to be monitored and to be settled at the time of receipt."[269] Operating Circular 1 warned that the Reserve Bank could "immediately terminate the services provided hereunder . . . if we, in our sole discretion, determine that the financial condition of the Payment Bank poses a risk to us if we continue to provide services."[270] The Reserve Banks' current operating circulars retain similar language and provisions.[271]

In 2004, the Federal Reserve Board significantly revised its policy statement on systemic risk in payment systems.[272] The statement was designed as a best practice guide for all payment settlement systems.[273] It instructed the Federal Reserve Banks and other payment system providers

---

[266] *Id.*

[267] BD. OF GOVERNORS OF THE FED. RSRV. SYS, FEDERAL RESERVE POLICY ON PAYMENT SYSTEM RISK 31 (2021); *see also* Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,866 (2021) (explaining that Reserve Banks currently monitor bank "supervisory ratings, capitalization data, and other supplementary information" to determine whether additional "risk controls or other restrictions should be placed on an institution's account").

[268] Operating Circular 1. (1998), *supra* note 173, § 1.1.

[269] *Id.* Apx. C §1.0.

[270] *Id.* § 7.1.

[271] *See, e.g.,* Operating Circular 1 (2021), *supra* note 176, §§ 1.0 (terms and conditions), 2.10 (account termination); Operating Circular No. 4 (Mar. 7, 2022), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/030722-operating-circular-4.pdf ("The Reserve Bank may restrict or terminate a bank's access to the FedGlobal® ACH Payments Service if the bank's participation in the service poses a compliance risk that is unacceptable to the Reserve Bank.").

[272] Policy on Payments System Risk, 69 Fed. Reg. 69,926 (2004).

[273] *Id.* at 69,928.

Electronic copy available at: https://ssrn.com/abstract=4048081

to adopt conforming risk management rules and procedures.[274] Recognizing that access to the system presents risk, the policy explained: "Examples of key features that might be specified in a system's rules and procedures are controls to limit participant-based risks, such as membership criteria based on participants' financial and operational health[.]"[275] Although the policy statement has been revised several times, the Board's invitation to Federal Reserve Banks to consider limiting risk through membership criteria remains.[276]

These examples illustrate that since the passage of the Monetary Control Act, the Federal Reserve Board and Reserve Banks have evaluated risks associated with providing account and payment services to individual banks. When individual banks present abnormally high risk, the Federal Reserve Banks have repeatedly stated that they have the authority to withhold services those banks. Indeed, operating major nation-wide payment systems without imposing risk-related terms and conditions would be foolhardy. Having risk-related term and conditions without ability to enforce the terms by limiting services would be useless.

### 4.   Judicial Review

As much as I might wish that an academic (me!) had the final authority to interpret statutes, the Federal Reserve has authority to interpret the Monetary Control Act.[277] Here the statutory grant of authority is unclear. One section of the Act states that Reserve Banks "may" provide accounts, while another section states that the Reserve Banks "shall" provide depository institutions payment services.[278] Because the statute is unclear, courts would likely afford some deference to the Federal Reserve's interpretation that it can impose risk-related terms and conditions on its accounts and payment services.[279]

---

[274] *Id.* at 69,928-29.

[275] *Id.* at 69,931 n.15.

[276] BD. OF GOVERNORS OF THE FED. RSRV. SYS, FEDERAL RESERVE POLICY ON PAYMENT SYSTEM RISK 13 n.28 (2021), https://www.federalreserve.gov/paymentsystems/files/psr_policy.pdf.

[277] 12 U.S.C. §§ 248, 342.

[278] 12 U.S.C. §§ 248, 342; *see also* Part II.2.1 (discussing possible interpretations of the statute).

[279] *See* Chevron U.S.C. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984) ("[A] court many not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"); Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (holding that administrative rulings, interpretations, and opinions "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

Electronic copy available at: https://ssrn.com/abstract=4048081

The Federal Reserve's discretion with respect to accounts and payment servicers is not unbounded. In setting its terms and conditions, the Federal Reserve cannot impose terms conditions that discriminate against nonmember banks when compared to member banks.[280] It also cannot impose conditions untethered from providing efficient and well-functioning payment system. And it cannot impose terms that conflict with other federal statutes.

The level of deference courts afford the Federal Reserve's risk-management practice may also depend on the manner those risk-management practices are implemented. Written policies implemented after public notice and comment and followed consistently when evaluating account and payment services requests are likely to be afforded the most deference.[281]

### III. Proposed Guidelines

Perhaps recognizing that courts would be more deferential to the Federal Reserve if its account and payment service access policies were formally established and consistently followed, the Federal Reserve Board in 2021 proposed guidelines for access requests.[282] The Board explained that the Reserve Banks were "receiving an increasing number of inquiries and requests for access to accounts and services from novel institutions."[283] The guidelines are "intended to ensure that Reserve Banks evaluate a transparent and consistent set of factors when reviewing requests for accounts and services."[284]

At the outset, the Board emphasized that while the Reserve Banks should consider the principles explained in the guidelines, the Reserve Banks retain significant discretion.[285] The Reserve Banks are not obligated

---

[280] 12 U.S.C. § 248.

[281] *See* Skidmore, 323 U.S. at 140 (suggesting that agency interpretations are more persuasive when they are consistent); Barnhart v. Walton, 535 U.S. 212, 222 (2002) ("Whether a court should give . . . deference depends in significant part upon the interpretive method used that the nature of the question at issue.").

[282] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (2021). While the guidelines were designed for new requests for accounts or payment services, the Board explained that "Reserve Banks should also apply the guidelines to existing account and services relationships when a Reserve bank becomes aware of a significant change in the risk that the account holder presents." *Id*. at 25,866.

[283] *Id.* at 25,866.

[284] *Id*. at 25,866.

[285] *Id*. at 25,867.

Electronic copy available at: https://ssrn.com/abstract=4048081

to open accounts for all banks meeting the definition of "depository institution."[286] If a Reserve Bank decides to open an account, the Reserve Bank may impose terms and conditions designed to "limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy."[287] If the accountholder later breaches the terms and conditions, the Reserve Bank "may further restrict the institution's use of accounts and services or may close the account."[288]

The bulk of the proposed guidelines are six principles that "identify potential risks and prompt the Reserve Bank to identify risk mitigation strategies adopted by the institution (including capital, risk frameworks, compliance with regulations, and supervision) and by the Reserve bank (including account agreement provisions, restrictions on financial services accessed, account risk controls, and denial of access requests)."[289] Those six principles are:

1. Each institution requesting an account or services must be eligible under the Federal Reserve Act or other federal statute to maintain an account at a Federal Reserve Bank (Reserve Bank) and receive Federal Reserve services and should have a well-founded, clear, transparent, and enforceable legal basis for its operations.
2. Provision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank.
3. Provision of an account and services to an institution should not present or create undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system.
4. Provision of an account and services to an institution should not create undue risk to the stability of the U.S. financial system.
5. Provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, or other illicit activity.

---

[286] *Id.*

[287] *Id.*

[288] *Id.*

[289] *Id.* at 25,866.

Electronic copy available at: https://ssrn.com/abstract=4048081

6.  Provision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy.[290]

Within each risk principle, the guidelines prompt the Reserve Banks to consider an applicant's financial condition, internal controls, policies, procedures, risk assessments, systems security measures, management expertise, governance arrangements, training programs, and more.[291] Obviously, the level of scrutiny required by the guidelines is extensive. The guidelines instruct Reserve Banks to review risk assessments already performed by an institution's federal and state supervisors when conduction their own "independent analysis" of each applicant's risks.[292] In cases where federal supervisors have already analyzed the institution's risk profile, the Board anticipates that the Reserve Bank's application of the guidelines will be "fairly straightforward."[293] If, however, the institution is not federally insured, the guidelines say that "more extensive due diligence" may be required.[294]

When an account or payment access request raises risks of systemic or monetary policy importance, a Reserve Bank should assess the risk "in coordination with other Reserve Banks and the Board."[295]

## IV. NOVEL BANKS

Although the Federal Reserve Board's guidelines were prompted by an increasing number of account and payment service requests from novel institutions, the proposed guidelines do not discuss those account applications.[296] It is difficult to evaluate the usefulness of the guidelines without an understanding of how Reserve Banks have handled novel account applications. Using interviews, court filings, and press reports, this Part provides a more comprehensive picture of the Federal Reserve's handling of account applications. It examines applications from a marijuana credit union, a public bank, a narrow bank, and two cryptocurrency custody banks.

---

[290] *Id*. at 25,867-69.

[291] *Id*.

[292] *Id*. at 25,867.

[293] *Id*.

[294] *Id*.

[295] *Id*. at 25,869.

[296] *Id*. at 25,866.

Electronic copy available at: https://ssrn.com/abstract=4048081

### A.   Cannabis Bank

The first Federal Reserve account application to receive significant public attention was from Fourth Corner Credit Union, a de novo institution that intended to serve the cannabis industry. Although marijuana was illegal under federal law,[297] Colorado legalized it.[298] The federal government lacked the will and the resources to punish most marijuana-related crimes, so the cannabis industry in Colorado grew.[299] But the state-legal cannabis industry was plagued with banking problems.[300] Because marijuana will still illegal under federal law, handling funds from the industry violated federal anti-money laundering laws.[301] At a minimum, the federal Financial Crimes Enforcement Network (FinCEN) and federal bank regulators expected banks to perform costly and detailed reporting for cannabis-related accounts.[302] At worst, financial institutions and their employees faced criminal or regulatory punishment for banking the cannabis industry. Under these circumstances, most banks and credit unions would not open accounts or provide loans to cannabis-related businesses.[303]

Fourth Corner Credit Union intended to be different. It was the brainchild of Mark Mason, a North Carolina attorney, and his son, Alex Mason,

---

[297] 18 U.S.C. §§ 802(6), 812, 841(a).

[298] Colo. Const. art XVIII, § 16.

[299] *See* Robert A. Mikos, *Medical Marijuana and the Political Safeguards of Federalism*, 89 Denv. U. L. Rev. 997, 1009 (2012) ("Today . . . the federal government lacks the fiscal and political capital needed to enforce [the marijuana] ban aggressively and to quash the burgeoning medical marijuana movement."); Alison Felix, *The Economic Effect of the Marijuana Industry in Colorado*, Rocky Mountain Econ. (Fed. Rsrv. Bank of Kansas City) (Apr. 16, 2018), https://www.kansas-cityfed.org/denver/rocky-mountain-economist/rme-2018q1/ (detailing the growth of marijuana in Colorado).

[300] Julie Andersen Hill, *Cannabis Banking: What Marijuana Can Learn from Hemp*, 101 B.U. L. Rev. 1043, 1049-50 (2021); Julie Andersen Hill, *Banks, Marijuana and Federalism*, 65 Case W. Rsrv. L. Rev. 597, 600 (2015).

[301] 18 U.S.C. §§ 1956(a)(1)(B), 1957(a).

[302] FinCEN, Dep't of the Treas, FIN-2014-G001, BSA Expectations Regarding Marijuana-Related Businesses (Feb. 14, 2014), https://www.fincen.gov/sites/default/files/guidance/FIN-2014-G001.pdf.

[303] *See* Jennifer Shasky Calvery, Dir., Fin. Crimes Enforcement Network, Remarks at Mid-Atlantic AML Conference 4 (Aug. 12, 2014), https://www.fincen.gov/sites/default/files/2016-08/20140812.pdf (stating that 105 financial institutions had "engaged in banking relationships with marijuana-related businesses").

Electronic copy available at: https://ssrn.com/abstract=4048081

a Colorado resident with friends in the cannabis industry.[304] They set out to create a new credit union, chartered under Colorado law, to bank the marijuana industry. With anti-money laundering experts, they planned a "cutting-edge anti-money laundering compliance unit."[305] In April 2014, Fourth Corner Credit Union submitted is application for a Colorado charter.[306] By November Colorado banking officials granted the charter.[307] Its request to the American Bankers Association was similarly straightforward. Fourth Corner requested a routing number in August 2014 and received one within a month.[308]

The snag came when Fourth Corner Credit Union submitted its application to the Kansas City Fed for an account. In theory, Fourth Corner might have avoided opening its own Federal Reserve account by instead conducting transactions through a correspondent bank, but it seems highly unlikely that banks unwilling to serve the cannabis industry directly would have been eager to do so through an intermediary bank. Indeed, that was the point of organizing Fourth Corner Credit Union in the first place. So, in November 2014, immediately after receiving its charter, Fourth Corner Credit Union requested an account from the Kansas City Fed.[309]

Fourth Corner Credit Union's account application consisted of three documents: (1) the account agreement form from Operating Circular 1, (2) a resolution of the Credit Union's board of directors authorized certain individuals to conduct business on behalf of the Credit Union, and (3) a

---

[304] Misty Baxter, *Meet the Family Behind the Legal Weed Industry's First Credit Union*, ROLLING STONE (Jan. 8, 2015, 3:23 PM), https://www.rollingstone.com/politics/politics-news/meet-the-family-behind-the-legal-weed-industrys-first-credit-union-86721/.

[305] *Id.*

[306] First Amended Complaint ¶ 38, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633).

[307] Colorado Comm'r of Fin. Services, Charter No. 272 The Fourth Corner Credit Union (Nov. 19, 2014); David Migoya, *Pot Turns a Huge Corner*, DENVER POST, Nov. 21, 2014, at 11A.

[308] Complaint ¶¶ 44, 47, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633).

While the ABA's quick issuance of a routing number suggests that Fourth Corner Credit Union was easily classified as a "depository institution," this may not have been the case. In court filings, Fourth Corner alleged that a few months after it received a routing number, the Kansas City Fed "asked the NCUA if [Fourth Corner] was 'eligible to make application to become an insured credit union' pursuant to 12 U.S.C. § 1781." First Amended Complaint ¶ 90, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633). According to Fourth Corner, the NCUA later confirmed in writing that Fourth Corner was eligible. *Id.* at ¶ 101.

[309] First Amended Complaint ¶ 53, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633).

Electronic copy available at: https://ssrn.com/abstract=4048081

list of those authorized individuals.[310] "Shortly after submission" the Kansas City Fed's Financial Management department "verified the authenticity of the signatures on the" documents and confirmed "that the forms were properly completed."[311] Thereafter, Fourth Corner's application languished. Representatives for the Credit Union were told the application was waiting for "approval by credit and risk."[312] When Credit Union counsel inquired about the "rules pertaining to approval by credit and risk," they were "advised that no such rules exist."[313]

In January 2013, Fourth Corner received a letter from Esther L. George, the President of the Kansas City Fed. She explained that "[i]ssuance of a master account is within the Reserve Bank's discretion and required that the Reserve Bank be in a position to clearly identify the risk(s) posed by a financial institution and how that risk can be managed to the satisfaction of the Reserve Bank."[314] However, rather than requesting additional information directly from Fourth Corner, George indicated that the Reserve Bank would consider material that the Credit Union had submitted to the National Credit Union Administration (NCUA) as part of its application for federal share insurance.[315] Representatives from the Reserve Bank and the NCUA discussed Fourth Corner by telephone on at least two occasions.[316] More waiting ensued.

