Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn.net

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,                    )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )          Civil Number: 22-cv-00125-SWS
                                        )
FEDERAL RESERVE BOARD OF                )
GOVERNORS and FEDERAL RESERVE           )
BANK OF KANSAS CITY,                    )
                                        )
        Defendants.                     )

---

**PLAINTIFF CUSTODIA BANK, INC.'S OMNIBUS BRIEF IN SUPPORT OF ITS PETITION FOR REVIEW ON ITS APA CLAIM AND ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ...................................................................4

PROCEDURAL POSTURE ...............................................................................4

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW AND DECISION ....................6

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.........................................6

    I.      Wyoming Developed a Novel SPDI Charter and Supervisory Framework in Close Conjunction with the Kansas City Fed. ....................................................6

    II.     As the OCC Approved the Authority of National Banks To Provide Cryptocurrency Custody Services, Incumbent Banks Announced Crypto-Related Banking Services. ......................................................................8

    III.    Custodia Was One of the First SPDIs To Apply for a Master Account. .................9

    IV.    The Kansas City Fed Tried To "Buy . . . Some Time" for the Board To Answer the Important Policy Questions Raised by Custodia's Master Account Application. ...................................................................10

    V.     The Board Set Up the Nontraditional Account Access Workstream Structure To Assess Master Account Applications from Novel Banks. ..............12

    VI.    Following Custodia's Application, the Board Issued New Guidelines for the Assessment of Master Accounts. ..............................................13

    VII.   Custodia Applied for Membership to the Federal Reserve....................15

    VIII.  The Board and Kansas City Fed Reviewed Custodia's Master Account and Membership Applications in Tandem and Determined That All Gaps Identified Were "Addressable."......................................................16

    IX.    The Board Issued the S-2677 Letter ("S-Letter") To Instruct Reserve Banks on How To Implement the Account Access Guidelines. ...........................19

    X.     Pursuant to the S-Letter, the Reserve Banks and Board Staff Developed a Handbook To Implement the Account Access Guidelines ("Handbook"), Which Further Increased Board Control............................................20

i

XI.     Numerous Board Employees Participated in the Review of Custodia's
        Master Account Request. ..................................................................21

XII.    Unbeknownst to President George, Board Staff Edited the Kansas City
        Fed's Memorandum Recommending Denial of Custodia's Master Account
        Application. .....................................................................................23

XIII.   The January 27, 2023 Denial Decisions Were Coordinated. ................27

STANDARD OF REVIEW ............................................................................30

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................31

ARGUMENT ...............................................................................................33

I.      The Federal Reserve Lacked Discretion To Deny Custodia a Master
        Account. .........................................................................................33

        A.      The Unambiguous Language of the Monetary Control Act of 1980
                Controls. ..............................................................................33

        B.      Defendants' Reliance on 12 U.S.C. § 342 Is Misplaced. ...........36

        C.      Past Interpretations by the Board of Governors Support Custodia's
                Reading of the Monetary Control Act. .....................................38

        D.      Interpretations by Officials with the Regional Federal Reserve
                Banks also Support the Plain Meaning of the Monetary Control
                Act. ....................................................................................39

        E.      The Legislative History of the Monetary Control Act Supports the
                Statute's Plain Meaning. ........................................................41

        F.      Two Courts of Appeals Have Viewed § 248a(c)(2) as Requiring
                Open Access. ........................................................................45

        G.      Academics Examining the Issue Support Custodia's Reading of the
                Statute. ...............................................................................46

II.     The Board Took Final Agency Action Against Custodia. ....................49

III.    Discovery Has Revealed That the Board Inserted Itself into the Master
        Account Decision-Making Process. .....................................................49

CONCLUSION ............................................................................................54

# TABLE OF AUTHORITIES

## CASES

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, ---- F. Supp. 3d ---- 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023)................................................45, 46

*Bank Stationers Ass'n, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 704 F.2d 1233 (11th Cir. 1983) ..............................................................................................................39

*Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250 (10th Cir. 2016)......................................................................................33–34, 34

*Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310 (10th Cir. 2007)........................................49

*Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223 (10th Cir. 2016) ....................................49

*Est. of Smith v. Heckler (In re Smith)*, 747 F.2d 583 (10th Cir. 1984) ..........................................31

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ....................................................34

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 154 F. Supp. 3d 1185 (D. Colo. 2016), *vacated*, 861 F.3d 1052 ......................................................................................33

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017) ..................................................................................................................... passim

*Gares v. Willingboro Township*, 90 F.3d 720 (3d Cir. 1996) ......................................................36

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)....................45

*Hernandez-Avalos v. INS*, 50 F.3d 842 (10th Cir. 1995)............................................................32

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) ..........................................................31

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983)...........37, 45

*Karim v. Allen*, No. 21-cv-2861-WJM-KLM, 2023 WL 4624896 (D. Colo. July 19, 2023) ..30, 31

*Lopez v. Davis*, 531 U.S. 230 (2001) ........................................................................................34

*Marathon Oil Co. v. Lujan*, 937 F.2d 498 (10th Cir. 1991)........................................................54

*McGraw v. Barnhart*, 450 F.3d 493 (10th Cir. 2006)................................................................33

*Nat. Res. Def. Council v. Regan*, 67 F.4th 397 (D.C. Cir. 2023)............................................34–35

*Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520 (S.D.N.Y. 1983) ............................45

*Tista v. Jaddou*, 577 F. Supp. 3d 1219 (D.N.M. 2021)....................................................31

*Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087 (E.D.N.Y. 1986) ..............45

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ...........................................32, 49

*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019)...........................................37

*Western Minnesota Municipal Power Agency v. Federal Energy Regulatory Commission*, 806 F.3d 588 (D.C. Cir. 2015)...........................................................................................36

*WildEarth Guardians v. National Park Service*, 703 F.3d 1178, 1189 (10th Cir. 2013) ..36–37, 38

## STATUTES AND REGULATIONS

12 C.F.R. § 265.20 (2022) ...........................................................................................10, 50

86 Fed. Reg. 25,865 (May 11, 2021) ...................................................................................13

86 Fed. Reg. 25,865, 25,867–69 (May 11, 2021) ...................................................................13

87 Fed. Reg. 51,099 (Aug. 19, 2022)...............................................................................13, 14

101 Pa. Code § 15.142(c)................................................................................................36

5 U.S.C. § 704.............................................................................................................49

5 U.S.C. § 706(2)(C)......................................................................................................31

12 U.S.C. § 248(k)......................................................................................................10, 50

12 U.S.C. § 248a.........................................................................................................6, 35

12 U.S.C. § 248a(b)(1)–(7) .............................................................................................34

12 U.S.C. § 248a(b)(8)..................................................................................................34

12 U.S.C. § 248a(c)(2)................................................................................................34, 45

12 U.S.C. § 342...........................................................................................................44

12 U.S.C. § 461(b)(2)(A).................................................................................................44

12 U.S.C. § 461(c)(1)(A)................................................................................................37

12 U.S.C. § 632...........................................................................................................4

12 U.S.C. § 5321(b) ...................................................................................................10–11

12 U.S.C. § 5322(a)(1)................................................................................................10–11

28 U.S.C. § 1331 .................................................................................................4

021-19 Wyo. Code R. § 19-4 ...............................................................................7

Wyo. Stat. Ann. §§ 13-12-101–13-12-126 ......................................................6, 7

Wyo. Stat. Ann. § 13-12-103 ...............................................................................8

Wyo. Stat. Ann. § 13-12-105 ...............................................................................8

Wyo. Stat. Ann. § 13-12-119 ...............................................................................8

Wyo. Stat. Ann. § 34-29-104 ...............................................................................8

## OTHER AUTHORITIES

126 Cong. Rec. 6250 (1980) ...............................................................................44

126 Cong. Rec. 6897 (1980) ...............................................................................44

Anatoli Kuprianov, *The Monetary Control Act & the Role of the Fed. Rsrv. in the Interbank Clearing Market* (1985)..................................................................42

Bd. of Governors of the Fed. Rsrv. Sys., 2023–2025 FOMC Trading and External Communications Blackout Calendar, https://www.federalreserve.gov/monetarypolicy/files/fomc-blackout-period-calendar.pdf..........28

Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services: About*, https://www.federalreserve.gov/paymentsystems/pfs_about.htm .................................................39

Bd. of Governors of the Fed. Rsrv. Sys., FOMC Policy on External Communications of Federal Reserve System Staff (adopted June 22, 2011), https://www.federalreserve.gov/monetarypolicy/files/FOMC_ExtCommunicationStaff.pdf ......................................................................................................28–29

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, http://www.federalreserve.gov/paymentsystems/pfs_principles.htm ...........................................38

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (emphasis added) http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.............................39

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm ...............................39

Brian Deese, Arati Prabhakar, Cecilia Rouse, & Jake Sullivan, *The Administration's Roadmap To Mitigate Cryptocurrencies' Risks*, White House (Jan. 27, 2023), https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/ .................................................................................27

Fed. Rsrv. Fin. Servs., Fed. Rsrv. Banks Operating Circular No. 1:  Account Relationships (2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. ...............................................................9

*Federal Reserve Requirements:  Hearing on S. 353, and Proposed Amendments on S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 96th Cong. 11 (1980) ........43

*Federal Reserve Requirements: Hearings on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 96th Cong. Rec. 5 (1980) ...................................................................................................................................41

Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333 (1984) ................46

Gordon H. Sellon, Jr., *The Instruments of Monetary Policy*, Economic Review 6 (1984), https://www.kansascityfed.org/documents/1281/1984-The%20Instruments%20of%20Monetary%20Policy.pdf............................................................40

H.R. Rep. No. 95-1590 (1978)..........................................................................................44

Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117 (2023) ..........................................................................................42, 47

Lawrence E. Filson & Sandra L. Strokoff, *The Legislative Drafter's Desk Reference* § 22.10 (2d ed. 2008) .........................................................................................................36

Lydia Beyoud, Allyson Versprille, & Katanga Johnson, *Federal Reserve Says It Won't Approve US Crypto Firm's Membership*, Bloomberg (Jan. 27, 2023, 11:01 AM), https://www.bloomberg.com/news/articles/2023-01-27/federal-reserve-signals-it-won-t-approve-crypto-firm-s-membership-application...........................................................................27

Monetary Control Act of 1980, Pub. L. No. 96-221, § 103, 94 Stat. 132 (1980)..........................37

Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Its Order Denying the Application by Custodia Bank, Inc., To Be Supervised by the Federal Reserve (Mar. 24, 2023), https://www.federalreserve.gov/newsevents/pressreleases/orders20230324a.htm .................16, 29

Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Announces Denial of Application by Custodia Bank, Inc. To Become a Member of the Federal Reserve System (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm .................27–28

SR 20-16 Letter from Board of Governors of the Federal Reserve System, to the Officer in Charge of Supervision at Each Federal Reserve Bank (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm ........................................17

Staff of H. Subcomm. on Domestic Monetary Policy, H. Rep. No. 98-17 (Comm. Print 1984) ...........................................................................................................................47–48

Statement To Promote a Level Playing Field for All Banks with a Federal Supervisor, Regardless of Deposit Insurance Status (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm........................27

Statement, Board of Governors of the Federal Reserve System, Policy Statement on Section 9(13) of the Federal Reserve Act (Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230127a1.pdf ..............23

Thomas C. Baxter, Jr. & James H. Freis, Jr., *Fostering Competition in Financial Services: From Domestic Supervision to Global Standards*, 34 New Eng. L. Rev. 57 (1999)................................................................................................................................46

Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13 Cornell J.L. & Pub. Pol'y 203 (2004)................................................................................................46

William P. Statsky, Legislative Analysis and Drafting (2d ed. 1984).........................................36

Wyo. Div. of Banking, Special Purpose Depository Institution Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view......................8

Plaintiff Custodia Bank, Inc. ("Custodia") respectfully submits this omnibus brief in support of its petition for review on its Administrative Procedure Act ("APA") claim and its motion for judgment as a matter of law on its Mandamus claim challenging Defendants' denial of its master account request.  Custodia respectfully submits that Defendants' unlawful actions warrant relief under the APA as to Defendant Federal Reserve Board of Governors ("Board"), and warrant statutory mandamus with respect to Defendant Federal Reserve Bank of Kansas City ("Kansas City Fed") requiring the issuance of a master account to Custodia.

## INTRODUCTION

This case presents a David and Goliath story.  The Federal Reserve is the nation's central bank and the most powerful financial institution in the world.  Custodia is a small Wyoming-chartered Special Purpose Depository Institution ("SPDI"), deemed a "novel bank" by the Federal Reserve because its business plans involve both traditional and digital asset services. Custodia follows in a long line of state-chartered financial institutions that have brought innovation to America's dual banking system.

A master account is a straight-forward affair.  It is the key to banking services that the Monetary Control Act of 1980 guaranteed to all eligible depository institutions such as Custodia, not just to banks that are members of the Federal Reserve System.  When Custodia applied for a master account with the Kansas City Fed in October 2020, it hardly expected that the one-page application for the master account, which advised that action on the application might take 5–7 business days, would be purposefully deferred by the Reserve Bank, at the request of the Board, to buy some time for the Board to consider how to deal with the application.  Wyoming officials had literally spent years revising the SPDI charter legislation, rules, and supervisory program based on input from Kansas City Fed officials.  After nearly two years of fruitless waiting, Custodia brought a lawsuit to compel a decision.

