# EXHIBIT C

# [PUBLIC VERSION]

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3

4       CUSTODIA BANK, INC.,

5                         Plaintiff

6       vs.                              No.

7       FEDERAL RESERVE BOARD OF         22-cv-00125-SWS

8       GOVERNORS and FEDERAL RESERVE

9       BANK OF KANSAS CITY,

10                        Defendant.

11

12

13

14

15            CONFIDENTIAL DEPOSITION OF JUDITH HAZEN,

16      FRBKC Representative, a Defendant, taken on behalf of

17      the Plaintiff before Kelsey Robbins Schmalz, CSR No.

18      1571, CCR No. 1148, RPR, pursuant to Notice on the

19      16th of November, 2023, at the offices of the Federal

20      Reserve Bank of Kansas City, 1 Memorial Drive, Kansas

21      City, Missouri.

22

23

24

25

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 20

1    generally about his involvement in conversations with

2    the State of Wyoming about the SPDI draft litigation?

3         A.    So he provided me information on

4    conversations that were happening predating my

5    involvement with the legislation and with the

6    entities, and that included an overview of our -- of

7    conversations between the Federal Reserve Bank staff

8    and the State of Wyoming during that time.

9         Q.    And what is the time period that he

10   was referencing with you?  Or let me ask it a

11   different way.

12              What is the time period that the

13   Kansas City Fed was engaged in conversations with

14   representatives of the State of Wyoming in connection

15   with the draft SPDI legislation?

16        A.    So conversations with the Kansas City

17   Fed would go back to 2017 or 2018.  Conversations

18   that I covered with Nick I believe were occurring in

19   the 2019 time frame.

20        Q.    Okay.  And did Nick have perspective

21   or knowledge about conversations that would have

22   occurred with the State of Wyoming representatives in

23   2017 or 2018?

24              MS. CARLETTA:  Objection.  Form.

25        A.    So Nick Billman would have been

Page 53

1    BY MR. SCARBOROUGH:

2           Q.    Were representations made by Kansas

3    City Fed officers that if Wyoming SPDI charters

4    entities applied they would be given access to the

5    Federal Reserve payment system?

6                MS. CARLETTA:  Objection.  Form.

7           A.    I'm not aware of a conversation that

8    SPDI entities would have master accounts made

9    available to them.

10   BY MR. SCARBOROUGH:

11          Q.    When you mentioned a moment ago that

12   there are ways to access the Federal Reserve payment

13   system other than through a master account, the

14   testimony that we've heard from various

15   representatives or various employees of the Kansas

16   City Fed is that the only other way to access it is

17   through a correspondent banking relationship?

18                Is that correct, first of all?  Is

19   that the Kansas City Fed's understanding that the

20   only two ways to access the Federal Reserve payment

21   system are through a master account or through a

22   correspondent banking relationship?

23                MS. CARLETTA:  Objection.  Form.

24   Misstates testimony.

25          A.    So the only two are not that, but yes,

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 54

1    often you will see an institution that as accessing

2    services and maintains an account with the Reserve

3    Bank and settles directly within that account.  You

4    also have institutions that have direct access to

5    services and choose to settle in another

6    institutions's master account.  That is what I would

7    think of as a correspondent/respondent relationship.

8              There are also other ways you can

9    access the banking system, though, and that would be

10   as a commercial customer of another bank that

11   maintains access to services, either through their

12   own master account or a correspondent relationship,

13   and so to have direct access, the two most common

14   ways would be through your own master account or by

15   settling in a correspondent account, but they're not

16   the only ways to access.

17        Q.    If you don't have your own master

18   account and you have to go through a correspondent

19   relationship or a commercial banking relationship to

20   get access, does that, first of all, interject

21   additional time into the process before transactions

22   can settle?

23             MS. CARLETTA:  Objection.  Form.

24        A.    I can't answer the specifics on how

25   all of the mechanics could work for all of the

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 55

1    iterations of those, but it could.

2    BY MR. SCARBOROUGH:

3         Q.    And could it also inject additional

4    cost to the entity seeking to access the Federal

5    Reserve payment system?

6              MS. CARLETTA:  Same objection.

7         A.    I would expect that any entity

8    providing services is going to charge for that.

9    BY MR. SCARBOROUGH:

10        Q.    Okay.  And if an entity had its own

11   master account, it would not face those same timing

12   issues and it would not face those same cost issues;

13   is that fair?

14             MS. CARLETTA:  Objection.  Form.

15        A.    If the question is if an entity

16   maintains its own master account does it not need to

17   pay a fee to another entity for using its services or

18   whatever fees that a commercial bank may choose to

19   charge its customers, that would be accurate, but

20   there are other expenses that might be incurred, so

21   there is still an expense relative to maintaining a

22   master account.

23             MR. SCARBOROUGH:  Okay.  We've been

24   going a while.  I haven't finished this document yet,

25   but why don't we take a break and then we can pick

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 57

1    George or meetings that we would have attended, but I

2    can't cite like where they were at in the deposition.

3          Q.    That's fine.  Based on what you

4    reviewed -- and, again, I'm speaking to you in your

5    capacity as the Kansas City Fed representative.

6          A.    Yes.

7          Q.    Was there any testimony that Tara

8    Humston gave that the Kansas City Fed would disavow?

9          A.    No.

10          Q.    And was there any testimony that she

11    gave that the Kansas City Fed would disagree with?

12          A.    No.

13          Q.    Okay.  Thank you for those

14    clarifications.

15                I just wanted to return to Exhibit 226

16    so that we could finish up with that.  That's the

17    talking points that were prepared by some combination

18    of Veronica Sellers, Kevin Moore and Ryan Harwell,

19    correct?

