# EXHIBIT E

# [PUBLIC VERSION]

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF WYOMING

3

4        _____

5    CUSTODIA BANK INC.,            )Civil Number
                                    )22-cv-00125-SWS
6        Plaintiff,                 )
                                    )
7    v.                             )
                                    )
8    FEDERAL RESERVE BOARD          )
     OF GOVERNORS and FEDERAL       )
9    RESERVE BANK OF                )
     KANSAS CITY,                   )
10                                  )
         Defendants.                )
11       _____

12

13

                - C O N F I D E N T I A L -

14

15                  Deposition of

16                  TARA HUMSTON

17               November 3, 2023

18                  8:04 a.m.

19

20

21    Reported by:  Bonnie L. Russo

22    Job No. 6153223

CONFIDENTIAL

```
                                          Page 9
 1                   P R O C E E D I N G S
 2                      (8:04 a.m.)
 3
 4                   TARA HUMSTON,
 5        being first duly sworn, to tell the truth, the
 6            whole truth and nothing but the truth,
 7                  testified as follows:
 8        EXAMINATION BY COUNSEL FOR PLAINTIFF
 9               BY MR. SCARBOROUGH:
10        Q.    Ms. Humston, good morning.  My name
11   is Ryan Scarborough.  I represent Custodia
12   Bank.
13               How long have you worked at the
14   Kansas City Fed?
15        A.    25 years.
16        Q.    And have you ever worked at the
17   board of governors?
18        A.    No.
19        Q.    If I refer to the board, do you
20   understand that to refer to the board of
21   governors?
22        A.    Yes.
```

Page 12

1          A.    That is correct.

2          Q.    And custodial services is just a

3    fancy term for like a safe deposit box, right?

4          A.    I wouldn't necessarily use that

5    definition.  I'm not sure if that's how it's

6    defined.

7          Q.    Is a safe deposit box one form of a

8    custodial service?

9          A.    Yes.

10          Q.    And there are other forms as well,

11    correct?

12          A.    That is correct.

13          Q.    State-chartered banks are permitted

14    to do anything that national banks can do,

15    right?

16               MR. MICHAELSON:  Objection.  Form.

17               THE WITNESS:  Yes.  I believe most

18    -- yes, banks are permitted to do anything a

19    national bank is permitted to do.

20               BY MR. SCARBOROUGH:

21          Q.    And their abilities to provide

22    banking services are coextensive of what

1          A.    I would say it's been a novel

2     activity that's come into banking.

3          Q.    And there are banks in the Federal

4     -- excuse me.

5               There are banks in the Federal

6     Reserve system that provide custodial services

7     for digital assets, right?

8          A.    Yes, I believe that's correct.

9          Q.    And examples of banks are -- include

10    -- strike that.

11              Examples of banks that provide

12    custodial services for digital assets include

13    Bank of New York Mellon, right?

14              MR. MICHAELSON:  I just instruct you

15    not to answer that question to the extent it

16    would reveal confidential supervisory

17    information confidential to the Fed.  If you

18    know, you can answer this question based on

19    publicly available information.  You can

20    answer.

21              THE WITNESS:  I'm not sure if what I

22    know is public or not in talking to my New York

CONFIDENTIAL

Page 18

1          Q.    Now, there is nothing illegal about

2     a bank providing custodial services for

3     cryptocurrency assets, right?

4          A.    At this time I'm not aware of it

5     being illegal.

6          Q.    Would you agree it's a legally

7     permissible activity?

8               MR. MICHAELSON:  Objection.  Form.

9               THE WITNESS:  Legally permissible to

10    custody those assets.

11              BY MR. SCARBOROUGH:

12         Q.    Are you aware that the OCC permits

13    national banks to provide custodial services

14    for crypto assets?

15         A.    I believe that's their regulation.

16         Q.    Do you know that the OCC issued an

17    interpretive letter in July 2020 opining that

18    providing custodial services for crypto assets

19    is a legally permissible activity?

20         A.    Yes, I know the OCC issued that

21    letter.

22         Q.    And that's around the same time that

Page 24

1              MR. MICHAELSON:  Objection.  Form.

2              THE WITNESS:  No, I was not working

3       with them directly.

