# EXHIBIT J

# [PUBLIC VERSION]

```
                                          Page 1
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF WYOMING
 2
 3
        CUSTODIA BANK, INC.,        )
 4                                  )
                       Plaintiff,   )
 5                                  )
        v.                          )
 6                                  ) 1:22-cv-00125-SWS
        FEDERAL RESERVE BOARD       )
 7      OF GOVERNORS AND            )
        FEDERAL RESERVE BANK OF     )
 8      KANSAS CITY,                )
                                    )
 9                     Defendants.  )
10
11
12              * DESIGNATED CONFIDENTIAL *
13            * SUBJECT TO A PROTECTIVE ORDER *
14
15
16              ZOOM/IN-PERSON DEPOSITION OF ESTHER
17      GEORGE, a Witness, taken remotely on behalf of
18      the Plaintiff before Peggy E. Corbett, CSR, CCR,
19      RDR, pursuant to Notice on the 9th day of
20      November, 2023, at the offices of the Federal
21      Reserve Bank of Kansas City, 1 Memorial Drive,
22      Kansas City, Missouri 64198.
23
24
25
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 12

1          A.    He was a good working associate here and

2     served well as a director of our bank.

3          Q.    All right.  I take it given your 40-year

4     involvement you have pretty good general

5     understanding of the operations of the Kansas

6     City Federal Reserve Bank, would that be a fair

7     statement?

8          A.    I do think I have a broad understanding

9     of this bank's operation.

10         Q.    So tell me, you started here at the

11    Kansas City Fed approximately two years after the

12    Monetary Control Act of 1980 was passed by

13    Congress; is that your understanding?

14         A.    I joined in 1982, and the Monetary

15    Control Act was in 1980, yes.

16         Q.    Tell me what your general understanding

17    is as to what the Monetary Control Act did in

18    regard to changes with the Federal Reserve Bank

19    system.

20         A.    My understanding of the changes had to

21    do with levelling the playing field and really

22    setting in motion pricing standards for the

23    Reserve Banks, in terms of how they deliver

24    services, making them not exclusive to member

25    banks, but opening them up for non-member banks,

Page 15

1     Q.   Do you know, is there a similar Annual
2     Report for the Kansas City Federal Reserve that
3     references what the changes in the Monetary
4     Control Act really mean?
5                 MR. MICHAELSON:  Objection, form.
6     A.   I would not know here what the 1980
7     report of the Kansas City Fed would have said.
8     There was not a standard form.  Each bank would
9     have developed their presentation based on their
10    own judgments.
11    Q.   (BY MR. ORTIZ)  Earlier when you told me
12    that your understanding of the Monetary Control
13    Act was that it leveled the playing field that
14    really meant that State-chartered banks were
15    entitled to access Federal services, basically
16    access to the Federal Reserve system, correct?
17                MR. MICHAELSON:  Objection, form.
18    A.   My understanding of the Monetary Control
19    Act is it no longer made a distinction between
20    those that were members of the Federal Reserve
21    and those that were not, in terms of access to
22    services and their pricing.
23    Q.   (BY MR. ORTIZ)  So when you are not a
24    member of a member bank, you're typically a
25    State-chartered bank; is that correct?  That's a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 16

1    non-member bank?

2        A.   A State-chartered bank can be a member

3    bank, yeah.

4        Q.   Sure, but most non-member banks are

5    State-chartered banks, true?

6        A.   That would be true.

7        Q.   And you're saying what the Monetary

8    Control Act said, you can be a State-chartered

9    non-member bank and you have to be given access

10   to Federal services; is that correct?

11               MR. MICHAELSON:   Objection, form,

12   misstates prior testimony.

13       Q.   (BY MR. ORTIZ)  Is that your

14   understanding?

15       A.   It eliminated the distinction between

16   member banks and non-member banks.

17       Q.   And that's what you meant when you said

18   it levels the playing field?

19       A.   That's what I meant.

20       Q.   So back when you started in '82, and

21   maybe for the first 15 years or more there was no

22   such thing or no term that you called the master

23   account, was there?

24       A.   I'm not sure.

25       Q.   Can we agree, say at least starting at

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 24

1    they were interfacing with your team, correct?

2        A.   I did understand they wanted access to

3    an account at the Federal Reserve Bank of Kansas

4    City.

5        Q.   That was the whole point; draft

6    something that would qualify as a depository

7    institution, in order to get a master account,

8    correct?

