# EXHIBIT AH

# [PUBLIC VERSION]

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF WYOMING
 3
 4     CUSTODIA BANK, INC.,
 5                     Plaintiff,
 6     vs.                                  No.
 7     FEDERAL RESERVE BOARD OF             22-cv-00125-SWS
 8     GOVERNORS and FEDERAL RESERVE
 9     BANK OF KANSAS CITY,
10                     Defendants.
11
12
13
14                        CONFIDENTIAL
15
16
17
18          CONFIDENTIAL DEPOSITION OF CHRISTI
19     MAY-ODER, a Witness, taken on behalf of the Plaintiff
20     before Kelsey Robbins Schmalz, CSR No. 1571,
21     CCR No. 1148, RPR, pursuant to Notice on the 19th of
22     October, 2023, at the Federal Reserve Bank of Kansas
23     City, 1 Memorial Drive, Kansas City, Missouri.
24
25
```

Page 72

1     any additional information.
2            Q.     So I'll represent to you just to save
3     some time they applied for their master account in
4     October of 2020, so assuming that that's true, how
5     long did it take to do the credit and risk management
6     assessment for Custodia?
7            A.     So early on based off the information
8     that we had initially, we didn't have much to go on,
9     and so -- so we could have ended our review very,
10    very early on because we -- they didn't have a lot of
11    the documentation that we needed in order to assess
12    some of these areas, so that's why there was such a
13    prolonged time in working with them to go back to
14    them to request information that we needed in order
15    to do our assessment.
16           Q.     And my question is when you went back
17    to them, they gave you the information you requested,
18    didn't they?
19           A.     They could give us some of the
20    information that we needed, but in a lot of cases it
21    was not complete or to the extent that we needed it
22    to be in.
23           Q.     So back to my question.  How long did
24    it take to finish the credit and risk management
25    assessment on Custodia?  Give me a time frame.  When

Page 73

1   was it done to the best of your ability?
2        A.    So we were probably at a point and
3   then they decided to apply for membership
4   application, and so then our work was -- became -- a
5   lot of what they started to look at through the
6   membership application we could also use from a
7   master account, so -- so I would say -- I mean, we
8   could have made a decision at that point, but then
9   when they decided to apply for a membership, we
10  didn't -- we wanted to wait to see if there was
11  anything that came out of that membership that would
12  help move them to a different tier, so there were
13  various points along the way that we could have just
14  ended our review.
15       Q.    My question is very simple.  When did
16  you finish your review?  When did it get done where
17  you could go back in and decide what risk rating, you
18  know, follow your policy?  When did you finish that
19  review?
20            MR. MICHAELSON:  Objection.  Form.
21       A.    We made a decision, then, around the
22  end of 2022.
23  BY MR. ORTIZ:
24       Q.    So your testimony is it took you from
25  October of 2020 until the end of 2022 to simply do

Page 203

1   time you're making these notes in November that
2   you're going to deny the master account application
3   from your perspective?
4                   MR. MICHAELSON:  Objection.  Form.
5          A.     A decision had not been made.
6   BY MR. ORTIZ:
7          Q.     But I think what you told me was if
8   the Board of Governors granted membership, then you
9   were probably going to look at it differently about
10  granting a master account, correct?
11         A.     It would have moved them into a
12  different tier.
13         Q.     Sure.  And you were told that you
14  wanted to be in step and in -- you didn't want to be
15  inconsistent with what the Board of Governors did on
16  membership in regard to your master account
17  determination, correct?
18                  MR. MICHAELSON:  Objection.  Form.
19         A.     No.  We never said there was anything
20  about being inconsistent.  We had conducted our
21  review from a master account perspective, but we were
22  waiting to see if -- what the outcome of the
23  membership was to see if we needed to reconsider the
24  risk that they posed to the system moving into a
25  Tier 2.

Page 269

1  Mullins to you and others.  It looks like -- is this
2  something you're sending with Custodia five-year
3  projections to someone, or have you maybe asked for
4  five-year projections from Andrea Mullins and she's
5  sending them to you?
6           A.    It looks like she's sending them to
7  me.
8           Q.    Maybe so you could send them to
9  Mary-Francis?
10          A.    Possibly.  I don't recall here.
11                (May-Oder Exhibit No. 810 was marked
12  for identification.)
13 BY MR. ORTIZ:
14          Q.    I'm going to hand you what we've
15 marked as Exhibit 81, Bate No. 13603.  This is
16 July 14th, 2022, and your commenting back to Andrea,
17 This is very interesting and helpful to have you
18 included in those discussions with the Board.  I do
19 think it would be helpful to talk through this
20 personal scenario more.
21                And it says Chris plans to schedule
22 some time for the three us and Suzee to discuss and
23 do brainstorming around pros and cons depending on
24 yes/no decision.
25                If you're involved in this, this is

Page 270

1    all dealing with master account decisions, isn't it?
