# EXHIBIT AI

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING

CUSTODIA BANK, INC.,         )
                             )
            Plaintiff,       )
                             )
v.                           )
                             ) 1:22-cv-00125-SWS
FEDERAL RESERVE BOARD        )
OF GOVERNORS AND             )
FEDERAL RESERVE BANK OF      )
KANSAS CITY,                 )
                             )
            Defendants.      )
                             )


* DESIGNATED CONFIDENTIAL *
* SUBJECT TO A PROTECTIVE ORDER *


DEPOSITION OF ANDREA MULLINS, a Witness, taken on behalf of the Plaintiff before Peggy E. Corbett, CSR, CCR, RDR, pursuant to Notice on the 7th day of December, 2023, at the offices of the Federal Reserve Bank of Kansas City, 1 Memorial Drive, Kansas City, Missouri 64198.







1    Q.   And that was part of the master account
2    review still?
3    A.   I believe that was part of the review
4    process.
5    Q.   And it was continuing throughout this
6    time.  It never stopped at any point to your
7    knowledge?
8    A.   I'm not aware of the review stopping.
9    Q.   Was it put on pause?
10   A.   I don't know anything about a pause.
11   Q.   As a member of Credit Risk do you
12   remember working on it before this time period?
13   A.   I don't recall specifically.
14            MR. MICHAELSON:  Well, object.
15   When you say this time period, are you referring
16   to the Exhibit 282?
17            MR. MENDELSON:  Yes.
18   A.   I don't recall specifically when I
19   started working on Custodia within Credit Risk.
20   Q.   (BY MR. MENDELSON)  Okay.  So when you
21   say in this e-mail, "The combined request with
22   the membership exam," what did you mean by that?
23   A.   I'm referencing a document request list
24   that we would send to Custodia ahead of the exam
25   requesting documents for our review.

1    Q.   Uh-huh.  So were you going to reach out
2    to the membership exam team to see what their
3    requests were?
4    A.   We compared their requests to ours to
5    make sure there weren't duplicative documents.
6    We wanted to only ask Custodia once for
7    documents.
8    Q.   So at what point did you coordinate with
9    them regarding documents?
10   A.   I don't recall.
11   Q.   Was it within a month of sending this
12   e-mail?
13   A.   I really can't say.
14   Q.   Do you remember who you talked to on the
15   membership exam team when you were coordinating
16   document requests?
17   A.   I often spoke with Ross Crouch.
18   Q.   Uh-huh.  And what was his position at
19   the time?
20   A.   On the exam, he was an AIC.  In general,
21   he was an examiner.
22   Q.   What's EIC stand for?
23   A.   The Examiner in Charge.
24   Q.   So he was leading the exam, the
25   membership exam for Custodia?

Page 103

1   understanding, was there a significant overlap
2   between both types of reviews, were they very
3   different in your opinion?
4        A.   The processes were completely different.
5   I had to learn a new process when I joined Credit
6   Risk, and some of the information is the same.
7   Like I said, the financials, the activities, some
8   of that activity, like the document we might
9   review, the questions we might ask would overlap,
10  but the processes were very different.
11       Q.   So what percentage roughly would you say
12  of information that you requested was the same as
13  you saw being requested from the membership
14  review?
15            MR. MICHAELSON:  Objection, form.
16       A.   And that's where I said earlier I think
17  we kind of covered this.  I can't put a
18  percentage to it.
19       Q.   (BY MR. MENDELSON)  Let me put it this
20  way, did you consider documents that weren't
21  considered as part of the membership review?
22       A.   For example, we were, yes, asking about
23  a resolution plan, and I don't think the
24  examination was planning on requesting that.
25       Q.   Were there any other documents?

