# EXHIBIT AJ

# [PUBLIC VERSION]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING

CUSTODIA BANK, INC.,          )
                              )
           Plaintiff,         )
                              )
v.                            )
                              ) 1:22-cv-00125-SWS
FEDERAL RESERVE BOARD         )
OF GOVERNORS AND              )
FEDERAL RESERVE BANK OF       )
KANSAS CITY,                  )
                              )
           Defendants.        )
                              )

* DESIGNATED CONFIDENTIAL *
* SUBJECT TO A PROTECTIVE ORDER *

DEPOSITION OF ROSS CROUCH, a Witness, taken on behalf of the Plaintiff before Peggy E. Corbett, CSR, CCR, RDR, pursuant to Notice on the 25th day of October, 2023, at the offices of the Federal Reserve Bank of Kansas City, 1 Memorial Drive, Kansas City, Missouri 64198.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 18

1   Board?
2           MS. CARLETTA:  Objection, form.
3      A.   I don't understand.  Like just in
4   regards -- that's a broad question.
5      Q.   (BY MS. WEINBERGER)  Yeah, okay.  So
6   let's start with you've always worked in the
7   course of your career at the Kansas City Federal
8   Reserve; is that correct?
9      A.   Yeah.
10     Q.   Have you ever had interaction with
11  members of the Federal Reserve, or any staff
12  members from the Federal Reserve Board?
13     A.   Yes.  So in examinations, that's a
14  delegated function of the Board, and so in our
15  examination process for routine exam work, we go
16  out and we conduct the exam and we come back and
17  we vet the exam results, star management, and
18  ensure we're being fair and consistent and the
19  Board is routinely invited to attend and observe
20  those vettings.
21          Back in the financial crisis in 2008, we
22  had problem banks.  The Board would be aware of,
23  you know, our exam reports, and they'd be aware
24  of what's going on.  So I -- it's not unusual to
25  have contact with Board analysts for routine exam

Page 19

1  work.
2      Q.  Okay, so let's break that down a little
3  bit.  So the exam work is a delegated function of
4  the Board, correct?
5      A.  Uh-huh.
6      Q.  Do you know why that is, like what
7  statute or where that delegation comes from?
8      A.  I don't know.
9      Q.  And are you aware of what else, what
10 policy matters the Board cannot delegate?
11     A.  I can't speak to all the -- I shouldn't
12 say, because I don't know all the policy matters.
13     Q.  So for example, monetary policies, is
14 the Board in charge of that, or can the Kansas
15 City Fed be in charge of that, do you know?
16     A.  Monetary policy is complicated.  I can't
17 speak to how all of that -- I don't know how all
18 of that works.
19     Q.  Do you tend to -- are you aware of the
20 Kansas City Fed needing to look to the Board for
21 direction on monetary policy?
22              MS. CARLETTA:  Objection, form.
23     A.  This is -- that has -- I guess that
24 doesn't have any bearing on what I do, so I can't
25 speak to that.

1   piece.  I understand the master account decision
2   piece, but I don't know.
3       Q.   And here in Custodia's case it seems
4   like there was coordination between the master
5   account review and the membership review; is that
6   correct?
7            MS. CARLETTA:  Objection, form.
8       A.   So what I did and what I observed was
9   related to reviewing the risk of Custodia itself,
10  providing an output that could be leveraged by
11  membership, the membership review or the master
12  account review.
13           So in that regard, I did that analysis,
14  and then at that point it would move to those
15  areas.
16      Q.   (BY MS. WEINBERGER)  And did you have an
17  understanding that the folks working on master
18  account review and folks working on the
19  membership review didn't want to contradict each
20  other or get ahead of each other?
21           MS. CARLETTA:  Objection, form.
22      A.   I may have -- relative to my work, they
23  were both waiting on my work and I mean the
24  output was intended to provide them both with
25  accurate analysis, and so I guess I don't see or

