# EXHIBIT BZ

# [PUBLIC VERSION]



RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Date:    January XX, 2023

To:       Esther George

From:    Judith Hazen and Christi May-Oder

Subject:  Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation

---

## EXECUTIVE SUMMARY

Custodia Bank, Inc., (Custodia) Cheyenne, Wyoming, a *de novo* state-chartered special purpose depository institution (SPDI), requested a master account with the Federal Reserve Bank of Kansas City (FRBKC) on October 29, 2020. Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and brokerage services. FRBKC's review of Custodia's business plan and supporting documents noted the following key concerns:

- Custodia's planned business model relies heavily upon a nascent and volatile crypto industry and presents illicit finance risks through novel activities.
- As noted in the federal bank regulatory agencies' January 3, 2023 Joint Statement,[1] these novel activities do not yet have legal clarity at the federal level and have not yet been deemed permissible for insured depository institutions. Further, it has yet to be determined whether or how the activities may be conducted in a manner that adequately addresses safety and soundness concerns. This uncertainty, inherent risk, and the narrowly-focused business plan call into question the financial viability of the firm and its ability to generate sufficient earnings to support operations and augment capital.
- FRBKC credit risk and supervisory staff's review of existing operations and policies (related to the core banking services Custodia intends to offer at launch and in the near term) revealed exceptions to safe and sound banking standards and best practices in the areas of BSA/AML and OFAC compliance, information technology, internal audit, financial projections, and liquidity risk management. While these matters could be remediated for the limited set of core banking services in the near- and medium-term, the viability of the business model is fundamentally dependent upon Custodia engaging in digital asset activities that have significantly more risk and operational complexity (and would require correspondingly more robust risk management and compliance systems).
- Absent a federal regulator, the Reserve Bank will have limited visibility into Custodia's financial condition and operations (and therefore, limited visibility into the risks borne by the Reserve Bank and other participants in the Federal Reserve payment system), which are expected to change significantly through evolution of the business model following commencement of operations. Relatedly, regulation of Custodia is entirely dependent on an unproven supervisory program for a novel charter/institution type that does not inherently include the safety and soundness standards, requirements, and safeguards embedded within the regulatory regime established for insured depository institutions. FRBKC also has serious concerns with safely and effectively resolving a deposit-taking entity outside of the Federal Deposit Insurance Corporation (FDIC) resolution process through the new and untested Wyoming state law resolution process for SPDIs.

---

[1] *See* Joint Statement on Crypto-Asset Risks to Banking Organizations, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230103a1.pdf, January 3, 2023.

1

CONFIDENTIAL - Subject to Protective Order               FRB-AR-000315

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

- The approval of an uninsured, state-chartered entity with a narrowly-focused business model reliant on serving the crypto industry and issuing a proprietary crypto token or other liabilities to be backed by cash held as reserve balances at the FRBKC would pose material public policy concerns that could create lead to undue risk to the financial system and or adversely affect complicate the Federal Reserve's ability to implement monetary policy.

| Formatted: Pattern: Clear (Yellow) |
| Formatted: Pattern: Clear (Accent 1) |
| Formatted: Pattern: Clear (Yellow) |
| Formatted: Pattern: Clear (Yellow) |

In light of these concerns, staff recommends denial of Custodia's master account request.

While the decision to deny a master account request rests with the Reserve Bank, Federal Reserve System guidance is being developed that requires a preliminary recommendation for denial of a master account request to be shared with the Director of the Board's Division of Reserve Bank Operations and Payment Systems (RBOPS) prior to communicating any denial to the entity seeking the account. The consultation process provides an opportunity for RBOPS and other Board Divisions to provide feedback to the Reserve Bank regarding the Reserve Bank's analysis of the entity. The Reserve Bank may incorporate or address any feedback or concerns, but still retains decision making authority. The Reserve Bank plans to provide a summary recommendation to Matt Eichner, Director of RBOPS, following your support for the denial decision.

BACKGROUND AND TIMELINE

Custodia is a *de novo* SPDI with a charter issued under the Wyoming SPDI Act. The Wyoming legislature enacted the SPDI Act (and other digital-asset-related legislation) in 2019, to facilitate the establishment of a new type of financial institution that could serve blockchain innovators and encourage crypto-asset-based businesses to form and operate in Wyoming. Under the SPDI Act, Custodia may engage in nonlending banking business, provide payment services for depositors, and, with the approval of the State Banking Commissioner, engage in any other activity that is usual or incidental to the business of banking. Wyoming law prohibits SPDIs from making loans and requires SPDIs to maintain unencumbered liquid assets with a value of at least 100 percent of its deposit liabilities.

