# EXHIBIT CJ

# [PUBLIC VERSION]

 

DATE DOWNLOADED: Tue Aug 22 12:18:59 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
i (1984)  The Role and activities of the Federal Reserve System in the nation's check clearing and payments system : report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Ninety-eighth Congress, second session.

ALWD 7th ed.
. The Role & activities of the Federal Reserve System in the nation's check clearing & payments system : report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, & Urban Affairs, House of Representatives, Ninety-eighth Congress, second session.  (1984).

APA 7th ed.
(1984). The Role and activities of the Federal Reserve System in the nation's check clearing and payments system report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Ninety-eighth Congress, second session. . Washington, U.S. G.P.O.

Chicago 17th ed.
The Role and activities of the Federal Reserve System in the nation's check clearing and payments system : report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Ninety-eighth Congress, second session. . Washington, U.S. G.P.O.

McGill Guide 9th ed.
The Role & activities of the Federal Reserve System in the nation's check clearing & payments system : report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, & Urban Affairs, House of Representatives, Ninety-eighth Congress, second session.  (Washington: U.S. G.P.O., 1984)

AGLC 4th ed.
The Role and activities of the Federal Reserve System in the nation's check clearing and payments system : report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Ninety-eighth Congress, second session.  (U.S. G.P.O., 1984

MLA 9th ed.
The Role and activities of the Federal Reserve System in the nation's check clearing and payments system : report of the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Ninety-eighth Congress, second session. . Washington, U.S. G.P.O. HeinOnline.

OSCOLA 4th ed.
The Role and activities of the Federal Reserve System in the nation's check clearing and payments system : report of the Subcommittee on Domestic Monetary Policy of the



FRBKC
EXHIBIT NO. 231
111623  KRS
MCR METROPOLITAN
COURT REPORTING ● LEGAL VIDEO

[COMMITTEE PRINT 98–17]

# THE ROLE AND ACTIVITIES OF THE FEDERAL RESERVE SYSTEM IN THE NATION'S CHECK CLEARING AND PAYMENTS SYSTEM

---

REPORT OF

## THE SUBCOMMITTEE ON DOMESTIC MONETARY POLICY

OF THE

COMMITTEE ON

BANKING, FINANCE AND URBAN AFFAIRS

HOUSE OF REPRESENTATIVES

98th Congress, Second Session



NOVEMBER 1984

---

Printed for the use of the Committee on Banking, Finance and Urban Affairs

---

This report has not been officially adopted by the Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance and Urban Affairs and may not necessarily reflect the views of its members.

U.S. GOVERNMENT PRINTING OFFICE

40–081 O            WASHINGTON : 1984

## HOUSE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS

FERNAND J. ST GERMAIN, Rhode Island, *Chairman*

HENRY B. GONZALEZ, Texas
JOSEPH G. MINISH, New Jersey
FRANK ANNUNZIO, Illinois
PARREN J. MITCHELL, Maryland
WALTER E. FAUNTROY, District of
Columbia
STEPHEN L. NEAL, North Carolina
JERRY M. PATTERSON, California
CARROLL HUBBARD, JR., Kentucky
JOHN J. LaFALCE, New York
NORMAN E. D'AMOURS, New Hampshire
STAN LUNDINE, New York
MARY ROSE OAKAR, Ohio
BRUCE F. VENTO, Minnesota
DOUG BARNARD, JR., Georgia
ROBERT GARCIA, New York
MIKE LOWRY, Washington
CHARLES E. SCHUMER, New York
BARNEY FRANK, Massachusetts
BILL PATMAN, Texas
WILLIAM J. COYNE, Pennsylvania
BUDDY ROEMER, Louisiana
RICHARD H. LEHMAN, California
BRUCE A. MORRISON, Connecticut
JIM COOPER, Tennessee
MARCY KAPTUR, Ohio
BEN ERDREICH, Alabama
SANDER M. LEVIN, Michigan
THOMAS R. CARPER, Delaware
ESTEBAN E. TORRES, California
GERALD D. KLECZKA, Wisconsin

CHALMERS P. WYLIE, Ohio
STEWART B. McKINNEY, Connecticut
GEORGE HANSEN, Idaho
JIM LEACH, Iowa
RON PAUL, Texas
ED BETHUNE, Arkansas
NORMAN D. SHUMWAY, California
STAN PARRIS, Virginia
BILL McCOLLUM, Florida
GEORGE C. WORTLEY, New York
MARGE ROUKEMA, New Jersey
BILL LOWERY, California
DOUG BEREUTER, Nebraska
DAVID DREIER, California
JOHN HILER, Indiana
THOMAS J. RIDGE, Pennsylvania
STEVE BARTLETT, Texas
JACK EDWARDS, Alabama

———

## SUBCOMMITTEE ON DOMESTIC MONETARY POLICY

WALTER E. FAUNTROY, District of Columbia, *Chairman*

STEPHEN L. NEAL, North Carolina
DOUG BARNARD, JR., Georgia
CARROLL HUBBARD, JR., Kentucky
BILL PATMAN, Texas
BUDDY ROEMER, Louisiana
BRUCE A. MORRISON, Connecticut
JIM COOPER, Tennessee
THOMAS R. CARPER, Delaware

GEORGE HANSEN, Idaho
RON PAUL, Texas
BILL McCOLLUM, Florida
BILL LOWERY, California
JOHN HILER, Indiana

HOWARD LEE, *Staff Director*

(II)

FERNAND J. ST GERMAIN, R.I., CHAIRMAN
HENRY B. GONZALEZ, TEX.
JOSEPH G. MINISH, N.J.
FRANK ANNUNZIO, ILL.
PARREN J. MITCHELL, MD.
WALTER E. FAUNTROY, D.C.
STEPHEN L. NEAL, N.C.
JERRY M. PATTERSON, CALIF.
CARROLL HUBBARD, JR., KY.
JOHN J. LaFALCE, N.Y.
NORMAN E. D'AMOURS, N.H.
STANLEY N. LUNDINE, N.Y.
MARY ROSE OAKAR, OHIO
BRUCE F. VENTO, MINN.
DOUG BARNARD, JR., GA.
ROBERT GARCIA, N.Y.
MIKE LOWRY, WASH.
CHARLES E. SCHUMER, N.Y.
BARNEY FRANK, MASS.
BILL PATMAN, TEX.
WILLIAM J. COYNE, PA.
BUDDY ROEMER, LA.
RICHARD H. LEHMAN, CALIF.
BRUCE A. MORRISON, CONN.
JIM COOPER, TENN.
MARCY KAPTUR, OHIO
BEN ERDREICH, ALA.
SANDER M. LEVIN, MICH.
THOMAS R. CARPER, DEL.
ESTEBAN E. TORRES, CALIF.
GERALD D. KLECZKA, WIS.

CHALMERS P. WYLIE, OHIO
STEWART B. McKINNEY, CONN.
GEORGE HANSEN, IDAHO
JIM LEACH, IOWA
RON PAUL, TEX.
ED BETHUNE, ARK.
NORMAN D. SHUMWAY, CALIF.
STAN PARRIS, VA.
BILL McCOLLUM, FLA.
GEORGE C. WORTLEY, N.Y.
MARGE ROUKEMA, N.J.
BILL LOWERY, CALIF.
DOUG BEREUTER, NEBR.
DAVID DREIER, CALIF.
JOHN HILER, IND.
THOMAS J. RIDGE, PA.
STEVE BARTLETT, TEX.
JACK EDWARDS, ALA.

225-4247

## U.S. HOUSE OF REPRESENTATIVES

### COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS

NINETY-EIGHTH CONGRESS

2129 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, D.C. 20515

November 21, 1984

TO:  Members of the Committee on Banking, Finance and Urban Affairs

A report of the Subcommittee on Domestic Monetary Policy entitled "The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System" is submitted for your consideration.

Sincerely,

Fernand J. St Germain
Chairman

(III)

, WALTER E. FAUNTROY, D.C., CHAIRMAN

STEPHEN L. NEAL, N.C.
DOUG BARNARD, JR., GA.
CARROLL HUBBARD, JR., KY.
BILL PATMAN, TEX.
BUDDY ROEMER, LA.
BRUCE A. MORRISON, CONN.
JIM COOPER, TENN.
THOMAS R. CARPER, DEL.

GEORGE HANSEN, IDAHO
RON PAUL, TEX.
BILL McCOLLUM, FLA.
BILL LOWERY, CALIF.
JOHN HILER, IND.

HG-100, ANNEX NO. 2
WASHINGTON, D.C.   20515
(202) 226-7315

**U.S. HOUSE OF REPRESENTATIVES**

SUBCOMMITTEE ON DOMESTIC MONETARY POLICY

OF THE

COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS

NINETY-EIGHTH CONGRESS

WASHINGTON, D.C.   20515

November 19, 1984

The Honorable Fernand J. St Germain
Chairman
Committee on Banking, Finance and Urban
 Affairs
2129 Rayburn House Office Building
Washington, D. C.   20515

My dear Mr. Chairman:

I am pleased to transmit herewith a report on the role and activities of the Federal Reserve System in the nation's check clearing and payments system. The Subcommittee on Domestic Monetary Policy, in conjunction with the Subcommittee on Commerce, Consumer and Monetary Affairs of the Committee on Government Operations held two days of hearings in the summer of 1983 on the role and activities of the Federal Reserve in the payment system following enactment of the Monetary Control Act. That investigation produced more than 1300 pages of testimony and supplementary materials upon which this report has been based.

Specifically, the report states that there continues to be a compelling need for the Federal Reserve to continue its central role in the payments system to assure universal accessibility, efficiency and security and that the Federal Reserve has complied with the directives of the Monetary Control Act in competition with the private correspondent banks as intended by the overall thrust of the Act. Additionally, the report concludes that Federal Reserve actions, mandated by the Monetary Control Act, should not be used as a basis for delays in funds availability or increases in checking account fees. Finally, the report concludes that the Federal Reserve should examine its role in the future payments system of electronic transfers and consider such steps as providing a linkage between local automated-teller-machine networks, processing credit/debit cards, and developing a means for non-financial institutions to access the payments system directly without reliance upon conventional financial intermediaries. On each of these matters, the Federal Reserve has been directed to report to the Subcommittee.

The Report has been circulated to Members of the Subcommittee who were invited to submit any concurring, additional, supplemental or dissenting views for inclusion in the Report that they might have.

Finally, I want to express my deep and sincere appreciation to all who contributed to this Report. Most importantly, I want to express my appreciation to my friend and colleague, the Chairman of the Subcommittee on Commerce, Consumer and Monetary Affairs, Congressman Doug Barnard, Jr., for his efforts and willing participation in this inquiry.

Sincerely yours,

Walter E. Fauntroy
Subcommittee Chairman

(V)

EXECUTIVE SUMMARY

The Monetary Control Act of 1980 (MCA) fundamentally altered the nation's payments system -- the network of services such as the clearing of checks, the provision of coin and currency to financial institutions, the wire transfers of funds, the Automated Clearing House, etc., that undergird all the transactions in our economy by assuring the smooth and rapid transfer of funds from a buyer's bank account to the seller's account.  Before the MCA, the payments system was segmented into two distinct and separate areas.  The Federal Reserve provided payments services without charge to banks that were members of the Federal Reserve System, handled most check clearing and funds transfers between banks in different parts of the country, and assured the basic security and trustworthiness of the payments system. Supplementing Federal Reserve's payment services were the private payments services provided by correspondent banks to non-member financial institutions for a fee or by local clearinghouses, which took care of most of the local check-clearing,  the clearing needs of non-member financial institutions, and the special high-priority check clearing that in total represented about 60% of the dollar volume of checks written.

The Monetary Control Act changed this system in three ways. First, it directed the Federal Reserve to impose explicit charges for payment services traditionally provided without charge to member banks. It further specified that these services should be made available to all depository institutions and not just to member banks. Finally, the Federal Reserve was directed to recover over the long run through these charges both the direct costs of providing the services and the imputed

(VII)

VIII

tax and capital costs a private company would have to bear. These legislative changes and the actions taken by the Federal Reserve to implement them broke down the division within the payments system, and placed the Federal Reserve in direct competition with private correspondent banks for the provision of payments services to other financial institutions. This changed the relative positions of the Federal Reserve and private correspondent banks in the provision of payments services, generated controversies about whether the Federal Reserve had been competing fairly, and raised questions about the appropriate role for the Federal Reserve in that system.

The Subcommittee on Domestic Monetary Policy investigated these controversies and questions in joint hearings with the Subcommittee on Commerce, Consumer and Monetary Affairs of the Committee on Government Operations in the summer of 1983, and in subsequent reviews of information and documents submitted in response to its enquiries. This Report summarizes the results of these investigations. It reviews the background to the Monetary Control Act, its effects on the payments system, the Federal Reserve's implementation of the Act, and the issues and controversies that have arisen as a result. It then reports its findings on four sets of issues: the general question of whether the Federal Reserve should continue to play a central role in the nation's payments system; specific questions as to whether the Federal Reserve in its implementation of the Act has complied with its directives and has competed fairly with private correspondent banks; consumer questions concerning the potential impacts of the changes in the payments system on the availability of deposited funds and increased fees for checking accounts; and prospective questions about the

IX

appropriate role of the Federal Reserve in the future as the payments
system shifts from paper checks to electronic funds transfers.

The findings of the Subcommittee are as follows.  First, the
Subcommittee concludes that there continues to be a compelling need for
a public institution to play a central role in the payments system to
assure its universal accessibility, efficiency, and security, and that
this institution should be the Federal Reserve as now structured, not a
separate public corporation containing the Federal Reserve's payments-
service activities.  Second, the Subcommittee concludes that the
Federal Reserve has complied with the directives of the Monetary
Control Act, that it has generally competed fairly with the private
correspondent banks in the pricing of its services and in its
activities, and that in the few instances where legitimate questions
can be raised about its actions, the Federal Reserve has already taken
corrective steps.  Third, the Subcommittee concludes that the
improvements in the efficiency of the payments system and the more
competitive prices and availability of payments services do not justify
many of the delays in funds availability and increases in checking
account fees that banks and financial institutions have imposed on
their customers.  Finally, the Subcommittee concludes that the Federal
Reserve in order to maintain the soundness, efficiency, and security of
the nation's payments should explore opportunities for playing a
central role in the future payments system of electronic transfers, and
should consider such steps as providing a linkage between local
automated-teller-machine networks, processing credit and debit card
payments, and developing a means for non-financial institutions to
access the payments system directly without a financial intermediary.

