Tyler J. Garrett, #6-4400
HATHAWAY & KUNZ, LLP
2515 Warren Avenue, Suite 500
Cheyenne, WY 82001
(307) 634-7723
tgarrett@hkwyolaw.com

Michelle S. Kallen*
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
mkallen@jenner.com

Matthew I. Summers*
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
msummers@jenner.com
*Admitted pro hac vice

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br>          *Plaintiff,* <br><br> v. <br><br> BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, and <br><br> FEDERAL RESERVE BANK OF KANSAS CITY, <br><br>          *Defendants.* | Civil Case No.: 1:22-CV-00125-SWS |

## [PROPOSED] BLOCKCHAIN ASSOCIATION AND PAYMENT SYSTEMS SCHOLARS' AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFF

## CORPORATE DISCLOSURE STATEMENT

Counsel for amicus Blockchain Association (BA) certifies that BA has no parent corporation and no publicly held corporation owns 10% or more of any stock in BA.[1]

---

[1] Amici curiae Gerald P. Dwyer, Frank Emmert, Tonya M. Evans, Julie Andersen Hill, and George Selgin are individuals, not corporations.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

IDENTITY AND INTEREST OF AMICI CURIAE ..................................... 1

PRELIMINARY STATEMENT .................................................................... 2

ARGUMENT ................................................................................................. 3

I.   Defendants' assertion of complete discretion to deny master accounts undermines the important role states play in the dual banking system ......... 3

    A.   The dual banking system respects the distinct chartering authority of both state and federal entities ............................................ 4

    B.   The Monetary Control Act maintains the state-federal balance in the dual banking system ..................................................................... 7

    C.   The Federal Reserve Board's self-assigned risk-vetting responsibility undermines financial innovation ................................... 11

II.   Defendants' newfound risk-assessment role fundamentally undermines Wyoming's chartering decision ......................................................... 15

CONCLUSION ............................................................................................. 25

CERTIFICATE OF SERVICE ..................................................................... 26

APPENDIX ............................................................................................. App. 1

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*,
   No. 23-cv-6414, 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023) ................................ 21

*FERC v. Mississippi*,
   456 U.S. 742 (1982) ........................................................................................ 13

*First Nat'l Bank v. Kentucky*,
   76 U.S. 353 (1869) ........................................................................................... 5

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
   861 F.3d 1052 (10th Cir. 2017) ................................................................. 6, 8, 21

*Lacewell v. Off. of Comptroller of Currency*,
   999 F.3d 130 (2d Cir. 2021) ............................................................................ 4

*Lusnak v. Bank of Am., N.A.*,
   883 F.3d 1185 (9th Cir. 2018) ......................................................................... 12

*Nat'l State Bank, Elizabeth, N.J. v. Long*,
   630 F.2d 981 (3d Cir. 1980) ............................................................................ 11

*New State Ice Co. v. Liebmann*,
   285 U.S. 262 (1932) ........................................................................................ 13

*In re S. Indus. Banking Corp.*,
   872 F.2d 1257 (6th Cir. 1989) ......................................................................... 11

*United States v. Lopez*,
   514 U.S. 549 (1995) ........................................................................................ 13

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) ......................................................................................... 5

*Utility Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014) ........................................................................................ 21

**Statutes and Rules**

12 U.S.C. § 1(a) (2010) ...................................................................................... 4

iii

12 U.S.C. § 25b(b)(1)(B) (Dodd-Frank) (2018) ............................................................ 11

12 U.S.C. § 248a(c)(2) (1980) ................................................................................... 8

Federal Reserve Act, ch. 6, 38 Stat. 251 (1913) ........................................................ 5

Fed. R. App. P. 29(4)(E) ........................................................................................... 1

021-20 Wyo. Code R. § 20-2(d)(i)–(vi) ................................................................. 18–19

Wyo. Rules & Regs. 021.0002.20 § 6(j)(ii) ................................................................ 7

Wyo. Rules & Regs. 021.0002.20 § 9(d)(i)–(iii) ...................................................... 16

Wyo. Stat. Ann. § 13-12-101, *et seq.* ...................................................................... 16

Wyo. Stat. Ann. § 13-12-105(a) .............................................................................. 16

Wyo. Stat. Ann. § 13-12-105(b)(iii) ......................................................................... 17

Wyo. Stat. Ann. § 13-12-119 .................................................................................. 19

D. Wyo. Local Rule 83.6(d) ...................................................................................... 1

D. Wyo. Local Rule 7.1(b)(1)(A) .............................................................................. 1

## Other Authorities

126 Cong. Rec. 6197 (1980) ...................................................................................... 8

Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation*, 57 Fla. L. Rev. 295 (2005) .................... 14, 15

Bank for Int'l Settlements, *Principles for Financial Market Infrastructures* 73 (Apr. 2012) .................................................................... 6

Bank of England, *Regulatory Regime for Systemic Payment Systems Using Stablecoins and Related Service Providers* (Nov. 2023) ............................ 24

Bd. of Governors of Fed. Rsrv. Sys., *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* § II. C. (eff. July 12, 2012) ................................................................................................ 6

*Bitcoin Banking: European Banks Are Beating U.S. Banks In The Crypto Custody Race*, Forbes (July 12, 2023) ...................................... 24

Jonathan Buck, *Bitcoin Banking: European Banks Are Beating U.S. Banks In The Crypto Custody Race*, Forbes (July 12, 2023) ................................ 24

Gaven Cheong et al., *Government Attitude and Definition in Blockchain & Cryptocurrency Laws and Regulations 2024 | Hong Kong*, Global Legal Insights (last visited Jan. 18, 2024) .................................... 24

Congressional Rsch. Serv., *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress* (May 17, 2019).................................................................................................... 3, 4

Peter Conti-Brown, *The Twelve Federal Reserve Banks: Governance and Accountability in the 21st Century*, Brookings Working Paper No. 10 (Mar. 2, 2015) ........................................................................ 5

Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But is That Legal?* Brookings (Nov. 14, 2018)........................................ 8

Jon Durfee et al., *Examining CBDC and Wholesale Payments*, FEDS Notes (Sept. 8, 2023) ........................................................................ 6

FDIC, *FDIC State Tables* (last visited Jan. 18, 2024) ................................ 4

FRB Order No. 2023-02, Order Denying Application for Membership (Jan. 27, 2023) .................................................................... 20, 21

