Chris Land, General Counsel (Wyo. Bar #7-6006)
Office of Senator Cynthia M. Lummis
United States Senate
127A Russell Senate Office Building
Washington, DC 20510

Phone: (202) 224-3424
E-Mail: chris_land@lummis.senate.gov

*Counsel for Amici Curiae*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC.,<br>2120 Carey Avenue, Suite 300<br>Cheyenne, WY 82001<br><br>    *Plaintiff,*<br><br>      v.<br><br>BOARD OF GOVERNORS OF THE<br>FEDERAL RESERVE SYSTEM,<br>Constitution Avenue NW & 20th St NW<br>Washington, DC 20551<br><br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br>1 Memorial Drive<br>Kansas City, MO 64108<br><br>    *Defendants.* | Civil Case 1:22-CV-00125-SWS |

---

# PROPOSED BRIEF *AMICI CURIAE* OF

# MEMBERS OF THE UNITED STATES SENATE BANKING COMMITTEE AND

# UNITED STATES HOUSE OF REPRESENTATIVES FINANCIAL SERVICES COMMITTEE

# IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW

---

**TABLE OF CONTENTS**

STATEMENT OF INTEREST………..……………………………………………………......….3

RULE 29(A)(4)(E) STATEMENT....………………………………………………………..4

SUMMARY OF ARGUMENT…………………………………………………………………...5

ARGUMENT

   1. Introduction……………………………...…………………….……6

   2. The Plain Text of the Monetary Control Act and Canons of Interpretation…………………..………………………………………6

   3. The Meaning of Section 342 is Not "Unambiguous"………..….……....12

   4. The Legislative History of Section 248a……………………………..16

   5. Only Congress is Empowered to Determine What is A "Depository Institution"……………………………………...………20

   6. Conclusion……………………………………………………………23

CERTIFICATE OF SERVICE....………………..……………………………………….26

## STATEMENT OF INTEREST

*Amici*, Senator Cynthia M. Lummis of Wyoming and Representative Warren E. Davidson of Ohio, are members of the United States Senate Banking Committee and the United States House of Representatives Financial Services Committee, respectively.

The Members have a distinct constitutional interest in the faithful execution of the laws enacted by Congress and the exercise of Congressional oversight prerogatives. Additionally, the Members have a strong legislative interest in promoting responsible financial innovation, including through robust crypto asset regulation and an effective, efficient and safe payments system.

*Amici* understand this case to be of vital importance to the future of the United States' financial system, because it will judicially affirm decades of existing precedent under which Defendants respected States' chartering and risk-management decisions within our dual banking system. Defendants have only recently reinterpreted the law to arrogate to themselves power that Congress never has granted.

*Amici* previously filed a brief in opposition to Defendants' Motions to Dismiss (ECF 92) in September 2022, and have continued to conduct a detailed analysis of the statutory scheme governing master accounts. In the past months, *amici* have crawled through the bowels of Congressional legislative history and U.S. Supreme Court briefing over the last century to uncover new primary source documents which will illumine the key issues before this Court.

## RULE 29(A)(4)(E) STATEMENT

The author of this brief certifies that no outside counsel, neither in whole nor in part, authored this brief. Further, the author of this brief did not receive funding from any party for preparation of the brief.

## SUMMARY OF ARGUMENT

The plain text of 12 U.S.C. § 248a, when read *in pari materia* with §§ 342 and 461, evidences a clear Congressional priority to embed the dual banking system into our payments system and to grant the same access to both State and Federally-supervised banks. Additionally, the Federal Reserve's focus on the "unambiguous" nature of 12 U.S.C. 342 is colorful at best, and subject to doubt. Finally, only Congress, not the Fed, is empowered to determine what is—and is not—a "depository institution."

For those reasons, and others set forth more fully *infra*, this Court should grant Plaintiff's Motion for Judgment as a Matter of Law (ECF 238).

# ARGUMENT

## 1. Introduction

> The dual banking system has provided and continues to offer significant benefits to our financial system and the economy. *One of the primary benefits of dual banking is that the multiple options for state and federal charters have led to considerable innovation and improvement in banking services*. We have seen these benefits from the beginning.[1]

Ten years prior to the start of this matter, then-Federal Reserve Bank of Kansas City President Esther George's remarks underscored how our banking system should function and the importance of responsible innovation in our financial framework. The case pending before this Court is yet another milestone in the "considerable innovation and improvement in banking services" which emerges from the system of state regulation lauded by President George.

The position advanced by the Board of Governors of the Federal Reserve System ("Board") and the Federal Reserve Bank of Kansas City ("Reserve Bank") would establish an unaccountable, nonreviewable process for state-chartered depository institutions to gain access to our Nation's payment system through Reserve Bank accounts and services ("master accounts"), one of the essential features of a depository institution. This exceeds the statutory authority of the Federal Reserve, and threatens to transmogrify our dual banking system into one Congress did not create—one where states do not operate on a level playing field and are mere appendages.

