Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF GOVERNORS OF<br>THE FEDERAL RESERVE SYSTEM &<br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br><br>Defendants. | Case No. 1:22-cv-00125-SWS |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S OPPOSITION TO PLAINTIFF'S PETITION FOR ADMINISTRATIVE PROCEDURE ACT REVIEW

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF THE ISSUE .................................................................................. 2

BACKGROUND ........................................................................................................ 2

STANDARD OF REVIEW ........................................................................................ 5

ARGUMENT .............................................................................................................. 6

I.    Federal Reserve Banks Retain the Necessary Discretion to Deny or Restrict Access to Master Accounts and Services ..................................................................... 6

    A.    Reserve Banks Have Always Assessed Risks When Providing Accounts and Services to Depository Institutions ........................................................... 6

        1.    Reserve Banks consistently exercised discretion over access to accounts and services between 1913 and 1980 ............................. 7

        2.    Reserve Banks have continued to exercise discretion over accounts and services for all institutions between the enactment of the Monetary Control Act in 1980 and the present ......................... 10

    B.    The Monetary Control Act of 1980 Did Not Eliminate Reserve Bank Discretion ............................................................................................... 13

        1.    Section 248a's plain text does not grant Custodia a right to a master account ......................................................................... 14

        2.    The MCA did not limit discretion granted under section 342 ................. 18

        3.    Custodia cannot bootstrap its favored reading onto the MCA's plain text by resorting to generalized statements and other extra-statutory sources ........................................................................ 21

        4.    *Banco San Juan* is both illustrative and persuasive ................................. 26

    C.    There Is No Indication That Congress Intended to Abdicate Federal Monetary Policy and Payment Systems to Control by Individual States or Territories ........ 29

II.     The Board Did Not Direct the Denial of Custodia's Master Account Request or Exceed
        Its Statutory Authority ................................................................................................. 34

        A.      The Board Followed the Consultation Process Set Forth in the Guidelines
                and Implementing S-Letter, But the Decision Was Made by FRBKC ................. 34

        B.      The Board Did Not Take Actionable "Final Agency Action" on Custodia's
                Account Request ................................................................................................... 39

        C.      Even if the Board Had "Inserted Itself into the Master Account Decision-
                Making Process" as Custodia Claims, That Is Neither Unlawful Nor a
                Violation of the APA ............................................................................................ 42

CONCLUSION ................................................................................................................................ 44

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**Cases**

*7-Eleven, Inc. v. National Union Insurance Co. of Pittsburgh, Pa.*,
    33 F. App'x 703 (5th Cir. 2002) ........................................................................ 16

*American Petroleum Institute v. DOI*,
    81 F.4th 1048 (10th Cir. 2023) ......................................................................... 6

*Anderson v. Suiters*,
    499 F.3d 1228 (10th Cir. 2007) ........................................................................ 24

*Andresen v. Maryland*,
    427 U.S. 463 (1976) ........................................................................................... 15

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*,
    No. 23-cv-6414 (JGK), 2023 WL 7111182
    (S.D.N.Y. Oct. 27, 2023) ...................................... 2, 3, 14, 17, 21, 26, 27, 28, 29, 30, 32, 33

*Barnett Bank of Marion County, N.A. v. Nelson*,
    517 U.S. 25 (1996) ............................................................................................. 30

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................... 41

*Bischoff v. Glickman*,
    54 F. Supp. 2d 1226 (D. Wyo. 1999), *aff'd on standing grounds sub nom.*,
    *Bischoff v. Myers*, 2000 WL 743686 (10th Cir. June 9, 2000) ......................... 43

*Board of Governors of the Federal Reserve System v. First Lincolnwood, Corp.*,
    439 U.S. 234 (1978) ..................................................................................... 22, 38

*Carroll v. Logan*,
    735 F.3d 147 (4th Cir. 2013) ............................................................................. 21

*Cherokee Nation v. Bernhardt*,
    936 F.3d 1142 (10th Cir. 2019) ........................................................................ 19

*Cherry v. U.S. Dep't of Agriculture*,
    13 F. App'x 886 (10th Cir. 2001) ..................................................................... 40

*Colorado Farm Bureau Federation v. U.S. Forest Service*,
    220 F.3d 1171 (10th Cir. 2000) ............................................................. 40, 41, 42

*Custis v. United States,*
    511 U.S. 485 (1994) ............................................................................................ 20

*DHS v. MacLean,*
    574 U.S. 383 (2015) ............................................................................................ 17

*Edwards v. Valdez,*
    789 F.2d 1477 (10th Cir. 1986) ........................................................................ 23

*Farmers & Merchants Bank v. Federal Reserve Bank of Richmond,*
    262 U.S. 649 (1923) ................................................................................. 8, 19, 20

*Fasano v. Federal Reserve Bank of New York,*
    457 F.3d 274 (3d Cir. 2006) ......................................................................... 2, 35

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City,*
    861 F.3d 1052 (10th Cir. 2017) ................................................................. 17, 27

*Gares v. Willingboro Township,*
    90 F.3d 720 (3d Cir. 1996) ................................................................................ 17

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York,*
    866 F.2d 38 (2d Cir. 1989) ................................................................................ 27

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................................ 43

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) ............................................................................................ 20

*Hohn v. United States,*
    524 U.S. 236 (1998) ............................................................................................ 20

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litigation,*
    1 F. Supp. 3d 34 (E.D.N.Y. 2014) ...................................................................... 3

*In re McDaniel,*
    973 F.3d 1083 (10th Cir. 2020) ........................................................................ 16

*In re TD Bank, N.A.,*
    150 F. Supp. 3d 593 (D.S.C. 2015) ..................................................................... 3

*Jet Courier Services., Inc. v. Federal Reserve Bank of Atlanta,*
    713 F.2d 1221 (6th Cir. 1983) ..................................................................... 10, 27

*Kay Electric Cooperative v. City of Newkirk, Oklahoma*,
  647 F.3d 1039 (10th Cir. 2011) ...................................................................... 21

*Kobach v. U.S. Election Assistance Commission*,
  772 F.3d 1183 (10th Cir. 2014) ..................................................................... 40

*Loughrin v. United States*,
  573 U.S. 351 (2014) ............................................................................... 16, 17

*Marathon Oil Co. v. Lujan*,
  937 F.2d 498 (10th Cir. 1991) ................................................................. 43, 44

*Marshall County Health Care Authority v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ...................................................................... 5

*Maryland v. Wilson*,
  519 U.S. 408 (1997) ...................................................................................... 17

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...................................................................................... 24

*McNary v. Haitian Refugee Center, Inc.*,
  498 U.S. 479 (1991) ...................................................................................... 16

*Merit Management Group, LP v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018) .................................................................................... 15

*Miami Tribe of Oklahoma v. United States*,
  198 F. App'x 686 (10th Cir. 2006) ................................................................ 42

*Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ...................................................................................... 24

*Nelson v. United States*,
  40 F.4th 1105 (10th Cir. 2022) ......................................................... 17, 21, 26

*NLRB v. SW General, Inc.*,
  580 U.S. 288 (2017) ...................................................................................... 23

*Oceana, Inc. v. Pritzker*,
  24 F. Supp. 3d 49 (D.D.C. 2014) .................................................................. 22

*Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*,
  390 F.3d 684 (10th Cir. 2004) ...................................................................... 30

*Sinclair Wyoming Refining Co., LLC v. U.S. EPA,*
    72 F.4th 1137 (10th Cir. 2023) ........................................................................ 40

*State of Utah v. Babbitt,*
    137 F.3d 1193 (10th Cir. 1998) .......................................................................... 5

*United States v. Allen,*
    983 F.3d 463 (10th Cir. 2020) .......................................................................... 20

*United States v. Rohde,*
    159 F.3d 1298 (10th Cir. 1998) ........................................................................ 28

*United States v. Sturm,*
    673 F.3d 1274 (10th Cir. 2012) ........................................................................ 21

*Western Energy Alliance v. Biden,*
    Nos. 21-cv-13 and 56-SWS, 2022 WL 18587039 (D. Wyo. Sept. 2, 2022) ..................... 40

*Western Minnesota Municipal Power Agency v. FERC,*
    806 F.3d 588 (D.C. Cir. 2015) .................................................................... 17, 19

*Wyoming v. U.S. Dep't of Agriculture,*
    661 F.3d 1209 (10th Cir. 2011) ........................................................................ 43

**Statutes**

5 U.S.C. § 551(13) ........................................................................................ 41

5 U.S.C. §§ 701–706 ..................................................................................... 43

5 U.S.C. § 701(a) ......................................................................................... 43

5 U.S.C. § 701(a)(2) ..................................................................................... 43

5 U.S.C. § 706 ............................................................................................... 5

5 U.S.C. § 706(2) ................................................................................ 6, 42, 44

5 U.S.C. § 706(2)(A) ...................................................................................... 6

5 U.S.C. § 706(2)(C) ...................................................................................... 6

12 U.S.C. § 24(first)-(seventh cl. 1) ................................................................... 3

12 U.S.C. § 225a ......................................................................................... 35

12 U.S.C. § 248(j) .............................................................................................. 3

12 U.S.C. § 248(k) ............................................................................................ 35

12 U.S.C. § 248a ............................ 2, 11, 13, 14, 15, 19, 20, 21, 23, 24, 26, 27, 29, 30, 33, 34, 43

12 U.S.C. § 248a(a) .................................................................................. 2, 15, 43

12 U.S.C. § 248a(c) ............................................................................ 15, 16, 18, 26

12 U.S.C. § 248a(c)(1) ...................................................................................... 16

12 U.S.C. § 248a(c)(2) ............................................................................ 16, 18, 27

12 U.S.C. § 248a(c)(3)–(4) ................................................................................ 16

12 U.S.C. § 248c ............................................................................................... 34

12 U.S.C. § 248c(a)(3) ...................................................................................... 43

12 U.S.C. § 248c(b)(1) ...................................................................................... 33

12 U.S.C. § 248c(3) ............................................................................................ 2

12 U.S.C. § 301 .................................................................................................. 3

12 U.S.C. § 321 .................................................................................................. 7

12 U.S.C. § 321 *et seq* ....................................................................................... 4

12 U.S.C. § 341(first-seventh) ............................................................................ 3

12 U.S.C. § 341(sixth) ........................................................................................ 3

12 U.S.C. § 341(seventh) .................................................................................... 3

12 U.S.C. §§ 341–361 ........................................................................................ 3

12 U.S.C. § 342 ............................................ 2, 7, 12, 15, 16, 17, 18, 19, 20, 26, 27, 34, 39

12 U.S.C. § 343 .................................................................................................. 2

12 U.S.C. § 347 .................................................................................................. 2

12 U.S.C. § 347c ................................................................................................ 2

12 U.S.C. § 347d ............................................................................................... 2

12 U.S.C. § 355(1) ............................................................................................. 2

12 U.S.C. § 461 ............................................................................................... 19

12 U.S.C. § 461(b)(2) ...................................................................................... 18

12 U.S.C. § 461(c)(1)(A)(i) ............................................................................ 19

12 U.S.C. § 461(c)(1)(B) ................................................................................ 19

28 U.S.C. § 2412(b) ........................................................................................ 17

101 Pa. Code § 15.142(c) ................................................................................ 18

U.C.C. § 3-102(c) ........................................................................................... 12

U.C.C. § 4-103(b) ........................................................................................... 12

U.C.C. § 4A-107 ............................................................................................. 12

Wyo. Stat. § 34.1-3-102(c) ............................................................................. 12

Wyo. Stat. § 34.1-4-103(c) ............................................................................. 12

Wyo. Stat. § 34.1-4.A-107 .............................................................................. 12

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq*,
    Pub. L. No. 63-43, ch. 6 §§ 9, 13, 19, 38 Stat. 251, 259, 263, 270 .............. 7, 19
    Pub. L. No. 65-25, § 4, 40 Stat. 232, 234–35 ................................................. 7

