Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

Billie L.M. Addleman, #6-3690
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 532-4999
baddleman@hirstapplegate.com

*Counsel for Defendant Federal Reserve Bank of Kansas City*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC.,<br><br>     *Plaintiff*,<br><br>       v.<br><br>FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY,<br><br>     *Defendants.* | No. 1:22-cv-00125-SWS |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
MOTION TO STRIKE REPORTS AND EXCLUDE THE TESTIMONY
OF PROFESSOR PETER CONTI-BROWN**

Defendant Federal Reserve Bank of Kansas City ("FRBKC") moves this Court to enter an order to exclude the testimony of Plaintiff Custodia Bank, Inc.'s ("Custodia") putative expert witness Professor Peter Conti-Brown and to strike his Report dated October 20, 2023 (the "Report"), and his Supplemental Report dated December 11, 2023.

## PRELIMINARY STATEMENT

Custodia proffers Conti-Brown, a law professor who has never worked for any part of the Federal Reserve (the "Fed"),[1] as an expert on the Fed's historical practices. Conti-Brown offers two opinions in his Report. He first opines that the Fed's claim of discretion over access to Federal Reserve services "only began" in 2015, and that this change of direction conflicts with Conti-Brown's interpretation of the Monetary Control Act. This opinion seeks to usurp the role of the Court in interpreting the law and, in any event, is wrong—the product of an unreliable methodology that failed to account for countervailing facts found in the public record (that he ignored) and discovery in this case (left unreviewed). Second, Conti-Brown opines without any basis that the Board controlled the outcomes of specific master account requests, including that of Custodia. Indeed, he arrived at his opinion that the Board controlled Custodia's request without having reviewed *any testimony at all*, not even that of then-FRBKC President Esther George, who testified that *she* made the decision and explained how she arrived at it.

Conti-Brown's opinions should be excluded because they lack basis, are unreliable, and/or seek to usurp the Court's role in interpreting the law and its role as factfinder.

## LEGAL STANDARD

The proponent of expert testimony must prove that it is more likely than not that the

---

[1] Hereinafter, the "Federal Reserve" and the "Fed" each refer collectively to the Board of Governors (the "Board"), the Federal Reserve Banks, and the Federal Open Market Committee.

proffered evidence "will help the trier of fact to … determine a fact in issue" and "is based on sufficient facts or data," among other requirements.  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–95 (1993).  Expert testimony on questions of law "encroach[es] upon the trial court's authority … for it is axiomatic that the judge is the sole arbiter of the law and its applicability."  *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (en banc).  Expert testimony that is unhelpful or supplants the factfinder's judgment rather than assisting it is impermissible.  *See United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015).

### ARGUMENT

I.     **Conti-Brown's Opinion Regarding the Fed's Historical Exercise of Discretion Is Unfounded, Is Unreliable, and Improperly Seeks to Usurp the Role of the Court.**

Conti-Brown opines that the Fed first began to assert discretion over access to its priced services in 2015 and that its "newfound" assertion of discretion is inconsistent with the Fed's past practice and applicable law.  *See, e.g.*, Ex. 1 ("Rep.") ¶¶ 9–17, 25–96, 133.  This opinion should be stricken in its entirety.

A.     **Conti-Brown's Opinion on the Fed's Historical Exercise of Discretion Is Unfounded and Unreliable.**

Conti-Brown opines that the Fed "only began" to assert discretion over access to Federal Reserve services in 2015.  Rep. ¶ 9.  He writes that this discretion was "newly discovered," *id.* ¶ 14, and that it resulted in the Fed "veer[ing] away" from the "routine and deferential" approach to access that prevailed before 2015, *id.* ¶ 60.  This is all wrong, and Conti-Brown has no basis to opine—and followed no reliable methodology to conclude—otherwise.  Courts routinely exclude expert testimony where, as here, the putative expert failed to incorporate relevant facts into his analysis and followed no discernible, reliable methodology to arrive at his opinion.  *See, e.g.*, *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 671–72 (10th Cir. 2018) (affirming district court's exclusion of expert opinion that "ignored significant contrary evidence," "was based on superficial

research," and used methodology not based on specialized knowledge).

