# EXHIBIT 1

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

     *Plaintiff*,

        v.

FEDERAL RESERVE BOARD OF
GOVERNORS,
Constitution Ave NW & 20th St NW
Washington, DC 20551

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

     *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

---

**EXPERT REPORT OF PETER CONTI-BROWN, PH.D.**

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1
       A.    Qualifications ............................................................................1
       B.    Compensation Disclosure ..........................................................2
       C.    Documents Considered ..............................................................3
II.    Summary of Opinions ..........................................................................4
III.   THE FED WAITED MORE THAN THIRTY YEARS AFTER PASSAGE OF
       THE MONETARY CONTROL ACT TO ASSERT DISCRETION OVER
       WHETHER TO GRANT MASTER ACCOUNT REQUESTS ......................10
       A.    The Dual Banking System ........................................................10
       B.    The Federal Reserve System ....................................................12
       C.    The Fragmented Regulatory Landscape for Banking ...............14
       D.    The Monetary Control Act of 1980 ..........................................16
       E.    The 1998 Introduction of Master Accounts ..............................20
       F.    In 2015, the Federal Reserve Changes Course .........................25
             1.    Fourth Corner Credit Union ...........................................26
             2.    The Narrow Bank ...........................................................30
             3.    The Territorial Bank of American Samoa ("TBAS") ...............31
       G.    The Federal Reserve Doubles Down on Its Claim of Discretion with Its
             2022 Guidelines for Evaluating Account and Services Requests .........................33
IV.    THE BOARD CONTROLS DECISIONS OVER MASTER ACCOUNT
       REQUESTS LIKE CUSTODIA'S THAT RAISE PUBLIC POLICY
       QUESTIONS .......................................................................................39
       A.    Previous Cases of Board Intervention in Master Account Requests ...................40
             1.    The Narrow Bank ...........................................................40
             2.    The Territorial Bank of American Samoa ("TBAS") ...............42
       B.    The Board's Intervention in Custodia's Master Account Request ......................43
             1.    The Board Determined Whether Custodia Was Eligible for a
                   Master Account ...........................................................43
             2.    The Board's public and private guidance asserts Board Dominance
                   Over Master Account Access.........................................44
             3.    The Board Implemented Its Public and Internal Guidance when
                   Denying Custodia's Master Account Request...........................50
V.     CONCLUSION ...................................................................................52

i

I, Peter Conti-Brown, Ph.D., declare and state as follows:

## I.    INTRODUCTION

### A.    <u>Qualifications</u>

1.    I am the Class of 1965 Associate Professor of Financial Regulation at The Wharton School of the University of Pennsylvania.  I received an AB from Harvard College, a law degree from Stanford Law School, and a PhD in financial history from Princeton University, where my graduate coursework was in both history and economics.

2.    I teach courses on financial regulation, financial history, and business ethics, among other topics, to undergraduates, graduate students pursuing their Masters Degrees in Business Administration, and PhD students in the History Department of the University of Pennsylvania and in the Department of Legal Studies and Business Ethics at The Wharton School.  I also teach executives at The Wharton School's campus in Philadelphia and in San Francisco and around the world.  Prior to becoming a professor at Wharton in 2015, I was an academic fellow at Stanford Law School and Stanford's Graduate School of Business for four years.  I have also held positions in federal government as a law clerk for two federal appellate judges on the U.S. Courts of Appeals for the Second and District of Columbia Circuits.

1

3.    I have published numerous articles and books on the subjects of banking, central banking, and the Federal Reserve, including a forthcoming history of the Federal Reserve System and another on the history of bank supervision in the United States.  I am also the co-author of one of the leading textbooks on financial regulation in wide use in law schools in the United States.

4.    I have consulted widely in the financial services industry, and have been retained as an expert witness in *Holbrook vs. The Brink's Company*, US District Court for the Southern District of Ohio Eastern Division, Case No. 2:13-cv-873, which was resolved by the court on a motion for summary judgment prior to my deposition; *Home Federal Bank of Tennessee v. Home Federal Bank Corporation*, US District Court for the Eastern District of Tennessee, Case No. 3:18-cv-00379, which was settled by the parties prior to my deposition; and *Ocwen vs. Weiner,* US District Court for the Eastern District of California, Case No. 2:14-cv-02597, for which I was deposed in March 2019 and which was settled by the parties in 2023.[1]

### B.    Compensation Disclosure

5.    Plaintiff Custodia Bank, Inc, ("Plaintiff") is paying an hourly fee of $950 per hour for the time I spend working on this Report and otherwise assisting

---

[1]  More on my educational and research background is included in the attached Curriculum Vitae.  Exhibit 1.

counsel on this case.  My compensation is not contingent on any outcome in this case.  The views expressed herein are my own.

### C.   **Documents Considered**

6.      In conducting my analysis, I have considered the scholarly literature on the history and practices of Federal Reserve System services.  I also extensively consulted the legislative histories of the Federal Reserve Act (and its amendments, including the Banking Act of 1935), the Depository Institutions and Monetary Control Act of 1980 ("Monetary Control Act"), and the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, among others mentioned below.  I consulted the historical record regarding the challenges of providing Federal Reserve services throughout its 110-year history.  I consulted news coverage of the Federal Reserve's master account procedures from 1997 to the present.  I consulted the annual reports of the Board of Governors of the Federal Reserve System and the twelve Federal Reserve Banks.  And I reviewed the administrative record produced by the Federal Reserve Board of Governors as well as documents produced by the Federal Reserve Bank of Kansas City.  Specific citations follow below, with a list of citations included as Exhibit 2.  I refer to all materials, including any legal materials, only for factual and historical purposes; nothing in this report purport to be a legal conclusion on the questions pending before the court.

3

## II.    Summary of Opinions

7.    This report contains my findings and opinions as of October 20, 2023. My analysis of these issues is ongoing and my opinions may change if additional information relevant to these questions comes to my attention, for example, through reports or documents generated through further discovery by the parties.[2]

8.    I have been retained by Plaintiff to provide expert opinions on two related questions: (1) whether the Fed's claim of discretion over Master Account access conforms to history, practice, legal context, and the public policies of the US government and the Federal Reserve itself; and (2) whether the Board of Governors of the Federal Reserve exercises ultimate authority over Master Account access.

9.    *First*, I conclude that the Board's claim of discretion over Master Account access does not conform to history, practice, legal context, or the public policies of the US government and the Federal Reserve itself.  The Fed only began to assert such discretion over Master Account access around 2015.  This assertion also fundamentally remakes the nature of the US financial and banking system, a delicate balance that has evolved over 160 years, in a way that Congress never authorized and never intended.

---

[2] Throughout this report, I have referred to the decision-making entity in determining access to Master Accounts as "the Federal Reserve" or "the Fed." This refers to the Federal Reserve System, which includes the Fed's Board of Governors, a governmental agency in Washington, DC, and the twelve quasi-private Federal Reserve Banks.

10.     The Fed's assertion of discretion over Master Account access for legally eligible, duly chartered depository institutions upsets what is known as the "dual banking system," a system that permits state and federal chartering authorities and state and federal supervisory and regulatory authorities to participate in the management of the US financial system.[3] Key to the success of the dual banking system is the recognition that state and federal authorities each play a role in granting access to the banking system that is supervised and regulated jointly by both state and federal actors.

11.     The federalism at the heart of the dual banking system is important not only because of the historical evolution that produced it.   State and federal participation in bank chartering, supervision, and regulation also permits depository institutions to survey various options and business models – traditional banks, credit unions, thrifts, for example.   In turn, this system permits states and federal chartering and supervisory authorities to experiment in competition with each other to drive innovation, financial inclusion, and the availability of novel financial services to a dynamic economy.

12.     The Fed's assertion of discretion in granting access to a Master Account upsets this delicate balance.   As I wrote in 2018, a depository institution that is

---

[3] See, e.g., The National Banks and the Duel Banking System (Comptroller of the Currency, September 2003).

denied access to a Master Account at a Federal Reserve Bank "can't really function as a financial institution.  It becomes instead a kind of storage locker."[4] A depository institution so denied can no longer function by that name, despite the authorization from state chartering authorities and the legal eligibility to bank at the Federal Reserve.

13.     Before 2015, the Federal Reserve viewed access to a Master Account as, in legal scholar Julie Hill's description, a "quick" process that deferred risk assessments to "a federal or state bank supervisor."[5]  After 2015, the Fed changed that delicate process entirely.  By claiming a second look at every depository institution that seeks to do business with the Federal Reserve (as every depository institution must do), the Fed has become the *de facto* re-chartering authority for every depository institution in the country, whatever its business model, whatever its geographic footprint, whatever its local governmental support.

14.     Under the Fed's newly discovered discretion in providing access to the Master Account, it has displaced state chartering and supervisory authorities.  Under the Fed's theory of the scope of its authority, there is no limit to this displacement. It can, by its assertion, second guess any determination made by any state

---

[4]  Peter Conti-Brown, The Fed Wants To Veto State Banking Authorities.  But Is That Legal?  Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd.

[5] Julie A. Hill, *Opening a Federal Reserve Account*, 40 YALE J. REGUL. 453, 456, 463 (2023)

government at any time with respect to what constitutes the appropriate provision of banking and financial services anywhere within the reach of the global banking system.

15.    These sweeping assertions of authority are not limited to the question of Master Account access.  The Fed has also used ongoing access to its priced services as a cudgel for depository institutions to which it has already granted access.  As explained in more detail below, such was the case of the Territorial Bank of American Samoa ("TBAS").[6]This level of centralized federal control over every aspect of banking is new in the 160-year history of the formal federal banking supervision in the United States.

16.    It is also new in the nearly fifty-year history of the Monetary Control Act ("MCA").  As explained in more detail below, from the passage of the MCA in 1980 through the creation of the Master Account in 1998 until the Fed announced its discretion to deny access in 2015, the Fed treated such access as routine and deferential.  The legislative history surrounding the MCA illustrates what was intended by the passage of the relevant provisions: "open access to Federal Reserve System services" for all depository institutions while maintaining "the

---

[6] *See infra* §§ III.F.3, IV.A.2

continuation of the freedom for banks to choose a State or Federal charter and membership in the Federal Reserve System" as they preferred.[7]

17.    The Federal Reserve's newly asserted authority to grant or deny access as it sees fit to these services is thus inconsistent with the MCA and the choices Congress made when enacting that legislation.  It is also inconsistent with the history, practice, and public policy of the US government and the Federal Reserve itself.

18.    *Second*, the historical record shows that, since the Fed announced its authority to act as a re-chartering agency for all depository institutions, the Board of Governors has exercised control over specific access or lack of access to Master Account and other Fed services.

19.    The Board of Governors, not the twelve quasi-private Federal Reserve Banks, is responsible for controlling regulatory, supervisory, and financial policy for the Federal Reserve System.

20.    As I explain below, in at least three previous cases, the Board has intervened in decisions on Master Account access that, in the Fed's view, implicate its own policy choices.[8]

---

[7] Hrg. Before the Sen. Committee on Banking, Housing, and Urban Affair, 96th Cong. at 54 (Feb. 4-5 1980).

[8] *See infra* § IV.A.

21.    The administrative record in this case supports the conclusion that the Board reached the same determination in the present case, as well.  Staff at the Kansas City Fed and the Board of Governors viewed Custodia's request for access to a Master Account as setting "precedent."[9]

22.    The Fed thus attached policy importance to accepting Custodia's request to be accepted into the financial and banking system.  It also apparently disagreed with Wyoming state banking authorities and the Wyoming state legislature in this regard.  Based on my review of the administrative record in this case, I conclude that the Board of Governors expressed these views specifically in denying Custodia's access to the Master Account in two ways: (1) by consulting regularly with the Kansas City Fed throughout the pendency of Custodia's master account request, and (2) by redlining the recommendation that the Kansas City Fed staff made to the Kansas City Fed President regarding Custodia's request.

23.    More generally, the Board of Governors asserted its control over these evaluative processes in two additional ways: (1) by promulgating the Guidelines for Evaluating Account and Service Requests, which provides a detailed roadmap for denial of access and essentially invites Reserve Banks to consult with the Board on marginal cases; and (2) by issuing the non-public internal guidance letter S-

---

[9] FRB-AR-000336 at FRB-AR-000343; FRBKC-00014860 at FRBKC-000014862.

2677, which explicitly requires Reserve Banks that are "considering approval of an access request from a higher risk entity, *including all Tier 2 or Tier 3 institution*s," to "consult with the director of [Reserve Bank Operations and Payment Systems]" on the results of its pre-decisional analysis under the Guidelines prior to communicating any decision to the institution."[10]

24.    The Fed has gone to some length to make Custodia's denial of access to a Master Account appear to be an independent determination of the Federal Reserve Bank of Kansas City.  The record shows otherwise.  The Board must not be permitted to hide behind the quasi-private Federal Reserve Banks in making regulatory and supervisory decisions.

## III.   THE FED WAITED MORE THAN THIRTY YEARS AFTER PASSAGE OF THE MONETARY CONTROL ACT TO ASSERT DISCRETION OVER WHETHER TO GRANT MASTER ACCOUNT REQUESTS

### A.    The Dual Banking System

25.    The United States operates a dual banking system that allows banks to be chartered by either the state or federal government.  This system began with the passage of the National Banking Acts of 1863 and 1864, which initiated the era of nationally chartered banks.

---

[10] FRB-AR_000014 at FRB- AR-000016.

26.     Banks with national charters are primarily supervised and regulated by the Office of the Comptroller of the Currency (OCC), an independent regulator within the US Treasury.  Banks with state charters are primarily supervised by state regulators.  The existence of charter and supervisory optionality has raised debates about the wisdom of this system.[11]  Nevertheless, the dual banking system has been sustained by Congress for 160 years.

27.     While the dual-banking system divides the chartering and regulatory responsibilities between the Federal and state governments, it does not create two separate systems for bank services.  The Federal Reserve must provide access to the U.S. dollar payment system to eligible depository institutions on a nondiscriminatory basis.[12] This is because there is only one provider of essential central banking financial services: the US central bank, or the Federal Reserve System.  There is no state analogue of these services.  The Fed, in this respect, is the only game in town.

---

[11] *Compare* Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 STANFORD L. REV. 1 (1977) *with* Henry N. Butler and Jonathan R. Macey, *Myth of Competition in the Dual Banking System*, 73 CORNELL L. REV. 677 (1988).

[12] 12 U.S.C. §§ 248a(c)(2), 1831d(a).

### B.   <u>The Federal Reserve System</u>

28.    The Federal Reserve System was created by Congress and signed into law on December 23, 1913.[13]  The three words in its title, curious for central banks then and now, spoke to the balance that its framers had to strike in creating a new central bank in the United States, given Americans' longstanding skepticism of central banks and centralized bank power.

29.    The "Reserve" part of the new System was natural enough:  To combat the string of devastating Gilded Age financial panics and crises, Congress sought to create a reserve of "elastic" currency that could circulate more quickly through an economy in distress than the alternatives that had been tried before.[14]

30.    The "Federal" part was an acknowledgement that the power for this system would be shared between a central authority, then called the Federal Reserve Board, and the twelve quasi-private "Reserve Banks" organized according to a process set forth in the Federal Reserve Act.

31.   The Reserve Banks, the Federal Reserve Board, and the banks that opted to become members of the Federal Reserve to gain access to its financial services formed the "System."

---

[13] Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913).

[14] Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913); Roger Lowenstein, AMERICA'S BANK: THE EPIC STRUGGLE TO CREATE THE FEDERAL RESERVE (2015); Elmus Wicker, BANKING PANICS OF THE GILDED AGE (2000).

32.     Almost immediately there were conflicts and uncertainties about who would have supervisory authority over which depository entities.[15]

33.     National banks – those chartered by the OCC – were required by law to become members of the Federal Reserve System.  This created a conflict between the OCC and the Fed regarding which entity would have primacy with respect to regulating and supervising those national banks.

34.     Similarly, once state-chartered banks joined the Federal Reserve System, those banks were supervised by both state and federal regulators.  There again arose the question of supervisory primacy: would the states control these institutions, or would the Federal Reserve?  That answer varied state by state and reserve bank by reserve bank.  What was consistent across the System was that membership in the Fed did not replace state supervision.  Rather, state supervisors and state-chartered banks ensured that state supervision remained firmly in place, whatever requirements the Fed might impose on those state banks that joined its System.

35.     Originally, the Fed was charged with providing its financial services only to "its member banks" and "the United States."[16] In 1917, however, Congress

---

[15] 1 Allan Meltzer, A HISTORY OF THE FEDERAL RESERVE at 75 (2003) ("Tensions between the Board and the reserve banks began before the System opened for business.")

[16] Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251, § 13 (1913).

began expanding this list of covered entities.  Today, subject to some restrictions, covered entities include "member banks, or other depository institutions, . . . the United States" and "nonmember bank or trust company or other depository institution."[17]

### C.   The Fragmented Regulatory Landscape for Banking

36.    The problem of regulatory and supervisory confusion with the addition of the Federal Reserve—and thus the need to adjudicate those tensions— was recognized from the beginning.  Even before the Federal Reserve System was created, there were prominent individuals who advocated for the displacement of the national banking charter.

37.    For example, Lyman Gage, writing as a former Secretary of the Treasury in 1907, wrote that the Comptroller of the Currency had essentially failed in its efforts to supervise the financial system and "should be repealed" in favor of a "central bank or Government bank of adequate capital.[18]

38.    Such was a common refrain throughout the last 110 years, most recently in a call for reform issued by former Fed Chairman Paul Volcker in

---

[17] 12 USC § 342.

[18] Gage et al, "The Financial Situation," *North American Review,* Feb 1908, vol 187, page 161-192.

2015.[19]  Volcker and his colleagues looked at all the fractures in federal and state

bank regulation and reached the conclusion that so disjointed a system was not able

to effectuate the financial and monetary policy goals that Congress had put before

them.

39.     Despite the long enthusiasm for simplifying or centralizing this

system, each of these efforts failed.  As a result, a clear set of responsibilities

developed, echoing through many different statutory allocations of responsibility,

as follows:

> a.     The Comptroller of the Currency has exclusive chartering
>
> authority and primary supervisory authority over banks that
>
> sought or received a national charter.
>
> b.     The state chartering authorities have exclusive chartering
>
> authority and primary supervisory authority for state-law
>
> matters over those banks that sought or received a state charter.
>
> c.     Since 1933, the Federal Deposit Insurance Corporation has
>
> worked with the OCC in supervising national banks and the
>
> state chartering authorities in working with state banks.

---

[19] See Volcker Alliance, *Reshaping the Financial Regulatory System*, April 2015.  For more on the history of these failed efforts, see Elizabeth F. Brown, *Prior Proposals to Consolidate Federal Financial Regulators,* THE VOLCKER ALLIANCE (2015).

15

d.    The Federal Reserve shared supervisory authority over national banks (which were members of the Federal Reserve System by statute) and the state banks that opted into membership.

40.    Prior to 1980, the Fed was also permitted to discriminate in the provision of services in favor of those entities that became members of the Federal Reserve System.  Such discrimination, the Fed believed, was necessary in part to attract state banks to join the Federal Reserve System, given that membership also included regulatory requirements that were sometimes more burdensome than state banking authorities required of the same entities.

**D.    The Monetary Control Act of 1980**

41.    Federal Reserve Bank services were at one time limited to Federal Reserve discretion, which gave preference to Federal Reserve member banks.  That changed in 1980, when Congress passed the Monetary Control Act and removed such discretion from the Federal Reserve.

42.    Then-Fed Chairman Paul Volcker testified that Congress needed to change the law because failure to do so left the Fed "with the increasingly awkward problem of discriminating between members and nonmembers in the provision of certain services, such as automated clearinghouse payments, which for

16

practical reasons cannot operate efficiently unless open to all depository institutions."[20]

43.    William Proxmire, one of the sponsors of the legislation that would amend the Federal Reserve Act, stated his aim more clearly: he wanted "open access to Federal Reserve System services" and "the continuation of the freedom for banks to choose a State or Federal charter and membership in the Federal Reserve System."[21]

44.    Consistent with those statements, the conference report announces an intention to "open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks."[22]

45.    The Monetary Control Act as signed into law implemented that intention.  The Monetary Control Act requires the Federal Reserve to offer the services enumerated in 12 U.S.C. § 248a not just to its member banks but to all depository institutions regardless of their membership status.[23]  The Act also requires the Federal Reserve to price its services at cost, charge the same price to all

---

[20] Hrg. Before the Sen. Committee on Banking, Housing, and Urban Affair, 96th Cong. at 11 (Feb. 4-5 1980).

[21] *Id.* at 54.

[22] 126 Cong. Rec. 6250 (1980) (Conf. Rep.)

[23] See Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333, 1365 (1984) ("The [Monetary Control Act] required the Federal Reserve, for the first time, to provide access to virtually all of its services to all depositary institutions on the same terms and conditions, and to charge for such services.").

depository institutions, and  publish its prices publicly.[24]  No provision of the Monetary Control Act exempts a particular Federal Reserve payment service or indicates that providing payment services would be a discretionary matter with the Federal Reserve.  By mandating access to the priced services of the Federal Reserve to all depository institutions rather than merely to member banks, Congress intentionally "increased the potential universe served by the Federal Reserve from 5,400 member banks to over 40,000 depository institutions."[25]  After the Act's passage, the Fed invited nonmember banks and thrifts to take advantage of these services.[26]

46.    In 1980, the Fed issued its first regulatory implementation of the Monetary Control Act and stated in the Federal Register that the statute "requires the Board of Governors of the Federal Reserve System to begin putting into effect a schedule of fees for services . . . and to make such services covered by the fee schedule available to all depository institutions."[27]  A few months later, it

---

[24] 12 U.S.C. § 248a(c)(2).

[25] House Committee on Banking, Finance, and Urban Affairs:  Subcommittee on Domestic Monetary Policy, *The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System*, 98th Cong. (1984).

[26] See Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 462.

[27] Federal Reserve Bank Services; Proposed Fee Schedules and Pricing Principles, 45 Fed. Reg. 58,689, 58,689 (Sept. 4, 1980)

reaffirmed that such "[s]ervices covered" by the statute must be made "available to all depository institutions."[28]

47.    In July 1981, the Federal Reserve Bank of Dallas, which managed the Fed's automated clearing house service, similarly announced that beginning in August of that year, such services would be "available to all depository institutions in the District."[29]

48.    Indeed from 1980 until approximately2015, the Fed – both the Board of Governors and the Federal Reserve Banks – urged all depository institutions to take advantage of its services on equal terms.[30]

49.    Contemporary experts agreed with the Fed's interpretation of the Monetary Control Act:  Since the 1980s, it has been well-understood among

---

[28] Adoption of Fee Schedules and Pricing Principles for Federal Reserve Bank Service, 46 Fed. Reg. 1338, 1338 (Jan. 6, 1981)

[29] Federal Reserve Bank of Dallas, Circular No. 81-155 (July 30, 1981).  *See also* Julie Hill, From Cannabis to Crypto: Federal Reserve Discretion in Payments, Iowa Law Review, vol 109, draft July 17, 2023, pp 61-63 for more such citations.

[30] Hill, *Discretion in Payments*, *supra* n. 28 at 61.  *See also* J.L. Jackson & Willis J. Winn, *Foreword to Federal Reserve Bank of Cleveland 1980 Annual Report* at 2 (1981) (stating that in light of the 1980 Deregulation and Monetary Control Act, "[o]ur services will now be available to all depository institutions"); Elijah Brewer III, *The Depository Institutions Deregulation and Monetary Control Act of 1980*, Econ. Perspectives, Sept.-Oct. 1980, at 3, 4 (stating that the 1980 Deregulation and Monetary Control Act requires the Federal Reserve to "grant all depository institutions access to [Federal Reserve] services"); Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview*, New Eng. Econ. Rev., Jan.-Feb. 2001, at 3, 8 (stating that the 1980 Deregulation and Monetary Control Act required the Federal Reserve to make Federal Reserve services "available to all depository institutions"); Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev., July-Aug. 1985, at 23 (stating that the 1980 Deregulation and Monetary Control Act required Federal Reserve services to be "made available to all depository institutions on equal terms"); Gary C. Zimmerman, *The Pricing of Federal Reserve Services Under the MCA*, Econ. Rev., Winter 1981, at 22 (1981) (stating that the 1980 Deregulation and Monetary Control Act "provides for access by all depository institutions to major [Federal Reserve] services").

banking experts that "[t]he [Monetary Control Act] . . . required the Federal Reserve, for the first time, to provide access to virtually all of its services to all depositary institutions on the same terms and conditions, and to charge for such services."[31]

50.     For roughly two decades, from 1980 until 1998, the priced services identified in the Monetary Control Act were spread throughout the Federal Reserve System.  Nonbank depository institutions, such as thrifts and credit unions, made liberal use of the Fed's discount window and other priced services, including payment services.

51.     The timing of the Monetary Control Act's passage was fortuitous. Shortly after its passage, the US financial system was hit by a slow-boiling financial crisis that lasted from the early 1980s through at least 1995.  During a period of unprecedented tumult in this sector, the Fed provided financial services for these firms that it did not charter, whose business practices it did not sanction.

### E.     The 1998 Introduction of Master Accounts

52.     In the mid-1990s, Congress enacted the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994.[32] The Act made a sweeping

---

[31] Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333, 1365 (1984).

[32] Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. No. 103-328, 108 Stat. 2338 (1994).

change to the way that depository institutions could do business across state lines, ending a longstanding, uniquely American experiment in banking known as "unit banking," or the practice of limiting a bank to a single branch.  After this liberalization, the Fed consolidated all its priced services into a single account, which it called the "Master Account."[33] Following this consolidation, the only way to access Federal Reserve services such as check clearing and wire transfer services is through this new account.

53.    When introducing the master account, the Fed, through the Federal Reserve Bank of Dallas, announced via an Operating Circular several benefits of the new system that would be "uniform across Federal Reserve Districts."[34] The Circular outlined what the Fed called the "contract" between it and the depository institutions that were legally eligible.  While the circular did state that "all master accounts are subject to Reserve Bank approval," the Circular also stated that all that was needed to open a Master Account was to "execute a Master Account Agreement." This agreement was a single page long.  The boilerplate language indicated the institution's accession to the terms of the Opening Circular.  It then

---

[33] Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 462.

[34] Federal Reserve Bank of Dallas, *Notice 97-104:  Federal Reserve Standardized Operating Circulars* (Nov. 12, 1997),

contained space to input only basic identifying information related to the institution.

54.     There was no space in this Master Account Agreement for the institution to provide any information regarding risk assessments, capital structure, business model, shareholders, relationship with federal supervisors, Fed membership status, deposit or share insurance status, or any other such information on which the Fed later relied in finding its discretion.  The Dallas Fed later reported that the processing of these agreements could take "5-7 business days," suggesting a perfunctory processing function, not a risk evaluation or quasi-chartering determination.[35]

55.     The assertion in the Circular that the Reserve Bank could subject the Master Account Agreement to "approval" suggests some kind of discretionary determination.  The practices of the previous and subsequent decades suggest otherwise.  The Federal Reserve Banks and Board of Governors could indeed reject entities that lacked legal eligibility for such an account.  This legal determination was not necessarily a cut-and-dried exercise and could arguably mean that the Fed could conclude for marginal cases that a proposed Agreement

---

[35] Fed. Rsrv. Bank of Dallas, Operating Circular No. 1: Account Relationships, Apx. 1 (effective Sept. 1, 2002)

could not be executed because the Fed deemed the entity to lack legal eligibility for it.

56.     The reason for creating the Master Account as an agreement to strike between client and service provider rather than an application to be approved by a chartering authority to a supplicant goes back to the delicate balances of federalism in the dual banking system and pre-specified regulatory lanes in the federal government.  In our dual banking system, the chartering authority for banks is divided between the states and the federal government.  Each bank must choose its chartering authority.  At the federal level, the OCC, FDIC, and Fed also each play distinct roles.

57.     It is important to understand why these different lanes of operation are so important and so important to preserve.  Chartering authority is the ability of a government entity – state or federal – to give a depository institution permission to engage in the business of banking.  Chartering also commits the governmental entity to an ongoing relationship with the depository institution.  That relationship involves both regulation and bank supervision.  Regulation is the passage of rules for the entire system under that jurisdiction; supervision is a set of relationships

that puts banks and their chartering authorities in constant dialogue about, among

other things, the risk management of new and existing services.[36]

58.     I have searched through public records, every publicly available

annual statement of every Federal Reserve Bank and the Fed's Board of Governors

from 1980 to the present, news accounts, and the scholarly literature.  I have found

no instance of the Fed publicly asserting that it had discretion to deny a master

account to a duly-chartered depository institution between 1998 and 2015.  Instead,

it repeatedly stated or suggested that such accounts would be approved after a

cursory agreement was signed and submitted to the relevant Federal Reserve

Bank.[37]

59.     So far as I have been able to discern, none of the above was

controversial for the first 35 years after Congress enacted the Monetary Control

---

[36] See Peter Conti-Brown & Sean Vanatta, *Risk, Discretion, & Bank Supervision* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405074

[37] 2010, Board of Governors Annual Report, p153 (referring to a changes to interest-bearing deposits, with no reference to discretion in approving those accounts) https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/2010-2468; Federal Reserve Bank of Philadelphia. Annual Report. 2010. P7. https://fraser.stlouisfed.org/title/annual-report-federal-reserve-bank-philadelphia-469/navigating-change-579775; Marlin, Steven. "KeyCorp Moves to Single Fed Account." July 1998. BankTech.com. Available: https://drive.google.com/file/d/18EYlbXZ6nNNurycQa4e7eN9a1UPGf-oy/view?usp=share_link; 1997, Federal Reserve Bank of San Francisco, pdf6, https://www.frbsf.org/wp-content/uploads/1997_annual_report.pdf (discussing the emergence of depository institutions with nationwide networks as a reason to grant them master accounts); 1997, Board of Governors Annual Report, p248 (discussing that the new master account would be available to "each chartered institution), https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1997-2457; Board of Governors, p257 (discussing the need for consolidated priced services in the form of a "relationship between the Federal Reserve and any depository institution.") , https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1996-2460; Federal Reserve Bank of Dallas. New Bulletin 11, Circular No. 81-155. July 30, 1981. https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/new-bulletin-11-541337; Federal Reserve Bank of San Francisco "Federal Reserve Notes." July 1981. https://fraser.stlouisfed.org/title/federal-reserve-notes-5186/july-1981-527563. *See also*, Hill, *supra* n. 28 at 60-62.

Act.  I have found no evidence that during the period from 1980 to approximately 2015 was the Federal Reserve asserting the power to decide whether to grant priced services to legally eligible depository institutions.

### F.    In 2015, the Federal Reserve Changes Course

60.    The Federal Reserve's veered away from the routine and deferential nature of Master Account access in 2015, when it refused to grant access to Fourth Corner Credit Union, a duly-chartered Colorado state credit union.  The Fourth Corner Credit Union litigation was the first time that the Fed publicly asserted that it had discretion to choose which legally eligible, duly chartered depository institutions could or could not receive access to its priced services.

61.    Remarkably, in litigation regarding this denial, counsel for the Fed acknowledged that the Fed could not identify any time in the previous ten years when the Fed had exercised discretion to deny an eligible credit union access to a Master Account.[38]  The Court noticed the change.  In his separate opinion, Judge Bacharach observed that the departure from precedent appeared to be a "litigation position."[39]

---

[38] See Reporter's Transcript Oral Argument 37-39, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-CV-01633). See also Hill, *Discretion in Payments*, *supra* n. 28 at 62-63.[39] *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052, 1071 (10th Cir. 2017) (Op of Bacharach, J.).

[39] *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052, 1071 (10th Cir. 2017) (Op of Bacharach, J.).

62.     In the years that followed, the Fed would follow the course it charted in *Fourth Corner* on at least three other occasions.  I summarize *Fourth Corner* and these other cases below.[40]

### *1.     Fourth Corner Credit Union*

63.     The first instance of the Fed publicly claiming that it had the discretion to deny access to its priced services came, as noted, in the case of Fourth Corner Credit Union.

64.     The Fed's justification for this denial was that the credit union, as "a de novo depository institution, there is no historical record for the [Federal Reserve Bank of Kansas City] to review."[41] It also cited the National Credit Union Administration's determination that Fourth Corner did not submit sufficient information to "assess [its] ability to safely and soundly operate and comply with applicable laws and regulations, including Bank Secrecy Act and Anti-Money Laundering responsibilities."[42]

---

[40] The facts that follow are based on press reports, court filings, and the interviews conducted by legal scholar Julie Hill, as described in her two recent articles on the Fed's Master Accounts.  See Hill, *Discretion in Payments*, *supra* n. 28 and Hill, *Opening a Federal Reserve Account*, *supra* n. 5.

[41] Hill, *Discretion in Payments*, *supra* n. 28 at 15

[42] *Id.*  Julie Hill evaluates Fourth Corner's request for a Master Account and the subsequent litigation thoroughly in Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 471-76.

26

65.     This denial appears to be focused on Fourth Corner's plan for providing financial services to marijuana-related businesses that were unquestionably legal under Colorado state law and more questionably illegal under federal law.[43]

66.     The split between state drug laws and federal drug laws introduced a complex question of federalism, federal preemption, and prosecutorial discretion, a set of issues that scholars and policymakers continue to debate.[44]

67.     With Fourth Corner Credit Union, the Fed entered that debate with an emphatic view: an exception to the previously routine access to Master Accounts for legally eligible depository institutions.  That exception seems to be that depository institutions that might provide financial services to entities that violate federal law will be denied access to the Fed's priced services if it suspects that entities engaged in those services are violating federal drug law.

68.     After the Fed denied Fourth Corner's account, the bank sued, requesting that the Court enter an injunction ordering the Fed to comply with 12 U.S.C. § 248a and provide the bank with a master account.

---

[43] Some of the businesses that Fourth Corner sought to serve were advocacy groups whose activities were permissible under both state and federal law.

[44] Johnathan Adler, MARIJUANA FEDERALISM:  UNCLE SAM AND MARY JANE (2020).

69.     The district court dismissed Fourth Corner's complaint.  The Court
concluded that the bank was "asking the Court to exercise its equitable authority to
issue a mandatory injunction.  But courts cannot use equitable powers to issue an
order that would facilitate criminal activity."[45]  The district court also concluded
that "it is at least implicit that [12 U.S.C.§ 248a] does not mandate the opening of a
master account that will facilitate activities that violate federal law."[46]

70.     The bank appealed that decision to the Tenth Circuit, which remanded
the case to the district court for dismissal without prejudice with each judge writing
separately, without resolving the question of the scope of 12 U.S.C. § 248a or the
Fed's controversial interpretation of it.[47]

71.     Following the lawsuit, Fourth Corner requested a Master Account
again, this time with the explicit commitment that it would "not serve marijuana-
related businesses until there is a change in federal law that authorizes financial
institutions to serve marijuana-related businesses."[48]  The Kansas City Fed
responded to Fourth Corner's access request by calling Fourth Corner's request a

---

[45] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 154 F. Supp. 3d 1185, 1188 (D. Colo. 2016), *vacated,* 861 F.3d 1052 (10th Cir. 2017)

[46] *Id.* at 1189.

[47] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017).

[48] Complaint at ¶ 41, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-CV-02361 (D. Colo. Sept. 29, 2017).  See also Hill, *Discretion in Payments*, *supra* n.28 at 17-18;.

"unique" one that raised "legal and policy questions" that the Fed would have to resolve before it could grant that access.[49]

72.     Rather than continue to engage in the Fed's efforts to turn Master Account access into a rechartering exercise, the credit union filed another lawsuit. The Kansas City Fed then granted Fourth Corner's master account request conditional on Fourth Corner's acquisition of share insurance.[50]

73.     There is no statutory basis for requiring share insurance for credit unions:  Credit unions without share insurance are eligible for a Master Account. But the Fed used its claimed discretion to impose these additional requirements on Fourth Corner.  Fourth Corner could not get share insurance and thus never received Master Account access.[51]

---

[49] Complaint at ¶¶ 33,50 Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-CV-02361 (D. Colo. Sept. 29, 2017).  Answer at ¶¶ 33,50, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-CV-02361 (D. Colo. Nov. 8, 2017).  See also Hill, *Discretion in Payments*, *supra* n.28 at 18.

[50] *See* Hill, *Discretion in Payments*, *supra* n.28 at 18.

[51] *Id.*

### 2.    *The Narrow Bank*

74.    In 2017, James McAndrews, the former director of research for the Federal Reserve Bank of New York, saw a business opportunity in changes to the Fed's monetary policy framework.  He wanted to create a new bank that did not engage in lending and thus maintained a full, 100% reserve bank (as opposed to the fractional reserve model that most banks maintain in the deposit-taking and lending activities that they pursue).

75.    His bank, The Narrow Bank (TNB), received a Connecticut state charter and sought a Master Account.  The Fed refused to either grant or deny that request, but did subject TNB to extensive vetting in connection with its Master Account request (and after it had already received its Master Account request).  TNB filed suit, but the court dismissed its Complaint at the Fed's urging because, the Fed argued, the case was not ripe given the Fed's own lack of decision on that request.[52]  Six years later, TNB's request is still pending.[53]

76.    With TNB, the Fed appears to claim an exception to its previous assertions that all depository institutions would receive access to its priced services on equal terms.  That exception seems to be that depository institutions cannot

---

[52] Hill, *Discretion in Payments*, *supra* at n.28 at 21.

[53] *Id.*

have novel business practices that the Fed's monetary policymakers, in their sole

wisdom and determination, do not favor.

### 3.   *The Territorial Bank of American Samoa ("TBAS")*[54]

77.    In 2012, the Bank of Hawaii, a private bank and the only provider of

financial services in American Samoa, announced that it was ceasing operations in

this remote and deeply impoverished US territory.  Officials from American

Samoa tried but failed to persuade other banks from the U.S. and elsewhere to

open services.  They opted instead to open their own bank, with the government as

shareholders.

78.    The Federal Reserve Bank of San Francisco referred the case to the

Board of Governors in Washington DC. Board staff demanded that the bank

(owned by the government) explain how it would insulate itself from governmental

pressures from the American Samoan government.  It challenged the territory's

new supervisory agency, the Office of Financial Services, and queried whether the

American Samoan government could effectively supervise banking at all.

79.    TBAS's request stalled until the Trump Administration nominated and

the Senate confirmed the candidacy of Randal Quarles of Utah to become a

---

[54] The travails of the TBAS have been extensively documented in *American Banker*.  See Rob Blackwell, How Far Does American Samoa Have to Go to Get a Bank?, *American Banker*, July 31, 2017 and Rob Blackwell, American Samoa Finally Gets a Public Bank, *American Banker* (April 30, 2018).

member of the Board of Governors.  Quarles, who personally knew some of the

consultants retained by TBAS, helped push the request through.  TBAS was now a

bank with an executed Master Account Agreement.

80.    The execution of this Agreement was no mere formality, though.

TBAS had to agree to a higher capital buffer than other banks that received a lower

capital requirement.  It had to hold more reserves than regulations required.  It had

to send the Fed monthly financial statements.  And it had to agree that it could not

borrow from the discount window.[55]  In other words, before the Federal Reserve

would permit TBAS to execute a Master Account Agreement – an agreement that

had for many years been pro forma for legally eligible, duly chartered depository

institutions – the bank had to agree to ongoing, extensive Federal Reserve

supervision, despite there being no legal or historical basis for such supervision.

81.    With TBAS, the Fed appears to claim a third exception to its previous

assertions that all depository institutions would receive access to its priced services

on equal terms.  That exception seems to be that depository institutions that are

chartered by American Samoa (and perhaps other government entities?) must

subject themselves to Fed supervision, whether they want to join the Federal

Reserve System or not.

---

[55] The legal scholar Julie Hill learned these limitations from interviews with TBAS officials.  See  Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 487-92.

32

G.     **The Federal Reserve Doubles Down on Its Claim of Discretion with Its 2022 Guidelines for Evaluating Account and Services Requests**

82.     No statute addresses the provision of Master Accounts.  While the Board recognized as early as 2004 that the Reserve Banks should adopt policy statements governing standards and processes for Master Accounts, only one Reserve Bank, the Federal Reserve Bank of New York, did so.[56]  The Board itself issued no guidance for Master Accounts until after the Plaintiff in this case sued.

83.     In August 2022, the Federal Reserve's Board of Governors adopted Guidelines for Evaluating Account and Service Requests.  The draft version of this guidance was published on May 5, 2021.  This "final guidance" was meant to clarify the process the Board of Governors has instructed the Reserve Banks to follow when the Banks (and Board) make decisions about access to priced services.[57]

84.     In this Guidance document, adopted well after the Fed was subject to multiple lawsuits regarding its authority in this space, the public learned for the first time of the Fed's newly adopted posture as a quasi-chartering authority.

---

[56] Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 467.

[57] Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099 (Aug. 15, 2022).

85.    In conjunction with lengthy assertions of the Fed's own discretion in approving what it regards as Master Account "applications," the Board also announced the factors it would weigh against legally eligible, duly chartered depository institutions that sought to execute a Master Account Agreement. Among other principles, the Board announced three that render it a quasi-chartering authority over the entire financial system.

86.    *First*, the Fed asserts that a legally eligible, duly chartered depository institution will face a searching evaluation in its attempt to execute a Master Account Agreement based on the Fed's own assessments of the "credit, operational, settlement, cyber, or other risks" to the Federal Reserve Banks, to the overall payment system, to the "stability of the US financial system" and to "the Federal Reserve's ability to implement monetary policy."[58]  The number of factors that could affect "other risks" to the "overall payment system" or undermine the "stability of the US financial system" or otherwise become adverse to the Fed's "ability to implement monetary policy" is so vast that there are few banking practices today that would not be subject to that analysis. In other words, by asserting this authority over master accounts (which are required for modern

---

[58] *Id.* at 51,099 – 51,100.

34

banking), the Fed has asserted that it is the primary (re)chartering authority for the entire US financial system.

87.    Relatedly, the Fed asserts that a legally eligible, duly-chartered depository institution will face a more challenging task in executing its Master Account Agreement if it engages "in novel activities for which authorities are still developing appropriate supervisory and regulatory frameworks."[59]

88.    There is no question that assessing the business practices of a proposed depository institution is an important determination for the appropriate governmental entity to make.  The problem with the Fed's assertion of this sweeping authority is that it is not that entity for the overwhelming number of legally eligible depository institutions in the United States.  It can only assess its supervisory and regulatory abilities for those entities for which it is the primary supervisor, namely, state-chartered members of the Federal Reserve System as well as bank and financial holding companies.  The determinations of harmful or helpful novelty has always been, historically, something for the chartering entity to determine.  In the dual banking system, this provides space for states to experiment as the so-called laboratories of democracy.  The Fed's contrary assertion

---

[59] *Id.* at 51,101.

eviscerates that historical model and places it in the position of evaluating every risk and every novelty everywhere in the financial system.

89.     It is also important to note some implications of the Fed's skepticism of novelty of new entrants into the banking system.  That posture puts a heavy thumb on the scale in favor of incumbent banks.  The Guidelines are specifically biased against innovators and novel financial institutions, decreasing the incentives for innovations for incumbents and new entrants alike.  The result if the Fed is permitted to persist in this practice is the stunted development of the US banking system.

90.     *Second*, the Board announced a "tiered" approach to evaluating these and other risks.  The most favored depository institutions to receive the least quasi-chartering scrutiny will be those "eligible institutions that are federally insured." Second are eligible depository institutions "that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency." By making this distinction, the Fed is actively discriminating against those legally eligible institutions that receive their charter from a state chartering authority and either do not seek deposit insurance at all or seek it from a state or private entity. The Fed labels the latter institutions third tier and will treat the chartering processes to which the states of the union (and its territories) as suspect, with risks to be reevaluated by the Fed in the way it chooses, with minimal disclosure.

91.     This tiered approach whereby the Fed explicitly favors depository institutions with *federal* deposit insurance or a *federal* prudential supervisory authority is as stunning a departure from the traditions of American banking as I can recall reading from an official document.  Nowhere in the statutes governing the Federal Reserve System or in the rich political history regarding the reach of the central bank's powers over the American financial system have I ever seen an assertion of power by the Fed to supplant completely the activities of state banking authorities.  There will be countless examples of depository institutions that do not have a primary federal supervisor, all of which chartered at the state level, many serving unique financial needs to their communities.  The Guidelines are a signal to, for example, state-chartered, state-insured credit unions that their entire business model is now under heavy federal scrutiny, despite the fact that these entities structured their affairs to stay closer to their own communities.

92.     All of the depository institutions considered in each of these tiers are legally eligible and duly chartered.  These are the depository institutions that the framers of the Monetary Control Act meant for the Fed to service on equitable terms to Fed member banks.  Now, suddenly, the Fed has determined that some of them will be more equal than others.

93.     *Third*, "[p]rovision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy."

37

Again, this wide-open prerogative of the Fed is the Board of Governor's alone to determine.[60]  Banking practices that expose the weaknesses of adopted monetary policy procedures – procedures not adopted by statute, but by practice – can subject those depository institutions to existential crisis if the Fed does not like that exposure.  If, for example, a banking practice creates incentives for institutions to take advantage of services through facilities that the Fed has designed poorly, rather than face the criticism for such poor design, the Fed can threaten to use its substantial authority over the payment system to protect itself in the pursuit of flawed monetary policy.  The Fed, in these circumstances, becomes judge and jury of itself.

94.    By placing itself in the position of evaluating all of these issues, the Fed has made access to its priced services – access that the framers of the Monetary Control Act intended to be open and to all depository institutions – a second chartering event.  The Fed will determine whether a depository institution can access the entire payment and financial services system.  In this way the Fed can determine whether any depository institution, anywhere, will live or die, succeed or fail, before having the chance to do so on its own merits.

---

[60] 12 U.S.C. § 248(k)

95.     With the adoption of these Guidelines in 2022, in direct departure from decades of practice, the Fed has decided that it has finally achieved a status that Congress considered and rejected for most of the Fed's 110 years: the Federal Reserve is now the supervising authority of the entire US banking system.

96.     The Fed's 2022 Guidance is the clearest signal I can name in the 160-year history of the dual banking system that an entity of the federal government has decided that state banking authorities do not have rights that require respect and deference.  It is an astonishing claim of authority, unprecedented in banking history.

## IV.    THE BOARD CONTROLS DECISIONS OVER MASTER ACCOUNT REQUESTS LIKE CUSTODIA'S THAT RAISE PUBLIC POLICY QUESTIONS

97.     The Federal Reserve Board of Governors makes key legal determinations for the Federal Reserve System, particularly when it comes to regulatory, supervisory, and financial policy matters (as opposed to monetary policy matters under statutory control of the Federal Open Market Committee). The Board is responsible for supervising the Federal Reserve System's twelve regional banks and for supervising and regulating Fed member banks, various holding companies, and other entities defined by law.   The Board has authority to

delegate some of its responsibilities.  But even then, the delegation is not complete: the Board is responsible for the ultimate outcomes of its policymaking authority.[61]

98.    Such policymaking authority includes the management of its priced services.  Although I have seen no evidence that the Board intervenes in run-of-the-mill requests for master accounts, the Board has intervened in two of the cases noted above.  As described more fully below, it is clear from the record, including most recently in the case of TBAS, that the chief decision-maker in these cases is the Board of Governors, not the individual Federal Reserve Banks.  The Board dictated the outcome of TNB's and TBAS's master account requests because each of those cases raised public policy questions.

99.    It is also clear from the administrative record in this case that the Board dictated the outcome of Custodia's request.

**A.    Previous Cases of Board Intervention in Master Account Requests**

*1.    The Narrow Bank*

100.    Discovery in this case has revealed that the Board has intimately involved in the denial of TNB's master account request.

---

[61] See 12 U.S.C. 248(k) (giving the Board the power "[t]o delegate, by published order or rule and subject to subchapter II of chapter 5, and chapter 7, of title 5, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to one or more administrative law judges, members or employees of the Board, or Federal Reserve banks.")

101.   In a 2018 letter to Counsel for TNB, the General Counsel of the New York Fed informed TNB "that senior policy officials at the Board of Governors have expressed the *strong view* that the New York Fed should not approve TNB's request for a master account."[62]

102.   The New York Fed's letter further explained that "there are substantial policy concerns regarding TNB's business model, whose sole purpose is to arbitrage the Federal Reserve's Interest on Excess Reserves ("IOER") rate."[63] The letter noted that TNB was "well aware" of such concerns "from its communications *with staff at the Board of Governors*."[64]

103.   Litigation documents from the TNB lawsuit further confirm the Board's involvement in TNB's master account request.  When the New York Fed filed its motion to dismiss, the Board of Governors filed an amicus brief in support of that motion.[65]  In that brief, the Board told the Court that it was "weighing the policy considerations implicated by TNB's business model."[66]

---

[62] TNB-0000002 (emphasis added).

[63] *Id.*

[64] *Id.* (emphasis added)

[65] Memorandum of Law of Amicus Curiae the Bd. of Governors of the Fed. Rsrv. in Support of Defendant the Fed. Rsrv. Bank of N.Y.'s Motion to Dismiss, TNB USA v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (2020)

[66] *Id.* at 15.

104.   As noted, TNB's request is still pending, six years later.

## 2.    *The Territorial Bank of American Samoa ("TBAS")*[67]

105.   When TBAS applied for a master account with the Federal Reserve Bank of San Francisco, the San Francisco Fed referred the case, apparently very quickly, to the Board of Governors in Washington DC.

106.   The request then stalled at the Board with plenty of questions about whether TBAS was suited to its chartering authority but no action on its request to become a full-fledged participant in the financial system.

107.   This changed in 2017 when Randal Quarles, a newly confirmed member of the Federal Reserve Board of Governors, helped push the request to completion.

108.   TBAS gained access to a Master Account, but the Board decided that it did not trust the government of American Samoa to adequately supervise TBAS. TBAS had to agree to a higher capital buffer than other banks that received a lower capital requirement.  It had to hold more reserves than regulations required.  It had to send the Fed monthly financial statements.  And it had to agree that it could not borrow from the discount window.  These ongoing conditions on TBAS mean that the Fed has an ongoing supervisory relationship with the bank.

---

[67] See Rob Blackwell, How Far Does American Samoa Have to Go to Get a Bank?, *American Banker*, July 31, 2017 and Rob Blackwell, American Samoa Finally Gets a Public Bank, *American Banker* (April 30, 2018).

109.  There is no statutory basis for these requirements.  The Board reached

them on its own.

**B.      The Board's Intervention in Custodia's Master Account Request**

110.     It is uncontroversial that Custodia, as the first bank to combine

traditional banking with crypto-assets, implicated matters of policy that the Board

felt essential to assess before deciding on Custodia's Master Account access.

Based on my review of the administrative record and documents produced by the

Kansas City Fed, I conclude that the Board did so on its own initiative and

assessment of its risks.

*1.    The Board Determined Whether Custodia Was Eligible for a
        Master Account*

111.   Throughout 2021, Custodia and its outside counsel had a series of

calls with Board staff regarding Custodia's eligibility for a master account.[68]

Notably, Custodia primarily conducted those calls with Board staff rather than with

Reserve Bank staff.[69]

112.   On August 2, 2021, the Kansas City Fed sent Custodia a letter stating

that "it would be inappropriate for [the Bank] to issue a decision" on Custodia's

master account request before the Board clarified its interpretation of Custodia's

---

[68] Cox Rpt. ¶ 38.

[69] *Id.*

"legal eligibility for a master account under the Federal Reserve Act."[70]  The

reference to Custodia's legal eligibility appears to be in reference to the same

statement that the Board's General Counsel had previously made to the same

effect.[71]

<h2>2.   The Board's public and private guidance asserts Board Dominance Over Master Account Access</h2>

113.   The Board's primacy in reaching conclusions about TNB, TBAS, and

Custodia is consistent with its own public and private guidance about Master

Account access.  This bears out in the present litigation.  On May 5, 2021, the

Board proposed Guidelines for Evaluating Account and Services Requested (the

"Guidelines").  While those guidelines were pending, the Kansas City Fed

informed Custodia that "it would be inappropriate to issue a decision" on

Custodia's master account request until those guidelines were finalized.[72]  The

Guidelines became final on August 15, 2022.

114.   In addition to the principles discussed about the Guidelines above,

they also show the Board's assertion over the process for granting Master Account

access.  The Guidelines were designed so "that the Reserve Banks [would] apply a

---

[70] FRB-AR-003858.

[71] FRBKC-00000234 ("As was recently conveyed to your counsel ... it has been determined that Avanti satisfies the threshold definition of an entity eligible to maintain a master account.").

[72] FRBKC-00003858

consistent set of guidelines when reviewing [] access requests to promote

consistency across Reserve Banks and to facilitate equitable treatment across

institutions."[73] The Board stated that the Guidelines were needed due to "a recent

uptick in novel charter types being authorized or considered by federal and state

banking authorities across the country.  As a result, the Reserve Banks are

receiving an increasing number of inquiries and access requests from institutions

that have obtained, or are considering obtaining, such novel charter types."[74]

115.   As explained above, the Board's articulation of these new principles

and risk assessments, as well as its categorization of state-supervised depository

institutions as second and third tier, is an extraordinary usurpation of chartering

authority that is not the Fed's to exercise.  What these Guidelines also demonstrate

is that the Board is in full command of that usurpation.

116.   Similarly and more concretely, on January 17, 2023, the Board

finalized and issued internal guidance letter, S-2677.[75]

117.   In S-2667, the Board sets forth a series of "Expectations":  "the Board

expects the Reserve Banks to (1) establish and maintain Federal Reserve System

---

[73]   Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099, 51106.

[74] *Id.* at 51,099.

[75] FRB-AR-000014.

(System) implementation procedures for the Guidelines, (2) participate in an access request information sharing forum, and (3) consult, as appropriate, with Board staff."[76]

118.   Expectations is a euphemism, however.  Consistent with its role as policymaker for the entire Federal Reserve System, the Board uses S-2667 to instruct the Reserve Banks on how they must perform in evaluating requests to access Master Accounts from beginning to end.  Under S-2667, Reserve Banks' implementation of the Guidelines mentioned above "should reflect the guidance provided by the Board in the Guidelines" and "must" be provided "to the director of the Division of Reserve Bank Operations and Payment Systems (RBOPS)" before they take effect.[77]  Such procedures "shall not take effect if the director of RBOPS (or director's designee), in consultation with the Board's general counsel (or the general counsel's designee), raises an objection within 10 business days of receipt."[78]

119.   The Board goes further.  Under S-2667, the "Reserve banks should consult with the other Reserve Banks and Board staff, as appropriate, via an

---

[76] FRB-AR-000014 at FRB-AR-000015.

[77] *Id.*

[78] *Id.*

information sharing forum to discuss administration of access requests, implementation of the Guidelines, and other related issues."[79]  The Board directed that the information sharing forum "should include members form all Reserve Banks and be open to Board staff liaisons."[80]

120.   Although the Board also included the proviso that it "recognizes the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act to grant or deny access requests or to take action on existing access relationships," the Board in fact made no room for that discretion: Master Account decisions required Board input.  The Board "expects the Reserve Banks to consult, as appropriate, with Board staff to provide insight into application of the Guidelines to requests and to further support consistency in decision-making across Reserve Banks."[81]

121.   In advocating for Reserve Bank discretion, the Board may have meant that the access to Master Accounts is usually an automatic exercise.  The Board instructs the Reserve Banks that "[m]ost requests for master accounts by U.S. branches and agencies of foreign banks (FBOs) are expected generally to be

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

47

routine, and accordingly Reserve Banks need not consult with the Board regarding such requests in most cases."[82]  When "account requests . . . present novel risks," however, the Board insists that "Reserve Banks should consult RBOPS."[83]  S-2667 also makes clear that eligibility for access should be determined "in consultation with Board Legal."[84]

122.   The Board goes further still on its instruction to Reserve Banks on how decisions on Master Account access must be made.  In brief, the decision is not the Reserve Banks to make.  S-2667 makes clear that "any Reserve Bank that is considering approval of  an access request from a higher risk entity, *including all Tier 2 or Tier 3 institution*s, should consult with the director of RBOPS on the results of its pre-decisional analysis under the Guidelines prior to communicating any decision to the institution."[85]  Relatedly "[a]ny Reserve Bank that is considering denying any access request, including an access request from an institution in Tier 1, should consult the director of RBOPS prior to communicating any decision to the requesting institution."[86]  The Board thus not only reinforces

---

[82] FRB-AR-000014 at FRB-AR-000016.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

the favoritism for federal institutions with federal insurance already found in the Guidelines. It also emphasizes that such favoritism is ultimately the responsibility of the Board of Governors.

123.   After the Reserve Banks contacts the Board, "the director of RBOPS will review, in coordination with other Board divisions (such as Legal, Monetary Affairs, Supervision and Regulation, and Financial Stability), as appropriate, the Reserve Bank's record documenting application of the Guidelines in evaluating the access request, including the risk level after implementation of the Reserve Bank's plans to mitigate any risks identified."[87]

124.   Remarkably, given S-2667's assertion that Reserve Banks retain the discretion to grant or deny access to Fed services, S-2667 directs the Reserve Banks to "confirm in writing to the director of RBOPS how [they have] addressed any concerns the RBOPS director has raised regarding" requests for services "[p]rior to granting an access request."[88]

125.   Finally "[a]ny Reserve Bank that is considering an involuntary termination of access should consult the director of RBOPS prior to communicating any decision to an institution."[89]

---

[87] *Id.*

[88] *Id.*

[89] FRB-AR-000014 at FRB-AR-000017.

126.   S-2667 is an unremarkable document in many respects.  It merely restates the uncontroversial view that the Board of Governors controls policymaking within the Federal Reserve System.  To the extent that Reserve Banks participate in that decision, they do so as subordinates.

127.   What is remarkable is that the Board somehow insists otherwise, that it is merely a consultative body available to Reserve Banks should they need extra resources.  S-2667 lays bare the conceit that this description of power dynamics within the Federal Reserve System is an argument meant to shield the Board from scrutiny and subvert careful systems of public accountability over a government agency.  Despite its careful wording, S-2667 leaves the reader with no doubt that the Board "expects" that it will dictate the results of access requests of interest.

### 3.   The Board Implemented Its Public and Internal Guidance when Denying Custodia's Master Account Request

128.   In this case, the Board not only insisted on "consulting" on Custodia's access request, the Board dictated the outcome of that request and the reasoning for the denial.  The Board also did so while attempting to obscure the fact of its involvement.

129.   The Board and the Kansas City Fed implemented S-2667's new review procedures when evaluating Custodia's master account.  "Pursuant to" the draft of S-2677, the Kansas City Fed "provid[ed] [its] pre-decisional draft

memorandum regarding potential actions on Custodia's request for a master

account" to Board staff on January 10, 2023.[90]

130.   Board staff reviewed the draft memo written by Reserve Bank staff

outlining the reasons for denying Custodia's request to gain access to a Master

Account for the Kansas City Fed.  This memo was meant for an internal audience.

The Board provided extensive feedback, including deleting and adding language to

the memo in tracked changes.[91]  One particularly notable edit is Board staff's

removal of a reference to "broad policy matters" and "risk mitigation strategies"

that were "being considered by the Federal Reserve Board" during the pendency of

Custodia's access request.[92]

131.   The Reserve Bank staff's final memo substantially incorporated the

Board's edits and comments.  More pointedly, the Reserve Bank only relayed the

Fed's decision on Custodia's Master Account access after Board staff blessed the

final recommendation by stating that they "have no concerns with the Reserve

Bank moving forward with its plan to communicate to Custodia Bank its decision

---

[90] FRB-AR-000335.

[91] FRB-AR-000315;000326.

[92] FRB-AR-000315 at FRB-AR-000323.  *See also* FRB-AR-000344.

to deny the request for a master account and access to services" that the Kansas City Fed proceeded to deny Custodia's master account request.[93]

132.   Through the Guidelines and S-2667, the Board formalized what had been an informal process previously – namely, the Board intervening in master account requests that raised public policy questions.  Custodia's request appears to fit the parameters of what the Board wanted to accomplish.  The task was not delegation to the Reserve Banks, but Board control of Master Account access.  The record in this case is replete with evidence of such intervention, and such intervention is consistent with recent Board practice.  Ultimately, it was the Board's decision to deny Custodia's master account request.

## V.   CONCLUSION

133.   For the reasons explained above, it is my opinion that the Fed's claim of discretion over master account requests is inconsistent with history, practice, legal context, and the public policies of the US government and of the Federal Reserve itself prior to 2015.

134.   It is also my opinion that the Board of Governor's exercises control over Master Account access when the Board deems such access relevant to its own assessment of public policy.

---

[93] FRB-AR-000002.

135.   I further conclude that the Board, consistent with past recent practice, exercised control over Custodia's efforts to gain access to a Master Account at the Federal Reserve Bank of Kansas City.

136.   Because discovery is ongoing and the Kansas City Reserve Bank has not completed its production of documents, I reserve the right to modify or supplement the opinions set forth in my report and the bases for those opinions.


DATE: _____            By:_____
                                        Dr. Peter Conti-Brown

# EXHIBIT 1

# Peter Conti-Brown

The Wharton School of the University of Pennsylvania • 3730 Walnut Street, Suite 600
Philadelphia, PA 19104 • petercb@wharton.upenn.edu • (215) 898-6516 (office) • U.S. Citizen

---

## ACADEMIC APPOINTMENTS

**The Wharton School of the University of Pennsylvania**, Department of Legal Studies and Business Ethics

*Class of 1965 Associate Professor of Financial Regulation* (with tenure)                    2021 – present

*Assistant Professor*                    2015 – 2021

Courses taught: Legal Studies 101; Securities Regulation; Other People's Money: The Law, Politics, and History of Financial Institutions; Responsibility in Business; The Regulation of Financial Institutions (University of Pennsylvania Law School

**Goethe University – Frankfurt**, House of Finance                    2021-2022

*Metzler Visiting Professorship*

Courses taught: Other People's Money: The Law, Politics, and History of Financial Institutions; Global Central Banking: The Institutional Context

**Columbia Law School**                    Fall 2020

*Pritzker-Pucker Family Visiting Assistant Professor of Law*

Course taught: Secured Transactions

## OTHER AFFILIATIONS

**Advisory Board Member,** *Federal Reserve Archival System for Economic Research (FRASER)*                    2021 – present

**Nonresident Fellow in Global Policy,** Visa Economic Empowerment Institute                    2021 – present

**Advisory Board Member,** *Twenty Acre Capital LP*                    2019 – present

**Member,** The Committee on Monetary and Financial Law of the International Law Association (MOCOMILA)                    2019 – present

**Nonresident Fellow,** Economic Studies, The Brookings Institution                    2019 – present

Affiliated with the Hutchins Center on Fiscal and Monetary Policy and the Center on Regulation and Markets

**Visiting Researcher,** International Monetary Fund, Research Department                    2019

September 2023

## E D U C A T I O N

**Princeton University**, Department of History, PhD                                            2017

**Stanford Law School**, J.D.                                                                 2010

**The City College of New York**, Department of Education, M.S.                                2007

**Harvard College**, A.B., *magna cum laude*, Phi Beta Kappa                                   2005

## O T H E R   E X P E R I E N C E

**Academic Fellow**, Rock Center for Corporate Governance, Stanford Law School        2010 – 2015
    In residence 2010-2011; nonresident, 2011-2015.

**Of Counsel**, Gupta Wessler PLLC, Washington, D.C.                                 2013 – 2016

**Law Clerk**, Judge Stephen F. Williams, U.S. Court of Appeals for the D.C. Circuit   2012 – 2013

**Law Clerk**, Judge Gerard E. Lynch, U.S. Court of Appeals for the Second Circuit    2011 – 2012

**English and ESL Teacher**, High School for Media & Communications, New York City Department
of Education                                                                        2005 – 2007

## P U B L I C A T I O N S
### Books

*The Federal Reserve: An American History,* under contract WW Norton

*The Banker's Thumb: A History of Bank Supervision in America* (with Sean Vanatta), under contract Princeton University Press

*The Law of Financial Institutions*, Aspen, 7th edition (2021) (with Richard Carnell, Jonathan Macey, Geoffrey Miller)

*Research Handbook on Central Banking,* Edward Elgar Publishing, 2018 (with Rosa M. Lastra)

*The Power and Independence of the Federal Reserve,* Princeton University Press (2016)

*When States Go Broke: Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University Press, 2012 (with David Skeel)

### Published and Forthcoming Articles and Essays

"Bankruptcy and the Macroeconomy: A New Approach for Governmental Reaction to Economic Crisis" (with David Skeel) (forthcoming *Yale Journal on Regulation*, March 2023)

"Banking on a Curve: How to Restore the Community Reinvestment Act," *Harvard Business Law Review*, forthcoming (with Brian Feinstein)

"Financial Crises and Legislation" *Journal of Financial Crises*, vol 4, issue 3, 2021 (with Michael Ohlrogge)

"The Federal Reserve System: Diversity and Governance, 1913-2019," *Journal on Financial Crises*, vol 4, issue 4, 2021 (with Kaleb Nygaard as first author)

"The Contingent Origins of Financial Legislation," *Washington University Law Review*, forthcoming 2021 (with Brian Feinstein)

"The Principled Leadership of Middle Management: Stephen F. Williams's Liberal Critique of *Marks*," 38 *Yale Journal on Regulation* 736 (2021).

"The Logic and Legitimacy of Supervision: Revisiting the Bank Holiday of 1933," 95 *Business History Review* 87 (2021) (with Sean Vanatta)

"Technocratic Pragmatism, Bureaucratic Expertise, and the Federal Reserve" 130 *Yale Law Journal* (2021) (with David Wishnick)

"Towards an Administrative Law of Central Banking," 38 *Yale Journal on Regulation* (2021) (with Yair Listokin and Nicholas Parrillo)

"Independence in Institutional Design: Gilson & Kraakman's Revolution, Postponed," 45 *Journal of Corporation Law* 865 (2020).

"Institutions: A Research Program for Law, Macroeconomics, and History," 83 *Law and Contemporary Problems* 157 (2020)

"Private Markets, Public Options, and the Payment System," 37 *Yale Journal on Regulation* 380 (2020) (with David Wishnick)

"The Foreign Affairs of the Federal Reserve," 44 *Journal on Corporation Law* 665 (2019) (with David Zaring)

"Ulysses and the Punch Bowl: The Governance, Accountability, and Independence of the Federal Reserve," 24 *George Mason Law Review* 617 (2017)

"The Institutions of Federal Reserve Independence," 32 *Yale Journal on Regulation* 257 (2015)

"Elective Shareholder Liability," 64 *Stanford Law Review* 409 (2012)

"Liability Holding Companies," 59 *UCLA Law Review* 852 (2012) (with Anat Admati and Paul Pfleiderer)

"Direct Democracy and State Fiscal Crises: The Problem of Too Much Law," 7 Duke Journal on Constitutional Law & Public Policy 43 (2012)

"Scarcity Amidst Wealth: The Law, Finance, and Culture of Elite University Endowments in Financial Crisis," 63 *Stanford Law Review* 669 (2011)

"A Proposed Fat-Tail Risk Metric: Disclosures, Derivatives, and the Measurement of Financial Risk," 87 Washington University Law Review 1461 (2010)

## Articles under Submission

"Risk, Discretion, and Bank Supervision," (with Sean Vanatta)

"Board Diversity Matters: An Empirical Assessment of Community Reinvestment at Federal Reserve-Regulated Banks" (with Brian Feinstein and Kaleb Nygaard)

## Book Chapters

"The Central Banking Century: An Introduction to Institutional Central Banking," in Conti-Brown and Lastra, eds., *Research Handbook on Central Banking*, Edward Elgar Publishing, 2018.

"Central Banking and Institutional Change in the United States: Punctuated Equilibrium in the Development of Money, Finance, and Banking," in Conti-Brown & Lastra, eds. *Research Handbook on Central Banking*, Edward Elgar Publishing, 2018

"Politics, Independence, and Retirees: Long-term Low Interest Rates at the U.S. Federal Reserve," *How Persistent Low Returns Will Shape Saving and Retirement*, edited by Robert Clark, Raimond Maurer, and Olivia Mitchell, Oxford University Press, 2018.

"Introduction: The Perennial Crisis Among the American States," in *When States Go Broke: Origins, Context, and Solutions for the American States in Fiscal Crisis* (Peter Conti-Brown and David Skeel eds., Cambridge University Press) (2012)

## Reports, Reviews, Op-eds and Other Materials

"This Bank Proposal Will Damage Our Economy and Make Voters Even More Resentful," *New York Times,* April 2023

"The Federal Reserve Cannot Investigate Itself," *The American Prospect*, April 2023

"It was the worst of times," *American Banker,* November 2021

"Focus on bank supervision, not just bank regulation," Brookings Institution, Series on Financial Markets and Regulation, November 2, 2021 (with Sean Vanatta)

"Where is the Fed's Vice Chair for Supervision?" Brookings Institution, Series on Financial Markets and Regulation, October 26, 2021

"What can an investment bank teach us about American power?" *American Banker*, September 6, 2021

"Where are the Biden financial regulations?" Brookings Institution, Series on Financial Markets and Regulation, August 17, 2021

"Rethinking the Power of Market Influencers," *American Banker*, July 29, 2021

"Diversity Within the Federal Reserve System," Brookings Institution, Series on Financial Markets and Regulation, April 13, 2021 (with Kaleb Nygaard)

"What's Next for the Treasury-Fed Covid-19 Lending Facilities?" Brookings Institution, Hutchins Center for Fiscal and Monetary Policy, November 24, 2020

"Twitter and the Federal Reserve: How the U.S. Central Bank Is (and Is Not) Surviving Social Media, Brookings Institution, Series on Financial Markets and Regulation, October 29, 2020

"Using the Federal Reserve's Discount Window for Debtor-in-Possession Financing During the Covid-19 Bankruptcy Crisis," Brookings Institution, Hutchins Center for Fiscal and Monetary Policy, July 29, 2020 (with David Skeel)

"Restoring the Promise of Federal Reserve Governance," *Mercatus Working Paper*, January 2020

"Review: Sven Beckert & Christine Desan, eds., *American Capitalism: New Histories*" 72 Economic History Review 1099 (2019).

"Review: William L. Silber, *The Story of Silver: How the White Metal Shaped America and the Modern World*," Business History Review (2019)

"Explaining the New Fed-Treasury Emergency Fund," *Brookings Institution, Center on Regulation and Markets*, April 3, 2020.

"The curse of confidential supervisory information," *Brookings Institution, Center on Regulation and Markets*, December 20, 2019

"How do you solve a problem like Fannie and Freddie? Not by creating more of them," *Brookings Institution, Center on Regulation and Markets*, October 7, 2019

"What happens if Trump tries to fire Fed chair Jerome Powell?" *Brookings Institution, Hutchins Center on Fiscal and Monetary Policy*, September 9, 2019

"Can fintech increase lending? How courts are undermining financial inclusion," *Brookings Institution, Center on Regulation and Markets*, April 16, 2019

"The Fed Wants To Veto State Banking Authorities. But Is That Legal?" *Brookings Institution Center on Regulation and Markets*, November 14, 2018

"Can Trump Fire Jerome Powell? It's a Political Question," *Wall Street Journal*, December 10, 2018

"John Williams may be one of the best central bankers—but that doesn't mean he should run the New York Fed," *Brookings Institution Center on Regulation and Markets*, July 24, 2018

"The Fed's Job Isn't To Make Trump Happy," *Wall Street Journal*, July 22, 2018

"Why the next big bank shouldn't be the USPS," *Brookings Institution Center on Regulation and Markets*, May 31, 2018

"The Quarles Quarrel Hurts the Fed," *Wall Street Journal*, April 23, 2018

"Too Many Empty Chairs at the Federal Reserve," *Wall Street Journal*, October 4, 2017

"The Economy's Visible Hands," *Wall Street Journal*, March 2, 2017

"The Most Powerful Man in Washington You've Never Heard Of," *Wall Street Journal*, February 15, 2017

"To Fix the Fed, Simplify It," *New York Times*, July 29, 2015

"The Twelve Federal Reserve Banks: Governance and Accountability in the 21st Century," *Hutchins Center on Fiscal and Monetary Policy at the Brookings Institution*, Working Paper (2015)

"Governing the Federal Reserve System after the Dodd-Frank Act," *Peterson Institute for International Economics Policy Paper* 13-25 (2013)

"Misreading Walter Bagehot: What *Lombard Street* Really Means for Central Banking," Essay on Walter Bagehot's *Lombard Street*, *The New Rambler*, December 14, 2015

"The Accidental History of the Federal Banking and Securities Laws: A Review of Michael Perino's *Hellhound of Wall Street: How Ferdinand Pecora's Investigation of the Great Crash Forever Changed American Finance*," 39 Securities Regulation Law Journal 45 (2011)


## HONORS, GRANTS, AND AWARDS

| | |
|---|---|
| **Wharton MBA Excellence in Teaching Award** | 2018-2023 |
| **Tanoto Fund Award** | 2020-2021 |
| **Cynthia and Bennett Golub Endowed Faculty Scholar Award** | 2018-2019 |
| **Wharton Undergraduate Excellence in Teaching Award** | 2017, 2018, 2019 |
| **Penn Undergraduate Research Mentoring Award** | 2016, 2017, 2019, 2020, 2022 |
| **Wharton Dean's Fund Research Award** | 2016, 2017, 2019 |
| **Institute for Political History**, Hugh Davis Graham Award | 2016 |
| **Council on Foreign Relations**, Stephen M. Kellen Term Member | 2015-2020 |


## SELECT PRESENTATIONS

Available on request


## OTHER AFFILIATIONS

*Law & Macroeconomics*, conference co-convenor and SSRN e-journal co-editor, with Adam Feibelman (Tulane), Anna Gelpern (Georgetown), Rosa Lastra (Queen Mary, University of London), and Yair Listokin (Yale)

*Professional Memberships*, Business History Conference

*Bar Memberships*, District of Columbia Bar (2014-present); New York State Bar (2011-2015)


## OTHER

**Languages**:   Fluent in Portuguese, proficient in Spanish and Capeverdean Creole, beginner French and German

**Personal**:   Married to Nikki Conti-Brown, with four children

5

# EXHIBIT 2

## MATERIALS RELIED UPON LIST

- Motion to Dismiss Memorandum, ECF No. 49
- Motion to Dismiss Memorandum, ECF No. 51
- Amici Brief in Opposition to Motion to Dismiss, ECF. No. 92
- Reply in Support of Motion to Dismiss, ECF No. 96
- Reply in Support of Motion to Dismiss, ECF No. 97
- Transcript of Motion Hearing Proceedings
- Amended Complaint, ECF. No. 121
- Motion Dismiss, ECF. No. 124
- Motion Dismiss, ECF. No. 127
- Memorandum in Opposition to Motion to Dismiss Amended Complaint, ECF. No. 135
- Brief of Amicus Curiae, ECF. No. 151
- Reply to Motion to Dismiss, ECF. No. 159
- Reply to Motion to Dismiss, ECF. No. 160
- Amended Amicus Curiae Brief, ECF. No. 163
- Answer to Amended Complaint with Affirmative Defenses, ECF No. 166
- Amended Scheduling Order, ECF. No. 169
- Federal Reserve Bank of Cleveland, 1980 Annual Report (1981) (Federal Reserve Bank Cleveland Research Department)
- Gary C. Zimmerman , *Economic Review: Money and the Monetary Control Act*, Fed. Rsrv. (Winter 1981)
- Gary C. Zimmerman, The Pricing of Federal Reserve Services Under the MCA, Econ. Rev., Winter 1981, at 22 (1981)
- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services, https://www.federalreserve.gov/paymentsystems/pfs_about.htm (Aug. 11, 2020)

- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services (Nov. 20, 2008) ("Policies: Principles for the Pricing of Federal Reserve Bank Services")
- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services (Nov. 20, 2008) ("Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks")
- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services –, (last updated Aug., 11, 2020) ("Policies: The Federal Reserve in the Payments System, Issued 1984; revised 1990 and January 2001)
- Fed. Rsrv. Bank of Chi., The Depository Institutions Deregulation and Monetary Control Act of 1980: Landmark financial legislation for the 80s, (n.d.)
- Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past 30 Years: An Overview*, New Eng. Rev. (2001)
- Anatoli Kuprianov, *Economic Review: The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Fed. Rsrv. Bank of Richmond (1985)
- Steve Marlin, *KeyCorp Moves to Single Fed Account*, BankTech.com (July 1998)
- Kaitlin Ugolik, *Cannabis Economy Lags Behind Legalization*, Institutional Inv. (Aug. 28, 2015)
- David Kelly, *Legal Pot Shops Are a High-risk Business to Banks*, L.A. Times (n.d.)
- Nathaniel Popper, *Fed Denies Credit Union For Cannabis*, N.Y. Times (July 31, 2015)
- Matt Richtel, *First Bank of Bud*, N.Y. Times (Feb. 8, 2015)
- Ellen Brown, *A Public Bank for Los Angeles*, LA Mag. (2018) (Issue 69)
- Michael S. Derby, *Lawsuit Against New York Fed Seen as a Policy Threat*, Wall St. J. (Sept. 27, 2018)
- Ellen Brown, *The Public Banking Revolution Is upon Us*, Dissident Voice: Pol. Sci. Blog (Apr. 19, 2019)
- *Can the Cowboy State Sell Crypto to the Fed?*, Euromoney (Feb. 25, 2022)
- Desi Volker, *The Paycheck Protection Program Liquidity Facility*, 28 Econ. Pol'y Rev. (2022)
- Andrew Akerman, *Kansas City Rescinds Master Account for Payment Firm, GOP Senator Says*, Wall St. J. (June 9, 2022)

- Dennis M. Gingold, *Fed Nominee Sarah Bloom Rasking Did Nothing Wrong; Former Chairman of Reserve Trust Company Writes to Clear the Air*, Wall St. J: Letter to the Editor (Feb. 15, 2022)
- Peter Rudegeair, Plaid *Co-Founder Takes Aim at Technology for Banking*, Wall St. J. (Apr. 22, 2022)
- Paul Kiernan, *Federal Reserve Finalizes Guidelines for Access to Its Payment Systems; Institutions Engaged in Novel Activities Would Undergo More extensive Review*, Wall St. J. (Aug. 15, 2022)
- *Monetary Control and the Membership Problem: Hearing on H.R. 13476, H.R. 13477, H.R. 12706 and H.R. 14072 Before the H. Comm. on Banking, Finance and Urban Affairs*, 95th Cong. (1978).
- H.R. Rep. No. 95-1590 (1978).
- S. 3485, 95th Cong. (1978) (Cong Senate Bill Priced Services).
- H.R. Rep. No. 96-263 (1979).
- H.R. Rep. No. 96-842 (1978) (Conf. Rep.).
- *Federal Reserve Requirements: Hearings on S. 353, S. 85 and H.R. 7 Before the H. Comm. on Banking, Housing, and Urban Affairs*, 96th Cong. (1980).
- Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980).
- H.R. 7, 96th Cong. (1979).
- 125 Cong. Rec. 16,619 (1979).
- 126 Cong. Rec. H2273 (daily ed. Mar. 27, 1980).
- 126 Cong. Rec. S3235 (daily ed. Mar. 28, 1980).
- *Monetary Policy Improvement Act of 1979: Hearings on S. 85 and S. 353 Before the S Comm. on Banking, Housing, and Urban Affairs*, 96th Cong. (1979).
- 125 Cong. Rec. H10260 (daily ed. Nov. 7, 1979).
- 125 Cong. Rec. S467 (daily ed. Jan. 18, 1979) (statement of Sen. Proxmire).
- 125 Cong. Rec. S14785 (daily ed. Sept. 7, 1978) (Statement of Sen. Proxmire).
- 126 Cong. Rec. S1178 (daily ed. Jan. 30, 1980) (Statement of Sen. Tower).
- Federal Reserve Bank of Dallas, Circular No. 97-104 (Nov. 12, 1997) (Standardized Operating Circulars 1-10, Federal Reserve Bank of Dallas, January 2, 1988).
- Allan Meltzer, A History of the Federal Reserve, volume 1 (2003)
- Bd. of Govs. of Fed. Rsrv. Sys., Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 15, 2022)

- Dan Awrey, *Unbundling Banking, Money, and Payments* (January 31, 2021). European Corporate Governance Institute - Law Working Paper No. 565/2021, Cornell Legal Studies Research Paper No. 21-11, Georgetown Law Journal, Forthcoming, Available at SSRN: https://ssrn.com/abstract=3776739 or http://dx.doi.org/10.2139/ssrn.3776739
- Elijah Brewer III, The Depository Institutions Deregulation and Monetary Control Act of 1980, Econ. Perspectives, Sept.-Oct. 1980
- Fred H. Miller, Robert G. Ballen, & Hal S. Scott, Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers, 39 Bus. Law. 1333, 1365 (1984)
- Gage et al, "The Financial Situation," North American Review, Feb 1908.
- Henry N. Butler and Jonathan R. Macey, Myth of Competition in the Dual Banking System, 73 CORNELL L. REV. 677 (1988)
- Johnathan Adler, MARIJUANA FEDERALISM: UNCLE SAM AND MARY JANE (2020)
- Julie Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments* Iowa Law Review, vol 109, draft July 17, 2023
- Julie Hill, *Opening a Federal Reserve Account*, Yale Journal on Regulation, vol 40, 2023
- Kenneth E. Scott, The Dual Banking System: A Model of Competition in Regulation, 30 STANFORD L. REV. 1 (1977)
- Lynn Elaine Browne, The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview, New Eng. Econ. Rev., Jan.-Feb. 2001
- Paul Warburg, *The Federal Reserve System - Its Origin and Growth, Reflections and Recollections*, Vol. 2, New York, The MacMillan Company, 1930, digitized for Fraser http://fraser.stlouisfed.org
- Peter Conti-Brown, The Fed Wants To Veto State Banking Authorities. But Is That Legal? Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd
- Peter Conti-Brown & Sean Vanatta, *Risk, Discretion, & Bank Supervision* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405074
- Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. No. 103-328, 108 Stat. 2338 (1994)
- Rob Blackwell, How Far Does American Samoa Have to Go to Get a Bank?, American Banker, July 31, 2017
- Rob Blackwell, American Samoa Finally Gets a Public Bank, American Banker (April 30, 2018)
- Roger Lowenstein, America's Bank: The Epic Struggle To Create the Federal Reserve (2015)

- Volcker Alliance, Reshaping the Financial Regulatory System, April 2015.
- Elizabeth F. Brown, Prior Proposals to Consolidate Federal Financial Regulators, The Volcker Alliance (2015)
- 12 U.S.C. § 248
- 12 U.S.C. § 342
- 46 Fed. Reg. 1338, 1338 (Jan 6, 1981)
- 87 Fed. Reg. at 51,099 – 51,100
- Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913)
- Hrg.Before the Committee on Banking, Housing, and Urban Affairs, United States Senate 96th Cong. (1980)
- Reporter's Transcript of Oral Argument in *The Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City,* Civil Action No. 15-cv-01633, ECF No. 45, dated January 4, 2016
- Complaint in *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, Civil Action No. 17-CV-02361, dated September 29, 2017
- Answer in *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, Civil Action No. 17-CV-02361, dated November 8, 2017
- Memorandum of Law of *Amicus Curiae* The Board of Governors of the Federal Reserve in Support of Defendant The Federal Reserve Bank of New York's Motion to Dismiss in *TNB USA Inc. v Federal Reserve Bank of New York,* Civil Action No. 1:18-cv-7978-ACL, ECF No. 45, dated February 6, 2020
- Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 154 F. Supp. 3d 1185, 1188 (D. Colo. 2016), vacated, 861 F.3d 1052 (10th Cir. 2017)
- Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 861 F.3d 1052 (10th Cir. 2017)
- The National Banks and the Duel Banking System (Comptroller of the Currency, September 2003)
- Federal Reserve Requirements, Hearings
- Letter from Esther L. George, President, Federal Reserve Bank of Kansas City, to Deirdra A. O'Gorman, CEO
- 1997, Federal Reserve Bank of San Francisco, pdf6, https://www.frbsf.org/wp-content/uploads/1997_annual_report.pdf
- 1997, Board of Governors Annual Report, p248, https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1997-2457
- Board of Governors, p257, https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1996-2460

- Federal Reserve Bank of Dallas. New Bulletin 11, Circular No. 81-155. July 30, 1981. https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/new-bulletin-11-541337
- Federal Reserve Bank of San Francisco "Federal Reserve Notes." July 1981, https://fraser.stlouisfed.org/title/federal-reserve-notes-5186/july-1981-527563
- 2010, Board of Governors Annual Report, p153, https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/2010-2468
- Federal Reserve Bank of Philadelphia. Annual Report. 2010. P7, https://fraser.stlouisfed.org/title/annual-report-federal-reserve-bank-philadelphia-469/navigating-change-579775

- Documents Produced by the Federal Reserve Bank of Kansas City, including: FRBKC-00000054; FRBKC-00000234; FRBKC-00000254; FRBKC-00000266; FRBKC-00000276; FRBKC-00000297; FRBKC-00000313; FRBKC-00000314; FRBKC-00000319; FRBKC-00000328; FRBKC-00000387; FRBKC-00000390; FRBKC-00000394; FRBKC-00000397; FRBKC-00000437; FRBKC-00000446; FRBKC-00000460; FRBKC-00000465; FRBKC-00000480; FRBKC-00000488; FRBKC-00000513; FRBKC-00000565; FRBKC-00000626; FRBKC-00000667; FRBKC-00001586; FRBKC-00001601; FRBKC-00001668; FRBKC-00001715; FRBKC-00001908; FRBKC-00001961; FRBKC-00002132; FRBKC-00002133; FRBKC-00002169; FRBKC-00002172; FRBKC-00002183; FRBKC-00002200; FRBKC-00002366; FRBKC-00002407; FRBKC-00002424; FRBKC-00002514; FRBKC-00002560; FRBKC-00002573; FRBKC-00002695; FRBKC-00002728; FRBKC-0000297; FRBKC-00003309; FRBKC-00003331; FRBKC-00003348; FRBKC-00003379; FRBKC-00003421; FRBKC-00003424; FRBKC-00003426; FRBKC-00003428; FRBKC-00003432; FRBKC-00003561; FRBKC-00003592; FRBKC-00003607; FRBKC-00003671; FRBKC-00003695; FRBKC-00003950; FRBKC-00004229; FRBKC-00004256; FRBKC-00004282; FRBKC-00004620; FRBKC-00004638; FRBKC-00004647; FRBKC-00004677; FRBKC-00004710; FRBKC-00004768; FRBKC-00004808; FRBKC-00004836; FRBKC-00004899; FRBKC-00004902; FRBKC-00004904; FRBKC-00004916; FRBKC-00004943; FRBKC-00004977; FRBKC-00004983; FRBKC-00005021; FRBKC-00005060; FRBKC-00005156; FRBKC-00005172; FRBKC-00005232; FRBKC-00005243; FRBKC-00005245; FRBKC-00005326; FRBKC-00005333;

FRBKC-00009364; FRBKC-00009369; FRBKC-00009384; FRBKC-00009385; FRBKC-00009848; FRBKC-00009854; FRBKC-00013627; FRBKC-0009385; FRBKC-00014860

- Documents Produced by the Board of Governors of the Federal Reserve System, including: FRB-AR-000001; FRB-AR-000002; FRB-AR-000003; FRB-AR-000004; FRB-AR-000014; FRB-AR-000068; FRB-AR-000153; FRB-AR-000154; FRB-AR-000162; FRB-AR-000163; FRB-AR-000191; FRB-AR-000201; FRB-AR-000204; FRB-AR-000216; FRB-AR-000222; FRB-AR-000227; FRB-AR-000233; FRB-AR-000245; FRB-AR-000247; FRB-AR-000250; FRB-AR-000298; FRB-AR-000306; FRB-AR-000308; FRB-AR-000313; FRB-AR-000315; FRB-AR-000323; FRB-AR-000324; FRB-AR-000326; FRB-AR-000333; FRB-AR-000334; FRB-AR-000335; FRB-AR-000336; FRB-AR-000345; FRB-AR-000356; FRB-AR-000359; FRB-AR-000362; FRB-AR-000461; FRB-AR-000549; FRB-AR-000561; FRB-AR-000589; FRB-AR-000629; FRB-AR-000634; FRB-AR-000638; FRB-AR-000679; FRB-AR-000740; FRB-AR-000920; FRB-AR-000950; FRB-AR-000956; FRB-AR-000964; FRB-AR-000986; FRB-AR-000991; FRB-AR-001145; FRB-AR-001191; FRB-AR-001202; FRB-AR-001204; FRB-AR-001210; FRB-AR-001211; FRB-AR-001318; FRB-AR-001323; FRB-AR-001400; FRB-AR-001409; FRB-AR-001533; FRB-AR-001593; FRB-AR-001599; FRB-AR-001607; FRB-AR-001673; FRB-AR-001690; FRB-AR-001696; FRB-AR-001754; FRB-AR-001806; FRB-AR-001810; FRB-AR-001835; FRB-AR-001853; FRB-AR-001857; FRB-AR-001859; FRB-AR-001862; FRB-AR-001865; FRB-AR-001872; FRB-AR-001874; FRB-AR-001898; FRB-AR-001983; FRB-AR-002188; FRB-AR-002238; FRB-AR-002240; FRB-AR-002248; FRB-AR-002264; FRB-AR-002273; FRB-AR-002414; FRB-AR-002415; FRB-AR-002433; FRB-AR-002446; FRB-AR-002448; FRB-AR-002471; FRB-AR-00250; FRB-AR-002508; FRB-AR-002671; FRB-AR-002689l FRB-AR-002695; FRB-AR-002709; FRB-AR-002729; FRB-AR-002758; FRB-AR-002767; FRB-AR-002909; FRB-AR-002947; FRB-AR-002972; FRB-AR-002974; FRB-AR-002976; FRB-AR-002979; FRB-AR-002989; FRB-AR-002991; FRB-AR-002993; FRB-AR-003072; FRB-AR-003079; FRB-AR-003083; FRB-AR-003088; FRB-AR-003233; FRB-AR-003259; FRB-AR-003269; FRB-AR-003276; FRB-AR-003282; FRB-AR-003337; FRB-AR-003772; FRB-AR-003793; FRB-AR-003858; FRB-AR-003860; FRB-AR-003863; FRB-AR-003917; FRB-AR-003939; FRB-AR-003981; FRB-AR-003994; FRB-AR-003997; FRB-AR-004014; FRB-AR-004026; FRB-AR-004110; FRB-AR-004113; FRB-AR-004116; FRB-AR-004126; FRB-AR-004129; FRB-AR-004134; FRB-AR-004138; FRB-AR-004142; FRB-AR-004144; FRB-AR-004178;

FRB-AR-004195; FRB-AR-004199; FRB-AR-004214; FRB-AR-004225; FRB-AR-004353; FRB-AR-004369; FRB-AR-004381; FRB-AR-004383; FRB-AR-004385; FRB-AR-004412; FRB-AR-004452; FRB-AR-004549; FRB-AR-004558; FRB-AR-004585; FRB-AR-004588; FRB-AR-004593; FRB-AR-004594; FRB-AR-004605; FRB-AR-004617; FRB-AR-004619; FRB-AR-004783; FRB-AR-004786; FRB-AR-004796; FRB-AR-004805; FRB-AR-004807; FRB-AR-004808

- Documents Produced by The Narrow Bank: TNB-0000001-9