# EXHIBIT 2

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF WYOMING

2
      -------------------------------:
3  CUSTODIA BANK, INC.,              :
                                     :
4                 Plaintiff,         :
                                     : Case No.
5          vs.                       : 1:22-cv-00125-SWS
                                     :
6  FEDERAL RESERVE BOARD OF          :
   GOVERNORS and FEDERAL RESERVE     :
7  BANK OF KANSAS CITY,              :
                                     :
8                 Defendants.        :
      -------------------------------:
9
10            CONFIDENTIAL DEPOSITION OF
11             PETER CONTI-BROWN, PH.D.
12
13  DATE:           Thursday, December 14, 2023
14  TIME:           8:09 a.m.
15  LOCATION:       King & Spalding, LLP
                    1700 Pennsylvania Avenue, N.W.
16                  Washington, D.C. 20006
17
18  REPORTED BY:    Erick M. Thacker
                    Reporter, Notary
19
20
21            Veritext Legal Solutions
           1250 Eye Street, NW, Suite 901
22            Washington, D.C. 20005

Page 29

1          Q     Irrespective of which state's issuing

2     the charter?

3          A     That's right.

4          Q     And even irrespective of whether it's a

5     territory issuing the charter, correct?

6          A     I understand in the banking laws that

7     state is defined to include the District of

8     Columbia and the territories of the United

9     States.

10         Q     Okay.  And this access would be

11    irrespective of whether the state-chartered

12    depository institution has insurance, right?

13         A     There I would say whether it has

14    eligibility to apply for insurance, but

15    irrespective of whether that insurance has been

16    received.

17         Q     Okay.  And the access would be

18    available -- the Fed's priced services would be

19    available irrespective of whether the institution

20    presented risk to the federal payment system?

21         A     The -- I'm trying to think through that

22    question as it relates to my answer earlier about

Page 30

1     the discount window.  Certainly, it is the case,

2     as we have seen recently in the spring of 2023,

3     that the Federal Reserve has cut off insolvent

4     institutions from access to its services, and I

5     don't express the opinion that they have done so

6     inconsistent with the intentions of the framers

7     of the MCA when they acted in that way.

8          So if that -- if we take your question

9     about risk to include situations where a legally

10    eligible depository institution has become

11    insolvent, then I would think that risk is

12    relevant to -- to that question.

13         To the extent that it is giving the Fed

14    discretion to block legally eligible depository

15    institutions, then I would say that that -- that

16    that discretion was not -- is inconsistent with

17    the intentions of the framers of the MCA.

18         Q    So your bottom line is that a

19    state-chartered depository institution that's

20    legally eligible can get access to the Fed's

21    priced services even if doing so presents risk to

22    the payment system?

Page 31

1     A     That is my opinion, yes.

2     Q     Okay.  And is it also your opinion that

3 a legally eligible, state-chartered depository

4 institution can get access to Fed services even

5 if doing so would hinder the Fed's ability to

6 implement monetary policy?

7     A     That is my opinion, yes.

8     Q     And it's your opinion that that was

9 what was intended by Congress in 1980?

10    A     Yes.  Now, there are -- there were

11 discussions in -- in the late fall of 1979 and

12 winter of 1980 that preceded the passage of the

13 MCA that were focused on the ways that the regime

14 that preceded the MCA had complicated efforts for

15 monetary policy.  That explains the motivation

16 for the equalization treatment that the MCA

17 framers intended, but the MCA discussion did not

18 include discussion of prospective alteration of

19 that authority by the Federal Reserve

20 unilaterally to assist future changes in monetary

21 policy.  That was a long answer to your question.

22          So the short answer is, I -- it is my

Page 32

1    opinion that the Federal Reserve does not have

2    the discretion to both define its monetary policy

3    space and then to exclude legally eligible,

4    state-chartered depository institutions from its

5    priced services in service of that monetary

6    policy space.

7         Q    And do you understand that what -- what

8    Congress intended to accomplish in the Monetary

9    Control Act is -- is a legal dispute in this

10   case?

11        A    No.

12             MR. SCARBOROUGH:  Objection to form.

13             THE WITNESS:  I don't understand that,

14   no.

15   BY MR. MICHAELSON

16        Q    Okay.  You -- you're a lawyer, right?

17   You went to law school?

18        A    I did go to law school, yes.

19        Q    And you -- you clerked for a judge,

20   two, correct?

21        A    For two judges, yes.

22        Q    For two judges.  So how -- how do

CONFIDENTIAL

Page 33

1    courts go about interpreting statutes?

2              MR. SCARBOROUGH:  Objection.

3              THE WITNESS:  I don't know how -- you

4    know, this is the subject of great scholarly

5    debate, how they do, how they should.  Courts are

6    different in different ways.

7              I'm not offering -- the reason I

8    don't -- I didn't agree with your earlier

9    question is that I -- I offer my expertise here

10   as a historian of banking, and I'm not offering

11   an opinion on the legal interpretation of the

12   statute.  And so the intentions of the statutory

13   framers, while maybe useful to the Court in terms

14   of interpreting specific provisions, my -- of

15   the -- of the statute, that I would regard as a

16   legal dispute.

17             What I'm offering is a perspective on

18   the Fed's history from 1913 to 1980, how members

19   of Congress and others understood the changes

20   that occurred in 1980, and then how the Federal

21   Reserve understood and implemented those changes

22   from 1980 to 2015, and then, finally, how it

CONFIDENTIAL

Page 70

1    talking about here is from 1985, but what the

2    Federal Reserve would do here is block a

3    transaction that would represent a negative

4    balance or impose a negative balance on an

5    account holder.

6              I am not aware of the Federal Reserve

7    cutting off access to a master account on the

8    basis of an overdrawn account.  I saw only

9    evidence of blocking individual transactions.

10   BY MR. MICHAELSON

11        Q    Okay.  But if -- if an institution --

12   if every transaction would put that institution

13   into a negative balance, then the Fed could block

14   every transaction, right?

15        A    I -- again, I'm not speaking on what

16   the Fed could or can't do legally.  I'm

17   commenting on what it did do, and I don't -- I

18   did not see an instance where a master account

19   holder repeatedly tried to overdraw an account.

20   I didn't see that at all.

21        Q    Well, but you wouldn't have visibility

22   into that, right?

CONFIDENTIAL

Page 71

```
 1        A    I would -- I did not have visibility.

 2   I might have if -- I read through all of the

 3   newspaper coverage of -- during the period, so if

 4   it became a question of -- of press reports,

 5   which bank failures and incursions with

 6   regulators often do, that would have shown up.

 7   But I didn't -- I don't -- I didn't have access

 8   to any of that private information.

 9        Q    Okay.  Let's -- let's actually --

10   you've never worked for the Federal Reserve,

11   correct?

12        A    That's right.

13        Q    Never worked for the Board of

14   Governors, correct?

15        A    That's right.

16        Q    Never worked for a Reserve Bank?

17        A    That's right.

18        Q    Never worked for the FOMC?

19        A    That's right.

20        Q    You did obtain through this case access

21   to some internal Federal Reserve materials that

22   were subject to discovery in this case, correct?
```

CONFIDENTIAL

Page 72

1        A      That's right.

2        Q      So -- but aside from the discovery in

3    this case that you received, is your opinion

4    based on solely public information?

5        A      Public information meaning available,

6    like on a Google search kind of thing?

7        Q      Well, just information that's -- that's

8    not confidential to the Federal Reserve System.

9        A      Sure.  Yes.  In that sense, yes --

10       Q      Okay.

11       A      -- based on public information.

12       Q      So there's no -- no internal

13   confidential Federal Reserve documents or

14   information that's informing your opinion other

15   than what you received in discovery in this case?

16       A      Except that which has been disclosed

17   via FOIA or archival research or something like

18   that, but nothing -- no internal confidential

19   documents other than so described.

20       Q      Okay.  So I'd like to refer you to

21   paragraph 9 of your report.  And you write,

22   "First, I conclude that the Board's claim of

Page 104

1        A    That's right.

2        Q    But it's also your opinion that from

3   1980 to 2015, the Federal Reserve asserted the

4   authority to terminate a master account holder's

5   access to services?

6        A    That's right.

7        Q    Okay.  Let's go to page -- paragraph --

8   well, paragraph 42 is -- this is legislative

9   history concerning passage of the Monetary

10  Control Act?

11       A    This is the testimony of fed chair --

12  then Fed Chair Paul Volcker discussing his view

13  on the proposed change of law, which he

14  supported.

15       Q    And paragraph -- it sets the

16  legislative history of the Monetary Control Act,

17  correct?

18       A    Yes.  So I would regard that to be as

19  part of the legislative history, yes.

20       Q    And paragraph 43 also contains

21  legislative history on the Monetary Control Act?

22       A    That's right, testimony of one of the

Page 105

1    bill's sponsors.

2         Q    Okay.  And you -- you'd agree that the

3    presentation of legislative history on the

4    Monetary Control Act reflected in your opinion is

5    not complete, correct?

6              MR. SCARBOROUGH:  Objection.

7              THE WITNESS:  Can you define for me

8    what a complete legislative history would be?

9    BY MR. MICHAELSON

10        Q    Well, isn't it the case that part of

11   the legislative history of the Monetary Control

12   Act reflects a concern among Congress that the

13   percentage of banks or Fed members was declining?

14        A    That was the concern of some members of

15   Congress, no question.

16        Q    All right.  Federal membership was

17   declining, correct?

18        A    That's right.

19        Q    And that was a concern for banking

20   regulators, correct?

21        A    For -- the decline in Fed membership

22   rates was a concern for some bank regulators, not

CONFIDENTIAL

Page 106

1   all.

2        Q    And what was the concern?

3        A    The concern here was that in the fall

4   of 1979, the Federal Open Market Committee

5   launched a wholesale reorientation of its

6   monetary policy regime that required more

7   varieties of -- of efforts to control monetary

8   policy.  And Paul Volcker's concern and the

9   concern of some others that the Federal Reserve,

10  although not a concern shared by all, was that

11  the ability to manage this new monetary policy

12  system was limited by the decline in Fed

13  membership.

14       Q    And so -- so fair to say that

15  Volcker's -- well, Volcker's concern was that

16  declining Fed membership could impair the Federal

17  Reserve's ability to implement monetary policy?

18       A    That's right.

19       Q    And so one purpose of the Monetary

20  Control Act was to reinforce the Federal

21  Reserve's ability to implement monetary policy?

22       A    That's right.

CONFIDENTIAL

Page 107

1       Q    And one way that it did that is by

2   empowering the Federal Reserve to impose reserve

3   requirements on depository institutions, correct?

4       A    That's right.

5       Q    Including state-chartered nonmember

6   depository institutions, correct?

7       A    That's right.

8       Q    In that sense, the Monetary Control Act

9   increased the Federal Reserve's authority over

10  the banking system?

11      A    That's right.

12      Q    Okay.  And that's not reflected here in

13  paragraphs 42 and 43 of your report, correct?

14      A    That's right.

15      Q    Okay.  Let's -- let's go to -- well,

16  sticking with paragraph 45 here, you write --

17  it's on the top of page 18 -- that no provision

18  of the Monetary Control Act exempts a particular

19  Federal Reserve payment service or indicates that

20  providing payment services would be a

21  discretionary matter with the Federal Reserve?

22      A    Not that I saw either in -- either in

CONFIDENTIAL

Page 108

1    any of the bills or in the ultimate statute that

2    they produced.

3        Q    So referring to Exhibit 300, which

4    is -- which is 248a, under (c), subsection

5    (c)(2), there's a clause -- I'll direct your

6    attention to the clause at the end of (c)(2),

7    which says, "except that nonmembers shall be

8    subject to any other terms, including a

9    requirement of balances sufficient for clearing

10   purposes that the Board may determine are

11   applicable to member banks."

12            Do you see that?

13       A    I do.

14       Q    Doesn't that section give the Federal

15   Reserve discretionary authority over access to

16   services?

17            MR. SCARBOROUGH:  Objection to form.

18            THE WITNESS:  No.

19   BY MR. MICHAELSON

20       Q    What -- what does that clause refer to,

21   then?

22       A    So, again, recognizing that I'm, in my

Page 112

1          A     Okay.  I see paragraph 59.

2          Q     You write that so far as you've been

3     able to discern, none of the above was

4     controversial.  I'll just refer you to the last

5     sentence of paragraph 59.

6               You write, "I have found no evidence

7     that during the period from 1980 to approximately

8     2015, was the Federal Reserve asserting the power

9     to decide whether to grant priced services to

10    legally eligible depository institutions."

11              Do you see that?

12         A     I do.

13         Q     Did you look for evidence of this?

14         A     I did.

15         Q     What did you do?

16         A     I looked through every annual report of

17    the Fed's Board of Governors.  I looked at the

18    annual reports of many of the 12 Federal Reserve

19    Banks.  I looked through official publications of

20    the Federal Reserve that mentioned the Monetary

21    Control Act, Federal Reserve accounts and the

22    after 1998 master accounts.

CONFIDENTIAL

Page 113

1          I looked through the news sources from

2    over 140 databases available through ProQuest for

3    every reference to the Monetary Control Act that

4    I could find in historical newspapers and the

5    other things described in my report.

6          Q    Did you do all that yourself?

7          A    I did with the assistance of the

8    lawyers representing Custodia Bank who responded

9    to some of my research inquiries as I've made

10   them.

11         Q    So I want to be careful not to invade a

12   privilege here, but I think to the extent you

13   instructed the lawyers to do something, I'm

14   entitled to ask.

15             What did you instruct the lawyers to do

16   to assist you in that work?

17         A    I would make requests, but I'm going to

18   defer to them on privilege.

19             It's okay to answer?

20             MR. SCARBOROUGH:  That's fine.

21             THE WITNESS:  I would make requests to

22   the attorneys at Williams & Connolly to help me

Page 114

1   identify the comprehensive bodies of documents

2   relevant, both historically and public documents,

3   and then also, as relevant, anything produced in

4   discovery in this litigation.

5          The ProQuest searches I performed

6   myself.  The investigations of the annual

7   reports, I performed myself.

8          I did use one of my research

9   assistants, though I did not discuss either that

10  this was relevant to an expert report nor the

11  expert report itself with my research assistant,

12  who helped me look through the annual reports of

13  the Federal Reserve.

14  BY MR. MICHAELSON

15      Q    And what comprehensive research did you

16  ask Williams & Connolly to do?

17      A    I asked them to give me every hearing

18  and public statement from every committee and

19  member of Congress that had been issued in and

20  around the passage of the Monetary Control Act,

21  not including its predecessor bills in the late

22  1970s.

Page 115

1          I asked for information regarding the

2     flow of information in this litigation between

3     the Federal Reserve Bank of Kansas City and the

4     Board of Governors of the Federal Reserve System

5     with respect to the decision on Custodia, and

6     then, as other related inquiries, when I would

7     find a subsidiary question on which my opinion

8     were necessary to ensure that I had the relevant

9     documentary evidence in support to reach a

10    conclusion in that regard.

11         Q    Did -- did you ask them to look for

12    instances of the Federal Reserve asserting

13    discretion over access to services from 1980 to

14    2015?

15         A    Yes.

16         Q    And what did they find?

17         A    They, like I -- we operated in parallel

18    on that -- on that question -- did not find those

19    assertions of discretion for access to services.

20         Q    And are you -- do you include there the

21    Federal Reserve's assertion of power to terminate

22    access to services?

Page 117

1    a particular service between 1980 and 2015?

2         A    For solvent institutions --

3         Q    For solvent institutions.

4         A    -- that did not fail?  Again, the

5    instance of the -- the hijacked Central Bank of

6    Bangladesh instance, which would have been a

7    master account holder with a transaction that was

8    blocked, so that would be an example.  That may

9    have been after 2015, though.  I can't -- I can't

10   recall.

11        Q    And how about not an actual assertion

12   of this power, but a -- but a claim to this

13   power?  And that I mean the power to terminate

14   access to a service for a solvent institution.

15        A    I have not seen that claim, and I did

16   not see that claim until 2015, in the instance of

17   the Fourth Corner Credit Union.

18             MR. MICHAELSON:  Okay.  Let's look

19   at -- we'll just do one more document before we

20   break here.  Mark this as Exhibit 301, I guess.

21             (Deposition Exhibit Number 301 was

22             marked for identification.)

Page 118

1    BY MR. MICHAELSON

2        Q    So I put in front of you a document

3    marked Exhibit 301, which is a document from the

4    Federal Reserve Bank of Dallas, and it attaches,

5    beginning the fourth page, a publication from the

6    Federal Register.

7            Do you see that?

8        A    I do see that.

9        Q    And this is Federal Register, Volume

10   50, No. 99, page 21120, titled "Policy Statement

11   Regarding Risks on Large Dollar Wire Transfer

12   Systems."

13           Do you see that?

14       A    I do.

15       Q    This is a policy that is set with an

16   effective date in 1986.

17           Do you see that?

18       A    I do.

19       Q    Okay.  And, actually, the Fed Register

20   notice is at the top of the page.  It's May 22nd,

21   1985.  Do you see this?  Do you see that?

22       A    Where are you --

CONFIDENTIAL

1      Q     Just at the top of the page.

2      A     Oh, yeah.  I see it.  Yeah.

3      Q     Okay.  Is -- earlier you referred to a

4  policy statement from around this time period

5  regarding money transfers.

6            Is this the policy that you were

7  referring to?

8      A     It is.

9      Q     Okay.  So you're familiar with this

10 policy?

11     A     I am.

12     Q     You've seen it before?

13     A     I have.

14     Q     And it's -- and it's public?

15     A     It is.

16     Q     What -- what is daylight -- what are

17 daylight overdrafts?

18     A     I'm not exactly sure of the precise

19 definition.  My general sense is that an

20 overdraft that occurs in the same day with

21 additional transactions being ordered on that

22 same account during that same day, but I'm not

Page 120

1    certain that that's true.

2         Q    Okay.  I'll refer you to page 21123.

3    In the bottom -- bottom right-hand corner, this

4    provides, "The Board is still concerned with

5    these overdrafts, and believes that it is

6    appropriate to take effective steps to control

7    risks to the Federal Reserve Banks by placing

8    more effective limits on Fedwire daylight

9    overdrafts."

10             Do you see that?

11        A    I do.

12        Q    Okay.  And do you agree that -- that

13   this -- this policy is -- was public at the time?

14        A    Yes.

15        Q    And it reflects an assertion of Federal

16   Reserve authority to impose conditions and

17   restrictions on access to priced services?

18             MR. SCARBOROUGH:  Objection to form.

19             THE WITNESS:  Again, I would say that I

20   see the word "conditions" and "regulations" as

21   performing very different purposes for the Fed's

22   assertions of authority.  I hear this as creating

Page 136

1    intend for the Federal Reserve to usurp the

2    determination from other supervisory authorities

3    that had been given that authority in other

4    statutes.

5    BY MR. MICHAELSON

6        Q    But as you've said, Congress -- it was

7    not Congress's intent to eliminate entirely the

8    Federal Reserve System to -- the Federal

9    Reserve's power to conduct risk assessments of

10   institutions with master accounts, correct?

11       A    Can you point to me when -- to when I

12   said that sentence?  I don't -- I don't believe I

13   said it that way.

14            The way I would say it is that Congress

15   did not prevent -- again, without getting to the

16   legal determination, the framers of the MCA did

17   not engage substantially with the question of the

18   Fed's risk assessments around its priced

19   services.  And, again, I can't recall any

20   instances of that discussion.

21       Q    And at least we've seen here in Exhibit

22   301 that as of 1985, the Federal Reserve was

Page 137

1    claiming the power to conduct such risk

2    assessments, correct?

3                MR. SCARBOROUGH:  Objection.

4                THE WITNESS:  The -- I read Exhibit 301

5    to contain a regulation regarding what the Fed

6    shall do in the event of daylight overdrafts and

7    what to do to manage the question of daylight

8    overdrafts.

9    BY MR. MICHAELSON

10       Q    Okay.  And to prohibit the use of

11   Fedwire where an institution's use of Fedwire

12   would prevent risk to the Reserve Bank?

13               MR. SCARBOROUGH:  Objection.

14               THE WITNESS:  Again, just reading from

15   it, I would say that the 1985 policy statement

16   has a regulation that asserts the Reserve Bank's

17   right to protect its risk exposure from those --

18   those banks.

19   BY MR. MICHAELSON

20       Q    Okay.  I'm handing you a document

21   marked Exhibit 302, which is Operating Circular 1

22   from 1998.

CONFIDENTIAL

Page 138

1              Are you familiar with OC1?

2       A     I am.

3       Q     And have you seen -- this is from 1998.

4              Have you seen this version before?

5       A     I have.

6       Q     And this was public, right?

7       A     It -- it is.

8       Q     Okay.  I'd direct your attention to

9    Section 1.1, called "Scope."

10             Third paragraph, it says, "Your master

11   account is subject to Federal Reserve policies

12   such as those on payment system risk, reserve

13   balances and clearing balances as they may be

14   revised from time to time."

15             Do you see that?

16      A     I do.

17      Q     And this is a reference to policies

18   like the statement on large dollar wire transfers

19   that we were just looking at?

20      A     That's right.

21      Q     Okay.  So this -- this is also another

22   example of the Federal Reserve asserting the

Page 139

1    power to -- asserting the power to decide whether

2    to grant use of priced service, correct?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  No.

5    BY MR. MICHAELSON

6         Q    Well, it's -- it's -- it's saying that

7    your master account is subject to the policy that

8    we were just looking at, right?

9         A    That's right.

10        Q    And in that policy, the Federal Reserve

11   asserted the authority to conduct risk

12   assessments to protect -- for the purpose of

13   protecting Reserve Banks from risk presented by

14   individual institutions, right?

15             MR. SCARBOROUGH:  Objection.

16             THE WITNESS:  That's right.

17   BY MR. MICHAELSON

18        Q    Okay.  And where risk was presented,

19   the Federal Reserve was claiming the authority to

20   cut off use of Fedwire to mitigate risk, correct?

21             MR. SCARBOROUGH:  Objection.

22             THE WITNESS:  Again, we have a

Page 140

1    different view on -- on the question of what

2    constitutes cutoff.  And why I said no to my --

3    in my answer to your first question was because

4    you used the word "grant," which I took to be a

5    verb indicating access.

6            I don't read the 1985 policy statement

7    and don't see in the '98 Operating Circular 1 the

8    assertion that the Fed could reimpose discretion

9    as it has with Fed membership status on access to

10   accounts before 1998 and the master account

11   thereafter.

12   BY MR. MICHAELSON

13       Q    Okay.  I'll refer you to Section 2.3,

14   entitled "Establishing a Account," and the last

15   sentence of the first paragraph is "All master

16   accounts are subject to Reserve Bank approval."

17           Do you see that?

18       A    I do.

19       Q    So as of 1998, the Federal Reserve was

20   taking the position that master accounts are

21   subject to approval by a Reserve Bank?

22       A    That's right.

Page 141

1          Q    And in Section 2.8 on the following

2     page, on the right-hand side of the page, middle

3     of top paragraph there, there's a sentence that

4     reads, "We may close your master account or

5     terminate our approval of a pass-through

6     relationship at any time."

7               Do you see that?

8          A    I do see that.

9          Q    So as of 1998, the Federal Reserve was

10    asserting the power to close an institution's

11    master account at any time?

12         A    That's right.

13              MR. MICHAELSON:   All right.  Let's mark

14    this.

15              (Deposition Exhibit Number 303 was

16              marked for identification.)

17    BY MR. MICHAELSON

18         Q    I've put in front of you a document

19    marked 303.  It's an exhibit marked 303.  It's

20    federal -- from the Federal Register, entitled

21    "Policy on Payments System Risk," Federal

22    Register, Volume 69, No. 230, 69926.  This is

CONFIDENTIAL

Page 142

1  dated December 1, 2004.

2          Do you see that?

3      A    I do.

4      Q    Are you familiar with this policy on

5  payment system risk from 2004?

6      A    Generally speaking, yes.  I haven't

7  examined it thoroughly.

8      Q    When's the last time you reviewed it?

9      A    I glanced at it yesterday.  Before

10  that, it had been -- it had been several months.

11      Q    Okay.  Direct your attention to the

12  page 69929.  On the far left -- left column,

13  first full paragraph, it says, "Part II of this

14  policy governs the provision of intraday or

15  daylight credit in accounts of the Reserve

16  Banks."

17          Do you see that?

18      A    I do.

19      Q    And it says that it "sets out the

20  general methods used by the Reserve Banks to

21  control their intraday credit exposures."

22          Do you see that?

CONFIDENTIAL

Page 143

1    A    I do.

2    Q    Do you agree that as of 2004, Reserve

3    Banks were applying methods to control their

4    intraday credit exposures?

5    A    I am not familiar with what the Federal

6    Reserve Banks were doing in terms of their risk

7    exposure assessments for account holders.  I'm

8    familiar only with the policy statement from 2004

9    describing -- describing it.  So I'm familiar

10    with the policy statement, but not the --

11    Q    Not the actual --

12    A    -- practice itself.

13    Q    -- practice.  But you have no reason to

14    dispute that Reserve Banks were, in fact,

15    undertaking methods to control their intraday

16    credit exposures, correct?

17    A    No reason to -- I have no reason to

18    dispute it, but I -- again, I don't -- I haven't

19    evaluated what those methods are.

20    Q    Okay.  Do you know if those methods

21    included assessments of whether individual

22    institutions presented risk to the Reserve Bank?

Page 145

1        Q    Okay.  And continuing on in Section II,

2    flip forward a couple pages to 69935.  There's a

3    Section C on net debit caps.

4             Are you familiar with a net debit cap?

5        A    I am not.

6        Q    Do you know what a net debit cap is?

7        A    I do not.

8        Q    All right.  The last -- in the

9    paragraph underneath "Net Debit Caps," the last

10   sentence, it says, An institution must be

11   financially healthy --

12       A    I don't see where you are.  I'm sorry.

13       Q    Oh, so underneath "Net Debit Caps," No.

14   1 is Definition."

15       A    Yeah.

16       Q    Okay.  The last sentence of the first

17   paragraph there.

18       A    Yes, I see.

19       Q    "An institution must be financially

20   healthy and have regular access to the discount

21   window in order to adopt a net debit cap greater

22   than zero to qualify for the filing exemption."

Page 146

1          Do you know what this refers to?

2      A    I know in general terms what

3  constitutes regular access to the discount

4  window.  I have a general sense of what a net

5  debit cap is, but I don't know what the

6  qualification for a filing exemption is.

7      Q    Okay.  Go ahead to 69937.  The upper

8  left corner, the last sentence of the -- of the

9  paragraph in the upper left corner, it says, "For

10 example, if the institution's level of daylight

11 overdrafts constitutes an unsafe or unsound

12 banking practice, the Reserve Bank would likely

13 assign the institution a zero net debit cap and

14 impose additional risk controls."

15          Do you see that?

16     A    I do.

17     Q    Would you agree that this reflects the

18 Federal Reserve's assertion of power over use

19 of -- no, strike that.

20          Would you agree that this reflects, as

21 of 2004, the Federal Reserve's assertion of power

22 over the use of priced service?

Page 147

1       A    Over its use, yes.

2       Q    Okay.  Including the power to impose

3   risk controls to mitigate risk to the Reserve

4   Bank?

5       A    If we're defining zero in the net debit

6   cap and as a risk control, which the policy

7   statement seems to do, then yes.

8       Q    Okay.  Are you familiar with OC3,

9   Operating Circular 3?

10      A    Not by its name.

11      Q    But do you have a general understanding

12  of what OC3 relates to?

13      A    No.  I would need to review it.

14      Q    When's the last time that you reviewed

15  OC3?

16      A    If you could -- if I could see it, I

17  could tell you.  I don't know what OC3 -- I mean,

18  I know it's an operating circular, but I would

19  need to see it before I could answer the

20  question.

21      Q    Okay.  How about OC4?  Do you know what

22  OC4 is?

Page 148

1        A     Again, not by its name.

2        Q     Sitting here today, you don't know what

3   OC4 relates to?

4        A     That's right.

5        Q     Okay.  And how about OC5?  Are you

6   familiar with OC5?

7        A     No.

8        Q     Okay.  So referring back to your --

9   referring back to your paragraph 59 here, you say

10  you found no evidence --

11       A     Can you give me a second to --

12       Q     Yeah, sure.

13       A     -- go back?

14       Q     It's Exhibit 299, your report, at page

15  25, paragraph 59.

16       A     Okay.  Paragraph what?

17             MS. CARLETTA:  Page 25, paragraph 59.

18             THE WITNESS:  Got it.

19  BY MR. MICHAELSON

20       Q     So you're opining here that you found

21  no evidence of the Federal Reserve asserting

22  power to decide whether to grant priced services

CONFIDENTIAL

Page 158

1      Q    Okay.  Did you ever look for a draft?

2      A    I have looked at Julie Hill's SSRN page

3    before, but when -- in reading her -- her work,

4    as is standard practice for me, generally, as I

5    looked for published articles and used -- and

6    relied on those when they exist, and in this

7    instance, when I looked for the work, including

8    the work that I cited, I looked for the published

9    version.

10     Q    I see.  Have you ever discussed with --

11   with Julie Hill the extent to which the Federal

12   Reserve has asserted authority to limit access to

13   priced services?

14     A    Yes, I have.

15     Q    And did she ever express the view to

16   you that both the Board and the Reserve Banks

17   have long emphasized their discretion to limit

18   access to priced services?

19     A    Not in exactly those terms.  She did --

20   in 2018, I wrote an article for the Brookings

21   Institution where I came to the conclusion that

22   the Fed -- that the Fed's assertions here were

Page 159

1    inconsistent with the framers' intent of the MCA.

2             I believe but have not verified that

3    she responded to this on Twitter and that we had

4    a back and forth where she thought that my

5    conclusion was not correct.

6        Q    Okay.

7        A    And, again, that was in 2018.

8        Q    Okay.  So in formulating your opinion

9    in this case, did you rely on any of the Federal

10   Reserve Bank of Kansas City's internal policies

11   and procedures concerning master account access?

12       A    Only as identified in my report itself.

13       Q    Do you understand that the Federal

14   Reserve Bank of Kansas City has a credit and risk

15   management department?

16       A    I do understand that.

17       Q    Okay.  And that -- that department is

18   separate from divisions within the Federal

19   Reserve Bank of Kansas City that handle

20   supervision?

21       A    I'm not aware of what the relationship

22   is between them.  I doubt very much that there

CONFIDENTIAL

Page 160

1    is, in fact, a separation between them.

2         Q    You doubt that?

3         A    Yeah, I do --

4         Q    And why --

5         A    -- doubt that.

6         Q    Why would you doubt that?

7         A    My experience and understanding of the

8    way that the Federal Reserve Bank organizations

9    are that there's a lot of collaboration between

10   and among the divisions for all kinds of

11   purposes.

12        Q    Okay.  Do you have an understanding as

13   to whether the Federal Reserve Bank of Kansas

14   City has a credit risk management department

15   that's responsible for handling master account

16   requests?

17        A    I'm not familiar with the way that

18   their organizational system is set up.  I assume

19   and, in fact, recall relying upon documents that

20   suggested that their legal department, their

21   supervisory department, the president herself,

22   and others responded to master account requests.

Page 161

1      Q    Okay.  And sitting here today, do you
2    know whether the Federal Reserve Bank of Kansas
3    City has policies and procedures concerning the
4    handling of master account requests?
5      A    Following the promulgation of
6    guidelines by the Board of Governors in 2022
7    commanding the Reserve Banks to formulate such
8    policies, I assume that those have been
9    formulating thereafter.  I don't know what
10   policies existed prior to 2022.
11     Q    Okay.  So in preparing your report, you
12   didn't rely on any policies that the Federal
13   Reserve Bank of Kansas City had in place
14   concerning master accounts prior to 2022?
15     A    If I did, I would have identified them
16   in my report, and if they are identified in my
17   report, then I did.  If I did not, then I did
18   not.
19     Q    But sitting here today, you don't
20   recall relying on them in any way?
21     A    I did rely on a lot of different
22   documents that were produced as part of the

CONFIDENTIAL

Page 162

1    discovery in this litigation and made a careful

2    accounting of those documents in the report

3    itself.

4        Q    Did you ask Williams & Connolly to

5    provide you with policies and procedures that the

6    Federal Reserve Bank of Kansas City applies to

7    master account requests?

8        A    When asking the Williams & Connolly

9    research staff for documents, I did ask for

10   documents relating to the granting of master

11   accounts.

12        I don't believe that I asked for them

13   by the name that -- using the terms that you just

14   used.

15        MR. SCARBOROUGH:  Actually, we don't

16   need a sticker on that.

17        MR. MICHAELSON:  Oh, sorry.

18   BY MR. MICHAELSON

Page 163



CONFIDENTIAL



Page 164

CONFIDENTIAL

Page 165



Page 166



Page 169

1      Q    That's all right.  We'll cover that --
2  we'll cover that later.
3           Yeah, I want to focus on 2015.  Is
4  there -- did something come out in 2015 that
5  speaks to this?
6      A    The Fed asserted in its litigation with
7  Fourth Corner Credit Union various assessments
8  and categories of relevance in determining
9  access, and that's the -- that's what I refer
10  to as --
11      Q    Okay.
12      A    -- 2015.
13      Q    And as far -- sitting here today, right
14  now, that's -- you think that's the first time
15  that the Federal Reserve publicly asserted that
16  it would perform risk rating of entities with
17  master accounts?
18      A    No, no, not at all.  So the risk
19  ratings -- as I mentioned earlier, risk ratings
20  are supervisory categories, and so the Federal
21  Reserve would make these kinds of risk
22  determinations for the supervised entities with

CONFIDENTIAL

Page 170

1   master accounts that are under its supervisory

2   bailiwick, so Fed member banks, BHCs, financial

3   holding companies, Edge Act corporations, things

4   like that.

5           We've reviewed together the policy

6   statements that refer to risk assessments with

7   respect to ongoing use of -- of priced services,

8   but I have not reviewed an internal manual or a

9   publicly-available manual that refers to specific

10  risk assessments for the opening or maintenance

11  of master accounts prior to 2015.

12      Q   Okay.  Is -- let's -- let's break this

13  down.  Is it your understanding sitting here

14  today that -- that Reserve Banks will assign risk

15  ratings to state-chartered nonmember banks that

16  have master accounts?

17      A   I don't have that understanding.  It

18  may well be the case.  My understanding would be

19  what I read here just today in this 2019 manual

20  and the 2022 guidelines and the 2023 handbook,

21  the latter two written by the Board of Governors

22  to instruct the Reserve Banks on how to -- on how

CONFIDENTIAL

Page 171

1   to make these decisions.

2           Now, those -- those documents do

3   include reference to risk assessments, some

4   expansive references to risk assessments.  What

5   the Reserve Banks do, in fact, relative to those

6   policy statements, I cannot say based on this

7   information in front of me or otherwise.

8       Q    Okay.  Do you have a basis to opine

9   whether, let's say, in 2014, Reserve Banks were

10  conducting individualized risk assessments of

11  state-chartered nonmember banks with master

12  accounts?

13      A    Whether they were doing so publicly?

14      Q    Internally.

15      A    So I do have an opinion about whether

16  they were doing so publicly.  They were not, in

17  my opinion, based on the documents I have

18  reviewed.

19          I did not review internal confidential

20  documents that preceded or that were outside of

21  discovery in this case.  So that would have

22  preceded 2015.

Page 172

1     Q    Okay.  So it's your opinion that

2     there's nothing -- you found nothing in the

3     public record suggesting that Reserve Banks

4     perform individualized risk assessments of

5     state-chartered nonmember banks with master

6     accounts in 2014?

7     A    These caveats are extremely important

8     because --

9     Q    Yes.

10     A    -- again, I want to be very specific

11     and -- and particular in the opinions I'm

12     offering.

13          I have found policy statements to the

14     effect that risk assessments could be or even

15     should be performed.  I have not seen those risk

16     assessments.  In the same way that I make all

17     kinds of New Year's resolutions, whether or not

18     they happen or not are two different questions.

19     I've seen the policy vision laid out in the

20     policy statements, including the ones that we

21     have reviewed.  I have not seen the

22     particularized risk assessments.

Page 173

1          Without seeing those particularized

2     risk assessments, I have -- I cannot say I've

3     seen evidence that they occurred.  I don't take

4     the policy statement that they could or should

5     occur to be evidence that they did occur.

6          Q    So I want to -- so at the end of the

7     day, are you -- are you saying you don't have a

8     basis to opine on whether risk -- individualized

9     risk assessments of any of these were actually

10    happening?  Is that -- is that what I hear you

11    saying?

12         A    That's right.

13         Q    Okay.  So you're not -- you're not

14    opining either way?  You don't know if they were

15    happening or not?

16         A    That's right.

17         Q    Okay.  But you have reviewed the

18    account access guidelines that were finalized in

19    2022 --

20         A    That's right.

21         Q    -- correct?

22              Those were issued by the Board of

Page 174

1    Governors, correct?

2         A    That's right.

3         Q    You're familiar with those?

4         A    I am.

5         Q    And you understand that they outline a

6    number of principles for Reserve Banks to apply

7    when considering account access requests?

8         A    I'd love to review them before I can

9    answer on the specifics of the language you used

10   in characterizing them, if that's possible.

11        Q    Sure.  All right.  This is a document

12   previously marked as Exhibit 34, which is the S

13   letter, and the account access guidelines are

14   attached.

15             So if you'd like to refresh on the

16   account access guidelines, they commence on the

17   page stamped AR18.

18        A    I see that.

19        Q    And for the moment, I want to just

20   focus on the six principles.  So on page 35 of

21   the document that's Bates stamped AR52, we come

22   to the first principle.

Page 175

1        A     I see AR52 and I see No. 1, but I'm

2    looking to see it identified as the first

3    principle.  Sorry.

4        Q     Yeah, sure.  Go ahead.

5        A     Okay.  I'm there.

6        Q     Okay.  This is the first of the six

7    principles?

8        A     That's right.

9        Q     And you would agree that even before

10   the issuance of these guidelines, Reserve Banks

11   were considering an institution's eligibility

12   prior to granting master account requests,

13   correct?

14       A     Again, I didn't see in the public

15   record the individual considerations of

16   eligibility that the Reserve Banks were doing.

17            I saw reference in Operating Circular 1

18   to the -- the question of eligibility, but I

19   didn't evaluate Reserve Banks' assessments of

20   eligibility in specific instances.

21       Q     To your knowledge, was the Federal

22   Reserve Bank of Kansas City considering an

Page 176

1    institution's eligibility prior to granting it a

2    master account prior to the issuance of these

3    guidelines?

4         A    I -- to my knowledge, I don't have an

5    opinion one way or the other.

6         Q    Okay.  How about the second principle,

7    which can be found on the next page, page 36?

8              This principle concerns an assessment

9    of credit, operational settlement, cyber or other

10   risks to the Reserve Bank.  Do you see that?

11        A    I do.

12        Q    To your knowledge, was the Federal

13   Reserve Bank of Kansas City considering risks to

14   the Reserve Bank in connection with institutions'

15   master account requests prior to the issuance of

16   these guidelines?

17        A    Because I have not been able to review

18   the specific considerations and specific

19   instances, I can't tell you what the Federal

20   Reserve Bank of Kansas City did or did not do in

21   reviewing requests to access a master account.

22        Q    Okay.  I guess my -- my sort of

CONFIDENTIAL

Page 177

1    fundamental question is:  Is this -- is this

2    consideration -- are you expressing opinion on

3    whether this changed -- the issuance of these --

4    this guideline changed a practice?

5            MR. SCARBOROUGH:  Objection to form.

6            THE WITNESS:  I am offering an opinion

7    on whether it changed the policy and that it did.

8            On whether it changed practice, because

9    I have not been able to assess exactly how the

10   Federal Reserve Bank of Kansas City or other

11   Federal Reserve Banks individually assessed or

12   did not assess the different requests to access a

13   master account, I can't say whether practice

14   changed as a result of the 2022 guidelines.

15   BY MR. MICHAELSON

16       Q    I see.  In other words, it may be

17   that -- that the Federal Reserve Bank of Kansas

18   City in practice was acting in a manner

19   consistent with the policy that was later

20   announced when -- in connection with the issuance

21   of these guidelines?

22       A    It's possible that it was.  It's

Page 178

1     possible that it wasn't.  It's possible that it

2     still isn't.  In my work on the history of the

3     Federal Reserve System going back to 1913, I

4     found copious examples of one or another Reserve

5     Banks zigging or zagging in conjunction with the

6     Board on -- on these -- on these policies until

7     the Board's instructions to subordinate with

8     respect to -- to policy occurs.

9          Q    Are you expressing an opinion in this

10    case that the consideration of this principle,

11    No. 2, in connection with a request for account

12    access, is improper?

13         A    I'm not making legal determinations

14    about propriety, if that's what you mean.  I

15    don't offer an opinion on legal conclusions.

16         Q    Is it inconsistent with law for the

17    Federal Reserve to consider risk to a Reserve

18    Bank in connection with granting a master

19    account?

20         A    I offer --

21              MR. SCARBOROUGH:  Objection.

22              THE WITNESS:  I offer no opinion about

CONFIDENTIAL

Page 179

1    consistency or inconsistency with law of any of

2    the litigants' practices.

3    BY MR. MICHAELSON

4        Q    Okay.  But you're offering an opinion

5    about congressional intent, correct?

6        A    That's right.

7        Q    And you're offering an opinion about

8    the Federal Reserve's historical practice, right?

9        A    That's right.

10       Q    Okay.  So let's go through those two.

11            Is it your opinion that consideration

12   of risk to the Reserve Bank in connection with a

13   master account request is inconsistent with

14   congressional intent behind the Monetary Control

15   Act?

16       A    I think that to the extent that risk to

17   the Reserve Bank constitutes a de facto

18   supervisory assessment that is usurped from state

19   supervisory authorities, then, yes, it is

20   inconsistent with the intent of the framers of

21   the MCA.  And there are instances, including in

22   the ones that I reference in my expert report,

Page 187

1    has issued countless banking -- pieces of banking

2    legislation, each with -- especially after 1935

3    and the permanent institution of the FDIC, with a

4    specific lane of movement for the FDIC, OCC,

5    Federal Reserve, and state banking authorities,

6    and so the MCA comes from that legal context.

7            That legal context means that the very

8    kinds of assessments that we're talking about

9    here are a supervisory context for the

10   specifically designated supervisor to respond to.

11   In some cases, that would be the Fed, in some

12   cases, the OCC, in others, the FDIC, and in

13   others, the state banking authorities.

14           But for the Federal Reserve to then say

15   that it has the authority or the -- or it would

16   adopt the practice of usurping these other

17   entities within a financial system is something

18   that I am not aware of anyone around the passage

19   of the MCA even contemplating, including at the

20   Federal Reserve, because it had never been done

21   in that way before.

22           Q    If every bank is unique then isn't it

CONFIDENTIAL

Page 188

1    necessary for Reserve Banks to undertake an

2    individualized risk assessment of each

3    institution to assess the risk presented by that

4    institution to the Reserve Bank?

5         A    Most emphatically, no.  What it should

6    do is defer to those exact determinations by the

7    appropriately situated authority to -- that has

8    been put in place to assess precisely that risk

9    profile.  And, again, that might be the Fed if

10   we're talking about member banks, bank holding

11   companies, financial holding companies, et

12   cetera, but it might be the OCC, and it might be

13   the FDIC, and it might be a state banking

14   authority.

15        Q    So for Custodia that would be the

16   Wyoming Division of Banking?

17        A    That's right.

18        Q    And so it's your opinion that the

19   Federal Reserve Bank of Kansas City has to defer

20   to Wyoming Division of Banking's assessment of

21   the risk that Custodia presents to the Federal

22   Reserve Bank of Kansas City?

Page 189

1        A      That's right.  That deference is the

2    beating heart of the dual banking system.

3        Q      Okay.  And it's your opinion that

4    Congress intended through the Monetary Control

5    Act to empower states to be state-chartered --

6    states to be the gatekeepers of access to Federal

7    Reserve services?

8        A      Well, the Constitution does -- does

9    that even preceding the creation of the Federal

10   Reserve System by creating state banks.

11            The Federal Reserve System was created

12   institutionally on top of a system of

13   state-chartered banks and national-chartered

14   banks, and so the order of operations is

15   reversed.  The states come first and then the

16   Federal Reserve.

17       Q      So referring back to the guidelines,

18   principle 2, here the Board is saying that

19   Reserve Banks should -- connection with an

20   account access request should consider whether

21   the institution presents or creates risk to the

22   Reserve Bank.

CONFIDENTIAL

Page 190

1          Do you see that?

2     A    Which -- which subpoint?  Sorry.

3     Q    Principle -- Principle No. 2 on page

4    36.

5     A    I see that.  And is there a subpart

6    that you're reading or just --

7     Q    No, just --

8     A    -- the top?  Yeah.

9     Q    -- the -- just Principle No. 2.

10    A    Yeah.

11    Q    And it's your opinion that what

12   Congress intended with the Monetary Control Act

13   is that this consideration be handled by the

14   state banking authority?

15    A    No.  To be handled by the Federal

16   Reserve for member banks and for bank holding

17   companies and financial holding companies, for

18   the FDIC for state, nonmember banks that were

19   members of the deposit insurance corporation or

20   the system, for the Comptroller of the Currency

21   for national banks and for state banking

22   authorities for those few banks that were not

Page 200

1             A F T E R N O O N   S E S S I O N

2                                        (12:38 p.m.)

3    WHEREUPON,

4                 PETER CONTI-BROWN, PH.D.

5    was called for continued examination, and having

6    been previously duly sworn, was examined and

7    testified further as follows:

8                 THE WITNESS:  Andrew, I'm sorry to keep

9      on doing this, but I have --

10                MR. MICHAELSON:  I was going to ask.

11                THE WITNESS:  -- an answer to correct.

12    This one's a factual one.  I wanted to correct

13    something.  I misspoke about my knowledge of

14    Julie Hill's candidacy.

15                MR. MICHAELSON:  Okay.

16                THE WITNESS:  It is true that a year

17    ago or so, she mentioned to me that she was a

18    candidate to be a dean, but in -- after our

19    conversation, I looked back at my e-mail, and on

20    November 22nd, about a month after I filed my

21    report, in a conversation that I didn't respond

22    to, she told me that she was a finalist for the

CONFIDENTIAL

Page 201

1    deanship at the University of Wyoming.  So I did

2    hear that from her.

3              MR. MICHAELSON:  Okay.

4              THE WITNESS:  I just wanted to clarify

5    that.

6              EXAMINATION BY COUNSEL FOR DEFENDANTS

7              CONTINUED

8    BY MR. MICHAELSON

9         Q    Okay.  Did you discuss your report in

10   this case with her?

11        A    No.

12        Q    And did you discuss -- subsequent to

13   submitting your report in this case, did you

14   discuss with her her views on historical exercise

15   of discretion by the Federal Reserve over access

16   to services?

17        A    No.



Page 202

Page 203



Page 215

1    framework in the way that you and I might.

2         Q    So if an institution requests a master

3    account from a Reserve Bank -- well, strike that.

4         A Reserve Bank is exposed to risk

5    arising from the provision of services to an

6    entity with a master account, correct?

7         A    That's right.

8         Q    And is it your opinion that there are

9    restrictions on Reserve Banks' ability to manage

10   that risk?

11        A    I don't offer legal opinions of what

12   the Fed can and cannot do.  I can opine that the

13   intentions of the framers of the MCA intended to

14   remove the Federal Reserve from exercising risk

15   management or other discretionary practices to

16   turn access to services into a quasi-membership

17   status.  And so, in that sense, what the Federal

18   Reserve has been instructed to do, at least by

19   the intentions of the MCA's framers, is to use

20   the risk assessments that had been performed by

21   either the sister regulatory and supervisory

22   organizations at the federal level or by the

Page 216

1    state authorities in our federal system of dual

2    banking.

3         Q    When you say the framers of the MCA,

4    who -- who are you referring to?

5         A    Members of Congress, other participants

6    who lobbied for its -- its passage, people like

7    Paul Volcker, William Proxmire, people like that.

8         Q    Okay.  And so you are expressing the

9    opinion that they intended to restrict Reserve

10   Banks' ability to manage the risk presented by

11   the grant of master accounts to -- to

12   institutions?

13             (Cell phone interruption.)

14             MR. SCARBOROUGH:  Objection.

15             THE WITNESS:  Are you objecting to

16   yourself?  Okay.

17             MR. MICHAELSON:  He was objecting to

18   me.

19             THE WITNESS:  Yeah.

20   BY MR. MICHAELSON

21        Q    It is -- it is your opinion that the --

22   that the intent behind the Monetary Control Act

Page 217

1    was to restrict Reserve Banks' ability to manage

2    the risk presented by master accounts?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  No, not in those terms.

5    It's my testimony that the framers of the MCA

6    intended for the Federal Reserve to engage with

7    other government entities to engage in whatever

8    risk assessments it felt it needed to engage with

9    respect to depository institutions that it, prior

10   to 1980, might engage bilaterally with respect to

11   access to those services.

12             After 1980, the expectation by the

13   framers would be that the Federal Reserve engage

14   on those very questions, should they have them,

15   with other -- other government entities.

16             But here again, I'm not citing any

17   specific statement to that effect because this is

18   not a question that they were contemplating in

19   terms of the specific processes of risk

20   assessment or counterparty risk or -- or daylight

21   overdrafts or the like.  I didn't see discussion

22   at that level of specificity, so my opinion is at

Page 218

1   a level of abstraction higher.

2   BY MR. MICHAELSON

3       Q    Did the Monetary Control Act impose on

4   states any new obligations to assess risk

5   presented to Reserve Banks by the issuance of

6   master accounts and services?

7       A    I'll leave the legal interpretation of

8   the MCA to the Court to determine, so I can't --

9   I don't have an opinion about what the MCA

10  imposed or did not impose.

11      Q    You don't have an opinion on what the

12  MCA imposed or did not impose?

13      A    I don't have an opinion about the legal

14  interpretation of the scope of the MCA in terms

15  of the authorities or restrictions that it

16  placed.

17      Q    Okay.  But you are opining on the

18  intent -- the legislative intent behind the

19  statute, right?

20      A    (Nodding.)

21      Q    And did --

22           MS. CARLETTA:  Hold on.  You have to

Page 219

1    answer verbally.  Sorry.

2            THE WITNESS:  Yes, that's right.

3    BY MR. MICHAELSON

4       Q    And did the legislators who passed the

5    MCA intend to impose on states the obligation to

6    assess risk presented to Reserve Banks by the

7    issuance of master accounts to state-chartered

8    nonmember institutions?

9       A    It's my opinion that that is the

10   implication of the framers' intention, although

11   they did not state that exact fact, so I'm not

12   quoting one of the MCA's framers to that effect.

13           What I -- the expert opinion that I

14   offer in terms of the legislative history of the

15   MCA is that the framers intended to remove the

16   Federal Reserve from its position, former

17   position, of engaging in precisely these kinds of

18   assessments and to leave those assessments to the

19   other relevant governmental agencies at the state

20   or federal level.

21      Q    So you're saying that it was an

22   unintended consequence of the Monetary Control

Page 220

1    Act?

2         A    No.

3              MR. SCARBOROUGH:   Objection.

4    BY MR. MICHAELSON

5         Q    You're saying it's just an unstated

6    implication of the Monetary Control Act?

7              MR. SCARBOROUGH:   Objection.

8              THE WITNESS:   I'm saying it's an

9    implication of their decision to remove the

10   Federal Reserve from engaging in threshold-level

11   evaluations about whether legally eligible

12   depository institutions can gain access to

13   Federal Reserve services.

14   BY MR. MICHAELSON

15        Q    So did the framers of the MCA, in your

16   view, intend that result or not?

17        A    They did intend that result.

18        Q    They did?

19        A    Yes.

20        Q    While at the same time imposing no new

21   obligations on the states to consider risk to

22   Reserve Banks?

Page 221

1          A     The obligations on the states that did

2     exist were defined primarily by state law, except

3     insofar as these state depository institutions

4     sought to gain membership either to the federal

5     deposit insurance system or to the Federal

6     Reserve system.

7          Q     To your knowledge, is there any statute

8     that requires the Wyoming Division of Banking to

9     consider risks to the Reserve Bank of Kansas City

10     presented by state-chartered institutions subject

11     to its supervision?

12          A     Not to my knowledge, no.

CONFIDENTIAL

Page 222

5    BY MR. MICHAELSON

6        Q    My -- my question is:  What did -- when

7    Congress passed the Monetary Control Act, did it

8    intend for Wyoming to take over the

9    responsibilities reflected in this exhibit?

10       A    So a few parts in my answer to your

11   question.  So the first is, I'm not aware that

12   these responsibilities existed in 1980 as they

13   are defined here, so I don't think that the

14   framers of the MCA had these specific

15   responsibilities in mind.

16            It is my testimony that the framers of

17   the MCA intended for the Federal Reserve to defer

18   to the supervisory assessments made by the

19   supervisors, which the Federal Reserve was not

20   for nonmember banks other than for holding

21   companies and -- and others identified by

22   statute.



Page 223

Page 235

1    banking history, including the passage of various

2    statutes.

3         Q    Are you expressing an opinion about

4    congressional intent on any statute other than

5    the Monetary Control Act?

6         A    Not -- not as such, except in service

7    of the opinion that I offer about what the

8    framers of the MCA intended to do.

9         Q    Are you expressing an opinion about

10   the -- are you familiar with Section 342 that

11   says Reserve Banks may accept deposits?

12        A    Of the Federal Reserve Act, yeah.

13        Q    Yes?

14        A    Yes.

15        Q    You're familiar with that?

16        A    Yes.

17        Q    Are you expressing an opinion on the

18   congressional intent behind that opinion?

19        A    No.

20        Q    Okay.  And are you able to point to any

21   federal statute that authorizes Reserve Banks to

22   take actions to mitigate risk to that Reserve

Page 236

1    Bank presented by state-chartered nonmember banks

2    with master accounts?

3         A    I don't offer opinions about what

4    statutes authorize or don't authorize, which I

5    would regard as a legal conclusion left to the

6    Court to decide.

7              MR. MICHAELSON:  Let's mark this

8    document here.

9              (Deposition Exhibit Number 304 was

10             marked for identification.)

11   BY MR. MICHAELSON

12        Q    I'm handing you a document marked 304,

13   Exhibit 304, which is entitled -- entitled

14   "Guidance for Federal Reserve Financial Services

15   Applicants That Are Deemed High Risk by the

16   Federal Reserve Bank of New York."

17             Do you see that?

18        A    I do.

19        Q    And I'll refer you to the end.  At the

20   very end, you'll see that it's dated August 18,

21   2014.  Do you see that?

22        A    I do.

Page 237

1          Q    I'll give you a moment to review it,

2     and my question is whether you've seen it before.

3          A    May I ask, this is a public document?

4          Q    It is a public document.

5          A    It looks familiar to me, but I don't

6     know that I have -- if I have relied upon it for

7     my report.  I don't think that I did, but it is

8     very possible that I have seen it before.

9          Q    Okay.  And it says in the second

10    paragraph that for each high-risk applicant for

11    Federal Reserve services, the Bank will conduct

12    enhanced due diligence and risk assessment, and

13    the Bank may take steps to mitigate risks posed

14    by the applicant.

15               Do you see that?

16         A    I do.

17         Q    Are you expressing an opinion on this

18    case on whether, in 2014, the Federal Reserve

19    Bank of New York had statutory authority to do

20    that?

21         A    I don't express opinions about whether

22    the -- what statutory authority the Federal

Page 238

1    Reserve or any of its Reserve Banks does or does

2    not have.

3         Q    Okay.  But it is your opinion, though,

4    that this conduct by the Federal Reserve Bank of

5    New York would be inconsistent with the intent of

6    the drafters of the Monetary Control Act?

7         A    Not necessarily.  It depends entirely

8    on what is meant by the steps taken to mitigate

9    risk, risks posed by the applicant.

10        Q    I see.  So if those steps to mitigate

11   risk included restricting access to a service to

12   mitigate risk without entirely eliminating use of

13   the service, that could be consistent with the

14   Monetary Control Act?

15             MR. SCARBOROUGH:  Objection to form.

16             THE WITNESS:  It might be.  I'd need to

17   know more about what -- the nature of the service

18   restrictions, the process through which that

19   conclusion was reached and what relationship the

20   Federal Reserve Bank had with the supervising

21   authority, supervising authority of the legally

22   eligible depository institution.

Page 250

1    conclusion.

2              As I read this document and I'm

3    asking -- and you're asking if it changes my

4    opinion about whether the Fed asserted a

5    discretion to block access to its master account

6    or Federal Reserve account to legally eligible

7    depository institutions, this document does not

8    change my opinion in that regard for those

9    reasons.

10        Q    Well, I'm -- I mean, really, I'm

11   referring back to your own opinion, paragraph 86.

12             Here you opine that when the Fed issued

13   the account access guidelines in 2022, it

14   announces that it will be conducting a, quote,

15   searching evaluation --

16        A    That's right.

17        Q    -- in its attempt to execute the master

18   account agreement based on the Fed's own

19   assessment of risk.

20             And my question is whether you're

21   expressing an opinion that that is inconsistent

22   with the Fed's historical practice, and as I

Page 251

1      understand it, you are expressing that opinion.

2            You're saying this is inconsistent with

3      the Fed's historical practice, and you stand by

4      that; is that correct?

5            A    If I can define what I would mean by

6      historic practice going back to 1980, I would

7      stand by that opinion.  I would not stand by the

8      opinion that it is new in 2022, and, indeed, the

9      title of my heading here is that the Federal

10     Reserve doubles down on its claim of discretion,

11     which -- by which I mean that the Fed was not

12     announcing a new standard in 2022.

13           Q    Right.  Your -- your opinion is that it

14     changed in 2015 --

15           A    That's right.

16           Q    -- right?

17           A    That's right.

18           Q    Right.  That in 2015, it started to

19     exercise its discretion.

20           And your -- your testimony is that

21     Exhibit 304, which is dated 2014, doesn't affect

22     your opinion?

Page 252

1        A    It doesn't affect my opinion for simple

2     quantitative reasons.  I don't know the exact

3     numbers of legally eligible depository

4     institutions in the United States in 2014, but

5     could speculate that it's in -- well above 10 and

6     probably closer to 15,000 in -- in 2014.

7             Of those, the number of institutions

8     that are not subject to the supervision of the

9     United States -- of a United States federal

10    banking regulator, Edge Act corporations and the

11    like, would have been tiny relative to those

12    numbers, and so the searching evaluation that

13    we're talking about would not have -- would not

14    have occurred.

15       Q    And that opinion that you're just

16    expressing there isn't limited to the Reserve

17    Bank of New York's district, right?  That would

18    have been true nationwide?

19       A    That the -- that I think that it is

20    inconsistent with the intent of the framers of

21    the MCA that there be -- there would be a

22    searching evaluation to determine whether a

Page 253

1   legally eligible depository institution could

2   gain access to Federal Reserve services, you

3   mean?

4        Q    No.  I mean the -- as I understand what

5   you're saying is that there would have been --

6   prior to 2014, there would have been very few

7   banks requesting a master account from the

8   Federal Reserve of New York that were

9   state-chartered, nonmember banks that would have

10  been subjected to this enhanced due diligence.

11            Is that -- did I understand you

12  correctly?

13       A    That's right.  I don't think that's a

14  large number of depository institutions.

15       Q    Right.  And --

16       A    Even so --

17       Q    And that would -- then that would be

18  the same across all the districts?

19       A    I assume so.  I don't -- I don't know

20  the numbers, actually, and so I shouldn't -- I

21  shouldn't give a conclusive opinion on those

22  numbers.

Page 254

1      Q    Okay.  But is it -- but is it your

2   opinion that beginning in 2015 or around 2015,

3   there was an uptick in requests from

4   state-chartered, nonmember banks that presented

5   greater risk to the system?

6      A    I don't offer that opinion.  My opinion

7   would be consistent with the idea that the

8   Federal Reserve simply granted those access

9   requests without a searching evaluation prior to

10  2013, and would also be consistent if there were

11  an uptick, but I don't offer an opinion about the

12  quantities there.

13     Q    Are you able to identify any

14  institutions that are state-chartered, nonmember

15  banks who are uninsured that requested and

16  received master accounts between 1980 and 2015?

17     A    I am not aware, but I have -- I

18  wouldn't have access to that information because

19  it is not public.

20     Q    Okay.  And you'd agree that the Federal

21  Reserve didn't make public information till very

22  recently about what entities had or did not have

Page 255

1    master accounts?

2         A    That's right.  There was recent federal

3    legislation that required the disclosure, but

4    that was, again, very --

5         Q    Right.

6         A    -- recently.

7         Q    And that -- that legislation just

8    passed in 2022; is that right?

9         A    That's right.

10        Q    And one of the reasons why that

11   legislation was passed was because of concerns

12   about the capacity of the Federal Reserve System

13   with respect to grant of master accounts, right?

14        A    While I was familiar with and

15   participated in some of the debates regarding the

16   legislative process, I haven't acquainted myself

17   enough sufficiently to opine on the intents of

18   the -- intentions of the framers of the 2022 act.

19        Q    You would agree that prior to the

20   passage of that legislation, the Federal Reserve

21   Bank didn't publicize when a master account was

22   denied?

Page 263

1    Federal Reserve Bank of Kansas City that denied

2    Fourth Corner's request for a master account?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  My understanding was that

5    the Board of Governors had at least controlled

6    the decision, if not made the decision, to deny

7    the master account, although the decision was

8    formally issued from the Federal Reserve Bank of

9    Kansas City.

10   BY MR. MICHAELSON

11        Q    Are you expressing an opinion in this

12   case that the Board controlled the decision to

13   deny Fourth Corner's master account request?

14        A    I don't -- I don't offer that

15   conclusive opinion.  I have not been able to

16   evaluate internal deliberations between the Board

17   of Governors and the Kansas City Fed.

18              Certainly, the things that I have read

19   from that litigation and the public disclosures

20   about Fourth Corner and the scholarship

21   surrounding these questions lead me to include

22   that the Board of Governors -- the Board of

Page 264

1    Governors controlled that decision-making and

2    policy decision.

3         Q    In the next section of your expert

4    report, Section 4, you cover decisions that you

5    assert were made by the Board over master account

6    requests.  You focus in particular on three, The

7    Narrow Bank, Territorial Bank of American Samoa

8    and Custodia, but you don't opine on Fourth

9    Corner?

10        A    Can you tell me which parts you're

11   talking about here in my report, which

12   paragraphs?

13        Q    You can refer to romanette i.  The

14   table of contents might be easiest.

15        A    Okay.

16        Q    As I understand, in Section 4 of your

17   report is where you are opining on specific

18   decisions that were controlled by the Board of

19   Governors?

20        A    That's correct.

21        Q    And Fourth Corner's not there, right?

22        A    No, I -- I believe we just read in

Page 265

1    paragraph 60 that -- and 61 references to Fourth

2    Corner.

3         Q    Right.  I know.  I'm -- I'm focused

4    here on this distinction of whether it's the

5    Board of Governors that controlled the outcome of

6    Fourth Corner's request or the Reserve Bank of

7    Kansas City, and I'm trying to understand why

8    you're expressing an opinion in this case as to

9    who controlled that outcome.

10        A    My -- the opinion that I expressed to

11   you now in testimony and, I think, consistent

12   with my expert report is that everything that I

13   reviewed about the -- from the litigation file

14   regarding Fourth Corner Credit Union was that the

15   Board of Governors controlled that policy

16   process, but I haven't had access to all internal

17   files for the Board of Governors or Federal

18   Reserve Bank of Kansas City with respect to

19   Fourth Corner to reach that decisive conclusion.

20   But what I have reviewed is consistent with that

21   conclusion, and that's the opinion that I offer.

22        Q    So the -- I want to make sure I

Page 272

1    either in the briefing or in the scholarship that

2    talked more specifically about the Board of

3    Governors' participation in that decision.

4    BY MR. MICHAELSON

5        Q    Okay.  And sitting here today, what do

6    you recall about that?

7        A    Only that the decision was guided by

8    the Board of Governors, that this was not an

9    independent decision of the Federal Reserve Bank

10   of Kansas City.

11       Q    It's your recollection that the Board

12   of Governors guided the decision?

13       A    It's my recollection that the decision

14   was not an independent decision of the Federal

15   Reserve Bank of Kansas City.

16       Q    Well, those are two different things,

17   right?

18       A    Yeah.

19       Q    So what's your opinion?

20       A    That the decision was not an

21   independent decision of the Federal Reserve Bank

22   of Kansas City and Fourth Corner.

Page 273

1          Q     Okay.  When you say it was not an

2     independent decision, is that consistent -- I

3     want to understand how you're using that term.

4               Is that consistent with the Reserve

5     Bank of Kansas City denying it in the exercise of

6     its own discretion after having consulted with

7     other parties like the Board?

8               MR. SCARBOROUGH:  Objection to form.

9               THE WITNESS:  My understanding --

10    again, and the expert report didn't include it in

11    that section, not because I don't have a view on

12    the Board's participation, but because the

13    materials I reviewed in writing my expert report

14    were more conclusive with respect to the

15    Territorial Bank of American Samoa and The Narrow

16    Bank than in Fourth Corner.

17              But still sticking with Fourth Corner,

18    my understanding and my review of the materials

19    as I sit here today is that the -- the Kansas

20    City Fed did more than consult with the Board in

21    reaching its own independent decision, that, in

22    fact, the Board had a view, and that view was to

Page 274

1    deny that -- that request and that the Federal

2    Reserve Bank of Kansas City followed the Board's

3    view in this regard.

4    BY MR. MICHAELSON

5         Q    Okay.  And sitting here today, you

6    think that's reflected in the litigation papers

7    in the Fourth Corner case?

8         A    As I sit here today, it's reflected in

9    the materials I relied upon in my expert report,

10   which included those -- the litigation papers and

11   the press coverage and the scholarship about

12   master account access.

13        Q    But you're not able to point -- like,

14   this isn't in your expert report, so I'm trying

15   to --

16        A    Yeah.  I totally --

17        Q    I'm -- I'm --

18        A    I hear you.

19        Q    And so if you're expressing an opinion

20   in this case on this, I'd like to know your --

21   your basis, and so to say it's sort of in

22   everything you relied upon, that makes it

Page 327

1    a historian, I see innovations at various states,

2    including those that attract experimentation in

3    one state over another, consistent with great

4    practices and bad practices and practices in

5    between.

6    BY MR. MICHAELSON

7         Q    Just a few more questions, and then we

8    can take -- take a break.

9              It's your opinion that the Board

10   dictated the outcome of TBAS's master account

11   request?

12        A    Can you point to me where it said that

13   I dictated that outcome?

14        Q    Paragraph 98 of your report, last

15   sentence.

16        A    Yes, I wrote that.

17             "The Board dictated the outcome of

18   TNB's and TBAS's master account requests because

19   each of those cases raised public policy

20   questions."

21             That's right.

22        Q    Okay.  So that's -- that's your opinion

Page 328

1    in this case?  The Board dictated those outcomes?

2        A    That's right.

3        Q    And do you have any direct knowledge as

4    to who at the Board dictated the outcome of TNB's

5    master account request?

6        A    I do not.

7        Q    Do you have any direct knowledge as to

8    who at the Board dictated the outcome of TBAS's

9    master account request?

10       A    I do not.

11       Q    When you use the phrase "dictated the

12   outcome" here, is that the same -- mean the same

13   thing as control the outcome?

14       A    I do treat those as synonymous.

15       Q    Okay.  In this -- in this context?

16       A    In this context.

17       Q    All right.  And what is your basis for

18   concluding that the Board dictated the outcome of

19   TBAS's request?

20       A    I reviewed the -- because there was no

21   litigation in that case that I know of -- don't

22   know of -- at least there was no public

Page 329

1    litigation record that I could review.  There

2    were some press accounts in the American Banker

3    by Rob Blackwell, which I reviewed, and then I

4    reviewed the scholarship on TBAS from Julie Hill.

5              And in reviewing those outcomes,

6    including the role of Randy Quarles, who is

7    the -- appointed by President Trump as the vice

8    chair for supervision at the Board of Governors

9    in 2017, led me to the conclusion that TBAS's

10   master account approval, which only occurred

11   after that fact, was -- was controlled by the

12   Board of Governors.

13        Q    So you don't have direct -- direct

14   knowledge of board control.  You're relying on

15   secondary sources like articles in the American

16   Banker and Julie Hill's article?

17        A    Historians don't regard news articles

18   necessarily as secondary sources, although you

19   correctly characterized Julie Hill's scholarship

20   as a secondary source.

21             What I relied on in that sense -- I'm

22   not offering this opinion as a fact witness to

Page 330

1    say, here's what I know because of what I

2    observed.  I offer that opinion as an expert on

3    the Federal Reserve structure, its history, and

4    based on the review of these materials.

5            It's also informed by my historical

6    understanding of the relationship between the

7    Federal Reserve Banks and the Board of Governors

8    that leads me to that conclusion.

9        Q    If you look at Julie Hill's article,

10   page 491, the first full paragraph, she writes

11   that "TBAS learned the San Francisco Fed would

12   open TBAS's account."

13           Do you see that?

14       A    I do.

15       Q    So their account was opened with the --

16   with the San Francisco Fed, not the Board of

17   Governors, right?

18       A    The Board of Governors doesn't have

19   accounts.

20       Q    Right.  So it would be the San

21   Francisco Fed that was exposed to any

22   counterparty risk presented by TBAS's activities?

Page 331

1       A     No, the Federal Reserve --

2             MR. SCARBOROUGH:  Objection.

3             THE WITNESS:  The Federal Reserve

4    System is exposed to counterparty risk, which

5    comes in a variety of different categories,

6    including reputational risk, which would, in

7    fact, not just -- affect not only the San

8    Francisco Fed, but other Federal Reserve Banks

9    and the Federal Reserve System generally,

10   including the Board of Governors.

11   BY MR. MICHAELSON

12      Q     Okay.  And if you go to the next page,

13   492, at the top, she writes that "The San

14   Francisco Fed manages the risk posed by TBAS

15   remotely."

16             Do you see that?

17      A     I do.

18      Q     Do you agree that the San Francisco Fed

19   manages the risk imposed by TBAS?

20      A     I don't have independent knowledge of

21   what the Federal Reserve Bank of San Francisco

22   does in terms of its relationship to TBAS and the

CONFIDENTIAL

Page 351

1   request that were not provided to you prior to

2   your completing your expert report?

3       A    I can't remember the last time I was

4   surprised, so I don't know that that's -- that's

5   something I can say.

6            I know that the documents that I asked

7   for -- the category of documents that I requested

8   from the research staff at Williams & Connolly

9   pertain to the flow of information between the

10  Reserve Bank and Board of Governors about the

11  ultimate denial of Custodia's request for access

12  to a master account.

13           When I received those documents and

14  reviewed them, I felt that they were sufficient

15  to add to my understanding based on my

16  exploration of the Fed's history about the

17  relationship of the Board of Governors to the

18  Reserve Banks with respect to policy

19  determinations like access or denial to master

20  accounts and used the documents that are received

21  from the research staff at Williams & Connolly to

22  inform that ultimate conclusion.

Page 352

1          So if there were other documents that

2     might be relevant, I can't say, and if you put

3     them in front of me now, I'd be glad to review

4     them, but I don't know that I would be surprised

5     by their existence or not.

6          Q    Are you aware that Federal Reserve Bank

7     of Kansas City personnel conducted a risk

8     assessment of Custodia in the late 2021, early

9     2022 time period?

10         A    I'm aware in the documents on which I

11    relied that were produced by the research staff

12    at Williams & Connolly that there were

13    discussions of risk regarding Custodia.

14         What that -- whether those discussions

15    and analyses together constituted a risk

16    assessment, I couldn't say.  If there's a

17    document you have in mind, I'd be glad to review

18    it and then tell you if it was a document that I

19    reviewed that led to that conclusion.

20         Q    My question is whether you're aware

21    that Kansas City personnel performed a risk

22    assessment in late 2021, early 2022.

Page 353

1     A     And I'd want to -- before I accept your

2    characterization of what they said, I'd want to

3    say what the documents were that I relied on and

4    see if my characterization of their activity

5    would match yours before I could answer.

6          So if there's a specific document you

7    have in mind that reflected that risk assessment,

8    I'd be glad to look at it.

9     Q     Are you aware sitting here today that

10   Federal Reserve Bank of Kansas City personal

11   conducted an examination of Custodia in around

12   September of 2022?

13    A     I know that throughout that process

14   that the staff of the Federal Reserve Bank of

15   Kansas City and the staff of the Board of

16   Governors were in consultation with each other

17   and with Custodia regarding Custodia's request

18   initially for access to a master account and

19   subsequently for membership in the Federal

20   Reserve System.

21          I'd want to see the document you have

22   in mind that is the evidence of that examination

Page 354

1    before I could comment on it.

2         Q    You understand that -- that Custodia's

3    application for membership to be a Federal

4    Reserve member is a different request than their

5    request for a master account, right?

6         A    That has been at the heart of my

7    testimony from the very beginning.  Membership is

8    very different from a request for access.

9    There's no dispute about that.

10        Q    Different standards apply?

11        A    Very different standards apply --

12        Q    Okay.

13        A    -- to the request for Fed membership

14   versus access to a master account by a legally

15   eligible depository institution.

16        Q    Okay.  And the -- the examination that

17   was conducted of Custodia in September of 2022,

18   sitting here today, what do you know about it?

19        A    The reason I resist that

20   characterization and would prefer to look

21   together with you at a document is that

22   examination is a term of art in banking history.

Page 355

1    I'm very skeptical that an examination the way

2    that I understand the term occurred, and so I'd

3    want to know what it is that you're calling an

4    examination before I could comment on it.

5           I know that there were substantial and

6    lengthy conversations between Custodia and

7    staffers at the Federal Reserve Bank of Kansas

8    City and at the Board of Governors.  Which of

9    these constituted in your view an examination, I

10   can't say.  Which of these constituted in my view

11   an examination, I wouldn't be able to say until I

12   could see it.

13       Q    And sitting here today, do you recall

14   that in the view of Kansas City personnel, they

15   conducted an examination in September of 2022?

16       A    I -- I don't know what they viewed as

17   an examination.  The --

18       Q    Do you know whether they went on site?

19       A    I seem to recall that there was a site

20   visit.  I can't recall specifically.  That's

21   my -- so I'll repeat my request for any documents

22   that you have that I relied on.

1    from the fall of 2022 regarding back and forth

2    with the Kansas City Fed and -- and Custodia.

3              I recall also documents part of the

4    same --

5         Q    What documents do you remember?

6         A    I -- they were cited in my report.  I

7    can read to you those --

8         Q    What documents --

9         A    -- segments.

10        Q    -- do you remember today?

11        A    I don't remember the specifics.

12             MR. SCARBOROUGH:  Object to form.  Go

13   ahead.

14             THE WITNESS:  I don't remember the

15   specifics.  It's -- it's been a couple of months,

16   but I did list every document that I consulted in

17   my report.

18   BY MR. MICHAELSON

19        Q    Did you read every page of every

20   document cited in your report?

21        A    I turned every page, reading some fast,

22   some slow.  Some documents had -- I was more

Page 360

1    interested in the first pages and maybe did not

2    read the middle or last.

3         Q    Do you recall whether Kansas City

4    personnel conveyed to Custodia in the fall of

5    2022 their conclusion that Custodia was -- their

6    policies and procedures were not what -- were not

7    what Kansas City would expect to see with respect

8    to functioning depository institutions?

9              MR. SCARBOROUGH:  Objection.

10             THE WITNESS:  May I see the document

11   that you're alluding to?

12   BY MR. MICHAELSON

13        Q    I'm asking if you recall seeing one.

14        A    But that -- I can't answer your

15   question if I recall a characterization of a

16   document, because what I would want to see in the

17   document itself is whether your characterization

18   matches the document.

19             I recall reading the documents.  I

20   don't recall whether -- and, in fact, in many of

21   the questions you've asked me, your

22   characterization of the documents has not matched

Page 361

1    my reading of the document, and we've been able

2    to have a better conversation when we've been

3    able to look at the same document together.

4    That's what I'm worried about with being able to

5    answer your questions, because I doubt very much

6    that your characterization of the document would

7    match mine, even though I did review these

8    documents.

9              So you're asking if I reviewed the

10   documents.  The answer is yes.  If the answer is

11   that I agree with your characterization of them,

12   the answer is I don't know.  If you're telling me

13   I can't review -- see the documents that you're

14   characterizing to me today, then I don't know how

15   I can help you with your questions.

16        Q    Do you recall asking Williams &

17   Connolly to give you additional documents on any

18   particular subject?

19        A    We had a lot of correspondence.  I

20   corresponded with -- in making requests to the

21   research team, when they would give me some

22   responses, I would read through the documents and

Page 362

1    not feel like I had gotten a big enough picture

2    of what I was asking, and so I would ask repeated

3    efforts.  We iterated several times.

4         Q    And do you recall looking at Caitlin

5    Long's notes?

6         A    Are these cited in my report?

7         Q    Handwritten notes.  Do you recall

8    looking at Caitlin Long's handwritten notes?

9         A    I remember documents with handwritten

10   notes.  I can't recall if they were Caitlin

11   Long's.

12        Q    Do you understand that the Federal

13   Reserve Bank Kansas City personnel conducted what

14   they called a pre-membership exam of Custodia in

15   the fall of 2022?

16        A    I can't recall the way that they

17   characterized their engagements with Custodia in

18   the fall of 2022 in terms of the specific

19   terminology.

20        Q    Do you recall if the Kansas City

21   personnel formed conclusions about Custodia as a

22   result of what they called the pre-membership

CONFIDENTIAL

Page 363

1    examination?

2         A    I remember that there were several

3    conclusions, all of which I regarded as

4    preliminary, leading to the ultimate conclusion

5    from various staffers at the Kansas City Fed

6    about -- about Custodia.

7         Q    What conclusions do you recall them

8    reaching?

9         A    I recall Kansas City Fed personnel

10   discussing and expressing concerns about various

11   aspects of the policies that -- and systems that

12   Custodia had put in place, but more specific than

13   that, I'd invite you again to allow us to

14   collaborate together and see a document and

15   exhibit.

16        Q    And -- and did you -- do you recall

17   seeing any documents in which Kansas City Fed

18   employees conveyed their conclusions as to

19   Custodia to supervisors within the Federal

20   Reserve Bank of Kansas City?

21        A    I know that the -- the Department of

22   Credit within the Division of Supervision at the

Page 364

1   Kansas City Fed engaged with colleagues elsewhere

2   in the Division of Supervision, but I don't

3   recall something more specific than that.  I'd

4   invite you again to --

5        Q    Do you know who -- who runs Kansas

6   City's credit and risk management function?

7        A    I don't recall the person's name, no.

8        Q    And do you know who that person reports

9   to?

10        A    I would assume that person -- because

11   the credit department is a department of the

12   Division of Supervision, I would assume that the

13   hierarchy is within the Division of Supervision,

14   but it may be different.

15        Q    And who's that person?

16        A    I don't recall the name of the person

17   who's in charge of Supervision.

18        Q    Do you know who that person reports to?

19        A    The Division of Supervision reports to

20   the president of the Kansas City Fed.

21        Q    Referring to paragraph 110 in your

22   opinion, you write that Custodia's the, quote,

CONFIDENTIAL

Page 365

1    first bank to combine traditional banking with

2    crypto-assets.

3            Do you see that?

4        A    Yes.

5        Q    Is that your opinion?

6        A    It is not.  That is a typo.  It should

7    say as one of the first banks, not the first

8    bank.

9        Q    Who -- what are the other banks?

10       A    As I recall, there was a letter from

11   the Comptroller of the Currency to all national

12   banks -- the year I won't know off the top of my

13   head, but it would have been 2021 or '22 --

14   authorizing those banks, those national banks, to

15   provide some kinds of crypto-asset financial

16   services.  Those banks then would have been the

17   first to combine traditional banking with

18   crypto-assets.

19           I believe that one of them is J.P.

20   Morgan Chase.  I believe that another is Wells

21   Fargo.  I'm not certain of this, but I do know

22   that several national banks accepted the

CONFIDENTIAL

Page 371

1          Another is the use of blockchain,

2     another decentralized ledger technology, and the

3     management of back-office services for large

4     financial institutions, the likes of which have

5     already been --

6          Q    Is Custodia going to do that?

7          A    I haven't -- I don't offer an opinion

8     about Custodia's business model.

9          Q    Well, I want to know what matters of

10    policy that the Board felt essential to assess

11    before deciding on Custodia's master account.

12         A    My --

13         Q    What were those?

14         A    Yeah.  My understanding is that they

15    implicated not specific claims about Custodia's

16    business model, but what a financial institution

17    like Custodia Bank having received a charter

18    through Wyoming might do, not just Custodia, but

19    for the precedent it might set for those

20    institutions like Custodia.

21         Q    I see.  So broader policy concerns, not

22    specific to Custodia's business model?

CONFIDENTIAL

Page 372

1          MR. SCARBOROUGH:  Objection.  Form.

2          THE WITNESS:  My -- this sentence about

3     the -- that it was uncontroversial that the Board

4     felt essential that it address matters of policy

5     referred to specific questions that Custodia

6     raised, but also the Board's repeated insistence

7     in the documents that I reviewed that they were

8     worried about the, quote-unquote, precedent that

9     Custodia's master account access might set for

10    other kinds of engagement with the crypto

11    ecosystem.  And I could continue to enumerate

12    those if you'd like.

13    BY MR. MICHAELSON

14        Q    Well, let's start going through some of

15    these -- the matters of policy that the Board

16    felt essential to address.

17             So one was the combination of digital

18    asset custody with banking, right?  Did the

19    Board -- has the Board, to your knowledge,

20    resolved that policy question?

21        A    I don't know.

22        Q    You don't know.  Sitting here today, do

CONFIDENTIAL

Page 373

1    you know if the Board has concluded that the

2    combination of digital asset custody with banking

3    is okay as long as it's done in a safe and sound

4    manner?

5         A    I --

6              MR. SCARBOROUGH:  Objection to form.

7              THE WITNESS:  I can't say.  I would

8    need to -- again, because I can't be confident

9    that your characterization of what the Board has

10   done or hasn't done would match my

11   characterization, I would need to review a

12   document if you've got something -- if you've got

13   something to put in an exhibit.  Otherwise, it

14   would be very hard for me to comment on your

15   characterization of the Board's actions.

16   BY MR. MICHAELSON

17        Q    Okay.  So you've -- you've identified

18   this as a policy question --

19        A    Yeah.

20        Q    -- that the Board felt essential to

21   assess before deciding Custodia's master account

22   request, right?

Page 374

1      A      That's right.

2      Q      But you don't know what the Board

3  decided in that regard?

4      A      Well, assessing and deciding are two

5  very different things.  The Board is infamous,

6  perhaps, for taking a long time in assessing new

7  policy ideas.  So I don't know where that

8  assessment and its investigation of Custodia's

9  master account access request or its membership

10  application sits vis-à-vis its determination of

11  broader crypto policy questions that it has also

12  undertaken.

13      Q      Okay.  So sitting here today, you don't

14  know where the Board stands on that policy

15  question?

16      A      Not specifically and in the terms that

17  you've identified.

18      Q      All right.  The second one you

19  identified was combining crypto exchange services

20  with digital banking.

21            Where does the Board stand on that

22  today?

Page 375

1          A    Again, I'm not sure what their ultimate

2     conclusion would be.  I'm not aware of any

3     rulemaking that they've issued under

4     notice-and-comment rulemaking with respect to

5     traditional banking services and crypto-assets,

6     whether specific to that question or any of the

7     other questions listed.

8               My answer is going to be similar for

9     the others if you -- but we're -- I'd be happy to

10    go through them if you like.

11         Q    Well, what's another matter of

12    policy -- so we've covered combination of digital

13    asset custody and banking, combination of crypto

14    exchanges with banking.

15              How about issuance of stablecoins?

16         A    What do you mean --

17         Q    Is that --

18         A    -- by stablecoin?

19         Q    Well, let's go with a digital asset

20    that is designed to have its value pegged to a

21    dollar.  Let's go with that.

22         A    Okay.  Great.  So --

Page 376

1        Q    First of all, do you know if Custodia
2   was going to do that?
3        A    I don't -- I remember reading somewhere
4   in the documents about Custodia's intention to
5   offer a version of a -- of a stablecoin, but
6   let's take your definition for a second.
7             The Board has issued policy -- it's
8   been an enthusiastic endorser of banks issuing
9   digital liabilities that function as assets
10  pegged to the U.S. dollar, and those dominate
11  overwhelmingly the banking system in the United
12  States and are issued by every bank that I know
13  of that issues deposits.
14       Q    So that's -- that's a policy question
15  that's been resolved by the Board?
16       A    It is.
17       Q    And that's in favor of banks doing
18  that?
19       A    In favor of banks issuing digital
20  liabilities that function as digital assets that
21  are pegged to the U.S. dollar.
22       Q    Even uninsured banks?

Page 377

1      A    I -- those would be -- uninsured banks

2    that issue deposits, there I don't know, because

3    that's what those would be referring to would be

4    the deposits.

5      Q    So you're not sure where the Board is

6    on an uninsured bank issuing a stablecoin?

7      A    Well, those -- so, again, I'm taking

8    your definition.  I would not call what you call

9    a stablecoin at all.  I would call that just

10   dollars, the bank intermediate dollars.  That's

11   not a stablecoin.  We've had those since the

12   1960s at least.

13           So I don't know what the Fed has said

14   about uninsured banks issuing those kinds of

15   deposits.  I'm not sure.  Credit card banks might

16   be an example of that, but I'm not sure.

17      Q    How about a bank with a master account

18   holding crypto on its balance sheet?  Was that a

19   policy question that the Board felt essential to

20   assess before deciding on Custodia's master

21   account request?

22      A    Are you considering here in your

Page 378

1    question the implications of the affiliated party

2    transactions within bank holding companies and

3    the Bank Holding Company Act that the Federal

4    Reserve considers?

5        Q    I'm just talking about an institution

6    with a bank account holding Bitcoin on its

7    balance sheet.

8        A    And it's a hard question --

9            MR. SCARBOROUGH:  Objection.

10            THE WITNESS:  -- to answer, so what

11   I'm -- I'm trying to answer this because the

12   holder -- the specific corporate holder of a

13   master account is not J.P. Morgan.  It's Chase

14   National Bank.  J.P. Morgan and other affiliates

15   may hold --

16   BY MR. MICHAELSON

17       Q    I'm talking about the entity that has

18   the master account.

19       A    And is that entity the parent company,

20   or is that the individual sub in your --

21       Q    Well, let's --

22       A    -- hypothetical?

Page 379

1          Q    Well, let's go with Custodia.   What
2     would it be in Custodia's case?
3          A    I don't know.   I haven't evaluated
4     Custodia's business model.
5          Q    Okay.   So was that one of the policy
6     questions that the Board felt essential to assess
7     before deciding Custodia's master account access?
8          A    I think --
9               MR. SCARBOROUGH:   Objection --
10              THE WITNESS:   -- that it --
11              MR. SCARBOROUGH:   -- to form.
12              THE WITNESS:   -- is -- I think it is
13    one -- I think that one of the policy questions
14    that the Board felt essential to assess was the
15    access to a master account for a financial -- for
16    a depository institution that may also itself or
17    through an affiliated party or subsidiary hold
18    digital assets, cryptocurrencies, on -- on its
19    balance sheet, but again --
20    BY MR. MICHAELSON
21         Q    And where did the Board come out on
22    that?

Page 380

1      A     Same answer I gave you before.  I don't

2    know that it has.  I think that that

3    conversation -- that question is still being

4    discussed.

5      Q     Okay.  So, then, is it your testimony

6    that the Board of Governors dictated the denial

7    of Custodia's request before resolving its policy

8    questions?

9      A     My testimony is that the Board in its

10   engagement with the Federal Reserve Bank of

11   Kansas City, as it has with other Federal Reserve

12   Banks, dictated the denial of master accounts --

13   of a master account for Custodia before it

14   could -- before it has spoken unequivocally

15   through rulemaking about that question about

16   crypto-assets on a bank's balance sheet and

17   others that are still pending before the Board.

18     Q     So -- so it's -- I just want to

19   understand.  So Custodia's request implicated

20   matters of policy for the Board to consider.  The

21   Board is still considering those, but in the

22   meantime, it dictated the denial of Custodia's

Page 381

1    request.  That's your testimony?

2              MR. SCARBOROUGH:  Objection.

3              THE WITNESS:  My testimony is that

4    the -- that Custodia requested master account

5    access, that later it requested membership to the

6    Federal Reserve System on a separate process,

7    that it -- in close succession.  It might have

8    been the same day.  As I recall, it was denied

9    both.  That, meanwhile, the Federal Reserve

10   raised questions of policy about Custodia and its

11   business model and that it still has not resolved

12   one way or the other.

13   BY MR. MICHAELSON

14        Q    To your knowledge, did the Board of

15   Governors vote on whether to grant or deny

16   Custodia's master account request?

17        A    To my knowledge, they did not vote.

18   Votes of the Board of Governors become public,

19   and I have seen no public vote of the Board of

20   Governors as a body of governors.

21              Now, to be clear, the Board of

22   Governors refers legally and colloquially to two

Page 386

1    regard were in writing, in e-mail, by text, oral

2    communication or otherwise, I don't offer an

3    opinion about that.

4    BY MR. MICHAELSON

5         Q    Well, you offer an opinion that the

6    Board decided to reject Custodia's master account

7    request, right?

8         A    I offer the opinion that the Board

9    controlled the decision and dictated the decision

10   to the Federal Reserve Bank of Kansas City --

11        Q    Right.

12        A    -- to deny Custodia's --

13        Q    Right.  But --

14        A    -- access request.

15        Q    But are you saying they did it without

16   creating any internal paper analyzing the merits

17   or risks associated with Custodia's request?

18        A    No.

19             MR. SCARBOROUGH:  Objection to form.

20   BY MR. MICHAELSON

21        Q    What are you saying?

22        A    Well, I'm saying -- I can repeat my

CONFIDENTIAL

Page 387

1    answer from before.  It's the same answer.

2         So I'm saying that there will be --

3    there could be a paper trail, oral communication,

4    meetings that were held and the like in reaching

5    this conclusion, but for the very purposes that I

6    identified earlier, that it serves the interests

7    of the Board of Governors to have a private

8    instrumentality to effectuate its own decisions

9    because statutory accountability mechanisms such

10   as FOIA, Sunshine in Government Act,

11   recordkeeping and other things like that apply to

12   the Board, but do not apply to the Reserve Banks.

13        And so for that reason, the Board has a

14   very long history of making decisions that it

15   then implements through the Reserve Banks and

16   disclaiming responsibility for those decisions.

17   And based on the documents I reviewed in TBAS and

18   TNB, I come to the conclusion that consistent

19   with this long history, the Board did the same

20   thing in each of these instances, too.

21        Q    So you don't know who at the Board of

22   Governors made the decision to deny.  That's your

CONFIDENTIAL

Page 388

1  testimony?

2      A    I don't know the single individual who

3  dictated that result, no.

4      Q    Okay.  Do you know who -- who conveyed

5  that to the federal -- the decision to the

6  Reserve Bank of Kansas City?

7      A    I would -- I don't know the name of an

8  individual who did it.  I don't know that there

9  was an individual who made the decision instead

10  of a collaboration at the board level in reaching

11  that conclusion.

12      Q    Okay.  Do you recall -- in reaching

13  your decision -- in your conclusion reflected in

14  your expert report, you didn't rely on any of the

15  testimony from Kansas City personnel, did you?

16      A    In reaching my initial expert report,

17  the transcripts of depositions produced in this

18  litigation were not available to me.  They did

19  become available to me after the fact, but I did

20  not rely on them because of their lack of

21  availability in -- when I wrote my initial

22  report.

CONFIDENTIAL

Page 389

1      Q    Have you -- have you since reviewed

2   testimony from Esther George?

3      A    I have reviewed the testimony, the

4   deposition testimony of Esther George.

5      Q    Did you review the testimony of Tara

6   Humston?

7      A    I reviewed the testimony of Tara

8   Humston, yes.

9      Q    Did you review the testimony of Judith

10   Hazen in her personal capacity?

11      A    I did review the deposition testimony

12   of Judith Hazen.

13      Q    Have you reviewed the testimony of

14   Christi May-Oder?

15      A    I think that the testimony -- say the

16   name again.

17      Q    Christi May-Oder.

18      A    Is she Christi May-Oder -- may I ask,

19   is she the 30(b)(6) corporate representative?

20      Q    No, she's not.

21      A    No.  I believe I did.  Is that listed

22   on my supplemental report?

Page 390

1          Q     Well, let's go with the ones that you

2     remember.  Do you remember them all testifying

3     consistently that the president of the Kansas

4     City Fed, Esther George, made the decision to

5     deny Custodia's request?

6          A     I remember a lot of different testimony

7     pointing in many different directions with

8     respect to who ultimately made the decision

9     regarding the denial of access to the master

10    account to Custodia.

11         Q     Well, do you recall Esther George

12    testifying that she made the decision?

13         A     I recall from Esther George's testimony

14    that she described a lot of interactions with the

15    Board of Governors in managing that information

16    flow and -- and then, also, at the end of her

17    deposition, her conclusion when asked whether she

18    made the ultimate decision, and I remember her

19    saying that she did.

20         Q     Okay.  How do you square that with your

21    opinion in this case?

22         A     I relied not only on -- because I'm not

Page 402

1    proposed -- each bank is unique in its --

2         Q    I see.

3         A    -- risk profile, and so I don't know

4    how I would answer that question.

5         Q    So your view, then, is that this --

6    this notification -- this -- this comment in the

7    S letter about preliminary notification to Board

8    staff, which makes reference to requests that

9    raise novel issues, that that would encompass

10   every request because every bank raises novel

11   issues?

12        A    Elsewhere in either the S letter or in

13   the guidelines -- I think it's the S letter -- it

14   makes clear that even for those banks, the

15   so-called Tier 1 institutions that are not

16   engaged in what the Board calls, quote-unquote,

17   novel forms of banking, may be subject to exactly

18   this kind of searching evaluation.

19             And so it -- there is no limiting

20   principle that I can discern in the S letter or

21   in the guidelines that would give a single bank

22   comfort that it will have a straightforward

Page 403

1    process similar to what predominated between 1980

2    and 2015.

3         Q    Okay.  But let's be clear about what

4    was -- your knowledge of what was happening from

5    1980 to 2015.

6              You have no basis to opine on whether

7    Reserve Banks were conducting risk assessments on

8    institutions that requested master accounts from

9    1980 to 2015, correct?

10        A    No, that's not correct.

11        Q    Okay.  We looked at earlier, for

12   example, the New York Fed policy for high-risk

13   institutions for 2014, right?

14        A    We -- we did look at that document,

15   yes.

16        Q    Okay.  Were you aware of that before

17   today?

18        A    I was not aware of that document before

19   today, no.

20        Q    Okay.  That reflects that Reserve Banks

21   were conducting risk assessments of entities

22   requesting a master account prior to 2015,

Page 404

1    correct?

2         A    No.

3         Q    Okay.  So in 2015, when Fourth Corner

4    came around, which is brand new, for the first

5    time, Federal Reserve Bank conducting a risk

6    assessment of an entity requesting a master

7    account?

8              MR. SCARBOROUGH:  Objection to form.

9              THE WITNESS:  Do you have a question?

10   BY MR. MICHAELSON

11        Q    Yeah.  Was that -- you're saying that

12   Fourth Corner in 2015 was the first time that a

13   Reserve Bank subjected an entity requesting a

14   master account to any scrutiny or risk

15   assessment?

16        A    No.

17        Q    Okay.  What was happening before 2015?

18        A    The public record as we have it based

19   on comments around the time of the creation of

20   the master account, 1998, makes clear that there

21   was some kind of process that occurred, but in

22   the -- and I don't have the exact words, but I'll

Page 405

1    paraphrase -- that in the usual or majority of

2    cases or in most cases or something like that,

3    something to reflect the majority of cases, this

4    would -- it would be, quote-unquote, routine,

5    and, indeed, the time specified was five business

6    days.

7              What was happening in those five

8    business days, I couldn't say, and it may well be

9    that there was a, quote-unquote, risk assessment,

10   as you said, occurring within that period.

11             What happened in 2015, which was new,

12   and that the 2014 New York letter that you showed

13   me today does not dispute, is that a denial of

14   access to a legally eligible depository

15   institution occurred not because there was new

16   risk assessment -- that may or may not have been

17   taking place in cases prior to 2015 -- but that

18   that risk assessment or policy consideration led

19   ultimately to the denial of master account

20   access.

21        Q    Can you think of any institution that

22   requested a master account from 1980 to 2015

Page 406

1    that -- that would be denied today in light of

2    what you describe as a shift in approach toward

3    master account requests?

4        A    Because the guide -- the S letter and

5    the guide -- and the handbook are so broad --

6    sorry -- the S letter and the -- and the

7    guidelines are so broad, I can't be certain, but

8    I have a strong suspicion that, yes, the answer

9    to that is yes.

10            And what I have in mind here in

11   particular is the advent of Internet banking,

12   which was brand new in the 1990s, and included

13   the kinds of things that we take for granted in

14   2023 with respect to digital banking services

15   that are executed exclusively over the Internet.

16            These are -- the very kinds of issues

17   that are implicated, including through changes in

18   monetary policy regimes, changes which occurred

19   in 1984, occurred again in 1993, occurred again

20   in 2008, that -- it would implicate these

21   principles.

22            My answer to your question, then, is

1        A      Okay.

2        Q      Page FRBAR19, end of the first

3    paragraph, after -- in Section A.  "The original

4    proposal was also intended to ensure that Reserve

5    Banks apply a transparent consistent set of

6    factors when reviewing requests for access to

7    accounts and services."

8        A      I see that, yes.

9        Q      Okay.  So if -- if the goal of -- if

10   the goal of guidelines is to promote consistency

11   in decision-making across Reserve Banks, wouldn't

12   it make sense to ask Reserve Banks to consult

13   with the Board with respect to requests that

14   could result in variation across the Reserve

15   Banks?

16           MR. SCARBOROUGH:  Objection to form.

17           THE WITNESS:  I -- I -- I don't have

18   insights into the appropriate institutional

19   design for consistency.  I do know how the Board

20   behaved, not only in what it described in the

21   guidelines and S letter, but also in the specific

22   case of Custodia.

Page 412

1          For example, even on, quote-unquote,

2     internal deliberations within the Federal Reserve

3     Bank of Kansas City, these consultative processes

4     that they are talking about were not

5     consultative, but much more controlled.

6          So, for example, in the documents I

7     requested from the research staff at Williams &

8     Connolly, I was able to review, which I describe

9     in my report, a redline document that was

10    redlined by the Board, though it was written by

11    Kansas City Fed staff directed to Kansas City Fed

12    President Esther George and yet had significant

13    amendations by the Board, including the

14    elimination of reference to those very

15    consultations with the Board.

16         Now, consultations are one thing, but

17    if consultations turn into veto points, which, as

18    I document in my supplemental report, is exactly

19    what happened with the S letter and the

20    guidelines and as we have seen in the case of

21    Custodia, that is no longer consultation.  That's

22    control.  And that's the difference.  This -- I

CONFIDENTIAL

Page 413

1    don't see in the guidelines or in the S letter a

2    courtesy call.  I see mandates and I see ultimate

3    decision-making authority in the Board of

4    Governors.

5         Q    So is it your opinion that the Board of

6    Governors vetoed the Reserve Bank's decision to

7    grant Custodia's master account request?

8         A    No.

9         Q    Okay.  And where do you see a mandate

10   from the Board of Governors that the Federal

11   Reserve Bank of Kansas City must deny Custodia's

12   master account request?

13             MR. SCARBOROUGH:  Objection to form.

14             THE WITNESS:  Is my supplemental report

15   an exhibit in the record?

16             MR. MICHAELSON:  No, but it can be.

17   We're marking your supplemental report as Exhibit

18   307.

19             (Deposition Exhibit Number 307 was

20             marked for identification.)

21             THE WITNESS:  Thank you.

22

Page 417

1    only be produced at the end of a process by one

2    of the Federal Reserve Banks.

3              Why the Federal Reserve Board of

4    Governors has structured this process with those

5    two if -- to have those two effects is something

6    you'd have to ask the representatives of the

7    Board of Governors --

8              MR. MICHAELSON:  And --

9              THE WITNESS:  -- to clarify.

10   BY MR. MICHAELSON

11       Q    And the result of that would be that

12   the Reserve Bank could get sued, as it has been

13   here, and be subject to rules of civil discovery

14   without limitations of a record review case?

15             MR. SCARBOROUGH:  Objection.

16             THE WITNESS:  There are -- there are

17   all -- there are all kinds of statutes and

18   authorities and provisions that apply to the

19   Board of Governors that by their terms do not

20   apply to the Federal Reserve.

21             There's a reason that you are here and

22   not representatives of the Department of Justice.

Page 418

1    There are reasons why your client has dot org

2    e-mail instead of a dot gov e-mail.  There are

3    reasons why FOIA does not apply to the Federal

4    Reserve Banks, and there are -- even within the

5    Monetary Control Act itself, there are different

6    elements that point to the Board versus the

7    Reserve Banks.

8            The structure of this process has the

9    effect -- I don't comment on the intention -- has

10   the effect of putting all accountability at the

11   dot org private lawyer, non-FOIA, in different

12   parts of the MCA, with all of the control in the

13   dot gov subject to FOIA, public agency and

14   decision-making.

15           The Federal Reserve System and the

16   Board of Governors is seeking in this process to

17   have its cake and eat it, too, and that's the

18   opinion that I offer in my expert opinion that --

19   in my -- in my expert report that the Board both

20   controls and obscures its participation in the

21   denial of master account access.

22

Page 419

1    BY MR. MICHAELSON

2        Q    And to do that, they have to make

3    decisions on master account requests from novel

4    institutions like Custodia without leaving a

5    paper trail that can be subject to FOIA, right?

6            MR. SCARBOROUGH:  Objection to form.

7            THE WITNESS:  No.

8    BY MR. MICHAELSON

9        Q    Well, wouldn't their documents be

10   subject to FOIA?

11       A    Well --

12       Q    Isn't that what you're saying?

13       A    As a Fed historian who has been on the

14   sharp end of any number of FOIA request denials

15   at of the Board of Governors, I'm not saying that

16   FOIA represents a disclose all your documents

17   mechanism.

18           I will say -- and my earlier testimony

19   is consistent with this view -- that the paper

20   trail, so to speak, does include the exact kind

21   of exchange of information that's outlined in the

22   process in the S letter and -- and guidelines.