# EXHIBIT 15

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

 1      IN THE UNITED STATES DISTRICT COURT FOR THE
                  DISTRICT OF WYOMING
 2

 3

       CUSTODIA BANK, INC.,        )
 4                                 )
                   Plaintiff,      )
 5                                 )
       v.                          )
 6                                 ) 1:22-cv-00125-SWS
       FEDERAL RESERVE BOARD       )
 7     OF GOVERNORS AND            )
       FEDERAL RESERVE BANK OF     )
 8     KANSAS CITY,                )
                                   )
 9                 Defendants.     )
10
11
12            * DESIGNATED CONFIDENTIAL *
13         * SUBJECT TO A PROTECTIVE ORDER *
14
15
16           ZOOM/IN-PERSON DEPOSITION OF ESTHER
17    GEORGE, a Witness, taken remotely on behalf of
18    the Plaintiff before Peggy E. Corbett, CSR, CCR,
19    RDR, pursuant to Notice on the 9th day of
20    November, 2023, at the offices of the Federal
21    Reserve Bank of Kansas City, 1 Memorial Drive,
22    Kansas City, Missouri 64198.
23
24
25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 11

1  A. It is one and the same. CEO and
2  President is the title of the position.
3  Q. Oh, okay. So in 2009 I thought you told
4  me you became CEO.
5  A. In 2009 I was the Chief Operating
6  Officer --
7  Q. I see.
8  A. -- for the bank.
9  Q. COO?
10  A. Which is the second COO.
11  Q. Did Governor Mark Gordon from Wyoming
12  have any involvement in your nomination or
13  securing those positions for you?
14  A. Mark Gordon was a director of the bank,
15  and would have been on the search committee for
16  the selection.
17  Q. Do you know, did he nominate you or
18  encourage you to get involved in this process in
19  any way?
20  A. No, he did not.
21  Q. Did he support your nomination for CEO
22  and President?
23  A. I would not know that other than I
24  believe that to be the case.
25  Q. Do you consider him a friend?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 12

1    A.    He was a good working associate here and
2    served well as a director of our bank.
3    Q.    All right.  I take it given your 40-year
4    involvement you have pretty good general
5    understanding of the operations of the Kansas
6    City Federal Reserve Bank, would that be a fair
7    statement?
8    A.    I do think I have a broad understanding
9    of this bank's operation.
10   Q.    So tell me, you started here at the
11   Kansas City Fed approximately two years after the
12   Monetary Control Act of 1980 was passed by
13   Congress; is that your understanding?
14   A.    I joined in 1982, and the Monetary
15   Control Act was in 1980, yes.
16   Q.    Tell me what your general understanding
17   is as to what the Monetary Control Act did in
18   regard to changes with the Federal Reserve Bank
19   system.
20   A.    My understanding of the changes had to
21   do with levelling the playing field and really
22   setting in motion pricing standards for the
23   Reserve Banks, in terms of how they deliver
24   services, making them not exclusive to member
25   banks, but opening them up for non-member banks,

Page 13

```
 1    as well, on the same terms.
 2         Q.   When you got into -- did you actually
 3    look at the specific language of the Monetary
 4    Control Act and talk with peers when you started
 5    to see what that actually meant and what that
 6    obligations were for the Kansas City Fed?
 7              MR. MICHAELSON:  Objection, form.
 8         A.   In 1982 I would have been focused on
 9    training to become a bank examiner, and this
10    probably was not in front of mind.
11         Q.   (BY MR. ORTIZ)  Fair enough.  Have you
12    ever authored any papers or given any lectures on
13    the Monetary Control Act, and what it means in
14    regard to State-chartered banks' ability to
15    access Federal Reserve services?
16              MR. MICHAELSON:  Objection, form.
17         A.   I do not recall doing anything specific
18    to that, although I -- it would not be unusual to
19    reference relevant legislation in some kind of a
20    speech or discussion.
21         Q.   (BY MR. ORTIZ)  To your knowledge does
22    the Federal Reserve Bank of Kansas City have
23    annual reports?
24         A.   The bank does have annual reports.
25         Q.   Are those housed here on-site, if you
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 14

1    know?
2         A.   The Kansas City Fed would make those
3    annual reports available to the public.
4         Q.   They do or they can?
5         A.   We do.  We post them on our website.
6         Q.   Going how far back?
7         A.   As long as I can remember.
8         Q.   For instance, I am going to hand you
9    what's already in evidence as Exhibit 2 in this
10   case.  This is an example of an Annual Report
11   from the Federal Reserve Bank of Cleveland.
12        A.   Uh-huh.
13        Q.   And if you turn to what is Page 2 on
14   this document, Page 2 of Exhibit 2, there's a
15   paragraph that starts, it says, "The legislation
16   has fundamentally altered the relationship
17   between Federal Reserve Banks and depository
18   institutions."  Do you see that?
19        A.   No. I'm sorry, what paragraph are you
20   looking at?
21        Q.   Sure, it starts --
22        A.   I see the second paragraph.
23        Q.   Yes, the second paragraph starts with
24   the words, "The legislation..."
25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 15

1   Q.  Do you know, is there a similar Annual
2   Report for the Kansas City Federal Reserve that
3   references what the changes in the Monetary
4   Control Act really mean?
5           MR. MICHAELSON:  Objection, form.
6   A.  I would not know here what the 1980
7   report of the Kansas City Fed would have said.
8   There was not a standard form.  Each bank would
9   have developed their presentation based on their
10  own judgments.
11  Q.  (BY MR. ORTIZ)  Earlier when you told me
12  that your understanding of the Monetary Control
13  Act was that it leveled the playing field that
14  really meant that State-chartered banks were
15  entitled to access Federal services, basically
16  access to the Federal Reserve system, correct?
17          MR. MICHAELSON:  Objection, form.
18  A.  My understanding of the Monetary Control
19  Act is it no longer made a distinction between
20  those that were members of the Federal Reserve
21  and those that were not, in terms of access to
22  services and their pricing.
23  Q.  (BY MR. ORTIZ)  So when you are not a
24  member of a member bank, you're typically a
25  State-chartered bank; is that correct?  That's a

Page 16

1   non-member bank?
2      A.   A State-chartered bank can be a member
3   bank, yeah.
4      Q.   Sure, but most non-member banks are
5   State-chartered banks, true?
6      A.   That would be true.
7      Q.   And you're saying what the Monetary
8   Control Act said, you can be a State-chartered
9   non-member bank and you have to be given access
10  to Federal services; is that correct?
11           MR. MICHAELSON:  Objection, form,
12  misstates prior testimony.
13     Q.   (BY MR. ORTIZ)  Is that your
14  understanding?
15     A.   It eliminated the distinction between
16  member banks and non-member banks.
17     Q.   And that's what you meant when you said
18  it levels the playing field?
19     A.   That's what I meant.
20     Q.   So back when you started in '82, and
21  maybe for the first 15 years or more there was no
22  such thing or no term that you called the master
23  account, was there?
24     A.   I'm not sure.
25     Q.   Can we agree, say at least starting at

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 30

1    A.    That is correct, with Federal
2    supervision in both cases.
3    Q.    So let me make sure I am understanding
4    what you're telling me.  You're telling me that
5    even if it's a State-chartered non-member bank,
6    you have some Federal supervisory authority over
7    that?
8    A.    A State-chartered institution must
9    select a Federal supervisor, and it is either the
10   Federal Reserve, or it is the Federal Deposit
11   Insurance Corporation.
12   Q.    So early on Custodia made it very clear
13   that they would let you supervise them, agreed?
14   A.    At the time they asked for the master
15   account, they had not expressed membership
16   interest, in being supervised by the Federal
17   Reserve.
18   Q.    Well, I think we're talking two
19   different things.
20   A.    Okay.
21   Q.    You don't have to be a member bank of
22   the Fed, do you, if you're State-chartered?  You
23   don't have to be a member bank, correct?
24   A.    That is correct.
25   Q.    All right.  Now, obviously, you have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 31

```
 1      supervisory authority over member banks.
 2          A.    Correct.
 3          Q.    I thought you just told me you also have
 4      supervisory authority over a State-chartered
 5      non-member bank.
 6                MR. MICHAELSON:   Object.
 7          A.    We do not.
 8          Q.    (BY MR. ORTIZ)   You do not.  But you're
 9      saying some Federal authority, other than the
10      State of Wyoming as the chartering authority, has
11      to supervise that?
12          A.    Our dual banking system is based on a
13      national charter issued by the comptroller of the
14      currency, or the 50 states can issue their own
15      charter, in which case they apply to the Federal
16      Reserve or the FDIC for their Federal
17      supervision.
18          Q.    Okay.
19          A.    So all State-chartered institutions come
20      with Federal supervision in the current legal and
21      regulatory framework.
22          Q.    So is it your position here today that
23      Custodia never acknowledged that they would be
24      supervised by you -- by the Kansas City Fed or
25      the FDIC?
```

1            MR. MICHAELSON:  Objection, form.
2       A.   The nature of the charter allowed the
3    State of Wyoming to be the sole supervisor of
4    this institution.
5       Q.   (BY MR. ORTIZ)  Okay.  Did you ever make
6    an offer or a request to Custodia that they just
7    willingly agree to let the Kansas City Fed also
8    have a dual supervisory role?
9       A.   I did not suggest that at any time.
10      Q.   Why not?
11      A.   That would have been inconsistent with
12   the authorities --
13      Q.   Why?
14      A.   -- that existed.
15      Q.   Why?
16      A.   Because the legislation creating the
17   SPDI charter did not refer to it as a bank that
18   would have Federal supervision.  It was
19   designated as State-only supervised.
20      Q.   Was that a policy question that you
21   needed decided by the Board of Governors, whether
22   you could even offer that?
23      A.   There was a threshold question to me
24   about whether this charter was eligible for
25   access to an account at the Federal Reserve.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 252

1       MR. MICHAELSON:  Object to form and
2   foundation.
3       A.   It would be typical to say this guidance
4   supersedes previous guidance.
5       Q.   (BY MR. ORTIZ)  Let me talk to
6   co-counsel for a minute if we could, Counsel.
7   Let's take a quick break?
8       MR. MICHAELSON:  Okay.
9       MR. ORTIZ:  We're winding down
10  pretty well.
11            (Brief recess taken.)
12      Q.   (BY MR. ORTIZ)  So did you have
13  information shared with you what on the same day
14  you were going to be announcing the denial of
15  Custodia's master account application, that the
16  White House would be issuing a press release
17  basically on the dangers of crypto-currency?
18      A.   I was not aware of the White House
19  announcement.
20      Q.   Were you surprised then when it all kind
21  of came out within minutes of each other, your
22  decision, the membership denial, and then the
23  White House issuing a statement?
24      A.   I was mostly focused on the Board of
25  Governors' decision-making release, and how it

Page 253

1    coincided with ours.
2        Q.   So did you find out that same day that
3    the White House had issued this press release on
4    crypto?
5        A.   I saw it in the news.
6        Q.   But you had no heads up that was coming
7    from anyone?
8        A.   I did not.  It wasn't a factor in my
9    decision.
10       Q.   Is there another reason that you did not
11   think Custodia was entitled to a master account
12   that you and I have not talked about today?
13              MR. MICHAELSON:  Objection, form.
14       A.   I believe we've covered all the reasons.
15              MR. ORTIZ:  Okay.  I appreciate
16   your patience with me today.  That's all the
17   questions I have, although I think he's going to
18   have a bunch more for you, and then I get to come
19   back and ask more questions.
20              THE WITNESS:  Okay.
21                   EXAMINATION
22   BY MR. MICHAELSON:
23       Q.   All right.  Thank you.  First, I'd just
24   like to designate the transcript confidential.
25              Okay, so Ms. George did there come a

Page 254

1   time when Custodia's request for a master account
2   was denied?
3        A.   Yes.
4        Q.   Okay, and who made the decision to deny
5   that request?
6        A.   So this was a decision in consultation
7   with my team, but given its nature I signed the
8   letter on behalf of the bank.
9        Q.   So would you say it was your decision?
10       A.   Yes.
11       Q.   And when did you arrive at that
12  decision?
13       A.   So I think the concerns that we had
14  ultimately when we got to the Fall of 2022 had
15  led me to think this is the direction that we
16  were heading and this was the appropriate
17  decision, given all the information that we had
18  from that point.
19       Q.   Do you recall whether a pre-membership
20  exam was conducted by FRBKC staff in the Fall of
21  '22?
22       A.   Yes.  I was aware that our team was
23  conducting that review.
24       Q.   And did the results of that review
25  factor in at all into your decision to deny

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 255

1    Custodia's master account request?
2        A.   Yes.  The assessment that that team saw
3    with their firsthand look at policies, the
4    compliance programs and other aspects of the
5    risk, did inform our decision.
6        Q.   And what were the primary drivers in
7    your decision to deny Custodia's master account
8    request?
9        A.   So our decision is outlined in the memo
10   that was attached to the letter.  It had to do
11   with the risk involved, the risk to the Reserve
12   Bank, the risk to the financial system, and the
13   nature of the volatility, the assets, that there
14   were broad public policy issues that would have
15   implications potentially.
16            We had seen inadequacies in the policies
17   and procedures, the operational components, had
18   raised questions about the management's ability
19   to establish a risk management program for this
20   institution, and also had raised questions about
21   ultimately in the event of a failure, how the
22   resolution of this institution would be handled,
23   which is a very relevant factor in considering
24   stability and implications of a failure.
25       Q.   Can you explain what you mean by that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 256

1  last point, the risk presented by potential
2  failure?
3      A.   So in our traditional banking system,
4  the FDIC for insured institutions is the
5  resolution authority, and there are very long
6  tested processes for the failure of an
7  institution and how it's resolved.
8           This would have been something new for
9  the State of Wyoming, in terms of being able to
10 handle a resolution like that, and one, of
11 course, which could not have been tested at that
12 point.
13     Q.   I see, and did you have a view at that
14 time as to the risks that Custodia might fail?
15     A.   I think we had seen such tremendous
16 volatility in the broader industry around this,
17 and we had seen bankruptcies and failures, and so
18 there was a real question about how such
19 volatility would be managed here, what liquidity
20 risk and other issues could arise that would
21 threaten the viability of this institution.
22     Q.   Earlier when you described the primary
23 drivers of the decision to deny, you mentioned at
24 the outset the risks to the Reserve Bank.  What
25 do you mean by that?