# EXHIBIT 16

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF WYOMING
 3
 4      CUSTODIA BANK, INC.,
 5                    Plaintiff
 6      vs.                                    No.
 7      FEDERAL RESERVE BOARD OF               22-cv-00125-SWS
 8      GOVERNORS and FEDERAL RESERVE
 9      BANK OF KANSAS CITY,
10                    Defendant.
11
12
13
14
15           CONFIDENTIAL DEPOSITION OF JUDITH HAZEN,
16      FRBKC Representative, a Defendant, taken on behalf of
17      the Plaintiff before Kelsey Robbins Schmalz, CSR No.
18      1571, CCR No. 1148, RPR, pursuant to Notice on the
19      16th of November, 2023, at the offices of the Federal
20      Reserve Bank of Kansas City, 1 Memorial Drive, Kansas
21      City, Missouri.
22
23
24
25
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 76

1   communicated to Wyoming representatives that there
2   was a problem with having a resolution plan be
3   developed within six months of commencing operations?
4              MS. CARLETTA:  Objection.  Form and
5   outside the scope.
6        A.    I don't know if it was conveyed that
7   we had concerns with not having a plan for resolution
8   until an entity was operating.
9   BY MR. SCARBOROUGH:
10       Q.    When did the Kansas City Fed first
11  have concerns around the timing of developing a
12  resolution plan for a SPDI?
13             MS. CARLETTA:  Same objections.  Form
14  and outside the scope.
15       A.    Based on the typos here, I would say
16  as early at December of 2018 we had concerns.
17  BY MR. SCARBOROUGH:
18       Q.    And which talking point are you
19  specifically referencing?
20       A.    I'm sorry.
21       Q.    I ask because I don't see it on those
22  talking points.
23       A.    I misspoke.  Let me confirm that
24  they're not in here.
25             I don't know the specific date that

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 77

1   the Federal Reserve Bank of Kansas City identify that
2   had as a concern.
3        Q.   And as you sit here today, is it fair
4   to say that you can't point to any time that that
5   concern would have been communicated to Wyoming
6   representatives while the SPDI charter legislation
7   was being drafted?
8             MS. CARLETTA:  Objection.  Form.
9        A.   I don't know if it was communicated
10  during the drafting of the legislation.
11  BY MR. SCARBOROUGH:
12       Q.   Okay.  Let's put that document to the
13  side, and we can also put Exhibit 227 to the side for
14  the moment.  And before I move completely off of it,
15  during any of the discussions that occurred between
16  Kansas City Fed officers and Wyoming representatives
17  around the SPDI charter legislation, was there any
18  representation made by the Kansas City Fed that a
19  SPDI was not going to be able to get a master account
20  since it didn't have a federal supervisor?
21            MS. CARLETTA:  Objection.  Form.
22       A.   I'm not aware of any comments made
23  that a SPDI would or would not be able to get a
24  master account.  I believe the conversation focused
25  on being clear that the decision would be with the

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 78

1  Reserve Bank or with the Federal Reserve.
2  BY MR. SCARBOROUGH:
3       Q.    Was there any representation made that
4  a SPDI-chartered entity would not be able to get a
5  master account because it was not insured by the FDIC?
6            MS. CARLETTA:  Objection.  Form.
7       A.    Again, I think the feedback shared
8  during the drafting of the legislation was that the
9  decision on the master account would be that of the
10 Federal Reserve System.
11 BY MR. SCARBOROUGH:
12      Q.    And so none of the feedback that was
13 given by Kansas City Fed officers said that having a
14 federal supervisor was essential to getting a master
15 account; is that fair?
16           MS. CARLETTA:  Objection.  Form.
17      A.    Again, in the context of the
18 conversations around the legislation, I think that
19 the comments that were provided around the master
20 account was clarity and where the decision stood.
21 BY MR. SCARBOROUGH:
22      Q.    And same question for being FDIC
23 insured.  None of the representatives of the Kansas
24 City Fed communicated to Wyoming representatives that
25 having FDIC insurance was essential to getting a

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 79

1    master account, right?
2             MS. CARLETTA:  Objection.  Form.
3         A.   Again, in the conversations around the
4    legislation, I believe the feedback on the master
5    account was clarity regarding the decision being with
6    the Reserve Bank.
7    BY MR. SCARBOROUGH:
8         Q.   We were talking earlier about the
9    Monetary Control Act of 1980, and when the Kansas
10   City Fed first took the position that it was simply a
11   pricing statute.  Do you remember that?
12        A.   I remember you framed it as I said it
13   was simply a pricing statute.
14        Q.   Again, is that -- am I misrepresenting
15   the position that the Kansas City Fed is taking on
16   the Monetary Control Act of 1980?
17            MS. CARLETTA:  Objection.  Form.
18        A.   I didn't prepare to speak on behalf of
19   the entire Monetary Control Act, but the specific
20   piece that you keep bringing up I do believe applies
21   to equal pricing or similar pricing for entities that
22   have access to services as determined by the Reserve
23   Bank.
24   BY MR. SCARBOROUGH:
25        Q.   And that's a specific reference to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 80

1   statutory Section 248?
2         A.    That's my understanding.
3               MR. SCARBOROUGH:  Can we mark as our
4   next exhibit 228.
5               (FRB Exhibit No. 228 was marked for
6   identification by the reporter.)
7   BY MR. SCARBOROUGH:
8         Q.    I'll hand you Exhibit 228.  Does the
9   Kansas City Fed publish an annual report?
10        A.    We do.
11        Q.    And does the annual report go out
12  under the president of the Kansas City Fed's
13  signature?
14        A.    It currently does.
15        Q.    And I've handed you the annual report
16  that went out under the signature of Roger Guffey,
17  president in January of 1981.
18              Do you see that?
19        A.    I see that.
20        Q.    And do you know that Roger Guffey was
21  the president of the Kansas City Fed at that time?
22        A.    Based on this.
23        Q.    To help you, if you turn to the third
24  page of the document page wise, it would be Page 5 if
25  they were numbered, do you see an officer list?  At

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 81

1    the top it says officers and then reflects the
2    January 1st, 1981, date?
3         A.    I see that.
4         Q.    And it indicates that for the Federal
5    Reserve Bank of Kansas City, the president is Roger
6    Guffey?
7         A.    I see that.
8         Q.    The copy is not great so I apologize
9    for that, but I will try to read the first part here
10   so that it facilitates your understanding.
11              It says, The year 1980 was one of
12   change and challenge for the Federal Reserve Bank of
13   Kansas City and its branches in Denver, Oklahoma City
14   and Omaha.
15              Do you see that?
16        A.    I do.
17        Q.    And then it goes on to say, With the
18   passage of the Depository Institutions Deregulation
19   and Monetary Control Act, the financial industry
20   entered a new -- what's that word -- dynamic, I
21   believe, but it's difficult to read it for sure --
22   strike that.
23              Entered a new economic environment
24   which is sure to make the '80s a dynamic time for all
25   financial institutions.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 82

1          Did I read that correctly?
2          A.   As well as I can read it.  It's
3    difficult on the side.
4          Q.   Right.  There's nothing that I read
5    there that does not appear to reflect the document;
6    is that fair?
7          A.   Correct, beyond the framing of that
8    new environment that I just can't make out.
9          Q.   And does the Kansas City Fed agree
10   that in the wake of the passage of the Monetary
11   Control Act that there was a rapidly changing
12   financial environment?
13              MS. CARLETTA:  Objection.  Form.
14   Outside the scope.  We did not agree to have the
15   witness testify on the entirety of the Monetary
16   Control Act of 1980, and we discussed this in our
17   meet and confer.
18         A.   I see the statement there.
19   BY MR. SCARBOROUGH:
20         Q.   Okay.  President Guffey goes on to say
21   that the services provided by the Federal Reserve
22   Bank such as check clearing, wire transfer -- wire
23   transfer processing, occurrence and coin processing
24   and fiscal agency services will become directly
25   available to many more financial institutions.  The