Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

Billie L.M. Addleman, #6-3690
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 532-4999
baddleman@hirstapplegate.com

*Counsel for Defendant Federal Reserve Bank of Kansas City*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC.,<br><br>    *Plaintiff,*<br><br>    v.<br><br>FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY,<br><br>    *Defendants.* | No. 1:22-cv-00125-SWS |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
MOTION TO STRIKE REPORTS AND EXCLUDE THE TESTIMONY OF KATIE S. COX**

Defendant Federal Reserve Bank of Kansas City ("FRBKC") moves this Court to enter an order to exclude the testimony of Plaintiff Custodia Bank, Inc.'s ("Custodia") putative expert witness Katie S. Cox and to strike her Report dated October 20, 2023, and her Supplemental Report dated December 4, 2023.

## PRELIMINARY STATEMENT

Cox left work at the Board of Governors (the "Board") in February 2020 and commenced work as a paid consultant to Custodia three months later. In exchange for providing Custodia advice on the Federal Reserve, Cox received stock options as well as monthly payments that continue to this day. Cox is a fact witness in this case, designated by Custodia to testify about her first-hand accounts of communications with FRBKC and the Board concerning Custodia's master account request. FRBKC has no objection to Cox testifying as a fact witness consistent with the Federal Rules of Evidence.

FRBKC does, however, object to Custodia's attempt to proffer Cox as an expert witness to provide biased, unreliable opinions on factual and legal questions that are for this Court—not an expert—to decide. Cox purports to offer the expert opinion that the Board controlled the outcome of Custodia's master account request, but that non-technical fact question is not the proper subject of expert testimony, and in any event, Cox's opinion is unreliable because it is based on only a partial, selective review of the discovery record. And her opinion is most assuredly *not* based on any expertise because she had effectively no experience working on master account requests during her tenure with the Board.

Cox also purports to offer a legal opinion on the proper construction of the Federal Reserve Act. She is not a lawyer, and her opinion conflicts with the interpretation that has consistently been advanced by her former employer, the Board. The even more fundamental problem, however,

is that questions of law are for the Court—not an expert witness—to decide.

Tellingly, Custodia seldom relies on Cox's reports in its Motion for Judgment as a Matter of Law. Instead, it appears that Custodia wants to use Cox at trial as a vehicle to tell its preferred narrative. Custodia would like Cox to testify as a fact witness with the gloss of an expert, through whom Custodia could enter a range of evidence about which Cox has no first-hand knowledge. But an expert must actually provide relevant, reliable expertise—not merely serve as a "conduit" a party uses to "construct a narrative." Order at 7, *Houska v. Newkota Servs. & Rentals LLC, et al.*, No. 2:20-cv-68-SWS (D. Wyo. Feb. 22, 2022), ECF 82 (Skavdahl, J.). This gambit should be rejected, and Cox's expert testimony and Reports stricken.

## BACKGROUND

**1. Federal Reserve Experience.** Cox began her career working as a bank examiner for various Reserve Banks. Ex. 1 ("Cox Rep.") at Ex. 2. From 1993 to 1995, Cox worked at FRBKC. *Id.* As a bank examiner, Cox did not work on *any* master account requests during her time with any Reserve Bank, including FRBKC. Ex. 2 ("Tr. (Day 1)") at 23:13-24:1; 65:22-66. She understood, however, that master account requests are "typically handled at the reserve banks." *Id.* She knew that FRBKC's Credit Risk Management department ("CRM") are "the payment system people" who "handle master accounts." Cox Rep. 3-6; Tr. (Day 1) at 170:8-15. But Cox did not work in CRM. Ex. 3 ("Tr. (Day 2)") at 47:5-17. Cox does not know what policies and procedures CRM applies to master account requests, nor whether CRM conducts risk assessments in connection with provision of access to services. Tr. (Day 1) 149:11-16; *see also* Tr. (Day 2) 90:13-91:1.

From 1999 to 2020, Cox worked in the Mergers and Acquisitions Section ("M&A") of the Board's Supervision and Regulation Division. *See* Cox Rep. at Ex. 2. M&A's focus is reviewing

and recommending action on applications submitted to the Board by bank holding companies, state member banks, foreign banking organizations, and other entities and individuals for approval to undertake various transactions, including mergers and acquisitions, and to engage in new activities. *See* Ex. 5 at FRBKC-00012801.  Cox started as a senior financial analyst and finished as a manager.  *See id.*  In her time in M&A, Cox did not independently analyze any master account requests and lacked insight into the Board Legal Division's ("Board Legal") communications with the Reserve Banks on legal eligibility or any other analysis of master account requests.  Tr. (Day 1) 70-72.

At the Board, the Division of Reserve Bank Operations and Payment Systems ("RBOPS") oversees Reserve Bank operations (including Reserve Banks' provision of financial services to depository institutions); the issuance of currency and the production of new currency; the safety and efficiency of U.S. payment, clearing, and settlement systems; and payments-related research. *See* Ex. 6 (Fed. Rsrv., Reserve Banks Operations and Payment Systems (Jan. 22, 2024), http://tinyurl.com/cdv4zh5d).  Cox never worked in RBOPS and was unfamiliar with its work.  Tr. (Day 1) 170:15-19 ("Q. And when ... [CRM] speak[s] with individuals at the Board, who do they tend to interact with? A. I really don't know."); Tr. (Day 2) at 46-47 ("[I]t would be difficult for me to go into a lot of detail as to what [RBOPS] do[es].").

[redacted]

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████
      ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████

**2. Custodia Experience.** Cox left the Board in February 2020 and commenced work as a paid advisor to Custodia in May 2020. *See* Cox Rep. ¶ 2. She has been compensated $2500/month, plus stock options, for more than three years. *See id.* ¶ 3; Tr. (Day 2) 18:10-19:20. Cox continues to hold the stock options, whose value could well be impacted by the outcome of this litigation. Cox's proffered testimony is that she generally advised Custodia that the Board would determine the outcome of its master account request. Tr. (Day 1) 218:1-6. She gave this advice even after she was repeatedly told otherwise by both FRBKC and the Board. For example,

4

Cox reached out to FRBKC about who was deciding the master account request and was told that FRBKC would decide the request. *See, e.g.*, Ex. 8 at Custodia-00008664 ("Esther has the final decision on granting the master account and the Board is being looped in for consultation and consensus building."). The next month, she reached out to staff of the Board's Legal Division, but Board Legal informed her that "individual account requests are handled at the Reserve Bank level ... ." Ex. 9 at Custodia-00009742.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, the proponent of expert testimony is burdened with demonstrating its admissibility, and unreliable expert testimony must be excluded. To assess the admissibility of expert testimony under Rule 702, the Court must perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–95 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "Particularly important in this case, where an expert witness is relying solely or primarily on experience, the expert must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how the experience is reliably applied to the facts." *Houska,* No. 2:20-cv-68-SWS, at 4-5 (quotation marks omitted).

## ARGUMENT

I. **Cox Is Not Qualified and Offers No Specialized Knowledge Concerning the Decision to Deny Custodia's Master Account Request.**

Cox purports to offer the expert opinion that "the Board intervened in Custodia's request for a master account and exercised control over the denial of Custodia's master account." Cox

5

Rep. ¶ 7. Under Rule 702, however, an expert witness must (a) be "qualified as an expert" and (b) offer "specialized knowledge" that will assist the trier of fact. Cox clears neither hurdle.

Cox admitted that master account requests are "typically" handled by Reserve Banks and conceded that she had no personal experience with such requests. Cox never received training on handling master account requests or worked on guidance related to master accounts. *See* Tr. (Day 1) 58:21-59:5, 68:1-19; 74:1-4; Tr. (Day 2) 110:21-111:17. She did not know whether Reserve Banks conducted risk assessments before granting master account requests. *See* Tr. (Day 1) 64:12-16; Tr. (Day 2) 91:2-17. She did not know whether conditions were imposed on master account holders. *See* Tr. (Day 1) 91:5-11, 166:11-19. She did not know whether master account holders could have their access to services restricted. *See id.* 167:8-12. And she did not know about the numerous policies and procedures concerning how to process master account requests and conduct risk assessments, many of which were either publicly available or produced during discovery. *See id.* 148:8-13 ("Q. Were you familiar with any policies or procedures that the reserve banks had put out concerning master account request procedures? A. No, not in — no, I can't say I knew anything specifically. Maybe some things in general, but ... "); 149:11-16 ("Q. Okay. Were you aware that FRBKC had policies and procedures concerning evaluation of master account requests. A. No I wasn't — aware of that."); *see also* Tr. (Day 2) 60:10-12, 90:13-91:1.[1]

During her tenure with the Federal Reserve, she recalled involvement in only *two* master account requests, and that involvement was limited to watching from the sideline as Board Legal considered the requesting entity's "legal eligibility." If anything happened thereafter, she did not

---

[1] Cox was even unaware of longstanding, publicly available policies such as FRBNY's Account and Financial Services Handbook (Ex. 10), *see* Tr. (Day 2) 61:2-16, and Operating Circulars 3, 4, and 5, *see* Tr. (Day 1) 148:14-149:1; Tr. (Day 2) 134:22-135:10. Cox was aware that Operating Circular 1 existed, but she had never read it. *See* Tr. (Day 1) 148:14-20.

6

know about it. [2] Tr. (Day 2) 34-36. This minimal experience provides no basis to provide expert testimony on who denied Custodia's request, particularly given that the one issue she had any involvement with—eligibility—was resolved in Custodia's favor. *See* Ex. 12 at FRBKC-00000234. At issue in this case is what happened *after* the eligibility determination—how it came to be that, despite the favorable eligibility ruling, Custodia's request was denied. Cox brings no experience or specialized knowledge to bear on that question. Tr. (Day 1) 64:12-20 (Reserve Banks "might be" performing risk assessments, "but I don't know"); Tr. (Day 2) 90:13-91:17 ("I don't know what [Reserve Banks] were doing" before opening master accounts); Tr. (Day 1) 61:1-62:18 (acknowledging that she did not know what happened after the ICE eligibility determination).

Custodia's CEO, Caitlin Long, understood that Cox did not have experience with the master account process. *See* Ex. 13 ("Long Tr.") at 133-34 (testifying that she knew Cox spent the "vast majority" of her career "dealing with membership applications and other applications in the M&A division" and did not have "recent experience with master accounts"). As Long was aware, Cox had only general knowledge of Federal Reserve practices, but general knowledge about the Federal Reserve does not make Cox an expert on master account requests. *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (affirming exclusion of testimony by proffered insurance expert with 30 years of experience in claims handling where expert did not demonstrate knowledge specific to New Mexico and third-party claims); *see also In re EpiPen*

---

[2] Cox posits that The Narrow Bank's master account request was also controlled by the Board. *See* Cox Rep. ¶¶ 35–36. But Cox did not even see The Narrow Bank's request because it was not submitted with another proposal (like membership) and therefore was not seen by the M&A division. Tr. (Day 1) 73:13-14. She was not sure the request even reached the Board. Tr. (Day 2) 185:20-186:16. She supports her opinion with a single document, *see* Ex. 11 at TNB-0000002, that does not establish Board control of the decision.

7

*(Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490, at *49 (D. Kan. June 23, 2021) (finding a proffered expert unqualified despite "many years' experience working in the pharmaceutical industry generally" because he lacked experience "with manufacturing or mechanical issues" in particular).

**II.     Cox's Proffered Expert Opinion Is Unnecessary and Unreliable.**

The Court expressed interest in discovery into whether the Board controlled the outcome of Custodia's request. *See* ECF 164 at 10–12; ECF 197.  The Court is equipped to assess the evidence (on a full record) and make any necessary factual findings.  *See Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002).  Evaluating the deposition testimony and documentary record to determine who made the decision does not require the kind of technical or scientific expertise that would call for expert testimony.  *See Weidenbach v. Casper-Natrona Cnty. Health Dep't*, 2021 WL 2492480, at *2 (D. Wyo. May 21, 2021) (Skavdahl, J.) (finding expert testimony "cumulative and unnecessary" where the factfinder could evaluate "each of these assertions based solely on the testimony of the direct participants without any further explanation or opinion from an expert witness.").

But even if genuine expert input on this subject could be helpful to the Court, the unsupported opinion of someone who lacks relevant expertise and failed to consider critical evidence would not be helpful.  An expert opinion "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation ... ." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (internal quotation marks omitted).  And yet, Cox seeks to offer this Court an expert factual opinion on the Board's role in Custodia's request upon review of only a selectively curated part of the record and a series of *ipse dixits* about the Board's role in requests for master accounts, relying on her experience in working on separate and distinct applications (such as M&A transactions) that, by statute, explicitly require

8

the Board's approval. The law makes clear that unreliable, unfounded opinions like these must be disallowed.

Cox's fact opinion is that "the Board intervened in Custodia's request for a master account and exercised control over the denial of Custodia's master account." Cox Rep. ¶ 7; *see also* Ex. 4 ("Cox Supp. Rep.") ¶ 13. To support that view, Cox claims that the Board (1) determined whether Custodia was legally eligible to receive an account, (2) intervened and "halted the Kansas City Reserve Bank's examination of Custodia and thwarted Custodia's entitlement to a master account," (3) denied Custodia's membership application, thereby preventing "the Reserve Bank from approving the master account application," (4) issued the Guidelines, (5) issued and operated in conformance with the S-Letter, and (6) issued the internal Federal Reserve Handbook for implementing the Guidelines. Cox Rep. ¶ 7; Cox Supp. Rep. ¶ 2.

But in reaching her opinion, Cox either did not review or did not address key documents that would be relevant to determining the Board's role in Custodia's master account request. Examples of relevant evidence that Cox either did not consider before submitting her initial Report or did not address at all include:

- Any deposition testimony, including the testimony of then-FRBKC President Esther George, who explained under oath how and when *she* made the decision to deny Custodia's request. *See* Tr. (Day 2) 134:1-21; Ex. 18 ("George Tr.") at 259:9-261:21.

- Statements from Board staff that FRBKC would make the decision on Custodia's master account request. *See, e.g.*, Ex. 9 at Custodia-00009742 (Board counsel telling Cox that "individual account requests are handled at the Reserve Bank level"); Ex. 14 at FRBKC-00009849 (Caitlin Long stating in a meeting that Federal Reserve Governor Lael Brainard had said the master account was a "purely reserve bank decision").

- Documents showing that FRBKC had significant concerns with Custodia throughout its review, including FRBKC's risk assessments identifying numerous deficiencies. *See, e.g.*, Ex. 15 (FRBKC-00003607); Ex. 16 (FRBKC-00000054);

9

Ex. 17 (FRBKC-00017421) (final assessment from the pre-membership exam).[3]

- Documents and deposition testimony that stated that FRBKC had already decided to deny Custodia's master account request unless the Board granted membership, which would have changed the risk calculus. *See, e.g.*, George Tr. at 259:9-19; *id.* at 196:4–8; *id.* at 210:17–20 ("If the Board granted membership, it would have changed the analysis we would have put in here, because it would have changed who their prudential supervisor was.").

Cox opines that the Account Access Guidelines, the S-Letter, and the Handbook gave the Board control over Custodia's request. *See* Cox Rep. ¶ 7; Cox Supp. Rep. ¶ 13. But none of those documents contains any reference to Custodia, and each confirms that Reserve Banks have discretion over individual access requests, including requests from "Tier 3" institutions. *See* Ex. 20 at FRB-AR-000015 (recognizing "the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act to grant or deny access requests or to take action on existing access relationships."); *id.* at FRB-AR-000064 (stating that "a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers");

When addressing these documents, Cox did not review Federal Reserve policies that outlined FRBKC's longstanding approach to deciding master account requests. *See* Cox Rep. at Ex. 1. These policies show that the Reserve Banks conduct risk assessments in the provision of access to accounts and services, and that the Guidelines, S-Letter, and Handbook reflect—but did not change— many of FRBKC's established internal practices. *See, e.g.*, Ex. 21 ("May-Oder Tr.") at 53:19-25, 54:1-3, 54:17-20, 189:13-17; 290:11-25;

---

[3] The bleak findings of FRBKC's risk assessments directly contradict Cox's opinion that FRBKC had "positive assessments" of Custodia and its business. Cox Rep. ¶ 59.

Cox also opines that the Board must have controlled the outcome because "whether to allow Custodia, a novel institution, holding custody for crypto-assets, into the reserve system was a policy decision, which only the Board can make." Cox Rep. ¶ 8. But her opinion that Board policy decisions about crypto custody dictated the outcome does not withstand scrutiny. It cannot be based on her personal experience at the Federal Reserve, since she could recall only two master account requests, and in both instances her awareness of the Board's review was limited to Board Legal's determination of "legal eligibility." And it cannot be based on the discovery record in this case, since the Board determined that custody of crypto-assets *can* be permissible if done in a safe and sound manner. Ex. 25 (Policy Statement on Section 9(13) of the Federal Reserve Act, 88 Fed. Reg. 7848, 7850 (Feb. 7, 2023)). At her deposition, she testified that the policy decision she was referring to was *not* about digital-asset custody after all, but rather "whether or not novel institutions should have access to a master account." Tr. (Day 2) 173:9-11; *see id.* at 172-75. But she fails to point to any evidence in the record suggesting that the Board has a policy that bars novel entities from accessing the payment system. Cox's failure (in her reports and her testimony) to explain which policy issues the Board decided or how those purported decisions dictated denial of Custodia's master account request means she has no reliable basis for her policy-based opinions.

**III.    Cox's Reports Do Little More Than Repeat Custodia's Factual Allegations.**

Cox spends the majority of her reports reciting documents from the public record or from fact discovery with little to no analysis. "When an expert merely restates the factual narrative of the case and then reaches conclusory opinions, the expert assumes the role of an advocate and invades the province of the jury... . When an expert does not analyze the facts but instead regurgitates them and reaches conclusory opinions that are purportedly based on these facts the

11

expert has improperly invaded the province of the jury." *Houska*, No. 2:20-cv-68-SWS, at 12 (internal quotations and citations omitted). Courts in this Circuit routinely exclude expert opinion that simply "regurgitat[es] factual information that is better presented through introduction of documents ... ." *See Pritchett v. I-Flow Corp.*, 2012 WL 1059948, at *7 (D. Colo. Mar. 28, 2012); *Baumann v. Am. Fam. Mut. Ins. Co.*, 836 F. Supp. 2d 1196, 1203 (D. Colo. 2011).

If there is a trial, Cox may be competent to testify as a fact witness to her communications on behalf of Custodia with the Board and FRBKC concerning Custodia's master account request. Her reports, however, regurgitate Custodia's view of the factual narrative and go far beyond any knowledge she may have as a fact witness. *Compare* Cox Rep. ¶¶ 21–29, *with* ECF 121 & 234. This makes her a paid advocate intent on arguing Custodia's case from the witness stand while cloaked with the authority of an expert. *See, e.g.*, *Brown v. Cooper*, 2012 WL 8897779 (D. Wyo. Nov. 8, 2012) (Rankin, M.J.) (excluding expert testimony that primarily regurgitated others' testimony and was an attempt to cloak factual evidence with the authority of an expert); *Summers v. A.L. Gilhert Co.*, 69 Cal. App. 4th 1155, 1185 (Cal. Ct. App. 1999) (holding that allowing an expert to essentially make a party's closing argument from the witness stand was improper).

**IV.    Cox's Proffered Opinion of Law Usurps the Court's Role.**

This case turns on a dispositive question of law: does 12 U.S.C. § 248a give every state-chartered depository institution an absolute right to a Federal Reserve master account irrespective of risk? Cox would answer this legal question in the affirmative, opining that the "only statutory factor" that the Federal Reserve may consider is legal eligibility. Tr. (Day 2) 43:17-18; *see id.* 78:6-13. In her view, the Federal Reserve Act ("FRA"), as amended by the Monetary Control Act ("MCA"), does not afford the Federal Reserve discretion to consider anything else. When asked how her opinion squares with the Reserve Bank's practice of considering risk-based "principles"

12

in deciding whether to grant access (as outlined in the Account Access Guidelines), Cox opined that the application of risk-based principles exceeds the Federal Reserve's statutory authority:

> THE WITNESS: So what I'm saying is that, like I've said before, the Fed just has one job here for a master account, and that's the legal eligibility determination. That's — that's their only job that Congress has authorized them to do.
>
> BY MS. CARLETTA: Q Based on your review of the Monetary —
>
> A Based on my understanding of the Monetary Control Act.
>
> Q So why — then why did they issue the guidelines, the implementation handbook, and the S Letter?
>
> MS. WEINBERGER: Object to form
>
> ... .
>
> A So having worked at the Board for a long time, sometimes they go down rabbit holes. And it's a bad decision to go down those rabbit holes. And I think what happened here is they went into a massive rabbit hole. And no one at the Board stood — stood back and said, "Is this a good idea? Should we be doing this?" And I've seen this happen where staff is well intentioned, and they think they're doing the right thing, but they went down this giant rabbit hole.

Tr. (Day 2) 178-80; *see id.* at 78–79.

How Cox, a non-lawyer, arrived at a legal interpretation of the MCA that contradicts the longstanding position of her former employer (the Board) is unclear. Regardless, Custodia's attempt to introduce legal opinion through an expert witness is improper. The interpretation of a statute presents a legal question for the Court—not a purported expert witness—to decide. *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (en banc); *Abraham v. WPX Production Productions, LLC*, 184 F. Supp. 3d 1150, 1204 (D.N.M. 2016) ("[T]he Court is an expert in the law and needs no guidance from" expert witnesses); *see also Millward v. Bd. of Cnty. Comm'rs*, 2018 WL 9371674, at *2 (D. Wyo. Oct. 19, 2018) (Skavdahl, J.) (explaining that expert opinions on legal issues infringe upon the province of the court).

13

### V.     Cox Is Biased.

An expert witness should be excluded under *Daubert* when she "becomes an advocate for a cause" who "departs from the ranks of an objective expert witness." *See Downhole Stabilization Rockies Inc. v. Reliable Field Servs. LLC*, 2017 WL 3477743, at *3 (D. Wyo. Feb. 10, 2017) (Rankin, M.J.) (internal quotations and citations omitted).  In making this assessment, courts consider whether the proffered expert is employed by one party to the lawsuit.  *See id.*

Cox's financial entanglements with Custodia taint her opinions and warrant her exclusion as an expert.  In addition to paying Cox an hourly rate to be its expert witness, Custodia has paid Cox $2500/month for more than three years—over $100,000 and counting—to be an advisor.  She continues to be paid by Custodia on a monthly basis to this day.  Cox Rep. at Ex. 2.  Custodia has also given Cox stock options, the value of which will undoubtedly be affected by the outcome of this litigation.  *See* Cox Rep. ¶ 3; Tr. (Day 2) 18:10-19:20.  Because Cox's personal finances are closely tied to the outcome of this case, she is the quintessential "advocate for a cause" that courts have recognized cannot serve as an "objective expert witness." *Downhole Stabilization Rockies Inc.*, 2017 WL 3477743, at *3.

At minimum, given Cox's financial ties to Custodia and her stake in the outcome of this case, the Court should take extra care in evaluating the reliability and factual foundations of her opinions.  *United States v. Allerheiligen*, 1998 WL 918841, at *7 (D. Kan. Nov. 19, 1998).  For the reasons explained in the preceding sections, Cox lacks expertise and her proffered opinions are unhelpful and unreliable even putting aside her financial bias, but her bias further confirms that her testimony as an expert should be excluded.

## CONCLUSION

For the foregoing reasons, FRBKC requests that the Court grant its motion and exclude Katie Cox's Report, Supplemental Report, and testimony.

14

Date: January 26, 2024

  /s/ Billie LM Addleman
Billie L.M. Addleman, #6-3690
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (pro hac vice)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

## CERTIFICATE OF SERVICE

I certify the foregoing ***Defendant Federal Reserve Bank of Kansas City's Motion to Strike Reports and Exclude the Testimony of Katie Cox*** was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure via CM/ECF on January 26, 2024.

<u>*Shannon M. Ward*</u>
OF HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC