# EXHIBIT 2

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3        --------------------------

         CUSTODIA BANK, INC.,          :

4                                       :

             Plaintiff,                :

5                                       :   Case No.:

         vs.                           :

6                                       :   1:22-cv-00125-SWS

         FEDERAL RESERVE BOARD OF       :

7        GOVERNORS,                     :

                                        :

8        AND                            :

                                        :

9        FEDERAL RESERVE BANK OF        :

         KANSAS CITY,                   :

10                                      :

             Defendants.               :

11       --------------------------

12           "CONFIDENTIAL" DEPOSITION OF KATIE S. COX

13                     Volume 1 of 2

14       DATE:          December 19, 2023

15       TIME:          8:38 a.m. to 4:15 p.m.

16       LOCATION:      King & Spalding, LLP

                        1700 Pennsylvania Ave, NW

17                      Suite 900

                        Washington, DC 20006

18

19       REPORTED BY:  Felicia A. Newland, CSR

20

                        Veritext Legal Solutions

21             1250 Eye Street, N.W., Suite 350

                        Washington, D.C. 20005

22

CONFIDENTIAL

Page 22

1              A     I don't recall there being one

2       denied.  There could have been one where I didn't

3       happen to be on the team.

4              Q     Okay.  Great.

5                    Okay.  So any other positions you

6       held while you were in Dallas?

7                    How long were you in Dallas actually?

8              A     So I was -- yeah, so I was in Dallas

9       until, I want to say, 1991.

10             Q     Okay.  So you were in Dallas for

11      quite a while?

12             A     Yeah, I was in Dallas for almost six

13      years.

14             Q     Okay.  Great.

15                   So you started as a financial analyst

16      in Mergers and Acquisitions.  You moved over to the

17      bank examiner function, I think you said late '80s,

18      early '90s?

19             A     Well, I moved in January '88.

20             Q     Okay.  Great.

21                   And then is -- did you stay in that

22      function thereafter or did you --

Page 23

1          A     So -- so then I moved to Pittsburgh.

2    And I moved -- worked for the Cleveland Reserve

3    Bank.  And I think I was there from January 1991 to

4    January 1992, same thing, doing -- being a bank

5    examiner.

6          Q     Okay.  Great.

7                And then so you were in -- and after

8    Pittsburgh?

9          A     After Pittsburgh, I moved to the

10   Richmond Reserve Bank.  And I was there in '92 and

11   '93 as an examiner.

12         Q     Yep.

13         A     And then I moved to the Kansas City

14   Reserve Bank.  And I was there from '93 to '95.

15   And the whole time I'm -- I'm a bank examiner.

16         Q     Okay.  Great.

17               And so just to clarify, during that

18   time you were not working on master account

19   requests.  Is that right?

20         A     No, I was not working on master

21   account --

22         Q     Okay.  You were working on --

CONFIDENTIAL

1              A       Bank exams.

2              Q       -- bank exams for -- were they member

3       banks or were they applicants to become member

4       banks or both?

5              A       Sometimes the applicants become

6       member banks, but most of the time it was just

7       banks that were already existing --

8              Q       Okay.

9              A       -- or holding -- like I said, the

10      Federal Reserve is responsible for all different

11      types of financial institutions, so I might be

12      doing a foreign bank for a while, I might be going

13      to a holding company inspection --

14             Q       Gotcha.

15             A       -- a commercial bank, a mortgage

16      company, a leasing company.  It's just -- there's

17      all types of financial institutions that the

18      Federal Reserve is responsible for examining, it's

19      not just banks.

20             Q       I gotcha.

21             A       But we call it bank examining.

22             Q       Okay.  That's great.

Page 25

1          Okay.  So you're at the Federal

2     Reserve Bank of Kansas City now.  Who-hoo.

3          Did you work with -- during your time

4     at the Federal Reserve Bank of Kansas City, did you

5     work with anyone that worked on Custodia's master

6     account request or membership application?

7          A     Well, I was there only until '95, so

8     no.

9          Q     So no.  Okay.

10          There's some lifers in the Federal

11    Reserve Bank of Kansas City, so I had to ask.

12          A     Well, I worked -- so the people --

13    are you talking -- let me make sure I understand

14    your question.  Are you asking me if I worked with

15    anyone who --

16          Q     Who then went on to work on

17    Custodia's, years later.

18          So was Esther George there, for

19    example, and did you work with her?

20          A     No.  She, I believe, was at the

21    Denver Branch or not in the -- now, the person I

22    did work with was Jackie Nugent, but not while --

CONFIDENTIAL

Page 57

1              A      Sure.

2                     So an SR Letter is a letter developed

3       in the division of Supervision and Regulation.  And

4       it's giving public guidance to the banks and to the

5       reserve banks, that's your audience, as to some new

6       policy or -- or some tweak to an old policy.  You

7       know, we're taking an old SR Letter and we're

8       updating it or this is a new -- so anyways, it's

9       public guidance.

10             Q      Okay.  So the SR Letters are public?

11             A      Uh-huh.

12             Q      And do you know what kinds of topics

13      they tend to cover?

14             A      Well, they cover supervisory

15      matters --

16             Q      I gotcha.  Okay.

17                    And so --

18             A      -- for that division.

19             Q      I gotcha.

20             A      Ours is of supervisory, so it's

21      covering supervisory matters.

22             Q      Okay.  And so you also mentioned S

1          Letters.

2                    A      Uh-huh.

3                    Q      Do you -- do you know what a S Letter

4          is?

5                    A      Well, that's a letter of public

6          guidance issued by the secretary's office.

7                    Q      Okay.  S Letters are public?

8                    A      Well, that one, it can be.  I don't

9          know.  I -- ours are public.

10                   Q      I gotcha.

11                          Okay.  SR Letters are public, and

12         you're not sure --

13                   A      I'm not sure about the S Letters --

14                   Q      Okay.

15                   A      -- because I really didn't deal with

16         those much.

17                   Q      Okay.  And do you happen to know what

18         subjects S Letters dealt with or --

19                   A      I -- I didn't really deal with S

20         Letters.

21                   Q      Okay.  So would guidance concerning

22         master accounts be promulgated through S Letters or

Page 59

1      SR Letters, to your knowledge?

2           A    So I didn't work on --

3           Q    Okay.

4           A    -- guidance related to master account

5      requests.

6           Q    Okay.  Great.  I just wanted to --

7           A    Yeah.

8           Q    Because we're talking about so many

9      different things --

10          A    Yeah, right.

11          Q    -- I just want to make --

12          A    Right.

13          Q    -- sure I keep track.

14          A    Right.

15          Q    Okay.  So in that same vein, I just

16      want to make sure I button up a couple of things.

17             You were always in the Mergers and

18      Acquisitions Division when you were working at the

19      Board of Governors.  Is that correct?

20          A    Yeah.  And it's a section of the

21      division, just for the -- to be more precise.

22          Q    Okay.  And they oversee membership

Page 60

1           applications, correct?

2                   A      That's part of the job.

3                   Q      And mergers and acquisitions?

4                   A      That's part -- like I said, there's

5           40 different --

6                   Q      Right, right.

7                   A      -- types of proposals that come

8           through.

9                   Q      We were talking about your chain of

10          command.  I didn't hear RBOPS in there.  Did you

11          ever work with RBOPS?

12                          When I say -- let me strike that.

13          Let me back up.

14                          When I say RBOPS, do you know what

15          I'm talking about?

16                  A      Yes.  Reserve Bank Operations and

17          Payment Systems division.

18                  Q      Okay.  And did you ever work with

19          them?

20                  A      Not really.  I mean, they were

21          involved in the ICE Trust proposal, but what they

22          did, I don't know.

Page 61

1          Q      Okay.  Gotcha.

2                 So, you know, it sounds like you've

3      had some exposure to master accounts when they were

4      brought in conjunction with a membership

5      application, for example.

6                 Was it your understanding that the

7      Fed believed it had discretion to grant or deny a

8      master account?

9          A      My understanding was when the

10     proposal came in, that the legal division needed to

11     determine whether it was a legally eligible

12     depository institution.

13         Q      Okay.  That was the Board's role?

14         A      Well, the Board would make that

15     determination.  If it was kind of a novel type of

16     institution, it would come up to the Board.  Those

17     are the ones that I saw, let's put it that way.

18         Q      Okay.

19         A      And then once they were determined to

20     be legally eligible depository institutions, then

21     that part of the master account piece was finished,

22     and then we would work on the state membership bank

Page 62

1          or something like that.

2                  Q      Okay.  So once that determination

3          happened, you didn't know what happened from there?

4                  A      No.  We approved them.

5                  Q      You approved the master account?

6                  A      Well, for the -- for the ICE Trust

7          one, the Board order cites that the institution has

8          been granted access to Federal Reserve services.

9                  Q      Okay.  And we can -- we can revisit

10         that.

11                 I think the ICE Trust Board order

12         says ICE Trust would be eligible to open an account

13         with the Federal Reserve Bank of New York.

14                 A      Yeah.

15                 Q      I don't know if it actually granted

16         it.

17                 A      Well, they -- I don't know what

18         happened afterwards --

19                 Q      Okay.

20                 A      -- but that's an up-and-running

21         institution that -- you know, I'm the gatekeeper.

22         Once it's out of the gate, then it goes into

CONFIDENTIAL

Page 63

1    Supervision or it goes into RBOPS or the payment
2    system people.
3            Q      Right.
4                   Okay.  So when you say you're the
5    gatekeeper, you would help track a legal
6    eligibility determination and then it would go off
7    from there.  So either --
8            A      Well, it would get --
9            Q      -- it would go to -- I'm sorry, it
10   would either go back to the reserve bank, it would
11   go -- you know, if something needed to go through
12   RBOPS, it might go through RBOPS.  You were sort of
13   first line?
14           A      Right.  So the only -- the only
15   thing -- the only statutory factor for the master
16   account, was it legally eligible?  And then after
17   that's determined that it's legally eligible, then
18   there's no other factors that the Feds have been
19   granted authority to do in order to grant them.
20                  You know, you're either eligible and
21   you get your master account or you're not eligible.
22           Q      So that -- you mean there's one

Page 64

1        determination that the Board needs to consider,

2        legal eligibility.  Is that correct?

3                    MS. WEINBERGER:  Object to form.

4                    THE WITNESS:  So what I'm saying is

5        there's only one statutory factor that the Federal

6        Reserve is given, only one power that it's given

7        for the master account proposals.  And that's just

8        a -- is it a legally eligible depository

9        institution?  And Board Legal worked on that

10       factor.

11       BY MS. CARLETTA:

12               Q     Okay.  And so you wouldn't know if

13       the reserve banks were conducting a risk assessment

14       on master account requests.  Is that right?

15                   MS. WEINBERGER:  Object to form.

16                   THE WITNESS:  They might be.

17       BY MS. CARLETTA:

18               Q     Okay.

19               A     But I don't know what they're doing

20       with it.  Either you get your master account

21       because you're legally eligible or you don't.  I

22       mean, it's the way -- that's the authority that

Page 65

1     congress has given the Fed.

2           Q     Okay.  But you didn't work just on

3     master accounts.  Is that right?

4           A     Yeah, that's correct.

5           Q     Okay.  So you wouldn't know how

6     reserve banks were typically handling master

7     account requests.  Is that right?

8                 MS. WEINBERGER:  Object to form.

9                 THE WITNESS:  So I'm saying what --

10    the way the whole Federal Reserve System works, any

11    proposal, is that we only look at the statutory

12    factors that we're permitted to look at, that's it.

13    BY MS. CARLETTA:

14          Q     Okay.  But you --

15          A     So there's just one --

16          Q     -- you don't know what was happening

17    at that --

18          A     It wasn't --

19          Q     Did every master account request come

20    through the Board of Governors?

21          A     Of course not.

22          Q     Okay.  So they were typically handled

Page 66

1        at the reserve banks.  Is that right?

2                A       So typically, yes.

3                Q       Okay.  And would you know what the

4        typical process was for handling a master account

5        request?

6                        MS. WEINBERGER:  Object to form.

13       BY MS. CARLETTA:

14               Q       So I'm sorry, let me back --

15               A       Uh-huh.

16               Q       -- let me back up for a second.



Page 67

```
21          Q     Okay.  So let me -- let me just take
22      a step back.
```

CONFIDENTIAL

Page 68

1                When you were working -- when you

2       would receive a master account -- when you would

3       review a master account request in tandem with some

4       other request --

5                A      Uh-huh.

6                Q      -- did you receive training on how to

7       handle the master account request?

8                A      So each statutory factor is divvied

9       up among the different divisions.  So the only

10      statutory factor is, "Is it legally eligible?"

11      That factor goes to Board Legal.  And my --

12               Q      Okay.  So you would just sort of ship

13      off the master account request to Board Legal.

14      Would you analyze anything independently?

15                      MS. WEINBERGER:  Object to form.

16                      THE WITNESS:  No, because the only

17      thing that the Feds are statutorily permitted to do

18      for a master account application, is just to look

19      at the legal eligibility.

20      BY MS. CARLETTA:

21               Q      So what's your --

22               A      That's it.

CONFIDENTIAL

Page 69

1           Q      -- basis for that opinion, that

2      there's only one statutory factor?

3           A      So every statutory factor is tied

4      back to some sort of banking act, or that we look

5      at.  And that is tied back -- so like there's a

6      Bank Holding Company Act, it has the statutory

7      factors.  The bank Merger Act has the statutory

8      factors.  The Monetary Control Act has the

9      statutory factors.  I mean, when you look at that,

10     there's only one, there's only one statutory

11     factor.

12          Q      Okay.  And is -- and you're not a

13     lawyer though, right?

14          A      No, I'm not.

15          Q      Okay.  So a master account request

16     would come in, you would send it off to Board

17     Legal.  And would you do anything else with the

18     master account request?

19                 MS. WEINBERGER:  Object to form.

20                 THE WITNESS:  So, like I said before,

21     the analyst is in charge of making sure every

22     statutory factor is analyzed by somebody within the

Page 70

1     Federal Reserve, and particularly at the Board.

2     And each division has its responsibilities.  So

3     legal tells me whether it's an eligible depository

4     institution.

CONFIDENTIAL

Page 71

17          Q      And who -- who from the Board of

18    Governors would typically speak to reserve banks

19    about master account requests?

20                 Would that be Board Legal?

21          A      Who would do what?

22          Q      I'm sorry.

Page 72

1           Who from the Board of Governors would

2    typically be in communication with reserve banks

3    about master account requests?

4           Would that be Board Legal?

5        A    Well, when I was involved in master

6    account proposals, it was typically an eligibility

7    issue, and Board Legal would be the one leading the

8    determination on that particular statutory factor.

9        Q    Were you engaged in routine

10   conversations with any of the reserve banks about

11   master account requests?

12       A    Not unless there was a proposal in

13   hand, you know, that we were working -- a companion

14   proposal.

15       Q    Okay.

16           MS. CARLETTA:  You know, I think

17   we've been going for about an hour.  Do you want to

18   take a break for a minute?

19           (Recess from 9:32 a.m. to 9:45 a.m.)

20   BY MS. CARLETTA:

21       Q    Okay.  So I just want to follow up on

22   a couple of questions on our conversation before.

CONFIDENTIAL

Page 73

9        Q      Okay.  Did you work on Fourth Corner?

10       A      No, I did not.

11       Q      The Reserve Trust Company?

12       A      No, I didn't work on that.

13       Q      Narrow Bank, The Narrow Bank?

14       A      No, I didn't work on that.

15       Q      So when an applicant would bring both

16   a membership and a master account request at the

17   same time, that's when you would review master

18   account requests?

19       A      Right.  There would be a companion

20   proposal --

21       Q      Okay.

22       A      -- with the master account request.

CONFIDENTIAL

Page 74

1          Q     Okay.  And for handling master

2     account requests, was there any training in

3     writing?

4          A     No.

5          Q     Okay.  So you would see the master

6     account request and then communicate to Board Legal

7     that a master account request was pending.  Is that

8     right?

9          A     So there's a centralized process or

10    database.  So when proposals come in, each division

11    is notified that's -- that's involved that there's

12    a proposal.  So I -- it's -- it's a --

13         Q     It's the database?

14         A     Yeah, it's a database.  It's a system

15    that notifies people.

16         Q     I see.

17               So you wouldn't need to have direct

18    contact with Board Legal on a master account

19    request?

20         A     No, not initially.

21         Q     Okay.  And so then would Board Legal

22    communicate a decision through you or would they

CONFIDENTIAL

Page 75

1          discuss directly with the reserve bank?

2                    A     So the way it works is --

3                    Q     And I'm sorry on a master account

4          request.

5                    A     Yeah.  So the way these proposals

6          that come into the system work is there's a

7          database and then within the database, the managers

8          assign people to work on those.  And then you can

9          look in the database and you see who is assigned to

10         the proposals.  But what Legal does with the

11         reserve bank, I don't -- I don't know.

12                   Q     Okay.  Would anybody else from the

13         Board of Governors be assigned to review the master

14         account request other than Board Legal?

15                   A     I don't -- I -- other than them, I

16         don't know.

17                   Q     Okay.  And so they would communicate

18         with the reserve bank directly?

19                   A     I -- I don't know what the -- what

20         the -- what Board Legal did once they had them.

21                   Q     Would you communicate with reserve

22         banks on master account requests?

Page 90

1          employee's performance.

2                Q    Okay.  Did you ever work with a

3     member bank whose membership was revoked?

4                A    I can't think of one.

5                Q    Okay.  Do you know what circumstances

6     might lead to membership revocation?

7                A    Typically it's a failure, the bank

8     fails, but I'm -- that's all -- that's the only one

9     I can think of.

10               Q    Okay.  Could they ever act in a way

11    that proposes risks to the system that might

12    generate a revocation?

13                    MS. WEINBERGER:  Object to form.

14                    THE WITNESS:  Well, that's certainly

15    a possibility.

16    BY MS. CARLETTA:

17               Q    If a membership was revoked, would a

18    bank be closed?

19               A    Well, I don't -- I don't recall a

20    membership being revoked, so I don't know how that

21    works.

22               Q    Okay.  When you grant an -- I'm

Page 91

1    sorry.

2                    When the Board of Governors grants

3    membership, can it impose conditions on the member?

4            A    It -- it can -- it could, yes.

5            Q    So when a reserve bank grants a

6    master account request, can it do so subject to

7    conditions?

8                    MS. WEINBERGER:  Object to form.

9                    THE WITNESS:  Yeah.  So I'm -- I'm

10   not familiar with what conditions can be imposed

11   regarding a master account request.

12   BY MS. CARLETTA:

13           Q    Okay.  Did you ever work with an

14   applicant who was not granted membership?

15           A    They applied for a membership and

16   weren't granted?  We could have asked a member --

17   you know, someone applying to withdraw their

18   membership, but I don't recall myself working on

19   that.

20           Q    Okay.  You never worked on a

21   membership application that had been -- that was

22   ultimately withdrawn?

1              A     I could have.  I just don't recall if

2       I did or not.

3              Q     Okay.

4              A     I mean, I could have.

5              Q     Do you know what circumstances would

6       lead to a denial or a request for withdrawal?

7              A     Of what?

8              Q     A membership application.

9              A     Well, I don't -- if you didn't meet

10      the statutory factors, then that's when, you know,

11      the system staff would ask you to withdraw.

12             Q     Okay.  And for the membership, what

13      are those statutory factors again?

14             A     I believe it's financial and

15      managerial.

16             Q     What does that mean?

17             A     Well, that means we look at your

18      CAMELS rating and your Bank Secrecy Act compliance.

19             Q     Okay.

20             A     Also capital.  And we look at the

21      bank's current financial condition, too.

22             Q     Okay.

Page 147

1          an officer and an official of a bank.  That's the

2          only one that I can think of that the reserve banks

3          have the authority to deny.

4                  Q    Do the reserve banks have authority

5          to deny master account requests?

6                       MS. WEINBERGER:  Object to form.

7                       THE WITNESS:  Well, they -- yes, they

8          have the -- they do have the authority to do that.

9          BY MS. CARLETTA:

10                 Q    And they have the authority to grant

11         them?

12                 A    And the authority to grant them, yes.

13                 Q    I think --

14                      MS. CARLETTA:  How long have we been

15         going?  Let's take a break.

16                 (Recess from 10:52 a.m. to 11:08 a.m.)

17         BY MS. CARLETTA:

18                 Q    So I want to talk a little bit about

19         Custodia's master account request.  Did you review

20         the request before it was submitted?

21                 A    No.  I think it's just -- no, I

22         didn't.

CONFIDENTIAL

Page 148

1          Q      Did you advise Custodia about how the

2     master account review process would work?

3          A      No, I didn't.

4          Q      So you didn't tell them either way

5     what would happen once they submitted their master

6     account request?

7          A      No, I didn't.

8          Q      Were you familiar with any policies

9     or procedures that the reserve banks had put out

10    concerning master account request procedures?

11         A      No, not in -- no, I can't say I knew

12    anything specifically.  Maybe some things in

13    general, but . . .

14         Q      Were you aware of, for example, the

15    Federal Reserve Bank of New York's handbook on

16    master account requests?

17         A      No.  I knew about Business Operating

18    Circular No. 1.

19         Q      Okay.  Had you reviewed that before?

20         A      No, I had not.

21         Q      So you were aware that it existed?

22         A      Yeah, I was aware that the operating

Page 149

1       circular existed.

2                Q       Okay.  But you hadn't reviewed it?

3                A       No.

4                Q       And did Custodia seek your advice on

5       the master account process?

6                A       Not really.  I mean, they knew I

7       wasn't -- they knew they were hiring me more for

8       understanding the whole Federal Reserve System, how

9       it -- how it -- how the Federal Reserve System

10      works in relationship to proposals in general.

11               Q       Okay.  Were you aware that FRBKC had

12      policies and procedures concerning evaluation of

13      master account requests?

14               A       No, I wasn't --

15               Q       Okay.

16               A       -- aware of that.

17               Q       Is it your understanding that the

18      review process for a master account may be

19      different than the review process for a membership?

20               A       I know what the review process is for

21      membership, and that's based on the statutory

22      factors, but -- and so that process for a master

CONFIDENTIAL

Page 150

1         account should be based on statutory factors, but

2         other than that --

3                    Q     You don't know?

4                    MS. WEINBERGER:  Object to form.

5                    THE WITNESS:  Well, I know there's a

6         difference in the statutory factors, but I don't

7         know how else to answer that.

8         BY MS. CARLETTA:

9                    Q     Okay.  Did you meet with the Federal

10        Reserve Bank in 2020 about Custodia's master

11        account request?

12                   A     So there may have been some

13        conference calls with the -- with the reserve bank.

14                   Q     But would you have been a part of

15        those in 2020?

16                   MS. WEINBERGER:  To clarify, you're

17        talking about in the year?

18        BY MS. CARLETTA:

19                   Q     In the year 2020, would you have been

20        a part of any calls with the Reserve Bank of Kansas

21        City and Custodia concerning Custodia's master

22        account request?

CONFIDENTIAL

Page 165

1          And the -- and the standard is you go by what the

2          statutory authority is.

3          BY MS. CARLETTA:

4                 Q     So that's what Board Legal

5          determines, correct?

6                 A     That's true.

7                 Q     And you never reviewed policies or

8          procedures concerning how master account requests

9          are decided --

10                       MS. WEINBERGER:  Object to form.

11         BY MS. CARLETTA:

12                Q     -- from the Board?

13                       MS. WEINBERGER:  Object to form.

14         Foundation.

15                       THE WITNESS:  So it's -- so the Fed

16         only has the authority to determine whether it's

17         eligible or not.  It's the chartering authority's

18         job, and they have the authority to grant the

19         charter.

20         BY MS. CARLETTA:

21                Q     Isn't that a legal determination?

22                       MS. WEINBERGER:  Object to form.

CONFIDENTIAL

Page 166

1       BY MS. CARLETTA:

2            Q     You're interpreting a statute?

3            A     No.  That's how it works.  I mean,

4       that's the dual banking system.  That's widely

5       accepted.  That's how it works.  They get the

6       charter.  The Fed doesn't charter institutions.

7            Q     I understand that.

8            A     And that's --

9            Q     Who decides master account requests?

10           A     Well, the Federal Reserve does.

11           Q     So based on your experience at the

12      Fed, in your position that you just told me, is the

13      Fed entitled to impose conditions on master account

14      holders?

15                 MS. WEINBERGER:  Object to form.

16      Calls for a legal conclusion.

17                 THE WITNESS:  So I don't know what

18      conditions are imposed on master accounts.  I can't

19      speak to that.

20      BY MS. CARLETTA:

21           Q     Have you ever seen any imposition of

22      conditions on master account holders?

Page 167

6        Q      Any others?

7        A      I -- I don't recall.

8        Q      Okay.  Have you ever seen the Fed

9   restrict access to certain services for master

10  account holders?

11       A      I didn't work in that area, so I

12  wouldn't know.

13       Q      Okay.  Have you ever seen the Fed

14  close master accounts?

15       A      I'm aware of -- of a closing.  I

16  think -- I think there's only one that I'm aware

17  of.

18       Q      And what would happen if the Board

19  kicked a member out of the system, would that bank

20  still be entitled to a master account and all of

21  its services?

22       A      So I wouldn't work on that end of it.

Page 168

1      Again, I'm in the gatekeeping function, we're --

2      once they're in and we've approved them, some

3      other -- other divisions and other sections of the

4      Federal Reserve handle that.

5              Q      Okay.  So I'm going to introduce

6      another exhibit.  You can set that to the side.

7                      (Cox Deposition Exhibit Number 309 marked

8                      for identification.)

9                      MS. CARLETTA:  So this is going to be

10     introduced as Exhibit 309.  And it's Bates stamped

11     Custodia5452.

12     BY MS. CARLETTA:

13             Q      Okay.  Do you recognize this

14     document?

15             A      No, not really, but it's -- I don't

16     recall this document.

17             Q      Is it an e-mail from Caitlin to you?

18             A      That's what it appears to be.

19             Q      Okay.  Great.

20                      So this is marked December 4, 2020,

21     correct?

22             A      That's correct.

                                                    Page 169

1            Q      So this is about two months -- well,

2       it's about five weeks after Custodia applied for

3       the master account request.  Is that right?

4            A      I believe so.

5            Q      So Caitlin says, "Hi, Katie.  Please

6       see the below, so you're up to speed on Fed

7       questions posed to us.  They're digging in, but so

8       far the questions are easy to answer."

9                   Do you see where she says that?

10           A      Yes.

11           Q      Okay.  So let's flip over and look at

12      some of the questions that Katie -- I'm sorry, that

13      Caitlin is referencing.

14                  I believe she's referencing this

15      e-mail from Christi May-Oder to Katherine Mooney

16      Carroll.  Is that correct?

17           A      That's correct.

18           Q      Who is Katherine Mooney Carroll?

19           A      I believe she was -- she's an

20      attorney at Cleary Gottlieb.

21           Q      And Cleary Gottlieb is?

22           A      Outside counsel for Custodia.

Page 170

1          Q     Okay.  And who is Christi May-Oder?

2          A     Christi May-Oder, I believe, is an

3     assistant vice president at the Kansas City Reserve

4     Bank.

5          Q     Okay.  And what does she -- does she

6     work on master account requests?

7          A     Yeah, that's my understanding.

8          Q     Do you know what the credit risk and

9     management department is?

10         A     Yes, I'm familiar with them.

11         Q     What is it?

12         A     So they're the area that handles --

13    they're the payment system people.  So they -- they

14    handle master accounts and discount window matters

15    with member banks.

16         Q     And when they speak with

17    individual -- and when they speak with individuals

18    at the Board, who do they tend to interact with?

19         A     I really don't know.

20         Q     Okay.  So I'm going to look at this

21    e-mail.  So, "Good afternoon, Katherine.  Thank you

22    for reaching out.  We've prepared the following

Page 171

1          questions to provide an idea of some of the topics

2          we're interested in discussing."

3                         And then some of the questions

4          follow.  "An example of a customer or types of

5          customer that would need to use the Avanti Payment

6          Service and how existing providers do not

7          adequately meet their needs.  The process of --

8          two, the process of consumer purchasing and

9          redeeming an Avit and how as noted in the business

10         plan materials, Avit's master" -- I'm sorry --

11         "Avanti's master account with the reserve bank

12         would be unchanged.

13                         "What would change the balance in the

14         master account?  How will you manage liquidity?

15         How does volatility and Bitcoin affect Avanti's

16         balance sheet and cash flow payment volumes?  And

17         what is your earnings model on prime and custody

18         services?"

19                         None of these questions pertain to

20         legal eligibility, correct?

21                         MS. WEINBERGER:  Object to form.

22         Calls for a legal conclusion.

Page 217

1          considerations.  Is that your testimony?

2                    A     No --

3                    MS. WEINBERGER:  Object to form.

4                    THE WITNESS:  -- that's not my

5          testimony.  Our concern at this stage is this

6          eligibility matter is starting to rear its head

7          with Board Legal, and so I'm just -- anyway, that's

8          our concern at this time.

9          BY MS. CARLETTA:

10                   Q     Why didn't you say that?

11                   I don't see you mention legal

12         eligibility here anywhere.

13                   A     Well, we don't know how -- we don't

14         know how big of a concern it is at this point, so

15         we don't know if it's worth mentioning.

16                   Q     Generally speaking, looking at .8,

17         did you advise that the Fed had discretion to

18         decide a master account request?

19                   MS. WEINBERGER:  Object to form.  And

20         calls for a legal conclusion.

21                   THE WITNESS:  So I'm not a lawyer.

22         What I -- what I --

CONFIDENTIAL

Page 218

1      BY MS. CARLETTA:

2             Q      I know.  I'm asking what you advised

3      them how this process would work.

4             A      I told them -- I told them it would

5      very likely go to the Board and it could take some

6      time.

7             Q      And they could grant or deny your

8      request?

9             A      I didn't say that.  I just said it

10     could take some -- that's what not -- are you

11     asking me what I told -- what I said to Custodia

12     initially?

13            Q      Yes.

14            A      That's -- that's what I said to

15     Custodia initially when --

16            Q      You said, "I'm not saying a denial

17     can't happen"?

18            A      Well, this is when I'm talking to the

19     investors.

20            Q      But --

21            A      Your question --

22            Q      But the investor -- did you tell the

CONFIDENTIAL

Page 219

1          investors something different than --

2                    A       These are potential --

3                    Q       -- what you told Custodia?

4                         MS. WEINBERGER:  Sorry.  Don't talk

5          over each other.

6                         THE WITNESS:  Okay.

7                         MS. WEINBERGER:  Question, answer.

8          BY MS. CARLETTA:

9                    Q       Did you tell Custodia some -- did you

10         tell Custodia's investors something different than

11         what you told Custodia?

12                        MS. WEINBERGER:  Object to form.

13         Foundation.

14                        THE WITNESS:  So what I told the

15         potential investors is this.

16         BY MS. CARLETTA:

17                   Q       And is this consistent with what you

18         told Custodia?

19                   A       So I don't remember all the

20         conversations.  My general conversations with

21         Custodia were that this could take -- this could

22         take a while and it could go up to the Board of

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Number: 22-cv-00125-SWS |
| | ) |
| FEDERAL RESERVE BOARD OF | ) |
| GOVERNORS and FEDERAL RESERVE | ) |
| BANK OF KANSAS CITY, | ) |
| | ) |
| Defendants. | ) |

**ERRATA SHEET FOR THE TRANSCRIPTS OF THE DEPOSITIONS OF
KATIE COX**

I, Katie Cox, have read the transcripts of my depositions taken on December 19, 2023 ("Vo1. 1") and December 20, 2023 ("Vol. 2") in the above captioned matter and make the following corrections:

| Vol. | Page | Line | Current Transcript | Change | Reason |
|---|---|---|---|---|---|
| 1 | 71 | 10 | Council | Counsel | Transcription error |
| 1 | 84 | 9–10 | Division of Consumer Community Affairs | Division of Consumer and Community Affairs | Transcription error |
| 1 | 87 | 18 | Allison Crowe | Alison Thro | Transcription error |
| 1 | 95 | 16 | general council | general counsel | Transcription error |
| 1 | 97 | 1 | Ben Mickey | Ben McGee | Transcription error |
| 1 | 110 | 2 | Ben Bader | Ben Bauder | Transcription error |
| 1 | 182 | 6 | secondment | seconded | Transcription error |
| 1 | 183 | 10 | secondment | seconded | Transcription error |
| 1 | 248 | 14 | sure | insured | Transcription error |

| Vol. | Page | Line | Current Transcript | Change | Reason |
|---|---|---|---|---|---|
| 1 | 343 | 14 | Custodia on products and services that was | Custodia on products and services that it was | Transcription error |
| 2 | 21 | 11 | And A lot of things | And a lot of things | Transcription error |
| 2 | 38 | 9 | So I reference | So I referenced | Transcription error |
| 2 | 58 | 8 | narrowed it down farther | narrowed it down further | Transcription error |
| 2 | 87 | 8 | Territory bank of Americas | Territorial Bank of American Samoa | Clarification |
| 2 | 144 | 8 | American Bank of Samoa | Territorial Bank of American Samoa | Clarification |
| 2 | 145 | 13, 17 | American Samoa Bank | Territorial Bank of American Samoa | Clarification |
| 2 | 164 | 7 | might sent it out | might send it out | Transcription error |
| 2 | 176 | 17–18 | Office of the Comptroller, the currency | Office of the Comptroller of the Currency | Transcription error |
| 2 | 197 | 9 | there's two ways to get a master account was to buy | there's two ways to get a master account – to buy | Transcription error |
| 2 | 197 | 14 | And we had went in with the FDIC in | And we went in with the FDIC and | Transcription error |
| 2 | 201 | 15 | hand version | handbook version | Transcription error |
| 2 | 211 | 17 | Florida charter | Florida chartered | Transcription error |

Dated: January 8, 2024

/s/ Katie Cox

Katie Cox