# EXHIBIT 3

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

```
                                        Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF WYOMING
 2

 3        --------------------------
          CUSTODIA BANK, INC.,         :

 4                                     :

              Plaintiff,               :

 5                                     :   Case No.:
          vs.                          :

 6                                     :   1:22-cv-00125-SWS
          FEDERAL RESERVE BOARD OF     :

 7        GOVERNORS,                   :
                                       :

 8        AND                          :
                                       :

 9        FEDERAL RESERVE BANK OF      :
          KANSAS CITY,                 :

10                                     :

              Defendants.              :

11        --------------------------

12           "CONFIDENTIAL" DEPOSITION OF KATIE S. COX

13                     Volume 2 of 2

14        DATE:          December 20, 2023

15        TIME:          8:42 a.m. to 3:33 p.m.

16        LOCATION:      King & Spalding, LLP
                         1700 Pennsylvania Ave, NW

17                       Suite 900
                         Washington, DC 20006

18

19        REPORTED BY:  Felicia A. Newland, CSR

20

21                      Veritext Legal Solutions
                    1250 Eye Street, N.W., Suite 350

22                      Washington, D.C. 20005
```

Page 17

1           Q     Okay.  And how much time did you prep

2     for your expert deposition?

3           A     So I worked directly with Williams &

4     Connolly probably at least I would say 20-some

5     hours.  And then I probably -- I spent about

6     another, it was probably 15 to 20 hours on my own

7     going through depositions and all the documents

8     that have been sent to me.

9           Q     Okay.  Have you billed for your time

10    already?

11          A     I've only billed for the 33 hours for

12    the expert report, the larger -- the first expert

13    report.  I have not billed for the second expert

14    report and the testimony.

15          Q     Okay.  And how do you submit your

16    bills?  Do you -- do you send Custodia an invoice?

17          A     Yes, Custodia receives an invoice

18    from me.

19          Q     And how many have you sent them, do

20    you know?

21          A     I've just sent them one, and that was

22    for the 33 hours for the first report.

Page 18

1              Q     Okay.

2                    MS. CARLETTA:  I think I've seen one,

3         Lauren.  Is that the only --

4                    THE WITNESS:  And that's the only

5         one --

6                    MS. WEINBERGER:  Yes.

7                    MS. CARLETTA:  Okay.

8                    THE WITNESS:  -- that's out there.

9         BY MS. CARLETTA:

10             Q     Okay.  And then when you submit

11        others, we would request a copy of those.

12                   Okay.  So we touched on your

13        retainer.  You also have stock options.  Is that

14        correct?

15             A     Yes, I do have stock options.

16             Q     And what are the -- can you tell me

17        about those stock options again?

18             A     Yes.  So the way the stock options

19        initially worked, for the first 25 months, I would

20        receive 1,000 stock options, exercisable at $1.04.

21        These shares are Class 2, non-voting shares.  Then

22        after the first 25 months, the stock option

1          program, whatever you want to call it, changed.

2                         I want to say it's like 350 shares

3          per quarter, or something like that, like 1,500 --

4          1,500 stock options a year, exercisable at, I

5          think, it's $8.33, or something like that.

6          Somewhere around $8.

7                 Q     So when you say exercisable at a

8          certain amount, do you mean that it won't fluctuate

9          with the value of Custodia over time?

10                        MS. WEINBERGER:  Object to form.

11                        THE WITNESS:  So it means if I want

12         to purchase -- exercise my stock options, I have to

13         pay $1.04 for the -- for the first 25,000 --

14         BY MS. CARLETTA:

15                Q     Uh-huh.

16                A     -- and then any shares after that, I

17         have to pay $8 a share --

18                Q     I see.  I see.

19                A     -- to -- to exercise those stock

20         options.

21                Q     Okay.  And would it be fair to say

22         that the value of your stock options depends on the

Page 20

1          outcome of this litigation?

2                          MS. WEINBERGER:  Object to form.

3                          THE WITNESS:  So I have no idea what

4          these shares are worth for a couple reasons.  The

5          shares aren't publicly traded.

6          BY MS. CARLETTA:

7                  Q       Uh-huh.

8                  A       These are what I would call an

9          inferior class of shares.  It's Class 2,

10         non-voting.  Only -- right now if everyone had

11         exercised their options, only -- it would only

12         represent like 5 percent of all common stock within

13         Custodia's common stock, you know, balance.  And so

14         I have no idea what they're worth.

15                         And also, my shares were -- the

16         exercise price is based on what the price of the

17         shares were worth for the voting common at the

18         time.

19                 Q       At the time of what?

20                 A       At the time that the -- of the first

21         stock issuance that -- because the overall issuance

22         that Custodia had.  So the first stock option --

Page 33

1       the research department will assign the proposal to

2       an economist.

3                       Now, the reason why there's this

4       division among the four -- the reason why there's a

5       separation of work among the four divisions at the

6       Board is because each division has responsibilities

7       for different statutory factors.

8                       So if it's a state membership, for

9       example, then someone in the Division of Consumer

10      and Community Affairs is going to be looking at

11      compliance with the Community Reinvestment Act,

12      what that rating is.  They would also be looking at

13      consumer compliance ratings.  And if the

14      institution is large enough, ratings from the

15      Consumer Financial Protection Bureau.  That goes

16      in -- you know, the analysis for a -- for example,

17      a membership and also for a bank holding company

18      formation.

19                      My section would look at financial

20      and managerial factors and Bank Secrecy Act

21      compliance.  The legal division is going to look to

22      permissibility and if it's -- if they're going to

Page 34

1    be conducting some sort of different activity

2    within the state member bank.  And then for the

3    master account, they have the primary

4    responsibility for looking at the eligibility

5    factor.

6         Q    Okay.  And so for the master account,

7    would your division analyze anything about the

8    master account request or would that go to Board

9    Legal?

10        A    Board -- so our group -- like I said

11   yesterday, our section is going to be -- would be

12   in charge of the -- any briefing document that

13   has -- that -- that -- that if it's -- if one's

14   needed to brief senior officers or the -- or the

15   governors.

16             And then our section would also be

17   responsible for compiling the recommendation

18   document.  And so Board Legal would be responsible

19   for the master account, providing the input for

20   the -- for that statutory factor for the master

21   account.

22        Q    I see.

1              And so your role would be summarizing

2      what Board Legal's analysis was on the legal --

3              A      Right.

4              Q      -- eligibility --

5              A      Uh-huh.

6              Q      -- component of it?

7              A      Yes.  And also moving the proposals

8      along.

9              Q      Okay.

10             A      So that's -- that -- the -- getting

11     request letters out for additional information --

12             Q      Uh-huh.

13             A      -- that also comes from my section,

14     the section I worked in, the M&A section.  So most

15     proposals, when you receive them, aren't -- don't

16     answer every question or raise questions that --

17     staff at the Board will write, you know, "We need

18     extra information about this, this, this and that."

19     And so we'll also coordinate the correspondence

20     going back and forth to the applicant.

21             Q      Okay.  Would you generate questions

22     on the master account or would Board Legal do that?

Page 36

```
 1              A     Board Legal would more than likely --
 2         because the only thing they're working towards --
 3         or should be working towards is the eligibility
 4         determination.
 5              Q     Just so I understand, is this file
 6         system you're talking about called FedEZFile or
 7         E-Apps?
 8              A     Yes.
 9              Q     Okay.  And are you -- is it your
10         testimony that those -- the FedEZFile -- that's
11         what it's called, yeah, the FedEZFile has master
12         account requests logged into them?
13              A     So --
14                    MS. WEINBERGER:  Object to form.
15                    THE WITNESS:  Yeah.  So FedEZFile was
16         implemented after -- that's a new system that was
17         implemented after I retired, so I can't speak to
18         the EZ File.
19         BY MS. CARLETTA:
20              Q     So you're talking about E-Apps then?
21              A     Yeah, I'm talking about E-Apps.
22              Q     Okay.  And is it your testimony that
```

1    E-Apps has master account requests logged into

2    them?

3                   MS. WEINBERGER:  Object to form.

4                   THE WITNESS:  So I don't recall

5    exactly how -- how the master accounts were logged

6    in.  I mean, we would know they're there, whether

7    it's in E-Apps or there's some sort of notation.

8    But you'd know that there's this --

9    BY MS. CARLETTA:

10          Q    Would you know that all master

11   account requests are in E-Apps or just the ones --

12   strike that.  Let me back up.

13                Is E-Apps a -- like a Board filing

14   system?

15          A    No.  It's a systemwide compliance

16   system.

17          Q    So would all master account requests

18   be logged in E-Apps?

19          A    So the --

20                MS. WEINBERGER:  Object to form.

21                THE WITNESS:  Right.  So the reserve

22   banks log that into -- they're the ones responsible

Page 38

1    for logging the document, the filings, into E-Apps,

2    and I don't recall how they did master accounts.

3    BY MS. CARLETTA:

4           Q    Okay.  So you told me you worked

5    on -- or I'm sorry, you told me you were aware of

6    several master account requests during your time at

7    the Board of Governors.  Is that right?

8                    MS. WEINBERGER:  Object to form.

9                    THE WITNESS:  So I reference the two

10   I recalled working on.

11   BY MS. CARLETTA:

12          Q    Okay.  And what two were those?











```
 4       BY MS. CARLETTA:

 5              Q       So who at Board Legal would you

 6       typically work with?

 7                      MS. WEINBERGER:  Object to form.

 8                      THE WITNESS:  So Board Legal has -- I

 9       usually worked with the senior attorneys, and then

10       they worked directly for the general counsel.

11       BY MS. CARLETTA:

12              Q       Okay.  Can you name some names of who

13       you typically worked with?

14              A       Well, there's -- there's like 20 or

15       30 of them.

16              Q       Did you typically work with Jason

17       Hinkle?

18              A       No, I did not work with -- I don't

19       recall working with Jason Hinkle.

20              Q       Okay.  And Stephanie Martin?

21              A       I -- yes, our paths crossed on --

22       particularly on          .
```

1              Q      Okay.  Any other occasions?

2              A      Well, yeah.  I mean, I've been in

3      meetings with her on other matters, but exactly

4      what, I don't remember, but yeah, I've worked with

5      Stephanie.

6              Q      Is she someone you worked with

7      frequently or is it other attorneys you think you

8      worked with more frequently?

9              A      I worked with other attorneys more

10     frequently than her.

11             Q      And did you work frequently with

12     Asad, for example?

13             A      Yeah, I worked with Asad, Asad

14     Kudiya.  He came in later in my career, maybe the

15     last three years or four years or so, but I worked

16     with Asad quite a bit.

17             Q      Okay.  Were there any other novel

18     master account requests that you saw during your

19     time at the Board?

20             A      Those are the two that I can recall

21     that -- those are the two that I recall that were

22     similar to -- or have similar characteristics to

Page 46

1      Custodia.  The others, there's nothing that

2      particularly stands out.

3           Q     Okay.  Can you explain to me what the

4      difference is between mergers and acquisitions and

5      RBOPS at the Board?

6           A     I can -- there's -- so let me

7      explain.  There's 15 divisions at the Board.

8           Q     Okay.  And I don't need all 15.

9           A     Yeah, I know.  So the problem is --

10          Q     Unless you guys want to give me more

11     time.

12          A     There's 15 divisions.  So I know in

13     particular what my division's --

14          Q     Okay.

15          A     -- functions were.  But RBOPS, I have

16     a general -- you know, a general understanding that

17     they work on payment systems, systemwide payment

18     systems matters for the Federal Reserve.  But, you

19     know, that's -- you know, that's not -- it -- it

20     would be difficult for me to go into a lot of

21     detail as to what they do.

22          Q     Okay.  So you know they generally

1        work on payment system issues.  Do you know

2        anything else?

3                A    I don't know a whole lot more about

4        them.

5                Q    Okay.  So at a reserve bank -- you

6        worked at the Federal Reserve Bank of Kansas City?

7                A    Yes.

8                Q    And were you aware of an applications

9        division?

10               A    Well, yes, I am.

11               Q    And you worked in that division?

12               A    No, I didn't.

13               Q    You worked in supervision?

14               A    I worked in supervision.

15               Q    Okay.  And were you aware of a Credit

16       Risk Management Division?

17               A    Yes, I was aware of them.

18               Q    And do you know what the applications

19       division typically handled?

20               A    So are you asking me what the

21       applications equivalent of the M&A function within

22       the Kansas City reserve bank does?

Page 48

```
 1                    Is that what you're asking?
 2          Q      Is M&A the equivalent -- is M&A the
 3    counterpart to applications in a reserve --
 4          A      Uh-huh.
 5          Q      -- bank?
 6                 I see.
 7          A      Correct.
 8          Q      That's great.
 9                 Sure, if you can give me a brief
10    explanation, that would be helpful.
11          A      So the applications function at any
12    reserve bank handles about probably 40 different
13    types of applications that come into the system.
14          Q      Okay.  Is master accounts one of
15    them?
16          A      Most -- most of those are -- it goes
17    straight to what they call the Reserve Bank at
18    Kansas City, the Credit Reserve Risk and
19    Management.
20          Q      And is the Credit Reserve Risk and
21    Management department, is there, let's say -- you
22    know, loose language, but let's say, is their
```

Page 59

```
 1    walk --
 2              A      Okay.
 3              Q      -- through each of them.
 4              So did you ask -- did you ask counsel
 5    for documents showing that the Board determined
 6    whether Custodia Bank was eligible for a master
 7    account?
 8                       MS. WEINBERGER:  Object to form.
 9                       THE WITNESS:  So I asked for the
10    documents I just mentioned.  The ones that -- that
11    show the different avenues or angles that the Board
12    was using to control the master account application
13    process.
14    BY MS. CARLETTA:
15              Q      Okay.  Did you listen to or review
16    transcripts from Caitlin Long, Zev Shimko or Peter
17    Conti-Brown's depositions?
18              A      No, I did not.
19              Q      Okay.
20                       MS. CARLETTA:  You know, I think this
21    might be -- we're going to get into some documents,
22    but I think this might be a good time to take a
```

Page 60

1          real quick break.  Does that sound good?

2                          THE WITNESS:  Yes.

3                          MS. CARLETTA:  Okay.  Great.

4                  (Recess from 9:35 a.m. to 10:19 a.m.)

5                          MS. CARLETTA:  Back on the record.

6     BY MS. CARLETTA:

7               Q       Katie, are you ready?

8               A       Yes.

9               Q       Thank you.

10                      So, Katie, have you ever seen

11     policies that the reserve banks had concerning

12     master account requests before the guidelines?

13              A       No, I did not see those policies.

14                  (Cox Deposition Exhibit Number 319 marked

15                      for identification.)

16     BY MS. CARLETTA:

17              Q       Okay.  And I'm going to have you turn

18     to what's been marked as Exhibit 319.

19              A       What tab?

20              Q       And it's Tab 4 --

21              A       Uh-huh.

22              Q       -- in the documents in front of you.

Page 61

 1              A      Uh-huh.

 2              Q      Okay.  And this is the Federal

 3       Reserve Bank of New York Account and Financial

 4       Services Handbook.  Is that right?

 5              A      That's what it says.

 6              Q      Okay.  And it's dated February 25th,

 7       2020.  Is that right?

 8              A      That's what it says.

 9              Q      Okay.  And have you ever seen this

10       before?

11              A      I retired four days after this was

12       issued.

13              Q      Okay.  And was this provided to

14       you -- did you review this as part of your

15       expert --

16              A      No, I did not.

17              Q      -- materials?

18              Okay.  And I'll represent to you that

19       this is a publicly available handbook.  And why

20       don't we take a look at page -- the first page.  In

21       the introduction it says, "The Federal Reserve Bank

22       of New York assesses, manages, and mitigates the

Page 62

1      risks that arise in connection with its decision to

2      provide in its sole discretion accounts for Federal

3      Reserve Financial Services to a financial

4      institution.

5                  "Among other things, the Federal

6      Reserve Bank of New York may assess (i) any risk

7      posed to FRBNY or the Federal Reserve System by the

8      provisions of accounts or Federal Reserve Financial

9      Services to a financial institution, (ii) the

10     effectiveness of any control or other mitigant

11     designed to allay such risks, and (iii) whether the

12     provision of accounts for Federal Reserve Financial

13     Services to a financial institution would cause

14     FRBNY or the Federal Reserve System to violate any

15     applicable law or," so on and so forth."

16                 Do you see that here?

17          A     Yes, I do.

18          Q     Okay.  And then do you see where it

19     says, "To assess, manage, and mitigate the risks

20     involved in the provision of the accounts or the

21     Federal Reserve Financial Services, FRBNY may

22     consider among other things the factors set forth

Page 77

1          MS. WEINBERGER:  Object to form and

2     foundation.



21          Q     Okay.  And did you ask Williams &

22     Connolly to provide you with any policies and

Page 78

1      procedures that the Federal Reserve Bank of Kansas

2      City would have used in connection with deciding

3      whether or not to grant or deny master account

4      requests?

5                      MS. WEINBERGER:  Object to form.

6                      THE WITNESS:  So I -- right.  So I

7      did not ask for the procedures manuals that Kansas

8      City's CRM unit, whatever they -- whatever they

9      used.  Because, as I've said before, there's only

10     one statutory factor, and after that statutory

11     factor is decided, and the master account is

12     granted, I understood there was risk management

13     analysis being performed.

14     BY MS. CARLETTA:

15             Q    So you --

16             A    But, you know, that's after you're --

17     you're determined to be eligible and you receive

18     your master account.

19             Q    It's after you receive your master

20     account or before you receive your master account?

21             A    So I don't know what their -- what

22     their process is, but it should be after you're

```
 1        determined that you're eligible, that's the only
 2        statutory factor that the Fed has.  You should be
 3        granted your master account immediately and then
 4        all of this can proceed.
 5               Q     So is --
 6               A     They can go through and figure out
 7        for the purposes of providing whatever products and
 8        services the Federal Reserve wants to provide that
 9        institution.  You're not going to be providing the
10        same services to a 10-million-dollar bank in the
11        middle of Nowhere, Nebraska -- I've been to
12        those -- as you would be to an institution like
13        Bank of America.  And I've been on those exams.
14               Q     Okay.  So is it your opinion --
15               A     So it's just different.
16                     MS. WEINBERGER:  Please.
17                     THE WITNESS:  It's different.
18                     MS. WEINBERGER:  Please don't --
19                     THE WITNESS:  That's what this should
20        be.  This is the purpose of this, is determining
21        the level of products and services.  That's what
22        the purpose -- that's what this should be doing.
```

1      If they're adding all this other stuff, then

2      they're not following the law, and they're not

3      following what Congress authorized them to do.

4      BY MS. CARLETTA:

5           Q     I see.

6                 So it's --

7           A     But they --

8           Q     So it's your opinion that there's one

9      statutory factor that determines whether or not a

10     master account request should be opened?

11          A     Yes.

12          Q     Is that your --

13          A     I've said that for two days.

14          Q     Is that your own reading of the

15     statute?

16          A     Yes.  And we -- and --

17          Q     Did you receive that legal advice

18     from the Board?

19          A     No.

20                MS. WEINBERGER:  Object to form and

21     foundation.

22                THE WITNESS:  So when you work for

Page 89

1           in federal court right now --

2                   A       Yes, I do.

3                   Q       -- on the question of who decides

4           master account requests?

5                           MS. WEINBERGER:  Object to form.

6                           THE WITNESS:  Yes, I understand that.

7           BY MS. CARLETTA:

8                   Q       Okay.  And this case is before a

9           federal judge?

10                  A       Yes, I do.

11                  Q       And you understand that the judge

12          will analyze the statutes in this case?

13                  A       Yes, I do.

14                  Q       Okay.  Including the statutory

15          provisions that we've discussed?

16                  A       I hope he does.

17                  Q       Okay.  And the Monetary Control Act

18          that --

19                  A       I certainly hope he does.

20                  Q       Okay.  Great.

21                          And you understand it's the judge's

22          role to determine the meaning of the statute?

Page 90

```
 1              A     Yes.  And I would -- and I'm looking
 2      forward to that.
 3              Q     Okay.  And that's not your job?
 4              A     That's not my job.  I'm looking
 5      forward to him doing his job.
 6              Q     And you would defer to Judge Skavdahl
 7      in determining the statutory language?
 8                    MS. WEINBERGER:  Object to form.
 9                    THE WITNESS:  I will participate as
10      asked in any legal proceedings, and I will see what
11      happens.
12      BY MS. CARLETTA:
13              Q     Okay.  And so you weren't aware of
14      all of these policies and procedures that the
15      reserve banks were engaging in to conduct risk
16      assessments before opening master account requests.
17      Is that correct?
18                    MS. WEINBERGER:  Object to form.
19                    THE WITNESS:  So like I said
20      before --
21      BY MS. CARLETTA:
22              Q     That's a yes-or-no question.
```

Page 91

1          A      No.

2          Q      You weren't --

3          A      I was aware that the -- I was aware

4     that divisions, like the Credit Risk Management

5     Group, did do analysis after an institution

6     receives its master account in order to determine

7     what products and services the Federal Reserve --

8     and what level of products and services the reserve

9     bank would provide.

10         Q      But you weren't aware they did them

11    before?

12                MS. WEINBERGER:  Object to form.

13    BY MS. CARLETTA:

14         Q      Unless they would --

15         A      I don't know what they were doing

16    before.  I know what they were doing once an

17    institution is in their shop.



1           A      I don't -- that's your

2     interpretation, but I don't know who wrote this.  I

3     don't know if they're actually using this.  And

4     they could -- they can write whatever they want --

5           Q      And it was --

6           A      -- in here -- someone can write what

7     they want in here, but whether that is the legal

8     process or not, that -- I mean, I've worked on

9     documents like this, and you put in there what you

10    want to do and want to look at often.  And it may

11    not be correct.  But we don't even know who wrote

12    this.

13          Q      Okay.

14          A      We don't know if they're using it

15    every day, from what I can tell.

16          Q      But we do know --

17          A      I didn't see anything --

18          Q      -- that they revise it regularly?

19                 MS. WEINBERGER:  Object to form and

20    foundation.

21                 THE WITNESS:  Well, I don't know who

22    "they" is.

Page 110

1     BY MS. CARLETTA:

2              Q      It's been revised multiple times.

3              A      Right.  Well, who --

4              Q      This document has been revised many

5     times.

6              A      Who revised it?  Who issued this?

7     How often does someone use it?  There are manuals

8     galore within the Federal Reserve System, and a lot

9     of them sit on the shelf.

10             Q      And you haven't seen any of them on

11    master account requests prior to the guidelines

12    that's --

13             A      I have not seen the ones that you

14    have presented here.

15             Q      Okay.  You didn't receive any

16    training on master account requests when you were

17    in mergers and acquisitions.  Is that correct?

18                    MS. WEINBERGER:  Object to form.

19                    THE WITNESS:  No, that is not true.

20    BY MS. CARLETTA:

21             Q      What training did you receive on

22    master account requests review when you were a

Page 111

1       manager?

2              A      You know, we have gone over this, how

3       the process works.  Okay?

4              Q      But you told me --

5              A      There is a standard process for

6       looking at every single proposal that comes into

7       the Federal Reserve System.  And I don't -- if we

8       want to spend the time for me to go through the

9       whole process --

10             Q      I don't.

11             A      Okay.  Well, because that's -- the

12      training -- the training is -- I don't even know

13      where to start.

14             Q      You stand on your prior testimony.

15      Is that right?

16             A      Yes, I will stand on my prior

17      testimony.

18             Q      Okay.  Let's continue.

19                    I'm going to -- this, we're looking

20      at Tab 7 now.

21             A      Uh-huh.



Page 133

1       Custodia's case is creating policy and is creating

2       hurdles, it's giving itself all kinds of authority.

3       And the Board is controlling that.

4                    So yeah, they can say it's subject to

5       approval by the financial institution's

6       Administrative Reserve Bank.  Well, yes, the

7       president of that reserve bank signs the approval

8       letter, but there's a whole lot more going on

9       behind that, particularly for novel institutions

10      like Custodia.

11              Q    So is it your testimony that the

12      Federal Reserve System doesn't follow its own

13      policies and procedures?

14                   MS. WEINBERGER:  Object to form.

15      Mischaracterizes prior testimony.

16                   THE WITNESS:  Well, that's a very

17      broad statement.  What I'm stating is in Custodia's

18      case, that's not what happened.  A reserve bank

19      president signed the letter, but all -- I have --

20      at least, you know, six or -- six ways that the

21      Board -- there's six ways that the Board

22      controlled --

Page 134

1      BY MS. CARLETTA:

2              Q      Did you review Christi May-Oder's --

3              A      -- the master account.

4              Q      -- deposition transcript before you

5      rendered your opinion in your initial expert

6      report?

7              A      I did not have access to her

8      testimony until I wrote the second one, the

9      handbook.

10             Q      And you didn't review Esther George's

11     transcript before you rendered your initial report?

12             A      Before I wrote this?  I did not have

13     her transcript.

14             Q      And you didn't review Judith Hazen's

15     testimony?

16             A      I reviewed -- I reviewed all of -- I

17     reviewed at least -- I reviewed nine different

18     depositions after I had written this -- the first

19     expert witness document.

20             Q      But not before?

21             A      That's correct.

22             Q      Are you familiar with Operating

Page 135

1          Circular 3?

2                    A      Where is that?

3                    Q      I'm just asking if you have a general

4          familiarity with --

5                    A      No, I'm not familiar with Operating

6          Circular No. 3.

7                    Q      How about Operating Circular No. 4?

8                    A      No, I'm not.

9                    Q      How about Operating Circular No. 5?

10                   A      No, I'm not.

11                   Q      So let's turn to page 9 of your

12         report for a moment.

13                   MS. WEINBERGER:  If we reach a good

14         breaking point, I think we've been going for about

15         an hour.

16                   MS. CARLETTA:  Let's go off the

17         record for a second.

18                   (Discussion had off the record.)

19         BY MS. CARLETTA:

20                   Q      So on page 9 of your report --

21                   A      Uh-huh.

22                   Q      -- paragraph 24 --

Page 136

1              A      Uh-huh.

2              Q      -- you say, "Rather than simply

3       process the request for a master account, as is

4       typically the case for eligible depository

5       institutions, the reserve banks subjected Custodia

6       to a safety and soundness examination."

7                     Do you see that?

8              A      Yes.

9              Q      How do you know what reserve banks

10      typically do when it's reviewing a master account

11      request?

12             A      Right.  So if you're a de novo

13      institution applying for a master account, the

14      chartering authority would conduct the -- would

15      conduct the exam.

16             Q      So if the reserve banks merely

17      process requests, why would they have all these

18      policies that we just went through?

19                    MS. WEINBERGER:  Object to form.

20                    THE WITNESS:  Right.  Well,

21      they're -- the way I read those, and I just skimmed

22      them, they're relying on safety -- whatever safety

Page 171

1    hours.

2                    MS. WEINBERGER:  I think we should

3    proceed with your questioning, give her the chance

4    to answer.

5                    Do you want to read back --

6    BY MS. CARLETTA:

7         Q    What policy determinations did the

8    Board make that determined Custodia's master

9    account request?

10        A    So what the Board did was it came up

11   with a handbook for dealing with master accounts

12   and it also came up with guidelines.  And the

13   guidelines are basically a policy decision.

14                    And the guidelines provide for six

15   elements that are going to be reviewed when the

16   master account is -- is -- is filed with the

17   reserve bank -- with the Federal Reserve and it's a

18   novel institution or it has a novel business plan.

19   So that is policy.

20                    When they -- when they published

21   those guidelines during the process of reviewing

22   Custodia's account, that's policy.  They're setting

Page 172

1          policy, and they created six new hurdles for a

2          company like Custodia to get over.

3                  Q      So your testimony is when you're

4          talking about policy determinations in your expert

5          report, you're talking about the guidelines in the

6          handbook?

7                  A      So the guidelines in the handbook are

8          implementing policy.

9                  Q      Okay.

10                 A      That's how it works at the Federal

11         Reserve.  We -- we -- we design examination

12         procedures, we issue guidelines, we issue

13         regulations.  That's how policies get -- are

14         issued.  Public letters like SR Letters, that's how

15         policy is developed.

16                 Q      Okay.  But you say, "Custodia's

17         master account" --

18                 A      Which page are we on?

19                 Q      I'm on page 3.

20                 A      Page 3.  And what sentence?

21                 Q      "Custodia's master account -- the

22         above events support my opinion that the Board

Page 173

1          ultimately controlled the decision on Custodia's

2          master account application because whether to allow

3          Custodia, a novel institution, holding custody for

4          crypto-assets into the reserve system was a policy

5          decision, which only the Board can make."

6                    So is the policy decision a question

7          about the custody of crypto-assets?

8                    MS. WEINBERGER:  Object to form.

9                    THE WITNESS:  No.  The policy

10         decision is whether or not novel institutions

11         should have access to a master account.

12         BY MS. CARLETTA:

13              Q    So whether this involved

14         crypto-assets is not a policy determination that

15         you're referencing in your expert report?

16              A    That --

17                    MS. WEINBERGER:  Object to form.

Page 174

 5    BY MS. CARLETTA:

 6            Q    Okay.  So when you said yesterday

 7    that matters of policy are decided exclusively by

 8    the Board, what did you mean by "matters of

 9    policy"?

10                    MS. WEINBERGER:  Object to form.

11                    THE WITNESS:  So only the Board can

12    make policy.  That's what I'm stating.

13    BY MS. CARLETTA:

14            Q    Okay.  So I'm just trying to

15    understand the logic of your opinion.  You

16    testified that the -- there's only one statutory

17    factor to consider when determining a master

18    account request.  Is that correct?

19            A    Uh-huh.  That's correct.

20            Q    The Board determines that statutory

21    factor.  Is that correct?

22            A    The Board Legal interprets that

Page 175

```
 1        statutory factor, uh-huh.

 2              Q     Okay.  And this was a -- then the

 3        master account request was a Board of Governors'

 4        decision based on your testimony.  Is that correct?

 5              A     That's how it turned out.

 6              Q     And it was a policy decision that the

 7        Board of Governors made.  Is that correct?

 8              A     Yes.  So -- yes, it created -- so the

 9        Board basically created new policies as to how to

10        review master account proposals from novel

11        institutions.

12              Q     Why would it issue policies -- why

13        would it adopt these policies and guidelines if

14        there's only one statutory factor?

15              A     Well, that's the whole crux of this

16        lawsuit.

17              Q     So --

18              A     They didn't have the authority --

19        they didn't have the authority to do that.

20              Q     So it's --

21              A     I mean --

22              Q     -- your expert opinion that the Board
```

Page 176

1          didn't have the authority to issue the guidelines

2          or the S Letter or the implementation handbook?

3                          MS. WEINBERGER:  Object to form.

4          Mischaracterizes testimony.

5                          THE WITNESS:  So what I'm stating is

6          the Board stepped in -- really into the shoes of

7          the chartering authority.  And the chartering

8          authority should be doing that type of work that's

9          explained in the guidelines.

10         BY MS. CARLETTA:

11                 Q     By the chartering authority, do you

12         mean the state chartering authority?

13                 A     Yeah, the state chartering authority.

14         Or it could be a national.  You know, it could be

15         the OCC.  There's really three types of chartering

16         authorities we have in -- in this country; it's the

17         states, the territories, and the Office of the

18         Comptroller, the currency that does national bank

19         charters.

20                        So the chartering authority should be

21         doing it.  That's their job to do that.  And the

22         Fed stepped into the chartering -- basically

                                                      Page 177

1        stepped into the chartering authority's shoes and
2        started doing their work.
3                Q      So your expert opinion is that the
4        Board of Governors should not have -- has no legal
5        authority to issue the guidelines or the handbook
6        or the S Letter?
7                        MS. WEINBERGER:  Object to form.
8        Calls for a legal conclusion.
9                        THE WITNESS:  So what I'm saying is
10       that, like I've said before, the Fed just has one
11       job here for a master account, and that's the legal
12       eligibility determination.  That's -- that's their
13       only job that congress has authorized them to do.
14       BY MS. CARLETTA:
15               Q      Based on your review of the
16       Monetary --
17               A      Based on my understanding of the
18       Monetary Control Act.
19               Q      So why -- then why did they issue the
20       guidelines, the implementation handbook, and the S
21       Letter?
22                       MS. WEINBERGER:  Object to form.

Page 178

1          Calls for speculation.

2                          THE WITNESS:  Yeah, that -- you know

3          what --

4          BY MS. CARLETTA:

5                  Q      You're here to serve as an expert.

6                  A      Uh-huh.

7                  Q      So in your expert opinion, why did

8          they do that?

9                          MS. WEINBERGER:  Object to form.

10         Calls for speculation.  And outside the scope.

11         BY MS. CARLETTA:

12                 Q      You can answer.

13                 A      So having worked at the Board for a

14         long time, sometimes they go down rabbit holes.

15         And it's a bad decision to go down those rabbit

16         holes.  And I think what happened here is they went

17         into a massive rabbit hole.

18                          And no one at the Board stood --

19         stood back and said, "Is this a good idea?  Should

20         we be doing this?"

21                          And I've seen this happen where staff

22         is well intentioned, and they think they're doing

1      the right thing, but they went down this giant

2      rabbit hole.

3              Q     Only the staff?  The Board of

4      Governors wasn't involved?

5              A     Well, the Board --

6                    MS. WEINBERGER:  Object to form.

7                    THE WITNESS:  So it's my

8      understanding -- later on I became aware, maybe it

9      was after this report, that Vice Chair Barr was

10     briefed on this, both these -- it appears that --

11     well, he would have been briefed on both these

12     proposals.  You don't brief the chair -- a vice

13     chair on just one proposal when they're both there.

14     You would -- like I said before --

15     BY MS. CARLETTA:

16             Q     No, no.  I'm talking about the

17     guidelines and the -- not Custodia's request, the

18     guidelines and the implementation handbook.

19             A     So the Board was heavily involved in

20     developing those -- the guidelines, if you look at

21     whose -- who you call to ask for help on these

22     guidelines, it's only Board members -- it's only

Page 180

```
 1          Board staffers.
 2                  Q     So Board Legal wouldn't have been
 3          involved in their development?
 4                  A     Well, there's -- Board Legal
 5          attorneys are listed on those guidelines.
 6                  Q     And so your opinion is that the Board
 7          of Governors and Board Legal and Board staff all
 8          got it wrong when they issued the guidelines, the
 9          implementation handbook, and the S Letter?
10                      MS. WEINBERGER:  Object to form.
11          Mischaracterizes testimony.
12                      THE WITNESS:  So I think what they
13          did, they all went down this rabbit hole together,
14          and they got -- they got stuck down in this rabbit
15          hole.  And that's the crux of this -- I mean,
16          that's really the crux of this whole thing, is they
17          only had one job.
18                      They didn't have the chartering
19          authority's job.  And that -- but they took on
20          the chartering authority's job.  And whether the
21          Fed likes it or not, we have a dual banking
22          system and you have to rely on the chartering
```

Page 181

1    authority to do their job.

2    BY MS. CARLETTA:

3         Q    And that's --

4         A    And that's not what they did.

5         Q    And that's based on your

6    interpretation of the Monetary Control Act?

7         A    No.  That's based on -- it -- well,

8    yeah, in part, but it's based on -- we have a dual

9    banking system and each regulator in that dual

10   banking system has a role.  And the Fed's role in

11   this was just to look at eligibility.

12              It was the State of Wyoming's job to

13   do all the risk analysis, permissibility analysis.

14   It's going to be their bank.  It's up to them to do

15   all that work.

16         Q    Okay.

17         A    And that -- that is -- that -- and

18   the State of Wyoming put together a 771-page

19   examination manual.  I mean, this is -- they took

20   this -- they've taken this very seriously, this

21   SPDI charter, and how to supervise it.  And they

22   put together, to me, it looks like a very strong

Page 184

1     Hugely precedential, that indicates significant

2     difficulty.

3              And he also states that they're very

4     worried that if they do apply -- if they do approve

5     Custodia, you're going to get a couple hundred of

6     these applications in quickly.

7          Q     And at 13 you also say, "Reserve

8     banks are not deaf to such statements; in my

9     experience, staff are highly attuned to Board

10    pronouncements and act accordingly."

11             Is that right?

12         A     That's correct.

13         Q     Did you ask for documents concerning

14    whether the Reserve Bank of Kansas City actually

15    considered Powell's testimony before you rendered

16    an expert opinion?

17         A     No.  My -- it's my experience staff

18    actually tunes into -- we actually -- we will

19    actually go and watch the testimony live.  And

20    there's live stream throughout the -- with the

21    Federal Reserve's intranet system that we have.

22             You can -- they make it available,

Page 185

1      that you can go click on and watch confirmation

2      hearings.  And also be covered in the American

3      Banker, which everyone in the Federal Reserve

4      System gets a free subscription to.  We -- everyone

5      at the Fed, that's the first thing you do when you

6      sit down -- most people, when you sit down at your

7      desk, you read the American Banker to know what's

8      going on.

9                  So it would be highly unusual for

10     someone at a reserve bank, particularly the Kansas

11     City Reserve Bank, not to have been aware of this

12     testimony.

13          Q     At 14, you talk about the Narrow

14     Bank.

15          A     That's correct.

16          Q     Okay.  You say, "The Narrow Bank's

17     business model is similar to Custodia's."  Is that

18     correct?

19          A     I do.

20          Q     Okay.  And if I recall correctly from

21     your testimony yesterday, you testified that you

22     were not involved in the Narrow Bank's master

Page 186

1          account request.  Is that correct?

2                  A      That's correct, I was not involved in

3          that request.  There wasn't, to my knowledge, a

4          companion proposal with that one.

5                  Q      So it didn't come to the Board of

6          Governors?

7                  A      It could have come to the Board of

8          Governors, and it appeared it did, based on the

9          letter that the New York Fed, I believe, president

10         issued to the Narrow Bank, because that letter

11         references that senior policy officials at the

12         Board of Governors have expressed a strong view

13         that the New York Fed should not approve the TNB's

14         request for a master account.  So that's what the

15         New York Feds -- well, I guess it was the general

16         counsel that wrote that letter.

17                 Q      Okay.  So is that letter the basis

18         for your opinion that interference by the Board

19         derailed TNB's application for a master account?

20                 A      Yes, it is.

21                 Q      Okay.  So you also said that -- I'm

22         sorry.  I want to back up to another question.  You

Page 187

1          said TNB's business model is similar to Custodia's.

2          Is that correct?

3                    A      That's correct.

4                    Q      How are they similar?

5                    A      Well, they were both going to be

6          charted by a state, both of them would serve

7          institutional customers, and both of them would not

8          have FDIC insurance.

9                    Q      Are they similar in any other ways?

10                   A      What?

11                   Q      Are they similar in any other ways?

12                          Are they structurally similar?

13                   A      I don't know more than -- those are

14         the three most common characteristics I'm aware of.

15                   Q      And do you know how the Narrow

16         Bank -- do you know what the Narrow Bank's business

17         model is?

18                   A      Yes, I do.

19                   Q      What is the Narrow Bank's business

20         model?

21                   A      So their business model was to take

22         deposits from money market fund managers and place

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

CUSTODIA BANK, INC., )
)
     Plaintiff, )
)
v. )     Civil Number: 22-cv-00125-SWS
)
FEDERAL RESERVE BOARD OF )
GOVERNORS and FEDERAL RESERVE )
BANK OF KANSAS CITY, )
)
     Defendants. )

---

### ERRATA SHEET FOR THE TRANSCRIPTS OF THE DEPOSITIONS OF KATIE COX

---

I, Katie Cox, have read the transcripts of my depositions taken on December 19, 2023 ("Vol. 1") and December 20, 2023 ("Vol. 2") in the above captioned matter and make the following corrections:

| Vol. | Page | Line | Current Transcript | Change | Reason |
|------|------|------|--------------------|--------|--------|
| 1 | 71 | 10 | Council | Counsel | Transcription error |
| 1 | 84 | 9–10 | Division of Consumer Community Affairs | Division of Consumer and Community Affairs | Transcription error |
| 1 | 87 | 18 | Allison Crowe | Alison Thro | Transcription error |
| 1 | 95 | 16 | general council | general counsel | Transcription error |
| 1 | 97 | 1 | Ben Mickey | Ben McGee | Transcription error |
| 1 | 110 | 2 | Ben Bader | Ben Bauder | Transcription error |
| 1 | 182 | 6 | secondment | seconded | Transcription error |
| 1 | 183 | 10 | secondment | seconded | Transcription error |
| 1 | 248 | 14 | sure | insured | Transcription error |

| Vol. | Page | Line | Current Transcript | Change | Reason |
|---|---|---|---|---|---|
| 1 | 343 | 14 | Custodia on products and services that was | Custodia on products and services that it was | Transcription error |
| 2 | 21 | 11 | And A lot of things | And a lot of things | Transcription error |
| 2 | 38 | 9 | So I reference | So I referenced | Transcription error |
| 2 | 58 | 8 | narrowed it down farther | narrowed it down further | Transcription error |
| 2 | 87 | 8 | Territory bank of Americas | Territorial Bank of American Samoa | Clarification |
| 2 | 144 | 8 | American Bank of Samoa | Territorial Bank of American Samoa | Clarification |
| 2 | 145 | 13, 17 | American Samoa Bank | Territorial Bank of American Samoa | Clarification |
| 2 | 164 | 7 | might sent it out | might send it out | Transcription error |
| 2 | 176 | 17–18 | Office of the Comptroller, the currency | Office of the Comptroller of the Currency | Transcription error |
| 2 | 197 | 9 | there's two ways to get a master account was to buy | there's two ways to get a master account – to buy | Transcription error |
| 2 | 197 | 14 | And we had went in with the FDIC in | And we went in with the FDIC and | Transcription error |
| 2 | 201 | 15 | hand version | handbook version | Transcription error |
| 2 | 211 | 17 | Florida charter | Florida chartered | Transcription error |

Dated: January 8, 2024

/s/ Katie Cox
Katie Cox