# EXHIBIT 18

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING

```
CUSTODIA BANK, INC.,            )
                                )
            Plaintiff,          )
                                )
    v.                          )
                                ) 1:22-cv-00125-SWS
FEDERAL RESERVE BOARD           )
OF GOVERNORS AND                )
FEDERAL RESERVE BANK OF         )
KANSAS CITY,                    )
                                )
            Defendants.         )
```

\* DESIGNATED CONFIDENTIAL \*
\* SUBJECT TO A PROTECTIVE ORDER \*

ZOOM/IN-PERSON DEPOSITION OF ESTHER GEORGE, a Witness, taken remotely on behalf of the Plaintiff before Peggy E. Corbett, CSR, CCR, RDR, pursuant to Notice on the 9th day of November, 2023, at the offices of the Federal Reserve Bank of Kansas City, 1 Memorial Drive, Kansas City, Missouri 64198.

Page 195

1    out of sync with membership side," that's not
2    discretionary, is it?  That's:  Make sure we
3    don't do that.
4            MR. MICHAELSON:  Object to form and
5    foundation.
6        A.   I think it's to make sure we are aware
7    of how others are looking at the same risk and
8    how they are describing this.
9        Q.   (BY MR. ORTIZ) And when we say, "We do
10   not want to contradict one another," the only
11   explanation for that is you don't want to grant a
12   master account if they deny membership or
13   vice-versa, correct?
14       A.   Would you state that question again.
15       Q.   Sure.  When this talks about not getting
16   out of sync with the membership side, and then it
17   says we do not to want contradict one another,"
18   the only explanation for that is if they are
19   denying membership, you should be denying a
20   master account and vice-versa.  If they are
21   granting membership, you need to grant a master
22   account.  That's what that means, doesn't it, to
23   not contradict one another?
24            MR. MICHAELSON:  Object to form.
25       A.   No, I would not interpret it that way at

Page 196

1    all.
2         Q.   (BY MR. ORTIZ)  Then tell me how we
3    should interpret that.
4         A.   I think the interpretation of this, as I
5    was talking to this team, is this was relevant
6    information to us to understand how risks
7    associated with this membership application were
8    being viewed.
9              We had already made our own assessment
10   around the nature of concerns we had about the
11   master account, but this was not irrelevant to us
12   in terms of understanding how the risk would be
13   described here.
14        Q.   So you're saying that the contradiction
15   would be what then?  If they are making, the
16   Board is making a decision on membership, right,
17   correct?
18        A.   That's correct.
19        Q.   And you're making the determination on
20   master account, correct?
21        A.   Correct.
22        Q.   But you've already mutually shared all
23   of the information on risk back and forth,
24   haven't you?
25             MR. MICHAELSON:  Object to form.

Page 197

1    A.   So there was information-sharing going
2    on, I presume, around that, but contradicting one
3    another might be looking at the same risk and
4    describing it differently, whether intentional
5    or --
6    Q.   (BY MR. ORTIZ)  You're really just kind
7    of speculating on all of that, aren't you?
8    A.   I'm not speculating on the fact that we
9    were making our judgment about this master
10   account based on the information we had.
11   Q.   But you are simply speculating about
12   what Chris Gaul-Pearson was directing his team
13   when he said:  We do not to want contradict one
14   another?
15            MR. MICHAELSON:  Object to form and
16   fashion.
17   A.   I was not aware of this conversation.
18   Q.   (BY MR. ORTIZ)  So do you recall, I'm
19   going to hand you what's already in evidence as
20   Exhibit 51, which is just basically an e-mail
21   communicating to you a memo for your review
22   documenting the analysis of the request by
23   Custodia for a master account.  Do you recall
24   generally receiving Exhibit 51 from your team?
25   A.   I do recall in this timeframe getting

Page 209

1  to go back to the paragraph, on the third page
2  where you have deleted and struck out," Custodia
3  has pointed to other financial institutions that
4  Custodia believes have master accounts and are,
5  in part, conducting operations and engaging in
6  activities similar to some of those of which
7  Custodia seeks to engage."
8        Then it says, "Putting aside Custodia's
9  lack of insight as to how other entities may or
10 may not be conducting certain operations or
11 engaging in certain activities."  Why did you
12 strike that out?
13    A.   So I thought our assessment was focused
14 on what had been proposed to us by Custodia, and
15 this language was not relevant to our analysis
16 here.
17    Q.   So let's go to the next page where
18 there's a strike-out under, "Lack of Federal
19 Regulatory Oversight," where it says, "The
20 Reserve Bank has consistently indicated that
21 whether Custodia is subject to Prudential Federal
22 supervision and regulation is an important input
23 into the Reserve Bank's decision regarding a
24 master account."  Do you see that?
25    A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 210

1     Q.    Someone from your team or outside your
2  team had that in the memo for you to consider,
3  right?
4     A.    This was one of the original sentences,
5  yes.
6     Q.    So why did you strike that out?
7     A.    So again, this was referencing
8  conversations, views, and I was trying to focus
9  the lack of Federal oversight on the factual
10 components of this, and that reference is to what
11 we had talked about in the past.
12    Q.    So can we agree that if the Board of
13 Governors had granted membership, Custodia
14 becomes Tier 2 under the guidelines, and more
15 probable than not, you grant them a master
16 account agreed?
17    A.    If the Board granted membership, it
18 would have changed the analysis we would have put
19 in here, because it would have changed who their
20 prudential supervisor was.
21    Q.    Everything you and I have talked about
22 in the last two hours basically goes away, lack
23 of Federal supervision and oversight, and all of
24 this.  If they simply give them membership, all
25 of those fears go away and you can grant a master

Page 211

1     account, right?
2              MR. MICHAELSON:  Object to form.
3         A.   That is not how I viewed our decision in
4     this case.
5         Q.   (BY MR. ORTIZ)  Well, would you agree
6     with me more probable than not they would have
7     gotten a master account, had they been granted
8     membership and then been in a Tier 2 institution
9     under the new access guidelines?
10             MR. MICHAELSON:  Object to the
11    form, calls for speculation, asked and answered.
12        A.   That would have been new information
13    that would have caused us to extend our analysis
14    here, and to understand what the supervisory
15    framework would be for this institution relative
16    to the risk that we were discussing with the
17    master account.
18        Q.   (BY MR. ORTIZ)  Well, wait a minute.  If
19    they are granted membership, you become their
20    supervisory authority as the ARB in their region,
21    don't you?
22        A.   I assume that would have been the case.
23        Q.   Well, you know exactly how your
24    supervisory framework is set up at the Kansas
25    City Fed, don't you?

Page 258

1  economic and financial stability, to make sure
2  that the public's trust in financial institutions
3  and the safety and soundness of their operations
4  means that we think carefully about the conduct
5  of those activities, the nature of those
6  activities that are being -- in institutions, and
7  the creation of this new charter was a point at
8  which to say: "What is different about this
9  institution than our traditional framework, where
10 we have many of the levers, enforcement actions,
11 where we have regular oversight, where we have a
12 partnership with the State in many cases to
13 understand the nature of those risks?"
14         This posed a different model that we
15 needed to think through.
16    Q.   I mean as a general matter when during
17 your tenure as President of the Federal Reserve
18 Bank of Kansas City, did you prefer larger banks
19 over smaller banks or vice-versa?
20    A.   So I did not have a preference for large
21 over small, but I will tell you it was clear in
22 our supervision that we understood that there
23 were a set of banks that were too big to fail in
24 this country, and we were often looking at the
25 regulatory construct that seemed to create undue

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 259

1  burdens for smaller institutions.
2        And so I was most familiar with
3  community and regional banks that we supervised
4  in our region.  We did not have one of the
5  too-big-to-fail banks in the 10th Federal Reserve
6  District, and so I understood firsthand how
7  important these smaller institutions were to the
8  region.
9     Q.   When you arrived at your decision to
10 deny Custodia's master account, did you have an
11 understanding as to whether the Board of
12 Governors had voted on Custodia's master account
13 request?
14    A.   The Board of Governors would not have
15 voted on this.  This was not within their
16 purview, and at no time in my conversations with
17 them did I get any sense they were interested in
18 making a decision on this question that they had
19 raised.
20    Q.   Can you explain that further?  What is
21 the basis for that?
22    A.   So in my conversations asking them to
23 give me a broader picture of how they were
24 thinking about the policies associated with
25 crypto-assets more generally, what they saw as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 260

1   financial stability issues, implications for
2   monetary policy, there was never an indication,
3   in fact, more often than not, Governor Brainard
4   would indicate:  "This is your decision.  I'm
5   happy to understand what you're asking.  I
6   understand that you see this has other
7   ramifications," but at no time did any of the
8   Governors offer me any counsel or suggestions on
9   the master account.
10       Q.   But yet the time that you made the
11  decision to deny the request, was it your
12  understanding that the Board of Governors had not
13  voted on Custodia's master account request?
14       A.   When we decided on the master account, I
15  was -- I don't think they had scheduled a vote on
16  the membership application.
17       Q.   Right, but I'm asking about the master
18  account request.  It was your understanding that
19  the Board of Governors had not voted on a master
20  account request?
21       A.   They were not going to vote on the
22  master account.  This was not part of any action
23  they were going to take.
24       Q.   Did you have an understanding as to when
25  you denied the request as to whether the Board of