# EXHIBIT 21

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF WYOMING
 3
 4     CUSTODIA BANK, INC.,
 5                      Plaintiff,
 6     vs.                                    No.
 7     FEDERAL RESERVE BOARD OF               22-cv-00125-SWS
 8     GOVERNORS and FEDERAL RESERVE
 9     BANK OF KANSAS CITY,
10                      Defendants.
11
12
13
14                         CONFIDENTIAL
15
16
17
18            CONFIDENTIAL DEPOSITION OF CHRISTI
19     MAY-ODER, a Witness, taken on behalf of the Plaintiff
20     before Kelsey Robbins Schmalz, CSR No. 1571,
21     CCR No. 1148, RPR, pursuant to Notice on the 19th of
22     October, 2023, at the Federal Reserve Bank of Kansas
23     City, 1 Memorial Drive, Kansas City, Missouri.
24
25
```

Page 52

1   like a SharePoint file where we housed those
2   documents.
3           Q.    That would make sense to me, because
4   I'm assuming more than one team member would have to
5   get in and access what was going on with this
6   application?
7           A.    Yes.  We had a number of risk
8   specialists involved.
9           Q.    And I'm assuming that someone would
10  have to be going through to make sure how are we
11  following the policy to make sure we're covering all
12  these bullet points for Custodia's application,
13  correct?
14                MR. MICHAELSON:  Objection.  Form.
15          A.    So just to clarify, we -- so when
16  you -- when we go about conducting a review of an
17  institution's access to a master account, it is not a
18  checkbox process that we go through.  It is a very
19  comprehensive, fulsome review of all the risks that
20  the entity poses, and it is -- they can be very
21  unique and different from institution to institution,
22  so it is not that we take this guidance and go
23  through and checkbox every single one of these.
24  BY MR. ORTIZ:
25          Q.    Well, can we just agree you didn't

Page 53

1   really follow this procedure at all for Custodia, did
2   you?  You created something totally different and you
3   reached out trying to get different guidelines that
4   would apply to Custodia; isn't that really what
5   happened?
6              MR. MICHAELSON:  Objection.  Form.
7         A.   We conducted our review for this
8   institution like we would do any other institution,
9   and that is we pull together a team of experts that
10  understand the risk and dig into the entity's
11  business plan to understand what they are trying to
12  accomplish, and so each and every entity can look
13  very, very different, and we approach it the same way
14  with every institution, but what is different are the
15  risks that each institution poses.
16  BY MR. ORTIZ:
17        Q.   So are you telling me that you did not
18  follow any procedure other than this one?
19        A.   We followed this procedure up until
20  the new account access guidelines were distributed,
21  and those were basically just a way to make what our
22  internal procedures that we had been following for
23  many years, making those more transparent to the
24  public so they better understand the process that we
25  go through, so what we have done for years is

Page 54

1  basically the same thing that was distributed in
2  those account access guidelines that were
3  published.
4           Q.    Well, those account access guidelines
5  used a tier system that put Custodia into a Tier 3
6  category.  Nothing like that exists in the policies
7  that applied when Custodia submitted its account
8  application.  Can we agree on that?
9           A.    So for --
10          Q.    That's a yes-or-no question.  Do you
11 agree that there's no tier system that existed in
12 your policies that applied to Custodia when they
13 submitted their application?
14               MR. MICHAELSON:  Objection.  Form.
15 BY MR. ORTIZ:
16          Q.    Agree?
17          A.    The practice that we have done for
18 years would have been that we would have applied a
19 more stringent review of any de novo that had the
20 same type of risk profile that that institution had,
21 so while it may not have been captured in writing, it
22 would have -- our practice would not have changed at
23 all.
24          Q.    Okay.  So are you telling me that the
25 document in front of us, 43, has a tier system in it?

Page 55

1   Are you telling me that that exists in this document
2   or are you just telling me well, that's something
3   that we had that we didn't have in writing?  Which is
4   it?
5                MR. MICHAELSON:  Objection.  Form.
6   BY MR. ORTIZ:
7        Q.   Can we agree there's nothing in the
8   document, and we'll go through it to see if you
9   really followed it for Custodia, but there's nothing
10  in this document that references a Tier 1, a Tier 2,
11  and a Tier 3 institution, is there?
12       A.   So on the back page of this document,
13  it captures routine versus nonroutine, but this
14  document was not explicit in saying what the tier
15  levels were.  But, again, in practice, we would have
16  applied a more stringent review of any uninsured
17  de novo institution.  It just is not explicitly laid
18  out in this document in a tier.
19       Q.   So the only way to know that would be
20  to see how you handled other de novo institutions
21  that applied for master accounts; is that right?
22  That would confirm what you're telling me, that
23  although it's not in writing, you really used a
24  different procedure?
25               MR. MICHAELSON:  Objection.  Form.

1   answer.  Let her complete the answer and then you can
2   move to strike.
3           MR. ORTIZ:  If you want to enlarge the
4   time frame for me beyond seven hours and I'll come
5   back another time, I'll let her ramble as long as she
6   want's counsel.  You choose.  You choose.
7           MR. MICHAELSON:  Given your comment
8   today, I'm not extending past seven hours --
9           MR. ORTIZ:  Then she need to answer
10  the question I ask.
11          MR. MICHAELSON:  She is.
12          MR. ORTIZ:  When she goes on a
13  rambling narrative that is unrelated to my question,
14  I'm going to immediately move to strike.
15          MR. MICHAELSON:  So how about this.
16  We're going to end at seven hours.  You let her
17  finish the answer.  You move to strike, and if you
18  win, we'll up open up the deposition again by the
19  number of minutes.
20          MR. ORTIZ:  Counsel, I don't have time
21  to move to strike all --
22  BY MR. ORTIZ:
23      Q.    Ma'am, just listen to my question.
24  They're easy and straightforward.  They're easy and
25  straightforward.

Page 189

1              So this references Tier 3.  There is
2    no references to a Tier 3 in any of the existing
3    policies we went through for master account
4    applications; is there?
5              MR. MICHAELSON:  Objection.  Form.
6    BY MR. ORTIZ:
7         Q.   That's not a term that was used in any
8    of the existing policies at the Kansas City Fed?
9              MR. MICHAELSON:  Objection.
10   BY MR. ORTIZ:
11        Q.   Before the new guidelines, true?
12             MR. MICHAELSON:  Objection.  Form.
13        A.   Tier 3 is something that was applied
14   to how we had already been assessing institutions
15   such as Custodia that were in that higher risk
16   category.
17   BY MR. ORTIZ:
18        Q.   Ma'am, again, move to strike.  My
19   question was none of the policies that we've looked
20   that were in place used a term of Tier 3, do they;
21   yes or no?
22        A.   They did not specifically identify as
23   a Tier 3, but we talked about routine versus
24   nonroutine.
25        Q.   Exactly.  Tier 1, Tier 2, Tier 3 were

Page 190

1   all new terms of art introduced with the new account
2   guidelines that came out sometime in the spring of
3   2022, correct?
4              MR. MICHAELSON:  Objection.  Form.
5   BY MR. ORTIZ:
6        Q.    You can answer.  It's okay.
7        A.    Those guidelines helped provide
8   transparency into how we have consistently --
9              MR. ORTIZ:  Object.  I move to strike.
10             MR. MICHAELSON:  Please --
11             MR. ORTIZ:  The question was --
12             MR. MICHAELSON:  You have to let her
13  finish and then you can move to strike all you want.
14             MR. ORTIZ:  The question was --
15             MR. MICHAELSON:  What she's saying is
16  directly responsive to what --
17             MR. ORTIZ:  It wasn't.
18             MR. MICHAELSON:  Unless your goal here
19  is to simply --
20             MR. ORTIZ:  Counsel, my goal is to get
21  straightforward answers to straight questions.
22  BY MR. ORTIZ:
23       Q.    Ma'am, my question is much simpler.
24  The terminology of Tier 1, Tier 2 and Tier 3 first
25  were utilized in the account access guidelines in the

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    that Avit could trade in the secondary market an even
2    bad actors could have an implicit guarantee.
3                    So the word being chosen by the Board
4    of Governors and by Esther George were being
5    coordinated and changing by the minute up until the
6    official denials, weren't they?
7         A.     What I recall from this is that we
8    were just asking Ben to share what updates had been
9    made to the Board order.  That's what I recall from
10   that exchange.
11                   (May-Oder Exhibit No. 91 was marked
12   for identification.)
13   BY MR. ORTIZ:
14        Q.     I'll hand you Exhibit 91, from Esther
15   George to you, and then at the bottom looks like to
16   be Judith Hazen to Esther George with you being
17   copied.  It says, The updated memo incorporating your
18   edits is also attached for your reference.  This
19   version will be shared with director of RB OPS per
20   the S Letter requirements.
21                   So the S Letter changed things and
22   required you at the bank level to send all your
23   predecisional thoughts to the Board of Governors to
24   review ahead of time, didn't it?
25                   MR. MICHAELSON:  Objection.  Form.

Page 290

1  A. So the S Letter requires the Reserve
2 Bank in certain -- for certain situations to share
3 our recommendation with them.
4 BY MR. ORTIZ:
5  Q. That was never in any of the policies
6 and procedures that existed at the Federal Reserve
7 Bank of Kansas City when Custodia submitted its
8 application in October of 2020, correct?
9  MR. MICHAELSON: Objection. Form.
10 BY MR. ORTIZ:
11  Q. That's something totally new.
12 S Letter 2667, totally new requirement instituted by
13 the Board, correct?
14  MR. MICHAELSON: Objection. Form.
15  A. Our practice prior to the S Letter
16 being enacted, we would have typically engaged the
17 Board on these types of requests or activities that
18 would be considered unusual, novel, so that would
19 have been -- again, as I've stated previously, that
20 given the types of issues that we were dealing with
21 and the uniqueness around them, that is what we do
22 here in the System is we coordinate and we share
23 information across Reserve Banks with the Board of
24 Governors when we're dealing with these types of
25 issues.

Page 291

1  BY MR. ORTIZ:
2       Q.   If you were doing that anyway, why is
3  there a specific directive in the S Letter 2667?  If
4  what you just told me is true and that's how it
5  worked anyway, you wouldn't need S Letter 2667
6  directing that you do that, would you?
7            MR. MICHAELSON:  Objection.  Form.
8       A.   I can't speak to why they decided --
9  BY MR. ORTIZ:
10      Q.   That doesn't make sense, does it?  If
11 that's how you always did anyway, that you gave them
12 predecisional heads-up, they wouldn't be making that
13 new requirement with these new guidelines, would
14 they?
15           MR. MICHAELSON:  Objection.  Form.
16      A.   I can't speculate why they issued the
17 S Letter.
18 BY MR. ORTIZ:
19      Q.   Did you have the ability to comment on
20 the S Letter and provide input on that just like you
21 did the guidelines?
22      A.   I had the opportunity to review the
23 draft S Letter and provide feedback.
24      Q.   Did you provide feedback that said we
25 already do this anyway, we don't need it?