Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 532-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

*Counsel for Defendant Federal Reserve Bank of Kansas City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants*. | No. 1:22-cv-00125-SWS |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S PETITION FOR REVIEW AND MOTION FOR JUDGMENT AS A MATTER OF LAW**

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................... iii

Preliminary Statement ................................................................................................. 1

Counterstatement of Undisputed Facts ....................................................................... 4

I.  Reserve Banks Mitigate Risk By Exercising Discretion Over Access to Services. ..................................................................................................... 5

    A.  The Federal Reserve's Mission Is to Promote Financial Stability and Implement Monetary Policy. ................................................................ 5

    B.  Congress Empowered Reserve Banks to Provide Payment Services While Mitigating the Risks Arising Therefrom. ................................... 5

    C.  For Nearly a Century, Reserve Banks Have Mitigated Risk by Exercising Discretion Over Access to Services. ................................... 7

    D.  FRBKC's "Credit Risk Management" Department Is Responsible for Access to Services in the System's Tenth District. .............................. 9

II.  Custodia Presents Novel Risks and Considerations. ....................................... 11

    A.  Custodia Is Not a Traditional Bank. .................................................... 11

    B.  FRBKC Cautioned Wyoming That SPDIs Would Not Receive Automatic Access to Reserve Bank Accounts and Services. ............... 12

III.  Custodia Requested a Master Account Before Building Its Business. ............ 13

    A.  Custodia Planned to Hold Uninsured Customer Deposits and Profit from Digital Asset Services that It Had Not Yet Designed. ................. 13

    B.  Custodia's Executive Team Lacked Relevant Banking Experience. ... 16

    C.  Custodia's Risk Management and Compliance Infrastructure Was Unbuilt. ............................................................................................... 17

IV.  FRBKC Denied Custodia's Master Account Request. ..................................... 18

    A.  Custodia's Request Was "Non-Routine," Non-Traditional, and Premature. ........................................................................................... 18

    B.  Custodia's Request Raised Questions Concerning Legal Eligibility, Policy, and Risk. ................................................................................. 19

C.    FRBKC Leadership Was Never Comfortable with the Risks Posed by Custodia's Request..................................................................... 24

D.    FRBKC Decided to Deny Custodia's Request After an In-Depth, On-Site Examination Confirmed Policy and Risk Issues. ........................... 26

E.    FRBKC Controlled the Outcome.......................................................... 29

F.    The Board's Account Access Guidelines Did Not Dictate the Outcome of FRBKC's Decision. .......................................................... 30

G.    The Board's "S-Letter" Process Did Not Dictate the Outcome of FRBKC's Decision.................................................................. 32

H.    Custodia's Membership Application Did Not Dictate the Outcome of FRBKC's Decision.................................................................. 34

ARGUMENT .................................................................................................... 35

I.    FRBKC Is Entitled to Judgment as a Matter of Law Because Section 248a Does Not Provide an Absolute, Non-Discretionary Entitlement to a Master Account. ............. 35

A.    Mandamus Is a Remedy Only for Non-Discretionary, Ministerial Rights. .................................................................................... 35

B.    Section 248a Does Not Provide an Absolute Entitlement to a Master Account. .................................................................................... 36

C.    FRBKC Made the Decision to Deny Custodia's Master Account Request, but Mandamus Relief Is Unwarranted Regardless................................. 42

1.    *FRBKC decided Custodia's master account request.* .............................. 42

2.    *FRBKC is entitled to judgment as a matter of law regardless of its and the Board's respective roles in denying Custodia's master account request.* ........................................................... 48

CONCLUSION................................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**

*Am. Bankers Ass'n v. United States,*
  932 F.3d 1375 (Fed. Cir. 2019) .................................................................. 5

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y. (BSJI),*
  2023 WL 7111182 (S.D.N.Y. Oct. 24, 2023) ........................................ 3, 38

*Bartlett Mem'l Med. Ctr., Inc. v. Thompson,*
  347 F.3d 828 (10th Cir. 2003) ................................................................. 35

*Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.,*
  766 F.2d 538 (D.C. Cir. 1985) .................................................................. 5

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta,*
  713 F.2d 1221 (6th Cir. 1983) .................................................................. 5

*Johnson v. Rogers,*
  917 F.2d 1283 (10th Cir. 1990) ............................................................... 36

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ................................................................. 36

*Marquez-Ramos v. Reno,*
  69 F.3d 477 (10th Cir. 1995) ................................................................... 36

*Nero v. Oklahoma,*
  2022 WL 14423872 (10th Cir. Oct. 25, 2022) ........................................ 36

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.,*
  906 F. Supp. 2d 202 (S.D.N.Y. 2012) ...................................................... 5

*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.,*
  2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ..................................... 6, 21

*United States ex rel. Dunlap v. Black,*
  128 U.S. 40 (1888) .................................................................................. 36

**Statutes**

12 U.S.C. § 222 ........................................................................................ 5

12 U.S.C. § 248a ................................................................ 2, 12, 48, 49

12 U.S.C. §§ 341-361 ............................................................................... 5

12 U.S.C. § 342 ........................................................................................ 5

12 U.S.C. § 1841(c) ................................................................. 12, 19

28 U.S.C. § 1361 ........................................................................ 35

Wyo. Stat. Ann. § 13-2-103 .................................................11, 12

Wyo. Stat. Ann. § 13-2-201 ..........................................................11

Wyo. Stat. Ann. §§ 13-12-101–13-12-126 ...................................11

Wyo. Stat. Ann. § 13-12-103 ........................................................ 12

Wyo. Stat. Ann. § 13-12-105 ........................................................ 12

## Regulations

12 C.F.R. § 201.1, *et seq.* .............................................................. 6

12 C.F.R. § 265.20(e)(1) ............................................................. 34

Guidelines for Evaluating Account and Services Requests,
   87 Fed. Reg. 12,957 (Mar. 8, 2022)......................................... 31

Policy Statement on Section 9(13) of the Federal Reserve Act,
   88 Fed. Reg. 7848 (Feb. 7, 2023) ............................................ 15

## Other Authorities

Bd. of Governors,
   FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to
   Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d ...................................... 15

Bd. of Governors,
   Federal Reserve Policy on Payment System Risk
   (*as amended* July 20, 2023), https://bit.ly/3zVvBd1 ......................................................... 6, 7

BNY Mellon,
   Annual Report 2022, http://tinyurl.com/yed5j4na.................................................... 23

BNY Mellon,
   Comment Letter on Proposed Rule on Safeguarding Advisory Client Assets (May 8,
   2023), http://tinyurl.com/yrykzkxd................................................................. 23

Brus, Brian
   *Old-fashioned financing: S&L still thriving without FDIC insurance,*
   J. Record (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx ......................................11

Diamond, Douglas W., et al.
Fed. Rsrv. Bank of Minneapolis, *Bank Runs, Deposit Insurance, and Liquidity*,
24 Quarterly Rev. 14 (2000), http://tinyurl.com/ycyt7byd ........................................11

*Failed Bank List: Failed Bank Information for Signature Bank, New York, NY*, FDIC.gov
(Mar. 20, 2023), http://tinyurl.com/4vvuz5r9 ................................................. 14

Fed. Rsrv. Bank of Kansas City,
*Esther L. George* (2023), http://tinyurl.com/3bbzk9vm ......................................... 9

Fed. Rsrv. Bank of Kansas City,
*What We Do* (Jan. 8, 2021), https://www.kansascityfed.org/careers/what_we_do/ ................... 9

Ihrig. Jane, Zeynep Senyuz, & Gretchen Weinbach,
The Fed's "Ample Reserves" Approach to Implementing Monetary Policy
(Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020),
http://tinyurl.com/29xuwpw8 ....................................................................... 7

*Master Account and Services Database*,
FederalReserve.gov (*current as of* Nov. 30, 2023),
http://tinyurl.com/4c95xdt9 ....................................................................11

Moen, Jon R., & Ellis W. Tallman,
*The Panic of 1907*, Fed. Rsrv. History (Dec. 4, 2015),
https://www.federalreservehistory.org/essays/panic-of-1907 ................................. 41

*Monetary Policy: Credit and Liquidity Programs and the Balance Sheet*,
FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva ..................................... 7

Morrow, Allison
*Crypto-friendly lender Silvergate collapses*,
CNN (Mar. 8, 2023), http://tinyurl.com/4nkezrze .................................................. 14

Nat'l Cmty. Reinvestment Coal. et al.,
Comment Letter on Proposed Guidelines for Evaluating Account and Services
Requests (Jan. 17, 2023), http://tinyurl.com/nzpc24us ........................................... 42

Nebraska Financial Innovation Act,
LB 649, 107th Leg., 1st Sess. (announced in January 2021),
https://nebraskalegislature.gov/FloorDocs/107/PDF/Intro/LB649.pdf .................................. 21

Off. of Comptroller of Currency, Interpretive Letter No. 1179 on Bank Authority
(Nov. 18, 2021), http://tinyurl.com/38c4e99b ...................................................... 22

Proposed Guidelines for Evaluating Account and Services Requests,
86 Fed. Reg. 25,865 (May 11, 2021) .......................................................... 30, 31

Report on Stablecoins
  (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021),
  http://tinyurl.com/5225srnv) ............................................................................... *passim*

Reserve Maintenance Manual,
  FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl .................................................... 6

Sablik, Tim
  Fed. Rsrv. Bank of Richmond, *The Fed Is Shrinking Its Balance Sheet.*
  *What Does That Mean?*, Econ Focus 4, 7 (Q3 2022), http://tinyurl.com/5x66nes8 ................. 6

SEC Staff Accounting Bulletin No. 121 (Apr. 11, 2022)............................................................. 23

U.S. Fed. Rsrv. Sys.,
  No. 0821, The Fed Explained:
  What the Central Bank Does (11th ed. 2021), http://tinyurl.com/a7y83ejh ....................... 5, 34

Wilmarth, Arthur E., Jr.
  *The Expansion of State Bank Powers, the Federal Response, and the Case for*
  *Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133 (1990) ................................ 42

Wilmarth, Arthur E., Jr.
  *We Must Protect Investors and Our Banking System from the Crypto Industry*,
  101 Wash. U. L. Rev. 235 (2023)............................................................................................. 42

Wyo. Div. of Banking (2021),
  http://tinyurl.com/bdfsryhw ...................................................................................................... 12

Wyo. Div. of Banking,
  *Special Purpose Depository Institutions* (2021),
  http://tinyurl.com/2p8uwc8p...................................................................................................... 12

## PRELIMINARY STATEMENT

Congress created the Federal Reserve Bank of Kansas City ("FRBKC") to act, along with the other eleven Reserve Banks and the Board of Governors (the "Board"), as part of the Federal Reserve System (the "Federal Reserve").  Congress charged Reserve Banks with operating a safe, stable, and reliable national payment system.  For over one hundred years, Reserve Banks have exercised discretion over direct access to this payment system.

Custodia is a start-up seeking to straddle the worlds of banking and digital asset commerce. Unlike traditional banks, Custodia operates without deposit insurance and seeks to profit from transaction fees on a range of digital asset services commonly provided by non-banks.  A member of its Board of Directors considers it a "transaction processer"—like Visa and other companies that do not have master accounts.  Custodia intends to serve as a "bridge" between banking and digital asset services, and to profit from regulatory arbitrage, enjoying bank-like access to Federal Reserve services, but without bank-like deposit insurance, oversight, or risk management.

In October 2020, Custodia requested a master account from FRBKC to obtain direct access to Federal Reserve payment services.  At the time, it had not yet developed concrete plans for *any* of the three digital asset services—prime services (facilitating crypto transactions), stablecoin issuance, and digital asset custody—that it hoped would someday make it profitable.  Nor had it completed building its risk management or compliance infrastructure for its day-one activities.  It wanted a master account first and would figure the rest out later.

In keeping with its longstanding procedures, FRBKC led in-depth risk assessments into all aspects of Custodia's business and found that it did not have adequate policies, procedures, personnel, or infrastructure to provide banking services in a safe and sound manner.  Meanwhile, FRBKC engaged with other Reserve Banks and the Board of Governors on the novel and complex policy issues raised by requests for Federal Reserve services from a range of other non-traditional

entities located across the country.  Some of these policy issues included treatment of digital assets (*e.g.*, is it permissible for banks to issue stablecoins or hold crypto-assets on balance sheet), while others were more structural in nature (*e.g.*, what risks arise from granting access to institutions that are uninsured, not federally supervised, and not engaged in the traditional business of banking).

In June 2022, Custodia initiated this lawsuit to demand an answer on its master account request.  By this time, it had *still* not developed concrete plans for its three digital asset services and had *still* not completed building its risk management and compliance infrastructure for its day-one activities.  FRBKC continued its analysis and led an in-depth, on-site risk assessment in September 2022.  FRBKC proceeded to deny the request, for a host of reasons, in January 2023.

Custodia now asks this Court to compel the Board of Governors and FRBKC to give it a master account and access to services.  The absolutist nature of Custodia's legal theory is striking. Custodia does not challenge the reasons given by FRBKC for denying its request.  Custodia does not, for example, allege that FRBKC erred in assessing the risks that would be posed by granting it a master account or misjudged the adequacy of its compliance infrastructure, or that the denial was arbitrary and capricious for any other reason.  Instead, Custodia's position is that it doesn't matter what risk it poses.  According to Custodia, the Federal Reserve has no discretion over depository institutions' use of its services, irrespective of risk.[1]  Custodia's interpretation of the Federal Reserve Act ("FRA") would confer an entitlement to automatic access to Reserve Bank accounts and services upon any and all state- or territory-chartered depository institutions, even

---

[1] Custodia claims a statutory right not only to a "master account" but also to direct access to all Federal Reserve services accessible via master accounts and identified in 12 U.S.C. § 248a(b). *See* Custodia Br. at 35 (ECF 234) ("Put in every day terms, an individual may be entitled to the contents of a safe deposit box, but without the key to the box that entitlement is worthless."); *id.* (asking the Court to "command[] Defendants to grant access to all services covered by 'the fee schedule'" in § 248a(b)).

over a Reserve Bank's well-founded risk concerns. Reserve Banks would be forced into a counterparty relationship with every entity to which any state gave a novel charter, effectively handing over control of the nation's payment system, and implementation of the nation's monetary policy through the Federal Reserve's balance sheet, to state legislatures.

FRBKC moves for summary judgment on both of Custodia's claims against it (Claims II and III) because they are without merit. Both stand on the radical, erroneous premise that the FRA provides Custodia an absolute, non-discretionary statutory right to directly access and use Reserve Bank master accounts and services. Custodia's theory fails first and foremost because the FRA does not say that. *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*), 2023 WL 7111182, at *6-9, *11 (S.D.N.Y. Oct. 24, 2023) (rejecting argument that § 248a provides a right to a master account and services). Construing the FRA as Custodia urges also would violate multiple canons of statutory construction: it would render provisions of the FRA meaningless and dramatically reshape the relationship between the federal government and the states in a way that Congress did not and could not have intended. What the FRA requires is simple: equal pricing subject to baseline terms, not automatic access. Or put differently, the Federal Reserve must treat nonmembers and members equally when pricing its services, but it can exercise discretion over access to services for both members and nonmembers alike to protect the integrity of the nation's payment system.[2]

---

[2] Custodia repeatedly hints at "discriminat[ion]" and casts itself as a "David" seeking to engage in digital asset activities enjoyed by large banks. Custodia Br. at 1-2. Yet Custodia, the master of its own complaint, elected *not* to contend that the denial of its request was discriminatory or "arbitrary and capricious," instead relying solely on its absolute-entitlement theory. *See* ECF 197 ("The soundness and correctness of that decision [the denial of Custodia's request] is not at issue."). As a result, there is no claim in this case that the Federal Reserve is treating Custodia unfairly.

The Court denied dismissal at the pleading stage and ordered discovery on Custodia's claim that the Board, rather than FRBKC, denied its master account request. ECF 164 at 10-11. Discovery has made clear that FRBKC—not the Board—denied Custodia's master account request in the exercise of its own discretion. Even Custodia seemingly recognizes that the evidence contradicts its earlier allegations that FRBKC was poised to grant a master account until the Board took over, ECF 121 ¶¶ 10, 44, as Custodia now contends merely that the Board "inserted itself" into FRBKC's decision-making process. Whether the Board played some role, however, is beside the point. While the Court used the words "inserted itself," what the Court wanted to know was whether the Board dictated the outcome: "if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little, because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes ...")." ECF 164 at 10 (quotation marks omitted). And on this question, there is no genuine issue of fact. No reasonable factfinder could find that FRBKC was a mere puppet and the Board dictated the outcome. But even if the Board had done so, Custodia's claims would still fail as a matter of law because they are premised entirely on its absolute-entitlement theory, which is wrong. Custodia is therefore not entitled to any relief regardless of the respective roles of the Board and FRBKC in the denial. Accordingly, FRBKC is entitled to summary judgment on Claims II and III, and Custodia's motion for summary judgment must be denied.

## COUNTERSTATEMENT OF UNDISPUTED FACTS

FRBKC provides a counterstatement of facts not in dispute below and provides specific objections to each paragraph of Custodia's statement of facts in Exhibit 1.

**I.    Reserve Banks Mitigate Risk By Exercising Discretion Over Access to Services.**

**A.    The Federal Reserve's Mission Is to Promote Financial Stability and Implement Monetary Policy.**

1.    The Federal Reserve is composed of the Board, twelve regional Reserve Banks, and the Federal Open Market Committee ("FOMC").   12 U.S.C. § 222.   Congress created the Federal Reserve "to oversee banking operations and promote [] greater economic stability." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019); *see also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1228 (6th Cir. 1983) ("The Federal Reserve System ... functions as the nation's chief money manager.   It is this nation's central bank, performing a vital governmental role.").   It serves the public interest by promoting a stable financial system and implementing monetary policy.   *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F. Supp. 2d 202, 232 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538, 539 (D.C. Cir. 1985).

2.    The Federal Reserve ensures "the stability of the financial system" by "minimiz[ing] and contain[ing] systemic risks."   U.S. Fed. Rsrv. Sys., No. 0821, The Fed Explained: What the Central Bank Does ("The Fed Explained") at 1 (11th ed. 2021), http://tinyurl.com/a7y83ejh.

**B.    Congress Empowered Reserve Banks to Provide Payment Services While Mitigating the Risks Arising Therefrom.**

3.    In furtherance of the Federal Reserve's mission, Reserve Banks "take the lead in providing accounts and payment services to depository institutions."   *See id.* at 86-87.   Payment services include check clearing, wire transfers, Automated Clearinghouse ("ACH") payments, and FedNow, a real-time settlement system.   *See id.* at 4, 11, 38, 93-95.

4.    Congress authorized Reserve Banks to carry out this function, 12 U.S.C. §§ 341-361, and granted them discretion to do so, 12 U.S.C. § 342 ("Any Federal reserve bank *may* receive from any of its member banks, or other depository institutions ... deposits ... ." (emphasis added)).

5. To directly access Federal Reserve services, a depository institution must open a "master account" with its administrative Reserve Bank and place deposits therein.[3]  Reserve Maintenance Manual, FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl.

6. As set forth below, a depository institution's access to services presents at least three different categories of risk: risk to the Reserve Bank, risk to implementation of monetary policy through the Federal Reserve's balance sheet, and risk to the overall payment system.

7. Risk to the Reserve Bank includes counterparty credit risk.  Reserve Banks extend credit to banks that use the payment system, and a Reserve Bank is therefore at risk of losing money that a depository institution may owe to it.  *See* Bd. of Governors, Federal Reserve Policy on Payment System Risk, at 3-4, 15, 33 (*as amended* July 20, 2023), https://bit.ly/3zVvBd1.  Losses incurred by a Reserve Bank are ultimately borne by U.S. taxpayers.  *See* Tim Sablik, Fed. Rsrv. Bank of Richmond, *The Fed Is Shrinking Its Balance Sheet. What Does That Mean?*, Econ Focus 4, 7 (Q3 2022), http://tinyurl.com/5x66nes8 (noting that Federal Reserve losses could require fiscal support from the Treasury).

8. Master accounts are "bank account[s] for banks," *see TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, 2020 WL 1445806, at *1 (S.D.N.Y. Mar. 25, 2020), and just as commercial banks protect themselves against counterparty credit risk by doing business only with those customers deemed creditworthy, Reserve Banks do the same.  *See, e.g.*, 12 C.F.R. § 201.1, *et seq.* (establishing rules under which a Reserve Bank may extend credit to depository institutions and others); Federal Reserve Policy on Payment System Risk at 15-35 (outlining the methods used to provide intraday credit while controlling credit risk to the Reserve Banks).

---

[3] A master account is not required "to engage in banking or bank-like activities."  Ex. 2 ("Ricks Rep.") at 11.  Rather, financial institutions can "'plug in' to the Federal Reserve's payment services" through intermediaries.  *Id*. at 9.

9.  The second risk concerns the Federal Reserve's ability to implement monetary policy. When a bank deposits money in a master account, the deposits ("reserve balances") sit directly on the Federal Reserve's balance sheet.  *See Monetary Policy: Credit and Liquidity Programs and the Balance Sheet*, FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva.  The more deposits, the bigger the liabilities on the balance sheet.  *See id.*

10.  When the Federal Reserve seeks to implement monetary policy by increasing (or decreasing) monetary supply, its ability to do so may be affected by the magnitude and nature of the liabilities on the balance sheet.  *See* Jane Ihrig, Zeynep Senyuz, & Gretchen Weinbach, The Fed's "Ample Reserves" Approach to Implementing Monetary Policy (Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020), http://tinyurl.com/29xuwpw8.

11.  A third risk is systemic.  If a bank with a master account fails, its inability to make good on payments could result in harm to others and undermine faith in the system.  *See, e.g.*, Federal Reserve Policy on Payment System Risk at 4-5.

**C.    For Nearly a Century, Reserve Banks Have Mitigated Risk by Exercising Discretion Over Access to Services.**

12.  To mitigate risks presented by access to master accounts and services, the Federal Reserve has long exercised discretion to grant, deny, or limit banks' ability to deposit funds and access services.  Numerous examples in the public record are described in the Board's brief being filed today, which is incorporated by reference herein (the "Board's brief").  These examples show Reserve Banks' exercise of discretion over access to clearing accounts dating back to the 1930s. *See, e.g.*, Ex. 3 (Letter No. X-9187 from Chester Morrill, Sec'y, Fed. Rsrv. Bd., to E.M. Stevens, Chairman, Fed. Rsrv. Bank of Chi., 364, 372 (Apr. 26, 1935), https://perma.cc/UGY2-EAP7 ("It is the Board's view that requests for the establishment of clearing accounts by nonmember banks should be passed upon by [Reserve Bank] directors *in the light of all the circumstances*

*surrounding each application*." (emphasis added)).   They also include, in more recent years, numerous policies in the public record.  *See, e.g.*, Ex. 4 (Fed Rsrv. Bank of Dallas, Circular No. 85-75 on Large Wire Transfers (June 4, 1985)); Ex. 5 (Operating Circular 1 ("OC1") (1998)); Ex. 6 (Policy on Payments System Risk, 69 Fed. Reg. 69,926 (Dec. 1, 2004)).

13.  Internal policies and procedures likewise reflect Reserve Bank discretion over access to master accounts and services.  ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████

14.  ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████

15.  Reserve Banks adopt and implement their own policies and procedures concerning access to services.  *See, e.g.*, Ex. 9 (Fed. Rsrv. Bank of N.Y., Guidance for Federal Reserve Financial Services Applicants That Are Deemed High Risk by the Federal Reserve Bank of New

York (Aug. 18, 2014)); Ex. 10 (Fed. Rsrv. Bank of N.Y., Accounts and Financial Services Handbook (Feb. 25, 2020)).

> **D.      FRBKC's "Credit Risk Management" Department Is Responsible for Access to Services in the System's Tenth District.**

16.    FRBKC is the administrative Reserve Bank for the Federal Reserve's Tenth District. *See* Fed. Rsrv. Bank of Kansas City, *What We Do* (Jan. 8, 2021), https://www.kansascityfed.org/careers/what_we_do/.    As such, FRBKC is responsible for providing services to banks located in several states, including Wyoming, and for monitoring and mitigating the risks arising therefrom. *See id.* FRBKC has a department dedicated to this—the aptly named Credit Risk Management ("CRM") Department.  *See* Ex. 11 at FRBKC-00010263 (noting that a Reserve Bank's CRM department manages payment system access).

17.    During the relevant period, Christi May-Oder served as the head of CRM.  *See* Ex. 12 ("May-Oder Tr.") at 19:15-18, 20:19-21.  At the time of the denial of Custodia's request, Ms. May-Oder reported to Judith Hazen, a Vice President of Supervision and Risk Management, who in turn reported to Tara Humston, the Senior Vice President of Supervision and Risk Management.  *See* Ex. 13 ("Imgarten Tr.") at 113:2-20.  Ms. Humston reported to then-President Esther George, *see* Ex. 14 ("Humston Tr.") at 10:12-16, who served as FRBKC's President and Chief Executive Officer from 2011 to 2023, s*ee* Fed. Rsrv. Bank of Kansas City, *Esther L. George* (2023), http://tinyurl.com/3bbzk9vm.

18.

9

19. ████████████████████████████████████████

20. ████████████████████████████████████████

████████████████████ "Routine" requests can be processed "in a week's time or less." Humston

Tr. 191:2-7.

21. ████████████████████████████████████████

██████████ Non-routine requests are rare, and master accounts are rarely provided to entities that

lack federal insurance and a federal regulator.  *See* Ex. 16 ("30(b)(6) Tr.") at 298:19-299:2

(recalling only two such master accounts over the past twenty years).[4]

---

[4] Custodia's assertion that there are 442 uninsured master account holders, Custodia Br. at 29, is incorrect.  It offers as proof only Ms. Long's testimony that this was "publicly disclosed in the

22.   Historically, non-routine requests have "received the highest level of scrutiny and review."  May-Oder Tr. 313:9-14; *see also* 30(b)(6) Tr. 359:15-20.

23.   At present, 540 institutions have master accounts with FRBKC.  All but one are <u>*both*</u> federally insured and federally supervised.[5]  The majority (394) are state-chartered.  *See* Ex. 17 at Tab 13.

## II.   Custodia Presents Novel Risks and Considerations.

### A.   Custodia Is Not a Traditional Bank.

24.   The traditional business of banking involves taking deposits and making loans, and Wyoming provides a charter for institutions engaged in these activities.  *See* Wyo. Stat. Ann. § 13-2-201.  Wyoming's traditional charter obligates banks to obtain insurance provided by the Federal Deposit Insurance Company ("FDIC").  Wyo. Stat. Ann. § 13-2-103.  Deposit insurance is widely seen as having successfully protected against systemic bank runs for nearly a century.  *See* Douglas W. Diamond et al., Fed. Rsrv. Bank of Minneapolis, *Bank Runs, Deposit Insurance, and Liquidity*, 24 Quarterly Rev. 14 (2000), http://tinyurl.com/ycyt7byd.

25.  In 2019, Wyoming created a novel charter for "special purpose depository institutions" ("SPDIs").  Wyo. Stat. Ann. §§ 13-12-101–13-12-126.  Unlike traditional banks, SPDIs are *prohibited* from engaging in lending and are not required to obtain insurance.  SPDIs are expected to operate on a fully reserved basis and to generate revenue from fees on digital asset-related

---

Fed's August database," Ex. 18 ("Long Tr.") at 139, but that database includes entities that access Federal Reserve services through an intermediary.  *See Master Account and Services Database*, FederalReserve.gov (*current as of* Nov. 30, 2023), http://tinyurl.com/4c95xdt9 ("Financial institutions accessing Reserve Bank financial services can settle transactions either by having their own master account or by using another depository institution's master account.").

[5] The one institution lacking federal insurance and a federal supervisor is a century-old, traditional savings and loan association in Oklahoma.  Brian Brus, *Old-fashioned financing: S&L still thriving without FDIC insurance*, J. Record (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx.

services.  *See* Wyo. Stat. Ann. §§ 13-2-103, 13-12-103, 13-12-105; Wyo. Div. of Banking, *Special Purpose Depository Institutions* (2021), http://tinyurl.com/2p8uwc8p.

26.   SPDIs are not subject to numerous federal statutes and regulations that apply to traditional banks and that have provided a time-tested process for ensuring the safety and soundness of the banking system.  *See* Ex. 19 at FRBKC-00010139 (assessing applicability of various statutes and regulations to SPDIs).  Notably, the parent companies of SPDIs are not subject to the restrictions and limitations in the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1841(c), because SPDIs do not fit that statute's definition of what constitutes a "bank."

27.   SPDIs are supervised by the Wyoming Division of Banking (the "WY DOB").  *See* Wyo. Div. of Banking, *Special Purpose Depository Institutions* (2021), http://tinyurl.com/2p8uwc8p.  The WY DOB's mission, in part, is to "maintain a financial regulatory system for Wyoming that promotes a progressive banking environment" and that "allows for economic development within this State."  Wyo. Div. of Banking (2021), http://tinyurl.com/bdfsryhw.  Understandably, the WY DOB is not charged with protecting the nation's financial stability or implementing federal monetary policy.

**B.     FRBKC Cautioned Wyoming That SPDIs Would Not Receive Automatic Access to Reserve Bank Accounts and Services.**

28.   On December 5, 2018, FRBKC personnel spoke with Albert Forkner, the then-Wyoming Banking Commissioner, regarding the draft SPDI legislation.  *See* Ex. 20 at FRBKC-00018340.  Talking points developed in preparation for the call stated that Reserve Banks are not required by 12 U.S.C. § 248a to provide access to services.  *See* Ex. 21 at FRBKC-00018341. Immediately following the call, an FRBKC participant reported to internal stakeholders that "[f]or the reasons ... cited in the talking points," Wyoming realized it could not sue FRBKC to force it to provide master accounts to SPDIs and that FRBKC "relayed" to Mr. Forkner that decisions about

"Fed services" are "the p[u]rview of the Fed." *See* Ex. 20 at FRBKC-00018339-40.[6]  Separately,

Mr. Forkner told President George that master accounts would be "desirable" but "not required"

for SPDIs.  *See* George Tr. 65:6-66:1.

### III.   Custodia Requested a Master Account Before Building Its Business.

#### A.   Custodia Planned to Hold Uninsured Customer Deposits and Profit from Digital Asset Services that It Had Not Yet Designed.

29.  Custodia, formerly known as Avanti, sought to act as a "bridge" connecting "the U.S.

dollar payments system" to "digital assets."  *See* Ex. 22 at Custodia-00008801.  It envisioned four

business lines, one of which involved an aspect of traditional banking (deposit accounts with

payment services), but three of which involved digital asset services frequently provided in today's

market by non-banks such as crypto exchanges:

- "**Core Banking**": offering deposit accounts and payment services (*e.g.*, ACH and wire transactions), but only on a remote basis.[7]  Ex. 22 at Custodia-00008807-08.

- "**Prime Services**": facilitating crypto transactions, including a "fiat on/off ramp (i.e., brokerage of digital assets)."  Ex. 22 at Custodia-00008810-11.

- "**Custody Services**": providing custody of digital assets.  Ex. 22 at Custodia-00008809-10.

- "**The Avit**": issuing, selling, and redeeming a digital asset "akin to a stablecoin," "utilizing the same technology" as a stablecoin, offering the "functionality" of a stablecoin, and "replac[ing] some of the demand for stablecoins," but which Custodia was "careful not to call [] a stablecoin" because it was "very different."  *See* Ex. 24 at

---

[6] Custodia contends (at 7) that Wyoming worked "hand-in-hand" and had "approximately 100 meetings" with FRBKC from 2017 to 2019.  The vast majority of these meetings, however, related to subjects other than the legislation, such as FRBKC's joint supervision of Wyoming's traditional Federal Reserve member banks.  *See* Ex. 23 ("George Tr.") at 27:22-28:9; *see also* 30(b)(6) Tr. 38:16-39:18.  FRBKC has "help[ed]" to supervise Wyoming's traditional banks at times because the WY DOB has "lack[ed] the resources to be able to supervise some of the entities in their state."  *See* Humston Tr. 26:3-9.

[7]

30.

31.

32.

33.   Transaction processors, money transmitters, and many other businesses provide Custodia's planned digital asset services—prime services, custody, and stablecoins—without master accounts. *See* Ricks Rep. at 10-12.

34.

35. **Prime Services** ("matching buyers and sellers" of crypto) would require Custodia to partner with a third-party crypto exchange, but as of June 2022 (when it launched this lawsuit), it had no "leading candidate" and no agreements in place. *See* Long Tr. 107-109. Custodia "hadn't figured out the details." *See* Long Tr. 80-81; 109.

36. **Custody Services** were also undeveloped. As of June 2022, Custodia "had not built the technology platform" for its "core" custody product offering. *See* Long Tr. 74-75, 78. It had not built systems to prevent a rogue employee from stealing uninsured, custodied digital assets. *Id.* And it was unclear how Custodia could operate its custody business in a manner consistent with both state and federal guidance. Custodia says that Wyoming would have *required* Custodia to hold crypto on its balance sheet to facilitate its custody business, but the Federal Reserve's position was that holding crypto on balance sheet was "highly likely to be inconsistent with safe and sound banking practices." *Compare* Long Tr. 87-88, 90, *with* Bd. of Governors, FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d, *and* Policy Statement on Section 9(13) of the Federal Reserve Act, 88 Fed. Reg. 7848, 7850 (Feb. 7, 2023).

37. **The Avit's** technology, policies, procedures, and controls had, as of June 2022, also not been developed. *See* Ex. 27 at FRBKC-00017437. Moreover, the federal banking agencies' collective view was that stablecoins should be issued only by *insured* depository institutions and only if they had appropriate controls in place. *See* Report on Stablecoins at 17 (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021) ("PWG Report"), http://tinyurl.com/5225srnv); Long Tr. 66.

38. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**B.**     **Custodia's Executive Team Lacked Relevant Banking Experience.**

39. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

40.   Ms. Long previously worked at Credit Suisse and Morgan Stanley.  *See* Long Tr. 20:6-10.  At Credit Suisse, Ms. Long was involved in lending against life insurance but "didn't interact with the master account."  *See* Long Tr. 21:21-22:6.  At Morgan Stanley, Ms. Long worked in the "Pension Solutions Group" and "Corporate Strategies Group," but not "with Morgan Stanley's banks."  *See* Long Tr. 22:12-23:25.  She has never managed a bank supervised by a federal banking regulator.  *See* Ex. 22 at Custodia-00008803; Ex. 24 at Custodia-00001095.

41.   Custodia's second-in-command is Zev Shimko, President and COO.  *See* Ex. 28 ("Shimko Tr.") at 24:12-15.  Mr. Shimko graduated from college in 2014 and, prior to joining Custodia, had most recently worked for a blockchain technology company involved in underwriting, issuing, and trading different financial assets.  *See* Shimko Tr. 13:20-23, 18:4-21; *see also* Ex. 24 at Custodia-00001095.  Like Ms. Long, Mr. Shimko had never managed a bank supervised by a federal banking regulator.  *See* Shimko Tr. 19:2-11.

42.  Custodia's remaining leadership lacked significant banking experience.  *See* Ex. 29 at Custodia-00003347 (noting feedback from FRBKC that "the number one thing that has caused problems for the Fed with de novo banks is that they don't have enough people experienced in bank regulations" and acknowledging that Custodia's executive team and board lacked such experience to date); Ex. 30 at Custodia-00002854, 2856 (from November 2022: "[C]onsider adding a director with bank regulatory and especially BSA/AML experience... .").

### C.  Custodia's Risk Management and Compliance Infrastructure Was Unbuilt.

43.  In early 2022, roughly 18 months after requesting a master account, Custodia had only a "first draft" of its BSA/AML policies that had not been reviewed by consultants or the WY DOB.[8]  *See* Long Tr. 16:21-17:8.

44.  On February 16, 2022, Custodia's Chief Legal and Compliance Officer (CLO/CCO) advised that "no one in the compliance function was comfortable" with the company's financial crime mitigation software and that, as a result, Custodia would be starting from square one with a new vendor.  *See* Ex. 25 at FRBKC-00000145.  Custodia also informed its Board of Directors that it needed to "build out its compliance group."  *Id*. at FRBKC-00000146.  Custodia's CLO/CCO then stepped down.  Long Tr. 261:14-19.

45.  Custodia thereafter engaged a third party, Crowe, to advise on BSA/AML compliance and risk management gaps, and Custodia started work with a new financial crime mitigation vendor.  *See* Ex. 31 at FRBKC-00016118 (providing May 18, 2022 update that Custodia had "engaged Crowe to perform a comprehensive review of the BSA program, including a system

---

[8] Ms. Long testified that stablecoins present no higher risk of use in money laundering than paper currency.  Long Tr. 100:103:19, 104:15-105:16.  This contrasts with federal guidance reporting on the challenges presented by the use of cryptocurrency for illicit purposes.  *See, e.g.*, PWG Report at 19-21 (outlining "Illicit Finance Risk" presented by stablecoins).

validation prior to launch"); Long Tr. 230:9-14; Ex. 32 at FRBKC-00005784-85 (stating that Custodia changed financial crime mitigation providers because it did not believe the initial provider "could be certified as providing to the Company the capabilities that it needs to accurately perform sanctions screening and transaction monitoring").

46.   Before completing the remediation identified by Crowe, Custodia filed this lawsuit.[9]

## IV.   FRBKC Denied Custodia's Master Account Request.

### A.   Custodia's Request Was "Non-Routine," Non-Traditional, and Premature.

47.   Custodia requested a master account with FRBKC in October 2020.  *See* Ex. 33 at FRBKC-00012687.  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌  Custodia checked both boxes.

48.   In addition, Custodia proposed to operate as a non-traditional bank—without deriving profit from lending or investment.  There are presently no uninsured, non-traditional depository institutions with a master account in the Tenth District.  *See* Ex. 17 at Tab 13 and *supra* note 5.

49.   And, Custodia's non-routine, non-traditional request was premature.  CRM grants master accounts to de novo institutions like Custodia only once "everything is in place."  Ex. 34 at FRBKC-00004231-32.  The master account is "the last thing."  Ex. 35 ("Crouch Tr.") at 131:22-132:4; *see also id.* at 278:16-279:3 (master accounts are opened when the de novo bank has the "controls in place" and is "ripe ... mature and ready to go.").  Custodia, however, filed its request

---

[9] As of May 2022, Crowe had told Custodia that its BSA/AML policy required "more granularity" and "lack[ed] specificity."  *See* Ex. 36 at FRBKC-00003008; *see also* Long Tr. 266:20-267:3.  Crowe's review concluded around August 2022 and resulted in recommendations for program enhancements across areas such as model development, validation, calibration, and risk management; due diligence and customer risk identification; corporate governance; policies and procedures; risk assessment; self-testing; transaction monitoring, investigations, and case management; and record retention.  *See* Ex. 27 at FRBKC-00017428.

"well in advance of when they were ready to open." *Id.* at 131:22-132:4.  Custodia was still in its "construction period."  *See* Long Tr. 144:3-9.

50.    When it submitted its request prematurely, Custodia lacked familiarity with the process.  Ms. Long had no experience using or requesting a master account.  Long Tr. 21:21-24:25. She relied on Katie Cox for advice on the Federal Reserve, but master accounts were "not something [Ms. Cox] had recent experience with."  Long Tr. 133:20-22.  Ms. Cox had never seen CRM's account opening policies and procedures and did not know that CRM conducted a risk assessment.  *See* Ex. 37 ("Cox Tr. (Day 1)") at 35:3-7, 148:8-20, 149:11-16 and Ex. 38 ("Cox Tr. (Day 2)") at 60:10-13.

51.  In November 2020, FRBKC's senior staff met with Custodia virtually.  *See* Ex. 39 at FRBKC-00014922.  President George conveyed that the decision "was not going to be quick," and that it could "go either way."  *id.* at FRBKC-00014923.  She was "very noncommittal."  *See* Long Tr. 47:22-48:2.  President George "focused" on how Custodia was doing "novel things."  *See* Long Tr. 142:8-13; Ex. 40 at Custodia-00005521.

**B.     Custodia's Request Raised Questions Concerning Legal Eligibility, Policy, and Risk.**

52.  **Legal Eligibility.** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬     ▬▬▬▬▬▬▬▬▬▬▬▬

Eligibility is a "threshold issue."  *See* George Tr. 50:16-24; May-Oder Tr. 30:22-25.

53.  President George "questioned whether they were eligible ... [and] whether the way this [SPDI] charter had been constructed was consistent with laws that governed eligibility ... ." George Tr. 264:19-22.  As noted *supra* at paragraph 26, Custodia did not, for example, meet the definition of a "bank" under the BHCA.  *See* 12 U.S.C. § 1841(c).

54.

55. FRBKC Legal consulted with Board Legal. *See* 30(b)(6) Tr. 194:14-22. In January 2022, it was determined that based on information then known, Custodia met the FRA's definition of a "depository institution" and was therefore "eligible" to request a Reserve Bank account and services. *See* Ex. 41 at FRBKC-00000234.

56. **Policy Issues.** Custodia's request also implicated a range of policy questions. One set of policy questions concerned the "novel [SPDI] charter" and "an uninsured institution having access to the Federal Reserve payment system." George Tr. 106:13-21. A second set of policy questions concerned the permissibility of Custodia's planned digital asset services—prime services, digital asset custody, and stablecoin issuance—and whether such activities constituted "appropriate banking activity." George Tr. 106:13-21; *see* Ex. 42 at FRBKC-00014934 (noting that Custodia "introduce[d] a complex set of considerations for risks and opportunities to banking organizations, their customers and the Reserve Banks, as well as to the nation's overall financial system and the implementation of monetary policy"); Ex. 43 at FRBKC-00013806 (Christi May-Oder talking points from September 2021 raising outstanding policy and risk questions posed by Custodia).

57. President George recognized that her decision on Custodia's request could set precedent for FRBKC's evaluation of account requests from other SPDIs and serve as a relevant example for the other Reserve Banks. George Tr. 57:4-11 ("I think it's fair to say that I was aware this was potentially precedent-setting, and that this was an evolving landscape in terms of the considerations that were being given both legislatively by Congress and the banking agencies, and

I thought it was a relevant factor for me to take in before making a decision about this master account."). Her decision would affect "how others would understand their eligibility and access expectations." George Tr. 93: 1-3.

58. President George decided not to resolve these policy questions in a silo, and instead sought input from a variety of sources to inform her decision. George Tr. 50:25-52:7 ("[W]e were seeking the Board's input as part of our decision-making to understand ... [the] broader policy issues that we would need to take into account."); Humston Tr. 441:10-12 ("we would find it imprudent not to take in views from others"); *id.* 45:10-46:6.

59. President George had, in fact, initiated a discussion on issues presented by SPDIs even before Custodia submitted its request for a master account. In August 2020, President George raised the subject with other Reserve Bank Presidents in the Conference of Reserve Bank Presidents (the "COP"), as these other presidents could potentially see similar requests in their districts. Ex. 44 at FRBKC-00010932. There was "broad recognition of the policy issues." *Id*. And the policy questions "raise[d] bigger issues than just in WY." *Id*.

60. Around that time, states other than Wyoming were considering SPDI-like charters. *See, e.g.*, Nebraska Financial Innovation Act, LB 649, 107th Leg., 1st Sess. (announced in January 2021), https://nebraskalegislature.gov/FloorDocs/107/PDF/Intro/LB649.pdf.

61. There was also, at the time, an uptick in requests for master accounts from non-traditional entities that were *not* involved in digital assets. *See* Humston Tr. 175:15-22. An example was The Narrow Bank ("TNB"), which had obtained a Connecticut banking charter in hopes of arbitraging the Federal Reserve's payment of interest on reserves of cash held in master accounts. *See TNB USA Inc.*, 2020 WL 1445806, at *2.

62.   Partly as a result of President George's efforts, an existing System-wide group called the Payments System Policy Advisory Committee ("PSPAC") (which coordinates some System work and policy/strategy development for domestic and international payment and settlement issues) created a nontraditional account access group (the "NTAA") composed of staff from Reserve Banks and the Board that "was looking at issues that were relevant and of interest to the [S]ystem as a whole."  30(b)(6) Tr. 142:11-20.

63.   As of the date when Custodia's request was denied, many policy questions presented by Custodia's request were still unresolved.  George Tr. 244:10-11 ("[T]he broad policy issues had not been codified and resolved in my view.").  The following announcements demonstrate the unsettled nature of these policy decisions when Custodia's master account request was pending:

- **Stablecoins.**  On November 1, 2021, the President's Working Group on Financial Markets (along with the FDIC and OCC) issued a report on stablecoins.  The Working Group called on Congress to pass legislation to "require stablecoin issuers to be insured depository institutions."  PWG Report at 2.

- **Incomplete "Policy Sprints."**  On November 23, 2021, the Board, the FDIC, and the OCC issued a "Joint Statement on Crypto-Asset Policy Sprint Initiative and Next Steps." *See* Ex. 45.  The agencies announced that they had recently completed "sprints" on several "crypto-asset activities," including custody, stablecoins, holding crypto on balance sheet, and "facilitation of customer purchases and sales of crypto-assets." *Id.*  The joint statement did not announce policy decisions but rather provided a "roadmap" for a plan to provide greater clarity in 2022. [10] *See id.*

- **Crypto on Balance Sheet.**  On January 3, 2023, the Board, FDIC, and OCC issued a Joint Statement on Crypto-Asset Risks to Banking Organizations, which explained that holding crypto assets on balance sheet was "highly likely to be

---

[10] While the OCC had previously stated that "a national bank may provide ... cryptocurrency custody services on behalf of customers," Custodia Br., Ex. L at 1 (Interpretive Letter No. 1170), on November 18, 2021, the OCC clarified that the cryptocurrency and stablecoin activities addressed in its prior interpretive letters are only legally permissible for a bank to engage in as part of the "business of banking" if the bank can demonstrate, to the satisfaction of its banking supervisor, that it has controls in place to conduct the activity in a safe and sound manner. *See* Off. of Comptroller of Currency, Interpretive Letter No. 1179 on Bank Authority (Nov. 18, 2021), http://tinyurl.com/38c4e99b.

inconsistent with safe and sound banking practices."  Joint Statement on Crypto-Asset Risks to Banking Organizations at 2.

- **Custody.**  Digital asset custody was permissible if done in a safe and sound manner, but in March 2022, the SEC issued a "bulletin" requiring that SEC-registered institutions account for crypto-custodied assets on balance sheet.  *See* SEC Staff Accounting Bulletin No. 121 (Apr. 11, 2022) ("SAB 121").  SAB 121 had the practical effect of putting SEC-registered institutions (including BNY Mellon) out of the digital asset custody business. [11]

64.   **Layered Risk.**  In addition to the eligibility and policy questions, FRBKC "would make our independent risk assessment around whether the institution should be granted access." George Tr. 51:12-16; Ex. 15 at FRBKC-00015583-84.  CRM must "evaluate the risk parameters of the institution requesting the account."  *See* George Tr. 33:12-14.

*see also supra* ¶¶ 18-19.

65.   FRBKC led multiple risk assessments of Custodia's business.  *See, e.g.*, Ex. 46 at FRBKC-00002695 (summer 2020); Ex. 47 at FRBKC-00015695 (October 2020); Ex. 48 at FRBKC-00003638 (January 2021); Ex. 49 at FRBKC-00016716 (March 2021); Ex. 50 at FRBKC-00016665 (August 2021); Ex. 51 at FRBKC-00003331 (October 2021 through January 2022); Ex. 52 at FRBKC-00016159 (October 2021 through January 2022); Ex. 27 at FRBKC-00017421 (May 2022 through October 2022).

66.   A multi-month review commenced in October 2021.  *See* Ex. 52 at FRBKC-00016159. The review was conducted exclusively by FRBKC personnel and was led in part by Ross Crouch,

---

[11] *See* BNY Mellon, Comment Letter on Proposed Rule on Safeguarding Advisory Client Assets (May 8, 2023), http://tinyurl.com/yrykzkxd; BNY Mellon, Annual Report 2022 at 135, http://tinyurl.com/yed5j4na (noting that BNY Mellon's digital asset custody represents a *de minimis* amount).

who has more than 18 years of professional experience conducting safety and soundness examinations of supervised banks and bank holding companies. *See id.*; *see also* Ex. 51 at FRBKC-00003331; Crouch Tr. 7-8.

[REDACTED]

67. Custodia's existence was little more than "a business plan with some draft policies." Crouch Tr. 43:25-44:8 ("there weren't a lot of issues to identify because there just wasn't a lot to review").

**C.    FRBKC Leadership Was Never Comfortable with the Risks Posed by Custodia's Request.**

68.    Throughout the process, FRBKC had serious concerns about the risks posed by Custodia's request. *See* Humston Tr. 439:1-5 ("there was quite a bit of skepticism from Day 1"); Ex. 53 ("Hazen Tr.") at 156:16-19 ("From the beginning of this process, I have concerns about

what this entity type and this specific business model present to this Reserve Bank and to the System more broadly."), 344:17-20 ("Consistently through the analysis, I believe that [President George] was highly skeptical of granting an account, and so I would say that her views were skewed towards denying the account."); May-Oder Tr. 307 ("from very, very early in the process it was leaning towards no given their risk profile and the concerns that were raised regarding the business model ... I can't think of a time where I felt like there was a lean towards approval.").

69. In its initial meeting, in November 2020, President George was "very noncommittal" and indicated that it "could still go either way." Ex. 39 at FRBKC-00014923; Long Tr. 47:22-48:2. On January 20, 2021, Ms. Humston informed Custodia that the "work still continues" and there were "complexit[ies]." *See* Ex. 54 at FRBKC-00014277. FRBKC raised a number of questions to Custodia concerning policy questions, the definition of stablecoins (and whether they are "securities" under federal securities laws), and whether there was any "movement" on Custodia obtaining FDIC insurance (answer: "no") that made clear FRBKC had concerns and that a grant of the request was not imminent. *See id.* at FRBKC-00014277-80. [12]

70. In February 2021, President George's view was "no access b/c don't know what we're dealing with yet." Ex. 54 at FRBKC-00014288; Hazen Tr. 252:3-8 (discussing drafting a denial memo before Custodia applied for membership in 2021); *see also* Ex. 54 at FRBKC-00014295. FRBKC thereafter conducted a series of risk assessments that consistently found substantial risk management gaps. *See supra* ¶¶ 65–66.

---

[12] During this meeting, Ms. Long asked FRBKC, "Are there show stoppers?" *See* Ex. 54 at FRBKC-00014277. Ms. May-Oder's contemporaneous notes reflect no direct response to the question, and as the meeting continued, FRBKC raised a number of complex policy questions. *See id.*

71. There is no evidence that any member of FRBKC's senior leadership ever favored granting Custodia's request.

### D. FRBKC Decided to Deny Custodia's Request After an In-Depth, On-Site Examination Confirmed Policy and Risk Issues.

72. In May 2022, FRBKC geared up for another risk assessment (the "pre-membership exam"). Ex. 56 at FRBKC-00016141-42; Ex. 55 at FRBKC-00017394. This examination was also led by FRBKC personnel, including Mr. Crouch. *Id.* At a May 2022 meeting, Mr. Crouch provided Custodia feedback on a prior risk assessment and described FRBKC's plans to conduct an additional exam. Mr. Crouch specifically informed Custodia that the exam would look beyond "day one" activities. Ex. 56 at FRBKC-00016141 ("[W]ill focus on specific operational risks related to planned products and services ... core banking, custody and prime services").

73. By this time, Custodia had applied to become a Federal Reserve member bank. In order to minimize duplicative requests and reduce burden on Custodia, the pre-membership exam was intended to inform both FRBKC's decision on Custodia's master account request and resolution of Custodia's membership application. *See* Ex. 56 at FRBKC-00016141-42; Ex. 55 at FRBKC-00017394. In May 2022, an examiner in FRBKC's CRM department assigned to the master account piece of the exam began compiling questions for the examination relevant to the master account request. Ex. 57 at FRBKC-00002203.

74. FRBKC had a meeting scheduled with Custodia to discuss the pre-membership exam on June 9, 2022. *See* Ex. 58 at FRBKC-00011132.

75. On June 7, 2022, Custodia initiated this lawsuit. ECF 1. The meeting that had been scheduled for June 9, 2022, was postponed, but FRBKC's work on the pre-membership exam continued. *See* Ex. 58 at FRBKC-00011132.

76.

77.

78. In addition, policy questions persisted concerning Custodia's plan to derive profit from fees on digital asset services while providing "core banking" services on an uninsured basis. Custodia's prime services and Avit product lacked sufficient detail to evaluate, and its proposal to facilitate its digital asset custody business by holding crypto on balance sheet contravened Federal Reserve supervisory guidance.  *See, e.g*., Ex. 59 at FRBKC-00002175 (discussing issues with

prime services); Joint Statement on Crypto-Asset Risks to Banking Organizations at 2 (discussing concerns with crypto held on the balance sheet as principal instead of in a purely custodial arrangement).  Custodia's plan to issue the Avit product continued to run counter to the November 2021 federal banking agencies' recommendation that stablecoins should be issued only by insured depository institutions.  *See* PWG Report at 2.

79.   Following the conclusion of the pre-membership exam, President George directed FRBKC staff to draft an internal memo recommending denial and draft a denial letter to Custodia. *See* George Tr. 193:15-19; May-Oder Tr. 307.  FRBKC staff began to draft a denial memo by early December 2022.   Hazen Tr. 252:3-8; Ex. 60 at FRBKC-00002133.   The FRBKC memo recommended denial on multiple bases.  *See* Ex. 61 at FRBKC-00009928.  FRBKC solicited input on the memo from Board staff on January 6, 2023.  *See* Ex. 62 at FRBKC-00016409.  Board staff provided comments that had no significant impact on the memo's substance and none on its conclusion.  *See* Ex. 63 at FRB-AR-000313; Ex. 64 at FRB-AR-000315; Ex. 65 at FRB-AR-000324; Ex. 66 at FRB-AR-000326.

80.   On January 27, 2023, President George issued the denial to Custodia.  *See* Ex. 59 at FRBKC-00002172.  She explained the timing as follows:

> So we discussed the timing of this letter, because I was within a few days of leaving the Federal Reserve. By that point we had gotten what I thought we were going to get. … [T]he account access guidance had been issued, the issue of legal eligibility had been decided, and there was no sense that some of the broader policy issues that I was hoping to see resolved were going to be resolved in a timely manner.
>
> * * *
>
> So given that timing and given the fact that Custodia had filed a lawsuit challenging the timing, I felt we should make a decision here that we would be able to take the information that we had, and that before I transitioned out of the organization, it would be responsible for us to give them that decision.

George Tr. 242:21-243:16.  President George retired a few days later, on January 31, 2023.  *Id.* at 244:25-245:2.

      **E.**      **FRBKC Controlled the Outcome.**

     81.   President George testified that she made the decision to deny Custodia's master account request.  *See* George Tr. 254:4-10; 260:24-261:21.  Her decision was based on a range of risk and policy considerations set forth in her letter and summary analysis to Custodia communicating the denial.  *See* George Tr. 254:19-260:23.; Ex. 59 at FRBKC-00002172.  President George further testified that FRBKC "had seen inadequacies in the policies and procedures, the operational components, had raised questions about the management's ability to establish a risk management program for this institution, and also had raised questions about ultimately in the event of a failure, how the resolution of this institution would be handled, which is a very relevant factor in considering stability and implications of a failure."  George Tr. 255:16-24; *see also id.* at 176:22-177:8 ("I knew from my experience that one of the highest indicators of failure can be a highly concentrated institution around a particular asset class, and that had been borne out over history… .  And … [FRBKC] had gone on in to look at the risk profile of Custodia, and saw inadequate compliance and risk management practices in place around this very concentrated activity.").

     82.   Every FRBKC employee who worked on the request and was deposed testified that President George made the decision to deny Custodia's master account request.  *See* 30(b)(6) Tr. 330:11-15; Humston Tr. 429:7-14; Hazen Tr. 190:15-25; May-Oder Tr. 308:16-18; Imgarten Tr. 294:6-9; Crouch Tr. 311:11-16; Ex. 67 ("Haake Tr.") at 218:21-25; Ex. 68 ("Mullins Tr.") at 233:23-235:12; Ex. 69 ("Nugent Tr.") at 202:13-16.

     83.  FRBKC and the Board repeatedly informed Custodia that FRBKC owned the decision:

- In November 2020, FRBKC informed Custodia that FRBKC was responsible for making the decision. *See, e.g.*, Ex. 39 at FRBKC-00014924 ("it is a RB decision.").

- On March 5, 2021, FRBKC informed Custodia that "[President George] has the final decision on granting the master account and the Board is being looped in for consultation and consensus building. So there really isn't anyone in particular at the Board driving any decision making...." Ex. 70 at Custodia-00008664.

- On April 27, 2021, the Board confirmed to Custodia that "individual account requests are handled at the Reserve Bank level." Ex. 71 at Custodia-00004601.

- On March 24, 2022, President George stated that "these are Reserve Bank decisions." Ex. 72 at FRBKC-00009849. During the same meeting, Custodia informed FRBKC that Governor Lael Brainard of the Federal Reserve Board had told Senator Cynthia Lummis that master account requests are "purely reserve bank decision[s]." *Id.*

84. The Board of Governors did not vote on Custodia's master account request. George Tr. 259:9-19, 260:17-23. The Board did not dictate the denial, and no individual Governor expressed a view to President George as to whether to grant Custodia's request. *See* George Tr. 292:19-21 ("Actually at no time did I hear a Governor express a view of whether they would grant or not grant a master account."); *see also id.* at 259:9-261:13; 30(b)(6) Tr. 330:6-10; Crouch Tr. 302:18-303:7; Haake Tr. 147:6-10; Hazen Tr. 184:25-185:11; Humston Tr. 435:1-436:22; Imgarten Tr. 296:12-14; May-Oder Tr. 308:25-309:17; Nugent Tr. 248:22-249:1; Mullins Tr. 167:21-168:7.

85. The System-wide working groups addressing policy issues concerning non-traditional master accounts and/or digital assets never expressed a view of Custodia's request. Hazen Tr. 75-83; 30(b)(6) Tr. 329-330.

**F.    The Board's Account Access Guidelines Did Not Dictate the Outcome of FRBKC's Decision.**

86. In May 2021, the Board proposed guidelines for Reserve Banks to apply when deciding individual master account requests. Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021) ("Proposed Guidelines"). The Board issued the

proposal because there had been "a recent uptick in novel charter types being authorized or considered across the country and, as a result, the Reserve Banks are receiving an increasing number of inquiries and requests for access to accounts and services from novel institutions." *Id*. at 25,866.

87.   The Proposed Guidelines did not address the specific policy issues raised by Custodia's request.  Ex. 73 at FRB-AR-000049.  Instead, to "support consistency in approach and decision-making across Reserve Banks," the Proposed Guidelines announced six general "principles"[13] for Reserve Banks to consider in deciding requests "while maintaining Reserve Bank discretionary authority to grant or deny requests."  *See* Proposed Guidelines, 86 Fed. Reg. at 25,866.

88.   FRBKC was already considering the same six principles described in the Proposed Guidelines.  May-Oder Tr. 53:19-54:3 (the Guidelines were "just a way to make … our internal procedures that we had been following for many years … more transparent to the public.").

89.   In March 2022, the Board announced revised proposed guidelines. *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022) ("Revised Proposed Guidelines").  The Revised Proposed Guidelines added a "tiering structure" pursuant to which entities lacking federal insurance and a federal supervisor—"Tier 3"—would receive the "strictest" level of scrutiny.  *See id.* at 12,958.

90.   FRBKC was already applying the highest level of scrutiny to Custodia's request.  May-Oder Tr. 313 ("Given that it was considered a nonroutine account opening ... they received the highest level of scrutiny and review."); *id.* 189:13-17 ("Tier 3 is something that was applied to how

---

[13] The six "principles" were 1) legal eligibility, 2) risks to the Reserve Bank, 3) risks to the overall payment system, 4) risks to the stability of the U.S. financial system, 5) risks to the economy, and 6) whether the requestor could have an adverse effect on the Federal Reserve's ability to implement monetary policy.  Proposed Guidelines, 86 Fed. Reg. at 25,867-69.

we had already been assessing institutions such as Custodia that were in that higher risk category."); George Tr. 82:15-18 ("I think early on we understood that any of these novel or unusual cases required a different level of scrutiny, and that was longstanding, it was well before these guidelines were promulgated...."); *see* 30(b)(6) Tr. 359:7-20; Mullins Tr. 210:4-17; Shimko Tr. 140:16-141:8 (Custodia's President agreeing that "Custodia was, over a long period of time, asked many questions about its business models, many questions about digital assets" from "early on," even "from before the application itself").

91.   Even before the Revised Proposed Guidelines were issued, FRBKC had subjected Custodia to an examination that revealed substantial gaps in Custodia's business plans and compliance infrastructure.  Ex. 52 at FRBKC-00016159.  FRBKC management had always been skeptical, and policy questions remained unresolved. *See supra* ¶¶ 68-71.  Thus, when the Revised Proposed Guidelines were issued, it was already FRBKC's view that, unless something significant were to change, a master account was "unlikely" and "not anticipate[d]."  *See* Ex. 74 at FRBKC-00004944 ("At this time we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Federal Reserve member."); Ex. 75 at FRBKC-0013964.

92.   In March 2022, FRBKC informed Custodia that while FRBKC "can decide this on [its] own," it did not intend to render its decision until the Guidelines were "finalized."  Ex. 72 at FRBKC-00009849.  The Revised Proposed Guidelines were finalized in August 2022.

### G.   The Board's "S-Letter" Process Did Not Dictate the Outcome of FRBKC's Decision.

93.   The Board issued an "S-Letter" to provide Reserve Banks with guidance in connection with implementation of the final Guidelines.  Ex. 73 at FRB-AR-000014.  System Letters (more commonly known as S-Letters) are not rare—they are numbered sequentially, and this one was numbered S-2677 (the "S-Letter"), Ex. 73 at FRB-AR-000014.  *Id.*; 30(b)(6) Tr. 261-63.  S-Letters

are internal policy statements from the Board to the Reserve Banks on topics such as the administration of Reserve Bank operations (*e.g.*, budget and audit matters), personnel matters (*e.g.*, salary limits for Reserve Bank officers), and issues related to the Reserve Banks' provision of financial services (*e.g.*, S-Letter 2677). 30(b)(6) Tr. 292-293.

94. The S-Letter provides that the Board expects Reserve Banks to "notify Board staff when new access requests ... involve higher-risk institutions or raise unusual, novel, or complicated issues." Ex. 76 at FRB-AR-0000016. This was consistent with FRBKC's existing practice: President George had started System-wide discussions concerning novel issues cropping up around the System more than a year before the Board issued even the Proposed Guidelines. *See* Ex. 44 at FRBKC-00010932; May-Oder Tr. 290:11-25 ("Our practice prior to the S Letter being enacted, we would have typically engaged the Board on these types of requests or activities that would be considered unusual, novel ... .").

95. The S-Letter also states that Reserve Banks should "consult" with the Board before denying or approving a request from a higher-risk entity. Ex. 76 at FRB-AR-0000016. FRBKC shared its draft denial recommendation memo with Board staff on January 6, 2023. Ex. 77 at FRB-AR-000335; *see* Hazen Depo. Tr. 227:12-20 (explaining that the draft memo was provided to Board staff because the issuance of the S-Letter was imminent and the Custodia denial would likely be the first one, so there was interest in gathering staff-level feedback on the format and content). The Board's feedback was in line with FRBKC's thinking and did not change the outcome. *See* Ex. 64 at FRB-AR-000315; Ex. 66 at FRB-AR-000326; May-Oder Tr. 309 (S-Letter feedback was "very much aligned with what we had provided to the Board").

96. On January 24, 2023, FRBKC shared the final version of its analysis. Ex. 78 at FRB-AR-0000003. The Board responded that it had "no concerns" with FRBKC's denial. Ex. 79 at FRB-AR-000002.

97. The Guidelines, the S-Letter, and an accompanying "Handbook" developed to facilitate implementation of the Guidelines all confirm that Reserve Banks have discretion to decide individual master account requests. Ex. 73 at FRB-AR-000015, 49; Ex. 80 at FRBKC-00017294.

### H.    Custodia's Membership Application Did Not Dictate the Outcome of FRBKC's Decision.

98. In 2021, while its master account request was pending, Custodia applied for membership with the Federal Reserve. *See* Ex. 81 at FRBKC-00017547. The Board has authority to decide on applications for membership, though it has delegated authority to approve—but not to deny—membership applications to Reserve Banks. *See* 12 C.F.R. § 265.20(e)(1).

99. State-chartered nonmember banks typically are insured and thus have the FDIC as their primary federal regulator and supervisor (while national banks are supervised by the OCC). *See* The Fed Explained at 62-82. But Custodia did not have FDIC insurance and thus did not have a federal regulator or supervisor. *See* Long Tr. 61:2-4; Ex. 72 at FRBKC-00009848. If it were to become a member of the Federal Reserve, however, that would change, as it would come under the regulatory and supervisory authority of the Federal Reserve. George Tr. 210:17-20. Thus, if membership were granted to Custodia, FRBKC would have considered Custodia's master account request differently in light of the fact that Custodia would be operating with a federal prudential supervisor. *See* George Tr. 211:12-17 ("That would have been new information that would have caused us to extend our analysis here....").

100. President George was prepared to deny Custodia's request, but she felt it would make little sense to deny the request only to have the Board subsequently grant membership. *Id.*

at 210:17-20.  If the Board were to grant membership, FRBKC would have had to "rethink the risks that we had identified and what potential mitigants might be in place."  30(b)(6) Tr. 314:16-315:17.  Accordingly, President George held Custodia's master account request due to the chance the Board would grant its membership application.[14]  George Tr. 196:4-8; *see also id.* 210:17-20 ("If the Board granted membership, it would have changed the analysis we would have put in here....").

101.  The Board voted to deny membership to Custodia on January 27, 2023, and President George thereafter informed Custodia of FRBKC's denial of its master account request.[15]

## ARGUMENT

### I.  FRBKC Is Entitled to Judgment as a Matter of Law Because Section 248a Does Not Provide an Absolute, Non-Discretionary Entitlement to a Master Account.

#### A.  Mandamus Is a Remedy Only for Non-Discretionary, Ministerial Rights.

The Mandamus Act, 28 U.S.C. § 1361, grants district courts the authority to issue a writ of mandamus compelling "an officer or employee of the United States" to perform a non-discretionary, ministerial duty owed to the plaintiff.  *Bartlett Mem'l Med. Ctr., Inc. v. Thompson*, 347 F.3d 828, 835 (10th Cir. 2003) ("Mandamus relief is available to a plaintiff ... only if the

---

[14]  FRBKC staff were simultaneously working on two separate analyses—one to inform FRBKC's decision on the master account and one to support the Board's decision on membership. FRBKC staff took care to ensure that their respective analyses did not contradict each other, Hazen Tr. 212:4-217:12;  May-Order Tr. 299:18-303:3;  George Tr. 181:14-185:14, but there is no evidence that President George deferred to any Board decision on whether to grant the master account request.  Indeed, she arrived at her decision to deny that request before the Board voted on membership.  *See* George Tr. 244:12-246:12.

[15]  Custodia has suggested that the White House played a role in "coordinating" the denial of Custodia's membership application and master account request.  *See* ECF 121 ¶ 7.  Custodia brings no evidence of this.  Ms. Long testified that she believes it to be true based on conversations she had with a Bloomberg reporter in which the Bloomberg reporter *declined* to confirm that the White House was a source of a leak.  *See* Long Tr. 319:6-323:6.  President George had "no heads up" about the White House announcement, and it "wasn't a factor" in her decision.  George Tr. 253:2-9.

defendant owes him a clear nondiscretionary duty." (cleaned up)).

Custodia's choice to bring only a mandamus claim against FRBKC is consistent with the absolutist nature of its legal theory, namely, that § 248a gives Custodia an automatic, non-discretionary, ministerial-type right to a master account.  *See, e.g.*, ECF 121 ¶¶ 2, 6, 13, 40, 97, 101; Custodia Br. at 35, 38, 46, 48.  Anything less than such an absolute, "clear and indisputable" right would not be cognizable as a mandamus claim.  *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990); *see Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995) (mandamus claim cannot succeed if "statute vests discretion in a public official" (quotation marks omitted)); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170-71 (1803); *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 44 (1888). [16]

## B.    Section 248a Does Not Provide an Absolute Entitlement to a Master Account.

As explained in the Board's brief, Custodia's contention—that § 248a gives every eligible depository institution an automatic, non-discretionary right to a Reserve Bank master account irrespective of risk—is wrong.  No court has ever forced a Reserve Bank to provide an account and services to *any* entity.  To avoid duplication, FRBKC incorporates the Board's brief, which explains why Custodia's position cannot be reconciled with the text, structure, context, or history of the FRA.  But FRBKC's thorough evaluation of Custodia's risk management and compliance

---

[16] While Custodia also asserts Claim III against FRBKC under the Declaratory Judgment Act, this Court has already held that "the Declaratory Judgment Act provides a remedy for valid federal causes of action and does not offer a separate cause of action."  ECF 164 at 15.  As a result, while Claim III may be a viable request for a declaratory form of relief if Custodia were to prevail on its mandamus claim (Claim II), the mandamus claim is the only cause of action at issue.  *See id*.  And if Claim II against FRBKC fails, then Custodia is not entitled to any relief against FRBKC and Count III fails along with Count II.  *See Nero v. Oklahoma*, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (declaratory judgment claim requires "a valid federal cause of action—one that exists independent of any request for declaratory relief").

infrastructure makes FRBKC uniquely situated to expand on the Board's brief in one important respect: Custodia itself is a case study in why its reading of § 248a cannot be right.

As explained in the Counterstatement of Facts, FRBKC conducted eensive analyses of Custodia in evaluating its request for a master account. And what FRBKC found raised serious concerns. When Custodia's master account request was pending, Custodia was not ready for business and had inadequate risk management and compliance controls. Shortly before denying Custodia's request, FRBKC led an on-site examination that found "significant risk management gaps" relating to Custodia's "overall risk management, the BSA/AML and OFAC compliance program, the information technology program, the internal audit program, and various financial areas"—in other words, Custodia's risk management and compliance programs were inadequate *across the board*. *See* Ex. 27 at FRBKC-00017423.

Moreover, Custodia sought a master account and access to services while planning to launch digital asset services contrary to federal guidance and emerging crypto policy. It planned to issue the "Avit" notwithstanding the collective recommendation of the federal banking agencies that stablecoins should be issued only by insured depository institutions. PWG Report at 16. It contemplated holding crypto as principal on its balance sheet to facilitate digital asset custody notwithstanding that this is "highly likely to be inconsistent with safe and sound banking practices." Joint Statement on Crypto-Asset Risks to Banking Organizations at 2. And its "Prime Services," facilitating crypto/fiat transactions, could have potentially run afoul of various federal policies and guidance, though Custodia's plans for those services were too undeveloped to know for sure. Long Tr. 109 ("we hadn't figured out the details"). Despite all of these issues, Custodia's construction of § 248a would still mandate that it receive and maintain access to services.

To be sure, Custodia may disagree with FRBKC's conclusions about the risks Custodia would pose if given a master account.  But Custodia chose not to challenge the denial of its request on the merits.  That choice is telling.  If Custodia had argued, for example, that the denial was arbitrary and capricious, that would have put FRBKC's *reasons* for the denial directly at issue (setting aside for the moment FRBKC's belief that it is not a federal agency subject to the APA).  Likewise, if Custodia had argued that the denial was discriminatory, that would have put at issue whether Custodia in fact was similarly situated to (as opposed to riskier than) banks that have master accounts.  Custodia evidently did not want this case to be about those factual issues, so it limited its claims to a theory of absolute, non-discretionary entitlement.

On that extreme theory, Custodia is entitled to a master account even if everything FRBKC cited as reason for concern is true—FRBKC's reasons don't matter.  Indeed, because FRBKC supposedly had a ministerial duty to give Custodia a master account, FRBKC had no business even asking Custodia questions about its compliance infrastructure, risk management practices, or business plans.  That is why Ms. Long views this case as posing the question whether a SPDI is entitled to a master account even if it does not have a chief compliance officer.  Long Tr. 265:7-12 (stating "we're about to find out" the answer to that question).

If Custodia's extreme theory were correct, Custodia would not be the only entity to take advantage of it.  FRBNY found that continuing to provide an account and services to Banco San Juan Internacional, for example, "pose[d] undue risk to the overall economy by facilit[ating] activities such as money laundering, economic or trade sanctions violations, or other illicit activities." *BSJI*, 2023 WL 7111182, at *4 (quotation marks omitted).  Custodia tries to run away from BSJI, *see* Custodia Br. at 45-46, but it cannot escape the absoluteness of its interpretation of § 248a.  The very kind of risk assessment that led FRBNY to revoke BSJI's master account would

be ultra vires on Custodia's interpretation.  Any statutory interpretation that would require the Federal Reserve to give master accounts and access to services to banks as risky as BSJI was assessed to be should raise a massive red flag. [17]

It is especially notable that even certain of Custodia's amici recognize that a theory of absolute entitlement to a master account for every eligible institution is untenable.  Wyoming's amicus brief thus argues that Custodia "should be judged according to its own merits."  Wyo. Amicus Br. at 5 (ECF 251).  *It was*—and it conspicuously opted not to challenge that merits judgment.  And if Custodia's absolute-entitlement theory were correct, there would be no "merits" to "judge[]"—every eligible institution would automatically get a master account and access to services as a ministerial matter.  Indeed, Custodia's construction threatens to eviscerate many of the Federal Reserve's longstanding risk management policies and procedures, including OC1, the Policy on Payments System Risk, Standard Operating Procedure 10, the Guidelines, and the risk assessment procedures and controls used to monitor and mitigate risks associated with account holders' use of services.  All of these would be thrown out the window if § 248a were to provide a statutory right to unfettered access to services. [18]

Custodia acknowledges that its legal position would result in what could charitably be called anomalies, but it fails to dispel these concerns.  In an effort to blunt the most dangerous and absurd implications of its position, Custodia implies that Reserve Banks might retain authority to impose "use-based conditions" on master accounts, Custodia Br. at 24, but this raises more

---

[17] FRBKC describes the facts relating to BSJI as laid out by the court.  The point, again, is that Custodia's absolute-entitlement theory requires assuming those very concerning facts to be true, just as it requires assuming that FRBKC's reasons for denying Custodia's request were well taken.

[18] Other amici of Custodia's recognize—and advocate—that result.  *See* Legislators' Amicus Br. at 22 (ECF 259) (arguing that Board's Account Access Guidelines, S-Letter, and Handbook are not "legally viable").

questions than it answers. Custodia fails to explain what these "use-based conditions" may be, what limits apply to them, and how they square with Custodia's proffered construction of § 248a. Custodia cautions, for example, that even if Reserve Banks retain authority to impose "use-based conditions," they cannot impose "membership-like requirements," but Custodia fails to explain where in the statute this rule comes from, what "membership-like requirements" are, why that position does not run contrary to § 248a(c)(2)'s provision that "nonmembers shall be subject to any other terms ... that the Board may determine are applicable to member banks," and why this would not result in FRBKC preventing Custodia's use of the very services to which it claims statutory entitlement.[19] Custodia's acknowledgment of the issue helpfully demonstrates why its proposed interpretation of law cannot be accepted.

Nor can invoking the dual banking system—as Custodia and its amici do countless times—make these problems with Custodia's interpretation go away. Eliminating Reserve Bank discretion over access to master accounts and services would mean putting *state* legislatures and banking authorities in control of *federal* priorities. Under Custodia's interpretation, the WY DOB would control Custodia's access to the federal payment system, while the Federal Reserve would need to defer to Wyoming's judgments. State authorities would even be responsible for monitoring and mitigating risk that state-chartered institutions present *to Reserve Banks*. Ex. 82 ("Conti-Brown Tr.") at 188:18-189:2. Suggesting that states control access to the Federal Reserve balance sheet, with the provision of master accounts to all comers mandatory and ministerial, does not respect the dual banking system—it writes the federal part out of the equation.

---

[19] If Custodia's legal position is that § 248a mandates only the provision of an empty and unusable master account, then it should say so. As FRBKC understands it, Custodia's position is rather that § 248a affords it a statutory, nondiscretionary right to *use* enumerated services—in Custodia's words, "the contents of [the] safe deposit box." Custodia Br. at 35.

Custodia's interpretation would also encourage a race to the bottom among state chartering authorities.  States would be free to attract business by crafting simplified banking charters, reducing regulatory requirements, and/or easing supervision, all while promising that access to the Federal Reserve's services would be guaranteed by § 248a.  Custodia itself intends to use "geographically dispersed" staff to serve remote customers.  *See* Ex. 22 at Custodia-00008804. Nothing would prevent another state (or in Conti-Brown's view, American Samoa) from luring Custodia away from Wyoming with fewer regulatory requirements or softer supervision.  *See* Conti-Brown Tr. 313-18.  It would make no sense to interpret the FRA this way given that preventing such a race to the bottom is precisely what led Congress to create the Federal Reserve in the first place.  *See, e.g.*, Jon R. Moen & Ellis W. Tallman, *The Panic of 1907*, Fed. Rsrv. History (Dec. 4, 2015), https://www.federalreservehistory.org/essays/panic-of-1907 (noting that the lack of an institution designed to bring stability to banking and financial markets spurred the establishment of the Federal Reserve).  Adopting that radical position is what would "fundamentally remake" the system, Custodia Br. at 47 (quotation marks omitted), and it is not what the dual chartering system has ever meant or required.

As Custodia's amici note, President George consistently supported the dual banking system in the decades following the enactment of the Monetary Control Act of 1980.  Legislators' Amicus Br. at 6.  Despite Custodia's desire to wrap itself in a states' rights theme, this case is not about whether states can charter banks as they see fit.  It is about whether states' chartering decisions deprive the Federal Reserve of any ability to protect its own balance sheet and the integrity of the nation's payment system.  Historically, state-chartered institutions have been subject federal oversight from the Federal Reserve and the FDIC.  Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58

Fordham L. Rev. 1133, 1159-60 (1990).  Indeed, until 2019, "every state required state-chartered banks that accepted deposits from the public to obtain federal deposit insurance."  Arthur E. Wilmarth Jr., *We Must Protect Investors and Our Banking System from the Crypto Industry*, 101 Wash. U. L. Rev. 235, 322 (2023).[20]  Federal oversight from the Federal Reserve and FDIC of state-chartered nonmember banks is a core feature of the dual banking regime.  *See* Wilmarth, *Dual Banking*, 58 Fordham L. Rev. at 1137 n.8, 1159-60, 1191, 1250; George Tr. 31:12-21 ("Our dual banking system is based on a national charter issued by the [OCC], or the 50 states issue their own charter, in which case they apply to the Federal Reserve or the FDIC for their federal supervision.... So all state-chartered institutions come with federal supervision in the current legal and regulatory framework.").

### C.   FRBKC Made the Decision to Deny Custodia's Master Account Request, but Mandamus Relief Is Unwarranted Regardless.

#### 1.   *FRBKC decided Custodia's master account request.*

FRBKC made the decision to deny Custodia's master account request.  *See supra* Section IV. E.  President George testified that she made the decision in consultation with FRBKC's senior staff.  George Tr. 254.  Her testimony is corroborated by the testimony of every other FRBKC employee or representative who testified, who all said it was President George's decision. 30(b)(6)

---

[20] Custodia's Blockchain Association amici cite Wilmarth no less than nine times in support of their view that the Federal Reserve has no discretion regarding access to master accounts and services.  Blockchain Amicus Br. at 3, 5, 11, 12, 13 & n.15, 14, 22 n.23 (ECF 257).  Amici may not be aware that Wilmarth has made his views on this subject clear—and they run directly contrary to amici's portrayal: "The Federal Reserve Act (FRA) rightfully confers the right to determine access to Fed services to the Federal Reserve and only to the Federal Reserve."  Nat'l Cmty. Reinvestment Coal. et al., Comment Letter on Proposed Guidelines for Evaluating Account and Services Requests (Jan. 17, 2023), http://tinyurl.com/nzpc24us.  Finding otherwise "would encourage states to use regulatory arbitrage for their gain" and "would create very substantial risks and costs for the Fed.  Such decisions cannot depend solely on the whim and discretion of state legislators and regulators."  *Id.*

Tr. 330:14-15; Humston Tr. 429:7-14; Hazen Tr. 190:15-25; May-Oder Tr. 308:16-18; Imgarten Tr. 294:6-9; Crouch Tr. 73:1-4; Haake Tr. 218:21-25; Mullins Tr. 233:23-235:12; Nugent Tr. 202:13-16. It is corroborated by contemporaneous documents reflecting that FRBKC employees led risk assessments of Custodia, that President George met routinely with them to discuss progress, and that FRBKC repeatedly told Custodia that FRBKC (not the Board) would make the call. *See, e.g.*, George Tr. 62:8-63:6; Ex. 75 at FRBKC-00013942-46, FRBKC-00013950; Ex. 46 at FRBKC-00002695; Ex. 47 at FRBKC-00015695; Ex. 48 at FRBKC-00003638; Ex. 49 at FRBKC-00016716; Ex. 50 at FRBKC-00016665; and Ex. 52 at FRBKC-00016159. And it is corroborated by the fact that FRBKC has an entire department—the CRM department—established to handle master account requests, and that the head of CRM testified that she applied CRM's longstanding policies and procedures to Custodia's request. May-Oder Tr. 35-36; 53-56.

There is no genuine issue of fact as to whether FRBKC denied Custodia's request in the exercise of its own discretion. Custodia had set out to prove that the Board dictated the result, *see, e.g.*, ECF 121 ¶¶ 3, 10, 44, 46, 51, 55, 72, 74, but failed. It therefore now contends that the "issue[] presented" is whether the Board "inserted itself into the process" for deciding Custodia's master account request, Custodia Br. at 6, such that FRBKC's exercise of discretion was not "unfettered." *Id.* at 49-54. But the question the Court wanted answered is whether FRBKC denied the request and exercised its own discretion in so doing, ECF 164 at 10-12, and the unrefuted facts described above establish that it did and was not a mere "puppet" with the Board pulling the strings.

Custodia is unable to reasonably contend that the Board dictated the outcome because there is no evidence at all suggesting that it did. The Board did not vote on the request, *see* George Tr. 259:14-19, and there is no evidence that any of the Governors or their staff expressed the view

to President George that Custodia's request should be denied.   George Tr. 259-61; 30(b)(6) Tr. 330:6-10;  Crouch  Tr. 302:18-303:7;  Haake  Tr. 147:6-10;  Hazen  Tr. 185:6-11;  Humston Tr. 435:1-436:22; Imgarten Tr. 296:12-14; May-Oder Tr. 308:25-309:17; Nugent Tr. 200:4-201:5, 248:22-249:1; Mullins Tr. 167:21-168:7.  In March 2021, President George made a handwritten note indicating that one Governor "feels we don't have authority to say no to request."  Ex. 83 at FRBKC-00017834.  President George testified that this concerned whether Custodia was "legally eligible" for an account (not whether its request should be granted), *see* George Tr. 104:1-15, but either way, that individual Governor's view certainly did not dictate denial.[21]

Custodia principally argues that the Board "inserted itself" into the process by taking part in policy discussions.  To be clear, the Board did not need to "insert itself" into such processes. *President George solicited the Board's views as part of her evaluation of the request*.  President George tried to initiate System-wide policy discussions on issues presented by SPDIs and other non-traditional entities in August 2020, even before Custodia's request came in, and in March 2021 she "argued" to the Board that "we need the broader policy issue addressed."  Exs. 44, 83. Custodia's request presented a range of policy issues.  George Tr. 106:17-21 (the "broader policy issues which involved a novel charter, an uninsured institution having access to the Federal Reserve payment system, and the nature and risks associated with these activities as an appropriate banking activity").  It would, in President George's view, set expectations in the industry for when

---

[21]

access would be granted and when it would not.  It therefore made sense for President George to discuss the policy issues presented with other Reserve Banks and the Board.

That said, the notion that System-wide policy discussions eviscerated FRBKC's discretion to decide Custodia's request is entirely without basis in the record.  Custodia argues that the Board was involved at "every critical juncture" and refers generally to the existence of System-wide policy workstreams, but it brings no proof that any of these working groups expressed a view on Custodia's request, let alone dictated its outcome.  The record reflects that they did not.  30(b)(6) Tr. 329-330.[22]

Custodia asserts that the Board-issued Guidelines relegated Custodia to "dead-end, Tier 3 status."  Custodia Br. at 51.  To be sure, the Board's Revised Proposed Guidelines, issued on March 8, 2022, provide that requesting institutions that lack federal insurance and a federal supervisor are to be considered "Tier 3" and are subjected to the highest level of scrutiny.  That, however, states the obvious.  To Custodia's great frustration, FRBKC had by that point already been applying heightened scrutiny to Custodia's request *for more than a year*.  May-Oder Tr. 53-56; Shimko Tr. 140:16-141:8. President George had been "very noncommittal" from the outset and was never comfortable with the idea of granting Custodia's request.[23]  *See, e.g.*, George Tr. 183, 254, 260; Hazen 351:17-20; May-Oder Tr. 307:7-25.  Custodia brings no proof that FRBKC would have

---

[22] The multi-dimensional bases for FRBKC's denial of Custodia's request, as reflected in its letter to Custodia, belie the notion that any System-wide working group rendered a policy decision that dictated the outcome of Custodia's request.

[23] In its Amended Complaint, Custodia alleged that FRBKC was on track to grant its master account request until the Board "derailed" it.  ECF 121 ¶ 72.  Discovery revealed that, to the contrary, FRBKC at no time leaned in favor of granting it. *See supra* ¶¶ 68-71.

granted Custodia's request had the guidelines not been issued.[24]  It has therefore failed to establish that the Revised Proposed Guidelines had any impact on FRBKC's decision.

Custodia breathlessly contends that the most "stunning fact that would have never seen the light of day but for discovery is" that FRBKC shared its draft recommendation to deny Custodia's request with the Board and Board staff commented on it.  Custodia Br. at 54.  So what?  Yes, the Board issued an S-Letter asking Reserve Banks to "consult" with the Board before denying master account requests from Tier 3 institutions.  Ex. 73 at FRB-AR-000016.  Yes, FRBKC shared its draft recommendation with Board staff in a manner consistent with the S-Letter.  And yes, Board staff provided comments on the draft recommendation.  But these documents speak for themselves, and FRBKC welcomes the Court's review of the Board's limited comments.  Ex. 65 at FRB-AR-000324; Ex. 66 at FRB-AR-000326-34; Ex. 63 at FRB-AR-000313; Ex. 64 at FRB-AR-000315-23; Ex. 79 at FRB-AR-000002.    President George requested that her staff draft the recommendation memo before the Board ever saw it, the draft reflected her thinking, and the Board staff's comments and suggested edits changed neither its substance nor its direction.  May-Oder Tr. 307.  The notion that FRBKC's sharing of a draft with Board staff, and Board staff's provision of minor comments, mean that FRBKC was not exercising its discretion does not withstand scrutiny.

Rather, the record makes clear that President George decided to deny Custodia's request unless there was a major change in circumstance, such as obtaining insurance (from the FDIC) or membership (from the Board).  Membership would have resulted in Custodia having a federal

---

[24] Both the Guidelines and an internal Handbook implementing them provide that a Reserve Bank has the authority to grant or deny an access request by an institution in "any of the three proposed tiers."  Ex. 73 at FRB-AR-00064;

prudential regulator, so rather than denying Custodia's request *before* the Board voted on membership, President George chose to hold her decision in abeyance pending the Board vote on membership.[25]   *See* George Tr. 210:17-20, 211:12-17; Humston Tr. 251:19-252:4.   But that was President George's choice.

It is helpful to step back from the trees to survey the forest.   Custodia asks this Court to believe that the Board denied Custodia's request without a vote and without any internal Board analysis regarding that request.   It would have this Court believe that the Board issued Guidelines—public guidelines, subject to two notice-and-comment-periods—that say one thing (Reserve Banks retain discretion and should apply generic principles to any request) but mean another (FRBKC must deny Custodia's request).[26]   Its theory is that the Board pulled the strings through an elaborate "ploy," Custodia Br. at 2, tricking Custodia into applying for membership, only to use the results of the membership exam to deny the master account request. That theory does not make sense.

---

[25] The Board's decision whether to grant membership is based on different standards and a different set of considerations than a Reserve Bank's decision whether to grant a master account. *See* Custodia Opp. to MTD 30 (ECF 135) (conceding that the membership decision and master account decision are "completely separate applications with different standards governed by different bodies of law").

[26] Custodia claims that several of the Guidelines' principles are "non-delegable policy matters that statutes require the Board, and not Reserve Banks, to decide."   Custodia Br. at 13.   As a threshold matter, that is an inaccurate, over-simplified characterization of how the Board and the Reserve Banks interact.   The entire System—the Board, the Reserve Banks, and the FOMC (which includes Reserve Bank Presidents)—works together to set and effectuate the goals of the FRA. *See, e.g.*, George Tr. 53:5-17; 296-302; May-Oder Tr. 138-39.   Legal eligibility, monetary policy, and financial stability are all considerations that FRBKC has historically considered when evaluating master account requests.   *See generally* Ex. 15.   Regardless, the primary issues leading to Custodia's denial were traditional risk-based considerations, including the facts that Custodia was uninsured, had no federal oversight, lacked sufficient BSA/AML compliance measures, and posed risks to FRBKC and to the payment system because of its business model, lack of capital requirements, and unproven resolution process.   *See* Ex. 59 at FRBKC-00002172-78.

Why would the Board go through so much effort "instead of simply imposing its will?" ECF 225 at 11.  The Board had no qualms about denying Custodia's membership application and issuing an 86-page order explaining all the reasons why.  Why would it simultaneously hide a desire to deny Custodia's master account request?  Discovery in this case shows that it did no such thing.  Instead, FRBKC conducted due diligence into Custodia's request, had serious concerns at all times about granting it, communicated with other parties including the Board and Reserve Banks (as one would expect given the federated nature of the System and the importance of communication on these sorts of novel issues), and made a decision based on all available inputs.

> 2. *FRBKC is entitled to judgment as a matter of law regardless of its and the Board's respective roles in denying Custodia's master account request.*

Even if (contrary to fact) the Board controlled the decision regarding Custodia's master account request, that would not entitle Custodia to any relief.  As explained in the preceding section and in the Board's brief, § 248a does not afford an automatic, non-discretionary right to a master account and Federal Reserve services to all depository institutions irrespective of risk.[27]  Because all of Custodia's claims are based on that erroneous legal theory, Custodia's claims fail as a matter of law regardless of FRBKC's and the Board's respective roles in the denial.  To be sure, as the Court observed in its motion to dismiss order, if the Board did not control the denial, then Count I—"Claim for Unlawful Denial of Master Account Application Against the Board"—is asserted against the wrong defendant and fails for that separate reason.  *See* ECF 164 at 11; ECF 121 at 27.  The Court thus believed that discovery concerning the Board's role was relevant, *see*

---

[27] The Federal Reserve would retain discretion over access to services and, at minimum, would retain the power to make services available to nonmembers only on the "terms ... that the Board may determine are applicable to member banks."  § 248a(c)(2).  If the Federal Reserve would not permit a member bank similarly situated to Custodia to access services as Custodia intends to do, then Custodia could be denied access on a non-discriminatory basis.

*also* ECF 164 at 12, and stated that "a full statutory interpretation of the matter is more appropriate after further development of important facts," ECF 164 at 10-11.  Now that the facts have been developed, the Court should hold that § 248a does not give Custodia an absolute, non-discretionary right to a master account and that FRBKC is thus entitled to judgment as a matter of law on Custodia's mandamus claim, regardless of how the Court may view the evidence concerning FRBKC's and the Board's respective roles in the denial.

## CONCLUSION

For the foregoing reasons, this Court should grant FRBKC's motion for summary judgment, deny Custodia's request for summary judgment, and dismiss Custodia's Amended Complaint with prejudice.

Respectfully submitted,

Dated: January 26, 2024

/s/ Billie LM Addleman

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

50

## CERTIFICATE OF SERVICE

I certify that on the 26 January 2024, a copy of the foregoing was served upon all parties to this action via CM/ECF.

         s/ Shannon M. Ward
OF HIRST APPLEGATE, LLP
Attorneys for Defendant