# EXHIBIT 4

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.



FEDERAL RESERVE BANK
OF DALLAS

WILLIAM H. WALLACE
FIRST VICE PRESIDENT

June 4, 1985

DALLAS, TEXAS  75222

Circular 85-75

TO:  The Chief Executive Officer of all
     depository institutions and others concerned
     in the Eleventh Federal Reserve District

SUBJECT

     Federal Reserve policy statement on the control and reduction of risks to depository
institutions participating in large-dollar wire transfer systems, together with four related
requests for public comment.

DETAILS

     After extensive comment from the public, the Federal Reserve Board has adopted a policy to
control and reduce the risks to depository institutions which participate in large-dollar wire
transfer systems.  The policy calls on private networks and depository institutions to reduce their
own credit risks, particularly from daylight overdrafts.  It also makes use of the examining,
monitoring, and counseling role of the Federal Reserve and other financial institution regulators.

     The policy takes effect March 27, 1986, but depository institutions which incur daylight
overdrafts on Fedwire or participate in private large-dollar wire networks are encouraged to adopt
voluntarily by December 31, 1985, a cross-system sender net debit cap following guidelines
established by the Board.

     At the same time the Board requested public comment on four related issues:

     --Docket No. R-0515A, on reducing risks from the transfer of book-entry securities on
Fedwire (comments to be received by August 15, 1985);

     --Docket No. R-0515B, on reducing risks from automated clearing house (ACH) transactions
(comments to be received by August 15, 1985);

     --Docket No. R-0515C, on reducing risks from the provision of net settlement services to
other than large-dollar transfer systems (comments to be received by August 15, 1985); and

     --Docket No. R-0515D, on a proposed data collection request for ex post monitoring of
automated clearing house transactions (comments to be received by June 17, 1985).

     Comments should be addressed to Mr. William W. Wiles, Secretary, Board of Governors of the
Federal Reserve System, Washington, D. C.  20551. All correspondence should refer to the appropriate
docket numbers and should be received by the appropriate deadlines.

     In the near future the Federal Reserve Bank of Dallas will hold educational meetings
concerning the implementation of this new policy for the depository institutions most likely to be
affected.  Additional details on these meetings will be provided to the institutions concerned at a
later date.

ATTACHMENTS

     The Board's press release, the Board's policy statement (with appendix) as published in the
Federal Register, and the four requests for public comment are attached.

MORE INFORMATION

     For further information, please contact George C. Cochran, III, Senior Vice President, at
(214) 651-6257, or Neil B. Ryan, Senior Vice President, at (214) 651-6330.

Sincerely yours,

William H Wallace

EXHIBIT

301

12/14/23

For additional copies of any circular please contact the Public Affairs Department at (214) 651-6289. Banks and others are
encouraged to use the following incoming WATS numbers in contacting this Bank (800) 442-7140 (intrastate) and (800)
527-9200 (interstate).

This publication was digitized and made available by the Federal Reserve Bank of Dallas' Historical Library (FedHistory@dal.frb.org)

# FEDERAL RESERVE  press release



For immediate release                                                May 17, 1985

      The Federal Reserve Board today issued a statement of its policy to control and reduce the risks to depository institutions participating in large-dollar wire transfer systems.

      The policy calls on private networks and depository institutions to reduce their own credit risks.  It also depends, in part, on the role of the Federal Reserve and other financial institution regulators in examining, monitoring, and counseling institutions.

      Large-dollar networks are an intregal part of the payments and clearing mechanism.  Current data indicate that total daylight overdrafts average $110 to $120 billion per day.  A daylight overdraft occurs when an institution has sent funds over Fedwire (the Federal Reserve wire transfer system) in excess of the balance in its reserve or clearing account, or it has sent more funds over a private wire network than it has received.

      Because a failure of a participant to settle its net position on a private large-dollar network could cause substantial disruption in financial markets, one of the Board's major objectives in establishing its policy is to reduce the possibility of a settlement failure.  This would be accomplished primarily through a reduction in the volume of overdrafts and by encouraging institutions to exercise better control over exposures that remain.

      In establishing its policy, the Board made it clear that it is not condoning the use of this practice by depository institutions.  While some degree of intra-day credit may be necessary to keep the payments mechanism operating smoothly, the Board expects to see, over time, a reduction in both the total volume of daylight over-drafts and the number of institutions with a pattern of substantial reliance on

-2-

such credit.  After reviewing the initial impact of the new policy, the Board
may adopt additional guidelines to reduce further the volume and incidence of
daylight overdrafts and other use of intra-day credit.

The Board's policy becomes effective March 27, 1986.

The Board encourages each depository institution that incurs daylight
overdrafts on Fedwire or participates on private large-dollar wire networks
voluntarily to adopt by December 31, 1985, a cross-system sender net debit cap
(a sender net debit cap that applies across all wire transfer systems as a total)
following the guidelines that the Board established. 1/

The Board's policy also states that no large-dollar payment network will
be eligible for Federal Reserve net settlement services unless it:

1.   requires each participant to establish a maximum net amount it is willing
     to receive from any sender (bilateral net credit limit).

2.   establishes a maximum ceiling on the amount of intra-day credit a sender
     may incur (sender net debit cap) reasonably designed to reduce the risks
     to participants on that network;

3.   develops and implements a system that will reject or hold any payment
     that would exceed either bilateral net credit limits or the network's
     sender net debit cap; and

4.   agrees to provide transaction data to its Reserve Bank on request.

In addition to its policy action, the Board also requested comment
by August 15, 1985 regarding:

-- the treatment of Fedwire overdrafts resulting from transfer of book-entry
   securities;

-- automated clearing house issues; and

-- net settlement issues.

The Board also requested comment by June 17, 1985 on a proposed data
collection for ex post monitoring of authomated clearing house transactions.

The Board's notices are attached.

Attachments                              -0-

---

1.  The cross-system cap selected should have two components:  a ceiling on the net
debit position that an institution could incur on any single day, and a limit that
the institution could incur on average over a two-week period.  For example, if an in-
stitution rated itself as "average" under the Board's guidelines, it would not allow
its net debit position to exceed 1.5 times its capital on any single day or 1.0
times its capital on average over a two-week period.

21120        Federal Register / Vol. 50, No. 99 / Wednesday, May 22, 1985 / Notices

**FEDERAL RESERVE SYSTEM**

[Docket No. R-0515]

**Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Policy statement.

**SUMMARY:** In March, 1984, the Board requested public comment on several proposed methods of reducing the risks to depository institutions associated with their participation on large-dollar electronic funds transfer systems. After studying the public comments and recent data on the exposure of institutions using such systems, the Board has formulated a policy to reduce these risks. The policy relies in part on the efforts of depository institutions to reduce their own exposures through the use of bilateral net credit limits and sender net debit caps, and in part on the role of the Federal Reserve and other financial institution regulators in examining, monitoring, and counseling institutions.

Effective March 27, 1986, no large-dollar payment network will be eligible for Federal Reserve net settlement services unless it (1) requires each participant to establish bilateral net credit limits vis-a-vis each other participant on that network, (2) establishes a sender net debit cap that is reasonably designed to reduce the risks to participants on that network, (3) develops and implements a system that will reject or hold any payment that would breach either bilateral net credit limits or the network's sender net debit cap, and (4) agrees to provide transaction data to its Reserve Bank on request.

The Board also strongly encourages each institution that runs daylight overdrafts on Fedwire or participates on a private large-dollar wire network to adopt voluntarily by December 31, 1985, a cross-system sender net debit cap following the guidelines set out in an appendix to the Board's policy statement.

**EFFECTIVE DATE:** March 27, 1986.

**FOR FURTHER INFORMATION CONTACT:** Edward C. Ettin, Deputy Director (202–

**21121**

452–3368), David B. Humphrey; Assistant Director (202–452–2557), Terrence Belton, Economist (202–452–2444), Division of Research and Statistics; Elliott C. McEntee, Associate Director (202–452–2231), Nancy R. Wesolowski, Operations Analyst (202–452–3437), Division of Federal Reserve Bank Operations; Joseph R. Alexander, Attorney (202–452–2489), Legal Division; Jeffrey C. Marquardt, Economist (202–452–2360), Division of International Finance; Anthony G. Cornyn, Assistant Director (202–452–3354), Division of Banking Supervision and Regulation; or Joy W. O'Connell, TDD (202–452–3244).

**SUPPLEMENTARY INFORMATION:** The Federal Reserve Board has issued the following policy statement concerning reducing risks on large-dollar electronic funds transfer systems:

### Reducing Risks on Large-Dollar Electronic Funds Transfer Systems

Over the past several years, the Board has become increasingly concerned about the risks that participation on large-dollar payment networks [1] present to the depository institutions that participate on them, to the banking system, and to other sectors of the economy. Because private wire networks operate by the transmission of payment messages throughout the day with settlement of net positions at the end of the day, the network is exposed to the possibility that a participant could be unwilling or unable to settle a large net debit position. A failure of one participant to settle could seriously jeopardize the financial positions of its net creditors on that network, with serious repercussions spreading from those participants to their creditors. Thus, an unexpected settlement failure could result in serious disruptions of money and financial markets.

On March 29, 1984, the Board requested public comment on possible components of a risk reduction policy, including both the goals that such a policy should seek to attain and several possible methods for controlling and reducing risk. 49 FR 13186 (Apr. 3, 1984). After considering the comments, together with recent data on the

[1] In a changing technological and regulatory environment, it is not possible or desirable to adopt an all inclusive and permanent definition of a "large-dollar payment network" for the purpose of Federal Reserve risk control policy. In determining whether any particular network or system is a "large-dollar" system, the Board will consider any of the following four factors: (1) The employment of multilateral netting arrangements, (2) the use of same-day settlement, (3) the routine processing of a significant number of individual payments larger than $50,000, and (4) the possibility that any one participant could be exposed to a net debit position at the time of settlement in excess of its capital.

activities and exposures of institutions on large-dollar networks and the recommendations of its staff,[2] the Board has developed a risk reduction policy.

In fashioning this policy, the Board's first concern was reducing the possibility of a settlement failure. This is accomplished primarily through a reduction in the volume of intra-day credit exposures and by encouraging institutions to exercise better control over exposures that remain. Reduction and control of credit exposures are also important in attaining a second primary goal: containing the effects of a settlement failure should one occur.

The Board is well aware that large-dollar networks are an integral part of the payments and clearing mechanism and that it is of vital importance to keep the payments mechanism operating without significant disruption. Indeed, it is precisely because of the importance of avoiding such disruptions that the Board is seeking to reduce the risks of settlement failures that could cause these disruptions. The Board is also aware, however, that some intra-day credit may be necessary to keep the payments mechanism running smoothly and efficiently. While it is essential to reduce and control intra-day credit, this must be done in a manner that will minimize disruptions to the payments mechanism. The Board anticipates that in relying largely on the efforts of individual institutions to identify, control, and reduce their exposures, and by establishing guidelines for use by institutions, the goal of reducing and controlling risks will not unduly disrupt the smooth operation of the payments mechanism.

In establishing such a policy, the Board underlines that it is not condoning daylight overdrafts. While, as noted, some intra-day credit may be necessary, the Board anticipates that as a result of its policy, there will not be an increase in the number of institutions consistently relying on daylight overdrafts or other intra-day credit to conduct their business, and expects to see, over time, a reduction in both the volume of intra-day credit and the number of institutions with a pattern of substantial reliance on such practices. The policy presented below is purposely designed to minimize initial disruptions and permits the Board to monitor the impact of its policy on financial markets. The Board fully expects that it will, after review of the initial impact of its

[2] The staff recommendations are contained in a study, *Reducing Risk on Large Dollar Transfer Systems* (May, 1985). Copies of this study are available from each of the Federal Reserve Banks or the Secretary of the Board.

policies, be adopting guidelines designed to reduce further the volume and incidence of daylight overdrafts and other uses of intra-day credit. If institutions appear not to be cooperating with the spirit of the Board's current or future policies, the Board will consider its other options—including regulatory restraints.

The elements of the Board's risk reduction policy are set out below:

### I. Bilateral Net Credit Limits

In its earlier statement announcing an interim risk-reduction policy, 49 FR at 13191, the Board stated that any large-dollar network obtaining net settlement services from a Federal Reserve Bank would have to require each of its participants to establish bilateral net credit limits vis-a-vis each other participant on that network. In setting bilateral net credit limits, each participant determines for itself the maximum dollar amount of net transfers (i.e., the value of receives in excess of the value of sends) that it is willing to accept from each other participant on a network. The Board believes that bilateral net credit limits reduce risk by enabling an institution to identify and control the exposure it could face in the event of a settlement failure. Accordingly, the Board has decided to continue this requirement and strengthen it.

After the effective date of this policy (March 27, 1986), no private large-dollar payment network will be eligible for Reserve Bank net settlement services unless it (1) requires each participant to establish bilateral net credit limits vis-a-vis each other participant on that network, and (2) establishes a system that will reject or hold any payment that would exceed such a limit. (Bilateral net credit limits do not apply to Fedwire since the Federal Reserve, under Regulation J provides irrevocable credit to the receiver when advice of credit is given for the transfer. Reserve Banks, however, may take action to reduce their credit exposure.

The federal bank regulators have agreed that examiners will, during regular examinations, review and comment on the procedures used by each institution in establishing, monitoring, reviewing, and modifying bilateral net credit limits, and ensure that institutions understand their potential exposures with each other participant over more than one network and in more than one market.

### II. Sender Net Debit Caps

Bilateral net credit limits are not sufficient by themselves to reduce

aggregate risk on large-dollar payment networks. The volume of daylight exposure that each institution is willing to accept from each other institution is likely to be quite large when aggregated across all receivers. Moreover, each institution is unaware of the credit made available to a given sender by other potential receivers. For this reason, the Board believes that bilateral net credit limits must be supplemented by a limit on the aggregate amount of risk that an institution can present to the payments system. Accordingly, the Board strongly urges that the board of directors of each institution either participating on a large-dollar network or incurring daylight overdrafts on Fedwire adopt a sender net debit cap (a ceiling or "cap" on the aggregate net debit position—the value of all sends in excess of the value of all receives—that it can incur during a given interval).

Sender net debit caps—expressed as multiples of capital—should be applied across all large-dollar systems, i.e., to the aggregate position of an institution at a moment in time on all large-dollar transfer systems combined. With this "cross-system" sender net debit cap, net debit positions on one system can be offset by credit positions on other systems.[3] In addition to the cross-system sender net debit cap, the Board has extended its interim policy on private network sender net debit caps. As of the effective date of this policy, each private network will, as a condition for access to the Federal Reserve net settlement service, be required to develop and impose on its participants a network sender net debit cap reasonably designed to reduce individual institution risk exposure on that network. In addition, each network will be required to develop and apply a mechanism for rejecting or holding those transfers that would cause an institution to exceed its cap.

In developing its policy toward cross-system sender net debit caps, the Board noted the views of commenters strongly urging that new regulations be avoided and that voluntary self-policing techniques be at least tried. In addition, the Board is uncertain about the impact of regulatory controls on the payments mechanism. Moreover, the Board is sensitive to the practical difficulties of selecting regulatory caps for thousands

of depository institutions, each with differing abilities to deal with risk. At the same time, the Board is concerned that voluntary sender net debit caps might provide no discipline, and end up treating similarly situated institutions differently, place no effective limit on an individual institution's risk exposure, and provide no remedy for the Federal Reserve should it find a particular cap excessive.

Consequently, the Board's policy calls for a voluntary cross-system sender net debit cap board on a specific set of guidelines and some degree of examiner oversight.[4] The Board's policy has no regulatory dimension except (1) potential responses to an actual level of aggregate daylight credit exposure at an individual institution deemed by the institution's examiner to be unsafe or unsound, (2) elimination of access to daylight overdrafts on Fedwire by institutions not engaging in the self-evaluation process, and (3) control of Fedwire overdrafts of individual institutions determined by a Reserve Bank to expose it to excessive risk. If events subsequently demonstrate that senior management and the boards of directors of depository institutions do not take the proposed guidelines and procedures seriously, the Board will reconsider its options, including the adoption of regulations designed to impose explicit limits on daylight credit exposure.

### A. Determining Cap Category

The first step for an institution in establishing its cross-system sender net debit cap is to determine its own cap category by evaluating its creditworthiness, credit policies, and operational controls and procedures.[5]

The guidelines to be used by each institution in establishing its cap category are detailed in the Appendix to this policy statement.

In applying these guidelines, each institution would be expected to maintain a confidential file for examiner review that includes (1) worksheets and supporting analysis developed in its self-evaluation of its own risk category, (2) copies of senior management reports to the institution's board of directors regarding that self-evaluation, and (3) copies of the minutes of the discussion of the board of directors concerning the institution's adoption of a cap category. The process of self-evaluation, with board of director review, should be conducted at least once in each six month period.

As part of its normal examination, the depository institution examiners will review the contents of the self-evaluation file.[6] The objective of this review will be to assure that the institution has seriously and diligently applied the guidelines, that the underlying analysis and methodology were reasonable, and that the resultant self-evaluation was generally not inconsistent with the examination report. Examiner comments, if any, would be expected to be forwarded to the board of directors of the institution. Consistent with the voluntary nature of the Board's policy with regard to sender net debit caps, however, it should be emphasized that the examiner cannot require a modification of the self-evaluation cap category unless the level of daylight credit used by the institution constitutes an unsafe or unsound banking practice.

### B. Establishing Sender Net Debit Cap

The cap category resulting from the self-evaluation process should be used by each institution to establish its cross-system sender net debit cap. The cap levels, set as multiples of adjusted primary capital,[7] would be as follows:

| Cap class | Dual sender net debit cap | |
|---|---|---|
| | Two week average | Plus single day |
| High | 2.0 | 3.0 |
| Above average | 1.5 | 2.5 |
| Average | 1.0 | 1.5 |
| No cap | 0.0 | 0.0 |

---

[3] As noted below, however, Reserve Banks will not permit daylight overdrafts on Fedwire to exceed the cross-system cap established by an institution; i.e., net credits on private wire systems will not be able to be used to increase the Fedwire cap. A similar arrangement will exist for private network participants where net credits on Fedwire and other private networks cannot be used to increase a participant's cap on a given private network.

[4] The Board acknowledges with appreciation that its policy draws heavily on the *Final Report of the Risk Control Task Force, Payments System Committee, Association of Reserve City Bankers*, prepared with the assistance of the Bank Administration Institute and Robert Morris Associates (October, 1984).

[5] This evaluation should be done on an individual institution basis—treating as separate entities each commercial bank, each Edge (and its branches), each thrift institution, etc. While the Board realizes that depository institution holding companies usually act as integrated entities and that performing the self-evaluation on an individual institution basis may result in some increased costs, consolidation presents to the Federal Reserve and other financial institution regulators a number of operating and policy complexities that must be resolved. The Board will continue to review this issue, but notes that many of the benefits of consolidation can be obtained directly by intra-family wire transfers.

An exception is made in the case of U.S. agencies and branches of foreign banks. Since these entities have no existence separate from the foreign bank, all the U.S. offices of foreign banks (excluding U.S. chartered bank subsidiaries and U.S. chartered Edge subsidiaries) should be treated as a

consolidated family relying on the foreign bank's capital.

[6] In the interim between examinations, examiners may contact an institution about its cap if statistical or supervisory reports or ad hoc information suggest that there may have been a change in the institution's position.

[7] See Section II-C on capital, *infra*.

An institution would be expected to avoid incurring cross-system net debits that, on average over a two week period, exceeded the two week average cap *and*, on any day, exceeded the single day cap. The two week average cap provides some flexibility for institutions and recognizes that fluctuation in payments can occur from day-to-day. The purpose of the higher single day cap is to limit excessive daylight overdrafts on any day, and to assure that institutions develop internal controls that focus on the exposures each day, as well as over time.

The two-week average overdraft volume to be measured against the cap is the average over a two-week reserve maintenance period of an institution's daily maximum net debit position across all network. In calculating the two week average, individual days on which an institution is in an aggregate net credit position across all systems throughout the day should be treated as if the institution was in a net position of zero. The number of days to be used in calculating the average should be the number of business days the institution's Reserve Bank is open during the reserve maintenance period.

It should be noted that the Board has purposely set the recommended caps to be associated with each category at relatively high levels so that institutions and their examiners can gain experience with caps while maintaining a margin of flexibility for most institutions. The Board will evaluate these caps continuously, and expects to have enough data on their impact to recommend new, lower cap levels by March, 1987. The Board may also recommend reducing the averaging period, and may ultimately recommend a single day cap only.

*c. Capital*

Sender net debit caps should be multiples of "adjusted primary capital." Primary capital includes common stock, perpetual-preferred stock, surplus, undivided profits, contingency and other capital reserves, qualifying mandatory convertible instruments, allowances for possible loan and lease losses (exclusive of any allocated transfer risk reserves),[8] and minority interests in equity accounts of consolidated subsidiaries, but excludes limited-life preferred stock. "Adjusted" primary capital is defined as the sum of these

---

[8] Allocated transfer risk reserves ("ATRR") are reserves against certain assets whose value has been found by the federal bank regulatory agencies to have been significantly impaired by protracted transfer risk problems. Such reserves are not considered capital by the agencies.

---

primary capital components less all intangible assets and deferred net losses on loans and other assets sold. Adjusted primary capital for thrift institutions would include any capital assistance provided by the Federal Deposit Insurance Corporation in the form of net worth certificates pursuant to 12 U.S.C. 1729(f) or 1823(i).

Any institution with negative adjusted primary capital will be permitted to incur daylight overdrafts on Fedwire only with the permission of its Reserve Bank, and all such overdrafts will have to be collateralized.

In some instances, further adjustments will be required. For example, virtually all Edge Act and agreement corporations are subsidiaries of depository institutions that may themselves use intra-day credit. The same capital would be double-counted if both the parent and the Edge Act or agreement corporation subsidiary used such credit based on their own capital bases. Accordingly, if a parent elects to permit its Edge Act or agreement corporation subsidiary to use daylight credit, any adjusted primary capital attributable to its Edge Act or agreement corporation subsidiary that is reflected on the parent's balance sheet should be subtracted from the parent's capital. The parent could choose, however, not to permit its Edge Act or agreement corporation subsidiary to use intra-day credit, and use all of its (the parent's) capital for its own cap.

In determining cross-system sender net debit cap levels, U.S. branches and agencies of foreign banks should use the world-wide capital of the foreign bank establishing the branches and/or agencies, not that bank's parent. Further, the adjusted primary capital of any U.S. bank subsidiaries of the foreign bank should be subtracted from the bank's adjusted primary capital to avoid double counting.

Determining world-wide capital for U.S. agencies and branches of foreign banks provides considerable definitional and measurement problems. Under current procedures, data are collected through the Y–7 report, which is submitted annually and is due four months after the close of a foreign banking organization's fiscal year. These procedures result in the Federal Reserve's foreign bank capital data being more than one year old at certain times in the reporting cycle. Without more current data, timely monitoring of U.S. agency or branch adherence to overdraft limitations would prove difficult.

In order to alleviate these problems, the Board has directed its staff to devise

a reporting form that would allow the Federal Reserve to collect more timely information on the world-wide shareholder equity capital of foreign banks that use intra-day credit. To reduce reporting burden, the report would likely allow a foreign banking organization that had not experienced losses during a reporting period simply to warrant that fact rather than to provide more frequent quantitative capital information. Organizations that had experienced losses would be asked to provide updated equity capital data. Any proposed information collection procedure will be published for comment prior to implementation.

*D. Additional Considerations*

The contents of the self-evaluation cap category file will be considered confidential by the institution's examiner. Similarly, the actual cap level selected by the institution will be held confidential by the Federal Reserve and the institution's examiner. Finally, the Board notes that exceptional circumstances may require an institution to incur overdrafts in excess of its cap. Such a pattern of overdrafts should be discussed with the Reserve Bank, with specific plans developed to reduce the intra-day credit positions as soon as possible to a level within the institution's cap.

**III. Other Components of the Board's Policy**

*A. Daylight Overdrafts on Fedwire*

The Board's concern with risks on large-dollar payment systems began with its concern about daylight overdrafts on Fedwire. In response to this concern, the Board, in 1982, required Reserve Banks to counsel institutions that regularly incurred daylight overdrafts on Fedwire in excess of 50 per cent of capital.

The Board is still concerned with these overdrafts, and believes that it is appropriate to take effective steps to control risks to the Federal Reserve Banks by placing more effective limits on Fedwire daylight overdrafts. Therefore, beginning on March 27, 1986, the Board will establish a Fedwire cap for each depository institution. This cap will be equal to the voluntary cross-system cap adopted by the institution, reduced by the institution's actual net debits on other networks as determined in an after the fact measurement process. This cap will thus be monitored on an ex post basis. (Reserve Banks, however, will monitor an institution's Fedwire positions on a real-time basis when they believe that the institution is

exposing the Reserve Bank to excessive risk. Real time monitors will permit Federal Reserve Banks to reject funds transfered by—and to pend or hold book-entry securities transferred for—the institution when such transactions expose the Reserve Bank to excessive risk.] The Fedwire cap will not be increased by the institution's net credits on other networks. Each Reserve Bank will, of course, retain the right to protect its risk exposure from individual institutions by reserving the right to reduce unilaterally Fedwire caps, impose collateralization or clearing balance requirements, hold or reject Fedwire transfers during the day until the institution has collected balances in its Federal Reserve account, and—in extreme cases—take the problem institution off-line or prohibit it from using Fedwire.

Institutions that incur Fedwire overdrafts for the first time will be subjected to a 50 per cent of capital limit pending completion of the self-evaluation procedure described above. Institutions that do not follow the self-evaluation procedure will not be permitted to incur overdrafts on Fedwire.[9]

### B. Book-entry Securities Transfers

In formulating its daylight overdraft policies, the Board has always been concerned about the impact that overdraft restrictions could have on the U.S. government securities market and on the Board's ability to conduct monetary policy through open market operations. Accordingly the Board, pending development of procedures for collateralizing such overdrafts—or other procedures for reducing the Reserve Banks' risk exposure—had provisionally exempted from quantitative overdraft control those Fedwire daylight overdrafts resulting from the transfer of book-entry securities.[10]

---

[9] Under the self-policing policy adopted by the Board, an institution that does not adopt a cap for itself would be able to use without limit all credit available to it over any *private* network, unless use of such credit were found to constitute an unsafe or unsound banking practice by the institution's examiner. Such behavior, however, would not be consistent with the spirit of the Board's policy.

[10] Such overdrafts occur when the institution receiving book-entry securities has received more book-entry securities against payment at a point in time than it has sent. Since receipt of a book-entry security and Fedwire payment to the sender of securities are simultaneous, the sender of the security receives Fedwire payment regardless of the securities overdraft position of the receiver of the securities. The definition used for a book-entry securities overdraft means that such an overdraft could occur even while the receiver's funds account was in credit balance.

In a related action (Docket No. R-0515A), the Board is today requesting comment on a series of proposals for treating Fedwire daylight overdrafts resulting from the transer of book-entry securities. Until the Board adopts a new policy in this area, book-entry overdrafts will remain unconstrained and separate from any sender caps adopted or placed on Fedwire funds transfers, except at problem institutions.

### C. Automated Clearing Houses

When the Board first became concerned with risks on large-dollar payment systems, automated clearing houses (ACHs) were regarded as small-dollar systems. Recently, however, the ACHs have been evolving in such a way that they appear to be taking on many of the characteristics of larger-dollar transfer systems, and they therefore present many of the same risks.

Accordingly, the Board has directed its staff to undertake a study of ACH risk. The study will focus on (1) whether the ACH is an appropriate mechanism for making large-dollar payments, (2) what kind of controls should be implemented if ACH is increasingly used for large-dollar payments, and (3) how depository institutions now control the financial risk associated with ACH debit and credit transactions. As part of this study, the Board, in a related action, requesting public comment on a series of questions on ACH risk. (See Docket No. B-0515B.)

Until the Board's study of ACH risk is complete and the Board has formulated a new policy to deal with ACH risk, the Board is modifying its ex post monitoring or intra-day credit to (1) recognize the potential risks associated with ACH transactions processed by both the Federal Reserve and privately-operated ACHs, and (2) inhibit the use of ACHs to circumvent the risk reduction policies the Board has adopted for large-dollar funds transfer networks. Specifically, for purposes of ex post monitoring, gross debits resulting from the origination of credit transactions and the gross credits resulting from the receipt of credit transactions will be posted at the Reserve Bank's opening of business on the settlement date, and gross credits resulting from the origination of debit transactions and the gross debits resulting from the receipt of debit transactions will be posted at the Reserve Bank's close of business on the settlement date.[11] As a condition of

---

[11] This posting procedure is for ex post monitoring purposes and will in no way change when actual settlement entries are made or when ACH transactions become final.

obtaining net settlement services, privately-operated ACHs will be required to provide to the Federal Reserve the date necessary to include such transactions processed over their networks in the Federal Reserve's ex post monitoring system. In another separate action, the Board is requesting public comment on the parameters of this data collection. (See Docket No. R-0515D.) In addition, pending completion of the ACH study, the Board has suspended consideration of providing same-day ACH settlement service by Reserve Banks.

### D. Net Settlement Services

While the Board has thus far been concerned mainly with risks on large-dollar funds transfer networks, the Federal Reserve has long provided net settlement services to a variety of other private sector clearing arrangements. In addition to large-dollar funds transfer networks, today these include check clearing houses, credit card processors, ACHs, and small-dollar funds transfer networks, such as automated teller machine (ATM) and point-of-sale (POS) networks.

Because the terms of the settlement arrangements vary and because there are questions regarding the risks that these arrangements entail, the Board has directed its staff to conduct a thorough review of net settlement risk. In conducting this study, the staff will address (1) whether the terms of net settlement arrangements should vary based on the type of transactions being settled, and (2) how depository institutions treat or should treat net settlement entries for the various types of net settlement arrangements.

To facilitate the staff's study, the Board is, in a related action (see Docket No. R-0515C), today requesting public comment on a series of questions on the net settlement service.

### E. Edge Act and Agreement Corporations, U.S. Branches and Agencies of Foreign Banks, and New York Article XII Investment Companies [12]

There are special risks associated with the participation on large-dollar transfer systems of these institutions. Some of them are major participants in such networks, often making and receiving a large volume of payments on behalf of affiliates and their parent

---

[12] This section excludes discussion of foreign-owned U.S. banks, including U.S. banks that are either subsidiaries of foreign banks or of foreign bank holding companies. These entities have U.S. bank charters and capital in the U.S., and are treated identically to any other U.S. bank.

Federal Register / Vol. 50, No. 99 / Wednesday, May 22, 1985 / Notices

organizations. The size of their payment activities is generally quite large relative to their U.S. capital (or capital equivalent), and thus sender net debit caps would tend to constrain severely the ability of many of these institutions to participate directly in the U.S. dollar payments mechanism, forcing them to deal either through their U.S. parent (in the case of Edges) or through U.S. correspondents or affiliates (in the case of U.S. agencies, branches, Edge subsidiaries of foreign banks, and some New York investment companies).

In developing its policy for these institutions, the Board has sought to balance the goal of reducing and managing risk in the payments system, including risk to the Federal Reserve, with that of minimizing the adverse effects on the payments operations of these institutions. In addition, the principle of fair and equitable treatment embodied in the Board's policy of national treatment for foreign banking organizations are given explicit consideration.

*1. Edge Act and Agreement Corporations.* Under current Board policy, all Fedwire overdrafts of Edge and agreement corporations must be fully collateralized. This policy reflects the lack of access of these institutions to the discount window and the possibility that the parent of an Edge or agreement corporation may be unable or unwilling to cover its subsidiary's overdraft on a timely basis.

The Board believes that Edge Act and agreement corporation subsidiaries of U.S. banks can, together with their parents, arrange their affairs in a way that would allow them to continue to service their customers at the same time that risk exposures are reduced. Specifically, the Board notes that the parent of an Edge or agreement corporation could fund its subsidiary during the day over Fedwire and the parent could substitute itself for its subsidiary on private networks. Indeed, data suggest that, in virtually all cases, the consolidated Edge and parent overdraft position would be within the cap limits of the parent if it were evaluated as an above average cap institution, even though the Edge's overdrafts are very large in relation to the Edge's own capital. This suggests that such an approach by the parent could both reduce systemic risk exposure and permit the Edge corporation to continue to service its customers.

With respect to Edge and agreement subsidiaries of foreign banks, the Board believes that because they lack access to the discount window and ready access to a U.S. affiliate that can

provide support, these institutions should be treated in the same manner as their domestically-owned counterparts. The policy of national treatment also supports this conclusion.

Accordingly, the Board has determined that all Edge Act and agreement corporations will continue to be required to collateralize Fedwire daylight overdrafts, and strongly urges that each such corporation restrain its use of intra-day credit by establishing sender net debit caps based on its own capital in the same manner as any other domestic depository institution. In addition, the Board urges parents of Edge and agreement corporations to substitute themselves for their Edge or agreement subsidiaries on private large-dollar networks.

For purposes of sender net debit caps, the Board suggests that all branches of the same Edge or agreement corporation be consolidated. The consolidated entity's overdraft position will be monitored by the Reserve Bank of the Edge or agreement corporation's head office.[13] The monitoring Reserve Bank, in consultation with those Reserve Banks in which the Edge or agreement branches operate and the management of the consolidated entity, can either (1) determine that Edge or agreement branches outside its District will not be permitted to run Fedwire overdrafts, or (2) allocate part or all of the Edge or agreement corporation's Fedwire cap (and the responsibility of administering part or all of the collateral requirement) to a Reserve Bank in which one or more of the branches operate.

*2. U.S. Branches and Agencies of Foreign Banks.* As noted previously, the Board believes that U.S. branches and agencies of foreign banks should undergo the same self-evaluation process as domestic depository institutions, but that it be done on the basis of all U.S. branch and agency operations, rather than on a branch-by-branch, agency-by-agency basis. In setting a cross-system sender net debit cap, the Board believes that it is appropriate that branches and agencies develop a cap based on the world-wide capital of the foreign bank (less any adjusted primary capital attributable to subsidiary U.S. banks and Edge Act or agreement corporations reflected in the foreign bank's world-wide capital). The Board has reached this conclusion because public comments and other data indicate that private market participants view the intra-day credit risk associated with U.S. offices of

foreign banks in terms of the world-wide creditworthiness of the entire foreign bank.

In assessing the Federal Reserve's own risk, however, the Board is still concerned about the lack of timely information filed with Reserve Banks, and the Federal Reserve's inability to monitor developments concerning each foreign bank's non-U.S. operations. Accordingly, the Board has determined that, only for purposes of determining the volume of a foreign bank family's uncollateralized Fedwire overdrafts, the multiples developed from the self-evaluation process (Section II–B, above) will be multiplied by the consolidated U.S. capital equivalency of all of its U.S. agencies and branches.[14] Any Fedwire overdrafts in excess of that amount will have to be collateralized. Any use of intra-day credit on private large-dollar networks will be treated as any other use of intra-day credit and, as noted above, the total cross-system cap of a foreign bank's U.S. agencies and branches will be based on the world-wide capital of the foreign bank (less the noted adjustments).

The cross-system sender net debit cap for families of branches and agencies of the same foreign bank will be monitored by the Reserve Bank which exercises the Federal Reserve's oversight responsibilities under the International Banking Act. The administering Reserve Bank can, in consultation with Reserve Banks in which other U.S. agencies and/or branches of the same foreign bank are located and the management of the foreign bank's U.S. operations, determine that branches and agencies outside its District either will not be permitted to incur Fedwire overdrafts or will allocate part or all of the foreign family's Fedwire cap (and the responsibility for administering part or all of the collateral requirement) to a Reserve Bank in which one or more of the foreign offices operate.[15]

---

[13] With the consent of the parties, a Reserve Bank other than that of an Edge head office can assume the management of these responsibilities.

[14] "Capital equivalency" will be defined as the greater of (1) the sum of the amount of capital (but not surplus) which would be required of a national bank being organized at each branch or agency location, or (2) the sum of 5 per cent of the total liabilities of each branch or agency, including acceptances, but excluding (A) accrued expenses and (B) amounts due and other liabilities to offices, branches, and subsidiaries of the foreign bank.

[15] As in the case of Edge and agreement corporations and their branches, with the approval of the designated administering Reserve Bank, a second Reserve Bank may assume the responsibility of managing and monitoring the cross-system sender net debit cap of particular foreign branch and agency families. This would often be the case when the payments activity and national administrative office of the foreign branch and agency family is located in one District, while the

Continued

The Board believes that this approach will limit the Federal Reserve's risk while giving U.S. branches and agencies of foreign banks open access to the U.S. payments mechanism in keeping with the policy of national treatment.

3. *New York Investment Companies.* Investment companies chartered under Article XII of the New York Banking Law are not subject to reserve requirements and do not have access to the discount window. Because they cannot maintain accounts with the Federal Reserve, they cannot use Fedwire. Some are, however, active participants on private networks, and therefore introduce risk in the payments system much like other participants. Accordingly, the Board urges that investment companies that participate on private large-dollar networks establish for themselves a cross-system sender net debit cap using the procedures and guidelines the Board has established for depository institutions.

*F. Bankers' Banks*

Bankers' banks are exempt from reserve requirements and do not have regular access to the discount window. They do, however, have access to Federal Reserve payment services. To protect Reserve Banks from potential loss resulting from daylight overdrafts incurred by bankers' banks, the Board adopted, in 1982, a policy that bankers' banks should refrain from incurring overdrafts and post collateral to cover any overdrafts they do incur. Bankers' banks may voluntarily give up their exemption from reserve requirements, thus gaining access to the discount window and avoid having to post collateral.

The Board has determined to continued the present policy.

*G. Monitoring*

The Board believes that ex-post monitoring is consistent with the voluntary, flexible approach it has adopted. Under ex-post monitoring, an institution with a cross-system net debit position in excess of its cap will be contacted by a Federal Reserve Bank.[16]

oversight responsibility under the International Banking Act is in another District. If a second Reserve Bank assumes management responsibility, monitoring data will be forwarded to the designated administrator for use in the supervisory process.

[16] Even if the institution is not a state member bank, the Reserve Bank can make this contact because an overdraft is occurring on Fedwire or because the institution is in a net debit position on a wire system settling on the books of the Federal Reserve.

The Reserve Bank will counsel with such institutions, discussing ways to reduce their excess use of intra-day credit. No regulatory action will be taken, but the Reserve Bank may

• Advise the appropriate examiner, who may recommend supervisory action if the volume of cross-system overdrafts are deemed unsafe or unsound, and/or

• Take appropriate action to limit its own risk exposure on Fedwire.

A Federal Reserve Bank will apply real-time monitoring to an individual institution's Fedwire position when the Reserve Bank believes that it faces excessive risk exposure, e.g. for problem banks or from institutions with chronic overdrafts in excess of what the Reserve Bank thinks is prudent. In such a case, the Reserve Bank will control its risk exposures by monitoring the institution's position, rejecting Fedwire transfers of funds, and pending Fedwire book-entry securities transfers that would result in overdrafts in excess of a level the Reserve Bank judges to be prudent.

In order that Reserve Banks may properly monitor the use of intra-day credit, no future or existing large-dollar network will be permitted to settle on the books of a Reserve Bank unless its members authorize the network to provide position data to the Reserve Bank on request.

*H. Avoidance of Risk Reduction Measures*

In its March 29, 1984, policy statement, the Board stated that "use of Fedwire for the avoidance of Federal Reserve or private sector risk reduction measures is not appropriate." The Board adopted this policy to prevent institutions from participating in bilateral netting arrangements whereby they would exchange gross payment messages during that day and settle at the end of the day by using Fedwire to adjust net positions bilaterally. Such arrangements would be difficult for Reserve Banks to detect and would be outside of Federal Reserve and private-sector risk control measures. They still, however, present the same risks to the payments mechanism that other net settlement arrangements present because settlement failures are still possible, and such failures would have the same deleterious consequences as any other settlement failures.

The Board, therefore, reaffirms its policy that institutions may not use Fedwire or other payments networks as a method of avoiding risk reduction measures.

The Board realizes, however, that certain netting arrangements are not intended to avoid risk reduction

measures. Indeed, they can themselves reduce risk. For example, institutions may net gross obligations prior to settlement, with each participant legally obligated only for the resultant net position. This arrangement reduces risk because it replaces gross obligations with the smaller net obligation, and failures to settle would almost always involve smaller exposures (and less systematic risk) than with bilateral net settlement. The Board's policy on limiting avoidance techniques is not intended to restrict this kind of netting arrangement.

*I. Large-Dollar Payment System Advisory Group*

During the course of their studies on large-dollar payment system risk, the Board and Reserve Bank staff have met with individual depository institutions, advisory groups, and trade associations to obtain information and assistance in understanding the risk issue and the implications of various risk reduction options. Such contacts and discussions have been invaluable. The Board also found invaluable the work of the Federal Advisory and Thrift Institution Advisory Councils' Committee on Payment System Risk, and the Payment System Committee of the Association of Reserve City Bankers. The Board has therefore decided to formalize this contact and, with the consultation of the Federal Advisory Council and the Thrift Institutions Advisory Council, will appoint knowledgeable representatives of depository institutions active in the large-dollar payments market to serve on a joint advisory committee with Board staff representatives.

When the Study Group is impaneled, the Board requests that it study:

• The need for settlement finality and/or payments finality to customer receivers on private wire networks;

• The costs and benefits of consolidation of holding company affiliates for purposes of determining sender net debit caps;

• the effectiveness of voluntary sender net debit caps in controlling and reducing risk exposure;

• the need for intra-day funding mechanisms, including a Federal Reserve overline facility and other special Fedwire services;

• the best timing for reductions in cap levels;

• the need for a federal funds settlement window; and

• other matters of mutual interest.

*J. Implementation Date*

The Board believes that an implementation date of March 27, 1986,

will provide ample time for depository institutions and the Federal Reserve to develop plans and procedures to implement the Board's policy. The Board stongly recommends that institutions establish their sender net debit caps no later than December 31, 1985, to enable the Federal Reserve Banks to provide institutions with a three month trial run of the new polices. During this interval the agencies may also consult with institutions that the former may believe have chosen inappropriate caps.

No implementation date is proposed for any change in Board policies regarding overdrafts arising from the transfer of book-entry securities, and transactions or net settlement services generally. Such policy changes, if any, and their effective date will be determined after further staff study and public comment.

By order of the Board of Governors of the Federal Reserve System, May 17, 1985.
William W. Wiles,
*Secretary of the Board.*

Appendix—Guidelines for Establishing Risk Categories

This appendix presents the Board's guidelines to be used by institutions in determing their own classifications for purposes of setting their own sender net debit caps. The Board policy recognizes that individual institutions may perceive that special or unusual circumstances not adequately captured in these guidelines may, in the view of the institution's management and board of directors, be consistent with a higher grade classification and higher sender net debit cap. Such a position should be fully supported by analysis and evidence included in the file for examiner review. Examiners will be critical if such special factors are not fully documented, and will be especially sensitive to evidence that special positive factors are being emphasized and adverse factors ignored or downplayed.

The guidelines address creditworthiness; operational controls, policies, and procedures; and credit policies and procedures. The last section suggests how the self-evaluation in each of these three areas is to be combined into an overall assessment, which is then to be the basis for determining a sender net debit cap.

I. Creditworthiness

Self-assessment of creditworthiness should begin by reference to an institution's most recent examination report and, where applicable, to peer group statistics contained in the most recent Uniform Bank Performance Report (UBPR) and to the most recent Bank Holding Company Performance Report (BHCPR). Additional data from other reports and analyses should, of course, be used.

Major emphasis should be placed on asset quality, capital, and earnings where an institution's relative standing can be determined based upon quantifiable measures. Liquidity and holding company strength should be added in as modifying

factors which, if strongly positive or negative, could influence the overall assessment of creditworthiness. For each of the characteristics that become the primary determinants of the initial benchmark assessment of creditworthiness, each institution should rank itself using a scale from "A" to "D"—with "A" being best and "D" being worst.[1] The institution's files maintained for examiner review of cap determination should provide supporting analysis for the self-ranking assigned for each of the characteristics.

a. *Asset quality:* Asset quality should be graded A through D in relation to (a) the level, distribution, and severity of classified assets; (b) the level and composition of non-accrual and reduced rate assets; (c) the adequacy of valuation reserves; and (d) demonstrated ability to administer and correct problem credits. The self-analysis should take peer group satistics into consideration.[2] Obviously, adequate valuation reserves and a proven capacity to police and collect problem credits mitigate to some degree the weaknesses inherent in given level of classified assets. In evaluating asset quality, consideration should also be given to any undue degree of concentration of credits or investments, the nature and volume of credits specially mentioned or classified, lending policies, and the adequacy of credit administration procedures. Evaluations of asset quality significantly different from the last examination report should be highlighted and supported in the cap determination file.

b. *Capital:* In the self-evaluation of capital, institutions should, as a starting point, note that the federal guidelines call for a minimum primary capital-to-asset ratio of 5.5 per cent for commercial banks. In assigning an A to D self-ranking for its capital position, adjustments should be made for the volume of risk assets; the level of off-balance sheet risk; the volume of classified assets; and bank growth experience, plans, prospects, and peer group capital levels. Asset quality should receive particular weight. Any institution that ranks its capital more than one grade above its asset quality has significant burden of proof to justify such a grade, and its cap file should contain specific documentation.

c. *Earnings:* Earnings should also be graded A to D with respect to (a) the ability to cover losses and provide for adequate capital, (b) earnings trends, (c) peer group comparisons, and (d) quality and composition of earnings. Consideration must also be given to the inter-relationship that exist between the dividend payout ratio, the rate of growth of retained earnings, and the adequacy of bank capital. A dividend payout rate that is excessive in this context, would warrant a lower grade despite a level of earnings that might otherwise result in a more favorable appraisal. Quality is also an important factor in evaluating this dimension of an institution's performance. Consideration

should be given to the adequacy of transfers to the valuation reserve and the extent to which extraordinary or nonrecurring items, securities transactions, and tax effects contribute to net income.

The self-grading for asset quality, capital, and earnings should be combined into a signle preliminary grade of creditworthiness based on an average of the three components. This preliminary grade would be affected by two final considerations, which are graded positive (+), neutral (0), or negative (−).

d. *Liquidity:* In most instances, an analysis of liquidity will indicate a stable funding base with a reasonable cushion of assets or untapped funding sources available to meet contingencies. In such instances, liquidity should be regarded as a neutral (0) factor in assessing creditworthiness. Evidence of frequent, unplanned borrowing from the Federal Reserve's discount window or deterioration in the normal funding base would be regarded as negative (−), and, depending upon the severity of the situation, the preliminary grade might be downgraded. Extremely liquid findings (+) could cause an upgrading of the preliminary rating but such findings would usually need to demonstrate asset liquidity as well as sound liability management practices.

e. *Holding company and affiliates:* The relative strength of other depository institutions within the holding company, the parent company itself, and nondepository institution subsidiaries within the company can also marginally affect the preliminary grade. In general, if the regulators have characterized the consolidated holding company as in satisfactory condition in its most recent inspection, the influence should be regarded as neutral (0). If it was regarded as less than satisfactory, the influence should be regarded as negative (−). Downgrading of the preliminary grade would be expected if significant losses were being incurred or anticipated at the parent or nondepository institution subsidiary level, if consolidated capital was materially less than that of the subsidiary institution(s), or if holding company debt service necessitated excessive dividends from the depository institution subsidiaries. If the parent had a demonstrated record of capital contributions and other support for the depository institution subsidiary, its influence would be regarded as positive (+) and could raise the preliminary grade upward.

These five factors become the initial and minimum benchmark for the self-assessment. Other considerations, such as major changes in management or pending litigation that is material, may be adjusted when evaluating an institution. Further, in using any ratio in the analysis of the first three factors, the limitations of using a single ratio or even a few ratios must be recognized. To the extent that other factors or mitigating circumstances are factored into the final grade on creditworthiness, the reasoning for special consideration should be clearly laid out for the examiner's review. Also, in a voluntary self-assessment program, management should recognize its own natural predisposition to identify and emphasize positive factors while downplaying adverse ones. To the extent

---

[1] A rating of "A" means "high" or "strong;" "B" means "above average;" "C" means "average;" and "D" means "unacceptable."

[2] In the case of classified assets, reference should be made to nonperforming assets of peer group institutions.

files do not document balanced analyses, examiners should be critical.

**U.S. Branches and Agencies of Foreign Banks**

U.S. branches and agencies of foreign banks pose special problems for assessing creditworthiness because they do not have a corporate identity in the United States separate from that of the world-wide institution. Conceptually, however, the same analytical approach is appropriate, although special considerations are necessary to address data limitations.

In many cases, branches and/or agencies belonging to a single family will be found in several different geographic regions and subject to different supervisory authorities. Because the strength of the foreign bank, including all of its parts, will largely determine the strength of each branch or agency in the United States, a single overall assessment is necessary. Thus, branches and agencies of foreign banks should assess creditworthiness on the basis of the entire family—excluding any subsidiary U.S. chartered banks or Edge corporations of the foreign bank—rather than on an individual branch or agency basis.

For capital and earnings, the same approach and standards used for domestic depository institutions are appropriate. In general, the analysis should be done using available data on the foreign parent. Branches and agencies may restate their data to identify undisclosed reserves that are functionally undisclosed equivalent to capital and to adjust earnings to reflect additions to such reserves. To the extent that the self-assessment relies on these factors, the file available to the examiner should provide supporting documentation.

For assessment of asset quality, additional difficulties are encountered. While information on the overall organization is clearly the data that should be used, asset quality information on the foreign bank or on the consolidated organization is generally not avilable to either the manager of U.S. operations or U.S. supervisory authorities. Instead, only U.S. asset quality information is available. Even then, organizations with multiple branches or agencies will typically have examinations of individual entities conducted on different dates and by different supervisors. Combining these results into a single meaningful composite of U.S. operations is therefore not easily accomplished. Recognizing these imperfections, the only practical approach available in most cases is to extrapolate for the overall family from whatever information is available in the U.S. operations.

Recognition should be given to the distortions that can arise when a single international credit becomes problematic and is booked entirely in or outside the U.S. for control purposes. In instances where it is booked in the U.S., the credit may unduly overstate the severity of asset problems in the U.S. when it should more properly be attributed to the overall family. Judgment is therefore clearly appropriate in assessing asset quality.

As in the case for domestic depository institutions, asset quality, capital, and earnings provide a benchmark for the assessment of creditworthiness of the branch or agency. Other factors, like liquidity or the effect of affiliates, should be factored in as appropriate. However, because the assessment has already included the strength of the foreign bank in measuring capital and earnings, extra care should be taken to avoid double counting the foreign bank in the assessment of its U.S. branches and agencies.

**II. Operational Controls, Policies, and Procedures**

Two district components require analysis in the operational area if an institution is to be able to monitor its payments systems risk effectively. These components are:

• monitoring of the position of the institution on *each* payments system on which it operates and *across* all systems as an overall net position; and

• monitoring of individual customers and the extent to which the institition extends credit by making funds available before they are collected, both when the institition is a sender and a receiver of funds.

Both components are important to any institition in its efforts to manage its payments system risk. The significance of monitoring the debit and credit flows to determine one's overall position and the position of individual customers does not decrease for smaller institutions. For both components, the business activity is first defined, areas of significant risk identified, and the adequacy of controls reviewed.

Factors such as automation or the size of the institution are not relevant except as they affect the ability to monitor risks. References to "real-time," therefore, address the timeliness of information, and not the degree of automation. Indeed, a manual system in a small institution that records every transaction may be far more effective as a real-time monitor than a fully automated and integrated system in a major operation that has yet to bring one area with substantial risk exposure in the institution into the monitored environment.

Based upon the analysis of the business activities and the indentification of existing monitoring capabilities, each component is graded from "A" to "C" indicating a range of "strong" to "satisfactory" to "unsatisfactory," using specific standards. These two separate ratings of overall activity and individual customers should then be combined into an overall rating of operational controls, policies, and procedures.

a. *Monitoring Institution Positions Relative to Net Debt Caps.* Before evaluating its wire transfer operations, each institution needs to define the magnitude and relative importance of each payment system in which it participates. The table below seeks to define the institutions's funds transfer environment.[3]

---

[3] To the extent that an institution uses other payments systems with same-day settlement, the list should be expanded to include them.

| System | Average Daily Volume | | | |
|---|---|---|---|---|
| | Dollars sent | Percent of total | Dollars received | Percent of total |
| 1. CashWire. | | | | |
| 2. CHESS | | | | |
| 3. CHIPS | | | | |
| 4. Fedwire. | | | | |
| 5. Other | | | | |
| Total | | 100 | | 100 |

For each system in which the institution participates, an acceptable level of risk exposure needs to be identified against which its position will be monitored. The monitoring of each system should then be identified as being: (1) On a real-time basis; (2) on a periodic basis and at what periodicity; or (3) not currently monitored or monitored only at the end of the day. Completing the following table summarizes the type of monitoring activity for each system:

INDIVIDUAL SYSTEM MONITORING CAPABILITY

| System | Real Time | Periodic | (Frequency) | No Interim Monitoring |
|---|---|---|---|---|
| 1. CashWire. | | | ( ) | |
| 2. CHESS | | | ( ) | |
| 3. CHIPS | | | ( ) | |
| 4. Fedwire. | | | ( ) | |
| 5. Other | | | ( ) | |

For systems that are monitored, the extent of cross-system monitoring can then be determined. By identifying which systems used by the institution are monitored on a cross-system basis to determine a net exposure, an overall risk exposure can be obtained. As with the individual system, a summary table of cross-system monitoring capability can be completed like the one below.[4]

CROSS-SYSTEM MONITORING CAPABILITY

| Systems Monitored Together | Real Time | Periodic | (Frequency) | No Interim Monitoring |
|---|---|---|---|---|
| — — — | | | ( ) | |
| — — — | | | ( ) | |
| — — — | | | ( ) | |

Based upon the cross-system monitoring capability and the volume of business handled by each system, a rating for the institution's controls for its cross-system exposure can be obtained as follows:

*Rating for Monitoring Institution Positions*

*Strong*

a. 95% of total dollars sent and received are monitored on a real-time basis or at 15 minute intervals or less *and*

b. a cross-system calculation of the institution's net debit/credit position is

---

[4] System may often be listed on more than one line. For example, a real-time cross-system monitor on Fedwire and CHIPS might be combined with a periodic monitoring on CHESS and CashWire to give a periodic cross-system monitor on all four systems.

computed and compared to established limits on a real-time basis or at 15 minute intervals or less.

*Satisfactory*

a. 80% of the total average daily dollar volume sent is monitored on a real-time basis or at 30 minute intervals or less; *and*

b. a cross-system calculation of the institution's net debit/credit position, utilizing these data is computed and compared to established limits on a real-time basis or at 30 minute intervals or less.

*Unsatisfactory*—Any other condition.

b. *Monitoring Customer Positions.* Each institution should have the capability of monitoring the effect of all significant transactions on the funds positions of customers as the transactions occur during the business day. At a minimum, the institution should be aware of the positions of customers that have a high-dollar volume of funds transfer activity in relation to each customer's funds position or to the institution's capital. Customer position should reflect the collected status of funds sent and received over payments systems, as well as the effect of other activities, such as loan advances, loan payments, and book transfers (transfers between customers on the institution's own books) which may result from instructions developed internally or received over message systems, such as BankWire or S.W.I.F.T. Some customers require frequent monitoring because the volume of their daily transactions is large. Others need to be monitored only as a result of particularly large and unusual transactions.

For customers that are significant users of the payments system, three questions are important:

| | Yes | No |
|---|---|---|
| 1. Has the institution isolated its customers which participate to a significant degree in funds transfer systems as either senders or receivers of funds? | | |
| 2. Can the institution monitor the positions of these customers taking into account the source of significant transactions? | | |
| 3. Does the monitoring system include the opening collected balance? | | |

In monitoring customers for compliance with intra-day overdraft position limits established by credit policy and/or in approving over-limit payments, transactions other than those being transmitted and received over payments systems need to be considered as they directly affect the intra-day position. Among the transaction sources that should be considered are message systems such as BankWire, S.W.I.F.T., and Telex; internal book transfers; and the institution's own lending, investment, and check processing operations. While it may not be feasible or reasonable to monitor all transactions from all areas, material thresholds should be established by the institution as criteria for monitoring individual transactions or aggregate transactions for a single customer that could put the institution at risk. The files should clearly document the reasons for including or excluding other areas and justify threshold limits sets.

Once customers have been identified and individual transaction limits set, the institution's ability to monitor and control the funds positions of its customers can be determined. The following checklist identifies the adequacy of controls:

| | Yes | No |
|---|---|---|
| 1. Does the system for monitoring positions of customers cover: | | |
| a. All significant sources generating customer account entries? | | |
| b. Total transactions over an established dollar limit? | | |
| c. Overdraft limits? | | |
| d. Single transfer limits? | | |
| 2. Does the system halt any transaction in excess of established limits from further processing until appropriate action is taken? | | |
| 3. If documentation of action taken with regard to over-limit transactions reflects consistent exceptions attributed to a customer, is analysis of those accounts intensified? | | |
| 4. Are reviews of the funds transfer environment conducted by internal or external auditors at least annually? (These reviews should conform to the standards established by the Bank Administration Institute and the Federal Financial Institutions Examination Council) | | |

Institutions must be able to respond positively to all questions in this section on monitoring customer positions if they are honestly to evaluate their control as satisfactory or strong. These ratings should be obtained as follows:

*Rating for Customer Monitoring System and Controls*

1. *Strong*—Responses to all of the above are positive and comprehensive customer monitoring is in force *for both debits and credits* on a real-time basis or at intervals of 15 minutes or less.[8]

2. *Satisfactory*—Responses to all of the above are positive and comprehensive customer monitoring is in force for all debit transactions greater than or equal to the monitoring threshold on a real-time basis or at intervals of 30 minutes or less.

3. *Unsatisfactory*—Any other condition.

OVERALL RATING FOR OPERATIONAL CONTROLS, POLICIES, AND PROCEDURES

| Monitoring Institution Positions | Monitoring Customer Positions and Controls | Overall Rating |
|---|---|---|
| Strong | Strong | Strong. |
| Strong | Satisfactory | Satisfactory. |
| Satisfactory | Strong | Satisfactory. |
| Satisfactory | Satisfactory | Satisfactory. |
| Either Rated Unsatisfactory | | Unsatisfactory. |

III. Credit Policies and Procedures

A simple two-way classification system for credit policies and procedures should be used. All institutions should have explicit, written credit policies and the necessary internal procedures in place to implement these policies. Failure to have such policies

and procedures puts all participants in the payments system at risk, and should preclude a satisfactory overall rating and its associated debit cap limit regardless of the ratings for creditworthiness or monitoring capabilities.

The following checklist identifies the adequacy of credit policies and procedures:

| | Yes | No |
|---|---|---|
| 1. Does the institution have a written credit policy detailing normal and exception approval and exporting procedures for all loans and credit commitments, including daylight overdraft and bilateral limits and other special facilities? | | |
| 2. Are all facilities and exposures approved as part of acknowledged aggregate exposures to individual bank and commercial customers? | | |
| 3. Does the institution use monitoring systems which identify usage in excess of approved facilities and provide adequate information for review and evaluation of such usage on a timely basis? | | |
| 4. Does the institution have exception identification and approval systems which are tailored to the speed, volume, and size of credit approvals required by its payment system generated exposures? | | |
| 5. Are the institution's review systems geared to single out and take action on deteriorating risk situations? | | |
| 6. Does senior management periodically review and take action on aggregate exposures over a finite limit? | | |
| 7. Are all controls and procedures reviewed and tested by the institution's internal auditors? | | |
| 8. Is adequate training available and required for operations, credit, and account officer staff responsible for monitoring the intra-day overdraft exposure system of the institution? | | |

In completing the checklists, negative responses should not be explained away in order to obtain a satisfactory self assessment except under extremely unusual circumstances. Institutions that attempt to explain shortcomings will be scrutinized very closely by the examiners.

IV. Overall Assessment

The three component evaluations can be combined into a single overall assessment using the following table:

| Credit policies and procedures | Operational controls policies and procedures | Credit worthiness | Overall assessment |
|---|---|---|---|
| Satisfactory | Strong | A | High cap. |
| Do | do | B | Above average cap. |
| Do | do | C | Average cap. |
| Do | do | D | No cap. |
| Satisfactory | Satisfactory | A or B | Above average cap. |
| Do | do | C | Average cap. |
| Do | do | D | No cap. |
| Satisfactory | Unsatisfactory | Any | No cap. |
| Unsatisfactory | Strong or Satisfactory | Any | No cap. |
| Unsatisfactory | Unsatisfactory | Any | No Cap |

In completing the assignment for U.S. branches and agencies of foreign banks that are part of a single family operating in more than one state, a single assessment for the

---

[8] If an institution monitors on a worst case basis, that is debits only, a strong rating may still be justified if the limits established are no higher than those appropriate for monitoring a net position.

family should be conducted. If more than one branch or agency has access to a large-payments system, the adequacy of operational controls for each access point should be assessed separately and combined into a single assessment. A single cap should then be determined and divided among the entities having access. The file documenting the assessment and its division among the separate entities should be available to examiners in the office through which the Federal Reserve exercises its oversight responsibilities under the International Bank Act.

[FR Doc. 85–12313 Filed 5–21–85; 8:45 am]
BILLING CODE 6210-01-M

[Docket No. R–0515B]

**Request for Comments on Proposals Regarding Automated Clearing Houses**

AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Request for comments.

SUMMARY: In a related action today (Docket No. R–0515), the Board issued a statement of its policy to reduce risks on large-dollar electronic funds transfer systems. The Board did not, however, resolve the issues of risks arising from automated clearing house (ACH) transactions. The Board is requesting, therefore, comment on issues relating to risks inherent in such transfers.

DATE: Comments must be received by August 15, 1985.

ADDRESS: Comments, which should refer to Docket No. R–0515B should be addressed to Mr. William W. Wiles, Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW, Washington, D.C. 20551, or delivered to room B–2223 between 8:45 A.M. and 5:15 P.M. Comments received may be inspected in room B–1122 between 8:45 A.M. and 5:15 P.M., except as provided in § 261.6(a) of the Board's Rules Regarding Availability of Information, 12 CFR 261.6(a).

FOR FURTHER INFORMATION CONTACT: Edward C. Ettin, Deputy Director (202–452–3368), David B. Humphrey, Assistant Director (202–452–2557), Terrence Belton, Economist (202–452–2444), Division of Research and Statistics; Elliott C. McEntee, Associate Director (202–452–2231), Florence M. Young, Adviser (202–452–3955), Nancy R. Wesolowski, Operations Analyst (202–452–3437), Division of Federal Reserve Bank Operations; Joseph R. Alexander, Attorney (202–452–2489), Legal Division; Jeffrey C. Marquardt, Economist (202–452–2360), Division of International Finance; Anthony G. Cornyn, Assistant Director (202–452–

3450), Division of Banking Supervision and Regulation; or Joy W. O'Connell, TDD (202–452–3244).

SUPPLEMENTARY INFORMATION: Over the past several years, the Board has become increasingly concerned with the risks that large-dollar payments systems present to depository institutions using them, to the banking system, and to other sectors of the economy. In March, 1984, the Board issued for public comment a series of proposals to reduce and control these risks. In a related action today (Docket No. R–0515), the Board issued a statement of the policy it has formulated to reduce these risks. The Board's policy, reflecting the need for flexibility and the desires of those who commented, relies heavily on the efforts of participants to identify, control, and reduce their own risks.

Since the automated clearing house (ACH) mechanism was designed in the early 1970s, it has been considered to be a substitute for recurring consumer payments that are typically made by paper check. All ACH payments are value dated, with settlement occurring one or two days after transactions are submitted to a Federal Reserve Bank or a privately-operated ACH. In addition, to encourage consumer acceptance, credit transactions,[1] such as salary and pension payments, are generally treated as irrevocable payments on the settlement date, that is, the credits are made available to the receiving depository institutions at the opening of business on the settlement date and cannot generally be revoked. In this respect, ACH credit transactions are like Fedwire transfers. Federal Reserve ACH debit transactions,[2] such as mortgage and insurance premium payments, are treated as provisional payments and, like checks, they may be returned if funds are not in the account. It should be noted that ACH participants appear to treat both ACH debit and credit transactions processed by privately operated ACHs like transactions processed by the Federal Reserve.

Because the ACH has been viewed as a small-dollar payment system, the issue of financial risk to ACH participants and operators had not been a serious concern. The characteristics of the ACH mechanism, however, are beginning to change. Improvements in automated systems have resulted in shorter processing times. Further, both the Federal Reserve and privately operated

ACHs have been considering offering same-day ACH services with considerably more attractive deposit times than are presently available. Besides the improvements being made in processing times, the types of payments made through the ACH are changing. Corporations are now using the ACH to concentrate balances at lead banks, to fund accounts of geographically dispersed operating units, to repay loans, and to make vendor payments. These new uses for the ACH mechanism have contributed to the increasing number of large-dollar payments processed.

Currently, payments amounting to $1.0 million and more are regularly processed through the ACH. Based on a one-week survey conducted during January, 1985, approximately 900 ACH transactions amounting to $1.0 million or more were processed daily. While these transactions represented only about 0.1 percent of the daily average number of commercial ACH payments, they accounted for nearly 50 percent of the daily average dollar value of such ACH payments. The majority of these transactions were revocable debit transactions. Only 5 percent were credit transactions, and they accounted for about 3 percent of the daily average dollar value of commercial ACH payments.

Some of the changes that are being observed in the ACH have been encouraged by the Federal Reserve and ACH associations, because they improve the efficiency of the nation's payments mechanism. For example, the use of ACH cash concentration debits to accumulate funds at corporations' lead banks is more timely, more reliable, and less costly than the use of paper depository transfer checks. Similarly, the use of ACH corporate trade payments is expected to lead to significant operating efficiencies. Both cash concentration debits and corporate trade payments tend to be fairly high value payments.

The difference between the Federal Reserve's fees for ACH and Fedwire transactions also provides incentives for depository institutions to use the ACH for large-dollar transfers that are not time-critical. The Federal Reserve assesses depository institutions transaction fees of 1.0 cent and 1.8 cents to originate ACH intra- and interregional payments, respectively, and 55 cents to send a Fedwire. Fixed fees are also assessed to originators of ACH and Fedwire transactions. Therefore, the total cost of originating either type of payment varies across depository institutions based on

---

[1] When credit transactions are sent through the ACH, funds are transferred from the originator to the receiver.

[2] When debit transactions are processed, funds are transferred from the originator to the receiver.

transaction volumes, but is typically much lower for ACH transactions.

Finally, the proposed ex post monitoring procedures for large-dollar funds transfer systems are likely to provide incentives for some depository institutions to use the ACH as a substitute for funds transferred over large-dollar networks. Specifically, the ex post monitoring procedures for daylight overdrafts measure only wire transfers of funds as they occur. All other "off-line" transactions, including check, ACH, and definitive securities, are netted and are posted ex post at either the opening or closing of business. To give depository institutions the greatest benefit or least disadvantage, if the sum of "off-line" transactions results in a net credit, the net credit is posted in the ex post monitoring system as though it occurred at the opening of business. If the sum results in a net debit, it is posted as though it occurred at the close of business. Therefore, if a depository institution repaid federal funds borrowings or originated other large-dollar credit payments over the ACH— all of which are irrevocable to the receiver—the debits to the originator's reserve account would be measured in the ex post monitoring system with other "off-line" transactions. If the net of these transactions were a debit, it would be posted at the end of the day, with no impact on the intra-day debit position of the sender. As a result, the procedures would enable depository institutions to circumvent the sender net debit caps placed on wire transfer systems.

Thus, it appears that the ACH may be evolving into a payments mechanism with many similarities to large-dollar funds transfer systems. The financial risks, however, are difficult to quantify. In cases where depository institutions make funds available to customers for ACH credit transactions before the payments are final, they are exposed to temporal risk because they may not be able to collect from the sender at the time of settlement. In addition, ACH participants may be exposed to risk in handling ACH debit transactions. While ACH debit transactions are treated as provisional payments by the Federal Reserve, it is not clear that originators of debit transactions always treat the funds received as provisional to their customers. If depository institutions treat the funds as final and make them available to their customers, they may not be able to recover the funds if the receiving institution returns the transaction. If a depository institution were unable to recover funds from a customer for a return of a large cash concentration debit, it could affect the

institution's liquidity and its ability to settle for other payments or other settlement arrangements.

Because of the changes occurring in the ACH mechanism and the increasing use of the ACH for large-dollar payments, the Board believes that it should undertake a thorough review of ACH risk. Pending completion of the study, the Board has decided to postpone further consideration of same-day finality for ACH services. In addition, until this study is completed, the Board believes its ex post monitoring procedures to calculate depository institutions' intra-day net debit positions should be modified in order to (1) recognize the potential risks associated with ACH transactions processed by both the Federal Reserve and privately operated ACHs, and (2) inhibit the use of the ACH to circumvent risk reduction policies. Specifically, the Board plans to make the following modifications to its ex post monitoring procedures: (1) Post the gross debits resulting from the origination of ACH credit transactions and the gross credits resulting from the receipt of credit transactions at the opening of business on the settlement date, and (2) post the gross credits resulting from the origination of debit transactions and the gross debits resulting from the receipt of debit transaction at the close of business on the settlement date.[5] This procedure would result in posting the net of ACH credit transactions in the ex post monitoring system at the opening of business on the settlement date and in posting the net of ACH debit transactions at the close of business on the settlement date.

In order to assist the Board in its consideration of ACH risk, the public is requested to respond to the following questions:

1. Should the ACH be used for handling large-dollar payments?

(a) If it should not be, what controls should be implemented to limit its use to small-dollar payments? For example,

(1) Should restrictions on the dollar amount of ACH credit and/or debit transactions processed by the Federal Reserve and privately operated ACHs be imposed?

(i) Should restrictions be set for the gross dollar amounts of all transactions, the daily overage dollar amount of all transaction, the dollar value per deposit or file, the dollar value per batch, or the dollar value of individual transactions?

(ii) At what dollar value should the cut-off be?

(iii) Should implementation of procedures to limit large-dollar payments be a condition of the Federal Reserve's granting net settlement services to privately operated ACHs?

(2) Should restrictions be placed on the types of transactions processed through the ACH?

(i) Should returns of federal funds be prohibited?

(ii) Should corporate-to-corporate payments, which are frequently large-dollar payments, be prohibited?

(3) How effective would restrictions on dollar amounts and transaction types be?

(b) If the ACH should be used for large-dollar payments, what controls should be implemented?

(1) Should ACH transactions be included in monitoring institutions' sender net debit caps? If so, should ACH credit and debit transactions be treated differently?

(2) Should participants in privately operated ACHs be required to "guarantee" settlement? Should the "guarantee" apply to consumer/small-dollar payments only and/or to corporate/large-dollar payments, or both?

(3) Should controls be placed on large-dollar ACH transactions only, that is, transactions over $25,000, over $100,000, or $500,000?

2. Currently, funds provided to receivers of ACH credit transactions processed by Reserve Banks are generally treated as final payments at the opening of business on the settlement date. Funds provided to originators of ACH debit transactions processed by the Reserve Banks are posted on the settlement date but are considered provisional payments until the business day following the settlement date. Net settlement entries, reflecting the net of both debit and credit transactions, for privately operated ACHs are posted on the settlement date, but are generally considered provisional payments until the business day following the settlement date.

(a) How does your institution treat credits received as the result of originating debit transactions for customers? Are the funds treated as provisional or final payments? Are there differences in the treatment of retail and wholesale payments or in the treatment of small-dollar and large-dollar payments? Are holds placed on the funds?

(b) If your institution participates in a privately operated ACH, are funds

---

[5] This posting procedure is for ex post monitoring only and will in no way change the time that actual settlement entries are made or the time that ACH transactions become final.

treated as provisional or final payments to customers before the Federal Reserve net settlement entries become final? Are credit payments received for consumers and corporations treated differently?

(c) Should the Federal Reserve change the way it treats ACH credit transactions, that is, treat credit transactions as provisional until the business day following the settlement date rather than as final at the opening of business on the settlement date?

(d) If all ACH transactions, both debits and credits, were treated as provisional payments, how would use of the ACH be affected? Would your institution make any changes in the way it currently handles incoming ACH credit transactions, such as modifying funds availability policies?

(e) Should net settlement services provided to privately operated ACHs provide same-day or next-day finality for net settlement entries? If net settlement entries are considered provisional until the business day following settlement date, what risks if any would your institution face?

3. What is your institution's perception of the degree of ACH risk associated with cash concentration debits and disbursements, corporate trade payments, and so forth? Do you believe that there are different degrees of risk associated with debit versus credit transactions?

4. Does your institution monitor or limit the dollar amounts and/or types of ACH transactions that are originated for your customers?

5. How does your institution see the changes occuring in the ACH—such as the use of the ACH for large-dollar payments and the potential for same-day ACH—affecting the way it handles ACH transactions?

6. In order to determine whether the interim changes in the Board's ex post monitoring procedures should be adopted as final procedures, please indicate how the interim procedures would affect your institution's use of the ACH and its operating costs?

7. What alternative methods for controlling ACH risk should the Federal Reserve consider in its analysis?

By order of the Board of Governors of the Federal Reserve System, May 17, 1985.

**William W. Wiles,**

*Secretary of the Board.*

[FR Doc. 85–12315 Filed 5–21–85; 8:45 am]

BILLING CODE 8210-01-M

---

**[Docket No. R-0515A]**

**Request for Comments on Proposals Regarding Book-Entry Securities Transfers**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Request for comments.

**SUMMARY:** In a related action today (Docket No. R–0515), the Board issued a statement of its policy to reduce risks on large-dollar electronic funds transfer systems. The Board did not, however, resolve the issues of risks arising from the transfers of book-entry securities on Fedwire. The Board is requesting, therefore, comment on issues relating to risks inherent such transfers.

**DATE:** Comments must be received by August 15, 1985.

**ADDRESS:** Comments, which should refer to Docket No. R–0515A should be addressed to Mr. William W. Wiles, Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW., Washington, D.C. 20551, or delivered to room B–2223 between 8:45 A.M. and 5:15 P.M., except as provided in § 261.6(a) of the Board's Rules Regarding Availability of Information, 12 CFR 261.6(a).

**FOR FURTHER INFORMATION CONTACT:** Edward C. Ettin, Deputy Director (202-452-3368), David B. Humphrey, Assistant Director (202-452-2557), Terrence Belton, Economist (202-452-2444), Division of Research and Statistics; Elliott C. McEntee, Associate Director (202-452-2231), Florence M. Young, Adviser (202-452-3955), Nancy R. Wesolowski, Operations Analyst (202-452-3437), Division of Federal Reserve Bank Operations; Joseph R. Alexander, Attorney (202-452-2489), Legal Division; Jeffrey C. Marquardt, Economist (202-452-2360), Division of International Finance; Anthony G. Cornyn, Assistant Director (202-452-3450), Division of Banking Supervision and Regulation; or Joy W. O'Connell, TDD (202-452-3244).

**SUPPLEMENTARY INFORMATION:** Over the past several years, the Board has become increasingly concerned with the risks that on large-dollar payments systems present to depository institutions using them, to the banking system, and to other sectors of the economy. In March, 1984, the Board issued for public comment a series of proposals to reduce and control these risks. In a related action today (Docket No. R–0515), the Board issued a statement of the policy it has formulated to reduce these risks. The Board's policy, reflecting the need for flexibility and the desires of those who

commented, relies heavily on the efforts of participants to identify, control, and reduce their own risks.

In formulating its policies to reduce risks on large-dollar payments systems and control daylight overdrafts of Fedwire, the Board has always been concerned about the impact that overdraft restrictions could have on the U.S. government securities market. The smooth functioning of this maket is vital both to the conduct of monetary policy through Federal Reserve open market operations and to the efficient funding of the federal debt. Consequently the Board has thus far exempted from quatiative overdraft controls those Fedwire daylight overdrafts resulting from the transfer of book-entry securities.[1] The Board originally had hoped to develop a plan whereby such overdrafts would be collateralized with the underlying securities being transferred. It appears, however, that depository institutions might not be authorized to pledge all of these securities because of arrangements they may have with their customers. Moreover, operational considerations related to tracking the specific security that caused, and therefore secured, a particular overdraft amount rendered this process unworkable.

The Board has developed, and is requesting comment on, a proposal to control the risks associated with daylight overdrafts resulting from the transfer of book-entry securities. The plan would require institutions incurring book-entry related overdrafts to select one of three collateralization options:

**Option 1. No Separate Collateral**

Under this option, daylight overdrafts on Fedwire resulting from book-entry securities transactions would not be differentiated from other daylight overdrafts. Each institution's sender net debit cap would be applicable to the sum of their securities overdrafts and other ("funds") daylight overdrafts across all wire systems.

The Board expects that most of the over 1,000 institutions that make book-entry securities transfers would elect this option. Securities transfers represent a small portion of most

---

[1] Such overdrafts are defined to occur when the institution receiving book-entry securities has received more book-entry securities against payment at a point in time than it has sent. Since receipt of a book-entry security and Fedwire payment to the sender are simultaneous, the sender of the security receives Fedwire payment regardless of the securities overdraft position of the receiver of the securities. The definition used for a book-entry securities overdraft means that such an overdraft could occur even while the receiver's funds account was in credit balance.

institutions' business activity. Thus, there would be little benefit for these institutions in establishing the collateralization and tracking procedures associated with the other options.

## Option 2. Stable Pool of Collateral

This option would allow institutions to establish a separate pool of collateral [2] held at the Reserve Bank to secure any daylight overdrafts arising from their book-entry securities business. Collateral in this pool would be pledged by the institution to the Federal Reserve, and the pledged securities or other assets in this account would not be eligible for transfer during the regular business day. Changes in the account could be made overnight. Securities overdrafts in excess of the value of the stable pool would be included with "funds" daylight exposures and covered by the net debit caps that apply to such exposures.

A separate pool of collateral would be useful in correspondent banks that engage in a sizeable securities transfer business but may not have the right to pledge customer book-entry securities being transferred, as required by option 3, below. These institutions generally separate their securities traffic and related funds transactions from other business activity, and their securities-related overdrafts would be too large to be accommodated within the caps that will apply to their other daylight exposures. Therefore, a separate securities collateral pool would be essential to controlling and managing their securities related risks.

## Option 3. Pledge Account

Under this option, each institution would enter into an agreement with its Reserve Bank providing for the creation of a special book-entry securities account for deposit of securities that the institution would warrant it has authority to pledge to the Reserve Bank to secure daylight overdrafts. Consequently, each institution would have a minimum of two securities accounts—one to hold pledged securities ("Pledge Account") and one to hold securities ineligible for pledge to the Reserve Bank. The Reserve Bank would rely on the institution's warranty of authority to pledge, which would cover both securities owned by the institution and customer securities that the institution has a right to pledge by virtue of its intra-day credit agreements with its customers. It would be the

[2] Such as collateral already on deposit at Reserve Banks to secure potential discount window advances.

institution's obligation to instruct customers to direct their senders to deliver eligible securities to the Pledge Account. It would also be the institution's responsibility to transfer ineligible securites out of the Pledge Account promptly upon learning of their ineligibility.

On the basis of this agreement, the Reserve Bank would permit the institution to incur a securities-related overdraft. To determine when an overdraft occurs, a separate dollar balance would be kept for securities transactions. At the beginning of each day, a separate securties dollar balance of zero ($0) would be established for each institution, and such balance would be recorded separately from other activity in the account while the securities wire is open. A securities-related overdraft would occur when the payments for securities received exceeds the dollar credits posted to the securities dollar balance. The occurrence of a securities-related overdraft will automatically trigger the pledge of securities deposited in the Pledge Account.

During the day, the institution may continue to run a securities-related overdraft provided that the Pledge Account contains securities of a value equal to the overdraft. If an incoming transfer of securities ineligible for pledge would increase the securities-related overdraft beyond the value of the collateral, a separate pool of non-transferrable collateral provided specifically for securities transfers could be used to secure the remaining exposure. Overdrafts above the sum of the pledged book-entry and definitive collateral pool would be included in "funds only" overdrafts subject to the institution's sender net debit cap. In this fashion, the entire securities-related daylight overdraft would either be secured by the pool of pledge-eligible securities, by a separate non-transferrable pool of collateral, or combined with "funds" daylight exposures.

Of the three options presented, this one relies most heavily on the quality of a financial institution's internal management and control. In contrast to the other two approaches, this option does ot result in any de-facto cap on daylight exposure; indeed, this approach can yield a result in which such exposures are limited only by the capacity of banks to collateralize their own credit extensions to dealers. This option also does little to require changes in market practices, such as the intra-day receipt/delivery matching process, that clearly exacerbate the level of

intra-day risk exposure. In that regard, the Board proposes that institutions selecting this option be examined by the Federal Reserve and other bank supervisors to ensure that the collateralization process is property administered by participating banks. Proper administration should both protect the interests of third parties in securities, and encourage changes over time in market practices of large clearing banks in ways that will reduce Reserve Bank and systemic exposure. Such changes and careful supervision of depository institution management and control of the securities clearing business are necessary before the Federal Reserve, federal and state bank supervisors, market participants, and investors can be truly comfortable with this option.

This proposed option differs in a major way from an approach favored by the large clearing institutions. These institutions maintain that the value of the collateral in the Pledge Account will almost certainly not cover securities-related daylight overdraft amounts. This is because some portion of their daylight overdrafts arises out of transactions for trust accounts or involves securities that cannot be pledged to the Reserve Bank. The clearing banks maintain, however, that they should have enough collateral in the Pledge Account to secure about 90 percent of their securitires-related daylight overdraft, and have argued that option 3 should provide a percentage of unsecured credit of at least 10 percent for book-entry overdrafts. The purpose of this unsecured credit would be to provide flexibility to the large clearers, and to avoid as much as possible any mixing of their securities business with other funding activity. They do agree, however, that if collateral value in the Pledge Account fell below 90 percent of the overdraft, the remaining amounts would be covered by a separate pool of securities, or be combined with other funds exposures under the applicable net debit cap.

Another issue is whether it would be necessary to perform a market value check on the securities being transferred by book-entry. Under the current securities transfer process, there is no check that the cash debit associated with a securities transfer has any relationship to the market value of the securities. The transferring institution specifies the purchase price, but it can send securities against no payment, or conceivably, for an amount much greater than the value of the securities. The cash credit for securities being transferred is made simultaneously with the transfer at the purchase price and

the receiving institution is immediately debited for the same amount. This procedure dates from the origins of the book-entry process in the early 1960s. The Federal Reserve assumed the risk of ensuring that the cash credits given to the originators of securities transfers would be ultimately covered by the recipient who would be debited. Clearly, this process is in conflict with the current emphasis on daylight exposure measurement and control.

The Federal Reserve has not previously considered a market value check necessary, but has relied upon sending and receiving institutions to adjust under/and over-payments through the reversal process. However, the possibility that the purchase price and the value of securities being transferred could be seriously out of line provides an opportunity for the seller of securities to acquire, at least temporarily, cash in a fraudulent way. Moreover, this deficiency could seriously undermine the collateralization process recommended under option 3, since the Reserve Banks would have no assurance that collateral amounts held in the Pledge Accounts were actually worth the funds extended to the purchaser for them in the form of a daylight overdraft. Thus, the Board Proposes that the securities transfer system used by Reserve Banks be modified to include a reasonableness check between the purchase price and the market value of the securities being transferred. This may be difficult operationally and require market changes. However, this control deficiency will have to be addressed if the collateralization process is to be meaningful.

The Board requests comments from the public on all aspects of this proposal; specifically:

1. Will the choice among the three options proposed meet the needs of all institutions involved in the book-entry securities market? Will any type of institution or any particular institution be seriously disadvantaged by the collateralization proposal? If so, what further collateralization or other option(s) might be proposed, recognizing that the aim is to secure daylight exposures arising out of securities transfers to the greatest degree possible—or to include such exposure within an institution's sender net debit cap—with the least impact on the government securities markets? Will implementation of any of the proposals have any impact on the ability of market participants to turn items around? Will the proposals require any significant

extension of the time that the securities wire must remain open?

2. What will it cost for an institution to implement the option it would likely choose (please specify the option)? Will the option chosen be costly to operate? If so, will this affect the efficiency of the U.S. government securities market?

3. Should institutions choosing option 3 ("Pledge Account") be allowed an amount of unsecured credit on any overdraft amount as has been indicated is needed by the large clearing institutions? If not, could such institutions supplement the Pledge Account with non-transferrable collateral up to 100 percent of their book-entry securities overdraft? If not, can the amount uncovered be included with all other daylight overdrafts and subject to net debit caps? What are the costs and market implications of these approaches?

4. If the Federal Reserve adopts the proposed market value check on the purchase price of securities being transfered, market participants may also have to adopt such a practice. Are such measures necessary? If so, how much would such a development effort cost?

By order of the Board of Governors of the Federal Reserve System, May 17, 1985.
**William W. Wiles,**
*Secretary of the Board.*
[FR Doc. 85–12314 Filed 5–21–85; 8:45 am]
BILLING CODE 6210-01-M

[Docket No. R-0515C]

## Request for Comments on Net Settlement Arrangements

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Request for comments.

**SUMMARY:** In a related action today (Docket No. R–0515), the Board issued a statement of its policy to reduce risks on large-dollar electronic funds transfer systems. The Board did not, however, resolve the issues of risks arising from the provision of net settlement services to other than large-dollar transfer systems. The Board is requesting, therefore, comment on issues relating to risks inherent to such arrangements.

**DATE:** Comments must be received by August 15, 1985.

**ADDRESS:** Comments, which should refer to Docket No. R–0515C should be addressed to Mr. William W. Wiles, Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, N.W., Washington, D.C. 20551, or delivered to room B-2223 between 8:45 A.M. and 5:15 P.M. Comments received may be inspected in room B-

1122 between 8:45 A.M. and 5:15 P.M., except as provided in § 261.6(a) of the Board's Rules Regarding Availability of Information, 12 CFR 261.6(a).

**FOR FURTHER INFORMATION CONTACT:** Edward C. Ettin, Deputy Director (202–452–3368), David B. Humphrey, Assistant Director (202–452–2557), Terrence Belton, Economist (202–452–2444), Division of Research and Statistics; Elliott C. McEntee, Associate Director (202–452–2231), Florence M. Young, Adviser (202–452–3955), Nancy R. Wesolowski, Operations Analyst (202–452–3437), Division of Federal Reserve Bank Operations; Joseph R. Alexander, Attorney (202–452–2489), Legal Division; Jeffrey C. Marquardt, Economist (202–452–2360), Division of International Finance; Anthony G. Cornyn, Assistant Director (202–452–3450), Division of Banking Supervision and Regulation; or Joy W. O'Connell, TDD (202–452–3244).

**SUPPLEMENTARY INFORMATION:** Over the past several years, the Board has become increasingly concerned with the risks that large-dollar payments systems present to depository institutions using them, to the banking system, and to other sectors of the economy. In March, 1984, the Board issued for public comment a series of proposals to reduce and control these risks. In a related action today (Docket No. R–0515), the Board issued a statement of the policy it has formulated to reduce these risks. The Board's policy, reflecting the need for flexibility and the desires of those who commented, relies heavily on the efforts of participants to identify, control, and reduce their own risks.

Currently, the Federal Reserve provides net settlement services to a variety of private sector clearing arrangements in addition to large-dollar funds transfer networks; *e.g.,* check clearing houses, credit card processors, automated clearing houses (ACHs), and small-dollar funds transfer networks, such as, automated teller machine (ATM) and point-of-sale (POS) networks.

The finality accorded net settlement entries varies. In most cases, net settlement entries that the Federal Reserve processes for large-dollar funds transfer networks are accorded same-day finality. Net settlement entries for some check clearing house arrangements are also treated as final on the business day they are received. Net settlement entries for ATM, POS, and some ACHs are considered provisional until the business day following the receipt of the settlement data.

From the perspective of the Federal Reserve, the potential for financial loss is greater when settlement entries are accorded same-day finality and lower when next-day finality is provided. This is because the risk of loss increases as the time the Reserve banks have to ensure that institutions possess sufficient balances to cover net debit positions is reduced. Conversely, for depository institutions participating in private clearing arrangements, financial risk declines as the time between the exchange of transaction data (or the settlement date in the case of the ACH) and the finality of settlement entries is reduced. Therefore, same day finality reduces temporal risk for participants in private clearing arrangements, shifting that risk to the Federal Reserve. As private sector, temporal risk is reduced, systemic risk is also reduced.

The second factor concerning the risk faced by depository institutions participating in private clearing arrangements is the treatment that they accord the transactions that are exchanged in these arrangements. If funds are made available to customers as the transaction data are received—a common practice for participants on funds transfer networks—or on a specified settlement date—in the case of participants in ACH networks—then the timing of finality for settlement entries directly affects the risk faced by the participating institutions. On the other hand, if the underlying transactions are treated as provisional payments to customers and funds are not made available immediately, the timing of finality of settlement entries may not substantially increase participating institutions' risk.

Because the Board is reconsidering certain aspects of risks associated with providing net settlement services, it is requesting public comment on the following issues:

1. Should the terms of net settlement arrangements vary based on the type of transactions being settled?

(a) If they should vary, should the differences be reflected in the finality accorded settlement entries (same-day or next-day) or be reflected in the controls imposed in the group of depository institutions requesting net settlement services?

(b) If they should vary, what types of settlement should be provided to:

- Privately operated ACHs?
- ATM networks?
- POS networks?
- Check clearing houses?
- Credit card processors?

2. If they should not vary, please explain why.

3. How do the terms of settlement arrangements affect the way your depository institution handles the following underlying transactions, that is, as final or provisional payments:

- ACH transactions?
- ATM transactions?
- POS transactions?
- Checks?
- Credit cards?

4. If the terms of net settlement arrangements do not affect the way your institution handles the underlying transactions, what factors are considered in determining the treatment accorded:

- ACH transactions?
- ATM transactions?
- POS transactions?
- Checks?
- Credit cards?

5. Should institutions participating in private clearing arrangements "guarantee" settlement or provide a means whereby settlement is assured, such as, through the use of insurance, indeminification, or collateral, in the event that one or more participants may be unable to settle? What type of "settlement guarantee" arrangement would be most effective?

By order of the Board of Governors of the Federal Reserve System, May 17, 1985.
William W. Wiles,
*Secretary of the Board.*
[FR Doc. 85-12316, Filed 5-21-85; 8:45 am]
BILLING CODE 6210-01-M

---

[Docket No. R-0515D]

**Request for Comment on Information Collection Request Directed to Automated Clearing Houses**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Request for comments.

**SUMMARY:** In related action today (Docket No. R-0515), the Board issued a statement of its policy to reduce risks on large-dollar electronic funds transfer systems. As part of this policy, the Board has required that automated clearing houses (ACHs) obtaining net settlement services from the Federal Reserve must, among other things, provide the Federal Reserve with certain information. Accordingly, the Board is requesting comment on the parameters of this information collection request.

**DATE:** Comments must be received by June 17, 1985.

**ADDRESS:** Comments, which should refer to Docket No. R-0515D should be addressed to Mr. William W. Wiles, Secretary, Board of Governors of the Federal Reserve System, 20th and C

Streets, N.W., Washington, D.C. 20551, or delivered to room B-2223 between 8:45 A.M. and 5:15 P.M. Comments received may be inspected in room B-1122 between 8:45 A.M. and 5:15 P.M., except as provided in § 261.6(a) of the Board's Rules Regarding Availability of Information, 12 CFR 261.6(a).

A copy of the comments may also be submitted to the OMB desk officer for the Board: Mr. Robert Neal, Office of Information and Regulatory Affairs, Office of Management and Budget, New Executive Office Building, Room 3208, Washington, D.C. 20503.

**FOR FURTHER INFORMATION CONTACT:** Edward C. Ettin, Deputy Director (202-452-3368), David B. Humphrey, Assistant Director (202-452-2557), Division of Research and Statistics; Elliott C. McEntee, Associate Director (202-452-2231), Florence M. Young, Adviser (202-452-3955), Division of Federal Reserve Bank Operations; Joseph R. Alexander, Attorney (202-452-2489), Legal Division; or Joy W. O'Connell, TDD (202-452-3244).

A copy of the request for clearance (SF 83), supporting statement, instructions, and other documents that will be placed into OMB's public docket files once the collection is approved may be requested from the agency clearance officer, whose name appears below. Federal Reserve Board Clearance Officer: Ms. Cynthia Glassman, Division of Research and Statistics, Board of Governors of the Federal Reserve System, Washington, D.C. 20551 (202-452-3829).

**SUPPLEMENTARY INFORMATION:** Over the past several years, the Board has become increasingly concerned about the risks that large-dollar payments systems present to depository institutions using them, to the banking system, and to other sectors of the economy. In a related action today (Docket No. R-0515), the Board issued a statement of the policy it has formulated to reduce these risks.

The Board's policy statement noted that its concern with risks on large-dollar payment systems did not originally encompass the risks posed by ACHs because the ACH was regarded as a small-dollar payments system. Recently, however, the ACH has been evolving in such a way that it appears to be taking on many of the characteristics of large-dollar systems and consequently presents many of the same risks. Accordingly, the Board has directed its staff to undertake a study of ACH risk and is requesting comment on various aspects of such risks. (See Docket No. R-0515B.)

Until the Board's study of ACH risk is complete and the Board has formulated a new policy to deal with such risk, the Board is modifying its procedures for ex post monitoring of intra-day credit exposures to (1) recognize the potential risks associated with ACH transactions processed by both the Federal Reserve and privately operated ACHs, and (2) inhibit the use of the ACH to circumvent the Board's risk reduction policies adopted today. Specifically, the Board intends that, for the purpose of ex post monitoring, gross debits resulting from the origination of credit transactions and gross credits resulting from the receipt of credit transactions will be posted at the Reserve Bank's opening of business on the settlement date, and gross credits resulting from the origination of debit transactions and the gross debits resulting from the receipt of debit transactions will be posted at the Reserve Bank's close of business on the settlement date.[1] This procedure would result in posting the net of ACH credit transactions in the ex post monitoring system at the opening of business on the settlement date and in posting the net of ACH debit transactions at the close of business on the settlement date.

The Board has also determined that privately operated ACHs will not be eligible to receive Federal Reserve net settlement services unless they agree to provide the Federal Reserve with the data necessary to include transactions processed over their networks in the ex post monitoring system. Under the new ex post monitoring proceeding, the information that will be required from each ACH will be the total dollar value for each ACH participant of the following elements: (1) Gross debits resulting from the origination of credit transactions, (2) gross credits resulting from the receipt of credit transactions, (3) gross credits resulting from the origination of debit transactions, and (4) gross debits resulting from the receipt of debit transactions. Beginning September 30, 1985, the information is to be provided to the Reserve Bank providing the net settlement service.

The Board requests comment on the following aspects of this information collection request:

1. Which of the following would be least costly or burdensome:

(a) to provide each of the four data elements for each participant regardless of the amount of each element?

(b) to provide for each participant only the value of the data element when it exceeds a specified amount, e.g., $5,000; $10,000; $25,000; $50,000; $100,000.

2. Given the Board's objectives, is there any way in which it could obtain this information in any less costly or burdensome manner for the purposes of ex post monitoring?

In accordance with section 3507 of the Paperwork Reduction Act of 1980, 44 U.S.C. section 3507, and the regulations issued thereunder, 5 CFR 1320.12, these information collection requests will be submitted to the Board for review under delegated authority from the Office of Management and Budget after consideration of the comments received during the 30 day comment period.

By order of the Board of Governors of the Federal Reserve System, May 17, 1985.

William W. Wiles,
*Secretary of the Board.*

[FR Doc. 85–12317 Filed 5–21–85; 8:45 am]

BILLING CODE 6210-01-M

---

[1] This posting procedure is for ex post monitoring purposes only and will in no way change when actual settlement entries are made and when ACH transactions become final. Generally, funds provided to receivers of ACH credit transactions processed by Reserve Banks are treated as final payments at the beginning of business on the settlement date. Funds provided to originators of ACH debit transactions processed by the Reserve Banks are posted on the settlement date, but are considered provisional payments until the business day following the settlement date.