# EXHIBIT 6

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.



## FEDERAL RESERVE SYSTEM

[Docket No. OP–1191]

### Policy on Payments System Risk

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Notice.

**SUMMARY:** The Board has adopted several revisions to its Policy on Payments System Risk (PSR policy). Specifically, the Board revised its expectations for risk management in payments and securities settlement systems as previously set out in part II of the PSR policy, Policies for Private-Sector Systems, and expanded the scope of this part to cover Federal Reserve payments and securities settlement systems. The Board also reorganized the policy such that the more general Risk Management in Payments and Securities Settlement Systems now constitutes part I of the policy, while Federal Reserve Daylight Credit Policies constitute part II. Finally, the Board has deleted part III of the policy, entitled "Other Policies."

**DATES:** Revisions described in this notice will take effect on January 2, 2005.

**FOR FURTHER INFORMATION CONTACT:** Jeff Stehm, Assistant Director (202) 452–2217, or Doug Conover, Senior Analyst (202) 452–2887, Division of Reserve Bank Operations and Payment Systems; for the hearing impaired only: Telecommunications Device for the Deaf, (202) 263–4869.

**SUPPLEMENTARY INFORMATION:**

### I. Background

On April 26, 2004, the Board requested comment on proposed changes to part II of its Policy Statement on Payments System Risk addressing risk management in payments and securities settlement systems (69 FR 22512). Key aspects of the proposal included an expansion of the policy's scope to include the Federal Reserve Banks' (Reserve Banks) payments and securities settlement services, revised general risk management expectations for all systems subject to the policy, and the incorporation of the *Core Principles for Systemically Important Payment Systems* (Core Principles) and *Recommendations for Securities Settlement Systems* (Recommendations) as the Board's minimum standards for systemically important systems.[1] The proposed changes did not affect part I of the PSR policy, Federal Reserve Daylight Credit Policies, other than to renumber it as part II.

The Board proposed these revisions to update the policy in light of current industry and supervisory risk-management approaches and the recent publication of new international risk-management standards for payments and securities settlement systems. Over the course of several years, the Federal Reserve has worked with other central banks and securities regulators to develop standards to strengthen payments and securities settlement infrastructures. These efforts initially produced the Lamfalussy Minimum Standards, which were incorporated into the Board's PSR policy in 1994.[2] More recently, this work resulted in the publication of the Core Principles and the Recommendations. The Core Principles extend and replace the Lamfalussy Minimum Standards, while the Recommendations provide, for the first time, explicit standards for securities settlement systems.[3]

In addition to establishing specific standards, however, the Core Principles and Recommendations call for central banks to state clearly their roles and policies regarding payments and securities settlement systems, assess compliance with the Core Principles and the Recommendations when overseeing relevant systems, and coordinate with other authorities in overseeing systems. Moreover, the Core Principles and Recommendations are intended to apply to systems operated by central banks as well as the private sector. The policy revisions proposed by the Board in April were designed to meet these and other expectations.

### II. Summary of Comments and Analysis

The Board received eight comments on the proposed policy—three from private-sector payment system operators, two from industry associations, two from commercial banks, and one from the Federal Reserve Bank of Richmond. Comments generally supported the substantive policy revisions set out in the proposal, but varied in regard to the Board's series of specific questions on the policy threshold, the definition of a system, the general policy expectations, and the criteria for determining a systemically important system. Several commenters also discussed risks related to third-party access in ACH systems.

The final policy retains all substantive aspects of the proposed policy. The final policy, however, includes several minor changes that address specific comments. The final policy also includes other editorial and technical corrections, including several changes to make the new introduction consistent with recent revisions to the Federal Reserve Daylight Credit Policies, as published on September 28, 2004 (69 FR 57917). Finally, in an action not proposed in April, the Board also deleted part III of the policy.

*Policy Threshold*

Five of the eight commenters offered specific comments on the $5 billion policy threshold. Three commenters suggested that the threshold be modified to be more inclusive by lowering the threshold or by suggesting additional quantitative or qualitative criteria. One commenter stated that the $5 billion threshold would leave out certain unnamed systems that should be covered by the policy for reasons of both systemic risk and competitive equity. Several commenters specifically supported the threshold, pointing out the current approach would "result in a level playing field" and "ensure a consistent regulatory approach."

In contrast, one commenter suggested that the threshold be modified to be less inclusive, specifically by raising the threshold to $10 billion. This commenter cited the original intent of the $5 billion threshold as described in January 1999 as exempting from the policy smaller systems that are not likely to "pose systemic risks or other significant risk concerns."[4] The commenter argued that the $5 billion threshold was appropriate in 1999, but due to economic growth, the level is no longer appropriate, as some systems with gross settlement near $5 billion per day still pose no systemic risk concerns. This commenter and one other suggested that the threshold be increased periodically.

The Board agrees with the opinions of several commenters who pointed out the value of a simple policy threshold in ensuring a consistent approach and transparent application of the policy. In

---

[1] The Core Principles were developed by the Committee on Payment and Settlement Systems (CPSS) of the central banks of the Group of Ten countries, and the Recommendations were developed by the CPSS in conjunction with the Technical Committee of the International Organization of Securities Commissions (IOSCO). The full reports on the Core Principles and the Recommendations are available at http://www.bis.org.

[2] 59 FR 67534, Dec. 29, 1994. The Lamfalussy Minimum Standards were set out in the "Report of the Committee on Interbank Netting Schemes of the Central Banks of the Group of Ten Countries," published by the Bank for International Settlements in November 1990.

[3] Both sets of standards are part of the Financial Stability Forum's Compendium of Standards that have been widely recognized and endorsed by U.S. authorities as integral to strengthening global financial stability. Both sets of standards were published by the relevant committees for public comment before being adopted in their final form.

[4] 63 FR 34888, June 26, 1998.



Federal Register / Vol. 69, No. 230 / Wednesday, December 1, 2004 / Notices     69927

fact, the $5 billion gross settlement threshold was adopted in response to industry comments in 1998 that largely opposed the use of more complex formulas in favor of a simple, numerical threshold. With regard to the absolute level of the threshold, the Board continues to believe that the $5 billion level appropriately eliminates any administrative burden of complying with the policy for those systems that are unlikely to pose significant risk concerns. The Board sees no reason to modify the existing threshold at this time.

*Definition of a System*

Of the four commenters that specifically addressed the definition of "system" as set out in proposed policy, three agreed that the definition was "reasonable and appropriate," especially the exemption for bilateral relationships, such as in traditional correspondent banking. One commenter, however, suggested that the Board clarify the relationship between the "general definition" of a system and the three characteristics typically "embodied" by such systems. The final policy explains how the Board may use these characteristics in determining whether a particular arrangement meets the policy's definition of a system.

*General Policy Expectations*

All eight commenters expressed support for the general risk management expectations set out in part B of the proposed policy. Several offered strong support for these revisions. Two commenters raised questions about whether risks related to third-party access to payment systems, especially ACH systems, would fall under the general risk-management expectations (these comments are discussed below).

One commenter sought additional clarity on how systems should assess their dependencies and inter-relationships with other payment and securities settlement systems. This same commenter suggested that, where appropriate, oversight efforts associated with the revised policy be conducted through existing bank supervisory programs, citing a minimization in regulatory burden. The final policy elaborates on the Board's expectation that a system understand the risks posed by its various relationships with other systems, and clarifies the Board's intent to minimize unnecessary burden on systems subject to the policy, including coordinating, where possible, any assessments of compliance with the policy with other supervisory attentions to a system. The final policy also clarifies that systems currently falling below the $5 billion threshold for applying the policy, though not subject to the policy, are nonetheless encouraged to implement a sound risk-management framework.

*Criteria for Systemic Importance*

Four of the eight commenters suggested modifications to the criteria for determining "systemically important" systems that were set out in the proposed policy for assessing whether the Core Principles or Recommendations would be applicable to a payments or securities settlement system. Two commenters suggested that the criteria needed more clarity so that systems and their participants can know whether a particular system would be considered systemically important. These same commenters also suggested that the policy include some indicators that suggest when a system is not systemically important. One commenter suggested the inclusion of a seventh criterion, whether "a failure of the system would cause significant or extended loss of investor or consumer confidence." A fourth commenter suggested that the policy clarify whether a system would be considered systemically important if it met only one of the six criteria.

The Board decided to retain the six proposed criteria for systemic importance. These criteria are based upon the description of "systemically important systems" provided in the Core Principles, adjusted to be applicable to securities settlement systems and to provide consistency with the criteria previously set out in the policy for applying the Lamfalussy Standards. Regarding the suggestion that the policy include a list of exclusions or characteristics of systems that are not systemically important, the Board believed that this type of change could introduce unnecessary conflicts with the existing criteria. On whether to add a seventh explicit criterion regarding investor or consumer confidence, the Board believes that these changes would unnecessarily broaden the definition of systemically important in a potentially ambiguous manner, and with possible unintended consequences. For example, such a criterion may suggest that many retail systems, such as debit card, credit card, and ACH systems, be considered systemically important regardless of any limited potential to spread credit and liquidity shocks through the financial system.

To address commenters' concerns about transparency regarding whether the Board considers a particular system to be systemically important for purposes of the PSR policy, the final policy states that the Board will separately inform each system subject to the policy as to whether they are or are not considered systemically important. This revision retains necessary flexibility in the criteria for systemic importance, but provides clarity for each system subject to the policy as to whether the Board expects them to meet the standards for systemically important systems.

*Third-Party Access*

Three commenters focused their comments on the risks regarding "third-party access" to ACH systems. Two of these organizations offered specific suggestions on how to address third-party risks in the ACH. Both suggested that the policy include a requirement that all third-party arrangements be subject to the approval of the sponsoring institution's board of directors or other senior management body. One of the two suggested that ACH operators provide tools for institutions to manage these risks, and controls that should, at a minimum, include gross debit limits. The third commenter did not make these specific suggestions and instead suggested that the Board request comment on a "specific proposal" to address these risks.

The Federal Reserve is interested in risks related to third-party access in ACH networks, and through the Federal Reserve Banks' role as an ACH operator, is taking steps to address these risks. For example, the Federal Reserve Bank presidents recently circulated a letter to depository institutions outlining the risks and possible risk mitigation techniques related to ACH debit originations, including third-party originators. The Federal Reserve Banks also have offered to work with ACH participants and the ACH rule-making body to discuss these risks. The Federal Reserve Banks are also examining possible enhancements to FedACH that could strengthen depository institutions' controls over ACH activity settling through their accounts.

In recent years, however, the Board specifically moved away from addressing outsourcing and third-party access risks in the context of the PSR policy. In August 1995, the Board sought comment on the benefits and costs of adopting third-party access provisions for ACH credit transfers in the PSR policy.[5] The Board's analysis of this issue, however, indicated that the costs, complexity, and operational effect of potential changes outweighed the risk reduction benefits. An ACH third-party access policy was never adopted.

---

[5] 60 FR 42413, Aug. 15, 1995.

Moreover, in April 2001, the Board rescinded the third-party Fedwire access section of the PSR policy, adopted in 1987, stating that such access, when properly managed by depository institutions, poses little additional risk to the Federal Reserve and does not warrant the administrative burden imposed by the third-party access policy.[6] The Board also stated that as part of the ongoing supervisory process, banking organizations are expected to address and manage risks that may arise out of third-party arrangements.[7]

*Deletion of Part III*

Given the changes to the policy that the Board is adopting in this notice and the changes adopted in recent revisions to the policy concerning Federal Reserve Daylight Credit Policies, the Board has decided to delete part III of the PSR policy, entitled Other Policies. Part III encourages, but does not require, depository institutions to use rollovers and continuing contracts in federal funds and Eurodollars to minimize their use of daylight credit in their Federal Reserve accounts. The Board adopted this aspect of the policy in 1989 as guidance for depository institutions. Given the incentives to manage daylight credit provided by the implementation of daylight overdraft fees in 1994, the Board believes that depository institutions have the appropriate incentives to incorporate the practices encouraged in part III into their daylight credit management procedures, and that specific guidance in this area is no longer necessary.

### IV. Regulatory Flexibility Act Analysis

The Board has determined that these revisions to the PSR policy would not have a significant economic impact on a substantial number of small entities. The policy requires payments and securities settlement systems to address material risks in their systems. The policy applies to relatively large systems, *i.e.*, those that expect to settle an aggregate gross value exceeding $5 billion on any day during the next twelve-month period. Thus, the policy is designed to minimize regulatory burden on smaller systems that do not raise material risks. Although small financial institutions may participate in payments or securities settlement systems that are subject to the policy,

---

[6] 66 FR 19165, April 13, 2001.

[7] Federal Reserve and other FFIEC supervisors have issued guidance concerning third-party access risk, and continue to work to identify specific types of ACH flows and businesses that may pose special risks to depository institutions. See SR Ltr. 01–16 (July 3, 2001), SR Ltr. 00–4 (February 29, 2000).

the compliance burden largely falls on system operators and not on individual participants.

### V. Competitive Impact Analysis

The Board has established procedures for assessing the competitive impact of rule or policy changes that have a substantial impact on payments system participants.[8] Under these procedures, the Board will assess whether a change would have a direct and material adverse effect on the ability of other service providers to compete effectively with the Federal Reserve in providing similar services due to differing legal powers or constraints, or due to a dominant market position of the Federal Reserve deriving from such differences. If no reasonable modifications would mitigate the adverse competitive effects, the Board will determine whether the anticipated benefits are significant enough to proceed with the change despite the adverse effects. The PSR policy provides that Reserve Bank payments and securities settlement systems will be treated similarly to private-sector systems and thus should have no material adverse effect on the ability of other service providers to compete effectively with the Federal Reserve Banks in providing payments and securities settlement services.

### VI. Paperwork Reduction Act

In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. ch. 3506; 5 CFR part 1320 Appendix A.1), the Board has reviewed the policy under the authority delegated to the Board by the Office of Management and Budget. No collections of information pursuant to the Paperwork Reduction Act are contained in the revisions to the PSR policy.

### VII. Federal Reserve Policy on Payments System Risk

The PSR policy is revised, effective January 2, 2005, to read as follows:

Introduction
Risks in Payments and Securities Settlement Systems
I. Risk Management in Payments and Securities Settlement Systems
  A. Scope
  B. General Policy Expectations
  C. Systemically Important Systems
    1. Standards for Systemically Important Payments Systems
    2. Standards for Systemically Important Securities Settlement Systems
II. Federal Reserve Daylight Credit Policies
  A. Daylight Overdraft Definition and Measurement
  B. Pricing

---

[8] These procedures are described in "The Federal Reserve in the Payments System," as revised in March 1990 (55 FR 11648, March 29, 1990).

  C. Net Debit Caps
    1. Definition
    2. Cap Categories
      a. Self-Assessed
      b. De minimis
      c. Exempt-From-Filing
      d. Zero
    3. Capital measure
      a. U.S.-Chartered Institutions
      b. U.S. Branches and Agencies of Foreign Banks
  D. Collateralized Capacity
  E. Special Situations
    1. Edge and Agreement Corporations
    2. Bankers' Banks
    3. Limited-Purpose Trust Companies
    4. Government-Sponsored Enterprises and International Organizations
    5. Problem Institutions
  F. Monitoring
    1. Ex Post
    2. Real Time
    3. Multi-District Institutions
  G. Transfer-Size Limit on Book-Entry Securities

### Introduction

Payments and securities settlement systems are critical components of the nation's financial system. The smooth functioning of these systems is vital to the financial stability of the U.S. economy. Given the importance of these systems, the Board has developed this policy to address the risks that payments and securities settlement systems present to the financial system and to the Federal Reserve Banks (Reserve Banks).

In adopting this policy, the Board's objectives are to foster the safety and efficiency of payments and securities settlement systems. These policy objectives are consistent with (1) the Board's long-standing objectives to promote the integrity, efficiency, and accessibility of the payments mechanism; (2) industry and supervisory methods for risk management; and (3) internationally accepted risk management standards and practices for systemically important payments and securities settlement systems.[1]

Part I of this policy sets out the key risk management expectations of the Board that public- and private-sector payments and securities settlement systems should meet in the design and operation of those systems. Under the policy, all payments and securities settlement systems that expect to settle an aggregate gross value exceeding $5 billion on any day during the next twelve months are expected to implement a risk management

---

[1] For the Board's long-standing objectives in the payments system, *see* "The Federal Reserve in the Payments System," September 2001, FRRS 9–1550, available at *http://www.federalreserve.gov/paymentsystems/pricing/frpaysys.htm*.

framework that is appropriate for the risks they pose to the system operator, system participants, and the financial system more broadly. Systemically important payments and securities settlement systems are also expected to meet more specific standards based upon the Core Principles for Systemically Important Payments Systems (Core Principles) and the Recommendations for Securities Settlement Systems (Recommendations), respectively.[2]

Part II of this policy governs the provision of intraday or "daylight" credit in accounts at the Reserve Banks and sets out the general methods used by the Reserve Banks to control their intraday credit exposures. Under this part, the Board expects institutions to manage their Federal Reserve accounts effectively and use Federal Reserve daylight credit efficiently and appropriately, in accordance with this policy.[3] Although some intraday credit may be necessary, the Board expects that, as a result of this policy, relatively few institutions will consistently rely on significant amounts of intraday credit supplied by the Federal Reserve to conduct their business. The Board will continue to monitor the effects of its daylight credit policies on the payments system.

### Risks in Payments and Securities Settlement Systems

The basic risks in payments and securities settlement systems are credit risk, liquidity risk, operational risk, and legal risk. In the context of this policy, these risks are defined as follows.[4]

*Credit Risk.* The risk that a counterparty will not settle an obligation for full value either when due, or anytime thereafter.

*Liquidity Risk.* The risk that a counterparty will not settle an obligation for full value when due.

*Operational Risk.* The risk of loss resulting from inadequate or failed internal processes, people, and systems, or from external events. This type of risk includes various physical and information security risks.

*Legal Risk.* The risk of loss because of the unexpected application of a law or regulation or because a contract cannot be enforced.

These risks arise between financial institutions as they settle payments and securities transactions and must be managed by institutions, both individually and collectively.[5][6] Multilateral payments and securities settlement systems, in particular, may increase, shift, concentrate, or otherwise transform risks in unanticipated ways. These systems also may pose systemic risk to the financial system where the inability of a system participant to meet its obligations when due may cause other participants to be unable to meet their obligations when due. The failure of one or more participants to settle their payments or securities transactions, in turn, could create credit or liquidity problems for other participants, the system operator, or other financial institutions. Systemic risk might lead ultimately to a disruption in the financial system more broadly or undermine public confidence in the nation's financial infrastructure.

These risks stem, in part, from the multilateral and time-sensitive credit and liquidity interdependencies among financial institutions. These interdependencies often create complex transaction flows that, in combination with a system's design, can lead to significant demands for intraday credit, either on a regular or extraordinary basis. Some level of intraday credit is appropriate to ensure the smooth functioning of payments and securities settlement systems. To the extent that financial institutions or the Reserve Banks are the direct or indirect source of such intraday credit, they may face a direct risk of loss if daylight credit is not extinguished as planned. In addition, measures taken by Reserve Banks to limit their intraday credit exposures may shift some or all of the associated risks to private-sector systems.

The smooth functioning of payments and securities settlement systems is also critical to certain public policy objectives in the areas of monetary policy and banking supervision. The effective implementation of monetary policy, for example, depends on both the orderly settlement of open market operations and the efficient distribution of reserve balances throughout the banking system via the money market and payments system. Likewise, supervisory objectives regarding the safety and soundness of depository institutions must take into account the risks payments and securities settlement systems pose to depository institutions that participate directly or indirectly in, or provide settlement, custody, or credit services to, such systems.

Through this policy, the Board expects financial system participants, including the Reserve Banks, to manage appropriately the settlement and systemic risks arising in payments and securities settlement systems, consistent with the smooth operation of the financial system. This policy is designed to fulfill that aim by (1) informing all financial system participants and system operators of the basic risks that arise in the settlement process, and encouraging the management of these risks (2) describing the Board's general expectations for risk management in payment and securities settlement systems subject to this policy, (3) providing explicit risk management standards for systemically important systems, and (4) establishing the policy conditions governing the provision of Federal Reserve intraday credit to account holders. The Board's adoption of this policy in no way diminishes the primary responsibilities of financial system participants generally and settlement system operators, participants, and Federal Reserve accountholders more specifically, to address the risks that may arise through their operation of, or participation in, payments and securities settlement systems.

### I. Risk Management in Payments and Securities Settlement Systems

This part sets out the Board's expectations regarding the management of risk in payments and securities settlement systems, including those operated by the Reserve Banks. The Board will be guided by this part, in conjunction with relevant laws and other Federal Reserve policies, when (1)

---

[2] The Core Principles were developed by the Committee on Payment and Settlement Systems of the central banks of the Group of Ten countries (CPSS) and the Recommendations were developed by the CPSS in conjunction with the Technical Committee of the International Organization of Securities Commissions (IOSCO). The full reports on the Core Principles and the Recommendations are available at http://www.bis.org.

[3] In part II of this policy, the term "institution" will be used to refer to institutions defined as "depository institutions" in 12 U.S.C. 461(b)(1)(A), U.S. branches and agencies of foreign banking organizations, Edge and agreement corporations, and bankers' banks, limited purpose trust companies, government-sponsored enterprises, and international organizations, unless the context indicates a different reading.

[4] These definitions of credit risk, liquidity risk, and legal risk are based upon those presented in the Core Principles and the Recommendations. The definition of operational risk is based on the Basel Committee on Banking Supervision's "Sound Practices for the Management and Supervision of Operational Risk." See these publications at http://www.bis.org for a fuller discussion of these risks.

[5] The term "financial institution," as generally used in part I of this policy, includes organizations, such as depository institutions, securities dealers, and other institutions, that act as intermediaries in financial markets and engage in financial activities for themselves and their customers.

[6] Several existing regulatory and bank supervision guidelines and policies also are directed at institutions' management of the risks posed by interbank payments and settlement activity. For example, Federal Reserve Regulation F (12 CFR part 206) directs insured depository institutions to establish policies and procedures to avoid excessive exposures to any other depository institutions, including exposures that may be generated through the clearing and settlement of payments.

supervising state member banks, bank holding companies, and clearinghouse arrangements, including the exercise of authority under the Bank Service Company Act, where applicable,[7] (2) setting the terms and conditions for the use of Federal Reserve payments and settlement services by system operators and participants, (3) developing and applying policies for the provision of intraday credit to Reserve Bank account holders, and (4) interacting with other domestic and foreign financial system authorities on payments and settlement risk management issues. The Board's adoption of this policy is not intended to exert or create new supervisory or regulatory authority over any particular class of institutions or arrangements where the Board does not currently have such authority.

Where the Board does not have direct or exclusive supervisory or regulatory authority over systems covered by this policy, it will work with other domestic and foreign financial system authorities to promote effective risk management in payments and securities settlement systems. The Board encourages other relevant authorities to consider the principles embodied in this policy when evaluating the payments and securities settlement risks posed by and to the systems and individual system participants that they oversee, supervise, or regulate. In working with foreign financial system authorities, the Board will be guided by Responsibility D of the Core Principles, Recommendation 18 of the Recommendations, and the "Principles for Cooperative Central Bank Oversight of Cross-border and Multi-currency Netting and Settlement Schemes" and related documents.[8] The Board believes these international principles provide an appropriate framework for cooperating with foreign authorities to address risks in cross-border, multicurrency, and, where appropriate, offshore payments and securities settlement systems.

A. Scope

This policy applies to public- and private-sector payments and securities settlement systems that expect to settle a daily aggregate gross value of U.S. dollar-denominated transactions exceeding $5 billion on any day during the next 12 months.[9] For purposes of this policy, a payments or securities settlement system is considered to be a multilateral arrangement (three or more participants) among financial institutions for the purposes of clearing, netting, and/or settling payments or securities transactions among themselves or between each of them and a central party, such as a system operator or central counterparty.[10] In determining whether a particular arrangement meets this definition, the Board may consider, but will not be limited to, whether the arrangement exhibits one or more of the following characteristics: (1) A set of rules and procedures, common to all participants, that govern the clearing or settlement of payments or securities transactions, (2) a common technical infrastructure for conducting the clearing or settlement process, and (3) a risk management or capital structure where at least some losses would be borne by participants rather than the arrangement's operator, central counterparty or guarantor, or shareholders or owners.

These systems may be organized, located, or operated within the United States (domestic systems), outside the United States (offshore systems), or both (cross-border systems) and may involve other currencies in addition to the U.S. dollar (multicurrency systems). The policy also applies to any system based or operated in the United States that engages in the settlement of non-U.S. dollar transactions if that system would be otherwise subject to the policy.[11]

This policy does not apply to bilateral relationships between financial institutions and their customers, such as traditional correspondent banking and correspondent securities clearing arrangements, including, for example, government securities clearing services provided to securities dealers by banks or correspondent clearing services provided by broker-dealers. The Board believes that these relationships do not constitute "a system" for purposes of this policy and that relevant safety and soundness issues associated with these relationships are more appropriately addressed through the supervisory and regulatory process. This policy also does not apply to clearance or settlement systems for exchange-traded futures and options that fall under the oversight of the Commodities and Futures Trading Commission or the Securities and Exchange Commission.

B. General Policy Expectations

The Board expects payments and securities settlement systems within the scope of this policy to implement a risk management framework appropriate for the risks the system poses to the system operator, system participants, and other relevant parties as well as the financial system more broadly. A risk management framework is the set of objectives, policies, arrangements, procedures, and resources that a system employs to limit and manage risk. While there are a number of ways to structure a sound risk management framework, all frameworks should:

• Clearly identify risks and set sound risk management objectives;
• Establish sound governance arrangements;
• Establish clear and appropriate rules and procedures; and,
• Employ the resources necessary to achieve the system's risk management objectives and implement effectively its rules and procedures.

The Board also expects any system it deems to be systemically important both to establish a sound risk management framework and to comply with the more detailed standards set out in Section I.C. The Board will seek to understand how and whether systems subject to this policy achieve a sound risk management framework, and, if relevant, meet the detailed standards for systemically important systems. In addition, the Board encourages systems with settlement activity below the $5 billion threshold, though not subject to this policy, to consider implementing some or all of the elements of a sound risk management framework.[12]

---

[7] 12 U.S.C. 1861 *et seq.*

[8] The "Principles for Cooperative Central Bank Oversight and Multi-currency Netting and Settlement Schemes" are set out in the "*Report of the Committee on Interbank Netting Schemes of the central banks of the Group of Ten countries*" *(Lamfalussy Report)*. The Lamfalussy Report is available at *http://www.bis.org/cpss/cpsspubl.htm*.

[9] The 'next' twelve-month period is determined by reference to the date a determination is being made as to whether the policy applies to a particular system. Aggregate gross value of U.S dollar-denominated transactions refers to the total dollar value of individual U.S. dollar transactions settled in the system which also represents the sum of total U.S. dollar debits (or credits) to all participants prior to or in absence of any netting of transactions.

[10] A system includes all of the governance, management, legal and operational arrangements used to effect settlement as well as the relevant parties to such arrangements, such as the system operator, system participants, and system owners. The types of systems that may fall within the scope of this policy include, but are not limited to, large-value funds transfer systems, automated clearinghouse (ACH) systems, check clearinghouses, and credit and debit card settlement systems, as well as central counterparties, clearing corporations, and central depositories for securities transactions. For purposes of this policy, the system operator is the entity that manages and oversees the operations of the system. For the definition of financial institution, *see* footnote 5.

[11] The daily gross value threshold will be calculated on a U.S. dollar equivalent basis.

[12] The Board may ask a system approaching the policy threshold to provide limited information on trends in its gross settlement activity to determine when that system might become subject to the policy. Systems approaching the threshold should anticipate meeting the expectations of this policy.

*Identify Risks and Set Sound Risk Management Objectives.* The first element of a sound risk management framework is the clear identification of all risks that have the potential to arise in or result from the system's settlement process and the development of clear and transparent objectives regarding the system's tolerance for and management of such risks.

System operators should identify the forms of risk present in their system's settlement process as well as the parties posing and bearing each risk. In particular, system operators should identify the risks posed to and borne by themselves, the system participants, and other key parties such as a system's settlement banks, custody banks, and third-party service providers. System operators should also analyze whether risks might be imposed on other external parties and the financial system more broadly.

In addition, system operators should analyze how risk is transformed or concentrated by the settlement process. System operators should also consider the possibility that attempts to limit one type of risk could lead to an increase in another type of risk. Moreover, system operators should be aware of risks that might be unique to certain instruments, participants, or market practices. System operators should also analyze how risks are correlated among instruments or participants.[13]

Based upon its clear identification of risks, a system should establish its risk tolerance, including the levels of risk exposure that are acceptable to the system operator, system participants, and other relevant parties. The system operator should then set risk management objectives that clearly allocate acceptable risks among the relevant parties and set out strategies to manage this risk. Risk management objectives should be consistent with the objectives of this policy, the system's business purposes, and the type of instruments and markets for which the system clears and settles. Risk management objectives should also be communicated to and understood by both the system operator's staff and system participants.

System operators should re-evaluate their risks in conjunction with any major changes in the settlement process or operations, the instruments or transactions settled, a system's rules or procedures, or the relevant legal and market environments. Systems should review their risk management objectives regularly to ensure that they are appropriate for the risks posed by the system, continue to be aligned with the system's purposes, remain consistent with this policy, and are being effectively adhered to by the system operator and participants.

*Sound Governance Arrangements.* Systems should have sound governance arrangements to implement and oversee their risk management frameworks. The responsibility for sound governance rests with a system operator's board of directors or similar body and with the system operator's senior management. Governance structures and processes should be transparent; enable the establishment of clear risk management objectives; set and enforce clear lines of responsibility and accountability for achieving these objectives; ensure that there is appropriate oversight of the risk management process; and enable the effective use of information reported by the system operator's management, internal auditors, and external auditors to monitor the performance of the risk management process.[14] Individuals responsible for governance should be qualified for their positions, understand their responsibilities, and understand their system's risk management framework. Governance arrangements should also ensure that risk management information is shared in forms, and at times, that allow individuals responsible for governance to fulfill their duties effectively.

*Clear and Appropriate Rules and Procedures.* Systems should implement rules and procedures that are appropriate and sufficient to carry out the system's risk management objectives and that have a well-founded legal basis. Such rules and procedures should specify the respective responsibilities of the system operator, system participants, and other relevant parties. Rules and procedures should establish the key features of a system's settlement and risk management design and specify clear and transparent crisis management procedures and settlement failure procedures, if applicable.[15]

*Employ Necessary Resources.* Systems should ensure that the appropriate resources and processes are in place to allow them to achieve their risk management objectives and effectively implement their rules and procedures. In particular, the system operator's staff should have the appropriate skills, information, and tools to apply the system's rules and procedures and achieve the system's risk management objectives. System operators should also ensure that their facilities and contingency arrangements, including any information system resources, are sufficient to meet their risk management objectives.[16]

The Board recognizes that payments and securities settlement systems differ widely in terms of form, function, scale, and scope of activities and that these characteristics result in differing combinations and levels of risks. Thus, the exact features of a system's risk management framework should be tailored to the risks of that system. The Board also recognizes that the specific features of a risk management framework may entail trade-offs between efficiency and risk reduction and that payments and securities settlement systems will need to consider these trade-offs when designing appropriate rules and procedures. In considering such trade-offs, however, it is critically important that systems take into account the costs and risks that may be imposed on all relevant parties, including parties with no direct role in the system.

To determine whether a system's current or proposed risk management framework is consistent with this policy, the Board will seek to understand how a system achieves the four elements of a sound risk management framework set out above. In this context, it may be necessary for the Board to obtain information from system operators regarding their risk management framework, risk management objectives, rules and procedures, significant legal analyses, general risk analyses, analyses of the credit and liquidity effects of settlement disruptions, business continuity plans, crisis management procedures, and

---

[13] Where systems have inter-relationships with or dependencies on other systems, system operators should also analyze whether and to what extent any cross-system risks arise and who bears them. Examples of such dependencies include, but are not limited to, financial and legal relationships, such as cross-margining, cross-collateralization, or cross-guarantees, operational relationships, such as shared platforms or networks, inter-system links to move transactions between systems, and tiered settlement dependencies (*e.g.* reliance on a second system to settle net obligations).

[14] The internal audit function should be independent of those responsible for day-to-day operational and other business functions.

[15] Examples of key features that might be specified in a system's rules and procedures are controls to limit participant-based risks, such as membership criteria based on participants' financial and operational health, limits on settlement exposures, and the procedures and resources to hedge, margin, or collateralize settlement exposures. Other examples of key features might be business continuity requirements and loss allocation procedures.

[16] Such arrangements may also be subject to various supervisory guidelines, such as the "Interagency Paper on Sound Practices to Strengthen the Resilience of the U.S. Financial System." (68 FR 17809, April 11, 2003)

other relevant documentation.[17] It may also be necessary for the Board to obtain data or statistics on system activity on an ad-hoc or ongoing basis. All information provided to the Federal Reserve for the purposes of this policy will be handled in accordance with all applicable Federal Reserve policies on information security, confidentiality, and conflicts of interest. In seeking to obtain information and in determining whether a system's risk management framework is consistent with this policy, the Board intends to minimize unnecessary burden on systems, and will coordinate its activities, if practicable, with supervisory attentions to the system.

C. Systemically Important Systems

In addition to establishing a risk management framework that includes the key elements described above, the Board expects systemically important payments and securities settlement systems to comply with the detailed standards set out in this section.[18] To determine whether a system is systemically important for purposes of this policy, the Board may consider, but will not be limited to, one or more of the following factors:
• Whether the system has the potential to create significant liquidity disruptions or dislocations should it fail to perform or settle as expected;
• Whether the system has the potential to create large credit or liquidity exposures relative to participants' financial capacity;
• Whether the system settles a high proportion of large-value transactions;
• Whether the system settles transactions for critical financial markets;[19]
• Whether the system provides settlement for other systems;
• Whether the system is the only system or one of a very few systems for settlement of a given financial instrument.

Systemically important systems are expected to meet specific risk management standards because of their potential to cause major disruptions in the financial system. The Board, therefore, expects systemically important payments systems to comply with the standards listed in section I.C.1. Securities settlement systems of systemic importance are expected to comply with the standards listed in section I.C.2. Some systemically important systems, however, may present an especially high degree of systemic risk, by virtue of their high volume of large-value transactions or central role in the operation of critical financial markets. Because all systems are expected to employ a risk management framework that is appropriate for their risks, the Board may expect these systems to exceed the standards set out below.

The Board acknowledges that payments and securities settlement systems vary in terms of the range of instruments they settle and markets they serve. It also recognizes that systems may operate under different legal and regulatory constraints and within particular market infrastructures or institutional frameworks. The Board will consider these factors when assessing how a systemically important system addresses a particular standard.

The Board's standards for systemically important payments and securities settlement systems are based, respectively, on the Core Principles and the Recommendations. The Core Principles and the Recommendations are two examples of recent initiatives pursued by the international financial community to strengthen the global financial infrastructure.[20] The Federal Reserve worked closely with other central banks to develop and draft the Core Principles and with other central banks and securities regulators to develop and draft the Recommendations. These standards are part of the Financial Stability Forum's Compendium of Standards that have been widely recognized, supported, and endorsed by U.S. authorities as integral to strengthening the stability of the financial system.

1. Standards for Systemically Important Payments Systems

1. The system should have a well-founded legal basis under all relevant jurisdictions.
2. The system's rules and procedures should enable participants to have a clear understanding of the system's impact on each of the financial risks they incur through participation in it.
3. The system should have clearly defined procedures for the management of credit risks and liquidity risks, which specify the respective responsibilities of the system operator and the participants and which provide appropriate incentives to manage and contain those risks.
4. The system should provide prompt final settlement on the day of value, preferably during the day and at a minimum at the end of the day.
5. A system in which multilateral netting takes place should, at a minimum, be capable of ensuring the timely completion of daily settlements in the event of an inability to settle by the participant with the largest single settlement obligation.
6. Assets used for settlement should preferably be a claim on the central bank; where other assets are used, they should carry little or no credit risk and little or no liquidity risk.
7. The system should ensure a high degree of security and operational reliability and should have contingency arrangements for timely completion of daily processing.
8. The system should provide a means of making payments which is practical for its users and efficient for the economy.
9. The system should have objective and publicly disclosed criteria for participation, which permit fair and open access.
10. The system's governance arrangements should be effective, accountable and transparent.

2. Standards for Systemically Important Securities Settlement Systems

The CPSS–IOSCO Recommendations apply to the full set of institutional arrangements for confirmation, clearance, and settlement of securities transactions, including those related to market convention and pre-settlement activities. As such, not all of these standards apply to all systems. Moreover, the standards applicable to a particular system also will vary based on the structure of the market and the system's design.

While the Board endorses the CPSS–IOSCO Recommendations in their entirety, its primary interest for

---

[17] To facilitate analysis of settlement disruptions, systems with significant settlement flows may need to develop the capability to simulate credit and liquidity effects on participants and on the system resulting from one or more participant defaults, or other possible sources of settlement disruption. Such simulations may need to include, if appropriate, the effects of changes in market prices, volatilities, or other factors.

[18] The Board will separately inform systems subject to the policy as to whether they are or are not systemically important.

[19] The "Interagency Paper on Sound Practices to Strengthen the Resilience of the U.S. Financial System" defines critical financial markets as the markets for federal funds, foreign exchange, and commercial paper; U.S. government and agency securities; and corporate debt and equity securities.

[20] The Core Principles draw extensively on the previous work of the CPSS, most importantly the Report of the Committee on Interbank Netting Schemes of the Central Banks of the Group of Ten Countries (the Lamfalussy Minimum Standards). The Core Principles extend the Lamfalussy Minimum Standards by adding several principles and broadening the coverage to include systemically important payments systems of all types, including gross settlement systems and hybrid systems, operated by either the public or private sector. The Core Principles also address the responsibilities of central banks in applying the Core Principles.

purposes of this policy is in those standards related to the settlement aspects of securities transactions, including the role of central counterparties and central depositories, the delivery of securities against payment, and related risks.[21] The Board expects that systems engaged in the management or conduct of settling securities transactions and their participants to comply with the expectations set forth in the applicable Recommendations. Securities settlement systems also may wish to consult the *Assessment Methodology for "Recommendations for Securities Settlement Systems"* for further guidance on each standard.[22]

1. Securities settlement systems should have a well-founded, clear and transparent legal basis in the relevant jurisdictions.

2. Confirmation of trades between direct market participants should occur as soon as possible after trade execution, but no later than the trade date (T+0). Where confirmation of trades by indirect market participants (such as institutional investors) is required, it should occur as soon as possible after the trade execution, preferably on T+0, but no later than T+1.

3. Rolling settlement should be adopted in all securities markets. Final settlement should occur no later than T+3. The benefits and costs of a settlement cycle shorter than T+3 should be evaluated.

4. The benefits and costs of a central counterparty should be evaluated. Where such a mechanism is introduced, the central counterparty should rigorously control the risks it assumes.

5. Securities lending and borrowing (or repurchase agreements and other economically equivalent transactions) should be encouraged as a method for expediting the settlement of securities transactions. Barriers that inhibit the practice of lending securities for this purpose should be removed.

6. Securities should be immobilized or dematerialized and transferred by book entry in a central securities depository to the greatest extent possible.

7. Central securities depositories should eliminate principal risk by linking securities transfers to funds transfers in a way that achieves delivery versus payment.

8. Final settlement should occur no later than the end of the settlement day. Intraday or real time finality should be provided where necessary to reduce risks.

9. Central securities depositories that extend intraday credit to participants, including central securities depositories that operate net settlement systems, should institute risk controls that, at a minimum, ensure timely settlement in the event that the participant with the largest payment obligation is unable to settle. The most reliable set of controls is a combination of collateral requirements and limits.

10. Assets used to settle the ultimate payment obligations arising from securities transactions should carry little or no credit or liquidity risk. If central bank money is not used, steps must be taken to protect central securities depository members from potential losses and liquidity pressures arising from the failure of the cash settlement agent whose assets are used for that purpose.

11. Sources of operational risk arising in the clearing and settlement process should be identified and minimized through the development of appropriate systems, controls and procedures. Systems should be reliable and secure, and have adequate, scalable capacity. Contingency plans and backup facilities should be established to allow for the timely recovery of operations and completion of the settlement process.

12. Entities holding securities in custody should employ accounting practices and safekeeping procedures that fully protect customers' securities. It is essential that customers' securities be protected against the claims of a custodian's creditors.

13. Governance arrangements for central securities depositories and central counterparties should be designed to fulfill public interest requirements and to promote the objectives of owners and users.

14. Central securities depositories and central counterparties should have objective and publicly disclosed criteria for participation that permit fair and open access.

15. While maintaining safe and secure operations, securities settlement systems should be cost-effective in meeting the requirements of users.

16. Securities settlement systems should use or accommodate the relevant international communication procedures and standards in order to facilitate efficient settlement of cross-border transactions.

17. Central securities depositories and central counterparties should provide market participants with sufficient information for them to identify and evaluate accurately the risks and costs associated with using the central securities depository or central counterparty services.

18. Securities settlement systems should be subject to transparent and effective regulation and oversight. Central banks and securities regulators should cooperate with each other and with other relevant authorities.

19. Central securities depositories that establish links to settle cross-border trades should design and operate such links to reduce effectively the risks associated with cross-border settlement.

II. Federal Reserve Daylight Credit Policies

This part outlines the methods used to control intraday overdraft exposures in Federal Reserve accounts. These methods include limits on daylight overdrafts in institutions' Federal Reserve accounts and collateralization, in certain situations, of daylight overdrafts at the Federal Reserve.

To assist institutions in implementing this part of the policy, the Federal Reserve has prepared two documents: the *Overview of the Federal Reserve's Payments System Risk Policy on Daylight Credit* (Overview) and the *Guide to the Federal Reserve's Payments System Risk Policy on Daylight Credit* (Guide).[23] The Overview summarizes the Board's policy on the provision of daylight credit, including net debit caps and daylight overdraft fees, and is intended for use by institutions that incur only small and infrequent daylight overdrafts. The Guide explains in detail how these policies apply to different institutions and includes procedures for completing a self-assessment and filing a cap resolution, as well as information on other aspects of the policy.

A. Daylight Overdraft Definition and Measurement

A daylight overdraft occurs when an institution's Federal Reserve account is in a negative position during the business day. The Reserve Banks use an ex post system to measure daylight overdrafts in institutions' Federal Reserve accounts. Under this ex post measurement system, certain transactions, including Fedwire funds transfers, book-entry securities transfers, and net settlement transactions, are posted as they are processed during the business day. Other transactions,

---

[21] The CPSS and the Technical Committee of IOSCO have recently developed a separate set of Recommendations for Central Counterparties, which are intended to supersede those elements of the Recommendations for Securities Settlement Systems that are applicable to central counterparties. The Board will review the new recommendations and determine whether it is appropriate to incorporate them into this policy.

[22] CPSS and Technical Committee of IOSCO (November 2002). Available at http://www.bis.org.

[23] Available at http://www.federalreserve.gov/paymentsystems/PSR.

including ACH and check transactions, are posted to institutions' accounts according to a defined schedule. The following table presents the schedule used by the Federal Reserve for posting transactions to institutions' accounts for purposes of measuring daylight overdrafts.

Procedures for Measuring Daylight Overdrafts [24]

Opening Balance (Previous Day's Closing Balance)

Post throughout business day:
± Fedwire funds transfers.
± Fedwire book-entry securities transfers.
± National Settlement Service entries.

Post throughout business day (beginning July 20, 2006):
+ Fedwire book-entry interest and redemption payments on securities that are not obligations of, or fully guaranteed as to principal and interest by, the United States.[25] [26] [27]
+ Electronic payments for matured coupons and definitive securities that are not obligations of, or fully guaranteed as to principal and interest by, the United States.[28]

Post at 8:30 a.m. eastern time:
± Government and commercial ACH credit transactions.[29]
+ Treasury Electronic Federal Tax Payment System (EFTPS) investments from ACH credit transactions.
+ Advance-notice Treasury investments.
+ Treasury checks, postal money orders, local Federal Reserve Bank checks, and EZ-Clear savings bond redemptions in separately sorted deposits; these items must be deposited by 12:01 a.m. local time or the local deposit deadline, whichever is later.
− Penalty assessments for tax payments from the Treasury Investment Program (TIP).[30]

Post at 8:30 a.m. eastern time and hourly, on the half-hour, thereafter:
± Main account administrative investment or withdrawal from TIP.
± Special Direct Investment (SDI) administrative investment or withdrawal from TIP.
+ 31 CFR part 202 account deposits from TIP.
− Uninvested paper tax (PATAX) deposits from TIP.
− Main account balance limit withdrawals from TIP.
− Collateral deficiency withdrawals from TIP.
− 31 CFR part 202 deficiency withdrawals from TIP.

Post at 8:30 a.m., 1 p.m., and 6:30 p.m. eastern time:
− Main account Treasury withdrawals from TIP.[31]

Post by 9:15 a.m. eastern time:
+ U.S. Treasury and government agency Fedwire book-entry interest and redemption payments.[32]
+ Electronic payments for U.S. Treasury and government agency matured coupons and definitive securities.[33]

Post by 9:15 a.m. eastern time (until July 20, 2006):
+ Fedwire book-entry interest and redemption payments on securities that are not obligations of, or fully guaranteed as to principal and interest by, the United States.[34]
+ Electronic payments for matured coupons and definitive securities that are not obligations of, or fully guaranteed as to principal and interest by, the United States.[35]

Post beginning at 9:15 a.m. eastern time:
− Original issues of Treasury securities.[36]

Post at 9:30 a.m. eastern time and hourly, on the half-hour, thereafter:
+ Federal Reserve Electronic Tax Application (FR–ETA) value Fedwire investments from TIP.

Post at 11 a.m. eastern time:
± ACH debit transactions.
+ EFTPS investments from ACH debit transactions.

Post at 11 a.m. eastern time and hourly thereafter:
±Commercial check transactions, including returned checks.[37, 38]

---

[24] This schedule of posting rules does not affect the overdraft restrictions and overdraft-measurement provisions for nonbank banks established by the Competitive Equality Banking Act of 1987 and the Board's Regulation Y (12 CFR 225.52).

[25] The Reserve Banks act as fiscal agents for certain entities, such as government-sponsored enterprises (GSEs) and international organizations, whose securities are Fedwire-eligible but are not obligations of, or fully guaranteed as to principal and interest by, the United States. The GSEs include Fannie Mae, the Federal Home Loan Mortgage Corporation (Freddie Mac), entities of the Federal Home Loan Bank System (FHLBS), the Farm Credit System, the Federal Agricultural Mortgage Corporation (Farmer Mac), the Student Loan Marketing Association (Sallie Mae), the Financing Corporation, and the Resolution Funding Corporation. The international organizations include the World Bank, the Inter-American Development Bank, the Asian Development Bank, and the African Development Bank. The Student Loan Marketing Association Reorganization Act of 1996 requires Sallie Mae to be completely privatized by 2008; however, Sallie Mae plans to complete privatization by September 2006. Upon privatization, the Reserve Banks will no longer act as fiscal agents for new issues of Sallie Mae securities, and the new Sallie Mae will not be considered a GSE.

[26] The term "interest and redemption payments" refers to payments of principal, interest, and redemption on securities maintained on the Fedwire Securities Service.

[27] The Reserve Banks will post these transactions, as directed by the issuer, provided that the issuer's Federal Reserve account contains funds equal to or in excess of the amount of the interest and redemption payments to be made. In the normal course, if a Reserve Bank does not receive funding from an issuer for the issuer's interest and redemption payments by the established cut-off hour of 4 p.m. eastern time on the Fedwire Securities Service, the issuer's payments will not be processed on that day.

[28] Electronic payments for credits on these securities will post according to the posting rules for the mechanism through which they are processed, as outlined in this policy. However, the majority of these payments are made by check and will be posted according to the established check posting rules as set forth in this policy.

[29] Institutions that are monitored in real time must fund the total amount of their commercial ACH credit originations in order for the transactions to be processed. If the Federal Reserve receives commercial ACH credit transactions from institutions monitored in real time after the scheduled close of the Fedwire Funds Service, these transactions will be processed at 12:30 a.m. the next business day, or by the ACH deposit deadline, whichever is earlier. The Account Balance Monitoring System provides intraday account information to the Reserve Banks and institutions and is used primarily to give authorized Reserve Bank personnel a mechanism to control and monitor account activity for selected institutions. For more information on ACH transaction processing, refer to the ACH Settlement Day Finality Guide available through the Federal Reserve Financial Services Web site at http://www.frbservices.org.

[30] The Reserve Banks will identify and notify institutions with Treasury-authorized penalties on Thursdays. In the event that Thursday is a holiday, the Reserve Banks will identify and notify institutions with Treasury-authorized penalties on the following business day. Penalties will then be posted on the business day following notification.

[31] On rare occasions, the Treasury may announce withdrawals in advance that are based on institutions' closing balances on the withdrawal date. The Federal Reserve will post these withdrawals after the close of Fedwire.

[32] For purposes of this policy, government agencies are those entities (other than the U.S. Treasury) for which the Reserve Banks act as fiscal agents and whose securities are obligations of, or fully guaranteed as to principal and interest by, the United States.

[33] Electronic payments for credits on these securities will post by 9:15 a.m. eastern time; however, the majority of these payments are made by check and will be posted according to the established check posting rules as set forth in this policy.

[34] See footnote 25.

[35] See footnote 33.

[36] Original issues of government agency, government-sponsored enterprise, or international organization securities are delivered as book-entry securities transfers and will be posted when the securities are delivered to the purchasing institutions.

[37] This does not include electronic check presentments, which are posted at 1 p.m. local time and hourly thereafter. Paper check presentments are posted on the hour at least one hour after presentment. Paper checks presented before 10:01 a.m. eastern time will be posted at 11 a.m. eastern time. Presentment times will be based on surveys of endpoints' scheduled courier deliveries and so

± Check corrections amounting to $1 million or more.[39]

+ Currency and coin deposits.

+ Credit adjustments amounting to $1 million or more.[40]

Post at 12:30 p.m. eastern time and hourly, on the half-hour, thereafter:

+ Dynamic investments from TIP.

Post by 1 p.m. eastern time:

+ Same-day Treasury investments.

Post at 1 p.m. local time and hourly thereafter:

− Electronic check presentments.[41]

Post at 5 p.m. eastern time:

+ Treasury checks, postal money orders, and EZ-Clear savings bond redemptions in separately sorted deposits; these items must be deposited by 4 p.m. eastern time.

+ Local Federal Reserve Bank checks; these items must be presented before 3 p.m. eastern time.

± Same-day ACH transactions; these transactions include ACH return items, check-truncation items, and flexible-settlement items.

Post at 6:30 p.m. eastern time:[42]

+ Penalty abatements from TIP.

Post after the close of Fedwire Funds Service:

± All other transactions. These transactions include the following: local Federal Reserve Bank checks presented after 3 p.m. eastern time but before 3 p.m. local time; noncash collection; currency and coin shipments; small-dollar credit adjustments; and all debit adjustments. Discount-window loans and repayments are normally posted after the close of Fedwire as well; however, in unusual circumstances a discount window loan may be posted earlier in the day with repayment 24 hours later, or a loan may be repaid before it would otherwise become due.

Equals: Closing Balance.

B. Pricing

Reserve Banks charge institutions for daylight overdrafts incurred in their Federal Reserve accounts. For each two-week reserve-maintenance period, the Reserve Banks calculate and assess daylight overdraft fees, which are equal to the sum of any daily daylight overdraft charges during the period.

Daylight overdraft fees are calculated using an annual rate of 36 basis points, quoted on the basis of a 24-hour day. To obtain the effective annual rate for the standard Fedwire operating day, the 36-basis-point annual rate is multiplied by the fraction of a 24-hour day during which Fedwire is scheduled to operate. For example, under a 21.5-hour scheduled Fedwire operating day, the effective annual rate used to calculate daylight overdraft fees equals 32.25 basis points (36 basis points multiplied by 21.5/24).[43] The effective daily rate is calculated by dividing the effective annual rate by 360.[44] An institution's daily daylight overdraft charge is equal to the effective daily rate multiplied by the institution's average daily daylight overdraft minus a deductible valued at the deductible's effective daily rate.

An institution's average daily daylight overdraft is calculated by dividing the sum of its negative Federal Reserve account balances at the end of each minute of the scheduled Fedwire operating day by the total number of minutes in the scheduled Fedwire operating day. In this calculation, each positive end-of-minute balance in an institution's Federal Reserve account is set to equal zero.

The daily daylight overdraft charge is reduced by a deductible, valued at the effective daily rate for a 10-hour operating day. The deductible equals 10 percent of a capital measure (see section II.C.3., "Capital measure"). Because the effective daily rate applicable to the deductible is kept constant at the 10-hour-operating-day rate, any changes to the scheduled Fedwire operating day should not significantly affect the value of the deductible.[45] Reserve Banks will waive fees of $25 or less in any two-week reserve-maintenance period. Certain institutions are subject to a penalty fee and modified daylight overdraft fee calculation as described in section II.E.

C. Net Debit Caps

1. Definition

To limit the aggregate amount of daylight credit that the Reserve Banks extend, each institution incurring daylight overdrafts in its Federal Reserve account must adopt a net debit cap, that is, a ceiling on the uncollateralized daylight overdraft position that it can incur during a given interval. If an institution's daylight overdrafts generally do not exceed the lesser of $10 million or 20 percent of its capital measure, the institution may qualify for the exempt-from-filing cap. An institution must be financially healthy and have regular access to the discount window in order to adopt a net debit cap greater than zero or qualify for the filing exemption.

An institution's cap category and capital measure determine the size of its net debit cap. More specifically, the net debit cap is calculated as an institution's cap multiple times its capital measure:

net debit cap = cap multiple × capital measure

Cap categories (see section II.C.2., "Cap categories") and their associated cap levels, set as multiples of capital measure, are listed below:

NET DEBIT CAP MULTIPLES

| Cap category | Single day | Two-week average |
|---|---|---|
| High | 2.25 | 1.50 |
| Above average | 1.875 | 1.125 |
| Average | 1.125 | 0.75 |
| De minimis | 0.40 | 0.40 |
| Exempt-from-filing[46] | $10 million or 0.20 | $10 million or 0.20 |

---

will occur at the same time each day for a particular institution.

[38] Institutions must choose one of two check-credit posting options: (1) All credits posted at a single, float-weighted posting time, or (2) fractional credits posted throughout the day. The first option allows an institution to receive all of its check credits at a single time for each type of cash letter. This time may not necessarily fall on the clock hour. The second option lets the institution receive a portion of its available check credits on the clock hours between 11 a.m. and 6 p.m. eastern time. The option selected applies to all check deposits posted to an institution's account. Reserve Banks will calculate crediting fractions and float-weighted posting times for each time zone based on surveys. Credits for mixed cash letters and other Fed cash letters are posted using the crediting fractions or the float-weighted posting times for the time zone of the Reserve Bank servicing the depositing institution. For separately sorted deposits, credits are posted using the posting times for the time zone of the Reserve Bank servicing the payor institution.

[39] Corrections are account entries made to correct discrepancies detected by a Reserve Bank during the initial processing of checks.

[40] Adjustments are account entries made to correct discrepancies detected by an institution after entries have posted to its account and are made at the request of the institution.

[41] The Federal Reserve Banks will post debits to institutions' accounts for electronic check presentments made before 12 p.m. local time at 1 p.m. local time. The Reserve Banks will post presentments made after 12 p.m. local time on the next clock hour that is at least one hour after presentment takes place but no later than 3 p.m. local time.

[42] The Federal Reserve Banks will process and post Treasury-authorized penalty abatements on Thursdays. In the event that Thursday is a holiday, the Federal Reserve Banks will process and post Treasury-authorized penalty abatements on the following business day.

[43] A change in the length of the scheduled Fedwire operating day should not significantly change the amount of fees charged because the effective daily rate is applied to average daylight overdrafts, whose calculation would also reflect the change in the operating day.

[44] Under the current 21.5-hour Fedwire operating day, the effective daily daylight-overdraft rate is truncated to 0.0000089.

[45] Under the current 21.5-hour Fedwire operating day, the effective daily deductible rate is rounded to 0.0000042.

| Cap category | Single day | Two-week average |
|---|---|---|
| Zero | 0.0 | 0.0 |

NET DEBIT CAP MULTIPLES—Continued

[46] The net debit cap for the exempt-from-filing category is equal to the lesser of $10 million or 0.20 multiplied by the institution's capital measure.

An institution is expected to avoid incurring daylight overdrafts whose daily maximum level, averaged over a two-week period, would exceed its two-week average cap, and, on any day, would exceed its single-day cap.[47] The two-week average cap provides flexibility, in recognition that fluctuations in payments can occur from day to day. The purpose of the higher single-day cap is to limit excessive daylight overdrafts on any day and to ensure that institutions develop internal controls that focus on their exposures each day, as well as over time.

The Board's policy on net debit caps is based on a specific set of guidelines and some degree of examiner oversight. Under the Board's policy, a Reserve Bank may limit or prohibit an institution's use of Federal Reserve intraday credit if (1) the institution's use of daylight credit is deemed by the institution's supervisor to be unsafe or unsound; (2) the institution does not qualify for a positive net debit cap (see section II.C.2., "Cap categories"); or (3) the institution poses excessive risk to a Reserve Bank by incurring chronic overdrafts in excess of what the Reserve Bank determines is prudent.

While capital measures differ, the net debit cap provisions of this policy apply to foreign banking organizations (FBOs) to the same extent that they apply to U.S. institutions. The Reserve Banks will advise home-country supervisors of the daylight overdraft capacity of U.S. branches and agencies of FBOs under their jurisdiction, as well as of other pertinent information related to the FBOs' caps. The Reserve Banks will also provide information on the daylight overdrafts in the Federal Reserve accounts of FBOs' U.S. branches and agencies in response to requests from home-country supervisors.

2. Cap Categories

The policy defines the following six cap categories, described in more detail below: high, above average, average, de minimis, exempt-from-filing, and zero. The high, above average, and average cap categories are referred to as "self-assessed" caps.

a. *Self-assessed.* In order to establish a net debit cap category of high, above average, or average, an institution must perform a self-assessment of its own creditworthiness, intraday funds management and control, customer credit policies and controls, and operating controls and contingency procedures.[48] The assessment of creditworthiness is based on the institution's supervisory rating and Prompt Corrective Action (PCA) designation.[49] An institution may perform a full assessment of its creditworthiness in certain limited circumstances, for example, if its condition has changed significantly since its last examination or if it possesses additional substantive information regarding its financial condition. An institution performing a self-assessment must also evaluate its intraday funds-management procedures and its procedures for evaluating the financial condition of and establishing intraday credit limits for its customers. Finally, the institution must evaluate its operating controls and contingency procedures to determine if they are sufficient to prevent losses due to fraud or system failures. The "Guide to the Federal Reserve's Payments System Risk Policy" includes a detailed explanation of the self-assessment process.

Each institution's board of directors must review that institution's self-assessment and recommended cap category. The process of self-assessment, with board-of-directors review, should be conducted at least once in each twelve-month period. A cap determination may be reviewed and approved by the board of directors of a holding company parent of an institution, provided that (1) the self-assessment is performed by each entity incurring daylight overdrafts, (2) the entity's cap is based on the measure of the entity's own capital, and (3) each entity maintains for its primary supervisor's review its own file with supporting documents for its self-assessment and a record of the parent's board-of-directors review.[50]

In applying these guidelines, each institution should maintain a file for examiner review that includes (1) worksheets and supporting analysis used in its self-assessment of its own cap category, (2) copies of senior-management reports to the board of directors of the institution or its parent (as appropriate) regarding that self-assessment, and (3) copies of the minutes of the discussion at the appropriate board-of-directors meeting concerning the institution's adoption of a cap category.[51]

As part of its normal examination, the institution's examiners may review the contents of the self-assessment file.[52] The objective of this review is to ensure that the institution has applied the guidelines appropriately and diligently, that the underlying analysis and method were reasonable, and that the resultant self-assessment was generally consistent with the examination findings. Examiner comments, if any, should be forwarded to the board of directors of the institution. The examiner, however, generally would not require a modification of the self-assessed cap

---

[47] The two-week period is the two-week reserve-maintenance period. The number of days used in calculating the average daylight overdraft over this period is the number of business days the institution's Reserve Bank is open during the reserve-maintenance period.

[48] This assessment should be done on an individual-institution basis, treating as separate entities each commercial bank, each Edge corporation (and its branches), each thrift institution, and so on. An exception is made in the case of U.S. branches and agencies of FBOs. Because these entities have no existence separate from the FBO, all the U.S. offices of FBOs (excluding U.S.-chartered bank subsidiaries and U.S.-chartered Edge subsidiaries) should be treated as a consolidated family relying on the FBO's capital.

[49] An insured depository institution is (1) "well capitalized" if it significantly exceeds the required minimum level for each relevant capital measure, (2) "adequately capitalized" if it meets the required minimum level for each relevant capital measure, (3) "undercapitalized" if it fails to meet the required minimum level for any relevant capital measure, (4) "significantly undercapitalized" if it is significantly below the required minimum level for any relevant capital measure, or (5) "critically undercapitalized" if it fails to meet any leverage limit (the ratio of tangible equity to total assets) specified by the appropriate Federal banking agency, in consultation with the FDIC, or any relevant capital measure established by the agency to determine when an institution is critically undercapitalized (12 U.S.C. 1831o).

[50] An FBO should undergo the same self-assessment process as a domestic bank in determining a net debit cap for its U.S. branches and agencies. Many FBOs, however, do not have the same management structure as U.S. institutions, and adjustments should be made as appropriate. If an FBO's board of directors has a more limited role to play in the bank's management than a U.S. board has, the self-assessment and cap category should be reviewed by senior management at the FBO's head office that exercises authority over the FBO equivalent to the authority exercised by a board of directors over a U.S. institution. In cases in which the board of directors exercises authority equivalent to that of a U.S. board, cap determination should be made by the board of directors.

[51] In addition, for FBOs, the file that is made available for examiner review by the U.S. offices of an FBO should contain the report on the self-assessment that the management of U.S. operations made to the FBO's senior management and a record of the appropriate senior management's response or the minutes of the meeting of the FBO's board of directors or other appropriate management group, at which the self-assessment was discussed.

[52] Between examinations, examiners or Reserve Bank staff may contact an institution about its cap if there is other relevant information, such as statistical or supervisory reports, that suggests there may have been a change in the institution's financial condition.

category, but rather would inform the appropriate Reserve Bank of any concerns. The Reserve Bank would then decide whether to modify the cap category. For example, if the institution's level of daylight overdrafts constitutes an unsafe or unsound banking practice, the Reserve Bank would likely assign the institution a zero net debit cap and impose additional risk controls.

The contents of the self-assessment file will be considered confidential by the institution's examiner. Similarly, the Federal Reserve and the institution's examiner will hold the actual cap level selected by the institution confidential. Net debit cap information should not be shared with outside parties or mentioned in any public documents; however, net debit cap information will be shared with the home-country supervisor of U.S. branches and agencies of foreign banks.

The Reserve Banks will review the status of any institution with a self-assessed net debit cap that exceeds its cap during a two-week reserve-maintenance period and will decide if the cap should be maintained or if additional action should be taken (see section II.F., ''Monitoring'').

*b. De minimis.* Many institutions incur relatively small overdrafts and thus pose little risk to the Federal Reserve. To ease the burden on these small overdrafters of engaging in the self-assessment process and to ease the burden on the Federal Reserve of administering caps, the Board allows institutions that meet reasonable safety and soundness standards to incur de minimis amounts of daylight overdrafts without performing a self-assessment. An institution may incur daylight overdrafts of up to 40 percent of its capital measure if the institution submits a board-of-directors resolution.

An institution with a de minimis cap must submit to its Reserve Bank at least once in each 12-month period a copy of its board-of-directors resolution (or a resolution by its holding company's board) approving the institution's use of daylight credit up to the de minimis level. The Reserve Banks will review the status of a de minimis cap institution that exceeds its cap during a two-week reserve-maintenance period and will decide if the de minimis cap should be maintained or if the institution will be required to perform a self-assessment for a higher cap.

*c. Exempt-from-filing.* Institutions that only rarely incur daylight overdrafts in their Federal Reserve accounts that exceed the lesser of $10 million or 20 percent of their capital measure are excused from performing self-assessments and filing board-of-directors resolutions with their Reserve Banks. This dual test of dollar amount and percent of capital measure is designed to limit the filing exemption to institutions that create only low-dollar risks to the Reserve Banks and that incur small overdrafts relative to their capital measure.

The Reserve Banks will review the status of an exempt institution that incurs overdrafts in its Federal Reserve account in excess of $10 million or 20 percent of its capital measure on more than two days in any two consecutive two-week reserve-maintenance periods. The Reserve Bank will decide if the exemption should be maintained or if the institution will be required to file for a cap. Granting of the exempt-from-filing net debit cap is at the discretion of the Reserve Bank.

*d. Zero.* Some financially healthy institutions that could obtain positive net debit caps choose to have zero caps. Often these institutions have very conservative internal policies regarding the use of Federal Reserve daylight credit or simply do not want to incur daylight overdrafts and any associated daylight overdraft fees. If an institution that has adopted a zero cap incurs a daylight overdraft, the Reserve Bank counsels the institution and may monitor the institution's activity in real time and reject or delay certain transactions that would cause an overdraft. If the institution qualifies for a positive cap, the Reserve Bank may suggest that the institution adopt an exempt-from-filing cap or file for a higher cap if the institution believes that it will continue to incur daylight overdrafts.

In addition, a Reserve Bank may assign an institution a zero net debit cap. Institutions that may pose special risks to the Reserve Banks, such as those without regular access to the discount window, those incurring daylight overdrafts in violation of this policy, or those in weak financial condition, are generally assigned a zero cap (see section II.E.5., ''Problem institutions''). Recently-chartered institutions may also be assigned a zero net debit cap.

3. Capital Measure

As described above, an institution's cap category and capital measure determine the size of its net debit cap. The capital measure used in calculating an institution's net debit cap depends upon its chartering authority and home-country supervisor.

*a. U.S.-chartered institutions.* For institutions chartered in the United States, net debit caps are multiples of ''qualifying'' or similar capital measures that consist of those capital instruments that can be used to satisfy risk-based capital standards, as set forth in the capital adequacy guidelines of the Federal financial regulatory agencies. All of the Federal financial regulatory agencies collect, as part of their required reports, data on the amount of capital that can be used for risk-based purposes—''risk-based'' capital for commercial banks, savings banks, and savings associations and total regulatory reserves for credit unions. Other U.S.-chartered entities that incur daylight overdrafts in their Federal Reserve accounts should provide similar data to their Reserve Banks.

*b. U.S. branches and agencies of foreign banks.* For U.S. branches and agencies of foreign banks, net debit caps on daylight overdrafts in Federal Reserve accounts are calculated by applying the cap multiples for each cap category to the FBO's U.S. capital equivalency measure.[53] U.S. capital equivalency is equal to the following:

• 35 percent of capital for FBOs that are financial holding companies (FHCs).[54]
• 25 percent of capital for FBOs that are not FHCs and have a strength of support assessment ranking (SOSA) of 1.[55]
• 10 percent of capital for FBOs that are not FHCs and are ranked a SOSA 2.
• 5 percent of ''net due to related depository institutions'' for FBOs that are not FHCs and are ranked a SOSA 3.

Granting a net debit cap, or any extension of intraday credit, to an

---

[53] The term ''U.S. capital equivalency'' is used in this context to refer to the particular capital measure used to calculate net debit caps and does not necessarily represent an appropriate capital measure for supervisory or other purposes.

[54] The Gramm-Leach-Bliley Act defines a financial holding company as a bank holding company that meets certain eligibility requirements. In order for a bank holding company to become a financial holding company and be eligible to engage in the new activities authorized under the Gramm-Leach-Bliley Act, the Act requires that all depository institutions controlled by the bank holding company be well capitalized and well managed (12 U.S.C. 1841(p)). With regard to a foreign bank that operates a branch or agency or owns or controls a commercial lending company in the United States, the Act requires the Board to apply comparable capital and management standards that give due regard to the principle of national treatment and equality of competitive opportunity (12 U.S.C. 1843(l)).

[55] The SOSA ranking is composed of four factors, including the FBO's financial condition and prospects, the system of supervision in the FBO's home country, the record of the home country's government in support of the banking system or other sources of support for the FBO; and transfer risk concerns. Transfer risk relates to the FBO's ability to access and transmit U.S. dollars, which is an essential factor in determining whether an FBO can support its U.S. operations. The SOSA ranking is based on a scale of 1 through 3, with 1 representing the lowest level of supervisory concern.

institution is at the discretion of the Reserve Bank. In the event a Reserve Bank grants a net debit cap or extends intraday credit to a financially healthy SOSA 3-ranked FBO, the Reserve Bank may require such credit to be fully collateralized, given the heightened supervisory concerns with SOSA 3-ranked FBOs.

### D. Collateralized Capacity

The Board recognizes that while net debit caps provide sufficient liquidity to most institutions, some institutions may still experience liquidity pressures. The Board believes it is important to provide an environment in which payment systems may function effectively and efficiently and to remove barriers, as appropriate, to foster risk-reducing payment system initiatives. Consequently, certain institutions with self-assessed net debit caps may pledge collateral to their administrative Reserve Banks to secure daylight overdraft capacity in excess of their net debit caps, subject to Reserve Bank approval.[56,57] This policy is intended to provide extra liquidity through the pledge of collateral to the few institutions that might otherwise be constrained from participating in risk-reducing payment system initiatives.[58] The Board believes that requiring collateral allows the Federal Reserve to protect the public sector from additional credit risk. Additionally, providing extra liquidity to these few institutions should help prevent liquidity-related market disruptions.

An institution with a self-assessed net debit cap that wishes to expand its daylight overdraft capacity by pledging collateral should consult with its administrative Reserve Bank. Institutions that request daylight overdraft capacity beyond the net debit cap must have already explored other alternatives to address their increased liquidity needs.[59] The Reserve Banks will work with an institution that requests additional daylight overdraft capacity to determine the appropriate maximum daylight overdraft capacity level. In considering the institution's request, the Reserve Bank will evaluate the institution's rationale for requesting additional daylight overdraft capacity as well as its financial and supervisory information. The financial and supervisory information considered may include, but is not limited to, capital and liquidity ratios, the composition of balance sheet assets, CAMELS or other supervisory ratings and assessments, and SOSA rankings (for U.S. branches and agencies of foreign banks). An institution approved for a maximum daylight overdraft capacity level must submit at least once in each twelve-month period a board-of-directors resolution indicating its board's approval of that level.

If the Reserve Bank approves an institution's request, the Reserve Bank approves a maximum daylight overdraft capacity level. The maximum daylight overdraft capacity is defined as follows:

maximum daylight overdraft capacity = single-day net debit cap + collateralized capacity.[60]

An institution that has a self-assessed net debit cap and that has also been approved for a maximum daylight overdraft capacity level has a two-week average limit equal to its two-week average net debit cap plus its collateralized capacity, averaged over a two-week reserve-maintenance period. The single-day limit is equal to an institution's single-day net debit cap plus its collateralized capacity. The institution should avoid incurring daylight overdrafts whose daily maximum level, averaged over a two-week period, would exceed its two-week average limit, and, on any day, would exceed its single-day limit. The Reserve Banks will review the status of any institution that exceeds its single-day or two-week limit during a two-week reserve-maintenance period and will decide if the maximum daylight overdraft capacity should be maintained or if additional action should be taken (see section II.F., "Monitoring").

Institutions with exempt-from-filing and *de minimis* net debit caps may *not* obtain additional daylight overdraft capacity by pledging collateral without first obtaining a self-assessed net debit cap. Likewise, institutions that have voluntarily adopted zero net debit caps may *not* obtain additional daylight overdraft capacity by pledging collateral without first obtaining a self-assessed net debit cap. Institutions that have been assigned a zero net debit cap by their administrative Reserve Bank are *not* eligible to apply for any daylight overdraft capacity.

### E. Special Situations

Under the Board's policy, certain institutions warrant special treatment primarily because of their charter types. As mentioned previously, an institution must have regular access to the discount window and be in sound financial condition in order to adopt a net debit cap greater than zero. Institutions that do not have regular access to the discount window include Edge and agreement corporations, bankers' banks that are not subject to reserve requirements, limited-purpose trust companies, government-sponsored enterprises (GSEs), and certain international organizations.[61] Institutions that have been assigned a zero cap by their Reserve Banks are also subject to special considerations under this policy based on the risks they pose. In developing its policy for these institutions, the Board has sought to balance the goal of reducing and managing risk in the payments system, including risk to the Federal Reserve, with that of minimizing the adverse effects on the payments operations of these institutions.

Regular access to the Federal Reserve discount window generally is available to institutions that are subject to reserve requirements. If an institution that is not subject to reserve requirements and thus does not have regular discount-window access were to incur a daylight overdraft, the Federal Reserve might end up extending overnight credit to that institution if the daylight overdraft were not covered by the end of the business day. Such a credit extension would be contrary to the quid pro quo of reserves for regular discount-window access as reflected in the Federal Reserve Act and in Board regulations. Thus, institutions that do not have regular access to the discount window should not incur daylight overdrafts in their Federal Reserve accounts.

Certain institutions are subject to a daylight-overdraft penalty fee levied

---

[56] The administrative Reserve Bank is responsible for the administration of Federal Reserve credit, reserves, and risk management policies for a given institution or other legal entity.

[57] Institutions have some flexibility as to the specific types of collateral they may pledge to the Reserve Banks; however, all collateral must be acceptable to the Reserve Banks. The Reserve Banks may accept securities in transit on the Fedwire book-entry securities system as collateral to support the maximum daylight overdraft capacity level. Securities in transit refer to book-entry securities transferred over the Fedwire Securities Service that have been purchased by an institution but not yet paid for and owned by the institution's customers.

[58] Institutions may consider applying for a maximum daylight overdraft capacity level for daylight overdrafts resulting from Fedwire funds transfers, Fedwire book-entry securities transfers, National Settlement Service entries, and ACH credit originations. Institutions incurring daylight overdrafts as a result of other payment activity may be eligible for administrative counseling flexibility (59 FR 54915–18, Nov. 2, 1994).

[59] Some potential alternatives available to an institution to address increased intraday credit needs include shifting funding patterns, delaying the origination of funds transfers, or transferring some payments processing business to a correspondent bank.

[60] Collateralized capacity, on any given day, equals the amount of collateral pledged to the Reserve Bank, not to exceed the difference between the institution's maximum daylight overdraft capacity level and its single-day net debit cap.

[61] See footnote 25.

against the average daily daylight overdraft incurred by the institution. These include Edge and agreement corporations, bankers' banks that are not subject to reserve requirements, and limited-purpose trust companies. The annual rate used to determine the daylight-overdraft penalty fee is equal to the annual rate applicable to the daylight overdrafts of other institutions (36 basis points) plus 100 basis points multiplied by the fraction of a 24-hour day during which Fedwire is scheduled to operate (currently 21.5/24). The daily daylight-overdraft penalty rate is calculated by dividing the annual penalty rate by 360.[62] The daylight-overdraft penalty rate applies to the institution's average daily daylight overdraft in its Federal Reserve account. The daylight-overdraft penalty rate is charged in lieu of, not in addition to, the rate used to calculate daylight overdraft fees for institutions described in section II.B. Institutions that are subject to the daylight-overdraft penalty fee do not benefit from a deductible and are subject to a minimum fee of $25 on any daylight overdrafts incurred in their Federal Reserve accounts.[63]

1. Edge and Agreement Corporations [64]

Edge and agreement corporations should refrain from incurring daylight overdrafts in their Federal Reserve accounts. In the event that any daylight overdrafts occur, the Edge or agreement corporation must post collateral to cover the overdrafts. In addition to posting collateral, the Edge or agreement corporation would be subject to the daylight-overdraft penalty rate levied against the average daily daylight overdrafts incurred by the institution, as described above.

This policy reflects the Board's concerns that these institutions lack regular access to the discount window and that the parent company may be unable or unwilling to cover its subsidiary's overdraft on a timely basis. The Board notes that the parent of an Edge or agreement corporation could fund its subsidiary during the day over Fedwire or the parent could substitute itself for its subsidiary on private systems. Such an approach by the parent could both reduce systemic risk exposure and permit the Edge or agreement corporation to continue to service its customers. Edge and agreement corporation subsidiaries of foreign banking organizations are treated in the same manner as their domestically owned counterparts.

2. Bankers' Banks [65]

Bankers' banks are exempt from reserve requirements and do not have regular access to the discount window. They do, however, have access to Federal Reserve payment services. Bankers' banks should refrain from incurring daylight overdrafts and must post collateral to cover any overdrafts they do incur. In addition to posting collateral, a bankers' bank would be subject to the daylight-overdraft penalty fee levied against the average daily daylight overdrafts incurred by the institution, as described above.

The Board's policy for bankers' banks reflects the Reserve Banks' need to protect themselves from potential losses resulting from daylight overdrafts incurred by bankers' banks. The policy also considers the fact that some bankers' banks do not incur the costs of maintaining reserves as do some other institutions and do not have regular access to the discount window.

Bankers' banks may voluntarily waive their exemption from reserve requirements, thus gaining access to the discount window. Such bankers' banks are free to establish net debit caps and would be subject to the same policy as other institutions. The policy set out in this section applies only to those bankers' banks that have not waived their exemption from reserve requirements.

3. Limited-Purpose Trust Companies [66]

The Federal Reserve Act permits the Board to grant Federal Reserve membership to limited-purpose trust companies subject to conditions the Board may prescribe pursuant to the Act. As a general matter, member limited-purpose trust companies do not accept reservable deposits and do not have regular discount-window access. Limited-purpose trust companies should refrain from incurring daylight overdrafts and must post collateral to cover any overdrafts they do incur. In addition to posting collateral, limited-purpose trust companies would be subject to the same daylight-overdraft penalty rate as other institutions that do not have regular access to the discount window.

4. Government-Sponsored Enterprises and International Organizations (Beginning July 20, 2006)

The Reserve Banks act as fiscal agents for certain GSEs and international organizations in accordance with federal statutes. These institutions generally have Federal Reserve accounts and issue securities over the Fedwire Securities Service. The securities of these institutions are not obligations of, or fully guaranteed as to principal and interest by, the United States. Furthermore, these institutions are not subject to reserve requirements and do not have regular access to the discount window. GSEs and international organizations should refrain from incurring daylight overdrafts and must post collateral to cover any daylight overdrafts they do incur. In addition to posting collateral, these institutions would be subject to the same daylight-overdraft penalty rate as other institutions that do not have regular access to the discount window.

5. Problem Institutions

For institutions that are in weak financial condition, the Reserve Banks will impose a zero cap. The Reserve Bank will also monitor the institution's activity in real time and reject or delay certain transactions that would create an overdraft. Problem institutions should refrain from incurring daylight overdrafts and must post collateral to cover any daylight overdrafts they do incur.

F. Monitoring

1. Ex Post

Under the Federal Reserve's ex post monitoring procedures, an institution with a daylight overdraft in excess of its maximum daylight overdraft capacity or net debit cap may be contacted by its Reserve Bank. The Reserve Bank may counsel the institution, discussing ways to reduce its excessive use of intraday credit. Each Reserve Bank retains the right to protect its risk exposure from

---

[62] Under the current 21.5-hour Fedwire operating day, the effective daily daylight-overdraft penalty rate is truncated to 0.0000338.

[63] While daylight overdraft fees are calculated differently for these institutions than for institutions that have regular access to the discount window, overnight overdrafts at Edge and agreement corporations, bankers' banks that are not subject to reserve requirements, limited-purpose trust companies, GSEs, and international organizations are priced the same as overnight overdrafts at institutions that have regular access to the discount window.

[64] These institutions are organized under section 25A of the Federal Reserve Act (12 U.S.C. 611–631) or have an agreement or undertaking with the Board under section 25 of the Federal Reserve Act (12 U.S.C. 601–604(a)).

[65] For the purposes of this policy, a bankers' bank is a depository institution that is not required to maintain reserves under the Board's Regulation D (12 CFR part 204) because it is organized solely to do business with other financial institutions, is owned primarily by the financial institutions with which it does business, and does not do business with the general public. Such bankers' banks also generally are not eligible for Federal Reserve Bank credit under the Board's Regulation A (12 CFR 201.2(c)(2)).

[66] For the purposes of this policy, a limited-purpose trust company is a trust company that is a member of the Federal Reserve System but that does not meet the definition of "depository institution" in section 19(b)(1)(A) of the Federal Reserve Act (12 U.S.C. 461(b)(1)(A)).

individual institutions by unilaterally reducing net debit caps, imposing collateralization or clearing-balance requirements, rejecting or delaying certain transactions as described below, or, in extreme cases, taking the institution off line or prohibiting it from using Fedwire.

2. Real Time

A Reserve Bank will, through the Account Balance Monitoring System, apply real-time monitoring to an individual institution's position when the Reserve Bank believes that it faces excessive risk exposure, for example, from problem banks or institutions with chronic overdrafts in excess of what the Reserve Bank determines is prudent. In such a case, the Reserve Bank will control its risk exposure by monitoring the institution's position in real-time, rejecting or delaying certain transactions that would exceed the institution's maximum daylight overdraft capacity or net debit cap, and taking other prudential actions, including requiring collateral.[67]

3. Multi-District Institutions

Institutions, such as those maintaining merger-transition accounts and U.S. branches and agencies of a foreign bank, that access Fedwire through accounts in more than one Federal Reserve District are expected to manage their accounts so that the total daylight overdraft position across all accounts does not exceed their net debit caps. One Reserve Bank will act as the administrative Reserve Bank and will have overall risk-management responsibilities for institutions maintaining accounts in more than one Federal Reserve District. For domestic institutions that have branches in multiple Federal Reserve Districts, the administrative Reserve Bank generally will be the Reserve Bank where the head office of the bank is located.

In the case of families of U.S. branches and agencies of the same foreign banking organization, the administrative Reserve Bank generally is the Reserve Bank that exercises the Federal Reserve's oversight responsibilities under the International Banking Act.[68] The administrative Reserve Bank, in consultation with the management of the foreign bank's U.S. operations and with Reserve Banks in whose territory other U.S. agencies or branches of the same foreign bank are located, may determine that these agencies and branches will not be permitted to incur overdrafts in Federal Reserve accounts. Alternatively, the administrative Reserve Bank, after similar consultation, may allocate all or part of the foreign family's net debit cap to the Federal Reserve accounts of agencies or branches that are located outside of the administrative Reserve Bank's District; in this case, the Reserve Bank in whose Districts those agencies or branches are located will be responsible for administering all or part of the collateral requirement.[69]

G. Transfer-Size Limit on Book-Entry Securities

Secondary-market book-entry securities transfers on Fedwire are limited to a transfer size of $50 million par value. This limit is intended to encourage partial deliveries of large trades in order to reduce position building by dealers, a major cause of book-entry securities overdrafts before the introduction of the transfer-size limit and daylight overdraft fees. This limitation does not apply to either of the following:

a. Original issue deliveries of book-entry securities from a Reserve Bank to an institution

b. Transactions sent to or by a Reserve Bank in its capacity as fiscal agent of the United States, government agencies, or international organizations.

Thus, requests to strip or reconstitute Treasury securities or to convert bearer or registered securities to or from book-entry form are exempt from this limitation. Also exempt are pledges of securities to a Reserve Bank as principal (for example, discount-window collateral) or as agent (for example, Treasury Tax and Loan collateral).

By order of the Board of Governors of the Federal Reserve System, November 24, 2004.

**Jennifer J. Johnson,**
*Secretary of the Board.*
[FR Doc. 04–26444 Filed 11–30–04; 8:45 am]
**BILLING CODE 6210–01–P**

---

[67] Institutions that are monitored in real time must fund the total amount of their ACH credit originations in order for the transactions to be processed by the Federal Reserve, even if those transactions are processed one or two days before settlement.

[68] 12 U.S.C. 3101–3108.

[69] As in the case of Edge and agreement corporations and their branches, with the approval of the designated administrative Reserve Bank, a second Reserve Bank may assume the responsibility of managing and monitoring the net debit cap of particular foreign branch and agency families. This would often be the case when the payments activity and national administrative office of the foreign branch and agency family is located in one District, while the oversight responsibility under the International Banking Act is in another District. If a second Reserve Bank assumes management responsibility, monitoring data will be forwarded to the designated administrator for use in the supervisory process.

---

## GENERAL SERVICES ADMINISTRATION

**OMB Control No. 3090–0086**

**General Services Administration Acquisition Regulation; Information Collection; Proposal to Lease Space (Not Required By Regulation), GSA Form 1364**

**AGENCY:** General Services Administration (GSA), GSA.

**ACTION:** Notice of request for comments regarding a renewal to an existing OMB clearance.

**SUMMARY:** Under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35), the General Services Administration will be submitting to the Office of Management and Budget (OMB) a request to review and approve a renewal of a currently approved information collection requirement regarding proposal to lease space (not required by regulation), GSA Form 1364.

Public comments are particularly invited on: Whether this collection of information is necessary and whether it will have practical utility; whether our estimate of the public burden of this collection of information is accurate, and based on valid assumptions and methodology; ways to enhance the quality, utility, and clarity of the information to be collected.

**DATES:** Submit comments on or before: January 31, 2005.

**FOR FURTHER INFORMATION CONTACT:** Julia Wise, Procurement Analyst, Contract Policy Division, at telephone (202) 208–1168 or via e-mail to *julia.wise@gsa.gov*.

**ADDRESSES:** Submit comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to the Regulatory Secretariat (VIR), General Services Administration, Room 4035, 1800 F Street, NW., Washington, DC 20405. Please cite OMB Control No. 3090–0086, Proposal to Lease Space (Not Required By Regulation), GSA Form 1364, in all correspondence.

**SUPPLEMENTARY INFORMATION:**

A. Purpose

The General Services Administration (GSA) has various mission responsibilities related to the acquisition and provision of real property management, and disposal of real and personal property. These mission responsibilities generate requirements that are realized through the solicitation and award of leasing contracts. Individual solicitations and