# EXHIBIT 12

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3

4      CUSTODIA BANK, INC.,

5                          Plaintiff,

6      vs.                               No.

7      FEDERAL RESERVE BOARD OF          22-cv-00125-SWS

8      GOVERNORS and FEDERAL RESERVE

9      BANK OF KANSAS CITY,

10                         Defendants.

11

12

13

14                       CONFIDENTIAL

15

16

17

18           CONFIDENTIAL DEPOSITION OF CHRISTI

19     MAY-ODER, a Witness, taken on behalf of the Plaintiff

20     before Kelsey Robbins Schmalz, CSR No. 1571,

21     CCR No. 1148, RPR, pursuant to Notice on the 19th of

22     October, 2023, at the Federal Reserve Bank of Kansas

23     City, 1 Memorial Drive, Kansas City, Missouri.

24

25

1     I was in --

2             Q.     Let's go both.  Let's start when you

3     were with credit and risk.

4             A.     I don't recall if there were any at

5     that time.  It's been too many years ago.

6             Q.     And you know when I say de novo

7     institution, that's something that means something to

8     you?

9             A.     Yes.  It means a -- from my

10    perspective, what that means is it's an institution

11    that has not been in existence or not a going

12    concern.

13            Q.     When you got into the auditor role --

14    tell me how long you were in that auditor role first.

15            A.     So I was in the role from 2014 to

16    2018.

17            Q.     Okay.  So would it be fair to say that

18    you're in -- what do you do from '07 to 2014?

19            A.     So I must have been in consumer

20    affairs, then, longer, because I was only over credit

21    risk and our stats function for two to three years

22    before I moved into the AGA role.

23            Q.     Okay.  So you think you probably were

24    in consumer affairs until 2011 or so, then?

25            A.     Yeah.  It must have been, yes.

1    Q.    Then you go credit risk in 2011?

2    A.    Yes.

3    Q.    Become auditor in 2014?

4    A.    Yes.

5    Q.    And you were in role until 2018?

6    A.    Uh-huh.

7    Q.    Correct?

8    A.    That's right.

9    Q.    Everybody does it.  Don't worry about

10   it.

11         So from 2014 to 2018 in your auditor

12   role, were you auditing from a risk standpoint any

13   de novo institutions?

14   A.    No.  I don't recall.

15   Q.    Tell me what happens in 2018.

16   A.    In 2018, I rotated back into the

17   credit reserves and risk management function and had

18   oversight for our statistics function as well.

19   Q.    What was your official title then?

20   Was that a promotion when you rotated back to that?

21   A.    It was a transition as -- it was a

22   lateral rotation as assistant vice-president.

23   Q.    And credit risk management has direct

24   hands-on involvement with applicants for master

25   accounts?

1          A.     Yes, that's correct.

2          Q.     So explain to me the hierarchy kind of

3     who reported to you in that department, and I want to

4     know who you reported to.

5          A.     So initially we had two managers at

6     the time that reported to me, Chris Gaul-Pearson and

7     Lisa Klose, and during that time then Lisa retired

8     and she was replaced with Tara Botwell, and then we

9     eventually brought on a third manager, Cole Prather,

10    and so all thee of them report to me and then I

11    report to Judith Hazen.

12         Q.     And at that time, was Judith Hazen

13    reporting to Tara Humston?

14         A.     Yes, and I should back up, because

15    when I transitioned into credit risk it was a

16    different senior officer at that time, and so there's

17    been three or four different senior officers during

18    that time period.

19         Q.     Okay.  And so you take on that role in

20    2018.  Is that the current role you're in?

21         A.     Yes.

22         Q.     So you've been in that role for the

23    last five years or so?

24         A.     With the exception of -- so I no

25    longer have the statistics function.  I have credit

Page 21

```
 1    and risk management, and we rolled in a new area
 2    which is the reserves function.
 3              Q.    And tell me what the reserve function
 4    is.
 5              A.    So the reserves function is
 6    responsible for essentially paying interest on
 7    reserves, making sure that the interest is paid on
 8    those master accounts.  We're -- also serve as a
 9    backup reserves administrator where we ensure that
10    from a technical standpoint that when there are
11    changes made by our board of directors on interest
12    rates or the FLMC that those rates are accurately
13    input into our technology, into our system, so
14    interest is paid as it's been decided by the board of
15    directors and the FLMC.
16              Q.    Throughout this time frame and let's
17    say by the time we get to 2018 and your transition
18    back into credit and risk, how would you describe
19    your personal, I guess, sophistication level with
20    digital currency and the trends going on in the
21    banking world?
22                    MR. MICHAELSON:  Objection.  Form.
23              A.    What exactly do you mean by that?
24    BY MR. ORTIZ:
25              Q.    Well, by 2018, was the concept of
```

1    credit risk, that would be something that you would

2    be aware of almost immediately, true?

3           A.    Yes.  Yes, I became aware of it.  I'm

4    not sure at what point in the process, but yes, I

5    became aware of it.

6           Q.    And did you become aware at some point

7    in time that they also applied to be a member of the

8    Fed and applied for membership?

9           A.    Yes, I was aware of that.

10          Q.    Is that something you had any

11    oversight over?

12          A.    No.  I am focused on the master

13    account request, not the membership.

14          Q.    So a bank like Custodia that's a

15    state-chartered bank, were there procedures in place

16    for a de novo state-chartered bank that wasn't a

17    member that wanted to apply for a master account that

18    the Kansas City Fed should have followed when they

19    applied?

20                MR. MICHAELSON:  Objection.  Form.

21          A.    So anytime we receive a request for a

22    master account, whether it's state chartered,

23    national chartered, de novo, going concern, we have

24    procedures in place that we follow to ensure that

25    they are legally eligible, and then we have a whole

1   host of work that our condition and monitoring team

2   does to assess the risk that that institution could

3   pose to this Reserve Bank and to the financial

4   system.

5   BY MR. ORTIZ:

6          Q.     And everything you just described was

7   codified in writing by the time Custodia applied in

8   October of 2020?

9                 MR. MICHAELSON:  Objection.  Form.

10         A.     Yes.  We had -- so we had procedures

11  in place on how we go about conducting that risk

12  analysis.

13  BY MR. ORTIZ:

14         Q.     You didn't need to go outside the

15  Kansas City Fed to find procedures as to how to deal

16  with a de novo state-chartered institution, did you?

17  You already had them set up?

18         A.     We had procedures for how we go about

19  conducting our risk analysis.

20         Q.     And is it your testimony today that

21  you followed the procedures you had in place when

22  Custodia submitted its application and you began

23  processing it?

24         A.     I'm sorry.  Do you mind repeating

25  that?

Page 36

```
 1                  MR. ORTIZ:  Why don't you just read it
 2       back to your, Kelsey.
 3                      (The requested portion of the record
 4       was read by the reporter.)
 5            A.     We followed our procedures that --
 6       yes, that we had in place.
 7            Q.     I'm going to hand you what we will
 8       mark as Exhibit 43.
 9                   (May-Oder Exhibit No. 43 was marked
10       for identification.)
11       BY MR. ORTIZ:
12            Q.     And I'll tell you, I received this
13       yesterday from your counsel.  Ms. Hazen testified
14       that there was procedures and practices that had been
15       in place but she did not think they were in writing.
16       She told me the way that I could verify the policies
17       that were followed would be to look at how they
18       had -- the Fed had handled other applicants.
19                   I got this document yesterday
20       submitted from your attorneys saying no, there are
21       written procedures in place.  So I want to know which
22       is it, were there written procedures in place?
23                      MR. MICHAELSON:  Objection.  Misstates
24       prior testimony.
25                   But you can answer the question.
```

Page 37

```
 1                    MR. ORTIZ:  Which part did I misstates
 2      of Ms. Hazen's testimony?
 3                    MR. MICHAELSON:  The transcript will
 4      speak for itself.
 5                    MR. ORTIZ:  I know it does.
 6                    MR. MICHAELSON:  We don't have to get
 7      into it.
 8                    You can go ahead and answer the
 9      question.
10      BY MR. ORTIZ:
11           Q.    I just want to know were these
12      practices that you followed or was it actually a
13      written procedure that you followed?
14           A.    These are the -- so these were --
15      these are in writing and these are procedures that
16      our condition and monitoring team follow.
17           Q.    Okay.  So is Exhibit 43 -- and take a
18      minute to lock at it to make sure that this is what
19      was in place and would have controlled Custodia's
20      application when they applied, okay?
21           A.    Yes.  These were in place at the time
22      that they applied for a master account.
23           Q.    And the effective date on Exhibit 43
24      says June of 2019; is that correct?
25           A.    Yes.  That's what this shows.
```

Page 52

1    like a SharePoint file where we housed those

2    documents.

3             Q.     That would make sense to me, because

4    I'm assuming more than one team member would have to

5    get in and access what was going on with this

6    application?

7             A.     Yes.  We had a number of risk

8    specialists involved.

9             Q.     And I'm assuming that someone would

10   have to be going through to make sure how are we

11   following the policy to make sure we're covering all

12   these bullet points for Custodia's application,

13   correct?

14                   MR. MICHAELSON:  Objection.  Form.

15            A.     So just to clarify, we -- so when

16   you -- when we go about conducting a review of an

17   institution's access to a master account, it is not a

18   checkbox process that we go through.  It is a very

19   comprehensive, fulsome review of all the risks that

20   the entity poses, and it is -- they can be very

21   unique and different from institution to institution,

22   so it is not that we take this guidance and go

23   through and checkbox every single one of these.

24   BY MR. ORTIZ:

25            Q.     Well, can we just agree you didn't

Page 53

1    really follow this procedure at all for Custodia, did

2    you?  You created something totally different and you

3    reached out trying to get different guidelines that

4    would apply to Custodia; isn't that really what

5    happened?

6                    MR. MICHAELSON:  Objection.  Form.

7            A.      We conducted our review for this

8    institution like we would do any other institution,

9    and that is we pull together a team of experts that

10   understand the risk and dig into the entity's

11   business plan to understand what they are trying to

12   accomplish, and so each and every entity can look

13   very, very different, and we approach it the same way

14   with every institution, but what is different are the

15   risks that each institution poses.

16   BY MR. ORTIZ:

17           Q.      So are you telling me that you did not

18   follow any procedure other than this one?

19           A.      We followed this procedure up until

20   the new account access guidelines were distributed,

21   and those were basically just a way to make what our

22   internal procedures that we had been following for

23   many years, making those more transparent to the

24   public so they better understand the process that we

25   go through, so what we have done for years is

Page 54

1    basically the same thing that was distributed in

2    those account access guidelines that were

3    published.

4           Q.    Well, those account access guidelines

5    used a tier system that put Custodia into a Tier 3

6    category.  Nothing like that exists in the policies

7    that applied when Custodia submitted its account

8    application.  Can we agree on that?

9           A.    So for --

10          Q.    That's a yes-or-no question.  Do you

11   agree that there's no tier system that existed in

12   your policies that applied to Custodia when they

13   submitted their application?

14               MR. MICHAELSON:  Objection.  Form.

15   BY MR. ORTIZ:

16          Q.    Agree?

17          A.    The practice that we have done for

18   years would have been that we would have applied a

19   more stringent review of any de novo that had the

20   same type of risk profile that that institution had,

21   so while it may not have been captured in writing, it

22   would have -- our practice would not have changed at

23   all.

24          Q.    Okay.  So are you telling me that the

25   document in front of us, 43, has a tier system in it?

1    Are you telling me that that exists in this document

2    or are you just telling me well, that's something

3    that we had that we didn't have in writing?  Which is

4    it?

5                    MR. MICHAELSON:  Objection.  Form.

6    BY MR. ORTIZ:

7            Q.    Can we agree there's nothing in the

8    document, and we'll go through it to see if you

9    really followed it for Custodia, but there's nothing

10   in this document that references a Tier 1, a Tier 2,

11   and a Tier 3 institution, is there?

19           Q.    So the only way to know that would be

20   to see how you handled other de novo institutions

21   that applied for master accounts; is that right?

22   That would confirm what you're telling me, that

23   although it's not in writing, you really used a

24   different procedure?

25                   MR. MICHAELSON:  Objection.  Form.

Page 56

1    BY MR. ORTIZ:

2           Q.    Is that what you're telling me?

3           A.    A lot of this comes into examiner

4    judgment, so I -- so I'm sorry.  Could you repeat

5    your questions?

6                 MR. MICHAELSON:  And you can repeat

7    the question.  We've been going a little over an hour

8    so if we could take a break at a convenient point,

9    but happy for you the repeat the question and get an

10   answer before the break, if you prefer.

11                MR. ORTIZ:  I forgot my question.

12   Kelsey, do you want to read it back?

13                (The requested portion of the record

14   was read by the reporter.)

15                MR. MICHAELSON:  Objection.  Form.

16   BY MR. ORTIZ:

17           Q.    Go ahead.

18           A.    We did not use a different procedure.

19   It's just the level of scrutiny and detail we have to

20   do is different.

21           Q.    Okay.

22                MR. ORTIZ:  Let's take -- we're

23   shooting for a seven-minute break to keep us on

24   track.

25                (Off the record.)

Page 57

1     BY MR. ORTIZ:



Page 60

1          Q.     And so the Kansas City Fed already had

2     procedures in place to deal with a nonroutine

3     applicant like Custodia?

4          A.     We had high-level procedures in place

5     to deal with nonroutine, yes.



Page 61



20          Q.      And they should all be in this point

21    share folder you referenced?

22          A.      All of that information should be

23    documented in a number of different documents, yes,

24    that were on the SharePoint site.

25          Q.      SharePoint.

Page 62

1              A.      Uh-huh.

2              Q.      So what is CAMELS or CAMEL or other

3       regulatory rating?  What does that mean?

4              A.      So this is a rating that regulators

5       provide institutions when they go in to conduct a

6       review of their safety and soundness, so the C stands

7       for capital adequacy, asset is asset quality, M is

8       management, E is earnings, L is liquidity and then

9       the S is sensitivity.

10             Q.      So does that apply to Custodia in some

11      aspect?

12             A.      So that would have been -- part of the

13      review that we did would be looking at all of those

14      components.

15             Q.      So I take it somewhere in the point

16      share file you described for me there should be a

17      reference as to the capital adequacy for Custodia,

18      correct?

19             A.      Yes.

20             Q.      There would be a reference to that

21      asset size?

22             A.      So in their -- so I don't know that it

23      will be explicit to their asset quality because they

24      were not -- they are prohibited from extending

25      credit.  That was part of their -- the legislation,

Page 137

1   what that is.

2            Q.    Well, certainly seems to be the

3   deadline to process these applications for master

4   account, doesn't it?

5                  MR. MICHAELSON:  Objection.  Form.

6            A.    I can't tell based off what I've read

7   here.

8   BY MR. ORTIZ:

9            Q.    This is kind of like right in your

10  wheelhouse, though, isn't it?  You're in charge with

11  all this stuff with master accounts for Custodia and

12  Kraken at the time, right?  This stuff all applies to

13  what you and your team are doing on these special

14  purpose depository institutions from Wyoming,

15  correct?

16                 MR. MICHAELSON:  Objection.  Form.

17           A.    So myself and my team were heavily

18  involved in this, but there were others also involved

19  because of the --

20  BY MR. ORTIZ:

21           Q.    Broader policy implications?

22                 MR. MICHAELSON:  Please let the

23  witness finish.

24           A.    Because of the nuanced business model

25  that they were proposing.

Page 138

1    BY MR. ORTIZ:

2           Q.    Sorry for interrupting you, but I've

3    just heard that term so many times, broader policy

4    considerations.  Is that a term of art that you

5    developed with your team or the Board of Governors

6    when dealing with Custodia?

7           A.    So we're talking about a lot of --

8    we're talking about monetary policy.  We're talking

9    about financial stability, so when I refer to broader

10   public policy issues, that's what is intended by some

11   of those -- by that term.

12          Q.    And those subjects you just described,

13   those decisions are all made by the Board of

14   Governors, correct?

15          A.    No.

16          Q.    So you're saying the Kansas City Fed

17   makes the monetary policy consideration for Custodia?

18                MR. MICHAELSON:  Objection.  Form.

19   BY MR. ORTIZ:

20          Q.    Because I'll represent to you Judith

21   Hazen told me just the opposite.

22          A.    The question that was asked, the way I

23   interpreted it was that the Board makes all of those,

24   and so they are a part of that but it is a system, a

25   broader system that has input into monetary policy an

Page 139

1    financial stability.
2              Q.    Who makes the ultimate decision
3    on monetary policy involving a startup like
4    Custodia?
5              MR. MICHAELSON:  Objection.  Form.
6    BY MR. ORTIZ:
7              Q.    Is it the Board of Governors or is it
8    the Kansas City Fed?
9              MR. MICHAELSON:  Objection.  Form.
10             Go ahead.
11             A.    When we -- in evaluating Custodia's
12   request, monetary policy and financial stability were
13   part of that review that we gathered input from the
14   Board on, but that was just one of many factors that
15   we considered and by no means was the prominent
16   reason for the denial.
17   BY MR. ORTIZ:
18             Q.    Ma'am, that had nothing to do with
19   what I asked you.  I don't want to keep saying I move
20   to strike your answer.
21             My specific question is on the context
22   of monetary policy, that is a determination made by
23   the Board of Governors, not the Kansas City Fed,
24   correct?
25             MR. MICHAELSON:  Objection.  Form.

Page 140

1              A.      There is input.  In making monetary

2       policy decisions, there is input gathered from all

3       Reserve Banks.

4       BY MR. ORTIZ:

5              Q.      Ultimate decision made by the Board of

6       Governors?

7                      MR. MICHAELSON:  Objection.  Form.

8                      What decision are you talking about?

9                      MR. ORTIZ:  The monetary policy aspect

10      with somebody like Custodia.

11                     MR. MICHAELSON:  Objection.  Form.

12             A.      So for the monetary policy and the

13      financial stability risk considerations, we provided

14      the Board our perspective on those.  We were aligned

15      in how we were thinking about it and the feedback

16      that we received from the Board, so we provided

17      feedback on both of those.

18      BY MR. ORTIZ:

19             Q.      And then they make the ultimate call,

20      correct?

21                     MR. MICHAELSON:  Objection.  Form.

22             A.      The Board did not make the ultimate

23      call.  It was --

24      BY MR. ORTIZ:

25             Q.      I'm talking about on those policies.

                                                        Page 188

1     answer.  Let her complete the answer and then you can

2     move to strike.

3                     MR. ORTIZ:  If you want to enlarge the

4     time frame for me beyond seven hours and I'll come

5     back another time, I'll let her ramble as long as she

6     want's counsel.  You choose.  You choose.

7                     MR. MICHAELSON:  Given your comment

8     today, I'm not extending past seven hours --

9                     MR. ORTIZ:  Then she need to answer

10    the question I ask.

11                    MR. MICHAELSON:  She is.

12                    MR. ORTIZ:  When she goes on a

13    rambling narrative that is unrelated to my question,

14    I'm going to immediately move to strike.

15                    MR. MICHAELSON:  So how about this.

16    We're going to end at seven hours.  You let her

17    finish the answer.  You move to strike, and if you

18    win, we'll up open up the deposition again by the

19    number of minutes.

20                    MR. ORTIZ:  Counsel, I don't have time

21    to move to strike all --

22    BY MR. ORTIZ:

23          Q.    Ma'am, just listen to my question.

24    They're easy and straightforward.  They're easy and

25    straightforward.

Page 189

1              So this references Tier 3.  There is

2     no references to a Tier 3 in any of the existing

3     policies we went through for master account

4     applications; is there?

5                   MR. MICHAELSON:  Objection.  Form.

6     BY MR. ORTIZ:

7          Q.    That's not a term that was used in any

8     of the existing policies at the Kansas City Fed?

9                   MR. MICHAELSON:  Objection.

10    BY MR. ORTIZ:

11         Q.    Before the new guidelines, true?

12                  MR. MICHAELSON:  Objection.  Form.

13         A.    Tier 3 is something that was applied

14    to how we had already been assessing institutions

15    such as Custodia that were in that higher risk

16    category.

17    BY MR. ORTIZ:

18         Q.    Ma'am, again, move to strike.  My

19    question was none of the policies that we've looked

20    that were in place used a term of Tier 3, do they;

21    yes or no?

22         A.    They did not specifically identify as

23    a Tier 3, but we talked about routine versus

24    nonroutine.

25         Q.    Exactly.  Tier 1, Tier 2, Tier 3 were

Page 190

```
1    all new terms of art introduced with the new account
2    guidelines that came out sometime in the spring of
3    2022, correct?
4                   MR. MICHAELSON:  Objection.  Form.
5    BY MR. ORTIZ:
6         Q.    You can answer.  It's okay.
7         A.    Those guidelines helped provide
8    transparency into how we have consistently --
9                   MR. ORTIZ:  Object.  I move to strike.
10                  MR. MICHAELSON:  Please --
11                  MR. ORTIZ:  The question was --
12                  MR. MICHAELSON:  You have to let her
13   finish and then you can move to strike all you want.
14                  MR. ORTIZ:  The question was --
15                  MR. MICHAELSON:  What she's saying is
16   directly responsive to what --
17                  MR. ORTIZ:  It wasn't.
18                  MR. MICHAELSON:  Unless your goal here
19   is to simply --
20                  MR. ORTIZ:  Counsel, my goal is to get
21   straightforward answers to straight questions.
22   BY MR. ORTIZ:
23        Q.    Ma'am, my question is much simpler.
24   The terminology of Tier 1, Tier 2 and Tier 3 first
25   were utilized in the account access guidelines in the
```

Page 289

1    that Avit could trade in the secondary market an even

2    bad actors could have an implicit guarantee.

3              So the word being chosen by the Board

4    of Governors and by Esther George were being

5    coordinated and changing by the minute up until the

6    official denials, weren't they?

7         A.    What I recall from this is that we

8    were just asking Ben to share what updates had been

9    made to the Board order.  That's what I recall from

10   that exchange.

11             (May-Oder Exhibit No. 91 was marked

12   for identification.)

13   BY MR. ORTIZ:

14        Q.    I'll hand you Exhibit 91, from Esther

15   George to you, and then at the bottom looks like to

16   be Judith Hazen to Esther George with you being

17   copied.  It says, The updated memo incorporating your

18   edits is also attached for your reference.  This

19   version will be shared with director of RB OPS per

20   the S Letter requirements.

21             So the S Letter changed things and

22   required you at the bank level to send all your

23   predecisional thoughts to the Board of Governors to

24   review ahead of time, didn't it?

25             MR. MICHAELSON:  Objection.  Form.

Page 290

1            A.      So the S Letter requires the Reserve

2     Bank in certain -- for certain situations to share

3     our recommendation with them.

4     BY MR. ORTIZ:

5            Q.      That was never in any of the policies

6     and procedures that existed at the Federal Reserve

7     Bank of Kansas City when Custodia submitted its

8     application in October of 2020, correct?

9                   MR. MICHAELSON:  Objection.  Form.

10    BY MR. ORTIZ:

11           Q.      That's something totally new.

12    S Letter 2667, totally new requirement instituted by

13    the Board, correct?

14                  MR. MICHAELSON:  Objection.  Form.

15           A.      Our practice prior to the S Letter

16    being enacted, we would have typically engaged the

17    Board on these types of requests or activities that

18    would be considered unusual, novel, so that would

19    have been -- again, as I've stated previously, that

20    given the types of issues that we were dealing with

21    and the uniqueness around them, that is what we do

22    here in the System is we coordinate and we share

23    information across Reserve Banks with the Board of

24    Governors when we're dealing with these types of

25    issues.

Page 291

1    BY MR. ORTIZ:

2         Q.    If you were doing that anyway, why is

3    there a specific directive in the S Letter 2667?  If

4    what you just told me is true and that's how it

5    worked anyway, you wouldn't need S Letter 2667

6    directing that you do that, would you?

7              MR. MICHAELSON:  Objection.  Form.

8         A.    I can't speak to why they decided --

9    BY MR. ORTIZ:

10        Q.    That doesn't make sense, does it?  If

11   that's how you always did anyway, that you gave them

12   predecisional heads-up, they wouldn't be making that

13   new requirement with these new guidelines, would

14   they?

15             MR. MICHAELSON:  Objection.  Form.

16        A.    I can't speculate why they issued the

17   S Letter.

18   BY MR. ORTIZ:

19        Q.    Did you have the ability to comment on

20   the S Letter and provide input on that just like you

21   did the guidelines?

22        A.    I had the opportunity to review the

23   draft S Letter and provide feedback.

24        Q.    Did you provide feedback that said we

25   already do this anyway, we don't need it?

Page 298

1    BY MR. ORTIZ:

2         Q.    I'm going to hand you Exhibit 34

3    that's already in the record.  Is this your

4    understanding as to what S Letter 2667 is?

5         A.    Yes.

6         Q.    So do you remember how long before

7    January 17th of 2023 this you were able to provide

8    your input as to what should be in this S Letter

9    2677?

10        A.    I don't recall when I saw the draft.

11        Q.    Was your input on this in a group

12   setting or was it like you got to review it and you

13   sent off your thoughts to someone?

14        A.    I believe we worked internally in the

15   Federal Reserve Bank here at Kansas City to collect

16   feedback, but I don't recall exactly.

17        Q.    So Chris Gaul-Pearson is somebody that

18   you corresponded often with, correct?

19        A.    Yes.  He's a manager in the credit

20   risk department.

21        Q.    You supervise him?

22        A.    Correct.

23        Q.    You interfaced with him throughout the

24   process on master account issues, right?

25                MR. MICHAELSON:  Objection.  Form.

Page 299

1          A.     That's right.

2     BY MR. ORTIZ:

3          Q.     And you ultimately shared information

4     with him about what was really going on in the

5     process, didn't you?  You were open and honest with

6     him about what was really going on behind the scenes,

7     weren't you?

8               MR. MICHAELSON:  Objection.  Form.

9          A.     He manages the department and so has

10    responsibility for helping evaluate master account

11    requests.

12    BY MR. ORTIZ:

13         Q.     So you would be open and honest with

14    him about what's really going on, right?  No reason

15    to be deceptive with your own team member, agree?

16         A.     Right.  I am open and honest with my

17    team.

18         Q.     Okay.  So I want to ask you look at

19    Exhibit 24.  This came in yesterday.  This is an

20    exchange from Gaul-Pearson to Ashle Baxter and Ben

21    McGhee regarding the Custodia memo to Esther.

22               MR. ORTIZ:  Do you have it handy?  Do

23    you want me to show her this copy --

24               MR. MICHAELSON:  It seems to be

25    missing from the stack.

Page 300

1    BY MR. ORTIZ:

2          Q.    So what he says, Ben, at this time

3    I've been asked to see if you could help us make sure

4    we are not getting out of sync with the membership

5    side.  We do not want to contradict one another.

6                Are you the one that gave the

7    directive to Chris Gaul-Pearson to talk to Ben about

8    this, don't contradict what the membership decision

9    is.

10               MR. MICHAELSON:  Objection.  Form.

11         A.    So where are you seeing that?

12   BY MR. ORTIZ:

13         Q.    Take a look where it says, Nancy,

14   could you add context to the capital section,

15   specifically highlighting capital issues with SPDIs

16   and Custodia in particular.  If possible, could you

17   also indicate which issues are curable versus those

18   that are not or may not be curable?

19               Ben, at this time I've been asked to

20   see if you could help us make sure we're not getting

21   out of sync with the membership side.  We do not want

22   to contradict one another, and there may be

23   additional asks by Judith for assistance with the

24   memo but nothing specific.

25         A.    So going back to the pre-membership

Page 301

1    review, so a lot of the same areas are reviewed and

2    assessed that also apply to a master account, and so

3    there is some overlap in the reviews that were being

4    done, so we wanted to make sure that our analysis of

5    those reviews were consistent.

6         Q.    To be fair to you, ma'am, this is

7    specifically dealing with Custodia recommendation

8    memo, so this would have nothing to do with anything

9    other than the recommendation to Esther George

10   whether to deny or give a master account.  That's the

11   only possible context of not contradicting the

12   decision on the membership side, agree?

13            MR. MICHAELSON:  Objection.  Form.

14        A.    From my perspective, I think it was

15   more around how we were framing up the risks that

16   were applied to both and the consistency around that,

17   because in those recommendation memo that we sent to

18   Esther on the master account, it outlined all the

19   risks that Custodia posed to the Reserve Bank and to

20   the payment system.

21   BY MR. ORTIZ:

22        Q.    Since I haven't been provided that, I

23   can't tell you whether that's true or not what you're

24   telling me, but I just want to know for the record,

25   you're saying this has nothing to do with not

Page 302

1    contradicting the decision on whether they get

2    membership and whether they get a master account?

3    That's your testimony?

4                    MR. MICHAELSON:  Objection.  Form.

5    Misstates her testimony.  She's directly addressed

6    this.  Asked and answered.

7                    You can go ahead.

8        A.    As I previously mentioned, the way I

9    understand this that -- I can't tell for sure, but I

10   suspect that it has more to do with the risks that

11   had been reviewed and the evaluation around those

12   risks and how those were being framed in our

13   recommendation memo.

14       Q.    Who has the authority to direct Chris

15   Gaul-Pearson to do anything on these memo changes

16   other than you?

17                    MR. MICHAELSON:  Objection.  Form.

18   BY MR. ORTIZ:

19       Q.    You're his direct supervisor, aren't

20   you?

21       A.    Yes, I am.  So both Judith and I have

22   oversight of Chris.

23       Q.    So it's either you or Judith telling

24   him to go in and -- when he says, I've been asked to

25   see if you could make sure we're not getting out of

Page 303

```
 1    sync, that's either your or Judith asking him to do
 2    something, correct?
 3            A.     Most likely.
 4                   MR. ORTIZ:  How much time left, boss?
 5                   MR. MICHAELSON:  One minute.  Maybe
 6    two.
 7                   MR. ORTIZ:  Counsel, we're willing to
 8    adjourn the deposition today.  We obviously feel
 9    given the fact that I've got a hundred plus pages of
10    policies in the record that I've never even had a
11    chance to review until the lunchtime today, I think
12    we're entitled to come back and ask her about that.
13    We may incorporate that into a 30(b)(6) request as
14    well.  Since we also have all these documents that we
15    just got since Friday and over the weekend, there may
16    be additional areas of inquiry for this witness, and
17    I understand you object to that request but I just
18    want the make sure that's clear on the record.
19                   MR. MICHAELSON:  Understood, and we do
20    object to that.  I just have a few questions if
21    you're done.
22                   MR. ORTIZ:  Sure.
23                   MR. MICHAELSON:  So first I would like
24    to designate the transcript confidential, the
25    entirety of the confidential.
```

1                    EXAMINATION

2      BY MR. MICHAELSON:

3            Q.      You testified earlier -- what's the

4      name of the department in which you work?

5            A.      I work in the credit reserves and risk

6      management department.

7            Q.      And what does that department do?

8            A.      So we are responsible for overseeing

9      the discount window, evaluating requests to master

10     accounts, monitoring Tenth District Institutions and

11     ensuring that there's compliance with the Board's

12     payment system risk policy.

13           Q.      And over the course of the day, you

14     made reference to a different department called

15     applications.  Is there a department called

16     applications?

17           A.      Yes, there is.

18           Q.      Is that department part of your

19     department?

20           A.      No.  It's a distinct department led by

21     another supervising officer and staffed with a number

22     of examiners, and the work they do is very different

23     and distinct from the work that we conduct in credit

24     risk, so they are responsible for a lot of

25     board-delegated responsibility, including evaluating

                                                    Page 306

1       comes in, who decides whether the master account

2       request is granted or not?

3               A.      It depends.  I mean, typically for

4       most pretty straightforward, traditional type of

5       entities, I would approve those.  For situations like

6       Custodia, that would be Esther's decision.

7               Q.      And who, in fact, made the decision to

8       deny Custodia's master account request?

9               A.      Esther.

10              Q.      And you testified earlier you're part

11      of developing a recommendation that went up to

12      Ms. George?

13                      MR. ORTIZ:  They want you to turn your

14      mic on.

15      BY MR. MICHAELSON:

16              Q.      You testified earlier you were part of

17      a recommendation that went up to Ms. George with

18      respect to Custodia's master account request?

19              A.      Yes, I was.

20              Q.      And was that recommendation to approve

21      the account or deny the account?

22              A.      The recommendation was to deny the

23      account.

24              Q.      When that recommendation was being

25      prepared, did you have -- what was your sense as to

Page 307

1    whether Ms. George was going to follow your

2    recommendation or not?

3         A.    It was my sense all along that she

4    would agree with our recommendation to deny.

5         Q.    And what's the basis for that view,

6    for your sense that she was going to support denial?

7         A.    So that was my sense based off

8    conversations that we had had internally with others

9    that had more direct interactions with Esther, but

10   really from very, very early in the process it was

11   leaning towards no given their risk profile and the

12   concerns that were raised regarding the business

13   model, so by the time the recommendation memo was

14   provided to Esther, there was no -- there was no

15   question whether or not she would approve that

16   recommendation to deny.

17        Q.    Was there any doubt in your mind as to

18   whether she would support denial?

19        A.    No.  There was no doubt.

20        Q.    Throughout the entirety of the

21   process, was there ever a time when you had a view

22   that Ms. George was likely to approve the master

23   account request?

24        A.    No.  I can't think of a time where I

25   felt like there was a lean towards approval.

Page 308

1          Q.    If you go back to the earlier part of

2     this time period in the months after Custodia

3     requested a master account, what do you recall

4     understanding about why Ms. George had concerns about

5     this particular request?

6          A.    There were concerns around just the

7     structure of the entity.  There were concerns about

8     the broader policy implications and making sure that

9     those were addressed.  There were concerns around the

10    permissibility of the activities that they were

11    wanting to do.  There were concerns around how the

12    capital requirements were brought about.  There were

13    concerns around the resolution process or the lack

14    thereof.  There were a litany of concerns that were

15    discussed and raised.

16         Q.    To your knowledge -- well, and who

17    ultimately made the decision to deny the request?

18         A.    Esther.

19         Q.    Did Vice Chair Barr make the decision

20    to deny the request?

21              MR. ORTIZ:  Let me object.  Lacks

22    foundation.

23         A.    No.

24    BY MR. MICHAELSON:

25         Q.    Did the Board of Governors deny the

Page 309

```
 1    Custodia's request for a master account?
 2                    MR. ORTIZ:  Let me object.  Lacks
 3    foundation.
 4           A.     No.
 5    BY MR. MICHAELSON:
 6           Q.     To your knowledge, was there a board
 7    order concerning Custodia's master account request?
 8                    MR. ORTIZ:  Same objection.
 9           A.     No.
10    BY MR. MICHAELSON:
11           Q.     Are you aware of any instance in which
12    feedback came from the Board that changed the
13    direction of Ms. George's thinking about Custodia's
14    master account request?
15           A.     No.  In fact, I felt like the feedback
16    that was provided through the S Letter, it was very
17    much aligned with what we had provided to the Board.
18           Q.     Did there come a time when Ms. George
19    retired?
20           A.     Yes.
21           Q.     Do you recall when that happened in
22    relation to when Custodia's master account request
23    was denied?
24           A.     It was sometime around that same first
25    quarter of this year.
```

Page 310

1        Q.     And are you aware of any length

2   between the timing of her retirement and the timing

3   of her denial of Custodia's master account request?

4        A.     I know she had been heavily involved

5   throughout that process and just had a sense that she

6   wanted to be part of the final decision.

Page 311



Page 312



Page 313

15          Q.     I would like to --

16                 MR. ORTIZ:  Did we not have a hard

17     stop?

18                 MR. MICHAELSON:  Yeah.  I would have

19     preferred to start 30 minutes earlier.  I have a few

20     more questions.

21     BY MR. MICHAELSON:

Page 314



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 364



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Page 365

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 366



21      Q.   Okay, and are there other guidelines or

22  procedures or handbooks that you utilized in

23  connection with the review of Custodia's master

24  account request that we haven't shown you either

25  in your earlier deposition or today?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 367

1       A.   I'm not aware of anything else.

2       Q.   Okay.  And in terms of getting ready for

3   today's deposition, I know, I'm assuming you

4   focused on various procedures or reviewed

5   documents; is that fair?

6       A.   So I saw this document and me met for a

7   few minutes prior to the deposition, so that was

8   my preparation.

9       Q.   Okay.  Was there anything that you

10  reviewed in getting ready for today that

11  refreshed your recollection in connection with

12  account opening procedures, discretion, denial,

13  anything like that?

14      A.   No.

15      Q.   Okay.

16           MR. ORTIZ:  Give us just a minute.

17           MR. SCARBOROUGH:  Can we go off the

18  record?  We'll take one minute.  I think we're

19  about done.

20           (Recess)

21      Q.   (BY MR. SCARBOROUGH)  Ma'am, if you

22  would get Exhibit 174 which was the October 21,

23  2022 Implementation Handbook, and I want to just

24  direct your attention to the back of that

25  document, Page 94, ending in Bates-stamp 8166.