# EXHIBIT 13

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL

Page 1

1         IN THE UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF WYOMING
2
3
         CUSTODIA BANK, INC.,        )
4                                    )
                   Plaintiff,        )
5                                    )
         v.                          )
6                                    ) 1:22-cv-00125-SWS
         FEDERAL RESERVE BOARD       )
7        OF GOVERNORS AND            )
         FEDERAL RESERVE BANK OF     )
8        KANSAS CITY,                )
                                     )
9                  Defendants.       )
                                     )
10
11
12              * DESIGNATED CONFIDENTIAL *
              * SUBJECT TO A PROTECTIVE ORDER *
13
14
15
16             DEPOSITION OF JEFFREY IMGARTEN, a
17       Witness, taken on behalf of the Plaintiff before
18       Peggy E. Corbett, CSR, CCR, RDR, pursuant to
19       Notice on the 24th day of October, 2023, at the
20       offices of the Federal Reserve Bank of Kansas
21       City, 1 Memorial Drive, Kansas City, Missouri
22       64198.
23
24
25

Page 112

1    to in this exchange with Pat Grant is in
2    reference to that standing meeting, that
3    bi-weekly meeting that was established.
4         Q.   Who from the Kansas City Fed side
5    typically took place in that standing meeting?
6         A.   So it would be generally representatives
7    from our Applications Department, Examinations
8    and Inspections Department, I believe Judith
9    would participate since she oversees the
10   Application Department, and the membership
11   application was being discussed, Tara Humston
12   would participate in those conversations.  So I
13   think those are the primary areas covered.
14        Q.   So Judith would take part in this
15   standing meeting?
16        A.   Yes.
17        Q.   Judith Hazen, I'm sorry?
18        A.   Yes.
19        Q.   And Tara Humston would take part in this
20   standing meeting?
21        A.   Yes.
22        Q.   During the standing meetings, would they
23   ever discuss the master account applications?
24        A.   I don't recall that specifically being
25   discussed.  My focus was on stuff related to the

1    membership application.
2        Q.   And so Christi May-Oder was your
3    counterpart for the master account
4    application; is that correct?
5        A.   Yes.
6        Q.   Who is above Christi May-Oder?
7        A.   Judith Hazen.
8        Q.   Judith Hazen?  And where does Tara
9    Humston fit in?
10       A.   She oversees our entire Supervision and
11   Risk Management Division, so she's who Judith
12   reports to.
13       Q.   So Christi reports to Judith?
14       A.   Yes.
15       Q.   Judith reports to Tara?
16       A.   Yes.
17       Q.   Do you also report to Tara?
18       A.   I report to Judith.
19       Q.   You report to Judith?
20       A.   Yes.
21       Q.   Okay.  That's helpful.  And then just to
22   sort of close out this document, so you don't
23   have a specific recollection of the meeting
24   referred to in this e-mail?
25       A.   No, I don't.

Page 114

1    (Exhibit 98 was marked by the
2    reporter for identification.)
3       Q.   (BY MR. SWENSON)  I'm handing you what
4    we're marking as Exhibit 98 this is
5    FRBKC-00016522, and you'll see if we flip to the
6    next page which is 16523, the bottom is that
7    first e-mail to Pat and Scott, right?
8       A.   Yes.
9       Q.   And then the next one is Pat's response
10   to you, right?
11      A.   Yes.
12           MS. CARLETTA:  And we're possibly
13   needing to claw this portion back based on the
14   deliberative process privilege.
15      Q.   (BY MR. SWENSON)  And then we have an
16   e-mail from you on November 27th at 6:30 p.m.; do
17   you see that?
18      A.   Yes.
19      Q.   Okay, and you've sent this to a bunch of
20   different people at the bank.  Generally like
21   which divisions are represented here?
22      A.   So Tara Humston, she oversees the entire
23   division, Craig Zahnd, General Counsel, Kara
24   Binboom, Vice-President within Reserve Bank
25   Legal, Nick Billman, Vice-President within

```
1        A.    Yes.
2        Q.    And here, does this mean that you'll be
3    involved in determining account opening
4    eligibility?
5        A.    No.
6        Q.    What does this mean?
7        A.    That would not be my interpretation.
8    That's not a role or a responsibility that I
9    currently have.
10       Q.    How would you interpret this?
11       A.    I would interpret this to mean that if
12   there's an entity seeking to open an account, and
13   if they are also simultaneously applying for
14   membership, then our department would be engaged.
15       Q.    In what capacity would your department
16   be engaged?
17       A.    Probably them, CRRM, seeking status of
18   the membership application.
19       Q.    But you don't think your department
20   would be involved in determining account opening
21   eligibility?
22       A.    No.
23       Q.    Would your department be involved in
24   classifying the institution as Tier 1, 2 or 3?
25       A.    No.
```





```
1      [redacted]
2      [redacted]
3      [redacted]
4      [redacted]
5      [redacted]
```

6                   MS. CARLETTA:   It's been an hour,
7       but take your time.
8                   (Exhibit 109 was marked by the
9       reporter for identification.)
10          Q.   (BY MR. SWENSON)   I'm handing you what's
11      been marked as Exhibit 109.   Do you see on the
12      first page where it says FRBKC-00014758?
13          A.   Yes.
14          Q.   And if you'd turn to Page 7 of the
15      document which is FRBKC 00014764, do you see that
16      you signed this?
17          A.   Yes.
18          Q.   And this is a letter to Custodia,
19      correct?
20          A.   Yes.
21          Q.   It's addressed to the members of the
22      Board, care of Caitlin Long, correct?
23          A.   Yes.
24          Q.   And you sent this letter following the
25      membership exam, correct?

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  | A. | Yes.                                                   |
| 2  | Q. | The seal at the top, where it says                     |

3   Federal Reserve Bank of Kansas City and then
4   there is the Eagle, is that the seal of the
5   Federal Reserve Bank of Kansas City?
6        A.   That's a version of the letterhead that
7   we use on our letters.
8        Q.   But that is one of the official
9   letterhead used by the Kansas City Fed?
10       A.   It's been used on other correspondence
11  that has been sent by our Reserve Bank, yes.
12  Whatever process it's gone through to vet it and
13  approve it, I don't know.  It was provided by
14  Public Affairs at one point.
15       Q.   But this is something that commonly
16  appears on your letterhead?
17       A.   Yes.
18       Q.   All right.  Turning to the first
19  paragraph here, the last sentence it says, "As
20  previously communicated the information obtained
21  during the examination and the Reserve Bank's
22  assessment of Custodia's operations, activities
23  and risk profile are also informing the ongoing
24  master account request evaluation process."  Do
25  you see that?

Page 293

1   supervisory review that the Reserve Bank was
2   conducting, and then I need to read this master
3   account section.
4        Q.   Let me know when you're done reading.
5        A.   Okay.  Okay.
6        Q.   Are you finished?
7        A.   Yes.
8        Q.   Okay.  So turning back to this bullet,
9   "Avanti supervisory review, feed into membership
10  and master account applications," this is the
11  Board telling you that Avanti supervisory review
12  should feed into both the membership and the
13  master account applications, correct?
14       A.   No, this would be us conveying our
15  supervisory review feeding into the membership
16  and the master account applications.
17       Q.   So this is you telling the Board that
18  you intend the supervisory review to feed into
19  membership and master account applications?
20       A.   Yes.  It's us representing our
21  intentions for the supervisory review.
22       Q.   There would be one review for both
23  applications?
24            MS. CARLETTA:  Objection, form.
25       A.   The review would be used to inform both

Page 294

1   applications, to the extent that it's able.
2               MR. SWENSON:  No further questions.
3               MS. CARLETTA:  Okay, great.
4                    EXAMINATION
5   BY MS. CARLETTA:
6       Q.   I just have a few follow-up questions
7   for you.  All right.  Do you know who decided the
8   master account requests?
9       A.   Esther George.
10      Q.   And when did Esther retire?
11      A.   At the end of January of 2023.
12      Q.   Do you know if Esther's retirement
13  impacted the timing of the master account
14  decision?
15      A.   Yes, I believe it did.
16      Q.   Are the requirements for evaluating a
17  master account request different from evaluating
18  a membership application?
19      A.   Yes.
20      Q.   How so?
21      A.   I can't speak to specifics, but I do
22  know that there are factors that we look at
23  within the membership application that are not
24  looked at within the context of a master account
25  request.

1              A couple that come to mind are the
2     convenience of needs.  The permissibility piece
3     would be exclusive to the membership application.
4     Those are the two that come to mind, but there's
5     likely others.
6              I don't know enough about the master
7     account request evaluation criteria to speak to
8     it too exhaustively.
9        Q.   Okay.  And we talked a lot about policy
10    decisions today.  Are those policy decisions that
11    you are referring to specific to the master
12    account application?
13       A.   No.  The policy issues that I am
14    referring to are specific to the membership
15    application and other applications that flow
16    through our department, such as Section 3, Change
17    in Bank Control Act notice, branch filing, those
18    types of applications, so the policy issues that
19    I referred to were specific to those types of
20    applications that my department oversees.
21       Q.   Okay, and just to clear up my sloppy
22    question, those apply to the membership
23    application, correct?
24       A.   Yes.  The policy issues are specific to
25    the membership applications.

1     Q.   Do you know if they apply to the master
2     account request?
3     A.   I do not.
4     Q.   Okay.  So I believe you testified today
5     that you had regular communications with the
6     Board staff about the membership application; is
7     that right?
8     A.   Yes, we did.
9     Q.   About how often?
10    A.   Bi-weekly I believe would be a good
11    estimate.
12    Q.   Did the Board ever try to intervene on
13    the master account request?
14    A.   No, they did not.
15    Q.   Did the Board ever tell you that a Tier
16    3 institution could not obtain a master account?
17    A.   No, that was never communicated.
18    Q.   Give me two seconds.  I'll just check a
19    couple of things.
20         Okay, one additional thing.  You
21    testified that you were part of the FRBKC
22    internal NTMA meetings; is that correct?
23    A.   Yes, I did testify to that.
24    Q.   When did you start to participate in
25    those meetings?

1           A.    That would be when the membership
2     application was submitted by Custodia.
3           Q.    And what were the extent of your
4     communications in those meetings?
5           A.    My role was limited to providing updates
6     on the membership application, and answering any
7     questions related to that.
8           Q.    Okay.  I think that's it.
9                 MR. SWENSON:  Just a couple of
10    questions.  It will be quick.
11                     FURTHER EXAMINATION
12    BY MR. SWENSON:
13          Q.    How do you know that Esther George
14    decided the master account application?
15          A.    Because that's where the decision-making
16    authority lie.
17          Q.    So Esther George had the decision-making
18    authority?
19          A.    Yes.
20          Q.    Who set up the tiers for master
21    accounts?
22          A.    The Board issued the guidelines.  I
23    don't know what went into the process for
24    determining that.
25          Q.    Does Kansas City Fed have the authority