# EXHIBIT 14

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF WYOMING

3

4      _____

5  CUSTODIA BANK INC.,          )Civil Number
                                )22-cv-00125-SWS

6      Plaintiff,               )
                                )

7  v.                           )
                                )

8  FEDERAL RESERVE BOARD        )
   OF GOVERNORS and FEDERAL     )

9  RESERVE BANK OF              )
   KANSAS CITY,                 )

10                              )

   Defendants.                  )

11 _____

12

13

                - C O N F I D E N T I A L -

14

15              Deposition of

16              TARA HUMSTON

17           November 3, 2023

18              8:04 a.m.

19

20

21  Reported by:  Bonnie L. Russo

22  Job No. 6153223

CONFIDENTIAL

Page 9

1                    P R O C E E D I N G S

2                        (8:04 a.m.)

3

4                     TARA HUMSTON,

5        being first duly sworn, to tell the truth, the

6            whole truth and nothing but the truth,

7                    testified as follows:

8            EXAMINATION BY COUNSEL FOR PLAINTIFF

9                BY MR. SCARBOROUGH:

10           Q.    Ms. Humston, good morning.  My name

11       is Ryan Scarborough.  I represent Custodia

12       Bank.

13                    How long have you worked at the

14       Kansas City Fed?

15           A.    25 years.

16           Q.    And have you ever worked at the

17       board of governors?

18           A.    No.

19           Q.    If I refer to the board, do you

20       understand that to refer to the board of

21       governors?

22           A.    Yes.

CONFIDENTIAL

Page 10

1          Q.     What position do you hold today?

2          A.     Senior vice president.

3          Q.     And how long have you held that

4     position?

5          A.     Since May of -- I think May of 2019.

6          Q.     Okay.  In that position are you

7     essentially the right-hand person to the Kansas

8     City Fed president?

9          A.     I wouldn't characterize it as

10    right-hand person, just a division head of

11    supervision and risk management.

12         Q.     And did you work closely with Esther

13    George when she was president of the Kansas

14    City Fed?

15         A.     She was my direct boss, so yes, I

16    worked directly with her.

17         Q.     Have you ever been deposed before?

18         A.     No.

19         Q.     Ma'am, national banks are permitted

20    to engage in the business of banking; isn't

21    that right?

22                MR. MICHAELSON:  Objection.  Form.

Page 11

1                    THE WITNESS:  As far as I know, yes,
2          they are permitted.
3                    BY MR. SCARBOROUGH:
4              Q.    And that includes providing services
5          that are incidental to the business of banking?
6                    MR. MICHAELSON:  Objection.  Form.
7                    THE WITNESS:  In -- are you speaking
8          generally or by a rule or regulation?
9                    BY MR. SCARBOROUGH:
10             Q.    I am speaking generally.
11             A.    Could you repeat that.
12             Q.    Sure.  That includes the business of
13         banking includes providing services that are
14         incidental to the business of banking, correct?
15             A.    I --
16                   MR. MICHAELSON:  Objection.  Form.
17                   THE WITNESS:  I believe that's
18         what -- how it is settled out.
19                   BY MR. SCARBOROUGH:
20             Q.    Okay.  And activities incidental to
21         banking include things like providing custodial
22         services, right?

Page 25

1      I can't speak to how many.  I know she had some

2      contact at some point.

3          Q.    And did her contacts include

4      speaking with the commissioner of the Wyoming

5      Division of Banking, Albert Forkner?

6          A.    I do recall her saying she had

7      talked with Albert Forkner.

8          Q.    And did you have any conversations

9      with Wyoming representatives?

10         A.    At the time Albert would have been

11     the commissioner of Wyoming, and so in

12     supervising institutions in Wyoming, I would

13     have had periodic contact with Albert.  I don't

14     recall a specific meeting just to discuss the

15     SPDI charter.

16         Q.    You mentioned that you had regular

17     conversations with Wyoming more generally in

18     connection with their supervision -- was that

19     in connection with their supervision of

20     entities in Wyoming?

21         A.    Yes.  We work with the state

22     commissioners on the institutions that we

Page 26

1      jointly supervised through the dual banking

2      system.

3          Q.    Okay.  Do you have any criticism of

4      the Wyoming Division of Banking?

5          A.    No specific -- it's not a criticism,

6      but we often help some of our state

7      counterparts because they lack the resources to

8      be able to supervise some of the entities in

9      their state.

10         Q.    Did Wyoming have experience

11     personnel performing supervisory roles?

12         A.    For traditional banking charters,

13     they had staff that were -- had the skill set

14     needed to supervise traditional bank charters.

15         Q.    They were qualified?

16              MR. MICHAELSON:  Objection.  Form.

17              THE WITNESS:  Qualified for what?

18              BY MR. SCARBOROUGH:

19         Q.    For supervising traditional bank

20     charters, as you said?

21         A.    They had individuals I think our

22     team would say were qualified.

Page 27

1          Q.     And they had individuals who were

2     also competent, correct?

3          A.     Competent in...?

4          Q.     Supervising traditional bank

5     charters.

6          A.     I think if we say they were skilled,

7     they would be competent in supervising a

8     traditional bank charter.

9          Q.     And they had individuals who were

10    well trained in supervising traditional bank

11    charters, right?

12         A.     Wyoming Department of Banking had

13    training available to their examiners.  Some of

14    the states rely on the Federal Reserve's

15    training, so I don't know to what extent their

16    state relied on ours, but many of our states

17    are not able to fully utilize their own

18    training programs.

19         Q.     But your experience with Wyoming was

20    that they -- the individuals you dealt with

21    were well trained, correct?

22         A.     I don't deal with many of their

CONFIDENTIAL

Page 44

1      Kansas City Fed, not just from Wyoming but in

2      other reserve banks as well?

3           A.    Yes.   I think she was referring to

4      this as a broader issue than just firms in

5      Wyoming.

6           Q.    And at the -- at the beginning of

7      your e-mail on the second line, you note that

8      she said there is broad recognition of the

9      policy issues that need to be addressed.

10               Do you see that?

11          A.    Yes.

12          Q.    And was that your view as well, that

13     there -- that there was broad recognition

14     within the Federal Reserve system that there

15     were policy issues related to nontraditional

16     master accounts?

17               MR. MICHAELSON:  Objection.  Form.

18               THE WITNESS:  I don't know that I

19     can speak to -- I think I was regurgitating

20     what she said to me in the call.  I don't know

21     that I -- I have the same sense if there was

22     broad recognition or not, so I can't speak to

CONFIDENTIAL

Page 45

```
 1        that.
 2                    BY MR. SCARBOROUGH:
 3            Q.    Okay.  But Esther George, the
 4        president of the Kansas City Fed, indicated to
 5        you that there was broad recognition of the
 6        policy issues that needed to be addressed in
 7        connection with nontraditional master accounts,
 8        right?
 9            A.    It appears that's what she told me.
10            Q.    Okay.  She also told you that she
11        does not expect we alone will answer this
12        policy issue.
13                    Do you see that?
14            A.    Correct.
15            Q.    And was that also your understanding
16        that the Kansas City Fed alone would not answer
17        the policy issue about nontraditional master
18        account access?
19                    MR. MICHAELSON:  Objection.  Form.
20                    THE WITNESS:  I -- I knew that there
21        was issues that needed to be addressed broader,
22        and reserve banks don't set policies.  So
```

Page 46

```
1      those -- if it was associated to a direct

2      Federal Reserve policy issue, monetary policy,

3      those would need to be handled with the board

4      of governors.  And the extent that reserve

5      banks provide input might vary depending on the

6      policy issue.

7              BY MR. SCARBOROUGH:

8          Q.    And nontraditional master account

9      requests raised those broader policy issues,

10     didn't they?

11         A.    A component of it does.  The master

12     account -- just the broader idea of what those

13     entities can and can't do, that was what was

14     rising to the broader policy issues, but it

15     still came down to the master account request

16     itself remains -- there was no changing that

17     that was a reserve bank decision.

18         Q.    Do you see in the next sentence here

19     that there is a reference to governor -- well,

20     let me just read it:  "Apparently the PSPAC,"

21     P-S-P-A-C, "met to talk about" --

22         A.    Where are you?  In the second
```

CONFIDENTIAL

```
 1      paragraph?

 2           Q.    No.  The first paragraph --

 3           A.    First.

 4           Q.    -- middle of it.

 5           A.    Okay.

 6           Q.    The very next sentence, do you see

 7      it starts out:  "Apparently the PSPAC met to

 8      talk about finality, and Governor Brainard

 9      tasked them with solving for these questions

10      separately from the SCRM community"?

11                 What's the SCRM community?

12           A.    It is the subcommittee on credit and

13      risk management.

14           Q.    And is that a subcommittee -- is

15      that a board subcommittee?

16           A.    No.  It's reserve banks.

17           Q.    Okay.  And Governor Brainard, is

18      that a reference to Lael Brainard?

19           A.    Yes.

20           Q.    And Lael Brainard at that time was a

21      member of the board of governors at the Federal

22      Reserve board?
```

Page 174

1          in the Federal Register was to request comment

2          from the public about the proposed account

3          access guidelines, right?

4               A.    Yes, this is a notice of request for

5          comment.

6               Q.    And if people needed further

7          information, there at the bottom right there

8          was contact information provided for a Jason

9          Hinkle, correct?

10              A.    Yes.

11              Q.    Now, he is listed there as the

12         assistant director in the division of reserve

13         bank operations and payment systems.  Is the

14         acronym for that RBOPS?

15              A.    Yes, it is.

16              Q.    Okay.  And is Mr. Hinkle a board

17         employee?

18              A.    Yes, he is.

19              Q.    Okay.  And looking at this if you

20         flip over to the second page in the middle --

21         middle of the first column, do you see it says:

22         "Relatedly, there has been a recent uptick in

Page 175

1          novel charter types being authorized or

2          considered across the country"?

3              A.    You're in the first column?

4              Q.    First column, middle, on the left

5          side there.

6                    The paragraph begins:  "The payments

7          landscape," and then partway through that

8          paragraph, it says:  "Relatedly"?

9              A.    Okay.  I now see it.

10             Q.    Okay.  Do you agree that there had

11         been a recent uptick in novel charter types

12         being authorized or considered across the

13         country at the time -- at this time in 2021?

14             A.    Yes.

15             Q.    Okay.  And were you receiving --

16         were you, the Kansas City Fed, receiving an

17         increasing number of inquiries and requests for

18         access to accounts and services from novel

19         institutions?

20                   MR. MICHAELSON:  Objection.  Form.

21                   THE WITNESS:  Yes, we were getting

22         an increase in inquiries.

Page 176

1             BY MR. SCARBOROUGH:

2        Q.    Okay.  And that would have included

3    requests from like SPDI-chartered institutions,

4    correct?

5        A.    That would be one example that we

6    were getting inquiries from.

7        Q.    And the board of governors proposed

8    six principles to guide the process of

9    determining who gets access to the payment

10   system for a master account, right?

11       A.    Well, it was the guidelines for

12   reserve banks to do their risk analysis.

13       Q.    And that risk analysis was in

14   connection with determining who would get

15   access to master accounts and, therefore, the

16   payment system, right?

17       A.    Well, it wasn't driving who got

18   access.  It was driving the factors that a

19   reserve bank and the expectation of what a

20   reserve bank is considering in their analysis

21   to make their decision.

22       Q.    Okay.  And the first principle that

CONFIDENTIAL

Page 190

1       a bank before and their ability to run an

2       institution.  And so this is a new type of

3       institution, and I think we were all trying to

4       gather, you know, who has the expertise,

5       because their -- their leadership team did

6       change.

7               But I -- I don't know that I could

8       say there was a direct view.

9       Q.    Okay.  You write here that the time

10      line is probably, technically accurate.

11              First of all, in terms of timing at

12      this point, the application had been -- strike

13      that.

14              Custodia's request for a master

15      account had been pending for approximately one

16      year, correct?

17      A.    That is correct.

18      Q.    And the account access guidelines's

19      first draft was published in May of 2021, so

20      that would have been more than -- about half a

21      year or so after the first -- after Custodia

22      made its request for a master account?

Page 191

1          A.     True.

2          Q.     Okay.  How long does it typically

3     take for a master account to be --

4          A.     For a traditional --

5          Q.     -- decided?

6          A.     -- commercial bank, it can be done

7     in a week's time or less.

8          Q.     Okay.  In terms of the time line

9     that you referenced here about the time line is

10    probably, technically accurate about -- is that

11    referencing the fact that the request just sat

12    at the Fed before Custodia was hit out of left

13    field with the proposed account access

14    guidelines?

15               MR. MICHAELSON:  Objection.  Form.

16               THE WITNESS:  No.  I mean, in the

17    e-mail, we are not seeing an attached picture.

18    I may have been referring to that.  I don't --

19    I don't recall what that looked like.

20               But, I mean, I would be speculating

21    to say if I am referring to what was in the

22    picture attached --

Page 192

1              BY MR. SCARBOROUGH:

2         Q.    Okay.

3         A.    -- which we don't -- unless you have

4    that.

5         Q.    It wasn't produced by the Kansas

6    City Fed.

7              Let me ask you this:  In the terms

8    of the account access guidelines that were

9    published in May of 2021, they listed out the

10   six principles that we've discussed, right?

11        A.    The account access guidelines, yes.

12        Q.    Okay.  But nothing in that proposal

13   contemplated a tiered structure or dividing

14   banks into tiers, correct?

15        A.    I believe the tiering came later

16   after the comment period.

17        Q.    Okay.  All right.  So I want to

18   switch gears for just a moment.

19              Would you agree with me,

20   Ms. Humston, that only an eligible depository

21   institution is permitted to obtain a master

22   account?

Page 250

1          The board had the opportunity to put

2     Custodia into a Tier II category if it had

3     granted membership, correct?

4          A.   After we had already sent our

5     recommendation memo, you're saying if they had

6     made their decision that was not consistent

7     with ours?  It would have ultimately -- they

8     would have -- then their facts and

9     circumstances would have changed to a Tier II.

10          Q.   Ms. Humston, do you understand that

11     the Kansas City Fed made significant efforts to

12     make sure that the master account decision did

13     not get out ahead of the membership question?

14          A.   Oh, we considered the -- I mean, the

15     timing of the decisions, but there were drivers

16     because if that tiering did change, we would

17     need to go back and do different analysis.

18          But we knew factually we had made

19     the decision that the master account should be

20     denied.  We recommended to the board the

21     membership should be denied.  And so we had our

22     decisions prepared.

Page 251

1           The board of governors we hoped were

2       following our recommendation, and so if for

3       some reason they didn't and we -- I didn't know

4       the outcome of it, then we would need to take a

5       pause and reconsider is there more -- what more

6       work did we need to do in our consideration.

7           Q.    So the master account decision

8       ultimately hinged on what status or tier level

9       Custodia would wind up in, correct?

10          A.    No, it didn't ultimately.  I mean,

11      we were already giving it heightened scrutiny,

12      and so --

13          Q.    Right.  But if -- I'm sorry.  I

14      didn't mean to interrupt you.

15          A.    We were already giving it heightened

16      scrutiny in Tier III.  So we had done a great

17      deal of work and found that the answer should

18      be no.

19              If the board had somehow found a

20      different fact pattern that they should

21      appropriately fit into being a member bank --

22      we do not have instances that I'm aware of a

Page 252

1          member bank not having a master account.  And,

2          therefore, I would need to go back and see is

3          that really something that I would reconsider

4          my decision of a master account being no.

5               Q.    And, in fact, if somebody was in a

6          Tier II, you wouldn't look at that from a risk

7          perspective as a nonstarter, would you?

8               A.    I'm sorry --

9                     MR. MICHAELSON:  Object to form.

10                    BY MR. SCARBOROUGH:

11              Q.    If an entity was in a Tier II

12         classification, you wouldn't look at that from

13         a risk perspective as a nonstarter for getting

14         a master account?

15                    MR. MICHAELSON:  Object to form.

16                    THE WITNESS:  I -- I'm not

17         following.  Like, what -- I mean, from a risk

18         perspective, I'm not sure where you're going

19         with that.  Like --

20                    BY MR. SCARBOROUGH:

21              Q.    Well --

22              A.    -- I mean, all of these have a risk

CONFIDENTIAL

Page 253

1          to them.
2                Q.    Correct.  But if you have a federal
3          regulator, if you're a member of the Federal
4          Reserve system and, therefore, you qualify as
5          Tier II, from that perspective it would not be
6          a nonstarter to getting a master account,
7          right?
8                     MR. MICHAELSON:  Object to form.
9                     THE WITNESS:  Well, none of these I
10         would say are indicating that it's a nonstarter
11         if that's what you're asking.  I am not
12         following what you're getting at here.
13                    BY MR. SCARBOROUGH:
14               Q.    Has there ever been a Tier III
15         entity that has been given master account
16         access since the guidelines were published?
17               A.    I'm not aware of any but --
18               Q.    Okay.  Has there been a Tier II
19         entity, to your knowledge, since the guidelines
20         were published that has been given master
21         account access?
22               A.    I'm not aware one way or the other.

                                        Page 428

1              MR. MICHAELSON:  All right.  Thank

2      you.  I have a few -- a few question for

3      Ms. Humston.

4              I would first like to designate the

5      entire transcript confidential now.

6          EXAMINATION BY COUNSEL FOR DEFENDANT

7              By MR. MICHAELSON:

8          Q.   Ms. Humston, you just sat through

9      seven hours of testimony.  Did --

10             MR. SCARBOROUGH:  Technically it

11     wasn't seven hours.

12             MR. MICHAELSON:  A minute shy --

13             MR. SCARBOROUGH:  It was like three

14     minutes shy.

15             MR. MICHAELSON:  -- a minute or

16     two -- minute or two shy of seven hours.

17             BY MR. MICHAELSON:

18         Q.   Did --

19         A.   It has felt like 20 so...

20         Q.   Did counsel for Custodia ask you who

21     made the decision to deny Custodia's master

22     account request?

CONFIDENTIAL

Page 429

1          A.     No, I was not asked.

2          Q.     Did he ask you whether the board

3     controlled the outcome of that decision?

4          A.     In evasive ways but not directly.

5                 MR. SCARBOROUGH:  Objection to form.

6                 BY MR. MICHAELSON:

7          Q.     So let me ask you:  Who made the

8     decision to deny Custodia's master account

9     request?

10          A.     The Kansas City Reserve Bank.

11          Q.     And who specifically?

12          A.     I would say it would be between

13     Christi May-Oder, Judith Hazen, myself, and

14     Esther in consultation with our legal team.

15          Q.     And approximately -- and how was the

16     decision made?  Was it a vote?  Like, how was

17     the decision arrived at?

18          A.     It was extremely iterative over a

19     number of years, in fact.  And so from when we

20     took in the initial request, as you can see

21     from the many pages of documents that we

22     submitted, there were meetings over many years

Page 430

1      in trying to determine if we had risk factors

2      assessed right.

3              And so ultimately I think as we

4      entered the end of 2022, there continued to be

5      meetings among those stakeholders, briefings

6      with Esther.  I would have status meetings with

7      her, as we determined that we felt we had fully

8      performed our analysis and all the facts that

9      we could gather, and we just felt the risks

10     were too great that our team had identified and

11     that the gaps were -- at the time we were

12     concluding particularly what was coming out of

13     our membership review, that the risk was too

14     significant for us to allow them to have an

15     account in the payment system.

16              And so Esther agreed with that final

17     recommendation and then asked us to ultimately

18     put that on paper so we could ensure ourselves

19     that we had full support.

20         Q.    Okay.  I'll unpack that a little

21     bit.

22              You mention she asked you to put it

Page 434

1          A.    You mean to Custodia or --

2          Q.    No.  Just in general if one were to

3     look to -- if there is a place that lays out

4     kind of the reasoning behind the denial of the

5     master account, is there such a thing?

6          A.    I mean, we created it and sent that

7     to the firm.  I wouldn't -- publicly, no, there

8     would not be that information where somebody in

9     the public could go out.  That's considered

10    confidential supervisory and confidential

11    business plans.  We don't give that out so that

12    the public knows business plans of entities.

13         Q.    Would you say that the letter that

14    went out to the firm fairly reflects the

15    reasoning behind the denial?

16         A.    I think so.  We put a lot of thought

17    into making sure we outlined what we felt were

18    the biggest risks.

19         Q.    Okay.  And at the time that this --

20    so you placed the decision to deny it before

21    that memo to Ms. George was drafting, right?

22         A.    Yes.

Page 435

1      Q.    Okay.  At the time that decision was

2      reached, had the board of governors instructed

3      Federal Reserve Bank of Kansas City to deny the

4      master account request?

5      A.    No.

6      Q.    Had the board of governors compelled

7      in some way, directly or indirectly, the

8      Reserve Bank of Kansas City to deny Custodia's

9      master account request?

10     A.    No.  In fact I didn't even know the

11     governors' view on -- whether they even had a

12     view.

13     Q.    Okay.  Did any individual governor

14     ever instruct the Reserve Bank of Kansas City

15     to deny the request?

16     A.    No.

17     Q.    Okay.  Did any individual governor

18     compel the Reserve Bank of Kansas City to deny

19     the request?

20     A.    No.

21     Q.    At the time the decision to deny was

22     reached, did you have any understanding as to

Page 436

1      where any governor stood on the question of the

2      master account?

3          A.    No.  There was one time Esther had

4      alluded to me in a conversation that she said

5      views were mixed, and she couldn't allude to

6      any particular view, just views were mixed

7      so...

8          Q.    Did you ever hear directly or

9      indirectly whether Vice Chair Barr had an

10     opinion on whether to grant or deny Custodia's

11     master account request?

12         A.    No.  I had never heard an opinion.

13     I never heard even a shared one.

14         Q.    Okay.  Did you -- when the decision

15     was reached, did you feel that the Federal

16     Reserve Bank of Kansas City had the freedom to

17     go either way on it?

18         A.    Absolutely.

19         Q.    Did you feel that you could have

20     granted the master account request even if the

21     board decided to deny membership?

22         A.    Yes.

Page 437

1      Q.    Okay.  Now, I want to go back in

2      time to -- actually, a couple quick questions

3      about Vice Chair Barr.

4            What was his role at the board?

5      A.    He is a vice chair of supervision.

6      Q.    What does that mean?

7      A.    So that means everything in

8      supervision, everything reports up through Vice

9      Chair Barr, but these decisions that are under

10     RBOPS and master accounts do not fall under

11     Vice Chair Barr.

12           So my -- my department that I've

13     talked about that we call credit risk and

14     reserves management, all of their body of work

15     does not -- is not considered supervision.

16     Almost everything else my division does goes up

17     to Vice Chair Barr in supervision.

18     Q.    Okay.  Does his role relate to

19     Federal Reserve membership?

20     A.    Yes, it reports up through him.

21     Q.    So membership reports up to him?

22     A.    Yes.

Page 438

1      Q.    So would it be your expectation that

2      Vice Chair Barr would have been involved in

3      Custodia's membership application?

4      A.    Yes.

5      Q.    I just want to go back to when

6      Custodia's master account request first came

7      in.

8            When it first came in, what was your

9      understanding as to who would be responsible

10     for deciding it?

11     A.    Well, we always knew it would be our

12     decision.  We would be responsible for making

13     the decision on the master account.

14           But as I talked about early on,

15     there were questions of are these firms even

16     legally eligible to hold a master account.  So

17     there were some very early questions that we

18     were having to navigate before even getting to

19     the master account analysis.

20     Q.    When it first came in -- so on Day

21     1 -- did you have a view as to whether it

22     should be granted or denied?

Page 439

1          A.    I think early on we were fairly

2     skeptical because it was such a novel entity

3     and the first time a state had just created a

4     new charter, so I think there was quite a bit

5     of skepticism from Day 1.

6          Q.    But were you able to make the

7     decision on Day 1?

8          A.    We could have, but that wouldn't

9     have been a fair process to not study and

10    understand not only the legislation but the

11    business model of the firm itself.

12             So just early on, it seemed that it

13    was very unlike a traditional community bank or

14    commercial bank, and it doesn't -- not having

15    insurance, not having a federal regulator, not

16    lending -- I mean, it's very different business

17    model, so it called into question of how is

18    that going to fit into the banking system and

19    particularly the eligibility for a master

20    account.

21         Q.    So when it came in, was it your

22    understanding that work needed to be done to

Page 440

1        arrive at a decision?

2            A.    Yes.

3                MR. SCARBOROUGH:  Objection.

4                THE WITNESS:  A lot of work needed

5        to be done, and so that's I think where we were

6        really trying to bring in a lot of views

7        because some of these activities, even over the

8        last few years, you've seen, you know, a lot of

9        movement in not only knowledge but firms using

10       DLT, blockchain, you know, different types of

11       new and innovative technology.

12               So, you know, it's not unlike any

13       other master account request that's

14       unusual or -- you know, because it's not just

15       these that require extra analysis.  We've had

16       other cases in the past where like a fintech

17       firm tries to come in and buy a bank or start,

18       and it's a very unusual model.  And so those

19       are taking quite a bit of time to navigate

20       through, and so it doesn't just have to be in

21       the crypto sector.

22               BY MR. MICHAELSON:

Page 441

1      Q.    Is it -- in handling a master

2  account request that presents novel issues, is

3  it necessary for the Federal Reserve Bank of

4  Kansas City to do its work in a silo without

5  communicating with any other reserve bank

6  before?

7      A.    Did you say was that necessary or --

8      Q.    Is it necessary?

9      A.    Is it necessary to do it in a silo?

10  No.  I mean, we would find it imprudent not to

11  take in views from others and ensure that there

12  is not similar cases happening.

13            So if we very narrowly focused it,

14  you would start having, you know, a great deal

15  of regulatory arbitrage in just trying to find

16  where you'll get -- an entity could go try to

17  find where they'll get that -- the answer they

18  we want.  We want consistency across the

19  country so that if you go to one reserve bank

20  with a particular fact set, it would be handled

21  similarly with the same fact set at another

22  reserve bank.

Page 442

1          Q.    Okay.  And earlier today you

2     testified about a number of subjects in which

3     there was discussion between the reserve bank

4     and the board concerning Custodia's request.

5     And I just want to quickly touch on a few of

6     them, and then we'll be done.

7               One was the subject of legal

8     eligibility.  Did the decision as to legal

9     eligibility control the outcome of denial of

10    the master account request?

11         A.    No.  In fact the board said yes on

12    legal eligibility.

13         Q.    Okay.  Another subject that was

14    discussed was legal permissibility.  Did legal

15    permissibility issues control the outcome of

16    the denial of Custodia's master account

17    request?

18         A.    Legal permissibility of what?

19         Q.    Well, what -- whose -- what do you

20    understand the discussion earlier today about

21    permissibility to relate to?

22               MR. SCARBOROUGH:  Objection to form.