# EXHIBIT 16

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3

4       CUSTODIA BANK, INC.,

5                          Plaintiff

6       vs.                              No.

7       FEDERAL RESERVE BOARD OF          22-cv-00125-SWS

8       GOVERNORS and FEDERAL RESERVE

9       BANK OF KANSAS CITY,

10                         Defendant.

11

12

13

14

15           CONFIDENTIAL DEPOSITION OF JUDITH HAZEN,

16      FRBKC Representative, a Defendant, taken on behalf of

17      the Plaintiff before Kelsey Robbins Schmalz, CSR No.

18      1571, CCR No. 1148, RPR, pursuant to Notice on the

19      16th of November, 2023, at the offices of the Federal

20      Reserve Bank of Kansas City, 1 Memorial Drive, Kansas

21      City, Missouri.

22

23

24

25

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 38

1      City Fed provide a ballpark estimate, because this is

2      one of the topics that we identified to have somebody

3      speak on behalf of the Kansas City Fed about.

4                    MS. CARLETTA:  And we made it clear

5      that it was irrelevant and we would prepare on a

6      general matter, but it is irrelevant to this

7      litigation.  It has nothing to do with whether or not

8      the Board or the Bank made a decision on Custodia's

9      master account request.

10                   You can answer the question if you

11     know.

12     BY MR. SCARBOROUGH:

13           Q.     Can you answer the question?

14           A.     I'm aware of a handful of meetings

15     that occurred.

16           Q.     If you were speaking on behalf of the

17     Kansas City Fed, does the Kansas City Fed have any

18     basis to disagree with the statement that between the

19     meetings concerning the draft SPDI legislation as

20     well as the meetings around the supervisory framework

21     that occurred between 2017 and 2020 that in total

22     there were more than 100 meetings or calls or

23     engagements between the Kansas City Fed and

24     representatives of the State of Wyoming?

25                   MS. CARLETTA:  Same objection in

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 39

1   that --

2   BY MR. SCARBOROUGH:

3         Q.    Do you have any basis to disagree with

4   that?

5               MS. CARLETTA:  Same objection.

6         A.    So I understand the assertion by

7   Custodia that that occurred.  I'm not aware of any

8   conversations that occurred with the State of

9   Missouri and the Kansas City Fed that included

10  representatives of Custodia.  I can say that over

11  that time frame our engagement with the State of

12  Wyoming would've included a number of topics that

13  extended beyond this legislation and beyond these

14  charters and beyond the supervisory program, and so

15  it may be that conversations between our staff were

16  in a high number, but I don't believe that that

17  number is accurate for those that were focused on

18  this topic.

19  BY MR. SCARBOROUGH:

20        Q.    And when you say this topic, what are

21  you referencing?

22        A.    I'm referencing SPDI legislation, SPDI

23  supervisory program and any specific SPDI charter

24  holders.

25        Q.    So the Kansas City Fed would dispute

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 141

1    that everybody should be treated equally, everybody

2    should pay the same price?

3                    MS. CARLETTA:  Objection.  Outside the

4    scope.  Calls for a legal conclusion.

5            A.      For those institutions that are

6    approved to access services through the Federal

7    Reserve System, the prices should be consistent.

8                    MR. SCARBOROUGH:  Why don't we take a

9    few minute break.

10                   (Off the record from 11:37 to 11:52.)

11   BY MR. SCARBOROUGH:

12           Q.      I want to shift gears, and I saw in

13   your binder, Exhibit 225, that you had compiled

14   certain lists of people in response to certain

15   topics.

16           A.      Yes.

17           Q.      I want to try to do something similar

18   to understand the people at the Board of Governors

19   who had involvement either in connection with

20   Custodia's master account request or more generally

21   addressing issues around novel chartered entities

22   like SPDIs, so let me start by asking it's my

23   understanding that the Board of Governors created

24   certain working groups to try to answer policy

25   questions that were raised by novel chartered

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 142

 1    entities like SPDIs; is that right?

 2                    MS. CARLETTA:  Objection.  Form.

 3            A.      So the PSPAC, which I'll have to get

 4    you the acronym for --

 5    BY MR. SCARBOROUGH:

 6            Q.      Policy --

 7            A.      Payment Systems Policy --

 8            Q.      Payment Systems Policy --

 9            A.      -- Advisory Council or Committee.

10            Q.      I think it's Committee.

11            A.      Thank you.  Consists of both Governors

12    and Reserve Bank presidents, and as -- over several

13    years in watching the evolution of new charters and

14    new business models for existing charters and new

15    uses of existing charters, there was work under way,

16    and one of those was the creation of a nontraditional

17    account access group that was looking at issues that

18    were relevant and of interest to the system as a

19    whole that these nontraditional account access

20    requests were creating.

21            Q.      I'm going to hand you a document

22    that's been previously marked as Exhibit 202.

23                    MR. SCARBOROUGH:  I don't have another

24    copy of it but it was used yesterday.

25                    MS. CARLETTA:  Yeah.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 143

1   BY MR. SCARBOROUGH:

2            Q.     Do you see that Exhibit 202 sets forth

3   the nontraditional account access workstream

4   structure that the Board was establishing?

5            A.     Give me just a minute to take a look

6   at this.  I see the overview of the structure of that

7   account access steering committee.

8            Q.     And the Payment System Policy Advisory

9   Committee, the PSPAC, that was a preexisting

10  committee that has been longstanding within the

11  Federal Reserve System, correct?

12           A.     Yes.  The PSPAC predates the creation

13  of this account access steering committee.

14           Q.     And the nontraditional account access

15  workstream structure that's reflected in Exhibit 202

16  was something that was established by the Board

17  specifically to address policy questions that were

18  being raised by nontraditional chartered entities

19  like SPDIs who were seeking access to the payment

20  system, correct?

21                 MS. CARLETTA:  Objection.  Form.

22           A.     So, again, questions were being raised

23  broadly, and the PSPAC, which consists of both

24  Governors and Reserve Bank Presidents, were looking

25  at these broader issues that were being brought to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 193

1    Custodia's business model.  We were discussing a

2    draft document that had a note about permissibility

3    considerations.  Then more broadly we were discussing

4    what's applicable to OCC-chartered and other

5    state-chartered entities, but I think that in our

6    final analysis we would have looked at the legal

7    eligibility for Custodia to maintain a master account

8    and then also would have looked at the activities

9    that they were proposed to engage in and the risks

10   associated with that.

11   BY MR. SCARBOROUGH:

12        Q.    So let's take that one step at a time.

13   There is no dispute, is there, that Custodia was

14   legally eligible to receive a master account,

15   correct?

16              MS. CARLETTA:  Objection.  Form.

17        A.    The Reserve Bank has conveyed that

18   they met the threshold eligibility question to apply

19   for a master account.

20   BY MR. SCARBOROUGH:

21        Q.    So the Kansas City Fed is not taking a

22   different position today than was taken in January of

23   2022 that Custodia is legally eligible to receive a

24   master account, correct?

25              MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 194

1    Outside the scope.  Foundation.

2            A.    We've conveyed that they meet the

3    threshold to request a master account.

4    BY MR. SCARBOROUGH:

5            Q.    Okay.  And by the way, that

6    determination was reached by the representatives of

7    the Board of Governors and first conveyed to Custodia

8    by the Board's general counsel, Mark Van Der Wiede,

9    correct?

10                MS. CARLETTA:  Objection.  Form.

11           A.    I don't know how that was first

12   conveyed to Custodia.

13   BY MR. SCARBOROUGH:

14           Q.    Are you aware that the determination

15   that Custodia was legally eligible to receive a

16   master account was reached by the Board of Governors?

17   It was decided by the Board of Governors?

18                MS. CARLETTA:  Objection.  Form.

19           A.    I know that in answering the question

20   of if they met that threshold eligibility question

21   our legal counsel consulted with Board legal -- or

22   general counsel.

23   BY MR. SCARBOROUGH:

24           Q.    And do you understand that the Board

25   of Governors made the determination that Custodia was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 195

1    legally eligible for a master account?

2              MS. CARLETTA:  Objection.  Form.

3         A.    I understand that the Reserve Bank

4    conveyed that Custodia had met the threshold legal

5    eligibility question.

6    BY MR. SCARBOROUGH:

7         Q.    My question wasn't who conveyed it.

8    My question was who made the determination of legal

9    eligibility.  It was the Board, wasn't it?

10             MS. CARLETTA:  Objection.  Form.

11        A.    The Board of Governors would be the

12   ones that have the interpretation of legal

13   eligibility, and so we would consult with them in

14   determining legal eligibility.

15   BY MR. SCARBOROUGH:

16        Q.    And is the Kansas City Fed taking the

17   position today in the litigation that Custodia's

18   business model was legally impermissible?

19             MS. CARLETTA:  Objection.  Form.

20        A.    Legally impermissible by whom or who?

21   BY MR. SCARBOROUGH:

22        Q.    I'm asking the question straight up.

23   Is the Kansas City Fed taking the position that

24   Custodia's business model related to providing

25   banking services related to cryptocurrency assets was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 260

 1    accelerate the process to ensure that we didn't wait

 2    until it went to the director of RBOPS and then had

 3    to circle back around to staff.

 4    BY MR. SCARBOROUGH:

 5        Q.    So by sharing it in the first instance

 6    with the Board staff, you're looking to get

 7    additional feedback in advance; is that fair?

 8            MS. CARLETTA:  Objection.  Form.

 9        A.    So we had outlined our analysis of

10    the master account request and our support for our

11    decision to deny the request for the master

12    account, but within that we would look particularly

13    in our analysis around some of the broader principles

14    and risks that are identified to gather input from

15    the Board of Governors staff that has specific

16    expertise in those areas, and so this allows us to

17    do that.

18    BY MR. SCARBOROUGH:

19        Q.    And earlier I asked you was this the

20    first time that the Kansas City Fed had ever shared a

21    draft of its recommendation memo on a master account

22    request, and I believe you said this was the first

23    time that we were doing it under the S Letter

24    process, right?

25            MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 261

1          A.     So this is the first time I think that

2     we're sharing this version of the memo with them, and

3     we're doing it pursuant to that proposed S Letter.  I

4     don't know if there were earlier versions that were

5     shared as well.

6     BY MR. SCARBOROUGH:

7          Q.     And there's been testimony given in

8     this case by Esther George that over her 40-year

9     career at the Kansas City Fed, this was the first

10    S Letter that she had ever encountered.  Has the

11    Kansas City Fed ever received an S Letter before this

12    one?

13         A.     So S Letters are numbers subsequently,

14    so this would have been the 2,677th S Letter that had

15    been issued.

16         Q.     And can the Kansas City Fed give me an

17    example of any other S Letter that it has received in

18    the past ten years?

19              MS. CARLETTA:  Objection.  Outside the

20    scope.

21         A.     I didn't review all S Letters that

22    have been issued in the last ten years.

23    BY MR. SCARBOROUGH:

24         Q.     Can the Kansas City Fed identify a

25    single S Letter in the past ten years other than the

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 262

1    one pertaining to the requirements of master

2    accounts?

3                MS. CARLETTA:  Same objections.

4        A.    I can't identify by name S Letters

5    that have been issued in the last ten years.

6    BY MR. SCARBOROUGH:

7        Q.    Can the Kansas City Fed identify by

8    topic or subject matter?

9                MS. CARLETTA:  Same objections.

10   BY MR. SCARBOROUGH:

11       Q.    You understand that one of the topics

12   that was listed here was the frequency, occurrence,

13   the -- about S Letters, the subjects of these

14   S Letters, what they covered?

15       A.    I didn't --

16                MS. CARLETTA:  I believe we objected

17   to the scope of that topic.

18       A.    Which number is the one addressing all

19   S Letters that have been issued?

20   BY MR. SCARBOROUGH:

21       Q.    Which topic?

22       A.    Yes, please.

23       Q.    If you look at Topic 10.

24                MS. CARLETTA:  Is it 10 or is it 7?

25   I'm sorry.  Yeah.  I'm sorry.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 263

1    BY MR. SCARBOROUGH:

2         Q.    So can you answer my question,

3    Ms. Hazen?

4         A.    I can't speak to all of the

5    S Letters that have been issued over the last 10 or

6    25 years.

7         Q.    I'm not asking you to speak to all of

8    them.  I'm just asking you to identify any topic or

9    subject matter that any S Letter addressed.

10         A.    So S Letters are used to communicate

11   guidance or -- communicate expectations around

12   guidance to the Reserve Banks, so any guidance that's

13   been issued over the last 10 or 25 years likely has

14   an S Letter that accompanies it.

15         Q.    And are you aware that there is a

16   difference between an SR Letter versus an S Letter?

17         A.    Yes.

18         Q.    When the Board of Governors issues an

19   S Letter, is it optional for a Reserve Bank to comply

20   with it?

21              MS. CARLETTA:  Objection.  Form and

22   outside the scope.

23         A.    So I suppose it's optional for a

24   Reserve Bank to comply with guidance from the Board

25   of Governors, but generally speaking I think the

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 264

1    expectation is that the Reserve Banks endeavor to

2    comply with the expectations of the Board.

3    BY MR. SCARBOROUGH:

4          Q.     The Reserve Banks listen and follow

5    whatever guidance, policies, procedures are

6    established by the Board in whatever form they're

7    communicated, right?

8                 MS. CARLETTA:  Objection.  Form.

9          A.     If an expectation is communicated

10   through an S Letter, then a Reserve Bank would follow

11   that.

12   BY MR. SCARBOROUGH:

13         Q.     And so you submitted -- the Kansas

14   City Fed submitted to Board of Governors staff a

15   draft of it, and did it receive feedback back from

16   the Board?

17         A.     Yes, we received feedback from the

18   Board staff.

19         Q.     I'm going to hand you what has been

20   marked as Exhibit 28.  I'm also going to hand you

21   what has been marked as Exhibit 29.  On Exhibit 28,

22   does this reflect that Jason Hinkle emailed feedback

23   from Board S&R, financial stability and himself to

24   the Kansas City Fed?

25         A.     Yes.  Attached is feedback from Board

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 292

1         A.      Are -- sorry.  I was just going to say

2    on the break I was able to get answers to a few

3    questions I couldn't answer before.  I don't know if

4    you want those now or --

5         Q.      Sure.  Go ahead.

6         A.      So I think that you had asked me about

7    who issues operating circulars.

8         Q.      Yes.

9         A.      So operating circulars are drafted and

10   issued by Reserve Banks.  The Reserve Banks are party

11   to them, and there is a notice in consultation

12   process with RBOPS.

13        Q.      Okay.

14        A.      So they are issued by the Reserve

15   Banks.

16        Q.      With a notice and comment process?

17        A.      Consultation process with RBOPS.

18        Q.      Was there another question that you

19   got the answer to over the break?

20        A.      Yes.  I just wanted to provide you

21   some additional information on S Letters.

22        Q.      Okay.

23        A.      So you had asked me how many had been

24   issued in the last ten years.  There's been at least

25   26 issued since 2013.  They're on a variety of

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 293

1      topics, but broadly I'd say that they are on

2      administration, personnel and financial services.

3              Q.      And how did you check that to

4      determine?

5              A.      In reviewing the titles of the

6      S Letters that have been issued since 2013.

7              Q.      And is that available on an internal

8      Federal Reserve System workspace or platform?

9              A.      S Letters are available internally to

10     the Reserve Banks.

11             Q.      In what way are they provided

12     internally or tracked internally?

13             A.      So they're available for review

14     internally on our intranet site.

15             Q.      Okay.  Anything else that you had

16     identified over the break?

17             A.      I can give you examples of those if

18     you're interested, but just broadly those would be

19     the topics addressed in the 26 issued.

20             Q.      All right.  Why don't we keep going on

21     to other topics at the moment.

22             A.      Okay.

23             Q.      And then to be sensitive to time here.

24             A.      Sure.

25             Q.      Anything else that you wanted to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 297

1    Q.    So it's the Kansas City Fed's

2    understanding that that public-facing database that

3    the Board has published since essentially end of last

4    year encompasses both entities that have master

5    accounts as well as those that have direct access to

6    services; is that right?

7                    MS. CARLETTA:  Objection.  Form.

8            A.    So I believe the database was first

9    published in the summer of 2023, and yes, it includes

10   a list of all entities with direct access to Federal

11   Reserve services regardless if they settle in their

12   own master account or if they settle in a

13   correspondent account.

14   BY MR. SCARBOROUGH:

15           Q.    And as of November of 2023, so the

16   present, there is one institution within the Kansas

17   City Fed's district that has a master account but

18   does not have -- but is not FDIC insured and does not

19   have a federal supervisor; is that right?

20           A.    So yes.  In looking at the depository

21   institutions that currently maintain a master

22   account, we have one institution that is a

23   state-chartered savings and loan association.  It's

24   not insured by the FDIC and it does not have a

25   federal regulator.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 298

1          Q.     And if I'm reading this correctly,

2     there are two other entities, federal government

3     sponsored enterprises, or GSEs, that have a master

4     account within the Kansas City Fed's district; is

5     that correct?

6          A.     That's correct.

7          Q.     Are those -- is that -- I didn't mean

8     to interrupt you.

9          A.     I'm sorry.  Go ahead.

10          Q.     Is that a reference to Fannie Mae and

11     Freddie Mac, or are they different GSEs?

12          A.     So the GSEs that we would be

13     referencing here would include a member of the Farm

14     Credit System.  It would be a federal supervisor

15     through the FCA.  We also have an account with a

16     federal home loan bank and they -- so they are part

17     of a GSE and they have a federal supervisor, the

18     FHFA.

19          Q.     Okay.  And have you done an analysis

20     to determine over any particular period of time, say

21     in the last 10 years or 20 years or whatever time

22     frame is appropriate to determine the number of

23     institutions that have had a master account without

24     being FDIC insured or having a federal supervisor?

25          A.     I've not reviewed the historical data.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 299

1    We currently have one.  We have had at least one
2    other in the past.
3            Q.    Okay.  Now, I want to make sure I'm
4    understanding the terminology.  So when we talked
5    about having direct access to Federal Reserve payment
6    services, is it -- is it, in fact, the case that in
7    order to use a correspondent bank, a bank needs to
8    have a master account?
9                  MS. CARLETTA:  Objection.  Form.
10           A.    So I suppose a bank could have a
11   master account and still use correspondent services
12   with another bank.
13   BY MR. SCARBOROUGH:
14           Q.    Is that a prerequisite, though?
15           A.    It is not.
16           Q.    In order to have a correspondent
17   relationship to have a master account?
18           A.    No.  So, again, I think of it first
19   through the lens of wanting to have direct access to
20   Federal Reserve financial services, and so once we
21   determine that an entity is eligible to access those
22   services directly and approved to do so, we need to
23   understand where they're going to settle their
24   activity.  An entity might choose to settle that in a
25   master account, their own master account, in which

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 300

1   case we would also need to approve the master

2   account.  They may also choose to settle in a

3   correspondent account or another entity's master

4   account.  So you don't have to have your own master

5   account to settle in a correspondent's account.

6          Q.     And I want to make sure I'm not mixing

7   up terminology, but is there a concept that in order

8   to have a correspondent relationship an entity needs

9   have a master account to have a correspondent

10  relationship?

11              MS. CARLETTA:  Objection.  Form.

12         A.     If an entity wanted to serve as a

13  correspondent and allow others to settle in their

14  account.

15  BY MR. SCARBOROUGH:

16         Q.     Yeah.  That's not my question.

17         A.     Then they would need a master account.

18         Q.     My question is coming at it from the

19  opposite end.  If an entity wanted to have access and

20  establish through a correspondent relationship, is

21  there any scenario that you're aware of that would

22  require the entity that's seeking the access to have

23  a master account?

24              MS. CARLETTA:  Objection.  Form.

25         A.     If an entity requested and was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 313

1      again.

2      BY MR. SCARBOROUGH:

3              Q.      I'm on Page 36.

4              A.      This one's framed differently, but

5      yes, I see this bullet point referencing institutions

6      engaged in novel and high-risk activities.  As we go

7      through this, though, each of these is referencing a

8      different principle, and, again, I think the broader

9      notification is that in assessing the specific

10     principle and the risk that it contemplates, if risk

11     is noted relative to these things, that's what would

12     raise this to the awareness of the Board.

13             Q.      And one of the triggers to bringing

14     this to the Board's attention is if the entity is

15     engaged in what's viewed as novel or high-risk

16     business activities?

17                     MS. CARLETTA:  Objection.  Form.

18             A.      Again, I think that for an institution

19     type that is newly created, we would see that it made

20     sense to provide that information to the Board and to

21     seek their expertise in specific risk matters as we

22     conducted our assessment.

23     BY MR. SCARBOROUGH:

24             Q.      Okay.  Coming back for a moment to the

25     determination to acceptably put pencils down on the

Page 314

 1    review of Custodia master account and to begin

 2    drafting the denial recommendation, first of all, am

 3    I right that once the focus shifted to drafting the

 4    denial recommendation memo the Kansas City Fed put

 5    its pencils down on considering approval of the

 6    master account at that point?

 7                   MS. CARLETTA:  Objection.  Form.

 8          A.      So drafting -- drafting of the

 9    recommendation began in December.  The conclusion on

10    the decision was not reached and communicated until

11    January, and so we had the challenging job of both

12    thinking through how do we analyze the information

13    that we have to date and also incorporate additional

14    information that we are receiving.

15    BY MR. SCARBOROUGH:

16          Q.      And you were -- the Kansas City Fed

17    was trying to stay in sync and not get out ahead of

18    the Board in terms of its analysis of the membership

19    question; is that right?

20                   MS. CARLETTA:  Objection.  Form.

21          A.      I don't think it's a matter of staying

22    in sync.  One of the potential ways to mitigate risk

23    that we saw was if Custodia had been granted

24    membership and that would then allow us to rethink

25    the risks that we had identified and what potential

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 315

1    mitigants might be in place, and so it's not a matter

2    of being out of sync but rather that we can't

3    finalize our analysis until we understand if the

4    Board is going approve membership or if it's going to

5    deny.

6    BY MR. SCARBOROUGH:

7         Q.    And if the Board in a counterfactual

8    world had granted membership to Custodia, that

9    effectively would have meant that Custodia would have

10   a federal regulator going forward, correct?

11              MS. CARLETTA:  Objection.  Form and

12   outside the scope.

13        A.    So if the Board approved membership of

14   Custodia, that would then have us -- that would

15   require us to factor that into our fact pattern that

16   we were considering in reviewing Custodia's master

17   account.

18   BY MR. SCARBOROUGH:

19        Q.    Okay.  You mentioned earlier I think

20   was it Nick Billman who contributed to the internal

21   implementation handbook drafts?  Am I remembering

22   that correctly?

23        A.    I believe that Nick Billman was

24   sitting on the practical workstream at the time that

25   the implementation handbook was being drafted.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 316

1        Q.      Okay.  And Nick would have been the

2    representative on the practical workstream from the

3    Kansas City Fed?

4        A.      At the time that the implementation

5    handbook was being drafted.

6        Q.      Okay.  Did --

7        A.      And just to clarify --

8        Q.      Sure.

9        A.      He wasn't the only member that we had.

10   Just you're asking about him specifically, so he was

11   on that.

12       Q.      Well, was there anybody else besides

13   Nick at the Kansas City Fed that provided input into

14   the development or drafting of the internal

15   implementation handbook that was required by the

16   S Letter?

17           MS. CARLETTA:  Objection.  Form and

18   outside the scope.

19       A.      So I'm not certain who all provided

20   Nick input to pass along on behalf of the Federal

21   Reserve Bank of Kansas City, but Nick had shared with

22   us a draft of the handbook for our review and

23   comment.

24   BY MR. SCARBOROUGH:

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 317



CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 318



CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 328

1    the items of interest or that they are -- they're

2    engaged in.

3    BY MS. CARLETTA:

4         Q.    Is it fair to say that it was broader

5    than just SPDIs?

6         A.    Yes.

7         Q.    Broader than crypto?

8         A.    Yes.

9         Q.    Did it deal with nontraditional master

10   accounts generally?

11        A.    It would have included that but it

12   would've been broader than that.

13        Q.    And how about the NTAA?

14        A.    So the NTAA would have been a group

15   that was looking at broader matters related to

16   account access for new types of entities, new uses of

17   existing entities and new business models that were

18   being conducted within existing entities.

19        Q.    How about the policy workstream?

20        A.    So the policy workstream was created

21   under the steering committee to look broadly at how

22   to help or what risks to think about relative to

23   these novel entities and novel uses of charters and

24   their connection to the payment system, also how to

25   provide clarity around those considerations.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 329

1          Q.     When you say these entities, what do

2     you mean?

3          A.     I mean new entity types or new uses of

4     existing entity types.

5          Q.     And that extends beyond SPDIs?

6          A.     That does.

7          Q.     And how about the practical

8     workstream?  I don't think I asked about that yet.

9          A.     So the practical workstream was

10    brought together to determine how best to share

11    information across the 12 Reserve Banks as they

12    individually considered master account requests that

13    they might receive from new types of entities or from

14    existing types of entities that were being used in

15    new ways (inaudible.)

16               THE REPORTER:  I'm sorry.  Used?

17         A.     I'm sorry.  New types of entities or

18    existing types of entities being used in new ways or

19    with new types of business models.

20    BY MS. CARLETTA:

21         Q.     So did PSPAC express a view to the

22    Federal Reserve Bank of Kansas City on whether to

23    grant or deny Custodia's master account request?

24         A.     No.

25         Q.     Did the NTAA?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 330

1          A.     No.

2          Q.     The policy workstream?

3          A.     No.

4          Q.     Did the practical workstream?

5          A.     No.

6          Q.     Did any of those groups indicate to

7     Federal Reserve Bank decisionmakers whether the Board

8     wanted the Reserve Bank to grant or deny Custodia's

9     request?

10         A.     No.

11         Q.     And did you prepare to testify today

12    on the denial of Custodia's master account?

13         A.     Yes.

14         Q.     Who made that decision?

15         A.     Esther George.

16         Q.     What is the most accurate reflection

17    of the basis of that decision?

18                MR. SCARBOROUGH:  Objection to form.

19    BY MS. CARLETTA:

20         Q.     I can rephrase.  What document would

21    reflect that decision?

22         A.     I would reference the communication to

23    Custodia and the memo to Esther that outlined the

24    reasons recommending denial.

25         Q.     By the communication, you mean the

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 331

1    denial letter sent to --

2         A.    The denial letter sent to Custodia and

3    the memorandum sent to Esther George documenting

4    staff analysis and recommending denial.

5         Q.    And when that decision was made, was

6    output from PSPAC used to arrive at that decision?

7         A.    No.

8         Q.    How about the NTAA?

9         A.    No, other than to the extent that the

10   handbook that was being drafted would have been

11   referenced to see if there were principles or risks

12   that ought to be included in our analysis.

13        Q.    And how about either workstream?

14        A.    No.

15        Q.    I'm just going to turn quickly to

16   30(b)(6) Topic 3.  I don't -- we marked that as an

17   exhibit, the topics?

18             MR. SCARBOROUGH:  Yes.  It's the first

19   exhibit we marked today, 224.

20             MS. CARLETTA:  Thanks.

21   BY MR. SCARBOROUGH:

22        Q.    Did you prepare on this topic?

23        A.    Yes.

24        Q.    Did you undertake to identify

25   individuals at the Board who had substantive

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 358

```
 1    BY MR. SCARBOROUGH:
 2            Q.     And the guidelines also established a
 3    tiering system, correct?
 4                    MS. CARLETTA:  Objection.  Outside the
 5    scope.
 6            A.     Yes.  When the guidelines are
 7    finalized, they include a section that creates a
 8    tiering -- or a definition of three tiers.
 9                    MS. CARLETTA:  By scope, I meant
10    outside the scope of redirect, not the scope of the
11    questions.
12    BY MR. SCARBOROUGH:
13            Q.     Did the policy workstream under the
14    nontraditional account access working group have
15    input into the development of that three-tiered
16    system that was reflected in the account access
17    guidelines?
18                    MS. CARLETTA:  Same objection.
19            A.     The policy work group did not
20    exclusively develop the tiering system but did have
21    the opportunity to provide input.
22    BY MR. SCARBOROUGH:
23            Q.     And did that tiering system have an
24    impact on Custodia's master account request?
25                    MS. CARLETTA:  Objection.  Form.
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 359

1          A.     No.

2     BY MR. SCARBOROUGH:

3          Q.     Custodia under the tiering system was

4     placed in a Tier 3 status, correct?

5               MS. CARLETTA:  Objection.  Form and

6     outside the scope of the redirect.

7          A.     Yes.  So the tiering system would have

8     defined a Tier 3 institution as an institution that

9     did not have deposit insurance or a federal regulator

10    and would have outlined that as that type of entity,

11    there would have been greater scrutiny applied to the

12    review, so Custodia as an uninsured SPDI that is not

13    a member of the Federal Reserve would have been a

14    Tier 3 institution and would have been subject to

15    greater scrutiny in our review.  That greater

16    scrutiny was not applied at the time that the tiering

17    system was created, though, because prior to that the

18    Reserve Bank would have considered Custodia's request

19    as nonroutine and would have reviewed it with greater

20    scrutiny.

21    BY MS. CARLETTA:

22         Q.     The -- but just to be clear, the

23    tiering structure that was established by the account

24    access guidelines did not exist before those

25    guidelines were published and finalized, correct?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 360

1          MS. CARLETTA:  Objection.  Asked and

2     answered.

3          A.     I don't believe that there was

4     anything that defined the words Tier 3 to constitute

5     an uninsured depository institution without a federal

6     regulator existing prior to the guidelines.

7     BY MR. SCARBOROUGH:

8          Q.     Under the pre-guideline world,

9     Custodia's request for membership would have been

10     treated as nonroutine, correct?

11          MS. CARLETTA:  Objection.  Outside the

12     scope.

13          MR. SCARBOROUGH:  Strike that last

14     question.  I don't have any further questions.

15          MS. CARLETTA:  We can go off the

16     record for a second.

17               (Off the record from 6:58-6:59.)

18          MS. CARLETTA:  Okay.  Everybody's all

19     set.  We're done.

20          (Deposition concluded at 6:59 p.m.)

21

22

23

24

25