# EXHIBIT 18

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

*Meadors Court Reporting*

C O N F I D E N T I A L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

No. 1:22-cv-00125-SW

───────────────────────────────────────────────

DEPOSITION OF CAITLIN LONG

November 29, 2023

───────────────────────────────────────────────

CUSTODIA BANK, INC.,

Plaintiff,

vs.

FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL
RESERVE BANK OF KANSAS CITY,

Defendants.

───────────────────────────────────────────────

APPEARANCES:

     WILLIAMS, PORTER, DAY & NEVILLE, P.C.
         By Scott E. Ortiz, Esq.
         159 North Wolcott Street
         Suite 400
         Casper, WY  82601
         sortiz@wpdn.net
             Appearing on behalf of Plaintiff.

     KING & SPALDING LLP
         By Andrew Michaelson, Esq.
         1185 Avenue of the Americas
         34th Floor
         New York, NY  10036
         amichaelson@klaw.com.
            and
     HIRST APPLEGATE, LLP
         By Billie L.M. Addleman, Esq.
         1720 Carey Avenue
         4th Floor
         Cheyenne, WY  82003-1083
          baddleman@hirstapplegate.com
            Appearing on behalf of Defendant.

1      A     Which denial letter?

2      Q     The denial letter that you referenced

3   earlier that you reviewed in preparation for today.

4      A     The master account denial letter did not

5   detail risk management gaps.  The master account

6   denial letter was relatively short.

7      Q     When I refer to the -- the denial letter

8   that you're referring to there, is it a letter from

9   Esther George?

10     A     Yes.

11     Q     And there's -- do you recall whether it has

12  an attachment -- both a letter and the attachment?

13     A     Yes, there was an attachment.

14     Q     And when you refer to "the letter," you're

15  referring to the letter and the attachment?

16     A     Well, it depends on what you would like for

17  me to refer to it as.

18     Q     In preparation for today, did you look at

19  both --

20     A     Yes.

21     Q     -- the letter and the attachment?

22     A     Yes.

23     Q     So in the attached attachment articulated

24  any of the risk management issues Ross Crouch

25  identified to you following the membership exam?

1      A    I don't recall.  If there were -- if they

2    were mentioned, they were not mentioned in detail.

3      Q    You also mentioned preparing for today by

4    looking at Esther George's testimony?

5      A    Yes.

6      Q    Now, shifting to documents that you reviewed

7    with counsel, without describing the substance of any

8    documents, did you review documents with counsel --

9      A    Yes.

10      Q    -- in preparation for today?

11      A    Yes.

12      Q    Did review of any of those documents refresh

13    your memory about events that happened around the

14    time of those documents?

15      A    Yes, to some extent.

16      Q    How many documents would you say refreshed

17    your memory?

18      A    Refresh my memory?  A few.

19      Q    Which ones?

20      A    I don't recall.

21      Q    You don't recall which ones?

22      A    Not specifically.

23      Q    Do you recall if there were any from 2020 --

24      A    Yes.

25      Q    -- that refreshed your memory?

1      A      Um-hum.

2      Q      Which ones do you recall from 2020?

3      A      The e-mails about Tara Humston telling us

4   there were no show stoppers with our master account

5   application.   That would have been actually 2021.

6      Q      Any others come to mind, anything from

7   2020?

8      A      I know we reviewed e-mails from 2020, but I

9   don't recall that any of them refreshed my memory.

10     Q      Anything else from 2021 refresh your memory,

11  any other document?

12     A      Not from -- not that I can think of, no.

13     Q      Okay.   2022?

14     A      Yes.   The conversations around

15  Christi May-Oder telling us in March 2022 that our

16  applications had not -- that the federal reserve had

17  not begun to process either our master account or

18  membership applications.

19     Q      You recall that being a document from

20  2022?

21     A      Yes.   That would have been March 2022.

22     Q      Separate from the document, what do you

23  remember about that event; what do you remember

24  Christi May-Oder telling you?

25     A      I was shocked.

1     Q     What did she tell you?

2     A     She told us that she had not -- that the

3   federal reserve had not begun to process Custodia's

4   applications, including the master account

5   application.

6     Q     At that time, though, you knew, Rob Triano

7   and others the Federal Reserve Bank of Kansas City

8   had been performing a risk assessment of Custodia,

9   right?

10    A     Of course.

11    Q     So you knew that work had been done on the

12  master account before Christi May-Oder made that

13  statement, to your recollection?

14    A     Thus I was shocked by her statement.

15    Q     Well, your recollection of that statement

16  would be inconsistent with the fact you knew Kansas

17  City had already been working on a risk management

18  for Custodia, right?

19    A     We received conflicting information at so

20  many junctures in this process, and that is the

21  reason why I requested a meeting with Esther George

22  at that point.  I didn't know what to believe at that

23  point.  It shocked me.

24    Q     Do you recall -- in preparation for today

25  with counsel, did you review any other documents from

1    the 2022 time period that refreshed your memory?

2        A    Yes.

3        Q    What else?

4        A    My letter to Esther George requesting that

5    meeting and the proposal that we made to her in that

6    meeting for finding a way to break through.

7        Q    And what was that proposal?

8        A    It proposed, for example, to have -- to

9    forgo access to the discount window, to have what's

10   called a zero net debit cap master account where we

11   would not ever overdraw our master account.

12            It proposed information sharing where we

13   would file monthly financial statements and the like.

14       Q    Do you recall approximately when that

15   meeting occurred?

16       A    It was later in March 2022.  It happened

17   fairly soon.  I think Esther -- well, I don't know,

18   but when we told Esther George that Christi May-Oder

19   told us she had not even been begun to process our

20   applications, Esther immediately responded that she

21   wanted -- to our requests for a meeting, that we

22   should do it quickly.  I think Esther probably

23   understood she had a real problem on her hands at

24   that point because we had been told so many different

25   things, and that was a shocking statement.

1    Q    The statement from Christi May-Oder?

2    A    Yes.

3    Q    Given that you were aware -- at the time

4    Christi May-Oder made that statement, given you were

5    aware that FRBKC had already conducted a risk

6    assessment of Custodia, what did you understand

7    Christi's statement to mean?

8    A    I had no idea.

9    Q    So you didn't know what it meant?

10   A    It shocked me.

11   Q    Okay.

12   A    Can I add one other thing?  Rob Triano had

13   left the Kansas City fed, and we had in the been

14   given any feedback whatsoever from Rob Triano's risk

15   assessment, and it was almost four months later by

16   that point.  We were just waiting.

17   Q    So you knew a risk assessment had been done,

18   but your testimony is you hadn't received feedback

19   from it yet?

20   A    Correct.

21   Q    Were you -- at that time in March of 2022

22   were Custodia's BSA/AML policies and procedures

23   complete?

24   A    We did have them yes.

25   Q    They were complete?

1    A    We had not had them reviewed by either

2    consultants or the Wyoming Division of Banking, but

3    we did have them.

4    Q    Were they, like -- I mean, were they ready

5    to go; were they final?

6    A    We had a first draft.

7    Q    A first draft?

8    A    Um-hum.

9    Q    Any other -- going back to meetings with

10   counsel, preparing for today, any other documents

11   from 2022 refresh your memory?

12   A    Not that I can think of off the top of my

13   head, no.

14   Q    Anything from 2023?

15   A    Yes.

16   Q    What from 2023?

17   A    The e-mail exchanges with

18   Mark Van Der Weide, and also the e-mails from

19   Bloomberg pertaining to the press leaks that were

20   designed to pressure Custodia into withdrawing their

21   applications.

22   Q    Okay.  What were the e-mails with

23   Mark Van Der Weide?

24   A    The e-mail that we sent declining to

25   withdraw our application, but offered to resubmit if

1    the fed would agree to review all of the documents

2    that it had in its possession since June 30th, which

3    it had not reviewed, and Mark's response that he

4    received our letter and acknowledged that we had

5    declined to withdraw, and then my response to him,

6    which was that that was not actually what happened,

7    we declined to withdraw, but offered to resubmit, and

8    he never acknowledged that.

9        Q    Okay.  And then e-mails from Bloomberg.  Who

10   at Bloomberg were you corresponding with?

11       A    Ally Versprille.

12            THE REPORTER:  Can you spell that, please?

13            THE WITNESS:  Yes.  V-E-R-S-P-R-I-L-L-E, I

14   believe.  Ally -- Allison Versprille.

15   BY MR. MICHAELSON:

16       Q    What is the leak that you're referring to?

17       A    Ally started calling our press officer on

18   Wednesday, January 25th, and left voicemails that she

19   had been told that we had been asked -- Custodia had

20   been asked to withdraw our applications at the fed,

21   and that if we did not withdraw, that we were going

22   to be voted down, and that the vote was going to

23   happen on Friday, January 27th.

24            We did not -- I directed our press officer

25   not to respond to those voicemails on Wednesday,

1    January 25th, and that's when she started e-mailing

2    our press at custodiabank.com e-mail on January 26th,

3    and at that point, we knew that there was a serious

4    press leak because the Wall Street Journal was also

5    calling around with the same information looking to

6    confirm.

7        Q    Do you have any specific reason to believe

8    that anyone from the Federal Reserve Bank of Kansas

9    City leaked that information?

10       A    I don't know who leaked that information

11   except that it is obvious that someone from the

12   federal reserve leaked at least three times during

13   those three days.

14       Q    You have no specific reason to believe that

15   the leak was anyone at Federal Reserve Bank of Kansas

16   City, correct?

17       A    No.

18       Q    Any other documents that you reviewed in

19   preparation for today from January 2023 that refresh

20   your memory?

21       A    No.

22       Q    You have a law degree, correct?

23       A    I do.

24       Q    What year did you receive it?

25       A    1994.

1    Q    So from 1994 to the present, how many

2    different financial institutions have you worked

3    for?

4    A    Four.

5    Q    Can you name them?

6    A    Well, okay.  I'll explain.  I started at

7    Saloman Brothers in 1994, then I moved to Credit

8    Suisse in 1997, then to Morgan Stanley in 2007, and

9    then worked outside of a financial institution for a

10   few years, and then started Custodia in 2020.

11         Within those financial institutions, I also

12   worked for a regulated financial institutions

13   underneath those bigger financial institutions.

14         So at Credit Suisse, I was a director of

15   Boston Re, which is a reinsurance company in Bermuda,

16   and I formed Merton Re, a reinsurance company in

17   Bermuda.  I also worked -- well, I didn't work

18   directly for Credit Suisse's insurance subsidiary in

19   Zurich, but I worked on the restructuring of that

20   insurance company.  I was still working for Credit

21   Suisse Group at the time.

22         And then under Morgan Stanley, I was the

23   president of Morgan Stanley's life insurance

24   subsidiary longevity insurance company.  I chose not

25   to take the CEO title, but that was my function, and

1    I signed all the financial statements and handled all

2    the regulatory exams.

3         Q    So were you at Credit Suisse from

4    roughly '97 to 2007; is that right?

5         A    Yes.

6         Q    And at Credit Suisse, did you work for any

7    depository institution?

8         A    Yes.

9         Q    What was the depository institution?

10        A    The Credit Suisse USA Commercial Bank.

11        Q    Did you say, "commercial bank"?

12        A    Um-hum.

13        Q    And what was your role with respect to

14   Credit Suisse USA Commercial Bank?

15        A    That wasn't its formal title, but it was a

16   commercial bank.  It was Credit Suisse USA.  I don't

17   even recall the formal name of the U.S. subsidiary.

18             With that particular role, I started a

19   lending business lending against life insurance cash

20   value.

21        Q    At that time, were you aware as to whether

22   Credit Suisse USA had a master account with the

23   federal reserve bank?

24        A    Yes, it did.

25        Q    And do you know when it obtained that master

1    account?

2        A    No.

3        Q    Was it prior to your role with that

4    institution?

5        A    I assume so, but I didn't interact with the

6    master account at Credit Suisse.

7        Q    Okay.  And then you joined Morgan Stanley

8    2007?

9        A    Yes.

10       Q    And when did you leave Morgan Stanley?

11       A    2016.

12       Q    At Morgan Stanley, did you have any role

13   with a depository institution?

14       A    I interacted with Morgan Stanley's banks.

15   The history there is Morgan Stanley was a securities

16   firm until the financial crisis, and then it and

17   Goldman Sachs and I believe a couple of others

18   converted to bank holding companies as part of the

19   solution to the financial crisis.

20            At that point, Morgan Stanley acquired a

21   bank -- actually, two banks, and I was working with

22   Morgan Stanley's corporate treasurer on something.  I

23   was not working with Morgan Stanley's banks.

24       Q    Technically, who was your employer at Morgan

25   Stanley?

1    A    Morgan Stanley U.S., the U.S. subsidiary,

2    which ultimately became one of the fed-regulated

3    banks.  So at that time, the distinction between

4    securities firms and banks essentially went away.

5    Q    What was your primary job at Morgan Stanley?

6    A    I headed the pension solutions group in the

7    initial years and then added additional function as

8    head of corporate strategies.

9    Q    And what were your responsibilities as the

10   head of pension solutions group?

11   A    I ran a group that helped corporate

12   treasurers solve their pension-risk problems

13   including settling pension liabilities.

14   Q    Essentially, providing advice to Morgan

15   Stanley customers who were companies that had pension

16   solution programs?

17   A    Correct.  And through that role, that was

18   head of Morgan Life Insurance subsidiaries, as well.

19   Q    And was that during the -- during what time

20   period would you say you were heading up the pension

21   solutions group at Morgan Stanley?

22   A    The entirety of my tenure at Morgan Stanley,

23   2007 to 2016.

24   Q    And then you also mentioned you were head of

25   corporate strategy?

1        A       Um-hum.

2                MR. ORTIZ:  Is that a yes?

3        A       Yes, sorry.  Corporate strategies group.

4   That was a group that my boss asked me to start after

5   the financial crisis.  So it was probably 2009 and

6   that continued until 2016 as well.

7   BY MR. MICHAELSON:

8        Q       What did that job entail?

9        A       It entailed working with corporate

10  treasurers to understand the financial systems at a

11  macro level.  Corporate treasurers were my basic

12  clients, and back in 2009, Morgan Stanley, of course,

13  had balance-sheet issues, and so corporate treasurers

14  were not transacting with Morgan Stanley until after

15  the financial crisis calmed down, and my boss wanted

16  to create a way for us to stay in front of our

17  corporate treasury clients, and he knew that I had

18  interesting experience and had taken a deep dive on

19  what really went wrong in the financial system.

20              And so he asked me to go start meeting with

21  corporate treasurers, and the feedback that he got on

22  that was fantastic, and he said, "Keep going.  It's

23  really helping us keep in front of our clients," and

24  once things calmed down in the financial crisis, he

25  asked me to continue in that role.

1    Q    Any particular industry that you were

2   serving,  corporate treasurers and particular

3   industries?

4    A    No.  It was across the board.  Most of my

5   pension transactions I started a brand-new market,

6   and it started with a $29 billion pension transaction

7   between General Motors and Prudential.  There was a

8   follow-up transaction for Bristol Myers Squibb and a

9   follow-up transaction for Motorola, so three

10  completely unrelated companies.  What linked them was

11  pension liabilities, and then from there on, we did

12  transactions for a lot of other companies, as well,

13  and that market is continuing today.

14   Q    And you left Morgan Stanley in around

15  2016?

16   A    Correct.

17   Q    And you worked outside of the financial

18  services sector; is that right?

19   A    Correct.

20   Q    With a company?

21   A    Yes.

22   Q    What company was that?

23   A    Symbiont, S-Y-M-B-I-O-N-T.

24   Q    And when did you leave Symbiont?

25   A    2018.

1   helping, and so the index provider was looking for a

2   way -- it was really Vanguard that drove this --

3   looking for a way using blockchain technology using

4   what's called, literally, "smart contracts," to

5   automate that function for Vanguard and reduce the

6   risk to the entity that those manual processes ended

7   up with a mistake, and bad information went to their

8   portfolio managers.

9          So that product I helped create, not the

10   technology, but I was the business person responsible

11   for the relationship with Vanguard at Symbiont, and

12   it went into production.  Vanguard still uses it to

13   my knowledge today.

14   Q    And is that blockchain and the smart

15   contracts be public?

16   A    They used a permissioned platform that

17   Symbiont built.  It was propriety.

18   Q    So not public?

19   A    Correct.

20   Q    And when was -- I think we referred a couple

21   times already today, Custodia, formerly called

22   Avanti, correct?

23   A    Yes.

24   Q    If I refer to it as Custodia, will you know

25   that I'm referring also to Avanti?

```
1     A     Yes.

2     Q     When was Avanti formed?

3     A     2020.

4     Q     Who's idea was it?

5     A     Mine.
```

20    Q     How many members are there on the board

21    now?

22    A     Five.

23    Q     How many were on the board at inception?

24    A     Five.

25    Q     And has the composition changed over the

1    years?

2       A     Yes.

3       Q     Is it the same?

4       A     Yes.  It has changed.  Slow down.

5       Q     How many board members have left?

6       A     Two.

7       Q     Which ones left?

8       A     Bryan Bishop and his replacement

9    Jeff Vanhart.

10      Q     So I take it you're familiar with Wyoming

11   speedy statute?

12      A     Yes.

13      Q     How do you call it a speed statute; how do

14   you refer to it?

15      A     Speedy banks.

16      Q     Speedy banks.  Okay.  Whose idea was that?

17      A     That was -- well, it depends on which part

18   of the idea.  The idea to create a bank was

19   Tyler Lindholm, who was a legislator in the Wyoming

20   legislature.  The idea to create the particular

21   structure of the bank was Albert Forkner, the Wyoming

22   banking commissioner at the time.

23      Q     Did you have communications with

24   Tyler Lindholm prior to the speedy statutes passage

25   about speedy statute?

1      Q      Approximately when did that occur?

2      A      2019, I would guess.

3      Q      And about when did he leave that role?

4      A      When Senator Lummis was elected, and she

5  recruited him to be her general counsel.

6      Q      So then he joined Senator Lummis's staff?

7      A      Was that 2020?   I think it was 2020,

8  whenever Senator Lummis was elected.   It might have

9  been 2022.   Yeah, it was 2022, yeah.

10      Q      Do you have though -- I mean, sitting here

11  today, do you have any recollection of Forkner

12  telling you that there was an agreement with the

13  Federal Reserve Bank of Kansas City pursuant to which

14  any charter speedy is getting a master account?

15      A      I don't recall specifically talking about

16  the agreement because, again, everyone assumed that

17  this was a done deal.   What I do recall is

18  Commissioner Forkner at multiple stages guiding us

19  that he expected we would get our master account very

20  soon.

21      Q      But you don't have any recollection of him

22  referring to an agreement with the Kansas

23  City Fed on that, correct?

24      A      Not specifically, no.

25      Q      And in that first meeting with

1    Esther George, that occurred, you said, November

2    2020?

3        A    Correct.

4        Q    Via Zoom?

5        A    Correct.

6        Q    How many -- do you recall that meeting?

7        A    Yes.

8        Q    How many people participated from the

9    Custodia side?

10       A    It would have been the whole executive team,

11   so probably five, and then our counsel at Cleary, a

12   couple of those folks were on.  I don't recall.

13   Katie Cox may have joined us, as well.  She was an

14   advisor.

15       Q    Who do you recall participating in the

16   Kansas City side?

17       A    Probably 15 people, Esther George,

18   Tara Humston.

19       Q    Was there anyone from the Board of Governors

20   in that call?

21       A    No.

22       Q    What do you recall sitting here today

23   Esther George communicating to you on that call?

24       A    That the process would be fair and

25   transparent.

1      Q      Anything else?

2      A      She was very noncommital.

3      Q      So coming away from that meeting, did you

4  have an understanding that a master account was not a

5  slam dunk?

6      A      I understood what the law was.  I understood

7  she was suddenly taking a different position, and it

8  was surprising to the Wyoming Division of Banking

9  when I conveyed it to them.

10     Q      On that call with Esther George, did you say

11 that the Federal Reserve Bank of Kansas City had

12 agreed with the Wyoming legislature that you would

13 get a master account?

14     A      I don't recall.

15     Q      Are you familiar with the concept of a

16 traditional bank?

17     A      Yes.

18     Q      Fair to say a traditional bank is involved

19 in taking deposits?

20     A      Yes.

21     Q      And also lending?

22     A      It depends.

23     Q      Well, that's a question.  Does the

24 traditional business of banking involve lending?

25     A      No, not legally in Wyoming.

1     Q    So you're saying -- you're saying that the

2     traditional business of banking can include banks

3     that don't engage in lending?

4     A    Yes.

5     Q    In Wyoming?

6     A    The most important distinction of a bank is

7     a depository institution.  It is a corporation

8     bestowed with the right to accept deposits.  The

9     definition of "bank" in different statutes is very

10    different.

11    Q    That's why I'm trying to level set on here

12    what we're talking about if we're talking about

13    traditional banking.  I'm not referring to a specific

14    statute?

15         So it sounds like in your head, the

16    traditional business of banking need not include

17    lending; is that correct?

18    A    A depository institution takes deposits.  It

19    says nothing about lending.  You don't have to be a

20    bank to lend.  Some banks lend, some banks don't.

21    Q    So in your view, the traditional view of

22    banking doesn't necessarily include lending?

23    A    The different statutes are so different, it

24    really honestly is very difficult to draw a broad

25    brush conclusion because the definition of "bank" in

1    A    There were others.  I don't recall their

2  names off the top of my head, though.

3    Q    Is it your understanding that Miss Clark was

4  sort of leading the analysis --

5    A    Yes.

6    Q    -- on the FDIC side?

7    A    Yes.

8    Q    And is that who you submitted the draft

9  application to?

10    A    Yes.

11    Q    Did there come a time when the FDIC provided

12  feedback on that draft application?

13    A    Yes.

14    Q    How did they provide that feedback to you;

15  was it orally or written?

16    A    Both.

17    Q    Let's start with the oral.  Was that

18  provided via Zoom?

19    A    Yes.

20    Q    Was it provided by Clarisa Clark?

21    A    Yes.

22    Q    And what did she say?

23    A    She said, This is a novel activity.  It's a

24  novel charter, and that the FDIC was not prepared to

25  provide insurance for digital asset-focused banks

1     that were starting de novo.

2          Q     So your take away then was the FDIC would

3     say, "no," if you formally submitted the application?

4          A     Correct.

5          Q     How long was that call with Miss Clark?

6          A     30 minutes.

7          Q     Did you argue on that call for a different

8     conclusion?

9          A     No.

10         Q     And then you said feedback was also

11    submitted or provided to you in writing?

12         A     Correct.

13         Q     Was that provided to you before or after the

14    call with Miss Clark?

15         A     I don't remember.  I don't know.

16         Q     And what format did that writing take,

17    e-mails, was it a memo?

18         A     A letter.

19         Q     Letter?  E-mailed to you or sent via snail

20    mail?

21         A     E-mail.

22         Q     How long was the letter?

23         A     Two or three pages.

24         Q     And it was from the FDIC?

25         A     Correct.

1    Q    You remember who the signatory was of

2    Miss Clark?

3    A    It was probably her.  I don't know for

4    sure.

5    Q    What do you recall the letter saying?

6    A    What I just laid out to you.

7    Q    So essentially, your recollection is that

8    letter conveyed the answer would be no if you filed

9    this?

10    A    Not directly, but yes.  It was clear that we

11    should not file an application.  If we did, it would

12    not be approved.

13    Q    And after receipt of that letter, do you

14    remember approximately when you received this

15    feedback from the FDIC?

16    A    They did not meet their 60-day feedback

17    timeline because, as she explained, they had to go

18    through Washington D.C., and it took longer for them

19    to get the feedback from Washington, D.C.

20    Q    Do you recall when you got the feedback?

21    A    It was closer to 120 days later, but I don't

22    recall the specific timing of when we filed the

23    application and when we got the feedback.

24    Q    Do you recall, generally, if you got the

25    feedback in 2021?

1    stablecoin insurance?

2        A    Well, first of all --

3             MR. ORTIZ:  Hold on a second.  Let me object

4    to the form of the question.  Go ahead.  You can

5    answer.

6        A    First of all, the president's working group

7    made only a recommendation.  It was not law.  It was

8    not rule.  It was not even guidance.  It was a

9    recommendation, but I should note that when we

10   resubmitted our business plan to the fed after the

11   denial, we asked the fed for help getting FDIC

12   insurance.  If this is what it was going to take, and

13   the fed was in a position to get us FDIC insurance,

14   we would have been fine with that.

15            So we did not abandon that plan of FDIC

16   insurance.  We just didn't go back to the FDIC

17   because Marty Gruenberg was in charge, and the board

18   of the FDIC has to approve every applicant, and we

19   knew we weren't going to be approved.  That was

20   crystal clear.

21   BY MR. MICHAELSON:

22       Q    Okay.  Is the communication with the fed

23   that you just described there in which you sought the

24   fed's help getting FDIC insurance, that didn't occur

25   until February 2023 after the master account request

1  and membership had been denied, correct?

2      A    Correct.

3      Q    So following receipt of the feedback from

4  FDIC, fair to say that Custodia's business plan

5  included issuance of digital asset that -- in a

6  manner that would have been inconsistent with the

7  president's working group guidance and recommendation

8  on stablecoin insurance?

9          MR. ORTIZ:  Let me object to the form of the

10  question.  Go ahead.  You can answer it.

11      A    Okay.  Yes.  That's why we haven't issued

12  it.

13          MR. ORTIZ:  Can we take a break?

14          (Break from 10:10 a.m. to 10:29.)

15  BY MR. MICHAELSON:

16      Q    So we're back on the record.  Referring to

17  Exhibit 238, the business plan, Page 8, they're

18  talking about the first of the four business lines,

19  which is core banking?

20      A    Yes.

21      Q    So what this says, "customer deposits a

22  fiat," right?

23      A    Yes.

24      Q    And it would be uninsured given FDIC's

25  response to, correct?

1    A    Correct.

2    Q    The customer deposits would remain a hundred

3    percent backed; is that right?

4    A    In a master account, yes.

5    Q    If you had a master account, they'd go into

6    the master account?

7    A    Correct.

8    Q    And what would happen to the interest that

9    you -- Custodia would earn on the master account

10   deposits?

11   A    Well, at this time, interest was zero, so it

12   didn't matter.

13   Q    But if interest rates were higher, then what

14   happens?

15   A    What we said in the business plan was that

16   we didn't intend to pay interest on deposits, but we

17   recognized in high-interest scenarios, that that

18   might be expected.  So we would reserve the right to

19   respond to the market if we had to, but it was not

20   our plan to pay interest on deposits.

21   Q    So that was the business plan at the time?

22   A    Correct.

23   Q    And then as we moved -- this was 2021.  As

24   we moved into a higher-interest-rate environment,

25   what was the plan of the higher interest-rate

1   Uniform Commercial Code was amended, nobody owns

2   securities outright anymore unless you own the paper

3   stock certificate.

4          What you own is a security entitlement under

5   UCC, Article 8, which is, to your question, a pro

6   rata share of the omnibus account.  What some

7   securities custodians attempt to do is to create a

8   bailment on top of that, but obviously, you're an

9   attorney.  You understand a bailment on an IOU

10   doesn't really exist in the law.

11          A bailment on property, of course, exists in

12   the law.  That's common law that predates the United

13   States.  So bailment is not unique to Wyoming.

14   Bailment is a common law concept.

15          We were trying to improve on the UCC,

16   Article 8 structure, which failed during the 2008

17   financial crisis, and create a counterparty credit

18   risk for securities holders to their custodians, and

19   what Wyoming wanted to do was clarify that a

20   bailment, because a digital asset is natively

21   digital, it's not an IOU like a securities

22   entitlement under UCC, Article 8.  Wyoming wanted to

23   clarify that a bailment could actually be applied to

24   a digital asset.

25   BY MR. MICHAELSON:

```
 1       Q     So the Wyoming statute enabled Custodia to
 2   offer this pooled account fungible bailment for
 3   custody of digital assets?
 4       A     Correct.
 5       Q     Which would have been held together in a
 6   pool?
 7       A     Correct.
 8       Q     Would it have been held in one wallet or
 9   multiple wallets?
10       A     We -- this is not what we actually did.
11   What we ended up rolling out was No. 4, segregated
12   on-chain account.  That's what we're operating with
13   right now.
14             We talked about the different alternatives
15   back then, but we had not built the technology
16   platform, and we ended up rolling out segregated
17   on-chain account.  So to answer your question, every
18   customer has a different wallet, and every digital
19   asset is segregated from every other customer's
20   digital assets, and of course, segregated from
21   Custodia because we're not permitted to own digital
22   assets on balance sheet.
23       Q     So what's rolled out now is not the pooled
24   account fungible bailment?
25       A     Correct.
```

1    Q    What was rolled out now, what's reflected in

2    this business plan as No. 4, segregated on-chain

3    account, which are segregated -- essentially

4    segregated deposits on the customer's digital

5    assets?

6    A    I have to correct the word, "deposit."

7    "Deposit" has a very specific meaning in banking, but

8    yes, this is -- is an asset held in custody.

9    Q    Segregated, not pooled?

10   A    Correct.

11   Q    But at the time of this business plan, you

12   envisioned the core custody service to be provided

13   would be via the pooled account fungible bailment,

14   correct?

15   A    We listed all five of these because we will

16   eventually provide all five most likely, but at the

17   time, we didn't know which one we were starting with.

18   Q    Here on Page 10, No. 1, the pooled account,

19   it says, "This product will be Avanti's core product

20   offering for custody of digital assets"; do you see

21   that?

22   A    I do.

23   Q    Was that accurate at the time?

24   A    That was our intention at the time.

25   Q    So your intention at the time is that this

1    pooled account fungible bailment would be the core

2    custody product offering, right?

3         A    Yes, and the history of that is that was

4    easier to build than the segregated on-chain account.

5         Q    But it wasn't build out at that time?

6         A    It was not, correct.  We actually went a lot

7    further, and did the hardest thing first, which is

8    the segregated account.

9         Q    But at this time, what you are representing

10   would be the core product offering for custody wasn't

11   built out?

12        A    Correct.

13        Q    So at this time, 2021, did you know whether

14   the pooled account be held in one wallet or multiple

15   wallets, or that wasn't thought through yet?

16        A    Every customer would have had a different

17   wallet.  So there would have been -- are you familiar

18   with the concept HD wallets,

19   hierarchial-deterministic wallets.  Multiple wallets

20   hang off a hierarchial-deterministic wallet, a single

21   wallet, so that's -- every customer would have had

22   their own wallet.

23        Q    In the custody?

24        A    Yes, but the --

25        Q    But the assets are held in a wallet?

1      A      In an HD structure, yes.

2      Q      But all the assets are going to be together,

3   correct; the digital assets are going to be

4   together?

5      A      Yes, in that No. 1 as we originally

6   envisioned it, yeah.

7      Q      And it would be a single wallet?

8      A      No.

9      Q      Not a single HD wallet?

10     A      There would have been probably a single HD

11   wallet.  You can have an infinite number of wallets

12   off a single HD wallet for each customer.

13   "Infinite's" probably not the right word, actually.

14   You can have a large number of wallets.

15     Q      But the wallets -- would you refer to those

16   wallets as, like, SubWallets?

17     A      No, just wallets.

18     Q      Just wallets?

19     A      Um-hum.

20     Q      And the wallets would indicate how much each

21   customer was holding of a digital asset?

22     A      Yes.

23     Q      But that's not -- it's still not a

24   segregated account, right; it's still -- the digital

25   assets with pulled together in the HD wallet?

1    A    Yes.  In that structure, yes.

2    Q    All right.  And that would be uninsured,

3    correct?

4    A    All digital assets under custody are

5    uninsured just like securities held in custody are

6    uninsured.

7    Q    So you'd have to build -- Custodia would

8    have to build systems to ensure that the HD wallet

9    wasn't hacked, right?

10    A    Yes.

11    Q    And build systems to ensure a rogue employee

12    didn't transfer digital assets out?

13    A    Yes.

14    Q    But that wasn't done yet, correct?

15    A    Correct.

16    Q    And there are a few sub bullets here.  No.

17    1, "Send digital assets from a pooled account to a

18    destination address"?

19    A    Um-hum.

20    Q    Do I understand that to mean a customer

21    would direct Custodia to send some of their digital

22    assets out of the pooled account to a third party?

23    A    Yes.

24    Q    And then the second sub bullet here is,

25    "received digital assets."  Do I understand that to

1    mean a customer would send to Custodia a digital

2    asset --

3        A    Correct.

4        Q    -- from some wallet outside of the

5    Custodia's asset control?

6        A    Yes.

7        Q    And then internal transfers, it says, "Send

8    payments or transfers between Avanti customers

9    through the online banking portal."  What does that

10    refer to?

11        A    That means if two customers that had digital

12    assets in the pooled account wanted to transact with

13    each other, they could do so without sending the

14    assets outside of Custodia.

15        Q    So if Customer A wanted to send Customer B

16    bitcoin in exchange for fiat, Custodia would

17    facilitate that?

18        A    No.   This is bitcoin to bitcoin or Ethereum

19    to Ethereum.

20        Q    So if Customer A wanted to send bitcoin to

21    Customer B, Custodia would facilitate that within

22    this pooled account?

23        A    Yes.

24        Q    What is Customer B providing back to

25    Customer A in exchange for bitcoin?

1     A     Dollars from their Custodia account.

2     Q     So bitcoin would travel from A to B in the

3     pooled account, and fiat would travel from B to A in

4     the core banking account?

5     A     In that example using an internal transfer,

6     yes.

7     Q     And how would -- would -- so Custodia's

8     business plan at the time, would Custodia play a role

9     in matching A and B, like if A wanted to sell

10    bitcoin, and B wanted to buy, would Custodia play a

11    role?

12    A     To create a platform for transacting like

13    that, yes, but not to act as an exchange.  That was a

14    very critical distinction.  None of these would ever

15    have touched Custodia's balance sheet.  We were not

16    acting as principal.

17    Q     But you would have provided a service of

18    matching a buyer with a seller?

19    A     Through prime services, yes.

20    Q     Through prime services?

21    A     That's what we called prime services.  It's

22    really settlement services, yes.

23    Q     And as of the time of this document, so

24    August 2021, had that matching service been planned

25    out yet?

1    A    No.

2    Q    And taking this forward to the fall of 2022,

3    the time of the membership exam that we discussed

4    earlier, had that been built out?

5    A    No.

6    Q    And had the pooled -- had the pooled account

7    generally been built out at that time?

8    A    No.

9    Q    There's a reference here to physical

10   storage; is that storage of hardware?

11   A    Yes.

12   Q    And we discussed already No. 3, the omnibus

13   account.  The No. 4, segregated on-chain account, was

14   non-fungible bailment?

15   A    Yes.

16   Q    And what is that?

17   A    That's what we're offering today.

18   Q    That's what you're offering today.  Okay.

19   As part of the custody services that you planned to

20   provide as part of this business plan, I'm correct

21   that Custodia's plan was to have crypto on balance

22   sheet, correct?

23   A    No.

24   Q    Custodia would have -- it's your testimony

25   that Custodia's plan was to have zero crypto on

1    balance sheet as part of its custody service?

2       A    Our proposal to the fed, which was not

3    mentioned in this business plan, was to hold up to

4    $10,000 on balance sheet to facilitate customer fees,

5    but we abandoned that.

6       Q    To facilitate customer fees in connection

7    with the custody service or a different service?

8       A    To facilitate, yes.  Every time you transact

9    on blockchain, fees have to be paid in the token.  So

10   in our case for custody, either bitcoin or Ethereum.

11   The question was, who pays the fee.  We asked the fed

12   for permission to hold up to $10,000 on our balance

13   sheet because we will always charge the fee through

14   to the customer.

15          The challenge becomes, you estimate a fee,

16   but you don't know exactly what the fee is going to

17   be when the transaction is confirmed on the

18   blockchain, and so there will be differences that

19   will be very small, but we did not want to have to go

20   back to a customer to ask for additional bitcoin to

21   pay for the fee because these are small differences.

22          And so we asked for permission from the fed

23   to hold a de minimis amount, and every time the fed

24   has talked about us holding digital assets on balance

25   sheets, it has made that material omission that our

1    for additional information, operationally, it is far

2    less risky if we have the ability to hold the de

3    minimis digital assets on balance sheet.

4           So when we were thinking about it from a

5    risk perspective, it made so much more sense, and I

6    could see that the team, including the Board of

7    Governors, including Asad Padilla agreed with that

8    assessment when we talked about it on our biweekly

9    calls.  This subject came up on our biweekly calls

10   repeatedly because we had requested permission and

11   were waiting for the answer.

12       Q    At that time of that membership exam, was it

13   the position of the Wyoming Division of Banking that

14   you had to have the digital assets on balance

15   sheet?

16       A    I don't recall the precise timing relative

17   to the exam because this whole issue wasn't an exam

18   issue.  This was a request for additional information

19   issue.  That's where it played out.

20       Q    You referenced at some point Wyoming

21   changing its position on this.  So there

22   was -- strike it.  There was a point in time where

23   Wyoming was requiring Custodia to hold digital assets

24   on balance sheet to facilitate receipt of fees in

25   connection with a custody service, correct?

1    A    To hold a de minimis amount, correct, and

2    this was before we had launched.  So this was one of

3    those details that was getting worked out prior to

4    getting approval to launch.  At no time did we ever

5    hold digital assets on balance sheet, and we still

6    have not.

7    Q    And then there came a time where Wyoming

8    changed its position?

9    A    Correct.

10    Q    First time it would no longer require

11    Custodia to hold any digital assets on balance sheet?

12    A    Correct.

13    Q    When did that change of position occur?

14    A    In the fall of 2022.

15    Q    In the fall of 2022?

16    A    Yes.

17    Q    And how was that conveyed to you --

18    Wyoming's change of position?

19    A    We had biweekly meetings with the Wyoming

20    Division of Banking.

21    Q    Was that conveyed to you orally?

22    A    Yes.

23    Q    Was it conveyed in writing?

24    A    I don't recall.

25    Q    Do you recall whether Custodia conveyed to

1    the board or the Federal Reserve Bank of Kansas City

2    that Wyoming's position on that had changed?

3         A    Yes.

4         Q    How was that conveyed?

5         A    In our biweekly calls.

6         Q    As of -- so as of the time of the membership

7    exam, did Custodia's plan involve holding a small

8    amount of digital assets on balance sheet?

9         A    As of August 2022, yes, the membership exam

10   didn't cover this.

11        Q    Would it have been the Federal Reserve

12   Bank's of Kansas City's understanding at the end of

13   2022 that Custodia's plan was to hold small amount of

14   digital assets on balance sheet?

15        A    We had requested permission.  It was never

16   part of our business plan.  We had requested

17   permission, but it was not part of our business plan.

18   That was materially misleading.

19        Q    What was materially misleading?

20        A    The 86-page order making it sound like

21   Custodia was proposing to trade digital assets on its

22   balance sheet as principle.

23        Q    As a matter of authority, am I correct, that

24   Custodia had authority to hold up to 0.5 percent of

25   custody in digital assets on balance sheet?

1        MR. ORTIZ:  Let me object to the form of the
2   question.  It's vague and confusing as phrased.  Go
3   ahead.  You can answer.
4        A     The Wyoming laws are silent on -- and
5   regulations are silent on this.  This was a detail
6   that had to be worked out between our regulators --
7   well, at the time, only the Wyoming Division of
8   Banking, but we were requesting permission from the
9   fed.
10  BY MR. MICHAELSON:
11       Q     Okay.  So let's -- did custody
12  offer -- custody service require -- let me rephrase
13  that.  What custody service could Custodia provide
14  without any prime services?
15       MR. ORTIZ:  Without any what?
16  BY MR. MICHAELSON:
17       Q     Prime services.
18       A     It could provide the same primary services;
19  transfers in and transfers out.
20       Q     But wouldn't it only be able to receive from
21  customers digital assets?
22       A     Correct, yes.  That's what I mean.  I want
23  to amend my previous answer.  It's the same custody
24  services.  Custody is a passive function.
25       Q     But without the prime services, the only way

*Meadors Court Reporting*



1    imagine large businesses, multinational businesses,

2    such as Ford and the other corporate treasurers that

3    I worked with at Morgan Stanley, this was exactly

4    what they wanted, the ability to have U.S. dollars

5    for transaction purposes that didn't have to go

6    through the Swift system and get caught up in the

7    Swift black hole, which was the term that corporate

8    treasurers used for the problems they were having

9    transferring dollars overseas.

10        Q    So -- look, I hear you referring as

11   testimony to use by -- use of the Avit by

12   sophisticated professional companies in the United

13   States, but you'd agree that stablecoins are

14   attractive to criminals around the world, correct?

15            MR. ORTIZ:   Let me object to the question.

16   It's overly broad.  Go ahead.

17        A    I would not agree that stablecoins are,

18   attractive and there's a simple reason why.  They're

19   traceable.

20   BY MR. MICHAELSON:

21        Q    I guess really the question is, when you're

22   working on this business plan for Avanti in 2021, do

23   you recognize that there's a risk that the Avit would

24   be used for money laundering?

25        A    Yes.  I recognize that any financial

1    instrument could be used in money laundering.  I do

2    not agree that this had a higher risk of use in money

3    laundering than other forms, such as physical U.S.

4    dollars or such as other stablecoins.

5           What we presented to the fed was the ability

6    to bring this into the regulatory perimeter where

7    transactions could be watched to ensure that they

8    were not being used by terrorists or money

9    launderers.

10     Q    And look, transactions and digital assets

11   can be watched, right?

12     A    Correct.

13     Q    Not just stablecoins, but transactions and

14   digital assets can be watched, right?

15     A    Correct.

16     Q    People can look on the blockchain and see

17   what's happening in Manaro and all kinds of different

18   digital assets?

19     A    Not Manaro as easily, but bitcoin and

20   eretheum, the two that Custodia proposed to transact

21   in and to issue Avits on, yes, very easily.

22     Q    And even still, you would agree that bad

23   actors out there in the world have come to use

24   digital assets for money laundering, correct?

25           MR. ORTIZ:  Let me object.  It's overly

1    broad.  Go ahead.

2        A    I can't -- I have no direct knowledge of

3    that.  There is so much misinformation out there, and

4    I would encourage anyone who has this view to look at

5    how the FBI brought down the silk road and really

6    understand how they did that.

7            There's a reason why law enforcement prefers

8    criminals to use this technology because they can

9    find who is behind it if they look closely enough,

10   and that is exactly why, as a policy matter, the U.S.

11   should bring this into the regulatory perimeter

12   where, very importantly -- you may not understand

13   this as a non-bank person -- the amount of Bank

14   Secrecy Act compliance that banks are required to do

15   is far higher than the amount of Bank Secrecy Act

16   compliance that non-banks do, and as a result,

17   bringing this into the regulatory perimeter would

18   reduce the possibility that it ended up in the hands

19   of elicit actors.

20           It is also worth noting, Custodia proposed

21   voluntarily to file suspicious activity reports on

22   anyone who used Avit, and we would do that monitoring

23   ourselves.

24

25   BY MR. MICHAELSON:

1    Q    You keep saying, "bring it into the

2    regulatory perimeter," but secondary market

3    transaction in the Avit would not be in the

4    regulatory perimeter, correct?

5    A    Not necessarily.  It may very well be within

6    the regulatory perimeter.

7    Q    But if a customer sells an Avit to a third

8    party -- sells an Avit to another third party, and

9    that Avit could proceed to trade in the secondary

10   market, correct?

11   A    If it goes peer to peer, but --

12   Q    So yes, it could continue to trade in the

13   secondary market, right?

14   A    In small amounts, yes.

15   Q    And it may be visible on a blockchain that a

16   transaction's happening, but neither Custodia nor

17   regulators would know who controls the wallets that

18   were involved in the secondary transactions

19   correct?

20   A    Not necessarily.  Again, this is why the

21   blockchain surveillance firms are so important to law

22   enforcement because --

23   Q    Is it your testimony, though --

24        MR. ORTIZ:  Hold on.  Make sure she's

25   finished, Counsel.  You guys are both going fast.

1    Were you done?

2        A    No, I'm not done.  There was an entire

3    industry that exists to unmask who owns which digital

4    asset wallets, and the amount of work that they do to

5    determine who owns which wallets is incredible.

6            I will point to the Twitter hack as an

7    interesting example.  When Jack Dorsey's account was

8    hacked a couple of years ago, within minutes the

9    blockchain surveillance people knew who the hacker

10   was because they could trace the wallet.

11       Q    Okay.  And Custodia's working with

12   Chainalysis as one type of firm that performs that

13   kind of work, correct?

14       A    Correct.  Exactly.

15       Q    Your testimony that Chainalysis is able to

16   figure out who's behind every wallet in the

17   blockchain; is that your testimony?

18           MR. ORTIZ:  Let me object; lacks foundation.

19   Go ahead.

20       A    Given enough time and enough transactions,

21   yes.

22   BY MR. MICHAELSON:

23       Q    So at the end of the day, your business plan

24   involves -- Custodia's business plan involves issuing

25   a digital asset called the Avit, right, and this

1   digital asset could trade on a secondary market,

2   correct?

3        A     Correct.

4        Q     And it would replace some of the demand for

5   stablecoins, correct?

6        A     For the regulated stablecoins, most likely

7   yes.

8        Q     And it's your testimony that this asset

9   presents no greater risk for use in money laundering

10  than a standard U.S. dollar?

11       A     Than a physical U.S. dollar?  It presents

12  less risk than a physical U.S. dollar because a

13  physical U.S. dollar cannot be traced.  As soon as

14  you take it out of the ATM, there's no watching those

15  transactions; whereas, every blockchain transaction

16  can be traced, and the record is there forever.

17       Q     But physically, U.S. dollars present other

18  issues, like you have to move them around in

19  suitcases, right?  Okay.  So your testimony --

20            MR. ORTIZ:  Did you respond?  I didn't hear

21  a response.

22       A     Can you repeat the question?

23  BY MR. MICHAELSON:

24       Q     It's your testimony that -- well, I'll

25  strike that and move on.  So let's talk about prime

1    services then, last one.

2          So as far as prime services, will consist of

3    a number of value added services including digital

4    asset to fiat exchange?

5      A    Yes.

6      Q    And vice versa; do you see that?

7      A    Yes.

8      Q    And referring to Point Number One at the

9    bottom of Page 11, "the fiat on off ramp"; you see

10   that?

11     A    Yes.

12     Q    Conversion between fiat and digital assets,

13   and the first sub bullet is "Buy Digital Assets:

14   Purchase digital assets with fiat held in a deposit

15   account."  So do I understand that to mean that a

16   Custodia customer who has deposited fiat in a core

17   banking account could then indicate to Custodia that

18   it wants to use some of that fiat to buy digital

19   asset?

20     A    Yes.

21     Q    And Custodia would facilitate that purchase

22   of a digital asset with the fiat held in the deposit

23   account?

24     A    The key word is "facilitate."

25     Q    So tell me how -- under this business plan,

1    tell me how that would work.

2        A    Here's how custody works.  Custody is a

3    passive function, a passive service.  Prime services

4    is matching buyers and sellers, but it's not prime

5    brokerage.  That's an incredibly important

6    difference.

7            Prime brokers will transact on balance

8    sheets.  Custodia would never transact on balance

9    sheet.  So what that means is, just like in the

10   securities industry, if you have securities in your

11   401(k) at Bank of New York Mellon, and you direct

12   them to sell the securities and liquidate for cash,

13   what Bank of New York Mellon is going to do is go to

14   an exchange and liquidate those securities.

15           So go to the NASDAQ or go to the New York

16   Stock Exchange.  Bank of New York Mellon is not going

17   to act as principal liquidate anything.  The dollars

18   then come back from the exchange to Bank of New York

19   Mellon, and then they put them in your 401(k).

20           So the important distinction is there's a

21   difference between the custodian and the exchange.

22   And that is exactly the model that Custodia proposed.

23   We would not be an exchange.

24       Q    So walk me through how the transaction would

25   happen.  You would go to an exchange?

1      A      Yes.

2      Q      Have you had conversations with exchanges at

3  this time, August of 2021?

4      A      At this time?  We had introductory

5  conversations about who would want to be integrated

6  to our platform to provide bids and offers to our

7  customers, but we had not taken any further steps

8  than that.

9      Q      What exchanges had you spoken with as of

10  August 2021?

11      A      We had Coinbase as a shareholder already.

12  We had talked to some of the over the counter -- OTC

13  liquidity providers like Cumberland, Jump Trading.

14  Those are the names that come to mind.

15      Q      But you didn't have any agreements in place

16  with any of these entities?

17      A      No.

18      Q      How about moving forward to the year of the

19  time of the yearly membership exam, did you have any

20  agreements in place with any exchanges or liquidity

21  providers?

22      A      No.

23      Q      At the time of the membership exam, was

24  there a leading candidate for who would serve as a

25  liquidity provider for this service?

```
1      A     No.

2      Q     So it was yet to be determined?

3      A     Correct.

4      Q     Okay.  Assuming it was an exchange like a

5  Coinbase, can you explain how that would work; was it

6  Custodia would have an account with Coinbase?

7      A     Well, again, we hadn't figured out the

8  details.  You can have customers have accounts or you

9  can have an omnibus account that for the benefit of

10 customers.  I would assume we would have had the

11 latter, but we hadn't worked out the details yet on

12 that.

13     Q     So how would -- ultimately, dollars would

14 have to be -- if there's a purchase of bitcoin on,

15 say, Coinbase, dollars would have to be transferred

16 to Coinbase, right?

17     A     Um-hum.

18            MR. ORTIZ:  Yes.

19     A     Yes.

20 BY MR. MICHAELSON:

21     Q     How would the dollars be transferred?

22     A     Well, the easiest way is if Coinbase had an

23 account with us and the customer had an account with

24 us, then it's just a ledger entry on our ledger;

25 otherwise, the dollars would go to Coinbase's bank.
```

1    Q    How would the bitcoin flow from Coinbase to

2    Custodia?

3    A    It would flow in -- from Coinbase into the

4    customer's wallet at Custodia, or if we had the

5    pooled account, it would have been in that pooled

6    wallet at Custodia.

7    Q    And the bid asked would come from a third

8    party?

9    A    Solely from the third party, correct.

10    Q    And then who would present that to the

11    customer?

12    A    Custodia would.

13    Q    Custodia would. Without getting into the

14    substance of any legal advice, did Custodia receive

15    legal advice on the subject whether that would render

16    Custodia a commodity broker under the CEA?

17    A    It didn't --

18         MR. ORTIZ:  That's just a yes or no

19    question.

20    A    Okay.  No.

21  BY MR. MICHAELSON:

22    Q    And did Custodia receive legal advice on the

23    subject -- yes or no question.  Did Custodia receive

24    legal advice on the subject of whether this would

25    render Custodia a commodities exchange?

1    where you brought her on as --

2        A    Advisor.

3        Q    -- as an advisor?

4        A    Yes.

5        Q    She's paid a salary or by the hour?

6        A    She's paid a salary and options.

7        Q    Salary and options.  Before bringing her on,

8    did she provide you with a resume?

9        A    Probably.  I don't recall, actually.  I

10   assume so because we would have done a background

11   investigation on her.

12       Q    Would you have -- did you interview her --

13       A    Yes.

14       Q    -- before bringing her on?

15       A    Yes.

16       Q    And during that interview, was that in

17   person?

18       A    No.

19       Q    Was it, like, via Zoom?

20       A    Probably, yes.

21       Q    Did you interview her once or more than

22   once?

23       A    Probably just once.

24       Q    And do you recall that interview?

25       A    Not specifically.

1    Q    Do you recall roughly how long it was?

2    A    No.

3    Q    During the interview, did you talk to her

4  about whether the Board of Governors or reserve banks

5  make the calls on whether to grant master accounts?

6    A    During the interview, I don't recall whether

7  I asked her that or not.  Keep in mind the context.

8  We didn't think this was going to be an issue because

9  the Wyoming Division of Banking thought it already

10  had an agreement, thought it had a deal with the

11  Kansas City Fed.

12    Q    So when you interviewed Katie Cox, do you

13  recall asking her about her experience with master

14  accounts?

15    A    No, I don't specifically recall that.  I

16  don't know whether we would have asked about that.

17  Katie spent her whole career in different parts of

18  the fed, and the vast majority of it was at the Board

19  of Governors dealing with membership applications and

20  other applications in the M&A division.  So I knew

21  that was not something she had recent experience

22  with.

23    Q    And when you say, "that," you mean master

24  accounts?

25    A    Correct.

1    Q    So you knew when you brought her on that she

2   didn't have recent experience with master accounts?

3    A    Correct.

4    Q    Did she represent to you prior to her

5   retention that she did have recent experience in

6   master accounts?

7    A    She worked -- yes.  I do recall her saying

8   that she worked with de novo banks that were applying

9   for membership because she told me about one de novo

10   bank that got three membership exams, and so I

11   remember talking to her from an early stage about

12   membership, which was always on our road map.  The

13   only question was when.

14    Q    Got it.  So given her experience with

15   membership, fair to say that your conversations with

16   her in those early months were more about membership

17   than master accounts?

18    A    I don't recall.

19    Q    This document, Exhibit 5 --

20        MR. ORTIZ:  Can we pick a good time to have

21   lunch if our lunch is here?

22        MR. MICHAELSON:  Yeah, yeah.  We can just

23   break now.

24        (Lunch break from 12:04 p.m. to 12:54 p.m.)

25   BY MR. MICHAELSON:

1     Q    But we already -- those ones aren't focused

2    on digital assets, though, right?

3     A    I don't know, actually.  I don't know.

4    What's so interesting about this is I seemingly come

5    across more banks that are doing something in digital

6    asset once a week, it seems.  There's a lot more out

7    there than has been publicly disclosed.  So I can't

8    say that I know that we were unique among master

9    account holders or master account applicants.

10     Q    So when the speedy legislation was passed,

11    there was nothing else like it out there in any other

12    state, right?

13     A    Again.

14          MR. ORTIZ:  Object on foundation.  If you

15    know, go ahead.

16     A    Thank you.  Again, so there are -- there are

17    six states now that have uninsured bank charters.  So

18    it depends on what you define by "like it."  That

19    seems to be, again, the biggest issue that the fed

20    had with the speedy charter was that it was

21    uninsured.

22          There were applicants from four different

23    states that is have uninsured state bank charters

24    applying for master accounts.  So are we like those?

25    Of course we are because we're an uninsured

1    state-chartered institution.  There's about a dozen

2    of those that have applied for fed master accounts,

3    and like I said, there are 442 uninsured

4    non-federally regulated holders of fed master

5    accounts.

6              MR. ORTIZ:  Hold on.  Hold on.  Slow down.

7    BY MR. MICHAELSON:

8        Q    So is it your testimony, then, that when

9    Custodia requested a master account in the fall of

10   2020, it was not breaking any new ground?

11       A    It was not breaking any new ground in a lot

12   of ways because stablecoins had already been in

13   existence.  There were uninsured state bank charters

14   in other states.  There were other banks pursuing

15   digital asset custody, if not already providing

16   digital asset custody services.  There's a lot about

17   Custodia's proposal that was simply not new.

18       Q    So in your view, it wasn't a

19   precedent-setting request for master account?

20       A    I don't have -- that requires me to

21   speculate.  I don't know for sure.

22       Q    So you didn't know if it was a

23   precedent-setting request?

24       A    Yes.  I didn't know.

25       Q    You didn't know if Custodia was trying to

1   accomplish something that no other institution had

2   accomplished before?

3        A    I knew there were a lot of institutions

4   either doing or trying to do the same thing Custodia

5   was doing or proposing to.

6        Q    Help me square that with what you're telling

7   investors at the time about how Custodia's uniquely

8   positioned in part due to Wyoming digital asset

9   legislation, to provide a solution to the market that

10  was no other institution was able to provide.  I'm

11  trying to square those representations that you're

12  doing something new with what I hear you saying now,

13  which is Custodia's request may have been just like

14  any others?

15       A    Great question.

16            MR. ORTIZ:  Hold on hold on.  Let me object

17  to the form of the question.  Go ahead.

18       A    Thank you.  Actually, I'm so glad you asked

19  that because Bank of New York Mellon doesn't have the

20  benefit of Wyoming's bailment laws that clarify that

21  you hold digital assets -- you can hold digital

22  assets in bailment.  Bank of New York Mellon uses an

23  omnibus banking structure.

24            Remember I told you early on that they tried

25  to create a bailment on an Article 8 securities

1    A    Correct.

2    Q    So during that meeting, do you -- who's the

3    lead spokesperson for Kansas City?

4    A    Esther George.

5    Q    Do you recall her -- do you recall her

6    saying that Custodia had selected a novel charter?

7    A    I don't recall that specifically.

8    Q    Do you recall her saying that Custodia's

9    proposed business had certain aspects that were

10   unconventional?

11   A    She focused on us doing novel things, yes,

12   but I don't know that she used the word,

13   "unconventional."

14   Q    What were the novel things you recall her

15   focusing on?

16   A    She actually didn't define us.  She was very

17   high level in that.

18   Q    But you do recall her saying that your

19   business involved novel things?

20   A    Yes.

21   Q    You recall her saying that Custodia's

22   request for a master account raised broad issues?

23   A    I don't recall that.

24   Q    Do you recall her saying that she was going

25   to be reaching out to colleagues across the system?

1     A     I don't recall that.  She may have.

2     Q     Do you recall her saying that it was -- in

3    substance, it was too soon to say one way or the

4    other whether the master account request would be

5    granted or denied?

6     A     Not specifically, but the impression I had

7    from that meeting was she was very noncommittal.

8     Q     So take away from you was you were not sure

9    you were going to get one?

10    A     Yes.  At that point, we were concerned

11   because that was inconsistent with everything the

12   Wyoming Division of Banking had been telling us all

13   along.

14    Q     Right.  But in that meeting, you didn't say

15   that Kansas City had already agreed to give Custodia

16   a master account, right?

17    A     I don't recall.

18    Q     Do you recall Esther George asking in that

19   very first meeting if a master account was necessary

20   to Custodia's viability?

21    A     I don't recall.

22    Q     Do you recall making any representations in

23   that very first meeting about Custodia's BSA/AML

24   policies and procedures?

25    A     I don't recall.  I doubt it because that was

1    so early on.  That was three years ago.  It was so

2    early on, and also it's worth giving this context.

3           The process in Wyoming is the charters are

4    granted, but you cannot use them until you receive a

5    certificate of authority to operate.  So everyone

6    understood that the certificate of authority to

7    operate was necessary in order to operate, and

8    between the charter grant and the certificate of

9    authority to operate was the construction period.

10   Q     We've marked this as 241.

11         (Deposition Exhibit No. 241 marked.)

12   BY MR. MICHAELSON:

13   Q     This is document Bates stamped Custodia

14   5521.  This is an e-mail from you dated November

15   12th, 2020 to a number of people, including Richard

16   McGinty, John Pettway, Bryan Bishop, and

17   Phillip Treick, T-R-E-I-C-K?

18   A     Yes.

19   Q     The subject of this is a "fed meeting

20   update"; do you see that?

21   A     Yes.

22   Q     Does this e-mail concern that first meeting

23   you had with the Reserve Bank of Kansas City?

24   A     It was about that time, so probably yes.

25   Q     Okay.  You write, "We've had the first real

1   curve ball thrown at us.  The fed's new guidance is

2   that our timeline for a master account will be,"

3   quote, months, not weeks, end quote; do you see

4   that?

5       A    I do see that.  It wasn't months.

6       Q    So your recollection, though, is that coming

7   out of that meeting, it was going to take time for

8   this to be resolved, right?

9       A    That's what Esther told us; months, not

10  weeks.

11      Q    And you write here in the second paragraph,

12  your -- "Esther George indicated the master account

13  review process is going to be slow"; do you see that?

14      A    Yes.

15      Q    Do you recall her saying that?

16      A    I don't recall her saying that

17  specifically.

18      Q    This is -- who's this an e-mail to?

19      A    To my board.

20      Q    To your board.  Do you strive to be truthful

21  in your communications with the board?

22      A    Yes.

23      Q    You try to -- then you write, "This

24  contrasts to the guidance Wyoming had previously

25  received from a different staffer at the KC Fed"?

1    Q    When you refer here to, "customer to

2    customer transactions," are you referring to customer

3    to customer digital asset transactions?

4    A    Yes.  Those would not be very frequent most

5    like apply where a customer would transfer to another

6    customer because, most likely, if there's a transfer

7    happening, it's a sale, and so that would go to an

8    exchange, but it is conceivable there could be

9    customer to customer transactions done over the

10   counter that wouldn't involve us.

11        So the way this would work for a securities

12   custodian is, for example, your 401(k) manager says,

13   "Transfer the Apple shares to a different fund or to

14   a different account within the 401(k)."  So it is

15   possible that there could be two account transfers,

16   but realistically, that's not going to be a very

17   large quantity of transactions, most likely.

18   Q    Referring to Page 18 of the presentation,

19   Proposed Guideline No. 5, the second bullet refers to

20   "retaining third-party Temenos," T-E-M-E-N-O-S --

21   A    Yes.

22   Q    -- "to develop and implement integration,"

23   and you write that "Avanti will utilize its financial

24   crime litigation module."  What is the Temenos

25   financial crime mitigation module?

1     A     That is software that Temenos offers that is

2     integrated with its core banking system for BSA

3     compliance.

4     Q     And at this time, was the development of

5     Custodia's use of Temenos's financial crime

6     mitigation module complete and finalized and ready to

7     go?

8     A     No.

9     Q     At this time, was Custodia's BSA and AML

10    policies and procedures complete and finalized and

11    ready to go?

12    A     Policies, yes; procedures, we had some.  We

13    ultimately ended up replacing the Temenos FCM

14    software with a different provider.

15    Q     You recall when that occurred?

16    A     Early 2022, I believe.

17    Q     When the -- I see in these slides walking

18    through the different principles that were announced

19    by the board for public comment and the proposed

20    account access guidelines.  When it first came out,

21    did you view those as a favorable event, the release

22    of the principals?

23    A     Well, that's what Governor Brainard tried to

24    portray it as to the Wyoming officials.  I was

25    concerned that this was just the fed buying time, so

1    I didn't know what to think.

2         Q     You recall what you said publicly about

3    it?

4         A     No.

5              (Deposition Exhibit No. 252 marked.)

6    BY MR. MICHAELSON:

7         Q     Bates stamp Custodia Bates stamp 450.

8    E-mail July 1, 2021, and second paragraph, you're

9    referring to the comment period on the payment system

10   access policy?

11        A     Yes.

12        Q     And then you write, "The issue becomes moot

13   if Governor Brainard," quote, waives speedies through

14   after the comment period closes as she apparently

15   hinted to Senator Lummis would happen for speedies

16   once the rules are final; do you see that?

17        A     Yes, and now that I'm seeing this, I'm

18   remembering, that was a term that she used in her

19   conversations with Senator Lummis.

20        Q     That's -- okay.  Break that down for me.

21   First of all, who are you hearing this from?  Are you

22   hearing this from Cynthia Lummis?

23        A     No.

24        Q     Are you hearing this from Chris Land?

25        A     Yes or from Tyler Lindholm.  It could have

1    something you heard directly from Esther?

2         A    Yes.  She said that in that March meeting.

3         Q    So the basis of this comment is whatever

4    Esther conveyed to you in that March meeting in

5    person?

6         A    Yes.

7         Q    So following that meeting with Esther, do

8    you recall receiving a letter from the Kansas City

9    Fed --

10        A    Yes.

11        Q    -- from Tara Humston?

12        A    Um-hum.

13        Q    Do you recall generally what that letter

14   conveyed?

15        A    Yes.

16        Q    What did it generally convey?

17        A    That there was no decision imminent.

18        Q    And did you have a view that that was in

19   contradiction with the message you heard directly or

20   indirectly from Governor Brainard?

21        A    Yes.  Every time Senator Lummis and Governor

22   Brainard talked, it was positive, and then we would

23   hear these contradicting messages from other

24   places.

25        Q    Like the Federal Reserve Bank of Kansas

1    City?

2       A       Including the Federal Reserve Bank of Kansas

3    City, but I concluded at the end of that meeting with

4    Esther George that we were going to initiate this

5    lawsuit, and I told her that.  I believe I said, "We

6    all know where this is going."

7       Q       Mark this Exhibit 257.

8               (Deposition Exhibit No. 257 marked.)

9    BY MR. MICHAELSON:

10      Q       Handing you a document marked Exhibit 257,

11   Minutes of the Board of Directors Meeting on May 11,

12   2022?

13      A       Yep.

14      Q       So Bates No. FRBKC 2881.  Did there come a

15   time when Chuck Thompson departed as a full-time

16   employee?

17      A       Yes.

18      Q       Did that happen around May 2022?

19      A       Sometime around then, yes.

20      Q       Did he remain an employee, just not full

21   time or was he gone?

22      A       He did for a while, and he remains an

23   advisor.

24      Q       And who replaced him?

25      A       We split the role.  Tanya McCorquodale is

1    the general counsel, and we hired a separate chief

2    compliance officer.  Chuck had been in both roles

3    previously.

4        Q    You told the board at this meeting according

5    to the minutes that there's no FDIC update at this

6    time; do you recall where things stood at the FDIC as

7    of May of 2022?

8        A    I presume if we're still talking about the

9    FDIC that we hadn't received our feedback from the

10   FDIC yet.

11       Q    And you also say, "The company's on track

12   with the Wyoming Division of Banking still planning

13   to have the certificate of authority to operate by

14   the end of June"?

15       A    Yes.

16       Q    "Our company cannot apply until the end of

17   all necessary testing"?

18       A    Correct.

19       Q    So as of May 2022, Custodia had not

20   completed all necessary testing in order to get a

21   certificate of authority to operate from the State of

22   Wyoming?

23       A    Yes.

24       Q    What testing remained to be done at this

25   time?

1       Q     And you replied it was Reserve Trust, and

2    you asked Thompson to provide an update.   Do you

3    recall learning that Reserve Trust had BSA/AML

4    issues?

5       A     Yes.

6       Q     Who did you learn that from?

7       A     We were interviewing some of their former

8    employees.

9       Q     Did you ask -- did you discuss with those

10   employees why Reserve Trust lost its master

11   account?

12      A     Chuck Thompson did when he was interviewing.

13   I didn't interview any of the employees, but we

14   interviewed a couple of their former employees who

15   were looking for new jobs.

16      Q     So Chuck Thompson interviewed Reserve Trust

17   employees who were looking for new jobs?

18      A     Yes.

19      Q     And Chuck Thompson learned from them that

20   Reserve Trust had BSA/AML issues?

21      A     Yes.

22      Q     And Chuck Thompson learned from them that

23   those BSA/AML issues resulted in losing its master

24   account?

25      A     That's what they told us.   I don't know if

1    that's true, but that's what they told him.  I also

2    recall learning that they didn't have a chief

3    compliance officer.  That was also one of the pieces

4    of feedback.  It's not here in these meeting minutes,

5    but I was really surprised that they didn't have a

6    chief compliance officer.

7        Q    In your view can a speedy that doesn't have

8    a chief compliance officer obtain a master account?

9            MR. ORTIZ:  Let me object; lacks foundation.

10   Go ahead.

11       A    That also calls for a legal conclusion.

12   We're about to find out.

13   BY MR. MICHAELSON:

14       Q    Refer to the next page, FRBKC 2882,

15   "Chairman Long asked Thompson to give the board a

16   BSA/AML policy update"; do you see that?  It's the

17   last paragraph.

18       A    Yes.

19       Q    And you provided a high-level overview?

20       A    Um-hum.

21       Q    You stated, "The policy is a living document

22   that has changed"; do you see that?

23       A    Yes.  All policies are living documents that

24   have been changed.

25       Q    At this time, did you have -- as of May

1    2022, did Custodia have BSA/AML policies and

2    procedures that were complete and final and ready to

3    go?

4        A    Policies, yes; procedures, I don't know

5    because we'd switched over to Foundry at this point,

6    so anytime you switch a vendor, the procedures are

7    going to change, but the policy had been in place and

8    had been continually updated since 2020.

9        Q    Do you recall where things stood with

10   Foundry as of May 2022?

11       A    Not specifically, no.

12       Q    Was their work complete as of May 2022?

13       A    I doubt it, but we were heavy in the new

14   vendor onboarding and integration around that time

15   because we'd replaced them earlier in the year.

16       Q    And the minutes reflect that "The policy

17   will continue to change as a result of engaging Crowe

18   to help advise regarding best practices"?

19       A    Yes.

20       Q    So does that refresh your memory as to

21   whether Crowe had not yet completed its work as of

22   May 2022?

23       A    I don't know.  Again, Crowe was actually --

24   there was ongoing work.  We're still working with

25   Crowe, so there was the initial assessment, and then

1    ongoing work.  The board brought them in, I think,

2    twice.  So there were multiple interactions with

3    Crowe, multiple reports by Crowe.

4            (Deposition Exhibit No. 258 marked.)

5    BY MR. MICHAELSON:

6        Q    Exhibit 258 is document Bates stamped

7    Custodia 8686.  Do you recognize this document?

8        A    I do.

9        Q    What is it?

10       A    A notebook.

11       Q    These are your notes?

12       A    Yes.

13       Q    Are all of them your notes?

14       A    Yes.

15       Q    In other words, this doesn't contain anyone

16   else's notes?

17       A    Correct.

18       Q    And I gather you provided this to your

19   counsel in connection with this litigation?

20       A    Yes.

21       Q    Were all of those notes in this exhibit

22   contained in the same notebook?

23       A    Yes.

24       Q    Do you know approximately -- the approximate

25   date range of the notes contained in this notebook?

1      A    I don't know what this is.  In the context,

2    though, this is looking at market opportunities.  I'm

3    talking "huge TAM," is total addressable market.

4    This looks like notes to prepare for a conversation

5    with a potential investor.  So "problems" is market

6    problems in the payments industry, which is what the

7    opportunities were that we were trying to solve.

8      Q    Got it.  The next Page 705, on the left, the

9    notes that begin with "JBH."  What is JBH in

10   reference?

11     A    I'm sorry.  Which page?

12     Q    705.

13     A    Okay.



```
24      Q    Want to take a break?

25           (Break from 4:34 p.m. to 4:47 p.m.)
```

1    the Kansas City Fed did not want a de novo bank to

2    apply for membership because the hurdle that it set

3    for us was so high.

4          And to give you an example, the entire

5    banking industry in the State of Wyoming has roughly

6    seven billion dollars in assets, and we as a de novo

7    bank were measured against a $50 billion complex bank

8    standard.

14    Q    Custodia would not be profitable?

15    A    That's normal for de novo banks.

16    Q    What's your basis for saying it's normal for

17    de novo banks?

18    A    Every bank before it launches has to spend

19    the money on the banking core, has to put the risk

20    management systems in place, has to put the financial

21    management systems in place.

22          It's the nature of a de novo that you have

23    to spend money before you generate your first dollar

24    of revenue.

 4           MR. MICHAELSON:  For those listening, we

 5    just unmuted you.  We've been going about 10 minutes.

 6    We're on Exhibit 258, Page 706.

 7    BY MR. MICHAELSON:

 8       Q    So for Custodia to obtain profitability,

 9    they're going to have to roll out digital assets

10    products and services that weren't yet built out?

11       A    Correct.

12       Q    If Custodia, though, were to grant you a

13    master account -- I'm sorry.  If the Reserve Bank of

14    Kansas City were to grant a master account based

15    solely on a review of day one products and services

16    absent fed membership, they'd have no supervisory

17    rights over you, correct?

18       A    We volunteered to have whatever supervisory

19    rights the fed wanted.  You saw that in the May 2021

20    slides that we presented to the board.  That should

21    not have been an obstacle at all.

22       Q    But if you changed your mind, they couldn't

23    enforce that, right?

24       A    We would have contractually committed to

25    that.  That wouldn't have been a problem.

1    Q    So on the -- we're back on the record.  On

2  the same day that Custodia received notice from the

3  Federal Reserve Bank and Kansas City that the master

4  account was denied?

5    A    Um-hum.

6    Q    There was also an announcement from the

7  White House that same day, correct?

8    A    Correct.

9    Q    Do you believe that the White House

10 announcement was coordinated with the federal

11 reserves system's announcements concerning the

12 membership application of the master account

13 request?

14   A    Yes.

15   Q    What is the basis for that belief?

16   A    Our conversations with the Bloomberg

17 reporters.

18   Q    What do the Bloomberg reporters tell you

19 about coordination between the White House and

20 federal reserve?

21   A    As I mentioned at the beginning of this, the

22 Bloomberg reporters started calling us on Wednesday,

23 the 25th.  They had clearly been leaked by somebody

24 who had to have been inside the fed that we had been

25 asked to withdraw our application, and if we didn't,

1    we would be voted down on Friday.

2          The Bloomberg reporters were hounding us.

3    By that I mean, voicemail after voicemail, and having

4    worked with Bloomberg for 20 years, I understand why.

5    They needed a second confirmation.  So they got

6    tipped off by somebody, and they needed a second

7    confirmation.  They can't publish without second

8    confirmations; that's their policy.

9          They ultimately, when we did talk to them,

10   admit that.  They were looking for second

11   confirmation.  They couldn't publish until -- they

12   needed second confirmation, but I already expected

13   that.

14         Our PR agent had five or six conversations

15   with Bloomberg's reporters over that two-day -- it

16   was around 48 hours.  They started calling Wednesday

17   afternoon, the 25th, and then, of course, the

18   announcement of the denial was Friday morning, the

19   27th.

20         So it was three days, but around 48 hours in

21   total, and the Bloomberg reporter, when she finally

22   got a hold of our PR agent, he asked her, "Who at the

23   fed is leaking this?"

24         And she said, "Well, it wasn't necessarily

25   the fed."

1       And so he said, "Oh, that must mean the

2   White House," and she laughed, and in all of their

3   prior subsequent conversations, when she called him,

4   he started with, "What are our friends at the White

5   House saying?"  And she never denied it was the White

6   House.

7       When I talked to Katanga Johnson -- it's

8   K-A-T-A-N-G-A, Johnson on Friday morning, we had a

9   very similar conversation because he knew that we had

10  sent the letter to Mark Van Der Weide the night

11  before, and Allie Versprille was recounting sentences

12  from our letter to the fed.  So she had it within

13  hours of us sending it to the fed, and when

14  Katanga Johnson called me, I said, "I need to know

15  who at the fed is leaking this because what they're

16  doing is illegal, and it's clearly designed to

17  intimidate us into withdrawing our application and

18  dropping this lawsuit."

19      And he said, "Who says it was coming

20  directly from the fed?"  And I said, "Oh, that must

21  mean it was the White House, right?"

22      And by this conversation on Friday morning,

23  we already knew that we had been voted down, and the

24  White House had released its statement simultaneously

25  with the Board of Governors releasing its statement.

1    There were three things released simultaneously.

2          And when I asked Katanga, "So it's the White

3    House?"  He said, "Hmmm."  So the Bloomberg reporters

4    never formally confirmed, it but they indirectly

5    confirmed it and never denied it when we repeatedly

6    said, "So this is coming from the White House?"

7          And that is the basis upon which we

8    concluded that, indeed, it was the White House.  I do

9    not know who at the fed leaked.  They got the leak of

10   the board votes, as well.  I don't know who at the

11   fed was leaking.  It was clearly somebody at the fed.

12   Were they leaking directly to Bloomberg or were they

13   leaking to the White House and the White House was

14   leaking to Bloomberg, I do not know.

15   Q    So you're saying the reporters didn't

16   confirm that the White House was the source?

17   A    Correct.

18   Q    They suggested it was?

19   A    It was clear.

20   Q    And it's your testimony that the Bloomberg

21   reporters were suggesting that it was the White House

22   leaking information about Custodia's membership

23   application, correct?

24   A    Somebody clearly got three different leaks

25   from the fed to Bloomberg.  Was it directly from

1   someone at the fed or was someone at the fed feeding

2   it to the White House, who was then leaking it to

3   Bloomberg, I don't know, but there were clearly three

4   separate leaks of Custodia confidential supervisory

5   information to Bloomberg either directly or

6   indirectly.

7       Q    As you said, Bloomberg typically required

8   two sources.  So if they were getting a leak from the

9   fed and a leak from the White House, they could run

10  with it, right?

11          MR. ORTIZ:  Object on foundation.  Go

12  ahead.

13      A    I don't know.

14  BY MR. MICHAELSON:

15      Q    I guess I'm confused because you were

16  saying, "Who's your source at the fed?"  And they

17  were suggesting it wasn't at the fed; it was at the

18  White House; that's your testimony?

19      A    Yes.

20      Q    So they weren't suggesting that there was a

21  leak from the fed?

22      A    They weren't saying that, either.  They

23  weren't disclosing the source.  They just hinted that

24  it was the White House, and that was the joke

25  everytime they called Nate trying to get us to

1    confirm it.  If they couldn't publish the story.

2    Clearly, it had been leaked.  Clearly, the nature

3    of -- and by the way, the Wall Street Journal got the

4    leak, as well -- the nature of it and the timing of

5    it was designed to pressure us, and I don't know

6    whether it was the fed and the White House or the

7    White House alone, but somebody was leaking from the

8    fed.  That was clear by definition.

9        Q    Didn't you say the reporters denied that?

10       A    Somebody -- somebody got the information

11   outside of the federal reserve.  There was

12   confidential Custodia information going outside the

13   federal reserve.  I just don't know whether it was

14   directly to Bloomberg or to the White House.

15       Q    In your experience or -- do you have

16   experience talking with reporters?

17       A    Yes.

18       Q    Extensive?

19       A    Yes.

20       Q    In your experience, are reporters always

21   straight with potential sources about who their

22   existing sources are?

23       A    When they have material information that was

24   not public in any other way, it was clear they were

25   getting leaks from the feds.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Number: 22-cv-00125-SWS |
| ) | |
| FEDERAL RESERVE BOARD OF ) | |
| GOVERNORS and FEDERAL RESERVE ) | |
| BANK OF KANSAS CITY, ) | |
| ) | |
| Defendants. ) | |

## ERRATA SHEET FOR THE TRANSCRIPT OF THE DEPOSITION OF CAITLIN LONG

I, Caitlin Long, have read the transcript of my deposition taken on November 29, 2023 in

the above captioned matter and make the following corrections:

| Page | Line | Current Transcript | Change | Reason |
|---|---|---|---|---|
| 7 | 3 | comments | complaints | Transcription error |
| 9 | 12 | feds | Fed | Transcription error |
| 16 | 13 | had in the been | had not been | Transcription error |
| 17 | 20 | their | our | Transcription error |
| 17 | 25 | offered | offering | Transcription error |
| 19 | 2 | press at custodiabank.com | press@custodiabank.com | Transcription error |
| 20 | 24 | longevity insurance company | Longevity Insurance Company | Transcription error |
| 23 | 18 | Morgan Life Insurance subsidiaries | Morgan Stanley life insurance subsidiary | Transcription error |
| 27 | 1 | helping | happening | Transcription error |
| 27 | 17 | propriety | proprietary | Transcription error |

| Page | Line | Current Transcript | Change | Reason |
|------|------|--------------------|--------|--------|
| 29 | 11 | speedy | SPDI | Transcription error |
| 29 | 15 | speedy | SPDI | Transcription error |
| 29 | 16 | speedy | SPDI | Transcription error |
| 29 | 24 | speedy | SPDI | Transcription error |
| 29 | 25 | speedy | SPDI | Transcription error |
| 30 | 9 | speedy | SPDI | Transcription error |
| 30 | 11 | speedy | SPDI | Transcription error |
| 30 | 13 | speedy | SPDI | Transcription error |
| 30 | 15 | speedy | SPDI | Transcription error |
| 30 | 20 | speedy | SPDI | Transcription error |
| 30 | 21 | speedy | SPDI | Transcription error |
| 31 | 6 | speedy | SPDI | Transcription error |
| 31 | 9 | speedy | SPDI | Transcription error |
| 31 | 10 | speedy | SPDI | Transcription error |
| 32 | 3 | speedy | SPDI | Transcription error |
| 32 | 19 | speedy | SPDI | Transcription error |
| 35 | 15 | documents | accounts | Transcription error |
| 37 | 7 | speedy | SPDI | Transcription error |
| 37 | 9 | speedy | SPDI | Transcription error |
| 37 | 16 | speedy | SPDI | Transcription error |
| 39 | 3 | speedy | SPDI | Transcription error |
| 39 | 8 | speedy | SPDI | Transcription error |

| Page | Line | Current Transcript | Change | Reason |
|------|------|--------------------|--------|--------|
| 39 | 17 | speedy | SPDI | Transcription error |
| 40 | 16 | speedy | SPDI | Transcription error |
| 41 | 3 | speedies | SPDIs | Transcription error |
| 50 | 3 | speedies | SPDIs | Transcription error |
| 50 | 6 | speedy | SPDI | Transcription error |
| 50 | 15 | speedies | SPDIs | Transcription error |
| 52 | 4 | criteria | criterion | Transcription error |
| 54 | 11 | additional | a few | Transcription error |
| 58 | 17 | Avid | Avit | Transcription error |
| 59 | 13 | Clarisa | Perissa | Transcription error |
| 59 | 16 | Clarisa | Perissa | Transcription error |
| 60 | 20 | Clarisa | Perissa | Transcription error |
| 73 | 17 | create a | reduce | Transcription error |
| 76 | 19 | hierarchial | hierarchical | Transcription error |
| 76 | 20 | hierarchial | hierarchical | Transcription error |
| 84 | 10 | principle | principal | Transcription error |
| 86 | 2 | providing | proposing | Transcription error |
| 86 | 7 | Padilla | Kudiya | Transcription error |
| 86 | 8 | New York Mellon | Bank of New York Mellon | Transcription error |
| 87 | 7 | Padilla | Kudiya | Transcription error |
| 89 | 22 | principle | principal | Transcription error |
| 98 | 23 | speedy | SPDI | Transcription error |

| Page | Line | Current Transcript | Change | Reason |
|------|------|--------------------|--------|--------|
| 101 | 20 | eretheum | Ethereum | Transcription error |
| 102 | 19 | elicit | illicit | Transcription error |
| 121 | 22 | occasioning | occasions | Transcription error |
| 121 | 22 | meant | met | Transcription error |
| 123 | 23 | speedy | SPDI | Transcription error |
| 124 | 6 | speedy | SPDI | Transcription error |
| 124 | 17 | Kansas City | Kansas City Fed | Transcription error |
| 124 | 18 | speedy | SPDI | Transcription error |
| 125 | 2 | heat back | feedback | Transcription error |
| 128 | 14 | speedies | SPDIs | Transcription error |
| 129 | 3 | speedies | SPDIs | Transcription error |
| 130 | 2 | speedies | SPDIs | Transcription error |
| 136 | 21 | speedy | SPDI | Transcription error |
| 136 | 25 | speedy | SPDI | Transcription error |
| 137 | 1 | speedy | SPDI | Transcription error |
| 138 | 20 | speedy | SPDI | Transcription error |
| 148 | 19 | speedy | SPDI | Transcription error |
| 150 | 9 | accurate | inaccurate | Transcription error |
| 151 | 19 | Clearly called | Cleary call | Transcription error |
| 154 | 8 | the documents this we | the documents we | Transcription error |
| 159 | 14 | treasury at Ford | treasury IT at Ford | Transcription error |

| Page | Line | Current Transcript | Change | Reason |
|---|---|---|---|---|
| 161 | 9 – 13 | Q . . . She agreed there were no show -- I asked Tara Humston specifically. I explained, "We are going to be raising capital. Are there any show stoppers?" She said, "Yes, there are no show stoppers." She specifically said, "There are no show stoppers." | A . . . She agreed there were no show -- I asked Tara Humston specifically. I explained, "We are going to be raising capital. Are there any show stoppers?" She said, "Yes, there are no show stoppers." She specifically said, "There are no show stoppers." | Transcription error where the speaker was misidentified. Lines 9–13 are the response to the question at lines 5–8. |
| 168 | 13 | speedy | SPDI | Transcription error |
| 168 | 14 | speedy | SPDI | Transcription error |
| 168 | 20 | speedy | SPDI | Transcription error |
| 169 | 4 | speedy | SPDI | Transcription error |
| 169 | 5 | speedy | SPDI | Transcription error |
| 170 | 9 | about | to | Transcription error |
| 172 | 8 | speedies | SPDIs | Transcription error |
| 172 | 9 | speedy | SPDI | Transcription error |
| 176 | 22 | form | formed | Transcription error |
| 178 | 7 | feds | Fed | Transcription error |
| 179 | 13 | at OMO | open kimono | Transcription error |
| 181 | 13 | CDs | SPDIs | Transcription error |
| 185 | 10 | speedy | SPDI | Transcription error |
| 191 | 10 | speedy | SPDI | Transcription error |
| 191 | 21– 22 | OC, one | OC1 | Transcription error |
| 192 | 16 | OC One | OC1 | Transcription error |
| 194 | 9 | knew | new | Transcription error |

| Page | Line | Current Transcript | Change | Reason |
|------|------|--------------------|--------|--------|
| 195 | 7 | speedy | SPDI | Transcription error |
| 196 | 3 | not anyone | not chartered anyone | Transcription error |
| 196 | 6 | speedies | SPDIs | Transcription error |
| 199 | 2 | speedies | SPDIs | Transcription error |
| 200 | 14 | speedies's | SPDIs' | Transcription error |
| 200 | 18 | principals | principles | Transcription error |
| 202 | 11 | The | She | Transcription error |
| 207 | 4 | FCS | FTX | Transcription error |
| 209 | 25 | appointee | appointees | Transcription error |
| 220 | 2–3 | apply to the Monetary Control Act at all. The applies to applicants that apply after August | comply with the Monetary Control Act at all, and they apply to applicants that apply after August | Transcription error |
| 221 | 14 | principals | principles | Transcription error |
| 224 | 20 | speedy | SPDI | Transcription error |
| 225 | 10 | two | to | Transcription error |
| 231 | 15 | speedies | SPDIs | Transcription error |
| 232 | 13 | speedies | SPDIs | Transcription error |
| 232 | 14 | speedies | SPDIs | Transcription error |
| 240 | 23 | speedy | SPDI | Transcription error |
| 258 | 3 | speedies | SPDIs | Transcription error |
| 258 | 8 | speedy | SPDI | Transcription error |
| 263 | 4 | speedy | SPDI | Transcription error |
| 274 | 15 | Bloomberg | Gruenberg | Transcription error |

| Page | Line | Current Transcript | Change | Reason |
|------|------|--------------------|--------|--------|
| 282 | 13 | single lay | single A | Transcription error |
| 282 | 14 | network | networks | Transcription error |
| 285 | 18 | only on products | only on launch products | Transcription error |
| 286 | 21 | billed out | built out | Transcription error |
| 287 | 19 | 2016 | SR 2016 | Transcription error |
| 304 | 21 | Tire | Tier | Transcription error |
| 311 | 6 | divisions | decisions | Transcription error |
| 313 | 19 | Tire | Tier | Transcription error |
| 315 | 8 | close | do so | Transcription error |
| 321 | 2–3 | all of their prior subsequent conversations | all of their subsequent conversations | Transcription error |
| 324 | 25 | feds | Fed | Transcription error |
| 326 | 6 | move to move | move to moot | Transcription error |
| 327 | 15 | No | Yes | Transcription error |
| 328 | 16 | Padilla | Kudiya | Transcription error |
| 331 | 14 | Clain | Klain | Transcription error |
| 332 | 9 | email. The Bloomberg email put it | emails. The Bloomberg emails put it | Transcription error |

Dated: January 5, 2024

/s/ Caitlin Long
Caitlin Long