# EXHIBIT 23

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1           IN THE UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF WYOMING

2

3

        CUSTODIA BANK, INC.,          )
4                                     )
                     Plaintiff,       )
5                                     )
        v.                            )
6                                     ) 1:22-cv-00125-SWS
        FEDERAL RESERVE BOARD         )
7       OF GOVERNORS AND              )
        FEDERAL RESERVE BANK OF       )
8       KANSAS CITY,                  )
                                      )
9                    Defendants.      )
10

11

12              * DESIGNATED CONFIDENTIAL *
13            * SUBJECT TO A PROTECTIVE ORDER *
14

15

16              ZOOM/IN-PERSON DEPOSITION OF ESTHER
17      GEORGE, a Witness, taken remotely on behalf of
18      the Plaintiff before Peggy E. Corbett, CSR, CCR,
19      RDR, pursuant to Notice on the 9th day of
20      November, 2023, at the offices of the Federal
21      Reserve Bank of Kansas City, 1 Memorial Drive,
22      Kansas City, Missouri 64198.
23

24

25

Page 25

```
 1              MR. MICHAELSON:  Objection, form.
 2      A.   I don't recall advising anyone of that.
 3      Q.   (BY MR. ORTIZ)  This draft bill that I
 4  gave you, on Page 23, this would be of Exhibit 4,
 5  actually has a provision that references, "If a
 6  Special Purpose Depository Institution is denied
 7  authorization to access any service required to
 8  be made available under 12 USC 248(a), the
 9  Attorney General shall on behalf of the State of
10  Wyoming and the institution commence a civil
11  action to enforce the requirements of USC
12  248(a)."
13              You were specifically told at some point
14  in time by your staff that was being built into
15  this bill, weren't you?
16      A.   I was aware of this.
17      Q.   Did you direct your staff to tell them
18  to take that provision out because it wouldn't be
19  necessary, that they would have to sue you?
20      A.   I did not make any judgment for my legal
21  staff about how they should respond to that.
22      Q.   Did you know that your legal staff asked
23  the legislators to take that provision out?
24      A.   My understanding was our staff did not
25  believe this was an essential component to the
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 26

1    authorities.

2        Q.   Did your staff tell that you they

3    advised the Wyoming legislature it wouldn't be

4    necessary to have that in there because it wasn't

5    going to be a problem?

6        A.   My understanding was legally they did

7    not think that this provision was part of the

8    decision-making process for the bank.

9        Q.   Tell me, explain to me what that means;

10   your staff told you really that they didn't think

11   what, explain that to me.

12       A.   That the issue about denying

13   authorization, that the legal aspects that were

14   anticipated here about being denied were not part

15   of the considerations that the bank would be

16   making in decisions about a master account, so

17   their views would have been on the legal framing

18   of this and the legislation, and not the

19   authorities of the bank.

20       Q.   So would it be fair to say that you knew

21   very early on it was a primary consideration that

22   SPDI charters be able to get master accounts, and

23   they were even saying, "We're going to sue you if

24   you try to deny us a master account," you knew

25   that early on, didn't you?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 27

1          MR. MICHAELSON:  Objection, form.

2     A.   I was aware of that.

3     Q.   (BY MR. ORTIZ)  So as you get through

4    this process a little bit, and I want to have you

5    walk through this, there came a point in time

6    that the SPDI legislation passed; is that right?

7     A.   Yes.

8     Q.   And then at least one or two

9    organizations at some point in time may have

10   applied for a master account?

11    A.   That is correct.

12    Q.   And I know we've somewhat talked about

13   it.  There may be some time that an institution

14   called Kraken applied for a master account.  Is

15   that something you were aware of?

16    A.   I was aware of that.

17    Q.   But primarily Avanti that became

18   Custodia, they were the ones that were really

19   pushing to get the master account, correct?

20    A.   We were working directly with Custodia

21   on their request.

22    Q.   How many times did you personally meet

23   with any representatives from the State of

24   Wyoming about the SPDI charter legislation and

25   these type of banks?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 29

1      Q.   And the State of Wyoming Banking

2    Commission had always been very cooperative with

3    you at the Kansas City Fed when you wanted any

4    information or sharing of information regarding

5    State-chartered banks, agreed?

6      A.   Yes, they would do so within their

7    authorities --

8      Q.   Sure.

9      A.   -- just as we would.

10     Q.   Very good.  So as you moved forward in

11   time with Custodia, there was never a belief or a

12   problem that you wouldn't be able to get

13   necessary information from Custodia's supervisory

14   authority, which would be the State Banking

15   Commission, agreed?

16          MR. MICHAELSON:  Objection, form.

17     A.   It would not have been clear to me that

18   the rules that governed how we supervised

19   State-chartered member banks with them were going

20   to apply in the same way here, since we were not

21   part of the supervision of those institutions.

22     Q.   (BY MR. ORTIZ)  Well, but that's part of

23   the whole dual banking system, isn't it, that

24   State-chartered banks are supervised by their

25   chartering authority, correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 30

1      A.    That is correct, with Federal

2    supervision in both cases.

3      Q.    So let me make sure I am understanding

4    what you're telling me.  You're telling me that

5    even if it's a State-chartered non-member bank,

6    you have some Federal supervisory authority over

7    that?

8      A.    A State-chartered institution must

9    select a Federal supervisor, and it is either the

10   Federal Reserve, or it is the Federal Deposit

11   Insurance Corporation.

12     Q.    So early on Custodia made it very clear

13   that they would let you supervise them, agreed?

14     A.    At the time they asked for the master

15   account, they had not expressed membership

16   interest, in being supervised by the Federal

17   Reserve.

18     Q.    Well, I think we're talking two

19   different things.

20     A.    Okay.

21     Q.    You don't have to be a member bank of

22   the Fed, do you, if you're State-chartered?  You

23   don't have to be a member bank, correct?

24     A.    That is correct.

25     Q.    All right.  Now, obviously, you have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 31

1    supervisory authority over member banks.

2        A.   Correct.

3        Q.   I thought you just told me you also have

4    supervisory authority over a State-chartered

5    non-member bank.

6                  MR. MICHAELSON:   Object.

7        A.   We do not.

8        Q.   (BY MR. ORTIZ)  You do not.  But you're

9    saying some Federal authority, other than the

10   State of Wyoming as the chartering authority, has

11   to supervise that?

12       A.   Our dual banking system is based on a

13   national charter issued by the comptroller of the

14   currency, or the 50 states can issue their own

15   charter, in which case they apply to the Federal

16   Reserve or the FDIC for their Federal

17   supervision.

18       Q.   Okay.

19       A.   So all State-chartered institutions come

20   with Federal supervision in the current legal and

21   regulatory framework.

22       Q.   So is it your position here today that

23   Custodia never acknowledged that they would be

24   supervised by you -- by the Kansas City Fed or

25   the FDIC?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 32

1              MR. MICHAELSON:  Objection, form.

2        A.   The nature of the charter allowed the

3    State of Wyoming to be the sole supervisor of

4    this institution.

5        Q.   (BY MR. ORTIZ)  Okay.  Did you ever make

6    an offer or a request to Custodia that they just

7    willingly agree to let the Kansas City Fed also

8    have a dual supervisory role?

9        A.   I did not suggest that at any time.

10       Q.   Why not?

11       A.   That would have been inconsistent with

12   the authorities --

13       Q.   Why?

14       A.   -- that existed.

15       Q.   Why?

16       A.   Because the legislation creating the

17   SPDI charter did not refer to it as a bank that

18   would have Federal supervision.  It was

19   designated as State-only supervised.

20       Q.   Was that a policy question that you

21   needed decided by the Board of Governors, whether

22   you could even offer that?

23       A.   There was a threshold question to me

24   about whether this charter was eligible for

25   access to an account at the Federal Reserve.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 33

1      Q.   Whether it was a quote "eligible
2      depository institution"?
3          A.   That's correct.
4      Q.   If it was, if it was determined to be an
5      eligible depository institution, which we know
6      sometime it was determined to be that, you
7      already had existing policies and procedures in
8      place at the Kansas City Fed to provide a master
9      account for State-chartered banks or
10     State-chartered depository institutions, correct?
11                  MR. MICHAELSON:   Objection, form.
12         A.   If an institution is eligible, then our
13     next step is to evaluate the risk parameters of
14     the institution requesting the account.
15         Q.   (BY MR. ORTIZ)   Based on the policies
16     and procedures you had in place when Custodia
17     applied for its master account, agreed?
18         A.   Yes.
19         Q.   Those are the policies and procedures
20     that should have been followed to determine
21     whether Custodia was granted its master account,
22     agreed?
23                  MR. MICHAELSON:   Objection, form.
24         A.   We were following those procedures at
25     the outset.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 34

1          Q.   (BY MR. ORTIZ)  Who told you that?

2          A.   It would be my assumption based on my

3     briefings with the staff that they were looking

4     at their existing procedures around the nature of

5     this novel institution.

6          Q.   Did you ever, is there an actual master

7     account application file that's kept in some type

8     of server or file point system that applies to

9     Custodia?

10              MR. MICHAELSON:  Objection, form.

11         A.   I believe there is a database that

12    Reserve Banks are required to populate, noting

13    who has accounts, and the status of those

14    accounts.

15         Q.   (BY MR. ORTIZ)  Have you ever gone and

16    actually looked at the status of Custodia in the

17    concept of the policies that applied and how far

18    they got in the application process, like what

19    was populated in this electronic file?

20              MR. MICHAELSON:  Objection, form.

21         A.   I have not looked at the actual

22    database.

23         Q.   (BY MR. ORTIZ)  Like for instance, do

24    you know if a risk rating was ever given to

25    Custodia?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 49

1      Q.   (BY MR. ORTIZ)   In what timeframe, do

2    you remember reaching out to the Board of

3    Governors on that question?

4      A.   I would have reached out to them early

5    on, both at the point we knew that the

6    legislation was being approved, at the point that

7    we received the request from Custodia for access

8    to a master account.

9      Q.   So you reached out to the Board of

10   Governors to answer the question for you as to

11   whether Custodia's proposed activity was legally

12   permissible?

13     A.   I reached out to the Board of Governors

14   to inform the decision we were asked to make

15   about granting a master account, and one of the

16   factors, a couple of factors that were important

17   was the threshold decision of legal eligibility

18   for the kind of charter that had been created in

19   Wyoming, and then a broader question of is this

20   activity or the proposed activities here

21   considered permissible?

22          Are they falling within the regulatory

23   and legal perimeters that we have set up for

24   other depository institutions?

25     Q.   So who did you reach out to at the Board

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 50

1      of Governors to answer those questions for you?

2          A.   Our staff would have had long-standing

3      relationships with the Board staff, who would

4      have dealt with these issues both at a policy

5      level, at a risk level, and that's where the

6      initial conversations took place.

7          Q.   So let's kind of break down when you're

8      analyzing whether Custodia could get a master

9      account in your view, tell me the specific issues

10     that you needed the Board Of Governors to make a

11     decision on versus something you think you can do

12     at the Kansas City Fed level.

13              MR. MICHAELSON:   Objection, form.

14         Q.   (BY MR. ORTIZ)   So I think you talked

15     about legal permissibility; is that right?

16         A.   Right.   So as we approached this issue

17     there were really in my mind three parts to this.

18     One was the threshold issue of legal eligibility.

19     The entity that normally issues routing transit

20     numbers had flagged this for the Reserve Bank

21     without issuing.   They had asked the question

22     about whether the institution was legally

23     eligible.   So that was a threshold question for

24     us.

25              The second question was the nature of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 51

1    the activity itself, the framework with which

2    that activity would occur; in other words a

3    State-chartered entity that did not have Federal

4    supervision, and we were seeking the Board's

5    input as part of our decision-making to

6    understand was that raising broader policy issues

7    that we would need to take into account.

8        Q.   So the Board has to make --

9             MR. MICHAELSON:   Hold on.   Let the

10   witness finish.

11       Q.   (BY MR. ORTIZ)   Go ahead, I'm sorry.

12       A.   And the third question which was one

13   that we always involve is assuming those things

14   were affirmed, then we would make our independent

15   risk assessment around whether the institution

16   should be granted access.

17       Q.   Were there other considerations that the

18   Board had to weigh in on that you could not do on

19   your own, other than what you have just described

20   for me?

21       A.   Those were the general issues,

22   interpretation of law as it related to legal

23   eligibility, and consistency with a broader

24   policy framework, regulatory framework.

25       Q.   How about the whole issue of monetary

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 52

1    policy and how it would affect the system?  Was

2    that an issue that had to be determined for

3    Custodia?

4                MR. MICHAELSON:  Objection, form.

5         A.   So the Board of Governors policy

6    objectives would have included effective

7    implementation of monetary policy.  We would have

8    been in a position to make some judgments about

9    whether we thought there was an intersection with

10   that policy objective.

11        Q.   (BY MR. ORTIZ)  Does the Board make the

12   determination on any monetary control issues?

13                MR. MICHAELSON:  Objection, form.

14        A.   I'm sorry, I don't understand; any

15   monetary control issues or monetary --

16        Q.   (BY MR. ORTIZ)  If that's potential

17   issue that deals with monetary control in the

18   system, is that a determination made by the Board

19   versus you at the Kansas City Fed?

20        A.   I'm sorry, I want you to clarify.  If

21   you're talking about monetary control as in the

22   Monetary Control Act interpretation, or you're

23   talking about monetary policy implementation?

24        Q.   I think, I've seen it used, I've seen

25   the term monetary control used in the documents

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 53

1    and with other witnesses we've deposed on your
2    staff that have talked about monetary control
3    determinations are made by the Board, but is that
4    not a term you're familiar with?
5         A.   I guess the way I think about it is we
6    have a legal responsibility under the Monetary
7    Control Act that talks about how we provide
8    financial services.
9              The implication in a financial system
10   for how money flows through it can have
11   implications for both financial stability and for
12   the conduct of monetary policy, which is the
13   purview of the Federal Open Market Committee.
14             So as we think about issues that could
15   impinge on any of those policy objectives, it
16   would not be unusual to consult with the Board of
17   Governors about how they saw those same issues.
18        Q.   You would let the Board of Governors
19   make the determination on those issues, like
20   financial stability, correct?
21             MR. MICHAELSON:  Objection, form.
22        A.   It was not clear there was a decision to
23   make about financial stability.  It would have
24   been a factor to consider in the judgments we
25   were trying to make, and so I would have listened

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 54

1    to their views on whether an issue created issues

2    of stability or instability in the financial

3    system.

4         Q.   (BY MR. ORTIZ)  What other issues with

5    the Board of Governors weigh in on, other than

6    the ones we've discussed now, what other would be

7    policy considerations that the Board of Governors

8    needed to give you a "yes" or a "no" on?

9              MR. MICHAELSON:  Objection, form.

10        A.   So the Board of Governors would have

11   been responsible for the regulatory framework for

12   the supervision of state-member banks and bank

13   holding companies.

14             We would have consulted on safety and

15   soundness relative to that regulatory framework

16   that is theirs.

17        Q.   (BY MR. ORTIZ)  So you're telling me the

18   Board of Governors really could make a

19   determination that they were not comfortable with

20   the State of Wyoming being the regulatory

21   authority over the State charter, and therefore,

22   were simply not going to agree to give you

23   access; is that what you're telling me?

24             MR. MICHAELSON:  Objection, form,

25   misstates testimony.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 55

1      A.    That is not what I said.

2      Q.    (BY MR. ORTIZ)   Then tell me what you

3   mean by that.   If they are interpreting the

4   framework, the supervisory framework over

5   Custodia, what does that mean then?

6      A.    The Board of Governors was not

7   determining the supervisory framework.   Their

8   authority resided with State-chartered banks that

9   were members, and under the Federal Reserve Act

10  it is the Board of Governors' responsibility to

11  establish the regulatory framework for those

12  institutions.

13         I was not aware they had any authority

14  in the case of the Wyoming SPDI charters.

15     Q.    Well, and that's what I'm surprised

16  then, that did you think the Board of Governors

17  was advising you as to whether this was even a

18  viable supervisory authority set-up, since it was

19  solely going to be supervised by the State of

20  Wyoming?

21     A.    I was not seeking their input on that.

22     Q.    Were you making your own determination

23  on that?

24     A.    It would have been a factor I was

25  considering as I talked to Albert Forkner about

Page 56

1    how they would carry out their supervision.

2         Q.   Were you getting policy consideration

3    advice from the White House or representatives of

4    the White House about what they thought about

5    this type of depository institution that would be

6    dealing with crypto-assets?

7                   MR. MICHAELSON:  Objection, form.

8         A.   I had no interactions with the White

9    House.

10        Q.   (BY MR. ORTIZ)  Did the White House

11   pronouncements throughout this sequence of

12   events, is that something you considered at any

13   time?

14                  MR. MICHAELSON:  Objection, form,

15   foundation.

16        A.   We were considering a number of public

17   announcements that were coming both out of

18   Congress, that were coming out of the Financial

19   Stability Oversight Committee, that were coming

20   out of the Bank for International Settlements in

21   Basel, Switzerland.

22        Q.   (BY MR. ORTIZ)  So you were waiting to

23   see what, I guess, what the public leanings were

24   from those different outside agencies or

25   branches, and that was going to affect your

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 57

1    decision in regards to giving Custodia a master

2    account?

3              MR. MICHAELSON:   Objection, form.

4         A.   I think it's fair to say that I was

5    aware this was potentially precedent-setting, and

6    that this was an evolving landscape in terms of

7    the considerations that were being given both

8    legislatively by Congress and the banking

9    agencies, and I thought it was a relevant factor

10   for me to take in before making a decision about

11   this master account.

12        Q.   (BY MR. ORTIZ)   State-chartered banks,

13   depository institutions by design are typically

14   more innovative in nature than the existing

15   Federal system banks, agreed?

16        A.   There are some cases where I'm sure that

17   could be cited.   I'm not sure that is a universal

18   characterization.

19        Q.   Wasn't that the whole concept of having

20   a dual banking system, to allow innovation at the

21   State level, from State-chartered institutions?

22        A.   I believe it has been a strength of our

23   financial system to have the dual banking system

24   to allow for innovation.

25        Q.   But what you're just describing for me

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 58

```
1    is Federal efforts to thwart that innovation,
2    right?
3        A.    Actually, I didn't see any evidence of
4    trying to thwart innovation.
5        Q.    Would it be fair to say -- were you
6    against this throughout the process?  You didn't
7    want to give them a master account from the time
8    you first heard the concept until all the way to
9    the very end?  Was that your mindset?
10                MR. MICHAELSON:  Objection, form.
11       A.    I don't believe it's a fair
12   characterization to say I didn't want this.  I
13   wanted to understand the nature of this
14   innovation, and whether it would be in the public
15   interest, whether it was consistent with our
16   existing framework and authorities, to be
17   prepared to make a judgment about access.
18       Q.    (BY MR. ORTIZ)  Your staff has testified
19   that you were against giving a master account at
20   every step in the process; is that true?
21                MR. MICHAELSON:  Objection, form,
22   misstates prior testimony by other witnesses.
23       Q.    (BY MR. ORTIZ)  Well, Ms. Hazen and
24   Christi May-Oder both said that you were against
25   it, against giving a master account at the
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 61

1    a conversation with Tara Humston where she said,

2    "Listen, I don't think there's any show-stoppers

3    here.  It looks good to go"?

4              MR. MICHAELSON:  Objection, form.

5        A.   I do remember I had multiple

6    conversations with Tara.  The term "show-stopper"

7    I recall was in the context of, "Do you have any

8    more information that you need?"

9        Q.   (BY MR. ORTIZ)  Okay.  Explain that to

10   me.

11       A.   So in our consideration of factors that

12   will influence our decision, our understanding of

13   risk, we will go back to the requesting party, to

14   the applicant to fill any gaps in information

15   that we think we don't have.

16            Those might be policies.  They might be

17   a business plan.  They may be artifacts that we

18   think are relevant to our decision-making.

19       Q.   (BY MR. ORTIZ)  So did Tara tell you

20   that she told Caitlin Long, "There's no

21   show-stoppers with your application," did she

22   report that to you?

23       A.   I was aware of that frame, and in the

24   context of my conversation with Tara, my

25   understanding was, "Do we have all the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1    information from Custodia that is relevant to our

2    analysis?"

3         Q.   And the report to you was, "Yes, and I

4    don't see any show-stoppers?"

5         A.   I am aware of that, yes.

6         Q.   That was her comment back to you?

7         A.   That was her comment.

8         Q.   And Tara, and I don't, just

9    colloquially, was she kind of like your

10   right-hand person on a lot of these issues?

11        A.   Tara reported to me as the head of our

12   Division of Bank Supervision.

13        Q.   Would it be fair to say you interfaced

14   with her with direct contact as much as anyone on

15   your team?

16        A.   I did have regular status meetings with

17   Tara.

18        Q.   Is that something where when you're in

19   town, you probably see and talk to her daily?

20        A.   It may not be every day, but we worked

21   on the same floor and I could contact her.

22        Q.   Is she one of those people, did you have

23   like a select few that had your cell number and

24   had the green light to call you any time they

25   wanted to?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 63

1          A.    My entire management team had my

2     cellphone number.

3          Q.    So Tara had that kind of access, if she

4     had questions, she would just call you on your

5     cell and run it by you?

6          A.    That would be true.

7          Q.    I want to ask you about conversations

8     with Governor Gordon.  Did you have some

9     follow-up conversations with Governor Gordon

10    directly about Custodia's application for a

11    master account?

12         A.    Yes.

13         Q.    Tell me about what you recall about

14    that.

15         A.    My recollection is Governor Gordon

16    wanted to understand the process, what is the

17    process, the timing.  Governor Gordon was hearing

18    from the banking department, he was hearing from

19    Custodia, and was trying to have a full picture

20    of how this master account review was being

21    conducted.

22         Q.    He expressed to you he was really

23    concerned about the delays, didn't he?

24         A.    In our conversations, he wanted to know

25    timing and considerations for this process.

Page 64

1        Q.    Because the Wyoming Division of Banking

2     was a bit frustrated with the delays.  That got

3     back to you, didn't it?

4        A.    I was not aware they were frustrated

5     with delays.

6        Q.    Well, then tell me the context of

7     Governor Gordon reaching out to you for a

8     conversation to understand the timing of this

9     then.

10       A.    Because Custodia was concerned about the

11    timing my assumption was that that was where he

12    was getting the questions, and wanted to hear

13    first-hand from us how we were handling this

14    request.

15       Q.    And when you say Custodia was concerned

16    about the timing, you mean Custodia was concerned

17    about how long this was taking, correct?

18       A.    Custodia had raised that question

19    several times.

20       Q.    Governor Gordon also talked to you about

21    the fact that it was important that these type of

22    chartered SPDI institutions be able to get a

23    master account.  He talked to you directly about

24    that, as well, didn't he?

25       A.    I don't remember Governor Gordon talking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 65

1    about the importance of the master account per

2    se.  Governor Gordon knew it was important for

3    these institutions to begin to operate, and that

4    they very much wanted a master account at the

5    Kansas City Fed.

6        Q.   Sure.  Well, Governor Gordon expressed

7    to you that in order for these institutions to be

8    viable, they needed direct access to Fed services

9    through a master account.

10       A.   Governor Gordon did not indicate that to

11   me at any time.

12       Q.   Never?

13       A.   Not that they would be -- not that they

14   would not be viable without access to a master

15   account.

16       Q.   Did you ever have that conversation with

17   him and tell him you wanted them going a

18   different route?

19       A.   I specifically had that conversation

20   with Albert Forkner in the State Banking

21   Department to ask on several occasions:  Was

22   access to a master account at the Kansas City Fed

23   the only route to viable operations for these

24   entities?  And each time the answer was:  No, it

25   is desirable, but it is not required for them to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1    begin operations."

2         Q.   So Albert Forkner said, "I guess if they

3    get a correspondent bank relationship, they could

4    technically be viable."  That's what he told you,

5    wasn't it?

6         A.   That was the nature of his response.

7         Q.   But you knew from Custodia that that

8    really wasn't an option for long-term viability

9    because of the fees they had to pay a

10   correspondent bank, and that's why the direct

11   access to a master account was so important,

12   correct?

13        A.   We understood from Custodia that they

14   wanted a master account at the Kansas City Fed.

15        Q.   Because of what I just said, because of

16   the fees they would have to pay a correspondent

17   bank to go through their master account, you knew

18   that, as well, didn't you?

19        A.   I knew they had their reasons around why

20   they wanted a master account versus using a

21   correspondent bank.

22        Q.   So is what I said incorrect?  What were

23   the reasons you understood that they wanted their

24   own master account?

25        A.   My understanding of their -- because

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 67

1    they had requested it, and I do not recall asking

2    their motivation, although going through a

3    third-party likely did involve other kinds of

4    costs.

5         Q.   Getting back to what Tara Humston

6    reported to you in her conversations with Caitlin

7    Long, the conversations with Caitlin Long where

8    she reported or she said, "I told her there were

9    no show-stoppers, "was in the context of Caitlin

10   saying, "Are we going to be able to get our

11   master account?"  That was the context of that

12   conversation, true?

13                  MR. MICHAELSON:  Objection, form.

14        A.   I wasn't involved in the conversation,

15   so I can't speak to that.

16        Q.   (BY MR. ORTIZ)  So you're not sure if

17   that's true or not?

18        A.   I wasn't party to the conversation.

19        Q.   All you know is that it was reported

20   back to you by Tara that she had conversations

21   with Caitlin and told her there were no

22   show-stoppers.  That's basically what you know

23   about that?

24        A.   That was my understanding.

25        Q.   So many people have testified under oath

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 81

1    ever get a master account, wouldn't it?

2        A.   It was clear that the third tier raised

3    a number of questions about how we would go about

4    due diligence in granting an account under that

5    scenario.

6        Q.   And that's a nice way of saying made it

7    virtually impossible that you could get a master

8    account if you were Tier 3, agreed?

9        A.   The hurdle would have been high.

10       Q.   Can we agree candidly, virtually

11   impossible, true?

12       A.   I would not say virtually impossible.

13   The very reason the tier was laid out there was

14   to describe the amount of due diligence, and I

15   think to heightened awareness of the nature of

16   the concerns.

17       Q.   Did you know as being part of the

18   committees discussing this that the bar was going

19   to be set very high, and there were going to be a

20   tier system in place well before it was

21   promulgated?

22                MR. MICHAELSON:   I just want to

23         interject here.  Obviously, the Board has

24         asserted deliberative process privilege over the

25         development of the guidelines, and the S letter

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 82

1     that's disputed before the Court.  It sounds to
2     me like that question is perhaps trying to invade
3     the Board's privilege there, so I'd ask you to
4     reframe it with that in mind, and bear that in
5     mind when you answer.
6          Q.   (BY MR. ORTIZ)  I'm not asking about the
7     deliberative process that went into it, I'm just
8     asking didn't you know well ahead of time that
9     there was going to be a tier system before it was
10    actually published that way?
11               MR. MICHAELSON:  Objection, form,
12    same objection, but go ahead and answer.
13         A.   That there would be a tiering system was
14    not part of understanding the due diligence that
15    would be required here.  I think early on we
16    understood that any of these novel or unusual
17    cases required a different level of scrutiny, and
18    that was long-standing, it was well before these
19    guidelines were promulgated and we understood how
20    tiering would be described.
21         Q.   (BY MR. ORTIZ)  You understood from
22    being on the committee that the bar was going to
23    be raised very high for an institution like
24    Custodia to ever qualify --
25               MR. MICHAELSON:  Objection, form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 83

1       Q.   (BY MR. ORTIZ)  -- weren't you?

2       A.   I already knew the bar was going to be

3   high in terms of the factors we'd have to

4   consider.  That document was codifying for public

5   dissemination.

6       Q.   Why did you tell Custodia that they had

7   to wait until the guidelines were finalized

8   before you could process their request?

9       A.   I don't recall telling them they would

10  have to wait.  I would likely have said, "These

11  guidelines would be a factor in our

12  decision-making."

13      Q.   Well, in fact, have you seen the

14  correspondence from your staff back and forth

15  that indicates that there was going to be a pause

16  or a hold on considering Custodia's application

17  until the new guidelines got put in place?

18           MR. MICHAELSON:  Objection, form.

19      A.   It would have been reasonable, knowing

20  that something was pending, to take that into

21  account in our decision-making, and not move

22  ahead on something we understood was yet to come.

23      Q.   (BY MR. ORTIZ)  You would agree that

24  that is basically moving the bar to a different

25  level?  If Custodia under your existing

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 92

1      Q.   (BY MR. ORTIZ)  Did you direct your

2   staff to answer those particular questions about

3   the OCC's letter saying that this is legally

4   permissible activity and whether you were

5   obligated to give them a master account?

6      A.   So these were the same issues that we

7   were engaged in as we asked the Board of

8   Governors to give us insight on the policy

9   aspects here and on the threshold question of

10  legal eligibility, including the nature of the

11  OCC's charter.

12     Q.   So were you trying to stall for time

13  because you really didn't want to answer the

14  questions about whether you had to give them a

15  master account?

16     A.   I was not stalling for time.  I was --

17  my objective was to collect information and to

18  inform a decision that I thought was

19  consequential for not only Custodia, but for

20  those that would follow.

21     Q.   Would it be a concern of others, if you

22  gave a master account to Custodia, it was a

23  weighing concern that you might have others that

24  would want the same thing?

25     A.   We understood that to say to endorse one

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 93

1    would be setting a precedent for how others would

2    understand their eligibility and access

3    expectations.

4         Q.    Philosophically did you not want a bunch

5    of SPDI charters having access to the Federal

6    Reserve system?

7                   MR. MICHAELSON:  Objection, form.

8         A.    There was never a point that we had a

9    preference one way or the other.  We were really

10   trying to understand the nature of the charter

11   and to fulfill our responsibilities for providing

12   financial services to eligible institutions.

13        Q.    (BY MR. ORTIZ)  Let me hand you what we

14   already have in evidence as Exhibit 7,

15   Ms. George.  We are now say 4 or 5 months forward

16   in time from the last exhibit.

17             These are communications between Tara

18   Humston and you.  Is this a document you saw

19   prior to today that you have prepared for?

20        A.    I believe I did see this.

21        Q.    So I want to go to the middle of that

22   paragraph when it's from Tara to you starting

23   with the word, "Meeting."  Well, let's go ahead

24   in the sentence before that.  "We would outline a

25   few key areas for discussion, but not requesting

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1    they submit any additional information to us.

2    Meeting with them might also buy us some time

3    while the system discussions are getting geared

4    up.  I think we would be pretty careful about

5    discussing these system groups that are starting

6    up, and just say we are engaged with our

7    colleagues to consider not only SPDI charters,

8    but also other non-traditional charter types that

9    may be requesting a master account."

10              Why did you want to hide from Custodia

11   that you were waiting for these system groups to

12   get up and running and tell you what you should

13   be doing?

14              MR. MICHAELSON:  Objection, form.

15        A.   So at no point were we interested in

16   hiding information from Custodia.

17        Q.   (BY MR. ORTIZ)  Well, what does that

18   mean then, to say that:  We want to buy some

19   time?  Buying some time means delay, doesn't it?

20        A.   So Custodia was regularly inquiring

21   whether they had provided the information that we

22   needed from them --

23        Q.   Okay.

24        A.   -- and perhaps with an understanding

25   that that would lead to the decision, and I think

Page 103

1      Q.   And is Lael telling you that she's

2   expressed positive reaction to the Wyoming

3   supervisory framework, as consistent with the

4   OCC?

5              MR. MICHAELSON:  Objection, form.

6      A.   My recollection is she is characterizing

7   Senator Lummis'.

8      Q.   (BY MR. ORTIZ)  Then decipher that next

9   sentence for me.

10      A.   Is your question what does it say?

11      Q.   Yes.

12      A.   "With Libra designation as DM."

13      Q.   Say that again, ma'am.  I'm sorry.

14      A.   "With Libra designation as DM."

15      Q.   What's Libra?

16      A.   Libra would have been something that

17   Facebook had talked about issuing.

18      Q.   So is that some type of currency or

19   something?

20      A.   It would have been part of the crypto

21   currency.

22      Q.   Okay, and then, "Designated as DM," is

23   that digital money?

24      A.   I do not recall what that designation

25   means.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 104

1      Q.   Then the next sentence, tell me if I'm

2   reading this correctly, "Lael feels we don't have

3   authority to say no to request."  This is dealing

4   with Custodia's application for a master account,

5   isn't it?

6      A.   We were talking about the threshold

7   issue of eligibility for a master account.

8      Q.   And she's saying you don't have

9   authority to say no to the request, right?

10   That's her interpretation to you.

11              MR. MICHAELSON:  Objection, form.

12      A.   My recollection is we were talking about

13   a decision on legal eligibility for access to a

14   master account and at this time we did not have

15   that.

16      Q.   (BY MR. ORTIZ)  Well, Custodia was not

17   requesting an interpretation on legal ability or

18   permissibility or eligibility.  Custodia was

19   requesting from you a master account access,

20   right?

21      A.   That is correct.

22      Q.   And the context of this, "Lael feels

23   like we don't have authority to say no to the

24   request," that's solely dealing with the master

25   account, correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 105

1          A.   We were talking about the master account

2     on the basis of that threshold issue.

3          Q.   Because this doesn't say anything about

4     whether there's a legal determination or anything

5     like that.  She's talking about the authority to

6     say no to their request.  That's what the context

7     of this conversation with Lael Brainard, correct?

8                MR. MICHAELSON:  Objection, form,

9     asked and answered.  Go ahead.

10         A.   This would not be a complete transcript

11    of our conversation, so the context was around

12    the threshold issue of legal eligibility, one

13    that had been raised by Acuity in issuing the

14    routing transit number.

15         Q.   (BY MR. ORTIZ)  And I realize it's not a

16    whole transcript, but you felt it was important

17    to write in your note what Lael was telling you

18    about her belief about you not having authority

19    to deny, agreed?

20         A.   No, this was not about my authority to

21    make a decision on this account.  This was about

22    the range of issues that we were contemplating,

23    and again whether a threshold issue about

24    eligibility or the broader policy questions that

25    needed to be addressed in my view.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1      Q.    Well, let's look at the next sentence.
2   After you document that Lael says, "We don't have
3   authority to say no to the request," you
4   document, "I pushed back and argued:  We need
5   broader policy issue addressed."
6      A.    Uh-huh.
7      Q.    A broader policy issue has nothing to do
8   with legal -- or eligibility.  You were trying to
9   push back to see if there was something broader
10  about the whole concept of holding digital
11  assets.  That's what this is saying, isn't it?
12            MR. MICHAELSON:  Objection, form.
13     A.    So again, there were multiple questions
14  I was asking the Board, and their authorities to
15  interpret legal eligibility was one question, and
16  that was a threshold question before we could
17  pursue these broader policy issues which involved
18  a novel charter, an uninsured institution having
19  access to the Federal Reserve payment system, and
20  the nature and risks associated with these
21  activities as an appropriate banking activity.
22     Q.    (BY MR. ORTIZ)  Lael told you under the
23  Monetary Control Act, she felt like you had to
24  give them a master account, didn't she?
25     A.    Lael did not say that to me.

Page 107

1      Q.   What did she say when you pushed back
2   and said, "No, we need broader policy issues
3   addressed," what did she say when you did that
4   and pushed back on her?
5      A.   I don't remember Lail's answer in this
6   conversation, but we were working on -- through
7   these other forums, trying to understand how to
8   think about these broader policy issues.
9      Q.   So I want to have you turn the page to
10  the second page on this exhibit, and for
11  everybody listening in, the first page is
12  Bates-stamped 17834, the second page 17835, and
13  then we have a date at the top, 3/9/21, so this
14  would have been 3 days before this call with Lael
15  Brainard, correct?
16     A.   Yes.
17     Q.   It says, "Jeff Walker, Board Of
18  Governors, work on SPDI."  Is that what that
19  says?
20     A.   Yes.
21     Q.   Who's Jeff Walker?
22     A.   Jeff Walker worked for the Board of
23  Governors in their payments policy area.
24     Q.   And does it say, "Targeting late
25  April to release FRN"?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 175

1    an answer, right?

2                    MR. MICHAELSON:  Objection, form.

3         A.   Custodia was not a bank that was

4    supervised by the Federal Reserve.

5         Q.   (BY MR. ORTIZ)  I understand that.  But

6    the whole -- the prediction of what would happen

7    if you unfairly wouldn't give them a decision or

8    denied them was that all the established banks

9    would take their business model, jump into the

10   marketplace and start conducting these

11   activities.  That's exactly what happened, isn't

12   it?

13        A.   It's not clear that's happened.  This

14   was a different business model.

15        Q.   What was different about it?

16        A.   This was a uniquely chartered

17   institution in the State of Wyoming that did not

18   provide for Federal supervision.

19        Q.   Well, that's the supervision aspect.

20   What's different about Custodia's business model

21   of what they wanted to do and what all of these

22   other banks by August of '22 are doing.  Other

23   than the size of the bank and them having Federal

24   supervision, there's no difference you can point

25   me to, is there?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 176

1              MR. MICHAELSON:  Objection to form.

2        A.    I think one important difference was the

3   narrow and high level of concentration in this

4   activity for the entity.

5        Q.    (BY MR. ORTIZ)  Does that mean that the

6   fact that Custodia wanted to specialize in this?

7        A.    They were highly concentrated around a

8   narrow activity.

9        Q.    So specializing in a legally permissible

10  activity that has been embraced by the big banks,

11  are you saying that's a bad thing?

12             MR. MICHAELSON:  Object to form.

13       A.    A high level of concentration poses a

14  different level of risk.

15       Q.    (BY MR. ORTIZ)  How did you know that if

16  you didn't even know what volumes of transactions

17  were being done by any of the other member banks

18  that are doing this?  How did you know that

19  Custodia's risk would be any different than any

20  of the member banks if you didn't look at the

21  volume?

22       A.    So a couple of ways.  I knew from my

23  experience that one of the highest indicators of

24  failure can be a highly concentrated institution

25  around a particular asset class, and that had

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 177

1      been borne out over history, about why we care
2      about highly concentrated institutions.
3              And the second was the Kansas City Fed
4      team had gone on in to look at the risk profile
5      of Custodia, and saw inadequate compliance and
6      risk management practices in place around this
7      very concentrated activity.  Those were the
8      indicators that I was looking at.
9              MR. ORTIZ:  I'm sorry, did you say
10     adequate or inadequate?
11              THE WITNESS:  Inadequate.
12     Q.   (BY MR. ORTIZ)  That's not what your
13     team told you early on in the process, though,
14     did they?  Your team told you early on that there
15     was a robust supervisory framework in place with
16     an experienced management team and that your risk
17     overall was low to the system.  Your team told
18     you that within the first year, didn't they?
19     A.   I do not recall my team telling me that.
20     Q.   If that's in the paperwork that we have
21     in this case, we should be able to rely on that
22     that information from your team that's evaluating
23     this, was getting to you, correct?
24              MR. MICHAELSON:  Objection, form
25     and foundation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A.   I don't recall that assessment.  That
2  would have been core to our analysis.
3    Q.   (BY MR. ORTIZ)  Do you know why Rob
4  Triano left Kansas City Fed?
5    A.   I do not know Rob Triano.
6    Q.   Who did you think was your most
7  experienced person within this master account
8  assessment that had knowledge with blockchain
9  technology or crypto-currency custody issues?
10    A.   I was relying on Tara and Judith Hazen
11  to source expertise around the work that we were
12  asked to do.
13    Q.   Does "source expertise" mean to go
14  outside the Kansas City Fed?
15    A.   It could have been outside the Kansas
16  City Fed.
17    Q.   Let me change topics with you a little
18  bit.  Do you know Vice-Chairman Barr?
19    A.   Yes.
20    Q.   How often in the general scheme of
21  things would you be interacting with him?
22    A.   I would interact with Vice-Chairman Barr
23  infrequently.
24    Q.   Were you aware that he wanted to be
25  briefed and brought up to speed on Custodia's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 179

1    master account issues in November of 2022?

2         A.   I would not have had a reason to be

3    aware of that.

4         Q.   Did you ever speak to him about either

5    before or after he had a meeting where he was

6    briefed on the status of Custodia's master

7    account application and where it stood?

8         A.   I don't remember such a meeting,

9    although Vice-Chairman Barr and I might have met

10   on a number of supervisory matters.

11        Q.   Did you ever have any communication from

12   your staff indicating what Vice Chair Barr was

13   saying about Custodia's master account

14   application and whether it should be granted or

15   denied?

16             MR. MICHAELSON:  Objection, form.

17        A.   I do not recall getting any feedback

18   about his views.

19        Q.   (BY MR. ORTIZ)  Do you recall getting

20   any feedback from either your staff or someone at

21   the board that Vice Chair Barr had concerns one

22   way or another of the timing of when the decision

23   would be made on Custodia's master account?

24        A.   Vice Chairman Barr did not raise any

25   questions with me about the timing.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 180

1      Q.   Did you know your staff was monitoring

2    what was happening with Vice Chair Barr in the

3    briefing and getting feedback, did you know that

4    one way or another?

5              MR. MICHAELSON:  Objection, form.

6      A.   I would not have known that.

7      Q.   (BY MR. ORTIZ)  At some point in time

8    didn't you receive information from the Board of

9    Governors that the decision on the master account

10   needed to be made in conjunction with the Board

11   making their decision on membership?

12             MR. MICHAELSON:  Objection to form.

13     A.   I did not get that direction.

14     Q.   (BY MR. ORTIZ)  In fact, didn't your

15   team tell you that they knew you should not get

16   out of sync with the Board of Governors in regard

17   to your decision and that you should not make

18   your decision until they were ready to make their

19   decision on membership?

20             MR. MICHAELSON:  Objection to form.

21     A.   No one directed the timing of my

22   decision that the bank was about to make relative

23   to the Board's decision.  We would not have had

24   control over the timing of their decision.

25     Q.   (BY MR. ORTIZ)  Are you saying it's just

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 181

1    coincidence that your denial to Custodia on

2    January of 27th coincided with their notification

3    of denial of membership on the same day, and also

4    coincided with the White House's pronouncement on

5    the dangers of crypto, are you saying that's all

6    coincidence that that happened on the same day?

7              MR. MICHAELSON:  Object to form.

8         A.   I'm saying we had made our decision

9    about responding to the master account request,

10   and the timing of that letter I discussed with

11   our general counsel to make sure we were aware of

12   any other communications that would be coming

13   out.

14        Q.   (BY MR. ORTIZ)  Did you ever advise your

15   staff that whatever decision was made had to be

16   in sync with the Board of Governors on

17   membership, that you could not contradict what

18   they were doing, so if they granted membership,

19   you would grant master account access.  If they

20   denied membership, you would deny master account

21   access?

22              MR. MICHAELSON:  Objection, form.

23        Q.   (BY MR. ORTIZ)  Did you ever give that

24   directive?

25        A.   I did not give that directive.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 182

1      Q.    Do you know if your staff was given that
2   directive, that that's how this was to work?
3                MR. MICHAELSON:  Object to form.
4      A.    I don't believe my staff received any
5   directives.  I think they were in regular
6   communication and were trying to be aware of
7   where these issues were being handled.
8      Q.    (BY MR. ORTIZ)  Well, when you say they
9   were in regular communication, are you talking
10  about with Board staff members?
11     A.    Yes.
12     Q.    So do you know if Board of Governors
13  staff members told your staff that your decision
14  could not contradict the Board's decision on
15  membership?
16     A.    I have no knowledge that they would have
17  been given that direction.
18     Q.    Would your chain of command dealing with
19  the master account application, they wouldn't
20  have authority on their own to say, "We have to
21  make a decision that is consistent with the
22  Board's decision on membership.  They wouldn't
23  have that authority, would they?
24                MR. MICHAELSON:  Object to form.
25     A.    They would not have that authority.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 183

1          Q.    (BY MR. ORTIZ)  That would have to come

2      from you or someone at the Board of Governors, if

3      your staff is being directed on the timing and

4      how the vote has to go, correct?

5          A.    That would have not have been a decision

6      of my staff.

7          Q.    And you're saying that decision did not

8      come from you, correct?

9          A.    What decision, the timing?

10         Q.    The decision that we have to be in sync

11     on the timing, meaning we have to make our master

12     account decision at the time they make the

13     membership decision, you're saying you did not

14     give that directive, correct?

15               MR. MICHAELSON:  Object to form.

16         A.    I did not ask for our decision to be in

17     sync.

18         Q.    (BY MR. ORTIZ)  And more importantly,

19     you're saying you never gave a directive to your

20     staff that your decision on the master account

21     could not contradict whatever decision they made

22     on membership.  You're saying you never gave that

23     directive either; is that correct?

24         A.    We were quite interested in the factors

25     that the Board of Governors would be considering

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 184

1    for that membership application.

2         Q.   My question is a lot simpler.  You never

3    gave a directive to your staff that the master

4    account decision had to be consistent with the

5    Board's decision on membership.  You never gave

6    that directive, did you?

7         A.   I gave no such directive.

8         Q.   So if your staff believed that that's

9    how these decisions had to go, that had to come

10   from someone outside the Kansas City Federal

11   Reserve, agreed?

12             MR. MICHAELSON:  Object to form and

13   foundation.

14        A.   I'm not sure they would have viewed that

15   as a directive.

16        Q.   (BY MR. ORTIZ)  Have you seen the

17   e-mails and the paperwork in this case where

18   that's exactly what your Board staff believed had

19   to occur based on directives they received?

20             MR. MICHAELSON:  Object to form and

21   foundation, misstates the documents and the

22   record.

23        Q.   (BY MR. ORTIZ)  Have you seen that

24   paperwork?

25        A.   I would not have seen all the e-mail

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 185

1    exchange between the Board staff and my team.

2         Q.   Were you considering giving a limited

3    type of master account to Custodia in the early

4    Fall of '22, where you give them a master

5    account, but maybe put some safeguards in place

6    on their daily overdraft provisions or other

7    things where they would not put, you know, the

8    Fed at risk?

9         A.   In the course of our review we

10   considered a number of scenarios, whether to

11   accommodate the account, manage risk, a number of

12   factors that we were trying to weigh, in terms of

13   appropriate decision-making framework for this

14   case.

15        Q.   Did you research the background of

16   Caitlin Long about, you know, her experience and

17   ability to be the CEO of this de novo

18   institution?

19             MR. MICHAELSON:   Object to form.

20        A.   Our team would have made an assessment

21   of the management capabilities.

22        Q.   (BY MR. ORTIZ)  Did you do an

23   independent assessment of Caitlin?

24        A.   I did not do an independent assessment.

25        Q.   What was the report for your team on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 186

1    what they thought about Caitlin Long's

2    capabilities?

3         A.   My understanding of Caitlin's

4    capabilities came from her discussion of her

5    experience in one of our early meetings.

6         Q.   Did you ever have anybody follow that

7    up, and for instance, verify, you know, what she

8    did for Morgan Stanley over the years, or verify

9    her background and experience with digital assets

10   and blockchain technology?  Did you have anybody

11   actually, you know, kind of run that to ground to

12   truly verify?

13        A.   It would be customary for our team to

14   make that kind of decision.

15        Q.   So ultimately did you get a

16   recommendation that she was knowledgeable and

17   experienced with this kind of endeavor?

18        A.   We were looking at the whole of this

19   bank management's team ability to operationalize

20   a depository institution.

21        Q.   And what do you recall the assessment

22   from your team being about the management team as

23   a whole?

24        A.   I recall that they were concerned that

25   this management team lacked experience in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 192

1      in the chain of command.

2          A.   Okay.

3          Q.   But you wouldn't know that one way or

4      another?

5          A.   Christi would know that.

6          Q.   So Ashle Baxter, Ben McGhee, Nancy

7      Fitzgerald no one that you're generally familiar

8      with?

9          A.   I do know who Nancy Fitzgerald is.

10         Q.   Who is she?

11         A.   She's worked in the bank supervision

12     area for a number of years in our capital and

13     policy area.

14         Q.   So this, if we look down at the bottom

15     of this it says Chris Gaul-Pearson, Manager of

16     Credit Reserves and Risk Management Department.

17         A.   I see that.

18         Q.   Did you know he was your manager of the

19     Credit Reserves and Risk Management?

20              MR. MICHAELSON:  Object to form.

21         A.   I see that here.  I didn't recognize his

22     name.

23         Q.   (BY MR. ORTIZ)  Okay.  That's a pretty

24     important position for the Kansas City Fed, isn't

25     it?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 193

1          A.   It is a first level supervisory

2     position.

3          Q.   And the CRRM Department is -- kind of

4     basically has got the lead on the whole risk

5     assessment with Custodia, right?

6          A.   That would be their area of

7     responsibility, yes.

8          Q.   So I want to look at this.  It says,

9     "Good afternoon.  CRRM is working on a memo to

10    Esther regarding a potential decision on

11    Custodia's master account."

12              So this is December 6th, 2022.  Did you

13    have an idea in early December they were working

14    on a memo for you on a potential decision?

15         A.   So I wouldn't put the dates exactly

16    here, but in this timeframe, I would have asked

17    this team to begin to pull together a memo that

18    would state our position in potentially denying

19    this request.

20         Q.   So this also says, "This is moving

21    pretty quick and there are some gaps that Judith,

22    Christi and I would like your help filling in,

23    given you are the experts.  Do you have any idea

24    what that means, what gaps needed to be filled in

25    now that this was moving quick?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 194

1          A.    I do not know what gaps they are

2     referring to here.

3          Q.    Then I want to look at the middle

4     paragraph where it says, "Ben - at this time I

5     have been asked to see if you could help us make

6     sure we are not getting out of sync with the

7     membership side.  We do not want to contradict

8     one another."

9                And you've already told me that's not a

10    directive that you gave, correct?

11         A.    Correct.

12         Q.    So you don't who gave this direction to

13    Chris Gaul-Pearson when he's directing his team

14    that he's been asked to see if you could help

15    make sure we're not getting out of sync, and that

16    we do not contradict one another, you don't know

17    who gave that direction to Chris Gaul-Pearson

18    then, do you?

19         A.    It's not clear that there was a

20    directive here, as opposed to a desire to make

21    sure that we had a fulsome picture of how

22    everyone was looking at this information.

23         Q.    Well, when someone up the chain of

24    command says, "I have been asked to see if you

25    could help us make sure that we are not getting

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 195

```
 1    out of sync with membership side," that's not
 2    discretionary, is it?  That's:  Make sure we
 3    don't do that.
 4                MR. MICHAELSON:  Object to form and
 5    foundation.
 6         A.   I think it's to make sure we are aware
 7    of how others are looking at the same risk and
 8    how they are describing this.
 9         Q.   (BY MR. ORTIZ) And when we say, "We do
10    not want to contradict one another," the only
11    explanation for that is you don't want to grant a
12    master account if they deny membership or
13    vice-versa, correct?
14         A.   Would you state that question again.
15         Q.   Sure.  When this talks about not getting
16    out of sync with the membership side, and then it
17    says we do not to want contradict one another,"
18    the only explanation for that is if they are
19    denying membership, you should be denying a
20    master account and vice-versa.  If they are
21    granting membership, you need to grant a master
22    account.  That's what that means, doesn't it, to
23    not contradict one another?
24                MR. MICHAELSON:  Object to form.
25         A.   No, I would not interpret it that way at
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 196

1    all.

2        Q.   (BY MR. ORTIZ)   Then tell me how we

3    should interpret that.

4        A.   I think the interpretation of this, as I

5    was talking to this team, is this was relevant

6    information to us to understand how risks

7    associated with this membership application were

8    being viewed.

9            We had already made our own assessment

10   around the nature of concerns we had about the

11   master account, but this was not irrelevant to us

12   in terms of understanding how the risk would be

13   described here.

14       Q.   So you're saying that the contradiction

15   would be what then?   If they are making, the

16   Board is making a decision on membership, right,

17   correct?

18       A.   That's correct.

19       Q.   And you're making the determination on

20   master account, correct?

21       A.   Correct.

22       Q.   But you've already mutually shared all

23   of the information on risk back and forth,

24   haven't you?

25                 MR. MICHAELSON:   Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 197

1    A.   So there was information-sharing going

2    on, I presume, around that, but contradicting one

3    another might be looking at the same risk and

4    describing it differently, whether intentional

5    or --

6    Q.   (BY MR. ORTIZ)  You're really just kind

7    of speculating on all of that, aren't you?

8    A.   I'm not speculating on the fact that we

9    were making our judgment about this master

10   account based on the information we had.

11   Q.   But you are simply speculating about

12   what Chris Gaul-Pearson was directing his team

13   when he said:  We do not to want contradict one

14   another?

15            MR. MICHAELSON:  Object to form and

16   fashion.

17   A.   I was not aware of this conversation.

18   Q.   (BY MR. ORTIZ)  So do you recall, I'm

19   going to hand you what's already in evidence as

20   Exhibit 51, which is just basically an e-mail

21   communicating to you a memo for your review

22   documenting the analysis of the request by

23   Custodia for a master account.  Do you recall

24   generally receiving Exhibit 51 from your team?

25   A.   I do recall in this timeframe getting

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 209

1    to go back to the paragraph, on the third page
2    where you have deleted and struck out," Custodia
3    has pointed to other financial institutions that
4    Custodia believes have master accounts and are,
5    in part, conducting operations and engaging in
6    activities similar to some of those of which
7    Custodia seeks to engage."
8            Then it says, "Putting aside Custodia's
9    lack of insight as to how other entities may or
10   may not be conducting certain operations or
11   engaging in certain activities."  Why did you
12   strike that out?
13       A.   So I thought our assessment was focused
14   on what had been proposed to us by Custodia, and
15   this language was not relevant to our analysis
16   here.
17       Q.   So let's go to the next page where
18   there's a strike-out under, "Lack of Federal
19   Regulatory Oversight," where it says, "The
20   Reserve Bank has consistently indicated that
21   whether Custodia is subject to Prudential Federal
22   supervision and regulation is an important input
23   into the Reserve Bank's decision regarding a
24   master account."  Do you see that?
25       A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 210

1        Q.   Someone from your team or outside your

2     team had that in the memo for you to consider,

3     right?

4        A.   This was one of the original sentences,

5     yes.

6        Q.   So why did you strike that out?

7        A.   So again, this was referencing

8     conversations, views, and I was trying to focus

9     the lack of Federal oversight on the factual

10    components of this, and that reference is to what

11    we had talked about in the past.

12        Q.   So can we agree that if the Board of

13    Governors had granted membership, Custodia

14    becomes Tier 2 under the guidelines, and more

15    probable than not, you grant them a master

16    account agreed?

17        A.   If the Board granted membership, it

18    would have changed the analysis we would have put

19    in here, because it would have changed who their

20    prudential supervisor was.

21        Q.   Everything you and I have talked about

22    in the last two hours basically goes away, lack

23    of Federal supervision and oversight, and all of

24    this.  If they simply give them membership, all

25    of those fears go away and you can grant a master

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 211

1    account, right?

2              MR. MICHAELSON:  Object to form.

3         A.   That is not how I viewed our decision in

4    this case.

5         Q.   (BY MR. ORTIZ)  Well, would you agree

6    with me more probable than not they would have

7    gotten a master account, had they been granted

8    membership and then been in a Tier 2 institution

9    under the new access guidelines?

10              MR. MICHAELSON:  Object to the

11   form, calls for speculation, asked and answered.

12        A.   That would have been new information

13   that would have caused us to extend our analysis

14   here, and to understand what the supervisory

15   framework would be for this institution relative

16   to the risk that we were discussing with the

17   master account.

18        Q.   (BY MR. ORTIZ)  Well, wait a minute.  If

19   they are granted membership, you become their

20   supervisory authority as the ARB in their region,

21   don't you?

22        A.   I assume that would have been the case.

23        Q.   Well, you know exactly how your

24   supervisory framework is set up at the Kansas

25   City Fed, don't you?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 212

1         A.    Not in the case of an uninsured

2    depository that was established under the laws of

3    Wyoming.  It was unique in the sense of what

4    other Federal laws would apply to this

5    institution.

6         Q.    Well, you'd already had more than two

7    years to figure that out.  By that point in time

8    you knew it was a permissible activity, you knew

9    they were legally eligible, and you knew the Fed

10   system was embracing these activities with other

11   member banks, and you knew you could supervise

12   and put in any parameters you wanted.  What more

13   did you need to know?

14              MR. MICHAELSON:  Object to form.

15        A.    So I disagree with your characterization

16   of that, because we did not know over that

17   two-year period that a decision was yet pending

18   on legal eligibility.

19              We were still assessing the policy

20   implications of having a uniquely chartered,

21   narrow-scoped institution without Federal

22   supervision uninsured relative to the broader

23   landscape of these crypto-assets, and during that

24   time, the Board of Governors was contemplating

25   guidance to these 12 Reserve Banks on how they

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 241

1      that the only one you've seen say in the last 20

2      years, the S letter?

3                      MR. MICHAELSON:  Object to form.

4           A.   I cannot remember any other S letters.

5           Q.   (BY MR. ORTIZ)  You can't remember any

6      others?

7           A.   It doesn't mean they are not there.  I

8      just don't -- I couldn't name one for you.

9           Q.   Let me hand you what's already in

10     evidence as Exhibit 37.  Is this a copy of the

11     actual denial letter that went out to Caitlin

12     Long at Custodia?

13          A.   Yes, I think this is the SR letter.

14          Q.   And I apologize, you're right.  This was

15     broken down into a short one-page letter that you

16     signed then with an attachment of the summary

17     analysis.

18          A.   Yes.

19          Q.   Okay, so your team did follow your

20     requests there in the last day or two?

21          A.   Yes.

22          Q.   Now did you know that this decision had

23     been leaked out to media sources and was being

24     recorded the day before the letter was issued?

25                      MR. MICHAELSON:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 242

1          A.    I was not aware.

2          Q.    (BY MR. ORTIZ)  If that was leaked out

3     either from the Board of Governors or from

4     someone at the Kansas City Fed, that would be a

5     significant breach of policy and probably law,

6     agreed?

7                    MR. MICHAELSON:  Object to form and

8     calls for a legal conclusion.

9          A.    It would be completely inappropriate.

10         Q.    (BY MR. ORTIZ)  So the fact that

11    Bloomberg would have been calling my client

12    wanting comment the day before they got the

13    letter about the denial, that would be -- that

14    would raise serious concerns if you knew that was

15    occurring, wouldn't it?

16         A.    If I knew it was coming from my staff,

17    of course.

18         Q.    So I want to talk about this whole idea

19    then.  Who set the timing for your letter to be

20    issued on the 27th?

21         A.    So we discussed the timing of this

22    letter, because I was within a few days of

23    leaving the Federal Reserve.  By that point we

24    had gotten what I thought we were going to get.

25    We had the account access guidance had been

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 243

1     issued, the issue of legal eligibility had been

2     decided, and there was no sense that some of the

3     broader policy issues that I was hoping to see

4     resolved were going to be resolved in a timely

5     manner.

6         Q.   So you had never even --

7              MR. MICHAELSON:   Hold on, let the

8     witness finish, please.

9         Q.   (BY MR. ORTIZ)   I apologize.

10        A.   So given that timing, and given the fact

11    that Custodia had filed a lawsuit challenging the

12    timing, I felt we should make a decision here

13    that we would be able to take the information

14    that we had, and that before I transitioned out

15    of the organization, it would be responsible for

16    us to give them that decision.

17        Q.   Had Custodia not filed the lawsuit,

18    would have been content just to continue to let

19    it sit and wait to see if somebody would make a

20    policy determination?

21             MR. MICHAELSON:   Object to form,

22    calls for speculation.

23        A.   I think at this point I did not see a

24    timeframe in which these issues were going to be

25    resolved by Congress, by the banking agencies and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 244

1    others, and I was leaving, regardless.

2         Q.   (BY MR. ORTIZ)  So really the majority

3    of the issues that you told me that you

4    had concerns about, the broad policy considerations,

5    things you wanted Congress considering, maybe the

6    Board of Governors considering you never got an

7    answer to any of those questions; is that right?

8              MR. MICHAELSON:  Object to form,

9    misstates testimony.

10        A.   Yeah, the broad policy issues had not

11   been codified and resolved in my view.

12        Q.   (BY MR. ORTIZ)  Okay.  So how long

13   before January 27th did you have insight from

14   your staff through the Board of Governors that

15   membership was being denied for Custodia?

16             MR. MICHAELSON:  Object to form.

17        A.   I would not have had insight in the

18   sense that this was going to be a decision of the

19   Board of Governors and my staff had participated

20   in the pre-membership exam, the assessment, I

21   knew clearly what the nature of the risk issues

22   that they discovered, the gaps and compliance and

23   other aspects of that operation, but all I knew

24   is that they were going to be making a decision

25   at some point, and I knew I was leaving by the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 245

1    end of January and would need to make our

2    decision before I went out the door.

3         Q.   (BY MR. ORTIZ)  Would you have known

4    about the Board staff's recommendation to the

5    Board of Governors to deny membership?

6         A.   I think at the point that we were making

7    our decision here was into the Fall, in December,

8    so ahead of January we were talking about the

9    fact, we were not -- these bigger issues aren't

10   going to be resolved in the timeframe that we

11   need to.

12         We know what's been resolved, and we

13   know what the risk issues are here, and so we

14   should proceed to put together our assessment and

15   our denial of this master account.

16         Q.   My question is more directed to the

17   membership decision.  Would it be fair to say

18   that you knew weeks or months in advance that

19   Custodia wasn't going to get Federal membership

20   granted?

21         A.   That would not be fair to say I knew

22   that.

23         Q.   You had a strong suspicion.

24         A.   I was often asking my staff what they

25   were hearing, and what we were hearing was these

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 246

1    are the issues that we are laying out under the

2    factors that the Board has to assess in making a

3    determination.

4         Q.   So was the feedback that you were

5    getting from the Board staff through your staff,

6    there's big concerns on all of these issues and

7    they are not going to get membership?

8              MR. MICHAELSON:   Object to form,

9    misstates testimony.

10        A.   I think we were hearing there were big

11   issues.  The second part of that was not clear

12   that they were going to.

13        Q.   (BY MR. ORTIZ)  Did you hear that

14   Custodia was being pressured to withdraw their

15   membership application?

16        A.   I was not aware Custodia was being

17   pressured.  It was in the normal course, when an

18   application does not look like it's destined for

19   approval, to give the applicant an opportunity to

20   make that decision.

21        Q.   To withdraw?

22        A.   To withdraw.

23        Q.   Is that some type of black eye or

24   something, if you apply for membership and are

25   denied, does that somehow cause you future harm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 247

1    or detriment?

2        A.   I think we leave that to the applicant's

3    judgment about how they view the consequence of a

4    decision like that.

5        Q.   Do you have any knowledge of anyone,

6    either you or anyone on your team talking to the

7    FDIC about a decision not to serve or not to have

8    let Cross River Bank serve as the corresponding

9    bank for Custodia?

10       A.   I am not aware of that, no.

11       Q.   Have you heard that in any context, that

12   Cross River Bank was being pressured by their

13   regulator to not get into business with Custodia?

14       A.   I have not heard that.

15       Q.   If, in fact, that occurred, that someone

16   from the Kansas City Fed reached out to the FDIC

17   and made some statement or comment that Cross

18   River shouldn't be doing business with Custodia,

19   that would be illegal, wouldn't it?

20            MR. MICHAELSON:   Object to form,

21   calls for speculation, calls for a legal

22   conclusion.

23       A.   I can't imagine that anyone would do

24   that.  I have had no experience with a member of

25   our staff doing that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 252

1            MR. MICHAELSON:  Object to form and
2      foundation.
3          A.   It would be typical to say this guidance
4      supersedes previous guidance.
5          Q.   (BY MR. ORTIZ)  Let me talk to
6      co-counsel for a minute if we could, Counsel.
7      Let's take a quick break?
8            MR. MICHAELSON:  Okay.
9            MR. ORTIZ:  We're winding down
10      pretty well.
11                  (Brief recess taken.)
12          Q.   (BY MR. ORTIZ)  So did you have
13      information shared with you what on the same day
14      you were going to be announcing the denial of
15      Custodia's master account application, that the
16      White House would be issuing a press release
17      basically on the dangers of crypto-currency?
18          A.   I was not aware of the White House
19      announcement.
20          Q.   Were you surprised then when it all kind
21      of came out within minutes of each other, your
22      decision, the membership denial, and then the
23      White House issuing a statement?
24          A.   I was mostly focused on the Board of
25      Governors' decision-making release, and how it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 253

1    coincided with ours.

2         Q.   So did you find out that same day that

3    the White House had issued this press release on

4    crypto?

5         A.   I saw it in the news.

6         Q.   But you had no heads up that was coming

7    from anyone?

8         A.   I did not.  It wasn't a factor in my

9    decision.

10        Q.   Is there another reason that you did not

11   think Custodia was entitled to a master account

12   that you and I have not talked about today?

13             MR. MICHAELSON:  Objection, form.

14        A.   I believe we've covered all the reasons.

15             MR. ORTIZ:  Okay.  I appreciate

16   your patience with me today.  That's all the

17   questions I have, although I think he's going to

18   have a bunch more for you, and then I get to come

19   back and ask more questions.

20             THE WITNESS:  Okay.

21                  EXAMINATION

22   BY MR. MICHAELSON:

23        Q.   All right.  Thank you.  First, I'd just

24   like to designate the transcript confidential.

25             Okay, so Ms. George did there come a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 254

1      time when Custodia's request for a master account

2      was denied?

3          A.   Yes.

4          Q.   Okay, and who made the decision to deny

5      that request?

6          A.   So this was a decision in consultation

7      with my team, but given its nature I signed the

8      letter on behalf of the bank.

9          Q.   So would you say it was your decision?

10         A.   Yes.

11         Q.   And when did you arrive at that

12     decision?

13         A.   So I think the concerns that we had

14     ultimately when we got to the Fall of 2022 had

15     led me to think this is the direction that we

16     were heading and this was the appropriate

17     decision, given all the information that we had

18     from that point.

19         Q.   Do you recall whether a pre-membership

20     exam was conducted by FRBKC staff in the Fall of

21     '22?

22         A.   Yes.  I was aware that our team was

23     conducting that review.

24         Q.   And did the results of that review

25     factor in at all into your decision to deny

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 255

1     Custodia's master account request?

2          A.    Yes.  The assessment that that team saw

3     with their firsthand look at policies, the

4     compliance programs and other aspects of the

5     risk, did inform our decision.

6          Q.    And what were the primary drivers in

7     your decision to deny Custodia's master account

8     request?

9          A.    So our decision is outlined in the memo

10    that was attached to the letter.  It had to do

11    with the risk involved, the risk to the Reserve

12    Bank, the risk to the financial system, and the

13    nature of the volatility, the assets, that there

14    were broad public policy issues that would have

15    implications potentially.

16              We had seen inadequacies in the policies

17    and procedures, the operational components, had

18    raised questions about the management's ability

19    to establish a risk management program for this

20    institution, and also had raised questions about

21    ultimately in the event of a failure, how the

22    resolution of this institution would be handled,

23    which is a very relevant factor in considering

24    stability and implications of a failure.

25          Q.    Can you explain what you mean by that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 256

1    last point, the risk presented by potential

2    failure?

3        A.    So in our traditional banking system,

4    the FDIC for insured institutions is the

5    resolution authority, and there are very long

6    tested processes for the failure of an

7    institution and how it's resolved.

8            This would have been something new for

9    the State of Wyoming, in terms of being able to

10   handle a resolution like that, and one, of

11   course, which could not have been tested at that

12   point.

13       Q.    I see, and did you have a view at that

14   time as to the risks that Custodia might fail?

15       A.    I think we had seen such tremendous

16   volatility in the broader industry around this,

17   and we had seen bankruptcies and failures, and so

18   there was a real question about how such

19   volatility would be managed here, what liquidity

20   risk and other issues could arise that would

21   threaten the viability of this institution.

22       Q.    Earlier when you described the primary

23   drivers of the decision to deny, you mentioned at

24   the outset the risks to the Reserve Bank.  What

25   do you mean by that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 257

1      A.    So the credit risk, the account risk is

2    borne by the Reserve Bank.  We are the holder of

3    the account, and having controls around that

4    account, having supervisory authority or access

5    to information that tells us the condition of the

6    institution, access to reporting and other

7    things, affects how we understand what our risk

8    is relative to the money that moves through that

9    account.

10     Q.    Okay, and did you have a view as to

11   whether Custodia if granted a master account

12   would present risks to the Reserve Bank?

13     A.    Yes, I believed it did pose risks to the

14   Reserve Bank.

15     Q.    Okay, and the would you consider that a

16   primary driver of your decision to deny?

17              MR. ORTIZ:  Let me object, leading.

18     A.    It would have been among the factors

19   that we considered.

20     Q.    (BY MR. MICHAELSON)  Okay.  In

21   connection with the denial, did you deny

22   Custodia's master account request with the intent

23   to favor one type of bank over another?

24     A.    Absolutely not.  As an institution who

25   understands its public mission here is to foster

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 258

1    economic and financial stability, to make sure

2    that the public's trust in financial institutions

3    and the safety and soundness of their operations

4    means that we think carefully about the conduct

5    of those activities, the nature of those

6    activities that are being -- in institutions, and

7    the creation of this new charter was a point at

8    which to say:  "What is different about this

9    institution than our traditional framework, where

10   we have many of the levers, enforcement actions,

11   where we have regular oversight, where we have a

12   partnership with the State in many cases to

13   understand the nature of those risks?"

14            This posed a different model that we

15   needed to think through.

16       Q.   I mean as a general matter when during

17   your tenure as President of the Federal Reserve

18   Bank of Kansas City, did you prefer larger banks

19   over smaller banks or vice-versa?

20       A.   So I did not have a preference for large

21   over small, but I will tell you it was clear in

22   our supervision that we understood that there

23   were a set of banks that were too big to fail in

24   this country, and we were often looking at the

25   regulatory construct that seemed to create undue

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 259

1    burdens for smaller institutions.

2           And so I was most familiar with

3    community and regional banks that we supervised

4    in our region.  We did not have one of the

5    too-big-to-fail banks in the 10th Federal Reserve

6    District, and so I understood firsthand how

7    important these smaller institutions were to the

8    region.

9       Q.   When you arrived at your decision to

10   deny Custodia's master account, did you have an

11   understanding as to whether the Board of

12   Governors had voted on Custodia's master account

13   request?

14      A.   The Board of Governors would not have

15   voted on this.  This was not within their

16   purview, and at no time in my conversations with

17   them did I get any sense they were interested in

18   making a decision on this question that they had

19   raised.

20      Q.   Can you explain that further?  What is

21   the basis for that?

22      A.   So in my conversations asking them to

23   give me a broader picture of how they were

24   thinking about the policies associated with

25   crypto-assets more generally, what they saw as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 260

1       financial stability issues, implications for

2       monetary policy, there was never an indication,

3       in fact, more often than not, Governor Brainard

4       would indicate:  "This is your decision.  I'm

5       happy to understand what you're asking.  I

6       understand that you see this has other

7       ramifications," but at no time did any of the

8       Governors offer me any counsel or suggestions on

9       the master account.

10          Q.   But yet the time that you made the

11      decision to deny the request, was it your

12      understanding that the Board of Governors had not

13      voted on Custodia's master account request?

14          A.   When we decided on the master account, I

15      was -- I don't think they had scheduled a vote on

16      the membership application.

17          Q.   Right, but I'm asking about the master

18      account request.  It was your understanding that

19      the Board of Governors had not voted on a master

20      account request?

21          A.   They were not going to vote on the

22      master account.  This was not part of any action

23      they were going to take.

24          Q.   Did you have an understanding as to when

25      you denied the request as to whether the Board of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 261

1    Governors had reached a consensus on whether to

2    grant or deny Custodia's master account request?

3         A.   I was never aware of a consensus, and,

4    in fact, from time to time it was clear to me

5    that they did not have a clear view or a

6    consensus around how this should be treated.

7         Q.   When you denied the request, was your

8    decision to deny the request controlled by the

9    Board of Governors?

10        A.   It was not.

11        Q.   Was it dictated by the Board Of

12   Governors?

13        A.   It was not.

14        Q.   Did you feel that you had the freedom to

15   grant Custodia's master account request if you

16   felt that was appropriate?

17        A.   Yes, I did.

18        Q.   Do you feel that you could reach that

19   result even if the Board denied membership?

20        A.   I think in terms of my authorities I

21   could have done that.

22        Q.   All right.  I want to go back to when

23   the master account request first came in.  When

24   it first came in late 2020, did you have an

25   understanding as to what type of activities

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 262

1    Custodia was proposing to do?

2        A.   So the original business plan that we

3    discussed had several elements to it in terms of

4    activities, including the issuance of a token,

5    some aspects of custody, and throughout the

6    process that business plan changed on several

7    occasions, as I discussed with my staff on what

8    was being proposed, so there were several

9    iterations of activities that were being

10   proposed.

11       Q.   So if you can go back in time to when it

12   first came in and what the initial business plan

13   was, did you have an initial view as to whether

14   to grant or deny the request?

15       A.   So I initially had a lot of questions

16   about the nature of the activity and the question

17   really led to seeking out others' views on what

18   are these different activities, what is the

19   nature of risk associated with the different

20   activities that are proposed, what do we see

21   happening in the broader industry, and it was

22   really an effort to say we will need to

23   understand how these things work within the

24   confines of an institution that will be taking

25   deposits and requesting access to the Federal

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 263

1    payment system.

2        Q.    You mentioned seeking out other's views.

3    Did you seek out views from the Board of

4    Governors, Board staff?

5        A.    So I sought views from the Board of

6    Governors, from my colleagues at the other 11

7    Reserve Banks in terms of their experience in

8    this space.

9            I would have contacted the Conference of

10   the State Bank Supervisors who would have been

11   watching this landscape at the State level unfold

12   for their views on it.

13       Q.    And did you feel that you had the

14   authority to reach out to the Board of Governors

15   for their views on these questions?

16       A.    I have often reached out to the Board of

17   Governors and their staff to inform decisions, to

18   clarify any number of issues.

19       Q.    At any time did you feel that the Board

20   interjected themselves into your decision-making

21   process?

22       A.    No, in fact, quite the opposite.  I felt

23   like I was having to knock on the door quite a

24   bit to again say:  "Are you making decisions?  Do

25   you see other parts of the banking agencies that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 264

1    are on the cusp of making decisions about this

2    that I should be aware of as I entertain this

3    request?"

4         Q.   So in those early months when you had

5    these questions, again did you have an

6    inclination at times as to whether to grant or

7    deny the request?

8         A.   I think initially we had enough

9    questions that I felt like we needed to resolve,

10   and again one of those very foundational

11   questions was this threshold issue of:  Are we

12   dealing with an institution that is eligible?

13        That would have then led to a series of

14   other things we had to answer.  If for some

15   reason they were not eligible, that would have

16   made moot some of these other questions.

17        Q.   Did you personally have a view on

18   whether they were eligible?

19        A.   I questioned whether they were eligible.

20   I questioned whether the way this charter had

21   been constructed was consistent with how the laws

22   that governed eligibility had viewed a bank, and

23   so that was really fundamental to the question I

24   was asking the Board of Governors, is to say:

25   Can you interpret that for me?  Are you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 265

1   interested in interpreting that?

2       Q.   So you mentioned the charter.  What was

3   the -- earlier today you answered questions about

4   concerning the novelty of the charter, the novel

5   nature of the charter.  What was the significance

6   of a SPDI charter being a novel charter?

7       A.   So I guess novel in a couple of ways.

8   Novel in the context of the nature of the

9   activities, so the crypto-asset focus and

10  concentration for the operation of this business

11  model, but novel in the sense that the states

12  have entities that they supervise at the State

13  level that are not connecting to the Federal

14  payment system.

15          And our normal legal regulatory

16  framework has been a different one.  It has been

17  one where a dual banking system involves both

18  national and state charters that come with

19  Federal supervision, that addresses any number of

20  issues in that landscape.

21          This charter was explicit that it would

22  be only state-supervised, that it would be

23  uninsured, and that it would intend to connect to

24  either the Federal Reserve or operate with a

25  third-party.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 266

1      Q.   Did the novelty of the charter present
2   supervisory issues that differed from supervision
3   of traditional banks?

4      A.   Well, to be clear, de novo institutions
5   always have a heightened focus in terms of
6   start-up operations, how quickly they will become
7   profitable, understanding the experience of the
8   management.  Those are fairly straightforward in
9   any de novo institution.

10          I think in one that involved a
11   relatively new type of digital asset, digital
12   currency, created another layer both around the
13   concentration risk associated with the narrow
14   activity, and really a broader understanding of
15   what supervisory regime would apply to this,
16   because we did not have models really to look to
17   to say:  How do you supervise digital currencies.

18      Q.   So what do you mean by that?  Why would
19   supervision of Custodia be different than
20   supervision of a traditional bank?

21      A.   Well, legal authorities would be one.

22      Q.   What do you mean by legal authorities?

23      A.   So in this case, for example, if you're
24   not -- if Custodia is not the traditional bank,
25   which it was not, it would be not subject to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 267

1    change in the Bank Control Act, it would not be

2    subject to the enforcement authorities, the

3    reporting of data to the Federal Reserve, which

4    of course, feeds into how we evaluate monetary

5    policy and other aspects.

6           This was a different model that was

7    intersecting with one that had other very

8    traditional requirements.  It was uninsured.

9    Insurance has been viewed as really core to the

10   stability of our financial system, both in terms

11   of the public's confidence, but also in terms of

12   resolution, authorities in the event of failures

13   of financial institutions.

14          So there were a number of aspects that

15   had been built into the framing of this that gave

16   it a bespoked kind of regulation that didn't

17   align with the institutions that we have been

18   serving through master accounts.

19      Q.   Okay.   Are there --you mentioned some

20   of the regulatory differences, supervision, that

21   it was uninsured, are there other aspects of

22   supervising Custodia that represented challenges

23   that were different than supervision of a

24   traditional bank?

25      A.   In the case of Wyoming, the Kansas City

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 290

1    Scott Ortiz wanting to draw money out of his
2    checking account on a debit card and I have zero
3    money in my checking account, when I go to draw
4    something out on a debit card, it won't give me
5    any money because there's nothing in the account,
6    right?
7         A.   Correct.
8         Q.   That's how a master account works with
9    you guys on a transaction.  You can put it in
10   place where if there's no money there, the
11   transaction won't occur, because we won't bear
12   the risk, right?  Right?
13        A.   That functionality is available, but
14   that is not the entirety of the question that
15   we're asking here.
16        Q.   It's the question I'm asking you,
17   though, ma'am.
18        A.   And I've answered it.
19        Q.   When you're saying --
20        A.   That is available.
21        Q.   -- that there's these broad risks to the
22   entire system, and somehow you're going to put
23   money at risk, you had the ability to give them a
24   master account, give them a run to see how their
25   model worked, and simply put limitations in place

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 291

1    so you would never have any risk.  You had the
2    ability to do that, didn't you?
3              MR. MICHAELSON:  Objection, form.
4        A.   That was not consistent with the
5    criteria that we considered to grant access to
6    master accounts.
7        Q.   (BY MR. ORTIZ)  My question is you had
8    the ability to do that, though, didn't you?
9        A.   Those capabilities exist.
10       Q.   And those existed under your existing
11   SOP guidelines, when you gave somebody a risk
12   rating and decided how much daily credit you
13   would give them, right?
14       A.   That is correct.
15       Q.   Really a whole set of rules were put in
16   place just for Custodia, weren't they?
17              MR. MICHAELSON:  Object to form.
18       Q.   (BY MR. ORTIZ)  Weren't they,
19   Ms. George, candidly?
20       A.   No, we were dealing with a number of
21   evolving issues in the financial system, and
22   Custodia was among those.
23       Q.   (BY MR. ORTIZ)  Do you think banks that
24   are too big to fail should get preference in
25   being able to engage in activities, because the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                          Page 292

1       government will always bail them out?

2            A.   No, I don't.

3            Q.   That would seem to be directly contrary

4       to what the Monetary Control Act says, agreed?

5                      MR. MICHAELSON:  Object to form,

6       calls for a legal conclusion.

7            A.   The Monetary Control Act isn't looking

8       at the size of institutions, it's looking at the

9       charter, but yes, it is seeking equity.

10           Q.   (BY MR. ORTIZ)  So when you said the

11      Board of Governors did not have consensus on

12      whether Custodia should get a master account, how

13      many Board of Governors did you know of that were

14      in favor of Custodia getting a master account,

15      other than Lael Brainard?  I'm assuming that

16      Brainard was one of them that wanted them to get

17      a master account; is that right?

18                      MR. MICHAELSON:  Object to form.

19           A.   Actually at no time did I hear a

20      Governor express a view of whether they would

21      grant or not grant a master account.

22           Q.   (BY MR. ORTIZ)  Then why did you tell

23      counsel under oath that there was no consensus

24      among the Governors?

25           A.   Because none was sought.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 293

1      Q.   Because none was what?

2      A.   None was sought.  I wasn't asking for

3   consensus among the Governors, and nor was I

4   going to each of them to understand their views

5   on this.

6      Q.   So a better way to say that would be

7   that you don't know whether they were,

8   individuals were in favor of it, or not; is that

9   right?

10     A.   I would not know that.

11     Q.   The risk management remedial measures

12  that Custodia was putting in place based on

13  issues your team had raised, that's the issues

14  you said you guys never even verified, right?

15  You went ahead and made the decision without even

16  verifying those risk management measures,

17  remediations they put in place; is that right?

18             MR. MICHAELSON:  Object to form.

19     A.   My recollection is they were in the

20  process of doing remediations, but it was not

21  clear on what timeframe, and we would not have

22  reviewed those with the timing of the letter that

23  we sent in late January.

24     Q.   (BY MR. ORTIZ)  So you talked at length

25  about this being your decision and the Board not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 294

1    voting formally on the master account decision,

2    but you agree that the Board and its staff worked

3    closely with your staff, were closely involved on

4    all of these issues moving forward over this two

5    and-a-half year timeframe, agreed?

6                MR. MICHAELSON:  Objection, form.

7        A.   We were seeking input then and sharing

8    information, yes.

9        Q.   (BY MR. ORTIZ)  Working closely kind of

10   hand-in-glove with the Board and their staff

11   members, agreed?

12               MR. MICHAELSON:  Objection, form.

13       A.   We were communicating with staff as we

14   normally would.

15       Q.   (BY MR. ORTIZ)  And as you previously

16   said, there were some issues that were solely the

17   Board's to make, eligibility, permissibility,

18   monetary policy issues, other policy issues,

19   broader policy issues as you've stated, how this

20   will affect the whole system as a whole, how is

21   this going to be viewed in the community, banking

22   community.  Those are all, all of those things I

23   just described are questions that you wanted the

24   Board to answer for you, true?

25               MR. MICHAELSON:  Objection to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 295

1        A.   Those were not all the questions that I
2   wanted the Board to answer.   There are public
3   policy objectives.
4        Q.   (BY MR. ORTIZ)  Did I state all the ones
5   at least correctly that you wanted the Board to
6   answer, the ones I just stated, those were all
7   Board decisions you wanted them to make and then
8   you even had more beyond that; is that right?
9             MR. MICHAELSON:   Objection to form.
10       A.   So I may have to have you repeat those
11  again because monetary policy, yes.   Financial
12  stability, you made some reference to the bank's
13  view of this or the -- I'm sorry I didn't hear
14  that.
15       Q.   (BY MR. ORTIZ)  So let's just list them,
16  all the things you needed the Board to weigh in
17  on.   Let's start with the basics.   Legal
18  permissibility for this activity, you wanted the
19  Board to weigh in on that, right?
20            MR. MICHAELSON:   Objection, form.
21       A.   That was my question, how were we
22  treating this.
23       Q.   (BY MR. ORTIZ)  And you wanted the Board
24  to weigh on and make the decision on eligibility
25  for a master account, correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 296

1          A.   Yes.

2          Q.   You wanted the Board to weigh in on a

3     monetary policy considerations and make a

4     decision on that, correct?

5               MR. MICHAELSON:   Objection to form.

6          A.   I was raising questions about the

7     monetary policy implications and asking for their

8     views, not asking for a decision on that.

9          Q.   (BY MR. ORTIZ)  You were asking them to

10    give you their determination on the financial

11    stability issues associated with Custodia,

12    correct?

13         A.   I was asking them what financial

14    stability issues they saw with this.

15         Q.   You were asking the Board or others in

16    the system to tell you whether they thought that

17    this would be an accepted banking activity,

18    right?

19               MR. MICHAELSON:   Objection, form.

20         A.   I was asking whether there was going to

21    be the same treatment of this activity across

22    banks, as well as how we were looking at the

23    Wyoming treatment of this also.

24         Q.   (BY MR. ORTIZ)  And then you were

25    waiting to see if Congress was going to weigh in

Page 297

1    on this issue, correct?

2        A.   We were trying to understand whether

3    Congress was going to act.

4        Q.   You knew the White House was issuing

5    statements or giving at least some thought on

6    whether they were in favor or not in favor of

7    this, correct?

8                MR. MICHAELSON:  Objection, form.

9        A.   I knew they were issuing public

10   statements about it.

11       Q.   (BY MR. ORTIZ)  And you were taking that

12   into consideration, as well?

13       A.   I was observing it.  I didn't see it as

14   a factor.

15       Q.   All right.  And then you've talked a lot

16   about you had all of these other unanswered

17   policy questions that you wanted the Board to

18   answer.  Other than what I have just described,

19   what else did you want the Board answering for

20   you?

21       A.   The only answers I needed from the Board

22   was legal eligibility, and I was seeking broader

23   perspective on these other public policy issues

24   and the context, was there information that I

25   should have in making this decision that I might

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 298

1    not be aware of, things like the banking

2    agencies, deciding how do we want to treat the

3    activity in commercial banks, deciding in terms

4    of monetary policy does access to accounts by

5    these non-traditional change how we think about

6    reserve liabilities in the Federal Reserve

7    system, and no one was prepared to address that

8    based on the questions I was asking.

9        Q.    Have you described for me completely all

10   the ways you think Custodia caused true monetary

11   risk to your bank or the system as a whole?

12              MR. MICHAELSON:  Objection, form.

13       Q.    (BY MR. ORTIZ)  Because I guess I still

14   don't get it.  If Custodia wanted to do a

15   million-dollar transaction on a Saturday in

16   realtime, you had the ability to have the

17   controls in place where they had to have a

18   million dollars in their master account with you

19   for that transaction to go through, right?  True?

20       A.    That's an example.

21       Q.    Sure.  And you had the ability to say,

22   "We'll let you do that $1 million-dollar

23   transaction, because you've got it in your

24   account, but we're not going to give you credit

25   to do a $10 million-dollar transaction the next

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 299

1    day, because we don't have verifiable funds in
2    the account."  You had the ability to put that
3    parameter in place, didn't you?
4              MR. MICHAELSON:  Object to form and
5    asked and answered.
6         A.    We had that capability.
7         Q.    (BY MR. ORTIZ)  So then what's, again
8    then, explain to me the financial risk.  If
9    you're not extending them credit beyond what's in
10   their master account and they are not asking you
11   to accept crypto as payment, what's the financial
12   risk --
13             MR. MICHAELSON:  Objection, form.
14        Q.    (BY MR. ORTIZ)  -- other than it's a
15   novel idea that you hadn't thought about before?
16             MR. MICHAELSON:  Objection, form,
17   argumentative, asked and answered.
18        A.    That is a highly concentrated business
19   model around a very monolithic and narrow asset
20   class.  It is one of the key historical risks in
21   the failure of a financial institution and
22   instability in the financial system, and the very
23   design of this institution at the outset, on Day
24   1, raised questions about the nature of its risk.
25             And that this would be a precedent of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 300

1    the first one of these to access the Federal

2    payment system, required that we think broadly

3    about:  Are we prepared, both in terms of

4    understanding how risk will be assessed.  We had

5    to make a judgment about the specific case, the

6    management and how they had demonstrated their

7    ability to manage that heightened risk, and our

8    conclusion was that they were not ready to manage

9    the risk commensurate with how we judge risk to

10   the financial system would be.

11       Q.   Have you explained to me then all the

12   reasons that you think they put you at financial

13   risk, "you" being the Kansas City Fed?

14            MR. MICHAELSON:  Objection, form,

15   asked and answered.

16       A.   I believe our decision letter of

17   January 27th laid out all the reasons that we

18   considered.

19       Q.   (BY MR. ORTIZ)  If Custodia failed as a

20   start-up, their model didn't work, they weren't

21   making money, are you suggesting somehow that

22   that would impact the overall financial ability

23   of the U.S. financial system --

24            MR. SCARBOROUGH:  Stability?

25       Q.   (BY MR. ORTIZ) -- financial stability of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 301

1    the U.S. system?

2          A.    Is your question for a single

3    institution?

4          Q.    Yeah, for Custodia.  If Custodia failed

5    as a start-up, are you suggesting that that

6    somehow affects the financial stability of the

7    Federal Reserve system?

8          A.    It would in the sense that it would have

9    opened up a precedent, not just for one entity,

10   but for any others to follow.

11         Q.    How does opening the precedent of

12   getting a master account equate to adversely

13   affecting overall financial stability?

14         A.    So if we had a number of highly

15   concentrated institutions like this at scale, it

16   would pose a threat to the financial stability

17   potentially of the system.

18         Q.    Unless you put safeguards in place and

19   made them have money in their account before they

20   did transactions, agreed?

21         A.    And all the supervisory --

22               MR. MICHAELSON:  Object to form.

23   Go ahead.

24         A.    And the supervisory framework with which

25   to judge the valuation of those assets and how

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 302

1      they were being managed, in compliance with

2      relevant laws and regulations.

3            Q.   (BY MR. ORTIZ)  Did you know that

4      Custodia was actually invited by your staff to

5      remediate the risks and resubmit their risk

6      management plan?

7            A.   It would not be unusual for an

8      institution that we've raised questions with to

9      come back at another time and resubmit a request.

10           Q.   Would you agree, given the parameters

11     you've talked about, a broad question, if you're

12     a novel start-up wanting to deal with digital

13     assets and you're a State-chartered entity, like

14     Custodia, you can never get a master account.

15     You can't.

16                MR. MICHAELSON:  Object to form,

17     calls for speculation.

18           A.   I can't answer that question.

19           Q.   (BY MR. ORTIZ)  You don't see a pathway

20     for that as you sit here right now, though, do

21     you?

22           A.   I did not see it as of January 27th.

23           Q.   You have been really patient.  That's

24     all the questions I have.

25                MR. MICHAELSON:  No further

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 303

1        questions.

2                     THE REPORTER:  Do you all want

3        rush, a rough?

4                     MR. SCARBOROUGH:  Regular is fine

5        for us, yeah.

6                     MR. MICHAELSON:  I think regular is

7        fine.

8                     THE REPORTER:  And you all have

9        been getting roughs.

10                    MR. ORTIZ:  You bet, we'd

11       appreciate that.

12                    THE REPORTER:  And you, a rough?

13                    MR. MICHAELSON:  Yes.

14            (Deposition ended at 4:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25