# EXHIBIT 35

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF WYOMING
2

3

4      CUSTODIA BANK, INC.,          )
                                     )
5                    Plaintiff,      )
                                     )
6      v.                            )
                                     ) 1:22-cv-00125-SWS
7      FEDERAL RESERVE BOARD         )
       OF GOVERNORS AND              )
8      FEDERAL RESERVE BANK OF       )
       KANSAS CITY,                  )
9                                    )
                     Defendants.     )
10                                   )

11

12

13

14             * DESIGNATED CONFIDENTIAL *

15          * SUBJECT TO A PROTECTIVE ORDER *

16

17

18             DEPOSITION OF ROSS CROUCH, a Witness,

19     taken on behalf of the Plaintiff before Peggy E.

20     Corbett, CSR, CCR, RDR, pursuant to Notice on the

21     25th day of October, 2023, at the offices of the

22     Federal Reserve Bank of Kansas City, 1 Memorial

23     Drive, Kansas City, Missouri 64198.

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 6

1     until I finish my question, and your counsel may
2     still have an objection, and wait until that
3     happens and then answer.
4              And also I'll try not to interrupt you
5     as you're answering my question, okay?
6          A.   Okay.
7          Q.   And we also plan to take a break about
8     every hour, but if you need to take a break
9     earlier than that for any reason, we're happy to,
10    as long as if there's a pending question, answer
11    that, and then ask to take a break, okay?
12         A.   Okay.
13         Q.   So I just want to start with your
14    personal background.  Where are you from?
15         A.   I live in Kansas City.  I'm from
16    St. Joseph, Missouri.
17         Q.   Okay.  And what is your educational
18    background?
19         A.   I have a Bachelor's degree from
20    Northwest Missouri State University in finance
21    and accounting.
22         Q.   Okay.  Did you go to graduate school at
23    all?
24         A.   I did not.  I also have a CPA license,
25    too, but I did not go to graduate school.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 7

1      Q.    Okay.  And when did you graduate from

2   college?

3      A.    2006.

4      Q.    And what has your work history been

5   since 2006?

6      A.    I was hired at the Federal Reserve as a

7   bank examiner, assistant bank examiner straight

8   out of college, and I've worked here for 18 years

9   or close to 18 years.

10     Q.    In Kansas City the entire time?

11     A.    Yeah, in Kansas City.

12     Q.    And how has your role changed over the

13  course of your time here at the Kansas City

14  Federal Reserve?

15     A.    So I started as an assistant bank

16  examiner and then there's a commissioning process

17  to become a commissioned bank examiner, so over

18  the course of four years after I graduated from

19  college I went through this training and

20  commissioning process to become a commissioned

21  bank examiner.  And in that role, both assistant

22  and as a commissioned examiner, I've reviewed

23  safety and safety and soundness of banks that we

24  supervise.  I examine banks.

25     Q.    So what is your current title?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 8

1         A.    Lead examiner.

2         Q.    So does that mean that you're leading a

3    large team of more junior examiners?

4         A.    So for a given exam, yeah, I may be -- I

5    most often am in a leadership role where I will

6    lead a team of examiners.  They are not all

7    necessarily junior examiners, and a lot of them

8    are peers.

9         Q.    And how would you describe what a bank

10   examiner does?

11        A.    So we examine the safety and soundness

12   of banks and holding companies that we supervise,

13   so the financial condition, risk management

14   practices, that's generally.

15        Q.    So are you examining things that are

16   applying to become members or for master accounts

17   or for banks that already have those things and

18   you examine them on an on-going basis?

19        A.    So primarily we examine banks that we

20   supervise, so those would be State-member Federal

21   Reserve member banks that don't have an

22   application.

23             Now but we also, and I'm involved in

24   that, too, if a bank applies for Fed membership,

25   we do either a -- it can be called a risk review

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 9

1      or a pre-membership exam, but we also would
2      review the safety and soundness of the bank as a
3      pre-membership exam, and then that would -- that
4      information would ultimately inform or help the
5      applications examiners kind of make a decision on
6      a membership application.
7           Q.    Do you also review banks that are
8      applying for master accounts?
9           A.    Traditionally in examinations and
10     inspections, my role is not to review banks that
11     are applying for master accounts.
12          Q.    And why is that?  Does someone else do
13     that?
14          A.    Yeah, there's a different department,
15     credit risk reserves management, or CRRM, I might
16     refer to them as that, they do the analysis for
17     making a determination for a master account
18     request.
19          Q.    Okay.
20          A.    And that's a separate process from a
21     membership application.
22          Q.    Does that department also have bank
23     examiners?
24          A.    They have -- yeah, they do have some
25     people that have gone through the commissioned --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 39

1      A.    Yes, Albert Forkner.

2      Q.    And what was the scope of those

3   conversations that you had with him?

4      A.    We had an initial conversation to just

5   clarify questions that we had about the SPDI

6   charter, and then we might have asked for some

7   updates on Avanti at the time, kind of where

8   things were there.  We had an initial discussion

9   with the intention to have more, and we just had

10   the first discussion there in that initial 2020

11   review.

12          We met once with, I was involved in one

13   other meeting with Jeremiah in 2022.  That would

14   have been prior to the pre-membership exam.

15      Q.    So why were you meeting with Albert

16   Forkner?  You said before you did the

17   pre-membership exam?

18      A.    That was when he was still a

19   commissioner, and that was in the end of -- it

20   was at the very end of 2021 or early 2022.

21      Q.    And what prompted that meeting?  Was

22   it -- were you doing a pre-membership exam or

23   what prompted the meeting?

24      A.    So at the end of 2021 we were doing a

25   risk review, and trying to get updates on, you

1    know, looking at materials that both Custodia

2    provided, additional materials -- or Avanti at

3    the time provided additional materials that we

4    requested to make a determination of kind of next

5    steps on how to examine the bank or Custodia.

6         Q.   So what's the difference between a risk

7    review and a pre-membership review?

8         A.   I'm probably using those words.  So

9    there's a pre-membership exam.  The nature of

10   those reviews that we did the end of 2021, and

11   the one we did in 2022 was different, but I'm

12   probably using those terms somewhat

13   interchangeably here.

14        Q.   How were those reviews in 2021 different

15   in your view with regard to Custodia?

16        A.   So in 2021 Custodia was -- you know, we

17   had a business plan, we had some policies and we

18   had some capital.  They were very early in the

19   processing.

20             So that first review that Rob led and

21   that I -- Rob Triano led, and that I assisted

22   with, had, the output of that review probably had

23   a little more risk review, summary results that

24   were intended to help CRM with their analysis.

25             So there was consideration given to some

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 41

1    of the draft principles.  The 2022 review, at

2    that time we had with an examiner that was

3    assigned as kind of a liaison for CRM to help

4    interpret, her name is Andrea Mullins, to help

5    interpret the examination results for CRM's

6    analysis for the master account.

7            So that exam, the one that was connected

8    in 2022, the thinking was Custodia is more

9    mature, they asked for the pre-membership exam,

10   so we went in and conducted that with more of a

11   view of:  "This is going to inform the membership

12   request, with the understanding that the results

13   would also be interpreted by Andrea and used for

14   CRM's analysis for the master account, so that's

15   how they do differ.

16       Q.   So let's start with the 2021 risk review

17   that you did.  Do you recall when you conducted

18   that?

19       A.   It would have been primarily in

20   December, I think.  It went into January.

21       Q.   And you said that that was -- was that

22   primarily for CRM to assess Custodia's master

23   account application?

24       A.   It was both, but it had more of that --

25   the output of that was intended to help CRM think

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1    through the master account, but it was also, the

2    membership -- there was a membership application

3    in place, and Examinations and Inspections is a

4    separate department.  We were thinking through,

5    using that risk review to think through what are

6    the next things we need to look at in order to

7    make sure that we have an effective

8    pre-membership exam for purposes of kind of

9    informing the membership application.

10       Q.   And had you ever done a risk review

11   where the primary purpose was for CRM to assess

12   the master account before this one --

13            MS. CARLETTA:  Objection, form.

14       Q.   (BY MS. WEINBERGER) -- you did for

15   Custodia?

16       A.   So Rob Triano led this.  It really

17   wasn't intended to inform both.  The output for

18   a -- to help inform the master account was

19   somewhat unique because Custodia was unique in --

20   their risk profile was unique and this approach

21   was taken because Avanti at the time was

22   immature.  It was a business plan.  It was

23   capital, some draft policies, and, you know, not

24   near mature enough to open, which influenced how

25   the output would look.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 43

1    Q.   So for this exam that you did in late

2    2021, early 2022, did you have any communication

3    with Board staff in regard to that exam?

4    A.   No, I had none.

5    Q.   Are you aware of anyone having

6    communication with Board staff?

7    A.   I'm not aware.

8    Q.   And do you recall your conclusions from

9    that exam as to whether you thought it was likely

10   Custodia might be granted a master account?

11             MS. CARLETTA:  Objection, form.

12   A.   So I don't conduct the master account

13   analysis, so the conclusions that we drew from

14   that exam were, "What do we need to do next from

15   an exam standpoint?"

16             There were no recommendations either for

17   or against a master account made or membership

18   made as a result of that review from either I or

19   other examiners.

20   Q.   (BY MS. WEINBERGER)  And as a result of

21   this risk review that you did in late 2021, early

22   2022 do you recall your assessment of whether the

23   risks you identified in Custodia could be

24   addressed by Custodia?

25   A.   So this would be the risk review in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 44

1      2021?

2            Q.    Right.

3            A.    The focus of that review was pretty

4      narrow, because of what there was to review at

5      the time, so there weren't a lot of issues to

6      identify because there just wasn't a lot to

7      review, so I am not sure I can answer that either

8      way.

9            Q.    Do you recall an impression or feeling

10     at that time that the risks that you were

11     identifying could be addressed by Custodia, if

12     you continued to work with Custodia?

13                 MS. CARLETTA:   Objection, form.

14           A.    So again, the 2021/2022 review, there

15     just wasn't enough to review at that time to make

16     an assessment on what risks still needed to be --

17     there was so much that needed to be addressed

18     that it was -- it would have been premature to

19     have conclusions that could have gone either, you

20     know, been stuff that we would have known, and

21     that could have been addressed by Custodia, or

22     not, at that 2021/2022 period.

23           Q.    (BY MS. WEINBERGER)  Do you recall any

24     red flags during that early review that, you

25     know, made you pause or think that you weren't --

Page 45

1    you know, that the bank wasn't going to -- it was

2    going to either deny the master account

3    application, or this was just going to be too

4    risky to go forward?

5                    MS. CARLETTA:  Objection, form.

6        A.    Based on my review, do I recall any red

7    flags?

8        Q.    (BY MS. WEINBERGER)  At that time in

9    December of 2021.

10       A.    I don't recall either way.

11       Q.    Okay.  So you do not recall any red

12   flags that arose out of the December of 2021,

13   January 2022 review that you did?

14                    MS. CARLETTA:  Objection, misstates

15   testimony.

16       A.    So any red flags related to --

17       Q.    (BY MS. WEINBERGER)  The risks posed by

18   Custodia.

19       A.    I mean we had items that we communicated

20   to Custodia as feedback, as a result of their

21   review.  Again, they weren't mature enough to do

22   a full assessment as to whether or not a

23   determination relative to what kind of

24   deficiencies might exist at that time that can or

25   cannot be corrected.  It was too premature to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1    know that.

2        Q.   So it was too premature to identify any

3    red flags?

4              MS. CARLETTA:  Objection, form.

5        A.   Well, "any," I don't know if that's the

6    word choice that I would use, but to clearly

7    identify the types of red flags that we -- it was

8    too early.

9        Q.   (BY MS. WEINBERGER)  And in that time

10   you thought it was possible that the items you

11   identified for Custodia could be addressed by

12   Custodia?

13             MS. CARLETTA:  Objection, form.

14       A.   I can't recall what all feedback was

15   given as a result of that January review.  I

16   don't know.

17       Q.   (BY MS. WEINBERGER)  So as you sit here

18   today you do not recall any feedback that you

19   gave in January of 2022, that was something that

20   was not addressable by Custodia?

21             MS. CARLETTA:  Objection to form.

22       A.   I mean the feedback we did provide was

23   later, was in April or May, so it was later.

24       Q.   (BY MS. WEINBERGER)  Okay.

25       A.   But that feedback was heavy caveated

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 47

1    with:  This review is limited in scope, because

2    of where Custodia is.

3            So whether or not they can address the

4    feedback we provided isn't relevant, because

5    the -- it was too premature.  The organization

6    wasn't developed enough at that time to

7    accurately identify all the risks it might pose.

8        Q.   So regardless of whether you think it is

9    relevant or not, I just want to be clear on the

10   question.  The feedback that you provided it

11   sounds like in May of 2022, you do not recall

12   providing anything that at that time you thought

13   was not addressable by Custodia?

14           MS. CARLETTA:  Object to form.

15       A.   Again, the feedback was heavily caveated

16   by the limitations and the scope of what we could

17   look at.

18       Q.   (BY MS. WEINBERGER)  But given the

19   limited scope, you today do not recall anything

20   that you provided feedback on that you, at that

21   time you recall feeling like this is not

22   addressable by Custodia?

23           MS. CARLETTA:  Objection, asked and

24   answered.  You can answer.

25       Q.   (BY MS. WEINBERGER)  You can answer.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 48

1      A.    All right.   Sorry, again, that was

2   heavily caveated feedback.   I don't know if

3   that's a word.   The feedback was qualified.

4          I would be uncomfortable answering that

5   question or responding affirmatively to that,

6   because the limitations in what was available to

7   review at that time.

8      Q.    Okay.

9      A.    So the organization at that time was a

10   business plan with some draft policies and

11   capital and part of a management team, but there

12   wasn't a lot to examine.

13      Q.    So with the caveat that you identified,

14   which was that it was a limited exam, you do not

15   recall, though, at that time, given the

16   information that you knew, that there was any

17   particular thing that stood out in your mind that

18   you felt was not addressable by Custodia?

19          MS. CARLETTA:   Objection, form.

20      A.    Given the limitations of the available

21   materials to examine and where they were, there

22   was limited things to review.   Because there were

23   limited things to review, there wasn't a lot of

24   meaningful feedback that could be provided at

25   that time --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 49

1      Q.   (BY MS. WEINBERGER)  Okay.

2      A.   -- whether or not it's addressable or

3    not.

4      Q.   Okay.  But in the limited feedback that

5    you were able to provide, given the limited

6    information that you had, at that time you did

7    not have a feeling that something specific was

8    not addressable by Custodia?

9              MS. CARLETTA:  Objection to form.

10     A.   Again, the review was limited based on

11   the materials that were provided that were

12   limited.  One of the feedback items we did

13   provide was that Custodia didn't have a lot of

14   depth and expertise in banking, so that's across

15   the board, across senior management, and

16   management, and that feedback was provided.

17             So I guess depending on how I interpret

18   that question, that's an unknown on how that

19   could be addressed with the staff and the Board

20   at the bank.

21     Q.   (BY MS. WEINBERGER)  So in your view

22   that issue could have been addressed, if they

23   addressed their staffing?

24             MS. CARLETTA:  Objection, form.

25     A.   No.  I'm saying, I guess it's with the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 72

1      Again, that was something that I believe Rob
2      Triano shared with me.
3           Q.   Okay.  And can you help me a little more
4      with what date you think that might have been?
5           A.   That would have been about the time of
6      the first reviews.  I probably saw that towards
7      the end of 2021.
8           Q.   And do you remember seeing in those
9      materials anything about when the Federal Reserve
10     Board should be consulted in the consideration of
11     a master account membership application?
12          A.   We don't consult the Board for master
13     account requests, so I did not see that anywhere.
14          Q.   So does that mean when there's a master
15     account request there should be, under normal
16     procedure, no communication with the Board?
17               MS. CARLETTA:  Objection to form.
18          A.   I guess "no communication with the
19     Board" I'm confused by.
20          Q.   (BY MS. WEINBERGER)  In the ordinary
21     course, your understanding is there would be no
22     communication between the Kansas City Fed staff
23     and Board staff about a master account
24     application review?
25               MS. CARLETTA:  Objection, form.

Page 73

1          A.    I'm not involved in the master account

2     request process.  I don't know to what extent

3     there would even need to be communication.  I

4     know the decision is made locally.

5                    (Exhibit 118 was marked by the

6     reporter for identification.)

7          Q.    (BY MS. WEINBERGER)  I'm going to show

8     you what I'm marking as Exhibit 118, which for

9     the record is FRBKC-0004916.

10                   MS. CARLETTA:  I'm sorry, what

11    Exhibit Number are we on?

12                   MS. WEINBERGER:  118?

13                   MS. CARLETTA:  Thanks.

14         Q.    (BY MS. WEINBERGER)  So this looks like

15    a conversation between yourself and Rob Triano

16    dated December 8th, 2021; is that correct?

17         A.    Yes.

18         Q.    So the first sentence, the first message

19    you said, "Hey, Rob, I'm drafting a response to

20    Allan from the Board."  Who is Allan from the

21    Board?

22         A.    His name is Allan -- it's Purod -- he's

23    in Board accounting policy, so he's not involved

24    in Board M&A.  Any time I would talk to him, he

25    understood crypto accounting, so I would -- he'd

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 74

 1    be someone I could contact for accounting

 2    questions.

 3         Q.   What did you say his last name was?

 4         A.   I'm going to butcher it, it starts with

 5    a P.  It's Purod or -- he's left the Board.  He

 6    was a Board Accounting Fellow from one of the Big

 7    4 accounting firms.

 8         Q.   Is there any chance you could spell it

 9    for the record?

10         A.   No, I would butcher it.

11         Q.   And when you say Board Accounting

12    Fellow, does that mean the Federal Reserve Board?

13         A.   Yes.  The Federal Reserve Board has an

14    Accounting Policy Department that they just

15    essentially answer accounting questions, and they

16    deal more with FASBI.

17              I think this is about the time that SAB

18    121 came out, which was an accounting

19    pronouncement related to crypto custody.

20         Q.   So how often would you reach out to the

21    Board accounting policy with questions?

22         A.   With questions?  Oh, I'm an accounting

23    contact for Kansas City, and I'm a system expert

24    for certain accounting issues, so I work

25    hand-in-hand with Board accounting policy all the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 130

1          A.    Yeah, they should have.

2          Q.    And then that would have included a

3     discussion of conversations with -- a

4     communication with the Board?

5                    MS. CARLETTA:  Objection to form.

6          A.    For membership requests, the Board

7     should be looped in.

8          Q.    (BY MS. WEINBERGER)  So they didn't

9     contemplate any conversations or communication

10    with the Board as to a master account?

11                   MS. CARLETTA:  Objection, form.

12         A.    It shouldn't, it shouldn't have.

13         Q.    (BY MS. WEINBERGER)  It shouldn't have

14    because the Board is not supposed to be involved

15    in master account decisions?

16                   MS. CARLETTA:  Objection, form.

17         A.    Yeah, that's my understanding.

18         Q.    (BY MS. WEINBERGER)  Your understanding

19    is the Board is supposed to have no involvement

20    in a master account decision?

21                   MS. CARLETTA:  Objection, form.

22         A.    I am not an expert in this area, but

23    that's, again, my understanding.

24         Q.    (BY MS. WEINBERGER)  Okay, and then the

25    last thing on this document, if we move on, it's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 131

1  right above where Lacey Peters says, "It's a
2  special case," you say, "I think that is
3  especially important to consider for firms that
4  have just now applied for MA --" is that a master
5  account?
6      A.   Yes.
7      Q.   "-- and have been waiting 2-plus years."
8  So what is your understanding of how long it
9  usually takes to process a master account
10  application?
11     A.   I think the routine requests are pretty
12  quick.  I don't know what the timing is supposed
13  to be, but it's not two years.
14     Q.   A matter of weeks or a matter of months?
15     A.   That, I don't know.
16     Q.   So was it unusual that Custodia's master
17  account request was pending 4 years?
18     A.   It's an unusual case, because again, I
19  am not a -- I do not work in CRM, but banks
20  typically request a master account, from what
21  I've observed, when they are ready to open.
22          So those requests a lot of times are the
23  last thing that they do and get processed before
24  they open.
25          Custodia, or Avanti at the time,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 132

1     requested the master account well in advance of

2     when they were ready to open, from my

3     perspective.  It was premature when they

4     requested it.

5          Q.   I'm going to show you what was

6     previously marked as Exhibit 19.  Let me see if I

7     can find it, and for the record this is a

8     document Bates-stamped FRBKC-11941.

9               MR. LAX:   Lauren, you said this

10    was previously an Exhibit --

11              MS. WEINBERGER:  19.

12         Q.   (BY MS. WEINBERGER)  So I want to point

13    your attention to the bottom e-mail on the first

14    page.  Do you see that that's an e-mail from

15    Judith Hazen on October 27th, 2022 to a group of

16    people that included yourself?

17         A.   Yes.

18         Q.   And the subject line was Custodia/VC

19    Barr; is that correct?

20         A.   Yes.

21         Q.   And then I'm going to read the first two

22    sentences there, "Jeff and I are attending the

23    MAMG meeting in DC this week."  Do you know what

24    MAMG is?

25         A.   I have no idea.

Page 133

1      Q.   And then it says, "In passing we learned

2   that Board staff will be briefing V.C. Barr this

3   afternoon, and that Custodia is expected to

4   figure prominently into the discussion."  Did I

5   read that correctly?

6      A.   Yes.

7      Q.   Who is V.C. Barr?

8      A.   Vice Chair Barr at the Board.

9      Q.   At the Board of Governors?

10     A.   Yeah.

11     Q.   And did you learn any information about

12  this briefing of V.C. Barr?

13     A.   From this e-mail, I don't know.

14     Q.   Do you have any personal recollection

15  about anything that happened from that e-mail?

16     A.   I don't, looking at this e-mail.  I

17  don't know what this relates to.

18     Q.   So let's back up.  I assume that you

19  have a personal recollection of certain events

20  regarding Custodia, beyond the documents that I

21  show you during this deposition; is that correct?

22            MS. CARLETTA:  Objection, form.

23     A.   Yeah.

24     Q.   (BY MS. WEINBERGER)  So in your personal

25  recollection do you recall any conversation or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 277

1    "info" or "into gap."  I'm guessing that's

2    "information gap, each phase learn, feel like we

3    need to know to assess risks, not too

4    definitive."

5        Q.   Okay.  So does that mean you had just

6    finished your initial risk review and your

7    conclusions were you still had some more to learn

8    but you didn't have any definitive conclusions

9    yet?

10                MS. CARLETTA:  Objection, form.

11       A.   I don't know.

12       Q.   (BY MS. WEINBERGER) Then how would you

13   frame it if you disagree with what my phrasing

14   was?

15       A.   I don't know that I disagree.  I just

16   don't know.  I think it's just, again, I don't

17   know that those are my words.  I might be writing

18   what other people are saying.

19       Q.   Do you know who might have told you

20   that?

21       A.   No.

22       Q.   Let's go to the next page 16040.  Do you

23   see where it says, "De Novo process:

24       A.   Yes.

25       Q.   Can you read to me what the three

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    bullets are under "De Novo Process"?

2         A.    "Believe more 11th hour, things in place

3    before granted, cost to expectations projection,

4    work with regulators," it says, "competent,

5    involvement in other institutions."

6         Q.    So what does that mean?

7         A.    So the 11th -- I know what this means.

8    This is related to the conversation that we had

9    with CRM analysts on when a master account is

10   typically requested and granted, and that would

11   be at the 11th hour.

12              That's kind of the last thing that is

13   granted before a traditional bank would get

14   access to the master account, and that's the

15   conversation we had.

16        Q.    So what does that mean for a master

17   account to only be granted to a de novo

18   institution at the 11th hour?

19        A.    That means that the bank has all the

20   systems in place, the controls in place.  They

21   have gotten approval oftentimes from a Federal

22   regulator, but they have got an approval to

23   operate with all the risks and controls in place,

24   and then they request a master account when they

25   are ripe, when they are mature and ready to go,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 279

1   and it's granted at that time.  That's my

2   understanding of the conversation that I had with

3   the CRM analyst.

4       Q.   Do you remember who you spoke with?

5       A.   That would have been Chris Gaul-Pearson,

6   and another -- I can't remember her name offhand,

7   another experienced CRM analyst.

8       Q.   Okay.  Let's go to Page 16042.

9       A.   I'm sorry, which one, 16042?  Okay.

10      Q.   Is that the meeting with Christi on

11  February 2 of 2022?

12      A.   Yes.

13      Q.   So what was that meeting about?

14      A.   This would have been -- hold on, let me

15  read this.  I assume that this related to, I

16  don't know what the date was of that memo.

17      Q.   Oh, the --

18      A.   The conclusions, the summary memo that

19  we vetted internally, I assume we were preparing

20  for a meeting with Tara Humston on that summary,

21  but I don't, without seeing the dates, I think I

22  had that earlier.

23      Q.   Okay.  And then looking at the bullet I

24  know the memo you're referring to.

25      A.   Yeah, I just don't know for sure.  I'm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 280

1    just assuming based on the date and how this

2    reads.

3         Q.    So that memo was ultimately provided to

4    Tara and you had a meeting about it?

5         A.    Yes.

6         Q.    That summarized the results of the risk

7    review that you conducted in late 2021 and early

8    2022?

9         A.    Yes.

10        Q.    So I'm looking at the bullet that says,

11   "Judith MA lens and application lens and

12   supervisory lens."  Is that what that says?

13        A.    Yes.

14        Q.    So what does that mean?  It says master

15   account lens, applications lens and supervisory

16   lens?

17        A.    Yeah.

18        Q.    So how is a supervisory lens different

19   than a masters lens?

20        A.    So I'm supervisory staff.

21        Q.    Okay.

22        A.    So that's just kind of how we do.

23   There's a membership request, so if they were

24   granted membership, how would we supervise the

25   organization?  What is the supervisory staff's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 301

1      questioning.  That concludes my questioning for

2      you today.  Do you have any follow-up

3      questioning?

4                     MS. CARLETTA:  Yeah.

5                     MS. WEINBERGER:  I just want to for

6      the record reiterate what was stated earlier

7      about the reasons why we made the request to

8      continue this deposition based on how the

9      deliberative process issue was resolved, if

10     that's a dispute for the Court, as you were

11     instructed not to answer a couple of questions

12     today, in addition to the late production of

13     documents.

14                     MS. CARLETTA:  And to the extent I

15     lodge objections, same objections apply.  I'm

16     going to have a few redirect questions, but I'm

17     going to need a couple of minutes to prepare my

18     thoughts.  We can go off the record until then.

19                         (Recess)

20                         EXAMINATION

21     BY MS. CARLETTA:

22         Q.   Okay.  Ross, I just have a few questions

23     for you on Redirect.  To the best of your

24     knowledge, do you know who decided the master

25     account request?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 302

1      A.    That would have been the Federal Reserve

2   Bank in Kansas City.   That would be the CRM

3   Department and Esther George.

4      Q.    And to the best of your knowledge, do

5   you know who denied the membership application?

6      A.    Yeah, that would have been the Board

7   applications group.

8      Q.    So I believe you testified earlier today

9   that you were in regular communications with the

10  Board about the membership application; is that

11  correct?

12     A.    Yes.

13     Q.    How often were you in communication with

14  them?

15     A.    That would have been after I took that

16  role in June.   That was probably every other

17  week.

18     Q.    During those meetings, did the Board

19  ever try to intervene about the decision on the

20  master account request?

21           MS. WEINBERGER:   Object to form.

22     A.    No.

23     Q.    (BY MS. CARLETTA)   To your knowledge did

24  the Board ever mandate denial of the master

25  account request?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 303

1           MS. WEINBERGER:  Object to form.

2      A.   No.

3      Q.   (BY MS. CARLETTA) So based on your

4   review of Custodia, do you disagree with FRBKC's

5   decision to deny the master account request?

6           MS. WEINBERGER:  Object to form.

7      A.   No.

8      Q.   (BY MS. CARLETTA)  Based on your review

9   of Custodia do you disagree with the Board's

10  decision to deny membership?

11          MS. WEINBERGER:  Object to form.

12     A.   No.

13     Q.   (BY MS. CARLETTA)  Who's Jenifer Haake?

14     A.   She's an examiner that worked with me on

15  the pre-membership exam work that was conducted

16  in September of '22.

17     Q.   Okay, and at a certain point her title

18  was co-EIC; is that correct?

19     A.   Yes.

20     Q.   But you were in charge of any exams or

21  risk assessments conducted that you conducted

22  together; is that right?

23          MS. WEINBERGER:  Object to form.

24     A.   I was the primary lead for the

25  pre-membership exam that was conducted.

Page 304

1      Q.   (BY MS. CARLETTA)  Okay, great.  I'm
2   going to direct you to Exhibit 135, previously
3   marked as Exhibit 135, and these are some of
4   Ross' handwritten notes.
5           I'm going to bring you to -- I didn't
6   write the Page Number.  Let's find it.  Oh, I
7   might have the wrong one.  I think I have the
8   wrong -- oh.
9      A.   That's where I've got questions.
10     Q.   I see, okay, okay.  Okay, yep, this is
11  the right document.  Okay, so I'm going to bring
12  you back to, I'm looking at Bates Number, it's
13  17804.  You were previously asked about this
14  quote and if I'm reading this correctly it says
15  Ross and Rob think everything is fine.  Can you
16  provide me context for this quote?
17     A.   Again, my understanding is that that
18  was -- that sentiment was assumed -- our officer
19  group assumed that Custodia's sentiment was that
20  Rob and I had a positive view of Custodia's, you
21  know, business model and chances to get either a
22  master account or a membership.
23     Q.   I see, so Custodia was saying this to
24  other FRBKC employees?
25     A.   I don't know for sure.

Page 308

1    draft?

2                    MS. WEINBERGER:  Object to form.

3         A.   No, I don't.  I don't know.

4         Q.   (BY MS. CARLETTA)  Do you know whether

5    counsel provided edits on this Custodia master

6    account request memo to Esther?

7         A.   I believe I saw edits from Nick in

8    there, but I don't know for certain.

9         Q.   And do you know when counsel provided

10   edits?

11        A.   No.

12        Q.   And do you know who directed the

13   creation of the memo referenced in this chat?

14                   MS. WEINBERGER:  Object to form.

15        A.   No.

16        Q.   (BY MS. CARLETTA)  And I'm directing you

17   to Exhibit 36.  Is this the memo to Esther

18   George --

19        A.   This is --

20        Q.   -- on the master account request?

21        A.   This is a memo to Esther George on the

22   master account.  I mentioned earlier that there

23   were multiple memos.  I don't know if this ended

24   up being the one memo that was prepared, or if

25   there was multiple.  This was a memo related to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 309

1    the master account that went there.

2         Q.   Do you know who directed the creation of

3    this document?

4         A.   No.

5         Q.   Did Custodia need a master account to

6    begin operations?

7              MS. WEINBERGER:  Object to form.

8         A.   No.  They could have opened with

9    their -- with Cross River Bank, partner bank.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 310



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 311



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 312

1              MS. CARLETTA:  Okay, great.  No

2      further questions.

3              MS. WEINBERGER:  I have no

4      questions.

5              (Deposition ended at 5:50 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25