# EXHIBIT 53

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3

4       CUSTODIA BANK, INC.,

5                          Plaintiff,

6       vs.                              No.

7       FEDERAL RESERVE BOARD OF         22-cv-00125-SWS

8       GOVERNORS and FEDERAL RESERVE

9       BANK OF KANSAS CITY,

10                         Defendants.

11

12

13

14                      CONFIDENTIAL

15

16

17

18          CONFIDENTIAL DEPOSITION OF JUDITH HAZEN, a

19      Witness, taken on behalf of the Plaintiff before

20      Kelsey Robbins Schmalz, CSR No. 1571, CCR No. 1148,

21      RPR, pursuant to Notice on the 16th of October, 2023,

22      at the Federal Reserve Bank of Kansas City, 1

23      Memorial Drive, Kansas City, Missouri.

24

25

CONFIDENTIAL

Page 74

1    legislation and these kind of charters out of

2    Wyoming?

3              A.    I don't think that there were specific

4    committees created to address the legislation in

5    Wyoming.  That was something that just by virtue of

6    our boundaries existed within the Federal Reserve

7    Bank of Kansas City.  That said, some of the

8    questions that were raised by this unique charter

9    type were similar to questions that were being raised

10   in other areas of the country.

11             Q.    So let me ask you about some acronyms

12   we've seen in the documents.

13             A.    Sure.

14             Q.    And I'm going to ask you about who

15   created this group and who sits on it.  We see an

16   acronym of NTAA.  Are you familiar with what that

17   means?

18             A.    Yes.

19             Q.    I'm assuming that's nontraditional

20   account activity or applicant.

21             A.    I think of it as nontraditional

22   account access.

23             Q.    And is that an actual group of

24   individuals that are part of an NTAA committee?

25             A.    Yes.

Page 75

1          Q.      Who formed that committee, the NTAA?

2          A.      So going back a few years as you're

3    watching evolution in banking and you are seeing the

4    creation of new charters or new uses of existing

5    charters, conversations start amongst the presidents

6    of the Reserve Banks about the need to be open and

7    communicating what is coming to the door and the

8    requests for the accounts and services to make sure

9    that we are fully considering all the risks that are

10   presented by these different activities, and so with

11   that you need a structure or a framework in order to

12   bring those conversations together, and so through

13   that, the nontraditional account access group was

14   created to give thought to how those conversations

15   can be facilitated and how there can be better

16   awareness by the public of what risks are being

17   analyzed when an account request comes in.

18         Q.      Is this nontraditional account access

19   group something created by the Federal Reserve Board

20   of Governors?

21         A.      The Board of Governors was engaged as

22   well.

23         Q.      So who sits on the NTAA?

24         A.      So there is a steering committee that

25   consists of representatives from several reserve

1    banks as well as individuals from the Board of

2    Governors.

3              Q.    So is there like a listserv of NTAA

4    people that you guys are communicating where we could

5    know exactly who is on that?

6              A.    We could go and pull the membership

7    list.  There's not a listserv, but.

8              Q.    Do you keep minutes of meetings?

9              A.    The -- I don't recall if the steering

10   committee keeps minutes.  I would have to verify

11   that.

12             Q.    Who is on the steering committee?

13             A.    Representatives from several Reserve

14   Banks and representatives from the Board of

15   Governors.

16             Q.    Are you on the steering committee?

17             A.    I am.

18             Q.    And were you throughout the time that

19   Custodia was trying to get their master account?

20             A.    I was not.

21             Q.    When did you get put on the committee?

22             A.    I would have to verify the specific

23   year, but it was in the course of when the request

24   was pending.

25             Q.    You were put on that committee due to

Page 77

1      Custodia pushing for their master account

2      application, correct?

3              A.      I was put on the committee to take the

4      place of a former member who retired from the Federal

5      Reserve Bank of Kansas City.

6              Q.      And who is that?

7              A.      Susan Zubradt.

8              Q.      Give me a sense.  How many people are

9      we talking about on the steering committee?  Is there

10     a representative from each Federal Reserve Bank?

11             A.      No, there is not.  There is probably

12     around ten folks.

13             Q.      How many of the ten individuals on the

14     steering committee are associated with the Federal

15     Reserve Board of Governors?

16             A.      I would have to pull the list to

17     confirm.

18             Q.      And are those Reserve Board employees

19     or are they actually members that sit on the board

20     that are --

21             A.      They're staff members.

22             Q.      They are staff members?  All right.

23     So we don't actually have any member of the Board of

24     Governors that sit on the steering committee?

25             A.      No.  The governors do not sit on the

Page 78

1    steering committee.

2          Q.    Does the Federal Reserve Board of

3    Governors general counsel sit on that steering

4    committee?

5          A.    No.

6          Q.    Do any lawyer general counsel sit on

7    that steering committee, to your knowledge?

8          A.    The general counsel of the Board does

9    not sit on the committee.  There's engagement from

10   legal at the Board, but I...

11         Q.    How often does the NTAA have meetings?

12         A.    At the time that it was formed, I

13   believe it sat out with a cadence of every other

14   week.  It's something that has flexed over time as

15   needed, so.

16         Q.    Would it be fair to say that Custodia

17   was a topic of discussion repeatedly by the NTAA

18   steering committee?

19         A.    It wouldn't.

20         Q.    Was Custodia ever a topic of

21   discussion by the NTAA steering committee?

22         A.    So the group was charged with looking

23   at different entity types, and so I would say there

24   was probably an awareness by members of Custodia as

25   an entity that had received a SPDI charter, but

Page 79

```
 1      Custodia itself was never a topic of conversation
 2      with the group.
 3              Q.      Was the SPDI charter itself from
 4      Wyoming a topic of conversation?
 5              A.      As an example of what was emerging in
 6      the industry, yes.
 7              Q.      Does the NTAA actually formulate
 8      policy or regulations?
 9              A.      No.
10              Q.      Is this just basically a think tank?
11              A.      I'd say that it was a group that was
12      brought together in recognition that there seemed to
13      be questions about how requests for master accounts
14      are considered, and so the group came together to
15      determine how to better clarify, particularly for the
16      public, how those requests are reviewed.
17              Q.      Did the NTAA ever come out with an
18      official recommendation for the Kansas City Federal
19      Reserve as to whether Custodia's application should
20      be approved or denied?
21              A.      No.
22              Q.      So let me ask you about another entity
23      or committee.  What is the practical workstream
24      group?
25              A.      So the practical workstream was one
```

CONFIDENTIAL

Page 80

1    arm underneath the steering committee that was

2    thinking through what is the approach that's taken to

3    bring together 12 Reserve Banks as we -- to share

4    information as we receive and individually analyze

5    requests for master accounts.

6            Q.    So the practical workstream would be

7    solely focused on master accounts and sharing

8    information among all the reserve banks?

9                  MR. MICHAELSON:  Objection.  Form.

10   BY MR. ORTIZ:

11           Q.    Did I hear you correctly?

12           A.    I couldn't say that they were solely

13   focused on that, but the primary focus was just on

14   the practical matter of how you bring together 12

15   Reserve Banks who each individually are receiving

16   requests and making determinations on how to act on

17   them.

18           Q.    Was it part of the practical

19   workstream process to try to get consistency among

20   all the Federal Reserve Banks?

21           A.    I think that the practical workstream

22   was looking at what is the form that could be used to

23   facilitate the conversations between Reserve Banks so

24   that we could ensure that when we are looking at

25   risks that are presented by a request for master

Page 81

1      accounts that we have just a broad view into what

2      those risks are and how they might be mitigated.

3              Q.      Does the practical workstream group --

4      how many people are part of that?

5              A.      I'm not certain how many sat on the

6      practical workstream.

7              Q.      Did you sit on it?

8              A.      I did not.

9              Q.      Who does from the Kansas City Fed?

10             A.      At the time that the practical

11     workstream was functioning, I believe that Christi

12     May-Oder and Nick Billman were sitting on that group.

13             Q.      Nick Billman would be assistant

14     general counsel?

15             A.      Yes.

16             Q.      And remind me of Ms. May-Oder's title.

17             A.      She's an assistant vice-president with

18     responsibility for our credit reserves and risk

19     management function.

20             Q.      In the chain of command of the Kansas

21     City Fed, is she someone that reports to you?

22             A.      Yes.

23             Q.      Is she a direct report to you?

24             A.      She is.

25             Q.      Has this practical workstream group

Page 82

1      been disbanded now?

2            A.      For all intents and purposes, it's

3      morphed into a group that's called our account

4      request information sharing group which has

5      representation from all the Reserve Banks and is the

6      forum that was designed by the practical workstream

7      to offer a space for Reserve Banks to share what they

8      are seeing with requests for nontraditional accounts.

9            Q.      Did the practical workstream group get

10     formed sometime after Custodia submitted its

11     application for master account?

12           A.      I would have to go check the specific

13     date.  I don't know that I can answer that off the

14     top of my head.

15           Q.      And you said so the practical

16     workstream group has morphed into this new group, and

17     tell me what it's called again?

18           A.      Account request information sharing

19     group.

20           Q.      Is Christi May-Oder still on that group?

21           A.      She is.

22           Q.      Did the practical workstream group

23     issue any guidelines, regulations, guidance

24     bulletins, anything like that?

25           A.      No.

Page 83

1          Q.     Did the practical workstream group

2     make recommendations to anyone about whether

3     Custodia's master account application should be

4     approved or denied?

5          A.     No.

6          Q.     How does legal eligibility

7     determination occur with an entity like Custodia

8     seeks a master account application?

9               MR. MICHAELSON:   Objection.   Form.

10    BY MR. ORTIZ:

11         Q.     If you know?

12         A.     In the review of legal eligibility, we

13    would engage with our legal staff, and it would

14    require understanding the legal structure and the

15    activities of the institution to ensure that they met

16    the legal eligibility standard.

17         Q.     When someone like Custodia is applying

18    for a master account, are there certain aspects of

19    their application that the Kansas City Fed doesn't

20    deal with and the Board of Governors deals with

21    directly?

22         A.     Not to my knowledge.

23         Q.     Is it true that the Board of Governors

24    cannot delegate the function of looking at the

25    financial system stability aspects of a new

Page 84

1      applicant?

2                    MR. MICHAELSON:  Objection.  Form.

3      BY MR. ORTIZ:

4           Q.     If you know.

5           A.     I couldn't answer if they could

6      delegate it, but the Federal Reserve Board is the one

7      that's charged with -- or is granted a seat on the

8      federal stability oversight group and maintains that

9      responsibility currently.

10          Q.     So does the Board of Governors retain

11     that responsibility or does the Kansas City Fed have

12     that responsibility with new applicants?

13          A.     Have what responsibility?

14          Q.     Looking at financial system stability

15     with a new applicant.

16          A.     So in situation where an entity

17     requested a master account, the Federal Reserve Bank

18     of Kansas City would be responsible for reviewing and

19     analyzing that.  In reviewing the potential impact on

20     financial stability, we would want to consult with

21     those that have responsibility for maintaining

22     financial stability, which would be the Board of

23     Governors, so we would solicit their input on that

24     topic.

25          Q.     The Board of Governors makes the

Page 155

1   this Reserve Bank, to the System more broadly, or to

2   other principles so that we can make a final

3   determination.

4   BY MR. ORTIZ:

5       Q.      You know, by this point in time when

6   you get that determination by Craig Zahnd, Custodia

7   has been trying to get this for almost a year and a

8   half, and I guess can you not even give me the basic

9   analysis whether at that time, January 2022, were you

10  leaning in favor of giving them a master account or

11  were you against it?

12      A.      Again, I don't think that it's am I in

13  favor of or am I against.  I think it's a unique

14  situation that requires careful consideration, and so

15  throughout that process, there is an ongoing analysis

16  of the business model that's being proposed, the

17  risks that it presents, if it's possible to mitigate

18  those risks, how that applies in the broader

19  structure, and so as each piece of the puzzle starts

20  to fit into place, that moves us closer to a decision

21  point.  I'm not on a camp of one direction or the

22  other.  I'm taking into account all of this

23  information to make an informed decision.

24      Q.      So you're telling me even a year and a

25  half into this process, you can't even tell me as you

Page 156

1   sit here today whether you personally were in favor

2   of it or against it?  You can't answer that simple

3   question?

4                   MR. MICHAELSON:  Objection.  Form.

5   BY MR. ORTIZ:

6          Q.    With all the parameters you talked

7   about, all the information you wanted, you have a

8   year and a half to get all that information, as we

9   sit here right now, you can't even tell me whether

10  you were for or against it by the time it's

11  determined to be legally eligible?

12                  MR. MICHAELSON:  Objection.  Form.

13  BY MR. ORTIZ:

14         Q.    And if you just tell me you can't

15  answer that, tell me that.

16         A.    From the beginning of this process, I

17  have concerns about what this entity type and this

18  specific business model present to this Reserve Bank

19  and to the System more broadly.

20         Q.    Would you --

21         A.    And despite that, I have the

22  obligation to continue to review the proposal to

23  determine what the final recommendation ought to be

24  on the master account request.

25         Q.    Do you think you fall into the camp of

Page 157

1    being in favor of new innovation for banks, or are

2    you someone that's more conservative in your approach

3    and you don't like to see new innovation in the

4    banking industry?

5                    MR. MICHAELSON:  Objection.  Form.

6           A.       Personally, I'm supportive of

7    responsible innovation that's done in a safe and

8    sound manner and protects consumers.  My personal

9    views, though, are not what is determining these

10   decisions.

11   BY MR. ORTIZ:

12          Q.       You kind of got stepped into a role of

13   having to interface with Custodia because someone

14   named Rob Triano resigned, didn't he?

15          A.       Yes.  And individual named Rob Triano

16   resigned.

17          Q.       What was his role with the Kansas City

18   Fed?

19          A.       Rob was an examiner.

20          Q.       Rob came from San Francisco because he

21   had special expertise with cryptocurrency, true?

22          A.       He did spend time in San Francisco and

23   had expertise in BSA/AML compliance, and I believe

24   also had experience with cryptocurrency.

25          Q.       He was the most familiar of anyone at

Page 183

1    deals with membership, because the account access

2    guidelines that were put out in the federal register

3    don't deal with membership, correct?

4           A.    I'm not certain why they're mentioned

5    here other than the timing seems to align that these

6    conversations were happening around membership -- the

7    membership application, and at the same time the

8    Federal Register Notice on proposed account access

9    guidelines came out.

10          Q.    Can we agree on one basic premise that

11   this was unusual and unprecedented in manner and

12   processing a request like Custodia's?

13                MR. MICHAELSON:  Objection.  Form.

14          A.    I can agree that I had never been part

15   of processing a request for an account as well as

16   membership for a special purpose depository

17   institution.

18   BY MR. ORTIZ:

19          Q.    Is that why you really didn't do

20   anything without getting the green light from the

21   Board of Governors?

22                MR. MICHAELSON:  Objection.  Form.

23          A.    On the question of membership, then

24   the -- it was important to understand the Board's

25   views on how we should think about membership in the

Page 184

1    Federal Reserve System for a new entity type like a

2    SPDI.  As far as decisions on the request for access

3    to an account or services, those discussions were

4    ongoing within this Reserve Bank in reaching that

5    decision.

6           Q.    You really didn't want to do anything

7    that the Board would be unhappy with; agree?

8                 MR. MICHAELSON:  Objection.  Form.

9           A.    I think we wanted to make a

10   well-informed decision.

11   BY MR. ORTIZ:

12          Q.    You agree with me the Board of

13   Governors basically had veto power over everything

14   you were going to propose or recommend when it came

15   to Custodia?

16                MR. MICHAELSON:  Objection.  Form.

17          A.    No.  I don't think that the Board had

18   veto power over this Reserve Bank's decision on

19   Custodia's master account request.

20   BY MR. ORTIZ:

21          Q.    You don't think the Board had veto

22   power?

23          A.    The Board did have a role in our

24   assessment of the membership application.

25          Q.    Well, in fact, really when we go

CONFIDENTIAL

Page 185

1    through all this, the Board directed what they wanted

2    you to do, and you worked with them to get guidelines

3    in place that would help you get to where they wanted

4    you to be; agree?

5                    MR. MICHAELSON:  Objection.  Form.

6         A.    No.  This Reserve Bank had concerns

7    with this charter type and with the specific request

8    from Custodia from early on, and we worked to ensure

9    that there were broad conversations happening across

10   the system about unique requests for master accounts,

11   but the Board did not direct this decision.

12   BY MR. ORTIZ:

13        Q.    One way to know whether the Board was

14   actually pulling all the strings and making the

15   decisions would be to see what the notes and

16   conversations were in the, quote, deliberative

17   process when these account access guidelines were

18   promulgated, true?

19                    MR. MICHAELSON:  Objection.  Form, and

20   that is calling for what is precisely protected by

21   the privilege.

22                    Instruct you not to answer.

23                    MR. ORTIZ:  You do understand there is

24   a balancing test as to whether our need outweighs

25   your privilege, counsel, and I'm simply establishing

Page 186

1    that.

2    BY MR. ORTIZ:

3         Q.    If we're really looking to answer the

4    question of is the Federal Board of Governors

5    directing everything that happens with Custodia, that

6    would be one way to find out, to see if Custodia was

7    the driver between all these guidelines that seem to

8    get promulgated that apply to them, true?

9                   MR. MICHAELSON:  Objection.

10   Objection.  Form.

11                  You can answer that question as the

12   effect to this case --

13   BY MR. ORTIZ:

14        Q.    You can answer.

15        A.    I'm not sure what question I'm

16   answering.  Can you repeat it?

17        Q.    If we're looking to see if the Board

18   of Governors is really directing this process with

19   Custodia versus independent discretion being utilized

20   by the Kansas City Fed, one thing we could look at

21   would be what was the purpose and motivation for the

22   account access guidelines and the various drafts of

23   the S Letter, true?

24                  MR. MICHAELSON:  Counsel, I object,

25   and this is calling for what is behind the dual

Page 189

1      With all the narrative from him, can you answer my

2      question yes or no?

3                      MR. MICHAELSON:  Repeat the question.

4      BY MR. ORTIZ:

5              Q.     If we want to look and see what the

6      motivation for things like the account guidelines,

7      the S Letter, and whether really that was motivated

8      to thwart Custodia, evidence of that would exist in

9      the written communications, notes and emails that

10     went into why these things were promulgated.

11                     Do you agree with that; yes or no?

12                     MR. MICHAELSON:  Objection to form.

13                     I instruct you not to answer, because

14     the way that question is formed is evidence of what

15     exists.  You can't answer that question without

16     revealing the substance of what's behind the

17     privilege.

18                     You can ask whether documents --

19                     MR. ORTIZ:  Counsel, this is all

20     inappropriate narrative coaching.

21                     MR. MICHAELSON:  It's not.

22                     MR. ORTIZ:  It's coaching.

23                     MR. MICHAELSON:  You're asking for

24     privileged information.

25                     MR. ORTIZ:  I'm not.  I'm simply

Page 190

1    asking if the evidence of the real motivation of what
2    drove the guidelines, as she has said earlier, had
3    nothing to do with Custodia versus whether it really
4    does deal with Custodia and SPDIs, I'm simply asking
5    her wouldn't that be the best evidence of the real
6    motivation other than you simply telling her she
7    can't answer what the real motivation was.
8                    MR. MICHAELSON:  You can't answer --
9    she can't answer what the motivation was behind the
10   guidelines.  She can answer what the motivation was
11   behind the master account request.
12   BY MR. ORTIZ:
13       Q.    Are you going to answer my question or
14   not?  Are you unwilling to answer my question, ma'am?
15       A.    I don't fully understand your
16   question, but -- I can't speak to the motivations for
17   the account access guidelines, but I can tell you
18   that the decision to deny the account was that of
19   this Reserve Bank.
20       Q.    You're saying solely the Kansas City
21   Fed made that decision?  That's what you're saying
22   again?
23       A.    The Federal Reserve Bank of Kansas
24   City made the decision to deny the master account
25   request from Custodia.

Page 191

1                    (Hazen Exhibit No. 18 was marked for

2        identification.)

3        BY MR. ORTIZ:

4               Q.    Okay.  Let's take a look at

5        Exhibit 18.

6                    MR. MICHAELSON:  We've been going for

7        an hour.  Can we take a break before we start a new

8        exhibit?

9                    MR. ORTIZ:  Sure.  Let's take seven

10       minutes.

11                   (Off the record.)

12       BY MR. ORTIZ:

13              Q.    I'm going to hand you what's been

14       marked as Exhibit 18, Bate No. 12387.  This is an

15       exchange from Tara Humston -- I guess it's from her

16       to you, copy to Christi May-Oder?

17                   And if I look at this, it looks like

18       this is referencing questions that someone named Kara

19       had about master account issues -- master account

20       decisions.

21                   Do you know who Kara would be?

22                   MR. MICHAELSON:  I think this is

23       privileged.  This is -- I apologize.  We're going to

24       have to claw this back.  Kara is in-house counsel,

25       and I note the timing of this is just a month after

1    ever tell them if the Board of Governors does not

2    approve your membership, we're not going to approve

3    your master account prior to the time you gave them

4    notice?

5              A.    I don't recall if we spoke in those

6    terms.

7              Q.    Because that certainly would have been

8    a big waste of time for Custodia to go through all

9    this gyrations in excess of a two-year period if it

10   was always just tied to membership.  If you can't get

11   Fed membership, we'll never get you an account.  That

12   might have been information you should have shared

13   with them if that was true, correct?

14             MR. MICHAELSON:  Objection.  Form.

15             A.    I don't think that the only way to

16   mitigate the risk is through membership.  Custodia

17   made the election to apply for membership, and we had

18   to consider how that would impact the risk profile of

19   the institution and the account if we were to grant

20   it.  At the time that the Board decided that they

21   would not approve membership, then that had to be

22   considered in our decision on the master account

23   request.

24   BY MR. ORTIZ:

25             Q.    Really it had nothing to do with your

Page 212

1    risk assessment, it had to do with you did not want

2    to appear to be inconsistent with the Board, true?

3              A.      No.

4                      (Hazen Exhibit No. 24 was marked for

5    identification.)

6    BY MR. ORTIZ:

7              Q.      I'll hand you Exhibit 24, Bate

8    No. 2131.

9                      MR. MICHAELSON:   I believe it's 2132.

10                     MR. ORTIZ:  Apologize, counsel.

11   BY MR. ORTIZ:

12             Q.      So it's Bate No. 2132 on the front and

13   2133 on the back, and I want to have you look at the

14   second page on the back.  It's an email from

15   Gaul-Pearson to Ashle Baxter, Ben McGhee, Nancy

16   Fitzgerald regarding Custodia memo to Esther.

17                     Who are those individuals?

18             A.      Chris Gaul-Pearson is a manager in the

19   credit reserve and risk management function.  Ashle

20   Baxter and Nancy Fitzgerald are individuals in the

21   surveillance and risk analysis are.  Ben McGhee is an

22   examiner in the applications function.

23             Q.      So is it your understanding these

24   individuals would have been responsible for some

25   draft recommendation for Esther George to sign?

Page 213

1          A.      I'm sorry.  Were they working on a

2     memo for Esther to sign; is that what you said?

3          Q.      Yeah, the recommendation memo, or is

4     that just something for her to review based on the

5     recommendation from the group?  Is that what that is?

6          A.      I believe that we're asking for their

7     input into a recommendation memo we're drafting for

8     Esther.

9          Q.      So this says CRRM.  Is that credit

10    risk and risk management?

11         A.      Credit reserves and risk management.

12         Q.      Credit reserves.  This is moving

13    pretty quick.  There are gaps that Judith, Christi

14    and I would like your help filling in given you are

15    the experts.

16              I want to ask you about this:  Ben, I

17    have been -- at this time, I've been asked to see if

18    you could help us make sure that we are not getting

19    out of sync with the membership side.  We do not want

20    to contradict one another.

21              This is simply saying that if

22    membership is denied, we need to make sure we deny

23    the master account so there's no contradiction,

24    correct?

25              MR. MICHAELSON:  Objection.  Form.

Page 214

1          A.     I don't recall that being the context

2     of this discussion.  I think that this is looking at

3     the risks that are present, including the capital

4     structure, and then there's also reference to the

5     digital assets and wanting to understand are there

6     any issues that are fixable, curable, or I would say

7     could be mitigated, and we would want to be

8     consistent in saying if they could be mitigated for

9     either the membership or the master account request.

10    BY MR. ORTIZ:

11         Q.     So it's your testimony this has

12    nothing to do with making sure you don't contradict

13    the Board of Governors on the membership decision?

14         A.     I don't recall that.

15         Q.     Have you seen the recommendation that

16    was provided to Esther George?

17         A.     I've seen the final recommendation on

18    action on the master account, yes.

19         Q.     That she signed off on.  But I guess

20    I'm asking have you seen this recommendation memo.

21              MR. ORTIZ:  And I'll ask you guys, I

22    don't think that's been produced.

23              MS. CARLETTA:  I think it has been.

24              MR. MICHAELSON:  I think it has.

25              MR. ORTIZ:  We'll try to confirm that.

Page 215

1    Has that been produced just like in the last day or

2    so?

3                    MR. MICHAELSON:  No, no.  I don't

4    think so.

5    BY MR. ORTIZ:

6         Q.    This is referencing a recommendation

7    memo in December; is it not?  It's attached as a

8    document with these emails in December, correct?

9         A.    I see that there is work on a memo in

10   December.

11        Q.    Dated December 6th, 2022.  We've been

12   provided memos from January.

13                   MR. MICHAELSON:  Okay.  Yeah.  This --

14   so this has not been produced.  The early drafts of

15   this memo reflect attorney-client privilege.  There

16   reached a time when the memo ceased to be privileged.

17   We've produced the non-privileged, later-in-time

18   versions.

19   BY MR. ORTIZ:

20        Q.    Are any of the individuals responsible

21   for drafting this recommendation memo lawyers that we

22   just talked about, Ashle, Ben or Nancy?

23                   MR. MICHAELSON:  Objection.  Form.

24        A.    The individuals on this email are not

25   attorneys.

Page 216

1     BY MR. ORTIZ:

2          Q.     And there's no lawyers on this email

3     at all, is there?

4          A.     No.  I don't see any lawyers on this

5     email.

6          Q.     Do you know of any information in this

7     original recommendation memo that was drafted by

8     lawyers versus the individuals on that chain?

9          A.     I think that the original memo was not

10    drafted by the individuals on this chain.  I think we

11    were looking for input from these individuals.  I

12    wouldn't be able to speak to who drafted the original

13    recommendation from this.

14         Q.     Do you know what the original

15    recommendation was?

16         A.     I believe that we've been consistently

17    moving towards a recommendation to deny the account

18    unless there were material facts that would change

19    that, including if the Board of Governors had

20    approved the application for membership.

21         Q.     Did members of Vice Chairman Barr's

22    team provide input to you about what should go in

23    that initial recommendation memo to Esther George?

24         A.     I don't know that they provided input

25    in the version that was in existence in December.

Page 217

1   Ultimately, they did review our recommendation memo
2   to Esther George specifically to provide input on
3   areas of -- within their purview, including
4   implementation of monetary policy and financial
5   stability.  I believe that they also had experts in
6   BSA/AML risk that provided input as well.
7           Q.    Were those experts from the Board or
8   from somewhere else, what you just said, BSA and AML?
9           A.    The document was drafted by staff at
10  the Federal Reserve Bank of Kansas City for President
11  George, but we did share a draft copy to gather input
12  from the Board of Governors on those areas.
13              (Hazen Exhibit No. 25 was marked for
14  identification.)
15  BY MR. ORTIZ:
16          Q.    I'll hand you Exhibit 25, Bate
17  No. 11698.  You may not know this.  Do you know where
18  it's referenced as privilege, is it your
19  understanding that's attorney-client privilege on
20  this document?  Do you know one way or another?
21          A.    I do not know.
22          Q.    I want you to look at the second page.
23  Looks like an email from Margaret DeBoer from the
24  Board of Governors that you were copied on.
25              Who is Margaret DeBoer, if you know?

Page 218

1          A.     Marnie DeBoer is a staff member in

2     monetary affairs of the Board of Governors.

3          Q.     She references at the top of this

4     page, One thing that came to mind is that membership

5     request does not rely on monetary policy or financial

6     stability concerns, and wonder if it makes sense to

7     take a similar tack with the account request.  Best,

8     Marnie.

9               What is she asking you to do, to

10    dovetail the responses between the membership and the

11    master account?

12         A.     Can you show me where you were reading

13    from?

14         Q.     Sure.  The very top of Page 11699?

15         A.     Happy New Year all?

16         Q.     Yeah.  Look at the second sentence

17    there, referencing coordinated account request work

18    for MA, which I assume means master account.

19         A.     I think it might mean monetary

20    affairs, the division of the Board of Governors.

21         Q.     Well, it says one thing that came to

22    mind is the membership request does not rely on

23    monetary policy or financial stability concerns.  I

24    wonder if it makes sense to take a similar tack with

25    the account request.

Page 226

1    involved in tracking the lawsuit.  We were focusing,

2    for our purposes, on the assessment of the account

3    and our determination of the request.

4    BY MR. ORTIZ:

5           Q.    I don't want to know what you said,

6    but I take it you met with legal counsel throughout

7    the litigation process to see where this stood,

8    especially after the notion to dismiss hearing with

9    Judge Skavdahl; is that true?

10                MR. MICHAELSON:  Objection.  Form.

11          A.    We work closely with the legal staff

12   in the Reserve Bank, and so that didn't change with

13   the timing of the lawsuit.

14   BY MR. ORTIZ:

15          Q.    I'm going to hand you what we'll

16   mark -- this is Bate No. FRB-AR 000335.  I'm going to

17   mark it as Exhibit 26.

18                (Hazen Exhibit No. 26 was marked for

19   identification.)

20   BY MR. ORTIZ:

21          Q.    This is a document from you to Jason

22   Hinkle at the board, Marnie DeBoer at the Board, and

23   others with copies to a number of people at the

24   Kansas City Fed, and you're advising on January 6th,

25   2023, Pursuant to the proposed S Letter, we are

Page 227

1    providing our predecisional draft memorandum

2    regarding potential actions on Custodia's request for

3    a master account; is that right?

4               Did I read that right?

5          A.    That's what it says.

6          Q.    And this was something new where you

7    had to provide a predecisional memorandum to the

8    board of directors regarding your potential action,

9    and it was due what was required by the S Letter

10   2667?

11              MR. MICHAELSON:  Objection.  Form.

12         A.    To my knowledge, this was the first

13   time that we had had a master account that we were

14   going to deny since the S Letter had been drafted,

15   and so this was provided in line with what was at the

16   time in the draft S Letter.  Our practice prior to

17   the S Letter would have been to notify the Board of

18   decisions to deny accounts, but this would be the

19   first time it would be pursuant to the proposed

20   S Letter.

21   BY MR. ORTIZ:

22         Q.    And the S Letter and the change in

23   guidelines all came just shortly before this, didn't

24   they?

25              MR. MICHAELSON:  Objection.  Form.

Page 228

1          A.     I think you showed me earlier what the

2     S Letter had been in draft for quite some time prior

3     to this.

4     BY MR. ORTIZ:

5          Q.     Yeah, but nobody really saw it.  My

6     clients never saw it until it was issued late in

7     2022; agree?

8          A.     I don't know when your clients saw it.

9          Q.     So I'm going to hand you what we'll

10    mark as Exhibit 27, which is -- this is Bate number

11    AR 000336.

12               (Hazen Exhibit No. 27 was marked for

13    identification.)

14    BY MR. ORTIZ:

15         Q.     So this is referenced as an executive

16    summary.  It also says it's attorney-client

17    privileged and confidential, but it looks like

18    it's -- tell me what if is, and does that correspond

19    with what was attached in the previous exhibit?

20               Does that correspond with Exhibit 26

21    where there was an attachment of the master account

22    recommendation memo draft?  Do you think that's the

23    same thing, or is that something different?

24               MR. ORTIZ:  And, counsel, if you know,

25    is this something else that hasn't been produced yet,

Page 251

1     we had to take into account the actions by Custodia,

2     and when they applied for membership, we had to

3     understand how that was going to play out so we could

4     factor it into our decision.

5     BY MR. ORTIZ:

6          Q.    Let me just get to the bottom line.

7     Was every initial recommendation memo to Esther

8     George showing what we've gone through, were all

9     those recommendations to deny master account?

10         A.    All of our communications have

11    consistently highlighted the risks that are posed by

12    the SPDI charter, by the risks that we saw through

13    our analysis of Custodia specifically.

14         Q.    My question is a lot simpler.  I just

15    want to know what's the end product.  Was the end

16    product your representation to the president of the

17    Kansas City Fed deny their master account

18    application; is that the recommendation coming from

19    you and your team for as long as you started making

20    recommendations to her in writing?

21         A.    The recommendation memo that you have

22    is a recommendation to deny based on our analysis of

23    the Federal Reserve Bank of Kansas City.

24         Q.    And the first time we have a

25    recommendation memo in writing is sometime after the

Page 252

1    meeting and the briefings with Vice Chair Barr

2    sometime in November, correct?

3           A.     I don't know the specific times of

4    when we began drafting recommendations.  I recall

5    that we had early versions prior to membership even

6    being pursued of how we would consider the master

7    account application and recommending denial at that

8    point.

9           Q.     Prior to the time frame when we get

10   down to this crunch time in October, November,

11   December of 2022, were there members of your group

12   that were in favor of approving Custodia's master

13   account application, to your knowledge?

14          A.     Of approving the request for a master

15   account?

16          Q.     Yes.

17          A.     I couldn't answer -- I don't know.

18          Q.     Did you ever take a polling of the

19   people that were working on that and, you know, get a

20   sense what they thought one way or another?

21          A.     I'd say our ongoing analysis focused

22   on an open discussion of raising the risks that the

23   account would present, how we might think about

24   mitigating those risks and what action we might take.

25   I wouldn't say that we polled individuals to make a

Page 253

1    determination, no.

2            Q.      You didn't ever do that?

3            A.      Poll them?

4            Q.      Yeah.  Asked them what do you think.

5    You know, what do you think, John Smith, would you be

6    in favor of granting a master account based on what

7    you know, or, Mary Jane, what do you think about

8    that?

9            A.      I think that was an active part of the

10   conversations, but we didn't stop and poll everybody

11   at various points in time on the application.

12           Q.      Who made the determination to consider

13   Custodia a complex bank?

14                   MR. MICHAELSON:  Objection.  Form.

15           A.      So a complex banking designation

16   generally comes through the supervision function, so

17   it would have been more relevant to the request for

18   membership rather than the request for a master

19   account.

20   BY MR. ORTIZ:

21           Q.      So do you think that's a definition

22   that was put on Custodia by the Board of Governors

23   versus the Kansas City Fed?

24           A.      I don't know in what context it was

25   determined or that it was determined.

Page 343

1    about the SPDI charter generally at that time period.

2            A.      I think she had questions about the

3    SPDI charter generally and I think that that is why

4    she expressed that she wanted to confirm that a

5    master account was not necessary for the operation of

6    a SPDI.

7            Q.      What do you mean by that?

8            A.      That while an institution that has a

9    SPDI charter might want to pursue a master account,

10   did not want Wyoming creating a structure that it was

11   only possible to operate a SPDI charter if it had a

12   master account, because the assumption that all SPDI

13   charters would be able to obtain master accounts was

14   not accurate.

15           Q.      Do you recall -- at anytime do you

16   recall a moment, a period when Ms. George was

17   favoring granting a master account to Custodia?

18           A.      I don't.

19           Q.      And did there come a time when she

20   retired?

21           A.      There did.

22           Q.      Do you recall about when that

23   happened?

24           A.      At the end of January.

25           Q.      And is there any connection between

Page 344

1    the timing of her retirement and the denial of

2    Custodia's master account request?

3            A.     I think it was important to us that

4    given the work that Esther had been engaged in in

5    this and her understanding of the topics and her

6    strong views on the decision on the master account,

7    it was important that she be able to make the final

8    decision on the master account prior to retiring.

9            Q.     When you say strong views on the

10   outcome, were they strong views in favor of granting

11   or denying the master account request?

12           MR. ORTIZ:  Can you restate that

13   counsel?  You're fading off.

14   BY MR. MICHAELSON:

15           Q.     What were her strong views on

16   Custodia's master account request?

17           A.     Consistently through the analysis, I

18   believe that Esther was highly skeptical of granting

19   an account, and so I would say that her views were

20   skewed towards denying the account.

21           Q.     I would like to direct your attention

22   to Exhibit 15.

23           MR. ORTIZ:  How much more do think,

24   counsel?  I might need a break.

25           MR. MICHAELSON:  I think this is going

Page 345

1    to be the last document that I work with.

2    BY MR. MICHAELSON:

3         Q.    Do you recognize Exhibit 15?

4         A.    I do.

5         Q.    What is Exhibit 15?

6         A.    It's a copy of the guidelines for

7    evaluating account and service requests that was

8    issued by the Board of Governors.

9         Q.    And when was it issued?

10        A.    March 8th, 2022, is the date of the

11   Federal Register Notice.

12        Q.    This is like the Federal Register

13   Notice of the guidelines?

14        A.    Yes.

15        Q.    Okay.  Let's work with this date.  So

16   do you see on the third page of the document, at the

17   top it's -- in the top right corner, it's Page

18   No. 12959?

19        A.    Yes.

20        Q.    There's Section 4, updated account

21   access guidelines, do you see that?

22        A.    I do.

23        Q.    And can you talk very high level what

24   this section of the guidelines contains?

25        A.    So this section of the draft

Page 350

1    specifically craft the SPDI litigation to the

2    satisfaction of your Reserve Bank?

3            A.      I wasn't engaged in work on the SPDIs

4    at the time that the legislation was being drafted.

5            Q.      Do you think there is a way Esther

6    George did not know that her general counsel and

7    assistant general outside counsel were engaged in

8    over a hundred meetings with the Wyoming legislature

9    to craft the legislation in a manner that the Federal

10   Reserve Board approved them?  Are you saying there is

11   possibility she did not know that was going on?

12                  MR. MICHAELSON:  Objection.  Form.

13           A.      I can't speak to what Esther knew or

14   didn't, but I don't agree that Esther would have been

15   looking to Wyoming drafting the legislation to the

16   satisfaction of the board.  I do think that Esther

17   was aware of the legislation, and my understanding in

18   subsequent conversations is that this is where

19   Esther's view that the legislation shouldn't require

20   or presume that all SPDIs would have access to master

21   accounts was important.

22           Q.      So if I understand correctly, I want

23   to synthesize what I think you told your counsel that

24   notwithstanding how much work would have been -- gone

25   in on the front end with Wyoming's legislature and

Page 351

1    representatives from your Reserve Bank and

2    notwithstanding what the business plan was and

3    anything else, from day one, Esther George was

4    skeptical of the whole SPDI charter concept, correct?

5                    MR. MICHAELSON:  Objection.  Form.

6    BY MR. ORTIZ:

7         Q.    Go ahead.  You can answer.

8         A.    I think that Esther had questions

9    about the risks that it presented, and I think that

10   it would -- because there is always a decision to be

11   made on if an account is going to be granted, it

12   shouldn't be presumed that all entities of any type

13   are going to have access to an account.

14        Q.    And as you already said, from day one

15   throughout the process, she was a no on granting a

16   master account to Custodia, true?

17        A.    My understanding from conversation

18   around this is that Esther was -- had concerns or was

19   not -- was leaning towards denying an account from

20   the beginning.

21        Q.    So when my client goes through this

22   two-year process plus and all the work on the front

23   end by the Wyoming legislature and you get to this

24   point in time, regardless of what 248a says,

25   regardless of anything my clients have done, you're

Page 352

1    saying one person, Esther George, can thwart their

2    entire ability to work and get a master account

3    through the Federal Reserve System simply at her

4    subjective belief that she doesn't like that and is

5    skeptical?

6              If what you said, she alone makes that

7    decision, then this one person based on their

8    subjective belief can prevent charter banks like

9    Custodia from every getting a master account, true?

10             MR. MICHAELSON:  Objection.  Form.

11        A.    I still don't agree with the phrasing

12   that any of this work is being done relative to what

13   individuals like or don't like.  I think that the

14   responsibility of any Reserve Bank president is to

15   think through the request for accounts and services

16   that come to their Reserve Bank and that that's done

17   through the lens of the risk that it presents to the

18   Reserve Bank and to the payment system, and so based

19   on her experience, I think that she had questions

20   about the risks that were introduced, but I think we

21   had a responsibility to assess the specific business

22   model and determine if those risks could be

23   mitigated.

24             When we determined that those could

25   not, then I think you get the recommendation and her