# EXHIBIT 59

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.





**FEDERAL RESERVE BANK** *of* **KANSAS CITY**

January 27, 2023

Caitlin Long
Chief Executive Officer
Custodia Bank, Inc.
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82001

Via Electronic Mail: caitlin@custodiabank.com

Dear Ms. Long:

We have completed our review of the request by Custodia Bank, Inc. ("Custodia") to open a master account with the Federal Reserve Bank of Kansas City ("Reserve Bank"). Our analysis is based on the information Custodia has provided to the Reserve Bank, including information provided through the pre-membership examination that commenced September 6, 2022. As addressed in our correspondence on October 21, 2022, in its current structure as an uninsured, state-chartered depository institution that is not subject to prudential supervision by a federal banking agency, Custodia is considered a Tier 3 institution under the Board of Governors' Guidelines for Evaluating Account and Services Requests ("Account Access Guidelines"). Institutions in Tier 3 are subject to the strictest level of review. Our review considered activities proposed to be conducted in Custodia's business plan in both the near- and longer-term, and the potential risks they introduce relative to the Account Access Guidelines.

Custodia intends to engage in a number of crypto-asset-related activities, including offering core banking services to crypto-asset companies; providing custody of digital assets, including holding crypto-assets as principal to facilitate the execution of transactions; offering "prime services" to facilitate transactions between fiat currency and crypto-assets, including agency services such as crypto-asset escrow, foreign exchange, and other activities related to digital asset lending by customers; and issuing "Avit," a bank-issued crypto token utilized for instantaneous payments that is intended to freely circulate on at least two public permissionless networks.

Custodia proposes to focus almost exclusively on offering products and services related to novel crypto-asset activities and to accept entirely uninsured deposits, an unprecedented business model that presents heightened risks involving activities that do not currently have clarity at the federal level. As noted in the January 3, 2023 Joint Policy Statement on Crypto-Asset Risks to Banking Organizations issued by the Board of Governors, Federal Deposit Insurance Corporation ("FDIC"), and Office of the Comptroller of the Currency ("OCC"), it is highly likely that key activities proposed by Custodia are inconsistent with safe and sound banking practices, including issuing and holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network. The federal agencies also have significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposures to the crypto-asset sector.

1 Memorial Drive   ·   Kansas City, Missouri 64198   ·   800.333.1010   ·   www.kansascityfed.org



As a *de nova* Special Purpose Depository Institution ("SPDI"), that is not federally insured or subject to prudential supervision by a federal banking agency, with a business plan narrowly focused on crypto-asset activities and serving the crypto-asset sector by offering novel and higher-risk business activities, and not subject to an established, interagency capital framework that fully addresses the relevant risks or a defined resolution process, we have determined accepting deposits from Custodia into a master account would introduce undue risk as described in the attached summary analysis. Therefore, based on the current facts and circumstances, the Reserve Bank denies Custodia's request for a master account.

Sincerely,

*Esther J. George*

Esther George
President and CEO

Attachment

Cc:   Jeremiah Bishop, Wyoming Banking Commissioner
      Tara Humston, Senior Vice President, Federal Reserve Bank of Kansas City

2



**FEDERAL RESERVE BANK** *of* **KANSAS CITY**

CUSTODIA MASTER ACCOUNT SUMMARY ANALYSIS
Attachment

BACKGROUND AND TIMELINE

Custodia was granted an SPDI bank charter by the Wyoming Division of Banking ("DOB") on October 28, 2020, and submitted Operating Circular 1 ("OC1") Master Account Agreements to the Reserve Bank on October 29, 2020. At that time, Custodia had not yet been granted a Certificate of Authority ("COA") from the DOB approving the firm to commence business.[1]   From the time Custodia submitted the OC1 Master Account Agreements, the Reserve Bank has engaged extensively with Custodia regarding its master account request and devoted significant resources to understanding Custodia's business plan, the SPDI charter, the DOB's supervision program for SPDIs, and the risks and benefits presented by Custodia's request. On January 27, 2022, the Reserve Bank conveyed to Custodia that it "satisfies the threshold definition of an entity eligible to maintain a master account." The Reserve Bank also conveyed that "efforts related to potential access to Federal Reserve accounts and services by novel, nontraditional charters and the permissibility of crypto-asset related activities remain under active evaluation" and that a decision on granting a master account had not been reached. On September 12, 2022, Custodia was granted a COA by the DOB, approving the firm to commence business within six months.

Throughout the Reserve Bank's review, the timelines for Custodia's various planned crypto-related products and services have changed, as have staff employed by Custodia in key areas. Additionally, the proposed use cases of Custodia's bank-issued crypto token, the "Avit," have evolved over time. Custodia submitted application materials to become a member of the Federal Reserve System on August 5, 2021, and throughout 2021 and 2022, Custodia continued to build products and operational infrastructure that were necessary to commence operations and regularly engaged with Reserve Bank supervisory staff regarding risk management and operational infrastructures. Beginning September 6, 2022, a pre-membership examination was conducted by Reserve Bank staff. Custodia was advised that information obtained during the pre-membership examination would be used both in the evaluation of Custodia's master account request and membership application to reduce duplicative questions and burden on Custodia. At the time of the pre-membership examination, Custodia's plans for crypto-asset-related products and services, including the technology and risk management infrastructures to support, facilitate, and execute the planned activities, remained in the early stages of development and therefore could not be formally assessed as part of the review. The membership examination evaluated Custodia's risk management program related to core banking products that would be offered upon opening, namely deposit accounts and core payment services. Nonetheless, the pre-membership examination identified significant risk management gaps concerning the limited banking services Custodia would offer upon opening, which Custodia is currently addressing. These gaps were most notable in the areas of Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") and Office of Foreign Asset Control ("OFAC") compliance, internal audit, and information technology relative to what would be expected of an operating state member bank with only traditional banking activities. The information obtained from the pre-membership examination helped to inform the evaluation of the master account; however, the review of the master account considers the entirety of Custodia's proposed business plan and structure based on all activities in which it intends to engage.

---

[1] When a charter application is approved by the State Banking Board, the institution may not commence operations before receiving a certificate of authority to operate from the Commissioner pursuant to Wyo. Stat. § 13-12-116 and Wyo. Stat. 13-2-213.

1



Concurrent with the Reserve Bank's review, numerous reports and events have illuminated the volatile nature of the crypto-asset market, the vulnerabilities of open, public, decentralized networks, and the impact of insufficient oversight of firms engaged in crypto-related activities. In 2020 and 2021, the OCC issued Interpretive Letters 1170, 1172, 1174, and 1179, reaffirming the primacy of safety and soundness in conducting certain cryptocurrency, distributed ledger, and stablecoin activities, and requiring supervisory nonobjection before national banks may engage in such activities. In November 2021, the President's Working Group on Financial Markets ("PWG"),[2] joined by the FDIC and the OCC, released a report highlighting the benefits and risks of stablecoins, including inconsistent and fragmented oversight of token issuers. The report provided several recommendations for mitigating risks to stablecoin users and guarding against stablecoin runs (including a requirement for stablecoin issuers to be insured depository institutions), the latter of which sought to address concerns related to payment system risk and concentration of economic power.3 In both December 2021 and October 2022, the Financial Stability Oversight Council ("FSOC") published reports[4] highlighting regulatory concerns with stablecoins and the wider cryptocurrency market, including the risks that crypto-asset activities could pose to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall scale were to grow without adherence to or being paired with appropriate regulation.

Most recently, the Federal Reserve Board of Governors, along with the FDIC and OCC, issued the Joint Statement[5] highlighting crypto-asset risks to banking organizations. The Joint Statement specifically referenced the events of the past year marked by significant volatility and exposure of vulnerabilities in the crypto-asset sector, resulting in significant losses in the total market value of cryptocurrency and failure of several prominent crypto and blockchain companies. These episodes have illustrated the risks, interconnectedness, and volatility within the nascent industry.

The market volatility described above is important because Custodia proposes to serve the crypto-asset industry by acting as a bridge to the established banking and payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption on open, public, decentralized networks, and other crypto-asset escrow and prime services. In addition to the individual risks posed by these activities, Custodia's business model is narrowly focused and concentrated in a high-risk and volatile industry.

---

[2] *See* President's Working Group on Financial Markets Report on Stablecoins, https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf, November 1, 2021.
[3] As communicated in the materials provided for the pre-membership examination, Custodia applied for FDIC insurance in November 2021 and at the FDIC's request, entered into the FDIC's draft proposal review program. The FDIC provided oral feedback in both December 2021 and January 2022, and written feedback in March 2022. Based on these interactions, Custodia concluded that FDIC insurance would not be approved and, as a consequence, Custodia did not proceed further.
[4] *See* Financial Stability Oversight Council 2021 Annual Report, https://home.treasury.gov/system/files/261/FSOC2021AnnualRepmt.pdf; see also the FSOC's Report on Digital Asset Financial Stability Risks and Regulation (October 3, 2022), https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf.
[5] *See* Joint Statement on Crypto-Asset Risks to Banking Organizations, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg2o230101at.pdf, January 3, 2021.

2



EVALUATION OF MASTER ACCOUNT REQUEST

The Reserve Bank has evaluated Custodia's business plan and proposed structure based on all activities in which it intends to engage, and not only those proposed to be offered initially. An assessment of the overall business model is important to determine both the viability of the business model and the associated risks presented by future activities. In completing its review of Custodia's request, the Reserve Bank considered the principles outlined in the Account Access Guidelines,[6] as the Account Access Guidelines formalized the pre-existing process (areas of risk and modes of analysis) encompassed in the evaluation of master account requests (i.e., heightened scrutiny applied to non-traditional entities or those with business activities presenting various types of heightened risks).

### BSA/AML and OFAC Compliance Risk

As outlined in the Account Access Guidelines, receiving deposits through the provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity. Crypto-assets pose significant BSA/AML and OFAC compliance risks due to the significant anonymity afforded to holders; ease and speed of transfer; and general irrevocability of transactions. The ability to conduct instantaneous transactions electronically and pseudonymously enables numerous small transactions to move large sums of money undetected by monitoring systems. Custodia's planned issuance of the Avit on two public permissionless networks[7] highlights the need for strong BSA/AML and OFAC compliance. Custodia acknowledges that users would have the ability to conduct Avit transactions indefinitely using wallets not hosted or controlled by Custodia, which would not have undergone an onboarding process with Custodia. Similarly, unknown persons who are not customers of Custodia would be able to hold and redeem Avits without undergoing the full due diligence required for customer onboarding. In addition, by the nature of the crypto-assets Custodia intends to hold in custody and the networks upon which transactions in those assets are recorded, both Custodia and holders of Avits will pay transaction processing fees to unknown transaction validators. This places Custodia and its customers in the position of making payments to unknown parties who could be illicit actors or sanctioned entities. A sound BSA/AML and OFAC compliance program is critical in deterring and preventing these types of activities at, or through, banks and other financial institutions. Custodia has not yet built or demonstrated the ability to scale an effective BSA/AML and OFAC compliance program to control for these risks.

### Financial Considerations

A narrowly focused business model offering banking services to a novel, higher-risk, and not fully mature industry raises questions about the firm's viability. This uncertainty highlights the need for capital to mitigate risks in the business model and offset fluctuations in earnings. The narrow nature of Custodia's anticipated use of the novel SPDI charter, focused on fee-based income from planned crypto-asset-related activities, exposes Custodia's revenue to significant fluctuations in response to industry stresses and events. For example, a potential

---

[6] *See* Guidelines for Evaluating Account and Services Requests,
https://www.federalreserve.gov/newsevents/pressreleases/files/other20220815a1.pdf, August 15, 2022.
[7] Custodia plans to use Ethereum and Liquid networks. Ethereum operates on distributed ledger technology and Liquid operates on a blockchain.

*3*



rapid loss of customers (or decrease in volume of transactions from which Custodia generates fees) could result in a rapid decline in revenue and threaten Custodia's earnings.

Unlike ordinary commercial banks providing traditional banking services, Custodia is an uninsured, *de nova* depository institution not subject to federal supervision and regulation, seeking to engage in multiple high-risk endeavors concentrated in a high-risk industry. Its revenue will be generated primarily from crypto-adjacent activity with no history of safe and sound operations, diversified sources of revenue, and effective risk-management practices, meaning comparisons between Custodia and insured depository institutions are misplaced.

<u>Capital Requirements</u>

Custodia is not subject to the federal regulatory capital framework for insured banks. Neither the federal capital framework nor the Wyoming state rules have incorporated requirements related specifically to crypto-assets. The recent market events discussed above demonstrate the interconnectedness of crypto-market participants, contagion risk, and the need for a robust capital framework. In the absence of deposit insurance and interagency capital standards that account for the types of risks posed by Custodia's business model, which includes significant operational, cybersecurity, BSA/AML and OFAC compliance, strategic, and other risks, and considering the institution's reliance on revenue generated from narrowly focused, volatile crypto-asset-based activities as its primary source of capital augmentation, it remains unclear if Custodia's current and projected capital base will be sufficient to support its risk profile.

<u>Counterparty Risk and Resolution Process</u>

Custodia is required to maintain unencumbered liquid assets equal to at least one hundred percent of deposit liabilities.[8] Nonetheless, Custodia could be subject to run risks, as its business is focused on novel, risky activities and the firm will be subject to a legal regime and resolution process that has not been subject to a court-validated claims process (even where assets purportedly are in excess of deposit liabilities). Moreover, Custodia is not subject to any federal prudential regulation or supervision - either at the institution level or on a consolidated basis - and would not offer the protection of federal deposit insurance and FDIC receivership in the event of a failure. Existing federal statutory and regulatory frameworks to protect both depositors and the safety and soundness of the banking system, including those related to resolution, certain capital requirements, enforcement actions, changes in control, activities restrictions, and consumer protection are directly linked to (and only applicable based on) status as an insured depository institution.

The absence of a proven resolution process exacerbates the risk to the Reserve Bank presented by the receipt of deposits from Custodia. In addition, the Reserve Bank has serious concerns with safely and effectively resolving a deposit-taking entity without significant customer impacts outside of a proven resolution process, particularly without a formal resolution plan in place or tested. While the DOB, as the chartering authority, does not require a resolution plan to be developed until the institution has been in operation for six months, the sufficiency of the plan is a critical component of the Reserve Bank's evaluation of the risks presented by Custodia in the event of a liquidation or conservatorship by the DOB. Custodia's suggestion that a straightforward

---

[8] Custodia has indicated a willingness to hold these assets as reserves for the first three years of operation, however the Wyoming rules allow Custodia to hold other high-quality liquid assets, which may introduce credit or market risk to the institution.

*4*

CONFIDENTIAL



resolution could be accomplished via a sale of its custody business and deposits to another de-novo Wyoming SPDI or another financial institution with a focus on the crypto-asset industry is questionable, as such proposed acquirers are likely to be experiencing stress at the same time and for the same reasons as Custodia. Under the Wyoming Division of Banking's SPDI Rules and Regulations, the resolution plan is required to include how Custodia would "protect the interests of the customers of the institution and to protect the financial system from material risks." Wyo. Rules & Regs. 021.0002.20 § 4(c). As part of the provision of accounts and payment services to depository institutions, it is the role of the Reserve Bank to ensure the risks presented from accepting deposits and providing services to an account holder do not result in loss to the Reserve Bank or negatively impact the payment system. However, in the absence of a resolution plan, these risks cannot be effectively and comprehensively assessed.

<u>Lack of Federal Regulatory Oversight</u>

The statutory and regulatory safety and soundness framework for SPDis is substantially different from the framework that applies to federally insured institutions. While state and federal banking agencies are responsible for ensuring safety and soundness of an entity's activities, only the Federal Reserve has a mission to ensure a safe and efficient payments system. The Reserve Bank has a long-standing and productive relationship with the DOB in our respective supervisory roles for state-chartered member banks. However, the lack of a federal prudential framework for SPDis leaves the Reserve Bank with limited risk-monitoring tools and virtually no remediation or enforcement authority, other than what would be available under the Board's Policy on Payment System Risk and Operating Circular 1.[9] These limited monitoring and mitigation tools are insufficient given the risks posed by Custodia's proposed business model.

Federal regulation and supervision take on heightened importance in this case. Access to a master account for an uninsured, state-chartered entity, with a narrowly focused business model reliant on serving the crypto-asset industry and issuing a proprietary crypto token to be backed by cash held as reserves at the Reserve Bank, poses important public policy questions that have not been fully addressed. Even absent the concerns detailed above, a proposal of this nature has the potential to create undue risk to the financial system and adversely affect the Federal Reserve's ability to implement monetary policy. In short, Custodia currently has no federal banking regulator and is not obligated to comply with the comprehensive set of federal banking regulations applicable to federally-insured banks. Thus, Custodia is seeking to utilize a novel high risk business model to benefit from access to Federal Reserve System financial services without being subject to the same regulatory limitations as insured depository institutions designed to protect depositors and bank counterparties.

CONCLUSION

Based on the facts and circumstances described above, we have determined accepting deposits from Custodia into a master account would introduce undue risk to the Reserve Bank, risk to the overall economy due to potential illicit activities, and potential risk to the payments system that cannot be effectively mitigated at this time.

---

[9] Under Operating Circular 1, depositmy institutions with accounts at Reserve Banks agree as a matter of contract law to particular arrangements with the Reserve Banks. Under the Payment System Risk Policy, firms with access to Fed payment services may be required to post collateral to protect Reserve Banks from the credit risk associated with operating the payment system and providing services to a particular institution.

CONFIDENTIAL

FRBKC-00002178