# EXHIBIT 61

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Attorney-Client Privileged and Confidential

Date: January 19, 2023

To: Esther George

From: Judith Hazen and Christi May-Oder

Subject: Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation

EXECUTIVE SUMMARY

Custodia Bank, Inc., (Custodia) Cheyenne, Wyoming, a *de novo, uninsured* state-chartered special purpose depository institution (SPDI), requested a master account with the Federal Reserve Bank of Kansas City (FRBKC) on October 29, 2020. Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and prime services. FRBKC's review of Custodia's business plan and supporting documents noted the following key concerns:

- Custodia's planned business model relies heavily upon a nascent and volatile crypto industry and presents illicit finance risks through novel activities.
- As noted in the federal bank regulatory agencies' January 3, 2023 Joint Statement,[1] several of these novel activities are highly likely to be inconsistent with safe and sound banking practices. Further, the regulatory agencies specifically expressed safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposures to the crypto-asset sector. The inherent risks of Custodia's proposed activities and the narrowly-focused business plan concentrated in the crypto sector call into question the financial viability of the firm and its ability to generate sufficient earnings to support operations and augment capital.
- FRBKC credit risk and supervisory staff's review of existing operations and policies (related to the core banking services Custodia intends to offer at launch and in the near term) revealed exceptions to safe and sound banking standards and best practices in the areas of BSA/AML and OFAC compliance, information technology, internal audit, financial projections, and liquidity risk management. While these matters could be remediated for the limited set of core banking services in the near- and medium-term, the viability of the business model is fundamentally dependent upon Custodia engaging in digital asset activities that have significantly more risk and operational complexity (and would require correspondingly more robust risk management and compliance systems). This poses heightened BSA/AML risks, elevating FRBKC's concerns with Custodia being able to conduct crypto-asset activity in a safe and sound manner.
- Absent a federal regulator, FRBKC will have limited visibility into Custodia's financial condition and operations (and therefore, limited visibility into the risks borne by FRBKC and other participants in the Federal Reserve payment system), which, as noted above, likely create significant safety and soundness concerns due to the higher risk nature of Custodia's business model. Additionally, the financial condition and operations are expected to change significantly through evolution of the business model following commencement of operations. Regulation of Custodia is entirely dependent on a state prudential supervisory program specifically designed for this novel charter/institution type that does not incorporate the full range of safety and soundness standards, requirements, and safeguards embedded within the regulatory regime established for

---

[1] *See* Joint Statement on Crypto-Asset Risks to Banking Organizations, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230103a1.pdf January 3, 2023.

CONFIDENTIAL                                                                                                         FRBKC-00009928

insured depository institutions, and creates gaps in FRBKC's access to supervisory results. FRBKC also has serious concerns with safely and effectively resolving a deposit-taking entity through the new and untested Wyoming state law resolution process for SPDIs, which relies on development of a resolution plan by the entity following commencement of operations.

- The approval of an uninsured, state-chartered entity with a narrowly-focused business model reliant on serving the crypto industry and issuing a proprietary crypto token or other liabilities to be backed by reserve balances at the FRBKC, and issued and circulated on an open, public, decentralized network, could lead to undue risk to the financial system or complicate the Federal Reserve's ability to implement monetary policy.

In light of these concerns, staff recommends denial of Custodia's master account request.

While the decision to deny a master account request rests with the appropriate administrative Reserve Bank, recently issued Federal Reserve System S-Letter guidance requires a preliminary recommendation for denial of a master account request to be shared with the Director of the Board's Division of Reserve Bank Operations and Payment Systems (RBOPS) prior to communicating any denial to the entity seeking the account. The consultation process provides an opportunity for RBOPS and other Board Divisions to provide feedback to the Reserve Bank regarding the Reserve Bank's analysis of the entity. The Reserve Bank may incorporate or address any feedback or concerns, but still retains decision making authority under the Federal Reserve Act (12 U.S.C. § 342). FRBKC plans to provide a summary recommendation to Matt Eichner, Director of RBOPS pursuant to the S-Letter.

On August 15, 2022, the Board approved final guidelines (Account Access Guidelines) for Reserve Banks to utilize in evaluating requests for access to Reserve Bank master accounts and services. Therefore, FRBKC is referencing the principles outlined in this guidance while assessing Custodia's request for a master account, as the Account Access Guidelines formalized the pre-existing areas of risk and modes of analysis encompassed in the evaluation of master account requests (*i.e.*, heightened scrutiny applied to non-traditional entities or those with business activities presenting various types of heightened risks). In applying the Account Access Guidelines, FRBKC has determined that under its current structure, Custodia qualifies as a Tier 3 institution, posing the highest level of risk and subject to the strictest level of review. This is due to the institution not being subject to prudential supervision by a federal banking agency, not being federally insured, and because planned business activities are novel in nature and of inherently higher risk.

Under the Guidelines, Reserve Banks evaluate how each institution requesting access to an account and services will meet the following principles:

1) *Legal eligibility* (Each institution requesting an account or services must be eligible under the Federal Reserve Act or other federal statute to maintain an account at a Reserve Bank and receive Federal Reserve services and should have a well-founded, clear, transparent, and enforceable legal basis for its operations);
2) *Risks to the Reserve Bank* (Provision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank);
3) *Risks to the overall payment system* (Provision of an account and services to an institution should not present or create undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system);
4) *Risks to the stability of the U.S. financial system* (Provision of an account and services to an institution should not create undue risk to the stability of the U.S. financial system);

5) *Risks to the overall economy from illicit activities* (Provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity); and

6) *Impact on monetary policy implementation* (Provision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy).

BACKGROUND AND TIMELINE

Custodia is a *de novo* SPDI with a charter issued under the Wyoming SPDI Act. The Wyoming legislature enacted the SPDI Act (and other digital-asset-related legislation) in 2019, to facilitate the establishment of a new type of uninsured depository institution that could serve blockchain innovators and encourage crypto-asset-based businesses to form and operate in Wyoming. Under the SPDI Act, Custodia may engage in nonlending banking business, provide payment services for depositors, and, with the approval of the State Banking Commissioner, engage in any other activity that is usual or incidental to the business of banking. Wyoming law prohibits SPDIs from making loans and requires SPDIs to maintain unencumbered liquid assets with a value of at least 100 percent of its deposit liabilities.

Custodia was granted an SPDI bank charter by the Wyoming Division of Banking (DOB) on October 28, 2020. Custodia submitted Operating Circular 1 Master Account Agreements to FRBKC on October 29, 2020, and later submitted application materials to become a member of the Federal Reserve System on August 5, 2021. Since that time, FRBKC has engaged extensively with Custodia regarding its master account request and devoted significant resources to understanding Custodia's business plan, the SPDI charter, the DOB's supervision program for SPDIs, and the risks and benefits presented by Custodia's request. On January 27, 2022, FRBKC, following consultation with Board staff, conveyed to Custodia that they "satisfy the threshold definition of an entity eligible to maintain a master account." It was also conveyed that "efforts related to potential access to Federal Reserve accounts and services by novel, nontraditional charters and the permissibility of crypto-asset related activities remain under active evaluation" and that a decision on granting a master account had not been reached.

Concurrent with the FRBKC's review, numerous reports and events surfaced that shed light on the nascent, volatile crypto-asset industry, vulnerabilities of open, public, decentralized networks, and the impact of insufficient oversight of firms engaged in related activities. In 2020 and 2021, the Office of the Comptroller of the Currency (OCC) Interpretive Letters 1170, 1172, 1174, and 1179 provided and clarified interpretations of permissibility for national banks, reaffirming the primacy of safety and soundness in conducting certain cryptocurrency, distributed ledger, and stablecoin activities, and requiring supervisory nonobjection before national banks may engage in such activities. In November 2021, the President's Working Group (PWG),[2] joined by the Federal Deposit Insurance Corporation (FDIC) and the OCC, released a report highlighting the benefits and risks of stablecoins, including inconsistent and fragmented oversight of token issuers. The report provided several recommendations for mitigating risks to stablecoin users and guarding against stablecoin runs (including a requirement for stablecoin issuers to be insured depository institutions), the latter of which sought to address concerns related to payment system risk and concentration of economic power. In both December 2021 and October 2022, the Financial Stability Oversight Council (FSOC) published reports[3] highlighting regulatory concerns with stablecoins and the

---

[2] *See* President's Working Group on Financial Markets Report on Stablecoins, https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf November 1, 2021.

[3] *See* Financial Stability Oversight Council 2021 Annual Report, https://home.treasury.gov/system/files/261/FSOC2021AnnualReport.pdf; *see also* the FSOC's Report on Digital

wider cryptocurrency market, including the risks that crypto-asset activities could pose to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall scale were to grow without adherence to or being paired with appropriate regulation.

The volatility of the market was evident during this time as well. In May 2022, the TerraUSD stablecoins and Luna token, which together formed an algorithmic stablecoin, collapsed, causing investors to lose millions. In November 2022, the cryptocurrency exchange FTX collapsed and filed for bankruptcy, which had a direct and significant impact on Silvergate Bank, La Jolla, California, an insured state member bank, and reportedly led to instability in a number of crypto-related companies.[4] Amidst these reports and collapses, the crypto industry continues to experience a so-called "crypto winter" in which two-thirds of the market capitalization or total market value of cryptocurrency has been lost and many crypto and blockchain companies continue to experience losses as prices fall, illustrating the risks and volatility within the nascent industry. These events have also highlighted the vulnerabilities of open, public decentralized networks to hacks/theft, the lack of governance mechanisms or clear standards, and the potential use to conduct of illicit activities. Most recently, the Federal Reserve along with the FDIC and OCC issued a joint statement highlighting crypto-asset risks that banking organizations should be aware of as confirmed by these events over the past year, including the risks of mono-line crypto-focused business models. In addition to these industry developments, the Board issued Guidelines for Evaluating Account and Services Requests (Account Access Guidelines) to the Reserve Banks, inclusive of a tiered framework, in August 2022.

The market volatility described above is important because Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption on open, public, decentralized networks, and other crypto-asset escrow and prime services. In addition to the dividual risks posed by these activities, Custodia's business model is narrowly focused and concentrated in a high-risk and volatile industry. Custodia represents it is seeking direct access to the Federal Reserve payment system and a master account to execute its business plan in a revenue efficient manner and to mitigate apparent liquidity and settlement risks within the broader digital asset ecosystem.

Upon receipt of the account request, Reserve Bank staff began an immediate assessment of Custodia's business plan and supporting documents. During this evaluation, the timelines for the various planned crypto products and services have changed and the proposed use cases of the Avit have evolved over time, as have staff employed by Custodia in various key areas. Custodia was notified of its legal eligibility for a master account and legal eligibility for membership in the Federal Reserve System in early 2022, understanding that legal eligibility merely means an entity has met the initial threshold of eligibility and can proceed to an assessment of business model and risks posed. Shortly after the issuance of the PWG report, Custodia submitted a draft deposit insurance application to the FDIC. The FDIC provided feedback and based on those interactions, Custodia subsequently abandoned plans to seek deposit insurance. Custodia continued work throughout 2021 and 2022 to build products and operational infrastructure and regularly engaged with Reserve Bank supervisory staff regarding risk management and operational infrastructures.

---

Asset Financial Stability Risks and Regulation (October 3, 2022), https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf.

[4] *See, e.g.*, Silvergate Capital Corporation, Form 8-K (January 5, 2023) (explaining that the "recent turmoil in the digital asset industry" and "a crisis of confidence across the ecosystem" has had a corresponding impact on Silvergate's balance sheet); Silvergate Capital Corporation, Form 8-K (November 28, 2022); Silvergate Capital Corporation, Form 8-K (November 14, 2022; "Silvergate Raced to Cover $8.1 Billion in Withdrawals During Crypto Meltdown," Wall Street Journal (January 5, 2023), https://www.wsj.com/articles/silvergate-raced-to-cover-8-1-billion-in-withdrawals-during-crypto-meltdown-11672895207?st=rtt0i89dnb6gnrb&reflink=desktopwebshare_permalink

Beginning September 6, 2022, a pre-membership examination occurred. Custodia was informed that information obtained during the pre-membership examination would be used both in the evaluation of Custodia's master account request and membership application (as had been the case through these processes) to reduce repetitive questions and burden on Custodia. The membership examination was aimed at evaluating only Custodia's risk management program related to core banking products that would be offered upon opening, namely deposit accounts and traditional payment services.

Custodia reported throughout 2021 and 2022 that crypto-asset-related products would be offered after it opened for business, although the permissibility of these activities for an insured depository institution or state member bank remained in question and prior DOB notification is required. At the time of the pre-membership examination, Custodia's plans for crypto-asset-related products and services, including the technology and risk management infrastructures to support, facilitate, and execute the planned activities, remained in the early stages of development and were not formally assessed as part of the review. Nonetheless, the September 6, 2022 pre-membership examination identified significant risk management gaps in Custodia's day-one activities, which will consist of only limited banking services. These gaps were most notable in the areas of BSA/AML and OFAC compliance, internal audit, and information technology relative to what would be expected of an operating state member bank with only traditional banking activities.

A review of activities was conducted by the DOB in September 2022. While the state examiners identified some of the issues raised by FRBKC supervisory staff, the scope of the review and details regarding findings appear more limited. Subsequent to the DOB review, Custodia was granted a Certificate of Authority (COA) on September 12, 2022, approving the firm to commence business within six months. The approval was limited to imminent traditional banking products, relying on a phased formal approval process to be followed by the organization prior to commencing proposed digital asset activities.

On December 20, 2022, Custodia provided the Reserve Bank an update of their efforts to remediate the risk management gaps that were identified during the pre-membership examination. However, given the significance and breadth of the detailed issues identified during the examination, a targeted review conducted by the Reserve Bank would be necessary to fully assess the adequacy of Custodia's response. At this time, sufficient review and analysis of Custodia's request has occurred to enable staff to make a recommendation.

EVALUATION OF MASTER ACCOUNT REQUEST

Structure

By legislative design, an SPDI is not a traditional bank; SPDIs have unique features that distinguish them from traditional commercial banks and weaken or remove protections that exist for customers of insured depository institutions. For example, SPDIs are exempt from Wyoming's requirement that its banks obtain FDIC insurance.[5] *See* Wyo. Stat. § 13- 2-103(a). FDIC insurance "protects depositors if a bank fails … and helps prevent bank runs by providing consumers with the confidence that their money will be available during periods of economic or financial stress."[6]

---

[5] As noted above, Custodia filed a draft deposit insurance application with the FDIC following the release of the PWG on Financial Markets Report on Stablecoins on November 1, 2021, which recommended that stablecoin issuance be limited to FDIC-insured depository institutions. The FDIC reviewed the draft application and provided feedback to Custodia in early 2022. Custodia subsequently abandoned plans to seek deposit insurance.

[6] See Congressional Research Service, *An Analysis of Bank Charters and Selected Policy Issues* (January 21, 2022), https://crsreports.congress.gov/product/pdf/R/R47014

CONFIDENTIAL                                                                                                           FRBKC-00009932

As noted above, SPDIs are required to maintain unencumbered liquid assets equal to at least 100 percent of deposit liabilities, which is intended to mitigate the absence of FDIC insurance protection. Nonetheless, Custodia could be subject to run risks, as its business is focused on novel, risky activities and the firm will be subject to a legal regime and resolution process that has not been subject to a court-validated claims process (even where assets purportedly are in excess of deposit liabilities). Moreover, because Custodia is not federally regulated or insured, it would not be subject to any federal prudential regulation or supervision – either at the institution level or on a consolidated basis – and would not benefit from the protection afforded by federal deposit insurance and the proven regime of FDIC receivership. Existing federal statutory and regulatory frameworks, including those related to resolution, certain capital requirements, enforcement actions, changes in control, activities restrictions, and consumer protection are directly linked to (and only applicable based on) status as an insured depository institution. In short, Custodia has no federal banking regulator and is not obligated to comply with traditional banking regulations. Thus, Custodia is seeking to benefit from access to Federal Reserve System (FRS) financial services without being subject to the same regulatory limitations as insured depository institutions designed to protect depositors and bank counterparties.

Proposed Business Plan

Custodia's proposed business plan is narrowly focused on serving the crypto-asset sector, offering novel, high-risk business activities for which a fully mature legal/regulatory environment and industry-standard, business-cycle-tested set of risk management and operational practices and tools have not yet been established. Custodia intends to engage in a broad range of digital-asset-related activities that, while allowed for an SPDI as a matter of Wyoming state law, are not clearly permissible for insured depository institutions or state member banks because they extend beyond existing interpretations and guidance from the federal banking agencies on digital asset/blockchain technology and raise safety and soundness and illicit finance concerns.[7] Custodia has identified four key business lines that it intends to initiate over a three-year time frame:

(1) core banking – traditional banking services, including demand deposits, ACH and wire services, offered through internally developed online and mobile platforms;
(2) custody – custody of digital assets, including holding crypto-assets on balance sheet to facilitate the execution of transactions;
(3) prime services – on/off ramp transactions between fiat currency and crypto-currency, agency services including crypto-asset escrow, foreign exchange, and activities related to digital asset lending by customers; and
(4) Avit – a bank-issued crypto token utilized for instantaneous payments that would freely circulate on a public blockchain.

BSA/AML and OFAC Compliance – Principle 5

In addition to concerns with Custodia's business plan being focused on a narrow sector of the economy and financial services industry, Custodia presents heightened risk as an uninsured depository institution focused almost entirely on serving the crypto-asset market, which presents elevated illicit finance and other safety and soundness risks.

---

[7] Custodia alleges that existing banks, including banks such as BNY Mellon, are permitted by the Federal Reserve to engage in crypto activities, meaning Custodia should be as well. Without fully analyzing BNY Mellon's situation, it is our understanding that the activities proposed by BNY Mellon are of a different scale and scope than Custodia's activities and would be done within a different banking framework than Custodia.

CONFIDENTIAL

FRBKC-00009933

Crypto-assets pose significant BSA/AML and OFAC compliance risks due to anonymity; ease and speed of transfer; and general irrevocability of transactions. The ability to conduct instantaneous transactions electronically and pseudonymously enables numerous small transactions to move large sums of money undetected by monitoring systems. While the pre-membership examination did not include a review of the proposed crypto-asset activities, examiners identified significant gaps in Custodia's BSA/AML and OFAC compliance programs even for its core banking activities. Although Custodia has communicated they are actively working to remediate the gaps identified during the pre-membership examination, the gaps identified with respect to its core banking activities raise significant concerns regarding Custodia's ability to effectively scale the program to comply with BSA/AML and OFAC requirements for its proposed, higher-risk crypto-asset activities. Such concerns are highlighted in the January 3, 2023 Joint Statement, which notes that, "agencies are continuing to assess whether and how current and proposed crypto-asset-related activities by banking organizations can be conducted in a manner that adequately addresses safety and soundness, […] legal permissibility, and compliance with applicable laws and regulations, including anti-money laundering and illicit finance statutes and rules."

Although not reviewed in detail during the pre-membership examination, Custodia's planned issuance of the Avit on two public permissionless blockchains (Ether and Liquid) adds to concerns related to BSA/AML and OFAC compliance. In the Joint Statement, the federal banking agencies also note that "[b]ased on the agencies' current understanding and experience to date, the agencies believe that issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices." Custodia acknowledges that users would have the ability to conduct Avit transactions indefinitely using wallets not hosted or controlled by Custodia, which would not have undergone an onboarding process with Custodia. Similarly, unknown persons who are not customers of Custodia would be able to hold and redeem Avits without undergoing the full due diligence required for customer on-boarding. In addition, by the nature of the digital assets Custodia intends to hold in custody and the blockchains upon which transactions in those assets are recorded, Custodia will pay processing fees to transaction validators who are unknown at the time the payment is made and who may remain anonymous even after the wallet associated with the validator is known. This places Custodia and its customers in the position of making payments to unknown parties who could be illicit actors or sanctioned entities While the crypto-asset industry remains in its infancy, and there are several questions related to application of the existing BSA/AML/OFAC legal regime to digital assets that neither FinCEN nor OFAC has addressed, such issues highlight the inherent risks associated with crypto-assets that need to be mitigated to ensure this activity can be conducted in a safe and sound manner consistent with applicable law.

Furthermore, Custodia has experienced turnover within key leadership roles, most notably the BSA/AML compliance officer, a role that four individuals have held since 2021, as well as the chief technology officer and chief compliance officer. The lack of stability in these key roles and lack of collective depth of relevant banking experience and bank-specific risk management expertise raise concerns regarding the management team's ability to conduct the proposed activities in a safe and sound manner. A lack of depth and breadth of expertise in risk, banking regulation, and compliance at the board of directors and management levels may have contributed to the number and degree of shortcomings identified in the pre-membership examination. Custodia added management and staff resources in BSA and risk after the pre-membership examination to address these concerns. However, the effectiveness of these additions is not readily apparent.

CONFIDENTIAL                                                                                                                                    FRBKC-00009934

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Financial Considerations and Risk Management – Principle 2

A narrowly-focused business of offering banking services to a novel, high-risk, and not fully mature industry raises questions about the firm's viability. At the Reserve Bank's pre-membership review, which covered only core banking operations, examiners identified numerous exceptions to safe and sound banking standards, requirements, and best practices. While it may be possible for Custodia to remedy some of these matters for the initial core banking services planned to be offered by the institution in the near term, there was insufficient information available at the time of the examination to fully evaluate the adequacy of Custodia's risk management systems for much riskier and complex planned digital asset activities, which are fundamental to the institution's ongoing viability. Additionally, the narrowly-focused nature of Custodia's anticipated use of the novel SPDI charter means an SPDI's customer base is not diversified and likely to respond in a similar manner to industry stresses and events. For example, the potential rapid loss of customers could result in a rapid decline in revenue and threaten the viability of an SPDI, which is exacerbated by the absence of deposit insurance and an untested resolution program administered by the DOB.

Capital Requirements – Principle 2

The state statutory capital requirements (Wyo. Stat. § 13-12-110) prescribe initial capital for the first three years of operations. They provide little guidance to the Commissioner on how to develop capital regulations. The SPDI rules (Chapter 20, section 2) say that an SPDI shall have initial capital commensurate with its risk profile and proposed activities; however, the rules do not specify how to assess the risk of the activities unique to SPDIs or relate them to capital requirements. The rules give the Commissioner a high degree of discretion in setting capital requirements, which have been set as three years of projected operating expenses for Custodia. It is not clear how this capital requirement was determined or will change over time. It is unlikely that the Wyoming capital regulations for SPDIs adequately capture an SPDI's risks. If Custodia's business model is successful, capital requirements based on projected operating expenses would not restrain asset growth. This has implications for safety and soundness of Custodia, as well as for monetary policy implementation and financial stability, as discussed below. Insufficient capital to support its operations and timely fulfillment of obligations, including during periods of stress, creates undue risk to the Reserve Bank.

Custodia is not subject to the federal regulatory capital framework for traditional insured banks and the state regulations do not contain minimum leverage and risk-based capital requirements. Even if the state regulations did contain such requirements, the federal framework for all but the largest banks is based on capital necessary for credit risk, which is the primary risk of a traditional banking model. It may not be adequate to measure capital adequacy for a nontraditional institution like an SPDI, which is not permitted to engage in lending by statute, but has significant operational, cybersecurity, BSA/AML, strategic, and other risks. Neither the federal capital framework nor the Wyoming state rules have incorporated requirements related specifically to crypto-assets. The recent market events discussed above demonstrate the interconnectedness of crypto market participants and contagion risk and the need for a robust capital framework.

In the absence of deposit insurance and absence of interagency capital standards that account for the types of risks posed by Custodia's business model and considering the institution's reliance on revenue generated from narrowly focused, volatile crypto-asset-based activities as its primary source of capital augmentation, it remains unclear if Custodia's current and projected capital base will be sufficient to support its risk profile.

CONFIDENTIAL                                                                                                          FRBKC-00009935

Resolution Process – Principles 2 and 3

The difference between the resolution framework for a federally insured depository institution and an SPDI is a key difference in the evaluation of risks posed by Tier 1 and Tier 3 institutions under the Account Access Guidelines and a major source of risk to the FRBKC. Custodia is required by state regulation to develop a resolution plan within six months of commencing operations. Wyo. Rules & Regs. 021.0002.20 § 4(a). Since Custodia is not FDIC insured, nor federally regulated, the resolution process in the event of a failure is not sufficiently defined without a resolution plan. Under Wyoming's SPDI statute, each SPDI must secure a surety bond or irrevocably pledge specified assets to the State to cover costs likely to be incurred by the Commissioner in a liquidation or conservatorship of the SPDI. Wyo. Stat. § 13-12-118. The DOB has required Custodia to pledge $15MM of capital. This capital is not presumed to support the risk born by the Federal Reserve Bank, and instead is excluded from consideration of unencumbered assets that could protect the Reserve Bank in the event of a Custodia failure with a negative balance in the master account. At this time, Custodia has not developed a resolution plan, but has indicated preliminarily that it would rely upon a sale of its assets and liabilities to another Wyoming SPDI, none of which are federally regulated or currently operating. In the event no Wyoming SPDI is available to acquire its business, Custodia would sell its custody business to crypto-asset exchanges or trust companies, and its deposit business to banks that provide traditional banking services to the crypto-asset industry. However, as evident by recent events in the crypto industry, such proposed acquirers are likely to be experiencing stress at the same time as Custodia.

If a resolution plan is put in place by Custodia, the process outlined by the DOB contains no guarantees the Reserve Bank would be made whole in the event Custodia fails to meet its obligations. In the event of an SPDI's failure and subsequent resolution under a receivership administered by the State Banking Commissioner, this Reserve Bank would have the same priority treatment as all other Custodia customers, with its claims paid at the same time and with the same priority as any customer "claims relating to deposits, custodial, fiduciary and trust assets." Wyo. Rules & Regs. 021.0002.20 § 6(j). This contrasts with insured, federally regulated entities where customer deposits are insured and indemnity agreements between the Reserve Banks and both the FDIC and National Credit Union Administration would provide indemnification to the Reserve Bank in the event of a failure up to the value of the collateral pledged to the Reserve Bank. With the DOB and Custodia, there is no indemnity agreement or other arrangement in place to provide assurance that the Reserve Bank would be protected in the event it continues providing financial services to an SPDI experiencing financial distress. The Reserve Bank's practice to assist and ensure orderly closures of depository institutions would be severely hindered by a lack of clarity around protecting the Reserve Bank from loss. In addition, the process for resolution, in the absence of a plan defined by the institution and approved by the DOB, is unclear. The DOB would be faced with the receivership of a depository institution with novel activities for which it does not have any prior experience.

Financial Stability and Monetary Policy Implications – Principles 4 and 6

The statutory and regulatory safety and soundness framework for SPDIs is substantially different from the framework that applies to federally insured institutions. While state and federal banking agencies are responsible for ensuring safety and soundness of an entity's activities, ***only*** the Federal Reserve has a mission to ensure a safe and efficient payments system.

The lack of a federal prudential framework for SPDIs (like other Tier 3 institutions under the Account Access Guidelines) leaves the Reserve Bank with limited risk-monitoring tools and virtually no remediation or enforcement authority, other than what would be available under the Board's Policy on Payment System

Attorney-Client Privileged and Confidential

Risk and Operating Circular 1.[8] Under Operating Circular 1, depository institutions with accounts at Reserve Banks agree as a matter of contract law to particular arrangements with the Reserve Banks. Under the Payment System Risk Policy, firms with access to Fed payment services may be required to post collateral to protect Reserve Banks from the credit risk associated with operating the payment system and providing services to a particular institution. The potential for contractual commitments by Custodia to provide information and other limited monitoring or visitation rights by the Reserve Bank as a condition for the provision of an account and services would not satisfactorily mitigate the risks Custodia poses to nearly the same extent or with the same legal certainty as available remedies that would come from federal prudential supervision over Custodia pursuant to a well-established legal and regulatory framework. In other words, given the heightened risks associated with Custodia's business model and unclear place of FRBKC in Custodia's untested resolution process, the remedies available to the parties in a breach of contract or state-run receivership process are unlikely to prove as effective as the enforcement authority given to the federal banking agencies over institutions subject to their supervisory authority (which, if present, would provide greater assurance to FRBKC that Custodia is operating in a safe and sound manner).

These concerns are presented through Custodia's use of the structure of an SPDI as well as Custodia's planned business model and *de novo* status. Although not currently considered determinative in this instance, staff also reviewed the potential monetary policy implementation and financial stability considerations around this account request. The design of the Avit, which is intended to be backed by reserve balances held in a master account, could have implications for the Federal Reserve's balance sheet. In particular, the backing of Avits by reserve balances could be viewed as implicit endorsement by the Federal Reserve, which could enable it to scale quickly. Growth in the Avit could generate significant demand for Federal Reserve liabilities and given the volatility of the crypto business, could create significant fluctuations in demand for Federal Reserve liabilities and could complicate the Federal Reserve's ability to implement monetary policy, particularly absent regulatory clarity currently on much of the crypto industry.

Even if Custodia alone does not materially impact the Federal Reserve's balance sheet, granting Custodia a master account would set a precedent for other existing SPDIs and other similar non-traditional charters. It could make uninsured state charters more attractive for the crypto-asset industry, and issuance of instruments like the Avit by master account holders may be precedent-setting in allowing similar products at other banks. Collectively, these potential trends could create more significant monetary policy implementation and financial stability concerns.

CONCLUSION

The identified issues create undue risk to the Reserve Bank, risk to the overall economy due to potential illicit activities, and potential risk to the payment system. In light of these unacceptable risks that could also present public policy implications, staff recommends denial of Custodia's master account request.

---

[8] *See* The Federal Reserve's Payment System Risk Policy, https://www.federalreserve.gov/paymentssystems/psr_relpolicies.htm; Operating Circular 1, Section 2.11, https://www.frbservices.org/binaries/content/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf

10