# EXHIBIT 69

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF WYOMING
 3
 4     CUSTODIA BANK, INC.,
 5                    Plaintiff,
 6     vs.                                   No.
 7     FEDERAL RESERVE BOARD OF              22-cv-00125-SWS
 8     GOVERNORS and FEDERAL RESERVE
 9     BANK OF KANSAS CITY,
10                    Defendants.
11
12
13
14
15
16
17          CONFIDENTIAL DEPOSITION OF JACKIE NUGENT, a
18     witness, taken on behalf of the Plaintiff before
19     Kelsey Robbins Schmalz, CSR No. 1571, CCR No. 1148,
20     RPR, pursuant to Notice on the 15th of November,
21     2023, at the offices of the Federal Reserve Bank of
22     Kansas City, 1 Memorial Drive, Kansas City, Missouri.
23
24
25
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 199

```
 1    BY MR. ORTIZ:
 2         Q.    Where it says, I mentioned previously
 3    monetary affairs had a few follow-up questions, is
 4    monetary affairs a Board committee?
 5         A.    No.  I think it's a division at the
 6    Board.
 7         Q.    It's a division at the Board?
 8         A.    Uh-huh.
 9         Q.    All right.  So this is a Board
10    function, not the Kansas City Fed is all I'm asking.
11              MS. CARLETTA:  Objection.  Form.
12    BY MR. ORTIZ:
13         Q.    Is that right?
14         A.    Monetary affairs is a division at the
15    Board.
16         Q.    And so if we look at the email from
17    David Lowe, he's a Board employee, and it's going to
18    Porcia Block as well as numerous other Board
19    employees, correct?
20         A.    It appears by the email address, that
21    is correct.
22         Q.    The monetary affairs division, they
23    handle monetary policy issues throughout the system,
24    correct?
25              MS. CARLETTA:  Objection.  Form.
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 200

1    A.    I confess I don't know what all they
2    do.
3    BY MR. ORTIZ:
4    Q.    So you're not sure what the Board
5    weights in on versus the Kansas City Fed on some of
6    these issues?
7    A.    Board M&A would not have a decisional
8    role in a master account.
9    Q.    Well, if -- how do you know that if
10   you're not a part of the decisionmaking process and
11   you don't know what the Board weighs in on?
12   A.    I don't have a source to cite for how
13   I know that.  Just my understanding from being an
14   employee at the Kansas City Federal Reserve Bank is
15   that Reserve Banks make decisions on master accounts.
16   Q.    That may not be the case in this case,
17   though, right?
18              MS. CARLETTA:  Objection.  Form.
19   BY MR. ORTIZ:
20   Q.    Because normally Reserve Banks make
21   the decision in two days and they go through existing
22   policies without new policies being drafted by
23   boards, so really everything you've known up until
24   Custodia really doesn't apply, does it?
25              MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 201

1   BY MR. ORTIZ:
2       Q.   Can we agree on that?
3            MS. CARLETTA: Objection. Form.
4       A.   No. I couldn't agree to what you
5   said.
6   BY MR. ORTIZ:
7       Q.   Okay. So let's get back to my
8   question, then. Who makes decision about monetary
9   affairs implications, if you know?
10      A.   I don't know. I don't know what you
11  mean by decisions about monetary affairs policy
12  implications.
13      Q.   Whether an applicant or an institution
14  affects monetary policy throughout the system, is
15  that something that the Board makes a determination
16  on, if you know?
17      A.   Board monetary affairs may have a view
18  on implications for monetary policy.
19      Q.   So I guess I'm wondering why you've
20  even being sent information that references -- that
21  spells that out. They're conducting their research
22  on the monetary policy implications of Avanti's
23  business model.
24           Did you not know that's something the
25  Board is doing versus the Kansas City Fed?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 202

1      MS. CARLETTA: Objection. Form.
2      A.   I have no -- I don't know why. I
3  don't know how to interpret this email message.
4  BY MR. ORTIZ:
5      Q.   Really the Board -- based on what you
6  told me your limited role is and you really not
7  having any involvement with master accounts and you
8  not being familiar with these Board groups and
9  functions, it would be fair to say you can't tell me
10 really who weighed in and made the decision on this
11 master account for Custodia, can you?
12     MS. CARLETTA: Objection. Form.
13     A.   My understanding from being an
14 employee at the Kansas City Federal Reserve Bank is
15 that decisions on a master account are made by a
16 Reserve Bank.
17 BY MR. ORTIZ:
18     Q.   That's just your historical belief?
19     A.   That's my historical understanding.
20     Q.   And that's the sole basis for saying
21 that's how it was made in this case, right?
22     MS. CARLETTA: Objection. Form.
23 Misstates testimony.
24 BY MR. ORTIZ:
25     Q.   Correct?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 203

1    A.    Can you reframe that question?
2    Q.    Sure.  Your belief that the Kansas
3    City Fed made the decision on Custodia versus the
4    Board of Governors or other outside work groups or
5    executive groups solely comes from your historical
6    belief that master account decisions are made by the
7    Kansas City Fed, right?
8              MS. CARLETTA:  Same objections.
9    A.    I still don't understand your
10   question, but affirm Kansas City Federal Reserve Bank
11   makes the decision on master account requests that
12   come to this Reserve Bank.
13   BY MR. ORTIZ:
14   Q.    You're saying that's just your belief?
15   A.    That's my understanding.
16   Q.    And I guess I was just asking your
17   basis for that, because you were never -- you've
18   never been part of the decisionmaking process for
19   master accounts.  You've already told me that, right?
20   A.    Right.
21   Q.    So this is something that somebody
22   else is just telling you that's how it works?
23   A.    I don't know who told me that or how I
24   know that.  I just have --
25   Q.    You believe it?

1    of Governors gives membership to Custodia, we're
2    going to give them a master account, but if they
3    don't give them membership, we're going to deny
4    master account because we have to be consistent and
5    in sync with the Board of Governors?
6                    Were you part of any of those
7    conversations with anyone?
8                    MS. CARLETTA:  Objection.  Form.
9         A.    No.
10   BY MR. ORTIZ:
11        Q.    Anything similar to that at all?
12        A.    No.
13        Q.    Did you have anything to do with
14   implementation of the account access handbook that
15   came out late in 2022?
16        A.    No.
17        Q.    Did you have anything to do with the
18   S Letter that was issued by the Board?
19        A.    No.
20        Q.    Have you seen those documents?
21        A.    I have not studied those documents or
22   seen them.
23        Q.    You have not?
24        A.    No.
25                    MR. ORTIZ:  You have been very patient

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 248

1    with me today, Ms. Nugent.  That's all the questions
2    I have for you.
3                    THE WITNESS:  Likewise.  Thank you.
4                    MS. CARLETTA:  We're going to take a
5    few minutes.
6                    (Off the record.)
7                         EXAMINATION
8    BY MS. CARLETTA:
9            Q.     Can you explain what your role was
10   with respect to Custodia, if any?
11           A.     My role was to bring my general
12   fintech subject matter expertise and experience in
13   bank supervision to support Christi May-Oder's
14   department in credit risk management.
15           Q.     And did you listen in on weekly
16   internal NTMA meetings?
17           A.     I did occasionally, yes.
18           Q.     When you listened in on those
19   meetings, did you hear discussions about Custodia's
20   master account request?
21           A.     Yes.
22           Q.     At any point in time during those
23   meetings, did you ever hear anyone say that the Board
24   wanted to make the ultimate decision on Custodia's
25   master account request?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 249

1     A.     No.
2     Q.     Did individuals in the internal NTMA
3 meeting have concerns about Custodia master account
4 request?
5     A.     Yes.
6     Q.     Were those concerns consistent with
7 your perspective as a fintech advisor?
8     A.     Yes. Some of those concerns were
9 shared.
10     Q.     And what were some of your concerns?
11     A.     Examples might include how it would be
12 possible to -- how effective a SPDI would be at
13 BSA/AML compliance, concerns about how adequate
14 capital would be in a nascent environment or nascent
15 business, questions about how effective a SPDI would
16 be in managing its liquidity risks, so examples like
17 that.
18     Q.     I'm just going to quickly call us back
19 to your notes, and I'm sorry, I don't know what
20 exhibit number these were.
21     MR. ORTIZ: It would have been 195.
22     MS. CARLETTA: Yes, 195.
23 BY MS. CARLETTA:
24     Q.     And we're going to flip to Bates stamp
25 No. 18265.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 250

1      A.      Okay.
2      Q.      We talked a lot about the working
3  groups that are referenced on this page and on the
4  next page.  Did any work product come out of the
5  interagency policy sprints?
6      A.      No.
7      Q.      How about the BASEL committee?
8      A.      No.
9      Q.      How about the Board's crypto activity
10 working group?
11     A.      No.
12     Q.      To your knowledge, was Custodia's
13 master account request discussed in any of those
14 working groups?
15     A.      No.  Not to my knowledge.
16     Q.      And we're just going to flip to the
17 same exhibit but Bates stamp 18260, and you
18 represented that these were your personal talking
19 points; is that right?
20     A.      These are my personal talking points.
21     Q.      Did anybody outside of the Kansas City
22 Fed review your talking points?
23     A.      No.
24     Q.      And what was the purpose of this
25 division strategic planning meeting?