David Zaring (pro se)
The Wharton School
The University of Pennsylvania
600 Jon M. Huntsman Hall
3730 Walnut Street, #600
Philadelphia, PA 19104-6340
(215) 573-7154
zaring@wharton.upenn.edu



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants.* | No. 1:22-cv-00125-SWS |

## DAVID ZARING'S AMICUS BRIEF IN SUPPORT OF DEFENDANTS

### Introduction and Overview

I, amicus David Zaring,[1] am a professor at the Wharton School of the University of Pennsylvania. I am a scholar of financial regulatory institutions, have authored over fifty articles on administrative law and financial regulation, and am currently writing an article on novel charters and new entrants in the banking market, *Rebuilding the Regulatory Perimeter*. I have studied the Office of the Comptroller of the Currency (OCC)'s chartering practices, including the special

---

[1] This brief is filed pursuant to consents obtained from all parties. No person other than amicus authored this brief in whole or in part or made a monetary contribution toward its preparation or submission. Amicus thanks Rachel Shoemaker of the University of Pennsylvania School of Law for research assistance.

1

purpose charter program for financial technology (fintech) companies that is a federal version of the state charter that Custodia received from the State of Wyoming.[2] I am one of the twenty most cited active scholars of administrative law in general, and one of the ten most cited in financial regulation. Before entering the academy and winning tenure at Wharton, I served as a litigator in the Federal Programs Branch of the Department of Justice. My background provides a unique perspective on the financial system and the risks presented if Custodia's requested relief is granted. I have no financial interest in the outcome of this case.

This case is about statutory interpretation — Custodia contends that the Monetary Control Act gives the Federal Reserve Banks and Board no discretion in deciding whether to allow Custodia access to the payment rails run by the Fed (I will not distinguish between the Board and the Reserve Bank for the purposes of this brief, although I know the Reserve Bank and the Board have different roles with regard to master accounts). Because such an argument is inconsistent with the way that financial regulation works and could lead to adverse outcomes if adopted as a generalized rule, I write in support of the position of the Federal Reserve Bank of Kansas City and the Board of Governors. The statute cannot leave the Fed with no choice in the matter.

The limited nature of the question before the Court makes a difference in the legal analysis. This case is not about whether Custodia has devised a business model that is worthy of master account access, and so I offer no argument on that

---

[2] *See* David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397 (2020).

question. Nor is this case only about whether Custodia is entitled to a master account as of right. Under Custodia's view of the case, *any* state-chartered bank, trust, special purpose depositary institution, or other kind of business, is entitled to a master account, no matter the viability of the business, or the nature of the state charter.

I would place the question of master account access in the context of how financial regulation works more generally. It is a system that relies on the ability of regulators and supervisors to exercise discretion – mandatory obligations that regulators have towards regulated industry are few and far between, and with good reason. Regulators must exercise discretion because banks, while providing an extraordinarily valuable service, are risky enterprises, capable of failing in hours, if not days, with effects that can be felt by other banks, and even by the broader economy.[3]

Regulators must be able to identify and respond to these sorts of risks. It would be surprising and inconsistent with the regulatory scheme if regulators, who have almost total discretion over whether to charter a bank, whether to provide it with deposit insurance, how to oversee the bank once it opens for business, and how to test banks for riskiness once they are open, had no choice but to let a bank make payments through the Fed's master account system, no matter the purpose of the bank or its solvency.

---

[3] We saw just how quickly a bank could fail only last year. Ken Sweet & Stan Choe, *'A Bank Sprint, Not a Bank Run': These Days, Depositors' Mass Fear Can Go Viral Faster Than Regulators are Able to Respond*, CHI. TRIB. March 17, 2023 ("What made the failure of Silicon Valley Bank unique compared to past failures of large banks was how quickly it collapsed.").

## Argument

Banks are financial intermediators: they take deposits, use those deposits to make loans, and facilitate payments between clients.[4] In each of these functions, supervisors have — and, indeed, require if they are to do their job properly — the discretion to grant and then supervise these banking practices. Banks that want to hold deposits, other than trust funds, must establish to the satisfaction of the Federal Deposit Insurance Corporation that they are safe enough to warrant deposit insurance, and then must undergo regular examinations to ensure that the deposits they do hold are safe and sound.[5] Banks that want to issue loans must establish that they are prudently managed to get a bank charter, and then must comply with balance sheet analyses designed to ensure that they are holding sufficient capital against those loans, which in turn are "risk weighted" by regulators.[6] It would be terribly surprising if supervisors had no discretion to

---

[4] 12 C.F.R. § 5.20(e)(i); see OFF. OF THE COMPTROLLER OF THE CURRENCY, CONSIDERING CHARTER APPLICATIONS FROM FINANCIAL TECHNOLOGY COMPANIES (2018), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/pub-considering-charter-apps-from-fin-tech-co.pdf (stating that special purpose national banks must engage in at least one of the "core banking functions of taking deposits, paying checks, or lending money").

[5] See 12 U.S.C. § 1815(a) (titled "Application to Corporation Required," and providing, in subsection 1, that "any depository institution which is engaged in the business of receiving deposits other than trust funds…,upon application to and examination by the Corporation and approval by the Board of Directors, may become an insured depository institution). See also Exploring Special Purpose National Bank Charters for Fintech Companies, OFFICE OF THE COMPTROLLER OF THE CURRENCY (Dec. 2016) ("[A] fintech company with a special purpose national charter that does not take deposits, and therefore is not insured by the Federal Deposit Insurance Corporation (FDIC), would not be subject to laws that apply only to insured depository institutions.").

[6] See Andrew P. Scott and Marc Labonte, Bank Capital Requirements: A Primer and Policy Issues, CONG. RSCH. SERV. (March 9, 2023), https://crsreports.congress.gov/product/pdf/R/R47447 (reviewing the measures financial regulators take to ensure that banks have adequate capital to issue loans).

decide whether new entrants into the business of banking were ready to take on the third core activity in banking – processing payments.

The basis for this discretion lies in the dangerous nature of banking, which, although an invaluable service, has, throughout the nation's history, led to financial crisis after financial crisis.[7] In financial regulation, regulators cannot be expected to open the full suite of banking services to new entrants as of right.

### I. Banks May Not Open as a Matter of Right.

Consider the review of the question whether to charter a bank. While corporate charters can be obtained from states within minutes, the bank chartering process is much more elaborate. Bank submit lengthy applications to regulators who have, in the past, enjoyed almost total discretion over whether to grant or not grant the applicant's license to open a bank. Courts, recognizing the need for discretion and expertise provide "extraordinary deference" to the OCC when reviewing its chartering decisions.[8] As Margaret Tahyar has observed, "a generation has grown to accept that the granting of bank charters is so up to the discretion of the bank regulators that the regulator need not even give reasons for a denial."[9]

For example, the OCC, after the last financial crisis, decided to radically limit the issuance of bank charters, presumably because it wanted to be sure that the

---

[7] *See generally* CHARLES KINDLEBERGER, MANIAS, PANICS, AND CRASHES: A HISTORY OF FINANCIAL CRISES (8TH ED. 2023). *See also* David Zaring, *The Corporatist Foundations of Financial Regulation*, 108 IOWA L. REV. 1304 (2023) ("[B]anking is weirdly dangerous and is accordingly regulated weirdly.").
[8] MICHAEL S. BARR, ET. AL., FINANCIAL REGULATION: LAW & POLICY 168 (2d ed. 2018).
[9] Margaret E. Tahyar, *Are Bank Regulators Special?* THE CLEARING HOUSE (Jan. 1, 2018), https://www.theclearinghouse.org/banking-perspectives/2018/ 2018-q1-banking-perspectives/articles/are-bank-regulators-special.

banking sector had stabilized before it opened the doors to new institutions. The FDIC took a similar approach to applications for deposit insurance. During the decade between 2007 and 2017, the OCC only issued six bank charters, and the FDIC accepted even fewer deposit insurance applications – and during that period, at least 800 banks disappeared.[10] Regulators never took the perspective that they were obligated to issue charters to new entrants into the banking system, or that they had an obligation to replace old banks with new ones.

When federal regulators felt comfortable enough to reopen the application process, charter applicants were met with searching and lengthy reviews. Novel kinds of banks, like the online-only bank Varo, spent years and millions of dollars seeking a national bank charter.[11] After receiving a conditional approval from the OCC, the FDIC took three years and multiple rounds of applications before issuing its own order conditionally approving Varo's application for deposit insurance.[12]

---

[10] David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397, 1399 n.4 (2020) (citing MICHAEL S. BARR, ET. AL., FINANCIAL REGULATION: LAW & POLICY 168 (2d ed. 2018)).

[11] *See* OCC, Preliminary Conditional Approval 1205 of the De Novo Charter Application for the Proposed Varo Bank, National Association, Salt Lake City, UT (Charter Number 25147), https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2018/ca1205.pdf (Sep. 2018); Penny Crosman, *Mission-Driven Varo Money Secures $45 Million from Investors*, AM. BANKER (Jan. 18, 2018, 9:00 AM), https://www.americanbanker.com/news/mission-driven-varo-money-secures-45-million-from-investors (Varo's CEO observed that "The OCC is not going to relax their standards, so it's been a rigorous process.").

[12] Kate Rooney, *Fintech Varo Gets One Step Closer to Becoming an Actual Bank: 'We See It as a Pretty Big Moat'*, CNBC (Feb. 11, 2020) https://www.cnbc.com/2020/02/11/start-up-bank-varo-gets-approval-to-become-a-full-scale-bank.html. ("After three years and multiple rounds of applications, the FDIC approved the fintech company's national bank charter application"). *See also* FDIC, *Re: Varo Bank, NA*, www.fdic.gov/regulations/laws/bankdecisions/depins/varo-bank-na-draper-utah.pdf (Feb. 7, 2020).

Moreover, this protracted initial application process does not get the bank all the way toward opening.[13] The OCC ordinarily extracts a Capital Assurance and Liquidity Maintenance Agreement and a Capital Liquidity and Support Agreement from conditionally improved applicants.[14] It also imposes capital raising requirements on the bank before it will let the bank open for business, even after issuing the conditional approval.[15] The FDIC has its own set of requirements that must be met before a conditional approval becomes a final one permitting the bank to open for business.[16] No bank is entitled to a conditional approval as of right, nor are banks that receive conditional approvals entitled to final approvals permitting them to open. In fact, the cryptocurrency trust Protego – a business not unlike Custodia – has still not received a final approval from the OCC, although it did obtain a conditional approval on February 5, 2021.[17]

## II. Banks, Once Open, Are Subject to Highly Discretionary Supervision.

Once open for business, banks are subject to an even more discretionary and searching regular review of their business practices.

---

[13] *See* OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S LICENSING MANUAL: CHARTERS 4 at 3 (2021), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/licensing-booklet-charters.html.
[14] *Id.* at 30, 59.
[15] *See id.*
[16] *See Applying For Deposit Insurance A Handbook for Organizers of De Novo Institutions*, FED. DEP. INS. CORP. (April 2017), https://www.fdic.gov/regulations/applications/handbook.pdf.
[17] Derek Andersen, *Protego's Conditional National Bank Status Expired Without Approval: Report*, COINTELEGRAPH, Mar. 17, 2023, https://cointelegraph.com/news/protego-s-conditional-national-bank-status-expired-without-approval-report.

Consider lending. All banks, whether chartered by a state or federal regulator, must justify their lending decisions in ways that comply with capital rules that require the bank to calculate how much capital it must hold against each loan it makes.[18] The idea is that banks take on a great deal of credit risk – the risk that a borrower from the bank will not pay the bank back and will default on its loan. To prepare for that risk, banks must hold capital against those loans, and regulators will complain if the mix of lending decisions made by the bank could expose it to a risk that too many of its loans could go bad at once, as happened to many financial institutions in wake of the housing crisis that led to the last great financial crisis.[19]

For example, in their "Underwriting and Loan Approval Process" guide, the FDIC's Division of Supervision and Consumer Protection provides a list of a dozen factors that might signal elevated risk worthy of follow up for loan underwriters and approvers, but notes that "[t]hese lists are not exhaustive, and examiners must exercise discretion in determining the expanse and depth of examination procedures to apply. If examiners identify significant concerns, they should expand procedures

---

[18] Scott and Labonte, *supra* note 4.
[19] Steven L. Schwarcz, Essay, *Markets, Systemic Risk, and the Subprime Mortgage Crisis*, 61 SMU L. REV. 209, 210 (2008) (pointing to the mortgage crisis as a trigger in the 2008 financial crisis). Naturally, this regulatory discretion is matched by bank lending discretion – no one is entitled to a bank loan as of right. *See generally* Gene Ambrocio and Iftekhar Hasan, *What Drives Discretion in Bank Lending? Some Evidence and a Link in Private Information*, 106 J. OF BANKING & FINANCE 323 (July 11, 2019) (discussing how the level of discretion used by banks has varied across time and type of lending institution).

accordingly."[20] Banks cannot make loans as of right and must expect that regulators will scrutinize their loan books regularly.

If lending – the asset side of a bank balance sheet – is supervised in a way replete with discretion, one can think about the liability side of the bank balance sheet in a similar way. The FDIC exists to protect depositors from the risk that their bank will fail. If it does, the agency will make depositors whole if the failing bank cannot do so. This form of insurance has had many salutary consequences. But because the government is on the hook for losses sustained by a failing bank, the FDIC's examiners will very carefully ensure that the bank has an adequate cushion of money from shareholders or other lenders to the bank to make it unlikely that resort to the agency's insurance fund will be needed. Here too, the regulatory watchword's discretion. FDIC examiners embed themselves inside the bank and go through the balance sheet.[21] They also look to see if there are other signs of trouble and how the bank is operated as well.[22]

More generally, banking regulators assesses banks pursuant to its CAMELS rating system. CAMELS – which stands for capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk – is a rating system

---

[20] *Fed. Deposit Ins. Corp.*, Credit Card Activities Manual, Ch. VII – Underwriting and Loan Approval Process (2007) available at https://www.fdic.gov/regulations/examinations/credit_card/ch7.html.
[21] *Basic Examination Concepts and Guidelines*, FED. DEP. INS. CORP. (March 2023), https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/section1-1.pdf ("Given the fundamental reasons for conducting examinations, regulatory personnel must have access to all records and employees of a bank during an examination.").
[22] *Id.* ("[B]ank examinations play a key role in the supervisory process by helping the FDIC identify the cause and severity of problems at individual banks and emerging risks in the financial-services industry. The accurate identification of existing and emerging risks helps the FDIC develop effective corrective measures for individual institutions and broader supervisory strategies for the industry..")

that allows banking regulators to monitor the health of banks and compare bank health over time with peers.[23] Banks are rated on each element from 1 ("strong") to 5 ("critically deficient"), and a composite rating for each bank is determined based on all six components.[24] However, this overall composite score is not based on the average of the ratings for each individual component. Instead "some components are weighed more heavily than others based on examiner judgment of risk."[25] For example, due to the size of the loan portfolio at community banks, the "asset quality" rating is the most important.[26] When it comes to assessing capital, "examiners also compare a bank's capital ratios with those of similar banks" – regulators may come to different views about similar amounts of capital if one bank looks like its peer group, while another one does not.[27] This rating, though confidential, is hugely important to the supervision of the bank by regulators, as if a bank's CAMELS composite rating is a 3, 4 or 5, bank supervisors will require the bank's board of directors to enter into an agreement to correct the issues identified by supervisors.[28]

---

[23] Julie Stackhouse, *The ABCs of CAMELS*, FEDERAL RESERVE BANK OF ST. LOUIS (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Julie Stackhouse, *CAMELS Ratings: Capital Adequacy*, FEDERAL RESERVE BANK OF ST. LOUIS (Aug. 22, 2018), https://www.stlouisfed.org/on-the-economy/2018/august/camels-ratings-capital-adequacy.
[28] Julie Stackhouse, *The ABCs of CAMELS*, FEDERAL RESERVE BANK OF ST. LOUIS (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.

Moreover, many banks are, if large enough, subjected to an additional discretionary review under the federal government's stress testing regime.[29] Stress tests force banks to consider not only whether they would survive under the conditions that exist in in the real world, but also what actions the bank could take to survive in a hypothetical situation, such as a rapid rise in interest rates, or a sudden recession.[30] Traditionally, supervisors devise different kinds of stress tests each time they impose the requirement on banks, and they have in the past not let the banks know what kind of a test they will impose in any particular year.[31] The watchword is discretion, once again, and no bank is entitled to pass a stress test as of right.

Perhaps unsurprisingly, courts have understood the need for this sort of discretionary oversight of deposit taking, lending, and overall resiliency, and have accordingly reviewed appeals of supervisory decisions by banking regulators deferentially.[32]

---

[29] The larger the bank, the more frequent the test. For explanation of testing, *see Stress Tests and Capital Planning*, THE FEDERAL RESERVE, Aug. 10, 2020, available at https://www.federalreserve.gov/supervisionreg/stress-tests-capital-planning.htm.

[30] For examples of hypothetical scenarios used by the Federal Reserve, *see Federal Reserve Board Releases Hypothetical Scenarios for Second Round of Bank Stress Tests*, THE FEDERAL RESERVE, Sept. 17, 2020, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20200917a.htm.

[31] "Stress tests usually vary in design and complexity." FDIC, *Proposed Guidance on Stress Testing for Banking Organizations With More Than $10 Billion in Total Consolidated Assets*, 76 Fed. Reg. 35,072, 35,074 (June 15, 2011).

[32] Julie Andersen Hill's 2015 study found in examining over a decade of appeals that against the OCC, the "appealing bank was the clear winner in only 20% of appeals," and through the Fed's appeals process, in only 8% of the appeals was the examiner determination reversed. Julie Andersen Hill, *When Bank Examiners Get It Wrong: Financial Institution Appeals of Material Supervisory Determinations*, 92 WASH. U.L. REV. 1101, 1127, 1137 (2015).

11

### III. Payment Processing Must Be Supervised in the Same Way that Deposit-Taking and Lending is Supervised

In addition to taking deposits and making loans, a third critical role that banks play is facilitating payments. The Fed has long played a role in helping them through that process. Here too, the watchword has been discretion. The Fed's traditional payment system, Fedwire, is only open to a limited set of financial institutions, and certainly not to commercial firms.[33] Its new service, FedNow, is an optional way to settle payments more quickly.[34] Banks have the discretion to decide whether they wish to adopt the new service, and the Fed has indicated that not everyone who wishes to sign up for FedNow will be entitled to do so as a matter of right.[35]

Nor does this change, as a matter of regulation, for nonbanks. They must obtain money transmitter licenses from the states in which they operate, and they are certainly not entitled to those as a matter of right. Meeting the requirements for these consumer protection "safety and soundness" laws can be a lengthy and expensive process.[36] In describing this process, Faisal Khan observed that "[o]btaining money transmitter licenses is no easy feat. It involves a large amount of paperwork, money and time. It can take up to two years to amass all 50 state

---

[33] FRB, Fedwire Funds Services, https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm (describing the institutions eligible to participate in Fedwire).
[34] See Common Questions About the FedNow Service, FEDNOW.ORG (2023), https://explore.fednow.org/common-questions.
[35] See id. ("As with current Federal Reserve Bank services, the FedNow Service is available to depository institutions eligible to hold accounts at the Federal Reserve Banks under applicable federal statutes and Federal Reserve rules, policies and procedures.").
[36] Kevin V. Tu, *Regulating the New Cashless World*, 65 ALA. L. REV. 77, 82 (2013)

licenses."[37] Wyoming does not require SPDI holders to acquire MTL licenses, however, meaning that neither the federal government nor the states would have any discretion to supervise these MTL licenses – an outcome that, when it comes to payments, would make SPDIs unregulated by either the federal government or the states in which the SPDIs do business.[38]

### IV. Requiring the Fed to Give Master Accounts to Novel Financial Institutions as a Matter of Right Would Mean That the Fed Could Be Forced to Do Business with Bad Actor or Insolvent Banks.

In short, the financial regulatory system does not entitle banks to anything as a matter of right but relies on the informed choices by regulators to ensure that only safe and sound institutions offer banking services to the public.

It would be curious if, given the almost total discretion afforded to regulators when it comes to assessing the credit risk that banks take when they lend, protecting the depositors who trust their money to banks, and assessing the safety and soundness of banks as they continue to operate, that regulators would lack any discretion when it comes to allowing banks to access the Fed's payment rails.

Such a rule would have extremely risky consequences, as Morgan Ricks observed in his expert report.[39] If a state chartered a bank, or developed a novel kind of bank charter and awarded it to a firm that risked violating federal law, it

---

[37] Faisal Khan, *How to Get Money Transmitter License Coverage for Your Startup?*, BLOG FAISAL KHAN (Sept. 9, 2016), https://blog.faisalkhan.com/money-transmitter-licenseapplication-d9dd32286871 [https://perma.cc/MJ2U-XRB6].
[38] *See* WYO. STAT. ANN. § 40-22-104(vi) (West 2021) (stating the "[b]uying, selling, issuing, or taking custody of payment instruments or stored value in the form of virtual currency or receiving virtual currency for transmission to a location within or outside the United States by any means" is exempted from the state's Money Transmitter Law).
[39] *See* Expert Report of Morgan Ricks, Doc. 240-91, filed Dec. 22, 2023, at 12-19.

13

cannot be the case that federal regulators would be obligated to allow that bank to access the payment rails.

One could imagine institutions using special-purpose charters to evade anti-money laundering rules with which they would otherwise have to comply. Nor does it seem in any way logical to permit a financial institution about which federal regulators had real doubts about insolvency, to send as much money as it liked to whatever destination it chose, with the support of the Fed. It is similarly inconceivable that the Fed would be required to continue access to the payment rails for banks engaged with international financial institutions in opposition to the United States' interests. Custodia's position, if generalized, would mean that states could play politics with their charters, and force the famously apolitical Fed to go along. Some states might devise special purpose charters designed to cater to or any kind of interest group across the political spectrum at the exclusion of others, and the Fed would be obligated to support them.

None of this is meant to reflect at all on the merits of plaintiff's application — it is only to note that, as a statutory matter, the way banking regulation works cannot possibly entitle Custodia to payment services as a matter of right.

In fact, I am on record supporting the OCC's efforts to develop a financial technology charter of which special-purpose banks like Custodia could avail themselves.[40] Federal regulators should be open to innovative new entrants — and

---

[40] Peer-to-peer lenders could obtain a lending-only charter from the federal government and evade the need for deposit insurance. Or perhaps payments processors should be allowed to have a federal charter that would obviate the need for them to obtain money transmitter licenses in every state in which they do business.

perhaps should afford those institutions' aspects to so-called "skinny charters" such as the charter that Custodia received from Wyoming. These sorts of novel charters might be good for the financial industry, but it has to be the case that federal regulators would not have to provide them with payment services as of right, but rather after the sort of careful review that characterizes banking regulation in every other context.

Moreover, I was sufficiently intrigued by Custodia's project to invite the firm's Chief Executive Officer to speak to a group of financial regulation academics about it in June, 2021. I came away from the speech with a sense that the firm was managed by a thoughtful leader.

But this dispute is not about the quality of Custodia's business plan, it is a question of statutory interpretation. The Monetary Control Act, and the financial regulatory scheme more generally, does not entitle Custodia or any other applicant to a master account as of right.

### V. The Plain Language of the Monetary Control Act Does Not Require the Fed to Award Custodia a Master Account.

I will leave most of the statutory interpretation arguments in the case to the litigants. But as the Board's and the Reserve Bank's briefs explain in greater detail, the Monetary Control Act's plain language hardly requires the defendants to award master accounts to any and all applicants who seek them. In its attempt to level the playing field between financial institutions, the Monetary Control Act states that "[a]ll Federal Reserve bank services covered by the fee schedule *shall* be

available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks...".[41]

The purpose of the statute and fee schedule is to prevent price discrimination for services with an associated cost between member and non-member institutions. But providing access with no assessment of risk cannot be what the statute requires. Having access to a Master Account is not a service on the fee schedule for which non-member and member institutions have been charged different and discriminatory prices for, it is a status granted in accordance with the Federal Reserve's discretion. Furthermore, regardless of what services § 248a(c)(2) covers, the statute does not guarantee such services to any depository institution without discretion, as the statute does not require that "[a]ll...services" be provided to *all* depository institutions. The inclusion of "all" with respect to the Federal Reserve services and exclusion of "all" regarding which depository institutions suggests that there be no discretion over which services must be priced according to the fee schedule, but that discretion remains in providing depository institutions access to such services, such as retaining discretion in granting master accounts.

As the Board and the Reserve Bank explain, the Fed's discretion here is also consistent with the text of 12 U.S.C. § 342. That statute provides that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon

---

[41] 12 U.S.C. § 248a(c)(2) (emphasis added).

presentation or other items, and also, for collection, maturing notes and bills...."[42] By using "may" it appears that Congress intended to provide discretion to the Federal reserve banks in their ability to receive funds from depository institutions. As Judge Koeltl of the Southern District of New York concluded, "12 U.S.C. § 342 makes clear that Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so."[43]

It is reasonable to conclude that the Federal Reserve has discretion under § 342 to receive deposits by granting access to Fed master accounts, and that if granted such access, under § 248a(c)(2) these nonmember institutions must have access to the fees covered by the fee schedule at the same prices as available to member banks. As Judge Koeltl observed, § 248a(c)(2) "is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System."[44]

---

[42] 12 U.S.C. § 342.
[43] Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *7 (S.D.N.Y. Oct. 27, 2023).
[44] *Id.*

## Conclusion

For the foregoing reasons, the Court should rule in favor of the defendants.

Dated: 9 February 2024.

David Zaring (pro se)
The Wharton School
The University of Pennsylvania
600 Jon M. Huntsman Hall
3730 Walnut Street
Philadelphia, PA 19104-6340
(215) 573-7154
zaring@wharton.upenn.edu

## CERTIFICATE OF SERVICE

I certify the foregoing ***David Zaring's Amicus Brief in Support of Defendants*** was served upon all parties to this action via CM/ECF pursuant to the Federal Rules of Civil Procedure on 9 February 2024.

DAVID ZARING (pro se)