# EXHIBIT B

# [PUBLIC VERSION]

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF WYOMING

2
     -------------------------------:
3    CUSTODIA BANK, INC.,            :
                                     :
4                Plaintiff,          :
                                     : Case No.
5           vs.                      : 1:22-cv-00125-SWS
                                     :
6    FEDERAL RESERVE BOARD OF        :
     GOVERNORS and FEDERAL RESERVE   :
7    BANK OF KANSAS CITY,            :
                                     :
8                Defendants.         :
     -------------------------------:
9
10              CONFIDENTIAL DEPOSITION OF
11               PETER CONTI-BROWN, PH.D.
12
13   DATE:           Thursday, December 14, 2023
14   TIME:           8:09 a.m.
15   LOCATION:       King & Spalding, LLP
                     1700 Pennsylvania Avenue, N.W.
16                   Washington, D.C. 20006
17
18   REPORTED BY:    Erick M. Thacker
                     Reporter, Notary
19
20
21              Veritext Legal Solutions
            1250 Eye Street, NW, Suite 901
22               Washington, D.C. 20005

CONFIDENTIAL

Page 32

1    opinion that the Federal Reserve does not have

2    the discretion to both define its monetary policy

3    space and then to exclude legally eligible,

4    state-chartered depository institutions from its

5    priced services in service of that monetary

6    policy space.

7         Q    And do you understand that what -- what

8    Congress intended to accomplish in the Monetary

9    Control Act is -- is a legal dispute in this

10   case?

11        A    No.

12             MR. SCARBOROUGH:  Objection to form.

13             THE WITNESS:  I don't understand that,

14   no.

15   BY MR. MICHAELSON

16        Q    Okay.  You -- you're a lawyer, right?

17   You went to law school?

18        A    I did go to law school, yes.

19        Q    And you -- you clerked for a judge,

20   two, correct?

21        A    For two judges, yes.

22        Q    For two judges.  So how -- how do

CONFIDENTIAL

Page 33

1    courts go about interpreting statutes?

2              MR. SCARBOROUGH:  Objection.

3              THE WITNESS:  I don't know how -- you

4    know, this is the subject of great scholarly

5    debate, how they do, how they should.  Courts are

6    different in different ways.

7              I'm not offering -- the reason I

8    don't -- I didn't agree with your earlier

9    question is that I -- I offer my expertise here

10   as a historian of banking, and I'm not offering

11   an opinion on the legal interpretation of the

12   statute.  And so the intentions of the statutory

13   framers, while maybe useful to the Court in terms

14   of interpreting specific provisions, my -- of

15   the -- of the statute, that I would regard as a

16   legal dispute.

17             What I'm offering is a perspective on

18   the Fed's history from 1913 to 1980, how members

19   of Congress and others understood the changes

20   that occurred in 1980, and then how the Federal

21   Reserve understood and implemented those changes

22   from 1980 to 2015, and then, finally, how it

CONFIDENTIAL

Page 34

1    understood in different ways those

2    implementations from 2015 to the present.

3            I regard those as relevant to my

4    expertise as a business professor and as a

5    financial historian.  And while I'm very glad

6    that I went to law school -- I had a good time

7    there and enjoyed working for those judges --

8    that was not a legal interpretation that I offer

9    in my report.

10       Q    All right.  Let's take a look at --

11   we'll take a break about every hour, and if you

12   ever need a break, just let me know.

13       A    Okay.  Sounds good.

14            MR. MICHAELSON:  So we'll mark this

15   as -- you'll be pleased to be hear we bought your

16   textbook.  We'll mark this as exhibit -- is it

17   280 --

18            THE REPORTER:  298.

19            MR. MICHAELSON:  298?

20            MR. SCARBOROUGH:  Yes.

21            (Deposition Exhibit Number 298 was

22            marked for identification.)

CONFIDENTIAL

Page 62

1   evaluating the component parts because I don't

2   grant the premise that it can engage in that sort

3   of assessment.

4        Q    Right.  Your position is that it's --

5   they're prohibited by law from denying the

6   request?

7        A    No, I don't offer a legal opinion.

8   I'll leave that to the Court and to the lawyers.

9   I'm saying that the framers of the MCA and the

10  Federal Reserve itself after its passage did not

11  intend or act in a way that suggested it had the

12  ability to engage in precisely these kinds of

13  assessments.

14       Q    Okay.  So you're saying that the

15  decision to deny the master account request is

16  inconsistent with the intent of the Congress that

17  passed the Monetary Control Act?

18       A    In part, yes.

19       Q    And you're saying that it's -- the

20  decision to deny is inconsistent with the Federal

21  Reserve's practice following passage of the

22  Monetary Control Act?

CONFIDENTIAL

Page 105

1    bill's sponsors.

2         Q    Okay.  And you -- you'd agree that the

3    presentation of legislative history on the

4    Monetary Control Act reflected in your opinion is

5    not complete, correct?

6              MR. SCARBOROUGH:  Objection.

7              THE WITNESS:  Can you define for me

8    what a complete legislative history would be?

9    BY MR. MICHAELSON

10        Q    Well, isn't it the case that part of

11   the legislative history of the Monetary Control

12   Act reflects a concern among Congress that the

13   percentage of banks or Fed members was declining?

14        A    That was the concern of some members of

15   Congress, no question.

16        Q    All right.  Federal membership was

17   declining, correct?

18        A    That's right.

19        Q    And that was a concern for banking

20   regulators, correct?

21        A    For -- the decline in Fed membership

22   rates was a concern for some bank regulators, not

CONFIDENTIAL

Page 106

1   all.

2         Q    And what was the concern?

3         A    The concern here was that in the fall

4   of 1979, the Federal Open Market Committee

5   launched a wholesale reorientation of its

6   monetary policy regime that required more

7   varieties of -- of efforts to control monetary

8   policy.  And Paul Volcker's concern and the

9   concern of some others that the Federal Reserve,

10  although not a concern shared by all, was that

11  the ability to manage this new monetary policy

12  system was limited by the decline in Fed

13  membership.

14        Q    And so -- so fair to say that

15  Volcker's -- well, Volcker's concern was that

16  declining Fed membership could impair the Federal

17  Reserve's ability to implement monetary policy?

18        A    That's right.

19        Q    And so one purpose of the Monetary

20  Control Act was to reinforce the Federal

21  Reserve's ability to implement monetary policy?

22        A    That's right.

CONFIDENTIAL

Page 117

1   a particular service between 1980 and 2015?

2        A    For solvent institutions --

3        Q    For solvent institutions.

4        A    -- that did not fail?  Again, the

5   instance of the -- the hijacked Central Bank of

6   Bangladesh instance, which would have been a

7   master account holder with a transaction that was

8   blocked, so that would be an example.  That may

9   have been after 2015, though.  I can't -- I can't

10  recall.

11       Q    And how about not an actual assertion

12  of this power, but a -- but a claim to this

13  power?  And that I mean the power to terminate

14  access to a service for a solvent institution.

15       A    I have not seen that claim, and I did

16  not see that claim until 2015, in the instance of

17  the Fourth Corner Credit Union.

18            MR. MICHAELSON:  Okay.  Let's look

19  at -- we'll just do one more document before we

20  break here.  Mark this as Exhibit 301, I guess.

21            (Deposition Exhibit Number 301 was

22            marked for identification.)

CONFIDENTIAL

Page 118

1    BY MR. MICHAELSON

2         Q    So I put in front of you a document

3    marked Exhibit 301, which is a document from the

4    Federal Reserve Bank of Dallas, and it attaches,

5    beginning the fourth page, a publication from the

6    Federal Register.

7              Do you see that?

8         A    I do see that.

9         Q    And this is Federal Register, Volume

10   50, No. 99, page 21120, titled "Policy Statement

11   Regarding Risks on Large Dollar Wire Transfer

12   Systems."

13             Do you see that?

14        A    I do.

15        Q    This is a policy that is set with an

16   effective date in 1986.

17             Do you see that?

18        A    I do.

19        Q    Okay.  And, actually, the Fed Register

20   notice is at the top of the page.  It's May 22nd,

21   1985.  Do you see this?  Do you see that?

22        A    Where are you --

CONFIDENTIAL

1       Q    Just at the top of the page.

2       A    Oh, yeah.  I see it.  Yeah.

3       Q    Okay.  Is -- earlier you referred to a

4  policy statement from around this time period

5  regarding money transfers.

6             Is this the policy that you were

7  referring to?

8       A    It is.

9       Q    Okay.  So you're familiar with this

10  policy?

11      A    I am.

12      Q    You've seen it before?

13      A    I have.

14      Q    And it's -- and it's public?

15      A    It is.

16      Q    What -- what is daylight -- what are

17  daylight overdrafts?

18      A    I'm not exactly sure of the precise

19  definition.  My general sense is that an

20  overdraft that occurs in the same day with

21  additional transactions being ordered on that

22  same account during that same day, but I'm not

CONFIDENTIAL

Page 120

1     certain that that's true.

2          Q    Okay.  I'll refer you to page 21123.

3     In the bottom -- bottom right-hand corner, this

4     provides, "The Board is still concerned with

5     these overdrafts, and believes that it is

6     appropriate to take effective steps to control

7     risks to the Federal Reserve Banks by placing

8     more effective limits on Fedwire daylight

9     overdrafts."

10              Do you see that?

11         A    I do.

12         Q    Okay.  And do you agree that -- that

13    this -- this policy is -- was public at the time?

14         A    Yes.

15         Q    And it reflects an assertion of Federal

16    Reserve authority to impose conditions and

17    restrictions on access to priced services?

18              MR. SCARBOROUGH:  Objection to form.

19              THE WITNESS:  Again, I would say that I

20    see the word "conditions" and "regulations" as

21    performing very different purposes for the Fed's

22    assertions of authority.  I hear this as creating

CONFIDENTIAL

Page 121

1    regulation rather than conditionality, which I

2    would regard as -- conditions I would think of as

3    more bespoke and idiosyncratic.

4         I hear -- I see in this document the

5    regulation and the record of that regulation even

6    as it's described as a policy statement in the

7    Federal Register for rules that apply to the

8    entire system as opposed to conditions placed on

9    individual account holders.

10   Q    But -- but doesn't this regulation

11   reflect an assertion of the Federal Reserve to

12   restrict individual institutions access to

13   services based on risk presented by that

14   institution?

15        MR. SCARBOROUGH:  Objection to form.

16        THE WITNESS:  I don't think I

17   understand how that -- how your last statement

18   would be correct in the sense -- so the -- the

19   conditions that I've seen the Federal Reserve

20   impose on an account holder's master account are

21   the most -- the most striking example is with the

22   American Samoa Bank.  Those I would regard as

CONFIDENTIAL

Page 137

1    claiming the power to conduct such risk

2    assessments, correct?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  The -- I read Exhibit 301

5    to contain a regulation regarding what the Fed

6    shall do in the event of daylight overdrafts and

7    what to do to manage the question of daylight

8    overdrafts.

9    BY MR. MICHAELSON

10       Q    Okay.  And to prohibit the use of

11   Fedwire where an institution's use of Fedwire

12   would prevent risk to the Reserve Bank?

13             MR. SCARBOROUGH:  Objection.

14             THE WITNESS:  Again, just reading from

15   it, I would say that the 1985 policy statement

16   has a regulation that asserts the Reserve Bank's

17   right to protect its risk exposure from those --

18   those banks.

19   BY MR. MICHAELSON

20       Q    Okay.  I'm handing you a document

21   marked Exhibit 302, which is Operating Circular 1

22   from 1998.

CONFIDENTIAL

Page 138

1          Are you familiar with OC1?

2     A    I am.

3     Q    And have you seen -- this is from 1998.

4          Have you seen this version before?

5     A    I have.

6     Q    And this was public, right?

7     A    It -- it is.

8     Q    Okay.  I'd direct your attention to

9    Section 1.1, called "Scope."

10          Third paragraph, it says, "Your master

11   account is subject to Federal Reserve policies

12   such as those on payment system risk, reserve

13   balances and clearing balances as they may be

14   revised from time to time."

15          Do you see that?

16    A    I do.

17    Q    And this is a reference to policies

18   like the statement on large dollar wire transfers

19   that we were just looking at?

20    A    That's right.

21    Q    Okay.  So this -- this is also another

22   example of the Federal Reserve asserting the

Page 139

1    power to -- asserting the power to decide whether

2    to grant use of priced service, correct?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  No.

5    BY MR. MICHAELSON

6         Q    Well, it's -- it's -- it's saying that

7    your master account is subject to the policy that

8    we were just looking at, right?

9         A    That's right.

10        Q    And in that policy, the Federal Reserve

11   asserted the authority to conduct risk

12   assessments to protect -- for the purpose of

13   protecting Reserve Banks from risk presented by

14   individual institutions, right?

15             MR. SCARBOROUGH:  Objection.

16             THE WITNESS:  That's right.

17   BY MR. MICHAELSON

18        Q    Okay.  And where risk was presented,

19   the Federal Reserve was claiming the authority to

20   cut off use of Fedwire to mitigate risk, correct?

21             MR. SCARBOROUGH:  Objection.

22             THE WITNESS:  Again, we have a

CONFIDENTIAL

                                                              Page 140

1    different view on -- on the question of what

2    constitutes cutoff.  And why I said no to my --

3    in my answer to your first question was because

4    you used the word "grant," which I took to be a

5    verb indicating access.

6            I don't read the 1985 policy statement

7    and don't see in the '98 Operating Circular 1 the

8    assertion that the Fed could reimpose discretion

9    as it has with Fed membership status on access to

10   accounts before 1998 and the master account

11   thereafter.

12   BY MR. MICHAELSON

13       Q    Okay.  I'll refer you to Section 2.3,

14   entitled "Establishing a Account," and the last

15   sentence of the first paragraph is "All master

16   accounts are subject to Reserve Bank approval."

17           Do you see that?

18       A    I do.

19       Q    So as of 1998, the Federal Reserve was

20   taking the position that master accounts are

21   subject to approval by a Reserve Bank?

22       A    That's right.

Page 141

1        Q    And in Section 2.8 on the following

2   page, on the right-hand side of the page, middle

3   of top paragraph there, there's a sentence that

4   reads, "We may close your master account or

5   terminate our approval of a pass-through

6   relationship at any time."

7             Do you see that?

8        A    I do see that.

9        Q    So as of 1998, the Federal Reserve was

10  asserting the power to close an institution's

11  master account at any time?

12       A    That's right.

13            MR. MICHAELSON:   All right.  Let's mark

14  this.

15            (Deposition Exhibit Number 303 was

16            marked for identification.)

17  BY MR. MICHAELSON

18       Q    I've put in front of you a document

19  marked 303.  It's an exhibit marked 303.  It's

20  federal -- from the Federal Register, entitled

21  "Policy on Payments System Risk," Federal

22  Register, Volume 69, No. 230, 69926.  This is

Page 142

1    dated December 1, 2004.

2            Do you see that?

3        A    I do.

4        Q    Are you familiar with this policy on

5    payment system risk from 2004?

6        A    Generally speaking, yes.  I haven't

7    examined it thoroughly.

8        Q    When's the last time you reviewed it?

9        A    I glanced at it yesterday.  Before

10   that, it had been -- it had been several months.

11       Q    Okay.  Direct your attention to the

12   page 69929.  On the far left -- left column,

13   first full paragraph, it says, "Part II of this

14   policy governs the provision of intraday or

15   daylight credit in accounts of the Reserve

16   Banks."

17           Do you see that?

18       A    I do.

19       Q    And it says that it "sets out the

20   general methods used by the Reserve Banks to

21   control their intraday credit exposures."

22           Do you see that?

CONFIDENTIAL

Page 146

1           Do you know what this refers to?

2       A    I know in general terms what

3   constitutes regular access to the discount

4   window.  I have a general sense of what a net

5   debit cap is, but I don't know what the

6   qualification for a filing exemption is.

7       Q    Okay.  Go ahead to 69937.  The upper

8   left corner, the last sentence of the -- of the

9   paragraph in the upper left corner, it says, "For

10  example, if the institution's level of daylight

11  overdrafts constitutes an unsafe or unsound

12  banking practice, the Reserve Bank would likely

13  assign the institution a zero net debit cap and

14  impose additional risk controls."

15          Do you see that?

16      A    I do.

17      Q    Would you agree that this reflects the

18  Federal Reserve's assertion of power over use

19  of -- no, strike that.

20          Would you agree that this reflects, as

21  of 2004, the Federal Reserve's assertion of power

22  over the use of priced service?

CONFIDENTIAL

Page 147

1        A     Over its use, yes.

2        Q     Okay.  Including the power to impose

3   risk controls to mitigate risk to the Reserve

4   Bank?

5        A     If we're defining zero in the net debit

6   cap and as a risk control, which the policy

7   statement seems to do, then yes.

8        Q     Okay.  Are you familiar with OC3,

9   Operating Circular 3?

10       A     Not by its name.

11       Q     But do you have a general understanding

12   of what OC3 relates to?

13       A     No.  I would need to review it.

14       Q     When's the last time that you reviewed

15   OC3?

16       A     If you could -- if I could see it, I

17   could tell you.  I don't know what OC3 -- I mean,

18   I know it's an operating circular, but I would

19   need to see it before I could answer the

20   question.

21       Q     Okay.  How about OC4?  Do you know what

22   OC4 is?

CONFIDENTIAL

Page 149

1   to legally eligible depository institutions,

2   correct?  That's your -- that's your opinion

3   here?

4        A    That's right.

5        Q    But would you agree that between 1980

6   and 2015, the Federal Reserve was asserting the

7   power to decide whether all priced services would

8   be available to all legally eligible,

9   state-chartered depository institutions?

10            MR. SCARBOROUGH:  Objection to form.

11            THE WITNESS:  No, I would not.  I would

12   say that between 1980 and 2015, at several

13   different junctures, the Federal Reserve issued

14   policy statements and regulations governing the

15   general provision of its priced services,

16   including some regulations that governed the use

17   of those services.

18            The statement that I make -- the

19   opinion that I offer in paragraph 59 of my report

20   refers to the idiosyncratic decisions to grant

21   priced services to individual legally eligible

22   depository institutions.