# EXHIBIT C

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br> 2120 Carey Avenue, Suite 300 <br> Cheyenne, WY 82001 <br><br> *Plaintiff*, <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS, <br> Constitution Ave NW & 20th St NW <br> Washington, DC 20551 <br><br> FEDERAL RESERVE BANK OF KANSAS CITY, <br> 1 Memorial Drive <br> Kansas City, MO 64108, <br><br> *Defendants*. | Civil Case No.: 1:22-CV-00125-SWS |

**SUPPLEMENTAL EXPERT REPORT OF PETER CONTI-BROWN, PH.D.**

I, Peter Conti-Brown, declare and state as follows:

## I. INTRODUCTION

1. On October 20, 2023, I submitted a report in this matter.

2. Counsel for Plaintiff Custodia Bank, Inc. subsequently provided me with deposition transcripts and documents that were produced after I submitted my report. This Supplemental Report presents additional opinions based on these additional materials. I have also reviewed the Expert Report of Morgan Ricks, which was served by counsel for the Federal Reserve Bank of Kansas City on December 4. All opinions and conclusions expressed in my original report remain unchanged. The additional materials I considered are attached as Exhibit 1.

## II. OPINIONS BASED ON ADDITIONAL DISCOVERY MATERIALS

### A. Kansas City Fed Employees Understood that the Monetary Control Act Required the Kansas City Fed to Provide Access to All Depository Institutions

3. After reviewing materials made available through discovery, I conclude that Kansas City Fed Employees understood that the Monetary Control Act would, in the testimony of Esther George, "level[] the playing field" so that all Federal

1

Reserve services provided formerly to Fed member banks would be open to all depository institutions "on the same terms."[1]

4.  This understanding was not merely a reference to the pricing of these services, a question not in dispute, but also a reference to "access to services."[2] Although the "master account" had not yet been created in 1980, President George understood that the equal access aims of the MCA applied to "the access to a Federal Reserve banking account."[3] George started at the Kansas City Fed in 1982, shortly after the passage of the Monetary Control Act, and was President of the Kansas City Fed from 2011–2023.[4]

5.  George's testimony is consistent with statements from the Kansas City Fed immediately following the passage of the Monetary Control Act. The Kansas City Fed's annual report from 1980 announced that the Monetary Control Act made Federal Reserve services "directly available to many more financial institutions" and "require[d] that these services be priced explicitly."[5]

---

[1] George Dep. Tr. 12:16–13:1.
[2] *Id.* at 15:18–22.
[3] *Id.* at 47:1–9.
[4] *Id.* at 8:10–14, 9:12–13.
[5] Federal Reserve Bank of Kansas City Annual Report (1980) (Dep. Ex. 228).

2

**B. The Federal Reserve Banks Must Adhere to a Board-Approved Handbook That Gives the Board Control Over the Review of Master Account Applications**



3

4



4



## III. RESPONSE TO MORGAN RICKS

14. I have reviewed the expert report filed by Professor Morgan Ricks on behalf of Defendant Federal Reserve Bank of Kansas City. I comment here on some of the differences in our opinions.

15. Professor Ricks argues that the Fed retains its discretion in granting access to Master Accounts because (1) the FDIC "exercises discretion over access to federal deposit insurance" and (2) "the [OCC] exercises discretion in granting national bank charters."[13]

16. These opinions are a non-sequitur. First, it is not disputed that the Comptroller of the Currency and state bank chartering authorities enjoy significant discretion in the exercise of their supervisory authority. Unlike the OCC or the state bank chartering authorities, the FDIC does not issue bank charters. The framers of the statutory authorizations of the FDIC in 1933 (on a temporary basis) and in 1935 (more permanently) made clear, however, that membership in the FDIC system was not automatic and would go through significant vetting at the FDIC before they could become members.[14]

17. Professor Ricks' conclusion in these respects have nothing to do with whether the framers of the Monetary Control Act intended that statute to give the

---

[13] Ricks Report ¶ 8.
[14] FDIC, The First Fifty Years – A History of the FDIC 1933–1983 46–53 (1984).

6

Federal Reserve discretion over access to Federal Reserve services. The framers of the MCA sought to eliminate more favorable access and pricing treatment to Fed members. To note that other government entities retained their discretionary authority to determine relevant membership only highlights the differences between the practices that the Fed has employed for considering access to Federal Reserve services after 1980.

18. Professor Ricks recharacterizes my report as expressing the view that "dual banking was inoperative between 1913 and 1980."[15] He misapprehends my opinions. In reaching the conclusion that "[t]he Fed's assertion of discretion over Master Account access for legally eligible, duly chartered depository institutions upsets . . . the 'dual banking system,'" I highlight the ways that system "has evolved over 160 years."[16] The dual banking system is not static; it has changed over time. It is the endpoint of that evolution (the period since the MCA's passage in 1980), not its starting point, that is relevant here. The question is not whether the Federal Reserve discriminated against banks that were not members of the Federal Reserve System prior to 1980. It certainly did. But the MCA's framers intended to change that balance in 1980, and the Federal Reserve adhered to that new balance for the better part of four decades before reversing course. The question is whether

---

[15] Ricks Report ¶ 13.
[16] Conti-Brown Report ¶¶ 9–10.

discretionary authority newly asserted in 2015[17] over banks throughout the financial system, inside and outside of Fed membership, upsets that balance in 2023. I conclude that it does.

19. In paragraphs 14–17 of his report, Professor Ricks makes two separate points. First, he cites a single contemporaneous source, that the framers of the MCA were motivated to help Fed member banks since they were "perceived to be at a disadvantage relative to nonmember banks" given the difference in regulatory treatment for those banks.[18]

20. I do not express the view that the MCA framers were motivated only to privilege the interests of nonmember depository institutions. I offer only the conclusion that the MCA was passed in order to eliminate the distinction between Fed member and Fed nonmember depository institutions with respect to access to the Fed's priced services. I focused in my opinion on the part of that equalization pointed at the nonmember depository institutions, but the equality of treatment works, as Professor Ricks notes, in both directions.

---

[17] Even though the Federal Reserve first asserted discretionary authority in 2015, it waited until September 2023 to amend Operating Circular 1 to assert that "[a] Reserve Bank has discretion in deciding whether to provide a Financial Institution with access to a Master Account and may require a Financial Institution to provide additional information and documentation to the Reserve Bank to support its decision making." Federal Reserve Banks Operating Circular No. 1 (Sept. 1, 2023) (Redlined Version showing changes from Aug. 16, 2021), available at https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1-redline.pdf.

[18] Ricks Report ¶ 14.

21. This fact does not change my fundamental conclusion that the framers of the MCA intended—and the Fed acted in accordance with—the conclusion that legally eligible Fed nonmember depository institutions were to be afforded equal access to the Fed's priced services.

22. Professor Ricks' second point refers to the idea that banks today need not worry about Master Account access because banks between 1913 and 1980 could make liberal use of "correspondent banking relationships, in which one bank provides payment clearing services to another bank."[19] Professor Ricks correctly recounts the historical structure of the banking system, and the availability of correspondent banking services, but his conclusion that such availability obviates the need for the Fed to honor the practices it had followed from 1980–2015 fails for three independent reasons.

23. First, the world has changed since 1980. Prior to the passage of the MCA, as Professor Ricks himself points out, Fed member banks received some benefits for their membership (free Fed services, for example) but also significant costs (such as increased reserve requirements). This cost-and-benefit mix presented a choice to banks who opted in or out of Fed membership. More importantly, prior to 1994, most banks operated within their own home states without the opportunity

---

[19] *Id.* ¶ 16.

for interstate branching. When a bank customer in Moore, Oklahoma wrote a check at the local grocer in the same town using the same bank, there was no need for correspondent banking or Fed services to satisfy the demands. In 2023, that world is gone. In 1994, Congress passed a law, the Riegle-Neal Interstate Banking and Branching Efficiency Act, that eliminated most of the obstacles to interstate banking, making the ability to cross state lines and interact with a variety of different depository institutions much more central to the business of banking than it had historically been. The Fed's assertion of discretion prior to 1980 to determine access to Fed membership did not upset dual banking because the benefits and costs of Fed membership still permitted substantial optionality for alternatives. In 2023, the Fed's assertion that it can determine access to Fed services does. The world of banking in 1980 is simply no longer the world of banking in 2023.

24. The second reason Professor Ricks' conclusion that the existence of correspondent banking obviates the need for the Fed to provide equal access to depository institutions to its services is that the conclusion sidesteps the core issue at play. If the Fed enjoys total discretion to exclude legally eligible depository institutions from access to its services, it has the same authority to exclude correspondent banks that seek to serve those same needs. Nothing in either the 2022 Guidelines, the updates to the Operating Circular, or the Fed's own internal Handbook would prevent it.

25. Third, the conclusion that legally eligible depository institutions can simply pay a premium for correspondent banks to provide pass-through access to the Federal Reserve Banks reintroduces the very price discrimination that the framers of the MCA sought to eliminate. The conclusion that the Fed may reimpose a premium on the prices of its services through a separate entity to legally eligible depository institutions that it disfavors for its own reasons is completely antithetical to the intention to equalize those prices and that access.

26. The remainder of Professor Ricks' report speculates on why access to Master Accounts and the related priced services must be discretionary. Here he mostly echoes the Fed's own views on why it thinks it is justified in its 2015 and subsequent departures from historical practice and the statutory framers' intent through the denial of Master Account access to legally eligible depository institutions. Whatever Professor Ricks thinks of Federal Reserve discretion over access to Federal Reserve services in 2023 has no bearing on what the framers of the MCA intended to accomplish in 1980, or how the Federal Reserve implemented the MCA from 1980 until 2015.

DATE: __December 11, 2023__        By: ___*Peter Conti-Brown*___
                                            Peter Conti-Brown

# EXHIBIT 1

**CONTI-BROWN SUPPLEMENTAL MATERIALS RELIED UPON LIST**

- Documents Produced by the Federal Reserve Bank of Kansas City, including Expert Report of Morgan Ricks; FRBKC-00017290; FRBKC-00017974; FRBKC-00010073.
- Deposition Transcripts, including: Federal Reserve Bank of Kansas City's Rule 30(b)(6) Designee; Christi May-Oder (Volumes I and II); Esther George; Jackie Nugent; Jeffrey Imgarten; Jenifer Haake; Judith Hazen; Ross Crouch; Tara Humston
- Documents that Have Been Designated as Deposition Exhibits in this Litigation, including: Exhibit 228
- Public Documents, including: FDIC, The First Fifty Years – A History of the FDIC 1933–1983 (1984); Federal Reserve Banks Operating Circular No. 1 (Sept. 1, 2023).