Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:      sortiz@wpdn net

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Number: 22-cv-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF CUSTODIA BANK, INC.'S OMNIBUS OPPOSITION TO THE FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY BRIEF IN SUPPORT OF CUSTODIA'S PETITION FOR REVIEW ON ITS APA CLAIM AND ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM**

---

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................1

II. DEFENDANTS LACK DISCRETION TO DENY CUSTODIA A MASTER ACCOUNT. ...................................................................................................4

    A. The Plain Language of the Monetary Control Act of 1980 Is Dispositive. ............4

    B. Section 342, Relied on By Defendants, is Not Controlling. ...................................16

    C. The Decision of the SDNY in *Banco San Juan* Was Wrongly Decided and is Not Precedential. ...............................................................................18

    D. Defendants' Pre-1980 History is Irrelevant and Their Post-1980 History Misleading..........................................................................................20

    E. Defendants Demonize Custodia and Its Business Plan...........................................22

    F. The Denial of a Master Account to Custodia Constitutes Final Agency Action Under the APA..............................................................................24

    G. The Board Lacks Authority to Regulate State Banks That Are Not Members of the Federal Reserve System....................................................28

    H. Defendants' Prematurity Argument is Meritless. ...................................................29

III. DEFENDANTS' ARGUMENTS ARE AN AFFRONT TO THE DUAL-BANKING SYSTEM. ....................................................................................30

IV. THE BOARD CONTROLLED THE DECISION ON CUSTODIA'S MASTER ACCOUNT APPLICATION. ..............................................................................34

    A. The Board Controlled the Master Account Decision Via the Guidelines.............37

    B. The Board Controlled the Master Account Decision Via its Membership Decision. ...............................................................................38

    C. The Board Controlled the Master Account Decision Via the S-Letter and Revisions to the Recommendation Memo. ...........................................39

V. EVEN IF THE KANSAS CITY FED DECIDED CUSTODIA'S MASTER ACCOUNT APPLICATION, SECTION 248A ENTITLES CUSTODIA TO RELIEF.........................................................................................................41

VI. CONCLUSION..................................................................................................42

APPENDIX A: CORE FACTS THAT FRBKC HAS NOT DISPUTED .................................. A-1

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Gardner,* 387 U.S. 136 (1967)........................................................27

*Banco San Juan v. Federal Reserve Board of New York*, 2023 WL 7111182 (S.D.N.Y. Oct. 24, 2023) .............................................................................................11, 18, 19, 20

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................27

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169 (D. Wyo. 2022) ...................................................................................................................7, 42

*Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90 (D.C. Cir. 2018) ............................6

*Duncan v. Walker*, 533 U.S. 167 (2001) ...................................................................9

*First Nat. Bank in Plant City v. Dickinson,* 396 U.S. 122 (1969)................................................33

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008)......................................7

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017) .......................................................................................................... *passim*

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)....................11

*Heard v. Dulayev*, 29 F.4th 1195 (10th Cir. 2022) ................................................37, 41

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ...................................................................................41

*Janny v. Gamez*, 8 F.4th 883 (10th Cir. 2021) ........................................................34, 36

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983)................11

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ..................................................4, 8

*King v. Burwell*, 576 U.S. 473 (2015)........................................................................6

*Lincoln v. Vigil*, 508 U.S. 182 ................................................................................27

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018) .............................................7

*Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507 (D.C. Cir. 2000) .....................................8

*Nelson v. United States*, 40 F. 4th 1105 (10th Cir. 2022) ......................................................13, 14

*Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520 (S.D.N.Y. 1983) ..............................11

*Robbins v. Chronister*, 435 F.3d 1238 (10th Cir. 2006) ....................................................11

*Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087 (E.D.N.Y. 1986) .............11

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ..................................27

*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019)................................18

*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ...........................................28

*W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588 (D.C. Cir. 2015) ................................................................................................................13

*W. Virginia v. EPA*, 597 U.S. 697 (2022) ..................................................................15

*Weyerhaeuser Co. v. U.S. Fish and Wldlife Serv.*, 139 S. Ct. 361 (2018)....................27

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ..................................25, 27

## STATUTES AND REGULATIONS

87 Fed. Reg. 51,099 (Aug. 19, 2022).........................................................................25

Fed. R. Civ. P. 56(a) ...............................................................................................34, 41

5 U.S.C. § 701(a)(2)...................................................................................................27

12 U.S.C. § 248a ..................................................................................................... *passim*

12 U.S.C. § 342 ...................................................................................................... *passim*

12 U.S.C. § 461 ............................................................................................................4

12 U.S.C. § 1831d(a) .................................................................................................31

021-20 Wyo. Code R. § 20-9(d) ...............................................................................31

## OTHER AUTHORITIES

126 Cong. Rec. 6897 (1980) .......................................................................................5

*Avanti Statement on its Application to Become an FDIC-Insured Bank*, Custodia (Nov. 5, 2021), https://custodiabank.com/press/avanti-statement-on-its-application-to-become-an-fdic-insured-bank/ ................................................................................................23

*BNY Mellon Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html ..........................................22

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118 (2016)...............15

SR 20-16 Letter from Bd. of Governors of the Fed. Rsrv. System (June 24, 2020),
https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm ........................................30

H. Conf. Rpt. 96-842, Depository Institutions Deregulation and Monetary Control Act of
1980, 96th Cong., 2d Sess. (Mar. 21, 1980) ..............................................................................1, 7

John F. Manning, *What Divides Textualists from Purposovists*, 106 Colum. L. Rev. 70
(2006)........................................................................................................................................15

Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980)............................ *passim*

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...................................8

William P. Statsky, *Legislative Analysis and Drafting* 184 (2d ed. 1984) ..................................13

## I.    INTRODUCTION

Defendants invite the Court to second-guess Congress and the choices it made in 1980 when enacting the Monetary Control Act ("MCA").  Defendants now reject the dramatic alterations the MCA made to the legal landscape in 1980, although they readily acknowledged these changes for decades.  Their discussion of the Federal Reserve Act of 1913, and the Federal Reserve as it existed in the decades prior to the MCA, may be an interesting historical digression, but it is not relevant to a post-1980 world where Congress decided that all depository institutions should be subject to reserve requirements that are integral to the Federal Reserve Board of Governors' ("Board") ability to control monetary policy and, as a trade-off, granted access to Federal Reserve payment services to all eligible depository institutions.

Defendants' misreading of Section 342 and syntactic deconstruction of Section 248a are rebutted by the statute's plain text and Congress's repeated statements that the MCA's legislative purpose was both to "price services provided by the Federal Reserve Banks ***and*** open access to these services to all depository institutions on the same terms and conditions as member banks." H. Conf. Rpt. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980, 96th Cong., 2d Sess. at 71 (Mar. 21, 1980) (emphasis added).  Open access means that eligible institutions, not in violation of applicable law, must be given equal access to Federal Reserve services; and the only way to do that is through a master account.  This does not throw open the doors to risky institutions, because the state chartering process ensures front-end risk assessments, the Board's eligibility decision weeds out impermissible banking activities, and Section 248a expressly provides that the Board can manage risk by requiring banks to maintain sufficient clearing balances in their master accounts.

Defendants also ignore the facts that have come to light through discovery.  In the Court's motion to dismiss opinion, it observed that "[i]n this particular case, the facts alleged by

1

Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application."  Order on Defendants' Motion to Dismiss Am. Compl. ("MTD Order"), ECF No. 164, at 10.  The Court also opined that

> if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested).

*Id.*

Discovery has been revealing.  It is quite clear now that the initially positive assessments of Custodia and its management team changed dramatically after the Board took over.  The Board baited Custodia into applying for membership, promising that it would hasten the master account approval process and would focus its membership analysis on Day One operations, only to move the goalposts by focusing on Custodia's long-range business plan and dictate an outcome on membership with which Federal Reserve Bank of Kansas City ("Kansas City Fed" or "Reserve Bank") officials understood they needed to stay in "sync" for the master account. *See e.g.*, Ex. AL, ECF No. 236-38, at FRBKC-00002133.

Defendants chiefly argue that the final decision denying a master account was the decision of Esther George, the President of the Kansas City Reserve Bank.  Although the denial went out under her name, discovery demonstrates that the Board's influence, like gravity, was inescapable.  The Board's constant presence in the decision-making process, and shaping of the final decision, exerted an inexorable pull on the Reserve Bank, starting from the very moment that Custodia submitted its application and senior executives at the Kansas City Fed began trying to "buy some time" for the Board to get involved and up to speed.  The Kansas City Fed's self-

serving assertion that Esther George simply consulted with the Board is like saying the sun orbits the earth.  Copernicus knew better.

No matter what spin Defendants put on the facts, the obvious and inescapable conclusion is that the Board was not going to let the Reserve Bank reach a decision on Custodia's application for a master account with which the Board disagreed.  Without conceding the following are relevant under the MCA, there is no dispute that (1) Defendants thought Custodia was going to set a precedent, and the Board wanted to get it right; (2) Defendants thought Custodia's application presented overarching policy questions for the Board to decide; (3) the Kansas City Fed looked to the Board to decide policy and eligibility questions; and (4) the Board established a process that gave it visibility and control over Reserve Bank handling of master account applications through the Guidelines, the Handbook, and the S-Letter.  While Ms. George may have signed the final denial letter, it came on the heels of the Board's denial of Custodia's membership application (which then served as the basis for the master account denial) and was subject to the Board's review, scrutiny, editing, and ultimate veto authority.

Many of Defendants' arguments, particularly those going to the question of risk, are at bottom a rejection of the dual-banking system and an affront to Wyoming's Division of Banking.  Custodia is legally entitled to a master account, and Defendants' refusal to provide that account violates Section 248a.  If Defendants are dissatisfied with the state of the law, they can ask Congress to revise the Federal Reserve Act.  Congress was concerned enough with the lack of transparency surrounding the Board's master account process that it recently enacted legislation requiring the Board to disclose a public database of institutions that hold, or have requested, access to master accounts.  But Congress did not change the MCA, whose guiding principle is equal access.  Until that happens, it is this Court's duty to apply the law, not amend it in response

to agency policy arguments.  Pursuant to Section 248a, the Court should deny Defendants'

motions, sustain Custodia's APA challenge to the Board's final agency action, grant Custodia

summary judgment on its mandamus claim against the Kansas City Fed, and order that Custodia

receive its long overdue master account.

## II.     DEFENDANTS LACK DISCRETION TO DENY CUSTODIA A MASTER ACCOUNT.

### A.     The Plain Language of the Monetary Control Act of 1980 Is Dispositive.

The heart of the case is a legal issue, concerning whether the Board and the Kansas City

Fed have discretion to deny Custodia a master account once Custodia was found to be eligible

for one.  As Custodia explained in its opening brief, three statutory sections are in play, i.e., 12

U.S.C. §§ 248a, 342 and 461.  All three provisions were amended by the Monetary Control Act

of 1980 and function together as a whole.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291

(1988) (to determine the plain meaning of a statute, the court must look not only to "the

particular statutory language at issue," but also to "the language and design of the statute as a

whole").

Custodia relies for its no-discretion argument on Section 248a(c), which was enacted

through the Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980):  "The

schedule of fees prescribed pursuant to this section shall be based on the following principles:

. . . (2) All ***Federal Reserve bank services*** covered by the fee schedule ***shall be available*** to

nonmember depository institutions ***and*** such services ***shall be priced*** at the same fee schedule

applicable to member banks."  12 U.S.C. § 248a(c)(2) (emphasis added).  The enumerated bank

services include (1) currency and coin services; (2) check clearing and collection services; (3)

wire transfer services; (4) automated clearinghouse services; (5) settlement services; (6)

securities safekeeping services; and (7) Federal Reserve float.  *Id.* § 248a(b).  In addition, access

must be given to (8) "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds." *Id.*

Congress enacted Section 248a in 1980 when Federal Reserve member banks were withdrawing from the Federal Reserve System in the wake of high inflation, rising interest rates, and onerous Board requirements to maintain ever-increasing non-interest-bearing reserves within the System. Pl. Custodia Bank, Inc.'s Omnibus Br. in Support of its Petition for Review on its APA Claim and its Mot. for Judgment as a Matter of Law on its Statutory Mandamus Claim ("Custodia Br."), ECF No. 234, at 41. At the same time, thrifts and certain other financial institutions wanted to become members of the Federal Reserve System because membership offered access to the payments system at no charge. *Id.* at 42. The new legislation was a compromise. It invited into the Federal Reserve System non-member depository institutions, including state non-member banks, thrifts and credit unions, whether or not they had FDIC or NCUA insurance. These entities were given full access to the Federal Reserve's enumerated services, but in return they had to meet federal monetary reserve requirements. Further, the enumerated services, formerly free to members, were now to be made available and priced equally for all, regardless of membership status. *Id.* at 43. As Senator Proxmire, one of the bill's sponsors, explained the statute's twin purposes: "since nonmember institutions will be required to hold reserves under the act it is reasonable that they should be provided access to Fed services." *See* 126 Cong. Rec. 6897 (1980).

Defendants argue that because Section 248a does not reference master accounts, they are not obligated to provide master accounts to eligible depository institutions. Def. Bd. of Governors of the Fed. Rsrv. System's Opposition to Pl.'s Petition for Administrative Procedure Act Review ("Bd. Br."), ECF No. 271, at 15; *see also* Def. Fed. Rsrv. Bank of Kan. City's

Cross-Mot. for Summ. Judgment and Opposition to Pl.'s Petition for Review and Mot. for Judgment as a Matter of Law ("FRBKC Br."), ECF No. 273, at 36 (incorporating the Board's arguments). Judge Bacharach was not persuaded by this argument, because "[w]ithout a master account, none of the fee schedule's services would be available." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1069 (10th Cir. 2017) (Op. of Bacharach, J.). Defendants' argument proves too much. If accepted, Defendants' position would amend the statute, allowing Defendants to avoid their statutory obligations to provide services by imposing a non-statutory prerequisite on banks seeking services. It cannot be so easy to defy "Congress's unambiguous command to make services in the fee schedule available to nonmember depository institutions."[1] *Id*. (Opinion of Bacharach, J.).

The Board launches several other attacks on a plain reading of the statute that are equally unpersuasive and ignore that when "expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 97 (D.C. Cir. 2018) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)); *see also King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty, after all, is 'to construe statutes, not isolated provisions.'" (quoting *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010))).

---

[1] Section 248a's list of services includes a catchall provision that covers "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds." 12 U.S.C. § 248a(b)(8). Because master accounts did not exist in 1980 and are required "to effectuate the electronic transfer of funds," they can either be interpreted as a "new service[]" the Federal Reserve must provide to nonmember banks, or the functional reality that the enumerated services, by definition, cannot be provided except through an account (which is a bookkeeping tool for keeping track of the services). *Id.*

Reprising an argument from its motion to dismiss (soundly rejected by Judge Bacharach), the Board argues that Section 248a is a mere pricing statute.  It points to the title of the section, which refers to pricing.  This Court, in its opinion at the motion to dismiss stage, recognized that "the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little." *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169, 1184 (D. Wyo. 2022).  Here, there is no ambiguity.  Section 248a's plain language addresses both access and pricing, stating unequivocally that:  "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions ***and*** such services shall be priced at the same fee schedule applicable to member banks."

The House Conference Report reinforces this conclusion, explaining that the purpose of the legislation was both to "price services provided by the Federal Reserve Banks ***and*** open access to these services to all depository institutions on the same terms and conditions as member banks."  H. Conf. Rpt. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980, 96th Cong., 2d Sess. at 71 (Mar. 21, 1980) (emphasis added).  The Reserve Banks themselves understood this at the time, as a number of them—including the Kansas City Fed—published official statements that acknowledged the monumental changes wrought by the 1980 MCA.  *See* Custodia Br. at 39–41.  Given the plain statutory language and the clear legislative history, the title of the section is irrelevant.  *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,583 U.S. 366, 380 (2018) ("[S]ection headings cannot limit the plain meaning of a statutory text . . . ."); *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[A] subchapter heading cannot substitute for the operative text of the statute."); *Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000) ("The plain meaning of a

statute cannot be limited by its title . . . and provisions in a statute do not always align with its title.").

The Board also contends that the introductory clause of subsection (c) limits the operation of the subsequent statutory language to pricing.  Board Br. at 15–16.  Here the Board commits a cardinal sin of statutory interpretation:  failing to consider "the language and design of the statue as a whole."  *K Mart Corp.*, 486 U.S. at 291; Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 153 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").  Start with the text.  Section 248a(c)(2) provides:

> (c) The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
>                         \*\*\*
>
> (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

At a minimum, the text of Section 248a(c)(2) acknowledges that the availability of Federal Reserve services has been expanded to "nonmember depository institutions" and that the pricing of such services should factor in their use by nonmember depository institutions.  *Id.* § 248a(c)(2).  As explained in Custodia's opening brief, prior to the MCA, Federal Reserve services were provided only to member banks and were provided for free.  Custodia Br. at 41.  When Congress extended access to Federal Reserve services to nonmember banks, Congress empowered the Fed to charge for its services in order to account for the increased costs

associated with the increased use of such services.  *Id.* at 43.  Even if Section 248a(c)(2) is read as a pricing principle, the principle is that the Fed must base its prices on the fact that non-member depository institutions have access to Federal Reserve services and the requirement that the Fed provide these services to members and non-members at the same price.  The MCA imposed an enormous increase in the Fed's operating footprint, and thus its operating costs, by expanding access from "5,400 member banks to over 40,000 depository institutions," Ex. CJ, ECF No. 236-88, at 11, and the MCA incorporated into the pricing principle the twin mandate of exponential growth in access.

When one takes a step back and looks at the entirety of the MCA, it becomes even clearer that Section 248a(c)(2) operates not only as a pricing principle but also as a guarantee of access to Federal Reserve services.  Section 248a was added by Section 107 of the Monetary Control Act.  *See* Monetary Control Act of 1980, Pub. L. No. 96-221, § 107, 94 Stat. 132 (1980).  No other section of the MCA speaks to the availability of Federal Reserve services.  *See generally id.*  Since prior to the MCA only members had access to Federal Reserve services, Section 248a(c)(2) must guarantee access to nonmembers to give content to the principles of nondiscrimination in pricing and of the use of Federal Reserve services by nonmembers.  To read Section 248a(c)(2) as merely addressing pricing and not nonmember access would render the provision superfluous and nonsensical, even as a pricing principle—another cardinal sin of statutory interpretation.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute. . . .  We are thus reluctan[t] to treat statutory terms as surplusage in any setting." (internal quotation marks omitted) (alteration in original)).  Rather the clear implication of the statute's text and structure is that

Section 248a(c)(2) provides that pricing should be based on the fact that nonmembers will have access to Federal Reserve services and it extends access to those nonmembers.

Section 248a(c)(2) does one more thing:  It empowers the Board to "subject" nonmember banks' access to Federal Reserve services to the same terms the Board "determine[s] are applicable to member banks," including "a requirement of balances sufficient for clearing purposes" so long as those requirements are also applicable to member banks.  This second half of Section 248a(c)(2) has nothing to do with how 248a(c)(2) operates as a pricing principle; it only pertains to the terms governing access to services.  For this dependent clause to have meaning, the preceding independent clause must extend access to nonmembers.  This reading is also consistent with the MCA's legislative history.  Member banks are supervised by the Federal Reserve, and the framers of the MCA stated repeatedly that the goal was to provide Federal Reserve services to "all depository institutions [including nonmember banks] on the same terms and conditions as member banks."  Custodia Br. at 44 (quoting 126 Cong. Rec. 6250 (1980) (Conf. Rep.)).  Conditionality and access are thus inextricably linked.  If Congress had not included the conditional language in Section 248a(c)(2), then nonmember banks would have been granted access to Federal Reserve services on *more favorable terms* than member banks.

To the extent there is any doubt about what Congress accomplished with Section 248a, the legislative history of the MCA removes it.  The legislative history is replete with references to the need to open access to Federal Reserve services to nonmember banks.  Custodia Br. at 43–44.  The original public meaning of Section 248a is further corroborated by the Board's and the Reserve Banks' post-enactment statements, which uniformly show that they originally understood the MCA extended access to nonmember institutions.  *Id.* at 38–41.  Because Section 107 of the MCA (codified as Section 248a) is the only provision of the Act that discusses

10

the availability of Federal Reserve services, it is the only statutory provision that could support those understandings.  It is therefore no surprise that every court, save one (which arose in the context of a bank that lost its master account allegedly for failing to comply with the law), to address Section 248a since 1980 construed that provision as guaranteeing access to Federal Reserve services.  *See Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983); *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1986); *Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520, 522–23 (S.D.N.Y. 1983).  *But see Banco San Juan v. Federal Reserve Board of New York*, 2023 WL 7111182, at *7–8 (S.D.N.Y. Oct. 24, 2023).

        At bottom, Defendants ask this Court to adopt an absurd reading of Section 248a. *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) ("This court has said that an interpretation of a statute is absurd if it leads to "results 'so gross as to shock the general moral or common sense." (internal quotation marks omitted)).  Why would Congress pass a statute directing the Federal Reserve to price its services based on the principle that such services are "available to nonmember depository institutions" and are available "at the same fee schedule applicable to member banks" without granting access to services to nonmember institutions? Congress would not do so.  The only reading of Section 248a that gives meaning to the entire section is one that respects Congress's understanding of the MCA—as reflected in the Act's text, structure, and context—and acknowledges that Section 248a guarantees that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions."

Notably, the Board agrees that Section 248a directs the Board to "take into consideration, *inter alia*, that Reserve Banks would be accepting deposits from, and offering corresponding services to, a larger universe of institutions that included nonmember depository institutions" when setting prices for Federal Reserve Services.  Bd. Br. at 15.  But the Board asserts that "the MCA's modification of section 342" is what granted nonmember banks access to such services.  *Id.*  The MCA, however, only modified Section 342 to include "other depository institutions" among the entities that could make deposits at Reserve Banks.  *See* Monetary Control Act of 1980, Pub. L. No. 96-221, § 105, 94 Stat. 132 (1980) (amending Section 342).  And Section 342 only mentions "services" as a "factor[]" the Board should consider when determining the minimum balance a nonmember bank must hold with a Reserve Bank to maintain an account.  12 U.S.C. § 342.  There is no textual basis for the position that the MCA's amendments to Section 342 expanded access to Federal Reserve services.

In various parts of its brief, the Board proclaims that member banks do not have a right to access Federal Reserve services.  Bd. Br. at 13, 15, 18.  But the Board cites no evidence of member banks being denied access to Federal Reserve services.  The Board's pre-MCA history documents denials to ***nonmember*** institutions, which, all agree, did not have any right to access such services at that time.  Bd. Br. at 7–10.  The Board's post-MCA history reflects conditions placed on the use of Federal Reserve services, not the wholesale denial of access to such services.  Bd. Br. at 10–13.  Other than the Board's incorrect assertion that Section 342 controls access to Federal Reserve services, the Board provides no support for the idea that member banks do not have a right to access Federal Reserve Services.

The Board touts the absence of the modifier "all" before the statute's language about access as yet another reason to reject Custodia's position.  This, too, was an argument that

12

Defendants raised at the motion to dismiss stage without success, as they did several years earlier when Judge Bacharach issued his opinion in *Fourth Corner*.  Defendants contend that even if Section 248a(c) "were somehow construed to be a mandate concerning access to services, it would not guarantee Custodia a master account because it does not make a reference to granting access to *all* depository institutions."  Bd. Br. at 16.  Rather, the adjective "all" is only used, in the same sentence, to modify "services."

As Custodia observed in its opening omnibus brief, *see* Custodia Br. at 36, the statute retains its mandatory and inclusive nature without the adjective "all."  Judge Bacharach in *Fourth Corner* rejected the very same argument made by Defendants, after an in-depth analysis.  As Judge Bacharach concluded:  "Omitting 'all' resulted in the absence of a restrictive modifier for the phrase 'nonmember depository institutions.'  Without a restrictive modifier, the phrase 'nonmember depository institutions' is an inclusive term that includes all nonmember depository institutions."  861 F.3d at 1069–70 (Opinion of Bacharach, J.) (footnote omitted); *see also W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588, 592 (D.C. Cir. 2015) (terms "states" and "municipalities" included all states and municipalities).  Judge Bacharach further observed that, in similar circumstances, "drafters of statutes are often cautioned against unnecessarily inserting the adjective 'all' before a plural noun (like 'nonmember depository institutions')."  861 F.3d at 1070 (Opinion of Bacharach, J.) (citing, *inter alia*, William P. Statsky, *Legislative Analysis and Drafting* 184 (2d ed. 1984) (observing that when the subject of the sentence is plural, adjectives such as 'any' and 'all' should "almost never" be used)).

The Board cites *Nelson v. United States*, 40 F. 4th 1105 (10th Cir. 2022) for its argument that there is some significance to omitting "all" before "nonmember depository institutions."  Bd.

Br. at 17.  But the Board reads *Nelson* too broadly.  There the Court addressed whether the terms "statute" and "any statute" had the same meaning when used in the same statute.  40 F.4th at 1114–15.  The Court, citing the rule against surplusage, "conclude[d] that it would be wrong to interpret the first use of 'statute' . . . and the later use of 'any statute' as identical in meaning" because to do so would vitiate Congress's use of "any." *Id.* at 1115.  The Court held that "the word 'any' has an expansive meaning" and that "the rule against surplusage" directed the Court to give the phrase "any statute" "a different and broader" meaning than the word "statute" "in order to give meaning to the term 'any.'" *Id.*  But here the Board points to two totally different phrases—"All Federal Reserve bank services" and "nonmember depository institutions"—so there is not the same need to draw a distinction between otherwise identical terms.  And construing the phrase "nonmember depository institutions" as encompassing all nonmember depository institutions does not render any part of the statute surplusage in the same way that construing "any statute" as meaning merely "federal statutes" nullifies the word "any" with an unduly narrow construction. *Nelson* does not help the Board in this case.

In passing, the Board swipes at Custodia's expert, Dr. Peter Conti-Brown, and an independent scholar, Professor Julie Hill, whose law review article Custodia referenced.  Bd. Br. at 24–26.  But it does not engage with the substance of either scholar's analysis.  The Board tries to dismiss Dr. Conti-Brown's opinions because his "analysis do[es] not engage with the MCA's *actual text*."  Bd. Br. at 24.  As Custodia's expert witness, Dr. Conti-Brown was not asked to interpret the MCA; instead, he opined on the "history, practice, legal context, and the public policies of the US government and the Federal Reserve."  Ex. A (Conti-Brown Expert Report), ECF No. 236-1, ¶ 8.  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory

scheme." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022).  *See also* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2121 (2016) ("[C]ourts should seek the best reading of the statute by interpreting the words of the statute, ***taking account of the context of the whole statute***, and applying the agreed upon semantic canons." (emphasis added)).  John F. Manning, *What Divides Textualists from Purposovists*, 106 Colum. L. Rev. 70, 75 (2006) ("[T]extualists understand that the meaning of statutory language (like all language) ***depends wholly on context***." (emphasis added)).  Although Dr. Conti-Brown does not opine on the ultimate legal question of how the MCA should be interpreted, the historical analysis he offers supplies the ***context*** necessary for a proper statutory interpretation.  The Board's only response to Professor Hill's analysis is that she changed her mind.  But that strengthens rather than undermines her ultimate conclusion.  As an independent third party, Professor Hill did what careful scholars do—she put out a draft paper about a topic whose opacity Defendants guarded so closely that Congress had to force the disclosure of master account holders and requestors by requiring them to make their database public.  Following critical responses, and new information, she refined her analysis.  The Board may disagree with her ultimate conclusions, but her process was sound and her conclusions are well-supported.

Finally, the Board suggests that Section 248a does not grant Custodia an entitlement to a master account because the statute provides that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks."  Bd. Br. at 18 (quoting 12 U.S.C. § 248a(c)(2)).  As discussed above, this provision imbues the Board with the ability to impose lawful conditions (such as maintaining an adequate clearing balance) on the usage of a master account (provided those conditions also apply to members), but does not permit the Board to deny access outright.

15

**B.      Section 342, Relied on By Defendants, is Not Controlling.**

Defendants rely solely on 12 U.S.C. § 342, another statutory section amended by the MCA, without accounting for the interplay between two other statutory sections that were also amended at the same time.  The statutory section, as enacted in 1913, provided that:  "Any Federal reserve bank may receive from any of its member banks, and from the United States, deposits of current funds in lawful money, national bank notes, Federal Reserve notes, or checks and drafts upon solvent member banks, payable upon presentation . . . ."  In 1980, through the MCA, Congress inserted "or other depository institutions" after "member banks," and inserted that same phrase after "non-member bank or trust company" wherever it appeared in the statute. Today, the relevant portion of Section 342 provides:

> Any Federal reserve bank may receive from any of its member banks, ***or other depository institutions***, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills; or, solely for purposes of exchange or of collection may receive from other Federal reserve banks deposits of current funds in lawful money, national-bank notes, or checks upon other Federal reserve banks, and checks and drafts, payable upon presentation within its district  or other items, and maturing notes and bills payable within its district[.]  (emphasis added)

This statutory provision must be read in harmony with the others.  At the same time Congress added Section 248a to mandate the twin principles of uniform access and equal pricing, without regard to membership status, Congress expanded Federal Reserve control over the money supply by requiring all depository institutions to maintain reserves at a rate set by Reserve Banks.  Custodia Br. at 37.  Prior to 1980, Section 342 only permitted Reserve Banks to accept deposits from Federal Reserve members.  *Id.*  Thus, Congress amended Section 342 to authorize Reserve Banks to accept deposits from not only Federal Reserve members, but also from "other depository institutions," which was a necessary step, given the significant expansion

16

of access to a far larger group of depository institutions.  *Id.*  The amendment allowed

nonmember depository institutions to comply with Section 461's newly imposed reserve

requirements, but it did not undermine Section 248a's grant of access to Federal Reserve

services.

Defendants argue that under Section 342 a Reserve Bank has discretion to deny access to

Federal Reserve services because it states that Reserve Banks "may" receive deposits from any

of its member banks or other depository institutions.  Bd. Br. at 7–8, 16, 19–21; FRBKC Br. ¶ 4.

Thus, according to Defendants, Congress did not intend to require Reserve Banks to accept

deposits in all situations, and, by extension, this discretion necessarily extends to the provision of

Federal Reserve services.  FRBKC Br. ¶ 4; Bd. Br. at 6–13.  Judge Bacharach took this argument

head on and explained that "Section 342 addresses the types of monetary instruments that

Federal Reserve Banks may receive for deposit or collection. . . . But § 342 does not address

which institutions can access Federal Reserve services; that subject is governed instead by

§ 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember

depository institutions."  *Fourth Corner*, 861 F.3d at 1074 (Op. of Bacharach, J.).  Judge

Bacharach's analysis—that Section 342 affords a Reserve Bank discretion regarding deposits,

something separate and apart from the issuance of master accounts—is correct.  *See id.* at 1074

(Op. of Bacharach, J.) ("But this discretion does not encompass the issuance of master

accounts.").

Defendants point out that *Fourth Corner* was a three-way panel split and Judge

Bacharach was the only member of the panel to address the statutory issues.  But as this Court

observed at the motion to dismiss stage, "Judge Bacharach's opinion may plausibly be the law on

this matter in this case."  MTD Order at 10.  Counsel for Defendants, at the motion to dismiss

argument, conceded as much.  *See* Mot. Dismiss Hr'g Tr., ECF No. 101, at 31:1–17 (counsel for

the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the

services of Section 248a are distinct); *id.* at 57:7–58:9 (counsel for FRBKC agreeing that

Section 342 allows FRBKC discretion over deposit-taking even after a master account is

opened).   As for the *Fourth Corner* ruling, it is worth noting that the other two judges on the

Tenth Circuit panel did not disagree with Judge Bacharach; they just did not reach the merits of

the statutory interpretation question.  Judge Matheson found that the case raised prudential

ripeness concerns.  Judge Moritz was concerned with the illegality defense.  Only Judge

Bacharach spoke to the broad legal issues.  His opinion stands alone as the only appellate

opinion to thoroughly address the legal issues presented in this case.

What is clear, in any event, is that Section 342 does not give the Board or the Kansas City

Fed discretion to deny an eligible depository institution access to the payments system.  The

statute does not mention master accounts; rather, it speaks to which entities may make deposits

with a Reserve Bank, *see United States v. Wells Fargo & Co.*, 943 F.3d 588, 603 n.13 (2d Cir.

2019), and the types of deposits that may be received in an account (e.g., lawful money, national

bank notes, Federal Reserve notes, checks, drafts, etc.).  In contrast, not only is Section 248a

targeted, clear, and precise, it is the capstone that explains the simultaneous changes Congress

made to Section 342 and Section 461.  Thus, there can be no doubt that Section 248a is the

relevant—indeed paramount—statutory section as it harmonizes all three statutory provisions.

### C.     The Decision of the SDNY in *Banco San Juan* Was Wrongly Decided and is Not Precedential.

Defendants cite *Banco San Juan v. Federal Reserve Board of New York*, 2023 WL

7111182, (S.D.N.Y. Oct. 24, 2023) (appeal withdrawn Feb. 12, 2024), for the proposition that

Section 342 is dispositive.  Custodia addressed that case in its opening brief, but does so now at greater length given Defendants' reliance on that out-of-circuit district court opinion.

*Banco San Juan* is easily distinguishable.  That case did not address front-end access. Banco San Juan already had a master account.  Instead, it arose on a motion for a TRO and preliminary injunction seeking to require the Board and the Reserve Bank to refrain from closing Banco San Juan's master account for allegedly failing to comply with federal law, specifically the Bank Secrecy Act and related Anti-Money Laundering requirements.  The district court (Koeltl, J.) recognized that "***whatever rights BSJI may have had to open a Master Account is not at issue***."  *Banco San Juan*, 2023 WL 7111182, at *8 (emphasis added).  Yet that is precisely the issue at the heart of Custodia's lawsuit.  The court went on to rule that the decision to close the master account was not arbitrary and capricious.  It held that the bank's statutory claim failed because, inter alia, "the FRBNY executed a Master Account Agreement and Supplemental Terms agreement with BSJI both of which give the FRBNY the contractual right to close BSJI's Master Account."  *Id.* at *7 (internal citation omitted).

Nonetheless, when evaluating the likelihood of success on the merits for purposes of the preliminary injunction, the court ruled that Section 248(a) was a pricing statute, and Section 342 controlled master accounts and gave the Reserve Bank discretion.  This was *dictum*, since the court earlier recognized that "whatever rights BSJI may have had to open a Master Account [wa]s not at issue."  *Id.* at *8.  In any event, to the extent the district court ruled on the statutory issues presented here, its analysis pales in comparison to the in-depth exegesis of Section 248a provided by Judge Bacharach in *Fourth Corner*.  *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8, *with Fourth Corner*, 861 F.3d at 1067–74 (Op. of Bacharach, J.).

19

The district court did not focus on the fact that Section 248a(c)(2) refers to both the availability of Federal Reserve services *and* the pricing of Federal Reserve services.  *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7 *with*, *Fourth Corner*, 861 F.3d at 1068–70 (Op. of Bacharach, J.).  Furthermore, the district court did not engage with the long record of the Board and the Reserve Banks interpreting the MCA as entitling eligible depository institutions to access to Federal Reserve services.  *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8 *with*, *Fourth Corner*, 861 F.3d at 1070–72 (Op. of Bacharach, J.).  Nor did the court consider the MCA's legislative history.  *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8, *with Fourth Corner*, 861 F.3d at 1072–73 (Op. of Bacharach, J.).  While the court acknowledged Second Circuit precedent holding that "the Federal Reserve must make [§ 248a] services available without regard to a bank's member status," the court failed to recognize that the only way to access those services is via a master account.  *Banco San Juan Internacional*, 2023 WL 7111182, at *7 n. 8 (citing *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989)).  Finally, the district court disregarded the academic literature on the MCA.  *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8, *with Fourth Corner*, 861 F.3d at 1073 (Op. of Bacharach, J.).  Given its deficiencies, *Banco San Juan*'s *dictum* is unpersuasive and should not be followed.

### D.    Defendants' Pre-1980 History is Irrelevant and Their Post-1980 History Misleading.

This case turns on the Court's construction of the statutory sections relied on by the parties and does not necessitate a trial.  The Board's brief contains a section (pages 7–10) styled "Reserve Banks consistently exercised discretion over access to accounts and services between 1913 and 1980."  Nothing in this discussion is remotely persuasive on the issue of post-1980 discretion to deny access outright to eligible depository institutions; citing the answer to a

question from an Iowa bank in 1945 or a 1935 survey of Reserve Banks (in which several,

including Kansas City, Minneapolis and San Francisco, noted that they provided access to

members and nonmembers alike) is irrelevant when Congress changed the law in 1980 to

expressly address the question.  The pertinent historical record starts in 1980 with passage of the

Monetary Control Act.  As recounted by Custodia in its omnibus brief, Custodia Br. at 38–41,

past interpretations of the Board and statements by Reserve Bank officials supported Custodia's

position until a decade ago, when the Board started flexing its gatekeeping authority beyond its

statutory bounds.  For example, in 1984, the Board conceded that the MCA "expanded the

Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository

institutions on an equitable basis."  *Id.* at 39.  Additionally, Dr. Peter Conti-Brown, retained by

Custodia as an expert legal historian, examined in his report "the nearly fifty-year history of the

Monetary Control Act."  Ex. A (Conti-Brown Expert Report), ECF No. 236-1, ¶ 16.  He

concluded that "the Board's claim of discretion over Master Account access does not conform to

history, practice, legal context, or the public policies of the U.S. government and the Federal

Reserve itself." *Id.* ¶ 9.  Yet the Kansas City Fed is so worried that the Court will consider his

opinions—which are devastating to its defense—that they moved to exclude his opinions in a

bench trial.

The Board's assertion (pages 10–13) that "Reserve Banks have continued to exercise

discretion over accounts and services for all institutions between the enactment of the Monetary

Control Act in 1980 and the present" is flawed.  No such discretion applied to access; the only

discretion that the Board can point to over several decades pertains to conditions on the account

itself (e.g, daily overdraft limits), Bd. Br. at 11, which are lawful as a "requirement of balances

sufficient for clearing purposes" under Section 248a(c)(2), and which are not being challenged

by Custodia.  The Board also points to the 1998 version Operating Circular 1 and its statements

that "master accounts are subject to Reserve Bank approval" as evidence that Reserve Banks

exercised discretion.  Bd. Br. at 12.  But the application for a master account was the same one

Custodia completed when it applied for a master account—a one-page form that states that a

decision will be made in 5–7 business days—and Defendants cannot compel Custodia to abridge

its statutory right to a master account through precatory language in what amounts to a contract

of adhesion.  The reference to Reserve Bank approval meant that the applicant needed to be

deemed legally eligible for a master account before it could receive one.  That determination was

straightforward and, until a decade ago, master accounts were issued pro forma.  It was only then

that the Federal Reserve Board claimed that Reserve Banks had discretion over master accounts.

This litigation position is not supported by past practice.

### E.       Defendants Demonize Custodia and Its Business Plan.

Among its many mischaracterizations, the Reserve Bank asserts that Custodia "is not a

traditional bank."  FRBKC Br. at 11.  But Custodia is a traditional bank that also provides

cryptocurrency custody services.  The OCC concluded in Interpretive Letter 1170 (July 22,

2020), that "providing cryptocurrency custody services, including holding unique cryptographic

keys associated with cryptocurrency, is a modern form of . . . traditional bank activities" related

to custody services."  Ex. L (Interpretive Letter 1170), ECF No. 236-12.  "The OCC recognize[d]

that there will likely be increasing need for banks and other service providers to leverage new

technology and innovative ways to provide traditional services on behalf of customers.  By

providing such services, banks can continue to fulfill the financial intermediation function they

have historically played in providing payment, loan and deposit services."  *Id.*  Custodia does

just that.  To show how mainstream crypto-currencies have become, on January 10, 2024, the

Securities and Exchange Commission approved eleven applications for exchange-traded funds

(ETFs) that hold bitcoin, including applications from Blackrock and Fidelity.  The Bitcoin ETFs
are listed and traded on registered national securities exchanges.  And established banks like
BNY Mellon have long been providing digital asset custody services. *See, e.g.*, *BNY Mellon
Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022),
https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-
digital-asset-custody-platform-130305.html.

Defendants also fault Custodia for not having FDIC insurance.  Custodia was not
required to obtain FDIC insurance to be eligible for a master account, and would not need it in
any event since it is fully reserved (keeping $1.08 for every $1.00 of deposits) and has no credit
risk because it does not lend money.  *See* FRBKC Br. ¶ 55 (confirming that Custodia is
"eligible" for a master account); Custodia Br. ¶¶ 2, 45.  Moreover, Custodia applied for FDIC
insurance but it was not available.  *Avanti Statement on its Application to Become an FDIC-
Insured Bank*, Custodia (Nov. 5, 2021), https://custodiabank.com/press/avanti-statement-on-its-
application-to-become-an-fdic-insured-bank/.

There are a host of other mistaken statements in Defendants' briefs.  *See* Ex. CR
(Custodia Bank, Inc.'s Objections to the Federal Reserve Bank of Kansas City's
Counterstatement of Undisputed Facts).  For example, they allege that the Federal Reserve did
not want Custodia to apply for a master account while it was still "building its business."
FRBKC Br. at 13.  This is not what the Defendants told Custodia (or Wyoming) going into the
process, and it is not consistent with Defendants' own policies; nor is it consistent with what the
Board's General Counsel told Custodia when he encouraged Custodia to apply to become a Fed
member bank while it was still under construction.  *See infra* § II.H.  The law and Defendants'
own policies allow *de novo*, still-under-construction banks to apply.  Defendants further claim

(in a footnote) that the numerous meetings between Reserve Bank officials and Wyoming banking authorities were not about the SPDI charter legislation.  FRBKC Br. at 13 n.6.  The record, however, clearly shows the contrary.  Custodia Br. ¶ 3.

### F. The Denial of a Master Account to Custodia Constitutes Final Agency Action Under the APA.

The Board took final agency action in connection with the denial of Custodia's master account.  Although it once disclaimed any role in the decision-making process, it no longer pretends otherwise, having designated its S-Letter determination as "final agency action" for purposes of this APA challenge.  When filing the administrative record, the Board advised that: "The document with ID of A1 (Bates numbered FRB-AR-000002) is the ***final agency action*** at issue as required by Local Rule  83.6(b)(1)(A)."  Def. Bd. of Governors of the Fed. Rsrv. System's Notice of Lodging Admin. Record, ECF No. 178 (emphasis added).  The document referred to is the January 26, 2023 email from Matthew Eichner of the Board to Esther George of the Reserve Bank.  Ex. CC, ECF No. 236-81, at FRB-AR-000002.  In that email, the Board— referring to both the S-Letter and the Kansas City Fed's "pre-decisional" analysis of Custodia's request for a master account pursuant to the S-Letter (as well as the earlier-issued Guidelines)— gave the Kansas City Fed the green light to deny Custodia's master account application.  *Id.* That action indisputably affected Custodia's substantive rights, which is a hallmark of agency action.

The Board now wants to retract that statement.  It argues that the Eichner email does not meet the tests for "agency action" or "finality" as to Custodia's master account request to FRBKC, "causing Custodia's APA claim to fail."  Board Br. at 41.  Further, the Board contends that "[b]ecause Congress vested final decision-making authority over master accounts in the Reserve Banks, and Board staff consultations culminating in the Eichner email expressing 'no

24

concern' were just 'part of the process,' they do not constitute the final agency action necessary for Custodia to maintain an APA claim against the Board." *Id.* at 42. The Court should take the Board at its word. The Board itself designated the Eichner email as final agency action. Its wish to recant that admission should be rejected.

Even assuming for the sake of argument that the Eichner email is not the Board's final agency action, the Board's participation in the master account process meets the requirement that there be final agency action. Agency action is defined broadly "to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc.* 531 U.S. 457, 478 (2001). Here the Board exercised its power in many ways:

- The Board set up a "Nontraditional Account Access Workstream Structure" to assess master account applications from banks it deemed novel. *See* Custodia Br. ¶ 16. That NTAA Workstream focused, *inter alia*, on issues raised by SPDI charters.

- The Board issued its Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022). The Guidelines were issued because of "a recent uptick in novel charter types being authorized or considered by federal and state banking authorities across the country," *id.* at 51,099, and the Board finalized them the day before Defendants' motions to dismiss were due in this litigation. The Guidelines made it all but impossible for Custodia and other Tier 3 novel banks to obtain master accounts.

- The Board linked its membership decision to the assessment of Custodia's master account application under the Guidelines. As a result, the Kansas City Fed could not conclude its analysis of Custodia's master account application until the Board decided Custodia's membership application. Custodia Br. ¶ 28.

25

- The Board circulated its S-2677 Letter to "Instruct Reserve Banks on How to Implement the Account Access Guidelines," first in draft format and later in final just before the denial of Custodia's master account application.  The S-Letter requires Reserve Banks to notify the Board when a Tier 2 or Tier 3 institution applies for a master account and to consult directly with the Board's Director of Reserve Bank Operations and Payment Services ("RBOPS") prior to communicating a decision on a Tier 2 or 3 institution's master account.  It effectively gives the Board a veto over master account decisions with which it disagrees.  Ex. AS, ECF No. 236-45, at FRB-AR-000016.

- The S-Letter also mandated information sharing with a new Board group, the Account Request Information Sharing Group ("ARISG"), which includes Board staff. Custodia Br. ¶ 41.  President George recognized that the S-Letter "cannot be ignored," and that, as Board guidance, it supplanted Reserve Bank procedures and policies, requiring for the first time that Reserve Banks provide "pre-decisional" drafts to the Board for its review.  *Id.* ¶ 36.

- Pursuant to the S-Letter, the Reserve Banks and Board Staff developed a Handbook to implement the Guidelines, which further cemented Board control by requiring Board involvement,[2] Custodia Br. ¶¶ 38–43, in what is, in effect, an attempt to

---

[2] In addition, the Kansas City Fed has admitted that more than a dozen individuals at the Board were involved in reviewing and denying Custodia's master account request, producing a list of names at its Rule 30(b)(6) deposition.  Custodia Br. ¶ 44.  In response to questioning, the Kansas City Fed agreed that at least 10 more Board employees were involved in Custodia's master account application, edited the draft denial memo or addressed policy questions concerning Wyoming SPDI banks' access to Federal Reserve services.  *See id.*

mandate (in violation of the MCA) a Federal Reserve re-chartering process for an

applicant already chartered by its chartering authority.

Each of these steps constituted agency action.  RBOPS Director Eichner's sign-off on the

denial of Custodia's master account application was simply the culmination of a long stretch of

Board action.  There can be no question, therefore, that the Board controlled the Custodia master

account process, and that Eichner's sign-off constitutes final agency action since, under the

Supreme Court's jurisprudence, that term is defined broadly "to cover comprehensively every

manner in which an agency may exercise its power."  *Whitman*, 531 U.S. at 478.

Further, the Supreme Court has "long taken" a pragmatic approach with respect to

finality.  *U.S. Army Corps of Engineers v. Hawkes Co*., 578 U.S. 590, 599 (2016).  The

pragmatic inquiry is colored by the APA's embodiment of the "basic presumption of judicial

review."  *Abbott Labs v. Gardner,* 387 U.S. 136, 140 (1967).  As a general matter, two

conditions must be satisfied for agency action to be final.  First, the action must mark the

consummation of the agency's decision-making process; it must not be of a merely tentative or

interlocutory nature.  And second, the action must be one by which rights or obligations have

been determined or from which legal consequences will flow.  *Bennett v. Spear*, 520 U.S. 154,

177–178 (1997).  Both conditions are met here.  The Board's actions culminated in the denial of

the master account.  And from that action legal consequences adverse to Custodia flowed.

Defendants separately contend that there can be no judicial review under the APA's

"committed to agency discretion by law" provision.  5 U.S.C. § 701(a)(2).  That exception,

however, must be read "quite narrowly."  *Weyerhaeuser Co. v. U.S. Fish and Wldlife Serv.*, 139

S. Ct. 361, 370 (2018).  It is confined to "those rare circumstances where the relevant statute is

drawn" in such a manner that the "court would have no meaningful standard against which to

judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (cleaned up). Here, because there is a concrete dispute between the parties on the statutory issue, there are clear standards for the Court to apply and the matter is not entrusted to agency discretion. The Board's actions are, therefore, reviewable; the Court may determine whether Board action violated the judicially cognizable limitations provided by Section 248a.

### G.   The Board Lacks Authority to Regulate State Banks That Are Not Members of the Federal Reserve System.

The Federal Reserve is the primary federal supervisor of state-chartered banks that have decided to join the Federal Reserve System as members. Custodia is not a member of the Federal Reserve System and is not insured by the FDIC. Therefore, the Wyoming Division of Banking, the state chartering authority, is Custodia's banking regulator. Like other State banking agencies, Wyoming's Division of Banking issues bank charters, conducts bank examinations, enforces bank regulations, and decides on proposed branch and merger applications. It also can impose sanctions such as revoking a state bank's charter, issuing cease-and-desist orders, removing bank officials and levying fines. Further, the Division regularly supervises banks chartered in the state and issues Reports of Examination documenting those examinations. By contrast, the Board does not have supervisory authority over Custodia.

By sitting in judgment on state banking authorities (through its recently promulgated Guidelines and Handbook, among other vehicles) and by asserting the right to second-guess those state banking authorities' judgments as to risk, the Board has arrogated power to itself that it simply does not have. The Supreme Court has made it clear that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts should] typically greet its announcement with a measure of skepticism." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation marks

omitted).  Nothing in the brief of the Board establishes just where the power to second-guess

state regulatory officials comes from, and certainly not in the circumstances presented here.

Instead, the Board argues that there is no indication Congress intended to abdicate the federal

monetary policy and payments systems to the states.  There is no federal monetary policy based

on excluding Custodia (or any other SPDI, for that matter) from accessing the payments system,

particularly when Defendants can require Custodia to maintain a sufficient clearing balance in its

master account under Section 248a(c)(2), so long as those conditions also apply to members.

The position espoused by the Board, if accepted, would amount to a rejection of the dual-

banking system.  It would elevate the Board to a super-chartering authority that could restrict

direct access to the payments system to disfavored entities notwithstanding a state's chartering

decision.  Dividing banks into tiers according to risk, as the Board's Guidelines do, and second-

guessing state authorities, violate the MCA's non-discrimination charge.

### H.   Defendants' Prematurity Argument is Meritless.

Finally, Defendants raise a new argument to defeat Custodia's efforts for a master

account.  They now claim that Custodia's application was premature because Custodia was still

under construction.  FRBKC Br. ¶¶ 47–51.  But access to the Federal Reserve's payment system

does not depend on whether a bank is a *de novo* entity or an established one.  The statute does

not require an institution to be operational, and there is no basis to read such a requirement into

the statute.  Access is guaranteed by statute to all eligible depository institutions, not just

already-operating ones.

Defendants' position is incorrect for several reasons.  First, the MCA has no requirement

that applicants for master accounts be fully operational (much less profitable) when they apply.

Were it otherwise, then there would be a chicken-and-egg problem, as operating without a master

account before applying for it requires the use of a partner bank to clear transactions, which

imposes substantially greater costs and makes the applicant susceptible to the whims of its partner bank, which could be pressured to drop the relationship at any time. Defendants' position also contravenes the Federal Reserve's own policies, which define a *de novo* period as three years and do not require banks to be operational when they apply. *See, e.g.*, Ex. 15, ECF No. 274-15, at FRBKC-00015594 ████████████████████████

███████████ ; SR 20-16 Letter from Bd. of Governors of the Fed. Rsrv. System (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm (describing that an institution is considered *de novo* until it has been operating for at least three years). Finally, their stance is at odds with the record in the case, which shows that prematurity was never mentioned and is only offered at the summary judgment stage of this litigation as a *post hoc* rationale for an impermissible agency action. Likewise, it is belied by the actions of the Board's General Counsel, Mark Van Der Weide, who encouraged Custodia, at an early date, to apply for membership as a non-operating entity, thereby paving the way to a master account. *See* Ex. AE (Long Tr.), ECF No. 236-31, at 222:21–223:22, 287:13–288:8. Thus, there is no support for the notion that Custodia (which is operational now) had to be operational before it could apply for a master account.

## III.   DEFENDANTS' ARGUMENTS ARE AN AFFRONT TO THE DUAL-BANKING SYSTEM.

The United States operates a dual-banking system that allows banks to be chartered by either the state or federal government. At the founding, almost all banks were state chartered. Banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority. Ex. A (Conti-Brown Expert Report), ECF No. 236-1, ¶¶ 25–26. National banks are primarily regulated by the OCC, while state banks are principally overseen by state regulators. *Id.* ¶ 26. While the dual-banking

system divides the chartering and regulatory responsibilities between the Federal and state governments, it does not create two separate systems for bank services.  *Id.* ¶ 27.  The Federal Reserve must provide access to the U.S. dollar payment system to eligible depository institutions on a nondiscriminatory basis.  *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).  Just because a bank has a state charter does not mean that it uses a state system to clear checks, transfer electronic funds, or provide other banking services.  Instead, state-chartered banks have the right to use the Federal Reserve System for such banking services if they qualify as eligible depository institutions.  The dual-banking system has never segregated national and state-level banking services, or given the Board a veto over state-chartered depository institutions' ability to access payment services— and there is no reason to start doing so now.

Defendants repeatedly contend that Custodia's position in this lawsuit "threatens to eviscerate many of the Federal Reserve's longstanding risk management policies and procedures."  FRBKC Br. at 39.  This argument is not only untrue (because Defendants did not reinterpret the MCA to find alleged power to deny certain state-chartered applicants until a decade ago), but it also ignores the role states play as the principal supervisors of state-chartered banks.  In this case, the Wyoming Division of Banking spent years developing a regulatory framework for SPDIs (incorporating Defendants' feedback along the way), and then carefully considered Custodia's application before granting it a charter.  Custodia Br. ¶¶ 2–5.  As the Brief of Amicus Blockchain Association and Payment Systems Scholars observes:  "[T]o qualify as a Wyoming SPDI a depository institution must be considerably *safer* than most banks, including national banks."  Blockchain Br., ECF No. 257, at 16; *see also* Wyoming Br., ECF No. 251, at 2 (describing the SPDI regulatory regime as "carefully crafted").  Wyoming's regulatory scheme requires that an SPDI's assets be "managed prudently, consistent with safe and sound banking

practices."  021-20 Wyo. Code R. § 20-9(d).  An SPDI must invest 100 percent of its U.S. dollar

demand deposits in cash on hand or high-quality assets, and is prohibited from making loans.

Custodia Br. ¶ 2.  Custodia's model is stricter still, since it proposes to back its customers' U.S.

dollar deposits with Federal Reserve master account balances, the safest of all U.S. dollar assets,

and to hold reserves at 108% for its first three years.  *See* Bd. of Governors of the Fed. Rsrv.

Sys., Order Denying App. for Membership, at 11 (Jan. 27, 2023),

https://www.federalreserve.gov/newsevents/pressreleases/files/orders20230324a1.pdf.

Custodia's plan does not require FDIC insurance; as Amicus Blockchain observed,

"[b]ecause of its 100% requirement, Custodia's SPDI could not fail because of bad loans, falling

bond prices, depositors' fears, or any common causes of bank failures."  Blockchain Br., ECF

No. 257, at 17–18.  This conclusion is reinforced by the Kansas City Fed itself, which conducted

a tabletop exercise after the FTX failure and Silvergate run that determined that Custodia would

have survived the same crisis that took down Silvergate.  Ex. BJ, ECF No. 236-62, at FRBKC-

000015275 ("If I understand the exercise we went through a couple of weeks ago, Custodia

wouldn't be in the same situation under the same duress?"); *see also* Ex. M, ECF No. 236-13, at

FRBKC-00004964 (Kansas City Fed examiner explaining that Custodia is "not comparable to

FTX" as, among many differences, the "SPDI rules require SPDI stablecoins to be backed dollar

for dollar by cash.").

Defendants' actions prompted the State of Wyoming to file a second amicus brief in this

case.  That submission expressed "the State's existing concern that the Defendants'

overwhelming bias against State-chartered banks, and those chartered by Wyoming particularly,

makes any Wyoming issued SPDI charter irrelevant."  Wyoming Br., ECF No. 251, at 2.  As the

State went on to note, "Even though it is carefully crafted, the State's regulatory banking regime

for all SPDIs is essentially nullified by the Defendants' posture and actions taken in this appeal." *Id.* Equality between federally-chartered and state-chartered banks is "firmly embedded in the statutes governing the national banking system." *First Nat. Bank in Plant City v. Dickinson,* 396 U.S. 122, 133 (1969). The Federal Reserve, however, has usurped that authority.

It is telling that neither Defendant ever identifies any state that gives out charters without careful consideration and a rigorous review process, and never suggests that Wyoming would do so. Indeed, staff at the Kansas City Fed expressed favorable views about the SPDI framework and Wyoming's supervision. *See, e.g.*, Ex. K (Nugent Tr.), ECF No. 236-11, at 36:18–38:6, 62:20–63:4 (Wyoming "took a thoughtful approach to developing the [SPDI] framework."); Ex. E (Humston Tr.), ECF No. 236-5, at 25:16–28:5 ("[M]y team found [the Wyoming Division of Banking has] examiners that would be skilled in their job."); Ex. J (George Tr.), ECF No. 236-10, at 28:14–20, 282:6–11 ("I believe [the Wyoming Division of Banking] would have been willing to share information" with the Reserve Bank). Accordingly, when Custodia applied for a master account, it had earned a charter from a qualified and competent state banking authority after rigorous risk examination, an 8-0 vote by the Wyoming State Banking Board, all pursuant to a statute that was enacted after many meetings with Federal Reserve representatives to ensure that any risks were flagged and mitigated.

Nor was the Board's eligibility review a perfunctory exercise. Once Custodia applied for a master account, the Board spent over a year evaluating Custodia, including its business plan and its eligibility for a master account, evaluating the permissibility of crypto-related banking services as well as broader policy issues and risks presented by SPDIs in general. Custodia Br. ¶¶ 8–17, 21–23. The Board convened a Board-controlled working group—the NTAA Workstream—with separate "Policy" and "Practical" workstreams that were populated largely

by Board staff.  *Id.* ¶¶ 16–17.  In the meantime, Kansas City Fed examiners also reviewed

Custodia and reached favorable conclusions about its management team, business plan, and

approach.  *Id.* ¶ 54.  Ultimately, just days after Chairman Powell promised Senator Lummis that

he would address the SPDI eligibility question during his Senate confirmation hearing, the

Board's General Counsel contacted Custodia to notify it that the Board had decided to deem

Custodia eligible.  *Id.* ¶ 45.

Congress empowered Defendants to manage risk in two ways.  First, the Board can

manage risk as part of its eligibility determination, which can take into account whether the bank

is engaged in legally impermissible activities.  And second, the Reserve Banks can establish

terms governing master account usage for members and nonmembers, such as by requiring banks

to maintain sufficient balances in their master accounts to clear their account at the end of each

day.  *See* 12 U.S.C. § 248a(c)(2).  Indeed, the Kansas City Fed was progressing with considering

Custodia's master account application with conditions through November 2022, prior to shifting

gears shortly after the FTX implosion and a meeting about Custodia's membership and master

account applications that Vice-Chair Barr held in late November 2022.  Custodia Br. ¶¶ 47, 49–

51.  What Defendants cannot do, however, is bar access to the payments system or frustrate

Section 248a by imposing conditions that functionally equate to denial.

## IV.     THE BOARD CONTROLLED THE DECISION ON CUSTODIA'S MASTER ACCOUNT APPLICATION.

There is no genuine dispute of material fact that would preclude summary judgment in

this case.  Fed. R. Civ. P. 56(a).  "A disputed fact is 'material' if it might affect the outcome of

the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Janny v. Gamez*, 8 F.4th 883,

898 (10th Cir. 2021) (citation omitted).

The Kansas City Fed's about-face once the Board issued its first draft of the Guidelines, took control over Custodia's membership exam, and faced Custodia's lawsuit starkly reveals the extent of the Board's influence on the outcome of Custodia's master account application.

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████  To the extent weaknesses were observed, everything could "be addressed." Ex. AQ, ECF No. 236-43, at 5.  After, the Board intervened, the Fed did an about-face and declared management "lack[ing]" in "depth," Ex. BS, ECF No. 236-71, at FRB-AR-000331, "risk management gaps" were "significant," *id.*, at FRB-AR-000329, there was "liquidity risk" and "lack" of a "robust capital" framework, *id.*, at FRB-AR-000331–32, Custodia was mischaracterized as having a "monoline business plan," *id.*, at FRB-AR-000326, 28, was alleged to pose "significant BSA/AML risks," *id.*, at FRB-AR-000327, and problems were "not fixable," Ex. CU, at FRBKC-00013854.  The Board essentially re-wrote history to justify its counter-narrative in the litigation, dooming Custodia's master account application.  But the Board's fingerprints are all over this, evidenced by the Board's NTAA Workstream, Guidelines, Handbook, S-Letter, edits to the Kansas City Fed denial memo, and ultimate veto power.  This conclusively answers the Court's discovery question (who did what to whom).

The Kansas City Fed responded to the facts listed in Custodia's opening brief by offering scant, one-word responses of "disputed" or "undisputed" in a chart—without any further explanation regarding what exactly the Kansas City Fed disputes versus which parts of Custodia's statements the Kansas City Fed concedes.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1.  But upon closer examination, when one compares the statements of facts offered by Custodia and the Kansas City Fed, it is apparent that the core facts set forth in the attached Appendix A are not genuinely in dispute.  There is no need for a trial because Custodia is entitled to summary judgment on the statutory argument, and the facts that matter reinforce the Board's extensive involvement in the decision-making process and the Kansas City Fed's continuous deference to the Board.[3]

Defendants' arguments are largely focused on how the Court should interpret the meaning of the key facts in the case—such as the Guidelines, the S-Letter, and the Handbook—rather than the existence of the facts themselves.  It is undisputed that the Board, not the Kansas City Fed, did the following: formed the NTAA Workstream; decided whether Custodia was eligible for a master account; promulgated the Guidelines, and beyond public view issued the S-Letter and accompanying Handbook (which dictate how master account applications are

---

[3] The Kansas City Fed spends pages attacking Custodia's business model, attacking the qualifications of its personnel, and defending the alleged reasoning for the denial of Custodia's master account application.  *See* FRBKC Br. ¶¶ 24–80.  But the Court has already ruled that the reason for denial is not at issue.  *See* Order Denying Wy. Mot. for Permission to Intervene, ECF No. 162, at 5 ("The reasoning for the denial is not at issue").  Moreover, none of that is relevant to whether Section 248a entitles Custodia to a master account, which is a pure question of law, or to the question of which entity controlled the decision over Custodia's master account application.  Although Custodia vigorously contests many of the Kansas City Fed's assertions, *see* Ex. CR (Custodia Bank, Inc.'s Objections to the Federal Reserve Bank of Kansas City's Counterstatement of Undisputed Facts), those factual disputes do not prevent the Court from granting summary judgment because they do not "affect the outcome of th[is] suit."  *Janny*, 8 F.4th at 898 (citation omitted).  The Court can disregard much of the Kansas City Fed's brief.

evaluated); revised the Kansas City Fed's rationale for denying Custodia's master account application (unbeknownst to President George or her senior deputy, Tara Humston); and denied Custodia's membership application (which relegated Custodia to dead-end, Tier 3 status). *See infra*, Appendix A. In the face of this overwhelming evidence, the Kansas City Fed responds by pointing to self-serving testimony from its employees asserting that President George decided Custodia's master account application, *see* FRBKC Br. at 42–43, but the record reveals the superficial nature of those claims. To be sure, the Kansas City Fed communicated the denial decision to Custodia. FRBKC Br. ¶ 101; Custodia Br. ¶ 57. But the Board, through its actions and its policies, did not leave the decision to the unfettered discretion of the Kansas City Fed. No "rational trier of fact" who considers "the record . . . as a whole" could deny that the Board controlled the decision on Custodia's master account application given its extensive involvement. *Heard v. Dulayev*, 29 F.4th 1195, 1202 (10th Cir. 2022) (citation omitted).

### A.   The Board Controlled the Master Account Decision Via the Guidelines.

The Kansas City Fed offers the misguided argument that "Custodia brings no proof that [the Kansas City Fed] would have granted Custodia's request had the [G]uideline[s] not been issued" and therefore "failed to establish that the [Guidelines] had any impact on [the Kansas City Fed's] decision." FRBKC Br. at 45–46. Any refusal to issue a master account to Custodia would have been unlawful. *See supra* § II. But the reality is that the Kansas City Fed, with heavy editing by the Board, applied the Guidelines to Custodia's master account application in the final recommendation memo. *See* Ex. CV, at FRB-AR-000005–06; *see also* Ex. BS, ECF No. 236-71, at FRB-AR-000326 (showing where the Board directed the Kansas City Fed to include a Guidelines analysis).

The Board issued the Guidelines; the Guidelines set the framework for analyzing master account requests; at the Board's direction, the Kansas City Fed (with Board edits) applied the

Guidelines to Custodia's master account request; and then the Board used the Handbook and S-Letter to check the Kansas City Fed's work all while holding out the ability to veto any decision with which it disagreed.  These facts, all undisputed, are crucial to understanding how the Board "controll[ed] the outcome of Custodia's master account application."  MTD Order at 11.

### B.     The Board Controlled the Master Account Decision Via its Membership Decision.

Among other changes to the review process, the Guidelines elevated the importance of membership in the Federal Reserve—which the Board indisputably controlled—in the assessment of Custodia's master account application.  *See, e.g.*, FRBKC Br. ¶ 101 (Kansas City Fed conceding that the Board voted on Custodia's membership application).  As the Kansas City Fed's Judith Hazen testified, Custodia would have been analyzed as "non-routine" before the Guidelines regardless of whether it was a member of the Federal Reserve, but after the Guidelines, the tiering system made the Board's membership decision determinative of whether Custodia was in Tier 2 or Tier 3.  Ex. CW (Hazen Tr. (Vol. 2)), at 390:5–391:4.

Moreover, the Board's General Counsel, Mark Van Der Weide, urged Custodia to apply for membership.  Ex. AE (Long Tr.), ECF No. 236-31, at 222:21–223:22.  This subjected Custodia to a Board-controlled membership review.  This turned into a bait-and-switch when the Fed, in the middle of its examination, veered from a routine pre-membership exam based on Day One activities to a full-scope examination covering Custodia's entire three-year business plan and using a "complex bank" standard comparable to that used for $10 billion-plus banks.  *See* Custodia Br. ¶ 30.  This change meant that Custodia, as a *de novo* bank, was judged against an unfair standard—indeed, an illegal standard under the MCA, given that the MCA does not allow the Board to subject a bank to a membership-like review for purposes of obtaining a master account.  *See supra* §§ II–III; *see also* Ex. CX (Conti-Brown Tr.), at 286:15–288:9 (describing

the intent of the MCA framers to remove the Fed's authority to impose "membership entrance standards" for access to services).  And when Custodia remediated the issues, as it was invited to do, the Board simply ignored that work and failed to conduct a follow-up review, as it had committed to do in writing and as would have been customary.  Custodia Br. ¶¶ 32–33.

The Board's actions on membership were a pretext for denying Custodia's master account application.  As deposition testimony from Kansas City staffers shows, the Board's denial of Custodia's membership application effectively dictated the decision on Custodia's master account application.  *See* Ex. AH (May-Oder (Vol. I) Tr.), ECF No. 236-34, at 72:23–73:14 (describing that when Custodia applied for membership, "our work was – became – a lot of what they started to look at through the membership application we could also use from a master account" perspective); *id.* at 203:13–25 ("we were waiting to see . . . what the outcome of the membership was to see . . . [if Custodia] mov[ed] into a Tier 2"); Ex. N (Hazen Tr.), ECF No. 236-14, at 248:2–14 ("The timing of the membership decision and the final decision on the master account was based on the timing of the Board of Governors' decision on the membership."); Ex. E (Humston Tr.), ECF No. 236-5, at 403:16–404:12.

## C.    The Board Controlled the Master Account Decision Via the S-Letter and Revisions to the Recommendation Memo.

The Board also required Reserve Banks to implement the Guidelines via a behind-the-scenes S-Letter, which required Reserve Banks to "consult" with Board staff regarding master account applications.  Ex. AS, ECF No. 236-45, at FRB-AR-000015.  The terms of the S-Letter ensure that the Board controls master account decisions, particularly for Tier 3 institutions that are subject to the highest scrutiny.  *Id.*  There is also no dispute that "[p]ursuant to" the S-Letter, the Kansas City Fed provided its recommendation memo to Board staff.  Ex. CB, ECF No. 236-80.  Staff from four different Board divisions provided feedback on that recommendation memo

in the form of both comment bubbles and tracked changes.  FRBKC Br. ¶ 79; Custodia Br.

¶¶ 52–56.

    While the parties dispute how to characterize the Board's revisions, *compare* Custodia

Br. ¶¶ 52–56, *with* FRBKC Br. at 46; Bd. Br. at 36–37, nobody denies that they occurred.  They

reflect far deeper involvement by the Board than Defendants previously acknowledged before

discovery began.  *See* Custodia Br. ¶¶ 52–56.  In any event, there is no dispute that the Kansas

City Fed shared a revised version of its recommendation memo with the Board, that the revised

memo incorporated the Board's revisions, and that the Kansas City Fed did not act until after the

Board confirmed it had "no concerns" with denying Custodia's master account application.

FRBKC Br. ¶ 96; Custodia Br. ¶ 56.[4]

    The Kansas City Fed asks "[w]hy would the Board go through" the effort to promulgate

Guidelines and the S-Letter "instead of simply imposing its will."  FRBKC Br. at 48 (quotation

marks omitted).  The short answer is to give a veneer of independence.  The slightly longer

answer is that the Board did impose its will by issuing the Guidelines, the Handbook, and the S-

Letter, and by wielding a veto that it could use at any time.

    At the end of the day, "the record taken as a whole could not lead a rational trier of fact

to" doubt that the Board controlled the decision over Custodia's master account application.

---

[4] The Kansas City Fed asserts that there was no "internal Board analysis regarding" Custodia's
master account request.  FRBKC Br. at 47.  Notably, the Board says no such thing.  The Board
only produced an administrative record covering roughly a one-month period starting in January
2023, *see* ECF No. 178, even though discovery from the Kansas City Fed revealed far more
extensive and prolonged Board involvement.  The parties stipulated that the entire discovery
record would be used for all purposes in this case, ECF No. 220, but Custodia was not afforded
the opportunity to take discovery from the Board to learn what else existed internally about
Custodia's master account application.  At any rate, the existing Administrative Record shows
that the Board revised the Kansas City Fed's analysis of Custodia's master account to conform to
the Board-promulgated Guidelines and S-Letter, and ultimately approved of the revised
rationale.  FRBKC Br. ¶ 96; Custodia Br. ¶¶ 52–56.

*Heard*, 29 F.4th at 1202 (citation omitted).  For that reason, "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 980 (10th Cir. 2022).  The facts adduced in discovery are sufficiently clear that it is not necessary to hold a trial to answer the statutory question.

## V.   EVEN IF THE KANSAS CITY FED DECIDED CUSTODIA'S MASTER ACCOUNT APPLICATION, SECTION 248A ENTITLES CUSTODIA TO RELIEF.

In its Order denying Defendants' Motions to Dismiss Amended Complaint, the Court elected to forgo "a full statutory interpretation of the matter" at that time because it held that "further development of important facts," particularly the roles played by the Board and the Kansas City Fed, could inform its legal analysis.  MTD Order at 10–11.  Discovery has now given the lie to Defendants' claim that Reserve Banks alone decide master account access questions, especially for novel charters like SPDIs.  The facts confirm Custodia's theory of the case:  The Board of Governors "was pulling the puppet strings behind the scenes" and Section 248a governs the Court's analysis.  *Id.* at 10.

Even if the Court were to conclude, counterfactually, that the Kansas City Fed decided Custodia's master account application, Section 248a still entitles Custodia to relief.  Under Section 248a, "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions."  Notably, the statute is written in the passive voice; while Section 248a states that Federal Reserve services "shall be available," it does not specify the entity responsible for making such services available.  Congress left open ***how*** the Federal Reserve System would provide Federal Reserve Services to depository institutions; but, as explained above (*supra* § II) and in Custodia's Opening Brief, Congress was explicit ***that*** all eligible depository institutions would be entitled to access to Federal Reserve Services.  The legislative history confirms this reading and is crystal clear that Congress intended for all

41

depository institutions to have access to such services.  Custodia Br. § I.E.  Similarly, there is a

long history of both the Board and the Reserve Banks applying the MCA consistent with

Congress's intent and recognizing that Federal Reserve Services are available to all eligible

depository institutions.  Custodia Br. §§ I.C–D.  Courts and academics agree that Section 248a

entitles all eligible depository institutions to access the Federal Reserve payments system.

Custodia Br. §§ I.F–G.  No matter how the Board and the Reserve Banks allocate responsibility

for providing Federal Reserve Services, eligible depository institutions such as Custodia are

unambiguously entitled to such services under Section 248a.

## VI.    CONCLUSION

For the foregoing reasons, Custodia's Petition for Review on its APA Claim and Motion

for Judgment as a Matter of Law on its Statutory Mandamus Claim should be granted and the

Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment should be denied.

DATED this 16th day of February, 2024.

CUSTODIA BANK, INC., Plaintiff

By:    /s/ Scott E. Ortiz                              
Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:    (307) 265-0700
Email:        sortiz@wpdn.net

-and-

John K. Villa, *pro hac vice*
Ryan Scarborough, *pro hac vice*
Lauren Weinberger, *pro hac vice*
Ian Swenson, *pro hac vice*
Russell Mendelson, *pro hac vice*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024

42

Telephone:   (202) 434-500
Emails:      jvilla@wc.com
                rscarborough@wc.com
                lweinberger@wc.com
                iswenson@wc.com
                rmendelson@wc.com

*Attorneys for Plaintiff*

**APPENDIX A: CORE FACTS THAT FRBKC HAS NOT DISPUTED**

     **1.**      **Wyoming Developed the SPDI Charter in Consultation with the Kansas City Fed.**

     1.      In 2019, Wyoming created a charter for Special Purpose Depository Institutions ("SPDIs").  FRBKC Br. ¶ 25; Custodia Br. ¶ 2.

     2.      The Kansas City Fed consulted with and provided feedback to the Wyoming Division of Banking as it developed its SPDI legislation.  FRBKC Br. ¶ 28; Custodia Br. ¶¶ 3–4.

     3.      SPDIs are fully reserved (i.e., their reserves must cover 100% of deposits) and do not make loans.  FRBKC Br. ¶ 25; Custodia Br. ¶ 2.

     4.      The Wyoming Division of Banking supervises SPDIs.  FRBKC Br. ¶ 27; Custodia Br. ¶ 5.

     **2.**      **The Board Issued Guidelines that Were Applied to Custodia's Master Account Application.**

     5.      In May 2021, while Custodia's master account application was pending, the Board proposed Account Access Guidelines that applied to the assessment of master account requests.  FRBKC Br. ¶ 86; Custodia Br. ¶ 18.

     6.      The Kansas City Fed told Custodia that its master account application would not be decided until the Guidelines were finalized.  FRBKC Br. ¶ 92; Custodia Br. ¶ 23.

     7.      The Board finalized the Guidelines in August 2022.  FRBKC Br. ¶ 92; Custodia Br. ¶ 19.

     8.      The memo that sets forth the rationale for denying Custodia's master account application applied the Guidelines' framework to Custodia's master account application.  Ex. CV, at FRB-AR-000005–06.

     **3.**      **The Board Issued an S-Letter that the Board and the Kansas City Fed Followed When Deciding Custodia's Master Account Application.**

     9.      The Board issued an "S-Letter" to instruct Reserve Banks regarding how to implement the Guidelines, and finalized it days before the Custodial denial. FRBKC Br. ¶ 93; Custodia Br. ¶¶ 34, 36.

     10.     The S-Letter required Reserve Banks to notify Board staff when there were new account access requests from institutions that raised novel issues.  FRBKC Br. ¶ 94; Custodia Br. ¶ 37.

     11.     Accompanying the S-Letter was a "Handbook" that described to Reserve Banks how to implement the Account Access Guidelines. FRBKC Br. ¶ 97; Custodia Br. ¶ 38.

Pursuant to the Handbook, the Kansas City Fed was required to consult with Board staff regarding Custodia's master account application, and in fact did so.  Custodia Br. ¶ 41. [5]

12.     "Pursuant to" the S-Letter, the Kansas City Fed was required to consult with Board staff regarding Custodia's master account application, and in fact did so.  FRBKC Br. ¶ 95; Custodia Br. ¶ 37.

### 4.     The Board Denied Custodia Membership in the Federal Reserve.

13.     Custodia applied for membership in the Federal Reserve in 2021 at the urging of Board General Counsel Mark Van Der Weide,[6] while its master account application was pending. FRBKC Br. ¶ 98; Custodia Br. ¶¶ 24–25.

14.     The decision on Custodia's master account application was delayed while the Board considered Custodia's membership application.  FRBKC Br. ¶ 100; Custodia Br. ¶ 26.

15.     The Board made the decision to deny Custodia's membership application. FRBKC Br. ¶ 101; Custodia Br. ¶ 57.

16.     Kansas City Fed officials working on Custodia's master account application understood that they were not to get out ahead of the Board's membership decision.  FRBKC Br. ¶ 100; Custodia Br. ¶ 26.

17.     If Custodia had been granted membership, that would have meaningfully changed the assessment of Custodia's master account application. FRBKC Br. ¶ 99; Custodia Br. ¶ 26.

### 5.     The Board Was Involved in Custodia's Master Account Application Every Step of the Way.

18.     A depository institution must either open a master account or work with another institution that has a master account in order to access Federal Reserve services.  FRBKC Br. ¶ 5 & n.3; Custodia Br. ¶¶ 8–9.

---

[5] The Kansas City Fed cites a variety of paragraphs from its Counterstatement of Undisputed Facts in support of its assertion that paragraph 41 of Custodia's brief is in dispute.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1, ¶ 41.  But none of the cited paragraphs contest that pursuant to the Handbook, the Kansas City Fed was required to consult with Board staff regarding Custodia's master account application or that the Kansas City Fed in fact did so.

[6] The Kansas City Fed cites a variety of paragraphs from its Counterstatement of Undisputed Facts in support of its assertion that paragraph 24 of Custodia's brief is in dispute.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1, ¶ 24 (citing FRBKC Br. ¶¶ 98–101).  But none of the cited paragraphs are relevant to whether Mark Van Der Weide urged Custodia to apply for membership.

19.     Custodia submitted its master account request in October 2020.  Custodia Br. ¶ 8; FRBKC Br. ¶ 47.

20.     Custodia is "eligible" for a master account.  FRBKC Br. ¶ 55; Custodia Br. ¶ 45.

21.     The Board, not President George, established system-wide working groups to address policy issues regarding non-traditional master accounts shortly after Custodia filed its master account application. FRBKC Br. ¶ 85; Custodia Br. ¶¶ 16–17.

22.     The Kansas City Fed consulted with Board Legal regarding Custodia's eligibility for a master account, and Board Legal determined that Custodia was eligible.  FRBKC Br. ¶¶ 54–55; Custodia Br. ¶ 45.

23.     More than a dozen individuals at the Board were involved in reviewing Custodia's master account request.  Custodia Br. ¶ 44.[7]

24.     In late 2022, President George directed Kansas City Fed staff to draft a memo regarding potential actions on Custodia's master account.  FRBKC Br. ¶ 79; Custodia Br. ¶ 51.

25.     Pursuant to the S-Letter, the Kansas City Fed shared that memo with Board staff. FRBKC Br. ¶ 79; Custodia Br. ¶¶ 52–55.

26.     Staff from four different Board divisions – Supervision & Regulation (SR), Monetary Affairs (MA), Financial Stability (FS), and RBOPS – provided feedback on that recommendation memo.  FRBKC Br. ¶ 79; Custodia Br. ¶¶ 52–55.  That feedback came in the form of comment bubbles and tracked changes.  *See, e.g.*, Ex. BS, ECF No. 236-71.

27.     After implementing the Board's feedback, the Kansas City Fed shared a revised version of its recommendation memo with the Board.  FRBKC Br. ¶ 96; Custodia Br. ¶ 56.

28.     Two days later, the Board responded that it had "no concerns" with denying Custodia's master account application. FRBKC Br. ¶ 96; Ex. CC, ECF No. 236-81.

29.     Custodia's membership application was denied on January 27, 2023.  Custodia's master account application was denied later that same day.  FRBKC Br. ¶¶ 80, 101; Custodia Br. ¶ 57.

---

[7] The Kansas City Fed cites a variety of paragraphs from its Counterstatement of Undisputed Facts in support of its assertion that paragraph 44 of Custodia's brief is in dispute.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1, ¶ 44.  But none of the cited paragraphs are relevant to the number of Board employees who were involved in reviewing Custodia's master account request.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document was served this day of February 16, 2024, addressed to:

Mark Van Der Weide
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
Erin E. Berry
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
Emily Caroline Snell Freeman
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Angela Tarasi
Jared M. Lax
KING & SPALDING, LLP
1401 Lawrence Street
Suite 1900
Denver, Colorado 80202

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

    /s/ Scott E. Ortiz
Scott E. Ortiz