# EXHIBIT CR

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

**Custodia Bank Inc.'s Objections to the Federal Reserve Bank of Kansas City's Counterstatement of Undisputed Facts**

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| 1 | The Federal Reserve is composed of the Board, twelve regional Reserve Banks, and the Federal Open Market Committee ("FOMC"). 12 U.S.C. § 222. Congress created the Federal Reserve "to oversee banking operations and promote [] greater economic stability." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019); *see also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1228 (6th Cir. 1983) ("The Federal Reserve System ... functions as the nation's chief money manager. It is this nation's central bank, performing a vital governmental role."). It serves the public interest by promoting a stable financial system and implementing monetary policy. *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F. Supp. 2d 202, 232 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538, 539 (D.C. Cir. 1985). | Undisputed. |
| 2 | The Federal Reserve ensures "the stability of the financial system" by "minimiz[ing] and contain[ing] systemic risks." U.S. Fed. Rsrv. Sys., No. 0821, The Fed Explained: What the Central Bank Does ("The Fed Explained") at 1 (11th ed. 2021), http://tinyurl.com/a7y83ejh. | Disputed in part. The Federal Reserve Board of Governors ("Board") is tasked with ensuring "the stability of the United States financial system." *See* Pl. Custodia Bank, Inc.'s Omnibus Br. in Support of its Petition for Review on its APA Claim and its Mot. for Judgment as a Matter of Law on its Statutory Mandamus Claim, Statement of Material Facts not in Dispute, ECF No. 234 ("Custodia SOMF") ¶ 12 (quoting 12 U.S.C. § 5322(a)(1)). But given that every bank poses some measure of risk, the Board's role is, *inter alia*, to *manage* risk rather than to forbid it. *See* Ex. A, ECF No. 236-1, ¶ 57. |
| 3 | In furtherance of the Federal Reserve's mission, Reserve Banks "take the lead in providing accounts and payment | Disputed in part. Payment services do include items such as check clearing, wire transfers, ACH payments, and FedNow. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | services to depository institutions." *See id.* at 86-87. Payment services include check clearing, wire transfers, Automated Clearinghouse ("ACH") payments, and FedNow, a real-time settlement system. *See id.* at 4, 11, 38, 93-95. | *See* Custodia SOMF ¶ 8. But the Board has taken control of decisions regarding access to these payment services, which requires a master account, by issuing the Account Access Guidelines ("Guidelines"), S-Letter, the Implementation Handbook ("Handbook"), and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63. |
| 4 | Congress authorized Reserve Banks to carry out this function, 12 U.S.C. §§ 341-361, and granted them discretion to do so, 12 U.S.C. § 342 ("Any Federal reserve bank *may* receive from any of its member banks, or other depository institutions ... deposits" (emphasis added)). | Disputed. Custodia's Omnibus Opening Brief describes why this legal argument is erroneous. *See* Pl. Custodia Bank, Inc.'s Omnibus Br. in Support of its Petition for Review on its APA Claim and its Mot. for Judgment as a Matter of Law on its Statutory Mandamus Claim ("Custodia Br."), ECF No. 234, at 31–55. |
| 5 | To directly access Federal Reserve services, a depository institution must open a "master account" with its administrative Reserve Bank and place deposits therein.* Reserve Maintenance Manual, FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl.<br><br>* Fn: A master account is not required "to engage in banking or bank-like activities." Ex. 2 ("Ricks Rep.") at 11. Rather, financial institutions can "'plug in' to the Federal Reserve's payment services" through intermediaries. *Id.* at 9. | Disputed in part. It is true that a depository institution must open a master account with a Reserve Bank in order to directly access Federal Reserve services. Custodia SOMF ¶¶ 8–9. But it is untrue that a depository institution can indirectly access all Federal Reserve services via an intermediary. *See, e.g.*, Fed. Rsrv. Fin. Servs., Fed. Rsrv. Banks Operating Circular No. 1: Account Relationships at 6 (effective Sept. 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf ("Correspondent – Respondent relationships cannot be established for Fedwire Funds Service transactions, Fed Funds checks, and Custodial Inventory Program transactions, which must settle in a Financial Institution's own Master Account."). And whether such access through an intermediary is achievable is wholly subject to a willing intermediary's approval, which can be rescinded at any time. Custodia SOMF ¶ 9. Consequently, the loss of a relationship with an intermediary can pose an existential risk to a bank that has no master account, especially if that bank is unable to find or quickly |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | integrate with a replacement when a partner bank closes its account. Custodia has already experienced this, as one of its partner banks closed Custodia's account in 2023 due to "regulatory pressure." Ex. CY (Shimko Tr.), at 220:20–221:10. |
| 6 | As set forth below, a depository institution's access to services presents at least three different categories of risk: risk to the Reserve Bank, risk to implementation of monetary policy through the Federal Reserve's balance sheet, and risk to the overall payment system. | Disputed in part, with respect to risk to the Reserve Bank. "Significant losses" that are accrued by one Reserve Bank are "shar[ed] with other Reserve Banks" in accordance with "the [Federal Reserve] System's existing Loss Sharing Agreement." Standard Operating Procedure 10.0: Financial Institution Account Management Procedures, Federal Reserve 20–21 & n.36 (Dec. 31, 2022) ("The *Risk Management Agreement of the Federal Reserve Banks*, dated October 24, 2005 (SCRM Document 3821), as amended from time to time, is the agreement by and among the Reserve Banks for establishing credit risk management responsibilities and loss allocation. The *Loss Sharing Agreement of the Federal Reserve Banks*, dated January 1, 2016, governs loss sharing among the Reserve Banks."). |
| 7 | Risk to the Reserve Bank includes counterparty credit risk. Reserve Banks extend credit to banks that use the payment system, and a Reserve Bank is therefore at risk of losing money that a depository institution may owe to it. *See* Bd. of Governors, Federal Reserve Policy on Payment System Risk, at 3-4, 15, 33 (*as amended* July 20, 2023), https://bit.ly/3zVvBd1. Losses incurred by a Reserve Bank are ultimately borne by U.S. taxpayers. *See* Tim Sablik, Fed. Rsrv. Bank of Richmond, *The Fed Is Shrinking Its Balance Sheet. What Does That Mean?*, Econ Focus 4, 7 (Q3 2022), http://tinyurl.com/5x66nes8 (noting that Federal Reserve losses could require fiscal support from the Treasury). | Disputed, to the extent this is specifically addressing Custodia (Custodia's business plan avoids the use of Reserve Bank credit, *see generally* Ex. 22, ECF No. 274-22). If a depository institution always has a positive clearing balance and no discount window access, it would not pose counterparty credit risk. *See* Ex. 18, ECF No. 277-4 (Long Tr.), at 14:24–15:13 (describing Custodia's proposal to President George for Custodia to "forgo access to the discount window" and have "a zero net debit cap master account" where Custodia could "not ever overdraw" its master account). <br><br> Disputed in part, with respect to the characterization of risk to the Reserve Bank. "Significant losses" that are accrued by one |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  |  | Reserve Bank are "shar[ed] with other Reserve Banks" in accordance with "the [Federal Reserve] System's existing Loss Sharing Agreement." Standard Operating Procedure 10.0: Financial Institution Account Management Procedures, Federal Reserve 20–21 & n.36 (Dec. 31, 2022) ("The *Risk Management Agreement of the Federal Reserve Banks*, dated October 24, 2005 (SCRM Document 3821), as amended from time to time, is the agreement by and among the Reserve Banks for establishing credit risk management responsibilities and loss allocation. The *Loss Sharing Agreement of the Federal Reserve Banks*, dated January 1, 2016, governs loss sharing among the Reserve Banks."). |
| 8 | Master accounts are "bank account[s] for banks," *see TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, 2020 WL 1445806, at *1 (S.D.N.Y. Mar. 25, 2020), and just as commercial banks protect themselves against counterparty credit risk by doing business only with those customers deemed creditworthy, Reserve Banks do the same. *See, e.g.*, 12 C.F.R. § 201.1, *et seq.* (establishing rules under which a Reserve Bank may extend credit to depository institutions and others); Federal Reserve Policy on Payment System Risk at 15-35 (outlining the methods used to provide intraday credit while controlling credit risk to the Reserve Banks). | Disputed. This presents an inaccurate legal assertion implicating the parties' disputed interpretations of the Monetary Control Act of 1980 ("MCA"). While Reserve Banks may manage counterparty credit risk in ways that are legally authorized, *i.e.*, imposing conditions that are equally applicable to both members and non-members, such as requiring a sufficient clearing balance in the master account, they may not bar access to a master account for a legally eligible depository institution under the MCA. 12 U.S.C. § 248a(c)(2); *see* Custodia Br. at 31–55. |
| 9 | The second risk concerns the Federal Reserve's ability to implement monetary policy. When a bank deposits money in a master account, the deposits ("reserve balances") sit directly on the Federal Reserve's balance sheet. *See Monetary Policy: Credit and Liquidity Programs and the Balance Sheet*, FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva. The more deposits, the bigger the | Undisputed. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | liabilities on the balance sheet. *See id.* |  |
| 10 | When the Federal Reserve seeks to implement monetary policy by increasing (or decreasing) monetary supply, its ability to do so may be affected by the magnitude and nature of the liabilities on the balance sheet. *See* Jane Ihrig, Zeynep Senyuz, & Gretchen Weinbach, The Fed's "Ample Reserves" Approach to Implementing Monetary Policy (Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020), http://tinyurl.com/29xuwpw8. | Disputed in part, to the extent this is specifically addressing Custodia, and incomplete. Myriad factors can influence monetary policy. Paper currency has "traditionally been the largest liability item on the Fed's balance sheet," and there are more than $1.8 trillion of notes in circulation. *See* Jane Ihrig, Zeynep Senyuz, & Gretchen Weinbach, The Fed's "Ample Reserves" Approach to Implementing Monetary Policy at 33 (Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020), http://tinyurl.com/29xuwpw8. Any deposits Custodia might place in its master account would be negligible compared to the overall magnitude of the liabilities on the Federal Reserve's balance sheet. Moreover, other factors (such as the size of so-called shadow banking or the offshore "Eurodollar" market) minimize the size of the Federal Reserve's balance sheet with respect to monetary policy. |
| 11 | A third risk is systemic. If a bank with a master account fails, its inability to make good on payments could result in harm to others and undermine faith in the system. *See, e.g.*, Federal Reserve Policy on Payment System Risk at 4-5. | Disputed, to the extent this is specifically addressing Custodia. There is no risk that Custodia would not have made good on its payments for a master account, as Custodia's master account application contemplated that it would "forgo access to the discount window" and have "a zero net debit cap master account where" Custodia could "not ever overdraw" its master account. *See* Ex. 18, ECF No. 277-4 (Long Tr.), at 14:24–15:13. |
| 12 | To mitigate risks presented by access to master accounts and services, the Federal Reserve has long exercised discretion to grant, deny, or limit banks' ability to deposit funds and access services. Numerous examples in the public record are described in the Board's brief being filed today, which is incorporated by reference herein (the "Board's brief"). These examples show Reserve Banks' | Disputed. This presents an inaccurate legal assertion, as the Federal Reserve does not have "discretion" to deny access to a master account under the MCA. *See* Custodia Br. at 31–55. To the extent the Federal Reserve Bank of Kansas City ("FRBKC") makes a legal assertion regarding the ability of the Federal Reserve to deny access to payment services before 1980, that is immaterial to this case. Furthermore, Custodia |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | exercise of discretion over access to clearing accounts dating back to the 1930s. *See, e.g.*, Ex. 3 (Letter No. X-9187 from Chester Morrill, Sec'y, Fed. Rsrv. Bd., to E.M. Stevens, Chairman, Fed. Rsrv. Bank of Chi., 364, 372 (Apr. 26, 1935), https://perma.cc/UGY2-EAP7 ("It is the Board's view that requests for the establishment of clearing accounts by nonmember banks should be passed upon by [Reserve Bank] directors *in the light of all the circumstances surrounding each application*." (emphasis added)). They also include, in more recent years, numerous policies in the public record. *See, e.g.*, Ex. 4 (Fed Rsrv. Bank of Dallas, Circular No. 85-75 on Large Wire Transfers (June 4, 1985)); Ex. 5 (Operating Circular 1 ("OC1") (1998)); Ex. 6 (Policy on Payments System Risk, 69 Fed. Reg. 69,926 (Dec. 1, 2004)). | disputes any legal assertion—in this or any other paragraph—that any Federal Reserve System internal policies contravening the MCA (or any other legal authority) are legally enforceable to the extent the FRBKC's reference to such policies imply as much. |
| 13 | Internal policies and procedures likewise reflect Reserve Bank discretion over access to master accounts and services. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ | Disputed in part. While Custodia acknowledges that some policies and procedures exist at the FRBKC, it is an inaccurate legal assertion to imply that these policies and procedures mean that the Reserve Banks have "discretion" to deny access to a master account under the MCA. *See* Custodia Br. at 31–55. |
| 14 | ████████████████████████████████████ | Disputed in part. While Custodia acknowledges that the SOP 10 Eligibility Processing Guidelines exist, it is an inaccurate |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | legal assertion to imply that this policy means that the Reserve Banks have "discretion" to deny access to a master account under the MCA. *See* Custodia Br. at 31–55. |
| 15 | Reserve Banks adopt and implement their own policies and procedures concerning access to services. *See, e.g.*, Ex. 9 (Fed. Rsrv. Bank of N.Y., Guidance for Federal Reserve Financial Services Applicants That Are Deemed High Risk by the Federal Reserve Bank of New York (Aug. 18, 2014)); Ex. 10 (Fed. Rsrv. Bank of N.Y., Accounts and Financial Services Handbook (Feb. 25, 2020)). | Disputed in part. Custodia acknowledges that some policies and procedures exist at the Reserve Banks. But the Board has taken control of decisions regarding access to payment services via a master account by issuing the Guidelines, S-Letter, Handbook, and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63. Custodia disputes any legal assertion—in this or any other paragraph—that any Federal Reserve System internal policies contravening the MCA (or any other legal authority) are legally enforceable to the extent the FRBKC's reference to such policies imply as much. |
| 16 | FRBKC is the administrative Reserve Bank for the Federal Reserve's Tenth District. *See* Fed. Rsrv. Bank of Kansas City, *What We Do* (Jan. 8, 2021), https://www.kansascityfed.org/careers/what_we_do/. As such, FRBKC is responsible for providing services to banks located in several states, including Wyoming, and for monitoring and mitigating the risks arising therefrom. *See id.* FRBKC has a department dedicated to this—the aptly named Credit Risk Management ("CRM") Department. *See* Ex. 11 at FRBKC-00010263 (noting that a Reserve Bank's CRM department manages payment system access). | Disputed in part. Custodia acknowledges that the FRBKC is the Reserve Bank for the Tenth District and has a department referred to as "CRM." However, Custodia disputes the implication that payment system access necessarily involves "credit risk" (*i.e.*, "the aptly named Credit Risk Management ("CRM") Department), as Custodia sought "a zero net debit cap master account where" credit was not extended. *See* Ex. 18, ECF No. 277-4 (Long Tr.), at 14:24–15:13. Custodia further disputes the implication that CRM "manage[d] payment system access" in Custodia's case, as the Board took control of the decision by issuing the Guidelines, S-Letter, |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | Handbook, and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63. |
| 17 | During the relevant period, Christi May-Oder served as the head of CRM. *See* Ex. 12 ("May-Oder Tr.") at 19:15-18, 20:19-21. At the time of the denial of Custodia's request, Ms. May-Oder reported to Judith Hazen, a Vice President of Supervision and Risk Management, who in turn reported to Tara Humston, the Senior Vice President of Supervision and Risk Management. *See* Ex. 13 ("Imgarten Tr.") at 113:2-20. Ms. Humston reported to then-President Esther George, see Ex. 14 ("Humston Tr.") at 10:12-16, who served as FRBKC's President and Chief Executive Officer from 2011 to 2023, *see* Fed. Rsrv. Bank of Kansas City, Esther L. George (2023), http://tinyurl.com/3bbzk9vm. | Undisputed. |
| 18 | | Disputed in part. Custodia acknowledges that the FRBKC had a "Procedures Manual," but disputes any implication that the manual was followed in Custodia's case. For example, the Board, not the FRBKC, determined Custodia's legal eligibility for a master account. Ex. BC, ECF No. 236-55; *compare* Ex. 15, ECF No. 274-15, at FRBKC-00015583–84 (requiring a "risk rating" as part of a post-eligibility assessment), *with* Ex. CZ (May-Oder Tr.), at 77:9–16 ("I don't recall if we gave [Custodia] a risk rating."). Custodia further disputes any legal implication that the "risk assessment" described complies with the MCA. *See* Custodia Br. at 31–55. |
| 19 | | Disputed. Custodia disagrees with any implication that the "risk assessment" described complies with the MCA or that the FRBKC's ordinary procedures were followed in Custodia's case. *See* Custodia Br. at 31–55; *compare* Ex. 15, ECF No. 274-15, at FRBKC-00015583–84 (requiring a "risk rating" as part of a post-eligibility assessment), *with* Ex. CZ (May-Oder |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | [REDACTED] "Routine" requests can be processed "in a week's time or less." Humston Tr. 191:2-7. | Tr.), at 77:9–16 ("I don't recall if we gave [Custodia] a risk rating."). Custodia is also unable to verify to what "fulsome" standard the FRBKC is comparing its risk assessments. |
| 20 | [REDACTED] "Routine" requests can be processed "in a week's time or less." Humston Tr. 191:2-7. | Disputed in part. Custodia acknowledges that the FRBKC had a manual that used the phrases "routine" or "non-routine," but disputes that this manual was followed in Custodia's case and disputes any legal implication that the manual described complies with the MCA. *See* Custodia Br. at 31–55. |
| 21 | [REDACTED] Non-routine requests are rare, and master accounts are rarely provided to entities that lack federal insurance and a federal regulator. *See* Ex. 16 ("30(b)(6) Tr.") at 298:19-299:2 (recalling only two such master accounts over the past twenty years).*  <br><br> * Fn: Custodia's assertion that there are 442 uninsured master account holders, Custodia Br. at 29, is incorrect. It offers as proof only Ms. Long's testimony that this was "publicly disclosed in the Fed's August database," Ex. 18 ("Long Tr.") at 139, but that database includes entities that | Disputed in part. Custodia acknowledges that the FRBKC had a manual that used the phrases "routine" or "non-routine," but disputes that this manual was followed in Custodia's case and disputes any legal implication that the manual described complies with the MCA. *See* Custodia Br. at 31–55.  <br><br> Custodia disputes the footnote's implication that it could otherwise access Federal Reserve services indirectly through an intermediary as described by the FRBKC. The FRBKC's argument that the database lists some financial institutions that access Federal Reserve services indirectly is likewise a distinction without a difference in this context. "Both avenues of access to Reserve Bank financial services are subject to the Account Access Guidelines." *Master Account and Services* |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | access Federal Reserve services through an intermediary. *See Master Account and Services Database*, FederalReserve.gov (*current as of* Nov. 30, 2023), http://tinyurl.com/4c95xdt9 ("Financial institutions accessing Reserve Bank financial services can settle transactions either by having their own master account or by using another depository institution's master account"). | *Database*, FAQ, FederalReserve.gov (current as of Nov. 30, 2023), http://tinyurl.com/4c95xdt9. In 2022, Custodia requested this form of indirect access but was denied regardless. There is no dispute that 442 *uninsured* entities have either direct or indirect access to Federal Reserve services; Custodia requested such access and was denied. |
| 22 | Historically, non-routine requests have "received the highest level of scrutiny and review." May-Oder Tr. 313:9-14; *see also* 30(b)(6) Tr. 359:15-20. | Disputed in part. Custodia acknowledges that the FRBKC had a manual that used the phrases "routine" or "non-routine," but disputes that this manual was followed in Custodia's case and disputes any legal implication that the manual described complies with the MCA. *See* Custodia Br. at 31–55. |
| 23 | At present, 540 institutions have master accounts with FRBKC. All but one are *both* federally insured and federally supervised.* The majority (394) are state-chartered. *See* Ex. 17 at Tab 13.<br><br>* Fn: The one institution lacking federal insurance and a federal supervisor is a century-old, traditional savings and loan association in Oklahoma. Brian Brus, *Old-fashioned financing: S&L still thriving without FDIC insurance*, J. Record (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx. | Disputed. The Federal Reserve's Master Account and Services Database lists 10 institutions within FRBKC's district that are not federally insured. *See Master Account and Services Database*, FederalReserve.gov (current as of Nov. 30, 2023), http://tinyurl.com/4c95xdt9. |
| 24 | The traditional business of banking involves taking deposits and making loans, and Wyoming provides a charter for institutions engaged in these activities. *See* Wyo. Stat. Ann. §13-2-201. Wyoming's traditional charter obligates banks to obtain insurance provided by the Federal Deposit Insurance Company ("FDIC"). Wyo. Stat. Ann. § 13-2-103. Deposit insurance is widely seen as having successfully protected against systemic bank runs | Disputed in part. While many banks may take deposits and make loans, the FRBKC offers no basis for concluding that making loans is required to qualify as engaging in "[t]he traditional business of banking." *Cf.* 12 U.S.C. § 1813(a)(2) (defining a "State bank" as "any bank . . . or other banking institution which . . . is engaged in the business of receiving deposits . . . and . . . is incorporated under the laws of any State"). |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | for nearly a century. *See* Douglas W. Diamond et al., Fed. Rsrv. Bank of Minneapolis, *Bank Runs, Deposit Insurance, and Liquidity*, 24 Quarterly Rev. 14 (2000), http://tinyurl.com/ycyt7byd. | |
| 25 | In 2019, Wyoming created a novel charter for "special purpose depository institutions" ("SPDIs"). Wyo. Stat. Ann. §§ 13-12-101–13-12-126. Unlike traditional banks, SPDIs are *prohibited* from engaging in lending and are not required to obtain insurance. SPDIs are expected to operate on a fully reserved basis and to generate revenue from fees on digital asset-related services. *See* Wyo. Stat. Ann. §§ 13-2-103, 13-12-103, 13-12-105; Wyo. Div. of Banking, *Special Purpose Depository Institutions* (2021), http://tinyurl.com/2p8uwc8p. | Disputed in part. Custodia acknowledges that Wyoming created the SPDI charter. Wyo. Stat. Ann. §§ 13-12-101–13-12-126. However, this statement makes an erroneous and unsupported legal argument that "traditional" banks are required to obtain insurance, *see* 12 U.S.C. § 461(b)(1)(A)(i), and further fails to differentiate between federal insurance (which is not available to SPDIs) and other types of insurance. |
| 26 | SPDIs are not subject to numerous federal statutes and regulations that apply to traditional banks and that have provided a time-tested process for ensuring the safety and soundness of the banking system. *See* Ex. 19 at FRBKC-00010139 (assessing applicability of various statutes and regulations to SPDIs). Notably, the parent companies of SPDIs are not subject to the restrictions and limitations in the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1841(c), because SPDIs do not fit that statute's definition of what constitutes a "bank." | Disputed. This statement presents a legal argument that overlooks that SPDIs are subject to nearly every federal banking law. *See, e.g.*, Wyo. Stat. Ann. § 13-12-103(f) ("A special purpose depository institution, including any branch of the institution, may only accept deposits or provide other services under this chapter to depositors engaged in activities which are lawful under the laws of Wyoming and federal law."); *id.* § 13-12-107 ("A special purpose depository institution shall comply with all applicable federal laws, including those relating to anti-money laundering, customer identification and beneficial ownership."). |
| | | This paragraph also misrepresents the applicability of federal banking laws to SPDIs. The Bank Holding Company Act ("BHCA") was designed by Congress to apply only to a subset of banks that *make loans*. *See* 12 U.S.C. § 1841(c)(1)(B). Outside of the subset of banks addressed by the BHCA, much |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | of federal law defines a "State bank" more broadly to include "any bank . . . or other banking institution which . . . is engaged in the business of receiving deposits . . . and . . . is incorporated under the laws of any State," without any limitation regarding making loans. *See id.* § 1813(a)(2). |
| 27 | SPDIs are supervised by the Wyoming Division of Banking (the "WY DOB"). *See* Wyo. Div. of Banking, *Special Purpose Depository Institutions* (2021), http://tinyurl.com/ 2p8uwc8p. The WY DOB's mission, in part, is to "maintain a financial regulatory system for Wyoming that promotes a progressive banking environment" and that "allows for economic development within this State." Wyo. Div. of Banking (2021), http://tinyurl.com/bdfsryhw. Understandably, the WY DOB is not charged with protecting the nation's financial stability or implementing federal monetary policy. | Undisputed. |
| 28 | On December 5, 2018, FRBKC personnel spoke with Albert Forkner, the then- Wyoming Banking Commissioner, regarding the draft SPDI legislation. *See* Ex. 20 at FRBKC- 00018340. Talking points developed in preparation for the call stated that Reserve Banks are not required by 12 U.S.C. § 248a to provide access to services. *See* Ex. 21 at FRBKC-00018341. Immediately following the call, an FRBKC participant reported to internal stakeholders that "[f]or the reasons ... cited in the talking points," Wyoming realized it could not sue FRBKC to force it to provide master accounts to SPDIs and that FRBKC "relayed" to Mr. Forkner that decisions about "Fed services" are "the p[u]rview of the Fed." *See* Ex. 20 at FRBKC-00018339-40.* Separately, Mr. Forkner told President George that master accounts would be | Disputed. The email that the FRBKC cites does *not* indicate that "Wyoming realized it could not sue," but instead shows that the FRBKC asked Wyoming to remove the Attorney General suit provision as part of a compromise between the parties. *See* Ex. 20, ECF No. 274-20, at FRBKC-00018339 (simply saying that Wyoming had "agreed to remove any specific references to 12 USC 248a"). Indeed, the FRBKC's erroneous assertion is undermined by the fact that Wyoming attempted to intervene in this very case, thus clearly believing it had the ability to bring a suit. *See, e.g.,* The State of Wyoming's Memorandum in Support of Motion for Permission to Intervene and Leave to File Complaint as Intervenor, ECF No. 133. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | "desirable" but "not required" for SPDIs. *See* George Tr. 65:6-66:1. <br><br> * Fn: Custodia contends (at 7) that Wyoming worked "hand-in-hand" and had "approximately 100 meetings" with FRBKC from 2017 to 2019. The vast majority of these meetings, however, related to subjects other than the legislation, such as FRBKC's joint supervision of Wyoming's traditional Federal Reserve member banks. *See* Ex. 23 ("George Tr.") at 27:22-28:9; *see also* 30(b)(6) Tr. 38:16-39:18. FRBKC has "help[ed]" to supervise Wyoming's traditional banks at times because the WY DOB has "lack[ed] the resources to be able to supervise some of the entities in their state." *See* Humston Tr. 26:3-9. | The FRBKC's statement is further inaccurate in asserting that the "vast majority of these meetings" were about subjects other than the legislation, and the citations that the FRBKC provides do *not* support this false statement. The FRBKC cites to a portion of President George's testimony where she answers the question, "How many times did you *personally* meet with any representatives from the State of Wyoming about the SPDI charter legislation." Ex. DA ("George Tr.") at 27:22–28:9 (emphasis added). And in the portion of the 30(b)(6) deposition that is cited, the FRBKC's designee testified that she was not sure of the exact number of meetings that had occurred regarding the SPDI legislation and was not sure of how many meetings were about SPDIs as opposed to other topics. Ex. 16, ECF No. 277-3 (30(b)(6) Tr.), at 38:16–39:18. Thus, the FRBKC invented out of whole cloth the idea that a "vast majority" of meetings were about other topics. <br><br> By contrast, contemporaneous emails indicate that the FRBKC "has been meeting with [the Wyoming Division of Banking] on a weekly basis to discuss a variety of topics related to the SPDI charters." Ex. D, ECF No. 236-4. Furthermore, Judith Hazen testified that these conversations with Wyoming continued from "the time that the legislation was being contemplated and moved through the state legislature." Ex. DB (Hazen Tr. (Vol. 2)), at 395:25–396:9, and Jackie Nugent said that she was "heavily engag[ed]" in discussions with Albert Forkner from the Wyoming Division of Banking via routine calls to discuss SPDIs and Wyoming's supervisory framework, Ex. DC (Nugent Tr.), at 24:1–25:4. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | Custodia further disputes the erroneous notion that the Wyoming Division of Banking lacked resources to supervise entities in its state. This unwarranted dig at Wyoming is at odds with the American dual-banking system and contradicts the statements of the FRBKC's witnesses, who have praised Wyoming for its "thoughtful approach to developing the [SPDI] framework," Ex. K, ECF No. 236-11 (Nugent Tr.), at 36:18–38:6, 62:20–63:4, and its robust 772-page supervisory examination manual. Wyo. Div. of Banking, Special Purpose Depository Institution Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view. |
| 29 | Custodia, formerly known as Avanti, sought to act as a "bridge" connecting "the U.S. dollar payments system" to "digital assets." *See* Ex. 22 at Custodia-00008801. It envisioned four business lines, one of which involved an aspect of traditional banking (deposit accounts with payment services), but three of which involved digital asset services frequently provided in today's market by non-banks such as crypto exchanges:<br>• "**Core Banking**": offering deposit accounts and payment services (*e.g.*, ACH and wire transactions), but only on a remote basis.* Ex. 22 at Custodia-00008807-08.<br>• "**Prime Services**": facilitating crypto transactions, including a "fiat on/off ramp (i.e., brokerage of digital assets)." Ex. 22 at Custodia-00008810-11.<br>• "**Custody Services**": providing custody of digital assets. Ex. 22 at Custodia-00008809-10. | Disputed. The FRBKC offers no basis for the notion that these services are associated with "crypto exchanges." Instead, a multitude of banks provide prime services for digital assets today, including but not limited to Bank of New York Mellon. *See, e.g.*, *BNY Mellon Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html.<br><br>Custodia further disputes that "prime services," including a "fiat on/off ramp," includes "brokerage of digital assets." Custodia's business plan, which the FRBKC cites, uses the phrase "fiat on/off ramp," but the FRBKC's placement of the quotation mark appears to be a typo, as Custodia has never said that it is a broker for digital assets, which is a mischaracterization by the FRBKC. Ex. 22, ECF No. 274-22, at Custodia-00008810–11. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | • "**The Avit**": issuing, selling, and redeeming a digital asset "akin to a stablecoin," "utilizing the same technology" as a stablecoin, offering the "functionality" of a stablecoin, and "replac[ing] some of the demand for stablecoins," but which Custodia was "careful not to call [] a stablecoin" because it was "very different." *See* Ex. 24 at Custodia-00001100; Long Tr. 91-92. The Avit would be a "programmable dollar" with "no direct analogue to an existing payment product." *See* Ex. 24 at ████████████████████ ████████████████████ ████████████████████ ████████████████████ | Custodia is not a broker of digital assets. Instead, Custodia's service is no different than the banks serving the Bitcoin ETF issuers, which are not themselves brokers of digital assets but which do provide US dollar interfaces with crypto exchanges that are the brokers of digital assets. For example, Bank of New York Mellon interfaces with brokers of Bitcoin for the U.S. dollar flows involving Bitcoin ETFs, via its role as custodian of the ETF trust's cash, but is not itself a Bitcoin broker. *See, e.g.*, Prospectus, iShares Bitcoin Trust (Jan. 10, 2024), https://www.blackrock.com/us/individual/resources/regulatory-documents/stream-document?stream=reg&product=IUS-IBIT-J&shareClass=NA&documentId=2212465&iframeUrlOverride=%2Fus%2Findividual%2Fliterature%2Fprospectus%2Fp-ishares-bitcoin-trust-12-31.pdf<br><br>It is further inaccurate to say that Custodia contemplated "selling" Avit, which is akin to a digital cashier's check (which is issued by a bank, not sold by it). Ex. DD (Long Tr.), at 96:7–24.<br><br>████████████████████ |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  |  |  |
| 30 |  | Disputed. Custodia rejects any implication that it considered itself similar to these banks: for example, those banks made loans, while Custodia does not lend. It merely noted that, like Custodia, these banks were "some of the select few to have clear-cut business initiatives around digital assets." Ex. 22, ECF No. 274-22, at Custodia-00008852. The FRBKC's own documents show that it did not think Custodia would be in the same situation as banks like Silvergate if Custodia were to be put under the same duress, as Custodia was a non-lending bank with reserves that equal 100% of deposits. Ex. BJ, ECF No. 236-62 at FRBKC-00015275. |
| 31 |  | Disputed. The FRBKC's preceding paragraph directly contradicts its own statement here, as it admits that Custodia compared itself to banks with master accounts. Def. Fed. Rsrv. Bank of Kan. City's Cross-Mot. for Summ. Judgment and Opposition to Pl.'s Petition for Review and Mot. for Judgment as a Matter of Law ("FRBKC Br."), ECF No. 273, ¶ 30. |
| 32 |  | Disputed. The comparison to Visa and Mastercard was in regard to financial metrics, not the products offered. As Ms. Long stated in the portion of her deposition that the FRBKC cites, "Visa and Mastercard run at a [single-A credit-rated] capital model to protect against their network going down. So they voluntarily have a capital requirement. And he was drawing an analogy for our capital requirement to their capital |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | requirement." Ex. 18, ECF No. 277-4 (Long Tr.), at 281:14–282:23. |
| 33 | Transaction processors, money transmitters, and many other businesses provide Custodia's planned digital asset services—prime services, custody, and stablecoins—without master accounts. *See* Ricks Rep. at 10-12. | Disputed in part as incomplete. Many banks with master accounts provide the services listed in this paragraph, including Bank of New York Mellon and the many banks that provide US dollar services to Bitcoin ETF issuers. *See, e.g., BNY Mellon Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html; Prospectus, iShares Bitcoin Trust (Jan. 10, 2024), https://www.blackrock.com/us/individual/resources/regulatory-documents/stream-document?stream=reg&product=IUS-IBIT-J&shareClass=NA&documentId=2212465&iframeUrlOverride=%2Fus%2Findividual%2Fliterature%2Fprospectus%2Fp-ishares-bitcoin-trust-12-31.pdf. |
| 34 | | Disputed. Custodia's core banking services would turn a profit after its initial ramp-up period and Custodia forecasted it would turn a profit by year two, in addition to digital asset services becoming profitable in year two. Ex. 22, ECF No. 274-22, at Custodia-00008888–95. It is common for *de novo* banks to be unprofitable in their first years. Ex. 18, ECF No. 277-4 (Long Tr.), at 288:9–24. That is why the Federal Reserve's public guidance provides *de novo* institutions with a three-year ramp-up period. *See* SR 20-16, Letter from Board of Governors of the Federal Reserve System, to the Officer in Charge of Supervision at Each Federal Reserve Bank (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR20 16.htm. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| 35 | **Prime Services** ("matching buyers and sellers" of crypto) would require Custodia to partner with a third-party crypto exchange, but as of June 2022 (when it launched this lawsuit), it had no "leading candidate" and no agreements in place. *See* Long Tr. 107-109. Custodia "hadn't figured out the details." *See* Long Tr. 80-81; 109. | Disputed in part as incomplete. This future service was part of Custodia's long-term roadmap, not part of those services to be available on day one. Ex. 22, ECF No. 274-22, at Custodia-00008888–90 (financial projections from Custodia's business plan did not expect significant growth in prime services until at least year end 2023). And the fact that Custodia had long-term goals for the services it would like to provide in the future is irrelevant to this case and Custodia's entitlement to a master account. Furthermore, the MCA does not require banks to be operating ***before*** they obtain a master account. Pl. Custodia Bank Inc.'s Omnibus Opposition to the Fed. Rsrv. Bank of Kan. City's Cross-Motion for Summ. Judgment and Reply Br. in Support of its Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim § II.H. |
| 36 | **Custody Services** were also undeveloped. As of June 2022, Custodia "had not built the technology platform" for its "core" custody product offering. *See* Long Tr. 74-75, 78. It had not built systems to prevent a rogue employee from stealing uninsured, custodied digital assets. *Id.* And it was unclear how Custodia could operate its custody business in a manner consistent with both state and federal guidance. Custodia says that Wyoming would have *required* Custodia to hold crypto on its balance sheet to facilitate its custody business, but the Federal Reserve's position was that holding crypto on balance sheet was "highly likely to be inconsistent with safe and sound banking practices." *Compare* Long Tr. 87-88, 90, *with* Bd. of Governors, FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to Banking Organizations (Jan. 3, 2023), | Disputed. As of June 2022, Custodia "had not built the technology platform" for its custody service because it was not yet offering custody services and opted to instead "roll[] out segregated on-chain account" services. Ex. 18, ECF No. 277-4 (Long Tr.), at 74:8–22. Furthermore, while Wyoming contemplated requiring Custodia to hold crypto on its balance sheet, it ultimately decided not to; and while Custodia asked the Fed for permission to hold a *de minimis* amount of cryptocurrency on its balance sheet at the urging of the Wyoming Division of Banking, doing so was not key to Custodia's business plan, and Custodia planned to comply with whatever response it received from the Fed on this request. Ex. DD (Long Tr.), at 81:24–85:20. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | http://tinyurl.com/nhdkv56d, *and* Policy Statement on Section 9(13) of the Federal Reserve Act, 88 Fed. Reg. 7848, 7850 (Feb. 7, 2023). | |
| 37 | **The Avit's** technology, policies, procedures, and controls had, as of June 2022, also not been developed. *See* Ex. 27 at FRBKC-00017437. Moreover, the federal banking agencies' collective view was that stablecoins should be issued only by *insured* depository institutions and only if they had appropriate controls in place. *See* Report on Stablecoins at 17 (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021) ("PWG Report"), http://tinyurl.com/5225srnv); Long Tr. 66. | Disputed. This 2021 non-binding guidance came after Custodia developed its initial business plan in 2020, and Custodia did not proceed with issuance of Avit in light of this guidance. Ex. 18, ECF No. 277-4 (Long Tr.), at 66:3–12.<br><br>Moreover, the Bank of England is recommending that UK stablecoin issuers follow Custodia's non-lending, uninsured business model. *See Regulatory regime for systemic payment systems using stablecoins and related service providers: discussion paper*, Bank of England (Nov. 6, 2023), https://www.bankofengland.co.uk/paper/2023/dp/regulatory-regime-for-systemic-payment-systems-using-stablecoins-and-related-service-providers ("[I]ssuers are expected to play a very limited role in the transmission of monetary policy, as they would not engage in lending and would not be significant participants in money markets. Since participation in the transmission of monetary policy is the primary rationale for remunerating central bank reserves held by commercial banks, the Bank therefore proposes that the central bank deposits held by systemic stablecoins issuers as backing assets should not be remunerated."). |
| 38 | | |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | ███████████████████ | ███████████████████ |
| 39 | ███████████████████ | ███████████████████ |
| 40 | Ms. Long previously worked at Credit Suisse and Morgan Stanley. *See* Long Tr. 20:6-10. At Credit Suisse, Ms. Long was involved in lending against life insurance but "didn't interact with the master account." *See* Long Tr. 21:21-22:6. At Morgan Stanley, Ms. Long worked in the "Pension Solutions Group" and "Corporate Strategies Group," but not "with Morgan Stanley's banks." *See* Long Tr. 22:12-23:25. She has never managed a bank supervised by a federal banking regulator. *See* Ex. 22 at Custodia-00008803; Ex. 24 at Custodia-00001095. | Disputed in part. Custodia disputes any implication that banking experience is a prerequisite for receiving access to a master account under the MCA. Moreover, Ms. Long did not merely work in the groups described; she was a Managing Director of Morgan Stanley and Credit Suisse who started and ran the business listed by the FRBKC. Ex. 18, ECF No. 277-4 (Long Tr.), at 20:1–25:16. She also ran a life insurance company indirectly supervised by the Federal Reserve while she was at Morgan Stanley. *See id.* 22:24–24:6. She has a BA from the University of Wyoming and a JD and MPP from Harvard. Ex. 24, ECF No. 274-24, at Custodia-00001095. |
| 41 | Custodia's second-in-command is Zev Shimko, President and COO. *See* Ex. 28 ("Shimko Tr.") at 24:12-15. Mr. | Disputed in part as incomplete. Custodia disputes any implication that banking experience is a prerequisite for |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | Shimko graduated from college in 2014 and, prior to joining Custodia, had most recently worked for a blockchain technology company involved in underwriting, issuing, and trading different financial assets. *See* Shimko Tr. 13:20-23, 18:4-21; *see also* Ex. 24 at Custodia-00001095. Like Ms. Long, Mr. Shimko had never managed a bank supervised by a federal banking regulator. *See* Shimko Tr. 19:2-11. | receiving access to a master account under the MCA. Moreover, Mr. Shinko also worked at Morgan Stanley, where he was selected as a STAR Fellow (a program for the bank's top-ranked analysts worldwide). Ex. 28, ECF No. 274-28 (Shimko Tr.), at 13:25–14:23; Ex. 24, ECF No. 274-24, at Custodia-00001095. He has a BS from Northeastern University. Ex. 24, ECF No. 274-24, at Custodia-00001095. |
| 42 | Custodia's remaining leadership lacked significant banking experience. *See* Ex. 29 at Custodia-00003347 (noting feedback from FRBKC that "the number one thing that has caused problems for the Fed with de novo banks is that they don't have enough people experienced in bank regulations" and acknowledging that Custodia's executive team and board lacked such experience to date); Ex. 30 at Custodia-00002854, 2856 (from November 2022: "[C]onsider adding a director with bank regulatory and especially BSA/AML experience "). | Disputed. Custodia disputes any implication that banking experience is a prerequisite for receiving access to a master account under the MCA. Moreover, Custodia's team had significant banking experience, which included roles on Wall Street and at other banks. Ex. 24, ECF No. 274-24, at Custodia-00001095. Furthermore, in response to the suggestion that Custodia add a director with BSA/AML experience, Custodia did just that, hiring a former Fed BSA/AML examiner. |
| 43 | In early 2022, roughly 18 months after requesting a master account, Custodia had only a "first draft" of its BSA/AML policies that had not been reviewed by consultants or the WY DOB.* *See* Long Tr. 16:21-17:8.<br><br>* Fn: Ms. Long testified that stablecoins present no higher risk of use in money laundering than paper currency. Long Tr. 100:103:19, 104:15-105:16. This contrasts with federal guidance reporting on the challenges presented by the use of cryptocurrency for illicit purposes. *See, e.g.,* PWG Report at 19-21 (outlining "Illicit Finance Risk" presented by stablecoins). | Disputed. Custodia's first BSA/AML policies were approved by Custodia's Board in summer 2020, and the Wyoming Division of Banking considered them as part of Custodia's chartering process that culminated in October 2020. *See* Ex. DD (Long Tr.), at 172:19–173:14. In addition, Custodia provided the FRBKC with remediation materials regarding any BSA/AML compliance issues identified before the decision on Custodia's master account application was issued. Ex. AR, ECF No. 236-44 (cover email); Ex. DE (attached remediation material).<br><br>Furthermore, the FRBKC mischaracterized Ms. Long's testimony, in which she described how blockchain transactions |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  |  | can be traced in ways that cash cannot. Ex. 18, ECF No. 277-4 (Long Tr.), at 105:8–16; *see also, e.g.*, *U.S. Treasury Debunks Narrative That Hamas Relied on Crypto to Fund Terrorism*, CoinDesk (Feb. 14, 2024), https://www.coindesk.com/policy/2024/02/14/us-treasury-backs-down-narrative-that-hamas-relied-on-crypto-to-fund-terrorism/ (testimony from U.S. Treasury Undersecretary for Terrorism and Financial Intelligence Brian Nelson: "We also assess that terrorists still prefer, frankly, to use traditional products and services"). |
| 44 | On February 16, 2022, Custodia's Chief Legal and Compliance Officer (CLO/CCO) advised that "no one in the compliance function was comfortable" with the company's financial crime mitigation software and that, as a result, Custodia would be starting from square one with a new vendor. *See* Ex. 25 at FRBKC-00000145. Custodia also informed its Board of Directors that it needed to "build out its compliance group." *Id.* at FRBKC-00000146. Custodia's CLO/CCO then stepped down. Long Tr. 261:14-19. | Disputed as incomplete. Custodia replaced one vendor, and Wyoming, as Custodia's regulator, reviewed this change and approved Custodia's compliance capabilities when it granted Custodia its Certificate of Authority to operate in September 2022. *See* Ex. CI, ECF No. 236-87. |
| 45 | Custodia thereafter engaged a third party, Crowe, to advise on BSA/AML compliance and risk management gaps, and Custodia started work with a new financial crime mitigation vendor. *See* Ex. 31 at FRBKC-00016118 (providing May 18, 2022 update that Custodia had "engaged Crowe to perform a comprehensive review of the BSA program, including a system validation prior to launch"); Long Tr. 230:9-14; Ex. 32 at FRBKC-00005784-85 (stating that Custodia changed financial crime mitigation providers because it did not believe the initial provider "could be certified as providing to the | Undisputed. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | Company the capabilities that it needs to accurately perform sanctions screening and transaction monitoring"). | |
| 46 | Before completing the remediation identified by Crowe, Custodia filed this lawsuit.*<br><br>* Fn: As of May 2022, Crowe had told Custodia that its BSA/AML policy required "more granularity" and "lack[ed] specificity." *See* Ex. 36 at FRBKC-0003008; *see also* Long Tr. 266:20-267:3. Crowe's review concluded around August 2022 and resulted in recommendations for program enhancements across areas such as model development, validation, calibration, and risk management; due diligence and customer risk identification; corporate governance; policies and procedures; risk assessment; self-testing; transaction monitoring, investigations, and case management; and record retention. *See* Ex. 27 at FRBKC-00017428. | Disputed as incomplete. Custodia replaced one vendor, and Wyoming, as Custodia's regulator, reviewed this change and approved Custodia's compliance capabilities when it granted Custodia its Certificate of Authority to operate in September 2022. *See* Ex. CI, ECF No. 236-87. In addition, Custodia provided the FRBKC with remediation materials regarding any BSA/AML compliance issues identified before the decision on Custodia's master account application was issued, but Custodia's remediation materials were never considered. Ex. AR, ECF No. 236-44 (cover email); Ex. DE (attached remediation material); Ex. DD (Long Tr.), at 293:5–295:9 (describing instances in which remediation materials were not considered). |
| 47 | Custodia requested a master account with FRBKC in October 2020. *See* Ex. 33 at FRBKC-00012687. ██████ ████████████████████████████████ ████████ Custodia checked both boxes. | Disputed in part. Custodia acknowledges that the FRBKC had a manual that used the phrase "non-routine," but disputes that this manual was followed in Custodia's case and disputes any legal implication that the manual complies with the MCA. *See* Custodia Br. at 31–55. |
| 48 | In addition, Custodia proposed to operate as a non-traditional bank—without deriving profit from lending or investment. There are presently no uninsured, non-traditional depository institutions with a master account in the Tenth District. *See* Ex. 17 at Tab 13 and *supra* note 5. | Disputed. While many banks may take deposits and make loans, FRBKC offers no basis for concluding that deriving profit from lending or investment is required to qualify as "traditional" banking.<br><br>The Federal Reserve's Master Account and Services Database lists 10 institutions within FRBKC's district that are not federally insured. *See Master Account and Services Database,* |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | FederalReserve.gov (*current as of* Nov. 30, 2023), http://tinyurl.com/4c95xdt9. |
| 49 | And, Custodia's non-routine, non-traditional request was premature. CRM grants master accounts to de novo institutions like Custodia only once "everything is in place." Ex. 34 at FRBKC-00004231-32. The master account is "the last thing." Ex. 35 ("Crouch Tr.") at 131:22- 132:4; *see also id.* at 278:16-279:3 (master accounts are opened when the de novo bank has the "controls in place" and is "ripe ... mature and ready to go."). Custodia, however, filed its request "well in advance of when they were ready to open." *Id.* at 131:22-132:4. Custodia was still in its "construction period." *See* Long Tr. 144:3-9. | Disputed. The Federal Reserve's public guidance indicates that it expects *de novo* institutions to have a three-year ramp-up period. *See* SR 20-16, Letter from Board of Governors of the Federal Reserve System, to the Officer in Charge of Supervision at Each Federal Reserve Bank (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR20 16.htm. |
| 50 | When it submitted its request prematurely, Custodia lacked familiarity with the process. Ms. Long had no experience using or requesting a master account. Long Tr. 21:21-24:25. She relied on Katie Cox for advice on the Federal Reserve, but master accounts were "not something [Ms. Cox] had recent experience with." Long Tr. 133:20-22. Ms. Cox had never seen CRM's account opening policies and procedures and did not know that CRM conducted a risk assessment. *See* Ex. 37 ("Cox Tr. (Day 1)") at 35:3-7, 148:8-20, 149:11-16 and Ex. 38 ("Cox Tr. (Day 2)") at 60:10-13. | Disputed. Custodia disputes the FRBKC's unsupported assertion that its master account request was premature or any implication that the MCA prohibits *de novo* banks from applying for master accounts before they are operational. Moreover, Custodia's experienced advisor, Katie Cox, had experience working with at least two master account applications from *de novo* banks, which are quite rare. Ex. DF (Cox Tr. (Vol. 1)), at 38:16–39:19, 66:3–12; FRBKC Br., ECF No. 273, at 10 (acknowledging that such applications are "rare"). |
| 51 | In November 2020, FRBKC's senior staff met with Custodia virtually. *See* Ex. 39 at FRBKC-00014922. President George conveyed that the decision "was not going to be quick," and that it could "go either way." *id.* at FRBKC-00014923. She was "very noncommittal." *See* Long Tr. 47:22-48:2. President George "focused" on how | Disputed as incomplete. Wyoming regulators had indicated to Custodia that they expected a master account decision to promptly issue, and the FRBKC told Custodia in January 2021 there were "no showstoppers" in its application. Ex. DG, at Custodia-00002097. Furthermore, the FRBKC's message left |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | Custodia was doing "novel things." *See* Long Tr. 142:8-13; Ex. 40 at Custodia-00005521. | the impression that Custodia would receive its master account in a matter of months, not years. *Id.* |
| 52 | **Legal Eligibility.** ███████████████ ██████████████████████████████ ██████████████████████ █████ Eligibility is a "threshold issue." *See* George Tr. 50:16-24; May-Oder Tr. 30:22-25. | Disputed in part. While Custodia acknowledges that legal eligibility must be assessed, in Custodia's case, this was a legal conclusion that was reached by Board Legal, not the FRBKC's CRM. *See* Ex. BC, ECF No. 236-55, at FRBKC-00000447. |
| 53 | President George "questioned whether they were eligible ... [and] whether the way this [SPDI] charter had been constructed was consistent with laws that governed eligibility." George Tr. 264:19-22. As noted *supra* at paragraph 26, Custodia did not, for example, meet the definition of a "bank" under the BHCA. *See* 12 U.S.C. § 1841(c). | Disputed. The FRBKC offers irrelevant testimony on a legal issue, and it is undisputed that Custodia was found to be an eligible depository institution under the MCA. Ex. I, ECF No. 236-9, at FRBKC-0000234; FRBKC Br. ¶ 55. Additionally, the BHCA is an outlier in its definition of a "bank." The BHCA was designed by Congress to apply only to a subset of banks that *make loans*. *See* 12 U.S.C. § 1841(c)(1)(B). Outside of the subset of banks addressed by the BHCA, federal law defines a "State bank" more broadly to include "any bank . . . or other banking institution which . . . is engaged in the business of receiving deposits . . . and . . . is incorporated under the laws of any State," without any limitation regarding making loans. *See id.* § 1813(a)(2). |
| 54 | ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ | Disputed in part as incomplete. In Custodia's case, Board Legal made the determination of legal eligibility. Ex. BC, ECF No. 236-55, at FRBKC-00000447. Furthermore, Custodia does not concede that CRM's policies were followed in Custodia's case. |
| 55 | FRBKC Legal consulted with Board Legal. *See* 30(b)(6) Tr. 194:14-22. In January 2022, it was determined that based on information then known, Custodia met the FRA's definition of a "depository institution" and was therefore "eligible" to request a Reserve Bank account and services. *See* Ex. 41 at FRBKC-00000234. | Undisputed. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| 56 | **Policy Issues.** Custodia's request also implicated a range of policy questions. One set of policy questions concerned the "novel [SPDI] charter" and "an uninsured institution having access to the Federal Reserve payment system." George Tr. 106:13-21. A second set of policy questions concerned the permissibility of Custodia's planned digital asset services—prime services, digital asset custody, and stablecoin issuance—and whether such activities constituted "appropriate banking activity." George Tr. 106:13-21; *see* Ex. 42 at FRBKC-00014934 (noting that Custodia "introduce[d] a complex set of considerations for risks and opportunities to banking organizations, their customers and the Reserve Banks, as well as to the nation's overall financial system and the implementation of monetary policy"); Ex. 43 at FRBKC-00013806 (Christi May- Oder talking points from September 2021 raising outstanding policy and risk questions posed by Custodia). | Disputed in part. While Custodia acknowledges that the FRBKC viewed Custodia's master account application as raising policy questions that required direction from the Board, "appropriate banking activity" is a not a defined or relevant standard under the MCA or any other legal authority. |
| 57 | President George recognized that her decision on Custodia's request could set precedent for FRBKC's evaluation of account requests from other SPDIs and serve as a relevant example for the other Reserve Banks. George Tr. 57:4-11 ("I think it's fair to say that I was aware this was potentially precedent-setting, and that this was an evolving landscape in terms of the considerations that were being given both legislatively by Congress and the banking agencies, and I thought it was a relevant factor for me to take in before making a decision about this master account."). Her decision would affect "how others would understand their eligibility and access expectations." George Tr. 93: 1-3. | Disputed. Ultimately, the Board took control of the decision regarding Custodia's master account application by issuing the Guidelines, S-Letter, Handbook, and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| 58 | President George decided not to resolve these policy questions in a silo, and instead sought input from a variety of sources to inform her decision. George Tr. 50:25-52:7 ("[W]e were seeking the Board's input as part of our decision-making to understand ... [the] broader policy issues that we would need to take into account."); Humston Tr. 441:10-12 ("we would find it imprudent not to take in views from others"); *id.* 45:10-46:6. | Disputed in part. While it is true that President George was in communication with the Board, the FRBKC's characterization is not accurate. The Board took control of the decision on Custodia's master account by issuing the Guidelines, S-Letter, Handbook, and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63. |
| 59 | President George had, in fact, initiated a discussion on issues presented by SPDIs even before Custodia submitted its request for a master account. In August 2020, President George raised the subject with other Reserve Bank Presidents in the Conference of Reserve Bank Presidents (the "COP"), as these other presidents could potentially see similar requests in their districts. Ex. 44 at FRBKC-00010932. There was "broad recognition of the policy issues." *Id.* And the policy questions "raise[d] bigger issues than just in WY." *Id.* | Disputed to the extent this implies that the Board was not already aware of or considering these issues. |
| 60 | Around that time, states other than Wyoming were considering SPDI-like charters. *See, e.g.,* Nebraska Financial Innovation Act, LB 649, 107th Leg., 1st Sess. (announced in January 2021), https://nebraskalegislature.gov/FloorDocs/107/PDF/Intro/LB649.pdf. | Disputed in part. Custodia denies any implication that Wyoming's SPDI charter is necessarily materially similar to the FRBKC's examples. While it is true that other states considered developing new charters, Wyoming's legislation and supervision manual was particularly robust, and other states' legislation was not the same as Wyoming's legislation. *See, e.g.,* Wyo. Div. of Banking, Special Purpose Depository Institution Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view. |
| 61 | There was also, at the time, an uptick in requests for master accounts from non- traditional entities that were *not* involved in digital assets. *See* Humston Tr. 175:15-22. | Disputed. TNB's master account request was filed in August 2017, more than three years before Custodia filed its application in October 2020. *TNB USA Inc. v. Fed. Rsrv. Bank* |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | An example was The Narrow Bank ("TNB"), which had obtained a Connecticut banking charter in hopes of arbitraging the Federal Reserve's payment of interest on reserves of cash held in master accounts. *See TNB USA Inc.*, 2020 WL 1445806, at *2. | *of New York*, No. 1:18-CV-7978 (ALC), 2020 WL 1445806, at *2 (S.D.N.Y. Mar. 25, 2020). |
| 62 | Partly as a result of President George's efforts, an existing System-wide group called the Payments System Policy Advisory Committee ("PSPAC") (which coordinates some System work and policy/strategy development for domestic and international payment and settlement issues) created a nontraditional account access group (the "NTAA") composed of staff from Reserve Banks and the Board that "was looking at issues that were relevant and of interest to the [S]ystem as a whole." 30(b)(6) Tr. 142:11-20. | Disputed in part. While it is true that there were groups such as PSPAC and NTAA, there is no evidence to suggest that they were developed "[p]artly as a result of President George's efforts." Instead, the Board developed these groups. *See, e.g.*, Ex. X, ECF. No. 236-24, at FRBKC-00004899–90 (David Mills, a staff member of the Board, communicating with an FRBKC staffer regarding whether the FRBKC will be able to contribute resources to working groups *being developed by the Board*). |
| 63 | As of the date when Custodia's request was denied, many policy questions presented by Custodia's request were still unresolved. George Tr. 244:10-11 ("[T]he broad policy issues had not been codified and resolved in my view."). The following announcements demonstrate the unsettled nature of these policy decisions when Custodia's master account request was pending:<br><br>• **Stablecoins.** On November 1, 2021, the President's Working Group on Financial Markets (along with the FDIC and OCC) issued a report on stablecoins. The Working Group called on Congress to pass legislation to "require stablecoin issuers to be insured depository institutions." PWG Report at 2. | Disputed in part. Regarding the FRBKC's assertions concerning "Crypto on Balance Sheet," while Custodia asked the Fed for permission to hold a *de minimis* amount of cryptocurrency on its balance sheet in 2022 (no more than $10,000)—before the 2023 guidance cited in this paragraph was issued—at the urging of the Wyoming Division of Banking, doing so was not key to Custodia's business plan, and Custodia planned to comply with whatever response it received from the Fed on this request. Ex. DD (Long Tr.), at 81:24–85:20.<br><br>In addition, the SEC guidance referenced, SEC Staff Accounting Bulletin No. 121 (Apr. 11, 2022), does not apply to Custodia, as Custodia is not an "SEC-registered institution." |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | • **Incomplete "Policy Sprints."** On November 23, 2021, the Board, the FDIC, and the OCC issued a "Joint Statement on Crypto-Asset Policy Sprint Initiative and Next Steps." *See* Ex. 45. The agencies announced that they had recently completed "sprints" on several "crypto-asset activities," including custody, stablecoins, holding crypto on balance sheet, and "facilitation of customer purchases and sales of crypto-assets." *Id.* The joint statement did not announce policy decisions but rather provided a "roadmap" for a plan to provide greater clarity in 2022.* *See id.*<br><br>**Crypto on Balance Sheet.** On January 3, 2023, the Board, FDIC, and OCC issued a Joint Statement on Crypto-Asset Risks to Banking Organizations, which explained that holding crypto assets on balance sheet was "highly likely to be inconsistent with safe and sound banking practices." Joint Statement on Crypto-Asset Risks to Banking Organizations at 2.<br><br>• **Custody.** Digital asset custody was permissible if done in a safe and sound manner, but in March 2022, the SEC issued a "bulletin" requiring that SEC-registered institutions account for | Furthermore, it is incorrect to assert that BNY Mellon is out of the digital asset custody business. *See, e.g.*, BNY Mellon, *BNY Mellon Launches New Digital Asset Custody Platform* (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html.<br><br>The FRBKC misrepresents what BNY Mellon said about its custody business. In its annual report, it used the words "*de minimis*" in describing its *accounting* practices for its digital asset custody business, as it "recorded a *de minimis* asset and liability related to digital assets we safeguard," in contrast to "the accounting treatment of non-crypto-assets held in custody, which do not result in assets recorded on a custodian's balance sheet." BNY Mellon, Annual Report 2022 at 135, http://tinyurl.com/yed5j4na. BNY Mellon continues to advertise its digital custody services to customers. *See, e.g.*, BNY Mellon, *Digital Assets*, https://www.bnymellon.com/us/en/solutions/digital-assets.html.<br><br>Moreover, a *de minimis* amount of digital assets under custody for BNY Mellon could be a large absolute size considering the huge size of BNY Mellon as a bank. *See* Ex. DD (Long Tr.), at 116:1–15; BNY Mellon, *About Us*, https://bnymellon.com/us/en/about-us/about-bny-mellon.html#::~:text=BNY%20Mellon%20had%20%2447.8%20trillion,31%2C%202023 ("BNY Mellon had $47.8 trillion in assets under custody and/or administration and $2.0 trillion in assets under management as of Dec. 31, 2023"). |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | crypto-custodied assets on balance sheet. *See* SEC Staff Accounting Bulletin No. 121 (Apr. 11, 2022) ("SAB 121"). SAB 121 had the practical effect of putting SEC-registered institutions (including BNY Mellon) out of the digital asset custody business. ** | |
| | \* Fn: While the OCC had previously stated that "a national bank may provide ... cryptocurrency custody services on behalf of customers," Custodia Br., Ex. L at 1 (Interpretive Letter No. 1170), on November 18, 2021, the OCC clarified that the cryptocurrency and stablecoin activities addressed in its prior interpretive letters are only legally permissible for a bank to engage in as part of the "business of banking" if the bank can demonstrate, to the satisfaction of its banking supervisor, that it has controls in place to conduct the activity in a safe and sound manner. *See* Off. of Comptroller of Currency, Interpretive Letter No. 1179 on Bank Authority (Nov. 18, 2021), http://tinyurl.com/38c4e99b. | |
| | \*\* Fn: *See* BNY Mellon, Comment Letter on Proposed Rule on Safeguarding Advisory Client Assets (May 8, 2023), http://tinyurl.com/yrykzkxd; BNY Mellon, Annual Report 2022 at 135, http://tinyurl.com/yed5j4na (noting that BNY Mellon's digital asset custody represents a *de minimis* amount). | |
| 64 | **Layered Risk.** In addition to the eligibility and policy questions, FRBKC "would make our independent risk assessment around whether the institution should be | Disputed. This presents an inaccurate legal assertion. While Reserve Banks may address potential risks in ways that are legally authorized, *i.e.*, imposing conditions that are equally |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | granted access." George Tr. 51:12-16; Ex. 15 at FRBKC-00015583-84. CRM must "evaluate the risk parameters of the institution requesting the account." *See* George Tr. 33:12-14. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also supra* ¶¶ 18-19. | applicable to both members and non-members, such as requiring a sufficient clearing balance in a master account, they may not bar access to a master account to a legally eligible depository institution under the MCA. 12 U.S.C. § 248a(c)(2); *see* Custodia Br. at 31–55. |
| 65 | FRBKC led multiple risk assessments of Custodia's business. *See, e.g.*, Ex. 46 at FRBKC-0002695 (summer 2020); Ex. 47 at FRBKC-00015695 (October 2020); Ex. 48 at FRBKC-00003638 (January 2021); Ex. 49 at FRBKC-00016716 (March 2021); Ex. 50 at FRBKC-00016665 (August 2021); Ex. 51 at FRBKC-00003331 (October 2021 through January 2022); Ex. 52 at FRBKC-00016159 (October 2021 through January 2022); Ex. 27 at FRBKC-00017421 (May 2022 through October 2022). | Disputed in part. While Custodia acknowledges that FRBKC conducted more than two risk assessments of Custodia, this paragraph erroneously implies that every document that mentions "risk" is a different "risk assessment," which is not the case. *See* Exs. 46–52, 21, ECF. Nos. 274-46–274-52; Ex. 27, ECF No. 274-27. In addition, this paragraph fails to distinguish between assessments that related to Custodia's membership application and its master account application. |
| 66 | A multi-month review commenced in October 2021. *See* Ex. 52 at FRBKC-00016159. The review was conducted exclusively by FRBKC personnel and was led in part by Ross Crouch, who has more than 18 years of professional experience conducting safety and soundness examinations of supervised banks and bank holding companies. *See id.*; *see also* Ex. 51 at FRBKC-00003331; Crouch Tr. 7-8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | Disputed. Following this risk assessment, which occurred 15 months before Custodia's master account application was decided, Ross Crouch gave encouraging feedback to Custodia. For example, in Crouch's prepared talking points to provide feedback to Custodia, he wrote that "the board and senior management have impressive depth in tech, legal backgrounds, investment banking, and that the board members have diverse backgrounds and serve on other boards." Ex. 56, ECF No. 274-56, at FRBKC-00016143. He expressly said "I'm not saying" that there "is a problem here," and indicated a desire to work with Custodia as it continued to construct the bank, develop its business, and address his feedback. *Id.* |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | ███████████████████████████ | |
| 67 | Custodia's existence was little more than "a business plan with some draft policies." Crouch Tr. 43:25-44:8 ("there weren't a lot of issues to identify because there just wasn't a lot to review"). | Disputed. By January 2022, Custodia had a bank charter, had passed an investigation by Wyoming, was approved by a unanimous 8-0 vote of the Wyoming State Banking Board, and had developed much of its tech platform. *See generally* Ex. DH; *see also id.* at Custodia-00006156–62, Custodia-00006164–69. |
| 68 | Throughout the process, FRBKC had serious concerns about the risks posed by Custodia's request. *See* Humston Tr. 439:1-5 ("there was quite a bit of skepticism from Day 1"); Ex. 53 ("Hazen Tr.") at 156:16-19 ("From the beginning of this process, I have concerns about what this entity type and this specific business model present to this Reserve Bank and to the System more broadly."), 344:17-20 ("Consistently through the analysis, I believe that [President George] was highly skeptical of granting | Disputed. The record demonstrates a plethora of positive feedback regarding Custodia at the FRBKC before the Board intervened. *See* Custodia SOMF ¶ 54 (FRBKC describing Custodia as having "adequate" capital, "strong" risk management, "relatively low" "liquidity risk," and "impressive" and "extensive" management experience, but subsequently changing its assessment of Custodia as having a "lack of a robust capital requirement framework," "significant risk management gaps," insufficient "liquidity risk |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | an account, and so I would say that her views were skewed towards denying the account."); May-Oder Tr. 307 ("from very, very early in the process it was leaning towards no given their risk profile and the concerns that were raised regarding the business model ... I can't think of a time where I felt like there was a lean towards approval."). | management processes," and a management team with a "lack of collective depth of relevant banking experience" following Board intervention); *compare* Ex. CS, at FRBKC-00013908 (Kansas City Fed staff member "Rob [Triano] doesn't see anymore [sic] risk from these activities vs. others [redacted] etc. He believes they have diversity in activities—it's just that they're all tied to crypto"), *with* Ex. BS, ECF No. 236-71, at FRB-AR-000326, 28 (Board staff edits to recommendation memo adding Custodia's "monoline business plan" as a basis for questions surrounding "the financial viability of the firm" and recommending that a greater focus be placed on "risks that have been illustrated in the recent crypto market meltdown" such as "monoline, crypto-focused business models"). |
| 69 | In its initial meeting, in November 2020, President George was "very noncommittal" and indicated that it "could still go either way." Ex. 39 at FRBKC-00014923; Long Tr. 47:22- 48:2. On January 20, 2021, Ms. Humston informed Custodia that the "work still continues" and there were "complexit[ies]." *See* Ex. 54 at FRBKC-00014277. FRBKC raised a number of questions to Custodia concerning policy questions, the definition of stablecoins (and whether they are "securities" under federal securities laws), and whether there was any "movement" on Custodia obtaining FDIC insurance (answer: "no") that made clear FRBKC had concerns and that a grant of the request was not imminent. *See id.* at FRBKC-00014277-80.* <br><br> * Fn: During this meeting, Ms. Long asked FRBKC, "Are there show stoppers?" *See* Ex. 54 at FRBKC-00014277. Ms. May-Oder's contemporaneous notes reflect no direct | Disputed. Contemporaneous emails show that the FRBKC told Custodia that there were "no showstoppers" in its application. *See, e.g.*, Ex. O, ECF No. 236-15, at Custodia-00002096. Ms. May-Oder's notes reflect that there was discussion of whether there were "show stoppers." But because there is no indication that she was transcribing everything that was said at the meeting, her notes are incomplete in that they do not include the answer to every question that was asked nor the precise language used by those individuals who were speaking. *See* Ex. 54, ECF No. 274-54, at FRBKC-00014277; *see also* Ex. J (George Tr.), ECF No. 236-10, at 60:21–62:7. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | response to the question, and as the meeting continued, FRBKC raised a number of complex policy questions. *See id.* | |
| 70 | In February 2021, President George's view was "no access b/c don't know what we're dealing with yet." Ex. 54 at FRBKC-00014288; Hazen Tr. 252:3-8 (discussing drafting a denial memo before Custodia applied for membership in 2021); *see also* Ex. 54 at FRBKC-00014295. FRBKC thereafter conducted a series of risk assessments that consistently found substantial risk management gaps. *See supra* ¶¶ 65–66. | Disputed. The record demonstrates a plethora of positive feedback regarding Custodia at the FRBKC before the Board intervened. *See* Custodia SOMF ¶ 54 (FRBKC describing Custodia as having "adequate" capital, "strong" risk management, "relatively low" "liquidity risk," and "impressive" and "extensive" management experience, but subsequently changing its assessment of Custodia as having a "lack of a robust capital requirement framework," "significant risk management gaps," insufficient "liquidity risk management processes," and a management team with a "lack of collective depth of relevant banking experience" following Board intervention); *compare* Ex. CS, at FRBKC-00013908 (Kansas City Fed staff member "Rob [Triano] doesn't see anymore [sic] risk from these activities vs. others [redacted] etc. He believes they have diversity in activities—it's just that they're all tied to crypto"), *with* Ex. BS, ECF No. 236-71, at FRB-AR-000326, 28 (Board staff edits to recommendation memo adding Custodia's "monoline business plan" as a basis for questions surrounding "the financial viability of the firm" and recommending that a greater focus be placed on "risks that have been illustrated in the recent crypto market meltdown" such as "monoline, crypto-focused business models"). |
| 71 | There is no evidence that any member of FRBKC's senior leadership ever favored granting Custodia's request. | Disputed. The record demonstrates a plethora of positive feedback regarding Custodia at the FRBKC before the Board intervened. *See* Custodia SOMF ¶ 54 (FRBKC describing Custodia as having "adequate" capital, "strong" risk management, "relatively low" "liquidity risk," and "impressive" and "extensive" management experience, but |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | subsequently changing its assessment of Custodia as having a "lack of a robust capital requirement framework," "significant risk management gaps," insufficient "liquidity risk management processes," and a management team with a "lack of collective depth of relevant banking experience" following Board intervention); *compare* Ex. CS, at FRBKC-00013908 (Kansas City Fed staff member "Rob [Triano] doesn't see anymore [sic] risk from these activities vs. others [redacted] etc. He believes they have diversity in activities—it's just that they're all tied to crypto"), *with* Ex. BS, ECF No. 236-71, at FRB-AR-000326, 28 (Board staff edits to recommendation memo adding Custodia's "monoline business plan" as a basis for questions surrounding "the financial viability of the firm" and recommending that a greater focus be placed on "risks that have been illustrated in the recent crypto market meltdown" such as "monoline, crypto-focused business models"). |
| 72 | In May 2022, FRBKC geared up for another risk assessment (the "pre-membership exam"). Ex. 56 at FRBKC-00016141-42; Ex. 55 at FRBKC-00017394. This examination was also led by FRBKC personnel, including Mr. Crouch. *Id.* At a May 2022 meeting, Mr. Crouch provided Custodia feedback on a prior risk assessment and described FRBKC's plans to conduct an additional exam. Mr. Crouch specifically informed Custodia that the exam would look beyond "day one" activities. Ex. 56 at FRBKC 16141 ("[W]ill focus on specific operational risks related to planned products and services ... core banking, custody and prime services"). | Disputed. Following this May 2022 feedback meeting—which was based on outdated information from the October 2021 risk assessment—Crouch followed up in writing with Custodia about what specifically to expect in the pre-membership exam. In this August 19, 2022, letter, which preceded the September 2022 exam, Crouch expressly wrote that the "focus of this examination will be on overall risk management practices and products and services that will be in place when operations commence, or soon thereafter." Ex. AK, ECF No. 236-37, at Custodia-00009860. |
| 73 | By this time, Custodia had applied to become a Federal Reserve member bank. In order to minimize duplicative requests and reduce burden on Custodia, the pre- | Disputed in part. While Custodia acknowledges that, factually, the FRBKC used information from the pre-membership exam to inform both the master account and membership application |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | membership exam was intended to inform both FRBKC's decision on Custodia's master account request and resolution of Custodia's membership application. *See* Ex. 56 at FRBKC-00016141-42; Ex. 55 at FRBKC-00017394. In May 2022, an examiner in FRBKC's CRM department assigned to the master account piece of the exam began compiling questions for the examination relevant to the master account request. Ex. 57 at FRBKC-00002203. | reviews, Custodia does not concede that the FRBKC's actions complied with the MCA, as the MCA does not authorize the FBRKC to conflate the standards for a membership review and the review of a master account application. *See* Custodia's Omnibus Opening Brief at 31–55. |
| 74 | FRBKC had a meeting scheduled with Custodia to discuss the pre-membership exam on June 9, 2022. *See* Ex. 58 at FRBKC-00011132. | Undisputed. |
| 75 | On June 7, 2022, Custodia initiated this lawsuit. ECF 1. The meeting that had been scheduled for June 9, 2022, was postponed, but FRBKC's work on the pre-membership exam continued. *See* Ex. 58 at FRBKC-00011132. | Disputed in part. This paragraph erroneously implies that FRBKC's work on Custodia's master account was steady and "continu[ing]." *See* Ex. DI, at Custodia-00007978 (March 2022 letter from Caitlin Long to President George recounting a March 2, 2022, meeting with FRBKC staff where Long was informed that Custodia's "master account application review process has not yet formally begun."). Instead, Custodia was forced to sue because FRBKC failed to take timely action on Custodia's application, despite the passage of nearly two years. *See generally* Compl., ECF No. 1. |
| 76 |  | Disputed. In an August 19, 2022, letter to Custodia regarding the upcoming September exam, the FRBKC expressly stated that the "focus of this examination will be on overall risk management practices and products and services that will be in place when operations commence, or soon thereafter." Ex. AK, ECF No. 236-37, at Custodia-00009860. However, the FRBKC's examination creeped beyond this scope, thereby moving the goalposts. *See* Ex. AJ (Crouch Tr.), ECF No. 236-36, at 208:25–209:22. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| 77 | | Disputed. In the middle of the pre-membership exam, the FRBKC changed the exam's scope, deciding to hold Custodia to the standard of a "complex bank" (typically a bank of $50 billion in assets) even though Custodia had not yet opened. *See* Ex. AO, ECF No. 236-41, at Custodia-00003104–06; *see also* Custodia SOMF ¶¶ 30–31. Yet despite moving the goalposts, FRBKC staff reported to Custodia that all issues were addressable, and Custodia would be afforded a follow-up exam to allow it time to redress any purported issues. Custodia SOMF ¶ 32. While Custodia submitted detailed remediation materials in December 2022, the FRBKC did not uphold its promise to conduct a customary follow-up exam. *Id.* ¶ 33. |
| 78 | In addition, policy questions persisted concerning Custodia's plan to derive profit from fees on digital asset services while providing "core banking" services on an uninsured basis. Custodia's prime services and Avit product lacked sufficient detail to evaluate, and its proposal to facilitate its digital asset custody business by holding crypto on balance sheet contravened Federal Reserve supervisory guidance. *See, e.g.*, Ex. 59 at FRBKC-00002175 (discussing issues with prime | Disputed. The prime and Avit services were not part of Custodia's contemplated "Day 1" activities, which the FRBKC had expressly told Custodia would be the focus of the review. *See* Ex. AK, ECF No. 236-37, at Custodia-00009860 (August 19, 2022, letter stating the "focus of this examination will be on overall risk management practices and products and services that will be in place when operations commence, or soon thereafter."). The "supervisory guidance" to which the FRBKC refers was issued in January 2023, after the September |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | services); Joint Statement on Crypto-Asset Risks to Banking Organizations at 2 (discussing concerns with crypto held on the balance sheet as principal instead of in a purely custodial arrangement). Custodia's plan to issue the Avit product continued to run counter to the November 2021 federal banking agencies' recommendation that stablecoins should be issued only by insured depository institutions. *See* PWG Report at 2. | 2022 exam. *See* Bd. of Governors, FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d. The November 2021 "recommendation" that the FRBKC cites was *non-binding. See generally* Report on Stablecoins (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021) ("PWG Report"), http://tinyurl.com/5225srnv. In addition, this paragraph ignores that Custodia sought permission from the Fed for any services it hoped to provide and clearly communicated that it would not proceed with any services or products that the Fed would not approve. *See, e.g.*, Ex. DD (Long Tr.), at 81:24–85:20 (describing that Custodia would have only held *de minimis* crypto on balance sheet if the Fed had granted permission, and this was not essential to Custodia's business plan); Ex. 18, ECF No. 277-4 (Long Tr.), at 66:3–12 (describing that Custodia did not proceed with issuing the Avit). |
| 79 | Following the conclusion of the pre-membership exam, President George directed FRBKC staff to draft an internal memo recommending denial and draft a denial letter to Custodia. *See* George Tr. 193:15-19; May-Oder Tr. 307. FRBKC staff began to draft a denial memo by early December 2022. Hazen Tr. 252:3-8; Ex. 60 at FRBKC-00002133. The FRBKC memo recommended denial on multiple bases. *See* Ex. 61 at FRBKC-00009928. FRBKC solicited input on the memo from Board staff on January 6, 2023. *See* Ex. 62 at FRBKC-00016409. Board staff provided comments that had no significant impact on the memo's substance and none on its conclusion. *See* Ex. 63 at FRB-AR-000313; Ex. 64 at | Disputed. Drafting the denial letter came following discussions between Board and FRBKC staff in late November 2022 regarding "delivering the message" regarding "the denial." *See* Custodia SOMF ¶ 51. In addition, the Board's edits to the draft denial memo were extensive. *Id.* ¶¶ 52–55. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | FRB-AR-000315; Ex. 65 at FRB-AR- 000324; Ex. 66 at FRB-AR-000326. |  |
| 80 | On January 27, 2023, President George issued the denial to Custodia. *See* Ex. 59 at FRBKC-00002172. She explained the timing as follows: <br><br> So we discussed the timing of this letter, because I was within a few days of leaving the Federal Reserve. By that point we had gotten what I thought we were going to get. … [T]he account access guidance had been issued, the issue of legal eligibility had been decided, and there was no sense that some of the broader policy issues that I was hoping to see resolved were going to be resolved in a timely manner. <br> * * * <br> So given that timing and given the fact that Custodia had filed a lawsuit challenging the timing, I felt we should make a decision here that we would be able to take the information that we had, and that before I transitioned out of the organization, it would be responsible for us to give them that decision. <br><br> George Tr. 242:21-243:16. President George retired a few days later, on January 31, 2023. *Id.* at 244:25-245:2. | Disputed in part. While Custodia acknowledges that a letter denying Custodia's master account application was sent on January 27, 2023, this paragraph omits that the timing was coordinated to occur on the same day as the Board's denial of Custodia's master account application and the White House and Board's issuance of cryptocurrency policy statements. Custodia SOMF ¶ 57; *see also* Ex. 18, ECF No. 277-4 (Long Tr.), at 319:1–324:25. The Board took control of the decision on Custodia's master account application by issuing the Guidelines, S-Letter, Handbook, and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63. |
| 81 | President George testified that she made the decision to deny Custodia's master account request. *See* George Tr. 254:4-10; 260:24-261:21. Her decision was based on a | Disputed. The Board took control of the decision on Custodia's master account application by issuing the Guidelines, S-Letter, |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | range of risk and policy considerations set forth in her letter and summary analysis to Custodia communicating the denial. *See* George Tr. 254:19-260:23.; Ex. 59 at FRBKC-00002172. President George further testified that FRBKC "had seen inadequacies in the policies and procedures, the operational components, had raised questions about the management's ability to establish a risk management program for this institution, and also had raised questions about ultimately in the event of a failure, how the resolution of this institution would be handled, which is a very relevant factor in considering stability and implications of a failure." George Tr. 255:16- 24; *see also id.* at 176:22-177:8 ("I knew from my experience that one of the highest indicators of failure can be a highly concentrated institution around a particular asset class, and that had been borne out over history… . And … [FRBKC] had gone on in to look at the risk profile of Custodia, and saw inadequate compliance and risk management practices in place around this very concentrated activity."). | Handbook, and other methods described in Custodia's brief. Custodia SOMF ¶¶ 12–63.<br><br>The FRBKC is also incorrect in its assertion that there was undue risk from Custodia being a "highly concentrated institution." Custodia's business model is not "concentrated," because while it focused on digital assets, Custodia contemplated four separate business lines and was not designed as a monoline business. Ex. 22, ECF No. 274-22, at Custodia-00008805; *see also* Ex. CS, at FRBKC-00013908 (January 2022 notes from Christi May-Oder stating that FRBKC staffer "Rob [Triano] doesn't see anymore [sic] risk from these activities vs. others [redacted] etc. He believes they have diversity in activities – it's just that they're all tied to crypto."). |
| 82 | Every FRBKC employee who worked on the request and was deposed testified that President George made the decision to deny Custodia's master account request. *See* 30(b)(6) Tr. 330:11-15; Humston Tr. 429:7-14; Hazen Tr. 190:15-25; May-Oder Tr. 308:16-18; Imgarten Tr. 294:6-9; Crouch Tr. 311:11-16; Ex. 67 ("Haake Tr.") at 218:21-25; Ex. 68 ("Mullins Tr.")   at 233:23-235:12; Ex. 69 ("Nugent Tr.") at 202:13-16. | Disputed. While Custodia acknowledges that the FRBKC's counsel elicited self-serving testimony from its witnesses that President George signed the letter communicating to Custodia that its master account application was denied, the Board controlled this decision every step of the way by issuing the Guidelines, S-Letter, Handbook, and other methods described in Custodia's brief. *See* Custodia SOMF ¶¶ 12–63. |
| 83 | FRBKC and the Board repeatedly informed Custodia that FRBKC owned the decision:<br><br>    • In November 2020, FRBKC informed | Disputed. While Custodia acknowledges that President George signed the letter communicating to Custodia that its master |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | Custodia that FRBKC was responsible for making the decision. *See, e.g.*, Ex. 39 at FRBKC-00014924 ("it is a RB decision."). <br>• On March 5, 2021, FRBKC informed Custodia that "[President George] has the final decision on granting the master account and the Board is being looped in for consultation and consensus building. So there really isn't anyone in particular at the Board driving any decision making...." Ex. 70 at Custodia-00008664. <br>• On April 27, 2021, the Board confirmed to Custodia that "individual account requests are handled at the Reserve Bank level." Ex. 71 at Custodia-00004601. <br>• On March 24, 2022, President George stated that "these are Reserve Bank decisions." Ex. 72 at FRBKC-00009849. During the same meeting, Custodia informed FRBKC that Governor Lael Brainard of the Federal Reserve Board had told Senator Cynthia Lummis that master account requests are "purely reserve bank decision[s]." *Id.* | account application was denied, the Board controlled this decision every step of the way. *See* Custodia SOMF ¶¶ 12–63. |
| 84 | The Board of Governors did not vote on Custodia's master account request. George Tr. 259:9-19, 260:17-23. The Board did not dictate the denial, and no individual Governor expressed a view to President George as to whether to grant Custodia's request. *See* George Tr. | Disputed. While Custodia acknowledges that President George signed the letter communicating to Custodia that its master account application was denied, the Board controlled this decision every step of the way by issuing the Guidelines, S- |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | 292:19-21 ("Actually at no time did I hear a Governor express a view of whether they would grant or not grant a master account."); *see also id.* at 259:9-261:13; 30(b)(6) Tr. 330:6-10; Crouch Tr. 302:18-303:7; Haake Tr. 147:6-10; Hazen Tr. 184:25-185:11; Humston Tr. 435:1-436:22; Imgarten Tr. 296:12-14; May-Oder Tr. 308:25-309:17; Nugent Tr. 248:22-249:1; Mullins Tr. 167:21-168:7. | Letter, Handbook, and other methods described in Custodia's brief. *See* Custodia SOMF ¶¶ 12–63. |
| 85 | The System-wide working groups addressing policy issues concerning non-traditional master accounts and/or digital assets never expressed a view of Custodia's request. Hazen Tr. 75- 83; 30(b)(6) Tr. 329-330. | Disputed. As but one example of a system-wide group involving itself in Custodia's application, a November 2020 document reveals that the "Practical" workstream associated with the "Nontraditional Account Access" group was tasked with "consultation on the . . . . Avanti application[]." Ex. Y, ECF No. 236-25, at FRBKC-00004902. Avanti is the prior name for Custodia, and this document reveals that at least five Board staff members (Kathy Wilson, Gavin Smith, David Lowe, Dan McGonegle, and Ben Hobbs) were members of this workstream. *Id.* |
| 86 | In May 2021, the Board proposed guidelines for Reserve Banks to apply when deciding individual master account requests. Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021) ("Proposed Guidelines"). The Board issued the proposal because there had been "a recent uptick in novel charter types being authorized or considered across the country and, as a result, the Reserve Banks are receiving an increasing number of inquiries and requests for access to accounts and services from novel institutions." *Id.* at 25,866. | Undisputed. |
| 87 | The Proposed Guidelines did not address the specific policy issues raised by Custodia's request. Ex. 73 at FRB-AR-000049. Instead, to "support consistency in approach | Disputed in part. While Custodia acknowledges that the Guidelines described six principles, most of these principles concerned policy matters that cannot be delegated to Reserve |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | and decision- making across Reserve Banks," the Proposed Guidelines announced six general "principles"* for Reserve Banks to consider in deciding requests "while maintaining Reserve Bank discretionary authority to grant or deny requests." *See* Proposed Guidelines, 86 Fed. Reg. at 25,866.<br><br>\* Fn: The six "principles" were 1) legal eligibility, 2) risks to the Reserve Bank, 3) risks to the overall payment system, 4) risks to the stability of the U.S. financial system, 5) risks to the economy, and 6) whether the requestor could have an adverse effect on the Federal Reserve's ability to implement monetary policy. Proposed Guidelines, 86 Fed. Reg. at 25,867-69. | Banks. Custodia SOMF ¶¶ 12, 18. Furthermore, this paragraph contains an inaccurate legal assertion, as the Federal Reserve does not have "discretionary authority" to deny access to a master account under the MCA. *See* Custodia's Omnibus Opening Brief at 31–55. Custodia also disputes the FRBKC's assertion that the Proposed Guidelines "did not address the specific policy issues raised by Custodia's request." *Compare* 86 Fed. Reg. 25,865, 25,867–69 (May 11, 2021) (listing the principles), *with* Ex. 59, ECF No. 274-59, at FRBKC-00002172 ("Our review considered activities proposed to be conducted in Custodia's business plan in both the near- and longer-term, and the potential risks they introduce *relative to the Account Access Guidelines*." (emphasis added)); Ex. CV at FRB-AR-000005–06 (memo discussing the Guidelines' principles in the context of recommending denial of Custodia's master account application). |
| 88 | FRBKC was already considering the same six principles described in the Proposed Guidelines. May-Oder Tr. 53:19-54:3 (the Guidelines were "just a way to make … our internal procedures that we had been following for many years … more transparent to the public."). | Disputed. The FRBKC expressly told Custodia that the analysis of Custodia's master account application could not conclude until the Guidelines were finalized, as the Guidelines would materially impact the analysis. Ex. T, ECF No. 236-20, at FRB-AR-003858. Furthermore, the FRBKC has not produced a single policy document that contained these written six principles before the Guidelines were issued. *See, e.g.*, Ex. 15, ECF No. 274-15, at FRBKC-00015594 (FRBKC policy that refers to "routine" or "non-routine" requests, but does not contain the six principles from the Guidelines nor the Guidelines' tiering structure). |
| 89 | In March 2022, the Board announced revised proposed guidelines. *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022) ("Revised Proposed Guidelines"). The Revised Proposed | Undisputed. |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | Guidelines added a "tiering structure" pursuant to which entities lacking federal insurance and a federal supervisor—"Tier 3"—would receive the "strictest" level of scrutiny. *See id.* at 12,958. | |
| 90 | FRBKC was already applying the highest level of scrutiny to Custodia's request. May- Oder Tr. 313 ("Given that it was considered a nonroutine account opening ... they received the highest level of scrutiny and review."); *id.* 189:13-17 ("Tier 3 is something that was applied to how we had already been assessing institutions such as Custodia that were in that higher risk category."); George Tr. 82:15-18 ("I think early on we understood that any of these novel or unusual cases required a different level of scrutiny, and that was longstanding, it was well before these guidelines were promulgated. "); *see* 30(b)(6) Tr. 359:7-20; Mullins Tr. 210:4-17*;* Shimko Tr. 140:16-141:8 (Custodia's President agreeing that "Custodia was, over a long period of time, asked many questions about its business models, many questions about digital assets" from "early on," even "from before the application itself"). | Disputed. The record reveals that the FRBKC's assessment of Custodia materially changed following Board intervention. *See, e.g.*, Custodia SOMF ¶ 54. In addition, FRBKC witnesses have admitted that the Guidelines' tiering system changed the analysis by, for example, elevating the importance of the Board's membership decision. As Judith Hazen testified, Custodia would have been analyzed as "non-routine" before the Guidelines regardless of whether it was a member of the Federal Reserve, but after the Guidelines, the tiering system would have put Custodia into Tier 2 rather than Tier 3 if Custodia had been granted membership. Ex. CW (Hazen Tr. (Vol. 2)), at 390:5–391:4. |
| 91 | Even before the Revised Proposed Guidelines were issued, FRBKC had subjected Custodia to an examination that revealed substantial gaps in Custodia's business plans and compliance infrastructure. Ex. 52 at FRBKC-00016159. FRBKC management had always been skeptical, and policy questions remained unresolved. *See supra* ¶¶ 68-71. Thus, when the Revised Proposed Guidelines were issued, it was already FRBKC's view that, unless something significant were to change, a master account was "unlikely" and "not anticipate[d]." *See* Ex. | Disputed. The record demonstrates a plethora of positive feedback regarding Custodia at the FRBKC before the Board intervened. *See, e.g.*, Custodia SOMF ¶ 54 (FRBKC describing Custodia as having "adequate" capital, "strong" risk management, "relatively low" "liquidity risk," and "impressive" and "extensive" management experience, but subsequently changing its assessment of Custodia as having a "lack of a robust capital requirement framework," "significant risk management gaps," insufficient "liquidity risk management processes," and a management team with a "lack |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | 74 at FRBKC- 00004944 ("At this time we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Federal Reserve member."); Ex. 75 at FRBKC-0013964. | of collective depth of relevant banking experience" following Board intervention); *compare* Ex. CS, at FRBKC-00013908 (Kansas City Fed staff member "Rob [Triano] doesn't see anymore [sic] risk from these activities vs. others [redacted] etc. He believes they have diversity in activities—it's just that they're all tied to crypto"), *with* Ex. BS, ECF No. 236-71, at FRB-AR-000326, 28 (Board staff edits to recommendation memo adding Custodia's "monoline business plan" as a basis for questions surrounding "the financial viability of the firm" and recommending that a greater focus be placed on "risks that have been illustrated in the recent crypto market meltdown" such as "monoline, crypto-focused business models"). For example, in a May 2022 meeting where the FRBKC provided feedback from its initial risk assessment, Ross Crouch gave encouraging feedback to Custodia. And Crouch's prepared talking points providing feedback to Custodia stated that "the board and senior management have impressive depth in tech, legal backgrounds, investment banking, and that the board members have diverse backgrounds and serve on other boards." Ex. 56, ECF No. 274-56, at FRBKC-00016143. He expressly said, "I'm not saying" that there "is a problem here," and indicated a desire to work with Custodia as it continued to construct the bank, develop its business and address his feedback. *Id.* |
| 92 | In March 2022, FRBKC informed Custodia that while FRBKC "can decide this on [its] own," it did not intend to render its decision until the Guidelines were "finalized." Ex. 72 at FRBKC-00009849. The Revised Proposed Guidelines were finalized in August 2022. | Disputed. Most of the principles contained in the Board's Guidelines regard policy matters that cannot be delegated to Reserve Banks. Custodia SOMF ¶¶ 12, 18. Furthermore, this paragraph contains an inaccurate legal implication that the FRBKC could legally deny Custodia's application. The Fed did not have the discretion to deny Custodia access to a master |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | | account under the MCA. *See* Custodia's Omnibus Opening Brief at 31–55. |
| 93 | The Board issued an "S-Letter" to provide Reserve Banks with guidance in connection with implementation of the final Guidelines. Ex. 73 at FRB-AR-000014. System Letters (more commonly known as S-Letters) are not rare—they are numbered sequentially, and this one was numbered S-2677 (the "S-Letter"), Ex. 73 at FRB-AR-000014. *Id.*; 30(b)(6) Tr. 261-63. S-Letters are internal policy statements from the Board to the Reserve Banks on topics such as the administration of Reserve Bank operations (*e.g.*, budget and audit matters), personnel matters (*e.g.*, salary limits for Reserve Bank officers), and issues related to the Reserve Banks' provision of financial services (*e.g.*, S-Letter 2677). 30(b)(6) Tr. 292-293. | Disputed in part. President George and her deputy Tara Humston both testified that S-Letters are rare and they had never before seen an S-Letter in their decades-long careers at the FRBKC. Custodia SOMF ¶ 35. |
| 94 | The S-Letter provides that the Board expects Reserve Banks to "notify Board staff when new access requests ... involve higher-risk institutions or raise unusual, novel, or complicated issues." Ex. 76 at FRB-AR-0000016. This was consistent with FRBKC's existing practice: President George had started System-wide discussions concerning novel issues cropping up around the System more than a year before the Board issued even the Proposed Guidelines. *See* Ex. 44 at FRBKC-00010932; May-Oder Tr. 290:11-25 ("Our practice prior to the S Letter being enacted, we would have typically engaged the Board on these types of requests or activities that would be considered unusual, novel"). | Disputed in part. Custodia agrees that the S-Letter requires Board staff involvement. But Custodia disputes that this was consistent with prior practice, as Reserve Banks had never before been subject to the S-Letter's requirements. Ex. J (George Tr.), ECF No. 236-10, at 88:18–24 (President George admitting that it was never before written that the Reserve Banks had to "give predecisional drafts and memos to the Board of Governors to weigh in" on master account decisions). |
| 95 | The S-Letter also states that Reserve Banks should "consult" with the Board before denying or approving a request from a higher-risk entity. Ex. 76 at FRB-AR- | Disputed in part. Custodia agrees that the FRBKC shared its memo with Board staff. But the Board's edits to the draft denial memo were extensive and were noticeably more negative than |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | 0000016. FRBKC shared its draft denial recommendation memo with Board staff on January 6, 2023. Ex. 77 at FRB-AR-000335; *see* Hazen Depo. Tr. 227:12-20 (explaining that the draft memo was provided to Board staff because the issuance of the S-Letter was imminent and the Custodia denial would likely be the first one, so there was interest in gathering staff-level feedback on the format and content). The Board's feedback was in line with FRBKC's thinking and did not change the outcome. *See* Ex. 64 at FRB-AR-000315; Ex. 66 at FRB-AR-000326; May-Oder Tr. 309 (S-Letter feedback was "very much aligned with what we had provided to the Board"). | prior FRBKC assessments of Custodia. *See* Custodia SOMF ¶¶ 52–55; *see also id.* ¶ 54 (FRBKC describing Custodia as having "adequate" capital, "strong" risk management, "relatively low" "liquidity risk," and "impressive" and "extensive" management experience, but subsequently changing its assessment of Custodia as having a "lack of a robust capital requirement framework," "significant risk management gaps," insufficient "liquidity risk management processes," and management team with a "lack of collective depth of relevant banking experience" following Board intervention); *compare* Ex. CS, at FRBKC-00013908 (Kansas City Fed staff member "Rob [Triano] doesn't see anymore [sic] risk from these activities vs. others [redacted] etc. He believes they have diversity in activities—it's just that they're all tied to crypto"), *with* Ex. BS, ECF No. 236-71, at FRB-AR-000326, 28 (Board staff edits to recommendation memo adding Custodia's "monoline business plan" as a basis for questions surrounding "the financial viability of the firm" and recommending that a greater focus be placed on "risks that have been illustrated in the recent crypto market meltdown" such as "monoline, crypto-focused business models"). |
| 96 | On January 24, 2023, FRBKC shared the final version of its analysis. Ex. 78 at FRB-AR-0000003. The Board responded that it had "no concerns" with FRBKC's denial. Ex. 79 at FRB-AR-000002. | Disputed in part. The final version of this memo did not constitute "its" analysis (as in, the FRBKC), but instead consisted of the analysis of both the FBRKC and the Board. *See* Custodia SOMF ¶¶ 52–55. Custodia further disputes the characterization of the decision as "FRBKC's denial," as the Board took control of the decision by issuing the Guidelines, S-Letter, Handbook, and other methods described in Custodia's brief. *Id.* ¶¶ 12–63. |
| 97 | The Guidelines, the S-Letter, and an accompanying "Handbook" developed to facilitate implementation of the | Disputed. This presents an inaccurate legal assertion, asserted only for litigation purposes, as the Federal Reserve does not |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | Guidelines all confirm that Reserve Banks have discretion to decide individual master account requests. Ex. 73 at FRB-AR-000015, 49; Ex. 80 at FRBKC-00017294. | have "discretion" to deny access to a master account under the MCA. *See* Custodia's Omnibus Opening Brief at 31–55. |
| 98 | In 2021, while its master account request was pending, Custodia applied for membership with the Federal Reserve. *See* Ex. 81 at FRBKC-00017547. The Board has authority to decide on applications for membership, though it has delegated authority to approve—but not to deny—membership applications to Reserve Banks. *See* 12 C.F.R. § 265.20(e)(1). | Undisputed. |
| 99 | State-chartered nonmember banks typically are insured and thus have the FDIC as their primary federal regulator and supervisor (while national banks are supervised by the OCC). *See* The Fed Explained at 62-82. But Custodia did not have FDIC insurance and thus did not have a federal regulator or supervisor. *See* Long Tr. 61:2-4; Ex. 72 at FRBKC-00009848. If it were to become a member of the Federal Reserve, however, that would change, as it would come under the regulatory and supervisory authority of the Federal Reserve. George Tr. 210:17-20. Thus, if membership were granted to Custodia, FRBKC would have considered Custodia's master account request differently in light of the fact that Custodia would be operating with a federal prudential supervisor. *See* George Tr. 211:12-17 ("That would have been new information that would have caused us to extend our analysis here"). | Disputed in part as incomplete. Custodia sought a federal regulator, by applying for FDIC insurance and membership in the Federal Reserve, but was denied both. Moreover, the reason that Custodia's master account would have been viewed "differently" was because this was dictated by the Board's Guidelines—if Custodia had been granted membership, it would have been considered a Tier 2 rather than a Tier 3 entity. *See, e.g.*, Ex. AG, ECF No. 236-33, at FRBKC-0000297. |
| 100 | President George was prepared to deny Custodia's request, but she felt it would make little sense to deny the request only to have the Board subsequently grant membership. *Id.* at 210:17-20. If the Board were to grant membership, FRBKC would have had to "rethink the risks that we had | Disputed in part. Custodia agrees that the Board's membership decision affected the assessment of Custodia's master account application and a grant of membership would have required "rethink[ing]," as the Guidelines dictated that if Custodia had been granted membership, it would have been considered a |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
| | identified and what potential mitigants might be in place." 30(b)(6) Tr. 314:16- 315:17. Accordingly, President George held Custodia's master account request due to the chance the Board would grant its membership application.* George Tr. 196:4-8; *see also id.* 210:17-20 ("If the Board granted membership, it would have changed the analysis we would have put in here").<br><br>* Fn: FRBKC staff were simultaneously working on two separate analyses—one to inform FRBKC's decision on the master account and one to support the Board's decision on membership. FRBKC staff took care to ensure that their respective analyses did not contradict each other, Hazen Tr. 212:4-217:12; May-Order Tr. 299:18-303:3; George Tr. 181:14-185:14, but there is no evidence that President George deferred to any Board decision on whether to grant the master account request. Indeed, she arrived at her decision to deny that request before the Board voted on membership. *See* George Tr. 244:12-246:12. | Tier 2 rather than a Tier 3 entity. *See, e.g.*, Ex. AG, ECF No. 236-33, at FRBKC-00000297. But contrary to the FRBKC's statement, the record contains abundant evidence that President George deferred to the Board and that the Board controlled the decision regarding Custodia's master account. *See* Custodia SOMF ¶¶ 12–63. |
| 101 | The Board voted to deny membership to Custodia on January 27, 2023, and President George thereafter informed Custodia of FRBKC's denial of its master account request.*<br><br>* Fn: Custodia has suggested that the White House played a role in "coordinating" the denial of Custodia's membership application and master account request. *See* ECF 121 ¶ 7. Custodia brings no evidence of this. Ms. Long testified that she believes it to be true based on | Disputed in part. Custodia agrees that the Board voted to deny it membership and that President George was the messenger of the decision to deny Custodia's master account application. But this denial was not the "FRBKC's denial" given the Board's control over the decision. *See* Custodia SOMF ¶¶ 12–63. In addition, it belies common sense for the FRBKC to assert that the White House's anti-crypto statement just coincidentally was issued on the same day as the denial letters to Custodia and the Board's crypto policy statement. *See* Custodia SOMF ¶ 57; *see also* Ex. 18, ECF No. 277-4 (Long |

| Para. No. | FRBKC's Statement | Custodia's Response |
|---|---|---|
|  | conversations she had with a Bloomberg reporter in which the Bloomberg reporter *declined* to confirm that the White House was a source of a leak. *See* Long Tr. 319:6-323:6. President George had "no heads up" about the White House announcement, and it "wasn't a factor" in her decision. George Tr. 253:2-9. | Tr.), at 319:18–334:5 (discussing basis for knowledge of White House involvement). |