# EXHIBIT CX

# [PUBLIC VERSION]

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

---------------------------------:
CUSTODIA BANK, INC.,              :
                                  :
         Plaintiff,               :
                                  : Case No.
      vs.                         : 1:22-cv-00125-SWS
                                  :
FEDERAL RESERVE BOARD OF          :
GOVERNORS and FEDERAL RESERVE     :
BANK OF KANSAS CITY,              :
                                  :
         Defendants.              :
---------------------------------:

CONFIDENTIAL DEPOSITION OF
PETER CONTI-BROWN, PH.D.

DATE:          Thursday, December 14, 2023
TIME:          8:09 a.m.
LOCATION:      King & Spalding, LLP
               1700 Pennsylvania Avenue, N.W.
               Washington, D.C. 20006

REPORTED BY:   Erick M. Thacker
               Reporter, Notary


Veritext Legal Solutions
1250 Eye Street, NW, Suite 901
Washington, D.C. 20005

Page 286

1   MCA, must get access to an account, right?
2        A    All legally eligible depository
3   institutions, the intent of the framers of the
4   MCA was to give them access on equal terms to
5   Federal Reserve services, yes.
6        Q    Okay.  And that once they have an
7   account, you're not precluding the possibility
8   that the Federal Reserve can conduct a risk
9   assessment concerning each institution, right?
10       A    That's -- it's correct that I'm
11  asserting that the Federal Reserve's risk
12  assessments pursuant to regulation is consistent
13  with the Fed's practices after the passage of the
14  Monetary Control Act.
15       Q    But to the extent that they restricted
16  use of any service in perpetuity, that would be
17  inconsistent with the intent behind the Monetary
18  Control Act?  That's your opinion?
19       A    The --
20            MR. SCARBOROUGH:  Objection.
21            THE WITNESS:  My opinion is that the
22  intent of the framers of the Monetary Control Act

Page 287

1   was not to give the Federal Reserve the authority
2   to impose membership entrance standards for
3   federal -- use of Federal Reserve services as it
4   had done prior to 1980, after the passage of that
5   act.
6   BY MR. MICHAELSON
7       Q    Okay.  So The Narrow Bank is a
8   state-chartered nonmember bank, right?
9       A    That's right.
10      Q    Like Custodia, right?
11      A    Chartered by the state of Connecticut,
12  where Custodia was chartered by Wyoming.
13      Q    Right.  But both are state-chartered
14  nonmember banks, right?
15      A    That's right.
16      Q    And so it's your opinion that the
17  Federal Reserve -- that the Monetary Control
18  Act's intent was to force the Federal Reserve to
19  give entities like that access to services
20  irrespective -- without the Federal Reserve being
21  powered to conduct a risk assessment?
22      A    My opinion is that the intent of the

Page 288

1   framers of the MCA was to require the Federal
2   Reserve to equalize access to its service
3   irrespective of Fed membership and that the
4   process for determining Fed membership, which
5   could stay consistent both before and after 1980,
6   was not to be turned into the same process for
7   granting that access, which was to be on equal
8   terms to all legally eligible depository
9   institutions.
10       Q   In your view, is it consistent with the
11  Monetary Control Act for the Federal Reserve to
12  deny access to a -- both a federally-chartered
13  and state-chartered institution that are
14  identical?
15           MR. SCARBOROUGH:  Objection to form.
16           THE WITNESS:  My opinion is that that
17  would not constitute the access intended by the
18  federal -- by the framers of the Monetary Control
19  Act.  The intent of the framers of the Monetary
20  Control Act was not that the Federal Reserve
21  could act with whatever whim that it preferred
22  for so long as it did so consistently across

1    Q    Okay. And that would include payment
2  of interest on excess reserves?
3    A    That would include the master account.
4    Q    Would it include payment of interest on
5  excess reserves?
6    A    I'd regard the application of payment
7  on interest reserves and whether it fits within
8  the statutory parameters of Section 248a to be a
9  legal question, which the Court should decide and
10  on which I offer no opinion.
11    Q    So you're -- you're -- you're not
12  offering an opinion on -- so it's potentially
13  consistent with the intent behind the MCA for the
14  Federal Reserve to grant a master account to
15  The Narrow Bank, but refuse to pay interest on
16  excess reserves?
17    A    I don't offer an opinion about -- on
18  that -- on the specific legal interpretation of
19  what the -- of what would constitute additional
20  priced services and whether the interest on
21  reserves would -- would constitute those
22  services.

1          I do express the opinion that if the
2    Federal Reserve in granting a master account so
3    imposes conditions on its use as to render it
4    inert that that would be inconsistent with the
5    intent of the framers of the MCA.  Whether, in
6    this specific instance, the payment on interest
7    on excess reserves would -- would render that
8    account inoperable is not a question on which I
9    offer an opinion.
10        Q    But you understand that TNB's business
11   model was built around receipt of interest on
12   excess reserves, right?
13        A    I don't offer an opinion on the
14   business model of The Narrow Bank in this case.
15        Q    Do you know if any employees of the
16   Federal Reserve Bank of New York were inclined to
17   the grant The Narrow Bank's request for a master
18   account?
19        A    I don't have an opinion to offer about
20   the inclinations of individual members of the --
21   or staffers or employees of the Federal Reserve
22   Bank of New York.