# EXHIBIT DB

# [PUBLIC VERSION]

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 363

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

CUSTODIA BANK, INC.,

        Plaintiff,

vs.                                      No.

FEDERAL RESERVE BOARD OF        22-cv-00125-SWS

GOVERNORS and FEDERAL RESERVE

BANK OF KANSAS CITY,

        Defendants.

VOLUME II

CONTINUED CONFIDENTIAL DEPOSITION OF JUDITH HAZEN, a Witness, taken on behalf of the Plaintiff before Kelsey Robbins Schmalz, CSR No. 1571, CCR No. 1148, RPR, pursuant to Notice on the 15th of November, 2023, at the offices of the Federal Reserve Bank of Kansas City, 1 Memorial Drive, Kansas City, Missouri.

1   entity that had a brand new charter type that was
2   uninsured and that had a novel business model would
3   have been a nonroutine request for us.
4   BY MS. WEINBERGER:
5            Q.    And an entity like Custodia would've
6   been nonroutine regardless of whether its membership
7   application was granted?
8                 MS. CARLETTA:  Objection.  Form.
9                 Also, I'll note we've been going for a
10  half hour.
11           A.    So by its nature of being one of the
12  first entities to receive a charter that had just
13  been just been created, it would be unique.  The fact
14  that it was not insured would also be unique.  The
15  fact that it's a de novo entity would also be unique.
16  So all of those factors and probably more would drive
17  it into being a nonroutine request, so I don't know
18  that the membership decision would have influenced
19  whether it was routine or nonroutine.
20  BY MS. WEINBERGER:
21           Q.    Whereas under the guidelines, whether
22  Custodia's membership application was granted
23  affected whether it was going to be in Tier 2 or
24  Tier 3; is that correct?
25           A.    So far as the definition that the

1    Board ascribed to those different tiers, yes.  I
2    believe that if Custodia had been granted membership
3    that would have moved it to be considered a Tier 2
4    institution versus a Tier 3 institution.
5         Q.    Okay.  I want to move on to what I've
6    marked as Exhibit 192, which is Bates No. 17747.
7               So if you could look -- first of all,
8    do these appear to be your notes?
9         A.    They do.
10        Q.    And if you could look at Page 17749.
11   Can you tell when these notes are from?  And if you
12   need a moment to look at them, I'm happy to go off
13   the record for a minute.
14        A.    So the notes in this notebook I think
15   would have been from July of 2020 through August of
16   2020, but I don't know these specific pages where in
17   that timeline they would have been.
18        Q.    Okay.  And it says SPDI meeting at the
19   top of the page; is that correct?
20        A.    Yes.  SPDI meeting.
21        Q.    And who were you meeting with?
22        A.    It doesn't say.
23        Q.    Do you have any recollection?
24        A.    I don't.
25        Q.    So it seems to be referring to

Page 395

1  there could be relevant emails from that two-year
2  period where there were interactions with Wyoming on
3  the SPDI legislation?
4              MS. CARLETTA:  To the extent that this
5  involves counsel that you're -- advice that you
6  received from your legal counsel, I'll instruct you
7  not to answer.
8              I'm sorry.  I didn't understand that
9  this was attorney-client privileged information.
10 BY MS. WEINBERGER:
11      Q.    And I'm happy to rephrase.  I'm asking
12 in your personal knowledge separate from what an
13 attorney has told you, are you aware of any emails
14 that could exist between 2017 and 2019 regarding
15 communication with the State of Wyoming on SPDI
16 legislation?
17      A.    I would have had no communications
18 with the State of Wyoming on the legislation in that
19 time frame.
20      Q.    Are you aware of any colleague having
21 communication -- any colleague of yours at the Kansas
22 City Fed having communication with the State of
23 Wyoming on the litigation in that time frame?
24      A.    Can you say that again?  I'm sorry.
25      Q.    Sure.  Are you aware of anyone at the

Page 396

1    Kansas City Fed having communication with the State
2    of Wyoming about the SPDI legislation between 2017
3    and 2019?
4         A.    So I won't know specific dates off the
5    top of my head, but my understanding is that there
6    were individuals that were discussing with the
7    Division of Banking at the time that the legislation
8    was being contemplated and moved through the state
9    legislature.
10        Q.    And do you know who those individuals
11   at the Kansas City Fed are who had such
12   communications with folks in Wyoming?
13        A.    I wouldn't be able to give you an
14   exhaustive list off the top of my head.
15        Q.    Can you name anyone, even if not
16   exhaustive, just in your current recollection who you
17   can think of?
18        A.    My understanding is that individuals
19   in our legal division were discussing the proposed
20   SPDI legislation.  Also, Jackie Nugent and then I
21   imagine other individuals in the supervision risk
22   management division.
23        Q.    Do you know which other individuals it
24   might be?
25        A.    I assume that Jackie's reporting line