# EXHIBIT DD

# [PUBLIC VERSION]

*Meadors Court Reporting*

C O N F I D E N T I A L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

No. 1:22-cv-00125-SW

―――――――――――――――――――――――――――――――――――――――――――

DEPOSITION OF CAITLIN LONG

November 29, 2023

―――――――――――――――――――――――――――――――――――――――――――

CUSTODIA BANK, INC.,

Plaintiff,

vs.

FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL
RESERVE BANK OF KANSAS CITY,

Defendants.

―――――――――――――――――――――――――――――――――――――――――――
APPEARANCES:

        WILLIAMS, PORTER, DAY & NEVILLE, P.C.
            By Scott E. Ortiz, Esq.
            159 North Wolcott Street
            Suite 400
            Casper, WY  82601
            sortiz@wpdn.net
                Appearing on behalf of Plaintiff.

        KING & SPALDING LLP
            By Andrew Michaelson, Esq.
            1185 Avenue of the Americas
            34th Floor
            New York, NY  10036
            amichaelson@klaw.com.
                and
        HIRST APPLEGATE, LLP
            By Billie L.M. Addleman, Esq.
            1720 Carey Avenue
            4th Floor
            Cheyenne, WY  82003-1083
              baddleman@hirstapplegate.com
                Appearing on behalf of Defendant.

1      A    No.

2      Q    And taking this forward to the fall of 2022,

3 the time of the membership exam that we discussed

4 earlier, had that been built out?

5      A    No.

6      Q    And had the pooled -- had the pooled account

7 generally been built out at that time?

8      A    No.

9      Q    There's a reference here to physical

10 storage; is that storage of hardware?

11     A    Yes.

12     Q    And we discussed already No. 3, the omnibus

13 account.  The No. 4, segregated on-chain account, was

14 non-fungible bailment?

15     A    Yes.

16     Q    And what is that?

17     A    That's what we're offering today.

18     Q    That's what you're offering today.  Okay.

19 As part of the custody services that you planned to

20 provide as part of this business plan, I'm correct

21 that Custodia's plan was to have crypto on balance

22 sheet, correct?

23     A    No.

24     Q    Custodia would have -- it's your testimony

25 that Custodia's plan was to have zero crypto on

1    balance sheet as part of its custody service?

2        A    Our proposal to the fed, which was not

3    mentioned in this business plan, was to hold up to

4    $10,000 on balance sheet to facilitate customer fees,

5    but we abandoned that.

6        Q    To facilitate customer fees in connection

7    with the custody service or a different service?

8        A    To facilitate, yes.  Every time you transact

9    on blockchain, fees have to be paid in the token.  So

10   in our case for custody, either bitcoin or Ethereum.

11   The question was, who pays the fee.  We asked the fed

12   for permission to hold up to $10,000 on our balance

13   sheet because we will always charge the fee through

14   to the customer.

15           The challenge becomes, you estimate a fee,

16   but you don't know exactly what the fee is going to

17   be when the transaction is confirmed on the

18   blockchain, and so there will be differences that

19   will be very small, but we did not want to have to go

20   back to a customer to ask for additional bitcoin to

21   pay for the fee because these are small differences.

22           And so we asked for permission from the fed

23   to hold a de minimis amount, and every time the fed

24   has talked about us holding digital assets on balance

25   sheets, it has made that material omission that our

1    request -- first of all, that we requested it.  It

2    was not in our business plan, and second of all, that

3    it was only $10,000.

4        Q    So -- but your proposal to the fed was that

5    you would have the small amount of crypto digital

6    assets on balance sheet, correct?

7        A    We proposed that in -- as part of the -- I

8    believe it was the second request for additional

9    information that the Board of Governors sent us in

10   summer 2022 related to the membership exam.  That's

11   when it came up.  It was not in this business plan.

12       Q    So let's break that down.  So at the time of

13   this business plan then, you're saying this business

14   plan as of August of 2021 did not contemplate any

15   crypto on balance sheet at all?

16       A    Correct.

17       Q    Now, in 2022, just to pinpoint a place in

18   time, the time of the membership exam in September of

19   2022, you were proposing to put a small amount of

20   digital assets on balance sheet, correct?

21       A    Up to $10,000, yes.

22       Q    It was your understanding that the

23   membership exam that occurred at that time was going

24   to be used within the federal reserve system, broadly

25   speaking, to inform both the master account request

1    decision and the membership application decision,

2    correct?

3        A    That's what they told us.

4        Q    So at that time, you were proposing to put a

5    small amount of digital assets on balance sheet?

6        A    We asked for permission to do so.

7        Q    And what was their response to that?

8        A    The response was the January 27th 86-page

9    order that made it sound like we were going to hold

10   digital assets as principle, which was absolutely not

11   true.

12       Q    You're saying prior to January 27th, 2023,

13   you didn't get any notification from the federal

14   reserve that holding digital assets on balance sheet

15   was a bad idea?

16       A    The de minimis digital assets, we repeatedly

17   requested an answer to that question, which we had

18   sought permission to do, and we did not receive an

19   answer until the 86-page order on January 27th.

20       Q    Isn't it true that the federal reserve

21   suggested to you in the fall of 2022 that you come up

22   with a solution for those fees that would not involve

23   holding digital assets on balance sheet?

24       A    They asked us in that second -- I believe it

25   was the second.  There were three requests for

1    additional information in writing, and they asked us

2    for alternative proposals, and we did provide

3    additional proposals.

4         Q    The alternative proposals that you provided

5    included proposals that resulted in zero digital

6    assets on balance sheet?

7         A    Yes.

8         Q    When did you provide those proposals?

9         A    It would have been around August 2022.  We

10   had conversations at that time with our primary

11   regulator, the Wyoming Division of Banking.

12             They initially took the position that we

13   were required to have funds on hand to facilitate

14   digital asset transactions, and so we would have had

15   to make up the difference.  That is the reason for

16   the request.  It was the Wyoming Division of Banking

17   asking us to ask the fed for permission to do this.

18             The Wyoming Division of Banking subsequently

19   decided that that was not required, and therefore, we

20   abandoned it.

21             The other issue that was happening -- can I

22   finish?

23         Q    Yeah.

24         A    The other issue that was happening at the

25   time, is that we learned Bank of New York Mellon was

1   Custodia could transfer them to third customers who

2   are not customers of Custodia, correct?

3        A    Yes.

4        Q    And the customer holding Avits could redeem

5   the Avits from Custodia for dollar for dollar?

6        A    Yes.

7        Q    Could a noncustomer of Custodia redeem Avits

8   from Custodia?

9        A    Yes.  That was proposed because Avits are

10  structured as digital cashier's checks, and just like

11  a cashier's check is a negotiable instrument if it's

12  in paper form.  All Avits are are a digital form of

13  cashier's checks.  So we followed the exact same law.

14       Q    So when you say, "yes, that was proposed,"

15  do you mean, yes, Custodia could redeem Avits to

16  noncustomers?

17       A    Yes.  That is required under UCC to maintain

18  negotiability.

19       Q    Was there a plan to conduct KYC, BSA/AML

20  checks on noncustomers who approached Custodia to

21  redeem an Avit?

22       A    Yes, exactly the same as is required of

23  paper cashier's checks redeemed to any bank by a

24  noncustomer.

25       Q    So you mentioned earlier that there are many

1    Q    Is it your understanding that today BNY

2    Mellon is providing only de minimis digital asset

3    custody service?

4    A    I don't know how much they're providing.

5    Q    You don't know?

6    A    No.

7    Q    You don't know that they've publicly

8    announced that they're providing de minimis digital

9    asset custody service because of the impact of SAB

10   121?

11   A    I didn't know that.  I don't know what de

12   minimis means for Bank of New York Mellon.  They have

13   literally trillions under management, so de minimis

14   to them might mean hundreds of millions.  I don't

15   know.

16   Q    You'd agree, though, that if a bank needed

17   to hold -- if a bank needed to account for digital

18   asset held in custody on balance sheet, that it would

19   have a dramatic impact on their capital requirements,

20   right?

21   A    Yes.

22   Q    You understand that that accounting

23   treatment -- strike that.  You understand that the

24   accounting treatment set forth in SAB 121 would make

25   it uneconomic for banks to provide digital asset

1    know of any digital asset focused de novo

2    institutions that requested a master account between

3    2018 and 2020?

4        A    I knew that there were applicants to the

5    FDIC.  I knew that there were applicants to the OCC

6    that had also requested master accounts -- OCC trust

7    banks, and I knew about Kraken, plus the other

8    Wyoming speedies, yeah.

9        Q    There was no other Wyoming speedy that

10   requested a master account?

11       A    Kraken did it around the same time we did.

12   I don't know the precise date.

13       Q    Right.  I mean, aside from Custodia and

14   Kraken in 2020?

15       A    At that time, yes.  The other two were not

16   chartered until later, but they did show up in the

17   master account database as having applied for master

18   accounts, yes.

19       Q    Katie Cox writes in Point 4, "The company

20   also has developed policies and procedures in order

21   to operate in a safe and sound manner, as well as

22   comply with all BSA/AML requirements"; do you see

23   that?

24       A    Yes.

25       Q    At that time, were your BSA/AML policies and

1   procedures complete and final?

2       A    We had -- yes.  The board had approved them.

3   I don't recall the specific date, but I believe it

4   was in the summer of 2020, the first versions yes.

5       Q    You say, "first versions," but were they

6   sufficiently advanced that you could launch with

7   them?

8       A    Yes.  They were standard BSA/AML policies.

9   We did significant revisions to them subsequently,

10  but yes, what we did was we bought a package of

11  standard policies, and we adopted them before the

12  board adopted that first slew of policies in the

13  summer of 2020, and then we've continued to revise

14  them ever since.

15      Q    And in Point No. 8, Katie Cox writes that

16  "It will be difficult for the fed to deny its

17  application of a master account with the federal

18  reserve.  I'm not saying that a denial of the

19  application can't happen because the fed is always

20  concerned about unintended consequences of any action

21  that it takes is a very cautious organization."  She

22  continues, "What I am saying is based on my 30-year

23  experience with the federal reserve system, I believe

24  that the fed will approve Avanti's application."

25          So my question for you is whether Katie Cox

1      Q    And was the only issue they raised this

2  issue of automation?

3      A    That was actually the big one.  It drove a

4  lot of the conclusions.

5      Q    Well, let's go back to Exhibit 258, your

6  notes.  The notes in the left refer to a meeting with

7  Ross and Jennifer on September 16th, 2022; do you see

8  that?

9      A    Yes.

10      Q    And they're focused on BSA risk

11  assessment?

12      A    Yep.

13      Q    And Ross and Jennifer are both Kansas City

14  employees, correct?

15      A    Correct.

16      Q    On the right-hand side of the page, there's

17  a reference to notes of a meeting with Ross and

18  Jennifer on September 23, 2022; you see that?

19      A    Yes, yep.

20      Q    And the first notation is, "Lots more

21  documenting formalization of processes;" do you see

22  that?

23      A    Correct.

24      Q    Interpret these notes for me.  Is this what

25  they're telling you?

1    A    Yes.  These are things they're telling us,

2    correct.

3    Q    So they're telling you that Custodia needs

4    lots more documenting and formalization of

5    processes?

6    A    Yep.

7    Q    And that is needed in the IT area?

8    A    Yes.  There's an important context for that.

9    Ross had the cutoff date at June 30th, and we sent

10   all the documentation for IT in August and September,

11   and he did not review that as part of the exam.

12        Our agreement was that he would review those

13   documents in the follow-up exam that we acknowledged

14   by this point we were going to need.

15   Q    So you would -- by this point, by September

16   23rd, 2022, you acknowledged to the Kansas City team

17   that you would need a follow-up exam?

18   A    We all understood that that was the case,

19   yes.

20   Q    What do you mean by, "we all understood that

21   was the case"?

22   A    Both the exam team, Ross and Jennifer, in

23   the feedback and the one-on-one conversations I had

24   with Ross, also Katie Cox, as well.  She had told us

25   especially when they determined that we were going to

1    be held to a complex bank standard, we were not going

2    to make it on the first exam, and so the fact that we

3    sent all that documentation, which did exist by

4    September 23rd after the cut-off date of June 30th,

5    Ross didn't consider any of it.

6        Q    So it's your testimony that in Ross' exam,

7    he did not consider information about IT policies

8    that you provided to him after June 30th?

9        A    Correct.  The letter says that.

10       Q    And BSA -- he also indicates that BSA

11   required lots more documentation and formalization of

12   processes; is that right?

13       A    Correct, and those were Crowe

14   recommendations we were working on, yes.

15       Q    You hadn't completed as of September 23,

16   2022, correct?

17       A    Correct.

18       Q    He also indicated that Custodia needs to do

19   lots more documenting and formalization of processes

20   concerning project management?

21       A    Yes.

22       Q    And there's a notation here, "Big question

23   is how responses to Crowe remediation will be

24   evaluated"?

25       A    Yes.