# EXHIBIT A

# [PUBLIC VERSION]

**CONFIDENTIAL**

**IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.**

CONFIDENTIAL

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF WYOMING
 3        --------------------------
          CUSTODIA BANK, INC.,          :
 4                                       :
              Plaintiff,                 :
 5                                       :  Case No.:
          vs.                            :
 6                                       :  1:22-cv-00125-SWS
          FEDERAL RESERVE BOARD OF       :
 7        GOVERNORS,                     :
                                         :
 8        AND                            :
                                         :
 9        FEDERAL RESERVE BANK OF        :
          KANSAS CITY,                   :
10                                       :
              Defendants.                :
11        --------------------------
12          "CONFIDENTIAL" DEPOSITION OF KATIE S. COX
13                     Volume 1 of 2
14        DATE:          December 19, 2023
15        TIME:          8:38 a.m. to 4:15 p.m.
16        LOCATION:      King & Spalding, LLP
                         1700 Pennsylvania Ave, NW
17                       Suite 900
                         Washington, DC 20006
18
19        REPORTED BY:  Felicia A. Newland, CSR
20
                         Veritext Legal Solutions
21              1250 Eye Street, N.W., Suite 350
                         Washington, D.C. 20005
22
```

CONFIDENTIAL

Page 22

1           A     I don't recall there being one

2    denied.  There could have been one where I didn't

3    happen to be on the team.

4           Q     Okay.  Great.

5                 Okay.  So any other positions you

6    held while you were in Dallas?

7                 How long were you in Dallas actually?

8           A     So I was -- yeah, so I was in Dallas

9    until, I want to say, 1991.

10          Q     Okay.  So you were in Dallas for

11   quite a while?

12          A     Yeah, I was in Dallas for almost six

13   years.

14          Q     Okay.  Great.

15                So you started as a financial analyst

16   in Mergers and Acquisitions.  You moved over to the

17   bank examiner function, I think you said late '80s,

18   early '90s?

19          A     Well, I moved in January '88.

20          Q     Okay.  Great.

21                And then is -- did you stay in that

22   function thereafter or did you --

CONFIDENTIAL

Page 23

1          A      So -- so then I moved to Pittsburgh.

2     And I moved -- worked for the Cleveland Reserve

3     Bank.  And I think I was there from January 1991 to

4     January 1992, same thing, doing -- being a bank

5     examiner.

6          Q      Okay.  Great.

7                 And then so you were in -- and after

8     Pittsburgh?

9          A      After Pittsburgh, I moved to the

10    Richmond Reserve Bank.  And I was there in '92 and

11    '93 as an examiner.

12         Q      Yep.

13         A      And then I moved to the Kansas City

14    Reserve Bank.  And I was there from '93 to '95.

15    And the whole time I'm -- I'm a bank examiner.

16         Q      Okay.  Great.

17                And so just to clarify, during that

18    time you were not working on master account

19    requests.  Is that right?

20         A      No, I was not working on master

21    account --

22         Q      Okay.  You were working on --

CONFIDENTIAL

1            A      Uh-huh.

2            Q      -- I think you just told me you dealt

3    with a few different umbrellas.  So banks that

4    dealt with novel issues, banks that were policy

5    setting --

6            A      Complex.

7            Q      -- complex.  Were these under the

8    mergers and acquisitions umbrella or were they also

9    membership applications?

10               What -- what -- what were you -- what

11   did you typically look at?

12               So complex mergers and acquisitions

13   or complex membership applications or both?

14           A      Any of those.  So there's probably --

15   so let me back up.

16               The mergers and acquisitions section

17   is a gatekeeping function --

18           Q      I see.

19           A      -- at the Federal Reserve.

20           Q      Okay.

21           A      And there are 40 -- probably 40

22   different types of proposals that financial

CONFIDENTIAL

Page 29

1          institutions can file with the Federal Reserve.

2          And so could it be a holding company for -- I'll

3          give you an example.  Holding company formations,

4          holding company mergers, bank mergers, state

5          memberships.  Change in controls.  It goes on and

6          on, but there's probably -- maybe 40 different

7          types of proposals that come into the Federal

8          Reserve System.

9                    Q     I see.

10                   A     And once they -- they first come into

11         the reserve bank --

12                   Q     Okay.

13                   A     -- it's up to the reserve bank to

14         identify the issues with a proposal.

15                         And then someone like Jackie at the

16         reserve bank will call a manager, like me, at the

17         Board, because I'm her -- she's in my portfolio --

18                   Q     Gotcha.

19                   A     -- and say, "This proposal has this

20         issue" --

21                   Q     Gotcha.

22                   A     -- "does it need to come to the

CONFIDENTIAL

Page 30

1   Board?"

2           Q       Gotcha.

3           A       I, as the manager, decide yes, it

4   needs to come up or no, the reserve bank has

5   delegated authority to -- to deal with that --

6           Q       I see.

7           A       -- proposal.

8           Q       Okay.  So -- and when you say

9   "delegated authority," so that to me suggests that

10  this is something like a membership context, right,

11  where the reserve bank is working in a delegated

12  capacity?

13          A       It -- it can.

14          Q       Okay.  Did it ever deal with master

15  accounts during your time at the Board?

16          A       Yes, I've dealt with master account

17  proposals that would come to the Board.  Now,

18  typically, I would get involved with a master

19  account proposal if there's a companion proposal

20  with it.

21          Q       What do you mean by that?

22          A       So the -- the de novo bank that's --

CONFIDENTIAL

Page 31

1          that's being formed, it may have a parent company

2          over it that needs to be recognized as a bank

3          holding company.

4                    Q     I see.

5                    A     My section is going to handle the

6          parent company formation to be a bank holding

7          company.  You have to be approved to be a bank

8          holding company in this country --

9                    Q     I see.

10                   A     -- or -- and/or that bank may want to

11         have state membership, be a state member bank, be a

12         federal -- have the Federal Reserve as their

13         primary regulator, not the FDIC or the OCC.  The

14         OCC regulates national banks, and the Fed and the

15         FDIC, one of us would regulate a state-chartered

16         bank.  Okay?

17                   Q     Okay.

18                   A     Now, if -- if there -- if this master

19         account proposal has a state membership proposal or

20         a -- this is typical, there could be other ways, or

21         a bank holding company formation, then there would

22         be two proposals coming through the system at the

CONFIDENTIAL

Page 32

1        same time.

2                Q        Okay.

3                A        And my section would manage those two

4        proposals at the same time.

5                Q        Okay.

6                A        So -- so that's how you end up --

7        that's how I've ended up working on master account

8        proposals.

9                Q        So when you say you manage those two

10       proposals, with respect to master accounts -- the

11       master account request, what would you do?

12               A        Okay.  So any proposal that comes

13       into the Federal Reserve, there's statutory factors

14       that are applied for each type of proposal.  Okay?

15       So -- and it's up to the -- usually, it's the

16       financial -- the analyst who's assigned to it.  I

17       was an analyst for ten years --

18               Q        Uh-huh.

19               A        -- and then I became a manager.  So I

20       may be the analyst handling it.  And the analyst in

21       the mergers and acquisitions section is responsible

22       for developing the briefing documents that you may

Page 37

1                Would they conduct risk assessments?

2        A     I don't know.  They could.  I -- I

3    don't know.

4        Q     Okay.  And did -- would they

5    provide -- would they do their own analysis?  Would

6    they provide analysis to you?

7                Do you know what they were doing on a

8    master account request if you were looking at two

9    types of requests at the same time?

10       A     I don't know what they were doing.

11       Q     Gotcha.

12               And would you see -- so you would

13   see -- I think you testified, if you saw a master

14   account request, you tended to see them in tandem

15   with some other requests.  Is that right?

16       A     Right, that is when I would be pulled

17   in.

18       Q     Okay.  Great.

19       A     Okay.

20       Q     Would you ever see master account

21   requests absent something else?

22       A     In my section, no.

CONFIDENTIAL

Page 38

```
 1              Q    Okay.  Okay.  Great.

 2              So -- okay.  So this is very helpful.

 3    We were actually talking about your background, but

 4    that was -- that was useful information to help me

 5    orient what you've been working on.

 6              How many de novo institutions did you

 7    see while you were at the Board of Governors?

 8              A    I -- I don't know the number.  I was

 9    there --

10              Q    Yeah.

11              A    -- 20 years.  I don't -- I don't

12    really know.

13              Q    Was it many?

14              A    I don't know the number, to tell you

15    the truth.

16              Q    Okay.  So I -- I believe Caitlin

17    testified that there were none between, for

18    example, 2008 and -- 2008 and 2018.  So would you

19    say it was an uncommon occurrence to see a de novo

20    bank?

21              A    I don't -- I don't think I'd say it

22    was uncommon.  I mean, we did see them, and
```

Page 39

1        that's -- what dates did she provide?

2                Q       She said 2008 to 2018, there weren't

3        any.

4                A       No, that's not true.

5                Q       Okay.  There would be?  You think so?

6                A       Yeah, I can give you an example --

7                Q       Sure.

8                A       -- of a de novo.  There's a couple

9        that I worked on that had a master account.

10       They're very similar to -- it had some similar

11       characteristics, like ██████████

██       ████████████████████████████████

██       ██████████████████████████████████████

██       ██████████████████████████████████████

██       ██████████████████████████████████████

██       ████████████████  ████████████████████

██       ████████████  ██████████████████████

██       ████████████████████████  ████████████

██       ████████

██       █  ██████████████████████████████

██       █  ████████████████  ████████████████

██       ██████



CONFIDENTIAL

Page 51

1          Q      Yeah, yeah, I gotcha.

2          A      -- it's rotating.  But those are, you

3     know, the ones that -- it's the vice chair of

4     Supervision, plus two other governors were put on

5     that committee.  So there's three of them --

6          Q      I gotcha.

7          A      -- and it's rotating.

8          Q      Okay.  And would you brief the

9     committee directly?

10         A      Yes.

11         Q      Okay.  How often would you do

12    something like that?

13         A      Probably three, four times a year.

14         Q      Okay.  And would it be --

15         A      In twenty years, I have done it a

16    lot.

17         Q      Gotcha.

18                And would it be you alone?  Would it

19    be you with your team?  How would that tend to

20    work?

21         A      So -- oh, no.  The room is packed.

22    The room is packed.

Page 52

1          Q      But who's standing at that podium?
2     Just you?
3          A      It's just me.  Okay?  It's either
4     the -- it's either the senior analyst or the
5     manager.  The officers don't do the briefings, for
6     the most part, it's either the manager or the
7     senior analyst because they're the closest to the
8     proposal.
9          Q      I see.  Okay.
10               So a manager is, I think -- if I'm
11    counting this correctly, a manager is -- one, two,
12    three, four -- is five layers removed from the
13    governors.  Is that right?  Or is it four or five?
14         A      Maybe -- there's three people in
15    between me and the governor.
16         Q      Okay.  Okay.  Yeah, I -- math is not
17    my strong suit, that's why I'm a lawyer.
18         A      There's three people between me and
19    the governor.
20         Q      I see, yes.  So it's you, and then
21    there's the assistant division director, the senior
22    director, the division director of Supervision.

CONFIDENTIAL

Page 53

1          And then they would report to the vice chair of

2     Supervision.

3                    A       Uh-huh.

4                    Q       Did I get that right?

5                    A       That's correct.

6                    Q       Okay.  So how -- how would

7     information from the Board of Governors be shared

8     down to you?

9                            So if there's a policy determination,

10    would that come down the chain of command?

11                           Would you interact directly with a

12    governor?

13                           How would that communication

14    typically work?

15                   A       So the way it works is staff develops

16    the policy.

17                   Q       And when you say "policy," can you

18    give me sort of an example of what you mean?

19                   A       Well, there's all types of policies.

20    It might be like an S Letter -- in our division

21    it's called SR Letters, for Supervision and

22    Regulation.

CONFIDENTIAL

Page 54

1            Q      Okay.

2            A      So there might be a policy coming out

3       that's developed through -- to the public.  It's an

4       SR Letter, it's public guidance.

5            Q      Gotcha.

6            A      I've worked on or been a key author

7       for like three of those.

8            Q      I see.  Okay.

9            A      Or it might be -- another section

10      might be doing capital guidelines, "Here are the

11      capital guidelines.  You know, we want to make

12      changes to the capital guidelines, and this is how

13      it's going to impact the banks."

14                  And so you create briefing memos for

15      the governors that outline the policy, the impact,

16      the pros and cons of it, and a recommendation.

17           Q      Okay.

18           A      And then you go -- the staff goes and

19      meets with the governors and they say, "This is the

20      policy we want to promulgate."

21           Q      Okay.

22           A      "Give us your feedback.  Do you like

CONFIDENTIAL

Page 55

1        this policy?  You don't like it?  Or can we move

2        forward with our recommendation?"

3                        And then they give the green light or

4        they might give the green light with some tweaks.

5        And then staff goes back and makes the changes.

6                Q     Will they give it to you directly or

7        will they give it to the division director and the

8        division director then --

9                A     No.  It's one big meeting.  All of us

10       are in this --

11               Q     Okay.  I see.

12               A     -- big meeting and they tell you

13       directly they don't like --

14               Q     "Here's what we're thinking"?

15               A     Yes.

16               Q     I got it.

17               A     And they're given the memo well ahead

18       so they have a chance to think about it.

19               Q     I see.  Okay.

20                      So would you ever have informal

21       meetings with any of the Board of Governors?

22                      These sound more formal.  Is that

Page 56

1        fair to say?

2                A      It's informal.

3                Q      Would you have more informal meetings

4        with the Board of Governors?

5                A      Would I have more or less?

6                Q      Any -- I'm sorry.

7                       Would you have informal meetings with

8        the Board of Governors, individual Board of

9        Governors?

10               A      On -- on occasion.  On occasion.

11               Q      What would prompt such an occasion?

12               A      Sometimes a governor just wants to

13       meet with -- with two people that he or she thinks

14       are the most knowledgeable and not have a big

15       audience around them.

16               Q      I gotcha.

17               A      So I have been -- I've done a couple

18       of those.

19               Q      Okay.  Great.

20                      So you mentioned that you worked on

21       SR Letters.  Can you kind of just give me an

22       overview of what a SR Letter is?

CONFIDENTIAL

Page 66

1     at the reserve banks.  Is that right?

2          A    So typically, yes.

3          Q    Okay.  And would you know what the

4     typical process was for handling a master account

5     request?

6          MS. WEINBERGER:  Object to form.

13    BY MS. CARLETTA:

14          Q    So I'm sorry, let me back --

15          A    Uh-huh.

16          Q    -- let me back up for a second.



Page 67

Page 72

1          Who from the Board of Governors would

2     typically be in communication with reserve banks

3     about master account requests?

4          Would that be Board Legal?

5          A    Well, when I was involved in master

6     account proposals, it was typically an eligibility

7     issue, and Board Legal would be the one leading the

8     determination on that particular statutory factor.

9          Q    Were you engaged in routine

10    conversations with any of the reserve banks about

11    master account requests?

12         A    Not unless there was a proposal in

13    hand, you know, that we were working -- a companion

14    proposal.

15         Q    Okay.

16              MS. CARLETTA:  You know, I think

17    we've been going for about an hour.  Do you want to

18    take a break for a minute?

19              (Recess from 9:32 a.m. to 9:45 a.m.)

20    BY MS. CARLETTA:

21         Q    Okay.  So I just want to follow up on

22    a couple of questions on our conversation before.

CONFIDENTIAL

Page 73

9        Q      Okay.  Did you work on Fourth Corner?

10       A      No, I did not.

11       Q      The Reserve Trust Company?

12       A      No, I didn't work on that.

13       Q      Narrow Bank, The Narrow Bank?

14       A      No, I didn't work on that.

15       Q      So when an applicant would bring both

16    a membership and a master account request at the

17    same time, that's when you would review master

18    account requests?

19       A      Right.  There would be a companion

20    proposal --

21       Q      Okay.

22       A      -- with the master account request.

Page 111

1     month.

2            Q     And if you go over the retainer, do

3     they -- is that for a set -- strike that.

4                  Is that for a set number of hours?

5            A     No, that's a flat fee.

6            Q     It's a flat fee.  Okay.

7                  So you -- are you still on a

8     retainer?

9            A     Yes, I am.

10           Q     Okay.  So you've been receiving

11    $2,500 a month since you were retained in May 2020?

12           A     That's correct.

13           Q     Okay.  And you also received stock

14    options in Custodia?

15           A     That's correct.

16           Q     Can you tell me more about your stock

17    options?

18           A     So for the first 25 months, I

19    received 1,000 stock options that were Class 2

20    non-voting.  So if I were to exercise them, I would

21    get one share of Class 2 non-voting.  And when I

22    looked at the capital table, that -- that -- those

Page 112

1          shares are less than like 5 percent of all

2          outstanding shares.

3                 Q     Okay.  Do you know what they're

4          valued at at this time?

5                 A     No, I don't.

6                 Q     Okay.  Do you have an any idea,

7          ballpark?

8                 A     I have no idea what Custodia -- yeah,

9          they're a subordinate share of -- subordinate class

10         and they're non-voting and they're a very small

11         percentage of the overall shares, and they're not

12         publicly traded.  So it's really impossible for me

13         to assign a value to those.

14                Q     So when you spoke with Wyoming about

15         this SPDI charter, had the -- the SPDI legislation

16         had been passed by that time, correct?

17                A     I believe that was passed in 2019,

18         yes.

19                Q     And were you involved in the passage

20         of the SPDI statute at all?

21                A     No, I was not.

22                Q     Okay.  Did you have discussions with

Page 156

1          A      Typically, yes.

2          Q      Okay.  And so you -- if a Board takes

3     a master account request, in your view, they would

4     issue the decision on a master account request?

5                  MS. WEINBERGER:  Object to form.

6                  THE WITNESS:  So that's up to the

7     legal division to decide whether the Board is going

8     to act on the proposal or whether the reserve bank

9     is going to act on the --

10     BY MS. CARLETTA:

11          Q      Do you understand what the source of

12     the authority would be for the Board to act on a

13     master account request?

14                  MS. WEINBERGER:  Object to form.

15     Calls for a legal conclusion.

16                  THE WITNESS:  Yeah, that -- again, it

17     would be the legal division's determination.

18     BY MS. CARLETTA:

19          Q      Okay.  So you -- you don't know?

20          A      I -- all I -- no.  I know what the

21     statutory factor is, but whether the proposal is

22     acted on by the Board or the reserve bank would be

Page 158

1        other than legal eligibility?

2                        MS. WEINBERGER:  Object to form.

3                        THE WITNESS:  That's all the Fed's

4        supposed to review for a master account.

5        BY MS. CARLETTA:

6                Q     Okay.  And what's the basis for your

7        understanding of -- what's the basis for your

8        opinion?

9                A     Well, like I said, we go -- we always

10        go back to the whatever the act is that gives the

11        Fed the authority to do something.  And it's the

12        Monetary Control Act of 1980.

13                Q     What about the Federal Reserve Act?

14                A     What about it?  It's huge.

15                Q     Do you know the --

16                A     Right, it's huge.  I don't know.

17                Q     Does the Federal Reserve Act give

18        powers to the Federal Reserve banks and the -- and

19        the Board of Governors?

20                        MS. WEINBERGER:  Object to form.

21        Calls for a legal conclusion.

22                        THE WITNESS:  Yeah, I mean, I

CONFIDENTIAL

Page 159

```
 1        don't -- you would have to ask an attorney about
 2        that and not me.
 3        BY MS. CARLETTA:
 4              Q    Okay.  So why are you pointing to the
 5        Monetary Control Act?
 6              A    Well --
 7              Q    Is that something that you heard from
 8        counsel?
 9              A    No.
10              MS. WEINBERGER:  Object to form.
11              THE WITNESS:  No.  There's -- there's
12        probably, I would say, seven major banking acts
13        that you know about if you work for the Federal
14        Reserve, and that's one of them.
15        BY MS. CARLETTA:
16              Q    And the Federal Reserve Act is
17        another?
18              A    And the Federal Reserve Act -- you
19        are aware of certain pieces of certain acts that
20        apply to what your job is.
21              Q    Okay.  So do you understand what
22        the -- strike that.
```

CONFIDENTIAL

Page 350

1            Q     But that's when it's a delegated

2      function.  Is that right?

3            A     It --

4                  MS. WEINBERGER:  Object to form.

5                  THE WITNESS:  It's when the reserve

6      bank has -- has a proposal that Board staff has

7      said, "Okay.  Now you can act on it."

8      BY MS. CARLETTA:

9            Q     Okay.  But delegated functions are

10     defined by regulation.  Is that right?

11                 MS. WEINBERGER:  Object to form.  And

12     calls for a legal conclusion.

13                 THE WITNESS:  So delegated functions,

14     I'll say typically -- but I'm not a lawyer.  That's

15     the legal division's determination what's delegated

16     and what's not.

17     BY MS. CARLETTA:

18           Q     So you don't know whether or not this

19     statement is accurate?

20                 MS. WEINBERGER:  Object to form.

21     Misstates testimony.

22                 THE WITNESS:  I'm just repeating what

```
                                                Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF WYOMING
 2

 3        --------------------------
          CUSTODIA BANK, INC.,         :
 4                                     :
              Plaintiff,               :
 5                                     :  Case No.:
          vs.                          :
 6                                     :  1:22-cv-00125-SWS
          FEDERAL RESERVE BOARD OF     :
 7        GOVERNORS,                   :
                                       :
 8        AND                          :
                                       :
 9        FEDERAL RESERVE BANK OF      :
          KANSAS CITY,                 :
10                                     :
              Defendants.              :
11        --------------------------
12             "CONFIDENTIAL" DEPOSITION OF KATIE S. COX
13                      Volume 2 of 2
14        DATE:          December 20, 2023
15        TIME:          8:42 a.m. to 3:33 p.m.
16        LOCATION:      King & Spalding, LLP
                         1700 Pennsylvania Ave, NW
17                       Suite 900
                         Washington, DC 20006
18
19        REPORTED BY:  Felicia A. Newland, CSR
20
21                      Veritext Legal Solutions
                    1250 Eye Street, N.W., Suite 350
22                      Washington, D.C. 20005
```

Page 18

```
 1              Q     Okay.

 2                    MS. CARLETTA:  I think I've seen one,

 3      Lauren.  Is that the only --

 4                    THE WITNESS:  And that's the only

 5      one --

 6                    MS. WEINBERGER:  Yes.

 7                    MS. CARLETTA:  Okay.

 8                    THE WITNESS:  -- that's out there.

 9      BY MS. CARLETTA:

10              Q     Okay.  And then when you submit

11      others, we would request a copy of those.

12                    Okay.  So we touched on your

13      retainer.  You also have stock options.  Is that

14      correct?

15              A     Yes, I do have stock options.

16              Q     And what are the -- can you tell me

17      about those stock options again?

18              A     Yes.  So the way the stock options

19      initially worked, for the first 25 months, I would

20      receive 1,000 stock options, exercisable at $1.04.

21      These shares are Class 2, non-voting shares.  Then

22      after the first 25 months, the stock option
```

Page 19

1     program, whatever you want to call it, changed.

2                    I want to say it's like 350 shares

3     per quarter, or something like that, like 1,500 --

4     1,500 stock options a year, exercisable at, I

5     think, it's $8.33, or something like that.

6     Somewhere around $8.

7          Q    So when you say exercisable at a

8     certain amount, do you mean that it won't fluctuate

9     with the value of Custodia over time?

10                   MS. WEINBERGER:  Object to form.

11                   THE WITNESS:  So it means if I want

12    to purchase -- exercise my stock options, I have to

13    pay $1.04 for the -- for the first 25,000 --

14    BY MS. CARLETTA:

15         Q    Uh-huh.

16         A    -- and then any shares after that, I

17    have to pay $8 a share --

18         Q    I see.  I see.

19         A    -- to -- to exercise those stock

20    options.

21         Q    Okay.  And would it be fair to say

22    that the value of your stock options depends on the

1          outcome of this litigation?

2                          MS. WEINBERGER:  Object to form.

3                          THE WITNESS:  So I have no idea what

4          these shares are worth for a couple reasons.  The

5          shares aren't publicly traded.

6          BY MS. CARLETTA:

7                  Q      Uh-huh.

8                  A      These are what I would call an

9          inferior class of shares.  It's Class 2,

10         non-voting.  Only -- right now if everyone had

11         exercised their options, only -- it would only

12         represent like 5 percent of all common stock within

13         Custodia's common stock, you know, balance.  And so

14         I have no idea what they're worth.

15                         And also, my shares were -- the

16         exercise price is based on what the price of the

17         shares were worth for the voting common at the

18         time.

19                 Q      At the time of what?

20                 A      At the time that the -- of the first

21         stock issuance that -- because the overall issuance

22         that Custodia had.  So the first stock option --

Page 21

1         the first sale of shares, I believe, they sold them

2         for a dollar a share, and then the second batch of

3         capital raise are like $8, but my shares are not --

4         they don't have the same characteristics.

5              Q     Okay.  But stock can appreciate in

6         value over time, is that right, if the business

7         does well?

8                   MS. WEINBERGER:  Object to form.

9                   THE WITNESS:  So the issue for

10        Custodia is the last batch of shares were issued in

11        August of 2022.  And A lot of things have happened

12        in the cryptocurrency markets, Bitcoin crashed, FTX

13        failed.  So it's really difficult to price these

14        shares.  So I don't know what they -- what they're

15        worth now and what they'll be worth in the future.

16        BY MS. CARLETTA:

17             Q     I understand that.  But as a general

18        proposition, stock value can increase as the

19        business does -- if a -- as a business -- strike

20        that.

21                   If a business does well, their stock

22        option -- their stock value can increase.  Is that

Page 54

1          A     I don't know what they did after --

2     because, like I said, I'm the -- I've always for

3     the past -- for my last 20 years, I was in the

4     gatekeeping function.  And once you get through the

5     gate and you're in the Federal Reserve system or

6     you're approved to get Federal Reserve services,

7     other divisions and other areas of the Federal

8     Reserve take over.

9          Q     Okay.  On page 5 of your report, you

10     say you were a, quote, key driver in the

11     development of bank M&A policies.

12          A     That's correct.

13          Q     What did you mean by "key driver"?

14          A     So during my tenure at the Board, we

15     do things at the Board, like develop systemwide

16     guidance.  Some of it is public and some of it is

17     internal.  I have been the key author -- and it's

18     on my resume and on my LinkedIn page -- of at least

19     three prominent SR Letters related to mergers and

20     acquisitions.

21               I also was the -- I provided the

22     Fed's leadership in revising numerous application

Page 55

1    forms that either the -- were only for the Federal

2    Reserve, like bank holding company applications, or

3    their interagency forms for like the change in the

4    Bank Control Act, the -- what we call an IBFR, so

5    it's a biographical and -- an individual

6    biographical and financial report that anyone who's

7    going to be a key individual in an organization has

8    to file with their respective federal regulator.

9                I worked on a large initiative to

10   reduce burden on -- regulatory burden on community

11   banks.  I was one of the key presenters for

12   proposals that were novel or complex or policy

13   setting for the governors of the Federal Reserve,

14   and if necessary to the entire Board for the Board

15   to vote on the proposal.

16               Q    And so SR Letters are public

17   documents.  Is that right?

18               A    Those are public.

19               Q    Okay.  And they're different than S

20   letters?

21               A    Yeah.  I don't -- I don't -- you

22   don't -- in our division, we didn't see a lot of S

5    BY MS. CARLETTA:

6           Q    Okay.  So when you said yesterday

7    that matters of policy are decided exclusively by

8    the Board, what did you mean by "matters of

9    policy"?

10                  MS. WEINBERGER:  Object to form.

11                  THE WITNESS:  So only the Board can

12   make policy.  That's what I'm stating.

13   BY MS. CARLETTA:

14          Q    Okay.  So I'm just trying to

15   understand the logic of your opinion.  You

16   testified that the -- there's only one statutory

17   factor to consider when determining a master

18   account request.  Is that correct?

19          A    Uh-huh.  That's correct.

20          Q    The Board determines that statutory

21   factor.  Is that correct?

22          A    The Board Legal interprets that

Page 175

1          statutory factor, uh-huh.

2                  Q      Okay.  And this was a -- then the

3          master account request was a Board of Governors'

4          decision based on your testimony.  Is that correct?

5                  A      That's how it turned out.

6                  Q      And it was a policy decision that the

7          Board of Governors made.  Is that correct?

8                  A      Yes.  So -- yes, it created -- so the

9          Board basically created new policies as to how to

10         review master account proposals from novel

11         institutions.

12                 Q      Why would it issue policies -- why

13         would it adopt these policies and guidelines if

14         there's only one statutory factor?

15                 A      Well, that's the whole crux of this

16         lawsuit.

17                 Q      So --

18                 A      They didn't have the authority --

19         they didn't have the authority to do that.

20                 Q      So it's --

21                 A      I mean --

22                 Q      -- your expert opinion that the Board

Page 176

1          didn't have the authority to issue the guidelines

2          or the S Letter or the implementation handbook?

3                          MS. WEINBERGER:  Object to form.

4          Mischaracterizes testimony.

5                          THE WITNESS:  So what I'm stating is

6          the Board stepped in -- really into the shoes of

7          the chartering authority.  And the chartering

8          authority should be doing that type of work that's

9          explained in the guidelines.

10         BY MS. CARLETTA:

11                 Q     By the chartering authority, do you

12         mean the state chartering authority?

13                 A     Yeah, the state chartering authority.

14         Or it could be a national.  You know, it could be

15         the OCC.  There's really three types of chartering

16         authorities we have in -- in this country; it's the

17         states, the territories, and the Office of the

18         Comptroller, the currency that does national bank

19         charters.

20                          So the chartering authority should be

21         doing it.  That's their job to do that.  And the

22         Fed stepped into the chartering -- basically

1   stepped into the chartering authority's shoes and

2   started doing their work.

3           Q     So your expert opinion is that the

4   Board of Governors should not have -- has no legal

5   authority to issue the guidelines or the handbook

6   or the S Letter?

7                   MS. WEINBERGER:  Object to form.

8   Calls for a legal conclusion.

9                   THE WITNESS:  So what I'm saying is

10  that, like I've said before, the Fed just has one

11  job here for a master account, and that's the legal

12  eligibility determination.  That's -- that's their

13  only job that congress has authorized them to do.

14  BY MS. CARLETTA:

15          Q     Based on your review of the

16  Monetary --

17          A     Based on my understanding of the

18  Monetary Control Act.

19          Q     So why -- then why did they issue the

20  guidelines, the implementation handbook, and the S

21  Letter?

22                  MS. WEINBERGER:  Object to form.