# EXHIBIT B

# [PUBLIC VERSION]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

    *Plaintiff*,

    v.

FEDERAL RESERVE BOARD OF
GOVERNORS,
Constitution Ave NW & 20th St NW
Washington, DC 20551


FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

    *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

**EXPERT REPORT OF KATIE S. COX**

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................... 1

II.    SUMMARY OF OPINIONS ........................................ 2

III.   QUALIFICATIONS ........................................ 3

IV.   GENERAL BACKGROUND ........................................ 6

V.    CHRONOLOGY ........................................ 8

VI.   OPINIONS ........................................ 12

      A.    The Board, Not the Reserve Bank, Determined Whether Custodia Bank Was Eligible for a Master Account. ........................... 14

      B.    Board Intervention Halted the Kansas City Reserve Bank's Examination of Custodia and Thwarted Custodia's Entitlement to a Master Account. ........................... 17

      C.    The Board's Denial of Custodia's Membership Application Effectively Prevented the Reserve Bank from Approving the Master Account Application. ........................... 22

      D.    The Board Issued Guidelines That Gave It Control over Master Accounts for Novel Banks Such as Custodia. ........................... 25

      E.    Through the Non-Public S-Letter Process, the Board Revised Parts of the Denial of Custodia's Master Account Application. ........ 29

VII.  CONCLUSION ........................................ 36

I, Katie S. Cox, declare and state as follows:

## I.      INTRODUCTION

1.      My name is Katie S. Cox and I have been asked to prepare an expert report on behalf of Custodia Bank, Inc. ("Custodia") in this case pending before the United States District Court for the District of Wyoming.

2.      I have been an advisor to Custodia since May 2020, and I also serve as an observer on Custodia's audit committee.   In my role as an advisor, I have participated in telephone calls and meetings with officials from the Federal Reserve Bank of Kansas City and the Board of Governors of the Federal Reserve System ("the Board") concerning both Custodia's master account application and its Federal Reserve membership application.

3.      As an advisor to Custodia, I am compensated in two ways.  First, I am paid a monthly retainer of $2,500.  Second, I have received stock options, none of which I have exercised.

4.      My compensation for providing an independent written analysis in this Report is $500 per hour.  My compensation and my role as an advisor to Custodia are in no way contingent on the opinions expressed in this report.

5.      Neither my connection to Custodia, nor my compensation, has affected my opinions in this matter.  They are the same opinions I would express if I were not an advisor to Custodia.

6.     In formulating the opinions contained in this report, I have considered my training, knowledge, and experience working in the Federal Reserve System for over three decades, my current work as a regulatory consultant, and the materials cited in Exhibit 1 to this Report.  In addition, I have considered my first-hand experience as an advisor to Custodia, including my interactions with personnel from the Board and from the Federal Reserve Bank of Kansas City.

## II.    SUMMARY OF OPINIONS

7.     Based on my experience working in the Federal Reserve System for over three decades, my review of the relevant materials, and my communications with the Federal Reserve Bank and Board as a Custodia advisor, it is my opinion that the Board intervened in Custodia's request for a master account and exercised control over the denial of Custodia's master account.  This overarching opinion is supported by the following which will be explained in more detail below:

> a. The Board, not the Reserve Bank, determined whether Custodia was eligible for a master account;
>
> b. Board intervention halted the Kansas City Reserve Bank's examination of Custodia and thwarted Custodia's entitlement to a master account;

c. The Board's denial of Custodia's membership application effectively prevented the Reserve Bank from approving the master account application;

d. The Board issued Guidelines that gave it control over master accounts for novel banks such as Custodia;

e. Through a non-public S-Letter process, the Board revised parts of the denial of Custodia's master account application.

8.     The above events support my opinion that the Board ultimately controlled the decision on Custodia's master account application because whether to allow Custodia, a novel institution holding custody of crypto assets, into the Federal Reserve System was a policy decision which only the Board could make.

## III.   QUALIFICATIONS

9.     I hold a Bachelor of Science degree in Commerce with a concentration in finance from the University of Virginia.

10.     From 1985 until 1988, I was a financial analyst in the Mergers & Acquisitions Section at the Federal Reserve Bank of Dallas.  In this role, I analyzed proposals submitted for bank holding company formations, acquisitions, and mergers involving financial institutions with assets between $20 million and $600 million.

11.     From 1988 until 1995, I was a Bank Examiner in the Federal Reserve System at four different Reserve Banks.  In June 1993, I became a commissioned Federal Bank Examiner, which allowed me to directly supervise examination teams and be designated the "examiner-in-charge."  As a Bank Examiner, I conducted examinations of commercial banks, foreign branches, Edge Act Corporations, and bank holding companies.  The scope of work encompassed evaluating internal control systems and corporate governance, performing loan review, and evaluating the condition of the entities as related to capital, asset quality, management, earnings, and liquidity.  I reported findings to management of the banking entities and the individual Reserve Banks in written and oral form.

12.     I served as an instructor for the Federal Reserve System's core bank examiner school from 1992-1995.  In this role, I provided instruction to assistant bank examiners as to how the Federal Reserve analyzes the financial condition of banks and bank holding companies.

13.     Between 1995 and mid-1999, I accompanied my husband on two active duty U.S. Air Force tours.  During 1995 through 1997, I provided independent audit services for various entities operating on U.S. Air Base, Ramstein, Germany.  During the latter part of 1997 until mid-1999, I was an auditor for the U.S. Air Force Audit Agency.  I performed audits of numerous U.S. Air Force units, including hazardous material handling operations and accounting functions.

4

14.     From 1999, until my retirement in 2020, I worked in the Mergers and Acquisitions Section at the Board.  In 2010, I became a manager in the section.  As a manager, I oversaw the review of the most complex domestic and international merger and acquisition proposals filed with the Federal Reserve System.  I collaborated with applicants to address regulatory concerns involving areas such as the long-term viability of a business plan, direct and indirect proposed owners, product risk management, concentrations related to revenues or assets, and Bank Secrecy Act compliance.  I reviewed organizational documents, capital instrument documents, and proposed management and remediation for corporate governance weaknesses.  I presented oral and written briefings to the Governors of the Board to obtain guidance for proposals that presented novel banking policy questions (including banking products or services) or involved very large banking institutions. I served as one of the Federal Reserve's key drivers in the development of bank mergers and acquisitions policies.   I provided leadership in developing and implementing bank regulatory burden reduction initiatives, particularly for U.S. community banks.  While in this role, I saw first-hand how the Board creates policies and procedures with the goal of ensuring that Reserve Banks are consistent in their supervision and regulation of banking entities.

15.     Since May 2020, I have provided bank regulatory consulting services to a variety of firms, including Custodia.  My services have included advising banks

on their proposals before the Federal Reserve, as well as serving as a subject matter expert for investment firms to assess the probability of success for large, proposed mergers such as the TD Bank and First Horizon merger.

16.    Since May 2022, I have been a consultant to PricewaterhouseCoopers ("PwC").  I have helped PwC advise traditional and nontraditional financial firms on a range of regulatory matters, including charter conversions, applications before bank regulators, regulatory strategy, and risk management.

17.    All told, I have over 35 years of experience in the Federal Reserve System, working for both Reserve Banks and the Board, as well as providing bank regulatory advice to a variety of clients.

## IV.    GENERAL BACKGROUND

18.    The Board is the supervisory authority for the Federal Reserve System, which is the Central Bank for the United States.  Matters of policy are decided exclusively by the Board, which oversees the Reserve Banks.  *See* 12 U.S.C. § 248(k) (noting that the Board cannot delegate functions pertaining to "monetary and credit policies" to Reserve Banks).  The Board has many methods by which it ensures that Reserve Banks comply with its policies.  Overall, the Board can "exercise general supervision over said Federal Reserve Banks."  12 U.S.C. § 248(j).  Additionally, the Board has specific powers that it can use to ensure that Reserve Banks are following Board policy, including the review of accounts and records of Reserve

6

Banks, 12 U.S.C. § 248(a); removing Reserve Bank officers, 12 U.S.C. § 248(f); suspending operations of the Reserve Bank, 12 U.S.C. § 248(h); and approving or rejecting compensation for directors of the Reserve Bank, 12 U.S.C. § 307.

19.    While the Board is the head of the Federal Reserve, the United States and its territories are divided into twelve districts, each with a separately incorporated Reserve Bank.  The Board has delegated numerous functions and responsibilities to those Reserve Banks to carry out governmental monetary and regulatory policies.  Some of the key delegated responsibilities include: (1) the supervising and examining of certain banking entities in their districts; (2) lending to depository institutions; (3) providing key financial services that support the nation's payment system; and (4) examining certain financial institutions regarding consumer protection and fair lending laws. *See* United States Federal Reserve System, *The Fed Explained:  What the Central Bank Does* 10-11 (Aug. 2021), available at https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.  In my experience, while the Reserve Banks are separately incorporated and have their own presidents and boards of directors, they must defer to the Board regarding policy matters.  *See* 12 U.S.C. § 248(k).

20.    In carrying out certain responsibilities, the Reserve Banks provide accounts and payment services for financial institutions holding accounts at that Reserve Bank.  One type of Federal Reserve application which is evaluated and

processed by Reserve Banks is the master account application, which allows an institution to have access to the Federal Reserve's financial services. Reserve Banks typically quickly and summarily approve master account applications for traditional banks. Indeed, Custodia was initially advised that action on its application would take only five to seven business days. Ex. 1 to Am. Compl, ECF No. 121. However, as I describe below, Custodia's master account application did not proceed in the typical fashion. The ultimate decision denying Custodia a master account, taken after the application had been pending for years and litigation had ensued, was in my opinion engineered by the Board. The Board took control of Custodia's master account application because the application was linked to the Board's policy decision on whether non-traditional financial institutions holding custody of crypto-assets should be allowed access to Federal Reserve services.

## V.    CHRONOLOGY

21.    Custodia is a Wyoming depository institution founded in 2020. The bank has a special purpose depository institution charter ("SPDI") from the State of Wyoming. It is chartered to provide both traditional U.S. banking services and certain crypto asset banking services. Custodia offers institutional customers custody and settlement services for crypto assets, while also offering some traditional banking services.

22.     A master account would provide Custodia direct access to the Federal Reserve's payment system.  Banks primarily use master accounts to make payments to each other using Fedwire, a service that allows banks to clear and settle accounts in real time by instructing the Federal Reserve to adjust the balances in their respective accounts.  Without a master account, Custodia is unable to operate as designed in its business plan and relies on a correspondent banking relationship. Using a correspondent banking relationship (as Custodia presently must do to operate) is more expensive and introduces additional risks, particularly counterparty settlement risk.

23.     In early 2020, Custodia began communicating with the Kansas City Reserve Bank concerning its plans to apply for a master account.  On October 29, 2020, Custodia formally applied to the Reserve Bank to obtain a master account.

24.     Rather than simply process the request for a master account (as is typically the case for eligible depository institutions), the Reserve Bank subjected Custodia to a safety and soundness examination.  The Reserve Bank's process in examining Custodia was initially cordial and cooperative.  Many of the Reserve Bank's examination staff took courses and obtained certifications in order to better understand the crypto asset industry and how Custodia's business model would fit into that industry.  Custodia worked directly with Reserve Bank staff to help them understand not only the crypto industry, but also how Custodia's business plan

9

would operate.  The Reserve Bank examiners seemed genuinely excited and interested to be assigned to the Custodia review and appeared to look forward to having such a banking entity in their district.  Their communications with Custodia, both in writing and orally, signaled that there were no insurmountable issues.  *See, e.g.*, FRBKC-00003695 (describing Custodia management as "impressive" and "seasoned"); FRBKC-00009384 (assessing "risk management" as "strong"); FRBKC-00003607 at 20 (noting that Custodia would not "impact financial stability").  In January 2021, an officer of the Reserve Bank stated that she "did not see any showstoppers" regarding the bank's application, indicating that the Reserve Bank was open-minded about Custodia's master account application and believed that the application was ultimately approvable.

25.    In August 2021, Custodia also applied to the Board for membership in the Federal Reserve, which would subject Custodia to regulation by the Federal Reserve System in addition to regulation by the State of Wyoming.

26.    On January 27, 2022, the Reserve Bank notified Custodia that it met "the threshold legal definition of an entity that is eligible for a master account." FRBKC-00000488.

27.    In mid-December 2022, however, all Reserve Bank examination work for Custodia Bank halted, as did communications between the Reserve Bank and Custodia Bank.

10

28. On January 27, 2023, three actions occurred in quick succession that prevented Custodia from obtaining a master account. First, the Board denied Custodia's application to become a member of the Federal Reserve, citing among other things, the bank's "novel business model and proposed focus on cryptoassets." Second, the White House issued a statement on the risks of crypto assets. The statement made clear that the administration viewed with skepticism financial institutions engaging with crypto assets and that the administration was working with banking regulators to develop safeguards and to "continue these efforts, including those designed to address and limit financial institutions' exposure to the risks of digital assets." White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023). And finally, the Federal Reserve Bank of Kansas City communicated the denial of Custodia's application for a master account.

29. For the reasons explained below, based on my experience working in the Federal Reserve System, it is my opinion that the Board's concern over novel banks engaging with crypto assets as a policy matter dictated the denial of Custodia's master account application. The Board not only set policy; in this case it intervened in the decision-making process for Custodia's master account application in order to ensure its desired outcome.

## VI.   OPINIONS

30.    The story of the Federal Reserve Board's involvement in Custodia's efforts to seek a master account (and the ultimate denial of the bank's application) is clear from the record in the case.  I ground my opinions on the combination of these documents, as well as my experience and my first-hand involvement in dealings with the Board and the Kansas City Reserve Bank.  Beginning at his confirmation hearing on January 11, 2022, Board Chair Jerome Powell expressed concern to the Senate Committee on Banking, Housing, and Urban Affairs about granting master accounts to SPDIs and other "novel banks"

31.    During the confirmation hearing, Senator Cynthia Lummis of Wyoming asked Chair Powell about the Board's treatment of Wyoming SPDIs:

> The Federal Reserve Act says that a depository institution is any institution eligible for deposit insurance.  The FDIC says, in General Counsel Opinion 8867, that an entity is a depository institution if it is creating deposit liabilities out of customer assets and is characterized by state law as a bank. As you know, Chairman Powell, I am terribly concerned about the manner in which Wyoming's special purpose depository institutions are being treated by the Federal Reserve.  We have discussed this.  What is your reaction to this?

32.    Chair Powell responded:

> So as we discussed, ***there are novel charters, and the ["special purpose depository institutions"] are one of them, and we want to be really careful because they are hugely precedential.*** They are very important from a precedential standpoint.  ***And so we have been looking carefully at this***, and I would say there are good arguments for viewing SPDIs as depository institutions for this purpose, and ***we are looking carefully at it.  I do think we will make some progress on this***, and we can talk about it more offline.  But I

think you do understand that we--you know, if we start granting these there will be a couple hundred of them pretty quickly, and we have to think about the broader safety and soundness implications. And, you know, ***it is just hugely precedential. That is really why we have taken our time with it.*** And we appreciate you bringing it my attention, and so we can continue to talk about it.  (emphasis added).

33.    This excerpt demonstrates that, as early as his confirmation hearing, Chair Powell saw the issue of SPDIs as one for the Board since historically the Board has been in charge of making "precedential" policy decisions for the Federal Reserve System as a whole.  Deciding whether to allow novel institutions holding crypto assets access to the Federal Reserve System was such a precedential decision, within the Board's authority, not the authority of the Reserve Banks.  *See* 12 C.F.R. 265.20(a)(17) (2023) (excepting from powers granted to Federal Reserve Banks matters that raise "significant legal, supervisory, or policy issues").

34.    By stating that the Board was "looking carefully at this," Chair Powell made clear that the Board was, and would continue to be, involved in the decision-making process for whether SPDI banks should be permitted to access the Federal Reserve.  He also signaled that master accounts for nontraditional institutions such as Custodia should not be granted without Board approval.  Reserve Banks are not deaf to such statements; in my experience, staff are attuned to Board pronouncements and act accordingly.

### A.   The Board, Not the Reserve Bank, Determined Whether Custodia Bank Was Eligible for a Master Account.

35.    Despite the Reserve Bank's position (in this litigation and generally) that it controls the master account process, it has been my uniform experience that the Federal Reserve Board makes key legal determinations for the Federal Reserve System, particularly when it comes to policy matters.  The Board would not involve itself in run-of-the-mill requests for master accounts.   But a novel-chartered depository institution is expected to be singled out for Board scrutiny.  That was the case with The Narrow Bank ("TNB") and now Custodia as well as other novel institutions.

36.    Custodia is not an outlier when it comes to Board influence on applications for master accounts.   Interference by the Board derailed TNB's application for a master account.  TNB's business model was similar to Custodia's in that it intended to accept deposits but not make loans.  On April 27, 2018, TNB submitted an application to the Federal Reserve Bank of New York requesting a master account.  Soon thereafter, the New York Reserve Bank's General Counsel wrote that the Reserve Bank was not prepared to issue the account because "senior policy officials at the Board of Governors have expressed the strong view that the New York Fed should not approve TNB's request for a master account."  TNB-0000002.  To date, the New York Reserve Bank has not decided TNB's master account application.

14

37.     In November 2020, shortly after Custodia applied for a master account, the Board created a "Nontraditional Account Access Workstream Structure" which used resources and personnel from the Board as well as various Reserve Banks, including Kansas City.   *See* FRBKC-00004899; FRBKC-00004902.   This workstream was formed in direct response to the increasing number of requests for master account access from novel institutions and the Board's perceived need to provide "policy guidance and practical coordination to support Reserve Bank account decisions that are prudent, consistent, and timely." FRBKC-00004902.  The first novel institution to be considered by the Board's newly created workstream was Custodia, confirming that the Board viewed the master account decision as a policy matter. *Id*. Chair Powell himself, in his above-cited Congressional testimony, called the Custodia decision "just hugely precedential."  I believe that the Workstream was one of the vehicles that the Board used to communicate its views that Custodia's master account application should be denied.

38.     Throughout 2021, Custodia, its outside counsel and I, had a series of calls with Board staff regarding Custodia's eligibility for a master account.  Notably, we primarily conducted those calls *with Board staff* rather than with Reserve Bank staff and it was very clear that the Board's General Counsel would make the eligibility decision.

39.     In my experience, the specific decision on whether a novel institution such as Custodia was eligible for a master account is the type of decision that the Board would traditionally make.  And in fact, on August 2, 2021, the Kansas City Reserve Bank sent Custodia a letter stating that "it would be inappropriate for us to issue a decision" on Custodia's master account application before the Board clarified its interpretation of Custodia's "legal eligibility for a master account under the Federal Reserve Act."  FRB-AR-003858; *see also* FRBKC-00009854 (draft letter stating that the "Reserve Bank does not have authority to interpret legal eligibility").

40.     Making it incontestably clear that a decision on Custodia's eligibility rested squarely with the Board, on January 27, 2022, Mark Van Der Weide, the General Counsel for the Board, told Custodia's outside legal counsel in a conference call that Custodia satisfied the threshold definition of an entity eligible to maintain a master account.  *See* FRBKC-00000446 at 2.  While Craig Zahnd, the General Counsel, of the Kansas City Reserve Bank, formally conveyed the decision on eligibility to Custodia by letter, he did so by referencing Mr. Van Der Weide's call to Custodia's outside counsel.  See FRBKC-00000234 ("As was recently conveyed to your counsel ... it has been determined that Avanti satisfies the threshold definition of an entity eligible to maintain a master account.").  It could not be clearer, therefore, that as to a master account for Custodia, the Board was pulling the strings.

16

41.     The Board's role in Custodia's master account application is not surprising.  I would expect the Board to take the primary role in deciding any new policy questions, such as whether depository institutions holding custody of crypto-assets are eligible to access the Federal Reserve System.

**B.**     **Board Intervention Halted the Kansas City Reserve Bank's Examination of Custodia and Thwarted Custodia's Entitlement to a Master Account.**

42.     The Reserve Bank staff began its examination of Custodia Bank on September 6, 2022.  Because Custodia had applied both for a master account with the Kansas City Reserve Bank and later for membership in the Federal Reserve, the information from the examination was used to evaluate both the master account and membership applications.  *See* FRBKC-0000297 ("Our ongoing review of Custodia's master account request also leverages information and material from the September 6, 2022, examination of Custodia as part of the evaluation of Custodia's application for membership in the Federal Reserve System.").

43.     On October 21, 2022, the Reserve Bank provided Custodia written results of the initial examination.  The Bank identified "numerous exceptions to, or departures from, safe and sound banking practices in Custodia's prospective risk management program compared to the risk management practices that would typically be expected or required of an operating state member bank under Reserve Bank supervision."  *See* FRB-AR-001204 at 1-2.  It is typical, however, in my

17

experience, for a *de novo* institution such as Custodia to have numerous risk management functions not fully operational at the time of the first examination, and it is customary for the Federal Reserve to conduct at least one follow-up examination and sometimes more than one. *See* FRBKC-00013627 (noting there "will likely need to be multiple exams [of Custodia] given this is a de novo").

44.   The October 21, 2022 examination summary from the Reserve Bank further advised Custodia that its "remediation efforts will subsequently be assessed by Reserve Bank staff at a future date, which may include onsite reviews/examinations and/or additional request for information deemed necessary…the Reserve Bank will continue to engage in periodic discussions with Custodia's senior management regarding the status of its operations and other matters pertinent to the membership application." FRB-AR-001204 at 6. In the following months, and despite regular communication, Reserve Bank staff provided no indication that any of the issues were unexpected for a de novo institution, much less insurmountable.

45.   Custodia staff and I had bi-weekly calls with the Reserve Bank, and sometimes Board staff, to discuss Custodia's progress in addressing the examination findings as well as to inquire about the status of the membership and master account applications. The last of these calls occurred December 15, 2022, and it included Board staff. During this call, Caitlin Long, the CEO of Custodia Bank, informed

18

System staff that 12 of the 14 priority one examination items and 96% of the Bank Secrecy Act/Anti-Money Laundering issues had been remediated.

46.   Following this call, it appeared that Custodia was well on its way to securing a master account.   Custodia had been found eligible for such an account, had a supervisory examination, and had addressed nearly all of the priority one problems identified by the bank examiners prior to any subsequent examination.

47.   On December 20, 2022, Custodia provided a very comprehensive response to the Reserve Bank examiners, as well as a remediation plan for all priority two examination findings.  *See* Letter from Custodia to the Ross Crouch (Dec. 20, 2022).

48.   On December 16, 2022, the Kansas City Reserve Bank unexpectedly canceled the bi-weekly calls, not just for that week, but going forward.  This was highly unusual.  In my experience, following an initial examination, Reserve Bank staff will work with the financial institution to remediate identified risks.  In fact, as noted above, the Reserve Bank stated its intentions to do so in its examination findings letter to Custodia.  FRB-AR-001204 at 6.  That did not happen here.

49.   Custodia was unable to substantively communicate with Federal Reserve staff until January 23, 2023.  On that day, Board staff unexpectedly informed Custodia that the staff was recommending denial of the bank's application to become a member of the Federal Reserve System.

19

50.     Board staff did not provide any advance notice or an opportunity to correct any perceived problems.  The Board staff gave Custodia only 48 hours to decide whether to withdraw its application.  Ordinarily, banks in this position are afforded at least one week to decide whether to accept a denial or withdraw an application.  During my 21 years with the Board, in the mergers and acquisition section, I made at least 50 such calls indicating that a denial would be recommended; I cannot recall a single time when the Board gave an applicant only 48 hours to respond.  Rather than having a week or more to consider the Board's likely denial, Custodia was forced to convene a meeting of its board of directors on short notice to decide its course of action.  Custodia decided not to withdraw its membership application.  Custodia communicated this decision to the Board's General Counsel on January 26, 2023.

51.     Also on January 26, 2023, Custodia received an email from a reporter who notified Custodia that all banks with business plans involving crypto assets that had pending applications at both the Federal Reserve and the Office of the Comptroller of Currency (the federal regulator for national banks) were being asked to withdraw their applications.

52.     On January 27, 2023, the Board of Governors voted to deny Custodia's membership in the Federal Reserve.  *See* FRBKC-00005326.  The Board issued a press release making public its denial of Custodia's membership application on that

same day.  *See* Bd. of Govs. of the Fed. Reserve, *Federal Reserve announces denial of application by Custodia Bank, Inc., to become a member of the Federal Reserve System* (Jan. 27, 2023), available at https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm.

53.    Simultaneously, the White House released a statement highly critical of cryptocurrency.  The White House statement observed that "some cryptocurrency entities ignore applicable financial regulations and basic risk control—practices that protect the country's households, businesses, and economy.    In addition, cryptocurrency platforms and promoters often mislead consumers, have conflicts of interest, fail to make adequate disclosures, or commit outright fraud."  White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023), available at https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/.

54.    Based on my experience working with the Federal Reserve System, I do not believe that the simultaneous timing of the White House statement and the Board's denial of Custodia's Federal Reserve membership application was coincidental.  During my career with the Federal Reserve, I do not recall the White House issuing a policy statement or an Executive Order related to a Board matter coincident with the Board's action on a proposal.  I am aware of the White House intervening on at least two proposals for which I was the principal Board analyst.

21

However, on both occasions, the White House directly contacted a Governor of the Board to orally convey the White House's preferred action on a proposal.

55.    It is my opinion that the Board's denial of Custodia's membership application, in close coordination with the White House's anti-crypto policy statement, dictated the outcome of Custodia's master account application. Further, as will be explained below, under the Board's Payment Systems Access Guidelines, the Board's membership decision laid the foundation for denying Custodia's application for a master account, and more generally, the foundation to keep all banks with novel business models (e.g., Tier 3 banks) from obtaining master accounts.

### C.     The Board's Denial of Custodia's Membership Application Effectively Prevented the Reserve Bank from Approving the Master Account Application.

56.    Given the Board's denial of Custodia's membership application, and the White House's near-simultaneous statement on the risks of crypto assets, the decision to deny Custodia's master account application—which was communicated by the Kansas City Reserve Bank staff a few hours later—was preordained.

57.    Kansas City staff were charged with evaluating both Custodia's membership application and its master account application. Throughout this parallel review process, the master account evaluation and the membership evaluation proceeded in tandem.

58.   For example, a May 10, 2022 email from Ben McGhee of the Reserve Bank stated that "there is a lot of overlap" between the membership and master account reviews.  FRBKC-00002200; *see also* FRBKC-00003428 (explaining that the supervisory review would feed into the membership and master account applications).  Similarly, Christi May-Oder sent an email indicating that "[i]t would be helpful to hear more about how their [sic] looking at it from a membership perspective" when deciding if the master account evaluation should cover Day 1 operations or longer-term plans.  FRBKC-00000480; FRBKC-00004282 at 2 ("We will look to examiners to identify any commitments related to potential Reserve Bank membership and any conditions to a potential master account access request decision.").  And, most notably, on December 6, 2022, Chris Gaul-Pearson emailed "I've been asked to see if you could help us make sure that we are not getting out of sync with the membership side.  ***We do not want to contradict one another***."  FRBKC-00002132 at 2.   Based on the Kansas City Reserve Bank's fear of contradicting the Board's decision on membership, the Kansas City Reserve Bank determined that its master account decision would "follow up very quickly after the membership decision."  FRBKC-00001668.

59.   Because the two evaluations were running in parallel, the Board's denial of Custodia's membership application effectively dictated the Kansas City Reserve Bank's decision on Custodia's master account application.  The Board's

membership denial order was an unprecedented 86 pages long, and presented an extremely negative (but often erroneous) depiction of Custodia and its business plan. It also was starkly at odds with more positive assessments that Kansas City staff had expressed about Custodia during their review process.  For example, in October 2021, a Kansas City Reserve Bank examiner stated in a preliminary assessment, "Overall, based upon the information provided as of July 2020, Avanti (now Custodia) is taking appropriate steps in building a satisfactory audit and governance structure…risks are adequately identified and categorized." *See* FRBKC-00000054. Further, I note that none of the written correspondence from the Reserve Bank had introductory paragraphs that described insurmountable concerns.  *See, e.g.,* FRB-AR-001204.  In my experience, if Federal Reserve System staff believed Custodia's proposals were not approvable, they would have included such language.

60.     Following the Board's publication of the membership denial, there was no possibility that Custodia's master account application would get approved.  In fact, the Reserve Bank's denial of Custodia's master account application came just hours after the Board's denial action on the membership proposal.  This clearly was a coordinated action.  In my experience, the System works very hard to publicly present a united and consistent approach to regulating its banking entities throughout all twelve Reserve Banks.  In light of the Board's Guidelines governing master accounts and the newly announced tiering classifications (discussed below), the

Reserve Bank functionally did not have any discretion in acting on Custodia's master account proposal independently of the Board's adverse action on the membership application.

**D.      The Board Issued Guidelines That Gave It Control over Master Accounts for Novel Banks Such as Custodia.**

61.     On May 11, 2021, the Board proposed Guidelines for Evaluating Account and Services Requests (the "Guidelines"), which became final on August 15, 2022.   The Guidelines did not exist before Custodia filed its application for a master account.

62.     The Guidelines were designed so "that the Reserve Banks [would] apply a consistent set of guidelines when reviewing [] access requests to promote consistency across Reserve Banks and to facilitate equitable treatment across institutions."   87 Fed. Reg. 51,099 at 51,106 (Aug. 19, 2022).   As the Board explained, there was a particular need for the Guidelines due to "a recent uptick in novel charter types being authorized or considered by federal and state banking authorities across the country.   As a result, the Reserve Banks are receiving an increasing number of inquiries and access requests from institutions that have obtained, or are considering obtaining, such novel charter types."   87 Fed. Reg. 51,099 at 51,099 (Aug. 19, 2022).

63.     The Guidelines created a System-wide policy for how Reserve Banks would adjudicate master account applications.   Section 1 of the Guidelines

establishes six principles focused on risk management and mitigation. Section 2 describes how those principles will be applied within a three-tier review structure with different levels of scrutiny corresponding to the level of risk that the Board assigned to different entity categories. Tier 1 institutions are eligible institutions that are federally insured. Tier 2 institutions are not federally insured but are subject to prudential supervision by a federal banking agency. Tier 3 institutions include eligible institutions like Custodia that are not federally insured, do not have a holding company subject to Federal Reserve oversight, are chartered under state law and are not subject to prudential supervision by a federal banking agency, or have a holding company that is not subject to Federal Reserve oversight.

64.     Under the Guidelines, Reserve Banks can grant Tier 1 institutions master accounts in a streamlined review process without much scrutiny. Traditional financial institutions typically have federal insurance and are thus granted an easier path to Federal Reserve access due to their Tier 1 status.

65.     The presumption is reversed for Tier 2 and 3 institutions, which lack federal deposit insurance and/or a federal regulator. Reserve Banks must exercise increased scrutiny over applications from these institutions, including consultation with the Board. This "coordination" between the Reserve Banks and the Board effectively gives the Board veto power over which, if any, Tier 2 and 3 institutions

26

receive a master account.  In reality, though, the Board exercises its power long before any "recommendation" gets made by the Reserve Bank.

66.    Notably, since the Board started publicly keeping track of master account requests on December 23, 2022, only Tier 1 institutions have been granted master accounts.  Conversely, the only master account applications that have been rejected have come from Tier 3 institutions.  *See generally* Bd. of Govs. of the Fed. Reserve, *Master Account and Services Database*, available at https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm.

67.    It is my opinion that the Board developed the Guidelines to exert control over Custodia's master account application and similar future applications by novel banks.  The Board issued the proposed Guidelines in May 2021, almost seven months after Custodia had applied for a master account.  The Kansas City Reserve Bank made it clear that it would not decide Custodia's master account application until the Guidelines were finalized because such a decision would be "informe[d]" by the Guidelines, FRBKC-00000387 at 3, and that it would be "inappropriate" for the Kansas City Reserve Bank to reach a decision ahead of the finalized Guidelines.  FRB-AR-003858.

68.    On August 15, 2022, just one day before Defendants' motions to dismiss were due in this litigation, the Board issued its final Guidelines.  A month

27

later, the Kansas City Reserve Bank commenced evaluating Custodia as a Tier 3 institution. FRBKC-00001601.  And one month after that, the Kansas City Reserve Bank informed Custodia that "[i]n applying the Account Access Guidelines, FRBKC has determined that under its current structure, Custodia qualifies as a Tier 3 institution, posing the highest level of risk and subject to the strictest level of review." FRBKC-00000297.  But the Kansas City Reserve Bank also noted that "Custodia may become a Tier 2 institution under the Account Access Guidelines if it obtains membership in the Federal Reserve System." *Id*.

69.    Based on my experience working for the Board, the development and publication of the draft Guidelines shortly after Custodia applied for a master account, and the Kansas City Reserve Bank's swift reliance on the Guidelines in assessing Custodia's master account application, was not a coincidence.  Instead, given Custodia's novel proposal to provide custody services for crypto assets as well as Custodia's novel state banking charter, it is my opinion that the Board was particularly concerned with Custodia gaining access to the Federal Reserve System and therefore used the Guidelines to set up a process to ensure that the Board would be able to exert control over the ultimate decision through Custodia's status as a Tier 3 institution. *See* FRBKC-00000394 (acknowledging that the connection between Custodia's master account application and the initial proposal of the Guidelines is "technically accurate").

70.     The Board's desire to use the Guidelines to exert control over Custodia's master account application was ultimately successful.  In March 2022, Kansas City Reserve Bank staff acknowledged "we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Reserve member" because without FDIC insurance or Federal Reserve membership, Custodia would be a tier 3 institution.  FRBKC-00004943.  When asked about the practical effect of a tier 3 status, Christi May-Oder, an Assistant Vice President with the Kansas City Reserve Bank, admitted that "[e]ntities falling into Tier 3 will have a high bar to cross to get an account."  *Id*.  Ross Crouch who was responsible for conducting Custodia's examination agreed that "approval isn't anticipated if Tier 3 route is taken."  *Id*.  Using the tiering system that it had developed in direct response to Custodia's master account application, the Board effectively denied Custodia's master account application by denying its membership application.

71.     Issuance of the Guidelines gave the Board a way to control the master account application process, ensuring that even novel banks deemed eligible for master accounts such as Custodia, would find it almost impossible to secure them.

**E.      Through the Non-Public S-Letter Process, the Board Revised Parts of the Denial of Custodia's Master Account Application.**

72.     The Board's creation of System-wide policies to deal with applications from novel institutions did not end with the creation of the "Nontraditional Account Access Workstream Structure" or the publishing of the Guidelines.  Rather, the

Board took a further step when, on January 17, 2023, just days before the Reserve Bank denied Custodia Bank's master account application, the Board finalized and issued internal guidance letter, S-2677. FRB-AR-000014. This guidance is internal to the Federal Reserve System and hidden from public view. The S-2677 letter set out a mandatory review process that requires Reserve Banks to "consult" with the Board on Tier 2 and 3 institutions. One or more drafts of this internal guidance letter were circulated to the Kansas City Reserve Bank in 2022 and possibly much earlier, but to date neither the Board nor the Reserve Bank have produced those drafts or the communications surrounding them. It is my opinion that the letter itself, including the development of the draft versions, was another mechanism by which the Board exercised control over the outcome of Custodia's master account application.

73.    According to the S-2677 letter, Reserve Banks are required to provide the Board with early notification when Tier 2 or 3 institutions apply for a master account. FRB-AR-000014 at 3. This early notice allows the Board to influence the evaluation of Tier 2 and 3 institutions from the outset of the master account process. In addition, the Letter requires Reserve Banks to consult directly with a Division Director at the Board prior to communicating a decision on a master account to a Tier 2 or 3 institution. FRB-AR-000014 at 3. Under the terms of the S-2677 Letter, the Kansas City Fed could not approve Custodia's application without first "consult[ing]" with the Board. *Id*. Notably, this presumption against granting access

30

to Tier 2 and 3 institutions is reversed for Tier 1 institutions for which a Reserve Bank must notify the Board only if it is considering denying a master account application. *Id*.

74.   In my experience, the requirement that a Reserve Bank consult directly with a Division Director is highly unusual.   Typically, consultation with a Board staff member is sufficient, and the Board staff member decides whether to elevate the matter within the Board.   Requiring a Division Director to be consulted effectively removes decision-making authority from Reserve Banks.   While Reserve Banks may work collaboratively with Board staff, Reserve Banks would be extremely reluctant to countermand the opinion of a Board Division Director, who reports directly to the Governors of the Board.   By requiring consultation with a Division Director prior to the communication on a master account decision, the Board effectively established veto power over Reserve Bank decisions on master account applications for Tier 2 and 3 institutions.

75.   The Board's mandatory review process was deployed for the first time when evaluating Custodia's master account application. FRBKC-00000314 (describing "muddl[ing] through this process for more or less the first time").   On January 6, 2023, at a time when the Kansas City Reserve Bank still had the Custodia master account application under consideration, Judith Hazen, a Reserve Bank Vice President, sent an email and draft recommendation memorandum to members of the

Board.  *See* FRBKC-00012350 at 2 ("Pursuant to the proposed S Letter, we are providing our pre-decisional draft memorandum regarding potential actions on Custodia's request for a master account").  While the Kansas City Reserve Bank memo recommended denial of Custodia's master account application due to the earlier Board intervention described above, the Board's comments on and edits to the memo recommending master account denial served as the final nail in the coffin.

76.    The Kansas City Reserve Bank's recommendation memo regarding Custodia's master account application received heavy editing from Board staff.  As an initial matter, the Board requested that the Kansas City Reserve Bank revise the memo to "explicitly discuss the application of the Board's Account Access Guidelines to Custodia's request."  FRB-AR-000326.  The Board was expressly linking the recommendation memo to the Guidelines under which Custodia was a Tier 3 institution, virtually certain to be denied.

77.    The Board also tried to obfuscate the effect of being a Tier 3 institution under the Guidelines.  In a comment to one sentence, the Board asked, "[a]re you asserting that providing an account and/or services to any tier 3 institutions (without a federal regulator) would be contrary to Board policies?"  The Board then directed the Kansas City staff to "rework" this sentence.  FRB-AR-000326 at 8.  The resulting edit removed the implication that no Tier 3 institution could ever qualify for a master account (to preserve the fallacy that Tier 3 status was not a *de facto* denial), and

obscured the fact that Custodia was inevitably going to be denied a master account due to its Tier 3 status.

78.    The remaining Board-provided editing was nearly all negative towards Custodia's master account application.  Board staff requested that there be particular emphasis and elaboration on matters related to a high risk, highly volatile, so-called "monoline business," the alleged fostering of illicit activities just by engaging in crypto activities, and significant Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") risks.  *See, e.g.*, FRB-AR-000326 (Board comment on the "lack of visibility" for Custodia given the "monoline business model and the high volatility of the crypto industry"); *id*. at 2 (suggesting discussion of "BSA/AML risks"); *id*. at 3 (suggesting discussion of risks of "unregulated exchanges and cryptocurrencies").

79.    If the goal is for decision makers in the System to deny a proposal, using any combination of words such as high risk, high volatility, monoline business model, illicit activities, and BSA/AML risk, will achieve that result.  Decision makers in the System very rarely will approve a proposal that involves one of these characteristics.  Board staff doomed any chances of approval of Custodia's master account proposal by editing the Reserve Bank's recommendation memo to overly emphasize such risks.  The Board's comments on and edits to the memorandum effectively ensured that the application would be denied.

80.     Moreover, these edits from the Board staff contravened written assessments from Reserve Bank staff about Custodia reflected in earlier documents. *See, e.g.*, FRBKC-00002183 (expressing doubt that issues with "monetary base size or collateral silos is likely to be a concern for the next several years"); FRBKC-00000054 (preliminary analysis finding that Custodia was "building a satisfactory audit and governance structure"); FRBKC-00000465 (noting that in the event of a bank failure "there wouldn't be much to unwind aside from the cash in the master account"); FRBKC-00009385 (stating that "financial and operational risks will be satisfactorily managed"); FRBKC-00009384 (describing risk management as "strong").

81.     On January 10, 2023, a section chief in the Board's Division of Monetary Affairs, via an email sent to several Kansas City Reserve Bank staff, also provided material edits to the Kansas City Reserve Bank's recommendation memo regarding Custodia Bank's master account application.  FRB-AR-000313.  These edits included adding that Custodia could "create more significant monetary policy implementation ... concerns."  FRB-AR-000315 at 9.  This was another edit that dictated the denial of a master account application.  A Reserve Bank would never want to cause serious disruption to the System's ability to conduct monetary policy.  Nor would a Reserve Bank question Board staff's determination that a financial

institution would seriously disrupt the System's ability to implement monetary policy.

82.     In another edit, the Board removed a sentence stating: "These are broad policy matters that extend beyond the Reserve Bank and while risk mitigation strategies are being contemplated by the Federal Reserve Board, practically, it is not clear how these controls would be implemented."  FRB-AR-000315 at 9.  The removal of this sentence had a twofold effect: first, it further obscured the Board's role in the denial of Custodia's master account application given that only the Board decides policy questions; second, it withdrew the possibility that Custodia could, at later date, be granted a master account once certain risk mitigation controls were in place at the Board level.

83.     The Reserve Bank staff's final memo substantially incorporated the Board's edits and comments.  There appears to have been no effort by Board staff to help the Reserve Bank make a balanced presentation that included discussion of the significant risk management framework that Custodia had developed to mitigate identified risks.  Board staff similarly made no effort to include a discussion of the benefits of bringing a special purpose bank such as Custodia into the federal bank regulatory system.  Relatedly, Board staff did not discuss the risks of not approving the application and having non-regulated entities provide crypto asset custody services in the United States.  In my experience, if the Board were attempting to

35

present an unbiased opinion rather than attempting to ensure a denial, it would have discussed these balancing factors.  Instead, I hold the opinion that the Board-edits made pursuant to the S-2677 letter were a one-sided presentation intended to justify the Board's intended outcome.

84.     The Guidelines and its implementing S-2677 letter ultimately gave the Board control not only over the ultimate decision on Custodia's master account application, but also the reasoning used for that decision.  The nature of the Board's edits and comments on the memo similarly ensured the desired outcome for Custodia's master account application—denial.

## VII.  CONCLUSION

85.     For the reasons explained above, it is my opinion that although the final Custodia master account decision was issued under the imprimatur of the Reserve Bank, the Board was pulling the strings.

86.     This is not surprising.  It is the Board which by law must decide policy questions, and this was a policy question that the Board Chair himself described as "just hugely precedential."  The years 2020 to 2023 were characterized by vigorous debate over crypto-assets which always seemed to be in the news – the rise and fall of the price of Bitcoin, the increasing percentage of the population holding those assets, regulatory rumblings, comments from Congress and the White House, and legal actions by agencies such as the SEC asserting that the crypto-assets were

securities under the Securities & Exchange Act and could be regulated.  Against this backdrop, with Custodia being the first financial institution seeking a master account with a novel plan to offer both ordinary banking services and crypto-asset services, the Board necessarily was the ultimate decision-maker.  The Board used direct and indirect methods to insert itself into the adjudication of Custodia's master account application including making the eligibility determination; halting the Kansas City Reserve Bank's examination of Custodia; denying Custodia's membership application; publishing the Guidelines; heavily editing the denial memo; and issuing the S-2677 Letter.  Given the degree of Board interference throughout Custodia's master account application process, it is my belief that the Kansas City Reserve Bank would have been unable to exercise any authority it might arguably have had in deciding Custodia's application.

87.     Because discovery is ongoing and the Kansas City Reserve Bank has not completed its production of documents, I reserve the right to modify or supplement the opinions set forth in my report and the bases for those opinions.

DATE: _10/25/23_                          By: _Katie S. Cox_
                                              Katie S. Cox

37

# EXHIBIT 1

## MATERIALS RELIED UPON LIST

- Amended Complaint and Exhibit 1, ECF No. 121
- Bd. of Govs. of the Fed. Reserve, *Federal Reserve announces denial of application by Custodia Bank, Inc., to become a member of the Federal Reserve System* (Jan. 27, 2023), available at https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm.
- Bd. of Govs. of the Fed. Reserve, *Master Account and Services Database*, available at https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm.
- Chair Jerome Powell, *Senate Committee on Banking, Housing, and Urban Affairs Confirmation Hearing* (Jan. 11, 2022)
- Letter from Custodia to Ross Crouch (Dec. 20, 2022)
- Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021)
- Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 15, 2022)
- U.S. Fed. Reserve Sys., *The Fed Explained: What the Central Bank Does*, available at federalreserve.gov/aboutthefed/the-fed explained.pdf
- White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023)
- 12 C.F.R. 265.20
- 12 U.S.C. § 248
- 12 U.S.C. § 307
- Documents Produced by the Federal Reserve Bank of Kansas City, including: FRBKC-00000054; FRBKC-00000234; FRBKC-00000254; FRBKC-00000266; FRBKC-00000276; FRBKC-00000297; FRBKC-00000313; FRBKC-00000314; FRBKC-00000319; FRBKC-00000328; FRBKC-00000387; FRBKC-00000390; FRBKC-00000394; FRBKC-00000397; FRBKC-00000437; FRBKC-00000446; FRBKC-00000460; FRBKC-00000465; FRBKC-00000480; FRBKC-00000488; FRBKC-00000513; FRBKC-00000565; FRBKC-00000626; FRBKC-00000667; FRBKC-00001586; FRBKC-00001601; FRBKC-00001668; FRBKC-00001715; FRBKC-00001908; FRBKC-00001961; FRBKC-00002132; FRBKC-00002133; FRBKC-00002169; FRBKC-00002172; FRBKC-00002183; FRBKC-00002200; FRBKC-00002366; FRBKC-00002407; FRBKC-00002424; FRBKC-00002514; FRBKC-00002560; FRBKC-00002573; FRBKC-00002695; FRBKC-00002728; FRBKC-0000297;

FRBKC-00003309; FRBKC-00003331; FRBKC-00003348; FRBKC-00003379; FRBKC-00003421; FRBKC-00003424; FRBKC-00003426; FRBKC-00003428; FRBKC-00003432; FRBKC-00003561; FRBKC-00003592; FRBKC-00003607; FRBKC-00003671; FRBKC-00003695; FRBKC-00003950; FRBKC-00004229; FRBKC-00004256; FRBKC-00004282; FRBKC-00004620; FRBKC-00004638; FRBKC-00004647; FRBKC-00004677; FRBKC-00004710; FRBKC-00004768; FRBKC-00004808; FRBKC-00004836; FRBKC-00004899; FRBKC-00004902; FRBKC-00004904; FRBKC-00004916; FRBKC-00004943; FRBKC-00004977; FRBKC-00004983; FRBKC-00005021; FRBKC-00005060; FRBKC-00005156; FRBKC-00005172; FRBKC-00005232; FRBKC-00005243; FRBKC-00005245; FRBKC-00005326; FRBKC-00005333; FRBKC-00009364; FRBKC-00009369; FRBKC-00009384; FRBKC-00009385; FRBKC-00009848; FRBKC-00009854; FRBKC-00013627; FRBKC-0009385

- Documents Produced by the Board of Governors of the Federal Reserve System, including: FRB-AR-000001; FRB-AR-000002; FRB-AR-000003; FRB-AR-000004; FRB-AR-000014; FRB-AR-000068; FRB-AR-000153; FRB-AR-000154; FRB-AR-000162; FRB-AR-000163; FRB-AR-000191; FRB-AR-000201; FRB-AR-000204; FRB-AR-000216; FRB-AR-000222; FRB-AR-000227; FRB-AR-000233; FRB-AR-000245; FRB-AR-000247; FRB-AR-000250; FRB-AR-000298; FRB-AR-000306; FRB-AR-000308; FRB-AR-000313; FRB-AR-000315; FRB-AR-000323; FRB-AR-000324; FRB-AR-000326; FRB-AR-000333; FRB-AR-000334; FRB-AR-000335; FRB-AR-000336; FRB-AR-000345; FRB-AR-000356; FRB-AR-000359; FRB-AR-000362; FRB-AR-000461; FRB-AR-000549; FRB-AR-000561; FRB-AR-000589; FRB-AR-000629; FRB-AR-000634; FRB-AR-000638; FRB-AR-000679; FRB-AR-000740; FRB-AR-000920; FRB-AR-000950; FRB-AR-000956; FRB-AR-000964; FRB-AR-000986; FRB-AR-000991; FRB-AR-001145; FRB-AR-001191; FRB-AR-001202; FRB-AR-001204; FRB-AR-001210; FRB-AR-001211; FRB-AR-001318; FRB-AR-001323; FRB-AR-001400; FRB-AR-001409; FRB-AR-001533; FRB-AR-001593; FRB-AR-001599; FRB-AR-001607; FRB-AR-001673; FRB-AR-001690; FRB-AR-001696; FRB-AR-001754; FRB-AR-001806; FRB-AR-001810; FRB-AR-001835; FRB-AR-001853; FRB-AR-001857; FRB-AR-001859; FRB-AR-001862; FRB-AR-001865; FRB-AR-001872; FRB-AR-001874; FRB-AR-001898; FRB-AR-001983; FRB-AR-002188; FRB-AR-002238; FRB-AR-002240; FRB-AR-002248; FRB-AR-002264; FRB-AR-002273; FRB-AR-002414; FRB-AR-002415; FRB-AR-002433; FRB-AR-002446; FRB-AR-002448; FRB-AR-002471; FRB-AR-00250; FRB-AR-002508;

FRB-AR-002671; FRB-AR-002689l FRB-AR-002695; FRB-AR-002709; FRB-AR-002729; FRB-AR-002758; FRB-AR-002767; FRB-AR-002909; FRB-AR-002947; FRB-AR-002972; FRB-AR-002974; FRB-AR-002976; FRB-AR-002979; FRB-AR-002989; FRB-AR-002991; FRB-AR-002993; FRB-AR-003072; FRB-AR-003079; FRB-AR-003083; FRB-AR-003088; FRB-AR-003233; FRB-AR-003259; FRB-AR-003269; FRB-AR-003276; FRB-AR-003282; FRB-AR-003337; FRB-AR-003772; FRB-AR-003793; FRB-AR-003858; FRB-AR-003860; FRB-AR-003863; FRB-AR-003917; FRB-AR-003939; FRB-AR-003981; FRB-AR-003994; FRB-AR-003997; FRB-AR-004014; FRB-AR-004026; FRB-AR-004110; FRB-AR-004113; FRB-AR-004116; FRB-AR-004126; FRB-AR-004129; FRB-AR-004134; FRB-AR-004138; FRB-AR-004142; FRB-AR-004144; FRB-AR-004178; FRB-AR-004195; FRB-AR-004199; FRB-AR-004214; FRB-AR-004225; FRB-AR-004353; FRB-AR-004369; FRB-AR-004381; FRB-AR-004383; FRB-AR-004385; FRB-AR-004412; FRB-AR-004452; FRB-AR-004549; FRB-AR-004558; FRB-AR-004585; FRB-AR-004588; FRB-AR-004593; FRB-AR-004594; FRB-AR-004605; FRB-AR-004617; FRB-AR-004619; FRB-AR-004783; FRB-AR-004786; FRB-AR-004796; FRB-AR-004805; FRB-AR-004807; FRB-AR-004808

- Documents Produced by The Narrow Bank: TNB-0000002

# EXHIBIT 2



# Katie S. Cox

P.O. Box 171, Elkton, Virginia 22827| 703-640-8666| katie@coxfedlaw.com| LinkedIn KatieSCox

Former federal bank regulator with over 30 years of bank examination and mergers and acquisition experience.  Proven record of identifying and addressing corporate governance issues.  Material audit experience.  Significant experience in reviewing mergers and acquisition proposals for permissibility, strategic viability, and integration success.  In-depth expertise regarding U.S. federal and state regulation of digital assets.  Demonstrated ability to provide a regulator's point of view to make an organization regulatory compliant as well as financially successful.

## Corporate Governance Skills

- Board member of the Virginia State Golf Association.  Serve on the Strategic Planning, Governance and Finance Committees.
- Audit committee member of Custodia Bank, a digital asset products and service provider.
- Key presenter for the Federal Reserve's Large Banking Institution Director Orientation Program, which provides regulatory training for new directors of U.S. banking institutions with assets between $10 billion and $50 billion.
- Contributor to Federal Reserve Guidance SR 15-15 *Supervisory Concerns Related to Shareholder Protection Arrangements*, which describes unsafe and unsound issues related to certain provisions in shareholders' capital raising instruments.
- Federal bank examiner experience in assessing corporate governance adequacy, which included reviewing sufficiency of board packages and evaluating board member composition and effectiveness of oversight.

## Digital Transformation Regulatory Affairs Skills

- Regulatory affairs advisor for a de novo depository institution which will solely focus on digital asset products and services.  This institution applied with the Federal Reserve System for a master account and is working towards being the first U.S. digital asset-focused bank to receive such an account.
- Stay apprised of actions of U.S. regulators and legislators regarding a U.S. central bank digital currency as well as other digital assets and blockchain technology.

## Mergers & Acquisitions Skills

- Key official responsible for mergers and acquisitions in the Federal Reserve System.  Ensured that proposals met all statutory factors, including strategic future prospects; managed the review of proposals in a timely fashion; and developed recommendations for action on proposals.
- Presented policy setting or significantly large proposals to numerous chairs of the Federal Reserve, including Greenspan, Bernanke, Yellen and Powell, to seek a decision of approval or denial.
- Developed key regulatory M&A guidance, including SR 13-7 *State Member Bank Branching Considerations* and SR 14-*2 Enhancing Transparency in the Applications Process*.  This innovative guidance was designed to convey to the public mergers and acquisitions regulatory concerns that can hinder proposals.

## Work Experience

### PwC

*May 2022- Present*
<u>Consultant, Financial Services Risk & Regulatory Practice</u>
Advise clients on a range of regulatory matters, including charter conversions, applications, regulatory strategy, and risk management.  Assist a range of traditional and nontraditional financial services firms with respect to regulatory communications and engagement strategies.

### Fitco Consulting Pte, Limited

*July 2021 – January 2023*
<u>Financial Services Regulatory Consultant</u>
Fitco is an international company that connects subject matter experts with private and public entities.  Currently advise several Asian clients regarding U.S. banking regulators' economic and digital assets policies as well as U.S. legislators' actions.  Areas of focus include the Federal Reserve's Federal Open Market Committee actions, the Federal Reserve's on-going consideration of developing a central bank digital dollar, and U.S. regulatory and legislative efforts concerning stablecoins and other digital assets.

### Custodia Bank, Inc. (formerly known as Avanti Financial Group)

*May 2020 – Present*
<u>Advisor</u>
Custodia Bank is a *de novo* special purpose depository institution which will engage in a range of digital assets payments, custody, securities, and commodities activities for institutional customers.  Responsibilities include providing business, industry, regulatory affairs, and product advice, as well as guidance related to the company's business strategies.  Provide government relations services.  Also serve on the company's audit committee.

### Board of Governors of the Federal Reserve System (Board)

***Mergers & Acquisitions Section***

*November 2010 – March 2020*
<u>Manager</u>
Oversaw the review of the most complex domestic and international merger and acquisition proposals filed with the Federal Reserve System.  These proposals involved the offering of fintech products and services such as artificial intelligence, cryptocurrency, blockchain technology, and innovative money transmissions.  These proposals also included community bank acquisitions.  Collaborated with applicants to address regulatory concerns involving areas such as the long-term viability of a business plan, direct and indirect proposed owners, product risk management, concentrations related to revenues or assets, and Bank Secrecy Act compliance.  Reviewed organizational documents, capital instrument documents, and proposed management in order to identify corporate governance weaknesses.  Presented oral and written briefings to the Governors of the Board to obtain guidance for proposals that posed novel banking policy matters (including banking products or services) or involve very large banking institutions.  Served as one of the Federal Reserve's key drivers in the development of bank mergers and acquisitions policies.  Provided leadership in developing and implementing bank regulatory burden reduction initiatives, particularly for U.S. community banks.  Served as the Federal Reserve System's subject matter expert on Regulation W, which governs transactions between banks and their affiliates.

*March 2006 – October 2010*
<u>Senior Supervisory Financial Analyst</u>
Position required leadership skills to coordinate the review by Board and Reserve Bank staff and other banking regulators of complex mergers and acquisition proposals.  Served as analyst for several high profile, market disruption-related proposals filed during the height of the financial crisis.  These included the proposals to convert to bank holding companies by Ally (formerly GMAC) and Goldman Sachs, the acquisition of Merrill Lynch by Bank of America, and the acquisition of Countrywide by Bank of America.  Developed and presented briefings for policy setting proposals to the Governors of the Board, including several Chairs of the Board.

*March 2001 – February 2006*
<u>Supervisory Financial Analyst</u>
Performed financial and managerial reviews of proposals by domestic banks, foreign banks, and nonbanks that raised material supervisory, financial, and/or policy issues.  Coordinated these reviews with staff of the Board, the Reserve Banks, and other regulatory agencies.  Identified issues presented by such proposals and recommended appropriate solutions consistent with Federal Reserve System policies, procedures, and guidelines.  Developed written and/or oral presentations to the Governors of the Board to articulate Board staff's recommendations regarding the appropriate action on such banking proposals.  Served as the Board's primary analyst to review applications involving asset quality, securitization, and Regulation W issues.

*June 1999 – February 2001*
<u>Senior Financial Analyst</u>
Performed financial and managerial analysis of domestic and foreign bank proposals that raised supervisory, financial, or policy issues.  Developed written analysis and recommendations for immediate management.

**U.S. Air Force Audit Agency**[1]

*August 1997 – May 1999*
<u>Auditor</u>
Performed audits of U.S. Air Force entities.  Scope of work included researching prior audits, reviewing pertinent regulations and directives, and determining audit objectives.  Developed audit programs with specific audit steps to achieve the audit objectives.  Conducted audits that incorporated sampling techniques – both random and judgmental, reviewed internal controls, and determined compliance with applicable regulations and U.S. Air Force directives.  Developed recommendations for addressing identified weaknesses.  Presented findings and recommendations to military commanders in oral and written form.

**Federal Reserve System**

*April 1993 – June 1995*
<u>Commissioned Federal Bank Examiner</u>
Conducted examinations of commercial banks, foreign branches, Edge Act Corporations, and bank holding companies.  Directly supervised examination teams.  Scope of work encompassed evaluating internal audit systems and corporate governance, performing loan review, and evaluating the condition of the entities as related to capital, asset quality, management, earnings, and liquidity.  Reported findings to

---

[1] I temporarily left the Federal Reserve System in 1995 in order to accompany my husband on his active duty U.S. Air Force tours in Ramstein, Germany and San Antonio, Texas.  I was not employed for the first two years of his tour in Germany.

management of the banking entities and the Federal Reserve System in written and oral form.  Served as an instructor for the Federal Reserve System's core bank examiner school.

*August 1990 – March 1993*
<u>Associate Bank Examiner</u>
Performed loan review and served as examiner-in-charge of community banks and bank holding companies.  Served as assistant-in-charge of large and/or problematic institutions; primary function was to assess adequacy of internal control procedures.  Provided on the job training to less experienced examiners.

*January 1988 – July 1990*
<u>Assistant Bank Examiner</u>
Evaluated the audit functions and assessed the overall system of internal controls of commercial banks, foreign branches, and Edge Act Corporations.  Verified financial reports submitted to the Federal Reserve and determined compliance with various federal and state banking laws.

*November 1985 – December 1987*
<u>Financial Analyst</u>
Analyzed proposals submitted for bank holding company formations, acquisitions, and mergers involving financial institutions with assets between $20 million and $600 million.  Prepared written summary of findings, including detailed financial and managerial analysis of bank holding companies and banks for senior Reserve Bank management.

## Education & Certifications

**Central High School,** Woodstock, Virginia, High School Diploma, June 1981

**University of Virginia**, Charlottesville, Virginia, Bachelor of Science in Commerce, May 1985
Concentration in Finance with additional course working in accounting (21 hours)

**Kansas State University**, Manhattan, Kansas, Agricultural Lending School

**Commissioned Federal Bank Examiner**, Federal Reserve System, April 1993

## KATIE S. COX

## Board Experience

Board member, Virginia State Golf Association, Richmond, VA January 2022 - Present
Finance Committee, Mount Vernon Country Club, Alexandria, VA January 2008 - December 2018
Board member and Treasurer, Girl Scouts Overseas, Ramstein, Germany July 1995 - July 1997

## Other Interests

**Golf:**
2011 USGA Women's Mid-Amateur Competitor
2013 USGA Women's Senior Amateur Competitor
4-time Club Champion - Mount Vernon Country Club, Alexandria, VA
1-time Club Champion - Fort Belvoir Golf Club, Alexandria, VA
3-time Club Champion - Spotswood Country Club, Harrisonburg, VA
8-time member of winning team - Virginia Women's State Team Matches, Mount Vernon Country Club
2022 Ranked #5 VSGA Senior Women's Golfer
2022 Women's District of Columbia Golf Association's Senior Champion