# EXHIBIT 23

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

```
                                                 Page 1

  1         IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF WYOMING
  2
       -------------------------------:
  3  CUSTODIA BANK, INC.,              :
                                       :
  4              Plaintiff,            :
                                       : Case No.
  5         vs.                        : 1:22-cv-00125-SWS
                                       :
  6  FEDERAL RESERVE BOARD OF          :
     GOVERNORS and FEDERAL RESERVE     :
  7  BANK OF KANSAS CITY,              :
                                       :
  8              Defendants.           :
       -------------------------------:
  9
 10           CONFIDENTIAL DEPOSITION OF
 11            PETER CONTI-BROWN, PH.D.
 12
 13  DATE:            Thursday, December 14, 2023
 14  TIME:            8:09 a.m.
 15  LOCATION:        King & Spalding, LLP
                      1700 Pennsylvania Avenue, N.W.
 16                   Washington, D.C. 20006
 17
 18  REPORTED BY:     Erick M. Thacker
                      Reporter, Notary
 19
 20
 21           Veritext Legal Solutions
           1250 Eye Street, NW, Suite 901
 22            Washington, D.C. 20005
```

Page 6

1   depository institutions, which is the -- the term

2   used in -- in and around the Monetary Control

3   Act.

4       Q    Okay.  So it's your opinion, then, that

5   all state-chartered institutions that are legally

6   eligible -- sorry.  Strike that.

7            All state-chartered depository

8   institutions that are legally eligible are

9   automatically entitled to unfettered access to

10  all of the Fed's priced services?

11      A    I'll leave the legal conclusions to the

12  Court to determine.  My opinions are about the

13  intentions of the statutory framers of the

14  Monetary Control Act and the practices of the

15  Federal Reserve from 1980 to the present and

16  understanding that -- that authority, that --

17  that question.

18           I take your question to be a legal one.

19  I don't offer an opinion on that legal

20  conclusion.

21      Q    But you -- it is your opinion, though,

22  that Congress intended through the Monetary

CONFIDENTIAL

Page 7

1    Control Act to accomplish that result?

2         A    It's my opinion that the framers of

3    the -- of the Monetary Control Act intended to

4    equalize access to the Federal Reserve's priced

5    services to all depository institutions that were

6    legally eligible for them.

7         Q    And by equalized access, are you

8    referring there to unfettered access to all of

9    the Fed's priced services?

10        A    Can you define for me what you mean by

11   unfettered?

12        Q    Unconditional.  And you're referring

13   here to initial access or ongoing access, or what

14   do you mean by that?

15        A    Both.

16        Q    No, not necessarily.  There are

17   instances consistent in Fed history where

18   determinations are made that -- that access --

19   ongoing access to -- to some priced services can

20   be conditioned consistent with legislation and

21   regulation.

22        Q    And what's an example of that?

CONFIDENTIAL

Page 8

1      A     So, for example, a legally eligible

2   depository institution that has gained access to

3   the discount window can have that access

4   conditioned on the quality of collateral, the

5   quality of its own balance sheet, regulatory and

6   supervisory assessments, some of which are

7   defined by statute, some by regulation, some by

8   supervision.

9      Q     And -- and it's your opinion that the

10  Federal Reserve can exercise its discretion

11  over -- over access to that service applying

12  those conditions?

13     A     Tell me what you mean by discretion

14  here.

15     Q     Well, will use its judgment to manage

16  the risk presented and determine what the

17  appropriate collateral level is, et cetera.

18     A     It's my opinion that the Federal

19  Reserve can use its judgment consistent with the

20  legislation and regulation in reaching ultimate

21  conclusions, but it can't use its judgment

22  inconsistent with its -- the legislation or

CONFIDENTIAL

Page 9

```
 1    regulation.
 2         Q    Okay.  And what's the legislation that
 3    gives the Fed the power to exercise its
 4    discretion over -- to apply those conditions that
 5    you were just describing?
 6         A    The Federal Reserve Act at it's been
 7    amended over the years.
 8         Q    And which provision?
 9         A    So the discount window -- I can't speak
10    to every provision because the Federal Reserve
11    Act is a complex statute, but at least Section
12    10B would be relevant to the -- to the discount
13    window, but other -- other sections as well
14    govern, you know, the -- the scope of -- of
15    authority of the Federal Reserve.
16         Q    Are you familiar with Fedwire?
17         A    I am.
18         Q    What is Fedwire?
19         A    Fedwire is a payment rail that is owned
20    and operated by the Federal Reserve.
21         Q    Okay.  So does the -- in your opinion,
22    does the Federal Reserve have discretion to
```

CONFIDENTIAL

Page 10

1    impose conditions on access to Fedwire to legally

2    eligible, state-chartered depository

3    institutions?

4         A    I haven't looked sufficiently to see

5    the -- the context around Fedwire's

6    implementation to understand whether the judgment

7    we're talking about would be consistent with --

8    with the law in the same way that I have with the

9    passage and implementation of the Monetary

10   Control Act.

11        Q    Okay.  But your opinion on the meaning

12   of the Monetary Control Act implicates access to

13   Fedwire, right?

14        A    Insofar as Fedwire is a priced service

15   offered by the Federal Reserve as -- as relevant

16   to the Monetary Control Act, yes.

17        Q    Okay.  And -- but are you saying that

18   you haven't looked at whether there are other

19   statutes that bear on the Federal Reserve's

20   ability to apply discretion to access to Fedwire?

21        A    That's right.

22        Q    Okay.  What did you do to prepare for

CONFIDENTIAL

Page 29

```
 1        Q    Irrespective of which state's issuing
 2   the charter?
 3        A    That's right.
 4        Q    And even irrespective of whether it's a
 5   territory issuing the charter, correct?
 6        A    I understand in the banking laws that
 7   state is defined to include the District of
 8   Columbia and the territories of the United
 9   States.
10        Q    Okay.  And this access would be
11   irrespective of whether the state-chartered
12   depository institution has insurance, right?
13        A    There I would say whether it has
14   eligibility to apply for insurance, but
15   irrespective of whether that insurance has been
16   received.
17        Q    Okay.  And the access would be
18   available -- the Fed's priced services would be
19   available irrespective of whether the institution
20   presented risk to the federal payment system?
21        A    The -- I'm trying to think through that
22   question as it relates to my answer earlier about
```

Page 30

1    the discount window.  Certainly, it is the case,

2    as we have seen recently in the spring of 2023,

3    that the Federal Reserve has cut off insolvent

4    institutions from access to its services, and I

5    don't express the opinion that they have done so

6    inconsistent with the intentions of the framers

7    of the MCA when they acted in that way.

8         So if that -- if we take your question

9    about risk to include situations where a legally

10   eligible depository institution has become

11   insolvent, then I would think that risk is

12   relevant to -- to that question.

13        To the extent that it is giving the Fed

14   discretion to block legally eligible depository

15   institutions, then I would say that that -- that

16   that discretion was not -- is inconsistent with

17   the intentions of the framers of the MCA.

18        Q    So your bottom line is that a

19   state-chartered depository institution that's

20   legally eligible can get access to the Fed's

21   priced services even if doing so presents risk to

22   the payment system?

Page 31

1          A     That is my opinion, yes.

2          Q     Okay.  And is it also your opinion that

3     a legally eligible, state-chartered depository

4     institution can get access to Fed services even

5     if doing so would hinder the Fed's ability to

6     implement monetary policy?

7          A     That is my opinion, yes.

8          Q     And it's your opinion that that was

9     what was intended by Congress in 1980?

10         A     Yes.  Now, there are -- there were

11    discussions in -- in the late fall of 1979 and

12    winter of 1980 that preceded the passage of the

13    MCA that were focused on the ways that the regime

14    that preceded the MCA had complicated efforts for

15    monetary policy.  That explains the motivation

16    for the equalization treatment that the MCA

17    framers intended, but the MCA discussion did not

18    include discussion of prospective alteration of

19    that authority by the Federal Reserve

20    unilaterally to assist future changes in monetary

21    policy.  That was a long answer to your question.

22               So the short answer is, I -- it is my

CONFIDENTIAL

Page 32

1    opinion that the Federal Reserve does not have

2    the discretion to both define its monetary policy

3    space and then to exclude legally eligible,

4    state-chartered depository institutions from its

5    priced services in service of that monetary

6    policy space.

7        Q    And do you understand that what -- what

8    Congress intended to accomplish in the Monetary

9    Control Act is -- is a legal dispute in this

10   case?

11       A    No.

12            MR. SCARBOROUGH:  Objection to form.

13            THE WITNESS:  I don't understand that,

14   no.

15   BY MR. MICHAELSON

16       Q    Okay.  You -- you're a lawyer, right?

17   You went to law school?

18       A    I did go to law school, yes.

19       Q    And you -- you clerked for a judge,

20   two, correct?

21       A    For two judges, yes.

22       Q    For two judges.  So how -- how do

CONFIDENTIAL

Page 33

1    courts go about interpreting statutes?

2              MR. SCARBOROUGH:  Objection.

3              THE WITNESS:  I don't know how -- you

4    know, this is the subject of great scholarly

5    debate, how they do, how they should.  Courts are

6    different in different ways.

7              I'm not offering -- the reason I

8    don't -- I didn't agree with your earlier

9    question is that I -- I offer my expertise here

10   as a historian of banking, and I'm not offering

11   an opinion on the legal interpretation of the

12   statute.  And so the intentions of the statutory

13   framers, while maybe useful to the Court in terms

14   of interpreting specific provisions, my -- of

15   the -- of the statute, that I would regard as a

16   legal dispute.

17             What I'm offering is a perspective on

18   the Fed's history from 1913 to 1980, how members

19   of Congress and others understood the changes

20   that occurred in 1980, and then how the Federal

21   Reserve understood and implemented those changes

22   from 1980 to 2015, and then, finally, how it

CONFIDENTIAL

Page 81

1  Central Bank of Bangladesh.

2      Q    You first reference the regulatory

3  framework around Fedwire.  What are you referring

4  to there?

5      A    The Federal Reserve issued rules

6  governing the use of Fedwire, as I recall.  I

7  don't have them in front of me or could -- I

8  could offer you its -- its citation, but it has

9  rules about the use of Fedwire by master account

10  holders.

11      Q    And when were those first promulgated,

12  those rules?

13      A    I don't recall the date.

14      Q    Was it in the 1980s?

15      A    I think it would have been the late

16  1980s, but I'm not certain of that.  It might

17  have been -- it might have been before or after.

18  I can't say.

19      Q    In any event, was it before 2000?

20      A    Before -- it was before 2000.

21      Q    Okay.  And this would be an instance of

22  the Federal Reserve imposing conditions on master

CONFIDENTIAL

Page 82

1    account holders' access to wire transfer

2    services, correct?

3        A    No, I don't see it that way.

4    Conditions, I think of being bespoke,

5    idiosyncratic, applicable to individual account

6    holders.  These are regulations that apply to all

7    account holders in making their use of Fedwire

8    services.  So I think regulation is the term that

9    I would use to describe the way that the Fed

10   interacted with master account holders in this

11   respect.

12       Q    Are you aware of any instance in which

13   the Federal Reserve publicly claimed that it had

14   the authority to terminate a specific master

15   account holder's access to Fedwire prior to 2015?

16       A    I -- I am not aware of an instance such

17   as that.

18       Q    Okay.  All right.  So we're marching

19   through these covered services here.

20            And with respect to No. 2, the check

21   collection services, you recalled, in the 1980s,

22   the Federal Reserve terminating access to that

CONFIDENTIAL

Page 83

1   service for certain master account holders,

2   correct?

3       A    That's right.

4       Q    And with respect to wire transfer

5   services, is your testimony that through the

6   regulatory framework promulgated by the Fed,

7   they've restricted access to those services to

8   certain master account holders under certain

9   conditions?

10              MR. SCARBOROUGH:  Objection to form.

11              THE WITNESS:  No.  I -- I can't recall

12  the specific contours of its regulatory framework

13  and whether it excluded specific master account

14  holders.  I know that it did create the rules of

15  engagement for all master account holders.  What

16  more those rules had, I would have to -- I'd need

17  to be refreshed by reviewing those rules --

18              MR. MICHAELSON:  Okay.

19              THE WITNESS:  -- before I could

20  comment.

21  BY MR. MICHAELSON

22      Q    Moving on to No. 4, Automated Clearing

CONFIDENTIAL

Page 104

1           A    That's right.

2           Q    But it's also your opinion that from

3      1980 to 2015, the Federal Reserve asserted the

4      authority to terminate a master account holder's

5      access to services?

6           A    That's right.

7           Q    Okay.  Let's go to page -- paragraph --

8      well, paragraph 42 is -- this is legislative

9      history concerning passage of the Monetary

10     Control Act?

11          A    This is the testimony of fed chair --

12     then Fed Chair Paul Volcker discussing his view

13     on the proposed change of law, which he

14     supported.

15          Q    And paragraph -- it sets the

16     legislative history of the Monetary Control Act,

17     correct?

18          A    Yes.  So I would regard that to be as

19     part of the legislative history, yes.

20          Q    And paragraph 43 also contains

21     legislative history on the Monetary Control Act?

22          A    That's right, testimony of one of the

Page 105

1    bill's sponsors.

2         Q    Okay.  And you -- you'd agree that the

3    presentation of legislative history on the

4    Monetary Control Act reflected in your opinion is

5    not complete, correct?

6              MR. SCARBOROUGH:  Objection.

7              THE WITNESS:  Can you define for me

8    what a complete legislative history would be?

9    BY MR. MICHAELSON

10        Q    Well, isn't it the case that part of

11   the legislative history of the Monetary Control

12   Act reflects a concern among Congress that the

13   percentage of banks or Fed members was declining?

14        A    That was the concern of some members of

15   Congress, no question.

16        Q    All right.  Federal membership was

17   declining, correct?

18        A    That's right.

19        Q    And that was a concern for banking

20   regulators, correct?

21        A    For -- the decline in Fed membership

22   rates was a concern for some bank regulators, not

CONFIDENTIAL

Page 106

1    all.

2         Q    And what was the concern?

3         A    The concern here was that in the fall

4    of 1979, the Federal Open Market Committee

5    launched a wholesale reorientation of its

6    monetary policy regime that required more

7    varieties of -- of efforts to control monetary

8    policy.  And Paul Volcker's concern and the

9    concern of some others that the Federal Reserve,

10   although not a concern shared by all, was that

11   the ability to manage this new monetary policy

12   system was limited by the decline in Fed

13   membership.

14        Q    And so -- so fair to say that

15   Volcker's -- well, Volcker's concern was that

16   declining Fed membership could impair the Federal

17   Reserve's ability to implement monetary policy?

18        A    That's right.

19        Q    And so one purpose of the Monetary

20   Control Act was to reinforce the Federal

21   Reserve's ability to implement monetary policy?

22        A    That's right.

CONFIDENTIAL

Page 107

1          Q    And one way that it did that is by

2    empowering the Federal Reserve to impose reserve

3    requirements on depository institutions, correct?

4          A    That's right.

5          Q    Including state-chartered nonmember

6    depository institutions, correct?

7          A    That's right.

8          Q    In that sense, the Monetary Control Act

9    increased the Federal Reserve's authority over

10   the banking system?

11         A    That's right.

12         Q    Okay.  And that's not reflected here in

13   paragraphs 42 and 43 of your report, correct?

14         A    That's right.

15         Q    Okay.  Let's -- let's go to -- well,

16   sticking with paragraph 45 here, you write --

17   it's on the top of page 18 -- that no provision

18   of the Monetary Control Act exempts a particular

19   Federal Reserve payment service or indicates that

20   providing payment services would be a

21   discretionary matter with the Federal Reserve?

22         A    Not that I saw either in -- either in

Page 108

1    any of the bills or in the ultimate statute that

2    they produced.

3         Q    So referring to Exhibit 300, which

4    is -- which is 248a, under (c), subsection

5    (c)(2), there's a clause -- I'll direct your

6    attention to the clause at the end of (c)(2),

7    which says, "except that nonmembers shall be

8    subject to any other terms, including a

9    requirement of balances sufficient for clearing

10   purposes that the Board may determine are

11   applicable to member banks."

12              Do you see that?

13        A    I do.

14        Q    Doesn't that section give the Federal

15   Reserve discretionary authority over access to

16   services?

17              MR. SCARBOROUGH:  Objection to form.

18              THE WITNESS:  No.

19   BY MR. MICHAELSON

20        Q    What -- what does that clause refer to,

21   then?

22        A    So, again, recognizing that I'm, in my

CONFIDENTIAL

Page 117

1   a particular service between 1980 and 2015?

2          A     For solvent institutions --

3          Q     For solvent institutions.

4          A     -- that did not fail?  Again, the

5   instance of the -- the hijacked Central Bank of

6   Bangladesh instance, which would have been a

7   master account holder with a transaction that was

8   blocked, so that would be an example.  That may

9   have been after 2015, though.  I can't -- I can't

10  recall.

11         Q     And how about not an actual assertion

12  of this power, but a -- but a claim to this

13  power?  And that I mean the power to terminate

14  access to a service for a solvent institution.

15         A     I have not seen that claim, and I did

16  not see that claim until 2015, in the instance of

17  the Fourth Corner Credit Union.

18             MR. MICHAELSON:  Okay.  Let's look

19  at -- we'll just do one more document before we

20  break here.  Mark this as Exhibit 301, I guess.

21             (Deposition Exhibit Number 301 was

22             marked for identification.)

CONFIDENTIAL

Page 118

1    BY MR. MICHAELSON

2        Q    So I put in front of you a document

3    marked Exhibit 301, which is a document from the

4    Federal Reserve Bank of Dallas, and it attaches,

5    beginning the fourth page, a publication from the

6    Federal Register.

7             Do you see that?

8        A    I do see that.

9        Q    And this is Federal Register, Volume

10   50, No. 99, page 21120, titled "Policy Statement

11   Regarding Risks on Large Dollar Wire Transfer

12   Systems."

13            Do you see that?

14       A    I do.

15       Q    This is a policy that is set with an

16   effective date in 1986.

17            Do you see that?

18       A    I do.

19       Q    Okay.  And, actually, the Fed Register

20   notice is at the top of the page.  It's May 22nd,

21   1985.  Do you see this?  Do you see that?

22       A    Where are you --

Page 119

1       Q    Just at the top of the page.

2       A    Oh, yeah.  I see it.  Yeah.

3       Q    Okay.  Is -- earlier you referred to a

4  policy statement from around this time period

5  regarding money transfers.

6            Is this the policy that you were

7  referring to?

8       A    It is.

9       Q    Okay.  So you're familiar with this

10 policy?

11      A    I am.

12      Q    You've seen it before?

13      A    I have.

14      Q    And it's -- and it's public?

15      A    It is.

16      Q    What -- what is daylight -- what are

17 daylight overdrafts?

18      A    I'm not exactly sure of the precise

19 definition.  My general sense is that an

20 overdraft that occurs in the same day with

21 additional transactions being ordered on that

22 same account during that same day, but I'm not

Page 120

1    certain that that's true.

2         Q    Okay.  I'll refer you to page 21123.

3    In the bottom -- bottom right-hand corner, this

4    provides, "The Board is still concerned with

5    these overdrafts, and believes that it is

6    appropriate to take effective steps to control

7    risks to the Federal Reserve Banks by placing

8    more effective limits on Fedwire daylight

9    overdrafts."

10            Do you see that?

11        A    I do.

12        Q    Okay.  And do you agree that -- that

13   this -- this policy is -- was public at the time?

14        A    Yes.

15        Q    And it reflects an assertion of Federal

16   Reserve authority to impose conditions and

17   restrictions on access to priced services?

18            MR. SCARBOROUGH:  Objection to form.

19            THE WITNESS:  Again, I would say that I

20   see the word "conditions" and "regulations" as

21   performing very different purposes for the Fed's

22   assertions of authority.  I hear this as creating

1    regulation rather than conditionality, which I

2    would regard as -- conditions I would think of as

3    more bespoke and idiosyncratic.

4            I hear -- I see in this document the

5    regulation and the record of that regulation even

6    as it's described as a policy statement in the

7    Federal Register for rules that apply to the

8    entire system as opposed to conditions placed on

9    individual account holders.

10      Q    But -- but doesn't this regulation

11   reflect an assertion of the Federal Reserve to

12   restrict individual institutions access to

13   services based on risk presented by that

14   institution?

15           MR. SCARBOROUGH:  Objection to form.

16           THE WITNESS:  I don't think I

17   understand how that -- how your last statement

18   would be correct in the sense -- so the -- the

19   conditions that I've seen the Federal Reserve

20   impose on an account holder's master account are

21   the most -- the most striking example is with the

22   American Samoa Bank.  Those I would regard as

Page 122

1   conditions.  They're specific to the American

2   Samoa Bank.  They cut off access to the discount

3   window.  They require additional supervisory

4   impositions.  That I see as conditions.  I don't

5   see -- I've never seen any policy statement or

6   regulatory statement as relevant to the American

7   Samoa Bank.

8           As I review this 1985, '86 document, I

9   would say that this imposes a regulatory system

10  on the use of Fedwire as opposed to

11  conditionality, but I recognize, too, that I am

12  defining the terms as I use them.

13  BY MR. MICHAELSON

14      Q    Well, this -- this policy, you'd agree,

15  reflects the Federal Reserve's assertion of the

16  power to terminate access to priced services to

17  specific institutions based on the risk presented

18  by those institutions?

19          MR. SCARBOROUGH:  Objection to form.

20  BY MR. MICHAELSON

21      Q    Do you agree?

22      A    Can you point me to where -- the

Page 136

1    intend for the Federal Reserve to usurp the

2    determination from other supervisory authorities

3    that had been given that authority in other

4    statutes.

5    BY MR. MICHAELSON

6        Q    But as you've said, Congress -- it was

7    not Congress's intent to eliminate entirely the

8    Federal Reserve System to -- the Federal

9    Reserve's power to conduct risk assessments of

10   institutions with master accounts, correct?

11       A    Can you point to me when -- to when I

12   said that sentence?  I don't -- I don't believe I

13   said it that way.

14            The way I would say it is that Congress

15   did not prevent -- again, without getting to the

16   legal determination, the framers of the MCA did

17   not engage substantially with the question of the

18   Fed's risk assessments around its priced

19   services.  And, again, I can't recall any

20   instances of that discussion.

21       Q    And at least we've seen here in Exhibit

22   301 that as of 1985, the Federal Reserve was

Page 137

1    claiming the power to conduct such risk

2    assessments, correct?

3                 MR. SCARBOROUGH:  Objection.

4                 THE WITNESS:  The -- I read Exhibit 301

5    to contain a regulation regarding what the Fed

6    shall do in the event of daylight overdrafts and

7    what to do to manage the question of daylight

8    overdrafts.

9    BY MR. MICHAELSON

10       Q    Okay.  And to prohibit the use of

11   Fedwire where an institution's use of Fedwire

12   would prevent risk to the Reserve Bank?

13                MR. SCARBOROUGH:  Objection.

14                THE WITNESS:  Again, just reading from

15   it, I would say that the 1985 policy statement

16   has a regulation that asserts the Reserve Bank's

17   right to protect its risk exposure from those --

18   those banks.

19   BY MR. MICHAELSON

20       Q    Okay.  I'm handing you a document

21   marked Exhibit 302, which is Operating Circular 1

22   from 1998.

CONFIDENTIAL

Page 138

1        Are you familiar with OC1?

2    A    I am.

3    Q    And have you seen -- this is from 1998.

4         Have you seen this version before?

5    A    I have.

6    Q    And this was public, right?

7    A    It -- it is.

8    Q    Okay.  I'd direct your attention to

9    Section 1.1, called "Scope."

10        Third paragraph, it says, "Your master

11   account is subject to Federal Reserve policies

12   such as those on payment system risk, reserve

13   balances and clearing balances as they may be

14   revised from time to time."

15        Do you see that?

16   A    I do.

17   Q    And this is a reference to policies

18   like the statement on large dollar wire transfers

19   that we were just looking at?

20   A    That's right.

21   Q    Okay.  So this -- this is also another

22   example of the Federal Reserve asserting the

Page 139

1    power to -- asserting the power to decide whether

2    to grant use of priced service, correct?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  No.

5    BY MR. MICHAELSON

6         Q    Well, it's -- it's -- it's saying that

7    your master account is subject to the policy that

8    we were just looking at, right?

9         A    That's right.

10        Q    And in that policy, the Federal Reserve

11   asserted the authority to conduct risk

12   assessments to protect -- for the purpose of

13   protecting Reserve Banks from risk presented by

14   individual institutions, right?

15             MR. SCARBOROUGH:  Objection.

16             THE WITNESS:  That's right.

17   BY MR. MICHAELSON

18        Q    Okay.  And where risk was presented,

19   the Federal Reserve was claiming the authority to

20   cut off use of Fedwire to mitigate risk, correct?

21             MR. SCARBOROUGH:  Objection.

22             THE WITNESS:  Again, we have a

CONFIDENTIAL

Page 140

1    different view on -- on the question of what

2    constitutes cutoff.  And why I said no to my --

3    in my answer to your first question was because

4    you used the word "grant," which I took to be a

5    verb indicating access.

6            I don't read the 1985 policy statement

7    and don't see in the '98 Operating Circular 1 the

8    assertion that the Fed could reimpose discretion

9    as it has with Fed membership status on access to

10   accounts before 1998 and the master account

11   thereafter.

12   BY MR. MICHAELSON

13       Q    Okay.  I'll refer you to Section 2.3,

14   entitled "Establishing a Account," and the last

15   sentence of the first paragraph is "All master

16   accounts are subject to Reserve Bank approval."

17           Do you see that?

18       A    I do.

19       Q    So as of 1998, the Federal Reserve was

20   taking the position that master accounts are

21   subject to approval by a Reserve Bank?

22       A    That's right.

CONFIDENTIAL

Page 141

1        Q    And in Section 2.8 on the following

2    page, on the right-hand side of the page, middle

3    of top paragraph there, there's a sentence that

4    reads, "We may close your master account or

5    terminate our approval of a pass-through

6    relationship at any time."

7             Do you see that?

8        A    I do see that.

9        Q    So as of 1998, the Federal Reserve was

10   asserting the power to close an institution's

11   master account at any time?

12       A    That's right.

13            MR. MICHAELSON:  All right.  Let's mark

14   this.

15            (Deposition Exhibit Number 303 was

16            marked for identification.)

17   BY MR. MICHAELSON

18       Q    I've put in front of you a document

19   marked 303.  It's an exhibit marked 303.  It's

20   federal -- from the Federal Register, entitled

21   "Policy on Payments System Risk," Federal

22   Register, Volume 69, No. 230, 69926.  This is

CONFIDENTIAL

Page 142

1    dated December 1, 2004.

2            Do you see that?

3        A    I do.

4        Q    Are you familiar with this policy on

5    payment system risk from 2004?

6        A    Generally speaking, yes.  I haven't

7    examined it thoroughly.

8        Q    When's the last time you reviewed it?

9        A    I glanced at it yesterday.  Before

10   that, it had been -- it had been several months.

11       Q    Okay.  Direct your attention to the

12   page 69929.  On the far left -- left column,

13   first full paragraph, it says, "Part II of this

14   policy governs the provision of intraday or

15   daylight credit in accounts of the Reserve

16   Banks."

17           Do you see that?

18       A    I do.

19       Q    And it says that it "sets out the

20   general methods used by the Reserve Banks to

21   control their intraday credit exposures."

22           Do you see that?

CONFIDENTIAL

Page 143

1       A    I do.

2       Q    Do you agree that as of 2004, Reserve

3  Banks were applying methods to control their

4  intraday credit exposures?

5       A    I am not familiar with what the Federal

6  Reserve Banks were doing in terms of their risk

7  exposure assessments for account holders.  I'm

8  familiar only with the policy statement from 2004

9  describing -- describing it.  So I'm familiar

10  with the policy statement, but not the --

11       Q    Not the actual --

12       A    -- practice itself.

13       Q    -- practice.  But you have no reason to

14  dispute that Reserve Banks were, in fact,

15  undertaking methods to control their intraday

16  credit exposures, correct?

17       A    No reason to -- I have no reason to

18  dispute it, but I -- again, I don't -- I haven't

19  evaluated what those methods are.

20       Q    Okay.  Do you know if those methods

21  included assessments of whether individual

22  institutions presented risk to the Reserve Bank?

Page 145

1          Q     Okay.  And continuing on in Section II,

2     flip forward a couple pages to 69935.  There's a

3     Section C on net debit caps.

4                Are you familiar with a net debit cap?

5          A     I am not.

6          Q     Do you know what a net debit cap is?

7          A     I do not.

8          Q     All right.  The last -- in the

9     paragraph underneath "Net Debit Caps," the last

10    sentence, it says, An institution must be

11    financially healthy --

12         A     I don't see where you are.  I'm sorry.

13         Q     Oh, so underneath "Net Debit Caps," No.

14    1 is Definition."

15         A     Yeah.

16         Q     Okay.  The last sentence of the first

17    paragraph there.

18         A     Yes, I see.

19         Q     "An institution must be financially

20    healthy and have regular access to the discount

21    window in order to adopt a net debit cap greater

22    than zero to qualify for the filing exemption."

CONFIDENTIAL

Page 146

1          Do you know what this refers to?

2      A     I know in general terms what

3   constitutes regular access to the discount

4   window.  I have a general sense of what a net

5   debit cap is, but I don't know what the

6   qualification for a filing exemption is.

7      Q     Okay.  Go ahead to 69937.  The upper

8   left corner, the last sentence of the -- of the

9   paragraph in the upper left corner, it says, "For

10  example, if the institution's level of daylight

11  overdrafts constitutes an unsafe or unsound

12  banking practice, the Reserve Bank would likely

13  assign the institution a zero net debit cap and

14  impose additional risk controls."

15          Do you see that?

16     A     I do.

17     Q     Would you agree that this reflects the

18  Federal Reserve's assertion of power over use

19  of -- no, strike that.

20          Would you agree that this reflects, as

21  of 2004, the Federal Reserve's assertion of power

22  over the use of priced service?

CONFIDENTIAL

Page 147

1         A     Over its use, yes.

2         Q     Okay.  Including the power to impose

3    risk controls to mitigate risk to the Reserve

4    Bank?

5         A     If we're defining zero in the net debit

6    cap and as a risk control, which the policy

7    statement seems to do, then yes.

8         Q     Okay.  Are you familiar with OC3,

9    Operating Circular 3?

10        A     Not by its name.

11        Q     But do you have a general understanding

12   of what OC3 relates to?

13        A     No.  I would need to review it.

14        Q     When's the last time that you reviewed

15   OC3?

16        A     If you could -- if I could see it, I

17   could tell you.  I don't know what OC3 -- I mean,

18   I know it's an operating circular, but I would

19   need to see it before I could answer the

20   question.

21        Q     Okay.  How about OC4?  Do you know what

22   OC4 is?

CONFIDENTIAL

Page 148

1        A    Again, not by its name.

2        Q    Sitting here today, you don't know what

3    OC4 relates to?

4        A    That's right.

5        Q    Okay.  And how about OC5?  Are you

6    familiar with OC5?

7        A    No.

8        Q    Okay.  So referring back to your --

9    referring back to your paragraph 59 here, you say

10   you found no evidence --

11       A    Can you give me a second to --

12       Q    Yeah, sure.

13       A    -- go back?

14       Q    It's Exhibit 299, your report, at page

15   25, paragraph 59.

16       A    Okay.  Paragraph what?

17            MS. CARLETTA:  Page 25, paragraph 59.

18            THE WITNESS:  Got it.

19   BY MR. MICHAELSON

20       Q    So you're opining here that you found

21   no evidence of the Federal Reserve asserting

22   power to decide whether to grant priced services

Page 149

1    to legally eligible depository institutions,

2    correct?  That's your -- that's your opinion

3    here?

4         A    That's right.

5         Q    But would you agree that between 1980

6    and 2015, the Federal Reserve was asserting the

7    power to decide whether all priced services would

8    be available to all legally eligible,

9    state-chartered depository institutions?

10             MR. SCARBOROUGH:  Objection to form.

11             THE WITNESS:  No, I would not.  I would

12   say that between 1980 and 2015, at several

13   different junctures, the Federal Reserve issued

14   policy statements and regulations governing the

15   general provision of its priced services,

16   including some regulations that governed the use

17   of those services.

18             The statement that I make -- the

19   opinion that I offer in paragraph 59 of my report

20   refers to the idiosyncratic decisions to grant

21   priced services to individual legally eligible

22   depository institutions.

CONFIDENTIAL

Page 150

1    BY MR. MICHAELSON

2        Q    Well, but the -- but the regulations

3    that you're referring to included regulations in

4    which the Federal Reserve asserted the power to

5    conduct risk assessments of specific

6    institutions, correct?

7        A    That's right.

8        Q    And the power to impose restrictions on

9    an individual institution's use of services based

10   on the risk presented by that institution,

11   correct?

12       A    The key difference here between my

13   opinion and those regulations is that I am

14   referring to assertion of authority over specific

15   requests to access priced services, the

16   reciprocal for which is the granting of those

17   priced services, not to the regulatory framework

18   that might govern its use.

19            The policy statements that we've read

20   together today refer to the regulatory framework

21   for the use of priced services, including risk

22   assessments, over their use.  In the extreme

Page 187

1    has issued countless banking -- pieces of banking

2    legislation, each with -- especially after 1935

3    and the permanent institution of the FDIC, with a

4    specific lane of movement for the FDIC, OCC,

5    Federal Reserve, and state banking authorities,

6    and so the MCA comes from that legal context.

7            That legal context means that the very

8    kinds of assessments that we're talking about

9    here are a supervisory context for the

10   specifically designated supervisor to respond to.

11   In some cases, that would be the Fed, in some

12   cases, the OCC, in others, the FDIC, and in

13   others, the state banking authorities.

14           But for the Federal Reserve to then say

15   that it has the authority or the -- or it would

16   adopt the practice of usurping these other

17   entities within a financial system is something

18   that I am not aware of anyone around the passage

19   of the MCA even contemplating, including at the

20   Federal Reserve, because it had never been done

21   in that way before.

22        Q    If every bank is unique then isn't it

CONFIDENTIAL

Page 188

1   necessary for Reserve Banks to undertake an

2   individualized risk assessment of each

3   institution to assess the risk presented by that

4   institution to the Reserve Bank?

5        A    Most emphatically, no.  What it should

6   do is defer to those exact determinations by the

7   appropriately situated authority to -- that has

8   been put in place to assess precisely that risk

9   profile.  And, again, that might be the Fed if

10  we're talking about member banks, bank holding

11  companies, financial holding companies, et

12  cetera, but it might be the OCC, and it might be

13  the FDIC, and it might be a state banking

14  authority.

15       Q    So for Custodia that would be the

16  Wyoming Division of Banking?

17       A    That's right.

18       Q    And so it's your opinion that the

19  Federal Reserve Bank of Kansas City has to defer

20  to Wyoming Division of Banking's assessment of

21  the risk that Custodia presents to the Federal

22  Reserve Bank of Kansas City?

CONFIDENTIAL

Page 189

1        A    That's right.  That deference is the

2   beating heart of the dual banking system.

3        Q    Okay.  And it's your opinion that

4   Congress intended through the Monetary Control

5   Act to empower states to be state-chartered --

6   states to be the gatekeepers of access to Federal

7   Reserve services?

8        A    Well, the Constitution does -- does

9   that even preceding the creation of the Federal

10  Reserve System by creating state banks.

11            The Federal Reserve System was created

12  institutionally on top of a system of

13  state-chartered banks and national-chartered

14  banks, and so the order of operations is

15  reversed.  The states come first and then the

16  Federal Reserve.

17       Q    So referring back to the guidelines,

18  principle 2, here the Board is saying that

19  Reserve Banks should -- connection with an

20  account access request should consider whether

21  the institution presents or creates risk to the

22  Reserve Bank.

CONFIDENTIAL

Page 190

1        Do you see that?

2    A    Which -- which subpoint?  Sorry.

3    Q    Principle -- Principle No. 2 on page

4  36.

5    A    I see that.  And is there a subpart

6  that you're reading or just --

7    Q    No, just --

8    A    -- the top?  Yeah.

9    Q    -- the -- just Principle No. 2.

10   A    Yeah.

11   Q    And it's your opinion that what

12  Congress intended with the Monetary Control Act

13  is that this consideration be handled by the

14  state banking authority?

15   A    No.  To be handled by the Federal

16  Reserve for member banks and for bank holding

17  companies and financial holding companies, for

18  the FDIC for state, nonmember banks that were

19  members of the deposit insurance corporation or

20  the system, for the Comptroller of the Currency

21  for national banks and for state banking

22  authorities for those few banks that were not

Page 196

1    institution imposes risk.  Risk cannot be

2    eliminated.  They all do.  That was true in 1980,

3    and it's true in 2023.

4          And what the framers of the MCA were

5    saying is the Federal Reserve is now out of the

6    business of conditioning access to its priced

7    services on its own assessments of what is good

8    and right and just and true for the Federal

9    Reserve System or for America or for the world.

10   It was saying that we are going to bring the

11   entire dual banking system into that threshold

12   assessment and make those priced services

13   available to all.

14        Q    So you're saying that every snowflake

15   gets not only an account, but also the use of the

16   services therein, even if they present risk to

17   the Federal Reserve System?

18        A    And here again, that is a tautology,

19   because every bank presents risk.  Every single

20   bank presents risk.  There's no such thing as a

21   risk-free bank, even one that doesn't have

22   customers, and so, in that sense, saying that

Page 197

1   every bank that presents risk that is legally

2   eligible as a depository institution is the same

3   as saying every legally eligible depository

4   institution.

5        Q    I see.  And so it's your opinion this

6   is what the framers of the Monetary Control Act

7   intended, that every snowflake gets to use the

8   services, even if they present risk to the

9   system?

10       A    So, again, the term "snowflake bank" is

11  a term of art at this table.  I quite like it.

12  It's definitely not something that Senator

13  Proxmire was thinking about, but he was thinking

14  very carefully about the question of, in his

15  words, open access.  And so the idea that the

16  Federal Reserve would then be able to sneak in a

17  risk assessment that would block access as though

18  access were still on the pre-1980 membership

19  status would be inconsistent with the intentions

20  of Senator Proxmire and his associates and that

21  Congress.

22       Q    Okay.  And it's also your opinion if

Page 198

1    the Reserve Bank is conducting an individualized

2    risk assessment of a bank and determines that

3    that bank had -- does present risk to the system

4    that it can restrict use of services, but not

5    entirely?

6         A    It can -- I don't express the opinion

7    that it can do so in an idiosyncratic, bespoke

8    fashion.  I do express the opinion that through

9    regulation creating clear parameters of the use

10   of its priced services that does not constitute

11   the elimination of access, either in effect or in

12   fact, that that regulatory framework is

13   consistent with the way the Fed has responded to

14   the MCA since its passage.

15              Again, I don't make a legal

16   determination about whether it has the authority

17   to do so, as your question posed, but about

18   whether it's consistent with practice.

19              MR. MICHAELSON:  Okay.  It's about --

20   we've been going over an hour, and it's about

21   noon.  Should we continue for a bit or break for

22   lunch?  Do you have -- do you have a preference?

CONFIDENTIAL

Page 199

1              MR. SCARBOROUGH:  I leave it up to you.

2              THE WITNESS:  I mean, I'm good.

3              MR. SCARBOROUGH:  Do you want to -- do

4    you want to take like five minutes and then do

5    another 30, 45 minutes, and then grab lunch or --

6              MR. MICHAELSON:  Well, whatever --

7    whatever you prefer.

8              THE WITNESS:  You guys are the ones

9    that have been to this rodeo before.  I don't

10   know.  But I'm comfortable going or breaking or

11   --

12             MS. CARLETTA:  Lunch is ready.

13             MR. MICHAELSON:  Yeah.

14             THE WITNESS:  -- whatever you want.

15             MR. SCARBOROUGH:  Is lunch ready?

16             MR. MICHAELSON:  Yeah.

17             MS. CARLETTA:  Lunch is ready.

18             MR. MICHAELSON:  Lunch is ready.  Why

19   don't we break for lunch, and we'll come back.

20             THE WITNESS:  Okay.

21             (Whereupon, at 12:00 p.m., a

22             luncheon recess was taken.)

1    framework in the way that you and I might.

2         Q    So if an institution requests a master

3    account from a Reserve Bank -- well, strike that.

4             A Reserve Bank is exposed to risk

5    arising from the provision of services to an

6    entity with a master account, correct?

7         A    That's right.

8         Q    And is it your opinion that there are

9    restrictions on Reserve Banks' ability to manage

10   that risk?

11        A    I don't offer legal opinions of what

12   the Fed can and cannot do.  I can opine that the

13   intentions of the framers of the MCA intended to

14   remove the Federal Reserve from exercising risk

15   management or other discretionary practices to

16   turn access to services into a quasi-membership

17   status.  And so, in that sense, what the Federal

18   Reserve has been instructed to do, at least by

19   the intentions of the MCA's framers, is to use

20   the risk assessments that had been performed by

21   either the sister regulatory and supervisory

22   organizations at the federal level or by the

CONFIDENTIAL

Page 216

1    state authorities in our federal system of dual

2    banking.

3         Q    When you say the framers of the MCA,

4    who -- who are you referring to?

5         A    Members of Congress, other participants

6    who lobbied for its -- its passage, people like

7    Paul Volcker, William Proxmire, people like that.

8         Q    Okay.  And so you are expressing the

9    opinion that they intended to restrict Reserve

10   Banks' ability to manage the risk presented by

11   the grant of master accounts to -- to

12   institutions?

13              (Cell phone interruption.)

14              MR. SCARBOROUGH:  Objection.

15              THE WITNESS:  Are you objecting to

16   yourself?  Okay.

17              MR. MICHAELSON:  He was objecting to

18   me.

19              THE WITNESS:  Yeah.

20   BY MR. MICHAELSON

21        Q    It is -- it is your opinion that the --

22   that the intent behind the Monetary Control Act

Page 217

1    was to restrict Reserve Banks' ability to manage

2    the risk presented by master accounts?

3              MR. SCARBOROUGH:  Objection.

4              THE WITNESS:  No, not in those terms.

5    It's my testimony that the framers of the MCA

6    intended for the Federal Reserve to engage with

7    other government entities to engage in whatever

8    risk assessments it felt it needed to engage with

9    respect to depository institutions that it, prior

10   to 1980, might engage bilaterally with respect to

11   access to those services.

12             After 1980, the expectation by the

13   framers would be that the Federal Reserve engage

14   on those very questions, should they have them,

15   with other -- other government entities.

16             But here again, I'm not citing any

17   specific statement to that effect because this is

18   not a question that they were contemplating in

19   terms of the specific processes of risk

20   assessment or counterparty risk or -- or daylight

21   overdrafts or the like.  I didn't see discussion

22   at that level of specificity, so my opinion is at

Page 218

1    a level of abstraction higher.

2    BY MR. MICHAELSON

3         Q    Did the Monetary Control Act impose on

4    states any new obligations to assess risk

5    presented to Reserve Banks by the issuance of

6    master accounts and services?

7         A    I'll leave the legal interpretation of

8    the MCA to the Court to determine, so I can't --

9    I don't have an opinion about what the MCA

10   imposed or did not impose.

11        Q    You don't have an opinion on what the

12   MCA imposed or did not impose?

13        A    I don't have an opinion about the legal

14   interpretation of the scope of the MCA in terms

15   of the authorities or restrictions that it

16   placed.

17        Q    Okay.  But you are opining on the

18   intent -- the legislative intent behind the

19   statute, right?

20        A    (Nodding.)

21        Q    And did --

22             MS. CARLETTA:  Hold on.  You have to

Page 219

1   answer verbally.  Sorry.

2           THE WITNESS:  Yes, that's right.

3   BY MR. MICHAELSON

4       Q    And did the legislators who passed the

5   MCA intend to impose on states the obligation to

6   assess risk presented to Reserve Banks by the

7   issuance of master accounts to state-chartered

8   nonmember institutions?

9       A    It's my opinion that that is the

10  implication of the framers' intention, although

11  they did not state that exact fact, so I'm not

12  quoting one of the MCA's framers to that effect.

13          What I -- the expert opinion that I

14  offer in terms of the legislative history of the

15  MCA is that the framers intended to remove the

16  Federal Reserve from its position, former

17  position, of engaging in precisely these kinds of

18  assessments and to leave those assessments to the

19  other relevant governmental agencies at the state

20  or federal level.

21      Q    So you're saying that it was an

22  unintended consequence of the Monetary Control

Page 220

1   Act?

2        A    No.

3             MR. SCARBOROUGH:   Objection.

4   BY MR. MICHAELSON

5        Q    You're saying it's just an unstated

6   implication of the Monetary Control Act?

7             MR. SCARBOROUGH:   Objection.

8             THE WITNESS:   I'm saying it's an

9   implication of their decision to remove the

10  Federal Reserve from engaging in threshold-level

11  evaluations about whether legally eligible

12  depository institutions can gain access to

13  Federal Reserve services.

14  BY MR. MICHAELSON

15       Q    So did the framers of the MCA, in your

16  view, intend that result or not?

17       A    They did intend that result.

18       Q    They did?

19       A    Yes.

20       Q    While at the same time imposing no new

21  obligations on the states to consider risk to

22  Reserve Banks?

CONFIDENTIAL

Page 221

1          A     The obligations on the states that did

2     exist were defined primarily by state law, except

3     insofar as these state depository institutions

4     sought to gain membership either to the federal

5     deposit insurance system or to the Federal

6     Reserve system.

7          Q     To your knowledge, is there any statute

8     that requires the Wyoming Division of Banking to

9     consider risks to the Reserve Bank of Kansas City

10    presented by state-chartered institutions subject

11    to its supervision?

12         A     Not to my knowledge, no.

13         Q     Okay.  In front of you is the condition

14    monitoring guidelines, 2019.  It's exhibit --

15    Exhibit 55 in this case.  And this section on

16    page 6 concerns risk ratings.

17               Is -- is it your understanding that the

18    implication of the Monetary Control Act is that

19    these risk ratings should be assessed and applied

20    by the Wyoming Division of Banking and not the

21    Reserve Bank of Kansas City for state-chartered

22    nonmember institutions?

Page 222

1          MR. SCARBOROUGH:  Objection.

2          THE WITNESS:  I don't offer an opinion

3    about the soundness or lack thereof of these

4    specific categories, no.

5    BY MR. MICHAELSON

6     Q    My -- my question is:  What did -- when

7    Congress passed the Monetary Control Act, did it

8    intend for Wyoming to take over the

9    responsibilities reflected in this exhibit?

10    A    So a few parts in my answer to your

11    question.  So the first is, I'm not aware that

12    these responsibilities existed in 1980 as they

13    are defined here, so I don't think that the

14    framers of the MCA had these specific

15    responsibilities in mind.

16          It is my testimony that the framers of

17    the MCA intended for the Federal Reserve to defer

18    to the supervisory assessments made by the

19    supervisors, which the Federal Reserve was not

20    for nonmember banks other than for holding

21    companies and -- and others identified by

22    statute.

CONFIDENTIAL

Page 235

1    banking history, including the passage of various

2    statutes.

3         Q    Are you expressing an opinion about

4    congressional intent on any statute other than

5    the Monetary Control Act?

6         A    Not -- not as such, except in service

7    of the opinion that I offer about what the

8    framers of the MCA intended to do.

9         Q    Are you expressing an opinion about

10   the -- are you familiar with Section 342 that

11   says Reserve Banks may accept deposits?

12        A    Of the Federal Reserve Act, yeah.

13        Q    Yes?

14        A    Yes.

15        Q    You're familiar with that?

16        A    Yes.

17        Q    Are you expressing an opinion on the

18   congressional intent behind that opinion?

19        A    No.

20        Q    Okay.  And are you able to point to any

21   federal statute that authorizes Reserve Banks to

22   take actions to mitigate risk to that Reserve

CONFIDENTIAL

Page 236

1   Bank presented by state-chartered nonmember banks

2   with master accounts?

3        A    I don't offer opinions about what

4   statutes authorize or don't authorize, which I

5   would regard as a legal conclusion left to the

6   Court to decide.

7             MR. MICHAELSON:  Let's mark this

8   document here.

9             (Deposition Exhibit Number 304 was

10            marked for identification.)

11  BY MR. MICHAELSON

12       Q    I'm handing you a document marked 304,

13  Exhibit 304, which is entitled -- entitled

14  "Guidance for Federal Reserve Financial Services

15  Applicants That Are Deemed High Risk by the

16  Federal Reserve Bank of New York."

17            Do you see that?

18       A    I do.

19       Q    And I'll refer you to the end.  At the

20  very end, you'll see that it's dated August 18,

21  2014.  Do you see that?

22       A    I do.

Page 237

1        Q    I'll give you a moment to review it,

2   and my question is whether you've seen it before.

3        A    May I ask, this is a public document?

4        Q    It is a public document.

5        A    It looks familiar to me, but I don't

6   know that I have -- if I have relied upon it for

7   my report.  I don't think that I did, but it is

8   very possible that I have seen it before.

9        Q    Okay.  And it says in the second

10  paragraph that for each high-risk applicant for

11  Federal Reserve services, the Bank will conduct

12  enhanced due diligence and risk assessment, and

13  the Bank may take steps to mitigate risks posed

14  by the applicant.

15             Do you see that?

16        A    I do.

17        Q    Are you expressing an opinion on this

18  case on whether, in 2014, the Federal Reserve

19  Bank of New York had statutory authority to do

20  that?

21        A    I don't express opinions about whether

22  the -- what statutory authority the Federal

Page 238

1   Reserve or any of its Reserve Banks does or does

2   not have.

3        Q    Okay.  But it is your opinion, though,

4   that this conduct by the Federal Reserve Bank of

5   New York would be inconsistent with the intent of

6   the drafters of the Monetary Control Act?

7        A    Not necessarily.  It depends entirely

8   on what is meant by the steps taken to mitigate

9   risk, risks posed by the applicant.

10       Q    I see.  So if those steps to mitigate

11  risk included restricting access to a service to

12  mitigate risk without entirely eliminating use of

13  the service, that could be consistent with the

14  Monetary Control Act?

15            MR. SCARBOROUGH:  Objection to form.

16            THE WITNESS:  It might be.  I'd need to

17  know more about what -- the nature of the service

18  restrictions, the process through which that

19  conclusion was reached and what relationship the

20  Federal Reserve Bank had with the supervising

21  authority, supervising authority of the legally

22  eligible depository institution.

CONFIDENTIAL

Page 244

1    master account based on the Fed's own assessments

2    of credit and other risks may be entirely

3    consistent with the Fed's historical practice

4    following 1980, correct?

5         A    I -- I doubt that very much.  I do not

6    think that is true, in fact.

7         Q    So you are expressing an opinion on

8    whether -- whether the Fed had a historical

9    practice of conducting an evaluation like this

10   prior to 2022?

11        A    So in my search of the news coverage of

12   accounts and master accounts, I found documents,

13   for example, from the Dallas Fed and news

14   statements from the Cleveland Fed talking about

15   the fact that new applications for a master

16   account would be acted upon within days.  The

17   idea that this would happen so quickly seems

18   inconsistent to me to the searching evaluation

19   that I described following the promulgation of

20   these guidelines in 2022.

21        Q    I see.  So you relied -- and you relied

22   on those documents from -- it was the Dallas Fed?

CONFIDENTIAL

Page 245

1        A    I believe it was the Dallas Fed and

2    then statements again from the Cleveland Fed and

3    perhaps the Dallas Fed, too, in the news.

4        Q    All right.  Have you seen Exhibit 304?

5        A    What is that?

6        Q    Guidance for Federal Reserve Financial

7    Services Applicants Deemed High Risk by New

8    York -- Reserve Bank of New York.

9        A    I see that now.  I didn't rely on this

10   for my report, but having gone through it with

11   you today, it doesn't change my opinion.

12       Q    Okay.  It doesn't change your opinion

13   even though it says on page 1, for each high-risk

14   applicant, the Reserve Bank of New York will

15   conduct enhanced due diligence and a risk

16   assessment?

17       A    The -- I do see that and I don't -- it

18   doesn't change my opinion because I don't know

19   how they reached the determination of high-risk

20   applicants.  It may have been something -- and I,

21   in fact, assume that it would be -- something

22   that occurred well after the fact that an account

Page 246

1    had been given to a legally eligible depository

2    institution, and that fact makes this

3    inconsistent with the searching evaluation that's

4    described in 2022 to gain access to those

5    services in the first instance.

6              Now, it may well be that the policy

7    document that we're seeing here refers to that

8    access in general, but the document itself

9    doesn't stand for the proposition of the

10   individual assessments that may or may not have

11   occurred.

12        Q    Okay.  You see, though, on the first

13   paragraph it says that it applies where a

14   financial institution is, quote, seeking an

15   account or requesting to use one or more

16   financial services, right?

17             Do you see that?

18        A    I do see that.

19        Q    Does that change your opinion?

20        A    It doesn't change the opinion offered

21   in my expert report.  The opinion I offer in my

22   expert report about whether there's a searching

Page 247

```
 1    evaluation for the attempts to execute a master
 2    account agreement is not contradicted by the 2014
 3    New York Fed policy statement, because the New
 4    York Fed policy statement, it refers to those
 5    applicants who are already deemed high risk at
 6    the point of application as opposed to an
 7    undertaking that reviews that status.
 8              I do not see anything in the New York
 9    document that suggests all -- all attempts to
10    execute a master account agreement were subject
11    to the evaluations described in this document,
12    only, in fact, to those that were considered to
13    be a, quote-unquote, high-risk applicant.
14        Q    Well, the second paragraph said that
15    the bank deemed certain categories of financial
16    institutions seeking an account to be high-risk
17    applicants.
18              Do you see that?
19        A    I do see that.
20        Q    So isn't it -- isn't it New York that's
21    deciding -- the Federal Reserve Bank of New York
22    deciding whether an applicant is a high-risk
```

Page 248

1    applicant, and if so, conducting enhanced due

2    diligence and risk assessment before providing

3    that applicant access to services in 2014?

4         A    As I look at the rest of the document

5    and see the kinds of high risk that they're

6    talking about, it refers to AML and OFAC.  AML

7    refers to Anti-Money Laundering and OFAC refers

8    to the Office of Foreign Asset Control.  And the

9    kinds of organizations that are deemed high risk,

10   besides a catch-all category at the end, refers

11   to those institutions that are either chartered

12   or exist outside of the United States, which is

13   indeed what an Edge Act is -- Edge Act or

14   agreement corporation and the like.

15            I would regard this, then, to be

16   applicable not to, necessarily, those,

17   quote-unquote, legally eligible depository

18   institutions as that category was -- to the

19   extent that I understand that category in line

20   with the intentions -- intentions of the framers

21   of the MCA, because this is dealing with foreign

22   banks, largely, which is not the primary concern

CONFIDENTIAL

Page 249

1    of the MCA.

2         Q    You interpret this as applying largely

3    to foreign banks?

4         A    I do.

5         Q    So it's your opinion that as you read

6    this today, this is consistent with the framers'

7    intent of the Monetary Control Act?

8              MR. SCARBOROUGH:  Objection to form.

9              THE WITNESS:  As I read this today, it

10   is appropriate -- it is consistent with the --

11   with the framers of the Monetary Control Act

12   because the high-risk applicants identified by

13   the New York Fed, all of which would be

14   supervised by the New York Fed, not by individual

15   states in the United States or by the Comptroller

16   of the Currency or the FDIC.

17   BY MR. MICHAELSON

18        Q    So it's your testimony that this

19   doesn't apply to state-chartered nonmember banks?

20        A    I don't offer testimony about the

21   application of the Fed's own policy statements or

22   regulations, which I would regard as a legal

Page 402

1     proposed -- each bank is unique in its --

2          Q     I see.

3          A     -- risk profile, and so I don't know

4     how I would answer that question.

5          Q     So your view, then, is that this --

6     this notification -- this -- this comment in the

7     S letter about preliminary notification to Board

8     staff, which makes reference to requests that

9     raise novel issues, that that would encompass

10    every request because every bank raises novel

11    issues?

12         A     Elsewhere in either the S letter or in

13    the guidelines -- I think it's the S letter -- it

14    makes clear that even for those banks, the

15    so-called Tier 1 institutions that are not

16    engaged in what the Board calls, quote-unquote,

17    novel forms of banking, may be subject to exactly

18    this kind of searching evaluation.

19               And so it -- there is no limiting

20    principle that I can discern in the S letter or

21    in the guidelines that would give a single bank

22    comfort that it will have a straightforward

CONFIDENTIAL

Page 403

1  process similar to what predominated between 1980

2  and 2015.

3       Q    Okay.  But let's be clear about what

4  was -- your knowledge of what was happening from

5  1980 to 2015.

6            You have no basis to opine on whether

7  Reserve Banks were conducting risk assessments on

8  institutions that requested master accounts from

9  1980 to 2015, correct?

10      A    No, that's not correct.

11      Q    Okay.  We looked at earlier, for

12  example, the New York Fed policy for high-risk

13  institutions for 2014, right?

14      A    We -- we did look at that document,

15  yes.

16      Q    Okay.  Were you aware of that before

17  today?

18      A    I was not aware of that document before

19  today, no.

20      Q    Okay.  That reflects that Reserve Banks

21  were conducting risk assessments of entities

22  requesting a master account prior to 2015,

CONFIDENTIAL

Page 404

1    correct?

2         A    No.

3         Q    Okay.  So in 2015, when Fourth Corner

4    came around, which is brand new, for the first

5    time, Federal Reserve Bank conducting a risk

6    assessment of an entity requesting a master

7    account?

8              MR. SCARBOROUGH:  Objection to form.

9              THE WITNESS:  Do you have a question?

10   BY MR. MICHAELSON

11        Q    Yeah.  Was that -- you're saying that

12   Fourth Corner in 2015 was the first time that a

13   Reserve Bank subjected an entity requesting a

14   master account to any scrutiny or risk

15   assessment?

16        A    No.

17        Q    Okay.  What was happening before 2015?

18        A    The public record as we have it based

19   on comments around the time of the creation of

20   the master account, 1998, makes clear that there

21   was some kind of process that occurred, but in

22   the -- and I don't have the exact words, but I'll