# EXHIBIT 87

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF WYOMING
2
     ------------------------------:
3    CUSTODIA BANK, INC.,                  :
                                           :
4                   Plaintiff,             :
                                           : Case No.
5          vs.                             : 1:22-cv-00125-SWS
                                           :
6    FEDERAL RESERVE BOARD OF              :
     GOVERNORS and FEDERAL RESERVE         :
7    BANK OF KANSAS CITY,                  :
                                           :
8                   Defendants.            :
     ------------------------------:
9
10                CONFIDENTIAL DEPOSITION OF
11                 PETER CONTI-BROWN, PH.D.
12
13   DATE:            Thursday, December 14, 2023
14   TIME:            8:09 a.m.
15   LOCATION:        King & Spalding, LLP
                      1700 Pennsylvania Avenue, N.W.
16                    Washington, D.C. 20006
17
18   REPORTED BY:     Erick M. Thacker
                      Reporter, Notary
19
20
21                Veritext Legal Solutions
               1250 Eye Street, NW, Suite 901
22                Washington, D.C. 20005

Page 150

1    BY MR. MICHAELSON

2         Q    Well, but the -- but the regulations

3    that you're referring to included regulations in

4    which the Federal Reserve asserted the power to

5    conduct risk assessments of specific

6    institutions, correct?

7         A    That's right.

8         Q    And the power to impose restrictions on

9    an individual institution's use of services based

10   on the risk presented by that institution,

11   correct?

12        A    The key difference here between my

13   opinion and those regulations is that I am

14   referring to assertion of authority over specific

15   requests to access priced services, the

16   reciprocal for which is the granting of those

17   priced services, not to the regulatory framework

18   that might govern its use.

19             The policy statements that we've read

20   together today refer to the regulatory framework

21   for the use of priced services, including risk

22   assessments, over their use.  In the extreme

CONFIDENTIAL

Page 151

1    cases noted in the Reserve Banks, that use might

2    be temporarily suspended or assessments might be

3    offered for those, but nothing in those policy

4    statements referred to legally eligible

5    depository institutions that sought access to

6    those services.  They were only to those legally

7    eligible depository institutions that had access

8    to those services.  Those policy statements

9    governed the use of those services after they'd

10   been granted.

11          My opinion refers to the question of

12   whether to grant priced services to legally

13   eligible depository institutions in the first

14   instance.

15       Q    Okay.  And so would you -- would you

16   agree that the history and practice of the

17   Federal Reserve from 1980 to 2015 included the

18   Federal Reserve's assertion of the power to

19   restrict use of services to limit risk?

20       A    The word I would replace in your

21   sentence to make it my opinion is to regulate

22   rather than restrict, but yes otherwise.

Page 152

1     Q    Okay.  And would you agree that that's

2     actually long, well recognized that the Federal

3     Reserve has asserted the authority to regulate

4     use of services to limit risk?

5               MR. SCARBOROUGH:  Objection to form.

6               THE WITNESS:  I would say that the

7     Federal Reserve has long regulated the use of its

8     services for a variety of purposes.

9     BY MR. MICHAELSON

10    Q    Including to limit risk to the Reserve

11    Banks?

12    A    Yes.

13    Q    And including to limit risk to the

14    payment system?

15    A    That's a harder question to answer

16    because it's so broad.  Even where I see the

17    Federal Reserve asserting in those words, I feel

18    less sure that the risks assessed were to the

19    entire payment system itself.  But the risk to

20    the Reserve Banks, I have seen, yes.

21    Q    Okay.  And you'd agree that this --

22    this historical assertion of power by the Federal

Page 153

1   Reserve included the power to conduct

2   individualized risk assessments of specific

3   institutions, correct?

4           MR. SCARBOROUGH:  Objection to form.

5           THE WITNESS:  Only pursuant to a

6   regulatory framework that preceded the

7   individualized risk assessment, and in that

8   sense, I see the individualized assessment as

9   being a part of the regulatory authority asserted

10  as opposed to separate from it.

11  BY MR. MICHAELSON

12      Q    Okay.  And where does the Federal

13  Reserve statutory to do that emanate?

14      A    I will leave the question to the courts

15  and lawyers to determine legal authority.

16      Q    Okay.

17      A    I don't offer an opinion on the law.

18      Q    You are offering opinion, though, on

19  the intent of the framers of the Monetary Control

20  Act, correct?

21      A    That's right.

22      Q    Did the -- was it the intent of the

Page 179

1    consistency or inconsistency with law of any of

2    the litigants' practices.

3    BY MR. MICHAELSON

4         Q    Okay.  But you're offering an opinion

5    about congressional intent, correct?

6         A    That's right.

7         Q    And you're offering an opinion about

8    the Federal Reserve's historical practice, right?

9         A    That's right.

10        Q    Okay.  So let's go through those two.

11             Is it your opinion that consideration

12   of risk to the Reserve Bank in connection with a

13   master account request is inconsistent with

14   congressional intent behind the Monetary Control

15   Act?

16        A    I think that to the extent that risk to

17   the Reserve Bank constitutes a de facto

18   supervisory assessment that is usurped from state

19   supervisory authorities, then, yes, it is

20   inconsistent with the intent of the framers of

21   the MCA.  And there are instances, including in

22   the ones that I reference in my expert report,

1    where the Federal Reserve's assertion that it is

2    simply verifying the risks imposed to the Reserve

3    Bank do constitute de facto usurpation of

4    supervisory authority that is not the Fed's to

5    exercise.  And so in that sense, yes, I am saying

6    that that is inconsistent with congressional

7    intent.

8         Q    And is that a case-by-case

9    determination?

10        A    My conclusion on that front?

11        Q    Yeah.  Or is it across the board, this

12   is inconsistent -- consideration of this

13   principle is inconsistent with legislative

14   intent?

15             MR. SCARBOROUGH:  Objection to form.

16             THE WITNESS:  Could you -- could you

17   ask that question one more time?

18   BY MR. MICHAELSON:

19        Q    Well, I'm trying -- I'm trying to

20   understand if -- if it's your opinion that

21   Reserve Banks' consideration of Principle No. 2,

22   risks to the Reserve Bank, in connection with a

Page 181

1    master account request is always inconsistent

2    with congressional intent behind the Monetary

3    Control Act.

4         A    And my answer there is that the intent

5    of the Monetary Control Act was to equalize

6    access to legally eligible depository

7    institutions to Federal Reserve services.

8              If that access is made conditional on

9    conclusions that the Fed has made for any

10   purpose, risk management or otherwise, then that

11   is inconsistent with the intent of the framers of

12   the MCA.

13             If it's making a determination about

14   the legal eligibility, as we discussed earlier in

15   the day, then that may be consistent with the

16   intent of the framers of the MCA.  It also may

17   not be depending on how that is used.

18        Q    Well, I'm not talking about the legal

19   eligibility determination.  I'm talking about the

20   consideration of the risk to the Reserve Bank.

21             Is consideration of -- of that risk in

22   connection with the master account request

CONFIDENTIAL

Page 182

1    inconsistent with the intent of the framers of

2    the Monetary Control Act?

3              MR. SCARBOROUGH:  Objection to form.

4              THE WITNESS:  My short answer would be

5    yes, and here's why:  If, after the passage of

6    the MCA, the Federal Reserve said, thank you,

7    Congress, for telling us we need equalized

8    service, but you know what, we're going to

9    actually second-guess you here, and we're going

10   to perform our own independent risk assessment

11   about whether legally eligible, state-chartered

12   depository institutions that you just instructed

13   us to give equal treatment to deserve that equal

14   treatment.  And if the Federal Reserve did that

15   in its risk assessment leading to the conclusion

16   that access should be prevented, then that would,

17   in fact, be comprehensively inconsistent with the

18   framers of the MCA.

19             Again, we're talking here about access

20   to master accounts in this document.  I -- as

21   we've discussed, I haven't come to the same

22   conclusion with respect to different questions

Page 187

1    has issued countless banking -- pieces of banking

2    legislation, each with -- especially after 1935

3    and the permanent institution of the FDIC, with a

4    specific lane of movement for the FDIC, OCC,

5    Federal Reserve, and state banking authorities,

6    and so the MCA comes from that legal context.

7            That legal context means that the very

8    kinds of assessments that we're talking about

9    here are a supervisory context for the

10   specifically designated supervisor to respond to.

11   In some cases, that would be the Fed, in some

12   cases, the OCC, in others, the FDIC, and in

13   others, the state banking authorities.

14           But for the Federal Reserve to then say

15   that it has the authority or the -- or it would

16   adopt the practice of usurping these other

17   entities within a financial system is something

18   that I am not aware of anyone around the passage

19   of the MCA even contemplating, including at the

20   Federal Reserve, because it had never been done

21   in that way before.

22       Q    If every bank is unique then isn't it

Page 188

1    necessary for Reserve Banks to undertake an

2    individualized risk assessment of each

3    institution to assess the risk presented by that

4    institution to the Reserve Bank?

5         A    Most emphatically, no.  What it should

6    do is defer to those exact determinations by the

7    appropriately situated authority to -- that has

8    been put in place to assess precisely that risk

9    profile.  And, again, that might be the Fed if

10   we're talking about member banks, bank holding

11   companies, financial holding companies, et

12   cetera, but it might be the OCC, and it might be

13   the FDIC, and it might be a state banking

14   authority.

15        Q    So for Custodia that would be the

16   Wyoming Division of Banking?

17        A    That's right.

18        Q    And so it's your opinion that the

19   Federal Reserve Bank of Kansas City has to defer

20   to Wyoming Division of Banking's assessment of

21   the risk that Custodia presents to the Federal

22   Reserve Bank of Kansas City?

CONFIDENTIAL

Page 189

1        A     That's right.  That deference is the

2    beating heart of the dual banking system.

3        Q     Okay.  And it's your opinion that

4    Congress intended through the Monetary Control

5    Act to empower states to be state-chartered --

6    states to be the gatekeepers of access to Federal

7    Reserve services?

8        A     Well, the Constitution does -- does

9    that even preceding the creation of the Federal

10   Reserve System by creating state banks.

11           The Federal Reserve System was created

12   institutionally on top of a system of

13   state-chartered banks and national-chartered

14   banks, and so the order of operations is

15   reversed.  The states come first and then the

16   Federal Reserve.

17       Q     So referring back to the guidelines,

18   principle 2, here the Board is saying that

19   Reserve Banks should -- connection with an

20   account access request should consider whether

21   the institution presents or creates risk to the

22   Reserve Bank.

CONFIDENTIAL

```
                                    Page 270

1    condition to clearly identify the risks posed by

2    a financial institution and how that risk can be

3    managed to the satisfaction of the Reserve Bank."

4         Do you see that?

5    A    I do.

6    Q    Do you have any reason to dispute that

7    Esther George sent that letter to Fourth Corner

8    in January 2015?

9    A    I don't have a reason to dispute that

10   Esther George signed that letter.  I don't know

11   how -- how it was sent or received.

12   Q    Okay.  But -- so -- okay.  But you're

13   not disputing that -- that there was a letter

14   sent to Fourth Corner from Esther George in

15   January 2015, in which she says the master

16   account decision is within the Reserve Bank's

17   discretion?

18   A    That's right.

19   Q    Okay.  And if you move down two

20   paragraphs, the last full -- or last paragraph on

21   the page says, "Nevertheless, on July 16, 2015,

22   the Kansas City Fed denied Fourth Corner Credit
```

Page 271

1    Union's request for an account."

2              Do you see that?

3       A    I do see that.

4       Q    And it goes on to say, "The denial

5    letter focused primarily on risks presented by

6    Fourth Corner."

7              Do you see that?

8       A    I do.

9       Q    So this -- this suggests that it was

10   the Reserve Bank of Kansas City that made the

11   decision to deny Fourth Corner's request, right?

12             MR. SCARBOROUGH:  Objection.

13             THE WITNESS:  It doesn't say -- lead to

14   those -- sorry.  It doesn't specify the

15   participation or lack of participation of the

16   Board of Governors.

17             In coming to the tentative conclusion

18   that I offered to you in testimony today, it's

19   possible that I was relying on Julie Hill's other

20   article or the other materials that are not

21   included here.

22             I do recall more extended discussion

Page 272

1    either in the briefing or in the scholarship that

2    talked more specifically about the Board of

3    Governors' participation in that decision.

4    BY MR. MICHAELSON

5        Q    Okay.  And sitting here today, what do

6    you recall about that?

7        A    Only that the decision was guided by

8    the Board of Governors, that this was not an

9    independent decision of the Federal Reserve Bank

10   of Kansas City.

11       Q    It's your recollection that the Board

12   of Governors guided the decision?

13       A    It's my recollection that the decision

14   was not an independent decision of the Federal

15   Reserve Bank of Kansas City.

16       Q    Well, those are two different things,

17   right?

18       A    Yeah.

19       Q    So what's your opinion?

20       A    That the decision was not an

21   independent decision of the Federal Reserve Bank

22   of Kansas City and Fourth Corner.

Page 273

1       Q    Okay.  When you say it was not an

2    independent decision, is that consistent -- I

3    want to understand how you're using that term.

4            Is that consistent with the Reserve

5    Bank of Kansas City denying it in the exercise of

6    its own discretion after having consulted with

7    other parties like the Board?

8            MR. SCARBOROUGH:  Objection to form.

9            THE WITNESS:  My understanding --

10   again, and the expert report didn't include it in

11   that section, not because I don't have a view on

12   the Board's participation, but because the

13   materials I reviewed in writing my expert report

14   were more conclusive with respect to the

15   Territorial Bank of American Samoa and The Narrow

16   Bank than in Fourth Corner.

17           But still sticking with Fourth Corner,

18   my understanding and my review of the materials

19   as I sit here today is that the -- the Kansas

20   City Fed did more than consult with the Board in

21   reaching its own independent decision, that, in

22   fact, the Board had a view, and that view was to

CONFIDENTIAL

Page 282

1        Q    Okay.

2        A    -- not --

3        Q    And --

4        A    -- not after the crisis itself.

5        Q    And it was related to the crisis,

6    correct?

7        A    Chronologically, it was related to the

8    crisis.  It was occurring in the -- during the

9    crisis.

10       Q    Right.  But also the intent behind it

11   was -- was in part framed by addressing the

12   crisis, correct?

13       A    I'd have to know more what you mean.

14   Whose intent do you mean?

15       Q    It's okay.  Not important.

16            Fair enough to say that The Narrow

17   Bank's business model would not have been

18   possible prior to 2008, correct?

19       A    Can you say more about which aspect of

20   The Narrow Bank's business model you have in

21   mind?

22       Q    Well, its model involved arbitraging

CONFIDENTIAL

Page 283

1   the payment on excess reserves, right?

2       A    Again, the terms you're using have

3   specific terms of art in finance and law, and I

4   want to make sure that I'm being precise for you

5   and for the Court.

6            My understanding of The Narrow Bank's

7   business model is based on -- is not at the core

8   of my expert report.  I haven't evaluated that

9   business model sufficiently to offer -- offer an

10  expert opinion.

11      Q    So you haven't evaluated The Narrow

12  Bank's business model sufficient to offer an

13  opinion on that right?

14      A    That's right.

15      Q    And you haven't evaluated Custodia's

16  business model sufficient to render an expert

17  opinion on that, right?

18      A    That's right.

19      Q    Yet it's your opinion that the Federal

20  Reserve denying access to services to these

21  entities amounts to the Fed acting as a

22  rechartering authority, right?

CONFIDENTIAL

Page 284

1        A    My -- my opinion is that by inserting

2   itself into the question of access to, in these

3   cases, master accounts, that the Federal Reserve

4   is acting inconsistent with the intents --

5   intentions of the framers of the MCA and that

6   that process, including the principles identified

7   in its 2022 guidelines and its -- the

8   instantiations of those principles and these

9   cases, amounts to a process of -- of similar

10  evaluation to a chartering process.

11       Q    But in order to form that opinion,

12  don't you have to know what these business models

13  are?

14       A    No.

15       Q    So your -- your opinion in this case is

16  sort of agnostic as to what business is

17  requesting a master account?

18       A    My opinion on this is agnostic as to

19  the business models of legally eligible

20  depository institutions, yes.

21       Q    So even though every bank -- every bank

22  is different, right?  We've been over this.

CONFIDENTIAL

Page 285

1          A     That's right.

2          Q     Every bank's a snowflake, and every

3    bank presents risk to the system, right?

4          A     That's right.

5          Q     Some banks present more risk to the

6    system than other banks, right?

7          A     Again, that's a determination that I

8    don't know that I could -- I could make about

9    what kinds of risks are imposed and how to

10   compare, for example, reputational risk to

11   financial risk to legal risk.

12         Q     Okay.  But you'd agree that all -- all

13   banks present risk, right --

14         A     Yes.

15         Q     -- to the system?

16               And each bank is different, right?

17         A     Right.

18         Q     So each bank will present a different

19   risk to the system, right?

20         A     Right.

21         Q     And it's your opinion that all these

22   banks, pursuant to the MCA, intent behind the

CONFIDENTIAL

Page 286

1    MCA, must get access to an account, right?

2         A    All legally eligible depository

3    institutions, the intent of the framers of the

4    MCA was to give them access on equal terms to

5    Federal Reserve services, yes.

6         Q    Okay.  And that once they have an

7    account, you're not precluding the possibility

8    that the Federal Reserve can conduct a risk

9    assessment concerning each institution, right?

10        A    That's -- it's correct that I'm

11   asserting that the Federal Reserve's risk

12   assessments pursuant to regulation is consistent

13   with the Fed's practices after the passage of the

14   Monetary Control Act.

15        Q    But to the extent that they restricted

16   use of any service in perpetuity, that would be

17   inconsistent with the intent behind the Monetary

18   Control Act?  That's your opinion?

19        A    The --

20             MR. SCARBOROUGH:  Objection.

21             THE WITNESS:  My opinion is that the

22   intent of the framers of the Monetary Control Act

CONFIDENTIAL

Page 287

1   was not to give the Federal Reserve the authority

2   to impose membership entrance standards for

3   federal -- use of Federal Reserve services as it

4   had done prior to 1980, after the passage of that

5   act.

6   BY MR. MICHAELSON

7        Q    Okay.  So The Narrow Bank is a

8   state-chartered nonmember bank, right?

9        A    That's right.

10       Q    Like Custodia, right?

11       A    Chartered by the state of Connecticut,

12  where Custodia was chartered by Wyoming.

13       Q    Right.  But both are state-chartered

14  nonmember banks, right?

15       A    That's right.

16       Q    And so it's your opinion that the

17  Federal Reserve -- that the Monetary Control

18  Act's intent was to force the Federal Reserve to

19  give entities like that access to services

20  irrespective -- without the Federal Reserve being

21  powered to conduct a risk assessment?

22       A    My opinion is that the intent of the