# EXHIBIT 88

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

*Meadors Court Reporting*

C O N F I D E N T I A L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

No. 1:22-cv-00125-SW
_____

DEPOSITION OF CAITLIN LONG

November 29, 2023
_____

CUSTODIA BANK, INC.,

Plaintiff,

vs.

FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL
RESERVE BANK OF KANSAS CITY,

Defendants.
_____

APPEARANCES:

    WILLIAMS, PORTER, DAY & NEVILLE, P.C.
        By Scott E. Ortiz, Esq.
        159 North Wolcott Street
        Suite 400
        Casper, WY  82601
        sortiz@wpdn.net
           Appearing on behalf of Plaintiff.

    KING & SPALDING LLP
        By Andrew Michaelson, Esq.
        1185 Avenue of the Americas
        34th Floor
        New York, NY  10036
        amichaelson@klaw.com.
           and
    HIRST APPLEGATE, LLP
        By Billie L.M. Addleman, Esq.
        1720 Carey Avenue
        4th Floor
        Cheyenne, WY  82003-1083
          baddleman@hirstapplegate.com
            Appearing on behalf of Defendant.

*Meadors Court Reporting*

```
 1           (Deposition Exhibit No. 251 marked.)
 2   BY MR. MICHAELSON:
 3      Q    Which is a document marked Custodia 1094.
 4      A    Okay.
 5      Q    It's a presentation dated May 2021.
 6      A    Okay.
 7      Q    Do you recall this document?
 8      A    Yes, I do recall looking at a couple of
 9   slides.  This is probably the document that we
10   prepared for our meeting with the board in May.
11      Q    So May of 2021 in a meeting with the Board
12   of Governors?
13      A    Yes.
14      Q    And this is after the principals had been
15   released, and who at the Board of Governors did you
16   meet with?
17      A    It was organized by Mark Van Der Weide.
18   There were a lot of board people on that meeting.  I
19   don't recall everyone who was on it.  There were
20   board legal people.  There were board supervision and
21   regulation people.  There were board innovation
22   policy people and board reserve bank operations
23   people.  Those were generally what I recall as who
24   was on there.  It was a lot.
25      Q    Was it an in-person meeting?
```

1    A    No.  It was by Zoom.

2    Q    And how long did it last?

3    A    An hour.

4    Q    And who was the principal speaker on behalf
5    of Custodia?

6    A    I was.

7    Q    Did anyone else speak on behalf of
8    Custodia?

9    A    Derek Bush, and I'm not sure who else, but
10   the management team would have been on.

11   Q    Who were the primary speakers on behalf of
12   the board?

13   A    Mark.  It was Mark's meeting.

14   Q    So Mark Van Der Weide was the primary
15   speaker?

16   A    Yes.

17   Q    AND did you walk through this -- at that
18   time, where did Custodia's application for membership
19   stand?

20   A    We had not applied yet.

21   Q    Was that a subject of discussion at the
22   meeting, membership?

23   A    No.  Actually, what happened is I made the
24   comment that it was on our road map to apply for fed
25   membership, but my understanding based on advice we'd

1  received is that the fed does not want de novos to
2  become member banks until the banks had been
3  operating for a while and the kinks were worked out.
4           That prompted a call from Mark Van Der Weide
5  to Derek Bush right after the meeting to correct what
6  I had said, that the fed would welcome that, and
7  Derek and Mark spoke, and Derek's interpretation was,
8  "Mark is recommending that you apply for fed
9  membership, so let's do it."
10     Q    Do you recall whether the subject of
11  membership came up in this meeting that you had, the
12  Zoom meeting that you had with the board?
13     A    It definitely did because Mark made the
14  phone call on the basis of something I said, and I'm
15  just looking here to see if it's mentioned in the
16  slides or what the context was that would have
17  prompted Mark to make that phone call to Derek right
18  afterwards.  Nothing's jumping out at me, but
19  obviously, I did say something because he called to
20  correct, and Derek's interpretation of that was Mark
21  wants us to apply to become a member bank now instead
22  of waiting, and we did.
23     Q    Did you ask at that meeting -- did Custodia
24  ask at that meeting whether a decision on Custodia's
25  master account in the hands of the Board of

1  Governors?

2     A    No.

3     Q    Did the Board of Governors -- anyone on the
4  Board of Governors side represent the Board of
5  Governors was controlling the outcome of Custodia's
6  master account request?

7     A    No.

8     Q    Did anyone at the Board of Governors
9  indicate that it was Kansas City's decision?

10    A    No.  The Board of Governors said almost
11 nothing in that meeting.

12    Q    They were in listening mode?

13    A    They were in listening mode.

14    Q    Do you recall walking through this
15 presentation in that meeting?

16    A    I recall we spent almost the entire
17 presentation on Slides 4 and 5.

18    Q    Slide 4 is what Avanti is and is not?

19    A    Yes.

20    Q    And Slide 5 is what Wyoming speedy bank
21 charter is and is not?

22    A    Yes.  Yeah, here actually.  Avanti welcomes
23 federal reserve oversight.  It's on Page 4.  Avanti
24 offered from its inception to apply for membership,
25 still intends to seek it, and is open to defacto

```
 1        Q     And you replied it was Reserve Trust, and
 2   you asked Thompson to provide an update.  Do you
 3   recall learning that Reserve Trust had BSA/AML
 4   issues?
 5        A     Yes.
 6        Q     Who did you learn that from?
 7        A     We were interviewing some of their former
 8   employees.
 9        Q     Did you ask -- did you discuss with those
10   employees why Reserve Trust lost its master
11   account?
12        A     Chuck Thompson did when he was interviewing.
13   I didn't interview any of the employees, but we
14   interviewed a couple of their former employees who
15   were looking for new jobs.
16        Q     So Chuck Thompson interviewed Reserve Trust
17   employees who were looking for new jobs?
18        A     Yes.
19        Q     And Chuck Thompson learned from them that
20   Reserve Trust had BSA/AML issues?
21        A     Yes.
22        Q     And Chuck Thompson learned from them that
23   those BSA/AML issues resulted in losing its master
24   account?
25        A     That's what they told us.  I don't know if
```

Confidential

1   that's true, but that's what they told him.  I also

2   recall learning that they didn't have a chief

3   compliance officer.  That was also one of the pieces

4   of feedback.  It's not here in these meeting minutes,

5   but I was really surprised that they didn't have a

6   chief compliance officer.

7        Q    In your view can a speedy that doesn't have

8   a chief compliance officer obtain a master account?

9             MR. ORTIZ:  Let me object; lacks foundation.

10  Go ahead.

11       A    That also calls for a legal conclusion.

12  We're about to find out.

13  BY MR. MICHAELSON:

14       Q    Refer to the next page, FRBKC 2882,

15  "Chairman Long asked Thompson to give the board a

16  BSA/AML policy update"; do you see that?  It's the

17  last paragraph.

18       A    Yes.

19       Q    And you provided a high-level overview?

20       A    Um-hum.

21       Q    You stated, "The policy is a living document

22  that has changed"; do you see that?

23       A    Yes.  All policies are living documents that

24  have been changed.

25       Q    At this time, did you have -- as of May

1  2022, did Custodia have BSA/AML policies and
2  procedures that were complete and final and ready to
3  go?
4      A    Policies, yes; procedures, I don't know
5  because we'd switched over to Foundry at this point,
6  so anytime you switch a vendor, the procedures are
7  going to change, but the policy had been in place and
8  had been continually updated since 2020.
9      Q    Do you recall where things stood with
10 Foundry as of May 2022?
11     A    Not specifically, no.
12     Q    Was their work complete as of May 2022?
13     A    I doubt it, but we were heavy in the new
14 vendor onboarding and integration around that time
15 because we'd replaced them earlier in the year.
16     Q    And the minutes reflect that "The policy
17 will continue to change as a result of engaging Crowe
18 to help advise regarding best practices"?
19     A    Yes.
20     Q    So does that refresh your memory as to
21 whether Crowe had not yet completed its work as of
22 May 2022?
23     A    I don't know.  Again, Crowe was actually --
24 there was ongoing work.  We're still working with
25 Crowe, so there was the initial assessment, and then