# EXHIBIT 92

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3

4      CUSTODIA BANK, INC.,

5                         Plaintiff

6      vs.                              No.

7      FEDERAL RESERVE BOARD OF         22-cv-00125-SWS

8      GOVERNORS and FEDERAL RESERVE

9      BANK OF KANSAS CITY,

10                        Defendant.

11

12

13

14

15         CONFIDENTIAL DEPOSITION OF JUDITH HAZEN,

16      FRBKC Representative, a Defendant, taken on behalf of

17      the Plaintiff before Kelsey Robbins Schmalz, CSR No.

18      1571, CCR No. 1148, RPR, pursuant to Notice on the

19      16th of November, 2023, at the offices of the Federal

20      Reserve Bank of Kansas City, 1 Memorial Drive, Kansas

21      City, Missouri.

22

23

24

25

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 145

```
 1    form because I want to create a list, and I don't
 2    know if you have a pen, but I have a fancy one from
 3    the Federal Reserve Bank of Kansas City if you would
 4    like to use it.
 5            A.    I hear they're in high demand.
 6            Q.    Yes.  What I would like to do as we go
 7    through is to sort of keep a running list of
 8    individuals who were involved in dealing with
 9    nontraditional accounts like SPDIs or Custodia
10    specifically, okay?
11                  MS. CARLETTA:  And I'll just note for
12    the record I think we're talking about Topic No. 2;
13    is that right?
14                  MR. SCARBOROUGH:  I don't have it in
15    front of me, but let me look real quick.
16                  MS. CARLETTA:  Assuming we're talking
17    about Topic No. 2, we said that would produce a
18    witness to discuss generally the positions and
19    identities of individuals at the Board who had
20    substantive discussions with FRBKC employees about
21    Custodia's master account request.
22                  MR. SCARBOROUGH:  Yeah.  This is not
23    just limited to Topic 2.  It also encompasses
24    Topic 6, for instance, which deals with the various
25    working groups and PSPAC and et cetera that was
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 146

1    established.

2    BY MR. SCARBOROUGH:

3         Q.    So let's start, Ms. Hazen, with --

4              MS. CARLETTA:  Sorry.  I'll just note

5    for the record we also on Topic 6 said we prepared to

6    discuss generally that committees are working groups

7    that materially contributed to the decision to deny

8    Custodia's master account request.

9              Go ahead.

10             MR. SCARBOROUGH:  Thank you.

11   BY MR. SCARBOROUGH:

12        Q.    Ms. Hazen, with regard to the PSPAC, I

13   think you testified earlier that that was a

14   combination of -- was it Board Governors as well as

15   representatives from the Reserve Banks, too?

16        A.    It's Governors at the Board of

17   Governors -- a subset of Governors at the Board of

18   Governors and a subset of Presidents at the Reserve

19   Banks.

20        Q.    So do you know what that subset is,

21   like how many Governors are on the PSPAC?

22        A.    I don't know what the composition of

23   the PSPAC was at the time of this.

24        Q.    Okay.  Because we don't know

25   specifically, in the first -- on Exhibit 233, would

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 147

1     you just write on the first line there subset of

2     Board Governors that -- how about PSPAC - subset of

3     Board Governors?

4                    MS. CARLETTA:  Can I see this?  Okay.

5     Just for the record, this is a document that just has

6     numbers 1 through 44 with lines.  The header is

7     Federal Reserve Bank Staff/Governors, and, Ryan, you

8     just asked her to fill in, I'm sorry, what again?

9     BY MR. SCARBOROUGH:

10              Q.      PSPAC, and then you can put a dash and

11    say subset of Governors or whatever you think would

12    accurately summarize or synthesize what you told me.

13                   MS. CARLETTA:  And this is creating a

14    record of Board staff and Governors, or what do you

15    want this list to represent?

16                   MR. SCARBOROUGH:  This list is going

17    go to represent the folks at the Board of Governors,

18    whether it's Governors or their staff, who were

19    involved in dealing with issues around nontraditional

20    account access and/or Custodia specifically, its

21    master account request.

22                   MS. CARLETTA:  Can you answer that?

23    Was PSPAC involved as Ryan said?

24              A.      In the decision on Custodia's master

25    account request?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 148

1   BY MR. SCARBOROUGH:

2        Q.    No.  That's not the question.

3        A.    Can you ask again?  I'm sorry.

4        Q.    Sure.  The question was I believe you

5   just testified in response to my questioning earlier

6   that the PSPAC was the -- that they were originally

7   addressing some of the policy questions that were

8   being raised and they were the ones who decided to

9   establish this nontraditional account access working

10  group and the workstreams that were underneath it; is

11  that right?

12       A.    Yes.  So that's one of the groups that

13  was looking at the broader landscape and seeing these

14  requests coming in the door.

15            MS. CARLETTA:  Just to clarify the

16  record, do we mean nontraditional accounts or do we

17  mean -- this list is just going to -- I'm concerned

18  this list is going to get misused so I want to be

19  very clear about what's going on this list.

20       A.    And PSPAC wouldn't have been tracking

21  exclusively SPDIs.

22  BY MR. SCARBOROUGH:

23       Q.    I understand.

24       A.    So that's where --

25       Q.    But they address SPDIs in part, so if

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 149

1    you would, write PSPAC on the first line, and you can

2    say subset of Governors if you want.

3                    MS. CARLETTA:  I'm not comfortable

4    with her creating a new exhibit.  She is here to

5    answer questions.  You can ask her questions.  If you

6    want to compile a list from her deposition later,

7    that's fine, but this is going to be used

8    inappropriately.  It's not clear what this is.

9                    So just ask questions then.  Just ask

10   questions.  I'm not comfortable with her making a

11   document that's going to be misconstrued.

12                    I don't know what -- what is she --

13   she's writing PSPAC and that this had something to do

14   with nontraditional master account requests?  I mean,

15   that's not what this -- do you want her to write --

16                    MR. SCARBOROUGH:  I want her to write

17   PSPAC on the first line, because she has just told me

18   that the PSPAC had a role in connection with

19   evaluating and dealing with nontraditional account

20   access policy questions that came up.

21                    MS. CARLETTA:  She can answer the

22   questions.  I don't want her writing something down.

23   BY MR. SCARBOROUGH:

24        Q.    Why don't you hand me Exhibit 233.  I

25   will write it down as we go and you can verify that

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 150

1      I'm writing it correctly.

2                   MS. CARLETTA:  You can write it down

3      as you go.  I don't know what she's going to be able

4      to verify.  It's not clear from the face of that

5      document what we're doing here.  You can ask the

6      question and she can answer it.

7           A.     Can you repeat the question?

8      BY MR. SCARBOROUGH:

9           Q.     Sure.  Am I correct that you

10     previously have testified today that the Payment

11     Systems Policy Advisory Committee was involved in

12     addressing issues that were raised by novel chartered

13     entities, first of all?

14                  MS. CARLETTA:  Objection.  Form.

15          A.     So the PSPAC was one of the groups

16     that was aware of and interested in the issues that

17     were being raised by new charter types, by novel

18     business plans, by novel uses of existing charters.

19     BY MR. SCARBOROUGH:

20          Q.     And the PSPAC did not include every

21     member of -- every Governor on the Board, correct?

22          A.     A subset of Governors sitting on the

23     PSPAC.

24          Q.     So I'm going to write PSPAC, subset of

25     Governors on No. 1, okay?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 151

```
 1            A.      Okay.
 2                    MS. CARLETTA:  Okay.  You're writing
 3      it down.
 4            A.      I see you writing it down.
 5      BY MR. SCARBOROUGH:
 6            Q.      Does that capture the participants
 7      from the Board at the PSPAC level who had anything to
 8      do with nontraditional account access issues raised
 9      by novel chartered entities?
10                    MS. CARLETTA:  She is standing on her
11      deposition testimony.  She is not verifying this
12      document.
13            A.      So yes.  The representation on PSPAC
14      from the Board of Governors includes a subset of
15      Governors, but the PSPAC is broader than the
16      substance set of Governors, it also inside a subset
17      of Reserve Bank presidents.
18      BY MR. SCARBOROUGH:
19            Q.      Right, and I'm only looking to catch
20      the folks from the Board who were involved, so that's
21      why I've written subset of Governors and didn't say
22      anything more about Reserve Bank personnel, okay?
23                    MS. CARLETTA:  It doesn't matter what
24      you've written.  It's attorney work product.  We're
25      standing on her -- she is not verifying that document
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

                                          Page 152

1    that you're currently creating.  She is standing on
2    her deposition testimony.  She is not here to
3    create --
4                    MR. SCARBOROUGH:  Counsel, you can
5    object -- please don't give speaking objections.
6    I've given you a lot of leeway.  You can object, and
7    I'm entitled to ask my questions.
8                    MS. CARLETTA:  You're entitled to ask
9    your questions but you're not entitled to have her
10   create a document.
11                   MR. SCARBOROUGH:  Have you ever been
12   in a deposition where a witness has diagrammed a
13   scene?
14                   MS. CARLETTA:  This is not the same as
15   that.
16                   MR. SCARBOROUGH:  This is exactly the
17   same as that.
18                   MS. CARLETTA:  No, it's not.
19   BY MR. SCARBOROUGH:
20        Q.    So, Ms. Hazen, I'm going to show you
21   what I've written so far in Exhibit 233.  Do you see
22   it says PSPAC subset of Governors?
23        A.    I see that it says that.
24        Q.    And does that accurately reflect the
25   Board-related individuals who were -- participated at

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 153

1    the PSPAC level in connection with considerations

2    raised by nontraditional accounts like SPDIs or

3    others?

4                    MS. CARLETTA:  Same objections.

5            A.     It represents the membership on PSPAC

6    at the Board of Governors.

7    BY MR. SCARBOROUGH:

8            Q.     Okay.  So let me direct your

9    attention, then, to Exhibit 202, which you have you

10   in front of you.  You mentioned that there was a

11   steering committee, correct?

12           A.     Yes.

13           Q.     And this is a steering committee for

14   the nontraditional account access groups, correct?

15           A.     Yes.  That's what the group was

16   titled.

17           Q.     Okay.  So who served on the steering

18   committee at the board level?

19           A.     On this document, it notes David

20   Mills.

21           Q.     Okay.  I'm going to write these down

22   as you go.  So David Mills, and what was his role?

23           A.     He is a co-chair.

24           Q.     And what position did he have at the

25   Board?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 154

1          A.     I would have to look up his specific

2     title for you.

3          Q.     Does it indicate on Exhibit 202 that

4     he was with RBOPS?

5          A.     He worked in the RBOPS division.

6          Q.     And does that stand for Reserve Bank

7     Operations and Payment Services?

8          A.     I believe so.  I'm not sure if the S

9     is services or system.

10          Q.     Let me see if I can find the answer

11     for you quickly.  I have it down as Reserve Bank

12     Operations and Payment Systems.  Do you have any

13     reason to disagree with that?

14          A.     No.  I can confirm it during the break

15     if you want me to, but that seems reasonable.

16          Q.     And so do you see here that I've

17     written down on No. 2 David Mills, RBOPS?

18          A.     I see that.

19          Q.     Okay.  And that's written on

20     Exhibit 233.  So who's the next member from the Board

21     who served on the steering committee?

22          A.     This notes Jeff Walker.

23          Q.     Jeff Walker.  And was Jeff Walker also

24     with RBOPS?

25          A.     That's what noted on the paper.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 155

1      Q.      And I've written that down as No. 3,

2   correct?

3      A.      Yes.

4      Q.      The next person that's listed on the

5   steering committee from the Board is Stephanie

6   Martin; is that right?

7      A.      Yes.  That's the next name from the

8   Board on the list.

9      Q.      And she's with Board legal; is that

10   fair?

11      A.      That's what it says.

12      Q.      So I've written Stephanie Martin,

13   legal, as No. 4, correct?

14      A.      Okay.

15      Q.      And then the next person that's listed

16   is Kavita Jain.  Is she also with the Board?

17      A.      She is.

18      Q.      And she served on the nontraditional

19   account access steering committee?

20      A.      That's what's noted here.

21      Q.      And she is with the board S&R.  What

22   does S&R stand for?

23      A.      Supervision and regulation.

24      Q.      So I've written as No. 5 Kavita's name

25   and her role as Board S&R, right?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

1          A.     Yes.  Or just S&R, but yes.

2          Q.     Then we have Marnie DeBoer.  Does

3    she -- have you also seen her name as Margaret

4    DeBoer?

5          A.     Yes.

6          Q.     And is she also a staff member for the

7    Board of Governors?

8          A.     She is.

9          Q.     So I'm going to write down Marnie

10   DeBoer, and it indicates that she was in the Board

11   M&A; is that right?

12         A.     Board MA, yes.

13         Q.     Pardon me.  MA.

14                And so I've written her name, Marnie

15   DeBoer, MA there, correct?

16         A.     Correct.

17         Q.     And then if I look down, the next

18   Board person that I see is Jennifer Lucier.  Am I

19   getting that right; do you know?

20         A.     I see the name.  I don't know the

21   pronunciation.

22         Q.     And Jennifer Louis, it indicates here,

23   was also with RBOPS at the Board?

24         A.     That's on the paper, yes.

25         Q.     So I've marked that as No. 7 for her

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 157

1    name, correct?

2             A.    I see that on that page.

3             Q.    Okay.  Now, in addition to the

4    steering committee, if you look further down on this

5    document on the practical workstream, there are other

6    members of the Board who are also participating,

7    correct?

8                   MS. CARLETTA:  Objection.  Form.

9             A.    I see on the list under practical

10   workstream a list of Board staff.

11   BY MR. SCARBOROUGH:

12            Q.    Okay.  One of the co-chairs for the

13   practical workstream was a Board member, correct?

14            A.    This indicates Kathy Wilson.

15            Q.    And Kathy Wilson, it indicates she is

16   also with RBOPS?

17            A.    Yes.  That's in parentheses.

18            Q.    And I've written her name at No. 8,

19   correct?

20            A.    I see that.

21            Q.    And then there's representatives from

22   Board legal, Gavin Smith; is that right?

23            A.    I see that.

24            Q.    And I've written his name as No. 9 on

25   this, correct?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 158

1        A.    I see that.

2        Q.    There's a reference to MPOA David

3    Lowe, do you know what MPOA is?

4        A.    I don't.

5        Q.    Do you know who David Lowe is?

6        A.    The name is familiar, but I'm -- I

7    don't know the division.  I'm sorry.

8        Q.    Do you know if he worked for the

9    bank -- for the Board or a Reserve Bank?

10            MS. CARLETTA:  Objection.  Form.

11       A.    I don't.  I see that he's listed under

12   Board staff in this document, but I don't know him

13   specifically.

14   BY MR. SCARBOROUGH:

15       Q.    All right.  So I'm going to put David

16   Lowe down and I'll write MPOA since he's listed under

17   Board staff, okay?  Do you see that as No. 10?

18       A.    Yeah.  I see you wrote the same thing

19   over here that's on this document.

20       Q.    Okay.  And then the next person listed

21   as Board staff is Dan McGonegal; is that right?

22       A.    Yes.

23       Q.    And is Mr. McGonegal part of the Board

24   S&R department?

25       A.    He is now, yes.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 159

1      Q.    And do you see for No. 11 I've written
2   his name with S&R next to it?
3      A.    I see that.
4      Q.    Then the next person down it indicates
5   is Ben Hobbs, also with RBOPS; is that right?
6      A.    I see that.
7      Q.    And I've written his name and
8   indicated that he is with RBOPS, correct?
9      A.    I see that.
10      Q.    And then if you flip the page to
11   workstream No. 1, the policy workstream, one of the
12   co-chairs of that group is also a Board staffer,
13   correct?
14      A.    Yes.  On here I see Jason Hinkle.
15      Q.    And he is also with RBOPS?
16      A.    That's in parentheses, yes.
17      Q.    You see him as listed as No. 13?
18      A.    Yes.
19      Q.    And then under Board staff for this
20   policy workstream, there's a representative from
21   legal.  That's Sophia Allison, correct?
22      A.    On Board legal it says Sophia Allison.
23      Q.    And I'll write legal next to her name.
24   Do you see that?
25      A.    I see that.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 160

1        Q.     Okay.  And then we have Mary Francis,
2    and I'll never be able to say her last name, but it
3    looks like Styczynski?
4        A.     Yes.
5        Q.     Is she also with the Board?
6        A.     Yes.
7        Q.     And her specific role is listed there
8    as also being MPOA, correct?
9        A.     Yes.  That's the designation on the
10   page.
11       Q.     And I've written her in as No. 15,
12   correct?
13       A.     Yes.
14       Q.     Now, I'm not going to include Dan
15   McGonegle a second time, although he is also on this
16   policy workstream, right?
17       A.     Yes, I see his name on here.
18       Q.     So the next person we have come to
19   appears to be Kirstin Wells; is that right?
20       A.     Yes.
21       Q.     Is she also a Board member?
22       A.     She is designated here as RBOPS.
23       Q.     I've written her name in as No. 16
24   with RBOPS next to it.
25              Do you see that?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 161

1           A.      Okay.

2                   MS. CARLETTA:  I'll just note that

3       this document also -- next to Kirstin Wells also says

4       parentheses, FOCS.  I don't know what that means.

5       BY MR. SCARBOROUGH:

6           Q.      Ms. Hazen, are there other

7       Board-related members, so staffers, Governors,

8       anybody from the Board who, to your knowledge are or

9       the Kansas City Fed's knowledge, participated on

10      either the nontraditional account access steering

11      committee, practical workstream 1 or policy

12      workstream 2 other than the folks that we've listed

13      here?

14                  MS. CARLETTA:  Objection.  Form.

15          A.      I believe this document is showing

16      those that were engaged at the creation of this, and

17      I don't see any notable names missing.

18      BY MR. SCARBOROUGH:

19          Q.      So -- I didn't mean to interrupt you.

20          A.      I was just going to say I don't -- I

21      know that there have been changes in membership from

22      the Reserve Bank participation side, and so

23      potentially there's been changes from the Board side

24      but there's no names that I'm surprised not to see on

25      the list.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 162

1        Q.      Now I'm going to hand you a document

2    that was marked previously as Exhibit 218, and this

3    is a document that references crypto asset policy and

4    then it's got a redaction applications.

5                Do you see that?

6        A.      I see that.

7        Q.      And it also reflects that there is

8    involvement in answering some crypto policy questions

9    that the Kansas City Fed was facing; is that correct?

10       A.      The invitation says, This is to

11   discuss some of the crypto policy questions KC is

12   facing as it works through the redacted applications.

13       Q.      Are you familiar with Jeff Ernst?

14       A.      I am.

15       Q.      Is he -- in what ways are you familiar

16   with Mr. Ernst?

17       A.      So I've worked with Jeff Ernst through

18   my role in the supervision function and engagement

19   with what we call the system risk council.

20       Q.      And does the system risk council, does

21   that address questions that arise in connection with

22   novel chartered entities?

23       A.      They do not.

24       Q.      Okay.  Why is -- go ahead.

25       A.      I'm sorry.  I just realized when I

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 163

1      said -- I'm sharing with you how I personally know

2      Jeff Ernst.  I didn't prepare to be able to speak to

3      all that is -- what it encompasses, so I'm sorry.

4              Q.    I understand.  Is it fair to say that

5      Mr. Ernst was involved in answering crypto policy

6      questions that the Kansas City Fed was trying to

7      address?

8              MS. CARLETTA:  Objection.  Form and

9      outside the scope.

10             A.    I don't know about Jeff's engagement

11     other than what's noted on this calendar invitation.

12     BY MR. SCARBOROUGH:

13             Q.    Okay.  And is it -- and he is a Board

14     staff member?

15             A.    Yes.

16             Q.    And did the SPDI-chartered entities

17     present crypto policy questions that needed to be

18     addressed?

19             A.    Broadly, there were crypto policy

20     questions that were being contemplated by the Board

21     and Reserve Bank staff.  I can't speak to if this

22     document is referencing specific questions that would

23     have been raised by SPDIs or a specific entity.

24             Q.    And I'm less concerned about that

25     particular document than trying to identify

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 164

1      individuals at the Board who would have been involved

2      in addressing policy issues or other questions that

3      would arise in connection with SPDI charters or the

4      like.

5           A.    I think what's challenging for me in

6      responding is that there is an evolution that is

7      happening at this time in that industry and then also

8      within the financial industry, and so to be able to

9      pinpoint what questions are being raised because of

10     the SPDI charters and what questions are being raised

11     just as we more broadly monitor what's happening in

12     the financial industry, I'm not prepared to make that

13     delineation.

14          Q.    Okay.  Let me ask you, did Asad Kudiya

15     have interaction with the Kansas City Fed in

16     connection with SPDI charters or issues around crypto

17     policy novel chartered entity account access?

18               MS. CARLETTA:  Objection.  Form and

19     outside the scope.

20          A.    Asad Kudiya would have been involved

21     in the application for membership by Custodia.

22     BY MR. SCARBOROUGH:

23          Q.    Would Asad have had any role in

24     connection with broader crypto policy questions?

25               MS. CARLETTA:  Same objections.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 165

1          A.     I'm not certain what all is

2     encompassed in Asad's role.

3     BY MR. SCARBOROUGH:

4          Q.     What about Gavin Smith?  Strike that.

5     We've already established Gavin Smith's

6     participation.

7                 What about Molly Mahar?

8                 MS. CARLETTA:  Same objection.

9          A.     Kavita Jain reports to Molly Mahar.

10    I'm not aware of Molly Mahar's scope of

11    responsibilities or her specific engagement.

12    BY MR. SCARBOROUGH:

13         Q.     Okay.

14         A.     On activities related to Custodia or

15    requests related to Custodia.

16         Q.     In preparing to testify today, did you

17    identify individuals from the Board who participated

18    in providing comments or feedback on the

19    recommendation letter that was prepared for Esther

20    George?

21         A.     Yes.  I looked at comments that had

22    been provided on our analysis.

23         Q.     Okay.  Who provided comments from the

24    Board in connection with the recommendation memo to

25    Esther George?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 166

1              MS. CARLETTA:  Objection.  Form.

2         A.     I'm not certain that I could delineate

3    who specifically provided the comments on the memo

4    itself versus others that provided substantive

5    comments in other forms.

6    BY MR. SCARBOROUGH:

7         Q.     Let's just do it broadly.  Who

8    provided comments in any way, shape or form from the

9    Board to the Kansas City Fed in connection with the

10   recommendation memo?

11        A.     So individuals that --

12             MS. CARLETTA:  Objection.  Form --

13        A.     -- we would have had conversations

14   with at the Board included Sophia Allison.

15   BY MR. SCARBOROUGH:

16        Q.     Okay.  Let me see here.  We've already

17   got her on the list as No. 14 I'll show you.  Is that

18   right, No. 14?

19        A.     Yes.  Your list says Sophia Allison,

20   legal.

21        Q.     Who else?

22        A.     Lael Brainard.

23        Q.     So I'm going to write -- I'll write

24   Lael down although I put an asterisks -- do you know

25   if Lael was on the PSPAC?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 167

1          A.     I believe she was.

2          Q.     All right.  I'll write Lael's name but

3     I'll put an asterisk beside it on No. 17.

4                 MS. CARLETTA:  And, I'm sorry, what

5     are we creating -- can you restate the question for

6     this list?

7     BY MR. SCARBOROUGH:

8          Q.     So what was Lael Brainard's -- she

9     gave feedback on the recommendation memo?

10                THE WITNESS:  Can I answer now?

11                MS. CARLETTA:  I just didn't hear the

12    question.  That's all.

13         A.     Lael Brainard had conversations with

14    Esther George.

15    BY MR. SCARBOROUGH:

16         Q.     Okay.  And we'll come back to the

17    substance of it, but who else would have given

18    feedback on the recommendation -- the denial

19    recommendation?

20         A.     So others that I have include Margaret

21    DeBoer.

22         Q.     And we have Marnie DeBoer listed as

23    No. 6?

24         A.     I see that.

25         Q.     So I'm not going to write her down.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 168

1      Who else do you have?

2              A.      I have Matt Eichner.

3              Q.      And was he the head of RBOPS?

4              A.      Yes.

5              Q.      I'm going to write RBOPS there.  Who

6      else besides Matt?

7              A.      Jason Hinkle.

8              Q.      I've already got Jason written down as

9      No. 13 so I'm not going to rewrite him, okay?

10             A.      Okay.

11             Q.      Who else?

12             A.      Laura Lipscomb.

13             Q.      I don't have her, so what was her

14     position or role at the Board?

15             A.      I believe that she is in monetary

16     affairs.

17             Q.      So MA?

18             A.      Yes.

19             Q.      I've written her down at No. 19.  All

20     right, who else?

21             A.      Matt Malloy.

22             Q.      And what was his role?

23             A.      He is also in monetary affairs.

24             Q.      And do you see I've written him down

25     as No. 20?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 169

1          A.     I see that.

2          Q.     Okay.  Who else?

3          A.     Stephanie Martin.

4          Q.     I've got her already as No. 4,

5     correct?

6          A.     Yes.  I see that.

7          Q.     And then who else do you have?

8          A.     Dave Mills.

9          Q.     No. 2 on my list?

10         A.     Yes.

11         Q.     And who else?

12         A.     Gavin Smith.

13         Q.     He's No. 9 on my list.  Who else do

14    you have?

15         A.     Mark Van Der Weide.

16         Q.     Write him down, mark Van Der Weide,

17    and he is legal, correct?

18         A.     He's general counsel.

19         Q.     So I'll write GC as No. 21.

20         A.     Okay.

21                MS. CARLETTA:  Just for the record,

22    she is reading from Tab 10 of Exhibit 225.

23    BY MR. SCARBOROUGH:

24         Q.     Who else do you have?

25         A.     Jeff Walker.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 170

1    Q.    He's No. 3, correct?

2    A.    Yes.

3    Q.    Who else?

4    A.    Evan Winerman.

5    Q.    I'll write his name down.  What was

6    Evan's role?

7    A.    I believe Evan is in legal.

8    Q.    At the Board?

9    A.    Yes.

10   Q.    So do you see I've written him down as

11   No. 22?

12   A.    Yes.

13   Q.    Is that the complete list that you've

14   been able to compile of individuals who had

15   involvement in giving feedback in one way or another

16   to the denial recommendation?

17   A.    I would say that these are the

18   individuals that were involved in substantive

19   conversations around Custodia's master account

20   request from the Board of Governors.

21   Q.    Okay.  Does the Kansas City Fed have

22   any knowledge or awareness of briefings that were

23   provided to Vice Chair Barr in connection with

24   Custodia -- both its membership application and its

25   master account request?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 171

1          A.     I understand that Vice Chair Barr was

2    briefed on the membership application that was filed

3    by Custodia and in conjunction with that was informed

4    about the status of the Custodia's master account

5    request.

6          Q.     Was there any interaction between any

7    officer or representative of the Kansas City Fed and

8    Vice Chair Barr?

9               MS. CARLETTA:  Objection.  Form.

10   BY MR. SCARBOROUGH:

11         Q.     In connection with Custodia?

12               MS. CARLETTA:  Objection.  Form.

13         A.     Staff from Kansas City Fed did not

14   meet with Vice Chair Barr.

15   BY MR. SCARBOROUGH:

16         Q.     Was Vice Chair Barr a member of the

17   PSPAC?

18         A.     I do not believe so.

19         Q.     Are you familiar with Governor

20   Quarles?

21         A.     I am.

22         Q.     Did Governor Quarles serve on the

23   PSPAC?

24         A.     I don't know.

25         Q.     Did Governor Quarles, to your

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 172

1      knowledge, have any involvement with staff from the

2      Kansas City Fed in connection with Custodia's master

3      account request?

4             A.     I don't believe so.

5             Q.     Did he have any involvement with

6      Kansas City Fed staff in connection with more

7      generally either the SPDI charters or other novel

8      charter type entities and the issues that they would

9      raise?

10                   MS. CARLETTA:  Objection.  Form.

11     Outside the scope.

12            A.     I'm not familiar with conversations

13     between Federal Reserve Bank of Kansas City staff and

14     Vice Chair Quarles.

15     BY MR. SCARBOROUGH:

16            Q.     Okay.  Are you familiar with Courtney

17     DeMartini?

18                   The name is familiar.

19            Q.     Do you know if Courtney DeMartini was

20     an employee of the Federal Reserve Board?

21            A.     I would have to confirm that.

22            Q.     Let me hand you a document that's been

23     previously marked as Exhibit 28.  Do you see that

24     this is an email that Jason Hinkle sent to Judith

25     Hazen and other folks, including Board staff, in

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 173

1      connection with the draft recommendation memo for

2      Custodia?

3              A.      Yes.

4              Q.      And one of the people that he sent it

5      to is listed as Courtney DeMartini.

6                      Do you see that?

7              A.      I do.

8              Q.      Does the email address for Courtney

9      indicate that she was -- or is a Board employee?

10             A.      It does.

11             Q.      So I'm going to write Courtney's name

12     down as somebody else who would have touched the

13     issue around Custodia and its -- the recommendation

14     for its master account.

15                     MS. CARLETTA:  Objection.  That's also

16     changing the nature of the document.

17             A.      I didn't have her noted as someone

18     that we had substantive discussions with, but I do

19     see she is on the email that had -- that was

20     responsive to the draft recommendation.

21     BY MR. SCARBOROUGH:

22             Q.      Okay.  So I've written her name as

23     No. 23.

24                     Do you see that?

25             A.      I see that.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 174

1          Q.     But you're not aware of what her role

2     was specifically at the Board at the moment, right?

3          A.     I don't know her position, no.

4          Q.     Now, there's also a reference on the

5     cc line to Joshua Chadwick?

6          A.     Yes.

7          Q.     He is also a Board member with the

8     legal department there?

9          A.     I believe so, yes.

10          Q.     Did you have any substantive -- did

11     the Kansas City Fed have any substantive interaction

12     with Mr. Chadwick in connection with the Custodia

13     master account recommendation?

14          A.     I didn't have him noted as one, but I

15     see that he's included in the cc line on the email.

16          Q.     And do you see I've written him down

17     as No. 24, Joshua Chadwick, legal?

18          A.     I see that.

19          Q.     Is there anybody else that comes to

20     mind at the moment, and we can go through individual

21     documents later, but is there anybody else that comes

22     to mind that the Kansas City Fed would have engaged

23     with from the Board in connection either with

24     Custodia and its master account request or more

25     generally in connection with considering the policy

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 175

1      issues raised by novel chartered entities like SPDIs

2      and the like?

3                     MS. CARLETTA:   Objection.   Form and

4      outside the scope.

5      BY MR. SCARBOROUGH:

6             Q.     And I'll hand you Exhibit 233 so you

7      have that in front of you, but is there anybody

8      that's not reflected on that list so far?

9                     MS. CARLETTA:   Same objections.

10            A.     So to the latter part of your

11     question, there were conversations broadly that

12     were happening around evolution in the financial

13     industry, so this would not be an inclusive list of

14     all conversation that is have happened across the

15     Federal Reserve System in regard to individuals

16     that you've identified that are on emails, yes, I

17     see that we've pulled out the names that are relevant

18     from the Board, and then it's also inclusive of the

19     list that I had identified of individuals that the

20     Reserve Bank had substantive discussions regarding

21     Custodia.

22                     I don't have a full list of everyone

23     that's been engaged in watching the evolution of the

24     financial system for the last four years for this

25     discussion today.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 176

1     BY MR. SCARBOROUGH:

2              Q.     And if we were to include that, that

3     would include people like Jeff Ernst, for instance?

4                    MS. CARLETTA:  Objection.  Form.

5     Outside the scope.

6              A.     Among others, yes.

7                    MR. SCARBOROUGH:  Why don't we go

8     ahead and take our lunch break, and then we can pick

9     up afterwards.

10                   (Off the record from 12:37 to 1:20.)

11    BY MR. SCARBOROUGH:

12             Q.     All right.  We are back after lunch.

13    When we were talking earlier about the interactions

14    that occurred between Board staff or Board Governors

15    and representatives of the Kansas City Fed in

16    connection with the recommendation to deny Custodia a

17    master account, you mentioned that there were

18    substantive discussions with Lael Brainard.

19                    Do you remember that?

20             A.     Yes.

21             Q.     Can you on behalf of the Kansas City

22    Fed describe what those discussions were with

23    Vice Chair Brainard?

24                    MS. CARLETTA:  Objection.  Form.

25             A.     So discussions regarding Custodia's

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 177

1    master account request would have occurred between

2    Vice Chair Brainard and President Esther George.

3    BY MR. SCARBOROUGH:

4           Q.     Can you tell me about the substance of

5    those discussions?

6           A.     I believe according to President

7    George's testimony that there were discussions around

8    legal eligibility.

9           Q.     Is the sum and substance of your

10   knowledge to testify about discussions that occurred

11   with Vice Chair Brainard what Esther George testified

12   to in her deposition?

13          A.     Yes.

14          Q.     Are you aware of any other sources of

15   information or knowledge beyond Esther George's

16   testimony that would address the substance of any

17   communications involving Vice Chair Brainard?

18          A.     No.

19          Q.     Are you aware of any documents that

20   have been prepared to summarize communications from

21   Vice Chair Brainard concerning Custodia's master

22   account request?

23                 MS. CARLETTA:  Objection.  Form.

24          A.     So I think the direct or the firsthand

25   account of the conversations between Esther George

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 331

1      denial letter sent to --

2              A.      The denial letter sent to Custodia and

3      the memorandum sent to Esther George documenting

4      staff analysis and recommending denial.

5              Q.      And when that decision was made, was

6      output from PSPAC used to arrive at that decision?

7              A.      No.

8              Q.      How about the NTAA?

9              A.      No, other than to the extent that the

10     handbook that was being drafted would have been

11     referenced to see if there were principles or risks

12     that ought to be included in our analysis.

13             Q.      And how about either workstream?

14             A.      No.

15             Q.      I'm just going to turn quickly to

16     30(b)(6) Topic 3.  I don't -- we marked that as an

17     exhibit, the topics?

18                     MR. SCARBOROUGH:  Yes.  It's the first

19     exhibit we marked today, 224.

20                     MS. CARLETTA:  Thanks.

21     BY MR. SCARBOROUGH:

22             Q.      Did you prepare on this topic?

23             A.      Yes.

24             Q.      Did you undertake to identify

25     individuals at the Board who had substantive

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 332

1    discussions with the Reserve Bank of Kansas City

2    employees about Custodia's master account request?

3            A.    Yes.

4            Q.    When I say substantive, what do you

5    think that means?

6            A.    So when I say substantive, I feel that

7    those are individuals that were sufficiently informed

8    on the matters that we were seeking their input on,

9    so in discussion with legal counsel or with legal

10   staff, I think that those would be individuals that

11   we were engaging in the legal eligibility question.

12   I also think that those that were providing input on

13   our analysis for financial stainless steel and

14   monetary policy risk would have been informed enough

15   to provide input on that.

16           Q.    So I'm going to now turn to what has

17   been marked as Exhibit 233.  Is this the document

18   that Custodia counsel created during this deposition

19   today?

20           A.    Yes.

21           Q.    And so, first, did counsel direct you

22   to Exhibit 202 to identify some of the individuals on

23   Exhibit 233?

24           A.    Yes.

25           Q.    I want you to take a look at

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 333

1    Exhibit 202.  Does 202 appear to accurately reflect
2    all of the members on each of these committees?
3             A.    This appears to be an early draft of
4    individuals that were contemplated for the
5    workstream.
6             Q.    So is it fair to say that the document
7    in Exhibit 202 is not accurate?
8             A.    Yes.
9                   MR. SCARBOROUGH:  Objection to the
10    form.
11    BY MS. CARLETTA:
12             Q.    Is it fair to say that individuals
13    identified on Exhibit 233 that were referenced in
14    Exhibit 202 may not be accurate?
15                  MR. SCARBOROUGH:  Objection to form.
16             A.    That's correct.
17    BY MS. CARLETTA:
18             Q.    So looking at Exhibit 233, what is the
19    title of this exhibit?
20             A.    Federal Reserve Bank Staff/Governors.
21             Q.    Does the title indicate whether the
22    people on this list had substantive discussions with
23    the Reserve Bank of Kansas City about Custodia's
24    master account request?
25             A.    It does not.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 334

1        Q.    Does the title indicate whether people

2   on this list told the Reserve Bank of Kansas City to

3   grand or deny Custodia's master account request?

4        A.    It does not.

5        Q.    Would it be accurate to write on here

6   that the list includes Board of Governors personnel

7   who had no substantive discussion with the Federal

8   Reserve Bank of Kansas City on whether to deny

9   Custodia's request?

10              MR. SCARBOROUGH:  Objection to form.

11        A.    Yes.  That would be accurate.

12   BY MS. CARLETTA:

13        Q.    So I want you to take that red pen.

14   First I want you to tell me what is the color pen

15   that was used on this document.

16        A.    Black.

17        Q.    What color pen do you have?

18        A.    Red.

19        Q.    I want to be clear I'm going to

20   instruct you to write on this document but I do not

21   want you to write anywhere that would render anything

22   on this document legible, so not on the writing.

23   Maybe over here to the side where there is no

24   writing, okay?

25        A.    Okay.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 335

1          Q.     I want you to write what you have

2     indicated would be accurate, and correct me if I'm

3     wrong, but I believe it's that this list includes

4     Board of Governors personnel --

5                    MR. SCARBOROUGH:  Hang on.  Before you

6     write anything, let her ask her question.

7                    THE WITNESS:  Okay.

8     BY MS. CARLETTA:

9          Q.     And please confirm with me that you

10    agree this is accurate.  This list includes Board of

11    Governors personnel who had no substantive discussion

12    with the Federal Reserve Bank of Kansas City on

13    whether to deny Custodia request.

14         A.     That is accurate.

15                   MR. SCARBOROUGH:  I'm going to object

16    to the question and the instruction, because that is

17    not what is referenced or meant by the compilation

18    that has been put together as Exhibit 233.

19                   MS. CARLETTA:  Well, I think you've

20    changed the compilation on multiple occasions, so I

21    want to be very clear on what the list does and does

22    not represent.

23                   MR. SCARBOROUGH:  The list represents

24    anybody at the Board of Governors who had involvement

25    in determining issues with Custodia's master account

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 336

1    request or any involvement in determining policy
2    matters related to -- related to novel chartered
3    entities like SPDIs, so, for instance, account access
4    guidelines, handbooks that were developed, the
5    account request information sharing group.
6                    It reflects everybody at the Board who
7    the witness was able to document had involvement in
8    one of those things.  That is an accurate reflection
9    of what the list reflects.
10                   MS. CARLETTA:  Do you agree with that
11   characterization?  Is that accurate?
12                   THE WITNESS:  There are individuals on
13   this list that come from the document that you
14   provided that had proposed names for participation on
15   the account steering group, the policy workstream and
16   the practical workstream that, to my knowledge,
17   didn't have substantive input.
18                   MR. SCARBOROUGH:  Which individuals --
19   we're going to go back and forth for a minute.
20                   MS. CARLETTA:  No, no.  I want to
21   finish my questioning first.  If you want to redirect
22   her, that's fine.
23                   But I want to be clear on something.
24   Are you instructing that she can't write on this
25   document?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 337

1           MR. SCARBOROUGH:  I'm asking her to
2      identify which individuals that she has testified
3      were on these committees on Exhibit 202, which
4      individuals that she is now taking the position were
5      not involved in those committees on behalf of the
6      Kansas City Fed.
7           MS. CARLETTA:  Objection to form an
8      scope.
9           Do you know?
10          THE WITNESS:  Before you were asking
11     me if the list of names that you were referencing
12     from that document was accurate, I don't believe that
13     that list of names is inclusive or includes -- it
14     includes individuals that I'm not aware participated
15     on those workstreams.
16                       EXAMINATION
17     BY MR. SCARBOROUGH:
18          Q.    Do you have a basis to say that they
19     did not participate on those workstreams?  And which
20     individual or individuals are you thinking of?  Let's
21     be clear.
22          MS. CARLETTA:  Objection.  Form and
23     outside the scope.
24          A.    Again, I see names that are on there
25     that are highlighted.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 338

1    BY MR. SCARBOROUGH:

2          Q.     Which names are you referencing?

3          A.     And I'm not certain what their

4    engagement was.

5          Q.     Which names are you referencing?

6    That's what I want to know.

7          A.     I wasn't able to speak to David Lowe

8    or to Ben Hobbs, as an example.

9          Q.     Where is David Lowe's name -- I see

10   it.  Under the practical workstream one on

11   Exhibit 202?  That's who you're referencing there?

12         A.     Yes.

13         Q.     And you said there was another name,

14   Ben Hobbs?

15         A.     Ben Hobbs.

16         Q.     Do you know David Lowe or Ben Hobbs?

17         A.     I don't know David Lowe.  I do know

18   Ben Hobbs.

19         Q.     Do you know if either one of them

20   served on the practical workstream?

21         A.     I would need to confirm that this list

22   is accurate that this is the individuals that were on

23   the practical workstream.

24         Q.     Do you have a basis to believe that

25   David Lowe and Ben Hobbs did not serve on the

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 339

1     practical workstream?

2                    MS. CARLETTA:  Objection.  Form and

3     outside the scope.

4          A.     I just wanted to clarify that when you

5     were putting the list together, you were asking me if

6     the names that you were reading on here were on this

7     document, and I see that these names are on this

8     document but I also see that these names -- or this

9     document has items highlighted that say to be

10    determined, so I don't believe that this is the final

11    list of individuals that were on these workstreams,

12    so I -- yes, these names that you wrote over here are

13    the names that are also written on this document.

14                   I just want to make sure that I'm

15    clear that this document -- I don't know that this is

16    a finalized version.

17    BY MR. SCARBOROUGH:

18         Q.     Ms. Hazen, and perhaps you don't

19    understand it from the document, but did you

20    understand -- do you understand that this document

21    was prepared by the Board reflecting the Board

22    members who would be serving -- or the Board staff

23    who would be serving as members of the various

24    steering committees and workstreams and was sent to

25    certain Reserve Banks to have them identify and fill

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 340

1    in in the to-be-determined highlighted areas who from

2    a particular Reserve Bank would be serving in a given

3    role?

4                    MS. CARLETTA:  Objection.  Form and

5    misstates the document.

6            A.    I don't know from the document who

7    drafted it or who it was sent to.

8    BY MR. SCARBOROUGH:

9            Q.    Do you see that the TBD,

10   to-be-determined highlight on the first page of

11   Exhibit 202 references the Federal Reserve Bank of

12   San Francisco?

13           A.    I see the bullet that says TBD,

14   San Francisco.

15           Q.    And do you see on the second page of

16   the document the highlighted person is Avery Belka

17   from the San Francisco Federal Reserve Bank?

18           A.    I see that.

19           Q.    Do you see that the down below under

20   the System staff that it references Sabastian Astrada

21   highlighted as from the Reserve Bank of

22   San Francisco?

23           A.    Again, on the document you're asking

24   me to read from, I see the words and the highlighting

25   that you're noting.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 341

1        Q.     And none of those people from the
2   Reserve Bank in San Francisco or any other Reserve
3   Bank are listed and included on Exhibit 233, are
4   they, ma'am?
5        A.     The individuals that are highlighted
6   on this document aren't written on this document, but
7   the fact that this document has placeholders in it
8   makes me question if this is a finalized document, so
9   I don't know what changed between this document and a
10  finalized one.
11       Q.     So the only two names that you're not
12  sure about from the Board that are included on
13  Exhibit 233 are David Lowe and Ben Hobbs; is that
14  right?
15            MS. CARLETTA:  Objection.  Form.
16       A.     Is the question are those the
17  individuals that served on these workstreams?
18  BY MR. SCARBOROUGH:
19       Q.     Yeah.  Those are the only two that you
20  have a question about whether they participated in
21  these workstreams or the steering committee?
22            MS. CARLETTA:  Objection.  Form and
23  misstates testimony.
24       A.     So if you want me to confirm that this
25  list of names all participated on these workstream, I

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 342

1    will need to do that.

2    BY MR. SCARBOROUGH:

3         Q.    I asked -- I'm sorry.  I didn't mean

4    to interrupt you.

5         A.    You compiled this list by reading the

6    names that were on this group.

7         Q.    One of the topics that you were asked

8    to prepare to testify about today was people at the

9    Board level, the staff level who had involvement in

10   these work groups or who had involvement in

11   Custodia's master account request; isn't that

12   right?

13              MS. CARLETTA:  And I'll note that we

14   issued objections that that was overbroad, among

15   other objections.

16        A.    So I was prepared to discuss the

17   individuals at the Board that had communications with

18   FRBKC that were substantive to Custodia's master

19   account request.  These work groups existed over a

20   period of a number of years, and so there were

21   changes over time, the individuals that sat on them,

22   so I can't tell you that this list is inclusive of

23   individuals at the Board of Governors that

24   participates on these workstreams.

25   BY MR. SCARBOROUGH:

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 343

1      Q.      There could be more people from the

2   Board of Governors given the period of time that

3   we're talking about here who participated either as

4   steering committee members or on the workstreams,

5   correct?

6              MS. CARLETTA:  Objection.  Form.

7      A.      There could be some that are not

8   included on this document.  There could also be some

9   included on this document that ultimately did not

10  actually serve on these work groups, so I could just

11  tell you that these documents has these individuals

12  on it.

13  BY MR. SCARBOROUGH:

14     Q.      Okay.  So why don't you take your red

15  pen, and for the two individuals that you're not

16  sure about right now, David Lowe and Ben Hobbs, why

17  don't you put an asterisk beside each one of their

18  names?

19              MS. CARLETTA:  Objection.  Form.

20  Misstates her testimony and misstates the document.

21              Do you want her to mark up every one

22  she is not sure about?

23              MR. SCARBOROUGH:  Well, she's only

24  identified two.

25              MS. CARLETTA:  She's identified at

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 344

1      least two.

2                     MR. SCARBOROUGH:  Counsel, I asked her

3      to -- we issued a notice to have her prepared to

4      testify about this, and she clearly is trying to back

5      away and is not prepared to testify about something

6      that was clearly noticed.

7                     MS. CARLETTA:  I think we made very

8      clear in our objections that she would not be

9      testifying to every individual that served on all of

10     those Board working groups.  We said subject to -- we

11     had a whole host of objections, including subject to

12     and without waiving the foregoing objections FRBKC

13     will produce a witness to discuss generally the

14     committees or working groups that materially

15     contributed to the decision to deny Custodia's master

16     account request.  That's what we said she would be

17     prepared to speak on.

18                     MR. SCARBOROUGH:  Are you going to

19     bring her back to address the topic?

20                     MS. CARLETTA:  If you want to bring it

21     to the magistrate, we stand on our objections.

22                     MR. SCARBOROUGH:  That's what I'm

23     asking.  Are you going to bring her back to address

24     the topic or no?

25                     MS. CARLETTA:  If instructed to do so.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 345

1          MR. SCARBOROUGH:  Then I think the

2     list that we've compiled stands as is.  If you have a

3     concern or objection to it, you can raise it, but I

4     am going to instruct her other than if she wants to

5     put an asterisk beside the two names she has

6     identified but she should not write on the document

7     otherwise.

8          MS. CARLETTA:  Okay.  So just to be

9     clear, you're instructing her not to write on a

10    document that you created during this deposition --

11         MR. SCARBOROUGH:  Yeah.

12         MS. CARLETTA:  -- that's supposed to

13    reflect her testimony?

14         MR. SCARBOROUGH:  That's correct.  If

15    she wants to put an asterisk beside the two names

16    that she identified as not being sure if they were

17    actually on the practical workstream one as

18    identified in Exhibit 202, that's fine.

19         MS. CARLETTA:  Okay.  And that

20    misstates her testimony, but you can take this back.

21    We're going to create our own document that we'll

22    enter in as FRB exhibit whatever our next exhibit

23    number is.

24         (FRB Exhibit No. 237 was marked for

25    identification.)

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 346

```
 1                      EXAMINATION
 2    BY MS. CARLETTA:
 3          Q.    So we're going to mark into evidence
 4    Exhibit 237, and, Judith, would it be accurate to say
 5    that Exhibit 233 is a list written by opposed counsel
 6    that includes names of Board of Governors personnel
 7    who did not have substantive discussions with the
 8    Federal Reserve Bank of Kansas City on whether to
 9    deny Custodia request?
10                 MR. SCARBOROUGH:  Objection to form.
11          A.    Yes.
12    BY MS. CARLETTA:
13          Q.    Can you write that on this piece of
14    paper?
15          A.    Can you repeat it more slowly?
16          Q.    Sure.  Exhibit 233 is a list written
17    by opposing counsel for Custodia that includes names
18    of Board of Governors personnel who did not have
19    substantive discussions with the Reserve Bank of
20    Kansas City on whether to deny Custodia's master
21    account request.
22                 MR. SCARBOROUGH:  I'm going to object
23    to the form.
24                 MS. CARLETTA:  And I just want one
25    minute to make sure we're all set, and then I think
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

                                          Page 347

 1     I'm done.

 2                    (Off the record from 6:37-6:40.)

 3                    MS. CARLETTA:  We're done.

 4                    MR. SCARBOROUGH:  I have a few

 5     follow-up questions.

 6                         EXAMINATION

 7     BY MR. SCARBOROUGH:

 8          Q.    Ms. Hazen, you were asked some

 9     questions by counsel about the PSPAC and the

10     nontraditional account access working group and then

11     the workstreams underneath the NTAA.

12                    Do you recall that?

13          A.    I do.

14          Q.    The members of PSPAC discussed Wyoming

15     SPDIs during some of their meetings, correct?

16                    MS. CARLETTA:  Objection.  Form and

17     outside the scope.

18          A.    I believe the PSPAC was aware of the

19     Wyoming SPDI charter.

20     BY MR. SCARBOROUGH:

21          Q.    And the notes kept by Tara Humston,

22     for example, reference the fact that PSPAC was

23     discussing Wyoming SPDIs at various point, correct?

24                    MS. CARLETTA:  Objection.  Form.

25     Outside the scope.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 348

1          A.     I believe Tara Humston's notes

2     reference that PSPAC had discussions about the type

3     of institution SPDI.

4     BY MR. SCARBOROUGH:

5          Q.     And the PSPAC, did the PSPAC also play

6     a role in the development of the account access

7     guidelines by the Board?

8                    MS. CARLETTA:  Objection.  Form.

9          A.     So the PSPAC wouldn't have been the

10    body that developed the guidelines.

11    BY MR. SCARBOROUGH:

12         Q.     But the PSPAC was the body that

13    determined that guidelines would be necessary and set

14    in motion the development of the account access

15    guidelines, correct?

16                   MS. CARLETTA:  Objection.  Form and

17    outside the scope.

18         A.     I believe that the PSPAC asked the

19    nontraditional account access group to consider what

20    actions might be appropriate and then also were aware

21    of the recommendation to draft the principles and put

22    them out for public comment as account access

23    guidelines.

24    BY MR. SCARBOROUGH:

25         Q.     Can you keep your voice up?  I think