# EXHIBIT 93

CONFIDENTIAL

In accordance with a protective order, the enclosure(s) shall be treated as confidential and shall not be shown to any person other than those persons designated in paragraph 8.2 of the paragraph order.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING

CUSTODIA BANK, INC.,           )
                               )
            Plaintiff,         )
                               )
    v.                         )
                               )  1:22-cv-00125-SWS
FEDERAL RESERVE BOARD          )
OF GOVERNORS AND               )
FEDERAL RESERVE BANK OF        )
KANSAS CITY,                   )
                               )
            Defendants.        )


         * DESIGNATED CONFIDENTIAL *
       * SUBJECT TO A PROTECTIVE ORDER *


ZOOM/IN-PERSON DEPOSITION OF ESTHER GEORGE, a Witness, taken remotely on behalf of the Plaintiff before Peggy E. Corbett, CSR, CCR, RDR, pursuant to Notice on the 9th day of November, 2023, at the offices of the Federal Reserve Bank of Kansas City, 1 Memorial Drive, Kansas City, Missouri 64198.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 35

1           MR. MICHAELSON:  Objection, form.
2       A.   I'm not sure what a risk rating would
3   have --
4       Q.   (BY MR. ORTIZ)  You're not sure --
5       A.   I'm not sure that that is a field in the
6   database.  I'm not familiar with a risk rating.
7       Q.   You're not familiar with a risk rating
8   that can be A, B, or C, or S, if it's a new type
9   of institution, none of that rings a bell with
10  you?
11      A.   I would not have been involved in those.
12      Q.   Did you ever have specific conversations
13  with Albert Forkner specific to Custodia?
14      A.   I did have conversations with Albert
15  about Custodia.
16      Q.   How many times do you think you talked
17  to him, either in person or on the phone about
18  Custodia?
19      A.   I might have talked to him two or three
20  times.
21      Q.   Was it early on in the process or was it
22  throughout the process?
23      A.   I would have talked to him early on
24  before the legislation passed.  I would have
25  talked to him at the point that the request had

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 36

1  been made to us for the master account to
2  understand how they were doing the supervisory
3  program that would come alongside that.
4      Q.  Did you talk to him sometime later on,
5  as well?
6      A.  I could have talked to him later on.
7      Q.  When you talked to him early on in the
8  legislative process, did you tell him you were
9  not a fan of SPDIs or you were skeptical of this,
10 anything like that?
11         MR. MICHAELSON:  Objection, form.
12     A.  I think in my early conversations Albert
13 as the State bank Commissioner was expressing his
14 own concerns about how these institutions would
15 be supervised, and I shared his concerns, with
16 trying to understand the risk profile and how the
17 State would go about assessing those risks.
18     Q.  (BY MR. ORTIZ)  Then after the
19 legislation passes and Custodia has submitted its
20 application for a master account, what were your
21 conversations with Albert Forkner then?
22         MR. MICHAELSON:  Objection, form.
23     Q.  (BY MR. ORTIZ)  If you recall.
24     A.  My conversations then were really his
25 asking questions about what factors we'd be

Page 37

1   considering, how we would go about making these
2   determinations.
3           He would share information about their
4   supervisory program and how they were beginning
5   to think about carrying out their role.
6       Q.   Did Albert Forkner tell you that if they
7   were an eligible depository institution, you
8   didn't have the authority to deny them a master
9   account, that legally you had to give them one?
10      A.   I don't recall Albert telling me what my
11  authorities were around the master account.  He
12  did raise questions about legal eligibility.
13      Q.   (BY MR. ORTIZ)  He basically told you
14  under Monetary Control Act you couldn't
15  discriminate against Custodia and not give them a
16  master account, didn't he?
17          MR. MICHAELSON:  Objection, form.
18      A.   That could have been Albert's opinion.
19      Q.   (BY MR. ORTIZ)  Sure.  There were other
20  people that you respected that throughout this
21  process gave you their opinions about whether you
22  were obligated to give Custodia a master account,
23  agreed?
24          MR. MICHAELSON:  Objection, form.
25      A.   There could have been, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 64

1  Q. Because the Wyoming Division of Banking
2  was a bit frustrated with the delays. That got
3  back to you, didn't it?
4  A. I was not aware they were frustrated
5  with delays.
6  Q. Well, then tell me the context of
7  Governor Gordon reaching out to you for a
8  conversation to understand the timing of this
9  then.
10 A. Because Custodia was concerned about the
11 timing my assumption was that that was where he
12 was getting the questions, and wanted to hear
13 first-hand from us how we were handling this
14 request.
15 Q. And when you say Custodia was concerned
16 about the timing, you mean Custodia was concerned
17 about how long this was taking, correct?
18 A. Custodia had raised that question
19 several times.
20 Q. Governor Gordon also talked to you about
21 the fact that it was important that these type of
22 chartered SPDI institutions be able to get a
23 master account. He talked to you directly about
24 that, as well, didn't he?
25 A. I don't remember Governor Gordon talking

Page 65

1   about the importance of the master account per
2   se.  Governor Gordon knew it was important for
3   these institutions to begin to operate, and that
4   they very much wanted a master account at the
5   Kansas City Fed.
6       Q.  Sure.  Well, Governor Gordon expressed
7   to you that in order for these institutions to be
8   viable, they needed direct access to Fed services
9   through a master account.
10      A.  Governor Gordon did not indicate that to
11  me at any time.
12      Q.  Never?
13      A.  Not that they would be -- not that they
14  would not be viable without access to a master
15  account.
16      Q.  Did you ever have that conversation with
17  him and tell him you wanted them going a
18  different route?
19      A.  I specifically had that conversation
20  with Albert Forkner in the State Banking
21  Department to ask on several occasions:  Was
22  access to a master account at the Kansas City Fed
23  the only route to viable operations for these
24  entities?  And each time the answer was:  No, it
25  is desirable, but it is not required for them to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1  begin operations."
2      Q.   So Albert Forkner said, "I guess if they
3  get a correspondent bank relationship, they could
4  technically be viable."  That's what he told you,
5  wasn't it?
6      A.   That was the nature of his response.
7      Q.   But you knew from Custodia that that
8  really wasn't an option for long-term viability
9  because of the fees they had to pay a
10 correspondent bank, and that's why the direct
11 access to a master account was so important,
12 correct?
13     A.   We understood from Custodia that they
14 wanted a master account at the Kansas City Fed.
15     Q.   Because of what I just said, because of
16 the fees they would have to pay a correspondent
17 bank to go through their master account, you knew
18 that, as well, didn't you?
19     A.   I knew they had their reasons around why
20 they wanted a master account versus using a
21 correspondent bank.
22     Q.   So is what I said incorrect?  What were
23 the reasons you understood that they wanted their
24 own master account?
25     A.   My understanding of their -- because

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 67

1    they had requested it, and I do not recall asking
2    their motivation, although going through a
3    third-party likely did involve other kinds of
4    costs.
5         Q.   Getting back to what Tara Humston
6    reported to you in her conversations with Caitlin
7    Long, the conversations with Caitlin Long where
8    she reported or she said, "I told her there were
9    no show-stoppers, "was in the context of Caitlin
10   saying, "Are we going to be able to get our
11   master account?"  That was the context of that
12   conversation, true?
13             MR. MICHAELSON:  Objection, form.
14        A.   I wasn't involved in the conversation,
15   so I can't speak to that.
16        Q.   (BY MR. ORTIZ)  So you're not sure if
17   that's true or not?
18        A.   I wasn't party to the conversation.
19        Q.   All you know is that it was reported
20   back to you by Tara that she had conversations
21   with Caitlin and told her there were no
22   show-stoppers.  That's basically what you know
23   about that?
24        A.   That was my understanding.
25        Q.   So many people have testified under oath

```
 1    staff and Albert Forkner.  Do you recall this?
 2        A.   I've read it, yes.
 3        Q.   Is this one of the documents that you
 4    read in prep for today?
 5        A.   I did see that.
 6        Q.   So I want to direct you to the big
 7    middle paragraph toward the bottom, the bottom
 8    fourth where it says understandably.  Do you see
 9    that word?
10        A.   Yes.
11        Q.   "Understandably, Albert was disappointed
12    and while we did not discuss approval or denial,
13    he did share that he does not see a path for
14    denial based on the legal criteria.  He also
15    questioned how the OCC's recent letter on
16    national bank activity should be considered,
17    wondering if a denial of a SPDI would be viewed
18    as preventing new entrants, when the activity is
19    permissible for a national bank.
20             That's pretty clear, the way he viewed
21    the law and the right of Custodia to get a master
22    account, agreed?
23                 MR. MICHAELSON:  Objection, form.
24        A.   Yes, I think this is an expression of
25    his assessment.
```

Page 92

1    Q.   (BY MR. ORTIZ)  Did you direct your
2    staff to answer those particular questions about
3    the OCC's letter saying that this is legally
4    permissible activity and whether you were
5    obligated to give them a master account?
6    A.   So these were the same issues that we
7    were engaged in as we asked the Board of
8    Governors to give us insight on the policy
9    aspects here and on the threshold question of
10   legal eligibility, including the nature of the
11   OCC's charter.
12   Q.   So were you trying to stall for time
13   because you really didn't want to answer the
14   questions about whether you had to give them a
15   master account?
16   A.   I was not stalling for time.  I was --
17   my objective was to collect information and to
18   inform a decision that I thought was
19   consequential for not only Custodia, but for
20   those that would follow.
21   Q.   Would it be a concern of others, if you
22   gave a master account to Custodia, it was a
23   weighing concern that you might have others that
24   would want the same thing?
25   A.   We understood that to say to endorse one

1   would be setting a precedent for how others would
2   understand their eligibility and access
3   expectations.
4       Q.   Philosophically did you not want a bunch
5   of SPDI charters having access to the Federal
6   Reserve system?
7           MR. MICHAELSON:  Objection, form.
8       A.   There was never a point that we had a
9   preference one way or the other.  We were really
10  trying to understand the nature of the charter
11  and to fulfill our responsibilities for providing
12  financial services to eligible institutions.
13      Q.   (BY MR. ORTIZ)  Let me hand you what we
14  already have in evidence as Exhibit 7,
15  Ms. George.  We are now say 4 or 5 months forward
16  in time from the last exhibit.
17          These are communications between Tara
18  Humston and you.  Is this a document you saw
19  prior to today that you have prepared for?
20      A.   I believe I did see this.
21      Q.   So I want to go to the middle of that
22  paragraph when it's from Tara to you starting
23  with the word, "Meeting."  Well, let's go ahead
24  in the sentence before that.  "We would outline a
25  few key areas for discussion, but not requesting

Page 94

1   they submit any additional information to us.
2   Meeting with them might also buy us some time
3   while the system discussions are getting geared
4   up.  I think we would be pretty careful about
5   discussing these system groups that are starting
6   up, and just say we are engaged with our
7   colleagues to consider not only SPDI charters,
8   but also other non-traditional charter types that
9   may be requesting a master account."
10           Why did you want to hide from Custodia
11  that you were waiting for these system groups to
12  get up and running and tell you what you should
13  be doing?
14           MR. MICHAELSON:  Objection, form.
15       A.   So at no point were we interested in
16  hiding information from Custodia.
17       Q.   (BY MR. ORTIZ)  Well, what does that
18  mean then, to say that:  We want to buy some
19  time?  Buying some time means delay, doesn't it?
20       A.   So Custodia was regularly inquiring
21  whether they had provided the information that we
22  needed from them --
23       Q.   Okay.
24       A.   -- and perhaps with an understanding
25  that that would lead to the decision, and I think

Page 263

1    payment system.
2       Q.   You mentioned seeking out other's views.
3    Did you seek out views from the Board of
4    Governors, Board staff?
5       A.   So I sought views from the Board of
6    Governors, from my colleagues at the other 11
7    Reserve Banks in terms of their experience in
8    this space.
9            I would have contacted the Conference of
10   the State Bank Supervisors who would have been
11   watching this landscape at the State level unfold
12   for their views on it.
13      Q.   And did you feel that you had the
14   authority to reach out to the Board of Governors
15   for their views on these questions?
16      A.   I have often reached out to the Board of
17   Governors and their staff to inform decisions, to
18   clarify any number of issues.
19      Q.   At any time did you feel that the Board
20   interjected themselves into your decision-making
21   process?
22      A.   No, in fact, quite the opposite.  I felt
23   like I was having to knock on the door quite a
24   bit to again say:  "Are you making decisions?  Do
25   you see other parts of the banking agencies that

Page 264

1   are on the cusp of making decisions about this
2   that I should be aware of as I entertain this
3   request?"
4       Q.   So in those early months when you had
5   these questions, again did you have an
6   inclination at times as to whether to grant or
7   deny the request?
8       A.   I think initially we had enough
9   questions that I felt like we needed to resolve,
10  and again one of those very foundational
11  questions was this threshold issue of:  Are we
12  dealing with an institution that is eligible?
13          That would have then led to a series of
14  other things we had to answer.  If for some
15  reason they were not eligible, that would have
16  made moot some of these other questions.
17      Q.   Did you personally have a view on
18  whether they were eligible?
19      A.   I questioned whether they were eligible.
20  I questioned whether the way this charter had
21  been constructed was consistent with how the laws
22  that governed eligibility had viewed a bank, and
23  so that was really fundamental to the question I
24  was asking the Board of Governors, is to say:
25  Can you interpret that for me?  Are you

Page 265

1    interested in interpreting that?
2        Q.   So you mentioned the charter.  What was
3    the -- earlier today you answered questions about
4    concerning the novelty of the charter, the novel
5    nature of the charter.  What was the significance
6    of a SPDI charter being a novel charter?
7        A.   So I guess novel in a couple of ways.
8    Novel in the context of the nature of the
9    activities, so the crypto-asset focus and
10   concentration for the operation of this business
11   model, but novel in the sense that the states
12   have entities that they supervise at the State
13   level that are not connecting to the Federal
14   payment system.
15            And our normal legal regulatory
16   framework has been a different one.  It has been
17   one where a dual banking system involves both
18   national and state charters that come with
19   Federal supervision, that addresses any number of
20   issues in that landscape.
21            This charter was explicit that it would
22   be only state-supervised, that it would be
23   uninsured, and that it would intend to connect to
24   either the Federal Reserve or operate with a
25   third-party.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 266

1   Q.   Did the novelty of the charter present
2   supervisory issues that differed from supervision
3   of traditional banks?
4   A.   Well, to be clear, de novo institutions
5   always have a heightened focus in terms of
6   start-up operations, how quickly they will become
7   profitable, understanding the experience of the
8   management.  Those are fairly straightforward in
9   any de novo institution.
10          I think in one that involved a
11  relatively new type of digital asset, digital
12  currency, created another layer both around the
13  concentration risk associated with the narrow
14  activity, and really a broader understanding of
15  what supervisory regime would apply to this,
16  because we did not have models really to look to
17  to say:  How do you supervise digital currencies.
18  Q.   So what do you mean by that?  Why would
19  supervision of Custodia be different than
20  supervision of a traditional bank?
21  A.   Well, legal authorities would be one.
22  Q.   What do you mean by legal authorities?
23  A.   So in this case, for example, if you're
24  not -- if Custodia is not the traditional bank,
25  which it was not, it would be not subject to the