Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

*Counsel for Defendant Federal Reserve Bank of Kansas City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

<table>
<tr><td>

CUSTODIA BANK, INC.,

     *Plaintiff,*

       v.

FEDERAL RESERVE BOARD OF
GOVERNORS and FEDERAL RESERVE
BANK OF KANSAS CITY,

     *Defendants.*

</td><td>

No. 1:22-cv-00125-SWS

</td></tr>
</table>

## DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ................................................................................................................ 3

I.    The Federal Reserve Act Affords Discretion Over Access to Services............................. 3

      A.    The Federal Reserve Has Always Had Discretion Over Access to
            Accounts and Services, and the MCA Did Not Take That Away. ........................ 4

      B.    Custodia's Proposed "Open Access" Would "Throw Open the Doors" to
            Risky Institutions in Ways Congress Could Not Have Intended. ........................... 9

      C.    Discretion Is Consistent With the Dual Banking System. .................................... 13

II.   FRBKC Exercised Discretion in Denying Custodia's Master Account Request. ............ 15

III.  Custodia Has Conceded FRBKC's List of Undisputed Facts............................................ 19

IV.   Even if This Court Finds That the Board Dictated FRBKC's Denial of Custodia's
      Master Account Request, Custodia Is Still Not Entitled to a Master Account. ................. 20

CONCLUSION................................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*),
    2023 WL 7111182 (S.D.N.Y. Oct. 24, 2023) .................................................................. 12

*Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*,
    262 U.S. 649 (1923) ................................................................................................... 1, 4, 6

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................................................ 5

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ............................................................................................................ 5

*Lowe v. SEC*,
    472 U.S. 181 (1985) ............................................................................................................ 7

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ............................................................................................................ 5

*Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*,
    390 F.3d 684 (10th Cir. 2004) ............................................................................................ 5

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*,
    576 U.S. 519 (2015) ............................................................................................................ 5

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................................................ 9

**Statutes**

12 U.S.C. § 248a ................................................................................................... *passim*

12 U.S.C. § 248c ............................................................................................................ 6

12 U.S.C. § 342 ..................................................................................................... *passim*

12 U.S.C. § 461 .......................................................................................................... 11

12 U.S.C. § 1815 ........................................................................................................ 11

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
    Reading Law: The Interpretation of Legal Texts (2012) ...................................... 7, 8

Bd. of Governors,
   FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset
   Risks to Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d ........................ 11

Compl.,
   *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
   2015 WL 5025343 (D. Colo. 2015) (No. 15-cv-1633), ECF 1 .................................................. 12

*Master Account and Services Database*, FederalReserve.gov
   (current as of Dec. 15, 2023), http://tinyurl.com/4c95xdt9 ........................................................ 7

Wilmarth, Arthur, Jr.,
   *We Must Protect Investors and Our Banking System from the Crypto Industry*,
   101 Wash. U. L. Rev. 235 (2023) ..................................................................................................... 8

Wilmarth, Arthur, Jr.,
   Nat'l Cmty. Reinvestment Coal. et al., Comment Letter on
   Proposed Guidelines for Evaluating Account and Services Requests (Jan. 17, 2023),
   http://tinyurl.com/nzpc24us ......................................................................................................... 10

## PRELIMINARY STATEMENT

The parties agree that the "heart of the case is a legal issue," and there is much about the law that is not disputed. Custodia Opp. 4 (ECF 295) ("Opp.").  Before 1980, the Federal Reserve Act (the "FRA") authorized the Federal Reserve to exercise discretion over access to and use of services.  *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 655-56 (1923) (holding that "may" in 12 U.S.C. § 342 conferred discretion).  In 1980, Congress amended the FRA by enacting the Monetary Control Act (the "MCA") to reverse a decline in Federal Reserve membership and strengthen federal control over monetary policy.  The MCA accomplished this goal by imposing uniform reserve requirements on nonmember banks and opening up services to them with non-discriminatory pricing.  That much is clear.

The legal dispute concerns whether Congress went much further than that and eliminated the Federal Reserve's long-held discretion by providing all depository institutions an absolute entitlement to services.  But we know Congress did not do that because Congress *retained* § 342's "may"—authoritatively construed by the Supreme Court as establishing a discretion-based framework—and *extended* that discretion-based framework to nonmember banks (amending § 342 to bring "other depository institutions" within its scope).  The MCA's simultaneous amendments to 12 U.S.C. § 248a forbade discrimination in pricing, but that is a far cry from conferring an absolute right to access on each and every depository institution regardless of risk.  Section 248a does not say that, and there is not a shred of evidence that anyone in Congress intended that result.

Custodia proposes that the MCA mandates "open access" to services for all depository institutions, Opp. 1, but let's be clear: what Custodia is really talking about is access *and use*.  *See* Custodia Br. 5 (ECF 234) ("Custodia Br.").  And that's the problem.  Access to *and use of* Federal Reserve services presents a panoply of risks—to Reserve Banks, to the nation's financial stability, to implementation of federal monetary policy, and, ultimately, to taxpayers—that Custodia does

not dispute.  Instead, Custodia strains to explain how such risks might be mitigated, but its attempt to do so only serves to underscore why its absolute-entitlement legal theory cannot be right.  It first claims that the risks will be mitigated by "the state chartering process," Opp. 1, but states have neither the mission nor the means to look after federal interests, nor any direction from Congress to do so.  It then claims that the risks will be mitigated by Board powers to (a) "weed[] out" illegal and/or impermissible activities and (b) "establish terms governing account usage" based on risk. Opp. 1, 34.  It is telling that even Custodia recognizes that such discretion over access to and use of services must exist.  But if it does, then § 248a cannot simultaneously mandate an absolute entitlement to them.

It is Custodia's position—not FRBKC's—that threatens to undo the nation's dual banking system.  The Federal Reserve and federal banking agencies have exercised discretion as to state-chartered institutions for over a century, and the dual banking system has been doing just fine.  But if Custodia's legal position were to hold, federal influence over the banking and payment systems would be diminished to a degree unseen since the pre-FRA era littered with bank runs and fiscal crises.  Custodia's position would turn the keys to the federal payment rails over to each of 50 competing states (as well as the territories), none tasked with protecting national interests.

The Court ordered discovery to ascertain whether FRBKC exercised discretion in denying Custodia's master account request.  ECF 164 at 10.  After exhaustive discovery, Custodia has no evidence that the Board made or dictated the denial—no document indicates as much, no witness testified that it did, and a mountain of evidence shows that it did not.  That evidence demonstrates that FRBKC (but not the Board) had policies and procedures in place to handle account requests, including "non-routine" requests like Custodia's; that FRBKC's decision-makers were "skeptical" and "concern[ed]" about Custodia from the start; that this skepticism was initially driven by the

novel nature of Custodia's business plan (*e.g.*, providing uninsured deposit accounts while concentrating on crypto transactions and stablecoin issuance); that as soon as FRBKC started to kick the tires, it quickly found under-developed plans and substantial risk management and compliance gaps; and that, with this lawsuit pending, then-President George planning to retire, and risk-management gaps and regulatory questions persisting, FRBKC acted to deny the request, ultimately doing so after the Board expressed "no concerns" with its approach and denied Custodia membership (meaning that FRBKC would not need to reassess Custodia's request to take membership into account). These facts—none of which are in dispute—demonstrate that FRBKC exercised discretion.

Custodia's principal response is conjecture. It posits that the Board must have dictated the result because FRBKC did an "about-face" that can be explained only by Board intervention. Opp. 2, 35. But there was no about-face. FRBKC's decision-makers were skeptical from the start. Custodia was never even close, and, on top of that, Custodia fails to coherently explain how or when the Board intervened to change FRBKC's direction.

Ultimately, however, this case turns on the legal question of whether § 248a affords all depository institutions an absolute, nondiscretionary entitlement to access and use the enumerated services. It does not. Therefore, regardless of whether discretion lies with the Reserve Bank or the Board and regardless of their respective roles in Custodia's case, FRBKC and the Board are entitled to judgment as a matter of law.

## ARGUMENT

### I.   The Federal Reserve Act Affords Discretion Over Access to Services.

There is no question that the FRA afforded Reserve Banks discretion to grant or deny access to the federal payment system at the time of its passage. While the MCA amended the FRA in important ways, including by adding a non-discriminatory pricing provision, its innovation was

to extend that discretionary access framework—not to scrap that framework in favor of a regime of *automatic* access for all comers regardless of risk.

### A.   The Federal Reserve Has Always Had Discretion Over Access to Accounts and Services, and the MCA Did Not Take That Away.

The fact that § 342 afforded Reserve Banks discretion to grant or deny access to the federal payment system at the time of the FRA's passage is a thorny one for Custodia.  Rather than deal with it, Custodia tries to sweep it under the rug by insisting that "[t]he pertinent historical record starts in 1980 with passage of the Monetary Control Act."  Opp. 21.  But that view has no support in sound principles of statutory construction and runs contrary to the very canons Custodia invokes.  The MCA amended the FRA, so understanding the history and interpretation of the FRA is a critical part of understanding the context and meaning of the MCA.

Before the MCA, Congress, the Supreme Court, and the Federal Reserve all consistently viewed § 342 as affording Reserve Banks discretion over access to accounts and services.  In the wake of several severe bank panics, Congress passed the FRA in order to assert federal control over the regulation and supervision of banking.  *See* FRBKC Br. 5 (ECF 273); Board Br. 7 (ECF 271); Ex. 2 ("Ricks Rep.") at 6-7.  In *Farmers & Merchants Bank*, 262 U.S. at 655-56, the Supreme Court held that § 342 granted Reserve Banks discretion.  And documented evidence shows that Reserve Banks exercised that discretion over access to the federal payment rails, including nonmember access to and use of clearing accounts.  *See* Board Br. 8-10; FRBKC Br. 7-8; Ex. 3 at 365 (Chester Morrill, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys., Letter X-9187 (Apr. 26, 1935)).  Custodia does not address *any* of this.  In fact, Custodia managed to fill nearly 100 pages of briefing without so much as mentioning *Farmers & Merchants Bank*.  But ignoring Supreme Court precedent does not make it go away, and well-established canons of statutory construction refute the notion that Congress switched from a discretionary regime to automatic,

4

universal entitlement without changing § 342's permissive language. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519, 536 (2015) (when Congress amends a statute without changing language that courts had previously interpreted, that "is convincing support for the conclusion that Congress accepted and ratified" the courts' interpretation). Congress's decision to amend § 342 without modifying language that *Farmers & Merchants Bank* authoritatively held was permissive is a strong indication of its intent to retain this construction rather than overrule it.

Even aside from Congress's ratification of Federal Reserve discretion in the MCA's amendment to § 342, switching from that discretionary regime to one of automatic, universal entitlement would have been a radical change. It would have dramatically altered the federal/state balance by giving states the unilateral ability to decide which entities can access the Federal Reserve balance sheet, with no check at the federal level. *But cf. Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (Supreme Court will not find that Congress altered federal/state balance unless Congress's intent to do so is "clear and manifest" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))); *Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence that Congress "plainly intended" it). And it would have seriously threatened any number of important federal interests: without the ability to deny use of services where justified, the Federal Reserve could be limited in its ability to implement federal monetary policy, would bear greater financial risk of its own, and could even be forced to risk complicity in terrorist financing or BSA/AML violations. *But see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (Congress does not impose mandates of great significance in "cryptic" fashion); Board Br. 29-34.

Congress did no such thing.  What the Supreme Court said a century ago remains true: both before and after the MCA, the FRA has been "drawn with great care.  Throughout the [FRA] the distinction is clearly made between what the [B]oard and the Reserve Banks 'shall' do and what they 'may' do." *Farmers & Merchs. Bank*, 262 U.S. at 663.  Section 342 continues to give Reserve Banks discretion in considering access requests, and nothing in § 248a—directed to the Board, which does not and cannot provide deposit accounts—justifies overriding the settled meaning of § 342.[1]

Custodia ascribes (Opp. 4-11) a meaning to the phrase "shall be available" that it does not have—not as a matter of plain English, and certainly not when read in light of § 342's express grant of discretion.  Section 248a(c)(2) provides that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and ... nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks."  While services are to be made *available* to members and nonmembers on a nondiscriminatory basis, that does not mean services must be *provided* to each and every requester no matter what concerns a request may raise.  Not even member banks enjoy automatic, unfettered access to these services.  *See* Board Br. 15; Ex. 5 ("OC1") ¶¶ 2.3, 2.8 (Operating Circular 1 (1998)) ("All master accounts are subject

---

[1] Congress amended the FRA in 2022 to require the Board to maintain a public database of institutions that have requested, have been denied, or have access to a "reserve bank master account and services."  12 U.S.C. § 248c(b)(1).  The amendment defines "access request" as "a request to a Federal reserve bank for access to a reserve bank master account and services" and defines "Reserve bank master account and services" as "an account in which a Federal reserve bank ... receives deposits ... or ... provides any service under section 248a(b)."  12 U.S.C. § 248c(a)(1), (3).  Access to a "reserve bank master account" must logically be governed by the provisions of the FRA directed to Reserve Banks, such as § 342.

to Reserve Bank approval," and the Reserve Bank "may close [a member or nonmember's] master account ... at any time but will endeavor to give at least five business days' prior notice.").

FRBKC and the Board's reading harmonizes § 248a and § 342 without rendering either provision superfluous. *See, e.g.*, *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute"); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012) (explaining that a statutory provision should not be interpreted in a manner that "renders it pointless"). In contrast, Custodia's interpretation of § 248a would put it in conflict with § 342's discretionary framework. *See* Reading Law at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."). A further defect in Custodia's position is that if § 248a eliminated discretion over nonmember access to services, then it must either have also eliminated discretion over member access or created an imbalanced world in which nonmembers have greater rights than members. Neither makes sense.

The legislative history cited by Custodia is fully consistent with the extension of the FRA's discretionary regime to nonmembers. Opp. 10; Custodia Br. § I.E; *see* Board Br. 23-24. Yes, the MCA "open[ed] access" to the federal payment rails for nonmember banks, Opp. 10-11; numerous nonmember banks now have master accounts. *See Master Account and Services Database*, FederalReserve.gov (current as of Dec. 15, 2023), http://tinyurl.com/4c95xdt9; Board Br. 21-22; *see also* Ex. 85 ("Hill") at 37 (Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (Univ. of Ala. Legal Studies Rsch. Paper No. 4048081, Mar. 30, 2022) (revised article published as *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 453 (2023))) ("The legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, *rather than treat each individual bank exactly the same*

*regardless of risk*." (emphasis added)).  It is far more telling that there is no legislative history to suggest that the MCA amendments were intended to alter the meaning of § 342 or to give every bank chartered by any state (or territory), under whatever terms, an unfettered right to access the federal payment system and the central bank's balance sheet over the Federal Reserve's objection. Such a radical change would have been discussed.  *See* Board Br. 23-24.

Interpreting the FRA to preserve discretion is also the best reading within the context of the statutes that govern the federal banking system as a whole.  *See* Reading Law at 252 ("[L]aws dealing with the same subject ... should if possible be interpreted harmoniously.").  The nation's banking system is both crucial and dangerous.  *See* Zaring Amicus Br. 5 (ECF 286).  For this reason, the fundamental tenet of the statutes governing financial regulation is the creation of "a system that relies on the ability of regulators and supervisors to exercise discretion."  *Id*. at 3; Ex. 2, Ricks Rep. 4-5.  The OCC, the Board of Governors, and the FDIC all have broad discretion in assessing risks posed by particular entities in the consideration of applications for national bank charters, membership in the Federal Reserve, deposit insurance, and other types of applications, not to mention the broad discretion inherent in the supervision of banks; "[n]o bank is entitled to [even] a conditional approval as of right."  Zaring Amicus Br. 6-7; Ex. 2, Ricks Rep. 4-5.  These federal banking agencies have substantial statutory discretion to assess and act upon risks in nearly all of the other ways they consider requests or applications from depository institutions.  Federal oversight from the Federal Reserve and FDIC of state-chartered member and nonmember banks is a core feature of the dual banking regime.  *See* FRBKC Br. 41-42; Arthur E. Wilmarth Jr., *We Must Protect Investors and Our Banking System from the Crypto Industry*, 101 Wash. U. L. Rev. 235, 322 (2023).  It would be highly anomalous for Congress to have broken with this tradition when it enacted § 248a and to have done so in a provision about pricing discrimination.  *See*

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not

alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it

does not, one might say, hide elephants in mouseholes.").[2]

**B.    Custodia's Proposed "Open Access" Would "Throw Open the Doors" to Risky Institutions in Ways Congress Could Not Have Intended.**

When Custodia speaks of "open access," it is plainly talking about not only access to but

also *use* of services.  Opp. 1.  It is therefore notable (though unsurprising) that Custodia declined

to dispute that banks' use of Federal Reserve services presents risk to Reserve Banks, to the

nation's financial stability, to implementation of monetary policy, and ultimately, to federal

taxpayers.  FRBKC Br. § I.  Rather than refute any of this, Custodia suggests that these risks may

be mitigated in other ways, but it does so only in passing.  The risks are too significant to gloss

over in such a manner.  Custodia's half-formed attempt to contain the problems created by its

absolute-entitlement interpretation of § 248a is not rooted in any statutory provision (or even

legislative history) and underscores that its interpretation of § 248a cannot be right.

*First,* Custodia suggests that its interpretation of § 248a would not "throw open the doors

to risky institutions because the state chartering process ensures front-end risk assessments."

Opp. 1.  In other words, states and territories will take care of risk on the "front end."  Even setting

aside for the moment that risks may arise after an entity receives both its charter and a master

account, this doesn't work.   In our federal system, state (and territorial) financial regulatory

authorities have their own interests at stake, and rightfully so.  The Wyoming Division of Banking

---

[2] Custodia's suggestion that Defendants "conceded" that Judge Bacharach's view may be the law that governs this case, Opp. 17-18, is disingenuous.  As the Court knows, Defendants have been clear throughout this case that they believe Judge Bacharach's solo, non-binding opinion is incorrect.  In fact, Defendants made that crystal clear at the very hearing cited by Custodia.  *See, e.g.*, Mot. Dismiss Hr'g Tr. at 12:15-16 (ECF 101) ("Your Honor, I'm happy to turn to why I think you should not adopt Judge Bacharach's position."); *id.* at 23:14-21.

("WY DOB") has many purposes and aims, but protecting the *national* financial system and implementing *national* monetary policy are not among them.[3]   Indeed, the State of Wyoming submitted an amicus brief in which it declined to assume responsibility for the federal system. Rather than take on such duties, Wyoming advocates that the Federal Reserve should subject Custodia's account request "to an appropriate level of scrutiny" and that it should be "judged according to its own merits" using a "logical method based on Plaintiff's actual plan of operation." Wyoming Amicus Br. 5 (ECF 251).  FRBKC agrees.[4]   Congress could not have intended to entrust state authorities with protecting these national interests on their own, and Congress certainly could not have done so silently—without laying down rules for how the states would protect those national interests.

*Second*, Custodia claims, without so much as a nod to any statutory text, that the Board can take into account the activities a bank proposes to engage in when it determines "eligibility." Opp. 34.  In deciding "eligibility," Custodia posits, the Board can "weed[] out" institutions that

---

[3] States lack not only the mission but also the resources to protect national interests.  *See, e.g.*, Ex. 86 ("Humston Tr.") at 26:3-9.  And even if Wyoming had adequate resources, nothing would prevent a competing state from promoting a more lax supervisory regime to steal Wyoming's business.  *See* Arthur Wilmarth Jr., Nat'l Cmty. Reinvestment Coal. et al., Comment Letter on Proposed Guidelines for Evaluating Account and Services Requests (Jan. 17, 2023), http://tinyurl.com/nzpc24us (explaining that if the Federal Reserve did not have discretion over access to master accounts, that "would encourage states to use regulatory arbitrage for their gain").

[4] Custodia's suggestion that FRBKC worked hand-in-hand with Wyoming to draft the SPDI statute continues to be misleading.  Custodia relies heavily on a document referring to "weekly" meetings with Wyoming (Ex. D), but that document dates to *after* the passage of the SPDI statute, at a time when FRBKC was dealing with the fallout of the statute's passage and anticipating master account requests from newly chartered SPDIs like Custodia (August 2020).  Opp. 23-24 (citing Custodia Br. ¶ 3).  FRBKC's limited contributions to the statute *before* it was passed included reiterating to Wyoming that the Federal Reserve's view was that master accounts were discretionary (not automatic) and pressing Wyoming to make sure that SPDIs would be viable without master accounts.  Exs. 20, 21.

are "in violation of applicable law" or are engaged in "impermissible banking activities."[5]  Opp. 1, 34.  Custodia fails to explain where such authority is found in the FRA, or why such authority wouldn't contradict its supposed absolute entitlement to services.

At bottom, Custodia misconstrues what the "eligibility" determination is about.  Threshold "eligibility" refers merely to determining whether an entity is a "depository institution" within the meaning of the FRA.  Recall that both § 248a and § 342 refer to "depository institutions." "[D]epository institution" is defined in § 19(b) of the FRA to include "any bank which is *eligible* to make application to become an insured bank."  12 U.S.C. § 461(b)(1)(A)(i) (emphasis added). And § 5 of the Federal Deposit Insurance Act provides that "any depository institution which is engaged in the business of receiving deposits other than trust funds" is eligible to apply for FDIC insurance.  12 U.S.C. § 1815(a)(1).  Thus, when the Federal Reserve considered Custodia's "eligibility," it was focused solely on whether Custodia fit the threshold statutory definition of a "depository institution" in § 19(b) of the FRA.  Custodia baselessly suggests that it was deemed "eligible" only after the Board had blessed its activities as both "legal" and "permissible," Opp. 33-34, but it cites no evidence to support that view.  And as shown by the statutes governing eligibility quoted above, nothing in the applicable statutes addresses the permissibility or legality of a depository institution's planned activities—let alone the risks those activities would pose.

The limited nature of the "eligibility" determination is precisely what resulted in the *Fourth Corner* case: Fourth Corner was "eligible" for an account even though its business plan posed serious risks of violating federal law.  *See* Compl. ¶ 47, *Fourth Corner Credit Union v. Fed. Rsrv.*

---

[5] "Impermissibility" and "illegality" are distinct concepts.  For example, holding crypto on a balance sheet is legal (in that some companies may be allowed to do it), but banking authorities may deem it "legally [im]permissible" for banks.  Bd. of Governors, FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to Banking Organizations at 2 (Jan. 3, 2023), http://tinyurl.com/nhdkv56d.

*Bank of Kansas City*, 2015 WL 5025343 (D. Colo. 2015) (No. 15-cv-1633), ECF 1.  It is also what resulted in *BSJI*:  BSJI was "eligible" for an account, and indeed received one, even though it ultimately was determined to present undue BSA/AML risk.  *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*), 2023 WL 7111182, at *2 (S.D.N.Y. Oct. 24, 2023).  Discretion to cut off banks engaged in illegal, impermissible, or unduly risky conduct is crucial.  Even Custodia seemingly recognizes that the Federal Reserve needs to have—and has—this discretion.  That Custodia's absolute-entitlement interpretation of § 248a would require rewriting § 19(b) to provide for such discretion is another sign that its interpretation must be wrong.

*Third,* Custodia contends that Reserve Banks can "establish terms governing master account usage," such as requiring banks "to maintain sufficient balances in their master accounts to clear their account at the end of each day."  Opp. 34.  Here, Custodia at least points to a statutory provision—subsection (c)(2) of § 248a—but this does not square with Custodia's interpretation of that same statute as giving it an absolute entitlement to both access to a master account *and* use of all services.  *See* Custodia Br. 35.  Further, Custodia fails to articulate the scope of Reserve Banks' discretion to "establish terms" governing usage and whether such "terms" can be applied to mitigate all risks presented (including, for example, risks to financial stability and implementation of monetary policy).  If Reserve Banks can impose "terms" as necessary to address all risks (on a non-discriminatory basis), then it becomes even more clear that § 248a does not afford an absolute entitlement to services.[6]

---

[6] Conti-Brown agreed that the Federal Reserve "has long regulated the use of its services," and he agreed that it could do so pursuant to a "regulatory framework" used for "individualized risk assessments."  Ex. 87 ("Conti-Brown Tr.") at 152:6-8, 153:6.  Conti-Brown opines that the Federal Reserve cannot impose use-based conditions to such an extent that it becomes a "rechartering" authority, but he does not articulate how he would draw the line or, more importantly, where such a line is drawn in the FRA.  *Id.* at 180:1-181:16, 271:13-272:1, 283:19-284:10.  And while Conti-

Custodia's concessions that the Federal Reserve retains discretion over illegality, impermissibility, and "use-based" conditions give up the game.  Even Custodia is not willing to live in a world where every entity holding a state charter is absolutely entitled to Federal Reserve services.  But if the Federal Reserve has, somewhere, the discretion Custodia suggests, then Custodia cannot have an absolute right to anything.  Custodia forced itself into that corner by choosing not to challenge the basis for the denial and instead advocating an untenably absolute interpretation of § 248a; it cannot solve that problem or advance its own claim of entitlement by sourcing discretion in inapposite provisions and ignoring that such discretion could not coexist with its claimed entitlement.

## C.    Discretion Is Consistent With the Dual Banking System.

Custodia's contention that discretion is an "affront" to the "dual-banking" system, Opp. 30-34, is without basis.  Dual banking simply means that charters can be provided by either state or federal authorities. Ex. 2, Ricks Rep. 6.  For a century, federal banking regulators have supervised most every state-chartered bank. The Federal Reserve has had discretion over whether to accept deposits into accounts, and the dual-banking system has operated just fine.  *See* FRBKC Br. 41-42.  As of late 2023, all but one of the 540 institutions that have master accounts with FRBKC are both federally insured *and federally supervised*, and most were state-chartered.  *See* FRBKC Br. 11 (¶ 23).  Thus, history makes clear that federal discretion and state banking charters can co-exist.  In contrast, it is Custodia's position that would upset the status quo, eliminating the Federal Reserve's ability to control its balance sheet and to address undue risk to the payment system while

---

Brown concluded that FRBKC's denial of Custodia's request fell on the wrong side of his undrawn line, he did so without having knowledge of Custodia's business. *Id.* at 283:15-286:14 (expressing lack of familiarity with Custodia's business plan and making clear his opinion is agnostic to Custodia's business).

weakening federal influence over the banking system to a degree unseen since prior to the FRA (when banking crises prompted Congress to pass the FRA to strengthen federal control to stabilize the banking and payment systems).  After all this time, abdicating all federal control over the payment rails to the states would be a very strange thing for Congress to do, and there is no indication that the MCA was intended to have such an effect.  *See* Board Br. 29-31.

Custodia claims that FRBKC denigrates the capability of the WY DOB and "ignores the role states play as the principal supervisors of state-chartered banks."  Opp. 31.  But this case is not about the virtues of Wyoming's regime.  It is about whether § 248a provides every depository institution an absolute right to services *regardless* of risks posed by the institution, the state in which it is located, or the adequacy of that state's supervisory regime.  And for all Custodia's efforts to invoke Wyoming's interests, Wyoming conspicuously refuses to endorse Custodia's legal theory.  Wyoming Amicus Br. 5 (asserting that Custodia's account request should receive "an appropriate level of scrutiny" and be "judged according to its own merits" in light of Custodia's "actual plan of operation").

Custodia, for its part, embraces and even seems to relish how its theory would upend the status quo by disempowering the Federal Reserve.  It freely acknowledges that, under its legal theory, whether it has adequate BSA/AML controls or a viable business plan or otherwise poses significant risks to the Federal Reserve and the nation's payment system is none of the Federal Reserve's business: "none of that is relevant to whether Section 248a entitles Custodia to a master account, which is a pure question of law."  Opp. 36 n.3; *see also* Ex. 88 ("Long Tr.") at 265:7-12 ("we're about to find out" whether a SPDI is entitled to a master account even if it does not have a chief compliance officer); Ex. 87, Conti-Brown Tr. 188 (agreeing that "[FRBKC] has to defer to [the WY DOB's] assessment of the risk that Custodia presents to [FRBKC]").  This absolutist

position leaves Custodia compelled to declare *BSJI* wrongly decided, Opp. 20, which (given the compliance issues described by the *BSJI* court) should set alarm bells ringing, as the Federal Reserve cannot be powerless to protect itself against complicity in federal crimes.  Congress did not blindly turn the keys to the federal payment system over to the states, mandating that every entity holding any state charter, no matter the circumstances, receive a master account and access to Federal Reserve services even when the Federal Reserve has good reasons for concern.

## II.    FRBKC Exercised Discretion in Denying Custodia's Master Account Request.

The Court ordered discovery to determine whether the Board "pull[ed] the puppet strings" and dictated the denial to such an extent that FRBKC did not exercise any discretion of its own. ECF 164 at 10.  Custodia's Opposition confirms there is no evidence of this.  It brings no proof that the Board voted to deny Custodia's request, that the Governors reached a consensus that it should be denied, or even that any individual Governor held the view that it should be opposed. FRBKC Br. 43-44.  Nor is there evidence that Board *staff* instructed FRBKC to deny the request. This makes sense given that the Board (a) does not have its own policies and procedures to handle account requests, Ex. 89 at FRBKC-0001071-72; (b) does not provide accounts or services; and (c) informed Wyoming (in 2020), Custodia (in 2021), and the public (in 2021 and 2022) that this decision would be made by FRBKC.  Ex. 90 at FRBKC-00015572; Ex. 71 at Custodia-00004601. The fact that Board staff conveyed to FRBKC, after FRBKC had already drawn its own conclusions, that it had "no concerns" with FRBKC's plan to deny hardly constitutes evidence that the Board dictated the result.[7]

---

[7] Custodia's suggestion that Board staff dictated the result through Systemwide policy discussions is unsupported by evidence.  Ex. 91 (Addendum to Custodia Ex. BB (note regarding Custodia BOG list)); Ex. 92 ("30(b)(6) Tr.") at 146-176, 332-347 (demonstrating the inaccuracies and mischaracterization of Custodia's purported list of Board staff members involved, Ex. BB, and explaining that the list includes Board staffers who participated in only general discussions of

In the absence of actual evidence, Custodia posits that a factfinder could infer that the Board controlled the outcome because FRBKC made an "about-face" that can be explained only by Board intervention.  Opp. 35.  But there was no "about-face," as FRBKC's decision-makers were uncomfortable with Custodia's request from the outset:

- In 2019 and 2020, President George expressed general concern about SPDIs even before Custodia submitted its master account request.  Ex. 93 ("George Tr.") at 65:6-66:6 (expressing to Wyoming officials that SPDIs should be viable without master accounts); FRBKC Br. 21-23 (¶¶ 59-63); Ex. 44 at FRBKC-00010932 (launching a systemwide discussion on novel issues raised by SPDIs).

- In October 2020, from the day Custodia submitted its request, FRBKC leadership was highly "skeptical," "concern[ed]," "skewed toward denying" and "leaning towards no."  FRBKC Br. 24-25 (¶ 68); see Ex. 93, George Tr. at 36:7-17, 92:21-93:3, 264:8-265:25.

- In November 2020 and January 2021, FRBKC expressed skepticism to Custodia during their first meetings together.  FRBKC Br. 25 (¶ 69) (President George was "noncommittal"); Ex. 54 at FRBKC-00014277-80 (FRBKC raising range of difficult policy issues presented).

- In 2021, President George's view was "no access" even before Custodia applied for membership.  FRBKC Br. 25 (¶ 70); Ex. 53 ("Hazen Tr.") at 252:3-8 (discussing drafting a denial memo before Custodia applied for membership in 2021); Ex. 54 at FRBKC-00014288, FRBKC-00014295 (discussing President George's concerns with Custodia and early draft of denial letter).

- From October 2021 through January 2022, FRBKC led an early risk assessment finding substantial risk management issues.  FRBKC Br. 23-24 (¶¶ 65-66).[8]

---

non-traditional account access).  Custodia brings no proof that Systemwide discussions reached conclusions that forced FRBKC to deny Custodia's request.

[8] Custodia contends that the Court should "disregard" Custodia's immaturity and risk management gaps because the reasoning for the denial is not at issue.  Opp. 36 n.3.  But this misses the point.  The fact that FRBKC led risk assessments and found gaps that contributed to President George's decision-making supports that FRBKC exercised discretion.  And Custodia's lack of readiness to conduct even its Day One activities supports that FRBKC would have easily identified risk management and compliance gaps early on (as it did), thereby undermining Custodia's "about-face" narrative.

In the face of this overwhelming evidence that FRBKC was never inclined to grant Custodia an account, Custodia mined the extensive record for any shreds of positivity.  Opp. 35. It didn't find much.  It cites two exhibits (Exs. BX and BU) from the summer of 2020 that reflect nothing more than FRBKC staffers' preliminary reaction to Custodia's self-promotional claims, in its SPDI application, about what it "will [] accomplish[]."  FRBKC had not yet even received Custodia's master account request, let alone had the opportunity to engage in substantial analysis. But even then, the FRBKC staffers had many questions and concerns.

Custodia's "about-face" story fails because these few cherry-picked quotes do not create a genuine issue of fact as to whether FRBKC pivoted from Yes to No.  And it fails for the additional reason that Custodia does not coherently explain how and when the Board (or who at the Board) intervened to prompt FRBKC's supposed pivot.  Custodia first suggests that the pivot came when

the Board "issued its first draft of the Guidelines" in May 2021.  Opp. 35.  But FRBKC was already not inclined to grant Custodia's request (as described above), and Custodia fails to explain how or why the initial draft Guidelines—suggesting Reserve Banks consider six general principles— would have caused FRBKC to change course.  Custodia also contends the pivot came later, when the Board "took control over Custodia's membership exam" and faced this lawsuit.  Opp. 35.  But the pre-membership exam and lawsuit did not happen until mid-2022, far too late to be a pivot point.  The "about-face" story is pure fiction.[9]

Finally, Custodia repeats its refrain that the Board controlled the result through its membership decision, the S-Letter process, and its comments on the FRBKC denial memo. Opp. 37-41.  But none of this demonstrates that the Board stepped in and dictated the result.[10] Rather, what happened is straightforward:  FRBKC had a department of employees (and procedures in place) to handle account requests, including "non-routine" requests like Custodia's. FRBKC Br. § I.D.  When Custodia submitted its request, FRBKC leadership was skeptical, largely due to questions surrounding its lack of FDIC insurance to protect depositors, its plan to concentrate its business in facilitating crypto transactions and issuing a stablecoin, and the lack of federal supervision and crypto regulation.  Id. § IV.C.  Consistent with its account access procedures, FRBKC elevated questions around Custodia's "eligibility" and led multiple risk

---

[9] Custodia asserts that the Board "was not going to let the Reserve Bank reach a decision on Custodia's application for a master account with which the Board disagreed."  Opp. 3.  But as explained above, there is no evidence that FRBKC was ever heading toward a decision with which the Board disagreed.

[10] Custodia's suggestion that the Board "urged" Custodia to apply for membership and "promis[ed]" that doing so would hasten the master account approval process is inadmissible hearsay.  Opp. 2, 38; see Ex. 88, Long Tr. at 223 (testifying that Custodia's counsel (Derek Bush) told Ms. Long that he had had a conversation with the Board (Mark van der Weide) that Custodia's counsel "interpret[ed]" as a recommendation that Custodia apply for membership).  And regardless, if the Board invited Custodia to apply for membership, that would serve only to contradict Custodia's purported narrative that the Board orchestrated a denial.

assessments that consistently identified substantial risk management and compliance gaps. *Id.* § IV.B, D. It worked with others in the Federal Reserve on policy questions presented by non-traditional account requests. *Id.* at 27-39 (¶¶ 77-78, 81, 85). It identified ways in which Custodia planned to derive profitability from future digital asset activities contrary to federal guidance and recommendations (*e.g.*, issuing stablecoins without insurance). *Id.* § IV.B, D. It applied an appropriate level of scrutiny to Custodia's novel request both before and after the Board proposed Guidelines. *Id.* at 10-11 (¶¶ 21-22), 45. And finally, in the face of this lawsuit and President George's impending retirement, and with risk management gaps and crypto regulatory uncertainty persisting, FRBKC acted to deny Custodia's request, apprising the Board of its intention along the way. *Id.* § IV.D. FRBKC ultimately issued the denial after the Board indicated it had "no concerns" with FRBKC's approach and had denied Custodia's membership application (meaning that FRBKC did not need to revise its assessment to account for federal supervision). *Id.* at 34-35 (¶¶ 96, 100-01). Those facts are all undisputed. From them, no reasonable fact-finder could conclude that FRBKC failed to exercise its own discretion and was merely a puppet with the Board "pull[ing] the strings." ECF 164 at 10.

## III. Custodia Has Conceded FRBKC's List of Undisputed Facts.

In its Cross-Motion, FRBKC presented 101 facts as undisputed, each supported by record evidence. Local Rule 7.1(b)(2)(D) required Custodia to refute these facts on a paragraph-by-paragraph basis. Custodia failed to do so, and the material facts set forth in FRBKC's brief should therefore be deemed undisputed. *Id.* Instead of refuting FRBKC's facts, Custodia submitted a revised, substantially trimmed version of its own set of facts. Opp., A-1. What is left of Custodia's list of supposedly undisputed facts provides no basis to conclude that the Board eliminated FRBKC's discretion over Custodia's request and, in any event, FRBKC disputes some of what remains. *See* Ex. 94.

19

**IV.    Even if This Court Finds That the Board Dictated FRBKC's Denial of Custodia's Master Account Request, Custodia Is Still Not Entitled to a Master Account.**

All of Custodia's claims, against both the Board and FRBKC, turn on the "pure question of law" of whether § 248a entitles Custodia to a master account.  Opp. 36 n.3.  Because the answer to that legal question is no, Custodia's claims fail as a matter of law regardless of the respective roles of the Board and FRBKC in denying Custodia's request.[11]

## CONCLUSION

For the foregoing reasons, this Court should grant FRBKC's motion for summary judgment, deny Custodia's Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim, and dismiss Custodia's Amended Complaint with prejudice.

---

[11] Custodia's assertion that the Board conceded its "no concerns" letter constitutes final agency action, Opp. 24, 40, does not pass the straight-face test.  As the Board explained, the local rule required the Board to produce an administrative record of a decision—the denial of Custodia's master account request—that the Board did not make and to designate something as its "final agency action."  *See* Board Br. 39.  In light of the local rule and the Court's direction, it made sense for the Board to designate the last-in-time thing it did in relation to the denial of Custodia's request, and doing so cannot reasonably be construed as a concession of an allegation it has vigorously disputed.  *See* Board Br. 39-42.

Date: February 23, 2024

/s/ *Billie LM Addleman*
Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing ***Reply in Support of Cross-Motion for Summary Judgment*** was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure via CM/ECF on February 23, 2024.

*/s/ Shannon M. Ward*
OF HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
