# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., | |
| Plaintiff, | |
| v. | Case No. 22-CV-125-SWS |
| FEDERAL RESERVE BOARD OF GOVERNORS, and FEDERAL RESERVE BANK OF KANSAS CITY, | |
| Defendants. | |

## ORDER ON DISPOSITIVE MOTIONS

Plaintiff Custodia Bank is a Wyoming-chartered depository institution. In October 2020, it applied to Defendant Federal Reserve Bank of Kansas City (FRBKC) to obtain a Federal Reserve "master account," which is essentially a bank account for banks. In January 2023, Custodia's request for a master account was denied. In this lawsuit, Custodia contends FRBKC was statutorily required to grant the master account request, and Defendant Federal Reserve Board of Governors (the Board) hijacked FRBKC's consideration of the request and forced FRBKC to improperly deny the master account.

Custodia brings one cause of action against the Board (a federal agency) for violation of the Administrative Procedures Act (APA), alleging its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and asking the Court to compel the Board to issue a master account to Custodia (Claim I). Custodia's

cause of action against FRBKC seeks a writ of mandamus compelling it to grant a master account to Custodia (Claim II).

Custodia has filed a motion for judgment as a matter of law, arguing it is entitled to a master account as a matter of statutory construction.  (ECF 233.)  FRBKC has filed a cross-motion for summary judgment, contending Custodia is not entitled to a writ of mandamus because the law does not require it to grant a master account to Custodia.  (ECF 272.)  The Board has not filed its own dispositive motion, but it opposes Custodia's motion and asks the Court to find Custodia's APA claim fails as a matter of law.  (ECF 271.)

The Court has reviewed the extensive briefing and thousands of pages of exhibits submitted by the parties, as well as the administrative record lodged by the Board as to Claim I.  (ECF 178, 234, 236, 271, 273, 274, 277, 295, 296, 310, 311.)  The Court has also considered the several amicus briefs.  (ECF 251, 257, 259, 286.)  The Court agrees with the parties that no genuine dispute of material fact precludes the Court from rendering judgment as a matter of law.  And the Court concludes Custodia's dispositive motion must be denied and Defendants are entitled to judgment as a matter of law in their favor.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Custodia is state-chartered as a Special Purpose Depository Institution (SPDI), a unique-to-Wyoming financial institution intended to facilitate cryptocurrency banking that is unlike other banks in that it is generally prohibited from extending loans.  (Am. Compl.

---

[1] While the Court cites to Custodia's amended complaint for much of this background, which is unusual at the summary-judgment stage, the parties' briefing does not raise a genuine dispute of any material fact concerning these allegations.

¶¶ 36-37.[2])  "SPDI banks were designed to provide a bridge connecting crypto-asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars)." (*Id.* ¶ 37.)

> SPDI banks were also designed to provide custody services for crypto-assets via their trust departments, analogous to the custody services provided by the trust departments of custody banks for the trillions in securities held by retirement plans and mutual funds.  SPDI banks allow, for example, a customer to use his or her Bitcoin held in the trust department of an SPDI bank to make a direct transfer, a purchase, or an investment, rather than having to first convert the Bitcoin into U.S. dollars.

(*Id.*)  As a state-chartered depository institution, Custodia is regulated by the Wyoming Division of Banking.  (*Id.* ¶ 36.)  And as a SPDI bank, it is not required to be insured by the Federal Deposit Insurance Corporation (FDIC), but it is eligible to seek such deposit insurance because it is authorized and expected to take deposits.  (*Id.* ¶ 40.)

In October 2020, Custodia applied to FRBKC to obtain a Federal Reserve master account (*id.* ¶ 21), which is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system."  *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).  "Without such access, a depository institution is nothing more than a vault."  *Id.* at 1053 (Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to

---

[2] ECF 121.

this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.).  A master account also enables its holder to access various services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including wire transfer services, automated clearinghouse services, settlement services, securities safekeeping, and Federal Reserve float services.  *See id.* at 1053 (Moritz, J.) (noting a master account "gives depository institutions access to the Federal Reserve System's services, including its electronic payments system").

Absent a master account, "Custodia cannot directly access the Federal Reserve and cannot offer the same custodial services for crypto-assets that incumbent banks like BNY Mellon presently provide." (Am. Compl. ¶ 2.)  "Without a master account, if Custodia is able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty to an intermediary bank [which does have a master account]." (*Id.*)

> Having a master account means that SPDI banks do not have to use an intermediary ["correspondent"] bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions.  Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services that can be programmed using software.  It does not mean that SPDI banks hold crypto-assets within their master accounts.  Custodia would hold no crypto-assets on its balance sheet or within its master account.

(*Id.* ¶ 38; *see also* ¶ 4.)  For a while, and perhaps still, Custodia indeed accessed the Federal Reserve banking system through a correspondent bank with a master account.  However, "[d]oing so imposes additional costs and counterparty credit risk, injects settlement risk given the inability to ensure simultaneous settlements, and exposes institutions to existential risks if the correspondent bank terminates the relationship." (ECF 234 p. 18.)

Accordingly, Custodia's own Federal Reserve master account is significantly important to its business. *See Fourth Corner*, 861 F.3d at 1053 (Moritz, J.) (noting that when plaintiff credit union was denied a master account by FRBKC in that case, it "effectively crippl[ed] the Credit Union's business operations").

In August 2021, Custodia also applied to the Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system). (Am. Compl. ¶ 47.) "It is not necessary to be a member bank in order to receive a master account .... Custodia, however, took this additional step to demonstrate to [FRBKC] and the Board its willingness to submit to full federal supervision and accountability." (*Id.*)

On January 27, 2023, the Board denied Custodia's application for membership into the Federal Reserve. (*Id.* ¶¶ 62-70.) A few hours later, FRBKC conveyed the denial of Custodia's master account application. (*Id.*; ECF 236-84.) In this lawsuit, Custodia has not challenged the Board's membership denial or the reasons underlying the master account denial.

## STANDARD OF ANALYSIS

Custodia's Claim I is alleged only against the Board and concerns review of administrative action with a demand to compel agency action, and Claim II is alleged only against FRBKC and concerns a request for writ of mandamus. Despite the different postures of each claim, each party seeks judgment as a matter of law in its favor (ECF 234 p. 9; ECF 271 p. 55; ECF 273 p. 11), agreeing Custodia's claims are resolved in this case based on questions of law with no genuine dispute of material fact affecting the legal

decisions. The Court agrees, finding the limited areas of disputed facts are not material to the determinations in this case. Additionally, the parties stipulated that all evidence and discovery between Custodia, FRBKC, and the Board's administrative record "may be relied upon by all parties including any court hearing in this case throughout the remainder of this litigation," and this stipulation was approved by the Court. (ECF 220.) This stipulation is logical because Custodia seeks the same relief, compelling a master account, in both Claim I and Claim II, and therefore any distinction between the APA and the Mandamus Act is ultimately irrelevant, with the only difference in this case being which Defendant must comply with the potential writ. *See Hernandez–Avalos v. I.N.S.,* 50 F.3d 842, 844 (10th Cir.) (noting that the Mandamus Act and the APA are "merely different means of compelling an agency to take action [that] by law it is required to take"), *cert. denied,* 516 U.S. 826 (1995). Accordingly, the Court does not separately analyze the matter under the APA versus the Mandamus Act. *See New Mexico Health Connections v. United States Dep't of Health & Human Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019) ("[t]he court employs summary judgment to 'decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review") (quoting *Calloway v. Harvey*, 590 F. Supp. 2d 29, 36 (D.D.C. 2008)).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust*, 744 F.3d 623, 628 (10th Cir. 2014). "Cross-

motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

## DISCUSSION

"To be eligible for mandamus relief, the petitioner must establish (1) that he has a clear right to relief, (2) that the respondent's duty to perform the act in question is plainly defined and peremptory, and (3) that he has no other adequate remedy." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (citing *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990)). If the petitioner can establish these requirements, the Court may exercise its discretion to grant the requested writ of mandamus. *Id.* (citing *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995)).

> The court's jurisdiction over a mandamus petition depends on the character of the government's duty to the petitioner. [*Marquez-Ramos*, 69 F.3d at 479] ("[T]he question of whether a particular act is discretionary or ministerial rises to the jurisdictional level."). "The test for jurisdiction is whether mandamus would be an appropriate means of relief." *Carpet, Linoleum & Resilient Tile Layers v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981). If the duty is "ministerial, clearly defined and peremptory," mandamus is appropriate. *Id.* at 566 (quoting *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976)).

*Rios*, 398 F.3d at 1206–07. *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (a claim for mandamus under the APA "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take").

## 1. Custodia has not challenged a final agency action of the Board of Governors and Claim I under the APA must be dismissed.

The first issue to take up concerns the Board's contention that it never took any final

agency action on Custodia's request for a master account that would be subject to judicial review and Custodia's disagreement with that contention. (ECF 234 p. 57; ECF 271 pp. 50-53; ECF 295 pp. 30-34.) There is no dispute that the Board of Governors is a federal agency. The APA grants federal courts the authority to review the "final agency action" of an agency. 5 U.S.C. § 704. Therefore, a petitioner must challenge a "final agency action" in order to have statutory (prudential) standing to seek judicial review under the APA. The finality of an agency action is jurisdictional. *See Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997).

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13); *see also* 5 U.S.C. § 701(b)(2) (noting that "agency action" means as defined by § 551).

> In *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), we distilled from our precedents two conditions that generally must be satisfied for agency action to be "final" under the APA. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.*, at 177–178, 117 S.Ct. 1154 (internal quotation marks and citation omitted).

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016). The petitioner has "the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)." *Colorado Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000). Whether an agency's conduct constitutes "final agency action" under the APA is a question of law. *Id.* Courts take a

"pragmatic" approach to finality. *Hawkes Co.*, 578 U.S. at 599.

In this case, Custodia identifies as the final agency action an email sent from the Board to FRBKC, where the Board stated it has reviewed FRBKC's "pre-decisional analysis of Custodia Bank's request for a master account" and has "no concerns" with FRBKC's intent to deny the master account application. (ECF 234 p. 57 (citing to Administrative Record Bates Number FRB-AR-000002).) Custodia says the Board identified this no-concerns email as the relevant final agency action. (*Id.* (citing ECF 178).) In its Notice of Lodging of the Administrative Record, the Board stated the email "is the final agency action at issue as required by Local Rule 83.6(b)(1)(A), and that final agency action is followed by the three documents to which it directly refers." (ECF 178 p. 1.) Custodia relies on this statement by the Board to show it is the final agency action to be reviewed by the Court. The Board says not so fast—it lodged the administrative record and designated the last-in-time event (the no-concerns email) as the final agency action only to comply with the Court's requirements and the District of Wyoming's local civil rules, but that doesn't automatically mean the no-concerns email holds any legal significance as a "final agency action;" instead, the no-concerns email fails to meet the legal test for final agency action. (ECF 271 pp. 50-53.) Custodia responds that this no-concerns email "gave the Kansas City Fed the green light to deny Custodia's account application," which "indisputably affected Custodia's substantive rights." (ECF 295 p. 30.)

The no-concerns email does not constitute final agency action warranting judicial review under the APA for two reasons. First, the email is not an "agency action" because

it is not "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). In the similar case of *Cherry v. U.S. Dep't of Agriculture*, 13 F. App'x 886 (10th Cir. 2001), the U.S. Forest Service sent the plaintiff a letter demanding he remove his equipment from a millsite because he lacked an approved operating plan, and it warned him "that failure to remove his equipment or obtain an approved operating plan would place him in violation of 36 C.F.R. § 261.10." *Id.* at 889. The plaintiff tried to challenge the letter under the APA, but the Tenth Circuit concluded the letter was not an agency action under the § 551(13) definition because it was not a rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act. *Id.* at 890. Like there, the no-concerns email here cannot be said to be an agency action as defined by § 551(13).

Second, the January 26, 2023 no-concerns email constitutes only the Board of Governors' implementation decision pursuant to a broader agency plan, which is also not a final action. *See Chemical Weapons Working Group, Inc., v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (concluding the Army's decision to commence trial incinerations to test destruction of chemical weapons was not reviewable as a final agency action under the APA because it was instead the act of implementing its broader plan of chemical weapons disposal).

> An implementation decision is one that merely carries out a broader agency plan that marked the consummation of the relevant decision-making process. Therefore, despite being the *outcome* of some decision-making process, the decision does not represent the agency's "last word on the matter in question." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (discussing the APA's final action standard for purposes of applying the "final action" standard of § 307 of the Clean Air

Act).

*County Comm'rs of County of Sierra v. United States Dep't of the Interior*, 614 F. Supp.

3d 944, 953 (D.N.M. 2022) (italics in original) (concluding a decision to translocate two

wolves was an implementation decision conducted by the U.S. Fish and Wildlife Service

pursuant to a broader agency plan). The no-concerns email itself points to the *Guidelines*

*for Evaluating Account and Services Requests* previously announced by the Board on

August 15, 2022 (and published on August 19, 2022, at 87 Fed. Reg. 51099), as well as S-

letter 2667, a policy enacted by the Board requiring Federal Reserve Banks to consult with

Board staff on certain requests for master accounts. The no-concerns email was the

implementation of these *Guidelines* and S-letter as they pertained to Custodia's master

account application. The no-concerns email did not decide to impose the *Guidelines*

considerations or S-letter policy; those decisions were made several months before the no-

concerns email. And Custodia has not challenged the *Guidelines* or S-letter 2667 in this

case. The no-concerns email merely implemented these broader plans as they related to

Custodia's application.[3]

Custodia has not carried its burden of "identifying specific federal conduct and

---

[3]   To be sure, "not all agency decisions made pursuant to a broader agency plan are unreviewable implementation decisions." *County Comm'rs of County of Sierra*, 614 F. Supp. 3d at 954. "When a decision has independent legal force because it substantially changes, modifies, or imposes conditions upon an agency's previous disposition of a matter, and such changes have 'clear and definite' legal consequences, the decision can no longer be viewed as 'mere implementation' and should be subjected to judicial review under the APA." *Id.* Custodia has not argued such in this case, and there is no evidence suggesting the no-concerns email substantially changed the Board's previous disposition of a matter.

explaining how it is 'final agency action' within the meaning of section 551(13)."[4]

*Colorado Farm Bureau Fed'n*, 220 F.3d at 1173. Because the no-concerns email does not

constitute a final agency action, Custodia lacks standing under the APA to challenge it.

Consequently, this Court lacks jurisdiction to address the merits of Custodia's Claim I

alleged under the APA against the Board of Governors, and it must be dismissed.[5]

## 2.      Custodia is not statutorily entitled to a master account.

The Federal Reserve Act of 1913 established the Federal Reserve System, which

consists of the Board of Governors of the Federal Reserve System, the Federal Open

Market Committee (FOMC), and twelve regional Federal Reserve Banks that each serve

their respective district. *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New*

*York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023). In the

Federal Reserve Act, Congress also authorized the Federal Reserve Banks to carry out

certain banking functions, including accepting or rejecting deposits from depository

institutions (i.e., to act as a centralized bank for the depository institutions in the district).

---

[4] As an alternative argument, Custodia in its reply brief contends "the Board's participation in the master account process meets the requirement that there be final agency action" and then lists a myriad of alleged agency actions performed by the Board in an attempt to show this participation. (ECF 295 pp. 31-33.) This will not do the trick for two reasons. First, the Court has not permitted the Board to file a surreply, so the Court does not rely on this new argument found in Custodia's reply brief. *See Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (unless the district court allows a surreply from the non-moving party, "the court can avoid error only by not relying on the new materials and arguments in the movant's reply brief"). Second, in this spaghetti-at-the-wall tactic, Custodia does not demonstrate how any of the alleged agency actions, including the overarching claim that the Board "participated" in the master account process, are "final" because Custodia fails to explain how these actions "mark[] the consummation of the agency's decisionmaking process" or "determine[] [Custodia's] legal rights such that legal consequences will flow therefrom." *Cherry*, 13 Fed. App'x at 890.

[5] Even if Custodia was correct in alleging the Board had performed a final agency action subject to judicial review under the APA, the merits of that claim would rise and fall with Custodia's statutory-construction argument, discussed next.

*Id.*  The Federal Reserve Banks record and maintain such deposits in master accounts.  *Id.*

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to this single master account at one Reserve Bank.

*Fourth Corner*, 861 F.3d at 1064 n.1 (Bacharach, J.) (quoting Bd. of Governors of the Fed. Reserve Sys., *Reserve Maintenance Manual* 5 (Nov. 2016), available at https://www.federalreserve.gov/monetarypolicy/files/reserve-maintenance-manual.pdf).

In this case, it is undisputed that Custodia was "eligible" to obtain a master account.  Upon Custodia's application, FRBKC consulted with the Board's legal advisors, and they determined in January 2022 that "Custodia met the [Federal Reserve Act's] definition of a 'depository institution' and was therefore 'eligible' to request a Reserve Bank account and services."  (ECF 273 p. 27; *see also* ECF 236-9.)

The real dispute at the heart of this case is whether FRBKC must grant a master account to Custodia because it was legally eligible or whether FRBKC possessed the discretion to deny Custodia's master account application despite its eligibility.  Custodia contends that because it was legally eligible to request and obtain a master account, FRBKC was required by law to grant the request.  FRBKC says legal eligibility is only a threshold determination and it retains discretion under the law whether to issue master accounts to eligible depository institutions.  The parties rely on their interpretations of different provisions of the Federal Reserve Act to press their arguments.  Custodia has not challenged the reasons given by FRBKC for denying its master account application in this

lawsuit.

### 2.1   <u>Dispute Concerning Which Defendant Denied Custodia's Master Account Application</u>

Custodia applied to FRBKC for a master account.  (Am. Compl. ¶ 21.)  The master account denial was conveyed to Custodia by FRBKC, not the Board of Governors, and was signed by the then-President and CEO of FRBKC.  (ECF 236-84.)  In its amended complaint, Custodia asserted "the Board orchestrated the denial of Custodia's master account application," the Board's action "in denying Custodia's master account application" was unlawful, and the master account denial was "part of a larger effort coordinated by the Board (in conjunction with the White House) in response to its decision that de novo banks should not be permitted to engage with crypto-assets." (Am. Compl. ¶¶ 82, 84, 62.)  In briefing, the Defendants contend FRBKC is the entity that denied the master account application, with legal and appropriate input from the Board. (ECF 271 pp. 45-50; ECF 273 pp. 25-35.)  In response, Custodia reasserted that "the Board controlled the Custodia master account process." (ECF 295 p. 33.)

This dispute is a question of fact.  The extensive evidence presented by the parties as part of their motions practice weighs toward a factual finding that it was FRBKC that denied Custodia's master account application. (*See* ECF 273 pp. 36-37 and the citations to the record therein.)  Nonetheless, the Court need not make any factual determination on this dispute.  For purposes of considering Custodia's request for a writ of mandamus in Claim II alleged against FRBKC, the Court will assume without deciding that FRBKC denied the master account application.  The Court notes, though, that if Custodia is correct

that it was actually the Board that denied the application, such could amount to a final agency action sufficient to vest jurisdiction for judicial review. And regardless, because Custodia's bases for compelling a master account in Count I and Count II are identical—that the Federal Reserve Act commands Custodia receive a master account—the following statutory construction analysis would control the outcome for both causes of action.

### 2.2   Statutory Interpretation Principles

When construing federal statutes, the Court's goal is to "ascertain the congressional intent and give effect to the legislative will." *Ribas v. Mukasey*, 545 F.3d 922, 929 (10th Cir. 2008) (quotation omitted).

> In conducting this analysis, we first turn to the statute's plain language. *United States v. West*, 671 F.3d 1195, 1199 (10th Cir. 2012). We give undefined terms their ordinary meanings, considering "both the specific context in which the word is used and the broader context of the statute as a whole." *Theis*, 853 F.3d at 1181.
>
> In determining whether statutory language is ambiguous, we look to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Keller Tank Servs. II, Inc. v. Comm'r*, 854 F.3d 1178, 1196 (10th Cir. 2017) (quotation omitted). A statute is ambiguous if it "is capable of being understood by reasonably well-informed persons in two or more different senses." *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1178 (10th Cir. 2002).

*In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

**2.3**   <u>**Statutory Analysis**</u>

Custodia contends 12 U.S.C. § 248a(c)(2) requires that all legally-eligible depository institutions receive a master account. Section 248a was enacted as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA). As its name implies, the DIDMCA had two overarching principles:

(1)   Phase out certain restrictions on depository institutions, including state-law restrictions on interest rates because those restrictions had precluded banks from paying a market rate of interest on deposits and lenders from charging a market rate of interest on loans. *See Moyer v. Citicorp Homeowners, Inc.*, 799 F.2d 1445, 1446 (11th Cir. 1986).

(2)   Increase the Federal Reserve's control over the money supply by requiring even nonmember depository institutions to meet certain reserve requirements based on the size of their deposits. *See Texas State Bank v. United States*, 423 F.3d 1370, 1373 (Fed. Cir. 2005).

As part of the DIDMCA, § 248a, entitled "Pricing of services," provides in part:

> **(a)   Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
> Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
>
> **(b)   Covered services.**
> The services which shall be covered by the schedule of fees under subsection (a) are—

      (1)     currency and coin services;
      (2)     check clearing and collection services;
      (3)     wire transfer services;
      (4)     automated clearinghouse services;
      (5)     settlement services;
      (6)     securities safekeeping services;
      (7)     Federal Reserve float; and
      (8)     any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

**(c)    Criteria applicable.**

The schedule of fees prescribed pursuant to this section shall be based on the following principles:

      (1)    All Federal Reserve Bank services covered by the fee schedule shall be priced explicitly.

      (2)    All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

      …

12 U.S.C. § 248a.

Relying largely on Judge Bacharach's concurring opinion in *Fourth Corner*, Custodia contends § 248a(c)(2) requires that all legally-eligible depository institutions receive a master account. Specifically, Custodia says the language, "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions" requires every eligible depository institution to receive a master account because it is only through a master account that a depository institution can access the identified bank services. Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account. *Fourth Corner*, 861 F.3d at

1071 ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  To purchase these services, a master account is required.  Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts.").  Custodia asserts § 248a(c)(2) "unambiguously commands Defendants to grant access to all services covered by 'the fee schedule' to 'nonmember depository institutions.'  As a nonmember depository institution deemed eligible by both the Board and the Kansas City Fed, Custodia must be granted a master account." (ECF 234 p. 43.)

Unsurprisingly, the Defendants see it differently.  They contend the various Federal Reserve Banks have the discretion to grant or deny a master account application under 12 U.S.C. § 342, which says in part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, … deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items ….[6]

To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each depository institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits. *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923).  "The act merely confers authority to do so." *Id.* The Supreme Court in *Farmers' and Merchants' Bank* observed that the Federal Reserve

---

[6] Relevant here, the DIDMCA amended § 342 by adding "other depository institutions" to the list of entities from which Federal Reserve Banks may receive deposits.  Public Law No. 96-221 (HR 4986), § 105, 94 Stat. 132 (1980) (codified at 12 U.S.C. § 342).

Act "appears to have been drawn with great care.  Throughout the act the distinction is clearly made between what the board and the Reserve Banks 'shall' do and what they 'may' do."  *Id.* at 663.  The Defendants contend the discretion to receive or reject deposits necessarily carries with it the discretion to grant or deny master accounts.

Judge Bacharach's opinion in *Fourth Corner* is well-reasoned and insightful, and it offers a helpful starting point on this issue.  It is, however, not controlling authority because *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal.  *See Fourth Corner*, 861 F.3d at 1053; *see also Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023) (noting that Judge Bacharach's opinion is not controlling even in the Tenth Circuit).

Having carefully examined the relevant statutory language and considered the many arguments presented, the Court concludes § 248a does not do the lifting Custodia demands of it.  The Court respectfully deviates from Judge Bacharach's opinion in *Fourth Corner* based in large part on certain legislation enacted by Congress since then, which was not available for Judge Bacharach's consideration in 2017.  The Court concludes the statutory language is clear and unambiguous, and the Federal Reserve Act does not support Custodia's position for several reasons.

First, the express language of § 248a does not say anything about a master account, and it certainly does not instruct Federal Reserve Banks to grant a master account to every eligible depository institution that asks for one.  The language employed by Congress in §

248a establishes that it is directed to the Board of Governors, not the Federal Reserve Banks. Subsection 248a(a) instructs "the Board" to "publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles." The remainder of Section 248a sets forth those pricing principles and provides further instruction to the Board of Governors. *See, e.g.*, § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve banks ...). The plain language Congress employed in 12 U.S.C. § 248a does not expressly require anything from or provide instruction to the Federal Reserve Banks.

Second, it makes logical sense that § 248a is directed to the Board of Governors because that statute is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. And § 248a is titled, "Pricing of services." The titles of § 248a and Subchapter II persuasively suggest Congress was instructing the Board of Governors to create a non-discriminatory pricing schedule, not instructing the Federal Reserve Banks that they must provide master accounts to all eligible depository institutions. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, p. 221 (2012) ("The title and headings are permissible indicators of meaning."). Custodia's assertion that Congress intended to mandate Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions in a subchapter that sets forth the duties of a completely different entity (the Board of Governors) is a leap too far.

Third, the plain language of § 248a sets forth two primary directives: (1) require the

Board to establish a fee schedule for Federal Reserve Bank services that is the same for both member depository institutions and nonmember depository institutions, and (2) require the Board to ensure those services are available to both member depository institutions and nonmember depository institutions. Contrary to Custodia's position, there is no language in § 248a requiring the services be provided to *every* nonmember depository institution. *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at \*8 (S.D.N.Y. Oct. 27, 2023) ("the purpose of the statutory section is to prevent price discrimination when a service is offered to a nonmember institution, not to require the Federal reserve banks to provide specific services to nonmember banks") (citing *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983)). The Court finds it significant that Congress chose to include the word "all" before "Federal Reserve bank services covered by the fee schedule" but not before "nonmember depository institutions" in § 248a(c)(2). Thus, Congress did not signal its intent that all Federal Reserve bank services be available to *all* nonmember depository institutions. Indeed, by including "all" prior to "Federal Reserve bank services" but not prior to "nonmember depository institutions" within the same provision, Congress signaled it intended to treat the two phrases differently. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("We have often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Rule of the Last Antecedent*, <u>Black's Law Dictionary</u> 1532–1533 (10th ed. 2014) ("qualifying words or

phrases modify the words or phrases immediately preceding them and not words or phrases

more remote, unless the extension is necessary from the context or the spirit of the entire

writing").

> The inclusion of "all" with respect to the Federal Reserve services and
> exclusion of "all" regarding which depository institutions suggests that there
> be no discretion over which services must be priced according to the fee
> schedule, but that discretion remains in providing depository institutions
> access to such services, such as retaining discretion in granting master
> accounts.

(ECF 286 p. 16, Amicus Br. of Prof. David Zaring.)

Fourth, concluding the Federal Reserve Banks possess discretion to grant or deny

master accounts is harmonious with recent federal legislation.  In December 2022, as part

of the National Defense Authorization Act for Fiscal Year 2023, Public Law 117-263,

Congress enacted and the President signed into law 12 U.S.C. § 248c.  That statute instructs

the Board of Governors to create and maintain a public database identifying every entity

that currently possesses a master account at a Federal Reserve Bank as well as every entity

that has submitted an application for a master account.    12 U.S.C.  §  248c(b)(1).

Significantly, the Board's database must also show whether each new master account

application "was approved, rejected, pending, or withdrawn."  *Id.* § 248c(b)(1)(B)(ii).  If

Congress intended the DIDMCA to remove a Federal Reserve Bank's discretion to deny a

master account application, there would be no reason for Congress to now require a public

database indicating which master account applications have been granted and which have

been denied.    "This amendment confirms that Federal reserve banks may 'reject'

applications from depository institutions ...."  *Banco San Juan Internacional*, 2023 WL

7111182, at *7.  If, as Custodia contends, Federal Reserve Banks lack discretion to deny a

master account application as a matter of law, § 248c(b)(1)(B)(ii)'s "rejected" option would

be unnecessary and superfluous, but courts may not "construe a statute in a way that renders

words or phrases meaningless, redundant, or superfluous." *Bridger Coal Co./Pac. Mins.,*

*Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150, 1153

(10th Cir. 1991).  To avoid immediately rendering the "rejected" option of §

248c(b)(1)(B)(ii) meaningless, the Court must conclude the Federal Reserve Banks were

not stripped of their discretion to deny master account applications.

Fifth, reading § 248a to not strip the Federal Reserve Banks of their pre-DIDMCA

discretion in issuing master accounts is also consistent with the text of 12 U.S.C. § 342.

As quoted above, § 342 states a Federal Reserve Bank "may receive" deposits from

member banks and nonmember depository institutions.  The Supreme Court has noted this

confers the authority to receive such deposits on the Federal Reserve Banks, but it also

vests them with the discretion to accept or reject the deposits. *Farmers' & Merchants'*

*Bank*, 262 U.S. at 662.  This discretion to receive or reject deposits necessarily carries with

it the discretion to grant or deny master accounts.  The Court agrees with the interpretation

recently set forth by the Southern District of New York, concluding that § 342 "makes

clear that Federal reserve banks are authorized to maintain Master Accounts, but are not

required to do so," and the statute "provides that Federal reserve banks 'may' open

accounts, not that they shall." *Banco San Juan Internacional*, 2023 WL 7111182, at *7.

Construing § 248a and § 342 in this manner reads them in harmony with each other. *See*

*WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1189 (10th Cir. 2013) ("Statutes

must be read as a whole and in relation to one another.  When two related statutes appear to conflict, courts have a duty to construe them harmoniously and give each effect.") (citations omitted).

Sixth, Congress "does not ... hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).  The "no-elephants-in-mouseholes" canon of statutory construction "recognizes that Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'" *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680 (2020) (quoting *Whitman*, 531 U.S. at 468).  The Defendants' briefing described the Federal Reserve Banks' exercise of discretion in granting access to accounts and services dating back to the Federal Reserve Act of 1913. (ECF 271 pp. 17-21; ECF 273 pp. 14-16.)  Accepting Custodia's contention here would mean that Congress, in the DIDMCA in 1980, greatly altered the details of the regulatory scheme first initiated in 1913 by requiring Federal Reserve Banks to provide master accounts to all eligible depository institutions requesting one, and also that Congress did so in a provision (and a subchapter) directed at the Board of Governors and without expressly saying as much.  A better example of hiding an elephant in a mousehole would be difficult to find.  The Court finds it highly unlikely that Congress intended such a significant change in the Federal Reserve Banks' procedures, not to mention the access to the national banking system, via such implicit terms in a statute directed at a different entity.

Seventh and finally, important policy considerations support this construction of the relevant statutes.  If Custodia's position was correct, it would effectively mean that every

depository institution chartered under the laws of a state, regardless of how soundly crafted, is entitled to a master account allowing it direct access to the federal financial system. Thus, unless Federal Reserve Banks possess discretion to deny or reject a master account application, state chartering laws would be the only layer of insulation for the U.S. financial system.  And in that scenario, one can readily foresee a "race to the bottom" among states and politicians to attract business by reducing state chartering burdens through lax legislation, allowing minimally regulated institutions to gain ready access to the central bank's balance sheet and Federal Reserve services.  As FRBKC accurately notes, "The Wyoming Division of Banking ('WY DOB') has many purposes and aims, but protecting the *national* financial system and implementing *national* monetary policy are not among them." (ECF 310 pp. 13-14 (emphases in original).)  "States lack not only the mission but also the resources to protect national interests." (*Id.* p. 14 n.3.)  The potential negative consequences associated with Custodia's proffered interpretation do not suggest Congress intended the DIDMCA to remove the discretion of Federal Reserve Banks when considering master account applications.

### 2.4    Conclusion

The plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts. Accordingly, Custodia cannot prevail on Claim II, wherein it seeks a writ of mandamus compelling the Defendants to provide Custodia a master account.  "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes

him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (citing *Kerr v. United States Dist. Court*, 426 U.S. 394, 402–03 (1976)). "The importance of the term 'nondiscretionary' cannot be overstated—the judiciary cannot infringe on decision-making left to the Executive branch's prerogative." *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995). Having concluded the Federal Reserve Act of 1913, as amended, grants to the Federal Reserve Banks the discretion to grant or deny a master account application, the Defendants did not owe Custodia any non-discretionary duty to issue a master account upon request. Consequently, FRBKC is entitled to judgment as a matter of law in its favor against Custodia's Claim II.[7]

## CONCLUSION AND ORDER

Claim I of Custodia's amended complaint must be dismissed because Custodia fails to challenge a final agency action as required under the APA. As for Claim II, the relevant statutes establish that the Federal Reserve Banks possess the discretion to grant or deny master account requests. Therefore, Custodia is not entitled to its requested writ of mandamus compelling FRBKC to issue it a master account, and summary judgment on Claim II must be granted in FRBKC's favor.

**IT IS THEREFORE ORDERED** that Plaintiff's Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim (ECF 233, ECF 238) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's petition for review under the APA

---

[7] If the Court possessed jurisdiction for APA review in Claim I, judgement as a matter of law would be warranted in the Board of Governors' favor based on the same reasoning.

alleged against Defendant Board of Governors (Claim I) is **DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION**.

**IT IS FURTHER ORDERED** that Defendant FRBKC's Cross-Motion for Summary Judgment (ECF 272) is **GRANTED**. Judgment as a matter of law is granted in Defendant FRBKC's favor and against Plaintiff on the statutory mandamus claim (Claim II).

**IT IS FURTHER ORDERED** that Plaintiff's cause of action requesting declaratory judgment (Claim III) is **DISMISSED**. The Declaratory Judgment Act offers a remedy for valid federal causes of action and does not provide an independent cause of action, and Plaintiff has not prevailed on its other causes of action.

**IT IS FURTHER ORDERED** that Defendant FRBKC's Motion to Strike Reports and Exclude Testimony of Professor Peter Conti-Brown (ECF 267) and Motion to Strike Reports and Exclude the Testimony of Katie S. Cox (ECF 269) are **DENIED AS MOOT**. The Court reviewed and considered the reports and depositions of these experts, provided as exhibits in support of Custodia's arguments (ECF 236-1, 236-26, 236-47, 296-7, 296-15), in ruling on the pending motions.

**ORDERED**: March 29, 2024.

Scott W. Skavdahl
United States District Court Judge