On July 2, 2015, the NCUA denied Fourth Corner's application for federal share insurance.[317] This alone was not necessarily the death knell for Fourth Corner's bid to become operational. Credit unions that are eligible to apply for federal share insurance are considered "depository institutions" legally eligible to apply for an account.[318]

---

[310] *Id.* ¶¶ 57-58.

[311] *Id.* ¶ 59.

[312] *Id.* ¶ 61.

[313] *Id.* ¶ 62.

[314] *Id.* ¶ 100.

[315] *Id.*

[316] Fourth Corner Credit Union v. Nat'l Credit Union Admin., Civ. No. 15-cv-01634, 2016 WL 9735755 (D. Colo. Dec. 6, 2016) (discussing a discovery dispute over notes made during these calls).

[317] First Amended Complaint ¶ 112, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633).

[318] 12 U.S.C. §§ 342, 461. Under Colorado law, Fourth Corner may be able to operate with private share insurance. *See* Hill, *supra* note 300, at 624 n.133 (explaining that the Colorado credit union regulator would have to find the private share insurance comparable to federal insurance).

Electronic copy available at: https://ssrn.com/abstract=4048081

Nevertheless, on July 16, 2015, the Kansas City Fed denied Fourth Corner Credit Union's request for an account.[319] The denial letter focused primarily on the risks presented by Fourth Corner. The Reserve Bank wrote: "As a de novo depository institution, there is no historical record for the Bank to review, and the NCUA found insufficient information to assess [Fourth Corner's] ability to safely and soundly operate and company with applicable laws and regulations, including Bank Secrecy Act and Anti-Money Laundering responsibilities."[320] Of course, this is always a problem with de novo depository institution because they are, by definition, new.[321] The Kansas City Fed explained it was particularly concerned because Fourth Corner would "focus on serving marijuana-related businesses"—businesses that were illegal under federal law.[322] Moreover, the cannabis industry consisted of "relatively immature businesses operating in an environment of evolving laws and regulations."[323]

It is not clear whether the Kansas City Fed would deny an account to bank whose customers consisted primarily of marijuana related businesses. Parts of the denial letter are directed at deficiencies in Fourth Corner's plans. For example, the Reserve Bank noted that Fourth Corner had "not demonstrated its ability to conduct appropriate enhanced monitoring requirements and manage its risk appropriately with respect to its customers with marijuana-related businesses."[324] And the Reserve Bank explained that its "[c]oncern about this high-risk business model [was] heightened by the fact that [the Credit Union would] lack capital at inception, making it unable to absorb losses it may initially incur."[325] Perhaps a well-capitalized bank with more robust money-laundering controls would have received an account. While Fourth Corner's application was pending,

---

[319] Letter from Esther L. George, President, Federal Reserve Bank of Kansas City, to Deirdra A. O'Gorman, CEO, The Fourth Corner Credit Union, July 16, 2015 (Document 01019611484, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 861 F.3d 1052 (10th Cit. 2017) (No. 16-1016)).

[320] *Id.*

[321] It is, however, possible that in providing account and payment services, Reserve Banks sometimes apply a different standard to banks with existing account than they do when considering access for de novo banks.

[322] Letter from Esther L. George to Deirdra A. O'Gorman, *supra* note 319.

[323] *Id.*

[324] *Id.*

[325] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4048081

some banks were serving the cannabis industry[326] without any apparent consequences for their access to Federal Reserve payment systems.

Unhappy with the decision, Fourth Corner Credit Union asked a federal court for an injunction requiring the Reserve Bank to open its account.[327] Fourth Corner argued that Reserve Banks have no discretion to deny account applications to a chartered depository institution.[328] The district court dismissed the case with prejudice ruling that it could not use its equitable power to facilitate activity that was illegal under federal law—banking cannabis businesses.[329]

Fourth Corner appealed.[330] Perhaps sensing that it was going to be difficult to convince courts or regulators to allow a financial institution focused on marijuana, Fourth Corner argued that it would serve cannabis businesses only if doing so was legal under federal law.[331] One judge on the three-judge panel concluded that there was "no doubt" that Fourth Corner's intent was to serve marijuana-related businesses.[332] Judge Nancy L. Moritz wrote: "Indeed, the dearth of banking services for [marijuana-related businesses] is the Credit Union's founding purpose."[333] Like the district court, she would have dismissed the case on legality grounds.[334] But Judge Scott M. Matheson, Jr. concluded that the Kansas City Fed had not ruled on an account for Fourth Corner under the condition that Credit Union serve only businesses operating legally under federal law.[335] He recommended Fourth Corner file a new account application to allow the Reserve Bank to consider the issue.[336] The third judge, Judge Robert E. Bacharach, would not have dismissed the case.[337] He wrote that all depository

---

[326] Calvery, *supra* note 303.

[327] Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185, 1185 (D. Colo. 2016), *vacated on appeal by* 861 F.3d 1052 (10th Cir. 2017).

[328] *Id*. at 1187-88.

[329] *Id*. at 1188-90.

[330] Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 861 F.3d 1052 (10th Cir. 2017) (per curiam).

[331] *Id*. at 1055-57 (Moritz, J.), 1058 (Matheson, J.), 1065 (Bacharach, J.).

[332] *Id*. at 1056 (Moritz, J.).

[333] *Id*.

[334] *Id*. at 1059 (Moritz, J.).

[335] *Id*. at 1058-60 (Matheson, J.).

[336] *Id*. at 1064 (Matheson, J.).

[337] *Id*. at 1080 (Bacharach, J.).

Electronic copy available at: https://ssrn.com/abstract=4048081

institutions were entitled to Federal Reserve accounts.[338] With little agreement among the judges, the Tenth Circuit panel remanded the case with "instruction to dismiss the amended complaint without prejudice."[339] This left Fourth Corner free to file a new application for an account.

On September 12, 2017, Fourth Corner Credit Union submitted new documents to the Reserve Bank requesting an account.[340] Its application included the standard forms regarding individuals authorized to transact business on behalf of the Credit Union.[341] Fourth Corner also provided a copy of the board resolution stating that "[t]he Fourth Corner Credit Union shall not serve marijuana-related businesses until there is a change in federal law that authorizes financial institutions to serve marijuana-related businesses."[342] This time the Reserve Bank requested additional information, explaining that Fourth Corner's "unique" application raised "legal and policy questions."[343] Fourth Corner thought it was entitled to an account and the Reserve Bank had no authority to request additional information.[344] Rather than provide information, Fourth Corner again asked a federal court to grant an injunction forcing the Reserve Bank to open a an account.[345]

While the lawsuit was pending and before any significant motions or briefings, the Kansas City Fed sent Fourth Corner Credit Union a letter

---

[338] *Id.* at 1068-73.

[339] *Id.* at 1053 (per curiam).

[340] Complaint at ¶ 34, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Sept. 29, 2017); Answer at ¶ 34, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Nov. 8, 2017).

[341] Complaint at ¶ 34, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Sept. 29, 2017); Answer at ¶ 34, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Nov. 8, 2017).

[342] Complaint at ¶ 41, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Sept. 29, 2017); Answer at ¶ 41, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Nov. 8, 2017).

[343] Complaint at ¶ 33, 50, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Sept. 29, 2017); Answer at ¶ 33, 50, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Nov. 8, 2017). The specific information the Reserve Bank requested is not available in publicly available legal filings.

[344] Complaint at ¶ 33, 38-40, 50-52, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (Sept. 29, 2017).

[345] *See generally id.*

Electronic copy available at: https://ssrn.com/abstract=4048081

conditionally granting account access.[346] There were three notable conditions. First, Fourth Corner promised to obtain NCUA share insurance or private share insurance.[347] Second, the Credit Union committed to adopt a board resolution and amend its bylaws to prevent it from providing "any service to Marijuana-Related Businesses . . . unless and until it becomes lawful under federal law to provide banking or financial service to them."[348] Third, the Credit Union pledged to adopt a compliance program to prevent inadvertently serving the cannabis industry.[349] The Reserve Bank was aware that its decision on Fourth Corner's account was likely to receive public attention. It wrote: "This letter does not express the policy views of [the Kansas City Fed] or The Board of Governors of the Federal Reserve System, nor does it contain any supervisory, regulatory, or enforcement guidance or precedent."[350]

So far Fourth Corner Credit Union has been unsuccessful in its quest secure private share insurance.[351] It is again pursuing NCUA share insurance with a promise not to bank cannabis-touching businesses unless authorized under federal law.[352] As a result, Fourth Corner still has not opened a Federal Reserve account.

### B.   Public Bank

Not all novel banks are denied Federal Reserve accounts. The San Francisco Fed opened an account for the Territorial Bank of American Samoa, a publicly owned bank, in 2018.[353]

---

[346] Stipulation of Dismissal, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City (D. Colo. Feb. 2, 2018); Letter from Susan E. Zubradt, Senior Vice President, Fed. Reserve Bank of Kansas City to Deirdra O'Gorman & Christopher E. Nevitt, Fourth Corner Credit Union (Feb. 2, 2018) (copy on file with author).

[347] *Id*. at 2.

[348] *Id*. Fourth Corner also promised not to subsequently amend its bylaws to allow service to cannabis businesses until federal law allowed those banking services. *Id*.

[349] *Id*.

[350] *Id*. at 3.

[351] E-mail from Mark Mason, Attorney, Fourth Corner Credit Union to Author (Feb. 2, 2021) (on file with Author).

[352] *Id*.

[353] Fili Sagapolutele, *TBAS Opens "Master Account" with the Federal Reserve Bank*, SAMOA NEWS (Apr. 7, 2018, 11:24 AM), http://www.samoanews.com/local-news/tbas-opens-master-account-federal-reserve-bank.

Electronic copy available at: https://ssrn.com/abstract=4048081

American Samoa is a U.S. territory comprised of an archipelago of Pacific islands located about half-way between Hawaii and Australia.[354] Due to its remote location, small population,[355] and property laws,[356] banking has never been plentiful in American Samoa.[357] Banking was so scarce that in 1914, the U.S. Navy (which administered the territory at the time) established the Bank of American Samoa.[358] For many years it was the only bank.[359] It operated as a publicly owned bank[360] until it was purchased by the privately owned Bank of Hawaii in 1969.[361] By the beginning of the twenty-first century, American Samoa had only two deposit-taking banks: Bank of Hawaii and ANZ Amerika Samoa Bank.[362] As an Australian bank

---

[354] Central Intelligence Agency, World Factbook: American Samoa (last updated July 20, 2021), https://www.cia.gov/the-world-factbook/countries/american-samoa/.

[355] *Id.* (stating that American Samoa had an estimated population of 46,366 in July 2021).

[356] In American Samoa, only those who are at least one-half Samoan by blood are allowed to own property. AM SAMOA CODE ANN. § 37.0204(b) (2020). "[O]ver 90 percent of the land is communally owned." Fed. Reserve Bank of San Francisco, Community Reinvestment Act Performance Evaluation, Bank of Hawaii (Aug. 8, 2016). In addition, "[t]here are no written records of any kind indicating land ownership prior to 1900, as there was essentially no 'government' that originally owned the land and granted title to private citizens . . . . Because there were no legal descriptions of the property, claims based on oral traditions were very complicated and subject to continuing dispute." James R. Thornbury, *A Time for Change in the South Pacific*, 67 REV. JUR. U.P.R. 1099, 1101 (1998).

[357] Adrian E. Tschoegl, *Foreign Banks in the Pacific: A Note*, 40 J. OF PAC. HIST. 223, 233 (2005); Andrew Van Dam, *When Banks Abandoned American Samoa, the Islands Found a Solution Nobody Had Used in a Century*, WASHINGTON POST (May 9, 2018), https://www.washingtonpost.com/news/wonk/wp/2018/05/09/when-banks-abandoned-american-samoa-the-islands-found-a-century-old-solution-that-could-be-the-future-of-finance/.

[358] AMERICAN SAMOA: CODIFICATION OF THE REGULATIONS & ORDERS § 16 ¶ 2 (1931); HENRY F. BRYAN, AMERICAN SAMOA: A GENERAL REPORT BY THE GOVERNOR 98 (1927).

[359] BRYAN, *supra* note 358, at 98; NAVY DEP'T, AMERICAN SAMOA: INFORMATION ON AMERICAN SAMOA TRANSMITTED BY THE UNITED STATES TO THE SECRETARY-GENERAL OF THE UNITED NATIONS PURSUANT TO ARTICLE 73(E) OF THE CHARTER 22 (1947); Tschoegl, *supra* note 357.

[360] The Bank of American Samoa was regulated only by the government of American Samoa, the officials of which also largely ran the bank. OREN E. LONG & ERNEST GRUENING, STUDY MISSION TO EASTERN [AMERICAN] SAMOA, S. DOC. NO.87- 38, at 80 (1961). Deposits were not insured by the federal government. *Id.* At times the Bank was "subjected to political pressures to make loans for one purpose or another." *Id.*

[361] S. REP. NO. 91-996, at 1 (1970).

[362] Amerika Samoa Bank was founded in 1979 "by residents of Samoa, with the express intent of serving the Samoan population." Amerika Samoa Bank, Community Reinvestment Act Performance Evaluation, Amerika Samoa Bank (June 8, 1998). It was purchased by the large Australia and New Zealand Banking Group (ANZ) in 2001. *See* Fed. Deposit Ins. Corp., Community Reinvestment Act Performance Evaluation, Amerika Samoa Bank 3 (Jan. 19, 2010); Fed. Deposit Ins. Corp. Community Reinvestment Act Performance Evaluation, ANZ Guam, Inc. 1-2 (Aug. 12, 2019).

with no branches in the mainland U.S., ANZ's services did not easily facilitate payments to or from the U.S. It did not offer Mastercard or Visa debits cards.[363] Checks deposited at ANZ and drawn on mainland U.S. banks could take up to three weeks to process.[364] In addition, ANZ was not equipped to handle payments for the government of American Samoa.[365] Consequently, Bank of Hawaii was the primary financial institution for most people and businesses in American Samoa.[366]

Then, in 2012, Bank of Hawaii announced it planned to exit the American Samoa market.[367] This left the Territory scrambling for other ways to connect to the U.S. payments systems. A delegation tried to persuade other Hawaiian banks to open a branch in their Territory.[368] Locals tried to start a de novo community bank.[369] They explored the possibility of opening a credit union.[370] These efforts all proved unsuccessful.[371] The government of American Samoa moved its accounts to Zions Bank, a Utah bank that did not intend to open a branch in American Samoa.[372] The Bank

---

[363] Comment Letter from John Taylor, Nat'l Community Reinvestment Coalition, to Kelly Walsh, Senior Examiner, Federal Reserve Bank of San Francisco 2, Mar. 5, 2013, https://ncrc.org/wp-content/uploads/2013/03/ncrc_comment_letter_regarding_bank_of_%20hawaii.pdf.

[364] *Id.*

[365] *Id.* at 3.

[366] Rob Blackwell, *How Far Does American Samoa Have to Go to Get a Bank?*, AM. BANKER MAG. Aug. 2017, at 14.

[367] It explained that "geographic isolation and other factors posed operational challenges." ANNUAL REPORT, BANK OF HAWAII 1 (2012).

[368] Dave Segal, *American Samoa Courting Hawaii Bankers*, HONOLULU STAR-ADVERTISER, Dec. 31, 2012.

[369] Organizers filed an application to open the Community Bank of American Samoa on September 20, 2013. FDIC, Bank Application Actions (last updated July 14, 2021), https://www.fdic.gov/regulations/applications/rmsbankapp/document/tbl-applications-for-internet.xlsx; Fili Sagapolutele, *American Samoa Turns to Internet for Banking*, USA TODAY (Sept. 30, 2013, 9:30 PM), https://www.usatoday.com/story/money/business/2013/09/30/american-samoa-turns-to-internet-for-banking/2899241/.

[370] Blackwell, *supra* note 366 (noting that [t]he last credit union on the island was shuttered in 1993 after its president was accused and later convicted of the fraud that led to the institution's downfall").

[371] Blackwell, *supra* note 366, at 14; Fili Sagapolutele, *Governor Submits Bill to Authorize American Samoa Charter Bank*, PACIFIC ISLANDS REPORT (Jan. 16, 2015), http://www.pireport.org/articles/2015/01/16/governor-submits-bill-authorize-american-samoa-charter-bank.

[372] Dave Segal, *Zions Bank to Take Over Payroll Processing in American Samoa*, HONOLULU STAR-ADVERTISER (Mar. 12, 2013), https://www.staradvertiser.com/2013/03/12/breaking-news/zions-bank-to-take-over-government-payroll-processing-in-american-samoa/; *American Samoa to Bank Online*, HONOLULU STAR-ADVERTISER, Oct. 1, 2013.

Electronic copy available at: https://ssrn.com/abstract=4048081

of Hawaii agreed to stay in American Samoa until a replacement bank could be found,[373] but it closed one of its two branches[374] and stopped providing loans.[375]

Perhaps because American Samoa had a history with a government-owned bank, or perhaps because there were no other options, the Territory turn to a public bank.[376] Its leaders knew that getting cooperation from federal banking regulators was going to be difficult. In the wake of the 2008 financial crisis, the FDIC effectively stopped granting deposit insurance for de novo bank charters.[377] In addition, FDIC policy made it clear the agency was less likely to grant insurance to a publicly owned bank than a privately owned one.[378] Rather than pursue federal deposit insurance, the American Samoa government settled on a business model like that of Bank of North Dakota, the only successful public bank operating in the U.S. at the time.[379] Bank of North Dakota operates without deposit insurance but has an account and payment services provided by the Minneapolis Fed.[380]

---

[373] Dave Segal, *Bank of Hawaii Delays American Samoa Exit Indefinitely*, HONOLULU STAR-ADVERTISER (Dec. 9, 2013), https://www.staradvertiser.com/2013/12/09/breaking-news/bank-of-hawaii-delays-american-samoa-exit-indefinitely/.

[374] *Id.*

[375] Fed. Reserve Bank of San Francisco, Community Reinvestment Act Performance Evaluation, Bank of Hawaii (Aug. 8, 2016); Van Dam, *supra* note 357.

[376] *See* Blackwell, *supra* note 366.

[377] David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397, 1399 (2020).

[378] *See* Applications for Deposit Insurance, 63 Fed. Reg. 44,752, at 44,760-61 (Aug. 20, 1998) (noting that applications for deposit insurance from public banks "will be reviewed very closely" because they "present unique supervisory concerns"); Applications for Deposit Insurance, 62 Fed. Reg. 52,869, at 52,871 (Oct. 9, 1997) (stating that the FDIC "in unlikely to resolve satisfactorily all of the statutory factors which must be considered under section 6 of the FDI Act (12 U.S.C. 1816) in evaluating" insurance application from publicly owned banks).

[379] *See* Blackwell, *supra* note 366 (reporting that American Samoa's approach was partly inspired by the Bank of North Dakota); Telephone Interview with Drew Roberts, Chief Exec. Officer, Territorial Bank of Am. Samoa (Aug. 28, 2019) (explaining that American Samoa did not immediately apply for deposit insurance because FDIC was not regularly granting insurance applications for de novo banks and the bank organizers believed the FDIC was unlikely to approve insurance for a public bank).

[380] Bank of North Dakota, History of BND, https://bnd.nd.gov/history-of-bnd/ (last visited July 27, 2021).

Electronic copy available at: https://ssrn.com/abstract=4048081

Even here though, the precedent was thin. Bank of North Dakota, chartered in 1919, gained its access to Federal Reserve payment services before deposit insurance was ubiquitous.[381]

Nevertheless, American Samoa, with help from a group of Utah-based bank consultants,[382] pushed ahead. In 2015, its legislature, the Fono, approved a charter for the Territorial Bank of American Samoa (TBAS).[383] TBAS tried to prevent some of the political pressures that doomed prior publicly owned banks in the United States. For example, it adopted a policy preventing the Bank from lending to the government, government officials, and bank insiders.[384] The Fono also created a new Office of Financial Institutions to supervise and regulate the government-owned bank.[385] But while the Fono could grant a bank charter and create a bank regulator, it could not connect its bank to the US payment system.

Rather than connect directly to the Federal Reserve through a master account, the Territorial Bank of American Samoa initially planned to rely on correspondent banking services from Zions Bank (the Utah bank which was already handling payments for the American Samoa government).[386] This plan, however, hit two roadblocks. First, Zions Bank changed course

---

[381]  The Bank of North Dakota has held an account at the Federal Reserve since at least 1942. *See* G.4 State Member Banks of the Federal Reserve (1942), https://fraser.stlouisfed.org/title/1063/item/40828?start_page=15.

[382]  Van Dam, *supra* note 357 (reporting that American Samoa worked with Drew Roberts from "the Utah financial consulting firm Burton, Roberts and Meredith).

[383]  AM. SAMOA CODE ANN. § 28.0202; *Territorial Bank of American Samoa Details Its Origins*, SAMOA NEWS (Sept. 19, 2016, 3:20 PM), https://www.samoanews.com/local-news/territorial-bank-american-samoa-details-its-origins.

[384]  *See* Blackwell, *supra* note 366 ("The bank cannot lend to its board members or to the government."); *TBAS Chair Responds to Many of the Community's Concerns*, SAMOA NEWS (Sept. 22, 2016, 5:24 P.M.) ("The board at one of its first meetings adopted a Loan Policy that forbids lending to directors or senior management of the bank, [TBAS Chairman of the Board Utu Abe Malae] said . . . .").

[385]  AM. SAMOA CODE ANN. §§ 28.1202 (creating the Office of Financial Institutions to "regulate all financial institutions that operate or conduct business within American including but not limited to . . . .any [American Samoa Government]-owned financial and depository institutions"); AM. SAMOA CODE ANN. § 28.0208 (giving the Office of Financial Institutions the right "to examine the affairs of the Bank").

[386]  Fili Sagapolutele, *Governor Submits Bill to Authorize American Samoa Charter Bank*, PACIFIC ISLAND REPORT (Jan. 16, 2015), http://www.pireport.org/articles/2015/01/16/governor-submits-bill-authorize-american-samoa-charter-bank; *Treasurer: Zions Will Only Support ASG Charter Bank*, SAMOA NEWS (Feb. 4, 2015, 2:45 PM), https://www.samoanews.com/treasurer-zions-will-only-support-asg-charter-bank.

Electronic copy available at: https://ssrn.com/abstract=4048081

and told TBAS it could not act as a correspondent bank.[387] It intimated that its federal regulator, the Officer of the Comptroller of the Currency, was concerned about the risk posed by payment processing for TBAS.[388] The numerous other banks that TBAS approached also declined to act as its correspondent banks.[389] Second to connect with a correspondent bank, TBAS needed a routing number provided by the ABA.[390] Under ABA policy, "[t]o be eligible for a regular routing Number, a bank must be eligible to maintain an account at a Federal Reserve Bank."[391] So, in July 2016, when TBAS asked the ABA for a routing number, the ABA asked the San Francisco Fed to confirm that TBAS was eligible to maintain an account.[392] The Federal Reserve, however, did not readily confirm TBAS's eligibility.[393]

In October 2016, TBAS opened without an ABA routing number or Federal Reserve account.[394] Its offices, equipment, ATM machines, and even a house, had all been donated by the Bank of Hawaii.[395] Customer demand for accounts was robust.[396] Yet without access to the US payment system, TBAS could not even offer its customers checks.[397]

With deposits pouring in, TBAS set out to convince the Federal Reserve that not only was it eligible to receive an ABA routing number, but it also deserved an account with the San Francisco Fed. Although San Francisco Fed would operate the account, TBAS's organizers soon found themselves working with the Federal Reserve Board in Washington,

---

[387] Telephone Interview with Drew Roberts, *supra* note 379.

[388] *Id.*

[389] *Id.* (estimating that TBAS contacted thirty banks seeking correspondent bank services).

[390] Blackwell, *supra* note 366.

[391] *Id.*

[392] *Id.*

[393] *Id.*

[394] Joyetter Feagaimaalii-Luamanu, *Territorial Bank of American Samoa Opens Its Doors*, PACIFIC ISLAND REP. (Oct. 4, 2015, 2:22 PM), http://www.pireport.org/articles/2016/10/04/territorial-bank-american-samoa-opens-its-doors (describing the grand opening of TBAS); Blackwell, *supra* note 366 (explaining that TBAS has initially opened without a Federal Reserve account or routing number).

[395] ANNUAL REPORT, BANK OF HAWAII 4-5 (2019).

[396] Blackwell, *supra* note 366 ("At the bank's opening ceremony . . . the lobby was packed with customers. Even month later, the bank was opening 12 to 15 deposit accounts a day . . . .").

[397] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4048081

DC.[398] Federal Reserve Board General Counsel Scott Alvarez met with TBAS on numerous occasions.[399] He requested that TBAS provide written documents addressing numerous issues. Was TBAS eligible for an account?[400] How would TBAS protect itself from government pressures?[401] Could the newly created Office of Financial Services adequately supervise the bank?[402] How was TBAS different from the Development Bank of Puerto Rico – a public bank that failed while TBAS's request for a routing number was pending?[403] TBAS organizers did their best to address these and other Federal Reserve concerns.[404] They also emphasized that denying access to the Federal Reserve's payment systems left thousands of Samoans, many of whom live in poverty, without access to adequate banking.[405] After all, the Community Reinvestment Act requires the Federal Reserve to consider the credit needs of the community when addressing other types of bank applications.[406] Still TBAS seemed to be making little progress.[407]

TBAS's break came when Randal Quarles was appointed as vice chairman of banking supervision at the Federal Reserve Board. Quarles

---

[398] *Id.* (reporting that "The Federal Reserve Bank of San Francisco . . . has sent the case to the Federal Reserve Board to review given the unusual circumstances").

[399] *Id.*; Telephone Interview with Drew Roberts, *supra* note 379.

[400] Telephone Interview with Drew Roberts, *supra* note 379.

[401] *American Samoa Bank Struggles to Provide Some Services*, RNZ (Mar. 27, 2017, 1:01 PM), https://www.rnz.co.nz/international/pacific-news/327556/american-samoa-bank-struggles-to-pro-vide-some-services (quoting TBAS president Philip as stating "I try very hard to make sure that [Federal Reserve personnel] understand there's a barrier between the government and the bank, and the government will not influence us, nor will they get involved").

[402] Telephone Interview with Drew Roberts, *supra* note 379.

[403] *Id.*; *see also* Andrew Scurria, *Puerto Rico Government Development Bank Opts to Liquidate*, WALL ST. J. (Apr. 28, 2017, 12:55 PM), https://www.wsj.com/articles/puerto-rico-government-devel-opment-bank-opts-to-liquidate-1493386141?mod=article_inline (describing the financial difficulties of the Puerto Rico Development Bank and its decision to liquidate).

[404] Telephone Interview with Drew Roberts, *supra* note 379.

[405] *See id.* (explaining that TBAS asked the Federal Reserve to consider the importance of access to banking in American Samoa, especially given the Federal Reserve's responsibilities under the CRA); FED. DEPOSIT INS. CORP., COMMUNITY REINVESTMENT ACT PERFORMANCE EVALUATION: ANZ GUAM, INC. 16 (Aug. 12, 2019) ("As of the 2010 U.S. Census, the population is 55,519, of which 54.5 percent were below the poverty level and approximately 23.8 percent of the population is unemployed.").

[406] 12 U.S.C. § 2903(a)(2) (requiring the Federal Reserve to take and institution's record of meeting the credit needs of its community into account "in its evaluation of an application for a deposit facility by such institution").

[407] Telephone Interview with Drew Roberts, *supra* note 379.

Electronic copy available at: https://ssrn.com/abstract=4048081

had previously led the Utah-based Cynosure Group and knew some of TBAS's Utah-based organizers.[408] Within a month of Quarles's confirmation, TBAS organizers had met with him in Utah[409] and were on their way to receiving authorization to receive a routing number.[410] TBAS organizers credit Quarles with understanding the need for banking in American Samoa.[411] Ultimately, the Federal Reserve's decision to grant TBAS an account may have been driven more by benefits that TBAS provides to the people of American Samoa, rather than by the risk TBAS presented.[412]

On December 26, 2017, the American Bankers Association assigned the Territorial Bank of American Samoa its routing number.[413] Shortly thereafter, TBAS learned the San Francisco Fed would open TBAS's account, subject to conditions.[414] TBAS then entered an agreement with the Reserve Bank setting restrictions for its use of the account.[415] Among other

---

[408] *See* Van Dam, *supra* note 357 (noting that Quarles came to the Federal Reserve Board "from the Utah-based Cynosure Group"); Telephone Interview with Drew Roberts, *supra* note 379 (describing the founder familiarity with Quarles from their Utah banking experience).

[409] *See Bill Will Allow for TBAS Routing Number Says Governor*, TALANEI (Dec. 14, 2017), https://www.talanei.com/2017/12/14/bill-will-allow-for-tbas-routing-number-says-governor/ (reporting that Governor Lolo Moliga and others met with Randal Quarles in Utah in November 2017); Telephone Interview with Drew Roberts, Chief Exec. Officer, *supra* note 379 (stating that TBAS organizers met with Quarles within two or three weeks of his confirmation to the Federal Reserve Board).

[410] Quarles had one concern for TBAS to address. TBAS had originally been organized in a holding company structure. Fili Sagapolutele, *Two Words in the TBAS Statute Blamed for Stalling the Issuance of a Routing Number*, SAMOA NEWS (Nov. 28, 2017, 12:08 PM), https://www.samoanews.com/local-news/two-words-tbas-statute-blamed-stalling-issuance-routing-number; *Bill Will Allow for TBAS Routing Number Says Governor*, *supra* note 409. Quarles was concerned that this brought the holding company within the Bank Holding Company Act, which was not a good fit for a publicly owned bank. Telephone Interview with Drew Roberts, Chief Exec. Officer, Territorial Bank of Am. Samoa (Aug. 28, 2019). To alleviate this concern, the Fono amended the statute to eliminate the holding company. *Bill Will Allow for TBAS Routing Number Says Governor*, *supra* note 409.

[411] Van Dam, *supra* note 357; Rob Blackwell, *American Samoa Finally Gets a Public Bank*, AM. BANKER (Apr. 30, 2018, 9:45 PM), https://www.americanbanker.com/news/american-samoa-finally-gets-a-public-bank-and-us-states-are-watching.

[412] Telephone Interview with Drew Roberts, *supra* note 379 (explaining that he believes the decision to grant the account was driven by concern that without the account people in American Samoa would not have adequate access to banking).

[413] Fili Sagapolutele, *Routing Number in Place, Now TBAS Works to Set up Master Account*, SAMOA NEWS (Feb. 8, 2018, 11:51 AM), https://www.samoanews.com/local-news/routing-number-place-now-tbas-works-set-master-account.

[414] *Id.*

[415] Telephone Interview with Drew Roberts, *supra* note 379. I requested a copy of this agreement from the San Francisco Fed. E-mail from Author to Erik Revai, General Counsel, Fed. Reserve Bank of S.F. (June 25, 2019). The Reserve Bank declined to provide it, claiming that although it is not governed by the Freedom of Information Act, any material "describing restrictions or limitations

Electronic copy available at: https://ssrn.com/abstract=4048081

things, TBAS agreed to maintain more capital than would be required for an FDIC insured bank.[416] It promised to hold more reserves in its account than would be required under Regulation D.[417] It committed to send the Federal Reserve monthly financial statements.[418] It also agreed to provide regular audit reports, include reports of independent Bank Secrecy Act audits.[419]

On April 7, 2018, more than a year and a half after requesting a routing number, TBAS announced it had opened its account at the San Francisco Fed.[420] TBAS now uses the Federal Reserve for cash services, check clearing, ACH, and wire transfers. TBAS is not allowed to borrow at the discount window.[421] Consumers in American Samoa have access to checking accounts and debit cards.[422]

TBAS's banking regulator is a one-person shop.[423] No Federal Reserve personnel nor any other federal bank regulator has ever visited TBAS in American Samoa.[424] The San Francisco Fed monitors the risk posed by TBAS remotely through the information it provides and monitoring of its account activity. TBAS explains that it uses its account primarily for clearing, that its number of transactions are relatively low, and that the bank seeks to avoid daylight overdrafts.[425] Nevertheless, were the Reserve Bank to become concerned, it could close TBAS's account.

---

placed on TBAS related to its mater account" could be withheld under "Exemption 10 [that] provides that the FRBSF may decline to disclose records contained in statement of account or which reflect entries made to any account maintained at FRBSF." E-mail from Erik Z Revai, General Counsel, Fed. Reserve Bank of S.F. to Author (July 24, 2019).

[416] Telephone Interview with Drew Roberts, *supra* note 379 (stating that TBAS needs to maintain a capital ratio of between fourteen and sixteen percent).

[417] *Id.*; *see also* 12 C.F.R. § 204.4 (describing the computation of required reserves).

[418] Telephone Interview with Drew Roberts, *supra* note 379.

[419] *Id.*

[420] Fili Sagapolutele, *TBAS Opens "Master Account" with the Federal Reserve Bank*, Samoa News (Apr. 7, 2018, 11:24 AM), https://www.samoanews.com/local-news/tbas-opens-master-account-federal-reserve-bank.

[421] Telephone Interview with Drew Roberts, *supra* note 379.

[422] *Territorial Bank of American Samoa Introduces TBAS Debit Mastercard*, Samoa News (Aug. 3, 2020, 2:48 PM), https://www.samoanews.com/local-news/territorial-bank-american-samoa-introduces-tbas-debit-mastercard.

[423] Telephone Interview with Drew Roberts, *supra* note 379.

[424] *Id.*

[425] *Id.*

Even TBAS seems to acknowledge that its current situation is not ideal. It is exploring options to privatize and get federal deposit insurance.[426] If these efforts are successful, it would become a traditional community bank with the FDIC as its regulator.

### C.   Narrow Bank

Another Federal Reserve account application from a proposed bank without deposit insurance has been pending for years. TNB USA Inc. began trying to open an account at the New York Fed in the fall of 2017.[427] TNB stands for "the narrow bank."[428] It intends to accept deposits, but not make loans.[429]

TNB's business plan rests on the Federal Reserve's decision to begin paying interest on bank' excess reserves in 2008.[430] The Federal Reserve hoped that by paying interest on excess reserves, banks would hold excess reserves in Federal Reserve accounts when interest on excess reserve rate exceeded the interest from lending the excess reserves to other banks.[431] Thus, in setting the rate for interest on excess reserves (IOER), the Federal Reserve could effectively set a lower bound for the federal funds rate (the rate banks lend to each other).[432]

---

[426] *American Samoa Reveals Plans to Privatise Govt Bank*, RNZ (Mar. 21, 2019, 9:11 AM), https://www.rnz.co.nz/international/pacific-news/385234/american-samoa-reveals-plans-to-privatise-govt-bank.

[427] TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2002 WL 1445806 (S.D.N.Y. 2020).

[428] TNB, About Us, https://www.tnbusa.com/about/ (last visited Jan. 10, 2022), https://www.tnbusa.com/about/ [https://perma.cc/DFF6-PUW7].

[429] Complaint at 1, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2002 WL 1445806 (S.D.N.Y. 2020).

[430] Banks must keep a minimum amount of reserves on despot with the Federal Reserve. 12 U.S.C. § 461. Banks, however, can choose to maintain Federal Reserve balances exceeding that required; these are excess reserves. *TNB USA Inc.*, 2002 WL 1445806, at *1. Congress authorized the Federal Reserve to begin paying interest on both required and excess reserves during the 2008 financial crisis. Financial Services Regulatory Relief Act of 2006, Pub. L. No 109-351, §§ 201-03, 120 Stat. 1966, 1968-69, codified at 12 U.S.C. § 462(b)(12) (authorizing the Federal Reserve to begin paying interest beginning on October 1, 2011); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 128, 122 Stat. 3765, 3796 (accelerating the date the Federal Reserve could begin paying interest to October 1, 2008); *see also* Reserve Requirements of Depository Institutions, 73 Fed. Reg. 59482 (2008) (announcing the Federal Reserve's plan to pay interest on excess reserves).

[431] 73 Fed. Reg. at 59,482; TNB USA Inc., 2020 WL 1445806, *2.

[432] 73 Fed. Reg. at 59,482; *TNB USA Inc.*, 2020 WL 1445806, *1.

Electronic copy available at: https://ssrn.com/abstract=4048081

But what the Federal Reserve saw as a tool of monetary policy,[433] TNB hopes to translate into a money-making opportunity. TNB's CEO and chairman of the board, James McAndrews, headed the research division at the New York Fed from 2010 to 2016.[434] While there he studied both the Fed's use of IOER and the Fed's creation of a facility to pay interest to select non-bank institutional investors.[435] From this, grew the idea of a private sector narrow bank.[436] McAndrews left the New York Fed in 2016 and began organizing TNB.[437]

TNB wants to accept deposits from institutional investors, like money market funds and pension funds, who are not themselves eligible for Federal Reserve accounts.[438] TNB will then place all its customers' deposits in its Federal Reserve account, earning the IOER rate of interest.[439] "TNB will pay interest to its depositors at a . . . lower rate, thereby

---

[433] Press Release, Fed. Rsrv. Bd, Board Announces that it Will Begin to Pay Interest on Depository Institutions' Required and Excess Reserve Balances (Oct. 6, 2008), https://www.federalreserve.gov/newsevents/pressreleases/monetary20081006a.htm [https://perma.cc/LJ5Z-9ENF].

[434] Binyamin Appelbaum, *Former Official Sues the Fed for Rejecting a Plan for a New Kind of Bank*, N.Y. TIMES, Sept. 7, 2018, at B7; Opinion, *Narrow Odds for Narrow Banks*, WALL ST. J., Sept. 13, 2018, at A18.

[435] Antoine Martin, James McAndrews, Ali Palida, & David Skeie, *Federal Reserve Tools for Managing Rates and Reserves*, FED. RSRV. BANK OF N.Y. STAFF REP. 642 (2019), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr642.pdf; James McAndrews & Andrew Kroeger, *The Payment System Benefits of High Reserve Balances*, FED. RSRV. BANK OF N.Y. STAFF REP. 779 (2016), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr779.pdf?la=en; Michael Derby, *Bank Sues New York Fed Over Lack of Account*, WALL ST. J., (Sept. 5, 2018), https://www.wsj.com/articles/bank-sues-new-york-fed-over-lack-of-account-1536185523.

[436] James McAndrews, Chairman and Chief Executive Officer, TNB USA Inc., Narrow Banking: Delivering Safety and Competition to the Market for Large Deposits, Address at the Harvard Law School Conference Money as a Democratic Medium (Dec. 15, 2018) (video recording available at https://www.youtube.com/watch?v=YPudibodp_E (1:01:21)).

[437] *See* Applebaum, *supra* note 434, at B7 (stating that McAndrews "left the Fed in 2016"); Complaint at 10, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020) (stating that "TNB began discussions with the [Connecticut Department of Banking] in July 2016).

[438] Letter from James McAndrews, Chairman and Chief Executive Officer, TNB USA Inc. to Ann E. Misback, Secretary, Board of Governors of the Fed. Rsrv. Sys. 1 n.1 (June 11, 2021), https://www.federalreserve.gov/SECRS/2021/July/20210708/OP-1747/OP-1747_061121_138143_448935872132_1.pdf; Complaint at 1, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020); Frost et al., *supra* note 435, at 5.

[439] Complaint at 9, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

Electronic copy available at: https://ssrn.com/abstract=4048081

earning a . . . profit."[440] The appeal for potential TNB depositors is two-fold. First, TNB would provide a safe and liquid place for institutional investors to hold cash.[441] Second, TNB "would offer its customers a higher rate than they could earn [from such low-risk deposits] elsewhere."[442]

To implement this plan, TNB sought a banking charter from the Connecticut Department of Banking.[443] Because TNB's deposit base would consist of large institution investors with deposits well beyond the insurable amount, TNB did not request deposit insurance from the FDIC.[444] On August 10, 22, 2017, Connecticut issued a temporary certificate of authority for TNB's bank.[445] It included several conditions that TNB must satisfy before opening the bank. One of the conditions was that TNB provide "evidence that the [New York Fed] would open a master account for TNB."[446] Of course, a Federal Reserve account was also functionally required for TNB to implement its business plan. TNB described its situation of having a charter but no federal reserve account like having "the right to play tennis without the right to a racket."[447]

---

[440] *Id.*; *see also* Memorandum of Law in Support of Defendant Fed. Rsrv Bank of N.Y.'s Motion to Dismiss at 1, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 ("TNB seeks to open a deposit account at the New York Fed no so that it can engage in the typical business of banking, but solely so that TNB can park the funds of its wealthy, institutional depositors in the account and pass TNB's IOER earnings on to them, after taking a cut for itself.").

[441] *"Narrow Bank" Challenges Traditional Industry Model, But Fed Pushes Back*, S&P GLOBAL MARKET INTELLIGENCE (Mar. 27, 2019), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/narrow-bank-challenges-traditional-industry-model-but-fed-pushes-back-49204495; Gavriel Schreiber, *The Narrow Bank Update: SDNY Dismisses TNB Suit*, JUST MONEY (Mar. 30, 2020), https://www.printfriendly.com/p/g/spTCt8.

[442] Opinion, *Narrow Odds for Narrow Banks*, WALL ST. J., Sept. 13, 2018, at A18.

[443] TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806, *2 (S.D.N.Y. 2020).

[444] Complaint at 9, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020). Other commentators have noted that narrow banks that invest in only liquid, safe assets have little need for deposit insurance. *See* Schreiber, *supra* note 441 (stating that because "[a]ll money deposited at TNB will be in the Fed[,] . . . there is no risk of TNB being unable to meet demands for deposits").

[445] *New Banks in Connecticut*, STATE OF CONN. DEP'T OF BANKING, https://portal.ct.gov/DOB/Bank-Information/Bank-Information/New-Banks-in-Connecticut (last visited Jan. 27, 2022) (noting that temporary certificates are effective for eighteen months, but that TNB's was extended on January 25, 2019 and August 18, 2020).

[446] Complaint at 10, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020)

[447] Opposition to Defendant's Motion to Dismiss at 2, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 18-CV-07978, 2020 WL 1445806 (S.D.N.Y),

Electronic copy available at: https://ssrn.com/abstract=4048081

But so far TNB has been unsuccessful in its efforts to secure a Federal Reserve account. In September 2017, TNB sought a routing number from the ABA.[448] The ABA requested confirmation of TNB's eligibility from the New York Fed.[449] TNB and the New York Fed discussed whether TNB was eligible given the conditional nature of its Connecticut charter, but the New York Fed eventually agreed "that TNB would be eligible for a master account upon issuance of" final approval from Connecticut to open the bank.[450] Within a few months, TNB had a routing number,[451] but that was only the first hurdle.

The New York Fed began conducting due diligence to decide whether to allow TNB to open an account.[452] The New York Fed deemed a due diligence risk assessment necessary because TNB would be uninsured and have no federal supervisor.[453] As part of the risk assessment, TNB responded to a series of document and information requests, including requests for information about creditworthiness and anti-money laundering issues.[454] The New York Fed advised TNB that it should not submit its formal application for an account until the due diligence process was completed.[455]

During the due diligence process, attorneys at the New York Fed became concerned about "the novelty of TNB's business model" and consulted with the Federal Reserve Board.[456] The Board became concerned that allowing IOER to pass through TNB to institutional investors "could

---

[448] TNB USA, Inc., No. 18-cv-7978, 2020 WL 1445806, *2 (S.D.N.Y. 2020).

[449] *Id.*

[450] *Id.*

[451] *Id.*

[452] Complaint at 12, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[453] Memorandum of Law in Support of Defendant Fed. Rsrv Bank of N.Y.'s Motion to Dismiss at 6, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[454] Complaint at 12, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[455] *Id.*

[456] Memorandum of Law in Support of Defendant Fed. Rsrv Bank of N.Y.'s Motion to Dismiss at 7, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806.

Electronic copy available at: https://ssrn.com/abstract=4048081

complicate the implementation of monetary policy, disrupt financial inter-mediation, and negatively impact our nation's financial stability."[457] In particular, the Board was concerned that, unlike traditional banks, a nar-row bank would earn interest at the IOER rate without being constrained by "the costs of capital requirements and other elements of federal regula-tion and supervision."[458] As a result, narrow banks might grow very large holding funds that institutional investors could invest or withdraw in a vol-atile manner.[459] This volatility might lead to volatility in the federal funds rate and less overall financial stability.[460] The Board also worried that the narrow bank might draw deposits away from traditional banks, requiring those banks to seek more expensive funding to provide credit to consumers and businesses.[461]

TNB believes the Board's concerns are misplaced. It believes that "TNB's business model will, if anything, only enhance the efficacy of IOER as a policy tool."[462] It argues that traditional banks that earn interest at the IOER rate still pay their depositors interest well below the IOER rate.[463] In contrast, by passing much of the interest along to depositors, TNB would "more efficiently and effectively transmit[] rising Federal Re-serve interest rates to TNB depositors."[464] As for concerns about the po-tential size and volatility of TNB deposit base, TNB claims they can be effectively managed by measures such as counterparty caps, aggregate caps, and throttling depositor's movement of funds.[465]

---

[457] Memorandum of Law of Amicus Curiae the Bd. of Govs. Of the Fed. Rsrv. In Support of Defendant the Fed. Rsrv. Bank of N.Y.'s Motion to Dismiss, TNB USA v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (2020).

[458] Regulation D: Reserve Requirements of Depository Institutions, 84 Fed. Reg. 8829, 8830 (advance notice of proposed rulemaking Mar. 12, 2019).

[459] *Id.*

[460] *Id.* at 8830-31.

[461] *Id.* at 8830.

[462] Complaint at 19, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[463] Opposition to Defendant's Motion to Dismiss at 8, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020) (citing FDIC, Weekly National Rates and Rate Caps – Weekly Update (Mar. 25, 2019), https://web.ar-chive.org/web/20210402044509/https://www.fdic.gov/regulations/resources/rates/historical/2019-03-25.html.

[464] Complaint at 19, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[465] McAndrews, *supra* note 436 (1:01:56 – 1:06:04); *see also* Letter from James McAndrews to Ann E. Misback, *supra* note 438, at 5 ("[I]f the Board or Reserve Banks have reservations about the

Electronic copy available at: https://ssrn.com/abstract=4048081

On Valentine's Day 2018, "TNB's principals and legal advisors met in Washington, D.C. with several members of the [New York Fed] and the Board's staff, including its General Counsel."[466] But the Federal Reserve Board was apparently not feeling the love and review of TNB's account application continued. On April 26, 2018, TNB submitted a written response to the policy concerns to both the New York Fed and the Federal Reserve Board.[467] The next day, TNB submitted a formal application requesting an account.[468] Shortly thereafter, the New York Fed's general counsel wrote the New York Fed was not prepared to issue the account because "senior policy officials at the Board . . . have expressed the strong view that the New York Fed should not approve TNB's request."[469]

Frustrated that its process of opening an account had dragged on for more than a year and a half, TNB filed suit against the New York Fed in March 2019.[470] It asked the court to declare that TNB was entitled to a Federal Reserve account.[471]

While the suit was pending, the Federal Reserve Board issued an advance notice of proposed rulemaking seeking comments on whether the Federal Reserve should amend its regulations to "lower the rate" of IOER for "institutions that hold a very large proportion of their assts in the form of balances at Reserve Banks."[472] The notice summarized the Board's policy concerns surrounding "narrowly focused business models that involve

---

business plan of a potential account holder, they could conceivably limit the size of activity of the account holder . . . . Temporary size restrictions could allow the Board to test the effect of the new business play on the U.S. financial system. . . ."). TNB also notes that the Federal Reserve Board can influence the rate at which narrow banks and others deposit excess reserves through the interest rate it provides on those reserves. Letter from James McAndrews to Ann E. Misback, *supra* note 438, at 5.

[466] Complaint at 14, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[467] *Id.*

[468] *Id.*

[469] Opposition to Defendant's Motion to Dismiss at 11, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020) (citing Letter from Michael Held, General Counsel, New York Fed, to Thomas E.L.Dewey, Dewey Pegno & Kramarsky LLP (May 16, 2018)).

[470] Complaint, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y, No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[471] *Id.* at 23.

[472] Regulation D: Reserve Requirements of Depository Institutions, 84 Fed. Reg. 8829 (advance notice of proposed rulemaking Mar. 12, 2019). For a summary of these concerns see *infra* notes 456-461 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4048081

taking deposits from institutional investors and investing all or substantially all of the proceeds in balances at Reserve Banks."[473]

Days later, the New York Fed asked the court to dismiss the case on ripeness grounds because TNB's "application for a master account is still under consideration."[474] Among the issues the New York Fed said it was still considering was whether TNB's "business plan and proposed capital structure" allowed it to be classified as a "depository institution" and therefore eligible to apply for an account.[475] Apparently, the New York Fed did not consider that issue closed when it allowed the ABA to issue TNB's routing number.[476] TNB protested that the New York Fed had effectively denied its application by refusing to act.[477]

The federal district court found that the New York fed had "not reached a decision on TNB's application."[478] Accordingly, the court dismissed the case because TNB lacked standing and that its claim was unripe.[479]

Rather than appeal the district court's opinion, TNB decided to "work directly with the Federal Reserve to resolve" the account issue.[480] More than four years after raising the issue of an account with the New York Fed, TNB still has no official answer.

---

[473] Regulation D: Reserve Requirements of Depository Institutions, 84 Fed. Reg. at 8829.

[474] Memorandum of Law in Support of Defendant Fed. Rsrv Bank of N.Y.'s Motion to Dismiss at 7-9, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020) (noting that the Federal Reserve Board issued its advance notice of proposed rulemaking on Mar. 6, 2019); *see also* TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No1:18-CV-07978, 2020 WL 1445806, *4 (S.D.N.Y. 2020) (noting that the advance notice of proposed rulemaking was filed "[s]hortly before" the New York Fed filed its motion to dismiss).

[475] Memorandum of Law in Support of Defendant Fed. Rsrv Bank of N.Y.'s Motion to Dismiss at 7 n.4, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020). For a discussion of legal eligibility to apply for a Federal Reserve Account *see supra* Part II.A.

[476] *See supra* note 448-451 and accompanying text (discussing TNB's path to an ABA routing number).

[477] Opposition to Defendant's Motion to Dismiss at 11, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[478] TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806, *6 (S.D.N.Y. 2020).

[479] *Id.* at *6-10.

[480] Minutes of Special Meeting of the Connecticut Department of Banking Requested by the Organizers of TNB Bank for Extension of the Temporary Certificate of Authority, Aug. 18, 2020, https://portal.ct.gov/-/media/DOB/Enforcement/FID/TNB-USA-Special-Meeting-8-18-2020-Minutes.pdf.

Electronic copy available at: https://ssrn.com/abstract=4048081

### D.  *Cryptocurrency Custody Banks*

Other Federal Reserve account applications have also spent years in the due diligence process without a resolution. Two banks that have secured charters as special purpose depository institutions in Wyoming applied for accounts at the Kansas City Fed in 2020 but are still awaiting decisions.[481] While the business plans of these banks, differ somewhat, they both hope to accept U.S. dollar denominated deposits and provide cryptocurrency custody services.[482]

Cryptocurrencies (and blockchain technology underpinning some cryptocurrencies) are, of course, relatively new.[483] As cryptocurrencies have grown in popularity, many states have considered statutory modernizations to address the unique issues they present.[484] But so far Wyoming is leading the way.[485] In 2018 the Wyoming legislature created the Blockchain Task Force to "identify governance issues related to blockchain technology and develop appropriate legislation."[486] The next year, with the Taskforce leading the way, the Wyoming legislature passed a flurry of laws related to cryptocurrency and blockchain technology.[487] Among

---

[481] Lummis, *supra* note 9. Two additional banks, Commercium Financial, Inc. and Wyoming Deposit & Transfer, have received Wyoming special purpose depository institution charters. Nate DiCamillo, *Commercium Financial Becomes Fourth Wyoming Chartered Crypto Bank*, COINDESK (Aug. 11, 2021, 9:08 A.M.), https://www.coindesk.com/business/2021/08/11/commercium-financial-becomes-fourth-wyoming-chartered-crypto-bank/. It seems likely they are also seeking access to Federal Reserve Bank accounts and services.

[482] *Avanti Granted Bank Charter and Approval of Business Plan for Digital Asset Custody and Tokenized U.S. Dollar*, AVANTI (Oct. 28, 2020), https://avantibank.com/press/bank-charter-granted; *Kraken Wins Bank Charter Approval*, KRAKEN (Sept. 16, 2020), https://blog.kraken.com/post/6241/kraken-wyoming-first-digital-asset-bank/.

[483] One of the earliest U.S. law review articles using the term "cryptocurrency" appeared in 2012. Nikolei M. Kaplanov, Note, *Nerdy Money: Bitcoin, the Private Digital Currency, and the Case Against Its Regulation*, 25 LOY. CONSUMER L. REV. 111 (2012).

[484] GLOBAL BLOCKCHAIN BUS. COUNCIL, CHAIN REACTION: BLOCKCHAIN ENTERS THE MAINSTREAM 53 (2020), https://www.lw.com/thoughtLeadership/gbbc-report-blockchain-enters-mainstream.

[485] *Id.* (noting that "Wyoming has passed the most comprehensive blockchain-specific legislation to date"); Caitlin Long, *What Do Wyoming's 13 New Blockchain Laws Mean?*, FORBES, https://www.forbes.com/sites/caitlinlong/2019/03/04/what-do-wyomings-new-blockchain-laws-mean/?sh=396b27df5fde (Mar. 4. 2019, 7:29 A.M.) ("Wyoming has now enacted a total of 13 block-chain-enabling laws, making it the only US state to provide a comprehensive, welcoming legal framework that enable blockchain technology to flourish, both for individuals and companies.").

[486] 2018 WYO. SESS. LAWS 390.

[487] 2019 WYO. SESS. LAWS 197 (Financial Technology Sandbox); 2019 WYO. SESS. LAWS 485 (Wyoming Utility Token Act- Property Amendments); 2019 WYO. SESS. LAWS 346 (Commercial Filing System); 2019 WYO. SESS. LAWS 328 (Special Purpose Depository Institutions); 2018 WYO. SESS.

Electronic copy available at: https://ssrn.com/abstract=4048081

those laws was one creating a Special Purpose Depository Institutions (SPDI pronounced "speedy") charter.[488] The law allows SPDIs to provide cryptocurrency custody services, accept deposits, and provide payment services.[489] However, unlike traditional banks, SPDIs cannot make loans.[490] Moreover, SPDIs have a one hundred percent reserve requirement.[491] The reserves must be held in liquid assets (for example, a Federal Reserve account) and cannot be encumbered.[492]

The Wyoming Division of Banking soon had two applicants seeking a SPDI charter: Avanti Financial Group Inc. ("Avanti") and Payward Inc. ("Kraken").[493] Indeed, organizers from both applicants had been instrumental in the development of the SPDI legislation. Avanti's Chairman and

---

LAW 469 (Special Electric Utility Agreements); 2019 WYO. SESS. LAW 345 (Corporate Stock-Certificate Tokens); 2019 WYO. SESS. LAW 99 (Banking Technology and Stock Revisions); 2019 WYO. SESS. LAW 322 (Digital Assets-Existing Law).

[488] 2019 WYO. SESS. 328 (codified as amended in Wyo. Stat. §§ 13-12-101 to 13-12-126).

[489] WYO. STAT. § 13-12-103 (allowing SPDI to engage in "nonleading banking business" and provide "payment services," and "custodial services" under Wyoming's digital assets statute); *id.* §§ 13-12-104(a)(1) 13-12-103(b)(vii)(E) (requiring that each depositor be "a legal entity other than a natural person" or that the deposit be "relat[ed] to" the bank's custody or investment advisor services).

Subsequently, the Wyoming Division of Banking promulgated an administrative framework and developed an examination manual outlining the supervisory oversight of these new banks. 21-0002-20 WYO. CODE R.  §§ 1-13; WYO. DIV. OF BANKING, SPECIAL PURPOSE DEPOSITORY INSTITUTIONS MANUALS (Jan. 2001), https://drive.google.com/file/d/14dA8hrR59aG-sKZYxAoIWQ7dVr32cr_Vw/view?usp=sharing.

[490] *Id.* § 13-12-103(c).

[491] *Id.* § 13-12-105.

[492] *Id.* Reserves can also be held in currency, federal government securities, investment grade state or municipal bonds, investments permitted for standard Wyoming banks, or "other investments which are determined by the Commissioner to be substantially similar" 21-0002-20 WYO. CODE R. § 9.

[493] *See Avanti Financial Group Announces Accelerated Charter Application*, AVANTI (July 23, 2020), https://avantibank.com/press/bank-charter-application-accepted ("Avanti Financial Group, Inc. is a Wyoming corporation formed to apply for a bank charter under Wyoming's special purpose depository institution. . . . [I]t will likely do business under the name 'Avanti Bank & Trust.'"); *Kraken Wins Bank Charter Approval*, KRAKEN (Sept. 16, 2020), https://blog.kraken.com/post/6241/kraken-wyoming-first-digital-asset-bank/ (announcing that Kraken Bank had received a SPDI charter); Takashi Mochizuki & Yuki Furukawa, *One Crypto Exchange Is Going to Extreme Lengths on Cyber Security*, BLOOMBERG.COM (June 8, 2021, 11:01 P.M.), https://www.bloomberg.com/news/articles/2021-06-08/kraken-crypto-exchange-is-going-to-extreme-lengths-on-cybersecurity (describing Payward Inc. as "the San Francisco-based company established in 2011 to operate the cryptocurrency exchange Kraken").

Electronic copy available at: https://ssrn.com/abstract=4048081

CEO Caitlin Long, a former managing director at Morgan Stanley and native Wyomingite, was a member of the Blockchain Task Force.[494] She became interested in legislative reforms after legal ambiguities prevented the University of Wyoming from accepting her bitcoin donation.[495] Kraken's co-founder and CEO Jesse Powell was looking for a state with laws addressing directly addressing cryptocurrency issues. When his company's efforts to modernize Delaware were not completely successful, Powell turned to Wyoming.[496] He testified at two Taskforce meetings and met with the Wyoming Governor.[497]

Kraken was among the first to seek a SPDI charter.[498] As the fourth largest crypto exchange in the world, Kranken wanted a SPDI charter because it had difficulty finding banking partners.[499] Kraken also believes the SPDI charter will allow it to offer customers convenient services. Kraken plans to offer digital asset custody, US dollar denominated demand deposit accounts, and wire transfers and funding services.[500] Instead of a

---

[494] Maria Aspan, *How Caitlin Long Turned Wyoming into Crypto Country*, FORTUNE (July 29, 2021), https://fortune.com/2021/07/29/caitlin-long-wyoming-crypto/.

[495] Penny Crosman, *Fans Call Crypto Bank Avanti the Future. Critics Say It's Too Risky.*, AM. BANKER (Apr. 12, 2021, 3:20 P.M.), https://www.americanbanker.com/news/fans-call-crypto-bank-avanti-the-future-critics-say-its-too-risky; Laura Shin, *Caitlin Long: Why Avanti Will Be a New Kind of Crypto Bank*, UNCHAINED (Mar. 2, 2021) (podcast).

[496] @msantoriESQ, TWITTER (Sept. 16, 2020, 9:24 A.M.), https://twitter.com/msantoriESQ/status/1306237609786703873 [https://perma.cc/C5JJ-TP8D]; @msantoriESQ, TWITTER (Sept. 16, 2020, 9:25 A.M.), https://twitter.com/msantoriESQ/status/1306237693102370823, @msantoriESQ, TWITTER (Sept. 16, 2020, 9:27 A.M.), https://twitter.com/msantoriESQ/status/1306238261413769218.

[497] Nate DiCamillo, *Jesse Powell: Bitcoin Banker*, COINDESK (Dec. 8, 2020, 11:56 A.M.), https://www.coindesk.com/markets/2020/12/08/jesse-powell-bitcoin-banker/ (reporting that staff of the Wyoming Division of Banking credit Powell with teaching them "about fake exchange volumes and the many ways exchanges can harm customers").

[498] John Achs, *Blockchain Stampede Brings Big Tech to UW Campus*, WYO. TRIB.-EAGLE, Sept. 22, 2019, at 1.

[499] Ryan Browne, *Bitcoin Exchange Kraken Considers Going Public After Record Trading Volumes in the First Quarter*, CNBC (Apr. 8, 2021), https://www.cnbc.com/2021/04/08/bitcoin-coinbase-rival-kraken-may-go-public-via-direct-listing.html (stating that Kraken "is the fourth-largest cryptocurrency exchange by trading volume and has over 6 million clients"); DiCamillo, *supra* note 497 (describing Kraken's banking problems.); *Kraken Wins Bank Charter Approval, supra* note 482 ("With a charter in place, we can operate a fully independent bank that will reduce our reliance on third-party financial institutions and even help launch a new wave of innovative products for our users.").

[500] *Kraken Wins Bank Charter Approval, supra* note 482. Over time, Kraken hopes to expand its services to include trust account services, crypto debit cards, and services aimed at corporate clients. *Id.*

Electronic copy available at: https://ssrn.com/abstract=4048081

customer depositing her paycheck at a bank and then sending that money to Kraken to buy crypto, Kraken's bank charter would allow the customer to deposit her paycheck directly with Kraken.[501] Its suite of services would make it easier for customers to pay bills and receive salaries in cryptocurrency.[502] Kraken's earnings would come largely from fees for its services ("such as wires and bank-to-bank transactions") and margin fees on cryptocurrency deposited.[503]

Unlike Kraken, Avanti has no plans to become a cryptocurrency exchange.[504] Instead it plans to provide cryptocurrency custody services for institutional customers like crypto companies, hedge funds, pension funds, and family offices.[505] Avanti's business plan includes providing a unique stablecoin, dubbed the "Avit," offered through blockchain technology.[506] The Avit is designed to provide a "real-time payment settlement solution" for "institutional traders and corporate treasurers."[507] Like Kraken, Avanti sees value in "connect[ing] digital assets with the legacy financial system" including the payments services offered through the Federal Reserve.[508]

---

[501] DiCamillo, *supra* note 497.

[502] Robert Stevens, *Kraken Will Be First US Crypto Bank. Here's Why It Matters*, DECRYPT (Sept. 16, 2020), https://decrypt.co/42077/kraken-first-us-crypto-bank-heres-why-matters.

[503] DiCamillo, *supra* note 497.

[504] Benjamin Pirus, *Interview: Caitlin Long and David Kinitsky on Crypto's Big Win with Kraken Financial Bank Charter*, COINTELEGRAPH (Sept. 17, 2020), https://cointelegraph.com/news/interview-caitlin-long-and-david-kinitsky-on-crypto-s-big-win-with-kraken-financial-bank-charter.

[505] Aspan, *supra* note 494; Crosman, *Avanti Got a Bank Charter. Here's What's Next on Its Agenda*, AM. BANKER (Nov. 5, 2020, 1:30 P.M.), https://www.americanbanker.com/news/avanti-got-a-bank-charter-heres-whats-next-on-its-agenda; Michael del Castillo, *Why a New Breed of Banks Are Renouncing FDIC Insurance*, FORBES (Apr. 16, 2020, 6:00 A.M.), https://www.forbes.com/sites/michaeldelcastillo/2020/04/16/caitlin-long-interview-on-why-bitcoin-needs-new-banks/?sh=577a176d362b.

[506] Nate DiCamillo, *Unpacking the Avit, Avanti Bank's New Digital Asset Being Built With Blockstream*, COINDESK (Sept. 14, 2021, 4:42 A.M.), https://www.coindesk.com/business/2020/08/12/unpacking-the-avit-avanti-banks-new-digital-asset-being-built-with-blockstream/.

[507] *Avanti Financial Group Announces Accelerated Charter Application*, AVANTI (July 23, 2020), https://avantibank.com/press/bank-charter-application-accepted. Avanti has not offered a complete explanation of how its Avit will work, noting that it has a patent for the product pending. DiCamillo, *supra* note 506.

[508] *About Us*, Avanti (last visited Feb. 18, 2022), https://avantibank.com/about [https://perma.cc/NPQ9-Q4TL].

Electronic copy available at: https://ssrn.com/abstract=4048081

The Wyoming Division of Banking granted both Kraken and Avanti SPDI charters in fall 2020.[509]

Initially, neither of the Wyoming SPDIs sought FDIC insurance.[510] Under Wyoming law, SPDIs are not required to seek deposit insurance, but they may choose to do so.[511] As Kraken explained, the one hundred percent reserve requirement was designed to provide to protect deposits.[512]

The next step for the Wyoming SPDIs was to secure accounts from the Kansas City Fed. Avanti and Kraken formally began seeking access in October 2020.[513] The Kansas City Fed received the complete charter applications the banks had submitted to the Wyoming Division of Banking.[514] The Kansas City Fed also received all the due diligence that the Wyoming regulator conducted as part of the charter application processes.[515]

From the beginning, Wyoming understood that access to the Federal Reserve's payment systems would be critical to the success of its SPDIs.[516] The SPDI statute is crafted to ensure that SPDIs meet the legal eligibility

---

[509] *Kraken Wins Bank Charter Approval*, *supra* note 482; *Avanti Granted Bank Charter and Approval of Business Plan for Digital Asset Custody and Tokenized U.S. Dollar*, *supra* note 482.

[510] *Kraken Wins Bank Charter Approval*, *supra* note 482; Avanti Statement on Its Application to Become an FDIC-Insured Bank, Avanti Bank (Nov. 5, 2021), https://avantibank.com/press/avanti-statement-on-its-application-to-become-an-fdic-insured-bank (explaining that Avanti later decided to apply for FDIC insurance).

[511] *See* WYO. STAT. § 13-12-108 (providing that SPDIs without FDIC insurance must provide notice to their customers); WYO. DIV. OF BANKING, SPECIAL PURPOSE DEPOSITORY INSTITUTION INFORMATION SECURITY EXAMINATION MANUAL § 1 n.1 (Jan. 2021) ("Excluding incidental activities like fiduciary services, asset management and custody, SPDIs are prohibited from making loans with customer deposits of fiat currency and therefore are not required to obtain insurance from the Federal Deposit Insurance Corporation—though they may do so.").

[512] *Kraken Wins Bank Charter Approval*, *supra* note 482.

[513] Kevin Travers, *Avanti, Crypto Banks Shut Out*, LENDIT FINTECH (Nov. 22, 2021), https://www.lendacademy.com/avanti-crypto-banks-shut-out/; Avanti Statement on Its Application to Become a Federal Reserve Member Bank (Aug. 28, 2021), https://avantibank.com/press/avanti-statement-on-its-application-to-become-a-federal-reserve-member-bank (noting that Avanti "delivered its proposed business plan to the Federal Reserve Bank of Kansas City" on June 22, 2020, prior to receiving its Wyoming charter).

[514] Telephone Interview with Christopher Land, former General Counsel, Wyo. Div. of Banking (Feb. 9, 2022).

[515] *See id.*

[516] *See* Chris Matthews, *How Wyoming Became the Promised Land for Bitcoin Investors*, MARKETWATCH (Apr. 24, 2021, 8:21 A.M.), https://www.marketwatch.com/story/how-wyoming-became-the-promised-land-for-bitcoin-investors-11619201182 (quoting then Wyoming Commissioner of Banking Albert Forkner as stating that access to Federal Reserve accounts is "borderline essential" for the success of the SPDI charter).

Electronic copy available at: https://ssrn.com/abstract=4048081

requirements for Federal Reserve accounts and payment services. It calls the banks "depository institutions" and provides that they can accept deposits.[517] The statute identifies "currency held . . . by a federal reserve bank" as one type of liquid asset SPDIs may hold to satisfy their reserve requirements.[518] Wyoming Division of Banking further explains:

> Each SPDI is required to accept customer deposits, and as a 'state bank' under the Federal Deposit Insurance Act, a 'depository institution' under the Federal Reserve Act and a 'bank' under Wyoming law, is eligible to apply for a master account from the Federal Reserve System to clear payments and access other Federal Reserve services, subject to prudential standards relating to payment system risk and other applicable factors.[519]

Wyoming also sought to ensure that its supervision of the SPDIs would be robust enough to alleviate any Federal Reserve concerns about undue risk. In developing the legal framework for SPDIs, Wyoming officials held "more than 100 meetings with the Board of Governors and the [Kansas City Fed]."[520]

　　Notwithstanding Wyoming's efforts, there seemed to be confusion about whether Avanti and Kraken were "depository institutions" eligible for Federal Reserve accounts. The Federal Reserve spent more than a year contemplating this question.[521] Recently, the ABA issued a routing number for Avanti, but there was no public explanation of this decision from

---

[517] WYO. STAT. § 13-12-101 ("This chapter may be cited as the 'Special Purpose Depository Institutions Act.'"); WYO. STAT. § 13-12-103(b)(vii)(E) (stating that SPDIs may "receive deposits relating to" its custody service activities); WYO. STAT. § 13-12-104 (describing those eligible to make deposits at SPDIs).

[518] WYO. STAT. §13-12-105(b)(ii).

[519] WYO. DIV. OF BANKING, SPECIAL PURPOSE DEPOSITORY INSTITUTION PAYMENT SYSTEM RISK EXAMINATION MANUAL § 4.1 (Jan. 2021).

[520] Lummis, *supra* note 9.

[521] *See* Lummis, *supra* note 9 ("Over a year later, the Fed hasn't started processing [the Avanti and Kraken] applications, indicating it's still determining whether SPDIs are banks—which is not a serious legal question."); *CNBC Transcript, Senator Cynthia Lummis Speaks with Ylan Mui from the CNBC Financial Advisor Summit*, CNBC (June 29, 2021, 11:44 A.M.), https://www.cnbc.com/2021/06/29/cnbc-transcript-senator-cynthia-lummis-speaks-with-ylan-mui-from-the-cnbc-financial-advisor-summit.html ("[R]ight now, the Federal Reserve Bank of Kansas City is looking at [Avanti and Kraken] . . . to see if they can receive master accounts and they can participate with ABA bank routing numbers . . . ."); Nick Reynolds, *Wyoming's Crypto Sector's Fate Up to Federal Regulators*, OIL CITY NEWS (Sept. 26, 2021), https://oilcity.news/community/2021/09/26/wyomings-crypto-sectors-fate-up-to-federal-regulators/ (warning that Wyoming

either the ABA or the Federal Reserve.[522] Kraken still does not appear to have a routing number.[523]

Setting aside the question of legal eligibility, there also seem to be questions about whether Avanti and Kraken pose undue risk to the payment system. The Bank Policy Institute, a trade group representing the largest banks, issued a white paper calling the SPDI charter "an accident waiting to happen."[524] It contends that the one hundred percent reserve requirement is not sufficient to discourage bank runs, because Wyoming law allows SPDIs to hold illiquid and risky assets as reserves. It explains that the SPDIs will "take uninsured, demandable, retail deposits and invest them in . . . longer-term instruments like U.S. Treasury securities and corporate debt."[525] If the price of those securities fall, the bank may be unable to meet its depositor demands.[526] The Bank Policy Institute is also concerned that the Wyoming Division of Banking may not require SPDIs to maintain high enough capital levels to adequately protect depositors.[527] Unsurprisingly, the Bank Policy Institute prefers the traditional model of banking that comes with deposit insurance and significant federal oversight.

Avanti and Kraken have tried to blunt criticism aimed at their riskiness by affirming that, like all banks, they expect to be heavily regulated. Kraken Bank's CEO, David Kinitsky explained: "I agree these [SPDI] banks need to have a bank-grade supervisory and oversight program. . . .

---

could lose its first-mover advantage in adopting the SPDI charter because the ABA was delaying access to ABA routing numbers.

[522] Nikhilesh De, *Caitlin Long's Wyoming Crypto Bank Takes a Step Toward Fed Membership*, COINDESK (Feb. 9, 2022, at 6:28 P.M.), https://www.coindesk.com/policy/2022/02/10/caitlin-longs-crypto-bank-takes-a-step-toward-fed-membership/.

[523] A search of the ABA Routing Number Lookup website under the names Payward and Kraken in Cheyenne, Wyoming yields no results. ABA Routing Number Lookup, AM. BANKERS ASS'N (last searched Feb. 19, 2022), https://routingnumber.aba.com/Default1.aspx.

[524] Bank Pol'y Institute, Beware the Kraken 1 (Oct. 21, 2020), https://bpi.org/wp-content/uploads/2020/10/Beware-the-Kraken.pdf; *see also* Bank Pol'y Inst., Why a Wyoming Charter is No Hail Mary for the Anti-Fractional Banking Team (Nov. 6, 2020), https://bpi.org/wp-content/uploads/2020/11/Why-a-Wyoming-Charter-Is-No-Hail-Mary-for-the-Anti-Fractional-Banking-Team.pdf.

[525] Bank Pol'y Inst., Beware the Kraken, *supra* note 524, at 2.

[526] Bank Pol'y Inst., Beware the Kraken, *supra* note 524, at 2-3; Bank Pol'y Inst., Why a Wyoming Charter is No Hail Mary for the Anti-Fractional Banking Team, *supra* note 524, at 2-3.

[527] Bank Pol'y Inst., Beware the Kraken, *supra* note 524, at 4-6.

Electronic copy available at: https://ssrn.com/abstract=4048081

We do."[528] Avanti assured the Federal Reserve Board that it "embraces the level of supervision and oversight the Federal Reserve should choose to apply to state-chartered, non-FDIC insured banks that have payment system access, even if that is tantamount to state member bank supervision and oversight."[529] Avanti argues that "granting direct access to the Fed's payment systems to banks that cater to the digital asset sector should be welcomed because doing so would bring them under the watchful eyes of regulators."[530]

Avanti has taken its promises to submit to federal supervision two steps further. After the Federal Reserve Board released the proposed guidelines for evaluating account and service requests,[531] Avanti announced it was applying to become a Federal Reserve member bank.[532] It explained that "[b]y applying for Federal Reserve membership, Avanti is formally accepting what it had already informally accepted, which is the very same regulatory capital, compliance and supervisory examination standards that apply to traditional banks."[533] Then, after the President's Working Group on Financial Markets recommended legislation to "require stablecoin issuers to be insured depository institutions,"[534] Avanti announced it was applying for FDIC deposit insurance.[535]

At any rate, the Wyoming SPDIs' path to a Federal Reserve accounts and payment services has been anything but speedy. Both are still waiting for a decision. Wyoming Senator Cynthia Lummis has accused the Federal

---

[528] Andrew Ackerman, *U.S. News: Crypto Firms' Bid to Tap Fed System Meets Resistance*, WALL ST. J., Aug. 30, 2021, at A3.

[529] Letter from Caitlin Long, Chairman & CEO, Avanti Financial Group, & Chuck Thompson, Chief Legal Officer/Chief Compliance Officer, Avanti Financial Group, to Ann E. Misback, Sec., Bd. of Governors of the Fed. Rsrv. Sys. (July 12, 2021).

[530] Ackerman, *supra* note 528.

[531] For a discussion of the proposed guidelines *see supra* Part III.

[532] Avanti Statement on Its Application to Become a Federal Reserve Member Bank, *supra* note 513.

[533] *Id.*

[534] President's Working Group on Fin. Markets, FDIC, & the Office of the Comptroller of the Currency, Report on Stablecoins 2 (2021), https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf.

[535] Avanti Statement on Its Application to Become an FDIC-Insured Bank, *supra* note 510.

Electronic copy available at: https://ssrn.com/abstract=4048081

Reserve of "starving the applicants until they die."[536] In response, Chairman of the Federal Reserve Board Jerome Powell acknowledged that there "are good arguments for viewing SPDIs as depository institutions."[537] But Powell also defended the delay. "We want to be really careful, because they are hugely precedential. . . . We start granting these, there will be a couple hundred of them pretty quicky," he explained.[538] Powell's comments suggest that the Federal Reserve Board has been involved in the process of reviewing the SPDI requests for accounts at the Kansas City Fed.[539]

## V. Lessons from Novel Banks

The point of this Article is not to suggest that any of these novel banks should or should not get access to Federal Reserve accounts and payment systems. Those determinations may be impossible without access to the materials the applicants submitted. Rather this Article seeks to evaluate the process the Federal Reserve uses to evaluate these requests for access. The experiences of the novel bank applicants highlight the uncertainty of that process. This Part identifies procedural shortcomings and proposed improvements.

### A. Application Process

Perhaps the most noticeable feature of the novel banks' Federal Reserve account applications is the lengthiness of the process. Novel banks seeking accounts wait years for a decision. But it is not just the length of time that is causing problems, it is the near complete lack of procedural guidelines describing the process. The Federal Reserve Banks should provide a clear process for banks applying for accounts and payment services. Applicants should know what it expected of them and when they can expect decisions from the Reserve Banks.

---

[536] *Nomination of Jerome H. Powell, of Maryland, to be Chairman of the Board of Governors of the Federal Reserve System: Hearing Before the S. Comm. on Banking, Housing, & Urban Affairs*, (Jan. 11, 2022), https://www.banking.senate.gov/hearings/01/04/2022/nomination-hearing

[537] *Id*. (2:07:44).

[538] *Id*. (2:07:30, 2:08:02).

[539] Representatives from Avanti met with staff of the Federal Reserve Board, including General Counsel Mark E Van Der Weide, on May 5, 2021 to discuss regulatory reforms related to payments. Regulator Reform, Bd. of Governors of the Fed. Rsrv. Sys. (last updated Dec. 17, 2021), https://www.federalreserve.gov/regreform/reform-payments.htm.

Electronic copy available at: https://ssrn.com/abstract=4048081

From the very beginning novel banks seeking Federal Reserve accounts encounter confusion. How should they apply for an account? Operating Circular 1 says that an account agreement is needed to open an account.[540] In one case, the account agreement was treated as the application for an account.[541] In other cases, the account agreement seems to be the near final documents to be completed before the account is opened.[542] So, it is not apparent how banks should "apply" for Federal Reserve accounts. The applicant novel banks were also confused about what, if any, materials should be submitted as part of their application. For example, Fourth Corner Credit Union submitted the account agreement, a board resolution, and a document with signatures of credit union personnel authorize to access the account.[543] But Avanti submitted a business plan and the materials that it provided Wyoming when seeking the SPDI charter.[544]

The New York Fed is more forthcoming about its account procedures than other Reserve Banks. In 2020, the New York Fed adopted a handbook covering novel accounts.[545] It instructs, novel account applicants to provide a written notice of their intent to seek services, rather than submit a

---

[540] Operating Circular 1 (2021), *supra* note 176, at § 2.6.

[541] First Amended Complaint ¶¶ 52-58, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633) (explaining that Fourth Corner submitted its Account Agreement immediately upon receiving an unconditional credit union charter from Colorado).

[542] Territorial Bank of American Samoa and the Wyoming SPDIs could not submit completed account agreements at the beginning of their discussions with their district Reserve Banks because the ABA had not yet issued their routing numbers. *See supra* notes 390-393, 410, 513-515, 519-523, and accompanying text. TNB submitted its account agreement more than a year after beginning talks with the New York Fed because the New York Fed recommended waiting until the due diligence stage of the process was completed. TNB USA Inc. v. Fed. Rsrv. Bank of NY, No. 18-cv-7978, 2020 WL 1445806, *3 (S.D.N.Y. 2020).

[543] *See supra* notes 310-316, 340-344, and accompanying text.

[544] *See supra* notes 513-515 and accompanying text.

[545] Fed. Rsrv. Bank of N.Y., Account and Financial Services Handbook (Feb. 25, 2020), https://www.frbservices.org/binaries/content/assets/crsocms/forms/district-information/0220-frbny-financial-services-handbook.pdf (covering financial institutions that are "not subject to supervision of a primary federal supervisor" or that "engaged in activity that the [New York Fed] determines, in its sole discretion, is unusual when compared to Financial Institutions with a similar type of charter or license or is otherwise unusual or suspicious"); Federal Reserve Bank of New York Account and Financial Services Handbook ("Handbook") and Related Documentation, FRBServices.org (last visited Feb. 20, 2022), https://www.frbservices.org/forms/district-information/documentation.html.

Electronic copy available at: https://ssrn.com/abstract=4048081

completed account agreement.[546] The handbook also provides a list of documents that an applicant must provide when seeking a new account—everything the bank's charter application, to anti-money laundering policies, procedures, and risk assessments, to detailed business plan.[547] Other district Reserve Banks, however, provide little or no public information at all about their procedures for requesting an account.[548]

The Federal Reserve Board's proposed guideline for evaluating account and service requests would improve the procedural landscape. They clarify that Reserve Banks "should incorporate, to the extent possible, the assessments of an institution by state and/or federal supervisors" when making their own "independent assessment of [an] institution's risk profile."[549] And by identifying the relevant risks presented, the proposed guidelines give account applicants better notice of the types of information the Federal Reserve Banks may seek as part of the application process.[550] Still, the guidelines stop short of providing a straightforward explanation of how banks should request an account.

The procedural confusion continues after a bank submits an application. Was the Reserve Bank waiting for the applicant to provide further information, waiting for the FDIC or Reserve Board to determine legal eligibility, or evaluating the application to see if it presented undue risk?

---

[546] Fed. Rsrv Bank of N.Y., Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers § 2.6.1 (Feb. 25, 2020), https://www.frbservices.org/binaries/content/assets/crsocms/forms/district-information/0220-frbny-supplemental-terms-and-conditions-for-high-risk-customers.pdf ("[B]efpre submitting to the bank. . . forms or agreements . . . to maintain an account with the Bank, the Customer shall seek the Bank's authorization . . . to maintain an account by submitting written notice to the Bank . . . .").

[547] *See generally* FED. RSRV. BANK OF N.Y., *supra* note 545. The New York Fed reserves the right to request additional information and documentation. *Id.* at 1.

[548] Financial Reserve Bank Services, the organization that manages the Federal Reserve's payment services, provides only New York's Handbook on its web page. District Information Forms, FRBSERVICES.ORG (last visited Feb. 20, 2022), https://www.frbservices.org/forms/district-information. The San Francisco Fed's webpage provides a short list of information applicants seeking accounts should provide. Federal Reserve Accounts and Services, Fed. Rsrv. Bank of S.F. (last visited Feb. 20, 2022), https://www.frbsf.org/banking/about/what-we-do/accounts-services/.

[549] Proposed Guidelines for Evaluating Account and Service Requests, 86 Fed. Reg. 25,865, 25,868 (2021).

[550] *See infra* Part III discussing the proposed guidelines.

Electronic copy available at: https://ssrn.com/abstract=4048081

In contrast, agencies reviewing bank charter or deposit insurance applications often inform prospective banks that applications are complete.[551] Moreover, as several commentors have noticed, the Board's proposed guidelines do not provide timelines for Reserve Bank decisions about opening accounts.[552] Even when timelines cannot be ironclad for novel requests, bank regulators often provide timelines to guide their decisionmaking.[553] All of this uncertainty leaves applicants with impression that the Reserve Banks are inventing the review process as they go along or are deliberately delaying the process instead of denying the application. It is unsurprising that two novel applicants became so frustrated that they turned to the courts for redress.[554]

The Federal Reserve, either the Board or the district Reserve Banks, should adopt procedural guideposts that help applicants understand where their request for an account or services is in the application process. It should be clear how banks can request access, when the Federal Reserve Bank considers the application complete, when the Federal Reserve expects to decide, and when the application is granted or denied.

### B.   Legal Eligibility

Next, the novel applications reveal the opaque nature of decisions about uninsured banks' legal eligibility to receive Federal Reserve accounts and payment services. The Federal Reserve does not publicly release these decisions, and it is not clear who is making these legal determinations. The public would benefit from transparent decisions about which charter types are considered "depository institutions," and consequently legally eligible for Federal Reserve accounts and services.

---

[551] *See, e.g.*, FDIC, APPLYING FOR DEPOSIT INSURANCE – A HANDBOOK FOR ORGANIZERS OF DE NOVO INSTITUTIONS 21 (2019), https://www.fdic.gov/regulations/applications/depositinsurance/handbook.pdf; OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLERS LICENSING MANUAL: CHARTERS 27 (2021).

[552] *See, e.g.*, Letter from George Selgin, Director of the Center for Monetary & Financial Alternatives, Cato to Ann E. Misback, Sec'y, Bd. of Governors of the Fin. Rsrv. Sys. (May 19, 2020), https://www.federalreserve.gov/SECRS/2021/May/20210521/OP-1747/OP-1747_051921_138125_431924082571_1.pdf.

[553] *See, e.g.*, FDIC, FIL-81-2019, FDIC Re-Issues Its Processing Timeframe Guideline for Applications, Notices, and other Requests (Dec. 6, 2018), https://www.fdic.gov/news/financial-institution-letters/2018/fil18081.pdf (noting that timeframes may not apply to requests that "[r]ais legal or policy issuers" or "[c]ould attract unusual attention or publicity").

[554] TNB USA Inc. v. Fed. Rsrv. Bank of NY, No. 18-cv-7978, 2020 WL 1445806, *3 (S.D.N.Y. 2020); Complaint, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-cv-02361 (D. Colo. Sept. 29, 2017).

Electronic copy available at: https://ssrn.com/abstract=4048081

Reserve Banks' decisions to open accounts for uninsured banks like the Territorial Bank of American Samoa show that the Federal Reserve sometimes concludes that uninsured institutions are "depository institutions."[555] But it is often unclear who determines this and how. TNB appears to have received a routing number after the New York Fed confirmed it was a legally eligible depository institution.[556] (Although later the New York Fed said it had not concluded TNB was a "depository institution."[557]) Perhaps this means questions about legal eligibility are issues to be decided by the Reserve Banks. On the other hand, TBAS received a routing number after meeting with a member of the Board.[558] Additionally, in 1981, Board staff issued a general counsel opinion discussing whether Nebraska's cooperative credit associations were "depository institutions."[559] Perhaps the Board views questions of legal eligibility within its purview. A third possibility is that the federal insurers decide questions of legal eligibility because Monetary Control Act and Federal Reserve regulations define "depository institution" to include those banks that are eligible to apply for federal deposit or share insurance. When Fourth Corner Credit Union sought a Federal Reserve Account, the Kansas City Fed asked the NCUA if Fourth Corner was eligible to apply for federal share insurance.[560] The FDIC has also previously opined on who is eligible to apply for its deposit insurance.[561]

Part of the reason it is difficult to tell who is deciding the question of legal eligibility is that the law itself points to more than one agency.[562] However, part of the difficulty is that the Federal Reserve Banks do not publicly release explanations of their decisions. If an applicant gets an ABA routing number or a Federal Reserve account, we can infer that the applicant was found to be an eligible depository institution. But if an applicant is denied an account, it may be for any number of reasons including that the applicant's charter type was deemed ineligible, that the applicant

---

[555] *See supra* Part IV.B.

[556] *See supra* notes 448-451 and accompanying text.

[557] Memorandum of Law in Support of Defendant Fed. Rsrv Bank of N.Y.'s Motion to Dismiss at 7 n.4, TNB USA Inc. v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (S.D.N.Y. 2020).

[558] *See supra* notes 408-409 and accompanying text.

[559] Fed. Rsrv. Bd. Staff Op. of Feb. 10, 1981, *available at* 2006 WL 3848482.

[560] *See supra* note 308.

[561] *See supra* notes 203-214 and accompanying text.

[562] *See infra* Part II.A.

Electronic copy available at: https://ssrn.com/abstract=4048081

itself was not accepting deposits, or that the applicant was adjudged too risky.[563] Moreover, the Federal Reserve Bank's account request decisions only becomes public if the applicants decide to release communications or challenge the decision in court. If a denied applicant remains silent, the public may never know about the application, or be left to guess about both the substance of the decision and the ultimate decision maker.

The public would benefit from disclosures of decisions about which charter types are legally eligible for Federal Reserve accounts and payment services. Bank organizers spend a lot of money seeking bank charters and Federal Reserve account and payment access. For example, the fee to apply for a Wyoming SPDI charter is $50,000 dollars.[564] Likewise, state regulators incur time and expense evaluating charter applications. Even state legislatures may incur costs if they consider adopting charter types like those elsewhere.[565] If a Federal Reserve Bank, or the Federal Reserve Board, or a federal insurer concludes that no banks with a particular charter type are eligible to seek Federal Reserve Bank accounts and payment services, they should announce the decision so that others considering the same charter type can re-evaluate their plans. If a bank's business plan requires access to Federal Reserve accounts and payments, it makes little sense for the bank to incur start-up costs when the bank's charter type has already been secretly declared ineligible for Federal Reserve services. Because the decision about whether a bank is a depository institution turns on state law, the Federal Reserve could disclose decisions about whether a particular charter type is considered a "depository institution" without publicly releasing much (if any) confidential information provided by applicant banks.

### C.   The Board's Role

Once an applicant's legal eligibility for Federal Reserve services is established, the next question is whether the applicant poses undue risk. The novel applications discussed in Part IV show that although the Federal Reserve Banks ostensibly have discretion to grant or deny access based on risk, the Federal Reserve Board sometimes exerts significant influence.

---

[563] *See supra* Part II describing the Federal Reserve's statutory authority over accounts and payment services.

[564] 21-2-3 WYO. CODE R. § 2(d)(i).

[565] *See* Nate DiCamillo, *Nebraska Legislature Approves Framework for Digital Asset Banks*, COINDESK (May 21, 2021, 10:50 A.M.), https://www.coindesk.com/policy/2021/05/21/nebraska-legislature-approves-framework-for-digital-asset-banks/ (reporting that the Nebraska legislature passed a bill based on Wyoming's SPDI law).

Electronic copy available at: https://ssrn.com/abstract=4048081

Territorial Bank of American Samoa attributes its Federal Reserve account to a meeting with a member of the Federal Reserve Board.[566] The New York Fed ascribes its delay on TNB's narrow bank application to Board concerns.[567] Federal Reserve Board Chairman Jerome Powell seemed to acknowledge that the Board was evaluating the Wyoming SPDI applications.[568] And when Fourth Corner Credit Union and TNB sued, the Federal Reserve Board weighed in as amicus curiae.[569] Yet the Board is not transparent about the role it plays in deciding these account requests. The Board should clarify its role in addressing requests for Federal Reserve accounts and payment services.

The Board's proposed guidelines specify that the Reserve Bank should consider two questions "in coordination with the other Reserve Banks and Board."[570] Those questions are (1) "whether the access to an account and services by an institution itself or a group of like institutions could introduce financial stability risk to the U.S. financial system" and (2) "whether access to an account and services by an institution itself or a group of like institutions could have an effect on the implementation of monetary policy."[571] Moreover, the proposed guidelines say nothing further about how this coordination will occur.

It seems unlikely that the Board, as supervisor of the Reserve Banks, would be tolerant of a Reserve Bank's decision to open an account for an applicant that the Board believes poses systemic risk or raises monetary policy concerns.[572] Thus, the Board does not grant access, but it could prevent a bank from getting access. This is a rather broad power to be implemented through proposed guidelines that describe the Board's role as "coordinat[ing]" on discrete risks while emphasizing that the Reserve Banks' "discretionary authority to grant or deny requests."[573]

---

[566] *See supra* notes and accompanying text.

[567] *See supra* notes 466-469 and accompanying text.

[568] *See supra* notes 537-539 and accompanying text.

[569] Memorandum of Law of Amicus Curiae the Bd. of Govs. Of the Fed. Rsrv. In Support of Defendant the Fed. Rsrv. Bank of N.Y.'s Motion to Dismiss, TNB USA v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (2020).

[570] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,869 (2021).

[571] *Id.*

[572] *See supra* note 41 (discussing the Boards supervisory authority over Reserve Banks).

[573] *Id.* at 25,866.

Electronic copy available at: https://ssrn.com/abstract=4048081

The guidelines also do not describe the extent to which the Board might weigh in on non-risk questions such as whether granting a bank access to a Federal Reserve account and payments might bring important benefits.[574] For example, it seems likely that the Federal Reserve Board concluded that the benefits of allowing the Territorial Bank of American Samoa access to the payment system outweighed the risk that TBAS's account would open the floodgates for other risky public banks.[575]

The Federal Reserve Board should be clear about its role in the handling of account and payment services requests. If the Board is going to have a determinative role in the decisionmaking process, applicant banks should have an opportunity to address the Board's staff directly, rather than rely on the Reserve Banks to act as an intermediary. If the Board's decision denies an applicant access, the applicant should be provided enough information to allow the applicant to challenge the Board's decision.

### D.  Consistency

Finally, the novel applications for Federal Reserve accounts show that all the applicants were concerned about the consistency of the Federal Reserve Banks' decision-making process. There are few procedural safeguards designed to encourage consistency across the twelve district Reserve Banks. The decisions on account and services requests are not public. For matters that do not involve systemic risk or monetary policy concerns, there is no policy requiring that the Reserve Banks coordinate their decisions or even share their decisions and reasoning with each other. There is no appeals process within the Federal Reserve to resolve questions about consistency. Finally, the Board repeatedly emphasizes that the Reserve Banks have discretion—discretion that may limit judicial efforts to impose consistent outcomes.[576] The Federal Reserve should adopt procedures to encourage consistency in account and payment access across Reserve Bank districts.

The novel account applications discussed in Part IV all raised arguments about past decision about account and service access seeking what they believe is consistent treatment. Fourth Corner Credit Union argued that many existing banks were allowed to serve the state-legal marijuana

---

[574] *Id.* at 25,866 n.1 (stating that the proposed guidelines are not designed to evaluate "the net benefits to the financial system" that granting an applicant access could provide).

[575] *See supra* notes 411-412 and accompanying text.

[576] *Cf.* Yoav Dotan, *Making Consistency Consistent*, 57 ADM. L. REV. 995 (1036) (noting that [a]gencies are not formally bound by the principle of stare decisis")

Electronic copy available at: https://ssrn.com/abstract=4048081

industry without losing access to Federal Reserve accounts or payment services.[577] The Territorial Bank of American Samoa argued that the public Bank of North Dakota had access to a Federal Reserve account and payments for decades without incident.[578] TNB argued that Reserve Trust, a fintech company chartered as a Colorado trust, received an account and payment services.[579] Reserve Trust's account was also raised by Senator Cynthia Lummis as she sought to understand why Wyoming SPDIs had not received timely decisions on their requests for Federal Reserve accounts and services.[580] From these novel account applications, it is difficult to determine whether the Federal Reserve Banks are reaching inconsistent conclusions. The applications themselves are not public. Moreover, in three of the applications discussed, the district Federal Reserve Bank has not reached a decision.

There are, however, reasons to worry that the district Federal Reserve Banks have different risk tolerances when evaluating account and services requests. First, the Federal Reserve Banks' handling of clearing accounts prior to the Monetary Control Act shows that they had substantially different practices.[581] Second, Thomas Hoenig, the President of the Kansas City Fed from 1991 to 2011, told me that he believes district Reserve Banks have different risk tolerances.[582] Third, there are no other existing formalized procedures, like information sharing or appeals, that would promote consistent decisions across Reserve Banks. Fourth, the Reserve Banks sometimes actively resist the idea that past decisions create precedent. In granting Fourth Corner Credit Union conditional access to a Federal Reserve account (provided that they do not serve businesses violating federal law), the Kansas City Fed expressly noted that the letter was not intended to create precedent.[583] Fifth, the Reserve Board's proposed guidelines for evaluating account and services requests billed the proposal as "a

[577] First Amended Complaint ¶ 33, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-cv-01633).

[578] *See supra* notes 379-381 and accompanying text.

[579] Letter from James McAndrews, Chairman & CEO, TNB USA Inc., to Ann E. Misback, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys. (June 11, 2021), https://www.federalreserve.gov/SECRS/2021/June/20210611/OP-1747/OP-1747_061121_138143_448935872132_1.pdf

[580] Press Release, Senator Cynthia Lummis, Lummis Presses Fed Nominee Raskin Over Suspicious Influence Peddling (Feb. 3, 2022), https://www.lummis.senate.gov/press-releases/lummis-presses-fed-nominee-raskin-over-suspicious-influence-peddling/.

[581] *See supra* Part I.B.

[582] Telephone Interview with Thomas Hoenig, *supra* note 5.

[583] *See supra* note 350 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4048081

more . . . consistent approach."[584] There would be little need for guidelines to "promote consistent outcomes across Reserve Banks and to facilitate equitable treatment across institutions"[585] if the Federal Reserve's existing policies and procedures already ensured consistency.

The Federal Reserve Board's proposed guidelines seek to promote consistency primarily by identifying risks that Reserve Banks should evaluate when considering requests for accounts and payment services.[586] But it is not clear that risk-identification was the issue mostly likely to lead to inconsistent Reserve Bank decisions. All the novel bank requests suggest that the relevant district Reserve Bank spent substantial time considering the applicants' unique risks, whether those risks were related to money laundering, government corruption, operational risk, or risk to the Fed's ability to implement monetary policy. The problem is not that Reserve Banks will not spot the same risks; it is that they will evaluate those risks inconsistently. What one Reserve Banks sees as an undue risk, another Reserve Bank may see as acceptable.

This sort of inconsistency is harmful. It could lead to forum shopping and consolidate risk at the more permissive Reserve Banks.[587] It is unfair to state legislatures and state bank supervisors who cannot control which Reserve Bank's district they are located within.[588]  It undermines predictability in outcomes, raising costs for novel bank applicants.[589] It raises questions about whether the Federal Reserve is adequately complying with its statutory mandate to treat member and nonmember banks alike when establishing terms and conditions.[590] Ultimately, inconsistency invites speculation about "improper motives . . . or discriminatory bias in favor or

---

[584] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,866 (2021).

[585] *Id*. at 25,867.

[586] *See supra* Part III (describing the proposed guidelines).

[587] *Cf*. Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. at 25,866 (noting the possibility "for forum shopping across Reserve Banks").

[588] *See* Operating Circular 1 (2021), *supra* note 176, at § 2.5.

[589] *See* Dotan, *supra* note 576, at 1000 (noting that consistency "preserves the coherence and predictability of the process of decisionmaking").

[590] 12 U.S.C. § 248a(c)(2).

Electronic copy available at: https://ssrn.com/abstract=4048081

against some" applicants,[591] potentially eroding faith in the Federal Reserve.

Procedural measures could encourage consistency across Federal Reserve Bank districts. The Reserve Board could create a centralized committee led by the Board to review all applications for accounts and services.[592] The Reserve Banks could be transparent with the public about their account and payment access decisions. The Reserve Board could adopt procedures requiring that Reserve Banks share their decisions and analysis with each other. If a Reserve Bank chooses to impose conditions on an account, the Reserve Banks should share that information as well. The Federal Reserve could adopt an internal appeals procedure to remedy inconsistent outcomes. Absent procedures like these, there is little reason to believe that the Reserve Banks will treat banks with similar risk profiles similarly.

CONCLUSION

Banks of all types need access to Federal Reserve-provided accounts and payment systems. For traditional banks—those that accept federally insured deposits and make loans—access to Federal Reserve payment systems is straightforward. But for novel banks without deposit insurance the process for accessing Federal Reserve accounts is ill-defined. By examining Federal Reserve account applications from a marijuana credit union, a public bank, a narrow bank, and two cryptocurrency custody banks we see that novel banks spend years trying to navigate a system with no clear application documents, no clear decisionmaker, and sometimes no clear decision. Moreover, the Federal Reserve has no procedures to ensure that novel bank applicants are treated similarly across the twelve Federal Reserve districts.

---

[591] *Id.*; *see also* Press Release, Senator Cynthia Lummis, supra note 580 (describing an account access decision as "suspicious" after perceived inconsistent treatment of a fintech applicant for a Federal Reserve account).

[592] Letter from Rose Oswald Poels, President/CEO, Wisconsin Bankers Association to Ann E. Misback, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys. (July 12, 2021), https://www.federalreserve.gov/SECRS/2021/July/20210714/OP-1747/OP-1747_071221_138239_357757418056_1.pdf; Letter from James A. Reuter, CEO, FirstBank Holding Co., to Ann E. Misback, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys. (July 8, 2021), https://www.federalreserve.gov/SECRS/2021/July/20210714/OP-1747/OP-1747_070821_138241_359408681779_1.pdf.

Electronic copy available at: https://ssrn.com/abstract=4048081

The Federal Reserve Board has proposed guidelines intended to bring a "more transparent and consistent approach" to account and payment services requests.[593] They fall short. The guidelines consist primarily of "a consistent set" of risks for Reserve Banks to consider.[594] The novel bank applications examined show that risk identification was not the problematic part of the process. In each case, the Federal Reserve seemed to identify the risks adequately. Indeed, the risks identified in those applications are largely the same as the risks identified in the proposed guidelines.

If the Federal Reserve wants a transparent, consistent process for evaluating account and payment services requests, it should describe how banks can request account access, when the Reserve Bank considers the application complete, and when the Reserve Bank expects to decide. The Federal Reserve should be clear about who is deciding bank applicants' legally eligible for accounts and who is evaluating the applicants' risks. If some types of state bank charters are deemed legally ineligible for accounts and payment services, the Federal Reserve should be transparent about this decision. Transparency would allow similar prospective applicants and state regulators to avoid pointless costs. Finally, the Federal Reserve should adopt procedures designed to encourage consistency across the Federal Reserve districts. For example, the Federal Reserve could create a committee to review applications for all new accounts, or it could adopt an internal appeals process for denied accounts.

In sum, bank access to Federal Reserve accounts and payment systems is important. Future entrepreneurs will explore novel bank business plans, and states will explore novel types of bank charters. The Federal Reserve should have a transparent system to ensure novel banks seeking accounts and payment systems are treated similarly based on their risk profile across the Federal Reserve System.

---

[593] Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,866 (2021).

[594] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4048081