1

The Board, however, contrived a plan to ensure that Reserve Banks reach Board-desired outcomes on all master account decisions.  After Custodia filed its lawsuit, the Board issued three documents—the Guidelines, the S-Letter, and the Handbook[1]—largely aimed at Custodia and other "novel" banks; they set the bar so high for so-called Tier 3 depository institutions like Custodia that, realistically, a master account was almost certain to be denied to this category of state-chartered banks.  The Board euphemistically mandated "consultation" by the Reserve Banks with the Board, moving ultimate control of the master account decision-making process to the Board and requiring Reserve Banks to give the Board a last look at the end of the process.

Contrary to the Monetary Control Act's promise of access to Federal Reserve services for members and non-members alike, the Guidelines discriminated against state-chartered banks like Custodia that did not have a federal regulator (*e.g.*, FDIC or Federal Reserve), shunting them into a dead-end, Tier 3 status that disadvantaged state-chartered banks relative to their federally chartered peers.  The Board inserted itself into the review of Custodia's master account request every step of the way.  More than one dozen Board staff participated in the review and denial of Custodia's master account request.  At least another ten were involved in broader account access policies pertaining to SPDIs like Custodia, including Board-controlled working groups that drafted the Handbook governing Reserve Bank consideration of master accounts.

The Board's General Counsel encouraged Custodia to apply for membership to escape Tier 3 status, and Custodia followed his lead.  This, too, proved to be a ploy to derail Custodia's master account application.  The Board then maneuvered so that Custodia's Federal Reserve membership application and master account application would be linked and considered in

---

[1] These terms are defined in the Statement of Material Facts Not in Dispute below. *See infra* paragraphs 19, 34 (and accompanying header), 38 (same).

tandem; denial of one (membership) would mean denial of the other (master account).  The Board indisputably decided membership.  It misled Custodia about the membership examination, promising that it would be a targeted exam based on Custodia's Day 1 activities, as is typical for a *de novo* bank still being constructed, only to judge Custodia against the standard of a fully operating "complex bank."  It then invited Custodia to remediate gaps and promised, in writing, to consider that evidence in a follow-up examination, only to refuse to consider Custodia's remedial measures as a prelude to denial.  When Custodia exercised its statutory right to request reconsideration and submitted a revised business plan that addressed issues newly raised by the Board and Reserve Bank in the denial letters, its proposal was never considered.

If any question remained, the choreographed events on January 27, 2023—press leaks, membership denial, White House and Board anti-crypto statements, master account denial, and motions to dismiss—answer it definitively.  This was no coincidence.  The behind-the-scenes plotting does not reflect well on the Board, especially since in this (and other) litigation, the Board has claimed that it has nothing to do with master account decision-making, and that this authority rests exclusively with Reserve Banks.

The Board also, throughout the administrative process, ignored the relevant law.  Under the Monetary Control Act, the Federal Reserve had no discretion to deny a master account to Custodia.  This legal conclusion is not only supported by the plain language of the statute, but by repeated interpretations by the Board and Reserve Banks, the legislative history of the Monetary Control Act, the longstanding interpretation of this statute by other courts and academics, and the Board's admission in this case that it took ***final agency action*** that affected Custodia's rights. Finally, the fruits of discovery in this case demonstrate that, as Judge Bacharach concluded in

*Fourth Corner*,[2] the discretion argument put forward by Defendants is a litigation position only—wholly unsubstantiated by the facts, relevant law, or Federal Reserve history and precedent.

## JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 632, and 28 U.S.C. § 1331.  Under Section 632, "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."  Under Section 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

## PROCEDURAL POSTURE

After waiting nearly 20 months for a decision on a master account request that typically takes 5–7 days, Custodia filed this lawsuit on June 7, 2022.  (ECF No. 1, Compl.)  Custodia alleged that agency action had been unlawfully withheld and unreasonably delayed in violation of the APA and in contravention of its statutory rights.  (*Id.*)  On August 16, 2022, Defendants filed motions to dismiss.  (ECF Nos. 48, 50.)  One of their primary defenses was that the Board could not be sued because, while the Board was an agency for APA purposes, the authority for deciding master account applications rested solely with the Reserve Bank.  (ECF No. 49, at 17.)  The Kansas City Fed, in turn, asserted that while it has responsibility for deciding master account applications, it could not be sued because it was a federal instrumentality, not an agency of the United States.  (ECF No. 51, at 13–15.)  Both Defendants argued that, in any event, Section 342

---

[2] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1064–80 (10th Cir. 2017) (Op. of Bacharach, J.).

of the Federal Reserve Act gave them complete discretion to grant or deny master accounts. (ECF No. 49, at 17–26; ECF No. 51, at 20–29.)  The Court granted in part and denied in part Defendants' motions, allowing the case to proceed to discovery on a subset of APA, mandamus, and Due Process claims.  (ECF No. 102.)

On January 27, 2023, less than two weeks before the deadline for the Board to produce the Administrative Record, the Board denied Custodia's membership application and the Kansas City Fed communicated a denial of Custodia's master account application.  These actions were part of an orchestrated series of events discussed in greater detail below.  Custodia promptly amended its complaint to bring an APA claim against the Board, and statutory mandamus claims against both Defendants.  (ECF No. 121, Am. Compl. ¶¶ 77–94.)  Both Defendants again moved to dismiss, making many of the same arguments as in their first motions to dismiss, (ECF Nos. 124, 126.), and the Court again granted in part and denied in part the motions, allowing the APA claim to proceed against the Board and the statutory mandamus claim to proceed against the Kansas City Fed.  (ECF No. 164.)

The Board filed its Administrative Record on August 21, 2023 (ECF No. 178.), and the Kansas City Fed and Custodia engaged in discovery.  Custodia informed the Board that it intended to contest the contents of the Administrative Record given the evidence that had come to light in the Kansas City Fed's production and the testimony of its witnesses.  To resolve that dispute, the parties stipulated and the Court approved that all evidence between Custodia, the Kansas City Fed, and the Board's Administrative Record "may be relied upon by all parties and any court hearing this case, including in any appeal involving agency record review."  (ECF No. 219, ¶ 3.)  The parties further agreed that Custodia would file a single, omnibus brief addressing its claims against both Defendants.  Although the scheduling order does not require dispositive

motions to be filed until January 19, 2024, discovery has closed[3] and the uncontested record firmly establishes Custodia's right to relief, without need for trial.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW AND DECISION

In this case, Defendants argue that individual Federal Reserve Banks, and not the Board, exercise unreviewable discretion over applications for master accounts. The Board claims, accordingly, that it cannot be sued for actions it did not take; and the Kansas City Fed argues that it cannot be sued under the APA. The Court ordered discovery to determine the role each Defendant played in the denial of Custodia's master account application. The Court left resolution of the statutory issues presented by the case for the period after discovery closed.

The issues presented for the Court's review are the following:

1. Does the record demonstrate that the Board inserted itself into the process for deciding Custodia's application for a master account?

2. Does 12 U.S.C. § 248a, as amended by the Monetary Control Act of 1980, deprive Defendants of discretion to deny Custodia's master account application?

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

I.    **Wyoming Developed a Novel SPDI Charter and Supervisory Framework in Close Conjunction with the Kansas City Fed.**

1.    The dual-banking system permits depository institutions to be chartered by either federal or state banking authorities. Ex. A (Conti-Brown Expert Report) ¶ 11.

2.    In 2019, the State of Wyoming enacted a banking charter for SPDIs to facilitate banking with digital assets. *See* Wyo. Stat. Ann. §§ 13-12-101–13-12-126. The SPDI statute requires a conservative business plan, as unlike traditional banks, SPDIs are prohibited from making loans with customer deposits and must back all customer deposits with 100% cash on

---

[3] The parties agreed to allow the deposition of Custodia's hybrid fact/expert witness, Katie Cox, to occur on December 19–20 to accommodate scheduling issues.

hand or high-quality liquid assets.  Wyo. Stat. Ann. §§ 13-12-103, 13-12-105.  SPDIs hold

customer deposits in U.S. dollars (or similar "highly liquid" non-volatile "[i]nvestments," such

as "obligations of the United States treasury or other federal agency obligations")—not digital

assets—as SPDIs hold digital assets separately in trust.  *Id.* §§ 13-12-105, 34-29-104; 021-19

Wyo. Code R. § 19-4.  Additionally, because SPDIs must hold reserves covering 100% of U.S.

dollars that clients have deposited in bank accounts, if all customers seek to withdraw funds from

their accounts simultaneously, the bank has the cash on hand to cover all withdrawals.  *See* Wyo.

Stat. Ann. §§ 13-12-101–13-12-126.

       3.     The innovative SPDI statute was the result of two years of thoughtful planning.

Wyoming worked hand-in-hand with the Kansas City Fed to develop the SPDI legislation,

conducting approximately 100 meetings with staff from the Kansas City Fed and the Board

between 2017 and 2019.  *See* Ex. B, at FRBKC-00015090 (Wall Street Journal piece); Ex. C

(KC Fed 30(b)(6) Tr.), at 20:9–19; Ex. D (the Kansas City Fed "has been meeting with [the

Division of Banking] on a weekly basis to discuss a variety of topics related to the SPDI

charters."); Ex. E (Humston Tr.), at 24:17–25:7.  The Kansas City Fed asked Wyoming

legislators to remove a provision from its draft legislation that authorized the Wyoming Attorney

General to sue if a SPDI were denied a master account with the Federal Reserve.  *See* Ex. F, at

23 (Draft SPDI legislation with Attorney General provision); Ex. G (Kansas City Fed talking

points requesting removal of this provision).  Wyoming agreed to that request after Reserve

Bank officials assured state representatives that such a provision was unnecessary.  *See* Ex. C

(KC Fed 30(b)(6) Tr.), at 59:5–15, 61:14–62:9; *see also* Ex. H (Kansas City Fed email regarding

removal of this provision).

4.      Wyoming also agreed to the Reserve Bank's request to remove references to Section 248a of the Monetary Control Act, the provision under review here.  Ex. C (KC Fed 30(b)(6) Tr.), at 57:21–58:12; Ex. G.  Contrary to its current litigation posture, the Kansas City Fed displayed concern about Section 248a from the beginning.  The removal of both the Attorney General and Section 248a references in Wyoming's draft statute had no substantive impact on the eligibility of SPDIs to access Federal Reserve services.  *See, e.g.*, Ex. I (letter confirming eligibility).  Esther George, President of the Kansas City Fed, understood that a "big goal of a SPDI-chartered depository institution [was] to be able to get a master account and access Fed services."  Ex. J (George Tr.), at 24:16–20.

5.      Wyoming SPDIs are regulated by the Wyoming Division of Banking, Wyo. Stat. Ann. § 13-12-119, which developed a robust, 772-page supervisory examination manual, Wyo. Div. of Banking, Special Purpose Depository Institution Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.  President George has deep respect for the Wyoming Division of Banking, and her staff expressed favorable views toward the SPDI framework.  *See, e.g.*, Ex. J (George Tr.), at 28:14–20, 282:6–11 ("I believe [the Division of Banking] would have been willing to share information."); Ex. K (Nugent Tr.), at 36:18–38:6, 62:20–63:4 (Wyoming "took a thoughtful approach to developing the [SPDI] framework."); Ex. E (Humston Tr.), at 25:16–28:5.

**II.      As the OCC Approved the Authority of National Banks To Provide Cryptocurrency Custody Services, Incumbent Banks Announced Crypto-Related Banking Services.**

6.      On July 22, 2020, the Office of the Comptroller of the Currency ("OCC") advised that "a national bank may provide . . . cryptocurrency custody services on behalf of customers."  Ex. L, at 1 (Interpretive Letter No. 1170).  This OCC guidance, as well as the testimony of witnesses in this case, confirm there is nothing illegal about state-chartered depository

institutions providing banking services related to digital assets. *See, e.g.*, Ex. J (George Tr.), at

43:16–44:2 (acknowledging that the OCC has determined that it is legally permissible for its

banks to hold digital assets in a custodial relationship), 46:4–12 (same); Ex. E (Humston Tr.), at

18:1–15.

7.      In light of this guidance, large incumbent banks have started providing digital

asset-related banking services to their customers. *See, e.g.*, Ex. E (Humston Tr.), at 16:5–8; Ex. J

(George Tr.), at 44:13–23; *see also id.* at 171:7–13 (acknowledging that "if you were a member

bank you could start engaging in crypto-related asset activity and all you had to do was give

notice to your supervisor"). State-chartered banks are permitted to engage in the same activities

as national banks. Ex. E (Humston Tr.), at 12:13–19. Discovery revealed that, when drafting the

Custodia master account denial, Kansas City Fed staff used materials sent to it by the lobbying

group for the largest incumbent banks in the U.S., which mischaracterized Wyoming's digital

asset laws. *See, e.g.*, Ex. M, at 2 (Kansas City Fed officials sharing a piece by the Bank Policy

Institute called "Beware the Kraken").

## III.      Custodia Was One of the First SPDIs To Apply for a Master Account.

8.      On October 29, 2020, Plaintiff Custodia Bank, Inc. ("Custodia," formerly known

as "Avanti") was one of the first SPDIs to apply for a master account with the Federal Reserve.

(ECF No. 1, Ex. 1 to Compl.) (Custodia's application); Ex. E (Humston Tr.), at 39:5–8. A

master account is required for a bank to directly access the Federal Reserve's services for

executing debit and credit entries between institutions, clearing checks, transferring securities,

and cashing savings bonds. *See* Fed. Rsrv. Fin. Servs., Fed. Rsrv. Banks Operating Circular No.

1: Account Relationships §§ 2.3, 2.9, 4.1–3, 5.3 (2023),

https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-

operating-circular-1.pdf.

9.      Without a master account, the only way to access the Federal Reserve's payment system is indirectly, through a "middleman" correspondent bank or a correspondent-like relationship.  Ex. N (Hazen Tr.), at 53:15–25; Ex. C (KC Fed 30(b)(6) Tr.), at 53:11–54:16.  Doing so imposes additional costs and counterparty credit risk, injects settlement risk given the inability to ensure simultaneous settlements, and exposes institutions to existential risks if the correspondent bank terminates the relationship.  Ex. C (KC Fed 30(b)(6) Tr.), at 54:17–55:22.

10.      When Custodia applied for a master account, the one-page application stated that processing time may take 5–7 business days.  (ECF No. 1, Ex. 1 to Compl.)  Master account decisions tend to occur quickly, usually within a week or two, but no more than a couple of months.  Ex. E (Humston Tr.), at 191:2–7; Ex. J (George Tr.), at 101:8–14.

11.      Upon its initial review of Custodia's application, a senior official at the Kansas City Fed told Custodia in January 2021 that there were "no showstoppers."  Ex. J (George Tr.), at 60:21–62:7; Ex. O.

**IV.     The Kansas City Fed Tried To "Buy . . . Some Time" for the Board To Answer the Important Policy Questions Raised by Custodia's Master Account Application.**

12.      Contrary to the "no showstoppers" communication to Custodia, Kansas City Fed officials realized the Reserve Bank had no discretion to answer the "unprecedented" policy questions raised by Custodia's application.  *See infra* paragraph 14.  While Congress has authorized the Board to delegate certain responsibilities to Reserve Banks, the Board may not delegate functions that raise "significant legal, supervisory, or policy issues."  12 C.F.R. § 265.20 (2022) (excepting from powers that could be delegated to Reserve Banks).  Nor may the Board delegate functions "pertaining principally to monetary and credit policies" or financial stability, which are two of the six principles enumerated in the Guidelines.  *See* 12 U.S.C. § 248(k); *infra* paragraph 18; *see also* 12 U.S.C. §§ 5321(b), 5322(a)(1) (the purpose of the

Financial Stability Oversight Council—on which the Board, and not the Reserve Banks, holds a seat—is to, in part, "identify risks to the financial stability of the United States" and "respond to emerging threats to the stability of the United States financial system").

13.     At his nomination hearing in January 2022, Fed Chairman Jerome Powell publicly acknowledged the policy issues raised by Custodia's application and their consideration by the Board, testifying that SPDIs were "novel charters" that are "hugely precedential," and thus "we" (as in, the Board) "are looking carefully at it.  I do think we will make some progress on this . . . ."  Ex. P, at 39.

14.     Numerous statements made and actions taken by Kansas City Fed officials demonstrate that the Reserve Bank looked to the Board to answer these policy questions, confirming Chairman Powell's testimony and the Board's role here.  *See, e.g.*, Ex. Q, at FRBKC-00017834 (President George's March 2021 notes reflecting that "[Board Vice-Chair] Lael [Brainard] feels we don't have authority to say no to request.  I pushed back and argued we need broader policy issue addressed."); Ex. R, at FRBKC-00009848 (March 24, 2022, meeting where President George told Custodia that SPDIs "require us to engage broadly with the Board" and that "[w]e want any decision we make to align with public policy pronouncements."); Ex. S (November 5, 2020, email stating, "Due to the unique nature of SPDIs and the broader impacts this decision may have, we are working with our colleagues across the System and at the Board to understand their viewpoints on the matter."); Ex. T, at FRB-AR-003858 (August 2, 2021, letter from Kansas City Fed General Counsel Craig Zahnd stating that "[w]e are working closely with the [Board] as we continue to evaluate the novel risks and opportunities presented by digital assets and the SPDI charter."); Ex. E (Humston Tr.), at 331:12–332:11 (Senior Kansas City Fed

official testifying that "[f]rom very early . . . since the formation of the SPDI charters, we had

felt" that SPDIs were "precedent setting" and "first of its kind.").

15.    Indeed, as early as December 2020, the Kansas City Fed began orchestrating

delays in evaluating Custodia's master account application to "***buy . . . some time***" while internal

conversations with the Board were "getting geared up."  Ex. U (emphasis added).  Internal

communications among Reserve Bank staff at this time provide some explanation:  they were

"uncomfortable" about "mak[ing] it up as we go with crypto," "hard pressed to find anyone

that's comfortable in this murky water," did not "feel confident in this area," and wished that

Custodia would "go away."  Ex. V, at FRBKC-00002560; Ex. W, at FRBKC-00014058.  This

approach is consistent with President George's testimony:  that the Kansas City Fed would not

make a "risk assessment" until sufficient feedback had been provided by the Board.  *See* Ex. J

(George Tr.), at 50:14–51:16.

## V.    The Board Set Up the Nontraditional Account Access Workstream Structure To Assess Master Account Applications from Novel Banks.

16.    While Custodia's master account application languished at the Kansas City Fed,

the Board set up a "Nontraditional Account Access Workstream Structure" (the "NTAA

Workstream") to assess master account applications from banks it deemed novel.  *See* Ex. X; Ex.

Y.  Created in November 2020, this group was led by a Board-dominated Steering Committee

and contained two sub-groups, a Policy Workstream and a Practical Workstream, which were

staffed largely by Board employees.  Ex. Y; Ex. C (KC Fed 30(b)(6)), at Tr. 144:5–18, 157:3–10,

159:10–161:1.

17.    The Board created the NTAA Workstream in direct response to the increasing

number of requests for master account access from novel depository institutions like Custodia

and the Board's need to provide "policy guidance and practical coordination to support Reserve

Bank account decisions that are prudent, consistent, and timely"; the Workstream proved heavily influential in Reserve Bank decision-making concerning non-traditional banks like SPDIs.  Ex. Y, at FRBKC-00004902; *see* Ex. X; Ex. C (KC Fed 30(b)(6)), at Tr. 277:2–16, 356:12–357:3.

**VI.     Following Custodia's Application, the Board Issued New Guidelines for the Assessment of Master Accounts.**

18.     At the time that Custodia applied for a master account, the Board had never issued any public guidelines for the assessment of master accounts, *see* Ex. Z (Katie S. Cox Expert Report) ¶ 61, and the Kansas City Fed had denied a master account on only one occasion (Fourth Corner Credit Union, largely on the grounds that it would engage in illegal activity), *see* Ex. J (George Tr.), at 41:9–42:16.  But suddenly, months after Custodia's application, the Board published for public comment its Proposed Guidelines for Evaluating Account and Services Requests.  *See* 86 Fed. Reg. 25,865 (May 11, 2021).  These proposed guidelines set out six principles for evaluating master account applicants,[4] most of which were non-delegable policy matters that statutes require the Board, and not Reserve Banks, to decide (*e.g.*, legal eligibility, financial stability, monetary policy).  *Id.*; *see supra* paragraph 12.

19.     The Board finalized the proposed guidelines on August 15, 2022 ("Guidelines" or "Account Access Guidelines").  *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022).  The Board justified its issuance of the Guidelines due to

---

[4] These six principles include:  (1) Legal eligibility; (2) Risk to Reserve Banks (granting a master account should not present  undue credit, operational, settlement, cyber or other risks to the Reserve Bank); (3) Risk to the overall payment system; (4) Risk to the U.S. financial system; (5) Risk of facilitating illicit activity such as money laundering, terrorism financing, fraud, cybercrimes, or other illicit activity; and (6) Risk of adverse effects on monetary policy. Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,867–69 (May 11, 2021).

"a recent uptick in novel charter types being authorized or considered by federal and state banking authorities across the country." *Id.*

20.     The Guidelines introduced a three-tiered approach for classifying banks. Tier 1 institutions are eligible institutions that are federally insured through the Federal Deposit Insurance Corporation (FDIC). *Id.* at 51,109. Tier 2 institutions are not federally insured but are subject to prudential supervision by a federal banking agency, such as via membership in the Federal Reserve. *Id.* at 51,109–10. Tier 3 institutions are those like Custodia that are not federally insured and are not supervised by a federal agency. *Id.* at 51,110. Reserve Banks can grant Tier 1 institutions master accounts via a streamlined process without much scrutiny. *Id.* at 51,109. By contrast, "institutions in a higher tier will on average face greater due diligence and scrutiny than institutions in a lower tier," *i.e.*, "Tier 3 institutions will generally receive the strictest level of review," including mandatory consultations with the Board. *Id.* at 51,109–10.

21.     In internal discussions, Kansas City Fed staff acknowledged that Tier 3 was a dead end. *See, e.g.*, Ex. AA, at FRBKC-00004944 (March 14, 2022, Teams Chat acknowledging that "[e]ntities falling into Tier 3 will have a high bar to cross to get an account" and that the wording suggested "that approval isn't anticipated if Tier 3 route is taken."); Ex. AB, at FRBKC-00013860 (Kansas City Fed staffer's September 2022 notes reading, "Frame up as 'No' for Tier 3."), FRBKC-00013879 (same staffer's notes from March 2022 referring to a meeting with Custodia that says "Not finding path for you under Tier 3"); *see also* Ex. AC, at FRBKC-00013973 (Notes from Kansas City Fed official Tara Humston indicating, "Matt [Eichner from the Board] thought guidelines gives us all we need to say no.").

22.     Custodia's application was part of the impetus for the Guidelines. *See* Ex. Q, at FRBKC-00017835 (President George's notes: "3-9-21 Jeff Walker [Payments Policy Board

staff]—***Board of Gov work on SPDI targeting late April to release FRN [Federal Register
Notice]***. Is this an issue for Congress? Ultimately yes. Our grant of access will be global signal
of support for crypto." (emphasis added)); Ex. AD (November 4, 2021, observation by President
George's deputy that "[t]he timeline is probably technically accurate" in response to remarks by
Custodia's CEO, Caitlin Long, that the "Fed then decided to hit them 'out of left field' with the
proposed account access guidelines.").

23.     The Board's issuance of the Guidelines served as another mechanism to delay a
decision on Custodia's master account. On August 2, 2021, the Kansas City Fed's General
Counsel, Craig Zahnd, wrote to Custodia's CEO that the Federal Reserve "anticipate[s] that a
final decision on your application will be made ***pursuant to the guidelines and legal
interpretation the Board may provide*** and it would be inappropriate for us to issue a decision
before this work has progressed further." Ex. T, at FRB-AR-003858 (emphasis added).

## VII.     Custodia Applied for Membership to the Federal Reserve.

24.     In May 2021, the Board's General Counsel, Mark Van Der Weide, urged
Custodia to apply for membership in the Federal Reserve system as a way to become federally
regulated and ease its path to a master account. Ex. AE (Long Tr.), at 222:21–223:22. Although
Custodia was still building the bank and not yet operating, he noted that Federal Reserve
guidance permits it to admit pre-operating banks to membership. *Id.* at 287:13–288:8.

25.     Custodia filed an application for membership in August 2021. Ex. AF. If
granted, membership would have subjected Custodia to Federal Reserve supervision on top of its
existing supervision from Wyoming. Upon hearing that Custodia had applied for membership,
Mr. Van Der Weide reacted positively. *Id.*

26.     On October 21, 2022, the Kansas City Fed told Custodia that if Custodia were
granted membership, Custodia would qualify for Tier 2 status; without membership, Custodia

would remain Tier 3.  Ex. AG, at FRBKC-00000297.  Because of the importance of the Board's

membership decision to the assessment of Custodia's master account application under the

Guidelines, the Kansas City Fed could not conclude its analysis of Custodia's master account

application until the Board decided Custodia's membership application.  Ex. N (Hazen Tr.), at

245:20–246:12.

**VIII.    The Board and Kansas City Fed Reviewed Custodia's Master Account and Membership Applications in Tandem and Determined That All Gaps Identified Were "Addressable."**

27.    Kansas City Fed staff were charged, together with Board staff, with evaluating

Custodia's membership application and its master account application in tandem.  Ex. AH (May-

Oder (Vol. I) Tr.), at 269:14–271:14; Ex. AI (Mullins Tr.), at 125:13–127:4, 204:1–8; *see id.* at

50:6–52:15.  Work that was done on the membership application was leveraged for the master

account review, and vice versa.  Ex. AH (May-Oder (Vol. I) Tr.), at 277:14–22; Ex. AJ (Crouch

Tr.), at 116:3–15; Ex. AI (Mullins Tr.), at 60:20–61:7, 103:19–104:6, 125:13–126:4; Ex. AK

(August 19, 2022, letter from the Kansas City Fed explaining that "Information obtained" would

be used to inform both the membership and master account applications.).

28.    The Board was the decisionmaker for Custodia's membership application. *See,*

*e.g.*, Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Its

Order Denying the Application by Custodia Bank, Inc., To Be Supervised by the Federal

Reserve (Mar. 24, 2023),

https://www.federalreserve.gov/newsevents/pressreleases/orders20230324a.htm.  But the Board

used Kansas City Fed staff to conduct the examination.  Ex. AJ (Crouch Tr.), at 18:10–20, 19:2–

5.  In assessing Custodia's master account request, Kansas City Fed staff were careful not to

contradict the Board's analysis on membership.  As one Kansas City Fed staffer put it, "I've

been asked to . . . make sure that we are ***not getting out of sync*** with the membership side.  We

do not want to contradict one another."  Ex. AL, at FRBKC-2133 (emphasis added); *see also* Ex. AH (May-Oder Tr. (Vol. I)), at 300:13–301:20 ("[W]e wanted to make sure that our analysis of those reviews [for the membership and master account] were consistent.").

29.     Because each review leveraged information from the other, there was substantial "overlap" in the master account and membership reviews.  Ex. AM, at FRBKC-00002200–01 (May 10, 2022, email stating that "there is a lot of overlap" between the membership and master account reviews.); Ex. AH (May-Oder Tr. (Vol. I)), at 277:14–22 ("there was a lot of overlap"); *see also* Ex. AN (review "[f]eed[s] into membership and Master Account applications").

30.     The Board then used Custodia's decision to apply for membership at the Board's behest against it, subjecting Custodia to unparalleled scrutiny for a *de novo* institution in contravention of the Board's public, written guidance.  *See, e.g.*, SR 20-16 Letter from Board of Governors of the Federal Reserve System, to the Officer in Charge of Supervision at Each Federal Reserve Bank (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm (describing initial examinations of *de novo* institutions as "targeted in scope").  Before the pre-membership examination began, Custodia was told that it would only be examined on its Day 1 activities, and future products would be assessed in subsequent examinations.  Ex. AK, at FRBKC-00009860 (August 19, 2022, letter from the Kansas City Fed).  But the Kansas City Fed moved the goalposts during the examination, instead assessing Custodia's potential "future products and services," in addition to the products Custodia proposed for its initial phase of operations.  Ex. AJ (Crouch Tr.), at 208:25–209:22.  Moreover, mid-exam the Kansas City Fed determined that Custodia would be held to the standard of a "complex bank" (a bank of at least $10–50 billion in assets), even though Custodia had not yet opened.  *See* Ex. AO.

17

31.     In an October 21, 2022, letter to Custodia summarizing the results of the examination, the Kansas City Fed found "numerous exceptions to, or departures from, safe and sound banking practices."  Ex. AP, at FRBKC-00014758.  Most of these gaps were attributable to the fact that the Kansas City Fed (under the Board's direction) converted the examination, midstream, to one that would be applied to a complex bank while also examining its three-year product roadmap—not the Day 1 activities that the Kansas City Fed told Custodia it would be reviewing.  Ex. AK.

32.     Despite this onerous and unprecedented scrutiny, staff from the Kansas City Fed told Custodia during the follow-up exit meeting that "***everything can be addressed over time***." Ex. AQ, at 5 (emphasis added); Ex. AJ (Crouch Tr.), at 162:3–9, 164:12–18 (lead examiner testifying that all of the gaps identified in this exam "could be addressed" by Custodia).  The Kansas City Fed invited Custodia to "provide a comprehensive written response to the Reserve Bank describing all corrective actions taken or planned," committed in writing to provide feedback, and promised there would be a follow-up exam (as is customary).  Ex. AP, at FRBKC-00014763; *see also* Ex. Z (Katie S. Cox Expert Report) ¶ 43 ("it is customary for the Federal Reserve to conduct at least one follow-up examination").

33.     In December 2022, Custodia had already remediated the vast majority of the gaps identified during the examination and promptly submitted evidence documenting its efforts, as well as a plan to remediate the rest.  *See* Ex. AR, at Custodia-00007002.  But the Kansas City Fed reneged on its written promise to review this evidence as part of a follow-up examination; neither the Board nor the Reserve Bank considered the updated materials in their assessment of Custodia's application for a master account or membership.  Ex. C (KC Fed 30(b)(6) Tr.), at 215:19–219:10.

18

**IX.      The Board Issued the S-2677 Letter ("S-Letter") To Instruct Reserve Banks on How To Implement the Account Access Guidelines.**

34.      The Board took additional, behind-the-scenes actions to ensure that it controlled the decision on Custodia's master account application.  The Board drafted an "S-Letter," non-public guidance for Reserve Banks on implementing the Account Access Guidelines, which further cemented the Board's control over the master account review process.  *See generally* Ex. AS.

35.      S-Letters are exceedingly rare.  Prior to the S-Letter referenced here, neither Esther George nor her deputy Tara Humston had ever seen one during their long careers at the Kansas City Fed.  Ex. J (George Tr.), at 240:25–241:4 (could not recall another S-letter in the last 20 years); Ex. E (Humston Tr.), at 9:10–15, 221:15–22 (could not recall another S-letter in her 25-year career).

36.      The S-Letter, which was finalized on January 17, 2023, but circulated in draft form a year earlier, drew objection from President George.  *See, e.g.*, Ex. J (George Tr.), at 85:9–19 ("I had concerns of whether the S letter was necessary."); Ex. AT, at FRBKC-00011221 (February 9, 2022, Teams Chat noting that George "had concerns about that piece [the S-Letter] specifically").  Understanding her objection had been overruled by the Board, President George recognized that the S-Letter could not be ignored, *see* Ex. J (George Tr.), at 86:3–10, and that, as Board guidance, it supplanted Reserve Bank procedures and policies, requiring for the first time that Reserve Banks provide "predecisional" drafts to the Board for its review, *id.* at 88:10–24.

37.      The S-Letter requires Reserve Banks to notify the Board when a Tier 2 or Tier 3 institution applies for a master account and to consult directly with the Board's Director of Reserve Bank Operations and Payment Services ("RBOPS") prior to communicating a decision on a Tier 2 or 3 institution's master account.  Ex. AS, at FRB-AR-000016.

19

X.      **Pursuant to the S-Letter, the Reserve Banks and Board Staff Developed a Handbook To Implement the Account Access Guidelines ("Handbook"), Which Further Increased Board Control.**

38.     The S-Letter also required the development of a Board-approved handbook ("Handbook") instructing Reserve Banks how to implement the Account Access Guidelines. Ex. AS, at FRB-AR-000015.  The S-Letter dictated that the Handbook and any amendments to it be provided to the director of RBOPS and would "not take effect if the director of RBOPS (or director's designee), in consultation with the Board's general counsel (or the general counsel's designee), raises an objection within 10 business days of receipt."  *Id.*



40.     The Handbook was developed by the NTAA Workstream, which is a Board-controlled working group. Ex. C (KC Fed 30(b)(6) Tr.), at 276:6–277:15; *see supra* paragraph 16.  Drafts of the Handbook were used as a "reference point" in assessing Custodia's master account request. Ex. C (KC Fed 30(b)(6) Tr.), at 278:8–19.





## XI. Numerous Board Employees Participated in the Review of Custodia's Master Account Request.

44.      The Kansas City Fed has admitted that more than a dozen individuals at the Board were involved in reviewing Custodia's master account request, producing a list of names at its Rule 30(b)(6) deposition.  *See* Ex. BA, at Tab 10 (listing 13 Board staff, including Board Vice Chair Lael Brainard).  In response to questioning, the Kansas City Fed agreed that at least 10 more Board employees were involved in Custodia's master account application or addressed policy questions concerning Wyoming SPDI banks' access to Federal Reserve services.  *See* Ex.

BB (listing 10 additional Board personnel); *see also* Ex. C (KC Fed 30(b)(6) Tr.), at 144:19–

145:10, 150:9–151:17, 153:8–170:20, 175:6–25.

45.     The Board's involvement extended to its upper echelons.  Within days of

Chairman Powell's January 2022 testimony that "there are good arguments for viewing SPDIs as

depository institutions . . . .  I do think we will make some progress on this . . . ," Ex. P, at 39;

*see also supra* paragraph 13, the Board's General Counsel notified Custodia that the Board had

determined Custodia was a depository institution legally eligible for a master account.  Ex. BC,

at FRBKC-00000446–47 (January 26, 2022, email describing communication between the

Board's General Counsel, Mark Van Der Weide, and Custodia's lawyer, Derek Bush, confirming

eligibility.); Ex. I (January 27, 2022, letter to Custodia from the Kansas City Fed reconfirming

the Board's determination.).

46.     President George had numerous conversations with Lael Brainard, then-Vice

Chair of the Board, regarding Custodia and SPDIs more generally.  Ex. J (George Tr.), at 38:24–

39:6; Ex. C (KC Fed 30(b)(6) Tr.), at 176:12–177:8; *see e.g.*, Ex. BD, at FRBKC-00015475

(discussing President George's call with Vice-Chair Brainard regarding "Master account

requests" and indicating that Brainard "has asked her staff to focus attention on this issue . . . ,

but knows this will be a slow process and we will frustrate these SPDIs in the interim"); Ex. BE

(January 6, 2021, email from President George stating that she "plan[ned] to visit with Lael in

the next few weeks" regarding the issue of "Wyoming special charters (Avanti) gaining access to

a master account.").

47.     In late November 2022, just days before Kansas City Fed staff began drafting a

memo recommending denial of Custodia's master account application, Michael Barr, Vice Chair

of Supervision at the Board, met with staff to discuss Custodia's master account and membership

applications.  Ex. BF, at FRBKC-00002169–70 (November 22, 2022, email discussing the meeting with Vice Chair Barr.).

48.     The Kansas City Fed kept the Board apprised of everything that was happening on Custodia's master account.  *See, e.g.*, Ex. BG (September 27, 2022, email to Board staff regarding Custodia's master account.); Ex. BH, at FRBKC-00005022 (July 25, 2022, message discussing what information to include regarding Custodia's master account for a meeting with the Board.).

**XII.     Unbeknownst to President George, Board Staff Edited the Kansas City Fed's Memorandum Recommending Denial of Custodia's Master Account Application.**

49.     After the cryptocurrency exchange FTX collapsed in November 2022, the White House and the Board turned against anything associated with crypto.  *See, e.g.*, Ex. BI (January 27, 2023, White House statement on cryptocurrencies' risks.); Statement, Board of Governors of the Federal Reserve System, Policy Statement on Section 9(13) of the Federal Reserve Act (Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230127a1.pdf (describing a proposed Board policy statement that "would presumptively prohibit [state member banks] from holding most crypto-assets as principal").  They did so indiscriminately despite the fact that the collapse of FTX was caused by fraud, not by issues unique or inherent to digital assets.  *See, e.g.*, Ex. M, at FRBKC-00004964 (Kansas City Fed examiner explaining that Custodia is "not comparable to FTX" as, among many differences, the "SPDI rules require SPDI stablecoins to be backed dollar for dollar by cash."); Ex. BJ, at FRBKC-00015275 (email regarding the Kansas City Fed's determination that "Custodia wouldn't be in the same situation" as other banks that struggled after FTX's collapse); *see also* Ex. BK, at FRBKC-00014994 (email regarding Custodia's differences from FTX, and the Custodia CEO's provision of evidence of probable criminal activity at FTX to the FBI months before FTX collapsed).

50.     As late as mid-November 2022, Kansas City Fed staff internally were discussing conditions to accompany approval of Custodia's master account request.  Ex. BL, at FRBKC-0010129 (November 14, 2022, cover email); Ex. BM, at FRBKC-00010133–35 (attachment describing potential master account conditions).  Reserve Banks have imposed use-based conditions on master accounts, but cannot impose membership-like requirements to access Federal Reserve services.  Ex. BN (Conti-Brown Rough Tr.), at 180:3–16, 271:13–272:1.

51.     But soon after FTX collapsed, progress on Custodia's master account application stopped, and in early December the Kansas City Fed began drafting a memo to President George recommending denial of Custodia's master account application ("George Recommendation Memo").  *See, e.g.*, Ex. J (George Tr.), at 193:8–19.  This timing coincided with Board staff's communication to the Kansas City Fed its expectation that Custodia's application (likely membership, but never explicitly specified as such) would be denied.  On November 27, 2022, Board staffer Pat Grant indicated that "the current path is leaning towards denial," Ex. BO, and then three days later, a Kansas City Fed staffer discussed a "call from the Board yesterday"—*i.e.*, on November 29—that prompted "next steps" of "delivering the message" regarding "the denial" to Custodia.  Ex. BP (November 30, 2022, discussion).

52.     Unbeknownst to both President George and Ms. Humston, Board staff heavily revised the draft denial memo regarding Custodia's master account.  Ex. J (George Tr.), at 198:2–16; Ex. E (Humston Tr.), at 360:1–361:5.  On January 6, 2023—more than a week before the S-Letter was finalized and before President George had seen the George Recommendation Memo—Judith Hazen, a Reserve Bank Vice President, shared a draft of the George Recommendation Memo with Board staff.  *See* Ex. BQ, at FRB-AR-000324.  Hazen was responding to a request from a deputy in the Board's RBOPS division, Jason Hinkle, to see drafts

of the recommendation memo before it was shared with President George.  Ex. BR, at FRBKC-
00011699–70.

53.     Board staff from a wide range of divisions—including Supervision & Regulation
(SR), Monetary Affairs (MA), Financial Stability (FS), and RBOPS—extensively revised the
George Recommendation Memo, providing more than two dozen comments in a draft the Board
returned to the Kansas City Fed's Hazen on January 9, 2023.  Ex. BQ, at FRB-AR-000324
(January 9 email); *see generally* Ex. BS (attached draft with comments).  The Board's edits
included a request that the memo be revised to "explicitly discuss the application of the Board's
Account Access Guidelines to Custodia's request."  Ex. BS, at FRB-AR-000326.  The Board's
Deputy Director of RBOPS also did not want the dead-end nature of Tier 3 status to be stated
transparently in the memo.  *Id.* at FRB-AR-000333 (commenting that a Reserve Bank draft
sentence implied that "providing an account and/or services to any tier 3 institutions (without a
federal regulator) would be contrary to Board policies" and advising that the Kansas City Fed
edit this language to avoid saying the quiet part out loud).  In line with the Board's anti-crypto
stance following FTX's collapse, he also encouraged adding discussion of "the high volatility of
the crypto industry," *id.* at FRB-AR-000326, even though customers' digital assets would be
held in bailment and not on Custodia's balance sheet.

54.     The negative statements in this memo, made increasingly critical by edits from
the Board, contravened prior positive written assessments from Reserve Bank staff regarding
Custodia.  Kansas City Fed staff initially deemed Custodia's capital "adequate," but with Board
staff influence the assessment became that there was a "lack of a robust capital requirement
framework"; "strong" risk management turned into "significant risk management gaps";
"liquidity risk is relatively low" became insufficient "liquidity risk management processes"; and

an assessment that Custodia's management experience was "impressive" and "extensive" was

converted into a "lack of collective depth of relevant banking experience."  *Compare* 

*with* Ex. BS, at FRB-AR-000332 (Board suggested edits indicating that

because Custodia would "lack . . . a robust capital requirement framework," there could be

"implications for the assessment of monetary policy implementation and financial stability risks

under the Guidelines."); *compare*

and

*with* Ex. BS, at FRB-AR-000329 (asserting "significant

risk management gaps"); *compare* Ex. BW, at FRBKC-0004979 (January 26, 2022, Kansas City

Fed chat discussing that "liquidity risk is relatively low."), *with* Ex. BS, at FRB-AR-000331

(Board comment regarding "adding mention of analysis of the maturity of Custodia's liquidity

risk management processes."); *compare*

*with* Ex. BS, at FRB-AR-000331 (asserting "lack of collective depth of relevant banking

experience and bank-specific risk management expertise").

55.     On January 10, 2023, Matthew Malloy from the Board's Division of Monetary

Affairs provided additional edits that attempted to obscure the Board's role in the master account

decision-making process.  *See* Ex. BY (Malloy's cover email).  He suggested removing a

statement that Custodia's master account raised "broad policy matters that extend beyond the

Reserve Bank."  Ex. BZ, at FRB-AR-000323 (attached draft reflecting Malloy's line edits).

With the Board's edits implemented, the draft George Recommendation Memo was finally shared with President George on January 19, 2023.  Ex. CA.

56.     On January 24, 2023, Judith Hazen formally sent the George Recommendation Memo to the director of the Board's RBOPS division, Matt Eichner, as required by the S-Letter. Ex. CB; *see also* Ex. AS, at FRB-AR-000016–17 (S-Letter).  Eichner responded on January 26 at 10:39 p.m., authorizing "the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request for a master account and access to services."  Ex. CC.  The Board has admitted that Eichner's approval email constitutes its "final agency action" on Custodia's master account.  (ECF No. 178.)

## XIII.     The January 27, 2023 Denial Decisions Were Coordinated.

57.     On January 27, 2023, a number of carefully choreographed events transpired in quick succession.  Here is the timeline:

- **10:57 a.m. ET**:  The Board notified Custodia that the Board voted to deny its membership application.  Ex. CD, at Custodia-00010270.

- **11:01 a.m**. **ET**:  Bloomberg published a story about Custodia's membership denial.  Lydia Beyoud, Allyson Versprille, & Katanga Johnson, *Federal Reserve Says It Won't Approve US Crypto Firm's Membership*, Bloomberg (Jan. 27, 2023, 11:01 AM), https://www.bloomberg.com/news/articles/2023-01-27/federal-reserve-signals-it-won-t-approve-crypto-firm-s-membership-application.

- **11:30 a.m. ET**:  The White House released a new anti-cryptocurrency policy statement.  Brian Deese, Arati Prabhakar, Cecilia Rouse, & Jake Sullivan, *The Administration's Roadmap To Mitigate Cryptocurrencies' Risks*, White House (Jan. 27, 2023), https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/; Ex. CD, at Custodia-00010271.

- **11:30 a.m. ET**:  The Board released a new cryptocurrency policy statement.  Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Issues Policy Statement To Promote a Level Playing Field for All Banks with a Federal Supervisor, Regardless of Deposit Insurance Status (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm.

- **11:30 a.m. ET**:  The Board announced the denial of Custodia's membership application.  Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal

Reserve Board Announces Denial of Application by Custodia Bank, Inc. To Become a Member of the Federal Reserve System (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm.

- **2:00 p.m. ET**:  The Kansas City Fed notified Custodia that it denied Custodia's master account application.  Ex. CE (timestamped email relayed correspondence to Custodia, showing 1 pm CT); Ex. CF (attached correspondence).

- **4:35 p.m. ET**:  The Board and Kansas City Fed jointly moved to dismiss Custodia's lawsuit.  (ECF No. 116.)

58.     Nothing about this process was coincidence.  Kansas City Fed Assistant Vice President Christi May-Oder had written to Board staff in December 2022, "[W]e are planning to issue a decision on the master account very quickly following the decision on the membership."  Ex. CG.  Moreover, Bloomberg had been able to release a story by 11:01 am because information had leaked to Bloomberg *before* January 27 about these forthcoming decisions.  *See* Ex. CH (January 26, 2023, email from Bloomberg reporter.).  On January 26, within hours of Custodia informing the Board's General Counsel by letter that it would not be withdrawing its membership application, a reporter relayed the contents of that confidential letter back to Custodia.  Ex. CD, at Custodia-00010270; *see also* Ex. CQ (email correspondence with Board regarding Custodia's decision not to withdraw its membership); Ex. CH (Bloomberg reporter describing on January 26 that she was "told that the several financial institutions that have de novo banking licenses related to crypto in process with the Fed or OCC have received calls within the last 48 hours saying they have to pull their applications.")*.*  These press leaks violated Federal Reserve policy, which prohibited any communications with the media during a Federal Reserve "black-out" period (January 21–February 2, 2023).  *See* Bd. of Governors of the Fed. Rsrv. Sys., 2023–2025 FOMC Trading and External Communications Blackout Calendar, https://www.federalreserve.gov/monetarypolicy/files/fomc-blackout-period-calendar.pdf; *see also* Bd. of Governors of the Fed. Rsrv. Sys., FOMC Policy on External Communications of

Federal Reserve System Staff (adopted June 22, 2011),

https://www.federalreserve.gov/monetarypolicy/files/FOMC_ExtCommunicationStaff.pdf.

59.    President George testified that the denial of Custodia's master account came from the fact that she did not see a "pathway" for a "novel start-up wanting to deal with digital assets and you're a State-chartered entity, like Custodia" to get a master account.  Ex. J (George Tr.), at 302:10–22.  In other words, while established Federal Reserve member banks could (and do) deal with digital assets, a state-chartered start-up was not afforded that same opportunity.  *See, e.g.*, Ex. E (Humston Tr.), at 16:5–8; Ex. L (OCC Interpretive Letter).

60.    Had Custodia been granted a master account, it would have been the 443rd uninsured master account holder.  Ex. AE (Long Tr.), at 137:18–25 (describing 442 uninsured master account holders as of August 2023).  In the past, the Federal Reserve used to grant master accounts to applicants with the characteristics of the newly developed "Tier 3," as it did not claim discretion to control access to Federal Reserve services between the passage of the Monetary Control Act in 1980 and 2015.  Ex. BN (Conti-Brown Rough Tr.), at 88:18–21.  But since the implementation of the Guidelines, no Tier 3 institution has been granted a master account.  Ex. Z (Cox Expert Report) ¶ 66.

61.    The Board's membership denial order was an unprecedented 86-pages long, full of factual errors and misleading statements.  *See* Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Its Order Denying the Application by Custodia Bank, Inc., To Be Supervised by the Federal Reserve (Mar. 24, 2023), https://www.federalreserve.gov/newsevents/pressreleases/orders20230324a.htm.  Custodia subsequently sent a letter to the Office of the Inspector General for the Board documenting 23

violations and "a litany of irregular Board actions" that occurred over the course of the Board's consideration of Custodia's membership application.  Ex. CD, at Custodia-00010268–69.

62.     The characterizations of Custodia in the Board's membership denial order were also starkly at odds with more positive assessments that Kansas City staff had expressed about Custodia during their review process.  *See supra* paragraph 54.  And they contradicted a parallel onsite examination by Wyoming's Division of Banking in August and September 2022, which granted Custodia a certificate of authority to operate on September 12, 2022.  Ex. CI.

63.     Because the membership and master account evaluations were running in parallel, the Board's denial of Custodia's membership application effectively dictated the Kansas City Reserve Bank's decision on Custodia's master account application.  Ex. AH (May-Oder (Vol. I) Tr.), at 72:23–73:14, 203:13–25; Ex. N (Hazen Tr.), at 248:2–14; Ex. E (Humston Tr.), at 403:16–404:12.  The Board's action on Custodia's membership application sealed the fate of Custodia's master account.

## STANDARD OF REVIEW

When a party seeks review of agency action under the APA, the district court judge sits as an appellate tribunal and the entire case is a question of law.[5]  As the District of Colorado recently held:  "Federal Rule of Civil Procedure 56, which governs summary judgment, operates differently in an APA case.  Instead of considering whether there are genuine disputes of material fact, the district court sits as an appellate tribunal."  *Karim v. Allen*, No. 21-cv-2861-WJM-KLM, 2023 WL 4624896, at *1 (D. Colo. July 19, 2023) (internal quotation marks

[5] Accordingly, the Court's Second Amended Scheduling Order provides: "A federal district court sitting in review of an agency action must sit as a court of appeals including governing itself by referring [to the] Federal Rules of Appellate Procedure."  (ECF No. 211 at 11.)

omitted).  "The entire case on review is a question of law, and a court should only consider arguments about the legal conclusion to be drawn about the agency action."  *Id.* (internal quotation marks omitted).  Generally, in APA cases, the court's review is based on the administrative record.  *Id.*  Here, the parties stipulated and the Court approved that all evidence between Custodia, the Kansas City Fed, and the Board's Administrative Record "may be relied upon by all parties including any court hearing . . . this case throughout the remainder of this litigation."  (ECF No. 220.)

The APA instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(C).  The mandamus statute requires court action where there is a clear duty to act.  *See In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022); *see also Est. of Smith v. Heckler* (*In re Smith*), 747 F.2d 583, 591 (10th Cir. 1984) ("If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose.").  The analyses and the remedies under the Mandamus Act and the APA are identical when the relief sought is to compel agency action unlawfully withheld.  *Tista v. Jaddou*, 577 F. Supp. 3d 1219, 1231 (D.N.M. 2021) ("In this manner, § 706(1) incorporates the mandamus remedy into the APA.").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The two causes of action in this case, which are lodged against the Board and the Reserve Bank, arise under the APA and the Mandamus Act.  The remedies are identical where, as here,

the relief sought is to compel agency action unlawfully withheld.[6]  The Court has ruled that the case is one that is to be adjudicated under the APA.

The denial of a master account to Custodia is final agency action under the APA, reflecting the culmination of the decision-making process.  Legal consequences of great magnitude flow from that decision.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597–602 (2016) (setting forth requirements for judicial review in the APA context).  In its filing of the administrative record, the Board conceded that:  "The document with ID of A1 (Bates numbered FRB-AR-000002) is the ***final agency action*** at issue as required by Local Rule 83.6(b)(1)(A)."  (ECF No. 178 (emphasis added).)  The document referred to is the January 26, 2023, email from Matthew Eichner of the Board to Esther George of the Reserve Bank.  Ex. CC. In that email, the Board, referring to both the S-Letter and the Kansas City Fed's pre-decisional analysis of Custodia's request for a master account pursuant to the S-Letter (as well as the earlier-issued Guidelines) gave the Kansas City Fed the green light to deny Custodia's master account application.  *Id.*  The Board's insistence that it had nothing to do with the decision is belied by its admission that it took final agency action on January 26, 2023.  Accordingly, all the requirements for Court review in this case under the APA have been met.

In Section I below, Custodia addresses the principal legal issue in the case, *i.e.* whether the Federal Reserve (Board or Reserve Bank) has discretion to deny an eligible applicant a master account.  The argument tracks the thoughtful and in-depth opinion of Judge Bacharach in the *Fourth Corner* case.[7]  Judge Bacharach rejected the identical position advanced here by the

---

[6] "The two statutes [APA and Mandamus] are, after all, merely different means of compelling an agency to take action which by law it is required to take."  *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995) (internal quotation marks omitted).

[7] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017).

Defendants.  In so doing, he looked to the Monetary Control Act's unambiguous language; to past interpretations by the Board of Governors; interpretations by officials with the regional Federal Reserve Banks; the statute's legislative history; and interpretations of the relevant statutory provision by other courts and academics.  *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1067–74 (10th Cir. 2017) (Op. of Bacharach, J.).  Although Judge Bacharach wrote for himself, no other judge on the panel disagreed with his reasoning. Judge Moritz in fact agreed with Judge Bacharach's conclusion that a master account is necessary to access all Federal Reserve Bank services.  *See id.* at 1053 (Op. of Moritz, J.).  The district court, moreover, reached the same legal conclusion as Judge Bacharach, holding that the language of § 248a(c)(2) "is not limited to pricing."  *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 154 F. Supp. 3d 1185, 1188 (D. Colo. 2016), *vacated*, 861 F.3d 1052.

In Section II, Custodia answers the question the Court asked in ordering discovery:  what roles did the Defendants play in the denial of Custodia's master account application.  The undisputed answer is that the Board controlled the process and ultimate disposition of Custodia's master account application—which the Court, having read the Statement of Undisputed Facts, already knows.

**ARGUMENT**

**I.    The Federal Reserve Lacked Discretion To Deny Custodia a Master Account.**

**A.    The Unambiguous Language of the Monetary Control Act of 1980 Controls.**

When interpreting a statute, a court's "primary task" is to "determine congressional intent, using traditional tools of statutory interpretation."  *McGraw v. Barnhart*, 450 F.3d 493, 498 (10th Cir. 2006) (citation omitted).  The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*,

821 F.3d 1250, 1258 (10th Cir. 2016) (citation omitted).  "If the language is plain and unambiguous," the inquiry ends there, "and the plain meaning of the statute controls."  *Id.* (citation omitted).

The principal statutory provision is plain on its face.  Section 248a of the Monetary Control Act does two things:  "It ensures universal access to certain bank services and provides uniform pricing for them."  *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.).  The key statutory section states:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
> . . . (2) All *Federal Reserve bank services* covered by the fee schedule *shall be available* to nonmember depository institutions *and* such services *shall be priced* at the same fee schedule applicable to member banks . . . .

12 U.S.C. § 248a(c)(2) (emphases added).  The enumerated bank services include "(1) currency and coin services: (2) check clearing and collection services; (3) wire transfer services; (4) automated clearinghouse services; (5) settlement services; (6) securities safekeeping services; [and] (7) Federal Reserve float . . . ."  *Id.* § 248a(b)(1)–(7).  In addition, access must be given to (8) "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds."  *Id.* § 248a(b)(8).

The word "shall" in a congressional enactment is mandatory.  *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) (citation omitted) ("The Supreme Court and this circuit have made clear that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command."  (citation omitted)); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress used 'shall' to impose discretionless obligations."); *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023) ("It is well established that 'the word

34

"'shall'" generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.'" (citation omitted)). Accordingly, in this case, the statute unambiguously commands Defendants to grant access to all services covered by "the fee schedule" to "nonmember depository institutions." As a nonmember depository institution deemed eligible by both the Board and the Kansas City Fed, Custodia must be granted a master account.

While Defendants have argued Section 248a does not pertain to master accounts because master accounts are not referenced on this statutory list of services, a bank cannot access the promised services without a master account. As Judge Bacharach observed, "Without a master account, none of the fee schedule's services would be available." *Fourth Corner*, 861 F.3d at 1069 (Op. of Bacharach, J.). Judge Bacharach correctly saw this argument as an "effort to subvert congressional intent." *Id.* (Op. of Bacharach, J.). Judge Moritz agreed with Judge Bacharach's conclusion that a master account is necessary to access all Federal Reserve Bank services. *Id.* at 1053 (Op. of Moritz, J.). Put in every day terms, an individual may be entitled to the contents of a safe deposit box, but without the key to the box that entitlement is worthless. A master account is the key to bank access for the services enumerated in 12 U.S.C. § 248a.[8]

Defendants have also argued that because the statute did not employ the word "all," they did not need to grant the mandatory banking services to every legally eligible nonmember bank that applied. However, the statute retains its mandatory nature with or without the indefinite adjective "all." Judge Bacharach, in *Fourth Corner*, engaged in a learned exploration of the

---

[8] In any event, if a master account is viewed as a "service" that does not appear on the list, the statute remedies this. It plainly states that in addition to the enumerated services, equal access must be given to "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds."

indefinite article "all," examining how case law, statutes, and drafting treatises read the absence of that term in a statute. *Fourth Corner*, 861 F.3d at 1069–70 (Op. of Bacharach, J.) (citations omitted). He correctly concluded that it was not necessary to put "all" before a plural noun such as "nonmember depository institutions." *Id.* at 1070 (Op. of Bacharach, J.) (citation omitted). As he noted, in *Gares v. Willingboro Township*, 90 F.3d 720, 726 (3d Cir. 1996) (citation omitted), the court interpreted the phrase "prevailing plaintiffs" to include all prevailing plaintiffs; in *Western Minnesota Municipal Power Agency v. Federal Energy Regulatory Commission*, 806 F.3d 588, 592 (D.C. Cir. 2015), the court held that the terms "states" and "municipalities" included all states and municipalities. *Fourth Corner*, 861 F.3d at 1070 (Op. of Bacharach, J.). Drafters of statutes are often cautioned not to freely use "all." *See, e.g.*, 101 Pa. Code § 15.142(c). "Use adjectives such as 'each,' 'every,' 'any,' 'all,' 'no,' and 'some' . . . only when necessary. . . . If the subject of the sentence is plural, it is almost never necessary to use this kind of adjective." William P. Statsky, Legislative Analysis and Drafting 184 (2d ed. 1984). Grammarians agree. *See, e.g.*, Lawrence E. Filson & Sandra L. Strokoff, *The Legislative Drafter's Desk Reference* § 22.10, at 297–98 (2d ed. 2008).

## B. Defendants' Reliance on 12 U.S.C. § 342 Is Misplaced.

Defendants contend that 12 U.S.C. § 342 grants discretion to Reserve Banks to deny access to Federal Reserve services because it specifies that Reserve Banks "may" receive deposits from any of its member banks or other depository institutions. There are several problems with this argument. The Monetary Control Act of 1980 amended three pertinent statutory provisions—12 U.S.C. §§ 248a, 342, and 461—to effectuate three goals: uniform access, pricing, and reserve requirements that did not depend on Federal Reserve membership status. Each one of these provisions can and should be read in harmony with the others, which is consistent with statutory interpretation canons. *WildEarth Guardians v. National Park Service*,

703 F.3d 1178, 1189 (10th Cir. 2013) ("When two related statutes appear to conflict, courts have a duty to construe them harmoniously and give each effect.").

At the same time Congress added Section 248a to mandate uniform access and equal pricing, without regard to membership status, it also imposed reserve requirements on all depository institutions. *See Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983). The Monetary Control Act expanded Federal Reserve control over the money supply by requiring all depository institutions to maintain reserves at a rate set by the Federal Reserve under Section 461. *See* Monetary Control Act of 1980, Pub. L. No. 96-221, § 103, 94 Stat. 132 (1980). Section 461 requires reserves be held in a Reserve Bank account, by a correspondent, or as "vault cash." 12 U.S.C. § 461(c)(1)(A). But prior to 1980, Section 342 only permitted Reserve Banks to accept deposits from Federal Reserve members. Thus, Congress amended Section 342 to authorize Reserve Banks to accept deposits not just from Federal Reserve members, but also from "other depository institutions." Monetary Control Act of 1980, Pub. L. No. 96-221, § 105(a)(1), 94 Stat. 132. The amendment to Section 342 enabled non-member depository institutions to comply with Section 461's newly imposed reserve requirements by depositing funds with Reserve Banks. That enabling amendment did not undermine Section 248a's simultaneous grant of access to Federal Reserve services or the requirement that those services be priced consistently.

Section 342 speaks to which entities may make deposits with a Reserve Bank, *see United States v. Wells Fargo & Co.*, 943 F.3d 588, 602 n.13 (2d Cir. 2019), and the types of deposits that may be received in an account (*e.g.*, lawful money, national bank notes, Federal Reserve notes, checks, drafts, etc.), *see Fourth Corner*, 861 F.3d at 1073–74 (Op. of Bacharach, J.). It is easily harmonized with both Section 248a, which enumerates separate and distinct services that

37

eligible depository institutions are entitled to access, and Section 461 given Congress' desire to stop differentiating between members and non-members when it came to equality of access, equality of pricing, and equality of reserve requirements.

Even if there were a conflict, and there is none, the more specific statute, Section 248a would control access to Federal Reserve services over the more general Section 342.  *WildEarth*, 703 F.3d at 1189 ("Normally when two statutes conflict, we interpret the more specific statute as an exception to the more general statute.").

### C.    Past Interpretations by the Board of Governors Support Custodia's Reading of the Monetary Control Act.

For decades, the Board asserted that the Monetary Control Act gave all depository institutions access to the Federal Reserve payments system.  That practice started immediately after Congress passed the Monetary Control Act, increasing the number of institutions that could directly access Fed services from "5,400 member banks to over 40,000 depository institutions." Ex. CJ, at 11 (The Role and Activities of the Federal Reserve System In the Nation's Check Clearing and Payment System).  Those Board statements are critical evidence that the original public meaning of the Monetary Control Act provided all depository institutions access to Federal Reserve services.

- 1980:  "*Services covered by the fee schedule are available to all depository institutions*."  Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, http://www.federalreserve.gov/paymentsystems/pfs_principles.htm (emphasis added) (last updated Nov. 8, 2008).

- 1981:  The Board's Division of Data Processing issued a Notice discontinuing the list of "State Member Banks of the Federal Reserve System/Nonmember Banks that Maintain Clearing Accounts with Federal Reserve Banks/Corporations Doing Foreign Banking and Financing" because "*[d]ata on nonmember banks with clearing accounts with the Federal Reserve Banks . . . has little relevance due to changes in monetary policy as a result of the Monetary Control Act (MCA) of 1980*."  Ex. CK (Bd. of Governors, Notice (Aug. 20, 1981)) (emphasis added).

- 1983:  "***The Board contends that the language and legislative history of § [248a] evince an intent to provide nonmember financial institutions access to Federal Reserve services . . . .***"  *Bank Stationers Ass'n, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 704 F.2d 1233, 1236 (11th Cir. 1983) (emphasis added).

- 1984:  "The Monetary Control Act of 1980 (MCA) has expanded the Federal Reserve's role by ***requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis . . . .***"  Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (emphasis added) http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.

- 1984 / 1990 / 2001:  "***Federal Reserve payment services are available to all depository institutions . . . .***"  Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (emphasis added) (last updated Aug. 11, 2020).

- Today:  "Congress expanded the Federal Reserve's role in the payment system with the enactment of the Monetary Control Act of 1980 (MCA).  The MCA subjected all depository institutions, not just member banks, to reserve requirements and ***also gave all depository institutions access to the Federal Reserve's payment services.***"  Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services: About*, https://www.federalreserve.gov/paymentsystems/pfs_about.htm (last updated Oct. 28, 2016) (emphasis added).

Relying on a similar (but not identical) recitation of Board statements, Judge Bacharach determined that "the Board's current interpretation is '"entitled to considerably less deference" than a consistently held agency view.'"  *Fourth Corner*, 861 F.3d at 1070–71 (Op. of Bacharach, J.) (citation omitted).  The same conclusion should be reached here.

### D.  Interpretations by Officials with the Regional Federal Reserve Banks also Support the Plain Meaning of the Monetary Control Act.

Over the decades, the Board has not been alone in its interpretation that the Monetary Control Act extends access to the payments system to all depository institutions.  Reciting similar statements from other Reserve Banks and officers in Cleveland, Chicago, Richmond, Boston, and San Francisco, such as the Cleveland Fed's statement that "***[o]ur services will now***

39

**be available to all depository institutions**," Judge Bacharach described a "chorus of officials recognizing that the [Monetary Control Act] extends Federal Reserve services to all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1072 (Op. of Bacharach, J.) (alteration in original) (emphasis added) (citation omitted).

To that chorus we can now add the Kansas City Fed's voice.  Although the Kansas City Fed refused to produce its annual reports in discovery, Custodia obtained them from a university library.  In January 1981, the President of the Kansas City Fed described a "rapidly changing financial environment," noting that the passage of the Monetary Control Act was "sure to make the '80s a dynamic time for all financial institutions."  Ex. CL, at 1 (Kansas City Fed Annual Report (1980–1982)).  Confirming that the Monetary Control Act was not just a pricing statute, the president wrote that "[t]he services provided by the Federal Reserve Bank . . . will become directly available to many more financial institutions.  The Monetary Control Act also requires that these services be priced explicitly."  *Id.*

A few years later, a senior economist at the Kansas City Fed published an article openly acknowledging the reality that Defendants assiduously deny in this litigation:  "[A]ll institutions subject to reserve requirements were granted access to Federal Reserve services including the discount window."  Gordon H. Sellon, Jr., *The Instruments of Monetary Policy*, Economic Review 6, 7 (1984), https://www.kansascityfed.org/documents/1281/1984-The%20Instruments%20of%20Monetary%20Policy.pdf.  Since Section 461 imposed reserve requirements on all depository institutions, this amounts to an admission by the Kansas City Fed that Federal Reserve services are available to all.

Finally, Esther George, President of the Kansas City Fed during the pendency of Custodia's Master Account application, confirmed that the Monetary Control Act "level[ed] the

playing field." Ex. J (George Tr.), at 12:16–25.  George started at the Kansas City Fed in 1982, and she testified that "[her] understanding of the Monetary Control Act is it no longer made a distinction between those that were members of the Federal Reserve and those that were not, in terms of access to services and their pricing." *Id.* at 15:11–16:19 (The Monetary Control Act "eliminated the distinction between member banks and non-member banks"), 47:10–19 ("The Monetary Control Act allowed for equal access to [Federal Reserve Services] as a legal eligibility requirement.").  The chorus is now deafening.

### E.  The Legislative History of the Monetary Control Act Supports the Statute's Plain Meaning.[9]

Prior to the Monetary Control Act of 1980, the Board and its Reserve Banks provided services only to member banks and did so free of charge.  In the 1970s, however, many banks withdrew from the Federal Reserve System as they faced high inflation, spiking interest rates, and onerous Board requirements to maintain ever-increasing non-interest bearing reserve balances.  Many banks started to make the calculation that they were better off abandoning their membership in the Federal Reserve System, even though that would mean they would have to pay for banking services.  The Board worried that, with fewer banks, would come lessened Board influence.  *See Federal Reserve Requirements: Hearings on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 96th Cong. Rec. 5 (1980) (Statement of Paul A. Volcker, Chairman, Bd. Of Governors of the Fed. Rsrv. Sys.) (speaking of an "avalanche in loss of members.").

---

[9] When, as here, the meaning of a statute is clear, it is generally unnecessary to resort to legislative history.  Nonetheless, in this instance, the legislative history, which was also examined by Judge Bacharach in *Fourth Corner*, is particularly illuminating on the issue of Congress's intent and hence included here.

The Board was also having money problems.  One way to rectify that problem was to charge members for banking services.  Yet, if the Board were to do so, it feared that more banks would leave the System, and thereby lessen the Board's ability to influence monetary policy. Julie A. Hill, *From Cannabis to Crypto:  Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117, 168 (2023) (citing Monetary Control and the Membership Problem:  Hearings on H.R. 13476, H.R. 13477, H.R. 12706 and H.R. 14072 Before the H. Comm. on Banking, Fin. & Urb. Affs., 95th Cong. 80, 87 (1978) (statement of G. William Miller, Chairman, Bd. of Governors of Fed. Rsrv. Sys.)).

Adding to these problems, in the 1970s, the thrift industry was deregulated, and thrifts sought access to the Federal Reserve's automated clearing network, as well as other services.  At the time, thrifts and savings banks were considered "novel" charters like SPDIs are today.  *Id.* at 182–83.  In January 1976, the Board modified its access guidelines to accommodate thrifts that might become members of the automated clearing house associations that it serviced.  *See* Anatoli Kuprianov, *The Monetary Control Act & the Role of the Fed. Rsrv. in the Interbank Clearing Market* at 29 n.18 (1985) (citing Board of Governors of the Federal Reserve System, "Access to Federal Reserve Clearing and Settlement Facilities:  Proposed Policy," 40 Fed. Reg. 641 (June 17, 1975)).  The Justice Department's position, conveyed to the Board, was that the antitrust laws "***required equal access***."  *See id.* at 29 (citing *Comments of the United States Department of Justice; Proposed Amendment of Regulation J and Related Issues* (May 14, 1974)) (emphasis added).  The Department also argued that it favored the adoption of a system of competitively set prices for electronic funds transfer services.  The Department emphasized that a "discriminatory pricing system can be as substantial a bar to competition as exclusionary rules."  *Id.* (quoting Comments of the United States Department of Justice at 27).

42

Congress legislated against this backdrop.  In the run-up to passage of the Monetary Control Act, congressional hearings focused on access to Federal Reserve services, bank reserves, and pricing.  During the hearings, Federal Reserve Chairman Paul Volcker testified on the need to enact equal access legislation.  He warned that a failure to do so would leave the Federal Reserve "with the increasingly awkward problem of discriminating between members and nonmembers in the provision of certain services, such as automated clearinghouse payments, which for practical reasons cannot operate efficiently unless open to all depository institutions." *Federal Reserve Requirements:  Hearing on S. 353, and Proposed Amendments on S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 96th Cong. 11 (1980).

The compromise reached by Congress was that all depository institutions would have to meet federal reserve requirements; services provided would be priced equally for members and nonmembers alike; and in return, all depository institutions (state non-member banks, federally chartered banks, thrifts, credit unions) would have open access to the Federal Reserve's services without having to become members of the Federal Reserve System or obtain FDIC insurance. Congress was well-aware of the Federal Reserve's dwindling membership problem and its equally worrisome revenue problem.  Extending reserve requirements to nonmember depository institutions, and providing access to Federal Reserve services for nonmember banks, addressed both problems, while creating an even playing field for financial institutions rather than the Federal Reserve's "private club."

Judge Bacharach understood that "[t]his objective was ultimately implemented through [Section] 248a(c)(2)." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d at 1072 (Op. of Bacharach, J.).  As Senator Proxmire, one of the bill's sponsors, explained, "since nonmember institutions will be required to hold reserves under the act it is reasonable that they

should be provided access to Fed services."  *See* 126 Cong. Rec. 6897 (1980) (Statement of S. William Proxmire).  Indeed, the Monetary Control Act codified this requirement in 12 U.S.C. § 461(b)(2)(A) ("Each depository institution shall maintain reserves against its transaction accounts . . . .") and made a conforming amendment to 12 U.S.C. § 342 to add "or other depository institutions."  12 U.S.C. § 342 ("Any Federal reserve bank may receive from any of its member banks, ***or other depository institutions.***"  (emphasis added)); *see also* 126 Cong. Rec. at 7063 ("[T]his bill mandates banks to place reserves in the national bank.").  In other words, the Monetary Control Act in 1980 leveled the playing field by requiring equal access, equal pricing, and equal reserve requirements for all depository institutions and amended the text of Sections 248a, 342, and 461 to accomplish this outcome.

The legislative history, accordingly, fully supports the plain terms of the statute.  *See, e.g.*, 126 Cong. Rec. 6250 (1980) (Conf. Rep.) ("The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks and open access to [Federal Reserve] services to ***all depository institutions*** on the same terms and conditions as member banks." (emphasis added)); *see also* H.R. Rep. No. 95-1590, at 20 (1978) ("The [House Committee on Banking Finance and Urban Affairs] believes that the wide access to Federal Reserve services for nonmember banks authorized by this bill will insure [sic] that a basic level of services is available to all banks throughout [this] country on a nondiscriminatory basis."); 126 Cong. Rec. 6250 (1980) (Conf. Rep.) ("House amendment includes a provision for the Federal Reserve to . . . open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks.").

Four years after passage of the Monetary Control Act, the House Subcommittee on Domestic Monetary Policy assessed the Board's compliance with the statute.  It prepared a lengthy report, but the headline for this case comes from the "Executive Summary."

> ***Before the MCA, the payments system was segmented into two distinct and separate areas.***  The Federal Reserve provided payments services without charge to banks that were members of the Federal Reserve System . . . .  Supplementing Federal Reserve's payment services were the private payments services provided by correspondent banks to non-member financial institutions for a fee or by local clearinghouses . . . .
>
> ***The Monetary Control Act changed this system in three ways.***  First, it directed the Federal Reserve to impose explicit charges for payment services traditionally provided without charge to member banks.  ***It further specified that these services should be made available to all depository institutions and not just to member banks.***  Finally, the Federal Reserve was directed to recover over the long run through these charges both the direct costs of providing the services and the imputed tax and capital costs a private company would have to bear.

Ex. CJ, at vii–viii (emphases added).

### F.     Two Courts of Appeals Have Viewed § 248a(c)(2) as Requiring Open Access.

In two appellate rulings, more or less contemporaneous with enactment of the Monetary Control Act, the courts concluded that Section 248a establishes open access to Federal Reserve services.  *See Jet Courier*, 713 F.2d at 1223; *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989).  District courts have also observed that Section 248a creates a non-discretionary duty to provide the Federal Reserve services to all depository institutions. *See Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1986); *Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520, 522–23 (S.D.N.Y. 1983).

Only one court has held otherwise.  In *Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, ---- F. Supp. 3d ---- 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023), (currently on appeal to the Second Circuit) the plaintiff bank sought a preliminary injunction

requiring the Federal Reserve Bank of New York to maintain its master account, which it had

opened in 2012.  The account was closed because the Reserve Bank found that Banco San Juan

allegedly committed substantial BSA violations during its decade of operation.

The district court (Koeltl, J.), recognized that

> [W]hatever rights BSJI may have had to open a Master Account is
> not at issue because BSJI had a Master Account and specifically
> agreed that the FRBNY had the right to terminate that account.
> There is no statute that provides that a Federal reserve bank lacks
> the power to terminate a Master Account.  Rather, there is an
> agreement governing the Master Account that allowed the FRBNY
> to close the account.

*Id.* at *8–9 (citations omitted).  Accordingly, the court's ruling relied on an analysis—based on

contract principles, musings as to how the banking statutes should be read, and its rejection of

Judge Bacharach's analysis in *Fourth Corner*—that is largely inapplicable here.  Furthermore, it

is pure *dicta*, and of no precedential value in the Tenth Circuit.

### G.    Academics Examining the Issue Support Custodia's Reading of the Statute.

Judge Bacharach also looked to the work of academics, who "have agreed" that

Section 248a "entitle[s] all depository institutions to Federal Reserve services."  *See Fourth*

*Corner*, 861 F.3d at 1073 (Op. of Bacharach, J.).[10]

Since *Fourth Corner*, the issue of access to Federal Reserve services has received further

attention from legal scholars.  In the leading article on access to Federal Reserve services,

Professor Julie Hill carefully analyzed "the statutory text, the legislative purpose underpinning

---

[10] These include:  Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13
Cornell J.L. & Pub. Pol'y 203, 231 n.148 (2004); Thomas C. Baxter, Jr. & James H. Freis, Jr.,
*Fostering Competition in Financial Services:  From Domestic Supervision to Global Standards*,
34 New Eng. L. Rev. 57, 70 (1999); Fred H. Miller, Robert G. Ballen, & Hal S. Scott,
*Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*,
39 Bus. Law. 1333, 1365 (1984).

the statute[], and past Federal Reserve Practices," and "conclude[d] that the law requires that the Federal Reserve provide accounts and payment services to all member banks and depository institutions."  Hill, *supra* p. 42, at 122–23.

Additionally, Custodia retained Dr. Peter Conti-Brown as an expert legal historian in this case.  Ex. A (Conti-Brown Expert Report) ¶¶ 1–4.  Dr. Conti-Brown's report examines "the nearly fifty-year history of the Monetary Control Act" and "conclude[s] that the Board's claim of discretion over Master Account access does not conform to history, practice, legal context, or the public policies of the US government and the Federal Reserve itself."  *Id.* ¶¶ 9, 16, 25–96.

Dr. Conti-Brown also explains how Defendants' claimed discretion over Master Account access "fundamentally remakes the nature of the US financial and banking system, a delicate balance that has evolved over 160 years, in a way that Congress never authorized and never intended."  *Id.* ¶ 9.  Federal Reserve services are required to do the business of modern banking, and a Master Account is required to access those services.  *See Fourth Corner*, 861 F.3d at 1053 (Op., of Moritz, J.); Ex. A (Conti-Brown Expert Report) ¶ 12.  Because of that, access to a Master Account is a choke point through which the Federal Reserve System has sought to control "every depository institution in the country."  *Id.* ¶ 13.  The power to second-guess chartering decisions made by the OCC, FDIC, and state banking agencies, "is an astonishing claim of authority, unprecedented in banking history."  *Id.* ¶ 96.  In the past, Congress has recognized that possibility that the Federal Reserve might be conflicted in its role as provider of payment services and its other function as a bank regulator.  We see this clearly demonstrated in this case because the Board is second-guessing reasoned, chartering and risk management decisions made by a state banking authority under the guise of its role in providing payment services.  These functions are distinct and should be maintained so.  *See* Staff of H. Subcomm.

on Domestic Monetary Policy, H. Rep. No. 98-17, at 27 (Comm. Print 1984) ("The Federal Reserve has recognized the potential conflicts between its role as regulator and its role as competitive provider of payment services . . . ."). Congress has clearly said that the determination for what is a depository institution under federal law, and it is not the Board's role to second-guess that decision.

Professor Ricks, the Reserve Bank's "rebuttal" expert, has no response to Dr. Conti-Brown, Professor Hill, or the academics cited by Judge Bacharach. Professor Ricks' report says nothing about the Monetary Control Act's legislative history or how the Board and the Reserve Banks implemented the Monetary Control Act. His only substantive defense of Defendants' claimed discretion over master account access is to point to discretion in bank supervision, a completely different governmental function only exercised by a depository institution's supervisory authority. Ex. CM (Ricks Expert Report) ¶¶ 7–11; Ex. AY (Conti-Brown Suppl. Expert Report) ¶¶ 14–26. Otherwise, Ricks spends pages explaining why he thinks Section 248a's non-discretionary duty to provide Federal Reserve services is bad policy. Ex. CM (Ricks Expert Report) ¶¶ 21–35. These policy arguments turn a blind eye to how power is shared in the American banking system between the federal government and the States as well as between agencies at the federal and state levels. Ex. A (Conti-Brown Expert Report) ¶¶ 36–40. Ricks thus discounts the multitude of checks on his slippery slope. But in any event, these sorts of policy questions should be resolved by Congress and have no bearing on the proper interpretation of Section 248a.

The overwhelming evidence, from the statutory language and its legislative history to the Federal Reserve's contemporaneous understandings of the Monetary Control Act, plus court decisions and academic works, fully support Custodia's entitlement by law to a master account.

II.     **The Board Took Final Agency Action Against Custodia.**

"Final agency action[s]" are subject to judicial review under the Administrative

Procedure Act.  5 U.S.C. § 704.  Agency actions are final when they meet two conditions:  (1)

"the action must mark the consummation of the agency's decisionmaking process—it must not

be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights

or obligations have been determined, or from which legal consequences will flow."  *Ctr. for*

*Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (citations omitted).  Courts

take a "pragmatic" approach to finality and do not elevate form over function.  *U.S. Army Corps*

*of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).

Here, the Board identified Ex. CC (FRB-AR-000002) as the final agency action in this

case.  (ECF No. 178.)  In that letter, the Board informed the Kansas City Fed that it had

completed its review of Custodia's master account application and that it "ha[d] no concerns

with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its

decision to deny the request for a master account and access to services."  Ex. CC.  By

acknowledging it took "final agency action," the Board concedes that the Board "determin[ed]

the rights and obligations" of Custodia with respect to its master account application.  *Cure*

*Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1232 (10th Cir. 2016) (citation omitted).

III.     **Discovery Has Revealed That the Board Inserted Itself into the Master Account**
          **Decision-Making Process.**

This Court, deciding that a full statutory interpretation in this case was "better left for

another day," ordered discovery to ascertain the Board's involvement in the decision-making

process.  (ECF No. 164, at 10.)  It reasoned that "the facts . . . could weigh heavily on the Court's

analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no

discretion (under § 248a) in granting Custodia's master account application."  (ECF No. 164, at

49

10.)  Discovery in this case weaves a rich tapestry of facts—all undisputed, and heretofore

hidden from public view—revealing the Board's deep involvement in Custodia's master account

request from the very beginning.  If there were any doubt—and there should be none given the

five bases identified by Judge Bacharach and augmented by Custodia's own research and the

Board's concession that it took final agency action that determined Custodia's rights—discovery

in this case provides a final nail in the coffin.

As one of the first SPDIs to request a master account, *supra* paragraph 8, Custodia's

application raised unprecedented policy questions that only the Board could answer.  *See* 12

U.S.C. § 248(k); 12 C.F.R. § 265.20 (excepting from powers that can be delegated to Federal

Reserve Banks matters that raise "significant legal, supervisory, or policy issues").  President

George had to defer to the Board's decision on Custodia's "legal eligibility," as well as "broader

policy issues" raised by applications from novel SPDI charters.  Ex. J (George Tr.), at 50:7–

51:24.  Indeed, the Chairman of the Board of Governors, Jerome Powell, testified during his

confirmation hearing in response to a question from Senator Lummis that SPDIs like Custodia

raised significant legal, supervisory, and policy issues that warranted Board involvement.  *See*

Ex. P, at 39 ("[W]e want to be really careful because they are hugely precedential.  They are very

important from a precedential standpoint.  And so we have been looking carefully at this . . . .").

The pronoun "we" obviously means the Board.[11]

---

[11] This is consistent with the Board's past practice concerning "novel" entities.  In 2018, only
two years prior to Custodia submitting its master account application, the Federal Reserve Bank
of New York informed TNB USA Inc. ("TNB") that, after "consultation with the Board," the
Reserve Bank was "not currently in a position to . . . represent[]" that it was "prepared to open a
master account for TNB," noting that "senior policy officials at the [Board] have expressed the
strong view that the New York Fed should not approve TNB's request for a master account."
Ex. CN.  In its brief correspondence, the Reserve Bank also highlighted that TNB was already
"well aware from its communications with staff at the [Board]" that there were "substantial
public policy concerns regarding TNB's business model."  *Id.*

Discovery from the Kansas City Fed unequivocally reveals the Board's involvement at every critical juncture.  Immediately upon receiving Custodia's master account request, officials at the Kansas City Fed sought to "buy some time" for the Board and its Payment Systems Policy Advisory Committee to establish a Non-Traditional Accounts Access ("NTAA") group, led by a Board-dominated Steering Committee and served by two sub-groups—a Policy Workstream and a Practical Workstream—staffed largely by Board employees.  The Board then proposed public "Guidelines for Evaluating Account and Services Requested," which contravened the Monetary Control Act by taking the position that Reserve Banks had discretion to deny master accounts. Not coincidentally, those Guidelines were finalized the day before Defendants' deadline to file motions to dismiss Custodia's claims in this case.  The Guidelines established a never-before-seen tiering system that relegates novel institutions like Custodia (which are state-chartered but lack a federal regulator) into a dead-end, Tier 3 status.  Kansas City Fed staff understood at the time that Tier 3 status was a dead-end, commenting in a private chat about a Custodia "Review Playbook":

| | |
|---|---|
| Crouch: | First sentence of the document, Master Account:  At this time, we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Federal Reserve member. |
| Crouch: | Is that true?  Does the [Federal Register Notice] tier 3 review come into play at all here? |
| May-Oder: | Yes, that's correct.  Entities falling into Tier 3 will have a high bar to cross to get an account. |
| Crouch: | Understand the high bar, just the wording through [*sic*] me off, that approval isn't anticipated if Tier 3 route is taken. |

Ex. AA (Mar. 14, 2022, Teams Chat).

The Board was active behind the scenes.  Roughly a year before it was issued, the Board drafted a rare S-Letter, *see* Ex. AS, that drew objections from the Kansas City Fed:

Hinkle (Bd):   Hello, just sent an email to the [Payments System Policy Advisory Committee] that we are willing to hold back the S-letter is [*sic*] that is their recommendation.  Hope that alleviates any concerns that Esther and you have.

Hazen (KCF): Thanks for the heads up.  I believe she is planning to send her response shortly and will likely support further conversation on the S Letter.  We were not able to brief her but she sent a message earlier today noting that she had concerns about that piece specifically.

Ex. AT (Feb. 9, 2022, Teams Chat).  The S-Letter mandated consultation with the Board on master account decisions, establishment of the ARISG to ensure immediate Board notification of master account requests by novel charters, and adherence to an Implementation Handbook that spelled out the Board's ability to veto any master account decision with which it disagreed.  *See* Ex. AS.  Like the Guidelines, although drafts had circulated for more than a year, the S-Letter was not officially issued until shortly before the denial of Custodia's membership and master account applications.  *See id.*

But the Board's involvement did not stop there.  Roughly two dozen Board employees played a role in determining the outcome of Custodia's master account request or the ability of SPDIs to access the payments system.  *See supra* paragraph 44.  For instance, Vice Chair Lael Brainard had numerous conversations with Esther George about Custodia's master account request.  *See supra* paragraph 46.  President George's contemporaneous notes reflected that "[Federal reserve Vice-Chair] Lael [Brainard] feels we don't have authority to say no to [Custodia's] request.  I pushed back and argued we need broader policy issue addressed."  Ex. Q, at FRBKC-0017834.  In January 2022, shortly after Chairman Powell's confirmation hearing and 15 months after Custodia first applied for a master account, the Board—not the Reserve Bank—decided that Custodia was eligible for a master account.  Vice-Chair Brainard communicated the

news to Senator Lummis, while Board General Counsel Mark Van Der Weide informed

Custodia.  Ex. CO; *see supra* paragraph 45.

Behind the scenes, the Board took steps that virtually guaranteed denial of Custodia's

master account request.  The Board's General Counsel invited Custodia to apply for Federal

Reserve membership, supposedly as a way to facilitate consideration of its master account

request.  *See supra* paragraph 24.  When Custodia obliged, the Board then used that decision

against Custodia, subjecting it to a punishing pre-membership exam whose process was so

lacking that it led Custodia to ask the Board's Inspector General to investigate 23 violations of

federal law, rules, policies and procedures.  *See supra* paragraph 58.  As but one example,

Reserve Bank staff told Custodia to prepare for a targeted examination that would focus on

Custodia's Day 1 business plan and shortly thereafter; but the membership denial treated

Custodia as a complex bank and judged it on its three-year product roadmap that was not yet

fully constructed.  Ex. CD.  Similarly, during the post-exam exit meeting, Kansas City Fed staff

working at the behest of the Board informed Custodia that everything "could be addressed" and

invited Custodia to submit proof of remediation.  Ex. AJ (Crouch Tr.), at 162:3–9, 164:12–18;

Ex. AP, at FRBKC-00014763.  Custodia did so, but the Kansas City Fed refused to consider this

evidence.  Ex. C (KC Fed 30(b)(6) Tr.), at 215:19–219:10.  These deviations condemned

Custodia—which was willing to have a federal regulator—to Tier 3 status and an orchestrated

master account denial that came immediately on the heels of the membership denial.

Staff at the Kansas City Fed understood that their recommendation on Custodia's master

account request should not contradict the Board's membership decision.  *See* Ex. CP, at FRBKC-

00002133 (Reserve Bank email stating "we do not want to contradict one another."); *see also* Ex.

N (Hazen Tr.), at 246:3–246:12 ("[T]he final piece that we needed to understand before we could

53

conclude our analysis [of the master account] was what the decision was going to be by the Board of Governors on the membership request.").  Thus, the denial of Custodia's membership application rendered the master account decision a *fait accompli*.  In effect, it dictated the outcome of Custodia's master account request.  The decisions were so intertwined that the Kansas City Fed did not start drafting a denial recommendation memo until after Board staffers communicated that they were leaning towards denial, and did not issue its master account denial until the Board voted to deny membership.

But perhaps the most stunning fact that would never have seen the light of day but for discovery is this:  in the wake of FTX's collapse and a mysterious briefing to Vice-Chair Barr concerning Custodia's membership and master account applications, ***Board staff edited and rewrote key parts of an internal Kansas City Fed memo recommending denial to the Kansas City Fed President without her knowledge before she saw or signed the denial letter***.  The Kansas City Fed later shared that memo with the Board's Director of RBOPS for non-objection, which was provided late at night, less than 12 hours before the Board voted to deny membership to Custodia.

By focusing only on President George's self-serving testimony that she made the master account decision, Defendants invite the Court to blinker itself from reality.  Discovery reveals that the Board was deeply intertwined in the outcome of Custodia's master account request.  That level of involvement is not consistent with the notion of unfettered Reserve Bank discretion that the Defendants advanced at the motion-to-dismiss stage.

## CONCLUSION

"Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform."  *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991).  In this case, both the Board and the Kansas City Fed lack discretion to deny a master

account to an eligible depository institution.  Custodia respectfully submits that, whether

pursuant to the APA count against the Board, or pursuant to the statutory mandamus count

against the Kansas City Fed, or both, the Monetary Control Act requires the Court to vacate the

denial of Custodia's master account request and enjoin Defendants from refusing to grant

Custodia direct access to the Federal Reserve payments system.

      DATED this 20th day of December, 2023.

CUSTODIA BANK, INC., Plaintiff

By:     /s/ Scott E. Ortiz
       Scott E. Ortiz, W.S.B. # 5-2550
       WILLIAMS, PORTER, DAY & NEVILLE, P.C.
       159 No. Wolcott, Suite 400
       P.O. Box 10700
       Casper, Wyoming 82602
       Telephone:   (307) 265-0700
       Facsimile:   (307) 266-2306
       Email:      sortiz@wpdn.net

       -and-

       John K. Villa, *pro hac vice*
       Ryan Scarborough, *pro hac vice*
       Lauren Weinberger, *pro hac vice*
       Ian Swenson, *pro hac vice*
       Russell Mendelson, *pro hac vice*
       WILLIAMS & CONNOLLY, LLP
       680 Maine Avenue SW
       Washington, DC 20024
       Telephone:   (202) 434-500
       Emails:     jvilla@wc.com
               rscarborough@wc.com
               lweinberger@wc.com
               iswenson@wc.com
               rmendelson@wc.com

       *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served this day of December 20, 2023, addressed to:

Mark Van Der Weide
Richard M. Ashton
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
Erin E. Berry
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Angela Tarasi
Jared M. Lax
KING & SPALDING, LLP
1401 Lawrence Street
Suite 1900
Denver, Colorado 80202

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

/s/ Scott E. Ortiz
Scott E. Ortiz