20          A.    I believe also Nick Billman.

21          Q.    Correct.  Thank you for pointing that

22    out.  So we talked before about section 248a and the

23    desire of the Kansas City Fed officers to have that

24    reference -- or those references removed from the

25    draft legislation.  Do you know whether references to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 58

1    248a were removed from the final legislation?

2                    MS. CARLETTA:  Objection.  Form.

3          A.    Chris Land agreed to remove the

4    specific references to that section.

5    BY MR. SCARBOROUGH:

6          Q.    And that's reflected in the email

7    Exhibit 227 --

8          A.    Correct.

9          Q.    -- that Nick Billman sent summarizing

10   his call with Chris Land on December 12th, 2018?

11         A.    The email is dated December 12th,

12   2018.  The conversation may not have been that day.

13         Q.    Yeah, you're right.  It looks like if

14   you read the first line of the email it's a little

15   faint, but it says that he wanted to follow up on his

16   call with Chris Land last Friday afternoon, and this

17   email was sent on December 12th, Wednesday, so if I'm

18   doing my math correctly, that would put this back at

19   December 7th, Friday; is that right?

20         A.    I believe that's accurate.

21         Q.    The other concern that was reflected

22   in the key issues at the top was that the Kansas City

23   Fed wanted Wyoming to remove the requirement for the

24   attorney general of the State of Wyoming to sue the

25   Federal Reserve Bank on behalf of a private entity if

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 59

1    it was denied a master account?

2                    MS. CARLETTA:   Objection.   Form.

3    Sorry.

4    BY MR. SCARBOROUGH:

5           Q.    Did Wyoming make changes to its

6    legislation to address that concern?

7                    MS. CARLETTA:   Objection.   Form.

8           A.    So I see the reference that the Kansas

9    City Fed suggested removing that, and it was reported

10   to Kevin Moore and Ryan Harwell by Albert that the

11   State had struck the language that required the state

12   attorney general to sue the Fed for reasons that had

13   been cited in the talking points when the State

14   realized it could not take legal actions against the

15   Fed on behalf of private citizens.

16   BY MR. SCARBOROUGH:

17          Q.    And are you reading from Exhibit 227,

18   the December 5th, 2018, email summary from Kevin

19   Moore?

20          A.    I am.

21          Q.    That same email, the following

22   paragraph references that fact that Albert -- and

23   this is a reference to Albert Forkner, correct?

24          A.    Yes, Albert Forkner.

25          Q.    Also knows there's sensitivity to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 61

1        A.     That is what this says.

2        Q.     Was the issue around member status

3    raised because the Reserve Bank did not control

4    whether a special purpose depository institution

5    would be granted membership?

6               MS. CARLETTA:  Objection.  Form and

7    outside the scope.

8        A.     Concerns about membership status and

9    Federal Reserve services are raised because they're

10   not within the purview of the state to determine, and

11   so there's concern in the legislature implying or

12   conveying that.

13   BY MR. SCARBOROUGH:

14       Q.     I see.  And did Chris Land confirm in

15   his conversation with anybody that occurred I believe

16   on December 17th, 2018, that, in fact, the language

17   that had been discussed about a mandatory lawsuit

18   provision was ultimately removed from the SPDI

19   legislation?

20              MS. CARLETTA:  Objection.  Form.

21       A.     I'll need just a moment to read it to

22   see if that's in here.

23   BY MR. SCARBOROUGH:

24       Q.     I believe it's reflected in the second

25   sentence at the top of the email?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 62

1          A.     Yes.  The one that I can't read with

2     the highlighting.

3          Q.     Yeah.  I believe it says -- I have a

4     clearer version on my screen that says, Chris

5     confirmed what Kevin and Ryan heard from Jeff and

6     Albert below about the mandatory lawsuit provision

7     being removed.

8                 Did I read that accurately?

9          A.     You did read that accurately.

10    BY MR. SCARBOROUGH:

11         Q.     Now, in looking through the talking

12    points, and those talking points are I think four

13    pages long; is that right?

14         A.     Yes.

15         Q.     There are -- in addition to the two

16    key issues that were identified and we've already

17    discussed, it appears that there were other

18    observations that the Kansas City Fed officers shared

19    with the Wyoming representatives about the draft

20    legislation; is that fair?

21         A.     So referencing the talking points

22    document, I think this is information that was

23    developed internally.  What was conveyed in

24    conversations may not have included all of these, but

25    I would rely on the communications that are outlined

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 144

1      the forefront and ultimately resulted in creating the

2      novel account -- or the account access steering

3      committee is what's defined on this page.

4      BY MR. SCARBOROUGH:

5            Q.    Gotcha.  And on the nontraditional

6      account access group -- work group, am I

7      understanding it correctly that there was both a

8      steering committee as well as two different

9      workstreams, a practical workstream and a policy

10     workstream?

11           MS. CARLETTA:  Objection.  Form.

12           A.    So as outlined here, yes.  There was a

13     group put together that constituted what became the

14     nontraditional account access steering committee, and

15     under that there were groups that were focusing on

16     looking at broader policy -- that was dubbed the

17     policy workstream and one that was dubbed the

18     practical workstream.

19           MR. SCARBOROUGH:  Can you mark that as

20     Exhibit 233.

21           (FRB Exhibit No. 233 was marked for

22     identification by the reporter.)

23     BY MR. SCARBOROUGH:

24           Q.    I'm going to hand you a document

25     that's been marked as Exhibit 233, which is simply a

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 145

1    form because I want to create a list, and I don't

2    know if you have a pen, but I have a fancy one from

3    the Federal Reserve Bank of Kansas City if you would

4    like to use it.

5              A.    I hear they're in high demand.

6              Q.    Yes.  What I would like to do as we go

7    through is to sort of keep a running list of

8    individuals who were involved in dealing with

9    nontraditional accounts like SPDIs or Custodia

10   specifically, okay?

11             MS. CARLETTA:  And I'll just note for

12   the record I think we're talking about Topic No. 2;

13   is that right?

14             MR. SCARBOROUGH:  I don't have it in

15   front of me, but let me look real quick.

16             MS. CARLETTA:  Assuming we're talking

17   about Topic No. 2, we said that would produce a

18   witness to discuss generally the positions and

19   identities of individuals at the Board who had

20   substantive discussions with FRBKC employees about

21   Custodia's master account request.

22             MR. SCARBOROUGH:  Yeah.  This is not

23   just limited to Topic 2.  It also encompasses

24   Topic 6, for instance, which deals with the various

25   working groups and PSPAC and et cetera that was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 150

1    I'm writing it correctly.

2                MS. CARLETTA:  You can write it down

3    as you go.  I don't know what she's going to be able

4    to verify.  It's not clear from the face of that

5    document what we're doing here.  You can ask the

6    question and she can answer it.

7         A.    Can you repeat the question?

8    BY MR. SCARBOROUGH:

9         Q.    Sure.  Am I correct that you

10   previously have testified today that the Payment

11   Systems Policy Advisory Committee was involved in

12   addressing issues that were raised by novel chartered

13   entities, first of all?

14               MS. CARLETTA:  Objection.  Form.

15        A.    So the PSPAC was one of the groups

16   that was aware of and interested in the issues that

17   were being raised by new charter types, by novel

18   business plans, by novel uses of existing charters.

19   BY MR. SCARBOROUGH:

20        Q.    And the PSPAC did not include every

21   member of -- every Governor on the Board, correct?

22        A.    A subset of Governors sitting on the

23   PSPAC.

24        Q.    So I'm going to write PSPAC, subset of

25   Governors on No. 1, okay?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 151

 1          A.      Okay.

 2                  MS. CARLETTA:   Okay.   You're writing

 3     it down.

 4          A.      I see you writing it down.

 5     BY MR. SCARBOROUGH:

 6          Q.      Does that capture the participants

 7     from the Board at the PSPAC level who had anything to

 8     do with nontraditional account access issues raised

 9     by novel chartered entities?

10                  MS. CARLETTA:   She is standing on her

11     deposition testimony.   She is not verifying this

12     document.

13          A.      So yes.   The representation on PSPAC

14     from the Board of Governors includes a subset of

15     Governors, but the PSPAC is broader than the

16     substance set of Governors, it also inside a subset

17     of Reserve Bank presidents.

18     BY MR. SCARBOROUGH:

19          Q.      Right, and I'm only looking to catch

20     the folks from the Board who were involved, so that's

21     why I've written subset of Governors and didn't say

22     anything more about Reserve Bank personnel, okay?

23                  MS. CARLETTA:   It doesn't matter what

24     you've written.   It's attorney work product.   We're

25     standing on her -- she is not verifying that document

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 153

1    the PSPAC level in connection with considerations

2    raised by nontraditional accounts like SPDIs or

3    others?

4                    MS. CARLETTA:   Same objections.

5            A.     It represents the membership on PSPAC

6    at the Board of Governors.

7    BY MR. SCARBOROUGH:

8            Q.     Okay.  So let me direct your

9    attention, then, to Exhibit 202, which you have you

10   in front of you.  You mentioned that there was a

11   steering committee, correct?

12           A.     Yes.

13           Q.     And this is a steering committee for

14   the nontraditional account access groups, correct?

15           A.     Yes.  That's what the group was

16   titled.

17           Q.     Okay.  So who served on the steering

18   committee at the board level?

19           A.     On this document, it notes David

20   Mills.

21           Q.     Okay.  I'm going to write these down

22   as you go.  So David Mills, and what was his role?

23           A.     He is a co-chair.

24           Q.     And what position did he have at the

25   Board?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 154

```
 1           A.    I would have to look up his specific
 2      title for you.
 3           Q.    Does it indicate on Exhibit 202 that
 4      he was with RBOPS?
 5           A.    He worked in the RBOPS division.
 6           Q.    And does that stand for Reserve Bank
 7      Operations and Payment Services?
 8           A.    I believe so.  I'm not sure if the S
 9      is services or system.
10           Q.    Let me see if I can find the answer
11      for you quickly.  I have it down as Reserve Bank
12      Operations and Payment Systems.  Do you have any
13      reason to disagree with that?
14           A.    No.  I can confirm it during the break
15      if you want me to, but that seems reasonable.
16           Q.    And so do you see here that I've
17      written down on No. 2 David Mills, RBOPS?
18           A.    I see that.
19           Q.    Okay.  And that's written on
20      Exhibit 233.  So who's the next member from the Board
21      who served on the steering committee?
22           A.    This notes Jeff Walker.
23           Q.    Jeff Walker.  And was Jeff Walker also
24      with RBOPS?
25           A.    That's what noted on the paper.
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 155

1      Q.      And I've written that down as No. 3,

2   correct?

3      A.      Yes.

4      Q.      The next person that's listed on the

5   steering committee from the Board is Stephanie

6   Martin; is that right?

7      A.      Yes.  That's the next name from the

8   Board on the list.

9      Q.      And she's with Board legal; is that

10  fair?

11     A.      That's what it says.

12     Q.      So I've written Stephanie Martin,

13  legal, as No. 4, correct?

14     A.      Okay.

15     Q.      And then the next person that's listed

16  is Kavita Jain.  Is she also with the Board?

17     A.      She is.

18     Q.      And she served on the nontraditional

19  account access steering committee?

20     A.      That's what's noted here.

21     Q.      And she is with the board S&R.  What

22  does S&R stand for?

23     A.      Supervision and regulation.

24     Q.      So I've written as No. 5 Kavita's name

25  and her role as Board S&R, right?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 156

1          A.     Yes.  Or just S&R, but yes.

2          Q.     Then we have Marnie DeBoer.  Does

3     she -- have you also seen her name as Margaret

4     DeBoer?

5          A.     Yes.

6          Q.     And is she also a staff member for the

7     Board of Governors?

8          A.     She is.

9          Q.     So I'm going to write down Marnie

10    DeBoer, and it indicates that she was in the Board

11    M&A; is that right?

12         A.     Board MA, yes.

13         Q.     Pardon me.  MA.

14                And so I've written her name, Marnie

15    DeBoer, MA there, correct?

16         A.     Correct.

17         Q.     And then if I look down, the next

18    Board person that I see is Jennifer Lucier.  Am I

19    getting that right; do you know?

20         A.     I see the name.  I don't know the

21    pronunciation.

22         Q.     And Jennifer Louis, it indicates here,

23    was also with RBOPS at the Board?

24         A.     That's on the paper, yes.

25         Q.     So I've marked that as No. 7 for her

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 157

1    name, correct?

2         A.    I see that on that page.

3         Q.    Okay.  Now, in addition to the

4    steering committee, if you look further down on this

5    document on the practical workstream, there are other

6    members of the Board who are also participating,

7    correct?

8              MS. CARLETTA:  Objection.  Form.

9         A.    I see on the list under practical

10   workstream a list of Board staff.

11   BY MR. SCARBOROUGH:

12        Q.    Okay.  One of the co-chairs for the

13   practical workstream was a Board member, correct?

14        A.    This indicates Kathy Wilson.

15        Q.    And Kathy Wilson, it indicates she is

16   also with RBOPS?

17        A.    Yes.  That's in parentheses.

18        Q.    And I've written her name at No. 8,

19   correct?

20        A.    I see that.

21        Q.    And then there's representatives from

22   Board legal, Gavin Smith; is that right?

23        A.    I see that.

24        Q.    And I've written his name as No. 9 on

25   this, correct?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 158

1          A.     I see that.

2          Q.     There's a reference to MPOA David

3     Lowe, do you know what MPOA is?

4          A.     I don't.

5          Q.     Do you know who David Lowe is?

6          A.     The name is familiar, but I'm -- I

7     don't know the division.  I'm sorry.

8          Q.     Do you know if he worked for the

9     bank -- for the Board or a Reserve Bank?

10         MS. CARLETTA:  Objection.  Form.

11         A.     I don't.  I see that he's listed under

12    Board staff in this document, but I don't know him

13    specifically.

14    BY MR. SCARBOROUGH:

15         Q.     All right.  So I'm going to put David

16    Lowe down and I'll write MPOA since he's listed under

17    Board staff, okay?  Do you see that as No. 10?

18         A.     Yeah.  I see you wrote the same thing

19    over here that's on this document.

20         Q.     Okay.  And then the next person listed

21    as Board staff is Dan McGonegal; is that right?

22         A.     Yes.

23         Q.     And is Mr. McGonegal part of the Board

24    S&R department?

25         A.     He is now, yes.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 159

1        Q.     And do you see for No. 11 I've written
2    his name with S&R next to it?
3        A.     I see that.
4        Q.     Then the next person down it indicates
5    is Ben Hobbs, also with RBOPS; is that right?
6        A.     I see that.
7        Q.     And I've written his name and
8    indicated that he is with RBOPS, correct?
9        A.     I see that.
10        Q.     And then if you flip the page to
11    workstream No. 1, the policy workstream, one of the
12    co-chairs of that group is also a Board staffer,
13    correct?
14        A.     Yes.  On here I see Jason Hinkle.
15        Q.     And he is also with RBOPS?
16        A.     That's in parentheses, yes.
17        Q.     You see him as listed as No. 13?
18        A.     Yes.
19        Q.     And then under Board staff for this
20    policy workstream, there's a representative from
21    legal.  That's Sophia Allison, correct?
22        A.     On Board legal it says Sophia Allison.
23        Q.     And I'll write legal next to her name.
24    Do you see that?
25        A.     I see that.

Page 160

1           Q.      Okay.  And then we have Mary Francis,

2      and I'll never be able to say her last name, but it

3      looks like Styczynski?

4           A.      Yes.

5           Q.      Is she also with the Board?

6           A.      Yes.

7           Q.      And her specific role is listed there

8      as also being MPOA, correct?

9           A.      Yes.  That's the designation on the

10     page.

11          Q.      And I've written her in as No. 15,

12     correct?

13          A.      Yes.

14          Q.      Now, I'm not going to include Dan

15     McGonegle a second time, although he is also on this

16     policy workstream, right?

17          A.      Yes, I see his name on here.

18          Q.      So the next person we have come to

19     appears to be Kirstin Wells; is that right?

20          A.      Yes.

21          Q.      Is she also a Board member?

22          A.      She is designated here as RBOPS.

23          Q.      I've written her name in as No. 16

24     with RBOPS next to it.

25                  Do you see that?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 161

1          A.     Okay.

2                 MS. CARLETTA:  I'll just note that

3     this document also -- next to Kirstin Wells also says

4     parentheses, FOCS.  I don't know what that means.

5     BY MR. SCARBOROUGH:

6          Q.     Ms. Hazen, are there other

7     Board-related members, so staffers, Governors,

8     anybody from the Board who, to your knowledge are or

9     the Kansas City Fed's knowledge, participated on

10    either the nontraditional account access steering

11    committee, practical workstream 1 or policy

12    workstream 2 other than the folks that we've listed

13    here?

14                MS. CARLETTA:  Objection.  Form.

15         A.     I believe this document is showing

16    those that were engaged at the creation of this, and

17    I don't see any notable names missing.

18    BY MR. SCARBOROUGH:

19         Q.     So -- I didn't mean to interrupt you.

20         A.     I was just going to say I don't -- I

21    know that there have been changes in membership from

22    the Reserve Bank participation side, and so

23    potentially there's been changes from the Board side

24    but there's no names that I'm surprised not to see on

25    the list.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 162

1        Q.      Now I'm going to hand you a document

2    that was marked previously as Exhibit 218, and this

3    is a document that references crypto asset policy and

4    then it's got a redaction applications.

5                Do you see that?

6        A.      I see that.

7        Q.      And it also reflects that there is

8    involvement in answering some crypto policy questions

9    that the Kansas City Fed was facing; is that correct?

10       A.      The invitation says, This is to

11   discuss some of the crypto policy questions KC is

12   facing as it works through the redacted applications.

13       Q.      Are you familiar with Jeff Ernst?

14       A.      I am.

15       Q.      Is he -- in what ways are you familiar

16   with Mr. Ernst?

17       A.      So I've worked with Jeff Ernst through

18   my role in the supervision function and engagement

19   with what we call the system risk council.

20       Q.      And does the system risk council, does

21   that address questions that arise in connection with

22   novel chartered entities?

23       A.      They do not.

24       Q.      Okay.  Why is -- go ahead.

25       A.      I'm sorry.  I just realized when I

Page 163

1     said -- I'm sharing with you how I personally know

2     Jeff Ernst.  I didn't prepare to be able to speak to

3     all that is -- what it encompasses, so I'm sorry.

4             Q.     I understand.  Is it fair to say that

5     Mr. Ernst was involved in answering crypto policy

6     questions that the Kansas City Fed was trying to

7     address?

8             MS. CARLETTA:  Objection.  Form and

9     outside the scope.

10            A.     I don't know about Jeff's engagement

11    other than what's noted on this calendar invitation.

12    BY MR. SCARBOROUGH:

13            Q.     Okay.  And is it -- and he is a Board

14    staff member?

15            A.     Yes.

16            Q.     And did the SPDI-chartered entities

17    present crypto policy questions that needed to be

18    addressed?

19            A.     Broadly, there were crypto policy

20    questions that were being contemplated by the Board

21    and Reserve Bank staff.  I can't speak to if this

22    document is referencing specific questions that would

23    have been raised by SPDIs or a specific entity.

24            Q.     And I'm less concerned about that

25    particular document than trying to identify

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 164

1   individuals at the Board who would have been involved

2   in addressing policy issues or other questions that

3   would arise in connection with SPDI charters or the

4   like.

5           A.    I think what's challenging for me in

6   responding is that there is an evolution that is

7   happening at this time in that industry and then also

8   within the financial industry, and so to be able to

9   pinpoint what questions are being raised because of

10  the SPDI charters and what questions are being raised

11  just as we more broadly monitor what's happening in

12  the financial industry, I'm not prepared to make that

13  delineation.

14          Q.    Okay.  Let me ask you, did Asad Kudiya

15  have interaction with the Kansas City Fed in

16  connection with SPDI charters or issues around crypto

17  policy novel chartered entity account access?

18              MS. CARLETTA:  Objection.  Form and

19  outside the scope.

20          A.    Asad Kudiya would have been involved

21  in the application for membership by Custodia.

22  BY MR. SCARBOROUGH:

23          Q.    Would Asad have had any role in

24  connection with broader crypto policy questions?

25              MS. CARLETTA:  Same objections.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 165

1          A.    I'm not certain what all is

2     encompassed in Asad's role.

3     BY MR. SCARBOROUGH:

4          Q.    What about Gavin Smith?  Strike that.

5     We've already established Gavin Smith's

6     participation.

7               What about Molly Mahar?

8               MS. CARLETTA:  Same objection.

9          A.    Kavita Jain reports to Molly Mahar.

10    I'm not aware of Molly Mahar's scope of

11    responsibilities or her specific engagement.

12    BY MR. SCARBOROUGH:

13         Q.    Okay.

14         A.    On activities related to Custodia or

15    requests related to Custodia.

16         Q.    In preparing to testify today, did you

17    identify individuals from the Board who participated

18    in providing comments or feedback on the

19    recommendation letter that was prepared for Esther

20    George?

21         A.    Yes.  I looked at comments that had

22    been provided on our analysis.

23         Q.    Okay.  Who provided comments from the

24    Board in connection with the recommendation memo to

25    Esther George?

Page 166

```
 1                    MS. CARLETTA:  Objection.  Form.
 2            A.      I'm not certain that I could delineate
 3      who specifically provided the comments on the memo
 4      itself versus others that provided substantive
 5      comments in other forms.
 6      BY MR. SCARBOROUGH:
 7            Q.      Let's just do it broadly.  Who
 8      provided comments in any way, shape or form from the
 9      Board to the Kansas City Fed in connection with the
10      recommendation memo?
11            A.      So individuals that --
12                    MS. CARLETTA:  Objection.  Form --
13            A.      -- we would have had conversations
14      with at the Board included Sophia Allison.
15      BY MR. SCARBOROUGH:
16            Q.      Okay.  Let me see here.  We've already
17      got her on the list as No. 14 I'll show you.  Is that
18      right, No. 14?
19            A.      Yes.  Your list says Sophia Allison,
20      legal.
21            Q.      Who else?
22            A.      Lael Brainard.
23            Q.      So I'm going to write -- I'll write
24      Lael down although I put an asterisks -- do you know
25      if Lael was on the PSPAC?
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 167

1          A.     I believe she was.

2          Q.     All right.  I'll write Lael's name but

3     I'll put an asterisk beside it on No. 17.

4               MS. CARLETTA:  And, I'm sorry, what

5     are we creating -- can you restate the question for

6     this list?

7     BY MR. SCARBOROUGH:

8          Q.     So what was Lael Brainard's -- she

9     gave feedback on the recommendation memo?

10              THE WITNESS:  Can I answer now?

11              MS. CARLETTA:  I just didn't hear the

12    question.  That's all.

13         A.     Lael Brainard had conversations with

14    Esther George.

15    BY MR. SCARBOROUGH:

16         Q.     Okay.  And we'll come back to the

17    substance of it, but who else would have given

18    feedback on the recommendation -- the denial

19    recommendation?

20         A.     So others that I have include Margaret

21    DeBoer.

22         Q.     And we have Marnie DeBoer listed as

23    No. 6?

24         A.     I see that.

25         Q.     So I'm not going to write her down.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 168

1      Who else do you have?

2              A.      I have Matt Eichner.

3              Q.      And was he the head of RBOPS?

4              A.      Yes.

5              Q.      I'm going to write RBOPS there.  Who

6      else besides Matt?

7              A.      Jason Hinkle.

8              Q.      I've already got Jason written down as

9      No. 13 so I'm not going to rewrite him, okay?

10             A.      Okay.

11             Q.      Who else?

12             A.      Laura Lipscomb.

13             Q.      I don't have her, so what was her

14     position or role at the Board?

15             A.      I believe that she is in monetary

16     affairs.

17             Q.      So MA?

18             A.      Yes.

19             Q.      I've written her down at No. 19.  All

20     right, who else?

21             A.      Matt Malloy.

22             Q.      And what was his role?

23             A.      He is also in monetary affairs.

24             Q.      And do you see I've written him down

25     as No. 20?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 169

1           A.      I see that.

2           Q.      Okay.  Who else?

3           A.      Stephanie Martin.

4           Q.      I've got her already as No. 4,

5      correct?

6           A.      Yes.  I see that.

7           Q.      And then who else do you have?

8           A.      Dave Mills.

9           Q.      No. 2 on my list?

10          A.      Yes.

11          Q.      And who else?

12          A.      Gavin Smith.

13          Q.      He's No. 9 on my list.  Who else do

14     you have?

15          A.      Mark Van Der Weide.

16          Q.      Write him down, mark Van Der Weide,

17     and he is legal, correct?

18          A.      He's general counsel.

19          Q.      So I'll write GC as No. 21.

20          A.      Okay.

21                  MS. CARLETTA:  Just for the record,

22     she is reading from Tab 10 of Exhibit 225.

23     BY MR. SCARBOROUGH:

24          Q.      Who else do you have?

25          A.      Jeff Walker.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 170

1          Q.     He's No. 3, correct?

2          A.     Yes.

3          Q.     Who else?

4          A.     Evan Winerman.

5          Q.     I'll write his name down.  What was

6     Evan's role?

7          A.     I believe Evan is in legal.

8          Q.     At the Board?

9          A.     Yes.

10          Q.     So do you see I've written him down as

11     No. 22?

12          A.     Yes.

13          Q.     Is that the complete list that you've

14     been able to compile of individuals who had

15     involvement in giving feedback in one way or another

16     to the denial recommendation?

17          A.     I would say that these are the

18     individuals that were involved in substantive

19     conversations around Custodia's master account

20     request from the Board of Governors.

21          Q.     Okay.  Does the Kansas City Fed have

22     any knowledge or awareness of briefings that were

23     provided to Vice Chair Barr in connection with

24     Custodia -- both its membership application and its

25     master account request?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 175

1      issues raised by novel chartered entities like SPDIs

2      and the like?

3                     MS. CARLETTA:   Objection.   Form and

4      outside the scope.

5      BY MR. SCARBOROUGH:

6           Q.     And I'll hand you Exhibit 233 so you

7      have that in front of you, but is there anybody

8      that's not reflected on that list so far?

9                     MS. CARLETTA:   Same objections.

10          A.     So to the latter part of your

11     question, there were conversations broadly that

12     were happening around evolution in the financial

13     industry, so this would not be an inclusive list of

14     all conversation that is have happened across the

15     Federal Reserve System in regard to individuals

16     that you've identified that are on emails, yes, I

17     see that we've pulled out the names that are relevant

18     from the Board, and then it's also inclusive of the

19     list that I had identified of individuals that the

20     Reserve Bank had substantive discussions regarding

21     Custodia.

22                     I don't have a full list of everyone

23     that's been engaged in watching the evolution of the

24     financial system for the last four years for this

25     discussion today.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 176

1    BY MR. SCARBOROUGH:

2          Q.    And if we were to include that, that

3    would include people like Jeff Ernst, for instance?

4                MS. CARLETTA:  Objection.  Form.

5    Outside the scope.

6          A.    Among others, yes.

7                MR. SCARBOROUGH:  Why don't we go

8    ahead and take our lunch break, and then we can pick

9    up afterwards.

10               (Off the record from 12:37 to 1:20.)

11   BY MR. SCARBOROUGH:

12         Q.    All right.  We are back after lunch.

13   When we were talking earlier about the interactions

14   that occurred between Board staff or Board Governors

15   and representatives of the Kansas City Fed in

16   connection with the recommendation to deny Custodia a

17   master account, you mentioned that there were

18   substantive discussions with Lael Brainard.

19               Do you remember that?

20         A.    Yes.

21         Q.    Can you on behalf of the Kansas City

22   Fed describe what those discussions were with

23   Vice Chair Brainard?

24               MS. CARLETTA:  Objection.  Form.

25         A.    So discussions regarding Custodia's

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 177

1    master account request would have occurred between

2    Vice Chair Brainard and President Esther George.

3    BY MR. SCARBOROUGH:

4         Q.    Can you tell me about the substance of

5    those discussions?

6         A.    I believe according to President

7    George's testimony that there were discussions around

8    legal eligibility.

9         Q.    Is the sum and substance of your

10   knowledge to testify about discussions that occurred

11   with Vice Chair Brainard what Esther George testified

12   to in her deposition?

13        A.    Yes.

14        Q.    Are you aware of any other sources of

15   information or knowledge beyond Esther George's

16   testimony that would address the substance of any

17   communications involving Vice Chair Brainard?

18        A.    No.

19        Q.    Are you aware of any documents that

20   have been prepared to summarize communications from

21   Vice Chair Brainard concerning Custodia's master

22   account request?

23             MS. CARLETTA:  Objection.  Form.

24        A.    So I think the direct or the firsthand

25   account of the conversations between Esther George

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 207

1              A.     I can't speak to the activities of
2       other institutions.
3       BY MR. SCARBOROUGH:
4              Q.     The Kansas City Fed has
5       information-sharing agreements with other Reserve
6       Banks as well as the Board of Governors, correct?
7                     MS. CARLETTA:  Objection.  Form and
8       outside the scope.
9              A.     I believe that we do, but I didn't
10      prepare by reviewing to confirm.
11      BY MR. SCARBOROUGH:
12             Q.     Well, there's an -- are you also
13      familiar with the fact that there is an ARISG,
14      Account Request Information Sharing Group, that
15      exists between the Board and the Reserve Banks in
16      connection with master account requests?
17                    MS. CARLETTA:  Same objections.
18             A.     So I'm aware of a group that consists
19      of representatives from across the Reserve Banks and
20      also includes liaisons to the Board of Governors.
21      BY MR. SCARBOROUGH:
22             Q.     Okay.  And through any of the
23      information-sharing vehicles that are available to
24      the Kansas City Fed, is the Kansas City Fed aware of
25      other institutions within the Reserve system that

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 215

1              THE REPORTER:  I need you to slow
2      down, please, when you're reading.
3              THE WITNESS:  I'm sorry.
4          A.      To clarify, Currently policies,
5      procedures and risk limits are not as developed as
6      what would be expected for an operating traditional
7      bank, most notably, in the areas of the BSA/AML and
8      OFAC compliance and IT.
9      BY MR. SCARBOROUGH:
10         Q.      And did the Kansas City Fed reach
11     those conclusions in connection with the
12     pre-membership exam that was performed in the fall of
13     2022?
14              MS. CARLETTA:  Objection.  Form.
15         A.      So looking at this draft document, I
16     assume it would have been informed by the membership,
17     the review that was conducted that fall.
18     BY MR. SCARBOROUGH:
19         Q.      Did the Kansas City Fed after the
20     exclusion of that pre-membership exam in the fall of
21     2022 invite Custodia to remediate and submit
22     documentation of the remedial measures that it was
23     taking to address the gaps that were identified
24     related to BSA/AML OFAC compliance and IT issues?
25              MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 216

1          A.      So my understanding is that after the

2     conveying the findings from that membership review,

3     Custodia asked if they could submit additional

4     information.  That information was received, but it

5     was made clear that it would require additional

6     review to determine the effectiveness of the

7     remediation steps.

8     BY MR. SCARBOROUGH:

9          Q.      So is it the Kansas City Fed's

10    position that it was Custodia that asked whether it

11    could resubmit versus the Kansas City Fed

12    representatives asking Custodia to address and

13    resubmit?

14         A.      So there was clarification on what the

15    expectations were coming out of that review, and it's

16    my understanding that Custodia was planning to be

17    responsive to those findings but it was clarifying

18    that there was not a timeline that needed to be acted

19    on, and then as information was received that it

20    would not be able to be responded to on a flow basis

21    but instead that we would need to see substantive

22    movement and then go in and conduct follow-up review

23    to determine the effectiveness of the remediation

24    actions.

25         Q.      And Custodia provided to the Kansas

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 217

1    City Fed evidence of the remedial actions that it had

2    taken to fill the gaps that had been identified in

3    the pre-membership exam, correct?

4                    MS. CARLETTA:  Objection.  Form.

5            A.    So Custodia provided updated

6    information following that examination, but there was

7    not opportunity to review for sufficiency with

8    follow-up activity to confirm that it had

9    addressed -- in fact, addressed all of the issues

10   identified.

11   BY MR. SCARBOROUGH:

12           Q.    Did the remedial information provided

13   by Custodia relating to the gaps, was that

14   information conveyed to the Board of Governors?

15                   MS. CARLETTA:  Objection.  Form and

16   outside the scope.

17           A.    I would need to -- I didn't prepare

18   with what information was conveyed to the Board in

19   the context of the membership request, so I'm...

20   BY MR. SCARBOROUGH:

21           Q.    Did the Kansas City Fed take any steps

22   to review the adequacy of the information -- remedial

23   measures that Custodia took and submitted in late

24   2022?

25                   MS. CARLETTA:  Same objections.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 218

1          A.     So the information that Custodia

2     submitted was reviewed, but the -- to determine the

3     adequacy or sufficiency of the response would have

4     required more than reviewing the documentation.

5     BY MR. SCARBOROUGH:

6          Q.     It would have required a second

7     examination to go back in and validate what had been

8     put in place, correct?

9               MS. CARLETTA:  Objection.  Form.

10         A.     It likely would have required

11    follow-up and time for Custodia to have implemented

12    what it proposed.

13    BY MR. SCARBOROUGH:

14         Q.     Why didn't the Kansas City Fed go in

15    and do that follow-up review?

16               MS. CARLETTA:  Objection.  Form and

17    outside the scope.

18         A.     My understanding is that Custodia was

19    frustrated with the timeline, and so once we had

20    information sufficient to make a determination on the

21    master account, we communicated that.

22    BY MR. SCARBOROUGH:

23         Q.     Ma'am, Custodia was invited to submit

24    remedial evidence, did so, and is it the Kansas City

25    Fed's position that after being -- after Custodia was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 219

1      invited to provide that information and did so that
2      it didn't want the Kansas City Fed to come back in
3      and review the measures and the adequacy of the
4      measures that it had put in place?
5                  MS. CARLETTA:  Same objections.
6            A.      So Custodia provided that in response
7      to the exam that was conducted for membership, and so
8      when the Board of Governors determined that they had
9      sufficient information to deny membership, that was
10     informative to our master account request.
11     BY MR. SCARBOROUGH:
12           Q.      Did anybody at the Kansas City Fed
13     say, Wait, Board, you shouldn't be denying membership
14     and citing shortcoming in BSA/AML OFAC compliance or
15     IT because Custodia was invited to remediate, did so,
16     and we should go in and see if they did it?
17                  MS. CARLETTA:  Objection.  Form and
18     outside the scope.  This is about membership.
19           A.      Yeah.  So for the membership process,
20     I can't speak to how the Board of Governors handled
21     the processing of their review.  The feedback that
22     was provided by -- or to Custodia, Custodia indicated
23     they were going to respond to, which is in Custodia's
24     purview, but the Board's determination to move
25     forward on the membership is a separate matter.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 276

1    individuals from multiple Reserve Banks and, again,

2    with input from staff at the Board of Governors with

3    specific subject matter expertise relative to the

4    handbook.

5    BY MR. SCARBOROUGH:

6            Q.    Who at the Kansas City Fed worked on

7    or contributed to drafts of the handbook?

8                  MS. CARLETTA:  Objection.  Form and

9    outside the scope.

10           A.    So drafts of the handbook would have

11   been shared with several individuals through the

12   nontraditional account access practical workstream as

13   well as the policy workstream, and then within the

14   Reserve Bank we would have shared it with relevant

15   staff for the opportunity to provide input.  I

16   believe that Nick Billman is the one that provided

17   input on behalf of the Kansas City Fed to the

18   handbook.

19   BY MR. SCARBOROUGH:

20           Q.    And who at the Board provided input on

21   the handbook to the Kansas City Fed's knowledge?

22                 MS. CARLETTA:  Objection.  Form and

23   outside the scope.

24           A.    I don't know the specific individuals

25   that provided input into the handbook.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 277

1    BY MR. SCARBOROUGH:

2          Q.    You mentioned that the nontraditional

3    account access working group as well as the practical

4    and policy workstream -- did they have input into --

5    did those groups have input into the implementation

6    handbook?

7                MS. CARLETTA:  Objection.  Form and

8    misstates testimony.

9          A.    So the practical workstream would have

10   been engaged in helping to develop the handbook and

11   then the information would have been shared with the

12   policy workstream and the steering committee and

13   probably others beyond that.  I don't know who

14   specifically took advantage of the opportunity to

15   provide feedback on the drafts.

16   BY MR. SCARBOROUGH:

17         Q.    When was the final version of the

18   handbook created?

19         A.    The final version of the handbook was

20   approved by the Conference of Presidents I believe at

21   the August or September meeting 2023.

22         Q.    A version has been produced that's

23   dated in August of 2023.  Would that coincide with

24   when it was finalized and approved?

25                MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 278

1      A.     I assume -- so the Conference of

2   Presidents did not approve the handbook until after

3   Custodia's master account request had been

4   determined.  If you have a version dated August 2023,

5   I assume that's the final version that was approved

6   by COP.

7   BY MR. SCARBOROUGH:

8      Q.     Did the Kansas City Fed rely on drafts

9   of the handbook when assessing Custodia's master

10  account request?

11           MS. CARLETTA:  Objection.  Form.

12     A.     So the Federal Reserve Bank of Kansas

13  City began the analysis of Custodia's master account

14  prior to the drafting of the handbook, but as the

15  handbook was drafted and the guidelines were

16  contemplated, we were mindful of how those were

17  evolving and used those as a reference point to

18  ensure that we were conducting a fulsome analysis of

19  the request.

20  BY MR. SCARBOROUGH:

21     Q.     Now, did the handbook supplant the

22  Kansas City Fed's policies, procedure, et cetera,

23  when it came to considering and determining master

24  account requests?

25           MS. CARLETTA:  Objection.  Form and

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

1           A.     I would say that we were using the

2     handbook to ensure that our own analysis wasn't

3     omitting any material risk that had been identified

4     through that document.

5     BY MR. SCARBOROUGH:

6           Q.     Was another output from the NTAA the

7     account access guidelines?

8                  MS. CARLETTA:  Objection.  Form.

9           A.     So the account access guidelines would

10    have been issued by the Board of Governors.

11    BY MR. SCARBOROUGH:

12          Q.     And they were developed through the

13    NTAA process and finalized and issued by the Board of

14    Governors, correct?

15                 MS. CARLETTA:  Objection.  Form.

16          A.     So the policy workstream under the

17    nontraditional account access steering committee had

18    engagement in thinking about the principles and the

19    guidelines.

20    BY MR. SCARBOROUGH:

21          Q.     I want to make sure I heard you

22    correctly.  The NTAA did participate in the

23    development of the guidelines that were ultimately

24    issued by the Board, correct?

25                 MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 357

1          A.     The policy workstream under the

2     nontraditional account access steering committee had

3     engagement.

4     BY MR. SCARBOROUGH:

5          Q.     Okay.  Did the Kansas City Fed

6     determine that before it would decide Custodia's

7     master account request, it would wait for the Board's

8     account access guidelines to be finalized?

9               MS. CARLETTA:  Objection.  Form.

10         A.     So the Kansas City Reserve Bank had

11     been conducting a review of Custodia's master account

12     request, and as we were aware the guidelines were

13     forthcoming, we would have incorporated that into our

14     analysis as well.

15     BY MR. SCARBOROUGH:

16         Q.     And the Kansas City Fed didn't want to

17     make a decision before those guidelines were

18     finalized on the master account request, right?

19               MS. CARLETTA:  Objection.  Form.

20         A.     We would want to make an informed

21     decision on the master account request, and so if

22     the Board is considering clarifying for the public

23     the risks that are considered in master account

24     requests, we would take that into account in our

25     analysis.