4              BY MR. SCARBOROUGH:

5       Q.     Were there people at the Kansas City

6       Fed who worked directly with representatives of

7       Wyoming in connection with the SPDI

8       legislation?

9       A.     I wouldn't consider it working with

10      them, but I do know some from my team had

11      reviewed drafts and had discussions.

12      Q.     Would it be fair to characterize it

13      as consultation?

14      A.     I can't speak -- I wasn't part of

15      those conversations, but they sent us drafts to

16      review.

17      Q.     Who from your staff had -- had

18      discussions with representatives from Wyoming?

19      A.     To my knowledge, it was primarily

20      Jackie Nugent.

21      Q.     Did Esther George?

22      A.     Esther did have a conversation or --

Page 25

1       I can't speak to how many.  I know she had some

2       contact at some point.

3            Q.    And did her contacts include

4       speaking with the commissioner of the Wyoming

5       Division of Banking, Albert Forkner?

6            A.    I do recall her saying she had

7       talked with Albert Forkner.

8            Q.    And did you have any conversations

9       with Wyoming representatives?

10           A.    At the time Albert would have been

11      the commissioner of Wyoming, and so in

12      supervising institutions in Wyoming, I would

13      have had periodic contact with Albert.  I don't

14      recall a specific meeting just to discuss the

15      SPDI charter.

16           Q.    You mentioned that you had regular

17      conversations with Wyoming more generally in

18      connection with their supervision -- was that

19      in connection with their supervision of

20      entities in Wyoming?

21           A.    Yes.  We work with the state

22      commissioners on the institutions that we

CONFIDENTIAL

1      jointly supervised through the dual banking

2      system.

3           Q.    Okay.  Do you have any criticism of

4      the Wyoming Division of Banking?

5           A.    No specific -- it's not a criticism,

6      but we often help some of our state

7      counterparts because they lack the resources to

8      be able to supervise some of the entities in

9      their state.

10          Q.    Did Wyoming have experience

11     personnel performing supervisory roles?

12          A.    For traditional banking charters,

13     they had staff that were -- had the skill set

14     needed to supervise traditional bank charters.

15          Q.    They were qualified?

16               MR. MICHAELSON:  Objection.  Form.

17               THE WITNESS:  Qualified for what?

18               BY MR. SCARBOROUGH:

19          Q.    For supervising traditional bank

20     charters, as you said?

21          A.    They had individuals I think our

22     team would say were qualified.

CONFIDENTIAL

Page 27

1      Q.    And they had individuals who were
2   also competent, correct?
3      A.    Competent in...?
4      Q.    Supervising traditional bank
5   charters.
6      A.    I think if we say they were skilled,
7   they would be competent in supervising a
8   traditional bank charter.
9      Q.    And they had individuals who were
10   well trained in supervising traditional bank
11   charters, right?
12      A.    Wyoming Department of Banking had
13   training available to their examiners.  Some of
14   the states rely on the Federal Reserve's
15   training, so I don't know to what extent their
16   state relied on ours, but many of our states
17   are not able to fully utilize their own
18   training programs.
19      Q.    But your experience with Wyoming was
20   that they -- the individuals you dealt with
21   were well trained, correct?
22      A.    I don't deal with many of their

Page 28

1    examiners directly, so I don't have personal

2    representation on the training level of their

3    staff.  But more generally I think my team

4    found they have examiners that would be skilled

5    in their job.

6        Q.    Now, in spending -- in developing

7    the SPDI legislation, Wyoming had several years

8    of experience and focus on learning and

9    developing a cryptocurrency supervisory regime;

10   is that fair?

11       A.    I -- I don't know that they trained

12   their exam staff on that supervisory regime.

13   My understanding is they worked with an

14   external party to develop a supervisory regime,

15   and I heard from Commissioner Forkner at the

16   time that they were working with them to

17   develop the supervisory program.  But to the

18   extent their team was ever trained on that

19   program, I don't know how successful that was.

20       Q.    Would it be fair to say that at the

21   time you -- the Kansas City Fed received the

22   first request for a master account from a SPDI

Page 38

1      terminology here.  You say legal to apply for a

2      master account.

3              Do you understand that to mean the

4      same thing as being legally eligible for a

5      master account?

6          A.    To be legally eligible to apply for

7      a master account.

8          Q.    Okay.  And so that determination as

9      to whether Custodia was legally eligible to

10     apply for a master account was made by the

11     board of governors, wasn't it?

12         A.    I don't recall.

13         Q.    Okay.  Do you have any reason -- any

14     basis to dispute that that determination was

15     made by the board of governors?

16         A.    I can't say either way.

17         Q.    Would you agree that Custodia's

18     request for a master account was one of several

19     applications that presented the policy question

20     about whether a novel chartered institution

21     should get access to the payment system?

22              MR. MICHAELSON:  Objection.  Form.

CONFIDENTIAL

Page 39

1                    THE WITNESS:  Custodia was one of

2          other entities that were bringing this question

3          to light.

4                    BY MR. SCARBOROUGH:

5               Q.   Was Custodia the first

6          SPDI-chartered institution to request a master

7          account?

8               A.   Yes, I believe they were the first.

9               Q.   Let me hand you a document which

10         we'll mark as Exhibit 147.

11                   MR. SCARBOROUGH:  Oh, let's not mark

12         this one as 147.

13                   THE COURT REPORTER:  Let's not?

14                   MR. SCARBOROUGH:  Yeah.  I

15         apologize.  Can we take the sticker off?

16                   (Discussion off the stenographic

17         record.)

18                   BY MR. SCARBOROUGH:

19              Q.   So I'm going to hand you a

20         document -- sorry.  Yeah.  I'm going to hand

21         you a document that has been marked as Exhibit

22         10.  I will try to catch that next time.

CONFIDENTIAL

Page 191

```
 1              A.      True.
 2              Q.      Okay.  How long does it typically
 3       take for a master account to be --
 4              A.      For a traditional --
 5              Q.      -- decided?
 6              A.      -- commercial bank, it can be done
 7       in a week's time or less.
 8              Q.      Okay.  In terms of the time line
 9       that you referenced here about the time line is
10       probably, technically accurate about -- is that
11       referencing the fact that the request just sat
12       at the Fed before Custodia was hit out of left
13       field with the proposed account access
14       guidelines?
15                      MR. MICHAELSON:  Objection.  Form.
16                      THE WITNESS:  No.  I mean, in the
17       e-mail, we are not seeing an attached picture.
18       I may have been referring to that.  I don't --
19       I don't recall what that looked like.
20                      But, I mean, I would be speculating
21       to say if I am referring to what was in the
22       picture attached --
```

1      for what?  Supervisory --

2            A.     Supervision and regulation.

3            Q.     Oh, supervision and regulation.

4                   Okay.  And an SR letter is different

5      than an S letter, correct?

6            A.     Yes.

7            Q.     Do you know what the S for S letter

8      stands for?

9            A.     I do not.

10           Q.     Okay.  And so with SR letters, you

11     see those frequently in your role at the Kansas

12     City Fed, correct?

13           A.     Yes, I would say I see those on a

14     regular cadence.

15           Q.     Okay.  With regard to an S letter,

16     the only time in your experience that you have

17     seen one is the S letter that was issued in

18     connection with implementing or

19     operationalizing the account access guidelines;

20     is that fair?

21           A.     To my recollection, that's the only

22     one.

Page 331

1      to identify which public officials were being

2      referenced in your letter concerning the

3      responsible development of digital assets and

4      their integration into the financial system?

5          A.    Yeah.   As I said in the deposition I

6      think three times here just now, I do not know

7      who that is referring to in these public

8      officials.

9          Q.    Okay.   And turning to the second

10     page of the letter, in the --

11         A.    In the draft or the letter?

12         Q.    Oh, I'm sorry.   Exhibit 158, the

13     final letter.

14              In the penultimate paragraph, you

15     start out:   "We understand the urgency with

16     which you will need to make business decisions

17     for Custodia," and then you say:   "I hope that

18     you understand the precedent-setting decision

19     involving nontraditional charters and new

20     activities is one that the Federal Reserve Bank

21     of Kansas City must weigh carefully."

22              Was that your view at the time, that

Page 332

1       the decision on whether to grant Custodia a

2       master account was a precedent-setting decision

3       for nontraditional charters?

4            A.    Yes.  From very early on I think

5       since the formation of the SPDI charters, we

6       had felt that -- that nontraditional nature and

7       the word of being "nontraditional" or "novel,"

8       that would be precedent setting, because in my

9       mind nontraditional and novel means it's one of

10      the first times you're seen in an early stage.

11      So it would be the first of its kind.

12               And so any other federal district

13      getting a request or having a state form, a

14      state charter, this would be influential to

15      another reserve bank's decision.

16           Q.    Okay.  And this letter would have

17      gone out to the Custodia on April 15, 2022,

18      right?

19           A.    That would be my understanding the

20      way it's stated.

21               MR. SCARBOROUGH:  Okay.  I'm going

22      to hand you what we'll mark as Exhibit 160.

CONFIDENTIAL

Page 360

1      Q.   What's your understanding of who

2   would have had input on the recommendation memo

3   to Esther George?

4      A.   That we were writing to Esther, it

5   would have -- if -- I don't know what Chris,

6   his involvement was in the memo itself, but

7   Christi May-Oder and Judith Hazen, myself, and

8   we would have asked for our legal colleagues to

9   ensure that we -- since we are under this

10   lawsuit, they would be reviewing it as well

11   from a legal basis.

12      Q.   Okay.  So Christi May-Oder, Judith

13   Hazen, your legal colleagues, and yourself

14   would have had input on it.  You're not aware

15   of whether Chris Gaul-Pearson did.

16          Anybody else that you're aware of

17   having input on the recommendation memo to

18   Esther George?

19      A.   I mean, I don't know if Chris

20   Gaul-Pearson -- I mean, he reports to Christi,

21   so she may have assigned it to him or someone

22   on her team to begin the beginnings of a memo.

CONFIDENTIAL

Page 361

1          But, no, I'm not aware of others.

2               Q.    Do you know whether anybody from the

3          board of governors edited the memo before it

4          was provided to Esther George?

5               A.    I would not be aware of that.

6               Q.    Okay.  Would it be appropriate for

7          anybody at the board of governors to edit the

8          memo to Esther George?

9               A.    If there was a component where we

10         were speaking on behalf of something

11         represented by the board, our team might

12         consult with the board on a particular part, if

13         we are representing something that falls with

14         the board of governors's realm.

15                    But in this case, I don't recall if

16         that was necessary.

17              Q.    What parts of the recommendation

18         memo relating to Custodia master account

19         request would have been appropriate for the

20         board of governors to comment or edit on or

21         edit?

22              A.    I would only think of the legal

CONFIDENTIAL

Page 403

1      before that could be communicated to Custodia?

2          A.    Could you say that once again --

3          Q.    Sure.

4          A.    -- is that my understanding or are

5      you saying --

6          Q.    Yes, I am asking about your

7      understanding.

8          A.    It was my understanding we needed to

9      wait for Matt Eichner to respond to what we had

10     sent him.

11         Q.    Was it also your understanding that

12     this response from Matt Eichner needed to occur

13     before the board voted on the membership

14     application?

15         A.    No, that was not my understanding.

16         Q.    Okay.  Was it your understanding

17     that the Kansas City Fed was going to wait to

18     issue its denial of Custodia's master account

19     request until the board of governors informed

20     Custodia that its membership application was

21     denied?

22         A.    That was a decision we were weighing

CONFIDENTIAL

1      locally in that did it make sense for us to

2      hold our denial letter in case the board went a

3      direction we were not expecting because we had

4      recommended denial.  We did not -- I did not

5      know with certainty if any of the governors had

6      different views, and it was -- their vote would

7      come out differently.

8              And so of the vote came out

9      differently, it might cause us to rethink our

10     analysis because some of the factors that we

11     had included -- maybe the fact pattern would

12     change if they were a member institution.

13         Q.    So the next morning the board of

14     governors voted 7-0 to deny membership to

15     Custodia; is that correct?

16         A.    Yes.

17         Q.    And they issued a denial letter that

18     morning, right?

19         A.    I don't know when it was in the day.

20     I believe it was morning.

21         Q.    Okay.  Is it your understanding that

22     the rollout of the denial of the membership and