9             MR. MICHAELSON:  Objection, form.

10       A.   Actually it was one of the early

11   questions we raised about whether that made the

12   institution viable --

13       Q.   (BY MR. ORTIZ)  Sure.

14       A.   -- or whether there were other options

15   to them.

16       Q.   And you knew early on that that was a

17   big goal of a SPDI-chartered depository

18   institution, to be able to get a master account

19   and access Fed services?

20       A.   I did understand that.

21       Q.   All right.  So did you ever direct any

22   representatives from the Kansas City Fed to

23   advise someone at the State of Wyoming that you

24   didn't have policies in place that would allow

25   you to evaluate a SPDI charter like Custodia?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 28

1        MR. MICHAELSON:  Objection, form.

2    A.   I don't recall any meetings that were

3    specifically intended for this.  Our interactions

4    with the State Banking Department covered a

5    broader set of responsibilities that we had.

6        So I would meet a couple of times a year

7    with the State Banking Department about

8    supervisory issues that we shared over

9    State-chartered banks.

10   Q.   (BY MR. ORTIZ)  Do you have a good

11   relationship with the Wyoming State Banking

12   Commission?

13   A.   I believe we do.

14   Q.   Do you have a good relationship with

15   Albert Forkner?

16   A.   I believe we did.

17   Q.   You did at that time, as well?

18   A.   I did, yes.

19   Q.   Did you have respect for him?

20   A.   I did have respect for Albert Forkner.

21   Q.   Respect for the way Wyoming Banking

22   Commission went about supervising their charter

23   banks?

24   A.   Yes.  We worked closely together in the

25   supervision of our State-chartered banks.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

1        Q.    (BY MR. ORTIZ)   Who is Lael Brainard?

2        A.    Lael Brainard was a member of the Board

3    of Governors of the Federal Reserve.

4        Q.    Was there a time that she was a Chairman

5    of the Board of Governors?

6        A.    No, Lael Brainard at one point was the

7    Vice Chair of the Board.

8        Q.    Vice Chair.  Did you have a sense as to

9    her background and experience within the Federal

10   Reserve system?

11       A.    Lael Brainard is a highly regarded

12   economist and policymaker.

13       Q.    You had conversations with Lael Brainard

14   where she specifically told you under the

15   Monetary Control Act you didn't have the

16   authority to deny Custodia a master account,

17   didn't she?

18       A.    Lael Brainard did not at any point tell

19   me I did not have authority.

20       Q.    Never anything in that context at all?

21             MR. MICHAELSON:   Objection, form.

22       A.    I'm not sure what you mean about

23   context.

24       Q.    (BY MR. ORTIZ)   The context of you

25   somehow just saying, "I have discretion, I can

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 39

1    deny this master account at any time."  Didn't

2    you have specific conversations with Lael

3    Brainard about that?

4        A.   I had conversations with Lael Brainard

5    about the threshold issue of eligibility for this

6    particular charter.

7        Q.   But you don't think she told you if they

8    were eligible, they had to have a master -- you

9    had to give them a master account?

10       A.   Lael Brainard did not at any point tell

11   me to grant nor deny a master account.

12       Q.   Did you have conversations with Senator

13   Cynthia Lummis about the issue of whether you

14   were obligated under the Monetary Control Act to

15   give Custodia a master account?

16       A.   I had at least one, and maybe two

17   conversations with Senator Lummis at her

18   requests.

19       Q.   Did Senator Lummis advise you that her

20   office's interpretation of the law was the

21   Monetary Control Act required you to give

22   Custodia a master account if they were an

23   eligible depository institution?

24       A.   I believe the Senator did have that

25   view.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 41

1    without naming names or based on public

2    information, that you're not divulging

3    confidential information of the bank.

4              MR. ORTIZ:   I think given the

5    change in the law, Counsel, I don't think that's

6    confidential at all, but you --

7         A.   Would you please ask your question

8    again.

9         Q.   (BY MR. ORTIZ)  Sure.  You just told me

10   that it's long been your practice that regardless

11   of legal eligibility for a master account, you

12   could still evaluate them and deny a master

13   account; is that right?  Is that what you're

14   telling me?

15        A.   That is correct.

16        Q.   So I want to know, give me an example in

17   the last 25 years where an eligible depository

18   institution was denied a master account, other

19   than Custodia.

20             MR. MICHAELSON:   Same objections,

21   but go ahead.

22        A.   I can think of one case.

23        Q.   (BY MR. ORTIZ)  Okay, who was that?

24        A.   Four Corners.

25        Q.   All right, and Four Corners Bank was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1      dealing with the question of legal
2      permissibility, since they were going to be
3      dealing with marijuana sales and growers, and
4      that was in contradiction of Federal law, right?
5          A.   That was among the issues that we were
6      addressing.
7          Q.   Sure, right.  Other than Four Corners
8      Bank that had a conflict between the Federal Drug
9      Control Act which said you can't buy and sell
10     marijuana, in conflict with Colorado law that
11     said you could, can you give me any other example
12     of a depository institution that is conducting
13     legally permissible activities and is also
14     legally eligible for a master account, where it's
15     been denied by the Kansas City Fed?
16         A.   I do not have any examples right now.
17         Q.   There is not -- there isn't one, is
18     there?  Custodia is the only one, isn't it,
19     ma'am?
20         A.   I am not aware if they are the only one,
21     but I don't recall that.
22         Q.   And you would probably be the person,
23     given your tenure at the Fed, 40 years being
24     involved in this, you would be the one person
25     that would probably have that historical

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 43

1    knowledge, agreed?

2         A.   I have a long-standing experience with

3    these institutions, yes.

4         Q.   And I'm not implying anything with age.

5    I'm just implying you're kind of the keeper of

6    the historical knowledge over the last 30 or 40

7    years, aren't you --

8              MR. MICHAELSON:   Objection, form.

9         Q.   (BY MR. ORTIZ)   -- for the Kansas City

10   Fed?

11             MR. MICHAELSON:   Lack of

12   foundation.

13        A.   I am not a keeper of the information.

14   This is an institution that has deep

15   institutional knowledge.

16        Q.   (BY MR. ORTIZ)   But one thing that was

17   determined early on in this case was that holding

18   crypto-assets in a custodial relationship, that

19   was not legally -- that was determined to be a

20   legally permissible activity early on by the OCC,

21   wasn't it?

22             MR. MICHAELSON:   Objection, form.

23        A.   I believe the OCC had made judgments

24   around its special charter.

25        Q.   (BY MR. ORTIZ)   Sure, and said it was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 44

1    legally permissible to do so, right?

2         A.   I believe they did.

3         Q.   And you also knew that there were member

4    banks within the system doing the same thing that

5    Custodia wanted to do, correct?

6              MR. MICHAELSON:  Objection, form.

7         A.   I did not have access to the

8    confidential supervisory information of other

9    institutions, and really had only available to me

10   the public pronouncements, news articles, press

11   releases that those institutions would have

12   offered.

13        Q.   (BY MR. ORTIZ)  So from just a public

14   knowledge standpoint, you knew that BNY Mellon,

15   State Street, other institutions were engaged in

16   the same activities that Custodia was trying to

17   become involved in, correct?

18             MR. MICHAELSON:  Objection, form.

19        A.   I was aware these activities were being

20   described, but in the context of a very different

21   legal and regulatory framework for insured

22   depository institutions than the one we were

23   looking at with the SPDI charter.

24        Q.   (BY MR. ORTIZ)  Just because they were

25   state -- or excuse me, because they were Federal

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1    issued their letter, correct?

2        A.   I was not aware that this activity was

3    legally permissible.

4        Q.   Really?  You did not have information

5    from other sources that the OCC had issued an

6    advisory letter that this type of activity,

7    custodial activity with crypto-assets was, in

8    fact, legally permissible?

9             MR. MICHAELSON:  Objection, form.

10       A.   I would have understood that the OCC

11   believed that it was permissible for a national

12   bank.

13       Q.   (BY MR. ORTIZ)  Well, was that not good

14   enough for you?

15       A.   We were dealing with State-chartered

16   institutions, and again, the Wyoming legislation

17   had created a bespoke regulatory structure that

18   did not include Federal supervision under the

19   existing framework.

20       Q.   Well, you agree that the whole concept

21   of the Monetary Control Act is that you can't

22   allow member banks to do something, but then tell

23   State-chartered banks it's illegal them for them

24   to do it, right?

25             MR. MICHAELSON:  Objection, form.

Page 47

1      A.    The Monetary Control Act was focused on

2    the financial services provided by the regional

3    Reserve Banks, and not the broader regulatory

4    framework of the banking agencies.

5      Q.    (BY MR. ORTIZ)   How do you know that?

6      A.    Because we would apply the Monetary

7    Control Act provisions to our provision of

8    financial services and the access to a Federal

9    Reserve banking account.

10     Q.    Because the Federal, the Monetary

11   Control Act says all State-chartered banks are

12   entitled to all Federal services.   That's what

13   Monetary Control Act says, right?

14            MR. MICHAELSON:   Objection, form,

15   misstates the statute.

16     Q.    (BY MR. ORTIZ)   True?

17     A.    The Monetary Control Act allowed for

18   equal access to those services as a legal

19   eligibility requirement.

20            (Exhibit 176 was marked by the

21   reporter for identification.)

22     Q.    (BY MR. ORTIZ)   So I'm handing you what

23   we've marked as Deposition Exhibit 176 which is

24   the Interpretive Letter Number 1170, July, 2020

25   from the Office of the Comptroller of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 50

1      of Governors to answer those questions for you?

2          A.   Our staff would have had long-standing

3      relationships with the Board staff, who would

4      have dealt with these issues both at a policy

5      level, at a risk level, and that's where the

6      initial conversations took place.

7          Q.   So let's kind of break down when you're

8      analyzing whether Custodia could get a master

9      account in your view, tell me the specific issues

10     that you needed the Board Of Governors to make a

11     decision on versus something you think you can do

12     at the Kansas City Fed level.

13                MR. MICHAELSON:  Objection, form.

14         Q.   (BY MR. ORTIZ)  So I think you talked

15     about legal permissibility; is that right?

16         A.   Right.  So as we approached this issue

17     there were really in my mind three parts to this.

18     One was the threshold issue of legal eligibility.

19     The entity that normally issues routing transit

20     numbers had flagged this for the Reserve Bank

21     without issuing.  They had asked the question

22     about whether the institution was legally

23     eligible.  So that was a threshold question for

24     us.

25                The second question was the nature of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 51

1    the activity itself, the framework with which

2    that activity would occur; in other words a

3    State-chartered entity that did not have Federal

4    supervision, and we were seeking the Board's

5    input as part of our decision-making to

6    understand was that raising broader policy issues

7    that we would need to take into account.

8         Q.   So the Board has to make --

9              MR. MICHAELSON:   Hold on.   Let the

10   witness finish.

11        Q.   (BY MR. ORTIZ)   Go ahead, I'm sorry.

12        A.   And the third question which was one

13   that we always involve is assuming those things

14   were affirmed, then we would make our independent

15   risk assessment around whether the institution

16   should be granted access.

17        Q.   Were there other considerations that the

18   Board had to weigh in on that you could not do on

19   your own, other than what you have just described

20   for me?

21        A.   Those were the general issues,

22   interpretation of law as it related to legal

23   eligibility, and consistency with a broader

24   policy framework, regulatory framework.

25        Q.   How about the whole issue of monetary

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 60

1    by nominee Powell, whether he was going to be
2    Chairman of the Federal Reserve Board,
3    representations he made to Cynthia Lummis about
4    maybe moving this forward on the process, agreed?
5    That's how that timing worked out?
6                    MR. MICHAELSON:  Objection, form.
7         A.   I would not have been privy to the
8    conversations between Chairman Powell and Senator
9    Lummis.
10        Q.   (BY MR. ORTIZ)  Did you attend any of
11   the hearings or watch any of the hearings and
12   statements he made, questions raised by Senator
13   Lummis when he was going through the confirmation
14   process?
15        A.   I did not watch those confirmation
16   hearings.
17                    MR. ORTIZ:  Do you want to take
18   about a 7-minute break.
19                    MR. MICHAELSON:  Sure.
20                        (Brief recess taken.)
21        Q.   (BY MR. ORTIZ)  I want to talk about a
22   couple of other -- you know, I was asking about
23   people that may have made comments to you.  Do
24   you remember after Custodia had submitted its
25   application and put in all the materials, having

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    a conversation with Tara Humston where she said,

2    "Listen, I don't think there's any show-stoppers

3    here.  It looks good to go"?

4               MR. MICHAELSON:  Objection, form.

5        A.    I do remember I had multiple

6    conversations with Tara.  The term "show-stopper"

7    I recall was in the context of, "Do you have any

8    more information that you need?"

9        Q.    (BY MR. ORTIZ)  Okay.  Explain that to

10   me.

11       A.    So in our consideration of factors that

12   will influence our decision, our understanding of

13   risk, we will go back to the requesting party, to

14   the applicant to fill any gaps in information

15   that we think we don't have.

16               Those might be policies.  They might be

17   a business plan.  They may be artifacts that we

18   think are relevant to our decision-making.

19       Q.    (BY MR. ORTIZ)  So did Tara tell you

20   that she told Caitlin Long, "There's no

21   show-stoppers with your application," did she

22   report that to you?

23       A.    I was aware of that frame, and in the

24   context of my conversation with Tara, my

25   understanding was, "Do we have all the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1    information from Custodia that is relevant to our
2    analysis?"
3        Q.    And the report to you was, "Yes, and I
4    don't see any show-stoppers?"
5        A.    I am aware of that, yes.
6        Q.    That was her comment back to you?
7        A.    That was her comment.
8        Q.    And Tara, and I don't, just
9    colloquially, was she kind of like your
10   right-hand person on a lot of these issues?
11       A.    Tara reported to me as the head of our
12   Division of Bank Supervision.
13       Q.    Would it be fair to say you interfaced
14   with her with direct contact as much as anyone on
15   your team?
16       A.    I did have regular status meetings with
17   Tara.
18       Q.    Is that something where when you're in
19   town, you probably see and talk to her daily?
20       A.    It may not be every day, but we worked
21   on the same floor and I could contact her.
22       Q.    Is she one of those people, did you have
23   like a select few that had your cell number and
24   had the green light to call you any time they
25   wanted to?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 85

1      interject, same objection regarding the Board's

2      assertion to the deliberative process.  I think

3      it's okay to answer the question with yes or no,

4      whether you had concerns, but I instruct you not

5      to get into the substance of what the draft S

6      letter looked like, or the nature of any

7      questions or concerns or comments that FRBKC had

8      with respect to a draft S letter.

9          Q.   (BY MR. ORTIZ)  Is that correct, you had

10     concerns about the S letter?

11         A.   I had concerns of whether the S letter

12     was necessary, given our long-standing practice

13     of consulting with the Board whenever we were

14     raised with unique or novel questions.

15         Q.   That was the only concern you had?

16         A.   That was my fundamental concern.

17         Q.   Were there other concerns?

18         A.   I did not see the S letter as changing

19     our authorities in any way, so I'm not sure I

20     understand your question.

21         Q.   What is, had you ever seen an S letter

22     before directing you to do something at the

23     Kansas City Fed?

24         A.   The Board of Governors uses S letters as

25     a guidance form across The Reserve Banks for the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 86

1    Federal Reserve system, to ensure consistent

2    understanding of various expectations.

3        Q.   When you -- I'm sorry for interrupting

4    you.  When you get an S letter from the Board of

5    Governors, do you follow it?  Do you follow the

6    directives of the S letter?

7        A.   That would be the expectation.

8        Q.   You can't just ignore it, correct?

9        A.   You should not ignore it.  It would be

10   our practice to follow the expectations.

11       Q.   You get slapped by the mother ship if

12   you ignore the S letters, right?

13            MR. MICHAELSON:  Objection, form.

14       A.   Our expectation is that we want to

15   follow consistent practices.

16       Q.   (BY MR. ORTIZ)  Sure.  So this is -- and

17   in the context of this S letter and these account

18   access guidelines really are applying directly to

19   novel institutions like Custodia, agreed?

20            MR. MICHAELSON:  Objection, form.

21       A.   No actually the guidelines are clear

22   that they apply to all institutions that have

23   access to Fed accounts.

24       Q.   (BY MR. ORTIZ)  Were the S letter and

25   the account access guidelines being circulated in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 88

1    being able to communicate to potential requestors

2    for these accounts, with the expectations that we

3    had.

4         Q.   So if we look at, when you said that the

5    guidelines, or this was published for public

6    comment, the S letter is not public.  That is a

7    private document, is it not?

8         A.   That would be internal to the Federal

9    Reserve.

10        Q.   Sure, so if we look at the first couple

11   of pages of Exhibit 34 and we see things like

12   Board expectations, Board consultation process,

13   that type of stuff, that was never disseminated

14   to the public, was it?

15        A.   Unless it was part of the guidelines,

16   that's what the public would have seen in terms

17   of any of those characterizations.

18        Q.   And in fact, it was never in writing at

19   any time before that you had to give

20   predecisional drafts and memos to the Board of

21   Governors to weigh in on when you were making

22   decisions on master accounts.  That was never in

23   writing anywhere before this S letter, was it?

24        A.   I'm not aware that that was in writing.

25        Q.   And, in fact, that wasn't the practice

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 101

1          A.    October of 2020.

2          Q.    (BY MR. ORTIZ)  I apologize.

3                MR. SCARBOROUGH:  Good objection.

4          Q.    (BY MR. ORTIZ)  I apologize -- has been

5     pending with you for basically 5 or 6 months,

6     correct?

7          A.    That is correct.

8          Q.    Just as an aside how long was it -- did

9     it normally take to assess risk on an institution

10    and give them an answer yea or nay on a master

11    account?  That can be done in a couple of months

12    typically, can't it?

13         A.    Yes, under routine circumstances it

14    typically moves quicker.

15         Q.    So we're maybe six months in the

16    process, you're having, and this looks like to be

17    a phone call with President George and Governor

18    Brainard to discuss a new proposal from TCH.

19    What does that mean?  What's TCH?

20         A.    TCH is the acronym for the

21    clearinghouse.  It's an association of the

22    largest banks.

23         Q.    So I want to go down and look at your

24    notes there.  It says, "Call with Bill," is it

25    "Demchak"?

Page 171

1      Q.   So have you ever seen Exhibit 185 which
2  are basically the questions and answers
3  associated with this letter from the Board of
4  Governors?
5      A.   I don't remember these frequently asked
6  questions but --
7      Q.   Did you have a general understanding
8  from any of your staff at the time that basically
9  if you were a member bank you could start
10  engaging in crypto-related asset activity and all
11  you had to do was give notice to your supervisor?
12     A.   Yes, I would have been aware of this
13  guidance.
14     Q.   So what this means is if you are a
15  member bank, you can do exactly what Custodia was
16  doing.  You don't even have to ask permission.
17  You simply give notice that you're doing it,
18  right?
19               MR. MICHAELSON:  Objection, form.
20     A.   This was a requirement to give notice.
21  It wasn't an assessment of the risk associated
22  with these activities.
23     Q.   (BY MR. ORTIZ)  So Custodia has been
24  waiting now almost two years.  We're at August of
25  '22.  They have been waiting two years.  You get

Page 193

1      A.   It is a first level supervisory

2    position.

3      Q.   And the CRRM Department is -- kind of

4    basically has got the lead on the whole risk

5    assessment with Custodia, right?

6      A.   That would be their area of

7    responsibility, yes.

8      Q.   So I want to look at this.  It says,

9    "Good afternoon.  CRRM is working on a memo to

10   Esther regarding a potential decision on

11   Custodia's master account."

12          So this is December 6th, 2022.  Did you

13   have an idea in early December they were working

14   on a memo for you on a potential decision?

15     A.   So I wouldn't put the dates exactly

16   here, but in this timeframe, I would have asked

17   this team to begin to pull together a memo that

18   would state our position in potentially denying

19   this request.

20     Q.   So this also says, "This is moving

21   pretty quick and there are some gaps that Judith,

22   Christi and I would like your help filling in,

23   given you are the experts.  Do you have any idea

24   what that means, what gaps needed to be filled in

25   now that this was moving quick?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 198

1    it.

2        Q.   What I would like to know from you is

3    did you have an understanding as to who actually

4    had drafted the memo that was sent to you in this

5    timeframe in Exhibit 51?

6        A.   My understanding is that our staff did

7    the drafting of this memo.

8        Q.   Just the Kansas City Fed staff?

9        A.   The Kansas City staff, yes.

10       Q.   Do you know if the Board weighed in on

11   multiple occasions and made edits and additions

12   and corrections as to what they wanted that memo

13   to say?

14                   MR. MICHAELSON:  Object to form.

15       A.   I am not aware that they would have been

16   involved in that.

17       Q.   (BY MR. ORTIZ)  That would surprise you

18   if that happened, wouldn't it?

19       A.   It would not surprise me that the staff

20   would be sharing their analysis.

21       Q.   But it would surprise you if someone

22   from the Board started doing rewrites and

23   additions and edits?

24                   MR. MICHAELSON:  Object to form.

25       A.   I don't know if it would surprise me.

                                          Page 240

1      seen in the last 20 years?
2                  MR. MICHAELSON:  Object to form.
3           A.   I wouldn't know.  I wouldn't know.
4           Q.   (BY MR. ORTIZ)  It's pretty rare, isn't
5      it?
6           A.   I would think there would be not many,
7      compared to what we see coming out of the
8      Division of Bank Supervision.
9           Q.   And that would be the SR-type letters?
10          A.   The SR-type letters.
11          Q.   So an S letter that comes and is dealing
12     with these account access issues, can you think
13     of another one that you received other than S
14     letter 2667?
15                 MR. MICHAELSON:  Object to form.
16                 MR. ORTIZ:  2677.
17          Q.   (BY MR. ORTIZ)  Whatever the number is.
18                 MR. MICHAELSON:  Object to form.
19          Q.   (BY MR. ORTIZ)  Have you seen another
20     one other than the S letter in the guidelines
21     we've talked about in this case?
22          A.   No.  Given the nature of the guidelines
23     I saw this S letter as accompanying those as a
24     compliment.
25          Q.   (BY MR. ORTIZ)  And my question is, is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                    Page 241

1     that the only one you've seen say in the last 20

2     years, the S letter?

3                    MR. MICHAELSON:  Object to form.

4          A.   I cannot remember any other S letters.

5          Q.   (BY MR. ORTIZ)  You can't remember any

6     others?

7          A.   It doesn't mean they are not there.  I

8     just don't -- I couldn't name one for you.

9          Q.   Let me hand you what's already in

10    evidence as Exhibit 37.  Is this a copy of the

11    actual denial letter that went out to Caitlin

12    Long at Custodia?

13         A.   Yes, I think this is the SR letter.

14         Q.   And I apologize, you're right.  This was

15    broken down into a short one-page letter that you

16    signed then with an attachment of the summary

17    analysis.

18         A.   Yes.

19         Q.   Okay, so your team did follow your

20    requests there in the last day or two?

21         A.   Yes.

22         Q.   Now did you know that this decision had

23    been leaked out to media sources and was being

24    recorded the day before the letter was issued?

25                    MR. MICHAELSON:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 282

1    on Custodia, and they made it clear to you they

2    would do that, didn't they?

3        A.   That was under a different legal and

4    regulatory framework than our tradition and

5    decades of information sharing.

6        Q.   As to specifically SPDI institutions,

7    Albert Forkner made it clear they were going to

8    share all the information you wanted as to those

9    charters, didn't he?

10       A.   I believe Albert would have been willing

11   to share information.

12       Q.   So this whole issue of you not having

13   data or access to information, that's not true

14   either, is it?

15            MR. MICHAELSON:  Object to form.

16       Q.   (BY MR. ORTIZ)  Because you had

17   everything the Banking Commission in Wyoming had,

18   you could have gotten access to, true?

19            MR. MICHAELSON:  Objection to form.

20       A.   I was not aware that we had any

21   authority to compel that information to be shared

22   with us.

23       Q.   (BY MR. ORTIZ)  Well, if you had

24   information sharing agreements in place with the

25   State of Wyoming for banks that they chartered,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 302

1     they were being managed, in compliance with

2     relevant laws and regulations.

3          Q.   (BY MR. ORTIZ)  Did you know that

4     Custodia was actually invited by your staff to

5     remediate the risks and resubmit their risk

6     management plan?

7          A.   It would not be unusual for an

8     institution that we've raised questions with to

9     come back at another time and resubmit a request.

10         Q.   Would you agree, given the parameters

11    you've talked about, a broad question, if you're

12    a novel start-up wanting to deal with digital

13    assets and you're a State-chartered entity, like

14    Custodia, you can never get a master account.

15    You can't.

16              MR. MICHAELSON:  Object to form,

17    calls for speculation.

18         A.   I can't answer that question.

19         Q.   (BY MR. ORTIZ)  You don't see a pathway

20    for that as you sit here right now, though, do

21    you?

22         A.   I did not see it as of January 27th.

23         Q.   You have been really patient.  That's

24    all the questions I have.

25              MR. MICHAELSON:  No further