2                    MR. MICHAELSON:  Objection.  Form.
3            A.    So during the membership review -- let
4    me back up.  Andrea Mullins was our point person on
5    the master account review.  When the membership
6    application reviewed kicked, we did ask her to stay
7    plugged into that review from a master account
8    perspective, and so there, I believe, were periodic
9    touch points with the Board on membership review
10   because, again, that's a board-delegated function,
11   and so I did ask Andrea to sit in on those
12   discussions just so she had a better understanding of
13   what was going on from a membership standpoint that
14   might help inform where we ends up on the master
15   account.
16           Q.    So when we look back at those
17   documents months later when you said there was
18   sharing back and forth between membership and master
19   account, it's not the application materials, is it,
20   because you're already sharing all that information
21   in the summer of 2022, agree?
22                    MR. MICHAELSON:  Objection.  Form.
23           A.    I'm not following what you're asking.
24   BY MR. ORTIZ:
25           Q.    Well, what you're sharing in the

Page 271

1   summer of 2022 and having Andrea get involved with
2   the Board and looking at this, it sounds like you're
3   saying we're sharing information about membership and
4   the master account; is that right?
5                MR. MICHAELSON:  Objection.  Form.
6        A.     I am asking Andrea to sit in on those
7   conversations with the Board that they are having
8   regarding the membership, but her role on those calls
9   was not to share information from a master account
10  perspective.  As I've indicated before, the
11  membership review helped inform where we might end up
12  ultimately with the master account decision.  So her
13  role was not to share information with the Board on
14  the master account.
15               (May-Oder Exhibit No. 82 was marked
16  for identification.)
17  BY MR. ORTIZ:
18       Q.     Here's Exhibit 82, exchange between
19  you and Judith Hazen.  This is July 27th, 2022, and I
20  want to have you decipher for me what that means in
21  the middle of the page where it says, My observation
22  is that this document aligns with Asad's comments on
23  our last meeting that board staff would be briefing
24  the principals on key questions with an eye toward
25  whether a bespoke framework for supervising Custodia

1            MR. MICHAELSON:  Objection.  Form.
2       A.   So, again, Andrea was part of this --
3  we wanted her to stay tuned in to what was happening
4  on the membership examination.  The membership
5  examination, the Board is heavily involved in that
6  decisions, so that's what this references, that they
7  did not want to have any misinformation about the
8  Board's involvement on the master account standpoint,
9  because -- but they are clearly involved on the
10 membership side, so that's why that was -- they
11 wanted to make sure that there was a clear
12 distinction between the Board's involvement on the
13 membership versus the master account access.
14      Q.   Well, why was she disappointed at this
15 removal if this was simply dealing with membership?
16 Do you have any idea?
17      A.   Because the pre-membership review,
18 there was a lot of overlap in the information that we
19 would look at from the master account standpoint, so
20 we were trying to reduce duplication of asks of
21 Custodia by coordinating the requests for
22 information.
23      Q.   By this time because of litigation or
24 threatened litigation, were lawyers basically
25 scrutinizing every document that was being drafted

Page 300

1   BY MR. ORTIZ:
2           Q.     So what he says, Ben, at this time
3   I've been asked to see if you could help us make sure
4   we are not getting out of sync with the membership
5   side.  We do not want to contradict one another.
6                  Are you the one that gave the
7   directive to Chris Gaul-Pearson to talk to Ben about
8   this, don't contradict what the membership decision
9   is.
10                 MR. MICHAELSON:  Objection.  Form.
11          A.     So where are you seeing that?
12  BY MR. ORTIZ:
13          Q.     Take a look where it says, Nancy,
14  could you add context to the capital section,
15  specifically highlighting capital issues with SPDIs
16  and Custodia in particular.  If possible, could you
17  also indicate which issues are curable versus those
18  that are not or may not be curable?
19                 Ben, at this time I've been asked to
20  see if you could help us make sure we're not getting
21  out of sync with the membership side.  We do not want
22  to contradict one another, and there may be
23  additional asks by Judith for assistance with the
24  memo but nothing specific.
25          A.     So going back to the pre-membership

Page 301

1   review, so a lot of the same areas are reviewed and
2   assessed that also apply to a master account, and so
3   there is some overlap in the reviews that were being
4   done, so we wanted to make sure that our analysis of
5   those reviews were consistent.
6       Q.   To be fair to you, ma'am, this is
7   specifically dealing with Custodia recommendation
8   memo, so this would have nothing to do with anything
9   other than the recommendation to Esther George
10  whether to deny or give a master account.  That's the
11  only possible context of not contradicting the
12  decision on the membership side, agree?
13          MR. MICHAELSON:  Objection.  Form.
14      A.   From my perspective, I think it was
15  more around how we were framing up the risks that
16  were applied to both and the consistency around that,
17  because in those recommendation memo that we sent to
18  Esther on the master account, it outlined all the
19  risks that Custodia posed to the Reserve Bank and to
20  the payment system.
21  BY MR. ORTIZ:
22      Q.   Since I haven't been provided that, I
23  can't tell you whether that's true or not what you're
24  telling me, but I just want to know for the record,
25  you're saying this has nothing to do with not