Page 104

1  A.  I'm not recalling specific documents.
2  Q.  So you can only recall the resolution
3  plan, one document?
4  A.  If we're speaking to documents
5  specifically at that time and what was available,
6  yes.
7  Q.  What about other information?  Did you
8  request any other information that wasn't
9  requested as a part of the membership review?
10           MR. MICHAELSON:  Objection, form.
11  A.  I can't recall specifically what I asked
12  for.
13  Q.  (BY MR. MENDELSON)  So you can't recall
14  any other information that wasn't part of the
15  membership review that you requested?
16  A.  I don't recall the differentiation of
17  what was on the membership list and what was on
18  the master account list, because you asked
19  earlier did I review the membership first or the
20  master account first.  I don't remember.
21           And so by the time I saw the request
22  list for the exam, it had been combined, and so
23  it's combined in my memory.
24  Q.  Uh-huh, okay.  The reason why I asked
25  for information is because when I asked for

Page 125

1  maybe would hinder it, but in reality I was going
2  to be on the exam, I was going to be in the room,
3  I was going to be able to ask the examiners in
4  person any questions that I might have.
5          And that's why I said at the end, "I
6  think it's going to be fine."
7      Q.   Fair enough.  Were you on-site for the
8  Custodia review?
9      A.   I was.
10     Q.   Do you remember from like when to when?
11     A.   I don't recall the exact days, but I was
12 there the majority of the time.
13     Q.   So I know we've discussed this a bit
14 already.  Before we turn away from this document
15 Christi above says, "As long as we're able to
16 leverage the assessments."
17         Were there any particular assessments
18 she was referring to?
19     A.   I take that to mean the assessments of
20 the exams she mentioned about Custodia.
21     Q.   So everything that the exam team was
22 assessing?
23     A.   We would review their conclusions in
24 their entirety.
25     Q.   Well, review is different than leverage

1    though, right?
2         A.   Yes, and then we would pull out the
3    information that pertains specifically to our
4    review process for a master account.
5         Q.   So what information were you looking
6    for?
7         A.   For example, we were particularly
8    interested in whether or not the BSAAML program
9    was going to be sufficient.  We were also
10   interested in capital and policies, procedures,
11   controls around capital liquidity, risks
12   associated with liquidity and how that might
13   behave, and how those would impact the master
14   account, as well as the risk framework of
15   Custodia in general.
16            So their practices of conducting risk
17   assessments, implementing policies and procedures
18   to control any risks identified and mitigate
19   them, and how they would inform their Board and
20   determine whether or not to engage in certain
21   activities, roll out new products, or if there
22   was too much risk involved, those were the sort
23   of assessments we were looking for from a master
24   account perspective.
25        Q.   So when you say assessments, are those

1     the assessments of the membership examiners?
2         A.   I'd say the conclusions of the exam,
3     which would have been built by the work done by
4     the examiners.
5         Q.   Is that work that you could have done?
6         A.   I was assigned to the payment system
7     risk area.
8         Q.   Uh-huh.
9         A.   And so yes, my assessment of payment
10    system risks would have fed into the exam
11    conclusions.
12        Q.   Could you have produced the other
13    conclusions made by the other membership
14    examiners, if you had been asked to?
15        A.   As a generalist I could have done a lot
16    of the review, but we also had some specialists
17    on the exam who were -- had more experience or
18    knowledge in certain areas than I, and would give
19    a more comprehensive review in certain areas than
20    I would have been able to.
21        Q.   Was feedback ever requested from you
22    outside of your area of expertise, coming from
23    you as a generalist?
24             MR. MICHAELSON:  Objection, form.
25        A.   Feedback pertaining to what?





Case 1:22-cv-00125-SWS   Document 240-35   Filed 12/22/23   Page 15 of 18
CONFIDENTIAL</>

Page 159



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830</>





1  Q. (BY MR. MENDELSON) What information and
2  data do you consider during that exam that you
3  don't consider during the master account exam?
4           MR. MICHAELSON: Objection, form,
5  foundation, asked and answered.
6      A. In my experience we leverage all of the
7  membership exam information as part of the master
8  account review.
9      Q. (BY MR. MENDELSON) So did the master
10 account review consider more data and information
11 than the membership exam?
12          MR. MICHAELSON:  Objection,
13 foundation.
14     A. We're evaluating different risks.
15     Q. (BY MR. MENDELSON) My question is about
16 what information do you consider. You can make a
17 different evaluation based on the same data so
18 I'll ask it again. Do you consider more
19 information for the member -- I'm sorry, strike
20 that. Do you consider more information for the
21 master account review than you do for the
22 membership exam?
23          MR. MICHAELSON: Objection,
24 foundation, and asked and answered.
25     A. I would just describe it as different.