1      A.   I don't work with the mechanisms of the
2    policy questions, so I don't know.
3      Q.   And this feedback that you provided to
4    Custodia, did you feel like these were items that
5    could be addressed by Custodia over time?
6      A.   This feedback, yes, I do.  The feedback
7    in this, I do believe could be addressed over --
8    now some might take longer periods of time, but I
9    agree that it could be addressed.
10     Q.   Okay.  So all of these items were
11   addressable or theoretically addressable by
12   Custodia?
13              MS. CARLETTA:  Objection, form.
14     A.   The feedback provided here is
15   addressable, yes.
16     Q.   (BY MS. WEINBERGER)  Okay.  I want to
17   circle on something you just said.  So are you
18   indicating that you don't know if the Board
19   handles policy questions?
20              MS. CARLETTA:  Objection, form.
21     A.   I mean related to the membership, which
22   is what this feedback was focused on, on
23   membership stuff, they were working on I guess
24   the policy questions, the Board was, related to
25   crypto and permissibility, but I don't know how

Page 164

1      Q.   (BY MS. WEINBERGER)  I apologize that
2  this document is not Bates-stamped, so it's a
3  little harder to direct you to the right page.
4           I'd like for you to turn to Page 5 that
5  has enterprise risk management; do you see that?
6      A.   Yes.
7      Q.   And sort of halfway down the page in
8  italics it says, "Feedback-These are items that
9  can be addressed over time."  Did I read that
10 correctly?
11     A.   Yes.
12     Q.   And that's consistent with the view that
13 you just expressed that the feedback you were
14 providing were items that could be addressed by
15 Custodia?
16               MS. CARLETTA:  Object to form.
17     A.   Yeah, yeah, they could be addressed,
18 yeah.
19     Q.   (BY MS. WEINBERGER)  And this meeting
20 was October, 2022, right?
21     A.   Yes.
22     Q.   And did you feel like Custodia was going
23 to need some time to address all of these issues?
24               MS. CARLETTA:  Objection, form.
25     A.   Some of the issues would take time to

Case 1:22-cv-00125-SWS   Document 240-36   Filed 12/22/23   Page 8 of 9
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 208

1   that you did not, when you drafted the scope
2   memo, anticipate looking into.
3        A.   There's an executive summary of this
4   document that has it outlined of what all we
5   looked into.
6        Q.   Okay.
7        A.   It might be in the back, too.
8        Q.   Well, to be clear this document has been
9   before you started the exam?
10       A.   Yes.
11       Q.   Okay.  So this was -- this represents
12  what you intended to -- the scope of the exam you
13  intended to perform; is that correct?
14       A.   Yeah, this represented the plan.  So we
15  looked at broad-based -- when you look at things
16  like management and risk management, and you look
17  at things like BSA compliance, our intention was
18  to look at core banking operations, but you can't
19  ignore business plans.
20            So there's grey area when you scope
21  something.  So I guess the long and short of it
22  is my view is we didn't look at things that
23  weren't relevant to the risk areas that we had
24  scoped.
25       Q.   But if the scope of an exam begins to

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   creep into new areas, then you're moving the
2   goalposts for Custodia, right?
3           MS. CARLETTA:  Objection, form.
4       A.  I never said anything about scope creep.
5   That's a Custodia word.
6       Q.  (BY MS. WEINBERGER)  Okay.
7       A.  When we look at the adequacy of the BS
8   AMO compliance program, which is absolutely
9   relevant to a membership decision, we're going to
10  look at what's in place today and what's planned,
11  and all of that is relevant.
12          We understood that Custodia was only
13  intending to launch with core banking products,
14  but over -- well, the vast majority of their
15  revenue and their business model was based on
16  future products and services.
17          So we needed to understand that, not
18  only for this review, but if we were going to do
19  another review, how to think about these other
20  areas, and all of the gaps that we identified and
21  communicated to the bank were relevant to areas
22  that were initially scoped for the exam.
23      Q.  Was the exam you conducted comparable to
24  ones that you would conduct for another bank that
25  was sort of an institutional,