Custodia was granted an SPDI bank charter by the Wyoming Division of Banking (DOB) on October 28, 2020. Custodia submitted Operating Circular 1 Master Account Agreements to FRBKC on October 29, 2020, and later submitted application materials to become a member of the Federal Reserve System on August 5, 2021. Since that time, FRBKC has engaged extensively with Custodia regarding its master account request and devoted significant resources to understanding Custodia's business plan, the SPDI charter, the DOB's supervision program for SPDIs, and the risks and opportunities presented by Custodia's request.

Concurrent with the FRBKC's review, numerous reports and events surfaced that shed light on the nascent, volatile crypto-asset industry and the impact of insufficient oversight of firms engaged in related activities. In 2020 and 2021, the Office of the Comptroller of the Currency Interpretive Letter 1170 series provided and clarified interpretations of permissibility for national banks, reaffirming the primacy of safety and soundness in conducting cryptocurrency, distributed ledger, and stablecoin activities, and requiring supervisory nonobjection before national banks may engage in such activities. In November 2021, the President's Working Group (PWG),[2] joined by the FDIC and the Office of the Comptroller of the Currency (OCC), released a report highlighting the benefits and risks of stablecoins, including inconsistent and fragmented oversight of token issuers. The report provided several recommendations for mitigating risks to stablecoin users and guarding against stablecoin runs (including a requirement for stablecoin issuers to

---

[2] *See* President's Working Group on Financial Markets Report on Stablecoins, https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf, November 1, 2021.

2

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

be insured depository institutions), the latter of which sought to address concerns related to payment system risk and concentration of economic power. In both December 2021 and October 2022, the Financial Stability Oversight Council (FSOC) published reports[3] highlighting regulatory concerns with stablecoins and the wider cryptocurrency market, including the risks that crypto-asset activities could pose to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall scale were to grow without adherence to or being paired with appropriate regulation.

The volatility of the market was evident during this time as well. In May 2022, the TerraUSD stablecoins and Luna token, which together formed an algorithmic stablecoin, collapsed, causing investors to lose millions. In November 2022, the cryptocurrency exchange FTX collapsed and filed for bankruptcy, which had a direct and significant impact on Silvergate Bank, La Jolla, California, an insured state member bank, and reportedly led to instability in a number of crypto-related companies.[4] Amidst these reports and collapses, the crypto industry continues to experience a so-called "crypto winter" in which two-thirds of the market capitalization or total market value of cryptocurrency has been lost and many crypto and blockchain companies continue to experience losses as prices fall, illustrating the risks and volatility within the nascent industry. Most recently, the Federal Reserve along with the FDIC and OCC issued a joint statement highlighting crypto-asset risks that banking organizations should be aware of as confirmed by these events over the past year. In addition to these industry developments, the Board issued Guidelines for Evaluating Account and Services Requests (Account Guidelines) to the Reserve Banks, inclusive of a tiered framework, in August 2022.

Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and brokerage services. Custodia represents it is seeking direct access to the Federal Reserve payment system and a master account to execute its business plan in a revenue efficient manner and to mitigate apparent liquidity and settlement risks within the broader digital asset ecosystem.

Upon receipt of the account request, Reserve Bank staff began an immediate assessment of Custodia's business plan and supporting documents. During this evaluation, the timelines for the various planned crypto products and services have changed and the proposed use cases of the Avit have evolved over time, as have staff employed by Custodia in various key areas. Custodia was notified of its legal eligibility for a master account and legal eligibility for membership in the Federal Reserve System in early 2022, understanding that legal eligibility merely means an entity has met the initial threshold of eligibility and can proceed to an assessment of business model and risks posed. Shortly after the issuance of the PWG report, Custodia submitted a draft deposit insurance application to the FDIC. The FDIC provided feedback and based on those interactions, Custodia subsequently abandoned plans to seek deposit insurance. Custodia continued work throughout 2021 and 2022 to build products and operational infrastructure and regularly engaged with Reserve Bank supervisory staff regarding risk management and operational infrastructures. Beginning September 6, 2022, a pre-membership examination occurred. Custodia was informed that information obtained during the pre-membership examination would be used both in the evaluation of Custodia's master account request and membership application (as had been the case through these

---

[3] *See* Financial Stability Oversight Council 2021 Annual Report, https://home.treasury.gov/system/files/261/FSOC2021AnnualReport.pdf ; see also the FSOC's Report on Digital Asset Financial Stability Risks and Regulation (October 3, 2022), https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf.

[4] *See* "Silvergate Raced to Cover $8.1 Billion in Withdrawals During Crypto Meltdown," Wall Street Journal (January 5, 2023), https://www.wsj.com/articles/silvergate-raced-to-cover-8-1-billion-in-withdrawals-during-crypto-meltdown-11672895207?st=rtt0i89dpb6gnrb&reflink=desktopwebshare_permalink

3

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

processes) to reduce repetitive questions and burden on Custodia. The membership examination was aimed at evaluating only Custodia's risk management program related to core banking products that would be offered upon opening, namely deposit accounts and traditional payment services.

Custodia reported throughout 2021 and 2022 that crypto-asset-related products would be offered after they opened for business, although the permissibility of these activities for an insured depository institution or state member bank remained in question and prior DOB notification is required. At the time of the pre-membership examination, Custodia's plans for crypto-asset-related products and services, including the technology and risk management infrastructures to support, facilitate, and execute the planned activities, remained in the early stages of development and were not formally assessed as part of the review. Nonetheless, the September 6, 2022 pre-membership examination identified significant risk management gaps in Custodia's day-one activities, which will consist of only limited banking services. These gaps were most notable in the areas of BSA/AML and OFAC compliance, internal audit, and information technology relative to what would be expected of an operating state member bank with only traditional banking activities.

A review of activities was conducted by the DOB in September 2022. While the state examiners identified some of the issues raised by FRBKC supervisory staff, the scope of the review and details regarding findings appear more limited. Subsequent to the DOB review, Custodia was granted a Certificate of Authority (COA) on September 12, 2022, approving the firm to commence business within six months. The approval was limited to imminent traditional banking products, relying on a phased formal approval process to be followed by the organization prior to commencing proposed digital asset activities.

On December 20, 2022, Custodia provided the Reserve Bank an update of their efforts to remediate the risk management gaps that were identified during the pre-membership examination. However, given the significance and breadth of the detailed issues identified during the examination, a targeted review conducted by the Reserve Bank would be necessary to fully assess the adequacy of Custodia's response.

EVALUATION OF MASTER ACCOUNT REQUEST

Structure

By legislative design, an SPDI is not a traditional bank; SPDIs have unique features that distinguish them from traditional commercial banks and weaken or remove protections that exist for customers of insured depository institutions. For example, SPDIs are exempt from Wyoming's requirement that its banks obtain FDIC insurance.[5] *See* Wyo. Stat. § 13- 2-103(a). FDIC insurance "protects depositors if a bank fails ... and helps prevent bank runs by providing consumers with the confidence that their money will be available during periods of economic or financial stress."[6]

As noted above, SPDIs are required to maintain unencumbered liquid assets equal to at least 100 percent of deposit liabilities, which is intended to mitigate the absence of FDIC insurance protection. However, existing statutory and regulatory frameworks, including those related to resolution, certain capital requirements, enforcement actions, changes in control, activities restrictions, and consumer protection are directly linked to (and only applicable based on) status as an insured depository institution. Thus, Custodia

---

[5] As noted above, Custodia filed a draft deposit insurance application with the FDIC following the release of the PWG report on Financial Markets Report on Stablecoins on November 1, 2021, which recommended that stablecoin issuance be limited to FDIC-insured depository institutions. The FDIC reviewed the draft application and provided feedback to Custodia in early 2022. Custodia subsequently abandoned plans to seek deposit insurance.
[6] See Congressional Research Service, *An Analysis of Bank Charters and Selected Policy Issues* (January 21, 2022), https://crsreports.congress.gov/product/pdf/R/R47014.

4

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

is seeking to benefit from Federal Reserve System (FRS) financial services without being subject to the same regulatory limitations as insured depository institutions designed to protect depositors and bank counterparties, has no federal banking regulator,[7] and is not obligated to comply with traditional banking regulations.

<u>Proposed Business Plan</u>

Custodia's proposed business plan is narrowly focused on serving the crypto-asset sector, offering novel, high-risk business activities for which a fully mature legal/regulatory environment and industry-standard, business-cycle-tested set of risk management and operational practices and tools have not yet been established. Custodia intends to engage in a broad range of digital-asset-related activities that, while allowed for an SPDI as a matter of Wyoming state law, are not clearly permissible for insured depository institutions or state member banks because they extend beyond existing interpretations and guidance from the federal banking agencies on digital asset/blockchain technology and raise safety and soundness and illicit finance concerns. Custodia has identified four key business lines that it intends to initiate over a three-year time frame:

(1) core banking – traditional banking services, including demand deposits, ACH and wire services, offered through internally developed online and mobile platforms;

(2) custody – custody of digital assets, including holding crypto-assets on balance sheet to facilitate the execution of transactions;

(3) prime services – on/off ramp transactions between fiat currency and crypto-currency, agency services including asset brokerage, escrow, foreign exchange, and finder activities related to digital asset lending; and

(4) Avit – a bank-issued crypto token utilized for instantaneous payments that would freely circulate on a public blockchain.

<u>BSA/AML and OFAC Compliance</u>

In addition to concerns with Custodia's business plan being focused on a narrow sector of the economy and financial services industry, to date, there is lack of clarity at the federal level regarding the permissibility of several activities proposed by Custodia. These concerns are further heightened given that Custodia is an uninsured depository institution focused almost entirely on serving the crypto-asset market, which presents elevated illicit finance and other safety and soundness risks.

Crypto-assets pose significant BSA/AML and OFAC compliance risks due to the lack of transparency; ease and speed of transfer; and general irrevocability of transactions. The ability to conduct instantaneous transactions electronically enables numerous small transactions to move large sums of money undetected by monitoring systems. While the pre-membership examination did not include a review of the proposed crypto-asset activities, examiners identified significant gaps in Custodia's BSA/AML and OFAC compliance programs even for its core banking activities. Although Custodia has communicated they are actively working to remediate the gaps identified in the pre-membership examination, the gaps identified with respect to its core banking activities raise significant concerns regarding Custodia's ability to effectively scale the program to comply with BSA/AML and OFAC requirements for its proposed, higher-risk crypto-asset activities. Such concerns are highlighted in the January 3, 2023 Joint Statement, which notes that, "agencies are continuing to assess whether and how current and proposed crypto-asset-related activities by banking organizations can be conducted in a manner that adequately addresses safety

---

[7] [Place holder for final recommendation/action on membership application.]

5

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

and soundness, [...] legal permissibility, and compliance with applicable laws and regulations, including anti-money laundering and illicit finance statutes and rules."

Although not reviewed in detail during the pre-membership examination, Custodia's planned issuance of the Avit on two public permissionless blockchains adds to concerns related to BSA/AML and OFAC compliance. In the Joint Statement, the federal banking agencies also note that "[b]ased on the agencies' current understanding and experience to date, the agencies believe that issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices." Custodia acknowledges that users would have the ability to conduct Avit transactions in perpetuity using wallets not hosted or controlled by Custodia, which would not have undergone an onboarding process with Custodia. Similarly, non-customers of Custodia would be able to hold and redeem Avits without undergoing the full due diligence required for customer on-boarding. In addition, by the nature of the digital assets Custodia intends to hold in custody and the blockchains upon which transactions in those assets are recorded, Custodia will pay processing fees to transaction validators who are unknown at the time the payment is made and who may remain anonymous even after the wallet associated with the validator is known. This places Custodia and its customers in the position of making payments to unknown parties who could be illicit actors or sanctioned entities. While the cryptocurrency industry remains in its infancy, and there are several questions related to application of the existing BSA/AML/OFAC legal regime to digital assets that neither FinCEN nor OFAC has addressed, such issues highlight the inherent risks associated with crypto-assets that need to be mitigated to ensure this activity can be conducted in a safe and sound manner consistent with applicable law.

Furthermore, Custodia has experienced turnover within key leadership roles, most notably the BSA/AML compliance officer, a role that four individuals have held since 2021, as well as the chief technology officer and chief compliance officer. The lack of stability in these key roles and lack of collective depth of relevant banking experience and bank-specific risk management expertise raise concerns regarding the management team's ability to conduct the proposed activities in a safe and sound manner. A lack of depth and breadth of expertise in risk, banking regulation, and compliance at the board of directors and management levels may have contributed to the number and degree of shortcomings identified in the pre-membership examination. Custodia added management and staff resources in BSA and risk after the pre-membership examination to address these concerns. However, the effectiveness of these additions is not readily apparent.

<u>Financial Considerations</u>

It is uncertain whether a narrowly-focused business of offering banking services to a novel, high-risk, and not fully mature industry is viable. The Wyoming SPDI charter has not yet shown itself to support a successful business model. At the Reserve Bank's pre-membership review, which covered only core banking operations, examiners identified numerous exceptions to safe and sound banking standards, requirements, and best practices. While it may be possible for Custodia to remedy some of these matters for the initial core banking services planned to be offered by the institution in the near term, there was insufficient information available at the time of the examination to fully evaluate the adequacy of Custodia's risk management systems for much riskier and complex planned digital asset activities, which are fundamental to the institution's ongoing viability. Additionally, the narrowly-focused nature of the novel SPDI business model means an SPDI's customer base is not diversified and likely to respond in a similar manner to industry stresses and events. For example, the potential rapid loss of customers could result in a rapid decline in revenue and threaten the viability of an SPDI, which is exacerbated by the absence of deposit insurance and an untested resolution program administered by the DOB.

6

FRB-AR-000320

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

<u>Capital Requirements</u>

The statutory capital requirements (W.S. 13-12-110) prescribe initial capital for the first three years of operations. They provide little guidance to the Commissioner on how to develop capital regulations. The SPDI rules (Chapter 20, section 2) say that an SPDI shall have initial capital commensurate with its risk profile and proposed activities; however, the rules do not specify how to assess the risk of the activities unique to SPDIs or relate them to capital requirements. The rules give the Commissioner a high degree of discretion in setting capital requirements, which have been set as three years of projected operating expenses for Custodia. It is not clear how this capital requirement was determined or will change over time. It is unknown if the Wyoming capital regulations for SPDIs adequately capture an SPDI's risks. Insufficient capital to support its operations and timely fulfillment of obligations, including during periods of stress, creates undue risk to the Reserve Bank.

Custodia is not subject to the federal regulatory capital framework for traditional insured banks and the state regulations do not contain minimum leverage and risk-based capital requirements. Even if the state regulations did contain such requirements, the federal framework for all but the largest banks is based on capital necessary for the primary risk of a traditional banking model, credit risk. It is not adequate to measure capital adequacy for a nontraditional institution like an SPDI, which is not permitted to engage in lending by statute, but has significant operational, cybersecurity, BSA/AML, strategic, and other risks.

In the absence of deposit insurance and absence of interagency capital standards that account for the types of risks posed by Custodia's business model and considering the institution's reliance on revenue generated from narrowly focused, volatile crypto-asset-based activities as its primary source of capital augmentation, it remains unclear if Custodia's current and projected capital base will be sufficient to support its risk profile.

<u>Resolution Process</u>

The difference between the resolution framework for a federally insured depository institution and an SPDI is a key difference between Tier 1 and Tier 3 institutions as described in the Account Access Guidelines and a major source of risk to the FRBKC. Custodia is required by state regulation to develop a resolution plan within six months of commencing operations. Wyo. Rules & Regs. 021.0002.20 § 4(a). Since Custodia is not FDIC insured, nor federally regulated, the resolution process in the event of a failure is not sufficiently defined without a resolution plan. Under Wyoming's SPDI statute, each SPDI must secure a surety bond or irrevocably pledge specified assets to the State to cover costs likely to be incurred by the Commissioner in a liquidation or conservatorship of the SPDI. Wyo. Stat. § 13-12-118. The DOB has required Custodia to pledge $15MM of capital. This capital is not presumed to support the risk born by the Federal Reserve Bank, and instead is excluded from consideration of unencumbered assets that could protect the Reserve Bank in the event of a Custodia failure with a negative balance in the master account. At this time, Custodia has not developed a resolution plan, but has indicated preliminarily that it would rely upon a sale of its assets and liabilities to another Wyoming SPDI, none of which are federally regulated or currently operating. In the event no Wyoming SPDI is available to acquire its business, Custodia would sell its custody business to crypto-asset exchanges or trust companies, and its deposit business to banks that provide traditional banking services to the crypto-asset industry. However, as evident by recent events in the crypto industry, such proposed acquirers are likely to be experiencing stress at the same time as Custodia.

If a resolution plan is put in place by Custodia, the process outlined by the DOB contains no guarantees the Reserve Bank would be made whole in the event Custodia fails to meet its obligations. In the event of an SPDI's failure and subsequent resolution under a receivership administered by the State Banking

7

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Commissioner, this Reserve Bank would have the same priority treatment as all other Custodia customers, with its claims paid at the same time and with the same priority as any customer "claims relating to deposits, custodial, fiduciary and trust assets." Wyo. Rules & Regs. 021.0002.20 § 6(j). This contrasts with insured, federally regulated entities where customer deposits are insured and indemnity agreements between the Reserve Banks and both the FDIC and National Credit Union Administration would provide indemnification to the Reserve Bank in the event of a failure up to the value of the collateral pledged to the Reserve Bank. With the DOB and Custodia, there is no indemnity agreement or other arrangement in place to provide assurance that the Reserve Bank would be protected in the event it continues providing financial services to an SPDI experiencing financial distress. The Reserve Bank's practice to assist and ensure orderly closures of depository institutions would be severely hindered by a lack of clarity around protecting the Reserve Bank from loss. In addition, the process for resolution, in the absence of a plan defined by the institution and approved by the DOB, is unclear. The DOB would be faced with the receivership of a depository institution with novel activities for which it does not have any prior experience.

Public Policy Implications

The statutory and regulatory safety and soundness framework for SPDIs is substantially different from the framework that applies to federally insured institutions. While state and federal banking agencies are responsible for ensuring safety and soundness of an entity's activities, *only* the Federal Reserve has a mission to ensure a safe and efficient payments system.

The lack of a federal prudential framework for SPDIs (like other Tier 3 institutions under the Guidelines) leaves the Reserve Bank with limited risk-monitoring tools and virtually no remediation or enforcement authority, other than what would be available under the Board's Policy on Payment System Risk and Operating Circular 1.[8] The potential for contractual commitments by Custodia to provide information and other limited monitoring or visitation rights by the Reserve Bank as a condition for the provision of an account and services would not mitigate risks to nearly the same extent or with the same legal certainty that would come from federal prudential supervision over Custodia pursuant to a well-established legal and regulatory framework. This effectively creates an inability by the Reserve Bank to assist the Board in its policy goals of ensuring the safety and soundness of the banking system, effectively implementing monetary policy, promoting financial stability, protecting consumers, and promoting a safe, efficient, inclusive, and innovative payment system.

These concerns are presented through the structure of an SPDI as well as Custodia's planned business model and *de novo* status. Although not currently considered determinative in this instance, staff also reviewed the potential monetary policy implementation and financial stability considerations around this account request. For example, tThe design of the Avit, which is intended to be backed by reserve deposits balances held in a master account, could have implications for the Federal Reserve's balance sheet. In particular, the backing of Avits by reserve balances could be viewed as implicit endorsement by the Federal Reserve, which could enable it to scale quickly. Growth in the Avit cwould generate significant demand for Federal Reserve liabilities and given the volatility of the crypto business, could create significant fluctuations in demand for Federal Reserve liabilities and could complicate the Federal Reserve's ability to manage the size of its balance sheet implement monetary policy, particularly absent regulatory clarity currently on much of the crypto industry. In addition, the backing of Avits by deposits held at the Reserve

---

[8] *See* The Federal Reserve's Payment System Risk Policy,
https://www.federalreserve.org/paymentssystems/psr_relpolicies.htm; Operating Circular 1, Section 2.11,
https://www.frbservices.org/binaries/content/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf

8

CONFIDENTIAL - Subject to Protective Order

FRB-AR-000322

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

~~Bank could be viewed as implicit backing by the Federal Reserve, which could also enable such products to scale quickly.~~

~~In addition, the backing of Avits by deposits held at the Reserve Bank could be viewed as implicit backing by the Federal Reserve, which could also enable such products to scale quickly.~~ While-Even if Custodia alone ~~may~~ -does not ~~materially~~ impact the Federal Reserve's balance sheet, granting Custodia a master account would set ~~a favorable~~ precedent for other existing SPDIs and other similar non-traditional charters. It ~~c~~would make uninsured charters more attractive for the crypto-asset industry, and issuance of instruments like the Avit by master account holders may be precedent-setting in allowing similar products at other banks. Collectively, these potential trends could ~~accelerate the growth of the crypto-asset market, creating~~create more significant monetary policy implementation and financial stability concerns. ~~These are broad policy matters that extend beyond the Reserve Bank and while risk mitigation strategies are being contemplated by the Federal Reserve Board, practically, it is not clear how these controls would be implemented.~~

**Formatted:** Strikethrough

CONCLUSION

The identified issues create undue risk to the Reserve Bank, risk to the overall economy due to potential illicit activities, and potential risk to the payment system. In light of these risks and public policy implications, staff recommends denial of Custodia's master account request.

9

CONFIDENTIAL - Subject to Protective Order

FRB-AR-000323