THE ROLE AND ACTIVITIES OF THE FEDERAL RESERVE SYSTEM
IN THE NATION'S CHECK CLEARING AND PAYMENTS SYSTEM

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

REASON FOR THE REPORT. . . . . . . . . . . . . . . . . . . . 5

PART ONE:   BACKGROUND

    The Payments System Before the Monetary Control Act of 1980 . . 7

    Need for and Effects of the Monetary Control Act. . . . . . . 10

    The Federal Reserve's Implementation of Explicit Pricing. . . . 12

    The Federal Reserve's Actions with Regard to Float. . . . . . 15

PART TWO:   ISSUES AND CONTROVERSIES CONCERNING THE FEDERAL RESERVE'S
             PRICING OF PAYMENT SERVICES

    Competition between the Private Clearing Banks and
      the Federal Reserve . . . . . . . . . . . . . . . . . . . . . 17

    Impact on the Payments System . . . . . . . . . . . . . . . . 19

PART THREE: FINDINGS

    GENERAL FINDINGS WITH REGARD TO THE ROLE OF
    THE FEDERAL RESERVE IN THE NATION'S PAYMENTS SYSTEM . . . . . 23

    A National Public Institution Must Play a Central Role in
      This Nation's Payments System. . . . . . . . . . . . . . . . 23

    The Public Institution in the Nation's Payments System
      Should Be the Federal Reserve System. . . . . . . . . . . . 25

(XI)

XII

PART THREE: FINDINGS  (Continued)

SPECIFIC FINDINGS WITH REGARD TO COMPETITION BETWEEN
  THE FEDERAL RESERVE AND THE PRIVATE CLEARING BANKS. . . . . . 33

The Federal Reserve's Efforts to Offer Faster Collection
  of Checks and Earlier Availability of Funds
  Were Appropriate Actions. . . . . . .  .  . . . . . . . . 34

The Federal Reserve's Cost Allocation System and Cost
  Recovery Efforts Comply with the Monetary Control Act . . . . 37

  1. Average-Cost Versus Marginal-Cost Pricing. . . . . . . . 38

  2. Accuracy of the Federal Reserve's Planning and Control
     System . . . . . . . . . . . . . . . . . . . . . . . 40

  3. Treatment of Float in Prices for Check Clearing and
     Collection . . . . . . . . . . . . . . . . . . . . . . 41

  4. Recovery of Costs. . . . . . . . . . . . . . . . . . . 43

  5. Provision of Adequate Cost Information to the Public . . . 45

The Federal Reserve's Private Sector Adjustment Factor (PSAF)
  is Properly Calculated. . . . . . . . . . . . . . . . . . 45

  1. Model Industry Used by the Federal Reserve in
     Calculating the PSAF . . . . . . . . . . . . . . . . . 46

  2. Accuracy of Imputed Equity, Debt, and Tax Rates. . . . . 48

  3. Allocation of Capital Base to Priced Services. . . . . . 49

  4. Use of Book Value Instead of Market Value for
     Capital Assets . . . . . . . . . . . . . . . . . . . . 49

  5. Treatment of Leased Assets . . . . . . . . . . . . . . . 51

  6. Inclusion of Sales Taxes . . . . . . . . . . . . . . . . 51

Other Issues Concerning Competition:

  Presentment Fees. . . . . . . . . . . . . . . . . . . . . 52

  Interstate and Noncompetitive Intrastate Check Pick-ups . . . 53

  Automated Clearing House Subsidies. . . . . . . . . . . . . 54

  Direct Send Settlement. . . . . . . . . . . . . . . . . . 56

XIII

PART THREE: FINDINGS (Continued)

     FINDINGS WITH REGARD TO CONSUMER ISSUES . . . . . . . . . . . . 58

     Funds Availability and the Payments System. . . . . . . . . . 58

     Increased Checking Account Fees and the Explicit Pricing of
      Federal Reserve Services. . . . . . . . . . . . . . . . . . 61

     FINDINGS WITH REGARD TO PROSPECTIVE ISSUES:  THE FUTURE OF
      THE PAYMENTS SYSTEM AND NEW ROLES FOR THE FEDERAL RESERVE . . 63

     Switch Manager. . . . . . . . . . . . . . . . . . . . . . . . 65

     Debit/Credit Card Processing. . . . . . . . . . . . . . . . . 66

     Access to the Payments System for Non-Depository Institutions . 67

CONCLUSIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

THE ROLE AND ACTIVITIES OF THE FEDERAL RESERVE SYSTEM
IN THE NATION'S CHECK CLEARING AND PAYMENTS SYSTEM

INTRODUCTION

Of all the powers held by and used by financial institutions, the right to offer transaction accounts most distinguishes a depository institution from other types of financial institutions.  Concomitant with this authority is the institution's access to a payments mechanism linking it with other financial institutions in order to complete the transfer of the financial asset identified in the check or payment document.  The commitment of the Federal Reserve System, as well as of private commercial banks, to a widespread and accessible payments system is one reason checks are so widely used and accepted for the commercial needs of the public.

The issues inherent in understanding the payments system, and the role which the Federal Reserve as this nation's central bank performs in that process, go to the heart of the organizational structure of this nation's financial system and how various kinds of risks are managed.  The ability of all depository institutions to issue transaction accounts also raises issues which far transcend the readily apparent questions of whether particular institutions, including the Federal Reserve, possess special advantages, exercise monopolistic powers, or underprice their services through the use of inappropriate subsidies.

Transaction accounts represent assets of a person that can be transferred to another person or another institution at any time and upon demand.  The presence of a transaction account in a depository institution directly affects the maturity of assets and liabilities and

1

thus the type of business that a depository institution is willing to undertake.  Indeed, the asset side of the balance sheet for some institutions provides only a small margin of functional liquidity to meet large and sudden deposit outflows.  Consequently, the role which a central bank and other large clearing organizations must play to maintain confidence in the safety and soundness of the nation's financial system cannot be ignored.

The Subcommittee on Domestic Monetary Policy has investigated the role of the Federal Reserve in check clearing and other services of the nation's payment system following enactment of the Monetary Control Act of 1980, which mandated equal access by all depository institutions to the payments system of the Federal Reserve and the explicit pricing and charging of institutions for these services.  This inquiry has been conducted with the view of assuring that public confidence in the transfer of assets by use of a transaction account is readily facilitated, easy, safe, and unquestioned.

Until 1980, the Federal Reserve had, among other duties, a mandate to provide a uniform central clearing system for all member-banks in the nation that wanted to use it without regard to the costs such a process entailed.  Such a role had been given the Federal Reserve by the Federal Reserve Act of 1913, to foster effective cooperation among banks outside of clearinghouse cities, to assure the clearance at par of checks drawn on banks that became members of the Federal Reserve System, and to avoid the inefficient routing of checks that resulted from nonpar clearance.  Prior to the Federal Reserve Act, clearinghouses could and did refuse to accept, at par or otherwise, checks drawn on a particular bank if there was even the faintest

2

possibility that a bank had problems. Such an act by a local clearinghouse would likely result in the failure of that bank because any rumor that clearing privileges were withdrawn would almost surely cause a run on the bank. Indeed, the Federal Reserve was created in 1913 partly in response to the breakdown in the nation's payments mechanism during the Panic of 1907.

Under the Federal Reserve Act before the passage of the Monetary Control Act in 1980, the Federal Reserve provided services under the provisions of Section 13 and Section 16 of the Federal Reserve Act only to member banks. From 1918 to 1980, these services were provided without requiring an additional payment. Commercial banks which were not members of the Federal Reserve System could obtain access to the Federal Reserve's payment system through arrangements with a clearing bank that was a member of the Federal Reserve. Usually, such arrangements were on a fee-for-service, compensating balance, or loan-participation basis. The earnings on the Federal Reserve's relatively high level of reserves required to be held by member banks adequately compensated the Federal Reserve for the services rendered, although the amount of service provided was never set in relation to the amount of reserves held by a single bank.

The enactment in 1980 of the Monetary Control Act did not nullify any of the reasons why the Congress created the Federal Reserve System, including the need for a secure, efficient, and national payments system under the aegis of the Federal Reserve. Indeed, passage of the Monetary Control Act was a re-affirmation of the role which the Federal Reserve as this nation's central bank played in assuring that basic payment system services would be available to the whole country. The key change was that the Federal Reserve was to recover the cost of

3

providing such services through explicit fees. The Monetary Control Act required recovery of direct expenses and, almost as an afterthought, the implicit costs of taxes and capital that a private business would have. This encouraged private correspondent banks to compete with the Federal Reserve in an effort to achieve greater efficiencies in the payments system.

The Monetary Control Act thus created two goals: reaffirmation of a major Federal Reserve System role in the payments mechanism; and price competition between the Federal Reserve and private clearing banks in the provision of payment services. How these two goals have been reconciled and how they should be reconciled -- whether preservation of a Federal Reserve role or achievement of an ideally competitive payments system should take priority -- is the central issue addressed in this report.

4

REASON FOR THE REPORT

During the course of examining the conduct of monetary policy and the role which depository institutions perform as a conduit for the actions and policies of the central bank, a number of issues were raised by correspondent banks engaged in check clearing activities. One issue was whether the Federal Reserve had fully complied with the provisions of the Monetary Control Act requiring it to recover costs and to price its services in a non-predatory manner.

These questions arose because of two major concerns: one, the Federal Reserve has certain advantages because of its size, relationships to depository institutions, access to financial resources, and interstate jurisdiction; and, two, it is an important financial-institution regulator as well as the instrumentality setting and carrying out monetary policy.

In a generalized form, the concerns were:

Whether the Federal Reserve implemented the service pricing provisions of the Monetary Control Act in a manner that adversely affected competing correspondent banks.

Whether the Federal Reserve has sought to recover its costs in all priced services areas and whether it should do so immediately or on a longer term (phased-in) basis.

Whether the Federal Reserve enjoys advantages that are unavailable to competing correspondent banks and how it used these advantages.

Whether the Federal Reserve has used its regulatory powers to benefit its own competitive position vis-a-vis competing correspondent banks.

In a more specific form, the concerns become questions which directly relate to special practices that are often set in a particular market and competitive environment. Nonetheless, the specific questions illustrate the general issues. Some of the specific questions include:

5

Whether the Private Sector Adjustment Factor, which is intended to equal the taxes a private competitor would have to pay and the return on capital it would expect to achieve, is properly constructed and accurately reflects the taxes and return on capital investment of comparable private businesses.

Whether subsidies of Federal Reserve services during the transition from an unpriced era have fully ended, and whether there are inappropriate cross-subsidies among product lines (including subsidies to the automated clearing house services).

Whether the Federal Reserve took unfair advantage of its market presence, regulatory authority, and immunity from payment of presentment fees (which payor banks sometimes charge collecting banks when checks are presented for payment) when it adopted its policy of noon-presentment.

The Subcommittee on Domestic Monetary Policy in conjunction with the Subcommittee on Commerce, Consumer, and Monetary Affairs of the Committee on Government Operations, held two days of public hearings on these issues on June 15 and 16, 1983. At these hearings, testimony was received from seven witnesses representing the American Bankers Association, the Independent Bankers Association of America, the National Payments System Coalition (a group of competing correspondent banks), the U.S. Central Credit Union, the Bank of America, the General Accounting Office, and the Federal Reserve System. The Subcommittee then reviewed more than 1300 pages of printed hearing materials received both during and following these two days of hearings.

The findings and recommendations of the Subcommittee are herein set forth. The Subcommittee on Domestic Monetary Policy has used as its guiding principle the objectives of the founders of the Federal Reserve System and of those who have overseen the development of the Federal Reserve in its seventy-one year history of providing a safe and sound financial system that incorporates as one of its integral components a secure and efficient national payments system.

PART ONE

BACKGROUND

** The Payments System Before the Monetary Control Act of 1980 **

The Federal Reserve System is composed of twelve district banks under the direction of the seven-member Board of Governors.  The twelve Federal Reserve Banks, located in twelve different geographic areas and supported by thirty-seven branch offices and other facilities, today provide a variety of services to both member and non-member depository institutions.  These services include, but are not necessarily limited to, the following: provision of currency and coin, check clearing and collection, wire transfers, the Automated Clearing House operations, net settlement, securities safekeeping, and non-cash item collection. While such services were originally available only to member banks, the Monetary Control Act of 1980 directed that they be made available to all depository institutions as defined in the Act.

Many of the services provided by the Federal Reserve district banks can be and are provided by other institutions.  Indeed, until passage of the Monetary Control Act, non-member banks could obtain these or equivalent services only from member banks.  This effectively segmented the payments system into two markets:  a Federal Reserve check-clearing system and other services accessible to and used by member banks;  and the private patchwork of correspondent bank relationships and local clearinghouses which handled check clearings, collections, and other payment services for non-member banks.

Check collection has traditionally comprised the largest single payments activity for the Federal Reserve.  It processed 12 billion

7

checks in 1976, and 16 billion in 1983.  Prior to passage of the Monetary Control Act, checks received from member banks by the Federal Reserve would be sent directly to the bank or a processing center designated by the bank.  The Federal Reserve would then credit the depositing bank with funds in accordance with an availability schedule that reflected the time it would normally take for the Federal Reserve to receive payment from the bank upon which the check was drawn.  If the Federal Reserve did not collect the check prior to passing credit, Federal Reserve float was generated.  In 1979, this Federal Reserve float averaged $6.7 billion on a daily basis.  (It was reduced to a $1.2 billion daily average by the end of 1983 after improvements in the System's check processing.)

The Federal Reserve also processed "non-cash" items such as matured municipal and corporate coupons, bonds, and bankers' acceptances.  It would generally collect these items in a manner similar to the way in which checks are collected except that the depositing bank might not receive credit until the Federal Reserve actually received payment.

Wire transfers prior to the Monetary Control Act were used almost exclusively to transfer reserve account balances from one member bank to another.  In 1976, 21 million transfers worth $35.6 trillion occurred, compared with 62 million transfers worth $143 trillion in 1983. Member banks typically used the wire transfer system to transfer Federal funds purchases and sales, correspondent bank balances, and customer funds.  There was no charge for fund transfers over $1,000.  A charge of $1.50 was imposed for transfers less than $1,000 to discourage the use of this network for such smaller amounts.

8

The Automated Clearing House originated in 1970 with the intent of using new technologies to make more efficient transfers of fixed, small-dollar, recurrent payments such as salaries, wages, mortgages and insurance premiums.  Neither the originating nor receiving bank was explicitly charged by the Federal Reserve for this activity.

The Federal Reserve also maintained a definitive securities safekeeping service which, prior to the enactment of the Monetary Control Act, would maintain account instructions, provide periodic statements, reconcilement, and tranfers, as well as collection of matured securities, without explicit charge to member banks.

The Federal Reserve administered a book-entry system for the sale and transfer of certain U.S. government and U.S. agency securities that was, prior to the Monetary Control Act, also provided to member banks without explicit charge.

The result of this segmentation was the growth of correspondent bank relationships and an extensive network of private clearing systems.  In 1979 - 1980, some 60% of the dollar volume of all checks cleared in the United States was handled directly between banks without Federal Reserve involvement.  Correspondent relationships, of which check-clearing was a part, became important sources of profits for major banks, and private correspondent banks were naturally loath to lose any of this correspondent business when the Monetary Control Act mandated equal access by all depository institutions to Federal Reserve services.  As long as there were two classes of banks -- members and non-members of the Federal Reserve -- a member bank could attract correspondent relationships with non-member institutions by giving them access to the Federal Reserve's payment system and thus to all depository institutions in the United States.  Except for some possible

9

increases in the reserves required to be held at the Federal Reserve, the marginal costs to a correspondent bank would not be substantial since the Federal Reserve imposed no additional charges for an increase in the amount of items presented for payment and collection.

** Need for and Effects of the Monetary Control Act **

During the 1970's, no-charge clearing services to member banks by the Federal Reserve became enmeshed in the problem of retaining bank membership in the Federal Reserve System. Rising interest rates increased the opportunity costs to member banks of holding non-interest-earning reserves, inducing some banks to withdraw from membership in the Federal Reserve System. The prospects of more withdrawals threatened the implementation of monetary policy, because a shrinking proportion of the banking system would be subject to the fractional reserve system by which the Federal Reserve controlled money growth. One factor which tended to keep banks from leaving the Federal Reserve System was the provision of services without explicit charge, which partially offset the cost to member banks of holding non-interest-earning reserves.

When Congress addressed the issue of monetary control in 1980, it lowered reserve requirements but imposed them on all depository institutions (including non-members). The amount of reserves required to be held against demand deposits was reduced from 16% for member banks with more than $400 million in such deposits (lesser requirements applied to smaller institutions) to 12% for any depository institutions with more than $25 million in transactions balances and 3% for smaller ones. Reserve requirements for time and savings deposits also

10

were lowered.  Newly covered depository institutions (including non-member banks) were, however, given eight years to phase in the reserve requirements.  In return for the posting of reserves, non-member institutions were given access to Federal Reserve check-clearing and other services.

The Congress recognized that these actions would affect Federal Reserve net earnings, which are paid to the Treasury: the reduction in reserve requirements reduced the amount of reserves held by the Federal Reserve upon which it earned interest; and the extension of services to non-members increased the volume and potentially the total costs of services it provided.  To offset the decline in earnings (and the resultant reduction in Treasury revenues), charges for specific services were mandated, which over time were to be based on the costs of these services.  It was also argued that explicit pricing of Federal Reserve services would increase the incentives for the private sector to offer similar and additional services, and the resulting competition would increase the efficiency with which such services were provided.

By adding new categories of institutions entitled to access to Federal Reserve services and mandating explicit prices to cover the costs of these services, the Monetary Control Act of 1980 changed the relationships between member banks, non-member depository institutions, and the Federal Reserve System. Among those granted direct access were non-member commercial banks, credit unions, savings banks, and savings and loan associations.  That increased the potential universe served by the Federal Reserve from 5,400 member banks to over 40,000 depository institutions. All services offered by the Federal Reserve, with the exception of currency and coin processing, were to be explicitly priced

11

and paid for by their users.  The costs for transportation and any special wrappings of currency and coin were also to be priced and paid for.  Finally, Federal Reserve float was to be reduced as much as possible through increased speed of collection and the remainder priced at the Fed Funds rate.

**   The Federal Reserve's Implementation of Explicit Pricing  **

On August 28, 1980, the Federal Reserve Board published a proposed schedule of fees along with a statement of underlying principles, which it formally adopted on December 30, 1980 after receiving public comments.  Among these principles were that:

> Fees over the long run would be established on the basis of all direct and indirect costs actually incurred in providing those services.

> Fees would also cover, through addition of a "Private Sector Adjustment Factor" (PSAF), imputed costs taking into account "the taxes that would have been paid and the return on capital that would have been provided had the services been furnished by a private business firm".

> The Federal Reserve would accept revenue shortfalls for certain service categories during the start-up period if "new operational requirements and variations in volume" temporarily caused such situations.

> Service arrangements and related fee schedules would be responsive to the changing need for services in particular markets.

Fees and service arrangements would be designed both to improve efficient utilization of Federal Reserve services and to foster long-run improvements in the nation's payment system.

The following Federal Reserve services were covered by these principles:

> Transportation of currency and coin and coin wrapping;

> Check-clearing and collection;

12

Wire transfer of funds;

Federal Reserve automated clearing house facilities;

Net settlement of debits and credits affecting accounts held by the Federal Reserve;

Book entry and safekeeping of securities;

Any new services the Federal Reserve System offers, including but not limited to electronic funds transfers.

In addition, the cost of Federal Reserve float remaining after operational improvements was to be recovered at the Federal funds rate.

Individual Federal Reserve district banks were authorized, subject to Board approval, to establish charges under the proposed schedule. They were also expected to take steps to erect a "Chinese wall" in their operations to separate their priced services activities from their other operations such as bank regulation and functions related to the conduct of monetary policy.

The fee schedule for check clearing services provoked the most discussion. Initial prices were calculated on the basis of costs at prevailing levels of operation. However, in the months following implementation of the price schedules for check-clearing services, and despite increased use of the Federal Reserve services by non-member banks, the volume of checks processed by the Federal Reserve declined sharply -- by 15% from August through December 1981. This fall-off resulted in insufficient revenues to cover both direct and imputed costs of check-clearing, even after a 10% system-wide reduction of employees engaged in check operations and other cost reductions.

In response to this situation, the Federal Reserve in February 1982, undertook an extensive review of its pricing schedules. In August 1982, new check clearing prices were announced based on the principles that prices for any particular type of check clearing

13

service would always cover direct production costs, and that total check-clearing costs, including the PSAF, would be covered by total revenues from all check-clearing services.  In the fall of 1982, the Federal Reserve proposed several operational changes to speed up funds availability in order to make its services more attractive, improve the overall efficiency of the payments system, and decrease the residual float to be recovered in compliance with the Monetary Control Act. First, the Federal Reserve's Interdistrict Transportation System was restructured to provide two, instead of one, daily dispatches from Federal Reserve offices.  Second, the Federal Reserve also proposed to offer later deposit deadlines for checks collected, along with a later, uniform presentment time of noon by which it would present checks to paying banks located in Federal Reserve cities (i.e., cities with a Federal Reserve bank or branch).  With these changes, the Federal Reserve hoped to offer same-day clearing of most checks within a Federal Reserve city and next-day clearing of most other checks. District banks began to aggressively market their services, with two district banks hiring marketing vice presidents.

There were strong and numerous reactions to these proposals, with many commenters raising objections, especially to the "noon presentment" proposal.  That proposal, opponents said, would disrupt corporate cash management services, place financial institutions subject to noon presentment at a competitive disadvantage with other institutions, and give the Federal Reserve a competitive advantage vis-a-vis private sector clearing services.

In December 1982, the Federal Reserve revised its proposals to reflect some of these objections.  The revised proposals were

14

implemented in steps, with new deposit deadlines, new prices for check services, and an 11:00 A.M. presentment time for checks drawn on financial institutions in cities with a Federal Reserve office going into effect on February 24, 1983. The noon presentment time for checks drawn on institutions in Federal Reserve cities then went into effect on May 2, 1983, and new deposit deadlines and presentment times for certain financial institutions outside Federal Reserve cities with a high volume of check presentments went into effect on July 1, 1983.

As a result of these changes in check collection and presentment and more aggressive marketing efforts, the volume of checks cleared by the Federal Reserve partially recovered from the initial drop off. Moreover, with the new fee schedules Federal Reserve revenues from check clearings increased to the point that, in March and April of 1983, it experienced a small surplus of revenues over costs including the private sector adjustment factor.

**  The Federal Reserve's Actions with Regard to Float  **

The Monetary Control Act also directed the Federal Reserve to recover the cost of System float, with the Congress supporting the Federal Reserve's intention to first reduce the volume of that float through operational improvements to speed the collection of checks. Since the difference between the availability schedule and actual availability could be one or more days, the Federal Reserve was in effect allowing depositing banks to earn interest on these funds during this period. This System float was often as high as $6 - $7 billion a day in the late 1970's.

After passage of the MCA, the Federal Reserve made a number of operational changes to reduce float. Improved clearing procedures, a

15

better float reporting system, and float reduction targets helped bring float down to an average daily balance of about $2 billion in 1982 from the peak of $6.7 billion in 1979.

The Federal Reserve proposals to speed up funds availability described above were one effort to reduce this remaining float. The changes in its Interdistrict Transportation System, the later check collection times, and the noon presentment time have cut system float by an additional $150 million.

In November 1982, the Federal Reserve released for comment its second major proposal to eliminate or subject to pricing the nearly $1.5 billion of float still remaining. This included such sources as interdistrict float, return item float (float arising out of checks returned for non-payment), holdover float, holiday and midweek bank closings and other forms of float. The first of these to go into effect was the proposal for interdistrict float, which gave banks several options for being credited for interdistrict checks presented to the Federal Reserve for collection. The proposal was implemented in July 1983. Other proposals for dealing with the remaining types of float went into effect later in the year. With these new procedures, the Federal Reserve eliminated or priced all check float that arises from the provision of check collection services to depository institutions.

16

PART TWO

ISSUES AND CONTROVERSIES
CONCERNING THE FEDERAL RESERVE'S PRICING OF PAYMENT SERVICES

**  Competition between the Private Clearing Banks  **
and the Federal Reserve

The Federal Reserve's policies to implement the explicit pricing
requirements of the Monetary Control Act have brought the Federal
Reserve and the private clearing institutions into direct competition
with each other.  Non-member banks now have the option of clearing
their checks directly through the Federal Reserve or through a
correspondent bank.  Other depository institutions such as savings and
loan associations, savings banks, and credit unions that offer checking
or check-like accounts to their customers also have the choice of using
the Federal Reserve or private clearing services to clear these checks.
As a result, smaller banks, savings & loans, and credit unions that had
been buying services from correspondents have begun to take advantage
of the presence of the "new competitor" in the market.

Competition between the Federal Reserve and the private sector has
been accentuated by the Federal Reserve's efforts to speed up funds
availability and reduce float.  When the Federal Reserve made its
services available to non-member institutions at explicit prices,
market segmentation remained based on how quickly clearing was
accomplished.  With the Federal Reserve offering normal clearing at a
competitive price, private systems carved out a market segment by
offering faster clearing for special items at a higher price than the
Federal Reserve provided.  However, when the Federal Reserve moved to
improve funds availability and reduce float by speeding up its
clearing, offering later collection times, and shifting its presentment

17

time to noon, it moved into direct competition with these private clearing systems. Again, smaller depository institutions have benefited (some estimates are that the more rapid availability of funds under the Federal Reserve's proposals could add one-to-three percent to the earnings of a medium-sized country bank). The correspondent banks, however, were convinced that with noon presentment they would lose much of their check-processing business to the Federal Reserve.

As direct competition increased between the Federal Reserve and private clearing services, the correspondent banks challenged the prices charged by the Federal Reserve as being too low, and questioned the accuracy of the cost estimates that underlie its price schedules. They also argued that the "Private Sector Adjustment Factor" -- the surcharge the Federal Reserve adds to its costs to compensate for its advantage in not having to pay most taxes or interest on capital investments -- was not high enough, badly constructed, and did not include the presentment fees charged by private clearing services to their customers.

Fundamental questions have also been raised about the basic fairness of competition between the Federal Reserve's clearing services and private clearing services. Private clearing banks argue that they cannot compete equally with the Federal Reserve because of the Federal Reserve's special advantages, such as its national network and its exemption from bans on interstate banking, its role in another capacity as regulator of many of the institutions with which it competes, and its rule-making ability to establish practices such as noon presentment which might benefit it.

18

Federal Reserve officials argue that they are not competing unfairly, that they have made concerted efforts to segregate check-clearing and other priced activities from their bank regulation and other responsibilities. In addition, they say that competition between the Federal Reserve and the private clearing services is already benefiting financial institutions and the public by providing more efficient and faster check clearing.

** Impact on the Payments System **

The questions about competition between the Federal Reserve and private clearing systems raise the basic issue of the kind of payments system this country requires. The crux of the debate between the Federal Reserve and competing institutions is the role of the government in the national payments system.

Proponents of the view that the government should have a major role argue that check-clearing and other payment services are, like mail delivery, a basic function requiring a trusted, public agency that is always available at a standard rate to any party who wishes to use this service. They further argue that the central bank has a vital role to play as the guarantor of the financial stability of the payments system and the clearer of last resort. Maintaining a clearing system simply to handle these functions would be very expensive to the government, they contend, and a competitive Federal Reserve clearing system is the best way to assure that a trusted, secure, and reliable clearing mechanism is always in place.

Those who argue that check clearing should be handled by the private sector note that clearing and settlement among banks were

19

entirely private-sector functions prior to the Act of 1913 which created the Federal Reserve System. They contend that private sector institutions are inherently more efficient than public ones, and that provision of check clearing by the private sector would be cheaper and quicker.

The debate over explicit pricing of check-clearing services also raises questions about the future of the payments system, and in particular the continued use of paper checks versus electronic funds transfers. Before the Monetary Control Act, when the Federal Reserve processed without explicit charge any number of checks that a member bank presented for collection, the full costs of using checks for transaction payments were hidden. Aside from the relatively fixed price of membership, the only costs to a member bank were the costs of presorting and encoding the checks before they were shipped to a Federal Reserve office. The Federal Reserve bore the costs of all additional sorting and of any Federal Reserve float that was created. Since member banks were not required to pay an explicit price for check processing, consumers did not experience the true costs of check-writing. They in turn had little incentive to economize in their use of checks for payments. This may have encouraged the "overconsumption" of the paper-based payments mechanism and discouraged the development and use of electronic payments systems. Charging an explicit price enables users to decide which services they wish to purchase and can impose an incentive on the public to economize on the use of services that had been subsidized.

If the explicit pricing of check clearing does in fact lead to increased use of electronic transfers instead of checks, this will have implications for the Federal Reserve's role in the nation's payments

20

system.  The Federal Reserve already operates "Fedwire", which carries out the majority of the interbank electronic transfers of funds, and it has been an active participant in the development of regional automated clearing houses.  At present, the electronic payments mechanisms most used by consumers such as automated teller networks are handled on a regional basis between participating bank members in local exchange networks.  Linking of these networks together on a national basis will require a new mechanism.  The Federal Reserve could be a logical participant in these new arrangements, both on the basis of its operation of "Fedwire" and as the clearer of last resort.

PART THREE

FINDINGS

The issues raised in the hearings and described in this report fall into four categories: first, general issues concerning the role of the Federal Reserve in the nation's payments system; second, competitive issues dealing with whether the Federal Reserve's pricing and operational actions in response to the directives of the Monetary Control Act represent unfair competition with the correspondent banks that also provide payments services; third, consumer issues relating to the availability of funds received through the payments system and the alleged impact of priced services on checking account and other fees; and fourth, prospective issues concerning the role of the Federal Reserve in a future electronics-based payment system. The findings of the Subcommittee address the issues in that order because the answers to the first category of issues are fundamental, and affect how the others are answered.

Therefore, the report first presents general findings with regard to the appropriate and proper role for the Federal Reserve in the nation's payment system. Second, the report provides a series of specific findings on the issues of competition and the charges of unfair pricing and operational actions by the Federal Reserve that have been raised by the private clearing banks. Third, the report addresses the effects of the changes in the payments system on consumers, specifically, the delays consumers experience in obtaining access to funds received by check and deposited in their accounts, and the increases in fees on checking accounts because of explicit pricing of payments services by banks and the Federal Reserve. Finally, the

22

report explores the role of the Federal Reserve in the payments system as electronics fund transfers become more prominent and displace to some degree the use of checks.

GENERAL FINDINGS
WITH REGARD TO THE ROLE OF THE FEDERAL RESERVE
IN THE NATION'S PAYMENTS SYSTEM

. The first general finding is that a national public institution is needed to play the central role in the nation's payments system. The second general finding is that this public institution should be a part of the Federal Reserve System, this nation's central bank.

** A National Public Institution Must Play A Central Role  ** .
in This Nation's Payments System

The role of the central bank in the payments system is more substantial in this country than in a number of foreign countries. However, the Federal Reserve's role in this country's payments system, like the Federal Reserve System itself, is a reflection of the structure of our financial system. Our financial system, for complex historical reasons, consists of thousands of commercial banks, savings and loan associations, savings banks, and credit unions, of various sizes and functions. These financial institutions, in turn, have been legally constrained to operate primarily within their own states, and to take deposits exclusively within those states. ·

The multiplicity of financial institutions in this country and their geographical constraints necessitate a major role for a national public institution in check clearing, collection and other aspects of the payments system. Indeed, the need for a national institution to

23

conduct interstate and interbank clearing of checks, evident from the breakdown of the nation's payments mechanism during the Panic of 1907, was one of the major factors behind the creation of the Federal Reserve System.

The geographical constraints on deposit taking by private financial institutions virtually require a national public institution to provide nation-wide check clearing between different states and regions if checks are to be cleared at "par" or face value.  There are in this country no nation-wide banks such as exist in Canada or the United Kingdom.  Only the Federal Reserve under present banking laws has the national scope to clear payments directly by accepting interstate deposits.  If interstate banking should become legal on a national scale, this situation would of course change.  Nonetheless, a national public institution could still be necessary even with interstate banking, because it would be doubtful that any resulting interstate banks would be truly nationwide for many years after interstate banking became legal.

Even if private nationwide banks do develop, the multiplicity of competing financial institutions would necessitate a continued need for a public institution like the Federal Reserve to assure all financial institutions of a neutral, trusted intermediary to handle the clearing and settlement on payments.  Such private nation-wide banks would likely be very large and few in number, creating a potentially oligopolistic situation.  If these banks were the only clearers, smaller banks, thrifts, and credit unions could face competitive problems in obtaining reasonably priced clearing services or remaining independent when dependent on such banks for clearing services.  A

24

national public institution like the Federal Reserve would assure that all institutions had equal access to clearing services.

Finally, a national public institution is required to assure that in times of financial stress clearing institutions need not worry about the financial capacity of the clearing agent to honor its obligations. Recent events have demonstrated that even the largest private banks are subject to financial difficulties that jeopardize their ability to honor their commitments. It is this unique capacity of a central bank to guarantee the completion of the financial transactions involved in check payments that undergirds the desirability of a major role for the Federal Reserve in the payments system.

**   The Public Institution in the Nation's Payments System   **
Should Be the Federal Reserve System

This report further finds that the present role of the Federal Reserve in the payments system should be retained. It is true that this role in check-clearing and other payments processing is a product of history, and that there are no intrinsic reasons why it alone should be the national institution in the payments system. The role of the central banks in such countries as Canada and the United Kingdom has been limited to providing a mechanism for settlement of accounts between banks, with the actual clearing of checks handled by the banks themselves. Current bans on interstate banking and the diversity of financial institutions, however, require a national public check-clearing institution in this country, but this institution could be separate from the Federal Reserve. Indeed, some have recommended that the Federal Reserve's check-clearing operations be split from the

25

Federal Reserve System and set up as a separate public institution. However, the reasons for such a spin-off are not compelling, and the advantages of the present system outweigh any benefits of a separate public check clearing and collection agency.

The principal objection to the present system lies in the fact that the Federal Reserve regulates many of the financial institutions with which it competes in check clearing. It is argued that the Federal Reserve could use its regulatory powers to enhance the competitive appeal of its check-clearing services or hamper the ability of private banks providing check clearing services as part of their correspondent relations. Some argue that a spun-off check-clearing operation would solve this problem. Such a corporation, they contend, would also eliminate the questions of cost allocation and private sector adjustment factors that have created controversy over the Federal Reserve's prices for payment services, and would assure that any public subsidy of check clearing was explicit. The result would, in theory, be more fair and equal competition between the public check-clearer and private correspondent banks.

Despite the superficial appeal of this proposal, the case for spinning-off check clearing operations from the Federal Reserve is not strong, and the disadvantages of doing so are substantial. In particular, the risks of regulatory powers being used to the Federal Reserve's competitive advantage in check clearing are hypothetical at best, and nonexistent in practice. At the same time, a spun-off check-clearing corporation would create new and even more difficult questions about competition between a public check clearer and correspondent banks, increase the expense to the public of government payments processing, and deprive the payments system of the accessibility,

convenience, and above all security that the presence of the central bank now provides.

The Federal Reserve has recognized the potential conflicts between its role as regulator and its role as competitive provider of payment services and it has taken steps to avoid them. Personnel who work in the District Banks on priced services are separated in the chain of command from those who work in bank regulation, and Federal Reserve officials appear to be conscientious in assuring that regulatory actions are neutral with respect to competition between the Federal Reserve and correspondent clearing banks. The Subcommittee on Domestic Monetary Policy, despite repeated requests, received no evidence that the Federal Reserve's regulatory powers had been used or misused to provide it with a competitive advantage in check clearing. Indeed, the public status of the Federal Reserve and the Congressional oversight exemplified by these hearings provide powerful safeguards against any possible abuse of its regulatory powers.

The one case which has been cited as a potential abuse of its rule-making authority -- the noon presentment policy adopted by the Federal Reserve in 1982 -- is entirely consistent with this finding. Under this policy, and in connection with the Federal Reserve's initiation of later hours for the acceptance of checks for overnight delivery and its modifications in its transportation system, the Federal Reserve announced that it would have checks available for presentment (or dispatch) to paying institutions no later than noon. However, while this proposal was made with all of the apparatus of rule-making (the publication of the proposal in the Federal Register, comment period, and analysis of comments), it was not in fact rule-

27

making since no rule was changed.  Presentment times earlier than the
2:00 P.M. deadline set by the Uniform Commercial Code had been
established by local custom and agreement, not by law or regulation.  A
change by the Federal Reserve as to when it would present checks was a
breach of custom, not a change in rules.  Any impact on other financial
institutions came from the Federal Reserve's predominant position in
interstate check clearing, which meant that the times the Federal
Reserve adopted for check presentment became the _de facto_ standard for
all check clearers.  This result would still have occurred if the
Federal Reserve's check clearing were handled by a separate
corporation, because it was the Federal Reserve's prominent role in the
market, not its status as regulator, which brought about the change.
Indeed, a separate semi-public corporation might not be as constrained
by processes of proposal, comment, and final adoption followed by the
Federal Reserve.

The argument that a separate check-clearing corporation is needed
because of the alleged difficulties in constructing for a public agency
a facsimile of the direct and capital costs of a private firm also does
not stand up under examination.  As will be discussed below, the
Subcommittee has found, based on its own research, the investigations
of the GAO, and the conclusions of the independent accounting firm that
audited the Federal Reserve's check-clearing operations, that the
prices of the Federal Reserve's services are competitive, properly
calculated,  and reflective of the Federal Reserve's actual costs plus
appropriate private capital, tax and profit factors.  Thus, it is not
necessary to spin off the Federal Reserve's check-clearing operations
in order to have fair price competition between the Federal Reserve and
the correspondent bankers.

28

Consequently, the advantages of spinning off the Federal Reserve's check-clearing operations are relative, not absolute. Despite the absence of any evidence of actual conflicts between the Federal Reserve's role as regulator and as check clearer, it could, nonetheless, be argued the potential for such conflicts imposes a psychological disadvantage on private competitors, who would be inhibited from strongly challenging the Federal Reserve's check-clearing business out of fear that success in such a challenge would bring regulatory reactions. This potential competitive advantage for the Federal Reserve would be eliminated by the spin-off of the Federal Reserve's check clearing. Similarly, those who still had doubts about the accuracy of the Federal Reserve's cost allocation and private sector adjustment factor and the possibilities of hidden subsidies might be more comfortable competing with a non-Federal-Reserve payments-system corporation.

These limited advantages of a cleaner competitive framework must, however, be weighed against the disadvantages of spinning off the Federal Reserve's check-clearing. First, new competitive issues would be raised. Second, since the Federal Reserve would still retain its role as a fiscal agent for the government, which also involves payments services, there would be duplication of check-clearing operations between the Federal Reserve and the spun-off corporation, increasing the cost to the government of its own operations. To the extent that the Federal Reserve and the spun-off corporation shared check-collection resources, cost allocation issues would still have to be resolved. Finally, a spun-off corporation would remove the security, confidence, and convenience that the Federal Reserve's presence provides.

A spun-off check-clearing corporation would have both handicaps and advantages against private competitors. Depending on what powers, restrictions, and responsibilities it received, its advantages could make it such a formidable competitor that correspondent banks would be in a worse competitive position than now. Alternatively, its handicaps could be so severe that it would be unable to be provide essential services without large public subsidies.

If this corporation were to assume the Federal Reserve's role of providing uniform and equal access for all financial institutions to its clearing services, it would have the extra costs of clearing to and from remote and rural institutions. If correspondent banks through the removal of bans on interstate banking gained the opportunity to clear directly between states on the same basis as the Federal Reserve, the process known as "cream-skimming" could occur in which correspondents take over the low-cost and more profitable clearings between major bank centers. The new corporation would then be left with higher-cost clearings to remote and rural areas. To cover the higher costs, it would either have to charge more for these clearings, or depend on Federal government subsidies to provide these services at uniform prices. The first course would mean a return to non-par banking since customers of banks in remote areas would pay substantially more to write checks than would customers of banks in major financial centers; the second course would reverse the intent of the Monetary Control Act that the costs of check clearing be borne by the users of that service, not the general public. In addition, if the corporation assumed the Federal Reserve's present policy of fostering long-term, socially beneficial improvements in the payments system, it would have to bear

heavy development costs for innovations which its competitors could then freely use.

On the other hand, if the new corporation retained the Federal Reserve's monopoly in interstate clearing, it could be so powerful it could drive correspondents out of non-local clearing. As a public corporation, it would be freed from the degree of Congressional oversight and self-restraint that the Federal Reserve now has, and could be far more aggressive in offering new services, providing faster deliveries, and competitively pricing its products. For example, it could provide corporations with the total value of checks presented to their banks each day, effectively drawing cash management accounts away from banks. The expertise which the Federal Reserve as a public institution now shares with banks might, too, become proprietary under a public corporation, adding to the corporation's advantages. Finally, the new corporation's prices could actually be lower than those now charged by the Federal Reserve since it would not need to share the costs of overhead and high security associated with Reserve Banks.

These divergent sets of problems may not be insoluble, but the solutions are neither simple nor non-controversial. Finding the combination of restraints and powers that would assure both equal competition between the spun-off corporation and correspondent banks and uniform access to check clearing would be certainly no easier than establishing a level playing field between the correspondents and the Federal Reserve, and might well be a lot harder.

The most critical disadvantage of the spin-off would be the loss of security, reliability, and convenience to the payments system that the Federal Reserve, as the nation's central bank now provides. The extent of that loss would depend on how check-clearing was spun off and

31

the relationship of the new corporation to the Federal Reserve. In the
spin-off proposed by the National Payments System Coalition, the only
relation would be the same access to the Federal Reserve's settlement
facilities which would also be enjoyed by private correspondents. At
that extreme, the public clearing corporation would be simply a service
bureau, without the base of financial assets which the Federal Reserve,
or even correspondents, can draw on in carrying through uncertain
transactions. Such a corporation would either have to be very cautious
and conservative in its clearing, only giving credit for the transfer
of funds to a payee bank when it had received clear and unequivocal
credit for those funds from the payer bank, or it would have to run the
risk that the credit from the payer bank may be lost in the event of
its failure. Confidence in the reliability and timeliness of the
payments system would be weakened as result. Such a corporation would
not be able to provide the assurance currently provided by the Federal
Reserve that payments involving troubled institutions will continue to
be processed. This situation would increase the risks of such
institutions becoming insolvent.

SPECIFIC FINDINGS
WITH REGARD TO COMPETITION BETWEEN THE FEDERAL RESERVE
AND THE PRIVATE CLEARING BANKS

The general findings that a continued role for the Federal Reserve in the nation's payments system is both appropriate and necessary do not mean that the Federal Reserve has or should have a complete monopoly in this area. There has been private check clearing and collection in this country for as long as checks have been used, and the majority of checks are currently cleared outside the Federal Reserve through local clearing houses or correspondent banks. There is no reason this situation should change. Indeed, the competition between the Federal Reserve and the private clearing banks that the Monetary Control Act created was seen as leading to greater efficiencies in the payments system as a whole. Thus, finding that the Federal Reserve should continue to play a major role in the payments system does not vitiate the issues of whether the Federal Reserve has competed fairly with private clearing banks. These are legitimate questions that must be addressed if we are to assure that the Federal Reserve's role in check-clearing does not come at the expense of the private clearing banks.

The specific findings in this section address these questions about the fairness of competition between the Federal Reserve and the private banks in check clearing. They are set in the context of the general findings about the need for a continued Federal Reserve role in the payments system, because that need must take priority over all other considerations. Perfect competition and improved efficiency in payments services are desirable goals, but the safety, security, and accessibility of the payments system are necessary and paramount ones.

33

The clear intent of the Monetary Control Act and the firm conclusion of this Subcommittee is that the latter goals require a major role for the Federal Reserve in the payments system. The Monetary Control Act did not envisage, nor does the Subcommittee accept, the creation of a theoretically pure and perfect competitive setting if the result is to drive the Federal Reserve out of the payments system and thus weaken the safety, security, and accessibility of the system. However, the Subcommittee would also not accept, nor did the Monetary Control Act intend, a situation in which the Federal Reserve through its actions drives the private clearing banks out of check clearing. Thus, these specific findings do not seek to measure the actions of the Federal Reserve in the implementation of the Monetary Control Act against some ideal model of competitive markets, but against the practical test of whether those actions have had the intent and effect of reducing competition in and creating Federal Reserve dominance of check clearing.

**   The Federal Reserve's Efforts to Offer Faster Collection   **
of Checks and Earlier Availability of Funds
Were Appropriate Actions

Even if the continued role of the Federal Reserve in the nation's payments system is accepted, there can still be questions about the extent of the role. One solution could be to limit the Federal Reserve solely to the role of clearer of last resort. Under those conditions, the Federal Reserve would provide universal, basic clearing services, with direct subsidies if revenues from low volumes were insufficient to cover necessary fixed costs. The alternative solution is that the Federal Reserve be the clearer of both first and last resort. In this

34

scenario, the Federal Reserve would offer competitively priced and competitively structured clearing services that enable it to maintain sufficient volume to meet the fixed costs associated with being the clearer of last resort.

The Federal Reserve has chosen to follow this alternative course. It has argued that to do otherwise would be a less efficient and more costly use of resources. Accordingly, it has taken steps to improve the attractiveness of its processing and clearing services in order to be a competitive clearer of first as well as last resort.

That decision led to the controversy over the Federal Reserve's check clearing actions that became significant in 1982. Early in the year, the Federal Reserve announced it would provide faster check collection and earlier funds availability by reconfiguring its interdistrict transportation system and pushing to noon the deadline for its presentment of checks to banks. As a result of these actions, the Federal Reserve's check-processing became more generally competitive with private correspondent banks, which had been offering faster collection at higher prices.

The National Payments System Coalition on behalf of private clearing banks argued that the Federal Reserve's actions did not enhance payments-system efficiency. Instead, the Coalition claimed that "the Fed's recent actions enable it to subsidize high-dollar, availability-sensitive checks with low-dollar check volume." [Joint Hearings on the Role of the Federal Reserve in the Check Clearing and the Nation's Payments System, p. 34] The Coalition further charged that faster Federal Reserve clearing increased its costs and led to higher prices for all customers, even though earlier availability primarily benefited customers with many high-dollar checks.

35

The Federal Reserve defended the speed-up in its clearings as making the most efficient use of its facilities and as benefiting all users of the check-clearing system.  In regard to the specific charges about the alleged increase in costs to make these changes, it argued that "the reconfigured network, although more extensive, achieved these improvements in availability without significant increases in the costs of providing interdistrict transportation." [Hearings, Appendix 5, p. 1010]

These arguments were carefully considered by the Subcommittee.  A review of the contracts with transportation providers showed that the Federal Reserve had obtained the more frequent flights in its reconfigured network with little or no increase in the contracted prices.  The increases in the Federal Reserve's check-processing fees which occurred at the same time as its move to a later presentment time were not associated with any increased costs from the faster clearing.  These price increases were due, instead, to a recalculation of fee schedules to cover the revenue short-fall created by the volume decline experienced in 1982.  In these circumstances, the improvements in availability offered by the Federal Reserve were designed to prevent further declines in volume by providing a more attractive service to offset the increase in fees that would have occurred anyway.

The Subcommittee believes that the Federal Reserve's decision to be a competitive clearer of first as well as last resort is proper and consistent with the mandate of the Monetary Control Act.  It also finds the Federal Reserve's efforts to speed up funds availability through in enhancements of its check-clearing services were appropriate and proper.

**          The Federal Reserve's Cost Allocation System and          **
          Cost Recovery Efforts Comply with the Monetary Control Act

One of the principal charges made against check-clearing pricing by the Federal Reserve is that its prices are too low because the Federal Reserve has not calculated and allocated its costs properly. Specifically, it has been charged that the Federal Reserve: (1) has mistakenly used average-cost pricing instead of marginal-cost pricing; (2) has underallocated its joint operating costs; (3) has not fully recovered the cost of float; (4) has been too slow in recovering its stated costs and has not made provisions to recover its current losses in future periods; and (5) has not provided adequate cost information for competitors to assess the accuracy of the Federal Reserve's prices.

In examining how the Federal Reserve has elected to allocate and recover various costs, a number of models and judgments that a prudent business person would normally undertake were considered to determine whether to follow any particular course of action. If the Federal Reserve were not an instrumentality of the United States, a determination that reasonable business practices were followed would have sufficed. However, in as much as the entity whose policies are being questioned is the central bank and an instrumentality of the United States, there are two additional constraints placed upon it. As a governmental entity it has a special responsibility to assure that its cost allocation and recovery programs are impartial and uniform. As the central bank it has the responsibility to assure all depository institutions have access to its services. The examinations and findings, which have sought to reflect those responsibilities, are described below.

37

1. Average-Cost Versus Marginal-Cost Pricing

The National Payments System Coalition has argued that the Federal Reserve should use marginal-cost pricing instead of average-cost pricing. Marginal cost pricing means that prices are set on the basis of the increase in total costs involved in producing the last unit of production, while average-cost pricing means that prices reflect total costs divided by the total number of units. Marginal-cost pricing is considered by economists to be the most efficient way of pricing because "only marginal-cost pricing reflects the cost to society of producing more payment services rather than something else." [Hearings, p. 33] Since marginal-cost pricing is allegedly used by private firms, the Coalition has argued the Federal Reserve should also price in this fashion if it is to compete fairly.

The Federal Reserve has responded that, while marginal-cost pricing is preferable in principle, it is not feasible in practice. In the view of the Federal Reserve Board, it would not be consistent with their responsibility to provide an equitable and reliable nationwide payments system. Neither would it necessarily produce higher prices as the Coalition presumed.

The Federal Reserve also argued that principles of equity and the common economic good require that payments services be accessible on an equal basis to all financial institutions in all parts of the country. Marginal-cost pricing could lead to the loss of access by certain financial institutions and certain geographical locales to the national payments system at reasonable prices, while average-cost pricing provides greater assurance of universal and equal access.

38

The Coalition's argument that there are diseconomies of scale in check-clearing is also challenged by the Federal Reserve for methodological reasons.  While use of pre-pricing data by proponents of marginal pricing may have led to this finding, the Federal Reserve believes there have been constant returns, if not economies of scale (i.e., declining unit costs), since the reorganization of its check-clearing operations in response to the Congressional mandate to price check clearing and collection services.  Since Federal Reserve offices routinely experience, and are organized to handle, large intra-monthly swings in volume, unit costs actually rise during volume declines, suggesting at least certain economies of size.  It is probable, therefore, that marginal-cost pricing would have results equal to or lower than average-cost pricing -- not higher as the Coalition asserts.

Officials of the General Accounting Office in their testimony before the Subcommittee essentially agreed with the Federal Reserve's position, concluding that "in practice it is often very difficult to determine what are marginal costs." [Hearings, p. 302]  They went on to note that there could be "an inequity with respect to the competitive situation between the private sector and the Federal Reserve, if marginal-cost pricing were to be adopted" for the Federal Reserve. [Hearings, p. 303]

Therefore, while there are theoretical reasons which support marginal-cost pricing, the Federal Reserve's adoption of average-cost pricing is an acceptable solution.  It has not produced prices for Federal Reserve services which are uncompetitively low or so high as to inhibit its ability to perform its role as clearer of last resort.  The Coalition's argument that average-cost pricing guarantees inefficient resource allocation because it does not reflect the cost to society of

producing more payment services rather than something else ignores the basic need for certain minimal payment services for all financial institutions regardless of where they are located or the cost of providing service to them.

2. Accuracy of the Federal Reserve's Planning and Control System

The Coalition contends that the Federal Reserve's Planning and Control System (PACS) is flawed because of its arbitrary allocation of joint operating costs. As evidence, the Coalition presented a comparison of average 1982 check-clearing costs of 3.42¢ per check for 18 correspondent banks with estimated Federal Reserve's internal processing costs of 2.08¢ per check [Hearings, Appendix 6, p. 1148]. The Coalition further argued that the Federal Reserve has not accounted for other direct, allocation, and selling costs, which if included would produce costs closer to those of the correspondent banks.

In response, the Federal Reserve argues that the Coalition's analysis is incorrect and that the PACS system does, in fact, allocate all direct and indirect costs. As for its lower per-check costs, the Federal Reserve argued that its own per-check costs vary from location to location, and that the Coalition's sample may have included a large proportion of high-cost banks.

A GAO report to the Senate Banking Committee concluded that "examination of operating expenses found no understating of expenses that would raise Federal Reserve Reserve check clearing prices to any extent." [U.S. General Accounting Office, Draft Report to the Committee

40

on Banking, Housing and Urban Affairs, U.S. Senate, on Federal Reserve
System Pricing of Check Clearing Activities, March 16, 1984, p. viii]*

Based on staff analysis of these arguments, the Subcommittee
concludes that the Federal Reserve's system of cost allocation is
appropriate and inclusive.  The fact that several of the correspondent
banks had per-check clearing costs equal to or lower than the Federal
Reserve's supports this conclusion.  The Subcommittee agrees with the
Federal Reserve that any differences between the average per-check
clearing costs of the Federal Reserve and correspondent banks is likely
to reflect different levels of services provided by different
correspondents.

3. Treatment of Float In Prices for Check Clearing and Collection

Federal Reserve float occurs when the Federal Reserve has given
credit to the institution that where a check was deposited before the
Federal Reserve has received payment for the check from the institution
on which it was written.  Float is, in effect, an overnight loan, and
the value of that float is equal to the interest rate that could be
earned on overnight loans such as in the Fed Funds market.  In the
past, average daily float was as high as $6.5 billion in 1979.  The
intent of the Monetary Control Act was that the Federal Reserve would
price all float remaining after operational improvements.

The Federal Reserve's approach has been to improve operations so
that actual availability more closely equalled availability schedules.

---

* The final GAO report on Federal Reserve System Pricing of Check
  Clearing Activities will be published late in 1984.  GAO staff have
  assured the Subcommittee that the conclusions in the draft report
  cited here and below are the same as will appear in the final
  report.

These efforts reduced average daily float levels to $2.3 billion in 1982. In November 1982, the Federal Reserve offered several additional proposals to reduce and price the remaining float, which were implemented during 1983. By the end of 1983 average daily check float within the Federal Reserve System had been reduced to $1.2 billion, and the cost of this float (i.e., the earnings on it at the Fed Funds rate) fully recovered through fees and prices.

The Coalition, arguing at the time of the hearings that these efforts had been slow and uneven, had urged that the Federal Reserve should immediately either "penny price" all float or alter its availability schedules so that it only gave funds availability that it actually received. They further asked the Federal Reserve to drop plans to charge interdistrict float back to the institution that deposited the checks.

In response, the Federal Reserve stated that over 95% of the checks it handles are cleared according to its availability schedule. At the time of the hearings, it also promised that, on October 1, 1983, the value of all remaining Federal Reserve check float would be added to those costs which are to be recovered. The GAO in its subsequent report concluded that the Federal Reserve had substantially reduced System float, and that its prices now cover all operating and imputed costs, including the value of float. [GAO, Draft Report, Federal Reserve System Pricing of Check Clearing Activities, Appendix V, p. 3.]

The Subcommittee, in agreement with the GAO, therefore concludes that the Federal Reserve's approach of reducing system float before pricing the residual float was appropriate, and that present reduction and pricing of float satisfy the requirements of the Monetary Control Act.

42

4. Recovery of Costs

The Monetary Control Act directed the Federal Reserve to set prices for its services that would over the long run generate sufficient revenues to cover its costs (including the value of float) plus a private sector adjustment factor. The Federal Reserve has attempted to recover costs, but, because of volume declines and other factors, had not done so through 1982. For 1982, total revenue for check clearing was $21 million below total adjusted costs ($283 million in revenues, $304 million in costs). The total shortfall including the private sector adjustment was $61.6 million. The total value of float (that is, the value of the interest on the float), which was not included in the recovered costs, was $265.7 million. [Hearings, Appendix 5, pp. 956, 962]

The Coalition argued that the failure of the Federal Reserve in 1981 and 1982 to recover all of its costs (including float) plus the PSAF meant that it had effectively subsidized its check-clearing and other priced services. This, claimed the Coalition, gave the Federal Reserve an unfair competitive advantage since its prices to customers did not reflect the costs it or its competitor's incurred in providing check-clearing services. In the Coalition's view, "there appear[ed] to be no valid reasons for further delay in [the Federal Reserve] fully complying with the MCA." [Hearings, p. 26]

In response, the Federal Reserve argued that it had made good faith efforts to price in order to recover costs, that shortfalls were the product of unpredictable volume declines and lack of explicit pricing experience, and that the Monetary Control Act by directing the Federal Reserve to recover costs "over the long run" clearly

anticipated the possibility of such shortfalls. The Federal Reserve further stated that its cost recovery efforts for 1983 were substantially better. In the first quarter of 1983, total revenues exceeded total adjusted costs (including a phased-in partial recovery of float) by $2.2 million before the PSAF, and was only $8.2 million below costs including the PSAF. In the second quarter of 1983, total revenues exceeded adjusted costs without the PSAF by $17 million, and were $6.5 million above total costs including the PSAF. [Hearings, Appendix 5, pp. 957-958]. For the year, check-clearing revenues fell a scant $1.4 million below total expenses (including the value of float) plus the PSAF. [Board of Governors of the Federal Reserve System, 70th Annual Report, 1983, p. 232].

The GAO report, which analyzed the Federal Reserve's cost recovery data through 1983, agreed that since the second quarter of 1983, Federal Reserve revenues from check-clearing had exceeded the amount of costs and the PSAF, exclusive of about $100 million in the value of the remaining float. It concluded that "a price increase in December 1983 eliminated the remaining revenue shortfall" [GAO, Draft, Federal Reserve System Pricing of Check Clearing Activities, p. 10], thereby bringing the Federal Reserve into full compliance with the cost-recovery provisions of the Monetary Control Act.

The Subcommittee agrees with the Coalition that the failure of the Federal Reserve to fully recover its costs in 1982 may have given the Federal Reserve a temporary unfair competitive advantage. However, it finds that the Federal Reserve was nonetheless in compliance with the provisions of the Monetary Control Act. The MCA directed the Federal Reserve over time to recover all direct and indirect costs, except

44

where the Board determined that it was necessary to depart from this principle in order to maintain the provision of an adequate level of services nationwide.  Given the risks to the payments system that the transition to priced check-clearing services inevitably entailed, the Federal Reserve's gradual approach to full cost recovery was prudent and appropriate, and in conformity with the Monetary Control Act. More to the point, the revenue surplus for priced services since January 1984 indicates that the Federal Reserve has achieved full recovery of all identified expenses.

5. Provision of Adequate Cost Information to the Public

The Coalition as well as the American Bankers Association have complained about a lack of adequate information from the Federal Reserve on the basis for its fee schedules.  In response, the Federal Reserve has begun to release on a quarterly basis its costs, revenues, and surplus or deficit, and to provide more detailed annual data on its costs and on the construction of PSAF.  The Subcommittee believes that this appears to be a suitable arrangement.

** The Federal Reserve's Private Sector Adjustment Factor (PSAF) **
is Properly Calculated

The Private Sector Adjustment Factor (PSAF) is an amount intended to reflect the imputed financing costs and taxes that would have been incurred if the Federal Reserve were a private sector provider of clearing services.  The factors used by the Federal Reserve have been criticized for understating Federal Reserve costs.  Specifically, the formula used in calculating the PSAF has been criticized because it is

45

alleged that: (1) the model industry used by the Federal Reserve in calculating financing and tax costs is inappropriate; (2) as a result, the imputed equity financing, debt financing, and tax rates are too low; (3) the Federal Reserve has under-allocated its capital base to priced services; (4) the Federal Reserve has mistakenly used book values for its capital instead of market values; (5) it has not capitalized its leased properties as assets; and (6) it has ignored additional taxes paid by private sector competitors such as sales taxes on goods and services purchased.  The Subcommittee's findings on each of these points follow.

1. Model Industry Used by the Federal Reserve in Calculating the PSAF

In calculating the proportion of capital raised from equity, long-term debt and  short-term debt, the cost of equity, and the tax rates that would apply if it were a private institution, the Federal Reserve has used as a model the twelve largest bank holding companies.  It has argued that these companies are representative of the correspondent banks with whom the Federal Reserve competes for check clearing and collection, and that their services and activities are more analogous to the Federal Reserve's services than are other possible models such as public utilities, government-sponsored entities like the Federal National Mortgage Association, or nonbank data processing companies.

The Coalition challenged the use of bank-holding companies as a model, arguing that the rates of return on capital and the tax rates for such companies are based as much or more on their banking business than their payments processing business.  It argued that the more appropriate model is a group of financial-related data processing firms that "have the most similar mix of services to the FRB and in most

46

respects resemble the FRB in their methods of operation." [Hearings, Appendix 6, p. 1161].

The Federal Reserve in response reiterated its arguments that bank-holding companies are the most appropriate model, although it has expanded the sample from the 12 largest bank-holding companies to the 25 largest ones. It specifically rejected the data-processing companies as a model on the grounds that: first, "the fortunes of these data processors are tied to developments in activities far removed from the Federal Reserve," such as the health care industry [Hearings, Appendix 5, p. 1016]; second, "the data processors do not collect checks like the Federal Reserve and other depository institutions" [Ibid.]; and third, "the data processors generally only perform a portion of the Federal Reserve service ... the recording and transfer of payments information." [Ibid, p. 1017] The Federal Reserve agrees that large banking organizations engage in a wide range of activities, but also argues that many of these are related to the activities of their correspondent divisions. "The fact that the correspondent banking organization does not raise capital on its own and interacts with the totality of the banking organization generally reinforces the logic of using the bank holding company model." [Ibid.]

The GAO recommendation on this issue is clear: "In our opinion it is not appropriate on the basis of available evidence to expect the Federal Reserve's after tax rate of return on equity or capital to be comparable to that reported by data processing firms." [GAO, Federal Reserve System Pricing of Check Clearing Activities, Appendix X, p.26] "[W]e believe that basing the PSAF rates of return on those experienced by bank holding companies provides reasonable results...." [Ibid.., p. 24].

47

The Subcommittee recognizes that the choice of a model is critical because of its implications for capital costs and tax rates, and appreciates the differences between bank holding companies and the Federal Reserve's check-clearing operations.  However, while there is no ideal industry or group of companies which could serve as a model, the bank-holding-company model is a reasonable one.  In any case, the differences between the Federal Reserve's check-clearing operations and those of data-processing firms are even greater than those between the Federal Reserve's operations and bank holding companies.  In particular, the greatest capital expense incurred in check-clearing is entailed in the physical process of receiving, sorting, batching, and delivering checks, not in the processing of the data on the number and and value of checks processed.  Data-processing companies are not, therefore, a good model.  Accordingly, the Subcommittee finds that the bank-holding company model, while not perfect, is the best available one for purposes of calculating the Private Sector Adjustment Factor.

2. Accuracy of Imputed Equity, Debt, and Tax Rates

The imputed equity and debt costs and tax rates used in the PSAF are directly reflective of the model industry used.  The charges of the Coalition that the PSAF is too low because the Federal Reserve is using too small a proportion of equity-financed capital, too low a rate of return on that equity, and too low a tax rate, thus, are valid only if the Federal Reserve's model of bank-holding companies is incorrect and the Coalition's model of data processing firms is correct.  Since the Subcommittee finds that the Federal Reserve's model is not incorrect, and is preferable to the one proposed by the Coalition, the

48

Subcommittee also concludes that the imputed equity and debt costs and tax rates now used in the PSAF are appropriate.

### 3. Allocation of Capital Base to Priced Services

In determining what proportion of the capital base should be allocated to priced services and thus subject to the capital costs of the PSAF, the Federal Reserve in the past has used a ratio of priced-service operating expenses to total system operating expenses.  The Coalition has criticized this approach on the grounds that it ignores differing levels of capital assets, leaves out some assets, does not capitalize leases or investments, and omits financial assets.

The Federal Reserve has agreed that, while an expense ratio is a reasonable basis for allocating assets, direct determination of the uses of assets would be more precise.  It is using this method in its formulation of the PSAF for 1984, and has found that it actually lowers the proportion of assets allocated to priced services, largely because the amount of floor space in Federal Reserve buildings used by check processing and other priced services  is substantially less (31%) than the 40% assumed under the expense-ratio method.

The Subcommittee agrees with the Coalition that a direct-determination method is preferable to the expense-ratio method, and finds that the Federal Reserve's adoption of that approach resolves this issue.

### 4. Use of Book Value Instead of Market Value for Capital Assets

In calculating the value of the capital assets associated with check processing, the Federal Reserve has used the book costs; that is,

historical costs net of depreciation. The Coalition has criticized the use of book values as "not very useful ... in pricing products or services." .... "The correct measure is current replacement cost, market value, or some other measure that indicates the 'opportunity' cost of employing the capital in one use rather than another." [Hearings, p. 43]

In response, the Federal Reserve has argued that the use of book values is universal in private business, including the large bank-holding companies; that use of book value is consistent with generally accepted accounting principles; and that, in any case, it is the historical cost that must be financed through equity or debt. While the Federal Reserve conceded that market values may be important in making resource allocations, it argued that this would only make sense if market-value accounting was used by all firms or if there was a sizable difference between the market value and the book value of the equipment and building space devoted to priced services by the Federal Reserve. The Federal Reserve suggested that the latter was not true, and contended that the former did not prevail.

The GAO study agreed with the Coalition that "to make better resource allocation decisions it is important for the Federal Reserve to obtain the best possible market value of the assets it devotes to priced services." But, it disagreed with the Coalition's argument that use of market value for assets would increase the PSAF, calling such an effect "uncertain" [GAO, Federal Reserve System Pricing of Check Clearing Activities, p. 49].

The Subcommittee finds no reason that would obviate the GAO's conclusion. The Federal Reserve's continued use of book value would, therefore, appear to be appropriate at this time.

5. Treatment of Leased Assets

The Coalition has argued that all leased Federal Reserve physical assets and real estate should be included in operating expenses, and their value included as assets in the capital base. The Federal Reserve's outside accounting firm concurs that current generally accepted accounting principles do require capitalization of certain leases, and the Federal Reserve has agreed to do so. However, neither the Federal Reserve nor its outside accounting firm believe that such leases should be included in the asset base used in calculating the PSAF, because the financing costs associated with the leased assets would then be double-counted: once, in the operating expenses to be directly recovered, and again in the cost of capital associated with the asset base. The Subcommittee agrees with this argument, and finds that the Federal Reserve's treatment of leases is proper.

6. Inclusion of Sales Taxes

The Coalition has argued that the Federal Reserve has not included in the PSAF an adjustment factor for the state and local sales taxes that private competitors have to pay on the goods and services they purchase to carry out check processing. The Federal Reserve is specifically exempted under the Federal Reserve Act from paying such taxes.

The Federal Reserve has agreed with the Coalition's contention that sales taxes have not been and should be included in the PSAF. In its current proposal for the PSAF, the Federal Reserve has included a factor reflecting such taxes. The Subcommittee agrees with this action.

** Other Issues Concerning Competition **

** Presentment Fees **

Presentment fees are the charges that a bank accepting a check for deposit pays to the bank on which the check is drawn when presenting the check for payment. The Federal Reserve under the Federal Reserve Act is exempt from paying presentment fees. The Coalition has argued that presentment fees are a legitimate charge to cover costs of check processing, and that exemption of the Federal Reserve from the payment of such fees gives it a competitive advantage. The Coalition consequently recommended that the Federal Reserve be subject to the payment of presentment fees.

The Federal Reserve's response has been that presentment fees are an improper charge, because a bank which issues checks should assume any internal processing costs and assess them to the individual customer accounts. Consequently, it has argued that not only should the Federal Reserve not be subject to such fees, they should be banned altogether, at least for checks presented before 2:00 P.M., the time set by the Uniform Commercial Code.

There are also practical problems with imposing a presentment fee on the Federal Reserve. A study commissioned by the Federal Reserve of the industry's use of presentment fees indicates that they are neither universal nor linked to increased costs such as those for later processing. According to this study, only large correspondents typically charge presentment fees, while few, if any, small banks or thrifts do so. Moreover, such fees are normally only charged on checks sent by certain collecting banks directly to the payor bank, and not on checks presented through a clearing house to which the payor bank

52

belongs and on checks from banks with which the payor bank has a reciprocal arrangement. The fees themselves range considerably, being subject to individual bank arrangements with no standard fee prevailing in particular areas. The time of presentment did not affect whether there was a presentment fee charged but did affect the size of the fee. [Hearings, Appendix 5, pp. 1080-1081]

The Subcommittee agrees with the Federal Reserve's position on this issue. The only real justification for such fees has been the argument that banks incur additional costs for processing checks outside their normal processing times, and that presentment fees both help defray these costs and provide economic incentives for presenting checks within those processing times. However, since the UCC establishes the 2:00 P.M. time as the deadline before which a payor bank must pay on that day a check presented to it for payment, normal processing times should be set up to include all presentments up to 2:00 P.M. so that there should be no additional costs in processing such checks. Penalty fees for presentment after 2:00 P.M. may be legitimate, but the Subcommittee can see no justification for any presentment fees before that time.

** Interstate and Noncompetitive Intrastate Check Pick-ups **

Federal statutes prohibit interstate banking and certain state laws prohibit intrastate branches. Since checks presented to a clearing bank for clearing can be considered a deposit, these laws may prevent a clearing bank from picking up checks across state lines or outside its locale within a state. Because the Federal Reserve is not subject to these limitations, the Coalition has charged that it has

53

unfair competitive advantage. The Federal Reserve by crossing state and local boundaries to pick up checks can allegedly provide the depositing bank with more processing time and lower transportation costs than correspondents.

The Federal Reserve in response has argued that any advantage is marginal because correspondents can also provide interstate and intrastate pick-ups. Reviews of state branch banking laws and discussions with state banking supervisors suggest that in fact there is no explicit legal statement that picking up checks for processing constitutes branch banking, and little indication that this would be regarded as such. Moreover, many correspondent banks participate in arrangements with their own service subsidiaries for the interstate and intrastate pick-ups of checks. In any case, the Federal Reserve has endorsed legislation which would establish the legality of intrastate and interstate pick-ups of checks by correspondent banks for clearing.

The Subcommittee supports this legislative solution.


** Automated Clearing House Subsidies **

Automated Clearing House (ACH) services are means of making transactions electronically, without paper checks, by debiting on a pre-authorized basis one account and crediting those funds to the account of another. The types of transactions made through ACHs have typically been regular, set-amount payments to or from consumers, such as salaries, Social Security benefits, mortgage payments, and insurance payments. The Federal Reserve played a pioneering role in cooperation with the banking industry in the development of local automated clearing houses in the early 1970's, and in 1978 began operating a

54

nationwide inter-regional exchange using its bulk data communications network. When the Board in 1980 published its fee schedules for payment services in compliance with the Monetary Control Act, it proposed to set fees for ACH services on the basis of expected volume levels when potential use of such services had matured. This meant that in the near future the System would be subsidizing ACH services since the fees were below current costs. The Board justified such incentive pricing on the grounds that the ACH was still developing and expanding, and incentive pricing was needed to attract business to this more efficient means of making transactions. However, in 1982, the Board in response to complaints that the large System subsidies for ACH services were preventing the development of private alternative services, decided to phase out incentive pricing. Fees for 1983 were set to recover 40% of the cost of providing ACH services, rising to 60% for 1984, 80% for 1985, and 100% for 1986.

The National Payments System Coalition contended that the Federal Reserve's explicit subsidy for ACH services was unjustified and "virtually eliminates private competition" [Hearings, p. 28]. They disputed the Federal Reserve's contention that ACH services were a natural monopoly with increasing returns and declining costs to scale of operation, arguing that the service was too new and undeveloped to show conclusively whether returns to scale increased or decreased over the whole spectrum of operation levels. To encourage the private investment in ACH services that would be needed to establish the most efficient form of operation for ACH services, the Coalition called for the immediate elimination of ACH subsidies by the Federal Reserve.

In response, the Federal Reserve accepted the need to eliminate ACH subsidies in order to give private competitors the opportunity to

develop competing services, but defended its plan to phase out the subsidies over several years instead of eliminating them immediately. An immediate implementation of full cost recovery for ACH services, it said, "could very well have caused many users of the ACH service to revert to paper checks" [Hearings, p. 400], and thus set back the progress made in converting ACH users to this means of payments.

The Subcommittee believes that the development of the ACH service represents the kind of improvements in the efficiency and innovativeness of the nation's payment system that the Federal Reserve's presence has helped foster. However, it also believes that, after more than a dozen years of development, the ACH service should be ready to stand on its own without price subsidies, especially since the costs of alternative transaction methods such as paper checks are now fully reflected in the prices of those traditional payment mechanisms. Consequently, the Subcommittee agrees that the subsidy for ACH services should be eliminated in the phased-out way proposed by the Federal Reserve.  An immediate or more rapid end to those subsidies would be counter-productive, causing a reversion in business's and people's attitudes toward use of ACH systems for transactions that would impede their future development.

## **   Direct Send Settlement   **

At the hearings on June 15, 1983, Mr. D. Lee Falls of the Bank of America submitted a proposal that the Federal Reserve provide settlement services to banks who cleared directly from bank to bank instead of through the Federal Reserve System.  He said that this proposal was an extrapolation of an existing System "package-sort"

program in which the System transported and provided settlement for, but did not otherwise process, packages of pre-sorted checks delivered to it. The difference under direct-send settlement would be that the transportation of such packages would be done outside the Federal Reserve System instead of through it. Presentment of the checks to the paying banks would meet the same deadlines as Reserve Banks, the presentment and settlement times for the checks would be the same as if they had been processed through the System, and the Federal Reserve would make appropriate rules to insure equality of treatment. [Hearings, pp. 247-273]

The Federal Reserve has studied this proposal and said that it is "very intriguing" [Hearings, p. 319]. Since the hearing, the California Bankers Clearing House Association has been refining the concept and collecting data to enable the Federal Reserve to evaluate a concrete and detailed proposal. The Subcommittee believes that there is possible merit in the Bank of America proposal, and directs the Federal Reserve to report on its plans to adopt or its reasons for rejecting the proposal as soon as possible.

FINDINGS WITH REGARD TO CONSUMER ISSUES

With two exceptions, the consumer takes for granted the operations of the nation's payments system.  The process by which cashed checks are returned to the consumer's bank and the designated funds transferred to the recipient's bank is critical to the widespread acceptance of checks as a means for making payments, but it is not one that consumers ordinarily think or care about.  However, in two areas the payments system has impinged on consumers' consciousness:  delays in the availability of funds represented by checks deposited in accounts; and increases in fees for checking accounts allegedly because of the imposition of explicit charges by the Federal Reserve for the clearing of checks.  Because these two issues are directly or indirectly related to the pricing of Federal Reserve services, they are addressed in this Report.

## ** Funds Availability and the Payments System **

Over the past several years, complaints have increasingly been heard from consumers who deposited checks they had received in payment, but had been unable to access those funds for ten days, fifteen days, or even longer.  Such delays in funds availability are inconvenient even in the best of circumstances, and have caused embarrassing and costly account overdrafts to consumers who had not been informed of or were ignorant of their bank's policies on funds availability.  More generally, questions have been raised about why banks should place ten-day or two-week holds on deposited funds when the clearing time for most checks is one-to-two days.

58

The justification for delays in funds availability is the need to ascertain whether the funds represented in a deposited check actually are available in the account against which it was written. Check fraud and overdrafts are not uncommon, and a bank that credits such an unfunded or overdrawn check to the depositor's account will suffer the loss if those funds are withdrawn and the bank is not able to recover them from its depositor. Some delay in funds availability is therefore appropriate while the bank ascertains that the check will be honored by the payor bank. The problem is that, while it takes on average one or two days for a check to be sent from the bank where it is deposited to the bank on which it is drawn, it may take much longer for a dishonored check to make its way back to the bank where it had been deposited. The former trip is largely automated and thus rapid; the latter requires time-consuming hand processing through each bank and/or Federal Reserve facility that the check passed through on its initial journey to the payor bank. A bank where a check is deposited can thus not be sure if the funds represented by that check are good until it allows sufficient time for a potentially bad check to be returned. However, this problem should be kept in perspective. 99% of all checks are paid the first time through the collection process. Over 60% of the checks that are returned are for amounts of less than $100.00, and over one-half of these are paid when presented for payment the second time. The remaining amounts are almost always recovered by charging the account of the depositor.

The Subcommittee believes that there are three steps that can be taken to improve this situation. First, banks should develop explicit and up-to-date policies for funds availability that are consistent with the actual amount of time it takes to determine whether a check is

good. For checks written on banks within the same area, any delay in funds availability should be short; for checks on more distant banks, longer delays may be appropriate. For checks drawn on the U.S. government or on state governments, immediate credit should be granted. In any case, these policies should be regularly reviewed and revised to reflect any improvements in the payments system. If the banking industry does not develop such realistic policies, legislation may be necessary.

Second, banks should publicize their policies on funds availability and assure that their customers are aware of them. In too many cases, banks have inadequately informed consumers of the circumstances in which funds would not be immediately available. An explicit statement of bank policies that all customers receive and all new customers be told about would correct many of the problems that have arisen because of delays in funds availability. Again, legislation should be adopted if the banking industry fails to adopt such disclosure policies.

Finally, the Federal Reserve and the correspondent banks should develop ways to speed up the return processing of dishonored checks or information about such checks so that banks can learn within days instead of weeks whether a deposited check is good or not. The Federal Reserve Bank of Dallas has been conducting a pilot program to speed the return processing of dishonored checks by returning the check directly to the bank of first deposit and bypassing all the intervening banks that may have processed it. The Federal Reserve has requested public comment on another proposal for informing the bank of first deposit by wire that a check in excess of $2500 has not been honored. The Subcommittee believes that the lessons from these programs should be

60

applied nationally as soon as possible.  The Federal Reserve is
directed to report to the Subcommittee on the progess of and prospects
for its proposals to improve the processing of return items.

Increased Checking Account Fees
** and the Explicit Pricing of Federal Reserve Services **

A second consumer issue linked with the explicit pricing of
Federal Reserve check-clearing services has been the increases in
checking account fees and charges that many banks have made.  In many
cases, banks have justified these fee increases with the argument that
the Federal Reserve is now charging or has increased charges for
clearing checks, which the bank is simply passing onto the customer.
Hearings held by the Subcommittee on Financial Institutions Supervison,
Regulation and Insurance on April 4, 1984, demonstrated that some
depository institutions abused the check collection and clearing
process to the detriment of their customers.

Industry sources estimate that the average cost per check for the
approximately 40 billion checks collected annually is on the order of
24¢ for normal processing and 36¢ for returned checks.  These figures
include bank costs for internal check processing, losses on returned
checks, and the costs of interbank processing, whether through
correspondents, local clearinghouses, or the Federal Reserve System.
The average cost of processing checks through the Federal Reserve
System is approximately 3¢ per check and 14¢ for each returned item.
This indicates that the costs of Federal Reserve clearing are but a
fraction of the total cost of checks to a bank, and that any increases
in Federal Reserve charges for clearing do not justify substantial
increases in checking account fees.

61

Indeed, the changes brought about by the Monetary Control Act in many cases enhanced the opportunities for depository institutions to deliver checking services to their customers at the same or even at lower cost.  By sharply lowering the non-income producing sterile reserve requirements that depository institutions were required to hold on deposit with the Federal Reserve, the MCA enabled member banks to increase their earnings through 1983 by more than $2.3 billion.  The imposition of reserve requirements on non-member institutions has reduced their earnings by about $850 million, leaving the banking system as a whole with a net gain of more than $1.5 billion.  Against these earnings are the $1 billion in explicit charges that financial institutions have paid through 1983 for services that formerly were provided by the Federal Reserve without any additional or explicit payment.  In other words, financial institutions as a group have gained more from the Monetary Control Act's reduction in reserve requirements than they have lost because of the MCA's explicit pricing of Federal Reserve services.

The expectation was that, because improved bank earnings from lower reserve requirements would offset the increased costs of Federal Reserve payments services, the consumer would benefit from the Monetary Control Act by enhanced collection and clearing of payments at no real increase in costs.  That expectation does not in this instance appear to have been fulfilled, despite the net gains of the financial institutions from the MCA.  The charges imposed by banks on their customers for various services related to the payments system or excessive delays in funds availability therefore are not and cannot be justified by the explicit prices charged by the Federal Reserve for its payment services.

FINDINGS WITH REGARD TO PROSPECTIVE ISSUES:
THE FUTURE OF THE PAYMENTS SYSTEM AND NEW ROLES FOR THE FEDERAL RESERVE

Not long ago, the Federal Reserve Bank of Atlanta devoted the entire August 1983, issue of its _Economic Review_ to and held a two-day conference on the future of the payments system and the coming displacement of the check [Federal Reserve Bank of Atlanta, _Payments in the Financial Services Industry of the 1980s: Conference Proceedings_]. While one may debate the timing and the order of magnitude that shifts in use of the paper check system will take, the number of options which are available for payments have increased and will likely continue to do so over the forseeable future.

Most obvious are the growing number of automatic teller machines that have proliferated in banks throughout the country and are now beginning to appear in grocery stores, on street corners, and at service stations. Other innovations include the increase in the use of point of sale terminals, the increasing loss of distinction between credit and debit cards, the growing use of automatic payments from and debits to individual accounts, and the expansion in accounts supported by lines of credit based on a family's ownership of their home, stocks, bonds, and other liquid or fixed assets.

In short, access to and use of the payments system is being made easier and increasingly tied to the management of an individual's financial resources. One need only witness the growth of cash management accounts, money market funds, and the quest by firms of all types to acquire depository institutions in order to obtain access to the payments system.

63

The role of the Federal Reserve in such a changing environment needs to be carefully considered.  In light of the Federal Reserve's responsibilities as lender of last resort and the historical reasons for its role in the payments system, any diminution of the Federal Reserve's role in the transfer of financial assets from one party to another needs to be examined with the view of understanding the risks which the society undertakes when such a change is initiated.  On the other hand, the instantaneous settlement capacity which coded electronic systems offer can so substantially diminish certain risks that one of the reasons for the Federal Reserve substantial role might well be mitigated.  Such instantaneous transfers are, however, a mixed blessing because their ability to convert relatively fixed assets into transaction balances possess a potential to substantially increase the difficulties of conducting monetary policy.

Earlier in the report, the Subcommittee noted that its interest in the issues and controversies surrounding the Federal Reserve's role in the check clearing and collection system arose in the course of its regular examinations of the conduct of monetary policy and the role which depository institutions perform as a conduit for the actions and policies of the central bank.  Among the ways that payments system questions affect monetary policy are the following: the impact on the conduct of monetary policy by non-depository institutions which issue transaction accounts; the ability to instantly convert real estate, stocks, bonds, and other assets into funds capable of commanding goods and services; and the role of credit cards that allow transactions to be bunched for a single payment at the end of a month.  It would appear, therefore, that the Subcommittee would be remiss in its examination of the payments system if it did not suggest what the

64

future role of the Federal Reserve ought to be in this changing era.

If the Federal Reserve is to maintain a role in any future character of the payments system, that role should be premised on the reasons for its current role: the safety and soundness of the payments process, and the effective conduct of monetary policy.  The following are ways that future role may be manifested.

## ** Switch Manager **

According to a study by the Federal Reserve Bank of Atlanta ["Why People Write Checks", Economic Review, August 1983], people write checks for four reasons:

1. to acquire cash;
2. make retail purchases;
3. pay bills; and
4. pay other individuals.

With the exception of occasional payments to individuals who probably would not possess access to an electronic funds network, most transfers contemplated in the first three categories could be undertaken by some paperless means.  At present, most of the paperless information exchange intermediaries are local electronic networks composed of any number of terminals that are interconnected through a central switching device.  While efforts are being made to increase the compatability of various local networks, much work remains to be done in this area.  One role which the Federal Reserve ought to consider is that of intermediary between differing exchanges that have differing time and settlement policies.  Such an undertaking has the potential of assuring access by all depository instititions to a national EFT network and, more importantly, that interbank settlements are properly

65

and timely made.  To the extent that electronic networks become the major source of payments, the Federal Reserve's role would also assure it of timely information and capacity to influence monetary policy. This role will become especially crucial if additional institutions are given access to the payments system.  Accordingly, the Federal Reserve should report to the Subcommittee on Domestic Monetary Policy at the earliest possible time on the impact that increases in the use of EFT networks will have on its capacity to monitor the use of money and credit and its conduct of monetary policy, with a view towards establishing a national EFT settlement standard.

## ** Debit/Credit Card Processing **

To the extent that more transactions take place with the use of debit/credit cards that may generate an actual transfer of payment from one party to another, irrespective of credit considerations by the transferee, there would appear to be no reason for the Federal Reserve to forego entry into this undertaking.  While the Federal Reserve should not enter this field without some clearly defined goals of assuring payments, monitoring money and credit policies, or setting settlement standards, it would not appear that there are any inherent reasons the Federal Reserve should fail to consider entry. Accordingly, the Federal Reserve should examine and report to the Subcommittee on Domestic Monetary Policy at the earliest possible time on the efficacy of such an undertaking.

66

** Access to the Payments System for Non-Depository Institutions **

Among the reasons that depository institutions are special is their unique capability to access directly the national payments system and so to guarantee that payments are made from one party to another. No other type of institution has that capacity.  Depository institutions, however, also have other functions such as serving as sources of government insurance for investors.  Recently, there have been pro forma depository institutions created by nonfinancial businesses for the primary purpose of gaining access to the payments system.  The possible proliferation of such pro forma depository institutions that are intended to facilitate payments but also have all the other potential powers and functions of a depository institution has serious implications for the blurring of distinctions between commerce and finance.  To meet the desire of nonfinancial institutions to access the payments system without compromising the distinctions between banking and commerce, the Federal Reserve should consider the development of specialized entities that nonfinancial businesses can create to access the payments system but that are otherwise strictly limited in their powers and in their risk.  The Federal Reserve is, therefore, requested to study and report at the earliest possible time on the various practical and policy considerations that such an undertaking would present.

67

CONCLUSIONS

For the foreseeable future, the checking account will continue to be the backbone of the system used by American businesses and individuals to make payments to one another.  With the Federal Reserve's participation, the payments system of the United States has become one of the most secure, most efficient, and least expensive in the world. This report concludes that the Federal Reserve's continued participation is essential, first to the maintenance of safety and soundness, and then to further improvements that will enhance the payments mechanism and the development of new and innovative forms of payments that Americans might use.  It believes that this role was envisioned by the the Congress when it adopted the Monetary Control Act, and the implementation of explicit pricing for payments services by the Federal Reserve has been consistent with that objective.

Private sector competition will continue to be useful in assuring continued efficiency and low-cost of our payments system.  The Subcommittee recognizes that there may have been some temporary inequities in terms of competition during the Federal Reserve's implementation of pricing for its services, but that these were the inevitable and acceptable costs of maintaining a Federal Reserve role in the payments system during the transition. It believes that a basis for fair competition has been provided by present arrangements for calculation of Federal Reserve prices, and that these arrangements should continue, provided there is fair cost-allocation and calculation of the Private Sector Adjustment Factor by the Federal Reserve.  As long as neither the Federal Reserve nor the private sector dominate check-clearing, an efficient and equitable payments system will exist.

68

The Subcommittee will continue to monitor the Federal Reserve's pricing policies and practices to assure that remain fair and reasonable.

Individual depository institutions should become cognizant of the opportunities which competition offers them in check collection and clearing.  Using both private sector and Federal Reserve check collection and clearing options, depository institutions should be able to offer both faster and less expensive opportunities for their customers.  Unfortunately, excessive charges and delays on funds availability, especially when unjustly blamed on the Federal Reserve, tend to bring into question the wisdom of the decision to encourage competition and very likely discourage further movement of that nature in the future.  These matters will continue to occupy the interest of the various Subcommittees as they seek to provide guidance on the future role which the Federal Reserve should have in the national payments system.

Finally, the Subcommittee concludes that the Federal Reserve should continue to play a role in the payments system as it evolves toward increased use of electronic transactions and away from paper checks.  Therefore, the Federal Reserve should report to the Subcommittee on Domestic Monetary Policy at the earliest possible time on the following issues: (1) the impact that increases in the use of EFT networks will have on its capacity to monitor the use of money and credit and its conduct of monetary policy, with a view towards establishing a national EFT settlement standard; (2) the efficacy of processing of credit/debit card payments by the Federal Reserve; and (3) the practical and policy considerations involved in the creation of specialized payments-services entities that can be utilized by non-depository institutions to access the Federal Reserve's payment system.

69

LISTINGS OF RESERVE BANKS, BRANCHES AND RCPCs

BOSTON:
Frank E. Morris, President
Robert W. Eisenmenger, First Vice President
600 Atlantic Avenue
Boston, Massachusetts   02106
(617-973-3000)

NEW YORK:
Anthony M. Solomon, President
Thomas M. Timlen, First Vice President
33 Liberty Street
(Federal Reserve P.O. Station)
New York, New York   10045
(212-791-5000)

Buffalo Branch:
John T. Keane, Vice President and Branch
   Manager
160 Delaware Avenue
Buffalo, New York   14202
(716-849-5000)

PHILADELPHIA:
Edward G. Boehne, President
Richard L. Smoot, First Vice President
Ten Independence Mall
Philadelphia, Pennsylvania   19106
(215-574-6000)

CLEVELAND:
Karen N. Horn, President
William H. Hendricks, First Vice President
1455 East Sixth Street
Cleveland, Ohio   44101
(216-579-2000)

Cincinnati Branch:
Charles A. Cerino, Senior Vice
   President and Branch Manager
150 East Fourth Street
Cincinnatti, Ohio   45201
(513-721-4787)

Pittsburgh Branch:
Harold J. Swart, Senior Vice
   President and Branch Manager
717 Grant Street
Pittsburgh, Pennsylvania   15203
(412-261-7800)

RICHMOND:
Robert P. Black, President
Jimmie R. Monhollon, First Vice President
701 East Byrd Street
Richmond, Virginia   23219
(804-643-1250)

<u>Baltimore Branch</u>: Robert D. McTeer, Jr., Senior
 Vice President and Branch Manager
503 South Sharp Street
Baltimore, Maryland 21201
(301-576-3300)

<u>Charlotte Branch</u>: Albert D. Tinkelenberg, Senior
 Vice President and Branch Manager
401 South Tryon Street
Charlotte, North Carolina 28230
(704-373-0200)

ATLANTA: Robert P. Forrestal, President
Jack Guynn, First Vice President
104 Marietta Street, N.W.
Atlanta, Georgia 30303
(404-521-8500)

<u>Birmingham Branch</u>: Fred R. Herr, Vice President and
 Branch Manager
1801 Fifth Avenue, North
Birmingham, Alabama 35202
(205-252-3141)

<u>Jacksonville Branch</u>: James D. Hawkins, Vice President
 and Branch Manager
515 Julia Street
Jacksonville, Florida 32231
(904-632-4400)

<u>Miami Branch</u>: Patrick K. Barron, Vice President
 and Branch Manager
9100 Northwest 36th Street
Miami, Florida 33178
(305-591-2065)

<u>Nashville Branch</u>: Jeffrey J. Wells, Vice President
 and Branch Manager
301 Eighth Avenue, North
Nashville, Tennessee 37203
(615-259-4006)

<u>New Orleans Branch</u>: Henry H. Bourgaux, Jr., Vice
 President and Branch Manager
525 St Charles Avenue
New Orleans, Louisiana 70161
(504-586-1505)

CHICAGO:                Silas Keehn, President
                        Daniel M. Doyle, First Vice President
                        230 South LaSalle Street
                        Chicago, Illinois   60690
                        (312-322-5322)

        Detroit Branch:         Roby L. Sloan, Senior Vice President
                                  and Branch Manager
                                160 Fort Street, West
                                Detroit, Michigan   48231
                                (313-961-6880)

ST. LOUIS:              Theodore H. Roberts, President
                        Joseph P. Garbarini, First Vice President
                        411 Locust Street
                        St. Louis, Missouri   63102
                        (314-444-8444)

        Little Rock Branch:     John P. Breen, Vice President and
                                  Branch Manager
                                325 West Capitol Avenue
                                Little Rock, Arkansas   72203
                                (501-372-5451)

        Louisville Branch:      James E. Conrad, Vice President
                                  and Branch Manager
                                410 South Fifth Street
                                Louisville, Kentucky   40201
                                (502-568-9200)

        Memphis Branch:         Paul I. Black, Jr. Vice President and
                                  Branch Manager
                                200 North Main Street
                                Memphis, Tennessee   38103
                                (901-523-7171)

MINNEAPOLIS:            E. Gerald Corrigan, President
                        Thomas E. Gainor, First Vice President
                        250 Marquette Avenue
                        Minneapolis, Minnesota   55480
                        (612-340-2345)

        Helena Branch:          Robert F. McNellis, Vice President
                                  and Branch Manager
                                400 North Park Avenue
                                Helena, Montana   59601
                                (406-442-3860)

KANSAS CITY:      Roger Guffey, President
Henry R. Czerwinski, First Vice President
925 Grand Avenue
Kansas City, Missouri    64198
(816-881-2000)

    Denver Branch:    Wayne Martin, Senior Vice President
and Branch Manager
1020 16th Street
Denver, Colorado   80202
(303-534-5500)

    Oklahoma City Branch:    William G. Evans, Vice President
and Branch Manager
226 Dean A. McGee Avenue
Oklahoma City, Oklahoma   73125
(405-235-1721)

    Omaha Branch:    Robert D. Hamilton, Vice President
and Branch Manager
1701 Dodge Street
Omaha, Nebraska   68102
(402-341-3610)

DALLAS:      Robert H. Boykin, President
William H. Wallace, First Vice President
400 South Akard Street
Dallas, Texas   75222
(214-651-6111)

    El Paso Branch:    Joel L. Koonce, Jr., Vice President
and Branch Manager
301 East Main Street
El Paso, Texas   79999
(915-544-4730)

    Houston Branch:    J. Z. Rowe, Senior Vice President
and Branch Manager
1701 San Jacinto Street
Houston, Texas   77002
(713-659-4433)

    San Antonio Branch:    Thomas H. Robertson, Vice President
and Branch Manager
126 East Nueva Street
San Antonio, Texas   78204
(512-224-2141)

SAN FRANCISCO:   John J. Balles, President
Richard T. Griffith, First Vice President
101 Market Street
San Francisco, California   94105
(415-974-2000)

Los Angeles Branch:   Richard C. Dunn, Senior Vice
President and Branch Manager
409 East Olympic Boulevard
Los Angeles, California   90015
(213-683-8323)

Portland Branch:   Angelo S. Carella, Vice President
and Branch Manager
915 S.W. Stark Street
Portland, Oregon   97025
(503-221-5900)

Salt Lake City Branch:   Grant A. Holman, Senior Vice
President and Branch Manager
120 South State Street
Salt Lake City, Utah   84111
(801-322-7900)

Seattle Branch:   Gerald R. Kelly, Senior Vice
President and Branch Manager
1015 Second Avenue
Seattle, Washington   98104
(206-442-1376)

## Regional Check Processing Centers

Charleston, W. Va.   Richard L. Hopkins, Vice President
Federal Reserve Bank of Richmond

Cranford, N.J.   Fred A. Denesevich, Regional Manager
Federal Reserve Bank of New York

Columbia, S.C.   Boyd Z. Eubanks, Vice President
Federal Reserve Bank of Richmond

Columbus, Ohio   Charles F. Williams, Vice President
Federal Reserve Bank of Cleveland

Des Moines, Iowa   Allen R. Jensen, Operations Officer
Federal Reserve Bank of Chicago

Indianapolis, Ind.   Russell O. Langan, Assistant Vice
President
Federl Reserve Bank of Chicago

| | |
|---|---|
| Jericho, N.Y. | Anthony N. Sagliano, Regional Manager<br>Federal Reserve Bank of New York |
| Lewiston, Maine | James S. Phalen, Vice President<br>Federal Reserve Bank of Boston |
| Milwaukee, Wis. | Thomas G. Ciesielski, Assistant<br>Vice President<br>Federal Reserve Bank of Chicago |
| Utica, N.Y. | Harry A. Curth, Jr., Regional Manager<br>Federal Reserve Bank of New York |
| Windsor Locks, Conn. | James S. Phalen, Vice President<br>Federal Reserve Bank of Boston |