Fed. Rsrv. Bd., *A Summary of the Roundtable Discussion on the Risk and Security Involving Retail Payments Over the Internet* (last visited Jan. 18, 2024) ........................................................................ 10

Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular No. 1*, Account Relationships (eff. Sept. 1, 2023) ........................................ 7

Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* (11th ed. 2021) ........................................................................ 5

Bob Fernandez, *Wyoming Effort to Support Crypto-Focused Banks Set Back by Fed Concerns About Industry*, Wall St. J., Sept. 5, 2023 ...................... 19

Fin. Stability Bd., *High-Level Recommendations for the Regulation, Supervision and Oversight of Global Stablecoin Arrangements* (July 17, 2023) ........................................................................ 18

Tamar Frankel, *The Dual State-Federal Regulation of Financial Institutions–A Policy Proposal*, 53 Brook. L. Rev. 53 (1987).............................. 14

Stephen J. Friedman, *A New Paradigm for Financial Regulation: Getting From Here to There*, 43 Md. L. Rev. 413 (1984) ...................................... 20

Frontline, *Secret History of the Credit Card*, PBS (2004).................................... 14

*Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg.
51,099 (Aug. 19, 2022) ............................................................. 10

H.B. 74, 65th Leg., Reg. Sess. (Wyo. 2019) ................................................. 16

H.R. Rep. No. 95-1590 (1978) ................................................................ 8

Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. on
Reg. 459 (2023) ................................................... 5, 6, 7, 9, 10

Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L.
Rev. 357 (2016) ......................................................................... 17

Libr. of Congress, *Switzerland: New Amending Law Adapts Several
Acts to Developments in Distributed Ledger Technology* (Mar. 3,
2021) .................................................................................... 23–24

Libr. of Congress, *Yellowstone, the First National Park* (last visited
Jan. 18, 2024) ......................................................................... 13

Patricia A. McCoy, *The Moral Hazard Implications of Deposit
Insurance: Theory and Evidence* (Feb. 18, 2007) ................................. 17

Office of the Comptroller of the Currency, *Payment Systems* (Oct.
2021) ..................................................................................... 7

Martin Leo Rivers, *The World's First Regulated Crypto Bank Braces
For Flood Of Institutional Money*, Forbes (Apr. 21, 2022) ...................... 24

Julie L. Stackhouse, *Why America's Dual Banking System Matters*,
Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017) ................................... 3

State of Wyo., Dep't of Audit, Division of Banking, *Special Purpose
Depository Institutions: Updated Capital Requirement Guidance*
(July 7, 2021) ................................................................... 16, 18, 19

*The EPC and the SEPA Process*, European Payments Council, (last
visited Jan. 18, 2024) ............................................................... 23

J.W. Verret, *Federalism and Fintech Firms: A Review of Pro-Fintech
Innovations and A Suggested Federalism Based Reform to
Facilitate Fintech Innovation*, 41 Rev. Banking & Fin. L. 313 (2021)................. 12

Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the
Federal Response, and the Case for Preserving the Dual Banking
System*, 58 Fordham L. Rev. 1133 (1990).....................3, 5, 11, 12, 13, 14, 15, 22

Wyo. Div. of Banking, *Special Purpose Depository Institution Examination Manuals* (Jan. 2021) ............................................................ 9, 16, 19

Wyo. Sec'y of State, *The Choice is Yours* (2022) ........................................................ 13

Yesha Yadav et al., *Payments and the Evolution of Stablecoins and CBDCs in the Global Economy* Vand. L. Rsch. Paper No. 23-19 (revised Apr. 25, 2023) .......................................................................... 3, 6, 11, 23

## IDENTITY AND INTEREST OF AMICI CURIAE[2]

Amici curiae Gerald P. Dwyer, Frank Emmert, Tonya M. Evans, Julie Andersen Hill, and George Selgin are professors and scholars who specialize in financial markets, banking regulation, and digital asset markets. Their backgrounds are detailed in the attached appendix.

Amicus curiae Blockchain Association (BA) is the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for digital assets. BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace. BA represents over 100 member companies that reflect the diversity of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem. Blockchain technology, which underlies digital assets, has demonstrated the potential to foster a more equitable financial system and return control over user data back to individuals instead of large corporations. Unlike traditional payment methods, digital assets are accessible to anyone with an internet connection, enabling those who may lack financial services—or those who wish for more efficiency, transparency, and fewer fees—to join the global economy. Although the industry is still in its nascency, growth

---

[2] In accordance with Local Rule 7.1(b)(1)(A), Amici have conferred with the parties and they consent to the filing of this amicus brief. In accordance with Local Rule 83.6(d) and Federal Rule of Appellate Procedure 29(4)(E), Amici affirm that no party or counsel for a party authored this brief in whole or in part and that no person other than amici, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

is rapid and protecting the ability of developers and entrepreneurs to innovate through sensible regulation is key.

Amici have an interest in ensuring an effective regulatory banking regime.

## PRELIMINARY STATEMENT

The outcome of this case may gravely impact decades-long precedent and established Congressional directives to maintain the strength of America's dual banking system. The dual banking system established by Congress empowers both the state and federal governments to play equal roles in chartering and regulating banks. It reflects sovereign values dating back more than a century, and has allowed state banking systems to lead innovation in how Americans move, use, and manage their money. The arguments advanced by the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of Kansas City (Defendants) in this case threaten to upend this system. Defendants arrogate power to the federal banking agencies that Congress did not intend.

Defendants' actions in this case transform the long-established master account process from a simple application (akin to opening a bank account) into an opportunity for a federal agency to second-guess a state's risk-based supervisory framework. Not only is this inconsistent with the Federal Reserve Board's long-held practice for master accounts, but sanctioning this newly proclaimed power is inconsistent with the balance between state and federal responsibility in the dual banking system. Amici therefore urge this Court to grant Custodia's Petition for Review and Motion for Judgment as a Matter of Law. Pl's Omnibus Br., ECF 239.

## ARGUMENT

The impact of Defendants' arguments upends the balance between state and federal financial regulators.  This case raises the fundamental question of whether federal financial regulators can empower themselves to second-guess a state's risk analysis—like Wyoming's Special Purpose Depository Institution (SPDI) framework—and upset the balance between state and federal financial regulation within the dual banking system.

### I.   Defendants' assertion of complete discretion to deny master accounts undermines the important role states play in the dual banking system

"Since the early days of our Republic, the federal government and the states have shared responsibility for the regulation of banking."  Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).[3]  This shared responsibility has traditionally resulted in state regulation dominating payments, and federal regulation focused on money laundering and illicit finance concerns.  *See* Yesha Yadav et al., *Payments and the Evolution of Stablecoins and CBDCs in the Global Economy*, Vand. L. Rsch. Paper No. 23-19 at 6 (revised Apr. 25, 2023), http://tinyurl.com/msbc6b82; *see also* Julie L. Stackhouse, *Why America's Dual Banking System Matters*, Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017), http://tinyurl.com/mu7p78jw ("In our country's early years, those seeking to issue and

---

[3] The parallel state and federal banking systems that co-exist in the United States today is called the "dual banking system."  *See* Congressional Rsch. Serv., *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, 4–5 (May 17, 2019), https://sgp.fas.org/crs/misc/R45726.pdf.

circulate bank notes required a bank charter, and most of those charters were issued at a state level.").

A.   The dual banking system respects the distinct chartering authority of both state and federal entities

Under today's dual-banking system, banks have the option of applying "for a national charter from the Office of the Comptroller of the Currency (OCC) or a state charter from a state's banking authority." *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, *supra*, at 4–5. A bank's choice of chartering authority is also a choice of its primary regulator; the OCC is the primary regulator of national banks and state agencies serve as primary regulators of state-chartered banks. *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 135 (2d Cir. 2021) ("Within [the dual banking] system, both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters."); 12 U.S.C. § 1(a) (2010). As of September 2023, there are 3,551 state-chartered banks and 729 commercial banks with national charters. FDIC, *FDIC State Tables*, https://state-tables.fdic.gov/ (last visited Jan. 18, 2024). State banks are an important part of the United States banking system.

National banks are typically subject to generally applicable state laws, and state banks may be subject to generally applicable federal laws and federal regulations. *Federal Preemption in the Dual Banking System*, *supra*, at 6–7.[4]

─────────────

[4] By design, state law provides the legal backdrop against which national banks function, and "[t]he fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 352 (1963); *First*

"Because federal and state banking laws allow banks to convert between national and state charters without the approval of their current regulator, the dual banking system contains a 'safety valve' allowing banks to escape from arbitrary, inflexible or outdated regulation." Wilmarth Jr., *supra*, at 1155.[5]

Although common parlance refers to "the Fed" as a single, uniform entity, the system is more complex.[6] The Federal Reserve System includes a central governing Board with seven members and twelve Federal Reserve Banks supervised by the Board. *See* Federal Reserve Act, ch. 6, 38 Stat. 251 (1913); Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* 2 (11th ed. 2021), http://tinyurl.com/n8fkxy3m; Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 459 (2023). "[M]aster accounts" are Federal Reserve Bank accounts that provide financial institutions the safest place "to deposit money" and the potential to "earn interest." Andersen Hill, *supra*, at 459. A master account also confers access to "payment systems operated by the Federal Reserve" System, including "check clearing,

---

*Nat'l Bank v. Kentucky*, 76 U.S. 353, 362 (1869) (national banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation").

[5] This case highlights why the dual banking system is important: in the face of a vacuum of federal regulation for crypto banking services, states like Wyoming have stepped up to fill the void. *See* Section II, *infra*.

[6] *See* Peter Conti-Brown, *The Twelve Federal Reserve Banks: Governance and Accountability in the 21st Century*, Brookings Working Paper No. 10 at 3 (Mar. 2, 2015), http://tinyurl.com/444d8j74 ("The term 'Federal Reserve' is not a noun, but a compound adjective. There are Federal Reserve Banks, Federal Reserve Notes, a Federal Reserve Board, and, taken together, a Federal Reserve System, all created by the Federal Reserve Act of 1913. But there is no 'Federal Reserve' by itself. This vocabulary failure belies a harder problem for thinking about the Federal Reserve System—even though we rarely refer to it as such, to paraphrase Kenneth Shepsle, the Fed is a 'they,' not an 'it[.]'").

wire transfer, and automated clearinghouse payment systems." *Id.* at 459–60. *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Op. of Mortiz, J.) ("A master account is, put simply, a bank account for banks."). Payments made through the system are generally safer and cheaper than payments by other means. Federal Reserve notes and master account balances are "central bank money," which has no settlement or credit risk. Because paper notes can be stolen, master account balances are considered the safest money. Jon Durfee et al., *Examining CBDC and Wholesale Payments*, FEDS Notes (Sept. 8, 2023), http://tinyurl.com/53vfhjvh; Yadav et al., *supra*, at 11–12 (Banks with master account balances "enjoy the assurance that their funds are held in the safest [metaphorical] vaults anywhere.").

Access to master accounts reduces latent settlement and concentration risk, as depository institutions do not rely on other institutions to settle customer accounts with the Federal Reserve System. Bank for Int'l Settlements, *Principles for Financial Market Infrastructures* 73 (Apr. 2012), http://tinyurl.com/4uwxw294 (A financial market infrastructure (FMI) "should conduct its money settlements in central bank money where practical and available. If central bank money is not used, an FMI should minimi[z]e and strictly control the credit and liquidity risk arising from the use of commercial bank money.").[7]

---

[7] Risk is further reduced because Defendants can offer a SPDI a "zero net debit cap" master account, which, like a debit card, does not permit the institution to overdraw its account. Bd. of Governors of Fed. Rsrv. Sys., *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* § II. C. (eff. July 12, 2012), http://tinyurl.com/mry9be82. Additionally, the Federal Reserve is given a senior lien

Using a master account is also cheaper because payments are, in practice, ultimately settled through transfers to and from depository institutions' Federal Reserve master accounts. Transfers at the Fed have legal finality. Office of the Comptroller of the Currency, *Payment Systems* 11 (Oct. 2021), http://tinyurl.com/3sfefu64 ("[e]ach transfer is final and irrevocable when made"). A depository institution without a master account must work through a "correspondent bank" that has a Federal Reserve account and is willing to hold the other institution's "deposits and process its payments" through the Federal Reserve System (often at great expense to its correspondent institution). This arrangement typically involves more time, a settlement risk if the correspondent bank fails, and the possibility that the correspondent closes the account. Andersen Hill, *supra*, at 460. Within the dual banking system, a depository institution that obtains a state charter is legally eligible for a master account. *Id.*[8]

## B.    The Monetary Control Act maintains the state-federal balance in the dual banking system

Congress has taken steps to ensure that Federal Reserve payment services are equally available to state and nationally chartered depository institutions. In 1980, Congress passed the Monetary Control Act, which sought to provide broad access to

---

on an SPDI's assets in the event of receivership, which effectively reduces the risk to the Federal Reserve System to near zero. Wyo. Rules & Regs. 021.0002.20 § 6(j)(ii).

[8] To obtain a correspondent relationship with another bank, the Federal Reserve must approve the correspondent relationship based on the same standards as a master account application. So far, the Federal Reserve has refused permission to Custodia for even a correspondent relationship. Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular No. 1*, Account Relationships (eff. Sept. 1, 2023), http://tinyurl.com/ecftjvuu.

Federal Reserve's services.  The bill's key aim was to facilitate "wide access to Federal Reserve services for nonmember banks" and to ensure "that a basic level of services is available to all banks throughout the country on a nondiscriminatory basis."  H.R. Rep. No. 95-1590, at 20 (1978).[9]  In the provision at the heart of this case, Section 248a(c)(2), Congress required that Federal Reserve Banks provide the same account and payment services to all depository institutions (even though some posed more risk than others and that states weighed risk as part of their chartering process).[10]

The plain text of Section 248a(c)(2) reflects that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  As a practical matter, the Federal Reserve bank services discussed in Section 248a(c)(2) can only be provided to institutions with master accounts.[11]  It follows that the decision to deny a master account to any eligible depository institution is tantamount

---

[9] *See also* 126 Cong. Rec. 6197, 6250 (1980) (Conf. Rep.) ("House amendment includes a provision for the Federal Reserve to . . . open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks.").

[10] 12 U.S.C. § 248a(c)(2) (1980) ("All Federal Reserve bank services covered by the fee schedule [that the Monetary Control Act required the Board of Governors of the Federal Reserve System to propose] shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.").

[11] "[A]ll services offered by the Federal Reserve System are conditioned on the issuance of master accounts. . . . Without a master account, none of the fee schedule's services would be available." *Fourth Corner Credit Union*, 861 F.3d at 1068–69 (Op. of Bacharach, J.); Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities.   But  is  That  Legal?*   Brookings   (Nov.  14,  2018), http://tinyurl.com/569enyb5 ("The master account allows a financial institution to participate in the payment system.  Without it, a financial institution can't really function as a financial institution.  It becomes instead a kind of storage locker.").

to charging it a prohibitive price for the services in question.  Although Defendants suggest that certain depository institutions pose risks that make them unsuitable to receive master accounts, neither the Monetary Control Act nor any other part of the Federal Reserve Act grants the Federal Reserve the right to act as supervisor for state-chartered banks, by vetting them for risk or otherwise, absent a bank becoming a member bank of the Federal Reserve System.  Wyoming in particular has an extensive risk-vetting framework composed of two separate chapters of administrative rules and a 772-page examination manual, which are primarily based on Federal rules for banks.  Wyo. Div. of Banking, *Special Purpose Depository Institution Examination Manuals* (Jan. 2021), http://tinyurl.com/4medjt5v.

In fact, for almost four decades, the Federal Reserve Board did not view itself as responsible for second-guessing the risk evaluations in the state-chartering process. Opening a master account was straightforward and similar to opening a bank account: an institution would fill out "a one-page form" that identified the applicant, "list[ed] the people to whom the Federal Reserve Bank should direct questions," and committed to be "bound by the Federal Reserve's account policies."  Andersen Hill, *supra*, at 455. The process typically took five to seven business days.  *Id.* at 456.  In the last decade, however, the Federal Reserve Board began using the master account process to deny state-chartered depository institutions access to its payment services, while justifying such denials—whether outright or by refusal to make a decision—by appeal to

potential riskiness.  *Id.*  For more novel entities, securing a master account became "a lengthy process more like applying for a bank charter."  *Id.*[12]

The Federal Reserve Board recently formalized its self-declared risk-assessment responsibility by adopting *Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099, 51,099 (Aug. 19, 2022).  The Guidelines set forth an extensive risk-vetting framework for accounts and services, laying out three tiers for classifying banks.  *Id.* at 51,109.  Tier 1 for institutions insured by the Federal Deposit Insurance Corporation (FDIC).  Institutions not federally insured, but subject to federal banking agency supervision, are classified as Tier 2.  *Id.* at 51,109–110.  And Tier 3 institutions are neither federally insured nor subject to federal agency supervision.  *Id.* at 51,110.  Applications from Tier 3 institutions are presumptively denied.  *Id.* at 51,106–110; *see also* ECF 239 at 14 (citing discovery from Kansas City Federal Reserve staff stating that "approval isn't anticipated if Tier 3 route is taken").

The Guidelines formalized the chartering-like process novel banks recently encountered from the Federal Reserve Board (without appropriate Congressional authority).  *Id.* at 51,099 n.3 (acknowledging that "[i]n developing the Account Access Guidelines, the Board sought to incorporate as much as possible existing Reserve Bank risk management practices"); *accord* Decl. in Support of Pl's Omnibus Br., ECF

---

[12] Novel banking technologies are the vanguard of innovation, yet, as with digital banking in the early 2000s, the Federal Reserve System has often approached them with concern over potential risk.  *See* Fed. Rsrv. Bd., *A Summary of the Roundtable Discussion on the Risk and Security Involving Retail Payments Over the Internet*, http://tinyurl.com/5fprsstd (last visited Jan. 18, 2024).

240-17, Ex. Q at FRBKC-00017835 (notes from Kansas Federal Reserve President Esther George concluding that, notwithstanding the Board's work on the Guidelines, "this [is] an issue for Congress"). Notwithstanding the Guidelines, it remains difficult for innovative banks to obtain access to master accounts. And, while the Guidelines suggest that certain applicants will be subject to greater scrutiny, they give little clarity for precisely how a novel institution can obtain an account. Nor do they impose a clear limit on the time the Federal Reserve Board may take to reach a decision. In short, the Board has not imposed any constraint on its ability to arbitrarily deny legally eligible depository institutions access to master accounts. Yadav et al., *supra*, at 12–13.

The Federal Reserve Board essentially claims near-absolute authority over master accounts. This result is inconsistent with the dual-banking system enacted by Congress and the principles of good government.

### C.    The Federal Reserve Board's self-assigned risk-vetting responsibility undermines financial innovation

The Monetary Control Act does not empower the Federal Reserve Board to second-guess a state's chartering decisions. And, despite multiple efforts to remove state authority over bank regulation, Congress has repeatedly upheld the dual banking system. Wilmarth Jr., *supra*, at 1153–54; *In re S. Indus. Banking Corp.*, 872 F.2d 1257, 1260 (6th Cir. 1989) (describing "Congress' longstanding concern for maintaining a dual banking system in the United States"); *Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 985 (3d Cir. 1980) ("congressional support remains for dual regulation"); *see also* 12 U.S.C. § 25b(b)(1)(B) (Dodd-Frank) (2018)

(explaining that federal law will not preempt state consumer financial law unless "State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers").

In 1933, for example, Congress rejected proposals that would have undermined the state banking system by "allowing national banks to branch across state lines and by providing federal deposit insurance only to national banks and state member banks." Congress, instead, preserved the rule "allow[ing] national banks to establish branches only within their home state[s]," and only where state-chartered banks enjoyed the same privilege. Wilmarth Jr., *supra*, at 1154. In 1956, "Congress prohibited interstate acquisitions of banks by bank holding companies without state authorization," thus preserv[ing] state control over the expansion of banking organizations." *Id.* More recently, Dodd-Frank codified a high standard for federal preemption of state consumer financial law. *See Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1193 (9th Cir. 2018) ("state consumer financial law is preempted *only if* it 'prevents or significantly interferes with the exercise by the national bank of its powers'") (quoting 12 U.S.C. § 25b(b)(1)(B)).[13]

The dual banking system has a long record of state innovation inspiring Congress's legislation. "Courts and commentators frequently have recognized that the 50 States serve as laboratories for the development of new social, economic, and

---

[13] *Accord* J.W. Verret, *Federalism and Fintech Firms: A Review of Pro-Fintech Innovations and A Suggested Federalism Based Reform to Facilitate Fintech Innovation*, 41 Rev. Banking & Fin. L. 313, 340 (2021) ("the Dodd-Frank Act explicitly ensures that the CFPB cannot stand in the way of a 'race to regulate' or otherwise alleviate anticompetitive regulations adopted by states under the guise of consumer protection").

political ideas." *FERC v. Mississippi*, 456 U.S. 742, 788 (1982) (O'Connor, J., concurring in part and dissenting in part);[14] *see also United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring) (discussing states' role "as laboratories for experimentation to devise various solutions where the best solution is far from clear"); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").  The state banking system has helped innovate "real estate lending, trust services, reserve requirements, and deposit insurance"—all innovations that Congress eventually incorporated into the laws governing national banks.  *See* Wilmarth Jr., *supra*, at 1156–57.  State innovation also spurred "interstate electronic funds transfer ('EFT') systems" by establishing "networks of automated teller machines ('ATMs')."[15]  *Id.* at 1156.  States initiated use of "negotiable order of withdrawal ('NOW') accounts."[16]  *Id.*  Congress

---

[14] "This state innovation is no judicial myth.  When Wyoming became a State in 1890, it was the only State permitting women to vote."  *Mississippi*, 456 U.S. at 788.  Wyoming is also home to America's first national park, first national monument, and it created the limited liability company form of business entity.  Wyo. Sec'y of State, *The Choice is Yours* (2022), https://sos.wyo.gov/Forms/Publications/ChoiceIsYours.pdf; Libr. of Congress, *Yellowstone, the First National Park*, http://tinyurl.com/yyd9y3hb (last visited Jan. 18, 2024).

[15] "Interstate shared EFT systems enable customers of a participating bank to obtain access to their accounts by using ATMs located at other participating institutions in the same state or in different states." Wilmarth Jr., *supra*, at 1156 n.98.

[16] "NOW accounts are savings accounts" that allow a "customer to withdraw funds by means of a negotiable instrument" like "a check."  *Id.* at 1156 n.99.

authorized NOW accounts only after several states demonstrated that this convenient service was "highly desirable to both consumers and banks." *Id.* at 1157.[17]

Another example of state banking innovation is South Dakota's decision in the early 1980s permitting banks to charge credit card holders higher rates—most state usury laws at the time capped the maximum rate well below the Federal Reserve's Federal Funds Rate. South Dakota's innovation attracted banks (including Citibank and Wells Fargo) and allowed them to strengthen credit card offerings. Frontline, *Secret History of the Credit Card*, PBS (2004), http://tinyurl.com/y28u8cm9. "[B]y allowing the states to adopt new approaches to bank regulation, the dual banking system permits individual states to act as 'laboratories for change' and to have their experiments adopted by Congress if they prove to be successful." Wilmarth Jr., *supra*, at 1155–56.[18]

States' banking authorities also facilitate change in the face of Congressional paralysis. In the context of the interstate banking movement, for example, "Congress

---

[17] State regulators in the financial industry are generally more responsive to needs of local communities and locally-based banks. State regulators are, therefore, the driving force for innovation. Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation*, 57 Fla. L. Rev. 295, 392 (2005) (federalism "promotes the democratic ideal because state governments are more closely in tune with their citizens and therefore more accountable and responsive to local constituent needs"); *id.* at 394 ("[S]tates will often react to social and economic problems more immediately and responsively than the federal government.").

[18] Unsuccessful state innovation within the dual banking system limits the risk of widespread harm because the experiment was limited to a single state. Tamar Frankel, *The Dual State-Federal Regulation of Financial Institutions–A Policy Proposal*, 53 Brook. L. Rev. 53, 56 (1987) ("in times of change, when experiments and innovations are particularly valuable, the dual banking system reduces the risk of adverse effects to the national system by limiting experiments to one state"). Such "decentralized decision-making promoted by federalism allows for more and better opportunities for innovation and experimentation with social and economic policy than does one centralized bureaucracy." Azmy, *supra*, at 392; Wilmarth Jr., *supra*, at 1157 ("It seems likely that these state experiments will provide useful practical

was unable to enact legislation and the states took the lead in liberalizing geographic restraints on interstate acquisitions of banks." *Id.* at 1177. As another example, "[f]ederal law currently prohibits national banks and bank holding companies from engaging in most types of securities underwriting, insurance underwriting and sales, and real estate investment and development activities. In recent years Congress has been stymied by contests among competing interest groups and has not acted on legislative proposals to authorize new bank powers." *Id.* at 1152. "In contrast, many state legislatures have enacted laws permitting banking organizations to engage to some degree in securities, insurance or real estate activities." *Id.* And, some "states responding to the predatory lending phenomenon have supplemented [federal law] by including a greater proportion of loans to be subject to regulation." Azmy, *supra*, at 365.

*       *       *

Defendants' argument that the routine master account process empowers them to second-guess the risk assessment underlying a state-issued charter threatens the dual banking system, which has facilitated responsive and innovative banking.

## II.    Defendants' newfound risk-assessment role fundamentally undermines Wyoming's chartering decision

Any suggestion in this case that Wyoming's SPDI process requires additional federal risk micromanagement undermines Wyoming's role in the dual-banking

---

experience that will assist in fashioning a new federal policy on bank powers."); Azmy, *supra*, at 362 ("The percolation of state and local regulations is thus generating a sophisticated invaluable regulatory dialogue between the federal and state governments–a real value to our federal system[.]").

system.  Custodia was already evaluated—and passed—a thorough government risk assessment when it was chartered by the State of Wyoming as a Special Purpose Depository Institution.  First Am. Compl., ECF 121, ¶¶ 3, 14.

1.   Wyoming enacted a banking charter for Special Purpose Depository Institutions in 2019 to facilitate banking with digital assets.  *See* H.B. 74, 65th Leg., Reg. Sess. (Wyo. 2019); Wyo. Stat. Ann. § 13-12-101, *et seq.*  It thereby became the first state to offer a bank charter that outlines how regulatory authorities will supervise digital assets.

Just because Wyoming's SPDI charter is innovative, there is no reason to suppose that depository institutions established under it pose added risks that warrant extra scrutiny by federal officials, let alone refusal to grant master accounts. On the contrary: to qualify as a Wyoming SPDI a depository institution must be considerably *safer* than most banks, including national banks.  Wyoming's regulation requires that a SPDI's assets be "managed prudently, consistent with safe and sound banking practices, in a manner that [a]ddresses interest rate risk, including repricing, basis, yield curve and option risk; [p]revents mismatching; and [a]ccounts for potential stress scenarios."  Wyo. Rules & Regs. 021.0002.20 § 9(d)(i)–(iii); *Special Purpose Depository Institution Examination Manuals*, *supra*.  The regulation's specific requirements are strict: a SPDI must invest 100% of its U.S. dollar demand deposits in either cash on hand or high-quality liquid assets, altogether prohibiting it from making any loans.  State of Wyo., Dep't of Audit, Division of Banking, *Special Purpose Depository Institutions: Updated Capital Requirement Guidance* (July 7, 2021), http://tinyurl.com/yp5f5ncn; Wyo. Stat. Ann. § 13-12-105(a) ("At all times, a

special purpose depository institution shall maintain unencumbered liquid assets valued at not less than one hundred percent (100%) of its depository liabilities."). SPDIs hold customer deposits in U.S. dollars (or similar "highly liquid" non-volatile "[i]nvestments," such as "obligations of the United States treasury or other federal agency obligations").  Wyo. Stat. Ann. § 13-12-105(b)(iii).

Custodia's proposed model is stricter still.  Custodia proposes to 100% back its customers' U.S. dollar deposits with Federal Reserve master account balances (the safest of all U.S. dollar assets).  In short, Custodia seeks to operate what economists call a "full reserve" bank.  *See* Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357, 413–16 (2016) (citing Milton Friedman, *A Program for Monetary Stability* 65–76 (Fordham 1960)).  And while it is true that Custodia's plan does not include FDIC insurance, economists have long understood full-reserve banking as a safe alternative to deposit insurance because it dispenses with the risks responsible for most bank failures (severe decline in the value of bank assets or unsustainable depositor runs).  *Id.* at 361.  Because it also avoids the "moral hazard" problem—banks' tendency to take excessive risks with insured deposits—many economists consider full-reserve banking a safer alternative to deposit insurance.  *Id.*; *see also* Patricia A. McCoy, *The Moral Hazard Implications of Deposit Insurance: Theory and Evidence* (Feb. 18, 2007), http://tinyurl.com/2buuudsp.[19]

Because of its 100% reserve requirement, Custodia's SPDI could not fail because of bad loans, falling bond prices, depositors' fears, or any common causes of

---

[19] Full-reserve banking is uniquely situated to crypto asset regulation.  Nearly every proposal for regulation of stablecoins requires that each stablecoin be 100%

bank failures. It could, however, wind up for other reasons, including operational risks, and sufficiently high liquidation costs could in theory leave its creditors, including depositors, on the hook. But any reasonable capital cushion should rule out this possibility, and Wyoming's SPDI regulations provide for ample capital.

The capital requirement in Wyoming's 2021 SPDI Guidance has three parts:

1. **Capital Stock.** The capital stock consists of a "[s]tatutory requirement of not less than $5,000,000." The Wyoming Division of Banking Commissioner is vested with authority to "set the capital requirement on a case-by-case basis," "*in a manner commensurate with the risk profile* and proposed activities of the institution."

2. **Surplus/Operating Expenses.** The capital requirement includes three years "of projected operating expenses" "specified in the [SPDI's] business plan."

3. **Contingency Account.** The capital requirement also includes "2%" of non-custodial demand "deposits of fiat currency" starting in the SPDI's third year of operation.

*Special Purpose Depository Institutions: Updated Capital Requirement Guidance*, *supra* (emphasis added). Wyoming law requires the Banking Commissioner to consider the following factors with a holistic review: (i) "[p]eer institutions" of the SPDI, "which may include custodial banks and national trust banks"; (ii) *the* "*activities and risks posed by the business plan and financial projections*" *of the SPDI*; (iii) the federal "prompt corrective action tier 1 leverage ratio"; (iv) the "non-leveraged nature of deposits related to custodial, fiduciary and trust accounts administered by the institution"; (v) "[c]urrent market conditions, including capital requirements of recently-chartered de novo banks"; and (vi) "[p]otential costs of a receivership." 021-

---

backed by high-quality liquid assets held at a central bank or in government bonds. *See* Fin. Stability Bd., *High-Level Recommendations for the Regulation, Supervision and Oversight of Global Stablecoin Arrangements* 11 (July 17, 2023), http://tinyurl.com/4tkx3ypf.

20 Wyo. Code R. § 20-2(d)(i)–(vi) (emphasis added); *see also Special Purpose Depository Institutions: Updated Capital Requirement Guidance*, *supra*.

"Generally, the Division [of Banking] focuses significantly on the activities and risks posed by the business plan of a SPDI and its financial projections." *Special Purpose Depository Institutions: Updated Capital Requirement Guidance*, *supra* [20] The Guidance makes clear that "[a] prospective SPDI should anticipate an initial capital requirement similar to a federally-insured institution and other recently chartered de novo banks." *Id.* at 2. And it notes that the Wyoming Division of Banking expects that each SPDI "meet the capital ratios set by the Federal Reserve and FDIC." *Id.* Wyoming SPDIs are regulated by the Wyoming Division of Banking, Wyo. Stat. Ann. § 13-12-119, which developed a detailed, 772-page supervisory examination manual, *Special Purpose Depository Institution Examination Manuals*, *supra*.

Even though the SPDI framework has existed for more than three years, the Federal Reserve Board has not approved any SPDIs for "master accounts." Bob Fernandez, *Wyoming Effort to Support Crypto-Focused Banks Set Back by Fed Concerns About Industry*, Wall St. J., Sept. 5, 2023.

2.    Defendants contend it would be "highly anomalous" to conclude that the Board of Governors is required to give master accounts to "any and all state-chartered depository institutions, regardless of the Board of Governors' concerns about a given

---

[20] As they created the SPDI framework, Wyoming lawmakers consulted with the Kansas City Fed and implemented changes based on the Kansas City Fed's suggestions. Bob Fernandez, *Wyoming Effort to Support Crypto-Focused Banks Set Back by Fed Concerns About Industry*, Wall St. J., Sept. 5, 2023, at 4.

requestor." Fed. Rsrv. Bank of Kan. City Mot. to Dismiss, ECF 124 at 9–10.  More "anomalous," however, is a federal agency second-guessing a state's bank-chartering decision.  Stephen J. Friedman, *A New Paradigm for Financial Regulation: Getting From Here to There*, 43 Md. L. Rev. 413, 421 (1984) ("State banks were permitted to join the Federal Reserve System while still retaining their state charters as long as they met minimum capital and reserve requirements.").  Defendants highlight two "concerns" with Custodia.  Neither concern justifies expanding the scope of the Federal Reserve Board's power when granting master accounts.  And both concerns disparage the state chartering process and undermine the dual banking system.

*First*, Defendants insist that they must be able to review a state-chartered bank's risk profile.  *See* ECF 124 at 8–9; *see also* FRB Order No. 2023-02, Order Denying Application for Membership at 4 (Jan. 27, 2023), http://tinyurl.com/bdda8zwt (asserting that Custodia's "risk management and controls" are "insufficient").  The Federal Reserve Board does not seek to evaluate a state-chartered bank's risk profile in the first instance.  Instead, it claims power to re-review the entity's risk profile with the assumption that the state's process is insufficient.  *Accord* ECF 124 at 10 (suggesting that states issue charters "under whatever standards and procedures the state might choose to prescribe or follow (even if the charter contains unique features that remove or weaken protections that exist for traditional bank customers)").  Such a pejorative approach to state-issued charters tarnishes the dual banking system.[21]  And this presumption is itself

---

[21] Of course, the Federal Reserve Board is not required to give a master account to entities violating or that propose violating federal money laundering law or

undermined by discovery in this case, which revealed that the Federal Reserve Bank of Kansas City generally agreed with Wyoming's risk analysis, before they were reversed by the Board.  *See* ECF 239 at 25–26.

*Second*, Defendants suggest they must be able to review the sustainability of a state-chartered bank's business model.  ECF 124 at 8–10.  In this way, the Federal Reserve Board exceeds mere skepticism of Wyoming's risk analysis.  It also includes a power to weigh in on the strength of a bank's business model.[22]  An assertion of power to deny a master account because the Board doubts the likelihood that the business will thrive is unprecedented.  Adopting the Board's newfound power to deny master accounts based on its judgment of whether a business model will likely succeed is sure to squelch innovation, which is often pioneered by states.

In any event, Defendants' distrust of state regulatory bodies is misplaced, and the Supreme Court requires that courts greet it with skepticism.  *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover

---

providing banking services to industries engaged in activities that are illegal.  *Fourth Corner Credit Union*, 861 F.3d at 1053; *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 23-cv-6414, 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023).  If an entity that passed a state risk assessment is not otherwise violating federal law, the Board cannot leverage the master account process to oversee states.

[22]  *See* FRB Order No. 2023-02, Order Denying Application for Membership, *supra*, at 9–10 ("Even if Custodia were able to successfully remediate all issues identified with respect to its ability to safely and soundly conduct its limited day-one activities, conducting only this limited set of activities would not enable it to constitute a viable bank in the medium or long term.  Moreover, the future earnings prospects of the business model that Custodia has proposed—that is, an uninsured, undiversified, crypto-asset-focused business model featuring a number of novel and untested activities posing heightened risks—is inconsistent with approval.").  Discovery, however, has cast significant doubt on the validity of the Board's conclusions here.  ECF 239 at 23–24 (discussing the Board's anti-crypto shift after the collapse of FTX).

in a long-extant statute an unheralded power to regulate a significant portion of the American economy, . . . [we] typically greet its announcement with a measure of skepticism.") (internal quotation marks and citation omitted).[23]  Inventing a new oversight role for the Board as part of the master account process would be improper and undermined by the Board's long-held representation that it is not tasked with weighing risk for a state chartered bank.  To the extent that the Board based its decision to deny Custodia a master account on perceived inadequacies in Wyoming's regulatory scheme, the denial was improper; and in any event, Wyoming has a strong regulatory framework for digital assets that is respected, even by former Kansas City Federal Reserve President Esther George.  *See* ECF 239 at 8 (discussing President George's "deep respect for the Wyoming Division of Banking").

3.      *Finally*, even in the case of financial innovation that presents some risk, avoiding risk is not without tradeoffs.  Notwithstanding a shift to digital payments, "the underlying infrastructure for processing payments remains slow, unwieldy, and expensive.  Sending money from one person's bank account to another . . . routinely takes at least one, if not often multiple business days to finalize.  During these

---

[23] "[T]he empirical evidence does not support the existence of a 'competition in laxity' between federal and state banking regulators.  In recent years, state banks have consistently outperformed national banks in terms of average capital ratios and average returns on assets and equity.  In addition, the recent bank failure rate has been lower for state banks than for national banks."  Wilmarth Jr., *supra*, at 1240; *id.* at 1242 ("The empirical evidence on state bank performance supports the view that the states have generally maintained good regulatory standards with regard to banks.  Over the past six years, the capital ratios, financial results, and failure rates have been significantly more favorable for state banks than for national banks.").

lengthy processing periods, those entitled to money cannot use it-resulting in loss of economic value." Yadav et al., *supra*, at 3.

Bulky federal regulation is not well-equipped to account for such innovation. The proposed Access Guidelines, for example, would likely prohibit banks from implementing online banking services.[24]  Commonplace payments that used to be "unimaginable" (online shopping or taking a cab without cash) are now seamless.  *Id.* at 15.  But these innovations "ultimately rest on core payment processing systems founded on long-established, bank-centric infrastructure[,]" inviting exploration into how the system can be made more efficient and effective.  *Id.*

As federal legal support for innovation stagnates, other countries are actively courting the next wave of technology by providing regulatory frameworks that facilitate innovation while protecting market participants.[25]  The European Union created a cross-border payment zone to facilitate seamless payments across member countries.  *See The EPC and the SEPA Process*, European Payments Council, http://tinyurl.com/y27hduk7 (last visited Jan. 18, 2024).  Swiss civil law recognizes cryptocurrencies as intangible assets and permits the transfer of crypto tokens as a representation of value (while also regulating transfer of rights through digital registers).  Libr. of Congress, *Switzerland: New Amending Law Adapts Several Acts to*

---

[24] This was obviously not the Federal Reserve's intent but is a consequence of the Guidelines' text.

[25] "Many countries and regions have sought to create new payment rails capable of enabling user-friendly, digital, cheap, instant or very quick, and person-to-person/account-to-account payments as a critical part of their domestic financial infrastructure."  Yadav et al., *supra*, at 28 (discussing innovations in "real-time payment" technology in India, China, Thailand, Brazil, and South Korea).

*Developments in Distributed Ledger Technology* (Mar. 3, 2021), http://tinyurl.com/4zxc2aft.  Hong Kong regulators expanded jurisdiction to offer "investor protection" while building a "regulatory framework across the entire ecosystem such that Hong Kong" has become "a hub for cryptocurrency activity" in Asia.  *See* Gaven Cheong et al., *Government Attitude and Definition in Blockchain & Cryptocurrency Laws and Regulations 2024 | Hong Kong*, Global Legal Insights, http://tinyurl.com/25n32h2d (last visited Jan. 18, 2024).[26]  And the Bank of England now requires that issuers back all outstanding stablecoins with deposits in a master account at the Bank of England.  *See* Bank of England, *Regulatory Regime for Systemic Payment Systems Using Stablecoins and Related Service Providers* (Nov. 2023), http://tinyurl.com/2ze5nzux.  If the American banking system cannot adapt, it will fall behind.

The Federal Reserve Board's newfound risk-assessment responsibility as part of the master account process not only undermines the important role Wyoming's innovative SPDI system plays, it also stymies state innovation outside the crypto industry.  And because states have been laboratories of innovation, impeding states' progress will, in turn, impede federal innovation, and ultimately restrict America's future competitiveness in the global financial services industry.

---

[26] Digital asset banks in Switzerland, France, and Germany have raised money and offered services without major failures. *See, e.g.*, Martin Leo Rivers, *The World's First Regulated Crypto Bank Braces For Flood Of Institutional Money*, Forbes (Apr. 21, 2022), http://tinyurl.com/2s4mbd8s. These firms and traditional banks facilitating digital asset banking have been successful and stable global pioneers.  Jonathan Buck, *Bitcoin Banking: European Banks Are Beating U.S. Banks In The Crypto Custody Race*, Forbes (July 12, 2023), http://tinyurl.com/ythh6ef2.

*     *     *

Creating a new layer of federal administrative oversight to second-guess and effectively override state charter risk assessment is inconsistent with the dual banking system and undermines states' roles as laboratories of financial innovation. It also conflicts with Congress's intent to maintain the integrity and strength of the dual banking system.

## CONCLUSION

Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law should be granted.

Respectfully submitted,

Dated: January 18, 2024

/s/ *Michelle S. Kallen*
Michelle S. Kallen
*Counsel for Amici Curiae*

Tyler J. Garrett, #6-4400
HATHAWAY & KUNZ, LLP
2515 Warren Avenue
Suite 500
Cheyenne, WY 82001
(307) 634-7723
tgarrett@hkwyolaw.com

Michelle S. Kallen*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
mkallen@jenner.com

Matthew I. Summers*
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
msummers@jenner.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January 2024, I caused the foregoing document to be electronically transmitted to the Clerk of Court of the U.S. District Court, District of Wyoming, using the CM/ECF system for filing. Based on the records currently on file the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

Dated: January 18, 2024          By:   /s/ *Michelle S. Kallen*
                                        JENNER & BLOCK LLP

APPENDIX
DESCRIPTION OF AMICI CURIAE SCHOLARS

**Gerald P. Dwyer** is an Emeritus Professor and BB&T Scholar at Clemson University.  Previously, he was Director of the Center for Financial Innovation and Stability and Vice President at the Federal Reserve Bank of Atlanta for more than a decade.  Professor Dwyer's scholarship has appeared in *The Oxford Handbook of the Economics of Central Banking*, the *Journal of International Money and Finance*, *Applied Economics*, and other top publications.

**Frank Emmert** is a Professor of Law at the Indiana University Robert H. McKinney School of Law.  He has published more than a hundred books, articles, and conference papers, with a focus on business law and financial markets in the United States and abroad.  Professor Emmert is a thought leader on digital asset creation, regulation, and stabilization around the globe.

**Tonya M. Evans** is a Professor of Law at Penn State Dickinson Law with a co-appointment at the Penn State Institute for Computational and Data Sciences.  Professor Evans speaks and consults regularly in the United States and abroad about the legal implications of new technologies and innovation.  She sits on the Digital Currency Group Board of Directors and is the author of Digital Money Demystified.

**Julie Andersen Hill** is the Vice Dean and Alton C. and Cecile Cunningham Craig Professor of Law at the University of Alabama School of Law.  Professor Hill is a recognized expert on financial institution regulation.  Her scholarship has appeared

in the Yale Journal on Regulation, Washington University Law Review, Indiana Law Journal, the Wisconsin Law Review, and other respected publications.

**George Selgin** is a senior fellow and director emeritus of the Center for Monetary and Financial Alternatives at the Cato Institute and professor emeritus of economics at the University of Georgia. His research covers a broad range of topics within the field of monetary economics, including monetary history, macroeconomic theory, and the history of monetary thought. He is the author of numerous articles and books and is a founder of the Modern Free Banking School.