## 2. The Plain Text of the Monetary Control Act and Canons of Interpretation

Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980 ("Monetary Control Act")[2] to create a level playing field among depository institutions that are members of the Federal Reserve System (including all national banks and state member banks),

---

[1] President Esther L. George, *Perspectives on 150 Years of Dual Banking*, Conf. of State Bank Supervisors State-Federal Supervisory Forum, May 22, 2012 (emphasis added), *available at* https://www.kansascityfed.org/documents/2644/speeches-2012-george-ga-csbs-05-22.pdf.

[2] Depository Institutions Deregulation and Monetary Control Act, Pub. L. 96-221, 94 Stat. 132 (1980), § 105.

with state non-member banks and federal/state credit unions to enhance the Federal Reserve's ability to control the money supply during a period of heightened inflation.[3] Paul Volcker, Chairman of the Board of Governors at the time, noted that the legislation would "undoubtedly take [its] place among the most important pieces of financial legislation enacted in this century."[4]

As the Monetary Control Act evidences and as the forthcoming discussion analyzes in detail, Congress was clear in requiring master accounts be provided to all depository institutions.[5] The impetus of this was to enable depository institutions to comply with the new requirement of the Monetary Control Act to maintain a portion of the institution's capital at that institution's Administrative Reserve Bank[6] and to later[7] receive interest on excess reserves, both of which, as the Board acknowledges, are "essential"[8] to the appropriate conduct of monetary policy, which is the primary mission tasked to the Board and the Reserve Bank by Congress.[9]

Section 248a is clear. Defendants spill much ink discussing how that statute only governs pricing of Federal Reserve services, but a close textual analysis of the word "and" *infra* demonstrates the scope of the statute is clearly not limited to pricing. The key phrase in § 248a says:

---

[3] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (last visited Sept. 6, 2022). *See also* 126 Cong. Rec. 7070 (Mar. 28, 1980) (statement of Sen. Proxmire).

[4] *Id.* Twelve U.S.C. § 248a, the provision mandating that Federal Reserve Banks provide accounts and services to all depository institutions on a level playing field was enacted as part of this legislation.

[5] 12 U.S.C. § 248a(c)(2) ("*All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions* and such services shall be priced at the same fee schedule applicable to member banks…") (emphasis added).

[6] The term "Administrative Reserve Bank" refers to the Federal Reserve Bank designated by Congress to cover a particular geographic area. *See* FED. RSRV. BANKS, OPERATING CIRCULAR 1, at *1, *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

[7] Interest on excess reserves were authorized by Congress in the Financial Services Regulatory Relief Act of 2006, Pub. L. 109-256, 120 Stat. 1966, § 201.

[8] Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *5-6 (Aug. 16, 2022).

[9] 12 U.S.C. § 225a.

> All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions *and* such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.[10]

This statutory paragraph has three distinct components: (1) a requirement that all "Federal Reserve bank services" listed in the fee schedule in subsection (b) be made available to "nonmember depository institutions" (which unambiguously covers Plaintiff); (2) that the services listed in subsection (b) be priced utilizing the same fee schedule as member banks; and (3) that nonmember depository institutions be subject to the same terms of access as member banks. Adoption of Defendants' preferred reading would render the "shall be available" clause to be surplusage.

The Supreme Court has recognized that in cases where multiple statutes relate to the same issue (e.g., 12 U.S.C. §§ 248a, 342, 461), the canon against surplusage "is strongest."[11] Also, the *in pari materia* canon of statutory interpretation holds that courts should construe statutes governing the same issue as a single, whole body of law that fits together as functionally as possible.[12] This Court should interpret the provisions of §§ 342 and 461 in a manner that gives effect to the words of each. The Federal Reserve's proffered interpretation would not give effect to the plain text of § 248a.

---

[10] 12 U.S.C. § 248a(c)(2) (emphasis added).

[11] *Yates v. United States,* 574 U.S. 528, 543 (2015)( "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.") (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013)).

[12] *See Wachovia Bank, N.A.*, *v. Schmidt*, 546 U.S. 303, 315-16 (2006) ("…under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'") (citations omitted); *Stender v. Smith-Archstone Operating Trust*, 958 F.3d 938, 942 (10th Cir. 2020) (citation omitted) (stating the Tenth Circuit's "longstanding practice of construing statutes *in pari materia*."); *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1253 fn. 1 (10th Cir. 2012) ("Statutes that are *in pari materia* — dealing with the same subject matter — should be construed consistently with each other.").

Section 461 has three primary focus areas for the purpose of this case: (1) it defines "depository institution";[13] (2) specifies that "each depository institution shall maintain reserves against its transaction accounts" for the purposes of "implementing monetary policy,"[14] and mandates that required reserves be held in a master account, at a correspondent depository institution, or as cash in the vault of the institution.[15] The reserve requirement is unambiguous—it applies to "*each* depository institution," and like the purpose of the Monetary Control Act, was designed to give the Federal Reserve greater control over economic policy. Both §§ 248a and 461 likewise use the mandatory "shall."

Section 342 states that "[a]ny Federal reserve bank may receive from any of its member banks or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts...."[16] This authorizing language is further qualified by requirements that a depository institution maintain a sufficient clearing balance and for depository institutions to charge fees related to the clearing of checks and similar items.[17] This language uses the term "may," which could grant some discretion as to the types of monetary instruments that may be collected.[18] However, this term can yield to an alternate reading when contrary indications of legislative intent are present, especially in an

---

[13] 12 U.S.C. § 461(b)(1)(A). Plaintiff is unambiguously a depository institution under this statute, as Defendant concedes. *See* Ex. I, ECF 236.

[14] *Id.* at (b)(2).

[15] 12 U.S.C. § 461(c)(1)(A). Importantly, under Federal Reserve Operating Circular 1, a Reserve Bank is required to approve any correspondent relationship a depository institution may maintain. *See* FED. RSRV. BANKS, OPERATING CIRCULAR 1, at *8 *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf ("Each executed Pass-Through Agreement is subject to approval by the ARB [Administrative Reserve Bank] of the Correspondent."). This requirement, in effect, operates to give the Federal Reserve an absolute veto over a depository institution's ability to comply with 12 U.S.C. § 461—other than holding large amounts of vault cash, which implicates safety concerns and is impractical in this age of digital banking.

[16] 12 U.S.C. § 342.

[17] *Id.*

[18] *Cortez Byrd Chips v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198-99 (2000).

authorizing sense.[19] *Farmers and Merchants Bank* itself acknowledges the fact that "may" is not always permissive and that the context of the provision is key.[20] While the actual meaning of § 342 is subject to doubt (see section 3 *infra*), § 342 can be harmonized with §§ 248a and 461.

Sections 248a and 342 govern different services. Section 342 deals with the form of deposits and collection of certain monetary instruments (deposits of lawful money, checks, notes, etc.). Section 248a lists a broader range of services, including "currency and coin services," "wire transfer services," "automatic clearinghouse services," "settlement services," "securities safekeeping services" and all other new payment mechanisms the Federal Reserve implements (e.g., FedNow, a forthcoming stablecoin settlement system currently under consideration by Congress, etc.). The Federal Reserve may have some measure of discretion with respect to the form of deposits listed only in § 342, but this statute can *also* be read as granting the Federal Reserve legal authorization to receive these instruments, which is a necessary predicate.

Nevertheless, the distinct and separate services listed by § 248a are governed by the mandatory "shall." To the extent to which the same services are covered by both §§ 248a and 342, 248a would control because it was enacted later in time,[21] and a more specific statute generally governs a less specific statute.[22] The *Brown & Williamson* Court noted this, observing:

> Over time, however, subsequent acts can shape or focus those meanings. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." United States v. Fausto, 484 U.S. at 453. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.[23]

---

[19] *See id*. at 199 (citing *United States v. Rogers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion[, but] this common-sense principle of statutory construction . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute.").

[20] 262 U,S, 649, 662-63 (1923) ("It is true that in statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction.").

[21] *See FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 143 (2000).

[22] *WildEarth Guardians v. National Park Service*, 703 F.3d 1178, 1189 (10th Cir. 2013).

[23] *Id*.

Consequently, services like wires, settlement, securities safekeeping and new Federal Reserve payment innovations *shall* be provided to all depository institutions, but deposits of lawful money and check clearing could entail some measure of Fed discretion. Nevertheless, any level of discretion contained in § 342 would have to yield to the command in § 461(b) that each depository institution maintain reserves at the Fed or at a correspondent (both subject to the Reserve Bank approval under Operating Circular 1). For these reasons, §§ 248a, 342 and 461 can be read harmoniously, with §§ 248a and 461 imposing a duty on the Fed to provide a number of services to a depository institution that require a master account.

This is the reason why Congress amended § 342 as part of the Monetary Control Act.[24] In imposing the new reserve requirement for "each depository institution" under § 461, Congress technically had to amend 342 to add the term "other depository institutions" to permit nonmember state institutions to place deposits at the Fed, because, prior to 1980, only Federal Reserve members could place deposits with the central bank.

If Congress hadn't made these conforming amendments to § 342 in 1980, Defendants would *not* be able to point to this language today and claim discretion. Additionally, Congress failing to make these amendments and enacting § 461 would have created some disharmony between §§ 248a, 342 and 461, vis-à-vis the ability of nonmember depository institutions to place their required statutory reserves at the Federal Reserve. Consequently, these amendments should not be read as ratifying the Federal Reserve's *new* interpretation of this provision ('new' in the sense that the Federal Reserve previously argued it was required to accept deposits and checks under this statute in 1917, as set forth in section 3 *infra*), but as granting the threshold legal authority to the Fed to receive deposits from state nonmember depository institutions and

---

[24] Monetary Control Act, § 105.

effectuating the core intent of the Monetary Control Act—giving the Fed *more* control over economic policy.

### 3.   The Meaning of Section 342 is Not "Unambiguous"

The history of § 342 is colorful and not "unambiguous" as Defendants portray in their Memoranda on the Motions to Dismiss.[25] Section 342 was originally enacted as § 13 of the Federal Reserve Act in 1913, and was amended and recodified several times in 1916, 1917 and 1980. In 1917, when Congress enacted amendments to 342, the House Committee Report stated that the meaning of this provision was to:

> *[P]ermit* nonmember State banks and trust companies, even though too small to be eligible for membership in the Federal reserve banks, *to avail themselves* of the clearing and collection facilities of the Federal Reserve System, *provided they* cover at par checks on themselves sent for collection by the Federal reserve bank, and *provided further* that they keep a compensating balance with the Federal reserve banks in an amount to be determined under the rules proscribed by the Federal Reserve Board.[26]

This House Committee Report states § 342 was enacted to "permit" nonmember state banks to avail themselves of Federal Reserve clearing and collection system, provided they meet two (and only two) conditions: (1) that they cover certain checks at par; and (2) that a clearing balance be maintained at their Reserve Bank.[27] Through authorizing nonmember institutions to participate in the Federal Reserve clearing system, the intent of this provision was to bring the clearing of *all* checks into the Federal Reserve System, and give a legal entitlement to *all* banks to clear checks.[28]

---

[25] Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *17, 19 (Aug. 16, 2022) ("Here, the use of "may" in section 342 makes clear Congress's intent that Reserve Banks have authority to accept deposits or open deposit accounts but are not required to do so."); ("The unambiguous text of Section 13…"); Def. Fed. Rsrv. Bank of Kansas City's Mem. of Points and Authorities in Support of Its Motion to Dismiss*, Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *21 (Aug. 16, 2022) ("This plain statutory text makes clear that while Federal Reserve Banks have the authority to accept deposits…").

[26] H. Rept. 65-35, *Amendments to the Federal Reserve Act*, *H.R. 3673,* H. Comm. on Banking and Currency, 65th Cong., 1st Sess., at *2 (Apr. 27, 1917) (emphasis added) (on file with counsel).

[27] *Id.*

[28] *Id.* ("Any clearing and collection plan to be effective must be so comprehensive as to include all checks.") (emphasis added).

The House Committee Report also underscores the fact that a Federal Reserve clearing system needed all banks to participate in order to be effective:

> a necessary factor in any successful clearing plan is the offset whereby balances only require settlement instead of the total volume of transactions. As long as the clearing system does not embrace *all of the banks*, this offset is lost in a corresponding degree and the value of the system diminished in proportion.[29]

Moreover, a letter from Secretary of the Treasury McAdoo to Rep. Glass that was reprinted in the House Committee Report states that these amendments were "unanimously recommended" by the Federal Reserve Board to Congress in 1917.[30] Finally, newspaper reports surrounding the passage of the 1917 amendments evidence a broad public understanding that any state depository institution that wanted to access the Federal Reserve's payments and clearing system could do so, as long as it deposited a portion of its reserves at a Reserve Bank.[31]

The Board cites one piece of legislative history in support of its claim of discretion,[32] but this excerpt is conclusory and only restates the statutory text without further analysis. In its Memorandum on the Motion to Dismiss, the Board stated that "[t]he legislative history [of § 342] nowhere suggests the receipt of deposits is in any way mandatory."[33] This assertion is clearly false, given the 1917 committee report language *supra*.

---

[29] *Id.*

[30] *Id.* at *4.

[31] *See, e.g., To Fortify Reserve Act*, L.A. TIMES, Jun. 19, 1917 (noting the purpose of the amendments was "[t]o Open Doors of the System to State Institutions" and that "[a]ccession of trust companies and state banks will be brought about in two ways. The institutions may join the system outright [membership] … or they may, by depositing a portion of their reserves with a Federal reserve bank, become members of the Federal reserve clearance system, the most effective in the country." The article also noted that "[o]fficials anticipate a landslide of State banks and trust companies to the system…"); *Bill to Widen Reserve System Sent to Wilson*, CHICAGO DAILY TRIBUNE, Jun. 19, 1917; *Will Strengthen Reserve Banks*, THE HARTFORD COURANT, Jun. 19, 1917; *Congress Again Has Reserve Act Amendments*, WALL ST. J., Apr. 18, 1917 (all on file with counsel).

[32] Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *20 (August 16, 2022) ("The House Report on the FRA made clear that the permissive "may receive" language in § 13 "authorized" Federal Reserve Banks 'to receive current deposits from their [member banks].'").

[33] *Id.* at *35.

In interpreting the text of § 342 in *Farmers and Merchants Bank* as part of its response to the petition for certiorari before the U.S. Supreme Court in 1923, the Federal Reserve Bank of Richmond asserted that this statute created a legal right for nonmember depository institutions to place deposits and clear checks at a Reserve Bank.[34] In its merits brief in the 1923 case, the Richmond Reserve Bank stated the following:

> In addition to the banks having full membership in said System, as aforesaid, non-member State banks and trust companies of each district and *entitled to avail themselves* of the collection and clearance facilities of the Federal Reserve System, by establishing and maintaining clearing accounts and carrying appropriate balances with the Reserve Bank of the District in which they are located.[35]

The Richmond Reserve Bank also stated that "it was the obvious purpose of Congress to establish under [§ 13, codified as § 342]" a "*universal* par clearance system."[36] The Reserve Bank continued, commenting on the 1917 amendments to § 13 that "by this section as thus developed and amended, complete and adequate provision was made for the *universal* par-clearance and collection of checks in the United States through the Federal Reserve Bank."[37] It was further noted by the Reserve Bank:

> That the authority now existed in the Federal Reserve Banks to establish a *universal system* for par-clearance and collection of checks, would seem to be too clear for serious controversy. But it is submitted that this Act not only gave the banks the authority to establish such a system, *but required that they do so*, in the interest of the public at large.[38]

The word 'universal' hardly implies the presence of discretion on the part of the Fed among depository institutions. The Federal Reserve's position in *Farmers and Merchants* was that nonmember State banks had a legal entitlement to avail themselves of the "collection and clearance facilities" of the Fed—the exact opposite position that Defendants take today, based on nearly the

---

[34] Brief for Resp't, Petition for Cert., *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823, at *4 (Feb. 16, 1923) ("it is obvious that the express authority to perform a service for a member bank is equivalent to a mandatory provision that the service shall be performed if it is practical to do so.") (on file with counsel).

[35] Merits Brief for Resp't, *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823, at *5 (Apr. 19, 1923) (on file with counsel).

[36] *Id*. at *32. (emphasis added).

[37] *Id*. at *34. (emphasis added).

[38] *Id*. (emphasis added).

same statutory language.[39] The Fed's incentives in 1917 were to attract the maximum number of banks to participate in the new Federal Reserve payments system, whereas today—despite nearly the same statutory language—the Federal Reserve payment system is more akin to an exclusive club.

Of course, the reason the Federal Reserve feels empowered to take such a position is *Farmers and Merchants*, which held that "… in each amendment, as in § 13, the words used were 'may receive' -- words of authorization merely."[40] However, the Court's decision was not absolute, acknowledging that context has a key role to play in the interpretation of this statute.[41] The Court squarely found that "'may' is sometimes construed as 'shall' based on 'the context, or the subject-matter.'"[42]

The Supreme Court evidenced that the "statute appears to have been drawn with great care."[43] It was. Congress' clear intent, as evidenced by the 1917 committee report and the Fed's contemporaneous interpretation of this provision, was that *all* State nonmember banks should be permitted access to Federal Reserve clearing facilities. In *Farmers and Merchants,* neither the Petitioner nor the Respondent was seemingly aware of the existence of the 1917 House Committee Report in briefing that Supreme Court case—it was never mentioned or cited by any party in that case and was not cited by the Supreme Court in its decision.[44] Consequently, it is an open question whether the Supreme Court's interpretation of § 13/342 in *Farmers and Merchants* over 100 years

---

[39] *Farmers and Merchants Bank v. Federal Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923).
[40] *Id.*
[41] *Id.* at 662-63 ("It is true that in statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction.").
[42] *Id.*
[43] *Id.*
[44] *See generally id.*; Brief for Petitioner, Petition for Cert., *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Jan. 31, 1923); Brief for Resp't, Petition for Cert., *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Feb. 16, 1923); Merits Brief for Petitioner, *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Mar. 31, 1923); Merits Brief for Resp't, *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Apr. 19, 1923) (all on file with counsel).

ago should be accorded the full measure of precedential weight, having missed such an unambiguous indicator of Congressional intent.

Whether or not *Farmers and Merchants* remains good law, these sources demonstrate that the meaning of § 342 cannot bear the weighty interpretation that the Federal Reserve proffers to this Court. Given these indications of Congressional intent and the Fed's historical (and opposite) interpretation of this provision, § 342 should not be given controlling weight in this Court's statutory interpretation, and should be read *in pari materia* with §§ 248a and 461.

### 4.  The Legislative History of Section 248a

Conversely, evidence supporting Plaintiff's argument can be found in numerous instances within the Monetary Control Act's legislative history. "Depository institution" is defined in the Monetary Control Act as "(i) any insured bank as defined in section 3 of the Federal Deposit Insurance Act or any bank which is eligible to make application to become an insured bank under section 5 of such Act."[45] A bank "is eligible to make application to become an insured bank" if it is duly chartered under federal or state law and is engaged in the business of receiving deposits, other than trust funds…"[46]

In the final conference committee report on the Monetary Control Act, the conferees made the following explanatory statements on the scope, context and meaning of the legislation:

- "The conference reported bill provides certain Federal Reserve requirements for *all depository institutions*. It does not, however, require any institution to be a member of the Federal Reserve."[47]

---

[45] Monetary Control Act, § 103 (codified at 12 U.S.C. § 461(b)(1)(A)).

[46] *See* 12 U.S.C. § 1813 (Federal Deposit Insurance Act); Federal Deposit Insurance Corporation General Counsel Op. 88-67 (Oct. 27, 1988).

[47] H. Rept. 96-842, *Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report,* 96th Cong., 2d Sess., at *69 (March 21, 1980) (emphasis added). This is clear evidence of Congressional intent that banks should not be required to have a Federal regulator in order to access the payment system.

- "These reserve requirements would apply to *all depository institutions*. Depository institutions are authorized to use balances maintained in Federal Reserve banks to satisfy liquidity requirements under the Federal Home Loan Bank Act and the Nation[al] Credit Union Act."[48]

- "*Any depository institution* holding transaction accounts would have access under the same terms and conditions as member banks to the Federal Reserve discount window upon enactment of the bill."[49]

- "The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks."[50]

Additionally, in debate on the Senate floor on the conference committee report, Congress' intent for the act to apply to all depository institutions was evidenced clearly, as follows:

- "The *mandatory aspects of this bill* are directly opposite to the voluntary solution of Federal Reserve membership which were voted and agreed to by the Senate Banking Committee…"[51]

- "*This bill mandates banks to place reserves in the national bank.*"[52]

- "One way to resolve this problem [allowing better control of monetary policy by the Federal Reserve] is to provide *mandatory reserves for all depository institutions*, including

---

[48] *Id.* at 70.
[49] *Id.* at 71.
[50] *Id.* (emphasis added).
[51] 126 Cong. Rec. 7063 (Mar. 28, 1980) (emphasis added)
[52] *Id.* Sen. Armstrong's remark that the bill requires banks to hold reserves at the national bank refers to the requirement contained in 12 U.S.C. § 461(b)(2).

credit unions, savings and loan associations, commercial banks and mutual savings banks."[53]

- "Consequently, we will now have a system whereby *every depository institution in the country will be subject to keeping reserves at the Fed.*"[54]

Despite Defendants' claims to the contrary,[55] it is clear that Members of Congress, in both the House and Senate, understood the Monetary Control Act to apply to "every depository institution in the country," without exception, which is inconsistent with the Defendants' position that the Reserve Banks retain discretion.[56]

The Board, in its Memorandum on the Motion to Dismiss, attempts to advance the argument that the Federal Reserve Act (as amended by the Monetary Control Act) merely authorizes, but does not require, the Reserve Bank to provide a master account.[57] Moreover, the Board states the following about 12 U.S.C. § 248a, the provision that requires the Reserve Banks to provide master accounts to all depository institutions: "Nothing in that section requires that any particular institution receive a master account, or that each and every institution is entitled to access Federal Reserve services. Rather, it requires only that nonmember institutions that do obtain Federal Reserve services pay the same amount for those services as member banks."[58]

---

[53] *Id.* at 7071 (statement of Sen. Tower) (emphasis added). It is notable that the 96th Congress and Sen. Proxmire included a variety of charter types in his statement and in the definition of "depository institution," emphasizing that the bill should have broad application to all bank-like entities.

[54] *Id.* at 7072.

[55] Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *25, ECF 49. ("[T]here is no indication that Congress intended the MCA as a *mandatory* right of access to Reserve Bank services to all nonmember banks…").

[56] *See supra* note 19.

[57] *See, e.g.,* Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *20 (Aug. 16, 2022).

[58] *Id.*

The conference committee report on 12 U.S.C. § 248a states that "[t]he House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks."[59] There are two components to this statement: (1) "a provision for the Federal Reserve to price services"; *and* (2) "open access to these services to all depository institutions." Conference committee reports—generally bicameral and bipartisan—can be "authoritative" in statutory interpretation.[60]

Why would Congress have included this provision in the conference committee report if it had not intended the statutory language in §248a to have an effect, especially when that section clearly states "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions *and* such services shall be priced at the same fee schedule applicable to member banks…"? This statutory phrase has two parts as well, and its argument that § 248a only sets out a "pricing principle[]," misses the point that the word "*and*" separates the disjunctive phrases "All Federal Reserve bank services covered by the fee schedule *shall* be available to nonmember depository institutions…" and the phrase "such services shall be priced at the same fee schedule…" They are separate statutory functions, both of which should be given effect. Reading out half of this sentence, in favor of only effectuating the pricing principle, would likewise violate the rule against surplusage.[61]

---

[59] H. Rept. 96-842, *Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report,* 96th Cong., 2d Sess., at *71 (March 21, 1980) (emphasis added).

[60] *Diallo v. Gonzales*, 447 F.3d 1274, 1282 (10th Cir. 2006); George A. Costello, *Average Voting Members and Other "Benign" Fictions: The Relative Reliability of Committee Reports, Floor Debates and Other Sources of Legislative History*, 1990 DUKE L.J. 39, 47 ("Frequently the action of the conference committee is the critical stage in shaping legislation. It is here that bills subject to a conference take on their final form, and differences in House and Senate versions of the bills are reconciled. If the conference committee explains its action clearly, then courts will not hesitate to rely on that explanation.") (emphasis added).

[61] *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Four years after passage of the Monetary Control Act, the House Committee on Banking, Finance and Urban Affairs conducted a review of the implementation of this legislation.[62] The House Committee concluded that the Monetary Control Act changed the status quo in two ways: (1) by directing the Federal Reserve to impose explicit charges for payment services to both member and nonmember banks; and (2) specifying that the Federal Reserve should provide these services "to *all* depository institutions and not just member banks," foreclosing the notion that 248a is merely about pricing.[63] The Committee also found that these "legislative changes and the actions taken by the Federal Reserve to implement them broke down the division within the payments system…"[64]

The legislative history cited above makes it clear that the provisions of the Monetary Control Act were intended by Congress to apply to "every depository institution in the country," without exception. This was meant to enable the Federal Reserve to have increased control over monetary policy by requiring *all* depository institutions to hold a specified amount of capital at their Reserve Bank based on their deposits.[65]

**5.      Only Congress is Empowered to Determine What is a "Depository Institution"**

Moreover, the Board and the Reserve Bank are not empowered to determine what is—and what is not—a "depository institution" under the existing statutory scheme. The Reserve Bank—shockingly—does not attempt to hide an attempt to arrogate this power to itself,[66] diminishing the

---

[62] H. Rept. 98-17, *The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System*, H. Comm. on Banking, Finance and Urban Aff., 98th Cong., 2d Sess., at *VII (Nov. 1984).
[63] *Id.* (emphasis added).
[64] *Id.*
[65] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (last visited Sept. 6, 2022).
[66] *See* Def. Fed. Rsrv. Bank of Kansas City's Mem. of Points and Authorities in Support of Its Motion to Dismiss, *Custodia Bank , Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *24 (Aug. 16, 2022).

fact that Congress, through a number of laws,[67] has set out clearly what is a depository institution/bank[68] and what is not. A master account, and corresponding access to the payment system, is one of the hallmark features of a depository institution/bank that are not accessible to other financial institutions, including investment companies, broker/dealers and lenders. Moreover, in light of § 461(b)'s requirement that "each depository institution" place reserves at the Fed, if the Fed has an absolute veto over state chartered depository institutions obtaining a master account *and* being able to obtain a correspondent relationship under Operating Circular 1, is that entity *de facto* still a depository institution?

A depository institution that does not have a master account "can't really function as a financial institution,"[69] and if the Federal Reserve has the ability to determine which depository institutions can and cannot receive a master account, the Fed would essentially become the ultimate decision-maker for what is a bank in this country, upsetting our dual banking system.[70]

It is not conceivable that the Board or the Reserve Bank should have unaccountable authority to essentially determine what depository institutions are 'real' depository institutions and which are not, when Congress has set down in explicit detail the requirements for a federal or state-chartered entity to qualify as a "depository institution," consistent with the spirit of our dual banking system. Congress intended for states to be permitted to charter depository institutions

---

[67] *See, e.g.,* 12 U.S.C. § 461(b)(1)(A) (definition of "depository institution"); 12 U.S.C. § 1813(a) (definition of "bank" and "state bank"); 12 U.S.C. § 1841(c) (definition of "bank" for bank holding company supervision); 15 U.S.C. § 80b-2(a)(2) (definition of "bank" for Investment Company Act purposes); 15 U.S.C. § 80a-2(a)(5) (definition of "bank" for Investment Advisers Act purposes); 26 U.S.C. § 581 (definition of "bank" for tax purposes).

[68] A "depository institution" is a chartered financial institution that receives demand deposits, e.g., receiving customer currency for safekeeping/lending purposes and recording those customer funds as a liability on its balance sheet. A "depository institution" can be a bank, special purpose depository institution, credit union, federal thrift association or similar entities." This is in comparison to a credit union, which is a not-for-profit depository institution.

[69] *See* Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is that Legal? Brookings Institution* (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.

[70] Julie L. Stackhouse, *Why America's Dual Banking System Matters,* Fed. Rsrv. Bank of St. Louis, Sept. 18, 2017, https://www.stlouisfed.org/on-the-economy/2017/september/americas-dual-banking-system-matters.

under that state's laws, and as long as the institution comported with the definition of depository institution/bank under Federal law, Congress did not intend for the Board or Reserve Bank to overrule the prudent judgment of a state for its own. This is a dangerous precedent.

During debate on the Monetary Control Act in 1980, Congress dismissed the possibility that the Board, the Reserve Banks or the Federal Government might assume the power of determining which state-chartered banks are in fact banks under Federal law. Senator Proxmire, Chairman of the Senate Banking Committee, noted the following:

> Nevertheless, the fact is that the Federal Government does not replace the State chartering of banks. The Federal Government does not replace the Federal insurance for State banks. The Federal Government does not replace examination and supervision of State banks by the State examiners and the State instructors under State control. The States retain authority to define the power of State-chartered banks.[71]

Today, ironically, debate around the Monetary Control Act has come full circle as the Board and the Reserve Banks, through this litigation, the related Account Access Guidelines, S-Letter 2667 and the Implementation Handbook[72] are essentially arguing that they have the legal authority to determine what is a depository institution and what is not. In construing §§ 248a, 342 and 461 *in pari materia*, the Court should carefully consider whether the Account Access Guidelines, S-Letter 2667 and the Implementation Handbook are legally viable under currently law, and find that the Board is not permitted to override the risk assessment decisions of a state banking supervisor.

Congress understood the importance of protecting and preserving the dual banking system when it passed the Monetary Control Act,[73] and as described, has set down very clear definitions of what is a "depository institution," and what is a "bank" in statute. Despite some original

---

[71] 126 Cong. Rec. 7070 (Mar. 28, 1980).

[72] Guidelines for Evaluating Account and Service Requests, 87 Fed. Reg. 51099, 51100 (Aug. 19, 2022). *See* Ex. AS, AX, ECF 236.

[73] 126 Cong. Rec. 7070. (Mar. 28, 1980) (statement of Sen. Proxmire) ("Mr. President, this is not a destruction of the dual banking system. If it were, you would not get the tremendous over-whelming approval of the bill by the institutions themselves. The dual banking system is retained.").

concerns by some that the Monetary Control Act would destroy our dual banking system,[74] the four decades since the bill's passage have proven that these fears were unfounded because the dual banking system remains alive and well even today, as was Congress' intention. Should the defendants' argument be accepted, however, it would serve as a paradigm shift that would subvert the states' role within our financial system.

### 6. Conclusion

The Federal Reserve has historically stated that master accounts were available to all depository institutions. Today, the Federal Reserve's website states that "[i]n summary, the role of the Federal Reserve in providing payment services is to promote the integrity and efficiency of the payments mechanism and to ensure the provision of payment services to all depository institutions on an equitable basis, and to do so in an atmosphere of competitive fairness."[75] The Board's website also evidences that it understood the Monetary Control Act to require that Reserve Banks provide master accounts to all depository institutions.[76] Additionally, the Federal Reserve's Account Structure Guide states that "[a] Financial Institution may maintain a Master Account with its ARB [Administrative Reserve Bank] if it is eligible as defined in OC 1 [Operating Circular 1] and applicable law."[77] The current *litigating position* of the Board and Reserve Bank is not

---

[74] *Id.* at 7072. (Sen. Tower, "In my opinion, this will further erode the dual banking system and increase the possibility of creating a single bank regulatory agency, at the Federal level, for all financial institutions."

[75] *Policies: The Federal Reserve in the Payments System,* Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last visited Sept. 8, 2022) ("Federal Reserve payment services are available to all depository institutions . . . .").

[76] *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_standards.htm ("The Monetary Control Act of 1980 . . . has expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis . . . .").

[77] FED. RSRV. SYS., FEDERAL RESERVE ACCOUNT STRUCTURE, TRANSACTION SETTLEMENT AND REPORTING GUIDE 12 (2017), *available at* https://app.frbservices.org/assets/resources/rules-regulations/operating-circular-1-accnt-structure.pdf.

consistent with past statements and practice, and undercuts their stated commitment to provide payment services "in an atmosphere of competitive fairness."[78]

This matter is not about crypto assets, but fidelity to Congress' enactments and the dual banking system. At three other states, including Connecticut, Idaho and Vermont,[79] currently have depository institution charters similar to the Wyoming special purpose depository institution with pending master account applications at the Federal Reserve. In total, the Board recently disclosed 26 uninsured, non-federally regulated master account applicants in its most recent quarterly update of master account requests, a substantial majority of which have no plans to handle crypto assets.[80] One such institution which seeks to address inefficiencies in foreign exchange lists former Federal Reserve Board Vice Chair for Supervision Randy Quarles as an investor and organizer.[81]

Six months after the beginning of this matter, then-Kansas City Fed President Esther George delivered remarks prior to her January 2023 retirement. In commenting on her work on payments and the development of the new FedNow system, she noted "that the Federal Reserve's role *will ensure equitable access to banks of all sizes nationwide*" and that "*every bank* deserves the same opportunity to offer that service [FedNow] to its community."[82] While the Federal Reserve may have a laudable public position on equality of access to the payments system, this matter shows that the Federal Reserve System has miles to go in following the law.

---

[78] *Policies: The Federal Reserve in the Payments System,* Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last visited Sept. 8, 2022) ("Federal Reserve payment services are available to all depository institutions . . . .").

[79] *See* Fed. Rsrv. Bd., *Master Account and Services Database: Requests for Access*, https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm (last visited Jan. 17, 2024).

[80] *Id.*

[81] *See* Ben Margulies, *Ex-Fed Vice Chair Quarles Linked to Bank Seeking Master Account*, Central Banking Magazine, Jun. 28, 2023, https://www.centralbanking.com/regulation/banking/7959134/ex-fed-vice-chair-quarles-linked-to-bank-seeking-master-account.

[82] *Reflections on 40 Years at the Central Bank, Remarks by Esther George at the Exchequer Club of Washington, D.C.*, Jan. 18, 2023, https://www.kansascityfed.org/Speeches/documents/9332/2023-George-Exchequer-01-18.pdf.

For the reasons discussed above, this Court should grant Plaintiff's Motion for Judgment as a Matter of Law (ECF 238).

Submitted respectfully this XXth day of January, 2024,

<u>/s/ Chris Land</u>

Chris Land, General Counsel (Wyo. Bar #7-6006)
Office of Senator Cynthia M. Lummis
United States Senate
127A Russell Senate Office Building
Washington, DC 20510

Phone: (202) 224-3424
E-Mail: chris_land@lummis.senate.gov

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify, on the XXth day of January 2024, a true and correct copy of this motion

was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Andrew Michaelson
Angela Tarasi
Christine Carletta
Jared Lax
Laura Harris
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
KING & SPAULDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
amichaelson@kslaw.com
atarasi@kslaw.com
ccarletta@kslaw.com
jlax@kslaw.com
lharris@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L.M. Addleman
Erin Berry
HIRST APPLEGATE LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Scott E. Ortiz
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602
(307) 265-0700
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Jamie Wolfe
Ian M. Swenson
Lauren Weinberger
Russell Mendelson
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5173
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
jwolfe@wc.com
iswenson@wc.com
lweinberger@wc.com
rmendelson@wc.com

/s/ Chris Land