International Banking Center Regulatory Act,
    Puerto Rico Act No. 52-1989 (Aug. 11, 1989) https://bvirtualogp.pr.gov/ogp/Bvirtual/
    leyesreferencia/PDF/Y%20-%20Ingl%C3%A9s/52-1989.pdf ........................ 32

Monetary Control Act of 1980, Pub. L. No. 96-221,
    § 105(a)(1), 94 Stat. 132 ................................................................................. 16
    § 107, 94 Stat. 132, 141 ................................................................................. 15

**Regulations**

12 C.F.R. § 204.5(a)(1) ................................................................................... 19

12 C.F.R. § 204.5(a)(2) ................................................................................... 19

**Rules**

Local Rule 83.6(b)(1)...................................................................................... 39, 40

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
    86 Fed. Reg. 25,865 (May 11, 2021) (Proposal)............................................... 3
    87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice)............................... 3
    87 Fed. Reg. 51,099 (Aug. 19, 2022) (Final)............................. 3, 12, 13, 35, 38

Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems,
    50 Fed. Reg. 21,120 (1985) ................................................................ 11, 22, 23

**Other Authorities**

126 Cong. Rec. 6250 (1980)........................................................................... 24

126 Cong. Rec. 6897 (1980)........................................................................... 23

Board of Governors of the Federal Reserve System, Minutes of Board Meeting (July 26, 1945)
    https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/
    19450726_Minutes.pdf ............................................................................... 9

Board of Governors of the Federal Reserve System, Federal Reserve Bulletin (February 1964)
    https://fraser.stlouisfed.org/title/federal-reserve-bulletin-62/february-1964-21350 ......... 10

Chester Morrill, Secretary, Board of Governors of the Federal Reserve System, *Nonmember Bank Clearing Accounts*, Letter X-9187 (April 26, 1935), https://fraser.stlouisfed.org/
    archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill
    -re-nonmember-bank-clearing-accounts-505912........................................... 8, 9

Dan Awrey, *Unbundling Banking, Money, and Payments*,
    110 Geo. L.J. 715 (2022) ................................................................... 24

Department of the Treasury, National Money Laundering Risk Assessment (Feb. 2022),
    https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-
    Risk-Assessment.pdf........................................................................ 32

Federal Deposit Insurance Corporation, *The Banking Crises of the 1980s and Early 1990s: Summary and Implications*, https://www.fdic.gov/bank/historical/history/3_85.pdf ....... 32

Federal Reserve Bank Operating Circular 1, Account Relationships
    (Sept. 1, 2023) https://www.frbservices.org/binaries/content/assets/crsocms/resources/
    rules-regulations/090123-operating-circular-1.pdf........................................ 12

Federal Reserve Bank Operating Circular 1, Account Relationships
(Jan. 2, 1998) web.archive.org/web/20000116011948/http://www.frbservices.org/
Industry/pdf/Oc1.pdf........................................................................................ 11, 12, 23

Federal Reserve Board, *Interstate Branching: New Account Structure*,
https://www.federalreserve.gov/generalinfo/isb/qanda.htm ................................. 7

Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems*
(2022 draft) (ECF No. 160-1) .............................................................................. 26

Lawrence E. Filson & Sandra L. Strokoff,
The Legislative Drafters Desk Reference § 22.10 ...................................... 17, 18

Morgan Ricks, Professor, Expert Report (Dec. 4, 2023) ........................................ 31, 32

Office of the Comptroller of the Currency, OCC Interpretive Letter No. 1082,
2007 WL 5393636 (May 17, 2007)...................................................................... 3

Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?*
(Nov. 14, 2018) https://www.brookings.edu/research/the-fed-wants-to-veto-state-
banking-authorities-but-is-that-legal/ ............................................................... 25

William P. Statsky, Legislative Analysis and Drafting 177 (2d Cir. 1984)................................. 17

# INTRODUCTION

Custodia's extraordinary contention in this case is that Federal Reserve Banks are statutorily prohibited from assessing their counterparties for risks of any kind. This position is entirely untenable and there is no evidence that Congress intended such an anomalous result through the Monetary Control Act ("MCA") or otherwise. Neither the plain text of the statute nor its purpose—to improve the Federal Reserve's control of the money supply—requires Reserve Banks to ignore risks to themselves, the public, the financial system, or the economy in deference to any individual institution. Reserve Banks necessarily assess risk in their provision of accounts and services to both member and non-member institutions and Custodia's contrary contention defies law, reason, and longstanding historical precedent.

Among the mandates assigned by Congress to the Federal Reserve System are the preservation of financial stability and the implementation of national monetary policy. The Federal Reserve is of course also responsible for ensuring the safety and soundness of Reserve Banks, which serve as the operating arms of the nation's central bank and jointly operate a federal payments system. By Congressional design, these responsibilities rest within the Federal Reserve System and not with any individual state, territory, or financial institution. Nothing about the ability of states or territories to charter depository institutions, or Congress's broadening of access to Reserve Bank accounts and services as a general matter, alters this result. The recent expansion of novel charters and institutions—some that have inadequate money laundering controls or threaten the implementation of national monetary policy contrary to any conceivable understanding of Congressional intent in the MCA—renders the Federal Reserve's risk-assessment responsibilities more important, not less, and the recent formalization

of policies and procedures to address these issues within the central bank should not be surprising.

Because Custodia has staked its Administrative Procedure Act ("APA") claim on a phantom proscription against counterparty risk assessment by Federal Reserve Banks that would have grave consequences and was unintended by Congress—and in so doing has conspicuously and tellingly forsaken any challenge to the well-considered, risk-based *reasons* for its account denial—its claim fails as a matter of law.

## STATEMENT OF THE ISSUE

The central question presented for review is whether 12 U.S.C. § 248a imposes a discretionless mandate requiring that a Reserve Bank master account be provided to, and maintained for, each and every depository institution regardless of risk.

## BACKGROUND

As the Court knows, the Federal Reserve System is comprised of the Board, the Federal Open Market Committee ("FOMC"), and twelve Federal Reserve Banks that serve financial institutions within their respective districts. *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 277 (3d Cir. 2006). As a federal agency and not a bank, the Board has neither the ability nor the statutory authority to receive deposits or carry out activities such as check clearing, wire transfers, automated clearing house ("ACH") services, currency and coin services, or other services appurtenant to the business of banking that Congress has vested in the Reserve Banks. *See, e.g.*, 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1). Thus, the Reserve Banks are responsible for opening, maintaining, and, when appropriate, terminating accounts (and corresponding services) held by depository institutions. *See* 12 U.S.C. § 342; Operating Circular ("OC") 1; 12 U.S.C. § 248a(a) ("Federal Reserve bank services"); *id.* § 248c(3) ("reserve bank master account and services"); *see also Banco San Juan Internacional, Inc. v. Fed. Reserve Bank*

*of N.Y.*, No. 23-cv-6414 (JGK), 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023) ("Congress authorized Federal reserve banks to carry out certain banking functions . . . including the authority to accept or reject deposits from depository institutions") (citing 12 U.S.C. §§ 341–361).[1]

The Board routinely issues guidance as part of its general oversight of Reserve Banks, *see* 12 U.S.C. § 248(j), and did so with respect to Reserve Bank master accounts and services in August 2022 following two public notice and comment periods spanning fifteen months. *See* 87 Fed. Reg. 51,099, Guidelines for Evaluating Account and Services Requests ("Guidelines") (Aug. 19, 2022); 87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice); 86 Fed. Reg. 25,865 (May 11, 2021) (Proposal). The Guidelines set forth six principles for use in access decisions and create a three-tiered review framework that "is meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." 87 Fed. Reg. at 51,109. The Board subsequently issued S-Letter 2677 on January

---

[1] Consistent with the relevant statutory authorities, Reserve Banks necessarily exercise their banking functions with due consideration of attendant risks. *See, e.g.*, 12 U.S.C. § 341 (sixth) (Reserve Bank board of directors responsible for bylaws "regulating the manner in which its general business may be conducted"); § 341 (seventh) (granting Reserve Banks "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter"); § 301 (Reserve Bank board "shall perform the duties usually appertaining to the office of directors of banking associations" and "*may*, subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System, extend to each member bank such discounts, advancements, and accommodations as *may be safely and reasonably made*" (emphases added)). Notably, the powers of Federal Reserve Banks under the FRA were closely modeled on the powers granted to national banks (which previously served some of the functions of Reserve Banks) under the National Bank Act, *compare, e.g.*, 12 U.S.C. § 24(first)–(seventh cl. 1) *with id.* § 341(first)–(seventh), and the power granted under the latter act "to receive deposits" has likewise been construed as "discretionary." *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 611 (D.S.C. 2015) (quoting OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (May 17, 2007)); *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 45 (E.D.N.Y. 2014) (same). Risk assessment and mitigation is a necessary feature of operations at both types of banks.

17, 2023, which implemented the expectation set forth in the Guidelines that "Reserve Banks engage in consultation with" the Board, "as appropriate, to support consistent implementation of the Account Access Guidelines." Pl. Br., Exhibit AS at FRB-AR-14–17, 31.[2]

Custodia submitted its request for a master account to the Federal Reserve Bank of Kansas City ("FRBKC") in October 2020, and later initiated a separate application process to become a member bank of the Federal Reserve System in August 2021. Am. Compl. ¶¶ 21, 47. FRBKC performed a pre-membership examination of Custodia in September 2022 under Board-delegated authority (unlike accounts and services, membership is a Board function, *see* 12 U.S.C. § 321 *et seq.*), and sought additional information from Custodia in October 2022. FRB-AR-1400, 1806. On October 21, 2022, FRBKC bank examiners provided feedback to Custodia from the pre-membership examination. FRB-AR-1204. This feedback also informed the Reserve Bank's master account decision in an effort to reduce burden and avoid duplicative inquiries. FRB-AR-1806. Among other findings, the Reserve Bank examiners "identified numerous exceptions to, or departures from, safe and sound banking practices in Custodia's prospective risk management program compared to the risk management practices that would typically be expected or required." FRB-AR-1204–05.

On January 6, 2023, in an effort to meet the forthcoming S-Letter's expectation to consult with the Board when assessing higher risk entities such as Custodia, *see* Pl. Br., Exhibit AS at FRB-AR-16, FRBKC staff sought the perspective of various subject-matter experts at the Board

---

[2] S-Letters are sequentially numbered letters—*i.e.*, more than 2,600 such letters preceded S-2677—issued by the Board that provide operational guidance to Reserve Banks and have historically covered a range of topics, such as administration, personnel, and financial services. FRBKC Br., Exhibit 16 at 261:13–15, 263:10–14, 292:20–293:14. These letters are commonly incorporated into and consulted internally through the Federal Reserve Administrative Manual. *See, e.g.*, https://www.governmentattic.org/33docs/FRS-FRAM_2001-2010.pdf (excerpts).

on a memo it had drafted recommending denial of Custodia's master account request. *See* Pl. Br., Exhibit BQ. Board staff provided suggestions for consideration on January 9 and 10. Pl. Br., Exhibits BQ, BS, BY, BZ. After considering this feedback, and consistent with the process set forth in the S-Letter, FRBKC sent the Board Reserve Bank Operations and Payment Systems ("RBOPS") Division Director an email sharing its final analysis of Custodia's master account request. FRB-AR-3–13. In response, on January 26, 2023, the RBOPS Division Director wrote to the FRBKC President that: (1) the Reserve Bank's consultative approach was consistent with S-Letter 2677; (2) "Board staff have reviewed the Reserve Bank's record documenting application of the Guidelines in evaluating the access request;" and (3) the Board had "no concerns with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request for a master account and access to services." Pl. Br., Exhibit CC at FRB-AR-2. On January 27, 2023, the Board issued a detailed decision denying Custodia's application for Federal Reserve membership due to various failures to satisfy established membership criteria. *See* FRB-AR-153. Soon after, FRBKC informed Custodia of its decision to deny the master account request along with a written explanation of the reasons for its decision. Pl. Br., Exhibit CF. These reasons for FRBKC's account denial, s*ee id.* & FRBKC Br., stand unchallenged.

## STANDARD OF REVIEW

When agency action is challenged under the APA, "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *State of Utah v. Babbitt*, 137 F.3d 1193, 1207 n.20 (10th Cir. 1998). "[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

Custodia's APA claim asks only whether the Board has acted "in excess of statutory . . . authority" under 5 U.S.C. § 706(2)(C), *see* Pl. Br. at 31, and Custodia has elected not to pursue an "arbitrary and capricious" challenge to the reasons for its account denial under § 706(2)(A). *See generally id.* (declining to raise arbitrary and capricious standard or lodge any arguments challenging the reasons for its account denial); *Am. Petroleum Inst. v. DOI*, 81 F.4th 1048, 1058 n.5 (10th Cir. 2023) (noting that arguments under a specific subsection of § 706(2) had been waived "by inadequately developing an argument grounded in that provision in its opening brief"); Order Denying State of Wyo.'s Mot. For Permission to Intervene, ECF 162 at 5 (May 17, 2023) (denying intervention because it would "unnecessarily expand this case *from statutory construction* to one that involves what the Defendants are allowed to consider," and that "the Court need only address the potential of a *mandatory duty*" (emphases added)).

## ARGUMENT

## I.    Federal Reserve Banks Retain the Necessary Discretion to Deny or Restrict Access to Master Accounts and Services

### A.    Reserve Banks Have Always Assessed Risks When Providing Accounts and Services to Depository Institutions

Since the passage of the Federal Reserve Act ("FRA") in 1913, and continuing after the enactment of the MCA in 1980, the Federal Reserve Banks have considered risk in providing their banking services. While Custodia premises its argument on the concept of "access" or "availability" (Pl. Br. at 33–49), Custodia does not—and cannot—establish that such "access" to or "availability" of banking services has ever equated to an absolute, non-discretionary requirement that Reserve Banks provide accounts and services to all requesting institutions, regardless of risk. This extraordinary position defies common sense, the historical record, the text of the statute, and the expectations of Congress.

### 1. Reserve Banks consistently exercised discretion over access to accounts and services between 1913 and 1980

Since the enactment of the FRA, the Federal Reserve Banks have exercised discretion in granting access to Reserve Bank accounts and services. This longstanding exercise of discretion is rooted in Congress's general grant of banking authority to Reserve Banks, *see supra* at 2-3 & n.1, as well as Section 13 of the FRA, which stated from its enactment in 1913 that Federal Reserve Banks "*may* receive" deposits from "member banks." Pub. L. No. 63-43, 38 Stat. 251, 263 (currently codified at 12 U.S.C. § 342) (emphasis added). State-chartered banks became "members" of the Federal Reserve System by "mak[ing] application to the reserve bank organization committee, and thereafter to the Federal Reserve Board for the right to subscribe to the stock of the Federal reserve bank organized or to be organized within the Federal reserve district where the applicant is located," and the Federal Reserve could decide membership based upon "such rules and regulations as it may prescribe." Pub. L. No. 63-43, § 9, 38 Stat. at 259 (currently codified at 12 U.S.C. § 321). In 1917, Congress amended Section 13 to allow limited deposit-taking accounts "solely for the purposes of exchange or collection" from "any nonmember bank or trust company." Pub. L. No. 65-25, § 4, 40 Stat. 232, 234-35.[3]

In 1923, the Supreme Court had occasion to opine on the language in Section 13 regarding check collection, and held that the language granted Reserve Banks discretion.

---

[3] These limited "exchange or collection" accounts established at Reserve Banks pursuant to Section 13 were referred to as "clearing accounts." Beginning in 1998, the Federal Reserve no longer used the term "clearing account" and incorporated these accounts into its revised "master account" structure. *See* Federal Reserve Board, *Interstate Branching: New Account Structure*, *available at* https://www.federalreserve.gov/generalinfo/isb/qanda.htm ("All credits and debits resulting from the use of Federal Reserve services will be booked to this one account."). This unified account structure was made possible by the MCA's revision of FRA Section 13 to permit general deposit accounts for non-member depository institutions.

Specifically, in interpreting Section 13's language that a Reserve Bank "may receive from any nonmember bank . . . deposits of checks . . . payable upon presentation," the Court rejected an argument that "the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank." *Farmers & Merchs. Bank v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923). The Court noted that Congress had from time to time enlarged "[t]he class of cases" to which the Reserve Banks' authority to receive checks applied, "[b]ut in each amendment, as in section 13, the words used were 'may receive'—words of authorization merely." *Id*. The Court further observed that the FRA "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the [B]oard and the Reserve Banks 'shall' do and what they 'may' do." *Id.* at 663. The Court listed twenty-one provisions of the original FRA where both "may" and "shall" were used, and another seven where only "shall" was used, to illustrate the precision Congress took in distinguishing actions the Board or Reserve Banks were allowed to take from those they were required to take. *Id.* at 663 n.6.

In 1935, a Reserve Bank raised with the Board "a question of policy with respect to the circumstances and conditions under which clearing accounts of nonmember banks should be accepted under the authority of Section 13 of the Federal Reserve Act." Chester Morrill, Secretary, Bd. of Governors of the Fed. Reserve Sys., Letter X-9187 (Apr. 26, 1935), at 365.[4] The Board surveyed Reserve Banks, and many reported that they declined to open such accounts in various circumstances. For example, the Federal Reserve Bank of Dallas reported that "in considering an application from a nonmember bank to become a clearing member we simply

---

[4] *Available at* https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-nonmember-bank-clearing-accounts-505912.

weigh all the facts." *Id.* at 371. The Federal Reserve Bank of Minneapolis similarly indicated that it did not automatically open clearing accounts for all nonmember banks: "We have received a number of requests recently to open accounts for non-member banks for the purpose of depositing idle funds with us. . . . We have not accepted these accounts and have endeavored to restrict the accounts to active non-member clearing accounts." *Id.* at 369. And the Federal Reserve Bank of Philadelphia stated that, while it had opened accounts for nonmembers in the past, it had stopped doing so. The Board in no way required that Reserve Banks open these accounts and acknowledged that such decisions were left to the discretion of the Reserve Banks, stating "it is the Board's view that requests for the establishment of clearing accounts by non-member banks should be passed upon by your directors *in the light of all the circumstances surrounding each application*." *Id.* at 366 (emphasis added).

In 1945, the Board was asked by The Peoples Savings Bank in Iowa for a definition of a "nonmember clearing account." Minutes of Board Meeting of July 26, 1945, at 2.[5] The Board unanimously approved a response stating that Section 13 of the FRA "reasonably define[s]" the term, and "the Board has never found it necessary to further define it." *Id.* The Board further indicated that it "has not prescribed specific conditions or requirements which should or should not be made by a Federal Reserve Bank in connection with the opening and maintenance of nonmember clearing accounts," but that a Federal Reserve Bank can "*in its discretion* accept[] such an account." *Id.* at 3 (emphasis added). In a similar vein, in 1964 the Federal Reserve Board received an inquiry about whether branches of foreign banks and private banks were "nonmember banks" eligible to open clearing accounts at Reserve Banks pursuant to Section 13.

---

[5] *Available at* https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/19450726_ Minutes.pdf.

*Federal Reserve Bulletin* (Feb. 1964), at 168–69.[6] In response, the Board noted that these entities engaged in banking activities like those typically performed by commercial banks and were subject to supervision of state banking regulators. *Id.* Accordingly, the Board concluded that a foreign bank branch or a private bank was a "nonmember bank" eligible for a clearing account, but cautioned that *the opening of such accounts was subject to the "discretion" of the Federal Reserve Bank* whose district encompassed the institution. *Id.*

Thus, from the earliest days of the Federal Reserve, the provision of accounts and services was an exercise vested to the Federal Reserve's discretion. And the Supreme Court validated early on that, in the various places where Congress used permissive language in the FRA, including in Section 13, this language merely provided an *authorization* rather than a requirement.

> ## 2. Reserve Banks have continued to exercise discretion over accounts and services for all institutions between the enactment of the Monetary Control Act in 1980 and the present

The Federal Reserve's exercise of discretion to protect the financial system did not change following the enactment of the MCA in 1980. To facilitate its goal of restoring Federal Reserve control over the money supply, the MCA amended Section 13 to authorize Reserve Banks to open deposit accounts for nonmember depository institutions and provided for a pricing schedule in Section 11A under which corresponding Reserve Bank services would "be made available to non-member depository institutions *at the same fees charged member banks*." *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983) (emphasis added). The MCA in no way altered the discretion granted Reserve Banks in Section

---

[6] *Available at* https://fraser.stlouisfed.org/title/federal-reserve-bulletin-62/february-1964-21350.

13, and in the wake of its passage Reserve Banks continued to consider risk in making decisions about access to accounts and services.

For example, in 1985, the Federal Reserve adopted policies on overdrafts that limited some depository institutions' ability to send payments via Fedwire. *See Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 50 Fed. Reg. 21,120 (1985). In the ordinary course of their businesses, banks may incur negative balances in their master accounts when processing funds transfers on behalf of their customers. The Federal Reserve was concerned "that a participant could be unwilling or unable to settle a large net debit position," and noted that "[a] failure of one participant to settle could seriously jeopardize the financial positions of its net creditors on that network, with serious repercussions spreading from those participants to their creditors." *Id.* at 21,121. To limit the risk of overdrafts, the Federal Reserve validated that each Reserve Bank had the power "to reject funds transferred" when those transfers "expose[d] the Reserve Bank to excessive risk." *Id.* at 21,124. And in certain cases, a Reserve Bank could "prohibit [an institution] from using Fedwire." *Id.* Thus, an institution's "access" to this Federal Reserve service, which is among those listed in section 248a, was explicitly conditioned on risk in accordance with the authority provided by Congress in the FRA.

In 1998, the Federal Reserve Banks began issuing circulars governing the relationship between a Reserve Bank and a master account holder. These circulars make clear that a master account involves a contract between a depository institution and the Reserve Bank and that the Reserve Bank can terminate the relationship at any time. For example, the 1998 OC-1 "establish[es] the terms for opening, maintaining, and terminating master accounts with the

Federal Reserve Bank." Operating Circular 1, Account Relationships (Jan. 2, 1998) ¶ 1.1.[7] In addition, the Circular states that "*[a]ll master accounts* are subject to Reserve Bank approval," *without distinguishing between member or non-member banks*, and notes that the Reserve Bank "may close your master account . . . at any time but will endeavor to give at least five business days' prior notice." *Id.* ¶¶ 2.3, 2.8. Both of these provisions are substantively similar to the comparable provisions in the most recent operating circular, reflecting the longstanding practice in which decisions about all master accounts are made by Reserve Banks based on their exercise of discretion. *See* Operating Circular 1, Account Relationships (Sept. 1, 2023) ¶¶ 1.0, 2.6, 2.10.[8]

More recently, the growth of novel charters and rise of uninsured depository institutions led the Federal Reserve Board to establish more formalized processes to manage risk through its Guidelines and implementing S-Letter. *See supra* at 3. Consistent with 12 U.S.C. § 342, the Board's Guidelines continued to "make clear that legal eligibility does not bestow a right to obtain an account and services." 87 Fed. Reg. at 51,106. Rather, the Board emphasized that "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." *Id.* at 51,102. The Board emphasized that, even when access is

---

[7] *Available at* web.archive.org/web/20000116011948/http://www.frbservices.org/Industry/pdf/Oc1.pdf.

[8] *Available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. Notably, Federal Reserve Operating Circulars have been expressly incorporated into the Uniform Commercial Code and Wyoming law. *See, e.g.*, U.C.C. § 3-102(c) & Wyo. Stat. § 34.1-3-102(c) (noting, with respect to negotiable instruments, that "[r]egulations of the Board of Governors of the Federal Reserve System and operating circulars of the Federal Reserve Banks supersede any inconsistent provision of this Article to the extent of the inconsistency"); U.C.C. § 4A-107 & Wyo. Stat. § 34.1-4.A-107 (same with respect to funds transfers); U.C.C. § 4-103(b) & Wyo. Stat. § 34.1-4-103(c) (noting, with respect to bank deposits and collections, that "[a]ction or non-action approved by this Article or pursuant to Federal Reserve regulations or operating circulars" constitutes "the exercise of ordinary care").

granted, the Reserve Bank "may impose (at the time of account opening, granting access to service, or any time thereafter) obligations relating to, or conditions or limitations on, use of the account or services as necessary to limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy or to address other considerations." 87 Fed. Reg. at 51,106–07. However, "[i]f the obligations, limitations, or controls are ineffective in mitigating the risks identified or if the obligations, limitations, or controls are breached, the account-holding Reserve Bank may further restrict the institution's use of accounts and services or may close the account." *Id.* at 51,107.

In sum, as the historical record makes clear, Reserve Banks have always exercised discretion to make risk-based account and services decisions in furtherance of the stability of the U.S. financial and payment systems. It could hardly be otherwise. And as the iterations of OC-1 have long made clear with respect to master accounts in particular, Reserve Banks must first approve, and retain the authority to close, these accounts *for all member and non-member banks alike*. Custodia's contention that *it* has a non-discretionary right to a master account and corresponding services, *when member banks have no such right*, lays bare the utter implausibility of the statutory construction it urges upon the Court.

### B.   The Monetary Control Act of 1980 Did Not Eliminate Reserve Bank Discretion

Although Custodia relies exclusively on the MCA to support its claim, the Federal Reserve Banks' long-standing and common-sense consideration of risk in connection with their account decisions is entirely consistent with the MCA, which does not impose a duty, much less "a clear duty," *cf.* Pl. Br. at 31, that they grant master accounts to all depository institutions. The plain text of 12 U.S.C. § 248a merely obliges the Board to establish *a fee schedule* for Reserve Bank services. Neither the text of section 248a nor any other part of the MCA mandates the grant

13

of a master account or limits Reserve Banks' discretion over such accounts. The extra-statutory authorities that Custodia cites do not compel a different result. And the recent decision in *Banco San Juan* persuasively demonstrates why the statutory text does not mandate granting an account.

### 1.   Section 248a's plain text does not grant Custodia a right to a master account

Custodia rests its case on 12 U.S.C. § 248a, which states:

*Pricing of services*

*(a)   Publication of pricing principles and proposed schedule of fees; effective date of schedule of fees*

> [T]he Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and . . . the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
>
> . . .

*(c)   Criteria applicable*

> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
> (1)   All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.
>
> (2)   All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.
>
> (3)   Over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred . . . .
>
> (4)   Interest on items credited prior to collection shall be charged at the current rate applicable in the market for Federal funds.

12 U.S.C. § 248a(a), (c). Section 248a thus states that the Board must publish pricing principles

for services and must publish a fee schedule based on these principles, and that this schedule

must be based on enumerated principles. Specifically, in setting the fee schedule the Board must

take into consideration, *inter alia*, that Reserve Banks would be accepting deposits from, and

offering corresponding services to, a larger universe of institutions that included nonmember

depository institutions in accordance with the authorization in the MCA's modification of section

342.[9] The provision does not, as Custodia claims, "unambiguously command[]" Defendants to

grant access to services covered by 'the fee schedule' to every 'nonmember depository

institution[],'" Pl. Br. at 35, as underscored by the fact that no such requirement exists as to

member banks.

Moreover, the statute's text provides other indicia that the actions it mandates solely

concern pricing. As an initial matter, section 248a's title, which was enacted by Congress, MCA,

Pub. L. No. 96-221, § 107, 94 Stat. 132, 141, indicates that its purpose is to control "*[p]ricing of*

*services.*" *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section

headings "supply cues as to what Congress intended" (citation omitted)). Additionally, the

section's sole reference to availability of services is in subparagraph (c)(2), which is part of a list

of what the statute indicates are pricing principles. The list is preceded by "[t]he schedule of fees

. . . shall be based on the following principles," followed by a colon. 12 U.S.C. § 248a(c). When

a list is preceded by such prefatory language and a colon, this language limits the scope of what

follows. *See e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 481 (1976) ("[An item in] a series that

---

[9] Such a reading requiring the fee schedule to account for the use of services by nonmember institutions clearly leaves the reference to Reserve Bank services being "available to nonmember depository institutions" as more than mere surplusage, contrary to legislative amici's contention. *Cf.* Legislator Amicus Br. at 8.

follows [a colon] is limited by what precedes that colon"); *7-Eleven, Inc. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 33 F. App'x 703, at * 5 (5th Cir. 2002) ("[A colon preceding a list] tells [readers] that everything following the colon will deal exclusively with [what precedes it]."). And the other items in the list relate solely to pricing, 12 U.S.C. § 248a(c)(1), (3)–(4), further indicating that section 248a(c)(2) concerns pricing rather than access. *In re McDaniel*, 973 F.3d 1083, 1098 (10th Cir. 2020) (applying the canon of *noscitur a sociis* to construe a phrase in a list based on its "common quality" with other list items).

The MCA also amended section 342 by adding "or other depository institution" after "member banks" to those entities from which Reserve Banks "may" accept deposits, MCA § 105(a)(l), 94 Stat. 132, and notably did not change the "may" to "shall." Its failure to use this obvious language to mandate access further indicates that the MCA-enacting Congress did not intend to require Reserve Banks to accept deposits from all banks in all circumstances. *Cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 494 (1991) (construing a statute narrowly where Congress "could easily have used broader statutory language" but did not do so).

Moreover, even if subsection 248a(c)(2) were somehow construed to be a mandate concerning access to services, it would not guarantee Custodia a master account because it does not make a reference to granting access to *all* depository institutions. Instead, subsection 248a(c) uses, in the same sentence, the word "[a]ll" in relation to the services it covers, but not to the institutions that might access these services. 12 U.S.C. § 248a(c) ("All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions"). "When Congress includes particular language in one section of a statute but omits it in another— let alone in the adjoining provision—courts presume that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (cleaned up). This presumption

"applies with particular force" if the inclusion and omission occur "in close proximity—indeed [as here], in the same sentence." *DHS v. MacLean*, 574 U.S. 383, 392 (2015). The statute's text thus indicates that it at most concerns provision of "*all* Reserve bank services" to nonmember banks *as a class*, not to all banks in that class.[10] Indeed, the Tenth Circuit made this point in a recent controlling decision. *See Nelson v. United States*, 40 F.4th 1105, 1115 (10th Cir. 2022) ("The rule against surplusage . . . counsel[s] us to construe 'any statute,' in [28 U.S.C.] § 2412(b), in a different and broader manner than the provision's initial, unadorned reference to 'statute' in order to give meaning to the term 'any.'"). Custodia's reliance on Judge Bacharach's prior *Fourth Corner* opinion to argue otherwise, Pl. Br. at 35–36, is misplaced given the Tenth Circuit's subsequent ruling in *Nelson* that expressly addressed the use and omission of a qualifier comparable to "all" in the same statutory provision.[11] Moreover, the MCA's failure to include

---

[10] The fact that the MCA only amended section 342 to *allow* Reserve Banks to accept deposits from nonmember banks, rather than to order that they "shall" do so, is also consistent with reading it as authorizing the provision of services to nonmembers as a class, without mandating that such services be provided to any individual institution.

[11] Unlike *Nelson*, Judge Bacharach's concurring opinion—which discussed this issue but failed to account for the initial "all"—is not binding precedent in the Tenth Circuit. *Banco San Juan*, 2023 WL 7111182, at *8 ("Judge Bacharach's opinion is neither controlling (even in the Tenth Circuit), nor persuasive."); *accord Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (a statement in a concurrence does not "constitute[] binding precedent"). And the extra-circuit cases Custodia cites are readily distinguishable. In *Gares v. Willingboro Township*, 90 F.3d 720 (3d Cir. 1996), the court construed a statute awarding punitive damages to "prevailing plaintiffs" as applying to all plaintiffs, but relied on another provision in the same statute expressly making "punitive damages . . . available to *all* persons." *Id.* at 726 (emphasis in original) (citations omitted). Moreover, the statute at issue in both *Gares* and *Western Minnesota Municipal Power Agency v. FERC*, 806 F.3d 588 (D.C. Cir. 2015), did not use "all" in the same sentence as the term at issue. The treatises that Custodia cites also do not aid its cause. One treatise has not been published since 1984 and has been cited in only one federal case available on Westlaw, and that was in Judge Bacharach's opinion in *Fourth Corner*. Even still, that treatise cautions that drafters of statutes must "[b]e consistent and uniform in the use of language" and "[v]ariation for the sake of variation has no place in drafting." William P. Statsky, *Legislative Analysis and Drafting* 177 (2d Cir. 1984). The other treatise does not discuss the word "all" in the section cited by Custodia. Lawrence E. Filson & Sandra L. Strokoff, *The Legislative Drafters Desk Reference* § 22.10

"all" before "depository institutions" in § 248a(c) contrasts with use of express language elsewhere in the MCA where Congress *did* intend to make a universal mandate applicable to all depository institutions. Specifically, as legislative amici acknowledge, the MCA's universally-applicable "reserve requirement is unambiguous—it applies to 'each depository institution.'" Legislator Amicus Br. at 9 (quoting 12 U.S.C. § 461(b)(2)).

Lastly, by expressly providing that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks," section 248a(c)(2) itself importantly recognizes that there is no categorical right to access Reserve Bank services. Rather, as shown above, Reserve Banks appropriately exercise discretion with respect to their provision of accounts and services to member banks as well as to non-member banks, consistent with the authority granted to them by Congress in the FRA.

### 2.    The MCA did not limit discretion granted under section 342

Custodia no longer presses its prior argument, based on Judge Bacharach's plainly erroneous reading, that section 342 only provides for Reserve Bank discretion as to which *monetary instruments* to accept, rather than discretion as to which *institutions* to take such deposits from.[12] Instead, it now admits as it must that "Section 342 speaks to which entities may

---

(discussing terms "a," "an," "any," "each," and "every"). And while Custodia cites a provision of Pennsylvania law for the proposition that "[d]rafters of statutes are often cautioned not to freely use 'all'" (Pl. Br. at 36 (citing 101 Pa. Code § 15.142(c)), that proposition supports the Board because the drafters of the MCA acted consistent with that guidance—choosing not to "freely" use the word "all" and instead only using it in one part of section 248a(c)(2) and not the other.

[12] *See* ECF 135 at 18 ("[section] 342 has consistently been interpreted as relating to Reserve Bank's discretion over the types of monetary instruments to accept"). Undeterred by Custodia's abandonment, legislative amici continue to press this argument, *see* Legislator Amicus Br. at 10, which ignores the use of the permissive "may" in section 342 with respect to both whom the Reserve Banks "may" accept deposits from and what deposits they may accept. *See* 12 U.S.C.

make deposits with a Reserve Bank"—a precondition to corresponding services—but contends that reading section 342 "in harmony" with section 248a and section 461, as amended by the MCA, requires narrowing the discretion that section 342 gives Reserve Banks. Pl. Br. at 36–37. This yet again disregards statutory text.

First, section 461 does not conflict with a reading allowing Federal Reserve Banks to determine whether to allow depository institutions to open master accounts. The section's mandate to keep reserves can be satisfied by the common practice of maintaining reserves in another depository institution's account. 12 U.S.C. § 461(c)(1)(B); 12 C.F.R. § 204.5(a)(2).[13] Section 248a similarly does not conflict with reading section 342 as granting discretion. As explained in part B.1, *supra*, section 248a's plain text indicates in multiple ways that its only mandates concern pricing. Since its text does not support, much less compel, a broader reading modifying section 342, such a reading is disfavored. *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1156 (10th Cir. 2019) (a later statute modifies an earlier act "only to the extent necessary to avoid the irreconcilable conflict or inconsistency" (citations omitted)).

Moreover, Custodia's claim that the MCA imposes a requirement that Reserve Banks "shall" grant it a master account is an argument for implied repeal of section 342's permissive language, since "[t]he ordinary meaning of 'shall' is the opposite of 'may,'" *W. Minn. Mun. Power Agency*, 806 F.3d at 592, and *Farmers & Merchants* held that such was the meaning of

---

§ 342 ("Any Federal reserve bank *may* receive *from* [specified classes of depositors] deposits *of* [specified monetary instruments]." (emphases added)).

[13] Reserves may also be kept in vault cash, 12 U.S.C. § 461(c)(1)(A)(i); 12 C.F.R. § 204.5(a)(1), an option first available at the time the FRA was passed in 1913. Federal Reserve Act of 1913, Pub. L. No. 63-43, ch. 6, § 19, 38 Stat. 251, 270.

"may" as used in section 342.[14] While legislative amici make the extraordinary claim that "it is

an open question whether the Supreme Court's interpretation of § 13/342 . . . should be accorded

the full measure of precedential weight" because they contend the Court reached the wrong

result, Legislator Amicus Br. at 15–16, the Court has made clear that "*[o]ur* decisions remain

binding precedent until *we* see fit to reconsider them . . . ." *Hohn v. United States*, 524 U.S. 236,

252–53 (1998) (emphases added).

"Clear legislative intent" is required to repeal this grant of discretion in the earlier statute,

so even language "not entirely harmonious with an earlier [statute]" would be insufficient to

meet the "high bar" required to demonstrate an implied repeal. *United States v. Allen*, 983 F.3d

463, 471 & n.3 (10th Cir. 2020) (citations omitted). Also, as previously noted, the MCA

amended section 342 without changing "may" in that section to "shall." Congress' decision to

amend section 342 without modifying language that *Farmers & Merchants* construed as

permissive is a strong indication of its intent to retain this construction rather than overrule it.

*Custis v. United States*, 511 U.S. 485, 500 (1994) (citing *Herman & MacLean v. Huddleston*,

459 U.S. 375, 385–86 (1983)).

Finally, even if section 248a were susceptible to a reading mandating that Reserve Banks

must grant all requests for master accounts, that reading would be disfavored because the more

specific statute is section 342. This section governs Reserve Bank deposits (and by extension

Reserve Bank deposit accounts and corresponding services) and is in the FRA subchapter on the

---

[14] 262 U.S. at 662–63. Legislative amici argue that *Farmers & Merchants* acknowledged that "may" need not imply discretion in certain contexts, Legislator Amicus Br. at 10, but the Supreme Court rejected the argument in *this* context, holding that both *section 342 and the FRA as a whole* did not present "[a] context [that] compels such a construction [because t]hroughout the Act, the distinction is clearly made between what the Board and the reserve banks 'shall' do and what they 'may' do." 262 U.S. at 662–63.

"Powers and Duties of Reserve Banks," as opposed to section 248a, which does not mention deposits and is in the FRA subchapter concerning *the Board*, which indisputably does not open or provide Reserve Bank accounts or services. *Cf. Kay Elec. Co-op. v. City of Newkirk, Okla.*, 647 F.3d 1039, 1044 (10th Cir. 2011) ("a specific statute controls over a general one"); *see also Carroll v. Logan*, 735 F.3d 147, 152 (4th Cir. 2013) (a provision in Chapter 13 of the Bankruptcy Code was the more specific provision in the context of a proceeding governed by that chapter); *Banco San Juan*, 2023 WL 7111182, at *8 ("If Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board.").

### 3. Custodia cannot bootstrap its favored reading onto the MCA's plain text by resorting to generalized statements and other extra-statutory sources

Custodia also attempts resort to extra-statutory authorities such as statements by Federal Reserve personnel, individual legislators, and academics. Pl. Br. at 38–45, 46–48. But such sources cannot be used to overcome the plain text of the statute as construed based on traditional tools of statutory interpretation. *See*, *e.g.*, *Nelson*, 40 F.4th at 1116–17; *United States v. Sturm*, 673 F.3d 1274, 1279 (10th Cir. 2012). And the authorities Custodia cites do not support a different result.

First, Custodia cites statements from the Board's webpage, individual Board staffers, and elsewhere to argue that the Board's "interpretation [of the MCA] is 'entitled to considerably less deference," Pl. Br. at 38–39, as well as statements by various Reserve Bank constituents that it contends support its position. *Id.* at 38–41. As a threshold matter, these statements are ambiguous at best or consistent with Reserve Banks' undisputed post-MCA *ability* to provide accounts and

services to nonmember banks *as a class*, subject to equitable pricing conditions, rather than a *mandate* to provide accounts and services to each and every such bank regardless of individual bank risk. *See, e.g.*, *id.* at 39 (MCA requires the "Federal Reserve to provide its services to all depository institutions *on an equitable basis*" (emphasis added)); *id.* at 40 ("[T]he services provided by the Federal Reserve Bank . . . will become directly available to *many more* financial institutions.  The Monetary Control Act also *requires that these services be priced explicitly*." (emphasis added) (quoting FRBKC Annual Report (1980–82)).[15] Notably, not one of these statements speaks of eliminating the Reserve Banks' longstanding discretion over access to their accounts and services by those authorized by law to obtain them.

Moreover, as explained above, the Board bases its interpretation on the plain text of the MCA. As a result, the ambiguous statements on which Custodia relies do not call into question the deference that the Board's reasonable interpretation in the Guidelines invites. *See Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood, Corp.*, 439 U.S. 234, 251 (1978); *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 70 (D.D.C. 2014) (guidance "deserve[s] considerable deference" when, as here, the agency uses a "highly formal process,' including "notice[s] in the Federal Register," "accept[ing] public comments," engaging in lengthy "deliberation," and then "publish[ing] a proposed [set of guidelines] for further comment"). And other more formal guidance, including that issued near in time to the enactment of the MCA, as well as all versions of Operating Circular 1, which expressly sets out the guidelines for provision of Reserve Bank services, has long contained statements making clear that no bank or depository institution has an absolute right to a master account or services. *See, e.g.*, *Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 50 Fed. Reg. 21,120, 21,122, 21,124 (1985) (providing for

---

[15] As Custodia concedes, this is something that the Fed itself requested. *See* Pl. Br. at 43.

Reserve Bank "elimination of access to daylight overdrafts" and rejection of fund transfers by institutions that "expose the Reserve Bank to excessive risk"); 1998 OC-1 at ¶¶ 2.3, 2.6 ("*[A]ll master accounts* are subject to Reserve Bank approval . . . . [W]e may close your master account . . . at any time but will endeavor to give you at least five business days' prior notice." (emphasis added)). The various administrative statements Custodia cites could not entitle it to an account that the *statute* itself does not guarantee.

Second, Custodia cites to floor statements, testimony, and other portions of the MCA's legislative history (and even legislative history from a subsequent Congress). Pl. Br. at 41–45. But its divergent collection of excerpts of unenacted text hardly shows that the MCA imposes a universal access mandate that its own text does not impose. *Cf. NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("floor statements by individual legislators rank among the least illuminating forms of legislative history"); *Edwards v. Valdez*, 789 F.2d 1477, 1481 n.6 (10th Cir. 1986) ("The proper function of legislative history is to solve, and not create, ambiguity." (citation omitted)). In fact, the floor statement Custodia cites regarding "access to Fed services," *see* Pl. Br. at 43–44 (citing 126 Cong. Rec. 6897 (1980) (Statement of Sen. William Proxmire)), demonstrates the dangers of relying on such unenacted text to alter the meaning of the enacted statute; elsewhere, the same statement discusses in some detail an eight-year period to implement section 248a that is also unanchored in the statute's text. *See* 126 Cong. Rec. 6897 (1980) (Statement of Sen. William Proxmire) ("After the 8-year period there will be no differences . . . in access to Fed services, but until then it is likely that there will be differences. The final judgment on just what those differences will be is left to the Federal Reserve."). Moreover, the full excerpt of the conference report cited by Custodia says nothing about eliminating existing discretion (as with all of the public statements on which Custodia relies) and also treats section

248a as a provision governing "*Pricing* of Federal Reserve Services." And while it mentions opening services to all institutions, it does so in the same breath with *"on the same terms and conditions" as member banks*, rather than including a standalone requirement of (discretionless) access. 126 Cong. Rec. 6250 (1980) (emphases added). Thus, the legislative history cited by Custodia is consistent with the Board's reading and is hardly compelling support for its position. *Cf. Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("We will not [allow] ambiguous legislative history to muddy clear statutory language.").

Third, Custodia invites the Court to abdicate its judicial role and defer to the opinions of its paid expert, Professor Conti-Brown, and to Professor Julie Hill. As an initial matter, there is no academic consensus favoring Custodia. *See, e.g.*, Dan Awrey, *Unbundling Banking, Money, and Payments*, 110 Geo. L.J. 715, 746 (2022) ("[E]ven within th[e] relatively narrow universe of eligible institutions, the Fed has considerable discretion to impose further access restrictions."). And apart from the impropriety of relying on purported expert opinion to construe a statute, *cf. Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (expert "testimony on ultimate questions of law, i.e., legal opinions or conclusions," inappropriate), these sources are hardly persuasive.

The cited portions of Professor Conti-Brown's analysis do not engage with the MCA's *actual text*, *see generally* Pl. Br. at 47–48 (citations omitted), and rely on sources, such as unenacted statements by members of a subsequent Congress, which are an especially dubious basis for construing the act. *E.g.*, *Mass. v. EPA*, 549 U.S. 497, 530 n.27 (2007) ("post-enactment

legislative history is . . . inherently entitled to little weight" (citation omitted)).[16] Moreover, the persuasiveness of his assertions is further undermined by his prior suggestion that Reserve Banks must open accounts *even for entities intending to violate federal law*, a view that was rejected by the Colorado district court and each of the three members of the Tenth Circuit to consider the question. *See* Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?* (Nov. 14, 2018)[17] (the statute "isn't at all clear that they have the authority to reject Fourth Corner's application," despite the illegality of its business model).

Professor Hill is an equally unpersuasive source, given her readiness to disregard her own prior research. A draft article posted by Professor Hill in 2022 reached radically different conclusions from those Custodia now cites, stating, *inter alia*, that:

- "the text of the Monetary Control Act *is far from a conclusive mandate to provide service to every depository institution*";

- "since the passage of the Monetary Control Act, . . . [w]hen individual banks present abnormally high risk, the Federal Reserve Banks have repeatedly stated that they have the authority to withhold services [to] those banks. Indeed, *operating major nation-wide payment systems without imposing risk-related terms and conditions would be foolhardy. Having risk-related terms and conditions without ability to enforce the terms by limiting services would be useless*";

- "the Federal Reserve *has discretion to deny some institutions accounts and services*";

- "[i]f the Federal Reserve has the authority to set nondiscretionary terms, then *surely it also has authority to deny access to banks that did not meet those terms*";

- "[t]he legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, *rather than treat each individual bank exactly the same regardless of risk*"; and

---

[16] *See also* FRBKC's *Daubert* Motions (the Board concurs with and adopts these motions, which demonstrate the impropriety and unreliability of this testimony and that of Custodia's other expert-designee).

[17] *Available at* https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.

- "[d]enying [the Federal Reserve] the authority to set terms and conditions that would, for example, limit risk and improve function, could *frustrate the purpose of the Monetary Control Act*."

*See* Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (2022 draft), ECF 160-1, at 34–38, 41 (emphases added). She further noted that "both the Board and the Reserve Banks have emphasized their discretion to limit access" across many years, concluding that "*[a] complete catalog of these instances would be too voluminous for this [86-page] article*." *Id.* at 39 (emphasis added). The Court should therefore rely on the statute's plain text, which does not grant a right to a master account, rather than the dubious advocacy of these sources.

### 4.   *Banco San Juan* is both illustrative and persuasive

Custodia places heavy emphasis on Judge Bacharach's opinion and on two appellate decisions that did not engage in any analysis of the text of section 248a, but these authorities do not offer persuasive support for its position. In contrast, Custodia's attempt to disparage *Banco San Juan*'s holding as "dicta," Pl. Br. at 46, is a bald mischaracterization of the opinion, which thoroughly analyzed the relevant statutory provisions and held that their plain text does not grant depository institutions a right to a master account.

In addition to ignoring its pricing context, a significant part of Judge Bacharach's reasoning concerning construction of the plain text of section 248a(c) is inconsistent with the Tenth Circuit's subsequent ruling in *Nelson v. United States*, as noted above, casting further doubt on his opinion. Judge Bacharach's opinion also preceded the Board's Guidelines, adopted after public notice and comment, which constitute the most formal administrative pronouncement to date on the issue. And it relied for part of its analysis on a plainly erroneous reading of section 342 as only addressing discretion concerning the monetary instruments that

Reserve Banks may accept but not "which institutions can access Federal Reserve services," *Fourth Corner*, 861 F.3d at 1074 (Opinion of Bacharach, J.). Even Custodia has now wisely abandoned this interpretation. *See supra* at 18, Pl. Br. at 37.

Moreover, the two appellate cases that Custodia cites did not engage in any analysis of whether section 248a eliminated Reserve Bank discretion to grant or deny accounts to individual institutions, because the issue was not before the courts. The plaintiff in *Jet Courier Services*, 713 F.2d at 1224, simply argued that the Board's fee schedule violated section 248a's rules for *pricing*. *Id.* Consequently, the court, while making the vague and unremarkable observation that Reserve Bank services were being "made available" to non-members, conducted no analysis of the issue. Similarly, *Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York,* 866 F.2d 38 (2d Cir. 1989), was a suit by a company that was a depositor rather than a depository institution over an alleged delay in clearing checks, *id.* at 41, and in its own dicta simply cited to *Jet Courier's* unremarkable statement in the introduction without any additional analysis. *Id.* at 40. These cases are entirely consistent with the opening of accounts and provision of corresponding services to non-members as a class through the revision of section 342.

In contrast, Judge Koeltl in *Banco San Juan* engaged in a detailed analysis of the relevant statutory text—in the face of compelling real-world facts—and held that "Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so." 2023 WL 7111182, at *7. The court noted that section 248a's plain text indicates that its only mandate concerns pricing rather than a requirement to grant accounts to any requesting bank. *Id.* ("Section 248a(c)(2) . . . is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System. . . . [T]he section does not even state that the services covered by the fee schedule shall be available to 'all nonmember depository institutions.'"). The

27

court further explained that it did not find Judge Bacharach's opinion persuasive because, "[i]f Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board." *Id.* at *8.

While Custodia attempts to dismiss this holding as dicta because the court *also* held that the bank had contractually waived any right it might otherwise have had to a master account, Pl. Br. at 46, that was plainly an alternate holding. *See Banco San Juan*, 2023 WL 7111182, at *7 ("BSJI's statutory claim fails because . . . Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so. *Moreover*, the FRBNY . . . [had] the contractual right to close BSJI's Master Account." (emphasis added)); *cf. United States v. Rohde*, 159 F.3d 1298, 1302 & n.5 (10th Cir.1998) (The "alternate holding [was] not dicta . . . . Were this panel inclined to engage in the business of labeling as dicta one of the two alternative grounds . . . , it would then confront defendant's failure to demonstrate why that label ought not adhere to the alternative which is innocuous to her theory, rather than to the alternative which undermines it."). Tellingly, the Blockchain amici, including Professor Hill, agree that *Banco San Juan* is good law, concluding that "*[o]f course*" the Federal Reserve "is not required to give a master account to entities violating or that propose violating federal money laundering law or providing banking services to industries engaged in activities that are illegal." Blockchain Amicus Br. at 20–21 n.21. But, given that both BSJI and Custodia were denied master accounts in part based on gaps in their money laundering controls, this is an inherently inconsistent position that raises more questions than it answers. Indeed, amici are notably silent as to a coherent *statutory* basis to distinguish between these two circumstances, or others along the spectrum of risk, and they necessarily resort to advocacy for their preferred outcome untethered to the statute. In contrast,

*Banco San Juan* is persuasive and compelling authority indicating that the plain text of the statute does not require that all nonmember banks be granted accounts and services in all circumstances.

### C.   There Is No Indication That Congress Intended to Abdicate Federal Monetary Policy and Payment Systems to Control by Individual States or Territories

Beyond the failure of its statutory interpretation arguments, Custodia's opening brief fails to show how Reserve Banks are supposed to control risk with respect to their provision of accounts and services. This omission is notable—although Custodia cannot credibly contend that Reserve Banks are forbidden from making risk-based decisions, there is no way to square those risk-based decisions with Custodia's preferred reading of section 248a.

Notwithstanding Custodia's present desire to dodge the issue of a standard for access to accounts and services that incorporates risk assessment, recall that Custodia previously tried to furnish such a standard for the Court:

> There are at least three ways that a financial institution can be ineligible for a master account, giving Defendants justification to reject that institution's master account application. First, the institution could engage or intend to engage in activities illegal under Federal law. Second, the institution could fail to submit a completed application. Third, the institution could have a charter that does not comply with the Federal Reserve Act's requirements.

ECF 135 at 22. Custodia also claimed that master account requests are subject to "adjudication" to screen for these factors. *Id.* at 23. But lost in this complex attempt is any effort to reconcile Custodia's bespoke eligibility concept with its arguments about section 248a: Where in the "plain and unambiguous" language of section 248a (Pl. Br. at 34) is this conception of eligibility? Where in the "plain and unambiguous" language of section 248a is this "adjudication" process for access to accounts and services? And at what point is the prospect for illegal activity so great that access to accounts and services may be restricted? Upon risk of co-

opting a Federal Reserve Bank into illegal activity? Upon criminal investigation? Upon

indictment? Upon conviction? After all appeals have been exhausted? Although these are real-

world problems faced by Reserve Banks on a routine basis, as *Banco San Juan* persuasively

shows, no answers are forthcoming and they cannot be found in section 248a. Custodia's

eligibility rubric was created from whole cloth because even it understands that its "open access"

argument is highly problematic and at odds with Congressional intent.

 Nor is it the case that an institution chartered under state law is automatically entitled to a

Federal Reserve Bank master account despite Custodia's appeal to generalized conceptions of

dual banking. States have never been able to dictate which institutions have access to the Federal

Reserve's balance sheet, and indeed, when state and federal interests conflict with respect to

banking, federal law governs. *See, e.g.*, *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S.

25, 28 (1996) (holding that a federal law granting national banks the authority to sell insurance

impliedly preempted a state law that prohibited banks from engaging in this activity); *cf. Salt*

*Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to

states that could frustrate purposes of a federal statute absent evidence Congress "plainly

intended" it). And while amici write at length about purported harms to the dual banking system

and Wyoming's chartering decisions, *e.g.*, Blockchain Amicus Br. at 3–24, their alarmist claims

are divorced from the reality that state-chartered banks can and do operate with or without a

master account.[18] There is simply no inviolate right pursuant to which a state or territory can

---

[18] As a practical matter, the Federal Reserve's exercise of master account discretion in no way
infringes on Wyoming's or other states' ability to charter or regulate banks. Indeed, the many
other banks operating in the state of Wyoming, regardless of whether they are state or federally
chartered, or have a master account or not, appear to be getting along just fine. And Custodia,
like other banks that do not have master accounts, has access to Federal Reserve services through
partnership with an existing accountholder, Am. Compl. ¶ 6; Custodia in fact publicly announced

charter any type of entity it wishes and then have those institutions automatically granted a Federal Reserve master account without any consideration whatsoever by the Federal Reserve.[19]

Moreover, considering risks in providing access to Reserve Bank accounts and services is not merely an academic exercise; the failure to do so could lead to significant negative consequences to the financial system. As detailed in the expert report of Professor Morgan Ricks, if a judicial ruling required a Federal Reserve Bank to grant access to each and every chartered entity, regardless of risk, the adverse consequences could be dramatic:

- A state or territory might seek to win market share in digital asset or other financial businesses by enacting a "free banking" statute with no regulatory apparatus or supervision whatsoever. In such a situation, totally unregulated institutions would gain access to Federal Reserve accounts and services, with potentially devastating consequences to financial stability, monetary policy implementation, money laundering, and terrorism financing. Pl. Br., Exhibit CM at 18.

- A state or territory might enact a "self-depository" statute that allowed any individual or entity, from the United States or from abroad, to establish, for a small fee, an unregulated and unsupervised "bank" subsidiary to hold its own cash. In such a situation, the Federal Reserve would be bombarded with master account requests from individuals or entities, both domestic and foreign, including anyone who wanted to use the account for illicit purposes. Pl. Br., Exhibit CM at 18.

- Credit risks would be significantly heightened if the Federal Reserve was put in the position of extending credit to unsound institutions. Pl. Br., Exhibit CM at 12–14. For example, risky institutions might incur negative balances in their master accounts when processing funds transfers on behalf of their customers, and there also may be mismatches in check clearing operations. Such conduct could lead to large losses borne by the Federal Reserve, ultimately resulting in lower earnings being remitted to the Treasury. *Id.* at 13.

---

in August 2023 that it is presently serving external customers. The claims of an assault on the dual banking system—which are in any event policy and not legal arguments—ring hollow.

[19] The State of Wyoming suggests some appreciation for this in its amicus brief, offering that Custodia's account request should be "subject to an appropriate level of scrutiny" and "judged according to its own merits" using a "logical method based on Plaintiff's actual plan of operation," Wyo. Amicus Br. at 5, none of which would be permitted under Custodia's extreme view of the law.

Professor Ricks also addresses the important adverse monetary policy implications presented by potential new business models. *Id.* at 15. Thus, as Professor Ricks correctly concludes, "if the Fed lacked any discretionary authority over access to master accounts and related services, federal law enforcement and counterterrorism efforts could be hindered," and there would likely be substantial "negative consequences for the Fed, the financial system, and the American public." Pl. Br., Exhibit CM at 12–13, 17. Such consequences would go far beyond any conceivable intention of the Congress that passed the MCA.[20]

A compelling example of the need to allow Reserve Banks to make risk-based determinations was recently considered in the *Banco San Juan* case described above. After the Federal Reserve Bank of New York ("FRBNY") made the decision to terminate the master account of BSJI, a Puerto Rican bank, the institution sued.[21] The court refused to halt the master account closure, noting that "BSJI's specific and numerous risk factors justif[ied] the FRBNY's decision to close BSJI's Master Account." *Banco San Juan*, 2023 WL 7111182, at *11 (citations omitted). In particular, the court observed that "FRBNY's Compliance Office found a significant

---

[20] It bears noting that the MCA was passed during a time of traditional, insured depository institutions operating within the bounds of a single state. Interstate banking was not enabled until the enactment in 1994 of the Riegle-Neal Interstate Banking and Branch Efficiency Act. *See* FDIC, *The Banking Crises of the 1980s and Early 1990s: Summary and Implications*, at 11, *available at* https://www.fdic.gov/bank/historical/history/3_85.pdf.

[21] BSJI is an international banking entity ("IBE"), a type of banking entity chartered by Puerto Rico that first became allowed in 1989. *See* International Banking Center Regulatory Act, Puerto Rico Act No. 52-1989 (Aug. 11, 1989), *available at* https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/Y%20-%20Ingl%C3%A9s/52-1989.pdf. By law, IBEs generally cannot provide services to Puerto Rican residents; they may take deposits and offer loans only to nonresident customers and foreign business entities. The Treasury Department has warned that IBEs operating under this charter are "attractive money laundering vehicles, potentially allowing nefarious actors to misuse them to facilitate illicit financial activity." National Money Laundering Risk Assessment (Feb. 2022), at 69, *available at* https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-Risk-Assessment.pdf.

number of red flags identified in BSJI's transaction activity." *Id.* (citations omitted). The court determined that the FRBNY was justified in seeking to close a risky master account:

> Accepting deposits from and providing financial services to a financial institution with BSJI's record of noncompliance exposes the FRBNY and the financial system to risk. This harm is not just to the FRBNY, but to the fiscal system, because "federal reserve banks are not operated for the profit of shareholders; rather, they were created and are operated in furtherance of the national fiscal policy." Moreover, maintaining a Master Account with an entity that the FRBNY concluded posed an undue risk of "activities such as money laundering, economic or trade sanctions violations, or other illicit activity," implicates the Federal Reserve in BSJI's questionable transactions.

*Id.* at *12 (citations omitted). Thus, as the court concluded, "granting BSJI's motion for emergency relief [to stop the account closure] would place the public in harm's way." *Id.*

Custodia elides over these concerns by dismissing them as "policy questions" that "should be resolved by Congress." Pl. Br. at 48. But Congress *has* resolved these questions by enacting Section 13 of the FRA in 1913. And even as Congress modified some of the language of Section 13 in 1980, it left unchanged the operative permissive language regarding deposit-taking. Accordingly, Federal Reserve Banks have exercised continuous discretion throughout their 110-year history, consistent with the policy choices made by Congress in Section 13 of the FRA. Custodia's attempt to disrupt longstanding practice and introduce unprecedented risk into the financial system must be rejected.[22]

---

[22] Not surprisingly given this historical backdrop, Congress recently recognized, in a law enacted in 2022, that requests for master accounts and services (including those services set forth in section 248a) from "a depository institution that is not an insured depository institution"—a category that includes Custodia—may be "rejected." 12 U.S.C. § 248c(b)(1). If it were the case that the granting of a master account to depository institutions is purely ministerial under the FRA, then Congress could have readily clarified that expectation during its recent legislation on the issue of master accounts given its clear awareness of the Board's Guidelines and the dispute at hand. *See Banco San Juan*, 2023 WL 7111182, at *7 (holding that the recent FRA amendment "confirms that Federal reserve banks may 'reject' [master account] applications" by requiring the Board to create a searchable database that includes, *inter alia*, "rejected" applications (quoting

At bottom, Reserve Banks do not have a discretionless, ministerial mandate to open a master account for each and every depository institution under section 248a. Allowing any institution to receive and maintain a master account, regardless of the risks its presents, is an extraordinary proposition unsupported by the statute as enacted and its subsequent history, and the only way to avoid this extreme and unsupportable result is to acknowledge that the Federal Reserve Banks can exercise discretion in providing access to accounts and corresponding services pursuant to their statutory authorities including section 342.

## II.    The Board Did Not Direct the Denial of Custodia's Master Account Request or Exceed Its Statutory Authority

### A.    The Board Followed the Consultation Process Set Forth in the Guidelines and Implementing S-Letter, But the Decision Was Made by FRBKC

The Court should reject Custodia's unfounded claim that the Board's January 26, 2023 email informing FRBKC that Board staff had completed a review of FRBKC's "analysis of Custodia Bank's request for a master account"—and had "no concerns" with the Reserve Bank's "communicat[ing] to Custodia Bank its decision to deny the request"—somehow dictates the outcome of this case. Pl. Br., Exhibit CC at 1; *see* Pl. Br. at 3, 27, 32, 49–54; *see also* FRBKC Br. (cataloging FRBKC's extensive and detailed decision-making process leading up to its denial of Custodia's master account). As described below, Board and FRBKC staff appropriately followed the procedures set forth in the Board's recently issued S-Letter 2677, which is the Board's official policy implementing its Guidelines and provides that Reserve Banks should "consult, as appropriate, with Board staff" in evaluating requests for access to master accounts

---

statute)). Regardless of the purpose of the provision, it would be odd for Congress to contemplate that master account requests by depository institutions may be "rejected" in the newly enacted section 248c, while ignoring just two sections away (in section 248a) a purported Congressional mandate that they be granted in every instance.

and Reserve Bank services to promote consistency under the Guidelines. Pl. Br., Exhibit AS at

FRB-AR-14.

 As stated in the S-Letter, the Board issued the Guidelines under its "general supervisory

authority over Federal Reserve Banks" under section 11(j) of the FRA. *Id.* at FRB-AR-15. The

Guidelines "are intended to be used by Reserve Banks in evaluating requests for master

accounts" and they "reflect the Federal Reserve System's policy goals of (1) ensuring the safety

and soundness of the banking system, (2) effectively implementing monetary policy,

(3) promoting financial stability, (4) protecting consumers, and (5) promoting a safe, efficient,

inclusive, and innovative payment system." *Id.*[23] As provided by Section 13 of the FRA, and as

has been the Federal Reserve's longstanding practice through and including Custodia's master

account request, the S-Letter states that while consultation with the Board and other Reserve

---

[23] Custodia incorrectly argues that the Guidelines impermissibly delegate to Reserve Banks "non-delegable" monetary and credit policy, financial stability, and eligibility matters that statutes require the Board to decide. Pl. Br. at 10, 13. However, section 11k of the FRA, 12 U.S.C. § 248(k), upon which Custodia relies, provides in pertinent part that the Board has the power "[t]o delegate, by published order or rule . . . any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies," and contains no prohibition on delegation of financial stability responsibilities. 12 U.S.C. § 248(k). Moreover, the Guidelines plainly do not "delegate" to Reserve Banks the Board's authorities with regard to monetary and credit policy, *see* 12 U.S.C. § 225a (the Board and FOMC "shall maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates"), but rather simply require Reserve Banks to "evaluate" how institutions seeking a master account "will meet" the six principles, including the sixth principle that an access request not adversely affect implementation of monetary policy. Guidelines, 87 Fed. Reg. at 51,107, 109. Indeed, the Board's use in the Guidelines of the term "implement," *id.* at 51,109, makes plain that the monetary policy *decision* has already been made by the Board and FOMC pursuant to section 225a, and that the Reserve Banks' evaluation in connection with a master account request is consistent with the Reserve Banks' role in carrying out monetary policy directives. *See Fasano*, 457 F.3d at 277 ("[t]he individual Federal Reserve Banks carry out . . . monetary policy so formulated" by the Board and FOMC pursuant to section 225a). Rather than delegating the *Board's* authority, the Guidelines simply provide guidance on criteria that Reserve Banks consider when exercising authority that Congress has directly vested in the Reserve Banks.

Banks for novel requests or those that raise potential risks supports the goal of consistency, the *decision* to grant or deny a master account request and access to services rests with the administrative Reserve Bank. *See id.* at FRB-AR-15–16.

In furtherance of these goals, the S-Letter states that "Reserve Banks should notify Board staff when new access requests . . . involve higher-risk institutions or raise unusual, novel, or complicated issues . . . includ[ing] . . . Tiers 2 and 3" institutions, *id.* at FRB-AR-16, as was the case with Custodia. In addition, in order to "provide an opportunity for appropriate Board staff to advise on the analysis," the S-Letter provides that Reserve Banks "should consult with the director of RBOPS prior to communicating decisions on certain higher-risk actions," using the procedure outlined in the S-Letter. *Id.* And "[a]ny Reserve Bank that is considering *denying* any access request, including an access request from an institution in Tier 1, should consult the director of RBOPS prior to communicating any decision to the requesting institution." *Id.* (emphasis added).

This consultative process in support of consistency—while leaving the decision to the Reserve Bank—is precisely the procedure FRBKC followed when it denied Custodia's master account request.[24] In particular, pursuant to the procedures set forth in the proposed S-Letter, in early January 2023 FRBKC staff emailed Board staff a draft of its recommendation memo to President Esther George to seek any input Board staff with relevant expertise might have on FRBKC staff's analysis. Where appropriate, Board staff made minor suggestions on FRBKC

---

[24] Contrary to Custodia's claim that the S-Letter procedure was a "contrived . . . plan to ensure that Reserve Banks reach Board-desired outcomes on all master account decisions," Pl. Br. at 2, FRBKC President George testified that, even in the absence of the S-Letter, FRBKC had "a long-standing practice of consulting with the Board whenever [a master account request] . . . raised unique or novel questions" and "did not see the S-letter as changing [her] authorities in any way." Pl. Br., Exhibit J at 85.

staff's presentation of their analysis. *See* Pl. Br., Exhibits BQ, BS, BY, BZ (extracts from Board

Administrative Record at FRB-AR-313–34). Far from showing that "Board staff edited and

rewrote key parts of an internal Kansas City Fed memo recommending denial to the Kansas City

Fed President," as Custodia disingenuously claims, Pl. Br. at 54 (emphasis omitted), staff from

the Board's Division of Monetary Affairs with relevant expertise made "some *suggestions*" on

FRBKC's analysis "*for your consideration*," Pl. Br., Exhibit BY (emphases added), and the staff

suggestions from other Board divisions concluded, "[i]n summary, there is no concern with

[FRBKC staff's] proposed recommendation and the feedback points to places where the framing

could be augmented." Pl. Br., Exhibit BQ at FRB-AR-324. These two sets of staff comments

provided largely minor, technical, or organizational suggestions (some rejected) designed to

promote clarity, but in no way altered FRBKC's bottom-line conclusions. *See, e.g.*, Pl. Br.,

Exhibit BS at FRB-AR-326 ("[c]onsider adding an appendix that lists the 6 principles with

bullets of the key findings"); *id.* at FRB-AR-331 ("[s]uggest using the term 'crypto-assets' or

'digital-assets' for consistency").[25]

Indeed, contrary to Custodia's claim that "the Board controlled the process and ultimate

disposition of Custodia's master account application," Pl. Br. at 33, FRBKC staff's early January

2023 draft recommendation memo *already recommended denial of Custodia's master account

request* before Board staff added light comments that had no effect on the core substance of the

recommendation or its outcome. *See* Pl. Br., Exhibit BS at FRB-AR-316 ("[i]n light of these

---

[25] Despite this handful of innocuous comments (around "two dozen" by Custodia's count, *see* Pl. Br. at 25), Custodia attempts a sleight-of-hand to suggest that Board staff inserted adverse language—regarding, for example, Custodia's "lack of collective depth of relevant banking experience . . . and bank-specific risk management expertise"—in place of more favorable language. *Id.* at 25–26. Not so. As the cited documents make clear, this and other cited language was in FRBKC's original draft and not suggested by Board staff.

concerns, [FRBKC] staff recommends denial of Custodia's master account request"); *id.* at FRB-AR-323 (concluding with recommendation of denial). Similarly, contrary to Custodia's claim that RBOPS Director Matthew Eichner's January 26, 2023 email to Ms. George (Pl. Br., Exhibit CC) somehow overrode FRBKC's decision-making process, the email did little more than confirm to FRBKC, consistent with the procedures in the S-Letter for any Reserve Bank considering "denying an access request," Pl. Br., Exhibit AS at FRB-AR-16–17, that FRBKC "ha[d] provided to Board staff *its* pre-decisional analysis of Custodia Bank's request for a master account," that "Board staff have reviewed *the Reserve Bank's* record documenting application of the Guidelines," and that Board staff "ha[s] no concerns with [FRBKC's] moving forward with *its* plan to communicate to Custodia Bank *its* decision to deny the request for a master account." Pl. Br., Exhibit CC at FRB-AR-2 (emphases added).[26]

Two days prior to Mr. Eichner's email, consistent with the S-Letter, FRBKC staff emailed Mr. Eichner FRBKC's detailed, ten-page final memorandum to Ms. George, dated January 19, 2023, setting forth FRBKC staff's thorough and well-supported analysis underlying Reserve Bank staff's recommendation that she deny Custodia's master account request. FRB-AR-3–13. FRBKC staff's January 19, 2023 memo reiterated, consistent with the S-Letter, Section 13 of the FRA, and longstanding Federal Reserve practice, that "[w]hile the final

---

[26] While Custodia places weight on the assertion that "the Board—not the Reserve Bank— decided that Custodia was eligible for a master account," Pl. Br. at 52, there is no dispute that the Board exercises interpretive authority as to the FRA. *See* Guidelines, 87 Fed. Reg. at 51,103 n.11; *First Lincolnwood*, 439 U.S. at 251. In any event, legal eligibility was not a determinative factor in the account denial and the fact that FRBKC consulted with Board staff on the threshold eligibility determination *a year prior* to FRBKC's ultimate decision to deny the account, Pl. Br., Exhibit I, is of no moment as to FRBKC's ultimate authority, which it exercised, to make the final account decision. Indeed, Ms. George testified to her (correct) understanding that, "regardless of legal eligibility for a master account, [she] could still evaluate and deny a master account." Pl. Br., Exhibit J at 41:10–15.

decision to deny a master account rests with the appropriate administrative Reserve Bank, . . . [t]he Reserve Bank *may incorporate or address* any feedback or concerns, but still retains decision making authority under the Federal Reserve Act (12 U.S.C. § 342)." FRB-AR-5 (emphasis added).

And, consistent with FRBKC's decision-making authority, FRBKC, not the Board, conveyed its decision to deny the master account to Custodia. Pl. Br., Exhibits CE, CF. In her January 27, 2023 letter denying Custodia's request, Ms. George informed Custodia that FRBKC had "completed [its] review of the request by Custodia . . . to open a master account." Pl. Br., Exhibit CF at FRBKC-2172. Ms. George's letter, and FRBKC's attached summary analysis, described the factors FRBKC took into consideration in reaching its decision and concluded that, "based on the current facts and circumstances, *the Reserve Bank denies* Custodia's request for a master account." *Id*. at FRBKC-2173 (emphasis added).

### B.     The Board Did Not Take Actionable "Final Agency Action" on Custodia's Account Request

Local Rule 83.6(b)(1) provides in pertinent part that "the [administrative] record in proceedings to review agency action is comprised of: (A) the final agency action being challenged;" and "(B) all documents and materials directly or indirectly considered by the agency and/or agency decision-makers." Custodia's APA claim against the Board challenges "action orchestrating the denial of Custodia's master account application," Am. Compl. ¶ 83, and the Local Rules required the Board to file its administrative record responsive to that claim. *See* ECF 112, December 12, 2022 Order Denying Plaintiff's Motion to Strike, at 4 ("[t]he plaintiff is the master of the complaint," and it is appropriate for the Board "to rely on and respond to Custodia's pleadings" by filing an administrative record); *see also id.* at 3 (finding Custodia's contrary claim "borderline nonsensical"). Because the Guidelines and implementing S-Letter are

the official policy of the Board regarding the role of its staff on master account requests—and define the parameters of the Board's official role in this case consistent with its statutory authority under the FRA—the Board appropriately complied with the Local Rule's requirements by designating the last-in-time (*i.e.*, final) step (action) that the Board took (the Eichner email and supporting documentation) as the culmination of its role. Although Custodia now contends that the Board's lodging of the administrative record and its orientation of the Court to its structure and contents in compliance with the Local Rule[27] has substantive legal relevance, *see* Pl. Br. at 3, 27, 32, 49, this gimmicky argument does nothing to advance its claim and instead signals its desperation and inability to prove the existence of an actionable claim against the Board. *Cf. Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189–90 (10th Cir. 2014) (APA analysis focuses on substance, not labels).

Custodia's angst stems from its understanding that "[p]laintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action'" as to the decision at issue. *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000); *see also Cherry v. U.S. Dep't of Ag.*, 13 F. App'x 886, 890 (10th Cir. 2001). In the absence of such action, the Court lacks jurisdiction. *Sinclair Wyo. Ref. Co., LLC v. U.S. EPA*, 72 F.4th 1137, 1143 (10th Cir. 2023) ("a petitioner challenging agency action must show the action is final" in order to invoke the Court's jurisdiction under the APA); *see also Western Energy Alliance v. Biden*, Nos. 21-cv-13 and 56-SWS, 2022 WL 18587039, at *6 (D. Wyo. Sept. 2, 2022) ("a petitioner must challenge a 'final agency action' in order to have statutory (prudential) standing to seek judicial review under the APA").

---

[27] *See* ECF 178 (identifying documents "as required by Local Rule 83.6(b)(1)").

Here, the Eichner email, the only "final agency action" identified by Custodia, does not meet the tests for "agency action" or "finality" *as to Custodia's master account request to FRBKC*, causing Custodia's APA claim to fail. The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Eichner email, a statement that he had "no concerns" with the analysis underlying FRBKC's decision to deny the master account, is simply a response to *FRBKC's* determination to deny Custodia's master account in accordance with the Guidelines and does not give rise to a cause of action by Custodia against the Board. *See Colo. Farm Bureau*, 220 F.3d at 1174 (that Colorado had "federal government consent" for its plan to reintroduce the Canadian lynx on federal land; that the plan was "agreed to, supported, and facilitated by" the Forest Service; and that "Colorado allegedly worked with the Forest Service in formulating the Plan," did not constitute actionable agency action of the Forest Service (quoting complaint)).

In addition to not meeting the test for "agency action," the Eichner email, which simply reflects the Board's general supervision of FRBKC, does not meet the test for "final" agency action as to the denial of Custodia's account request. Any such action requires that two conditions be satisfied: (1) the action "must not be of a merely tentative or interlocutory nature;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotations omitted). Custodia points to no decision-making process by which the Board rendered the "last word" on Custodia's account request as it must. Rather, the emails and comments Custodia points to show the Board's consultations with and suggestions to FRBKC staff as to *the Reserve Bank*'s decision. Nor did "legal consequences" to Custodia flow from Mr. Eichner's email stating that he had "no concerns." Rather, those consequences flowed from

FRBKC's January 27, 2023 decision communicated to Custodia to deny the master account. *See Colo. Farm Bureau*, 220 F.3d at 1173 ("[n]either the Complaint nor the plaintiffs' brief tells us how rights and obligations are determined by, or how legal consequences flow from, the federal involvement"); *Miami Tribe of Oklahoma v. United States*, 198 F. App'x 686, 690 (10th Cir. 2006) (Department of Interior (DOI) opinion letter regarding tribal sovereignty over a tract of land did not constitute actionable final agency action because "Congress has vested the authority to decide gaming contracts under the [Indian Gaming Regulatory Act] with the NIGC [National Indian Gaming Commission]," and the "DOI Opinion Letter is only a *part of the process* that will eventually result in the final NIGC action" (emphasis added)).[28]

Because Congress vested final decision-making authority over master accounts in the Reserve Banks, and Board staff consultations culminating in the Eichner email expressing "no concern" were just "part of the process," they do not constitute the final agency action necessary for Custodia to maintain an APA claim against the Board.

### C.   Even if the Board Had "Inserted Itself into the Master Account Decision-Making Process" as Custodia Claims, That Is Neither Unlawful Nor a Violation of the APA

Finally, even if the Board had "inserted itself" into FRBKC's review of the master account application, as Custodia claims, Pl. Br. at 2, 6, 49, Custodia still has not shown that the Board violated the APA because it has failed to show any action by the Board that is "in excess of its statutory . . . authority" under 5 U.S.C. § 706(2). *See* Pl. Br. at 31.[29] Custodia suggests that

---

[28] Of course, relevant final agency action is only a necessary, not a sufficient, basis for an APA claim. Only "[a] person suffering legal wrong *because of* [such] agency action . . . is entitled to judicial review thereof," 5 U.S.C. § 702, and the "no concerns" email likewise fails this test.

[29] Indeed, Custodia's current claim that the Board "inserted itself" into FRBKC's review of the master account request is a significant retreat from the allegations of the Amended Complaint that the Board "orchestrat[ed] the denial of Custodia's master account application," *id.* ¶ 83, and

the Board should have intervened to block FRBKC's denial of its master account request, but it identifies no provision of law that requires the Board to take such action or that prevents the Board from expressing lack of concern with the decision of FRBKC. Section 248a is not such a provision, as it only requires the Board to "publish . . . a set of pricing principles . . . and a proposed schedule of fees . . . for Federal Reserve services to depository institutions," 12 U.S.C. § 248a(a), taking into consideration certain factors, and it has done so. Notwithstanding Custodia's argument that "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform," Pl. Br. at 54 (quoting *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991)), the Board has no ability to provide "Reserve Bank master account and services," 12 U.S.C. § 248c(a)(3), and Custodia identifies no statutory language requiring the Board to order FRBKC to grant Custodia's account request.[30]

---

*itself* "den[ied] Custodia's master account application." *Id.* ¶ 84. Custodia's shifting rationale reflects the absence of support for its claim.

[30] Even beyond Custodia's failure to show any unlawful Board action, its APA claim fails under the well-established exception to judicial review set forth in section 701(a) of the APA. 5 U.S.C. § 701(a). Section 701(a) provides that the APA's comprehensive judicial review provisions, *id.* §§ 701–706, apply "according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Under section 701(a)(2), judicial "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, because the Board's actions are not themselves unlawful, and the Board is not a bank and cannot itself provide a master account or services to Custodia, Custodia's claim would in effect require the Board to exercise its "general supervis[ory]" discretion under section 11(j) of the FRA to *order* FRBKC to provide an account and services to Custodia. Such action on the Board's part fails the *Heckler v. Chaney* test because section 11(j) is written in general terms and the action requested by Custodia is "committed to agency discretion by law" and exempt under section 701(a)(2) from the APA's judicial review provisions as a result. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1242 (10th Cir. 2011) (citing *Heckler*, 470 U.S. at 830); *Bischoff v. Glickman*, 54 F. Supp. 2d 1226, 1230 (D. Wyo. 1999) (dismissing APA claims because "issuance or non-issuance" of the requested action was "wholly within the discretion" of the

Indeed, *Marathon Oil*, cited by Custodia, does not support, but rather undermines, its claims. While the Tenth Circuit in that case held that the district court's mandamus order requiring an agency to "expeditiously complete administrative action" on an application for oil shale mining patents, which had been pending for four years, was appropriate, 937 F.2d at 500, the court *also* held that the district court had "exceeded its authority when it ordered the defendants *to approve the application*" because the agency had "not yet determined officially that all conditions to issuance of the patents have occurred." *Id*. at 501 (emphasis added). As the Tenth Circuit explained, while the court can compel that a discretionary decision be made in appropriate circumstances, "it cannot dictate how that discretion is to be exercised." *Id*. (citing cases). Likewise here. Because Custodia has no absolute right to a master account, its APA claim against the Board fails regardless of who exercised discretion over the decision.[31]

## CONCLUSION

For all of the foregoing reasons, Custodia has failed to show that the Board acted "in excess of statutory . . . authority" in violation of 5 U.S.C. § 706(2) and its APA claim against the Board fails as a matter of law.

---

agency), *aff'd on standing grounds sub nom. Bischoff v. Myers*, 2000 WL 743686, at *2 (10th Cir. June 9, 2000) ("a court may not order the agency to perform what is purely a discretionary act").

[31] Custodia's Declaratory Judgement Act claim (Count III) fails alongside its APA claim (Count I). As the Court noted in its decision dismissing the Count II mandamus claim against the Board, "Custodia's claim for declaratory judgment is not properly understood as a standalone cause of action," but rather a "request for relief" accompanying its other claims. ECF 164 at 15.

Dated: January 26, 2024

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the Federal Reserve System*

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2024, I electronically filed the foregoing using the

Court's CM/ECF system, which will send notification of such filing to all parties of record.

By:   /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors
of the Federal Reserve System*