Conti-Brown brings no first-hand experience to bear, having never worked for the Board or any Reserve Bank.  *See* Ex. 2 ("Tr.") at 71:9–17.  His knowledge is therefore limited to what is in the public record or the discovery record in this case, both of which contain evidence that contradicts his conclusion but that he either did not review or does not address.  For starters, the public record is replete with evidence of the Fed exercising discretion over access to "priced services" prior to 2015.  *See* Ex. 3 at 39 (Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (Univ. of Ala. Legal Studies Rsch. Paper No. 4048081, Mar. 30, 2022) (forthcoming Yale J. on Regulation)) (noting that the Board and Reserve Banks have repeatedly "emphasized their discretion to limit access" over the years, and that "[a] complete catalog of these instances would be too voluminous for this article").  Examples in the public record include, but are not limited to, the following:

- The Fed's 1985 policy statement on daylight overdrafts, limiting some depository institutions' ability to use Fedwire, *see* Ex. 4 (Fed. Rsrv. Bank of Dallas, Cir. No. 85-75, Policy Statement on the Control and Reduction of Risks (June 4, 1985); 50 Fed. Reg. 21,120, 21,123–24 (May 22, 1985);

- The Fed's 1998 Operating Circular 1, stating that master accounts are subject to Reserve Bank approval and that the Reserve Bank could close a master account at its sole discretion based on its risk assessment, *see* Ex. 5 at 5–6;

- The Fed's 2004 policy statement on systemic risk in payment systems, asserting the Fed's authority over the use of priced services, including the power to impose risk controls, *see* Ex. 6 (69 Fed. Reg. 69,926, 69,937 (Dec. 1, 2004)); and

- The Federal Reserve Bank of New York's ("FRBNY") 2014 guidance regarding access to services, describing FRBNY's procedures with respect to institutions deemed high-risk, *see* Ex. 7 (Fed. Rsrv. Bank of N.Y., Guidance for Federal Reserve Financial Services Applicants That Are Deemed High Risk by the Federal Reserve Bank of New York (Aug. 18, 2014)).

At his deposition, Conti-Brown admitted that he was aware of some of these documents but had not addressed them.  *See* Tr. 118:2–119:15, 137:14–18, 137:20–138:7, 140:13–141:12, 141:18–

142:7, 146:20–147:7.  He had never seen FRBNY's procedure for high-risk depository institutions, which was available on its website.  Tr. 236:12–237:8, 403:11–19; *see* Ex. 7, *available in* Way Back Mach. (archived Sept. 18, 2015), http://tinyurl.com/44erur2a.  His Report does not explain why he did not address those policies in concluding that there is "no evidence" of the Fed asserting discretion over access to services between 1980 and 2015.  Rep. ¶ 59.

Like the public record, the discovery record in this case contains evidence that the Federal Reserve exercised discretion over access to services.                                               Yet these policies are absent from the list of materials upon which Conti-Brown relied in his Report, *see* Rep. at Ex. 2, even though he had access to discovery materials, *see* Tr. 113:21–114:4.  When deposed, Conti-Brown admitted that he was unfamiliar with the Fed's internal processes for handling master account requests.  *Id.* at 404:17–405:10.  He did not know whether Reserve Banks conducted individualized risk assessments of entities holding master accounts prior to 2015.  *Id.* at 171:8–173:16, 404:17–405:10.  He did not know how FRBKC's credit risk management ("CRM") department operates, *id.* at 159:13–160:18, even though it is the department responsible for handling master accounts and access to services, *see* Ex. 9 at 28; Ex. 10 at FRBKC-10263.  He could not name a single FRBKC policy.  Tr. 161:11–162:3.  And he conceded that he had no basis to assess how FRBKC or any other Reserve Bank assessed master account requests in practice, historically or now.  *Id.* at 170:12–173:16, 176:12–178:2.

That Conti-Brown ignored significant evidence that is contrary to his conclusion—specifically, evidence reflecting that the Fed asserted discretionary authority over access to services prior to 2015—renders his opinion unreliable and subject to exclusion. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (an expert's methodology may be unreliable if it "completely ignore[s] or discount[s] without explanation" contrary evidence); *Rodgers*, 759 F. App'x at 671 (similar). District courts in this circuit have repeatedly excluded proffered expert testimony that suffered from these flaws.[2] *See, e.g., Hall v. ConocoPhillips*, 248 F. Supp. 3d 1177, 1191 (W.D. Okla. 2017) (finding expert opinion unreliable "[b]ecause [the proffered expert] did not acknowledge, account for, or even search for evidence in the relevant scientific literature which refutes her theory"), *aff'd sub nom. Hall v. Conoco, Inc.*, 886 F.3d 1308 (10th Cir. 2018); *Rimbert v. Eli Lilly & Co.*, 2009 WL 2208570, at *20 (D.N.M. July 21, 2009) ("A methodology that inexplicably ignores material facts and relies only on selective evidence does not lead to a reliable opinion."); *Cruz v. Bridgestone/Firestone N. Am. Tire, LLC*, 2008 WL 5598439, at *5–7 (D.N.M. Aug. 29, 2008) (experts' failure to consider relevant factors made their application of methodology to facts of the case unreliable).

Notably, Conti-Brown fails to explain *why* the Fed suddenly "change[d] course" and "veered away" from past practice in 2015. Rep. ¶¶ 59–60. Conti-Brown suggested that there might have been an increase in novel requests from institutions lacking a federal regulator beginning in 2015, but he testified that he was not offering an opinion on the quantities (either pre- or post-2015) because he "wouldn't have access to that information because it's not public."

---

[2] Such failures go to the admissibility, not merely the weight, of the proposed expert's opinion. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).").

Tr. 251:13–254:19.  To put a finer point on it, Conti-Brown did not know whether state-chartered, uninsured, nonmember banks (like Custodia) requested master accounts prior to 2015, or whether such requests arose only in more recent years.  *Id.*  And he conceded that he has no basis to opine on Reserve Banks' internal practices regarding risk assessments in connection with master account requests.  *Id.* at 171:8–173:16 (Q: "[A]re you saying you don't have a basis to opine on whether … individualized risk assessments of any of these [state-chartered nonmember banks] were actually happening?" … A: "That's right."); *id.* at 176:12–178:2 ("I can't tell you what the [FRBKC] did or did not do in reviewing requests to access a master account.").  Thus, Conti-Brown's conclusion that the Fed "changed course" in 2015 lacks basis and is unreliable, as he concededly has no basis for opining on the Fed's pre-2015 practice *or* its post-2015 practice.  *See id.* at 177:6–178:2 (Q: "In other words, it may be that … [FRBKC] in practice was acting in a manner consistent with the policy that was later announced … in connection with the issuance of [the 2022] guidelines?" A: "It's possible that it was.  It's possible that it wasn't.  It's possible that it still isn't.").

Conti-Brown's conclusion that the Fed "newly asserted" discretion over access to services in 2015 forms the foundation of his more sweeping opinion that the Fed's newfound exercise of such discretion eviscerates the "dual banking system."  *See, e.g.*, Rep. ¶ 10.  That opinion must therefore be stricken as well, for it is premised on a claim (the change in direction in 2015) that itself lacks reliability.  The Fed has asserted discretion over access to services for nearly a hundred years, *see* FRBKC SJ Brief at Section I.C., and throughout this time the dual-chartering system has been alive and well, as explained in the Expert Report of Morgan Ricks, Ex. 11 ("Ricks Rep.").  State-chartered nonmember banks have long co-existed with federal oversight or supervision of some kind.  Indeed, most all state-chartered nonmember banks are FDIC-insured and therefore

subject to FDIC supervision.  *See* Ex. 12 (Arthur E. Wilmarth Jr., *We Must Protect Investors and Our Banking System from the Crypto Industry*, 101 Wash. U. L. Rev. 235, 316–17, 322 (2023)). And specifically within the Federal Reserve's Tenth District, there are 394 state-chartered institutions with master accounts: all but one are subject to federal prudential supervision, and *all* are subject to FRBKC's risk-based, century-old exercise of discretion over access to services.  *See* Ex. 13 at Tab 13 (data as of November 2023).  Conti-Brown's opinion that the exercise of federal discretion over state-chartered institutions eviscerates the dual-banking system is therefore unreliable and must be stricken.

### B.     Conti-Brown Improperly Seeks to Usurp the Court's Role in Interpreting the Monetary Control Act.

At the center of this case is a legal dispute over the interpretation of 12 U.S.C. § 248a(c)(2). Custodia claims that § 248a(c)(2) affords it and all other state-chartered depository institutions an absolute, non-discretionary statutory right to Federal Reserve services, irrespective of risk. Defendants' position is that it does not.  The proper construction of § 248a(c)(2) is for this Court—not Conti-Brown—to decide.  *Specht*, 853 F.2d at 807; *Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1204 (D.N.M. 2016) ("[T]he Court is an expert in the law and needs no guidance from" expert witnesses); *see also Millward v. Bd. of Cnty. Comm'rs*, 2018 WL 9371674, at *2 (D. Wyo. Oct. 19, 2018) (Skavdahl, J.) (explaining that expert opinions on legal issues infringe upon the province of the Court).

Yet Conti-Brown repeatedly and improperly offers his own legal opinion as to the meaning of § 248a.  He does not even try to hide it.  He opines that the Fed's post-2015 exercise of discretion contravenes the "legal context" and "public policies of the US government" in "a way that Congress never authorized and never intended."  Rep. ¶ 9.  He opines that § 248a eliminated Federal Reserve discretion over access to services. Rep. ¶¶ 41, 45; *see also* Tr. 30:18–31:1 (Conti-

Brown's "bottom line" is that a "state-chartered depository institution that's legally eligible can get access to the Fed's priced services even if doing so presents risk to the payment system"). In a section of his Report entitled, literally, "The Monetary Control Act of 1980," Conti-Brown opines that "[t]he Monetary Control Act *requires* the Federal Reserve to offer the services enumerated in 12 U.S.C. § 248a not just to member banks but to *all* depository institutions…." Rep. ¶ 45 (emphasis added). He continues, "[n]o provision of the Monetary Control Act exempts a particular Federal Reserve payment service *or indicates that providing payment services would be a discretionary matter*…." *Id.* (emphasis added).[3]

To support his preferred interpretation of § 248a, Conti-Brown repeatedly cites the MCA's legislative history and the "framers' intent."[4]  *See, e.g.*, Rep. ¶¶ 16, 17, 28–31, 45, 92, 94–95; Supp. Rep. ¶¶ 17, 18, 20, 21, 25, 26. But it is the *court's* "primary task in interpreting statutes to 'determine congressional intent,'" including by reference to legislative history when needed. *St. Charles Inv. Co. v. Commissioner*, 232 F.3d 773, 776 (10th Cir. 2000) (quoting *NLRB v. United Food & Com. Workers Union*, 484 U.S. 112, 123 (1987)). Courts have repeatedly excluded experts

---

[3]  In his Supplemental Report, Conti-Brown offers the additional opinion that FRBKC "employees understood" that the Monetary Control Act ("MCA") would "level the playing field." Ex. 14 ("Supp. Rep.") ¶ 3 (cleaned up). These witnesses, however, emphatically did not share Conti-Brown's interpretation of the MCA as conferring a right to automatic, non-discretionary access to master accounts and services. Rather, FRBKC employees consistently testified that in their understanding, the MCA set pricing standards but did not eliminate federal discretion or supervision. *See, e.g.*, Ex. 15 ("George Tr.") at 12:20–13:1 (testifying that the MCA "set[] in motion pricing standards for the Reserve Banks, in terms of how they deliver services, making them not exclusive to member banks, but opening them up for non-member banks, as well, on the same terms"); *id.* at 31:12–21 (explaining that as part of "[o]ur dual banking system," "all State-chartered institutions come with Federal supervision in the current legal and regulatory framework"); Ex. 16 at 79:19–23 (testimony of Judith Hazen that she understood § 248a to "appl[y] to equal pricing or similar pricing for entities that have access to services *as determined by the Reserve Bank*" (emphasis added)).

[4]  The Report fails to define "framers." In his deposition, Conti-Brown testified that he meant both "[m]embers of Congress" *and* "people who lobbied for … its passage." Tr. 216:3–7.

who, like Conti-Brown, seek to explain how legislative intent or legislative history supports a preferred interpretation of law.  *See*, *e.g.*, *Rural Water Dist. No. 4 v. City of Eudora*, 604 F. Supp. 2d 1298, 1307–08 (D. Kan. 2009) (excluding proffered expert opinion that "explore[d] the legislative history and opine[d] about the purposes of" a statute because it was "actually a 'brief' in support of plaintiff's position on the meaning of [the statute], an issue hotly contested in this case"), *order clarified on other grounds on reconsideration*, 2009 WL 1360182, *and appealed on other grounds*, 659 F.3d 969 (10th Cir. 2011); *G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498, 1507 n.6 (9th Cir. 1994) (excluding law professors' affidavits that described legislative history "[b]ecause the interpretation of legislative history" is "uniquely [a] question[] for the court"); *United States v. Hausa*, 2017 WL 354197, at *2 n.2 (E.D.N.Y. Jan. 24, 2017) ("[D]ivining the intent of Congress would not be a proper subject for testimony by an expert"); *Bacchi v. Mass. Mut. Life Ins. Co.*, 2016 WL 1170958, at *1, *4 (D. Mass. Mar. 23, 2016) (excluding expert report that discussed legislative history and opined on legislative intent because those topics are appropriate for a "properly filed legal brief," but not for "expert opinion").[5]

Conti-Brown's opinions of law should be excluded for the additional reason that he (again) ignores without explanation contrary facts that do not fit his desired outcome, like one "entering a crowded cocktail party and looking over the heads of the guests for one's friends," *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment).  A central purpose of the MCA was to reinforce the Fed's ability to implement monetary policy by increasing the Fed's authority over state nonmember banks and shoring up its control over monetary supply.  Conti-

---

[5] In its motion for summary judgment, Custodia criticizes FRBKC's expert Professor Morgan Ricks for not opining on the meaning and intent of the MCA.  Custodia MSJ (ECF 239) at 48. Professor Ricks's expert report appropriately respects the role of the Court by refraining from opining on legal issues.  *See* Ricks Rep. ¶ 6 & n.1.

Brown admitted this, *see* Tr. 105:10–107:14, and yet his Report fails to mention or address it. Indeed, Congress's intent to *increase* federal control cannot be squared with a construction of the MCA that would result, as his does, in the elimination of federal discretion over access to the federal payment system and the transfer of such power to the states. *See* Tr. at 30:18–32:6, 188:18–189:2, 221:7–222:22. This unjustified selectivity makes his methodology unreliable. *See Norris*, 397 F.3d at 884–86; *Rodgers*, 759 F. App'x at 671; *Rimbert*, 2009 WL 2208570, at *20.

When pressed on this specific and critical issue—proof that the MCA's "framers" supposedly intended to eliminate the Fed's discretion over the federal payment rails—Conti-Brown was unable to identify any legislative history on point. He testified that "this is not a question that [the framers] were contemplating in terms of the specific processes of risk assessment or counterparty risk…." Tr. 216:21–218:1. He stated that the framers "did not state that exact fact," but that his interpretation of the MCA is the "implication" of the statute they passed. Tr. 218:17–221:6. This is not credible: it cannot be the case that legislators passed a statute intended to increase federal control over the system while simultaneously, but silently and without discussion, transferring the keys to the federal payment system to the states. More to the point, Conti-Brown's opinion on the statute's "implications" involves nothing more than reading and interpreting the statutory language itself, which is the quintessential role of the Court. *Id.*; *Specht*, 853 F.2d at 807. It is for the Court to decide the MCA's "implications."

## II.   Conti-Brown's Opinion that the Board Controlled Custodia's Master Account Request Improperly Usurps the Role of the Factfinder.

"[T]he 'touchstone' of admissibility is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991) (quoting *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1139 (3d Cir. 1983)). An expert may opine on an issue of fact only to the extent that his testimony is based on "scientific, technical, or other specialized knowledge," Fed. R. Evid.

702(a), and assists the factfinder rather than usurping the factfinder's role, *see Richter*, 796 F.3d at 1195–96.  If the factfinder is able to draw conclusions without expert testimony, then "an expert witness is not necessary and is improper." *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002) (quoting *Frase v. Henry*, 444 F.2d 1228, 1231 (10th Cir. 1971)).

Here, the Court expressed interest in discovery into the extent of the Board's role in deciding Custodia's master account request. *See* ECF 197.  Evaluating deposition testimony and the documentary record to resolve that question does not require the kind of technical or scientific expertise that would make expert testimony appropriate. *See Weidenbach v. Casper-Natrona Cnty. Health Dep't*, 2021 WL 2492480, at *2 (D. Wyo. May 21, 2021) (Skavdahl, J.) (finding expert testimony "cumulative and unnecessary" where the factfinder could evaluate factual assertions "based solely on the testimony of the direct participants without any further explanation or opinion from an expert witness.").  Because the Court is equipped to assess the full evidentiary record and make the necessary findings, Conti-Brown's attempt to opine on this question "is not necessary and is improper." *Wilson*, 303 F.3d at 1219.

But even if this Court needed assistance to decide this fact question (which it does not), Conti-Brown's opinion would be unhelpful because it is based on an incomplete review of the evidentiary record that did not utilize any technical or specialized method.  Conti-Brown reached the opinion reflected in his Report (that the Board controlled the outcome of Custodia's request, *see* Rep. ¶¶ 99, 128–132, 135), without having reviewed *any* of the testimony in the case—not even the FRBKC President's testimony concerning how and when she reached the decision to

deny.[6]  Tr. 388:12–389:4; *see* George Tr. 253:25–255:24.  Conti-Brown could not recall whether FRBKC had conducted risk assessments of Custodia, Tr. at 352:6–354:1, whether it had identified risk-management deficiencies, *id.* at 360:3–361:15, or whether it had communicated those conclusions to Custodia, *id.* at 360:3–361:15, 363:16–364:4.  He was unfamiliar with the policies and procedures that FRBKC had applied to Custodia's request.  *Id.* at 161:11–165:18, 201:21–202:6.  And while he opined that Custodia's request raised multiple "policy questions" to be addressed by the Board, Rep. ¶¶ 110, 132, 134, he did not know whether or how the Board had resolved such policy questions.  Tr. 372:17–373:7, 374:18–375:2, 377:5–16, 379:5–380:4.

Conti-Brown opines that the outcome of Custodia's request was dictated by the Board's internal guidance letter S-2677, Ex. 17, the accompanying Handbook, Ex. 18, and the Board's 2022 Guidelines for Evaluating Account and Services Requests, Ex. 19 (87 Fed. Reg. 51,099 (Aug. 19, 2022)).  *See* Rep. ¶¶ 116–32.  But by their own terms, those guidance documents do not "dictate" any outcomes.  To the contrary, they provide that "a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers," and they contain no assessment or evaluation of Custodia's specific request.  Ex. 17 at FRB-AR-64; ▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[6]  Although Conti-Brown eventually reviewed the then-FRBKC President's testimony, *see* Tr. 389:1–4, the Supplemental Report he wrote after that review does not revise his opinion and *does not even mention* her testimony that *she* made the decision to deny, *see generally* Supp. Rep., much less explain how he squares that sworn testimony with his opinion.  *Cf. J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (affirming exclusion of expert testimony based in part on the expert's failure to consider relevant witness testimony).

Expert testimony that purports to interpret legal documents and "simply reiterates" one party's position is inadmissible. *Hibbett Patient Care, LLC v. Pharmacists Mut. Ins. Co.*, 2017 WL 2062955, at *3 (S.D. Ala. May 12, 2017); *see also Burroughs v. Mackie Moving Sys. Corp.*, 2010 WL 1254630, at *7 (E.D. Mo. Mar. 24, 2010).

Conti-Brown also opines that suggested edits by Board staff on a memo drafted by FRBKC staff prove that the Board dictated the outcome of Custodia's request.  *See* Rep. ¶¶ 130–31; Tr. 412:1–22.  But the proposed edits speak for themselves, *see* Exs. 20, 21, and Conti-Brown fails to account for record evidence demonstrating that FRBKC's leadership had reached the decision to deny Custodia's request even before the draft memo was sent to the Board.  In any event, evaluation of these documents is "readily within the comprehension and ability" of the factfinder, *Curtis v. Okla. City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1219 (10th Cir. 1998), so no expert testimony is needed, *see Reiff v. Denver Publ'g Co.*, 1999 WL 1442047, at *10 (D. Colo. Dec. 23, 1999) (explaining that no "assistance from experts" is needed to assess and compare "ordinary" documents).  *See also Pritchett v. I-Flow Corp.*, 2012 WL 1059948, at *7 (D. Colo. Mar. 28, 2012) (excluding expert testimony that invaded the province of the factfinder "by regurgitating factual information that is better presented through introduction of documents"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004) ("simple inference drawn from [proffered

expert's] review of two documents" did not implicate expertise and was not helpful to the factfinder).

### III. Conti-Brown's Opinions Regarding Board Involvement in The Narrow Bank and the Territorial Bank of American Samoa Are Irrelevant and Lack Basis.

Early in this case, Custodia propounded third-party discovery to ascertain whether the Board controlled the outcomes of various master account requests.  This Court denied those requests, cabining discovery to the Board's involvement in *Custodia's* request and ruling that information regarding other banks' requests is outside the scope of permissible discovery. ECF 175.  Undaunted by the Court's ruling and the limited record available to him, Conti-Brown opines that the Board was the "chief decision-maker" for The Narrow Bank ("TNB") and the Territorial Bank of American Samoa ("TBAS").[7]  Rep. ¶ 98.  Those opinions are irrelevant to whether the Board controlled Custodia's request.  And even if they were relevant, they lack basis and amount to impermissible speculation.

At bottom, Conti-Brown's view is that the Board decides master account requests that raise policy questions, Rep. ¶ 134, but he has no basis to render this opinion.  He has no experience working for the Federal Reserve, *see* Tr. 71:9–17, and considers it opaque, *id*. at 387:2–12, 418:8–14.  "Experts may extrapolate from the evidence, but speculation is not permitted in expert testimony."  *Castro v. Bleimeyer*, 2015 WL 11143395, at *3 (D.N.M. Apr. 21, 2015) (Skavdahl, J.); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1275 (N.D. Okla. 2007) (excluding expert testimony where conclusions were "greater than the sum of their factual and analytical parts").

**TNB.**  Conti-Brown's opinion that the Board "dictated the outcome of TNB's" request,

---

[7] Conti-Brown renders no opinion on whether the Board controlled FRBKC's 2015 denial of Fourth Corner Credit Union's master account request.  *See* Rep. § IV; Tr. 264:16–22, 273:10–16.

Rep. ¶ 98, is based on his review of a single letter from FRBNY to TNB, but that letter does not reveal whether FRBNY or the Board controlled the process.  *See* Ex. 22 at TNB-2.  The letter says merely that FRBNY had been communicating with the Board and that the Board had a "strong view," but it does not state whether FRBNY shared the same "strong view" or whether the Board rendered any decision or dictated any outcome.  *Id.*  And regardless, whether FRBNY exercised discretion over the outcome of TNB's request is irrelevant to whether FRBKC exercised discretion over the outcome of Custodia's request.  ECF 175.

**TBAS.**  For TBAS, Conti-Brown traces his opinion of the Board's role, *see* Rep. ¶¶ 98, 105–09, to a couple of articles in *American Banker*, scholarship by one professor, and his "historical understanding of the relationship between" the Reserve Banks and the Board, *see* Tr. 328:17–330:8.  This is no basis on which to conclude that the Board controlled the outcome and, regardless, the Board's role in TBAS's request is irrelevant to this litigation.

## CONCLUSION

For the foregoing reasons, FRBKC requests that the Court grant its motion and exclude Professor Conti-Brown's Report, Supplemental Report, and testimony.

Date: January 26, 2024

/s/ Billie LM Addleman

Billie L.M. Addleman, #6-3690
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

## CERTIFICATE OF SERVICE

I certify the foregoing ***Defendant Federal Reserve Bank of Kansas City's Motion to Strike Reports and Exclude the Testimony of Professor Peter Conti-Brown*** was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure via CM/ECF on January 26, 2024.

*Shannon M. Ward*
OF HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC